**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| NEXTEEL CO., LTD. ET AL., | ) |
| | ) |
|     **Plaintiff and Consolidated** | ) |
|     **Plaintiffs,** | ) |
| | ) |
| **and** | ) |
| | ) |
| HUSTEEL CO., LTD. and HYUNDAI | ) |
| STEEL COMPANY, | ) |
| | ) |
|     **Plaintiff-Intervenors,** | ) |
| | ) |
|     **v.** | ) |
| | ) |
| UNITED STATES, | )    **Consol. Ct. No. 20-03898** |
| | ) |
|     **Defendant,** | ) |
| | ) |
| **and** | ) |
| | ) |
| CALIFORNIA STEEL INDUSTRIES, INC. | ) |
| ET AL., | ) |
| | ) |
|     **Defendant-Intervenors and** | ) |
|     **Consolidated Defendant** | ) |
|     **Intervenors.** | ) |

**PLAINTIFF-INTERVENOR HUSTEEL CO., LTD.'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Donald B. Cameron              **MORRIS, MANNING & MARTIN LLP**
Julie C. Mendoza                1401 Eye Street, N.W., Suite 600
R. Will Planert                   Washington, D.C. 20005
Brady W. Mills                   (202) 408-5153
Mary S. Hodgins
Eugene Degnan                  *Counsel to Plaintiff-Intervenor Husteel Co.,*
                             *Ltd.*

May 24, 2021

## TABLE OF CONTENTS

I.    STATEMENT PURSUANT TO RULE 56.2 ................................................................. 2

II.    ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
ADMINISTRATIVE DETERMINATION ............................................................. 2

III.    STATEMENT OF FACTS ....................................................................................... 2

IV.    SUMMARY OF ARGUMENT ................................................................................ 5

V.    STANDARD OF REVIEW ..................................................................................... 6

VI.    ARGUMENT ........................................................................................................... 7

    A.    Commerce's Determination That A PMS Exists In Korea Is Not In Accordance
With Law And Is Unsupported By Substantial Evidence ...................................... 7

        1. Government Subsidies on Hot-Rolled Steel Do Not Contribute to a PMS in
Korea ................................................................................................................ 10

        2. Chinese Steel Imports Do Not Contribute to a PMS in Korea ........................ 11

        3. "Strategic Alliances" Do Not Contribute to a PMS in Korea ......................... 12

        4. Government Involvement in the Electricity Market Does Not Contribute to a
PMS in Korea ................................................................................................... 13

    B.    Commerce's Adjustment To COP For The Sales-Below-Cost Test To Address A
PMS Is Not In Accordance With The Law ........................................................... 15

    C.    The Final Results For NEXTEEL And SeAH Are Otherwise Not Supported By
Substantial Evidence And Are Not In Accordance With Law, Which Resulted In
The Overstatement Of The Average Dumping Margin Assigned To Husteel ...... 18

VII.    CONCLUSION AND RELIEF REQUESTED .............................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
    426 F. Supp. 3d 1395, (Ct. Int'l Trade 2020) .............................................................6, 15, 17

*Husteel Co., Ltd. v. United States*,
    426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) .................................................................. passim

*Husteel Co., Ltd. v. United States*,
    471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) .................................................................. passim

*Husteel Co., Ltd. v. United States*,
    476 F. Supp. 3d 1363 (Ct. Int'l Trade 2020) ........................................................................3

*Maverick Tube Corp. v. United States*,
    273 F. Supp. 3d 1293, (Ct. Int'l Trade 2017) .......................................................................14

*NEXTEEL Co., Ltd. v. United States*,
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .............................................................3, 10, 11

*NEXTEEL Co., Ltd.  v. United States*,
    392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) ....................................................................3, 10

*Saha Thai Steel Pipe Public Co., v. United States*,
    422 F. Supp. 3d 1363, (Ct. Int'l Trade 2019) .........................................................6, 15, 17

*Union Steel Mfg. Co., Ltd. v. United States*,
    36 C.I.T. 717, 750-51, 837 F. Supp. 2d 1307 (Ct. Int'l Trade 2012).....................................18

*Union Steel Mfg. Co., Ltd.  v. United States*,
    968 F. Supp. 2d 1297 (Ct. Int'l Trade 2014). ......................................................................18

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................................................6

19 U.S.C. § 1677(15) .........................................................................................................16

19 U.S.C. § 1677b(e) ................................................................................................ 7, 10, 15-16

**Other Authorities**

*Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from
    Korea: Final Results of Antidumping Duty Administrative Review*, 62 Fed.
    Reg. 18,404, (Dep't Commerce Apr. 15, 1997).....................................................................13

*Certain Oil Country Tubular Goods From the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) .................................................................4

*Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) .................................................................4

*Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016,* 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) .................................................................4

*Common Alloy Aluminum Sheet From Bahrain: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13,331 (Dep't Commerce Mar. 8, 2021) .................................................................7

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Affirmative Determination*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) .................................................................14

*Welded Line Pipe From the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2028) .................................................................4, 5

*Welded Line Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) .................................................................4, 5

*Welded Line Pipe From the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 35,371 (Dep't Commerce July 23, 2019) .................................................................4

*Welded Line Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016–2017*, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019) .................................................................4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| NEXTEEL CO., LTD. ET AL., | ) |
| | ) |
|       **Plaintiff and Consolidated** | ) |
|       **Plaintiffs,** | ) |
| | ) |
| **and** | ) |
| | ) |
| HUSTEEL CO., LTD. and HYUNDAI | ) |
| STEEL COMPANY, | ) |
| | ) |
|       **Plaintiff-Intervenors,** | ) |
| | ) |
|       **v.** | ) |
| | ) |
| UNITED STATES, | )     **Consol. Ct. No. 20-03898** |
| | ) |
|       **Defendant,** | ) |
| | ) |
| **and** | ) |
| | ) |
| CALIFORNIA STEEL INDUSTRIES, INC. | ) |
| ET AL., | ) |
| | ) |
|       **Defendant-Intervenors and** | ) |
|       **Consolidated Defendant** | ) |
|       **Intervenors.** | ) |

**PLAINTIFF-INTERVENOR HUSTEEL CO., LTD.'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with Rule 56.2 of the Rules of this Court, and the February 23, 2021

Scheduling Order, ECF No. 57, Plaintiff-Intervenor Husteel Co., Ltd. ("Husteel") files this brief

in support of its Rule 56.2 motion for judgment upon the agency record.  As discussed below, the

U.S. Department of Commerce's ("Commerce") *Welded Line Pipe From the Republic of Korea:*

*Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 Fed. Reg. 76,517

(Dep't Commerce Nov. 30, 2020) ("*Final Results*") are unsupported by substantial evidence and

1

otherwise not in accordance with law.

## I.   STATEMENT PURSUANT TO RULE 56.2

The administrative determination under review is Commerce's final results in the antidumping duty ("AD") administrative review of welded line pipe from Korea, which covered entries of Welded Line Pipe ("WLP") into the United States between December 1, 2017, and November 31, 2018.  *See Final Results* (PR Doc. 860),[1] and accompanying Issues and Decision Memorandum (PR Doc. 854) ("Final Results IDM").

## II.   ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

1.     Whether Commerce's PMS determination and resulting cost adjustment is unsupported by substantial evidence and not in accordance with law?

2.     Whether Commerce's adjustment to cost of production ("COP") for the sales-below-cost test to address a particular market situation ("PMS") is not in accordance with the law?

3.     Whether the final results for NEXTEEL and SeAH are otherwise not supported by substantial evidence and not in accordance with law, which resulted in the overstatement of the average dumping margin assigned to Husteel?

## III.   STATEMENT OF FACTS

This Court is by now very familiar with the legal theories underpinning Commerce's PMS determination in this case, which are virtually identical to those of previous reviews of this order on WLP, prior oil country tubular goods from Korea administrative review appeals, and numerous other Korean pipe appeals.  *See, e.g Husteel Co., Ltd. v. United States*, 426 F. Supp. 3d

---

[1] Citations to the administrative record shall be to the public or confidential record document number ("PR Doc." or "CR Doc.") followed by the page or exhibit number.

1376 (Ct. Int'l Trade 2020) (litigation of *Welded Line Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) as amended by *Welded Line Pipe From the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2015-*2016, 83 Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2028) (collectively "*Welded Line Pipe from Korea First AR Final Results*"); *Husteel Co., Ltd. v. United States*, 471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) (litigation of *Welded Line Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016– 2017*, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019) as amended by *Welded Line Pipe From the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 35,371 (Dep't Commerce July 23, 2019) (collectively "*Welded Line Pipe from Korea Second AR Final Results*")); *NEXTEEL Co., Ltd. v. United States (NEXTEEL I)*, 355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) (litigation of *Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) as amended by *Certain Oil Country Tubular Goods From the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (collectively "*OCTG from Korea First AR Final Results*")); *NEXTEEL Co., Ltd. v. United States (NEXTEEL II)*, 392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) (litigation of *Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016,* 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) ("*OCTG from Korea Second AR Final Results*")); and *Husteel Co., Ltd. v. United States*, 476 F. Supp. 3d 1363 (Ct. Int'l Trade 2020) (litigation of *Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of*

*Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 24,805 (Dep't Commerce May 24, 2019) (collectively "Korean Pipe Cases").  The issue in this appeal, as in those prior appeals, is Commerce's determination that a PMS existed in Korea during the period of review such that the respondents' costs of production did not reflect costs in the ordinary course of trade, based on four factors:  "(1) subsidization of Korean hot-rolled steel products by the Korean government; (2) the distortive pricing of unfairly traded Chinese {hot-rolled coil ("HRC")}; (3) strategic alliances between Korean HRC suppliers and Korean WLP producers; and (4) distortive government control over electricity prices in Korea and Commerce's adjustment to the margin calculation of the respondents to account for the PMS."  PR Doc. 854 at Comment 2.  As a result of the PMS determination, Commerce made an adjustment to the COP for the sales-below-cost test for one of the mandatory respondents (SeAH).  *See Id*. at Comment 1 and 3.

Commerce based its PMS determination in this case essentially on the same grounds, legal theories, and facts as it did in the prior administrative reviews of the WLP Order, as well as the first and second administrative reviews of the antidumping order on OCTG from Korea.  *See Welded Line Pipe from Korea First AR Final Results* and accompanying Issues and Decision Memorandum*; Welded Line Pipe from Korea Second AR Final Results* and accompanying Issues and Decision Memorandum; *OCTG from Korea First AR Final Results* and accompanying Issues and Decision Memorandum; *OCTG from Korea Second AR Final Results* and accompanying Issues and Decision Memorandum.

Here, citing to the identical set of "four factors" on which Commerce relied to make a particular market situation determination in the prior reviews of this Order, Commerce in this case also found that a particular market situation existed during the period of review with respect to hot-rolled coil inputs used in the production of subject WLP.  *See* PR Doc. 854 at Comment 2.

4

This Court is also familiar with the methodology utilized by Commerce to adjust the margin of SeAH for the alleged distortion due to the PMS.  Specifically, Commerce applied its PMS adjustment to SeAH's COP for purposes of the sales-below-cost test.  *Id*. at Comments 1 and 3.  This is the same methodology, based on the same legal theory, that was applied by Commerce in the 2015-2016 administrative review of this Order.  *See Welded Line Pipe from Korea First AR Final Results* and accompanying Issues and Decision Memorandum.  This methodology was struck down by this Court in the litigation of that PMS determination.  *See Husteel*, 426 F. Supp. 3d at 1383.

Husteel concurs with and incorporates by reference the statement of facts provided by NEXTEEL and SeAH in their Rule 56.2 briefs, and refers the Court's attention to the those briefs for a complete discussion of the facts regarding Commerce's PMS determination and the other issues on appeal.

## IV.  <u>SUMMARY OF ARGUMENT</u>

Commerce's affirmative PMS determination is unsupported by substantial evidence and otherwise contrary to law.  In fact, Commerce's PMS determination in this case is based on the same determination and continues to suffer from the same "evidentiary void" noted by the Court when overturning prior iterations of virtually this same PMS determination in the litigation following administrative reviews of every one of the Korean Pipe Cases.  Nevertheless, Commerce has relied upon the same reasoning and virtually the same evidence to continue to find a PMS in this review.  The small amount of evidence in this review that was not on the record of some of these past reviews is not qualitatively different from and does not address the deficiencies of the record evidence noted by this Court in all of the Korean Pipe Case litigation.

Commerce's adjustment to COP for the sales-below-cost test to address a PMS is not in accordance with the law.  Section 504(c) of the Trade Preferences Extension Act ("TPEA")

modified the provisions concerning the calculation of "constructed value" (in 19 U.S.C. § 1677b(e)) to permit Commerce to adjust constructed value to address a PMS, but it did not change the statutory provisions regarding the calculation of COP or application of the sales-below-cost test (19 U.S.C. § 1677b(B)).  In making adjustments to SeAH's COP based on its PMS finding Commerce has run afoul of the plain language of the statute rendering the *Final Results* not in accordance with law.  The Court has held in numerous separate decisions that the antidumping statute does not permit Commerce to make a PMS adjustment to COP for purposes of the below-cost test pursuant to a cost-based PMS determination.  *See Husteel*, 426 F. Supp. 3d 1376; *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 426 F. Supp. 3d 1395, 1409-1412 (Ct. Int'l Trade 2020); *Saha Thai Steel Pipe Public Co., v. United States*, 422 F. Supp. 3d 1363, 1367-1371 (Ct. Int'l Trade 2019).

Finally, as Husteel was assigned an average dumping margin that was a simple average of the rates assigned to NEXTEEL and SeAH, Husteel joins in the arguments made by NEXTEEL and SeAH as to other issues affecting the calculation of these dumping margins and requests that any relief granted to NEXTEEL and SeAH also be extended to Husteel and reflected in the non-reviewed companies rate.

**V.    STANDARD OF REVIEW**

In reviewing a challenge to Commerce's determination in an AD administrative review, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## VI. <u>ARGUMENT</u>

### A. Commerce's Determination That A PMS Exists In Korea Is Not In Accordance With Law And Is Unsupported By Substantial Evidence

Commerce's determination that a PMS exists in Korea with respect to the WLP industry is contrary to law. Under the plain language of 19 U.S.C. § 1677b(e)(3) as amended by the TPEA, in order to use an alternative methodology to calculate a respondent's costs, Commerce must demonstrate that there is sufficient evidence that a PMS exists in the market such that the respondent's cost "does not accurately reflect the cost of production in the ordinary course of trade" and that those distortions prevent a proper comparison of normal value with export price or constructed export price. Commerce has noted that "Act expresses a preference for using a company's own books and records to determine costs for purposes of sections 773(b) and (e) of the Act." *See Common Alloy Aluminum Sheet From Bahrain: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13,331 (Dep't Commerce Mar. 8, 2021) and accompanying Issues and Decision Memorandum at 12. This preference is long-established in Department practice. The PMS provision of the TPEA is an exception to that rule, allowing Commerce to use another calculation methodology where reported prices or costs do not accurately reflect costs of production in the ordinary course of trade.

Commerce's PMS determination, however, wholly fails to demonstrate that any of the factors it has identified affect respondents' costs such that they rise to the level of a particular market situation. The PMS statute allows that a PMS can exist "{f}or purposes of Paragraph 1, if a particular market situation exists such that the cost of materials and fabrication and other processing of any kind does not accurately reflect the Cost of Production in the ordinary course of trade." 19 U.S.C. § 1677b(e). "Paragraph 1" refers specifically to "the cost of materials and fabrication…employed in producing the merchandise." *Id.* Thus, the PMS statute specifically

7

directs that Commerce must base its determination on the respondent's actual costs. Commerce has completely failed to do so in this review.

In the litigation of prior administrative reviews of this proceeding, the Court further clarified how and why Commerce's PMS determination was contrary to law and unsupported by substantial evidence. The Court has opined that "{t}o establish the existence of a PMS, Commerce must demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), (C)(iii) (stating that home market or third market prices that Commerce determines are affected by a PMS which prevents a proper comparison with export price or constructed price cannot be used to calculate normal value)." *Husteel*, 426 F. Supp. 3d at 1390 (emphasis added); *see also Husteel*, 471 F. Supp. 3d at 1362.

With this standard in mind, the Court noted that although Commerce found that the cumulative effect of four factors warranted a PMS finding, "Commerce possessed only enough information to quantify the impact of Korean HRC subsidies" based on adverse facts available ("AFA") CVD rates from a different proceeding. *Husteel*, 426 F. Supp. 3d at 1390. The Court noted that Commerce could not even quantify, and thus failed to substantiate, the effect of global steel overcapacity, strategic alliances, and the Government of Korea's ("GOK") subsidization of electricity on the respondents' costs. *Id.* at 1391. The Court held Commerce cannot simply cite to the totality of these alleged distortions to avoid substantiating each of them with record evidence. *Id.* This, however, is exactly what Commerce has again done in its PMS determination in the review underlying this litigation.

The Court additionally held that even if Commerce had substantiated the alleged distortions, it still failed to meet the second prong required for finding a PMS determination, *i.e.*,

"that those distortions prevent a proper comparison of normal value with export price or constructed export price." *Id.* at 1390.  That is, even if the alleged factors distorted the price of HRC, "it is unclear how that finding alone would support the determination that the home market price and export price (or constructed export price) cannot be compared because Commerce does not address whether costs would be lowered on both sides of the less than fair value equation. Therefore, Commerce's PMS finding is unsupported by substantial evidence." *Id.* at 1391-92. This is, again, the same as the facts and determinations in this review underlying this litigation.

In fact, Commerce asserted in the *Final Results* that it was not necessary to show that market distortions prevent a proper comparison of normal value and export price ("EP") or constructed export price ("CEP") price:

> We also disagree with Husteel's contention that Commerce must demonstrate that the distortions in the market due to the PMS prevent a proper comparison of NV with EP or CEP. As we explained above in Comment 1, under the TPEA, where a PMS affects the COP for the foreign like product through distortions to the cost of inputs, it is reasonable to conclude that such a situation may prevent a proper comparison of the EP or CEP with NV based on home market prices just as with NV based on CV.

PR Doc. 854 at 22.  This explanation is entirely unclear and the Court should remand to Commerce to fully explain this logic.

Thus, Commerce's PMS determination in this case is based on the same legal theory and continues to suffer from the same "evidentiary void" noted by the Court when overturning prior iterations of virtually this same PMS determination in the prior Korean Pipe Cases.  The small amount of evidence in this review that was not on the record of some of these past reviews is not qualitatively different from and does not address the deficiencies of the record evidence noted by this Court.  Accordingly, Commerce's PMS determination in this case continues to be unsupported by substantial evidence, as further discussed below.

1.    **Government Subsidies on Hot-Rolled Steel Do Not Contribute to a PMS in Korea**

Commerce's determination that there is a PMS in Korea due to the GOK's subsidization of HRC is baseless.  To make this determination, Commerce must "demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price." *Husteel*, 426 F. Supp. 3d at 1390 (emphasis added).  Commerce's determination relies on outdated information and speculation that are contradicted by hard record evidence.  First, and remarkably, Commerce cites to the *Hot-Rolled Steel from Korea* CVD investigation as evidence of the GOK's subsidization.  PR Doc. 854 at 18.  The Court in *NEXTEEL I* and *NEXTEEL II* found that this determination provides no evidence of a PMS in regard to OCTG.  *See NEXTEEL I*, 355 F. Supp. 3d at 1350-51; *NEXTEEL II*, 392 F. Supp. 3d at 1287-88.  Further, the investigation had been supplanted by the first administrative review of hot-rolled steel ("HRS"), which showed that subsidization of HRC ranged from 0.54% to 0.58%.  *Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Amended Final Results of the First Administrative Review*, 84 Fed. Reg. 35,604 (Dep't Commerce July 24, 2019) (Showing CVD rates of 0.54 – 0.58%).  Commerce's contention that these negligible subsidies "have a significant impact on the COP for WLP" is disingenuous at best.  PR Doc. 854 at 18.  A finding of 0.54 to 0.58% subsidization cannot reasonably be considered to be sufficient to constitute a situation where "the cost of materials . . . does not accurately reflect the cost of production in the ordinary course of trade." 19 U.S.C. § 1677b(e).  Further, Commerce does not show how this finding would "prevent a proper comparison of normal value with export price or constructed export price." *Husteel*, 426 F. Supp. 3d at 1390.

### 2.    Chinese Steel Imports Do Not Contribute to a PMS in Korea

Commerce's preliminary determination that Chinese steel imports into Korea contributed to a PMS in the Korean OCTG industry is unsupported by record evidence.  It is well recognized by Commerce that Chinese steel exports are a global issue affecting global markets.  In regard to the allegation that Chinese steel exports distorted the respondents' costs in producing the subject merchandise, the Court in *NEXTEEL I* cited favorably to Commerce's common sense preliminary determination in the OCTG from Korea First AR PMS Memo that the <u>global</u> effect of Chinese steel exports necessarily means that there is no <u>particular</u> market situation in Korea, or in regard to the specific respondents in the review.  *NEXTEEL I*, 355 F. Supp. 3d at 1349-50 (citing Memorandum to Carole Showers, Executive Director, Office of Policy, Policy & Negotiations from Gary Taverman, Associate Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, "2014-2015 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea: Memorandum on Particular Market Situation Allegations" (Feb. 21, 2017) ("OCTG from Korea First AR PMS Memo")).  Similarly, in the litigation of prior administrative reviews of this proceeding, the Court noted that global steel overcapacity does not support a determination that there is a distortion specific to the Korean market.  *See Husteel*, 426 F. Supp. 3d at 1391; *Husteel*, 471 F. Supp. 3d at 1362.  The Court noted Commerce's argument was based on facts similar to this review - that Chinese overcapacity affects the Korean market, causing downward pressure on steel prices and incentivizing the GOK to intervene.  *Id.*  The Court held that while a PMS determination need not be particular to only one market, evidence that is not particular to the Korean market at all is not sufficient.  *See Husteel*, 426 F. Supp. 3d at 1391-92; *Husteel*, 471 F. Supp. 3d at 1363-64.  Further, Commerce does not show how this finding would "prevent a

proper comparison of normal value with export price or constructed export price." *Husteel*, 426 F. Supp. 3d at 1390; *Husteel*, 471 F. Supp. 3d at 1362.

### 3.   "Strategic Alliances" Do Not Contribute to a PMS in Korea

Commerce's determination that "strategic alliances" contributed to a PMS is not based on substantial evidence.  To make this demonstration, Commerce must "demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price." *Id*. (emphasis added).  The evidence cited to support the existence of strategic alliances causing a PMS distortion is documentation showing a finding by the Korea Fair Trade Commission ("KFTC") that certain Korean Steel producers rigged bids to the Korea Gas Corporation between 2003 and 2013.  *See* PR Doc. 854 at 19-20, (citing Letter to Sec'y Commerce from Schagrin Associates, "Welded Line Pipe from the Republic of Korea: Particular Market Situation Allegation and Supporting Factual Information" (June 25, 2019) at Exhibit 33 (CR Doc. 168, PR Docs. 324 and 335)).  None of this information is relevant to the POR or the subject merchandise of this review.  Accordingly, it does not demonstrate a distortion in the market.  In fact, Commerce can only assert that "strategic alliances may have affected prices in the period covered by the prior administrative review, up to and including this POR,"  essentially admitting that there is no evidence of actual distortion to the WLP industry or the respondents costs in the administrative review.  *Id*. at 20.  Naturally, there is no demonstration that this "prevent{s} a proper comparison of normal value with export price or constructed export price." *Husteel*, 426 F. Supp. 3d at 1390; *Husteel*, 471 F. Supp. 3d at 1362.

4.    **Government Involvement in the Electricity Market Does Not Contribute to a PMS in Korea**

Commerce's determination that the GOK's intervention in the electricity market contributes to a PMS is speculative and not supported by the record evidence. Again, Commerce does not "demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price." *Id.* (emphasis added). Commerce points to no evidence of actual distortions, however. Commerce cites to the "SAA accompanying the URAA" and notes that "a PMS may exist where there is government control over prices to such an extent that home market prices cannot be considered to be competitively set." PR Doc. 854 at 20, (citing The Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. 1 at 822 (1994) ("SAA")). Commerce then makes the unsupported assertion that "electricity in Korea functions as a tool of the government's industrial policy" and argues that because the largest electricity supplier in Korea is a government-controlled entity, "the Korean government's involvement in the electricity market in Korea is a contributing factor to the PMS in Korea impacting the COP for WLP." *Id.*

This conclusion is not supported. First, Commerce itself has noted that simple government intervention, without evidence of actual distortions, is not sufficient to find a PMS. *Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea: Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 18,404, 18,412 (Dep't Commerce Apr. 15, 1997) ("Having reviewed and weighed the facts on the record, we find that, while there is some evidence of a substantial level of Korean government involvement in domestic steel pricing, there is not 'convincing evidence' that the Korean government controlled domestic steel prices 'to such an extent that home market prices cannot be considered to be

13

competitively set'" (citing the SAA at 152)).  Commerce, however, has done exactly that – it has simply cited to the potential for the GOK's intervention in the electricity market without demonstrating any effect on prices.  PR Doc. 854 at 20.

Further, Commerce's determination that electricity prices are distorted flies in the face of extensive record evidence.  Commerce has repeatedly found in CVD cases (including *Hot-Rolled Steel from Korea*), which have been upheld by the Court, that electricity in Korea is not being provided for less than adequate remuneration.  *See Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Affirmative Determination*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) and accompanying Issues and Decisions Memorandum at 36-53; *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1312 (Ct. Int'l Trade 2017).  Commerce dismisses this fact as "unavailing," arguing that "{w}hether we found a specific program used by a respondent in a countervailing duty proceeding to be countervailable has no bearing on our analysis of whether or not a PMS existed in Korea during the POR."  PR Doc. 854 at 20.  This response by Commerce is misleading.  The CVD cases cited *supra* found no provision of electricity for less than adequate remuneration.  This is not a question of Commerce not finding "a specific program."  It is a determination that the electricity was not being illegally subsidized at all.

For the reasons discussed above, each of the four allegations alleged to cause a PMS in the WLP industry of Korea are unsupported by record evidence.  Further, even if these allegations were supported, Commerce has made no attempt to demonstrate that "those distortions prevent a proper comparison of normal value with export price or constructed export price."  *Husteel*, 426 F. Supp. 3d at 1390; *Husteel*, 471 F. Supp. 3d at 1362.  Absent such a

demonstration, Commerce must find that each of these allegations, and its PMS determination, are unsupported.

### B. Commerce's Adjustment To COP For The Sales-Below-Cost Test To Address A PMS Is Not In Accordance With The Law

Setting aside for the moment if there is record evidence of a PMS that affected respondents' actual input costs, the antidumping statute does not provide for a cost-based PMS in computing COP for purposes of the sales-below-cost test.  For the margin calculation, Commerce based normal value for SeAH on a comparison to home market sales.  *See Welded Line Pipe From the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2017–2018*, 85 Fed. Reg. 7,268 (Dep't Commerce Feb. 7, 2020) (PR Doc. 812) and accompanying Decision Memorandum (PR Doc. 796) at 16.  The Court has held in numerous separate decisions that when normal value is based on home market sales, the antidumping statute does not permit Commerce to make a PMS adjustment to COP for purposes of the below-cost test pursuant to a cost-based PMS determination.  *See Borusan Mannesmann*, 426 F. Supp. 3d at 1410-12; *Husteel*, 426 F. Supp. 3d at 1382-91; *Saha Thai*, 422 F. Supp. 3d at 1367-71. Accordingly, Commerce is without legal authority to make any cost-based PMS adjustment to SeAH's reported COP for purposes of the below-cost test.

Petitioner's PMS Allegation in this review is without question a cost-based PMS allegation, premised on 19 U.S.C. § 1677b(e) as amended by Section 504(b) of the TPEA.  That section now reads as follows:

> **(e) CONSTRUCTED VALUE** For purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of—
>
> **(1)** the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade;
> . . .

> *For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology . . .*

19 U.S.C. § 1677b(e) (emphasis added).

Additionally, Section 504 amended the definition of "ordinary course of trade" in 19 U.S.C.

§ 1677(15) by adding a new subsection C.  As amended, that provision now reads as follows:

> **Ordinary Course Of Trade**. The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:
>
> > (A)Sales disregarded under section 1677b(b)(1) of this title.
> >
> > (B)Transactions disregarded under section 1677b(f)(2) of this title.
> >
> > (C)Situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price.

19 U.S.C. § 1677(15).

The amendment made by Section 504, however, applies only to the calculation of the

*constructed value* section under 19 U.S.C. § 1677b(e).  Section 504 did not make any changes to

the existing statutory language regarding the calculation of COP or the application of the sales-

below-cost test (19 U.S.C. § 1677b(b)).  By not making a change to 19 U.S.C. § 1677b(b), while

at the same time making changes to 19 U.S.C. § 1677(15)(C) and 19 U.S.C. § 1677b(e),

Congress did not authorize Commerce to modify the calculation of COP for its sales-below-cost

test based on any PMS finding.  Moreover, the language of 19 U.S.C. § 1677b(e)(3) expressly

limits PMS cost adjustments to constructed value by the introductory phrase "for purposes of

paragraph (1)," which is the provision that defines the materials and processing costs to be

16

included in the calculation of constructed value.  The calculation of COP for purposes of the

below-cost test is governed by subsection 1677b(b)(3), which does not authorize any adjustment

to the "cost of materials and of fabrication or other processing" on account of a PMS.

Accordingly, there is no basis for adjusting Husteel's reported actual COP.

The Court has consistently held that the statute does not permit Commerce to make a

cost-based PMS adjustment to COP for purposes of the below cost test.  In *Saha Thai*, the Court

held that Commerce's cost-based PMS adjustment in that case was not in accordance with the

statute and that Commerce "misapplie{d} a particular market situation adjustment to a

respondents' {sic} cost of production for purposes of the home-market sales-below-cost test."

*Saha Thai*, 422 F. Supp. 3d at 1368.  The Court stated that the PMS adjustment was misapplied,

as the "amended statute pertains to particular market situations in the context of constructed

value." *Id.* at 1369.  The Court reached the same conclusion in *Husteel*, holding that

> {t}he statutory scheme precludes Commerce's PMS adjustment to COP for
> purposes of a below cost sales analysis. Congress specifically delineated
> Commerce's options to account for a PMS whether using market sales or
> constructed value as normal value. Congress also provided for how to calculate
> the COP to identify sales below cost in the market sales context and, in doing so,
> did not provide a means to adjust for a PMS. Here, Commerce eschewed the
> options, provided by Congress, to account for a PMS; Commerce instead chose to
> adjust the COP in a manner not permitted by statue. The plain language of the
> statute prohibits Commerce's action and therefore its PMS adjustment is contrary
> to 1aw.

*Husteel*, 426 F. Supp. 3d at 1383.

Finally, in *Borusan Mannesmann*, the Court referenced both *Saha Thai* and

*Husteel*, and again concluded that "no adjustment for a PMS is permitted for the sales

below cost test."  *Borusan Mannesmann*, 426 F. Supp. 3d at 1411.

17

These three decisions by the Court make abundantly clear that Commerce's practice of calculating a PMS adjustment to COP for purposes of the below-cost test is impermissible and is inconsistent with the statute.

**C.     The Final Results For NEXTEEL And SeAH Are Otherwise Not Supported By Substantial Evidence And Are Not In Accordance With Law, Which Resulted In The Overstatement Of The Average Dumping Margin Assigned To Husteel**

In the underlying administrative review, Commerce assigned an average dumping margin to Husteel that was a simple average of NEXTEEL and SeAH's dumping margins.  For the reasons discussed in the briefs being concurrently filed by NEXTEEL and SeAH, the *Final Results* with regard to NEXTEEL and SeAH are not supported by substantial evidence and otherwise is not in accordance with law.  Husteel adopts and incorporates by reference the arguments set forth in NEXTEEL and SeAH's briefs regarding the other issues affecting the calculation of the dumping margins for these companies and requests that any other relief granted by the Court and resulting adjustment to the individual weighted average dumping margins for NEXTEEL and SeAH be incorporated into the revised average dumping margin applied to Husteel.  *See Union Steel Mfg. Co., Ltd. v. United States*, 36 C.I.T. 717, 750-51, 837 F. Supp. 2d 1307, 1335-36 (Ct. Int'l Trade 2012); *Union Steel Mfg. Co., Ltd.  v. United States*, 968 F. Supp. 2d 1297, 1326-27 (Ct. Int'l Trade 2014).

## VII.    CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, Husteel respectfully requests that this Court (i) hold that Commerce's *Final Results* and *Amended Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other and further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Donald B. Cameron
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff-Intervenor Husteel Co. Ltd.*

May 24, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 5,448 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

**/s/ Donald B. Cameron**