## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE CLAIRE R. KELLY

---

| | |
|---|---|
| NEXTEEL CO., LTD. ET AL., | ) |
| | ) |
| *Plaintiff and Consolidated Plaintiffs,* | ) |
| | ) |
| **and** | ) NON-CONFIDENTIAL |
| | ) VERSION |
| HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY, | ) |
| | ) |
| *Plaintiff-Intervenors,* | ) Consol. Ct. No.:  20-03898 |
| | ) |
| **v.** | ) |
| | ) |
| UNITED STATES, | ) **Business proprietary** |
| | ) **information removed** |
| *Defendant,* | ) **from pages 32 and 46.** |
| | ) |
| **and** | ) |
| | ) |
| CALIFORNIA STEEL INDUSTRIES, INC. ET AL., | ) |
| | ) |
| *Defendant-Intervenors* **and** *Consolidated Defendant-Intervenors.* | ) |
| | ) |

---

## MEMORANDUM IN SUPPORT OF PLAINTIFF AND CONSOLIDATED PLAINTIFF NEXTEEL CO., LTD.'S RULE 56. 2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee

*Counsel to NEXTEEL Co., Ltd.*
*Plaintiff and Consolidated Plaintiff*

Dated:  May 24, 2021

## TABLE OF CONTENTS

I.      STATEMENT PURSUANT TO RULE 56.2 .................................................................1

    A.      ADMINISTRATIVE DETERMINATION UNDER REVIEW.............................1

    B.      ISSUES PRESENTED FOR REVIEW .................................................................1

II.     STATEMENT OF FACTS .......................................................................................2

    A.      BACKGROUND AND FACTS RELEVANT TO COMMERCE'S
        PARTICULAR MARKET SITUATION FINDING.........................................2

    B.      FACTS RELEVANT TO NON-PRIME COST ALLOCATION ...........................10

    C.      FACTS RELEVANT TO SUSPENDED PRODUCTION LOSSES ....................11

III.    SUMMARY OF ARGUMENT...................................................................................12

IV.     STANDARD OF REVIEW .......................................................................................14

V.      ARGUMENT ...........................................................................................................16

    A.      COMMERCE'S PARTICULAR MARKET SITUATION
        DETERMINATION IS CONTRARY TO LAW AND UNSUPPORTED
        BY SUBSTANTIAL RECORD EVIDENCE ........................................................16

        1.      Commerce's Determination is Inconsistent with the Particular
            Market Situation Statute .................................................................18

        2.      The Record Does Not Support a Finding of a Particular Market
            Situation .........................................................................................21

            a.      Subsidization ....................................................................... 22

            b.      HRC Imports from China...................................................... 24

            c.      Strategic Alliances .............................................................. 29

            d.      Electricity ............................................................................ 30

            e.      Evidence Showing No Particular Market Situation Exists................. 31

    B.      COMMERCE'S RELIANCE ON A GLOBAL REGRESSION-BASED
        METHODOLOGY WAS NOT IN ACCORDANCE WITH LAW AND
        WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ................................34

        1.      Global Regression-Based Methodology Is Antithetical To An
            Allegation Of A Localized Particular Market Situation within
            Korea...............................................................................................36

        2.      There Are Flaws In The Data Upon Which Commerce Relied ................37

    C.      COMMERCE ERRED IN CALCULATING NON-PRIME COSTS...................42

    D.      COMMERCE ERRED IN REALLOCATING SUSPENSION LOSS
        FROM COGS TO G&A .....................................................................................45

VI.     CONCLUSION.......................................................................................................48

## <u>TABLE OF AUTHORITIES</u>

<u>**Federal Cases**</u>

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*
467 U.S. 837 (1984) ............................................................................14, 15, 21

*Consol. Edison Co. v. NLRB*
305 U.S. 197 (1938)..........................................................................................15

*Encino Motorcars, LLC v. Navarro*
136 U.S. 2117 (2016) ........................................................................................15

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000).........................................................................38

*Gerritsen v. Shirai*
979 F.2d 1524 (Fed. Cir. 1992) ........................................................................15

*Husteel Co., Ltd. v. United States*
Slip. Op. 20-125, Concol. Court No. 19-00112 (Ct. Int'l Trade Aug. 26, 2020) ..........4, 46

*Husteel Co., Ltd. v. United States*
426 F.Supp.3d 1376 (Ct. Int.'l Trade 2020) ....................................................20

*NEXTEEL Co., Ltd. v. United States*
355 F.Supp.3d 1336 (Ct. Int.'l Trade 2019) .......................................... *passim*

*NEXTEEL Co., Ltd. v. United States*
392 F.Supp.3d 1276 (Ct. Int'l Trade 2019) ........................................... *passim*

*Nippon Steel Corp. v. United States*
458 F.3d 1345 (Fed. Cir. 2006)...................................................................15, 22

*POSCO v. United States*,
296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ...................................................31

*POSCO v. United States*,
337 F.Supp.3d 1265 (Ct. Int'l Trade 2018) .....................................................31

*POSCO v. United States*,
353 F.Supp.3d 1357 (Ct. Int'l Trade 2018) .....................................................31

*POSCO v. United States*,
378 F.Supp.3d 1348 (Ct. Int'l Trade 2019). ......................................................3

*Robert Bosch LLC v. Pylon Mfg. Corp.*
    659 F.3d 1142 (Fed. Cir. 2011)............................................................................15

*Sterling Fed. Sys., Inc. v. Goldin*
    16 F.3d 1177 (Fed. Cir. 1994)............................................................................15

*SeAH Steel Corp. v. United States*
    Slip. Op. 21-43, Concol. Court No. 19-00086 (Ct. Int'l Trade Apr. 14, 2021) ......... *passim*

*Timex V.I. v. United States*
    157 F.3d 879 (Fed. Cir. 1998)............................................................................14

*Universal Camera Corp. v. NLRB*
    340 U.S. 474 (1951)...........................................................................15, 22, 39

## Federal Statutes

19 U.S.C. § 1516a...........................................................................................14

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................14

19 U.S.C. § 1673...........................................................................................18

19 U.S.C. § 1677a(a)......................................................................................18

19 U.S.C.§ 1677b(a)..................................................................................16, 17

19 U.S.C. § 1677b(a)(1)(B)(i)...........................................................................19

19 U.S.C. § 1677b(a)(4)...................................................................................19

19 U.S.C. § 1677b(e)...............................................................................*passim*

19 U.S.C. § 1677b(f)............................................................................42, 44, 45, 46

19 U.S.C. §1677m(g)........................................................................................8

28 U.S.C. § 1581(c)........................................................................................14

## Legislative History

S. Rep. No. 103-412 (1994)...........................................................................45, 47

## Commerce Determinations

*Biodiesel From Argentina: Final Determination of Sales at Less Than Fair Value and Final
Affirmative Determination of Critical Circumstances, in Part,*
    83 Fed. Reg. 8,837 (Dep't Commerce Mar. 1, 2018) ......................................................33

*Certain Carbon and Alloy Steel Cut-To-Length Plate From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*,
    82 Fed. Reg. 16,341, 16,342 (Apr. 4, 2017) ..................................................... 27

*Certain Hot-Rolled Steel Flat Products from Korea: Final Results of Countervailing Duty Administrative Review, 2016*,
    84 Fed Reg. 28,461 (Dep't Commerce June 19, 2019).....................................23

*Certain Oil Country Tubular Goods From Ukraine: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*,
    79 Fed. Reg. 41,969 (July 18, 2014) ...............................................................42

*Certain Oil Country Tubular Goods from the Republic of Korea*,
    83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018)......................................3

*Certain Oil Country Tubular Goods from the Republic of Korea*,
    84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) ..................................... 3

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Affirmative Determination*,
    81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016)......................................6

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    83 Fed. Reg. 8,058 (Dep't Commerce Feb. 23, 2018).......................................5

*Steel Concrete Reinforcing Bar From Taiwan: Final Determination of Sales at Less Than Fair Value*,
    82 Fed. Reg. 34,925 (Dep't Commerce July 27, 2017) ...................................33

*Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*,
    84 Fed. Reg. 27,762 (Dep't Commerce Jun. 14, 2019) ............................... 4, 41

*Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016*,
    83 Fed. Reg. 33,919 (Dep't Commerce Jul. 18, 2018),
    *as amended*, 83 Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2018)...............................4

*Welded Line Pipe From the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017*,
    84 Fed. Reg. 4,046 (Dep't Commerce Feb. 14, 2019)........................................5

*Welded Line Pipe From the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018-2019*,
    86 Fed. Reg. 20,484 (Dep't Commerce Apr. 20, 2021)...................................26

## I.  STATEMENT PURSUANT TO RULE 56.2

### A.    ADMINISTRATIVE DETERMINATION UNDER REVIEW

Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL"), a Korean producer and exporter of welded line pipe, brings this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii) to challenge certain aspects of the U.S. Department of Commerce's ("Commerce") final results in the third administrative review of the antidumping duty order covering welded line pipe from the Republic of Korea.  *See Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 76,517 (Dep't Comm. Nov. 30, 2020) ("*Final Results*").  The challenged findings and conclusions of fact and law are set out primarily in Commerce's Issues and Decision Memorandum accompanying the *Final Results* ("*Final Decision Memo*").

### B.    ISSUES PRESENTED FOR REVIEW

NEXTEEL respectfully submits that each of the following four issues presented to the Court demonstrates agency action that is contrary to law and unsupported by substantial evidence, necessitating remand:

1.    Whether Commerce's particular market situation ("PMS") finding was contrary to law or unsupported by substantial evidence;

2.    Whether Commerce's reliance on a global regression-based methodology to derive the PMS adjustment was contrary to law or unsupported by substantial evidence;

3.    Whether Commerce's determination to reallocate NEXTEEL's reported manufacturing costs for producing non-prime products, by adding the net costs of manufacturing of non-prime products to prime products' total manufacturing costs, was contrary to law or unsupported by substantial evidence; and

4.      Whether Commerce's reclassification of losses related to suspended production as general and administrative expenses rather than costs of goods sold pursuant to NEXTEEL's books and records and in accordance with the home country Generally Accepted Accounting Principles ("GAAP") was contrary to law or unsupported by substantial record evidence.

## II.   <u>STATEMENT OF FACTS</u>

### A.      BACKGROUND AND FACTS RELEVANT TO COMMERCE'S PARTICULAR MARKET SITUATION FINDING

The central issue in this appeal is Commerce's determination that a "particular market situation" existed in Korea during the period of review such that NEXTEEL's costs of production did not reflect costs in the ordinary course of trade.  *See Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 76,517 (Dep't Comm. Nov. 30, 2020) ("*Final Results*"), P.R. 860, and accompanying Issues and Decision Memorandum at cmts. 1-3 (Nov. 20, 2020) ("*Final Decision Memo*"), P.R. 854.  Based on the determination that a particular market situation existed in the Korean hot-rolled steel market, Commerce adjusted by a rate of 25.62 percent NEXTEEL's costs for hot-rolled steel coil used in the production of subject welded line pipe ("WLP").  *Id*. at cmt. 3 (at 41).

A brief summary of this Court's holdings on PMS-related issues is relevant to the Court's review of the instant case.  In the first, second, and third administrative reviews of oil country tubular goods ("OCTG") from Korea, the domestic industry alleged that a particular market situation existed in Korea with respect to hot-rolled steel coil inputs used in the production of OCTG, on the basis of four allegations: (1) alleged subsidization of Korean hot-rolled steel products by the Korean government; (2) alleged distortions resulting from imported Chinese

HRC; (3) alleged "strategic alliances" between Korean HRC suppliers and Korean OCTG producers; and (4) alleged involvement by the Korean government in the electricity market in Korea. *See generally Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,105 (Dep't Comm. Apr. 17, 2017) ("OCTG AR1"); *Certain Oil Country Tubular Goods from the Republic of Korea*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) ("OCTG AR2"); *Certain Oil Country Tubular Goods from the Republic of Korea*, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019), and accompanying Issues & Decision Memo ("OCTG AR3 Final Decision Memo").  In each review, Commerce considered the four allegations "as a whole" and found, "based on the totality of the conditions in the Korean market," that the domestic industry's allegations "represent facets of a single particular market situation."  *See e.g.*, OCTG AR3 Final Decision Memo at 26.  Commerce was explicit that its PMS determination in the second and third review were based on its PMS determination in the first review.

In each of those reviews, Commerce applied a PMS adjustment rate to the hot-rolled coil costs based on the CVD rate for hot-rolled steel coil calculated in the *Hot-Rolled Steel from Korea* investigation ("*Hot-Rolled Investigation*").  *See POSCO v. United States*, 378 F.Supp.3d 1348 (Ct. Int'l Trade 2019).  The Court has now struck down the PMS determinations in all three OCTG reviews as unsupported by substantial evidence.  *See NEXTEEL Co., Ltd. v. United States*, 355 F.Supp.3d 1336 (Ct. Int'l Trade 2019) (pertaining to OCTG AR1) ("*NEXTEEL I*"); *NEXTEEL Co., Ltd. v. United States*, 392 F.Supp.3d 1276 (Ct. Int'l Trade 2019) (pertaining to OCTG AR2) ("*NEXTEEL II*"), appeal docketed, No. 21-1334 (Fed. Cir. No. 25, 2020); and *SeAH Steel Corp. v. United States*, Slip Op. 21-43, Consol. Court No. 19-00086 (Ct. Int'l Trade Apr. 14, 2021) (pertaining to OCTG AR3) ("*SeAH*").

In the preceding first and second administrative reviews of the antidumping duty order on welded line pipe from Korea ("Line Pipe AR1" and Line Pipe AR2"), the domestic industry raised the same four-factor allegation, alleging that a particular market situation affected the costs of hot-rolled steel inputs used to product subject WLP. *See generally Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018), *as amended*, 83 Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2018), and accompanying Issues & Decision Memo ("Line Pipe AR1 Final Decision Memo"); and *Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019), *as amended*, 84 Fed. Reg. 35,371 (Dep't Commerce July 23, 2019), and accompanying Issues & Decision Memo ("Line Pipe AR2 Final Decision Memo"). This Court held that Commerce's PMS findings in Line Pipe AR1 and Line Pipe AR2 are not in accordance with law or unsupported by substantial evidence. *See generally Hyundai Steel Company v. United States*, 43 CIT __, 415 F. supp. 3d 1293 (pertaining to Line Pipe AR1) ("*Hyundai Steel I*"), appeal docketed, No. 21-1748 (Fed. Cir. Mar. 17, 2021); and *Husteel Co., Ltd. v. United States*, Slip Op. 20-125, Consol. Court No. 19-00112 (Ct. Int'l Trade Aug. 26, 2020) (pertaining to Line Pipe AR2) ("*Husteel*").

With respect to the instant review, on March 14, 2019, Commerce initiated the third administrative review of the antidumping duty order on welded line pipe from Korea, for the period December 1, 2016 to November 30, 2017 ("Line Pipe AR3"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Dep't Commerce Mar. 14, 2019). Commerce selected as mandatory respondents NEXTEEL and

SeAH Steel Corporation ("SeAH").  *See* Respondent Selection Memorandum. C.R. 3, P.R. 20 (Mar. 28, 2020).

On June 25, 2019, relying heavily on Commerce's prior determinations in the prior OCTG and welded line pipe proceedings, Petitioners California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA (collectively, "Petitioners") requested that Commerce also find a particular market situation with respect to the production of WLP in Korea with respect to the review at hand ("Line Pipe AR3").  *See generally* Particular Market Situation Allegation and Supporting Factual Information, C.R. 110-339, P.R. 95-696 (June 25, 2019) ("Petitioners' PMS Allegation").  Petitioners raised the same four-factor allegation, as in prior proceedings.  *Id*. Petitioners urged Commerce to "streamline the administrative process by starting with the rebuttable presumption that the prior PMS continued to exist in the subsequent proceeding."  *Id*. at 2-3.  Accordingly, Petitioners requested that Commerce "find - as it did in the first administrative review and second administrative review - that a PMS exists in Korea such that corrective adjustments to respondents' reported data are warranted."  *Id*. at 6.  Petitioners provided many of the same materials presented to Commerce in the OCTG and Line Pipe proceedings, such that the agency records are very similar.  *Id.* (Exhibit List).

To make "corrective adjustments to address PMS distortions," Petitioners urged that Commerce not only base its adjustments on subsidy rates calculated from *Hot-Rolled Investigation*, but also rely on a regression analysis that "estimate{s} the effect of global excess capacity on prices of HRC."  Petitioners' PMS Allegation at 40.  Petitioners explained that the regression analysis would regress "country-specific HRC import average unit values ("AUVs") . . . against global excess capacity to estimate the effect of global excess capacity on prices of HRC at the national level."  *Id*.

In particular, Petitioners' regression analysis used an ordinary least squares ("OLS") fixed-effects regression to estimate the Korean AUV of hot-rolled steel flat products of a blanket Harmonized Tariff Schedule ("HTS") category, HTS 7208 (flat-rolled iron or steel, hot-rolled). Petitioners' PMS Allegation at 47.  Relying on this statistical tool, Petitioners estimated the Korean import AUV of hot-rolled flat products in HTS 7208 in 2017, and claimed that the resulting estimated AUV of $808.80/MT "should have been" NEXTEEL's hot-rolled coil costs during the POR.  *Id.* at 52.  According to Petitioners, this estimated AUV figure "is 49.35 percent higher than the 2017 Korean import AUV for HRC of $541.54/MT."  *Id*.

Following the allegation, interested parties submitted additional materials, factual information, and comments concerning the PMS allegations.  *See, e.g.,* NEXTEEL's Particular Market Situation Comments and Rebuttal Factual Information, C.R. 372-383, P.R. 729-737 (Aug. 12, 2019) ("NEXTEEL PMS Submission"); Hyundai Steel's Rebuttal Factual Information Relating to PMS Allegation, C.R. 384-392, P.R. 738-745 (Aug. 12, 2019) ("Hyundai Steel PMS Submission").

On February 7, 2020, Commerce issued its preliminary results.  *See Welded Line Pipe from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 7,268 (Dep't Commerce Feb. 7, 2020) ("*Preliminary Results*"), P.R. 796, and accompanying Issues and Decision Memorandum, P.R. 979 ("Prelim. Decision Memo").  Acknowledging that its determination was based largely on its finding in Line Pipe AR2, Commerce determined that a particular market situation existed in Korea during the POR:

> {W}e preliminarily determine that the circumstances present during the instant review remained *largely unchanged* from those in 2016-2017 POR {Line Pipe AR2} which lead to the finding of a PMS in Korea in the 2016-2017 *Final Results*.  Therefore, based on the record evidence in this proceeding, we preliminarily find that a PMS exists in Korea which distorts the COP of WLP. This PMS results from the collective impact of the four factors described above.

Prelim. Decision Memo at 13, P.R. 979 (emphasis added).

To quantify the impact of the PMS, Commerce adopted, with its own modifications, Petitioner's regression analysis. *See id*. at 14; *see also* Memorandum, Preliminary Results Regression Analysis for PMS Adjustment, P.R. 798 (Feb. 3, 2020) ("Prelim PMS Memo"); Memorandum, Preliminary Results Cost Calculation Pertaining to NEXTEEL, C.R. 460, P.R. 820 (Feb. 4, 2020). First, rather than calculate a counterfactual Korean flat-rolled steel import AUV in 2017, Commerce calculated a PMS adjustment factor relying on the estimated regression coefficient (*i.e.*, the estimated "beta") for the "uneconomic capacity" explanatory variable, derived from Petitioner's OLS analysis, which is based on ten-year data from 2008 through 2017. *See* Prelim PMS Memo at 1. Second, Commerce calculated a PMS adjustment factor by determining that "a desired reduction of the uneconomic capacity is reasonably attained by a capacity utilization rate of 80 percent." *Id*. Third, Commerce used the 2017 global production data to calculate "counterfactual global production capacity." *Id*. In essence, Commerce used this "beta" factor and the regression model in an attempt to identify what the price of hot rolled steel would have been, had global hot rolled steel production been 80 percent of total production capacity. *Id*.

Based on the OLS regression analysis, Commerce calculated a particular market situation adjustment factor of 13.97 percent. *See* Prelim PMS Memo at 2. Commerce then increased NEXTEEL's hot-rolled coil input costs by 13.97 percent "to account for the cost-based PMS that existed in Korea." *Id*. With the cost adjustment, Commerce calculated a preliminary antidumping duty margin of 4.81 percent for NEXTEEL. *See Preliminary Results*, 85 Fed. Reg. at 7,269.

*NON-CONFIDENTIAL VERSION*

Between March 11 and March 18, 2020, interested parties submitted case and rebuttal briefs addressing issues in the *Preliminary Results*, including Commerce's preliminary decision with respect to the PMS issue.  *See generally* NEXTEEL's Case Brief, C.R. 474, P.R. 817 (March 11, 2020) ("NEXTEEL's Case Brief") and NEXTEEL's Rebuttal Brief, P.R. 834 (March 18, 2020) ("NEXTEEL's Rebuttal Brief").

Once the administrative record was closed after briefing concluded, on July 8, 2020, Commerce placed new factual information on the record.  *See* Memorandum, "Placing New Factual Information on the Record," P.R. 841-842 (July 8, 2020) ("July 8, 2020 Memorandum").  Commerce's July 8, 2020 Memorandum contained eight attachments, but no explanations as to why Commerce was placing new factual information on the record following the close of the record.  *Id*.  In the memorandum, Commerce provided interested parties with an opportunity to submit factual information to "rebut, clarify, or correct" factual information contained in the memorandum.  *Id*.

On July 15, 2020, NEXTEEL submitted rebuttal factual information.  *See* Factual Information in Response to the Department's July 8, 2020 Memorandum Placing New Factual Information on the Record, C.R. 475-479, P.R. 843-846 (July 15, 2020).  NEXTEEL requested that Commerce allow parties to comment and submit additional factual information once Commerce clarified the basis upon which Commerce viewed the new factual information as relevant to its analysis, the statute requires.  *Id*. at 2 (citing 19 U.S.C. §1677m(g) (Commerce "shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by {Commerce} . . . upon which the parties have not previously had an opportunity to comment.").  Commerce did not respond to NEXTEEL's request.

Commerce published the *Final Results* on November 30, 2020.  *See Final Results*, P.R. 860.  In the *Final Results*, Commerce affirmed its preliminary decision that a PMS existed in relation to the cost of inputs to the production of the subject WLP.  *See Final Decision Memo*, P.R. 854, at cmt. 2 (at 17).  Relying on the factual information Commerce placed on the record in its July 8, 2020 Memorandum, Commerce made additional modifications to Petitioners' regression analysis and calculated a higher adjustment factor (25.62 percent as opposed to 13.97 percent in the *Preliminary Results*) to NEXTEEL's hot-rolled input costs of manufacturing the subject WLP.  *See id.* at cmt. 3 (at 41).  As a result, NEXTEEL's final dumping margin increased to 15.07 percent from the preliminary margin of 4.81 percent.  *See Final Results*, 85 Fed. Reg. at 76,518.

In the *Final Results,* while continuing to rely on ten-year data from 2008 through 2017 for purposes of calculating the estimated regression coefficient "beta," Commerce used a five-year average of global production to calculate counterfactual global capacity.  *See Final Decision Memo* at 33-35.  Further, although Commerce acknowledged that Petitioners' regression analysis was "imperfect," Commerce nonetheless made no modifications to correct independent variables such as pricing data for coking coal inputs used to calculate the estimated regression coefficient beta.  *Id.* at 38-39.

On November 30, 2020, NEXTEEL filed a letter alleging ministerial errors in Commerce's PMS adjustment calculations.  NEXTEEL's Ministerial Error Comments, P.R. 861 (Nov. 30, 2020) ("NEXTEEL's Ministerial Error Comments").  NEXTEEL alleged that Commerce overlooked record information pertaining to 2017 global steel production and capacity data, as well as the regression-based "beta" coefficient calculations.  *Id.* at 2, 5.  Specifically, NEXTEEL established that, while Commerce determined not to use updated 2017

data because Commerce stated that the data were  not "available to" Petitioners when they filed a

PMS allegation, *Final Decision Memo* at 37, P.R. 854, in fact the record did contain the updated

2017 data in the Respondents' rebuttal PMS comments submissions.  NEXTEEL's Ministerial

Error Comments at 7 (citing Hyundai Steel PMS Submission, C.R. 384-392, P.R. 738-745, at

Attachment D.2 (at 41)).

Commerce declined to modify its *Final Results* pursuant to NEXTEEL's ministerial

errors letter, stating that NEXTEEL's allegation did not concern the type of error that Commerce

considers ministerial.  *See* Memorandum, Final Ministerial Error Allegation, P.R. 866 (Dec. 23,

2020).

## B.     FACTS RELEVANT TO NON-PRIME COST ALLOCATION

As with its reporting in the prior administrative reviews involving WLP and other non-

subject pipes (*i.e.,* OCTG and Circular Welded Pipe), for reporting of non-prime products,

NEXTEEL relied on the costs of non-prime products as recorded in its normal accounting

records.  *See* NEXTEEL's Sections C & D Response, C.R. 84-91, P.R. 80 (May 22, 2019)

("NEXTEEL Sections C & D Response"), at D-17.  Because NEXTEEL determines after all

stages of production have been completed whether a particular pipe meets the requirements for

the prime product, non-prime products incur the same costs of production as prime products, and

NEXTEEL accordingly calculates and records costs for non-prime products in the same manner

as costs for prime products.  *See Id*.

Nevertheless, in the *Final Results*, Commerce reallocated the reported costs of

NEXTEEL's non-prime line pipe products.  *See Final Decision Memo*, P.R. 854, at 45–47.

Commerce explained that the cost reallocation was justified because the non-prime pipe products

"are not WLP" and cannot be used for the same application as prime products.  *See id*.

Commerce explained that, because non-prime products are not capable of being used for the same applications as prime line pipe and non-prime products have a sales value less than the reported cost of production, it is reasonable for Commerce to adjust the reported full costs so that the costs "reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* at 47. As such, Commerce (1) set the costs of non-prime products equal to their sales value and (2) reallocated the difference between the production costs and the lower sales price for non-prime products as a cost for prime WLP products, in effect increasing the cost to produce prime line pipe products to include costs related to producing non-prime line pipe. *See id.*

### C.    FACTS RELEVANT TO SUSPENDED PRODUCTION LOSSES

During the POR, NEXTEEL suspended production on certain OCTG (*i.e.,* non-subject merchandise) lines and one of the forming lines for the subject merchandise production. *See* NEXTEEL Sections C & D Response, C.R. 84-91, P.R. 80, at D-10. The suspended production resulted in losses in the form of labor and overhead costs (including depreciation) and costs allocated to these lines from common cost centers. *See* NEXTEEL's Supplemental Sections A, C & D Response, C.R. 430-434, P.R. 755 (Sept. 6, 2019) ("NEXTEEL Supp. Sections ACD Response"), at S-16. In accordance with NEXTEEL's standard accounting practices and consistent with Korean GAAP, NEXTEEL transferred those suspension losses directly to NEXTEEL's costs of goods sold (COGS) at year end, because they were specific costs relating to specific production lines, rather than treated as a general cost of manufacturing. *Id.* As such, the costs were not included in NEXTEEL's reported costs of manufacturing. NEXTEEL provided a schedule reporting appropriate per-unit amounts by production line in response to Commerce's request. *Id.* at Exhibit SD-3-a.

Despite NEXTEEL's treatment of these costs in its normal books and records in

accordance with Korean GAAP, Commerce reclassified the associated costs (*i.e.,* suspended

loss) to NEXTEEL's G&A expenses and excluded the suspended losses from NEXTEEL's

COGS denominator.  *See Final Decision Memo*, P.R. 860, at 49.

### III.   <u>SUMMARY OF ARGUMENT</u>

Commerce's PMS finding in this review is based on the same facts and same allegations

as those made by the domestic interested parties ("petitioners") in the OCTG proceedings (*i.e.,*

OCTG AR1, OCTG AR2, and OCTG AR3) and the Welded Line Pipe proceedings (*i.e.,* Line

Pipe AR1 and Line Pipe AR2), as well in other cases involving steel products from Korea.  This

Court has now concluded that Commerce's PMS determinations in the OCTG and Line Pipe

lines of cases were unsupported by substantial evidence or contrary to law.  The evidentiary

record for Petitioners' PMS allegation in the instant administrative review (*i.e.,* Line Pipe AR3)

is very similar to the evidentiary record that was before Commerce in the OCTG and Line Pipe

proceedings.  The Court has already examined these facts several times and consistently found

them insufficient to support Commerce's PMS determinations.  Here again the record does not

contain evidence of a PMS that results in NEXTEEL's costs being outside the ordinary course of

trade.

To quantify the impact of the PMS, Commerce relied on a global regression-based

methodology.  Commerce's chosen methodology to "estimate" what NEXTEEL's hot-rolled

steel input costs would have been absent the claimed PMS, was unreasonable, because it bore no

relationship to the costs NEXTEEL incurred to produce subject WLP.  As a threshold matter, a

global regression-based methodology was antithetical to an allegation of a localized particular

market situation within Korea.  The use of the method itself suggests that market distortions exist

not just for a "particular" local market (*i.e.,* Korea, as Petitioners claimed and Commerce found) but also in the global market.  That is, any claimed situation in Korea is not a "particular" market situation, as accepting Commerce's PMS determination based on a theory of "global steel overcapacity" means that there is a broad and general situation across the globe, a situation not specific to Korea.  Commerce's regression model also contained fatal flaws that Commerce overlooked when calculating the PMS adjustment.  Commerce ignored the POR-specific and input-specific data when it purported to estimate NEXTEEL's hot-rolled input costs during the POR.

Commerce also erred in its calculations of the adjustment for the costs of NEXTEEL's non-prime merchandise as well as in its adjustment to NEXTEEL's G&A expense ratio to account for loss resulting from periods of suspended production operations during the POR. Commerce's adjustment for non-prime costs was an error because Commerce diverged from NEXTEEL's books and records which attribute full and actual costs to NEXTEEL's non-prime products.  In doing so, Commerce re-allocated the difference between the cost of production and sales value for non-prime products to prime products.  With regard to adjustments to account for suspended production loss, Commerce determined that the costs related to the company as a whole because the shut downs were for an "extended period of time."  Commerce accordingly revised NEXTEEL's G&A expense ratio to include the suspended loss amount in the numerator of G&A, and at the same time deducted the suspended loss amount from COGS denominator. However, the expenses resulting from the loss were manufacturing-related expenses as recorded in NEXTEEL's books and records kept pursuant to Korean GAAP, and as such do not belong in the G&A expense ratio at all, which is for general costs to be borne by the company as a whole.

**IV.    <u>STANDARD OF REVIEW</u>**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c), as this appeal is taken pursuant to 19 U.S.C. § 1516a.  The Court will hold Commerce's determinations unlawful in an antidumping duty proceeding where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce acts contrary to law where it acts arbitrarily or based on an impermissible interpretation of its statutory authority.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  When reviewing Commerce's interpretation of the antidumping statute, the Court first determines "whether Congress has directly spoken on the precise question at issue.  Where the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.*  Where, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.

However, as the Federal Circuit explained in *Timex V.I. v. United States*, the Court does "not fulfill {its} duty to say what the law is . . . by merely agreeing to Commerce's interpretation of the statutory provision at issue if it is 'reasonable,' regardless of whether {the Court thinks} it correct."  *Timex V.I. v. United States*, 157 F.3d 879, 881-82 (Fed. Cir. 1998) (internal citations omitted).  "Rather, before granting an agency's statutory interpretation such great deference . . . {the Court} must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable."  *Id.*  As the Federal Circuit further explained in *Timex*, where "the statute's text does not explicitly address the precise question,

{the Court does} not at that point simply defer to the agency. {The Court's} search for Congress's intent must be more thorough than that." *Id.* "Beyond the statute's text, those 'tools' include the statute's structure, canons of statutory construction, and legislative history." *Id.* Furthermore, *Chevron* deference is inappropriate where an agency has, without proper explanation, reversed course from a longstanding interpretation of the statute, on which parties have come to rely. *See Encino Motorcars, LLC v. Navarro*, 136 U.S. 2117, 2126–27 (2016).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Importantly, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

When reviewing an agency decision for abuse of discretion, the court examines whether the decision "1) is clearly unreasonable, arbitrary, or fanciful; 2) is based on an erroneous conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that contains no evidence on which the {agency} could rationally base its decision." *Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147-48 (Fed. Cir. 2011) (noting that a clear error of judgment occurs when an action is "arbitrary, fanciful, or clearly unreasonable.").

## V.     ARGUMENT

### A.     COMMERCE'S PARTICULAR MARKET SITUATION DETERMINATION IS CONTRARY TO LAW AND UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE

Commerce erred in concluding that a particular market situation ("PMS") exists with respect to NEXTEEL's costs of production, as the determination is inconsistent with 19 U.S.C. § 1677b(e), this Court's recent rulings, and the record facts.  The record of this administrative review does not contain substantial evidence of: (1) policies or mandates by the Government of Korea with regard to hot-rolled coil in that distort NEXTEEL's WLP costs of production or render them outside the ordinary course of trade; (2) price distortions in the Korean market due to imports of HRC from China that would render NEXTEEL's costs outside the ordinary course of trade; (3) strategic alliances that impact costs or prices such that NEXTEEL's costs are outside the ordinary course of trade; or (4) government involvement in the Korean electricity market that could support the conclusion that NEXTEEL's costs are outside the ordinary course of trade.  As such, Commerce did not have any legal or factual justification to apply a PMS adjustment to NEXTEEL's hot-rolled input prices in the *Final Results* of this review, particularly in light of the CIT's recent, related rulings.

This Court has now been presented with challenges to Commerce's PMS determinations multiple times, and has accordingly cultivated relevant expertise on the issue.  In *Dong-A Steel Co.*, addressing a similar PMS allegation related to the hot-rolled steel market in Korea, the Court found related prior rulings persuasive emphasizing that "the record evidence that Commerce relies upon to support its PMS determination here appears to be consistent with the evidence from prior administrative reviews, which the court has held to be insufficient to satisfy the substantial evidence burden," including earlier administrative reviews of similar steel

16

products from Korea including OCTG, WLP, and circular welded pipe.  *Dong-A Steel Co.*, 475

F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2020).  There the Court determined that Commerce

"relied on substantially the same record evidence in reaching its PMS determination here as

underlay earlier administrative reviews," which failed to meet the substantial evidence burden in

those earlier cases, and concluded that the evidence "was and remains insufficient to constitute

substantial evidence."  *Id.* at 1336.

    Most recently, in *SeAH* (pertaining to OCTG AR3), the Court reviewed Commerce's

determination based on much of the same evidence Commerce relied on to make a PMS

determination in the administrative review at hand.  *SeAH*, Consol. Court No. 19-00864, CIT

Slip Op. 21-43 (Apr. 14, 2021).  The Court first explained at length, pointing to specific evidence

relied upon by Commerce, why Commerce's PMS determinations were unsupported by

substantial evidence in *NEXTEEL I* and *NEXTEEL II*.  *Id.* at 30-39.  Then the Court analyzed

whether any additional or different evidence relied by Commerce to make a PMS finding in

OCTG AR3 supported an affirmative PMS finding.  *Id.* at 39-52.  The Court concluded that,

"{a}lthough the record in OCTG III contains some additional documents not included on the

OCTG I or OCTG II records, the court observes that Commerce's examination of the OCTG III

record overall, including previously submitted documents and newly submitted documents, with

related explanation, *does not support Commerce's OCTG III determination that a particular*

*market situation affected the cost of production of OCTG.*"  *Id.* at 39 (emphasis added).

    In particular, with respect to the alleged countervailable subsidization of Korean hot-

rolled steel products, the Court found that "Commerce's reliance on a subsidization rate of nearly

60% from a timeframe outside the relevant period of review is unreasonable in light of existing

contrary record information referenced by Commerce of significantly lower subsidization rates

17

of less than 2% from within the period of review." *Id*. at 43.  As to the alleged "an onslaught of imported 'cheaper Chinese steel products'" in the Korean steel market, the Court observed that the record evidence cited by Commerce "does not support a conclusion that the global glut of Chines hot-rolled coil imports caused price distortions *specific to the Korean steel market*." *Id*. at 46.  As to the evidence such as a notice from the Korean Free Trade Commission imposing penalties to certain Korean steel producers to show that "strategic alliances" existed during the POR, the Court found that "none of the evidence pertains to the relevant period of review," and Commerce's speculation that strategic alliances "may have created distortions" was not supported by the record.  *Id*. at 48.  With respect to electricity, the Court found that the evidence relied upon Commerce had a "temporal problem" and that the evidence that pre-dated the POR was "inconclusive regarding government control over electricity" during the OCTG AR3 period of review.  *Id*.  at 50.

As NEXTEEL demonstrates in Section A.2, below, Commerce relied on the same underlying evidence for which this Court has concluded that did not constitute substantial evidence.

### 1.     Commerce's Determination is Inconsistent with the Particular Market Situation Statute

Under the Tariff Act of 1930, as amended, Commerce conducts antidumping duty investigations and determines whether goods are being sold at less-than-fair value.  *See* 19 U.S.C. § 1673.  In conducting this analysis, Commerce compares the price at which the subject merchandise is sold in the United States (referred to as "export price" or "constructed export price") to a "normal value" benchmark.  Export price is defined as the price at which the subject merchandise is first sold in the U.S.  *See* 19 U.S.C. § 1677a(a).

With respect to normal value, the statute indicates a preference for using the price at which the subject merchandise is sold in the exporting country as the basis of normal value.  *See* 19 U.S.C. § 1677b(a)(1)(B)(i).  But if Commerce cannot determine the normal value of the subject merchandise based on price, then § 1677b(a)(4) authorizes Commerce to use a constructed value as the basis of normal value.  Prior to the enactment of the TPEA, the normal value statute at 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) permitted the agency to disregard home market sales if a "particular market situation prevent{ed} a proper comparison" to export price.  However, Section 504 of the TPEA amended the Tariff Act to also consider "particular market situations" when calculating normal value under the constructed value provision (*i.e.*, 19 U.S.C. § 1677b(e)).  *See* 2015 TPEA, Pub. L. No. 114-27, 129 Stat. 362.  When calculating constructed value under the revised statute, if Commerce finds the existence of a PMS "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology."  19 U.S.C. § 1677b(e).

The plain language of this provision ("such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade") necessitates a focus on actual costs, and an assessment of whether those costs are in the "ordinary course of trade."  In short, this statutory inquiry requires two determinations before the agency can resort to an alternative calculation methodology – Commerce must determine:  (1) that a PMS exists, (2) *such that* the respondents' costs are outside the ordinary course of trade.

As summarized by the Court in *Husteel*, "{t}o establish the existence of a PMS, Commerce must demonstrate *both* that there are distortions present in the market *and* that those distortions prevent a proper comparison of normal value with export price or constructed export price." *Husteel Co. v. United States*, 426 F.Supp.3d 1376, 1390 (Ct. Int'l Trade 2020) (emphases added). To reiterate: the statute allows for adjustments to cost where there is (1) some situation in the market at issue that constitutes a "PMS" and (2) the PMS results in "the cost of materials and fabrication or other processing of any kind" no longer "reflect{ing} the cost of production in the ordinary course of trade{.}" 19 U.S.C. § 1677b(e). Absent such a finding, there is no basis in the law to disregard the costs or determine that the reported costs are inadequate to sever as a proper comparison to U.S. price.

Nevertheless, despite this clear statutory directive, Commerce *never analyzed whether NEXTEEL's costs (or the actual costs prevalent in the market) accurately reflected costs in the ordinary course of trade*. That is, Commerce concluded that NEXTEEL's costs were outside the ordinary course of trade without even looking at NEXTEEL's actual costs, or looking at the prevailing costs generally in Korea, or assessing what the costs might be in the ordinary course of trade. Indeed, Commerce reached a decision that NEXTEEL's costs were outside the ordinary course of trade without reference to any evidence regarding actual costs. In Commerce's view, item (2) is essentially removed from the statute, as any time there is a PMS the costs are automatically deemed outside the ordinary course of trade.

The statute requires two findings, and Commerce has not made both findings here. It is axiomatic that Commerce must follow the statute, and must give effect to the statute's plain meaning. *NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed. Cir. 1997). Indeed, Commerce, like all administrative agencies, "must give effect to the unambiguously expressed intent of

Congress."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

Inconsistent with this mandate, Commerce did not follow its statutory directive, finding instead

that the alleged distortion in the market impacted respondents' costs in this review without

actually examining the impact (if any) of the alleged distortion on the actual costs of the

respondent under consideration.

<strong>2.  The Record Does Not Support a Finding of a Particular Market Situation</strong>

The Court's multiple opinions reviewing Commerce's PMS findings are instructive to the

issue at hand.  In the *Final Results*, while Commerce claims that its PMS determination in this

review was "based on an extensive amount of information . . . placed on the record of this

review," *Final Decision Memo*, P.R. 854, at 17, it is clear from the agency's decision memo that

Commerce relied on the same determinative set of evidence, which this Court has held in

multiple occasions that does not constitute substantial evidence.

Here, Petitioners submitted and Commerce endorsed the same allegations and materials

provided in PMS allegations with respect to the Korean hot-rolled steel market.  Commerce cited

to exhibits 19 (excerpts of PMS allegations filed in *Heavy-Walled Rectangular Pipe and Tube*

*from Kore*a ("*Heavy Walled from Korea*")), 23, (Commerce's determination in *Hot-Rolled*

*Investigation*) 26-30 (excerpts of PMS allegations filed in *Heavy Walled from Korea, Line*

*Pipe AR1, OCTG AR1, and OCTG AR2*), 33-36 (KFTC decisions and related articles, which

were also presented in *OCTG AR3*), and 38 (excerpts of PMS allegation filed in *Heavy Walled*

*from Korea*) of Petitioners' PMS allegation to support its affirmative PMS determination.  The

allegation in this case was nothing but a compendium of stale evidence this Court has repeatedly

determined is insufficient to establish that a PMS exists in the Korean hot rolled steel market --

21

in each successive review the factual submissions begin with the materials from prior allegations as attachments to the latest allegation.

As established below, NEXTEEL placed on the record substantial factual evidence affirmatively demonstrating that a PMS did not exist in Korea during the period of review.[1] Commerce has not explained why its determination that a PMS exists in Korea is reasonable in light of this conflicting evidence. *Universal Camera Corp.*, 340 U.S. at 488 ("{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *Nippon Steel Corp. v. United States*, 458 F.3d at 1351 (explaining that the substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable).

### a.  Subsidization

Commerce found that a particular market situation existed with regard to NEXTEEL's cost of production, due in large part to alleged upstream subsidies provided by the Korean government to POSCO, a Korean producer of hot-rolled coil. *See Final Decision Memo*, P.R. 854, at 18 (citing Petitioners' PMS Allegation at Exhibits 19 and 23 (containing Commerce's issues and decision memo in *Hot-Rolled Investigation*)). Commerce relied heavily on its own subsidy determination in *Hot-Rolled Investigation*, in which Commerce calculated a total AFA subsidy rate of almost 60 percent to mandatory respondent POSCO. *See also Certain Hot-Rolled Steel Flat Products from the Republic of Korea,* 84 Fed. Reg. at 23,019-20 (reducing POSCO's total AFA subsidy rate from 58.68% to 41.57%). Commerce relied on this AFA rate in a prior

---

[1] Many of these facts were also present on the record *NEXTEEL I*, which led Commerce to initially (and correctly) reject Petitioner's PMS allegations in that review. *See NEXTEEL I*, 355 F. Supp. 3d 1336, 1345-46 (Ct. Int'l Trade 2019).

proceeding to conclude that (1) "the Korean government subsidized HRC, the primary input into WLP production"; and (2) "the mandatory respondents purchased HRC from entities receiving these subsidies, including POSCO." *Final Decision Memo* at 18.

As this Court has previously found, the *Hot-Rolled Investigation* determination and corresponding CVD rate simply do not constitute substantial evidence supporting a PMS determination. Indeed, reviewing Commerce's reliance on the *Hot-Rolled Investigation* rate in *SeAH*, the Court found that reliance unreasonable:

> Commerce's reliance on the subsidy rate of nearly 60% or the revised subsidy rate of more than 40% from the {*Hot-Rolled Investigation*} countervailing duty investigation covering calendar year 2014 was unreasonable in light of available information of more contemporaneous subsidy rates of less than 2% for the period of review from August 12, 2016 to December 31, 2016, which overlaps partially with the OCTG III period of review from September 1, 2016 through August 31, 2017.

*SeAH* at 41.

As in *SeAH*, Commerce again ignored the fact that the AFA rate in the *Hot-Rolled Investigation* does not indicate actual level of subsidization in Korea. Commerce also glossed over the fact that the agency has now determined, in the Hot-Rolled Steel first administrative review, that the actual rate of subsidization in Korea for hot-rolled steel is barely above Commerce's *de minimis* threshold. *See Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2016*, 84 Fed. Reg. 28,461 (Dep't Commerce June 19, 2019), *as amended* in *Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Amended Final Results of the First Administrative Review*, 84 Fed. Reg. 35,604 (Dep't Commerce July 24, 2019) (collectively, *Hot-Rolled from Korea AR1*); *see also* NEXTEEL PMS Submission, C.R. 372-383, P.R. 729-737, at Exhibit 2 (containing Commerce's decision memorandum along with

calculation memoranda pertaining to POSCO and Hyundai Steel in *Hot-Rolled from Korea AR1*).

Indeed, in the first administrative review of *Hot-Rolled Steel from Korea*, published prior to the

preliminary results in the instant review, Commerce calculated near-*de minimis* final subsidy

rates of 0.58% for Hyundai Steel and 0.54% for POSCO.  *See Hot-Rolled from Korea AR1*.

Such near *de minimis* levels of subsidization undermined Commerce's finding that the Korean

hot-rolled steel market is subsidized at a level approaching "60 percent of the cost of hot-rolled

steel" and was accordingly affected by a "particular market situation."  *See Final Decision

Memo*, P.R. 854, at 18 (citing to Petitioners' PMS Allegation at Exhibit 23 (containing

Commerce's issues and decision memo in *Hot-Rolled Investigation*).  Commerce did not explain

how its finding of Korean Government intervention in the steel market is reasonable in light of

this contrary evidence.

Commerce's PMS determination is unsupported by substantial record evidence given its

sole reliance on an outdated AFA rate to support the allegation of significant subsidization in the

steel market in Korea during the POR.

### b.  HRC Imports from China

Commerce's finding that imports of hot-rolled steel coil from China into Korea

contributed to a PMS also lacked the support of substantial evidence.  Commerce concluded that,

as a result of significant overcapacity in Chinese steel production, the "Korean steel market has

been sharply impacted by imports of cheap Chinese steel products, placing downward pressure

on Korean domestic steel prices."  *Final Decision Memo.* P.R. 854, at *18*.  Commerce's

determination was premised on speculation and rife with obvious factual and logical flaws, as

this Court concluded in *NEXTEEL I, NEXTEEL II, SeAH, Hyundai Steel I* and *Huesteel*.

As a preliminary matter, Commerce pointed to no actual evidence concerning Korean steel prices or market forces to support its determination.  Commerce's lone factual support for its conclusion was a general reference to Petitioners' allegation, without tying the allegation to NEXTEEL's data or the reported costs.  *See Final Decision Memo* at 18-19, n. 105-110 (citing to Petitioners' PMS Allegation at Exhibits 20, 26-30, and 42).  Contrary to Commerce's finding, the record evidence demonstrated that there was in fact decreasing capacity, decreasing exports, and increasing hot-rolled steel prices during the POR.  OECD Steel Reports from the 2nd and 4th quarters of 2018 (*i.e.*, during the POR) included at Exhibit 5 of NEXTEEL's PMS Submission, C.R. 372-383, P.R. 729-737, showed that the Chinese industry targeted significant capacity reductions during these periods.  Exhibit 6 of NEXTEEL's PMS Submission contained a similar report from the International Monetary Fund, which reports at length on Chinese capacity reductions.  *Id.*

Further, by focusing on the broad impact of global overcapacity on global markets, Commerce's analysis failed to show that a particular market - specifically the Korean hot-rolled market - has been distorted.  There can be no "particular" market situation if the market factors cited by Petitioners are impacting the steel market in every country (and in fact for practically every steel product), in the same way.  Commerce's analysis failed to focus on the impact that alleged distortions have on the cost of production, and whether the resulting costs are outside the ordinary course of trade, as the statute requires.  *See* 19 U.S.C. § 1677b(e).  There simply was no evidence here of the required quantifiable link between the claimed global and/or Chinese overcapacity and a distortion of the cost of production of subject merchandise for a particular respondent (NEXTEEL) in the particular market (Korea).

With respect to the actual hot-rolled steel prices, the evidence on the record exhibited a trend of increasing hot-rolled steel prices, effectuated in part by the affirmative actions by the Chinese Government.  NEXTEEL provided summaries of data reported by the World Steel Association Yearbook 2018 and the Organization for Economic Co-operation and Development (OECD) in "Recent developments in steelmaking capacity" report regarding steel capacity, production, apparent use, excess capacity and capacity utilization reported from the world, as well as individually for both China and Korea.  *See* NEXTEEL's PMS Submission, C.R. 372-383, P.R. 729-737, at Exhibit 8.  The data showed that the global steel overcapacity situation significantly improved in recent years, including in China and Korea, and especially during the first part of the period of review in 2017.  These data established that, contrary to Petitioners' arguments, global (and especially Chinese and Korean) steel overcapacity was at significantly reduced levels prior to and during the POR.  In particular, substantial evidence demonstrates that the Chinese industry targeted significant capacity reductions and projects further declines in Chinese overcapacity along with corresponding price increases.  Critically, Commerce in Line Pipe AR4 *cited identical consideration to reach a completely different conclusion*:

> For example, the Domestic Interested Parties provided data showing a steady decline over recent years of imports of Chinese HRC into Korea, declining by 44 percent from 2015 to 2019.

*Welded Line Pipe from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 20,484 (Dep't Commerce Apr. 20, 2021), and accompanying Issues & Decision Memo, at 13 (citing Domestic Interested Parties PMS Allegation at Exhibit 56).

The Court has previously reviewed Commerce's determination on this issue and found it unsupported.  For example, in *NEXTEEL I*, this Court stated that Commerce "acknowledged a

*NON-CONFIDENTIAL VERSION*

rise in exports of steel products (including HRC) from China, but found that Maverick had not demonstrated that the trend was unique to Korea." *NEXTEEL I*, 335 F. Supp. 3d at 1350. The Court then cited Commerce's determination to elucidate further the specificity necessary for a PMS finding, stating that "the potential broad effect on prices creates a situation outside the scope of a particular market situation, as the impact of Chinese exports in the Korean market are also reflected in other markets across the world." *Id.* Likewise, here, Commerce failed to explain how it reached its PMS determination in light of record evidence that the alleged price distortion of hot-rolled steel based on global overcapacity is not unique to Korea.

Critically, Commerce's analysis concluded, without evidence, that there is a link between Chinese imports and prices in Korea. But the fact that prices within a market (*i.e.*, prices within Korea for hot rolled steel from various sources) tend to converge should not be surprising -- this is exactly what one would expect in a functioning marketplace with prices and sourcing determined by supply and demand.

Similarly, in *SeAH*, the Court noted that "Commerce has cited nothing on the record to support its determination that the oversupply of low-priced Chinese products is *particular* to the Korean market." *SeAH* at 46 (emphasis original). There the Court listed the record documents that Commerce relied on in OCTG III (but differed from OCTG II) to support a finding that hot-rolled imports from China contributed to a PMS:

- Global Trade Atlas, South Korea Import Statistics for Hot-Rolled Products, 2012–2017 ("GTA 2012–2017");
- an article in The Investor, Korea Herald, dated September 20, 2016, titled "POSCO, Hyundai Steel merger to benefit industry: report";
- an article in Pulse by Maeil Business Newspaper, dated November 23, 2016, titled "Hyundai Steel, Dongkuk Steel become latest beneficiaries of fast-track restructuring program";
- an article in Business Korea, dated September 19, 2016, titled "Korean Steel Industry Advised to Reduce Number of Steel Plate Plants by Half";

- an article in the Korea Times, dated September 22, 2016, titled "Voices growing for merger of POSCO, Hyundai Steel"; and
- Korean Purchases of Hot-Rolled Coils – Calendar Year 2017, United Nations COMTRADE ("COMTRADE").

*SeAH* at 44.  The Court observed that "the statistics and article cited by Commerce do not indicate that the experience in Korea due to Chinese hot-rolled coil imports is distinct from the experience in other countries around the world, which were also inundated with the global oversupply of low-priced Chinese products."  *Id* at 45.  Commerce in the review at hand *relied on exactly the same documents*, which this Court in *SeAH* found did not constitute substantial evidence.  *See Final Decision Memo*, P.R. 854, at 19, fn. 109 (citing Petitioners' PMS Allegation at Exhibit 30).  In particular, Petitioners' PMS Allegation at Exhibit 30 contained an excerpt from petitioners' PMS allegation filed in Line Pipe AR2.  That particular exhibit contained all of the above listed documents that this Court in *SeAH* examined and found insufficient to support Commerce's finding that Chinese hot-rolled coil imports contributed to a PMS in Korea.  On this basis alone, the Court should find Commerce's finding unsupported by substantial evidence.

If anything, imports from China and fluctuating prices indicate that the Korean market is operating efficiently under standard market principles.  It is a competitive market with purchasers basing their decisions on rational choices as to product, price, and quality.  This aspect of the Korean hot-rolled steel market is not indicative of transactions "outside the ordinary course of trade" or considerations evidencing a particular market situation.  Thus, Commerce's conclusion that excess capacity of Chinese hot-rolled steel imports demonstrates a particular market situation in Korea is not supported by substantial evidence.

### c.  Strategic Alliances

Commerce's determination that "strategic alliances have *led* to prices of HRC

significantly below prevailing market value, as evidenced by the record information" was not

supported by substantial evidence.  *Final Decision Memo*, P.R. 854, at 19-20 (emphasis added).

While there is no evidence of any relevant "strategic alliances," at a fundamental level

Commerce points to no evidence to support its position that that any such "strategic alliances"

resulted in lower HRC prices (let alone whether such prices could render NEXTEEL's costs

outside the ordinary course of trade).  Commerce again essentially mirrored its decision from

prior PMS cases finding that, "{s}uch evidence supports the allegation that these strategic

alliances *may* have affected prices in the period covered by the prior administrative review, up to

and including this POR."  *Id.* at 20 (emphasis added).

Leaving aside the fact that Commerce's own use of the word "may" confirms that

Commerce's conclusion is mere speculation, this Court has already reviewed the same evidence

in *SeAH* on which Commerce again relied in this review.  Specifically, Commerce pointed to

Korean Fair Trade Commission ("KFTC") findings with respect to alleged price fixing among

Korean pipe producers as evidence that "have led to prices of HRC significantly below

prevailing market value."  *Final Decision Memo* at 20 (citing Petitioners' PMS Allegation at

Exhibit 33 (containing the December 21, 2017 notice from KFTC, entitled "*KFTC punishes six

steel pipe manufacturers for rigging bids offered by Korea Gas Corporation.*").  In *SeAH*, the

Court examined the identical evidence, along with an article in the Korea Times, dated

December 20, 2017, titled "*Steelmakers fined W92 bil. For bid rigging*" (provided in Petitioners'

PMS Allegation at Exhibit 34, and cited by Commerce to show the existence of strategic

alliances in Korea (*see Final Decision Memo* at 17, fn. 100)).  The Court found that "{t}he

record documents cited by Commerce relate to findings of unfair corporate action that occurred in 2014 or earlier, and no evidence relates to unfair corporate action or other strategic alliances during the relevant period of review." *SeAH* at 48.  Because none of the evidence pertained to the relevant period of review, the Court concluded that "Commerce's purely speculative conclusions that strategic alliances 'may have created distortions' and 'may continue to impact {hot-rolled coil} pricing in a distortive manner …' were not supported by the record. *Id.*

The Court should reach the same determination here.  The period of review of the case at hand is from December 1, 2017 through November 30, 2018.  Any alleged action that occurred in 2014 or earlier has no relevance as to any alleged "strategic alliances" three years later during the POR between hot-rolled coil producers and their pipe-producing customers.  Commerce did not indicate how a price-fixing scheme *among pipe producers*, years earlier, affected the market for *hot-rolled coil* during the POR such that it contributed to a particular market situation. Commerce's speculation simply does not constitute substantial record evidence and, therefore, cannot withstand judicial scrutiny.  *See, e.g., LMI-La Metalli Indus., S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990) (explaining that an agency's "speculation . . . must yield to evidence"); *Jinan Yipin Corp.*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where Commerce's decision was based on "mere assumptions, which find no apparent support in record evidence").

### d.  Electricity

With respect to Commerce's determination as to alleged electricity subsidies, an analysis of the issue must start with Commerce's own extensive history in investigating allegations of electricity subsidies in Commerce's countervailing duty investigations.  Commerce has

repeatedly found that there are no measurable countervailable electricity subsidies in the Korean steel market, and this Court have uniformly affirmed these decisions.

In particular, with respect to the input at issue, hot-rolled steel, Commerce found that the Government of Korea's provision of electricity was not for less than adequate remuneration, and the determination was upheld by this Court.  *See POSCO v. United States*, 337 F.Supp.3d 1265 (Ct. Int'l Trade 2018).  Commerce and this Court have reached the same conclusion with respect to electricity in countervailing duty investigations involving many other steel products.  *See, e.g., POSCO v. United States*, 353 F.Supp.3d 1357 (Ct. Int'l Trade 2018) (concerning certain carbon and alloy steel cut-to-length plate from Korea); *POSCO v. United States*, 296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) (concerning cold-rolled steel flat products from Korea); *Nucor Corp. v. United States*, 286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) (concerning corrosion resistant steel); *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017) (concerning welded line pipe).

Commerce cannot square these decisions with its decision that the provision of electricity somehow contributed to a particular market situation in this case.  Moreover, Commerce pointed to no data or aspect of NEXTEEL's actual reporting which would indicate that NEXTEEL's electricity costs are somehow distorted or outside the ordinary course of trade.  Absent this basic finding, Commerce's conclusion that conditions in the electricity market in Korea contributed to a particular market situation and resulted in NEXTEEL's costs being outside the ordinary course of trade are unsupported and contrary to law.

### e.  Evidence Showing No Particular Market Situation Exists

As described above, Commerce's PMS finding in this case relied heavily on the agency's prior findings and the record documents from those proceedings.  While Commerce sought to

point to new documents, these additional citations do not constitute substantial record evidence of a particular market situation.  Moreover, there was ample evidence on the record demonstrating that the market in Korea is *not* distorted by government subsidization or outside the ordinary course of trade.  In particular, NEXTEEL provided Steel Benchmarker pricing data covering the POR, as well as several years prior to the POR.  *See* NEXTEEL PMS Submission, C.R. 372-383, P.R. 729-737, at Exhibits 9 and 12.  These materials included prices for various steel products around the globe, highlighting the fact that price levels generally move on a global basis.  *See id.*  NEXTEEL also highlighted how the price of steel scrap also moved in the same direction as the price of finished products, indicating that in addition to coordinated trends in the global finished product market, steel input costs are also linked to global trends.  *Id.*  In other words, NEXTEEL demonstrated that there was no situation "particular" to the Korean market; rather, the Korean market functioned in step with the rest of the world over the relevant period.

Record evidence demonstrated that the prices that NEXTEEL paid for HRC during the POR are reflective of market prices and therefore not indicative of a particular market situation.  Specifically, the data that NEXTEEL placed on the record demonstrated that the average worldwide export price for hot-rolled steel band during the POR was $511/MT.  *See* NEXTEEL PMS Submission at Exhibit 12.  The price in Western Europe was $543/MT, while the price in China was $474/MT.  *Id.*  NEXTEEL also provided its own per unit purchase prices for HRC inputs used to produce welded line pipe, which demonstrated that NEXTEEL paid an average [      ]/MT for its hot-rolled coil inputs.  *Id.* at Exhibit 13.  This value is indeed reflective of market prices and even higher than various record benchmark prices, underscoring Commerce's finding that NEXTEEL's input prices were "distortive."  Indeed, Petitioners' own data suggested that the 2017 Korean import AUV for HRC was $541.54/MT, demonstrating that there is nothing

particular or extraordinary about NEXTEEL's hot-rolled steel input costs.  *See* Petitioners' PMS

Allegation, C.R. 110-339, P.R. 95-696, at 52.

    Commerce did not meaningfully address this evidence in its determination, instead

concluded that such analysis is not required in this case.  *Final Decision Memo,* P.R. 854, at 22.

Here, Commerce is essentially speculating that a PMS may exist, but shifting the burden to

respondents to prove that a PMS does not exist (yet at the same time essentially ignoring the

evidence respondents submitted).  The problem with this approach is that it ignores the

requirement that Commerce's decisions must be supported by substantial record evidence.  In

any event, in other contexts, Commerce has relied on similar comparisons of input prices to

benchmark valuations.  *See Steel Concrete Reinforcing Bar From Taiwan: Final Determination*

*of Sales at Less Than Fair Value*, 82 Fed. Reg. 34,925 (July 27, 2017) at IDM Comment 1

(comparing the respondent's input purchase prices from Taiwan and China) and *Biodiesel From*

*Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative*

*Determination of Critical Circumstances, in Part*, 83 Fed. Reg. 8,837) at IDM Comment 3

(discussing a 40 percent gap between soybean input prices in Argentina compared to world

market prices).

    In sum, the evidentiary record for Petitioners' PMS allegations in this review was

virtually identical in relevant part to the evidentiary record that the Petitioners have put before

Commerce many times previously, and the Court should again determine that Commerce's PMS

finding is unsupported.

**B.    COMMERCE'S RELIANCE ON A GLOBAL REGRESSION-BASED METHODOLOGY WAS NOT IN ACCORDANCE WITH LAW AND WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

To "quantify the impact of the PMS," Commerce adopted, with its own modifications, a global regression-based methodology that purportedly "capture the effect of global uneconomic capacity in the steel industry on the cost of imported HRC in Korea." *See Final Results Memo* at 39. While Commerce claimed that its methodology is "a reasonable method to quantify the relationship between global uneconomic capacity and the cost of HRC," the methodology fails to satisfy the statute's mandate to Commerce to find that "the cost … reflect the cost of production in the ordinary course of trade." 19 U.S.C. § 1677b(e).

As a preliminary matter, Commerce's reliance on a "regression-based" methodology was a complete departure from its prior PMS determinations. As this Court is familiar, Commerce in its prior determinations relied on the subsidy rates found in the *Hot-Rolled Investigation* as the source of the PMS adjustment. Specifically, Commerce used the total AFA rate assigned to POSCO as a PMS adjustment factor and adjusted respondents' hot-rolled steel input costs. *See, e.g.*, *NEXTEEL I and NEXTEEL II*. Logically, Commerce would have used the subsidy rates from *Hot-Rolled from Korea AR1*, as the rates Commerce found there were the "timeliest" (*i.e.,* more contemporaneous with the period of review subject to this litigation that in *Hot-Rolled Investigation*) and concerns the input at issue (*i.e.,* hot-rolled steel). Moreover, that determination and resulting CVD rate was not plagued by the problems associated with using a total AFA rate from *Hot-Rolled Investigation*. In *Hot-Rolled from Korea AR1*, Commerce calculated a 0.54% rate for POSCO, as opposed to the 41.57% rate in the investigation remand proceeding. *See Hot-Rolled from Korea AR1.*

Commerce's abrupt departure from relying on the subsidy rate found on the input at issue and instead using a "regression-based" methodology was therefore arbitrary. Petitioners requested that "Commerce initiate a PMS inquiry solely based upon the finding that a PMS existed in the last segment," and Commerce, in turn, considered the same four factors of the PMS allegation and found that the Korean hot-rolled steel market was distorted due to a PMS. *See* Petitioners' PMS Allegation, C.R. 110-339, P.R. 95-696, at 5; *see also Final Decision Memo*, P.R. 854, at cmt. 1. Put differently, the allegation was the same as in prior reviews but when it came to "quantifying" the impact of such allegation the subsidy rates found in the most recently completed administrative review (*i.e., Hot-Rolled from Korea AR1*) suddenly now became irrelevant. Commerce instead relied on a novel statistical tool to "estimate" hot-rolled steel input prices to adjust NEXTEEL's hot-rolled steel input costs. On this basis alone, the Court should find that Commerce abused its discretion when it arbitrarily departed from its settled calculation methodology. *See, e.g., SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996))); *Royal Thai Gov't v. United States*, 502 F. Supp. 2d 1334, 1341 (Ct. Int'l Trade 2007) ("Commerce may not treat two like situations differently without explanation.").

This Court has held that Commerce does not have unfettered discretion to apply any calculation methodology as it sees fit. *See Vicentin S.A.I.C. v. United States,* 404 F.Supp.3d 1323, 1342 (Ct. Int'l Trade 2019). While Commerce may choose any calculation methodology for constructed value to determine antidumping duties, upon finding that a particular market situation exists, Commerce "is bound by reasonableness." *Id*. Here, Commerce's chosen

methodology, *i.e.,* a global regression-based model to "estimate" what NEXTEEL's hot-rolled

steel input costs would have been absent the claimed PMS, was unreasonable, because it bears

no reasonable relationship to the costs NEXTEEL incurred to produce subject WLP.

### 1.    Global Regression-Based Methodology Is Antithetical To An Allegation Of A Localized Particular Market Situation within Korea

As a preliminary matter, a PMS adjustment by its very definition can only apply to

distortions in a particular local market, not a global market.  Commerce's use of global

overcapacity in its regression analysis was illogical because it applied a factor grounded in

alleged world-wide distortion to adjust for an alleged local market distortion.  That is, any

claimed situation in Korea was not a "particular" market situation, as accepting the argument

meant that there was a broad and general situation across the globe; such global distortions

cannot evidence a "particular market situation" specific to Korea.

Petitioners' regression model upon which Commerce relied was structured to show that

Korea's hot-rolled steel import AUVs varied based on the level of global excess steel capacity.

*See generally* Petitioner's PMS Allegation, C.R. 110-339, P.R. 95-696.  But such analysis is

inherently inconsistent with the basic premise that a PMS exists within Korea.  Global excess

steel capacity is a factor that impacts the global market, and as such is not unique to Korea (or

any other country for that matter).  Therefore, the globalized architecture of a regression model,

which analyzed the relationship between a theoretical global excess steel capacity and a

country's steel import AUVs for 37 different countries—and assumed the relationship between

each country and the excess capacity variable is the same—simply indicated that there is no

market situation "particular" to Korea.  *See id*. at 47 (indicating that the regression uses

"Country-specific import AUVs from UN Comtrade at the four-digit 7208 HTS classification for

Korea, the other 32 member countries of the {OECD}, India, and four other of the largest steel

consuming countries outside the OECD.").  Indeed, because the model itself is global, the regression model demonstrates that there is no PMS unique to Korea that affects the costs of production of WLP.

### 2.  There Are Flaws In The Data Upon Which Commerce Relied

Commerce relied on the "beta" coefficient derived from Petitioners' global, regression-based model to estimate the increase in costs, assuming that global capacity was at a level of 80 percent during 2017.  *See Final Decision Memo,* P.R. 854, at cmt. 3.  As NEXTEEL fully explained in its case brief, the data upon which Commerce relied on to calculate the beta coefficient factor contained multiple flaws.  *See* NEXTEEL's Case Brief, C.R. 474, P.R. 817, at 25-32.  Had Commerce fully recognized the flaws it would have concluded that no adjustment would be necessary.  *See id.* at 33.

*First,* Commerce's calculations contained outdated and incorrect data for 2017 and no data at all for 2018, although the period of review covered *11 months of 2018* (from December 1, 2017, through November 30, 2018).  This mis-alignment of the regression data and the POR render the regression model useless and irrelevant.

Central to the regression model and Commerce's overall theory was that global overcapacity resulted in market distortions due to excess capacity relative to production.  In conducting this analysis, Commerce established a threshold of 80 percent capacity utilization as indicative of a healthy marketplace, with production levels below that level indicative of a possible particular market situation.  *See Final Results Memo*, P.R. 854, at 33.  Commerce then claimed that it calculated "counterfactual global capacity" for the "most contemporaneous year," based on the 80 percent capacity utilization rate and the average of annual global production "in the contemporaneous year" and the previous four years."  *Id* at 41.  Contrary to its claim,

Commerce ignored data from 2018 (which showed that global capacity utilization was above 80 percent in 2018) and updated data from 2017 (which, averaged over the POR, showed that global capacity utilization was at 80.68%).  *See* NEXTEEL's Case Brief at 32-34.  In other words, had Commerce used the POR capacity utilization rate pursuant to its own threshold, no adjustment was warranted because the market was already operating at a healthy level (*i.e.,* above 80 percent).

Commerce continued to ignore the updated 2017 data in its *Final Results* by claiming that "neither the updated 2017 capacity nor the updated 2017 production totals *were available to the Domestic Producers at the time the allegation was filed.*"  *Final Results Memo* at 37 (emphasis added).  Specifically, Commerce chose to use OECD figures for 2017 global steel production and global steel production capacity from a prior version of the OECD's published statistics.  *Id.* The figures were subsequently revised in a June 2019 publication (*i.e.,* well over a year prior to Commerce's *Final Results*), and Respondents submitted the revised figures in response to Commerce's request for information.  *See* Hyundai Steel PMS Submission, C.R. 384-392, P.R. 738-745, at Attachment H.1B.  Frankly, Commerce's statement here is that it is not obligated to look at all record data, only data that would have been available to Petitioners at the time they prepared its allegation.  Commerce reaches this conclusion without citation to any statute, regulation, or legal principle.

The issue here is not what data *Petitioners should have used* in their PMS allegation, but what data *Commerce should have used* in its *Final Results*.  The Court should reject Commerce's approach and direct the agency to consider all record information, including the updated 2017 data, as required by the substantial evidence standard.  Indeed, the agency itself continued to supplement the record after the close of briefing, *see* July 8, 2020 Memorandum, P.R. 841-842,

yet determined to ignore information respondents submitted well within the regulatory timeframe for the submission of factual information.

Concerning the 2018 data, Commerce claimed that "{s}ince the POR ended on November 30, 2018, the 2018 data includes information that falls beyond the POR and thus does not reflect the cost of goods that were sold during the POR." *See Final Results Memo* at 37. Put differently, while Commerce acknowledged that the POR covered *11 months of 2018*, when it purported to "quantify the relationship between global uneconomic capacity and the price of HRC inputs" during the POR, Commerce did not consider the relevant information for the vast majority of the POR. To be clear, Respondents submitted the relevant 2017 and 2018 data from sources Commerce found reliable. *See* Hyundai Steel PMS Submission at Attachment H.1B (containing "Revised Crude Steel Capacity, Production, and Capacity Utilization between 2003 and 2018" from sources, "OECD, World Steelmaking Capacity, 2019 Version," "World Steel Association, World Steel Statistical Yearbook 2018," and "2019 Steel Statistical Yearbook") and NEXTEEL Rebuttal NFI Submission, C.R. 475-476, P.R. 843-845, at Attachment 8 (containing the same), *compare Final Decision Memo*, P.R. 854, at 41 (deriving the 2017 global steel capacity and production data from Petitioners' PMS Allegation at Exhibit 56a (the underlying data is from OECD and World Steel Association Statistical Yearbook, provided at Exhibit 63 of Petitioners' PMS Allegation). Further, the latter 11 months of the 12-month POR were in 2018, directly undermining Commerce's claim that the 2018 data includes information that is "subsequent" to the POR. Because the capacity and production data were critical in Commerce's calculation of the PMS adjustment factor, overlooking the relevant data alone warrants a finding that Commerce's PMS adjustment factor calculation was unsupported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence

must take into account whatever in the record fairly detracts from its weight"). This fundamental error impacted Commerce's calculations in multiple ways, as NEXTEEL detailed in its case brief. In particular, (1) Commerce should not have applied any adjustment for 2018; and (2) Commerce should have revised its 2017 calculations to base the calculations on the most updated information available. *See* NEXTEEL's Case Brief, C.R. 474, P.R. 817, at 32-35.

*Second*, Commerce's global regression model ran from 2008 through 2017, which included the period of financial crisis from 2008-2009. This period of unusual stress in global markets has no bearing on the claimed global overcapacity crisis because the reasons for the market collapse included factors such as tightening of credit, spike in the cost of trade credit, disruptions of global supply chains, and the postponement of durable goods purchases. *See* NEXTEEL's Case Brief at 26-27, 30-31. None of these factors were related to Petitioners' claim of steel overcapacity, let alone the effect of downward pressure on Korean hot-rolled steel prices. NEXTEEL demonstrated that removing data from this period resulted in statistically insignificant relationship between uneconomic capacity and national AUVs. Specifically, either by removing or adjusting data for 2008 and 2009, the regression results fell to nearly zero and became statistically insignificant. *See id.* at 31.

*Third*, the data contained in Commerce's analysis lacked product-specific data. Commerce's analysis, which was based on Petitioners' regression model and accompanying data, contained hot-rolled steel AUV data based on the 4-digit level HTS. *See* NEXTEEL's Case Brief at 31-32. As NEXTEEL argued in its case brief, this basket category covered a much broader range of hot-rolled steel products that those that could be used in WLP production. *Id.* In other words, Commerce's analysis from the input data, which contained extraneous import values for irrelevant products, was far from being specific to the actual inputs used in the

production of WLP.  *Id.*  Commerce has previously stressed the importance of input-specificity

in calibrating any PMS adjustment, stating that "the rate must be applicable to the input product

whose price has been found to be distorted because of a PMS."  *See Welded Line Pipe From the*

*Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final*

*Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 27,762 (Dep't Commerce June 14,

2019), and accompanying Issues and Decision Memorandum at cmt. 3 (at 27).  There,

Commerce notably rejected COMTRADE data as a reasonable measure of hot-rolled steel prices

because the data were not specific enough, stating:

> For instance, the Domestic Interested Parties submitted COMTRADE data on
> Korean HRC purchases by weight and value from various countries for specific
> tariff numbers, some of which are not relevant to the major input, and others of
> which may "potentially be used" in the production of WLP, which has only
> introduced uncertainty as regarding the validity of the submitted data

*Id.* at cmt. 2 (at 20-21).  While the broad basket analysis based on the 4-digit HTS necessarily

introduced uncertainty and reduced the validity of the regression model, in the *Final Results*,

Commerce largely failed to address this argument and Respondents' analysis which was based

on a input-specific 6-digit HTS that were *actually used in WLP production during the POR.  See*

*Final Decision Memo*, P.R. 854 at 32.

    In sum, the data upon which Commerce relied to derive a particular market situation

adjustment contained significant flaws.  Critically, Commerce's analysis hinges upon what

would be the price of hot-rolled steel if the global capacity utilization rate was at 80 percent

during the POR.  *Final Decision Memo* at 33.  The record data before Commerce showed that the

global steel capacity utilization was at 81 percent in 2018 (or at a weight-averaged level of 80.36

percent over the POR).  *See* NEXTEEL's Case Brief, C.R. 474, P.R. 817, at 34.  Put differently,

following Commerce's logic, no adjustments would have been necessary at all because there was

no "global steel overcapacity" as the market was already operating at a "healthy" level.  *See*

41

*Final Results Memo* at 33.  Commerce's calculation of a particular market situation adjustment was thus contrary to law and unsupported by substantial record evidence.

### C.   COMMERCE ERRED IN CALCULATING NON-PRIME COSTS

NEXTEEL's reported costs for non-prime WLP reflect the actual costs of production, as recorded in NEXTEEL's normal accounting.  Despite the plain language of the statute directing Commerce use the respondent's costs as recorded in the company's books and records, Commerce reallocated NEXTEEL's reported costs for non-prime WLP.  Specifically, Commerce reallocated the WLP manufacturing costs for non-prime WLP, after deducting the sales revenue of those products, to the WLP manufacturing costs for prime products, on the premise that non-prime WLP cannot be used for the same application as prime products.  *See Final Decision Memo*, P.R. 854, at 47.  For the reasons that follow, NEXTEEL respectfully submits that the Court hold Commerce's reallocation of costs unsupported by substantial evidence and contrary to law.

The statute provides that, for purposes of calculating constructed value, "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles {("GAAP")} of the exporting country . . .  and reasonably reflect the costs associated with the production and sales of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  In other words, the statute requires that reported costs must normally be used if (1) they are "based on the records . . .  kept in accordance with the {GAAP}" and (2) "reasonably reflect" the costs of producing and selling the merchandise.  *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321 (Fed. Cir. 2020) ("*Dillinger*") (citing *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1365 (Fed. Cir. 2014)).

As Commerce acknowledges, NEXTEEL assigns the full costs of production to non-prime WLP in its normal books and records and calculates costs of the non-prime products in the same way as the costs of the prime products. *See Final Decision Memo* at 47.  NEXTEEL also explained to Commerce that it does not value these products differently for finished goods and inventory purposes.  *See* NEXTEEL Supp. Sec. ACD Response, C.R. 430-434, P.R. 755, at S-21. Nothing on the record suggests that NEXTEEL's non-prime costs were such that they did not "reasonably reflect" the costs of producing and selling non-prime WLP.

When adjusting NEXTEEL's non-prime costs, Commerce appears to have found as dispositive the fact that non-prime products cannot be used for the same specific applications as the prime products for that application.  *See Final Decision Memo* at 47.  According to Commerce, a non-prime product that is "physically not equivalent" to the kind used in the same specific applications as prime products "commands a price that is significantly less than the cost assigned to {non-prime} products," and costs should accordingly be adjusted.  *Id*.  Commerce essentially determined that because non-prime products are being sold at a lower price than the prime products, "assigning full costs to these products does not reasonably reflect the costs associated with the production and sales of the merchandise."  *Id*.  On this basis, Commerce adjusted NEXTEEL's reported costs for non-prime WLP "at their sales price, while allocating the difference between the full production cost and market value of non-prime products to the production costs of prime-quality WLP."  *Id*.

Commerce's adjustment of NEXTEEL's costs based on sales value is directly inconsistent with Federal Circuit precedent on this exact issue.  Indeed, the Court of Appeals for the Federal Circuit ("CAFC") has held that relying on the sales price contravenes the statute's

express requirements to use actual costs based on a respondent's books and records. *See Dillinger*, 981 F.3d at 1322-23.

Further, in *IPSCO, Inc v. United States*, the CAFC determined that a method that calculated "costs for both limited-service and prime products on the basis of their relative prices" represented "an unreasonable circular methodology. The selling price of pipe became a basis for measuring the fairness of the selling price of pipe." *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1060 (Fed. Cir. 1992). The Court determined that such "circular reasoning contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value." *Id.* While *IPSCO* was decided before the Tariff Act was amended to include section 1677b(f), the CAFC in the recent *Dillinger* decision again found that Commerce erred in relying on "likely selling price," rather than costs of production of non-prime products. *See Dillinger*, 981 F.3d at 1324.

In *Dillinger*, the respondent reported the costs of non-prime plate on the basis of average cost of production of all plate (prime and non-prime), despite the fact that the company recorded the costs for non-prime plate in its normal books and records on the basis of likely selling price. *See id.* at 1321. Commerce adjusted the costs as reported to reflect the likely selling price, on the logic that costs should be reported as they appear in the respondent's books and records. *Id.* at 1321-22. Commerce then -- just as it did in the present case -- reallocated the difference between the average costs of production and the selling price to prime products, increasing those costs. *Id.* The CAFC found that prior precedent instructs that Commerce should use the costs of production, rather than sales value, as the basis of cost under the statute. *Id.* at 1322.

To be clear, the CAFC in *Dillinger* determined that value-based cost allocations are so unreasonable and ill-suited to identifying the actual cost of production, as to *require* diverging

from a respondent's books and records where a company's normal accounting uses value-based allocations.  Here, Commerce has diverged from NEXTEEL's books and records which attribute full and actual costs to NEXTEEL's non-prime products, and in doing so Commerce has stepped the booked costs for non-prime products down to sales value and re-allocated the difference between the cost of production and sales value to prime products.

*Dillinger* is precedential on the precise issue presented here, and therefore the Court should remand Commerce's reallocation of NEXTEEL's costs of production for non-prime products.

**D.      COMMERCE ERRED IN REALLOCATING SUSPENSION LOSS FROM COGS TO G&A**

In the *Final Results*, Commerce reallocated costs related to the production line suspensions from the cost of goods sold (COGS), as NEXTEEL had recorded, to G&A expenses. *See Final Decision Memo*, P.R. 854, at 48-49.  Commerce explained that the suspensions were for an extended period of time and that the associated costs were related to the company as a whole, rather than to certain products.  *Id* at 49.  This explanation, as this Court has recently held, falls short of the statute's mandate.

Specifically, the statute provides that costs "*shall* normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  When amending the Tariff Act to add section § 1677b(f), Congress "expect{ed} {Commerce} … to examine the recorded production costs with a view to determining as closely as possible the costs that most accurately reflect the resources actually used in the production of the merchandise in question."  S. Rep. No. 103-412, at 75 (1994).  Put

differently, unless Commerce finds that NEXTEEL's records are not compliant with Korean GAAP or NEXTEEL's cost do not reasonably reflect production and selling costs, the statute directs that Commerce use NEXTEEL's actual costs based on its records.

In the appeal of the prior second administrative review of the same antidumping duty order on line pipe from Korea at issue here, the Court addressed the same facts and Commerce's reclassification of NEXTEEL's costs from suspended production. The Court's analysis turned on what the statute requires when calculating costs; that is, the plain requirements of 19 U.S.C. § 1677b(f)(1)(A) that direct Commerce to calculate costs (selling expenses, G&A expenses, and profit) based on the records of the exporter or producer of the merchandise. The Court found that Commerce's explanation did not address the statute's apparent preference in using actual costs based on NEXTEEL's records, which are kept in accordance with Korean GAAP and reasonably reflect production and selling costs. *See Husteel* at 28-29. The Court remanded for further explanation or reconsideration consistent with its interpretation of the statute.

Here, NEXTEEL explained that, during the POR, it suspended production on certain OCTG (non-subject) lines and one of the forming lines ([                    ]) for the subject merchandise production for some periods during the POR. *See* NEXTEEL Sections C & D Response, C.R. 84-91, P.R. 80, at D-10. In response to Commerce's supplemental questionnaire requesting that NEXTEEL identify and explain where the depreciation from the suspended lines and the costs were recorded, NEXTEEL fully explained that they were "directly transferred to COGS in NEXTEEL's trial balance at year-end." NEXTEEL Supp. Sec. ACD Response, C.R. 430-434, P.R. 755, at S-16. NEXTEEL's response included a schedule of the amount transferred to COGS during the POR and screen captures of the GL and trial balance showing where in COGS for the suspended loss was recorded. *Id.* at Exhibit SD-3-a.

NEXTEEL further explained that, in accordance with the company's normal accounting treatment, the costs of the suspended lines were classified as COGS in NEXTEEL's financial statements.  *See id.* at S-16.  These costs were not included in NEXTEEL's reported costs because they were not recognized as a cost of manufacturing, but rather than as cost of goods sold, in accordance with K-IFRS.  *Id.*

In other words, Commerce confirmed that NEXTEEL's costs were calculated based on NEXTEEL's records kept in accordance with GAAP and reasonably reflect production and selling costs, consistent with the requirements of the statute.  As such, nothing on the record of this review would warrant Commerce diverging from NEXTEEL's actual costs based on its normal books and records.  Here, the costs associated with the suspension of a forming line directly relate to the production of non-subject merchandise and, under Korean GAAP, these costs are recognized as COGS.  Reclassifying those costs as G&A as if they were incurred for the company's general operations as a whole, as Commerce did here, does not "accurately reflect the resources actually used in the production of the merchandise in question."  S. Rep. No. 103-412, at 75 (1994).

*NON-CONFIDENTIAL VERSION*

VI.     **CONCLUSION**

For the foregoing reasons, NEXTEEL respectfully requests that this Court hold

Commerce's *Final Results* to be unsupported by substantial evidence and otherwise not in

accordance with law.  NEXTEEL further requests that this Court remand the agency's

determination with instructions to Commerce to correct its errors and to provide such other relief

as this Court deems just and appropriate.

                                                         Respectfully submitted,

                                                         /s/ J. David Park
                                                         J. DAVID PARK
                                                         HENRY D. ALMOND
                                                         DANIEL R. WILSON
                                                         LESLIE C. BAILEY
                                                         KANG WOO LEE

                                                         ARNOLD & PORTER KAYE SCHOLER LLP
                                                         601 MASSACHUSETTS AVENUE, N.W.
                                                         WASHINGTON, D.C.  20001
                                                         PHONE:  (202) 942-5000
                                                         FAX:  (202) 942-5999

                                                         *Counsel to NEXTEEL Co., Ltd.*
                                                         *Plaintiff and Consolidated Plaintiff*

**Date:  May 24, 2021**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY**

_____

|  |  |
|---|---|
| **NEXTEEL CO., LTD. ET AL.,** | ) |
|  | ) |
| *Plaintiff and Consolidated Plaintiffs,* | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY** | ) |
|  | ) |
| *Plaintiff-Intervenors,* | ) **Consol. Ct. No.:  20-03898** |
|  | ) |
| **v.** | ) |
|  | ) |
| **UNITED STATES,** | ) |
|  | ) |
| *Defendant,* | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **CALIFORNIA STEEL INDUSTRIES, INC. ET AL.,** | ) |
|  | ) |
| *Defendant-Intervenors* **and** *Consolidated Defendant-Intervenors.* | ) |

_____

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Memorandum in Support of Plaintiff and Consolidated Plaintiff NEXTEEL Co., Ltd.'s Rule 56.2 Motion for Judgment Upon the Agency Record, filed on May 24, 2021, contains 13,985 words, exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 14,000 word count limitation set forth in the Court's Chambers Procedures.

By:   /s/ J. David Park
J. DAVID PARK

**Dated:  May 24, 2021**