UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| NEXTEEL CO., LTD., ET AL., ) | |
| ) | |
| Plaintiff and ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| HUSTEEL CO., LTD., AND HYUNDAI STEEL COMPANY, ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | Consolidated Court |
| ) | No. 20-03898 |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| CALIFORNIA STEEL INDUSTRIES, INC. ET AL., ) | |
| ) | |
| Defendant-Intervenors ) | |
| and Consolidated ) | |
| Defendant-Intervenors. ) | |

BRIEF OF SeAH STEEL CORPORATION IN SUPPORT OF
ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

PUBLIC VERSION

PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER DELETED FROM PAGE 25

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

May 24, 2021

Table of Contents

Page

STATEMENT PURSUANT TO RULE 56.2(C)(1) ...................................................................... 2

    A.    Administrative Determination under Review ........................................................ 2

    B.    Issues of Law and Summary of Reasons for
           Reversing Commerce's Determination ................................................................ 2

ARGUMENT ............................................................................................................................... 5

    A.    As This Court Has Repeatedly Found, the Statute Does
           Not Permit Commerce to Make a PMS Adjustment to
           Cost for Purposes of the Sales-Below-Cost Test, and
           Commerce's Insistence on Making Such an Adjustment
           to Respondents' Costs Is Not in Accordance with Law ........................................ 5

    B.    Commerce's Adjustment to the Costs Reported by SeAH
           Due to an Alleged "Particular Market Situation" for
           Steel Coils in Korea Was Not in Accordance with Law ....................................... 8

        1.    The Court Has Consistently Rejected Commerce's
                PMS Findings that Were Based on the Same
                Factors that Commerce Relied Upon in this Case........................................ 8

        2.    Commerce's Finding that a "Particular Market Situation"
                Distorted Korean Prices for Steel Materials Was Not Based
                on Substantial Evidence on the Record in This Proceeding........................ 11

                a.    Record Evidence Does Not Support a Conclusion
                      that Purported Subsidies by the Korean Government
                      Distorted Hot-Rolled Coil Prices During the Review Period.............. 12

                b.    Commerce's Claim that Imports from China Depressed
                      Korean Market Prices for Hot-Rolled Coil during the Review
                      Period Is Not Supported by Substantial Evidence............................... 13

                c.    There Is No Evidence of Strategic Alliances
                      between Korean Coil and WLP Manufacturers ................................... 15

                d.    There Is No Evidence that "Distortive Government Control
                      Over Electricity Prices in Korea" Contributed to a PMS
                      Involving Hot-Rolled Coil During the Review Period........................ 17

                e.    "Cumulative Analysis" Cannot Be Used to Circumvent
                      Meaningful Review of the Sufficiency of the Record........................ 18

Page

C.   Commerce Failed to Evaluate Whether Hot-Rolled Coil Prices
in Korea During the Review Period Reflected the Cost of
Production of that Input in the Ordinary Course of Trade ................................. 19

D.   Commerce's Regression-Based
PMS Adjustment Is Not Reasonable
or Consistent with Substantial Evidence .............................................................. 21

1.   Unrebutted Expert Testimony Indicate that
Commerce's Regression Analysis Is Invalid ............................................... 22

2.   The Record Evidence Demonstrates that the Purported
Relationship between Steel Prices and Unused Capacity
Is Not Stable Over Time and Therefore Cannot Be
Used to Predict Counterfactual Prices ......................................................... 23

3.   Because Nearly All of the Review Period
Falls within 2018, Use of an Adjustment to
Hot-Rolled Coil Costs Based Solely on an
Analysis of 2017 Prices Is Inappropriate .................................................... 27

4.   If the Court Does Not Invalidate the Regression
Model to Calculate a PMS Adjustment, It Should
Require Commerce to use the Regression Results
for the Period that Provides the Best Fit with the Data .............................. 28

E.   Commerce's Improperly Refused to Make a
"CEP Offset" Adjustment when Calculating
SeAH's Dumping Margin Was Unlawful .......................................................... 29

F.   Commerce Cannot Lawfully Cap the Adjustment
for Freight Revenue that Exceeds Actual Freight Costs ..................................... 33

CONCLUSION ...................................................................................................................... 35

Table of Authorities

Page

C‍ASES

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*,
    426 F. Supp. 3d 1395 (Ct. Int'l Trade 2020) ................................................. 7

*Consol. Edison Co. of New York v. N.L.R.B.*,
    305 U.S. 197, 229 (1938) .................................................................. 29

*Dong-A Steel v. United States*,
    475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020) ................................................. 7

*Dongguan Sunrise Furniture v. United States*,
    865 F. Supp. 2d 1216 (Ct. Int'l Trade 2012) ................................................. 34

*Husteel Co. v. United States*,
    471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) ........................................ *passim*

*Husteel v. United States*,
    426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ........................................ *passim*

*NEXTEEL v. United States*,
    355 F.Supp.3d 1336 (2019) ................................................................. 34

*NEXTEEL* v. United States,
    392 F.Supp.3d 1276 (2019) ................................................................. 34

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*,
    422 F. Supp. 3d 1363 (Ct. Int'l Trade 2019) ................................................. 6

*Universal Camera Corp. v. National Labor Relations Board*,
    340 U.S. 474 (1951) ....................................................................... 22

S‍TATUTES AND R‍EGULATIONS

19 C.F.R. § 351.412(c). .................................................................... 30

19 U.S.C. § 1677 .......................................................................... 5

19 U.S.C. § 1677a ......................................................................... 34

19 U.S.C. § 1677b .................................................................. *passim*

Page

<u>A</u>DMINISTRATIVE <u>D</u>ETERMINATIONS

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea:*
    *Final Results of Countervailing Duty Administrative Review, 2017,*
    85 Fed. Reg. 64122 (Oct. 9, 2020) .................................................................. 12, 18, 21

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea:*
    *Final Results of Countervailing Duty Administrative Review, 2016,*
    84 Fed. Reg. 28467 (June 19, 2019) ........................................................................... 21

*Large Diameter Welded Pipe from the Republic of Korea:*
    *Preliminary Determination of Sales at Less Than Fair Value*
    *and Postponement of Final Determination,*
    83 Fed. Reg. 43651 (Aug. 27, 2018) ........................................................................... 32

*Welded Line Pipe from Korea: Preliminary Results of Antidumping*
    *Duty Administrative Review; 2015-2016,*
    83 Fed. Reg. 1023 (Jan. 9, 2018) ................................................................................ 10

*Welded Line Pipe from the Republic of Korea:*
    *Preliminary Results of Antidumping Duty Administrative Review and*
    *Preliminary Determination of No Shipments; 2016-2017,*
    84 Fed. Reg. 4046 (Feb. 14, 2019) ............................................................................... 9

*Welded Line Pipe from the Republic of Korea: Final Results of*
    *Antidumping Duty Administrative Review,* 2017-2018,
    85 Fed. Reg. 76517 (Nov. 30, 2020) ............................................................................. 2

<u>B</u>OOKS AND <u>A</u>RTICLES

T. Mills, ANALYSING ECONOMIC DATA: A CONCISE INTRODUCTION (2013) ...................... 24

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| NEXTEEL CO., LTD., ET AL., | ) |
| | ) |
| Plaintiff and | ) |
| Consolidated Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| HUSTEEL CO., LTD., AND HYUNDAI STEEL COMPANY, | ) |
| | ) |
| Plaintiff-Intervenors, | ) |
| | ) |
| v. | ) Consolidated Court |
| | ) No. 20-03898 |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| CALIFORNIA STEEL INDUSTRIES, INC. ET AL., | ) |
| | ) |
| Defendant-Intervenors | ) |
| and Consolidated | ) |
| Defendant-Intervenors. | ) |

BRIEF OF SEAH STEEL CORPORATION IN SUPPORT OF
ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

This brief is submitted on behalf of SeAH Steel Corporation ("SeAH") to contest the

final determination by the U.S. Department of Commerce ("Commerce") in the third

administrative review of the antidumping duty order on Welded Line Pipe ("WLP") from

Korea.

PUBLIC VERSION

<u>STATEMENT PURSUANT TO RULE 56.2(C)(1)</u>

A.   *Administrative Determination under Review*

Commerce's notice of the Final Determination with respect to SeAH was published in the Federal Register on November 30, 2020.[1]  Commerce's discussion of the issues raised in the final results was set forth in a separate memorandum dated November 20, 2020.[2]

B.   *Issues of Law and Summary of Reasons for*
     *Reversing Commerce's Determination*

1.   *Whether Commerce's decision to include an adjustment to account for*
     *a "particular market situation" in its calculation of Plaintiffs' cost of*
     *production when it applied the sales-below-cost test to Plaintiffs' home*
     *market sales to be used in calculating normal value was lawful given*
     *that the Court of International Trade has repeatedly held that such*
     *adjustments are impermissible under the relevant statutes?*

In numerous decisions, the Court of International Trade has clearly and consistently held that the relevant provisions of the statute do not permit Commerce to apply a particular market situation ("PMS") adjustment to the cost of production for purposes of the sales-below-cost test.  Despite these clear holdings, Commerce insisted on increasing Plaintiff's cost of hot-rolled coil inputs for purposes of the sales-below-cost test to account for an alleged PMS with respect to hot-rolled steel coils ("HRC") in Korea.  Commerce's excuse for ignoring the Court's previous decisions on this issue has been specifically considered and rejected by this Court in multiple previous cases.  The Court should remand

---

[1] *See Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 2017-2018, 85 Fed. Reg. 76517 (Nov. 30, 2020).  (Public Record ("PR") 860).

[2] *See* Issues and Decision Memorandum for the Final Results of the 2017-2018 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from Korea (Nov. 20, 2020) (hereinafter "Final I&D Memo") (PR-854).

this issue to Commerce with explicit instructions to calculate cost of production for purposes of the sales-below-cost test in accordance with this Court's past decisions.

2. *Whether Commerce properly determined that a "particular market situation" existed with respect to hot-rolled coil prices in Korea?*

Commerce's finding of a PMS with respect to HRC in Korea was based on consideration of four factors. However, the Court has previously found in multiple cases that the specific factors relied upon for this determination do not support a finding that a PMS exists, and that a PMS determination based on those factors is not supported by substantial evidence.

3. *Whether Commerce properly adjusted the respondents' costs to account for the alleged PMS in the absence of any finding, or evidence, that the prices respondents paid for hot-rolled coils failed to accurately reflect the cost of production in the ordinary course of trade?*

Under the statute, Commerce may adjust constructed value for an alleged PMS affecting input costs only when it finds that, as a result of the PMS, the prices for the input (in this instance, HRC in Korea) failed to "accurately reflect the cost of production in the ordinary course of trade." In this review, there was no evidence that Korean prices for HRC during the review period failed to reflect the cost of production of those coils, and Commerce did not purport to make any finding on that issue.

4. *Whether the PMS adjustment applied by Commerce was supported by substantial evidence on the record and otherwise in accordance with law, where the adjustment was based on a regression analysis that was demonstrated to be invalid and inaccurate?*

Commerce calculated the PMS adjustment for HRC based on a regression analysis that purported to allow Commerce to estimate how prices for HRC would be affected if the global steel industry had operated at higher levels of capacity utilization. However, that regression analysis was logically and mathematically flawed, and its predictions were inherently unreliable. Among other things, the evidence demonstrates that the

relationships between steel prices and global capacity utilization are highly unstable over time.  This temporal instability makes any attempt to predict counterfactual steel prices inherently unreasonable and unreliable.

5.  *Whether Commerce properly denied a CEP offset when it compared normal value to constructed export price for SeAH?*

Commerce's regulations provide that, when assessing whether a Constructed Export Price ("CEP") offset is appropriate, Commerce will compare the U.S. level of trade for CEP sales based on the "constructed" level (that is, the level of the sale from SeAH to its affiliated U.S. importer, PPA) to the home-market level of trade based on the "starting price" (that is, the level of the sale from SeAH to its unaffiliated Korean customers). SeAH performed additional selling activities and with greater intensity in connection with its home-market sales to unaffiliated customers than the activities it performed in connection with U.S. sales to PPA.  Commerce's denial of a CEP offset for SeAH's U.S sales cannot be reconciled with the statute, regulations, or Commerce's past practice and should be rejected by this Court.

6.  *Whether Commerce properly capped the adjustment for revenue from freight charges that were separately identified on the invoices to U.S. customers based on the actual freight cost incurred?*

Commerce allowed an upward adjustment to U.S. price for separately-invoiced freight charges on U.S. sales, but "capped" that adjustment by the actual amount of freight costs incurred and deducted from the U.S. price, claiming that "it is inappropriate to increase the gross unit selling price for subject merchandise as a result of profit earned on the sale of services (*i.e.*, freight)."  But the statute does not permit that result.  Under the statute, Commerce may either include all of the freight revenue or none of the freight revenue in the U.S. price.  It may not include only a portion of the freight revenue in the price. Although the Court has rejected our argument on this issue in appeals of previous reviews,

the statute itself is clear. We therefore request that the Court reconsider and reverse its prior decisions on this issue.

<u>ARGUMENT</u>

A.   *As This Court Has Repeatedly Found, the Statute Does Not Permit Commerce to Make a PMS Adjustment to Cost for Purposes of the Sales-Below-Cost Test, and Commerce's Insistence on Making Such an Adjustment to Respondents' Costs Is Not in Accordance with Law*

Commerce found in this case that SeAH had a "viable" home market, and that normal value should therefore be based on home-market sales and not on constructed value.[3]  In accordance with the statutory requirements, Commerce conducted a sales-below-cost analysis to determine whether individual home-market sales for each respondent could be included in the calculation of normal value.  In calculating cost of production for purposes of the sales-below-cost test, Commerce made an upward adjustment increasing each respondent's direct material costs by 25.62 percent to account for an alleged PMS.  However, as this Court has found on numerous occasions, that adjustment was not permitted by the statute.

Section 504(a) of the Trade Preferences Extension Act ("TPEA") of 2015 modified the definition of "ordinary course of trade" (in 19 U.S.C. § 1677(15)) to add a new sub-paragraph (C), addressing circumstances in which a "particular market situation" in a comparison market prevents a proper comparison with the export price or constructed export price.  In addition, Section 504(b) of the TPEA modified the provisions concerning the calculation of "constructed value" (in 19 U.S.C. § 1677b(e)) to permit Commerce to

---

[3] Decision Memorandum for the Preliminary Results of the 2017-2018 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from Korea (January 31, 2020), at 16 (hereinafter "Preliminary Decision Memo") (PR-796).

adjust constructed value "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."  Significantly, Section 504 of the TPEA did not make any other changes to the existing statutory language.  It did not change the statutory provisions regarding the calculation of cost of production or application of the sales-below-cost test (which are found in 19 U.S.C. § 1677b(b)).

This Court has addressed the effect of Section 504 of the TPEA on the statutory sales-below-cost test in numerous cases.  For example, in the appeal of the first administrative review of *Welded Line Pipe from Korea* (hereinafter "*WLP1*"), this Court explained that:

> {T}here is nothing in the statutory scheme which can be read to grant Commerce the authority to modify the below cost sales test to account for a PMS. Indeed, the statute precludes a PMS adjustment to COP for the below cost sales analysis because it specifically lists the method of calculation and the adjustments to be made, and there is no ambiguity in this portion of the statute.[4]

The Court's holding in WLP1 is consistent with decisions by Judge Choe-Groves, Judge Restani, and Judge Katzmann in numerous other cases, all of which held that the statute does not permit a PMS adjustment to costs for the purposes of the sales-below-cost test.[5]

---

[4] *See Husteel v. United States*, 426 F. Supp. 3d 1376, 1383–89 (Ct. Int'l Trade 2020) (hereinafter *"Husteel I"*).

[5] In *Saha Thai*, Judge Choe-Groves held that "{b}ecause Commerce chose to make a comparison between home-market sales and U.S. price, Commerce may not apply a cost-based particular market situation adjustment in the context of this sales-based comparison."  *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 422 F. Supp. 3d 1363, 1371 (Ct. Int'l Trade 2019).

In *Borusan*, Judge Restani held that:

> The court will not discuss this matter in great detail as in recent and thorough opinions the court has explained that no adjustment for a PMS is permitted for the sales below cost test…. Because Commerce's adjustments to BMB's COP were only for the purpose of

*(footnote continued on following page)*

The Court's previous decisions on this issue are undoubtedly correct.  The statute

provides clear and unambiguous guidance for Commerce to follow when conducting the

sales-below-cost test that is used to identify home-market sales that should be included in

the calculation of normal value in cases where home market sales, rather than constructed

value, are used as the basis for normal value to determine dumping margins.  In this regard,

19 U.S.C. § 1677b(b)(1) directs Commerce to conduct a sales-below-cost test to determine

whether "sales ... have been made at prices that represent less than the cost of production,"

and 19 U.S.C. § 1677b(b)(3) defines the cost of production to include the cost of materials

and processing, amounts for selling, general, and administrative expenses, and the cost of

all containers and expenses incidental for shipment.[6]  Sales that Commerce determines

were made at prices below the cost of production based on the application of the sales-

below-cost test are to be disregarded from the calculation of normal value.[7]

There is nothing in the relevant provisions authorizing a PMS adjustment to cost of

production for purposes of the sales-below-cost test.  Instead, the only statutory reference

to such an adjustment is found only in 19 U.S.C. § 1677b(e) which, by its terms, *only*

---

*(footnote continued from previous page)*
> the sales below cost of production test, Commerce's adjustments on
> account of a PMS in this case are contrary to law.

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 426 F. Supp. 3d 1395, 1411 (Ct. Int'l
Trade 2020).

And in *Dong-A*, Judge Katzmann also noted that the interpretation adopted in the
*Husteel, Saha Thai,* and *Borusan* cases was consistent with the binding precedent
established by Federal Circuit and the Supreme Court decisions.  *See Dong-A Steel v.
United States*, 475 F. Supp. 3d 1317, 1341 (Ct. Int'l Trade 2020).

[6] 19 U.S.C. § 1677b(a)(6) and 19 U.S.C. § 1677b(a)(7) also identify permissible
adjustments to home market prices that are permitted in the calculation of normal value.

[7] *See* 19 U.S.C. § 1677b(a)(1)(B)(i).  *See also* 19 U.S.C. § 1677b(b)(1).

addresses the calculation of constructed value. Significantly, there is a separate provision

(19 U.S.C. § 1677b(f)) that describes "special rules" applicable to the calculation of both

cost of production and constructed value. But that provision does not list adjustments for

an alleged PMS affecting input costs.

In short, both the statutory provisions and the previous decisions by this Court are

clear: No PMS adjustment to input costs is permitted for purposes of calculating cost of

production for purposes of the sales-below-cost test. Accordingly, Commerce's final

determination to increase cost of production for SeAH for purposes of the sales-below-cost

test to account for an alleged PMS that purportedly affects SeAH's costs for HRC cannot

be sustained.

> B.   *Commerce's Adjustment to the Costs Reported by SeAH*
>       *Due to an Alleged "Particular Market Situation" for*
>       *Steel Coils in Korea Was Not in Accordance with Law*
>
> 1.   *The Court Has Consistently Rejected Commerce's*
>       *PMS Findings that Were Based on the Same*
>       *Factors that Commerce Relied Upon in this Case*

As mentioned, Commerce made an adjustment to SeAH's cost of manufacture, for

purposes of the sales-below-cost test, based on its determination that there was a

"particular market situation" affecting steel input costs. As in the first and second reviews

of WLP, Commerce's PMS finding relied on the following four factors: (1) alleged

subsidization of Korean hot-rolled steel products by the Korean government; (2) allegedly

unfairly-traded Chinese HRC; (3) alleged strategic alliances between Korean HRC

suppliers and Korean WLP producers; and (4) alleged distortive government control over

electricity prices in Korea. And, as in the first and second reviews of WLP, Commerce did

not discuss whether any of these factors created a PMS affecting HRC prices when

considered individually, and Commerce also provided no analysis to explain how these

factors might have interacted to generate a PMS that none of the factors generated on their own.  Instead, Commerce asserted that the totality of the circumstances described by the four factors collectively justified its decision.

Commerce's finding of a "particular market situation" in the third WLP review was largely based on the same evidence and same logic as its finding in the first and second WLP reviews.  Indeed, Commerce's Preliminary Determination explicitly stated that its assessment of the alleged PMS affecting steel input costs in the review that is the subject of this appeal was directly based on its finding in the second review of WLP and that the "circumstances present during the instant review remained largely unchanged from those in the {second} review."[8]  Thus, Commerce explained that:

> In the *2016-2017 Final Results*, the Domestic Interested Parties alleged that a PMS existed in Korea based on the same four factors and, upon analyzing the four allegations as a whole, Commerce found that a PMS existed in Korea during that POR. For the current review, after analyzing the Domestic Interested Parties' allegation and the factual information and comments subsequently submitted by interested parties, *we preliminarily determine that the circumstances present during the instant review remained largely unchanged from those in 2016-2017 POR which led to the finding of a PMS in Korea in the 2016-2017 Final Results.*[9]

In turn, Commerce's determination in the second review of WLP was explicitly grounded on its finding of a PMS in the first review of WLP.[10]  As this Court is aware, Commerce's findings of a PMS in those reviews have been consistently rejected by this Court.

---

[8] *See* Preliminary Decision Memo at 12-13 (PR-796).

[9] *Id.* (PR-796).

[10] *See Welded Line Pipe from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 4046 (Feb. 14, 2019), and accompanying Decision Memorandum at 15 (hereinafter "WLP2 Preliminary Decision Memo").  *See also Welded Line Pipe from Korea: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 83

*(footnote continued on following page)*

In *WLP1*, the Court found that Commerce's findings were not supported by

substantial evidence, explaining that:

> Commerce failed to substantiate three out of the four factors upon
> which it relied. Defendant argues that Chinese overcapacity affects the
> Korean market in particular because Chinese imports constitute a
> significant and growing portion of the HRC market in Korea, resulting
> in a downward pressure on steel prices and incentives for government
> interventions which would cause further distortions…. However,
> Defendant concedes that Chinese overcapacity is "not a phenomenon
> specific to the Korean market." ... Although 19 U.S.C. §1677b may not
> demand that a PMS be such that it only affects the subject market,
> there is no evidence on the record that Chinese overcapacity affects the
> Korean market in some way that is specific to the Korean market at all.
> Commerce's support for the other factors is likewise lacking.
> Regarding evidence of strategic alliances and government involvement
> in the Korean electricity market, both Defendant and Commerce seem
> to acknowledge that these factors support the PMS finding only to the
> extent that they lend credence to a determination based on the totality
> of the circumstances in the market…. Defendant and Commerce rely
> on the cumulative effect of these distortions taken together….
> Although Commerce may rely on the cumulative effect of multiple
> distortions to arrive at a PMS determination, it cannot use that phrase
> to circumvent a meaningful review of the sufficiency of the record.[11]

In addition, in the appeal of the second WLP review (hereinafter "*WLP2*"), this Court held

that, despite additional evidence, the record failed to support a finding of a PMS:

> Commerce finds that a PMS exists in Korea that distorts the cost of
> HRC, the main input in WLP production, based on the cumulative
> effect of Chinese steel overcapacity, the government of Korea's
> ("GOK") subsidization of hot-rolled steel products, strategic alliances
> between Korean HRC suppliers and Korean WLP producers, and
> government control over electricity prices in Korea. Yet, Commerce

---

*(footnote continued from previous page)*
Fed. Reg. 1023 (Jan. 9, 2018), and accompanying Decision Memorandum at 13-15
(hereinafter "WLP1 Preliminary Decision Memo").

   Furthermore, in this review Commerce stated that "… there is no basis for distinguishing
the HRC used to produce WLP from the HRC used to produce other steel products in
Korea during the POR."  Final I&D Memo at 21 (PR-854).

[11] *Husteel I*, 426 F. Supp. 3d at 1391-92.

> fails to explain how each factor lends credence to its finding that a
> PMS distorts the costs of HRC during the POR such that Commerce
> could not properly determine a constructed value of WLP that could
> properly be compared to export price (or constructed export price).[12]

In short, the Court again found that Commerce could not properly rely on claims of "cumulative effects" from the four alleged factors when the factors themselves had not been shown to have an impact. Since Commerce's PMS finding in this review was based on the same evidence and logic relied on in the previous reviews, the Court should reach the same conclusion as in *WLP1* and *WLP2* that Commerce's PMS determination is not supported by substantial evidence.

> 2. *Commerce's Finding that a "Particular Market Situation"*
> *Distorted Korean Prices for Steel Materials Was Not Based on*
> *Substantial Evidence on the Record in This Proceeding*

Commerce's final determination in the third WLP review, nevertheless, claimed that the "extensive amount of information, both qualitative and quantitative, placed on the record of this review" is different from the previous reviews thereby "satisfying any concern of the substantial evidence and reasonableness" of Commerce's PMS finding.[13] However, an examination of the evidence on the record of this review demonstrates that the evidence suffers from the same deficiencies that the Court identified in *WLP2*, and does not support the conclusion that any of the four factors created a PMS for HRC in Korea.

---

[12] *See Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1362-63 (Ct. Int'l Trade 2020) (hereinafter "*Husteel II*").

[13] Final I&D Memo at 17 (PR-854).

      *a.   Record Evidence Does Not Support a Conclusion*
           *that Purported Subsidies by the Korean Government*
           *Distorted Hot-Rolled Coil Prices During the Review Period*

Commerce's Final I&D Memorandum in the third WLP review provided the

following justification for its finding that subsidies to Korean HRC producers contributed

to the alleged PMS:

> The record evidence shows that the Korean government subsidized
> HRC, the primary input into WLP production, and that the mandatory
> respondents purchased HRC from entities receiving these subsidies,
> including POSCO.  Further, record evidence shows that HRC
> constitutes a substantial proportion of the cost of WLP production;
> thus, distortions in the HRC market have a significant impact on the
> COP for WLP.[14]

Beyond that conclusory declaration, however, Commerce provided no explanation

regarding the level of the alleged subsidies, and it also failed to explain how the alleged

subsidies might have had any meaningful impact on the prices for HRC in Korea during

the review period.

In the present review, these omissions are significant, because evidence on the record

showed that the alleged Korean government subsidies for HRC during the review period

were less than 1.0 percent.[15]  At such levels, it is implausible that any Korean government

subsidies could have had a noticeable impact on the pricing of HRC in the marketplace as a

whole or to the Plaintiffs in this proceeding.

---

[14] Final I&D Memo at 18 (PR-854).

[15] *See* SeAH's March 11, 2020, Case Brief at 7-8 (explaining that the most relevant
subsidy rate for POSCO was 0.54 percent based on the 2016 review of the countervailing
duty order on Hot-Rolled Coil from Korea) (PR-825, CR-472).  *See also Certain Hot-
Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing
Duty Administrative Review, 2017*, 85 Fed. Reg. 64122 (Oct. 9, 2020) (finding a 0.51
percent subsidy rate for the mandatory respondent, Hyundai Steel Co., Ltd.).

Furthermore, this Court has previously rejected Commerce's contention that the much higher adverse-facts-available subsidy rates found in prior reviews could justify a PMS finding.  As this Court explained in *WLP2*, Commerce's reliance on "dated CVD findings and calculations that resulted in subsidy rates, based on total adverse facts available with an adverse inference ("AFA"), and which Commerce has since reduced significantly, to corroborate its finding that government subsidies distort HRC costs in the Korean market during the POR" is not reasonable and does not support a finding of a PMS.[16]

> b.  *Commerce's Claim that Imports from China Depressed Korean Market Prices for Hot-Rolled Coil during the Review Period Is Not Supported by Substantial Evidence*

Commerce's Final Determination also asserted that alleged overcapacity in the Chinese steel industry had led to imports of Chinese HRC into Korea, driving down Korean HRC prices:

> {A}s a result of the significant overcapacity in Chinese steel production, … the Korean steel market has been sharply impacted by imports of cheap Chinese steel products, placing downward pressure on Korean domestic steel prices.  Specifically, there is evidence on the record of this proceeding that Korea is one of the top two destinations of Chinese exports of hot-rolled steel, and import prices of HRC from China have generally been significantly lower than they are from the rest of the world.  This situation distorts the Korean market prices of HRC….[17]

However, as this Court held in *WLP2*, "import data that demonstrates Korea receives the largest volume of Chinese steel exports, creating downward pressure on Korean domestic

---

[16] *See Husteel II* at 1362-63.

[17] Final I&D Memo, at 18 (PR-854).

steel prices… does not explain how this global phenomenon prevents a proper comparison between normal value and export price (or constructed export price)."[18]

Indeed, the available evidence demonstrates that Korean steel prices were not driven to below-cost levels by Chinese imports.  For example, the evidence showed that prices of imported and domestic HRC in the Korean market were not depressed when compared with previous years and with several well established and reliable global benchmark prices.[19]  From 2016 to 2017, the average unit values of Korean imports under the relevant tariff classification *increased* by 36.2 percent from $397.72 per metric ton to $541.54 per metric ton.[20]  From 2017 to 2018, the average unit values of Korean imports under that tariff classification *increased* again by 15.3 percent from $541.54 per metric ton to $624.20 per metric ton.[21]  And over the same period, total Korean import volumes of hot-rolled steel decreased.[22]  According to the Korean producer POSCO, its average selling

---

[18] *See Hansteel II* at 1362-63.

[19] *See* Hyundai Steel's Pre-Preliminary Comments at 6 (PR-791).  *See also* Hyundai Steel's August 13, 2019, PMS Rebuttal Comments, Attachment E at 7 (PR-741, CR-384-392).

[20] *See* Hyundai Steel's PMS Rebuttal Comments at Attachment H.3 (Korean AUVs for HS #7208 from Comtrade) (PR-744, CR-384-392).

[21] *Id*. (PR-744, CR-384-392).

[22] *See* DIPs' June 25, 2019, PMS Allegation at Exhibit 42 containing excerpts from the PMS allegation in the 2017-18 review of *Heavy-Walled Rectangular Pipes and Tubes from Korea* including Exhibits 113 and 115 (showing that China's exports of HR products to Korea declined from 3,524,488 metric tons in 2017 to 1,872,576 metric tons in 2018, or by 49.9 percent); Exhibit 114 (showing that Korea's imports of HRC products from China declined from 3,430,993 net tons in 2017 to 2,002,084 net tons in 2018, or by 41.7 percent); Exhibit 116 (showing that Korea's imports of HR products from China declined from 3,112,576 metric tons in 2017 to 1,816,279 metric tons in 2018, or by 41.7 percent); and Exhibit 117 (showing that total imports of HRC and HR plate from all sources declined from 4,563 thousand metric tons in 2017 to 3,098 thousand metric tons in 2018,

*(footnote continued on following page)*

prices for carbon steel products were 22 percent higher in 2017 than they had been in 2016.
In 2018, POSCO's average selling prices were higher still.[23]  More generally, POSCO has
reported increasing gross profits and operating profits in every year from 2014 to 2018 —
despite fluctuations in Chinese and global capacity utilization over that period.[24]  In short,
the evidence does not support Commerce's finding that HRC prices in Korea were
distorted by the impact of imports from China.

        c.    *There Is No Evidence of Strategic Alliances*
            *between Korean Coil and WLP Manufacturers*

    Commerce also claimed that its PMS finding was supported by evidence of "strategic
alliances" in the Korean steel industry.  However, Commerce did not identify *any* specific
alliances that were affecting the cost of HRC in Korea during the review period, or that any
such alliances involved the Plaintiffs in this proceeding.  The only example of non-
competitive behavior referenced in Commerce's Final I&D Memorandum was an alleged
bid-rigging scheme by Korean pipe producers on their sales of pipe products (not the hot-
rolled steel coils used in the production of WLP) to a Korean gas company.  SeAH has

---

*(footnote continued from previous page)*
or by 32.1 percent, with corresponding declines of 53 percent from China and 21 percent
from Japan over this period) (PR-301, CR-110-322).

[23] According to POSCO's earning announcements, the average selling price for carbon
steel products was 606,000 Korean Won per metric tons in 2015, 566,000 Korean Won per
metric ton in 2016, 691,000 Korean Won per metric ton in 2017, and 733,000 Korean Won
per metric ton in 2018.  *See* DIPs' June 25, 2019, PMS Allegation at Exhibit 42 containing
excerpts from the PMS allegation in the 2017-18 review of *Heavy-Walled Rectangular
Pipes and Tubes from Korea* including Exhibit 120 at 3 and Exhibit 121 at 5. (PR-301,
CR-110-322).

[24] *See* SeAH's August 12, 2019, PMS Rebuttal, Appendix 7 (PR-727, CR-356); DIPs' June
25, 2019, PMS Allegation at Exhibit 42 containing excerpts from the PMS allegation in the
2017-18 review of *Heavy-Walled Rectangular Pipes and Tubes from Korea* including
Exhibits 121 and 125. (PR-301, CR-110-322).

explained that it believes that the finding of bid-rigging for line-pipe sales was actually a misunderstanding by the relevant Korean government agency.[25]  But, for purposes of the assessment of Commerce's PMS finding, the critical fact is that the alleged finding of bid-rigging relates to bidding practices that ended in *January 2013* — more than four years before the start of the review period at issue in this appeal.[26]

In its Final Determination, Commerce appeared to recognize that there was no actual evidence to support a conclusion that "strategic alliances" among Korean companies during the period that would have resulted in distortions to HRC prices.  In this regard, Commerce's discussion of strategic alliance was replete with speculative phrases, such as "consistent with our conclusion that strategic alliances and price fixing schemes have created distortions in the prices of HRC in the past and *may continue to impact HRC pricing in a distortive manner* during the instant POR and in the future."[27]

In these circumstances, there was no basis for any finding that alleged "strategic alliances" contributed to a PMS affecting Korean HRC prices.  As this Court explained in *WLP2*, "{t}hese findings {of strategic alliances} are dated and bear no discernible relation to HRC costs during the POR."[28]

---

[25] *See* SeAH's Case Brief at 8, n. 17 (PR-825, CR-472).

[26] Final I&D Memo at 20 (PR-854).

[27] *Id*. (PR-854).

[28] *See Husteel II* at 1362-63.

>    d.   *There Is No Evidence that "Distortive Government Control*
>         *Over Electricity Prices in Korea" Contributed to a PMS*
>         *Involving Hot-Rolled Coil During the Review Period*

Commerce's determination also asserted that its finding of a "particular market situation" with respect to Korean HRC prices was supported by evidence that KEPCO, the Korean state-owned electricity supplier, experienced a loss in 2018.[29]  However, the evidence demonstrates that KEPCO was consistently profitable from at least 2014 to 2017.[30]  The evidence therefore confirms that there has *not* been a consistent Korean-government program to supply electricity to Korean consumers at below-cost prices.

Commerce has asserted in other cases that the crisis in steel prices was at its worst in 2015, and that prices have rebounded since then.[31]  Yet the evidence shows that KEPCO sold electricity at a profit in 2015 and again in 2016 and 2017.[32]  Once more, if the Korean government had intended to subsidize the steel industry with subsidies (in the form of below-cost electricity pricing) to combat low-priced imports from China, then KEPCO should have experienced its greatest losses in 2015, at the height of the alleged steel overcapacity crisis.  Yet the evidence shows that KEPCO was profitable then, and only incurred a loss after the overcapacity crisis had largely passed.  The absence of any correlation between KEPCO's profitability and the alleged steel overcapacity crisis

---

[29] Final I&D Memo at 20 (PR-854).

[30] *Id.  See also See* DIPs' June 25, 2019, PMS Allegation at Exhibit 38 containing excerpts from the PMS allegation in the 2017-18 review of *Heavy-Walled Rectangular Pipes and Tubes from Korea* including Exhibit 133 at 2-3 (PR-301, CR-110-322).

[31] *See, e.g.*, PMS Memorandum in the 2017-18 Review of Oil Country Tubular Goods from Korea at 15 (Now. 8, 2019) ("...the record shows that although during the POR world steel prices for flat products (which includes HRC) increased from a ten-year record low point achieved in 2015...").

[32] *See also* SeAH's Case Brief at n. 23 (PR-825, CR-472).

confirms that the Korean electricity prices were not adjusted to allow Korean producers to compete with imports.

Finally, Commerce has reviewed the Korean electricity-pricing scheme on numerous occasions and has found that electricity prices are established in Korea in a manner "consistent with market principles."[33]   And, perhaps most importantly, there is no evidence showing that alleged electricity subsidies (if they existed) were passed through by Korean steel producers to their HRC customers in the form of lower prices.   Accordingly, just as in *WLP2*, the record fails to "explain or support the claim that the purported government control places a downward pressure on electricity prices or otherwise renders HRC costs outside the ordinary course of trade."[34]   In such circumstances, there is no basis for concluding that alleged electricity subsidies interacted with the other factors Commerce has identified that distort the price for HRC in the Korean market.

> e.   *"Cumulative Analysis" Cannot Be Used to Circumvent Meaningful Review of the Sufficiency of the Record*

It is clear that Commerce failed to demonstrate that *any* of the four factors in the PMS allegation created a PMS involving HRC in Korea during the review period.   Instead, Commerce simply asserted that the "cumulative effect" of these factors or the "totality of circumstances in the marketplace" resulted in the creation of a PMS involving HRC in Korea during the review period.   Moreover, Commerce provided no guidance or insight as to how these four factors might have combined to suddenly create a PMS out of thin air.

---

[33] *See Certain Hot-Rolled Steel Flat Products from Korea: Final Results of the Administrative Review of the Countervailing Duty Administrative review; 2017*, 85 Fed. Reg. 64122 (Oct. 9, 2020) and accompanying Issues & Decision Memorandum at cmt.1 (hereinafter "Hot-Rolled Steel 2017 I&D Memo").

[34] *See Husteel II* at 1362-63.

As the Court explained in *WLP1*, "Although Commerce may rely on the cumulative effect of multiple distortions to arrive at a PMS determination, *it cannot use that phrase to circumvent a meaningful review of the sufficiency of the record*."[35]  In this regard, a "meaningful" review of the records leads to only one conclusion:  The record does not contain substantial evidence supporting a finding that any of the factors identified by Commerce (whether considered individually or on a combined basis) created a PMS for HRC in Korea during the third WLP review period.

C.   *Commerce Failed to Evaluate Whether Hot-Rolled Coil Prices in Korea During the Review Period Reflected the Cost of Production of that Input in the Ordinary Course of Trade*

Paragraph (1) of the statutory definition of "constructed value" requires Commerce to include in its calculations "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade."[36]  The 2015 amendments to the antidumping statute then added the following additional instruction to the statutory definition:

> For purposes of paragraph (1), if a particular market situation exists *such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade,* the administering authority may use another calculation methodology under this part or any other calculation methodology.[37]

---

[35] *Husteel I*, 426 F. Supp. 3d 1376 at 1391-92 (*emphasis added*).

[36] 19 U.S.C. § 1677b(e)(1).

[37] 19 U.S.C. § 1677b(e) (*emphasis added*).

By its terms, this provision applies only where, as a result of a "particular market situation," the cost of materials and other inputs "does not accurately reflect the cost of production in the ordinary course of trade."

In this case, Commerce did not make a finding of the "cost of production in the ordinary course of trade" for HRC.  And, it did not make a finding that the prices for HRC in Korea — whether considered on an aggregate country-wide basis or on an individual, company-specific basis — did not accurately reflect those costs.  Instead, Commerce took the position that the mere finding that a PMS "distorted" coil prices was sufficient to satisfy the statutory requirement.[38]  That position is, of course, flatly contrary to the statutory language, which permits an adjustment to constructed value only when a PMS exists "*such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade.*"

In order to give meaning to this statutory language, Commerce is required to make findings as to (1) what the cost of production for the input might be in the ordinary course of trade, and (2) whether the cost of materials and fabrication or other processing for producers of subject merchandise does or does not reflect that cost.  Commerce made no such findings in this review, either on a company-specific or country-wide basis.  Consequently, even if Commerce had properly found that a PMS existed with respect to Korean HRC prices, it was not permitted to make an adjustment to respondents' costs.

---

[38] Final I&D Memo at 19-20 (PR-854).

D.  *Commerce's Regression-Based
     PMS Adjustment Is Not Reasonable or
     Consistent with Substantial Evidence*

In past reviews involving WLP and other products, Commerce made its adjustment

for the alleged "particular market situation" affecting hot-rolled-coil prices in Korea based

on the subsidy rates found for POSCO and Hyundai Steel in the original countervailing

duty investigation of *Hot-Rolled Coil from Korea* — rates that were inflated by the

application of adverse facts available.  However, Commerce has subsequently found that

the actual subsidy rates for POSCO and Hyundai Steel were insignificant.[39]  Rather than

apply what would be an insignificant PMS adjustment under its old methodology,

Commerce changed course in this review in a flawed effort to justify a much larger PMS

adjustment.

In particular, Commerce disregarded the actual subsidy rates found for Korean

producers of HRC, and instead based the PMS adjustment in this review on a regression

analysis created and submitted by the Domestic Interested Parties ("DIPs") that purported

to allow Commerce to estimate what Korean steel prices "would have been" in 2017 under

the counterfactual assumption that global steel producers operated collectively at an 80

percent capacity utilization level.  Using this methodology, Commerce calculated that

Korean steel prices should have been 25.62 percent higher than they were, and it therefore

increased Plaintiffs' costs to reflect such an increase.[40]  However, as discussed below, the

---

[39] *See, e.g.*, SeAH's Case Brief at 33-34 (PR-825, CR-472); *see also Certain Hot-Rolled
Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty
Administrative Review, 2016*, 84 Fed. Reg. 28467 (June 19, 2019) (finding a 0.54 percent
subsidy rate for POSCO) and *Certain Hot-Rolled Steel Flat Products from the Republic of
Korea: Final Results of Countervailing Duty Administrative Review, 2017*, 85 Fed. Reg.
64122 (Oct. 9, 2020) (finding a 0.51 percent subsidy rate for Hyundai Steel Co., Ltd.).

[40] *See* Final I&D Memo at 41 (PR-854).

regression analysis that Commerce relied upon is mathematically flawed and contrary to the evidence in this case.

### 1. Unrebutted Expert Testimony Indicate that Commerce's Regression Analysis Is Invalid

The DIPs submitted their regression analysis, and Commerce adopted it, without *any* experts attesting to the validity of the DIPs' approach. By contrast, respondents submitted a report critiquing DIPs' regression model by an expert on statistical analysis. In that report, Michael Northeim, a financial analyst with a degree in data analytics, concluded that:

> The DIPs' OLS model, which purports to predict import AUVs over time for HRS, contains multiple issues that undermine the validity and reliability of the results. These issues involve a number of the model's key assumptions and can be identified and evaluated using a variety of statistical testing methods.
>
> Based on my investigation, I conclude that the analysis presented by the DIPs in Exhibit 67 of their April 5, 2019 submission does not represent an appropriate statistical analysis and cannot be expected to provide reliable estimates concerning the pricing behavior that it was designed to predict. Because many of the key assumptions for an OLS model are not met, the model they have presented is not valid and no statistically-meaningful conclusions can be drawn from it. Because of these problems, it would be inappropriate to use the model to estimate the average unit value for imports of hot-rolled steel into Korea.[41]

By contrast, the record is devoid of a single expert statement endorsing DIPs' regression methodology. Commerce's decision to rely on DIPs' regression analysis in the face of clear expert opinion is inexplicable and unlawful.[42]

---

[41] Michael Northeim, "Investigating the Validity of OLS For Predicting AUV: 2008 – 2017 Korea Import AUV," at 5 (provided in Appendix 11 of SeAH's August 12, 2019, PMS Rebuttal) (hereinafter referred to as the "Northeim Report") (PR-727, CR-356).

[42] *See Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must fairly take into account whatever in the record detracts from its weight.").

> 2. *The Record Evidence Demonstrates that the Purported*
> *Relationship between Steel Prices and Unused Capacity*
> *Is Not Stable Over Time and Therefore Cannot Be*
> *Used to Predict Counterfactual Prices*

The regression analysis proposed by DIPs and adopted by Commerce is necessarily based on the assumption that there is a consistent relationship between steel prices (as measured by average unit import values ("AUVs")) on the one hand and the proposed "explanatory variables" (uneconomic capacity, iron ore, scrap, exchange rates, gross fixed capital formation, and aluminum) on the other.  In particular, DIPs and Commerce assume that steel prices (i.e., AUVs) at any point in time can be calculated using the following formula:

$$\text{AUV} = \text{Uneconomic Capacity}^{\beta_1} \times \text{Iron Ore}^{\beta_2} \times \text{Scrap}^{\beta_3} \times$$
$$\text{Exchange Rate}^{\beta_4} \times \text{Gross Fixed Capital Formation}^{\beta_5} \times$$
$$\text{Aluminum}^{\beta_6} \times e^{\beta_0 + \alpha_i + \varepsilon_{i,t}}$$

In this formula, the various *betas* (*i.e.*, $\beta_0$, $\beta_1$, $\beta_2$, $\beta_3$, $\beta_4$, $\beta_5$, and $\beta_6$) are coefficients that are estimated using the regression analysis.[43]  In their regression, DIPs and Commerce have taken the values for AUVs and for each of the explanatory variables over the period from 2008 to 2017 and calculated the *betas* for each variable that would best fit the data.  They

---

[43] DIPs specified its formula as a "log-log" formula that set the logarithm of steel prices equal to the sum of each coefficient multiplied by the logarithm of the corresponding variable.  As a mathematical matter, their log-log formula can be restated as the non-logarithmic formula stated above by taking the anti-logarithm of each side of DIPs' equation.

Significantly, because the regression model multiplies the variables together, it does not consider the separate impact on AUVs of the various explanatory variables they have identified (*i.e.*, uneconomic capacity, iron ore, scrap, exchange rates, gross fixed capital formation, and aluminum).  Instead, the regression only considers the impact on AUVs of the *interaction* of all the explanatory variables together by multiplying all of the explanatory variables together.  Such a model is contrary to common statistical practice, as reflected in the "hierarchical principle."  Commerce has not offered any justification for this departure from normal statistical practices.

have then replaced the actual "uneconomic capacity" value for 2017 with a hypothetical figure calculated under an assumed 80-percent level of capacity utilization. And then, they have recalculated the value of the AUV for 2017 based on that hypothetical "uneconomic capacity" figure, the actual values for other explanatory variables, and the previously-calculated *betas.*

Such an analysis can be appropriate, however, only if there is a stable relationship between steel prices (that is, AUVs) and the explanatory variables.[44] If the relationship between steel prices and the explanatory variables is not stable, then there is no basis for assuming that the "average" coefficients calculated for the entire 2008-to-2017 period provide a reasonable estimate of the relationship between steel prices and the explanatory variables in 2017, or for using such coefficients to predict what steel prices would have been in a hypothetical 2017 situation in which capacity utilization was higher than it actually was.

In this case, the data demonstrates that the relationship between steel prices and the purported "explanatory" variables was not stable over time. Instead, the coefficients for key variables in the model (such as Uneconomic Capacity and Iron Ore) varied both in magnitude *and in sign* when calculated for different time-periods. A summary of the variations in the coefficients for two key variables — uneconomic capacity and iron ore prices — when analyzed over different time periods is set forth below.[45]

---

[44] *See, e.g.*, T. Mills, ANALYSING ECONOMIC DATA: A CONCISE INTRODUCTION (2013), at 244 (provided in Appendix 12-G SeAH's August 12, 2019, PMS Rebuttal) (PR-727, CR-366-367).

[45] *See* Northeim Report at 11 (PR-727, CR-356).

| Regression Period | Uneconomic Capacity Coefficient | Iron Ore Price Coefficient |
|---|---|---|
| 2008-12 | | |
| 2009-13 | | |
| 2010-14 | | |
| 2011-15 | | |
| 2012-16 | | |
| 2013-17 | | |

According to these results, when DIPs' model is run using the data for the 2008-to-2012 and 2009-2013 periods, the coefficients indicate that a small *increase* in capacity utilization would have massively *increased* steel prices, while a small *increase* in iron ore prices would have massively *reduced* steel prices.  By contrast, when DIPs' model is run using the data for the 2010-to-2014 and 2011-to-2015 periods, the coefficients indicate that a small *increase* in capacity utilization would have slightly *reduced* steel prices, while a small *increase* in iron ore prices would have resulted in a slight *increase* in reduced steel prices.  And, when DIPs' model is run using the data for the 2012-to-2016 and 2013-to-2017 periods, the coefficients indicate that a small *increase* in capacity utilization or iron ore prices would result in a slight *increase* in steel prices.

The inconsistencies in the results generated by Commerce's regression methodology using different time periods become even more glaring when Commerce's model is used to project 2017 steel prices under the counterfactual assumption that capacity utilization should be 80 percent.  The following table summarizes the results.[46]

---

[46] These figures were calculate using the coefficients generated for each time period, as set forth at page 11 of the Northeim report, the actual 2017 values for all "explanatory" variables other than uneconomic capacity, and a counterfactual assumption of "uneconomic capacity" of 394.86 million tons.  *See* Final I&D Memo at 41 (PR-854).

PUBLIC VERSION

| Regression Period Used to Determine Coefficients | Estimated 2017 AUV (in USD/ton) at Counterfactual 80-Percent Capacity Utilization | Percentage Difference from Actual 2017 AUV |
|---|---|---|
| 2008-12 | 2,086,388,383.21 | 385269387.61% |
| 2009-13 | 206,644,837.11 | 38158639.36% |
| 2010-14 | 533.59 | -1.47% |
| 2011-15 | 664.36 | 22.68% |
| 2012-16 | 522.33 | -3.55% |
| 2013-17 | 423.64 | -21.77% |

As this calculation demonstrates, the regression model proposed by DIPs and adopted by Commerce generates absurd results when the coefficients are calculated from the 2008-to-2012 data or the 2009-to-2013 data.  Use of coefficients for later periods generate less absurd results.  Significantly, use of coefficients derived from the most recent period (2013-to-2017) suggests that steel prices at the proposed 80-percent capacity utilization level would have been *lower* than the actual 2017 prices — which means that any PMS adjustment should have *reduced respondents' costs*.

In short, an analysis of the data confirms that, to the extent that there really is a relationship between steel prices and the "explanatory" variables, that relationship is not stable over time.  As a matter of basic statistical principles, this instability means that the regression analysis cannot be used to predict what steel prices "should have been" in 2017, because there is no reason to expect the coefficients calculated from a regression over a previous time period to match the actual relationship between steel prices and the explanatory variables in 2017.

3.   *Because Nearly All of the Review Period
     Falls within 2018, Use of an Adjustment to
     Hot-Rolled Coil Costs Based Solely on an
     Analysis of 2017 Prices Is Inappropriate*

The PMS adjustment Commerce applied was based on a comparison of the actual

AUVs for 2017 to the AUVs predicted for 2017 using the regression model under the

counter-factual assumption of 80 percent capacity utilization.  However, the review period

at issue in this proceeding runs from December 2017 to November 2018.  Only one month

of the period falls within 2017.  Eleven months — or over 90 percent of the total period —

falls within 2018.  In such circumstances, the use of an adjustment calculated based solely

on 2017 data is plainly inappropriate.

In its final determination, Commerce asserted that basing the adjustment on the

difference between actual and estimated 2018 prices was not appropriate, because calendar

year 2018 includes data subsequent to the review period and, therefore, does not reflect the

cost of goods sold during the review period.[47]  But the review period in this case ran from

December 2017 to November 2018.  Using calendar-year 2017 data therefore only

included one month of data from within the review period, and eleven months of data

outside the review period.  By contrast, the calendar-year 2018 data included eleven

months of data from within the review period, and only one month of data outside the

period.  In such circumstances, Commerce's insistence on using data that applied to one

month of the review period is plainly unreasonable.  And, given the sensitivity of

regression results to the time period included in the analysis, the exclusion of data for most

of the review period from the analysis is likely to distort the estimates of that HRC prices

---

[47] *See* Final I&D Memo at 37 (PR-854).

might have been during the review period if uneconomic capacity levels had been different.

4.   *If the Court Does Not Invalidate the Regression Model to Calculate a PMS Adjustment, It Should Require Commerce to use the Regression Results for the Period that Provides the Best Fit with the Data*

As discussed above, DIPs' regression model generates vastly different coefficients when run over different time periods, and thus fails basic validation. Nevertheless, in its Final Determination, Commerce asserted that the coefficients generated based on an analysis of the full 2008-17 data set should be preferred, because that analysis covers an adequate amount of data.[48] That claim is, however, misguided.

If the model is well-specified, then the enormous fluctuations in coefficients over different time periods means that the relationships among the variables identified in the model must have varied over time. In such circumstances, the analysis of the most recent period should be preferred, because the relationships during the most recent period are most likely to correspond to the relationships in the present. The evidence in this case shows that AUVs and uneconomic capacity had a very different relationship during the 2008-09 period than they did during later periods. Since Commerce has proposed to estimate what AUVs would have been during 2017 under counter-factual assumptions, the unusual relationship between AUVs and uneconomic capacity during 2008-09 is simply irrelevant.

Furthermore, normal statistical measures indicate that the coefficients generated by an analysis of the more recent periods — and, in particular, the coefficients generated by analysis of the 2013-17 data — are more accurate than those generated for the full 2008-17

---

[48] *Id.* at 36 (PR-854).

period.[49]  Accordingly, in the event that Commerce is not prevented from relying on this

regression model on remand, the Court should direct Commerce to use the data for the

period from 2013 to 2017 in calculating its PMS adjustment on remand.

E.    *Commerce's Improperly Refused to Make a*
      *"CEP Offset" Adjustment when Calculating*
      *SeAH's Dumping Margin Was Unlawful*

In its Final Determination, Commerce refused to include a constructed export price

("CEP") offset in its calculation of SeAH's normal value.[50]  Commerce asserted "that the

selling functions SeAH performed for its home market customers are at the same or similar

stage of distribution as those performed by SeAH for sales to its U.S. affiliate."[51]  To

justify that position, Commerce asserted that, while "the selling functions SeAH performed

for its home market and U.S. sales are not identical, we disagree that the few additional

activities SeAH performed to make its home market sales were so significant that SeAH's

home market LOT constitutes a different marketing stage."[52]  However, mere assertion

does not constitute substantial evidence.[53]  And the evidence on the record clearly

demonstrates that SeAH's home-market and U.S. sales were made at different levels of

trade.

---

[49] *See* SeAH's Case Brief at 33-34 (PR-825, CR-472).

[50] *See* Final I&D Memo at cmt. 3 (PR-854).

[51] *Id* at 58 (PR-854).

[52] *Id*. (PR-854).

[53] *See Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938) ("Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

As Commerce noted, the determination whether a CEP offset was appropriate had to be based on a comparison of the activities performed by SeAH for U.S. sales at the "constructed" level of trade for sales from SeAH to its U.S. affiliate PPA with the activities performed by SeAH for home-market sales at the level of SeAH's to unaffiliated customers in Korea.[54]   And, the unrefuted evidence demonstrated  that the constructed level of SeAH's U.S. sales was much less advanced than the actual level of the home-market sales that were used to establish normal value, and that a CEP offset was therefore appropriate.   As SeAH's initial Section A response explained:

> As shown in Appendix A-5, the activities performed by SeAH Steel in connection with its home-market sales are greater in scope and intensity than the activities it performed in connection with U.S. sales of Line Pipe.  By the same token, SeAH Steel's U.S. affiliate PPA performs functions (such as negotiating with customers, processing sales documentation, invoicing customers, collecting payment, and maintaining contact with customers) that are normally performed by SeAH Steel on its home-market sales of products in the same general category of merchandise.  Consequently, the constructed level of trade for the SeAH Steel to PPA is much less advanced than the level of trade of those home-market sales. A level-of-trade adjustment would, therefore, be appropriate, under the "constructed-export-price offset" provision of the statute, to account for the differences between the level of trade of home-market sales and the constructed level of trade of the U.S. sales.[55]

Furthermore, the supporting information submitted by SeAH demonstrated that SeAH performed additional activities and at much greater intensity on its sales to unaffiliated customers in Korea compared to its sales to PPA in the United States.[56]   Specifically, the record indicates that SeAH performed training to distributors and dealers, discount

---

[54] *See also* 19 C.F.R. § 351.412(c).

[55] *See* SeAH's April 29, 2019, Section A Response at 24 (PR-35-36, CR-5).

[56] *Id*. (PR-35-36, CR-5).

processing, and (pre- and post-sale) warehousing activities for its home-market sales.[57]  By contrast, SeAH did not perform any of those activities for its U.S. sales to PPA.[58]

In addition, the record demonstrates that SeAH performed sales forecasting, market research, strategic planning, marketing support, sales negotiation, order processing, invoicing, and customer payment processing activities at the *maximum level of intensity* for home-market sales.[59]  By contrast, SeAH performed a minimal level of those services for its sales to PPA, precisely because PPA is largely responsible for performing those activities for U.S. sales to unaffiliated customers.[60]  Therefore, Commerce's assertion that the submitted information "does not demonstrate that there were significant differences in the selling functions performed for {SeAH's} home market and U.S. sales" is wholly-unsupported by record evidence.[61]

Finally, it should be noted that Commerce considered the activities performed by SeAH at the relevant levels of trade in its investigation of *Large Diameter Welded Pipe* from Korea.  In that investigation, Commerce found that the selling functions performed by SeAH for its home-market customers were performed at a significantly higher degree and intensity compared to the activities performed at the constructed level of its U.S. sales to PPA.  Commerce therefore granted a CEP offset in its calculation of normal value based

---

[57] *Id*. at Appendix A-5-A (PR-36, CR-7).

[58] *Id*.

[59] *See id.* at Appendices A-5-A and A-5-B (PR-36, CR-7).

[60] *See id.* at Appendix A-5-A and A-5-C (PR-36, CR-7-8).  *See also* Appendix A-5-D (Documentation showing how PPA's forecasts are adopted by SeAH without additional analysis) (PR-36, CR-8).

[61] Final I&D Memo at 58 (PR-854).

on SeAH's home-market sales in that investigation.[62]  The determinative facts in *Large Diameter Welded Pipe* were virtually identical to the facts on the record of this case — SeAH made home-market and U.S. sales through the same distribution channels, and performed the same selling functions on home-market and U.S. sales in both the third WLP review and in the *Large Diameter Welded Pipe* investigation.[63]

Commerce nevertheless claimed that its determination in the *Large Diameter Welded Pipe* case was distinguishable, because the selling functions categories Commerce considered in that investigation were different from the categories considered in the third WLP review.[64]  But the changes in Commerce's categorization does not change the underlying facts about the types and intensity of the selling activities performed by SeAH on its home-market and U.S. sales.  The evidence is undisputable that the types and intensities of those activities were largely identical in both cases.[65]  Furthermore, even under the "new" categories Commerce used in this case, the record demonstrates that SeAH performed activities for its home-market sales at significant levels of intensity in four of the five categories (*i.e.*, provision of sales support, training services, logistical services, and sales-related administrative activities) that it did not perform for its U.S. sales

---

[62] *See Large Diameter Welded Pipe from the Republic of Korea: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 Fed. Reg. 43651 (Aug. 27, 2018), and accompanying Decision Memorandum at 21.

[63] *Id*. at 20-21.

[64] Final I&D Memo at 58-59 (PR-854).

[65] *Compare* SeAH's April 29, 2019, Section A Response at Appendix A-5-A (PR-36, CR-7) *with* Large Diameter Welded Pipe from Korea Less-Than-Fair-Value Investigation Preliminary Decision Memorandum at 21.

to PPA and State Pipe.[66]  In these circumstances, there was no basis for Commerce to deviate from its previous treatment of SeAH.  The Court should, therefore, instruct Commerce to revise its calculations to include a CEP offset adjustment in its calculation of the dumping margins for SeAH.

### F.   Commerce Cannot Lawfully Cap the Adjustment for Freight Revenue that Exceeds Actual Freight Costs

During the review period, SeAH had some U.S. sales through its U.S. affiliate PPA for which the invoice listed separate amounts for (1) the price for the merchandise on an ex-works basis; and (2) the price for freight to the customer's location.  For this type of sale, PPA was responsible for arranging delivery to the customer (and paying any freight costs incurred), and thus could make a profit or loss on the freight portion of the transaction, depending on whether the invoice price for freight was greater than the actual cost of freight.[67]

Commerce's final determination included the full amount of the separately-invoiced freight revenue as part of the U.S. price in its calculations, as long as the freight revenue was less than or equal to the actual freight cost incurred for the transaction.  However, if the freight revenue was greater than the actual freight cost, Commerce's calculation of the U.S price only included the portion of the freight revenue equal to the freight cost. According to Commerce, any additional freight revenue above the freight cost was disregarded because it "do{es} not represent changes in the price for subject merchandise," and "it is inappropriate to increase the gross unit price for merchandise under consideration

---

[66] *See* Final I&D Memo at 59 n. 318 (PR-854).

[67] SeAH's Case Brief at 40-41 (PR-825, CR-472).

as a result of any profit earned by SeAH on the sale of freight."[68] Therefore, to achieve an "apples-apples" comparison between constructed export price and normal value, Commerce asserts that a freight revenue "cap" is necessary.[69]

But, the statute states that Commerce may deduct freight costs *only if* freight is *included in the price that Commerce uses as the starting point of its calculations.*[70]  That provision may give Commerce discretion to decide either (1) to include all freight revenue in the price and then deduct all freight costs from the price, or (2) to calculate the U.S. price without considering freight revenue or costs.  However, it does not permit Commerce to treat only a part of the freight revenue as part of the price, simply because the revenue exceeds the cost.

We recognize that this Court has previously held that Commerce is permitted to disregard separately-invoiced prices for sales of "services" in order to achieve an "apples-to-apples" comparison.[71]  But Commerce's methodology in this case did not disregard the sales of freight "services."

Instead, Commerce included some or all of the separately-invoiced freight revenue in its determination of the starting U.S. price (depending on whether there was a profit or loss

---

[68] Final I&D Memo at 51 (internal quotations omitted) (PR-854).

[69] *Id*. at 52 (PR-854).

[70] 19 U.S.C. § 1677a(c)(2)(A).

[71] *See NEXTEEL v. United States*, 355 F.Supp.3d 1336, 1359 (2019); *NEXTEEL* v. United States, 392 F.Supp.3d 1276, 1292 (2019); *Dongguan Sunrise Furniture v. United States*, 865 F. Supp. 2d 1216, 1249-50 (Ct. Int'l Trade 2012).

It should be noted that we have appealed the Court's decision on this issue in the appeal of the second review of *Oil Country Tubular Goods from Korea* to the Federal Circuit.  *See NEXTEEL Co., Ltd. v. United States*, appeal nos. 2021-1334, -1430.

on the freight portion of the transaction), and then deducted the actual freight cost from the U.S. price determined in that manner.  The result was to ignore profits earned on separately-invoiced freight charges, but to reduce the calculated U.S. price for any losses incurred on those charges.  In other words, Commerce included the separate sales of freight "services" in its U.S. price calculations only to the extent that doing so increased the dumping margins.  There is no collection of fruit that makes such disparate treatment fair. The Court should, therefore, instruct Commerce to treat all separately-invoiced freight charges on a consistent basis, either including all such charges in the price or excluding all such charges from the price, but not using a biased method that includes only a portion of those charges in the price in order to inflate dumping margins.

CONCLUSION

     For the foregoing reasons, we respectfully request that the Court grant SeAH's motion for judgment on the agency record, and remand this matter to Commerce for disposition in a manner consistent with the judgment of this Court.

                              Respectfully submitted,

                              /s/Jeffrey M. Winton

                              Jeffrey M. Winton
                               Michael J. Chapman
                               Amrietha Nellan
                               Vi N. Mai
                              WINTON & CHAPMAN PLLC
                              1900 L Street, N.W., Suite 611
                              Washington, D.C. 20036
                              (202) 774-5500

                              Attorney for SeAH Steel Corporation

May 24, 2021

CERTIFICATE OF COMPLIANCE


    Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 10,079 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.


                                      /s/Jeffrey M. Winton


May 24, 2021