IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| NEXTEEL CO., LTD., ET AL., | ) |
| | ) |
|       Plaintiff and Consolidated Plaintiffs, | ) ) ) |
| | ) |
|   and | ) |
| | ) |
| HUSTEEL CO., LTD., and HYUNDAI STEEL COMPANY, | ) ) |
| | ) |
|       Plaintiff-Intervenors, | ) |
| | ) |
|   v. | ) |
| | )    Consol. Ct. No. 20-03898 |
| UNITED STATES, | ) |
| | ) |
|       Defendant, | ) |
| | ) |
|   and | ) |
| | ) |
| CALIFORNIA STEEL INDUSTRIES, INC., ET AL., | ) ) |
| | ) |
|       Defendant-Intervenors and Consolidated Defendant-Intervenors. | ) ) |

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE JR.
Assistant Director

OF COUNSEL:                          ROBERT R. KIEPURA
REZA KARAMLOO                        Trial Attorney
Senior Counsel                       U.S. Department of Justice
Office of the Chief Counsel          Civil Division
for Trade Enforcement and Compliance Commercial Litigation Branch
U.S. Department of Commerce          P.O. Box 480, Ben Franklin Station
Washington, D.C.                     Washington, D.C. 20044
                                     Tel: (202) 305-4436
                                     Fax: (202) 353-0461
                                     Robert.Kiepura@usdoj.gov

September 22, 2021                    *Attorneys for Defendant United States*

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ....................................................................2

    I.     Administrative Determination Under Review........................................................2

    II.    Issues Presented For Review ...............................................................................2

STATEMENT OF FACTS ........................................................................................3

    I.     Particular Market Situation...................................................................................3

    II.    Additional Relevant Facts ....................................................................................6

SUMMARY OF THE ARGUMENT.............................................................................6

ARGUMENT .......................................................................................................8

    I.     Standard Of Review .............................................................................................8

    II.    Commerce's PMS Determination Comports With Section 1677b And Is
          Supported By Substantial Evidence ....................................................................9

          A.    Legal Framework....................................................................................9

          B.    Commerce's Interpretation Of Section 1677 Is Reasonable..................11

          C.    Commerce's Determination Of A PMS In Korea Is Reasonable.............14

               1.    GOK Subsidies On HRC............................................................15

               2.    Korean Imports Of HRC From China .........................................17

               3.    Strategic Alliances Between Korean HRC Suppliers And
                     WLP Producers ..........................................................................17

                4.    GOK Control Over The Electricity Market ................................18

                5.    This Court's Prior Decisions Do Not Dictate The Outcome
                     In This Case ...............................................................................20

    III.   Commerce's Use Of A Regression Model To Adjust For A PMS In
          Korea Is Supported By Substantial Evidence And In Accordance
          With Law.............................................................................................................21

           A.    Legal Framework....................................................................................21

|   | B. | The TPEA Amendments Permit Commerce To Address Distortions In Reported Costs Through Various Calculation Methodologies, Including Cost Adjustments | 23 |

|   | C. | Commerce's Regression Model Is A Reasonable Methodology For Quantifying The Impact Of A Particular Situation Market In Korea | 27 |

| IV. | Commerce Properly Adjusted NEXTEEL's Costs For Non-prime WLP | 33 |

| V. | Commerce's Decision To Include Suspension Loss Costs In NEXTEEL's G&A Expenses Is Reasonable | 35 |

| VI. | Commerce's Decision To Cap Freight Revenue In The Calculation Of SeAH's CEP Is Supported By Substantial Evidence And In Accordance With Law | 37 |

| VII. | Commerce's Determination To Deny SeAH A CEP Offset Is Supported By Substantial Evidence And In Accordance With Law | 39 |

|   | A. | Legal Framework | 39 |

|   | B. | Commerce Properly Determined That SeAH's Selling Functions Were At The Same Or Similar Level Of Trade And That No Offset Was Warranted | 41 |

| VIII. | Commerce's Calculation Of The Weighted-Average Dumping Margin Assigned To The Non-Selected Respondents Is Supported By Substantial Evidence And Otherwise Lawful | 45 |

|   | A. | Legal Framework | 45 |

|   | B. | The Weighted-Average Dumping Margin Commerce Assigned To The Non-Selected Respondents Is Consistent With The Statute And Agency Practice | 45 |

| CONCLUSION | | | 46 |

## TABLE OF AUTHORITES

**Cases**                                                                **Page(s)**

*Albemarle Corp. & Subsidiaries v. United States,*
    821 F.3d 1345 (Fed. Cir. 2016) ................................................................21

*Algoma Steel Corp. v. United States,*
    865 F.2d 240 (Fed. Cir. 1989) .........................................................20, 24

*Andaman Seafood Co., Ltd. v. United States,*
    768 F. Supp. 2d 1315 (Ct. Int'l Trade 2011) ....................................41

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ..................................................... 8

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) .......................................................*passim*

*Cleo Inc. v. United States,*
    501 F.3d 1291 (Fed. Cir. 2007) ..................................................... 8

*Consol. Edison Co. of N.Y. v. NLRB,*
    305 U.S. 197 (1938) ..................................................................... 8

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ..................................................................... 8

*Dillinger France S.A. v. United States,*
    981 F. 3d 1318 (Fed. Cir. 2020) ..................................................34, 35

*Dongguan Sunrise Furniture Co. v. United States,*
    865 F. Supp. 2d 1216 (Ct. Int'l Trade 2012) ..................... 37, 38, 39

*Dunn v. Commodity Futures Trading Comm'n,*
    519 U.S. 465 (1997) ....................................................................13

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ................................................*passim*

*Haixing Jingmei Chem. Prod. Sales Co. v. United States,*
    335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ...............................36

*Husteel Co., Ltd. v. United States,*
    426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ...........................*passim*

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992) ................................................................................................ 8

*IPSCO, Inc. v. United States*,
  965 F. 2d 1056 (Fed. Cir. 1992) ....................................................................... 3, 34

*JBF RAK LLC v. United States*,
  790 F.3d 1358 (Fed. Cir. 2015) ................................................................... 9, 23, 28

*Longkou Haimeng Mach. Co. v. United States*,
  581 F. Supp. 2d 1344 (Ct. Int'l Trade 2008) ................................................... 45, 46

*Micron Tech., Inc. v. United States*,
  243 F.3d 1301 (Fed. Cir. 2001) ............................................................................. 40

*NEXTEEL Co., Ltd. v. United States*,
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ..................................................*passim*

*NEXTEEL Co., Ltd. v. United States*,
  392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) ............................................. 20, 23, 37

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ............................................................................... 8

*Norfolk & W. Ry. Co. v. American Train Dispatchers' Ass'n*,
  499 U.S. 117 (1991) ............................................................................................... 26

*Pakfood Pub. Co. Ltd. v. United States*,
  724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ............................................. 39, 41, 44

*Saha Thai Steel Pipe Public Co., Ltd. v. United States*,
  422 F. Supp. 3d 1363 (Ct. Int'l Trade 2019) ......................................................... 24

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
  203 F. Supp. 3d 1327 (Ct. Int'l Trade Feb. 3, 2017).........................................*passim*

*SolarWorld Americas, Inc. v. United States*,
  353 F. Supp. 3d 1315 (Ct. Int'l Trade Nov. 13, 2018) ........................................... 33

*Sucocitrico Cutrale Ltda. v. United States*,
  2012 WL 2317764 (Ct. Int'l Trade 2012) .............................................................. 44

*Tianjin Tiancheng Pharm. Co. v. United States*,
  366 F. Supp. 2d 1246 (Ct. Int'l Trade 2005) ........................................................... 8

*Ticaret A.S. v. United States,*
   426 F. Supp. 3d 1395 (Ct. Int'l Trade 2020) ....................................................................24

*Timken Co. v. United States,*
   354 F.3d 1334 (Fed. Cir. 2004) ..................................................................... 9, 11, 26

*Timken Co. v. United States,*
   699 F. Supp. 300 (Ct. Int'l Trade 1988) ....................................................... 15, 36, 43

*Torrington Co. v. United States,*
   68 F.3d. 1347 (Fed. Cir. 1995) ..............................................................................21

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) .................................................................................... 9, 13, 26

**Statutes**

19 U.S.C. § 1673d(c)(5) ..........................................................................................45

19 U.S.C. § 1675(a)(2)(A) ......................................................................................... 9

19 U.S.C. § 1677 ....................................................................................... *passim*

Pub. L. No. 114-27 § 504 .........................................................................................10

**Regulations**

19 C.F.R. § 351.102(b) .............................................................................................22

19 C.F.R. § 351.401(c) .............................................................................................22

19 C.F.R. § 351.412 .................................................................................... 40, 41, 44

*Acetone from the Republic of Korea,*
   85 Fed. Reg. 8,252 (Dep't of Commerce Feb. 13, 2020) ......................................36

*Antidumping Duties; Countervailing Duties,*
   62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) ....................................40

*Biodiesel from Argentina,*
   83 Fed. Reg. 8,837 (Mar. 1, 2018) .......................................................................14

*Biodiesel from Indonesia,*
   83 Fed. Reg. 8,835 (Mar. 1, 2018) .......................................................................14

*Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders,*
   81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016) ......................................................16

*Certain Oil Country Tubular Goods from the Republic of Korea,*
   82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017)....................................................27

*Circular Welded Carbon Steel Standard Pipe and Tube Products From Turkey; 2017-2018,*
   85 Fed. Reg. 3,616 (Dep't of Commerce Jan. 22, 2020) ......................................................30

*Circular Welded Non-Alloy Steel Pipe From the Republic of Korea,*
   83 Fed. Reg. 27,541 (Dep't of Commerce Jun. 13, 2018) ....................................................27

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Affirmative Determination,*
   81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) ...................................................16

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
   84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019) ...................................................... 3

*Large Diameter Welded Pipe from the Republic of Korea,*
   84 Fed. Reg. 6,374 (Dep't of Commerce February 27, 2019) ..............................................19

*Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings,*
   81 Fed. Reg. 15,641 (Dep't of Commerce Mar. 24, 2016) ...................................................23

*Steel Concrete Reinforcing Bar from Mexico,*
   82 Fed. Reg. 27,233 (Dep't of Commerce June 14, 2017) ...................................................33

*Welded Line Pipe From Korea,*
   85 Fed. Reg. 7,269 (Dep't of Commerce Feb. 7, 2020).......................................................... 3

*Welded Line Pipe From the Republic of Korea,*
   80 Fed. Reg. 75,056 (Dep't of Commerce Dec. 1, 2015) ...................................................... 3

*Welded Line Pipe From the Republic of Korea,*
   84 Fed. Reg. 27,762 (Dep't of Commerce June 14, 2019) ...................................................37

*Welded Line Pipe From the Republic of Korea,*
   84 Fed. Reg. 35,371 (Dep't of Commerce July 23, 2019)....................................................37

*Welded Line Pipe From the Republic of Korea,*
   85 Fed. Reg. 76,517 (Dep't of Commerce Nov. 30, 2020) ...........................................2, 3, 46

**Other Authorities**

1994 U.S.C.C.A.N. 4040 ........................................................................................................10

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

| | |
|---|---|
| NEXTEEL CO., LTD., ET AL.,<br><br>       Plaintiff and Consolidated<br>       Plaintiffs,<br><br>  and<br><br>HUSTEEL CO., LTD., and HYUNDAI STEEL<br>COMPANY,<br><br>       Plaintiff-Intervenors,<br><br>  v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>  and<br><br>CALIFORNIA STEEL INDUSTRIES, INC.,<br>ET AL.,<br><br>       Defendant-Intervenors and<br>       Consolidated Defendant-Intervenors. | Consol. Ct. No. 20-03898 |

_____

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response to the motions for judgment upon the agency record filed by plaintiffs NEXTEEL Co., Ltd. (NEXTEEL), SeAH Steel Corporation (SeAH), Husteel Co., Ltd. (Husteel), and Hyundai Steel Co. (Hyundai). Plaintiffs challenge the Department of Commerce's final results in the third administrative

review of the antidumping duty order on welded line pipe (WLP) from the Republic of Korea.[1] We demonstrate below that plaintiffs' motions should be denied because Commerce's determination is supported by substantial evidence and is otherwise lawful.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The final determination under review is *Welded Line Pipe From the Republic of Korea*, 85 Fed. Reg. 76,517 (Dep't of Commerce Nov. 30, 2020) (final admin. review) (P.R. 860), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 854) (collectively, final results). The period of review covers December 1, 2017, through November 30, 2018.

### II.   Issues Presented For Review

1. Whether Commerce's determination that a particular market situation (PMS) exists in Korea is supported by substantial evidence and in accordance with law.

2. Whether the use of a PMS adjustment to adjust the cost of hot-rolled steel coil (HRC) in the context of a below-cost analysis is in accordance with the law.

3. Whether Commerce's calculation of NEXTEEL's non-prime costs is supported by substantial evidence and in accordance with law.

4. Whether Commerce's adjustment to NEXTEEL's suspension loss costs is supported by substantial evidence and in accordance with law.

5. Whether Commerce's decision to exclude freight revenue in calculating SeAH's constructed export price (CEP) is supported by substantial evidence and in accordance with law.

6. Whether Commerce's determination to deny SeAH a CEP offset is supported by

---

[1] In its motion for judgment, Hyundai adopts arguments made by NEXTEEL, SeAH, and Husteel contesting Commerce's PMS determination; Husteel adopts arguments by NEXTEEL and SeAH challenging other issues affecting the calculation of the dumping margin assigned to the non-selected companies.

substantial evidence and in accordance with law.

    7.  Whether Commerce's calculation of the weighted-average dumping margin assigned to the non-selected respondents is proper.

## STATEMENT OF FACTS

    This case arises out of Commerce's antidumping duty order covering WLP from Korea. *See generally Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 75,056 (Dep't of Commerce Dec. 1, 2015). In March 2019, Commerce initiated an administrative review to determine assessment rates for sales of subject merchandise from December 1, 2017, to November 30, 2018. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Dep't of Commerce Mar. 14, 2019) (P.R. 6). Commerce selected NEXTEEL and SeAH as the mandatory respondents. Respondent Selection Memorandum at 4-5 (Mar. 28, 2019) (P.R. 20; C.R. 3). The preliminary results were published in February 2019, calculating weighted-average dumping margins of 4.81 percent, 3.45 percent, and 3.99 percent for NEXTEEL, SeAH, and the non-selected respondents. *Welded Line Pipe From Korea*, 85 Fed. Reg. 7,269 (Dep't of Commerce Feb. 7, 2020) (prelim. admin. review) (P.R. 812), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 796) (collectively, *Preliminary Results*). Based on changes to the margin calculations for the mandatory respondents in the final results, Commerce recalculated the weighted-average dumping margins for NEXTEEL, SeAH, and the non-selected respondents as 15.07 percent, 9.33 percent, and 11.60 percent, respectively. *Final Results*, 85 Fed. Reg. at 76,518-76,519.

## I.    Particular Market Situation

    In June 2019, Stupp Bros., Inc., American Cast Iron Pipe Company, California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA (collectively, the Domestic Interested

Parties) submitted materials to Commerce alleging that a PMS distorting the cost of production of WLP exists in the Korean HRC market. PMS Allegation (June 24, 2019) (P.R. 95-690; C.R. 110-339); *see also* PDM at 3, 9 & n.12 (Maverick Tube Corporation was not a party to the PMS Allegation). The Domestic Interested Parties predicated their allegation on the cumulative effect of four factors: (1) government of Korea (GOK) subsidies to the HRC industry; (2) Korean imports of low-priced HRC from China; (3) strategic alliances between Korean HRC suppliers and WLP producers; and (4) GOK intervention in the electricity market. *Id.*

Shortly thereafter, Commerce issued a letter inviting interested parties to submit factual information and comments regarding the Domestic Interested Parties' allegation. Ltr. re: Deadline for Submission of Factual Information Relating to PMS Allegation (July 17, 2019) (P.R. 699). In response, Commerce received factual information and comments from NEXTEEL, SeAH, and Hyundai. NEXTEEL PMS Comments (Aug. 12, 2019) (P.R. 729-737; C.R. 372-383); SeAH PMS Comments (Aug. 12, 2019) (P.R. 726-728; C.R. 355-371); Hyundai PMS Comments (Aug. 12, 2019) (P.R. 738-745; C.R. 384-392).

In the *Preliminary Results*, Commerce determined that a PMS exists in Korea that distorts the cost of production of WLP, explaining that it had "considered the four aspects underlying the {PMS} allegation as a whole, based on their cumulative effect," and found that they represent facets of a single PMS affecting the cost of producing WLP in Korea. PDM at 12-14.

Additionally, Commerce determined that sufficient record evidence existed to quantify the PMS's impact and to administer an alternative calculation methodology addressing distortion in the respondents' production costs. *Id.* at 14. Specifically, Commerce adjusted the respondents' reported costs of production to account for distortions in input costs, based on a

determination of a cost-based PMS. *Id*. Commerce quantified this distortion through a PMS adjustment factor derived from a regression analysis proposed by the petitioners, with certain adjustments, which Commerce adopted in response to interested parties' comments. *Id*. This adjustment represents a reasonable estimation of distortions in the respondents' HRC costs introduced by the observed PMS. *Id*. at 14-16.

Commerce maintained its determination in its final results. IDM at 6-8, and 17-22. The existence and collective impact of the four factors led it to find a single PMS impacting the cost of producing WLP. *Id*. at 17-20. The record supports the following findings in this administrative review:

(1) the GOK significantly subsidizes producers of HRC, the primary input in WLP, thereby distorting Korean market prices for HRC and the resulting cost of producing WLP;

(2) the Korean steel market has been flooded with imports of low-priced Chinese steel products as a result of significant overcapacity in Chinese steel production, further placing distortive downward pressure on Korean steel prices;

(3) a set of strategic alliances exists between certain Korean HRC suppliers and WLP producers that contributes to the PMS; and

(4) the GOK's involvement in the electricity market—in particular, the government's use of the electricity market as a tool of industrial policy and its control of the largest electricity supplier, the Korean Electric Power Corporation (KEPCO)—contributed to the PMS.

*Id*. Commerce determined that the collective impact of these "intertwined market conditions" indicated that the costs of producing WLP in Korea are distorted and are not in the ordinary course of trade. *Id*. at 20. Thus, Commerce continued to find that a PMS existed in the Korean market for the period at issue. *Id*. at 21.

Commerce also continued to find that it was appropriate, as an alternative methodology, to quantify the impact of the PMS by making an upward adjustment to the respondents' reported

costs of production, through a PMS adjustment factor derived from a regression analysis proposed by the petitioners. *Id.* at 32. In doing so, Commerce explained that it used this adjustment factor with certain adjustments. *Id.*

## II.    Additional Relevant Facts

In the final results, Commerce valued NEXTEEL's non-prime products at their sales price "while allocating the difference between the full production cost and market value of the non-prime products to the production costs of prime-quality WLP." *Id.* at 44-47. Non-prime products are those products that underwent the same production process as the subject merchandise but cannot be used for the same applications. *Id.* Because the product cannot be used for its intended purpose, its market value is significantly impaired and may not be able to recover sufficient production costs. *Id.*

Commerce also included in the calculation of general and administrative (G&A) expenses costs from NEXTEEL's suspension loss related to certain production lines that were suspended for an extended period of time during the period of review. *Id.* at 47-49. Commerce drew a distinction between NEXTEEL's losses that were the result of a lengthy suspension of production as compared to losses sustained during routine maintenance shutdowns. *Id.*

Finally, Commerce excluded freight revenue from SeAH's CEP (*Id.* at 49-52), and denied SeAH a CEP offset. *Id.* at 56-59.

## SUMMARY OF THE ARGUMENT

Commerce reasonably found that a PMS existed in the Korean HRC market, as an input of welded carbon steel standard pipes and tubes (pipe and tube), based upon the four factors described above. Commerce has the statutory authority to adjust the costs of production of inputs impacted by a PMS for the sales-below-costs test for home market sales. The language,

legislative history, and context of the statute as a whole demonstrate that Congress did not intend for Commerce to rely on distorted costs.

Commerce's quantification of the impact of Korea's PMS was reasonable. Pursuant to Section 1677b(e) Commerce utilized an "other calculation methodology" in calculating costs of production by adjusting reported cost of production to account for distortions in input costs based on a determination of a cost-based PMS. Commerce determined it would use an Ordinary Least Squares fixed effects regression model because this model appropriately quantifies the impact of the PMS concerning the distortion in cost of HRC that Commerce found to have existed in Korea during the POR. Commerce accepted the model using data up to and including 2017, which was within Commerce's discretion and based on substantial evidence.

Commerce found that the non-prime products could not be used for the same general applications as their prime counterparts. Accordingly, assigning full costs to non-prime products does not reasonably reflect the costs associated with the production and sale of the merchandise. Commerce properly included in the calculation of G&A expenses costs from NEXTEEL's suspension loss related to certain production lines that were suspended for an extended period of time during the period of review.

Additionally, Commerce properly capped freight revenue in its calculation of SeAH's CEP, consistent with the relevant statutory provisions, case law, and Commerce's normal practice. Commerce properly found that that SeAH's selling functions were at the same or similar level of trade and that no CEP offset was warranted.

Finally, the weighted-average dumping margin applicable to the non-selected respondents is supported by substantial evidence and lawful, and should be sustained.

# ARGUMENT

## I.    Standard Of Review

This Court sustains any determination, finding, or conclusion found by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see also Tianjin Tiancheng Pharm. Co. v. United States*, 366 F. Supp. 2d 1246, 1249 (Ct. Int'l Trade 2005) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

When Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, such as in this case, the agency's conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade Feb. 3, 2017) (noting tremendous deference to Commerce's factual findings; *see also Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007). Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556,

1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). Further, this Court affords Commerce an especially great deal of deference "when a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted). In such cases, "Commerce may perform its duties in the way it believes most suitable." *Id.* Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the dictates of the trade statute. *Fujitsu*, 88 F.3d at 1039.

## II. Commerce's PMS Determination Comports With Section 1677b And Is Supported By Substantial Evidence

### A. Legal Framework

The antidumping statute directs Commerce to determine whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (or CEP) and the normal value of merchandise. 19 U.S.C. § 1675(a)(2)(A). The statute further directs that "a fair comparison shall be made between the export price or CEP and normal value." 19 U.S.C. § 1677b(a). Generally, export price is defined as the price at which subject merchandise is first sold in the United States, and the normal value represents the price at which the merchandise is sold in the exporting country. *See id.* §§ 1677a(a), 1677b(b)(i). Within this framework, normal value generally is determined by reference to sales of merchandise in the

home market, sales of merchandise in a third country, or a constructed value of the merchandise consisting of the cost of manufacturing (*i.e.*, the costs of materials and fabrication), selling, general, and administrative expenses, profit, and packing expenses. *See* 19 U.S.C. §§ 1677b(a)(1), (a)(4), (e).

When the record includes home market sales, several considerations affect whether Commerce will rely on them in calculating normal value. Particularly, under 19 U.S.C. § 1677b(a)(1)(C), Commerce may consider home market sales unusable when "the *particular market situation* in the exporting {home market} country *does not permit a proper comparison* with the export price or CEP." 19 U.S.C. § 1677b(a)(1)(C)(iii) (emphasis added). Likewise, section 1677b(a)(1)(B)(ii) provides that Commerce may use sales to a third country market, but only if Commerce *does not* determine that a *PMS prevents a proper comparison* with United States price. 19 U.S.C. § 1677b(a)(1)(B)(ii)(III).

Thus, Commerce has statutory authority to disregard reported prices in either the home market or third country markets when a PMS exists in the exporting country or the third country, thereby preventing Commerce from making a proper comparison. *See* 19 U.S.C. §§ 1677b(a)(1)(C)(iii), (B)(ii)(III). Although the statute does not define PMS, the Statement of Administrative Action provides a non-exhaustive list of examples of what might be considered a PMS. *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, at 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 (SAA).

Section 504 of the Trade Preferences Extension Act of 2015 (TPEA) amended the Tariff Act of 1930 providing Commerce with additional discretion to apply the PMS concept when using constructed value to determine normal value. *See* Pub. L. No. 114-27 § 504, 129 Stat. 362 (2015). The amendments provide Commerce with methodological discretion in calculating the

costs and other items that comprise constructed value. Specifically, Congress in section 504 added the PMS concept to 19 U.S.C. § 1677(15)'s definition of sales and transactions that Commerce will consider outside the "ordinary course of trade," and thus not usable in its antidumping calculations. Under section 1677(15), Commerce *shall find* "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the particular market situation prevents a proper comparison with the export price or {CEP}." *Id.*

TPEA section 504 also amended the constructed value provision, 19 U.S.C. § 1677b(e), to permit Commerce to use alternative cost calculation methodologies based on PMS findings. Under section 1677b(e), when Commerce calculates constructed value finding that a PMS "exists such that the *cost of materials and fabrication or other processing of any kind* does not accurately reflect the cost of production in the *ordinary course of trade*," Commerce "may use another calculation methodology under this subtitle or *any other* calculation methodology." *Id.* § 1677b(e) (emphasis added).[2]

Accordingly, the statute provides Commerce with broad discretion to address situations in which "the cost of material and fabrication or other processing of any kind" is distorted as a result of a PMS.

## B. Commerce's Interpretation Of Section 1677b Is Reasonable

Because the statute does not define PMS, Commerce is permitted to utilize any reasonable interpretation of that term. *Timken*, 354 F.3d at 1342; *see Chevron*, 467 U.S. at 843 n.11. As we established above, TPEA section 504 expanded the applicability of the PMS

---

[2] The TPEA amendments permit Commerce to address distortions in reported *costs* through various calculation methodologies, including cost adjustments. *See* 19 U.S.C. § 1677b(e).

concept to cover distortions in input costs *within the markets for those inputs*. The provision's legislative history states that the amendments ultimately enacted in the TPEA "provide that where a PMS exists that *distorts pricing or cost in a foreign producer's home market*, {Commerce} has *flexibility* in calculating a duty that is not based on distorted pricing or costs." S. Rep. No. 114–45, at 37 (2015) (emphasis added); *see also NEXTEEL*, 355 F. Supp. 3d at 1349 (quoting same). Congress was specifically concerned with cost distortions in inputs, including cost distortions that resulted from unfair subsidization or dumping. 161 Cong. Rec. H4666-01, H4690 (daily ed. June 25, 2015) (highlighting that the legislation would empower Commerce "to disregard prices or costs of inputs that foreign producers purchase if {Commerce} has reason to believe or suspect *that the inputs in question have been subsidized or dumped*." (statement of Rep. Meehan) (emphasis added)); *NEXTEEL*, 355 F. Supp. 3d at 1349 (quoting same).

The amendments were described as necessary to "guarantee that Americans can find a more level playing field as we compete in the world economy." 161 Cong. Rec. S2899-05, S2900 (May 14, 2015) ("*Korea has created this industry only for exports and has been successful because they are not playing fair*. . . . It hurts our workers, our communities, and our country. It is time to stop it." (emphasis added)).

This Court has recognized Congress's express "desire to give Commerce the ability to choose the appropriate methodology when a PMS exists." *NEXTEEL*, 355 F. Supp. 3d at 1349. In other words, the TPEA amendments and their legislative history make clear Congress's intent to expand Commerce's discretion in administering the statute's constructed value provision when costs in a foreign producer's home market are distorted by the particular conditions in that market. Thus, Commerce "has the ability to choose the appropriate methodology so long as it comports with its statutory mandate and provides a reasoned explanation." *Id.* (citing, among

other things, *Fujitsu*, 88 F.3d at 1039 (discussing tremendous methodological deference afforded Commerce)).  Because Commerce reasonably construed a broad statutory provision, its determination should be sustained.  *See Chevron*, 467 U.S. at 843 n.11; *Eurodif*, 555 U.S. at 316; *NEXTEEL*, 355 F. Supp. 3d at 1347, 1349.

NEXTEEL and SeAH argue that the term PMS must be construed to require Commerce to perform what plaintiffs characterizes as a data- and respondent-specific analysis.  NEXTEEL Br. 18-21; SeAH Br. 19-21.  In other words, plaintiffs claim that, as a matter of law, the statute requires Commerce to solicit each respondent's individual cost data and to compare these data to what Commerce determines to be the cost of production in the ordinary course of trade.  *See id*. However, this position reads requirements into the statute that do not exist.

The statute's plain terms authorize Commerce to make an adjustment if Commerce finds the existence of a "{PMS} … *such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade*{.}" 19 U.S.C. § 1677b(e) (emphasis added); *see also* 19 U.S.C. § 1677(15) (requiring Commerce to consider sales and transactions outside ordinary course of trade when "the PMS *prevents a proper comparison with the export price or {CEP}*" (emphasis added)).  Congress did not include a requirement that Commerce make its determination on a respondent-specific basis; instead, Congress requires that Commerce make a PMS adjustment when the production costs did not accurately reflect the ordinary course of trade.  *See id*.; *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470 (1997) ("{A}bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it." (citation and quotation marks omitted)).  Similarly, the SAA merely includes several examples of situations that may constitute a PMS, while explicitly highlighting

that the term is undefined.  *See* SAA at 822.  Because neither the statute nor the SAA discuss a required methodology by which Commerce will identify a PMS, plaintiffs' efforts to do so here improperly read into the statute a requirement that does not exist.  *See* SAA at 822.

As this Court held in *NEXTEEL*, "{t}he statute's language and legislative history permit Commerce's chosen methodology in this investigation, which was to consider allegations of a PMS based on the cumulative effect and the totality of the conditions in the foreign market." 355 F. Supp. 3d at 1349; *cf. Biodiesel from Indonesia*, 83 Fed. Reg. 8,835, at IDM cmt. 3 (employing "totality of the circumstances" approach while explaining that "in certain contexts, an ordinary course of trade analysis may involve a comparison of specific sales and transactions to the general market," but that "we do not believe such a comparison is always appropriate within the context of a {PMS} analysis."); *Biodiesel from Argentina*, 83 Fed. Reg. 8,837, at IDM cmt. 3 (same).

Moreover, companies do not operate in a vacuum, but, rather, purchase their inputs in a market. If a particular market is distorted as a whole, it would be illogical to conclude that one company operating in that particular market is insulated from the market distortions with respect to costs. IDM at 19. In other words, it is not appropriate to analyze company-specific transactions for possible distortion in circumstances such as these when the overall market is distorted. *Id*. Accordingly, plaintiffs' arguments that Commerce erred by not making company-specific findings fail to acknowledge that such analysis exceeds what was necessary and appropriate in this case. *Id*. Consequently, Commerce's determination should be sustained.

## C.  Commerce's Determination Of A PMS In Korea Is Reasonable

As we demonstrated above, pursuant to the plain language of the statute and the legislative history of the TPEA amendments, Commerce is permitted to adjust a respondent's

costs when it determines that a PMS rendered the cost of an input to be outside of the ordinary course of trade. Here, Commerce's determination to adjust the cost of HRC was based on the cumulative effect of four factors, discussed in detail below. IDM at 18-19. Because Commerce reasonably evaluated the record before it in determining that a PMS exists in Korea, Commerce's determination should be sustained. *See Shandong Rongxin Import & Export Co., Ltd. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988).

Plaintiffs argue that Commerce simply relied on previous determinations in prior reviews or in other cases where it made affirmative PMS findings. *See* NEXTEEL Br. at 21; SeAH Br. at 9-11. Contrary to the plaintiffs' arguments, Commerce reasonably evaluated the record in this case and period of review in making its determination. *See* IDM at 18-19. The four factors identified by Commerce are present during this period of review and the cumulative impact of those factors resulted in a finding that a PMS exists in the Korean HRC market. *Id.* That Commerce's determination is consistent with its prior PMS determinations is unsurprising given that those prior determinations involved the same HRC market and the same distorting factors. It does not indicate that Commerce failed to consider and evaluate the record evidence for *this* administrative review. *See* IDM at 18-19. Accordingly, the Court should sustain Commerce's determination.

### 1.    GOK Subsidies On HRC

Record evidence demonstrates significant subsidization of HRC by the GOK and purchases of HRC from subsidized Korean companies by the mandatory respondents in the review. IDM at 18. For example, HRC, is the primary input in WLP, constitutes a substantial proportion of the cost of WLP production. *Id.* Accordingly, subsidization in the HRC market

significantly distorts the cost of producing WLP. *Id.* Substantial evidence supports Commerce's determination that distortion stemming from subsidization of hot-rolled steel in Korea contributed to a PMS.

NEXTEEL and SeAH ask this Court to reweigh the evidence Commerce relied upon when determining the existence of GOK intervention. *See* NEXTEEL Br. at 22-24; SeAH Br. at 12-13. Plaintiffs' disagreement with Commerce's conclusion does not negate the record evidence upon which Commerce relied. One factor that Commerce considered in reaching this determination was that in *Hot-Rolled Steel Flat Products from Korea*, Commerce found that the GOK heavily subsidizes hot-rolled steel producers in Korea, and the agency calculated a subsidy rate of 57.04 percent for POSCO, a large Korean steel producer (a rate that was later amended to 58.68 percent). IDM at 18 n.103 (citing PMS Allegation at Exhibit 23 (*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Affirmative Determination*, 81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) and accompanying Issues and Decision Memorandum; *Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders*, 81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016)). Petitioners also provided various articles new to this review, such as one detailing how the GOK has subsidized the Korean steel industry by propping up the struggling Korean shipbuilding industry. *See, e.g.*, *Id.* (citing articular Market Situation Allegation at Exhibit 19 (Costas Paris, *South Korea Hands Another $5 Billion to Hyundai Merchant Marine*, Wall St. Journal (Oct. 10, 2018)). Given this record evidence, Commerce reasonably concluded that evidence of government subsidization of HRC as well as evidence of GOK subsidies in the Korean steel market was sufficient to show the GOK provides financial and institutional support

to domestic steel producers. *Id.* The Court should decline plaintiffs' offer to reweigh the record evidence.

### 2. Korean Imports Of HRC From China

Commerce relied on substantial record evidence to determine that pervasive low-priced imports from China into the Korean market contributed to a PMS in Korea. Significant overcapacity in Chinese steel production resulted in the Korean steel market being flooded with imports of cheaper Chinese steel products. *See* IDM 18-19 & nn.105-110 (citing PMS Allegation at Exhibits 20, 26-30, and 42). This placed downward pressure on Korean domestic steel prices, which combined with the heavy subsidization by the GOK of domestic steel production, and distorted Korean market prices of HRC. *Id.*

Additionally, despite plaintiffs' claims that some steel manufacturers in Korea realized a profit over the period of review and there was a decline in Chinese steel imports, the volume of Chinese steel products continued to be imported into Korea at significant enough levels that the prices of these imports had a distorting effect on the domestic price of HRC in the Korean market and, in turn, distorted the costs of Korean WLP production. *Id.*; *see also* NEXTEEL Br. at 24-28; SeAH Br. at 13-15. Furthermore, the record did not indicate that Chinese imported steel prices increased to such an extent to relieve the market distortions or price suppression caused by Chinese overcapacity during the period of review. IDM at 18-19. In other words, even though there was a decline in the amount of Chinese steel imports and an increase in the price of those imports, the amount and price of imported Chinese steel still had a distorting effect on the domestic Korean price of HRC. *Id.*

### 3. Strategic Alliances Between Korean HRC Suppliers And WLP Producers

Record evidence further demonstrated the existence of strategic alliances between certain

Korean HRC suppliers and Korean WLP producers that may have ultimately affected the prices of HRC in Korea. *Id*. at 19-20 (citing Particular Market Allegation at Exhibit 33). Specifically, the record included evidence of collusion and price-fixing schemes engaged in by the Korean steel industry, including Husteel, Hyundai, and SeAH. *Id*. Participation in such anticompetitive arrangements in the past is a relevant consideration when evaluating the totality of circumstances. Even though the record did not contain specific evidence showing that strategic alliances *directly* created a distortion in HRC pricing, the record evidence of strategic alliances and price fixing schemes between certain Korean HRC suppliers and Korean WLP producers is relevant as an element of Commerce's PMS determination. *Id*. Specifically, the strategic alliances and price fixing schemes may have created distortions in the prices of HRC in the past and may continue to impact pricing in a distortive manner during the period of review and in the future. *Id*. Given that substantial record evidence supports the determination that these strategic alliances and price fixing schemes may have caused distortions, NETXEEL and Husteel's arguments to the contrary are unavailing.   NEXTEEL Br. at 29; Husteel Br. at 12.

SeAH attempts to excuse its bid rigging by asserting that it was a result of a misunderstanding. SeAH Br. at 15-16. However, the record demonstrates that the so-called "misunderstanding" involved multiple companies and products, lasted for a period of over 10 years and was described by GOK's official as a "long-time, chronic practice." *Id*. at 20. Indeed, the GOK found this "misunderstanding" to be an anticompetitive practice and imposed significant fines. *Id*.

### 4.    GOK Control Over The Electricity Market

The GOK has tight control over the electricity market, including supply and pricing. *Id*. at 16 (citing PMS Allegation at Exhibit 38). The price of electricity is set by the GOK and it

functions as a tool of the government's industrial policy. *Id*. Additionally, Korea's largest electricity supplier, KEPCO, is a government-controlled entity, and is responsible for the transmission, distribution, and sale of electricity to customers. *Id* (citing *Large Diameter Welded Pipe from the Republic of Korea*, 84 Fed. Reg. 6374 (Dep't of Commerce February 27, 2019) (final deter.), and accompanying IDM at Comment 1). These findings are consistent with the SAA's guidance that a PMS may exist when there is government control over prices to such an extent that home market prices cannot be considered to be competitively set. *Id*. (citing SAA at 822).

Based upon other determinations that the GOK has not provided electricity for less than adequate remuneration, NEXTEEL and Husteel contend that there is no basis for finding a PMS in this case. *See* NEXTEEL Br. at 31; Husteel Br. at 14. However, the record evidence establishes significant government control in the electricity market and associated distortions caused by price fixing across the market as a whole. *See* IDM at 20. Accordingly, this factor contributes to a PMS because the distortion of Korea's electricity market places downward pressure on the pricing of electricity.

SeAH does not dispute that KEPCO sold electricity at below cost during the period of review (*i.e.*, 2018) and sustained massive losses. *See* SeAH Br. at 17-18. Instead, SeAH contends that the Court should ignore these key facts simply because KEPCO sold electricity at above cost in the past. *Id*. However, record evidence establishes that during this period of review, KEPCO sold electricity at a massive loss. IDM at 20.

Commerce found that the intertwined market conditions signify that the production costs of WLP, especially the acquisition prices of HRC in Korea, are distorted and, thus, demonstrate that the costs of HRC to Korean WLP producers are not established in the ordinary course of

trade. *Id.* at 20-21.  Commerce undertook a cumulative analysis based on the totality of the circumstances and record evidence pertaining to each of the factors described above, and based on its evaluation of the record, reasonably concluded that a PMS exists in Korea during the period of review for the instant administrative review. *Id.* at 21.

### 5. This Court's Prior Decisions Do Not Dictate The Outcome In This Case

Plaintiffs argue that reversal is required because of this Court's decisions in prior cases. *See generally*, NEXTEEL Br., SeAH Br., and Husteel Br. (citing, *e.g.*, *NEXTEEL Co., Ltd. v. United States*, 355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) (*NEXTEEL I*); *NEXTEEL Co., Ltd. v. United States*, 392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) (*NEXTEEL II*), *Husteel Co. v. United States*, 426, F. Supp. 3d 1376 (Ct. Int'l Trade 2020) (*Husteel*).  There are several flaws in this position.  As an initial matter, each Commerce proceeding stands on its own and is a separate case before this Court.  *See*, *e.g.*, *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1342 n.13 (Ct. Int'l Trade 2018).  Additionally, the rulings relied on by plaintiffs are not final and remain subject to appeal, and are not binding on the Court in this case. *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).  Furthermore, "there is little question that {this Court} has upheld Commerce's {PMS} methodology with respect to the totality of the circumstances where substantial support exists." *See* IDM at 18 & n.101 (citing *NEXTEEL I*, 355 F. Supp. 3d at 1349 ("The statute's language and legislative history permit Commerce's chosen methodology in this investigation, which was to consider allegations of a PMS based on the cumulative effect and the totality of the conditions in the foreign market."); and *NEXTEEL II*, 392 F. Supp. 3d at 1287 ("The statute's language and legislative history permit Commerce's chosen methodology in this investigation, which was to consider allegations of a PMS based on the cumulative effect and the totality of the conditions in the foreign market.")).

These considerations are all the more relevant when, as here, the case presents a separate record that was critically evaluated by Commerce. *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1356 (Fed. Cir. 2016) ("There is no basis to simply assume that the underlying facts . . . . remain the same from period to period." (internal citations omitted)). During this period of review, KEPCO recorded a large operating loss, whereas during prior administrative reviews KEPCO was profitable. IDM at 20. This evidence indicates that KEPCO sold electricity, an input in HRC and WLP production, for less than adequate remuneration. Indeed, Commerce considered the most recent evidence. *See, e.g.*, *Id.* at 32 (explaining that despite the modest reduction in steel overcapacity in 2017, this fell short of alleviating the excess capacity problem.).

## III.   Commerce's Use Of A Regression Model To Adjust For A PMS In Korea Is Supported By Substantial Evidence And In Accordance With Law

### A.   Legal Framework

The statute's mandate for a "fair comparison" between normal value and export price or CEP also underlies the authorities authorizing Commerce to make price adjustments. 19 U.S.C. § 1677b(a). Indeed, the SAA recognizes that "{t}o achieve such a fair comparison, section {1677b} provides for the selection and adjustment of normal value to avoid or adjust for differences between sales which affect price comparability." SAA at 820. It is similarly well-established jurisprudence that the statute generally "seek{s} to produce a fair 'apples-to-apples' comparison between foreign market value and United States price." *Torrington Co. v. United States*, 68 F.3d. 1347, 1352 (Fed. Cir. 1995).

The statute and Commerce's regulations "call for adjustments to the base value of both foreign market value and United States price to permit comparison of the two prices at a similar point in the chain of commerce." *Id.* (citation omitted). Thus, both sections 1677a and 1677b of

the statute provide that, in determining export price or normal value, Commerce will begin with the price at which the subject merchandise or foreign like product is first sold (the "starting price"), while taking into account either various adjustments or the ordinary course of trade. *See* 19 U.S.C. §§ 1677a(a), 1677b(a)(1)(B)(i).

If Commerce determines that the normal value of the subject merchandise cannot be determined using home market sale prices, "the normal value of the subject merchandise *may* be the constructed value of that merchandise, as determined under {section 1677b(e)}." 19 U.S.C. § 1677b(a)(4) (emphasis added). Section 1677b(e) provides a method for calculating constructed value using costs and other inputs. The statute also provides in a subsection entitled "Adjustments to constructed value" that "{c}onstructed value as determined under {19 U.S.C. § 1677b(e)}, *may be adjusted, as appropriate*, pursuant to this subsection." 19 U.S.C. § 1677b(a)(8) (emphasis added); *see also* SAA at 831 (confirming same).

Commerce's regulations authorize price adjustments at 19 C.F.R. § 351.401(c), which provides, in relevant part, that "{i}n calculating export price, {CEP}, and normal value (where normal value is based on price)," Commerce "normally will use a price that is net of price adjustments, as defined in {19 C.F.R.} § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable)." Section 351.102(b)(38) of Commerce's regulations defines "Price adjustment" as "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale (see {19 C.F.R.} § 351.401(c)), that is reflected in the purchaser's net outlay." This regulation was amended to clarify that price adjustments are not limited to discounts or rebates but rather include other price adjustments as well. *Modification of Regulations Regarding Price*

*Adjustments in Antidumping Duty Proceedings*, Final Rule, 81 Fed. Reg. 15,641, 15,644 (Dep't of Commerce Mar. 24, 2016) (*Modification Regarding Price Adjustments*). Consequently, Commerce may employ a range of price adjustments to achieve a proper comparison.

Furthermore, as discussed above in section II.A, Congress in section 504 of the TPEA amended the statute's constructed value provision, 19 U.S.C. § 1677b(e), permitting Commerce to use alternative cost calculation methodologies based on PMS findings. Under section 1677b(e), when it finds that a PMS exists, Commerce "may use another calculation methodology under this part *or any other calculation methodology*." *Id.* (emphasis added).

Accordingly, the statute provides Commerce with broad discretion to address situations in which "the cost of material and fabrication or other processing of any kind" is distorted as a result of a PMS and to choose an alternative calculation methodology, as long as it is reasonable. *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015). Indeed, Commerce "has the ability to choose the appropriate methodology so long as it comports with its statutory mandate and provides a reasoned explanation." *NEXTEEL Co., Ltd. v. United States*, 392 F. Supp.3d 1276, 1287 (Ct. Int'l Trade 2019) (citing, among others, *Fujitsu*, 88 F.3d at 1039 (discussing tremendous methodological deference afforded Commerce)).

### B. The TPEA Amendments Permit Commerce To Address Distortions In Reported Costs Through Various Calculation Methodologies, Including Cost Adjustments

The plain language of the statute and the legislative history of the TPEA amendments demonstrate that Commerce possesses the discretion to adjust SeAH's HRC input purchase prices for calculating cost of production as part of Commerce's sales-below-costs test. They also establish that Commerce has discretion when a selecting a calculation methodology to address distortions in a particular market.

Husteel points to recent decisions where this Court has held that the section 504 TPEA amendments did not have any effect on Commerce's discretion in making cost adjustments under 19 U.S.C. § 1677b(b)(3).  Husteel Br. at 15 (citing *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 426 F. Supp. 3d 1395, 1410-12 (Ct. Int'l Trade 2020), *Husteel Co., Ltd. v. United States*, 426 F. Supp. 3d 1376, 1382-91 (Ct. Int'l Trade 2020), *Saha Thai Steel Pipe Public Co., Ltd. v. United States*, 422 F. Supp. 3d 1363, 1367-71 (Ct. Int'l Trade 2019)).  Respectfully, *Husteel* is presently on appeal to the Federal Circuit and *Saha Thai* is not final and remains subject to appeal.  Additionally, those and other rulings by this Court are not binding on the Court in the present case.  *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).

The basic statutory definition of normal value (not just constructed value), requires that normal value reflect a price that is in the "ordinary course of trade." *Id*. § 1677b(a)(1)(B)(i). This carries through to the subsection (b) normal value provisions concerning sales below cost (subsection (b)(3) uses the similar term "ordinary course of business"). *Id*. § 1677b(b)(1), (3). The TPEA generally expanded the meaning of "ordinary course of trade" to include any situation in which Commerce finds that a PMS prevents a proper comparison between markets. *See* 19 U.S.C. § 1677(15)(C) (Commerce "shall consider" such transactions outside ordinary course of trade). It also authorizes Commerce to use "any" alternative cost calculation methodology if it determines that a "PMS exists such that the cost of materials . . . does not accurately reflect the cost of production in the ordinary course of trade." *See* 19 U.S.C. § 1677b(e). Although the TPEA did not specifically amend § 1677b(b)'s provisions governing Commerce's sales-below-cost test, its expansion of the definition of the term "ordinary course of trade" and the continued inclusion of that term under § 1677b(b) indicate that Commerce was

within its broad discretion to interpret § 1677b(b) in line with this TPEA amendment.

The definition of "ordinary course of trade" is directly applicable when Commerce determines normal value. *See* 19 U.S.C. § 1677b(a)(1)(B)(i). Similarly, 19 U.S.C. § 1677b(e) addresses constructed value and provides Commerce with broad authority to use "any other calculation methodology" if costs are distorted by a PMS. *Id.* Although 19 U.S.C. § 1677b(e) is the subsection that is applicable to constructed value, given the applicability of the definition "ordinary course of trade" when Commerce determines normal value, 19 U.S.C. § 1677b(a)(1)(B)(i), having Commerce forgo considering costs distorted by a PMS for constructed value, but still consider and rely on those distorted costs for purposes of cost of production and the sales-below-cost test creates an illogical discordance.

Furthermore, 19 U.S.C. § 1677b(e)(1) states: "{f}or purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of – *(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade*." (emphasis added). This is later followed by: "{f}or purposes of paragraph (1), if a PMS exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology." This language is important because the part of section 1677b(b) that prescribes how Commerce shall calculate cost of production for the sales-below cost test states: "the cost of production shall be an amount equal to the sum of — (A) *the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like*

*product in the ordinary course of business.*" 19 U.S.C. § 1677b(b)(3)(A) (emphasis added). The language used in §§ 1677b(e)(1) and 1677b(b)(3)(A) incorporating the concept of ordinary course of trade/business is almost identical. Therefore, because the term "ordinary course of business" is not expressly defined, it is reasonable for Commerce both to interpret section 1677b(e)(1) to allow for a PMS adjustment to costs and to apply that same interpretation to nearly identical language in section 1677b(b)(3)(A).

A key issue before the Court is whether the adjustments Commerce uses in calculating constructed value are prohibited in the home market and third country sales contexts. As both a matter of statutory interpretation, and logic, they are not. Under longstanding precedent beginning with *Chevron*, agencies have been afforded discretion to interpret statutes that are silent on a particular issue. Namely, when a statutory scheme is complex as is the case here, the courts have recognized that it is the agency administering the statute that is best positioned to interpret the statute. *Timken*, 354 F.3d at 1342; *Eurodif S.A.*, 555 U.S. at 316. This Court should consider the totality of the statute in light of the TPEA amendments that expanded the fundamental and ubiquitous term "ordinary course of trade" to include PMS considerations. *See, e.g.*, *Norfolk & W. Ry. Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) (declining to resort to a canon of construction that supported a particular interpretation of a statute when the "whole context," "dictate{s} a different conclusion").

Based on statutory language, and the legislative history discussed above, and further evidence of legislative intent, Commerce has found consistently that section 504 of the TPEA added the concept of a PMS in the definition of the term "ordinary course of trade," for purposes of constructed value, "and through these provisions for purposes of the cost of production under {19 U.S.C. § 1677b(b)(3)}." *See, e.g.*, *Certain Oil Country Tubular Goods from the Republic of*

*Korea*, 82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017) (final results) and accompanying IDM at cmt. 3; *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't of Commerce Jun. 13, 2018) (final results) and accompanying IDM at cmt. 1.

Given the broad discretion afforded to Commerce in the statutory language and the legislative history regarding "PMS," Commerce's adjustment of SeAH's cost of production is a reasonable interpretation of the statute and is in accordance with law.

### C.   Commerce's Regression Model Is A Reasonable Methodology For Quantifying The Impact Of A Particular Situation Market In Korea

Commerce utilized an "other calculation methodology" in calculating respondents' costs of production by adjusting respondents' reported costs of production to account for distortions in input costs based on a determination of a cost-based PMS. *See* IDM at 32; *see also* 19 U.S.C. § 1677b(e) (providing that Commerce has the discretion to "use another calculation methodology under this subtitle or any other calculation methodology" to calculate cost of production in the ordinary cost of trade). Commerce quantified this distortion through a PMS adjustment factor derived from a regression analysis proposed by domestic interested parties that, when applied to respondents' costs of HRC, accounted for distortions introduced by the observed PMS. PDM at 14; *see also* IDM at 32. The distortions manifest differently within a given country's market, and the manner in which a national government and its steel industry act in the face of that crisis further differentiates the impact at the national level. *See* PMS Allegation at 39. Critical changes in trade patterns, combined with domestic policies and existing market forces, created a singular PMS in Korea driven by the overcapacity crisis. *Id.* The factors that define the current PMS in Korea are unique to Korea and linked by the distortive effects of the Chinese-led overcapacity crisis on the Korean market and the government of Korea's actions in the face of

27

that crisis.  *Id.*

The domestic interested parties provided a regression analysis on Commerce's record called the Ordinary Least Squares fixed effects regression (OLS), with price (*i.e.*, average unit values (AUVs)) as the dependent variable.  *See* PMS Allegation at 40-52.  Commerce determined it would use OLS because this model appropriately quantifies the impact of the PMS concerning the distortion in cost of HRC that Commerce found to have existed in Korea during the period of review; however, to isolate the factors contributing to the cost-based PMS in the Korean HRC market, and to capture the *ceteris paribus* effect (*i.e.*, holding all other factors constant) for global uneconomic capacity in the steel industry on HRC AUVs in Korea, Commerce relied on the dependent variable (regression coefficient) associated with uneconomic capacity to quantify the PMS adjustment to the respondents' reported HRC costs.  *See* PDM at 14.

SeAH argues that, because it provided unrebutted expert testimony against the regression analysis, Commerce's use of the approach is "inexplicable and unlawful."  SeAH Br. at 22.  Commerce, however, relies on its own extensive expertise and conducts an independent assessment.  Here, Commerce evaluated the regression analysis submitted by the domestic interested parties and made appropriate adjustments.  IDM at 32-39.  In selecting among imperfect alternatives, Commerce concluded that the regression analysis, as adjusted, "is a reasonable method to quantify the relationship between the global uneconomic capacity and the price of HRC."  *Id.* at 32; *see also Id.* at 39.  Commerce's determination is consistent with 19 U.S.C. § 1677b(e), which only requires that the methodology be reasonable.  *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) ("When a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of statutory tests,'

Commerce 'may perform its duties in the way it believes is the most suitable.').

SeAH also contends that Commerce's regression analysis is only permissible if a stable relationship exists between the steel prices and explanatory variables. SeAH Br. at 23-26. SeAH further argues that the data submitted in the tables in its brief indicate that, during certain periods, small changes in the independent variables would have had a great effect on the dependent variable, while in other periods they would not. *Id*. at 24-25. SeAH is wrong. Regarding the general relationship between steel prices and independent (or explanatory) variables, it is true that there exists some variation over time as is the case with almost any economic relationship if the variables are growing at different speeds. However, the employed OLS regression model is specifically designed to minimize differences between actual and estimated values of the dependent variable (which here was the actual imported AUV price of HRC). *See* PMS Allegation at 54-55. As for the specific relationship between steel prices and one of the independent variables, uneconomic capacity, the record evidence demonstrates that the uneconomic capacity beta coefficient is statistically significant, and shows a strong inverse correlation between uneconomic capacity and HRC prices. *Id*. This means that the model has found that changes to uneconomic capacity are not only a highly reliable determinant of changes to the imported price of HRC, but that increases in uneconomic capacity (which occur when used capacity falls below assumed normal levels) have the effect of lowering the imported price of HRC in the global market. Indeed, SeAH has not provided effective evidence of a problem. SeAH Br. at 25-26. SeAH simply ran different regressions for selected time periods (*e.g.*, 2008-2012, 2009-13, 2010-2014) and identified different coefficients that measured the relationship between the two independent variables with the dependent variable (price) to show that small changes in each of those independent variables have a significant impact on the dependent

variable, especially in the first two years (2008, 2009). *Id.* And because SeAH did not provide detailed regression results to meaningfully substantiate its "analysis," it is impossible to understand under what conditions these relationships between independent variables were obtained or whether the results were statistically significant. *See, id.*

Additionally, SeAH contends that Commerce should have limited its regression analysis to the most recent five years (2013-2017) instead of using a full ten-year period. SeAH Br. at 28. In particular, both SeAH and NEXTEEL seek to exclude data from 2008-2009 period, claiming that the relationship between the AUVs and uneconomic capacity was unusual during that period. *Id.*; NEXTEEL Br. at 40. However, both SeAH and NEXTEEL fail to substantiate their assertions regarding purportedly greater accuracy, apart from stating that it would result in a favorable adjustment. Commerce routinely uses a ten-year period in its regression analysis, which enables it to focus on longer-term effects. *See, e.g., Circular Welded Carbon Steel Standard Pipe and Tube Products From Turkey; 2017-2018*, 85 Fed. Reg. 3616 (Dep't of Commerce Jan. 22, 2020) (final results of admin. review) and accompanying IDM at 25. "{A} period of ten years allows for an adequate amount of data and ensures consistency of the regression analysis from one proceeding to another." IDM at 37. SeAH seeks to replace this objective, consistent and predicable methodological approach, by cherry-picking a shorter period that it considers more beneficial. Not only did Commerce articulate the need for methodological consistency regarding time periods, but it also explained why the data that SeAH seeks to exclude from the analysis are important:

> Commerce finds that the financial crisis of 2008-2009 is the main event of interest in the analysis, because the subsequent decline in global steel demand resulting from the crisis instigated the Chinese stimulus, and increased investment by the Government of China and spending to boost steel industry.

*Id*. Accordingly, Commerce included data for 2008-09 not only because it falls within the ten-year period Commerce normally considers in regression analyses, but also because such data is "included in the regression because they account for the volatile period and price fluctuations in the defining years of global overcapacity crisis that still affect steel import prices today." *Id*. So long as the years that gave rise to global uneconomic capacity phenomenon fall within the relevant 10-year period, which measures longer-term effects, it is illogical to exclude from consideration important data from these years.

SeAH and NEXTEEL also argue that Commerce improperly considered data from 2017 and ignored data from 2018 for purposes of the regression analysis. *See* SeAH BR. at 27; NEXTEEL Br. at 37. The updated production figures for 2017 were published in the 2019 World Steel in Figures Report in June 2019, before the PMS allegation by the petitioners was filed in July 2019. *See* IDM at 37. But Commerce did not rely on the 2019 World Steel in Figures Report because the updated global steel capacity figures for 2017 were published *after* the allegation was filed. *Id*. "{N}either the updated 2017 capacity nor the updated 2017 production totals were available to the {domestic interested parties} at the time the allegation was filed." *Id*. Therefore, Commerce found that the petitioner's regression analysis was based on the most recent annual data available for submission during the period of review and was based on consistent time periods and data sources for each time-variant variable. *Id*. As for the 2018 data, despite covering eleven months of the period of review, it encompassed data *after* the relevant period. *Id*. at 36. Accordingly, Commerce determined it would be inappropriate to use the 2018 data "because future production {would} not have any impact on prices during the {period of review}." *Id*. Indeed, because the POR ended on November 30, 2018, the 2018 data proffered by plaintiffs would not be reflective of the cost of goods sold during the relevant

period.  *Id*.  Therefore, Commerce accepted the model using data up to and including 2017, which was within its discretion.

Separately, NEXTEEL asserts that because regression modeling is premised on an assumption of global uneconomic steel capacity, which impacts the global market and is not unique to Korea, using such an analysis is unsuitable for determining the level of suppression in HRC prices in a specific country like Korea. *See* NEXTEEL Br. at 36-37. This argument is not persuasive because the global overcapacity crisis manifests its distortive effects differently in different markets depending on how a given country reacts to the crisis. Although global overcapacity may create distortions across countries, each manifestation of those distortions will be unique to that country.

NEXTEEL argues that the data contained in Commerce's analysis lacked adequately product-specific data because it was based on the regression model that contained hot-rolled steel average unit value data based on the 4-digit level Harmonized Tariff Schedule (HTS) category. *See* NEXTEEL Br. at 40. Although a regression model based on more detailed six-digit level HTS data would have arguably been more accurate, the record did not contain information to achieve this; the 6-digit subheading product groups proposed by NEXTEEL excluded many products that may be used in the production process. *See* IDM at 32. Commerce also explained that, because the record contained data on steel capacity and steel production at the broader 4-digit HTS level, combining these data with regression data at the 6-digit HTS level would prevent an accurate quantification of the PMS. *Id*. at 32.

In sum, Commerce lawfully relied upon a regression model to quantify a PMS adjustment based upon the permissive "any other calculation methodology" statutory language in 19 U.S.C. § 1677b(e) and reasonably explained why the data it considered was appropriate for this purpose.

**IV.**   **Commerce Properly Adjusted NEXTEEL's Costs For Non-prime WLP**

Commerce found that assigning full costs to non-prime products "does not reasonably reflect the costs associated with the production and sale of the merchandise" because the non-prime products could not be used for the same general applications as their prime counterparts. IDM at 47.   NEXTEEL contends that Commerce's adjustment is unsupported by substantial evidence and contrary to law.   NEXTEEL Br. at 42-45.   NEXTEEL's arguments lack merit.

In reporting its costs to Commerce, NEXTEEL assigned the same full cost to prime and non-prime WLP.  IDM at 45; *see also* PDM at 20.  Commerce rejected NEXTEEL's reported costs and, instead, valued the non-prime products at their sales price "while allocating the difference between the full production cost and market value of the non-prime products to the production costs of prime-quality WLP." IDM at 47. These non-prime products are not capable of being used in the same general applications as WLP, and, thus, their value is significantly impaired.  *Id.*

Commerce's treatment of costs of non-prime products, in this respect, is lawful, consistent with both generally accepted accounting principles (GAAP) and with agency practice. *See id.* at 45; *see also*, *e.g.*, *Steel Concrete Reinforcing Bar from Mexico*, 82 Fed. Reg. 27,233 (Dep't of Commerce June 14, 2017) (final admin. review), and accompanying IDM, at cmt. 3; and *SolarWorld Americas, Inc. v. United States*, 353 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade Nov. 13, 2018) (holding that "it is reasonable for Commerce to reduce the costs for grade 4 crystalline silicon photovoltaic products based on evidence on the record that the grade 4 merchandise could not be used for the same applications as prime merchandise."). The statute directs the agency to calculate reported costs based on the respondent's normal books and records "if such records are kept in accordance with home country GAAP *and* reasonably reflect

the costs associated with the production and sale of the merchandise." IDM at 45 (citing 19 U.S.C. § 1677b(f)(1)(A)) (emphasis added). But the treatment of costs of NEXTEEL's non-prime products in the company's normal books and records was *not reasonable. Id.* at 47.

Commerce's practice regarding non-prime products is to "analyze the products sold as non-prime on a case-by-case basis to determine how such products are treated in the respondent's normal books and records, whether they remain in scope, and whether they can be used in the same applications as the prime product." IDM at 45. Consideration of these factors is warranted "because non-prime products cover a wide spectrum of products and situations . . . {and} {i}n NEXTEEL's normal books and records, the cost the non-prime products are calculated in the same way as the cost of the prime products." *Id.* But NEXTEEL's non-prime products: (1) could not be used in the same general applications as prime products; (2) were outside the scope of the order because they were *not physically equivalent* to the kind of pipe used in the oil and gas industry for the transport of oil and gas; and (3) commanded a price, which could not recover their cost. *Id.* at 47. Accordingly, because NEXTEEL's method of assigning full costs to these products does not reasonably reflect the costs associated with the production and sale of the merchandise, an adjustment is warranted. *Id.*

NEXTEEL's sole argument against this adjustment is that it is inconsistent with the Federal Circuit's decision in *Dillinger France S.A. v. United States*, 981 F. 3d 1318 (Fed. Cir. 2020). NEXTEEL Br. at 43-45. NEXTEEL is incorrect. *Dillinger* relied on the Federal Circuit's earlier decision in *IPSCO, Inc. v. United States*, 965 F. 2d 1056, 1060-61 (Fed. Cir. 1992), which held that actual costs must be assigned to prime and non-prime products that are *suitable for use in the same general applications. Id.* at 1322 (citing *IPSCO*, 965 F. 2d at 1060-61). Here, Commerce determined that NEXTEEL's non-prime products *cannot be used in the*

*same general applications* as its prime products.  IDM at 43.  Indeed, the record shows that

NEXTEEL's non-prime products:  (1) could not be used in the same general applications  as

prime products; (2) were outside the scope of the order because they were not physically

equivalent to the kind of pipe used in the oil and gas industry for the transport of oil; and (3)

commanded a price, which could not recover their cost.  IDM at 47.  Consequently, Commerce's

determination  that an adjustment was warranted is not only *consistent* with *Dillinger*, but also

reasonable, and should  be sustained.

## V.   Commerce's Decision To Include Suspension Loss Costs In NEXTEEL's G&A Expenses Is Reasonable

Commerce properly included  in the calculation  of G&A expenses costs from

NEXTEEL's suspension  loss related to certain production  lines that were suspended for an

extended period of time  during  the period of review.  IDM at 48-49 & n.269 (citing  NEXTEEL's

Section D Response (May 22, 2019) (NEXTEEL's Section D Response) at D-10 (P.R. 80; C.R.

84-91) at D-10).  NEXTEEL argues that Commerce's adjustment  was improper.  NEXTEEL Br.

at 45-47.  This argument lacks merit.

It is Commerce's practice to include  routine shutdown expenses (such as maintenance

shutdowns) in a respondent's reported costs of manufacturing,  and to associate those expenses

with products produced on those lines.  IDM at 48-49.  However, the suspended losses at issue

were not related to a routine shutdown; they concerned "NEXTEEL's suspension of production

on certain lines  for an extended period of time."  *Id*. at 49.  "Unlike  a routine maintenance

shutdown, once a production  line is suspended, it no longer relates to ongoing  production."  *Id*.

The difference between the suspension at issues here and routine maintenance shutdowns is that,

regardless of the reason for an extended suspension of production activity,  "products  are not

produced on those {suspended} production  lines to recover the costs associated with them."  *Id*.

It would be unreasonable to treat these losses consistently with NEXTEEL's normal books and records because "where {the agency determines} that a company's normal books and records do not reasonably reflect the production costs of the merchandise under review, Commerce's practice has been to adjust these costs as necessary." *Id.* & n.273 (citing *Acetone from the Republic of Korea*, 85 Fed. Reg. 8,252 (Dep't of Commerce Feb. 13, 2020) (final deter.), and accompanying IDM at cmt.1). Here, it was reasonable to associate these costs with the general operations of the company as a whole (*i.e.*, with general expenses), and not specific to products associated with that production line (*i.e.*, costs of goods sold), because by suspending its production lines for an extended period of time during the period of review, no revenue from those products was generated for that period, and the associated costs were necessarily covered by all the other products produced by NEXTEEL. *Id.*

NEXTEEL argues that the agency's decision contravenes 19 U.S.C. § 1677b(f)(1)(A). NEXTEEL Br. at 46-47. However, NEXTEEL simply disagrees with Commerce's evidentiary conclusions. IDM at 48-49; *see also Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement with Commerce's weighing of the evidence" is insufficient basis for legal challenge); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (noting "tremendous amount of deference" afforded Commerce factual findings; *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988). Where, as in this case, a company's normal books and records do not reasonably reflect the production costs of the merchandise under consideration, Commerce adjusts the costs as necessary. 19 U.S.C. § 1677b(f)(1)(A); IDM at 45, 49. Here, "{t}he costs of suspended lines were transferred directly to the {cost of goods sold}, in accordance with NEXTEEL's normal accounting treatment." *Id.* & n.272 (citing NEXTEEL's

Section D Response at D-10.  Accordingly,  Commerce associated these costs with the general operations of NEXTEEL as a whole (*i.e.*, with the production  and sale of all products), and not specific to products associated with the production  lines.  *Id.*

Contrary to NEXTEEL's contention, Commerce's decision to include  the company's suspended losses as part of its G&A expenses is appropriate,  consistent with agency practice, and lawful.  *See Welded Line Pipe From the Republic of Korea*, 84 Fed. Reg. 27,762  (Dep't of Commerce June 14, 2019) (final admin. review), and accompanying IDM, *as amended by Welded Line Pipe From the Republic of Korea*, 84 Fed. Reg. 35,371  (Dep't of Commerce July 23, 2019) (amended final admin. review).  Indeed, this Court recently sustained Commerce's decision to include  NEXTEEL's suspended losses as part of the company's G&A expenses.  *See Husteel Co., Ltd. et al. v. United States*, Consol.  Court No. 19-00112,  Slip Op. 21-70 at 15-18 (Ct. Int'l Trade 2021) ("The court cannot say that it is unreasonable for Commerce, in its expertise, to determine that a company's  attribution  of costs relating  to the extended suspension of certain non-subject  product lines as costs of goods sold results in an inaccurate reflection of the general expenses incurred in the production  of subject merchandise.").  Because NEXTEEL's arguments in this proceeding fare no better, Commerce's determination  should  be sustained.

## VI.   Commerce's Decision To Cap Freight Revenue In The Calculation Of SeAH's CEP Is Supported By Substantial Evidence And In Accordance With Law

Commerce properly capped freight revenue in its calculation of SeAH's CEP, consistent with the relevant statutory provisions,  case law, and Commerce's normal practice.  This Court repeatedly has sustained Commerce's practice of capping a respondent's freight revenue in its calculation  of export price and CEP, including  in both previous reviews of this antidumping  duty order.  *See NEXTEEL I*, 355 F. Supp. 3d at 1359; *NEXTEEL II*, 392  F. Supp. 3d at 1293; *Dongguan Sunrise Furniture Co. v. United States*, 865 F. Supp. 2d 1216,  1248 (Ct. Int'l Trade

2012).

SeAH acknowledges, as it must, that its litigation position is contrary to this Court's prior decisions.  SeAH Br. at 34.  However, SeAH contends incorrectly that this Court misinterpreted the statute. *Id*. at 4-5.  The plain language of 19 U.S.C. § 1677a(c)(2)(A) deals exclusively with *downward* adjustments to U.S. price.  *Dongguan*, 865 F. Supp. 2d at 1249.  Section 1677a(c)(2)(A) requires Commerce to make certain adjustments to the starting U.S. price such that it is on the same basis as normal value to ensure that a proper comparison can be made between normal value and CEP.  IDM at 52.  It then requires Commerce to deduct freight expenses from the reported starting price to bring CEP back to the price of the goods alone without any additional charges, known as the *ex factory* level, to prevent artificial inflation of the price of subject merchandise.  *Id*.  Ultimately, freight costs will not be included in CEP.  *Id*.  "{A}djustments are necessary because the reported prices 'represent prices in different markets affected by a variety of differences in the chain of commerce' and must be adjusted 'to reconstruct the price at a specific 'common' point . . . so that value can be fairly compared on an equivalent basis.'"  *Id*.  (quoting *Dongguan*, 865 F. Supp. 2d at 1249-50).

This Court has held that "a proper 'apples-to-apples' comparison should not include profit earned from the sale of a service (freight) as opposed to profit earned from the sale of the subject merchandise."  *Dongguan*, 865 F. Supp. 2d at 1250; *NEXTEEL I*, 355 F. Supp. 3d at 1359.  In contrast, SeAH makes an unsubstantiated argument that section 1677a(c)(2)(A), a provision that deals exclusively with *downward* adjustments, requires Commerce to increase CEP of a *good* by the amount of revenue from a sale of a *service* (freight).  SeAH Br. at 34.  Section 1677a(c)(2)(A), however, requires only that freight expenses be deducted from the price charged to the customer to establish the price of the subject merchandise.  19 U.S.C.

38

§ 1677a(c)(2)(A).  This Court has explained that if Commerce were to alter its methodology  and "not cap freight-related  revenue by the amount of related freight expenses, adjustments  under section 1677a(c)(2) could potentially  increase the export price or {CEP}" and, thus, "contradict the plain import  of the statute."  *Dongguan*, 865 F. Supp. 2d at 1249; *NEXTEEL I*, 355 F. Supp. 3d at 1359.

Finally,  SeAH contends that Commerce penalizes  companies by including  freight losses in its calculations, but not including  freight profits.  SeAH Br. at 35.  Consistent with section 1677a(c)(2)(A), Commerce deducts freight expenses from the starting price of CEP to bring  the price to the *ex factory* level.  Even when a customer pays for delivery and the exporter charges more for freight services than the cost it incurred in delivering  goods, the freight expense is still excluded from the CEP of the subject merchandise.  The statute does not permit Commerce to artificially  inflate CEP of a *good* by increasing it by the amount of revenue from a sale of a *service*.  *Dongguan*, 865 F. Supp. 2d at 1250.

Because SeAH's arguments in this proceeding against Commerce's decision to exclude freight revenue from the company's CEP fare no better than those made by complainant  in other appeals of this issue, the agency's determination  should be sustained.

## VII.  Commerce's Determination To Deny SeAH A CEP Offset Is Supported By Substantial Evidence And In Accordance With Law

### A.  Legal Framework

To compare normal value to the appropriate U.S. price, Commerce is required to establish normal value "to the extent practicable, at the same {level of trade} as" the CEP. *Pakfood Pub. Co. Ltd.* v. *United States*, 724 F. Supp. 2d 1327, 1338 (Ct. Int'l Trade 2010); *see also* 19 U.S.C. § 1677b(a)(1)(B).  To that end, section 1677b(a)(1)(B) states that normal value shall be "the price at which the foreign like product is first sold. . . for consumption  in the

exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, *at the same level of trade as the export price or* {CEP}." 19 U.S.C. § 1677b(a)(1)(B) (emphasis added); *see also Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1304-05 (Fed. Cir. 2001). Commerce increases or decreases the normal value to account for "any difference (or lack thereof) between the export price or {CEP} and normal value that is shown to be wholly or partly due to a difference in the level of trade between the export price or {CEP} and normal value, if the difference in the level of trade (i) involves the performance of different selling activities; and (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade. . . ." 19 U.S.C. § 1677b(a)(7)(A). Commerce's regulations provide that "sales are made at different {levels of trade} if they are made at different marketing stages (or their equivalent)." 19 C.F.R. § 351.412(c)(2).

To determine whether sales are made at different levels of trade, Commerce analyzes the exporter's selling functions to determine if levels of trade identified by the exporter are meaningful. *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,371 (Dep't of Commerce May 19, 1997). However, "{w}hen normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the {CEP}, but the data available do not provide an appropriate basis to determine . . . a level of trade adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made {to the CEP} under 19 U.S.C. § 1677a(d)(1)(D)." 19 U.S.C. § 1677b(a)(7)(B). Pursuant to Commerce's regulations, a CEP offset under section 1677b(a)(7) will be granted only where: (1) normal value is compared to

40

CEP; (2) normal value is determined at a more advanced level of trade than the level of trade of the CEP; and (3) despite the fact that a person has cooperated to the best of its ability, the data available do not provide an appropriate basis to determine whether the difference in the level of trade affects price comparability.   19 C.F.R. § 351.412(f).

In other words, if Commerce determines that a respondent's normal value and CEP sales were at different levels of trade, and if the difference in the level of trade is demonstrated to affect price comparability, Commerce is required to make a level of trade adjustment to normal value.  19 U.S.C. § 1677b(a)(7)(A)(ii).   However, if the record does not contain data sufficient to make a level of trade adjustment, and where normal value is established at a level of trade that is more remote from the factory than that of CEP, Commerce may grant a capped CEP offset to normal value pursuant to 19 U.S.C. § 1677b(a)(7)(B).   *Pakfood*, 724 F. Supp. 2d at 1339.  To receive a CEP offset, the foreign producer or exporter must supply evidence that "the functions performed by the sellers at the same level of trade in the U.S. and foreign markets are similar, and that different selling activities are actually performed at the allegedly different levels of trade."  SAA at 829; *see also Andaman Seafood Co., Ltd.* v. *United States*, 768 F. Supp. 2d 1315,1320  (Ct. Int'l Trade 2011).

### B.   Commerce Properly Determined That SeAH's Selling Functions Were At The Same Or Similar Level Of Trade And That No Offset Was Warranted

Commerce properly found that no CEP offset was warranted.  IDM at 57.  As stated above, Commerce will grant a CEP offset if sales in the home market are at a more advanced level of trade than CEP sales in the United States and there is no basis for determining whether the differences in levels of trade affect price comparability.   Commerce compared the various selling functions that SeAH indicated were performed in the home market to those performed with respect to its U.S. sales.  *Id.*; *see also* PDM at 17-19.

In the home market, SeAH reported that it made sales through two channels of distribution (*i.e.*, direct sales to distributors and end users and sales that undergo additional processing before delivery to final user). PDM at 17. According to SeAH, it performed the following selling functions for sales to all home market customers: sales forecasting, market research, strategic/economic planning, sales/marketing support, sales negotiation, order input/processing, invoicing, receipt of customer payment, personnel training/exchange, distributor/dealer training, advertising/sales promotion, provision of cash discounts, procurement/sourcing services, inventory maintenance, warehouse operations, provision of post-sale warehousing, packing, provision of freight and delivery, provision of guarantees to customer, provision of warranty services, engineering services, and technical assistance. PDM at 18.

Commerce generally groups selling activities into five categories for its analysis: (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; and (5) performance of sales-related administrative activities. Based on these selling functions, Commerce found that SeAH performed selling activities within each of these five categories for all its home market sales. PDM at 18; IDM at 58. Because Commerce determined that there were no differences in the selling activities performed by SeAH to sell to its home market customers, it found all home market sales to be at the same level of trade. PDM at 18; IDM at 58.

Concerning the U.S. market, SeAH made sales through four channels of distribution: (1) back-to-back sales through its U.S. affiliate, Pusan Pipe America (PPA), to unaffiliated U.S. customers; (2) sales from State Pipe's inventory; (3) sales of uncoated merchandise from PPA's inventory; and (4) sales of further manufactured merchandise from PPA's inventory. PDM at 18.

For all four channels of distribution, SeAH reported that it performed the following selling functions for all sales to U.S. customers: sales forecasting, market research, strategic/economic planning, sales/marketing support, sales negotiation, order input/processing, invoicing, receipt of customer payment, personnel training/exchange, advertising/sales promotion, procurement/sourcing services, inventory maintenance, packing, provision of freight and delivery, provision of guarantees to customer, provision of warranty services, engineering services, and technical assistance. *Id.* Based on the selling function categories noted above, Commerce also found that SeAH performed selling activities within each of these five categories for its reported sales to customers in the United States. *Id.* Because SeAH performed these selling functions at the same relative level of intensity across all channels of distribution, Commerce found that all of SeAH's U.S. sales were at the same level of trade. *Id.*; IDM at 57-58.

Finally, Commerce compared the U.S. sales level of trade to the home market level of trade and concluded that the selling functions SeAH performed for its home market customers were at the same or similar stage of distribution as those performed by SeAH for sales to its U.S. affiliate. PDM at 19. Therefore, Commerce determined that SeAH's home market level of trade was at the same stage of distribution as the level of trade for SeAH's U.S. sales. As a result, Commerce found that no level of trade adjustment or CEP offset was warranted for SeAH.

SeAH insists that it performed selling functions at a more advanced level in the home market warranting a CEP offset, and that Commerce's decision was contrary to the record. SeAH Br. at 30. SeAH, however, disregards the applicable standard of review and improperly requests that the Court reweigh the record evidence. *Id.* Because Commerce reasonably evaluated the record before it in determining that a CEP offset was not warranted, Commerce's

determination should be sustained. *See Shandong Rongxin*, 203 F. Supp. 3d at 1338 (noting "tremendous amount of deference" afforded Commerce factual findings) (internal quotation omitted); *Timken*, 699 F. Supp. at 306 (explaining that the Court will not "weigh the adequate quality or quantity of the evidence for sufficiency") (citations omitted).

SeAH also claims that it performed additional activities at a greater intensity on its home market sales. *Id.* at 31. Although, Commerce acknowledged that the selling functions SeAH performed for its home market and U.S. sales are not identical, it concluded that the few additional activities SeAH performs to make its home market sales are not so significant that its home market level of trade constitutes a different marketing stage. IDM at 58; *see also* 19 C.F.R. § 351.412(c)(2). This Court has upheld similar determinations by Commerce where only minor differences exist between the U.S. and home markets. *See Sucocitrico Cutrale Ltda. v. United States,* 2012 WL 2317764, *6 (Ct. Int'l Trade 2012) ("Although Commerce noted minor differences between the two markets, these differences {do} not rise to the level required by the statute . . . {C}ommerce's factual determination that there is not a substantial difference in the levels of trade in the two markets is reasonable and supported by substantial evidence."). As in *Sucocitrico*, this Court should find Commerce's decision to deny a CEP offset to SeAH to be supported by substantial evidence and in accordance with law.

Finally, SeAH argues that because Commerce granted a CEP offset to SeAH in another proceeding, Commerce should likewise grant a CEP offset in this proceeding. SeAH Br. at 31-32. This argument necessarily fails because Commerce is not bound by decisions made in different segments of a proceeding, much less in different proceedings. For example, in *Pakfood Public Co. Ltd. v. United States*, this Court stated the agency's conclusions from earlier segments of the same proceeding do not serve as precedent controlling its conclusions in the instant

review. *Pakfood*, 724 F. Supp. 2d at 1345. Therefore, this argument is meritless.

## VIII. Commerce's Calculation Of The Weighted-Average Dumping Margin Assigned To The Non-Selected Respondents Is Supported By Substantial Evidence And Otherwise Lawful

### A. Legal Framework

Commerce, generally, determines an individual weighted-average dumping margin for each known exporter or producer. 19 U.S.C. § 1677f-l(c)(l). However, when "it is not practicable" to do so due to the large number of such exporters or producers, Commerce may examine a reasonable number of respondents. *Id.* § 1677f-l(c)(2). The statute "is silent as to the method for establishing the rate for non-selected respondents." *Longkou Haimeng Mach. Co. v. United States*, 581 F. Supp. 2d 1344, 1359 (Ct. Int'l Trade 2008). Thus, Commerce possesses broad discretion to select any reasonable methodology.

When calculating the rate for non-selected respondents, Commerce generally relies upon 19 U.S.C. § 1673d(c)(5), which provides the methodology for calculating the "all-others" rate in market economy antidumping investigations. *See Longkou*, 581 F. Supp. 2d at 1354. This provision directs Commerce to calculate the all-others rate by averaging the margins calculated for exporters and producers individually investigated, "excluding any zero and *de minimis* margins" and any margins based entirely upon facts available. 19 U.S.C. § 1673d(c)(5)(A). The statute further provides that if the weighted-average dumping margins for the individually investigated companies "are zero or *de minimis* margins, or are determined entirely" upon facts available, then Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated." *Id.* § 1673d(c)(5)(B).

### B. The Weighted-Average Dumping Margin Commerce Assigned To The Non-Selected Respondents Is Consistent With The Statute And Agency Practice

Commerce limited its examination of responding producers and exporters to NEXTEEL

and SeAH. Because Commerce preliminarily found that Hyundai and SeAH each sold WLP at less than fair value during the period of review, it preliminarily assigned the non-selected respondents a rate based on the weighted-average of the publicly-ranged data calculated for these companies. *See* Preliminary Results, 85 Fed. Reg. at 7,269. Commerce found that "due to requests to protect business proprietary information," the resulting rate is "the best proxy of the actual weighted-average margin determined for the mandatory respondents." *See id.* at 7,269 & n.5 (citing *Ball Bearings and Parts Thereof from France*, 75 Fed. Reg. 53,661, 53,663 (Dep't of Commerce Sept. 1, 2010) (final admin. review)); *see also* Preliminary Results Calc. Memo (Jan. 31, 2020) (P.R. 799; C.R. 456). Commerce did not depart from this standard methodology in calculating final weighted-average dumping margins for Husteel, Hyundai, and the other non-selected respondents. *See Final Results*, 85 Fed. Reg. at 76,518-19; Final Calc. Memo (Nov. 20, 2020) (P.R. 857; C.R. 483).

Husteel and Hyundai claim that the weighted-average dumping margin assigned to the non-selected respondents was not supported by substantial evidence and unlawful because it flows from the mandatory respondents' rates which were, in turn, not supported by substantial evidence and unlawful. *See* Husteel Br. 18; Hyundai Br. 9-11. Accordingly, Husteel and Hyundai believe that the weighted-average dumping margin assigned to the non-selected respondents should be remanded. *Id.* But for the same reasons supporting Commerce's determinations for the other issues under appeal, the weighted-average dumping margin applicable to the non-selected respondents is supported by substantial evidence and lawful, and should be sustained.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motions for

judgment upon the agency record and sustain Commerce's final results.

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ Robert R. Kiepura

OF COUNSEL:                              ROBERT R. KIEPURA
REZA KARAMLOO                            Trial Attorney
Senior Counsel                           U.S. Department of Justice
Office of the Chief Counsel              Civil Division
for Trade Enforcement and Compliance     Commercial Litigation Branch
U.S. Department of Commerce              P.O. Box 480, Ben Franklin Station
Washington, D.C.                         Washington, D.C. 20044
                                         Tel: (202) 305-4436
                                         Fax: (202) 353-0461
                                         Email: Robert.Kiepura@usdoj.gov

September 22, 2021                        *Attorneys for Defendant United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 13,913 words, excluding the parts of the brief exempted from the word limitation.   In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


<u>/s/ Robert R. Kiepura</u>