## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE CLAIRE R. KELLY

| | |
|---|---|
| NEXTEEL CO., LTD. ET AL., | ) |
| *Plaintiff and Consolidated Plaintiffs,* | ) |
| and | ) |
| HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY | ) |
| *Plaintiff-Intervenors,* | ) Consol. Ct. No.:  20-03898 |
| v. | ) |
| UNITED STATES, | ) |
| *Defendant,* | ) |
| and | ) |
| CALIFORNIA STEEL INDUSTRIES, INC. ET AL., | ) |
| *Defendant-Intervenors* and *Consolidated Defendant-Intervenors.* | ) |

## REPLY BRIEF IN SUPPORT OF NEXTEEL CO., LTD.'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee

*Counsel to NEXTEEL Co., Ltd.*
*Plaintiff and Consolidated Plaintiff*

Dated:  October 20, 2021

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   ARGUMENT .......................................................................................................4

      A.    The Response Arguments of Defendant and Defendant-Intervenors on
            Commerce's PMS Determination are Flawed as a Matter of Law and on
            the Record of this Case ...........................................................................4

            1.    Defendant and Defendant-Intervenors Fail to Distinguish the
                  Instant Case from Related Court Precedent Holding the PMS
                  Determination Unsupported by Substantial Evidence .................5

            2.    The Record of this Review Does Not Support a PMS Finding .................8

                  a.    HRC Subsidization ............................................... 9

                  b.    HRC Imports from China ...................................11

                  c.    Strategic Alliances .......................................... 13

                  d.    Electricity ..................................................... 14

            3.    Commerce May Not Rely on a Totality of the Circumstances
                  Approach Where, As Here, None of the Factors Individually
                  Demonstrates a PMS Existed ..........................................15

      B.    Defendant's and Defendant-Intervenors' Arguments in Support of
            Commerce's Regression-Based Methodology for Calculating the PMS
            Adjustment are Unpersuasive .................................................16

      C.    Defendant's Argument Regarding Commerce's Adjustments to
            NEXTEEL's Prime and Non-Prime Costs is Unavailing .....................19

      D.    Defendant's Argument Regarding Commerce's Allocation of Costs
            Associated with Suspended Production Line Losses to G&A Expenses is
            Unavailing .........................................................................22

III.  CONCLUSION....................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Dillinger France S.A. v. United States*,
  981 F.3d 1318 (Fed. Cir. 2020)......................................................................*Passim*

*Dong-A Steel Company v. United States*,
  475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020) ...........................................................5, 6

*Histeel Co., Ltd. v. United States*,
  Court No. 20-146, Slip Op. 21-126 (Ct. Int'l Trade Sept. 23, 2021)........................................5

*Husteel v. United States*,
  426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ................................................. *Passim*

*Husteel v .United States*,
  471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) ................................................*Passim*

*Husteel Co., Ltd. v. United States*,
  476 F. Supp. 3d 1363 (Ct. Int'l Trade 2020)…………………………………….................4

*Husteel v. United States*,
  517 F. Supp. 3d 1342 (Ct. Int'l Trade 2021) .......................................................1, 5

*Husteel v. United States*,
  520 F. Supp. 3d 1296 (Ct. Int'l Trade 2021) .............................................3, 21, 22

*IPSCO, Inc. v. United States*,
  965 F. 2d 1056 (Fed. Cir. 1992)......................................................................19, 20

*Jinan Yipin Corp. v. United States*,
  526 F. Supp. 2d 1347 (Ct. Int'l Trade 2007) .........................................................13

*LMI-La Metalli Indus., S.p.A. v. United States*,
  912 F.2d 455 (Fed. Cir. 1990)........................................................................11, 13

*NEXTEEL Co., Ltd. v. United States*,
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ................................................2, 4, 16

*NEXTEEL Co., Ltd. v. United States*,
  392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) ......................................................2, 4

*Nippon Steel Corp. v. United States*,
  458 F.3d at 1351 ........................................................................................9, 12

*SeAH Steel Corporation v. United States*,
  Court No. 20-150, Slip Op. 21-146 (Ct. Int'l Trade Oct. 19, 2021) .......................................2, 4

*SeAH Steel Corporation v. United States*,
  513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) ...................................................2, 4, 10

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)..........................................................................................8, 12

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
  716 F.3d 1370 (Fed. Cir. 2013)........................................................................11

**Federal Statutes**

19 U.S.C. § 1677b(e) .........................................................................................17

19 U.S.C. § 1677b(f)(1)(A)................................................................................23

**Commerce Determinations**

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final
  Results of Countervailing Duty Administrative Review, 2016, 84 Fed. Reg.
  28,461 (Dep't Commerce June 19, 2019)* ..........................................................9

*Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty
  Administrative Review and Final Determination of No Shipments; 2017-2018*,
  85 Fed. Reg. 76,517 (Dep't Commerce Nov. 30, 2020).......................................1

*Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products from the
  Republic of Korea: Amended Final Results of the First Administrative Review*,
  84 Fed. Reg. 35,604 (Dep't Commerce July 24, 2019) ....................................9, 10

*Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty
  Administrative Review; 2018-2019*, 86 Fed. Reg. ___ ........................................21

## I.      INTRODUCTION

Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL") submits this reply brief in further support of its Rule 56.2 Motion for Judgment on the Agency Record and the arguments raised in its opening brief, challenging Commerce's *Final Results* in the third administrative review of the antidumping duty order on welded line pipe from the Republic of Korea.  *See* Nexteel Co., Ltd.'s Rule 56.2 Motion for Judgment Upon the Agency Record, ECF Nos. 59 & 60, May 24, 2021 ("NEXTEEL Br."); *see also Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 76,517 (Dep't Commerce Nov. 30, 2020) ("*Final Results*"), and accompanying Issues & Decision Memo (Nov. 20, 2020) ("Final I&D Memo").

The Court has seen several times before the issues and arguments that are raised by the parties in this appeal.  The response briefs submitted by Defendant United States, Defendant-Intervenors California Steel Industries, TMK IPSCO, and Welspun Tubulars (collectively "CSI"), and Defendant-Intervenors Maverick Tube and Tenaris Bay City, Inc. (collectively, "Maverick") do not present arguments, explanation, or reasoning sufficient to justify Commerce's 1) finding of a particular market situation ("PMS") in Korea; 2) use of petitioners' regression-based methodology for calculating the PMS adjustment to NEXTEEL's costs; 3) reallocation of a portion of NEXTEEL's costs of production for non-prime line pipe to prime line pipe, overinflating the costs of production of subject merchandise; or 4) reallocation of costs related to the suspension loss on certain production lines during the period of review ("POR"). *See* Defendants' Response to Plaintiffs' Motions for Judgment Upon the Agency Record, ECF No. 69, Sept. 22, 2021 ("Def.'s Br."); Defendant-Intervenors' Response Brief, ECF No. 71, Sept.

22, 2021 ("CSI Br."); Response Brief of Defendant-Intervenors Maverick Tube Corporation and

IPSCO Tubulars Inc., ECF No. 70, Sept. 22, 2021 ("Maverick Br.").

With regard to Commerce's PMS determination, nothing in Defendant's or CSI's

arguments is sufficient to override the Court's multiple prior conclusions in related proceedings

that Commerce's finding of a PMS in Korea was unsupported by substantial evidence and not in

accordance with law.  While Defendant reiterates that each review stands on its own, Def. Br. at

20, there is nothing new or different this time around that would warrant a departure from the

Court's reasoned treatment of these issues in the appeals of the first and second administrative

reviews of the antidumping duty order on line pipe from Korea.  Indeed, here in the third

administrative review, the U.S. domestic industry ("petitioners") presented the same four factors

in support of its PMS allegation that it presented in the first and second reviews (and, indeed, in

the first, second, third, and fourth administrative reviews of the OCTG order).  Commerce again

found those four factors to indicate the existence of a PMS in Korea.  *See* Final I&D Memo at 8-

22.  Just as this Court determined in Line Pipe AR1 and AR2 (as well as in OCTG AR1, OCTG

AR2, OCTG AR3, and OCTG AR4), Commerce's PMS determination and adjustment here are

unsupported by substantial evidence and not in accordance with law.  *See Husteel v. United*

*States,* 426 F. Supp. 3d 1376, 1391 (Ct. Int'l Trade 2020) (LP AR1); *Husteel v .United States*,

471 F. Supp. 3d 1349, 1363-64 (Ct. Int'l Trade 2020) (LP AR2); *NEXTEEL Co., Ltd. v. United*

*States*, 355 F.Supp.3d 1336 (Ct. Int.'l Trade 2019) (OCTG AR1); *NEXTEEL Co., Ltd. v. United*

*States*, 392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) (OCTG AR2); *SeAH Steel Corporation v.*

*United States*, 513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) (OCTG AR3); *SeAH Steel*

*Corporation v. United States*, Court No. 20-150, Slip Op. 21-146 (Ct. Int'l Trade Oct. 19, 2021)

(OCTG AR4).

The Court has also already reviewed Commerce's reallocation of NEXTEEL's non-prime costs of production in the prior Line Pipe AR2 review (as well as in the OCTG AR3 proceeding). In the appeal of the Line Pipe AR2 decision, the Court remanded this issue, and the Court should remand again here.  No facts have changed in the instant review to warrant a different outcome. The response briefs submitted by Defendant United States and Defendant-Intervenors Maverick reinforce that nothing has changed.  Indeed, the defendant parties do not present arguments, explanation, or reasoning sufficient to justify Commerce's reallocation of NEXTEEL's non-prime costs, or any reason to warrant a different conclusion than the Court already reached in the prior proceedings.

One element that is different in this appeal relative to most of the prior appeals is that, in this case, Commerce used a global regression-based methodology to calculate the PMS adjustment to respondents' costs.  NEXTEEL respectfully submits that the Court need only reach the issue of the PMS adjustment if the Court were to conclude that Commerce's PMS determination is now suddenly supported by substantial evidence and in accordance with law. Because the PMS determination is neither supported by substantial evidence nor in accordance with law, NEXTEEL respectfully submits that the issue of the regression-based PMS adjustment is moot and need not be reached here.  However, as discussed below and in NEXTEEL's Rule 56.2 brief, should the Court reach this issue, the Court should determine that Commerce's chosen adjustment methodology is unreasonable and unsupported by substantial record evidence.

Finally, on the issue of Commerce's reallocation of costs associated with suspended production lines, NEXTEEL recognizes that the Court sustained Commerce's reallocation of such costs on remand in the LP AR2 remand opinion.  *See Husteel v. United States*, 520 F. Supp. 3d 1296, 1306-08 (Ct. Int'l Trade 2021).  Nevertheless, consistent with NEXTEEL's arguments

in the Rule 56.2 brief, we continue to submit that where, as here, the company reported costs consistent with its normal accounting principles, which accord with GAAP, and that recording reasonably reflects costs of production, it is unreasonable for Commerce to reallocate the reported costs.

## II.  ARGUMENT

### A.  The Response Arguments of Defendant and Defendant-Intervenors on Commerce's PMS Determination are Flawed as a Matter of Law and on the Record of this Case

NEXTEEL reiterates that there is no new factual information presented in the record of this third review that would justify a departure from the Court's determinations in the Line Pipe AR1 and AR2 reviews that Commerce's PMS finding was not supported by substantial evidence. Commerce's PMS finding in this review is based on the same facts and same allegations as those made by petitioners in Line Pipe AR1 and Line Pipe AR2, as well as the records in other cases involving a PMS allegation related to the Korean steel market, including the oil country tubular goods ("OCTG") proceedings (*i.e.,* OCTG AR1, OCTG AR2, OCTG AR3, and OCTG AR4), as well as other appeals involving Circular Welded Pipe and Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea ("HWR").  *See NEXTEEL Co., Ltd. v. United States*, 355 F.Supp.3d 1336 (Ct. Int.'l Trade 2019) (OCTG AR1); *NEXTEEL Co., Ltd. v. United States*, 392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) (OCTG AR2); *SeAH Steel Corporation v. United States*, 513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) (OCTG AR3); *SeAH Steel Corporation v. United States*, Court No. 20-150, Slip Op. 21-146 (Ct. Int'l Trade Oct. 19, 2021) (OCTG AR4); *Husteel v. United States,* 426 F. Supp. 3d 1376, 1391 (Ct. Int'l Trade 2020) (LP AR1); *Husteel v .United States*, 471 F. Supp. 3d 1349, 1363-64 (Ct. Int'l Trade 2020) (LP AR2); *Husteel Co., Ltd. v. United States*, 476 F. Supp. 3d 1363 (Ct. Int'l Trade 2020) (Circular Welded Pipe AR24);

*Husteel Co. v. United States*, 517 F. Supp. 3d 1342 (Ct. Int'l Trade 2021) (Circular Welded Pipe AR25); *Dong-A Steel Co.*, 475 F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2020) (HWR AR1); *Histeel Co., Ltd. v. United States*, Court No. 20-146, Slip Op. 21-126 (Ct. Int'l Trade Sept. 23, 2021) (HWR AR2).

Just as this Court has consistently concluded in its opinions reviewing these cases, the PMS determination made here on essentially the same record was unsupported by substantial evidence and contrary to law.  The record materials relevant to the PMS allegation in the instant review are largely identical to the record materials before Commerce in the prior Line Pipe proceedings and the OCTG proceedings.  As such, the Court has already examined these facts several times and consistently found them insufficient to support Commerce's PMS determinations.  Here again the record does not contain evidence of a PMS that resulted in NEXTEEL's costs being outside the ordinary course of trade.

### 1. Defendant and Defendant-Intervenors Fail to Distinguish the Instant Case from Related Court Precedent Holding the PMS Determination Unsupported by Substantial Evidence

Defendant and Defendant-Intervenors do not engage meaningfully with the arguments presented by the respondent parties, but instead largely continue to reiterate Commerce's thin reasoning and explanations related to the four factors of the PMS determination.  Particularly noticeable is the lack of engagement with the long and growing line of CIT opinions holding the PMS determinations in related proceedings on very similar records to be unsupported by substantial evidence.  Indeed, CSI does not so much as mention the other opinions of this Court deciding the whether Commerce's PMS determinations were supported by substantial evidence.[1]

---

[1] Although CSI does refer to the line of CIT cases holding that "Commerce's authority to apply a {PMS} adjustment is limited to the calculation of costs," thus prohibiting Commerce from applying a PMS adjustment for purposes of the sales-below-cost test, CSI Br. at 14 (quoting

With such consistent precedent, the absence of an attempt to distinguish the case at bar from those prior cases essentially confirms that there is nothing distinguishable about this case relative to the prior cases.

Defendant does attempt to address the Court's precedent, noting that "Plaintiffs argue that reversal is required because of this Court's decisions in prior cases.  There are several flaws in this position," prior to laying out the alleged " flaws."  Def. Br. at 20-21 (citations omitted). Defendant has not so much highlighted flaws in plaintiffs' position as mischaracterized it.  To be clear, NEXTEEL does not and has not argued that "reversal is required because of this Court's decisions in prior cases," as Defendant asserts.  Rather, NEXTEEL's position continues to be that the Court's multiple prior opinions reviewing Commerce's findings of a PMS in the Korean steel market are instructive to the case at hand because Commerce relied, for those prior PMS findings, on the same record documents put forward by petitioners in support of the same multiple-factor PMS allegation here.  Those prior cases accordingly are entirely relevant to the Court's review of the instant proceeding, as this Court recently determined in *Dong-A Steel Company*, responding to the same argument raised by the Government in the HRW proceeding. The Court noted that, "{w}hile it is true that those decisions {regarding Commerce's prior PMS findings} are non-binding, the court has determined that those earlier decisions are informative and persuasive here," emphasizing "that neither the Government nor {defendant-intervenor} offers more persuasive or binding case law as an alternative."  *Dong-A Steel Company*, 475 F. Supp. 3d at 1334.  There the Court determined that Commerce "relied on substantially the same

---

*Saha Thai Steel Pipe Pub. Co. v. United States*, 422 F. Supp. 3d 1363, 1369 (Ct. Int'l Trade 2019); and citing *Dong-A Steel Co. v. United States*, Consol. Ct. No. 19-00104, Slip Op. 21-79 (Ct. Int'l Trade June 24, 2021)), CSI does not reference the line of CIT cases holding Commerce's PMS determination unsupported by substantial evidence on the basis of evidence presented on the four-factor PMS allegation re-presented here.

record evidence in reaching its PMS determination here as underlay earlier administrative reviews," which failed to meet the substantial evidence burden in those earlier cases, and concluded that the evidence "was and remains insufficient to constitute substantial evidence." *Id.* at 1336.  The same is true here.

Defendant emphasizes that "here, the case presents a separate record that was critically evaluated by Commerce," quoting *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1356 (Fed. Cir. 2016), for the proposition that "{t}here is no basis to simply assume that the underlying facts . . . . remain the same from period to period.' (internal citations omitted))." Def. Br. at 21.  Again, NEXTEEL is not suggesting that this Court should "assume that the underlying facts… remain the same" from the prior review to this one.  *Id.*  However, it is the case that, in this review, petitioners resubmitted the same materials that they submitted in the prior reviews to support their PMS allegations, such that the significant majority of the relevant underlying record literally *is* the same as the underlying record in the Line Pipe AR1 and AR2 appeals.  Petitioners' PMS allegation in this case was a compendium of evidence petitioners had submitted in support of each of their prior PMS allegations, which this Court has repeatedly determined to be insufficient to establish that a PMS exists in the Korean hot rolled steel market. As such, and as NEXTEEL established in its opening brief, the relevant record materials quite literally remain the same.  *See* NEXTEEL 56.2 Br. at 21-31, ECF Nos. 59 & 60.

Nevertheless, NEXTEEL is not suggesting that the Court should "assume" that the facts remain the same.  NEXTEEL is highlighting that a careful review of the records demonstrates that the differences between what was submitted in prior reviews and what was submitted in this review are minor and inconsequential to the determination as to whether the PMS determination is supported by substantial evidence.  One need not "assume" that the facts are the same across

reviews when one can easily confirm that the record documents are actually the same documents. It remains the case that the materials do not constitute substantial record evidence of a particular market situation.

In this proceeding, Commerce stated that its PMS determination was "based on an extensive amount of information . . . placed on the record of this review," Final I&D Memo at 17, P.R. 854, yet it is clear that Commerce relied on the same actual documents on which it relied in past proceedings and which this Court has held does not constitute substantial evidence. More record documents simply does not render a determination supported by substantial evidence, unless those new record documents are meaningfully different from the prior record evidence and Commerce actually relies upon them.  Here, it remains the case that Commerce's conclusions are based on weak and indirect evidence, none of which establishes the existence of a particular market situation.

### 2.   The Record of this Review Does Not Support a PMS Finding

Defendant and CSI have presented no responsive arguments that adequately address the plaintiffs' arguments that Commerce's conclusions on each of the four PMS factors alleged in this review were entirely unsupported by substantial evidence.  Defendant and CSI have largely reiterated Commerce's own conclusions, and have not meaningfully engaged with many of the plaintiffs' arguments highlighting serious flaws in Commerce's reasoning and the evidence upon which it relied.  Further, Defendant and CSI have not sufficiently addressed the extensive record evidence to demonstrating the absence of a PMS in the Korean steel industry.  They have accordingly not made a persuasive argument demonstrating how Commerce's determination accords with the substantial evidence standard, requiring that the agency "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340

U.S. 474, 488 (1951); *see also Nippon Steel Corp. v. United States*, 458 F.3d at 1351 (explaining that the substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable).

### a.     HRC Subsidization

Defendant and CSI's responsive arguments with respect to Korea's alleged subsidization of hot-rolled coil fail to meaningfully respond to the plaintiffs' arguments that Commerce's determination on this issue is wholly unsupported by substantial evidence.

Specifically, both Defendant and CSI emphasize that Commerce relied on the fact that Commerce found in the *Hot-Rolled Steel Flat Products from Korea* investigation that the GOK heavily subsidizes hot-rolled steel coil ("HRC") producers in Korea, calculating a subsidy rate of 57.04 percent for steel producer POSCO.  *See* Def. Br. at 15 (citing Final IDM at 18 n.103, P.R. 854); CSI Br. at 24.  But neither Defendant nor CSI address the fact that the nearly-60 percent CVD rate calculated in the HRC Investigation was *a total AFA rate* which, by definition, bears no relationship to or even indicates the existence of any subsidization.  Both responsive parties entirely ignored the fact that the AFA rate in the *Hot-Rolled Investigation* does not indicate the actual level of subsidization in Korea.

Moreover, neither Defendant nor CSI addresses or attempts to explain the fact that Commerce used the AFA rate from the HRC Investigation as evidence of subsidization, despite that Commerce found, in the subsequent HRC first administrative review, that the actual rate of subsidization in Korea for hot-rolled steel *is barely above Commerce's de minimis threshold*. *See* Def. Br. at 15; CSI Br. at 24; *see also Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2016*, 84 Fed. Reg. 28,461 (Dep't Commerce June 19, 2019), *as amended* in *Countervailing Duty Order on*

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Amended Final Results of the First Administrative Review*, 84 Fed. Reg. 35,604 (Dep't Commerce July 24, 2019). Notably, Commerce issued these Final Results in the Hot Rolled Steel countervailing duty first review over a year prior to the November 2020 Final Results in the administrative review at issue here.

This Court has previously found that the *Hot-Rolled Investigation* determination and corresponding CVD rate simply do not constitute substantial evidence supporting Commerce's affirmative PMS determination.  Indeed, reviewing Commerce's reliance on the *Hot-Rolled Investigation* rate in the OCTG AR3 appeal, the Court found that reliance unreasonable:

> Commerce's reliance on the subsidy rate of nearly 60% or the revised subsidy rate of more than 40% from the {*Hot-Rolled Investigation*} countervailing duty investigation covering calendar year 2014 was unreasonable in light of available information of more contemporaneous subsidy rates of less than 2% for the period of review from August 12, 2016 to December 31, 2016, which overlaps partially with the OCTG III period of review from September 1, 2016 through August 31, 2017.

*SeAH Steel Corporation v. United States*, 513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021).

CSI suggests that a "key fact" in support of Commerce's PMS determination on the issue of subsidization is "that Commerce continues to find that Korean HRC producers are subsidized, regardless of the rates found in any particular proceeding."  CSI Br. at 25.  Again, CSI has entirely glossed over the fact that Commerce found, on the basis of AFA, a nearly-60 percent subsidization rate in the HRC investigation and subsequently found in the first review -- on the basis of respondents' own costs during a period corresponding more closely to the instant POR -- a near-*de minimis* rate.  Given these facts, CSI's argument is unpersuasive.

### b.    HRC Imports from China

Similarly, Defendant and CSI do not offer a persuasive response to NEXTEEL's arguments with respect to Commerce's determination that low-priced imports from China into the Korean market contributed to a PMS in Korea.  Specifically, Defendant mentions NEXTEEL's extensive argumentation on this point only in passing, referencing generally "plaintiffs' claims that some steel manufacturers in Korea realized a profit over the period of review and there was a decline in Chinese steel imports."  Def. Br. at 17.

Most glaringly, Defendant does not respond to NEXTEEL's point that Commerce identified no actual evidence concerning Korean steel prices or market forces to support its determination with respect to any impact of alleged low-priced imports.  See NEXTEEL 56.2 Br. at 25.  Commerce's only support for its conclusion as to the impact of Chinese imports on Korean prices was a general reference to Petitioners' allegation, without emphasizing any specific documentation or data points, or, indeed, without tying any alleged impact to NEXTEEL's reported costs.  *See* Final I&D Memo at 18-19, n. 105-110, P.R. 854 (citing to Petitioners' PMS Allegation at Exhibits 20, 26-30, and 42).  Clearly, an *allegation* made by an adversarial party is far from substantial evidence.  The substantial evidence standard does not allow Commerce to base its determinations on "mere conjecture or supposition."  *See, e.g., Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013); *LMI-La Metalli Indus., S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990) (explaining that an agency's "speculation . . . must yield to evidence").  As NEXTEEL has established, there is simply no evidence in the record that NEXTEEL's actual costs are outside the ordinary course of trade.

CSI highlights Commerce's explanation "that the evidence showed 'that Korea is one of the top two destinations of Chinese exports of hot-rolled steel, and import prices of HRC from China have generally been significantly lower than they are from the rest of the world.'"  CSI Br. at 25 (citing Final I&D Memo at 18, P.R. 854).  However, that Korea is a top destination for Chinese exports is separate from and immaterial to the question of whether Chinese imports into Korea have any adverse price effect on Korean hot-rolled steel prices generally or impacted the respondents' costs in particular.  As such, these materials do not provide support for the claim that these imports "plac{e} downward pressure on Korean domestic steel prices."  Final I&D Memo at 18, P.R. 854.

Importantly, neither Defendant nor CSI present any arguments that can overcome the significant evidence that NEXTEEL placed on the record in this review affirmatively demonstrating both that the global steel overcapacity situation improved in recent years, including in China and Korea during the POR, and a trend of increasing hot-rolled steel prices, which cuts against an indication of a PMS depressing steel prices in Korea.  *See, e.g.,* NEXTEEL 56.2 Br. at 25-27; NEXTEEL's PMS Comments and Rebuttal Factual Information (Aug. 12, 2019).  Commerce's determination that a PMS exists in Korea is not reasonable in light of this conflicting evidence.  *Universal Camera Corp.*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight"); *Nippon Steel Corp. v. United States*, 458 F.3d at 1351 (explaining that the substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable).

### c.   Strategic Alliances

With regard to strategic alliances, Defendant explicitly concedes that Commerce's conclusion on this point was based entirely on mere conjecture rather than any direct evidence. Indeed, Defendant states that "{e}ven though *the record did not contain specific evidence showing that strategic alliances <u>directly</u> created a distortion in HRC pricing*, the record evidence of strategic alliances and price fixing schemes between certain Korean HRC suppliers and Korean WLP producers is relevant as an element of Commerce's PMS determination."  Def. Br. at 18 (emphasis added).  Defendant goes on to state that "the strategic alliances and price fixing schemes *may have* created distortions in the prices of HRC in the past and *may* continue to impact pricing in a distortive manner during the period of review and in the future."  *Id* at 18 (emphasis added).

Of course, Defendant's position flies boldly in the face of the substantial evidence standard.  *See, e.g., LMI-La Metalli Indus., S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990) (explaining that an agency's "speculation . . . must yield to evidence"); *Jinan Yipin Corp.*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where Commerce's decision was based on "mere assumptions, which find no apparent support in record evidence").  As NEXTEEL has pointed out previously, Commerce's, and now Defendant's, own use of the word "may" confirms that Commerce's conclusion is total speculation.  There is no evidence of any relevant "strategic alliances" in the record, and -- importantly -- Commerce points to no evidence to demonstrate that that any such "strategic alliances" resulted in lower HRC prices, let alone any evidence to support the position that such HRC prices could render NEXTEEL's costs outside the ordinary course of trade.

13

### d.    Electricity

Finally, with regard to Commerce's determination that the Government of Korea's involvement in the electricity market in Korea is a contributing factor to the alleged PMS, NEXTEEL emphasized in its opening brief that Commerce pointed to no data or aspect of NEXTEEL's reporting that would reasonably indicate that NEXTEEL's electricity costs are somehow distorted or outside the ordinary course of trade.  NEXTEEL Br. 30-31.  Absent such evidence, Commerce cannot reasonably conclude that conditions in the electricity market in Korea contributed to a PMS and resulted in NEXTEEL's costs being outside the ordinary course of trade.  NEXTEEL also emphasized that, in CVD investigations into alleged electricity subsidies in , Commerce has repeatedly found that no measurable countervailable subsidies existed in the Korean steel market.  *See id.*

Defendant again has no real response to these arguments or offered an explanation as to why, despite Commerce's prior findings on this issue, it was reasonable to conclude that the electricity market is distorted in a manner that impacts respondents' costs.  Instead, Defendant contends that, notwithstanding these prior findings, "the record evidence establishes significant government control in the electricity market and associated distortions caused by price fixing across the market as a whole," such that "this factor contributes to a PMS because the distortion of Korea's electricity market places downward pressure on the pricing of electricity."  Def. Br. at 31.  Yet neither Defendant nor, indeed, Commerce, has highlighted any record evidence that would reasonably indicate that NEXTEEL's costs are distorted by any conditions within the electricity market.

### 3. Commerce May Not Rely on a Totality of the Circumstances Approach Where, As Here, None of the Factors Individually Demonstrates a PMS Existed

Defendant-Intervenors contend that Commerce properly relied on the "totality of the circumstances" arising from the four factors to reach its affirmative PMS finding. CSI Br. at 23-24. CSI argues that, where, as here, none of the factors individually was found to indicate a PMS, it is nevertheless reasonable for Commerce to conclude that the four factors together evidence a PMS:

> A totality of the circumstances is, by definition, a situation in which individual factors do not create a given outcome, but the combination of those factors does. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) ("Our precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation"). The easiest way to conceive of this is in hypothetical, numerical terms. Assume a PMS required some numerical threshold—say 20% distortion. If each factor accounted for only a 5% distortion, no single factor would support a PMS finding. But the four factors in the aggregate would accomplish what a single factor could not.

*Id.* CSI's analogy would be far more relevant if Commerce had actually quantified the effect of the four factors. Commerce has not done so, here or in any of its previous PMS determinations in the Korea steel cases. Commerce instead stated that, "{c}onsidered collectively, we continue to find that the allegations support a finding that a PMS existed during the POR in this administrative review." Final I&D Memo at 21, P.R. 854. As such, rather than the "5+5+5+5 = 20" example that CSI provides, CSI is really arguing that "0+0+0+0 = 1."

As the Court has determined previously, Commerce cannot reasonably point to the collective impact of related factors, without explaining explicitly how each factor individually contributes to the PMS finding. *See Husteel II*, 471 F. Supp. 3d at 1363-64; *Husteel I,* 426 F. Supp. 3d at 1391. Commerce has not done so here, and CSI's arguments that "totality of the

circumstances" is a sufficient replacement for substantial evidence on each factor therefore must fail.

The Court has, of course, already concluded that Commerce may not find that four factors collectively indicate a PMS when none of the factors individually indicates a PMS. For example, in *Husteel*, the Court concluded that "Commerce predicates its PMS determination, and adjustment, on the cumulative effect of various market 'distortions' without substantiating it findings regarding each factor or explaining how the factors prevent a proper comparison." *Husteel II*, 471 F. Supp. 3d at 1363-64. Similarly, in *Husteel I,* 426 F. Supp. 3d at 1391, the Court was clear that, "{a}lthough Commerce may rely on the cumulative effect of multiple distortions to arrive at a PMS determination, it cannot use that phrase to circumvent a meaningful review of the sufficiency of the record." *Id.* Likewise in the OCTG AR1 appeal, the Court concluded that "{i}t does not stand to reason that individually, the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion." *Nexteel*, 355 F. Supp. 3d at 1351. The same remains true in the instant proceeding.

**B. Defendant's and Defendant-Intervenors' Arguments in Support of Commerce's Regression-Based Methodology for Calculating the PMS Adjustment are Unpersuasive**

NEXTEEL submits that the issue of Commerce's PMS adjustment, and what methodology Commerce used to apply the PMS adjustment, is entirely moot because the PMS determination was unsupported by substantial evidence such that there should be no PMS adjustment. The statute only permits Commerce to apply a PMS adjustment to respondents' costs where a PMS "exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade." 19

U.S.C. § 1677b(e).  As such, the Court should only reach the issue of the PMS adjustment if the Court were to first conclude that Commerce's PMS determination were supported by substantial evidence and in accordance with law, such that Commerce could apply a PMS adjustment.  For the reasons established above and in the plaintiffs' moving briefs, the PMS determination was neither supported by substantial evidence nor in accordance with law.  As such, this Court should remand the PMS determination to Commerce with instructions to reverse its PMS determination and accordingly apply no PMS adjustment.

If, however, the Court sustains Commerce's PMS determination, NEXTEEL submits that Commerce's chosen methodology to quantify the impact of the PMS by "estimating" what NEXTEEL's hot-rolled steel input costs would have been absent the claimed PMS, was unreasonable because it bore no relationship to the costs NEXTEEL incurred (or the costs NEXTEEL would or could have incurred absent the PMS) to produce subject merchandise. Neither Defendant nor Defendant-Intervenor has submitted response arguments that provide necessary explanation as to the many errors contained within Commerce's regression methodology.

Indeed, Defendant has largely reiterated Commerce's unreasoned conclusions with respect to the regression-based methodology, without shedding necessary light on how the adjustment is reasonable.  Defendant, for example, states that

> Here, Commerce evaluated the regression analysis submitted by the domestic interested parties and made appropriate adjustments.   In selecting among imperfect alternatives, Commerce concluded that the regression analysis, as adjusted, "is a reasonable method to quantify the relationship between the global uneconomic capacity and the price of HRC."  Commerce's determination is consistent with 19 U.S.C. § 1677b(e), which only requires that the methodology be reasonable.

Def. Br. at 28-29 (citations omitted).  It is not sufficient for Commerce to state that its adjustment is reasonable; the agency is required to demonstrate why its selected methodology is reasonable under the statute.

NEXTEEL reiterates that Commerce's global regression-based methodology stands in complete contrast to the allegation of an *particular* market situation *within Korea*.  A global regression-based model in fact suggests that any "market situation" distorting costs in Korea is not "particular" at all, but rather a broad and general situation across the globe, resulting from "global steel overcapacity."

The Court has recently been presented with a related challenge to Commerce's use of a regression model to calculate a PMS adjustment in the appeal of the final results of the antidumping duty review of HWR from Korea.  *See Husteel*, Court No. 20-146, Slip Op. 21-126. There, as here, Commerce relied on a regression model to quantify the effects of the alleged PMS on the hot-rolled coil market and to calculate the upward adjustment.  There, as here, Commerce used in its regression model hot-rolled coil costs from 2017, despite that two-thirds of the period of review was in 2018.  The Court determined that Commerce's PMS adjustment was not supported by substantial evidence, concluding that "{u}sing data from 2017, which represents input costs for one-third of the review period, as opposed to 2018 data, which represents inputs costs from two-thirds of the review period, is neither reasonable nor supported by substantial evidence."  *Id.* at 29.

The same reasoning would apply here, where Commerce used outdated data for 2017 and no data at all for 2018, even though the period of review covered *11 months of 2018* (from December 1, 2017, through November 30, 2018).  As NEXTEEL has argued, this mis-alignment of the regression data and the POR render the regression model useless and irrelevant, and

Commerce deliberately ignored more timely record information. *See* NEXTEEL 56.2 Br. at 37-39, EFC Nos. 59& 60, May 24, 2021. And, just as in the HWR review, here too Commerce's explanation for declining to use the 2018 data was,"{s}ince the POR ended on November 30, 2018, the 2018 data includes information that falls beyond the POR and thus does not reflect the cost of goods that were sold during the POR." *See* Final I&D Memo at 37, P.R. 854. Again, 1 month of the POR was in 2017. This reasoning does not pass the laugh test, as Commerce instead used data from 2017 -- which, again, contained just one month of the POR -- rather than 2018, which contained 11 months of the POR.

### C. Defendant's Argument Regarding Commerce's Adjustments to NEXTEEL's Prime and Non-Prime Costs is Unavailing

With respect to Commerce's erroneous reallocation of a portion of NEXTEEL's non-prime costs of production to NEXTEEL's prime costs of production, NEXTEEL has established that the statute requires that reported costs must normally be used if (1) they are "based on the records . . . kept in accordance with the {GAAP}" and (2) "reasonably reflect" the costs of producing and selling the merchandise. *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321 (Fed. Cir. 2020).

Defendant contends that NEXTEEL is "incorrect" that the adjustment to NEXTEEL's costs "is inconsistent with the Federal Circuit's decision in {*Dillinger*}." Def. Br. at 34. Defendant attempts to distinguish the instant case from *Dillinger* by reference to a prior case on which *Dillinger* relied in part. Defendant's position seems to be that *Dillinger* can be distinguished because it relied on *IPSCO, Inc. v. United States*, 965 F. 2d 1056, 1060-61 (Fed. Cir. 1992), in which the Court "held that actual costs must be assigned to prime and non-prime products that are *suitable for use in the same general applications*," while "{h}ere, Commerce determined that NEXTEEL's non-prime products *cannot be used in the same general*

*applications* as its prime products." *Id.* at 34-35.  However, as NEXTEEL has pointed outthe

CAFC in *IPSCO* determined that a method that calculating costs on the basis of selling price

amounts to "unreasonable circular methodology," as "{t}he selling price of pipe became a basis

for measuring the fairness of the selling price of pipe." *IPSCO,* , 965 F.2d at 1060; see

NEXTEEL Br. at 44.

More importantly, however, Defendant has not and indeed cannot distinguish *Dillinger*

from the case at bar.  In *Dillinger*, the respondent recorded the costs for non-prime plate in its

normal books and records on the basis of likely selling price, but reported costs of non-prime

plate on the basis of average cost of production of prime and non-prime plate.  *See Dillinger* at

1321.  Commerce adjusted the reported costs to reflect the likely selling price, reasoning that

costs should be reported as they appear in the respondent's books and records.  *Id.* at 1321-22.

Commerce then reallocated the difference between the average costs of production and the

selling price to prime products, increasing those costs.  *Id.*  The CAFC found that such allocation

was unreasonable, and that Commerce was required instead to use the costs of production, rather

than sales value, as the basis of cost under the statute.  *Id.* at 1322.  Thus, the CAFC in *Dillinger*

determined that cost allocations based on sales value are such an unreasonable basis for

identifying the *actual* costs of production, as required by the statute, that Commerce must

diverge from the respondent's normal accounting where its normal accounting uses such sales

value-based allocations.

Although Defendant may disagree with the CAFC's reasoning in *Dillinger*, it is the case

that *Dillinger* is precedential on the precise issue presented here.  Here, Commerce has diverged

from NEXTEEL's books and records, which attributed full and actual costs to NEXTEEL's non-

prime products, by capping the booked costs for non-prime products at sales value and re-allocating the difference between the cost of production and sales value to prime products.

Importantly, this Court has squarely decided this issue in the prior Line Pipe AR2 proceeding, where the Court was clear that *Dillinger* requires that Commerce use actual costs when calculating constructed value:

> More problematic, however, is Commerce's explanation of how a methodology that calculates costs of non-prime products based on its resale value and reallocates the difference between the resale value and actual costs of producing non-prime products to the costs of prime products accords with the Court of Appeals' instruction to use actual costs when calculating constructed value. *Dillinger* holds that Commerce must calculate constructed value based on the actual costs incurred in the production of prime and non-prime products.

*See Husteel*, 520 F. Supp. 3d at 1309 (citations omitted).  The facts have not changed in the current review.  It remains the case that *Dillinger* requires Commerce to calculate constructed value using the actual costs incurred in the production of prime and non-prime products. Accordingly, the Court should remand Commerce's reallocation of NEXTEEL's costs of production for non-prime products.

Commerce itself adopted this analysis in the recent fourth administrative review Final Results issued on October 15, 2021 and set to publish in the Federal Register on October 21, 2021.  *See Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. ___ (Oct. 21, 2021) and accompanying Issues and Decision Memorandum at Cmt. 3 (explaining that, "in *Dillinger*, the CAFC held that Commerce is required to determine the actual costs of non-prime products.  Accordingly, we have reconsidered the non-prime adjustment applied in the Preliminary Results.").

**D.  Defendant's Argument Regarding Commerce's Allocation of Costs Associated with Suspended Production Line Losses to G&A Expenses is Unavailing**

With regard to Commerce's reallocation of NEXTEEL's suspended production loss costs from COGS to G&A expenses, NEXTEEL acknowledges that the Court recently sustained Commerce's determination on remand on this issue in *Husteel v. United States*, 520 F. Supp. 3d at 1306-08, in the LP AR2 appeal.  Nevertheless, NEXTEEL continues to submit that as the company reported costs consistent with its normal accounting principles, which accord with GAAP, and the costs reasonably reflects costs of production, it is unreasonable for Commerce to reallocate the reported costs.

Defendant argues in its response brief that

> It was reasonable to associate these costs with the general operations of the company as a whole (*i.e.*, with general expenses), and not specific to products associated with that production line (*i.e.*, costs of goods sold), because by suspending its production lines for an extended period of time during the period of review, no revenue from those products was generated for that period, and the associated costs were necessarily covered by all the other products produced by NEXTEEL.

Def. Br. at 36.  However, as NEXTEEL has established, the expenses resulting from the suspension loss were manufacturing-related expenses as recorded in NEXTEEL's books and records kept pursuant to Korean GAAP.  Such costs do not belong in the G&A expense ratio, which is for general costs to be borne by the company as a whole, because the costs were incurred in relation to suspended production on specific lines -- certain non-subject OCTG lines and on one line pipe forming line during the POR.  *See* NEXTEEL Sections C & D Response at D-10, C.R. 84-91, P.R. 80.  In accordance with the company's normal accounting treatment, the costs of the suspended lines were classified as COGS in NEXTEEL's financial statements.  *See id.*  NEXTEEL did not include these costs in its reported costs because they were not recognized as costs of goods sold, in accordance with K-IFRS.  *Id.*  Thus, the reported costs of production

were calculated consistent with the requirements of the statute, 19 U.S.C. §  1677b(f)(1)(A), which directs Commerce to calculate costs (selling expenses, G&A expenses, and profit) based on the records of the exporter or producer of the merchandise where such costs are kept in accordance with GAAP and reasonably reflect production and selling costs.

No party disputes that NEXTEEL's costs are kept in accordance with Korean GAAP.  As such, the only remaining question is whether NEXTEEL's costs "reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A). NEXTEEL's costs were calculated based on its records kept in accordance with GAAP and reasonably reflect production and selling costs, consistent with the requirements of the statute. Nothing in the record would warrant deviating from NEXTEEL's reporting in its books and records.  Again, the costs for suspending a line of production of non-subject merchandise directly relate to the production of non-subject merchandise.  Under Korean GAAP, these costs are recognized as COGS.  These costs were not included in NEXTEEL's reported costs because they were not recognized as a cost of manufacturing, but rather than as cost of goods sold, in accordance with K-IFRS.  *Id*.  Commerce's reallocation of these production-related costs to COGS is not reasonable in light of the statute's preference for using actual costs based on a respondent's records, so long as those records are kept in accordance with Korean GAAP and reasonably reflect production and selling costs.  The Court should accordingly remand this issue to Commerce for further explanation or reconsideration.

## III.   <u>CONCLUSION</u>

For the foregoing reasons and consistent with the arguments presented in NEXTEEL's moving brief, NEXTEEL respectfully requests that this Court hold Commerce's *Final Results* to be unsupported by substantial evidence and otherwise not in accordance with law.  NEXTEEL further requests that this Court remand the agency's determination with instructions to Commerce to correct its errors and to provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

/s/ J. David Park

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20001
PHONE:  (202) 942-5000
FAX:  (202) 942-5999

*Counsel to NEXTEEL Co., Ltd.*
*Plaintiff and Consolidated Plaintiff*

**Date:  October 20, 2021**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| NEXTEEL CO., LTD. ET AL., | ) |
| | ) |
| *Plaintiff and Consolidated Plaintiffs,* | ) |
| | ) |
| **and** | ) |
| | ) |
| HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY | ) |
| | ) |
| *Plaintiff-Intervenors,* | ) **Consol. Ct. No.:  20-03898** |
| | ) |
| **v.** | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| **and** | ) |
| | ) |
| CALIFORNIA STEEL INDUSTRIES, INC. ET AL., | ) |
| | ) |
| *Defendant-Intervenors* **and** *Consolidated Defendant-Intervenors.* | ) |

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Reply Brief in Support of NEXTEEL Co., Ltd.'s Motion for Judgment Upon the Agency Record, filed on October 20, 2021, contains 6,961 words, exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 7,000 word count limitation set forth in the Court's Chambers Procedures.

By:     /s/ J. David Park
        J. DAVID PARK

**Dated:  October 20, 2021**