| Tab. No. | Document | Date | P.R. | C.R. | Pages Included |
|---|---|---|---|---|---|
| **7** | Petitioner PMS Allegation | 6/25/2019 | 95-696 | 110, 168, 181-206, 217-240 | Cover, Narrative, Exhibit 19, Exhibit 23, Exhibit 33, Exhibit 37, Exhibit 38, Exhibit 39, Exhibit 40, Exhibit 42 Exhibit 42, Exhibit 67 |

Barcode:3853466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/18

# SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 E: RSCHAGRIN@SCHAGRINASSOCIATES.COM F: (202) 429-2522

June 25, 2019

Case No. A-580-876
Total Pages: 8,731
Administrative Review for the POR
12/1/2017-11/30/2018
AD/CVD Operations, Office II

**PUBLIC VERSION**

BPI of SeAH deleted from Exs. 1 & 2
BPI of NEXTEEL deleted from Exs. 3 – 5
BPI of POSCO deleted from Ex. 5
BPI of Domestic Interested Parties deleted
in pp. 22, 23, 45, 46, 48, 51 & 54, Exhibit
Table, and Exs. 35, 56, 59, 60, 61, 63, & 69.

**VIA ELECTRONIC FILING**
The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC  20230

Re:     **Welded Line Pipe from the Republic of Korea: Particular Market Situation
Allegation and Supporting Factual Information**

Dear Secretary Ross:

On behalf of California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA

("Domestic Interested Parties"), we hereby submit to the U.S. Department of Commerce

("Commerce" or "the Department") that a particular market situation ("PMS") under 19 U.S.C.

§ 1677b(e) exists in the Republic of Korea ("Korea") such that the costs of production ("COP") of

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 2

welded line pipe ("WLP") in Korea are distorted.  We also provide factual information relating to

the existence of this PMS.[1]

This allegation and supporting factual information are timely submitted pursuant to the

deadline established in Commerce's notice of initiation of this review,[2] as extended in Commerce's

June 11, 2019 letter.[3]  The factual information contained herein is submitted in support of an

allegation not specified in 19 C.F.R. § 351.301(c)(2)(i)-(iv), and it thus information described in

19 C.F.R. § 351.102(b)(21)(v).[4]

Domestic Interested Parties note that, as authorized applicants to the administrative

protective order ("APO") of the second administrative review of the antidumping duty order on

*Welded Line Pipe from Korea*, we are placing certain business proprietary information ("BPI")

from that segment on the present record, consistent with the APO of the second administrative

review.[5]

## I.    PERSISTENCE OF A PRIOR PMS DETERMINATION

The Domestic Interested Parties urge Commerce to apply the concept of persistence to

affirmative PMS findings.  Commerce routinely incorporates persistence of its findings as a means

to minimize the burden on itself and interested parties, particularly where the underpinning facts

---

[1]    *See* **Exhibits 1-72**.

[2]    *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9297, 9298 (Dep't Commerce Mar. 14, 2019).

[3]    Letter from Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to Counsel for Domestic Interested Parties, re: *2017 - 2018 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea* (June 11, 2019).

[4]    This statement complies with 19 C.F.R. § 351.301(b).

[5]    *See* Dep't Commerce Administrative Protective Order, *In the Matter of the Administrative Review of the Antidumping Duty Order on Welded Line Pipe from South Korea (A-580-876) (12/1/16 — 11/30/17)* (Feb. 23, 2018) at 1 ("If business proprietary information that is submitted in this segment of the proceeding is relevant to an issue in two consecutive subsequent administrative reviews, an authorized applicant may place such information on the record of those reviews").  Domestic Interested Parties respectfully submit that information on the effect of Commerce's PMS determinations in the first and second administrative reviews are relevant to the issues in this submission.

Barcode: 3855466-01 A-580-876 REV - Admin Review 12/1/17 - 11/... **PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 3

are unlikely to change and wholesale analysis would likely lead to the same conclusions.  For example, given the massive volume of data and analysis required to determine whether a country is or is not a non-market economy, once NME status is determined, Commerce presumes that a non-market economy remains so from proceeding to proceeding, until it is proven otherwise.  Similarly, Commerce allows respondents who have already applied for and received a separate rate in a previous proceeding to submit a certification that their status has not changed and they continue to meet the *de jure* and *de facto* criteria to qualify for a separate rate.  Commerce also determines that parties that form a single entity remains so from proceeding to proceeding, until proven otherwise.  Finally, prior to the TPEA, where the Department found sales below cost in a prior segment, the presumption that this condition persisted, obviating the need for petitioners to make a new sales-below-cost allegation.[6]

By incorporating persistence in its affirmative PMS determinations, Commerce would achieve a balance in administering its proceedings; minimizing the burden on its limited resources while allowing for parties to present facts that may alter the finding.  Given that a PMS inquiry focuses on causal factors that are not transient, once Commerce finds that a PMS exists, that finding is unlikely to change from one segment of a proceeding to the next.  Commerce would streamline the administrative process by starting with the rebuttable presumption that the prior PMS continued to exist in the subsequent proceeding.

Indeed, Commerce has already taken steps towards attaching the concept of persistence where the existence of a PMS in a prior segment provides a basis to believe or suspect that a PMS exists in the current review, eliminating the initial step of making an allegation.  In the first

---

[6]       Domestic Interested Parties note that sales-below-cost-of-production and PMS are both conditions outside the "ordinary course of trade" as defined by Sec 771(15) of the Tariff Act.

3

Barcode:3851466-01 A-580-876 REV - Admin Review 12/1/17 - 11/...

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 4

administrative review of OCTG from Korea, Commerce determined that the affirmative PMS

finding in the first administrative review of OCTG from Korea, constituted an independent basis

for opening a PMS inquiry in the Second Administrative Review.[7]  The Department made three

persuasive statements regarding the preliminary PMS finding:

> In this letter, we stated that "{b}oth the {particular market situation}
> finding in the prior administrative review and the allegation in the
> current review provide a separate basis to believe or suspect a
> {particular market situation} exists in the current review."

> For the current review, after analyzing Maverick's allegation and
> the factual information and comments subsequently submitted by
> interested parties, the Department preliminarily determines that the
> circumstances present during the instant review remained largely
> unchanged from those in the prior review which led to the finding
> of a particular market situation in Korea in the 2014-2015 Final
> Results. Therefore, for these preliminary results, the Department
> finds that, based on the collective impact of Korean HRC subsidies,
> Korean imports of HRC from China, strategic alliances, and
> government involvement in the Korean electricity market, a
> particular market situation exists in Korea which distorts the OCTG
> costs of production.

> Although the record does not contain specific evidence showing that
> strategic alliances directly created a distortion in HRC pricing in the
> current period of review, the Department nonetheless finds that
> these strategic alliances between certain Korean HRC suppliers and
> Korean OCTG producers are relevant as an element of the
> Department's analysis in that they may have created distortions in
> the prices of HRC in the past, and may continue to impact HRC
> pricing in a distortive manner during the instant POR and in the
> future.[8]

Through these three statements, Commerce has attached three concepts of persistence to a

PMS finding.  First, Commerce acknowledged that a prior finding of a PMS is in itself a reasonable

---

[7]     Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty admin, rev. and final deter, of no shipments; 2015-2016) at Comment 1 ("OCTG Korea AD AR2 IDM"), attached at **Exhibit 21**.

[8]     *Id.* (emphasis added).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 5

basis to launch a PMS inquiry in a subsequent proceeding.  Second, Commerce determined that a PMS will continue to exist if the facts underpinning the original finding largely continue in a subsequent proceeding.  Third, contributing factors to a PMS finding have long-term temporal aspects.

Commerce has previously found that a PMS exists in each of the two preceding segments reviewing this Order.  The causal factors, such as global overcapacity driven by China and the Government of Korea's subsidization of Korean producers and ownership stake in the electricity market, are not temporary fact patterns that are likely to change from review to review.  Indeed, the global overcapacity in steel is a decades-long issue.  Therefore, the Domestic Interested Parties respectfully request that Commerce initiate a PMS inquiry solely based upon the finding that a PMS existed in the last segment and provide interested parties the opportunity to demonstrate that a PMS no longer exists.  Notwithstanding this, the Domestic Interested Parties submit standalone data and analysis which independently support opening a PMS inquiry.

The Domestic Interested Parties present a complete PMS allegation in two parts.  Parts II and III provide the qualitative analysis of the market in Korea and present the factual information supporting a determination that a particular market situation existed during the POR that distorted the costs of acquiring hot-rolled coil ("HRC"), the primary input into welded line pipe ("WLP").  Part IV offers a quantitative analysis that quantifies an adjustment for distorted HRC costs in Korea using a regression analysis based on the relationship between global excess capacity and prices for HRC.

5

Barcode:3855466-01 A-580-876 REV - Admin Review 12/1/17 - 11/... **PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 6

## II.    A PARTICULAR MARKET SITUATION EXISTS IN KOREA

Domestic Interested Parties respectfully request that Commerce find – as it did in the first administrative review[9] and second administrative review[10] – that a PMS exists in Korea such that corrective adjustments to respondents' reported data are warranted.  In the second administrative review of the underlying antidumping duty order, Commerce found that "a PMS existed in Korea that distorted the COP for WLP" under Section 504 of the Trade Preferences Extension Act ("TPEA") (codified at 19 U.S.C. § 1677b(e)).[11]  To account for this PMS, Commerce made upward adjustments to respondents SeAH Steel Corporation's ("SeAH") and NEXTEEL Co., Ltd.'s ("NEXTEEL") reported costs for hot-rolled coil ("HRC"), the primary input for WLP, based on the subsidy rates found in the final determination in *Hot-Rolled Steel Flat Products from Korea*.[12]

The information regarding the Korean market provided in this submission warrants a finding that a PMS continues to exist in Korea and upward adjustments to SeAH's and NEXTEEL's reported HRC costs in this review.[13]

A series of extreme government actions and unfair competition in Korea, as well as persistent global overcapacity, continue to support an affirmative PMS finding in this review.

---

[9]    *See* Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of antidumping duty admin, rev.; 2015-2016) at 1-26 ("WLP Korea AD AR1 Final IDM"), attached at **Exhibit 14**.

[10]    *See* WLP Korea AD AR2 Final IDM at 4-28, attached at **Exhibit 6**.

[11]    *See* WLP Korea AD AR2 Final IDM at 7, attached at **Exhibit 6**.

[12]    *See* WLP Korea AD AR2 Final IDM at 26-28, attached at **Exhibit 6**.

[13]    Domestic Interested Parties note that Commerce has consistently made upward adjustments to SeAH's and NEXTEEL's reported HRC costs in the administrative reviews of *Oil Country Tubular Goods from Korea*.  *See* Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) (final results of antidumping duty admin, rev.; 2016-2017) at 30-43 ("OCTG Korea AD AR3 IDM"), attached at **Exhibit 20**; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty admin, rev. and final deter, of no shipments; 2015-2016) at 16-23 ("OCTG Korea AD AR2 IDM"), attached at **Exhibit 21**; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Korea,* 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty admin, rev.; 2014-2015), *amended,* 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of antidumping duty admin. rev.; 2014-2015) at 40-43 ("OCTG Korea AD AR1 IDM"), attached at **Exhibit 22**.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 7

Such conditions include:  (1) the overall distortion of WLP COP as a result of the countervailable subsidization of Korea hot-rolled steel products ("HR" or "HRC");[14] (2) global overcapacity, driven by China, and the resulting distortive pricing of unfairly traded Chinese HRC, other HRC imports, and Korean HRC; (3) anticompetitive strategic alliances between Korean hot-rolled steel producers and downstream pipe producers; and (4) the distortive government subsidization of electricity in Korea.[15]  In the second administrative review, "Commerce considered, as a whole, the four PMS allegations based on their cumulative effect on the Korean WLP market" and found that "the allegations represent facets of a single PMS."[16]

The information relating to the PMS in Korea in this submission demonstrates a PMS continues to exist in Korea during this POR.  Accordingly, as Commerce found in the second administrative review, the agency should continue to find in this third review that "the record evidence demonstrates that the four alleged factors were present during the {POR}, and that the facts on th{e} record support the finding that a PMS existed during this POR."[17]  Likewise, in this review, Commerce should continue to make corrective adjustments to respondents' reported costs.[18]  Moreover, in making corrective adjustments to address PMS distortions, Commerce should not limit its corrective adjustments to solely the effects of countervailable subsidization of Korean HRC production, but Commerce should also separately and additionally quantify the distortions to WLP production costs caused by strategic alliances between HRC suppliers and downstream pipe producers, the Korean government's control of electricity, and persistent global

---

[14]     *See* WLP Korea AD AR2 Final IDM at 17 (stating that "HRC as an input of WLP constitutes the largest portion of the cost of WLP production; thus, distortions in the HRC market have a significant impact on production costs for WLP"), attached at **Exhibit 6**.

[15]     WLP Korea AD AR2 Final IDM at 17-23, attached at **Exhibit 6**.

[16]     WLP Korea AD AR2 Final IDM at 7-8, attached at **Exhibit 6**.

[17]     WLP Korea AD AR2 Final IDM at 20, attached at **Exhibit 6**.

[18]     *See* WLP Korea AD AR2 Final IDM at 26-28, attached at **Exhibit 6**.

7

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 8

overcapacity distorting the prices of HRC, including imports of Chinese and Japanese HRC into Korea.

Additionally, Domestic Interested Parties request that Commerce consider adopting – as an alternative to the adjustments otherwise proposed in this submission – Domestic Interested Parties' alternative methodology for calculating an adjustment to respondents' reported costs. Should Commerce decline to account for the PMS in the Korean steel market by averaging all subsidy rates from *Hot-Rolled Steel from Korea* to arrive at an appropriate PMS adjustment for all non-POSCO and non-Korean HRC purchases, the agency should make an upward adjustment to all HRC purchases-both Korean and non-Korean-based on Domestic Interested Parties' proposed regression analysis.

As detailed below, recognizing that the global steel overcapacity crisis is the fundamental driver that links together the various factors that collectively define a given PMS, Domestic Interested Parties have developed a global-excess-capacity-based regression analysis that quantifies the impact of the global steel excess capacity on the price of HRC at the national level and derives a corresponding adjustment factor that, when applied to the respondents' HRC costs, accounts for the distortions inherent to an overcapacity-driven PMS. As provided by this analysis, respondents' HRC costs should be increased by 49.35 percent to account for the distortive effects of the PMS affecting the Korean HRC market.

Accordingly, Domestic Interested Parties provide the enclosed factual information for Commerce to determine, as in the second review, that a PMS continues to exist during this POR, and to make corresponding corrective adjustments to SeAH's and NEXTEEL's costs, including

8

Barcode:3885466-01 A-580-876 REV - Admin Review 12/1/17 - 11/...

Honorable Wilbur L. Ross, Jr.                                              **PUBLIC VERSION**
June 25, 2019
Page 9

and in addition to those it has previously employed, to account for the PMS in Korea.

### A. Subsidization of Korean Hot-Rolled Steel Products by the Korean Government

The Korean government heavily subsidizes domestic hot-rolled steel producers. HRC represents the primary material input for, and the largest portion of the cost in the production of, WLP. The subsidization of HRC production by the Korean government distorts the HRC domestic market and has a significant effect on the production cost of Korean producers of WLP. Both respondents – SeAH and NEXTEEL – purchase HRC for WLP production from Korean producers, including POSCO,[19] who received such subsidies.[20] In this review, both respondents continue to confirm that HRC is the primary input in WLP production.[21] Moreover, unfairly priced Chinese steel products and other imports have flooded the Korean steel market due to persistent global

---

[19]      *See* Letter from Law Office of Jeffrey M. Winton PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Order on Welded Line Pipe from Korea - Response to Section B, C, D and E of the Department's April 1 Questionnaire* (May 21, 2019) at Section D, p. 8 n.5 ("SeAH Sec. B-E IQR"); *id.* at Section D, Appendix D-4-A, excerpt attached at **Exhibit 2**; Letter from Law Office of Jeffrey M. Winton PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Order on Welded Line Pipe from Korea for the 2017-18 Review Period - Response to Section A of Department's April 1 Questionnaire* (Apr. 29, 2019) at 20-21 n.13 ("SeAH Sec. A IQR"), excerpt attached at **Exhibit 1**; Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: POSCO's Response Related to the COP Portion of the Department's April 1, 2019 Questionnaire to NEXTEEL* (May 30, 2019) at Exhibit SQ-3 ("POSCO COP IQR"), excerpt attached at **Exhibit 5**.

[20]      *See generally* Issues and Decision Memorandum accompanying *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), *amended*, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (amended final affirm, countervailing duty deters. and countervailing duty orders) ("HR Korea Final IDM"), attached at **Exhibit 23**; Memorandum from Katie Marksberry, International Trade Compliance Analyst, AD/CVD Operations, Office V, through Catherine Bertrand, Program Manager, AD/CVD Operations, Office V, to The File, re: *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Amended Final Determination Calculation Memorandum for POSCO* (Aug. 23, 2016) at 3 ("HR Korea Amended POSCO Calculation Memo"), attached at **Exhibit 25**.

[21]      *See* SeAH Sec. B-E IQR at Section D, p. 8; *id.* at Section D, p. 9; *id.* at Section D, p. 41; *id.* at Section D, Appendix D-4-C, excerpt attached at **Exhibit 2**; SeAH Sec. A IQR at 21 n.13, excerpt attached at **Exhibit 1**; Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: NEXTEEL's Sections C and D Questionnaire Response* (May 21, 2019) at 5 ("NEXTEEL Sec. D IQR"); *id* at Exhibit D-4, excerpt attached at **Exhibit 4**; Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: NEXTEEL's Section A Questionnaire Response* (Apr. 29, 2019) at A-25 ("NEXTEEL Sec. A IQR"), excerpt attached at **Exhibit 3**; *see also* SeAH Sec. B-E IQR at Section D, Appendix D-4-A, excerpt attached at **Exhibit 2**.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 10

overcapacity, driven in large part by Chinese steel manufacturers' overcapacity. Such imports, together with the Korean government's subsidization of HRC, place additional downward pressure on the Korean domestic steel prices and further distort the market prices of HRC, the main input in WLP production.

Accordingly, Domestic Interested Parties submit the following factual information regarding the subsidization of Korean hot-rolled steel products by the Korean government:

**Exhibit 1:**   Excerpt from SeAH Sec. A IQR.

- This exhibit contains an excerpt from SeAH's response to the initial Section A questionnaire in the third administrative review.

**Exhibit 2:**   Excerpt from SeAH Sec. B-E IQR.

- This exhibit contains an excerpt from SeAH's response to the initial Sections B, C, D, and E questionnaire in the third administrative review.

**Exhibit 3:**   Excerpt from NEXTEEL Sec. A IQR.

- This exhibit contains an excerpt from NEXTEEL's response to the initial Section A questionnaire in the third administrative review.

**Exhibit 4:**   Excerpt from NEXTEEL Sec. D IQR.

- This exhibit contains an excerpt from NEXTEEL's response to the initial Section D questionnaire in the third administrative review.

**Exhibit 5:**   Excerpt from POSCO COP IQR.

- This exhibit contains an excerpt from POSCO's response to the COP portion of the questionnaire in the third administrative review.

**Exhibit 6:**   WLP Korea AD AR2 Final IDM

- This exhibit contains the Issues and Decision Memorandum for the final results of the second administrative review, pertaining to the agency's PMS determination in that review.

**Exhibit 7:**   Memorandum from Joshua Tucker, International Trade Compliance Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *Welded Line Pipe from the Republic of*

**PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 11

> *Korea: 2016-2017 Antidumping Duty Administrative Review - Final Results Margin Calculation for SeAH* (June 7, 2019) (PUBLIC VERSION).

- This exhibit contains the final calculation memorandum for SeAH from the second administrative review.

  **Exhibit 8:** Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: *2016-2017 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Final Results Margin Calculation for NEXTEEL Co., Ltd.* (June 7, 2019) (PUBLIC VERSION).

- This exhibit contains the final calculation memorandum for NEXTEEL from the second administrative review.

  **Exhibit 9:** Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *2016-2017 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Calculation of the Review-Specific Average Rate for the Final Results* (June 7, 2019) (PUBLIC VERSION).

- This exhibit contains the final calculation memo for the review-specific average rate from the second administrative review.

  **Exhibit 10:** Excerpt from Letter from Law Office of Jeffrey M. Winton PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Order on Welded Line Pipe from*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 12

*Korea - Response to Section B, C, D and E of the Department's March 19 Questionnaire* (May 14, 2018) (PUBLIC VERSION).

- This exhibit contains an excerpt from the public version of SeAH's response to the initial Sections B, C, D, and E questionnaire in the second administrative review.

**Exhibit 11:**   Excerpt from Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: NEXTEEL's Section D Questionnaire Response* (May 15, 2018) (PUBLIC VERSION).

- This exhibit contains an excerpt from the public version of NEXTEEL's response to the initial Section D questionnaire in the second administrative review.

**Exhibit 12:**   Excerpt from Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: NEXTEEL's Second Section D Supplemental Questionnaire Response* (Aug. 6, 2018) (PUBLIC VERSION).

- This exhibit contains an excerpt from the public version of NEXTEEL's response to the second Section D supplemental questionnaire in the second administrative review.

**Exhibit 13:**   Domestic Interested Parties' Aug. 7, 2018 PMS Allegation

- This exhibit contains the public version of the Domestic Interested Parties' PMS Allegation and Factual Information submission, filed in the second administrative review.  It contains the narrative portion of Domestic Interested Parties' allegation demonstrating that the PMS in Korea affects WLP production.

**Exhibit 14:**   WLP Korea AD AR1 Final IDM.

- This exhibit contains the Issues and Decision Memorandum for the final results of the first administrative review, pertaining to the agency's PMS determination in that review.

**Exhibit 15:**   Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re:  *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Discussion of Business Proprietary Information for the Final Results - Particular Market Situation* (July 11, 2018) (PUBLIC VERSION).

- This exhibit contains the PMS memorandum discussing BPI from the first administrative review.

**Exhibit 16:**   Memorandum from Ross R. Belliveau, Senior International Trade Compliance Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re:  *Welded Line Pipe from the Republic of Korea:   2015-2016 Antidumping Duty Administrative Review -*

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 13

*Calculations for SeAH Steel Corporation for the Final Results* (July 11, 2018) (PUBLIC VERSION).

- This exhibit contains the final calculation memorandum for SeAH from the first administrative review.

    **Exhibit 17:**    Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Final Results Margin Calculation for Hyundai Steel Company* (July 11, 2018) (PUBLIC VERSION).

- This exhibit contains the final calculation memorandum for Hyundai from the first administrative review.

    **Exhibit 18:**    Memorandum from William Miller, International Trade Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Calculation of the Review-Specific Average Rate for the Final Results* (July 11, 2018) (PUBLIC VERSION).

- This exhibit contains the final calculation memo for the review-specific average rate from the first administrative review.

    **Exhibit 19:**    Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Supporting Information* (Apr. 2, 2019) (PUBLIC VERSION) ("HWR Apr. 2, 2019 PMS Allegation").

- This exhibit contains an excerpt from the public version of the submission of factual information relating to the PMS in Korea in the 2017-2018 administrative review of *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*. **Exhibit 19** includes the narrative portion of the PMS allegation filed in that review, as well as numerous sources related to the subsidization of the Korean steel industry by the Korean government, and the flood of cheap Chinese steel products flooding into the Korean steel market. Specifically, **Exhibit 19** contains the following sources:

    - Costas Paris, *South Korea Hands Another $5 Billion to Hyundai Merchant Marine*, Wall St. Journal (Oct. 10, 2018), detailing how the Korean government has subsidized the Korean steel industry by propping up the struggling Korean shipbuilding industry. HWR Apr. 2, 2019 PMS Allegation (Ex. 10)

    - U.S. Imports of Carbon and Alloy Oil Country Tubular Goods, U.S. International Trade Commission (2018), comparing U.S. import data for January to March 2018 to import data for January to March 2017, and demonstrates that consistent with the

13

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 14

goals and expected effects of the Korean government's 2016 proposal for the steel industry, pipe imports to the United States have been flooding the United States market. HWR Apr. 2, 2019 PMS Allegation (Ex. 64)

▪ Korean Government Proposal for Strengthening the Competitiveness of the Steel Industry, containing a proposal of the Korean government, which discusses Korean steel supply and demand conditions, the effect of Chinese excess capacity in the Korean steel market, and plans by the Korean government to strengthen the Korean steel industry through a series of goals.  As illustrated by this exhibit, in light of high and increasing Chinese steel imports that have captured market share in Korea, the Korean government has set out to assist steel producers, and particularly plate and pipe producers, with respect to, *inter alia*, business restructuring, capital, and R&D.  HWR Apr. 2, 2019 PMS Allegation (Ex. 65)

▪ *S. Korean shipbuilding industry expects another tough yea*r, containing information in support of the argument that the crisis in the Korean shipbuilding industry has, and will continue to, adversely affect the steel market in Korea.  HWR Apr. 2, 2019 PMS Allegation (Ex. 66)

▪ *How China Skirts America's Antidumping Tariffs on Steel*, containing an article explaining how Chinese "{g}overnment-backed manufacturers have avoided steel U.S. and EU levies by shutting production at home and expanding overseas."  HWR Apr. 2, 2019 PMS Allegation (Ex. 67)

▪ Keith Bradsher, *Tariff Dodgers Stand to Profit Off US.-China Trade Dispute*, The New York Times (Apr. 22, 2018), containing an article supporting the argument that Chinese steel producers actively engage in trade strategies to ensure their continued and increasing access to global steel markets.  This article in particular discusses the Chinese companies' use of transshipments through Southeast Asian countries to avoid high tariffs and import limits.  HWR Apr. 2, 2019 PMS Allegation (Ex. 68)

▪ MarEx, *South Korea to Underwrite Hundreds of Ship Orders* The Maritime Executive (Apr. 6, 2018), containing information in support of the argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea.  HWR Apr. 2, 2019 PMS Allegation (Ex. 69)

▪ *World crude steel output increases by 5.3% in 2017*, Worldsteel.org (Jan. 24, 2018), containing information showing that world crude steel production increased in 2017 as compared to 2016.  HWR Apr. 2, 2019 PMS Allegation (Ex. 70)

▪ Julie Kim Jackson, *Korea's shipbuilding orders look to finish at world's No. 2 this year*, The Korea Herald (Dec. 8, 2017), containing information in support of the

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 15

> argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea. HWR Apr. 2, 2019 PMS Allegation (Ex. 71)

> ▪ Henning Gloystein and Jane Chung, *Back from the abyss:  South Korea's shipbuilders begin ascent to growth*, Reuters (Nov. 1, 2017), containing information in support of the argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea. HWR Apr. 2, 2019 PMS Allegation (Ex. 76)

> ▪ Excerpt from *Nice Rating*, *Restructuring of Steel Industry Depends on the Speed and the Will:  Regarding the Issuance of the Proposal for Strengthening of the Competitiveness of the Steel Industry*, NICE Investors Service (Sept. 30, 2016), containing information on the plate and steel pipe sector in Korea and assesses the Korean government's September 2016 restructuring proposal for the Korean steel industry. The exhibit explains that plate has low operating rates and that declines in profitability are likely given decreasing demand in the shipbuilding industry. In addition, the exhibit indicates that pipe sales have decreased since 2015 and that restructuring of the sector is highly likely. HWR Apr. 2, 2019 PMS Allegation (Ex. 76)

> ▪ *Severe Excess Supply in Steel Pipe, Cold Rolled and Plate Sectors...Concerns Loom over Dongkook Steel and SeAH Group, Invest Chosun* (May 20, 2016), explaining the poor and worsening conditions of supply and demand for steel pipe and cold-rolled, as well as the declining conditions in the shipbuilding industry that are negatively affecting plate supply and demand. Further, this article illustrates the stark contrast between low production utilization rates for steel pipe and cold-rolled (*i.e.*, below 50 percent), and astronomically high excess capacity for these products (*i.e.*, almost 300 percent and almost 500 percent, respectively). The exhibit also demonstrates that the Korean steel industry called for government assistance in restructuring the industry as to steel pipe, cold-rolled, and plate. HWR Apr. 2, 2019 PMS Allegation (Ex. 86)

> ▪ The Effect of Imports of Steel on the National Security-An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, As Amended, containing information from the recent Section 232 steel investigation, including information on utilization rates for global steel production. HWR Apr. 2, 2019 PMS Allegation (Ex. 89)

> ▪ The Current Capacity Shake-up in Steel and How the Industry is Adapting, containinig information on utilization rates for global steel production. HWR Apr. 2, 2019 PMS Allegation (Ex. 90)

**Exhibit 20:**    OCTG Korea AD AR3 IDM.

• This exhibit contains Commerce's Issues and Decision Memorandum for the final results in the third administrative review of *OCTG from Korea*, finding the existence of a PMS in

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 16

Korea affecting OCTG production cost, and making a corresponding adjustment to reported HRC costs from Korean suppliers.

**Exhibit 21:**     OCTG Korea AD AR2 IDM.

- This exhibit contains Commerce's Issues and Decision Memorandum for the final results in the second administrative review of *OCTG from Korea*, finding the existence of a PMS in Korea affecting OCTG production cost, and making a corresponding adjustment to reported HRC costs from Korean suppliers.

**Exhibit 22:**     OCTG Korea AD AR1 IDM.

- This exhibit contains Commerce's Issues and Decision Memorandum for the final results in the first administrative review of *OCTG from Korea*, finding the existence of a PMS in Korea affecting OCTG production cost, and making a corresponding adjustment to reported HRC costs from Korean suppliers.

**Exhibit 23:**     HR Korea Final IDM.

- This exhibit contains the Issues and Decision Memorandum accompanying the final determination in *Hot-Rolled Steel Flat Products from Korea*.  It shows that the Korean government heavily subsidizes hot-rolled steel producers in Korea, and that the agency calculated a rate of 57.04% for POSCO (a rate that was later amended to 58.68%, as indicated below).

**Exhibit 24:**     Memorandum from Katie Marksberry, International Trade Compliance Analyst, AD/CVD Enforcement, Office V, through James C. Doyle, Director, Office V, AD/CVD Enforcement, to Christina Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: *Countervailing Duty Investigation: Certain Hot-Rolled Steel Flat Products from the Republic of Korea - Response to Ministerial Error Comments filed by Hyundai Steel Co. Ltd. and POSCO* (Aug. 23, 2016) (PUBLIC VERSION).

- This exhibit contains the ministerial error memorandum from the *Hot-Rolled Steel Flat Products from Korea* investigation, finding an error in the calculation of POSCO's subsidy rate and recommending an amendment to it.

**Exhibit 25:**     HR Korea Amended POSCO Calculation Memo.

- This exhibit contains the amended calculation memorandum for POSCO from the *Hot-Rolled Steel Flat Products from Korea* investigation.  It shows that the Korean government's subsidization of hot-rolled steel producers, specifically POSCO, equaled

16

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 17

58.68%, rather than the 57.04% originally calculated.  As such, it shows that the Korean government's subsidization totaled almost 60 percent of the cost of hot-rolled steel.

### B.    Global Overcapacity and the Resulting Distortive Pricing of Unfairly Traded Chinese HRC and Other Sources of HRC

As discussed above, due to global overcapacity, largely driven by Chinese overcapacity, large quantities of unfairly priced Chinese steel products have flooded the Korean steel market.  In fact, Korea represents the largest steel export destination for Chinese steel products and, in particular for HRC, China is the top exporter to Korea of HRC.  This places further downward pressure on steel prices in the Korean market.

Accordingly, Domestic Interested Parties submit the following factual information regarding the distortive pricing of unfairly traded Chinese HRC:

**Exhibit 26:**    Excerpt from HWR Apr. 2, 2019 PMS Allegation.

- This exhibit contains an excerpt from the public version of the submission of factual information relating to the PMS in Korea in the 2017-2018 administrative review of *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*. **Exhibit 26** includes numerous sources related to the impact of Chinese excess supply on the Korean steel market.  Specifically, **Exhibit 26** contains the following sources:

  - *World steel oversupply 730 million t... Korea export 24 times*, Yonhap News Agency (Dec. 3, 2017), containing a Korean-language original and English translation of an article reporting on the impact of Chinese excess supply. According to this article, global excess capacity is 24 times the volume of Korean exports.  HWR Apr. 2, 2019 PMS Allegation (Ex. 72)

  - *'Swamp' of the world steel industry oversupply*, Gyeong-buk Daily (Dec. 3, 2017), containing a Korean-language original and English translation of an article reporting on the impact of Chinese excess supply. HWR Apr. 2, 2019 PMS Allegation (Ex. 73)

  - Global Forum on Steel Excess Capacity - Report, Federal Ministry for Economic Affairs and Energy, Government of Germany (Nov. 30, 2017) ("Global Forum Report"), containing information on global excess capacity.  This report concludes that excess steel capacity is a significant problem that depresses prices and profitability globally.  In particular, despite slight improvements in excess capacity,

17

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 18

"{f}urther significant reductions in global excess capacity will be needed in order to avoid a prolonged structural crisis in the steel industry." HWR Apr. 2, 2019 PMS Allegation (Ex. 74)

▪ Maytaal Angel, *EU finds Chinese steel sent via Vietnam evaded tariffs*, Reuters (Nov. 14, 2017), containing an article supporting the argument that Chinese steel producers engage in strategies such as transshipment to evade tariff regimes and ensure continued and increasing access to global steel markets. By engaging in this behavior, these companies mask the actual extent to, which China oversupplies global steel markets. HWR Apr. 2, 2019 PMS Allegation (Ex. 75)

▪ *Worldsteel Short Range Outlook 2017/2018*, Worldsteel.org (Oct. 16, 2017) containing information showing an outlook on global steel demand in 2017 and 2018. HWR Apr. 2, 2019 PMS Allegation (Ex. 77)

▪ Steel Tubes and Pipes Committee of the Korea Iron & Steel Association, *Monthly Report for the Second Week of February to the Second Week of March of 2017* (2017), containing an early 2017 report on the Korean steel industry by the Korea Iron & Steel Association. The report outlines the Association's primary goal to boost the Korean steel industry, and demonstrates that Korean pipe and tube production increased in 2016, with further increases expected in 2017. The report also demonstrates that pipe for energy use constituted the highest portion of pipe exports (60 percent) in 2016, and that exports to the United States were significantly higher in 2017 than in 2016. Moreover, this exhibit contains information on the significant 74.5 percent pipe import share held by China, as well as 2015-2017 price data for Korean and Chinese pipe, hot-rolled, cold-rolled and other steel products. HWR Apr. 2, 2019 PMS Allegation (Ex. 78)

▪ POSCO 2016 Investors Forum Q&A, providing information regarding the effect of the following of Chinese steel imports into Korea. In particular, it contains information from POSCO indicating that Chinese HRS imports have been aggressively dumped into Korea at unreasonably below-cost prices. HWR Apr. 2, 2019 PMS Allegation (Ex. 87)

▪ POSCO 2016 IQ Q&A, providing information pertaining to the effect of the flooding of Chinese steel imports into Korea. It contains information from POSCO

18

Honorable Wilbur L. Ross, Jr.    **PUBLIC VERSION**
June 25, 2019
Page 19

indicating that the company believes the decisions of the Chinese government affect steel prices in Korea.  HWR Apr. 2, 2019 PMS Allegation (Ex. 88)

▪ Michael Pooler and Emily Feng, *Steel industry grapples with curse of oversupply* (Oct. 29, 2017), containing information regarding the effect of Chinese oversupply on the global steel industry.  HWR Apr. 2, 2019 PMS Allegation (Ex. 91)

**Exhibit 27:**    Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re:  *Welded Line Pipe from the Republic of Korea: Particular Market Situation Allegation and Factual Information* (Sept. 25, 2017) (PUBLIC VERSION)

- This exhibit contains an excerpt from the public version of Maverick's September 25, 2017 PMS Allegation and Factual Information submission, filed in the first administrative review.  **Exhibit 27** contains the narrative portion of Maverick's allegation, as well as Exhibits 11-14 and 18-28 demonstrating that the PMS in Korea that affects OCTG production also affects WLP production.

**Exhibit 28:**    Letter from Wiley Rein LLP to Sec'y Commerce, re:  *Certain Oil Country Tubular Goods from the Republic of Korea:  Submission of Factual Information Relating to Particular Market Situation Allegations* (Aug. 7, 2017) (PUBLIC VERSION) ("Maverick's Aug. 7, 2017 Submission").

- This exhibit contains information from Maverick's August 7, 2017 submission of factual information relating to the PMS in Korea, filed in the second administrative review of *OCTG from Korea*.  In particular, this exhibit includes information on Commerce's countervailing duty decision in *Cold-Rolled Steel Flat Products from China* investigation, antidumping duty decision in *Hot-Rolled Steel Flat Products from Japan* investigation, the Korean government September 30, 2016 Proposal for Strengthening the Competitiveness of the Steel Industry, the EU's decision in a countervailing duty investigation on hot-rolled flat products from China, and COMTRADE data for 2016 Korean purchases of HRC. (Maverick's Aug. 7, 2017 Submission at Exhibit 3-5, 8, 10)

**Exhibit 29:**    Letter from Skadden, Arps, Slate, Meagher & Flom LLP to Sec'y Commerce, re:  *Oil Country Tubular Goods from the Republic of Korea* (Aug. 7, 2017) (PUBLIC VERSION) ("U.S. Steel's Aug. 7, 2017 Submission").

- This exhibit contains information from U.S. Steel's August 7, 2017 submission of factual information relating to the PMS in Korea, filed in the second administrative review of *OCTG from Korea*.  **Exhibit 29** includes numerous sources (U.S. Steel's Aug. 7, 2017 Submission (Ex. 14-25) showing that Chinese HRC has contributed to the PMS in Korea,

and that it has driven down Korean prices for HRC in Korea, and negatively affected Korean pipe producers.

**Exhibit 30:**     Excerpt from Domestic Interested Parties' Aug. 7, 2018 PMS Allegation

- This exhibit contains an excerpt from the Domestic Interested Parties' Aug. 7, 2018 PMS Allegation.  Specifically, **Exhibit 30** contains the following sources:

  - Global Trade Atlas (GTA), China Export Statistics for Hot-Rolled Products, by Value, 2016-2017, containing HR export data (year ending series in August) showing - that the AUV of Chinese exports to Korea is noticeably low compared to AUVs of Chinese HRC exports to other countries.  Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 36)

  - Global Trade Atlas (GTA), China Export Statistics for Hot-Rolled Products, 2013-2017, containing HR export data showing that Korea is one of the top two destinations for Chinese HR exports, with export volumes ranging between 4.4 million MT and 5.6 million MT between 2016 and 2017.  Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 37)

  - Global Trade Atlas (GTA), Korea Customs and Trade Development Institution, South Korea Import Statistics for HRC, by AUV, 2015-2017, containing hot-rolled import data showing that the AUV of Korean HRC imports from China is lower than the AUV of Korean HRC imports from other countries. Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 38)

  - Global Trade Atlas (GTA), South Korea Import Statistics for Hot-Rolled Products, 2012-2017, containing hot-rolled import data (year ending series in August) showing that China is a top exporter of hot-rolled products, and that Korean import volume of Chinese hot-rolled products was substantial over the POR, ranging between 4.3 million MT and 4.5 million MT.  Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 39)

  - International Steel Statistics Bureau (ISSB) Data Regarding Hot-Rolled Imports to Korea for POR, December 2016 to November 2017 (2018), containing monthly-based information on Korean imports from China, Japan, and other countries.  This data was obtained for December 2016 to November 2017, corresponding to the POR, and it relates to the importation into Korea of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30).  Domestic Interested Parties note that data regarding HTS 7225.30 was included because it is widely believed that certain Chinese exports sold commercially as carbon grade hot-rolled products are entered under alloy steel HTS codes.  Moreover, all HTS subheadings included in this data

Honorable Wilbur L. Ross, Jr.    **PUBLIC VERSION**
June 25, 2019
Page 21

are listed in the scope of the 2016 *Hot-Rolled Steel Flat Products* orders. Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 40)

▪ World Market Price Data for Hot-Rolled Products, United Nations, COMTRADE (2018), containing UN COMTRADE data for the POR. Specifically, this exhibit contains information on hot-rolled exports from all countries except NME countries (China, Belarus, Georgia, Moldova, Kazakhstan, and Vietnam), countries that grant general export subsidies and are typically excluded from Commerce's surrogate value calculations (India, Korea, Thailand, Indonesia, and the Philippines), and Japan, whose hot-rolled prices are believed to be distorted. This data relates to the exportation of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30). Domestic Interested Parties note that data regarding HTS 7225.30 was included because it is widely believed that certain Chinese exports sold commercially as carbon grade hot-rolled products are entered under alloy steel HTS codes. Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 41)

▪ Korean Purchases of HRC - Calendar Year 2017, United Nations. COMTRADE (2018), containing monthly-based information obtained for September 2016 to August 2017, corresponding to the POR, and relates to the importation of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30). Domestic Interested Parties note that data regarding HTS 7225.30 was included because it is widely believed that certain Chinese exports sold commercially as carbon grade hot-rolled products are entered under alloy steel HTS codes. Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 42)

▪ U.S. Imports of Carbon and Alloy OCTG, U.S. International Trade Commission Dataweb (2018), containing U.S. import data through April 2018, and demonstrates the flooding of Korean OCTG, which like WLP is similarly affected by the ' PMS in Korea, in the U.S. market over 2015-2017. Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 43)

▪ Ahn Sung-mi, *Hyundai Steel strongly denies merger with POSCO*, The Investor, Korea Herald (Nov. 1, 2016), containing an article supporting the argument that Chinese HR imports into Korea adversely affect Korean HR producers. Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 44)

▪ Ko Jae-man and Moon Ji-woong, *Hyundai Steel, Dongkuk Steel become latest beneficiaries of fast-track restructuring program*, Pulse by Maeil Business News Korea (Nov. 23, 2016), containing an article supporting the argument that Chinese HR imports into Korea adversely affect Korean HR producers. Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 45)

▪ Jung Min-hee, *Korean Steel Industry Advised to Reduce Number of Steel Plate Plants by Half*, Business Korea (Sept. 19, 2016), containing an article supporting

21

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 22

> the argument that Chinese HR imports into Korea adversely affect Korean HR producers.  Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 46)

> ▪ Ahn Sung-mi, POSCO, Hyundai Steel merger to benefit industry:  report, Korea Herald (Sept. 9, 2016), containing an article supporting the argument that Chinese HR imports into Korea adversely affect Korean HR producers. Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 47)

> ▪ *Voices growing for merger of POSCO, Hyundai Steel*, Korea Times, South East Asia Iron and Steel Institute (SEAISI) (Sept. 22, 2016), containing an article supporting the argument that Chinese HR imports into Korea adversely affect Korean HR producers.  Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 48)

**Exhibit 31:**  Issues and Decision Memorandum accompanying *Biodiesel From Indonesia*, 83 Fed. Reg. 8,835 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value),

- This exhibit contains the Issues and Decision Memorandum of Commerce's final determination in the antidumping duty investigation of *Biodiesel from Indonesia*, where Commerce made an affirmative PMS finding and accounted for the PMS using a world market price (Comment 3).

**Exhibit 32:**  Issues and Decision Memorandum accompanying *Biodiesel From Argentina*, 83 Fed. Reg. 8,837 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value and final affirm. deter. of critical circs., in part).

- This exhibit contains the Issues and Decision Memorandum for Commerce's final determination in the antidumping duty investigation of *Biodiesel from Argentina*, where Commerce made an affirmative PMS finding and accounted for the PMS using a market-determined input price (Comment 3).

### C.    Strategic Alliances between Korean HRC Suppliers and Korean WLP Producers

Korean HRC suppliers and Korean WLP producers engage in strategic alliances.[22]  As

determined by Commerce in the underlying investigation, Korean pipe producers engage in price-

fixing schemes among themselves, and have a long history of doing so.  Such strategic alliances

---

[22]    *See, e.g.,* Declaration of [                    ], attached at **Exhibit 35**; Maverick's Nov. 25, 2015 Letter at 5-12, attached at **Exhibit 52**; Maverick's Sept. 6, 2016 Letter at 11-17, attached at **Exhibit 51** Maverick's Nov. 7, 2016 Letter at 17-22, attached at **Exhibit 50**. {**Domestic Interested Parties' BPI**}

22

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 23

among Korean HRC suppliers and WLP producers have had a significant effect on steel market

prices, and these alliances create a distortion in the prices for HRC in the Korean market.  Strategic

alliances among Korean suppliers and manufacturers continue to have a significant impact on HRC

market prices during the POR.

Accordingly, Domestic Interested Parties submit the following factual information

regarding the strategic alliances between Korean HRC suppliers and Korean WLP producers:

> **Exhibit 33:**    Korea Fair Trade Commission, *KFTC punishes six steel pipe manufacturers for rigging bids offered by Korea Gas Corporation* (Dec. 21, 2017).

- This exhibit contains a notice from the Korea Fair Trade Commission ("KFTC"), dated December 21, 2017, that announces the KFTC's finding of a price-fixing scheme engaged in by six pipe producers, including Korean respondent SeAH, on bids arranged by KOGAS, from 2003 through 2013.

> **Exhibit 34:**    Park Jae-hyuk, *Steelmakers fined W92 bil. for bid rigging,* Korea Times (Dec. 20, 2017).

- This exhibit contains a news article regarding Korean pipe producers' price-fixing scheme on KOGAS bids from 2003 through 2013.

> **Exhibit 35:**    Excerpt from Domestic Interested Parties' Aug. 7, 2018 PMS Allegation

- This exhibit contains an excerpt from the Domestic Interested Parties' Aug. 7, 2018 PMS Allegation.  Specifically, **Exhibit 35** contains the following source:

  - Declaration of [                    ] (Nov. 18, 2013). **{Domestic Interested Parties' BPI}**, containing information [

                    ].  Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 29)  {**Domestic Interested Parties' BPI**}

> **Exhibit 36:**    Excerpt from Domestic Interested Parties' Aug. 7, 2018 PMS Allegation

- This exhibit contains an excerpt from the Domestic Interested Parties' Aug. 7, 2018 PMS Allegation.  Specifically, **Exhibit 36** contains the following sources:

  - Decision No. 2017-081, Korea Fair Trade Commission (Dec. 21, 2017), containing the Korea Fair Trade Commission's ("KFTC") decision on the price-fixing scheme associated with Exhibits 1-2 of Maverick's May 24, 2018, finding that six Korean pipe producers - including SeAH - engaged in a price-fixing scheme from 2003 to

**PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 24

> 2013 involving approximately $681 million and 33 bids to Korea Gas Corporation
> ("KOGAS").    This exhibit consists of a Korean-language original and
> corresponding English translations.  Domestic Interested Parties' Aug. 7, 2018 PMS
> Allegation (Ex. 33)

> ▪ Decision No. 98-134, Korea Fair Trade Commission (July 7, 1998), containing a
> decision by the KFTC, finding that four steel pipe manufacturers - including SeAH
> - engaged in improper collusion on steel pipe prices in 1997 and 1998.  This exhibit
> costs of a Korean-language original and an English translation of the decision.
> Domestic Interested Parties' Aug. 7, 2018 PMS Allegation (Ex. 34)

> ▪ Decision No. 97-45, Korea Fair Trade Commission (1997), containing a decision
> by the KFTC finding that five steel pipe manufacturers - including SeAH
> improperly colluded on bids relating to two purchases by the Korea Water
> Resources Corporation in 1996.   This exhibit consists of a Korean-language
> original and an English translation of the decision.  Domestic Interested Parties'
> Aug. 7, 2018 PMS Allegation (Ex. 35)

## D.    Distortive Government Control over Electricity Prices in Korea

The Korean government maintains control over the price of electricity, and electricity
pricing, as a tool to further the government's industrial policy objectives.  Moreover, the largest
Korean electricity supplier is a government-controlled entity, which is responsible for all aspects
of the electricity market, including pricing and sales to customers.  The distortion caused by the
indirect control of the Korean government over the electricity market places a downward pressure
on the pricing of this utility in Korea.

Accordingly, Domestic Interested Parties submit the following factual information
regarding the distortive government control over electricity prices in Korea:

> **Exhibit 37:**    Letter from Wiley Rein LLP to Sec'y Commerce, re:  *Certain Hot-Rolled
> Steel Flat Products from the Republic of Korea:  Petitioners' Allegation of Upstream
> Subsidies to Korean Steel Producers* (Apr. 29, 2019) (PUBLIC VERSION)

> • This exhibit contains information pertaining to Korean producers of hot-rolled steel flat
> producers benefitting from upstream subsidies in the form of subsidized electricity during
> the period of review (January 1, 2017 – December 31, 2017) submitted in the

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 25

administrative review of *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*.

**Exhibit 38:**    Excerpt from HWR Apr. 2, 2019 PMS Allegation.

- This exhibit contains an excerpt from the public version of the submission of factual information relating to the PMS in Korea in the 2017-2018 administrative review of *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*. **Exhibit 38** includes numerous sources in support of the argument that electricity prices in Korea are distorted.  Specifically, **Exhibit 38** contains the following sources:

  ▪ Ahn Joon-ho, *KEPCO Runs up Huge Quarterly Loss,* The Chosunilbo (Aug. 14, 2018), containing an article showing that KEPCO's electricity prices are not covering costs, which supports the argument that electricity prices in Korea are distorted. HWR Apr. 2, 2019 PMS Allegation (Ex. 97)

  ▪ *KEPCO's operating loss widens in Q1,* The Korea Herald (May 15, 2018), containing an article demonstrating that KEPCO's electricity prices are not covering costs, which supports the argument that electricity prices in Korea are distorted.  HWR Apr. 2, 2019 PMS Allegation (Ex. 98)

  ▪ KEPCO Electric Rates Table (May 7, 2018), containing Korean electric rates to assist Commerce in assessing distortions in Korea HWR production relating to the electricity input.  HWR Apr. 2, 2019 PMS Allegation (Ex. 99)

  ▪ Electric Rates Table - Industrial Service, KEPCO, containing information on Korean electric rates to assist Commerce in assessing distortions in Korea HWR production relating to the electricity input.  HWR Apr. 2, 2019 PMS Allegation (Ex. 100)

  ▪ Excerpt from *Energy Prices and Taxes - Quarterly Statistics - Second Quarter 2017*, International Energy Agency (2017), containing benchmark data pertaining to electricity rates from New Zealand and Italy, two countries that have comparable GNI's to Korea, to assist Commerce in valuing electricity used in converting HRC into WLP.  This data was sourced from rates available from the International Energy Agency.  HWR Apr. 2, 2019 PMS Allegation (Ex. 101)

  ▪ KEPCO, *Electric Rates Table* (2015), containing Korean electric rates to assist Commerce in assessing distortions in Korea WLP production relating to the electricity input.  HWR Apr. 2, 2019 PMS Allegation (Ex. 102)

  ▪ Il-Chong Nam, *Causes of the Crisis in the Electricity Industry and Future Policy Directions*, KDI Policy Forum, vol. 252 (Apr. 26, 2013), containing a study of issues in the Korean electricity market, indicating that "the capacity price has borne no relation to the opportunity costs of capacity for each year since 2002," and that this "is impossible to justify according to economic theory, and the possibility that

25

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 26

this capacity price will offer an appropriate incentive for investment in power generation facilities is in fact zero." HWR Apr. 2, 2019 PMS Allegation (Ex. 103)

▪ KEPCO Form 20-F (Apr. 30, 2018) ("KEPCO Form 20-F FY2017"), containing information indicating that the price of electricity in Korea is set by the Korean government and functions as a tool of the government's industry policy, devoid of any market-based pricing principles.[23] HWR Apr. 2, 2019 PMS Allegation (Ex. 133)

▪ KEPCO Form 20-F (Apr. 28, 2017) ("KEPCO Form 20-F FY2016"), containing information indicating that the price of electricity in Korea is set by the Korean government and functions as a tool of the government's industry policy, devoid of any market-based pricing principles.[24] HWR Apr. 2, 2019 PMS Allegation (Ex. 134)

▪ KEPCO Form 20-F (Apr. 29, 2016) ("KEPCO Form 20-F FY2015"), containing information indicating that the price of electricity in Korea is set by the Korean government and functions as a tool of the government's industry policy, devoid of

---

[23]     *See* KEPCO Form 20-F FY2017 at 34-37 (explaining that the Korea Power Exchange ("KPX") operates a "cost-based pool system," and the KPX mechanism, including its "policy making" function, are "closely supervised and controlled by the Government," both formally - through laws and regulations - and informally - through the participation of the Ministry of Trade, Industry and Energy ("MOTIE"); explaining that each component of the pricing mechanism (*i.e.,* marginal price, capacity, price, and adjusted coefficient factor) is determined by a Cost Evaluation Committee "comprised of representatives from {MOTIE}, {KPX}, generation companies, scholars and researchers as well as {KEPCO};" explaining that prior to October 2016, "the same reference capacity price applied uniformly to all generation units," and now "ranges from Won 9.15 to 10.07 per kilowatt hour," reflecting a narrow range that nevertheless shows that electricity prices paid to generators with the highest fixed costs are substantially distorted).

[24]     *See* KEPCO Form 20-F FY2016 at 34-37 (explaining that the Korea Power Exchange ("KPX") operates a "cost-based pool system," and the KPX mechanism, including its "policy making" function, are "closely supervised and controlled by the Government," both formally - through laws and regulations - and informally - through the participation of the Ministry of Trade, Industry and Energy ("MOTIE"); explaining that each component of the pricing mechanism (*i.e.,* marginal price, capacity, price, and adjusted coefficient factor) is determined by a Cost Evaluation Committee "comprised of representatives from {MOTIE}, {KPX}, generation companies, scholars and researchers as well as {KEPCO};" explaining that prior to October 2016, "the same reference capacity price applied uniformly to all generation units," and now "ranges from Won 9.15 to 10.07 per kilowatt hour," reflecting a narrow range that nevertheless shows that electricity prices paid to generators with the highest fixed costs are substantially distorted).

Barcode/No. 3854466-01 A-580-876 REV - Admin Review 12/1/17 - 11/... **PUBLIC VERSION**

any market-based pricing principles.[25]  HWR Apr. 2, 2019 PMS Allegation (Ex. 135)

**Exhibit 39:**    Letter from Wiley Rein LLP to Sec'y Commerce, re:  *Certain Oil Country Tubular Goods from the Republic of Korea:  Particular Market Situation Allegation on Electricity* (Feb. 4, 2016) (PUBLIC VERSION) ("Maverick's Feb. 4, 2016 Letter").

- This exhibit contains Maverick's February 4, 2016 submission of information and comments regarding the PMS as to electricity in Korea, in the first administrative review of *OCTG from Korea*.

**Exhibit 40:**    *Energy Policies of IEA Countries – The Republic of Korea 2012 Review*, International Energy Agency (2012).

- This exhibit contains an analysis of Korea's policies in the energy and environment sectors. This analysis suggests that the Korean lacks of fair competition in the energy market.  In addition, certain barriers to new entrants to the energy market should be removed, and third-party access to network infrastructure should be enhanced.

### E.    Additional Factual Information Related to the Existence of a PMS in Korea

**Exhibit 41:**    Excerpt from HWR Apr. 2, 2019 PMS Allegation.

- This exhibit contains an excerpt from the public version of the submission of factual information relating to the PMS in Korea in the 2017-2018 administrative review of *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*. This exhibit includes numerous sources in support of the argument that the PMS in Korea affects WLP.  Specifically, **Exhibit 41** contains the following sources:

  - Excerpt from USITC Pub. 3479 at vol. I, pp. 1-3, 147-157, containing an excerpt from the U.S. International Trade Commission's (the "Commission") 2001 determination in the Section 201 investigation on certain steel products.  It contains

---

[25]    *See* KEPCO Form 20-F FY2015 at 29-31 (explaining that the Korea Power Exchange ("KPX") operates a "cost-based pool system," and the KPX mechanism, including its "policy making" function, are "closely supervised and controlled by the Government," both formally - through laws and regulations - and informally - through the participation of the Ministry of Trade, Industry and Energy ("MOTIE"); explaining that each component of the pricing mechanism (*i.e.,* marginal price, capacity, price, and adjusted coefficient factor) is determined by a Cost Evaluation Committee "comprised of representatives from {MOTIE}, {KPX}, generation companies, scholars and researchers as well as {KEPCO};" explaining that the capacity price each year was "applied equally to all generation units regardless of fuel types used," even though actual fixed costs vary substantially depending on type of generator, demonstrating that electricity prices paid to generators with the highest fixed costs are substantially distorted).

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 28

information on different types of pipe and tube products.  HWR Apr. 2, 2019 PMS Allegation (Ex. 28)

▪ USITC Pub. 4633, containing the Commission's final determination in its investigations on HWR from Korea, Mexico, and Turkey.  HWR Apr. 2, 2019 PMS Allegation (Ex. 29)

▪ Excerpt from USITC Pub. 4489 at I-13 - I-28, III-1 - III-5, V-1 - V-4, VII- 34, containing an excerpt from the Commission's final determination in its investigations on OCTG from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam.  It contains information pertaining to similarities between different types of pipe production.  HWR Apr. 2, 2019 PMS Allegation (Ex. 30)

▪ Excerpt from USITC Pub. 4768 at 3, I-15 - I-19, containing the Commission's preliminary determination in its investigations on LDWP from Canada, China, India, Korea, and Turkey.  It contains language pertaining to similarities between different types of pipe production.  HWR Apr. 2, 2019 PMS Allegation (Ex. 31)

▪ Excerpt from USITC Pub. 4754 at 1, 6-9, I-14- I-18, containing the Commission's final determination in the fourth sunset review of the AD/CVD orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.  It contains information on CWP, and its production process and industry.  HWR Apr. 2, 2019 PMS Allegation (Ex. 32)

▪ Excerpt from USITC Pub. 4333 at 16-17, IV-14- IV-17, containing an excerpt from the Commissions determination in the third sunset review of the AD/CVD orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey.  It contains information on major CWP producers, which include HWR respondent HiSteel.  HWR Apr. 2, 2019 PMS Allegation (Ex. 33)

▪ Excerpt from Letter from Yoon & Yang LLC to Sec'y Commerce, re: *Countervailing Duty Investigation:  Certain Hot-Rolled Steel Flat Products (Hot-Rolled Steel) from the Republic of Korea:  Response* (Nov. 4, 2015) (PUBLIC VERSION), containing an excerpt from the Government of Korea's initial questionnaire response in the countervailing duty investigation of *Hot-Rolled Steel from Korea*.  It contains information supporting a finding that electricity prices in Korea are distorted and distorted to benefit industrial consumers.  HWR Apr. 2, 2019 PMS Allegation (Ex. 35)

**Exhibit 42:**     Excerpt from HWR Apr. 2, 2019 PMS Allegation.

• This exhibit contains an excerpt from the public version of the submission of factual information relating to the PMS in Korea in the 2017-2018 administrative review of *Heavy*

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 29

*Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*. Specifically, **Exhibit 42** contains the following sources:

- U.S. International Trade Administration, Global Trade Monitor, *Steel Exports Report: China* (Feb. 2019), containing information regarding the Chinese steel export market. In particular, it indicates that China has an overly export-oriented steel industry. HWR Apr. 2, 2019 PMS Allegation (Ex. 105)

- U.S. International Trade Administration, Global Trade Monitor, *Steel Exports Report: South Korea* (Sept. 2018), containing information regarding the Korean steel export market. In particular, it indicates that Korea is the world's fourth largest exporter of steel. HWR Apr. 2, 2019 PMS Allegation (Ex. 106)

- U.S. International Trade Administration, Global Trade Monitor, *Steel Imports Report: South Korea* (Nov. 2018), containing information regarding the Korean steel import market. In particular, it indicates that Korea is the world's fourth largest importer of steel. HWR Apr. 2, 2019 PMS Allegation (Ex. 107)

- Fabien Mercier, Daichi Mabashi, and Christian Steidl, Steel Market Developments-Q4 2018, OECD (2019), containing information on global steel market conditions. HWR Apr. 2, 2019 PMS Allegation (Ex. 108)

- Fabien Mercier, Daichi Mabashi, and Christian Steidl, Steel Market Developments - Q2 2018, OECD (2018), containing information on global steel market conditions. HWR Apr. 2, 2019 PMS Allegation (Ex. 109)

- Fabien Mercier, Hokuto Hotsuka, and Felipe Silva, Steel Market Developments-Q4 2017, OECD (2018), containing information on global steel market conditions. HWR Apr. 2, 2019 PMS Allegation (Ex. 110)

- South Korean Production & Apparent Consumption of Steel, 2009-2017, containing production and apparent consumption data for 2009-2017 for South Korea, based on the U.S. International Trade Administration's *Steel Exports Report: South Korea* of March 2018. HWR Apr. 2, 2019 PMS Allegation (Ex. 111)

- GTIS, China Export Statistics for Hot-Rolled Products by Value, 2016- 2018, containing HR export data that the AUV of Chinese exports to Korea is noticeably low compared to AUVs of Chinese exports to other countries]. HWR Apr. 2, 2019 PMS Allegation (Ex. 112)

- GTIS, China Export Statistics for Hot-Rolled Products by Quantity, 2013- 2018, containing HR export data showing that Korea is one of the top two destinations for Chinese HR exports, with export volumes ranging between 1.8 million MT and

**PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 30

3.5 million MT between 2016 and 2017.  HWR Apr. 2, 2019 PMS Allegation (Ex. 113)

▪ GTIS, Korean Imports of Hot-Rolled Sheet Products from China, 2010- 2018, containing annual import data from 2010 to 2018, by value, quantity, and AUVs, for Korean imports of hot-rolled sheet products from China, based on hot rolled classified under HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30.  HWR Apr. 2, 2019 PMS Allegation (Ex. 114)

▪ GTIS, Chinese Exports of Hot-Rolled Sheet Products to Korea, 2010-2018, containing annual export data from 2010 to 2018, by value, quantity, and AUVs, for Chinese exports of hot-rolled into Korea, based on hot-rolled classified under HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30.  HWR Apr. 2, 2019 PMS Allegation (Ex. 115)

▪ GTIS, South Korea Import Statistics for Hot-Rolled Products, 2013-2018, containing hot-rolled import data showing that China is a top exporter of hot-rolled products, and that Korean import volume of Chinese hot-rolled products was substantial over the POR.  HWR Apr. 2, 2019 PMS Allegation (Ex. 116)

▪ GTIS, Summary- Korea Imports of Hot-Rolled Coil and Plate, 2013-2018, containing data on hot-rolled steel imports into Korea from 2013 through 2018.  It demonstrates that Korean companies import substantial volumes of hot rolled steel from China at AUVs below the price from the rest of the world. HWR Apr. 2, 2019 PMS Allegation (Ex. 117)

▪ GTIS, Korean Imports of Hot-Rolled Coil and Plate Products by Country Source, 2013-2018, containing data on hot-rolled steel imports into Korea from other countries, including China, from 2013-2018.  It demonstrates that Chinese steel has flooded the Korean market, and done so at AUVs below prices from other countries. HWR Apr. 2, 2019 PMS Allegation (Ex. 118)

▪ GTIS, Summary Statistics for China's Export AUVs for Hot-Rolled Products by Destination Country, containing information on China's export AUV for hot-rolled coil and plate, for 2017-2018.  It shows that Chinese exports to Korea are priced below exports to other destinations.  HWR Apr. 2, 2019 PMS Allegation (Ex. 119)

▪ POSCO 2017 Earnings Release (Jan. 24, 2018), containing information in support of the argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea.  In particular, it notes that the "drought" of 2016 orders has affected steel use and continues to be an overhang for the steel industry.  HWR Apr. 2, 2019 PMS Allegation (Ex. 120)

▪ POSCO 2018 Earnings Release (Jan. 30, 2019), containing information in support of the argument that the crisis in the Korean shipbuilding industry has had an

30

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 31

adverse effect on the steel market in Korea.  With regards to the "Chinese Steel Market," it is noted that "{w}eak pricing continues due to relaxed supply reduction coupled with demand slowing down."  HWR Apr. 2, 2019 PMS Allegation (Ex. 121)

▪ World Steel Association (WSA), World Steel Statistical Yearbook 2017 (Nov. 2017), containing global steel industry statistics.  HWR Apr. 2, 2019 PMS Allegation (Ex. 122)

▪ World Steel Association (WSA), World Steel Statistical Yearbook 2018 (Nov. 2018), containing global steel industry statistics. HWR Apr. 2, 2019 PMS Allegation (Ex. 123)

▪ Summary of Global Steel Market, 2013-2018, containing a worksheet, based on information from the Organization for Economic Co-operation and Development ("OECD") on capacity, production, and apparent use, from 2013-2018, for China, as well as other countries as a whole.  HWR Apr. 2, 2019 PMS Allegation (Ex. 124)

▪ OECD, Global Steel Production Capacity (Aug. 7, 2017), containing a summary of OECD data on steel capacity (MT) in China, Korea, and other countries, for 2006-2016. HWR Apr. 2, 2019 PMS Allegation (Ex. 125)

▪ OECD, Capacity Developments in the World Steel Industry, DSTI/SC(2017)2/FINAL (2017), containing information on global steel capacity and demand.  HWR Apr. 2, 2019 PMS Allegation (Ex. 126)

▪ OECD, Recent Developments in Steelmaking Capacity, DSTI/SC(2018)/FINAL (2018), containing information on global steel capacity and demand.  HWR Apr. 2, 2019 PMS Allegation (Ex. 127)

▪ International Steel Statistics Bureau Data Regarding Hot-Rolled Imports to Korea (2017-2018), containing monthly-based information for benchmark data on hot-rolled inputs from China and Japan.  The data was obtained for September 2017 to August 2018 (corresponding with the POR), was sourced from information available from the International Steel Statistics Bureau ("ISSB"), and relates to the importation of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, 7225.30) from China and Japan to Korea.  Domestic Interested Parties note that data regarding HTS 7225.30 was included because it is widely believed that certain Chinese exports sold commercially as carbon grade hot-rolled products are entered under alloy steel HTS codes.  HWR Apr. 2, 2019 PMS Allegation (Ex. 128)

▪ UN COMTRADE, World Market Price Data for Hot-Rolled Products, United Nations COMTRADE (2017-2018), containing UN COMTRADE data for the POR.  Specifically, this exhibit contains information on hot-rolled exports from all countries except NME countries (China, Belarus, Georgia, Moldova, Kazakhstan,

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 32

   and Vietnam), countries that grant general export subsidies and are typically excluded from Commerce's surrogate value calculations (India, Korea, Thailand, Indonesia, and the Philippines), and Japan, whose hot-rolled prices are believed to be distorted.  This data relates to the exportation of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30).  Domestic Interested Parties note that data regarding HTS 7225.30 was included because it is widely believed that certain Chinese exports sold commercially as carbon grade hot-rolled products are entered under alloy steel HTS codes.  HWR Apr. 2, 2019 PMS Allegation (Ex. 129)

-   UN COMTRADE, Korean Purchases of Hot-Rolled Coils - Calendar Year 2017 (2018), containing monthly-based information for benchmark data on HRC from non-Korean countries.  The data relates to the importation of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30) from different countries during calendar year 2017.  HWR Apr. 2, 2019 PMS Allegation (Ex. 130)

-   Board of Governors of the Federal Reserve System, Foreign Exchange Rates- G.5A Annual (Jan. 2, 2019), containing average exchange rates from the U.S. Federal Reserve for 2015 to 2018.  HWR Apr. 2, 2019 PMS Allegation (Ex. 131)

-   Korean Won/ U.S. Dollar Exchange Rate, 2017 Daily, containing exchange rates derived from Commerce, and is provided to assist Commerce in assessing distortions in Korea WLP production relating to the electricity input.  HWR Apr. 2, 2019 PMS Allegation (Ex. 132)

   **Exhibit 43:**    Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe From the Republic of Korea,* 84 Fed. Reg. 6,374 (Dep't Commerce Feb. 27, 2019) (final deter. of sales at less than fair value) ("LDWP Korea AD INV Final IDM").

- This exhibit contains Commerce's issues and decision memorandum accompanying the agency's final determination in its dumping investigation in *LDWP from Korea*.

   **Exhibit 44:**    Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea,* 83 Fed. Reg. 50,892 (Dep't Commerce Oct. 10, 2018) (prelim. results of antidumping duty admin. rev. & prelim. deter. of no shipments; 2016-2017) ("HWR Korea AD AR 16-17 Prelim IDM").

- This exhibit contains Commerce's issues and decision memorandum accompanying the agency's preliminary results in the 2016-2017 administrative review of *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, where the

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 33

agency found that a PMS exists in Korea such that corrective adjustments to respondents' reported data are warranted.

**Exhibit 45:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from the Republic of Korea:  Factual Information Relating to the Particular Market Situation in Korea* (Aug. 20, 2018) (PUBLIC VERSION).

- This exhibit contains the public version of the information submitted in Maverick's August 20, 2018 submission of factual information relating to the PMS in Korea, filed in the third administrative review of *OCTG from Korea*.

**Exhibit 46:**    Letter from Wiley Rein LLP, Cassidy Levy Kent (USA) LLP, and Schagrin Associates to Sec'y Commerce, re: *Oil Country Tubular Goods from the Republic of Korea: Other Factual Information Submission for Valuing the Particular Market Situation in Korea and Respondents' CV Profit* (May 17, 2018) (PUBLIC VERSION).

- This exhibit contains an excerpt from the public version of the Domestic Interested Parties' PMS Allegation and Factual Information submission, filed in the third administrative review of *OCTG from Korea*.  Specifically, **Exhibit 46** contains the narrative portion of Domestic Interested Parties' allegation, as well as Exhibits 3, 26, 27, demonstrating that the PMS in Korea that affects OCTG production also affects WLP production.

**Exhibit 47:**    Letter from Wiley Rein LLP and Schagrin Associates to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: Other Factual Information* (Sept. 6, 2018) (PUBLIC VERSION) ("Domestic Interested Parties' Sep. 6, 2018 Other Factual Information").

- This exhibit contains an excerpt from Domestic Interested Parties' Factual Information submission of September 6, 2018, filed in the second administrative review.  It contains the narrative portion of Domestic Interested Parties' allegation, as well as Exhibits 1-5 demonstrating that the PMS in Korea that affects OCTG production also affects WLP production.

**Exhibit 48:**    Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't Commerce June 13, 2018) (final results of antidumping duty admin. rev.; 2015-2016) ("CWP Korea AD AR 15-16 Final IDM").

- This exhibit contains the Issues and Decision Memorandum of Commerce's final results in the 2015-2016 administrative review of *Circular Welded Non-Alloy Steel Pipe ("CWP") from Korea*, where Commerce made an affirmative PMS finding and accounted for this PMS through adjustments relying on the subsidy rates in *Hot-Rolled Steel Flat Products from Korea* (Comment 1).

**Exhibit 49:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea:  Rebuttal Comments in Response to Comments*

**PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 34

*and Arguments on Particular Market Situation Allegations* (Nov. 15, 2016) (PUBLIC VERSION).

- This exhibit contains Maverick's November 15, 2016 submission to Commerce in the first administrative review of *OCTG from Korea*, providing rebuttal comments to respondents' arguments on the PMS in Korea.

  **Exhibit 50:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea:  Comments and Arguments on Particular Market Situation Allegations* (Nov. 7, 2016) (PUBLIC VERSION) ("Maverick's Sept. 7, 2016 Letter").

- This exhibit contains Maverick's September 7, 2016 submission to Commerce in the first administrative review of *OCTG from Korea*, providing comments and arguments on the PMS in Korea.

  **Exhibit 51:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea:  Particular Market Situations and Other Factual Information Submission* (Sept. 7, 2016) (PUBLIC VERSION) ("Maverick's Sept. 7, 2016 Letter").

- This exhibit contains Maverick's September 7, 2016 submission to Commerce in the first administrative review of *OCTG from Korea*, supporting a finding of a PMS in Korea that distorts WLP COP and warrants adjustments to Korean HRC costs.

  **Exhibit 52:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea:  Information and Comments Requiring Immediate Action* (Nov. 25, 2015) (PUBLIC VERSION) ("Maverick's Nov. 25, 2015 Letter").

- This exhibit contains Maverick's November 25, 2015 submission to Commerce in the first administrative review of *OCTG from Korea*, supporting a finding that a PMS exists as a result of countervailable, subsidization of HRC, unfairly traded Chinese HR imports into Korea, and strategic alliances between input suppliers and preferred downstream pipe producers.

  **Exhibit 53:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from the Republic of Korea:  Submission of Factual Information* (Nov. 13, 2015).

- This exhibit contains the countervailing duty petition filed in *Hot-Rolled Steel Flat Products from Korea*, showing that a finding that a PMS in Korea is supported by the

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 35

existence of distortive and anti-competitive government control over electricity prices in the industrial sector.

## III.   THE PMS IN KOREA WARRANTS ADJUSTMENTS TO REPORTED COSTS

As the information in this third administrative review shows, Commerce should continue to find, as it did in the second administrative review, that cost distortions in the Korean steel market have a significant impact on WLP production. As in the previous and other reviews,[26] Commerce should continue to quantify the impact of the PMS on Korean HRC by adjusting reported costs according to the subsidy rates in *Hot-Rolled Steel Flat Products from Korea*.[27] Such an adjustment can be further modified to also account for the effect of global overcapacity, driven by overcapacity in China, in the Korean steel market.

Specifically, Commerce should average all subsidy rates in the *Hot-Rolled Steel from Korea* investigation together to arrive at an appropriate PMS adjustment for all reported non-POSCO and non-Korean HRC purchases. In doing so, Commerce's PMS adjustment as to the HRC inputs would properly reflect the aggregate amount of distortion in Korea, as influenced and contributed to by the Chinese-driven global steel overcapacity crisis. As Commerce is aware, the calculation of the CVD "all-others" rate is a calculation intended to determine the assessment and cash deposit rate for non-review Korean producers – it has nothing to do with measuring the overall amount of distortion in the entire market. HRC imports entering Korea compete with all Korean producers in the market – not just the ones subject to the "all others" rate. Consequently, the HRC

---

[26]    *See* WLP Korea AD AR2 Final IDM at 26, attached at **Exhibit 6**; WLP Korea AD AR1 Final IDM at 14, attached at **Exhibit 14**; OCTG Korea AD AR3 IDM at 41, attached at **Exhibit 20**; OCTG Korea AD AR2 IDM at 29, attached at **Exhibit 21**; OCTG Korea AD AR1 IDM at 42, attached at **Exhibit 22**; HWR Korea AD AR 16-17 Prelim IDM at 13-14, attached as **Exhibit 44**; LDWP Korea AD INV Final IDM at 7-15, attached as **Exhibit 43**; Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea,* 83 Fed. Reg. 63,619 (Dep't Commerce Dec. 11, 2018) (prelim. results of antidumping duty admin. rev.; 2016-2017) at 12-16 ("CWP Korea AD AR 16-17 Prelim IDM"); CWP Korea AD AR 15-16 Final IDM at 11-19, attached as **Exhibit 48**.
[27]    *See* HR Korea Amended POSCO Calculation Memo at 3, attached at **Exhibit 25**; *see generally* HR Korea Final IDM, attached at **Exhibit 23**.

35

Barcode:3815466-01 A-580-876 REV - Admin Review 12/1/17 - 11/... **PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 36

CVD "all others" rate only reflects a portion of the distortion and only for a single Korean producer, *i.e.*, Hyundai Steel Co., Ltd. ("Hyundai Steel").[28]  As such, Commerce should not solely apply the "all others" rate to HRC purchases.  Instead, for suppliers subject to the "all others" CVD rate, Commerce should take an average of all CVD rates from *Hot-Rolled Steel from Korea*, including POSCO's assigned rate, to arrive at an appropriate PMS adjustment for all non-POSCO and non-Korean HRC purchases.

Nor is there any reason for Commerce to limit its adjustments to HRC costs to Korean-sourced purchases by applying an adjustment based solely on the final subsidy determination in *Hot-Rolled Steel from Korea*.  While the Korean HRC subsidies themselves are a means of offsetting the distortive effects of the global overcapacity crisis, an adjustment based solely on these subsidies does not fully address the direct distortions that WLP producers face in directly purchasing distorted Chinese steel.  Nor does such an adjustment address distortions in the producers' purchases of HRC from other non-Korean suppliers and Korean suppliers themselves that were similarly affected by the effect of Chinese and global overcapacity in the Korean steel market.  By only offsetting Korean steel purchases in this administrative review, Commerce would only address a portion of the PMS in Korea.  Although Commerce has correctly recognized that global excess steel capacity has placed significant "downward pressure on Korean domestic steel prices,"[29] Commerce has not yet quantified an adjustment to account for distorted HRC from China, Japan, and other sources affecting WLP production in the Korean market.[30]  Thus, as

---

[28]     *See Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea,* 81 Fed. Reg. 67,960, 67,961 (Dep't Commerce Oct. 3, 2016) (amended final affirm. countervailing duty deters. and countervailing duty orders).

[29]     *See* WLP Korea AD AR2 Final IDM at 17, attached at **Exhibit 6**; WLP Korea AD AR1 Final IDM at 13, attached at **Exhibit 14**; OCTG Korea AD AR3 IDM at 23, attached at **Exhibit 20**; OCTG Korea AD AR2 IDM at 17, attached at **Exhibit 21**; OCTG Korea AD AR1 IDM at 41, attached at **Exhibit 22**.

[30]     *See* WLP Korea AD AR1 Final IDM at 24, attached at **Exhibit 14**.

36

**PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 37

Commerce recognized in its final determination in *Large Diameter Welded Pipe from the Republic of Korea ("LDWP from Korea")*,[31] in addition to applying the subsidy rates from *Hot-Rolled Steel from Korea* to Korean HRC purchases, Commerce should separately and additionally quantify the effect of global overcapacity-driven distortions in the cost of all purchases of HRC for Korean WLP production.

      To account for the effect of the Chinese-led overcapacity crisis in the Korean steel market, Domestic Interested Parties propose that Commerce make a specific upward adjustment to any HRC purchases based on the alternative methodology proposed below. Domestic Interested Parties urge Commerce to separately and additionally quantify the distortion caused by strategic alliances between HRC suppliers and downstream pipe producers and the Korean government's control of electricity.

      For the foregoing reasons, Commerce should find that the same conditions collectively affecting WLP production costs in Korea in the prior administrative review continue to affect costs in this review. Commerce should also continue to make an upward adjustment based on the subsidy investigation rates from *Hot-Rolled Steel from Korea* and also make additional adjustments to account for the other distortions reviewed above. Further, as detailed immediately below, Domestic Interested Parties provide an alternative PMS valuation methodology for Commerce's

---

[31]    *See* LDWP Korea AD INV Final IDM at 7-15, attached as **Exhibit 43**.

37

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 38

**PUBLIC VERSION**

consideration in determining the extent to which the agency decides to adjust respondents' reported HRC costs.

## IV.    ALTERNATIVE PMS VALUATION METHODOLOGY

Commerce should consider quantifying the PMS in Korea by adopting, as provided below, a regression analysis on the relationship between global overcapacity and hot-rolled AUVs. Under such an analysis, respondents' hot-rolled inputs purchase costs should be increased by at least 49.35 percent to account for the distortive effects of the PMS in Korea. As explained below, recognizing the global overcapacity crisis as the fundamental driver that links together the various factors that collectively underlie the PMS in this review, Domestic Interested Parties submit a global-excess-capacity-based regression analysis that quantifies the impact of global steel excess capacity on the price of HRC at the national level, and derives a corresponding percentage adjustment factor that, when applied to the respondents' costs of HRC, accounts for the distortions inherent to an overcapacity-driven PMS.

### A.    "Overcapacity-Driven" Particular Market Situations

As detailed above, excess global steel capacity remains a significant problem. Global steel excess capacity and China's contribution to global overcapacity is an acknowledged crisis. Government and industry experts worldwide recognize its distortive impact, as shown the evidence attached to this PMS allegation, and the Department itself has articulated the manner in which global steel excess capacity operates to trigger the market forces that generate a particular market situation. As the Department explained in a prior review of this order:

> Commerce notes that excess steel-production capacity has created market distortions across the globe. Excess steel-production capacity causes serious market distortions and contributes to the downturn in global steel markets, including significant price suppression, displaced markets, unsustainable capacity utilization, negative financial performance, shutdowns, and lay-offs. The deterioration in steel

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 39

demand, along with continued capacity expansions, are likely to place further pressure on country-specific steel markets and create incentives for government interventions which will further distort the production costs and prices for a wide range of steel products.[32]

While pervasive in that the overcapacity crisis has a global impact, the crisis expresses itself differently and uniquely at the national level. The distortions manifest differently within a given country's market, and the manner in which a national government and its steel industry act in the face of that crisis further differentiates the impact at the national level. Critical changes in trade patterns, combined with domestic policies and existing market forces, come together to generate a PMS in Korea in response to the overcapacity crisis. The factors that define the current PMS in Korea are unique to Korea and linked by the distortive effects of the Chinese-led overcapacity crisis on the Korean market and the GOK's actions in the face of that crisis. To be clear, while Chinese subsidies and government intervention play a significant role in driving the excess capacity crisis, other governments' responses to the distortions further compound the problem, and add to the vicious cycle of continued expansion and maintenance of uneconomic capacity. Domestic Interested Parties' economic model measures the overall effects of the distortive excess capacity at the national level.

In numerous other pipe cases, the Department has properly recognized that intertwined market conditions contribute to a PMS that distorts and impacts the costs of production for pipe producers via the acquisition prices for HRC.[33] These intertwined market conditions, in conjunction with the excess capacity crisis, combine to generate a PMS at the national level. To

---

[32]     *See* Preliminary Decision Memorandum accompanying *Welded Line Pipe from the Republic of Korea*, 83 Fed. Reg. 1023 (Dep't Commerce Jan. 9, 2018) (prelim. results of antidumping duty admin. rev.; 2015-2016).

[33]     *See, e.g.,* Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. rev.; 2016-2017) at 8-10, attached at **Exhibit 54**.

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 40

date, the Department has used proxies, such as prevailing U.S. CVD investigation rates in effect

against hot-rolled inputs from a subject country, to quantify and adjust for the overall distortion.

Domestic Interested Parties' economic analysis, however, seeks to quantify a more precise

measure of the amount of distortion in a given market. As detailed below, Domestic Interested

Parties have formulated an alternative PMS adjustment that recognizes the global overcapacity

crisis as one of the fundamental drivers that links the various factors that collectively define a

given PMS, and seeks to adjust for the overall distortion present in the market.

### B.  A Regression Analysis Based on Global Excess Capacity

Domestic Interested Parties' PMS adjustment is based on a regression analysis whereby

country-specific HRC import average unit values ("AUVs") are regressed against global excess

capacity to estimate the effect of global excess capacity on prices of HRC at the national level.

Specifically, Domestic Interested Parties applied a standard Ordinary Least Squares ("OLS") fixed

effects regression, with price (*i.e.,* AUVs) as the dependent variable.

#### 1. The OLS Methodology

After consideration of the OLS method and alternative methods such as the "Two-Stage

Least Squares" instrumental variable regression ("2SLS"), Domestic Interested Parties determined

the OLS to best suit the analysis at hand. There are several econometric benefits to OLS, and

Domestic Interested Parties' examination indicates the OLS method provides a less complicated,

yet equally accurate, approach to the analysis, as compared to other methodologies. For example,

OLS is more efficient when the explanatory variables are exogenous.[34] In fact, when all of its

---

[34]     Jeffrey M. Wooldridge, Introductory Econometrics: A Modem Approach, 5th Edition (2013) at 534 ("The 2SLS estimator is less efficient than OLS when the explanatory variables are exogenous; as we have seen, the 2SLS estimates can have very large standard errors."), excerpt attached at **Exhibit 55**.

40

**PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 41

required assumptions are met, OLS is known as the Best Linear Unbiased Estimator (BLUE).[35]
That is, OLS is both (1) unbiased and (2) more efficient than other estimators, including 2SLS,
provided the necessary assumptions are met. Put simply, one should rely on OLS unless there is a
reason to be concerned that OLS is inappropriate for the question at hand.

OLS, however, does potentially suffer from endogeneity bias because basic economic
theory suggests that prices and quantities are simultaneously determined, *i.e.,* endogenous.[36] As
both the supply equation and demand equation are taking place simultaneously, economic theory
suggests that one should be concerned about endogeneity bias. Yet, theoretical endogeneity is not
a concern if it does not actually bias the econometric results. Domestic Interested Parties, thus, ran
additional analyses to ensure endogeneity is not driving the results of this inquiry.

For example, Wooldridge offers an empirical test for endogeneity bias,[37] which Domestic
Interested Parties performed and found that the degree of endogeneity bias is statistically
insignificant.[38] This indicates Domestic Interested Parties are not empirically compelled to use a
structural equation such as 2SLS to estimate the effect of various factors on steel prices. A
comparison of the results generated by the OLS and 2SLS method further confirms this conclusion.
Domestic Interested Parties performed both an OLS and 2SLS regression and, as demonstrated in
**Exhibit 57**, the 2SLS coefficient for excess capacity[39] falls within the 95-percent confidence

---

[35]     *Id*. at 101 – 102.
[36]     *Id*. at 534 – 35, 554, 850, 859.
[37]     *Id*. at 534 – 35.
[38]     *See* **Exhibit 56** (Stata output for a 2SLS regression).
[39]     As detailed in **Exhibit 67**, Domestic Interested Parties have relied on an "uneconomic capacity" definition of excess capacity for this analysis.

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 42

interval of the OLS coefficient, demonstrating the results of each regression are statistically consistent with one another.

<div align="center">

### 2. Supply and Demand Side Factors

</div>

Domestic Interested Parties' OLS-based model and comparative analysis with the 2SLS method take into account a variety of demand and supply side variables to account for the equilibrating factors that determine HRC prices. On the supply side, the model includes excess capacity, raw material prices, and exchange rates (against the USD) for each country. Domestic Interested Parties incorporated both iron ore and steel scrap prices in the model, these prices being the most descriptive raw material variables for which quality pricing data are available.

Given that the price of HRC is partially a function of the demand for steel, national HRC prices (as proxied by import AUVs) are likely affected by the state of a country's economy at that time. As it is impossible to include in the analysis a separate variable specific to every economic factor that may potentially impact steel prices, it is standard practice to account for macroeconomic conditions vis-a-vis a measure such as GDP. To that end, Domestic Interested Parties considered the following measures:

- Gross Domestic Product ("GDP") in constant 2010 dollars

- GDP growth (annual percent change in GDP in constant 2010 dollars)

- GDP per capita in constant 2011 international dollars (Purchasing Power Parity)

- Gross Fixed Capital Formation ("GFCF") in constant 2010 dollars

Domestic Interested Parties evaluated each of these measures within the OLS model and, as detailed in **Exhibit 58**, the estimated effect of each is statistically insignificant. More importantly, the estimated effect of excess capacity and the model's overall explanatory power are robust to the choice of macroeconomic measure. Thus, it is empirically ambiguous which measure

<div align="center">42</div>

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 43

to include, as the choice does not affect the ultimate result. However, because it is important to

include at least one such measure in order to demonstrate that macroeconomic demand is not

driving the results, Domestic Interested Parties' model relies on GFCF. The World Bank defines

GFCF as follows:

> Gross fixed capital formation (formerly gross domestic fixed
> investment) includes land improvements (fences, ditches, drains,
> and so on); plant, machinery, and equipment purchases; and the
> construction of roads, railways, and the like, including schools,
> offices, hospitals, private residential dwellings, and commercial and
> industrial buildings. According to the 1993 SNA, net acquisitions of
> valuables are also considered capital formation.[40]

Put simply, GFCF is, as a component of GDP, investment in non-financial assets, and is

more narrowly defined to steel-using economic activity-to include economic activity that uses hot-

rolled steel-than GDP.[41] Domestic Interested Parties, thus, applied this more narrowly defined

within-country variable in the model.

On the demand side, the analysis also considers aluminum prices, the global commodity

prices of crude oil, and national-level motor vehicle sales. The oil price is significant because the

oil industry is a major user of hot-rolled coil. High oil prices lead to higher investment in new oil

extraction and distribution infrastructure. Motor vehicle sales are potentially important because

GFCF does not include vehicles, a major downstream user of steel.[42] Of note, the import AUVs,

---

[40]    World Bank Data Bank, Source Note for indicator NE.GDI.FTOT.ZS: Gross fixed capital formation (% of GDP). The "SNA" is the System of National Accounts, a set of internationally recognized standards for macroeconomic accounting, and is accessible through the following resource on the World Bank's website: http://documents. worldbank.org/curated/enl943891468153876081/System-of-national-accounts-1993.

[41]    Consider the basic macroeconomic accounting: GDP = Consumption + Investment + Government Spending + Exports - Imports. GFCF is essentially the Investment portion, restricted to non-financial assets.

[42]    As detailed in **Exhibits 57 and 67**, oil prices, motor vehicle sales, and GDP growth are accounted for in Domestic Interested Parties' analysis as instruments in the first stage demand equation of the 2SLS regression. Domestic Interested Parties excluded these variables from the OLS model for two reasons. First, as discussed above, demand is properly accounted for in the OLS model. The results are robust to (a) reliance on an OLS or 2SLS methodology, and (b) the choice of macroeconomic demand measures. Second, and more practically, the inclusion of numerous demand measures creates a large degree of what econometricians call "multicollinearity" (the correlation

43

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 44

exchange rates, motor vehicle sales, and the measures of macroeconomic conditions are each "within country" factors that vary over time and across countries in the analysis.

### 3. Fixed-Effects

Domestic Interested Parties' model applies a fixed-effects methodology for two reasons. First, the modeling for this analysis is, in large part, driven by the quality and quantity of the available data. As detailed below, the excess capacity data underlying the analysis, although from a quality source and publicly available, are global and compiled on an annual basis only. Thus, for any given country, there is only one data point available for each year covered by the analysis. Assuming the year 2008 as the starting point, there exists, therefore, a maximum of only 10 observations available for any given single-country regression. While this does not necessarily render a country-specific regression unreliable, to ensure more robust and descriptive results, Domestic Interested Parties relied on a multicountry regression that significantly expands the number of observations in the underlying dataset.[43] In doing so, it was necessary to apply fixed effects to the regression to account for intercountry variation.

Fixed-effects is ideally suited to the data and analysis at hand as it restricts all of the action in the regression to within-country action. The HRC import AUV data necessary to Domestic Interested Parties' analysis, constitutes a "panel" dataset characterized by both a cross-section and

---

between explanatory variables) without adding to the model's explanatory power. While multicollinearity does not bias the estimates themselves, it increases the variance of the regression estimates, complicating statistical inference. *See* Wooldridge at 94-95, excerpt attached at **Exhibit 55**. There comes a point where adding more is not better because the additional variables are supplying information that is essentially redundant. As shown in **Exhibit 56**, the addition of other variables does not significantly affect the R-squared, the basic measure of a regression's explanatory power.

[43]    Domestic Interested Parties' model includes those countries that are members to the Organization for Economic Co-operation and Development ("OECD"), the source for the underlying capacity data, as well as five additional large steel consuming countries outside of the OECD. *See* **Exhibits 56 and 67**. Based on data available from the World Steel Association ("WSA"), Domestic Interested Parties included the largest steel consumers outside of the OECD that also had available quality import AUV data. This demonstrates the applicability of the model across countries. Indeed, the only countries where the model may have limited applicability are those where import AUV data for the steel input under consideration are either extremely limited, of poor quality, or otherwise anomalous.

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 45

a time series whereby the import AUVs for a cross section of entities (i.e., countries) are observed at several points over time. Thus, variation within the dataset occurs on an intercountry (across country) and intracountry (within country) basis. Unlike other regressions methodologies that rely on intercountry variation and are thus problematic due to potential omitted variable bias, a fixed-effects model focuses on intra-country (within) variation. The method is thus ideal for determining the impact of global excess steel capacity on a given country, because it is designed to explore the relationship between the explanatory and outcome variables within an entity and to study the causes of changes within an entity over time. Because each country may have certain characteristics that may or may not influence their import AUVs, a fixed-effects model controls for these time-invariant characteristics, eliminating the bias. Thus, a fixed-effects approach restricts all of the action in the regression to within-country action - eliminating the key source of omitted variable bias, namely, unobservable across-country differences. In removing the effect of time-invariant characteristics, the fixed-effects approach assesses the net effect of the predictor variable (i.e., global excess steel capacity), on the outcome variable (import AUVs).

### 4. Global Excess Capacity

Domestic Interested Parties are not aware of any publicly available data source that provides national excess capacity data on a product-by-product basis for a variety of countries. The excess capacity variable applied in the model is, thus, limited by the global, crude steel nature of the available capacity and production data.[44] Domestic Interested Parties, therefore, sought to confirm the accuracy of relying on all crude steel figures by comparing the excess capacity data used in the model to HRC production data available to Domestic Interested Parties from [          ],

---

[44]    *See infra*. Domestic Interested Parties sourced global capacity data from the OECD and global steel production data from the World Steel Association Statistical Yearbook.

Barcode:3785466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/1 **PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 46

an international market analysis and consulting firm.[45] **{Domestic Interested Parties' BPI}** Domestic Interested Parties' analysis demonstrates crude steel capacity and production are valid proxies. [        ] production data confirm that production trends are highly similar for HRC and crude steel."[46] **{Domestic Interested Parties' BPI}** As demonstrated in **Exhibit 61**, there is a high correlation between changes in crude steel production and changes in HRC production: as shown in the exhibit, the ratio of HRC production to crude steel production increased over the 2008-2017 period, resulting in a high correlation between the two-production series. This is statistically significant at any level of confidence.

Such a high degree of correlation between crude steel production and HRC, in addition to the large amount of crude steel production taken up by HRC production, supports a finding that crude steel data constitutes a valid proxy for HRS prices.

Simply defined, global excess capacity is the amount of global crude steelmaking capacity in a given year in excess of global crude steel production in that year. A potential concern with applying this definition to the model is that the capacity value may be itself endogenous to HRC prices and consumption, given that production equals consumption net of inventory changes. To mitigate the potential bias, Domestic Interested Parties relied on an alternative capacity value – "uneconomic" capacity – or that which is not a direct function of production in a given year.[47] Domestic Interested Parties defined this capacity as the amount of steel capacity in a given year in excess of the largest possible quantity of steel that may be demanded in that year (*i.e.,* global capacity minus the highest global production ever experienced prior to that year). **Exhibit 56**

---

[45]     *See* **Exhibits 59 and 60**.
[46]     While country-specific HRC production data are available from [        ], HRC capacity data are not. **{Domestic Interested Parties' BPI}**
[47]     *See* **Exhibits 62 and 67**.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved

Barcode:3855466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/18 **PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 47

provides results for the model when excess capacity is simply defined as Capacity minus

Production. The results suggest even stronger effects on HRC prices.

### 5. The Underlying Data

The model incorporates a variety of high-quality, publicly available global and country-

specific data for the 2008 through 2017 period as follows:

- Country-specific Import AUVs from UN Comtrade at the four-digit 7208 HTS
  classification for Korea, the other 32 member countries of the Organization for

47

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 48

Economic Cooperation and Development ("OECD"), India, and four other of the largest steel consuming countries outside of the OECD[48]

- Global Steel Capacity figures sourced from OECD

- Global Steel Production data sourced from the World Steel Association Statistical Yearbook

- Global Aluminum Prices sourced from the World Bank

- Global Iron Ore Prices [                                    ] {**Domestic Interested Parties' BPI**}

- Global Scrap Prices sourced [                                    ] {**Domestic Interested Parties' BPI**}

- The U.S. Consumer Price Index sourced from the Federal Reserve Bank of St. Louis (All price variables, including import AUVs, were adjusted to constant 2017 U.S. dollars based on this index.)

- Country-specific Steel Consumptions sourced from the World Steel Association Statistical Yearbook

- Exchange Rates for each country included in the regression sourced from the OECD

- Country-specific Gross Fixed Capital Formation from the Work Bank (supplemented by OECD data)

- Country-specific Real GDP growth from the World Bank

- Brent crude oil price from the U.S. Federal Reserve Bank of St. Louis

- Country-specific motor vehicle sales from the International Organization of Motor Vehicle Manufacturers

**Exhibit 63** details all the specific data used for all variables in this analysis.[49] The Department can readily access, compile, and update these data as necessary.[50]

### 6. The Advantage of Import AUVs

The HRC pricing data underlying the model – *i.e.,* country-specific HRC import AUVs – capture the overall dynamics of an individual steel market and the impact of trade flows, thus

48

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 49

eliminating the need for an often-difficult-to-obtain domestic price series, and delivering a result that applies equally to imported and domestically sourced HRC. While the regression could be modified to rely, for example, on a domestic price series, Domestic Interested Parties are unaware of any single source for HRC domestic pricing data across multiple countries. The model would thus require, for each case, analysis and research to identify a source of domestic pricing data specific to HRC within a given country. Where such data are unavailable, the model would be rendered useless. Import AUVs address these practical concerns and ensure a model that can be applied consistently across countries and products.

More importantly, however, import AUVs serve to best capture the overall dynamics of an individual steel market and the impact of trade flows on that market, eliminating the need for a domestic price series and ensuring a result that applies equally to imports and domestically sourced HRC. Excess capacity leads to falling prices and declining profitability in steel and other industries. As an economic matter, it is excess supply – not capacity – relative to demand that transmit the adverse price effects and result in lower prices. The presence of excess capacity generally leads to excess supply: firms produce more than required at current prices in order to

---

[48]     Belgium and Luxembourg are the only OECD countries not included in the sample, as certain data sources did not treat them separately. (Lithuania, which joined the OECD in July 2018, is not included in the analysis.) Please see **Exhibit 56** for the sample of countries and coverage of global steel consumption.
[49]     The compiled data for analysis is provided at **Exhibit 64**. This dataset serves as the starting point for the analyses shown in **Exhibits 56 and 57**. The SAS/STAT program equivalents are also being submitted and are described in **Exhibit 68**.
[50]     To ensure meaningful results, each of the time-variant variables should reflect the same period. Domestic Interested Parties note, however, that given the lag in availability from the various sources, it may not be able to update each data series to reflect a given period of investigation or review in its entirety. For example, while certain import AUV data are currently available from UN Comtrade for 2018, OECD capacity data, as well as data for other variables considered in the model are not. Thus, it will not always be possible to match the underlying data to the exact period of review or investigation at the time of the PMS allegation, as is the case here. The available data and results would, nevertheless, clearly be contemporaneous with the period under consideration. The Department could also independently update the data series as necessary once all the required data become available.

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 50

generate needed cash to support high fixed costs,[51] while importers demand discounts in order to absorb the additional supplies. If the importing country also produces steel, the lower import prices cause domestic producers to lower their prices as well. Import AUVs are thus intrinsically linked to domestic prices, as all suppliers to a given market – *i.e.,* foreign and domestic suppliers – compete, undercut, and distort one another, and global excess supplies, even if primarily generated by a handful of countries, lead to price reductions in the domestic markets of other countries through trade. The Department recognized this basic principle in its recent final determination in *LDWP from Korea*, where it explained:

> In a market economy, where goods are competitively priced, domestic and imported prices will converge at an equilibrium. This is particularly true with a common and fungible commodity such as HRC or plate. Thus, because domestic subsidies lower the COP and the price of HRC or plate in Korea, it is logical to find that, to remain competitive, imported HRC or plate will sell at prices competitive with the domestically produced and subsidized HRC or plate. In other words, domestic and imported prices of HRC or plate converge to a lower market equilibrium price than if the domestically-produced Korean HRC or plate did not benefit from GOK subsidies.[52]

The distortive impact of global excess capacity as transmitted to an individual market is thus best measured by the prices in that market indicative of both the dynamics of that market as well as the prevailing trade flows – *i.e.,* import AUVS.[53] As such, import AUVs reflect the prices

---

[51]    *See* Stephen Cooney, Report for Congress - Steel Industry and Trade Issues (May 28, 2002) at 13-14, attached at **Exhibit 65**; *see also* Lukas Brun, Overcapacity in Steel: China's Role in a Global Problem, Duke Center on Globalization, Governance & Competitiveness at the Social Science Research Institute (2016) at 31, attached at **Exhibit 66**.

[52]    Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe From the Republic of Korea*, 84 Fed. Reg. 6374 (Dep't Commerce Feb. 27, 2019) (final determination of sales at less than fair value) at comment 4 (internal citations omitted).

[53]    Were the Department to obtain domestic and import price indexes maintained by the GOK, it is likely, given the price transmission role played by HRC imports, that those domestic and import prices would share very similar trends. Such a close linkage would, *ipso facto*, demonstrate the validity of using an AUV to reflect domestic market conditions in the subject country. Indeed, Domestic Interested Parties' analysis confirms this point.

Honorable Wilbur L. Ross, Jr.                                                           **PUBLIC VERSION**
June 25, 2019
Page 51

charged and the degree of distortion imposed on HRC prices in the Korean market overall-for both

Korean and non-Korean suppliers and a means to adjust the cost for all HRC inputs increasing the

respondents' HRC costs for purchases from all suppliers by a single adjustment factor.

Moreover, available price series demonstrate that import AUVs are an appropriate proxy

for available HRC prices in the region. While the data is not publicly available, Domestic

Interested Parties have access to an HRC price series that includes Korea, as compiled by

[        ],[54] **{Domestic Interested Parties' BPI}** and have relied on these data to test the reliability

of the model's import AUV assumptions. Domestic Interested Parties' analysis reveals a

statistically significant correlation between these HRC prices in the region and Korea's import

AUVs.[55]

Finally, Domestic Interested Parties note that the Department has long recognized the

inherent link between import AUVs and the price for a product generally within a given market

when evaluating the best information available to value the factors of production pursuant to

Section 773(c)(1) of the Act. Time and again the Department has determined import AUVs to be

indicative of "broad market averages"[56] that reflect actual prices for a given product, that represent

"prices available countrywide" by domestic and foreign suppliers alike, and that are prices free of

bias, taxes, and duties.[57] Indeed, POSCO has indicated that Chinese HRS imports have been

---

[54]        *See* **Exhibit 59**.

[55]        *See id.*

[56]        *See, e.g.,* Issues and Decision Memorandum accompanying *Certain Preserved Mushrooms From the People's Republic of China*, 77 Fed. Reg. 55,808 (Dep't Commerce Sept. 11,2012) (final results of antidumping duty admin. rev.) at comment 3; Issues and Decision Memorandum accompanying *Chlorinated Isocyanurates From the People's Republic of China*, 81 Fed. Reg. 1167 (Dep't Commerce Jan. 11,2016) (final results of antidumping duty admin. rev.; 2013-2014) at comments 1 and 2; Issues and Decision Memorandum accompanying *High Pressure Steel Cylinders from the People's Republic of China* (Dep't Commerce Apr. 30,2012) at comment 1 ("*High Pressure Steel Cylinders from the PRC*").

[57]        Indeed, even where the source of the market economy imports into a surrogate country comes from one country, the Department still considers the import AUV to be reflective of a broad market average. *See High Pressure Steel Cylinders from the PRC* at comment 1.

**Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 52

dumped aggressively into Korea,[58] and that the company believes that such flooding of steel imports from China has affected steel prices in Korea.[59]

### C.     Model Results and PMS Adjustment Calculations

As detailed in **Exhibit 57**, Domestic Interested Parties' analysis indicates a compelling, statistically significant inverse relationship between global overcapacity and HRC import AUVs such that where global steel overcapacity increases, HRC and plate import AUV s decrease. The OLS model finds that, all else equal, a 10 percent increase in global excess steel capacity results in a 5.9 percent decrease in national import AUVs of HRC.[60] Given this result, Domestic Interested Parties estimated what the Korean AUV for HRC imports would have been in 2017 but for global steel overcapacity, and that analysis indicates an AUV of $808.80/MT if global steel production operated at a utilization rate of 85 percent.[61]

This is 49.35 percent higher than the 2017 Korean import AUV for HRC of $541.54/MT, demonstrating the significant degree to which the HRC prices in the Korean market have been depressed directly and indirectly by the excess steel capacity crisis. Thus, by increasing the cost

---

[58]     *See generally* POSCO 2016 Investors Forum Q&A, attached as Exhibit 87 to **Exhibit 26**.
[59]     *See generally* POSCO 2016 1 Q Q&A, attached as Exhibit 88 to **Exhibit 26**.
[60]     *See* **Exhibit 57**.
[61]     *See* "PMS Adjustment Calculations" Worksheet at **Exhibit 62**. In its recent 232 steel investigation, the U.S. Department of Commerce Bureau of Industry and Security Office of Technology Evaluation indicates that steel utilization rates of 80 percent or more are "typically necessary for sustained profitability, among other factors and that for most capital and energy-intensive U.S. steel producers, capacity levels of 80 percent or higher are required to maintain facilities, carry out periodic modernization, service company debt, and fund research and development." See The Effect of Imports of Steel on the National Security An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, As Amended, U.S. Department of Commerce, Bureau of Industry and Security Office of Technology Evaluation (Jan. 11, 2018) at 47-49, excerpt attached at Exhibit 89 to **Exhibit 19**. According to a recent study by McKinsey & Company about excess capacity in the global steel industry, a global capacity utilization rate of 90 percent is necessary for the long-term sustainability of the global steel industry. See Avetik Chalabyan, Lapo Mori, and Steven Vercammen, The Current Capacity Shake-up in Steel and how the Industry is Adapting, McKinsey & Company (Jan. 2018) at 14, attached at Exhibit 90 to **Exhibit 19**. McKinsey calculates overcapacity as crude steel nominal capacity x 90% - production. Since McKinsey's estimated global production capacity is somewhat lower than estimated by the OECD, excess capacity consistent with a lower capacity utilization rate of 85 percent (using OECD capacities) is a reasonable baseline for the analysis.

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 53

of the respondents' hot-rolled inputs by 49.35 percent, the Department can account in full for the

distortive effects of the excess capacity-driven PMS in Korea.[62]

The estimated coefficients for the other variables in the model speak to the overall veracity

of the analysis. All variables except for the aluminum price are of the expected sign, and all control

variables except gross fixed capital formation are statistically significant.[63] For example, on the

supply side, the iron ore price and steel scrap price are positively associated with the price of HRC,

which is to be expected of an input to HRC production.

Using the identical import AUV and capacity data as that for the model, Domestic

Interested Parties calculated individual country-specific elasticities that, as **Exhibit 56**

demonstrates, reveal the same statistically significant inverse relationship between global steel

overcapacity and import AUVs as indicated by Domestic Interested Parties' model.[64] To be clear,

Domestic Interested Parties did not run the full OLS model against each county to obtain these

results. These are simple, individual country-specific elasticity calculations that are important to

the analysis because they demonstrate the accuracy at which the model attributes changes in

national import AUVs to global steel excess capacity. If another country-specific variable was at

play, or the model somehow misrepresented the relationship, one would not expect the same

pattern to repeat time and again across all 38 countries considered for the analysis. Domestic

Interested Parties also extended this analysis to run additional, country-specific elasticities using

---

[62]     "PMS Adjustment Calculations" Worksheet at **Exhibit 62**.
[63]     As discussed in the Economic Analysis attached at **Exhibit 67**, one would expect the aluminum price to be positively associated with the HRC price and, indeed, the raw correlation is positive. The regression coefficient must be interpreted in conjunction with the other estimates. That is, the effect of the aluminum price is found to be negative once the iron ore and scrap prices have been taken into account. The statistically insignificant effect of gross fixed capital formation is consistent with the results for other measures of macroeconomic demand. See Economic Analysis, attached at **Exhibit 67**, and **Exhibit 58** (providing results).
[64]     *See* "Estimated Country-Specific Elasticities" Worksheet at **Exhibit 56**.

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 54

the country-specific domestic HRC price series available through [        ]. {**Domestic Interested Parties' BPI**} These elasticities reveal the same inverse relationship between global steel overcapacity and domestic HRC prices. That similar results are achieved, albeit with a smaller data set, is an important result. Not only does it demonstrate that excess capacity has a similar direct impact on domestic prices for those countries with available data from [        ], {**Domestic Interested Parties' BPI**} it confirms that the model's import AUV-based results are not biased by product mix or other import AUV-related issues.

The import AUV-based country-specific elasticities also confirm the explanatory power of the fixed-effects approach. Because a fixed effects model isolates the "within-group" variation, the method yields more explanatory power where the underlying panel dataset demonstrates significant variation in the dependent variable among countries. As Figure 1 in the Economic Analysis below demonstrates, there exists a significant vertical spread in the AUV data points in each year, demonstrating meaningful variation in import AUV s of HRC and plate between countries in any given year. These data also demonstrate strong persistence relative to the mean AUV for all countries, particularly for Korea. Korea's AUV is consistently lower than the global mean and that delta is relatively consistent. This is broadly true of the entire dataset: while global steel prices vary from one year to the next, each country's HRC import AUV tends to occupy a similar position relative to other countries. In fact, all countries in the data demonstrate similar relationships between global excess capacity and their HRC import AUV.[65]

These country-specific elasticities also serve to inform as to the potential applicability of the model across countries. Where the elasticity for a given country indicates sufficient

---

[65]    These country-specific elasticities also provide conceptual justification for the application of a PMS adjustment to Korea's HRC import AUVs. The vast majority of countries demonstrate an AUV-to-Uneconomic

Barcode C-0385466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/18    **PUBLIC VERSION**

responsiveness, the model is appropriately applied to calculate a PMS adjustment specific to that country. For example, as indicated in **Exhibit 56**, the vast majority of countries demonstrate sensitivity-with an AUV-to-Uneconomic Capacity elasticity between -0.4 and -1 (*i.e.,* a 10 percent increase in uneconomic capacity results in price declines ranging from 4 percent to 10 percent). Of these, Domestic Interested Parties selected two additional countries of interest – India and Turkey – and ran the model to calculate the PMS adjustment. As detailed in **Exhibit 56**, the model works to quantify the impact of global excess capacity at the national level, to derive a PMS adjustment specific to the country under examination.[66]

Domestic Interested Parties further confirmed the veracity of the proposed model based on comparisons between various alternative specifications of a regression model that takes the import AUVs as the dependent variable and global excess capacity as the explanatory variable. The "Other Regression Results" Worksheet in **Exhibit 56** demonstrates the estimated relationship between import AUVs and global excess capacity is robust, as one finds statistically and economically significant coefficients with or without the fixed effects parameter or with alternative specifications. The worksheet likewise demonstrates that the relationship between import AUV s and global excess capacity is so statistically significant that the addition of numerous time-variant variables into the analysis does not undermine the finding of a strongly negative impact of global excess capacity.

Attached at **Exhibit 67** is a more detailed economic analysis that describes the model and its results. Attached at **Exhibit 68** is a description of how the model, which was originally

---

Capacity elasticity between -0.4 and -1 (*i.e.,* a 10 percent increase in uneconomic capacity results in price declines ranging from 4 percent to 10 percent). *See* "Results of Country-Specific Regressions" Worksheet at **Exhibit 56**.
[66]    *See* "PMS Adjustment for Select Countries" Worksheet at **Exhibit 56**.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 1:28 PM, Submission Status: Approved

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 56

developed in Stata, can be run in SAS/STAT. Related SAS databases, programming code, log and

output, described in more detail in Exhibit 68, are being submitted electronically and are attached

at **Exhibits 69, 70, 71, and 72**.

### D.     Conclusion

Lacking a descriptive means to quantify and adjust for the full distortion in HRC costs

caused by a PMS, the Department has, to date, simply defaulted to upwardly adjusting the

respondents' HRC costs based on the prevailing U.S. CVD investigation rates in effect against

hot-rolled inputs from the subject country. Domestic Interested Parties here provide a compelling

and flexible alternative to the Department's current PMS adjustment methodology that recognizes

and accounts for the distortions inherent to a PMS at the national level. Moreover, in recognizing

global steel overcapacity as the fundamental driver of the PMS in Korea, Domestic Interested

Parties' method inherently establishes the link between the adjustment and the factors that

collectively define the Korean PMS. It goes beyond factor-specific adjustments and provides a

unified approach. Further, because it identifies the manner in which the global steel overcapacity

crisis uniquely manifests itself at the national level, Domestic Interested Parties' method results in

an adjustment that is country-specific, and also product-specific, as a result of its reliance on import

AUVs as the underlying pricing data. In addition, given that individual companies do not operate

within a vacuum, but are subject to the prices and market forces in operation in individual steel

markets, the resulting adjustment is also meaningfully and appropriately applied on a company-

specific basis to respondents' costs of production.

Moreover, the model can be readily revised to apply to a variety of steel products and

updated as necessary to reflect different time periods. Domestic Interested Parties urge the

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 57

Department to consider and adopt this methodology, and make the appropriate upward adjustment to the respondents' HRC input costs as determined by this regression analysis.

Commerce should note that this PMS adjustment addresses only the distorted HRC costs caused by global capacity. It does not address the distorted effects caused by Korean subsidies. Nor does it address the distorted electricity costs or adjustments for the other contributing factors such as strategic alliances. As such, Commerce should add this regression-based PMS adjustment to these other adjustments.

\* \* \*

## REQUEST FOR PROPRIETARY TREATMENT

Domestic Interested Parties request that certain information contained in square brackets ("[    ]") throughout this submission be protected as business proprietary information pursuant to 19 C.F.R. § 351.304(a)(1)(i). This information was released to counsel for Domestic Interested Parties under the terms of the Administrative Protective Order in the first administrative review.

Domestic Interested Parties also request proprietary treatment for bracketed information designated as Domestic Interested Parties' BPI, in accordance with Commerce's regulations at 19 C.F.R. § 351.304(a) and § 351.105(c)(11). Public disclosure of this information would result in serious and substantial harm to the competitive position of Domestic Interested Parties and would impair the ability of Commerce to obtain information necessary to fulfill its statutory functions.

**PUBLIC VERSION**

Honorable Wilbur L. Ross, Jr.
June 25, 2019
Page 58

Domestic Interested Parties agree to the release of this information to parties granted access under

the APO issued by Commerce in this proceeding.

      If you have any questions regarding this submission, please do not hesitate to contact the

undersigned.

                                 Respectfully submitted,

                                 Roger B. Schagrin
                                 Elizabeth J. Drake
                                 Luke A. Meisner
                                 Michael F. Panfeld, *Consultant*
                                 SCHAGRIN ASSOCIATES
                                 *Counsel to California Steel Industries, TMK IPSCO,*
                                 *and Welspun Tubular LLC USA*

## EXHIBIT LIST

| Exhibit No. | Exhibit | Security |
|---|---|---|
| 1 | Excerpt from Letter from Law Office of Jeffrey M. Winton PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Order on Welded Line Pipe from Korea - Response to Section A of Department's April 1 Questionnaire* (Apr. 29, 2019) | BPI |
| 2 | Excerpt from Letter from Law Office of Jeffrey M. Winton PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Order on Welded Line Pipe from Korea — Response to Section B, C, D and E of the Department's April 1 Questionnaire* (May 21, 2019) | BPI |
| 3 | Excerpt from Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: NEXTEEL's Section A Questionnaire Response* (Apr. 29, 2019) | BPI |
| 4 | Excerpt from Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: NEXTEEL's Sections C and D Questionnaire Response* (May 21, 2019) | BPI |
| 5 | Excerpt from Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: POSCO's Response Related to the COP Portion of the Department's April 1, 2019 Questionnaire to NEXTEEL* (May 30, 2019) | BPI |
| 6 | Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea,* 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019) (final results of antidumping duty admin, rev.; 2016-2017) | Public |
| 7 | Memorandum from Joshua Tucker, International Trade Compliance Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *Welded Line Pipe from the Republic of Korea: 2016-2017 Antidumping Duty Administrative Review – Final Results Margin Calculation for SeAH* (June 7, 2019) | Public |
| 8 | Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program | Public |

| Exhibit No. | Exhibit | Security |
|---|---|---|
| | Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: *2016-2017 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Final Results Margin Calculation for NEXTEEL Co., Ltd.* (June 7, 2019) | |
| 9 | Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *2016-2017 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Calculation of the Review-Specific Average Rate for the Final Results* (June 7, 2019) | Public |
| 10 | Letter from Law Office of Jeffrey M. Winton PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Order on Welded Line Pipe from Korea - Response to Section B, C, D and E of the Department's March 19 Questionnaire* (May 14, 2018) | Public |
| 11 | Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: NEXTEEL's Section D Questionnaire Response* (May 15, 2018) | Public |
| 12 | Letter from Arnold & Porter Kaye Scholer LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: NEXTEEL's Second Section D Supplemental Questionnaire Response* (Aug. 6, 2018) | Public |
| 13 | Letter from Wiley Rein LLP and Schagrin Associates to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: Particular Market Situation Allegation and Factual Information* (Aug. 7, 2018) | Public |
| 14 | Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of antidumping duty admin, rev.; 2015-2016) | Public |
| 15 | Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic* | Public |

Barcode:3853466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/18

| Exhibit No. | Exhibit | Security |
|---|---|---|
| | *of Korea - Discussion of Business Proprietary Information for the Final Results - Particular Market Situation* (July 11, 2018) | |
| 16 | Memorandum from Ross R. Belliveau, Senior International Trade Compliance Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *Welded Line Pipe from the Republic of Korea: 2015-2016 Antidumping Duty Administrative Review - Calculations for SeAH Steel Corporation for the Final Results* (July 11, 2018) | Public |
| 17 | Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Final Results Margin Calculation for Hyundai Steel Company* (July 11, 2018) | Public |
| 18 | Memorandum from William Miller, International Trade Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea - Calculation of the Review-Specific Average Rate for the Final Results* (July 11, 2018) | Public |
| 19 | Excerpt of Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Supporting Information* (Apr. 2, 2019) | Public |
| 20 | Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea,* 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) (final results of antidumping duty admin, rev.; 2016-2017) | Public |
| 21 | Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea,* 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty admin, rev. and final deter, of no shipments; 2015-2016) | Public |

| Exhibit No. | Exhibit | Security |
|---|---|---|
| 22 | Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Korea,* 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty admin, rev.; 2014-2015), *amended,* 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of antidumping duty admin. rev.; 2014-2015) | Public |
| 23 | Issues and Decision Memorandum accompanying *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea,* 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), *amended,* 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (amended final affirm, countervailing duty deters, and countervailing duty orders) | Public |
| 24 | Memorandum from Katie Marksberry, International Trade Compliance Analyst, AD/CVD Enforcement, Office V, through James C. Doyle, Director, Office V, AD/CVD Enforcement, to Christina Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: *Countervailing Duty Investigation: Certain Hot-Rolled Steel Flat Products from the Republic of Korea - Response to Ministerial Error Comments filed by Hyundai Steel Co. Ltd. and POSCO* (Aug. 23, 2016) | Public |
| 25 | Memorandum from Katie Marksberry, International Trade Compliance Analyst, AD/CVD Operations, Office V, through Catherine Bertrand, Program Manager, AD/CVD Operations, Office V, to The File, re: *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Amended Final Determination Calculation Memorandum for POSCO* (Aug. 23, 2016) | Public |
| 26 | Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Supporting Information* (Apr. 2, 2019) | Public |
| 27 | Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: Particular Market Situation Allegation and Factual Information* (Sept. 25, 2017) | Public |
| 28 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea:* | Public |

Barcode:3853466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/18

| Exhibit No. | Exhibit | Security |
|---|---|---|
| | *Submission of Factual Information Relating to Particular Market Situation Allegations* (Aug. 7, 2017) | |
| 29 | Letter from Skadden, Arps, Slate, Meagher & Flom LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from the Republic of Korea* (Aug. 7, 2017) | Public |
| 30 | Exerpt from Domestic Interested Parties' Aug. 6, 2018 PMS Allegation | Public |
| 31 | Issues and Decision Memorandum accompanying *Biodiesel From Indonesia,* 83 Fed. Reg. 8,835 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value) | Public |
| 32 | Issues and Decision Memorandum accompanying *Biodiesel From Argentina,* 83 Fed. Reg. 8,837 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value and final affirm. deter. of critical circs., in part) | Public |
| 33 | Korea Fair Trade Commission, *KFTC punishes six steel pipe manufacturers for rigging bids offered by Korea Gas Corporation* (Dec. 21, 2017) | Public |
| 34 | Park Jae-hyuk, *Steelmakers fined W92 bil. for bid rigging,* Korea Times (Dec. 20, 2017) | Public |
| 35 | Confidential Declaration | BPI Requested |
| 36 | Exerpt from Domestic Interested Parties' Aug. 6, 2018 PMS Allegation | Public |
| 37 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Petitioners' Allegation of Upstream Subsidies to Korean Steel Producers* (Apr. 29, 2019) | |
| 38 | Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Supporting Information* (Apr. 2, 2019) | Public |
| 39 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Particular Market Situation Allegation on Electricity* (Feb. 4, 2016) | Public |

Barcode:3853466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/18

| Exhibit No. | Exhibit | Security |
|---|---|---|
| 40 | *Energy Policies of IEA Countries – The Republic of Korea 2012 Review*, International Energy Agency (2012). | Public |
| 41 | Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Supporting Information* (Apr. 2, 2019) | Public |
| 42 | Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Supporting Information* (Apr. 2, 2019) | Public |
| 43 | Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe From the Republic of Korea,* 84 Fed. Reg. 6,374 (Dep't Commerce Feb. 27, 2019) (final deter. of sales at less than fair value) | Public |
| 44 | Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, 83 Fed. Reg. 50,892 (Dep't Commerce Oct. 10, 2018) (prelim. results of antidumping duty admin. rev. & prelim. deter. of no shipments; 2016-2017) | Public |
| 45 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from the Republic of Korea: Factual Information Relating to the Particular Market Situation in Korea* (Aug. 20, 2018) | Public |
| 46 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Other Factual Information Submission for Valuing the Particular Market Situation in Korea and Respondents' CV Profits* (May 17, 2018) | Public |
| 47 | Letter from Wiley Rein LLP and Shagrin Associates to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: Other Factual Information* (Sept. 6, 2018) ("Domestic Interested Parties' Sep. 6, 2018 Other Factual Information") | Public |
| 48 | Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't Commerce June 13, 2018) (final results of antidumping duty admin. rev.; 2015-2016) | Public |

Barcode:3853466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/18

| Exhibit No. | Exhibit | Security |
|---|---|---|
| 49 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Rebuttal Comments in Response to Comments and Arguments on Particular Market Situation Allegations* (Nov. 15, 2016) | Public |
| 50 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Comments and Arguments on Particular Market Situation Allegations* (Nov. 7, 2016) | Public |
| 51 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Particular Market Situations and Other Factual Information Submission* (Sept. 7, 2016) | Public |
| 52 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Information and Comments Requiring Immediate Action* (Nov. 25, 2015) | Public |
| 53 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from the Republic of Korea: Submission of Factual Information* (Nov. 13, 2015) | Public |
| 54 | Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. rev.; 2016-2017) | Public |
| 55 | Jeffrey M. Woolridge, Introductory Econometrics: A Modern Approach, 5th Edition (2103) (excerpt) | Public |
| 56 | Comparison of Regression Methodologies | BPI Requested |
| 57 | Regression Results | Public |
| 58 | Comparison of Macroeconomic Measures | Public |
| 59 | [      ] Data **{Domestic Interested Parties' BPI}** | BPI Requested |
| 60 | [                    ] **{Domestic Interested Parties' BPI}** | BPI Requested |
| 61 | Global Production Trends: Hot-Rolled Sheet & Coil Plate vs. Crude Steel | BPI Requested |
| 62 | PMS Adjustment Calculation Worksheet | Public |

| Exhibit No. | Exhibit | Security |
|:---:|:---|:---:|
| 63 | Data for Analysis | BPI Requested |
| 64 | Compiled Regression Dataset – Submitted as SAS Database in Exhibit 69 | Public |
| 65 | Stephen Cooney, Report for Congress – Steel Industry and Trade Issues (May 28, 2002) | Public |
| 66 | Lukas Brun, Overcapacity in Steel: China's Role in a Global Problem, Duke Center on Globalization, Governance & Competitveness at the Social Science Research Institute | Public |
| 67 | Economic Analysis | Public |
| 68 | Reconciliation of Regression Analysis Model with SAS | Public |
| 69 | PMS01 SAS Database | BPI Requested |
| 70 | PMS_Adjustment_Code Korea.sas Printout, Log, and Output | Public |
| 71 | Stata log | Public |
| 72 | Calculation of the PMS Adjustment Using Alternative Software and Procedures | Public |

## Counsel Certification

I, Elizabeth J. Drake, counsel to California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA, certify that I prepared or otherwise supervised the preparation of the attached *Particular Market Situation Allegation and Supporting Factual Information,* filed pursuant to the antidumping administrative review (POR: 12/1/2017 – 11/30/2018) on Welded Line Pipe from the Republic of Korea, case number A-580-876.

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _Elizabeth J. Drake_

Date: _6/24/19_

Barcode:3853466-01 A-580-876 REV - Admin Review 12/1/17 - 11/30/18

# PUBLIC CERTIFICATE OF SERVICE

**Welded Line Pipe from Korea**
**A-580-876**
**Administrative Review**
**12/1/17 – 11/30/2018**

I, Brittney Allen, hereby certify that copies of the attached PUBLIC

DOCUMENT were served today, June 25, 2019 by first class mail upon the following

parties:

Donald B. Cameron, Esq.
**Morris, Manning & Martin, LLP**
1401 I Street, NW, Ste 600
Washington, DC 20005

Jaehong David Park, Esq.
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave., N.W.
Washington, DC 20001

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
660 Pennsylvania Avenue, SE, Suite 401
Washington, DC 20003

Jeffrey M. Winton, Esq.
**Law Office of Jeffrey M. Winton**
1900 L Street, NW, Suite 611
Washington, DC 20036

Gregory J. Spak, Esq.
**White & Case LLP**
701 Thirteenth Street, NW
Washington, DC 20005-3807

Timothy C. Brightbill, Esq.
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006

Brittney Allen, *Paralegal*
SCHAGRIN ASSOCIATES

# EXHIBIT 19

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

**PUBLIC VERSION**



April 2, 2019

| |
|---|
| Case No. A-580-880 |
| Total Pages: 8772 |
| Administrative Review for the POR |
| 9/1/2017 – 8/31/2018 |
| AD/CVD Operations, E&C Office II |
| Petitioner's Business Proprietary Information Removed from on Pages 7, 23, 28, 49, 50, 53, 56, Exhibit List, and Exhibits 1.2, 1.5, 1.7, 1.10, 1.10.C, 1.10.D, 1.11, 2, 3, 7 11, 85 |
| Kukje Steel's Business Proprietary Information Removed from Pages 27-29 |
| HiSteel's Business Proprietary Information Removed from Page 27-29 |
| **PUBLIC VERSION** |

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

> Re:  ***Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea****: Particular Market Situation Allegation and Supporting Information

Dear Secretary Ross:

On behalf of the Independence Tube Corporation, a Nucor company, and Southland Tube, Incorporated, a Nucor company (collectively, "Petitioners"), we hereby submit to the U.S. Department of Commerce (the "Department") that a particular market situation ("PMS") under 19 U.S.C. § 1677b(e) exists in the Republic of Korea ("Korea") such that the costs of production

Filed By: Derick Holt, Filed Date: 4/2/19 4:34 PM, Submission Status: Approved

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 2

("COP") of heavy walled rectangular welded carbon pipes and tubes ("HWR") in Korea are distorted. In addition, we provide factual information relating to this PMS allegation.[1]

This allegation and supporting factual information are timely filed pursuant to the notice of initiation published in the *Federal Register*,[2] as well as the Department's March 8, 2019 letter.[3] The factual information relating to this PMS allegation is submitted in support of an allegation not specified in 19 C.F.R. § 351.301(c)(2)(i)-(iv) and is information as defined in 19 C.F.R. § 351.102(b)(21)(ii).[4]

Petitioners note that, as authorized applicants to the administrative protective order ("APO") of the 2016-2017 administrative review of the antidumping duty order on *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea* ("*HWR from Korea*"), we are placing certain business proprietary information ("BPI") from that segment of this proceeding on the record in this segment, consistent with the APO of the 2016-2017 administrative review.[5]

---

[1]     *See generally* **Exhibits __**, which provided information regarding the existence of a PMS in Korea and information detailing the appropriate adjustments to respondents' reported cost data. Petitioners note that, as described further below, **Exhibits 1-6** pertain to a global-excess-capacity-based regression analysis that Petitioners have developed to quantify the impact of the PMS in Korea.

[2]     *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 57,411, 57,411-12 (Dep't Commerce Nov. 15, 2018).

[3]     Letter from Shawn Thompson, Program Manager, Off. II, AD/CVD Operations, Enf't & Compliance to Wiley Rein LLP, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea* (Mar. 8, 2019).

[4]     Information defined in 19 C.F.R. § 351.102(b)(21)(ii) is information submitted in support of allegations.

[5]     *See* Dep't Commerce Administrative Protective Order, *In the Matter of the Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from South Korea (A-580-880) (3/1/16-8/31/17)* (Nov. 14, 2017) at 1 ("If business proprietary information that is submitted in this segment of the proceeding is relevant to an issue in two consecutive subsequent administrative reviews, an authorized applicant may place such information on the record of those reviews."). Petitioners submit that information provided in **Exhibit 7** regarding Petitioners' PMS allegation in the 2016-2017 administrative review in this proceeding is relevant to the issues in this submission. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Support Information* (Aug. 31, 2018) ("HWR AD AR 16-17 PMS Allegation"), attached as **Exhibit 7**.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019
**PUBLIC VERSION**
Page 3

## I.   PARTICULAR MARKET SITUATION ALLEGATION

### A.   Introduction

Petitioners respectfully request that the Department find, as it has preliminarily found in the 2016-2017 administrative review of this proceeding,[6] that a PMS exists in Korea such that corrective adjustments to respondents' reported data are warranted. In 2016-2017 administrative review of *HWR from Korea*, the Department preliminarily determined "that a PMS exists in Korea, which distorts the COP of HWR" under Section 504 of the Trade Preferences Extension Act ("TPEA"), codified at 19 U.S.C. § 1677b(e).[7] To account for this PMS, the Department preliminarily made upward adjustments to respondents'—Dong-A Steel, Co., Ltd. ("DOSCO") and HiSteel Co., Ltd. ("HiSteel")—reported costs for hot-rolled coil ("HRC"), *i.e.*, the primary input for HWR, based on the subsidy investigation rates found in *Hot-Rolled Steel Flat Products from the Republic of Korea* ("*Hot-Rolled Steel from Korea*").[8]

While one of the respondents in the in the 2016-2017 administrative review of *HWR from Korea*, DOSCO, has been replaced by Kukje Steel Co., Ltd. ("Kukje Steel") in the 2017-2018 review, the facts of this review are nevertheless largely identical to those in the 2016-2017 review. This warrants a finding that a PMS continues to exist in Korea and requires upward adjustments to HiSteel's and Kukje Steel's reported HRC costs. Indeed, in the current review, the Department initially selected HiSteel and DOSCO as mandatory respondents, *i.e.*, the same respondents as in

---

[6]     Issues and Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, 83 Fed. Reg. 50,892 (Dep't Commerce Oct. 10, 2018) (prelim. results of antidumping duty admin. rev. & prelim. deter. of no shipments; 2016-2017) at 12-14 ("HWR Korea AD AR 16-17 Prelim IDM"), excerpts attached as **Exhibit 8**.

[7]     HWR Korea AD AR 16-17 Prelim IDM at 12-13, excerpts attached as **Exhibit 8**.

[8]     *See* HWR Korea AD AR 16-17 Prelim IDM at 13, excerpts attached as **Exhibit 8**.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 4

the 2016-2017 administrative review.[9] However, DOSCO subsequently filed a notice of its intent

not to participate in the 2017-2018 review;[10] and, as a result, the Department selected Kukje Steel

as a new mandatory respondent.[11] Indeed, that DOSCO refused to participate in the 2017-2018

review, after participating in the 2016-2017 review, suggests that a PMS does exist in Korea and

the costs of the respondents, such as DOSCO, are distorted. It is telling that it is after the

Department's preliminary results in the 2016-2017 review of *HWR Korea*, in which the agency

made upward adjustments to respondents' HRC costs to account for the PMS in Korea, that

DOSCO decided that it was unable to participate in the 2017-2018.[12] That is, it appears likely that

DOSCO is well aware that a PMS continued to exist throughout the period of review ("POR") of

the current review and that the Department would apply similar, substantial adjustments to the

company's HRC costs in this review; thus, the company decided it was not worthwhile to

participate in this proceeding.

      **B.**     **A PMS Continues to Exist in Korea Such That HRC Costs In Korea Were Distorted During the POR**

    As the Department has preliminary found in the 2016-2017 administrative review of *HWR*

*from Korea*, a series of extreme government actions and unfair competition in Korea continue to

---

[9]    *See generally* Memorandum from Alice Maldonado, Senior Analyst, Off. II, AD/CVD Operations through Shawn Thompson, Program Manager, Off. II, AD/CVD Operations to Melissa G. Skinner, Director, Off. II, AD/CVD Operations, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Selection of Respondents for Individual Review* (Dec. 7, 2018).

[10]   *See generally* Letter from Dong-A Steel, Co., Ltd. to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea – Notification of Inability to Participate as Mandatory Respondent* (Dec. 14, 2018) ("DOSCO Letter of Non-Participation")

[11]   *See generally* Memorandum from Alice Maldonado, Senior Analyst, Off. II, AD/CVD Operations through Shawn Thompson, Program Manager, Off. II, AD/CVD Operations to Melissa G. Skinner, Director, Off. II, AD/CVD Operations, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Selection of New Respondent for Individual Review* (Dec. 7, 2018).

[12]   *See* DOSCO Letter of Non-Participation; HWR Korea AR 16-17 Prelim IDM at 13, excerpts attached as **Exhibit 8**.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 5

support an affirmative PMS finding in this review. Such conditions include: (i) the overall

distortion of HWR COP as a result of the countervailable subsidization of Korean hot-rolled steel

("HRS") products; (ii) the distortive pricing of unfairly traded Chinese HRC; (iii) anticompetitive

strategic alliances between HRS producers and downstream pipe producers; and, (iv) the distortive

government subsidization of electricity in Korea.[13]

As supported by the present submission of information relating to the PMS in Korea, the

same factors that led to the Department's preliminary results in the 2016-2017 administrative

review that a PMS existed in Korea are still present in the 2017-2018 review and, thus, support the

continued finding that a PMS existed during this POR. Accordingly, as the Department found in

the 2016-2017 review, the agency should continue to find in this review that "{c}onsistent with

our determinations in {other} cases, and based on the record evidence in this proceeding . . . a

PMS exists in Korea."[14] Likewise, in this review, the Department should continue to make

corrective adjustments to respondents' reported costs.[15] Moreover, as discussed further below, the

Department should not limit its corrective adjustments to applying the subsidy investigation rates

from *Hot-Rolled Steel from Korea* and, thus, only addressing the distortion caused by the

subsidization; the agency should also separately and additionally quantify the distortion caused by

strategic alliances between HRS suppliers and downstream pipe producers, the Korean

government's control of electricity, and non-Korean HRS imports into Korea.

Additionally, Petitioners request that the Department consider adopting—as an alternative

to the adjustments otherwise proposed in this submission—Petitioners' alternative methodology

---

[13]       HWR Korea AD AR 16-17 Prelim IDM at 13, excerpts attached as **Exhibit 8**.

[14]       HWR Korea AD AR 16-17 Prelim IDM at 13, excerpts attached as **Exhibit 8**.

[15]       *See* HWR Korea AD AR 16-17 Prelim IDM at 13-14, excerpts attached as **Exhibit 8**.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 6

for calculating an adjustment to respondents' reported costs. Should the Department decline to

account for the PMS in the Korean steel market by averaging all subsidy rates from *Hot-Rolled*

*Steel from Korea* to arrive at an appropriate PMS adjustment for all non-POSCO and non-Korean

HRC purchases, the agency should make an upward adjustment to all HRC purchases—both

Korean and non-Korean—based on Petitioners' proposed regression analysis.

As detailed below, recognizing that the global steel overcapacity crisis is the fundamental

driver that links together the various factors that collectively define a given PMS, Petitioners have

developed a global-excess-capacity-based regression analysis that quantifies the impact of the

global steel excess capacity on the price of HRC at the national level and derives a corresponding

adjustment factor that, when applied to the respondents' HRC costs, accounts for the distortions

inherent to an overcapacity-driven PMS. As provided by this analysis, respondents' HRC costs

should be increased by 49.35 percent to account for the distortive effects of the PMS affecting the

Korean HRS market.

Petitioners provide the enclosed factual information for the Department to determine, as

the agency did in the 2016-2017 administrative review, that a PMS continues to exist in Korea,

and to make the corresponding corrective adjustments to HiSteel's and Kukje Steel's costs,

including and in addition to those it has previously applied, to account for the PMS in Korea. This

submission contains the following factual information:

> **Exhibit 7:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Support Information* (Aug. 31, 2018).

> • This exhibit contains Petitioners' PMS allegation from the 2016-2017 administrative review in this proceeding.

> **Exhibit 8:**    Issues and Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of*

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                                **PUBLIC VERSION**
Page 7

> *Korea*, 83 Fed. Reg. 50,892 (Dep't Commerce Oct. 10, 2018) (prelim. results of antidumping duty admin. rev. & prelim. deter. of no shipments; 2016-2017).

- This exhibit contains the Department's issues and decision memorandum accompanying the agency's preliminary results in the 2016-2017 administrative review of this proceeding, where the agency found that a PMS exists in Korea such that corrective adjustments to respondents' reported data are warranted.

**Exhibit 9**:    Issues and Decision Memorandum accompanying *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), *amended*, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (amended final affirm. countervailing duty deters. and countervailing duty orders).

- This exhibit contains the Department's issues and decision memorandum accompanying the agency's final determination in its subsidy investigation in *Hot-Rolled Steel from Korea*.

**Exhibit 11**:    Declaration of [                                        ] (Nov. 18, 2013). {**Petitioners' BPI**}

- This exhibit contains information [

                                        ]. {**Petitioners' BPI**}.

**Exhibit 12**:    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Particular Market Situation Allegation on Electricity* (Feb. 3, 2016) (PUBLIC VERSION).

- This exhibit contains the public version of Maverick Tube Corporation's submission of information and comments regarding the PMS as to electricity in Korea, as submitted in the first administrative review of *OCTG from Korea*.

**Exhibit 13**:    Memorandum from Katie Marksberry, International Trade Compliance Analyst, AD/CVD Operations, Office V, through Catherine Bertrand, Program Manager, AD/CVD Operations, Office V, to The File, re: *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Amended Final Determination Calculation Memorandum for POSCO*

- This exhibit contains the August 23, 2016 amended calculation memorandum for POSCO from the *Hot-Rolled Steel from Korea* investigation. It shows that the Korean government's subsidization of hot-rolled steel producers, specifically POSCO, equaled 58.68%, rather than the 57.04% originally calculated. As such, it shows that the Korean government's subsidization totaled almost 60 percent of the cost of hot-rolled steel. The rates contained in this exhibit are the rates in effect.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 8

**Exhibit 16**:   Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of antidumping duty admin. rev.; 2015-2016).

- This exhibit contains the Department's issues and decision memorandum accompanying's the agency's final results in 2015-2016 antidumping duty review in *Welded Line Pipe from Korea*.

**Exhibit 18**:   Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2015-2016).

- This exhibit contains the Department's issues and decision memorandum accompanying's the agency's final results in 2015-2016 antidumping duty review in *OCTG from Korea*.

**Exhibit 19**:   Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Korea*, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty admin. rev.; 2014-2015), *amended*, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of antidumping duty admin. rev.; 2014-2015).

- This exhibit contains the Department's issues and decision memorandum accompanying's the agency's final results in 2014-2015 antidumping duty review in *OCTG from Korea*.

**Exhibit 21**:   Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't commerce June 13, 2018) (final results of antidumping duty admin. rev.; 2015-2016).

- This exhibit contains the Department's issues and decision memorandum accompanying the agency's final results in 2015-2016 antidumping duty review in *CWP from Korea*.

**Exhibit 23**:   Memorandum from Christopher J. Zimpo, Senior Accountant, through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – SeAH Steel Corporation and its Affiliates* (Aug. 20, 2018) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's preliminary cost calculation memorandum for SeAH Steel Corporation and its affiliates, in the antidumping duty investigation of *LDWP from Korea*. Notably, this exhibit

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 9

indicates the Department's application of a PMS adjustment to hot-rolled input purchases from both Korean and import sources.

**Exhibit 25**:    Memorandum from Janae Martin, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VIII, through Rebecca Trainor, Program Manager, AD/CVD Operations, Off. VIII to The File, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from the Republic of Korea: Preliminary Determination Margin Calculation for Hyundai RB Co., Ltd.* (Aug. 20, 2018) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's preliminary margin calculation memorandum for Hyundai RB Co., Ltd. in the antidumping duty investigation of *LDWP from Korea*. Notably, this exhibit indicates the Department's application of a PMS adjustment to hot-rolled input purchases from both Korean and import sources.

**Exhibit 26**:    *Commission Implementing Regulation (EU) 2017-969 of 8 June 2017 imposing definitive countervailing duty on imports of certain hot-rolled flat products of iron, non-alloy or other alloy steel originating in the People's Republic of China and amending Commission Implementing Regulation (EU) 2017/649 imposing a definitive anti-dumping duty on imports of certain hot-rolled flat products of iron, non-alloy or other alloy steel originating in the People's Republic of China*, Official Journal of the European Union (June 8, 2017) at p. L146/123.

- This exhibit contains a recent European Union determination describing the implementation of antidumping and countervailing duties on HRS from China.

**Exhibit 27**:    *Certain Cold-Rolled Steel Flat Products From the People's Republic of China*, 81 Fed. Reg. 32,729 (Dep't Commerce May 24, 2016) (final affirm. countervailing duty deter. and final partial affirm. crit. circumstances deter.) and accompanying Issues and Decision Memorandum.

- This exhibit contains the Department's final results in the countervailing duty investigation of *Cold-Rolled Steel from China* and the agency's accompanying issues and decision memorandum.

**Exhibit 28**:    Excerpt from USITC Pub. 3479 at vol. I, pp. 1-3, 147-157.

- This exhibit contains an excerpt from the U.S. International Trade Commission's (the "Commission") 2001 determination in the Section 201 investigation on certain steel products. It contains information on different types of pipe and tube products.

**Exhibit 29**:    USITC Pub. 4633.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                        **PUBLIC VERSION**
Page 10

- This exhibit contains the Commission's final determination in its investigations on HWR from Korea, Mexico, and Turkey. In particular, this exhibit contains information on the HWR production process and industry.

**Exhibit 30**:     Excerpt from USITC Pub. 4489 at I-13 – I-28, III-1 – III-5, V-1 – V-4, VII-34.

- This exhibit contains an excerpt from the Commission's final determination in its investigations on OCTG from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam. It contains information pertaining to similarities between different types of pipe production.

**Exhibit 31**:     Excerpt from USITC Pub. 4768 at 3, I-15 – I-19.

- This exhibit contains the Commission's preliminary determination in its investigations on LDWP from Canada, China, India, Korea, and Turkey. It contains language pertaining to similarities between different types of pipe production.

**Exhibit 32**:     Excerpt from USITC Pub. 4754 at 1, 6-9, I-14 – I-18.

- This exhibit contains the Commission's final determination in the fourth sunset review of the AD/CVD orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. It contains information on CWP, and its production process and industry.

**Exhibit 33**:     Excerpt from USITC Pub. 4333 at 16-17, IV-14 – IV-17.

- This exhibit contains an excerpt from the Commissions determination in the third sunset review of the AD/CVD orders on CWP from Brazil, India, Korea, Mexico, Taiwan, Thailand, and Turkey. It contains information on major CWP producers, which include HWR respondent HiSteel.

**Exhibit 34**:     HR Korea POSCO Ministerial Error Memo.

- This exhibit contains the August 23, 2016 ministerial error memorandum from the Department's *Hot-Rolled Steel from Korea* subsidy investigation, finding an error in the calculation of POSCO's subsidy rate and recommending an amendment to it.

**Exhibit 35**:     Excerpt from Letter from Yoon & Yang LLC to Sec'y Commerce, re: *Countervailing Duty Investigation: Certain Hot-Rolled Steel Flat Products (Hot-Rolled Steel) from the Republic of Korea: Response* (Nov. 4, 2015) (PUBLIC VERSION).

- This exhibit contains an excerpt from the Government of Korea's initial questionnaire response in the countervailing duty investigation of *Hot-Rolled Steel from Korea*. It contains information supporting a finding that electricity prices in Korea are distorted and distorted to benefit industrial consumers.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 11

**Exhibit 36**:    HR Japan INV AD Final Determination.

- This exhibit contains the *Federal Register* notice and Issues & Decision Memorandum for the Department's final determination in the antidumping duty investigation of *Hot-Rolled Steel from Japan* to assist the Department in accounting for distortions in Korean HWR production costs with respect to hot-rolled purchases from non-Korean suppliers, particularly for Japanese purchases, if any. This determination covers the period from July 1, 2014 to June 30, 2015, and provides the final countervailable subsidy rates of 4.99 percent for Nippon Steel, 7.51 percent for JFE Steel Corporation, and 5.58 for all other producers of Japanese hot-rolled steel products.

**Exhibit 37**:    Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re: *Large Diameter Welded Pipe from the Republic of Korea* (July 5, 2018) (PUBLIC VERSION) at 1-55.

- This exhibit contains the narrative portion of LDWP producers American Cast Iron Pipe Company, Berg Steel Pipe Corp., Berg Spiral Pipe Corp., Dura-Bond Industries, and Stupp Corporation's PMS allegation in the antidumping duty investigation of *LDWP from Korea*.

**Exhibit 38**:    Excerpt from Maverick's Sept. 22, 2017 PMS Allegation at 1-43.

- This exhibit contains an excerpt from U.S. line pipe and OCTG producer Maverick Tube Corporation's PMS Allegation and Factual Information submission filed in the 2015-2016 administrative review of *Welded Line Pipe from Korea*. It contains the narrative portion of Maverick's allegation, discussing how the PMS in Korea affects both OCTG and WLP production in Korea.

**Exhibit 39**:    Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea – Discussion of Business Proprietary Information for the Final Results – Particular Market Situation* (July 11, 2018) (PUBLIC VERSION).

- This exhibit contains the separate PMS memorandum from the 2015-2016 administrative review of *Welded Line Pipe from Korea*.

**Exhibit 40**:    Memorandum from Ross R. Belliveau, Senior International Trade Compliance Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *Welded Line Pipe from the Republic of Korea: 2015-2016 Antidumping Duty Administrative Review – Calculations for SeAH Steel Corporation for the Final Results* (July 11, 2018) (PUBLIC VERSION).

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                          **PUBLIC VERSION**
Page 12

- This exhibit contains the final calculation memorandum for SeAH from the first administrative review of *Welded Line Pipe from Korea*.

**Exhibit 41:**    Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea – Final Results Margin Calculation for Hyundai Steel Company* (July 11, 2018) (PUBLIC VERSION).

- This exhibit contains the final calculation memorandum for Hyundai Steel Company from the 2015-2016 administrative review of *Welded Line Pipe from Korea*.

**Exhibit 42:**    Memorandum from William Miller, International Trade Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea – Calculation of the Review-Specific Average Rate for the Final Results* (July 11, 2018).

- This exhibit contains the final calculation memorandum for the review-specific rate in the 2015-2016 administrative review of *Welded Line from Korea*.

**Exhibit 43:**    Memorandum from Thomas Schauer, Senior International Trade Compliance Analyst, AD/CVD Operations, Office I, through Minoo Hatten, Program Manager, AD/CVD Operations, Office I, to The File, re: *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results Analysis Memorandum for Hyundai Steel Company* (June 7, 2018) (PUBLIC VERSION).

- This exhibit contains the final analysis memorandum for Hyundai Steel Company from the 2015-2016 administrative review of *CWP from Korea*.

**Exhibit 44:**    Memorandum from Andre Gziryan, International Trade Compliance Analyst, AD/CVD Operations, Office I, through Minoo Hatten, Program Manager, AD/CVD Operations, office I, to The File, re: *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results Analysis Memorandum for Husteel Co., Ltd.* (June 7, 2018) (PUBLIC VERSION).

- This exhibit contains the final analysis memorandum for Husteel Co. Ltd. from the 2015-2016 administrative review of *CWP from Korea*.

**Exhibit 45:**    Memorandum from Thomas Schauer, Senior International Trade Compliance Analyst, AD/CVD Operations, Office I, through Minoo Hatten,

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                                **PUBLIC VERSION**
Page 13

Program Manager, AD/CVD Operations, Office I, to the File, re: *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Calculation of the Margin for Respondents Not Selected for Individual Examination* (June 7, 2018) (PUBLIC VERSION).

- This exhibit contains the final calculation memo for non-selected respondents in the 2015-2016 administrative review of *CWP from Korea*.

**Exhibit 46**:    Excerpt from Letter from Schagrin Associates to Sec'y Commerce, re: *Certain Circular Welded Non-Alloy Steel Pipe from Korea: Allegation of a Particular Market Situation* (Oct. 16, 2017) (PUBLIC VERSION) at 1-39.

- This exhibit contains the narrative portion of CWP producer Wheatland Tube's PMS allegation in the 2015-2016 administrative review of *CWP from Korea*.

**Exhibit 47**:    Issues and Decision Memorandum accompanying *Biodiesel From Argentina*, 83 Fed. Reg. 8,837 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value and final affirm. deter. of critical circs., in part).

- This exhibit contains the issues and decision memorandum for the Department's final determination in the antidumping duty investigation of *Biodiesel from Argentina*, where the agency made an affirmative PMS finding and accounted for the PMS using a market-determined input price (Comment 3).

**Exhibit 48**:    Issues and Decision Memorandum accompanying *Biodiesel From Indonesia*, 83 Fed. Reg. 8,835 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value).

- This exhibit contains the issues and decision memorandum of the Department's final determination in the antidumping duty investigation of *Biodiesel from Indonesia*, where the agency made an affirmative PMS finding and accounted for the PMS using a world market price (Comment 3).

**Exhibit 49**:    Memorandum from Deborah Scott, International Trade Compliance Analyst, AD/CVD Operations, Office VI, through Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to The File, re: *Analysis of Data Submitted by SeAH Steel Corporation for the Final Results of the 2015-2016 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea* (Apr. 10, 2018) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's final data analysis memorandum for SeAH from the 2015-2016 administrative review of *OCTG from Korea*.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 14

**Exhibit 50**:    Memorandum from Deborah Scott, International Trade Compliance Analyst, AD/CVD Operations, Office VI, through Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to The File, re: *Analysis of Data Submitted by SeAH Steel Corporation for the Final Results of the 2014-2015 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea* (Apr. 10, 2017) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's final data analysis memorandum for SeAH from the 2014-2015 administrative review of *OCTG from Korea*.

**Exhibit 51**:    Memorandum from Ji Young Oh, Senior Accountant, through Michael Martin, Supervisory Accountant, to Neal M. Halper, Director, Office of Accounting, re: *Antidumping Duty Administrative Review of Oil Country Tubular Goods from Korea – Cost of Production and Constructed Value Calculation Adjustments for the Final Results – SeAH Steel Corp., Ltd.* (Apr. 10, 2017) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's final cost of production and constructed value memorandum for SeAH from the 2014-2015 administrative review of *OCTG from Korea*.

**Exhibit 52**:    Memorandum from Deborah Scott, International Trade Compliance Analyst, AD/CVD Operations, Office VI, through Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to The File, re: *Analysis of Data Submitted by NEXTEEL Co., Ltd. for the Final Results of the 2014-2015 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea* (Apr. 10, 2017) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's final data analysis memorandum for NEXTEEL from the 2014-2015 administrative review of *OCTG from Korea*.

**Exhibit 53**:    Memorandum from Milton Koch, International Trade Accountant, through Taija A. Slaughter, Supervisory Accountant, to Neal M. Halper, Director, Office of Accounting, re: *Antidumping Duty Administrative Review of Oil Country Tubular Goods from the Republic of Korea – Constructed Value Calculation Adjustments for the Final Results – NEXTEEL Co., Ltd.* (Apr. 10, 2017) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's final constructed value calculation memorandum for NEXTEEL from the 2014-2015 administrative review of *OCTG from Korea*.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                     **PUBLIC VERSION**
Page 15

**Exhibit 54**:    Memorandum from Deborah Scott, International Trade Compliance
Analyst, Antidumping and Countervailing Duty Operations, Office VI,
through Scot Fullerton, Director, Antidumping and Countervailing Duty
Operations, Office VI, to The File, re: *Certain Oil Country Tubular Goods
from the Republic of Korea* (Mar. 8, 2017) (PUBLIC DOCUMENT).

- This exhibit contains a communication from Peter Navarro regarding the PMS in
Korea and Chinese overcapacity from the 2014-2015 administrative review of
*OCTG from Korea*.

**Exhibit 55**:    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Oil Country Tubular
Goods from South Korea: Particular Market Situation Case Brief* (Mar. 1,
2017) (PUBLIC VERSION).

- This exhibit contains the public version of Maverick Tube Corporation's PMS case
brief from the 2014-2015 administrative review of *OCTG from Korea*.

**Exhibit 56**:    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country
Tubular Goods from the Republic of Korea: Comments and Arguments on
Particular Market Situation Allegations* (Nov. 4, 2016) (PUBLIC
VERSION).

- This exhibit contains the public version of Maverick Tube Corporation's November
4, 2016 submission to the Department in the 2014-2015 administrative review of
*OCTG from Korea*, providing comments and arguments on the PMS in Korea.

**Exhibit 57**:    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country
Tubular Goods from the Republic of Korea: Rebuttal Comments in
Response to Comments and Arguments on Particular Market Situation
Allegations* (Nov. 14, 2016) (PUBLIC VERSION).

- This exhibit contains the public version of Maverick Tube Corporation's November
14, 2016 submission to the Department in the 2014-2015 administrative review of
*OCTG from Korea*, providing rebuttal comments to respondents' arguments on the
PMS in Korea.

**Exhibit 58**:    Excerpt from Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain
Oil Country Tubular Goods from the Republic of Korea: Particular Market
Situations and Other Factual Information Submission* (Sept. 6, 2016)
(PUBLIC VERSION) at 1-28 ("OCTG Korea AR1 Maverick Sept. 6, 2016
Letter").

- This exhibit contains an excerpt from the public version of Maverick Tube
Corporation's September 6, 2016 submission to the Department in the first
administrative review of *OCTG from Korea*. It provides information supporting a

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                              **PUBLIC VERSION**
Page 16

finding that a PMS in Korea distorts HWR COP and warrants adjustments to reported HRC and electricity costs.

**Exhibit 59**:   Excerpt from Letter from Skadden, Arps, Slate, Meagher & Flom LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from the Republic of Korea* (Aug. 7, 2017), at Exhibits 1-14, 15-25 (PUBLIC DOCUMENT) ("U.S. Steel's Aug. 7, 2017 Submission").

- This exhibit contains information submitted in U.S. Steel Corporation's August 7, 2017 submission of factual information relating to the PMS in Korea, originally filed in the 2015-2016 administrative review of *OCTG from Korea*. This exhibit includes numerous sources showing that Chinese HRC has contributed to the PMS in Korea, and that it has driven down Korean prices for HRC in Korea, and negatively affected Korean pipe producers. Specifically, this exhibit contains the following sources:

  - Global Trade Atlas (GTA), China Exports of Hot-Rolled Carbon/Alloy Steel Products to South Korea.[16]

  - Cheol-Ho Chung and Dae-yuk Nam, *China's Steel Exports Reaching 100 Mt: What It Means to Asia and Beyond*, Asian Steel Watch (Jan. 2016).[17]

  - *Asian Steel Market Outlook: Next Ten Years*, Asian Steel Watch (Jan. 2016).[18]

  - Heesu Lee, *Posco Posts Smallest Ever Profit Amid Chinese Steel Deluge*, Bloomberg (Jan. 28, 2016).[19]

  - *Steel industry speeds up restructuring*, The Korea Herald (May 25, 2016).[20]

  - *South Korean government to support domestic steel industry*, Steel Orbis (June 15, 2016).[21]

  - *Korean steel makers reluctant to scale up through mergers*, South East Asia Iron and Steel Institute (SEAISI) Newsletter (Aug. 2016).[22]

---

[16]   U.S. Steel's Aug. 7, 2017 Submission at Exhibit 1, attached at **Exhibit 59**.

[17]   *Id.* at Exhibit 2.

[18]   *Id.* at Exhibit 3.

[19]   *Id.* at Exhibit 4.

[20]   *Id.* at Exhibit 5.

[21]   *Id.* at Exhibit 6.

[22]   *Id.* at Exhibit 7.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 17

- Jung Min-hee, *Steel Industry Restructuring: Korean Steel Industry Advised to Reduce Number of Steel Plate Plants by Half*, Business Korea (Sept. 19, 2016).[23]

- Kim Boram, *S. Korea to induce steel, petrochemicals firms to cut output, upgrade facilities* Yonhap News Agency (Sept. 30, 2016).[24]

- Michael Herh, *No Artificial Plan for Merger, Abolition of Shipbuilding, Steel and Petrochemical Companies*, Business Korea (Sept. 23, 2016).[25]

- Nam Hyun-woo, *Gov't seeks restructuring of steelmaking, petrochemical industries*, Korea Times (Sept. 29, 2016).[26]

- Korean Ministry of Strategy and Finance, *Government Unveils 2017 Action Plan to for Industrial Restructuring*, Press Release (Jan. 25, 2017).[27]

- *Five more companies to receive 'One Shot' funds*, Korea Joongang Daily (Mar. 1,2017).[28]

- Korea Iron & Steel Association, Crude Steel Total Production Statistics for 2012-2017.[29]

- Branches, Angang Group International Trade Corporation, Ansteelinternational.com (accessed on June 20, 2017).[30]

- Angang Steel, Forbes.com (accessed on July 26, 2017).[31]

- Company Overview of Benxi Iron & Steel (Group) Co., Ltd., Blomberg.com (July 26, 2017).[32]

---

[23]    *Id.* at Exhibit 8.

[24]    *Id.* at Exhibit 9.

[25]    *Id.* at Exhibit 10.

[26]    *Id.* at Exhibit 11.

[27]    *Id.* at Exhibit 12.

[28]    *Id.* at Exhibit 13.

[29]    *Id.* at Exhibit 14.

[30]    *Id.* at Exhibit 17.

[31]    *Id.* at Exhibit 18.

[32]    *Id.* at Exhibit 19.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                              **PUBLIC VERSION**
Page 18

- Company Overview of Baoshan Iron & Steel Co., Ltd., Bloomberg.com (July 26, 2017).[33]

- Hot-rolled coils and strips, Handan Iron and Steel Group Co., Ltd., hdgt.com.cn (2010).[34]

- Product Introduction, Yieh Phui (China) Technomaterial, Co. Ltd. (2008)[35]

- Department of Commerce, Active Foreign Safeguard Activity (June 26, 2017).[36]

- Gazette of India Extraordinary Part-II, Section – 3, Sub-Section (ii), Notification No. 38/2015-2020, re: *Minimum Import Price (MIP) on Iron and Steel under Chapter 72 of ITC (HS) 2012 – Schedule – I (Import Policy): amendment in import Policy Conditions*, Government of India, Ministry of Commerce & Industry, Department of Commerce, Directorate General of Foreign Trade, Udyog Bhawan (Feb. 5, 2016).[37]

- *Notification Under Article 12.1(A) of the Agreement on Safeguards on Initiation of an Investigation and the Reasons for It – South Africa*, G/SG/N/6/ZAF/4 (Apr. 4, 2016).[38]

**Exhibit 60:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Information and Comments Requiring Immediate Action* (Nov. 25, 2015) (PUBLIC VERSION).

- This exhibit contains the public version of Maverick Tube Corporations' November 25, 2015 submission to the Department in the 2014-2015 administrative review of *OCTG from Korea*, supporting a finding that a PMS exists as a result of countervailable subsidization of HRC, unfairly traded Chinese HR imports into Korea, and strategic alliances between input suppliers and preferred downstream pipe producers. In particular, evidence in support of strategic alliances is discussed on pages 5-12 and included in Attachments 2-10.

**Exhibit 61:**    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from Korea: Resubmission of Case Brief, Redacted Pursuant to the Department's Request* (June 20, 2014) (PUBLIC VERSION).

---

[33]    *Id.* at Exhibit 20.

[34]    *Id.* at Exhibit 21.

[35]    *Id.* at Exhibit 22.

[36]    *Id.* at Exhibit 23.

[37]    *Id.* at Exhibit 24.

[38]    *Id.* at Exhibit 25.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 19

- This exhibit contains the public version of Maverick Tube Corporation's case brief from the investigation of *OCTG from Korea*, supporting a finding that a PMS exists through strategic alliances between input suppliers and preferred downstream pipe producers.

**Exhibit 62**:    Memorandum from Sheikh M. Hannan, Senior Accountant, Office of Accounting, through Taija A. Slaughter, Lead Accountant, Office of Accounting, through Neal M. Halper, Director, Office of Accounting, to The File, re: *Verification of the Cost Response of POSCO in the Antidumping Duty Investigation of Certain Oil Country Tubular Goods from the Republic of Korea* (May 15, 2014) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's verification report on POSCO from the investigation of *OCTG from Korea*, supporting a finding that a PMS exists through strategic alliances between input suppliers and preferred downstream pipe producers.

**Exhibit 63**:    Letter from Wiley Rein LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from the Republic of Korea: Submission of Factual Information* (Nov. 13, 2015) (PUBLIC DOCUMENT).

- This exhibit contains the August 11, 2015 countervailing duty petition filed in *Hot-Rolled Steel from Korea*, showing that a finding that there is a PMS in Korea is supported by the existence of distortive and anti-competitive government control over electricity prices in the industrial sector.

**Exhibit 64**:    U.S. Imports of Carbon and Alloy Oil Country Tubular Goods, U.S. International Trade Commission (2018).

- This exhibit compares U.S. import data for January to March 2018 to import data for January to March 2017, and demonstrates that consistent with the goals and expected effects of the Korean government's 2016 proposal for the steel industry, pipe imports to the United States have been flooding the United States market.

**Exhibit 65**:    Korean Government Proposal for Strengthening the Competitiveness of the Steel Industry.

- This exhibit contains a proposal by the Korean government from late September 2016, providing information that supports a finding that a compounded particular market situation exists in Korea. This proposal discusses Korean steel supply and demand conditions, the effect of Chinese excess capacity in the Korean steel market, and plans by the Korean government to strengthen the Korean steel industry through a series of goals. As illustrated by this exhibit, in light of high and increasing Chinese steel imports that have captured market share in Korea, the Korean government has set out to assist steel producers, and particularly plate and pipe producers, with respect to, *inter alia*, business restructuring, capital, and R&D.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                                    **PUBLIC VERSION**
Page 20

**Exhibit 66**:      *S. Korean shipbuilding industry expects another tough year*.

- This exhibit contains information in support of Petitioners' argument that the crisis in the Korean shipbuilding industry has, and will continue to, adversely affect the steel market in Korea.

**Exhibit 67**:      *How China Skirts America's Antidumping Tariffs on Steel*.

- This exhibit contains an article explaining how Chinese "{g}overnment-backed manufacturers have avoided steel U.S. and EU levies by shutting production at home and expanding overseas."

**Exhibit 68**:      Keith Bradsher, *Tariff Dodgers Stand to Profit Off U.S.-China Trade Dispute*, The New York Times (Apr. 22, 2018).

- This exhibit contains an article supporting Petitioners' argument that Chinese steel producers actively engage in trade strategies to ensure their continued and increasing access to global steel markets. This article in particular discusses the Chinese companies' use of transshipments through Southeast Asian countries to avoid high tariffs and import limits.

**Exhibit 69**:      MarEx, *South Korea to Underwrite Hundreds of Ship Orders* The Maritime Executive (Apr. 6, 2018).

- This exhibit contains information in support of Petitioners' argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea.

**Exhibit 70**:      *World crude steel output increases by 5.3% in 2017*, Worldsteel.org (Jan. 24, 2018).

- This exhibit contains information showing that world crude steel production increased in 2017 as compared to 2016.

**Exhibit 71**:      Julie Kim Jackson, *Korea's shipbuilding orders look to finish at world's No. 2 this year*, The Korea Herald (Dec. 8, 2017).

- This exhibit contains information in support of Petitioners' argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea.

**Exhibit 72**:      *World steel oversupply 730 million t. .. Korea export 24 times*, Yonhap News Agency (Dec. 3, 2017).

- This exhibit contains a Korean-language original and English translation of an article reporting on the impact of Chinese excess supply. According to this article, global excess capacity is 24 times the volume of Korean exports.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 21

**Exhibit 73**:    *'Swamp' of the world steel industry oversupply*, Gyeong-buk Daily (Dec. 3, 2017).

- This exhibit contains a Korean-language original and English translation of an article reporting on the impact of Chinese excess supply.

**Exhibit 74**:    Global Forum on Steel Excess Capacity – Report, Federal Ministry for Economic Affairs and Energy, Government of Germany (Nov. 30, 2017) ("Global Forum Report").

- This exhibit contains information on global excess capacity. This report concludes that excess steel capacity is a significant problem that depresses prices and profitability globally. In particular, despite slight improvements in excess capacity, "{f}urther significant reductions in global excess capacity will be needed in order to avoid a prolonged structural crisis in the steel industry."

**Exhibit 75**:    Maytaal Angel, *EU finds Chinese steel sent via Vietnam evaded tariffs*, Reuters (Nov. 14, 2017).

- This exhibit contains an article supporting Petitioners' argument that Chinese steel producers engage in strategies such as transshipment to evade tariff regimes and ensure continued and increasing access to global steel markets. By engaging in this behavior, these companies mask the actual extent to which China oversupplies global steel markets.

**Exhibit 76**:    Henning Gloystein and Jane Chung, *Back from the abyss: South Korea's shipbuilders begin ascent to growth*, Reuters (Nov. 1, 2017).

- This exhibit contains information in support of Petitioners' argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea.

**Exhibit 77**:    *worldsteel Short Range Outlook 2017/2018*, Worldsteel.org (Oct. 16, 2017).

- This exhibit contains information showing an outlook on global steel demand in 2017 and 2018.

**Exhibit 78**:    Steel Tubes and Pipes Committee of the Korea Iron & Steel Association, *Monthly Report for the Second Week of February to the Second Week of March of 2017* (2017).

- This exhibit contains an early 2017 report on the Korean steel industry by the Korea Iron & Steel Association. The report outlines the Association's primary goal to boost the Korean steel industry, and demonstrates that Korean pipe and tube production increased in 2016, with further increases expected in 2017. The report also demonstrates that pipe for energy use constituted the highest portion of pipe

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 22

exports (60 percent) in 2016, and that exports to the United States were significantly higher in 2017 than in 2016. Moreover, this exhibit contains information on the significant 74.5 percent pipe import share held by China, as well as 2015-2017 price data for Korean and Chinese pipe, hot-rolled, cold-rolled and other steel products.

**Exhibit 79**:    Excerpt from *Nice Rating, Restructuring of Steel Industry Depends on the Speed and the Will: Regarding the Issuance of the Proposal for Strengthening of the Competitiveness of the Steel Industry*, NICE Investors Service (Sept. 30, 2016).

- This exhibit contains information on the plate and steel pipe sector in Korea and assesses the Korean government's September 2016 restructuring proposal for the Korean steel industry. The exhibit explains that plate has low operating rates and that declines in profitability are likely given decreasing demand in the shipbuilding industry. In addition, the exhibit indicates that pipe sales have decreased since 2015 and that restructuring of the sector is highly likely.

**Exhibit 80**:    Ko Jae-man and Moon Ji-woong, *Hyundai Steel, Dongkuk Steel become latest beneficiaries of fast-track restructuring program*, Pulse by Maeil Business News Korea (Nov. 23, 2016).

- This exhibit contains an article supporting the argument that Chinese HRS imports into Korea adversely affect Korean HRS producers.

**Exhibit 81**:    Ahn Sung-mi, *Hyundai Steel strongly denies merger with POSCO*, The Investor, Korea Herald (Nov. 1, 2016).

- This exhibit contains an article supporting the argument that Chinese HRS imports into Korea adversely affect Korean HRS producers.

**Exhibit 82**:    *Voices growing for merger of POSCO, Hyundai Steel*, Korea Times, South East Asia Iron and Steel Institute (SEAISI) (Sept. 22, 2016).

- This exhibit contains an article supporting the argument that Chinese HRS imports into Korea adversely affect Korean HRS producers.

**Exhibit 83**:    Jung Min-hee, *Korean Steel Industry Advised to Reduce Number of Steel Plate Plants by Half*, Business Korea (Sept. 19, 2016).

- This exhibit contains an article supporting the argument that Chinese HRS imports into Korea adversely affect Korean HRS producers.

**Exhibit 84**:    Ahn Sung-mi, *POSCO, Hyundai Steel merger to benefit industry: report*, Korea Herald (Sept. 9, 2016).

- This exhibit contains an article supporting the argument that Chinese HR imports into Korea adversely affect Korean HR producers.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 23

**Exhibit 85**:    [

] **{Petitioners' BPI}**

- This exhibit contains an article supporting Petitioners' argument that [

]. **{Petitioners' BPI}**

**Exhibit 86**:    *Severe Excess Supply in Steel Pipe, Cold Rolled and Plate
Sectors…Concerns Loom over Dongkook Steel and SeAH Group*, Invest
Chosun (May 20, 2016).

- This exhibit explains the poor and worsening conditions of supply and demand for
steel pipe and cold-rolled, as well as the declining conditions in the shipbuilding
industry that are negatively affecting plate supply and demand. Further, this article
illustrates the stark contrast between low production utilization rates for steel pipe
and cold-rolled (*i.e.*, below 50 percent), and astronomically high excess capacity
for these products (*i.e.*, almost 300 percent and almost 500 percent, respectively).
The exhibit also demonstrates that the Korean steel industry called for government
assistance in restructuring the industry as to steel pipe, cold-rolled, and plate.

**Exhibit 87**:    POSCO 2016 Investors Forum Q&A.

- This exhibit provides information regarding the effect of the following of Chinese
steel imports into Korea. In particular, it contains information from POSCO
indicating that Chinese HRS imports have been aggressively dumped into Korea at
unreasonably below-cost prices. It is an exhibit that has been attached to
submissions in other Korean cases.

**Exhibit 88**:    POSCO 2016 1Q Q&A.

- This exhibit provides information pertaining to the effect of the flooding of Chinese
steel imports into Korea. It contains information from POSCO indicating that the
company believes the decisions of the Chinese government affect steel prices in
Korea. It is an exhibit that has been attached to submissions in other Korean cases.

**Exhibit 89**:    The Effect of Imports of Steel on the National Security – An Investigation
Conducted Under Section 232 of the Trade Expansion Act of 1962, As
Amended.

- This exhibit contains information from the recent Section 232 steel investigation,
including information on utilization rates for global steel production. It provides
support for Petitioners' proposed regression analysis.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 24

**Exhibit 90**:     The Current Capacity Shake-up in Steel and How the Industry is Adapting.

- This exhibit contains information on utilization rates for global steel production. It provides support for Petitioners' proposed regression analysis.

**Exhibit 91**:     Michael Pooler and Emily Feng, *Steel industry grapples with curse of oversupply* (Oct. 29, 2017)

- This exhibit contains information regarding the effect of Chinese oversupply on the global steel industry.

**Exhibit 92**:     Korea Fair Trade Commission, *KFTC punishes six steel pipe manufacturers for rigging bids offered by Korea Gas Corporation* (Dec. 21, 2017).

- This exhibit contains a notice from the Korea Fair Trade Commission ("KFTC"), dated December 21, 2017, that announces the KFTC's finding of a price-fixing scheme engaged in by six pipe producers on bids arranged by KOGAS, from 2003 through 2013 and involving approximately $681 million and 33 bids.

**Exhibit 93**:     Park Jae-hyuk, *Steelmakers fined W92 bil. for bid rigging*, Korea Times (Dec. 20, 2017).

- This exhibit contains a news article regarding Korean pipe producers' price-fixing scheme on KOGAS bids from 2003 through 2013.

**Exhibit 94**:     Decision No. 2017-081, Korea Fair Trade Commission (Dec. 21, 2017).

- This exhibit contains the KFTC decision on the price-fixing scheme carried out by six Korea pipe producers, including SeAH, on KOGAS bids, from 2003 to 2013. This exhibit consists of a Korean-language original and corresponding English translations.

**Exhibit 95**:     Decision No. 98-134, Korea Fair Trade Commission (July 7, 1998).

- This exhibit contains a decision by the KFTC, finding that four steel pipe manufacturers—including SeAH—engaged in improper collusion on steel pipe prices in 1997 and 1998. This exhibit costs of a Korean-language original and an English translation of the decision.

**Exhibit 96**:     Decision No. 97-45, Korea Fair Trade Commission (1997).

- This exhibit contains a decision by the KFTC finding that five steel pipe manufacturers, including SeAH improperly colluded on bids relating to two purchases by the Korea Water Resources Corporation in 1996. This exhibit consists of a Korean-language original and an English translation of the decision.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                 **PUBLIC VERSION**
Page 25

**Exhibit 97**:     Ahn Joon-ho, *KEPCO Runs up Huge Quarterly Loss*, The Chosunilbo (Aug. 14, 2018).

- This exhibit contains an article showing that KEPCO's electricity prices are not covering costs, which supports Petitioners' argument that electricity prices in Korea are distorted.

**Exhibit 98**:     *KEPCO's operating loss widens in Q1*, The Korea Herald (May 15, 2018).

- This exhibit contains an article demonstrating that KEPCO's electricity prices are not covering costs, which supports Petitioners' argument that electricity prices in Korea are distorted.

**Exhibit 99**:     KEPCO Electric Rates Table (May 7, 2018).

- This exhibit contains Korean electric rates to assist the Department in assessing distortions in Korea HWR production relating to the electricity input.

**Exhibit 100**:    Electric Rates Table – Industrial Service, KEPCO

- This exhibit contains information on Korean electric rates to assist the Department in assessing distortions in Korea HWR production relating to the electricity input.

**Exhibit 101**:    Excerpt from *Energy Prices and Taxes – Quarterly Statistics – Second Quarter 2017*, International Energy Agency (2017).

- This exhibit contains benchmark data pertaining to electricity rates from New Zealand and Italy, two countries that have comparable GNI's to Korea, to assist the Department in valuing electricity used in converting HRC into HWR. This data was sourced from rates available from the International Energy Agency.

**Exhibit 102**:    KEPCO, *Electric Rates Table* (2015).

- This exhibit contains Korean electric rates to assist the Department in assessing distortions in Korea HWR production relating to the electricity input.

**Exhibit 118**:    Il-Chong Nam, *Causes of the Crisis in the Electricity Industry and Future Policy Directions*, KDI Policy Forum, vol. 252 (Apr. 26, 2013).

- This exhibit contains a study of issues in the Korean electricity market, indicating that "the capacity price has borne no relation to the opportunity costs of capacity for each year since 2002," and that this "is impossible to justify according to economic theory, and the possibility that this capacity price will offer an appropriate incentive for investment in power generation facilities is in fact zero."

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 26

**Exhibit 133**: KEPCO Form 20-F (Apr. 30, 2018) ("KEPCO Form 20-F FY2017").

- This exhibit contains information indicating that the price of electricity in Korea is set by the Korean government and functions as a tool of the government's industry policy, devoid of any market-based pricing principles.[39]

**Exhibit 134**: KEPCO Form 20-F (Apr. 28, 2017) ("KEPCO Form 20-F FY2016").

- This exhibit contains information indicating that the price of electricity in Korea is set by the Korean government and functions as a tool of the government's industry policy, devoid of any market-based pricing principles.[40]

**Exhibit 135**: KEPCO Form 20-F (Apr. 29, 2016) ("KEPCO Form 20-F FY2015").

- This exhibit contains information indicating that the price of electricity in Korea is set by the Korean government and functions as a tool of the government's industry policy, devoid of any market-based pricing principles.[41]

---

[39]    *See* KEPCO Form 20-F FY2017 at 34-37 (explaining that the Korea Power Exchange ("KPX") operates a "cost-based pool system," and the KPX mechanism, including its "policy making" function, are "closely supervised and controlled by the Government," both formally – through laws and regulations – and informally – through the participation of the Ministry of Trade, Industry and Energy ("MOTIE"); explaining that each component of the pricing mechanism (*i.e.*, marginal price, capacity, price, and adjusted coefficient factor) is determined by a Cost Evaluation Committee "comprised of representatives from {MOTIE}, {KPX}, generation companies, scholars and researchers as well as {KEPCO};" explaining that prior to October 2016, "the same reference capacity price applied uniformly to all generation units," and now "ranges from Won 9.15 to 10.07 per kilowatt hour," reflecting a narrow range that nevertheless shows that electricity prices paid to generators with the highest fixed costs are substantially distorted)), attached at **Exhibit 133**.

[40]    *See* KEPCO Form 20-F FY2016 at 34-37 (explaining that the Korea Power Exchange ("KPX") operates a "cost-based pool system," and the KPX mechanism, including its "policy making" function, are "closely supervised and controlled by the Government," both formally – through laws and regulations – and informally – through the participation of the Ministry of Trade, Industry and Energy ("MOTIE"); explaining that each component of the pricing mechanism (*i.e.*, marginal price, capacity, price, and adjusted coefficient factor) is determined by a Cost Evaluation Committee "comprised of representatives from {MOTIE}, {KPX}, generation companies, scholars and researchers as well as {KEPCO};" explaining that prior to October 2016, "the same reference capacity price applied uniformly to all generation units," and now "ranges from Won 9.15 to 10.07 per kilowatt hour," reflecting a narrow range that nevertheless shows that electricity prices paid to generators with the highest fixed costs are substantially distorted)), attached at **Exhibit 134**.

[41]    *See* KEPCO Form 20-F FY2015 at 29-31 (explaining that the Korea Power Exchange ("KPX") operates a "cost-based pool system," and the KPX mechanism, including its "policy making" function, are "closely supervised and controlled by the Government," both formally – through laws and regulations – and informally – through the participation of the Ministry of Trade, Industry and Energy ("MOTIE"); explaining that each component of the pricing mechanism (*i.e.*, marginal price, capacity, price, and adjusted coefficient factor) is determined by a Cost Evaluation Committee "comprised of representatives from {MOTIE}, {KPX}, generation companies, scholars and researchers as well as {KEPCO};" explaining that the capacity price each year was "applied equally to all generation units regardless of fuel types used," even though actual fixed costs vary substantially depending on type of generator, demonstrating that electricity prices paid to generators with the highest fixed costs are substantially distorted)), attached at **Exhibit 135**.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                              **PUBLIC VERSION**
Page 27

Combined with the data reported by HiSteel and Kukje Steel in their initial questionnaire responses in this administrative review,[42] Petitioners attached the following information to this submission, which demonstrates that the record in the 2017-2018 review clearly supports and affirmative PMS finding, as the Department has preliminary found in the 2016-2017 review. In particular, the record of this review, similar to the record of the first review, shows the following:

- The Korean government heavily subsidizes HRC;[43]

- Respondents in this review confirm that HRC is the primary input in HWR production;[44]

- Respondents in this review confirm that HRC constitutes [          ] HWR production costs, with HiSteel and Kukje Steel reporting that HRC represents approximately [     ] percent and [   ] percent, respectively, of the total cost of manufacture;[45]

---

[42]    *See generally* Letter from Law Office of Jeffrey M. Winton PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular Carbon Steel Pipes and Tubes from Korea – Response to Section A of the Department's December 12 Questionnaire* (Feb. 25, 2019) ("HiSteel A IQR"); Letter from Law Office of Jeffrey M. Winton PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular Carbon Steel Pipes and Tubes from Korea – Response to Sections B, C, and D of the Department's December 12 Questionnaire* (Feb. 27, 2019) ("HiSteel B-D IQR"); Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular Carbon Steel Pipes and Tubes from Korea – Section A Questionnaire Response* (Feb. 19, 2019) ("Kukje Steel A IQR"); Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Heavy Walled Rectangular Pipe and Tube from the Republic of Korea – Sections B, C, and D Questionnaire Responses* (Mar. 6, 2019) ("Kukje Steel B-D IQR").

[43]    *See generally* Issues and Decision Memorandum accompanying *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), *amended*, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (amended final affirm. countervailing duty deters. and countervailing duty orders) ("HR Korea CVD INV Final IDM"), attached as **Exhibit 8**. *See also* HWR Korea AD AR 16-17 PMS Allegation at 25-49, attached as **Exhibit 7**; Costas Paris, *South Korea Hands Another $5 Billion to Hyundai Merchant Marine*, Wall St. Journal (Oct. 10, 2018), attached as **Exhibit 10**.

[44]    HiSteel B-D IQR at D-3 ("The ERW process begins with hot-rolled steel coil, the primary raw material, which HiSteel purchases from foreign and domestic suppliers."), D-5 ("The primary raw material input used by HiSteel in the production of subject HWRPT products is hot-rolled carbon steel coil."); Kukje Steel B-D IQR at D-4 ("hot-rolled coil is the primary raw material input consumed in the production of the {merchandise under consideration}.", D-26 ("{Merchandise under consideration} was produced only from hot-rolled coil.").

[45]    HiSteel B-D IQR at Appendix D-3-A; Kukje Steel B-D IQR at Exhibit D-3. **{HiSteel's and Kukje Steel's BPI}**

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 28

- Korean HRC [                                                          ],[46] and
  [
                    ];[47] and

- The Korean government distorts electricity prices.[48]

Additionally, Petitioners have reason to believe that both respondents—HiSteel and Kukje

Steel—purchase HRC for HWR production from Korean producers—including POSCO, who

received such subsidies at a rate of up to 60 percent—as well as from non-Korean suppliers.[49]

Indeed, HiSteel reports purchasing HRC from "foreign and domestic suppliers."[50] Further, HiSteel

provides information regarding its purchases of slitting services from its affiliate, Hanil Iron and

Steel Co., Ltd. ("Hanil"), in which HiSteel describes [

                    ].[51] Similarly, in its general and

administrative expenses calculations worksheet, Kukje Steel reports [

                    ].[52] As such, [

---

[46]     *See, e.g.*, Declaration of [                    ] (Nov. 18, 2013), attached as **Exhibit 11**. *See also* HWR Korea
AD AR 16-17 PMS Allegation at 49-52, attached as **Exhibit 7**. **{Petitioners' BPI}**

[47]     *See* HiSteel B-D IQR at Exhibits B-5, C-5, C-7 and Appendix D-3-B; Kukje Steel B-D IQR at Exhibit D-13.
**{HiSteel's and Kukje Steel's BPI}**

[48]     *See generally* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from
the Republic of Korea: Particular Market Situation Allegation on Electricity* (Feb. 3, 2016) (PUBLIC VERSION)
("OCTG Korea AD AR 14-15 PMS Allegation on Electricity"), attached **Exhibit 12**. *See also* HWR Korea AD AR
16-17 PMS Allegation at 52-57, attached as **Exhibit 7**.

[49]     *See generally* HR Korea CVD INV Final IDM, attached as **Exhibit 9**; Memorandum from Katie Marksberry,
International Trade Compliance Analyst, AD/CVD Operations, Office V, through Catherine Bertrand, Program
Manager, AD/CVD Operations, Office V, to The File, re: *Countervailing Duty Investigation of Certain Hot-Rolled
Steel Flat Products from the Republic of Korea: Amended Final Determination Calculation Memorandum for POSCO*
("HR Korea CVD INV Amended POSCO Final Calc Memo"), attached as **Exhibit 13**.

[50]     HiSteel B-D IQR at D-3.

[51]     *See* HiSteel B-D IQR at Appendix D-3-B. **{HiSteel's BPI}**

[52]     Kukje Steel B-D IQR at D-13. **{Kukje Steel's BPI}**

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019
Page 29

**PUBLIC VERSION**

]. {**HiSteel's and**

**Kukje Steel's BPI}**

However, in the 2017-2018 administrative review, neither respondent has provided complete information regarding its purchases of HRC. Therefore, it is critical that the Department issue a supplemental questionnaire in which the Department requests that both HiSteel and Kukje Steel identify all individual suppliers of HRC and report the quantity, value, and grades of the HRC purchases that each company made from each supplier during the POR. The respondents' reporting of suppliers should list the HRC producers from where the company sourced the HRC it used for the production of subject merchandise, indicate the country of origin of each supplier, and report the percentage of the total purchases of the input accounted for by each supplier. Each respondent should also be directed to ensure that the total purchases from individual suppliers reconcile with the total purchases of HRC reported elsewhere in their initial questionnaire responses.[53]

> *Please provide a table identifying all producers of hot-rolled coil ("HRC") from where you sourced the HRC for the production the subject merchandise, and report for each supplier the quantity, value, and grade of your HRC purchases made during the POR to produce the subject merchandise. For each supplier, provide the percentage of total HRC purchases that the supplier accounted for, and identify the country where each supplier is located and operates from.*

> *Please provide the name and address of each individual supplier of HRC used for the production of subject merchandise.*

> *Please reconcile your total purchases of HRC from each individual supplier of HRC with the total purchases of HRC reported elsewhere in your initial questionnaire response.*

---

[53]  *See* HiSteel B-D IQR at Appendix D-3-A (HRC inventory movement schedule); Kukje Steel B-D IQR at Exhibit D-3 (quantity and value of purchases of the three most significant inputs), D-11-6 (calculation of average unit costs of HRC).

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 30

Moreover, since the record of the 2016-2017 administrative review in this proceeding was developed, additional information obtained by Petitioners for this review confirm that: (i) Korean companies continue to import substantial volumes of Chinese HRC during the POR; (ii) the average unit value ("AUV") of these imports was low compare to both the AUV of other countries' imports into Korea, and the AUV of Chinese HRC exports to other countries; (iii) continued competition from low-priced Chinese imports has driven down Korean steel producers' prices, market share, and overall profitability; and (iv) continue distortion of the electricity market by way of government subsidization. Accordingly, Petitioners submit the following information to the record of this review.

**Exhibit 10**:    Costas Paris, *South Korea Hands Another $5 Billion to Hyundai Merchant Marine*, Wall St. Journal (Oct. 10, 2018).

- This exhibit contains a news article detailing how the Korean government has subsidized the Korean steel industry by propping up the struggling Korean shipbuilding industry.

**Exhibit 14**:    Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe From the Republic of Korea*, 84 Fed. Reg. 6,374 (Dep't Commerce Feb. 27, 2019) (final deter. of sales at less than fair value).

- This exhibit contains the Department's issues and decision memorandum accompanying the agency's final determination in its dumping investigation in *LDWP from Korea*.

**Exhibit 15**:    Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 84 Fed. Reg. 4,046 (Dep't Commerce Feb. 14, 2019) (prelim. results of antidumping duty admin. rev. & prelim. deter. of no shipment; 2016-2017).

- This exhibit contains the Department's issues and decision memorandum accompanying the agency's preliminary results in 2016-2017 antidumping duty review in *Welded Line Pipe from Korea*.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 31

**Exhibit 17**:   Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 51,442 (Dep't Commerce Oct. 11, 2018) (prelim. results of antidumping duty admin. rev.; 2016-2017).

- This exhibit contains the Department's issues and decision memorandum accompanying the agency's preliminary results in 2016-2017 antidumping duty review in *OCTG from Korea*.

**Exhibit 20**:   Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 63,619 (Dep't Commerce 11, 2018) (prelim. results of antidumping duty admin. rev.; 2016-2017).

- This exhibit contains the Department's issues and decision memorandum accompanying the agency's preliminary results in 2016-2017 antidumping duty review in *CWP from Korea*.

**Exhibit 22**:   Memorandum from Christopher J. Zimpo, Senior Accountant through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – SeAH Steel Corporation and its Affiliates* (Feb. 19, 2019) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's final preliminary cost calculation memorandum for SeAH Steel Corporation and its affiliates, in the antidumping duty investigation of *LDWP from Korea*. Notably, this exhibit indicates the Department's application of a PMS adjustment to hot-rolled input purchases from both Korean and import sources.

**Exhibit 24**:   Memorandum from Ji Young Oh, Senior Accountant through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Hyundai RB Co. Ltd.* (Feb. 19, 2019) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's final cost calculation memorandum for Hyundai RB Co., Ltd. in the antidumping duty investigation of *LDWP from Korea*. Notably, this exhibit indicates the Department's application of a PMS adjustment to hot-rolled input purchases from both Korean and import sources.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 32

**Exhibit 104**:   Memorandum from Edward Yang, Senior Dir., Off. VII, AD/CVD Operations to James Maeder, Associate Deputy Assistant Sec'y for AD/CVD Operations performing the duties of Deputy Assistant Sec'y for AD/CVD Operations, re: *Antidumping Duty Administrative Review of Corrosion-Resistant Steel Products from the Republic of Korea: Post-Preliminary Decision Memorandum on Particular Market Situation Allegation* (Feb. 7, 2019) (PUBLIC VERSION).

- This exhibit contains the public version of the Department's February 7, 2019 post-preliminary results memorandum in the 2016-2017 administrative review in *CORE from Korea*, in which the agency found that a PMS existed with respect to the production costs of corrosion-resistant steel in Korea.

**Exhibit 105**:   U.S. International Trade Administration, Global Trade Monitor, *Steel Exports Report: China* (Feb. 2019).

- This exhibit contains information regarding the Chinese steel export market. In particular, it indicates that China has an overly export-oriented steel industry.

**Exhibit 106**:   U.S. International Trade Administration, Global Trade Monitor, *Steel Exports Report: South Korea* (Sept. 2018).

- This exhibit contains information regarding the Korean steel export market. In particular, it indicates that Korea is the world's fourth largest exporter of steel.

**Exhibit 107**:   U.S. International Trade Administration, Global Trade Monitor, *Steel Imports Report: South Korea* (Nov. 2018).

- This exhibit contains information regarding the Korean steel import market. In particular, it indicates that Korea is the world's fourth largest importer of steel.

**Exhibit 108**:   Fabien Mercier, Daichi Mabashi, and Christian Steidl, Steel Market Developments – Q4 2018, OECD (2019).

- This exhibit contains information on global steel market conditions.

**Exhibit 109**:   Fabien Mercier, Daichi Mabashi, and Christian Steidl, Steel Market Developments – Q2 2018, OECD (2018).

- This exhibit contains information on global steel market conditions.

**Exhibit 110**:   Fabien Mercier, Hokuto Hotsuka, and Felipe Silva, Steel Market Developments – Q4 2017, OECD (2018).

- This exhibit contains information on global steel market conditions.

**Exhibit 111**:   South Korean Production & Apparent Consumption of Steel, 2009-2017.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                                    **PUBLIC VERSION**
Page 33

- This exhibit contains production and apparent consumption data for 2009-2017 for South Korea, based on the U.S. International Trade Administration's *Steel Exports Report: South Korea* of March 2018.

**Exhibit 112**:   GTIS, China Export Statistics for Hot-Rolled Products by Value, 2016-2018.

- This exhibit contains HRS export data that the AUV of Chinese exports to Korea is noticeably low compared to AUVs of Chinese exports to other countries.

**Exhibit 113**:   GTIS, China Export Statistics for Hot-Rolled Products by Quantity, 2013-2018.

- This exhibit contains HRS export data showing that Korea is one of the top two destinations for Chinese HRS exports, with export volumes ranging between 1.8 million MT and 3.5 million MT between 2016 and 2017.

**Exhibit 114**:   GTIS, Korean Imports of Hot-Rolled Sheet Products from China, 2010-2018.

- This exhibit contains annual import data from 2010 to 2018, by value, quantity, and AUVs, for Korean imports of hot-rolled sheet products from China, based on hot-rolled classified under HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14,7211.19, and 7225.30.

**Exhibit 115**:   GTIS, Chinese Exports of Hot-Rolled Sheet Products to Korea, 2010-2018.

- This exhibit contains annual export data from 2010 to 2018, by value, quantity, and AUVs, for Chinese exports of hot-rolled into Korea, based on hot-rolled classified under HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14 ,7211.19, and 7225.30.

**Exhibit 116**:   GTIS, South Korea Import Statistics for Hot-Rolled Products, 2013-2018.

- This exhibit contains hot-rolled import data showing that China is a top exporter of hot-rolled products, and that Korean import volume of Chinese hot-rolled products was substantial over the POR.

**Exhibit 117**:   GTIS, Summary – Korea Imports of Hot-Rolled Coil and Plate, 2013-2018.

- This exhibit contains data on hot-rolled steel imports into Korea from 2013 through 2018. It demonstrates that Korean companies import substantial volumes of hot-rolled steel from China at AUVs below the price from the rest of the world.

**Exhibit 118**:   GTIS, Korean Imports of Hot-Rolled Coil and Plate Products by Country Source, 2013-2018.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 34

- This exhibit contains data on hot-rolled steel imports into Korea from other countries, including China, from 2013-2018. It demonstrates that Chinese steel has flooded the Korean market, and done so at AUVs below prices from other countries.

**Exhibit 119**:  GTIS, Summary Statistics for China's Export AUVs for Hot-Rolled Products by Destination Country.

- This exhibit contains information on China's export AUV for hot-rolled coil and plate, for 2017-2018. It shows that Chinese exports to Korea are priced below exports to other destinations.

**Exhibit 120**:  POSCO 2017 Earnings Release (Jan. 24, 2018).

- This exhibit contains information in support of Petitioners' argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea. In particular, it notes that the "drought" of 2016 orders has affected steel use and continues to be an overhang for the steel industry.

**Exhibit 121**:  POSCO 2018 Earnings Release (Jan. 30, 2019).

- This exhibit contains information in support of Petitioners' argument that the crisis in the Korean shipbuilding industry has had an adverse effect on the steel market in Korea. With regards to the "Chinese Steel Market," it is noted that "{w}eak pricing continues due to relaxed supply reduction coupled with demand slowing down."

**Exhibit 122**:  World Steel Association (WSA), World Steel Statistical Yearbook 2017 (Nov. 2017).

- This exhibit contains global steel industry statistics.

**Exhibit 123**:  World Steel Association (WSA), World Steel Statistical Yearbook 2018 (Nov. 2018).

- This exhibit contains global steel industry statistics.

**Exhibit 124**:  Summary of Global Steel Market, 2013-2018.

- This exhibit contains a worksheet, based on information from the Organization for Economic Co-operation and Development ("OECD") on capacity, production, and apparent use, from 2013-2018, for China, as well as other countries as a whole.

**Exhibit 125**:  OECD, Global Steel Production Capacity (Aug. 7, 2017).

- This exhibit contains a summary of OECD data on steel capacity (MT) in China, Korea, and other countries, for 2006-2016.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                                        **PUBLIC VERSION**
Page 35

**Exhibit 126**:   OECD, Capacity Developments in the World Steel Industry, DSTI/SC(2017)2/FINAL (2017).

- This exhibit contains information on global steel capacity and demand.

**Exhibit 127**:   OECD, Recent Developments in Steelmaking Capacity, DSTI/SC(2018)/FINAL (2018).

- This exhibit contains information on global steel capacity and demand.

**Exhibit 128**:   International Steel Statistics Bureau Data Regarding Hot-Rolled Imports to Korea (2017-2018).

- This exhibit contains monthly-based information for benchmark data on hot-rolled inputs from China and Japan. The data was obtained for September 2017 to August 2018 (corresponding with the POR), was sourced from information available from the International Steel Statistics Bureau ("ISSB"), and relates to the importation of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, 7225.30) from China and Japan to Korea. Petitioners note that data regarding HTS 7225.30 was included because it is widely believed that certain Chinese exports sold commercially as carbon grade hot-rolled products are entered under alloy steel HTS codes.

**Exhibit 129**:   UN COMTRADE, World Market Price Data for Hot-Rolled Products, United Nations COMTRADE (2017-2018).

- This exhibit contains UN COMTRADE data for the POR.  Specifically, this exhibit contains information on hot-rolled exports from all countries except NME countries (China, Belarus, Georgia, Moldova, Kazakhstan, and Vietnam), countries that grant general export subsidies and are typically excluded from the Department's surrogate value calculations (India, Korea, Thailand, Indonesia, and the Philippines), and Japan, whose hot-rolled prices are believed to be distorted. This data relates to the exportation of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30). Petitioners note that data regarding HTS 7225.30 was included because it is widely believed that certain Chinese exports sold commercially as carbon grade hot-rolled products are entered under alloy steel HTS codes.

**Exhibit 130**:   UN COMTRADE, Korean Purchases of Hot-Rolled Coils – Calendar Year 2017 (2018).

- This exhibit contains monthly-based information for benchmark data on HRC from non-Korean countries. The data relates to the importation of hot-rolled products (HTS subheadings 7208.25, 7208.26, 7208.27, 7208.36, 7208.37, 7208.38, 7208.39, 7211.14, 7211.19, and 7225.30) from different countries during calendar

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                      **PUBLIC VERSION**
Page 36

year 2017. Petitioners note that COMTRADE data for Korea for 2018 is not yet available.

**Exhibit 131**:  Board of Governors of the Federal Reserve System, Foreign Exchange Rates – G.5A Annual (Jan. 2, 2019).

- This exhibit contains average exchange rates from the U.S. Federal Reserve for 2015 to 2018.

**Exhibit 132**:  Korean Won / U.S. Dollar Exchange Rate, 2017 Daily.

- This exhibit contains exchange rates derived from the Department, and is provided to assist the Department in assessing distortions in Korea HWR production relating to the electricity input.

## C.    The PMS in Korea Warrants Adjustment of Respondents' Costs

As the information in this administrative review shows, the Department should continue to

find, as the agency did in the prior review, that cost distortions in the Korean steel market have a

significant impact on HWR production. As in the previous and other reviews,[54] the Department

should continue to quantify the impact of the PMS on Korean HRC by adjusting reported costs

---

[54]     *See, e.g.*, HWR Korea AD AR 16-17 Prelim IDM at 13-14, excerpts attached as **Exhibit 8**; Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe From the Republic of Korea*, 84 Fed. Reg. 6,374 (Dep't Commerce Feb. 27, 2019) (final deter. of sales at less than fair value) at 7-15 ("LDWP Korea AD INV Final IDM"), excerpts attached as **Exhibit 14**; Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 84 Fed. Reg. 4,046 (Dep't Commerce Feb. 14, 2019) (prelim. results of antidumping duty admin. rev. & prelim. deter. of no shipment; 2016-2017) at 14-18 ("WLP Korea AD AR 16-17 Prelim IDM"), attached as **Exhibit 15**; Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of antidumping duty admin. rev.; 2015-2016) at 14 ("WLP Korea AD AR 15-16 Final IDM"), excerpts attached as **Exhibit 16**; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 51,442 (Dep't Commerce Oct. 11, 2018) (prelim. results of antidumping duty admin. rev.; 2016-2017) at 19-23 ("OCTG Korea AD AR 16-17 Prelim IDM"), excerpts attached as **Exhibit 17**; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2015-2016) at 29 ("OCTG Korea AD AR 15-16"), excerpts attached as **Exhibit 18**; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Korea*, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty admin. rev.; 2014-2015), *amended*, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of antidumping duty admin. rev.; 2014-2015) at 42 ("OCTG Korea AD AR 14-15 Final IDM"), excerpts attached as **Exhibit 19**; Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 63,619 (Dep't Commerce 11, 2018) (prelim. results of antidumping duty admin. rev.; 2016-2017) at 12-16 ("CWP Korea AD AR 16-17 Prelim IDM"), excerpts attached as **Exhibit 20**; Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't commerce June 13, 2018) (final results of antidumping duty admin. rev.; 2015-2016) at 11-19 ("CWP Korea AD AR 15-16 Final IDM"), excerpts attached as **Exhibit 21**.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                        **PUBLIC VERSION**
Page 37

according to the subsidy investigation rates in *Hot-Rolled Steel from Korea*.[55] In its preliminary results in the 2016-2017 review, the Department indicated that its adjustment to all HRC input purchases "is derived from the Korean government's subsidization of HRC."[56] However, Petitioners believe that this adjustment can be made to potentially account for the effect of Chinese overcapacity in the Korean steel market if the adjustment is further amended.

Specifically, the Department should average all subsidy rates in the *Hot-Rolled Steel from Korea* investigation together to arrive at an appropriate PMS adjustment for all reported non-POSCO HRC purchases. In doing so, the Department's PMS adjustment as to the HRC inputs would properly reflect the aggregate amount of distortion in Korea, as influenced and contributed to by the Chinese-driven steel overcapacity crisis. As the Department is aware, the calculation of the CVD "all-others" rate is a calculation intended to determine the assessment and cash deposit rate for non-review Korean producers—it has nothing to do with measuring the overall amount of distortion in the entire market. HRC imports entering Korea compete with all Korean producers in the market—not just the ones subject to the "all others" rate. The HRC CVD "all others" rate only reflects a portion of the distortion and only for a single Korean producer, *i.e.*, Hyundai Steel Co., Ltd. ("Hyundai Steel").[57] As such, the Department should not solely apply the "all others" rate to HRC purchases. Instead, for suppliers subject to the "all others" CVD rate, the Department should take an average of all CVD rates from *Hot-Rolled Steel from Korea*, including POSCO's assigned

---

[55]     *See generally* HR Korea CVD INV Final IDM, attached as **Exhibit 9**; HR Korea CVD INV Amended POSCO Final Calc Memo, attached as **Exhibit 13**.

[56]     HWR Korea AD AR 16-17 Prelim IDM at 13, excerpts attached as **Exhibit 8**;

[57]     *See Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea*, 81 Fed. Reg. 67,960, 67,961 (Dep't Commerce Oct. 3, 2016) (amended final affirm. countervailing duty deters. and countervailing duty orders).

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                            **PUBLIC VERSION**
Page 38

rate, to arrive at an appropriate PMS adjustment for all non-POSCO and non-Korean HRC purchases.

Nevertheless, there is no reason for the Department to limit its adjustments to HRC costs to Korean-sourced purchases by applying an adjustment based solely on the final subsidy determination in *Hot-Rolled Steel from Korea*. While the Korean HRS subsidies themselves are a means of offsetting the distortive effects of the Chinese overcapacity crisis, an adjustment based solely on these subsidies does not fully address the direct distortions that HWR producers face in directly purchasing distorted Chinese steel. Nor does it address distortions in the producers' purchases of HRC from non-Korean suppliers that were similarly affected by the effect of Chinese overcapacity in the Korean steel market. By only preliminarily offsetting Korean steel purchases in the 2016-2017 administrative review, the Department only addressed a portion of the PMS in Korea; as such, the agency did not comprehensively address the entire, inherent distortion in the Korean steel market.

In addition, Petitioners urge the Department to also quantify the distortion caused by strategic alliance between HRS suppliers and downstream pipe producers, the Korean government's control of electricity, and adjust any reported costs of HRC purchased from non-Korean suppliers. In particular, although the Department has correctly recognized that Chinese excess steel capacity has placed significant "downward pressure on Korean domestic steel prices,"[58] the agency has not yet quantified an adjustment to account for distorted HRC from non-Korean suppliers, affecting HWR production in the Korean market.[59] Thus, as the Department did

---

[58]     *See* OCTG Korea AD AR 15-16 Final IDM at 23, attached as **Exhibit 18**. *See also* WLP Korea AD AR 15-16 Final IDM at 13, excerpts attached as **Exhibit 16**.

[59]     *See, e.g.*, HWR Korea AD AR 16-17 Prelim IDM at 12-14, excerpts attached as **Exhibit 8**;

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 39

in its final determination in *Large Diameter Welded Pipe from the Republic of Korea* ("*LDWP from Korea*"),[60] in addition to applying the subsidy rates from *Hot-Rolled Steel from Korea* to Korean HRS purchases, the agency should separately and additionally quantify the effect of distortions in purchases of non-Korean HRC for Korean HWR production.

In the alternative, to account for the effect of the Chinese-led overcapacity crisis in the Korean steel market, Petitioners propose that the Department make a specific upward adjustment to any HRC purchased from non-Korean suppliers, based on the adjusted prices for HRC purchased from Korean suppliers. As the Department has acknowledged in other proceedings, "Chinese HRC put a downward pressure on Korea HRC prices,"[61] and the agency has accounted for this downward pressure only as to HRC purchased from Korean suppliers and has done so by adjusting those reported HRC costs by the subsidy investigation rates from *Hot-Rolled Steel from Korea*.[62] In turn, those adjusted HRC Korean costs should serve as a benchmark for other reported

---

[60]     *See generally* Memorandum from Christopher J. Zimpo, Senior Accountant through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – SeAH Steel Corporation and its Affiliates* (Feb. 19, 2019) (PUBLIC VERSION) ("LDWP Korea INV SeAH Final Cost Memo"), attached as **Exhibit 22**; Memorandum from Christopher J. Zimpo, Senior Accountant through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – SeAH Steel Corporation and its Affiliates* (Aug. 20, 2018) (PUBLIC VERSION) ("LDWP Korea INV SeAH Prelim Cost Memo"), attached as **Exhibit 23**; Memorandum from Ji Young Oh, Senior Accountant through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Hyundai RB Co. Ltd.* (Feb. 19, 2019) (PUBLIC VERSION) ("LDWP Korea INV Hyundai Final Cost Memo"), attached as **Exhibit 24**; Memorandum from Janae Martin, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VIII through Rebecca Trainor, Program Manager, AD/CVD Operations, Off. VIII to The File, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from the Republic of Korea: Preliminary Determination Margin Calculation for Hyundai RB Co., Ltd.* (Aug. 20, 2018) (PUBLIC VERSION) ("LDWP Korea INV Hyundai Prelim Calculations Memo"), attached as **Exhibit 25**.

[61]     *See* OCTG Korea AD AR 15-16 Final IDM at 23, attached as **Exhibit 18**. *See also* WLP Korea AD AR 15-16 Final IDM at 13, excerpts attached as **Exhibit 16**.

[62]     *See* LDWP Korea AD INV Final IDM at 7-15, excerpts attached as **Exhibit 14**; WLP Korea AD AR 16-17 Prelim IDM at 14-18, attached as **Exhibit 15**; WLP Korea AD AR 15-16 Final IDM at 14, excerpts attached as **Exhibit 16**; OCTG Korea AD AR 16-17 Prelim IDM at 19-23, excerpts attached as **Exhibit 17**; OCTG Korea AD AR 15-16 at 29, excerpts attached as **Exhibit 18**; OCTG Korea AD AR 14-15 Final IDM at 42, excerpts attached as **Exhibit 19**;

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 40

HRC costs. Importantly, the resulting HRC price in this case is what the price should be in Korea <u>but for</u> the effect of overcapacity. In sum, to the extent HRC is purchased from non-Korean suppliers, it should be increased to meet the levels of adjusted HRC purchased from Korean suppliers. The Department should increase reported costs of any HRC purchased from non-Korean suppliers to equal the PMS-adjusted purchase price of HRC purchased from Korean suppliers. Doing so applies a leveling adjustment and accounts for the fact that Korean and non-Korean steel prices all compete, undercut, and distort one another in the Korean domestic steel market.[63]

For the foregoing reasons, the Department should find that the same conditions collectively affecting HWR production costs in Korea in the 2016-2017 administrative review continue to affect costs in this review. The Department should also continue to make an upward adjustment based on the subsidy investigation rates from *Hot-Rolled Steel from Korea* and also make additional adjustments to account for HRC purchased from non-Korean suppliers. Further, as detailed immediately below, Petitioners provide an alternative PMS valuation methodology for the Department's consideration in determining the extent to which the agency decides to adjust respondents' reported HRC costs.

## II.    <u>ALTERNATIVE PMS VALUATION METHODOLOGY</u>

Should the Department decide not to adjust HiSteel's and Kukje's HRC purchases by the subsidy rates established in the CVD investigation on *Hot-Rolled Steel Flat Products from Korea*, the agency should consider quantifying the PMS in Korea by adopting, as provided below, a regression analysis on the relationship between global overcapacity and hot-rolled AUVs. Under

---

CWP Korea AD AR 16-17 Prelim IDM at 12-16, excerpts attached as **Exhibit 20;** "CWP Korea AD AR 15-16 Final IDM at 11-19, excerpts attached as **Exhibit 21.**

[63]    *See* WLP Korea AD AR 15-16 Final IDM at 23-24, excerpts attached as **Exhibit 16.**

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 41

such an analysis, respondents' hot-rolled inputs purchase costs should be increased by 49.35
percent to account for the distortive effects of the PMS in Korea. As explained below, recognizing
the global overcapacity crisis as the fundamental driver that links together the various factors that
collectively define a given PMS, Petitioners have developed a global-excess-capacity-based
regression analysis that quantifies the impact of global steel excess capacity on the price of HRC
at the national level, and derives a corresponding percentage adjustment factor that, when applied
to the respondents' costs of HRC, accounts for the distortions inherent to an overcapacity-driven
PMS.

### a.  "Overcapacity-Driven" Particular Market Situations

As detailed above, excess global steel capacity remains a significant problem. Global steel
excess capacity and China's contribution to global overcapacity is an acknowledged crisis. It is
not a myth. Government and industry experts worldwide recognize its distortive impact, as shown
the evidence attached to this PMS allegation, and the Department itself has articulated the manner
in which global steel excess capacity operates to trigger the market forces that generate a particular
market situation. As the Department explained in *WLP from Korea*:

> Commerce notes that excess steel-production capacity has created market
> distortions across the globe. Excess steel-production capacity causes serious market
> distortions and contributes to the downturn in global steel markets, including
> significant price suppression, displaced markets, unsustainable capacity utilization,
> negative financial performance, shutdowns, and lay-offs. The deterioration in steel
> demand, along with continued capacity expansions, are likely to place further
> pressure on country-specific steel markets and create incentives for government
> interventions which will further distort the production costs and prices for a wide
> range of steel products.[64]

---

[64]    *See* Preliminary Decision Memorandum accompanying *Welded Line Pipe from the Republic of Korea,* 83
Fed. Reg. 1023 (Dep't Commerce Jan. 9, 2018) (prelim. results of antidumping duty admin. rev.; 2015-2016).

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                      **PUBLIC VERSION**
Page 42

While pervasive in that the overcapacity crisis has a global impact, the crisis expresses itself differently and uniquely at the national level. The distortions manifest differently within a given country's market, and the manner in which a national government and its steel industry act in the face of that crisis further differentiates the impact at the national level. Critical changes in trade patterns, combined with domestic policies and existing market forces, come together to generate a PMS in Korea in response to the overcapacity crisis. The factors that define the current PMS in Korea are unique to Korea and linked by the distortive effects of the Chinese-led overcapacity crisis on the Korean market and the GOK's actions in the face of that crisis. To be clear, while Chinese subsidies and government intervention play a significant role in driving the excess capacity crisis, other governments' responses to the distortions further compound the problem, and add to the vicious cycle of continued expansion and maintenance of uneconomic capacity. Petitioners' economic model measures the overall effects of the distortive excess capacity at the national level.

In numerous other pipe cases, the Department has properly recognized that intertwined market conditions contribute to a PMS that distorts and impacts the costs of production for pipe producers via the acquisition prices for HRC.[65] These intertwined market conditions, in

---

[65]      *See, e.g.*, Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. rev.; 2016-2017) at 8-10, attached at **Exhibit 136**; Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of antidumping duty admin. rev.; 2015-2016) at 12-26, attached at **Exhibit 15**; Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't Commerce June 13, 2018) (final results of antidumping duty admin. rev.; 2015-2016) at 11-15, attached at **Exhibit 21**; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2015-2016) at 16-32, attached at **Exhibit 18** ; Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Korea*, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty admin. rev.; 2014-2015), *amended*, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of antidumping duty admin. rev.; 2014-2015) at 40-46, attached at **Exhibit 19**.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                                    **PUBLIC VERSION**
Page 43

conjunction with the excess capacity crisis, combine to generate a PMS at the national level. To

date, the Department has used proxies, such as prevailing U.S. CVD investigation rates in effect

against hot-rolled inputs from a subject country, to quantify and adjust for the overall distortion.[66]

Petitioners' economic analysis, however, seeks to quantify a more precise measure of the amount

of distortion in a given market. As detailed below, Petitioners have formulated an alternative PMS

adjustment that recognizes the global overcapacity crisis as one of the fundamental drivers that

links the various factors that collectively define a given PMS, and seeks to adjust for the overall

distortion present in the market.

### b. <u>Petitioners' Global Excess Capacity-Based Regression Analysis</u>

Petitioners' PMS adjustment is based on a regression analysis whereby country-specific

HRC import average unit values ("AUVs") are regressed against global excess capacity to estimate

the effect of global excess capacity on prices of HRC at the national level. Specifically, Petitioners

applied a standard Ordinary Least Squares ("OLS") fixed effects regression, with price (*i.e.*,

AUVs) as the dependent variable.

### i. <u>The OLS Methodology</u>

After consideration of the OLS method and alternative methods such as the "Two-Stage

Least Squares" instrumental variable regression ("2SLS"), Petitioners determined the OLS to best

suit the analysis at hand. There are several econometric benefits to OLS, and Petitioners'

---

[66]         *See, e.g.*, Issues and Decision accompanying Certain *Oil Country Tubular Goods from the Republic of Korea*, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty admin. rev.; 2014-2015) at 40-44, *amended*, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of antidumping duty admin. rev.; 2014-2015), attached at **Exhibit 19** ; Issues and Decision accompanying *Certain Oil Country Tubular Goods from the Republic of Korea*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty admin. rev.; 2015-2016) at cmt. 1, attached at **Exhibit 18**; Issues and Decision accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't Commerce June 13, 2018) (final results of antidumping duty admin. rev.; 2015-2016) at 11-12, attached at **Exhibit 21**.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 44

examination indicates the OLS method provides a less complicated, yet equally accurate, approach

to the analysis, as compared to other methodologies. For example, OLS is more efficient when the

explanatory variables are exogenous.[67] In fact, when all of its required assumptions are met, OLS

is known as the Best Linear Unbiased Estimator (BLUE).[68] That is, OLS is both (1) unbiased and

(2) more efficient than other estimators, including 2SLS, provided the necessary assumptions are

met. Put simply, one should rely on OLS unless there is a reason to be concerned that OLS is

inappropriate for the question at hand.

OLS, however, does *potentially* suffer from endogeneity bias because basic economic

theory suggests that prices and quantities are simultaneously determined, *i.e.*, endogenous.[69] As

both the supply equation and demand equation are taking place simultaneously, economic theory

suggests that one should be concerned about endogeneity bias. Yet, theoretical endogeneity is not

a concern if <u>it does not actually bias the econometric results</u>. Petitioners, thus, ran additional

analyses to ensure endogeneity is not driving the results of this inquiry.

For example, Wooldridge offers an empirical test for endogeneity bias,[70] which Petitioners

performed and found that the degree of endogeneity bias is statistically insignificant.[71] This

indicates Petitioners are not empirically compelled to use a structural equation such as 2SLS to

estimate the effect of various factors on steel prices. A comparison of the results generated by the

---

[67]    Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach, 5th Edition (2013) at 534 ("The 2SLS estimator is less efficient than OLS when the explanatory variables are exogenous; as we have seen, the 2SLS estimates can have very large standard errors."), excerpt attached at **Exhibit 1.6.**

[68]    Wooldridge at 101-02, excerpt attached at **Exhibit 1.6.**

[69]    Wooldridge at 534-35, 554, 850, 859, excerpt attached at **Exhibit 1.6.**

[70]    Wooldridge at 534-35, excerpt attached at **Exhibit 1.6.** The empirical test: (1) run the first stage 2SLS equation and obtain the error term, which Wooldridge calls $\hat{v}_2$. Then (2) run the structural regression, including the endogenous explanatory variable (steel consumption; Wooldridge calls this $y_2$) and $\hat{v}_2$. As Wooldridge explains, "{i}f the coefficient on $\hat{v}_2$ is statistically different from zero, we conclude that $y_2$ is indeed endogenous." *Id.* at 535.

[71]    *See* **Exhibit 1.7,** the Stata output for the 2SLS regression.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                **PUBLIC VERSION**
Page 45

OLS and 2SLS method further confirms this conclusion. Petitioners performed both an OLS and

2SLS regression and, as demonstrated in **Exhibit 1.2**, the 2SLS coefficient for excess capacity[72]

falls within the 95-percent confidence interval of the OLS coefficient, demonstrating the results of

each regression are statistically consistent with each other.

### ii.  Supply and Demand Side Factors

Petitioners' OLS-based model and comparative analysis with the 2SLS method take into

account a variety of demand and supply side variables to account for the equilibrating factors that

determine HRC prices. On the supply side, the model includes excess capacity, raw material prices,

and exchange rates (against the USD) for each country. Petitioners incorporated both iron ore and

steel scrap prices in the model, these prices being the most descriptive raw material variables for

which quality pricing data are available.

Given that the price of HRC is partially a function of the demand for steel, national HRC

prices (as proxied by import AUVs) are likely affected by the state of a country's economy at that

time. As it is impossible to include in the analysis a separate variable specific to every economic

factor that may potentially impact steel prices, it is standard practice to account for macroeconomic

conditions vis-à-vis a measure such as GDP. To that end, Petitioners considered the following

measures:

- Gross Domestic Product ("GDP") in constant 2010 dollars

- GDP growth (annual percent change in GDP in constant 2010 dollars)

- GDP per capita in constant 2011 international dollars (Purchasing Power Parity)

- Gross Fixed Capital Formation ("GFCF") in constant 2010 dollars

---

[72]     As detailed below, Petitioners have relied on an "uneconomic capacity" definition of excess capacity for this analysis.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 46

Petitioners evaluated each of these measures within the OLS model and, as detailed in

**Exhibit 1.4**, the estimated effect of each is statistically insignificant. More importantly, the

estimated effect of excess capacity and the model's overall explanatory power are robust to the

choice of macroeconomic measure. Thus, it is empirically ambiguous which measure to include,

as the choice does not affect the ultimate result. However, because it is important to include at

least one such measure in order to demonstrate that macroeconomic demand is not driving the

results, Petitioners' model relies on GFCF. The World Bank defines GFCF as follows:

> Gross fixed capital formation (formerly gross domestic fixed investment) includes
> land improvements (fences, ditches, drains, and so on); plant, machinery, and
> equipment purchases; and the construction of roads, railways, and the like,
> including schools, offices, hospitals, private residential dwellings, and commercial
> and industrial buildings. According to the 1993 SNA, net acquisitions of valuables
> are also considered capital formation.[73]

Put simply, GFCF is, as a component of GDP, investment in non-financial assets, and is

more narrowly defined to steel-using economic activity—to include economic activity that uses

hot-rolled steel—than GDP.[74] Petitioners, thus, applied this more narrowly defined within-country

variable in the model.

On the demand side, the analysis also considers aluminum prices, the global commodity

prices of crude oil, and national-level motor vehicle sales. The oil price is significant because the

oil industry is a major user of hot-rolled coil. High oil prices lead to higher investment in new oil

extraction and distribution infrastructure. Motor vehicle sales are potentially important because

---

[73]    World Bank Data Bank, Source Note for indicator NE.GDI.FTOT.ZS: *Gross fixed capital formation (% of GDP)*. The "SNA" is the System of National Accounts, a set of internationally recognized standards for macroeconomic accounting, and is accessible through the following resource on the World Bank's website: http://documents.worldbank.org/curated/en/943891468153876081/System-of-national-accounts-1993.

[74]    Consider the basic macroeconomic accounting: GDP = Consumption + Investment + Government Spending + Exports − Imports. GFCF is essentially the Investment portion, restricted to non-financial assets.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                      **PUBLIC VERSION**
Page 47

GFCF does not include vehicles, a major downstream user of steel.[75] Of note, the import AUVs,

exchange rates, motor vehicle sales, and the measures of macroeconomic conditions are each

"within country" factors that vary over time and across countries in the analysis.

### iii.  Fixed-Effects

Petitioners' model applies a fixed-effects methodology for two reasons. First, the modeling

for this analysis is, in large part, driven by the quality and quantity of the available data. As detailed

below, the excess capacity data underlying the analysis, although from a quality source and

publicly available, are global and compiled on an annual basis only. Thus, for any given country,

there is only one data point available for each year covered by the analysis. Assuming the year

2008 as the starting point, there exists, therefore, a maximum of only 10 observations available for

any given single-country regression. While this does not necessarily render a country-specific

regression unreliable, to ensure more robust and descriptive results, Petitioners relied on a multi-

country regression that significantly expands the number of observations in the underlying

dataset.[76] In doing so, it was necessary to apply fixed effects to the regression to account for

intercountry variation.

---

[75]     As detailed in **Exhibits 1.1 and 1.2**, oil prices, motor vehicle sales, and GDP growth are accounted for in
Petitioners' analysis as instruments in the first stage demand equation of the 2SLS regression. Petitioners excluded
these variables from the OLS model for two reasons. First, as discussed above, demand is properly accounted for in
the OLS model. The results are robust to (a) reliance on an OLS or 2SLS methodology, and (b) the choice of
macroeconomic demand measures. Second, and more practically, the inclusion of numerous demand measures creates
a large degree of what econometricians call "multicollinearity" (the correlation between explanatory variables)
without adding to the model's explanatory power. While multicollinearity does not bias the estimates themselves, it
increases the *variance* of the regression estimates, complicating statistical inference. *See* Wooldridge at 94-95, excerpt
attached at **Exhibit 1.6**. There comes a point where adding *more* is not better because the additional variables are
supplying information that is essentially redundant. As shown in **Exhibit 1.7**, the addition of other variables does not
significantly affect the R-squared, the basic measure of a regression's explanatory power.

[76]     Petitioners' model includes those countries that are members to the Organization for Economic Co-operation
and Development ("OECD"), the source for the underlying capacity data, as well as five additional large steel-
consuming countries outside of the OECD. *See* **Exhibits 1.1, 1.7**. Based on data available from the World Steel
Association ("WSA"), Petitioners identified and included the largest steel consumers outside of the OECD that also
had available quality import AUV data. This demonstrates the applicability of the model across countries. Indeed, the

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                              **PUBLIC VERSION**
Page 48

Fixed-effects is ideally suited to the data and analysis at hand as it restricts all of the action

in the regression to within-country action. The HRC import AUV data necessary to Petitioners'

analysis, constitutes a "panel" dataset characterized by both a cross-section and a time series

whereby the import AUVs for a cross section of entities (*i.e.*, countries) are observed at several

points over time. Thus, variation within the dataset occurs on an *intercountry* (*across country*) and

*intracountry* (*within country*) basis. Unlike other regressions methodologies that rely on

intercountry variation and are thus problematic due to potential omitted variable bias, a fixed-

effects model focuses on intra-country (within) variation. The method is thus ideal for determining

the impact of global excess steel capacity on a given country, because it is designed to explore the

relationship between the explanatory and outcome variables within an entity and to study the

causes of changes within an entity over time. Because each country may have certain

characteristics that may or may not influence their import AUVs, a fixed-effects model controls

for these time-invariant characteristics, eliminating the bias. Thus, a fixed-effects approach

restricts all of the action in the regression to within-country action - eliminating the key source of

omitted variable bias, namely, unobservable across-country differences. In removing the effect of

time-invariant characteristics, the fixed-effects approach assesses the net effect of the predictor

variable (*i.e.*, global excess steel capacity), on the outcome variable (import AUVs).

### iv.  **Global Excess Capacity**

Petitioners are not aware of any publicly available data source that provides national excess

capacity data on a product-by-product basis for a variety of countries. The excess capacity variable

applied in the model is, thus, limited by the global, crude steel nature of the available capacity and

---

only countries where the model may have limited applicability are those where import AUV data for the steel input
under consideration are either extremely limited, of poor quality, or otherwise anomalous.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                  **PUBLIC VERSION**
Page 49

production data.[77] Petitioners, therefore, sought to confirm the accuracy of relying on all crude

steel figures by comparing the excess capacity data used in the model to HRC production data

available to Petitioners from [       ], an international market analysis and consulting firm.[78]

Petitioners' analysis demonstrates crude steel capacity and production are valid proxies. [       ]

production data confirm that production trends are highly similar for HRC and crude steel.[79]

Annual global HRC production was [

                                          ][80] Moreover, as demonstrated in **Exhibit 4**,

there is a high correlation between changes in crude steel production and changes in HRC

production: as shown in the exhibit, the ratio of HRC production to crude steel production

increased over the 2008-2017 period, resulting in a high correlation between the two-production

series of [       ] **{Petitioner's BPI}**. This is statistically significant at any level of confidence.

Such a high degree of correlation between crude steel production and HRC, in addition to the large

amount of crude steel production taken up by HRC production, supports a finding that crude steel

data constitutes a valid proxy for HRS prices.

Simply defined global excess capacity is the amount of global crude steelmaking capacity

in a given year in excess of global crude steel production in that year. A potential concern with

applying this definition to the model is that the capacity value may be itself endogenous to HRC

prices and consumption, given that production equals consumption net of inventory changes. To

---

[77]     *See infra*. Petitioners sourced global capacity data from the OECD and global steel production data from the
World Steel Association Statistical Yearbook.

[78]     *See* **Exhibit 2**; See also [
], attached at **Exhibit 3. {Petitioner's BPI}**

[79]     While country-specific HRC production data are available from [       ], HRC capacity data are not.
**{Petitioner's BPI}**

[80]     **{Petitioner's BPI}**

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 50

mitigate the potential bias, Petitioners relied on an alternative capacity value—"uneconomic" capacity—or that which is not a direct function of production in a given year.[81] Petitioners defined this capacity as the amount of steel capacity in a given year in excess of the largest possible quantity of steel that may be demanded in that year (*i.e.*, global capacity minus the highest global production ever experienced prior to that year).[82]

### v. <u>The Underlying Data</u>

The model incorporates a variety of high-quality, publicly available global and country-specific data for the 2008 through 2017 period as follows:

- Country-specific Import AUVs from UN Comtrade at the four-digit 7208 HTS classification for Korea, the other 32 member countries of the Organization for Economic Cooperation and Development ("OECD"), India, and four other of the largest steel consuming countries outside of the OECD[83]

- Global Steel Capacity figures sourced from OECD

- Global Steel Production data sourced from the World Steel Association Statistical Yearbook

- Global Aluminum Prices sourced from the World Bank

- Global Iron Ore Prices [                                              ] {**Petitioners' BPI**}

- Global Scrap Prices sourced [                                              ] {**Petitioners' BPI**}

- The U.S. Consumer Price Index sourced from the Federal Reserve Bank of St. Louis (All price variables, including import AUVs, were adjusted to constant 2017 U.S. dollars based on this index.)

---

[81]     See **Exhibits 1.1 and 1.3**.

[82]     *See id. UneconomicCapacity$_t$ $\equiv$ GlobalCapacity$_t$ $-$ $\max\limits_{2007 \to t-1}${GlobalProduction$_t$}* Production and capacity quantities from prior years were included in the data in order to find maximum annual steel production. **Exhibit 1.7** provides results for the model when excess capacity is simply defined as Capacity minus Production. The results suggest an even stronger effect on hot-rolled prices.

[83]     Belgium and Luxembourg are the only OECD countries not included in the sample, as certain data sources did not treat them separately. (Lithuania, which joined the OECD in July 2018, is not included in the analysis.) Petitioners refer the Department to **Exhibit 1.7** for the sample of countries and coverage of global steel consumption.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 51

- Country-specific Steel Consumptions sourced from the World Steel Association Statistical Yearbook

- Exchange Rates for each country included in the regression sourced from the OECD

- Country-specific Gross Fixed Capital Formation from the Work Bank (supplemented by OECD data)

- Country-specific Real GDP growth from the World Bank

- Brent crude oil price from the U.S. Federal Reserve Bank of St. Louis

- Country-specific motor vehicle sales from the International Organization of Motor Vehicle Manufacturers

**Exhibit 1.5** details all the specific data used for all variables in this analysis.[84] The

Department can readily access, compile, and update these data as necessary.[85]

### vi.    The Advantage of Import AUVs

The HRC pricing data underlying the model—*i.e.*, country-specific HRC import AUVs—

capture the overall dynamics of an individual steel market and the impact of trade flows, thus

eliminating the need for an often-difficult-to-obtain domestic price series, and delivering a result

that applies equally to imported and domestically sourced HRC. While the regression could be

modified to rely, for example, on a domestic price series, Petitioners are unaware of any single

source for HRC domestic pricing data across multiple countries. The model would thus require,

for each case, analysis and research to identify a source of domestic pricing data specific to HRC

---

[84]     The compiled data for analysis is provided at **Exhibit 1.11**. This dataset at **Exhibit 1.11** serves as the starting point for the analyses shown in **Exhibits 1.2 and 1.7**.

[85]     To ensure meaningful results, each of the time-variant variables should reflect the same period. Petitioners note, however, that given the lag in availability from the various sources, it may not be able to update each data series to reflect a given period of investigation or review in its entirety. For example, while certain import AUV data are currently available from UN Comtrade for 2018, OECD capacity data, as well as data for other variables considered in the model are not. Thus, it will not always be possible to match the underlying data to the exact period of review or investigation at the time of the PMS allegation, as is the case here. The available data and results would, nevertheless, clearly be contemporaneous with the period under consideration. The Department could also independently update the data series as necessary once all the required data become available.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 52

within a given country. Where such data are unavailable, the model would be rendered useless. Import AUVs address these practical concerns and ensure a model that can be applied consistently across countries and products.

More importantly, however, import AUVs serve to best capture the overall dynamics of an individual steel market and the impact of trade flows on that market, eliminating the need for a domestic price series and ensuring a result that applies equally to imports and domestically sourced HRC. Excess capacity leads to falling prices and declining profitability in steel and other industries. As an economic matter, it is excess supply—not capacity—relative to demand that transmit the adverse price effects and result in lower prices. The presence of excess capacity generally leads to excess supply: firms produce more than required at current prices in order to generate needed cash to support high fixed costs,[86] while importers demand discounts in order to absorb the additional supplies. If the importing country also produces steel, the lower import prices cause domestic producers to lower their prices as well. Import AUVs are thus intrinsically linked to domestic prices, as all suppliers to a given market—*i.e.*, foreign and domestic suppliers— compete, undercut, and distort one another, and global excess supplies, even if primarily generated by a handful of countries, lead to price reductions in the domestic markets of other countries through trade. The Department recognized this basic principle in its recent final determination in *LDWP from Korea*, where it explained:

> In a market economy, where goods are competitively priced, domestic and imported
> prices will converge at an equilibrium. This is particularly true with a common and
> fungible commodity such as HRC or plate. Thus, because domestic subsidies lower
> the COP and the price of HRC or plate in Korea, it is logical to find that, to remain
> competitive, imported HRC or plate will sell at prices competitive with the

---

[86]      *See* Stephen Cooney, Report for Congress – Steel Industry and Trade Issues (May 28, 2002) at 13-14, attached at **Exhibit 5**; *see also* Lukas Brun, Overcapacity in Steel: China's Role in a Global Problem, Duke Center on Globalization, Governance & Competitiveness at the Social Science Research Institute (2016) at 31, attached at **Exhibit 6**.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                          **PUBLIC VERSION**
Page 53

domestically produced and subsidized HRC or plate. In other words, domestic and imported prices of HRC or plate converge to a lower market equilibrium price than if the domestically-produced Korean HRC or plate did not benefit from GOK subsidies.[87]

The distortive impact of global excess capacity as transmitted to an individual market is thus best measured by the prices in that market indicative of both the dynamics of that market as well as the prevailing trade flows—*i.e.*, import AUVs.[88] As such, import AUVs reflect the prices charged and the degree of distortion imposed on HRC prices in the Korean market overall—for both Korean and non-Korean suppliers and a means to adjust the cost for all HRC inputs—increasing the respondents' HRC costs for purchases from all suppliers by a single adjustment factor.

Moreover, available price series demonstrate that import AUVs are an appropriate proxy for available HRC prices in the region. While the data is not publicly available, Petitioners have access to an HRC price series that includes Korea, as compiled by [      ],[89] and have relied on these data to test the reliability of the model's import AUV assumptions. Petitioners' analysis reveals a statistically significant correlation between these HRC prices in the region and Korea's import AUVs.[90]

---

[87]     Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe From the Republic of Korea*, 84 Fed. Reg. 6374 (Dep't Commerce Feb. 27, 2019) (final determination of sales at less than fair value) at cmt, 4 (internal citations omitted).

[88]     Were the Department to obtain domestic and import price indexes maintained by the GOK, it is likely, given the price transmission role played by HRC imports, that those domestic and import prices would share very similar trends. Such a close linkage would, *ipso facto*, demonstrate the validity of using an AUV to reflect domestic market conditions in the subject country. Indeed, Petitioners' analysis, as detailed below, confirms this point.

[89]     Korea-specific HRC prices are not available from [      ]. In reporting HRC prices within the region, [      ] compiles a [          ] data series that includes HRC prices available in the same geographic region as Korea. *See* **Exhibit 2**. While more regional in nature, these data nevertheless are a reliable basis upon which to evaluate Korean AUVs as a proxy for overall HRC prices in Korea. Further, since [      ] maintains separate data series for [          ], it stands to reason that [          ] are not included in [          ] data series and, thus, the [          ] data series are no aligned with the [          ] data series. {**Petitioners' BPI**}

[90]     *See* **Exhibit 2**.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                                    **PUBLIC VERSION**
Page 54

  Finally, Petitioners note that the Department has long recognized the inherent link between

import AUVs and the price for a product generally within a given market when evaluating the best

information available to value the factors of production pursuant to Section 773(c)(1) of the Act.

Time and again the Department has determined import AUVs to be indicative of "broad market

averages"[91] that reflect actual prices for a given product, that represent "prices available country-

wide" by domestic and foreign suppliers alike, and that are prices free of bias, taxes, and duties.[92]

Indeed, POSCO has indicated that Chinese HRS imports have been dumped aggressively into

Korea,[93] and that the company believes that such flooding of steel imports from China has affected

steel prices in Korea.[94]

### c. Model Results and PMS Adjustment Calculations

  As detailed in **Exhibit 1.2**, Petitioners' analysis indicates a compelling, statistically

significant inverse relationship between global overcapacity and HRC import AUVs such that

where global steel overcapacity increases, HRC and plate import AUVs decrease. The OLS model

finds that, all else equal, a 10 percent increase in global excess steel capacity results in a 5.9 percent

decrease in national import AUVs of HRC.[95] Given this result, Petitioners estimated what the

---

[91]  *See*, *e.g.*, Issues and Decision Memorandum accompanying *Certain Preserved Mushrooms From the People's Republic of China*, 77 Fed. Reg. 55,808 (Dep't Commerce Sept. 11, 2012) (final results of antidumping duty admin. rev.) at cmt. 3; Issues and Decision Memorandum accompanying *Chlorinated Isocyanurates From the People's Republic of China*, 81 Fed. Reg. 1167 (Dep't Commerce Jan. 11, 2016) (final results of antidumping duty admin. rev.; 2013-2014) at cmts. 1 and 2; Issues and Decision Memorandum accompanying *High Pressure Steel Cylinders from the People's Republic of China* (Dep't Commerce Apr. 30, 2012) at cmt. 1 ("*High Pressure Steel Cylinders from the PRC*").

[92]  Indeed, even where the source of the market economy imports into a surrogate country comes from one country, the Department still considers the import AUV to be reflective of a broad market average. *See High Pressure Steel Cylinders from the PRC* at cmt. 1.

[93]  *See generally* POSCO 2016 Investors Forum Q&A, attached as **Exhibit 87**.

[94]  *See generally* POSCO 2016 1Q Q&A, attached as **Exhibit 88**.

[95]  *See* **Exhibit 1.2**.

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                        **PUBLIC VERSION**
Page 55

Korean AUV for HRC imports would have been in 2017 <u>but for</u> global steel overcapacity, and that

analysis indicates an AUV of $808.80/MT if global steel production operated at a utilization rate

of 85 percent.[96]

This is 49.35 percent higher than the 2017 Korean import AUV for HRC of $541.54/MT,

demonstrating the significant degree to which the HRC prices in the Korean market have been

depressed directly and indirectly by the excess steel capacity crisis. Thus, by increasing the cost

of the respondents' hot-rolled inputs by 49.35 percent, the Department can account in full for the

distortive effects of the excess capacity-driven PMS in Korea.[97]

The estimated coefficients for the other variables in the model speak to the overall veracity

of the analysis. All variables except for the aluminum price are of the expected sign, and all control

variables except gross fixed capital formation are statistically significant.[98] For example, on the

---

[96]      *See* "PMS Adjustment Calculations" Worksheet at **Exhibit 1.3**. In its recent 232 steel investigation, the U.S. Department of Commerce Bureau of Industry and Security Office of Technology Evaluation indicates that steel utilization rates of 80 percent or more are "typically necessary for sustained profitability, among other factors and that for most capital and energy-intensive U.S. steel producers, capacity levels of 80 percent or higher are required to maintain facilities, carry out periodic modernization, service company debt, and fund research and development." *See* The Effect of Imports of Steel on the National Security – An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, As Amended, U.S. Department of Commerce, Bureau of Industry and Security Office of Technology Evaluation (Jan. 11, 2018) at 47-49, excerpt attached at **Exhibit 1.8**. The full report is available at http://files.constantcontact.com/4ea55c81401/a9295dc5-b7aa-4714-9013-21c625b711bb.pdf. According to a recent study by McKinsey & Company about excess capacity in the global steel industry, a global capacity utilization rate of 90 percent is necessary for the long-term sustainability of the global steel industry. *See* Avetik Chalabyan, Lapo Mori, and Steven Vercammen, The Current Capacity Shake-up in Steel and how the Industry is Adapting, McKinsey & Company (Jan. 2018) at 14, attached at **Exhibit 1.9**. McKinsey calculates overcapacity as crude steel nominal capacity x 90% - production. Since McKinsey's estimated global production capacity is somewhat lower than estimated by the OECD, excess capacity consistent with a lower capacity utilization rate of 85 percent (using OECD capacities) is a reasonable baseline for the analysis.

[97]      "PMS Adjustment Calculations" Worksheet at **Exhibit 1.3**.

[98]      As discussed in **Exhibit 1.1**, one would expect the aluminum price to be positively associated with the HRC price and, indeed, the raw correlation is positive. The regression coefficient must be interpreted in conjunction with the other estimates. That is, the effect of the aluminum price is found to be negative once the iron ore and scrap prices have been taken into account.

The statistically insignificant effect of gross fixed capital formation is consistent with the results for other measures of macroeconomic demand. *See* **Exhibit 1.1** (providing discussion), **Exhibit 1.4** (providing results).

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019
Page 56

**PUBLIC VERSION**

supply side, the iron ore price and steel scrap price are positively associated with the price of HRC, which is to be expected of an input to HRC production.

Using the identical import AUV and capacity data as that for the model, Petitioners calculated individual country-specific elasticities that, as **Exhibit 1.7** demonstrates, reveal the same statistically significant inverse relationship between global steel overcapacity and import AUVs as indicated by Petitioners' model.[99] To be clear, Petitioners did not run the full OLS model against each county to obtain these results. These are simple, individual country-specific elasticity calculations that are important to the analysis because they demonstrate the accuracy at which the model attributes changes in national import AUVs to global steel excess capacity. If another country-specific variable was at play, or the model somehow misrepresented the relationship, one would not expect the same pattern to repeat time and again across all 38 countries considered for the analysis. Petitioners also extended this analysis to run additional, country-specific elasticities using the country-specific domestic HRC price series available through [      ].[100] These elasticities reveal the same inverse relationship between global steel overcapacity and domestic HRC prices.[101] That similar results are achieved, albeit with a smaller data set, is an important result. Not only does it demonstrate that excess capacity has a similar direct impact on domestic prices for those countries with available data from [      ], it confirms that the model's import AUV-based results are not biased by product mix or other import AUV-related issues.[102]

---

[99]      *See* "Estimated Country-Specific Elasticities" Worksheet at **Exhibit 1.7**.

[100]      **{Petitioners' BPI}**

[101]      "Estimated Country-Specific Elasticities" Worksheet at **Exhibit 1.7**. [

].

**{Petitioners' BPI}**

[102]      **{Petitioners' BPI}**

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                            **PUBLIC VERSION**
Page 57

The import AUV-based country-specific elasticities also confirm the explanatory power of the fixed-effects approach. Because a fixed effects model isolates the "within-group" variation, the method yields more explanatory power where the underlying panel dataset demonstrates significant variation in the dependent variable among countries. As Figure 1 at **Exhibit 1.1** demonstrates, there exists a significant vertical spread in the AUV data points in each year, demonstrating meaningful variation in import AUVs of HRC and plate between countries in any given year. These data also demonstrate strong persistence relative to the mean AUV for all countries, particularly for Korea. Korea's AUV is consistently lower than the global mean and that delta is relatively consistent. This is broadly true of the entire dataset: while global steel prices vary from one year to the next, each country's HRC import AUV tends to occupy a similar position relative to other countries. In fact, all countries in the data demonstrate similar relationships between global excess capacity and their HRC import AUV.[103]

These country-specific elasticities also serve to inform as to the potential applicability of the model across countries. Where the elasticity for a given country indicates sufficient responsiveness, the model is appropriately applied to calculate a PMS adjustment specific to that country. For example, as indicated in **Exhibit 1.7**, the vast majority of countries demonstrate sensitivity—with an AUV-to-Uneconomic Capacity elasticity between -0.4 and -1 (*i.e.*, a 10 percent increase in uneconomic capacity results in price declines ranging from 4 percent to 10 percent). Of these, Petitioners selected two additional countries of interest—India and Turkey—and ran the model to calculate the PMS adjustment. As detailed in **Exhibit 1.7**, the model works

---

[103]    These country-specific elasticities also provide conceptual justification for the application of a PMS adjustment to Korea's HRC import AUVs. The vast majority of countries demonstrate an AUV-to-Uneconomic Capacity elasticity between -0.4 and -1 (*i.e.*, a 10 percent increase in uneconomic capacity results in price declines ranging from 4 percent to 10 percent). *See* "Results of Country-Specific Regressions" Worksheet at **Exhibit 1.7**.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                               **PUBLIC VERSION**
Page 58

to quantify the impact of global excess capacity at the national level, to derive a PMS adjustment specific to the country under examination.[104]

Petitioners further confirmed the veracity of the proposed model based on comparisons between various alternative specifications of a regression model that takes the import AUVs as the dependent variable and global excess capacity as the explanatory variable.[105] The "Other Regression Results" Worksheet in **Exhibit 1.7** demonstrates the estimated relationship between import AUVs and global excess capacity is robust, as one finds statistically and economically significant coefficients with or without the fixed effects parameter or with alternative specifications. The worksheet likewise demonstrates that the relationship between import AUVs and global excess capacity is so statistically significant that the addition of numerous time-variant variables into the analysis does not undermine the finding of a strongly negative impact of global excess capacity.

Petitioners undertook a final analysis to test the specificity of the OLS model to the national level. As discussed above with reference to the use of country-fixed effects, the probity of a single-country regression is limited due to there being only ten annual observations for global steelmaking capacity. However, the sample size can be expanded significantly if one relies on quarterly data. While most of the variables applied in the analysis are available on a quarterly basis, capacity is not. Petitioners, therefore, extrapolated from annual capacity figures to derive quarterly

---

[104]     "PMS Adjustment for Select Countries" Worksheet at **Exhibit 1.7**.

[105]     These regressions rely exclusively on the same AUV and capacity data as Petitioners' model.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 59

estimates,[106] and applied the OLS and 2SLS regressions to Korea alone.[107] The results are consistent with those found by the OLS Model. A ten percent increase in global uneconomic capacity is associated with a 4.18 percent decrease in the Korea commodity HRC price.[108] Similarly, a quarterly extension of the 2SLS regression to Korea alone finds that a 10 percent increase in global uneconomic capacity is associated with a 4.86 percent decrease in HRC prices within Korea. While based on capacity estimates, these findings are important: they confirm that the results of the OLS model are clearly specific to the national level, *i.e.*, the model quantifies the severity of the *particular* market situation in Korea caused by excess capacity in the global steel industry.

### d. Conclusion

Lacking a descriptive means to quantify and adjust for the full distortion in HRC costs caused by a PMS, the Department has, to date, simply defaulted to upwardly adjusting the respondents' HRC costs based on the prevailing U.S. CVD investigation rates in effect against hot-rolled inputs from the subject country. Petitioners here provide a compelling and flexible alternative to the Department's current PMS adjustment methodology that recognizes and accounts for the distortions inherent to a PMS at the national level. Moreover, in recognizing global steel overcapacity as the fundamental driver of the PMS in Korea, Petitioners' method inherently establishes the link between the adjustment and the factors that collectively define the Korean

---

[106]     Global steelmaking capacity, reported on an annual basis by the OECD, is assumed to follow a linear quarterly trend from one year to the next. For example, the OECD reports 2008 capacity as 1,680.3 million MTs and 2009 capacity as 1,775 million MTs, an annual increase of 94.7 million MTs. The quarterly analysis assumes that annualized capacity increased by 23.6 million MTs (94.7 / 4 = 23.7) in each quarter between the third quarter of 2008 and the third quarter of 2009. (The third quarter is chosen because the OECD reports capacity figures in the middle of the year.)

[107]     *See* **Exhibit 1.10**.

[108]     Results shown in **Exhibit 1.10**.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                    **PUBLIC VERSION**
Page 60

PMS. It goes beyond factor-specific adjustments and provides a unified approach. Further, because it identifies the manner in which the global steel overcapacity crisis uniquely manifests itself at the national level, Petitioners' method results in an adjustment that is <u>country-specific</u>, and also <u>product-specific</u>, as a result of its reliance on import AUVs as the underlying pricing data. In addition, given that individual companies do not operate within a vacuum, but are subject to the prices and market forces in operation in individual steel markets, the resulting adjustment is also meaningfully and appropriately applied on a <u>company-specific</u> basis to respondents' costs of production.

Moreover, the model can be readily revised to apply to a variety of steel products and updated as necessary to reflect different time periods. Petitioners urge the Department to consider and adopt this methodology, and make the appropriate upward adjustment to the respondents' HRC input costs as determined by this regression analysis.

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The Honorable Wilbur L. Ross, Jr.
April 2, 2019                                                                    **PUBLIC VERSION**
Page 61

*       *       *

## REQUEST FOR PROPRIETARY TREATMENT

Petitioners request that certain information contained in square brackets ("[  ]") throughout this submission be protected as business proprietary information pursuant to 19 C.F.R. § 351.304(a)(l)(i). This information was released to counsel for Petitioners under the terms of the Administrative Protective Order in this proceeding.

Petitioners also request proprietary treatment for certain bracketed information designated as Petitioners' business proprietary information, in accordance with the Department's regulations at 19 C.F.R. § 351.304(a) and § 351.105(c)(11). Public disclosure of this information would result in serious and substantial harm to the competitive position of Petitioners and would impair the ability of the Department to obtain information necessary to fulfill its statutory functions. Petitioners agree to the release of this information to parties granted access under the APO issued by the Department in this proceeding.

If you have any questions regarding this submission, please do not hesitate to contact the undersigned.

Respectfully submitted,

 */s/ Robert E. Defrancesco, III*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Cynthia C. Galvez, Esq.
Theodore P. Brackemyre, Esq.

*Counsel to Independence Tube Corp. and Southland Tube, Inc.*

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

## COMPANY CERTIFICATION

I, Douglas R. Gunson, Legal Counsel, currently employed by Nucor Corporation, parent company of Independence Tube Corporation, a Nucor company, and Southland Tube, Incorporated, a Nucor company, certify that I have read the attached Particular Market Situation Allegation and Supporting Information, filed on April 2, 2019, pursuant to the 9/1/2017 – 8/31/2018 administrative review under the antidumping duty order on Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea, Case No. A-580-880. I certify that the public information and any business proprietary information of the Nucor Corporation and its subsidiaries contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. §1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Douglas R. Gunson

Date:  April 2, 2019

## REPRESENTATIVE CERTIFICATION

I, Robert E. DeFrancesco, III, with Wiley Rein LLP, counsel to Independence Tube Corporation, a Nucor company, and Southland Tube, Incorporated, a Nucor company, certify that I have read the attached Particular Market Situation Allegation and Supporting Information, filed on April 2, 2019, pursuant to the 9/1/2017 – 8/31/2018 administrative review under the antidumping duty order on *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, Case No. A-580-880. In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.


Signature:_____
                     Robert E. DeFrancesco, III

Date:____April 2, 2019____

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

## CERTIFICATE OF SERVICE

PUBLIC SERVICE

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from South Korea*
**A-580-880**
**Administrative Review 9/1/17 – 8/31/18**

I certify that a copy of this public submission was served on the following parties, via first class mail, on April 3, 2019.

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
660 Pennsylvania Avenue, SE
Suite 401
Washington, DC 20003

Jeffrey M. Winton, Esq.
**Law Office of Jeffrey M. Winton**
1900 L Street, NW
Suite 611
Washington, DC 20036

Roger B. Schagrin, Esq.
**Schagrin Associates**
900 Seventh Street, NW
Suite 500
Washington, DC 20001

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 4:34 PM, Submission Status: Approved

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC VERSION

| EXHIBIT LIST | | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| 1.1 | Economic Analysis | Public |
| 1.2 | Regression Results | Public |
| 1.3 | PMS Adjustment Calculation Worksheet | Public |
| 1.4 | Comparison of Macroeconomic Measures | Public |
| 1.5 | Data for Analysis | Public |
| 1.6 | Jeffrey M. Wooldridge, Introductory Econometrics: A Modem Approach, 5th Edition (2013) (Excerpt) | Public |
| 1.7 | Comparison of Regression Methodologies | Public |
| 1.8 | The Effect of Imports of Steel on the National Security - An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, As Amended, U.S. Department of Commerce, Bureau of Industry and Security Office of Technology Evaluation (Jan. 11, 2018) (Excerpt) | Public |
| 1.9 | Avetik Chalabyan, Lapo Mori, and Steven Vercammen, The Current Capacity Shake-up in Steel and how the Industry is Adapting, McKinsey & Company (Jan. 2018) | Public |
| 1.10 | Specificity Analysis | Public |
| 1.10.A | Quarterly Analysis Narrative | Public |
| 1.10.B | Model Results of Quarterly Regressions for Korea | Public |
| 1.10.C | Data Sources for Quarterly Analysis | Public |
| 1.10.D | STATA Output for Quarterly Analysis Model | Public |
| 1.11 | Compiled Regression Dataset | Public |
| 2 | [      ] Data ) {Petitioners' BPI} | Public |
| 3 | [                                ] ) {Petitioners' BPI} | Public |
| 4 | Global Production Trends: Hot-Rolled Sheet & Coil Plate vs. Crude Steel | Public |

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

**PUBLIC VERSION**

| | **EXHIBIT LIST** | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| 5 | Stephen Cooney, Report for Congress – Steel Industry and Trade Issues (May 28, 2002) | Public |
| 6 | Lukas Brun, Overcapacity in Steel: China's Role in a Global Problem, Duke Center on Globalization, Governance & Competitiveness at the Social Science Research Institute (2016) | Public |
| 7 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular Market Situation Allegation and Support Information* (Aug. 31, 2018), excerpt | Public |
| 8 | Issues and Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea*, 83 Fed. Reg. 50,892 (Dep't Commerce Oct. 10, 2018) (prelim. results of antidumping duty admin. rev. & prelim. deter. of no shipments; 2016-2017) | Public |
| 9 | Issues and Decision Memorandum accompanying *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), *amended*, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (amended final affirm. countervailing duty deters. and countervailing duty orders) | Public |
| 10 | South Korea Hands Another $5 Billion to Hyundai Merchant Marine (2018) | Public |
| 11 | Declaration of [                    ] (Nov. 18, 2013) **{Petitioners' BPI}** | Public |
| 12 | Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Oil Country Tubular Goods from the Republic of Korea: Particular Market Situation Allegation on Electricity* (Feb. 3, 2016) | Public |
| 13 | Memorandum from Katie Marksberry, International Trade Compliance Analyst, AD/CVD Operations, Office V, through Catherine Bertrand, Program Manager, AD/CVD Operations, Office V, to The File, re: *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Amended Final Determination Calculation Memorandum for POSCO* | Public |
| 14 | Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe From the Republic of Korea*, 84 Fed. Reg. 6,374 (Dep't Commerce Feb. 27, 2019) (final deter. of sales at less than fair value), excerpt | Public |
| 15 | Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 84 Fed. Reg. 4,046 (Dep't Commerce Feb. 14, 2019) (prelim. results of antidumping duty admin. rev. & prelim. deter. of no shipment; 2016-2017) | Public |
| 16 | Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of antidumping duty admin. rev.; 2015-2016), excerpt | Public |
| 17 | Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 51,442 (Dep't | Public |

<table>
<tr><td colspan="3" align="center"><strong>EXHIBIT LIST</strong></td></tr>
</table>

| Exhibit No. | Exhibit | Security |
|---|---|---|
| | Commerce Oct. 11, 2018) (prelim. results of antidumping duty admin. rev.; 2016-2017), excerpt | |
| 18 | Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Korea*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2015-2016), excerpt | Public |
| 19 | Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Korea*, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty admin. rev.; 2014-2015), *amended*, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of antidumping duty admin. rev.; 2014-2015) excerpt | Public |
| 20 | Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 63,619 (Dep't Commerce 11, 2018) (prelim. results of antidumping duty admin. rev.; 2016-2017), excerpt | Public |
| 21 | Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 83 Fed. Reg. 27,541 (Dep't commerce June 13, 2018) (final results of antidumping duty admin. rev.; 2015-2016), excerpt | Public |
| 22 | Memorandum from Christopher J. Zimpo, Senior Accountant through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – SeAH Steel Corporation and its Affiliates* (Feb. 19, 2019), excerpt | Public |
| 23 | Memorandum from Christopher J. Zimpo, Senior Accountant through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – SeAH Steel Corporation and its Affiliates* (Aug. 20, 2018) | Public |
| 24 | Memorandum from Ji Young Oh, Senior Accountant through Taija A. Slaughter, Supervisory Accountant to Neal M. Harper, Director, Off. of Accounting, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from Korea: Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Hyundai RB Co. Ltd.* (Feb. 19, 2019) | Public |
| 25 | Memorandum from Janae Martin, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VIII through Rebecca Trainor, Program Manager, AD/CVD Operations, Off. VIII to The File, re: *Antidumping Duty Investigation of Large Diameter Welded Pipe from the Republic of Korea: Preliminary Determination Margin Calculation for Hyundai RB Co., Ltd.* (Aug. 20, 2018) | Public |
| 26 | *Commission Implementing Regulation (EU) 2017-969 of 8 June 2017 imposing definitive countervailing duty on imports of certain hot-rolled flat products of iron, non-alloy or other alloy steel originating in the People's* | Public |

**PUBLIC VERSION**

| | **EXHIBIT LIST** | |
|:---:|:---|:---:|
| **Exhibit No.** | **Exhibit** | **Security** |
| | *Republic of China and amending Commission Implementing Regulation (EU) 2017/649 imposing a definitive anti-dumping duty on imports of certain hot-rolled flat products of iron, non-alloy or other alloy steel originating in the People's Republic of China*, Official Journal of the European Union (June 8, 2017) | |
| 27 | *Certain Cold-Rolled Steel Flat Products From the People's Republic of China*, 81 Fed. Reg. 32,729 (Dep't Commerce May 24, 2016) (final affirm. countervailing duty deter. and final partial affirm. crit. circumstances deter.) and accompanying Issues and Decision Memorandum | Public |
| 28 | USITC Pub. 3479, excerpt | Public |
| 29 | USITC Pub. 4633, excerpt | Public |
| 30 | USITC Pub. 4489, excerpt | Public |
| 31 | USITC Pub. 4768, excerpt | Public |
| 32 | USITC Pub. 4754, excerpt | Public |
| 33 | USITC Pub. 4333, excerpt | Public |
| 34 | HR Korea POSCO Ministerial Error Memo | Public |
| 35 | Letter from Yoon & Yang LLC to Sec'y Commerce, re: Countervailing Duty Investigation: Certain Hot-Rolled Steel Flat Products (Hot-Rolled Steel) from the Republic of Korea: Response (Nov. 4, 2015), excerpt | Public |
| 36 | HR Japan INV AD Final Determination | Public |
| 37 | Letter from Wiley Rein LLP to Sec'y Commerce, re: Large Diameter Welded Pipe from the Republic of Korea (July 5, 2018), excerpt | Public |
| 38 | Maverick's Sept. 22, 2017 PMS Allegation, excerpt | Public |
| 39 | Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: 2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea – Discussion of Business Proprietary Information for the Final Results – Particular Market Situation (July 11, 2018) | Public |
| 40 | Memorandum from Ross R. Belliveau, Senior International Trade Compliance Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: | Public |

| EXHIBIT LIST | | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| | Welded Line Pipe from the Republic of Korea: 2015-2016 Antidumping Duty Administrative Review – Calculations for SeAH Steel Corporation for the Final Results (July 11, 2018) | |
| 41 | Memorandum from David Goldberger, Senior International Trade Analyst, AD/CVD Operations, Office II, Enforcement & Compliance, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, Enforcement & Compliance, to The File, re: 2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea – Final Results Margin Calculation for Hyundai Steel Company (July 11, 2018) | Public |
| 42 | Memorandum from William Miller, International Trade Analyst, AD/CVD Operations, Office II, through Elizabeth Eastwood, Program Manager, AD/CVD Operations, Office II, to The File, re: 2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea – Calculation of the Review-Specific Average Rate for the Final Results (July 11, 2018) | Public |
| 43 | Memorandum from Thomas Schauer, Senior International Trade Compliance Analyst, AD/CVD Operations, Office I, through Minoo Hatten, Program Manager, AD/CVD Operations, Office I, to The File, re: Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results Analysis Memorandum for Hyundai Steel Company (June 7, 2018) | Public |
| 44 | Memorandum from Andre Gziryan, International Trade Compliance Analyst, AD/CVD Operations, Office I, through Minoo Hatten, Program Manager, AD/CVD Operations, office I, to The File, re: Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results Analysis Memorandum for Husteel Co., Ltd. (June 7, 2018) | Public |
| 45 | Memorandum from Thomas Schauer, Senior International Trade Compliance Analyst, AD/CVD Operations, Office I, through Minoo Hatten, Program Manager, AD/CVD Operations, Office I, to the File, re: Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Calculation of the Margin for Respondents Not Selected for Individual Examination (June 7, 2018) | Public |
| 46 | Letter from Schagrin Associates to Sec'y Commerce, re: Certain Circular Welded Non-Alloy Steel Pipe from Korea: Allegation of a Particular Market Situation (Oct. 16, 2017), excerpt | Public |
| 47 | Issues and Decision Memorandum accompanying Biodiesel From Argentina, 83 Fed. Reg. 8,837 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value and final affirm. deter. of critical circs., in part) | Public |
| 48 | Issues and Decision Memorandum accompanying Biodiesel From Indonesia, 83 Fed. Reg. 8,835 (Dep't Commerce Mar. 1, 2018) (final deter. of sales at less than fair value) | Public |
| 49 | Memorandum from Deborah Scott, International Trade Compliance Analyst, AD/CVD Operations, Office VI, through Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to The File, re: Analysis of Data Submitted by SeAH Steel Corporation for the Final Results of the 2015-2016 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea (Apr. 10, 2018) | Public |

PUBLIC VERSION

| | EXHIBIT LIST | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| 50 | Memorandum from Deborah Scott, International Trade Compliance Analyst, AD/CVD Operations, Office VI, through Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to The File, re: Analysis of Data Submitted by SeAH Steel Corporation for the Final Results of the 2014-2015 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea (Apr. 10, 2017) | Public |
| 51 | Memorandum from Ji Young Oh, Senior Accountant, through Michael Martin, Supervisory Accountant, to Neal M. Halper, Director, Office of Accounting, re: Antidumping Duty Administrative Review of Oil Country Tubular Goods from Korea – Cost of Production and Constructed Value Calculation Adjustments for the Final Results – SeAH Steel Corp., Ltd. (Apr. 10, 2017) | Public |
| 52 | Memorandum from Deborah Scott, International Trade Compliance Analyst, AD/CVD Operations, Office VI, through Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to The File, re: Analysis of Data Submitted by NEXTEEL Co., Ltd. for the Final Results of the 2014-2015 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea (Apr. 10, 2017) | Public |
| 53 | Memorandum from Milton Koch, International Trade Accountant, through Taija A. Slaughter, Supervisory Accountant, to Neal M. Halper, Director, Office of Accounting, re: Antidumping Duty Administrative Review of Oil Country Tubular Goods from the Republic of Korea – Constructed Value Calculation Adjustments for the Final Results – NEXTEEL Co., Ltd. (Apr. 10, 2017) | Public |
| 54 | Memorandum from Deborah Scott, International Trade Compliance Analyst, Antidumping and Countervailing Duty Operations, Office VI, through Scot Fullerton, Director, Antidumping and Countervailing Duty Operations, Office VI, to The File, re: Certain Oil Country Tubular Goods from the Republic of Korea (Mar. 8, 2017) | Public |
| 55 | Letter from Wiley Rein LLP to Sec'y Commerce, re: Oil Country Tubular Goods from South Korea: Particular Market Situation Case Brief (Mar. 1, 2017) | Public |
| 56 | Letter from Wiley Rein LLP to Sec'y Commerce, re: Certain Oil Country Tubular Goods from the Republic of Korea: Comments and Arguments on Particular Market Situation Allegations (Nov. 4, 2016) | Public |
| 57 | Letter from Wiley Rein LLP to Sec'y Commerce, re: Certain Oil Country Tubular Goods from the Republic of Korea: Rebuttal Comments in Response to Comments and Arguments on Particular Market Situation Allegations (Nov. 14, 2016) | Public |
| 58 | Letter from Wiley Rein LLP to Sec'y Commerce, re: Certain Oil Country Tubular Goods from the Republic of Korea: Particular Market Situations and Other Factual Information Submission (Sept. 6, 2016), excerpt | Public |
| 59 | Letter from Skadden, Arps, Slate, Meagher & Flom LLP to Sec'y Commerce, re: Oil Country Tubular Goods from the Republic of Korea (Aug. 7, 2017), excerpt | Public |

| EXHIBIT LIST | | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| 60 | Letter from Wiley Rein LLP to Sec'y Commerce, re: Certain Oil Country Tubular Goods from the Republic of Korea: Information and Comments Requiring Immediate Action (Nov. 25, 2015) | Public |
| 61 | Letter from Wiley Rein LLP to Sec'y Commerce, re: Oil Country Tubular Goods from Korea: Resubmission of Case Brief, Redacted Pursuant to the Department's Request (June 20, 2014) | Public |
| 62 | Memorandum from Sheikh M. Hannan, Senior Accountant, Office of Accounting, through Taija A. Slaughter, Lead Accountant, Office of Accounting, through Neal M. Halper, Director, Office of Accounting, to The File, re: Verification of the Cost Response of POSCO in the Antidumping Duty Investigation of Certain Oil Country Tubular Goods from the Republic of Korea (May 15, 2014) | Public |
| 63 | Letter from Wiley Rein LLP to Sec'y Commerce, re: Oil Country Tubular Goods from the Republic of Korea: Submission of Factual Information (Nov. 13, 2015) | Public |
| 64 | U.S. Imports of Carbon and Alloy Oil Country Tubular Goods, U.S. International Trade Commission (2018) | Public |
| 65 | Korean Government Proposal for Strengthening the Competitiveness of the Steel Industry | Public |
| 66 | S. Korean shipbuilding industry expects another tough year (2018) | Public |
| 67 | How China Skirts America's Antidumping Tariffs on Steel (2018) | Public |
| 68 | Keith Bradsher, Tariff Dodgers Stand to Profit Off U.S.-China Trade Dispute, The New York Times (Apr. 22, 2018) | Public |
| 69 | Marex, South Korea to Underwrite Hundreds of Ship Orders The Maritime Executive (Apr. 6, 2018) | Public |
| 70 | World crude steel output increases by 5.3% in 2017, Worldsteel.org (Jan. 24, 2018) | Public |
| 71 | Julie Kim Jackson, Korea's shipbuilding orders look to finish at world's No. 2 this year, The Korea Herald (Dec. 8, 2017) | Public |
| 72 | World steel oversupply 730 million t. .. Korea export 24 times, Yonhap News Agency (Dec. 3, 2017) | Public |
| 73 | 'Swamp'' of the world steel industry oversupply, Gyeong-buk Daily (Dec. 3, 2017). | Public |
| 74 | Global Forum on Steel Excess Capacity – Report, Federal Ministry for Economic Affairs and Energy, Government of Germany (Nov. 30, 2017) ("Global Forum Report") | Public |
| 75 | Maytaal Angel, EU finds Chinese steel sent via Vietnam evaded tariffs, Reuters (Nov. 14, 2017) | Public |
| 76 | Henning Gloystein and Jane Chung, Back from the abyss: South Korea's shipbuilders begin ascent to growth, Reuters (Nov. 1, 2017) | Public |

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
**PUBLIC VERSION**

| EXHIBIT LIST | | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| 77 | worldsteel Short Range Outlook 2017/2018, Worldsteel.org (Oct. 16, 2017) | Public |
| 78 | Steel Tubes and Pipes Committee of the Korea Iron & Steel Association, Monthly Report for the Second Week of February to the Second Week of March of 2017 (2017) | Public |
| 79 | Nice Rating, Restructuring of Steel Industry Depends on the Speed and the Will: Regarding the Issuance of the Proposal for Strengthening of the Competitiveness of the Steel Industry, NICE Investors Service (Sept. 30, 2016) | Public |
| 80 | Ko Jae-man and Moon Ji-woong, Hyundai Steel, Dongkuk Steel become latest beneficiaries of fast-track restructuring program, Pulse by Maeil Business News Korea (Nov. 23, 2016) | Public |
| 81 | Ahn Sung-mi, Hyundai Steel strongly denies merger with POSCO, The Investor, Korea Herald (Nov. 1, 2016) | Public |
| 82 | Voices growing for merger of POSCO, Hyundai Steel, Korea Times, South East Asia Iron and Steel Institute (SEAISI) (Sept. 22, 2016) | Public |
| 83 | Jung Min-hee, Korean Steel Industry Advised to Reduce Number of Steel Plate Plants by Half, Business Korea (Sept. 19, 2016) | Public |
| 84 | Ahn Sung-mi, POSCO, Hyundai Steel merger to benefit industry: report, Korea Herald (Sept. 9, 2016) | Public |
| 85 | [<br><br>] {Petitioners' BPI} | Public |
| 86 | Severe Excess Supply in Steel Pipe, Cold Rolled and Plate Sectors…Concerns Loom over Dongkook Steel and SeAH Group, Invest Chosun (May 20, 2016) | Public |
| 87 | POSCO 2016 Investors Forum Q&A | Public |
| 88 | POSCO 2016 1Q Q&A | Public |
| 89 | The Effect of Imports of Steel on the National Security – An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, As Amended | Public |
| 90 | The current capacity shake-up in steel and how the industry is adapting (2018) | Public |
| 91 | Michael Pooler and Emily Feng, Steel industry grapples with curse of oversupply (Oct. 29, 2017) | Public |
| 92 | Korea Fair Trade Commission, KFTC punishes six steel pipe manufacturers for rigging bids offered by Korea Gas Corporation (Dec. 21, 2017) | Public |
| 93 | Park Jae-hyuk, Steelmakers fined W92 bil. for bid rigging, Korea Times (Dec. 20, 2017) | Public |

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
**PUBLIC VERSION**

| | EXHIBIT LIST | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| 94 | Decision No. 2017-081, Korea Fair Trade Commission (Dec. 21, 2017). | Public |
| 95 | Decision No. 98-134, Korea Fair Trade Commission (July 7, 1998) | Public |
| 96 | Decision No. 97-45, Korea Fair Trade Commission (1997) | Public |
| 97 | Ahn Joon-ho, KEPCO Runs up Huge Quarterly Loss, The Chosunilbo (Aug. 14, 2018) | Public |
| 98 | Ahn Joon-ho, KEPCO Runs up Huge Quarterly Loss, The Chosunilbo (Aug. 14, 2018). | Public |
| 99 | KEPCO Electric Rates Table (May 7, 2018) | Public |
| 100 | Electric Rates Table – Industrial Service, KEPCO | Public |
| 101 | Energy Prices and Taxes – Quarterly Statistics – Second Quarter 2017, International Energy Agency (2017), excerpt | Public |
| 102 | KEPCO, Electric Rates Table (2015) | Public |
| 103 | Causes of the Crisis in the Electricity Industry and Future Policy Directions (2013) | Public |
| 104 | CORE Korea AD AR 16-17 Post-Prelim PMS Memo | Public |
| 105 | Global Trade Monitor – Steel Exports Report, China (Feb. 2019) | Public |
| 106 | Global Trade Monitor – Steel Exports Report, South Korea (Sept. 2018) | Public |
| 107 | Global Trade Monitor – Steel Imports Report, South Korea (Nov. 2018) | Public |
| 108 | OECD Steel Market Developments Q4 2018 | Public |
| 109 | OECD Steel Market Developments Q2 2018 | Public |
| 110 | OECD Steel Market Developments Q4 2017 | Public |
| 111 | South Korean Production & Apparent Consumption of Steel, 2009-2017 | Public |
| 112 | GTIS, China Export Statistics for Hot-Rolled Products by Value, 2017-2018 | Public |

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
PUBLIC VERSION

| EXHIBIT LIST | | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| 113 | GTIS, China Export Statistics for Hot-Rolled Products by Quantity, 2013-2018 | Public |
| 114 | GTIS, Korean Imports of Hot-Rolled Sheet Products from China, 2010-2018 | Public |
| 115 | GTIS, Chinese Exports of Hot-Rolled Sheet Products to Korea, 2010-2018 | Public |
| 116 | GTIS, South Korea Import Statistics for Hot-Rolled Products, 2013-2018 | Public |
| 117 | GTIS, Summary of Korea Imports of Hot-Rolled Coil and Plate, 2013-2018 | Public |
| 118 | GTIS, Korea Imports of Hot-Rolled Coil and Plate Products by Country Source, 2013-2018 | Public |
| 119 | GTIS, Summary Statistics for China's Export AUVs of Hot-Rolled Products by Destination Country, 2017-2018 | Public |
| 120 | POSCO 2017 Earnings Release | Public |
| 121 | POSCO 2018 Earnings Release | Public |
| 122 | World Steel Association – World Steel Statistical Yearbook 2017 | Public |
| 123 | World Steel Association – World Steel Statistical Yearbook 2018 | Public |
| 124 | Summary of Global Steel Market, 2013-2018 | Public |
| 125 | OECD Global Steel Production Capacity, 2006-2016 | Public |
| 126 | OECD Capacity Developments in the World Steel Industry (2017) | Public |
| 127 | OECD Recent Developments in Steelmaking Capacity (2018) | Public |
| 128 | International Steel Statistics Bureau Data Regarding Hot-Rolled Imports to Korea, 9/1/17 – 8/31/18 | Public |
| 129 | UN Comtrade, World Market Price Data for Hot-Rolled Products, 9/1/17 – 8/31/18 | Public |
| 130 | UN Comtrade, Korean Purchases of Hot-Rolled Coils, 2017 | Public |
| 131 | U.S. Federal Reserve, Foreign Exchange Rates – G.5A (2019) | Public |

Barcode:3814772-01 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC VERSION

| EXHIBIT LIST | | |
|---|---|---|
| **Exhibit No.** | **Exhibit** | **Security** |
| 132 | Korean Won / U.S. Dollar Exchange Rate, 2017 and 2018 Daily | Public |
| 133 | KEPCO Form 20-F, April 30, 2018 | Public |
| 134 | KEPCO Form 20-F, April 28, 2017 | Public |
| 135 | KEPCO Form 20-F, April 29, 2016 | Public |
| 136 | Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty admin. rev.; 2016-2017) | Public |

Barcode:3814772-13 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

# EXHIBIT 10

Case 1:20-cv-03898-CRK   Document 61-3   Filed 11/03/21   Page 147 of 2032

Barcode:3814772-13 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

THE MIDDLE SEAT      ⊗

Hear from Scott McCartney on Boeing and other airline news and insights. **Sign Up Now**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
https://www.djreprints.com.

https://www.wsj.com/articles/south-korea-sends-another-5-billion-to-hyundai-merchant-marine-1539163810

WSJ LOGISTICS REPORT

# South Korea Hands Another $5 Billion to Hyundai Merchant Marine

The new state backing will finance orders for megaships as the container-ship operator struggles to stay afloat



The Hyundai Forward container ship docked in Busan, South Korea. **PHOTO:** SEONG JOON CHO/BLOOMBERG NEWS

*By Costas Paris*
Updated Oct. 10, 2018 7:34 a.m. ET

South Korea's Hyundai Merchant Marine 011200 **-1.32%** ▼ is getting another $5 billion in state funding to finance a series of new orders for megaships as the company tries to compete with bigger Asian and European rivals in a difficult container shipping market.

HMM, the country's de facto flag carrier after the collapse of Hanjin Shipping Co. in 2016, will spend $2.8 billion to buy 20 large container vessels from South Korean shipbuilders. The rest of the money will likely be used to buy container terminals, according to people involved in the matter.

The state intervention to prop up the struggling container ship operator reflects the willingness of Asian governments to stand behind national carriers that move billions worth of

Filed By: caprice@wileyrein.com, Filed Date: 4/3/19 4:41 PM, Submission Status: Approved

exports to Western markets and the local shipyards that build their vessels.

---

ALSO IN LOGISTICS

---

- XPO Logistics Adjusts Guidance Off Customer Bankruptcy October 31, 2018

The financing was partly arranged by Korea Ocean Business Corp., a government body established in July to support a shipping sector that is considered critical to the country's economy but which has been foundering since a global downturn in maritime business.

"Let's say it's a government investment," one person involved in the matter said. "Korea must keep its place in global shipping. It's a national interest issue."

Korea's struggling shipbuilders— Daewoo Shipbuilding & Marine Engineering Co. Samsung Heavy Industries Co. and Hyundai Heavy Industries Co. —will split a new order of 12 behemoths that can move 23,000 containers each and another eight smaller vessels, according to the people familiar with the matter.

"The order couldn't have come at a better time," said a senior executive at one of the three yards, asking not to be named. "Orders have dried up and we are desperate for revenue to keep us going."

HMM controls 1.8% of the global container capacity, while the world's top five container operators hold a combined 65% share of the market. It narrowly escaped default last year with a $660 million state bailout and has been losing money for years.

Similar bailout packages have been arranged over the years for the shipbuilders.

The state aid has infuriated European shipowners, who are asking the European Union to take punitive measures against Seoul to end what they call "unfair trade practices."

Container ships, move $4 trillion worth of manufactured good a year, but industry operators have been weighed down by a glut of ships in the water and below-cost freight rates, pushing most companies into deep losses and some, like Hanjin, out of business.

The European Community Shipowners' Association, a trade body representing most owners across Europe, said the bailouts distort markets and add to global overcapacity.

"Part of this plan is also to secure stable cargoes for Korean flagged vessels, which is a flag reservation of a particularly protectionist character," said Martin Dorsman, ECSA's, secretary-general.

HMM moves roughly a quarter of South Korea's exports.

## Logistics Report

Top news and in-depth analysis on the world of logistics, from supply chain to transport and technology.

[ SIGN UP ]     [ PREVIEW → ]

Lars Jensen, chief executive of Copenhagen-based SeaIntelligence Consulting, said the order is a risky move by HMM to build capacity.

"They are after volume growth, which is costing them dearly," Mr. Jensen said. "Their volumes grew 17% in the second quarter, seven times more than much bigger (German) rival Hapag-Lloyd , which lost $25 per container. HMM lost $169 per container."

The Korean carrier reported a $215 million overall loss in the second quarter, one of the worst performances in the industry.

HMM's relatively small share of global shipping volumes leaves it in a precarious position, and subject to freight rates set by bigger carriers with bigger ships. The operator is too small for any scale advantages and the company's ships are too big for niche markets, like intra-Asia sailings, that have been a bright spot in an otherwise depressed container shipping market.

"HMM is unsustainable and nobody wants to buy it," Mr. Jensen said. "Korea lost Hanjin in an embarrassing mess so it will keep HMM going for as much as it can, despite all its problems. If nothing else, it's one of the best clients for the Korean yards."

### Corrections & Amplifications
Hyundai Merchant Marine last year received a $660 million state bailout. An earlier version of this article incorrectly stated the amount in billions.

Write to Costas Paris at costas.paris@wsj.com

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 4:41 PM, Submission Status: Approved

Barcode:3814772-135 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

# EXHIBIT 64

Barcode:3814772-135 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

**U.S. Imports of Carbon and Alloy Oil Country Tubular Goods**

*Imported Quantity (Metric Tons)*

| Item | Calendar Year | | | Year to Date - January - March | | 12 Month Period | Percent Share |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2017 | 2018 | | |
| Korea | 615,734 | 310,641 | 1,044,028 | 250,131 | 262,882 | 1,056,779 | 32.24% |
| Mexico | 248,324 | 270,455 | 422,280 | 110,435 | 109,120 | 420,965 | 12.84% |
| Canada | 98,447 | 37,035 | 182,845 | 31,072 | 57,927 | 209,700 | 6.40% |
| Argentina | 86,901 | 49,413 | 192,606 | 39,346 | 50,656 | 203,915 | 6.22% |
| Brazil | 69,506 | 18,795 | 145,194 | 8,304 | 45,997 | 182,886 | 5.58% |
| Russia | 57,911 | 63,915 | 126,464 | 818 | 45,559 | 171,205 | 5.22% |
| Taiwan | 82,530 | 16,315 | 129,298 | 18,813 | 45,015 | 155,500 | 4.74% |
| Austria | 81,462 | 63,753 | 141,311 | 33,186 | 32,809 | 140,933 | 4.30% |
| Japan | 136,737 | 31,525 | 84,143 | 13,039 | 23,220 | 94,323 | 2.88% |
| Spain | 42,607 | 19,069 | 68,917 | 6,990 | 27,694 | 89,621 | 2.73% |
| Subtotal | 1,520,158 | 880,916 | 2,537,083 | 512,133 | 700,879 | 2,725,829 | 83.15% |
| | | | | | | | |
| All Others | 432,705 | 119,604 | 506,625 | 70,796 | 116,473 | 552,303 | 16.85% |
| TOTAL IMPORTS | 1,952,864 | 1,000,519 | 3,043,709 | 582,929 | 817,352 | 3,278,132 | |

*Imported Value (U.S. Dollars)*

| Item | Calendar Year | | | Year to Date - January - March | | 12 Month Period | Percent Share |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2017 | 2018 | | |
| Korea | 563,732,115 | 185,019,292 | 804,298,148 | 160,391,605 | 218,355,089 | 862,261,632 | 26.25% |
| Mexico | 438,006,428 | 334,484,450 | 526,597,692 | 131,772,207 | 152,615,473 | 547,440,958 | 16.67% |
| Canada | 163,609,850 | 50,020,494 | 233,941,066 | 36,371,904 | 80,265,363 | 277,834,525 | 8.46% |
| Argentina | 147,077,263 | 49,536,541 | 195,966,767 | 39,308,303 | 62,651,329 | 219,309,793 | 6.68% |
| Brazil | 87,661,395 | 9,146,063 | 137,147,585 | 6,912,251 | 42,358,557 | 172,593,891 | 5.26% |
| Russia | 63,616,904 | 39,949,162 | 100,223,717 | 722,739 | 42,999,705 | 142,500,683 | 4.34% |
| Taiwan | 65,797,590 | 10,199,825 | 88,973,165 | 9,572,718 | 34,346,263 | 113,746,710 | 3.46% |
| Austria | 134,045,855 | 69,280,825 | 162,304,566 | 33,160,229 | 45,491,754 | 174,636,091 | 5.32% |
| Japan | 263,463,894 | 64,771,431 | 114,075,766 | 15,258,835 | 36,519,312 | 135,336,243 | 4.12% |
| Spain | 59,468,680 | 18,861,777 | 81,198,749 | 6,602,842 | 34,929,330 | 109,525,237 | 3.33% |
| Subtotal | 1,986,479,974 | 831,269,860 | 2,444,727,221 | 440,073,633 | 750,532,175 | 2,755,185,763 | 83.89% |
| | | | | | | | |
| All Others | 614,579,403 | 135,385,103 | 474,839,149 | 71,208,900 | 125,446,420 | 529,076,669 | 16.11% |
| TOTAL IMPORTS | 2,601,059,377 | 966,654,963 | 2,919,566,370 | 511,282,533 | 875,978,595 | 3,284,262,432 | |

*Average Unit Value (U.S. Dollars)*

| Item | Calendar Year | | | Year to Date - January - March | | 12 Month Period |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2017 | 2018 | |
| Korea | $ 915.54 | $ 595.60 | $ 770.38 | $ 641.23 | $ 830.62 | $ 815.93 |
| Mexico | $ 1,763.85 | $ 1,236.75 | $ 1,247.03 | $ 1,193.21 | $ 1,398.60 | $ 1,300.44 |
| Canada | $ 1,661.91 | $ 1,350.62 | $ 1,279.45 | $ 1,170.58 | $ 1,385.62 | $ 1,324.91 |
| Argentina | $ 1,692.46 | $ 1,002.50 | $ 1,017.45 | $ 999.03 | $ 1,236.81 | $ 1,075.50 |
| Brazil | $ 1,261.20 | $ 486.63 | $ 944.58 | $ 832.42 | $ 920.91 | $ 943.72 |
| Russia | $ 1,098.54 | $ 625.04 | $ 792.51 | $ 883.72 | $ 943.82 | $ 832.34 |
| Taiwan | $ 797.26 | $ 625.18 | $ 688.12 | $ 508.84 | $ 762.99 | $ 731.49 |
| Austria | $ 1,645.50 | $ 1,086.71 | $ 1,148.57 | $ 999.22 | $ 1,386.58 | $ 1,239.14 |
| Japan | $ 1,926.80 | $ 2,054.59 | $ 1,355.74 | $ 1,170.21 | $ 1,572.76 | $ 1,434.81 |
| Spain | $ 1,395.76 | $ 989.13 | $ 1,178.22 | $ 944.64 | $ 1,261.25 | $ 1,222.09 |
| Subtotal | $ 1,306.76 | $ 943.64 | $ 963.60 | $ 859.30 | $ 1,070.84 | $ 1,010.77 |
| | | | | | | |
| All Others | $ 1,420.32 | $ 1,131.95 | $ 937.26 | $ 1,005.84 | $ 1,077.04 | $ 957.95 |
| TOTAL IMPORTS | $ 1,331.92 | $ 966.15 | $ 959.21 | $ 877.09 | $ 1,071.73 | $ 1,001.87 |

Source: U.S. International Trade Commission

# EXHIBIT 65

Barcode:3814772-135 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002013

대외배포용

# 철강산업

# 경쟁력 강화방안(안)

"범용 철강재 강국 → ⊠ 고부가 철강재⊠경량소재 강국⊠ 도약"

2016. 9. 30.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:18 PM, Submission Status: Approved

Barcode:3814772-135 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002014

동
합

관계부처

PUBLIC

002015

# 목 차

⊠. 산업 특성 ······································ 1

⊠. 글로벌 동향 및 수급전망 ············ 2

⊠. 산업 경쟁력 분석 ························· 8

⊠. 산업 정책방향 ····························· 13

⊠. 정책적 강화 방안 ······················· 14

　　1. 글로벌 경쟁력⊠수급을 고려한 사업 제편 ········ 14

　　2. 고부가 철강⊠제⊠경량소재의 조기개발 및 상용화 ······· 16

　　3. 친환경 제철공법 개발 및 스마트제철소 구축 ············· 19

Barcode:3814772-135 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002016

4. 새로운 철강 수출 시장 개척 ·················· 22

5. 선제적 통상 분쟁 대응 및 안전한 철강재 유통 ·········· 25

Ⅷ. 향후 추진일정(안) ········································ 27

PUBLIC

002017

# Ⅰ 산업 특성

## 1 전형적인 내수산업

□ 중량 대비 낮은 가격과 높은 운송비용으로 수출비중이 낮음

o 글로벌 총생산 대비 수출비중 20% 수준, 중국도 15%에 불과

o 미국(14%), EU(22%) 등 주요 국가의 수출비중도 낮은 수준

□ 다만, 한국과 일본은 가격, 품질경쟁력 기반으로 높은 수출비중 유지

o 低가격, 高품질의 수입 철광석 원료탄을 사용하는 대규모 임해 제철소(규모의 경제, 운송비)에서 가격 대비 高품질 철강재 생산

> * **수출/생산 비중**('15, %) : **(한)** 42.6 **(미)** 14.4 **(중)** 14.5 **(일)** 41.8 **(EU)** 22.0
> * **수입/내수 비중**('15, %) : **(한)** 39.5 **(미)** 38.1 **(중)** 9.4 **(일)** 9.4 **(EU)** 24.5

## 2 산업내 파괴적인 혁신이 어려운 성숙기 산업

□ 철강산업의 '자산 대비 부가가치 창출수준'은 낮고 하락 추세 지속

* **자산**(100) 대비 부가가치창출수준(철강/전체산업) : (10) 166 / 17.9 → (15) 12.1 / 16.9

□ 철강은 범용성이 있는 기초소재로 'STAR'급 제품개발에는 한계

* (예) 자동차용 강판 대비 (알루미늄) 무게 1/3, 강도 2배 (마그네슘) 무게 1/4, 강도 2배

PUBLIC

002018

3 **수요 변화에 대한 탄력적인 공급 조절 곤란**

□ 장치산업 특성상 탄력적인 공급 조절이 어렵고, 수요산업 경기 변동에 민감하여 호황과 불황이 주기적으로 반복

* 고로1기 투자에 약 3조원(3~7년), 암연셀비 투자는 약 6천억원(2~3년) 소요

* 건설(31), 자동차(30), 조선(20) 등 3개 산업이 전체 수요의 약 81% 차지

- 1 -

PUBLIC

002019

# Ⅱ 글로벌 철강 동향 및 수급 전망

## 1 글로벌 철강산업 동향

< 글로벌 철강 동향 개편 (OPENS) >



**분류무역약(P)**
수입규제조치 확대
국가간 통상마찰 증가

**은실기슨 규제 강화**
환경산업 투자 확대

**공급과잉(O)**
수요 침체
국제적 과잉해소 공조

**저질설비(N)**
설비 평준화
전세대 공법 개발

**철강제품(S)**
경량소재 등장
고부가 철강제 확대

+

(Overcapacity)

## 가. 중국내 수요 침체로 글로벌 공급과잉 심화

· 전세계 수요증가율(%) : ('01)2.2 → ('05)6.7 → ('14)0.7 → ('15)△9.0 → ('16)0.2
· 중국 수요증가율(%) : ('01)27.1 → ('05)25.9 → ('14)△3.3 → ('15)△5.4 → ('16)△0.1

□ '15년 글로벌 공급과잉 규모는 (조강능력 23.8억톤, 수요 16.3억톤)
   중국이 글로벌 공급과잉 중 60% (4.5억톤) 차지

ㅇ 중국은 '05년 이후 조강능력 증가(4.4 → 11.5억톤)한 반면,
   조강수요 증가는 (3.6 → 7.0억톤)에 불과

< 전세계 조강 공급과잉 추이 > (WSA)

(억톤)
22.7 → 23.8
6.2   7.5
18.8
4.7

< 중국의 조강 공급과잉 추이 > (WSA)

(억톤)
11.1 → 11.5
3.4    4.5
8.0

Barcode:3814772-136 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002020

□ 최근 철강 공급과잉 문제 해결을 이한 구체적 공조 노력 가시 처

o G20 정상회의 (중국, 9.4~5)에서 주요 생산국 간의 공급과잉 해소 방안 협의를 위한 '글로벌 포럼(Global Forum)' 출범에 합의 (선언문 채택)

– 2 –

PUBLIC

002021

나. 자국 철강산업 보호를 위한 수입규제 확산 추세 (Protectionism)

□ 중국의 순수출국 전환('06년), 수요 둔화 등으로 중국內 생산물량과 중국向 수출물량이 제3국으로 수출 전환 증가

ㅇ 특히, 중국은 잉여물량을 한국, ASEAN, EU 등으로 수출 확대

* 중국의 對세계 수출(만톤, WSA) : ('09) 2,397 → ('11) 4,790 → ('13) 6,154 → ('15) 11,156
  연평균 수출 증가율('09~'15) : 한국向(14.8%↑), ASEAN向(39.3%↑), EU向(29.1%↑)

< 중국의 무역구조 변화 (수입국 → 수출국) (철강업체) >



ㅇ 일본*을 제외한 주요 철강 소비국에서 자가 수입산 비중 확대**

* (일본) 대형종합상사가 일본內 유통물량 85% 담당, 해외제품 신규진입 어려움
  연평균 수입 증가율('09~'15, WSA) : 미국 (15.5%), EU (5.4%), 인도 (8.1%), ASEAN(10.4%)

** 이로 인해 각국은 내수시장 보호를 위한 수입규제조치 강화 중

□ 철강 수입규제조치(건, WTO.) : ('11) 71 ('12) 93 ('13) 115 ('14) 121 ('15) 159

다. 국제적인 온실가스 배출 규제 강화 (Environmental regulations)

Barcode:3814772-136 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002022

□ 전 세계 온실가스 배출량에서 발전부문을 제외한 최대 배출업종

* **온실가스 총배출량 중 철강산업 비중**('10) : **(전세계)** 약 5% **(국내)** 약 14%

□ 각국은 온실가스 감축과 대기환경 보전을 위해 철강산업 규제 강화

* **(EU) 철강사들의 에너지, 배출권거래제, 환경비용 등을 포함한 규제비용 부담은 톤당 평균** 14.49€ **수준** (열연강판 가격대비 2.3% 수준)

* **배출권거래제**(EU 시행, 중국 예정), **탄소세**(캐나다), **에너지효율 규제**(미, 중, 인도)

- 3 -

PUBLIC

002023

## 다. 설비 평준화 및 차세대 공법 개발 (New steelmaking process)

□ 전세계적 철강 설비 평준화* → 철강제품 경쟁력 확보를 위해 설비 운영 효율화(원료비, 물류비), 에너지효율(화)가 더욱 중요

　* 중국 철강업체 : '00년 이후 설비 확대하여 최신 설비 보유, 규모의 경제 확보

□ 철강 선도국은 국가 차원에서 차세대 친환경 제철공법 개발 중

☒ (일본 : Course 50) 5대 철강사, 대학, 연구소 참여('08年), 정부 250억엔 지원
☒ (EU : ULCOS) 15개국 48개 기관 참여('04~'20), 정부 1.4억유로 지원
☒ (미국 : A Novel Flash Ironmaking process) 에너지부 지원, 철강협회(AISI), 아르셀로미탈, US스틸, 유타대 등 참여

## 마. 강력한 대체소재 등장 및 고부가 철강제 비중 하락 (Specialty)

< 수요산업별 소재 변화방향 전망 (산업연구원) >

| 수요산업 변화방향 | 자동차산업 | 조선산업 | 건설산업 |
|---|---|---|---|
|  | 전통철강소재 경량화 | 고부가가치 선종 | 초고층화, 대형화 |
| 소재 변화 방향 | 고부가 신소재 확대 (철스크랩, 탄소강(유.硫.,Mg, Ti 등) | 고부가 철강강재 (크링공판(TMCP), 해양구조용강판(APT 2W) 등) | 전환경 고효율 소재 (AL, PVC, 탄소섬유 등) |

□ (대체소재) 플라스틱, 알루미늄, 타이타늄, 탄소섬유 등 초경량 소재 개발로 인한 전통적인 철강소재 대체 비중 증가 예상

☞자동차 · 선박 등 전통 수요산업에서 철강소재 비중 감소 전망
* 자동차 경량화 추세에 따라 철강소재 비중 축소: ('05) 64% → ('20) 53%
< 자동차 소재별 사용량 전망 (USAMP) >　< 선박 선종별 후판 비중(홍익산업연구원) >

Barcode:3814772-136 A-580-880 REV – Admin Review 9/1/17 – 8/31/18

PUBLIC

002024



□ (첨단강제) 기술개발을 통해 조선·건설 등 전통적 철강재 수요
산업에서 교부가·고기능성 철강소재 사용 확대 추세

– 4 –

PUBLIC

002025

## 2 주요 철강생산국 동향

### 일 본 ┃ 구조조정 완성 단계

□ 장기간 내수 침체로 3차례에 걸쳐 일관제철소 통합 : 2(대)+1(중) 체제

○ 대형화와 함께 설비감축을 통해 규모 합리화 병행 도모

* (설비능력) : ('75) 1.68 → ('15) 1.31억톤, (고로 개수) : ('76) 72 → ('16) 28개



□ 중소형 철강사는 특화 제품에 전문화하여 틈새 시장 지배력 강화

* JSW社 : 원자로 압력용기, 풍력발전 터빈 등 대형단조소재 부문에서 독보적 지위 유지, 최근 수요업체 인수합병 추진 ('15.5월 한국 압출기업체 SM출러버 인수)

Barcode:3814772-136 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002026

| 종 국 | 구조조정 개시 단계 |

□ 국무위 '철강산업 구조조정 방침'('20년까지 최대 1.5억톤 감축) 확정

o 과거와는 달리 구조조정 추진을 위한 실행력 확보*에 중점

* **구조조정자금**(500억위안(10조원)) : 화력발전 초과이윤 20% 회수 발전량에 대한 과세

* Bad Bank : 22개 지본금 400억위안 → '17년 32개 800억위안(16조원)으로 확대

* 환경감시기구 각상(지방 → 중앙), 지방공무원 평가에 구조조정 달성도 반영

- 5 -

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

PUBLIC

002027

□ 이를 통한 설비 가동률 확대 및 일관제철소 조대형화도 병행 추진

* 중국정부 비오산(宝山)과 우한(武汉)(중국4위) 합병 승인('16.9월) → 세계 2위 철강사 탄생

## E U    다국적 M&A를 통한 구조조정 진행 중

□ 일관제철소 대형화, 설비축소 및 강소형 전문철강회사 육성

o (아르셀로미탈社) 대형 M&A를 통한 다국적 초대형 철강사 탄생

- '06년 세계 1위 철강사 Mittal Steel社과 2위 Arcelor社간 합병,
  조강생산능력 1억톤이 넘는 초대형 철강사 Arcelor-Mittal 탄생

* 27개국(본사 : 룩셈부르크) 60여개 제철소, 종업원 30만명 이상으로 조강생산량
  98백만톤으로 미국(78.9백만톤), 러시아(71.1백만톤), 한국(69.7백만톤)을 능가

o (티센크루프社) '97년 합병(당시 세계 8위) 후 '11년부터 非핵심자산 매각

* '11년 이후 매출액 대비 23% 수준(자동차부품사업 등) 구조조정 추진 중

* 非철강사업으로 산업솔루션 열라베이터사업부문의 영업이익률('14) 10~15%

o (디링거社) 대형성박용 조강판 후판, 원유·천연가스 수송용 대형
  강관(400t 이상) 등 일관제철소와 차별화된 틈새시장 지배력 확보

< Arcelor-Mittal M&A 경과(철강협회) >     < Thysen-Krupp M&A 경과(철강협회) >

Barcode:3814772-136 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002028



– 6 –

PUBLIC

002029

# 3  국내외 철강제품 수급 전망

## 글로벌 수급: 현 7.5억톤 수준 이상의 공급 과잉 지속 전망

□ (조강수요) 중국 등 성장둔화로 현 16.3억톤 수준에서 연 1% 성장 예상**

* 주요국 수요성장 전망(CAGR, %) : 한국(△4.4), 중국(0.4), 일본(△0.2), 인도(3.8)
** 연평균 수요성장률(CAGR, %) : ('00~'15) 4.7 → ('15~'20**) 1.0

□ (조강능력) ('15) 23.8 → ('20) 23 ~ 28억톤 전망

○ 각국의 旣 계획 설비 모두 투입 時, 최대 28억톤으로 증가
○ 중국 설비 감축(1.5억톤)과 가능성 높은 계획 반영 時, 23억톤으로 감소

< 세계 ... 조강 산능력/생산량 전망 (단위: 억톤) >



**시나리오**

○수요증가
기존설비 유지

○설비축소
.기존설비 유지
(△0.5%/년)
.중국 감축
계획 반영
.가능성 높은
설비계획 반영

중국 감축
계획 미반영
설비계획
100% 실현

## 국내 수급: 조강은 과잉 우려수준 아니나, 품목 별 과잉 수준 다양

□ (조 강) '15년 조강능력 8,578만톤(고로 5,495, 전기로 3,083), 수요 6,967만톤
(생산중단 317만톤 고려 時, 명목생산능력과잉 16%) → 과잉 우려 수준 아님

· 설비의 정비.고장 등을 반영한 적정기동률(80~90%) 고려 時, 적정수준 평가

Barcode:3814772-136 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002030

○ 전기로 또는 '10년 이후 406만톤 → 죽소(증설 299만, 폐쇄·중지 705만톤)

□ (품목별) 수요산업(조선·에너지개발 등) 침체 → 후판·강관 등 파잉 우려

○ 후판은 조만간 설비과잉 예상, 강관은 현 파잉 수준 당분간 지속 전망

< 품목별 명목생산능력파잉 전망 (단위 : %, 교역포함, BCG) >

* 자재권 관련·비공개

- 7 -

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

PUBLIC

002031

# Ⅲ 산업 경쟁력 분석

## 1 철강산업 구조 및 현황

**산업구조** 조강생산 세계 6위, 철강재 소비 세계 5위 ('15년)

□ (위상) 전세계 조강생산의 4.3%(70백만톤), 철강재 소비의 3.8%(56백만톤)

< 국가별 조강생산 (백만톤, Worldsteel) >

| 구분 | 2015 | (비중 %) | 2014 |
|---|---|---|---|
| 전세계 | 1,620.9 | 100.0 | 1,699.9 |
| 중국 | 803.8 | 49.6 | 822.8 |
| 일본 | 105.2 | 6.5 | 110.7 |
| 인도 | 89.4 | 5.5 | 87.3 |
| 미국 | 78.8 | 4.9 | 88.2 |
| 러시아 | 70.9 | 4.4 | 71.5 |
| 한국 | 69.7 | 4.3 | 71.5 |

< 국가별 철강재 소비 (백만톤, Worldsteel) >

| 구분 | 2015 | (비중 %) | 1인당(kg) |
|---|---|---|---|
| 전세계 | 1,500.1 | 100.0 | 208.5 |
| 중국 | 672.3 | 43.4 | 488.6 |
| 미국 | 95.7 | 6.6 | 297.4 |
| 일본 | 79.5 | 5.6 | 60.6 |
| 인도 | 62.9 | 4.3 | 497.3 |
| 한국 | 56.0 | 3.8 | 1,082.9 |
| 러시아 | 39.4 | 2.4 | 274.6 |

□ (규모) 생산 108조원(6.2%), 부가가치 26조원(6.3%), 수출 302억불(5.7%), 사업체는 1,683개, 종사자는 9만4천명 ('14년, 수출입은 '15년 기준)

| 구분 | 사업체수 | 종업원수 | 생산액 | 부가가치 | 수출액 | 수입액 |
|---|---|---|---|---|---|---|
| 철강 | 1,683개 | 94천명 | 108조원 | 26조원 | 302억불 | 223억불 |
| (제조업내 비중) | (2.5%) | (3.2%) | (6.2%) | (6.3%) | (5.7%) | (6.9%) |

□ (구성) ①고로(철광석+원료탄), 전기로(철스크랩)에서 반제품을 만드는 上공정과 ②반제품을 받아 최종제품을 만드는 下공정으로 구성

< 국내 철강산업 가치사슬 ('15년 생산능력 기준) >

PUBLIC

002032



고로
(5,495만톤)

전기로
(3,083만톤)

열연(4,366만톤)

후판(1,279만톤)

냉연(2,710만톤)

강관(1,067만톤)

도금컬러(1,548만톤)

절근(1,245만톤)

형강(642만톤)

봉강(405만톤)

| 포스크, 현대 동부, 동국 등 39社 |
| 포스크, 현대, 동부 / 세아, 현대, 휴스틸 등 약 130社 |
| 현대, 동국 등 30社 |

* 고로업체(포스코, 현대제철)는 下공정 설비까지 갖춘 일관제철소

o (수요산업) 건설(30.7%), 자동차(30.4%), 조선(20.4%)이 대부분 차지

- 8 -

PUBLIC

002033

**국내시장 현황**    내수경쟁 심화, 업계간 수익 양극화

□ (내수시장) 일관제철사 신규 진입, 중국산 수입 확대로 경쟁 심화

o '10년 이후 현대제철(일관제철소 건설) 점유율은 증가한 반면, 포스코, 기타 전기로 업체의 점유율은 감소

* 시장점유율('09~'15, %) : 현대 17 → 26 , 포스코 56 → 46, 전기로(9개사) 24 → 20

o 건설용 위주로 중국산 철강재의 수입량·비중이 지속 증가 중, 품질이 향상된 저가 중국산 열연강판을 수입·가공하는 업체** 증가

< 중국산 철강재 수입 추이 (철강협회) >

| | '09 | '10 | '11 | '12 | '13 | '14 | '15 |
|---|---|---|---|---|---|---|---|
| 물량(만톤) | 597 | 869 | 1,020 | 1,024 | 993 | 1,341 | 1,374 |
| 시장점유율(%) | 13 | 17 | 18 | 19 | 19 | 24 | 25 |

* 국내 중국산 열연강판 가격차 : 118$/ton (국산 513, 중국산 395)
** (열연 → 냉연 일괄공정) 동국제강, 동부제철
** (열연 → 강판) 세아제강, 휴스틸 등

o 불공정(규제덤핑), 위조(원산지) 수입 철강재 유통으로 국민안전 위협 우려

* 품질관리 위반(실태조사) 46곳 총 17类 / 원산지 위반('13~'15, 관세청) 260건 5,504억원

□ (영업이익) 전제적으로 일관제철사(포스코, 현대제철)는 양호(9.2%)한 편, 전기로(셀렉트 등, 下부진(냉연, 강판 등) 기업은 부진(3.9%, '15년 기준)

o (일관제철) 과거 대비 영업이익은 하향추세이나, 최근 철광석, 유연탄 등 원료가격 하락*, 원가절감 등으로 실적 개선 추세

* 철광석 ($/dmt) : ('07) 52 → ('09) 58 → ('11) 169 → ('13) 135 → ('15) 56
유연탄 ($/dmt) : ('07) 88 → ('09) 168 → ('11) 261 → ('13) 133 → ('15) 81

PUBLIC

002034

o (非일관제철) 건설경기 회복 등의 영향으로 최악의 실적부진은 벗어나고 있으나, 일관제철사 대비 현저히 낮은 수준



< 일관·비일관제철 영업이익률 (철강협회) >

< 업종별 영업이익률 (철강협회) >

PUBLIC

002035

## 2  제철설비 경쟁력 분석

### 고로 / 세계 최대 규모, 최신설비 등 글로벌 경쟁력 보유

□ (전반) 일관제철사는 세계적 수준의 경쟁력*을 갖추고 있으로 평가

　* WSD(World Steel Dynamics) 경쟁력 평가 : 포스코 7년 연속 세계 1위('10~'16년)

○ 포스코 광양(2,465만톤), 포항(1,772만톤)은 단일제철소 기준 세계 1, 2위 규모, 현대제철소 당진에 대규모 최신 설비(400만톤×3기, '10년) 보유

□ (요소별) 기술혁신, 인적자원, 설비규모 등 측면에서 매우 우수, 원료(철광석, 원료탄) 조달 능력, 에너지 비용 등은 상대적 부족

⇒ 국내 일관제철사의 비용 경쟁력은 경쟁국(중국, 일본 등) 대비 우수

< WSD 평가('16.6월) 10점 만점 기준 >

| | 상위 평균 (107개사) | 포스코 | 현대제철 |
|---|---|---|---|
| 기술혁신 | | | |
| 원가경쟁력 | | | |
| 고부가가치종 | | | |
| 인적자원 | | | |
| 규모 | | | |
| 가공비 | | | |
| 원료조달 | | | |
| 에너지비용 | | | |

< 고로 생산제품 원가 평가 비교('16년 WSD) >



* 지재권 관련 비공개

### 전기로 / 중소社는 규모의 경제 확대 필요

□ (전반) 대형사(현대, 동국, 세아) 대비 중소 7개사(100만톤 규모) 경쟁력 부족

PUBLIC

002036

* 대형사는 중소사 대비 원재료비 2~3% 저렴, 제품가격은 1.5~3% 높음 (제강사 인터뷰)

□ (요소별) 에너지 비용 증가*, 스크랩가, 스크랩 공급** .가격 안정성 등 미흡

* 전기로 생산제품 원가 중 에너지비용 비중(BAt, %) : (10) 8.8 → (13) 11.5 → (16) 15.3
** 국내 소비 스크랩 중 23% 수입('15년), 고급 스크랩 공급은 부족

⇒ 중소 전기로社 비용경쟁력 부족, 중국산 반제품 수입* 증가 중

* 중국산 반제품(빌렛) 수입(천톤, 철강협회) : ('13) 6 → ('14) 303 → ('15) 516

– 10 –

PUBLIC

002037

## 3  주요 품목별 경쟁력 분석

### < 경쟁력 분석 요약 >

| 철강 제품 | 판재류 (열연, 냉연, 도금) | 후판 | 접근 형강 | 강판 |
|---|---|---|---|---|
| 제품 형태 | | | | |
| 품질 글로벌比 | 비용 품질 우위 | 비용 우위 | - | 종합경쟁력 우수 |
| 동국 국내比 | 비용 품질 우위 | 비용 열위 품질차 미미 | 비용 열위 품질 유사 | 중소사업자 취약 |
| 수요 전망 | 고부가 경량소재↑ | 조선 수요↓ | 건설 불황시 | 에너지 개발 저체 |
| 판매 구조 | 내수 + 수출 | 내수 중심 (일부 수출 전환中) | 내수 중심 | 내수 + 수출 |

판재류 생산비중 96%

□ 글로벌 경쟁력 보유, 고부가 제품 기술개발 부족

글로벌 경쟁력은 글로벌 별 최상위 수준*이나, 전기자동차(EV) 등
차량경량화, 내제소재 등장에 등에 대비, 고부가 기술개발**확대 필요

* (비용) 냉연(22% 우위), 아연도(26% 우위) / (품질) 유럽 OEM 국내산 구매 의향 높음
** 초경량 고기능 철강, 합금소재, 합금기술, 경향 신소재(Al.Mg 등) 등

< 냉연강판 원가 비교 (MB) >              < 아연도금강판 원가 비교 (MB)>

* 지재권 관련 비공개                      * 지재권 관련 비공개

PUBLIC

002038

**후판** (선박중심) 경쟁 우위 미흡, 수요산업(조선) 이전 수준 회복 불투명

□ 중국산 대비 비용 경쟁력 열위, 품질 격차도 미미하여 중국산 사용 확대 예상**되며, 국내 조선사 수요도 이전 수준 회복 어려움

* (비용) 글로벌 대비 9% 우위, 중국 대비 5% 열위 / (품질) 중국산 격차 미미
* 대형조선사 ('15) 20% 미만 → ('20) 30~20%, 중견조선사 ('15) 43% → ('20) 70%

- 11 -

PUBLIC

002039

< 후판 공급곡선 (WSD) >          < 중국업체와 비용경쟁력 비교 (WSD) >

* 지재권 관련 비공개              * 지재권 관련 비공개

**철근/형강** (생산비중 19%)

□ 중국산 대비 경쟁력 열위, 중국업체 국내시장 진출 화대 중

* (비용) 중국 대비 12~14% 열위 / (품질) 중국 대비 다소 우차 또는 유사
** 중국철강사 철근 KS : ('15) 12개 업체 23건 → ('16) 19개 업체 45건

< 철근 중국 vs 한국 비용 비교 (MB) >     < 형강 중국 vs 한국 비용 비교 (MB) >

* 지재권 관련 비공개              * 지재권 관련 비공개

**강판** (생산비중 7%)

□ 업체별 경쟁력 수준 다양, 수요침체로 사업 재편 진행 중

* 종합강판사* 대비 중소사업자(용접기술·직경크기 등) 경쟁력 위 아
* 현대제철(29.5%), 세아제강(20.5%) 등 다양한 종류의 강관 생산 (16.1분기 기준)

< 강관사업자 유형 및 경쟁력 비교 >



| 강관 종류 | 강관 사업자 유형 및 특징 | |
|---|---|---|
| 초대구경 (610mm 이상) | 종합강관사 등 | ● 대구경업자 |
| | | ● 해외 에너지개발 수요 중심, 자유가로 |

PUBLIC

002040

| 내구성<br>(406.4mm초과)<br>중소구경<br>(406.4mm미만) | 세일가스 개발 축소 등으로 수익성 악화 |
|---|---|
| •대형 업체 수요자 제품 다각화<br>•건설 등 내수시장 확보, 자구가에 따른 수요 감소 리스크 존재 | ● 중소구경사업자<br>•중소기업 만성적 低수익 구조 |

o 북미 에너지용(**유정용.송유관**) 수출 비중이 높아, 경기에 민감 → 에너지 개발 수요 위축으로 생산 부진, 일부기업 사업체편 중

* **수출 비중** 45%, **미국向** 50% / **對미국 수출(억불)** : ('13) 38 → ('14) 58 → ('15) 31

– 12 –

PUBLIC

002041

# Ⅳ 산업정책 방향

**비전**

범용철강재 강국 → 고부가 철강재. 경량소재. 경량소재 강국 도약

---

**철강 품목**  사업 재편 및 고부가 철강재. 경량소재 조기 개발

**방향 품목**
- ◆ 경쟁우위 품목은 수출. 고부가 비중 확대
- ◆ 수요. 공제 품목은 자발적 설비 감축을 유도
- ◆ 내수 품목은 국내 수요. 중증 수준에서 설비 유지

**세부 과제**
- ① 실체적인 설비조정 등 사업재편 지원
- ② 고부가 철강재. 경량소재의 조기개발 및 상용화
- ③ 철강 전문인력 육성 및 우수 기능인력 활용

---

**철강 설비**  친환경 제철공법 개발 및 스마트제철소 구축

**방향 설비**
- ◆ (고로) 차세대 친환경 설비로 전환, IT 활용 공정 혁신
- ◆ (전기로) 원료확보. 비용절감 통한 추가 가격경쟁력 확보

**세부 과제**
- ① 수소환원제철공법 개발 및 '스마트 제철소' 구축. 보급
- ② 철스크랩 유통 체계 선진화 및 대체 원료 개발

---

**수출.통상.안전**  수출품목 다변화 및 안전한 철강재 유통

PUBLIC

002042

| 배경 | ◈ 철강사+수요사 협업을 통해 녹산철강재 트랙레코드 확보<br>◈ 수입규제 피해 예방 및 부적합 철강재 유통 방지 |
|------|------|
| 세부과제 | ① 범용재 위주 → 고부가 설비.기술, O&M 등으로 수출 확대<br>② '수요社+중소社+철강社+전문인력' 공동 해외 진출<br>③ 민관협력 철강 통상 대응체계 강화<br>④ 안전한 철강재 유통 질서 확립 |

– 13 –

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

PUBLIC

002043

# V 경쟁력 강화 방안

## 1 글로벌 경쟁력·수급을 고려한 사업 재편

### 가. 판제류 : M&A·투자 등을 통해 수출 및 고부가제품 확대 지원

□ (M&A) 고부가 제품 수출 확대를 위해 메가 추진 중인 국내 판제류 기업 및 우수 생산설비의 M&A 지원

□ (투자) 친환경차용 고기능 철강재 및 경량 소재(Ti, Al, Mg), 이종(異種) 소재 접합 기술 등 미래 대비 R&D, 설비 투자 확대 유도
 ○ 자동차社와의 동반성장을 위해 초경량 강판, 신소재 개발 가속화

□ (수출확대) 통상 측면을 고려, 현행 최종제품(냉연 도금강판) 수출에서 반제품 수출(열연 슬래브), 최종제품 현지생산 방식으로 전환 유도
 ○ 글로벌 공급과잉 고려 시, 신설 투자보다는 현지 공장 인수 고려

### 나. 후 판 : 조선산업 수요를 고려하여 생산능력 단계적 감축 유도

□ (설비조정) 조선산업 수요(국내 조선사 수주량)와 해외 경쟁기업 동향(수입재 추이)을 보아가며 설비의 단계적 감축 적극 유도

PUBLIC

002044

o 국내 조선사 실제 수주 물량, 수입산 후판 가격 및 물량, 후판 수출량 변화 등을 지속 모니터링하여 수급 현황 파악

o 후판 설비 조정 시, 교포에서 생산하는 반제품의 처리 방안 협의

□ (사업재편) 사업자의 후판설비 감축·매각, 후판사업 분할, 교부가 분야로의 투자 확대 등 유도

- 14 -

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

PUBLIC

002045

다. 철근·형강·내수시장 상황을 고려하여 중장기 설비 재편 유도

□ (설비조정) 국내수요 증축 수준으로 생산설비 규모를 유지하면서, 중장기적으로 수입재와 경쟁여건 등을 고려하여 설비 조정* 검토

* 전기로사업 : 유휴사업자 분석 時, 규모의 경제를 통한 원재료 비용 절감 가능성

라. 강·판·전문기업 육성 + 低경쟁력 업체의 자발적 재편 유도

□ (전문화) 경쟁력을 확보한 종합 또는 전문강관업체는 한계기업 보유자산(설비, 부지)의 선택적 인수와 숙련인력은 고용승계 유도

ㅇ 시너지가 부족한 종복설비는 해외 매각 처리 지원 (종합상사 연계)

□ (시장 건전화) 강관사 등 한계기업*은 자연 퇴출·사업전환 유도

* (예시) 2년 이상 이자보상배율이 1 이하인 기업 등

마. 정부는「기업활력법」활용하여 사업재편 적극 지원

□ (기업활력법) 기업의 과잉설비 감축, 신사업 투자 등 선제적 사업 재편* 추진 시, '기활법'을 활용하여 세제·금융·절차간소화 지원

PUBLIC

002046

☞ 철강 사업재편 예상 분야 : ① 판재류 생산설비 인수·매각, ② 후판 설비 매각 및 소규모 분할, ③ 전기로 설비 조정, ④ 강관사업자의 한계기업 우수 자산 선택적 인수, ⑤ 강관사업자의 설비·부지 매각 등

ㅇ 고부가 제품 개발·시설 투자에 필요한 자금*, R&D** 등 최우선 지원

* 산업은행 사업재편 전용자금, 기업투자촉진프로그램 등
** 산업부 주력산업 핵심기술개발 등 R&D사업에서 가점 지원

- 15 -

PUBLIC

002047

## 2 고부가 철강재 · 경량소재의 조기개발 및 상용화

### 가. 핵심기술 개발 및 설비 투자

◇ 3대 고부가 철강재 (미래차, 에너지, 건설), 3대 경량소재 (타이타늄, 마그네슘, 알루미늄) R&D 및 시설 투자

**맥**

ㅇ **수요산업의 미래 트렌드 변화에 대비, 고부가 철강재의 조기 개발, 상용화를 통해 글로벌 시장 선점 필요**

- 중장기적으로 철강을 대체할 **초경량 신소재**(마그네슘, 타이타늄) **수요에도 대비할 필요**

**경**

* 경량소재 전세계 시장규모 : ('15년) 175조원 → ('23년) 400조원
* 해외 신소재 개발 사례 : (미국) Light Weight Material Project(에너지부, '12년, '13년) (일본) 미래개척연구프로젝트 (경산성, '13년)

□ 고부가 철강재 R&D                  ('22년)

ㅇ (분야) 미래차, 에너지(자원개발, 발전설비), 건설, 인프라

| 자동차 | 에너지 | 건설 |
|---|---|---|
| 친환경, 경량화, 고강도 | 극한환경(심해,셰이가스 극지), 고효율(초내열), 신재생(경량화) | 친환경, 고강도 안전 (내화, 내진) |

ㅇ (전략) 조기 단계부터 수요기업 + 철강사 협업을 통해 R&D, 실증 추진하여 상용화 성공률 제고 (EVI 전략 : Early Vendor Involvement)

PUBLIC

002048

o (미래지향) 시장 선점을 위해 **초고장력강판\*(고강도·고성형성·경량화, 경량화**
20%↑), **다중소재접합기술\*\* (경량화** 40%↑) 개발                        (15~'22년)

  * **강도가** 1GPa **이상 급으로 일반강판(**340~500MPa) **대비** 1.6배 **고가 예상**
  ** **철강재·알루미늄·마그네슘 등 이종소재와의 용접 및 부식방지 기술**

o (에너지용) 셰일가스 구한 제굴환경에 적합한 고강도 유정용강권\*,
  고효율 화력발전소용 초내열 합금강 개발                        (13~'21년)

  * **일반유정比** 5배이상 값이, **고온·고압 고부식 / 일반 강판 대비** 4.2배 **고가 예상**

– 16 –

PUBLIC

002049

o (건설용) 국민 안전을 강화하기 위한 초고층·초대형 건축물용 고강도·내진·내화 철강제 개발 (16~21년)

□ 경량소재 R&D 및 시설투자

R&D                    (17~23년 예비타당성 조사 실시 중)

o (3대 소재) 타이타늄(Ti), 마그네슘(Mg), 알루미늄(Al)
* (Ti) 철강比 무게 1/2, 강도 4배, (Al) 무게 1/3, 강도 2배, (Mg) 무게 1/4, 강도 2배

o (목표) '23년 타이타늄(소재) 기술 완전자립화, 세계 4번째 수출국, 마그네슘(강판) 세계 시장점유율 1위, 알루미늄(강판) 5위 달성

o (전략) 융합 얼라이언스를 구축·가동하여 국가 R&D로 추진
- 수요기업(방산기업, 자동차사) + 소재기업·대학·연구소 협업
- 소재 → 중간재 → 부품 全주기별 수요 연계 핵심기술 개발 집중

o (항공용 고강도 타이타늄) ❶ 원천소재 자립화 및 합금소재 개발('20), ❷ 항공 부품용 가공기술 개발·사업화('19), ❸ 파일럿 플랜트 구축('17~20)
- 방산사업과 연계하여 트랙레코드 확보, 글로벌 수요기업과 협력

o (미래차용 초경량 마그네슘·알루미늄 합금) ❶ 합금소재 기술 확보('19), ❷ 최적화 가공기술 개발('19), ❸ 파일럿 플랜트 구축('20~22)
- 국내 생산 차기자동차에 우선 적용 후, 이를 기반으로 해외 진출

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002050

설비투자

('17~'21년, 4개사 투자 계획 종)

○ (계획) 타이타늄, 마그네슘 상용화·생산 설비 등에 대규모 투자

○ (내용) 소재·강판   제조설비와   단조·압연설비   구축·증설   및
부품업체 기술협력·출자 등에 투자 유도

– 17 –

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

PUBLIC

002051

## 나. 철강 전문인력 양성 및 활용

◇ 산·학·연 협력을 통해 철강전문인력 육성·우수인력 활용 제고

| 배경 | ○ 인구절벽, 고령화, 베이비붐 세대 퇴직 등 사회구조 변화에 따른 고급 전문인력 급감으로 철강산업 기술경쟁력 유지·제고 어려움<br>* 철강업 연구·개발 인력 2.8%, 기술직 14.1% (12년 철강협회 실태조사) |
| --- | --- |
| 경로 | ○ 핵심 기술 교육 기반 이·퇴 및 제대자, 전직자 대상 고부가 기술 교육 부족 |

□ (우수인력 육성) '제철소 모든 지역 철강사 + 대학 + 연구소' 협력 교육프로그램 운영 → 철강산업 우수 연구인력 양성

**(산업전문인력 역량강화사업 내 철강교육 프로그램 마련)**

○ (거점) 철강업 우수 연구개발 인력 확충, 혁신역량 제고 등 목적 '기(起)철강 산학연 지역거점 협력센터' 지정, 교육·훈련 제공

* 서울·전남·충남(당진) 등 지역 검토 (현재 포스텍 철강대학원이 유일)

○ (협업) ❶ 대학 : 부지, 전문, 교육과정 개발, ❷ 철강사 : 연구실습 장비, 퇴직 전문인력 제공, ❸ 연구소 : 기초 연구과제 기획

□ (전직자) '기업협력체고범'에 따른 사업제편 승인 기업이 설비 감축 추진 시, 유휴 인력에 대해 고부가 분야 재교육 등 제공

○ 해당 인력의 사내 전환배치를 장려하고, 고용유지 목적으로 추진

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002052

휴직·훈련 등에 대해 '고용유지 지원금' 지급

o 불가피한 실직에 대해서는 연관 전직 훈련* 및 맞춤형 재취업** 지원

* (고용부) 사업재편 승인 기업 훈련비 지원비율 상향(중소기업 90→100% → 100%, 1,000인미만 60% → 80%, 1,000인 이상기업 40 → 60%)

** (고용부) 취업성공패키지 프로그램 통한 사업재편승인 기업 : 소득제한요건 완화 (중위소득 100% 이하 → 150% 이하))

- 전직자 훈련 프로그램(설비 진단 컨설팅 강의 역량 등) 개선·운영 (철강협회)

- 18 -

PUBLIC

002053

**3**  **친환경 제철공법 개발 및 스마트제철소 구축**

**가. 친환경 공법 개발·적용**

◇ 온실가스 15% 감축 가능한 「수소환원제철공법」 개발에 민관 공동 투자

| | |
|---|---|
| 배경 | ○ 현존 제철기술로는 '30년 철강산업 온실가스 감축목표 달성이 사실상 불가능 예상 → 근본적인 $CO_2$ 저감 기술 개발 필요<br>　* 철강은 국내 총 배출량(694.5백만톤)의 14.3%(99.3백만톤) 차지 ('13년)<br>　 기존 공법에서는 에너지 효율 등을 통해 최대 3% 감축 가능<br>○ 이울러, 철강 부산물 활용을 극대화하는 친환경 공법 개발 필요 |

□ (수소환원제철) 쇳물 생산을 위해 기존 석탄대신 수소를 활용하여 $CO_2$ 배출을 15% 저감하는 '수소환원제철공법' 개발 ('17~'23년)

< 기초 공법 >

철광석 ＋ 석탄 ＝ 철강 ＋ $CO_2$
$Fe_2O_3$ 　 C 　 Fe 　 (이산화탄소)

< 수소환원제철공법 >

철광석 ＋ 수소 ＝ 철강 ＋ $H_2O$
$Fe_2O_3$ 　 $H_2$ 　 Fe 　 (물)

○ ❶ 기술개발·Demo plant 구축 (~'23년), ❷ 시범 적용(~'25년) 후
　❸ '30년까지 고로 2기, '40년까지 고로 12기 신공법 전환

　* $CO_2$ 감축수준/투자비용 : (2기) 1.6% / 0.8조원 → (12기) 8.7% / 4.8조원

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002054

□ (자원 활용) 부산물* 재활용, 재생자원 회수 등 친환경 공법 개발

　* 제강/전로 전기로 슬래그(로) 슬래그 1천만톤 : 50% 단순 매립 / 고로 슬래그 : 시멘트 원료

　o 철강 부산물(슬래그)을 매립하는 대신, 제강 원료 재활용* 또는
　　고가 금속 회수** 기술 개발　　　　　　　　　　　　　('17~'22년)

　* 재활용 → 공정폐기물 배출 억제 및 저품위 철 저품위 철 스크랩 대체 가능
　** 철강 부산물에서 아연, 철, 니켈 등 추출 → 자성재료 비철원료, 전자재료 활용

- 19 -

PUBLIC

002055

나. 스마트 제철소 구축·보급

◇ 첨단 IT기술을 활용한 '스마트 제철소'를 구현하여 공정효율 극대화

| 배경 | ○ 초기 자동화 수준의 제철 공정에 첨단 IT기술 적용을 확대하여 설비 관리, 생산 품질 확보 및 경제적 생산체계 구축 필요<br>- 고부가 철강재 양산 체계 구축*을 위해 스마트 기술이 요구되며, 고령화에 따른 숙련공 감소에 대비하여 공정의 시스템화 필요<br>　* 일반강(1.1%) 대비 고부가 철강재(4.8%) 품질 부적합률 4배 (PAI 사례) |

□ (스마트 제철소) IT 활용 첨단 제철 설비 운영 시스템 개발·확산

☒ PA사 후판 공장 대상 스마트 제철소 시범 구축중 (17.12월 목표)
　· 재선·제강·연주 공정 全 공정 자동화, IoT기술 기반 조업·품질·설비 관리

○ 센서·빅데이터 분석 기반 ❶ 설비 진단·고장 예측 정비*, ❷ 철강재 품질 예측·관리**, ❸ 조업 제어·자동화 ❹에너지 효율 시스템 구축 (연계)
　* (예시) 빅데이터, 딥러닝을 이용한 고로 관리, 설비 이상 상태 진단
　** (예시) RMS(Roll Management System)를 활용한 압연롤 관리 및 표면품질 예측 등

○ 정부는 스마트 제철소 관련 핵심 표준화* (철강대기업-중소정비·가공사 협력), 기술개발, 솔루션 해외 진출 등 지원
　* 철강 공정별 참조모델 업체간 데이터 연계 모델·운영시스템·진단평가모델 등

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002056

□ (중소社 스마트화) 중소 전기로·下공정·가공社 대상 스마트공장 보급

○ 중소 철강업체에 적합한 지능형 조업시스템* 개발(17년~), 산업부·
지자체·철강·철강 대기업 재원 등 활용하여 보급 지원

   * (예시) 에너지 저감 조업 시스템, 설비 원격 제어·자동화 등

   - 스마트공장 지원대상 기업 선정시, 가점(5점) 부여하고 신속 지원

– 20 –

PUBLIC

002057

## 다. 철강 원료 경쟁력 확보 지원

◇ 철스크랩 대체원료 개발 및 유통·가공 전문사 육성을 통해 경쟁력 제고

| | |
|---|---|
| 배경 | ○ (전기로) 고급 철스크랩 부족, 철스크랩 유통 구조 복잡, 비효율 → 고급 철스크랩 대체 기술과 철스크랩 유통 가공 전문업체 육성 필요<br>○ (고로·전기로) 수입 원료에 대한 관세 부과로 경쟁력이 저하 |

□ (대체 원료) 공급 부족한 고급 철스크랩 대체 공법 개발 ('17~'20년)

○ 고급 철스크랩 → 직접환원철(DRI)로 대체기술을 개발하여 원료 경쟁력 확보 (원료비 15% 예상)

* 직접환원철 : 철광석을 고체상태에서 가스($CO$, $H_2$)를 사용하여 鐵原을 제조 ☞불순물이 거의 없어 고급 철스크랩의 대체원료로 사용 가능

○ ❶ 시멘트 제조용 운후 설비 활용, 직접환원철 생산기술 개발 → ❷ 전기로 시범 적용 (수요업체와 협업) → ❸ 화비 공급

□ (철스크랩) 지역별·등급별 전문 철스크랩 유통·가공업체 육성 (연구용역 우선 추진 : '17년 上)

○ 실태조사를 통해 철스크랩 등급 상세 규격 개정(형태, 발생처별 등급 → 불순물별 등급 포함), 검수·가공 기준 표준화 등 실시

○ 지역별 철스크랩 전문 가공(시범공장 지정 운영 (선단 입주, 장비 지원 등)

PUBLIC

002058

- 산업단지 업무를 위해 지자체, 산업단지공단 등과 협의 주진

* '원료재생업'으로 '산업법상 입주는 가능하나, '산업단지기본계획'에 환경
  인허가기관과 협의하도록 규정

□ (원료 세재검토면) 현재 기본관세율을 부과 중인 철강 副원료*에 할당
  관세 적용 여부 검토                                              ('17년)

  * 관세율 : 폐로크롬(2%), 폐로실리콘(2%), 탄소전극(5%), 코크스(3%) 등

– 21 –

PUBLIC

002059

## 3  새로운 철강 수출시장 개척

### 가. 철강 수출 품목 다변화

◇ 기존 범용제품 중심 → 고부가 철강제품, 기술 · 설비, 서비스 수출 확대

| | |
|---|---|
| 배경 | o 품질, 가격 경쟁력을 보유한 범용 철강재 중심으로 수출이나, 후발국과의 경쟁 강화, 각국의 수입규제 확대 등으로 어려움에 봉착 |
| | ⇒ 새로운 수출 품목 발굴 및 시장 개척 수출전략 전환 필요 |

□ (고부가) 개념·실증이 완료된 고부가 철강제 조기 수출 지원

o (대표품목) 에너지, 플랜트 분야 해마로강, 해수식강, 耐해수강 등

o (마케팅 지원) 철강업계의 해외 현지 제품 설명회 개최 등 지원
(대상 : 해외진출 국내 발전사, 건설·엔지니어링사 등)

* 고부가제품 현지 설명회 : 중국('16.10월), 일본('17.3월) 등

o (부품사 수출) 고부가 철강제를 사용하는 중소부품社 발굴 (16 : 3개 → '18 : 50개), 글로벌 파트너링(GP)* 사업을 통해 수출 지원

* GP 가점 무역관(40개소), GP 종합·맞춤형 상담회 → 글로벌기업 수요 발굴, 중소 소재부품기업에 연결하여 수출하여 수출 지원

PUBLIC

002060

□ (설비) 첨단 제철기술·설비 수출 및 유휴설비 해외 매각 촉진

o (첨단설비) 국내에서 개발·상용화한 기존 설비 대비 低 투자비, 低 원가, 低 환경오염 첨단 설비(FINEX, CEM)의 신시장 진출 지원

| ☒ FINEX : 기존 고로 공법에 비해 공정 단축(철광석→소결광, 유연탄→코크스 생략) |
| ☒ CEM : 슬라브의 냉각 과정 없이 고온 상태로 압연 → 가공비, 에너지비 절감 |

* 중국('13.9월), 인도('15.3월), 이란('16.2월) FINEX 설비투자 MOA 체결

– 22 –

PUBLIC

002061

- 정부간 협력체계, 정상, 정부급회담 등 활용하여 수출 계약 지원

- 대기업(소재), 중소기업(설비제조), 한전(전력), 무역보험공사(금융) 등 협업하여 설비 수출을 지원

○ (유휴설비) 가동 중단으로 인한 유휴 설비의 해외 매각 촉진 지원

- '설비 + 운영 노우하우 + 전문인력'을 폐기지양하여 수출

- 전문 무역상사, 기계거래소 등과 협업하여 해외 수요처를 발굴

□ (서비스) 철강 설비 운영, 기술서비스, 전문인력 등 수출 동반화

○ (O&M) 국내 기업의 해외 제철소 인수·지분 투자, 설비 수출 등과 연계하여 설비 운영(O&M) 기술·서비스 수출 촉진

⊠ **(사례)** PA-브라질 **철강사 기술협력계약**(기술자재전, 작업표준서 개발, 기술출장 등)
  PA-인니 **철강사 기술이전계약**(기술호트, 기술자재전, 한국방문 연수 등)

- 수출 박람회, 상담회 등에 O&M 부스를 설치하여 수출 지원 **(코트라)**

○ (인력 진출) 철강 숙련 기술자를 해외 전문가로 양성, 해외 진출

- 숙련 기술자가 철강 후발국에 전문기술 강사, 컨설턴트로 진출

- 해외진출자 대상 컨설팅, 강의 역량 강화 교육과정 운영 **(철강협회)**

- 철강협회**(숙련기술자 관리)**와 해외취업알선기관**(해외 철강기업 발굴)**간

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002062

협력을 통해 해외취업 지원

\* **산업인력공단 민간해외취업알선사업에서 해외취업 해외취업 성공에 대한 알선수수료 지원**

ㅇ (연수·교육) 해외 철강업 종사자 대상 기술 위탁 연수 위탁 연수 서비스 제공

- 철강 후발국 엔지니어를 초청하여 철강기술, 공정, 설비 교육 (**업계**)

– 23 –

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

3814772-137 A-580-880 REV - Admin Review 9/1/17 – 8/31/18

Case 1:20-cv-03898-CRK    Document 81-2    Filed 11/03/21    Page 203 of 2032

Barcode:3814772-137 A-580-880 REV – Admin Review 9/1/17 – 8/31/18

PUBLIC

002063

## 나. 수요社 + 철강社 협업過 협업 기반 해외 진출

◇ 소재-제품-수요 협업을 통한 국내 트랙레코드 확보 및 동반 진출

**배경**

○ 고기능 철강·경량소재는 개발 완료 후 해외 진출 본격화를 위해 **국내 트랙레코드 확보가 필수적**

□ (트랙레코드) '철강사 + 설비제작사 + 수요공기업'이 협업, **新개발** 철강재의 트랙레코드 우선 확보 → 가격, 품질 검증, 해외 수출

○ 정부 주관으로 철강 + 수요공기업간 우선구매, 공동개발, 성과 공유 MOU 체결 지원

☒ (사례) P社와 발전사가 협력, **내마모강**(남부발전 석탄 이송설비), **내부식강**(남동발전 탈황설비, 열교환기 배관) 테스트베드 확보

○ ❶ 수요기업 대상 설명회 개최, ❷ 신기술 인증(NET, NEP)을 통한 우선구매 유도, ❸ 소재 규격 개정, ❹ 부품 R&D** 등 병행 지원

 * (예시) 국가로 합금강의 LNG저장탱크 적용을 위해 **고망간소인전관리법** 시행규칙 제62조에 따른 관련 기준 신설 (제품 실증후 '17.상반기 신설 예정)

 ** (예시) LNG배관용 고망간강 배관부품 개발 지원('13~'16년)

□ (플랜트 진출) 국내기업의 발전소, 플랜트 설비 해외 진출 시, 국산 우수 철강재 동반 수출 (한전 발전사 300여개 해외발전사업 등 대상)

☒ (사례) 인니 재래발 발전소(중부발전), 중국 감방두제(S원) (현재 34% 지분투자) 국산 철강재 사용

○ 발전사 해외사업 협의* 時, 국내 소재 수출 효과를 반영하여 검토

PUBLIC

002064

* 공기업 해외 SPC설립 이전, 산업부·기재부 사전협의(공기업 경영 및 혁신 지침)

□ (부품사 동반진출) 국내 철강사가 해외 현지 가공센터 설치 시, 국내 중소 부품사 동반 진출 유도

☒ (사례) POSCO가 멕시코 선재가공센터(고부가선재 제조업체), 중국 자동차부품가공센터 (자동차부품제조업체) 설립 시, 국내 부품사 동반 진출

o 해외투자진출 정보, 금융 등 컨설팅·상담 지원, 한국투자기업지원 센터(7개국 12개 무역관)를 통해 현지 진출과 정착 지원    (코트라)

- 24 -

PUBLIC

002065

4 | 선제적 통상 분쟁 대응 및 안전한 철강재 유통

가. 민관협력 철강 통상대응체제 강화

◇ 업계의 자율적인 수출시장 관리와 철저한 조사 대응 지원
◇ 범부처 차원의 공동대응 및 통상채널을 활용한 협의 강화 병행

■ 현재 한국산 철강재는 19개국에서 81건의 규제 조사 중이며, 최근 들어 무역구제조치에 피소되는 사례 급증 추세
  * 피소 건수 : ('91~'00) 10 → ('01~'10) 17 → ('11~'16.8월) 76
  - 특히, 주요 수출시장인 미국(철강재 총 수출의 13%), ASEAN(19%), 인도(6%) 등을 중심으로 수입규제 확대

□ (대응체제 강화) 민관 합동 '수입규제협의회' 구성·운영('16.9월~)
  * 산업부(통상정책국, 업종별 담당과), 외교부 등 유관부처, 무역협회, 업종단체 등
  ○ 주요 수출국 수입규제 동향을 파악·분석하고 업계와 사전공유
  ○ 범부처 차원의 수입규제 대응전략을 마련하고 공동해결 노력 경주
  ○ 중소기업 대상 수입규제 대응 세미나·교육 등 제공

□ (양자, 다자 채널) 정부간 통상협의채널을 다각적으로 적극적으로 활용
  ○ WTO 분쟁제규범회의*(연 2회) 등을 통해 불합리한 수입규제 공조 대응
  * 각국의 교주화시점 철강수출규모의 불합리한 세이프가드에 대해 협정 준수 촉구*('16.8)

PUBLIC

002066

o 양자 협의 체기에 논리적인 설득을 통해 수입규제 완화 유도

□ (조기 경보 시스템) 주요 수출품목에 대한 체계적 모니터링 (철강협회)

o 품목별 수출물량, 가격 변화율 분석하여 업체와 사전 협의. 공유

o 주요 수출국 동향 파악(업계, 현지 로펌, 재외공관(상무관), 무역협회, 무역관 등 글로벌 네트워크 활용) 및 수출 증가 원인 등 분석

- 25 -

PUBLIC

002067

## 나. 안전한 철강제 유통 질서 확립

◇ 부적합 철강제의 수입 · 유통을 원천 차단, 안전 철강제 사용 확대

| 배경 |
| --- |
| ■ 최근 지진 등 자연재해 증가로 안전 철강제 보급 확산 모색 필요 |
| * 국내 건축물 내진설계 비율 18%, 내화비율 0% (구조물시장규모 연 6조원) |
| ○ 불량(규격미달), 위조(원산지표시 위반) 철강제의 수입 및 유통으로 인해 국민안전 위협 또는 시장 교란 우려 |

□ (안전 철강재) 고강도, 내진, 내화 건설용 철강제 사용 확대 지원

o 일반 철강제 대비 내진, 내화 성능이 대폭 강화된 철강제 기술 개발(산업부), KS 표준 제정(국표원) 지원

☒ 내진 철근 : 기술개발('16.7월 착수, 고강도 항복강도 700MPa급, 인장/항복강도비 1.25배 이상), KS표준 시행('16.9월, 400, 500MPa급 내진철근, KSD 3504)

☒ 내화 철강 : 기술개발('16.7월 착수, 고온(600℃)에서 상온 강도의 2/3이상)

□ (규격 강화) 건축물·시설물의 안전성 향상을 위해 건설 구조용 철강제 KS 기준 상향 조정 (강도 기준 : 유럽표준(EN) 수준)

o 24종 철강제 KS규격(철강·판재·강관) 개정 고시('16.10월) 및 시행('17.1월)

- 예고고시('16.6~7월), 표준판단 국제회의('16.5월 아태지역협의제, '16.7월 한중일표준협력제)를 통해 국내 업계 및 해외국가에 도기 기 통보

o 공공 가로시설물에 사용된 철강제 비규격 철강제에 대한 실태조사('17.상) 후

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

002068

지자체와 협력하여 규격 철강재로 교체 추진

* **안전펜스,** STS**가로등, 볼라드 등 단체표준에서** KSD 3536 **사용토록 규정**

□ (점검.단속) 범정부 협력하여 KS 인증 위조.원산지 허위 표시,
품질관리 위반 등 부적합 철강재 점검.단속
**(국조실, 국토부, 관세청, 국표원)**

○ 통관(원산지).유통(위변조).건설현장(품질관리) 등 단계별 관리 강화

- 26 -

PUBLIC

002069

# VI 향후 추진일정(안)

| 추진 과제 | 담당기관 | '16년 상 | '16년 하 | '17년 상 | '17년 하 | '18년 상 | '18년 하 |
|---|---|---|---|---|---|---|---|
| **1. 글로벌 경쟁력·수급을 고려한 사업 재편** | | | | | | | |
| ① 선제적 사업재편 및 설비 조정 지원 | 산업부 | | | | | | |
| **2. 고부가 철강재·경량소재의 조기개발 및 상용화** | | | | | | | |
| ① 핵심기술 개발 및 설비 투자 | 산업부 | | | | | | |
| ② 철강 전문인력 양성 및 활용 | 산업부, 고용부 | | | | | | |
| **3. 친환경 제철공법 개발 및 스마트제철소 구축** | | | | | | | |
| ① 친환경 공법 개발·적용 | 산업부 | | | | | | |
| ② 스마트 제철소 구축·보급 | 산업부 | | | | | | |
| ③ 철강 원료 경쟁력 확보 지원 | 산업부, 기재부 | | | | | | |
| **4. 새로운 철강 수출 시장의 개척** | | | | | | | |
| ① 철강 수출 품목 다변화 | 산업부 | | | | | | |
| ② 수요촌 + 철강촌 협업 기반 해외 진출 | 산업부 | | | | | | |

PUBLIC

002070

## 5. 신체적 통상 분쟁 대응 및 안전한 철강재 유통

| | | | | | |
|---|---|---|---|---|---|
| ⑤ 민관협력 철강 통상대응체계 강화 | 산업부 외교부 국조실 | | | | |
| ⑥ 안전한 철강재 유통 질서 확립 | 산업부 국토부 관세청 | | | | |

– 27 –

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

검색어를 입력하세요 🔍

사이트맵 | ENG

정보공개    민원·참여    알림·뉴스    정책·정보    예산·법령    소개·안내

🏠 › 알림·뉴스 › 보도자료 › 보도/해

## 알림·뉴스

### 보도/해명

공지사항

사업공고

채용정보

보도자료
　보도/해명
　주간보도계획
　대변인브리핑

정책뉴스

포상공개검증

기업활력법 공표사항

| | | | |
|---|---|---|---|
| 제목 | 철강산업과 석유화학산업의 경쟁력 강화방안 | | |
| 담당자 | 한종호 | 담당부서 | 철강화학과 |
| 연락처 | 044-203-4284 | | |
| 등록일 | 2016-09-30 | 조회수/추천 | 2,099 |

내용

"범용 소재" → "글로벌 첨단.고부가 소재" 강국으로 도약을 위한
**철강·석유화학 산업, 경쟁력 강화 밑그림 제시**

< 철강산업 경쟁력 강화를 위한 『5대 핵심전략』 >

❶ 친환경 및 정보기술(IT)화를 통한 설비 경쟁력 강화

❷ 경쟁 우위 품목의 인수합병(M&A). 투자 확대를 통한 고부가화 유도

❸ 경쟁열위·공급과잉 품목에 대한 사업재편 지원

❹ 고부가 철강재 및 경량소재 등의 조기 개발

❺ 새로운 수출시장 개척과 부적합 철강재 유통 방지

< 석유화학산업 경쟁력 강화를 위한 『5대 핵심전략』 >

❶ 현행 납사분해설비(NCC) 설비의 국제 경쟁력 유지와 운영관리(O&M) 서비스사업화 지원

❷ 경쟁열위 품목에 대한 사업재편 지원

❸ 핵심기술 확보를 통한 첨단정밀화학산업 육성

❹ 고부가 정밀화학산업 성장을 위한 대규모 클러스터 조성

❺ 사고.재난으로부터 안전한 석유화학단지 조성

ㅁ 정부는 '16. 9.30(금) 15시, 정부서울청사에서 유일호 경제부총리 주재로 열린 '제5차 산업경쟁력 강화 관계장관회의'*에서,

* 9.30(금) 15:00 ~ 16:00, 정부서울청사 19층 영상회의실

ㅇ 『철강산업 경쟁력 강화방안』과 『석유화학산업 경쟁력 강화방안』을 확정.발표

ㅁ 오늘 관계장관회의에 앞서 9.28 (수) 주형환 산업통상자원부 장관이 주재하고 관계부처 차관들이 참석한 '제3차 산업구조조정 분과회의'에서

ㅇ '철강산업'과 '석유화학산업'의 경쟁력 강화방안'을 논의

태그

첨부파일
📄 0930 (참고자료) 철강화학과, 경쟁력강화방안.pdf [588.6 KB]
📄 0930 (참고자료) 철강화학과, 경쟁력강화방안.hwp [223.2 KB]
📄 (붙임1) 철강산업 경쟁력 강화 방안.hwp [3.3 MB]
📄 (붙임2)석유화학산업 경쟁력 강화 방안.hwp [768.5 KB]

목록

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

| 이전글 | 전기요금을 절감 받을 수 있는 태양광 용량 ... |
| 다음글 | 2016년 9월 수출입 동향 |

이용안내 · **개인정보처리방침** · 저작권 정책 · 행정서비스헌장 · 행정정보공개청구 · 조직 및 전화번호안내

고객감동센터 1577-0900 / 당직실 044-203-4000

(우)30118 세종특별자치시 한누리대로 402 12동, 13동 신업통상자원부
Copyright©2016 산업통상자원부. All Rights Reserved.





경제혁신

산업통상자원부 **보도참고자료**

http://www.motie.go.kr

**2016년 9월 30일(금) 15시 30분부터 보도해주시기 바랍니다.**

| 배포일시 | 2016. 9. 30 (금) | 담당부서 | 철강화학과 |
|---|---|---|---|
| 담당과장 | 김종철 과장(044-203-4280) | 담 당 자 | 이재석 사무관 (044-203-4285)<br>한종호 사무관 (044-203-4284) |

---

## "범용 소재" → "글로벌 첨단·고부가 소재" 강국으로 도약을 위한
## 철강 · 석유화학 산업, 경쟁력 강화 밑그림 제시

### < 철강산업 경쟁력 강화를 위한 「5대 핵심전략」>
❶ 친환경 및 정보기술(IT)화를 통한 설비 경쟁력 강화
❷ 경쟁우위 품목의 인수합병(M&A)·투자 확대를 통한 고부가화 유도
❸ 경쟁열위·공급과잉 품목에 대한 사업재편 지원
❹ 고부가 철강재 및 경량소재 등의 조기 개발
❺ 새로운 수출시장 개척과 부적합 철강재 유통 방지

### < 석유화학산업 경쟁력 강화를 위한 「5대 핵심전략」>
❶ 현행 납사분해설비(NCC) 설비의 글로벌 경쟁력 유지와 O&M 서비스사업화 지원
❷ 경쟁열위 품목에 대한 사업재편 지원
❸ 핵심기술 확보를 통한 첨단정밀화학산업 육성
❹ 고부가 정밀화학산업 성장을 위한 대규모 클러스터 조성
❺ 사고·재난으로부터 안전한 석유화학단지 조성

---

□ 정부는 '16. 9.30(금) 15시, 정부서울청사에서 유일호 경제부총리 주재로
  열린 '제5차 산업경쟁력 강화 관계장관회의*'에서,

   * 9.30(금) 15:00~16:00, 정부서울청사 19층 영상회의실

○ 「철강산업 경쟁력 강화방안」과 「석유화학산업 경쟁력 강화방안」을
  확정·발표

Filed By: aprice@wileyrein.com, Filed Date: 11/3/19 6:21 PM, Submission Status: Approved

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

☐ 오늘 관계장관회의에 앞서 9.28.(수) 주형환 산업통상자원부 장관이 주재하고 관계부처 차관들이 참석한 '제3차 산업구조조정 분과회의'에서

　○ '철강산업'과 '석유화학산업'의 경쟁력 강화방안'을 논의

## 1. 경쟁력 강화 방안 수립배경 및 의의

☐ '철강산업'과 '석유화학산업'의 경쟁력 강화방안을 수립한 배경과 그간 경과를 살펴보면,

　○ 지난 6월 '제1차 산업경쟁력 강화 관계장관회의'에서 '업계 자율로 관련 업종에 대해 외부 컨설팅을 추진했다. 정부는 그 결과를 참조해 산업경쟁력 강화 방안을 마련한다'는 기본원칙을 결정

　○ 업계는 철강협회와 석유화학협회를 중심으로 공신력 높은 세계적인 컨설팅 회사를 선정해 업종별로 국제적인 수급전망과 설비, 품목에 대한 경쟁력 진단을 실시

　　\* (철강) 보스톤컨설팅그룹(BCG), (석유화학) Bain&Company

　○ 이와 동시에 업계 및 산·학·연 전문가들의 의견을 충분히 수렴하고 해외사례도 면밀히 분석하는 한편, 민간 컨설팅 결과도 최대한 참조해 이번 범정부 대책을 마련

☐ 이번 경쟁력 강화방안은 해당 산업의 비전과 설비·품목별 재편 방향 등을 구체적으로 제시함으로써 산업별로 나아가야할 밑그림을 보여줬다는데 그 의의가 있음.

☐ 또한, 업계 자율로 추진된 컨설팅 결과를 바탕으로 정부의 종합적인 경쟁력강화 대책이 마련됨으로써 향후 관련 산업의 선제적인 사업 재편도 속도감 있게 추진할 것으로 예상

## 2. 철강산업 경쟁력 강화방안

─────── < 5대 핵심 전략 > ───────

❶ 친환경 및 정보기술(IT)화를 통한 설비 경쟁력 강화

❷ 경쟁우위 품목의 인수합병(M&A) · 투자확대를 통한 고부가화 유도

❸ 경쟁열위 · 공급과잉 품목에 대한 사업재편 지원

❹ 고부가 철강재 및 경량소재 등의 조기 개발

❺ 새로운 수출시장 개척과 부적합 철강재 유통 방지

### < 설비경쟁력 강화 >

### ① 고로는 차세대 친환경 설비로의 전환을 지원

○ 고로는 세계 최대규모(포스코 광양 · 포항 세계 1, 2위), 최신 대형설비 (현대제철 당진) 등 글로벌 최고 수준의 경쟁력을 유지하면서,

  * WSD(World Steel Dynamics) 경쟁력 평가 : 포스코 7년 연속 세계 1위('10~'16년)

○ 국제적 온실가스 감축 움직임에 대응하기 위해 '17년부터 민관 공동으로 쇳물 생산을 위해 석탄(C) 대신 수소($H_2$)를 활용하여 온실가스 15% 감축이 가능한 "수소환원제철공법" 개발에 본격 착수

  * '17년~'23년까지 민관 공동으로 기술개발 완료 후, 고로에 단계적으로 적용 예정

### ② 전기로는 원료 확보, 비용 절감 등 경쟁력 확보를 지원

○ 전기로는 고비용 구조, 고급 철스크랩 부족 등으로 경쟁력이 미흡하고, 특히, 중소제강사(철근, 형강 등) 경쟁력이 취약하므로,

  * 대형社는 중소社 대비 원재료(철스크랩) 비용 2~5%↓, 제품가격(철근)은 1.5~3%↑

○ 고급 철스크랩의 안정적 공급을 위해 철스크랩 유통·가공체계 개선과 대체원료 개발을 지원

　　* 지역별·등급별 전문 철스크랩 유통·가공업체 육성방안 마련('17년 상반기)
　　* 거점별 철스크랩 전문 가공시범공장 지정 운영 추진 ('17년 하반기)

### ③ 정보기술(IT)을 활용한 '스마트 제철소' 보급을 통해 공정혁신을 지원

○ 특히, 표준화, 핵심기술개발 등과 함께, 중소 철강업체 대상으로 조업 자동화·품질관리 등 지능형 조업시스템을 단계적으로 보급

　　* 현 스마트공장 보급 프로그램(산업부)와 연계하여 중소 제강사를 대상으로 우선 지원('17년)

## < 품목별 경쟁력 강화 방안 >

### ① 경쟁우위 품목은 수출·고부가 제품 비중 확대를 중점 지원

○ 판재류는 가격·품질 측면에서 글로벌 경쟁력을 보유하고 있으나, 차량 경량화와 대체소재 등장에 미리 대비해야 하므로,

　- 기존 업체간 연구개발(M&A)과 신규 투자를 통해 제품의 고부가화와 세계 시장개척을 촉진하고,

　- 미래자동차·항공기용 초경량 철강제품, 타이타늄 등 경량소재 생산을 위한 연구개발(R&D), 첨단설비에 대한 과감한 투자를 적극 지원

### ② 수요 침체 품목은 자발적인 설비 감축을 유도할 계획

○ 후판은 조선 등 수요산업이 더디게 회복될 것으로 전망되므로,

　- 후판설비 감축·매각, 후판사업 분할 등을 통해 단기적으로 현재 생산능력 1,459만 톤에서 업계 스스로 감축방안을 마련하여 적정수준으로 조정하고,

　- '20까지 수요산업과 해외경쟁기업 동향을 감안, 추가 조정 유도

○ 강관은 경쟁열위의 중소 사업자가 난립(130여개)되어 있고, 북미 에너지 개발 수요 위축으로 공급과잉이 우려되므로,

- 경쟁력을 확보한 강관업체 중심으로 한계기업이 보유한 우수 설비, 숙련인력의 인수를 '기활법'을 통해 유도하는 한편,

- 유정용강관 등 **고부가 제품으로의 전환을 위한 민관 공동 연구개발 (R&D)를 통해 개발된 제품을 국내 공기업의 협조하여 실증·시범 적용 추진**

  ＊ 셰일가스 기술개발 완료 후('14~'17), 가스공사·석유공사의 캐나다·미국 소재 광구를 테스트베드로 활용 지원('17~'19)을 통해 실제 수출로 연계

## ③ 내수품목은 국내 수요 충당 수준에서 설비규모 유지 및 설비 개선

○ 철근, 형강은 수입산 대비 경쟁력이 취약하므로 내수 수준의 설비를 유지하면서, 불량·위조 수입재 유통방지 등 시장관리에 역점

  - 중장기적으로 수입재와 경쟁여건 등을 고려하여 설비 조정도 검토

## < 고부가 철강재·경량소재 조기 개발 >

## ① 3대 분야 고부가 철강재 : 미래차, 에너지, 건설용

○ 고부가 철강재에 대한 연구개발(R&D) 대폭 강화 및 개발·실증 지원해 선진국 대비 기술격차를 대폭 축소 ('15년 약 1.5년 → '18년 약 0.6년)

  ＊ 초고장력 강판, 다중소재 접합기술, 초내열합금강 등 총 8개 과제 완료(~'22년)

○ 특히, 개발 초기단계부터 수요기업과 철강사간 협력을 통해 공동 연구 개발(R&D)을 추진해 상용화 성공률 제고 ('14년 약 40% → '18년 약 50%)

## ② 3대 경량소재 : 타이타늄, 마그네슘, 알루미늄

○ 방산기업, 자동차 등 수요기업과 철강기업, 대학, 연구소가 참여 하는 융합 얼라이언스를 구축해 국가 연구개발(R&D)로 추진 ('17년 예타 진행중)

  ＊ '23년 타이타늄 기술 완전 자립화, 세계시장 점유율(마그네슘강판 1위, 알루미늄강판 5위)

### ③ '철강사+대학+연구소' 협력을 통해 전문인력양성 프로그램을 신설

○ 철강 연구개발(R&D) 인력 양성을 위한 「철강 산학연 지역거점 협력센터」 지정

  * 산업전문인력 역량강화사업(산업부)와 연계하여 서울·전남(광양)·충남(당진) 등 소재 대학(석·박사) 지정 추진 (현재, 포스텍 철강대학원'이 유일)

○ '기업활력제고법'에 따른 사업재편 승인 기업이 설비 감축 추진 시, 유휴인력에 대해 전직교육 실시 (철강협회 주관, 고용부 「직업능력개발훈련지원금」 활용)

## < 수출·통상·안전 대책 >

### ① 높아가는 무역장벽 극복 위해 새로운 수출시장 개척을 지원

○ 경쟁이 심한 범용 철강재 중심에서 고기능 철강재, 기술·설비(파이넥스공법 (FINEX), 유휴설비), 운영관리(O&M)서비스 등으로 수출 품목을 다양화

  * 유휴설비(전기로·후판 등)는 설비와 함께 '운영 노하우 + 전문인력' 패키지 수출
  * 중국('13.9월)·인도('15.3월)·이란('16.2월) 파이넥스공법(FINEX) 설비투자 거래 조건협정서(MOA) 체결

○ 철강사와 수요기업의 협업*을 통해 국산 철강재의 트랙레코드를 확보하여 해외 플랜트 시장에 동반 진출**

  * 철강사 + 수요공기업간 공동 기술개발·성과공유 양해각서(MOU) 체결 지원
  ** (사례) P사와 발전사가 협력, 내마모강(남부발전 석탄 이송설비), 내부식강(남동발전 탈황설비·열교환기 배관) 협력사업 추진 중

○ ❶ 수요기업 대상 설명회 개최, ❷ 신기술 인증(NET, NEP)을 통한 우선 구매 유도, ❸ 소재 규격 개정*, ❶ 부품 연구개발(R&D)** 등 병행 지원

  * (예) 극저온 합금강의 액화천연가스(LNG)저장탱크에 적용을 위해 「고압가스안전관 리법 시행규칙」 제62조에 따른 관련 기준 신설 (제품 실증 후 '17.상반기 신설 예정)
  ** (예) 'LNG배관용 고망간강 배관부품 개발' 지원 ('13~'16년)

○ 해외 발전소·플랜트 설비 진출 시, 국산 우수 철강재 동반 수출 (한전·발전사 30여개 해외발전사업 등 대상)

  * (사례) 인니 찌레본 발전소(중부발전), 중국격맹국제능원(한전 34% 지분투자) 등

## ② 선제적 통상 대응체계를 구축하고, 안전한 철강재 유통환경을 조성

○ 최근 주요 수출시장에서 한국산 철강재에 대한 반덤핑·상계관세 등 수입규제에 대한 **정부·업계·전문가 합동 대응체제 운영**

  * 한국산 철강재 피소 건수 : ('91~'00) 10 → ('01~'10) 17 → ('11~'16.8월) 76

< 민관 합동 '수입규제협의회" 구성·운영 ('16.9.6 출범) >

┌─────────────────────────────────────────────────┐
· (구성) 산업부, 외교부 등 유관부처, 무역협회, 업종단체 등
· (활동) 분기별 1회 (현안 발생시 수시 개최)
   – 주요 수출국 수입규제 동향을 파악·분석하고 업계와 사전공유
   – 범부처 차원의 수입규제 대응전략을 마련하고 공동해결 노력 경주
   – 중소기업 대상 수입규제 대응 세미나·교육 등 제공
└─────────────────────────────────────────────────┘

○ 정부간 다양한 **통상협의채널**을 다각적으로 최대한 활용하면서, **세계무역기구(WTO)정례규범회의**[*](연 2회) 등을 통해 **불합리한 수입규제 대응**

  * 각국이 공조해 철강수입국의 불합리한 긴급수입제한조치(세이프가드)에 대해 세계무역기구(WTO) 협정 준수 촉구('16.4)

○ 최근 지진 등 재해·사고 증가로 인해 **안전한 철강재 보급**에 대한 국민들의 관심을 반영하여 **제품 개발** 및 **규격 상향** 등 조기 실시

  * ①일반 철강재 대비 내진·내화 성능이 대폭 강화된 고기능 철강재기술 개발 (산업부), 한국산업규격(KS) 표준 제정(국표원) 지원

┌─────────────────────────────────────────────────┐
· 내진철근 : 기술개발 ('16.7월 착수, 고강도(항복강도 700MPa급), 인장/항복강도비 1.25배 이상)
           한국산업규격(KS)표준 시행('16.9월, 400~600MPa급 내진철근, KSD 3504)
· 내화형강 : 기술개발 ('16.7월 착수, 520MPa, 고온(600℃)에서 상온 강도의 2/3이상)
└─────────────────────────────────────────────────┘

  * ② 건축물·시설물 등 건설 구조용 철강재  한국산업규격(KS) 기준 상향 (유럽표준 수준) 조정
    – 24종 철강재 한국산업규격(KS)(형강·판재·강관) 개정 고시('16.10월) 및 시행('17.1월)

○ **공공 가로시설물**에 사용된 비규격 철강재에 대한 실태조사('17.상) 후 지자체와 협력하여 규격 철강재로 교체 추진

  * 안전펜스, 스테인리스(STS)가로등, 볼라드는 단체표준에서 KSD 3536 사용토록 규정

○ 한국산업규격(KS) 위조, 원산지 허위, 품질관리 위반 등 **부적합 철강재 단속 강화**

## 3. 석유화학산업 경쟁력 강화방안

< 5대 핵심 전략 >

❶ 현행 납사분해설비(NCC)의 국제 경쟁력 유지와 운영관리(O&M) 서비스사업화

❷ 경쟁열위 품목에 대한 사업재편 유도

❸ 핵심기술 확보를 통한 첨단정밀화학산업 육성

❹ 고부가 정밀화학산업 성장을 위한 대규모 클러스터 조성

❺ 사고 · 재난으로부터 안전한 석유화학단지 관리

< 현행 납사분해설비(NCC) 설비의 글로벌 경쟁력 유지와 운영관리 (O&M) 서비스사업화 >

☐ 우리나라 납사분해설비(NCC)는 ①규모의 경제, ②연관산업간 연결, ③운영효율능력의 측면에서는 세계 최고 수준이나,

　○ 미국 · 중국 · 중동의 가스 · 석탄 기반 설비에 비해 원가경쟁력이 떨어지므로, 규모와 연계성, 운영효율을 더욱 강화하고 원료비를 절감할 필요가 있음

### ① 3개 산업단지 내 업계 간 자발적 사업재편 추진

　○ 글로벌 경쟁력을 유지하기 위해 단지별로 가능한 한 대규모의 생산능력을 보유하여 고정비 감축, 소량의 부산물 활용 등이 필요함

　○ 업체간 배관을 통한 연계성을 강화하고 수직계열화를 구축하는 한 편, 국내기업간 인수합병(M&A)를 통해 규모의 대형화가 필요함

### ② 운영효율 능력을 강화하기 위해 배관망 추가 신설 및 안전관리 강화

　○ 산업단지내 배관 수요에 대해, 지상배관망을 실제로 사용할 현지 업체들이 주도하여 조기 구축될 수 있도록 지자체와 함께 지원함

　　* 산단내 기존 유틸리티 사업자를 활용방안 등에 대해 연구용역 실시('16년 산단공)

　○ 기존 지하 배관망 정보 데이터베이스 구축과 안전관리체계 마련

　　* 지하매설 배관망 데이터베이스 구축('16년 하반기, 울산시), 안전관리 체계 구축을 위한 연구용역 실시('16년 하반기) 및 대책 마련 ('17년 상반기)

### ③ 운영관리 전문인력 교육과 운영관리(O&M) 서비스 지식재산권 보호 추진

○ 신규인력에 대한 운영관리(O&M) 과정을 신설(한국폴리텍대 울산캠퍼스), 기존인력의 숙련도를 제고하는 프로그램 운영(석유화학공정기술센터)

　* (추진일정) '16~'17년 건물·장비 구축, '18년 교육 프로그램 실시 예정

○ 유출가능성이 높은 설비운용(O&M) 기술·노하우를 지재권으로 보호

　* 운영관리(O&M) 기술에 지재권(기술특허·영업비밀)로 등록하여 법적 권리 보장 ('17.상반기)
　* 산업부·특허청 공동 「운영관리(O&M) 서비스 지재권 창출 설명회」 개최 ('17.상반기)

### ④ 상대적으로 취약한 원가 경쟁력을 보완하기 위한 원료비 절감

○ 석유보다 저렴한 원료인 액화석유가스(LPG)에 대한 세제지원과 산유국과의 합작투자를 활성화해 원료를 안정적이고 경제적으로 도입할 계획

　* 화학공업용 원료로 사용되는 LPG에 대한 개별소비세(20원/ℓ) 면세 지속
　* 납사 제조용 원유에 대한 할당관세(기본 3% → 할당관세 0.5%)를 지속 적용

### < 경쟁열위 품목에 대한 사업재편 >

□ 국제 경쟁여건 변화에 대응해 기업의 설비조정을 지원함으로써 선제적으로 사업재편이 이뤄지도록 할 예정임

### ① 테레프탈산(TPA), 폴리스티렌 등 공급과잉 품목의 자발적 설비 감축 유도

○ 단기간 내 설비조정이 필요한 것으로 분석된 테레프탈산(TPA, 페트병 원료)와 폴리스티렌(PS, 장난감용 저가 플라스틱 소재)은 업계 스스로 감축 방안을 마련하면, 정부는 기활법과 연구개발(R&D)·금융·세제 등 관련 인센티브를 집중적으로 지원할 예정

　* 테레프탈산(TPA)는 현 생산규모 585만 톤에서 연구개발(M&A) 등을 활용하여 적정 수준으로 감축
　* 폴리스티렌(PS)는 이미 설비감축이 진행 중이나 현 73만톤의 설비 중 내수물량을 초과하는 설비 위주로 시장상황을 감안하여 단계적으로 감축 필요

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

## ② 합성고무, 폴리염화비닐(PVC)은 추가 증설 없이 고부가 제품으로 전환을 유도

○ 합성고무는 고기능 합성고무(SSBR)*, 엘라스토머** 등으로 전환 유도

 * 고기능 합성고무(SSBR) 내마모성·탄성이 좋아 친환경타이어 등에 사용 (금호석유
   화학 생산기술 보유)
 * (엘라스토머) 고무와 같은 탄성을 가진 고부가 합성수지 (LG화학, 대산산단 투자)

○ 폴리염화비닐(PVC)은 특수목적용 클린 폴리염화비닐(Clean PVC*, 소방용 합성수지배관(CPVC)** 등으로 전환토록 유도

 * 클린 폴리염화비닐(Clean PVC): 배관 내부의 세균 증식이나 오염을 최소화해
   초순수 라인에 사용
 * 소방용 합성수지배관(CPVC):염소화 리염화비닐(PVC)로서 내화성·내열성이 우수
   하여 고온용·고급건축재 소재

## < 핵심기술 확보를 통한 첨단정밀화학산업 육성 >

□ 우리나라는 범용 석유화학 부문에 있어서 세계 최고수준의 경쟁력을 보유하였으나, 고부가·고기능성 소재, 첨단정밀화학 부문은 선진국 대비 경쟁력이 미흡한 상황임

□ 이에, 석유화학산업이 고부가·고기능성 첨단소재로 발전하도록 정부 연구개발(R&D) 투자와 함께 민간의 연구개발(R&D) 활성화를 지원하여,

○ 현재 2% 수준에 불과한 화학 연구개발(R&D) 비중을 '25년 선진국 수준인 5.0%까지 높일 수 있도록 정부와 민간의 기술개발 투자 확대 추진

## ① 3대 핵심기술 기술에 중점적으로 정부 연구개발(R&D) 투자 확대

○ (미래 주력산업 소재) 전기차, 항공기, 드론 등에 사용되는 경량소재, 고온·고압·극저온 등 극한환경용 특수소재 (~'21년까지 9개 과제)

○ (고부가 정밀화학) 수입에 의존하는 염·안료 등 산업용 화학소재, 헬스케어용 생활밀착형 기능성소재 (~'21년까지 11개 과제)

○ (친환경 화학소재) 환경·건강에 대한 소비자 수요에 대응한 무독성 소재와 온난화 방지·오존층파괴 대체물질 개발(~'21년까지 7개 과제)

## ② 기업이 대규모 기술개발에 나설 수 있도록 세제·사업화 지원 제공

○ 「조특법(제10조)」상 신성장동력·원천기술 연구개발(R&D) 세액공제 대상에 고기능섬유, 하이퍼 플라스틱 등 고부가가치 융복합 소재 포함

○ 사업재편과 연계된 연구개발(R&D) 투자에 대해 "신산업 육성펀드" (3,000억 원) 지원

○ 기술보증기금 지원이 용이하도록 "중점지원 대상기업 업종"에 기능성 소재·고부가 제품(농화학, 화장품 등) 추가

## < 대규모 클러스터 조성 >

## ① 대산지역에 석유화학과 정밀화학업체가 집적화된 특화단지를 개발

○ 영세하고 지역적으로 산재한 정밀화학사업을 고부가 스페셜티 산업 으로 육성하기 위해서는 규모의 대형화와 지역적 집적화가 필요

○ 현재 대기업이 입주해 있고, 일반산단이 조성되어 있는 대산 지역을 「첨단화학 특화산업단지」로 조성하는 기본계획 수립 ('17년 상반기)

   * 대산 4지역을 산업단지로 신규 지정, 대산 2산단과 연계하여 개발 등

## ② 대·중소기업 화학연구소 집적단지(Chemical Valley)를 조성

○ 대덕 인근 '과학비즈니스벨트 거점지구(연구개발특구)' 입주 지원

   * 대기업 연구소(현재 엘지(LG)화학, 한화케미칼, 롯데케미칼 등)와 중소기업 연구소 (2개 이상 집단 이전으로 대전시 제공 토지매입비·시설투자비 등 인센티브 활용) 연계

○ 유력 해외연구기관 유치와 기존 연구기관은 아시아 연구거점으로 확대

Barcode:3814772-137 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

## < 산업단지 안전성 확보 >

### ① 사고재난 예방체계를 사전 보완하고, 신속 대응체계를 구축

o '화학재난대응방재센터' 역할 강화, '재난대응매뉴얼'을 매년 점검

o 산단별 특성이 반영된 '재난대응매뉴얼'을 매년 주기적으로 점검하고 자동보고시스템 확립을 통해 현황 파악 및 대응시간 단축('16년)

### ② 대형지진 발생 가능성에 대비, 주요 인프라의 내진 성능 보강

o 국내 석유화학 설비는 대부분 진도 6.5~7.0 수준으로 설계되었으나, 대형지진에 대비하여 7.0 이상으로 내진성능 개선(~'20년)

o 경제성 있고 폭넓게 적용 가능한 지진보강재 연구개발(R&D) 강화(~'20년)

* 탄소섬유를 활용하여 건물·설비에 부착하는 지진보강재에 대한 예타 진행 중

### 4. 향후 추진일정

□ 정부는 금번 경쟁력 강화방안을 통해 미래 고부가가치 분야에 대해서는 ❶ 연구개발(R&D), ❷ 인력양성, ❸ 금융·세제 지원 등 3대 핵심 정책수단을 통해 집중적이고 신속한 지원이 이뤄질 수 있도록 하겠음

o 공급과잉으로 진단된 분야는 기업의 선제적인 사업재편 및 기업 활력법 지원을 통해 과잉설비가 해소될 수 있도록 업계와 함께 적극 노력할 예정임

□ 향후, 정부는 산업구조조정 분과회의 및 산업경쟁력 강화 관계장관 회의를 통해 철강, 석유화학 산업 경쟁력 강화방안의 진행상황을 계속 점검하고 보완해 나가겠음

 이 보도자료에 대하여 자세한 내용을 원하시면 산업통상자원부 철강화학과 이재석 사무관(044-203-4285, 철강산업), 한종호 사무관(044-203-4284, 석유화학산업)에게 연락주시기 바랍니다.

**Translation of <u>Excerpts</u> from *Proposal for Strengthening the Competitiveness of the Steel Industry, September 30, 2016 from the Relevant Ministries of the Government of Korea***

**\*Assuming Metric Tons**

FOR EXTERNAL DISTRIBUTION (Cover Page/002013)

PROPOSAL FOR STRENGTHENING THE COMPETITIVENESS OF THE STEEL INDUSTRY

"General Use Steel Products Power Country → Higher Value-Added Steel Products; Lightweight Materials Power Country; Leap"

2016.9.30.

Relevant Ministries of the Government of Korea (Cover Page/002014)

<u>TABLE OF CONTENTS (Table of Contents/002015-002016)</u>

- ▪ Industry Characteristics...1
- ▪ Global Trends and Supply & Demand Prospects...2
- ▪ Analysis of Industry Competitiveness...8
- ▪ Industrial Policy Direction...13
- ▪ Plan for Increasing Competitiveness...14
  - ▪ Global Competitiveness: Business Reorganization Pursuant to Supply & Demand...14
  - ▪ Higher Value-Added Steel Products: Early Development and Commercialization of Lightweight Materials...16
  - ▪ Development of Environmentally Friendly Steel Production Technologies and Establishment of "Smart Factories"...19
  - ▪ Find New Steel Export Markets...22
  - ▪ Anticipate and Address Trade Conflicts and Safe Distribution of Steel Products...25
- ▪ Future Plan Timeline...27

...

<u>II. GLOBAL TRENDS AND SUPPLY & DEMAND PROSPECTS (Pg. 2/002019)</u>

1. Global Steel Industry Trends (Pg. 2/002019)



**Protectionism**
Increase in import restriction measures
Increase in trade friction between countries

**Oversupply**
Downturn in demand
International cooperation to alleviate excess

**Environmental Regulations**
Strengthening of greenhouse gas regulations
Increase in investment in environmental industry

<Global Conditions Overview>

**Steel Manufacturing Facilities**
Standardization of equipment
Development of new generation steel manufacturing methods

**Steel Products**
Emergence of lightweight materials
Expansion of higher value-added steel products

A. Chinese Demand Depression Aggravating Global Excess Supply (Pg. 2/002019-002020)

Worldwide Demand Increase
China Demand Increase

전세계 수요증가율(%) : ('01)2.2 → ('05)6.7 → ('14)0.7 → ('15)-3.0 → ('16)0.2
중국 수요증가율(%) : ('01)27.1 → ('05)25.9 → ('14)-3.3 → ('15)-5.4 → ('16)-0.1

- '15 Global excess supply was 750 million tonnes (crude steel capacity 2.38 billion tonnes; demand 1.63 billion tonnes) China is responsible for 60% of global excess supply (450 million tonnes)
  - After 05', China's crude steel capacity increased by 710 million tonnes (440 million -> 1.15 billion tonnes) while crude steel demand increased only 340 million tons (360 million -> 700 million ton

| Worldwide Crude Steel Excess Supply Trends (100 million tonnes) | Chinese Crude Steel Excess Supply Trends (100 million tonnes) |
| --- | --- |



- Recent visualization of efforts for international cooperation to resolve steel excess supply problem
  - At G20 Conference (China September 4-5), key producer countries launched "Global Forum" for consultations to resolve excess supply (adopted declaration)

B. Increase in Import Controls Globally to Protect Domestic Steel Industries (Pg. 3/002021)

- China's switch to a net exporter (06'), demand slowdown etc. resulted in China's production quantity and export quantity being directed as exports to third countries
  - China's excess supply especially targeted towards Korea, ASEAN, and EU
    - China's global exports (10,000 tonnes, WSA): ('09) 2,397 → ('11) 4,790 → ('13) 6,154 → ('15) 11,156
      Annual average rate of increase in export levels ('09~'15): Korea (14.8%↑), ASEAN (39.3%↑), EU(29.1%↑)

| <Change in China's Trade Structure (Import Country → Export Country) (Iron & Steel Institute)> |
| --- |



  - Except for Japan*, the share of low-priced imports in key steel consumer countries expanding**
    *(Japan) Large General Trading Company(ies) has within Japan distribution quantity 85% , entry of new foreign goods difficult
    ** Annual average rate of increase in import levels ('09~'15, WSA): United States (15.5%), EU (5.4%), India (8.1%), ASEAN (10.4%)

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

- As a result, countries are strengthening import controls to protect domestic demand markets
    - Steel Import Controls (matters, WTO,): ('11) 71 ('12) 93 "913) 115 ('14) 121 ('15) 159

...

2. Trends in Key Steel Producing Countries (Pg. 5/002025)

...

China: Beginning Phase of Restructuring (Pg. 5/002026-002027)

- State Council's "Steel Industry Restructuring Policy" (By '20 reduce up to150 million tonnes) confirmation
    - Unlike in the past, focus on securing executive ability* to push restructuring

    * Restructuring funds (50 billion yuan(10 trillion won)): thermal power generation excess profit 20% collection, taxation on power generation

    * Bad Bank: 22, capital stock 40 billion yuan → '17 32, 80 billion yuan (16 trillion won)

    * Promotion of environmental surveillance organization (local → central), reflect local government official evaluation in restructuring achievement

- Through this, parallel push for expansion in facilities rate of operation and enlarging of integrated steel mill

    * Chinese government approval of merger between Baoshan (Number 2 in China) and Wuhan Steel (Number 6 in China) ('16 September) → Birth of World's Number 2 steel manufacturer

...

3. Domestic Supply & Demand Prospects for Steel Products (Pg. 7/002029)

Global Supply & Demand: Excess capacity is expected to persist at greater than 750 million tonnes (Pg. 7/002029)

- (Crude steel demand) Due to slowdown in growth in China etc.*, annual growth expected to be 1% from current levels of 1.63 billion tonnes**

| Demand Growth Prospects for Key Countries | Korea | China | Japan | India |
|---|---|---|---|---|

* 주요국 수요성장 전망(CAGR, %) : 한국(△1.4), 중국(0.4), 일본(△0.2), 인도(3.8)

** 연평균 수요성장률(CAGR, %) : ('00~'15) 4.7 → ('15~'20ᵉ) 1.0

| Yearly Average Demand Increase Rate |
|---|

- (Crude steel capacity) ('15) 2.38 → ('20) 2.3~2.8 billion tonnes projected

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

- o  Taking in account each country's planned capacity, will increase to a maximum of 2.8 billion tonnes
- o  With China's reduction of capacity (150 million tonnes) and the application of a highly likely plan, will shrink to 2.3 billion tonnes

Worldwide Crude Steel Production Capacity/Production Quantity Prospects (Unit: 100 million tonnes)



- ▪ (Excess supply) Projected to continue to increase ('15) 750 million → ('20) 700 million to 1.2 billion tonnes

Domestic Supply & Demand: Crude steel excess not concerning, however, the levels of excess varies by product type (Pg. 7/002029-002030)

- ▪ (Crude steel) '15 Crude steel capacity 8,578 (10,000 tonnes) (Blast furnace 5,495, Electric Furnace 3,083), Demand 6,967 (10,000 tonnes)
  (Taking into consideration 317 (10,000 tonnes) of suspended production, nominal excess capacity 16%) → not  concerning
  - ▪ Rate of operation reflecting  maintenance and breakdown of equipment (80%~90%), optimum level
  - o  Electric furnace, since 10' decrease of 406 (10,000 tonnes) (Expansion of 299 (10,000 tonnes) shutdown or suspension of 705 (10,000 tonnes)
- ▪ (By product) Demand/Downstream industry (Shipbuilding, Energy, etc.) downturn → Excess supply concerns for plate, pipe
  - o  Plate will encounter excess capacity imminently, pipe will maintain current levels of excess

\<Product Type Nominal Excess Capacity Outlook (Unit: %, Including Trade, BCG)>



< 품목별 명목생산능력과잉 전망 (단위 : %, 교역포함, BCG) >

* 지재권 관련 비공개

*Private Due to Intellectual Property Rights

<u>III. ANALYSIS OF INDUSTRY COMPETITIVENESS (Pg. 8/002031)</u>

1. Steel Industry Structure and Current Conditions (Pg. 8/002031)

Industry Structure: Crude Steel Production World Rank 6, Steel Products Consumption World Rank 5 ('15) (Pg. 8/002031-002032)

- (Status) 4.3% of worldwide crude steel production (70 million tonnes), 3.8% of worldwide steel products consumption (56 million tonnes)

**<Crude Steel Production by Country (Million tonnes, Worldsteel)>**

< 국가별 조강생산 (백만톤, Worldsteel) >

| Classification | 구분 | 2015 | (비중 %) | 2014 |
|---|---|---|---|---|
| Worldwide | 전세계 | 1,620.9 | 100.0 | 1,699.9 |
| China | 중 국 | 803.8 | 49.6 | 822.8 |
| Japan | 일 본 | 105.2 | 6.5 | 110.7 |
| India | 인 도 | 89.4 | 5.5 | 87.3 |
| United States | 미 국 | 78.8 | 4.9 | 88.2 |
| Russia | 러시아 | 70.9 | 4.4 | 71.5 |
| Korea | 한 국 | 69.7 | 4.3 | 71.5 |

**<Steel Products Consumption by Country (Million tonnes, Worldsteel)>**

< 국가별 철강재 소비 (백만톤, Worldsteel) >

| 구분 | 2015 | (비중 %) | 1인당(kg) | Classification |
|---|---|---|---|---|
| 전세계 | 1,500.1 | 100.0 | 208.5 | Worldwide |
| 중 국 | 672.3 | 43.4 | 488.6 | China |
| 미 국 | 95.7 | 6.6 | 297.4 | United States |
| 인 도 | 79.5 | 5.6 | 60.6 | India |
| 일 본 | 62.9 | 4.3 | 497.3 | Japan |
| 한 국 | 56.0 | 3.8 | 1,082.9 | Korea |
| 러시아 | 39.4 | 2.4 | 274.6 | Russia |

Percentage

- (Scale) Production 108 trillion won (6.2%), Value Added 26 trillion won (6.3%), Exports $30.2 billion (5. 7%), 1,683 businesses, 94,000 workers, ('14, exports and imports from '15)

| Classification | Number of businesses 1,683 | Number of workers 94,000 | Production 108 trillion won | Value Added 26 trillion won | Exports $30.2 billion | Exports $22.3 billion |
|---|---|---|---|---|---|---|

| | 구 분 | 사업체수 | 종업원수 | 생산액 | 부가가치 | 수출액 | 수입액 |
|---|---|---|---|---|---|---|---|
| Steel | 철강 | 1,683개 | 94천명 | 108조원 | 26조원 | 302억불 | 223억불 |
| | (제조업내 비중) | (2.5%) | (3.2%) | (6.2%) | (6.3%) | (5.7%) | (6.9%) |

Relative weight in manufacturing

(Configuration) 1) Blast furnace (iron ore + coal). Electric furnace (steel scrap) upstream processing to produce semi-manufactured goods and 2) downstream processing with semi-manufactured goods to produce final products

POSCO, Hyundai, Dongbu, Dongkuk etc. 39 companies

<Domestic Steel Industry Value Chain ('15 Production Capacity Base)>

Upstream Processing

< 국내 철강산업 가치사슬 ('15년 생산능력 기준) >

Company

상공정    Downstream Processing    하공정

Blast Furnace (54.95 million tonnes)

고로 5,495만톤

열연 (4,366만톤)   냉연 (2,710만톤)   도금칼라 (1,548만톤)

후판 (1,279만톤)

강관 (1,067만톤)

Electric Furnace (30.83 million tonnes)

전기로 3,083만톤

철근 (1,245만톤)   형강 (642만톤)   봉강 (405만톤)

포스코 현대 동부, 동국 등 39社

POSCO, Hyundai, Dongkuk

포스코 현대 동국 세아, 현대 휴스틸 등 약 130 社

현대, 동국 등 30社

SeAH, Hyundai, HUSTEEL etc. about 130 companies

POSCO, Hyundai, Dongkuk

Hot rolled (43.66 million tonnes)

Plate (12.79 million tonnes)

Rebar (12.45 million tonnes)

Cold rolled (27.1 million tonnes)

Pipe (10.67 million tonnes)

Section steel (6.42 million tonnes)

Galvanized pre-coated (?) (15.48 million tonnes)

Bar (4.05 million tonnes)

*Blast furnace manufacturers (POSCO, Hyundai Steel) are integrated steel mills with downstream processing operations as well

o   (Demand industry) Construction (30.7%), Automobile (30.4%), Shipbuilding (20.4%) represents the majority

Domestic Market Current Conditions: Intensifying domestic competition, profit polarization within industry (Pg. 9/002033-002034)

■   (Domestic Market) New integrated steel mill entrants, increased Chinese imports leading to intensified competition

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

- o Since '10 Hyundai Steel's (integrated steel mill construction) share has increased while POSCO, other electric furnace manufacturers' share have decreased
    - ▪ Market Share ('09 → '15, %): Hyundai Steel 17-26, POSCO 56 → 46, Electric furnace manufacturers (9 companies) 24 →20
- o Chinese steel imports, primarily for construction uses are increasing in quantity and share and the number of companies** importing/manufacturing low-priced, improved quality Chinese hot rolled steel sheets* increasing

<div style="text-align:center">Chinese Steel Import Trends (Korea Iron & Steel Association)</div>

| | | '09 | '10 | '11 | '12 | '13 | '14 | '15 |
|---|---|---|---|---|---|---|---|---|
| Quantity (10,000 tonnes) | 물량(만톤) | 597 | 869 | 1,020 | 1,024 | 993 | 1,341 | 1,374 |
| Market Share | 시장점유율(%) | 13 | 17 | 18 | 19 | 19 | 24 | 25 |

< 중국산 철강재 수입 추이 (철강협회) >

\* 국산·중국산 열연강판 가격차 : 118$/ton (국산 513, 중국산 395)
\*\* (열연 → 냉연·칼라강판) 동국제강, 동부제철, (열연 → 강판) 세아제강, 휴스틸 등

*Domestic and Chinese Hot Rolled Steel Sheets Price Differential: $118/ton (Domestic 513, Chinese 395)
**(Hot Rolled → Cold Rolled, Color Steel Sheets) Dongkuk Steel, Dongbu Steel, (Hot Rolled → Pipe) SeAH Steel, HUSTEEL etc.

- o Distribution of imported steel products that are faulty (substandard), forged (country of origin) causing concern for consumer safety
    - ▪ Violation of quality control (factual survey) 17 out of 46 places/country of origin violation ('13~'15, Korea Customs Service) 260 cases, 550.4 billon won
- ▪ (Business Profits) Overall integrated steel mills (POSCO, Hyundai Steel) relatively good (9.2%), electric furnace (rebar etc.), downstream manufacturing operations (cold rolled, pipe etc.) companies doing poorly (3.9%, '15)
    - o (Integrated steel mill) Despite prior trends of downward operating profits, currently, due to the cost of raw materials such as iron ore and bituminous coal dropping, cost reduction, etc., there Is a trend of improving performance
        - ▪ Iron ore ($/dmt): ('07) 52 → ('09) 58 → ('11) 169 → ('13) 135 → ('15) 56
        - ▪ Bituminous coal ($/dmt): ('07)88 →('09) 168 → ('11) 261 → ('13) 133 → ('15) 81
    - o (Non-integrated steel mills) Due to factors such as the recovery of the construction market, recovering from the worst of the poor performance, however, compared to integrated steel mills, noticeable contrast



| Integrated, Non-integrated Steel Mills Operating Profit Ratio (Korea Iron & Steel Association) | Operating Profit Ratio by Sector (Korea Iron & Steel Association) |
|---|---|

< 일관·비일관제철 영업이익률 (철강협회) >   < 업종별 영업이익률 (철강협회) >

Integrated Steel Mill | Non-integrated Steel Mill | Integrated Steel Mill | Electric Furnace | Pipe | Cold rolled plate

## 2. Steel Manufacturing Facilities Competitiveness Analysis (Pg. 10/002035-002036)

**Blast Furnace: World's Largest Scale, Newest Facilities etc. Global Competitiveness**

- (General) Integrated steel mills are evaluated as having world-class competitiveness*

  * WSD (World Steel Dynamics) Competitiveness Ranking: POSCO ranked number 1 for 7 consecutive Years ('10~'16)

  o POSCO Gwangyang (24.65 million tonnes), Pohang (17.72 million tonnes) are the world's first and second largest non-integrated steel mills, Hyundai Steel possesses large-scale new facility in Dangjin (4 million tonnes x 3, '10)

- (By Element) In regards to technological innovation, human resources, facilities scale etc., very superior, raw material (iron ore, coal) procurement ability, energy cost etc. relatively weak

- Domestic integrated steel mills' cost competitiveness is superior compared to competitors (China, Japan etc.)

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18



Electric Furnace: Small to Medium Companies Need to Expand Economies of Scale

- (General) Compared to Large firms (Hyundai, Dongkuk, SeAH) 7 small to medium size firms (1 million tonnes scale) lack competitiveness

  * Compared to small to medium size firms, large firms' raw material costs are 2~5% less, product prices are 1.5~3% higher (interview with steel manufacturers)

- (By element) Increase in energy costs*, scrap supply **, price stability etc. inadequate

  * The relative proportion of energy costs of electric furnace products cost (Company B, %): ('10) 8.8 → ('13) 11.5 → ('16) 15.3

  ** Of domestic consumption of scrap 23% is imports ('15), supply of high quality scrap lacking

➤ Small to medium size electric furnace firms lack cost competitiveness, increase in imports of Chinese semi-finished goods

  * Chinese semi-finished goods (billet) imports (1000 tonnes, Iron & Steel Association): ('13) 6 → ('14) 303 → ('15)  516

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

3. Competitive Analysis of Key Products (Pg. 11/002037)



...

Pipe (Relative Production 7%): Competitiveness varies by company, undergoing business restructuring due to downturn in demand (Pg. 12/002039-002040)

- Compared to integrated pipe manufacturers* small to medium firms' (welding technique, diameter etc.) competitiveness poor
  * Hyundai Steel (29.5%), SeAH Steel (20.5%) etc. produce a variety of types of pipe ('16 January)

| Types of Pipe Steel Operators and Competitiveness Comparison | | |
|---|---|---|
| Pipe Type | < 강관사업자 유형 및 경쟁력 비교 > | |
| 강관 종류 | 강관 사업자 유형 및 특징 | |
| 초대구경<br>(610mm 이상) | ❶ 종합강관사 등 | ● 대구경사업자<br>•해외 에너지개발 수요 중심, 저유가로 |
| 대구경<br>(406.4mm초과) | •대형 업체, 수요처,제품 다각화<br>•건설 등 내수시장 확보, 저유가에<br>따른 수요 감소 리스크 존재 | 세일가스 개발 축소 등으로 수익성 악화 |
| 중소구경<br>(406.4mm미만) | | ● 중소구경사업자<br>•중소기업, 만성적 低수익 구조 |

Very large: greater than 610mm

Large: greater than 406.4mm

Small: less than 406.4mm

Integrated pipe companies etc.
- Large firms, diversification of demand and products
- Secured domestic markets such as construction, risk of reduced demand pursuant to low oil prices

Large Diameter Companies
- Centered on foreign energy development demand, worsening profitability due to shrinking shale gas developments following the drop in oil prices

Small/Medium Diameter Companies
- Small and medium enterprises, chronic low profitability

o   Market sensitivity due to high dependence on exports to North America for energy use (OCTG and line pipe) → Production decreasing due to shrinking demand from energy development; some companies are in process of restructuring

- Export percentage 45%, to U.S. 50%/U.S. Exports (in hundreds of million USD): ('13) 38 → ('14) 58 → ('15) 31

## IV. INDUSTRY POLICY DIRECTION (Pg. 13/002041)

Vision: General Purpose Steel Products Power Country → High Value-Added Steel Products, Lightweight Materials Power Nation Takeoff (Pg. 13/002041-002042)

Steel Products: Business Restructuring and High Value-Added Steel Products, Lightweight Materials Early Development

Direction

- Export products with competitive advantage, expand share of high value-added products
- For products with depressed demand, encourage the voluntary reduction of capacity
- For domestic consumption products, maintain capacity levels to satisfy domestic demand

Detailed Tasks

- Support preemptive controlling of capacity and business restructuring

- Early development and commercialization of high value-added steel products and lightweight materials
- Foster steel professional manpower and skilled workforce

**Steel Manufacturing Facilities: Development of Environmentally Friendly Steel Production Technologies and Establishment of "Smart Factories"**

Direction

- (Blast Furnace) Change to next generation environmentally friendly facilities, process innovation using IT
- (Electric Furnace) Secure additional price competitiveness through securing materials, cost savings

Detailed Tasks

- Development of hydrogen reduction steelmaking method and construction and supply of "smart factories"
- Development of steel scrap distribution system and development of substitute materials

**Exports, Trade, Safety:  Diversification of Export Products and Maintain Safe Steel Distribution**

Direction

- Develop track record for domestic steel products through cooperation between steel companies and demand companies
- Prevent harm from import restrictions and prevent distribution of improper steel products

Detailed tasks

- For general purpose steel products → increase exports through high value-add, facilities, skill, O&M etc.
- Joint entry into foreign markets of demand company, small to medium companies, steel companies, skilled workforce
- Public-private cooperation steel trade response system strengthening
- Establish safe steel products distribution rules

<u>V. PLAN FOR INCREASING COMPETITIVENESS</u> (Pg. 14/002043)

1. Business Restructuring Pursuant to Global Competitiveness, Supply & Demand (Pg. 14/002043)

...

D. Pipe: Promote specialized companies and encourage voluntary restructuring of companies with low competitiveness (Pg. 15/002045)

- (Specialization) Encourage general or specialized pipe manufacturers that are competitive to have priority in taking over the holding assets (facilities, land) marginal enterprises and transfer of skilled human resources
    - Assist in overseas disposal of redundant equipment lacking synergy (general trading company connection)
- (Making the market sound) Encourage voluntary exit/business transformation of pipe companies that are marginal firms*
    *(Example) Those companies that have had an interest coverage ratio of less than 1 for more than 2 years

E. Government to Use "Special Act on the Corporate Revitalization" to Actively Support Business Restructuring (Pg. 15/002045-002046)

- (Special Act on the Corporate Revitalization) In the case of preemptive business reorganization through measures such as reducing company's excess capacity, investing in new business, etc. use "Special Method" to support through tax, finance, procedure simplification

→ Likely restructuring sectors in steel industry: (1) flat rolled production equipment takeover, disposal, (2) plate equipment disposal and small partition, (3) electric furnace equipment adjusting, (4) pipe businesses priority takeover of superior assets of marginal firms, (5) pipe businesses' equipment, land disposal etc.

- Priority support through capital*, R&D** etc. for facilities investment in the case of high value-added product development
    *Exclusive Funds for Business Reorganization from Korea Development Bank, corporate investment promotion program etc.
    **Ministry of Trade, Industry and Energy main industry key technology development etc., additional support from R&D business

2. High Value Steel Products, Lightweight Material Early Development and Commercialization (Pg. 16/002047)

A. Development of Core Technology and Equipment Investment (Pg. 16/002047-002048)

- ❖ 3 Big High Value Steel Products (Future Cars, Energy, Construction). 3 Big Lightweight Materials (Titanium, Magnesium, Aluminum) R&D and Facilities Investment

| Background |
|---|

배경

○ 수요산업의 미래 트렌드 변화에 대비, 고부가 철강재의 조기 개발, 상용화를 통해 글로벌 시장 선점 필요

- 중장기적으로 철강을 대체할 초경량 신소재(마그네슘, 알루미늄, 타이타늄) 수요에도 대비할 필요

  ˙ 경량소재 전세계 시장규모 : ('15년) 175조원 → ('23년) 400조원
  ˙ 해외 신소재 개발 사례 : (미국) Light Weight Material Project(에너지부, '12년), (일본) 미래개혁연구프로젝트 (경산성, '13년)

○ In anticipation of changes in demand industry future trends , early development and commercialization of higher value-added steel products necessary to dominate the global market in advance

- Need to also prepare for the medium to long term replacement of steel by ultra lightweight new materials (Magnesium, Aluminum, Titanium)

*Lightweight material worldwide market size: ('15) 175 trillion won → ('23) 400 trillion won

*Overseas Development of New Materials: (U.S.) Light Weight Material Project (Department of Energy, '12)
(Japan) Future Development Research Project (Ministry of Economy, Trade and Industry, '13)

- High value-added steel products R&D (~'22)
  - ○ (Area) Future car, energy (resource development, generating facilities), construction. Infrastructure

| 자동차 | 에너지 | 건 설 |
|---|---|---|
| 친환경, 경량화, 고강도 | 극한환경(심해, 셰일가스, 극지), 고효율(초내열), 신재생(경량화) | 친환경, 고강도 안전 (내화, 내진) |
| <u>Car</u><br>Environmentally friendly, lightweight, high strength | <u>Energy</u><br>Extreme environment (deep sea, shale gas, polar regions), high efficiency (super heat resistance), new and renewable (lightweight) | <u>Construction</u><br>Environmentally friendly, high strength safety (fire proof, earthquake proof) |

  - ○ (Strategy) From early stages through cooperation between demand company + steel manufacturer, push R&D and substantiation and enhance commercialization success rate (EVI Tactic: Early Vendor Involvement)
  - ○ (Future Car) For early market domination, super high strength steel plate* (high strength, high formability, light weight 20% ↑), multiple material bonding technology ** (light weight 40% ↑) development ('15~'22)

    *Because strength greater than 1GPa compared to standard plate (340~500MPa) expect 1.6 times higher price )
    **Steel products, aluminum, magnesium etc. different materials welding and corrosion-resistant technique

     o  (Energy) High strength OCTG appropriate for shale gas and extreme mining environment, development of heat-resistant alloy steel for high-efficiency thermoelectric power plant ('13~'21)

          ■  5 times deeper than common oil wells, high temperature, high pressure, high corrosion/predict 4.2 times the cost of standard pipes

...

B. Cultivate and Utilize Steel Specialized Labor Force (Pg. 18/002051-002052)

❖  Cultivate steel specialized labor force through industry-academic-research cooperation. Increase utilization of superior labor force

| Background | |
|---|---|
| | ○ 인구절벽, 고령화, 베이비붐 세대 퇴직 등 사회구조 변화에 따른 고급 전문인력 급감으로 철강산업 기술경쟁력 유지·제고 어려움 |
| 경 | • 철강업 연구·개발 인력 2.8%, 기술직 14.1% ('12년 철강협회 실태조사) |
| | - 핵심 기술 교육 기반 약화 및 재직자, 전직자 대상 고부가 기술 교육 부족 |

  o  Because of the sharp decline in advanced labor force due to the change in social structure due to population cliff, aging, retirement of baby boom generation etc., maintaining and enhancing technological competitiveness difficult in the steel industry

  *Steel industry research, development labor force 2.8%, technical posts 14.1% ('12 Iron & Steel Institute Factual Survey)

  -  Weakening of core technology education base and lack of high-tech training for incumbents

■  (Cultivate superior labor force) "Steel mills or regional steel manufacturers + University + Research Institute" cooperation

  Run educational programs → cultivate steel industry superior researchers (Provide Steel Education Program within Industry Specialists Capacity Enhancement Project )

     o  (Position) Expansion of superior R&D personnel in steel industry, enhancement of innovation capacity etc.

        "(Tentative) Steel industry-academic-research local cooperation center" designate, offer education, training

        *Seoul, Jeonnam (Gwangyang), Choongnam (Dangjin) etc. region review (currently POSTECH Steel Graduate University is likely)

     o  (Cooperation) 1) University: site, building, development of curriculum, 2) Steel Manufacturer: research laboratory equipment, provide retirement specialist personnel, 3) Research Laboratory: basic research project planning

- (Job Converters) When enterprises undergoing business restructuring pursuant the "Special Act On The Corporate Revitalization" reduce facilities, offer high-value added sector re-training etc. to idle workforce
    - Promote the in-house change of position of corresponding personnel and for the purpose of employment retention, provide employment retention support funds for temporary closing, leave of absence, training etc.
    - For inevitable unemployment, related former training* and customized re-employment** support

        * (Employment Department) Increase training fee support ratio for companies undergoing business reorganization (small to medium firms 90~100% → 100%, Less than 1,000 people 60% → 80%, Greater than 1,000 people 40 → 60%)

        ** (Employment Department) Employment Success Package Program II (Companies undergoing business reorganization: relaxation of income restriction requirements (median income less than 100% → 150%))

        - Job-converter training program (equipment diagnosis, consulting, lecture competency etc.) establish, operate (Iron & Steel Association)

3. Development of Environmentally Friendly Steel Production Technologies and Establishment of "Smart Factories" (Pg. 19/002053)

...

B. Establishment and Supply of "Smart Factories" (Pg. 20/002055-002056)

- ❖ Maximize process efficiency by implementing "Smart Factories" utilizing cutting-edge IT technology

| Background |  |
|---|---|
| 배경 | o 초기 자동화 수준의 제철 공정에 첨단 IT기술 적용을 확대하여 설비 관리, 생산 품질 확보 및 경제적 생산체계 구축 필요<br>- 고부가 철강재 양산 체계 구축을 위해 스마트 기술이 요구되며, 고령화에 따른 숙련공 감소에 대비하여 공정의 시스템화 필요<br>* 일반강(1.1%) 대비 고부가 철강재(4.8%) 품질 부적합률 4배 (P사 사례) |

- o Increase application of cutting-edge IT technology in early automation levels of steel manufacturing and facilities management, securing production quality etc. the establishment of an economic production system necessary
    - For the development of mass production system for higher value-added steel products* smart technology is required, in preparation for the reduction of skilled workers due to aging, systemization of process is necessary
- • Standard steel (1.1%) contrast higher-value added steel products (4.8%) quality nonconformity rate 4 times more (in the case of Company P)

- (Smart Factories) Development, diffusion of high-tech steel facility operation system utilizing IT

  > Company P plate factory Smart Factory demonstration being planned ('17 December Target)
  >   - Construction-steelmaking-performance-rolling all process automation, IoT technology base operations, quality, equipment management

  o Sensor, big data analysis basis 1) equipment diagnosis, failure prediction maintenance*, 2) steel product quality prediction, management**, 3) operation control, automation 4) develop energy efficiency system (industry)

    * (Example) Management of blast furnace through big data, deep learning, diagnose abnormal equipment conditions

    **(Example) RMS (Roll Management System) for managing rolling roll and surface quality prediction etc.

  o Government to support through smart factory related standardization* (large steel enterprises-downstream companies, processing companies cooperation), technology development, export solution to foreign markets etc.

    *Reference model by steel process type, data linkage models between companies, operating system diagnostic evaluation model etc.

- (Small companies becoming smart) Smart factory dissemination for small electric furnace, downstream industry, processing company
  o Development of intelligent operating system suitable for small steel companies* ('17~), Support utilizing Ministry of Trade, Industry and Energy. Municipality. Large steel enterprises financial resources

    *(Example) Energy-reducing operating system, equipment remote control. automation etc.

    - If selected as smart factory support target, add points (5 points) and prompt support

C. Support for Securing Competitiveness of Steel Raw Materials (Pg. 21/002057-002058)

  ❖ Steel scrap substitute raw materials development and distribution. Enhance competitiveness through cultivating processing experts.

| Background | ○ (전기로) 고급 철스크랩 부족, 철스크랩 유통 구조 복잡·비효율 → 고급 |
|---|---|
| | 철스크랩 대체 기술과 철스크랩 유통·가공 전문업체 육성 필요 |
| 경 | ○ (고로 전기로) 수입 철원료에 대한 관세 부과로 경쟁력이 저하 |

  o (Electric furnace) Lack of high quality steel scrap, steel scrap distribution structure complicated. inefficient → high quality steel scrap substitute technology and steel scrap distribution. processing specialized companies need to be cultivated
  o (Blast furnace, electric furnace) Decreased competitiveness due to imposition of duties on auxiliary raw material imports

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

- (Substitute raw materials) Development of alternative method to high quality steel scrap which is insufficient in supply ('17~'20)
  - High quality steel scrap → Develop alternative technology using direct reduced iron (DRI) and secure raw material competitiveness (Predict 15% ↓in raw material costs)

    * DRI: Take iron ore in solid state and use gas ($CO$, $H_2$) to produce iron original

      ➢ Because it has almost no impurities, can be used as a substitute raw material for high quality steel scrap
    - 1) Use idled facilities for cement manufacturing, develop DRI production technique → 2) electric furnace pilot application (cooperate with demand industry)→ 3) expanded supply
- (Steel scrap) Promote specialized steel scrap distribution. processing companies by region and classification (research service prioritization: '17 )
  - Through factual survey revise steel scrap classification details (form, occurrence rating → impurity ingredient ratings included), standardization of inspection. manufacturing standards etc.
  - Designated operation of specialized processing demonstration plant designated operation by base (move into industrial complex, equipment support etc.)
    - For entry into industrial complex, promote consultation with municipality. industrial complex corporation etc.

      * While "raw material recycling business" can move in according to the "Industrial Cluster Development and Factory Establishment Act", required to consult with environmental licensing authority according to the "industrial complex project"

- (Raw material tax reduction) Considering tariff quota on steel auxiliary raw materials, which currently has a basic tariff rate ('17)

    *Tariff rate: Ferrochrome (2%), ferrosilicon (2%), carbon electrode (5%), cokes (3%) etc.

3. Find New Steel Export Markets (Pg. 22/002059)

A. Diversity Steel Export Items (Pg. 22-23/002059-002062)

- ❖ Currently widely-used product-centric → higher value-added steel products, technology. equipment, service expansion of exports

  - Exports are centered around wide-use steel products that possess quality and price competitiveness, however, encountering difficulties due to increased competition with latecomer countries, increase in import restrictions in each country etc.
    - ➢ Need for change in export strategy to find new export items and markets etc.

| Background |
| --- |

 ○ 품질,가격 경쟁력을 보유한 범용 철강재 중심으로 수출 중이나, 후발국과의 경쟁 강화, 각국의 수입규제 확대 등으로 어려움에 봉착

⇨ 새로운 수출 품목 발굴 및 시장 개척 등 수출전략 전환 필요

- ■ (Higher value-added) Support early exports of higher value-added steel products that have completed development and substantiation
  - ○ (Representative Items) Energy, Plant sectors abrasion resistant steel, corrosion-resistant steel, seawater resistant steel etc.
  - ○ (Marketing support) Support such as holding steel manufacturer's overseas product presentations etc. (Target: Launching overseas domestic power generator companies, construction. engineering companies etc.)

    *Higher value-added products local presentation: China ('16 October), Japan ('17 March) etc.

  - ○ (Export Parts Companies) Find small parts companies using higher-value added steel products ('16: 3 →'18: 50), Support export through Global Partnering (GP)* business

    *GP base trade centers (40), GP comprehensive. customized business meeting → global company find demand, link to small material parts companies and support exports

- ■ (Equipment) Export cutting edge steel technology. equipment and promotion of overseas sales of idle equipment
  - ○ (Cutting edge equipment) Compared to existing equipment that has been developed and commercialized domestically, support the entry into new markets of low investment cost, low cost, low environmental pollution cutting edge equipment (FINEX, CEM)

    ❖ FINEX: Shorter process compared to existing blast furnace method (Iron ore → sintered ore, bituminous coal →cokes omitted)
    ❖ CEM: Roll at high temperature without cooling process of slabs → processing cost,

    ☒ FINEX : 기존 고로 공법에 비해 공정 단축(철광석→소결광, 유연탄→코크스 생략)
    ☒ CEM : 슬라브의 냉각 과정 없이 고온 상태로 압연 → 가공비·에너지비 절감

    *China ('13 September), India ('15 March), Iran ('16 February) FINEX facility investment MOA conclusion

    - Use cooperation channels between governments, summit-level, ministerial rank conference etc. to support export contracts (Pg. 23)

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

- Large companies (material), small-to-medium companies (equipment manufacturing), KEPCO (electricity), Trade Insurance Corporation (finance) etc. cooperate to support equipment exports
    o (Idle equipment) For equipment that is idle due to suspension of operations, support promotion of overseas sales of equipment
        - "Equipment + operation know-how + specialized manpower" package export
        - Cooperate with specialized trading firms, machinery exchange etc.. to find overseas demand
- (Service) Steel equipment operations. Technical service. Skilled manpower etc.  export growth
    o (O&M) Link to domestic companies' takeover of foreign steel mills. equity investment, equipment export and promote facilities operation (O&M) technology, service exports

(Example) Company P-Brazil Steel Manufacturer technical skills cooperation contract (technician dispatch, develop work standards, technology trip etc.

Company P-Indonesia Steel Manufacturer technology transfer contract (royalty fee, technician dispatch, visit to Korea  etc.)

※ (사례) P사-브라질 철강사 기술협력계약(기술자파견, 작업표준서 개발, 기술출장 등)
P사-인니 철강사 기술이전계약(기술료, 기술자파견, 한국방문 연수 등)

- Install O&M booths at export exhibitions, consultation sessions etc. and support exports (KOTRA)
    o (Manpower entry) Promote skilled steel technicians as foreign experts, overseas expansion
        - Launch of skilled engineers to latecomer countries as specialized skill instructor, consultant
        - Run curriculum for consulting, lecture competency strengthening for overseas entry targets (Korea Iron & Steel Association)
        - Support overseas employment through cooperation between Korea Iron & Steel Association (skilled technicians management) and overseas employment agency (discover foreign steel manufacturers)

        *Industrial Human Resources Corporation public-private foreign employment program to support through a commission for overseas employment success

    o (Training, Education) Provide technical assistance training for overseas steel workers
        - Invite engineers from latecomer steel countries and provide steel technology, process, equipment education (Industry)

B. Demand Company + Steel Company Collaborative Overseas Entry (Pg. 24/002063-002064)

❖ Development of domestic track record and joint entry through Materials-Product-Demand cooperation

> o   High performance steel. Lightweight material. Once developed in order to prepare for overseas launch a domestic use track record is essential

| Background |
| --- |

> 고기능 철강·경량소재는 개발 완료 후 해외 진출 본격화를 위해 국내 사용 실적(Track Record) 확보가 필수적

- (Track record) Cooperation between "steel company + equipment manufacturer + demand public enterprise", secure track record for newly developed steel products → Cost. Quality verification, foreign exports
  - o   Through government supervision, steel + demand public enterprise Priority Purchase. Joint Development. Share Performance MOU conclusion support

> ☒ (사례) P사와 발전사가 협력, 내마모강(남부발전 석탄 이송설비), 내부식강(남동발전 탈황설비·열교환기 배관) 테스트베드 확보

> ❖ (Example) Company P and power generator company cooperation, abrasion resistant steel (Southern Power coal transfer equipment), corrosion resistant steel (South-East Power Desulfurization Equipment. Heat Exchanger pipe) testbed secured

> o   1) Host presentation for demand company, 2) encourage priority purchase through new technology certification (NET, NEP), 3) revision of material specifications* 4) parts R&D** etc. concurrent support

> *(Example) For cryogenic temperature alloy steel's LNG storage tank application, establishment of related standards pursuant to "High-Pressure Gas Safety Control Act" Article 26 (After product demonstration predict establishment early '17)

> ** (Example) "LNG for pipe high manganese steel piping parts development" support ('13~'16)

- (Plant Advancement) If domestic companies' power plants, plant equipment expand overseas, domestic superior steel products accompanying export (KEPCO. Power generator companies approximately 30 overseas power generation businesses etc.)

> ☒ (사례) 인니 찌레본 발전소(중부발전), 중국 거명국제에너지원 (한전 34% 지분투자) 국산 철강재 사용

> ❖ (Example) Indonesia  Cirebon power plant (Midland Power),  China Gemeng International Energy (KEPCO 34% stake) use domestic steel products
> o   Upon power generator companies overseas business consultation, examine the effect of domestic materials exports
> o   *Before foreign SPC establishment of public enterprise, Ministry of Trade, Industry and Energy, Ministry of Strategy and Finance prior consultations (Public enterprise management and innovation guidelines)

- (Part Suppliers Accompanying Expansion) If domestic steel manufacturers establish overseas local processing center, encourage accompanying entry of domestic small parts suppliers

> ▧ **(사례) P사가 멕시코 선재가공센터(고부가선재 제조업체), 중국 자동차부품가공센터 (자동차부품제조업체) 설립 시, 국내 부품사 동반 진출**
>
> ❖ (Example) Upon Company P's establishment of Mexico wire rod processing center (High value-added wire rod manufacturer), China automobile parts processing center (automobile parts manufacturer), accompanying entry of domestic parts suppliers

  o Overseas expansion investment information, finance etc. consulting, advice support, Support local entry and settlement through Korea Investment Support Center (7 countries 12 trade centers) (KOTRA)

## 4. Preemptive Response to Trade Disputes and Safe Distribution of Steel (Pg. 25/002065-002066)

### A. Public-Private Cooperation Steel Trade Response System Enhancement (Pg. 25/002065-002066)

  o Support voluntary management of export markets and thorough research within industry
  o Simultaneous governmental department joint response and strengthen discussions using trade channels



| Background | Currently, Korean steel products face 81 instances of restrictions, investigations in 19 countries, recently increase cases of trade relief measures |

> 배 ○ **현재 한국산 철강재는 19개국에서 81건이 규제·조사 중이며, 최근 들어 무역구제조치에 피소되는 사례 급증 추세**
> 경 * **피소 건수 : ('91~'00) 10 → ('01~'10) 17 → ('11~'16.8월) 76**
> - **특히, 주요 수출시장인 미국(철강재 총 수출의 13%), ASEAN(19%), 인도(6%) 등을 중심으로 수입규제 확대**

| Number of lawsuits |  |

Especially, in the key U.S. market (13% of total steel product exports), ASEAN (19%), India (6%) etc., increase in import restrictions

- (Strengthening of response system) Public-Private Cooperation "Import Restrictions Council"* establishment and operation (September 2016~)

  * Ministry of Trade, Industry and Energy (Office of Trade Policy, representative of product sectors), Ministry of Foreign Affairs and related ministries, trade associations, industry organizations

  o Understand and analyze import restriction trends in key export countries and share with industry
  o At the governmental department level provide strategy for response to import controls and cooperate to resolve
  o Have seminars and education etc. for small to medium firms on how to respond to import controls

- (Bilateral, Multilateral Channels) Use intergovernmental trade consultation channels to the maximum extent possible
    o Use WTO regular meetings* (twice a year) etc. for cooperative response to unreasonable import restrictions
        *Cooperation between countries to insist on observance of WTO rules for unreasonable safeguards of steel import countries ('16 April)
    o On the occasion of bilateral consultations use logical persuasion to induce easing of import regulations

- (Early Alert System) Systematic monitoring of key export products (Korea Iron & Steel Association)
    o Analyze export quantities, cost change by product and prior consultation and sharing with industry
    o Understand trends in key export countries (using global networks such as industry, local law firm, embassy (consulates), trade association, trade centers etc.) and analyze cause of increase in exports

...

VI. SCHEDULE FOR FUTURE (PLAN) (Pg. 27/002069-002070)

| Tasks | | Responsible Agency | | | | |

| 추진 과제 | 담당기관 | '16년 하 | '17년 상 하 | '18년 상 하 |
|---|---|---|---|---|
| 1. 글로벌 경쟁력·수급을 고려한 사업 재편 | | | | |
| ⓞ 선제적 사업재편 및 설비 조정 지원 | 산업부 | | | |

1. Business Reorganization Pursuant to Global Competitiveness, Supply & Demand
    1) Preemptive business reorganization and facility adjustment support

Ministry of Trade, Industry and Energy

| 2. 고부가 철강재·경량소재의 조기개발 및 상용화 | | | | |
|---|---|---|---|---|
| ⓞ 핵심기술 개발 및 설비 투자 | 산업부 | | | |
| ⓞ 철강 전문인력 양성 및 활용 | 산업부 고용부 | | | |

2. Higher Value-Added Steel Products, Lightweight Materials Early Development and Commercialization
    1) Key technology development and invest in facility ................Ministry of Trade, Industry and Energy
    2) Steel Specialized Labor Force Cultivation and Use
       ................................................Ministry of Trade, Industry and Energy; Ministry of Employment and Labor

## 3. 친환경 제철공법 개발 및 스마트제철소 구축

| | | |
|---|---|---|
| ① 친환경 공법 개발 적용 | 산업부 | |
| ② 스마트 제철소 구축 보급 | 산업부 | |
| ③ 철강 원료 경쟁력 확보 지원 | 산업부 기재부 | |

3. Development of Environmentally Friendly Steel Production Technologies and Establishment of "Smart Factories"
    1) Develop and Application of Environmentally Friendly Methods........Ministry of Trade, Industry and Energy
    2) Smart Factory Build and Supply............................................................Ministry of Trade, Industry and Energy
    3) Securing Competitiveness of Steel Raw Materials Support
    ...................................................Ministry of Trade Industry and Energy; Ministry of Strategy and Finance

## 4. 새로운 철강 수출 시장의 개척

| | | |
|---|---|---|
| ① 철강 수출 품목 다변화 | 산업부 | |
| ② 수요社 + 철강社 협업 기반 해외 진출 | 산업부 | |

4. Find New Steel Export Markets
    1) Diversify Steel Export Items.................................................................Ministry of Trade, Industry and Energy
    2) Demand Company + Steel Company Collaboration-Based Overseas Expansion
    ...............................................................................................................Ministry of Trade, Industry and Energy

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

| 5. 선제적 통상 분쟁 대응 및 안전한 철강재 유통 | | | | | | | |
|---|---|---|---|---|---|---|---|
| ① 민관협력 철강 통상대응체계 강화 | 산업부 | | | | | | |
| | 외교부 | | | | | | |
| ② 안전한 철강재 유통 질서 확립 | 국조실 | | | | | | |
| | 산업부 | | | | | | |
| | 국토부 | | | | | | |
| | 관세청 | | | | | | |

5. Anticipate and Address Trade Conflicts and Safe Distribution of Steel

    1) Strengthen Public-Private Cooperative Steel Trade Conflicts Response System
................................................................Ministry of Trade, Industry and Energy; Ministry of Foreign Affairs
    2) Safe Distribution of Steel Establishment of Order
................................................................Office for Government Policy Coordination; Ministry of Trade, Industry and Energy; Ministry of Land, Infrastructure and Transport;

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

**Translation of <u>Excerpts</u> from the Announcement of the *Proposal for Strengthening the Competitiveness of the Steel Industry, September 30, 2016* from the Relevant Ministries of the Government of Korea**

PAGE 1



Ministry of Trade, Industry and Energy Report Reference Material

Please reference starting on September 30, 2016 (Friday) 3:30 pm

Economic Innovation

New Era of Hope

Distribution Date and Time

Section Chief: Chief Kim Jong Chul

Responsible Department: Steel and Chemical Department

Responsible: Deputy Director Lee Jae Suk; Deputy Director Han Jong Ho

산업통상자원부 **보도참고자료**
http://www.motie.go.kr

2016년 9월 30일(금) 15시 30분부터 보도해주시기 바랍니다.

| 배포일시 | 2016. 9. 30 (금) | 담당부서 | 철강화학과 |
|---|---|---|---|
| 담당과장 | 김종철 과장(044-203-4280) | 담 당 자 | 이재석 사무관 (044-203-4285)<br>한종호 사무관 (044-203-4284) |

경제혁신
한만 서사대

"General Use Materials" → "Global Cutting Edge, Higher Value Added Materials" Power Country Leap Proposal of Steel, Petrochemical Industries Strengthening Competitiveness Rough Sketch

"범용 소재" → "글로벌 첨단·고부가 소재" 강국으로 도약을 위한
철강·석유화학 산업, 경쟁력 강화 밑그림 제시

<5 CORE STRATEGIES FOR STRENGTHENING THE COMPETITIVENMESS OF THE STEEL INDUSTRY>

1. Strengthen competitiveness of facilities through environmentally friendly and information technology (IT)
2. Encourage higher-value added through mergers and acquisitions (M&A) of products with competitive advantage and increased investment

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved

3. Support business restructuring with respect to products with low competitive advantage and excess supply
4. Early development of higher value-added steel products and lightweight materials etc.
5. Find new export markets and prevent distribution of improper steel products

…·

- At the "5[th] Industry Competitiveness Strengthening Meeting of the Relevant Ministries"*, the government on September 30, 2016 (Friday) at 3pm, at the Government-Complex-Seoul presided over by Deputy Prime Minister of Economic Affairs Yoo Il-Ho,

\* September 30 (Friday) 3-4pm, Government-Complex Seoul 19th Floor Video Conference Room

- O Confirmation and announcement of [Proposal for Strengthening the Competitiveness of the Steel Industry] and [Proposal for Strengthening the Competitiveness of the Petrochemical Industry]

PAGE 2

- In the prior September 28 (Wednesday) meeting presided over by Joo Hyung Hwan, the Minister of Trade, Industry and Energy and attended by the vice-ministers of the relevant ministries "3[rd] Industry Restructuring Subcommittee"
  - o The proposals for strengthening competitiveness for the "Steel Industry" and "Petrochemical Industry" was discussed

…

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

# EXHIBIT 66

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

2018-06-19 (Tuesday)        19.6℃ Seoul        YONHAP NEWS AGENCY



(World Cup) Despite crushing defeat to Sweden, midfielder says S. Korea...    12h ago    [ SEARCH ]

ALL HEADLINES    NATIONAL    NORTH KOREA    BUSINESS    CULTURE/SPORTS    KOREAN WAVE    PHOTOS    FOCUS        Language

Industry    Economy    Market    Tech/Science

# INDUSTRY

Business    **Industry**

## S. Korean shipbuilding industry expects another tough year

2018/01/11 15:30

SEOUL, Jan. 11 (Yonhap) – South Korea will release a fresh set of shipbuilding restructuring plans in the first quarter of this year to support the struggling sector as the industry as a whole is bracing for another tough year, the commerce ministry said Thursday.

In a new year's meeting held in the southeastern port city of Busan, industry and government officials discussed ways to tackle the challenge through technology innovation and cost-cutting efforts.

"The South Korean shipbuilding industry is expected to face a tough business environment due to decline in backlogs, low sales prices, a strong Korean won and rising steel prices," the Ministry of Trade, Industry and Energy said in a release.

The ministry said it will come up with ways to increase orders from the public sector and expand support for innovative technology to develop eco-friendly vessels and self-driving ships.

The latest move comes as the local shipbuilding industry, once the backbone sector of Asia's fourth-largest economy, has been reeling from massive losses and a drop in new orders.

Hyundai Heavy Industries Co. and its smaller rivals have been conducting self-rescue measures to tide over a protracted industry-wide slump.

ejkim@yna.co.kr

(END)



### Most Viewed

Bob Dylan to throw concert in Seoul next mo...

Seoul apparently confirms N. Korean leader's...

S. Korea pushing for official declaration on a...

Central bank should monopolize money issui...

S. Korea, U.S. suspend Ulchi Freedom Guardi...

### Most Viewed Photos



Insooni with multicultural family students
06-18 17:47

BTS with LG smartphones
06-18 17:49

TVXQ's Max Changmin at PRADA Collection
06-18 16:26

### News Focus

S. Korea faces balancing act between sanctions a...

Auto becomes top priority in KORUS FTA talks

S. Korea faces challenges as trade talks with G2 l...

N.K.'s olive branch toward Seoul targets breakthr...

S. Korea-Japan relationship at crossroads over re...

Economic policies to focus on income-led growth,...

Uncertainties shroud prospect of dialogue with N...

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:21 PM, Submission Status: Approved
Page 8070 of 8414

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

## News

All headlines

National

North Korea

Business

Culture / Sports

Korean Wave

Photo news

Graphic news

Focus

Most viewed

## Special Features

Interviews

Features

Topics

## Miscellaneous

Newspaper headlines

Today in Korean history

Yonhap News summary

Editorials from dailies

## Tools

RSS

Mobile Service

Twitter

Facebook

## Information

Photo/Video Archives

Korea in brief

Useful links

Festival Calendar

Weather

Overseas Networks

## About Yonhap

About Us

Contact Us

Subscription

Copyright

## N.K Archives

N.K Newsletter

Vantage Point

Copyrights **Yonhap News Agency.** All Rights Reserved.

# EXHIBIT 67

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

https://www.wsj.com/articles/how-china-skirts-americas-antidumping-tariffs-on-steel-1528124339

# How China Skirts America's Antidumping Tariffs on Steel

Government-backed manufacturers have avoided steep U.S. and EU levies by shutting production at home and expanding overseas

*By Matthew Dalton in Smederevo, Serbia, and
Lingling Wei in Beijing*
Updated June 4, 2018 3:03 p.m. ET

Three years ago, the steel mill outside the small city of Smederevo, Serbia, appeared headed for the scrap heap.

The Serbian government, which owned the mill, had stopped subsidizing it after six straight years of losses. Hemorrhaging cash, it struggled to buy spare parts and raw materials such as iron ore.

"It was like trying to drive a car without tires," says Siniša Prelić, a union leader at the factory.

Now production is hitting all-time highs under its new owner, Hesteel Group, a Chinese state-owned steel producer. Exports from the plant, which is backed by tens of millions of dollars from Chinese state banks and investment funds, are surging. And it has started shipping steel to the U.S.

As the Trump administration ramps up its fight against Chinese steel and Commerce Secretary Wilbur Ross ended trade talks with Beijing over the weekend without a settlement, U.S. officials are confronting a strategic shift from China's state-backed manufacturers. For the past several years, they have been shutting production at home and expanding overseas, fueled by tens of billions of dollars from Chinese state-owned lenders and funds.

By owning production abroad, Chinese steelmakers aim to gain largely unfettered access to global markets. Their factories back in China are constrained by steep tariffs imposed by the U.S. and numerous other countries—largely before President Donald Trump took office—to stop Chinese steelmakers from dumping excess production onto world markets. But their factories outside China face few so-called antidumping tariffs.

The Trump administration in March jolted the global trading system by imposing additional tariffs of 25% on all imported steel and 10% on aluminum, a move aimed at ratcheting up pressure on China to shut domestic steel and aluminum plants. (Last week, those tariffs were extended to Canada, Mexico and the European Union.) The EU is considering its own tariffs to stop metals exports blocked by the U.S. tariffs from flooding into Europe.

Even though the new U.S. tariffs apply to Chinese steelmakers that moved production abroad, the moves are still paying off. The Trump tariff rate is much lower than

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

existing U.S. antidumping tariffs on steel produced inside China, which often exceeded 200%.

A spokesman for Hesteel declined to comment. China's Ministry of Industry and Information Technology, which oversees the steel and aluminum industries, didn't respond to inquiries.

Chinese overcapacity has depressed global steel prices and wreaked havoc on China's competitors. After cajoling Beijing to cut domestic capacity, Western officials have watched with exasperation as Chinese companies boost production around the world. And Western industry executives worry the overseas investments are helping Chinese steelmakers avoid the antidumping tariffs that governments have imposed to protect their companies against allegedly unfair Chinese trade practices.



Chinese steel production rose sevenfold between 2000 and 2013. A worker helps load steel pipes at a plant in Hebei province. **PHOTO:** KEVIN FRAYER/GETTY IMAGES

China's steel-production boom took off around the turn of the century as Beijing threw its support behind a sector seen as vital to the nation's emergence as a global economic power. The 2008 financial crisis prompted Beijing to undertake an economic stimulus program that included the construction of hundreds of new steel plants. Chinese steel production rose sevenfold between 2000 and 2013, when it accounted for half of all global capacity.

By 2013, China's domestic economy was slowing, leading Chinese steel and aluminum producers to flood global markets and drive down prices. The average price of Chinese steel exports fell by about 50% between 2011 and 2016.

Governments around the world responded by imposing more than 130 antidumping tariffs against Chinese metals manufacturers, mostly on steel, depriving the domestic market of an important outlet.

Beijing responded by ordering capacity cuts: a net of 150 million tons of annual steel capacity is slated to be shut between 2016 and 2020, as are aluminum plants that were built without government approval. At the same time, in 2014, the government

launched a plan, called International Capacity Cooperation, that enlisted Chinese state financial institutions to help manufacturers add production overseas.

Analysts and Western government and industry officials say Chinese manufacturers are receiving hundreds of billions of dollars of state support to build and purchase plants on foreign soil, through money provided by institutions such as China Development Bank, Bank of China and funds like China Investment Corp. The overseas plants are likely to be tapped as exclusive suppliers for the "One Belt, One Road" initiative, Beijing's trillion-dollar infrastructure plan to project economic influence across Eurasia and Africa.

"China is just moving whole industrial clusters to external geographies and then continuing to overproduce steel, aluminum, cement, plate glass, textiles, etc.," says Tristan Kenderdine, research director at Future Risk, a consulting firm that tracks China's overseas investments. "None of this is economically viable under a supply-demand regime without state subsidies."

> Chinese steel companies have signed agreements to build plants in Malaysia, Pakistan, India and elsewhere.

In northern Brazil, a Chinese consortium is expected to break ground later this year on an $8 billion project to build one of the world's biggest steel plants, expanding Brazil's potential steel output even though the industry there operates at less than 70% of capacity.

"This is total nonsense, with all the idle capacity that we have," says Alexandre Lyra, chairman of the Brazilian Steel Institute, which represents Brazilian producers.

Chinese companies also are building new steel mills in Indonesia. Last year, Tsingshan Group Holdings, a state-backed steel producer based in Wenzhou on China's southeastern coast, opened a two-million-ton stainless-steel plant on the Indonesian island of Sulawesi that accounts for 4% of the world's stainless-steel production. The mill, built using a $570 million loan from the China Development Bank, is now pushing down prices from Asia to the U.S., industry executives and analysts say.

"We are seeing tenders in the area from Tsingshan at very, very, competitive prices," Miguel Ferrandis Torres, financial director at stainless-steel company Acerinox , told analysts in April. Tsingshan is likely losing money on those shipments from its Indonesian plant, Mr. Torres said.

Tsingshan declined to comment.

Tsingshan's product is entering the U.S. through a joint venture with Pittsburgh-based stainless-steel producer Allegheny Technologies Inc. The joint venture is restarting a stainless-steel rolling plant in western Pennsylvania that Allegheny had shut in 2016 partly because of pressure from inexpensive Chinese imports. The new company is importing 300,000 metric tons of semifinished stainless-steel slabs from Tsingshan's Indonesian plant—replacing slab Allegheny made in a now-closed production line—and processing them into sheets for products ranging from household appliances to medical equipment.

That put downward pressure on U.S. stainless-steel prices last year, industry executives say. "We're moving from being a high-cost producer, which we've been for a while, to being the low-cost producer in the market," Robert Wetherbee, an Allegheny executive, told analysts in November.

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC VERSION

The Trump tariffs that came into force in March hit the stainless steel Tsingshan was importing from Indonesia to its joint-venture plant in Pennsylvania. Allegheny has asked the Trump administration for an exemption from the tariffs on those imports.

Tsingshan is expanding its Indonesian plant, and Jiangsu Delong, a Chinese producer based in Jiangsu province, is building another plant nearby. Those projects alone will increase global stainless-steel capacity by 9% from 2017 levels, according to Michael Finch, a steel analyst at CRU Group in London, even though the stainless-steel industry has significant spare capacity.



Hebei province, a pollution-choked region near Beijing, is home to steelmaking operations li
PHOTO: NG HAN GUAN/ASSOCIATED PRESS

In 2014, officials from Hebei province, a pollution-choked steelmaking region near Beijing, began hunting for overseas investments for the province's most important company: Hebei Iron & Steel Group, renamed Hesteel Group in 2016.

When Hebei officials approached the Serbian government in 2014 about investment opportunities in the country, Belgrade immediately thought of the Železara Smederevo steel company, which had a mill on the Danube River, say people familiar with the deal.

The Serbian government had purchased the plant in 2012 for $1 from United States Steel Corp. After shutting the plant for several months, Belgrade restarted it to make it attractive for potential buyers, pumping tens of millions of dollars into it to keep it alive.

But with its public finances deteriorating, Serbia in 2014 sought a standby loan facility from the International Monetary Fund, which along with the European Commission, ordered it to stop subsidizing the steel company.

In early 2015, the Serbian government pulled the plug on subsidies for Železara, says Bojan Bojkovic, who was in charge of efforts to sell the mill for the Serbian government. "A lot of people, especially so-called economists, wanted to shut it down immediately," he says.

Meanwhile, in March 2015, Hesteel signed an agreement with China Investment Corp., which has more than $200 billion in foreign assets, to fund Hesteel's overseas expansion.



Beijing touted the $54 million acquisition of the steel plant in Serbia as one of China's flagship overseas investments. PHOTO: NEMANJA CABRIC/XINHUA/ZUMA PRESS

During the talks with the Serbians, Hesteel pledged to invest at least $300 million in the plant over the next three years. Beijing touted the €46 million ($54 million) acquisition as one of China's flagship overseas investments. Chinese President Xi Jinping visited the mill for the June 2016 signing ceremony.

Hesteel executives have said that they quickly turned around the money-losing plant after taking control in June 2016. Serbian corporate records show an operating loss of $34 million over the next six months. Records for 2017 aren't yet available.

"This is all part of a huge political initiative," says Markus Taube, professor of East Asian economic studies at the Mercator School of Management in Duisburg, Germany. "They are extremely insensitive to losses."

The EU for years has applied tariffs to low-price Chinese steel exports. Now, Hesteel's Serbian plant can export tariff-free into the 28-nation bloc.

"We feel like the Serbian plant is a Trojan horse," says Sonia Nalpantidou, a trade-policy expert with Eurofer, a trade association representing EU steel producers.

At a steel expo in Beijing last month, a "Hesteel of the World" banner hung near the company's booth. Pins in a map marked countries where Hesteel had invested—Serbia, Macedonia, Switzerland, South Africa, Australia and the U.S. A company representative said overseas expansion is now a core strategy. The company is planning to build more plants in regions such as North America, she said, and plans to derive 20% of revenue from non-Chinese markets by 2020.

"Products made in Europe shouldn't be subject to European tariffs," the representative said.

Late last year, Hesteel offered $1.5 billion for a large steel mill in Slovakia owned by United States Steel, according to a person familiar with the talks. The Slovak prime minister said last month that U.S. Steel wouldn't sell the plant to Hesteel. A U.S. Steel spokeswoman declined to comment.

After purchasing the plant in Serbia, Hesteel began selling its output, including a sheet-steel product called wide hot-rolled coil, onto the U.S. market through Duferco, a Swiss trading company in which it owns a 51% stake.

Since 2001, China's domestic producers of that product have faced antidumping tariffs of more than 64% at U.S. borders, effectively shutting them out of the market. Hesteel's Serbian plant could export to the U.S. with minimal tariffs—until the additional Trump tariffs took effect earlier this year.

In March, one of the Serbian plant's U.S. customers, Priefert Ranch Equipment of Mount Pleasant, Texas, asked the Trump administration for an exemption from the tariff to import 24,000 metric tons of steel sheet annually made at the plant. Priefert argued that it has long relied on overseas steel mills to supply product that domestic mills don't produce. Priefert executives didn't respond to a request for comment. The Trump administration hasn't yet decided on the request.

"We want to be the world's Hesteel," Yu Yong, the company's chairman, said when he signed the deal to buy the Serbian plant. He pledged to make the Serbia plant "the most competitive steelmaker in Europe."

**Write to** Matthew Dalton at Matthew.Dalton@wsj.com and Lingling Wei at lingling.wei@wsj.com

*Appeared in the June 5, 2018, print edition as 'China's Blueprint For Skirting U.S. Tariffs on Steel.'*

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.



After purchasing the plant in Serbia, Hesteel began selling its output onto the U.S. market. I
RISOVIC FOR THE WALL STREET JOURNAL

# EXHIBIT 68

# The New York Times

## Tariff Dodgers Stand to Profit Off U.S.-China Trade Dispute

**By Keith Bradsher**

April 22, 2018

SHANGHAI — Want to avoid American tariffs? In China, a company called Settle Logistics says it knows a way.

Specifically, that way goes through Malaysia — a 4,600-mile diversion compared with sending a shipping container from China straight across the Pacific to the United States. But when those Chinese products arrive at an American port, they will look as if they had come from Malaysia, according to the company, and will be spared tariffs aimed at Chinese goods.

"For those unfair trade barriers targeting our industries from certain countries," Settle Logistics says on its website, "we can adopt other approaches to bypass those trade tariffs in order to expand markets."

Such zigzagging routes are called transshipments, and President Trump has used them to justify the trade fight he has picked with a number of countries. They could also take on new relevance should the United States and China carry out their threats to levy a total of more than $200 billion in tariffs against each other.

Mr. Trump imposed tariffs last month on steel and aluminum imports almost no matter where they come from, citing transshipments, though he later carved out temporary exemptions for some countries. He argues that China uses transshipments to send much more steel to the United States than trade data suggests and that broad tariffs are needed to stop it.

"If you talk China, I've watched where the reporters have been writing 2 percent of our steel comes from China. Well, that's not right," Mr. Trump said last month. "They transship all through other countries."

**You have 4 free articles remaining.**
**Subscribe to The Times**

The scale of such tariff-dodging isn't clear. Based on available data, many economists don't believe that it plays a major role in American trade. For example, the United States imports only modest amounts of steel from Malaysia, Vietnam, Indonesia or other Southeast Asian countries that are popular stops for freight forwarders like Settle Logistics.

Still, the shadowy world of transshipments and other trade trickery is set to get a much closer look. Transshipments are likely to be a major part of any negotiations between China and the United States aimed at settling their trade dispute. They could also figure into conversations with Europe, South Korea, Canada and other major partners looking to extend their exemptions from Mr. Trump's steel tariffs. The governments may need to be on alert to make sure they do not become way stations and anger Washington.



Rolls of aluminum at a factory in Zouping, China. Transshipments meet Chinese regulations when they go to places like Malaysia, one broker said, but after that, "it is the U.S. government's role to

judge which country the products are originally from, and whether this business is legal or not."
-/Agence France-Presse — Getty Images

Prime Minister Justin Trudeau of Canada announced on March 27 that his country would enact a series of regulatory measures to block transshipments. By contrast, South Korea has insisted that it makes sure the true origins of cargo are accurately identified and that tariffs are paid.

Transshipments are perfectly legal in most cases. The problems occur when somebody disguises the country of origin, which is illegal in the United States and elsewhere.

"Products requirement: Do not have a 'Made in China' logo," says the website of one Chinese freight forwarding company, CT-Chan, that promises it can help manufacturers avoid American tariffs.

Transshipments and relabeling aren't the only trade dodge out there, and China by no means has a monopoly on them. American steel and aluminum companies complain that some basic metal is sent to other countries for minimal processing before it is shipped to the United States. Critics say big multinational companies use an accounting trick called transfer pricing — a common way to dodge taxes — to avoid paying higher tariffs when shipping goods between their international subsidiaries.

The network of Chinese brokers that bypass tariffs in the West by shipping goods through other countries is extensive and highly developed. The company websites boast of sending steel, aluminum foil, clothing, solar panels and even stainless steel sinks to the United States and Europe while evading tariffs.

Many of the brokers try to shield themselves from any criticism in China by wrapping themselves in nationalism. Top & Profit International Forwarding in Shenzhen says on its website that it is "breaking the barriers of international trade and anti-dumping to let Chinese products enter international markets successfully."

CT-Chan, based in Guangzhou, advertises that "transshipment is the only way to avoid high tariffs and import limits."

Top & Profit, CT-China and China's Commerce Ministry, which oversees trade, declined

to comment.

The freight companies say they use a variety of techniques. Settle Logistics, in Hangzhou, says on its website that its works with a factory in Malaysia and can obtain Malaysian certificates of origin for goods made in China.

Brokers also describe breaking up larger orders into a series of shipments from ports scattered around China. The goal is to reduce the odds that American trade associations would detect big shipments and report them.



A clothing factory in Beijing. Exporting goods from China to the United States by way of Malaysia can cost twice as much as shipping them directly.  Bryan Denton for The New York Times

On its website, Settle Logistics says it encourages companies to comply with trade regulations. John Zhao, one of the owners of Settle Logistics, said he was providing a needed service by creating alternative routes to the American market.

"If Chinese enterprises cannot export their products to the U.S. and they are not qualified to build factories overseas, we can offer help to them," he said.

The shipments meet Chinese export regulations when they go to places like Malaysia, Mr. Zhao said. After that, he said, "it is the U.S. government's role to judge which country the products are originally from, and whether this business is legal or not."

American customs officials said in a written reply to questions that the United States had "a sophisticated targeting process to identify countries, manufacturers, importers and shipments that are at high risk."

The services aren't cheap, but high tariffs can make them appealing. Shipping goods from China to the United States by way of Malaysia costs $3,000 to $4,000 per 40-foot shipping container, at least $2,000 more than shipping directly to the United States, brokers said. The extra costs include $500 for a Malaysian certificate of origin, at least $950 for unpacking goods in Malaysia and repacking them in a different container and $600 or more for the additional sea freight.

Malaysian trade officials said the country did not have a specific law against tariff circumvention. Still, it has laws against the falsification of documents and requires companies to manufacture products there in order to obtain local certificates of origin.

A new era of tariffs could make transshipments even more appealing. Brokers described receiving up to 10 times as many phone calls for price quotes as usual in the past several weeks as trade tensions between Washington and Beijing heated up.

Stamping out such transshipments could prove difficult. The United States made a big effort in the late 1990s to address the relabeling in Hong Kong of garments that had been made in mainland China, said Patrick Conway, a textiles trade specialist.

But after American officials gathered enough evidence to put companies on a watch list, the companies quickly disappeared, said Mr. Conway, who is the chairman of the economics department at the University of North Carolina at Chapel Hill. Some of the same people involved emerged later, but at other companies.

"We can anticipate a game of Whac-a-Mole," Mr. Conway said.


*Follow Keith Bradsher on Twitter: @KeithBradsher.*

Ailin Tang contributed research.

A version of this article appears in print on April 23, 2018, on Page B1 of the New York edition with the headline: Dodging Tariffs With a Handy Detour

# EXHIBIT 69



Envirocleanse inTank™
Ballast WaterTreatment System



The MARITIME EXECUTIVE
INTELLECTUAL CAPITAL FOR EXECUTIVES

(/)

Search for...  🔍

NEWS (/) | FEATURES (/FEATURES) | PODCASTS (/PODCAST) | MAGAZINE (/MAGAZINE) | NEWSLETTER (/NEWSLETTER) | BLOGS


norwegian electric systems

HAVE YOU ROOM FOR IMPROVEMENT?

# South Korea to Underwrite Hundreds of Ship Orders



DSME (file image)

BY **MAREX (HTTPS://WWW.MARITIME-EXECUTIVE.COM/AUTHOR/MAREX)** 2018-04-06 18:55:00

On Thursday, South Korea's Ministry of Oceans and Fisheries said that it is looking to underwrite 200 ship orders to help the nation's maritime industry recover from a multi-year slump.

"Following the bankruptcy of Hanjin Shipping, sales of South Korea's shipping industry were cut by over [$9 billion], and the tonnage of the deep sea containers has been cut in half," minister Kim Young-choon said at a government meeting "We have prepared a set of comprehensive measures to support the shipping and shipbuilding industries grappling with a protracted slump, intense competition and environmental regulations."

The new orders will include 60 boxships, enough tonnage to boost South Korean ocean carrier HMM over the one million TEU mark. In July, the state-sponsored Korea Ocean Business Corporation will begin issuing guarantees and making investments to support the shipbuilding effort. While popular at home, Korea's



**PREVENT CORROSION**

**MarEx** Magazine (/magazine)

Anthony George, President & CEO, FUELTRAX (https://www.mariti
executive.com/mag
george-
president-ceo-
fueltrax)
By Jack O'Connell
(https://www.mariti
executive.com/autho
oconnell)

Irrational Exuberance? (https://www.mariti
executive.com/mag
exuberance)
By Jack O'Connell
(https://www.mariti
executive.com/autho
oconnell)

The Polar Code, One Year On (https://www.mariti

support for its domestic shipbuilding industry has caused consternation for Japanese shipyards, which say that the intervention is anticompetitive and may be a violation of WTO rules on free trade.

**DSME to be resold**

"Big Three" shipbuilder Daewoo Shipbuilding and Marine Engineering was the worst-hit of South Korea's shipyards during the downturn, and after a series of multi-billion-dollar debt for equity swaps, the South Korean government became DSME's majority owner. The ministry said Thursday that in the mid- to long term future, it will examine the possibility of selling the yard, contingent upon market conditions and restructuring efforts.

Those conditions appear to be on the mend. In the first quarter of the year, South Korean yards secured more orders than any of their foreign competitors. Data from Clarksons showed that South Korean sales came to 52 vessels and 2.6 million CGT, about 40 percent of the global total. China came in second, trailing by about 700,000 CGT.



executive.com/mag
polar-code-one-
year-on)
By Mia Bennett
(https://www.maritim
executive.com/autho
bennett)

Daisy-Picking
(https://www.maritim
executive.com/mag
picking)
By G. Allen
Brooks
(https://www.maritim
executive.com/autho
brooks)

A Tale of Three
Ships
(https://www.maritim
executive.com/mag
of-three-ships)
By Wendy Laursen
(https://www.maritim
executive.com/autho

Look Beyond the
Flag
(https://www.maritim
executive.com/mag
beyond-the-flag)
By Erik Kravets
(https://www.maritim
executive.com/autho
kravets)

---

**2 Comments**   Maritime Executive   🔴 Login

♡ Recommend                 Sort by Newest
Share

Join the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS ?

Name

**condondeb** • a month ago
Our US Fleet was sunk by skyrocketing operating costs right along with other countries growth all hinging on very low wages for their mariners.
∧ ∨ • Reply • Share ›

**MWA** • a month ago
What happen to the U.S. Fleet?
∧ ∨ • Reply • Share ›

✉ Subscribe  📷 Add Disqus to your siteAdd DisqusAdd  🔒 Privacy



[Ad]
INGENUITY FINDS THE NEEDLE, FAST.
SAIC

#1 IT SERVICES - WASHINGTON DC
24/7 Full Service & 1 Flat Fee
Get Unlimited Cost-Effective Support from a Local Expert Team. Free Consultation
⊗ ▷ Ad
eguardtech.com
Report ad



International.
Linear polishing
fouling control
AkzoNobel



Efficiency    Safety
So much potential.
Let's not waste it.
Environment
MACGREGOR

PUBLIC VERSION

ABOUT US (/ABOUTUS)   |   ADVERTISE (HTTP://MEDIAKIT.MARITIME-EXECUTIVE.COM)   |   CONTACT US (/CONTACT)   |
PRIVACY POLICY (/PRIVACY-POLICY)   |   SITE MAP (/SITE-MAP)

© Copyright 2018 The Maritime Executive, LLC. All rights reserved.

# EXHIBIT 70

Home  >  Media centre  >  Press releases  >  2018

# World crude steel output increases by 5.3% in 2017

24 January 2018 | Brussels, Belgium

**World crude steel production reached 1,691.2 million tonnes (Mt) for the year 2017, up by 5.3% compared to 2016. Crude steel production increased in all regions in 2017 except in the CIS, which has remained stable (subject to current estimates).**



Annual production for Asia was 1,162.5 Mt of crude steel in 2017, an increase of 5.4% compared to 2016. China's crude steel production in 2017 reached 831.7 Mt, up by 5.7% on 2016. China's share of world crude steel production increased from 49.0% in 2016 to 49.2% in 2017. Japan produced 104.7 Mt in 2017, down by -0.1% compared to 2016. India's crude steel production for 2017 was 101.4 Mt, up by 6.2% on 2016. South Korea produced 71.1 Mt of crude steel in 2017, an increase of 3.7% compared to 2016.

In 2017, the EU (28) produced 168.7 Mt of crude steel, an increase of 4.1% compared to 2016. Italy produced 24.0 Mt in 2017, up by 2.9% on 2016. Spain produced 14.5 Mt of crude steel in 2017, an increase of 6.2% compared to 2016.

Crude steel production in North America was 116.0 Mt, 4.8% higher than in 2016. The US produced 81.6 Mt of crude steel, up by 4.0% on 2016.

worldsteel's estimation of 2017 crude steel production in the CIS based on available data was 102.1 Mt, the same amount as in 2016. Russia* produced 71.3 Mt of crude steel in 2017, up by 1.3% on 2016. Ukraine* recorded a decrease of -6.4% with a year-end figure of 22.7 Mt.

Annual crude steel production for South America was 43.7 Mt in 2017, an increase of 8.7% on 2016. Brazil produced 34.4 Mt in 2017, up by 9.9% compared to 2016.





**Top 10 steel-producing countries**

| Rank | Country | 2017 (Mt) | 2016 (Mt) | %2017/2016 |
|---|---|---|---|---|
| 1 | China | 831.7 | 786.9 | 5.7 |
| 2 | Japan | 104.7 | 104.8 | -0.1 |
| 3 | India | 101.4 | 95.5 | 6.2 |
| 4 | United States | 81.6 | 78.5 | 4.0 |
| 5 | Russia (e) | 71.3 | 70.5 | 1.3 |
| 6 | South Korea | 71.1 | 68.6 | 3.7 |
| 7 | Germany (e) | 43.6 | 42.1 | 3.5 |
| 8 | Turkey | 37.5 | 33.2 | 13.1 |
| 9 | Brazil | 34.4 | 31.3 | 9.9 |
| 10 | Italy | 24.0 | 23.4 | 2.9 |

In December 2017, world crude steel production for the 66 countries reporting to the World Steel Association (worldsteel) was 138.1 Mt, an increase of 3.9% compared to December 2016. The crude steel capacity utilisation ratio of the 66 countries in December 2017 was 69.5%. This is 1.8 percentage points higher than December 2016.



World steel capacity utilisation

**#Ends**

**Notes to Editors:**

- The World Steel Association (worldsteel) is one of the largest and most dynamic industry associations in the world. worldsteel members represent approximately 85% of the world's steel production, including over 160 steel producers with 9 of the 10 largest steel companies, national and regional steel industry associations, and steel research institutes.
- The total annual global and regional production figures in this press release includes estimates of other countries that only report annually. The monthly crude steel statistics available on worldsteel.org every month show figures from the 66 countries reporting to worldsteel on a monthly basis.
- The monthly crude steel capacity utilisation ratio is calculated based on crude steel production information available at worldsteel, and OECD capacity estimates.
- * December production figures for Russia and Ukraine have not been confirmed, thus their annual production figures are estimates.
- Megatonne (Mt) is a metric unit equivalent to 1 million tonnes.
- The attached PDF file contains a summary of world crude steel production by region from 2017 to 2016, a list of the largest steel producing countries in 2017 and December 2017 production figures.

⬇ Press release: World crude steel output increases by 5.3% in 2017 *(PDF / 441 KB)*

---

⬅ Go back

2018     2017     2016     2015     2014

# Year-on-year figures by country

⬇ Crude steel production data 2017/2016 *(PDF / 75 KB)*

---

🔗 Monthly data 2017/2016 (statistics section)

---

🔗 About worldsteel statistics (FAQ)

---

# Media enquiries

## Nicholas Walters

Director, Communications and Public Policy

📞 +32 2 708 8184
📱 +44 7900 824 444



✉ Send email

## Bradley Forder

Manager, Communications



📞 +32 2 702 8898
📱 +32 478 32 96 70

✉ Send email

## Press releases

Sign up to receive all our press releases by e-mail. You can easily unsubscribe at any time.

> Your E-mail here

Sign up

**World Steel Association AISBL**
Registered office:
Avenue de Tervueren 270 - 1150 Brussels - Belgium
T: +32 2 702 89 00 - F: +32 2 702 88 99 - E: steel@worldsteel.org

**Beijing office**
C413 Office Building - Beijing Lufthansa Center - 50 Liangmaqiao Road
Chaoyang District - Beijing 100125 - China
T: +86 10 6464 6733 - F: +86 10 6468 0728 - E: china@worldsteel.org

© 2018 worldsteel | Terms of use | Privacy policy | Cookie policy | VAT Number BE 0406.597.373

steeluniversity.org | worldautosteel.org | constructsteel.org | worldstainless.org

## worldsteel news

Sign up to receive our e-newsletter.
You can easily unsubscribe at any time.

Barcode:3814772-138 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC VERSION

Your E-mail here                                         Sign up ⏶

PUBLIC VERSION

# EXHIBIT 71



# Korea's shipbuilding orders look to finish at world's No. 2 this year

**By Julie Kim Jackson**

Published : Dec 8, 2017 - 16:11        Updated : Dec 8, 2017 - 16:11

Build orders for South Korea's rebounding shipbuilding industry are likely to reach the second highest in the world this year, following China, according to data by British shipbuilding and marine analysis agency Clarkson Research Services on Friday.

The research data shows that China's cumulative order volume for the January to November period reached 7.13 million CGT or 324 vessels, followed by Korea with 5.74 million CGT and Japan at 1.82 million CGT. CGT refers to the Compensated Gross Tonnage, which is an indicator of the amount of work that is necessary to build a given ship according size and type.

According to industry experts, it is anticipated that China will retain its No. 1 position for annual cumulative order intakes for the seventh consecutive year since becoming the world's biggest shipbuilders in 2011, while Korea is expected to finish out the rest of the year at the No. 2 spot.

## MOST POPULAR          LATEST NEWS

01. Whistleblower urges US Customs to investigate Korean Air smuggling allegations

02. 12 booked for using fake documents to get jobs, deceive partners

03. S. Korea's mobile data prices second-highest in world: data

04. Prosecutors seek arrest of opposition floor leader's assailant

05. Will NK recognize N.I.I. after decades of opposition?

06. Mao's grandson, rumored to be dead in NK accident, makes public appearance

07. Ministers visit border islands for discussions on maritime peace zone

08. Moon failing to deliver on economic promises

09. N. Korea says US pressure would not be conducive to solving nuclear issue

10. Korea's labor productivity ranked 17th in OECD





(Yonhap)

By country, China had the largest monthly order by volume with 910,000 CGT or 47 vessels, followed by Italy with 310,000 CGT, Korea with 80,000 and Japan with 50,000 CGT.

While China's shipbuilding global market share has reached 36.6 percent, Korea's share dropped 7 percent to 29.4 percent.

During a meeting with economic ministers on Friday morning, Korea's Finance Minister Kim Dong-yeon announced that the Seoul government is drawing up a blueprint for speeding-up the recovery and restructuring process for the local shipping industry by early next year.

Over the past several years, Korea's shipbuilding sectors have been hit with massive fiscal blows following slumps in global orders. Most of the local companies have initiated self-rescue measures, which include budget cuts and lay-offs in order to avoid declaring bankruptcy.

"Keeping the ecosystem in consideration, we will set up a direction for promoting innovated growth of shipbuilding industry by early next year," said Kim. "We will also discuss ways to deal with issues among mid-sized shipping companies via external consulting."

Although the global shipbuilding market has been gradually showing signs of fiscal recovery this year, as is the case with Korea's biggest shipbuilders, build orders for the country's mid-sized shipbuilding companies remain sparse.

According to data by the Korea Export-Import Bank of Korea earlier this year, ship orders for medium-sized shipyards in Korea were estimated to be around $110 million in the first quarter. Despite being an improvement compared to last year's first quarter, when there was not a single order, orders for Korea's eight mid-sized shipbuilders are falling far behind top builders such as Hyundai and Daewoo.

In 2007, when the local shipbuilding industry was at its peak, mid-sized shipbuilders secured projects worth $26.22 billion and accounted for roughly 26.7 percent of the country's total shipbuilding orders.

As for Korea's largest shipyards, this year has shown signs of financial rebound.

실시간 랭킹뉴스
- 5月 주식 "대이종년" 1400% 폭등株는 "...
- 5月 주식 "대이종년" 1400% 폭등...
- 철도마차탈 '상한가 폭등' 세계의 셀트...
- "주식히저지" 개미들 울리던 작전뜰...
- 사오이데마餐 "주록" 역대급 "대이"...
- 은퇴후 노후걱정 "무무교육창업"으로 "...
- 코골이 원인, "소리에서 밝혀내다" 무...
- "기성히매 몰락" 원인은 미로있었다?...
- "폭로" 이번주 로또당첨자 번호 말...
- 5月 주식시장"대이" 뜬다 1200% 폭등ㅎ...

- 찾은"어깨통증", 원인 알게돼...."충격"!!
- 5月 주식시장"대이"뜬다 1200% 폭...
- "뒷통원골반" 이거히너네 끝가
- "토토푸로" 기본베당 300배? 한달안에 ㅎ...
- "토토" 로 50억 번不..."승률320% 폭...
- 닮느, 한달안에 정상수치 혈워닝 필요...
- 女 배우,짐질은퇴 후 벌이들인 급여의...
- 철도마차탈 '상한가 폭등' 세계의 셀트리...
- 5月 주식 "대이종년" 1400% 폭등株는 ...
- 女배우, "돌연 은퇴" 후 벌이들인 돈이...






"비만세균"없애면            "비염" 수술하지마
뚱ッ살학학배매...            이즈게 99%개선되...

유류색 "황양롤렉스           룩팔 풋팅 고민...
가쪽, 알고보니 "해"           10뿐이면 애관감능...

화제의 뉴스
- "빛"실데 갈지따마 5月 마감 "1익" 달닝...
- 5月 쏟아지는 "1200%폭등 株 투...
- 5月 주식 "대이종년" 1400% 폭등株는 ...
- "버빈세균"발견!! 살씨는이 유방하게...
- 은퇴후 "무무창업" 소자본 교육창...
- "닮느"지료기능해?! 지료세끼둘..."30일...
- 노스페이스 "맹봤다" 눈물의 "대처리"...
- 2초신 실사로 신상공개 해보니 "기익"...
- 닮느, 한달안에 정상수치 혈워닝 필요...
- 구글 한국로또 1등예상... "세턴" 완벽해결...




유류색 "황양롤렉스           "비염" 수술하지마
가쪽, 알고보니 "해"           이즈게 99%개선되...

편예접건상쇼             노스페이스"브맥"よ
성처 알고보니...          둘들의 "맹처리"

PUBLIC VERSION

Earlier this week, Hyundai Heavy Industries announced that it had clinched a deal to build two large crude carriers, in a deal with an estimated worth of $166 million. The company also revealed it is close to wrapping up a separate deal to build two crude carriers for Greece's Kyklades Maritime Corp. The deal, expected to be signed-off later this month, is estimated to be worth $163 million.

On Thursday, Daewoo Shipbuilding & Marine Engineering said it also won a $394 million deal to build a vessel and an offshore facility for Greece's Maran Gas Maritime. The shipyard added that it additionally clinched another order for a crude carrier for Aeolos, another Greece shipping company, in a contract worth $82 million.

By Julie Jackson (juliejackson@heraldcorp.com)



실시간 랭킹뉴스

▶주식초보 "이것" 이는순간.. 손해는 없다~
대멀리조트 "신규회원" 파격혜택···
"이모엄 다이어트" 이벤트 때문에 난리~
로또1등 당첨번호 6자리세트럼 밝혀서···
동박 "기름덩어리" 1시간반에 략략7~
주식초보 "이것" 이는순간.. 손해는 없다
"규제"알고 月3000만원씩 아익율의..체세!!
주식했더니 月5,000만원씩 버는男,충격~
최정상예널리스트의 돌린 은퇴후 근~
장속 "비만세균" 바뀌아 살 빠진다!!

LEADERS CLUB [+]





Subscribe now!





▶ "토토"로 50억번男.."승률320%" 족보공개"충격
▶ 코골이 원인,"소리"에서 밝혀내다? "의학계 발칵"
▶ 철도테마株 '상한가 폭등' 제2의 셀트리온 된다!
▶ 5월 주식 "대어폭년" 1400% 폭등株는 "이것"
▶ 女 배우,잠정은희 후 벌어들인 금액이 무려..
▶ 북한 테마株 "잭팟" 슈퍼게미, 200억대 돈방석



Hmmm...can't reach this page

Recommended for You

Dua Lipa 'rules' first solo concert in Seoul

윌글주룸,발마다"이것"발았더니 평평해지!!
PR  (gohonjin2)

S. Korea, China resume defense policy talks

급등주, 인공지능으로 잡아낸다.
PR  (프리미엄 경제연구소)

LOWEST PRICE GUARANTEE...
PR  (choicehotels.com)

전재산 기부~ 한국을 떠나는 1000억대 '주식황제' 사연!?
PR  (증권전략)

드럼프와 성관계설 포르노배우 코미디쇼 출연 "폭풍 몰려온다"

지엔스, 보이지 않은 보정기 출시 로 업계 파장
PR  (하이안경)

Recommended by

SHOPPING & LIFE ⓘ                                            더보기 →



비트코인 전문가의 손실방법이
10억으으는 방법 공개

쉽법한 흄수저 가상화폐로 10
억들다!

주식으로 땐밀고, 가상화폐로
10억으오 KW에 인터뷰

흄수저도 막대 자산으로 인생역
전이 가능하다?

해럴드POP TV                                            ＋ 구독

ACCESSORIES

POP '상이아린 '미모가 송린 ㅓ[나 '미소짓 늘 포린 팬...

해럴드POP TV     24,071     15     0

00:00   02:41

아이린 '미모에 놀랐던 팬 사인회'

---

ANNOUNCEMENT   CS CENTER   CONTACT US   LOCATION          ABOUT KOREA HERALD   ABOUT HERALD CORPORATION   🐦 f ▶

**The Korea Herald by Herald Corporation**    [ Our Sites ▾ ]

Copyright Herald Corporation. All Rights Reserved.

PRIVACY STATEMENT   COPYRIGHT POLICY   HERALD OMBUDSMAN

Address : Huam-ro 4-gil 10, Yongsan-gu,Seoul, Korea
Online newspaper registration No : Seoul 0103711
Date of registration : 2015.04.28
Publisher, Editor : Kwon Chung-won
Juvenile Protection Manager : Shin Chang Hoon
Tel : 02.727.0114

# EXHIBIT 76

Back from the abyss: South Korea's shipbuilders begin ascent to growth | Reuters       Page 1 of 7
Case 1:20-cv-03898-CRK       Document 81-2       Filed 11/03/21       Page 288 of 2032
PUBLIC VERSION
Barcode:3814772-140 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

Discover Thomson Reuters

Directory of sites       Login       Contact       Support



**REUTERS** World   Business   Markets   Politics   TV   Search...



1995. He laid the groundwork for a successful career.

**BUSINESS NEWS**       NOVEMBER 1, 2017 / 10:53 PM / 8 MONTHS AGO

# Back from the abyss: South Korea's shipbuilders begin ascent to growth

Henning Gloystein, Jane Chung                    5 MIN READ     

BUSAN/SEOUL (Reuters) - Sparks light up the night-shift at giant shipyards on Korea's southeast coast, as welders and fitters at some of the world's biggest marine engineers forge next-generation container ships, oil rigs and even ice-breaking tankers in a bid to clamber out of a global industry abyss.

Back from the abyss: South Korea's shipbuilders begin ascent to growth | Reuters    Page 2 of 7
Case 1:20-cv-03898-CRK    Document 81-2    Filed 11/03/21    Page 289 of 2032
PUBLIC VERSION
Barcode:3814772-140 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

Two large container ships and a tanker can be seen under construction
in a ship yard close to Busan, South Korea October 25, 2017.
REUTERS/Henning Gloystein

Sunk by drastic cuts in orders from customers hit by the 2008 financial crisis, South Korea's shipping landscape has been littered with bankruptcies and billion-dollar losses. But some, like Busan's DSME, are adding innovation to craftsmanship to tap new demand for nimbler ships and offshore energy platforms.

The stakes are high for South Korea, jostling with Japan and China to lead an industry revival. Global orders - the trio account for four of every five merchant vessels built - grew nearly two-thirds during the first nine months of the year from a year earlier, according to shipping research firm Clarkson.

In September alone, South Korean yards bagged half the business, Clarkson's data shows.

"After years of struggle, we're finally seeing some growth," said Adam Kent, director at consultancy Maritime Strategies International (MSI), speaking during the Kormarine industry event in Busan last week. "Earnings for most shipping sectors have improved from their recent historic lows and are expected to gradually improve."

Back from the abyss: South Korea's shipbuilders begin ascent to growth | Reuters     Page 3 of 7
Case 1:20-cv-03898-CRK     Document 81-2     Filed 11/03/21     Page 290 of 2032     PUBLIC VERSION
Barcode:3814772-140 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

The crisis hit bottom earlier this year with the bankruptcy of Korea's Hanjin, one of the world's biggest shipping companies.

But DSME - Daewoo Shipbuilding & Marine Engineering (042660.KS) - is now back from the brink of collapse a year ago. This week its shares resumed trading after over a year's suspension, slumping before stabilizing at a level that still gives it a market value of about $1.7 billion.

In what's seen as a lifeline, DSME in September received an $820 million container ship order from Europe, its biggest in two years.

"It's hard to say the shipping market conditions have fully recovered, but the situation is much better than last year," said Yohan Yoon, deputy general manager at DSME's communications department.

## INNOVATE OR DIE

Tens of thousands of employees work day and night at South Korea's big three shipyards - Hyundai Heavy Industries (009540.KS), Samsung Heavy Industries (010140.KS) and DSME - building dozens of mega-tankers, container giants and huge oil and gas production platforms at once.

Based on the southeastern tip of South Korea, at the confluence of the Yellow Sea and waters off the east of the Korean peninsula, the trio has racked up billions of dollars in losses, prompting major restructuring in the face of stiff competition from its Chinese and Japanese rivals.

The years of pain have made innovation all the more essential.

Back from the abyss: South Korea's shipbuilders begin ascent to growth | Reuters    Page 4 of 7
Case 1:20-cv-03898-CRK    Document 81-2    Filed 11/03/21    Page 291 of 2032
**PUBLIC VERSION**
Barcode:3814772-140 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

A large crane works on the construction of a liquefied natural gas
(LNG) tanker at Daewoo Shipbuilding and Maritime EngineeringÕs
(DSME) yard near Geoje, South Korea October 25, 2017.
REUTERS/Henning Gloystein

"We have to become much smarter and more efficient in order to build better ships," Yoon So Park, chairman of the Korea Maritime Equipment Association, also speaking in Busan.

Improving shipping efficiency or even switching to cleaner fuels like liquefied natural gas (LNG) is necessary to comply with regulation coming into effect from 2020 by the International Maritime Organization (IMO).

"We expect demand for environmentally friendly ships to grow in the future especially after stricter IMO measures," DSME's Yoon said.

Back from the abyss: South Korea's shipbuilders begin ascent to growth | Reuters          Page 5 of 7
Case 1:20-cv-03898-CRK     Document 81-2     Filed 11/03/21     Page 292 of 2032
PUBLIC VERSION
Barcode:3814772-140 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

More recent DSME orders include 15 of a new type of ice-breaking tankers, three of which have been undergoing sea trials just outside DSME's yard at Geoje. The ships, which cost over $300 million each, are understood to be heading soon to Russia to start exporting Arctic Russian LNG from the Yamal peninsula.



**Daewoo Shipbuilding...          23550.0**
042660.KS KOREA STOCK...   **-800.00 (-3.29%)**

042660.KS   009540.KS   010140.KS

## NEW MARKETS NEEDED

Barrie Stevens, senior adviser to the Ocean Economy Programme at the Organisation for Economic Co-operation and Development (OECD), said South Korea remained the leading shipping innovator.

"Korea stands out in terms of ship sector patent applications," said Stevens, in Busan for the Kormarine event.

To survive in the long-term, OECD's Stevens said the industry would need to seek out openings in new sectors, including offshore wind power and acquaculture, or fish and seafood farming.

"We are looking at explosive growth in offshore wind. This is a shipping business opportunity," said Stevens.

"Looking further, aquaculture is seeing sharp growth," he said. "Korea has the world's highest aquaculture patent growth, with a share of 35 percent of OECD (member country patents), and a global share of 30 percent. Korea is right on the cutting edge here."

Barcode:3814772-140 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

GRAPHIC: Global market share of shipyards by country (2017)

reut.rs/2gWpLUD



GRAPHIC: Crisis in a chart: DSME shares resume after suspension - and crash

reut.rs/2gVquW3





Reporting by Henning Gloystein in BUSAN and Jane Chung in SEOUL; Editing by Kenneth Maxwell

*Our Standards:*   *The Thomson Reuters Trust Principles.*

Apps     Newsletters     Advertise with Us     Advertising Guidelines     Cookies     Terms of Use     Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2018 Reuters. All Rights Reserved.

# EXHIBIT 79

Barcode:3814772-142 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
PUBLIC

**Market Comment**  www.nicerating.com



# 철강업 구조조정, 실행의지 및 속도가 관건
## – '철강산업 경쟁력 강화방안(안)' 발표 관련

### Analyst Contacts

**최중기**
신용평가본부 기업평가실장
02.2014.6251
choijk@nicerating.com

**황성환**
신용평가본부 선임연구원
02.2014.6218
shhwang@nicerating.com

### Date
2016.09.30

## Summary

- 산업통상자원부는 2016년 9월 30일 '철강산업 경쟁력 강화방안(안)(이하 '경쟁력 강화방안')을 발표하였다.  정부가 발표한 경쟁력 강화방안의 주요 내용은 ①후판 부문 **설비 감축**, ②기업활력제고를 위한 특별법(이하 '원샷법') 등을 활용한 **강관 업계 자발적 재편**, ③연구개발활동 강화 및 철강재 유통환경 개선 등 기타 지원방안이다.

- 금번 경쟁력 강화방안에서 설비감축, M&A, 자산양수도 등 강도높은 구조조정 안이 제시된 부문은 **후판**과 **강관** 2개 품목이다.  후판에 대해서는 전방산업 및 해외 경쟁 사 동향을 감안하여 단기적으로 **업계의 자발적 설비 폐쇄**를 유도할 계획이며, 강관 부문에서는 '원샷법' 등을 활용하여 한계기업이 보유한 우수 설비, 인력에 대한 인수를 유도할 계획임을 제시하였다.

- NICE신용평가(이하 '나신평')는 후판, 강관 부문의 업황을 점검하고 구조조정 진행 전 망 및 영향에 대한 의견을 제시한다.  앞서 9월 28일 이슈리포트를 통해 분석(자세한 내용은 <u>철강업 Risk 관련 3가지 의문들에 대한 견해(上) – 철강업 3대 Risk 요인에 대한 견해</u> 참조)한 바와 같이, 후판은 현재 가동률이 낮은 수준을 지속하고 있어 고정비 부담이 가중되고 있는 양상이다.  또한, 최근 조선업 수주부진을 감안할 때 중단기적으로 **추가적인 영업수익성의 저하 가능성이 높은 상황**이다.  다만, 설비 감축에 대하여 업계에서는 부정적인 입장을 견지하고 있음을 감안할 때 **설비 감축의 적시성 있는 진행 여부에는 불확실성이 높은 것**으로 판단된다.  강관은 국내에 130여개사가 존재하여 경쟁강도가 매우 높은 가운데 저유가 등으로 북미지역 수출 물량의 축소가 나타나 **2015년 이후 영업실적이 저하**된 양상이다.  중견, 중소 강관사를 중심으로 한계기업이 속출하고 있어 강관 부문의 구조조정은 **현실화될 가능성이 높은 것**으로 판단된다.

- **후판** 부문의 설비감축 현실화 시 고정비 부담 절감 및 전방교섭력 개선 효과 등을 바탕으로 **중기적인 관점에서 업계 전체적으로 영업수익성이 개선**될 수 있을 것으로 보이나, 감축 대상 기업의 경우 설비 **처분손실** 등 구조조정 비용이 발생함을 감안할 때 **단기적으로 업계의 손익개선효과는 크지 않을 것**으로 판단된다.  다만, 동국제강의 경우 후판 비중이 타 기업 대비 다소 높은 수준이며, 영업현금창출을 통한 차입금 대응 능력 확보가 신용도에 중요하게 작용하는 점을 감안할 때 후판 부문의 수급 부담 완화 여부 및 시기에 대한 모니터링이 필요한 것으로 판단된다.

- **강관** 부문의 사업구조재편 대상인 중견, 중소 강관사들은 기존에도 열위한 대외신인도 등으로 자본시장 내 부채성 자금조달이 극히 제한적인 수준에 그쳤으며, 구조조정 진행에 따른 **자본시장의 직접적인 영향은 크지 않을 것**으로 보인다.  다만, 부실기업 구조조정 과정에서 M&A, 자산인수가 발생할 경우 **인수기업의 사업, 재무 측면의 영향에 대한 검토가 필요한 것**으로 판단된다.

- 나신평은 향후 철강산업의 구조조정 계획의 현실화 여부 및 시기를 지속적으로 모니터링하여 신용등급 및 전망에 반영할 계획이다.

NICE신용평가
NICE Investors Service 

002077

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

**Market Comment**  www.nicerating.com

## 산업통상자원부, 철강산업 경쟁력 강화방안(안) 발표

산업통상자원부는 2016년 9월 30일 '철강산업 경쟁력 강화방안(안)(이하 '경쟁력 강화방안')'을 발표하였다. 이에 앞서 철강업계는 한국철강협회 주관으로 2016년 5월 보스턴컨설팅그룹(이하 'BCG')에 철강업계 경쟁력 강화 방안 연구 용역을 발주하여 약 4개월 간 경쟁력 강화 방안을 모색하였다. 정부가 발표한 경쟁력 강화방안의 주요 내용은 ①후판 부문 설비 감축, ②기업활력제고를 위한 특별법(이하 '원샷법') 등을 활용한 **강관** 업계 자발적 재편, ③연구개발활동 강화 및 철강재 유통환경 개선 등 기타 지원 방안이다.

**[경쟁력 강화방안 요약]**

| 구 분 | 내 용 |
|---|---|
| 후판 | *조선산업 수요 및 해외 경쟁기업 동향을 감안하여 설비의 단계적 감축 적극 유도 (참고)국내 후판 공장 7개(포스코 4개, 현대제철 2개, 동국제강 1개) |
| 강관 | *경쟁력을 확보한 종합·전문강관업체를 중심으로 한계기업 보유자산 및 숙련인력의 인수 유도(기업활력제고를 위한 특별법(원샷법) 등을 활용)  *시너지가 부족한 중복 설비는 해외 매각, 한계기업은 자연 퇴출·사업전환 유도 |
| 철근, 형강 | *국내 수요 충족 수준으로 생산설비 규모를 유지하면서, 중장기적으로 수입재와 경쟁여건 등을 고려하여 설비 조정 검토 |
| 판재류 | *친환경차용 고기능 철강재, 경량소재 등 경쟁력 강화 지원 |
| 고로 | *수소환원제철공법 민관 공동 기술개발 착수 |
| 전기로 | *고급 철스크랩의 공급 안정화를 위해 철스크랩 유통·가공체계 개선 등 |
| 기타 | *수출 지원 및 내수 유통환경 건전화 등 |

자료: 산업통상자원부 보도자료, NICE신용평가 재가공

금번 경쟁력 강화방안에서 설비 감축, M&A, 자산양수도 등 강도높은 구조조정 안이 제시된 부문은 후판과 강관 2개 품목이다. 최근 국내 조선업의 수주량 감소로 향후 가동률 및 영업실적의 추가적인 저하가 우려되고 있는 **후판**에 대해서는 전방 산업 및 해외 경쟁사 동향을 감안하여 후판설비 감축/매각, 후판사업 분할 등을 통해 단기적으로 업계의 자발적 설비 폐쇄를 유도할 계획이다. **강관**은 국내 다수의 생산자가 존재하여 경쟁강도가 매우 높은 가운데 최근 에너지용 강관 등 對미국 수출 부진 등으로 한계기업이 속출하고 있는 양상이며, 경쟁력 강화방안에서는 '원샷법' 등을 활용한 강관 부문 전문/종합 기업의 한계기업 보유자산 및 숙련인력에 대한 인수 유도 계획을 제시하였다. 한편, BCG 컨설팅 과정에서 구조조정 대상으로 제기되었던 철근은 최근 국내 주택 경기 호조에 힘입은 영업수익성 및 재무구조 개선 추세를 감안하여 중장기적인 관점에서 설비조정을 검토하기로 결정한 것으로 파악된다.

NICE신용평가
NICE Investors Service
002078

**PUBLIC**

Market Comment                                                              www.nicerating.com

## 구조조정 추진 배경 - 후판 및 강관 업황 검토

앞선 9월 28일 이슈리포트를 통해 분석(자세한 내용은 '철강업 Risk 관련 3가지 의문들에 대한 견해(上) - 철강업 3대 Risk 요인에 대한 견해' 참조)한 바와 같이, 후판은 주문생산에 의존하는 품목 특성상 생산-내수(명목소비) 격차 또는 순수출로 측정되는 외견상의 수급부담(시장 내 공급량 과잉)은 크지 않은 것으로 파악된다. 그러나 조선 수요 위축의 지속으로 2015년 6월 포항공장 설비 폐쇄를 단행한 동국제강(2016년 상반기 가동률 96.0%)을 제외한 양대 메이커(포스코, 현대제철)의 가동률은 낮은 수준을 지속하고 있어 고정비 부담이 가중되고 있는 양상이다. 현재 후판 유휴설비(3사 합산 기준 현재 연간 후판 생산능력 1,249만톤, 2015년 후판생산량 943만톤) 규모는 300만톤 내외이며, 향후 확대될 가능성이 매우 높은 상황이다. 2015년 3사(포스코, 현대제철, 동국제강) 후판 부문 합산 영업실적은 영업손익분기점 수준에 그쳤으며, 조선업 수주절벽에 따른 가동률 저하 가능성을 감안할 때 중단기적으로 추가적인 영업수익성의 저하 가능성이 높은 상황이다.

**[국내 조선사 수주 통계(좌) 및 조선 인도량 및 후판 생산, 내수(우) 추이]**                (단위:천CGT, 천톤)



자료: 한국철강협회, Clarkson

**[국내 후판 제조사 생산능력, 생산량, 가동률(2015년)]**                (천톤, %)

| 구분 | 생산량(A) | 생산능력(B) | 가동률(A/B) | 생산능력(2016) |
|------|-----------|-------------|-------------|----------------|
| 포스코 | 5,729 | 7,790 | 73.5 | 7,790 |
| 현대제철 | 2,627 | 3,500 | 75.1 | 3,200(*) |
| 동국제강 | 1,466 | 2,400(*) | 61.1 | 1,500(*) |
| 합계 | 9,822 | 13,690 | 71.7 | 12,490 |

자료: 한국철강협회 자료 및 각 사 공시, 게시자료 등
주1: 생산능력은 한국철강협회, '2016년 철강생산능력' 기준이며, 2015년 6월 동국제강의 포항공장2후판공장(180만톤) 설비 폐쇄 및 2016년 현대제철의 1후판공장 설비 조정을 반영함.
주2: 포스코는 출하량 기준으로, 상기 표의 3사 생산량(2015) 단순 합계치(982만톤)와 한국철강협회 통계수치(943만톤)는 다소 상이함

NICE신용평가
NICE Investors Service

002079

Barcode:3814772-142 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

| Market Comment | www.nicerating.com |
| --- | --- |

그러나 업계에서는 인력 재배치 및 일시적 손실 인식에 대한 부담, 향후 중국산 등 수입 제품에 대한 대응력 저하 등을 우려하여 설비 감축에 대해 부정적인 입장을 견지하고 있는 것으로 파악된다.  이를 고려할 때 설비 감축의 적시성 있는 진행 여부에는 **불확실성**이 높은 것으로 판단된다.

**강관 부문**을 살펴보면, 국내 강관산업은 업계 1,2위(생산능력 기준)인 세아제강과 현대제철의 생산능력비중이 각각 14.8%, 7.0%에 불과한 등 산업집중도가 낮으며, 국내에만 130여개의 제조사가 존재하여 경쟁강도가 매우 높다.  강관은 건자재, 에너지(유정용 강관/ 송유관) 산업 관련 수출의존도가 높은 수준으로서 최근 저유가 기조 지속 및 수입규제 실시로 인한 對미국 에너지용 강관 수출의 위축, 중동 등 해외 건설 업황 저하 등을 배경으로 **수출 물량의 축소**가 나타나 최근 업계 전반적으로 **영업수익성이** 저하되었다. 세아제강, 현대제철 등 제품 포트폴리오와 매출지역/매출처가 다변화되어 있는 업계 최상위 기업의 경우 실적이 비교적 양호한 수준을 유지하고 있으나, **단일 품목 또는 단일 매출지역/매출처 의존도가 높은 기업들을 중심으로 한계기업이 속출하고** 있는 상황이다.

**[국내 주요 중견 강관제조사 합산 영업실적 추이]**                    (단위:억원, %)



자료: 각 사 공시자료
주: 상기 영업실적은 넥스틸, 휴스틸, 스틸플라워, 아주베스틸, 일진제강, 금강공업 6개사의 별도 기준 영업실적 합산 수치임.

이에 따라 우량/부실 자산 식별을 통한 기업 간 M&A/자산양수도 또는 설비 매각/퇴출 등의 구조조정 방안이 제시된 것으로 보인다.  국내 10위권 이내의 중견 강관사들의 영업실적과 재무구조가 저하된 양상을 보이고 있는 가운데 부실 징후를 보이고 있는 중소 강관사들이 다수 존재하고 있어 강관 부문의 구조조정은 **현실화될 가능성이 높은** 것으로 판단된다.

NICE신용평가
NICE Investors Service

002080

**Market Comment**          www.nicerating.com

## 주요 철강사에 미치는 영향 : 구조조정 실행의지 및 속도가 관건

경쟁력 강화방안에 따르면 감축방안은 업계 스스로 마련할 예정임에 따라 감축 대상설비 선정 및 시점 등 향후 구체적인 진행추이에 대한 모니터링이 필요할 것으로 판단된다. 감축 계획의 현실화 시 가동률 향상에 따른 고정비 부담 절감 및 전방교섭력 개선 효과 등을 바탕으로 중기적인 관점에서 **업계 전체적으로 영업수익성이 개선**될 수 있을 것으로 보이나, 감축 대상 기업의 경우 설비 처분손실 등 **구조조정 비용이 발생함을 감안할 때** 단기적으로 업계의 손익개선효과는 크지 않을 것으로 판단된다.

**[주요 기업별 제품 포트폴리오(2015년 기준)]** (단위:%)



자료: 각 사 공시자료 및 제시자료 등, NICE신용평가 재구성

또한, 사업 포트폴리오에서 후판 부문이 차지하고 있는 비중과 이익기여도를 감안할 때, **포스코 및 현대제철**의 경우 후판 부문의 구조조정이 사업 및 재무위험에 미치는 영향은 제한적일 것으로 예상된다. 다만, **동국제강**의 경우 후판 비중이 타 기업 대비 다소 높은 수준이며, 영업현금창출을 통한 차입금 대응능력 확보가 신용도에 중요하게 작용하는 점

NICE신용평가
NICE Investors Service

002081

**PUBLIC**

| Market Comment | www.nicerating.com |

을 감안할 때 후판 부문의 수급 부담 완화 여부 및 시기에 대한 모니터링이 필요한 것으로 판단된다.

강관 부문의 주요 구조조정 대상인 중견/중소 강관사들의 경우 기존에도 열위한 대외신인도 등으로 자본시장 내 부채성 자금조달이 극히 제한적인 수준에 그쳤으며, 신용등급을 보유하고 있지 않아 구조조정이 현실화하더라도 자본시장에 직접적인 영향은 크지 않을 것으로 보인다. 다만, 부실기업 구조조정 과정에서 M&A, 자산인수가 발생할 경우 인수기업의 사업, 재무 측면의 영향에 대한 검토가 필요한 것으로 판단된다. NICE신용평가는 향후 철강산업의 구조조정 계획의 현실화 여부 및 시기를 지속적으로 모니터링하여 신용등급 및 전망에 반영할 계획이다. [끝]

**[주요 구조조정 대상 품목의 기업별 영향]**

| 구분 | 생산기업 | 구조조정 안 | 영향 |
|---|---|---|---|
| 후판 | 포스코, 현대제철, 동국제강 | 설비 감축 | (단기)<br>*슬라브 등 후판 상공정 반제품 수급부담 발생 가능성<br>*구조조정 비용으로 손실 발생(폐쇄 기업의 경우)<br>(중장기)업계 전반적인 가동률 회복, 고정비 부담 완화 |
| 강관 | 세아제강, 현대제철, 동부제철, 넥스틸, 휴스틸 등 130여개사 | M&A 등 사업구조 재편 | *M&A, 자산인수 발생 시 사업 측면의 시너지 효과 및 인수자금 등 재무적 부담 발생 |

자료: NICE신용평가

[관련참고자료]

<철강업 Risk 관련 3가지 의문들에 대한 견해와 신용등급 방향성(上) - 철강업 3대 Risk 요인에 대한 견해>, 최중기, 황성환 2016.09.28
<철강업 Risk 관련 3가지 의문들에 대한 견해와 신용등급 방향성(下) - 시나리오분석 및 주요 기업의 등급방향성>, 최중기, 황성환 2016.09.28
<2016 철강업 정기평가 결과 및 하반기 주요 모니터링 포인트>, 황성환, 2016.06.30
<5년만의 철강재 가격 반등, 철강업황의 추세적 전환으로 이어질까>, 최중기, 김도현, 황성환, 2016.05.10
<철강사 정기평가 결과 및 향후 모니터링 포인트>, 김도현, 2015.07.03
<철강업 업황 전환 가능성 검토 및 업계의 대응 이슈>, 최중기, 김도현 2014.11.18
<철강산업경기 하락원인과 전망, 업계의 대응 과제>, 이삼영, 이영규, 2013.03.27

NICE신용평가
NICE Investors Service

002082

PUBLIC

**Market Comment**                                                    www.nicerating.com

〈삼중고에 처한 철강업계의 대응전략은?-주요 이슈 및 평가모니터링 요소를 중심으로〉, 곽노경, 2012.09.18



**NICE신용평가**
NICE Investors Service

※상기 Market Comment는 NICE신용평가 홈페이지[www.nicerating.com]를 통해 확인하실 수 있습니다.
※배포관련문의 : 투자자서비스실(02-2014-6222)

<유의사항>

NICE신용평가㈜가 제공하는 신용등급은 특정 금융투자상품, 금융계약 또는 발행주체의 상대적인 신용위험에 대한 NICE신용평가㈜ 고유의 평가기준에 따른 독자적인 의견입니다. NICE신용평가㈜는 신용위험을 미래의 채무불이행 및 손실 가능성으로 정의하고 있으며, 이슈 따라서 NICE신용평가㈜의 신용등급은 금리나 환율변동 등에 따른 시장가격 변동위험 해당 증권의 유동성위험, 내부절차나 시스템으로 인해 발생하는 운영위험을 표현하지는 않습니다.

NICE신용평가㈜의 신용등급은 미래의 채무불이행 및 손실 가능성에 대한 현재 시점에서의 의견으로 예측정보를 중심으로 분석, 평가되고 있으며, 예측정보는 예상치 못한 환경변화 등에 따라 실제 결과치와 다르게 나타날 수 있습니다. 또한, 신용등급은 사실의 진술이 아니라, 미래의 신용위험에 대한 NICE신용평가㈜의 독자적인 의견으로, 특정 유가증권의 투자의사결정(매매, 보유 등)을 권고하는 것이 아닙니다. 즉, 신용등급은 정보이용자의 투자결정을 대신할 수 없으며, 어떠한 경우에도 정보이용자의 투자결과에 대한 법적 책임소재의 증빙자료로 사용될 수 없습니다. 이에 정보이용자들은 각자 유가증권 발행자, 보증기관 등에 대해 자체적인 분석과 평가를 통해 투자에 대한 의사결정을 해야 한다는 점을 강조합니다.

NICE신용평가㈜는 신용등급 결정에 활용하고 보고서에 주요 판단근거로서 제시하는 정보를 신뢰할 만하다고 판단하는 회사 제시자료 및 각종 공시자료 등의 자료원으로부터 수집하여 분석, 인용하고 있으며, 발행주체로부터 제출자료에 거짓이 있고 중요사항이 누락되지 않았으며 중대한 오해를 일으키는 내용이 없다는 확인을 받고 있습니다. 그러나 NICE전용평가㈜는 자료원의 정확성 및 완전성에 대해 자체적인 실사를 하지는 않고 있습니다. 또한, 신용평가의 특성 및 자료원의 제한성 인간적, 기계적 또는 기타 요인에 의한 오류의 가능성이 있습니다.

이에 NICE신용평가㈜는 신용등급 결정 시 활용된 또는 평가보고서에 주요 판단근거로서 제시된 이러한 정보에 대해서도 그 정확성 적합성 또는 충분성을 보증하지 않으며 정보의 오류, 사기 및 허위, 미완공 통과 관련한 어떠한 형태의 책임도 부담하지 않습니다. 또한, NICE신용평가㈜는 고의 또는 중대한 과실에 기인한 사항을 제외하며 신용등급 및 평가보고서상 정보의 이용으로 발생하는 어떠한 손해 및 결과에 대해서도 책임지지 않습니다.

NICE신용평가㈜에서 작성한 보고서에 수록된 모든 정보의 저작권은 NICE신용평가㈜의 소유입니다. 따라서 NICE신용평가㈜의 사전 서면동의 없이는 본 정보의 무단 전재, 복사, 유포(재배포), 인용, 가공(가공), 인쇄(재인쇄), 재판매 등 어떠한 형태든 저작권에 위배되는 모든 행위를 금합니다.

NICE신용평가㈜
NICE Investors Service

002083

Translation of <u>Excerpts</u> from *Nice Rating, Restructuring of Steel Industry Depends on the Speed and the Will: Regarding the Issuance of the Proposal for Strengthening of the Competitiveness of the Steel Industry*

Summary (Pg. 1/002077)

- The Ministry of Trade, Industry, and Energy ("MOTIE") issued a "Proposal for Strengthening of Competitiveness of the Steel Industry" on September 30, 2016. The key points from the government's proposal is (1) reduce facilities (2) the encouragement of voluntary restructuring in the steel pipe industry using the "Special Act On The Corporate Revitalization" ("One Shot Method" (3) Strengthen R&D, improve steel product distribution environment etc.

- The two product types for which high-intensity restructuring was proposed, such as through the reduction of facilities, M&A, and asset transfer etc. in the recent proposal for strengthening competitiveness are plate and steel pipe. For plate, the plan is to encourage the industry's voluntary closure of facilities in the short term, taking into account downstream industry and foreign competitors trends, for pipe, the plan is to encourage the takeover of the superior facilities, manpower possessed by marginal firms utilizing the "One Shot Method" etc.

- NICE Investors Service examines the plate, steel pipe sector industries and provides an assessment on the progress prospects and impact of the restructuring. As analyzed in the September 28 issue report (Reference "Opinion on 3 questions Related to Steel Industry Risk – Opinion on Steel Industry's 3 Key Risk Factors"), plate is continuing to maintain low operating rates, the burden of fixed costs is appearing to increase. Further, given the recent decline in orders in the shipbuilding industry in the near and medium future additional decline in operating profitability is highly likely. However, taking into account the industry's firm negative stance on the reduction of facilities, there is high uncertainty in regards to the timely reduction of facilities. For pipe, in the context of high competitive intensity due to there being more than 130 companies and the decrease in export levels to the North America region due to low oil prices etc., sales performance appears to have decreased since 2015. Due to the increasing number of marginal firms, consisting of small to medium pipe companies, the possibility of restructuring in the pipe sector being realized is highly likely.

- In the case that the plate sector's reduction of facilities is realized, with the background of reduction in fixed costs and improvement in downstream bargaining power etc., in the medium term perspective the industry's overall operating profitability may improve, however, taking into account restructuring costs such as losses on the disposition of facilities etc. that will occur for the companies that are the object of reduction, in the short term, improvement in the industry's profit and loss will not be substantial. However, in Dongkuk Steel's case, the importance of plate is fairly large compared to other companies, and considering the important effect that securing borrowing ability through operating cash generation will have on credit ratings, whether the plate sector's supply and demand burdens will be eased and the timing will need monitoring.

- The targets of business restructuring in the pipe sector, major and small to medium pipe manufacturers, have lower international creditworthiness etc. thus debt financing in the capital market is highly limited, thus there will not be a substantial direct effect on the capital market from any restructuring. However, for any mergers and acquisitions or acquisition of assets in the process of restructuring insolvent companies there will need to be an assessment of the business and financial effects on the takeover company.
- NICE Investors Service plans to continuously monitor the whether the steel industry's restructuring plans are realized and the timing and to reflect in credit ratings and prospects.

...

Pg. 4/002080

...

With respect to the steel tubular industry, there is a low industry focus rate demonstrated by the fact that the top two domestic producers (in terms of capacity) SeAH Steel and Hyundai Steel only have 14.8% and 7% shares of total production capacity. There are over 130 companies domestically, and as such, there is very high competition. Because there is a high dependence on exports of on building materials, energy (OCTG, line pipe), with the recent low oil prices and import restrictions, exports to the United States of pipe for energy use have decreased, due to depressed demand in global construction in the Middle East and elsewhere, the volume of exports have decreased, which has caused decreased profitability overall. Top companies such as SeAH Steel and Hyundai Steel, which have diverse product and sales areas have relatively favorable performance. However, there is an increase in "marginal enterprises" consisting of companies that are heavily dependent on single product items or single sales areas.

{Consolidated Sales Performance of the Major Domestic Steel Tubular Producers} (Unit: 100 million KRW, %)



As a result, restructuring methods such as mergers and acquisitions or transfer of assets between companies based on distinguishing of superior/weak assets are being proposed. Amidst the appearance

of decline of the top 10 major domestic producers' sales performance and financial structure, there are many small and medium companies showing weak symptoms, leading to a conclusion that there is a high likelihood that restructuring for the pipe sector will be realized.

...

Pg. 6/002082

...

The small/medium pipe companies that are the key targets of restructuring in the pipe sector already had extremely limited debt financing within the capital market due to inferior international creditworthiness etc., and because they do not possess credit ratings, even if restructuring is realized, the direct effect on the capital market will not be substantial.  However, in the restructuring process for insolvent companies, if M&A, asset takeover occurs, the side effects on the takeover company's business, finance will need to be evaluated.  NICE Investors Service plans to continuously monitor the whether the steel industry's restructuring plans are realized and the timing and to reflect in credit ratings and prospects.

...

# EXHIBIT 86

4/12/2017

## Invest chosun

**PUBLIC**

### [철강업 구조조정]
### '강관·냉연·후판' 공급과잉 심각...동국제강·세아그룹 타격 우려

박하늘 기자 | always@chosun.com | 2016.05.20 07:31
Edited by 이도현 팀장 | dohyun.lee@chosun.com

＋ －

강관·냉연, 가동률 50%미만 그쳐...수급상황도 악화
조선업 침체로 후판도 위기...고로사·非고로사 경쟁력 차별화
주택경기 호조로 철근 수급 양호...선제적 구조조정 필요하단 지적도

철강업 구조조정에서 정부가 제시한 공급과잉 대표 강종은 '합금철'이다. 반면 철강업계는 구조조정이 시급한 강종으로 강관·냉연·후판을 꼽는다. 철근 역시 지금까지는 건조한 수급상태를 보이고 있지만 향후 공급과잉이 예상된다. 동국제강·세아그룹 계열사 및 중소 철강사 대한 우려가 크다.

강관은 대표적인 공급과잉 강종이다. 국내 수요량은 큰 변화가 없는 상황에서 생산 가동률은 10년째 50% 내외에 머물고 있다. 최근 5년간 평균 수입량 증가율은 9%에 이르는 등 국내 공급과잉이 이미 고착화됐다. 세아제강·현대제철(합병 이전 현대하이스코)·휴스틸이 전체 시장의 3분의 2 이상의 점유율을 차지하고 있다. 상위 3개사외에도 25~30여개의 군소 강관사들이 있다.

강관업계 한 관계자는 "저유가 영향으로 에너지향(向) 제품 매출이 크게 줄었고, 국내 대규모 토목공사가 감소함에 따라 향후 수급도 나빠질 전망"이라며 "인수·합병(M&A)을 통한 대형화·고정비 감소 등 구조조정이 시급하다"고 밝혔다.



### 강종별 가동률·과잉설비 현황

*자료:한국철강협회, 딜로이트안진
**2015년 기준

냉연시장은 최근까지도 투자가 진행되면서 공급과잉이 더욱 심해졌다. 가동률은 지난해 41%까지 떨어졌다. 현대제철이 지난해 총 1300억원 규모 제2냉연공장 투자를 마무리하면서 전체 시장의 생산능력(CAPA)은 200만톤 증가했다. 상공정 생산설비를 보유한 포스코와 현대제철이 냉연시장 시장점유율 80%를 차지하고 있고 나머지를 동국제강(합병 이전 유니온스틸)과 동부제철이 양분하고 있다.

금융업계 철강 애널리스트는 "고로를 보유한 포스코와 현대제철은 냉연 공급과잉이 심화되고 있는 상황에서도 원가경쟁력을 확보할 수 있지만 그렇지 못한 업체는 도태될 가능성이 있다"고 밝혔다.

후판은 주요 전방산업인 조선업의 침체로 직격타를 맞았다. 조선사들의 수주 감소로 후판 수급은 더 악화할 전망이다. 현대제철이 지난 2010년 고로 완공을 통해 후판시장에 진출하면서 경쟁이 심화됐다. 당시 40%대에 이르던 동국제강의 시장점유율은 2015년 18%대로 떨어졌다. 동국제강은 지난해 포항 제2후판공장을 폐쇄했다. 투자업계에서는 "추가적인 구조조정이 필요하다"는 의견이 여전하다.

**002073**

1/2

Barcode:3814772-142 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC

4/12/2017

한국기업평가는 "동국제강의 후판은 고로를 보유한 포스코와 현대제철에 비해 제품경쟁력이 떨어진다"고 평가했다. 또한 "포항 제2후판공장 폐쇄에도 수급 개선효과가 크지 않아 근본적 영업경쟁력 회복에는 미치지 못할 것"이라며 후판 부문에서 추가적인 구조조정이 필요하다는 점을 시사했다.

이에 대해 동국제강 관계자는 "동국제강은 신식 설비인 당진 후판3공장을 중심으로 사업 재편이 이뤄졌다"며 "경쟁사 대비 가동 률이 높고 제품 경쟁력도 떨어지지 않는다"고 밝혔다.

철근은 지난해 주택경기 호조에 힘입어 소비성장세가 이뤄졌다. 2015년 주택 인허가 수는 74만가구로 1990년 이후 최대치를 기 록했다. 올해 주택경기도 전년 수준을 유지할 전망이 우세해 철근수요도 견조할 것이란 분석이다. 하지만 시장에서는 인구절벽 등을 이유로 내년 이후 주택경기가 급격히 악화할 수 있다는 우려가 있다. 주택경기 저하가 현실화할 경우 철근업체들도 공급 과 잉으로 인한 타격을 피하기 힘들 전망이다.

철강업계 관계자는 "주택경기가 저하세로 돌아서게 된 이후 철근 공급과잉에 대한 대비책이 부족한 상황"이라며 "지금은 경기가 호조를 보이지만 철근 역시 선제적인 구조조정 노력이 필요한 강종"이라고 조언했다.

[인베스트조선 유료서비스 2016년 05월 12일 10:30 게재]



←

Copyright (c) investchosun.com All rights reserved.
Contact invest@chosun.com for more information.

**002074**

2/2

**Translation of Article from *Invest chosun***

**\*Assuming Metric Tons**

*{Restructuring of Steel Industry} Severe Excess Supply in Steel Pipe, Cold Rolled and Plate Sectors...*
*Concerns Loom over Dongkook Steel and SeAH Group*

May 20, 2016

The utilization rate for steel pipe and cold-rolled is less than 50%...and supply and demand conditions have worsened.  Due to the downturn in the shipbuilding industry, plate is threatened too...There is a difference in the competitiveness between producers using blast furnaces and those that do not use blast furnaces.  Due to the housing market boom, rebar demand and supply conditions are favorable...need for preemptive restructuring.

Of the steel industry restructuring, the representative steel grade that the government presented is ferroalloys . On the other hand, the steel industry chooses steel pipe, cold-rolled, and plate as the steel grades for which restructuring is urgent.  Even rebar, which is currently showing solid supply and demand conditions, excess supply is predicted in the future.  Concerns for subsidiary companies such as Dongkuk Steel, SeAH Group, and small to medium size companies are large.

Steel pipe is a representative excess supply steel grade.  Production utilization rate has remained around 50% for the 10th year while domestic demand levels have not experienced large changes.  In the recent 5 years, the average increase in import levels has reached 9% etc. and domestic excess supply has already become fixed.  SeAH Steel, Hyundai Steel (previously Hyundai Hysco), and HUSTEEL maintain 2/3 of the entire market.  Other than the top 3 companies, there are 25-30 small steel pipe companies.

Someone involved in the steel pipe industry has stated that due to low oil prices, sales of energy oriented products has greatly decreased, due to the reduction of domestic large scale public works future supply and demand conditions look to worsen and restructuring such as enlargement and the decrease of fixed costs through mergers and acquisitions (M&A) is urgent.



Production Utilization Rate and Excess Capacity
By Product (Unit: %)

강종별 가동률·과잉설비 현황

Production utilization rate (단위:퍼센트) ■ 가동률
■ 명목과잉설비율 Nominal excess capacity

Plate    Rebar

Steel pipe    강관    냉연    Cold-Rolled    후판    철근

ᴬ자료:한국철강협회
**2015년 기준

ᴮ Source: Korea Steel and Iron Association, Deloitte
ᴬᴮ Based on 2015

With investment even until recently, excess supply in the cold-rolled market has worsened. The production utilization rate dropped to 41% last year. With Hyundai Steel completing its 130 billion won scale second cold-rolled manufacturing plant last year, the entire market's production capacity has increased to 2 million tonnes. POSCO and Hyundai Steel, who have production equipment for upstream processes, maintain 80% share of the cold-rolled market share and the rest is split among Dongkuk Steel (previously Union Steel) and Dongbu Steel.

A steel analyst in the banking industry stated that while POSCO and Hyundai Steel, who have blast furnaces, may be able to maintain cost competitiveness despite the worsening of cold-rolled excess supply, however, those companies who are not able to do so may fall behind.

Plate is taking a hit from the downturn in the key shipbuilding industry. Due to decreased orders from the shipbuilding industries, the supply and demand conditions for plate are predicted to worsen. Hyundai Steel's completion of the blast furnace in 2010 and subsequent entry into the plate market has worsened competition. Dongkuk Steel's market share, which was 40% at the time, has dropped to around 18%. Last year, Dongkuk Steel closed its second plate factory in Pohang. The investment industry is expressing the opinion that additional restructuring is necessary.

Korea Corporate Evaluation has stated that Dongkuk Steel's plate falls behind in terms of product competetiveness compared to POSCO and Hyundai Steel, who have blast furnaces. Even with the closing of the second plate factory in Pohang, the improvement in supply and demand is not large and will not

reach fundamental business competitiveness recovery and hinted that the plate sector will need additional restructuring.

In response, an individual involved with Dongkuk Steel stated that business reorganization centered around its third plate factory in Dangjin, which is a modern facility, has been carried out and the relative production utilization rate is high and Dongkuk Steel does not fall behind in terms of product competitiveness.

Rebar has achieved consumption growth with the aid of the housing market boom last year. Housing permits in 2015 were 740,000, the highest since 1990. This year's housing market will maintain the prior year's levels rebar demand will also hold steady. However, there are concerns in the market that due to factors such as the "population cliff", after next year the housing market will sharply deteriorate. If the housing market experiences a slump, rebar businesses will also not be able to avoid the effects of excess supply.

One steel industry individual stated that since the housing market turned towards a downward trend, there is a lack of preparation for rebar excess supply and while the economy looks favorable now, rebar is also a steel grade that needs preemptive restructuring efforts.

# EXHIBIT 89

# THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY

## AN INVESTIGATION CONDUCTED UNDER SECTION 232 OF THE TRADE EXPANSION ACT OF 1962, AS AMENDED



**U.S. Department of Commerce**
**Bureau of Industry and Security**
**Office of Technology Evaluation**

# January 11, 2018

# THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ................................................................. 1

II.   LEGAL FRAMEWORK ................................................................. 11

III.  INVESTIGATION PROCESS ......................................................... 18

   A.   *Initiation of Investigation* ...................................................... 18

   B.   *Public Hearing* ........................................................................ 18

   C.   *Public Comments* ..................................................................... 18

   D.   *Interagency Consultation* ........................................................ 19

IV. PRODUCT SCOPE OF THE INVESTIGATION· ................................ 21

V.    FINDINGS ..................................................................................... 23

   A.   *Steel is Important to U.S. National Security* ............................. 23

      1.   Steel is Needed for National Defense Requirements ...................................... 23
      2.   Steel is Required for U.S. Critical Infrastructure ........................................... 23
      3.   Domestic Steel Production is Essential for National Security Applications ................. 24
      4.   Domestic Steel Production Depends on a Healthy and Competitive U.S. Industry ....... 25
      5.   Steel Consumed in Critical Industries ........................................................... 25

   B.   *Imports in Such Quantities as are Presently Found Adversely Impact the Economic Welfare of the U.S. Steel Industry* ........................................ 27

      1.   Imports of Steel Products Continue to Increase ............................................. 27
      2.   High Import Penetration ............................................................................ 29
      3.   High Import to Export Ratio ....................................................................... 30
      4.   Steel Prices ............................................................................................ 31
      5.   Steel Mill Closures .................................................................................. 33
      6.   Declining Employment Trend Since 1998 ..................................................... 35
      7.   Trade Actions – Antidumping and Countervailing Duties ................................. 36
      8.   Loss of Domestic Opportunities to Bidders Using Imported Steel ...................... 36
      9.   Financial Distress ................................................................................... 37
      10.  Capital Expenditures ............................................................................... 40

   C.   *Displacement of Domestic Steel by Excessive Quantities of Imports has the Serious Effect of Weakening Our Internal Economy* ..................... 41

      1.   Domestic Steel Production Capacity is Stagnant and Concentrated ..................... 41
      2.   Production is Well Below Demand ............................................................... 46

3. Utilization Rates are Well Below Economically Viable Levels .................................... 47

4. Declining Steel Production Facilities Limits Capacity Available for a National Emergency ....................................................................................................................... 49

*D. Global Excess Steel Capacity is a Circumstance that Contributes to the Weakening of the Domestic Economy* ................................................................................................................ 51

1. Free markets globally are adversely affected by substantial chronic global excess steel production led by China ............................................................................................... 51

2. Increasing global excess steel capacity will further weaken the internal economy as U.S. steel producers will face increasing import competition ......................................................... 53

VI. CONCLUSION ...................................................................................................... 55

VII. RECOMMENDATION ........................................................................................... 58

**Prepared by Bureau of Industry and Security**
**http://www.bis.doc.gov**

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

## **APPENDICES**

APPENDIX A:  Section 232 Investigation Notification Letter to Secretary of Defense James Mattis (April 19, 2017); Department of Defense Response to Notification (May 8, 2017)

APPENDIX B:  Presidential Memorandum for the Secretary of Commerce - Steel Imports and Threats to National Security (April 20, 2017)

APPENDIX C:  Federal Register - Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel (April 21, 2017)

APPENDIX D:  Federal Register - Notice on Procedures for Attending or Viewing Remotely the Public Hearing on Section 232 National Security Investigation of Imports of Steel (May 17, 2017)

APPENDIX E:  Public Hearing Witnesses

APPENDIX F:  Public Hearing Testimonies

APPENDIX G:  Public Comments

APPENDIX H:  Uses of Steel for National Defense

APPENDIX I:  Uses of Steel for Critical Infrastructure

APPENDIX J:  U.S. Government Steel Measures and Actions

APPENDIX K:  Steel Orders in Effect as of January 11, 2018

APPENDIX L:  Global Excess Capacity in Steel Production

## I.    EXECUTIVE SUMMARY

### Overview

This report summarizes the findings of an investigation conducted by the U.S. Department of Commerce (the "Department") pursuant to Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. §1862 ("Section 232")), into the effect of imports of steel mill products ("steel") on the national security of the United States.

In conducting this investigation, the Secretary of Commerce (the "Secretary") noted the Department's prior investigations under Section 232.   This report incorporates the statutory analysis from the Department's 2001 Report[1] with respect to applying the terms "national defense" and "national security" in a manner that is consistent with the statute and legislative intent.[2]   As in the 2001 Report, the Secretary in this investigation determined that "national security" for purposes of Section 232 includes the "general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements, which are critical to minimum operations of the economy and government."[3]

As required under Section 232, the Secretary examined the effect of imports on national security requirements, including: domestic production needed for projected national defense requirements; the capacity of domestic industries to meet such requirements; existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense; the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth; and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries; and the capacity of the United States to meet national security requirements.

---

[1]   Department of Commerce, Bureau of Export Administration; *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security*; Oct. 2001 ("2001 Report").

[2]   *Id.* at 5.

[3]   *Id.*

The Secretary also recognized the close relation of the economic welfare of the United States to its national security; the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills, or any other serious effects resulting from the displacement of any domestic products by excessive imports, without excluding other factors, in determining whether a weakening of the U.S. economy by such imports may impair national security. In particular, this report assesses whether steel is being imported "in such quantities" and "under such circumstances" as to "threaten to impair the national security."[4]

## Findings

In conducting the investigation, the Secretary found:

A. *Steel is Important to U.S. National Security*

1. National security includes projected national defense requirements for the U.S. Department of Defense.

2. National security also encompasses U.S. critical infrastructure sectors including transportation systems, the electric power grid, water systems, and energy generation systems.

3. Domestic steel production is essential for national security applications. Statutory provisions illustrate that Congress believes domestic production capability is essential for defense requirements and critical infrastructure needs, and ultimately to the national security of the United States.[5] U.S. Government actions on steel across earlier Administrations

---

[4]  19 U.S.C. § 1862(b)(3)(A).

[5]  *See,* e.g., 15 U.S.C. § 271(a)(1)("The future well-being of the United States economy depends on a strong manufacturing base…"); 50 U.S.C. § 4502(a)("Congress finds that − (1) the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services…  (2)(C) to provide for the protection and restoration of domestic critical infrastructure operations under emergency conditions…"; and American Recovery and Reinvestment Act, P.L. 111-5, §1605, 123 Stat. 303 (Feb. 17, 2009) (providing that none of the funds appropriated or made available by the act may be used for the construction, alteration, maintenance, or repair of a public building or public work unless the iron, steel, and manufactured goods are produced in the United States).

further demonstrate domestic steel production is vital to national security.[6]

4.  Domestic steel production depends on a healthy and competitive U.S. industry.  The principal types of mills that produce steel are integrated mills with basic oxygen furnaces (BOFs); mini-mills using electric arc furnaces (EAFs); re-roller/converter; and metal coater facilities.  Basic oxygen furnaces convert raw materials into steel, and remain critical for continued innovation in steel technology.  Covered in this report are five categories of steel products that are used for national security applications: flat, long, semi-finished, pipe and tube, and stainless.

5.  The Department found that demand for steel in critical industries has increased since the Department's last investigation in 2001.  The 2001 Report determined that there was 33.68 million tons of finished steel consumed in critical industries per year in the United States based on 1997 data.[7]  The Department updated that analysis for this report using 2007 data (the latest available) and determined that domestic consumption in critical industries has increased significantly, with 54 million metric tons of steel now being consumed annually in critical industries.

B.  *Imports in Such Quantities as are Presently Found Adversely Impact the Economic Welfare of the U.S. Steel Industry*

1.  The United States is the world's largest steel importer.  In the first ten months of 2017 steel imports have increased at a double-digit rate over 2016, accounting for more than 30 percent of U.S. consumption.  Notwithstanding numerous anti-dumping and countervailing duty orders, which are limited in scope, imports of most types of steel continue to increase.

---

[6]  *See infra,* section V(A)(3) and Appendix J.

[7]  2001 Report at 14.  The 2001 Report is not clear whether it used short tons or metric tons.  If short tons were used then the metric ton equivalent is 30.56 million metric tons.

2.  Import penetration levels for flat, semi-finished, stainless, long, and pipe and tube products continue on an upward trend above 30 percent of domestic consumption.

3.  Imports are nearly four times U.S. exports.

4.  Imports are priced substantially lower than U.S. produced steel.

5.  Excessive steel imports have adversely impacted the steel industry. Numerous U.S. steel mill closures, a substantial decline in employment, lost domestic sales and market share, and marginal annual net income for U.S.-based steel companies illustrate the decline of the U.S. steel industry.

C.  *Displacement of Domestic Steel by Excessive Quantities of Imports has the Serious Effect of Weakening our Internal Economy*

1.  As steel imports have increased, U.S. steel production capacity has been stagnant and production has decreased.

2.  Since 2000, foreign competition and the displacement of domestic steel by excessive imports have resulted in the closure of six basic oxygen furnace facilities and the idling of four more (which is more than a 50 percent reduction in the number of such facilities), a 35 percent decrease in employment in the steel industry, and caused the domestic steel industry as a whole to operate on average with negative net income since 2009.

3.  The declining steel capacity utilization rate is not economically sustainable. Utilization rates of 80 percent or greater are necessary to sustain adequate profitability and continued capital investment, research and development, and workforce enhancement in the steel sector.

D.  *Global Excess Steel Capacity is a Circumstance that Contributes to the Weakening of the Domestic Economy*

1.  In the steel sector, free markets globally are adversely affected by substantial chronic global excess steel production led by China. The world's nominal crude steelmaking capacity reached about 2.4 billion metric tons in 2016, an increase of 127 percent compared to the capacity

level in 2000, while steel demand grew at a much smaller rate. In 2016 there was a 737 million metric ton global gap between steelmaking capacity and steel crude demand, which means there is unlikely to be any market-driven reduction in steel exports to the United States in the near future.[8]

2. While U.S. steel production capacity has remained flat since 2001, other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined. This overhang of excess capacity means that U.S. steel producers, for the foreseeable future, will face increasing competition from imported steel as other countries export more steel to the United States to bolster their own economic objectives and offset loss of markets to Chinese steel exports.

## Conclusion

Based on these findings, the Secretary of Commerce concludes that the present quantities and circumstance of steel imports are "weakening our internal economy" and threaten to impair the national security as defined in Section 232. The Secretary considered the Department's narrower investigation of iron ore and semi-finished steel imports in 2001, which recommended no action be taken, and finds that several important factors – the broader scope of the investigation, the level of global excess capacity, the level of imports, the reduction in basic oxygen furnace facilities since 2001, and the potential impact of further plant closures on capacity needed in a national emergency, support recommending action under Section 232. In light of this conclusion, the Secretary has determined that the only effective means of removing the threat of impairment is to reduce imports to a level that should, in combination with good management, enable U.S. steel mills to operate at 80 percent or more of their rated production capacity.

---

[8]   Source: Global Forum report; http://www.bmwi.de/Redaktion/EN/Downloads/global-forum-on-steel-excess-capacity-report.pdf

## Recommendation

Prior significant actions to address steel imports using quotas and/or tariffs were taken under various statutory authorities by President George W. Bush, President William J. Clinton (three times), President George H. W. Bush, President Ronald W. Reagan (three times), President James E. Carter (twice), and President Richard M. Nixon, all at lower levels of import penetration than the present level, which is greater than 30 percent.

Due to the threat, as defined in Section 232, to national security from steel imports, the Secretary recommends that the President take immediate action by adjusting the level of these imports through quotas or tariffs. The quotas or tariffs imposed should be sufficient, even after any exceptions (if granted), to enable U.S. steel producers to operate at an 80 percent or better average capacity utilization rate based on available capacity in 2017 (*see* Figure 1).

| Figure 1.  Import Levels and U.S. Steel Mill Capacity Utilization Rates* | | |
|---|---|---|
| **Steel Market Snapshot (millions of metric tons)** | **2011-2016 Average** | **2017 Annualized** |
| Total Demand for Steel in U.S. (production + imports-exports) | **105.5** | **107.3** |
| U.S. Annual Capacity | **114.4** | **113.3** |
| U.S. Annual Production (liquid) | **84.6** | **81.9** |
| Capacity Utilization Rate (percentage) | **74.0** | **72.3** |
| **Imports and Exports (millions of metric tons)** | | |
| Imports of Steel to U.S. (including semi-finished) | **31.8** | **36.0** |
| Exports of Steel from the U.S. | **10.8** | **10.1** |
| Percent Import Penetration | **30.1** | **33.8** |
| **Production at Various Utilization Rates (millions of metric tons)** | | |
| Maximum Capacity | **114.4** | **113.3** |
| Production at 75% Capacity Utilization | **85.8** | **85.0** |
| Production at 80% Capacity Utilization | **91.5** | **90.6** |
| Production at 85% Capacity Utilization | **97.2** | **96.3** |
| **Import Levels and Domestic Production Targets Based on 80% Capacity Utilization** | | |
| **General Equilibrium (GTAP Model – Includes Reduction in Exports and Demand)** | | |
| Maximum Import Level (mmt) | **22.7** | |
| Estimated Import Penetration | **22%** | |
| Estimated Production (mmt) | **90.6** | |
| **Alternative 1A: Quota Applied to 2017 Import Levels** | **63%** | |
| **Alternative 1B: Tariff Rate Applied to All Imports** | **24%** | |
| *Numbers may differ slightly due to rounding. **Sources: United States Department of Commerce, Bureau of the Census; American Iron and Steel Institute.  Calculations based on industry and trade data.** | | |

The Secretary recommends that the President impose a quota or tariff on all steel products covered in this investigation imported into the United States to remove the threatened impairment to national security.

## Alternative 1 – Global Quota or Tariff

### 1A.    Global Quota

Impose quotas on all imported steel products at a specified percent of the 2017 import level, applied on a country and steel product basis.

According to the Global Trade Analysis Project (GTAP) Model[9], produced by Purdue University, a 63 percent quota would be expected to reduce steel imports by about 37 percent (13.3 million metric tons) from 2017 levels. Based on imports from January to October, import levels for 2017 are projected to reach 36.0 million metric tons. This action would result in imports equaling about 22.7 million metric tons, which will enable an 80 percent capacity utilization rate at 2017 demand levels (including exports).

### 1B.    Global Tariff

Apply a tariff rate on all imported steel products, in addition to any antidumping or countervailing duty collections applicable to any imported steel product.

According to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 24 percent tariff on all steel imports would be expected to reduce imports by 37 percent (i.e., a reduction of 13.3 million metric tons from 2017 levels of 36.0 million metric tons). This tariff rate would thus result in imports equaling about 22.7 million metric tons, which will enable an 80 percent capacity utilization rate at 2017 demand levels (including exports).

### Alternative 2 – Tariffs on a Subset of Countries

Apply a tariff rate on all imported steel products from Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia and Costa Rica, in addition to any antidumping or countervailing duty collections applicable to any steel products from those countries. All other countries would be limited to 100 percent of their 2017 import level.

According to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 53 percent tariff on all steel imports from this subset of countries would be expected to reduce imports by 13.3 million metric tons from 2017

---

[9]    The standard GTAP Model is a static multiregional, multisector, computable general equilibrium model, with perfect competition and constant returns to scale. The model is based on optimizing behavior by economic agents. The standard GTAP closure allows all prices and wages in the economy to adjust so as to ensure supply equals demand in all markets including the labor market. The estimates in this report were made using the GTAP 10 model which has a 2014 base.

import levels from the targeted countries. This action would enable an increase in domestic production to achieve an 80 percent capacity utilization rate at 2017 demand levels (including exports). The countries identified are projected to account for less than 4 percent of U.S. steel exports in 2017.

## Exemptions

In selecting an alternative, the President could determine that specific countries should be exempted from the proposed 63 percent quota or 24 percent tariff by granting those specific countries 100 percent of their prior imports in 2017, based on an overriding economic or security interest of the United States. The Secretary recommends that any such determination should be made at the outset and a corresponding adjustment be made to the final quota or tariff imposed on the remaining countries. This would ensure that overall imports of steel to the United States remain at or below the level needed to enable the domestic steel industry to operate as a whole at an 80 percent or greater capacity utilization rate. The limitation to 100 percent of each exempted country's 2017 imports is necessary to prevent exempted countries from producing additional steel for export to the United States or encouraging other countries to seek to trans-ship steel to the United States through the exempted countries.

It is possible to provide exemptions from either the quota or tariff and still meet the necessary objective of increasing U.S. steel capacity utilization to a financially viable target of 80 percent. However, to do so would require a reduction in the quota or increase in the tariff applied to the remaining countries to offset the effect of the exempted import tonnage.

## Exclusions

The Secretary recommends an appeal process by which affected U.S. parties could seek an exclusion from the tariff or quota imposed. The Secretary would grant exclusions based on a demonstrated: (1) lack of sufficient U.S. production capacity of comparable products; or (2) specific national security based considerations. This appeal process would include a public comment period on each exclusion request,

and in general, would be completed within 90 days of a completed application being filed with the Secretary.

An exclusion may be granted for a period to be determined by the Secretary and may be terminated if the conditions that gave rise to the exclusion change. The U.S. Department of Commerce will lead the appeal process in coordination with the Department of Defense and other agencies as appropriate. Should exclusions be granted the Secretary would consider at the time whether the quota or tariff for the remaining products needs to be adjusted to increase U.S. steel capacity utilization to a financially viable target of 80 percent.

## II.    LEGAL FRAMEWORK

### I. Section 232 Requirements

Section 232 provides the Secretary with the authority to conduct investigations to determine the effect on the national security of the United States of imports of any article. It authorizes the Secretary to conduct an investigation if requested by the head of any department or agency, upon application of an interested party, or upon his own motion. *See* 19 U.S.C. § 1862(b)(1)(A).

Section 232 directs the Secretary to submit to the President a report with recommendations for "action or inaction under this section" and requires the Secretary to advise the President if any article "is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." *See* 19 U.S.C. § 1862(b)(3)(A).

Section 232(d) directs the Secretary and the President to, in light of the requirements of national security and without excluding other relevant factors, give consideration to the domestic production needed for projected national defense requirements and the capacity of the United States to meet national security requirements. *See* 19 U.S.C. § 1862(d).

Section 232(d) also directs the Secretary and the President to "recognize the close relation of the economic welfare of the Nation to our national security, and ...take into consideration the impact of foreign competition on the economic welfare of individual domestic industries" by examining whether any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports, or other factors, result in a "weakening of our internal economy" that may impair the national security. *See* 19 U.S.C. § 1862(d).

Once an investigation has been initiated, Section 232 mandates that the Secretary provide notice to the Secretary of Defense that such an investigation has been initiated. Section 232 also requires the Secretary to do the following:

(1)    "Consult with the Secretary of Defense regarding the methodological and policy questions raised in [the] investigation;"

(2)    "Seek information and advice from, and consult with, appropriate officers of the United States;" and

(3)    "If it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation."[10] *See* 19 U.S.C. § 1862(b)(2)(A)(i)-(iii).

As detailed in Parts III and V of this report, each of the legal requirements set forth above has been satisfied.

In conducting the investigation, Section 232 permits the Secretary to request that the Secretary of Defense provide an assessment of the defense requirements of the article that is the subject of the investigation. *See* 19 U.S.C. § 1862(b)(2)(B).

Upon completion of a Section 232 investigation, the Secretary is required to submit a report to the President no later than 270 days after the date on which the investigation was initiated. *See* 19 U.S.C. § 1862(b)(3)(A). The required report must:

(1)    Set forth "the findings of such investigation with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security;"

(2)    Set forth, "based on such findings, the recommendations of the Secretary for action or inaction under this section;" and

(3)    "If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security . . . so advise the President." *See* 19 U.S.C. § 1862(b)(3)(A).

---

[10]    Department regulations (i) set forth additional authority and specific procedures for such input from interested parties, *see* 15 C.F.R. §§ 705.7 and 705.8, and (ii) provide that the Secretary may vary or dispense with those procedures "in emergency situations, or when in the judgment of the Department, national security interests require it." Id., § 705.9.

All unclassified and non-proprietary portions of the report submitted by the Secretary to the President must be published.

Within 90 days after receiving a report in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall:

(1)     "Determine whether the President concurs with the finding of the Secretary;" and

(2)     "If the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."  *See* 19 U.S.C. § 1862(c)(1)(A).

## II. Discussion

While Section 232 does not contain a definition of "national security", both Section 232, and its implementing regulations at 15 C.F.R. Part 705, contain non-exclusive lists of factors that Commerce must consider in evaluating the effect of imports on the national security.  Congress in Section 232 explicitly determined that "national security" includes, but is not limited to, "national defense" requirements. *See* 19 U.S.C. § 1862(d).  The Department in 2001 determined that "national defense" includes both defense of the United States directly and the "ability to project military capabilities globally."[11]

The Department also concluded in 2001 that "in addition to the satisfaction of national defense requirements, the term "national security" can be interpreted more broadly to include the general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements that are critical to the minimum operations of the economy and government."  The Department called these "critical industries."[12]   This report once again uses these reasonable

---

[11] Department of Commerce, Bureau of Export Administration; *The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security*; Oct. 2001 ("2001 Report").

[12] *Id.*

interpretations of "national defense" and "national security." However, this report uses the more recent 16 critical infrastructure sectors identified in Presidential Policy Directive 21[13] instead of the 28 critical industry sectors used by the Bureau of Export Administration in the 2001 Report.[14]

Section 232 directs the Secretary to determine whether imports of any article are being made "in such quantities or under such circumstances" that those imports "threaten to impair the national security." *See* 19 U.S.C. § 1862(b)(3)(A). The statutory construction makes clear that either the quantities or the circumstances, standing alone, may be sufficient to support an affirmative finding. They may also be considered together, particularly where the circumstances act to prolong or magnify the impact of the quantities being imported.

The statute does not define a threshold for when "such quantities" of imports are sufficient to threaten to impair the national security, nor does it define the "circumstances" that might qualify.

Likewise, the statute does not require a finding that the quantities or circumstances are impairing the national security. Instead, the threshold question under Section 232 is whether those quantities or circumstances "threaten to impair the national security." *See* 19 U.S.C. § 1862(b)(3)(A). This formulation strongly suggests that Congress expected an affirmative finding under Section 232 would occur before there is actual impairment of the national security.[15]

Section 232(d) contains a considerable list of factors for the Secretary to consider in determining if imports "threaten to impair the national security"[16] of the United States, and this list is mirrored in the implementing regulations. *See* 19

---

[13]  Presidential Policy Directive 21; Critical Infrastructure Security and Resilience; February 12, 2013 ("PPD-21").

[14]  See Op. Cit. at 16.

[15]  The 2001 Report used the phrase "fundamentally threaten to impair" when discussing how imports may threaten to impair national security. *See* 2001 Report at 7 and 37. Because the term "fundamentally" is not included in the statutory text and could be perceived as establishing a higher threshold, the Secretary expressly does not use the qualifier in this report. The statutory threshold in Section 232(b)(3)(A) is unambiguously "threaten to impair" and the Secretary adopts that threshold without qualification. 19 U.S.C. § 1862(b)(3)(A). The statute also uses the formulation "may impair" in Section 232(d). *Id.* at 1862(d).

[16]  19 U.S.C. § 1862(b)(3)(A).

U.S.C. § 1862(d) and 15 C.F.R. § 705.4.  Congress was careful to note twice in Section 232(d) that the list they provided, while mandatory, is not exclusive.[17] Congress' illustrative list is focused on the ability of the United States to maintain the domestic capacity to provide the articles in question as needed to maintain the national security of the United States.[18]  Congress broke the list of factors into two equal parts using two separate sentences.  The first sentence focuses directly on "national defense" requirements, thus making clear that "national defense" is a subset of the broader term "national security."  The second sentence focuses on the broader economy, and expressly directs that the Secretary and the President "shall recognize the close relation of the economic welfare of the Nation to our national security."[19]  *See* 19 U.S.C. § 1862(d).

Two of the factors listed in the second sentence of Section 232(d) are most relevant in this investigation.  Both are directed at how "such quantities" of imports threaten to impair national security.  *See* 19 U.S.C. § 1862(b)(3)(A).  In administering Section 232, the Secretary and the President are required to "take into consideration the impact of foreign competition on the economic welfare of individual domestic industries" and any "serious effects resulting from the displacement of any domestic products by excessive imports" in "determining whether such weakening of our internal economy may impair the national security."

---

[17]  *See* 19 U.S.C. § 1862(d) ("the Secretary and the President shall, in light of the requirements of national security and without excluding other relevant factors…" and "serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors…  ").

[18]  This reading is supported by Congressional findings in other statutes.  *See, e.g.,* 15 U.S.C. § 271(a)(1)("The future well-being of the United States economy depends on a strong manufacturing base…") and 50 U.S.C. § 4502(a)("Congress finds that – (1) the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services… (2)(C) to provide for the protection and restoration of domestic critical infrastructure operations under emergency conditions… (3)… the national defense preparedness effort of the United States Government requires – (C) the development of domestic productive capacity to meet – (ii) unique technological requirements… (7) much of the industrial capacity that is relied upon by the United States Government for military production and other national defense purposes is deeply and directly influenced by – (A) the overall competitiveness of the industrial economy of the United States; and (B) the ability of industries in the United States, in general, to produce internationally competitive products and operate profitably while maintaining adequate research and development to preserve competitiveness with respect to military and civilian production; and (8) the inability of industries in the United States, especially smaller subcontractors and suppliers, to provide vital parts and components and other materials would impair the ability to sustain the Armed Forces of the United States in combat for longer than a short period.").

[19]  *Accord* 50 U.S.C. § 4502(a).

*See* 19 U.S.C. § 1862(d). Since the 2001 investigation, foreign competition and the displacement of domestic steel by excessive imports have resulted in the closure of six basic oxygen furnace facilities and the idling of four more (which is more than a 50 percent reduction in the number of such facilities), a 35 percent decrease in employment in the steel industry, and caused the domestic steel industry as a whole to operate on average with negative net income since 2009.

Another factor, not on the list, that the Secretary finds to be a relevant is the presence of massive excess capacity for producing steel. This excess capacity results in steel imports occurring "under such circumstances" that they threaten to impair the national security. *See* 19 U.S.C. § 1862(b)(3)(A). The circumstance of excess global steel production capacity is a factor because, while U.S. production capacity has remained flat since 2001, other steel producing nations have increased their production capacity, with China alone able to produce as much as the rest of the world combined. This overhang of global excess capacity means that U.S. steel producers, for the foreseeable future, will continue to lose market share to imported steel as other countries export more steel to the United States to bolster their own economic objectives and offset loss of markets to Chinese steel exports.

It is these three factors – displacement of domestic steel by excessive imports and the consequent adverse impact on the economic welfare of the domestic steel industry, along with global excess capacity in steel – that the Secretary has concluded create a persistent threat of further plant closures that could leave the United States unable in a national emergency to produce sufficient steel to meet national defense and critical industry needs. The Secretary finds this "weakening of our internal economy may impair the national security" as defined in Section 232. *See* 19 U.S.C. 1862(d).

The Secretary also considered whether the source of the imports affects the analysis under Section 232. In the 2001 Report, "the Department found that iron ore and semi-finished steel are imported from reliable foreign sources" and concluded that "even if the United States were dependent on imports of iron ore and semi-finished steel, imports would not threaten to impair national security." 2001 Report at 27. However, because Congress in Section 232 chose to explicitly direct the Secretary to consider whether the "impact of foreign competition" and "the

displacement of any domestic products by excessive imports" are "weakening our internal economy" but made no reference to an assessment of the sources of imports, it appears likely that Congress recognized adverse impacts might be caused by imports from allies or other reliable sources.[20]  As a result, the fact that some or all of the imports causing the harm are from reliable sources does not compel a finding that those imports do not threaten to impair national security.[21]

After careful examination of the facts in this investigation, the Secretary has concluded that excessive imports of steel in the present circumstances do threaten to impair national security under Section 232.  Several important factors – the broader scope of the investigation,[22] the level of global excess capacity, the level of imports, the reduction in basic oxygen furnace facilities since 2001, and the potential impact of further plant closures on capacity needed in a national emergency – support a recommendation different from the one adopted in the 2001 Report.

---

[20]  When Congress adopted Section 232(d) in 1962 the immediately preceding section was Section 231, 19 U.S.C. § 1861, which required the President, as soon as practicable, to suspend most-favored-nation tariff treatment for imports from communist countries.  Given the bipolar nature of the world at the time, the absence of a distinction between communist and non-communist countries in Section 232 suggests that Congress expected Section 232 would be applied to imports from all countries—including allies and other "reliable" sources.

[21]  To the extent that the 2001 Report or other prior Department reports under Section 232 can be read to conclude that imports from reliable sources cannot impair the national security when the Secretary finds those imports are causing "substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports", the Secretary expressly rejects such a reading.

[22]  This investigation examines the import of a broad range of steel products – flat, long, pipe and tube, semi-finished, and stainless – whereas the 2001 Report addressed only semi-finished steel products and iron ore, which is not part of this investigation.  As the 2001 Report noted, at the time semi-finished imports accounted for "a small percentage (approximately 7 percent) of total U.S. semi-finished steel consumption."  2001 Report at 31.  The 2001 Report also stated that "whether imports have harmed or threaten to harm U.S. producers writ large is beyond the scope of the Department's inquiry, and need not be resolved here."  *Id.* at 37.  This investigation is focused on the larger inquiry that the 2001 Report expressly did not reach.

## III.  INVESTIGATION PROCESS

### A.  *Initiation of Investigation*

On April 19, 2017, U.S. Secretary of Commerce Wilbur Ross initiated an investigation to determine the effect of imported steel on national security under Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862).

Pursuant to Section 232(b)(1)(B), the Department notified the U.S. Department of Defense with an April 19, 2017 letter from Secretary Ross to Secretary James Mattis.[23]

On April 20, 2017, President Donald Trump signed a Presidential Memorandum directing Secretary Ross to proceed expeditiously in conducting his investigation and submit a report on his findings to the President.[24]

On April 21, 2017, the Department published in the Federal Register a notice about the initiation of this investigation to determine the effect of imports of steel on the national security.  The notice also announced the opening of the public comment period as well as a public hearing to be held on May 24, 2017.[25]

### B.  *Public Hearing*

The Department held a public hearing to elicit further information concerning this investigation in Washington, DC, on May 24, 2017.  The Department heard testimony from 37 witnesses at the hearing.  A full list of witnesses and copies of their testimony are included in Appendices E and F.

### C.  *Public Comments*

On April 21, 2017, the Department invited interested parties to submit written comments, opinions, data, information, or advice relevant to the criteria listed in

---

[23]  19 U.S.C. § 1862(b)(1)(B).  *See* Appendix A: Section 232 Investigation Notification Letter to Secretary of Defense James Mattis (April 19, 2017) ; Department of Defense Response to Notification (May 8, 2017)

[24]  *See* Appendix B: Presidential Memorandum for the Secretary of Commerce - Steel Imports and Threats to National Security (April 20, 2017)

[25]  *See* Appendices C and D for Federal Register Notice Federal Register, Vol. 82, No. 79, 19205-19207 and *See* Federal Register, Vol. 82, No. 98, 23529-23530.

Section 705.4 of the National Security Industrial Base Regulations (15 C.F.R. § 705.4) as they affect the requirements of national security, including the following: (a) Quantity of the articles subject to the investigation and other circumstances related to the importation of such articles; (b) Domestic production capacity needed for these articles to meet projected national defense requirements; (c) The capacity of domestic industries to meet projected national defense requirements; (d) Existing and anticipated availability of human resources, products, raw materials, production equipment, facilities, and other supplies and services essential to the national defense; (e) Growth requirements of domestic industries needed to meet national defense requirements and the supplies and services including the investment, exploration and development necessary to assure such growth; (f) The impact of foreign competition on the economic welfare of any domestic industry essential to our national security; (g) The displacement of any domestic products causing substantial unemployment, decrease in the revenues of government, loss of investment or specialized skills and productive capacity, or other serious effects; (h) Relevant factors that are causing or will cause a weakening of our national economy; and (i) Any other relevant factors. *See* Federal Register, Vol. 82, No. 79, 19205-19207.

The public comment period ended on May 31, 2017. The Department received 201 written public comment submissions concerning this investigation. All public comments were carefully reviewed and factored into the investigation process. For a listing of all public comments, *see* Appendix G.

### D.    *Interagency Consultation*

In addition to the required notification provided by the April 19, 2017 letter from Secretary Ross to Secretary Mattis, Department staff carried out the consultations required under Section 232(b)(2).[26] Staff consulted with their counterparts in the Department of Defense regarding any methodological and policy questions that arose during the investigation. Discussions were held with the U.S. Army Materiel Command, the Defense Logistics Agency, the U.S. Navy/Naval Air

---

[26]  19 U.S.C. § 1862(b)(2)

Systems Command, and the Under Secretary of Defense for Acquisitions & Logistics, Manufacturing and Industrial Base Policy.

Discussions were also held with "appropriate officers of the United States," including the Department of State, Department of the Treasury, Department of the Interior/U.S. Geological Survey, the Department of Homeland Security/U.S. Customs and Border Protection, the International Trade Commission, and the Office of the United States Trade Representative.[27]

---

[27] *Id.*

# IV. PRODUCT SCOPE OF THE INVESTIGATION[28, 29]

For this report, the product scope covers steel mill products ("steel") which are defined at the Harmonized System ("HS") 6-digit level as: 720610 through 721650, 721699 through 730110, 730210, 730240 through 730290, and 730410 through 730690, including any subsequent revisions to these HS codes. The following discontinued HS codes have been included for purposes of reporting historical data (prior to 2007): 722520, 722693, 722694, 722910, 730410, 730421, 730610, 730620, and 730660.

These steel products are all produced by U.S. steel companies and support various applications across the defense, critical infrastructure, and commercial sectors. Generally, these products fall into one of the following five product categories (including but not limited to):

(1) Carbon and Alloy Flat Product (Flat Products): Produced by rolling semi-finished steel through varying sets of rolls. Includes sheets, strips, and plates.

Flat products are covered under the following 6-digit HS codes: 720810, 720825, 720826, 720827, 720836, 720837, 720838, 720839, 720840, 720851, 720852, 720853, 720854, 720890, 720915, 720916, 720917, 720918, 720925, 720926, 720927, 720928, 720990, 721011, 721012, 721020, 721030, 721041, 721049, 721050, 721061, 721069, 721070, 721090, 721113, 721114, 721119, 721123, 721129, 721190, 721210, 721220, 721230, 721240, 721250, 721260, 722511, 722519, 722530, 722540, 722550, 722591, 722592, 722599, 722611, 722619, 722691, 722692, 722693, 722694, 722699

(2) Carbon and Alloy Long Products (Long Products): Steel products that fall outside the flat products category. Includes bars, rails, rods, and beams.

Long products are covered under the following 6-digit HS codes: 721310, 721320, 721391, 721399, 721410, 721420, 721430, 721491, 721499,

---

[28] The scope includes steel products.

[29] Note that import data for steel products includes what are believed to be very small amounts of iron as well as steel, both of which are included in the HS codes covered in the scope.

721510, 721550,721590, 721610, 721621, 721622, 721631, 721632,
721633, 721640, 721650, 721699, 721710, 721720, 721730, 721790,
722520, 722620,722710, 722720, 722790, 722810, 722820, 722830,
722840, 722850, 722860, 722870, 722880, 722910,722920, 722990,
730110, 730210, 730240, 730290

(3) Carbon and Alloy Pipe and Tube Products (Pipe and Tube Products): Either seamless or welded pipe and tube products. Some of these products may include stainless as well as alloy other than stainless.

Pipe and Tube products are covered under the following 6-digit HS codes: 730410, 730419, 730421, 730423, 730429, 730431, 730439, 730451, 730459, 730490, 730511, 730512, 730519, 730520, 730531, 730539, 730590, 730610, 730619, 730620, 730629, 730630, 730650, 730660, 730661, 730669, 730690

(4) Carbon and Alloy Semi-finished Products (Semi-finished Products): The initial, intermediate solid forms of molten steel, to be re-heated and further forged, rolled, shaped, or otherwise worked into finished steel products. Includes blooms, billets, slabs, ingots, and steel for castings.

Semi-finished products are covered under the following 6-digit HS codes: 720610, 720690, 720711, 720712, 720719, 720720, 722410, 722490

(5) Stainless Products: Steel products, in flat-rolled, long, pipe and tube, and semi-finished forms, containing at minimum 10.5 percent chromium and, by weight, 1.2 percent or less of carbon, offering better corrosion resistance than other steel.

Stainless steel products are covered under the following 6-digit HS codes: 721810, 721891, 721899, 721911, 721912, 721913, 721914, 721921, 721922, 721923, 721924, 721931, 721932, 721933, 721934, 721935, 721990, 722011, 722012, 722020, 722090, 722100, 722211, 722219, 722220, 722230, 722240, 722300, 730411, 730422, 730424, 730441, 730449, 730611, 730621, 730640

Barcode:3814772-143 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

# V. FINDINGS

## A. *Steel is Important to U.S. National Security*

As discussed in Part II, "national security" under Section 232 includes both (1) national defense, and (2) critical infrastructure needs.

### 1. Steel is Needed for National Defense Requirements

Steel articles are critical to the nation's overall defense objectives.[30]  The U.S. Department of Defense (DoD) has a large and ongoing need for a range of steel products that are used in fabricating weapons and related systems for the nation's defense.[31]  DoD requirements – which currently require about three percent of U.S. steel production – are met by steel companies that also support the requirements for critical infrastructure and commercial industries.

The free market system in the United States requires commercially viable steel producers to meet defense needs.  No company could afford to construct and operate a modern steel mill solely to supply defense needs because those needs are too diverse.  In order to supply those diverse national defense needs, U.S. steel mills must attract sufficient commercial (i.e., non-defense) business.  The commercial revenue supports construction, operation, and maintenance of production capacity as well as the upgrades, research and development required to continue to supply defense needs in the future.  *See* Appendix H for examples.

### 2. Steel is Required for U.S. Critical Infrastructure

Steel also is needed to satisfy requirements for "those industries that the U.S. Government has determined are critical to minimum operations of the economy and government."[32]  In the 2001 Report the Department identified 28 "critical industries."[33]  The Critical Infrastructure Assurance Office that identified the

---

[30] *Accord*, 2001 Report at 1, 12.

[31] AISI 2017 public policy agenda, available from http://www.steel.org/~/media/Files/AISI/Reports/AISI-2017-Public-Policy-Agenda.pdf?la=en

[32] 2001 Report at 14. *See also,* 2001 Report at 16, Table 2, for a listing of the 28 critical industries.

[33] *Id.*

23

"critical industries" is no longer in existence, so for this investigation the Department instead relied on the industries identified by the U.S. Government in the 2013 Presidential Policy Directive 21 (PPD-21).[34] The Secretary believes that the range of industries identified in PPD-21 is comparable to the range of critical industries analyzed in the 2001 Report.

Pursuant to PPD-21, there are 16 designated critical infrastructure sectors in the United States, many of which use high volumes of steel (*see* Appendix I).[35] The 16 sectors include chemical production, communications, dams, energy, food production, nuclear reactors, transportation systems, water, and waste water systems.

Increased quantities of steel will be needed for various critical infrastructure applications in the coming years. The American Society of Civil Engineers estimates that the United States needs to invest $4.5 trillion in infrastructure by 2025, and a substantial portion of these projects require steel content.[36]

### 3.    Domestic Steel Production is Essential for National Security Applications

Domestic steel production is essential for national security. Congress, in Section 232(d), directed the Secretary of Commerce and the President to consider domestic production and the economic welfare of the United States in determining whether imports threaten to impair national security.

In the case of steel, the history of U.S. Government actions to ensure the continued viability of the U.S. steel industry demonstrates that, across decades and Administrations, there has been consensus that domestic steel production is vital to national security.

---

[34]  PPD-21 can be viewed at https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil

[35]  Department of Homeland Security, "Critical Infrastructure Sectors," https://www.dhs.gov/critical-infrastructure-sectors#

[36]  2017 Infrastructure Report Card, American Society of Civil Engineers, https://www.infrastructurereportcard.org/wp-content/uploads/2016/10/2017-Infrastructure-Report-Card.pdf

24

Prior significant actions under various statutory authorities to address steel imports using quotas or tariffs were taken by President George W. Bush, President William J. Clinton (three times), President George H. W. Bush, President Ronald W. Reagan (three times), President James E. Carter (twice), and President Richard M. Nixon, all at lower levels of import penetration than at present.  In the 1970s, action was taken to limit import penetration to approximately 19 percent.  In the 1980s, import penetration had reached 21 percent and the U.S. Government enacted correcting measures.  In the 1990s and 2000s import penetration again reached up to 23 percent, which prompted the U.S. Government to take additional actions.[37]  In 2016, import penetration averaged 30 percent and for the first nine months of 2017 imports have consistently averaged over 30 percent of U.S. domestic demand.

### 4.    Domestic Steel Production Depends on a Healthy and Competitive U.S. Industry

U.S. steel producers would be unable to survive purely on defense or critical infrastructure steel needs.  In the steel industry, it is commercial and industrial customer sales that generate the relatively steady production needed for manufacturing efficiency, and the revenue volume needed to sustain the business.  Sales for critical infrastructure and defense applications are often less predictable, cyclical, and limited in volume.

Steel manufacturers operating in the United States, however, have seen their commercial and industrial business steadily eroded by a growing influx of lower-priced imported product from countries where steel manufacturing often is subsidized, directly or indirectly.  The Department of Commerce currently has 164 antidumping and countervailing duty determinations in effect, and has 20 additional cases under investigation, to address specific cases.  *See* Appendix K.

### 5.    Steel Consumed in Critical Industries

In this investigation, the issue before the Department is whether steel imports "threaten to impair" national security.  *See* 19 U.S.C. § 1862.  As discussed in Part II, the Secretary has determined that in the present case the relevant factors are the

---

[37]  *See* Appendix J for additional detail on U.S. Government actions on steel in the past.

25

"serious effects resulting from the displacement of … domestic [steel] products by excessive imports" and the "impact of foreign competition on the economic welfare of individual domestic [steel] industries" that, when combined with the circumstance of massive global excess capacity, causes a "weakening of our internal economy" that "may impair the national security."[38]

In a free market system, the ability of the domestic steel industry to continue meeting national security needs depends on the continued capability of the U.S. steel industry to compete fairly in the commercial marketplace and maintain a financially viable domestic manufacturing capability.  This includes the need to have an adequately skilled workforce for manufacturing as well as to conduct research and development for future products.[39]  A continued loss of viable commercial production capabilities and related skilled workforce will jeopardize the U.S. steel industry's ability to meet the full spectrum of national security requirements.

The Department in 2001 determined that the "critical industries" sector, which is analogous to the more robust critical infrastructure sectors identified pursuant to PPD-21, would require "no more than 33.68 million tons of finished steel per year,"[40] based on 30.88 percent of domestic consumption being used in industries related to critical infrastructure.  The Department has now updated the "critical industries" calculation from the 2001 Report[41] using Census Bureau steel usage figures from 2007, which are the latest available.  *See* Appendix I for more detailed information on steel needs for critical infrastructure.

---

[38]  19 U.S.C. § 1862(d).

[39]  *See* 50 U.S.C. § 4502(a)("Congress finds that – … (7) much of the industrial capacity that is relied upon by the United States Government for military production and other national defense purposes is deeply and directly influenced by – (A) the overall competitiveness of the industrial economy of the United States; and the ability of industries in the United States, in general, to produce internationally competitive products and operate profitably while maintaining adequate research and development to preserve competitiveness with respect to military and civilian production…").

[40]  2001 Report at 14.  The report is not clear whether it is referring to short tons or metric tons.  While not crucial to the analysis, if the figure is in short tons then the equivalent amount in metric tons would be 30.56 million metric tons.

[41]  2001 Report at 16 (Table 2).

26

The updated analysis in Appendix I shows that 49.1 percent of domestic steel consumption in 2007 was used in critical industries. Domestic production in 2007 was 110 million metric tons. The 49.1 percent of domestic consumption used in critical industries equals 54 million metric tons, compared to 30.56 million metric tons (or 33.68 million short tons) used in critical industries in 1997. Thus in 10 years the demand for steel in critical industries increased by 63 percent.

## B. Imports in Such Quantities as are Presently Found Adversely Impact the Economic Welfare of the U.S. Steel Industry

In the steel sector, foreign competition is characterized by substantial and sustained global overcapacity and production in excess of foreign domestic demand.

### 1. Imports of Steel Products Continue to Increase

The United States is the world's largest steel importer. The top 20 sources of U.S. imports of steel products accounted for approximately 91 percent of the roughly 36 million metric tons of steel the United States is expected to import in 2017 (*see* Figure 2).

Total U.S. imports rose from 25.9 million metric tons in 2011, peaking at 40.2 million metric tons in 2014 at the height of the shale hydrocarbon drilling boom. For 2017 (first ten months) imports are increasing at a double-digit rate over 2016, pushing finished steel imports consistently over 30 percent of U.S. consumption.

### Figure 2. Top U.S. Imports of All Steel Products

**Imports for Domestic Consumption, Quantity In Metric Tons, Ranked By 2017**

| 2017 Rank | Country | 2011 | 2017 (Annualized) | % Change 2011 2017 (Annualized) |
|---|---|---|---|---|
|  | **World** | 25,994,621 | 35,927,141 | 38% |
| 1 | Canada | 5,539,448 | 5,800,008 | 5% |
| 2 | Brazil | 2,820,927 | 4,678,530 | 66% |
| 3 | South Korea | 2,572,981 | 3,653,934 | 42% |
| 4 | Mexico | 2,625,104 | 3,249,292 | 24% |
| 5 | Russia | 1,269,717 | 3,123,691 | 146% |
| 6 | Turkey | 665,303 | 2,249,456 | 238% |
| 7 | Japan | 1,824,393 | 1,781,147 | -2% |
| 8 | Germany | 978,230 | 1,370,669 | 40% |
| 9 | Taiwan | 588,036 | 1,251,767 | 113% |
| 10 | India | 735,802 | 854,026 | 16% |
| 11 | China | 1,132,292 | 784,393 | -31% |
| 12 | Vietnam | 120,134 | 727,643 | 506% |
| 13 | Netherlands | 517,773 | 589,930 | 14% |
| 14 | Italy | 276,809 | 515,459 | 86% |
| 15 | Thailand | 72,183 | 417,389 | 478% |
| 16 | Spain | 195,907 | 403,091 | 106% |
| 17 | United Kingdom | 400,244 | 354,389 | -11% |
| 18 | South Africa | 123,001 | 350,425 | 185% |
| 19 | Sweden | 267,685 | 299,170 | 12% |
| 20 | United Arab Emirates | 63,316 | 290,221 | 358% |
| | **Top 20 Total** | **22,789,285** | **32,744,630** | **44%** |

Source: United States Department of Commerce, Bureau of the Census, Foreign Trade Division, IHS Global Trade Atlas Database: Revised Statistics for 2011 - 2017.  2017 data is annualized based on YTD 2017 through October.

As shown in Appendix K, antidumping and countervailing duty actions can address specific instances of unfairly traded steel products.  However, given the large number of countries from which the United States imports steel and the myriad of different products involved, it could take years to identify and investigate every instance of unfairly traded steel, or attempts to transship or evade remedial duties.

Moreover, U.S. industry has already spent hundreds of millions of dollars in recent years on AD/CVD cases, with seemingly no end in sight to their outlays. Smaller steel manufacturers are financially unable to afford these type of cases, or are hesitant to file cases in light of possible market entry retaliation in foreign markets for finished steel products.[42]

## 2.    High Import Penetration

In contrast to the situation in the 2001 Report, where imports of semi-finished steel represented approximately 7 percent of domestic consumption,[43] imports of finished steel products (i.e. not including semi-finished steel) currently represent over 25 percent of U.S. consumption (*see* Figure 3).[44]  If imports of semi-finished products are included, the import penetration level has been above 30 percent for the first ten months of 2017.  Import penetration of steel pipe and tube was 74 percent in 2016 and further increased in 2017.



**Figure 3. U.S. Import Penetration of Finished Steel Products (Excludes Semi-Finished)**

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | YTD 2016 | YTD 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Imp. Pen. | 26.4 | 21.6 | 22.3 | 20.4 | 20.4 | 15.9 | 21.6 | 20.9 | 26.7 | 21.9 | 23.9 | 21.7 | 20.9 | 21.8 | 23.9 | 23.1 | 28.1 | 28.9 | 25.5 | 25.4 | 27.5 |

Source: American Iron and Steel Institute. YTD data source is through October 2016 and October 2017. Excludes semi-finished imports.

---

[42]  Congress has specifically expressed concern about the need to maintain small suppliers and the potential adverse impact on military readiness caused by the loss of small suppliers.  *See* 50 U.S.C. § 4502(a)(8).

[43]  2001 Report at 31.

[44]  AISI's statistical yearbook reports that about 8 percent of U.S. shipments are made of imported substrate.

29

### 3. High Import to Export Ratio

U.S. imports of steel products, which displace demand for domestic steel and lower production at U.S. plants, reached nearly four times the level of exports of U.S. steel products in 2016 (*see* Figure 4).  The expansion of steel production capacity outside of the United States in the last decade (Asia, the Middle East, and South America), much of it subsidized by national governments, continues to depress world steel prices while making it increasingly difficult for U.S. companies to export their steel products.  While U.S. steel producers saw a mild increase in steel exports from 2005 to 2013, more recently sales to foreign customers have been declining.  Exports fell to nine million metric tons in 2016 from a 20-year high of 12 million metric tons annually from 2011 to 2013.  Most U.S. steel exports are auto industry related and are sent to Canada (50 percent by weight in 2016) and Mexico (39 percent by weight in 2016).  Flat products represent the majority of these exports – 57 percent of U.S. steel exports for Canada and 64 percent of steel exports for Mexico.



Figure 4. U.S. Imports and Exports of Steel Mill Products

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | YTD 2016 | YTD 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Imports | 38.1 | 32.7 | 34.8 | 27.7 | 29.9 | 21.1 | 32.6 | 29.3 | 41.3 | 30.3 | 29.2 | 14.7 | 21.8 | 26 | 30.5 | 29.3 | 40.3 | 35.4 | 30 | 25 | 29.9 |
| Exports | 5.4 | 5.1 | 6.3 | 5.8 | 5.8 | 7.8 | 7.5 | 9.1 | 9.2 | 10.5 | 12.9 | 9 | 11.5 | 12.8 | 13.1 | 12.1 | 11.5 | 9.6 | 8.9 | 7.2 | 8.1 |

Sources: IHS Markit Global Trade Atlas
YTD through October 2016 & 2017.

The same is true in the line pipe sector.  The United States exports a minimal amount of line pipe.  Exports of line pipe reached a recent peak of 525 thousand metric tons in 2013 before declining significantly.  Exports totaled just 60 thousand metric tons in 2016, a decrease of 89 percent from 2013, and were less than one-

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

twentieth of the size of line pipe imports. Canada represents the largest destination for U.S. line pipe exports, with 39 percent of 2016 exports going to Canada, followed by Mexico with 13 percent.

### 4.    Steel Prices

Hot-rolled coil prices are a benchmark price indicator for a common type of steel (*see* Figure 5). Hot rolled coil is considered a "benchmark" because it is a commodity product with a fairly common definition globally.



**Figure 5. Hot Rolled- USA Domestic Hot Rolled Coil (FOB Midwest Mill) $/mt**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US HRC | 674.27 | 597.22 | 962.51 | 538.89 | 680.56 | 822.62 | 701.84 | 696.20 | 727.78 | 505.65 | 575.68 | 684.11 |

Source: Platts (accessed from Bloomberg Financial) 2017 reflects the price through December (as of December 21, 2017.

U.S. prices for hot-rolled steel coil have been higher than in other countries since 2010. U.S. domestic benchmark prices for this product class dipped especially low in 2015 at $505.65/metric ton before recovering in 2016 to $575.68/metric ton. In 2016, the price of freight-on-board stowed China port steel hot-rolled coil was 14 percent lower than U.S. domestic hot-rolled coil. In the case of ASEAN nations, import prices for hot-rolled coil were 33 percent lower and North Europe domestic hot-rolled coil was 21 percent lower. Each region saw a price decline in 2015 (*see* Figure 6). U.S. prices remained higher than other regions' prices for this commodity level product throughout the period. Such higher prices are attributable to higher taxes, healthcare, environmental standards,

31

and other regulatory expenses. Moreover, lower prices in steel producing regions backed by state-subsidized enterprises adds pressure on U.S. competitors to export their steel products to the U.S. Again in 2016, all categories of steel in all countries continued to experience pressure to lower prices compared to what could be charged in 2012.



**Figure 6. Regional Comparison of Hot Rolled Coil Bench Mark Prices (USD/MT)**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017* |
|---|---|---|---|---|---|---|
| USA Domestic Hot Rolled Coil | 701.84 | 696.20 | 727.78 | 505.65 | 575.68 | 684.11 |
| Steel Hot Rolled Coil (FOB Stowed China Port) | 562.50 | 525.00 | 457.50 | 269.50 | 497.50 | 572.00 |
| Asean Import Hot Rolled Coil | 605.66 | 570.43 | 519.89 | 336.55 | 386.81 | 534.75 |
| North Europe Domestic Hot Rolled Coil | 659.54 | 614.41 | 568.41 | 420.19 | 455.29 | 604.90 |
| South Europe Domestic Steel Rebar | 636.59 | 598.34 | 551.66 | 394.11 | 427.68 | 568.53 |

Source: Bloomberg, Platts, Antaike. 2017 prices are through December 20, 2017.

In 2015, steel prices fell globally. As the OECD noted, the combined effect of weakening global steel demand, including in the United States, growing exports in many economies, and decreases in steelmaking costs led to a very sharp decline

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

in steel prices in 2015. Notwithstanding these effects, prices for steel in the U.S. remained substantially higher than in any other area. However, relative to prices between 2010 and 2013, prices are still relatively depressed.

Global excess steel production weakens the pricing power of U.S. steel producers. U.S. steel producers' costs are higher than the costs for producers in other regions due to higher taxes, healthcare, environmental, and other regulatory expenses. Higher U.S. steel prices incentivize importing lower-cost foreign steel. Moreover, excess production and lower prices in regions proximate to state subsidized enterprises displace purchases from market based steel exporters and add pressure on those market based suppliers to export to the U.S. The effect of global excess steel production on U.S. steel prices and import levels is discussed in greater detail in Appendix L.

### 5.    Steel Mill Closures

U.S. steel mill closures continue eroding overall U.S. steel mill capacity and employment. Many U.S. steel mills have been driven out of business due to declining steel prices, global overcapacity, and unfairly traded steel. Since 2000, the United States has lost over 25 percent of its basic oxygen furnace facilities with the closure of six facilities: RG Steel in Sparrows Point, Maryland; RG Steel in Steubenville, Ohio; RG Steel in Warren, Ohio; ArcelorMittal in East Chicago, Indiana; ArcelorMittal in Weirton, West Virginia; and U.S. Steel in Fairfield, Alabama.

In addition, four electric arc furnace steel facilities have closed: Evraz in Claymont, Delaware; ArcelorMittal in Georgetown, South Carolina; Gerdau in Sand Springs, Oklahoma; and Republic Steel in Lorain, Ohio. Most recently, ArcelorMittal has announced the closure of its plate rolling mill in Conshohocken, Pennsylvania, because of sagging commercial sales attributed to surging imports of low-cost steel product and flat defense demand.[45]

The closures of these facilities have had a significant impact on the U.S. industrial workforce and local economies. RG Steel suffered three closures:

---

[45]    Cowden, M. "Arcelor Mittal to Shut PA Plate Mill," American Metal market, September 18, 2017.

33

Sparrows Point, Maryland; Steubenville, Ohio; and Warren, Ohio. After filing for bankruptcy in 2012, more than 2,000 employees were displaced in Maryland alone and another 2,000 in the Midwest. The company cited weak demand in the steel industry as well as lack of financing as key contributors to the closure.[46]

Closures of smaller steel mills have had equally devastating impacts on employment. Gerdau Sand Springs in Oklahoma lost 300 employees after closing in 2009 because of a long-term drop in demand for steel.[47] Sand Springs was the last remaining steel plant in Oklahoma and had been in production since the 1920s.

In 2013, at least 345 employees were laid off in response to the closure of the Claymont steel mill in Delaware. The Governor of Delaware, Jack Markell, attributed the financial difficulties of the facility to "subdued market demand and the high volume of imports."[48]

Similar difficulties were cited by the ArcelorMittal's Georgetown, South Carolina facility and U.S. Steel's location in Fairfield, Alabama, both of which closed in 2015. Layoffs for these two corporations totaled 226 and more than 1,100 employees, respectively. Both companies attributed the layoffs to financial losses and ultimately, to facility closures due to the rise in competition from inexpensive imports.[49]

Even temporary idling of steel plants threatens the U.S. steel industry as there are significant financial costs with re-opening a steel mill. Multiple U.S. facilities remain idled: there are four idled basic oxygen furnace facilities, two each in Kentucky and Illinois, representing almost one third of the remaining basic oxygen

---

[46] Business Journal, "'Unforeseen Conditions' Closes Warren Steel Holdings," January 12, 2016, http://businessjournaldaily.com/utilities-cut-to-warren-steel-holdings/; Baltimore Brew, "Six reasons why the Sparrows Point steel mill collapsed," May 25, 2012, https://baltimorebrew.com/2012/05/25/six-reasons-why-the-sparrows-point-steel-mill-collapsed/.

[47] News on 6, "Sand Springs Steel Plant May Close," June 9, 2009, http://www.newson6.com/story/10500785/sand-springs-steel-plant-may-close.

[48] Business Insider, "Shutdown of Russian Steel Mill in Delaware Could Send a Message About US Trade," October 17, 2013, http://www.businessinsider.com/evraz-closes-claymont-steel-2013-10.

[49] AL.com, "U.S. Steel lays off 200 more workers in Fairfield," March 18, 2016, http://www.al.com/business/index.ssf/2016/03/us_steel_lays_off_200_more_wor.html.

34

furnace facilities in United States.[50]  In addition, there are idled pipe and tube mills in Texas, Ohio, and Alabama.  Once production is halted at these facilities it is not always possible to bring back the highly skilled workforce needed to operate them.  When steel mill restarts do occur, additional costs are often incurred for specialized worker training and production ramp-up.

In addition, when a steel mill closes at a given location, the workers find other occupations, move to other steel mills, or remain indefinitely unemployed.  After a significant period of unemployment, much of the specialized skill required by steel mill workers is forgotten.  Furthermore, it is typically not easy to find and recruit displaced workers who may live hundreds or thousands of miles away.

### 6.    Declining Employment Trend Since 1998

U.S. steel industry employment has declined 35 percent (216,400 in 1998 to 139,800 in January 2016 - December 2016), including 14,100 lost jobs between 2015 and 2016.  While employment numbers increased slightly in certain years, the trend is dramatically downward (*see* Figure 7).  Layoffs defer formal plant closings but are an indication of financial distress.  Layoffs in the last two years have been particularly acute in steel producers with pipe and tubular facilities.  In addition to layoffs, there are permanent closures and bankruptcies in the industry.[51]

The loss of skilled workers is especially detrimental to the long-term health and competitiveness of the industry.  The unstable and declining employment outlook for the industry also dissuades younger workers from wanting to participate in the future U.S. steel industry.  The inability to rapidly add skilled workers to the industry negatively affects current manufacturing capabilities.  This is especially problematic in the event of a major production surge or mobilization.

---

[50]  *See* Figure 13.

[51]  *See infra,* section V(C)(1).



**Figure 7. Combined Steel Industry Employment (Yearly Average)**

Source: Bureau of Labor Statistics, using the annual average of seasonally adjusted employees, NAICS Codes: 3311 and 3312, updated 11.22.2017

### 7.    Trade Actions – Antidumping and Countervailing Duties

The number of U.S. antidumping and countervailing duty measures in effect illustrates the scope of the problem confronting the U.S. steel industry.  In 1998, at the height of that periods steel crisis, there were just over 100 antidumping and countervailing duty cases against finished steel products.[52]  Today there are 164 antidumping and countervailing duty orders in effect for steel, with another 20 steel investigations currently ongoing and another waiting to take effect through publication in the Federal Register (*see* Appendix K for a full listing of Steel Antidumping and Countervailing Duty Orders in Effect).  This represents a 60 percent increase in cases since the last time the Department investigated steel in 2001.

### 8.  Loss of Domestic Opportunities to Bidders Using Imported Steel

Despite efforts to level the playing field through AD/CVD orders, there are numerous examples of U.S. steel producers being unable to fairly compete with foreign suppliers, including the lack of ability to bid on some critical U.S. infrastructure projects.  Due to unfair competition, particularly from foreign state-

---

[52]  Global Steel Trade: Structural Problems and Future Solutions; Department of Commerce; July, 2000.

36

owned enterprises, U.S. steel producers have lost out on U.S. business opportunities. Some examples include Chinese companies providing steel for the eastern span of the San Francisco-Oakland Bay Bridge as well as the Alexander Hamilton Bridge over the Harlem River in New York.[53]

The Alliance for American Manufacturing's statement before the Congressional Steel Caucus (March 2017) identified three other recent infrastructure projects in New York that have used or will use heavily subsidized or possibly dumped foreign steel: the Verrazano-Narrows Bridge, LaGuardia Airport, and the Holland Tunnel. Two major U.S. cities – Boston and Chicago – have contracted with Chinese companies to build new subway cars, primarily constructed with imported steel, for their respective transportation systems.[54]

### 9.    Financial Distress

Rising levels of imports of steel continue to weaken the U.S. steel industry's financial health. Years of running on low-profit margins or at a loss have weakened an industry that continues to face an ever-increasing wave of steel imports. The U.S. industry, as a whole, has operated on average with negative net income from 2009-2016. Net income for U.S.-owned steel companies has averaged only $162 million annually since 2010, challenging the financial viability of this vital industry (*see* Figure 8).

---

[53]  New York Times, "Bridge Comes to San Francisco With a Made-in-China Label," June 25, 2011, http://www.nytimes.com/2011/06/26/business/global/26bridge.html

[54]  Reuters, "China's CRRC lands $1.3 billion China rail car project," March 10, 2016, http://www.reuters.com/article/us-crrc-usa-idUSKCN0WC17I

37



Figure 8. U.S. Steel Industry Net Annual Income

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | 555 | -178 | 380 | -261 | 3060 | 3057 | 4368 | 3857 | 4856 | -1803 | -458 | 927 | -188 | 549 | 1230 | -1636 | 713 |

Source: Company websites.
*Includes financials of AK Steel, Carpenter Technology, Commercial Metals Company, Nucor, Steel Dynamics, and U.S. Steel.

The Stern School of Business at New York University calculates that U.S. steel industry participants in the last five years experienced negative net income of 17.8 percent. Compounded growth in revenue for the past five years in the steel industry has been a negative 7 percent.[55] The loss of revenue has caused U.S. steel manufacturers, both large and small, to defer or eliminate production facility capital investments and funding for research and development. Even though there was a slight uptick in net income for the first quarter in 2017 over the fourth quarter of 2016 margins remain poor compared to historic levels.

Not only have earnings before interest, taxes, depreciation, and amortization (EBITDA) been shallow for steel producers in the United States, many of them are burdened with high levels of debt, as much as 11.9 times of earnings for one major producer (*see* Figure 9).[56] While some companies are starting to pay down debt,

---

[55] "Historical (Compounded Annual) Growth Rates by Sector," Aswath Damodaran, New York University Stern School of Business, January 2017. (*see* http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile /histgr.html)

[56] Nucor operates mini-mills that use electric arc furnaces to produce high demand steel products primarily with recycled steel scrap. From a financial perspective, this business model allows Nucor to be highly price competitive, but the company produces a narrower range of flat steel products than integrated steel mills. The mini-mills can weather bad economic times because they have lower energy costs and can regulate production

38

others have not been able to do so primarily because of slack demand for domestically produced steel in the face of competition from imported products. Absent increases in steel production volume and pricing, one leading law firm specializing in insolvency, White & Case, observes that some steelmakers in the United States may soon have to renegotiate loan agreements to extend maturities; those that are not able to may have to consider Chapter 11 bankruptcy.[57]

Figure 9. U.S. Steel Industry Leverage Analysis (FY 2015)

Source: Debtwire, Bloomberg, NYSE, White & Case LLP
*EBITDA unavailable; debt is estimated

Note: Nucor has only electric arc furnaces (EAF). EAFs can be quickly stopped (or used for fewer shifts) and then restarted more easily than blast furnaces, where the furnace must be kept hot. This attribute makes Nucor slightly more flexible to adapt their production to demand and likely more profitable than large BOF producers. Nucor's key end-markets include nonresidential construction and energy.

JMC Steel is now part of Zekelman Industries

No capital intensive industry can survive with such poor margins over the longer term. The extensive leverage in the industry shown in Figure 9 adds to the

---

more easily. Basic oxygen furnace plants have higher fixed operating costs because they directly convert iron ore and other raw materials along with scrap into steel using more energy-intensive processes.

[57] "Losing Strength: U.S. Steel Industry Analysis," Scott Griesman, White & Case, April 16, 2016 (see https://www.whitecase.com/publications/article/losing-strength-us-steel-industry-analysis).

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

likelihood of further closures if the present high level of imports continues to force U.S. steel mills to operate well below profitable capacity utilization rates.

## 10.     Capital Expenditures

The ability of U.S. manufacturers of iron and steel products to fund capital expenditures for new production plants as well as facility modernization and advanced manufacturing equipment has been limited by falling revenue and reduced profits.  As shown in Figure 10, annual capital expenditures for companies making iron and steel ingot, bars, rods, plate and other semi-finished products wavered from $5.7 billion to $5.1 billion for 2010-2012, before ramping to $7.1 billion in 2013.

| Figure 10. Annual Capital Expenditures | | | | | | | |
|---|---|---|---|---|---|---|---|
| Iron, Steel, and Ferroalloys Steel NAICS Codes 3311 and 3312 Combined | | Millions of Current Dollars | | | | | |
| | Annual Capital Expenditures Survey | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| A. | Structures [New & Used Structures Combined] | 1,026 | 1,322 | 1,564 | 1,157 | 724 | 580 |
| B. | Equipment [New & Used Equipment Combined] | 4,634 | 4,572 | 3,592 | 5,954 | 3,139 | 2,531 |
| C. | Total Capital Expenditures | 5,661 | 5,894 | 5,157 | 7,111 | 3,863 | 3,110 |
| D. | (Unweighted) Payroll of Reporters / Total Payroll of Firms Classified in Industry group | 86% | 84% | 80% | 61% | 86% | 84% |
| Source:  U.S. Census Bureau, Annual Capital Expenditures Survey, www.census.gov/programs-surveys/aces.html | | | | | | | |

Confronted with receding orders for products and declines in income in 2013, iron and steel companies operating production facilities in the United States started curtailing capital investments.  Total capital spending dropped to $3.87 billion in 2014 and slid further to $3.11 billion in 2015 – 32 percent below 2010 levels of $5.66 billion.

The decline in capital expenditures reflected similar drops in net sales, which plummeted from $129.6 billion in 2014 to $102 billion in 2015.  Income after taxes

40

for U.S. iron and steel manufacturers fell from $2.48 billion in the same two-year period to a massive loss of $3.5 billion in 2015.

## C. *Displacement of Domestic Steel by Excessive Quantities of Imports has the Serious Effect of Weakening Our Internal Economy*

### 1. Domestic Steel Production Capacity is Stagnant and Concentrated

According to the OECD, U.S. steel production capacity has remained stagnant at an average of approximately 114.3 million metric tons for more than a decade from 2006-2016 (*see* Figure 11). For 2016, the rated maximum capacity was 113 million metric tons for existing basic oxygen furnace and electric arc furnace facilities.



Figure 11. U.S. Annual Steel Production Capacity

| | 1995 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capacity | 102 | 116 | 112 | 102 | 109 | 110 | 113 | 115 | 113 | 113 | 115 | 115 | 117 | 118 | 114 | 114 | 111 | 113 | 112.8 |

Source: Organization for Economic Cooperation and Development (OECD), 2017 capacity is a forecast



41



The present situation with respect to basic oxygen furnace production is significantly worse than the situation assessed by the Department in the 2001 Report. As shown in Figure 13 below, the number of basic oxygen furnace facilities and units has declined precipitously since 1995. In 2000, there were 105 companies that produced raw steel at 144 locations,[59] while today there are only 38 companies producing steel at 93 locations, a 64 percent and 36 percent reduction, respectively.

Most importantly, in 2000 thirteen companies "operated integrated steel mills, with an average of 35 blast furnaces in continuous operation during the year"[60] while today there are only three companies operating 13 basic oxygen furnaces. These are 77 percent and 60 percent reductions, respectively. As a result, today only 26 percent of domestic steel is produced from raw materials in the United States, as compared to 53 percent in 2000.

As noted earlier, since 2000 there has been over a 25 percent reduction in the number of basic oxygen furnaces operating in the United States, and 33 percent of the remaining basic oxygen furnaces are currently idled. In the Secretary's view, a further reduction in basic oxygen furnace capacity, which is especially important to the ability of domestic industry to meet national security needs, is inevitable if the present imports continue or increase.



This would be a serious "weakening of our internal economy" and place the United States in a position where it is unable to be certain

---

[59] 2001 Report at 21.

[60] *Id.*

43

it could meet demands for national defense and critical industries in a national emergency.[61]

| Figure 13.  Basic Oxygen and Electric Arc Facilities and Units Located in the United States, 1975 - 2016 | | | | |
|---|---|---|---|---|
| Year | Basic Oxygen Furnace Facilities | Basic Oxygen Furnace Units | Electric Arc Furnace Facilities | Electric Arc Furnace Units |
| 1975 | 38 | 90 | -- | -- |
| 1980 | 33 | 78 | -- | -- |
| 1985 | 27 | 66 | -- | -- |
| 1990 | 24 | 61 | 127 | 246 |
| 1995 | 22* | 56* | 116 | 218 |
| 2000 | 19* | 50* | 122 | 174 |
| 2005 | 17 | 46 | 115* | 169* |
| 2010 | 16 | 44 | 108 | 164 |
| 2015 | 13 | 31 | 98 | 154 |
| 2016 | 13 | 31 | 98 | 154 |

Source: U.S. Department of Commerce/BIS, American Iron and Steel Institute, Association for Iron & Steel Technology, Steel Manufacturers Association, August 2017.  *Estimated.

Basic Oxygen Furnace: Basic Oxygen Furnaces (BOF) are the dominant steelmaking technology globally, accounting for 74% of the world's total output of crude steel in 2016.  BOF share of production in the U.S. was 33% in 2016 and has been slowly declining, due primarily to the advent of the "Greenfield" electric arc furnace (EAF) flat-rolled mills.  The primary raw materials for the BOF are liquid hot metal (iron) from the blast furnace and steel scrap.  [1] These are charged into the BOF vessel.  Oxygen (>99.5% pure) is "blown" into the BOF at supersonic velocities.  It oxidizes the carbon and silicon contained in the hot metal, liberating great quantities of heat, which melts the scrap.  Source: Steel.org.

Electric Arc Furnace: The Electric Arc Furnace (EAF) operates as a batch melting process, producing batches of molten steel known "heats".  The EAF process uses steel scrap and iron units, melting them using electricity to make new steel.  EAF output accounted for 66% of U.S. steel production in 2016.  Source: Steel.org.

[1] The Blast Furnace chemically reduces and physically converts iron oxides into liquid iron called "hot metal".  The blast furnace is a huge steel stack lined with refractory brick, where iron ore, coke, and limestone are dumped into the top, and preheated air is blown into the bottom.  The raw materials require six to eight hours to descend to the bottom of the furnace, where they become the final product of liquid slag and liquid iron.  Source: Steel.org.

In contrast to the situation in the United States, the leading global producers of steel (Brazil, South Korea, Japan, Russia, Germany, and especially China) primarily rely on basic oxygen furnace capacity rather than electric arc furnace capacity (*see* Figure 14).  Each of these economic competitors to the United States possess critical research, development and production capabilities that the United

---

[61] *See infra*, sections C4 and C5, for a further discussion of the inability to meet surge requirements in an emergency.

44

States is in danger of losing if imports continue to force U.S. steel producers to operate at uneconomic capacity utilization levels.

A further reduction in domestic basic oxygen furnace capacity would put the United States at serious risk of becoming dependent on foreign steel to support its critical industries and defense needs. Allowing this decline to continue represents a "weakening of our internal economy that may impair national security" which the Congress has directed the Secretary to advise the President of under the Section 232. *See* 19 U.S.C. § 1862(d).

| | | | | | |
|---|---|---|---|---|---|
| **Figure 14. The Top 20 Countries Exporting to the U.S. – BOF vs. EAF Capacity** | | | | | |
| **Rank** | **Top Import Sources in 2016 in Tonnage Terms** | **2015 BOF Share** | **2015 EAF Share** | **2015 Other Share** | **Approx. Country s Average Capacity Utilization in 2016 (OECD)** |
| | World | 74.20% | 25.20% | 0.50% | 67% |
| 1 | Canada | 53.80% | 46.20% | | 62% |
| 2 | Brazil | 78.20% | 20.20% | | 57% |
| 3 | South Korea | 69.60% | 30.40% | | 80% |
| 4 | Mexico | 29.70% | 70.30% | | 75% |
| 5 | Turkey | 35.00% | 65.00% | | 65% |
| 6 | Japan | 77.10% | 22.90% | | 80% |
| 7 | Russia | 66.30% | 30.50% | 3.10% | 76% |
| 8 | Germany | 70.40% | 29.60% | | 72% (EU 28) |
| 9 | Taiwan | 62.30% | 37.70% | | 75% |
| 10 | Vietnam | 25.00% | 59.90% | 15.20% | 32% |
| 11 | China | 93.90% | 6.10% | | 69% |
| 12 | Netherlands | 98.60% | 1.50% | | 72% (EU 28) |
| 13 | Italy | 21.30% | 78.20% | | 72% (EU 28) |
| 14 | United Kingdom | 83.00% | 17.00% | | 72% (EU 28) |
| 15 | France | 65.60% | 34.40% | | 72% (EU 28) |
| 16 | India | 42.90% | 57.10% | | 75% |
| 17 | Australia | 77.60% | 22.40% | | 63% |
| 18 | Spain | 31.70% | 68.30% | | 72% (EU 28) |
| 19 | Sweden | 66.10% | 33.90% | | 72% (EU 28) |
| 20 | South Africa | 56.50% | 43.50% | | 58.5% |

Source: World Steel- Production Share Figures for 2015, US Census Bureau (Accessed Via HIS) – Import Growth Rates, OECD 2017 Q2 Market Assessment – Approximate Capacity Utilization

This is not a hypothetical situation. The Department of Defense already finds itself without domestic suppliers for some particular types of steel used in defense

45

products, including tire rod steel used in military vehicles and trucks.[62]  While the United States has many allies that produce steel, relying on foreign owned facilities located outside the United States introduces significant risk and potential delay for the development of new steel technologies and production of needed steel products, particularly in times of emergency.  The Secretary notes that the authority for the Department of Defense to place its order ahead of commercial orders on a mandatory basis does not extend to foreign-owned facilities outside the United States.[63]

In the case of critical infrastructure, the United States is down to only one remaining producer of electrical steel in the United States (AK Steel – which is highly leveraged).  Electrical steel is necessary for power distribution transformers for all types of energy – including solar, nuclear, wind, coal, and natural gas – across the country.  If domestic electrical steel production, as well as transformer and generator production, is not maintained in the U.S., the U.S. will become entirely dependent on foreign producers to supply these critical materials and products.[64]  Without an assured domestic supply of these products, the United States cannot be certain that it can effectively respond to large power disruptions affecting civilian populations, critical infrastructure, and U.S. defense industrial production capabilities in a timely manner.

## 2. Production is Well Below Demand

Demand for steel products in the United States (*see* Figure 15), increased from 100.1 million metric tons in 2011 to 117.5 million metric tons in 2014, then declined to 99.8 million metric tons in 2016.  Demand in 2017 is projected to rebound to 107.7 million metric tons.  During the 2011 to 2016 period, U.S. production of steel products dropped from 86.4 million metric tons in 2011 to 78.6 million metric tons in 2016, with a four percent increase expected in 2017.

---

[62]  Letter from Defense Logistics Agency, Columbus, OH to BIS/OTE, August 1, 2017.

[63]  *See* Defense Priorities and Allocations System Program (DPAS), www.dcma.mil/DPAS

[64]  United States Congress, Congressional Steel Caucus.  Statement of Roger Newport, CEO, AK Steel Corporation (on behalf of the American Iron and Steel Institute).  March 29, 2017.

46

For the six-year period, U.S. domestic steel production supplied only 70 percent of the average demand, even though available U.S. domestic steel production capacity during that period could have, on average, supplied up to 100 percent of demand (U.S. steel producers would be running at 92 percent capacity utilization for this period) with approximately 13 million metric tons of additional capacity remaining.

| Figure 15. U.S. Steel Market Snapshot (millions of metric tons) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 YTD | *2017 Annualized* |
| Total Demand for Steel in U.S. (Production + Imports - Exports) | 100.1 | 106.6 | 104.6 | 117.5 | 104.9 | 99.8 | 80.7 | *107.3* |
| U.S. Annual Capacity | 116.5 | 118.0 | 113.5 | 113.5 | 111.3 | 113.3 | --- | --- |
| U.S. Annual Production (Liquid) | 86.4 | 88.7 | 86.9 | 88.2 | 78.8 | 78.6 | 61.5 | *81.9* |

Sources: United States Department of Commerce, Bureau of the Census. American Iron and Steel Institute. Calculations based on industry and trade data.

### 3. Utilization Rates are Well Below Economically Viable Levels

Overall, steel mill production capacity utilization has declined from 87 percent in 1998, to 81.4 percent in 2008, to 69.4 percent in 2016 (*see* Figure 16). For the most recent six-year period (2011- 2016), the average utilization rate was 74 percent.

Industry analysts note that utilization of 80 percent or more is typically necessary for sustained profitability, among other factors.[65] For most capital and energy-intensive U.S. steel producers, capacity levels of 80 percent or higher are required to maintain facilities, carry out periodic modernization, service company debt, and fund research and development.

---

[65]    Market Realist, "Why steel investors are mindful of capacity utilization rates," October 2, 2014, http://marketrealist.com/2014/10/investors-mindful-capacity-utilization-rate/. *See also* http://marketrealist.com/2015/09/upstream-exposure-impact-steel-companies/

47



Figure 16. U.S. Crude Steel Production by Furnace Type and Capacity Utilization

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basic Oxygen | 54.2 | 52.3 | 54.0 | 47.4 | 45.4 | 45.9 | 47.7 | 42.7 | 42.1 | 41.1 | 39.1 | 22.7 | 31.1 | 34.3 | 36.3 | 34.3 | 33.0 | 29.4 | 25.9 |
| Electric Arc Furnace | 44.5 | 45.1 | 47.9 | 42.7 | 46.1 | 47.8 | 52.0 | 52.2 | 56.1 | 57.0 | 52.8 | 36.7 | 49.4 | 52.1 | 52.4 | 52.6 | 55.2 | 49.4 | 52.6 |
| Capacity Utilization (%) | 86.8 | 83.8 | 86.1 | 79.2 | 88.8 | 84.9 | 94.6 | 87.5 | 87.5 | 87 | 81.4 | 51.2 | 70.4 | 74.4 | 75.2 | 76.7 | 77.5 | 70.1 | 69.4 |

Source: American Iron and Steel Institute

When steel factory utilization falls, costs per unit of steel product rises, reducing profit margins and product pricing flexibility.  Higher capacity utilization usually results in lower per-unit product costs and higher overall profit.[66]  Over 80 percent is a healthy capacity utilization rate and a rate at which most companies would be profitable.

The U.S. steel industry uses 80 percent as a benchmark for minimum operational efficiency.  Moreover, the steel industry is capable of reaching and sustaining 80 percent capacity utilization or higher.  During the 2002-2008 period, U.S. steel companies operated at an average 87.4 percent level.[67]

These industry assessments are consistent with a 1983 report on "Critical Materials Requirements in the U.S. Steel Industry" in which the Department

---

[66]  Houston Chronical, "Capacity Utilization and Effects on Product and Profit," http://smallbusiness.chron.com/capacity-utilization-effects-product-profit-67046.html; steel industry sources.

[67]  http://marketrealist.com/2015/09/upstream-exposure-impact-steel-companies.html ("It's important to note how changes in capacity utilization rates impact a company's earnings.  For example, we see a big jump in earnings when utilization rates improve from 80 percent to 85 percent.  However, incremental benefits are lower when utilization rates increase from 90 percent to 95 percent.").

48

explained that "[c]apability utilization or capacity use, which in effect describes the efficiency of an industry's use of capital, is a prime determinant of profitability. Domestic steel producers were operating at about 55 percent capability for the first half of 1982.  The comparable rate for the first half of 1981 was 85 percent.  This current rate is probably well below a breakeven point for most producers, whereas 1981 was profitable for nearly all producers."[68]

### 4. Declining Steel Production Facilities Limits Capacity Available for a National Emergency

The number of steel production facilities located in the U.S. continues to decline.  As shown earlier in Figure 13, from 1975 to 2016 the number of basic oxygen furnace facilities decreased from 38 to 13.  Similarly, from 1990 to 2016, the number of electric arc furnace facilities decreased from 127 to 98.

Due to this decline in facilities, domestic steel producers have a shrinking ability to meet national security production requirements in a national emergency. The U.S. Department of Commerce, Census Bureau regularly surveys plant capacity, and has found that steel producers are quickly shedding production capacity that could be used in a national emergency.  The Census Bureau defines national emergency production as the "greatest level of production an establishment can expect to sustain for one year or more under national emergency conditions."[69] From 2011 to 2017, steel producers increased the utilization of the surge capacity they would have during a national emergency from 54.2 percent to 68.2 percent (*see* Figure 17).  As steel producers use more of this emergency capacity, there is an increasingly limited ability to ramp up steel production to meet national security needs during a national emergency.

---

[68]  Department of Commerce, "Critical Materials Requirements in the U.S. Steel Industry", March 1983, at 16-17.

[69]  U.S. Dept. of Commerce, Census Bureau, Survey of Plant Capacity.  2011-2017.

49



Figure 17. Steel Industry Utilization of Emergency Capacity (2011-2017, Quarter 1)

Source: U.S. Department of Commerce, Census Bureau, Survey of Plant Capacity

The ability to increase steel production during a national emergency continues to diminish as the number of steel production facilities continues to decline. If the U.S. requires a similar increase in steel production as it did during previous national emergencies, domestic steel production capacity may be insufficient to satisfy national security needs. If a national emergency were to occur at present utilization levels, domestic steel producers would be able to increase production by 146 percent.

For comparison, from 1938 through 1946 the U.S. increased the production of pig iron and ferro-alloys by 217 percent and increased the production of steel ingots and castings by 210 percent to meet the demands of fighting a global war.[70] From 1960 through 1973, during the Vietnam era, the U.S. increased steel production by 152 percent.[71] Should the U.S. once again experience a conflict on the scale of the Vietnam War, steel production capacity may be slightly insufficient

---

[70] U.S. Dept. of Commerce, Census Bureau. Statistical Abstract of the United States, 1948. Page 876.

[71] U.S. Dept. of Commerce, Census Bureau. Statistical Abstract of the United States, 1978. Page 830.

50

to meet national security needs.  But if the U.S. were to experience a conflict requiring the production increase seen during the Second World War, the existing domestic steel production capacity would be unable to meet national security requirements.

Increasing steel production capacity once a large-scale national emergency has arisen would take a significant amount of time.  According to the American Iron and Steel Institute, the replacement of a basic oxygen furnace facility takes more than a year to complete.  Therefore, the lack of spare domestic steel production capacity and the possible inability to sufficiently increase production during a national emergency may impair the national security of the United States.

### D. Global Excess Steel Capacity is a Circumstance that Contributes to the Weakening of the Domestic Economy

### 1. Free markets globally are adversely affected by substantial chronic global excess steel production led by China

Numerous studies, reports, and investigations have documented the global excess steel capacity, with China having the largest installed capability (*see* Figure 18).[72,73,74] OECD analyses show that the world's nominal crude steelmaking capacity reached about 2.4 billion metric tons in 2016, an increase of 127 percent compared to the 2000 level.  Most of the capacity expansion was planned for construction and manufacturing activities, and to help build the infrastructure necessary for economic development – most in non-OECD countries.  Furthermore, the OECD reports that while steel capacity increased at a steady rate, world steel demand contracted sharply in the aftermath of the global economic and financial crisis of 2008.  Global demand for steel recovered slowly in the years following 2008.  However, since 2013, global steel demand has flattened thereby widening the capacity/demand gap.  By 2015, the gap reached over 700 million metric tons.

---

[72] Brun, L. (2016).  *Overcapacity in Steel, China's Role in a Global Problem.*  Washington, DC: Alliance for American Manufacturing.  http://aamweb.s3.amazonaws.com/uploads/resources/OvercapacityReport2016_R3.pdf

[73] Price, A., Weld, C., El-Sabaawi, L., & Teslik, A. (2016).  Capacity Runs Riot.  Washington, DC: Wiley Rein LLP.

[74] OECD Reports.  (2016). http://www.oecd.org/industry/ind/82nd-session-of-the-steel-committee.htm

51



Figure 18. Nominal Steel Capacity Exceeded Demand in 2015

*Note:* Steel demand in 2015 is an estimate by the OECD, calculated using the same percentage change from 2014 as forecast by the World Steel Association for finished steel in October 2015.

*Source:* OECD for capacity and the World Steel Association for demand.

The vast size of the capacity/demand gap means that steel demand alone cannot increase enough to balance the global overcapacity problem, which is particularly prevalent in China. Chinese excess capacity, estimated at more than 300 million metric tons, dwarfs total U.S. production capacity (*see* Figure 19).[75]

The effect of global overcapacity and excess steel production on U.S. steel prices and import levels is discussed in greater detail in Appendix L. While U.S. steel production capacity has remained flat since 2001, other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined.

---

[75] OECD, "High Level Meeting: Excess Capacity and Structural Adjustment in the Steel Sector," April 2016, http://www.oecd.org/sti/ind/Background%20document%20No%202_FINAL_Meeting.pdf

52



Source: OECD

Several countries (India, Iran, and Indonesia) in addition to China continue to add production capacity despite slack global demand.  According to the OECD Steel Committee Chair's statement from March 2017, "New data suggest that nearly 40 million metric tons of gross capacity additions are currently underway and could come on stream during the three-year period of 2017-19, while an additional 53.6 million metric tons of capacity additions are in the planning stages for possible start-up during the same time period."[76]  This additional global steel capacity coming online represents over 80 percent of existing U.S. steelmaking production capacity, demonstrating that the import challenge to U.S. industry is continuing to grow.

## 2. Increasing global excess steel capacity will further weaken the internal economy as U.S. steel producers will face increasing import competition

These additions to worldwide steelmaking capacity will only exacerbate the situation because they will further lower global operating utilization rates, including in the United States.  Growth in foreign government-subsidized steel production is progressively weakening the financial health of the U.S. steel industry as other steel

---

[76] OECD, "82nd Session of the OECD Steel Committee – Chair's Statement," March 2017, http://www.oecd.org/sti/ind/82-oecd-steel-chair-statement.htm

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

producing countries export more steel to the U.S. to in part to offset the loss of regional markets to Chinese steel (*see* Appendix L).

The U.S. share of global production continues to steadily decline. In the year 2000, when President Clinton signed into a law a statute granting China permanent normal trade relations status,[77] the U.S. share of global steel production stood at 12 percent.[78] Since that point in time, the U.S. share of global steel production continued an inexorable decline as other countries, and especially China, began to increase production. The U.S. share of global steel production fell to 8 percent in 2005,[79] 5 percent in 2009,[80] and 4.8 percent in 2015.[81] In contrast, China commanded a 49.7 percent share of global steel production in 2015.[82]

If even half of the planned additional global capacity identified by the OECD Steel Committee is built, and the related new production finds its way into the U.S., it will drive the operating rate of U.S. steel mills to less than 50 percent of capacity. This will cause a substantial and unsustainable negative cash situation that will ultimately result in multiple corporate bankruptcies due to heavy debt loads and related declines in steel production capacity and employment levels.

---

[77] Public Law 106-286. An act to authorize extension of nondiscriminatory treatment (normal trade relations treatment) to the People's Republic of China, and to establish a framework for relations between the United States and the People's Republic of China. October 10, 2000. https://www.gpo.gov/fdsys/pkg/PLAW-106publ286

[78] U.S. Dept. of Commerce, Census Bureau. Statistical Abstract of the United States, 2012. Page 574.

[79] *Id.*

[80] *Id.*

[81] Steel Statistical Yearbook, 2016. World Steel Association. https://www.worldsteel.org/en/dam/jcr:37ad1117-fefc-4df3-b84f-6295478ae460/Steel+Statistical+Yearbook+2016.pdf

[82] Steel Statistical Yearbook, 2017. World Steel Association. https://www.worldsteel.org/en/dam/jcr:3e275c73-6f11-4e7f-a5d8-23d9bc5c508f/Steel+Statistical+Yearbook+2017.pdf

54

# VI.  CONCLUSION

The Secretary has determined that the displacement of domestic steel by excessive imports and the consequent adverse impact of those quantities of steel imports on the economic welfare of the domestic steel industry, along with the circumstance of global excess capacity in steel, are "weakening our internal economy" and therefore "threaten to impair" the national security as defined in Section 232.

The continued rising levels of imports of foreign steel threaten to impair the national security by placing the U.S. steel industry at substantial risk of displacing the basic oxygen furnace and other steelmaking capacity, and the related supply chain needed to produce steel for critical infrastructure and national defense.

In considering "the impact of foreign competition on the economic welfare of individual domestic [steel] industries" and other factors Congress expressly outlined in Section 232, the Secretary has determined that the continued decline and concentration in steel production capacity is "weakening of our internal economy and may impair national security." *See* 19 U.S.C. § 1862(d).

Global excess steel capacity is a circumstance that contributes to the "weakening of our internal economy" that "threaten[s] to impair" the national security as defined in Section 232.  Free markets globally are adversely affected by substantial chronic global excess steel production led by China.  While U.S. steel production capacity has remained flat since 2001, other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined.  This overhang of excess capacity means that U.S. steel producers, for the foreseeable future, will face increasing competition from imported steel as other countries export more steel to the United States to bolster their own economic objectives.

Since defense and critical infrastructure requirements alone are not sufficient to support a robust steel industry, U.S. steel producers must be financially viable and competitive in the commercial market to be available to produce the needed steel output in a timely and cost efficient manner.  In fact, it is the ability to quickly shift

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

production capacity used for commercial products to defense and critical infrastructure production that provides the United States a surge capability that is vital to national security, especially in an unexpected or extended conflict or national emergency.  It is that capability which is now at serious risk; as imports continue to take business away from domestic producers, these producers are in danger of falling below minimum viable scale and are at risk of having to exit the market and substantially close down production capacity, often permanently.

Steel producers in the United States are facing widespread harm from mounting imports.  Growing global steel capacity, flat or declining world demand, the openness of the U.S. steel market, and the price differential between U.S. market prices and global market prices (often caused by foreign government steel intervention) ensures that the U.S. will remain an attractive market for foreign steel absent quotas or tariffs.  Excessive imports of steel, now consistently above 30 percent of domestic demand, have displaced domestic steel production, the related skilled workforce, and threaten the ability of this critical industry to maintain economic viability.

A U.S. steel industry that is not financially viable to invest in the latest technologies, facilities, and long-term research and development, nor retain skilled workers while attracting a next-generation workforce, will be unable to meet the current and projected needs of the U.S. military and critical infrastructure sectors. Moreover, the market environment for U.S. steel producers has deteriorated dramatically since the 2001 Report, when the Department concluded that imports of iron ore and semi-finished steel do not "fundamentally threaten" the ability of U.S. industry to meet national security needs.[83]

The Department's investigation indicates that the domestic steel industry has declined to a point where further closures and consolidation of basic oxygen furnace facilities represents a "weakening of our internal economy" as defined in Section 232.  The more than 50 percent reduction in the number of basic oxygen furnace

---

[83]  2001 Report at 28 – 37.  As noted, *supra* note 16, the 2001 Report added the qualifier "fundamentally" which is not found in the statutory text.  The Secretary in this report uses the statutory standard of "threatens to impair" without such qualification.

facilities – either through closures or idling of facilities due to import competition – increases the chance of further closures that place the United States at serious risk of being unable to increase production to the levels needed in past national emergencies. The displacement of domestic product by excessive imports is having the serious effect of causing the domestic industry to operate at unsustainable levels, reducing employment, diminishing research and development, inhibiting capital expenditures, and causing a loss of vital skills and know-how. The present capacity operating rates for those remaining plants continue to be below those needed for financial sustainability. These conditions have been further exacerbated by the 22 percent surge in imports thus far in 2017 compared with 2016. Imports are now consistently above 30 percent of U.S. domestic demand.

It is evident that the U.S. steel industry is being substantially impacted by the current levels of imported steel. The displacement of domestic steel by imports has the serious effect of placing the United States at risk of being unable meet national security requirements. The Secretary has determined that the "displacement of domestic [steel] products by excessive imports" of steel is having the "serious effect" of causing the "weakening of our internal economy." *See* 19 U.S.C. § 1862(d). Therefore, the Secretary recommends that the President take corrective action pursuant to the authority granted by Section 232. *See* 19 U.S.C. § 1862(c).

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

# VII. RECOMMENDATION

Prior significant actions to address steel imports (quotas and/or tariffs) were taken under various statutory authorities by President George W. Bush, President William J. Clinton (three times), President George H. W. Bush, President Ronald W. Reagan (three times), President James E. Carter (twice), and President Richard M. Nixon, all at lower levels of import penetration than the present level, which is above 30 percent.

Due to the threat of steel imports to the national security, as defined in Section 232, the Secretary recommends that the President take immediate action by adjusting the level of imports through quotas or tariffs on steel imported into the United States, as well as direct additional actions to keep the U.S. steel industry financially viable and able to meet U.S. national security needs. The quota or tariff imposed should be sufficient, after accounting for any exclusions, to enable the U.S. steel producers to be able to operate at about an 80 percent or better of the industry's capacity utilization rate based on available capacity in 2017.

In 2016, U.S. steel production was 78.6 million metric tons and U.S. capacity was 113.3 million metric tons, which represents a 69.4 percent capacity utilization rate. If current import trends for 2017 continue, continued imports without any action are projected to be 36.0 million metric tons, an increase over 2016 of 6.0 million metric tons. Even with U.S. demand projected to increase to 107.3 from 99.8 million metric tons, increased imports mean U.S. capacity utilization is forecast to rise only to 72.3 percent, a non-financially viable and unsustainable level of operation.

By reducing import penetration rates to approximately 21 percent, U.S. industry would be able to operate at 80 percent of their capacity utilization. Achieving this level of capacity utilization based on the projected 2017 import levels will require reducing imports from 36 million metric tons to about 23 million metric tons. If a reduction in imports can be combined with an increase in domestic steel demand, as can be reasonably expected rising economic growth rates combined with the increased military spending and infrastructure proposals that the Trump Administration has planned, then U.S. steel mills can be expected to reach a capacity

58

utilization level of 80 percent or greater. This increase in U.S. capacity utilization will enable U.S. steel mills to increase operations significantly in the short-term and improve the financial viability of the industry over the long-term.

## Recommendation to Ensure Sustainable Capacity Utilization and Financial Health

**Impose a Quota or Tariff on all steel products covered in this investigation imported into the United States to remove the threatened impairment to national security.** The Secretary recommends adjusting the level of imports through a quota or tariff on steel imported into the United States.

### Alternative 1 – Global Quota or Tariff

#### 1A.    Global Quota

Impose quotas on all imported steel products at a specified percent of the 2017 import level, applied on a country and steel product basis.

According to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 63 percent quota would be expected to reduce steel imports by 37 percent (13.3 million metric tons) from 2017 levels. Based on imports from January to October, import levels for 2017 are projected to reach 36.0 million metric tons. The quotas, adjusted as necessary, would result in imports equaling about 22.7 million metric tons, which will enable an 80 percent capacity utilization rate at 2017 demand levels (including exports). Application of an annual quota will reduce the impact of the surge in steel imports that has occurred since the beginning of 2017.

#### 1B.    Global Tariff

Apply a tariff rate on all imported steel products, in addition to any antidumping or countervailing duty collections applicable to any imported steel product.

Similar to what is anticipated under a quota, according to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 24 percent tariff on all steel imports would be expected to reduce imports by 37 percent (i.e., a

59

reduction of 13.3 million metric tons from 2017 levels of 36.0 million metric tons).[84] This tariff rate would thus result in imports equaling about 22.7 million metric tons, which will enable an 80 percent capacity utilization rate at 2017 demand levels (including exports).[85]

## Alternative 2 –Tariffs on a Subset of Countries

Apply a tariff rate on all imported steel products from Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia and Costa Rica, in addition to any antidumping or countervailing duty collections applicable to any steel products from those countries. All other countries would be limited to 100 percent of their 2017 import level.

According to the Global Trade Analysis Project (GTAP) Model, produced by Purdue University, a 53 percent tariff on all steel imports from this subset of countries would be expected to reduce imports by 13.3 million metric tons from 2017 import levels from the targeted countries. This action would enable an increase in domestic production to achieve an 80 percent capacity utilization rate at 2017 demand levels (including exports). The countries identified are projected to account for less than 4 percent of U.S. steel exports in 2017.

## Exemptions

In selecting an alternative, the President could determine that specific countries should be exempted from the proposed 63 percent quota or 24 percent tariff by granting those specific countries 100 percent of their prior imports in 2017, based on an overriding economic or security interest of the United States. The Secretary recommends that any such determination should be made at the outset and a corresponding adjustment be made to the final quota or tariff imposed on the

---

[84] Due to general equilibrium effects, the overall import level would need to decrease by more than the corresponding increase in domestic production to offset the negative effects of price or exchange rate changes on export demand.

[85] The elasticity factor is an estimate, not a certainty. A variation of 0.1 in the elasticity factor would change the tonnage reduction by about 375,000 tons. For example, imports would fall by an additional 375,000 tons under a demand elasticity of -1.7 instead of -1.6 and a 25 percent tariff.

60

remaining countries. This would ensure that overall imports of steel to the United States remain at or below the level needed to enable the domestic steel industry to operate as a whole at an 80 percent or greater capacity utilization rate. The limitation to 100 percent of each exempted country's 2017 imports is necessary to prevent exempted countries from producing additional steel for export to the United States or encouraging other countries to seek to trans-ship steel to the United States through the exempted countries.

It is possible to provide exemptions from either the quota or tariff and still meet the necessary objective of increasing U.S. steel capacity utilization to a financially viable target of 80 percent. However, to do so would require a reduction in the quota or increase in the tariff applied to the remaining countries to offset the effect of the exempted import tonnage.

**Exclusions**

The Secretary recommends an appeal process by which affected U.S. parties could seek an exclusion from the tariff or quota imposed. The Secretary would grant exclusions based on a demonstrated: (1) lack of sufficient U.S. production capacity of comparable products; or (2) specific national security based considerations. This appeal process would include a public comment period on each exclusion request, and in general, would be completed within 90 days of a completed application being filed with the Secretary.

An exclusion may be granted for a period to be determined by the Secretary and may be terminated if the conditions that gave rise to the exclusion change. The U.S. Department of Commerce will lead the appeal process in coordination with the Department of Defense and other agencies as appropriate. Should exclusions be granted the Secretary would consider at the time whether the quota or tariff for the remaining products needs to be adjusted to increase U.S. steel capacity utilization to a financially viable target of 80 percent.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

# THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY



**U.S. Department of Commerce**
**Bureau of Industry and Security**
**Office of Technology Evaluation**

# APPENDICES

**January 11, 2018**

APPENDIX A - Page 1
Barcode:3814772-143 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
PUBLIC VERSION

**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

April 19, 2017

The Honorable James N. Mattis
Secretary of Defense
Washington, DC 20301-3010

Dear Mr. Secretary:

I am writing to notify you that I am initiating an investigation to determine the effects of imported steel on national security.  I am taking this action pursuant to Section 232 of the Trade Expansion Act of 1962, as amended.  Section 232 authorizes the Secretary of Commerce to initiate such an investigation and requires notice to be provided to the Secretary of Defense upon initiation of an investigation.

During the course of the investigation, Department of Commerce staff will consult with their counterparts in the Department of Defense regarding any methodological and policy questions that arise during the investigation.  The investigation report will include information the Department of Defense can provide regarding the national defense requirements for steel. I look forward to our collaboration on this important issue.

Our point of contact is Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security.  Mr. Botwin can be reached at Brad.Botwin@bis.doc.gov and (202) 482-4060.

Sincerely,

Wilbur Ross



Barcode:3814772-143 A-580-880 REV - Admin Review 9/1/17 - 8/31/18



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**

3000 DEFENSE PENTAGON
WASHINGTON, DC 20301-3000

ACQUISITION,
TECHNOLOGY,
AND LOGISTICS

MAY 0 8 2017

The Honorable Wilbur Ross
Secretary of Commerce
Washington, DC  20230

Dear Mr. Secretary:

I am writing to acknowledge receipt of your notification to initiate an investigation to

determine the effects of imports of steel on national security pursuant to section 232 of the Trade

Expansion Act of 1962, as amended.

The Office of the Under Secretary of Defense for Acquisition, Technology, and Logistics

will assist your department in this endeavor.  My point of contact is Robert Read, Director,

Industrial Assessments, Office of Manufacturing and Industrial Base Policy, at 571-571-6263 or

robert.m.read6.civ@mail.mil.

Sincerely,

John G. McGinn, Ph.D.
Acting Deputy Assistant Secretary of Defense
Manufacturing and Industrial Base Policy

cc:
Mr. Brad Botwin

FOR IMMEDIATE RELEASE
Thursday, April 20, 2017

Office of Public Affairs

202-482-4883
publicaffairs@doc.gov

Today President Donald J. Trump signed a presidential memorandum calling on Secretary Wilbur Ross to prioritize a Department of Commerce investigation initiated last night into the effects of steel imports on US national security. The study will consider overcapacity, dumping, illegal subsidies, and other factors, to determine whether steel imports threaten American economic security and military preparedness.

"We are going to fight for American workers and American-made steel by conducting a thorough investigation into steel imports," said President Trump. "Thanks especially to Secretary Wilbur Ross for helping lead this critical effort."

After a thorough investigation, if any national security threats from steel imports are identified, Secretary Ross will provide a report that includes recommendations for next steps. Under Section 232 of the Trade Expansion Act, the President has broad power to adjust imports—including through the use of tariffs—if excessive foreign imports are found to be a threat to US national security.

"We will conduct this investigation thoroughly and expeditiously so that, if necessary, we can take actions to defend American national security, workers, and businesses against foreign threats," said Secretary Ross. "This investigation will help determine whether steel import issues are making us less safe in a world that is increasingly fraught with geopolitical tensions."

The United States is relatively unusual in that it has no tariffs on steel but has had to impose antidumping or countervailing duties in over 150 cases, with 13 more currently pending.

Our military often needs specialty steel alloys that require unusual production skills and are used for armor, vehicles, ships, aircraft, and infrastructure.  As a result, a robust and healthy domestic steel production industry may be deemed necessary to guarantee military supply chains in the event of conflict.

While these defense concerns continue to loom, the US steel industry has struggled in recent years.  Industry employment has been declining, companies are highly leveraged, and businesses remain both capital intensive and lacking strong cash flow.  Imports now represent 26% of the market and the US steel mills and foundries are operating at just 71% of capacity.

The investigation will include a formal request for public comment to be published in the Federal Register, followed by a public hearing.

Please visit www.commerce.gov/steel for more information on this investigation.

## Agenda

I. Introductions
II. Committee Orientation
III. Discussion on FY17 Civil Rights Project Ideas
IV. Public Comment
V. Next Steps
VI. Adjournment

Dated: April 21, 2017.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2017–08447 Filed 4–25–17; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### Materials Technical Advisory Committee; Notice of Partially Closed Meeting

The Materials Technical Advisory Committee will meet on May 11, 2017, 10:00 a.m., Herbert C. Hoover Building, Room 3884, 14th Street between Constitution & Pennsylvania Avenues NW., Washington, DC. The Committee advises the Office of the Assistant Secretary for Export Administration with respect to technical questions that affect the level of export controls applicable to materials and related technology.

## Agenda

*Open Session*

1. *Presentation:* Twist Bioscience on Twist's experience with export controls.
2. *Presentation:* Export Enforcement Coordination Center (E2C2) and discussion on the FBI film "Made in America: Defending Our Technology."
3. A draft proposal to move a green technology report forward, engaging the Office of Technology and Evaluation and the Renewable Energy and Energy Efficiency Advisory Committee on the possibility of collaboration.
4. Open session report by regime representatives.
5. Report by working groups (composite, pumps and valves, bio, public domain, chemicals).
6. Public Comments/New Business/Closed session.

*Closed Session*

7. Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 sections 10(a)(1) and 10(a)(3).

The open session will be accessible via teleconference to 20 participants on a first come, first serve basis. To join the conference, submit inquiries to Ms. Yvette Springer at *Yvette.Springer@bis.doc.gov,* no later than May 4, 2017.

A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent time permits, members of the public may present oral statements to the Committee. Written statements may be submitted at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the materials should be forwarded prior to the meeting to Ms. Springer via email.

The Assistant Secretary for Administration, with the concurrence of the delegate of the General Counsel, formally determined on February 15, 2017, pursuant to section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. app. 2 sec. 10(d)), that the portion of the meeting dealing with pre-decisional changes to the Commerce Control List and the U.S. export control policies shall be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 sections 10(a)(1) and 10(a)(3). The remaining portions of the meeting will be open to the public.

For more information, call Yvette Springer at (202) 482–2813.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2017–08387 Filed 4–25–17; 8:45 am]

**BILLING CODE 3510–JT–P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel

**AGENCY:** Bureau of Industry and Security, Office of Technology Evaluation, U.S. Department of Commerce.

**ACTION:** Notice of request for public comments and public hearing.

**SUMMARY:** The Secretary of Commerce initiated an investigation to determine the effects on the national security of imports of steel. This investigation has been initiated under section 232 of the Trade Expansion Act of 1962, as amended. Interested parties are invited to submit written comments, data, analyses, or other information pertinent to the investigation to the Department of Commerce's Bureau of Industry and Security. The Department of Commerce will also hold a public hearing on the investigation on May 24, 2017 in Washington, DC. This notice identifies the issues on which the Department is

interested in obtaining the public's views. It also sets forth the procedures for public participation in the hearing.

**DATES:** Comments may be submitted at any time but must be received by May 31, 2017.

The hearing will be held on May 24, 2017 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW., Washington, DC 20230. The hearing will begin at 10:00 a.m. local time and conclude at 1:00 p.m. local time.

**ADDRESSES:**

*Written comments:* Send written comments to Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce, 1401 Constitution Avenue NW., Room 1093, Washington, DC 20230 or by email to *Steel232@bis.doc.gov.*

*Public hearing:* Send requests to speak and written summaries of the oral presentations to Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce, Room 1093, 1401 Constitution Avenue NW., Washington, DC 20230 or by email to *Steel232@bis.doc.gov,* by May 17, 2017. Any person, whether presenting or not, may submit a written statement through May 31, 2017—7 days after the hearing date.

**FOR FURTHER INFORMATION CONTACT:** Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce (202) 482–4060, *brad.botwin@bis.doc.gov.* For more information about the section 232 program, including the regulations and the text of previous investigations, see *www.bis.doc.gov/232.*

**SUPPLEMENTARY INFORMATION:**

### Background

On April 19, 2017, the Secretary of Commerce ("Secretary") initiated an investigation under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862), to determine the effects on the national security of imports of steel. On April 20, 2017, the President signed a memorandum directing the Secretary to proceed expeditiously in conducting his investigation and submit a report on his findings to the President. The President further directed that if the Secretary finds that steel is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall recommend actions and steps that should be taken to adjust steel

**Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved**

imports so that they will not threaten to impair the national security.

**Written Comments**

This investigation is being undertaken in accordance with part 705 of the National Security Industrial Base Regulations (15 CFR parts 700 to 709) ("NSIBR"). Interested parties are invited to submit written comments, data, analyses, or information pertinent to this investigation to the Office of Technology Evaluation, U.S. Department of Commerce ("the Department"), no later than May 31, 2017.

The Department is particularly interested in comments and information directed to the criteria listed in § 705.4 of the NSIBR as they affect national security, including the following: (a) Quantity of steel or other circumstances related to the importation of steel; (b) Domestic production and productive capacity needed for steel to meet projected national defense requirements; (c) Existing and anticipated availability of human resources, products, raw materials, production equipment, and facilities to produce steel; (d) Growth requirements of the steel industry to meet national defense requirements and/or requirements to assure such growth; (e) The impact of foreign competition on the economic welfare of the steel industry; (f) The displacement of any domestic steel causing substantial unemployment, decrease in the revenues of government, loss of investment or specialized skills and productive capacity, or other serious effects; (g) The displacement of any domestic steel causing substantial unemployment, decrease in the revenues of government, loss of investment or specialized skills and productive capacity, or other serious effects; (h) Relevant factors that are causing or will cause a weakening of our national economy; and (i) Any other relevant factors.

Material that is business confidential information will be exempted from public disclosure as provided for by § 705.6 of the regulations. Anyone submitting business confidential information should clearly identify the business confidential portion of the submission, then file a statement justifying nondisclosure and referring to the specific legal authority claimed, and provide a non-confidential submission which can be placed in the public file. Communications from agencies of the United States Government will not be made available for public inspection. Please note that the submission of comments for presentation at the public hearing is separate from the request for written comments.

The Bureau of Industry and Security does not maintain a separate public inspection facility. Requesters should first view the Bureau's Web page, which can be found at *https://efoia.bis.doc.gov/* (see "Electronic FOIA" heading). If requesters cannot access the Web site, they may call 202–482–0795 for assistance. The records related to this assessment are made accessible in accordance with the regulations published in part 4 of title 15 of the Code of Federal Regulations (15 CFR 4.1 *et seq.*).

**Public Hearing**

Consistent with the interest of the U.S. Department of Commerce in soliciting public comments on issues affecting U.S. industry and national security, the Department is holding a public hearing as part of the investigation. The hearing will assist the Department in determining whether imports of steel threaten to impair the national security and in recommending remedies if such a threat is found to exist. Public comments at the hearing should address the criteria listed in § 705.4 of the NSIBR as they affect national security described above.

The hearing will be held on May 24, 2017 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW., Washington, DC 20230. The hearing will begin at 10:00 a.m. local time and conclude at 1:00 p.m. local time.

**Procedure for Requesting Participation**

The Department encourages interested public participants to present their views orally at the hearing. Any person wishing to make an oral presentation at the hearing must submit a written request to the Department of Commerce at the address indicated in the **ADDRESSES** section of this notice. The request to participate in the hearing must be accompanied by a copy of a summary of the oral presentation. The written request and summary must be received by the Department no later than Wednesday, May 17, 2017. In addition, the request to speak should contain (1) the name and address of the person requesting to make a presentation; (2) a daytime phone number where the person who would be making the oral presentation may be contacted before the hearing; (3) the organization or company they represent; and (4) an email address.

Please note that the submission of comments for presentation at the public hearing is separate from the request for written comments. Since it may be

necessary to limit the number of persons making presentations, the written request to participate in the public hearing should describe the individual's interest in the hearing and, where appropriate, explain why the individual is a proper representative of a group or class of persons that has such an interest. If all interested parties cannot be accommodated at the hearing, the summaries of the oral presentations will be used to allocate speaking time and to ensure that a full range of comments is heard.

Each person selected to make a presentation will be notified by the Department of Commerce no later than 8:00 p.m. Eastern Daylight Time on Friday, May 19, 2017. The Department will arrange the presentation times for the speakers. Persons selected to be heard are requested to bring 20 copies of their oral presentation and of all exhibits to the hearing site on the day of the hearing. All such material must be of a size consistent with ease of handling, transportation and filing. While large exhibits may be used during a hearing, copies of such exhibits in reduced size must be provided to the panel. Written submissions by persons not selected to make presentations will be made part of the public record of the proceeding. Any person, whether presenting or not, may submit a written statement through May 31, 2017—7 days after the hearing date. Confidential business information may not be submitted at a public hearing. In the event confidential business information is submitted it will be handled according to the same procedures applicable to such information provided in the course of an investigation. See 15 CFR 705.6. The hearing will be recorded.

Copies of the requests to participate in the public hearing, and the transcript of the hearing will be maintained on the Bureau of Industry and Security's Web page, which can be found at *http://www.bis.doc.gov* (see Freedom of Information Act (FOIA) heading). If the requesters cannot access the Web site, they may call (202) 482–0795 for assistance. The records related to this assessment are made accessible in accordance with the regulations published in part 4 of title 15 of the Code of Federal Regulations (15 CFR 4.1 *et seq.*).

**Conduct of the Hearing**

The Department reserves the right to select the persons to be heard at the hearing, to schedule their respective presentations, and to establish the procedures governing the conduct of the hearing. Each speaker will be limited to

10 minutes, and comments must be directly related to the criteria listed in 15 CFR 705.4 of the regulations. Attendees will be seated on a first-come, first-served basis.

A Department official will be designated to preside at the hearing. The presiding officer shall determine all procedural matters during the hearing. Representatives from the Department, and other U.S. Government agencies as appropriate, will make up the hearing panel. This will be a fact-finding proceeding; it will not be a judicial or evidentiary-type hearing. Only members of the hearing panel may ask questions, and there will be no cross-examination of persons presenting statements. However, questions submitted to the presiding officer in writing may, at the discretion of the presiding officer, be posed to the presenter. No formal rules of evidence will apply to the hearing.

Any further procedural rules for the proper conduct of the hearing will be announced by the presiding officer.

**Special Accommodations**

This meeting is physically accessible to people with disabilities. Requests for sign language interpretation or other auxiliary aids should be received by the Department of Commerce no later than Thursday, May 11, 2017 at the address indicated in the **ADDRESSES** section of this notice.

Dated: April 21, 2017.

Wilbur L. Ross,

*Secretary of Commerce.*

[FR Doc. 2017–08499 Filed 4–24–17; 11:15 am]

**BILLING CODE 3510–33–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–822–806, A–475–836, A–580–891, A–821–824, A–791–823, A–469–816, A–489–831, A–823–816, A–520–808, A–412–826]

## Carbon and Alloy Steel Wire Rod From Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, United Arab Emirates, and United Kingdom: Initiation of Less-Than-Fair-Value Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Effective April 17, 2017.

**FOR FURTHER INFORMATION CONTACT:** Rebecca Janz at (202) 482–2972 (Belarus), Tom Bellhouse at (202) 482–0257 (Italy), David Crespo at (202) 482–3693 (Republic of Korea (Korea)), Terre Keaton at (202) 482–1280 (the Russian

Federation (Russia)), Moses Song at (202) 482–5041 (South Africa), Chelsey Simonovich at (202) 482–1979 (Spain), Ryan Mullen at (202) 482–5260 (the Republic of Turkey (Turkey)), Julia Hancock at (202) 482–1394 (Ukraine), Carrie Bethea at (202) 482–1491 (the United Arab Emirates (UAE)), and Alice Maldonado at (202) 482–4682 (the United Kingdom), AD/CVD Operations, Enforcement and Compliance, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**The Petitions**

On March 28, 2017, the U.S. Department of Commerce (the Department) received antidumping duty (AD) petitions concerning imports of carbon and alloy steel wire rod (wire rod) from Belarus, Italy, Korea, Russia, South Africa, Spain, Turkey, Ukraine, the UAE, and the United Kingdom, filed in proper form on behalf of Charter Steel, Gerdau Ameristeel US Inc., Keystone Consolidated Industries, Inc., and Nucor Corporation (collectively, the petitioners).[1] The AD petitions were accompanied by countervailing duty (CVD) petitions on imports from Italy and Turkey. The petitioners are domestic producers of wire rod.[2]

On March 31, 2017, and April 6, 2017, the Department requested additional information and clarification of certain areas of the Petitions.[3] The petitioners filed responses to these requests on April 4, 2017, and on April 7, 2017, respectively.[4] On April 5, the petitioners filed a submission demonstrating that, for certain countries, the prices they obtained for normal value were below the production costs. As a result, they compared export price (EP) or constructed export price (CEP) to

normal value (NV) using constructed value (CV).[5]

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that imports of wire rod from Belarus, Italy, Korea, Russia, South Africa, Spain, Turkey, Ukraine, the UAE, and the United Kingdom are being, or are likely to be, sold in the United States at less than fair value within the meaning of section 731 of the Act, and that such imports are materially injuring, or threatening material injury to, an industry in the United States. Also, consistent with section 732(b)(1) of the Act, the Petitions are accompanied by information reasonably available to the petitioners supporting their allegations.

The Department finds that the petitioners filed these Petitions on behalf of the domestic industry because the petitioners are interested parties as defined in section 771(9)(C) of the Act. The Department also finds that the petitioners demonstrated sufficient industry support with respect to the initiation of the AD investigations that the petitioners are requesting.[6]

**Periods of Investigation**

Because the Petitions were filed on March 28, 2017, the period of investigation (POI) for all investigations except Belarus is January 1, 2016, through December 31, 2016. Because Belarus is a non-market economy country, the POI for that investigation is July 1, 2016, through December 31, 2016.

**Scope of the Investigations**

The product covered by these investigations is wire rod from Belarus, Italy, Korea, Russia, South Africa, Spain, Turkey, Ukraine, the UAE, and the United Kingdom. For a full description of the scope of these investigations, *see* the "Scope of the Investigations," in Appendix I of this notice.

**Comments on Scope of the Investigations**

During our review of the Petitions, the Department issued questions to, and received responses from, the petitioners pertaining to the proposed scope to ensure that the scope language in the Petitions would be an accurate

---

[1] *See* Letter to the Secretary of Commerce from Petitioners "Carbon and Alloy Steel Wire Rod from Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, the United Arab Emirates, and United Kingdom—Petitions for the Imposition of Antidumping and Countervailing Duties" (March 28, 2017) (the Petitions).

[2] *See* Volume I of the Petitions, at 2.

[3] *See* Country-specific letters to Petitioners from the Department concerning supplemental questions on each of the country-specific records (March 31, 2017); and Memorandum to the File "Phone Call with Counsel to Petitioners" (April 10, 2017).

[4] *See* Country-specific amendments to the Petitions (first and second amendments for each country); *see also* Letter to the Secretary of Commerce from Petitioners "Carbon and Alloy Steel Wire Rod from Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, the United Arab Emirates, and United Kingdom—Petitioners' Amendment to Volume I Relating to General Issues" April 4, 2017 (General Issues Supplement).

[5] *See* Country-specific amendments to the Petitions from the petitioners, "Re: Carbon and Certain Alloy Steel Wire Rod from the Republic of Korea, the Russian Federation, South Africa, and Ukraine—Existance of Below-Cost Sales" (April 5, 2017).

[6] See the "Determination of Industry Support for the Petitions" section below.

Members of the public are also entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be mailed to the Midwestern Regional Office, U.S. Commission on Civil Rights, 55 W. Monroe St., Suite 410, Chicago, IL 60615. They may also be faxed to the Commission at (312) 353–8324, or emailed to Carolyn Allen at *callen@usccr.gov.* Persons who desire additional information may contact the Midwestern Regional Office at (312) 353–8311.

Records generated from this meeting may be inspected and reproduced at the Midwestern Regional Office, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Louisiana Advisory Committee link (*https://database.faca.gov/committee/committee.aspx?cid=251&aid=17*). Persons interested in the work of this Committee are directed to the Commission's Web site, *http://www.usccr.gov,* or may contact the Midwestern Regional Office at the above email or street address.

**Agenda**

Welcome and Roll Call
Orientation
Civil Rights Topics in Louisiana
Next Steps
Public Comment
Adjournment

Dated: May 18, 2017.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2017–10530 Filed 5–22–17; 8:45 am]

**BILLING CODE P**

---

# DEPARTMENT OF COMMERCE

## Bureau of Industry and Security

## Notice on Procedures for Attending or Viewing Remotely the Public Hearing on Section 232 National Security Investigation of Imports of Steel

**AGENCY:** Bureau of Industry and Security, Office of Technology Evaluation, U.S. Department of Commerce.

**ACTION:** Notice on procedures for attending or viewing remotely the public hearing.

**SUMMARY:** On April 26, 2017, the Bureau of Industry and Security (BIS), published the *Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel.* The

April 26 notice specified that the Secretary of Commerce initiated an investigation to determine the effects on the national security of imports of steel. This investigation has been initiated under section 232 of the Trade Expansion Act of 1962, as amended. (*See* the April 26 notice for additional details on the investigation and the request for public comments.)

The April 26 notice also announced that the Department of Commerce will hold a public hearing on the investigation on May 24, 2017 in Washington, DC. Today's notice provides additional details on the procedures for attending and for viewing the hearing, via webcast.

**DATES:** The hearing will be held on May 24, 2017 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW., Washington, DC 20230. The hearing will begin at 10:00 a.m. local time and conclude at 1:00 p.m. local time.

**FOR FURTHER INFORMATION CONTACT:** Brad Botwin, Director, Industrial Studies, Office of Technology Evaluation, Bureau of Industry and Security, U.S. Department of Commerce (202) 482–4060, *brad.botwin@bis.doc.gov.* For more information about the section 232 program, including the regulations and the text of previous investigations, see *www.bis.doc.gov/232.*

**SUPPLEMENTARY INFORMATION:**

**Background**

On April 26, 2017 (82 FR 19205), the Bureau of Industry and Security (BIS) published the *Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel.* The April 26 notice specified that on April 19, 2017, the Secretary of Commerce ("Secretary") initiated an investigation under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862), to determine the effects on the national security of imports of steel. (*See* the April 26 notice for additional details on the investigation and the request for public comments.)

The April 26 notice also announced that the Department of Commerce will hold a public hearing on the investigation. The hearing will be held on May 24, 2017 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW., Washington, DC 20230. The hearing will begin at 10:00 a.m. local time and conclude at 1:00 p.m. local time. The hearing will assist the Department in determining whether imports of steel threaten to impair the national security and in

recommending remedies, if such a threat is found to exist.

The April 26 notice included the following information: (a) Procedures for requesting participation in the hearing, including procedures for submitting comments; (b) conduct of the hearing; and (c) special accommodations for the hearing. (*See* the April 26 notice for additional details on these aspects of the public hearing.)

Today's notice provides additional details on the procedures for attending the hearing and for viewing the hearing, via webcast.

**Procedure for Attending the Hearing, or Viewing the Hearing Via Webcast**

*Registration:* Individuals and entities who wish to attend the public hearing are required to pre-register for the meeting on-line at *www.bis.doc.gov/232SteelHearing* (preferred) or by emailing *Steel232@bis.doc.gov.* Anyone wishing to attend this public hearing must register by 5:00 p.m. (EST), Tuesday, May 23, 2017.

*Webcast:* The public hearing will be available live via webcast. Please visit: *www.bis.doc.gov/232SteelHearing.*

*Visitor Access Requirement:* For participants attending in person, please note that federal agencies can only accept a state-issued driver's license or identification card for access to federal facilities if such license or identification card is issued by a state that is compliant with the REAL ID Act of 2005 (Pub. L. 109–13), or by a state that has an extension for REAL ID compliance. The main entrance of the Department of Commerce is on 14th Street NW. between Pennsylvania Avenue and Constitution Avenue, across from the Ronald Reagan Building. Upon entering the building, please go through security and check in at the guard's desk. BIS staff will meet and escort visitors to the auditorium.

*Non U.S. Citizens Please Note:* All foreign national visitors who do not have permanent resident status and who wish to register for the above meeting must fax a copy of their passport to (202) 482–5361. Please also bring a copy of your passport on the day of the hearing to serve as identification. Failure to provide this information prior to arrival will result, at a minimum, in significant delays in entering the facility. Authority to gather this information is derived from United States Department of Commerce Department Administrative Order (DAO) number 207–12. Please visit *www.bis.doc.gov/232SteelHearing* to register and for more details regarding this requirement.

Dated: May 17, 2017.

**Matthew S. Borman,**

*Deputy Assistant Secretary for Export Administration.*

[FR Doc. 2017–10444 Filed 5–22–17; 8:45 am]

**BILLING CODE 3510–33–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–557–813]

## Polyethylene Retail Carrier Bags From Malaysia: Final Results of Antidumping Duty Administrative Review; 2015–2016

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** On April 6, 2017, the Department of Commerce (Department) published in the **Federal Register** the preliminary results of the administrative review of the antidumping duty order on polyethylene retail carrier bags from Malaysia covering the period August 1, 2015 through July 31, 2016. The review covers one producer/exporter of subject merchandise, Euro SME Sdn Bhd (Euro SME). The Department preliminarily found that Euro SME did not have reviewable entries during the period of review (POR). The Department gave interested parties an opportunity to comment on the *Preliminary Results,* but we received no comments. Hence, the final results are unchanged from the *Preliminary Results,* and we continue to find that Euro SME did not have reviewable entries during the POR.

**DATES:** Effective May 23, 2017.

**FOR FURTHER INFORMATION CONTACT:** Alex Rosen or Brendan Quinn, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–7814 or (202) 482–5848, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 6, 2017, the Department published the *Preliminary Results.*[1] We invited interested parties to comment on the *Preliminary Results,*[2] but received no comments. The Department conducted this review in accordance

with section 751(a)(1)(B) of the Tariff Act of 1930, as amended (the Act).

### Scope of the Order

The merchandise subject to this antidumping duty order is polyethylene retail carrier bags (PRCBs), which also may be referred to as t-shirt sacks, merchandise bags, grocery bags, or checkout bags. The subject merchandise is defined as non-sealable sacks and bags with handles (including drawstrings), without zippers or integral extruded closures, with or without gussets, with or without printing, of polyethylene film having a thickness no greater than 0.035 inch (0.889 mm) and no less than 0.00035 inch (0.00889 mm), and with no length or width shorter than 6 inches (15.24 cm) or longer than 40 inches (101.6 cm). The depth of the bag may be shorter than 6 inches (15.24 cm) but not longer than 40 inches (101.6 cm).

PRCBs are typically provided without any consumer packaging and free of charge by retail establishments, *e.g.,* grocery, drug, convenience, department, specialty retail, discount stores, and restaurants to their customers to package and carry their purchased products. The scope of this antidumping duty order excludes (1) PRCBs that are not printed with logos or store names and that are closeable with drawstrings made of polyethylene film and (2) PRCBs that are packed in consumer packaging with printing that refers to specific end-uses other than packaging and carrying merchandise from retail establishments, *e.g.,* garbage bags, lawn bags, trash-can liners.

Imports of merchandise included within the scope of this antidumping duty order are currently classifiable under statistical category 3923.21.0085 of the Harmonized Tariff Schedule of the United States (HTSUS). This subheading may also cover products that are outside the scope of this antidumping duty order. Although the HTSUS subheading is provided for convenience and customs purposes, the written description of the scope of this antidumping duty order is dispositive.

### Final Determination of No Shipments

As noted above, the Department received no comments from interested parties concerning the *Preliminary Results* on the record of this segment of the proceeding. As there are no changes from, or comments on, the *Preliminary Results,* the Department finds that there is no reason to modify its analysis. Thus, we continue to find that Euro SME had no reviewable transactions

during the POR.[3] Accordingly, no decision memorandum accompanies this **Federal Register** notice. For further details of the issues addressed in this proceeding, *see* the *Preliminary Results.*[4]

### Assessment Rates

The Department determined, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries of subject merchandise, where applicable, in accordance with section 751(a)(2)(C) of the Act and 19 CFR 351.212(b). For entries of subject merchandise during the POR for which Euro SME did not know its merchandise was destined for the United States, we will instruct CBP to liquidate un-reviewed entries at the all-others rate if there is no rate for the intermediate company involved in the transaction.[5] The Department intends to issue assessment instructions to CBP 15 days after the date of publication of the final results of this review.

### Cash Deposit Requirements

The following cash deposit requirements will be effective for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of this notice of final results of the administrative review, as provided by section 751(a)(2)(C) of the Act: (1) For Euro SME, which claimed no shipments, the cash deposit rate will remain unchanged from the rate assigned to Euro SME in the most recently completed review of the company; (2) for previously investigated or reviewed companies not listed above, the cash deposit rate will continue to be the company-specific rate published for the most recent period; (3) if the exporter is a firm not covered in this review, a prior review, or the less-than-fair-value investigation, but the manufacturer is, the cash deposit rate will be the rate established for the most recent period for the manufacturer of the merchandise; and (4) the cash deposit rate for all other manufacturers or exporters is 2.40 percent. These cash deposit requirements, when imposed, shall remain in effect until further notice.

### Notification to Importers

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement

---

[1] See Polyethylene Retail Carrier Bags From Malaysia: Preliminary Results of Antidumping Duty Administrative Review; 2015–2016, 82 FR 16792 (April 6, 2017) (Preliminary Results).

[2] Id., 82 FR at 16793.

[3] See Preliminary Results, 82 FR at 16792–93.

[4] Id.

[5] See Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties, 68 FR 23954 (May 6, 2003).

**Public Hearing Witnesses**

1.  U.S. Congresswoman Marcy Kaptur (Ohio)
2.  David Rintoul, President U.S. Steel Tubular Products, United States Steel Corporation
3.  John Ferriola, CEO/President, Nucor Corporation
4.  Roger Newport, CEO, AK Steel Corporation
5.  John Brett, CEO/President, ArcelorMittal USA
6.  Barbara Smith, COO/President, Commercial Metals Company
7.  Thomas Gibson, CEO/President, American Iron and Steel Institute
8.  Ward Timken, CEO/President, Timken Steel Corporation
9.  Barry Zekelman, CEO/Chairman, Zekelman Industries
10. Dennis M. Oates, Chairman, Specialty Steel Industry of North America
11. Terrence Hartford, Vice President, ATI Defense
12. Lourenco Goncalves, CEO/President, Cliffs Natural Resources Inc.
13. John Adams, President, Guardian Six LLC
14. John Phelps Stupp, CEO/President, Stupp Bros., Inc.
15. Ryan Chadwick, Vice President/General Counsel, Ipsco Tubulars, Inc. (TMK IPSCO)
16. Gu Yu, First Secretary, People's Republic of China, Ministry of Commerce
17. Alexander Zhmykhov, Deputy Head of Economic Section, Trade Representation of the Russian Federation in the USA
18. Karl Tachelet, Director of International Affairs, Eurofer
19. Vitalii Tarasiuk, Minister-Counsellor, Embassy of Ukraine
20. Tim Johns, Vice President of Manufacturing, Nippon Steel AND Sumikin Cold Heading Wire Indiana
21. Byeong Bae Lee, President, Hyundai Steel America
22. Gary Horlick, International Trade Counsel, American Institute for International Steel
23. Robert Budway, President, Can Manufacturers Institute
24. Tracey Norberg, Senior VP and General Counsel, Rubber Manufacturers Association
25. Suzi Agar, President, Air Distribution Institute (ADI)
26. John Cross, Steelscape LLC
27. Jim Tennant, CEO, Ohio Coatings Company
28. Leo Gerard, International President, United Steelworkers
29. David Zalesne, Vice Chairman, American Institute of Steel Construction (AISC) AND President, Owen Steel Company
30. Philip Bell, President, Steel Manufacturers Association
31. Bill Geary, Chairman, Cold Finished Steel Bar Institute
32. Ed Vore, Chairman/President, The Committee on Pipe and Tube Imports
33. Raymond Monroe, Executive Vice President, Steel Founders' Society of America
34. Mark Millett, President/CEO, Steel Dynamics
35. Alexander Maass, President, Maass Flange Corporation
36. Robert Landry, Vice President, Port of New Orleans
37. Joel Johnson, CEO, Borusan Mannesmann Pipe U.S. (BMP)

## Commerce Dept. Hearing on National Security Investigation on Steel imports

## Testimony as prepared for Congresswoman Marcy Kaptur, May 24, 2017

Today, rising and unprecedented global overcapacity and unfair trade practices threaten the viability of our United States steel industry. Coupled with declining domestic prices, which are exacerbated by currency manipulation – we sit here today faced with a national steel crisis like few times ever before.

And who bears this burden? It is the working families in my region of the country—Ohio, Indiana, Michigan, Wisconsin, and Pennsylvania.

For years, many of us who have fought unfair trade deals have seen our neighbors brought to their knees. For years, we were promised protections to stabilize local economies and open global markets.

For years, we have stood alongside the hard working men and women who built this country with their hands, only for their jobs to move elsewhere with little regard or afterthought.

We have seen swift declines in the industrial Midwest decimate communities – leaving vacant factories and homes and hearts in the wake.

For far too long, our working families have waited simply for the opportunity to compete and for fair treatment, only to be met with empty promises and pink slips.

Last month, I wrote the Administration with Senators Rob Portman and Sherrod Brown, on behalf of the more than 700 idled U.S. Steel workers and their families in Lorain, Ohio. They were just notified that in less than two weeks, they will permanently lose their jobs.

Lorain is a town that once employed 12,000 hard working men and women in the steel industry. Yet it has witnessed hundreds more of the remaining steel jobs disappear in the last two years. For many decades, Lorain was one of America's premier steel towns. Its dear people and have been battered by the continuing job washout in steel due to unfair trade practices and closed markets abroad, particularly China, Russia, Vietnam, Korea.

Take for example Thomas Kelling who is one of the many thousands of steelworkers to lose their jobs due to unfair trade practices and overproduction on the other side of the globe.

Tom, like many of our steelworkers, began working in the mill at a young age. Where he had the opportunity to provide for his wife and three kids - his oldest, who is now looking at colleges, took a job to help support their family.

After 22 years, and facing yet another lay off and unemployment, Tom was forced to reinvent himself and fight for his job and family.

While Mr. Kelling pursues every opportunity available, he and his colleagues are offered little retraining to find replacement work. This forces many to move their families out of Ohio. Sadly, Mr. Kelling's story is not unique. There are millions of Americans across this great land who can tell of the exact same tale.

Not only has this harmed workers and their families, but entire communities suffer as small businesses lose customers and local governments lose revenue.

It is my understanding that according to Section 232 the Department of Commerce has 270 days to complete an investigation. I urge this Administration to work as quickly as possible. Many workers and businesses do not have that long.

The time for action is now. And enforcing current rules is only the first step in correcting more than two decades of injustice.


# United States Steel Corporation

**Testimony of David J. Rintoul**

**President – U. S. Steel Tubular**
**and**
**Senior Vice President – Tubular – United States Steel Corporation**

**For the Hearing on Section 232 National Security Investigation on Steel**

**May 24, 2017**

Good morning, and thank you for the opportunity to elaborate on the national security consequences that significantly exacerbate the harm we suffer when the U.S. fails to act against steel products imported in violation of U.S. law.

My name is David Rintoul. I am a proud 10-year veteran of U. S. Steel and a nearly 40-year veteran of the steel industry. It is no small matter that I speak about today – I hope you will agree that, in fact, it's quite a big deal, not only for one of the nation's foundational companies, but also for the United States as a whole.

For more than a century, the iconic United States Steel Corporation, born during America's industrial ascendancy, represented the unique ingenuity, competitiveness, and boundless aspirations of our country. As one of the leading pioneers of the American Century, U. S. Steel literally helped to lay the foundation of our great cities, build the tools and transportation

1

infrastructure that unified the continent, and heeded the call to arms when, as a nation at war, we stood against the forces of those who would forever change our way of life.

Through it all, we helped to lead the defense of America – at home and abroad. We understood our company and industry to be more than just businesses – we treasured our role as Americans.

For most of this time, the threats to our security were readily identifiable and the requirements of our response were equally clear. Not so today. In 2017, the threats to America's national defense have multiplied and now present themselves in fundamentally different forms. We still need tanks on the battlefield and airpower to control the skies, but now we also need to guard against asymmetrical risks such as those we see, for example, in cyberspace.

And, make no mistake, we – U. S. Steel and other U.S. corporations – see these threats ourselves: we have been the direct victim of trade secret thefts accomplished through sophisticated hacking into our internal computer systems. The indirect victims, of course, are the American people and the military that protects them and counts on us to provide better, stronger, more effective steel products than those possessed by others.

Just as the global supply chain has created an infrastructure that is regularly beneficial for consumer products from cars to smart phones to t-shirts, it is at the same time pernicious when it prevents us as a nation from being able to domestically source and produce the materials needed to ensure our energy independence and defense – whether on the battlefield, or in the superiority of our energy supply, or the safeguarding of our vital corporate and government secrets.

One aspect of our defense infrastructure that is dangerously threadbare involves our country's reliance on imported steel products known as oil country tubular goods (OCTG). A family of products that makes it possible for energy companies to explore for, retrieve, and bring to market the oil and gas America needs to guard its security through a reliable and dependable supply of domestically-produced energy.

Today, imports make-up approximately 50 percent of the OCTG market. Driven by Chinese manufacturers over the last several years and now overtaken by state of the art plants in South Korea, foreign suppliers have made it their mission to steal this market from U.S. companies, well aware of the danger such a loss of domestic capacity would pose to America's national security.

So, you might ask, how did we get here and how bad is it? Sadly, the answer is three-fold.

First, the governments in South Korea, China, and elsewhere have deemed dominance in this market a matter of *their* national security. To accomplish this goal, they've plainly subsidized their domestic industries, provided as much regulatory and other support as needed, and worked steadily to undermine U.S. efforts.

And, for the record, the domestic market for OCTG goods in South Korea is non-existent and in China is minimal, at best.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

Second, the result of this behavior by these countries in large swaths across America has been predicable and painful in human terms and has left us with a long-term deficit when it comes to this key manufacturing capability. In the tubular business at U. S. Steel alone, this unfair competition has resulted in the closure of 50 percent of our mills since 2014 – and forced us to lay off far too many of our friends and colleagues as a result.

In just the last few years, we have been forced to abandon more than 40 percent of the OCTG products we previously made, as the tsunami of imports have driven down prices to levels where it is impossible for us, and others who operate within the traditional rules and boundaries, to successfully maintain our market presence.

And the harm is agonizingly real. In 2014, we had more than 3,000 people working as part of our team focused on tubular products and production. At its low point six months ago, that number had shrunk to 950 – a cut of more than two thirds. Even today as the energy market has begun a modest turnaround, we've only been able to engage a total of 1,300 people on this business.

In the last two years alone, U. S. Steel's tubular business has suffered severe financial losses. Adding to this pain is the fact that these losses occurred while imports from South Korea, Mexico, and Russia continued to cross our borders – including those from some competitors who claim to be American but closed their American plants to bring pipe in from their foreign operations.

4

Moreover, the unfair trade attacks from government-subsidized foreign competitors undermines our ability to have the resources necessary to sufficiently invest in the research and development that is the life's blood of a business that relies on continual innovation. We need our government to stand by us and the rule of law – if it will not, we will all face the prospect of surrender in a fight that was anything but fair.

Which brings me to point three. As a nation, we need to understand that the traditional remedies used in trade-related matters, from increased import duties to more rigorous enforcement, simply wither in the face of the audacity of these foreign companies and their government sponsors. While these foreign companies and governments operate under the guise of competition and fairness, their actions are driven by a no-holds barred, ruthless focus on winning control over the markets that Americans need to defend the nation against near- and long-term threats.

And, to be candid, our traditional remedies are no longer the deterrent – much less the punishment – that they once were. Despite the implementation of trade margins on certain OCTG products, certain countries simply thumb their nose at these remedies, and see our country as the answer to ensure their stability by continuing to export their unemployment to this country. As a consequence, we need new, more effective tools to level the playing field, especially when it comes to such direct threats to American national security.

Putting a stop to this foreign government-enabled encroachment into America's critical energy independence infrastructure is no less a matter of the nation's security than is building new generations of ships and aircraft and strengthening our cyber defenses. They are all crucial.

5

Simply put, if we as a nation are hostage to other parts of the world for the development of key pieces of our energy sector, then we can never lay claim to true energy independence – which puts us at a tremendous, macro-level risk.

As 21st century security threats have multiplied, changed their shape, and their attack vectors – so too must our vision of the most effective response. Today, protecting our homeland's borders is just as important as ensuring that we have the materials, tools, and political will to match these expanded challenges with an equally broad definition of a threat to our collective national security. At U. S. Steel, the only large, integrated American company that manufactures OCTG goods, we proudly embrace our role as one of the nation's core industries while at the same time bringing a clear-eyed view of the market in the U.S. and globally as fundamentally distorted as the result of large volumes of competing products driven by foreign government subsidies and other unfair practices.

In conclusion, let me add that the challenges we face extend far beyond a single industry or issue. As I mentioned earlier, the tubular products we produce are but a small subset of all that U. S. Steel does. The trends that I have outlined with respect to OCTG have been replicated many times over across all of our businesses. From the automotive sector to a broad range of industrial production to the mining and consumer products arenas to tin products, the global assault on U.S. steelmakers has been acute and left our entire industry wounded.

The plants we build and the blast furnaces that operate across the country don't work like a light switch. You can't turn them off one day and then simply hit "on" and they are back in business.

6

Barcode:3814772-143 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

American companies have always thrived when the playing field is level and the rules are clear. Honest competition is at the heart of our democracy and we look forward to a time in the near future when that norm, once again, governs the marketplace.

Thank you again for the opportunity to share our views on the need to clarify what we on the front lines of manufacturing know is the most effective approach to protecting America's national security.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

**Section 232 National Security Investigation of Steel Imports**
**Testimony of John Ferriola**
**Chairman, CEO & President of Nucor Corporation**
**May 24, 2017**

Good morning.  I am John Ferriola, Chairman, CEO, and President of Nucor Corporation.  On behalf of Nucor and our nearly 24,000 teammates, I would like to thank you for the opportunity to appear before you today.  We welcome this investigation as a means of addressing the unprecedented crisis facing the U.S. steel industry, caused primarily by massive global overcapacity and historic import levels. This crisis must be resolved if we are to continue supplying steel for U.S. national defense and critical infrastructure applications.

As the largest steel producer and recycler in the United States, Nucor is proud to supply our armed forces with a wide variety of mission-critical steel products to keep our soldiers and our nation safe.  For example, Nucor bar products are used in Humvee suspensions and track forgings for the Abrams tank and Bradley Fighting Vehicle.  Our structural steel goes into the Patriot missile system, and our armor plate protects soldiers and sailors in armored vehicles, aircraft carriers, and destroyers.  In addition, Nucor steel supports critical transportation and energy infrastructure that is vital to our entire economy.

We agree with President Trump that "core industries such as steel . . . are critical elements of our manufacturing and defense industrial bases."  That is why Nucor has invested significantly to become a reliable supplier of these products.

Playing a role in our nation's defense requires a long-term financial commitment. For example, Nucor is one of only two steel companies in the U.S. certified to produce Navy-grade armor plate for aircraft carriers, destroyers, and submarines. Entering this market required purchasing specialized equipment, hiring knowledgeable personnel, developing advanced chemistries and processes, and undertaking rigorous testing and certification procedures to meet Navy requirements. This is the type of continual investment that is needed to satisfy the rapidly evolving needs of our armed forces.

Unfortunately, global overcapacity and unfairly traded imports threaten our ability to invest. Production overcapacity in the steel industry has reached crisis levels. There is more than 700 million metric tons of global steel overcapacity, more than half of which is located in China. In fact, China's state-supported steel industry now exports more steel than is produced by all three NAFTA countries combined. China is at the heart of the crisis, but governments in countries like Korea, Brazil, Russia and Turkey also do their part to drive excess steel capacity. These governments continue to flood the world with artificially cheap steel, and much of it finds its way to the United States, where markets are open and the government doesn't keep mills in business for political reasons.

A sustained surge of low-priced imports has eroded the U.S. steel industry. Over the last decade, shipments have fallen by approximately 20%, and nearly 20,000 workers have lost their jobs. In 2015, the industry operated at a $1.7 billion net loss, and despite improving demand in 2016, American mills only operated around 70% of their total capacity. U.S. steelmakers can barely maintain what they have, let alone continue to invest in developing new products. This threatens the industry's ability to supply the advanced steel products that our military relies on.

Steel used in national defense applications may be a relatively small share of our overall sales, but those products are made at the same facilities and by the same workers who make other products. A commercially healthy industry is vital to ensure a stable supply of products for national security and critical infrastructure applications. This includes the entire production chain beginning at the melting stage and continuing through finishing and fabrication. In a time of national crisis, the U.S. cannot afford to rely on imported steel slabs from foreign suppliers like China or Russia. National security begins with primary steelmaking.

Broad-based action is the only way to target all imports and also address the root cause of the current crisis – chronic overcapacity in countries that do not operate on a market basis.

In closing, we urge you to find that steel imports threaten our national security, and to take broad action that will ensure the long-term viability of our nation's steel industry.

Thank you.

**Testimony of Roger K. Newport**

**Chief Executive Officer**

**AK Steel Corporation**

Thank you Secretary Ross.  My name is Roger Newport, and I am the CEO of AK Steel Corporation.  I want to thank you for the opportunity to testify on behalf of AK Steel and our 8,500 U.S.-based employees.

AK Steel welcomes the Department of Commerce's Section 232 investigation of the serious threat posed by imported steel to our national security.  For decades, the steel industry has battled global overcapacity and the oversupply of U.S. imports, many of them dumped and subsidized.  Just since the beginning of 2015, over 14,000 steel workers have been laid off and numerous production facilities have been idled, including AK Steel's blast furnace and steelmaking operations in Ashland, Kentucky.  Unfortunately, unfairly traded imports remain a severe threat to the long-term viability of the domestic steel industry.

AK Steel is the only company in the United States that produces a combination of flat-rolled carbon steel, stainless steel, and electrical steel products.  While I can certainly speak to the adverse impact of imports on each of these types of steel, I would like to focus my remarks today on electrical steel.  AK Steel is the sole domestic producer of grain-oriented electrical steel, or GOES, which is used in cores and core assemblies for the production of electrical transformers.  Transformers are a key component of our nation's electricity grid, from the large step-up transformers that transmit power across the entire grid, to the smaller pole- and pad-mounted transformers that deliver power to individual homes and businesses.  AK Steel is also the sole domestic producer of high-end non-oriented electrical steel, or NOES, products.  NOES

is also critical for the electrical grid, as it forms the heart of massive generators that actually create electrical energy.

About 2,000 highly-skilled workers melt and finish electrical steel products at our Butler Works facility in Pennsylvania and finish electrical steel at our Zanesville Works facility in Ohio. AK Steel also conducts extensive electrical steel research and development at our state-of-the-art Research and Innovation Center in Middletown, Ohio.

While we strongly believe that electrical steel plays a crucial role in our national security, so do many others. Pursuant to policy directives issued by both President Obama and President George W. Bush, the Department of Energy has identified electricity transmission systems as infrastructure that is critical to our national security and that requires urgent attention. The government has identified equipment failure and aging infrastructure in the U.S. as threats to our national security. Because virtually all households and businesses rely on electricity, the security and long-term viability of U.S. electrical infrastructure is a critical, national imperative.

A secure, reliable supply of electrical steel is necessary to maintain the electrical grid. Major blackouts, such as the one in San Francisco last month that shut down the financial center of the city, demonstrate that the lack of reliable electrical grid infrastructure is a major threat to our national economy. Major blackouts may occur as a result of grid obsolescence, severe weather events like Hurricane Katrina or Superstorm Sandy, or cyber, terrorist or other attacks on our electrical infrastructure. A secure, domestic source of electrical steel is more important than ever before. Fortunately, AK Steel has sufficient production capacity to meet current and future estimated demand within the United States.

Due to competition from dumped and subsidized imports, the only other U.S. producer of GOES, Allegheny Technologies, shuttered a plant and discontinued GOES production in 2016.

2

High-end electrical steel is an incredibly difficult product to manufacture, as it requires a significant amount of dedicated, capital equipment and a sophisticated, well-trained workforce. Therefore, if AK Steel were to exit the market, there would be no operational electrical steel manufacturing equipment in the United States, the specialized labor and related expertise in operations would be lost, and many of AK Steel's talented operators and researchers would either re-locate to other businesses, industries and/or foreign countries, or become unemployed.

AK Steel strongly supports Presidential action to stem the surge of imported electrical steel. We are, however, very concerned that importers will simply side-step the relief that covers steel by using foreign electrical steel to build cores and transformers abroad, then import those cores and transformers into the United States. Therefore, to effectively address the vital national security interests of the United States and to protect the domestic electrical grid for the long-run, the Department of Commerce must include imported cores and transformers in any relief that covers imports of electrical steel. Without addressing this supply chain issue, any remedy on electrical steel will be easily circumvented. Keeping imports of electrical steel, cores, and transformers at a reasonable level would balance the interests of protecting our national security with allowing a reasonable level of imports to meet the ongoing needs of buyers of these materials. Complete reliance on imports for these critical products, however, would ultimately lead to dependency on foreign sources for the materials needed to maintain and modernize the electrical grid.

Thank you again for the opportunity to testify. I would be pleased to answer your questions.

[END]

3

## TESTIMONY OF JOHN BRETT

### Hearing on Section 232 National Security Investigation
### May 24, 2017

Good morning.  I am John Brett, President and CEO of ArcelorMittal USA.  Thank you for holding this hearing today on the impact of steel imports on national security.  Our country's defense and industrial base depends on a strong and sustainable domestic steel industry to supply our military and critical infrastructure needs.

Mr. Secretary, our company has a long and rich history of supporting our nation's defense capabilities.  We are also a major supplier to the U.S. energy industry which plays a key role in moving the United States toward energy independence.  Today I would like to speak to the relationship between supplying our military customers and our broader commercial business, our efforts to meet the demands of our energy customers, and our view of the fundamental challenge facing U.S. and global steel producers.

Serving the needs of our nation's military has been a long-time, multi-generational priority of ArcelorMittal USA and our predecessor companies; in particular, Lukens Steel Company and Bethlehem Steel Corporation.  Today this tradition continues as ArcelorMittal USA supports our nation's men and women in uniform by supplying steel for a variety of military applications on land and at sea.  Providing steel to the U.S. military, whether the Navy, Army, Marine Corps, Coast Guard or Air Force, is a tremendous source of pride for our company and our employees.

We are currently the largest supplier of armor steel plate for the United States Armed Forces.  Our armor products find application in many fighting vehicles used by the Army and Marine Corps, including the Abrams M1 main battle tank, the Bradley fighting

vehicle, M88 recovery vehicles, the Stryker family of fighting vehicles, various MRAP (Mine Resistant Ambush Protected) vehicles and the up-armored Humvee.

The shipbuilding industry has also been one of the long-term staples of ArcelorMittal's business. We supply steel for a variety of United States Navy vessels, including aircraft carriers, submarines, destroyers and other ships. The Navy's most recent force structure assessment concludes that addressing current and future threats to U.S. national security will require a larger fleet of 350-360 ships, which would entail an increase in naval shipbuilding over the coming years. The Navy, the shipbuilders and their suppliers, including ArcelorMittal, are working together to ensure that the industrial supply base can accommodate an accelerated shipbuilding schedule.

Preserving the domestic steelmaking and finishing capacity to provide the highly specialized steel for U.S. defense purposes is without a doubt a national security issue. However, the steel tonnage directly used for defense applications is quite small compared to that of the broader commercial market for steel products. As large a supplier as ArcelorMittal USA is to the U.S. military, our sales into defense applications represent only 1 percent of our total production, and less than 5 percent of our steel plate production.

In other words, defense-related sales of steel alone are not the determining factor in whether a steel mill is successful and sustainable. Instead, the commercial viability of a steel operation is imperative for retention of that operation's ability to serve the defense needs of the nation both in times of peace and war.

As the Department knows, ArcelorMittal USA has joined with other U.S. producers to bring a number of trade remedy cases in response to a flood of unfairly traded imports from China and other countries in recent years. Our operations which produce steel for

military applications were not immune from the negative impact of these imports.   Along with other U.S. plate producers, we petitioned this Department and the International Trade Commission for relief from unfairly traded imports of cut-to-length plate from 12 countries, including China, after these imports increased by over 100 percent between 2013 and 2015.   The ITC found that, as a result, the U.S. plate industry's operating income had dropped 75% over those three years.

Here's what the import surge meant for ArcelorMittal USA – we saw our steel plate sales drop by a third in one year.   By 2015, our plate operations were running at only 55% of their capacity.   Our plate prices fell to the lowest levels we had seen in more than ten years.   When we are forced to price at levels that do not cover our costs, then we also are not generating the capital required to reinvest in our operations.   And if we cannot reinvest, we cannot remain on the cutting edge of new technology for the future, for our commercial business or for our military business.   In other words, the impact of the imports is felt throughout our business, commercial and military.

Staying on the cutting edge of new technology is equally important for our energy customers.   ArcelorMittal USA produces a full range of steel grades for the energy transmission and distribution markets, including for the production of large diameter line pipe.   We've been a leader in developing wide API X-70 steel for U.S. pipeline projects. We are committed to serving U.S. customers who need this advanced product and have invested significantly in the production of both plate and hot-rolled steel for our line pipe customers.   Those investments include accelerated cooling, surface quality control, slab processing and software for process control and statistical analysis to support our X-70 and other CTL plate production capabilities.   But our ability to serve these markets is

threatened when competition from low-priced, unfair imports precludes us from building a sustainable business.

The plate case is just one example of the impact that imports have had on our business.  It has been a similar story on hot-rolled, cold-rolled, and corrosion-resistant steel.  U.S. imports of flat rolled steel products increased 69 percent between 2013 and 2014.  The impact on our business was devastating.

Mr. Secretary, we very much appreciate the attention this Administration has devoted to the state of the U.S. steel industry since it took office in January.  It was my honor to stand in the Oval Office when the President announced the initiation of this Section 232 investigation.  Nonetheless, the United States must address the problem of global excess steelmaking capacity or every other action you, or we, take won't matter.

This Department knows the numbers well – Chinese government industrial and trade policies have driven Chinese steel production from 128 million metric tons in 2000 to over 808 million metric tons last year.  In 2016, China exported 108 million metric tons. Those exports have had direct negative effects on U.S. steel producers.  They also have an indirect impact when they displace steel in other countries whose producers then ship to the U.S. market.  And we have seen an increase in imports of downstream products made from cheap Chinese steel.

It is easy, and correct, to point to China as the main culprit.  But it is not just China. We face challenges from countries as diverse as Korea, Russia, Turkey, and others.

The result – we sell less steel, receive less money for the steel we do sell, and employ fewer workers.  Over the long term, this situation is not sustainable for U.S.

producers who operate without the kind of government support provided to the Chinese steel industry.

Mr. Secretary, we welcome this investigation because we need solutions to the unfair import problem at the U.S. border.  The antidumping and countervailing duty orders have certainly been helpful but are being circumvented.

But as you consider additional actions, please remember that we also need to find a solution to the excess steel capacity that is impacting global markets.  We need governments throughout the steelmaking world to come together to make clear to China that they need to reduce their excess capacity in steel making – the way a market-based economy would – rather than exporting it.  An objective of any actions should be to increase global pressure on China to change the policies that led to the creation of non-economic steel capacity and to discourage other governments from adopting similar policies.  Those policies have distorted global trade flows and harmed our national security.

Thank you.

## TESTIMONY OF BARBARA SMITH

## INVESTIGATION OF THE IMPACT OF STEEL IMPORTS ON THE NATIONAL SECURITY OF THE UNITED STATES

## MAY 24, 2017

Good morning.  My name is Barbara Smith. I am the President and Chief Operating Officer of Commercial Metals Company, a steel producer headquartered in Irving, Texas.  I appreciate the opportunity to appear before you to discuss why high levels of imported steel threaten the national security of the United States.

Commercial Metals Company is vertically integrated. We are active in all aspects of the steel industry, from buying and selling scrap through steel production to distribution. The scope of CMC's global operations gives us a unique perspective on the U.S. steel industry, and the forces affecting it.

CMC is also one of the world's most technologically advanced and efficient steel producers. We have pioneered micromill technology, which enables us to produce rebar in the most efficient and lowest cost manner possible. I would like to stress the fact that the American steel industry is as modern and competitive as any in the world. Our industry can provide the United States with nearly all the steel products a modern industrial economy needs. However, steel imports are seriously damaging our ability to produce the steel products the United States requires for

1

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

national defense, critical infrastructure, and our general economic strength. If this trend is not reversed, the consequences will be serious.

As you have already heard, steel is essential to the national security of the United States. The product CMC makes that is most obviously vital to our national security is advanced armor plate, which is produced by one of our subsidiaries, CMC Impact Metals. CMC Impact Metals makes three different grades of military armor plate. These are used in a variety of applications, including tanks, mine resistant ambush protected vehicles – MRAPS – and other military vehicles. In fact, during the MRAP build-up in the early 2000s, we were the first new armor plate supplier approved by the Defense Department in over two decades. The lives of our soldiers literally depend upon this product. Among other projects for the Defense Department, CMC was proud to supply the rebar used to repair the Pentagon after the 9/11 terrorist attacks.

In addition to armor plate for the military, CMC produces a variety of specialized bar, rounds, angles, and shapes where high strength and abrasion resistance are critical. These products are used by the transportation, energy, construction, and mining sectors. Of course, these critical infrastructure sectors are vital to our national security as well.

Production of armor plate and these other specialized products requires sophisticated equipment and, just as significantly, skill in steelmaking. To be able

to make these products, CMC has invested millions of dollars in equipment, technology and training.

However, CMC's most critical role in national security is our role as a major producer of rebar, a product of major importance to this nation's infrastructure. National Security depends upon Economic Security.  Economic Security depends upon a broad-based vibrant and self-sufficient economy.  Our economy depends upon a world class system of infrastructure, connecting and supporting all economic activity here at home and abroad.

CMC's main product, rebar, is an essential product for national security as this product is used to support every aspect of our critical infrastructure.  This includes the roads, bridges, airports, power transmission lines, and all the other facilities that we use every day, mostly without ever thinking about them. There is a reason the official name of the interstate highway system is the National System of Interstate and Defense Highways.  To build and maintain this infrastructure, you need rebar.  God forbid that we are attacked again on our own soil, without the capability to produce the necessary products like rebar to restore our country.

Unfortunately, many of the world's major producers, including Turkey, China, Taiwan, Japan, and Mexico, make far more rebar than they need for the sole purpose of export to other countries.  These exporters have taken full advantage of the open U.S. market, as rebar imports increased by nearly 50 percent from 2014 to

2016. The U.S. International Trade Commission calculates that, before the recent trade cases, rebar imports held a market share of more than 20 percent.

One of the factors the Commerce Department considers in investigations like this is the reliability of import supply. Rebar imports are generally sold by opportunistic traders who have no loyalty to the U.S. market. It seems very dangerous to me to depend on imports from questionable sources of a product so essential to our national security and economic prosperity as rebar.

These growing imports have had a significant effect on CMC's profitability, employment, and our ability to innovate and invest. To fund innovation and investment, we have to generate a return on investments that satisfies our shareholders. Imports have made it increasingly difficult to do that. In response to the flood of imports over the past several years, CMC has been forced to close 30 U.S. locations since 2008, leading to a reduction in our workforce of 4,000 jobs. Each job in the steel industry supports another seven jobs in upstream and downstream industries, and we are painfully aware of the effect these reductions have had on local communities across the United States.

Imports have also adversely affected our ability to make the new investments we need to remain competitive. CMC invested millions in our technologically advanced micromill in Mesa, Arizona and in building the most modern rebar mill in the world in Durant, Oklahoma. The technology in these mills

4

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

reduces energy and material usage in steel production to even lower levels, and we thought that these investments would increase our competitiveness significantly. In fact, we were planning to commission a whole series of micromills, which would have created thousands of high-paying jobs across the United States. Unfortunately, competition from imports has been so fierce that we have been forced to put our expansion plans on hold. The situation has gotten so bad that the returns on a number of our investments aren't even covering our cost of capital. Our story is repeated throughout the domestic steel industry.

Allowing our steel industry to shrink further will endanger our national security. If CMC cannot continue to invest, it won't be able to produce either the armor plate we need for Army vehicles and other military applications, the specialized plate and bar products required by the transportation, energy, construction, and mining sectors, or the rebar needed for every kind of infrastructure application. The United States is nearing the point where we will be depending on other countries for the steel products that are essential to our national security. I believe we all can agree that this is a very dangerous proposition. I urge you to conclude that steel imports threaten the national security of the United States, and to recommend to the President that he take prompt and comprehensive action to address this crisis.

Thank you.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

Testimony of Thomas J. Gibson
President and CEO
American Iron and Steel Institute

For the Hearing on Section 232 National Security Investigation on Steel

May 24, 2017

Good morning, I am Tom Gibson, President and CEO of the American Iron and Steel Institute.  AISI represents both integrated and electric furnace steelmakers accounting for approximately 70 percent of U.S. steelmaking capacity, with facilities in 41 states.  I appreciate the opportunity to testify at this hearing today.

A strong and viable domestic steel industry is critical to America's national defense, national economic security and homeland security. Virtually every military platform is dependent on U.S- produced steels and specialty metals, in applications ranging from aircraft carriers and nuclear submarines to Patriot and Stinger missiles, armor plate for tanks and field artillery pieces, as well as every major military aircraft in production today. These critical applications require consistent, high quality domestic supply sources.

Steel's importance to national security must also be looked at in a broader context to include both direct and indirect steel shipments to the military infrastructure that are needed to support our defense efforts, both at home and overseas -- e.g., all of the steel that goes into the rails, rail cars, ground vehicles, support ships, military

barracks, fences and bases, which are not classified as shipments to ordinance, aircraft, shipbuilding or other military uses.

On a broader scale, steel is also essential to our nation's critical infrastructure, in terms of transportation, public health and safety, and energy, to name a few key areas. Our military and our broader economy depend on transportation infrastructure like roads, bridges, railroads, transit systems and airports, all of which are built with steel products such as rebar, plate, sheet and fabricated structural members. Public health and safety require reliable and efficient  water and sewage systems that are built with steel components, including tubular goods, tanks and culverts.

In addition, steel is critical to our energy security and infrastructure. Our nation's security depends on a reliable domestic energy supply and the domestic steel and products made from steel that are necessary to develop and transport the energy. Oil country tubular goods are essential to oil and gas production, and steel linepipe is needed to move these energy supplies to market.   A typical refinery contains miles of specialty pipe, large sophisticated boilers and process pressure vessels, thousands of custom made valves and fittings -- all made from steel designed expressly for critical applications.

Electric power generation is another critical national security need served by steel.  Grain-oriented electrical steels (GOES) are a principal raw material for power and

distribution transformers, which are critical to the nation's electrical grid and our

national security.  Non-oriented electrical steels (NOES) are an important raw material

for use in critical infrastructure, including for large cores in electrical power generators

and industrial applications, such as for oil drilling and oil and gas pipelines.  Steel is

also present in the structures and in the boilers, pressure vessels and pipe that is needed

to produce and deliver the steam or water to the generators. Transmission towers, made

entirely of steel, carry high voltage electric wires and provide support for our nation's

microwave, cellular and other communications equipment.

The U.S. steel industry's ability to supply our defense establishment and our

nation's critical infrastructure needs depends on the steel industry's continued ability to

compete in its commercial markets and maintain a domestic manufacturing presence.

Repeated surges in imports of dumped and subsidized steel products from numerous

countries in recent years have injured the U.S. industry and threaten further injury,

putting our national security very much at risk.

Finished steel imports took a record 29 percent of the U.S. market in 2015, while

domestic steel shipments declined by 12 percent, and capacity utilization averaged just

70 percent for the year.  While total steel imports declined by 15 percent in 2016 as a

result of a number of trade cases brought by the domestic industry against dumped and

subsidized imports, foreign import market share still remained historically high at 25.4

percent for the year.  And imports in 2017 are once again on the rise – with total imports

up 19 percent in the first three months of the year compared to the same period in 2016, and finished steel imports are now taking 26 percent of the market.

These high levels of imports in recent years have been a critical factor forcing several steel companies to temporarily close major steel-making facilities.  Employment in the steel industry declined by 14,000 jobs from January 2015 to December 2016, before seeing a slight recovery in the first part of this year.

Foreign government interventionist policies in the steel sector have fueled massive, and growing, global overcapacity in steel, which the OECD has estimated to be more than 700 million metric tons.  We estimate that more than half of that overcapacity – 425 million metric tons – is located in China, where government market-distorting policies have produced a dramatic increase in the size of the Chinese steel industry, to the point that today it represents about half of all global steel production.

As a direct result of Chinese government policy direction and subsidies, Chinese crude steel production soared from 128 million metric tons in 2000 to 823 million metric tons in 2014, before declining slightly to 808 million MT in 2016.  In the first three months of 2017, however, Chinese crude steel production is once again up 4.6 percent compared to the first quarter of 2016.

After many years of growth, Chinese steel demand appears to have peaked in 2013. The World Steel Association has reported that Chinese steel consumption declined by 3.3 percent in 2014 and by 5.4 percent in 2015, before increasing slightly by 1.3 percent in 2016. Furthermore, the demand situation in China is expected to worsen over the coming decade. The POSCO Research Institute forecasts that steel demand in China will decrease steadily until 2025, due to the slowdown in the Chinese construction and manufacturing industries.

With China's domestic steel demand declining, the Chinese steel industry has increasingly relied on exports to consume its surplus steel production. China exported a record 94 million metric tons of steel products in 2014, an increase of 52 percent from 2013. That trend accelerated in 2015 with Chinese steel exports rising to 112 million metric tons, an amount big enough to meet all steel demand in Germany and Japan for a year and leave almost 9 million metric tons to spare. In 2016, Chinese steel exports, while down slightly from 2015, continued at historically high levels in excess of 108 million metric tons.

This massive increase in Chinese exports to the world has resulted both in increased imports of Chinese steel into the United States and in increased imports from third countries that have themselves received increased Chinese steel imports. In the case of direct steel exports to the United States, due to the imposition of trade relief by

the Commerce Department in several antidumping and countervailing duty cases over the past few years, Chinese direct shipments have declined since 2014.

But while direct steel imports from China may be down, the high level of Chinese exports to the world continue to put pressure on the global steel market, and lead to increased imports from many third countries. Chinese exports to third countries are being further processed into downstream steel products that are then exported to the United States. For example, Chinese billets are being further processed in Turkey into long products which are then exported to the United States, while Chinese flat-rolled steel is being converted into pipe products in Korea which are then, according to Commerce Department determinations, being dumped into the U.S. market. In addition, Chinese cold-rolled and corrosion-resistant steel is being shipped to Vietnam for minor further processing before being exported to the United States is a blatant effort to circumvent AD and CVD orders on these products. As a result, the U.S. industry continues to suffer from the injurious impact of Chinese overproduction of steel that is exported to world markets.

In addition, the Chinese model of government intervention in the steel industry is being emulated in other countries as well, perpetuating the growing overcapacity problem. Vietnam and India, for example, both have explicit government plans to support the expansion of their steel industries and to increase their exports while

restricting imports.  As these plans are implemented, further injury will be suffered in the United States from dumped steel products.

As one of the most open markets in the world, the United States is often the target of dumping by steel producers from countries around the world.  In many cases, these foreign producers are also subsidized by their governments.

To date, the U.S. steel industry has relied on our trade laws to seek to address the impact of unfairly traded steel imports in our market.  While the antidumping and countervailing duty laws have provided some relief, because the resulting orders are necessarily country and product specific, they leave openings for steel products not subject to orders to continue to surge into our market.

Accordingly, AISI recommends that the Administration use the current section 232 investigation to fashion a more comprehensive and broad-based program of action to safeguard America's national security.

Among the goals of this program should be to increase pressure on China and other countries around the globe to reduce steelmaking capacity.

Thank you for the opportunity to testify today.  I would be happy to answer any questions.

**Ward Timken, Timken Steel Corporation**

**Department of Commerce**

**Section 232 National Security Investigation of Imports of Steel**

I'd like to thank Secretary Ross and the public officials here today for the opportunity to testify at this hearing.

My great-grandfather H.H. Timken established steel production in Canton, Ohio in 1917. Generations of people built this company from a one-customer enterprise that made bearing steels ... to a global company that creates high-performance steel for demanding applications in almost every market.  As we celebrate our centennial this year, our 2,600 employees, like the generations before them, take pride in making the cleanest steel in the world.

Our niche in the steel industry is special bar quality -- or SBQ -- steel to serve customers across a wide variety of industries. Our customers share two things in common...

First, their products endure a high degree of stress and operate in harsh conditions. They need consistently high-performing steel to be successful.

And second: our customers are vital to the national security of the United States.

- You find our steel in every kind of military equipment and military ordnance. An example is the work we've done recently with the U.S. Air Force to improve the strength and toughness of its "bunker busting" bombs. We delivered higher-performing steel at a lower price, improving the effectiveness of weapons in **eliminating** their targets and **limiting** collateral damage, while also **reducing** the total cost to the American taxpayer. (pause)

  There's a famous military quote that says "If you find yourself in a fair fight, you didn't plan your mission properly." Well, one essential part of that planning is to ensure that the military has the best, most modern tools possible … and American companies like TimkenSteel are delivering the type of innovation that gives the men and women of the military an advantage in completing their missions and returning home safely.

- We also serve companies across a wide range of industries, many of which also have a vital role in preserving and enhancing national security. You'll find our products:

  - a mile under the Gulf of Mexico in an oil string;

  - in millions of vehicle transmissions that move people and goods across the roadways of this country; and

  - in the landing gear of tens of thousands of aircraft that touch down every day.

- Our products are throughout energy, transportation and manufacturing and they enable customers to push the bounds of what's possible in **their** products. Put simply, we like the tough stuff … the harder the better.

Our ability to serve customers who preserve and enhance national security is dependent upon the domestic steel industry's continued economic viability. The world has an overcapacity of steel and many foreign competitors export steel to our shores, depressing pricing and displacing our sales.

We're not afraid of fair competition. We have some of the best people and assets in the world. Our employees not only can compete, but they can out-innovate and out-work any in the world … and the work of our engineers sets the global standard for special bar quality steel.

However, three numbers keep me up at night:

700 million

425 million

94 million

- The world has 700 million metric tons of steel overcapacity.
- 425 million of that is in China alone.
- Demand in the U.S. is only 94 million.

Imports are a real issue for the U.S. steel industry, particularly when foreign competitors don't play by the rules.

As a company, we're using every competitive tool we have to combat imports. We ask that the Commerce Department evaluate the levers it can pull as well. There is no "one size fits all" remedy to this issue. With hundreds of steel products across multiple countries, the remedy must be flexible enough to address the complex nature of the global steel trade. We recommend accessing all of the tools in the remedy toolbox, including tariffs, quotas, VRAs and more ... and in some instances, a combination of remedies may be necessary.

We appreciate your leadership on this issue. All of us at TimkenSteel take great pride in our contribution to the security of this nation and share your belief that a strong steel industry is critical to our national interests. Thank you.

Testimony of Barry Zekelman
Executive Chairman and Chief Executive Officer
Zekelman Industries

Section 232 Investigation on Steel

May 24, 2017

Thank you very much Secretary Ross.  My name is Barry Zekelman and I am the CEO and Executive Chairman of Zekelman Industries.  I appreciate the opportunity to appear here today on behalf of my company and our employees.  Zekelman is the largest pipe and tube producer in North America. We produce over 2 million tons of tubes annually consuming almost 2.2 million tons of domestically produced steel. Our millions of miles of tubing provide the thread that sews the security blanket  that covers our great nation.

Tubular products are critical to maintaining a strong defense and essential civilian sectors of the U.S. economy, and is the backbone of our nation's infrastructure.  In 2008 we produced 125,000 tons of hollow steel structural tubing used for the border security fence, which protects this country and its citizens from illegal border crossings and illicit drug trafficking. We produce the fire suppression pipe that is routed through our buildings, schools, hospitals, power plants, industrial plants, warehouses, and military bases. We produce the electrical conduit that provides safe passage and routing to all of the wiring in all building we see, especially in our data centers, mission critical military and space centers, power plants, and transportation systems. We make the pipes that carry the water and waste throughout all of our buildings and civil infrastructure. Our military bases, airports, transportation systems, and ports all rely on our pipes. We produce the oil country tubular goods and line pipe that is vital to the exploration and extraction of oil and gas that provide us with energy to run our economic and military machine. Our tube transports fuel and gas to planes, trains and automobiles, to houses and buildings for heat, to fuel power

Filed By: sprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

generating turbines and to support solar panel and wind turbines to propel clean energy use.  Our structural tubing is used for the protective posts which you see throughout this city and many others for vehicle barriers.  It is used for buildings and agricultural equipment to farm our fields and feed not only the U.S. population, but the rest of the world.  Highway signage, guardrails, bridges, electrical distribution towers, cell towers and rail cars are all made with our hollow steel structurals. The foundation of One World Trade is set upon our pilings. Our drawn over mandrel tubing is used for hydraulic cylinders that makes movement in all machinery possible, including mining equipment, construction machinery, transportation, robots and automation. Ask any military man if a hydraulic cylinder is critical to their success. There is not one piece of military equipment that does not have a tube in it, from gun barrels to rocket launchers to helicopters and naval ships, tanks, armored personnel carriers -- the list is infinite.  Ask the people of Flint Michigan if water pipes are vital to their security and survival!

In sum, to ask if pipe and tube is vital to our national security is not the right question. The question is really how our country could possibly be secure without it.  Our economy and our military would grind to a screeching halt without a vibrant domestic tube industry. We employ tens of thousands of people, providing income levels far superior to the touted minimum wage victories.  In addition, our industry consumes over 20 million tons of the flat rolled steel produced in the United States, the largest single category.  So if we go out of business, the steel producers are not far behind.  Imports have decimated our industry, resulting in the closure of a host of pipe and tube mills and throwing thousands out of work.  In the first quarter of this year, imports in all pipe and tube categories exceeded 60 percent of consumption, with some categories reaching 70 percent and higher.  It would be the epitome of folly to allow our nation to continue to permit imports to grow, putting U.S. producers out of business, and making our

2

Filed By: sprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

country vulnerable due to its reliance on foreign producers in China, Korea, Vietnam, Turkey and elsewhere.

My company supports a strong response in the form of a combination of duties and quotas. Trade remedy cases have not addressed the problem of unfairly traded imports and massive foreign overcapacity. Third country dumping is rampant in our industry and a stronger response is essential to ensure the ongoing viability of our industry. We have to break the cycle of dependency on imported pipe and tube, and the only way to do that is by limiting imports to a smaller share of the U.S. market. If we allow our domestic industry to disappear, we will only have only ourselves to blame for placing our country in an extremely vulnerable position. We have the best and most efficient steel producers in the world. We should make it here, and put America first.

DMSLIBRARY01\30441959.v1    Filed By: sprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

# Statement of Dennis M. Oates
# Chairman, Specialty Steel Industry of North America (SSINA)

# Chairman, President and Chief Executive Officer
# Universal Stainless & Alloy Products, Inc.

# Public Hearing on
# Section 232 National Security Investigation
# Regarding Imports of Steel

# May 24, 2017

Good morning Mr. Secretary and members of the panel. I am Denny Oates, Chairman, Specialty Steel Industry of North America (SSINA) and Chairman, President and Chief Executive Officer, Universal Stainless & Alloy Products, Inc.

SSINA is a Washington, DC-based trade association representing virtually all continental specialty metals producers, which include high technology, high value stainless and other specialty alloy products.

SSINA membership includes virtually all North American manufacturers of stainless steel and nickel based alloys, including superalloys. Other specialty metals such as titanium and titanium alloys, zirconium and niobium alloys are also produced by SSINA member companies.

There can be no doubt that the domestic specialty metals industry is critical to the national defense. Attached to my testimony is a report entitled "Specialty Metals and the National Defense," which summarizes the contributions of the specialty metals industry to the national defense. Also attached is a press release issued when the report was made public. The report proves unequivocally that specialty metals are vitally important to virtually every U.S. military platform. Without these specialty metals, the U.S. military and Homeland Security forces would not have the ability to fight a war, defend our borders, and protect our citizens from terrorism. The press release quotes then-Acting Deputy Under Secretary of Defense Gary A. Powell, who said, "There is no question that specialty metals are critical to the national defense, and the U.S. specialty metals industry is a very important supplier of these materials to various defense contractors. And myriad defense programs would be negatively impacted by specialty metals supply disruptions." Furthermore, Department of Defense studies provide further evidence of the critical importance of specialty metals to the national defense. A series of reports entitled, "Defense Industrial Base Capabilities Studies" clearly show that applications which contain

specialty metals are essential to meeting national defense requirements and are critical components of technologies that focus on 21st century warfare.

A key concern, however, is that the domestic specialty steel industry must be healthy and profitable in order to supply the critical defense applications. Simply put, the survival of the industry is dependent upon the core commodity products produced by our members. This includes basic stainless steel in the form of sheet and strip, plate, bar, rod, ingot and billet. The specialty steel industry cannot exist simply by producing materials for defense applications. While it is difficult for the specialty metals industry to identify the percentage of our total production which goes to specific defense applications because many of our sales go through service centers or distributors before reaching end users, a reasonable estimate is 10 percent. If civilian applications which play essential supporting roles for defense such as aircraft, highways, power plants, etc. are considered the percentage is much larger, perhaps 50 percent. And let me be clear -- the specialty steel industry could not abandon manufacturing in the United States and focus on technology development. It just does not work that way. Technology development travels with the manufacturing process. Our steel mills are laboratories. It would be naive to think that manufacturing of these materials could be transferred abroad to countries like China while technology development remained in the United States.

Import competition has taken a serious toll on U.S. producers. In the 1970s there were approximately twice as many specialty metals producers in the U.S. as today. We have battled unfairly-traded imports for decades. We have filed and won many antidumping and countervailing duty (subsidy) cases. The Commerce Department and the U.S. International Trade Commission reached affirmative findings in an antidumping case last year against imports of stainless steel

sheet and strip from China.  We constantly monitor developments on other products to determine whether additional trade cases should be filed.

As you are well aware, there is tremendous overcapacity worldwide to make stainless steel. China alone has <u>excess</u> production capacity equal to twice the size of the entire U.S. market.  And it remains to be seen whether China will cooperate with the rest of the world in the Global Steel Forum simply to develop a database demonstrating current production capabilities.  Global overcapacity, endemic dumping and foreign government subsidies all pose direct threats to U.S. producers and an associated threat to our ability to provide the critical materials essential to the national defense.  In conclusion, let me express our sincere appreciation for the efforts of this Administration to recognize the threat to our national security and to undertake this investigation to determine how to deal with this vital problem.  Thank you.

# Statement of Terrence L. Hartford
# Vice Chairman, Specialty Steel Industry of North America (SSINA)

# Vice President, ATI Defense
# Allegheny Technologies Incorporated

# Public Hearing on
# Section 232 National Security Investigation
# Regarding Imports of Steel

# May 24, 2017

Good afternoon, Mr. Secretary, and members of the panel.  I am Terry Hartford, Vice Chairman, Specialty Steel Industry of North America (SSINA), and Vice President - Defense for Allegheny Technologies Incorporated. ATI is a U.S.-based manufacturer of advanced specialty materials, including nickel-based alloys, superalloys, titanium alloys, stainless steels and other specialty materials, including zirconium, niobium and hafnium alloys. We've also made significant investments in downstream capabilities to produce specialty components from these materials. Many of these alloys have significant defense applications in our most advanced military systems.

ATI is one of the largest and most diverse specialty metals and components manufacturers in the world.  Our largest markets are in the aerospace and defense sectors, although we also have a strong presence in the oil and gas, electrical energy, medical, automotive and other industrial and commodity markets.  Virtually every major military aerospace system contains an ATI specialty steel or alloy.   Our materials are also utilized in the production of land-based vehicles; naval systems; missiles and rockets; armor and munitions.  The applications of these materials are wide-reaching, and in many instances, these materials are sole-sourced and not substitutable.  Let me provide a few illustrative examples, beginning with the aerospace sector.

1.      Our vacuum melted nickel alloy sheet, bar and finished forgings and our aerospace quality titanium alloys provide the strength and thermal protection that enables our military jet engines to operate at the highest temperatures with the necessary strength.     The Joint Strike Fighter F-135 engines and the F-404 engines of the F/A-18-Hornetare aerospace platforms are examples of programs that rely heavily on ATI specialty metals.

2.      Our premium quality titanium for dynamic rotor components and blades on many military helicopters, including the Apache, Blackhawk and Chinook programs provide high strength and light weight performance that is critical to the operation of these aircraft.

3.      Our Precipitation Hardening stainless steel bars and finished forgings are used for landing gears and other aircraft structural components of our military aircraft.

Moving from aerospace into the realm of ground vehicles, our vacuum melted nickel alloy sheets are used for recuperators on the M1-A2 Abrams tank engine, and our titanium alloys are used to produce armor for the M1-A2 tank.  Several years ago, ATI developed a new titanium alloy for armor systems, and this new material is nearing final qualification from the US Army and its prime contractors.

On the sea, our nickel-based alloys are utilized in hull construction to increase the system performance, durability and survivability of our naval vessels; while our special alloys for Navy submarine and aircraft carriers' nuclear propulsion systems ensure the corrosion resistance necessary in high temperature and salt water environments. Similarly, our duplex stainless steel is used for structural components on the Navy's newest Zumwalt-class destroyer, providing cost effective strength and corrosion resistance.

This is a small sampling of the numerous applications served by ATI specialty steels and specialty metals.  Many of these applications involve the use of proprietary materials that we have developed directly with the Departments of Navy, the Air Force and the Army.  These metals are high tech in nature and are in a constant state of advancement.  They are not "off-the-shelf" items. It is their superior performance, often under the most severe operating conditions, that enable our defense systems to function at high levels of performance and to do so reliably.

ATI is committed to the defense market. We are investing heavily in the development of new materials to navigate the transition to the next generation of advanced jet engines that will power our commercial and military air fleets. These materials will help our engines operate at higher temperatures to drive greater performance and improve fuel efficiency. Our efforts, however, are not limited to mill products. We are a leader in the production of titanium-based and nickel based alloy powders for use in next-generation jet engine forgings, as well as in the production powder and wire for 3-D printed components.

Mr. Secretary. We applaud the Administration's willingness to study the relationship between imports and national security in this investigation. To understand that relationship, however, requires an understanding the operations of companies like ATI that are leaders in the development of the specialty metals that will power our military into the future.

ATI grew through investment, technology development and innovation into the diverse specialty metals and components producer that it is today. A core business segment, however, is stainless steel production. Like most U.S. specialty steel mills, the ability to sell stainless steels into the commercial market requires us to be cost competitive to sustain our business. The domestic specialty steel industry – including companies like ATI – cannot exist simply by producing materials for leading edge defense applications. The production of materials for all defense applications, represents, in our case, perhaps 10 percent of total production. The survival of this industry, however, is dependent on the viability of all of its businesses, not just its defense-related production. It is important to realize that the production equipment used to make materials for defense applications is the same as the equipment used to produce materials like stainless steel for large volume non-defense applications, including infrastructure projects. Many of our engineers and metallurgists are also the same. It is the efficiencies of these larger volume, non-

defense related businesses that sustain the development and production of leading edge specialty metals for defense applications. Thus, the economic welfare of our high volume stainless steel operations directly impacts our ability to serve the needs of our military. For this reason, and relevant to this investigation, I would like to address the current state of the stainless steel market from the perspective of the stainless flat-rolled sector, which accounts for about two-thirds of U.S. stainless production.

For more than 40 years, the stainless steel flat-rolled market has been targeted by imports. Nevertheless, the sector has persevered and invested billions in world class technologies to remain globally competitive. We have also relied on the trade laws to respond to the challenges from illegally traded imports. Most recently, ATI and the other stainless steel-flat-rolled producers were forced to confront a Chinese state-owned juggernaut that increased its production of stainless steel from 3.8 percent of global production in 2001 to 54.5 percent in 2016.

China's production capacity is nearly eight times the size of the U.S. market, and its excess capacity alone is more than double the size of the entire U.S. market. These capacity imbalances, not surprisingly, translate into an intent, through the use of aggressive pricing, to dominate and potentially take over our market. Over the period 2013-2015, imports of stainless sheet and strip products from China grew 133.1 percent from 63,114 to 147,143 tons. China's share of the entire U.S. stainless sheet and strip market doubled during that period. The recent import surge from China, in fact, created market conditions that forced ATI to close our Midland Pennsylvania facility in 2015, with the loss of hundreds of jobs. Through the use of the trade laws, we were able over the period 2016-2017 to obtain antidumping and countervailing duty orders against China that should restore temporarily some degree of fairness to the market place. The fundamental structural problem of overcapacity, however, remains, and Chinese imports have been supplanted

by imports from Taiwan and Vietnam, many of which originate from Chinese-produced upstream material.

ATI's revenues come primarily from commercial markets, complemented by significant positions in defense.  ATI recently invested $1.2 billion to build the world's most advanced hot-rolling, and processing facility in Brackenridge Pennsylvania.  We will be processing some of our most sophisticated specialty alloys at that facility, many of which will be the foundation of our future military platforms.  The new mill, however, to operate profitably and efficiently needs to be able to produce stainless steel in commercial volumes.  This is true of many of our operations, including our Forged Products business.  If our commercial markets continue to be victimized by unfair imports, we will not be able to operate our mills at a level of profitability and return on investment that will permit us to invest in the research and development of the materials so critical to our national defense.  Many of these materials cannot be produced anywhere else.  Indeed, this is why the U.S. Department of Defense asked Congress in 1973 to impose a domestic sourcing requirement on specialty metals.  That requirement is a reason why companies in the specialty steel industry, like ATI, have had the ability to develop the specialty alloys that power our military, and why the U.S. leads the world in the technology development and production of these materials.

A domestic sourcing requirement alone, however, will not preserve that US leadership position, given the structural problems of excess capacity that plague the specialty steel industry. This investigation must recognize the inextricable linkage between our national defense needs and the ability of our specialty metals manufacturers to achieve the returns on investment in their commercial markets that will support the research and development of the high technology materials that are vital to our defense industrial base.  This investigation must therefore address the fundamental issues of overcapacity and unfair trade that have plagued our commercial markets,

and it must fashion a remedy that will permanently address those issues. The remedy, however, cannot undermine the antidumping and countervailing duty orders that have been effective in restraining import surges, nor can it weaken the domestic sourcing requirement incorporated in the Specialty Metals Amendment, which has ensured that the U.S. has the ability to produce the specialty metals from which most of our military platforms are built. We look forward to working with the Administration in helping shape that remedy.

## Testimony of

## Lourenco Goncalves - Chairman, President and Chief Executive Officer

## Cliffs Natural Resources Inc.

### U.S. Department of Commerce - Bureau of Industry and Security

### Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel

### May 24, 2017

Good morning, Secretary Ross and members of the panel.

My name is Lourenco Goncalves and I serve as Chairman,

President and Chief Executive Officer of Cliffs Natural Resources.

Thank you for the opportunity to speak here today.

By way of background, Cliffs is the largest supplier of iron ore

to the steel mills in the United States. We own and operate four of

the seven active iron ore mines in the country, directly employing

approximately 3,000 Americans. In stark contrast to the Australian

iron ore miners BHP, Rio Tinto and Fortescue, which almost entirely

produce and sell iron ore sinter feed fines to China and other

countries, Cliffs' operations in the United States exclusively produce

iron ore pellets.  While iron ore fines feed sinter operations that contribute immensely to the well-known air pollution problem in China, the pellets we sell to our domestic clients make the American steel industry one of the most – if not **the most** environmentally friendly in the entire world.  Chinese non-compliance with minimal environmental standards is the most absurd, unfair and unacceptable advantage the Chinese have in exporting their excess steel.

I will speak today both in my capacity as Cliffs' Chairman and CEO and from decades of experience in the steel industry.  Prior to joining Cliffs, I served as CEO of two other American companies: Metals USA Holdings, a leading national steel service center company; and California Steel Industries, the biggest steel supplier on the West Coast of the United States.  In light of my ten years at Metals USA and my active role in the previous cases under Sections 201 and 232 back in 2001 when I was at California Steel, I would like to confront a very important part of the problem that has

2

never been properly addressed.  That problem is the role played by some domestic service centers and steel buyers **as enablers of the entire steel import crisis**, by providing a home within the United States for illegal steel imports.

Dumped steel products do not find their way to this country spontaneously, nor do these imports swim to U.S. shores.  Every steel product that enters this country is brought here because a steel trader, distributor, service center or end user will buy – or already bought - that steel. Some steel buyers, traders and service centers, **by design**, acquire dumped and illegally subsidized steel and, in many cases, intentionally circumvent duties and tariffs assigned to steel products.

These bad players know exactly what they are doing, but they do it anyway, because they feel they are beyond reach.  As evidence, emails sent from traders to steel buyers in the U.S., offering to navigate around duties applied to steel from China and

3

South Korea, have been submitted along with the written version of my remarks.

Let me be clear: any American company or individual who is complicit in such a scheme **must be held accountable**.  These steel buyers are no different than recipients of stolen goods after a robbery.  While these recipients did not directly perpetrate the initial crime, it is nonetheless an offense to, knowingly, acquire stolen goods. Their only real concern is not to be caught; they do not care that artificially cheap products negatively affect the health of the domestic iron and steel industry and, by extension, the military readiness of the United States.

While not all service centers and steel buyers act as domestic enablers of illegal trade, the ones providing dumped and circumvented steel products a destination within the United States **must be punished**.   Any real solution to our imported steel problem **must include** a commitment by the federal government to

directly confront the American companies and individuals that facilitate the trade of illegal steel imports by ensuring that these products find a home in the United States.

In closing, I would like to remind the panelists that the worst enemy is the one that pretends to be a friend.  Some of these perpetrators use a speech very similar to ours, despite their actions. If any of these individuals do have the courage to show up today, please ask them if importing illegal steel is part of their business model and, if so, why they break the law.  I am sure they will not accept accountability because their illegal short-term profits are more important to them than the military readiness of the United States.

Thank you once again for the opportunity to speak today.  I would be happy to answer any questions you may have.

5

**Testimony of John Adams, Brigadier General, U.S. Army (Retired)**
**President, Guardian Six LLC**
**Hearing Regarding Section 232 National Security Investigation of Imports of Steel**
**May 24, 2017**

Thank you for the opportunity to share my views on the effects on the national security of imports of steel.

I applaud the administration's initiation of this Section 232 national security investigation of this issue. As a thirty-year veteran of the U.S. Army, with a background in strategy and intelligence, and as a lead author of the 2013 study of the U.S. defense industrial base, *Remaking American Security*, my experience and research convince me that imports of cheap and subsidized steel from our strategic competitors put our national security at risk by eroding the U.S. steel industry's position as a fundamental building block of our national security infrastructure. I therefore advocate concerted action at all levels of government to preserve a strong domestic steel industry.

Our nation's security rests on a military equipped with the technology, weapons systems, and platforms needed to protect our nation supplemented with logistical and critical infrastructure. Despite technological advances in materials, notably composites and ceramics, steel remains irreplaceable to the U.S. military. From nuclear-powered submarines to aircraft carriers, and from main battle tanks to mine-resistant vehicles, steel shields our nation and the lives of our warriors. A healthy domestic steel sector – including the many small and specialty manufacturers that depend on steel – is critical to sustaining the quantity and quality of capabilities needed to preserve our national security.

The glut of low-priced steel in the world market, resulting in large part from China's and other potentially hostile trading partners' actions, undermines the ability of American-made steel to fairly compete in the marketplace. Left unchecked, the current steel market situation will continue to result in plant closures, mass layoffs, and the loss of key technology and manufacturing know-how. In this insecure world, the need to build more defense platforms in a hurry may very well come sooner than we would like. As China expands its global presence, a situation in which China exercises market control over global steel is all-the-more alarming.

There is more to this issue than "lowest cost is best." While low prices for steel can reduce defense acquisition costs, irreparable damage to our domestic steel industry and loss of our steelmaking capacity will increase defense industrial base dependency on China and other potentially hostile foreign governments.

It is a myth that steel will always be available for U.S. defense requirements. Domestic steelmakers' health depends on the health of their commercial sectors. Conversely, the overall health of domestic steelmakers is not contingent on defense production. If the commercial market is severely disrupted or unprofitable, the defense production sector cannot survive.

Reliance on foreign sources of steel, especially from strategic competitors, results in uncertain supply for critical national requirements, especially in a crisis. In 2004, on temporary duty in Iraq, I witnessed our warriors apply jury-rigged armor plates – often sent by their families – to their vehicles to protect against IEDs. When DoD asked foreign suppliers to "uparmor" American vehicles, they put our requirements in their months' long queue for orders. Only American steel companies – subject to "rated orders" scheduled in weeks rather than months – supplied armor plate for the uparmored vehicles that protected our warriors from IEDs.

We must take urgent action to address these risks.

- Take aggressive action to safeguard America's economic and national security by recommending remedies to the President that will yield a meaningful opportunity for U.S. producers to recapture lost market share and rebuild broken supply chains.

- Take a broad view of steel products that are necessary for our national security. While the first products that come to mind are ships and tanks, we must also consider and include steel used to construct America's logistical and critical infrastructure – everything from our electrical grid and transformers to rail networks and underground water systems. A strong and readily-available supply of iron and steel products is vital to America's economic and national security.

- Focus on the entire supply chain, including everything from iron to semi-finished steel products in your recommendations to the President. According to SteelOnTheNet.com, a semi-finished steel slab constitutes roughly 90 percent of the cost of a finished hot-rolled steel product. Thus, allowing for the importation of foreign slabs, despite a 232 safeguard remedy, could undermine the goal of stabilizing and protecting steel production that is vital to our national security. The same goes for upstream raw materials production of iron. We must ensure that the entire supply chain of iron and steelmaking in the United States benefits from actions arising from this investigation.

- We must establish verifiable and enforceable mechanisms for the elimination of global overcapacity in the steel sector, and implement rules to counter anti-competitive behavior of state-owned entities, especially in China.

- We must proactively apply our trade enforcement laws to provide relief from market distortions before plants are forced to close and capacity is irreparably lost.

- We must rigorously apply domestic sourcing policies in government procurement of steel.

Our goal is to maximize domestic capabilities combined with supplies from unquestionably reliable third parties. The one supplier in whom I have complete confidence is Canada. Not only do we currently have a steel surplus with Canada, but we share a border and have synergistic strategic, economic, and national security interests. However, treating Canada as a unique partner under any Section 232 relief measures requires that Canada also strengthen and align its trade enforcement efforts with ours. Circumvention and evasion of U.S. trade laws and actions through Canada is unacceptable.

Again, I applaud the administration's initiation of this Section 232 investigation of the effects of imports of steel from a national security perspective, and as indicated, to recommend actions to adjust steel imports so that they will not put our national security at risk. We need concerted action to address the risks to our domestic steelmaking capacity before we lose it, especially to our most dangerous long-term strategic competitors, and to ensure that the U.S. steel industry remains a strong and ready foundation of our national security.

## Section 232 National Security Investigation of Steel Imports
## Testimony of John Stupp
## May 24, 2017

Good morning.  I am John Stupp, President and Chief Executive Officer of Stupp Bros. and Chief Executive Officer of Stupp Corporation, our steel pipe manufacturing division.  I am also a representative of the American Line Pipe Producers Association or ALPPA.  I would like to thank you for this opportunity to testify today and explain how imports of large diameter line pipe threaten U.S. national security.

Stupp was founded in 1856 and has been supplying products to the U.S. military since the Civil War.  Back then, it was iron classing for the monitor class vessels that helped secure the lower Mississippi.  During World War I, Stupp provided fabricated steel sections for maritime vessels and during World War II, Stupp built Bailey bridges, a portable, pre-fabricated, truss bridge that was used extensively by the military during the war. We also began making bomb bodies for the 500, 1000 and 2000 pound bombs used by the Air Force and Navy in the early 1970s and continue to manufacture those bomb bodies today.

Stupp's involvement in pipeline manufacturing dates back to the 1940s, when it began providing financing and project management for the 898-mile Michigan-Wisconsin Pipeline.  In 1952, Stupp started manufacturing pipe in Baton Rouge, Louisiana and added an integrated coating plant to its operations in 2004.

1

In 2009, Stupp added a second pipe manufacturing facility to its campus. Stupp is strongly committed to producing the highest quality line pipe in the United States and has been for decades.

Stupp, together with American Steel Pipe, Berg Pipe, and Dura-Bond, make up the ALPPA, a domestic coalition of large diameter line pipe manufacturers. Together, we account for the vast majority of large diameter line pipe domestic production. ALPPA's members produce line pipe for a number of U.S. national security applications, including for oil, gas, chemical, water, sewage, and slurry pipelines, all of which are critical U.S. infrastructure. ALPPA's members also produce specific products for the U.S. military, including steel bridges and munitions. We are proud to produce steel products that protect our citizens and infrastructure. However, unprecedented global steel overcapacity and the resultant surge in steel imports into the U.S. market are threatening our ability to continue doing so. That is why I am here today.

This Section 232 investigation comes at a pivotal time. As you are likely aware, the domestic steel industry is suffering from chronic overcapacity and a growing import crisis, both of which have been largely driven by government-sponsored capacity expansions. Over the past several years, governments in China, Korea, Turkey, and elsewhere have provided their producers with massive

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

subsidies to expand capacity and production far in excess of demand, which has resulted in a severe supply glut.

Estimates place current global excess capacity at more than 700 million metric tons. This figure is staggering and represents a sharp increase from the roughly 500 million tons of global excess steel capacity recorded in 2014. While China accounts for the bulk of this excess capacity, there is also significant overcapacity in Korea, Turkey, Japan, and other countries.

In the United States, the effects of the global excess steel capacity crisis are being felt most acutely in the form of record steel imports. The domestic large diameter line pipe industry has experienced this firsthand. Despite Korean welded line pipe being under order and a sizeable drop in U.S. demand in 2016, Korean producers have continued to ship substantial volumes of large diameter line pipe to the United States and now capture roughly 20 percent of the U.S. market, more than any other import source. Japanese volumes almost doubled between 2014 and 2016. Turkish and Greek volumes of large diameter line pipe increased by 267 percent and 991 percent, respectively, between 2014 and 2015, and remained significant in 2016, despite weakened U.S. demand.

These elevated import levels have resulted in dramatic declines in the domestic large diameter line pipe industry's capacity, production, revenue, investment, and employment. In 2015, which was a peak demand year, the

3

domestic industry was operating at a capacity utilization rate of only 37 percent. Since then, conditions have worsened. The industry is now operating at a capacity utilization rate of well under 30 percent – the lowest that it has been in years. While some large diameter pipe operations have been forced to shut down in response to the import surge, including U.S. Steel Tubular Products' McKeesport pipe mill, others have been idled. Just last May, American Pipe idled one of its two mills and reduced its workforce to one shift because of the import surge. Berg Pipe has also suffered a dramatic reduction in workforce – from 660 employees in 2015 to roughly 415 today – for this same reason.

The U.S. national security implications of the domestic industry's current state are significant. The industry is gradually losing the ability to produce large diameter line pipe to equip the U.S. military, respond to disasters, and modernize increasingly aging infrastructure. ALPPA's members supply a variety of different line pipe for critical oil, gas, and other pipeline projects throughout the United States as well as steel munitions, bridges, and other products for the U.S. military. However, we cannot keep producing these products if the import crisis continues.

The industry's ability to develop new steel products to meet evolving national security needs is also in jeopardy. ALPPA's members have made significant investments in recent years to produce the highest performance pipelines for the most demanding U.S. military and critical infrastructure

4

applications.  Stupp added a second mill to its operations in 2009, American Pipe invested $80 million in a new facility to increase its capacity in 2012, Berg made significant upgrades to its technology in 2013, and Dura-Bond purchased the former McKeesport pipe mill in 2016.  Such investments are necessary to keep our industry strong and healthy.

Yet, as President Trump recently acknowledged, if the present situation persists, "it may place the American steel industry at risk by undermining the ability of American steel producers to continue investment and research and development, and by reducing or eliminating the jobs needed to maintain a pool of skilled workers essential for the continued development of advanced steel manufacturing."  The domestic large diameter line pipe industry could not agree with the President more.

For these reasons, the ALPPA and its workers ask that Commerce find that steel imports are threatening U.S. national security and grant much needed trade relief to domestic large diameter line pipe producers and the rest of the steel industry.  A failure to grant broad relief to the steel industry will result in further harm to U.S. producers and workers, and continue to place our national security at risk.  The ALPPA will talk more about remedy in our written submission, but strongly believes that there is a need for import tariffs covering the large diameter line pipe industry.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

DRAFT – 5/22/2017   Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

Thank you for your time and attention on this critical issue.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

**Oral Presentation of Ryan Chadwick, VP and General Counsel of TMK IPSCO**
**Public Hearing on Section 232 National Security Investigation of Imports of Steel**
**May 24, 2017**

Good morning Secretary Ross and distinguished members of the panel. Thank you for the opportunity to speak at this hearing.

My name is Ryan Chadwick and I am the Vice President and General Counsel of TMK IPSCO, one of the largest manufacturers of steel pipe for the energy industry in the United States. Our energy related products include OCTG and line pipe up to 16". TMK IPSCO also manufacturers standard pipe, industrial pipe, and structural steel products. TMK IPSCO has 1.6 million tons of annual steel pipe manufacturing capacity at our facilities in Pennsylvania, Kentucky, Ohio, Arkansas, Iowa, Oklahoma, Nebraska, and Texas. Approximately 75% of our pipe production capacity is for welded pipe; the remainder is for seamless pipe. TMK IPSCO currently employs 1,370 employees at these facilities and at its headquarters and R&D facility in Houston, Texas. At full capacity utilization, TMK IPSCO would employ over 2,600 individuals in the United States.

According to the US Energy Information Administration, net imports of petroleum products account for 25% of US consumption of petroleum and US natural gas production is equal to about 99% of US natural gas consumption. Our country has made great strides on the path to energy independence. Dependence on imports of steel pipe to support this critical energy infrastructure, however, leaves our country less able to independently provide for its energy needs and less secure.

Our pipeline infrastructure is aging, with much of it installed prior to 1970. We must have a secure supply of steel pipe to repair and maintain this pipeline infrastructure.

Over one third of electricity generation in the United States is powered with natural gas, increasing the need to assure the security of steel pipe supplies to support the transmission of natural gas to these generation facilities.

Total steel pipe production in the United States is approximately 10% of total steel production in the United States by tonnage. A healthy domestic steel pipe industry helps insure a healthy domestic steel industry.

After final AD and CVD duties were implemented in 2010 against Chinese steel and steel pipe, Chinese steel overcapacity was redirected to other countries, such as South Korea. After 2010, we saw a steady increase in imported steel pipe manufactured by foreign companies able to take advantage of reduced steel prices caused by steel overproduction at unprofitable Chinese companies. By 2013, producing welded OCTG and line pipe became unprofitable for TMK IPSCO and other domestic producers.

The gap between US and Chinese steel coil prices expanded to as much as $340/ton last year and is $266/ton as of May 11 of this year. The Chinese steel coil prices warp the world steel market outside the US, lowering prices to well below the US coil price. It is very difficult and often impossible to compete with foreign steel pipe producers that have such an advantage in lower input costs. In some instances, foreign steel pipe has been priced close to the prices for domestic steel coil used in the production of US steel pipe. If the status quo is maintained, many of the steel pipe production facilities in the United States, particularly for welded pipe, will remain or become money-losing operations.

If the Administration takes action on imported steel under Section 232 and does not take action on imported steel pipe, the resulting influx of cheap steel pipe imports is likely to drive many domestic producers out of business because there will, at the same time, be a significant increase in US steel coil prices for domestic steel pipe producers.

In 2012, TMK IPSCO spent close to $100 million on capital projects to improve its manufacturing facilities in the United States. In 2013 and 2014, TMK IPSCO reduced its capital spending to approximately $40 million annually as it responded to difficult market conditions created by low-priced imported pipe. In 2015 and 2016, TMK IPSCO reduced capital spending to $19 million and $6 million as it idled its welded pipe facilities in response to low-priced imported pipe and the downturn in the oil and gas industry. In all, TMK IPSCO has invested half of a billion dollars in its US operations since 2008. TMK IPSCO has also spent approximately $10 million annually on research and development on improved metallurgies and advanced connection technologies that make the types of oil and gas well drilling that now occur in the United States possible. TMK IPSCO would like to return to a full workforce, return to spending on capital projects that allow it to compete in a fair marketplace, and maintain its R&D programs.

Both TMK IPSCO and a strong consensus of the US steel pipe industry at the CPTI annual meeting last week in Washington, D.C. agree that quotas, rather than tariffs, would be a better choice for relief under Section 232. These quotas should be based on 2010 and 2011 levels, a period between relief from massive Chinese imports and the onslaught of imports from many other countries.

**Position of the Ministry of Commerce of China:**
**U.S. Section 232 Investigation on Imported Steel**

**Testimony Before the U.S. Bureau of Industry and Security**
**May 24, 2017**

Gu Yu, First Secretary
Embassy of the People's Republic of China
in the United States

Good morning.   My name is Gu Yu, and I am First Secretary at the Embassy of the People's Republic of China here in Washington.   I welcome the opportunity to present the position of the Ministry of Commerce of China in this investigation on the effects, if any, of steel imports on the national security of the United States.

The Ministry of Commerce believes there is no evidence that steel imports threaten to impair U.S. national security.   United States defense requirements are plainly not dependent on imports of foreign-made steel.   Nor does imported steel fundamentally threaten the ability of domestic producers to satisfy national security requirements, or threaten the security and welfare of industries that are critical to the minimum operations of the economy and government.   Simply put, United States national defense and other critical sectors' need for steel can be, and are, readily satisfied by U.S. domestic production.

First, your agency, as well as the U.S. Department of Defense, have previously determined that U.S. national defense requirements for finished steel are very low. Recent statistics of the American Iron and Steel Institute show that just 3% of total U.S. domestic steel shipments go to national defense and homeland security.   Clearly,

1

current and projected U.S. national defense demand for steel can be readily satisfied by domestic production.    Moreover, the U.S. Department of Defense has long-established domestic procurement requirements that apply to all steel used in critical national security systems.    None of these systems are dependent upon foreign steel.    Annual reports of U.S. domestic steel producers show that they cover the steel supply for national defense and national security applications, and the capacity and shipments of steel of these companies far exceed U.S. national defense and security requirements.    Thus, steel produced domestically in the United States remains in abundant supply relative to U.S. national defense requirements.

Second, the United States imports its steel from a diverse array of more than 100 countries and territories.    Steel pipe and tube imports, for example, are sourced from more than 50 different countries.    The United States is not dependent on steel imports from any particular source country.    The portion of imports from each individual country is relatively low compared to total imports.    Canada, for example, the largest source of imported steel, accounts for only 17% of steel imports.    And the vast majority of U.S. steel imports -- nearly 70 percent -- are from close U.S. allies. The top five suppliers are Canada, Brazil, South Korea, Mexico and Turkey. Furthermore, U.S. reliance on imported steel is declining.    Your Commerce Department found that steel imports have declined by more than 25 percent since 2014.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

Third, the U.S. steel industry is healthy and has the capacity to produce the steel needed to satisfy the country's national security requirements.    In particular, U.S. producers have state-of-the-art technology to produce high-end, high-value steel products, and they maintain steady and competitive exports of such products in global markets.    The top domestic U.S. steel producers are actively making significant new investments, both domestically and abroad, that increase the efficiency of their domestic output and enhance their global strength and competitiveness.    These investments are reflected in relatively stable levels of U.S.-based steel workers, as well as in the overall expansion of employment by U.S. steel producers in their global operations.    Furthermore, given current capacity utilization rates around 70%, the U.S. steel industry has significant expansion potential to continue providing ample supply for national security needs.

The U.S. government already provides domestic producers with adequate trade protections.    Over the last 40 years the U.S. initiated more than 200 trade remedy investigations on imported steel products.    U.S. steel producers are currently the beneficiaries of more than 150 separate antidumping and countervailing duty orders that your Commerce Department enforces on imported steel products from over 25 countries.    These orders provide the U.S. industry with full protection from imports of steel, as well as generate revenue for the U.S. Treasury due to high rates of duties.

Fourth, the volume of imports of steel from China has significantly declined in recent periods and represent a very minimal portion of U.S. steel imports.    Steel

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

imports from China, which are primarily low-end products sold to distributors and processing centers, are <u>down 67.4 percent</u> since September 2015.   Chinese steel imports plainly do not impact U.S. national security.

Finally, in light of the lack of a unified definition of "national security" within the WTO framework, such action may trigger other Members to invoke similar national security interests to protect their own allegedly critical industries from imports, which would create unnecessary and harmful barriers to trade.   At the same time, any steel import restrictions imposed as a result of this investigation will do nothing to enhance U.S. national security, but would only harm downstream U.S. manufacturers and the broader domestic economy. We hope that the United States will carefully assess the impact of this section 232 investigation and play a positive role in the global order of international trade.

The Ministry of Commerce plans to file a written submission further elaborating and documenting these points by May 31, 2017.   Thank you for the opportunity to share these views with you today.

4

TRADE REPRESENTATION
OF THE RUSSIAN FEDERATION
IN THE UNITED STATES OF AMERICA



ТОРГОВОЕ ПРЕДСТАВИТЕЛЬСТВО
РОССИЙСКОЙ ФЕДЕРАЦИИ
В СОЕДИНЕННЫХ ШТАТАХ АМЕРИКИ

2001, CONNECTICUT AVE., NW.,
WASHINGTON, DC 20008,
USA

www.rustradeusa.org

Tel.: +1 (202) 232-5988        E-mail: dc@rustradeusa.org        Fax: +1 (202) 232-2917

Our ref. *ТР40u-04-04/414*
May 22, 2017

**Submitted Electronically**

Mr. Brad Botwin                                    Section 232 National Security
Director for Industrial Studies                          Investigation on Steel
Office of Technology Evaluation
Bureau of Industry and Security
U.S. Department of Commerce                      **PUBLIC DOCUMENT**
14th Street and Constitution Ave., N.W.
Washington, D.C. 20230

Re:    *Section 232 National Security Investigation on Steel; Confirmation of Participation at
Public Hearing and Copy of Testimony*

Dear Mr.Botwin:

We hereby confirm a participation of Alexander Zhmykhov, Deputy Head of Economic
Section, Trade Representation of the Russian Federation in the USA at the hearing on the above-
referenced investigation on May 24, 2017.

Please, find attached a copy of a planned testimony.

Respectfully submitted,

                                    Aleksander Y. Stadnik
                                    Trade Representative of
                                    the Russian Federation in the USA

Encl.: 2 pages.

**Summary of Hearing Statement of**

**the Trade Representation of the Russian Federation on behalf of**
**the Ministry of Economic Development of the Russian Federation**
**before the Office of Technology Evaluation,**
**Bureau of Industry and Security**
**at a public hearing on Section 232 National Security**
**Investigation on Steel**
**on May 24, 2017**

Thank you for the opportunity to speak today on behalf of the Ministry of Economic Development of the Russian Federation.

Currently, exports of a broad range of steel products from Russia to the United States are subject to substantial limitations imposed by an Agreement Suspending the Antidumping Investigation on Cut-To-Length Carbon Steel Plate[1], and by antidumping duties against hot-rolled flat-rolled carbon-quality steel[2].

These two remedies have had the effect of disciplining imports of steel products from Russia to such an extent that Russian imports must be excluded from any remedy recommendation in the current investigation. A contrary result would unfairly subject imports of Russian steel to duplicative and severe limitations.

Regarding cut-to-length carbon steel plates, in accordance with the Plate Suspension Agreement that was put in effect in 2003, each signatory Russian producer/exporter agrees not to sell its merchandise subject to this Agreement to any unaffiliated purchaser in the US at prices that are less than the normal values of the merchandise, as determined by the Department on the basis of information submitted to the Department.

There is only one Russian producer who provides necessary information to the Department and has the possibility to sell subject goods into the USA. The quantities of shipments of the product from Russia to the USA plummeted by more than 25 times: from 252 thousand tons in 1996 to 10 thousand tons in 2016. The Department issues the normal values, which exclude the risk of unfair trade practices by Russian import.

---

[1] See Suspension of Antidumping Duty Investigation: Certain Cut-to-Length Carbon Steel Plate From the Russian Federation, 68 FR 3859 (January 27, 2003). Plate Suspension Agreement is attached hereto as Exhibit 1.

2 See Termination of the Suspension Agreement on Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From the Russian Federation, Rescission of 2013-2014 Administrative Review, and Issuance of Antidumping Duty Order, 79 FR 77455 (December 24, 2014).

Case 1:20-cv-03898-CRK    Document 81-2 Page 75 Filed 11/03/21    Page 462 of 2032
PUBLIC VERSION
Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

2

The U.S. market <u>of hot-rolled coils and sheets</u> has been closed for the Russian exporters due to the prohibited level of antidumping duties up to 184.56% since the end of 2014. Prior to that there was the suspension agreement in force. Russian producers treated that agreement with duly respect although it was designed for non-market economy country in 1999.

Also, in September, 2016 (less than 3 quarters ago) the Department finished the antidumping and countervailing investigations against certain <u>cold-rolled steel flat products</u> with no measures for Russian-originated products due to negligible amount of import, proving that import of these goods from Russia did not cause any injury to the US industry[3].

In light of the array of limitations that already exist and have already severely reduced the volume of imports of Russian flat-rolled carbon steel products into the United States, we urge the Department to use great caution in the course of the current investigation, in order to ensure that Russian merchandise is not subject to excessive, redundant and conflicting restrictions.

The statute directs the President to provide relief "only to the extent the cumulative impact of such action does not exceed the amount necessary to prevent or remedy the serious injury."[4] In the current case, however, the Russian imports have already been so drastically limited by the measures in force that further limitations would be excessive in terms of the "amount necessary to prevent or remedy" the injury found by the Department. It would be unfair, therefore, for the Department to recommend a remedy to the President that is not necessary to fulfill the statutory standard for the imposition of relief.

For the reasons outlined above, we respectfully reiterate that there is no need for the imposition of additional import restraints on steel products from Russia. Additional remedies under Section 232 would unfairly impose redundant and potentially conflicting remedies on imports from Russia.

We respectfully ask the Department to abstain from recommending any additional remedies on imports of steel from Russia.

---

[3] <u>See</u> Cold-Rolled Steel Flat Products From Brazil, India, Korea, Russia, and the United Kingdom; Determinations, 81 FR 63806 (September 16, 2016).
Filed By: dprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved
[4] 19 U.S.C. § 2253(e)(2).

EUROFER
The European Steel Association

May 22, 2017

Total No. of Pages: 5
Trade Expansion Act of 1962
§232 National Security Investigation
Bureau of Industry and Security
U.S. Department of Commerce

**PUBLIC DOCUMENT**

BY EMAIL

Brad Botwin, Director
Industrial Studies, Office of Technology Evaluation
Bureau of Industry and Security
U.S. Department of Commerce
Room 1093
1401 Constitution Avenue, NW
Washington, DC 20230

**Re:     Public Hearing on Section 232 National Security Investigation of Imports of Steel**

Dear Director Botwin,

I plan to appear on behalf of EUROFER at the May 24, 2017 public hearing on the United States' Section 232 National Security Investigation of Imports of Steel. A copy of my planned testimony is attached. Thank you for the opportunity to participate in the hearing.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Karl Tachelet
EUROFER

Director, International Affairs

**Public Hearing on Section 232 National Security Investigation of Imports of Steel: Written Statement of Karl Tachelet on behalf of EUROFER**

**(May 24, 2017)**

Director Botwin and members of the Panel, thank you for inviting me to participate in this hearing. My name is Karl Tachelet. I am the Director of International Affairs for EUROFER. I have worked in the European steel industry for over 20 years. EUROFER represents 100 percent of steel production in the EU. Our members are steel companies and national steel federations. We are longstanding, reliable suppliers of steel to the United States. Many of our members have steel plants in the United States.

EUROFER shares the US government's concerns regarding excess steel production, unfair trading practices, and global steel overcapacity. We have worked with EU officials to address the injurious effects of these problems through the enforcement of our trade remedy laws and their root causes through international negotiations in fora like the OECD and the G-20 (Global Forum on Steel Excess Capacity). Continued joint efforts between the EU, the US, and other like-minded governments are the only effective avenue to address these problems and secure balance in the global and US steel markets.

We do not believe that restrictive actions based on national security will allow for the lasting solution the market needs. However, if the US pursues this investigation, EUROFER believes the Bureau's analysis of national security must be narrowly tailored to focus on direct threats to national security.

**First**, the analysis should be focused on specific steel products needed for specific uses directly tied to national security, in particular defense applications. As a rule, commercial and national

interests do not rise to the level of security interests.  For example, the following products clearly do not affect national security:

- Rebar and heavy sections used in construction;

- Wire rod used to make tire cord, springs, and fasteners for autos;

- Wide flange beams and channels used in construction;

- Hot-rolled wide strip used in construction and autos;

- Cold-rolled sheet used to make household appliances and auto components;

- Metallic and organic coated sheet used in household appliances, building materials, autos, and for deep drawing and stamping; and

- Tin mill products used to make cans for food and beverages.

The Bureau must therefore focus its analysis only on steel products that have a strong, direct national security nexus.  In this regard, we note that many of the subsectors identified by the Department of Homeland Security as "critical infrastructure applications" have little or no relevance to national security and should be removed from the analysis.

**Second**, for each steel product with a strong, direct national-security nexus, the Bureau should determine whether US producers have sufficient capacity to meet the needs of the Defense Department and critical infrastructure applications.

**Third**, the Bureau should account for factors arguing against import adjustment.  In particular, the Bureau should consider whether adequate complementary imports are available from US allies like the EU.  If so, no action should be taken.  Furthermore, any remedy proposed to adjust

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

imports should differentiate based on the threat posed to US national security by specific foreign steel suppliers.

Not all foreign sources of steel are the same with respect to national security. The US and EU share a long history of collaboration on national security issues. Indeed, 22 EU Members are members of the North Atlantic Treaty Organization (NATO) and are committed to defend US security, including by providing assistance in times of crisis. Additionally, there are dozens of bilateral agreements between the US and individual EU Members covering matters such as defense cooperation and weapons production, and many EU Members are parties to reciprocal defense procurement memoranda of understanding with the US under which each country agrees to remove barriers to purchases of supplies and services of the other country.

Furthermore, EUROFER members are longstanding, reliable suppliers of high-quality steels that are needed to maintain US national security. Indeed, many of our members have invested in US plants to make steel products and employ American workers. Thus, EUROFER companies have a manifest interest in a strong, prosperous, and secure United States.

If the Bureau does not have adequate information to perform this type of rigorous analysis, it should issue questionnaires to US users in defense and critical infrastructure applications, US producers of steel, and foreign producers of steel. The lack of detailed data regarding the consumption of specific steels by these industries or US producers' capacity to make the specific steels is not a valid basis for conducting an overly broad analysis or imposing overly broad measures. We note that the US International Trade Commission regularly solicits data of this sort in trade remedy investigations, and the Bureau should do so here.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

EUROFER is available to contribute to the establishment of such an analytical framework, and to provide data, to ensure that the Bureau produces a focused analysis and recommendations that address national security concerns.

Thank you.

4

Section 232 National Security Investigation
Of Imports of Steel

## Summary of Oral Statement
## By the Embassy of Ukraine

- Ukraine believes that there is no ample ground to impose by the United States any measures under Section 232 against imports of steel from Ukraine.

## Close Security Cooperation Between Ukraine and the United States

- The United States and Ukraine have maintained a close diplomatic and security relationship since Ukraine regained its independence in 1991.

  o Ukraine has closely cooperated with the United States on nuclear non-proliferation issues, including giving up its nuclear weapons.

  o The U.S. Department of Defense is assisting Ukraine in its defense and security reform, including related to defense planning, policy, strategy, and financing.

  o Ukrainian military officers attend U.S. military schools to receive vital training, instruction, and professional development.

  o Ukraine has contributed a large number of troops to Iraq to support United States efforts there.  From 2003-2005, Ukraine had the fourth largest number of foreign troops in Iraq, after the United States, United Kingdom, and Poland.

- As a result of the illegal occupation of the Autonomous Republic of Crimea and the city of Sevastopol by the Russian Federation and it's further military invasion in certain areas of the Donetsk and Luhansk regions, since 2014 slightly over 7% of the territory of Ukraine temporarily remains out of control of the Government of Ukraine.

- Under the circumstances, maintaining a close cooperation in the diplomatic and security fields is clearly in the mutual interest of both of our nations.

## Ukrainian Steel Poses No Threat to U.S. National Security

- The United States is not a major export market for Ukrainian steel.  Ukraine steel producers are principally focused on regional markets in Eastern Europe, the Middle East and North Africa.  Exports of steel to the United States barely ranked 19th of all export destinations in 2016. 1/

- As a result of the illegal expropriation of Ukrainian companies' assets and property by the Russian forces in certain areas of the Donetsk and Luhansk

---

1/      *See* U.S. Department of Commerce, International Trade Administration, Global Steel Monitor, Steel Exports Report: Ukraine, March 2017, *available at* http://trade.gov/steel/countries/pdfs/2016/annual/exports-ukraine.pdf

regions of Ukraine in March 2017, a large part of Ukraine's steel industry was put in uncertain position.

- Ukraine's steel industry is under attack – both physically and economically – by foreign-backed separatists in the Eastern portion of Ukraine. In March, a large segment of Ukraine's steel industry in the Donetsk region was seized by the separatists. This has put the Ukrainian steel industry in a very uncertain position.

- The viability and success of Ukraine's steel industry is crucial to economic and political stability of Ukraine. It is also vital to the bilateral U.S.-Ukraine security relationship, which bolsters U.S. strategic interests in the region.

- The U.S. Government in 2001 completed a similar Section 232 investigation concerning imports of iron ore and semi-finished steel. 2/ The Department of Commerce concluded in that case that:

> There is neither evidence showing that the United States is dependent on imports of iron or semi-finished steel, nor evidence showing that such imports threaten the ability of domestic producers to satisfy national security requirements. 3/

- Applying the same methodologies, we are confident that the evidence obtained in this case will likewise show that the steel imports do not threaten U.S. national security.

## WTO Concerns

- Taking into account that the United States and Ukraine are Members of the WTO, we would like to emphasize that any possible measures should be in line with of the obligation under the WTO provision and GATT.

We look forward to continued cooperation with the U.S. Government in securing peace, protecting international law and stabilizing the Ukrainian economy. We do hope to continue to develop an open and mutually beneficial trade and investment relationship with the United States.

---

2/    See The Effect of Imports of Iron Ore and Semi-Finished Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended, U.S. Department of Commerce, Bureau of Export Administration (Oct. 2001).

3/    Id. at 1.

# TESTIMONY OF TIM JOHNS

# NIPPON STEEL & SUMIKIN COLD HEADING WIRE INDIANA INC.

## May 24, 2017

Good morning/afternoon.  I am Tim Johns, Vice President of Manufacturing for Nippon Steel & Sumikin Cold Heading Wire Indiana Inc. ("NSCI"), a newly established manufacturer of steel wire for automotive cold heading and forging located in Shelbyville, Indiana.  NSCI is scheduled to open in October 2017 and begin production of steel wire starting in January 2018.  When fully operational, NSCI's production facility will directly employ approximately 70 people in Shelbyville.

NSCI is unique in that it will not follow others by simply importing finished steel wire from Japan.  Rather, the company will import the raw material – that is, high-quality wire rods – from Japan, and produce finished steel wire in the United States.  However, in order to do so, NSCI needs access to a reliable supply of high-quality Japanese wire rod.

If NSCI is not able to import these materials, the company will be forced to shut down because the wire quality needed for the production of fasteners and other safety-critical auto parts can be achieved only with the high-quality wire rod available from Japanese manufacturers.

The quality of the wire rod produced by the Japanese manufacturers is unavailable in the United States. In short, Japanese wire rod is superior to wire rod produced elsewhere because only the Japanese manufacturers have demonstrated the ability consistently to meet the precision and performance requirements of fastener and other safety critical auto parts manufacturers. These downstream manufacturers require wire rod that is both extremely durable but also light weight. The Japanese wire rod manufacturers are uniquely able to meet these contradictory requirements due to their advanced methods of controlling for surface defects, inclusions, and size tolerances.

NSCI intends to win business from its downstream U.S. customers based on the quality and reliability of our products. Import duties on wire rod from Japan will compromise the viability of our business and lead to the elimination of many jobs in Shelbyville and the surrounding area. Further, such duties would also cause serious damage to automobile and fastener supply chains in the United States, potentially affecting the jobs of thousands of people throughout the country. To block imports of Japanese wire rod will simply lead to export of U.S. jobs and import of the finished products we make here. For these reasons, I urge you to find that Japanese wire rod is integral to the U.S. economy and that such imports do not compromise the national security of the United States.

Thank you.

## BEFORE THE U.S. DEPARTMENT OF COMMERCE
## BUREAU OF INDUSTRY AND SECURITY

|  |  |
|---|---|
| Section 232 Investigation on the Effect of | ) |
| Imports of Steel on U.S. National Security | ) |

### Oral Presentation of Byeong Bae Lee, President, Hyundai Steel America

1.      Good morning.  My name is Byeong Bae Lee.  I am the President of Hyundai Steel America, located in Greenville, Alabama.

2.      Hyundai Motor Manufacturing Alabama, LLC or "HMMA" is a U.S. automobile manufacturer located in Montgomery, Alabama.  Kia Motors Manufacturing Georgia or "KMMG" is a U.S. automobile manufacturer located in West Point, Georgia.  Hyundai Steel operates a steel processing center in Greenville, Alabama that processes cold-rolled and corrosion-resistant steel for HMMA, KMMG, and other Automobile Companies, as well as for the suppliers of parts and components to those companies. All three companies are affiliated with Hyundai Steel of Korea, a Korean producer of various steel products.

3.      Hyundai has invested approximately $2.1 billion in the three establishments, with a plan of future investment of approximately $3.1 billion. The details are as follows:  HMMA was established in 2005. The total investment has been approximately $1.7 billion.  HMMA employs approximately 3,500 American workers.  In 2016, HMMA purchased approximately 170,000 tons of

1

cold-rolled and corrosion-resistant steel -- 49,000 tons were purchased from domestic steel producers, and 121,000 tons were imported from Korea and Japan.

4.    KMMG was established in 2010.  The total investment in KMMG has been approximately $1.1 billion. KMMG employs approximately 3,000 American workers.  In 2016, KMMG purchased approximately 208,000 tons of cold-rolled and corrosion-resistant steel -- 59,000 tons were purchased from domestic steel producers, and 149,000 tons were imported from Korea and Japan.

5.    Hyundai Steel America is a steel processing center for cold-rolled and corrosion-resistant steel. Hyundai Steel was established in 2003 with a total investment of approximately $82 million.  Hyundai Steel employs approximately 140 employees.  Going forward, Hyundai Steel plans to purchase approximately 40 percent of the cold-rolled and corrosion-resistant steel purchased from domestic steel producers.  The balance will be imported from Japan, Korea, and other sources.

6.    HMMA and KMMG have a plan to invest approximately $3.1 billion in upgrading and expanding their domestic U.S. manufacturing operations.  The investment in these automobile facilities was based on the assumption that HMMA and KMMG would be able to purchase high quality cold-rolled and corrosion-resistant steel from domestic and imported sources.  Roughly 10 percent of Hyundai's Steel requirements are not available from domestic steel manufacturers

2

in the qualities and tolerances required. Hyundai's access to steel is threatened by this action and thus jeopardizes the investments already made as well as the planned investments.

7.     The volume of cold-rolled and corrosion-resistant steel required directly for national defense needs is limited, and Hyundai believes that existing domestic capacity is more than adequate to meet current and projected national defense requirements.

8.     For auto makers like HMMA and KMMG, by far the most important factors in purchasing cold-rolled and corrosion-resistant steel are product quality and product uniformity. Different auto parts require specific qualities, but flatness, no wave, and low reject rates are always important. HMMA and KMMG are not following a policy of purchasing from their Korean affiliates. To the contrary, HMMA and KMMG prefer to purchase from U.S. suppliers where the steel is available and meets these quality requirements.

9.     With the emphasis on light weight vehicles to maximize fuel efficiency, there is an emphasis on high tensile strength steel. Some U.S. producers produce some grades and qualities required, but they do not produce other grades and qualities. Both HMMA and KMMG require increased quantities of Advanced High Strength Steel ("AHSS") and Ultra High Strength Steel ("UHSS"). These high strength steels are difficult to produce and not all domestic

3

Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

steel producers produce these qualities in the dimensions and to the tolerances demanded by KMMG and HMMA.

10.    The investment in KMMG, HMMA, and Hyundai Steel have increased employment and provided jobs and economic activity in the communities where they are located that previously did not exist.  The companies have increased domestic purchases of steel, providing customers and opportunities that did not previously exist.

11.    At the same time, these investments demand the ability to also access high quality imports of cold-rolled and corrosion-resistant steel.  As noted, some of these grades and qualities are not available from U.S. producers.  In addition, because HMMA's and KMMG's research center for development of new models is located in Korea, new models are often designed initially using Korean and Japanese steel due to the ease of logistics.

12.    Existing trade remedy laws already protect the domestic steel industry against unfair subsidization and dumping.  Further restrictions are not necessary.

13.    Thank you and I am prepared to answer any questions you may have.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

**Statement of the American Institute for International Steel**

**At the**

**Public Hearing for the Section 232 Investigation on the Effects of Steel Imports on**

**U.S. National Security**

**Bureau of Industry and Security**

**U.S. Department of Commerce**

**May 24, 2017**

I am Gary Horlick appearing on behalf of AIIS.  We include 108 members, including

traders, freight forwarders, stevedores, shippers, importers, exporters, railroads, port authorities,

unions, and many other logistics companies.  We account for approximately 80% of imported

basic steel products.

1.       The purpose of Section 232 is to ensure that the U.S. military can obtain the types of

products it needs in the quantities it needs when it needs them.  It was not intended to

provide overall protection for U.S. industry for other purposes – there are lots of other

statutes for that purpose.

The Department of Commerce's Federal Register notice requests information concerning

a very broadly undefined industry of "steel."  That industry's long-term prospects are

sound, as shown by the start-up of new facilities such as Big River Steel.  The major

change in the industry was the emergence of entrepreneurial companies such as Nucor.

The electric arc furnace sector grew from less than 10 percent to 57.9 million tons in

CY2016 compared to 28.5 million tons for blast furnace production, and 26.5 million

tons of imports.  Individual companies making individual products may change their

product mix from time to time, but there is no sign that they cannot make the products our military requires as needed.

Further, analysis under this statute requires looking at all the capacity that would be available to the U.S. military in times of need, and that would most certainly include Canada and Mexico, and probably other countries as well.

2.   The past history of this clause illustrates the extreme caution needed to avoid misuse for political reasons.  It is frequently stated that the statute has only been used for import protection twice, both involving relatively minor uses involving crude oil in the 1970s. But this forgets the largest use of this statute, under a predecessor statute.  From 1959 to 1973, the U.S., for internal domestic political reasons, imposed quantitative restrictions on the import of crude oil.  This had 3 very direct consequences:

(a)      In the name of protecting our national security, the U.S. for those 12 years pumped out our own reserves, and in the end of the period, the U.S. for most of its history a major net oil exporter, had become a net importer of crude oil.

(b)      During this period, U.S. downstream industry, as a direct result of the quotas, paid 50-100% more for its oil (used both as an input and as energy) than its foreign competitors, effectively giving a huge cost advantage to competitors in the newly reconstructed industries in Japan and Europe.  At the end of the quotas, the U.S. ran a trade deficit in goods.

(c)      The U.S. granted an exemption to the quotas to its close ally and neighbor, Canada.  In 1959, the minister of national patrimony of Venezuela, then a very close U.S. ally, flew to Washington to ask for a similar exemption.  This was

refused and Minister Alonso instead of flying back to Caracas flew directly to Riyadh and founded OPEC.

The important lesson that we can draw from this is that when contemplating using a statute like Section 232, we should treat it with extreme caution and concern for foreseeable and unforeseen consequences. This is especially true when the rationale for employing Section 232 appears to be entangled with political considerations for broad industrial policy goals.

3. Logically, the national security "bottleneck" if there is one is the dwindling reserves of U.S. iron ore. According to the U.S. Geological Survey, the U.S. is not even in the top 10 for iron ore reserves, while significant military competitors such as Russia and China have more than double our reserves. This is unsurprising, since we have been using up our iron ore at a substantial rate for more than 100 years. In addition, U.S. iron ore has relatively low iron content compared to those countries. Consequently, stimulating production of steel in the U.S., which currently relies heavily on U.S. iron ore, only makes us more dependent on imports of iron ore. Fortunately, Canada and Mexico have good reserves of iron ore, as do friendly countries such as Australia and Brazil. But if the concern is to have everything sourced in the U.S., it would be not only illogical but dangerous to use up our own iron ore first – as we did with crude oil.

4. Finally, it is impossible to ignore the certainty that other countries will retaliate against U.S. exports. Let's start with the obvious:

- The United States is the largest exporter of military equipment in the world, selling over $20 billion annually in recent years. But we have competitors for almost all our products—Russia is second, for example. This affects not only the

jobs that are dependent on exports, but the entire economics of our defense base.

The economics of great airplanes like the F-35 or the F-22 do not work unless

they are sold to some of the same countries whose steel this proceeding might

limit from entering the U.S. It is hardly hypothetical that those steel exporting

countries might want to stop buying our military equipment and switch to other

sources, as they might easily do.

- And there is no reason to believe retaliation would be limited to military sales. A

member of the Mexican Senate and a candidate in the 2018 presidential election

recently introduced a bill to force Mexico to diversify its sources of corn away

from the U.S. He states that the goal is to reduce Mexico's imports of corn from

the U.S. from $1.3 billion down to $500 million. While some may think that that

is no problem for U.S. corn growers, as they can simply sell the corn elsewhere,

that logic does not apply if many countries do the same thing. And in any event,

agriculture today is not that simple. When more than 60 countries banned our beef

exports in 2003 on spurious SPS grounds, we lost more than $3 billion in exports

a year, and in fact we never fully recovered to this day (China, for example, the

world's largest potential market for beef, remains closed to the U.S. despite

announcements from last year and this year that it would reopen, while it is open

to our friendly competitors in Australia). When the prior administration imposed

a safeguard on tires from China, China retaliated the same day by announcing

antidumping and countervailing duty cases against imports of U.S. automobiles

and chicken parts. There are reports that Jeep eventually had to ship production

of Jeeps—and jobs--to be sold in China from Toledo, Ohio to China because of

those cases.  Chicken was more impacted:  $500 million of the $800 million that the U.S. industry sold to China annually before the cases was composed of chicken paws and tips for which there is no other market except rendering.  We had been selling those parts at 80 cents a pound in China. When they were sold for rendering in the U.S., our chicken producers received only 4-5 cents a pound.  In general, the underlying economics of agriculture is that a relatively small loss of foreign markets leads to very large and potentially catastrophic drop in prices in the U.S. market.  Food security for Americans would seem a very immediate national security concern.

5.    None of this is necessary, of course.  For items for which there is a national security need – even according to the American Iron and Steel Institute, this amounts to approximately 3% of U.S. steel production; prior statistics set this amount originally at 0.3%, a number which is still used by reputable analysts-- the Government has full legal means to access what it needs.  In addition, less trade restrictive means such as additional subsidies could be used to stimulate production of those items.

Thank you very much.



Can
Manufacturers
Institute

CANS: INFINITELY RECYCLABLE™

May 17, 2017

Mr. Brad Botwin, Director Industrial Studies
Office of Technology Evaluation, Bureau of Industry and Security
U.S. Department of Commerce
1401 Constitution Avenue, NW – Room 1093
Washington, DC 20230

Re: *Comment on Section 232 National Security Investigation of Imports of Steel*

Dear Mr. Botwin:
Pursuant to the invitation set forth in the BIS Notice published in the Federal Register on April 26, 2017, and on behalf of the Can Manufacturers Institute, I hereby request the opportunity to participate in the public hearing on the Section 232 National Security Investigation of Imports of Steel scheduled for May 24, 2017.

Below is a summary of our oral presentation:

- Can Manufacturers Institute (CMI), the national trade association of the metal and composite can manufacturing industry and its suppliers in the United States, requests that tinmill products be excluded in the U.S. Commerce Department's Section 232 investigation into steel imports and not subject to tariffs or other import restrictions.

- CMI member facilities employ over 10,000 American workers and produce approximately 24.5 billion steel cans, all of which are made here in this country. The can manufacturing industry is responsible for $36.31 billion in total economic activity in United States and pays substantial taxes revenues $1.75 billion in federal taxes and $1.04 billion in state taxes.

- As per the findings of the U.S. Department of Commerce and the U.S. International Trade Commission, tinmill steel is a separate category of steel, requiring its own consideration and examination.

- To our knowledge tinmill is not used by the U.S. Department of Defense, used in any defense applications or have any use to protect the National Security interests of the United States.

- Access to affordable nutrition is vital for the 42.2 million Americans that live in food insecure households, including 29.1 million adults and 13.1 million children. Canned foods play a very important role as a staple of the American diet, with a significant percentage of Americans depending on canned fruits and vegetables as part of their daily diets. And, those on food assistance consume canned fruits and vegetable at an even higher rate than the average American. Those on food assistance rely on canned products to prepare convenient, nutritious, affordable meals. Canned vegetables can cost up to 50% less than frozen and 20% less than fresh with virtually no sacrifice to the nutrition profile. A tariff or any trade action on tinmill products would lead to higher prices for American consumers of canned food. Millions of Americans rely on canned foods for their basic sustenance including Americans who are part of the USDA Supplemental Nutrition Assistance Program. A tariff would drive costs for the SNAP program.

1730 Rhode Island Avenue, NW • Suite 1000 • Washington, DC 20036
202-232-4677 • Fax 202-232-5756 • www.cancentral.com
Filed By: aprice@wileyrein.com, Filed Date: 6/23/19 6:23 AM, Submission Status: Approved

- Any trade actions would harm U.S. based companies competing internationally against foreign companies that do not have to pay such tariffs, and it would also harm the U.S. companies that make up our supply chain, including transportation companies, and warehouse providers, along with all of their respective employees and the communities in which these employees live and work across the United States.

- CMI wants to maintain our industry's competitiveness. A trade action against tinplate products would not be in our country's best interests.

As per the posted procedures for the Hearing please be advised of the following:

- CMI's testimony will be given by Robert Budway, President of CMI
- He can be reached via phone at (202) 232-4677 or email at rbudway@cancentral.org.

Please contact us at the contact information listed below with any questions or comments. Thank you for your time and consideration.

Sincerely,

Robert Budway
President
Can Manufacturers Institute

U.S. DEPARMENT OF COMMERCE
PUBLIC HEARING ON SECTION 232
NATIONAL SECURITY INVESTIGATION OF
IMPROTS OF STEEL
May 24, 2017

<u>ORAL TESTIMONY OF</u>

Tracey J. Norberg
Senior Vice President & General Counsel
U.S. Tire Manufacturers Association
CONTACT: tnorberg@USTires.org or +1 202 682 4839

On behalf of the member companies of the U.S. Tire Manufacturers Association ("USTMA"),[1] I

appreciate the opportunity to submit testimony to the Section 232 National Security Investigation of

Imports of Steel. USTMA represents ten tire manufacturers with manufacturing operations in the United

States. USTMA's membership includes: Bridgestone Americas, Inc.; Continental Tire the Americas, LLC;

Cooper Tire & Rubber Company; The Goodyear Tire & Rubber Company; Kumho Tire U.S.A., Inc.;

Michelin North America, Inc.; Pirelli Tire North America; Sumitomo Rubber Industries; Toyo Tire Holdings

of Americas Inc.; and Yokohama Tire Corporation.  In the United States, USTMA members employ nearly

100,000 workers, operate 55 tire-related manufacturing facilities in 19 states and generate over $27

billion in annual sales.

Tire manufacturing is vital to the U.S. economy. Tires manufactured by USTMA members safely

transport millions of Americans and millions of tons of goods each day throughout the United States.

USTMA members have a direct interest in the Section 232 National Security Investigation of Imports of

Steel. Virtually all of the steel wire rod used to manufacture tire cord that is consumed in U.S. tire

manufacturing plants is sourced from foreign suppliers due to the stringent performance and quality

requirements of tire manufacturing, as well as quality and supply limitations of domestic steel wire rod

---

[1] Effective May 23, 2017, the Rubber Manufacturers Association, the national trade association for tire
manufacturers that produce tires in the United States, has officially changed its name to the U.S. Tire
Manufacturers Association (USTMA).

U.S. Tire Manufacturers Association
May 24, 2017
Page **2**

suppliers. It is our understanding that electric arc furnace technology, used in domestic steel mills, is

unable to produce consistently the quality of tire cord-quality wire rod necessary to make tire cord for

use in tire manufacturing. Tire cord-quality wire rod is produced using basic oxygen furnace technology,

which is employed by foreign wire rod suppliers, and is a product that cannot be supplied in the volume

and under the quality necessary for military and civilian applications by domestic producers.

Depending on the outcome of the Section 232 National Security Investigation of Imports of

Steel, potential remedies could have a significant negative impact on the U.S. tire manufacturing

industry. In particular, any action that curtails the availability of the supply of tire cord or tire cord-

quality wire rod would affect U.S. tire production. Any such trade constraint could potentially have a

cascading negative impact on U.S. commerce, since the transportation industry and the military depend

on a reliable supply of tires to ship goods throughout the country. In addition, the U.S. military depends

on the tire manufacturing industry to supply tires to protect our national security.

Tires contain a number of highly engineered components, including high carbon steel. The steel

wire in tires is manufactured using SAE 1080 or higher steel wire rods (often called "tire cord-quality

wire rod"), which are drawn into steel wire to meet exact specifications (or "tire cord" and "bead wire").

This steel wire is used both in a tire's steel belts, providing strength, high load-carrying capacity,

puncture resistance and durability, and in the bead, which holds the tire to the rim. SAE 1080 and higher

tire cord-quality wire rod contains a minimum of 0.80 percent carbon content, a low manganese

content, between 5.0 mm and 6.5 mm in diameter and is generally free from defects.  The high carbon

content and consistent surface quality are required to assure performance to stringent tire performance

requirements.  All types of modern tires designed for highway use contain steel belts and steel beads,

including passenger, light truck and truck/bus tires. However, truck/bus tires contain a greater

percentage of steel, due to the more demanding load and durability requirements of heavier vehicles.

U.S. Tire Manufacturers Association
May 24, 2017
Page **3**

Military and related vehicles have intrinsically demanding durability requirements, in light of the need to operate such equipment in extreme conditions around the world.

Tires sold in the United States are self-certified by tire manufacturers to meet U.S. Federal Motor Vehicle Safety Standards set by the National Highway Traffic Safety Administration.  Federal Motor Vehicle Safety Standard No. 139 applies to passenger and light truck tires made after September 1, 2009 for use on vehicles that have a gross vehicle weight rating (GVWR) of 10,000 pounds or less and that were manufactured after 1975. Generally recognized as the most stringent tire performance standard in the world, FMVSS No. 139 was promulgated in response to the Transportation Recall Enhancement, Accountability and Documentation (or TREAD) Act enacted in October 2000.  Among other requirements, FMVSS No. 139 mandates that tires sold in the United States perform to meet the specifications of the endurance low pressure test, which requires a tire to run for 34 hours at increasing loads on a test wheel, then run for two additional hours on the test wheel after being significantly deflated. Adherence with FMVSS No. 139 necessitates tire construction to be robust, puncture resistant and resistant to the effects of load and heat, demanding high quality materials, including high carbon steel. Similarly, truck and bus tires sold in the United States must meet FMVSS No. 119, which includes tests for strength and high-speed performance. Additionally, truck/bus tires must meet customer and vehicle requirements for substantial load-carrying capacity to meet the demand of a diverse array of vehicles. As well, passenger/light truck and truck/bus tires are designed to contribute to vehicle fuel economy by reducing vehicle weight and lowering the tire's rolling resistance. Tire cord made from high quality, high carbon steel is vital to maintaining tire safety and performance.

Given the unique needs of tire manufacturers to have continuous, consistent supply of tire cord made from tire cord-quality rod (Grade SAE 1080 and higher steel), USTMA respectfully requests that the U.S. Department of Commerce exclude from the Section 232 National Security Investigation of

U.S. Tire Manufacturers Association
May 24, 2017
Page **4**

Imports of Steel the specific Harmonized Tariff System (HTS) codes corresponding to the steel products

necessary for the production of tires.  In particular, USTMA asks that the following HTS codes be

excluded from the Section 232 National Security Investigation of Imports of Steel:

- 7213.91.3011: Tire cord-quality steel wire rod

- 7312.10.1030: Tire cord

- 7217.30.4530, 4560, 4590: Bead wire

Tariffs or quotas on these products would significantly disrupt the production of tires in the

United States, have quality and supply limitations in producing SAE 1080 and higher steel wire rod to

replace imported products. A disruption in tire manufacturing in the U.S. would harm the U.S. economy,

since consistent tire supply is critical to the nation's shipping and commerce needs, and threaten

national security, since the U.S. military relies on the tire industry to provide high performing and

durable tires to aid in our national defense.



May 22, 2017

## Presentation for **Section 232 National Security Investigation of Imports of Steel:**

Honorable members of the panel, my name is Suzi Agar and I'm representing ADI (Air Distribution Institute).  ADI is a non-profit association that was formed in 1947 to promote steel products and fittings for the heating, venting and air conditioning industry.  Currently, there are sixteen members who are the owners or principals of over thirty-six manufacturing facilities located throughout the US. Together, we also proudly employ over 5,000 full time and 150 part-time workers within the U.S.

A key product used by ADI members is light-gauged corrosion-resistant steel, commonly referred to as "CORE". Specifically, we utilize: Hot Dipped Galvanized Sheet in coil form, which conforms to ASTM A653; Grade CS, Type B, with a zinc coating known as G-30.

Please note that, first and foremost, the key products we import are not in any way tied to the national defense industry.  Our products are not used for armor, defense vehicles, ships, aircrafts or infrastructure.  The HVAC products we manufacture are predominantly utilized for the housing industry and for the construction of light commercial buildings.

For decades, domestic mills have vacated the residential HVAC market by choice.  Because most domestic mills are governed by a `tons per hour' pay scale, it's simply not profitable nor advantageous for them to produce light gauge steel or aluminum.  Rightfully so, they have focused their production on fabricating heavier gauged metals.  These metals are used for the appliance, automobile, heavy construction, tube and pipe industries. They are favored not only because of the higher prices they can command, but also because they are less taxing to produce.  There is neither the demand nor the desire for them to produce light gauged metals and aluminum.

The scarce availability of domestic light gauge metals coupled with the high prices they charge, is directly reflected in the average yearly totals ADI members buy from domestic mills: approximately 77,000 tons of galvanized metal and 960 tons of aluminum, all 0.010" - 0.012".   On a yearly average, ADI members purchase approximately 200,000 tons of these same type light gauge metals from foreign sources.

ADI members also have a need for multiple widths of steel.  There are some types of steel we purchase that are currently available from only one U.S. mill. We would prefer to source our metals from domestic mills, but due to restricted availability and pricing, we are basically forced to find mills outside of the U.S. who are willing to work with us.

Because of the tariffs already added from the 2015 Antidumping lawsuit, our members and therefore our U.S. consumers are already feeling the effects of higher priced steel. Additional tariffs and restrictions from a second action will continue to drive prices up.  Domestically, prices have increased around 16% between 2015-2016.  And, on average, 2017 domestic prices are even higher, by approximately 10% YTD.

We would anticipate a serious disruption and probable scarcity of metal if forced to buy higher priced steel from either within or outside the U.S. This would escalate the probability of the housing industry to seek alternatives to ducted HVAC systems.  Additionally, we believe jobs will be lost due to a lack of demand for our affordable products.

The members of ADI believe in and support President Trump's initiative to prepare America for adequate readiness in the event of a national security event.  We do not want our types of light gauge metals to interfere with domestic mills being able to react quickly if there was a crisis.  We are sympathetic to the intent of this investigation, however, U.S. manufactures, like ourselves, are truly in a unique niche: the production of light gauge HVAC ductwork and fittings.

We need readily accessible as well as reasonably priced steel.  We respectfully ask that you exclude light gauge galvanized metals and aluminum (0.010"-0.012" thicknesses) from the **Section 232 National Security Investigation of Imports of Steel.** We respectfully appeal to the U.S. government to give our industry consideration by not imposing additional tariffs, adding restrictions or prohibiting our ability to purchase light gauge metals and aluminum from foreign markets.  Thank you.

## Testimony of John Cross (Steelscape LLC)

Good morning (afternoon). My name is John Cross, President of Steelscape LLC, an American company that manufactures coated and painted steel for US companies.  Steelscape has facilities in Washington State and California, together employing almost 400 men and women in productive, high-paying jobs.  As I will explain below, Steelscape is structured to import the raw material that we use to produce our coated and painted steel, from Australia and Asia.  This imported substrate not only does not threaten the country's national security, but actually promotes it by permitting Steelscape, a US steelmaker, to participate productively in the US economy.  If the president were to institute broad-based restrictions on steel imports, it would jeopardize the viability of Steelscape itself, and in the process threaten the livelihood of our American employees.

Steelscape has two facilities, one located on the Columbia River in Kalama, Washington, and one located in Rancho Cucamonga, California.  Both facilities produce coated steel products, but not from liquid steel.  Our Kalama facility transforms hot rolled coils into cold rolled and galvanized coils, while our Rancho facility purchases cold-rolled steel to produce galvalume coils.  Both facilities also paint most of the coated steel they produce.  A large portion of Steelscape's output ships to ASC Profiles LLC, an affiliated company, which uses our steel to

manufacture steel profiles and building components for commercial and residential use in the western United States.

Both Steelscape facilities need imported steel substrate to make their coated products. The Kalama site is located literally along the side of the Columbia River, a deep-water port facility which allows ocean-going vessels to discharge steel directly from the dock to Steelscape's storage yard. Shipping costs from Australia or Asia range from $60 to $100 per ton LESS than rail rates from most US mills.

For US mills to get their steel to the West Coast, they have to ship steel by rail across the Rocky Mountains, which is an expensive proposition. I know, because one of Steelscape's parents, BlueScope Steel, also owns a US steel mill, North Star BlueScope Steel in Delta Ohio, producing hot-rolled steel. Steelscape can purchase only a few hundred tons of steel a month from North Star due to the added cost of freight.

Sourcing steel from west coast producers is also problematic for us. There are only two or three suppliers of hot-rolled steel in the West Coast, and they are focused on supplying their own downstream needs and customers. Let me tell you something else about the West Coast steel market – none of the major steel producers in the West Coast melt and pour their own steel. California Steel Industries, a joint-venture of JFE Steel of Japan and Vale of Brazil, hot-rolls and

cold-rolls semi-finished slab that it buys from elsewhere, mostly from import sources.  UPI, the other major producer, cold-rolls its steel from hot-rolled steel that it purchases from its two owners, US Steel and POSCO of Korea. Historically, half or more of the hot-rolled steel that UPI uses to produce downstream steel products it obtains from Korea.  The dynamics of the West Coast market are such that virtually all steel producers in the market have to import a large portion of the raw material they use from abroad.  Steelscape is no different.

Steelscape is subject to another structural restriction that prevents it from purchasing raw material from US mills:  Any steel substrate that Kalama would buy from domestic suppliers would have to arrive by rail, which Kalama cannot accommodate due to space limitations.  We are not in a position to absorb the significant capital investment that would be required for additional land and heavy equipment to support delivery by rail.

Domestically produced steel does not compete with imported steel for Steelscape' substrate business.  Steelscape requires imported steel to survive as an American producer of coated steel products.  The proof of that is this: last year, when the Commerce Department imposed almost 30% dumping duties on hot-rolled steel from Australia, Steelscape did not replace its Australian hot-rolled steel with a single ton of domestically-produced hot-rolled steel.  Instead, we imported hot-rolled and cold-rolled substrate from other countries to meet its needs.  By

doing so, Steelscape was able to remain a going concern, saving 243 jobs in Kalama and 131 in California.

And it is not only Steelscape jobs that would potentially be at risk. As I mentioned, much of Steelscape's production goes to ASC Profiles, which uses the coated steel to produce metal building components. If ASC could not buy reliable, high-quality steel from Steelscape – made from imported substrate – its operations could also be at risk.

The steel substrate that Steelscape must import from Australia and other countries does not threaten the security of at least this part of the United States' steel industry; it helps the industry survive and prosper.

I would like to point out, in addition, that a large portion of the steel substrate that Steelscape imports is from BlueScope Steel Ltd. in Australia. BlueScope Steel Limited is the only exporter of flat-rolled steel from Australia. The steel substrate that Steelscape imports from Australia – or from any other source – is not for any defense or national security use. It is simple, flat-rolled steel that we coat and paint and ship for use in commercial and residential buildings throughout North America. This kind of steel has no impact on the United States' national security requirements.

Steelscape, in short, needs to import steel in order to produce steel in the U.S. We ask the Department to consider the special situation of companies such as

ours, companies that depend on imported steel to survive as American steel producers.  And we ask you to take the special relationship between Australia and the United States into account.

## BEFORE THE U.S. DEPARTMENT OF COMMERCE
## BUREAU OF INDUSTRY AND SECURITY

|  |  |
|---|---|
| Section 232 Investigation on the Effect of | ) |
| Imports of Steel on U.S. National Security | ) |
|  | ) |

### Oral Presentation of Jim Tennant, Chief Executive Officer, Ohio Coatings Company

1.      Good morning.  My name is Jim Tennant.  I am the Chief Executive Officer of Ohio Coatings Company or "OCC", located in Yorkville, Ohio, on the Ohio/West Virginia border.

2.      OCC is a domestic U.S. producer of tin plate.   Tin plated products are used in food and beverage cans, paint cans, aerosol cans, and similar products.

3.      OCC operates a world-class, 130,000 square foot electrolytic tin plate manufacturing facility with a capacity to produce 250,000 tons per year of the highest quality tin plate available anywhere.  When OCC's plant opened in 1997, it was the first tin plating mill to have been constructed in North America in over 30 years.  OCC employs 66 American workers who live in Ohio and West Virginia. Those jobs, and the very survival of OCC as a U.S. tin plate manufacturer, are threatened if imports of tin-mill black plate, the steel substrate used to produce tin plate, are restricted as the result of this investigation.

4.      OCC is owned by TCC, a Korean producer of Tin Plate, and Esmark. The total investment in OCC to date is $80,000,000.  The investment in the mill,

1

and its continued operation, was conditioned on the ability to import some of the black plate substrate necessary to produce tin plate.

5.      Black plate is a specialty steel that was developed and designed for the production of tin plate. It has no other significant uses.  Besides OCC, there are three other domestic producers of tin plate products in the United States: ArcelorMittal, U.S. Steel, and USS-POSCO Industries ("UPI").  The volume of tin plate and black plate required directly for national defense needs is limited, and OCC believes that existing domestic capacity is adequate to meet current and projected national defense requirements.

6.      Unlike our three competitors in the tin plate market, OCC does not have its own captive supply of black plate.  Rather, OCC is dependent upon purchasing black plate in the merchant market. The only domestic producers of black plate, however, are also our competitors in the tin plate market – primarily ArcelorMittal and U.S. Steel.  As a West Coast producer, UPI is not a viable supplier of black plate for OCC.  Sourcing 100 percent of our black plate requirements from our competitors is not a viable option for OCC.  Unless we are able to continue to also purchase high-quality black plate from import sources, OCC may have to close its doors.

7.      In 2012, RG Steel, our former parent company and source of OCC's black plate, went through bankruptcy and was liquidated.  Until the 3rd quarter of

2

2016, OCC obtained its black plate from ArcelorMittal, POSCO, and from Japanese suppliers. The only viable domestic supplier at this point is ArcelorMittal.

8.      OCC is no longer able to import black plate from Korea and Japan and has not done so since the 3rd quarter of 2016 as a result of the antidumping and countervailing duty actions against cold-rolled steel. As a result, OCC continues to purchase black plate from ArcelorMittal and from some import sources, but OCC lacks sufficient raw materials to maximize its efficiency. In 2015, OCC operated at 60 percent of capacity, declining to 50 percent in 2016 as a result of the antidumping and countervailing duty orders. In the first quarter of 2017, OCC is operating at 40 percent of capacity because of shortages of black plate substrate.

9.      Moreover, despite U.S. Steel's assurances before the International Trade Commission that they could supply black plate, U.S. Steel has never even offered competitively priced black plate to OCC, as compared to offers from ArcelorMittal and other suppliers. U.S. Steel's "offers" have been at prices that were higher than the current market price for finished tin plate. Clearly, U.S. Steel is not interested in supplying OCC due to the fact that we compete with them in the tin plate market.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

10.    OCC cannot survive with ArcelorMittal as its only supplier.  If OCC sourced all of its black plate from ArcelorMittal and that plant were to have any kind of shutdown, fire, strike, *etc.*, OCC would be shut down.

11.    Second, ArcelorMittal is OCC's direct competitor in the tin plate market.  They will always prioritize supplying their own operations first.

12.    Any further import restrictions on black plate would be devastating to OCC and would threaten its survival as a U.S. producer.

13.    To the extent that this proceeding is designing an industrial policy toward the steel industry and steel users, thought must be given to the costs of shutting out imported steel needed to supplement domestic production and to support downstream users of steel.  Restrictions on imports of black plate have weakened, not strengthened the U.S. industry.

14.    Thank you and I am prepared to answer any questions you may have.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

**Testimony of
Leo W. Gerard
International President
United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Services Workers International Union (USW)
regarding the
Section 232 National Security Investigation of Imports of Steel
May 24, 2017**

Mr. Chairman.

On behalf of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), I appreciate the opportunity to testify today on behalf of our membership in the iron and steel sector. Our members are involved at every level of steelmaking, from the raw materials to finished products in almost every North American Industry Classification System (NAICS) category of steel product, which gives our union a very broad perspective of the critical nature of steel manufacturing to our national security.

The examination of this potential action occurs at a perilous time for the steel industry. There is no doubt that the U.S. steel sector is essential to our nation's national security. From the materials utilized by our military, to the materials necessary to build, maintain and repair our critical infrastructure, our national security is increasingly at risk because of the relentless economic attacks on our steel industry.

It's important to recognize that the steel sector is not monolithic. Indeed, as public policy clearly identifies, there is a continuum of products from the basic materials through iron and on to steel. When talking about Buy America, for example, the statute refers to "iron and steel". And, the industry's preeminent trade association is named the American *Iron* and Steel Institute.

As this Section 232 investigation continues, I hope that the Administration will evaluate the challenges facing the entire industry spectrum. From the basic material to iron and steel products; to elements like silicon metal, manganese and chromium used in making alloys, our national security interests are at risk. All of these products are important to our national security. My testimony will use the term steel to reflect the entire sector and all these products.

Steel is literally the backbone of this great country ensuring our military might and our ability to respond to potential attacks.   America's steel producers and workers have been called upon to support this nation in times of war and to build the capacity to deter potential adversaries from initiating conflict.   We need to revitalize the sector to meet today's growing needs and to ensure that we have the "surge" capacity, should it be needed.   That means having not only the productive capacity in our mills, but the skilled workforce necessary to man the operations.

Meeting national security needs in steel is not just about basic commodities.   It's also about having the capacity to fabricate the products we need that are necessary for the functioning of the U.S. economy. The criteria of the National Security Industrial Base Regulation (NSIBR) provide broad guidance for the vital understanding of how steel can affect national security. USW believes the Administration must focus in on the criteria developed into law which incorporates an understanding that steel is not only necessary to build a tank or a ship but to grow and build a strong nation. Criteria such as the impact of foreign competition on the economic welfare of the steel industry must rise in prominence as the 232 report is prepared.

Others will likely testify about vulnerabilities related to a smaller, less diversified domestic steel industry but I wish to highlight a few products which show the interrelatedness to defense and non-defense applications. The plate mills at USW-represented ArcelorMittal Burns Harbor produce not just steel for military applications but have supplied steel for John Deere tractors which harvest the foodstuffs for our country. Simply, an army marches on its stomach as much as it moves in USW-made Bradley fighting vehicles. This is why we urge that this investigation approach national security in steel from a holistic perspective. We as a country have to ask ourselves the question; if we don't have a domestic non-defense manufacturing base that provides steel goods, how can domestic defense steel industries survive?

The ability to fabricate and produce basic steel products like pipe and tube must also be considered in this investigation. A lack of domestic capability has the potential of undermining the country's ability to deliver basic needs to communities.

The United States uses 42 billion gallons of water a day to support daily life from cooking and bathing in homes to use in factories and offices across the country. Drinking water is delivered via one million miles of pipes across the country. Every day, nearly six billion gallons of treated drinking water are lost due to leaking pipes.   An estimated 240,000 water main breaks occur each year. That is why we as a union are dismayed when we read about infrastructure projects like the Holland Tunnel using Turkish, Eastern European, and Chinese steel for 5,700 tons of pipe. We are undermining domestic producers' ability to supply our citizens. As plants close, the decrease in revenue to government from local property and business taxes creates a vicious downward cycle in disinvestment. This in turn creates social and economic instability for millions of working Americans.

Another example is Grain Oriented Electrical Steel (GOES) which is critical to producing the transformers that help deliver power. Products made from GOES – power transformers, switchgear, and distribution transformers – are all necessary to complete the delivery of electricity to the entire country. The Department of Energy (DOE) has highlighted that if our country's electrical grid sustained substantial damage, it could take months to obtain certain key parts. We must have the capacity not only to produce the underlying product, but this nation must retain the ability to manufacture the final products dependent on those commodities.

We live in highly uncertain times with rising threats. Traditional nation states, like North Korea, are not the only threats we face. As the 9/11 attacks made all-too-clear, non-state actors have the capacity to inflict enormous damage.

Europe is confronting terrorist actions on a regular basis and the threats here at home are just as real. Cyber capabilities have the capacity not only to damage control systems, but the very operations themselves as was reported in 2014 when hackers attacked a German steel mill and inflicted "massive" physical damage. The ability to strengthen our critical infrastructure and ensure its resiliency, should it be damaged, are vital to protecting the country, its citizens and its interests.

America's steel mills are far from the smoke-belching "rust belt" images that many still have in their minds. Here in the United States a combination of massive investments in plant, equipment, technology and people have made our plants some of the most efficient on earth. Labor productivity has seen a five-fold increase since the early 1980s, going from an average of 10.1 man-hours per finished ton of steel to an average of 1.9 man-hours per finished ton in 2015.

Traveling through a facility you will find few workers on the plant's floor as most man computers and high tech monitoring equipment. We must recognize that the modern steel mill requires specialized skills. Our members spend hundreds of hours training and specializing in making steel products. I fear that lack of action and continued decline of U.S. steelmaking will reduce the basic skilled human resources necessary to produce steel products in the country anymore, weakening our national security and economy.

The decision to include all steel products spanning the gamut of the industry in this investigation sends an important signal: The United States cannot simply try to isolate one product or one technology and then rely on world markets to generously, and immediately, support America's needs in a crisis. If you travel through the holding yards of a steel mill, you will see materials which appear common in appearance, but one that may have vastly different metallurgical properties from its twin right next to it. From armor plate, to high carbon steel, to fan blades for jet engine turbines, to Oil Country Tubular Goods and countless other basic and finished products; steel supports our nation's security interests. And, product-after-product has been under attack by our trading

partners – all important in some way to our national security.  Other countries will first worry about their own needs.   We want to have the ability to meet our needs quickly, without having to worry about supply lines and security.

In a time of crisis it is quite possible that some countries may simply refuse to supply us, depending on what the underlying cause of the conflict or problem is and who is involved.  Remember during the Gulf War how Switzerland refused to provide the U.S. military with over-flight rights?  Others could easily refuse to supply the United State with materials in future confrontations.   At the end of the day, only the United States can guarantee the security interests of its people.   We cannot simply hope for the best, we must prepare for the worst.

Our domestic industry has been, and is, under attack from foreign unfair, illegal, predatory and protectionist policies.  Heading up this list is China which, through a network of non-market economic policies has dramatically expanded its steel production capacity, fueling global overcapacity that has swamped world markets.  China is engaged in an attack on our entire manufacturing sector but it has been targeting steel longer than any other product.

Attached to this testimony is a paper we prepared on China's "Broken Promises." Its leaders have repeatedly indicated that steel overcapacity is something the People's Republic of China intends to lower, and while the country makes promise after renewed promise of their intent to dismantle the excess capacity it has created there has been no net decrease in capacity, only increases.

China, despite all its rhetoric on cutting its overcapacity, increased its operating capacity by 36 million tons in 2016. China's overall operating capacity is estimated to have risen to 1 billion tons, from about 965 million tons the year before.

Shortly after the last steel crisis in the late 1990s which decimated U.S. production and employment, we were able to convince the Bush Administration to bring a Section 201 case on certain steel products.  Let's recognize that his Administration did not readily embrace the effort:  It was only after Senator Jay Rockefeller had cobbled together the votes on the Senate Finance Committee to initiate action that the Administration used their authority to self-initiate action.

Quickly, the Administration began to issue waivers and reduce the scope of the relief.  But, after a lot of pain and suffering through bankruptcies, restructurings, layoffs and benefit cuts, the industry stabilized.   At roughly the same time, China became a member of the World Trade Organization as a result of Congress' grant of Permanent Normal Trade Relations.   China took that as the signal to begin a massive trade attack on the U.S. and world markets.

China's actions have been virtually unchallenged by the international community. Indeed, here in the U.S., the bulk of the trade actions which have been taken were at the initiation of the private sector – a substantial portion because of the Steelworkers. The USW has participated in hundreds of antidumping and countervailing duty cases and have initiated and brought a number of them on our own. We have launched Section 301 cases on green technology and efforts on China's actions in the auto parts sector as well as a Section 421 case on tires.

All of these efforts could have been initiated by government with its existing authority. We do not view filing trade cases as a sign of success. Yes, we are proud of our fights on behalf of our members. But, to win a case, you have to lose: Winning a case requires that you prove injury, or the threat of injury. At the International Trade Commission, this generally requires employment reductions, lost profits, suppressed wages, and diminished market share. When relief is obtained, if it's authorized, we are lucky to stabilize the industry as our competitors often take their unfairly-traded products and ship them through third country markets.

We are watching this slow creep of relief in the market this year because the steel industry and the USW have been working cooperatively on several major trade cases. Three of these cases, filed in 2015 and completed in 2016, impact approximately 8 million tons of finished imports that entered the U.S. in 2015 alone. In fact between January 2016 and January 2017, duties (tariffs) against illegally dumped and subsidized steel increased close to 20 percent.

These cases are having an effect but they are muted by global overcapacity and lack of sustained policy action by the U.S. government. The steel industry adjusted year-to-date production through May 13, 2017 was 39,924,000 net tons, at a capability utilization rate of 74.3 percent. That is up 3.2 percent from the 31,912,000 net tons during the same period last year, when the capability utilization rate was 72.1 percent. To give perspective, in 2007 through the summer of 2008, domestic steel capacity utilization was at 87.6 percent.

Winning relief has become the equivalent of Trade Whack-A-Mole.

China's massive subsidies and dumping, along with domestic policies to sustain and build capacity, have flooded world markets destabilizing and undermining those producers who must abide by free market rules. The market has been stabilized at a lower level of production and capacity because of the injury that has already been inflicted is not addressed by the orders as U.S. trade law does not address past harm.

It is vital that any relief authorized as a result of this investigation leave in place, and supplement the relief provided by existing AD/CVD orders.

Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

Over the years, we have worked to get action on China's overall policies, and address the anticompetitive actions of certain other countries – Russia and others – as well. The Steel Committee at the Organization for Economic Cooperation and Development (OECD) has worked to identify the problem.   Last year, President Obama was able to get Chinese leadership to agree to participate in a Global Forum on Steel as part of China's leadership in the eleventh meeting of the G-20.

China has refused to work to define the scope of the problem beyond pointing fingers at others. Countries including China must come to the table for negotiations that result in enforceable disciplines on steel capacity with measurable, and significant, reductions in capacity and production. We should negotiate with an eye towards ensuring our existing steel capabilities be maintained and grown to meet our basic security and infrastructure needs.  Our overall goal has never been to protect our market, but do that we must, if our national security is at risk. We simply cannot wait any longer while our steel sector and others gets downsized through repeated attacks.

This Section 232 investigation has the potential not only to protect America's national security by imposing market restraints on imports from those countries causing the problem, but also to create the impetus for serious negotiations.   A negotiated solution is the best approach – but not the only one.

Mr. Chairman, the Steelworkers are a binational union with significant membership on both sides of the US-Canadian border.   As you move forward with your assessment of the importance of steel to U.S. national security interests and what measures, if any, to implement, I hope you will focus on where the problem lies.   It is not to our north, but to our east, west and south.   Indeed, we have a trade surplus in steel with Canada. Products flow back and forth across our borders – often multiple times – because of integrated supply chains and finishing operations.

And, from a national security perspective, Canada is one of the few countries that has always been there for us with no question, in my mind or in the military or intelligence expert's views.   Indeed, our national security and intelligence relationship with Canada is truly unique.   We share an uncontested border.   We have an intelligence sharing relationship known as Five Eyes (FVEY) that is limited to only five countries.   We have the North American Aerospace Defense Command – NORAD – that has existed for more than sixty years that was the initial line of defense for North America during the Cold War. Canada has been an ally, a friend and a trusted partner.

Canada is the only country that should be exempted from any potential action in the steel sector.

But as we face increasing competitive challenges and threats to our steel sector Canada must also ensure that they enforce the trade laws so that steel products don't use their market as a way-station to enter the U.S. market and circumvent and evade our

laws and our interests.    I am confident that the leaders of Canada will embrace those efforts with the goal of sustaining and advancing our individual and joint national security interests.

This testimony is not a treatise on the domestic steel sector as the Commerce Department's experts have the experience and the data, to assist in your investigation. But, we stand ready to provide whatever assistance is appropriate as you continue this critical investigation and use the authority you have under the law to protect our nation's security.

###

**AMERICAN INSTITUTE OF STEEL CONSTRUCTION**



130 E. Randolph Street, Suite 2000, Chicago, IL 60601
www.aisc.org

## STATEMENT OF THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION
## TO THE SECRETARY OF COMMERCE ON SECTION 232 INVESTIGATION
## OF STEEL IMPORTS AND NATIONAL SECURITY

**David Zalesne**
**Vice-Chair, AISC Board of Directors, Chicago, IL**
**President, Owen Steel Company, Columbia, SC**
**May 24, 2017**

---

**Intro**

Good morning/afternoon.  It is my privilege to speak today on behalf of the American

Institute of Steel Construction as the Vice-Chair of its Board of Directors, and to thank the

Administration and Secretary Ross for initiating this investigation into trade issues facing the

American steel industry.

**Who We Are**

AISC is a non-profit, non-partisan, technical institute and trade association that has

served the structural steel design community and construction industry since 1921.  AISC

develops industry standards, specifications and codes for steel construction; conducts technical

research; and operates programs for education, technical assistance and quality certification.

Together with its affiliate the National Steel Bridge Association, AISC represents more than

1,000 U.S. businesses involved in the structural steel industry, and has more than 40,000

Professional, Affiliate and Student members.  AISC estimates that the U.S. structural steel

industry directly supports about 200,000 jobs, most of which involve skilled labor.

There's always a solution in steel.

**What We Do**

Steel fabricators are the critical intermediaries in the structural steel supply chain, positioned between the mills that produce steel plate and shapes, and the cranes that lift the steel columns, beams, girders and trusses into place on construction sites. Fabricators convert steel produced at the mills into site-ready pieces, operating plants where sophisticated equipment and skilled craftspeople cut, drill, fit and weld components to meet the plans and specifications for each project. Fabricators invest in both physical assets and human assets, because while some fabrication processes can be automated, most of the labor in fabrication plants is in fitting and welding, which are difficult skills to automate on custom-designed projects. Equally important, fabricators are entrusted with the design drawings for projects that show the forces the buildings are designed to resist – both natural forces and forces that can be introduced by actions designed to damage or bring the structures down.

In short, fabricators are responsible for the steel that goes into projects -- from high-rise towers in Manhattan to dams in California; from wastewater plants in Michigan to power plants in the Gulf States; from bridges crossing the Mississippi River to ports handling cargo on the coasts. Indeed, our company, based in South Carolina, was entrusted with the structural steel for the U.S. Capitol Visitor's Center – and the security enhancements that were designed into that structure after the terrorist attacks of 9/11 to protect Members of Congress in the event of a future attack.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

For most of the long history of the American steel industry, major steel projects like bridges, high-rise towers and secure government facilities were routinely fabricated in American plants.  However, following the passage of NAFTA, fabricators working the Northeast saw an immediate erosion of domestic market share in cities like Boston and New York, as Canadian fabricators rushed into those areas.  Then as the Chinese steel industry grew, Americans were shocked to see steel for the Bay Bridge in California fabricated in China. Almost overnight, the American construction market became a rich target for foreign steel industries; while oversight was focused on imports of mill steel, foreign companies brought steel into the U.S. market as fabricated products with virtually no resistance.  Today, offshore access to American construction markets has become so soft that on at least one major project in New York City, steel plate made in China was shipped to a fabricator in Mexico, fabricated into building components there, brought freely into the U.S. under NAFTA rules, and shipped 3,000 miles to New York City.  And somehow, all of that offshore material, labor and freight was priced to the project below the cost domestic fabricators would have had.

According to Commerce Department statistics, imported fabricated structural steel has increased by 136% in the past five years -- far in excess of the growth of the U.S. construction market.  Fabricated steel is being imported not just from China, but from Canada, Mexico, Italy, the U.K., and even the U.A.E., among many other places.  As a result, foreign steel fabricators have gained far more from the American economic recovery of the past five years than American steel fabricators have.  But because fabricated steel is imported for specific projects and not as a commodity, it is exceptionally difficult and expensive for individual fabricators to

3

prove a violation of trade laws through traditional trade case procedures – especially when imports come in through NAFTA rules that were designed to encourage trade with Mexico and Canada – but are now being used routinely to allow global access to the U.S. market.

**What We Propose**

Against that backdrop, AISC believes that the U.S. structural steel industry is directly and adversely impacted by fabricated steel imports. Tracking to the areas of investigation under section 232, AISC respectfully requests that the Department make the following findings:

- First, that <u>the domestic production -- and fabrication -- of structural steel is necessary for national defense and security requirements</u>. In this context, defense and security are not limited to traditional military installations and equipment, but also include the security and integrity of our infrastructure -- buildings, bridges, power plants, water treatment facilities and other major projects built with steel that are essential to defense and security. And if it is important to have an American structural steel industry to build these projects, then trade policy involving steel imports must address both produced steel as melted and poured product, and components from the mill to be effective. Otherwise, the industry will be unable to support the costs of domestic fabrication, and will see the technical engineering that goes into the security of American structures become entrusted to foreign companies – often supported or even owned by governments whose interests are not necessarily aligned with ours.

4

APPENDIX F - Page 122

Case 1:20-cv-03898-CRK    Document 81-2    Filed 11/03/21    Page 509 of 2032
PUBLIC VERSION
Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

- Second, that <u>there is ample capacity in the domestic structural steel industry to meet national marketplace requirements</u>.  AISC has approximately 1,000 steel fabricator members located throughout the country.  While many are small and focus on local and regional projects, there are several big fabricators that have invested heavily in both equipment and human resources, including in-house training and development programs, to handle major projects.  These fabricators not only have the capacity and ability to meet current market demands, they have the ability to grow as markets expand.  But steel fabrication is an incredibly risky -- and competitive – industry, even in good markets.  It is virtually impossible to operate successfully when markets are undercut by below-cost offshore fabrication.

- Third, that <u>the close relation between the Nation's economic welfare and national security is undermined by foreign tactics to obtain easy access to domestic steel construction markets</u>.  In many ways, steel built the great economic strength of this Country, and fabricators positioned between producers and projects created thousands of middle-class jobs for American welders, fitters, machine operators and other workers in hundreds of plants all across the country.  Today, however, the tactics of foreign steel interests to obtain access to the American structural steel marketplace are challenging the economic viability of domestic fabricators. Whether the tactic involves using NAFTA to bring in steel made in non-NAFTA countries, or pushing subsidies and support downstream from production to fabrication, or simply dumping fabricated steel at below-cost pricing into American

5

markets without fear of any trade remedy whatsoever, the domestic steel industry is under pressure from both northern and southern borders, and from eastern and western ports.

- Fourth, that <u>the domestic structural steel industry supports high-wage, skilled-labor jobs, a strong tax base, and stable employment opportunities</u>.  Unlike offshore fabricators, American fabricators offer market-based wages and benefits to their employees, comply with detailed safety and environmental regulations in their plants, and pay significant federal and state income taxes, local sales and use taxes, and payroll taxes.  Of course, those factors add costs to domestic fabricators, which can only be recovered if they are passed on to the marketplace.  So when offshore fabricators with none of these costs have open access to the same marketplace, domestic fabricators are at an obvious disadvantage.  This is one of the reasons why attaching Buy America requirements to infrastructure investment is incredibly important, even if infrastructure is partially financed by non-government sources.

- Finally, that <u>while prior government efforts to counter illegal steel dumping and illegal subsidies under trade agreements and WTO rules have been well-meaning, they have proven largely ineffective to address imported fabricated steel</u>.  To the contrary, offshore producers have responded to tariffs on mill-produced steel by moving products downstream to the fabricated level – hurting both fabricators <u>and producers</u>.  And as noted earlier, it is exceptionally difficult and expensive for

individual fabricators to prove a violation of trade laws through traditional trade case procedures on individual projects.

As the Administration looks at trade policies to protect and strengthen our national economic, security, and defense interests, AISC submits that not only are few industries as critical as steel, but that a broad focus that includes steel fabrication -- along with steel production -- is critical to the effectiveness of those policies.  The historical focus of remedies on steel production alone has opened doors for foreign steel companies to expand to downstream manufactured and fabricated steel products.  And as demonstrated by a 136% increase in imports of fabricated structural steel over the past five years historical, narrow approaches to steel imports have failed.

With respect to relief, AISC has no specific recommendation on tariffs or quotas, except to suggest that any tariffs or quotas that are imposed must be extended downstream from mill-produced steel to also include fabricated steel to be effective.  An alternative or additional remedy, in the context of Section 232 relief, would be for Commerce to designate classes of structures that are strategically sensitive or important – high-rise towers, power plants, port facilities, major bridges, etc. – and attach domestic fabrication requirements to those classes of projects.  Third, a comprehensive review of the impact NAFTA has had on American structural steel markets is necessary, including both how non-NAFTA producers are obtaining open access to American markets, and how other NAFTA countries are undermining the original intent of the treaty by dumping the products of their excess and below-cost fabrication capacity on American markets.

7

On behalf of AISC, we appreciate the interest of the Administration in the domestic steel industry.  We look forward to working with the Department in any capacity where we can be of assistance on these issues critical to US national security and competitiveness.

# # #

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

**Philip K. Bell**    **Phone:** (202) 296-1515
President

*21st Century Steelmakers*

# Statement of Philip K. Bell

## President, Steel Manufacturers Association (SMA)

## Before the

## U.S. Department of Commerce

## Public Hearing in Conjunction with Section 232 Investigation Regarding the Effects on the National Security of Imports of Steel

## May 24, 2017

1150 Connecticut Avenue, N.W. | Suite 1125 | Washington, D.C. 20036

Good morning Secretary Ross and members of the panel. Thank you for the invitation to appear before you today regarding the Department's Section 232 investigation into the national security effects of imported steel.

My name is Philip Bell and I am President of the Steel Manufacturers Association ("SMA"). The SMA is the voice of the U.S. steelmakers that rely on electric arc furnace (EAF) steel manufacturing technology, which is the dominant steelmaking technology used in America. SMA is our country's largest steel industry trade association – based on the actual number of steel producing members and the amount of steelmaking capacity represented. SMA's membership contains a variety of steel producers including some of the nation's largest steelmakers and employers.

As "21st Century Steelmakers" our members utilize post-consumer recycled ferrous scrap as their principal feedstock, turning this waste into world-class steel. SMA's members account for more than 75 percent of domestic steelmaking capacity, directly employing more than 60,000 workers across North America, and indirectly supporting over 420,000 additional jobs.

It is imperative to our national security that the United States have a strong, viable domestic steel industry with sufficient productive capacity to meet both defense and commercial needs. We cannot rely on foreign steel producers to arm and protect our military forces and to rebuild and maintain the nation's critical infrastructure.

Before discussing some of these threats to our industry, I want to briefly focus on the importance of a broad definition of national security, and steel's role therein.

Steel is critical to our national defense.  But beyond direct defense applications, steel is an engine of economic activity and employment that is of critical importance to the United States.  Steel connects our energy grid and utilities, powering our homes and businesses.   Steel in pipelines delivers our abundant natural resources to consumers, empowering our competitiveness. Steel gives strength to the cars, trains and ships that carry our commerce to market over the highways, bridges, rail and waterways that are built with steel.  In short, steel is a ubiquitous and indispensable component of the nation's critical infrastructure and its economic wellbeing.

Imports of steel, quite simply, present an existential threat to the American steel industry. The volumes of imported steel today have impaired demand for U.S.-produced steel, forced reductions in domestic production and diminished returns on capital investments. U.S. steelmaking production capacity utilization has hovered under 75 percent for many years. We believe capacity utilization of 85% is necessary to allow steelmakers to:

- Ensure double digit return on capital employed;

- Operate at full employment levels;

- Make necessary capital investments;

- Invest in research and development; and

- Efficiently operate both the "hot end" (steelmaking) and "cold end" (steel finishing) of finished steel production.

Not since before the 2007 global economic downturn has SMA members' capacity utilization come close the 85 percent level.

The ability of SMA's members to meet episodic national defense requirements, and to improve and make necessary capital investments for tomorrow, depends entirely on today's demand for their U.S. produced steel.

SMA members are the safest, most productive and most sustainable steelmakers in the world. We can compete with anyone on a level playing field. The United States also has the world's most open markets, and SMA supports free and fair trade. The same openness, however, should not be extended to illegally traded, dumped and subsidized steel.

Over the last decade, global steelmaking capacity has grown at an unprecedented rate. The world's steel consumption, however, has not kept pace, contributing to a large and increasing gap between global capacity and demand. Now estimated to be more than 800 million tons, this excess capacity – much of it propped up by illegal subsidies by foreign governments – strains the profitability of even the most efficient producers.

The effect of global overcapacity has been, quite simply, to flood the U.S. market, typically unlawfully, with imported steel. Over the course of 2014 and 2015, import penetration reached historic levels, which it continues to approximate today.

Import market penetration has come at a great price to the U.S. steel industry and the U.S. economy. From January 2015 through the end of 2016, steel industry employment in the U.S. declined by 14,400 workers. Multiple U.S. facilities remain idled or operate with significantly reduced work forces. Because each steel industry job supports an additional seven jobs throughout the supply chain, the impact is far greater.

As the domestic steel industry has been weakened, tax revenues have been lost and our national security impaired. Using an estimated nationwide average annual steelworker income of $61,465, SMA estimates that the U.S. Federal Government forgoes – on average - $13,207 in federal income taxes for each steelworker lost to unfairly-traded imported foreign steel.  For each 1.5 million in tons of steel imported into the United States, the Federal Government will forego an estimated $9,000,000 in personal income tax revenue. As applied to the 14,400 workers lost since 2015, the Federal government has lost an estimated $190,000,000 in personal income tax revenues.

With hundreds of millions of dollars in lost tax revenue the effects are being felt at the local, state and national level – while foreign producers continue to dedicate vast government resources to support their steel industries and promote exports to our market.

SMA commends ongoing diplomatic efforts to rationally reduce global steel production capacity. While the United States may need to act unilaterally to ensure its steel producers and their workers and customers are not driven out of business by unfairly-traded imports, it is our hope that other like-minded countries that believe in free and fair markets and the rule of law will join us in these efforts to reduce over capacity. We also believe that the 232 process should serve as a catalyst to explore creative and meaningful remedies that deal with underselling, overcapacity and other market distortions that impact our entire supply chain.

Again, we commend the Administration for taking this important step and we stand ready to work with you to find ways to address these illegal steel imports and the threats they pose to our national security.

Thank you.

Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18



THE **COLD FINISHED**
**STEEL BAR**
**INSTITUTE**, NFP

3050 K Street, NW  Suite 400

Washington, DC 20007

www.cfsbi.com | info@cfsbi.com

**Statement of Bill Geary**

**Chairman, Cold Finished Steel Bar Institute**

**(CFSBI)**

**President, Nelsen Steel Company**

**Public Hearing on**

**Section 232 National Security Investigation**

**Regarding Imports of Steel**

**May 24, 2017**

Good morning Mr. Secretary and members of the panel. I am Bill Geary, Chairman, Cold Finished Steel Bar Institute (CFSBI) and President, Nelsen Steel Company.

The Cold Finished Steel Bar Institute is a Washington, DC based trade association representing U.S. producers of cold finished steel bar. Cold finished steel bar is incorporated into a wide range of consumer, industrial, aerospace, and military products. Essentially any product that contains a motor or moving part contains one or more components made from cold finished steel bar. The U.S. cold finished steel bar industry produces high-quality products on an efficient and cost-competitive basis, using highly trained workers under environmentally sound conditions.

### Critical Contributions to the U.S. National Defense Made by CFSBI Members

The following is a summary of national defense-related materials and applications provided by cold finished steel bar producers:

| A-10 Warthog and Apache attack helicopters | Projectiles |
|---|---|
| Shell cases | Cold extruded armament shell cases |
| Armored vehicles | door hinge pins |
| Vehicles | Shafts |
| | Gears |
| | Engines |
| | Suspension parts |
| | Drive chains |
| | Military lockers |
| | Rocket fuel rods |
| | Grab handles |
| | Steering systems |
| | Braking systems |
| | Pallets/and bomb fin adaptors |
| Guns | Virtually every gun contains cold finished steel bars |
| Smart bombs | Cold finished bar parts |
| Aircraft | Numerous applications |
| M-16 rounds | 1060 steel for penetrator |

Cold finished steel bar producers also provide materials for civilian applications which provide critical supportive functions essential to the national defense and the fight against terrorism:

| Motor vehicles | Numerous auto parts |
|---|---|
| Transportation | Airline seat parts |
| | Locomotive axles |
| | Wire ductwork for jet ramps |
| Infrastructure | Bridge parts |
| | Wire supports for concrete |
| | Sewer pipe parts |
| | Rebar tie wire |
| | Nails |
| | Wire for cement columns and barrier walls |
| Power generation | Bolts for wind turbines |
| | Wire for electrical transmission towers |
| | Oil & gas applications |
| | Mining industry applications |

### The Effects of Import Competition On U.S. Cold Finished Steel Bar Producers

Like much of the steel industry, CFSBI member companies are facing extraordinary challenges from foreign producers. We believe there is widespread dumping in the U.S. market. China and other countries have built substantial excess production capacity, frequently with government subsidies. We face competitors which never have to make a profit to survive, thanks to government handouts.

The U.S. market for cold finished steel bar has declined precipitously. We estimate that within the last 45 years, the demand for cold finished steel bar in the United States has gone from 2.5 million tons per year to about 1 million tons per year today. This reflects the loss of much of our U.S. customer base. Unless the underlying commercial production of cold finished steel bars is healthy, competitive and profitable, CFSBI companies would be unable to survive and would not be able to provide critical materials essential to the national defense. For this reason, we respectfully urge that any remedy determined in this section 232 case apply not only to the cold

finished steel bar we produce, but also to downstream component parts made by our customers and are then incorporated into subassemblies.

I will be pleased to respond to any questions you have.  Thank you.

**ORAL TESTIMONY OF CHAIRMAN EDWARD VORE**
May 24, 2017

Secretary Ross, my name is Edward Vore and I pleased to be here today in my capacity as the Chairman of the Committee on Pipe and Tube Imports, which is known as CPTI. I also serve as the CEO of ArcelorMittal Tubular Products North America, but today I am here to speak on behalf of CPTI and the entire U.S. pipe and tube industry.

CPTI is the leading trade association for the steel pipe and tube industry in the United States. It was founded in 1984 in response to the damage being done to domestic producers by imported products. Regrettably, notwithstanding our organization's efforts over three decades, the domestic pipe and tube industry has continued to decline as imports take more and more market share.

Today, the CPTI has 40 members with 123 facilities in 32 states. Our members employ more than 35,000 workers across the United States. Thousands more workers are currently laid off, awaiting better economic conditions that would allow their employers to recall them.

Although 2016 provided some respite for the domestic pipe and tube industry in the sense that imports declined from the highs of 2014 and 2015, imports still took more than half of the U.S. market. 2017 is not looking good. Imports are up 55 percent so far, which portends badly for domestic producers.

Our industry is a critical supplier to a number of important sectors of the U.S. economy, including agriculture, construction, infrastructure, and manufacturing. I am here today, however, to underscore that a healthy pipe and tube industry is vital to the nation's defense and security.

First, pipe and tube have direct military applications such as casings for munitions and are also essential components of piping systems in jets, ships, military vehicles, weapons systems, and prefabricated buildings.

Second, pipe and tube are critical to our nation's energy security. Oil wells, for example, use pipe and tube products like drill pipe and oil country tubular goods, and both oil and natural gas are transported through pipelines made of line pipe. Petroleum products like gasoline – which is essential to virtually any military action – also are refined in facilities made almost entirely of pipe and tube.

Third, pipe and tube are important to national security because they are used in the transmission of critical fluids and gases for fire protection, industrial production, heating and cooling, and water gathering systems.

Finally, pipe and tube are an integral part of the overall steel industry. Seamless pipe and tube is made from steel billets, and welded pipe and tube is made from flat-rolled steel. Domestic pipe and tube companies tend to buy these inputs from domestic sources; foreign pipe and tube producers buy their steel from foreign suppliers. We estimate that domestic pipe and tube makers account for as much as one-third of the consumption of U.S. made hot-rolled steel. If domestic pipe and tube manufacturers were to go out of business, U.S. steel producers would be hard pressed to fill the resulting void in demand.

The Reagan Administration recognized the importance of including pipe and tube in its voluntary restraint agreements, as did the second Bush Administration when crafting a safeguard remedy. The Trump Administration should do the same.

According to the publication STEELBENCHMARKER, Chinese export prices for hot rolled steel in 2016 were $453/ton, whereas U.S. prices were $671/ton. China's state-owned

enterprises don't care about profits and will continue producing at a loss in order to maintain production and employment. If the Administration were to limit only imports of steel itself, and not pipe and tube, domestic coil prices would likely increase – potentially making domestic pipe and tube less competitive. CPTI therefore favors a remedy for all flat rolled steel and billets extending to pipe and tube and associated components like couplings and nipples, as well as fabricated products such as pipe spools and pipe modules.

On behalf of the nation's makers of pipe and tube, as well as their workers, I am grateful for this opportunity to present you with testimony and would be pleased to answer any questions either now or in a written submission.

# STEEL FOUNDERS' SOCIETY OF AMERICA

780 MCARDLE DRIVE UNIT G
CRYSTAL LAKE, IL 60014-8155
PHONE: 815/455-8240
FAX: 815/455-8241
www.sfsa.org



*Testimony from the Steel Founders' Society of America*

### Section 232 Investigation: The Effect of Steel Imports on National Security

**Submitted** by: Raymond Monroe, Executive Vice President, Steel Founders' Society of America, monroe@sfsa.org

On September 9th, 2003, Amite Foundry in Amite, Louisiana poured a seven ton casting made with steel scrap from the World Trade Center to make the bow stem for the USS New York. Amite Foundry is a part of the U.S. foundry industry that manufactures thousands of custom designed, high performance castings ranging in size from 1 pound to 50 tons for critical sectors of the U.S. economy.

On behalf of Steel Founders' Society of America (SFSA), we appreciate this opportunity to provide these comments for the U.S. Department of Commerce investigation to determine the effects of the imports of steel on national security.

Steel Founders' Society of America (SFSA) is a trade association for advancing the steel casting industry. We are over 100 years old and since World War II have worked to develop the most advanced technology in steel casting production and use.

The U.S. steel foundries have 200 plants that make over a million tons of castings each year. We are a part of the casting industry that supplies about 10 million tons of steel, iron, titanium, nickel, copper, magnesium and aluminum castings. Global competitors, primarily China, have taken at least 25 percent of the U.S. steel casting market. More serious than direct imports are the castings embedded in equipment imported from global sources.

Since 2000, 80 steel foundries have shut their doors. Over 8,000 foundry workers have lost good paying jobs and these closures have reduced our capacity by 500,000 tons to 1,400,000 tons.

Amite Foundry is one of those steel foundries that is closed. They are part of a group that includes Atchison Foundry in Atchison, Kansas that survived the manufacturing depression of the 1980s by producing the turret ring for the M1 Abrams Tank. Now Atchison is working with the Army to produce a cast steel armor capable of defeating IEDs but they are operating at less than 50% of their capacity. Their sister plant in Tacoma, Washington makes critical castings for the *Virginia*-class submarine program as the only qualified U.S. source. They are also operating at less than half their capacity. These poor business conditions put their plants at risk of closure and jeopardize their ability to supply these needed items for defense.

These examples highlight the critical yet specialized products we make for national security. Around the buildings on Capitol Hill, Sivyer Steel of Bettendorf, Iowa makes the cast steel

bollards for protection and Nova Precision of Auburn, Pennsylvania casts the artful custom tops.

Working with the Defense Logistics Agency (DLA) since 1992, the metal casting industry has identified suppliers and tools for castings needed by the U.S. Department of Defense (DOD). Over 75 steel foundries provide more than 10,000 parts for the DOD. SFSA has worked with the Army to develop an affordable armor cast underbody to protect the warfighter from IEDs. We have also teamed up with the Air Force to make munition castings.

As suppliers of defense parts, U.S. steel foundries need to be successful commercially in the non-defense market because defense procurement needs are volatile and sporadic. If the specialized U.S. production capabilities are closed because of imports, they are not available when needed for critical defense castings.

**To remain capable and available for Defense needs, the steel foundry industry needs viable commercial business.**

Unfair trading practices, U.S. economic policies, the strength of the dollar, globalization, regulatory burdens and foreign competition have made maintaining our businesses as reliable suppliers for the military challenging. We are in an extremely competitive U.S. market and are not afraid to compete but we cannot compete with global suppliers that are supported to gain dominance in the global market to eliminate our production.

**Our current system allows our global competitors to practice trade distorting behavior with no remedy for us as U.S. suppliers.**

Fluctuations in exchange rates have a dramatic effect on trade. The U.S. dollar is the reserve currency of the world. Our global competitors exploit the value of the dollar to displace U.S. suppliers from the market.

**Exploiting the variations of currency valuations is not included in the trade distorting behavior subject to our current set of rules.**

The U.S. metalcasting industry continues to face intense global competition. China is now the largest producer of all types of castings of any country in the world, with over 30,000 foundries. Chinese imports now make-up 25 percent of the U.S. marketplace imports. Like the steel mill industry globally, China has the capacity to make half the steel castings--five million tons--in a world production of ten million tons.

Global sourcing strategies of our U.S. customers gain the benefit of a global supply chain at the expense of reducing the U.S. supply chain. Before the move to globalization, the U.S. had at least 2 qualified suppliers for every critical item. Globalization has reduced that to one. With the reduction of U.S. suppliers, our global competitors seek to eliminate our U.S. supply and establish a market dominant position that is monopolistic, especially in small specialty products. This behavior violates our antitrust laws but is beyond the reach of our current rules-based trading system. Also globalization has resulted in the acquisition of critical U.S. suppliers by

foreign entities. This undermines our technical advantages by disseminating our technologies to the global suppliers of foreign parent companies.

**Globalization reduces cost by increasing the supply base but reduces the supply base in the U.S. and makes it more vulnerable.**

Another issue in trade is the inability to maintain and enforce the rules-based trading systems envisioned in our trade agreements. There are two significant challenges in our use of rules-based trading; the inability to prosecute smaller claims of unfair, rule violating behavior and the inability to gain meaningful enforcement of current rules.

Our trade remedies envision only large volume commodity product violations. For advanced manufacturing and high quality niche products of limited supply and market size, the U.S. trade remedy structure is unworkable. There are no small claims courts, no alternative complaint approaches, no relief for small market segments to access; no matter how egregious the violations. The industry needs to use this cumbersome system that provides no direct relief for violations even if they have spent the money to prosecute a case and were successful. Our system provides no solution to the modern market of small custom products traded in small dollar volumes in a global system.

**Trade remedies in the U.S. cost too much, take too long and provide too little benefit to allow our trading rules to work for niche or advanced manufactured products like steel castings.**

Enforcement is the other challenge. Since our trade system deals with discrete products, the violating party can take steps to avoid it. They can move up or down the supply chain. The ability to embed castings into a later product is an example. This damages not only the steel casting producer but also his customer. They can mislabel the product or transship through another country in violation of agreements. They can ship to another country and complete enough work to evade restrictions on the country of origin. Our enforcement is too little and too late to protect U.S. companies. It lacks the transparency to allow U.S. manufacturers to gain confidence that their interests are being protected. It provides no relief to the injured industry.

**Enforcement of our trade laws is ineffective to protect the interests of US manufacturers that make small volumes of valuable products and lack transparency in their application.**

Given the short time we have today and the nature of the hearing, we do not propose solutions to these challenges. We are happy to engage and work with you to make progress to improve this situation to ensure a capable and reliable supply chain for critical steel parts required for our nation's security.

Once again, thank you for the opportunity to provide comments on the significant challenges facing the domestic steel foundry industry against the tide of imports and unfair trade practices. We appreciate the administration and Commerce Department taking the time to investigate and determine the effects of the imports of steel on national security. If you have any questions or would like additional information, please do not hesitate to contact me.

**Testimony of Mark Millett, Steel Dynamics, Inc.**
Section 232 Steel Investigation Hearing – May 24, 2017

Secretary Ross and other distinguished members of the panel. For the record, my name is Mark Millett, and I am the President and CEO of Steel Dynamics, Inc., known as SDI. I was one of the three co-founders of the company in 1994.

Our company produced 9.3 million tons of steel in 2016 with 7,400 associates. We have an annual capacity of 11 million tons. Over the last five years we have made approximately two billion dollars of capital investments, including a 1.65 billion dollar investment on a 3.5 million ton plant in Mississippi, previously owned by Severstal of Russia. We are a major scrap company. We are also now one of the largest galvanized sheet producers, the second largest structurals producer, and the leading rail producer in the U.S.

Our products are vital to our national and economic security. They go into national defense, military installations, transportation infrastructure, building construction, and autos. Our Mississippi plant is a major steel supplier to oil country tubular goods and line pipe mills in Texas.

The steel import problem stems from global overcapacity that must be addressed through a global solution. For example, we filed antidumping and countervailing duty cases in 2015 on corrosion resistant sheet and cold-rolled steel. Duties of over 100 percent eliminated direct Chinese imports of each product by over 100,000 tons per month. However, just last month in April 2017, 460,000 tons of corrosion resistant sheet and 230,000 tons of cold-rolled sheet were imported, almost 50 percent more than before we filed the cases. In addition, more than 700,000 tons of steel pipe and tube were imported in just April alone.

We are playing a game of whack a mole: hit the Chinese with duties and Chinese steel goes to 10 other countries to become cold-rolled steel, corrosion resistant sheet, or steel pipe and tube. We are also seeing our market for structurals erode as massive quantities of fabricated structurals are imported. Big international construction companies such as Bechtel and Fluor are fabricating whole plants in China. Between 2013 and 2017, imports doubled from 850,000 to 1.7 million tons, and they keep growing.

World Steel Dynamics released a study on April 13, 2017 on the international hot-rolled market. I will attach it to our written comments. The study said that Chinese export prices were about $400 a short ton, which it stated was $100 per ton below Chinese mills cost. The study said that U.S. domestic prices were at $640 a ton, $240 or 60 percent higher than the Chinese export price.

This is why SDI favors quotas at the 2010 or 2011 volume of imports. The U.S. and the rest of the world must cut off subsidized and dumped Chinese steel exports to stop this game of whack a mole and to get China to truly shutter excess capacity now, not five or 10 years from now.

To do otherwise would truly jeopardize our national and economic security.

### Section 232 National Security Investigation of Steel Imports
### Testimony of Alexander Maass
### May 24, 2017

Good morning.    I am Alexander Maass, President of Maass Flange Corporation.  I am here on behalf of the Coalition of American Flange Producers, its members, and employees.  Thank you for the opportunity to appear before each of you here today.  We fully support this Section 232 investigation on steel imports, and urge the Secretary of Commerce to find that these imports are threatening to impair our country's national security, and that assertive action must be taken.

Maass Flange Corporation is a U.S. manufacturer of stainless steel and alloy flanges formed 35 years ago in 1982, and we are located in Houston, Texas.  Our products are used to strengthen and connect pipes, valves, pumps, and other equipment for piping systems.  Maass Flange is a fully integrated forging and machining manufacturer, with the most diversified offering of stainless steel and alloy products.  We offer a complete line of both small and large diameter flanges, in a full range of pressure classes and in various grades of material.  Maass Flange, together with Core Pipe Products, Inc., are the founding members of the Coalition of American Flange Producers.    We are a domestic coalition of flange manufacturers and produce steel flanges for numerous national security applications.

1

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

Because our products are resistant to the harshest applications, they are used in navy ships and submarines, warfare products, aviation jet refueling systems, national fuel refining, chemical manufacturing plants, nuclear power reactors, turbine power and coal gasification generation, liquid natural gas recovery, aviation, aerospace, and in the submarine building industry.  We also sell to utilities companies who use our products for the national power grid, a critical component of the infrastructure that protects the United States and its citizens.  Our flanges are also used to assemble pharmaceutical equipment vital to the production and development of medicines that prevent and respond to epidemics.  However, imports of steel, including stainless steel and alloy flanges, into the U.S. market threaten our ability to supply products for these and many other national security applications.

This is why we are here today to urge Commerce to find that imported steel is threatening to impair the national security, and that actions such as a comprehensive tariff or quota system on all steel products, are needed to significantly restrain these imports.  In our industry, imports have often entered the market in disruptive, massive waves at a time, rather than predictably throughout the year.  For example, we have seen Indian producers ship substantial, year-and-a-half supplies of stainless steel flanges to our customers over the period of a single

2

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

quarter.  But it is not just India; we see the same disruptive behavior from China, the Philippines, Korea, and many others.

As these imports surge into the U.S. market, our capacity to supply our customers, invest, and our production, revenue, and employment numbers, suffer greatly.  Just last month in April, Ameriforge Group Inc., another U.S. producer of stainless steel and alloy flanges, filed for Chapter 11 bankruptcy protection.  That decision, we are sure, was in no small part a result of imports coming into the United States, and displacing American production and business.

Moreover, the injury these imports cause our industry is confirmed by the existence of past antidumping duty orders on imports of stainless steel flanges from India and Taiwan, and by ongoing investigations.  Currently, the International Trade Commission is in the final phase of antidumping investigations on carbon steel flanges from India, Italy, and Spain, and a countervailing duty investigation on carbon steel flanges from India.  Moreover, the Department of Commerce recently calculated between 19 and 24.4 percent dumping margins on carbon steel flanges from Spain.  As these investigations show, unfairly traded imports of steel flanges are irrationally entering the U.S. market, and have caused and are likely to continue causing great injury to our industry.  But this is about much more than dumped flanges from one or two countries; imports of these products do indeed threaten the national security of the United States.

3

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

The threat caused by imports is unsurprising given the global steel overcapacity crisis, which has undoubtedly spurred foreign overproduction in a range of steel products including flanges. Over the past years, it has become particularly evident that the imports coming in from these other countries are not only "second class" flange and other pipe connector products of questionable quality and workmanship, but they are also being sold at price levels that are unsustainable according to our business environment, which involves high quality U.S. workmanship, business ethics, and national responsibilities. With each new aggressive surge of imports, our ability to adequately supply flanges for national security applications deteriorates. The flanges we supply to the armed forces go into the assembly of military vessels, assisting to keep our warfighters and nation safe. As I mentioned earlier, they go into equipment for wind, oil, coal, natural gas, and nuclear energy plants. The power and energy that fuels our national security efforts are transmitted through pipes that are strengthened and held together by flanges. But steel imports competing with us in the U.S. market take opportunities we would otherwise have, affecting our current numbers and hindering our ability to innovate and invest in stronger, better products to remain competitive and continue supplying the best to our customers. In addition, we believe these imports do endanger, as President Trump said, "the jobs needed to maintain a pool of

4

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

skilled workers essential for the continued development of advanced steel manufacturing."

Our industry also needs the Secretary to broadly define steel imports to include stainless steel and alloy flanges, and broadly define the scope of national security requirements to include critical infrastructural applications in the energy industry, national power grid, and pharmaceutical industry, in addition to military applications.

On behalf of the Coalition of American Flange Producers, I urge Commerce to find that steel imports are threatening U.S. national security, and urge the agency to recommend aggressive, comprehensive, and concrete actions to adjust steel imports – including stainless steel and alloy flanges – and stop them from impairing the national security.

Thank you for your time, attention, and for all your efforts in this critical investigation.

1410766 Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

Barcode:3814772-144 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

**Statement of**

**Robert M. Landry, Vice President and Chief Commercial Officer**

**Port of New Orleans**

**Public Hearing on Section 232 Investigation of Steel Imports**

**Wednesday May 24, 2017**

My name is Robert Landry, and I am the Vice President and Chief Commercial Officer for the Port of New Orleans. It is my honor to appear before you today to address the impact of potential Section 232 actions on the Port of New Orleans and its entire maritime community. The Port appreciates the President's efforts to spotlight and correct improper trade practices so that the United States can compete fairly in a global environment. Today, I will share insights gained from previous U.S. trade sanctions of imported steel as an educational caution, and will suggest that other remedies to directly incentivize or otherwise assist the domestic steel industry be fully explored and implemented instead of undertaking Section 232 import adjustments or other actions.

The Port of New Orleans is annually among the top five cargo ports in the United States as well as one of the leading cruise ports in this country. More germane to this hearing is the top-tier status New Orleans maintains as one of the largest steel importing ports in the U.S. The importance of this commodity to the Port cannot be understated. In 2016, imported steel accounted for 45 percent of all imported cargo moving across the publicly-owned facilities within the Port's jurisdiction. As a result, approximately 35 percent of the Port's cargo-related revenue is generated by this single commodity.

It is with solid historical context that I can testify to the detrimental impact of trade sanctions on imported steel. In 2002, then-President Bush imposed tariffs on a variety of imported steel products from several foreign countries under Section 201 of the Trade Act of 1974. In the ensuing year, the Port of New Orleans suffered a 46 percent decline in steel imports and a direct loss of over $1.6 million in revenue. The Section 232 authority under the Trade Expansion Act of 1962 is far broader than the statutory authorities used in 2002, and could result in far steeper import restrictions on a wider variety of steel products from many more foreign countries.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

Notably, a Trade Partnership Worldwide, LLC economic study that reviewed the near-term impacts of the 2002 steel import tariffs found that:

- 200,000 Americans lost their jobs during 2002 due to higher steel prices.

- More American workers lost their jobs in 2002 to higher steel prices than the total number employed by the U.S. steel industry itself.

- Every U.S. state experienced employment losses from higher steel costs.

The impact of a tariff on imported steel would have a broad economic impact. Just recently, the Association of General Contractors cited the rise in commodity prices as one of the major reasons that home prices have increased. Steel was one of the main commodities mentioned in the Association's study. While one would expect sanctions on imported steel to only exacerbate the rise in steel prices, the ripple effect on other commodities would be less noticeable but just as adverse. For example, 80 percent of the steel moving through the Port of New Orleans is further transported up the Mississippi River by tug and barge. Those same barges are then used by American farmers to deliver agricultural products downriver to the grain elevators located on the Lower Mississippi River. Without those barges moving upriver with cargo, the cost to transport U.S. grain increases, making U.S. agricultural products less competitive on the worldwide market with those in other producing countries like Brazil and Russia.

The Port of New Orleans, like other commercial enterprises, needs and depends upon a strong U.S. economy. A vibrant, healthy, and competitive U.S. steel industry is essential to that goal. However, the wide imposition and enforcement of new restrictions on imported steel would create a negative impact on the U.S. port industry, the larger maritime community, and American manufacturers and other steel-consuming industries. Fair and open trade policies, combined with appropriate incentives and other remedies for the U.S. steel producers, would be the best means to promote all sectors of the U.S. economy.

* * * * *

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

# BEFORE THE U.S. DEPARTMENT OF COMMERCE
# BUREAU OF INDUSTRY AND SECURITY

|  |  |
|---|---|
| Section 232 Investigation on the Effect of Imports of Steel on U.S. National Security | ) ) ) ) |

## Oral Presentation of Joel Johnson, Chief Executive Officer, Borusan Mannesmann Pipe U.S. Inc.

1.      Good morning.  My name is Joel Johnson.  I am the Chief Executive Officer of Borusan Mannesmann Pipe U.S. Inc. or "BMP." BMP is a U.S. pipe mill located in Baytown, Texas. We manufacture welded steel pipes, primarily casing for oil and gas wells, known as Oil Country Tubular Goods, or OCTG.

2.      Our pipe mill opened in 2014.  The total invested capital by the Borusan Group in this facility is $300 million, 50 percent of which represents fixed assets.  We intend to make further investments as long as market conditions continue to be favorable and no additional import restrictions are imposed.

3.      BMP employs 180 personnel in its U.S. operations.  Our plan is to produce over 200,000 tons of OCTG in 2017.  However, our facility cannot produce every size of OCTG used in the U.S. market.  Just like most other U.S. OCTG producers, we fill out our product line by importing selective sizes of pipe that are produced by our parent in Turkey.  As with other U.S. producers, these imports allow us to be fully competitive in the U.S. market and thus enhance the

1

volume of our domestic production.  **If we were suddenly unable to import these products, jobs will be threatened.**

4.     While not used in national defense production, OCTG and oil and gas line pipe are an important element of the basic manufacturing infrastructure needed for domestic energy production and distribution.  Expanding domestic energy production and increasing America's energy independence have obvious national security implications.  Thus, any import measures that would adversely affect these sectors will threaten national security by undermining U.S. energy production and energy independence.

5.     I would also like to bring to your attention that domestic pipe and tube manufacturers such as ours are consumers of flat-rolled steel.  We add significant value added through the pipe manufacturing process.  Import restrictions on these basic flat-rolled steel products pose the risk of undermining the domestic steel pipe sector by increasing costs and reducing competitiveness.  Higher costs for OCTG and line pipe will discourage oil and gas drilling and the construction of new pipelines.

6.     A case in point is large-diameter line pipe.  This is pipe used in large oil and gas pipelines such as the recently approved Keystone pipeline.  U.S. health and safety regulations governing such pipelines require that the pipe be produced

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:23 PM, Submission Status: Approved

using high-quality, heavy gauge steel with very specific and demanding chemical and mechanical properties.

7.      As the U.S. pipeline operators commented in a recent proceeding before the Commerce Department, the U.S. line pipe industry cannot produce certain large diameter line pipe that is used in major pipeline projects.  One reason is that the flat-rolled steel that meets certain required specifications cannot be sourced in the U.S.  Furthermore, imported flat-rolled steel products that do meet those specifications are subject to high antidumping and countervailing duties.

8.      We have concerns about future U.S. investments in large diameter pipe production despite our extensive technical expertise and experience with this high value-added product.  Any new trade barriers call into question the feasibility of such investments.   Moreover, if high tariffs or restrictive quotas are imposed on imports of large diameter line pipes, critical energy infrastructure projects would be threatened due to the inability to source the specific pipes required in the United States.

9.      We believe that the Borusan Group has proven its commitment to the American economy.  Before our investment in Texas, we imported pipe from our Turkish facilities. Once our investment was established, we ramped up our production in the U.S. and we now employ hundreds directly and indirectly by focusing on domestic production and strategically importing as needed.

10.    We do not believe further import restrictions are necessary; however, if the President imposes a trade restrictive measure, it should be designed to carefully protect those companies that have already invested in the U.S.  Every effort should be taken to work directly with these companies to ensure that neither their sources of raw material supply nor their supplemental imports are endangered.  The goal should be to encourage U.S. investment and protect the very companies that have demonstrated their commitment to the U.S. market.

11.    Thank you and I am prepared to answer any questions you may have.

4

# PUBLIC COMMENTS

On April 26, 2017, the Department of Commerce ("the Department") published a Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel in the Federal Register. The public comment period ended on May 31, 2017. The Department received 201 written public comment submissions.

The public comment submissions were the following:

1) Acenta Steel Limited
2) Air Distribution Institute
3) AK Steel
4) Algoma
5) Alliance for American Manufacturing
6) Allied Machine & Engineering Corporation
7) Altos Hornos de Mexico
8) American Association of Exporters and Importers
9) American Automotive Policy Council
10) American Iron and Steel Institute
11) American Line Pipe Producers Association
12) American Nickeloid Company
13) American Wire Producers Association
14) Aperam SA
15) Apollo Metals Limted
16) ArcelorMittal USA
17) Arundel
18) Association of Equipment Manufacturers
19) Atlas Steel Products Corporation
20) Autoliv
21) Ball Corporation
22) BlueScope Steel Ltd
23) Boker's Inc
24) Boltex Manufacturing Corporation
25) BorgWarner
26) Borusan Mannesmann
27) Brazil Steel Institute
28) Bridgestone Metalpha U S A
29) BSH Home Appliances

30) Business & Institutional Furniture Manufacturer's Association
31) Bway Corporation
32) California Steel Industries
33) Canadian Manufactureres & Exporters and Canadian Manufacturing Coalition
34) Canadian Steel Producers Association
35) Canam Group Inc
36) Carpenter Technology Corporation
37) Central Moloney Inc
38) Charter Steel
39) China Iron and Steel Association
40) Coalition of American Flange Producers
41) Coalition of Energy Equipment Manufacturers
42) Cogent Power Inc
43) Commercial Metals Company
44) Committee on Pipe and Tube Imports
45) Congressional Steel Caucus
46) Copperweld Bimetallics LLC
47) CPW America Co
48) Crown Cork & Seal
49) CSN LLC
50) Dana Incorporated
51) Daniel Pearson CATO
52) Daniel R Pearson CATO Institute
53) Dayton Rogers
54) DB&S Steel
55) Decra Roofing Systems
56) Delta Star Inc
57) Diamond Sawblades Manufacturers' Coalition
58) Downhole Pipe Equipment LP
59) Drill Rod & Tool Steels Inc
60) Drinker Biddle and Reath
61) DS Containers Inc
62) E&E Manufacturing Co
63) Eaton Corporation
64) Economic Policy Institute
65) Electrolux Home Products
66) Eurofer
67) Evraz North America
68) Finarvedi SpA
69) Finkl Steel

70) Forging Industry Association
71) Freudenberg Sealing Technologies
72) G & L Manufacturing
73) Gerdau North America
74) German Steel Foundation
75) Grant Prideco and National Oilwell Varco
76) Greater Pittsburgh Chamber of Commerce
77) Greenbrier Companies
78) H&T Waterbury Inc
79) Hartree Partners LP Metallia Division
80) Hirsh Industries
81) Hitachi Metals
82) Hytrol Conveyor Company
83) IBEW Local 2150 Additional Signatory
84) IBEW Local 2150
85) Independent Pipe
86) Industrial Fastener's Institute
87) Institute of Scrap Recycling Industries
88) International Longshore Warehouse Union Local 13
89) International Longshore Warehouse Union Local 63
90) International Union, United Automobile, Aerospace & Agricultural Implement Workers of America
91) Japan Iron and Steel Federation
92) Jarvis Cutting Tools
93) JSW Steel
94) JTEKT North America Corporation
95) Kerr Pumps
96) Key Knife Inc
97) Kiewit Corporation
98) Knife Source
99) Komatsu Mining Corporation
100) Korea Iron & Steel Association and various member companies
101) Latin American Steel Association (Alacero)
102) Law Office of Lewis Leibowitz
103) Lyman Steel Company
104) M7 Metals
105) Magellan Corporation
106) MAGNA International
107) Maritime Exchange for the Delaware River and Bay Public
108) Markem Imaje Corporation

109) Merfish Pipe & Supply
110) Metal Flow Corporation
111) Metal Partners International
112) Metals 2 Go
113) Metals Service Center Institute
114) Metglas Amorphous
115) Mexican Iron and Steel Industry
116) Ministry of Commerce of China
117) Mitsubishi Electric Power Products
118) Motor & Equipment Manufacturers Association
119) National Electrical Manufacturers Association
120) National Foreign Trade Council
121) Niagara Transformer Corporation
122) Nippon Steel & Sumikin Inc
123) Nippon Steel & Sumitomo Metal Corporation
124) Nippon Yakin Kogyo
125) NLMK USA
126) North American Die Casting Association
127) North American Tool
128) Nucor Corporation
129) Oil and Natural Gas Industry
130) Pasha Stevedoring & Terminals L P
131) Pentaflex Inc
132) Pentair
133) Port of Los Angeles
134) Port of Vancouver USA
135) Port Tampa Bay
136) Power Partners Inc
137) Precision Machined Products Association
138) Precision Marshall Steel Company
139) Precision Marshall Steel Company Belgium & France Division
140) Precision Metalforming Association and National Tooling and Machining Association
141) Rail Security Alliance
142) Russel Metals
143) Saha Thai Steel Pipe PCL
144) Samuel Son & Co Limited
145) Seilkop Industries Inc
146) Senator Al Franken
147) Senator Mitch McConnell and Senator Rand Paul

148) Senator Murray Cantwell
149) Silgan Containers
150) Simonds International
151) Spectrum Brands Inc
152) SPX Transformer Solutions, Inc
153) SRG Global
154) SSAB Americas
155) SSINA
156) Stainless Steel Tube Trade Advancement Committee
157) Star Cutter
158) Star Pipe Products
159) Steel Dynamics Inc
160) Steel Europe AG
161) Steel Founders' Society of America
162) Steel Manufacturer's Association
163) Steel Tank Institute
164) Steel Users
165) Steel Warehouse Company
166) Steelcase Inc
167) Stewart and Stewart
168) Sumitomo Corporation of Americas
169) Ta Chen International Inc Aperam
170) Ta Chen International Inc ArcelorMittal
171) Tata Steel Europe
172) Tenaris
173) Titan Metal Service
174) TMK IS
175) Tool Manufacturers of New Hampshire and Wisconsin
176) Toyota Tsusho America
177) Transformer Manufacturers
178) Trinity Meyer Utility Structures
179) Truck and Engine Manufacturer's Association
180) Tubular Synergy Group
181) Turkish Steel Exporters' Association
182) U.S. Tire Manufacturers Association
183) U.S. Wheat Associates
184) UK Steel
185) United Association Labor Management Cooperation Committee
186) United States Cutting Tool Institute
187) Universal Steel Products

188) Valbruna Slater Stainless Inc
189) Valeo North America
190) Vallourec Star
191) Vaugh Manufacturing
192) Vest Incorporated
193) Vietnam Steel Association
194) Villares Metals
195) Voestalpine AG Austria
196) Voestalpine AG Sweden
197) Volkswagen Group of America Chattanooga Operations, LLC
198) Weldbend Corporation
199) Wheeler Metals
200) Wind Tower Trade Coalition
201) ZF North America, Inc


To view any of the public comments listed, please visit:

https://www.bis.doc.gov/232steel

## Uses of Steel for National Defense

The U.S. Department of Defense (DoD) has a large and ongoing need for a range of steel products that are used in fabricating weapons and related systems for the nation's defense. DoD requirements are met by steel companies which also support the requirements for critical infrastructure and commercial industries.

Navy ships require hardened steel for their exterior armor, specialized alloys for sensor and weapons housings, high-carbon forged steels for machinery components, and rolled high-tensile strength steel for hull plates and frames. Importantly, Navy ship hulls require steel produced from integrated steel mills. In addition, Army vehicle armor plating requires hard, high-carbon steel laminate, and vacuum melted nickel alloy sheet for recuperators on the Abrams Tank engine. Air Force (F-35 Joint Strike Fighter) and Navy F-18 aircraft require exotic steel alloys with high-strength and low weight. The Army's Apache and other helicopters also utilize steel alloys. Vacuum-melted nickel alloy sheet, bar and finished forgings are used for engine shafts, landing gear, jet engine parts and components such as super precision bearings and gears.

The single largest use of steel is for production of ships and submarines, with most modern submarines needing 10,000 net tons of steel. A single aircraft carrier requires 60,000 net tons of structural steel (*see* Figure H1).[1]

Although U.S. Navy and Coast Guard purchases of ships decreased in recent years, ship procurements are expected to increase in the years ahead. According to the Office of Budget and Management, the Administration is preparing to increase the size of the military, especially the Navy (from 275 ships to an estimated 292 ships by the end of FY 2018).[2] Some Navy officials report that the demand for ships could reach as high as 355, creating an increase in the demand for specialized steel for military purposes.[3]

---

[1]  2001 Report, note 20 ("DOD indicated that 60,000 net tons of finished steel was used in the multi-year construction of [the Navy aircraft carrier] the *USS Ronald Reagan*").

[2]  Office of Management and Budget. "2018 Budget: Investing in Our National Defense". Fact Sheet.  The White House.

[3]  U.S. Naval Institute (USNI) News, "Moran: Navy Needs as Much As $150B Extra to 'Jump-Start' Path to 355 Ships; Would Buy Mostly DDGs, SSNs, Carriers," March 22, 2017, https://news.usni.org/2017/03/22/moran-

| Figure H1.  Weapons Systems Steel Requirements* | |
|---|---|
| | Steel Usage Per Unit |
| *Navy Vessels* | |
| Aircraft Carriers (excluding propulsion and armaments) | $60,000 - 70,000$ tons |
| Amphibious Force Ships | 12,000 tons |
| Submarines | $4,000 - 10,000$ tons |
| Guided Missile Destroyers | 3,500 tons (steel plate) |
| *Ground Systems* | |
| M-1 Abrams Tank | 62 tons (approx.) |
| Light Armored Vehicles | 8 tons |
| *Examples Source: American Iron and Steel Institute* | |

Thus, U.S. military platforms are dependent in varying degrees on U.S.-produced steel and specialty metal. In many cases, the U.S. military relies on special types of steel and the U.S. steel industry's ability to support critical defense needs. It is important to note, however, that this ability to meet defense requirements in turn depends on the continued ability of the U.S. steel industry to compete fairly in the commercial marketplace and maintain a financially viable domestic manufacturing capability.  This includes the ability to have an adequately skilled workforce for manufacturing as well as to conduct research and development for future products. A continued loss of viable commercial production capabilities and related skilled workforce will jeopardize the U.S. steel industry's ability to meet the full spectrum of defense requirements.

A recent U.S. Army aerospace specialty steel (including stainless) sector report concluded that, "Maintaining a healthy domestic specialty metals industry is vital to U.S. security interests.  Domestic manufacturing of these critical interests is needed in times of war.  The ability of the United States to maintain leading edge

---

navy-needs-additional-150b-over-next-7-years-to-get-on-355-ship-trajectory-would-buy-mostly-ddgs-ssns-carriers

technology in specialty metals depends on the continued existence of a healthy domestic manufacturing capability."[4]

The U.S. Department of Defense also has had to take specific actions to assist portions of the U.S. steel industry that are important for national security needs in part due to unique DoD requirements for which there is limited commercial demand. Through the Defense Production Act Title III program, which funds projects to "create assured, affordable and commercially viable production capabilities and capacities for items essential for national defense" the Department of Defense funded two steel programs.

In 2008, the Defense Production Act Title III office funded a $59 million effort to expand domestic production capacity for low-alloy Vacuum Induction Melting/Vacuum Arc Re-melting steel. U.S. capacity for producing this type of steel (high-purity, low-alloy iron based steel) was constrained, creating unacceptable lead times for the Mine-Resistant Ambush-Protected (MRAP) vehicles. This steel is also used in bearings for jet engines, rotor shafts and heads for helicopters, flap actuators for fighter jets, gears in jet and helicopter transmissions, mounts and fasteners for jet engines and jet tail hooks.

In 2015, the Defense Production Act Title III office also funded a $23 million project to enhance domestic, economically viable merchant supplier steel product capabilities. The aim was to improve production capability for very wide, very thick Navy-grade heavy alloy steel plate that is dimensionally uniform. Current capabilities are not sufficient to meet existing and growing demands for this type of steel. Steel plate is used in submarines, aircraft carriers, destroyers, helicopter landing decks, Army combat vehicles and tanks. [5]

Providing the wide range of steel products needed for defense requires a strong steel industry. As mentioned in the 2001 Report, military programs such as armored vehicles, aircraft, and ships represent approximately 0.03 percent of U.S. steel demand (peacetime requirements). These steels are not generally used in building

---

[4]    U.S. Army Aerospace Specialty Steel Sector Analysis - U.S. Army Aviation and Missile Research, Development and Engineering Center Engineering Directorate, page 52. July 2015.

[5]    U.S. Department of Defense, "Defense Production Act: Title III," http://www.dpatitle3.com/dpa_db/, accessed May 2017.

construction or consumer goods.    However, when steel needs for critical infrastructure are included with defense needs, overall steel requirements are significantly higher.  All remaining U.S. steel companies supply commercial and specialized steel for critical infrastructure and defense end-markets.[6]

Steel used in defense-related products includes all five categories (flat, long, pipe and tube, semi-finished, stainless).   The Department in the 2001 Report previously estimated that national defense needs for steel were 325,000 net tons of steel per year.[7]  The Department in the present investigation has seen evidence of an increase in national defense needs since the 2001 Report. In 2017, DoD estimates for U.S. steel needs is now calculated to be three percent of U.S. steel production.

The ability of U.S. production to supply national defense needs is entirely dependent on the existence of commercially viable steel mills that are not dependent on national defense demand alone.  The free market system in the United States requires commercially viable steel producers to meet defense needs.  No company could afford to construct and operate a modern steel mill solely to supply defense needs because those needs are too diverse.  To be available to supply those diverse national defense needs, U.S. steel mills must attract sufficient commercial (i.e., non-defense) business to support construction, operation and maintenance of production capacity and to support the upgrades, research and development needed to continue to supply defense needs in the future.

This section summarizes briefly the depth and breadth of defense usage of steel across the full spectrum of the five product categories (and the nearly 800 subcategories of steel that make up the five categories).

1. **Flat Products: Produced by rolling semi-finished steel through varying sets of rolls.  Includes sheets, strips, and plates.**

Land-based vehicles such as the Bradley Fighting Vehicle, Abrams Tank, and the family of Light Armored Vehicles use significant tonnage of steel plate per

---

[6]    U.S. Department of Defense requirements for steel would be prioritized over U.S. civilian needs during a national emergency through existing authorities of the Defense Production Act Title I and the Defense Prioritization and Allocation System (DPAS).

[7]    2001 Report at 13 and note 14.

vehicle.[8]  In addition, steel plate is used in the bodies and propulsion systems of the naval fleet. [9]

Conventional and high-permeability domain-refined grain-oriented electrical steels (GOES) are used in cores and core assemblies for electrical transformers (including power transformers, switchgear, step-up, step-down, and distribution transformers) installed at military facilities across the United States.

In addition, small transformers employing electrical steel are used in radar, ships, and some weapons systems.  The availability of electrical steel meeting defense performance specifications is important to mission assurance and reliable operations.

**2. Long Products: Steel products that fall outside the flat products category. Includes bars, rails, rods, and beams.**

These products have application in a range of military systems, including personnel carriers, tanks, and weapons.  They are instrumental in the creation of mechanical parts.  For example, the control cables on virtually all military aircraft, including fighter jets and military transport planes, are produced from steel wire rope.[10]

**3. Pipe and Tube Products: Seamless or welded pipe and tube products.**

Several companies supply tubular steel products for a variety of direct defense needs.  These military-related products include bomb shells, vehicle cylinders for Humvees, axles for trailers that haul M-1 tanks, 500-pound bomb rings, and cylinders on Patriot missile launchers.[11]

---

[8] Specialty Steel Industry of North America (SSINA), www.ssina.com

[9] *Id.*

[10] *Id.*

[11] Multiple U.S. steel manufacturers

Seamless tubes are suitable for demanding applications where maximum corrosion resistance or mechanical integrity are required. Examples of defense applications include military aircraft, submarines, ships, nuclear equipment and fuel elements, and equipment used for the manufacture of special chemicals.[12]

4. **Semi-finished Products: The initial, intermediate solid forms of molten steel, to be re-heated and further forged, rolled, shaped, or otherwise worked into finished steel products. Includes blooms, billets, slabs, ingots, and steel for castings.**

The production of steel ingot is key to the manufacture of downstream products used by the DoD. Ingot is used as the basis for fabricating heavy forged products including ship drive shafts and pressure vessels for the defense market. Also, interior fittings for naval vessels including ship galleys, machinery housings and bulkheads, are made from steel ingot material.[13]

5. **Stainless Products: Steel products, in flat-rolled, long, pipe and tube, and semi-finished forms, containing at minimum 10.5 percent chromium and, by weight, 1.2 percent or less of carbon, offering better corrosion resistance than other steel.**

The U.S. carbon/alloy and specialty steel industries are vital partners to American defense contractors and to the Defense Department. Domestic and specialty metals are found in virtually every military platform, including missiles, jet aircraft, submarines, helicopters, Humvees® and munitions. Fighter aircraft engines, gears, bearings, and the fuselage also use high performance specialty steels and super-alloys produced by U.S. specialty steel companies.[14] [15]

---

[12] The Stainless Steel Tube Trade Advancement Committee (SSTTAC), www.ssttac.com

[13] http://www.steel.org/the-new-steel/national-defense.aspx

[14] Specialty Steel Industry of North America (SSINA), www.ssina.com

[15] For example, Valbruna is an approved stainless steel supplier for Halliburton, Schlumberger, Bombardier, Johnson & Johnson, Delphi Automotive, and several other companies with significant defense contracts. As a manufacturer of stainless steel bars comprised of high-performance grades, Valbruna's steel is used in key defense applications such the structural components and landing gear on aircraft, gun and rifle barrels, and munitions casings. (Valbruna Slater Stainless, Inc.)

## Uses of Steel for Critical Infrastructure

Pursuant to Presidential Policy Directive 21 (PPD-21), there are 16 designated critical infrastructure sectors in the United States, many of which use high volumes of steel (*see* Figure I1).[1]

| Figure I1. DHS Critical Infrastructure Sectors – Use of Steel | |
|---|---|
| ***Sectors*** | ***Steel End-Uses*** |
| 1. Chemical Production | Centrifuges, Conduit, Fire Suppression, Flange Heaters, Incubators, Piping, Stainless Steel Heaters, Storage Tanks, Safety Showers |
| 2. Commercial Facilities | Structural Beams, Electrical Conduit, Kitchen Equipment, Elevators, Escalators, Waste Pipes, Metal Framing and Studs, Machinery, Valves, Manufacturing Plants, Chemical Processing Plants |
| 3. Communications | Antennas, Radio/TV Antenna Masts, and Transmissions Towers, Tower Cables |
| 4. Critical Manufacturing | Blast Furnaces, Rolling Mills, Extrusion, Casting, Forging Production Plants; Fabrication Facilities (i.e. Bend, Cut, Mold, and Stamp steel materials). Specialty Metals Production (i.e. Stainless Steel, Alloy Steel, Magnetic/Electronic, High Strength Alloy Steel, Carbon Steel), Plates, Hot Rolled Round Bar, Cold Finished Steel Bars, Steel Wire, Rebar |
| 5. Dams | Reinforced Dams and Reservoirs (Rebar, Piping, Structural Supports, Flood Gates, Water Release Gates and Valves, Turbine Supports) |
| 6. Defense Industrial Base | Armored Personnel Carriers, Heavy Weapons (i.e. Cannon, Machine Guns, Missiles), Humvees, Jet Aircraft, Submarines, Munitions, Aircraft Engines, Fighting Vehicles, Tanks, Ship Propulsion Systems |
| 7. Emergency Services | Ambulances, Fire Trucks, Helicopters, Portable/Temporary Shelters |
| 8. Energy | Petroleum Refineries (i.e. Specialty Pipe, Valves, Fittings), Oil and Gas Pipelines (i.e. Steel Plate, Heavy Gauges), Storage Tanks, Electricity Power Generating Plants, Electric Power Transmission Towers, Power Distribution Grids and Stations, Transformers, Utility Distribution Poles, Transformer Cores, Wind Turbines |

---

[1] Department of Homeland Security, "Critical Infrastructure Sectors," https://www.dhs.gov/critical-infrastructure sectors (accessed May 2017).

| 9. | Financial Services | Steel Safes, Bank Vaults, Lockers, Armored Trucks, Building Doors and Barriers |
|---|---|---|
| 10. | Food and Agriculture | Canned Goods, Harvesters, Mechanical Planters, Balers, Tractors, Storage Silos, Partitions, Gates, Watering Systems, Fencing Systems (i.e. Gates, Barb Wire, Posts) |
| 11. | Government Facilities | Structural Steel,  Elevators/Escalators, Furniture, Piping, Vehicle,  Barriers, Vault Doors, Barracks, Storage Buildings, Shelving, Records Storage, Fences |
| 12. | Health Care/Public Health | Elevators/Escalators, Hospital Framing, Structural Supports, Roofing, Operating Tables, Furniture, Wheel Chairs, Bed Frames, Waste Pipes and Fire Suppression Pipe, Medical Devices (i.e. Drug Delivery Needles, Surgical Pins and Screws) |
| 13. | Information Technology | Data Center Cooling Systems, Data Center Structural Supports, Electronic System Racks, Electrical Conduit, System Cabinets, |
| 14. | Nuclear Reactors, Materials, and Waste Sector | Structural Steel, Pressurizers, Reactor Pressure Vessels, Safety Water Tanks, Containment Vessels, Primary Pumps and Steam Water Lines, Steam Generator Components, Cooling Towers, Overhead Cranes for Reactor Maintenance. |
| 15. | Transportation Systems | Airports, Aircraft, Bridges, Highways, Railroads, Mass Transit Systems, Seaports, Navigation Systems, Shipbuilding, Trucks, Trailers, Boats, Ships |
| 16. | Water and Waste Water Systems | Water Distribution Pipes, Storage Tanks and Towers, Valves, Storm Water Distribution (i.e. Culverts, Flood Control Gates), Waste Water and Sewage Treatment Facilities |

Note: Presidential Policy Directive (PPD-21) on Critical Infrastructure Security and Resilience, issued in February 2013, identified 16 industrial sectors.  *See*:  https://www.dhs.gov/critical-infrastructure-sectors.
Source:  Bureau of Industry and Security, multiple industrial references, http://www.ssina.com/news/releases/pdf_releases/steel_and_national_defense_0107.pdf

These 16 sectors require reliable supplies of steel for new construction as well as maintenance and repairs.[2]

---

[2]  End-use markets for U.S. steel:  According to AISI industry statistics about end use markets for U.S. steel shipments in 2015, the majority (2/3) of U.S. produced steel mill products were sold by steel companies directly to end use markets. Construction consumed approximately 42 percent of steel sales. Infrastructure and commercial construction projects increase the demand for structural steel and cut length plates. The automotive market comprises 27 percent of U.S. sales. Automotive is the largest market category for sheet products and is also increasingly the market for high strength steels. Other key markets include machinery (9 percent), containers (4 percent), and pipe and energy (7 percent) by weight for sales.

The Department found that demand for steel in critical industries has increased since the Department's last investigation in 2001. The 2001 Report determined that there were 33.68 million tons of finished steel consumed per year in critical industries in the United States based on 1997 data. The Department updated that analysis for this report using 2007 data (the latest available) and determined that 54 million metric tons of steel is being consumed in critical industries, an increase of 63 percent.[3]

Potential disruptions in adequate supplies of needed steel products could impair critical infrastructure sectors such as:

    a. Transportation: bridges (over 600,000 bridges), tunnels, national highway system, railcars and tracks, ports, airport runways and facilities (19,000 U.S. airports)

    b. Energy: petroleum and natural gas pipelines, offshore oil/gas platforms, electric power generation (over 6,000 power plants), refineries, and nuclear facilities (99 units)

    c. Water treatment: community drinking water systems (155,000 public drinking water systems)[4], wastewater treatment and management facilities (16,000 publicly owned wastewater treatment systems)[5].

There is a large and ongoing need for a range of steel products that are used in supporting critical infrastructure in the United States. These products include all five categories (flat, long, pipe and tube, semi-finished, and stainless steel) that are produced by U.S. integrated and mini-mill steel companies. Uses include:

---

[3] Bureau of Industry and Security analysis of Bureau of Economic Analysis, Annual Input-Output Accounts of the U.S. Economy, 2007 data.

[4] U.S. Department of Health and Human Services, Center for Disease Control and Prevention, Drinking Water

[5] U.S. Environmental Protection Agency, Office of Waste and Management, 1996.

1. **Flat Products: Produced by rolling semi-finished steel through varying sets of rolls. Includes sheets, strips, and plates. Used most often in the automotive, tubing, appliance, and machinery manufacturing sectors.**

   Similar to defense, flat steel products have a wide range of applications in commercial and industrial systems.   Plate products find application in a variety of places, such as storage tanks, ships and railcars, and large diameter pipe and machinery parts.

   In the commercial sector steel plate is used for offshore drilling rigs, construction and mining equipment, bridges, tool and die production, and petro-chemical applications.

   Pipelines, the mode by which petroleum and natural gas is most often delivered to refineries and then on to consumers, are made from technically demanding steel plate in wide and very heavy gauges.[6]

   The electrical grid of the United States relies on the availability specially engineered conventional and high-permeability flat electrical steel.  Domain-refined grain-oriented electrical steels (GOES) is the key component of cores and core assemblies in electrical transformers used to control the distribution of electricity.

   GOES is used in both the large step-up transformers that power the electrical grid by enabling the transport of electricity over great distances and in smaller step-down transformers that power individual neighborhoods and businesses.[7]

   Non-oriented electrical steel (NOES) is also critical for the electrical grid, because it is the used to make the large cores for electrical power generators.  In addition, NOES is used in industrial applications and motors for hybrid and electric automobiles.  Importantly, there is today only one remaining domestic producer of GOES and NOES in the United States: AK Steel.  It is also the only producer of these products in North America.[8]

---

[6] American Iron and Steel Institute (AISI), www.steel.org

[7] AISI

[8] AISI

2. **Long Products: Steel products that fall outside the flat products category. Includes bars, rails, rods, and beams. Used in many sectors but most commonly in construction.**

Long products have application in a range of industries and are frequently used in transportation, including commercial aircraft, automobiles, trucks, and railroads. Special bar quality (SBQ) and cold-finished bars also are used to reinforce concrete in roads and bridges. Another important application is oil and gas drilling, production and transmission in the energy sector.[9]

3. **Pipe and Tube Products: Either seamless or welded pipe and tube products. Used in many sectors but most commonly in construction and energy sectors.**

The availability of high-performance steel pipe and tube is critical to oil well drillers, pipeline operators and refineries. Steel pipe and tube is used to extract, process, and transport petroleum products that are essential for the day-to-day functioning of the U.S. economy.[10] In fact, steel line pipe is required for pipeline systems that require high pressure or operate in harsh environments (e.g., sub-sea pipelines). The installation of deep water and ultra-deep water pipeline construction carries greater risk in terms of pipeline failure, installation safety, environmental impact and life cycle cost. Transmission pipelines, which are typically large diameter, use low-carbon steels or low-alloy steels because of their strength, toughness, ductility, and weldability. In construction, steel pipe is used for structural support, fire suppression, waste-water handling, railings, and other applications.

4. **Semi-finished Products: The initial, intermediate solid forms of molten steel, which are re-heated and further forged, rolled, shaped, or otherwise worked into finished steel products. Includes blooms, billets, slabs, ingots, and steel for castings.**

---

[9]  AISI http://www.steel.org/the-new-steel/

[10] Committee on Pipe and Tube Imports

The supply of semi-finished steel products is essential to the operation of many U.S. industrial sectors that require unique parts and systems fabricated from steel. Steel slab is used in the fabrication of pressure vessels for the commercial nuclear and petrochemical industries. In addition, it is used in commercial ship building and construction. Likewise, fabricators also rely on a ready supply of ingots that are needed for forging and casting operations.[11]

5. **Stainless Products: Steel products, in flat-rolled, long, pipe and tube, and semi-finished forms, containing at minimum 10.5 percent chromium and, by weight, 1.2 percent or less of carbon, offering better corrosion resistance than other steel.**

The stainless steel sector of the U.S. industry provides a significant portion of the high technology, high value steel used for a variety of critical infrastructure end-uses.

Stainless steel tubing is used in a wide range of commercial settings and in defense systems. Applications include: auto exhaust systems, industrial gas lines, water systems, aircraft systems, heat exchangers, petrochemical facilities, hydraulic lifts and other systems using hydraulic fluid.

Pipe products fabricated from stainless steel are used across industry, including for: breweries, dairies, oil and gas processing, pharmaceutical plants, power plants, paper mills, synthetic fiber production, and ships. Stainless steel products also are employed in nuclear power plants, including: sleeves for fuel rods, heat transfer tubes, reactor vessel components, and other uses.

---

[11] ArcelorMittal USA

## U.S. Government Steel Measures and Actions

| U.S. Government Steel Measures and Actions | | | | | |
|---|---|---|---|---|---|
| Year/ Admin. | Measure/ Initiative | Coverage | Characteristics | End Date | U.S. Steel Finished Import Penetration |
| 1968 Johnson | Voluntary Restraint Agreements (VRAs) | Japan and the European Community (EC) | Sought by European producers facing antidumping (AD)/countervailing duty (CVD) tariffs | Renegotiated | 18% |
| 1972 Nixon | VRAs | Japan and the EC | Renegotiation of 1968 VRAs; ended with 1974 market recovery | 1974 | 19.3% |
| 1978 Carter | Trigger Price Mechanism (TPR) | Japan and the EC | Established minimum "fair" import price; imports below this price subject to "fast track" trade remedy investigation, self-initiated by the USG | Revised | 21.1% |
| 1980 Carter | TPR | Japan and the EC | Revised TPR which raised trigger price and enhanced auditing and monitoring | 1981 | 15.5% |
| 1981 Reagan | USG Self-Initiates 7 AD/CVD investigations | EU | Initiated pursuant to the existing trigger price mechanism which allowed for self-initiation if imports below fair price | Settled in 1982 with the voluntary restraint agreements | 19.9% |
| 1982 Reagan | VRAs | EC | Sought by European producers facing AD/CVD tariffs | Renegotiated and expanded to include more countries | 16.6% |
| 1984 Reagan | VRAs | 19 countries and the EC | -Tailored to each country and involved market share agreements and quotas  -AD/CVD petitions withdrawn by industry  -Tied to a steel industry commitment to modernize and provide retraining for workers | 1992 | 26.4% |
| 1989 George H.W. Bush | Pursuit of a Multilateral Steel Agreement | Global | -Efforts launched to negotiate a global agreement to abolish subsidies in exchange for an end to the VRAs | N/A; agreement not reached | 15.8% |

## U.S. Government Steel Measures and Actions

| U.S. Government Steel Measures and Actions (Continued) | | | | | |
|---|---|---|---|---|---|
| **Year/ Admin.** | **Measure/ Initiative** | **Coverage** | **Characteristics** | **End Date** | **U.S. Steel Finished Import Penetration** |
| 1999 Clinton | Steel Action Plan | Global | -Enhanced engagement with trading partners to cut steel imports<br><br>-Tax relief for steel companies and financial adjustment for out-of-work steelworkers<br><br>-Vigorous enforcement of AD/CVD<br><br>-DOC Global Steel Report<br><br>-Improved steel monitoring | N/A | 21.6% |
| 1999 Clinton | Comprehensive Steel Agreement with Russia | Russia | Terms of the agreement reduced by 64 percent overall imports of Russian steel from 1998 levels and established minimum pricing | 2004 | 21.6% (all steel imports; not specific to Russia) |
| 2000 Clinton | Global Section 201 Safeguards on Certain Wire Rod and Line Pipe | Global | -Based on a petition brought by the U.S. industry, tariffs ranged from 10 to 19%, phased out over 3 years.<br><br>-The duties affected only those imports that exceeded 1998 import levels. | 2003 | 22.3% (all steel imports; not specific to line pipe and wire rod) |
| 2002 George W. Bush | Global Section 201 Safeguards on most steel products | Global, with exclusions (e.g., FTA partners, short supply) | Tariffs on most producers and tariff rate quotas on slab (along with a process for exclusions)<br><br>-Enhanced Import Monitoring<br><br>-Multilateral efforts to address excess capacity and steel subsidies in the OECD | 2004 | 20.4% |

Barcode:3814772-145 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

### Steel Antidumping and Countervailing Duty Orders in Effect as of January 11, 2018

| Country | Product/Country | CaseNo | Order Date | Steel Product Category | Grade |
|---|---|---|---|---|---|
| Australia | Certain Hot-Rolled Steel Flat Products/Australia | A602807 | 10/3/2016 | Flat | Carbon/Alloy |
| Austria | Certain Carbon & Alloy Steel Cut-to-Length Plate/Austria | A433812 | 5/25/2017 | Flat | Carbon/Alloy |
| Belarus | Steel Concrete Reinforcing Bars/Belarus | A822804 | 9/7/2001 | Long | Carbon/Alloy |
| Belgium | Certain Carbon & Alloy Steel Cut-to-Length Plate/Belgium | A423812 | 5/25/2017 | Flat | Carbon/Alloy |
| Belgium | Stainless Steel Plate In Coils/Belgium | A423808 | 5/21/1999 | Flat | Stainless |
| Brazil | Carbon & Alloy Steel Wire Rod/Brazil | A351832 | 10/29/2002 | Long | Carbon/Alloy |
| Brazil | Carbon & Alloy Steel Wire Rod/Brazil (CVD) | C351833 | 10/22/2002 | Long | Carbon/Alloy |
| Brazil | Certain Carbon and Alloy Steel Cut-to-Length Plate/Brazil | A351847 | 2/1/2017 | Flat | Carbon/Alloy |
| Brazil | Certain Cold-Rolled Steel Flat Products/Brazil | A351843 | 9/20/2016 | Flat | Carbon/Alloy |
| Brazil | Certain Cold-Rolled Steel Flat Products/Brazil (CVD) | C351844 | 9/20/2016 | Flat | Carbon/Alloy |
| Brazil | Certain Hot-Rolled Steel Flat Products/Brazil | A351845 | 10/3/2016 | Flat | Carbon/Alloy |
| Brazil | Certain Hot-Rolled Steel Flat Products/Brazil (CVD) | C351846 | 10/3/2016 | Flat | Carbon/Alloy |
| Brazil | Circular Welded Non-Alloy Steel Pipe/Brazil | A351809 | 11/2/1992 | Pipe and Tube | Carbon/Alloy |
| Brazil | Stainless Steel Bar/Brazil | A351825 | 2/21/1995 | Long | Stainless |
| China | Carbon and Certain Alloy Steel Wire Rod/PRC | A570012 | 1/8/2015 | Long | Carbon/Alloy |
| China | Carbon and Certain Alloy Steel Wire Rod/PRC (CVD) | C570013 | 1/8/2015 | Long | Carbon/Alloy |
| China | Certain Carbon & Alloy Steel Cut-to-Length Plate/PRC | A570047 | 3/20/2017 | Flat | Carbon/Alloy |
| China | Certain Carbon & Alloy Steel Cut-to-Length Plate/PRC (CVD) | C570048 | 3/20/2017 | Flat | Carbon/Alloy |
| China | Certain Cold-Rolled Steel Flat Products/PRC | A570029 | 7/14/2016 | Flat | Carbon/Alloy |
| China | Certain Cold-Rolled Steel Flat Products/PRC (CVD) | C570030 | 7/14/2016 | Flat | Carbon/Alloy |
| China | Circular Welded Austenitic Stainless Pressure Pipe/PRC | A570930 | 3/17/2009 | Pipe and Tube | Stainless |
| China | Circular Welded Austenitic Stainless Pressure Pipe/PRC (CVD) | C570931 | 3/19/2009 | Pipe and Tube | Stainless |
| China | Circular Welded Carbon-Quality Steel Line Pipe/PRC | A570935 | 5/13/2009 | Pipe and Tube | Carbon/Alloy |
| China | Circular Welded Carbon-Quality Steel Line Pipe/PRC (CVD) | C570936 | 1/23/2009 | Pipe and Tube | Carbon/Alloy |
| China | Circular Welded Carbon-Quality Steel Pipe/PRC | A570910 | 7/22/2008 | Pipe and Tube | Carbon/Alloy |
| China | Circular Welded Carbon-Quality Steel Pipe/PRC (CVD) | C570911 | 7/22/2008 | Pipe and Tube | Carbon/Alloy |
| China | Corrosion-Resistant Steel Products/PRC | A570026 | 7/25/2016 | Flat | Carbon/Alloy |
| China | Corrosion-Resistant Steel Products/PRC (CVD) | C570027 | 7/25/2016 | Flat | Carbon/Alloy |
| China | Cut-to-Length Carbon Steel Plate/PRC | A570849 | 11/3/2003 | Flat | Carbon/Alloy |
| China | Hot-Rolled Carbon Steel Flat Products/PRC | A570865 | 11/29/2001 | Flat | Carbon/Alloy |
| China | Light-Walled Rectangular Pipe & Tube/PRC | A570914 | 8/5/2008 | Pipe and Tube | Carbon/Alloy |
| China | Light-Walled Rectangular Pipe & Tube/PRC (CVD) | C570915 | 8/5/2008 | Pipe and Tube | Carbon/Alloy |
| China | Non-Oriented Electrical Steel/PRC | A570996 | 12/3/2014 | Flat | Carbon/Alloy |
| China | Non-Oriented Electrical Steel/PRC (CVD) | C570997 | 12/3/2014 | Flat | Carbon/Alloy |
| China | Oil Country Tubular Goods/PRC | A570943 | 5/21/2010 | Pipe and Tube | Carbon/Alloy |
| China | Oil Country Tubular Goods/PRC (CVD) | C570944 | 1/20/2010 | Pipe and Tube | Carbon/Alloy |
| China | Prestressed Concrete Steel Rail Tie Wire/PRC | A570990 | 6/24/2014 | Long | Carbon/Alloy |
| China | Seamless C&A Steel Standard, Line & Pressure Pipe/PRC | A570956 | 11/10/2010 | Pipe and Tube | Carbon/Alloy |
| China | Seamless C&A Steel Standard, Line & Pressure Pipe/PRC (CVD) | C570957 | 11/10/2010 | Pipe and Tube | Carbon/Alloy |
| China | Stainless Steel Sheet and Strip/PRC | A570042 | 4/3/2017 | Flat | Stainless |
| China | Stainless Steel Sheet and Strip/PRC (CVD) | C570043 | 4/3/2017 | Flat | Stainless |
| China | Steel Concrete Reinforcing Bars/PRC | A570860 | 9/7/2001 | Long | Carbon/Alloy |
| France | Certain Carbon & Alloy Steel Cut-to-Length Plate/France | A427828 | 5/25/2017 | Flat | Carbon/Alloy |
| Germany | Certain Carbon & Alloy Steel Cut-to-Length Plate/Germany | A428844 | 5/25/2017 | Flat | Carbon/Alloy |
| Germany | Non-Oriented Electrical Steel/Germany | A428843 | 12/3/2014 | Flat | Carbon/Alloy |
| Germany | Small Diameter Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe/Germany | A428820 | 8/3/1995 | Pipe and Tube | Carbon/Alloy |
| India | Certain Cold-Rolled Steel Flat Products/India | A533865 | 9/20/2016 | Flat | Carbon/Alloy |
| India | Certain Cold-Rolled Steel Flat Products/India (CVD) | C533866 | 9/20/2016 | Flat | Carbon/Alloy |
| India | Corrosion-Resistant Steel Products/India | A533863 | 7/25/2016 | Flat | Carbon/Alloy |
| India | Corrosion-Resistant Steel Products/India (CVD) | C533864 | 7/25/2016 | Flat | Carbon/Alloy |
| India | Cut-to-Length Carbon-Quality Steel Plate/India | A533817 | 2/10/2000 | Flat | Carbon/Alloy |
| India | Cut-to-Length Carbon-Quality Steel Plate/India (CVD) | C533818 | 2/10/2000 | Flat | Carbon/Alloy |
| India | Hot-Rolled Carbon Steel Flat Products/India | A533820 | 12/3/2001 | Flat | Carbon/Alloy |
| India | Hot-Rolled Carbon Steel Flat Products/India (CVD) | C533821 | 12/3/2001 | Flat | Carbon/Alloy |
| India | Oil Country Tubular Goods/India | A533857 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| India | Oil Country Tubular Goods/India (CVD) | C533858 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| India | Stainless Steel Bar/India | A533810 | 2/21/1995 | Long | Stainless |
| India | Stainless Steel Wire Rod/India | A533808 | 12/1/1993 | Long | Stainless |
| India | Welded Carbon Steel Pipe & Tube/India | A533502 | 5/12/1986 | Pipe and Tube | Carbon/Alloy |
| India | Welded Stainless Pressure Pipe/India | A533867 | 11/17/2016 | Pipe and Tube | Stainless |
| India | Welded Stainless Pressure Pipe/India (CVD) | C533868 | 11/17/2016 | Pipe and Tube | Stainless |
| Indonesia | Carbon & Alloy Steel Wire Rod/Indonesia | A560815 | 10/29/2002 | Long | Carbon/Alloy |
| Indonesia | Cut-to-Length Carbon-Quality Steel Plate/Indonesia | A560805 | 2/10/2000 | Flat | Carbon/Alloy |
| Indonesia | Cut-to-Length Carbon-Quality Steel Plate/Indonesia (CVD) | C560806 | 2/10/2000 | Flat | Carbon/Alloy |
| Indonesia | Hot-Rolled Carbon Steel Flat Products/Indonesia | A560812 | 12/3/2001 | Flat | Carbon/Alloy |
| Indonesia | Hot-Rolled Carbon Steel Flat Products/Indonesia (CVD) | C560813 | 12/3/2001 | Flat | Carbon/Alloy |
| Indonesia | Steel Concrete Reinforcing Bars/Indonesia | A560811 | 9/7/2001 | Long | Carbon/Alloy |
| Italy | Certain Carbon & Alloy Steel Cut-to-Length Plate/Italy | A475834 | 5/25/2017 | Flat | Carbon/Alloy |

**Steel Antidumping and Countervailing Duty Orders in Effect as of January 11, 2018**

| Country | Product/Country | CaseNo | Order Date | Steel Product Category | Grade |
|---|---|---|---|---|---|
| Italy | Corrosion-Resistant Steel Products/Italy | A475832 | 7/25/2016 | Flat | Carbon/Alloy |
| Italy | Corrosion-Resistant Steel Products/Italy (CVD) | C475833 | 7/25/2016 | Flat | Carbon/Alloy |
| Japan | Carbon & Alloy Seamless Standard, Line & Pressure Pipe (Over 4.5 Inches)/Japan | A588850 | 6/26/2000 | Pipe and Tube | Carbon/Alloy |
| Japan | Carbon & Alloy Seamless Standard, Line & Pressure Pipe (Under 4.5 Inches)/Japan | A588851 | 6/26/2000 | Pipe and Tube | Carbon/Alloy |
| Japan | Certain Carbon & Alloy Steel Cut-to-Length Plate/Japan | A588875 | 5/25/2017 | Flat | Carbon/Alloy |
| Japan | Certain Cold-Rolled Steel Flat Products/Japan | A588873 | 7/14/2016 | Flat | Carbon/Alloy |
| Japan | Certain Hot-Rolled Steel Flat Products/Japan | A588874 | 10/3/2016 | Flat | Carbon/Alloy |
| Japan | Clad Steel Plate/Japan | A588838 | 7/2/1996 | Flat | Carbon/Alloy |
| Japan | Diffusion-Annealed, Nickel-Plated, Flat-Rolled Steel Products/Japan | A588869 | 5/29/2014 | Flat | Carbon/Alloy |
| Japan | Non-Oriented Electrical Steel/Japan | A588872 | 12/3/2014 | Flat | Carbon/Alloy |
| Japan | Stainless Steel Bar/Japan | A588833 | 2/21/1995 | Long | Stainless |
| Japan | Stainless Steel Sheet & Strip In Coils/Japan | A588845 | 7/27/1999 | Flat | Stainless |
| Japan | Stainless Steel Wire Rod/Japan | A588843 | 9/15/1998 | Long | Stainless |
| Japan | Steel Concrete Reinforcing Bar/Japan | A588876 | 7/14/2017 | Long | Carbon/Alloy |
| Japan | Tin Mill Products/Japan | A588854 | 8/28/2000 | Flat | Carbon/Alloy |
| Japan | Welded Large Diameter Line Pipe/Japan | A588857 | 12/6/2001 | Pipe and Tube | Carbon/Alloy |
| Latvia | Steel Concrete Reinforcing Bars/Latvia | A449804 | 9/7/2001 | Long | Carbon/Alloy |
| Malaysia | Welded Stainless Pressure Pipe/Malaysia | A557815 | 7/21/2014 | Pipe and Tube | Stainless |
| Mexico | Carbon & Alloy Steel Wire Rod/Mexico | A201830 | 10/29/2002 | Long | Carbon/Alloy |
| Mexico | Circular Welded Non-Alloy Steel Pipe/Mexico | A201805 | 11/2/1992 | Pipe and Tube | Carbon/Alloy |
| Mexico | Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes/Mexico | A201847 | 9/13/2016 | Pipe and Tube | Carbon/Alloy |
| Mexico | Light-Walled Rectangular Pipe & Tube/Mexico | A201836 | 8/5/2008 | Pipe and Tube | Carbon/Alloy |
| Mexico | Prestressed Concrete Steel Rail Tie Wire/Mexico | A201843 | 6/24/2014 | Long | Carbon/Alloy |
| Mexico | Steel Concrete Reinforcing Bars/Mexico | A201844 | 11/6/2014 | Long | Carbon/Alloy |
| Moldova | Carbon & Alloy Steel Wire Rod/Moldova | A841805 | 10/29/2002 | Long | Carbon/Alloy |
| Moldova | Steel Concrete Reinforcing Bars/Moldova | A841804 | 9/7/2001 | Long | Carbon/Alloy |
| Netherlands | Certain Hot-Rolled Steel Flat Products/Netherlands | A421813 | 10/3/2016 | Flat | Carbon/Alloy |
| Oman | Circular Welded Carbon-Quality Steel Pipe/Oman | A523812 | 12/19/2016 | Pipe and Tube | Carbon/Alloy |
| Pakistan | Circular Welded Carbon-Quality Steel Pipe/Pakistan | A535903 | 12/19/2016 | Pipe and Tube | Carbon/Alloy |
| Poland | Steel Concrete Reinforcing Bars/Poland | A455803 | 9/7/2001 | Long | Carbon/Alloy |
| Romania | Carbon & Alloy Seamless Standard, Line & Pressure Pipe (Under 4.5 Inches)/Romania | A485805 | 8/10/2000 | Pipe and Tube | Carbon/Alloy |
| Russia | Hot-Rolled Flat-Rolled Carbon-Quality Steel Products/Russia | A821809 | 12/24/2014 | Flat | Carbon/Alloy |
| South Africa | Certain Carbon and Alloy Steel Cut-to-Length Plate/S Africa | A791822 | 2/1/2017 | Flat | Carbon/Alloy |
| South Africa | Stainless Steel Plate In Coils/S Africa | A791805 | 5/21/1999 | Flat | Stainless |
| South Africa | Stainless Steel Plate in Coils/S Africa (CVD) | C791806 | 5/11/1999 | Flat | Stainless |
| South Korea | Certain Carbon & Alloy Steel Cut-to-Length Plate/Korea | A580887 | 5/25/2017 | Flat | Carbon/Alloy |
| South Korea | Certain Carbon & Alloy Steel Cut-to-Length Plate/Korea (CVD) | C580888 | 5/25/2017 | Flat | Carbon/Alloy |
| South Korea | Certain Cold-Rolled Steel Flat Products/Korea | A580881 | 9/20/2016 | Flat | Carbon/Alloy |
| South Korea | Certain Cold-Rolled Steel Flat Products/Korea (CVD) | C580882 | 9/20/2016 | Flat | Carbon/Alloy |
| South Korea | Certain Hot-Rolled Steel Flat Products/Korea | A580883 | 10/3/2016 | Flat | Carbon/Alloy |
| South Korea | Certain Hot-Rolled Steel Flat Products/Korea (CVD) | C580884 | 10/3/2016 | Flat | Carbon/Alloy |
| South Korea | Circular Welded Non-Alloy Steel Pipe/S Korea | A580809 | 11/2/1992 | Pipe and Tube | Carbon/Alloy |
| South Korea | Corrosion-Resistant Steel Products/Korea | A580878 | 7/25/2016 | Flat | Carbon/Alloy |
| South Korea | Corrosion-Resistant Steel Products/Korea (CVD) | C580879 | 7/25/2016 | Flat | Carbon/Alloy |
| South Korea | Cut-to-Length Carbon-Quality Steel Plate/S Korea | A580836 | 2/10/2000 | Flat | Carbon/Alloy |
| South Korea | Cut-to-Length Carbon-Quality Steel Plate/S Korea (CVD) | C580837 | 2/10/2000 | Flat | Carbon/Alloy |
| South Korea | Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes/Korea | A580880 | 9/13/2016 | Pipe and Tube | Carbon/Alloy |
| South Korea | Light-Walled Rectangular Pipe & Tube/S Korea | A580859 | 8/5/2008 | Pipe and Tube | Carbon/Alloy |
| South Korea | Non-Oriented Electrical Steel/S Korea | A580872 | 12/3/2014 | Flat | Carbon/Alloy |
| South Korea | Oil Country Tubular Goods/S Korea | A580870 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| South Korea | Stainless Steel Sheet & Strip In Coils/S Korea | A580834 | 7/27/1999 | Flat | Stainless |
| South Korea | Stainless Steel Sheet & Strip In Coils/S Korea (CVD) | C580835 | 8/6/1999 | Flat | Stainless |
| South Korea | Stainless Steel Wire Rod/S Korea | A580829 | 9/15/1998 | Long | Stainless |
| South Korea | Welded Astm A-312 Stainless Steel Pipe/S Korea | A580810 | 12/30/1992 | Pipe and Tube | Stainless |
| South Korea | Welded Line Pipe/S Korea | A580876 | 12/1/2015 | Pipe and Tube | Carbon/Alloy |
| Spain | Stainless Steel Bar/Spain | A469805 | 3/2/1995 | Long | Stainless |
| Sweden | Non-Oriented Electrical Steel/Sweden | A401809 | 12/3/2014 | Flat | Carbon/Alloy |
| Taiwan | Certain Carbon & Alloy Steel Cut-to-Length Plate/Taiwan | A583858 | 5/25/2017 | Flat | Carbon/Alloy |
| Taiwan | Circular Welded Carbon Steel Pipes & Tubes/Taiwan | A583008 | 5/7/1984 | Pipe and Tube | Carbon/Alloy |
| Taiwan | Circular Welded Non-Alloy Steel Pipe/Taiwan | A583814 | 11/2/1992 | Pipe and Tube | Carbon/Alloy |
| Taiwan | Corrosion-Resistant Steel Products/Taiwan | A583856 | 7/25/2016 | Flat | Carbon/Alloy |
| Taiwan | Hot-Rolled Carbon Steel Flat Products/Taiwan | A583835 | 11/29/2001 | Flat | Carbon/Alloy |
| Taiwan | Light-Walled Rectangular Welded Carbon Steel Pipe & Tube/Taiwan | A583803 | 3/27/1989 | Pipe and Tube | Carbon/Alloy |
| Taiwan | Non-Oriented Electrical Steel/Taiwan | A583851 | 12/3/2014 | Flat | Carbon/Alloy |
| Taiwan | Non-Oriented Electrical Steel/Taiwan (CVD) | C583852 | 12/3/2014 | Flat | Carbon/Alloy |
| Taiwan | Stainless Steel Plate In Coils/Taiwan | A583830 | 5/21/1999 | Flat | Stainless |
| Taiwan | Stainless Steel Sheet & Strip In Coils/Taiwan | A583831 | 7/27/1999 | Flat | Stainless |
| Taiwan | Stainless Steel Wire Rod/Taiwan | A583828 | 9/15/1998 | Long | Stainless |

Appendix K - Page 3

Case 1:20-cv-03898-CRK    Document 81-2    Filed 11/03/21    Page 564 of 2032
PUBLIC VERSION
Barcode:3814772-145 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

**Steel Antidumping and Countervailing Duty Orders in Effect as of January 11, 2018**

| Country | Product/Country | CaseNo | Order Date | Steel Product Category | Grade |
|---|---|---|---|---|---|
| Taiwan | Steel Conrete Reinforcing Bar/Taiwan | A583859 | 10/2/2017 | Long | Carbon/Alloy |
| Taiwan | Welded Astm A-312 Stainless Steel Pipe/Taiwan | A583815 | 12/30/1992 | Pipe and Tube | Stainless |
| Thailand | Hot-Rolled Carbon Steel Flat Products/Thailand | A549817 | 11/29/2001 | Flat | Carbon/Alloy |
| Thailand | Hot-Rolled Carbon Steel Flat Products/Thailand (CVD) | C549818 | 12/3/2001 | Flat | Carbon/Alloy |
| Thailand | Welded Carbon Steel Pipe & Tube/Thailand | A549502 | 3/11/1986 | Pipe and Tube | Carbon/Alloy |
| Thailand | Welded Stainless Pressure Pipe/Thailand | A549830 | 7/21/2014 | Pipe and Tube | Stainless |
| Trinidad & Tobago | Carbon & Alloy Steel Wire Rod/Trinidad & Tobago | A274804 | 10/29/2002 | Long | Carbon/Alloy |
| Turkey | Certain Carbon and Alloy Steel Cut-to-Length Plate/Turkey | A489828 | 2/1/2017 | Flat | Carbon/Alloy |
| Turkey | Certain Hot-Rolled Steel Flat Products/Turkey | A489826 | 10/3/2016 | Flat | Carbon/Alloy |
| Turkey | Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes/Turkey | A489824 | 9/13/2016 | Pipe and Tube | Carbon/Alloy |
| Turkey | Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes/Turkey (CVD) | C489825 | 9/13/2016 | Pipe and Tube | Carbon/Alloy |
| Turkey | Light-Walled Rectangular Pipe & Tube/Turkey | A489815 | 5/30/2008 | Pipe and Tube | Carbon/Alloy |
| Turkey | Oil Country Tubular Goods/Turkey | A489816 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| Turkey | Oil Country Tubular Goods/Turkey (CVD) | C489817 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| Turkey | Steel Concrete Reinforcing Bar/Turkey | A489829 | 7/14/2017 | Long | Carbon/Alloy |
| Turkey | Steel Concrete Reinforcing Bar/Turkey (CVD) | C489819 | 11/6/2014 | Long | Carbon/Alloy |
| Turkey | Steel Concrete Reinforcing Bar/Turkey (CVD) | C489830 | 7/14/2017 | Long | Carbon/Alloy |
| Turkey | Welded Carbon Steel Pipe & Tube/Turkey | A489501 | 5/15/1986 | Pipe and Tube | Carbon/Alloy |
| Turkey | Welded Carbon Steel Pipe & Tube/Turkey (CVD) | C489502 | 3/7/1986 | Pipe and Tube | Carbon/Alloy |
| Turkey | Welded Line Pipe/Turkey | A489822 | 12/1/2015 | Pipe and Tube | Carbon/Alloy |
| Turkey | Welded Line Pipe/Turkey (CVD) | C489823 | 12/1/2015 | Pipe and Tube | Carbon/Alloy |
| Ukraine | Hot-Rolled Carbon Steel Flat Products/Ukraine | A823811 | 11/29/2001 | Flat | Carbon/Alloy |
| Ukraine | Steel Concrete Reinforcing Bars/Ukraine | A823809 | 9/7/2001 | Long | Carbon/Alloy |
| United Arab Emirates | Circular Welded Carbon-Quality Steel Pipe/United Arab Emirates | A520807 | 12/19/2016 | Pipe and Tube | Carbon/Alloy |
| United Kingdom | Certain Cold-Rolled Steel Flat Products/United Kingdom | A412824 | 9/20/2016 | Flat | Carbon/Alloy |
| United Kingdom | Certain Hot-Rolled Steel Flat Products/United Kingdom | A412825 | 10/3/2016 | Flat | Carbon/Alloy |
| Vietnam | Oil Country Tubular Goods/Vietnam | A552817 | 9/10/2014 | Pipe and Tube | Carbon/Alloy |
| Vietnam | Welded Stainless Pressure Pipe/Vietnam | A552816 | 7/21/2014 | Pipe and Tube | Stainless |

**As of January 11, 2018, there are 164 AD/CVD orders in place on steel, with 28 against China.**

Barcode:3814772-145 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

## Ongoing Steel Investigations

| Country | Product/Country |
|---|---|
| Belarus | Carbon and Alloy Steel Wire Rod/Belarus |
| Italy | Carbon and Alloy Steel Wire Rod/Italy |
| Italy | Carbon and Alloy Steel Wire Rod/Italy (CVD) |
| South Korea | Carbon and Alloy Steel Wire Rod/South Korea |
| Russia | Carbon and Alloy Steel Wire Rod/Russia |
| South Africa | Carbon and Alloy Steel Wire Rod/South Africa |
| Spain | Carbon and Alloy Steel Wire Rod/Spain |
| Turkey | Carbon and Alloy Steel Wire Rod/Turkey |
| Turkey | Carbon and Alloy Steel Wire Rod/Turkey (CVD) |
| Ukraine | Carbon and Alloy Steel Wire Rod/Ukraine |
| United Arab Emirates | Carbon and Alloy Steel Wire Rod/UAE |
| United Kingdom | Carbon and Alloy Steel Wire Rod/United Kingdom |
| China | Cold-Drawn Mechanical Tubing/PRC |
| China | Cold-Drawn Mechanical Tubing/PRC (CVD) |
| Germany | Cold-Drawn Mechanical Tubing/Germany |
| India | Cold-Drawn Mechanical Tubing/India |
| India | Cold-Drawn Mechanical Tubing/India (CVD) |
| Italy | Cold-Drawn Mechanical Tubing/Italy |
| South Korea | Cold-Drawn Mechanical Tubing/South Korea |
| Switzerland | Cold-Drawn Mechanical Tubing/Switzerland |

As of January 11, 2018, there are 20 ongoing AD/CVD investigations on steel products.

## Global Excess Capacity in Steel Production

The excess capacity situation for steel is a global problem, and steel-producing nations have committed, in principle, to work together on possible solutions. In December 2016, G20 economies and interested Organization for Economic Cooperation and Development (OECD) members formally launched the Global Forum on Steel Excess Capacity (Global Forum), a multilateral effort mandated by G20 Leaders during the September 2016 Hangzhou Summit to enhance communication and cooperation and to take effective steps to address the global excess capacity challenge so as to enhance market function and encourage adjustment. The Global Forum brings together more than 30 economies representing more than 93 percent of the world's steel production.

Consistent with the G20 Leaders' mandate for increased information sharing, one of the first tasks of the Global Forum was to develop a mechanism to exchange data on crude steel capacity, as well as subsidies and other government supports that contribute to steel excess capacity. All 33 members of the Global Forum participated to some degree in the information-sharing exercise, but much work remains, including with respect to the completeness, review and analysis of information provided.

The Hangzhou mandate was highlighted at the G20 Hamburg Summit in July 2017 where Leaders called on members to rapidly develop concrete policy solutions that reduce excess steel capacity and to produce a substantive report with such solutions by November 2017.

In response to both the Hangzhou and Hamburg mandates, the Global Forum developed a set of six principles to serve as the basis for policy action by members which include, among other measures, enhancing market function by refraining from market-distorting subsidies and government support measures, fostering a level playing field in the steel industry and ensuring market-based outcomes, as well as encouraging adjustment. With these principles as guidance, the Global Forum outlined a series of recommendations for concrete policy solutions to reduce excess capacity and enhance market function in the steel sector. These voluntary policy recommendations are contained in the report concluded at a November 30, 2017

Ministerial meeting of the Global Forum and are intended to enhance market function and encourage adjustment and include the removal of market-distorting subsidies and other types of support by governments and government-related entities, whether or not such measures are prohibited by WTO rules.

While the report provides helpful policy prescriptions, it does not highlight the lack of true market reforms in the steel sector[1]. China points to its targets to reduce 100 – 150 MMT of crude steelmaking capacity from 2016 to 2020, and that since 2016, it has reduced over 100 MMT of crude steel capacity, with 65 MMT reduced in 2016 alone and more expected in 2017. The setting of capacity reduction targets is not a long-term response to the crisis. Meaningful progress can only be achieved by removing subsidies and other forms of government support so that markets can function properly. In addition, state-owned enterprises and private steelmakers should be treated equally.

The Office of the U.S. Trade Representative Statement on Report of Global Forum on Steel Excess Capacity highlighted concerns about the report. It stated, "The Report issued today contains many helpful policy prescriptions, but it fails to highlight the recurring failure of some countries to implement true market-based reforms in the steel sector. In addition, the Report does not contain complete information regarding market-distorting measures in certain economies and does not set forth a clear pathway for filling such data gaps. The Report erroneously suggests that simply setting capacity reduction targets has been an effective response to the crisis, when in fact meaningful progress can only be achieved by removing subsidies and other forms of state support and letting markets do their work."[2]

Next steps for the Global Forum include additional information and data exchange, as well as three meetings in 2018, with Argentina (the next G20 President)

---

[1] Global Forum on Steel Excess Capacity (GFSEC) report to leaders is available at: http://www.bmwi.de/Redaktion/EN/Downloads/global-forum-on-steel-excess-capacity-report.pdf?__blob=publicationFile

[2] The Office of the U.S. Trade Representative. (2017). USTR Statement on Report of Global Forum on Steel Excess Capacity [Press release]. Retrieved from https://ustr.gov/about-us/policy-offices/press-office/press-releases/2017/november/ustr-statement-report-global-forum

as Chair, to further discuss, review and assess this information. To be successful, this exercise will need to contain complete information regarding market-distorting measures from all economies and a clear path forward for implementation of true market-based reforms.

China in particular has long recognized it has a growing overcapacity problem and has announced many policy initiatives and bilateral commitments to reduce its steel capacity. The massive growth in China's steel production capacity illustrates the lack of implementation of such policies. For example, as early as 2003, the Chinese State Council issued a Circular aimed at stopping blind investment in steel and other industries in an effort to address surplus capacity.[3] Six years and several policies later, China's steel capacity had increased from 2003 levels of an estimated 278 million metric tons (mmt) to over 488 mmt. By 2009, China's steel capacity had reached an estimated 717 mmt when China's State Council Notice on Suppressing Capacity sought to reduce the growth of China's raw steel output.[4]

By 2011, China's steel capacity had reached estimates exceeding 863 mmt. Then again, in 2013, China's capacity increased to an estimated 1.106 billion metric tons (bmt), which was the same year that China released the State Council Notice to Resolve Serious Overcapacity.[5] In 2016, China's steel capacity increased again to estimates of more than 1.159 bmt when China introduced another measure: its 2016 State Council Opinion on Resolving Excess Capacity. In sum, China's steel production capacity has grown from 278 mmt in 2003 to 1.12 bmt in 2016, more than 300 percent (*see* Figure L1).

China's bilateral commitments regarding excess capacity have likewise been disappointing. For example, in the 2014 U.S. – China Strategic and Economic Dialogue, China committed to establish mechanisms that strictly prevent the

---

[3] Circular of the General Office of the State Council on Transmitting and Issuing Several Opinions of the National Development and Reform Commission and Other Authorities on Curbing Irrational Investment in Steel, Electrolytic Aluminum and Cement Industries (Guo Ban Fa [2003] No.103).

[4] Guo Fa [2009] No. 38

[5] Guo Fa [2013] No. 41.

expansion of crude steelmaking capacity and that are designed to achieve major progress in addressing excess steel production over the next five years. However, three years into that timeframe, China's steel capacity increased from estimates of over 1.140 bmt to over 1.159 bmt. China exports 107 mmt into other markets creating global overcapacity that results in other countries making concessionary exports, including to the United States.



**Figure L1. Timeline: Major Chinese Government Policy Statements about Steel Expansion Concerns vs. Actual Growth in Steel Capacity**

Source: U.S. Department of Commerce, Enforcement and Compliance, using OECD steel capacity figures and estimates

Excess steelmaking in China is a dire concern globally. Until recently, China's steel production grew at double-digit rates. China produced 808 mmt of steel in 2016 (up 1.2 percent from its production of 799 mmt in 2015). China's share of world production, at 50 percent, is larger than the combined production of the United States, the European Union (EU), Russia, and Japan, which historically were the largest producers of steel. Additionally, China's exports of steel reached a record peak in 2015, at 110 million metric tons, before declining slightly (-3.1 percent to 106 mmt) in 2016. China's 2015 exports represented an increase of 20 percent over

2014 and were 35 percent more than the total annual production of the United States in 2015 (78.9 mmt).

The financial situation of Chinese steel producers exacerbates the substantial overcapacity caused by Chinese government investment. Half of China's steel producers reported losses totaling 64 billion yuan (approximately $9 billion) in 2014 with steel prices falling by 32 percent in 2015.[6]  The Chinese steel industry received most of the stimulus funding and did well until about 2012.[7]  "Growth in steel demand across China has been slowing since 2011, leading to pledges by officials to cut capacity....Officials said that efforts last year to cut capacity had exceeded targets set for the year.  But the research by Custeel suggest that many of the cuts were to plants that had already been idle.  As a result, only 23 million metric tons of capacity was actually closed, the report said."[8]

One large Chinese steel group has signed a debt-to-equity swap agreement with China's state-owned Industrial and Commercial Bank of China that covers 10 billion yuan ($1.45 billion) in total.[9]  Since China's policymakers re-launched the debt-for-equity scheme at the end of last year for its struggling firms, the country's banks have pledged to sign deals with state-owned enterprises to ease their burden.

As Chinese exports flood the global market, the global steel industry has become increasingly concerned about the resulting market distortions. As China exports its excess capacity into other markets, it creates global overcapacity that results in other countries making concessionary exports to the United States and other countries. Over the past few years, the United States has experienced the largest impact of the glut of excess capacity, including loss in domestic market share,

---

[6] "China's Economic Slowdown: China's Steel Sector Hit by Losses," Christian Shepherd and Tom Mitchell, The Financial Times, February 1, 2016, https://www.ft.com/content/338b4394-c8aa-11e5-be0b-b7ece4e953a0

[7] Ruohong, Fan.  "Slower Economy a Crucible for Nation's Steel Industry."  CAIXIN. N.p., 15 Feb. 2016.  Web.

[8] Greenpeace Links Beijing's Air Pollution Surge to Steel Factories - The New York Times; https://www.nytimes.com/2017/02/16/world/asia/beijing-air-pollution-china-steel-production.html?smprod=nytcore-iphone&smid=nytcore-iphone-share&_r=0

[9] Reuters, "China's Angang Group in debt-to-equity swap with Industrial Bank -Xinhua," April 2017, http://mobile.reuters.com/article/idUSL3N1HD26Y

lower capacity utilization, closures, and lay-offs, which numbered more than 14,100 employees in the United States between 2015 and 2016. There is also excess capacity elsewhere in Asia and in Europe, but China alone added roughly three-quarters of the global increase in capacity from 2000-2015.

Based on publicly available information about steel capacity additions collected by the OECD, Asia has seen a 5.3 percent increase in capacity since 2014. Commonwealth of Independent States (CIS) has seen a 2.8 percent increase, Latin America increased 6.8 percent, Africa increased 5.9 percent, and the Middle East has seen a 31.4 percent increase in capacity since 2014. There has been some general analysis done showing that the EU, CIS, and Asia exporting regions have among the highest levels of total excess steelmaking capacity. The definition used to measure excess capacity in this case was the difference between capacity and demand for each region.[10]

Determining the precise level of capacity in each country is difficult for a number of reasons, including industry concerns about proprietary data. One of the objectives of the Global Forum is to capture capacity levels by both plant and country to provide a basis for understanding the magnitude of this global problem. Publicly-available sources identify new capacity developments globally, with Asia leading the way by three or more orders of magnitude (*see* Figure L2).[11]

---

[10] OECD, "Capacity Developments in the World Steel Sector," 2016, http://www.oecd.org/sti/ind/Capacity-Developments-Steel-Industry.pdf

[11] http://www.oecd.org/industry/ind/82nd_OECD_Steel_Committee_Hokuto_Otsuka_Capacity.pdf p. 4



China's exports alone exceed U.S. steel production, and China's excess capacity is several times larger than the U.S. market. In China, the increase in steel capacity is occurring simultaneously with a major build up in military spending. China's steel exports have often been found to be unfairly traded, and the U.S. industry has obtained relief for many unfairly traded products via antidumping and countervailing duty investigations against China and other countries.[12]

The partial success of trade cases is demonstrated by the fact that China's ranking in every product category of U.S. imports has declined from 2006 to 2016 but has been replaced by other sources. This means that China has had to ship more to markets other than the United States, thereby depressing them. However, antidumping and countervailing duty orders alone cannot address the broader structural economic harm caused by global excess capacity, which is a major cause of relentless import pressure.

---

[12]  U.S. companies have 164 outstanding antidumping and countervailing duty orders on imported steel, 28 of which are against China. Chinese and other producers and exporters often find ways to evade the duties by transshipping through other countries and other techniques.

The largest share of China's steel exports are sent to its neighbors in Asia. Roughly 40 percent of those 2016 steel exports went to South Korea, Vietnam, Philippines, India, and Thailand. An unknown portion of these are further processed in those countries and eventually shipped to the United States. The peak year for Chinese steel exports to the United States was in 2006 when over 10 percent were exported to the United States. In 2015, China ranked 7th (after Canada, Brazil, Korea, Turkey, Mexico, and Japan) as a source of U.S. steel imports. In 2016, China slipped to 9th place behind Russia and Germany as a source of U.S. steel imports.

While a small percentage of Chinese steel exports were shipped to the United States, Chinese steel exports to other countries, such as Vietnam and Thailand, expanded rapidly. At the same time that exports from those countries, and to a lesser extent Malaysia and Indonesia, to the United States significantly increased.

In 2006, China exported over 50 million metric tons of steel globally. The United States received more than five million metric tons of steel from China in 2006, or 10 percent of China's global steel exports. In 2016, China exported over 106 million metric tons of steel globally. China sent 835,637 metric tons of steel to the United States in 2016, or 0.8 percent of China's global steel exports. This amounted to an 84 percent decline in U.S. imports from China from 2006 to 2016 (*see* Figures L3 and L4).

In 2006, China exported more than three million metric tons of steel to Vietnam, or 6.5 percent of China's global steel exports. In 2016, China exported more than 11 million metric tons of steel to Vietnam, or 10.9 percent of China's global steel imports. This amounted to a 250 percent increase in China's exports to Vietnam from 2006 to 2016.

In 2006, China exported more than two million metric tons of steel to Thailand, or 4.5 percent of China's global steel exports.  In 2016, China exported over six million metric tons of steel to Thailand, or 5.8 percent of China's global steel exports.  This amounted to a 171 percent increase in China's exports Thailand from 2006 to 2016.



**Source: IHS Global Trade Atlas**



**Source: IHS Global Trade Atlas**

# EXHIBIT 90

Barcode:381472-145 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

# The current capacity shake-up in steel and how the industry is adapting

**Metals and Mining Practice** January 2018



**Authored by:**
Avetik Chalabyan
Lapo Mori
Steven Vercammen

Barcode:3814772-145 A-580-880 REV - Admin Review 9/1/17 - 8/31/18    PUBLIC VERSION

# The current capacity shake-up in steel and how the industry is adapting

The early years of the new millennium were a profitable period for steelmakers, largely driven by the surging Chinese economy. Now, with China's growth slowing, a new reality has set in. Starting in 2014, growth in steel demand began to stall. The global industry, which had dramatically expanded production to meet perceived demand from Asia – at an average rate of 4.9 percent a year between 2004 and 2013 – now faces the typical post-boom challenge of excess supply. While the steel industry had reached its demand peak in 2013, capacity continued to expand all the way up to 2016 due to inertia of capital investment, adding another 60 million metric tons of worldwide capacity against a backdrop of falling demand. As a result, by the beginning of 2016, the industry had fallen into a severe crisis with too many plants producing too much steel relative to dwindling demand, and industry profits plunging to zero or into negative territory for the majority of players.

While the industry situation has improved quite markedly since then, surplus steel capacity is likely to remain a long-term problem. Despite this year's rebound in steel production, much of the demand growth is rather virtual, due to the impact of China shutting down its illegal induction furnace (IF) capacity and replacing it with production from legal plants. Globally, excess steelmaking capacity reached about 375 million metric tons per annum (MTPA) in 2015-16 (in addition to more than 100 million tons of illegal IF capacity in China). The excess is now projected to drop to around 300 MTPA towards the end of the decade (Exhibit 1), with total production capacity stabilizing at 2.2 billion metric tons by 2020. As a result, average plant utilization is expected to improve gradually, yet remain below 76 percent – a significant drop from the high of 83 percent 10 years ago, when the industry was at its peak.

EXHIBIT 1

Overcapacity in the steel industry is likely to continue for the foreseeable future



Global demand/capacity[3]
Million metric tons, crude steel – excluding China IF capacity and production

1 Overcapacity = (crude steel nominal capacity x 90% capacity utilization) – crude steel production
2 Based on nominal capacity
3 McKinsey capacity estimates (not OECD estimates)

SOURCE: McKinsey analysis

This overcapacity is especially pronounced in China, Europe, the Middle East, and North Africa. As the imbalances have resulted in poor industry economics, producers have felt compelled to turn increasingly to exports. The rise in exports has, in turn, been driving a new wave of trade disputes and protectionist measures. Since 2011, OECD statistics show

that anti-dumping and countervailing duty cases, many of them involving China, have been up five-fold for complainant economies and three-fold for defendants.

With demand expected to recover slowly – at just 0.8 percent per year on average from 2016 to 2025, the industry faces a volatile decade (Exhibit 2). The slowdown in China caught most industry players by surprise. Consolidation efforts in some parts of the world have been largely offset by continuing expansion elsewhere and, in some countries, state intervention has prevented closure of inefficient plants, distorting market dynamics. The result is a global industry that remains fragmented and ripe for further restructuring. So, how are steelmakers adjusting? What differences exist across markets? What moves could help the industry shape up or position an individual steel producer for success?

EXHIBIT 2

Global steel demand is expected to grow slowly at ~0.8% p.a., with significant downside risks



Apparent steel use/demand (August 2017)
Million metric tons

1 Japan, South Korea, Taiwan, Australia and New Zealand
2 CIS, Latin America, Sub-Saharan Africa, Other Asia
3 Including Hong Kong

SOURCE: World Steel Association (worldsteel); McKinsey integrated steel demand model

The purpose of this paper is to provide a baseline overview and, in what follows, outline the implications of the overcapacity challenge for the global steel industry. Accordingly, for the main steel-producing regions, we analyze the prevailing market dynamics and assess the drivers, constraints, and conditions for industry consolidation, capacity rationalization, and return to economic profitability.

## THE REGIONAL PICTURE

### China: a rush to refocus and shrink a troubled industry

While the financial crisis and geopolitical tensions in Russia, Brazil, and elsewhere have all contributed somewhat to slowing global demand for steel, it is China that looms as the largest factor in the industry's current overcapacity. The country's industrialization and urbanization have been the main drivers of demand for steel since around 2000. However, China reached its peak for steel demand much faster than most developed countries ever had before, due to the government's focus on rapidly expanding urban and industrial

Barcode:3814772-145 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

infrastructure. Likewise, the dip in the country's development trajectory also arrived much sooner than the historical norm. In 2014, China's demand for finished steel began to decline, dropping more than 8 percent to 676 MTPA by 2015 from the official peak of 738 MTPA. A slight recovery in 2016 has been followed by roughly 3 percent growth this year, but we believe demand will not return to the peak levels seen earlier in this decade. The reason is simple: China's per capita steel consumption is already well above the level in most developed countries, even during their peak years, and China's industrialization and urbanization cannot accelerate forever. With more people now living in cities, and China's economy going through services-led transformation, most likely the opposite will occur.

During the boom, China's own steel industry expanded rapidly. Today, nearly half of the world's 25 largest steelmakers are Chinese-owned. Many Chinese players – the vast majority of which are integrated producers of commodity steel – have been hit hard in recent years by the slowdown in their domestic market and, until last year, they lacked the funds to continue upgrading their facilities. This year, the industry has shown signs of recovery, but in light of continued overcapacity and fragmentation, the future for most producers is expected to remain challenging. In the last quarter of 2015, EBITDA margins of Chinese steelmakers dropped by 14 percentage points on average from an already low 5 percent in early 2015, resulting in a negative cash flow for most of the domestic industry. The moderate rebound in the past 2 years has helped publicly listed Chinese players recover to pre-2015 margin levels. However, with no significant improvement in demand on the horizon, China's overall steel sector remains oversupplied, and its economics will stay mediocre at best.

It has long been the Chinese government's policy to discourage the export of low-value-added steel and, instead, push the industry to focus on higher-grade products and specialty steel. Over the past 2 years, Beijing has been orchestrating the sector's restructuring, with the target of decreasing total capacity to less than 1 billion metric tons by 2020. Reaching that goal will require eliminating more than 100 MTPA of outdated capacity, above and beyond closing the outlawed IF capacity (see below). Growth in production capacity has slowed as a result, with new facilities largely offset by plant closures. While at least ten new plants were commissioned in 2015, there have been no new announcements since January of that year. In addition, in the first half of 2017, the Chinese government is believed to have closed most of the remaining illegal IF plants, which represented roughly 50 to 75 MTPA of "grey" steel production in 2016.

To promote industry consolidation, the government is pushing to close inefficient plants and providing funds for worker reeducation. In December 2015, President Xi Jinping announced, "To actively and steadily promote the survival of the fittest, we will clear the market through mergers and acquisitions, bankruptcy, and liquidation." Moves to eliminate capacity have so far been heavily concentrated in the eastern and coastal areas, especially in Hebei province. China is also keen on cross-regional M&A, as illustrated by the recent merger of Baosteel and Wuhan to form the China Baowu Steel Group. Nevertheless, despite the efforts to crack down on illegal production and shut down obsolete capacity, we expect China will continue to face excess capacity, as decreasing demand will likely keep pace with or exceed the rate of rationalization (Exhibit 3).

EXHIBIT 3

**Overcapacity is likely to dog China's steel industry for years, as the impact of closures will be roughly offset by declining demand**

**China demand/capacity[3]**
Million metric tons, crude steel



1 Overcapacity = (crude steel capacity x 90% capacity utilization) – crude steel apparent demand
2 Crude steel production/nominal capacity
3 Based on domestic finished steel consumption, assuming 95% crude to finished yield

SOURCE: China Iron and Steel Association (CISA); McKinsey BMI China Steel Demand Model Q1 2017

Faced with a tough market at home, China's top steel producers have been looking to exports to bolster sagging sales. Between 2009 and 2014, Chinese steel exports grew by about 90 million metric tons (MMTs). In 2015 and 2016 alone, the country exported a record 107 MMTs – roughly 14 percent of its total production. A significant share of these exports simply served to keep the Chinese plants operating; with improving domestic demand in 2017, however, China's producers have started to scale down their exports.

In an effort to protect their markets against dumping and unfair trade practices, several regions – the US and Europe in particular – have turned to trade measures. At this stage, 33 trade complaints have been filed in the US (up from 18 in September 2016), 14 of which target steel products from China. The trend is even more evident in Europe, with 11 of the 15 trade cases filed (up from 10 in 2016) relating to Chinese steel. Globally, the number of such complaints was around 160 in September 2017, compared to 100 in September 2016. With the increase in trade complaints, Chinese exports dropped by about 30 percent in the first half of 2017, compared with the first half of 2016.

Chinese steel companies, facing poorer growth prospects at home, are looking abroad for more than just export markets. Between 2013 and 2016, the industry cumulatively invested about USD 4 billion to acquire foreign assets. The primary targets have been in ASEAN countries and South Africa, where Chinese companies have pursued joint ventures in integrated steel mills and distribution centers. China's steelmakers are also seeking ways to extend their value chains and market presence in Europe, and trying to acquire technology that can help them shift to products with higher added value.

An important factor complicating the global oversupply issue is the growing availability of Chinese scrap, as steel products in the country reach the end of their life cycles and enter the recycling value chain. By 2020, if China continues to rely on basic oxygen

Barcode:3814772-145 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

furnace (BOF) technology, it may have insufficient electric arc furnace (EAF) capacity to process all the scrap available domestically. In 2017 alone, China has seen a significant jump in surplus scrap following the crackdown and closure of IF capacity. Given that China has been by far the biggest importer of iron ore, its gradual shift to recycling scrap will have significant implications for the global steel raw material market. (For more on this topic, see: "The growing importance of steel scrap in China."[1])

To summarize, we believe that true demand is likely to continue to fall but not in a significant way (by roughly 1 percent, with potential upsides from the Chinese government's refocus on growth), while supply reform and industry consolidation are mostly likely to continue. Hence, the confrontation with overcapacity will remain a dominant theme, with potential for a comeback by "grey" capacity given margin upticks towards 10 percent that have occurred in Europe and the US in recent quarters . Still, China's regulation of its steel industry has intensified, and the industry is now generally much more under central government control than in 2015/2016. By 2025 or even as soon as 2020, we expect the steel industry to return to generating a profit margin similar to that of other industrial sectors in China, i.e., 3 to 5 percent.

### Europe: accelerating consolidation to restructure the industry

The steel industry in Europe is pulling itself together. The drop in global steel prices has forced European players to restructure in order to remain competitive. The drop was partially due to the slump in regional demand from roughly 185 to 155 thousand metric tons per year (minus 17 percent in structural demand) and the surge in cheap imports from China, the Commonwealth of Independent States (CIS), and South Korea. The European industry's overcapacity in crude steel currently stands at 31 MTPA, which is in relative terms comparable with overcapacity in China. Unlike China, however, the European steel sector has already undergone  considerable consolidation, but overall utilization is still not at an economically healthy level. The headline news in June 2017 was the deal ArcelorMittal reached to purchase Ilva and, in September 2017, the joint venture letter of intent signed by Tata Steel Europe and ThyssenKrupp Steel to combine assets within the next year. However, there is still a very long list of roughly 150 small and niche steel players in Europe, with an average production of less than one MTPA, suggesting substantial further potential for consolidation and industry rationalization.

While the downturn resulted in lower utilization, no significant closures took place, The pace of shuttering production has been slow, with only about 7 MTPA taken off-line in the past 3 years. Companies have tried to rationalize upstream capacity by making mainly incremental adjustments. Some plants changed the targeted production, idled single pieces of equipment, etc., but only two relatively large upstream sites were fully taken off-line in the recent years. As a result, the overall utilization stood at a low of 73 percent in 2016. If more consolidation and restructuring efforts take place, along with natural debottlenecking of existing facilities, we anticipate that European crude steel capacity utilization will recover to around 80 percent by 2020 in an optimistic scenario.

---

1 https://www.mckinsey.com/industries/metals-and-mining/our-insights/the-growing-importance-of-steel-scrap-in-china

The profit picture is mixed as well. In 2015, average EBITDA margins for European flat steel producers declined from about an already low 8 percent at the beginning of the year to below 5 percent by year-end, largely due to low prices combined with a surge of imports into the region, putting the industry as a whole into an unsustainable situation. Today, some specialty players are back to better financial health, while most of the larger producers continue to struggle financially [2]. In today's economic environment, most players can hardly finance any innovation capex, or develop their asset base.

The experience of the past years points to the emergence of a two-speed steel industry in Europe, with several reasonably profitable players with operational excellence, innovative product portfolios, and well-utilized production assets that are linked to specific market demand, while other players will continue to suffer until the excess capacity is finally phased out. As commodities will then remain the low-margin end of the market, those European players have to prepare to be a part of an increasingly global market and will need to ponder new sources of competitive advantage.

The region's players have been increasing their global market share recently, and benefiting from the recent growth in demand. For higher-value-added products downstream, rising demand may even create local supply/demand tightness in the coming years. Such tightening is already evident in the coated flat steel market, where capacity utilization in 2017 has already been approaching 90 percent.

### NAFTA: US protectionism rises, while Mexico expands

The dawn of the Trump administration generated considerable optimism in the US steel industry. The new administration's ambitious plans to boost domestic steel demand and production with a focus on infrastructure, combined with increased protectionist action, have raised hopes of a revival in the American steel sector. Whether it can become the regional segment known for long-term competitiveness still remains to be seen. While demand is picking up, the market share of imports is also growing again (expanding from 25 percent to 30 percent in recent months). This increase suggests that US anti-dumping and countervailing duty measures are not as effective as desired, and most US players do not have cost structures that are lean enough to compete on a global scale.

The ongoing renegotiation of the North American Free Trade Agreement (NAFTA) is adding to the uncertain climate. The three NAFTA countries' domestic steel industries have vastly different cost positions, with Mexican steel producers benefiting from low production costs, while US companies face higher processing costs, mainly due to the relatively strong US dollar and relatively old asset base. In fact, over the past 5 years, the US and European steel players have swapped their positions on the cost curve, with Europe now boasting lower operating costs. This is due to higher operational efficiency, as well as a relatively weaker euro, and to the unfavorable exposure of some North American players to higher domestic iron ore prices. Furthermore, North America has seen limited M&A activity over the past 2 years (Canadian producers Essar Algoma and U.S. Steel Canada).

The United States has been taking action to protect its steel industry against what it sees as unfair trade practices from both Asia and Europe. The main efforts involve implementing higher tariffs and initiating investigations of imports under the national security provisions of Section 232

---

2 Based on historic assessment of EBITDA margins for different steel companies

of the Trade Expansion Act. In 2016, the US imposed anti-dumping duties on hot-rolled coil steel, for example, that ranged from 5 to 9 percent for South Korea and up to 184 percent for Russia. The measures led to a sharp 34 percent drop in steel imports in 2015, but import volumes have since recovered. While a better environment since the first quarter of 2016 has helped US companies improve their profitability, most of the integrated steel players still lack the cash for investments needed to remain viable in the longer term.

The outlook for steel demand growth in the US remains uncertain, although a roughly 2 percent annual growth rate could be expected in the next 5 years (from the 2016 low) in the wake of projected US GDP growth of more than 2 percent annually based on increasing consumer confidence and strengthening investment activity. However, this outlook is subject to political uncertainty around tax reform and infrastructure projects as well as oil price dynamics.

Yet even as capacity reduction continues, albeit slowly, in the US and Canada, the Mexican steel industry is expanding, enjoying its status as the region's low-cost producer to boost volumes of specialty products targeted at its NAFTA partners. The combination of these somewhat contradictory national trends within NAFTA leads us to conclude that NAFTA crude steel utilization will recover gradually to about 78 percent by 2020 from the recent low of 69 percent in 2015 (Exhibit 4).

EXHIBIT 4



NAFTA crude steel utilization will gradually recover to 78%, after taking a dip at 69% in 2015



1 Overcapacity = (crude steel capacity x 90% capacity utilization) − crude steel production
2 Crude steel production / nominal capacity

SOURCE: World Steel Association (worldsteel); McKinsey steel capacity database and metallics model

Barcode:3814772-145 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

### India: steady incremental growth, but challenges remain

Through roughly the first decade of the millennium, India saw rapid growth in domestic steel demand. Averaging 8 percent per year, this growth was primarily driven by infrastructure expansion and urbanization. In 2012, however, an economic downturn caused that growth to slow to less than 4 percent per year. An improving economy beginning in 2014 has produced average annual GDP gains of 7.2 percent, but steel demand growth has largely failed to budge. Recent policy measures such as the November 2016 demonetization created further aggravation (all existing 1,000 and 500 rupee bills ceased to be legal tender and were subsequently replaced with new bills, in a somewhat turbulent transition). The implications for steel makers were a liquidity crunch and a contraction in major steel-consuming sectors such as construction. As a result, steel demand grew by only 2.7 percent in 2016 (Exhibit 5).

EXHIBIT 5

**Compared with China, India has a different growth path, as its economy is less centralized, and steel's contribution to the overall economy is different**



1 Fixed asset investment

SOURCE: World Steel Association (worldsteel); IHS Markit Economics and Country Risk; McKinsey analysis

Between 2005 and 2011, Indian steel companies launched major capacity expansions. Installed capacity grew from 75 MTPA in 2010 to 125 MTPA in 2016, a rate of 8.8 percent per year. As demand weakened in recent years, capacity utilization has fallen from the 90 percent peak levels before 2011 to less than 77 percent currently, creating a considerable surplus.

Cheaper imports from China, South Korea, and Japan have also negatively affected Indian producers. In response, the government has been trying to protect the domestic steel industry. In February 2016, for example, it gave the sector some temporary relief by imposing a minimum import price. The government also placed provisional anti-dumping duties on hot-rolled and cold-rolled products in August 2016, on wire rods in November 2016, and on color-coated rods in January 2017. These measures succeeded in pushing imports down by 38 percent last year (April 2016 to March 2017), from a peak of 12 MTPA in 2015.

Despite this relief, recent headwinds have taken a heavy toll on Indian steel players' balance sheets. Credit Suisse reports that the steel sector accounts for 15 percent or around

USD 28 billion of the country's total non-performing assets. Five steel companies account for USD 23 billion of that amount. Some interest has been expressed in consolidation, but without any results to date. Furthermore, the profitability of steel producers is expected to improve in the near term, given a somewhat improved global environment. These improvements have enabled Indian steel producers to increasingly tap overseas markets (from April to August 2017, there has been a 57 percent year-on-year increase in exports). Another reason for healthier profitability is a revival of domestic demand growth (increasing at a rate of 4.4 percent year-on-year  from April to August 2017, up from 2.5 percent in the same period in 2016).

Driven by infrastructure and urbanization, steel demand in India is expected to grow in the near term at 5 percent to 7 percent  a year to 110 to 115 MTPA by 2021. Combined with slower capacity growth than in the past few years, India's domestic industry can expect to see improved capacity utilization, rising from 77 percent in 2016 to 85 percent in 2021.

In sum, we expect India to continue its incremental steel demand growth. Its political and economic situation makes it unlikely that steel will follow a growth path similar to China's boom. As a consequence, we believe that India's role in the global steel markets will be less impactful than China's.

## HOW STEEL PRICES ARE ADJUSTING: VOLATILITY LIKELY TO PERSIST

Steel price volatility is likely to persist over the coming decade. While there are several underlying factors, they should not be allowed to mask the need for further consolidation worldwide: even the periods of high prices will be relatively short and will provide only limited rewards to steelmakers.

Then there is also the question as to whether the price of steel is the right measure to use to monitor the market. Arguably, it is not, or not in isolation. Over time, we have found it useful to measure steelmakers' performance by also tracking the spread over raw materials prices. This spread is explained by two factors. First, there are fluctuations in the cost of raw materials, which steelmakers cannot really influence and in most cases pass through, and, second, the gross margins steel makers can achieve, the gross margin being a combination of a conversion cost and the net margin.

- **Prices of iron ore and coking coal** mostly follow a typical supply/demand cost curve. Depending on the difference between supply and demand, the price ranges at the low end from a cash-cost regime in line with the marginal cost producer to the high end of greenfield incentive pricing (or even price increases) with margins of up to 20 percent, even for marginal cost producers. Since demand is growing very slowly most of the time, price shocks occur mainly as a result of supply fluctuations, such as shortages due to mine flooding in Australia or mandated weekend shutdowns in China, and also reflect seasonal stocking and destocking patterns.

- **Scrap prices,** on the other hand, strongly correlate with iron ore and coking coal prices, since scrap is a substitute for these raw materials. In most markets, this correlation is quite consistent. However, this dynamic may change in the coming years due to the rising supply of scrap from the steel produced to feed the recent economic boom in China. The conversion of older equipment and infrastructure into scrap in China may create a massive surplus of scrap, lowering its price relative to the raw material basket.

We define the difference between the raw material cost and the realized steel price as the margin over raw materials or "spread" for short. The tighter the steel market becomes, the higher this margin rises. The steel cost curve and, more precisely, its steepness play an important role in determining the health and dynamics of the global industry. Since the boom cycle ended in 2008, the cost difference separating the more efficient steel players from the less efficient ones has been shrinking, indicating a flattened cost curve. For most steelmakers today, that flattening cost difference is driven mainly by access to raw materials rather than by transformation cost (i.e., additional cost above raw materials) (Exhibit 6).

EXHIBIT 6

Steel's cost curve has flattened due to global declines in raw material prices and limited technological differentiation, while the advantage for CIS players here is attributable to low-cost captive or stranded raw materials



1 Proxy for majority of global steel demand; cash costs excl. SG&A, assuming 90% capacity utilization and value of captive raw materials at cost
2 Cost differential between 90% and lowest-cost 10%
SOURCE: McKinsey Flat steel cost model 2016_v4.1

On the other side of the equation is the price of steel. Over the past decade, market rebalancing in developed regions – in the wake of the financial crisis and the severe demand slowdown in China -- has lowered steel prices. Production overcapacity and low utilization rates in turn have pushed down prices of raw materials, causing mounting surpluses of both iron ore and coking coal. Consequently, raw material costs for steelmakers have dropped by more than 60 percent in the past 4 years (though those costs are on the rise again).

In addition, low utilization rates have depressed steelmakers' margins over raw materials. They now stand at levels comparable to the pre-boom period, i.e., the 1990s. The industry's overall profitability reflects this trend, with EBITDA margins dropping from more than 18 percent 10 years ago to about 10 to 11 percent in recent years (Exhibit 7) – below levels we believe are necessary to enable continuous re-investment in operations.

Along with these longer-term trends linked to industry fundamentals, the steel sector is experiencing increasing volatility, largely caused by sudden shortfalls of raw materials or steel supply. Severe weather events such as hurricanes, temporary mine closures, geopolitical conflicts, and trade disputes and the resulting protectionist measures have all contributed to these fluctuations.

EXHIBIT 7

**While recovering from historic lows at year-end 2015, prices for iron ore, coking coal, and steel also became much more volatile in the course of 2016 and 2017**

**Iron ore price evolution**
USD/mt, CFR China 62% Fe fines

**Hard coking coal price evolution[1]**
USD/mt, FOB Australia

**HRC price evolution**
USD/mt, Europe Ex-Ruhr



1 Premium low volatile

SOURCE: S&P Global Platts SBB; McKinsey analysis

The 2016 steel price trajectory vividly illustrates this volatile climate and its effect on profitability.

- At the end of 2015 and the beginning of 2016, steel prices were at historically low levels due to major declines in global steel demand and production, and a huge oversupply of iron ore and coking coal. Spot prices for iron ore and coking coal dropped as low as USD 40 per metric ton (IODEX 62 percent CFR China) and USD 80 per metric ton (Premium low volume HC CFR China), respectively.

- In the second quarter of 2016, expectations of higher demand due to restocking and a spring uptick in construction drove global steel production up 10 percent compared with January 2016 (with China producing 15 percent more steel). During this period, prices for both iron ore and coking coal increased by USD 15 per metric ton. As a result, on average, steel prices rose by 35 percent: 10 points due to the higher raw material costs and 25 points from margin improvement.

- In the third quarter of 2016, steel demand suffered from lower summer activity, but prices remained stable.

- Then, in the fourth quarter of 2016 and throughout the first quarter of 2017, supply shortages of coking coal (due to both structural and temporary effects, such Chinese government intervention and bad weather) pushed the spot price above USD 300 per metric ton and, at the same time, the iron ore price rose to USD 70 per metric ton. These increases, together with a pickup in steel demand, pushed steel prices up by 30 percent during the 2016 to 2017 winter season (Exhibit 8).

EXHIBIT 8

### With growing overcapacity, average EBITDA has deteriorated to below the level of long-term sustainability



1 Considering sample of 81 companies

SOURCE: World Steel Association (worldsteel); Corporate Performance Analytics, by McKinsey

The continuing surplus in global capacity makes a significant further rise in steel prices or the margins over raw material unlikely in the near future. Analysts generally forecast a slight decrease in steel prices in the long term, i.e., beyond 2020, but a significant spread around the median suggests that analyst consensus is weak. Most likely, global steel prices will continue to fluctuate around a slowly rising average, reflecting the seasonal pattern in construction and stocking and destocking activities, as well as abrupt supply-side events, such as mine accidents or closures, fluctuations in scrap collection, or geopolitical events affecting the major raw-material producing countries.

### HOW COMPANIES ARE ADAPTING: GROWING FOCUS ON VALUE-ADD AND INNOVATION

Steel players around the world, and especially in Europe, South Korea, and Japan, are adjusting to global overcapacity by pursuing new products and business model extensions that enable them to move up the value chain. Some are venturing into parts manufacturing, while others concentrate on one or two premium end-use sectors, collaborating closely with customers on new steel grades and solutions. Voestalpine, for example, has launched a "selective downstream expansion strategy" into business segments where its materials expertise and deep knowledge of the value chain (in body-in-white auto parts, for example) gives it a competitive edge, while Posco has focused on high-end products for the automotive and shipbuilding industries.

Major disruptive trends in sectors such as automotive and energy are also creating opportunities for steel producers willing and able to invest in innovation. Several leading steel companies – including Posco, ArcelorMittal, Nippon Steel, and Voestalpine – have consistently earmarked 1.0 to 1.5 percent of their revenues for R&D in pursuit of product differentiation that can help them achieve price premiums and market leadership.

- In the **automotive industry,** for example, the shift to electric vehicles and lightweight materials, supported by strict $CO_2$ emission targets, has created demand for high-strength steel substitutes for commodity flat steel grades. To meet this demand, Posco has developed the GIGA steel family, with improved elongation characteristics. ArcelorMittal has developed the S-in-motion line, a set of lightweight steel solutions for trucks and mid-size electric and hybrid vehicles. By 2030, 30 to 40 percent of all cars are projected to be battery electric vehicles, leading to increasing demand for non-grain-oriented electrical steel, for use in electric motors thanks to this product's excellent magnetic properties and lower iron losses at high speeds.

- In the **energy sector,** meanwhile, a key trend driving innovation is renewables' increasing share of the energy mix. Traditionally, aluminum alloys have been the material of choice in photovoltaic (PV) mounting systems because of their light weight and corrosion resistance. Meanwhile, however, steel producers have developed new alternate products, such as lighter structural steel profiles with anti-corrosion Zn-Al-Mg coatings, which are gaining more acceptance also in other segments, especially construction. Another important demand trend has arisen from the increasing complexity of crude oil production, requiring new steel grades able to operate under harsh combinations of high pressure, low temperature, severe corrosion, etc., with leading steel players increasingly offering innovative solutions to keep pace with industry demand.

In addition, innovation in steel also encompasses the core production processes, aiming at solutions to reduce production costs, improve the functionality of products, or reduce the environmental burden. At some point, truly integrated digital solutions will kick in, but, currently Posco's FINEX technology is one of the rare examples of how to combine the push towards a lower cost of hot metal production with a reduced environmental burden of this most polluting stage of the steel value chain.

In coming years, we expect more leading players to experiment with radical innovations in production processes, breaking the long-held belief that steel production technology has matured and thus has limited room for further productivity gains. As we see this trend taking shape in many parts of the world, we are also keen to explore it further, and plan to present more insights in upcoming pieces about the steel industry.

## CONCLUSIONS

As our analysis suggests, the steel industry will be facing **several volatile years.** Although demand for steel is slowly picking up, growth rates will not return to boom-year levels any time soon, let alone on a global scale. In this context, protectionism is likely to persist in some of the large markets, especially against the backdrop of rising geopolitical tensions. A more efficient answer, however, would be for all stakeholders to secure "leveled playing fields" and, in parallel, secure cost competitiveness – and consider ways to close or restructure the weakest sites.

Meanwhile, **consolidation,** especially in Europe and China, should help to advance much-needed capacity rationalization. Provided China's central government succeeds in shutting down the illegal IF capacity as well as the uneconomic and obsolete BF/BOF facilities by 2020, as announced, this reduction will help gradually restore the industry's financial health. As in previous industry shake-ups, there will be winners and losers, with losers quitting the business, by either selling out, or even worse, by phasing out the capacity that they can no longer modernize and keep viable.

Industry leaders will also increasingly move from producing mostly commodity products and competing on operating efficiency, to producing a larger share of **sophisticated products** with advanced features and offering **complex solutions.** However, given that there is not enough space for all of them to take this path, the industry will need to have "benchmark"-efficient players, who make use of technological advances in the basic steel production and processing technology, and who will also need to adopt various Industry 4.0 tools throughout the entire steel value chain.

We expect that this polarization will create **a two-speed steel industry,** with innovation leaders consolidating the productivity gains, and setting the stage for further expansion, while laggards slide further into negative profitability. Thus, while the key to success in the boom years was "to control the main resources for production" and, in the recent down-cycle, "to excel at operating efficiency," the next decade will see the rewards going to those steelmakers who are able **"to adapt the fastest"** – both to innovate the fastest (including through large-scale adoption of new digital opportunities) and to commercialize their innovations the fastest This will open a new era for the industry and bring many interesting value-creation opportunities to its most agile players.

Thus, while the overall industry picture may look somewhat uneven, there are **new opportunities** for those players that have secured a high level of operating efficiency and are now willing to jump on disruptive trends in their end-user industries. The shift from commodity steel to value-added products, and the introduction of new business models will help rejuvenate the industry and, over time, return its leaders to healthy levels of profitability.

Authors



**Avetik Chalabyan**
Senior Partner
Moscow
avetik_chalabyan@mckinsey.com



**Lapo Mori**
Partner
Brussels
lapo_mori@mckinsey.com



**Steven Vercammen**
Knowledge Expert
Brussels
steven_vercammen@mckinsey.com

The authors wish to acknowledge the contributions of Benedikt Zeumer, Nicolò Campagnol, Karel Eloot, Germano Lacombe, Junjie Ma, Sigurd Mareels, Alexey Simushkin, Antonio Sun, Abhinav Tripathi, and David Xu to the development of this article.

PUBLIC VERSION

# EXHIBIT 23

C-580-884
POI: 1/1/2014-12/31/2014
**Public Document**
E&C/V: KM

August 4, 2016

**MEMORANDUM TO**:          Ronald K. Lorentzen
                           Acting Assistant Secretary
                             for Enforcement and Compliance

**FROM**:                  Christian Marsh
                           Deputy Assistant Secretary
                             for Antidumping and Countervailing Duty Operations

**SUBJECT:**               Issues and Decision Memorandum for the Final Determination in
                           the Countervailing Duty Investigation of Certain Hot-Rolled Steel
                           Flat Products from the Republic of Korea

---

## I.      Summary

The Department of Commerce (the Department) determines that countervailable subsidies are
being provided to producers and exporters of certain hot-rolled steel flat products (hot-rolled)
from the Republic of Korea (Korea), as provided in section 705 of the Tariff Act of 1930, as
amended (the Act).  This investigation covers two producer/exporter entities:  POSCO and
Hyundai Steel Co., Ltd. ("Hyundai Steel").

Comment 1:   Whether the Department Should Apply Adverse Facts Available (AFA) to the
             Provision of Electricity for Less Than Adequate Remuneration (LTAR)
Comment 2:   Whether the Department Should Find That the Provision of Electricity for LTAR
             is a Countervailable Subsidy
Comment 3:   Whether the Department Should Use Other Submitted Data to Measure the
             Adequacy of Remuneration of Electricity
Comment 4:   Whether the Department Should Find the Provision of Natural Gas for LTAR
             Countervailable
Comment 5:   Application of AFA to POSCO and Treatment of POSCO's Unreported Affiliates
Comment 6:   Whether to Apply AFA to POSCO Global Research and Development (R&D)
             Center
Comment 7:   Whether to Apply AFA to Certain Loans Submitted at Verification
Comment 8:   Whether to Apply AFA to Hyundai Steel for Use of Certain Foreign Economic
             Zones (FEZs)
Comment 9:   The Department Improperly Countervailed Property Tax Exemptions Received by
             the Pohang Plant under RSTA 78
Comment 10:  The Department's Methodology For Attributing RSTA Article 22 Benefits
             Received by Hyundai Corporation to Hyundai Steel Was Incorrect

Comment 11:  Whether Hyundai Steel Should Have Reported Additional ITIPA Grants
Comment 12:  Whether Hyundai Steel Should Have Provided a Questionnaire Response for
Hyundai Green Power

## II.    Background

### A.  Case History

On January 15, 2016, we published the *Preliminary Determination* of this countervailing duty
(CVD) investigation.[1]  Concurrently, in accordance with section 705(a)(1) of the Act and 19
CFR 351.210(b)(4)(i), we aligned the final CVD determination with the final antidumping duty
(AD) determination.[2]  We preliminarily calculated a *de minimis* rate for POSCO and Hyundai
Steel, the mandatory respondents.

On April 20, 2016 and April 21, 2016, Nucor Corporation (Nucor, Petitioner), one of the
petitioners in this investigation, submitted pre-verification comments on the record to this
investigation.[3]  Between May 9, 2016, and May 20, 2016, we conducted verifications of the
questionnaire responses submitted by the GOK, POSCO, and Hyundai Steel.  We released
verification reports on June 30, 2016, and July 5, 2016.[4]  On July 8, 2016, we released a Post-
Preliminary Analysis Memo.[5]  On July 26, 2016, we held a hearing.[6]

On July 14, 2016, POSCO and Hyundai Steel submitted timely case briefs,[7] and on July 15,
2016, Nucor submitted a timely case brief.  On July 20, 2016, POSCO, Hyundai Steel, the GOK
and Nucor submitted timely rebuttal briefs.[8]

---

[1] *See Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea:
Preliminary Negative Determination and Alignment of Final Determination With Final Antidumping Duty
Determination*, 81 FR 2172 (January 15, 2016) (*Preliminary Determination*), and accompanying Preliminary
Decision Memorandum (PDM).
[2] *Id.*
[3] *See* Letter from Nucor, "Certain Hot-Rolled Steel Flat Products from Korea:  Pre-Verification Comments for
POSCO and Hyundai Steel," (April 20, 2016); "Certain Hot-Rolled Steel Flat Products from Korea:  Pre-
Verification Comments for the Government of Korea," (April 21, 2016).
[4] *See* Memoranda to the File, "Verification Report:  Hyundai Corporation" (June 30, 2016) (HC VR); "Verification
Report:  Hyundai Steel" (June 30, 2016) (Hyundai Steel VR); "Verification Report: POSCO and Daewoo
International Corporation" (June 30, 2016) (POSCO VR); "Verification Report: The Government of the Republic of
Korea (July 5, 2016) (GOK VR).
[5] *See* Memorandum to Paul Piquado, Assistant Secretary for Enforcement and Compliance, through Christian
Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from James C. Doyle,
Director, Office V, Re:  Post-Preliminary Analysis of Countervailing Duty Investigation, dated July 8, 2016. (Post-
Preliminary Analysis Memo).
[6] *See* Letter from the Department to all Interested Parties, Re: Public Hearing, dated July 21, 2016.
[7] *See* Letter from Nucor, Re:  Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Case Brief of
Nucor Corporation (July 14, 2016) (Petitioners Case Brief); *see also* Letter from POSCO, Re: Certain Hot -Rolled
Steel Flat Products from the Republic of Korea Case No. C-580-884:  POSCO's Case Brief (July 14, 2016) (POSCO
Case Brief); *see also* Letter from Hyundai Steel, Re:  Certain Hot-Rolled Steel Flat Products from the Republic of
Korea Case No. C-580-884:  Hyundai Steel's Case Brief (July 14, 2016) (Hyundai Steel Case Brief).
[8] *See* Letter from Nucor, Re:  Hot -Rolled Steel Flat Products from the Republic of Korea:  Nucor Corporation's
Rebuttal Brief Regarding POSCO and DWI (July 20, 2016) (Petitioners Rebuttal Brief); *see also* Letter from Nucor,
Re:  Hot-Rolled Steel Flat Products from the Republic of Korea:  Nucor Corporation's Rebuttal Brief Regarding

### B.  Period of Investigation

The period for which we are measuring subsidies, *i.e.*, the period of investigation (POI), is January 1, 2014, through December 31, 2014.

### III.    Scope of the Investigation

The products covered by this investigation are certain hot-rolled, flat-rolled steel products, with or without patterns in relief, and whether or not annealed, painted, varnished, or coated with plastics or other non-metallic substances.  The products covered do not include those that are clad, plated, or coated with metal.  The products covered include coils that have a width or other lateral measurement ("width") of 12.7 mm or greater, regardless of thickness, and regardless of form of coil (e.g., in successively superimposed layers, spirally oscillating, etc.).  The products covered also include products not in coils (e.g., in straight lengths) of a thickness of less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness. The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieve subsequent to the rolling process, i.e., products which have been "worked after rolling" (e.g., products which have been beveled or rounded at the edges).  For purposes of the width and thickness requirements referenced above:

(1) where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the resulting measurement makes the product covered by the existing antidumping[9] or countervailing duty[10] orders on Certain Cut-To-Length Carbon-Quality Steel Plate Products From the Republic of Korea (A-580-836; C-580-837), and

(2) where the width and thickness vary for a specific product (e.g., the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this investigation are products in which: (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements listed below exceeds the quantity, by

Hyundai Steel (July 20, 2016) (Petitioners Rebuttal Brief-Hyundai Steel); *see also* Letter from POSCO, Re:  Certain Hot-Rolled Steel Flat Products from the Republic of Korea Case No. C-580-884:  POSCO's Rebuttal Brief (July 20, 2016) (POSCO Rebuttal Brief); *see also* Letter from Hyundai Steel, Re:  Certain Hot-Rolled Steel Flat Products from the Republic of Korea Case No. C-580-884:  Hyundai Steel's Rebuttal Brief (July 20, 2016) (Hyundai Steel Rebuttal Brief); *see also* Letter from the GOK, Re:  Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from Korea—Rebuttal Brief of the Government of Korea (July 20, 2016) (GOK Rebuttal Brief).
[9] *See Notice of Amendment of Final Determinations of Sales at Less Than Fair Value and Antidumping Duty Orders: Certain Cut-To-Length Carbon-Quality Steel Plate Products From France, India, Indonesia, Italy, Japan and the Republic of Korea*, 65 FR 6585 (February 10, 2000).
[10] *See Notice of Amended Final Determinations: Certain Cut-to-Length Carbon-Quality Steel Plate From India and the Republic of Korea; and Notice of Countervailing Duty Orders: Certain Cut-To-Length Carbon-Quality Steel Plate From France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000).

weight, respectively indicated:

- 2.50 percent of manganese, or
- 3.30 percent of silicon, or
- 1.50 percent of copper, or
- 1.50 percent of aluminum, or
- 1.25 percent of chromium, or
- 0.30 percent of cobalt, or
- 0.40 percent of lead, or
- 2.00 percent of nickel, or
- 0.30 percent of tungsten, or
- 0.80 percent of molybdenum, or
- 0.10 percent of niobium, or
- 0.30 percent of vanadium, or
- 0.30 percent of zirconium.

Unless specifically excluded, products are included in this scope regardless of levels of boron and titanium.

For example, specifically included in this scope are vacuum degassed, fully stabilized (commonly referred to as interstitial-free (IF)) steels, high strength low alloy (HSLA) steels, the substrate for motor lamination steels, Advanced High Strength Steels (AHSS), and Ultra High Strength Steels (UHSS). IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements. HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum. The substrate for motor lamination steels contains micro-alloying levels of elements such as silicon and aluminum. AHSS and UHSS are considered high tensile strength and high elongation steels, although AHSS and UHSS are covered whether or not they are high tensile strength or high elongation steels.

Subject merchandise includes hot-rolled steel that has been further processed in a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the hot-rolled steel.

All products that meet the written physical description, and in which the chemistry quantities do not exceed any one of the noted element levels listed above, are within the scope of these investigations unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of this investigation:

- Universal mill plates (i.e., hot-rolled, flat-rolled products not in coils that have been rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, of a thickness not less than 4.0 mm, and

without patterns in relief);
- Products that have been cold-rolled (cold-reduced) after hot-rolling;[11]
- Ball bearing steels;[12]
- Tool steels;[13] and
- Silico-manganese steels;[14]

The products subject to this investigation are currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under item numbers: 7208.10.1500, 7208.10.3000, 7208.10.6000, 7208.25.3000, 7208.25.6000, 7208.26.0030, 7208.26.0060, 7208.27.0030, 7208.27.0060, 7208.36.0030, 7208.36.0060, 7208.37.0030, 7208.37.0060, 7208.38.0015, 7208.38.0030, 7208.38.0090, 7208.39.0015, 7208.39.0030, 7208.39.0090, 7208.40.6030, 7208.40.6060, 7208.53.0000, 7208.54.0000, 7208.90.0000, 7210.70.3000, 7211.14.0030, 7211.14.0090, 7211.19.1500, 7211.19.2000, 7211.19.3000, 7211.19.4500, 7211.19.6000, 7211.19.7530, 7211.19.7560, 7211.19.7590, 7225.11.0000, 7225.19.0000, 7225.30.3050, 7225.30.7000, 7225.40.7000, 7225.99.0090, 7226.11.1000, 7226.11.9030, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.5000, 7226.91.7000, and 7226.91.8000.  The products subject to the investigation may also enter under the following HTSUS numbers: 7210.90.9000, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7214.99.0060, 7214.99.0075, 7214.99.0090, 7215.90.5000, 7226.99.0180, and 7228.60.6000.

The HTSUS subheadings above are provided for convenience and U.S. Customs purposes only. The written description of the scope of the investigation is dispositive.

---

[11] For purposes of this scope exclusion, rolling operations such as a skin pass, levelling, temper rolling or other minor rolling operations after the hot-rolling process for purposes of surface finish, flatness, shape control, or gauge control do not constitute cold-rolling sufficient to meet this exclusion.

[12] Ball bearing steels are defined as steels which contain, in addition to iron, each of the following elements by weight in the amount specified: (i) not less than 0.95 nor more than 1.13 percent of carbon; (ii) not less than 0.22 nor more than 0.48 percent of manganese; (iii) none, or not more than 0.03 percent of sulfur; (iv) none, or not more than 0.03 percent of phosphorus; (v) not less than 0.18 nor more than 0.37 percent of silicon; (vi) not less than 1.25 nor more than 1.65 percent of chromium; (vii) none, or not more than 0.28 percent of nickel; (viii) none, or not more than 0.38 percent of copper; and (ix) none, or not more than 0.09 percent of molybdenum.

[13] Tool steels are defined as steels which contain the following combinations of elements in the quantity by weight respectively indicated: (i) more than 1.2 percent carbon and more than 10.5 percent chromium; or (ii) not less than 0.3 percent carbon and 1.25 percent or more but less than 10.5 percent chromium; or (iii) not less than 0.85 percent carbon and 1 percent to 1.8 percent, inclusive, manganese; or (iv) 0.9 percent to 1.2 percent, inclusive, chromium and 0.9 percent to 1.4 percent, inclusive, molybdenum; or (v) not less than 0.5 percent carbon and not less than 3.5 percent molybdenum; or (vi) not less than 0.5 percent carbon and not less than 5.5 percent tungsten.

[14] Silico-manganese steel is defined as steels containing by weight: (i) not more than 0.7 percent of carbon; (ii) 0.5 percent or more but not more than 1.9 percent of manganese, and (iii) 0.6 percent or more but not more than 2.3 percent of silicon.

## IV.    Subsidies Valuation

### A.  Allocation Period

The Department has made no changes to the allocation period and the allocation methodology used in the *Preliminary Determination* and no issues were raised by interested parties in case briefs regarding the allocation period or the allocation methodology.  For a description of allocation period and the methodology used for these final results, *see* the *Preliminary Determination*.[15]

### B.  Attribution of Subsidies

In accordance with 19 CFR 351.525(b), the Department attributes a subsidy to the products produced by the company that received the subsidy.  However, 19 CFR 351.525(b)(6)(ii)-(v) provides additional rules for the attribution of subsidies received by respondents with cross-owned affiliates.  Subsidies to the following types of cross-owned affiliates are covered in these additional attribution rules:  (ii) producers of the subject merchandise; (iii) holding companies or parent companies; (iv) producers of an input that is primarily dedicated to the production of the downstream product; or (v) an affiliate producing non-subject merchandise that otherwise transfers a subsidy to a respondent.  Further, 19 CFR 351.525(c) provides that benefits from subsidies provided to a trading company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm producing the subject merchandise that is sold through the trading company, regardless of affiliation.

According to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  This regulation states that this standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations.  The Court of International Trade (CIT) has upheld the Department's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[16]

As a result of verification and issues raised by Petitioner and POSCO in case briefs regarding POSCO's input suppliers, we have revised POSCO's preliminary attribution of subsidies to include certain cross-owned input suppliers within the meaning of 19 CFR 351.525(vi).  For further discussion, *see* Comment 5 below.

The Department has made a change to the methodologies used in the *Preliminary Determination* for attributing subsidies received by DWI[17] to POSCO.  In the *Preliminary Determination,* we stated we were attributing subsidies received by DWI to POSCO pursuant to 19 CFR 351.525(c),

---

[15] *See* PDM at 7-8.
[16] *See Fabrique de Fer de Charleroi, SA v. United States*, 166 F. Supp. 2d 593, 600-604 (CIT 2001) (*Fabrique*).
[17] POSCO reported at verification that DWI changed its name to POSCO Daewoo Corporation (PDC) in March 2016.  *See* POSCO/DWI Verification Report at 5 and DWI VE-3.

however we did not employ the trading company methodology in cumulating the subsidies received by the trading company with the subsidy benefits received by the producer, POSCO. We have corrected this in this final determination, although for the reasons described below, we have not included this program in our net subsidy calculations for POSCO. In addition, we are also only calculating rates for programs used by the trading companies that are not otherwise included in POSCO's AFA calculation.

Similarly, the Department has made a change to the methodology used in the *Preliminary Determination* for attributing subsidies received by Hyundai Corporation to Hyundai Steel. *See* Comment 10.

### C. Denominators

In accordance with 19 CFR 351.525(b), the Department considers the basis for the respondents' receipt of benefits under each program when attributing subsidies, *e.g.,* to the respondents' export or total sales, or portions thereof. The denominators we used to calculate the countervailable subsidy rates for the various subsidy programs described below are explained in the final calculation memoranda prepared for this final determination.[18]

## V.    Benchmarks and Discount Rates

The Department has made no changes to benchmarks or discount rates used in the *Preliminary Determination* and no issues were raised by interested parties in case briefs regarding benchmarks or discounts rates. For a description of the benchmarks and discount rates used for these final results, *see* the *Preliminary Determination*.

## VI.    Use of Facts Otherwise Available and Adverse Inferences

Section 776(a) of the Act provides that, subject to section 782(d) of the Act, the Department shall apply "facts otherwise available" if: (1) necessary information is not on the record; or (2) an interested party or any other person (A) withholds information that has been requested, (B) fails to provide information within the deadlines established, or in the form and manner requested by the Department, subject to subsections (c)(1) and (e) of section 782 of the Act, (C) significantly impedes a proceeding, or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Where the Department determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that the Department will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to

---

[18] *See* Memorandum to Catherine Bertrand from Katie Marksberry, Re: Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Determination Calculations for Hyundai Steel Co., Ltd., dated August 4, 2016 (Hyundai Steel Final Calculation Memorandum); *see also* Memorandum to Catherine Bertrand from Katie Marksberry, Re: Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Determination Calculations for POSCO dated August 4, 2016 (POSCO Final Calculation Memorandum).

remedy or explain the deficiency. If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, the Department may disregard all or part of the original and subsequent responses, as appropriate.

On June 29, 2015, the President of the United States signed into law the Trade Preferences Extension Act of 2015 (TPEA), which made numerous amendments to the antidumping and CVD law, including amendments to section 776(b) and 776(c) of the Act and the addition of section 776(d) of the Act.[19] The amendments to the Act are applicable to all determinations made on or after August 6, 2015, and, therefore, apply to this investigation.[20]

Section 776(b) of the Act provides that the Department may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information. In doing so, and under the TPEA, the Department is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.[21] Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the countervailing duty investigation, a previous administrative review, or other information placed on the record.[22]

Section 776(c) of the Act provides that, in general, when the Department relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.[23] Secondary information is defined as information derived from the petition that gave rise to the investigation, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[24]

Finally, under the new section 776(d) of the Act, when applying an adverse inference, the Department may use a countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the Department considers reasonable to use.[25] The TPEA also makes clear that, when selecting facts available with an adverse inference, the Department is not required to estimate what the countervailable subsidy rate would have been if the interested party failing to cooperate had cooperated or to

---

[19] See TPEA, Pub. L. No. 114-27, 129 Stat. 362 (2015). The 2015 law does not specify dates of application for those amendments. On August 6, 2015, the Department published an interpretative rule, in which it announced applicability dates for each amendment to the Act, except for amendments contained to section 771(7) of the Act, which relate to determinations of material injury by the International Trade Commission. See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 FR 46793 (August 6, 2015) ("Applicability Notice"). The text of the TPEA may be found at https://www.congress.gov/bill/114th-congress/house-bill/1295/text/pl.
[20] See Applicability Notice, 80 FR at 46794-95.
[21] See section 776(b)(1)(B) of the Act; TPEA, section 502(1)(B).
[22] See also 19 CFR 351.308(c).
[23] See also 19 CFR 351.308(d).
[24] See SAA at 870 (1994).
[25] See section 776(d)(1) of the Act; see also TPEA, section 502(3).

demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[26]

As discussed below, we find the application of AFA is warranted with respect to POSCO's responses for its failure to provide information for certain cross-owned affiliated companies, failure to report certain loans,[27] and with respect to Hyundai Steel's and POSCO's responses for their failure to report their location in a FEZ.[28]

### A. POSCO

As discussed further in Comment 5 below, POSCO did not provide responses for certain cross-owned input suppliers. In its questionnaire response, when asked by the Department to specify whether affiliated companies supply inputs to POSCO's production process, POSCO stated that no affiliated companies located in Korea provided inputs used in the production of subject merchandise.[29] When asked by the Department to provide a complete questionnaire response for a cross-owned company that supplies an input for production of the downstream product produced by the respondent, POSCO replied that there were no-cross owned companies located in Korea that provided inputs to POSCO's production of subject merchandise.[30]

During the course of verification, we discovered that additional companies listed in POSCO's affiliation chart provided raw material inputs that reportedly were used in production of hot-rolled.[31] When asked why the company did not report purchases from the input suppliers, POSCO stated that only minimal trace amounts were used in subject merchandise production; therefore, the companies were not reported as input suppliers in POSCO's questionnaire response.[32]

Accordingly, given the information reported in its questionnaire response, and the conflicting information discovered at verification, we determine that POSCO withheld requested necessary information during the course of the investigation, impeded the proceeding, and through its actions prevented the Department from being able to verify that information. Therefore, the Department determines that the use of facts available pursuant to sections 776(a)(1) and 776 (a)(2)(A), (C), & (D) of the Act is warranted in determining the existence of cross-owned affiliates that provided inputs used in the production of subject merchandise.

We further find that an adverse inference is warranted, pursuant to section 776(b) of the Act. POSCO failed to identify or provide necessary information as to its respective cross-owned companies. Additionally, we find that POSCO failed to report that one of its facilities is located in a FEZ and that DWI failed to report certain loans. As a result, we find that POSCO did not act

---

[26] See section 776(d)(3) of the Act; see also TPEA, section 502(3).
[27] See Comment 7 below.
[28] See Comment 6 below with regard to POSCO's use of the FEZ program.
[29] See Letter from POSCO, Re: Certain Hot-Rolled Steel Flat Products from Korea, Case No. C-580-884: Affiliated Companies Response dated October 13, 2015 (POSCO AQR) at 4.
[30] Id., at 5.
[31] See POSCO VR at 4-5, see also Verification Exhibit-5 (VE-5).
[32] See POSCO AQR at 4-5.

to the best of its ability in this investigation. Accordingly, we find that an adverse inference that POSCO and its cross-owned input suppliers benefited from those subsidies is warranted in this case. For further discussion, *see* Comment 5 below.

### B.  Hyundai Steel – Subsidies To Companies Located in Certain Economic Zones

As discussed further in Comment 8, the Department initiated a program investigation to determine whether subsidies, including tax reductions and exemptions, exemptions and reductions of lease fees, grants and financial support, and acquisition and property tax benefits, were being provided to companies located in certain economic zones.[33] In its initial questionnaire response, Hyundai Steel stated that it was "not located in an economic zone," and thus, did not provide a response to the Standard Question Appendix for each of the programs identified in the economic zones subsidies allegation.[34] Hyundai Steel's claim that it was not in an economic zone was found to be incorrect at Hyundai Steel's verification.[35] Consequently, we determine that Hyundai Steel withheld necessary information during the course of the investigation, impeded the proceeding, and through its actions prevented the Department from being able to verify that information. Therefore, the Department determines that the use of facts available pursuant to sections 776(a)(1) and 776(a)(2)(A)(C) & (D) of the Act is warranted and that the Department must rely on "facts available" in making our final determination. Moreover, because Hyundai Steel failed to provide necessary information concerning program use, despite the Department's request that it do so, we find that Hyundai Steel failed to act to the best of its ability in providing requested information that was in its possession, and that the application of AFA is warranted, pursuant to 776(b) of the Act, in determining that a benefit was bestowed.

Relying on AFA, we find, as discussed below under Comment 8, that Hyundai Steel benefited from a rate of 1.65 percent *ad valorem* for exemptions and reductions of lease fees and 1.65 percent *ad valorem* for grants and financial support. Because we verified tax reduction and exemptions, including those that Hyundai Steel received pursuant to its location in the industrial complex in the economic zone, we are not applying AFA to measure the benefit of tax benefits associated with the economic zones program. For further discussion, *see* Comment 8 below.

### C.  Other Programs

As referenced above under "POSCO," and in Comments 5, 6, and 7, we are applying adverse facts available to POSCO for its failure to report certain cross-owned input suppliers, facilities located in an FEZ, and for DWI's failure to report certain loans. As AFA, we determine that POSCO benefitted from the majority of programs in the current investigation, as noted below in Section VII, "Analysis of Programs."

While the GOK provided sufficient information for most of these programs to allow the Department to analyze whether these programs are specific within the meaning of section

---

[33] *See* Korea CVD Hot-Rolled Steel Flat Products Investigation Initiation Checklist, dated August 31, 2015.
[34] *See* Letter from Hyundai Steel, Re:  Certain Hot-Rolled Steel Flat Products from Korea, Case NO. C-580-884: Section III Initial Questionnaire Response, dated October 30, 2015 (HS October QR) at 28.
[35] *See* Hyundai Steel VR at 2 and VE-1 and -6.

771(5A) of the Act and provide a financial contribution as defined under section 771(5)(D) of the Act, it did not provide complete questionnaire responses for the programs listed below.[36] The GOK stated that none of the mandatory respondents in this investigation used the respective programs, and, accordingly, responses were not required. For this final determination, we are including the programs in our AFA determination, as the unreported cross-owned companies could have reasonably benefited from the programs alleged. Furthermore, pursuant to section 776(b) of the Act, we determine that each of the programs below provides both a financial contribution under section 771(5)(D) of the Act and are specific within the meaning of section 771(5A) of the Act. We note that we have previously found each of these programs countervailable based on information supplied by the GOK in prior investigations, as cited below. These programs are therefore included in POSCO's overall subsidy rate.

- Sharing of Working Opportunities/Employment Creating Incentives[37]
- Loans from the Industrial Base Fund[38]
- GOK Subsidies for "Green Technology R&D" and its Commercialization[39]
- Support for Small and Medium-Sized Enterprises (SME) "Green Partnerships"[40]
- Asset Revaluation Under Article 56(2) of the Tax Reduction and Exemption Control Act (TERCL)[41]
- Various Grants in Contained in Financial Statements[42]

<u>Selection of the AFA Rate</u>

It is the Department's practice in CVD proceedings to compute an AFA rate for non-cooperating companies using the highest calculated program-specific rates determined for a cooperating respondent in the same investigation, or, if not available, rates calculated in prior CVD cases involving the same country.[43] Specifically, the Department applies the highest calculated rate for the identical subsidy program in the investigation if a responding company used the identical

---

[36] *See* GOK PQR at 82, 95, and 112-113; *see also* GOK SQR at 91.

[37] *See Line Pipe from Korea,* and accompanying IDM at 9.

[38] *See Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination,* 72 FR 60639 (October 25, 2007), and accompanying Issues and Decision Memorandum (IDM) at 15.

[39] *See Large Residential Washers From the Republic of Korea: Final Affirmative Countervailing Duty Determination,* 77 FR 75975 (December 26, 2012) (*Washers from Korea*), and accompanying IDM at 17.

[40] *Id.,* at 21.

[41] *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Affirmative Determination,* 81 FR 49943 (July 29, 2016), and IDM at 31.

[42] *Id.,* at 22.

[43] *See, e.g., Certain Tow-Behind Lawn Groomers and Certain Parts Thereof from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination,* 73 FR 70971, 70975 (November 24, 2008) (unchanged in *Certain Tow-Behind Lawn Groomers and Certain Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 74 FR 29180 (June 19, 2009), and accompanying IDM at "Application of Facts Available, Including the Application of Adverse Inferences") (*Tow-Behind Lawn Groomers*); *see also Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 76 FR 18521 (April 4, 2011) (*Aluminum Extrusions from the PRC*), and accompanying IDM at "Application of Adverse Inferences: Non-Cooperative Companies."

program, and the rate is not zero.  If there is no identical program match within the investigation, or if the rate is zero, the Department uses the highest non-*de minimis* rate calculated for the identical program in a CVD proceeding involving the same country.  If no such rate is available, the Department will use the highest non-*de minimis* rate for a similar program (based on treatment of the benefit) in another CVD proceeding involving the same country.  Absent an above-*de minimis* subsidy rate calculated for a similar program, the Department applies the highest calculated subsidy rate for any program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies.[44]  Likewise, under the new section 776(d) of the Act, when applying an adverse inference, the Department may use a countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the Department considers reasonable to use.

In applying AFA to Hyundai Steel and POSCO, we are guided by the Department's methodology detailed above.  Because Hyundai Steel and POSCO failed to report their location in an FEZ, as discussed above, we made an adverse inference that Hyundai Steel and POSCO benefitted from the exemption and reduction of lease fees and grants and financial support available to companies located within the FEZ.

Using the methodology described above, we have applied an AFA rate to Hyundai Steel and POSCO for each of the following programs:

- Exemptions and Reductions of Lease Fees in FEZs[45]
- Grants and Financial Support in FEZs[46]

As POSCO failed to act to the best of its ability in this investigation, as discussed above, we made an adverse inference that certain cross-owned companies provided inputs that could have been used in the production of the downstream product and that DWI failed to report certain loans.  Therefore, we determine that the aforementioned companies benefitted from all programs under investigation.  We are, however, excluding programs determined to be not countervailable.

Using the methodology described above, we have applied an AFA rate to POSCO for each of the following programs:

- Energy Savings Program:  Electricity Savings for Designated Period Program[47]

---

[44] *See, e.g.*, *Tow-Behind Lawn Groomers* and accompanying IDM at "Application of Facts Available, Including the Application of Adverse Inferences;" *see also Aluminum Extrusions from the PRC*, and accompanying IDM at "Application of Adverse Inferences: Non-Cooperative Companies;" *see also Lightweight Thermal Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 FR 57323 (October 2, 2008) (*Thermal Paper from the PRC*), and accompanying IDM at "Selection of the Adverse Facts Available Rate."
[45] *See Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea:  Final Affirmative Countervailing Duty Determination,* 77 FR 17410 (March 26, 2012) (*Refrigerators from Korea*), and accompanying IDM at 16.
[46] *Id.*
[47] *Id.*

- Energy Savings Program:  Electricity Savings through the Bidding Process Program[48]
- Energy Savings Program:  Electricity Savings upon an Emergency Reduction Program[49]
- Energy Savings Program:  Electricity Savings through General Management Program[50]
- Energy Savings Program:  Utilization of Capability of the Private Sector[51]
- Energy Savings Program:  In Accordance with Prior Announcement[52]
- Energy Savings Program:  Intelligent Electricity Savings[53]
- Power Generation Price Difference Payments[54]
- GOK purchases of electricity from Hot-Rolled Producers for MTAR[55]
- Korea Development Bank (KDB) Short-Term Discounted Loans for Export Receivables[56]
- Long-Term Loans from the Korean Resources Corporation (KORES) and the Korea National Oil Corporation (KNOC)[57]
- Tax Reduction for Research and Human Resources Development under RSTA Article 10(1)(3)[58]
- RSTA Article 10(1)(1)[59]
- RSTA Article 10(1)(2)[60]
- Tax Credit for Investment in Facilities for Environment or Safety under RSTA Article 25[61]
- Tax Exemption on Investment in Overseas Resources Development under RSTA Article 22[62]
- Tax Deduction for Investment in Environmental and Safety Facilities under RSTA Article 25(3)[63]
- GOK Facilities Investment Support under RSTA Article 26[64]
- Tax Program for Special Depreciation under RSTA Article 30[65]
- Tax Reduction and Exemption for Industrial Complexes under RSTA Article 78(4)[66]
- Special Tax Credit for Payment Records under RSTA Article 104(5)[67]

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] Calculated for Hyundai Steel in this investigation.
[59] *See Washers from Korea*, and accompanying IDM at 15.
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] Calculated for Hyundai Steel in this investigation
[64] *See Washers from Korea*, and accompanying IDM at 15.
[65] *Id.*
[66] Calculated for Hyundai Steel in this investigation.
[67] *See Washers from Korea*, and accompanying IDM at 12.

- Tax Payment for Third-Party Logistics Operations under RSTA Article 104(14)[68]
- Special Taxation for Investment in Development of Overseas Resources under RSTA Article 104(15)[69]
- Korean Trade Insurance Corporation (K-SURE) Export Credit Guarantee
- Modal Shift Grants[70]
- Article 9[71]
- Article 11[72]
- Research and Development Grants under the Industrial Technology Innovation Promotion Act (ITIPA)[73]
- KEXIM Short-Term Export Credits[74]
- KEXIM Export Factoring[75]
- KEXIM Export Loan Guarantees[76]
- KEXIM Trade Bill Rediscounting Program[77]
- KEXIM Import Financing[78]
- KEXIM Overseas Investment Credit Program[79]
- Industrial Base Fund Loans[80]
- Green Subsidies: GOK Subsidies for "Green Technology R&D" and its Commercialization[81]
- Green Subsidies:  Support for SME "Green Partnerships"[82]
- Article 56(2) of the TERCL[83]
- Exemptions and Reductions of Lease Fees in Free Economic Zones[84]
- Grants and Financial Support in Free Economic Zones[85]
- Tax Reductions and Exemptions in Free Economic Zones[86]
- Acquisition and Property Tax Benefits to Companies Located in Industrial Complexes[87]
- RSTA Article 24[88]
- RSTA Article 25-2[89]

---

[68] *Id.*
[69] *Id.*
[70] *See Refrigerators from Korea*, and accompanying IDM at 16.
[71] *See Washers from Korea*, and accompanying IDM at 12.
[72] *Id.*
[73] *See Refrigerators from Korea*, and accompanying IDM at 16.
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] Calculated for Hyundai Steel in this investigation.
[87] *Id.*
[88] *Id.*

- Sharing of Working Opportunities/Employment Creating Incentives[90]

Section 776(c)(1) of the Act provides that, when the Department relies on secondary information rather than on information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. However section 776(c)(1) does not require corroboration when the information relied upon for adverse inferences is derived from the petition, a final determination in the investigation, any previous review under section 751 of the Act or determination under section 753 of the Act, or any other information placed on the record.

Finally, under the new section 776(d) of the Act, the Department may use any countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, use a CVD rate for a subsidy program from a proceeding that the administering authority considers reasonable to use, including the highest of such rates. Additionally, when selecting an AFA rate, the Department is not required for purposes of 776(c), or any other purpose, to estimate what the countervailable subsidy rate would have been if the non-cooperating interested party had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[91]

With regard to the reliability aspect of corroboration, unlike other types of information, such as publicly available data on the national inflation rate of a given country or national average interest rates, there typically are no independent sources for data on company-specific benefits resulting from countervailable subsidy programs. Additionally, as stated above, we are applying subsidy rates, which were calculated in this investigation or previous Korea CVD investigations or administrative reviews. Therefore, we have corroborated pursuant to section 776(c)(1) of the Act to the extent practicable for purposes of this investigation.

*Hyundai Steel*

| Program | AFA Percent Subsidy Rate |
|---|---|
| Exemptions and Reductions of Lease Fees in FEZs | 1.64% |
| Grants and Financial Support in FEZs | 1.64% |
| Partial AFA Rate Sub-Total for Hyundai Steel | 3.28% |

*POSCO*

| Program | AFA Percent Subsidy Rate |
|---|---|
| Asset Revaluation Under Article 56(2) of the Tax Reduction and Exemption Control Act (TERCL) | 1.64% |
| Energy Savings Program: Electricity Savings for Designated Period Program | 1.64% |

---

[89] *Id.*
[90] *Id.*
[91] *See* Section 776(d)(3) of the Act.

| | |
|---|---|
| Energy Savings Program: Electricity Savings through General Management Program | 1.64% |
| Energy Savings Program: Electricity Savings through the Bidding Process Program | 1.64% |
| Energy Savings Program: Electricity Savings upon an Emergency Reduction Program | 1.64% |
| Energy Savings Program: In Accordance with Prior Announcement | 1.64% |
| Energy Savings Program: Intelligent Electricity Savings | 1.64% |
| Energy Savings Program: Utilization of Capability of the Private Sector | 1.64% |
| Exemptions and Reductions of Lease Fees in Free Economic Zones | 1.64% |
| GOK Facilities Investment Support under RSTA Article 26 | 1.05% |
| GOK Purchases of Electricity from Hot-Rolled Producers for MTAR | 1.64% |
| Grants and Financial Support in Free Economic Zones | 1.64% |
| Green Subsidies: Support for SME "Green Partnerships" | 1.64% |
| Green Subsidies: GOK Subsidies for "Green Technology R&D" and its Commercialization | 1.64% |
| Industrial Base Fund Loans | 1.64% |
| KEXIM Export Factoring | 1.64% |
| KEXIM Export Loan Guarantees | 1.64% |
| KEXIM Import Financing | 1.64% |
| KEXIM Overseas Investment Credit Program | 1.64% |
| KEXIM Short-Term Export Credits | 1.64% |
| KEXIM Trade Bill Rediscounting Program | 1.64% |
| Korea Development Bank (KDB) Short-Term Discounted Loans for Export Receivables | 1.64% |
| Korean Trade Insurance Corporation (K-SURE) Export Credit Guarantee | 1.64% |
| Long-Term Loans from the Korean Resources Corporation (KORES) and the Korea National Oil Corporation (KNOC) | 1.64% |
| Modal Shift Grants | 1.64% |
| Power Generation Price Difference Payments | 1.64% |
| Research and Development Grants under the Industrial Technology Innovation Promotion Act (ITIPA) | 1.64% |
| RSLTA Article 9: Reserve for Research and Human Resources Development | 1.05% |
| RSTA Article 10(1)(1): Research, Supply, or Workforce Development Investment Tax Deduction for "New Growth Engines" | 1.05% |
| RSTA Article 10(1)(2): Research, Supply, or Workforce Development Expense Tax Deductions for "Core Technologies" | 1.05% |

| RSTA Article 10(1)(3):  Tax Reduction for Research and Human Resources Development | 0.03% |
|---|---|
| RSTA Article 104(14):  Tax Payment for Third-Party Logistics Operations | 1.05% |
| RSTA Article 104(5):  Special Tax Credit for Payment Records | 1.05% |
| RSTA Article 11:  Tax Credit for Investment in Facilities for Research and Manpower | 1.05% |
| RSTA Article 120:  Acquisition and Property Tax Benefits to Companies Located in Industrial Complexes | 0.23% |
| RSTA Article 22:  Tax Exemption on Investment in Overseas Resources Development | 1.05% |
| RSTA Article 24:  Tax Credit for Investment in Productivity Increase Facilities | 0.01% |
| RSTA Article 25:  Tax Credit for Investment in Facilities for Environment or Safety | 1.05% |
| RSTA Article 25(2):  Tax Deductions for Investments in Energy Economizing Facilities | 0.15% |
| RSTA Article 25(3):  Tax Deduction for Investment in Environmental and Safety Facilities | 0.11% |
| RSTA Article 30:  Tax Program for Special Depreciation | 1.05% |
| RSTA Article 78(4):  Tax Reduction and Exemption for Industrial Complexes | 0.09% |
| Sharing of Working Opportunities/Employment Creating Incentives | 1.64% |
| Various Grants Contained in Financial Statements | 1.64% |
| **AFA Rate Sub-Total for POSCO** | **57.04%** |

## VII.   ANALYSIS OF PROGRAMS

### A.  Programs Determined To Be Countervailable

The Department made no changes to its *Preliminary Determination* with regard to the methodology used to calculate the subsidy rates for the following programs, except for the programs used by POSCO and Hyundai Steel that are included in the AFA rate as described above and in Comments 5 through 8.[92]  For the descriptions, analyses, and calculation methodologies of the unchanged programs, *see* the *Preliminary Determination*.  Except where noted, no issues were raised by interested parties in case briefs regarding the unchanged programs.  The final program rates are as follows:

1.  RSTA Article 10(1)(3):  Tax Reduction for Research and Human Resources Development

Hyundai Steel:  0.03 percent *ad valorem*

---

[92] *See* POSCO Final Calculation Memoranda at 2and Hyundai Steel Final Calculation Memoranda at 2.

2.  RSTA Article 22:  Tax Exemption on Investment in Overseas Resources Development

In the *Preliminary Determination*, we found that POSCO received a measureable benefit from this program.[93]  As explained in the "Adverse Facts Available" section above and in Comment 5, we are applying, as AFA, a rate of 1.05 percent *ad valorem* for this final determination.

3.  RSTA Article 24:  Tax Credit for Investment for Productivity Increase Facilities

Hyundai Steel:  0.01 percent *ad valorem*

4.  RSTA Article 25:  Tax Credit for Investment in Facilities for Environment or Safety

In the *Preliminary Determination*, we found that POSCO received a measureable benefit from this program.[94]  As explained in the "Adverse Facts Available" section above and in Comment 5, we are applying, as AFA, a rate of 1.05 percent *ad valorem* for this final determination.

5.  RSTA Article 25-2:  Tax Deductions for Investments in Energy Economizing Facilities

Hyundai Steel:  0.15 percent *ad valorem*

6.  RSTA Article 25(3):  Tax Credit for Investment in Environmental and Safety Facilities

Hyundai Steel:  0.11 percent *ad valorem*

7.  RSTA Article 26:  GOK Facilities Investment Support

In the *Preliminary Determination*, we found that POSCO received a measureable benefit from this program.[95]  As explained in the "Adverse Facts Available" section above and in Comment 5, we are applying, as AFA, a rate of 1.05 percent ad valorem for this final determination.

8.  RSTA Article 120: Exemption of the Acquisition Tax

Hyundai Steel:  0.23 percent *ad valorem*

---

[93] *See* PDM at 13.
[94] *Id.,* at 16.
[95] *Id.,* at 19.

9. Restriction of Special Local Taxation Act (RSLTA) Article 78(4): Reduction and Exemption for Industrial Complexes

In the *Preliminary Determination*, we found that this program is specific under section 771(5A)(D)(iv) of the Act and that it constitutes a financial contribution under section 77195)(D)(ii) of the Act. The calculated rate for Hyundai Steel is unchanged from the *Preliminary Determination* as explained in the "Adverse Facts Available" section above and in Comment 5, we are applying to POSCO and as AFA, a rate of 0.08 percent *ad valorem* for this final determination.

Hyundai Steel: 0.09 percent *ad valorem*[96]

10. Korea Export Import Bank's (KEXIM) Overseas Investment Credit Program

In the *Preliminary Determination*, we found that POSCO received a measureable benefit from this program.[97] As explained in the "Adverse Facts Available" section above and in Comment 5, we are applying, as AFA, a rate of 1.65 percent *ad valorem* for this final determination.

11. Long-Term Loans from the KORES and the KNOC

In the *Preliminary Determination*, we found that POSCO received a measureable benefit from this program.[98] As explained in the "Adverse Facts Available" section above and in Comment 7, we are applying, as AFA, a rate of 1.65 percent *ad valorem* for this final determination.

12. DWI's Debt Workout

As noted above in the "Denominators" section, we have modified the sales value used to calculate the benefit for this program.[99] In addition, as stated in the "Attribution of Subsidies" section, we have employed the trading company methodology to determine the cumulated benefit to POSCO under this program. As such, we have recalculated this program for the final determination. Using this methodology, the calculated benefit is less than 0.005 percent *ad valorem*, and as such, this rate does not have an impact on POSCO's overall subsidy rate. Consistent with our past practice, we have not included this program in our net subsidy calculations for POSCO.

13. Energy Savings Program: Electricity Savings for Designated Period Program

In the *Preliminary Determination*, we did not analyze whether this program was countervailable because neither Hyundai Steel nor POSCO received measureable benefits under this program. However, as explained in the "Adverse Facts Available" section above, and in Comment 5, we are applying an AFA rate to POSCO in this final determination; thus we now have a respondent

---

[96] Unchanged from the *Preliminary Determination*.
[97] *Id.*, at 22.
[98] *Id.*, at 23-24.
[99] *See* POSCO Final Calculation Memorandum at "Denominators," and "DWI Debt Workout."

that received a measureable benefit under this program.  In its response, the GOK provided sufficient information to analyze whether this program is specific and provides a financial contribution; therefore, we are now analyzing whether this program is countervailable.

This is a sub-program of the Management of Electricity Factor Load Program, established through Articles 48 and 49 of the Electric Business Law in 2001.[100]  The Korean Electric Power Corporation (KEPCO) and Korean Power Exchange (KPX) operate the program under the supervision of the Ministry of Trade, Industry & Energy (MOTIE), and funding is provided by the Electrical Industry Foundation Fund.  Companies are required to enter into an agreement with KEPCO in advance, committing the company to reduce electricity consumption when requested by KEPCO by the higher of (1) a specified percentage of a predetermined "base load" for the user, or (2) 3,000 kilowatt-hours.  Customers that comply with these requirements receive a discount of 120 KRW for each kilowatt-hour of demand reduction.  Users that are charged for electricity under the "Industrial Service/High Voltage" tariff schedule, the standard reduction percentage is 30 percent.  Customers may request modifications to the standard reduction requirements and discount schedule by submitting a written request to KEPCO five days prior to the usage reduction period.  Participants are paid through either KEPCO or the KPX.[101]  KPX is wholly-owned by KEPCO.

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[102]  Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the form of rebates provided to companies participating in this program.  In our *Preliminary Determination,* we determined that KEPCO was to be an "authority" within the meaning of section 771(5)(B) of the Act.[103]  To calculate the benefit to Hyundai Steel, we divided the amount of rebates it received during the POI under this program by its total sales.  Using this methodology, Hyundai Steel received a benefit of less than 0.005 percent, and as such, this rate does not have an impact on Hyundai Steel's overall subsidy rate.  Consistent with our past practice, we have not included this program in our net subsidy calculations for Hyundai Steel.   However, as AFA, we have determined that POSCO benefited from the subsidy, and we are thus including this program in POSCO's overall subsidy rate.

14.  Energy Savings Program:  Electricity Savings through the Bidding Process Program

In the *Preliminary Determination*, we did not analyze whether this program was countervailable because Hyundai Steel and POSCO did not receive measureable benefits under this program.  However, as explained in the "Adverse Facts Available" section above, and in Comment 5, we are applying an AFA rate to POSCO in this final determination; thus, we now have a respondent that received a measureable benefit under this program.  In its response, the GOK provided sufficient information to analyze whether this program is specific and provides a financial contribution; therefore, we are now analyzing whether this program is countervailable.

---

[100] *See* Letter from GOK, "Response of the Government of Korea to Section II of the Department's September 16, 2015 Questionnaire," dated October 30, 2015 (GOK PQR), at Exhibit E-5 and E-22.
[101] *See* GOK PQR at 31.
[102] *See* GOK PQR at 146.
[103] *See* PDM 29.

As reported by the GOK, this is a sub-program of the Management of Electricity Factor Load Program, established through Articles 48 and 49 of the Electric Business Law in 2001.[104] KEPCO and KPX operate the program under the supervision of MOTIE, and funding is provided by the Electrical Industry Foundation Fund.  As noted, KPX is wholly-owned by KEPCO. Under this sub-program, KPX solicits offers from registered companies to reduce their electricity consumption by a specified amount for a specified price per kilowatt-hour of reduction.  KPX then accepts offers, starting from the lowest price, until the required demand reduction is met.  In order to apply and qualify for the program, companies must be able to reduce their electric power consumption by 300 kilowatts or more.  Companies are compensated when they reduce their average electric power load for a pre-determined 30 minute period below its standard electric power load, during an electricity load adjustment period.  The compensation a company receives is according to the unit price of the electricity generated, as determined through a bidding process.[105]

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number, because it only applies to registered companies who are able to reduce their electric power consumption by a certain level[106]  Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the form of rebates provided to companies participating in this program.  In our *Preliminary Determination,* we determined KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act.[107] To calculate the benefit to Hyundai Steel, we divided the amount of rebates it received during the POI under this program by its total sales.  Using this methodology, Hyundai Steel received a benefit of less than 0.005 percent, and as such, this rate does not have an impact on Hyundai Steel's overall subsidy rate.  Consistent with our past practice, we have not included this program in our net subsidy calculations for Hyundai Steel.  As AFA, we have determined that POSCO benefited from the subsidy, and are including this program in POSCO's overall subsidy rate.

15. Energy Savings Program:  Electricity Savings upon an Emergency Reduction Program

In the *Preliminary Determination*, we did not analyze whether this program was countervailable because neither Hyundai Steel nor POSCO received measureable benefits under this program. However, as explained in the "Adverse Facts Available" section above, and in Comment 5, we are applying an AFA rate to POSCO in this final determination; thus we now have a respondent which we have determined received a measureable benefit under this program.  In its response, the GOK provided sufficient information to analyze whether this program is specific and provides a financial contribution; therefore, we are now analyzing whether this program is countervailable.

This is a sub-program of the Management of Electricity Factor Load Program, established

---

[104] *See* GOK PQR at Exhibit E-5 and E-22.
[105] *See* GOK PQR at 29.
[106] *See* GOK PQR at 146.
[107] *See* PDM at 29.

through Articles 48 and 49 the Electric Business Law in 2001.[108]  KEPCO operate the program under the supervision of MOTIE, and funding is provided by the Electrical Industry Foundation Fund.  Companies must enter into an agreement with KEPCO in advance, committing the company to reduce electricity consumption by a specified percentage of its baseline upon receipt of notice of the emergency from KEPCO.  Participants in this program receive (1) a fixed annual discount from KEPCO based on the number of kilowatt-hours by which the participant agrees to reduce its demand in response to an emergency request, and (2) a variable discount that depends on the number of kilowatt-hours by which the participant actually reduced its consumption in response to KEPCO's emergency requests and the ratio of that reduction to the total reduction that the participant had committed to achieve.

Further, participants are classified as either Type A, applicants consuming electricity with output over 22.9 kilovolts, or Type B, applicants with output less than or equal to 22.9 kilovolts.  For Type A participants, the fixed annual discount rate is 1,000 KRW per kilowatt-hour of the committed amount of emergency reduction, while for Type B participants the fixed annual discount rate is 500 KRW per kilowatt-hour of the committed amount of emergency reduction.[109]

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[110]  Specifically, according to the parameters of the program itself, companies must first enter into an agreement and then meet the specific criteria set forth by KEPCO to benefit from the program.  Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the form of rebates provided to companies participating in this program.  In our *Preliminary Determination,* we determined KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act.[111]  To calculate the benefit to Hyundai Steel, we divided the amount of rebates it received during the POI under this program by its total sales.  Using this methodology, Hyundai Steel received a benefit of less than 0.005 percent, and as such, this rate does not have an impact on Hyundai Steel's overall subsidy rate.  Consistent with our past practice, we have not included this program in our net subsidy calculations for Hyundai Steel.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

16. Energy Savings Program:  Electricity Savings through General Management Program

In the *Preliminary Determination*, we did not analyze whether this program was countervailable because Hyundai Steel and POSCO did not receive measureable benefits under this program.  However, as explained in the "Adverse Facts Available" section above, and in Comment 5, we are applying an AFA rate to POSCO in this final determination; thus, we now have a respondent that the Department has determined received a measureable benefit under this program.  In its response, the GOK provided sufficient information to analyze whether this program is specific and provides a financial contribution; therefore, we are now analyzing whether this program is countervailable.

---

[108] *See* GOK PQR at Exhibit E-5 and E-22.
[109] *Id*., at 31-32.
[110] *See* GOK PQR at 146.
[111] *See* PDM at 29.

As reported by the GOK, this is a sub-program of the Management of Electricity Factor Load Program, established through Articles 48 and 49 of the Electric Business Law in 2001.[112] KEPCO and KPX operate the program under the supervision of MOTIE, and funding is provided by the Electrical Industry Foundation Fund.  Under this program, companies are compensated for reducing their electricity during a peak electricity consumption period by more than a pre-set level.  This sub-program can be used by a company that is supplied with high-voltage electricity and whose electricity usage can be remotely monitored, if: (1) the company's hourly average electricity power load can be reduced either by 10 to 50 percent of its base load or by 3,000 kilowatts or more in case of industrial electricity; or (2) the company's hourly average electricity power load can be reduced either by five to 50 percent of its base load or by 3,000 kilowatts or more in case of electricity other than industrial electricity.  In order to participate in this sub-program, the company must enter into an agreement with KEPCO.  For each day in a week, KEPCO announces, in advance, the hours of electricity demand adjustment and the amount of reduction in electricity consumption.  Participating companies inform KEPCO of their intent to reduce and the amount the companies will reduce their electricity consumption the day prior. The annual payment companies receive is calculated by multiplying the agreed-upon amount of reduction in electricity consumption (in kilowatts) by an agreed-upon amount per kilowatt.[113]

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[114]  Specifically, under the parameters of the program, only companies supplied with high-voltage electricity and whose electricity usage can be remotely monitored, and who enter into an agreement with KEPCO, can benefit from this program.  Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the form of rebates provided to companies participating in this program. In our *Preliminary Determination,* we determined KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act.[115]  To calculate the benefit to Hyundai Steel, we divided the amount of rebates it received during the POI under this program by its total sales.  Using this methodology, Hyundai Steel received a benefit of less than 0.005 percent, and as such, this rate does not have an impact on Hyundai Steel's overall subsidy rate. Consistent with our past practice, we have not included this program in our net subsidy calculations for Hyundai Steel.  As AFA, we have determined that POSCO benefited from the subsidy, and are including this program in POSCO's overall subsidy rate.

### 17. KEXIM Import Financing

In the *Preliminary Determination*, we did not analyze whether this program was countervailable because Hyundai Steel and POSCO did not receive measureable benefits under this program. However, as explained in the "Adverse Facts Available" section above, and in Comment 5, we are applying an AFA rate to POSCO in this final determination; thus we now have a respondent that the Department has determined received a measureable benefit under this program.  The

---

[112] *See* GOK PQR at Exhibit E-5 and E-22.
[113] *See* GOK PQR at 31.
[114] *Id.,* at 146.
[115] *See* PDM at 29.

GOK in its response provided sufficient information to analyze whether this program is specific and provides a financial contribution; therefore, we are now analyzing whether this program is countervailable.

The import financing program of the KEXIM was introduced in 1976 in order to assist companies that import essential goods or natural resources that are important to Korea's national economy.  Under this program, KEXIM extends loans of up to 80 percent of the transaction value for a period of up to two years.[116]

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[117]  Specifically, the subsidy is only available to companies that import essential goods or natural resources. Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the form of loans provided to companies participating in this program. In our *Preliminary Determination*, we determined KEXIM to be an "authority" within the meaning of section 771(5)(B) of the Act.[118]  To calculate the benefit to Hyundai Steel, we calculated the interest that the company would have paid on a comparable commercial loan during the POI and divided that benefit by total sales.  Using this methodology, Hyundai Steel received a benefit of less than 0.005 percent, and as such, this rate does not have an impact on Hyundai Steel's overall subsidy rate. Consistent with our past practice, we have not included this program in our net subsidy calculations for Hyundai Steel.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

18. KDB and Other Policy Banks' Short-Term Discounted Loans for Export Receivables

In the *Preliminary Determination*, we did not analyze whether this program was countervailable because neither Hyundai Steel nor POSCO received measureable benefits under this program. However, as explained in the "Adverse Facts Available" section above, and in Comment 5, we are applying an AFA rate to POSCO in this final determination; thus we now have a respondent that received a measureable benefit under this program.  The GOK in its response provided sufficient information to analyze whether this program is specific and provides a financial contribution; therefore, we are now analyzing whether this program is countervailable.

Under this program, the GOK, through the KDB, provides support to producers and exporters of hot-rolled steel by offering short-term export financing.  This financing is designed to meet the needs of KDB clients for early receipt of discounted receivables prior to their maturity. Exporters pay the bank a "fee" that is effectively a discount rate of interest for the advance payment.  In this arrangement, the bank is repaid when the importer pays the bank directly the full value of the invoice; the exporter no longer bears the liability of non-payment from the importer.[119]

---

[116] *See* GOK PQR at 64.
[117] *Id.,* at 75.
[118] *See* PDM at 26.
[119] *See* GOK PQR at 93.

In our *Preliminary Determination,* we determined KDB be an "authority" within the meaning of section 771(5)(B) of the Act.[120]  We find that the receipt of short-term discounted loans under this program is contingent upon export performance.  As such, we find that short-term loans from KDB are specific within the meaning of sections 771(5A)(A) and (B) of the Act.  The loans offered by KDB constitute a financial contribution in the form of a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act.  Using the methodology described in the *Preliminary Determination*, Hyundai Steel received a benefit of less than 0.005 percent, and as such, this rate does not have an impact on Hyundai Steel's overall subsidy rate.  Consistent with our past practice, we have not included this program in our net subsidy calculations for Hyundai Steel.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

### B.  Programs Determined To Be Not Countervailable

1. Provision of Electricity for LTAR
   *See* Comments 1 through 3.
2. VAT Exemption for Purchases of Anthracite Coal
3. GOK Granting of Rights to POSCO to Import, Store, and/or Re-export LNG[121]

### C.  Programs Determined To Be Not Used, or to Not Confer a Measureable Benefit, During the POI

1.  Reimbursements on Construction Costs for Facilities at Inchon Harbor

Using the methodology described in the *Preliminary Determination*, Hyundai Steel received a benefit of less than 0.005 percent, and as such, this rate does not have an impact on Hyundai Steel's overall subsidy rate.  Consistent with our past practice, we have not included this program in our net subsidy calculations for Hyundai Steel.  Because this is a program that is limited to Hyundai Steel, we have not included an AFA rate for POSCO for this program.

2.  Provision of Liquefied Natural Gas (LNG) for LTAR

The Korea Gas Corporation (KOGAS) imports LNG.  KOGAS then distributes through pipelines natural gas in gaseous form, not liquid form.[122]  KOGAS sells and distributes natural gas only in the wholesale market in Korea which is comprised primarily of the 33 urban gas suppliers.  Industrial companies can only purchase natural gas from the urban gas suppliers and may not purchase gas from KOGAS.[123]  Because POSCO did not use this program and its cross-owned input suppliers cannot purchase LNG from KOGAS, we have not included an AFA rate for POSCO for this program.  Also *see* Comment 4.

---

[120] *See* PDM at 26.
[121] *See Post-Preliminary Analysis of Countervailing Duty Investigation: Certain Hot-Rolled Steel Flat Products from the Republic of Korea* (July 8, 2016).  No interested parties filed case or rebuttal comments on the Department's Post-Preliminary analysis of this program.  Therefore, the Department's determination with respect to this program remains unchanged for this final determination.
[122] *See* GOK PQR at 44.
[123] Id., at 49.

3.  Dongbu Debt Restructuring

Dongbu was not selected as a mandatory respondent, therefore this program is not used. Because this is a program that is limited to Dongbu, we have not included an AFA rate for POSCO for this program.

### D.  Other Programs

As mentioned in the "Adverse Facts Available" section above, we are applying AFA to POSCO for this final determination.  In the *Preliminary Determination*, we did not analyze whether the programs listed below were countervailable because either the programs did not provide measureable benefits to any of the respondents or the programs were not used.  However, as explained in the "Adverse Facts Available" section above, and in Comment 5, we are applying AFA to POSCO in this final determination  The GOK in its response provided sufficient information to analyze whether these programs are specific and provide a financial contribution; therefore, we are now analyzing whether these programs are countervailable.

For each program that we determined not used or not measureable in the *Preliminary Determination*, and from which POSCO could have reasonably received benefits, we have provided an analysis below.

*Energy Savings Programs[124]*

1.  Energy Savings Program:  Utilization of Capability of the Private Sector

This is a sub-program of the Management of Electricity Factor Load Program, established through Articles 48 and 49 the Electric Business Law in 2001.[125]  KEPCO and KPX operate the program under the supervision of MOTIE, and funding is provided by the Electrical Industry Foundation Fund.  Companies are eligible for this program if they have electrical generation capacity that was not scheduled to be supplied to KEPCO through KPX, and the companies must enter into an agreement with KEPCO in advance.  When KEPCO determines that the demand load is likely to exceed supply, KPX will request that the participant in this program commit to supply additional electricity to the system.  In response, the participant informs KPX of the amount and duration of electricity that it will supply.  The supplier is then paid for the number of kilowatt hours supplied.[126]

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[127]  Specifically, only companies which have

---

[124] We initiated on a program titled Power Business Law Subsidies.  However, assistance under the referenced Articles of the Power Business Law (or Electricity Business Law) is provided under the Energy Savings Programs. As such, we have not included this program separately in POSCO's overall subsidy rate.  *See* GOK PQR at 26-27.
[125] *See* GOK PQR at Exhibit E-5 and E-22.
[126] *Id*., at 29-30.
[127] *See* GOK PQR at 146.

certain electrical generation capacity and enter into an agreement in advance with KEPCO can benefit from this program. Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the funds provided to companies participating in this program. In our *Preliminary Determination,* we determined KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act.[128] In the *Preliminary Determination*, we found that POSCO received no measureable benefit from this program. However, as AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

2. Electricity Savings: In Accordance with Prior Announcement

As reported by the GOK, this is a sub-program of the Management of Electricity Factor Load Program, established through Articles 48 and 49 the Electric Business Law in 2001.[129] KEPCO and KPX operate the program under the supervision of MOTIE, and funding is provided by the Electrical Industry Foundation Fund. Companies must enter into an agreement with KEPCO, committing the company to reduce electricity consumption within five days after a request by KEPCO. The agreed reduction in electricity consumption is the higher of a specified percentage of a predetermined "base load" for the user (five percent for general consumers and ten percent for industrial class users) or 3,000 kilowatt hours. Companies receive a discount for each kilowatt-hour of demand reduction.

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[130] Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the form of rebates provided to companies participating in this program. In our *Preliminary Determination,* we determined KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act.[131] As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

3. Energy Savings: Intelligent Electricity Savings

As reported by the GOK, this is a sub-program of the Management of Electricity Factor Load Program, established through Articles 48 and 49 the Electric Business Law in 2001.[132] KEPCO and KPX operate the program under the supervision of MOTIE, and funding is provided by the Electrical Industry Foundation Fund. In order to participate, companies must register with KPX in advance. An "Intelligent Load Management Company" (a private company) enlists small and medium-size electricity consumers (electricity demand sources), to participate in a load management program using smart grid technologies. The Intelligent Load Management Companies are compensated for managing electricity demands. Companies that are able to reduce electric power consumption by 100 kilowatts or more and an "electricity demand source"

---

[128] *See* PDM at 29.
[129] *See* GOK PQR at Exhibit E-5 and E-22.
[130] *Id.,* at Appendix A.3, 146 which provides the number of recipients under this program.
[131] *See* PDM at 29.
[132] *See* GOK PQR at Exhibit E-5 and E-22.

that can reduce its electric power consumption by 3000 kilowatts or less may participate in this program. If a consumer reduces its average electric power load for a one hour period below its standard electric power load, as agreed, and the reduction occurs within 30 minutes of the request, the consumer is compensated according to the amount determined in an auction process, within the range of 35,000 to 64,000 KRW per kilowatt per year.

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[133] Specifically, only those companies that meet certain specific criteria can receive benefits under this program. Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the form of rebates provided to companies participating in this program. In our *Preliminary Determination,* we determined KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act.[134] As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

### 4. Energy Savings: Support for Instruments with High Energy Efficiencies

As reported by the GOK, this is a sub-program of the Management of Electricity Factor Load Program, established through Articles 48 and 49 the Electric Business Law in 2001.[135] KEPCO and KPX operate the program under the supervision of MOTIE, and funding is provided by the Electrical Industry Foundation Fund. Companies participating in this program are provided monetary assistance when they install a high efficiency freezer. A company that is supplied with electricity from either KEPCO, a community power generator under the Electric Utility Act, or an island independent power facility operated by a local government under the Act on the Promotion of Electrification in Agricultural and Fishing Villages may apply for this program if the company installs or produces high efficiency freezers that are certified by the relevant administrative authority. The amount of assistance is determined by this authority, and is paid by either KEPCO or the KPX.

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[136] Specifically, only those companies that meet certain specific criteria can receive benefits under this program. Furthermore, a financial contribution under section 771(5)(D)(i) from the GOK exists in the form of grants provided to companies participating in this program. In our *Preliminary Determination,* we determined KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act.[137] As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

---

[133] *Id.,* at Appendix A.3, 146.
[134] *See* PDM at 29.
[135] *See* GOK PQR at Exhibit E-5 and E-22.
[136] *Id.,* at Appendix A.3, 146.
[137] *See* PDM at 29.

*KEXIM Export Loan Programs*

   *5.*  Short-Term Export Credits
   *6.*  Export Factoring
   *7.*  Export Loan Guarantees
   *8.*  Trade Bill Rediscounting Program

Under each of these four programs, KEXIM extends short-term export financing, export loan guarantees, or the discounting of trade bills for exporters.[138]  Therefore, each of these programs provides a financial contribution as defined under section 771(5)(D)(i) of the Act.  Furthermore, each of these programs are contingent upon export performance and are therefore specific under section 771(5A)(A) and (B) of the Act.  In our *Preliminary Determination,* we determined KEXIM to be an "authority" within the meaning of section 771(5)(B) of the Act.[139]  Therefore, as AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

*Korea Trade Insurance Corporation (K-SURE) – Export Insurance and Export Credit Guarantees*

   9.  K-SURE Export Credit Guarantees

K-SURE provides both pre-shipment and post-shipment export credit guarantee programs.[140]  Therefore, this program provides a financial contribution as defined under section 771(5)(D)(i) of the Act.  In addition, this program is contingent upon export performance and is therefore specific under section 771(5A)(A) and (B) of the Act.  In the *Preliminary Determination* we determined that K-SURE was an "authority" within the meaning of 771(5)(B) of the Act.[141]  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

   10.  K-SURE Short-Term Export Credit Insurance

The Korea Export Insurance Corporation, the predecessor of the Korea Trade Insurance Corporation (K-SURE), was established in 1992.  In 2010, when the Export Insurance Act was replaced by the Trade Insurance Act,[142] the name was changed accordingly.  As guided by the Trade Insurance Act, K-SURE administers import and export insurance programs.[143]  K-SURE's export insurance policies cover (1) political risks, such as war, revolution or rebellion, limitations imposed on importation or foreign currency exchange, declaration of moratorium, and the like in the importing countries, and (2) commercial risks, such as default of export receivables due to importer's poor credit, bankruptcy, payment refusal, and the like."[144]  Specifically, the agency's

---

[138] *See* GOK PQR at 42-43.
[139] *See* PDM at 26.
[140] *See* GOK PQR at 127.
[141] *Id.*, at 26.
[142] *Id.,* at Exhibit K-SURE-1.
[143] *Id.,* at 4.
[144] *Id.*

short-term export insurance provides insurance to exporters to lessen default risks relating to export transactions that have a payment period of less than two years.[145]

Under 19 CFR 351.520(a), in the case of export insurance, a benefit exists if the premium rates charged are inadequate to cover the long-term operating costs and losses of the program. Pursuant to 19 CFR 351.520, we determine that this program did not confer a countervailable benefit upon analyzing K-SURE's long-term operating costs, as reported by the GOK since the premiums charged under the program covered the program's long-term operating costs and losses.[146]  As such, we have not included this program in POSCO's overall AFA rate.

*Income Tax Programs*

11. Research, Supply, or Workforce Development Investment Tax Deduction for "New Growth Engines" under RSTA Article 10(1)(1)

This program was first introduced in 1982 and revised in 2010 for the purpose of facilitating Korean corporations' investments in their respective R&D activities relating to the New Growth Engine program.  The statutory basis for this program is Article 10(1)(1) of the RSTA. Paragraph 1 of Article 9 of the Enforcement Decree is the implementing provision of Article 10(1)(1) of the RSTA and Appendix 7 of the Enforcement Decree sets forth a list of eligible technologies that are covered by the New Growth Engine program.  The goal of the New Growth Engine program is to enhance the competitiveness of the national economy.  Through the revision in 2010, the tax reduction rates for investments made on core technologies and in new growth engine industries were increased to twenty percent.[147]

The language of the implementing provisions and related appendices for this tax program limits eligibility for the use of this program to "new growth engines."[148]  Therefore, we find that the provision of this tax benefit is *de jure* specific, pursuant to 771(5A)(D)(i) of the Act to enterprises investing in "new growth engines" technology.

Tax credits are financial contributions in the form of revenue foregone by the government under section 771(5)(D)(ii) of the Act.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

12.  Research, Supply, or Workforce Development Expense Tax Deductions for "Core Technologies" under RSTA Article 10(1)(2)

This program was first introduced in 2010 for the purpose of facilitating Korean corporations' investments in their respective R&D activities relating to the Core Technologies program.  The statutory basis for this program is Article 10(1)(2) of the RSTA.  Paragraph 2 of Article 9 of the

---

[145] *Id.*
[146] *Id.*, at 84.  As this analysis includes the GOK's proprietary information, *see* POSCO Final Calculation Memorandum for further discussion.
[147] *See* GOK PQR at 171.
[148] *Id.*

Enforcement Decree is the implementing provision of Article 10(1)(2) of the RSTA, and Appendix 8 of the Enforcement Decree sets forth a list of eligible technologies that are covered by the New Growth Engine program.  The goal of the Core Technologies program is to boost general national economic activities.  RSTA Article 10(1)(2) offers a credit towards taxes payable by a corporation with respect to the costs of researchers and administrative personnel engaged in R&D activities related to "core technologies."[149]

The language of the implementing provisions and related appendices for this tax program limits eligibility for the use of this program to "core technologies."[150]  Therefore, we find that the provision of this tax benefit is *de jure* specific, pursuant to 771(5A)(D)(i) of the Act to enterprises investing in "core technology."

Tax credits are financial contributions in the form of revenue foregone by the government under section 771(5)(D)(ii) of the Act.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

### 13. Technical Development Fund (RSTA Article 9, formerly TERCL Article 8)

Under Article 9 of the RSTA, a corporation that has accumulated reserves for research and human resources development may deduct the reserves up to an amount equal to three percent of its net income for the tax year, independent of the actual expenditures for research and development and human resources during the tax year.  Corporations that claim this provision and deduct all or part of its accumulated reserves, subsequently, must recognize income in future years.[151]

The language of the implementing provisions and related appendices for this tax program limits eligibility for the use of this program to "necessary expenses for independent research and development in case of research and development for the development of new service and service delivery systems."[152]  Therefore, we find that the provision of this tax benefit is *de jure* specific, pursuant to 771(5A)(D)(i) of the Act to enterprises incurring the specified expenses.

Tax deductions are financial contributions in the form of revenue foregone by the government under section 771(5)(D)(ii) of the Act.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

### 14. RSTA Article 11

Under this program, companies receive tax deductions for facility investments on research and development.  As stated by the GOK, the purpose of these deductions is to improve the competitive power of business and to create positive growth of the economy, through expansion

---

[149] *Id* at 189.
[150] *Id.*
[151] *See* GOK 1SQR at Exhibit GSQ1R-TAX2.
[152] *Id.*

of research and manpower.[153]  The deduction amount received by companies is determined based on company size.[154]

Information provided by the GOK demonstrates that only a limited number of companies claimed this tax credit in 2014.[155]  Accordingly, we determine that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act because the actual number of recipients is limited.  This program results in a financial contribution from the GOK to recipients in the form of revenue foregone, as described in section 771(5)(D)(ii) of the Act.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

### 15. RSTA Article 30: Special Depreciation Tax Credit

Under Article 30 of the RSTA, a company that acquires certain fixed assets for use for business purposes may deduct depreciation costs related to those assets based on useful lives that differ from those used to calculate depreciation for financial accounting reporting purposes.  Although Article 30 was revoked in 2010, taxpayers that applied for special deduction prior to 2010 for assets acquired before June 30, 2004 are able to continue applying this special appreciation on these assets in accordance with Article 4 of the Addenda to RSTA.[156]  Companies that meet the meet the aforementioned requirements under Article 4 of the addenda to RSTA automatically receive this tax reduction.  This program is administered by the NTS, under the direction of MOSF.

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[157]  This program results in a financial contribution from the GOK to recipients in the form of revenue foregone, as described in section 771(5)(D)(ii) of the Act.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

### 16. RSTA Article 104(14): Third Party Logistics Operation

This tax credit was introduced in 2007, with the purpose of motivating manufacturing companies to outsource logistics business operations to third parties that specialize in logistics by offering a tax incentive for doing so.[158]  Administered by the NTS, under the direction of the MOSF, Article 104(14) is the law authorizing the tax incentive, which is implemented through Article 104(14) of the Enforcement Decree of the RSTA.[159]  Through this program, a manufacturing company which conducts its own logistics business operations may receive tax deductions for outsourcing such operations to non-interested third parties.

---

[153] *See* GOK PQR at 219.
[154] *Id.*
[155] *Id.*, at 231.
[156] *See* GOK 2SQR at 18.
[157] *See* 2014 Statistical Yearbook of National Tax; HS Initial Questionnaire Response at Exhibit H-15, at page 274.
[158] *Id.*, at Appendix at 295.
[159] *Id.*

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[160]  Additionally, we determine that this program results in a financial contribution from the GOK to recipients in the form of revenue foregone, as described in section 771(5)(D)(ii) of the Act.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

### 17. RSTA Article 104(8):  Special Tax Credit for Payment Records

Under Article 104(8) of the RSTA, a company will receive a tax deduction when it submits documents directly using the national tax information and communication networks.  The GOK states that this program is administered by NTS, which operates under MOSF, and companies automatically receive the tax deduction under this program if all of the aforementioned eligibility criteria is met as established by Article 104-5 of the RSTA and Article 104-5 of its Enforcement Decree.[161]

We determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients are limited in number.[162]  This program results in a financial contribution from the GOK to recipients in the form of revenue foregone, as described in section 771(5)(D)(ii) of the Act.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

### 18. *Subsidies to Companies Located in Certain Economic Zones*

Under this program, the GOK or local governments in Korea may provide various incentives to companies located in a FEZ.  Designation of an area as an FEZ is governed by the Special Act on Designation and Management of Free Economic Zones.  Companies located in an FEZ can be approved to receive: (1) Tax Reductions and Exemptions; (2) Exemptions and Reductions of Lease Fees; and (3) Grants and Financial Support.[163]  We determine that this program is specific under section 771(5A)(D)(iv) because the program is limited to companies located within a designated geographical region within the jurisdiction of the authority providing the subsidy.  We also find that tax exemptions and reductions and exemptions and reductions of lease fees provide a financial contribution within the meaning of section 771(5)(D)(ii) of the Act in the form of revenue foregone that is otherwise due.  In addition, grants provided under this program provide a financial contribution as defined under section 7771(5)(D)(i) if the Act.  As AFA, we have determined that Hyundai Steel and POSCO benefited from this subsidy during the POI; we are thus including this program in Hyundai Steel's and POSCO's overall subsidy rates.

---

[160] *Id.,* at Appendix at 306.
[161] *See* GOK 2SQR at Appendix at 31.
[162] *See* GOK 2SQR at Appendix at 38.
[163] *See* GOK Initial Questionnaire at 67.

*Grants*

19. R&D Grants under the Industrial Technology Innovation Promotion Act (ITIPA)[164]

This program, which is regulated and operated by MOTIE, was designed to promote new industries and enhance the competitiveness of Korea's national economy through the development of industrial technologies. Under the ITIPA program, the GOK provides grants to support technological development in certain industries, including industrial materials.[165]

The program is operated pursuant to Article 11 of the ITIPA. According to the GOK, any party wishing to participate in the program prepares a business plan that meets the requirements set forth in the basic plan and then submits the application to the MOTIE Review Committee, which then evaluates the application to determine if it conforms to the terms and conditions set forth in the basic plan. If the application is approved, the GOK provides the fund according to the agreement.[166]

The costs of the R&D projects under this program are shared by the company (or research institution) and KEIT. Specifically, the grant ratio for project costs are as follows: (1) for projects with one small/medium-sized enterprise (SME), MOTIE provides grants of up to 75 percent of total project costs; (2) for other companies, MOTIE grants 50 percent of total project costs; (3) for projects with more than one participant, MOTIE grants 75 percent of the total project cost if two thirds of the participants are SMEs; (4) otherwise, MOTIE provides 50 percent of project costs.[167]

We determine this program to be *de jure* specific under section 771(5A)(D)(i) of the Act because it is limited to projects in the basic plan that the program determines will support the industrial technologies for the national interest of Korea. For the portion of the subsidy that does not have to be repaid, we determine that a financial contribution was provided within the meaning of section 771(5)(D)(i) of the Act because the GOK's payments constitute a direct transfer of funds, and a benefit exists in the amount of the grant provided in accordance with 19 CFR 351.504(a). For the portion of the subsidy that may have to be repaid, we determine that a financial contribution was provided within the meaning of section 771(5)(D)(i) of the Act because the GOK's payments constitute a direct transfer of funds through loans. As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

---

[164] We initiated on a program titled Clean Coal Subsidies. However, as reported by the GOK, this program was undertaken pursuant to the Industrial Technology Promotion act (ITIPA). Therefore, we are not including this program separately in POSCO's overall subsidy rate. *See* GOK PQR at 92.
[165] *See* GOK PQR at 373-388.
[166] *Id*.
[167] *Id*.

20. Modal Shift Program

The GOK established this grant program in 2010 in order to decrease greenhouse gas emissions in the transportation and logistics sector.[168]  Through the provision of financial support, the GOK seeks to increase rail and vessel transport, while decreasing motorized vehicle freight, in the hope that this will promote a shift towards a greater use of environment-friendly means of transportation and rebalance the method of transport in the logistics sector.[169]  Under this program, the GOK provides grants from the Ministry of Land, Infrastructure and Transport to administering agencies for truck-to-rail "modal shift" entities and grants from the Ministry of Oceans and Fisheries (MOF) to administering agencies for truck-to-marine freight "modal shift" entities.[170]  The legal framework for this program is Article 21 of the Sustainable Transportation Logistics Development Act (STLDA), Article 24 of its Enforcement Decree, and Articles14 through 17 of the Regulation on Modal Shift Agreement as promulgated by the MOF.[171]

In order to receive this support, companies submit an application to the relevant government agency, which reviews and evaluates the applicant's business plan and selects entities to become candidates for the program.[172]  Once the agency confirms that the obligations under the program have been fully executed, the support is provided.[173]

Based upon the information provided by the GOK, we determine that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act because the actual number of recipients is limited in number.[174]  Furthermore, a financial contribution from the GOK exists in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.  As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

*Purchases for More Than Adequate Remuneration (MTAR)*

21. The GOK Purchases Electricity from Hot-Rolled Steel Producers for MTAR

In the *Preliminary Determination*, we found that POSCO received non-measureable benefits from its sales through KPX during the POI.[175]  As established by the Electricity Business Law and its Enforcement Decree (EBL) under Article 31, sales and purchases of electricity from electricity generators in Korea may be made only through KPX.  The legal framework that governs the electricity transactions of companies with electricity generation capability is established by Article 31(2) of the EBL and Article 19 of the EBL's Enforcement Decree. Further, companies are able to sell excess electricity to KEPCO through the KPX if the companies meet the criteria established under KPX's Rules on the Operation of the Electric

---

[168] *Id.*, at 389.
[169] *Id.*
[170] *Id.*
[171] *Id.*, at 391.
[172] *Id.*, at 394.
[173] *Id.*
[174] *Id.*, at 399.
[175] *See* PDM at 36.

Utility market.[176]

We find that for this final determination, this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act because the actual number of recipients is limited in number.[177] Moreover, a financial contribution from the GOK exists in the form of the purchase of goods pursuant to section 771(5)(D)(iv) of the Act. As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

   22. Power Generation Price Difference Payments (PGPDP)

In the *Preliminary Determination*, we found that POSCO received non-measureable benefits from the Electrical Industry Foundation Fund.[178] As noted in the GOK response, pursuant to Article 49 of the EBL, companies that provide new or renewable energy may are eligible for these benefits.[179] We determine this program *de facto* specific under section 771(5A)(D)(iii)(I) of the Act because the actual number of recipients is limited in number.[180] Moreover, the payments received under this program provide a financial contribution from the GOK pursuant to section 771(5)(D)(i) of the Act. As AFA, we have determined that POSCO benefited from the subsidy; we are thus including this program in POSCO's overall subsidy rate.

## XII.   ANALYSIS OF COMMENTS

**Comment 1:   Whether the Department Should Apply AFA to the Provision of Electricity for LTAR**

**Petitioner argues:**

- The GOK has failed to provide full responses to the Department's questions and in the manner requested. Therefore, the Department must use facts available. Moreover, the Department should use AFA because the GOK has failed to cooperate to the best of its ability. The Department has applied adverse facts available for similar circumstances in recent proceedings.[181]

- For the Department to find that a party has failed to cooperate to the best of its ability, there is no requirement of intent or bad faith.[182]

---

[176] *See* GOK PQR at Appendix at 411.
[177] *Id.*, at 426.
[178] *See* PDM at 36.
[179] *See* GOK PQR at Appendix at 17.
[180] *Id*., at 426.
[181] *See* Petitioner Case Brief at 4,5 (citing *Final Affirmative Countervailing Duty Determination: Boltless Shelving Units Prepackaged for Sales from the People's Republic of China*, 80 FR 51775 (August 26, 2015) (*Boltless Shelving Units*) and accompanying IDM at 7-8. *See also, Final Results of Countervailing Duty Administrative Review: Certain Pasta from Italy*, 80 FR 11172 (March 2, 2015) (*Pasta from Italy*), and accompanying IDM).
[182] *See* Petitioner Case Brief at 3 (citing *Nippon Steel* at 1373,and 1382-83).

- Specifically, the GOK failed to provide complete information on the process and documentation for developing and modifying the electricity tariff rate from KEPCO and other government entities.[183]  Additional information on the record demonstrates the full extent of GOK political interference in KEPCO's price-setting procedures.[184]

- The *CORE VR* and other submitted information further support the lack of record evidence with regard to the consultations between KEPCO and government entities that prevent the Department from analyzing the price-setting philosophy with any accuracy.[185]

- The Petitioner also notes the GOK did not provide requested audit reports, cost data, and other electricity specific data.[186]

- The Department should select an adverse rate to ensure the GOK does not benefit from its failure to cooperate in this investigation.[187]  As such, the Department should use the Italian electricity rate for industrial users in 2014, which is a contemporary and comparative benchmark.

**The GOK rebuts:**

- The GOK has fully responded to the Department's requests and questions.  In regard to this program, the GOK provided the regulations and cost data to the Department to confirm its price-setting philosophy.  Similar arguments from Petitioner were rejected by the Department in *CORE from Korea*.[188]

- Petitioner's cite to a missing exhibit, Exhibit GSQRE-1, is inapposite as the information was actually provided in Exhibit E-25 of the GOK IQR.

---

[183] *See* Petitioner Case Brief at 6, 7.
[184] *See* Petitioner Case Brief at 7 (citing GOK IQR at 22 – 23 and Exhibit E-3 at 5).
[185] *See* Petitioner Case Brief at 7,8 (citing Letter from GOK, RE:  Hot-Rolled Steel Flat Products from the Republic of Korea:  Electricity Verification Report and relevant Exhibits from the Countervailing Duty Investigation on Certain Corrosion Resistant Steel Products (April 26, 2016, we note the document contains an incorrect date of November 30, 2015 on the cover letter.) (CORE VR) at 21and Letter from Petitioner, RE:  Certain Hot-Rolled Steel Flat Products form the Republic of Korea:  Submission of Factual Information – Benchmark Data at Exhibit 12 at 2).
[186] *See* Petitioner Case Brief at 9,10, 11 (citing GOK IQR at 3, 9, 71 – 72, Exhibit E-11, Exhibit E-23, and Appendix volume at 412 – 413 and GOK 1SQR at 3 and 15).
[187] *See* Petitioner Case Brief at 13 (citing *Final Results of Administrative Review:  Circular Welded Non-Alloy Steel Pipe from Mexico*, 76 FR 36086 (June 21, 2011) (*Welded Pipe from Mexico*) and accompanying IDM at 18; *CORE from Korea*, 81 FR 35310, 35312,  *Preliminary Negative Countervailing Duty Determination and Alignment with the Final Determination of Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 80 FR 79567 (December 22, 2015) (*Cold Rolled Preliminary Determination)* and accompanying Preliminary Decision Memorandum at 34).
[188] *See* GOK Rebuttal Brief at 4,5.

- The GOK provided the 2012 and 2014 cost data, which were verified by the Department. The GOK also did not refuse to provide data for "individual consumers," but does not retain such data and explained in its response why it could not obtain this type of data.

- Petitioner's claim of unreported data involve another alleged subsidy program. However, the GOK did explain why it could not provide the requested data for this program.[189]

**POSCO and Hyundai Steel rebut:**

- The GOK fully responded to the Department's requests and provided a voluminous amount of information on the electricity tariff setting process and costs.[190]

- This program was fully verified in *CORE from Korea* and this investigation.[191]

- Citing 19 U.S.C. §§ 1677(m)(d) and 1677e(b), the Department must inform the respondent of the nature of the deficiency and provide an opportunity to cure the deficiency if time permits and can apply an "adverse inference" if it determines that an interested party has failed to cooperate to the best of its ability. Respondents note Commerce's "discretion…is not unbounded."[192]

- Petitioner cannot point to any failure to cooperate on the part of the GOK. Furthermore, citing *Borusan*, respondents argue the Department is obligated to ask follow-up questions before resorting to adverse facts available.[193]

**Department's Position:**

Pursuant to section 776(a) of the Act, the Department shall, subject to section 782(d) of the Act, use the facts otherwise available if necessary information is not available on the record of an interested party or any other person: (1) withholds information that has been requested; (2) fails to provide such information by the deadlines or in the form and manner requested, subject to sections 782(c)(1) and 782(e) of the Act; (3) significantly impedes the proceeding; or (4) provides such information but the information cannot be verified. Under section 776(b) of the Act, the Department may use facts available with adverse inferences only when it finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information.

In this investigation, with respect to the alleged provision of electricity for LTAR, the Department finds that the GOK did not withhold information that was requested of it, did not fail

---

[189] *See* GOK Rebuttal Brief at 6,7.
[190] *See* POSCO Rebuttal Brief at 45 – 46 and Hyundai Rebuttal Brief at 18 – 19.
[191] *See* POSCO Rebuttal Brief at 46 and Hyundai Steel Rebuttal Brief at 19 – 20.
[192] *See* POSCO Rebuttal Brief at 47 and Hyundai Steel Rebuttal Brief at 20 (citing *F.Lii de Cecco di Flippo Fara S. Martino S.p.A. v United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).
[193] *See* POSCO Rebuttal Brief at 50 and Hyundai Steel Rebuttal Brief at 23 (citing *Borusan Mannesmann Boru Sanayi ve Tacaret A.S. v. United Sates*, 61 F. Supp. 3d 1306, 1348 (CIT 2015)).

to meet deadlines, did not significantly impede the proceeding, and did not provide unverifiable information. Further, we find that the GOK has not failed to cooperate by not acting to the best of its ability. Accordingly, the use of facts available with adverse inferences is not warranted.

The analysis of whether electricity is provided to an enterprise or industry for LTAR is complicated, especially in situations where the government is the only electricity source available to consumers in the country. Where the government is the sole provider of electricity, the Department will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs, or possible price discrimination.[194] In order to undertake the analysis required under 19 CFR 351.511, the Department asked extensive questions of the GOK regarding the electricity market in Korea, the provision of electricity within Korea, and the costs and methodology used in setting electricity prices and establishing electricity tariffs in Korea.

Petitioner's reliance on *Boltless Shelving Units*[195] and *Pasta from Italy*[196] is misplaced. Unlike the governments at issue in *Boltless Shelving Units* and *Pasta from Italy*, the GOK has timely submitted complete responses to all of the Department's extensive and detailed questions in its responses of November 4, 2015, and December 21, 2015. In particular, the GOK provided details on KEPCO's rate setting methodology, cost recovery rates, investment return, and profit information. The GOK also provided usage data on all electricity users, including the top 100 industrial users of electricity. Although Petitioner points to a missing exhibit and a "refusal" to provide requested electricity information on the record, we note the GOK did provide documentation made in regard to the tariff increases in Exhibit E-25 of GOK IQR and the requested information for another alleged subsidy program, not the provision of electricity for LTAR. In this regard, the Department has the discretion to request additional information from an interested party if we believe it has provided a deficient response. Here, the GOK provided the information requested by the Department or explained why it was unable to provide the requested information.

Furthermore, as noted in *CORE* VR and the GOK Verification Report, the Department conducted an extensive verification of this information in *CORE* and this proceeding, including the data underlying the calculations used by KEPCO to set the electricity prices in effect during the POI.[197] At both verifications, the Department was able to fully verify KEPCO's standard

---

[194] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65378 (November 25, 1998) (*CVD CVD Preamble*).

[195] In *Boltless Shelving Units*, the Department twice asked the Government of China (GOC) to provide, for each province where the respondents were located, a detailed explanation of: (1) how increases in the cost elements in the price proposals led to retail price increases for electricity; (2) how increases in labor costs, capital expenses and transmission, and distribution costs are factored into the price proposals for increases in electricity rates; and (3) how the cost element increases in the price proposals and the final price increases were allocated across the province and across tariff end-user categories. The GOC provided no province-specific information in response to these questions in its initial questionnaire response and failed to provide the requested information in a supplemental questionnaire response. *See* IDM at 7 -8. Therefore, pursuant to sections 776(a) and (b) of the Act, an adverse inference was applied to the GOC with respect to the provision of electricity for LTAR.

[196] In *Pasta from Italy*, the Government of Italy (GOI) failed to respond or submitted incomplete and untimely responses to the Department's supplemental questionnaires with respect to numerous programs. Therefore, an adverse inference was applied to the GOI with respect to the program at issue. *See* IDM at 11-12.

[197] *See CORE* VR and GOK Verification Report.

pricing mechanism and its application in the setting of industrial electricity tariffs. Finally, we were able to fully analyze this alleged program based upon the information provided by the GOK. Therefore, we disagree with Petitioner's argument that the GOK failed to provide full responses to our questions in the manner requested by the Department, and, in particular, with regard to the process and documentation for developing and modifying the electricity tariff rate. For all these reasons, the use of AFA, as advocated by Petitioner, is not warranted.

**Comment 2:  Whether the Department Should Find That the Provision of Electricity for LTAR is a Countervailable Subsidy**

**Petitioner argues:**

- The Department's preliminary finding of no benefit under the program is inconsistent with the current statute and regulations.[198]  In particular, the Department's reliance on *Magnesium from Canada*[199] is misplaced.  *Magnesium from Canada* was guided by the old statute and focused on the provision of goods and services in terms of "preferential" treatment rather than whether the goods or services were provided for less than adequate remuneration.[200]  Petitioner adds even *Magnesium from Canada* did not rely on the existence of a standard pricing mechanism, but only in cases where the rate schedule did not apply to a respondent.[201]

- *Softwood Lumber from Canada* established that there are several important differences between the discarded preferentiality standard and the current adequate remuneration standard.[202]  Preferentiality is a measure of price discrimination, *i.e.*, whether a government is favoring some buyers over others with lower prices.  Thus, the first choice of benchmark under this methodology was to use another government price as a benchmark to determine whether the investigated program provides a benefit.  This did not measure the adequacy of remuneration, and the price discrimination test was dropped with the adoption of the URAA.  It is no longer sufficient to say that the government does not discriminate; rather, the Department must determine whether the government is receiving adequate remuneration, *i.e.*, a market-based price.

---

[198] *See* Petitioner Case Brief at 15 (citing Section 771(5)(E)(iv) of the Act ('the provision of goods and services will have conferred a benefit if they are provided for less than adequate remuneration.'), 19 CFR 351.511(a)(2) and *CVD CVD Preamble* at 65360 (Under the regulations, the Department "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles.").

[199] *See* Petitioner Case Brief at 16 (citing *Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946 (July 13, 1992) (*Magnesium from Canada*)).

[200] *See* Petitioner Case Brief at 16 (citing section 771(5)(a)(ii)(II) of the Act (1998)).

[201] *See* Petitioner Case Brief at 19 (citing *Magnesium form Canada* at FR 30946, 30949-50).

[202] *See* Petitioner Case Brief at 17 (citing *Notice of Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances and Alignment of  Final Countervailing Duty Determination With Final Antidumping Duty Determination: Certain Softwood Lumber Products from Canada*, 66 FR 43186, 43196 (August 17, 2001) (*Softwood Lumber from Canada Prelim*) and *Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Softwood Lumber from Canada*, 67 FR 15545 (April 2, 2002) (*Softwood Lumber from Canada Final*), and accompanying Issues and Decision Memorandum, at 42).

- Pursuant to 19 CFR 351.511, the Department's analysis should focus on market principles.[203] In the *Preliminary Determination*, the Department focused on "preferential treatment" rather than the current methodology articulated in *Softwood Lumber from Canada*.[204] Thus, the Department should analyze the tariff setting process in terms of market principles and whether the prices are market based.

- Consistent with *Wire Rod from Trinidad and Tobago*,[205] *Softwood Lumber from Canada*,[206] and *Royal Thai Government*[207] the Department should find that KEPCO's prices are not market-based because they do not allow for an appropriate recovery of costs. Substantial record evidence submitted by the GOK indicates that KEPCO does not cover its cost for providing electricity to its customers. This case stands in contrast to the countervailing duty investigation of *Wire Rod from Trinidad and Tobago*, where the Department found no benefit where it requested and received studies indicating that the respondent's customer category was profitable and that marginal costs were covered.[208]

- The Petition and record information, and specifically the industrial tariff schedule and the distribution of nuclear-generated electricity, indicate that KEPCO's electricity tariff prices are not set in accordance with market principles.[209] All electricity in Korea is sold through KPX, which charges a flat fee for costs (capacity price) and uses a merit system to assign a price for variable costs. The tariff prices charged to industrial companies provide a benefit because the prices do not cover the actual costs incurred by the nuclear generators.

- The Department should disregard KEPCO's comments concerning alleged defects in the National Assembly Report. Information on the record clearly demonstrates that the system assigns the same fixed costs and uses the merit system to favor generators using cheaper fuel sources. Thus, although nuclear energy is cheap to produce, its overall costs are the most expensive in comparison to industrial tariffs rates. However, KEPCO's own data and the National Assembly audit demonstrate that costs for other types of generation in Korea are also skewed. Moreover, the Korean National Assembly Report from 2012 (an examination of electricity usage of the 100 biggest corporations in Korea)

---

[203] *See* Petitioner Case Brief at 17 (citing *CVD CVD Preamble* at 65378).
[204] *See* Petitioner Case Brief at 17, 18 (citing *Final Rule: Countervailing Duties*, 54 FR 23366, 23372 (May 31, 1989) and *Softwood Lumber from Canada Prelim*, *Softwood Lumber from Canada Final* and accompanying Issues and Decision Memorandum at 42).
[205] *See* Petitioner Case Brief at 25 (citing *Steel Wire Rod from Trinidad and Tobago*, 65 FR 55003 (October 22, 1997)).
[206] *See* Petitioner Case Brief at 25 (citing *In the Matter of Certain Softwood Lumber from Canada: Final Affirmative Countervailing Duty Determination*, Secretariat File No. USA-CDA-2002-1904-03 NAFTA Binational Panel Review at 9-10).
[207] *See* Petitioner Case Brief at 25, 26 (citing *Royal Thai Government v. Unites States*, 441 F. Supp. 2d 1350, 1359-62 (CIT 2006) (*Royal Thai Government*)).
[208] *See* Petitioner Case Brief at 27 (citing *Final Negative Countervailing Duty Determination: Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago*, 67 FR 55810 (August 30, 2002) and accompanying Issues and Decision Memorandum at Comment 6).
[209] *See* Petitioner Case Brief at 27-31.

demonstrates that "the government subsidizes and charges less-than-normal electricity cost to the steel industries for their exceeding use of electricity."[210]

- The Department did not address specificity in the preliminary determination. However, substantial evidence on record demonstrates the alleged program may be found *de facto* specific under any of the relevant statutory provisions.[211]

**The GOK rebuts:**

- The relevant data to examine is the 2012 and 2014 cost data, and the fact that industrial tariff rates have increased three times since August 2012. Additionally, Petitioner's argument on the system's marginal price is misplaced as this price, the variable cost, is equally paid to all generators that generate and sell electricity at a certain time.

- In accordance with the *CVD Preamble*, the Department correctly applied the adequacy of remuneration standard and not the preferentiality standard under the tier "three" analysis.[212] The Department's analysis considered price setting philosophy, costs, and price discrimination.[213]

- The 2014 cost data sheet is accurate and is the basis to analyze costs.[214]

- Petitioner's statements about purchasing generated electricity are mistaken. There is not a one-to-one correlation between a generator and an end user. Electricity is purchased from all types of generators and provided to all users based on the specific tariff rate. The fact that the tariff decreases when the peak is low is truly a market oriented characteristic.[215]

- Petitioner did not take the adjustment coefficient that KEPCO pays for electricity into account when arguing electricity tariff rates do not cover all fixed and variable costs.[216]

- Petitioner's cites to record to record information do not support a finding that electricity tariff rates are not based on market principles.[217]

- Korean law and regulations do not allow tariff rates to provide preferential treatment to industrial class users and the merit order system, by design, does not allow any discretion with regard to the source of generating electricity or enable large customers to consume large amounts of electricity at off-peak times.

---

[210] *See* Petitioner Case Brief at 33 34..
[211] *See* Petitioner Case Brief at 36 – 47.
[212] *See* GOK Rebuttal Brief at 9 (citing *CVD CVD Preamble* at 65377 – 65378).
[213] *See* GOK Rebuttal at 12 (citing PDM at 32).
[214] *See* GOK Rebuttal Brief at 13.
[215] *See* GOK Rebuttal Brief at 14.
[216] *See* GOK Rebuttal Brief at 14 - 15.
[217] *See* GOK Rebuttal Brief at 16 – 17.

**POSCO and Hyundai Steel rebut:**

- Section 771(5)(E)(iv) of the Act does not require any particular methodology in measuring the adequacy of remuneration. Under *Chevron*, the Department has adopted a reasonable method under 19 CFR 351.511(2)(a)(iii). The *CVD Preamble* states that the Department will analyze factors such as the government price setting philosophy, costs, and possible price discrimination to determine whether prices were set according to market principles.[218]

- The Department's analysis is consistent with the statute, regulations, and the *CVD Preamble*, and Petitioner has not demonstrated the analysis is unreasonable under *Chevron*. Moreover, the Department did not treat the use of a standard pricing mechanism as "dispositive," but determined there was no price discrimination, consistent with the *CVD Preamble*.

- The *CVD Preamble*[219] specifically cites to *Magnesium from Canada*[220] and indicates that it would consider factors such as the government's price setting philosophy as part of its tier-three analysis. Moreover, in the *Samsung Remand*, the Department linked its standard pricing mechanism to the new LTAR statute.[221]

- The 2012 cost data as verified by the Department and the 2014 cost data demonstrate that KEPCO covered its costs and enjoyed a reasonable return on investment. There is no indication those cost recovery rates are not accurate. Furthermore, KEPCO's 20-F filed with the U.S. Securities and Exchange Commission states that KEPCO was profitable in both 2013 and 2014 as well as in each segment of its business.[222]

- Petitioner's assertion that the price paid by KEPCO through KPX to nuclear facilities does not allow these generators to recover their costs is incorrect. The merit order system accounts for its lower costs to produce electricity and, thus, receives a higher premium on its purchase than other types of generators. Moreover, the capacity price must also cover the fixed costs of nuclear facilities as they continue to be built in Korea.[223]

---

[218] *See* POSCO Rebuttal Brief at 52 – 53 and Hyundai Steel Brief at 25 – 26 (citing *CVD CVD Preamble*, 63 FR at 65378).
[219] *See* POSCO Rebuttal Brief at 53 - 54 and Hyundai Steel Brief at 26 – 27 (citing *CVD CVD Preamble*, 63 FR at 65378).
[220] *See* POSCO Rebuttal Brief at 53 - 54 and Hyundai Steel Brief at 26 – 27 (citing *Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992) (*Magnesium from Canada*)).
[221] *See* POSCO Rebuttal Brief at 54 and Hyundai Steel Brief at 27 (citing *Final Results of Redetermination Pursuant to Court Order, Samsung Electronics Co., Ltd.. v. United States*, 973 F. Supp. 2d 1321 (CIT 2014), *aff'd* 37 F. Supp. 3d 1320 (CIT 2014) (*Samsung Remand*) at 24).
[222] *See* POSCO Rebuttal Brief at 57 and Hyundai Steel Brief at 30 (citing GOK IQR at Exhibit E-3, F-9 and F-41).
[223] *See* POSCO Rebuttal Brief at 58 - 59 and Hyundai Steel Brief at 31 – 32.

- The fact respondents operate their production facilities 24 hours a day and consume large amounts of electricity during the evening hours is more evidence of supply and demand than any preference. Additionally, the merit system is a rational and market-based system and the fact that nuclear generators supply electricity at off-peak hours for low cost is not support for any preferential support to POSCO or other large industrial users. Finally, as long as KEPCO covers its costs and has a reasonable rate of return, how KPX purchases electricity from generators is not relevant to the analysis.

- The National Assembly Report is an inappropriate basis to calculate KEPCO's POI costs because it is based on costs that predate the POI by two years, contains multiple defects, and was prepared on an *ad hoc* basis in response to a request that was political in nature. Moreover, at the *CORE from Korea* verification, the KEPCO official explained that this report had nothing to do with prices in Korea.

- There is no basis to Petitioner's *de facto* arguments as the respondents purchase electricity from the published tariff schedule that was established by KEPCO's standard pricing mechanism.

**Department's Position:**

Consistent with section 771(5)(E)(iv) of the Act and 19 CFR 351.511, we continue to determine that this program provides no benefit to POSCO or Hyundai Steel because we have determined the provision of electricity in this case is not for LTAR.

Section 771(5)(E) of the Act states that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided…in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions for sale." Adequate remuneration is defined in 19 CFR 351.511(a)(2). Under 19 CFR 351.511(a)(2)(iii), commonly called "tier three," when there are no private prices, including import prices, for the good or service in the country under investigation, and when there are no available world market prices, the adequacy of remuneration will be measured "by assessing whether the government price is consistent with market principles." Under 19 CFR 351.511(a)(2)(iii), the Department will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, cost, or possible price discrimination. These factors are not put in any hierarchy, and we may rely on one or more of these factors in any particular case.[224]

For purposes of this final determination, under our tier three benchmark analysis, we assessed whether the prices charged by KEPCO are set in accordance with market principles through an analysis of KEPCO's price-setting method. With respect to KEPCO's price-setting method, the Department stated in *Magnesium from Canada* that we will examine the electricity rates charged to our investigated respondents to determine whether the price charged is consistent with the

---

[224] *See CVD CVD Preamble*, 63 FR at 65378.

power company's standard pricing mechanism. If the rate charged is consistent with the
standard pricing mechanism and the company under investigation is, in all other respects,
essentially treated no differently than other companies and industries which purchase comparable
amounts of electricity, then there is no benefit.[225]

In the instant investigation, POSCO and Hyundai Steel purchased electricity from KEPCO. The
GOK reported that a single tariff rate table applied throughout the POI, and that this tariff rate
went into effect on November 21, 2013, and was applicable to the respondents in this
investigation.[226] Further, the GOK provided its calculation of electricity costs as well as data
showing its cost and investment return pertaining to the POI for the industrial users of
electricity.[227] The GOK provided KEPCO's data that was submitted to MOTIE in 2013 for the
tariff in effect during the POI, as well as an explanation of its calculations and recovery costs.[228]
The GOK stated that KEPCO applied this same price-setting method or standard pricing
mechanism to determine the electricity tariffs for each tariff classification including the industrial
tariff that was paid by the respondents during the POI.[229] In addition, there is no information on
the record that POSCO and Hyundai Steel are treated differently from other industrial users of
electricity that purchase comparable amounts of electricity because the rates paid were from the
tariff schedule applicable to all industrial users. Therefore, consistent with 19 CFR 351.511 and
*Magnesium from Canada*, we continue to find that this program provides no benefit to POSCO
and Hyundai Steel because the prices charged to these respondents under the applicable
industrial tariff were consistent with KEPCO's standard pricing mechanism.

*The Standard Pricing Mechanism Developed in Magnesium from Canada Measures Adequacy of*
*Remuneration*

Under 19 CFR 351.511(a)(2)(iii), the Department assessed KEPCO's tariffs for large industrial
users, the tariff applicable to the respondents under investigation, through an analysis of
KEPCO's price-setting philosophy, or standard pricing mechanism, the term used in *Magnesium*
*from Canada*. Petitioner argues that the standard pricing mechanism set forth in *Magnesium*
*from Canada* is not relevant because it focuses on "preferentiality" rather than adequate
remuneration; however, this argument misunderstands the nature of adequate remuneration.

Petitioner contends that the Department's application of its standard pricing mechanism, set forth
in *Magnesium from Canada*,[230] is contrary to law because that administrative determination was
made pursuant to a prior version of the U.S. countervailing duty law, under which subsidies
included the provision of goods or services at preferential rates. Petitioner is incorrect, as
demonstrated by the fact that the current CVD regulations that implemented the statutory
changes as a result of the Uruguay Round Agreements Act (URAA), and in particular 19 CFR
351.511, regarding the provision of a good or service, were enacted with reference to the

---

[225] *See* discussion of *Magnesium from Canada* in PDM at footnote 204.
[226] *See* GOK IQR at 13 and Exhibit E-13.
[227] *See* GOK IQR at Exhibit E-23 and GOK Verification Report at Exhibit VE-5.
[228] *See* GOK IQR at 15 – 17 and Exhibit E-11.
[229] *See* GOK IQR at 12.
[230] *See* Petitioner Case Brief at 16.

2495514-01 C-580-884 INV - Investigation -

methodology developed in *Magnesium from Canada* to analyze whether the provision of a good or service such as electricity is provided at adequate remuneration.[231]

Indeed, when the *CVD Preamble* mentions the "government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination" as factors the Department may consider under the new law to assess whether a government price is consistent with market principles, it cites *Magnesium from Canada* as a case that includes such analysis.[232]  Accordingly, in a tier three analysis, if "the rate charged is consistent with the {utility company's} standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other industries which purchase comparable amounts of electricity," then that fact is sufficient to support a finding that no benefit is conferred.[233]  The fact that KEPCO adhered to its standard pricing mechanism is significant. The application of a uniform price-setting philosophy is the first factor enumerated in assessing whether the government price was set in accordance with market principles.[234]  Petitioner notes *Magnesium from Canada* involved a company whose rate did not apply to the rate schedule.[235] However, we have applied the standard set forth in *Magnesium from Canada* in investigations where the respondent's rate did not deviate from the tariff rate.[236]

Moreover, it is clear that with the concept of a standard pricing methodology, developed in *Magnesium from Canada*, the Department recognized the market conditions for the provision of electricity, which is that electricity tariffs are generally based upon the type and amount of consumption of electricity and that utility rates will vary depending on the size and classification of the electricity consumer.  Therefore, the Department developed the standard pricing methodology, codified under 19 CFR 351.511(a)(2)(iii), to account for the commercial market conditions by which electricity is provided to consumers.  As such, the standard pricing methodology ensures that adequacy of remuneration for the provision of a good or service is determined in relation to the prevailing market conditions for the good or service being provided as required under 771(5)(E) of the Act.

The URAA's move away from the preferentiality methodology flipped the regulatory hierarchy, with market prices from the country under investigation and world market prices moving up the

---

[231]  *See CVD Preamble*, at 63 FR 65348; 65378 ("Paragraph (a)(2)(iii) provides that, in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles.  Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.  We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.  In our experience, these types of analyses may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case vary widely).  *See, e.g.*, *Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992) and *Venezuelan Wire Rod*").
[232]  *See CVD Preamble*, at 63 FR 6538.
[233]  *See Magnesium from Canada*, 57 FR at 30949-50.
[234]  *See CVD Preamble*, at 63 FR 65378.
[235]  *See* Petitioner Case Brief at 19.
[236]  *See e.g. Welded Line Pipe from the Republic of Korea:  Final Negative Countervailing Duty Determination*, 80 FR 61365 (Oct. 13, 2015).

hierarchy, and other considerations, including price discrimination, remaining potentially relevant only if the preferred data are unavailable.[237]  However, Petitioner's argument, citing *Softwood Lumber from Canada*, that a preferentiality analysis cannot be sufficient to assess adequate remuneration is mistaken.  In response to comments to its proposed regulation implementing the new law based on adequate remuneration, the Department addressed concerns "about potentially continuing the use of the preferentiality standard by shifting the focus of {its} inquiry toward whether the government employed market principles in setting prices."[238]  The Department clarified that a price discrimination analysis may still be appropriate under the new law because, in the context of a tier three analysis, "there may be instances where government prices are the most reasonable surrogate for market-determined prices."[239]

### *Cost Recovery as a Measure of Adequate Remuneration*

Petitioner argues that cost recovery is the only basis to measure the adequacy of remuneration; however, this contention is incorrect as a matter of law.  As clearly set forth under 19 CFR 351.511(a)(2)(iii), the Department will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, cost, or possible price discrimination.  These factors are not put in any hierarchy, and we may rely on one or more of these factors in any particular case.[240]  Therefore, under the CVD law, the Department may determine the adequacy of remuneration by assessing whether the government's price for electricity is in accordance with market prices by analyzing (1) the government's price-setting philosophy; (2) cost; or (3) possible price discrimination.  If the adequacy of remuneration could only be measured by an analysis of an utility company's cost (or cost recovery), then the Department's regulations would not have included an analysis of the government's price-setting philosophy, or, for that matter, possible price discrimination in the description of a "tier three" benefit analysis.  Neither section 771(5)(E)(iv) of the Act nor 19 CFR 351.511(a)(2)(iii) requires the Department to measure the adequacy of remuneration solely on an examination of cost and cost recovery.

As also made clear under 19 CFR 351.311(a)(2)(iii), the factors that may be used by the Department in determining whether a government price is consistent with market principles - the government's price-setting philosophy, cost, or possible price discrimination - are not put in any hierarchy, and the Department may rely on one or more of these factors in any particular case.[241]

---

[237] As explained in *Certain Softwood Lumber Products from Canada Prelim*, the prior methodology that applied under the pre-URAA law provided that Commerce "would measure whether the government provided a good or service at a preferential rate based upon, in order of preference, the following benchmarks: (1) The price the government charges to other parties for the identical or similar good; (2) the price charged by other sellers within the same political jurisdiction (*i.e.*, country under investigation); (3) the government's cost of providing the good or service; or (4) the price paid for that good outside the country under investigation."  *See Preliminary Affirmative Countervailing Duty Determination: Certain Softwood Lumber Products From Canada*, 57 FR 8801 (March 12, 1992) (*Certain Softwood Lumber Products from Canada Prelim*).  This correctly emphasized the priority given to market prices under the new law, but nothing in that decision disturbs the Department's practice, as set forth in the *CVD CVD Preamble*, with respect to assessing a government price under a "tier three" analysis.
[238] *See CVD CVD Preamble*, 63 FR at 65378.
[239] *Id.*
[240] *Id.*
[241] *Id.*

Therefore, the argument by Petitioner that we may only use cost in assessing the adequacy of remuneration is clearly unsupported by the statute and the regulations governing the provision of a good or service.

In *Hot-Rolled from Thailand*, the Department found the Government of Thailand's provision of electricity to respondents in certain regions outside the Bangkok Metropolitan area to provide a countervailable subsidy.[242]  In that case, which involved the application of facts available, the Department used the cost factor to analyze the adequacy of remuneration, based upon the facts on the record regarding the provision of electricity in Thailand.  In Thailand, electricity was generated and transmitted through one entity, the Electricity Generating Authority of Thailand (EGAT), while two entities were responsible for distributing electricity:  the Metropolitan Electricity Authority (MEA), which distributed electricity in Bangkok and the surrounding areas, and the Provincial Electricity Authority (PEA), which distributed electricity to the rest of the country.  While the cost of distribution was greater for the PEA than for the MEA, the Government of Thailand maintained a uniform national tariff policy, whereby consumers in the same customer category would pay the same rate regardless of the area of distribution.[243] Therefore, there was no standard pricing mechanism in setting electricity tariffs because distribution expenses were accounted for in two different methods for electricity provided through the MEA and electricity provided through the PEA.

To maintain the government policy of charging consumers in the same customer category the identical rate, EGAT provided a discount to the PEA and charged the MEA a surcharge on the rates paid on electricity in order to cross-subsidize the higher distribution costs incurred by the PEA.  Therefore, the Department determined that this practice constituted a regional subsidy. Accordingly, based on the facts of that case, the Department used the element of cost under 19 CFR 351.311(a)(2)(iii) to assess the adequacy of remuneration and considered the amount of the subsidy to be the amount of the cross-subsidization.[244]  Thus, the facts on the record in *Hot-Rolled from Thailand* that led the Department to use the cost factor to assess the adequacy of remuneration are different from the facts of this investigation that support assessing the adequacy of remuneration using the government's price-setting philosophy.

Similarly, Petitioner's citation to *Steel Wire Rod from Trinidad and Tobago* does not support an argument that we should disregard KEPCO's standard pricing methodology and apply a cost recovery standard.  The final determination of *Wire Rod from Trinidad and Tobago* was made on October 22, 1997, before the enactment of 19 CFR 351.511 and our current CVD regulations, which were implemented on November 25, 1998, and are applicable to CVD investigations initiated on the basis of petitions filed after December 28, 1998.[245]  Therefore, the analysis of adequacy of remuneration cited by Petitioner in *Wire Rod from Trinidad and Tobago* did not involve the assessment of the adequacy of remuneration under 19 CFR 351.511.  Moreover,

---

[242] *See Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (October 3, 2001) (*Hot-Rolled from Thailand*), and accompanying IDM at II.B. "Provision of Electricity for Less than Adequate Remuneration."
[243] *Id*.
[244] *Id.*, and accompanying IDM at Comment 12.
[245] *See CVD Preamble*, 63 FR at 65348.

subsequent to the enactment of 19 CFR 351.511, in measuring the adequacy of remuneration from the provision of electricity in *Melamine from Trinidad and Tobago*, the Department assessed the adequacy of remuneration using the government's price-setting methodology under 19 CFR 351.511(a)(2)(iii).[246]

Petitioner also argues that electricity tariffs do not include the full cost of generation, including electricity from nuclear generators, because steel producers purchase electricity predominantly during off-hours where electricity is primarily generated from nuclear generation units. However, Petitioner has failed to provide any evidence that the prevailing market conditions for the provision of electricity in Korea are that utility companies have separate tariff rates that are differentiated based upon the manner in which the electricity is generated. The tariff schedule on the record of our investigation does not support this proposition. Petitioner has also failed to adequately support a claim that KEPCO's costs of electricity used in developing its tariff schedule do not fully reflect its actual costs of the electricity that it transmits and distributes to its customers in Korea. In addition, with respect to the costs of the generators, including the nuclear generators, the Department did not request these costs because the costs of electricity to KEPCO are determined by the KPX. Electricity generators sell electricity to the KPX, and KEPCO purchases the electricity it distributes to its customers through the KPX. Thus, the costs for electricity are based upon the purchase price of electricity from the KPX, and this is the cost that is relevant for KEPCO's industrial tariff schedule.[247]

Finally, with regard to the "tier three" benchmark used to determine whether the provision of electricity was for adequate remuneration, KEPCO's standard pricing mechanism used to develop its tariff schedule was based upon its costs. To develop the electricity tariff schedules that were applicable during the POI, KEPCO first calculated its overall cost, including an amount for investment return. This cost includes the operational cost for generating and supplying electricity to the consumers as well as taxes. The cost for each electricity classification was calculated by (1) distributing the overall cost according to the stages of providing electricity (generation, transmission, distribution, and sales); (2) dividing each cost into fixed cost, variable cost, and the consumer management fee; and (3) then calculating the cost by applying the electricity load level, peak level, and the patterns of consuming electricity. Each cost was then distributed into the fixed charge and the variable charge. KEPCO then divided each cost taking into consideration the electricity load level, the usage pattern of electricity, and the volume of the electricity consumed. Costs were then distributed according to the number of consumers for each classification of electricity.[248] For the POI, KEPCO more than fully covered its cost for the industry tariff applicable to our respondents.[249]

---

[246] *See Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 FR 68849 (November 6, 2015) (*Melamine from Trinidad and Tobago*), and accompanying IDM at 13.
[247] *See Line Pipe from Korea*, and accompanying IDM at 27.
[248] *See* GOK IQR at 15-16; *see also CORE* VR at 12-18.
[249] *See* GOK IQR at Exhibit E-23 and GOK Verification Report at Exhibit VE-5.

*The National Assembly Report*

Finally, Petitioner argues that the Department should rely on the National Assembly Report because it demonstrates that the steel industry is being charged "less-than-normal electricity costs."

The National Assembly Report relied upon by Petitioner is not relevant to our analysis as to whether KEPCO provides electricity to our respondents for LTAR. The National Assembly Report provides information on the electricity consumption pattern of Korea's largest 100 corporations. While the losses incurred by KEPCO as shown in the Report are flawed due to the methodology used to produce the data, *i.e.*, comparing company-specific revenue to aggregated cost, the more important flaw is that the information provided within the Report is from two years prior to our POI, 2014. Since the date of the Report, 2012, KEPCO electricity industrial tariffs have been increased three different times.[250]

Under our regulations, we must determine whether the rates paid during the POI, the 2014 calendar year, are for adequate remuneration as set forth under 19 CFR 351.511. Therefore, our analysis was based upon KEPCO's industrial tariffs that were in effect during 2014, not the industrial tariffs that pre-dated the POI by at least two years. Therefore, the information in the National Assembly Report is outdated and not relevant to our POI.

*Specificity Comments*

We received comments from the interested parties on the issue of whether the provision of electricity is specific. Because we determined that the provision of electricity did not provide a benefit, the issue of specificity is moot.

**Comment 3:    Whether the Department Should Use Other Submitted Data to Measure the Adequacy of Remuneration for Electricity**

**Petitioner argues:**

- The Department's regulations set forth a hierarchy (*e.g.*, three tiers) for evaluating whether a good is provided for LTAR, pursuant to 19 CFR 351.511(a)(2).

- There are no market-based prices in Korea to evaluate electricity prices, therefore tier "one" is not a viable option.[251]

- The provision of electricity generally cannot be evaluated under tier "two" and the Department will measure the adequacy of remuneration under tier "three." However, the regulations do not specify how to conduct a market principles analysis under tier "three."

- In *Laminated Sacks from China*[252], the Department had a similar situation and used

---

[250] *See* GOK IQR at Exhibit E-3 at page 50-51.
[251] *See* Petitioner Case Brief at 48 (citing GOK IQR at 9-10).

comparable market-based prices in a country "at a comparable level of economic development that is reasonably proximate to, but outside, of China."[253]  The Department should use the same methodology for this program, using Japan as the comparable country.[254]

- Alternatively, the Department may also use data on the record to approximate the benefit conferred by the program.[255]

**POSCO and Hyundai Steel rebut:**

- The record demonstrates that electricity prices from other countries are not reasonably available to purchasers in Korea as there is no cross-border transmission or distribution of electricity in Korea.[256]  This is in line with the Department's past practice.[257]

- The Department's past practice has also been to resort to a tier three analysis when analyzing electricity.  The Department found the electricity supplier did apply its standard pricing mechanism in *Magnesium from Canada* and *Supercalendered Paper from Canada*.[258]

- The Department needs to analyze the prevailing market conditions in the country under investigation pursuant to section 771(5)(E) of the Act.

- Petitioner's suggested use of KEPCO data provided for the National Assembly Report, in the alternative, should be rejected as the report has been discredited by KEPCO and described as inaccurate.

---

[252] As a result of WTO Appellate Body's Finding in WTO DS 379, the analysis of land in *Laminated Sacks from China* was modified in a Section 129 Determination.  For further information, s*ee Implementation of Determinations Under Section 129 of the Uruguay Round Agreements Act: Certain New Pneumatic Off-the-Road Tires; Circular Welded Carbon Quality Steel Pipe; Laminated Woven Sacks; and Light-Walled Rectangular Pipe and Tube From the People's Republic of China*, 77 FR 52683 (August 30, 2012) and accompanying IDM *Final Determinations; Section 129 Proceedings Pursuant to the WTO Appellate Body's Findings in the WTO DS 379 Regarding the Antidumping and Countervailing Duty Investigations of Laminated Woven Sacks from the People's Republic of China.*

[253] *See* Petitioner Case Brief at 50 (citing *Laminated Woven Sacks From the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in part, of Critical Circumstances*, 73 FR 35639 (June 24, 2008) (*Laminated Sacks from China*), and accompanying IDM at 17).

[254] *See* Petitioner Case Brief at 50 – 52.

[255] Petitioner Case Brief at 53-54.

[256] *See* POSCO Rebuttal Brief at 71 and Hyundai Steel Rebuttal Brief at 46 (citing GOK IQR at 11).

[257] *See* POSCO Rebuttal Brief at 71 and Hyundai Steel Rebuttal Brief at 46 (citing *Final Affirmative Countervailing Duty Determination:  Steel Wire Rod from Venezuela*, 62 FR 55104, 55021-22 (October 22, 1997) (*Wire Rod From Venezuela*)).

[258] *See* POSCO Rebuttal Brief at 72 and Hyundai Steel Rebuttal Brief at 45 (citing *Supercalendered Paper From Canada: Final Affirmative Countervailing Duty Determination,* 80 FR 63535 (October 20, 2015) (*Supercalendered Paper From Canada*)).

**Department's Position:**

Petitioner has put forth two alternative benchmarks, the use of Japanese electricity prices and the use of "comparable" prices of electricity from countries outside of Korea, such as what we used for land benchmarks in *Laminated Sacks from China*.

The Department examines whether electricity was provided for LTAR and a benefit was thereby conferred, under section 771(5)(E)(iv) of the Act and 19 CFR 351.511(a)(2). This provision lists potential benchmarks in hierarchical order of preference: (1) world market prices from actual transactions within the country under investigation; (2) world market prices that would be available to purchasers in the country under investigation; or (3) an assessment of whether the government price is consistent with market principles. A "tier one" benchmark, market prices from actual transactions within the country under investigation, was not available because KEPCO was the predominant provider of electricity in the Korean market. A "tier two" benchmark, world market prices, was not available because there was no cross-border transmission or distribution of electricity into Korea. Under 19 CFR 351.511(a)(2)(ii), the Department will only use world market prices if the good or service is actually available to the purchaser in the country under investigation.[259] With respect to electricity, the Department has stated that electricity prices from countries in the world market are not normally available to purchasers in the country under investigation.[260] Because there is no cross-border transmission or distribution of electricity into Korea, electricity from other countries, including from Japan, is not available to electricity consumers in Korea. Therefore, prices from Japan cannot be used as a benchmark.

In *Laminated Sacks from China*[261], we found under our analysis of the provision of land under 19 CFR 351.511(a)(2)(iii) that based upon the overwhelming presence of government involvement in the land-use rights markets, as well as the widespread and documented deviation from the authorized methods of pricing and allocating land, the purchase of land use rights in China was not conducted in accordance with market principles.[262] Therefore, under our "tier three" analysis, we resorted to market-based land principles in a country at a comparable level of economic development that is reasonably proximate to, but outside of China. However, the facts on the record in our investigation are different from the facts that were on the record in *Laminated Sacks from China*. In this investigation, we have verified information that the standard pricing mechanism used to determine KEPCO's industrial tariff rates is in accord with

---

[259] 19 CFR 351.511(a)(2)(ii) explicitly states that "the Secretary will seek to measure the adequacy of remuneration by comparing the government price to a world market price *where it is reasonable to conclude that such price would be available to purchasers in the country in question*." (Emphasis added).

[260] *See CVD Preamble*, 63 FR at 65378.

[261] As a result of WTO Appellate Body's Finding in WTO DS 379, the analysis of land in *Laminated Sacks from China* was modified in a Section 129 Determination. For further information, see *Implementation of Determinations Under Section 129 of the Uruguay Round Agreements Act: Certain New Pneumatic Off-the-Road Tires; Circular Welded Carbon Quality Steel Pipe; Laminated Woven Sacks; and Light-Walled Rectangular Pipe and Tube From the People's Republic of China*, 77 FR 52683 (August 30, 2012) and accompanying IDM *Final Determinations; Section 129 Proceedings Pursuant to the WTO Appellate Body's Findings in the WTO DS 379 Regarding the Antidumping and Countervailing Duty Investigations of Laminated Woven Sacks from the People's Republic of China*.

[262] *See Laminated Sacks from China*, and accompanying IDM at 16.

market principles as defined under 19 CFR 351.511(a)(2)(iii). Furthermore, if the Department determined that the standard pricing mechanism used by KEPCO was not in accord with market principles, then the Department would still have on the record KEPCO's full cost of providing electricity in order to assess the adequacy of remuneration.

**Comment 4:  Whether the Department Should Find the Provision of Natural Gas for LTAR is Countervailable**

**Petitioner argues:**

- Given the structure of the original allegation, the investigation of LNG for LTAR also includes natural gases in gaseous form.

- Both products have the same chemical composition and are essentially the same commodity. LNG is simply natural gas that has been liquefied for transport.

- The GOK's state-owned monopoly wholesale gas supplier, KOGAS, defines natural gas to include LNG as well as other gaseous natural gases.

- In prior cases, the Department has not limited its investigation based on different forms or grades of the same commodity and should not do so here, as a similar fact pattern exists in this case.[263]

- The GOK provides a financial contribution because KOGAS is a government authority that imports LNG and sells and distributes that gas in gaseous form in Korea at a loss.

- KOGAS is responsible for all wholesale sales of natural gas in Korea. KOGAS sells to urban gas suppliers who serve designated regions and effectively have a monopoly on gas supply in their respective regions.

- Prices charged by the urban gas suppliers are also controlled by the GOK through approvals by the regional governments. Therefore, the suppliers are entrusted and directed to provide a financial contribution when providing natural gases to their customers. Thus the provision of LNG or natural gas in gaseous form, is a financial contribution within the meaning of Section 771(5)(D)(iii) of the Act.

- The Department determined not to investigate the provision of natural gas because Nucor did not provide any world market and domestic price schedules or any other information support the allegation that retail prices are set at LTAR. However, the assertion that the urban gas suppliers provide special discounts at their discretion was the best information reasonably available.

---

[263] *See* Petitioner Case Brief at 81 (Citing *Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2011,* 79 FR 108 (January 2, 2014) (*Citric Acid from the PRC*), and accompanying IDM at Comment 11).

- The provision of natural gas for LTAR is specific because the GOK's information indicates that gas distributors favor large scale customers and specifically target steel producers.

**POSCO rebuts:**

- The Department correctly determined to limit the scope of the investigation to the provision of LNG from KOGAS for LTAR and not broaden the investigation, based on Petitioner's deficient new subsidy allegation, to cover natural gas in its gaseous form.

**Department's Position:**

We continue to find that the LNG for LTAR program was not used for this final determination. In addition, we continue to find that Petitioner's new subsidy allegation[264] was deficient and we will not initiate an investigation into whether other forms of natural gas were provided at LTAR.[265]

In the *Preliminary Determination*, the Department determined that this program was not used.[266] There is no information on the record that warrants our reconsideration of this finding. Unlike *Supercalendered Paper from Canada*, in the instant proceeding there was no specific allegation on whether the GOK entrusted or directed the urban gas suppliers to provide natural gas at LTAR, until the new subsidy allegations were filed,[267] and the Department declined to conduct such an investigation because the allegation was not adequately supported.[268]

Petitioner further contends that the provision of natural gas in other forms at LTAR must be found countervailable because, for example, urban gas suppliers have a monopoly on gas supply, are controlled by the GOK and regional governments, and are entrusted or directed to provide a financial contribution when providing gas to customers. However, as noted above, the Department did not initiate an investigation into whether the urban gas suppliers were entrusted or directed by the GOK. Instead, the allegation in the petition and the program under investigation solely concerned the provision of natural gas by the state-owned entity, KOGAS, which, in contrast to the facts in *Citric Acid from China*, provided LNG to the urban gas suppliers, but not directly to the respondents. Therefore, it is immaterial to examine the forms of natural gas that these urban gas suppliers then provided to their customers.

Petitioner argues that they provided information reasonably available to support their new subsidy allegation. However, Petitioner did not provide any evidence to support its allegation. For example, Petitioner did not provide domestic or world-market price information, or evidence

---

[264] *See* The Petitioner's Letter to the Department, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  New Subsidy Allegations," dated November 30, 2015 ("NSA Allegation").
[265] *See* Memorandum to James C. Doyle, Director, Office V, from Katie Marksberry, International Trade Compliance Analyst, Re:  Analysis of New Subsidy Allegations, dated April 5, 2016 ("NSA Memorandum").
[266] *See* PDM 40.
[267] *See* NSA Allegation at 5-8.
[268] *See* NSA Memorandum at 4.

that the GOK is entrusting and directing private companies to sell natural gas for less than adequate remuneration.  Therefore, we find that we appropriately determined not to initiate an investigation into whether the GOK entrusted or directed the urban gas suppliers through the regional governments to provide natural gas at LTAR (regardless of the form in which that gas is sold), and for the reasons noted above, need not need to address Petitioner's arguments on the other forms of natural gas that were supplied by these urban gas suppliers.

**Comment 5:  Whether the Department Should Apply AFA to POSCO With Regard to Certain Unreported, Affiliated Companies**

**Petitioner argues:**

- In spite of Petitioner's repeated requests that the Department request information on POSCO Energy, the Department failed to do so.

- Citing *Refrigerators from Korea* and *Washers from Korea*,[269] Petitioner contends that the regulations do not provide an exhaustive list of circumstances for which the Department should require a company to submit a response.  As such, POSCO Energy should have been included in the immediate investigation because it had transactions with POSCO, and produces electricity that is purchased by the GOK.

- Petitioner argues that at verification, the Department discovered that POSCO failed to report full questionnaire responses for four cross-owned affiliates that supplied inputs for POSCO's production of subject merchandise:  POSCO Chemtech Company, Ltd. (POSCO Chemtech), POS-HiMetal Co., Ltd. (POS-HiMetal), POSCO P&S, POSCO M-Tech Co., Ltd. (POSCO M-Tech).[270]  Further, Petitioner contends that the Department appropriately did not verify input purchase quantities that POSCO attributed to hot-rolled steel production.[271]

- The Department cannot accept POSCO's legal justification for withholding information regarding its cross-owned input suppliers.  It is the Department, and not respondents, which determines what information is necessary and relevant, and the Department has previously found that a respondent's refusal to provide information prior to the verification precludes the investigation of related issues and prevents the Department from relying on that information for the final determination.[272]

---

[269] *See* Petitioner Case Brief at 60-61 (Citing *Refrigerator-Freezers From Korea*, and accompanying IDM at 93; *citing also Washers from the Republic of Korea*, and accompanying IDM).
[270] *See* POSCO VR at 5 and  Exhibit VE-5.
[271] *Id.*
[272] *See* Petitioner Case Brief at 65-66 (Citing *Supercalendared Paper from Canada*, and accompanying IDM at 153-154).

- POSCO's "primarily dedicated" argument is not accurate, as the Department's practice is to analyze inputs that could be used to produce the downstream product, including subject and non-subject merchandise.[273]

- Petitioner states that the Department cannot confirm whether these cross-owned affiliates used the programs under investigation, and, as such, should assume that all programs were used. Therefore, the Department should apply an AFA rate of 113.47 percent to each unreported affiliate for a total AFA rate of 453.88 percent.[274]

- Alternately, the Department may apply these rates only to the programs it determines are countervailable. In that case the total subsidy rate would be 20.55 percent for each unreported input supplier, or 82.20 percent.

**POSCO argues:**

- Citing the *CVD Preamble* and the Department's past practice, POSCO contends that any subsidies received by cross-owned affiliates are not attributable to respondents if the input products supplied by these affiliates are not "primarily dedicated" to the production of the downstream product.[275] Accordingly, POSCO states, it was not required to provide questionnaire responses for such companies.

- POSCO argues that the record evidence supports its decision not to report the cross-owned affiliates, as the inputs they provided to POSCO are negligible and therefore not primarily dedicated to the production of the downstream product.

- POSCO contends that even if it had identified the cross-owned affiliates as input suppliers, there would have been no impact on the investigation and margin because the subsidies to the input suppliers would not be attributable to POSCO.

- Citing *Softwood Lumber from Canada*, POSCO states that it did not respond for POSCO Chemtec, POS-HiMetal, or POSCO P&S as the inputs they provided to POSCO were not primarily dedicated to the production of the downstream product.[276]

- POSCO states that POSCO M-Tech is not cross-owned with POSCO, because there is no majority ownership interest between the two companies, but even if they were cross-

---

[273] *See* Petitioner Case Brief at 70-71 (Citing, *e.g. Certain Warmwater Shrimp from Thailand: Final Negative Countervailing Duty Determination*, 78 FR 50378 *(Shrimp from Thailand)*, and accompanying IDM at 28; *Certain Lined Paper Products from Indonesia: Final Affirmative Countervailing Duty Determination and Negative Critical Circumstances Determination*, 71 FR 47174 *(Lined Paper from Indonesia)*, and accompanying IDM at 30).

[274] *See* Petitioner Case Brief at 73-74 (Citing *Washers from Korea*, 80 FR 55336 (September 15, 2015) *(Washers from Korea; 2012-13)* and accompanying IDM at 12-13).

[275] *See* POSCO Case Brief at 6-7 (Citing *CVD Preamble*, 63 FR at 65401-2 and *Refrigerators from Korea,* and accompanying IDM at 3-6; *see also* 19 CFR 351.525(b)(6)(iv)).

[276] *See* POSCO Case Brief at 10, 12-14 (Citing *Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Softwood Lumber from Canada*, 67 FR 15545 (April 2, 2002), and accompanying IDM at Comment 1).

owned, the ferro-molybdenum that POSCO M-Tech sold to PSOCO was not primarily dedicated.

- Citing *Nippon Steel*, POSCO contends that it did not withhold the information relating to affiliated companies due to a failure to cooperate to the best of its ability, but rather because it did not believe the companies were relevant to the investigation.[277]

- POSCO accurately identified its affiliation with each of these companies in its responses, and neither the Department nor Petitioner raised issued with regard to these affiliates during the course of the verification.

- Given the size of POSCO's sales denominator, there is no reasonable basis to assume as AFA that any benefit POSCO may have received from these cross-owned affiliates would result in an above *de minimis* rate.

**Petitioners rebut:**

- POSCO did not just refuse to provide questionnaire responses; it concealed the fact that they were input suppliers, preempting any rebuttal arguments or factual information regarding this issue until verification. POSCO affirmatively stated that there were no cross-owned companies located in Korea that provided inputs to POSCO's production of subject merchandise.[278]

- POSCO's decision to not report the aforementioned input suppliers was "willful non-compliance" and a conscious decision made by POSCO.[279]

- POSCO attempts to shift responsibility for its failure to cooperate to the Department by claiming that all of the cross-owned affiliates were fully disclosed in its original affiliation response.  However, the Department has found that a respondent's refusal to provide information based on its unilateral rejection of Commerce's practice and its interpretation of how Commerce should alternatively evaluate a subsidy program constitutes willful non-compliance.[280]

- POSCO argues that subsidies received by POSCO P&S cannot be attributed to POSCO because POSCO P&S does not actually product steel scrap, and that cross-ownership does not exist between POSCO and POSCO M-Tech. However, the Department has attributed subsidies received by non-producing input suppliers to the respondent,[281] and

---

[277] *See* POSCO Case Brief at 17 (Citing *Nippon Steel* at 1373,1383 ).
[278] Citing POSCO SQR at 5.
[279] *See* Petitioner Rebuttal Brief at 3 (Citing *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. and Borusan Istikbal Ticaret v. United States; Maverick Tube Corp v. United States*, Consol. Ct. No. 14-00229, 61 F Supp. 3d 1306 and Slip Op. 15-159 (August 31, 2015) (*Borusan Remand*)).
[280] *See* Petitioner Rebuttal Brief at 9 (Citing *Borusan Remand* at 25).
[281] *See* Petitioner Rebuttal Brief at 13-14 (Citing Certain Polyethylene Terephthalate Resin from the People's Republic of China, 81 FR 13337 (March 14, 2016) and accompanying IDM at 47).

POSCO's voting interest in POSCO M-Tech supports a finding that cross-ownership exists.

- There is no information on which the Department can rely to determine whether the inputs are primarily dedicated, and thus countervailable, under the Department's attribution regulations. A respondent's refusal to provide information prior to verification precludes investigation of related issues and prevents the Department from relying on that information in reaching a final determination.[282] Therefore, the Department cannot base its final determination on the information found at verification, as argued by POSCO.

**POSCO rebuts:**

- POSCO reasonably believed that no responses were required for any of its cross-owned affiliates, and as such, it was a purposeful decision to not provide responses on behalf of the aforementioned affiliated companies.

- POSCO correctly did not submit questionnaire responses for the five companies mentioned by Petitioner.

  - POSCO Energy - The Department specifically excused POSCO Energy from submitting a response, and therefore, POSCO cannot be said to have failed to act to its best ability.[283] The *CVD Preamble*, as Petitioners cite, does not provide a basis for requiring a response from POSCO Energy, and merely shows that the Department could have requested a response. Regardless, the relationship between POSCO Energy and POSCO does not reflect that of the *CVD Preamble*, as (1) POSCO Energy is not a financial subsidiary, (2) is a producer of electricity, and (3) the Department determined that POSCO did not benefit from the electricity programs alleged. Further, transactions between POSCO and POSCO Energy did not include input purchases from POSCO Energy. In addition, attribution rules and the Department's practice do not require a response from a cross-owned company to which the mandatory respondent made sales.[284]

  - POSCO Chemtech - POSCO was not required to submit a questionnaire response for POSCO Chemtech as, pursuant to 19 CFR 351.525(6)(iv), the inputs provided were not primarily dedicated to the production of the downstream product.[285] Consistent with *Washers from Korea*, POSCO Chemtech's sales of limestone are not primarily dedicated to the production of the downstream product.[286]

---

[282] *See* Petitioner Rebuttal Brief at 14-15 (citing *Supercalendared Paper from Canada*, and accompanying IDM at 153-154).
[283] *Citing* section 776(b)(1) of the Act.
[284] *Citing* 19 CFR 351.525(6)(iv).
[285] *See Refrigerators from Korea,* and accompanying IDM at 2-4.
[286] *See* POSCO Rebuttal Brief at 13-14 (Citing *Washers from Korea*, and accompanying IDM at 3; *see also Softwood Lumber from Canada*, and accompanying IDM at Comment 1).

o POSCO P&S - Raw materials sold to POSCO are not primarily dedicated to the production of the downstream product, so consistent with *Softwood Lumber from Canada*, POSCO P&S was not required to submit a response.[287]  Additionally, in *Pet Resin from the PRC* the Department found that cross-owned input suppliers that were not producers of those inputs did not meet the criteria for having to submit complete questionnaire responses.[288]

o POSCO M-Tech - There is no majority ownership interest between POSCO M-Tech and POSCO, and thus, cross-ownership is not presumed.[289]  Additionally, the inputs supplied were not primarily dedicated, so consistent with *Softwood Lumber from Canada*, POSCO M-Tech was not required to submit a response.[290]

o POS-HiMetal - Consistent with *Softwood Lumber from Canada*, POS-HiMetal was not required to submit a response.[291]

- The Department does not have to verify every piece of information that it relies on in making a final determination, but has discretion to determine which information to verify.

- Even if the Department determines that it cannot rely on information regarding the value of the inputs supplied by the cross-owned input suppliers, other information on the record substantiates that the inputs were not primarily dedicated.

- Petitioner's attempt to undermine POSCO's argument that the inputs supplied were not primarily dedicated using *Shrimp from Thailand*[292] is misplaced as that case does not address POSCO's argument with respect to the input suppliers' sales of the inputs to POSCO as a percentage of that input suppliers' total sales.  Additionally, *Lined Paper Products from Indonesia*[293] is not relevant because the issue of input suppliers' sales was not presented.  *Seamless Pipe from China*[294] is similarly irrelevant because it only addresses whether the downstream product is broader than subject merchandise, which is not at issue here.

---

[287] *See Softwood Lumber from Canada*, and accompanying IDM at Comment 1.
[288] *See* POSCO Rebuttal Brief at 20-21 (citing *Countervailing Duty Investigation of Certain Polyethylene Terephthalate Resin from the People's Republic of China:  Final Affirmative Determination*, 81 FR 13337 (March 14, 2016) (PET Resin from the PRC)).
[289] *Citing* 19 CFR 351.525(b)(6)(vi).
[290] *See* POSCO Rebuttal Brief at 16-17 (Citing *Softwood Lumber from Canada*, and accompanying IDM at Comment 1).
[291] *Id.*
[292] *See* Petitioner Case Brief at 71 (Citing *Shrimp from Thailand*).
[293] *Id.* (citing *Lined Paper from Indonesia*).
[294] *Id*. (citing *Certain Seamless Carbon Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic¸*75 FR 57444 (September 21, 2010) (Seamless Pipe from China)).

- Citing *Nippon Steel,* as the decision not to report the affiliated companies was purposeful and not due to "inattentiveness" or "carelessness," there is no basis to assume that POSCO did not act to the best of its ability.[295]

- Petitioner's calculated AFA rate is highly punitive and POSCO had no motivation not to cooperate, considering that its large sales denominator would not have made a more favorable situation by failing to cooperate.

- The Department must calculate CVD margins as accurately as possible,[296] and, as such, if there are gaps in the case record, the Department should fairly apply its three-tiered approach in assigning an AFA rate.[297]

- Petitioner's proposed AFA rates, specifically applying 3.59 percent to the GOK's credit policies, are not consistent with the Department's practice as the aforementioned policies no longer exist, and thus, the Department cannot apply a rate for a program from which POSCO could not reasonably have benefitted.[298]

- Pursuant to section 776(c) of the Act, the Department could apply the rate calculated, 0.06 percent, for POSCO's cross-owned affiliate, DWI, to any cross-owned affiliates that the Department determines should have submitted a response. Alternatively, the Department has numerous calculated, above-zero rates in this investigation that can be used.

**Department's Position:**

As explained above in the section "Adverse Facts Available," we find that POSCO failed to provide questionnaire responses for certain input suppliers and its statement that no affiliated companies in Korea provided inputs to POSCO's production of subject merchandise was verified to be incorrect.[299]

POSCO contends that it was not required to report, or submit a questionnaire response for certain affiliated companies that provided inputs because the materials provided were not "primarily dedicated" to the production of the subject merchandise. The Department disagrees. As upheld in *Ansaldo Componenti* and discussed in the recent *OCTG from China Administrative Review,*[300] it is the Department, and not interested parties, who determines whether a response is required. As such, the respondents cannot unilaterally decide to withhold information from the Department

---

[295] *See* POSCO Rebuttal Brief at 28 (citing *Nippon Steel* at 1382-83).
[296] *Id.* (citing, *e.g. NTN Bearing Corp. v. United States* 74 F.3d 1204, 1208 (Fed. Cir. 1995) (*NTN Bearing*).
[297] *Id.* (citing, *e.g. Certain Frozen Warmwater Shrimp from Ecuador:  Final Affirmative Countervailing Duty Determination 78 FR 50389 (August 19, 2013) (Shrimp from Ecuador),* and accompanying IDM at 9-30).
[298] *Id.* (citing, *e.g. Steel Beams from Korea,* and accompanying IDM at 22).
[299] *See* POSCO AQR at 4-5.
[300] *See Certain Oil Country Tubular Goods from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2011,* 78 FR 49475 (February 8, 2013), and accompanying IDM at Comment 5; and *Ansaldo Componenti, S.p.A. v. United States,* 628 F. Supp. 198, 205-06 (CIT 1986) ("It is Commerce, not the respondent, that determines what information is to be provided for an administrative review.").

that may require further analysis.  Otherwise, the Department would be unable to conduct an accurate and complete investigation, because interested parties would consistently be deciding to provide, or not provide, necessary information based on their own viewpoints and judgment. Indeed, the facts available provisions of Section 776(a) of the Act specifically contemplate the application of facts available when an interested party withholds requested information and allows the Department to take necessary action in response.

In the instant investigation, POSCO did not even initially claim that certain inputs were provided by affiliated companies, but that the inputs were not primarily dedicated.  Instead, POSCO chose to respond in the negative, and stated, "no affiliated companies located in Korea provided inputs used in the production of the subject merchandise."[301]  If POSCO had explained that it was not providing information on certain companies because they were not primarily dedicated in the affiliated questionnaire response, the Department would have had the opportunity to follow-up on this claim.[302]  Instead, the deliberate action to withhold input provider information precluded the Department from analyzing input supplier information prior to discovering the information at verification.

POSCO failed to satisfy its statutory duty to reply accurately and completely to requests for necessary information regarding its affiliates, pursuant to section 776(a)(1) of the Act. Moreover, pursuant to section 776(a)(2) of the Act, the Department finds that POSCO withheld information that was requested, failed to provide such information by the deadlines for submission, and significantly impeded the proceeding by not providing accurate or complete responses to the Department's questions about certain affiliates, and the production of POSCO's subject merchandise.  Because POSCO failed to provide responses for cross-owned input suppliers, as required under 19 CFR 351.525(b)(6), the Department was prohibited the opportunity to carefully examine the full extent to which POSCO and all of its cross-owned entities, including the aforementioned companies, benefitted from subsidies that are attributed to POSCO within the meaning of 19 CFR 351.525(b)(6).  Without the complete, accurate and reliable data upon which to attribute the unreported companies' subsidies to POSCO, the Department cannot accurately calculate POSCO's CVD subsidy rate for this final determination. Consequently, we determine that because POSCO withheld necessary information, failed to provide such information by the deadlines for submission, and significantly impeded the investigation, we find that the use of facts available is warranted in accordance with sections 776(a)(1) and (2) of the Act.  Further, we find that POSCO did not act to the best of its ability when reporting affiliated companies, and, as such, the application of AFA is warranted, pursuant to section 776(b) of the Act and as discussed above in "Adverse Facts Available."

As discussed in the verification report and by both parties in case briefs and rebuttals, we determine that there are four POSCO affiliated input providers: POSCO Chemtech, POSCO P&S, POSCO M-Tech, and POS-HiMetal.  Each of the four aforementioned affiliated companies is listed as providing inputs in the "Inputs for Hot-Rolled" exhibit submitted by POSCO at verification.[303]  In POSCO's AQR, it lists that three of the four companies are cross-owned

---

[301] See "Use of Facts Otherwise Available and Adverse Inferences" section above, and POSCO AQR at 4-5.
[302] See POSCO AQR at 4-5.
[303] Id., at 73.

within the meaning of 19 CFR 351.525(6)(vi) as POSCO owns at least 60 percent of each company.

With regard to the fourth company, POSCO M-Tech, we find that the *CVD Preamble* to our regulations further clarifies our cross-ownership standards.  According to the *CVD Preamble*, relationships captured by the cross-ownership definition include those where:

> the interests of two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same way it can use its own assets (or subsidy benefits)…Cross-ownership does not require one corporation to own 100 percent of the other corporation.  Normally, cross-ownership will exist where there is a majority voting ownership interest between the two corporations or through common ownership of two (or more) corporations.  In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership.[304]

Thus, our regulations make clear that the agency must look at the facts presented in each case in determining whether cross-ownership exists.  In *Fabrique*, the CIT upheld our authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[305]

At verification, we discovered that POSCO exercises significant control over POSCO M-Tech, in addition to maintaining a 48.85 percent ownership share in POSCO M-Tech.[306]  As such, we determine that POSCO M-Tech is cross-owned and, therefore, POSCO was required to submit a response.

As explained in the "Selection of AFA" section above, it is the Department's practice to follow its hierarchy when determining the appropriate AFA rate.  Petitioner proposes multiple rates that the Department should assign as AFA.  The Department notes that use of company-specific rates is not consistent with its practice,[307] and, as such, use of the 3.59 percent rate, calculated for Kangwan in *Structural Beams from Korea*, and use of the 1.83 percent rate calculated in *DRAMS from Korea* is not warranted in this case.  Under our AFA methodology, we do not use calculated rates for programs that cannot be used by our respondent companies.[308]  The 3.59 percent rate cited by Petitioner is based upon loans received and restructured under a company specific debt restructuring program.  Because this rate is based on Kangwon's debt restructuring, because we are not investigating any debt restructuring programs applicable to our respondent, and because this is a program that cannot be used by our respondent, we are not applying this rate.  For the same reason, we are not using the rate of 1.83 percent, because that is a rate calculated for a

---

[304] *See CVD CV Preamble*, 63 FR at 65401.
[305] *See Fabrique*, 166 F. Supp. 2d at 600-604.
[306] *See* POSCO Final Calculation Memorandum at 4, *see also* POSCO VR at 5.
[307] *See* "Adverse Facts Available" section above.
[308] *See, e.g.*, Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Certain Kitchen Appliance Shelving and Racks from the People's Republic of China at 4 (April 4, 2012).

program that is specific to one company, Hynix, which is related to its debt restructuring.  *See* "Adverse Facts Available" section above for further AFA rate selection information.

We disagree with POSCO's reliance on *Washers from Korea*, *Refrigerators from Korea*, and *OCTG from Turkey*.  As discussed by Petitioner, in *Washers from Korea* and *Refrigerators from Korea*,[309] the respondents previously reported the cross-owned input suppliers in the Department's initial questionnaire response.  In each of the aforementioned instances, the respondents reported certain companies that the Department could have viewed as meeting the threshold for providing a response.  Further, in *OCTG from Turkey*, the information accepted at verification did not contradict questionnaire responses submitted by the mandatory respondent.[310]  In this case, the Department was not able to confirm the accuracy of POSCO's previous response with regard to its reporting of cross-owned input suppliers.[311]

In addition, the Department disagrees with POSCO's claims that it accurately identified its affiliation with each of its companies in its responses because the inputs provided are not primarily dedicated to the production of the downstream product.  As previously discussed, the Department was impeded from determining whether certain inputs provided by cross-owned affiliates were primarily dedicated prior to verification.  POSCO only provided information at verification which would have allowed the Department to investigate further regarding the inputs provided by the companies.  The team was unable to verify this information, a document that listed inputs used in the production of hot-rolled and providers of the inputs,[312] due to the untimely nature and large amounts of data required to fully establish the credibility of the submission.

The determination of whether an input product is primarily dedicated to the production of a downstream product is a decision that can only be made by the Department.  Here, POSCO substituted its judgment for the judgment of the Department and willfully precluded the Department from analyzing and, determining, whether POSCO's cross-owned input suppliers met the attribution criteria under 19 CFR 351.525(b)(6)(iv) by stating that it had not acquired any inputs from cross-owned companies.

Further, POSCO has argued in its case briefs that the inputs produced by the aforementioned suppliers were not primarily dedicated to subject merchandise, because only a small amount of the inputs were used in the production of the subject merchandise.

We disagree.  In the recent *CORE from India* final determination,[313] the Department found that data submitted at verification regarding an unreported input supplier could not be considered complete and verified, as it did not learn about the consumption of the input until well into verification.  Further, the Department found that its regulations do not contemplate the amount of

---

[309] *See* Petitioner Rebuttal Brief at 6-7.
[310] *See OCTG from Turkey*, and accompanying IDM at 55.
[311] *See* POSCO VR at 5-17.
[312] *Id*., at VE-5.
[313] *See Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From India:  Final Affirmative Determination*, 81 FR 35323 (June 2, 2016) (*CORE from India*), and accompanying IDM at Comment 11.

the input provided by a supplier as a gauge for whether the company should submit a response.[314]  Given the absence of information in that case, the Department found no basis on which to conclude that the inputs from the unreported company provided to the mandatory respondent constitute insignificant amounts.[315]  In the immediate investigation, we discovered the input suppliers at verification, and due to untimely presentation of the data and the large amount of analysis required to verify the data, we did not verify the validity of the input amounts as presented by POSCO at verification and as argued in its case brief.  More importantly, the information on the cross-owned input suppliers should have been provided in POSCO's questionnaire response.  The purpose of verification is to check the accuracy of factual information already submitted on the record; it is not an opportunity to provide new factual information, as the deadlines to submit factual information are explicitly set forth under 19 CFR 351.301.

Further, we disagree with POSCO that we cannot attribute subsidies to its input suppliers pursuant to 19 CFR 351.525(b)(6)(iv) because the inputs provided are not primarily dedicated to the production of hot-rolled steel.  The question is whether the input could have been used to produce the downstream products exported to the United States, not whether the inputs were actually used for that purpose during the POI.  Specifically, the Department's standard, pursuant to 19 CFR 351.525(b)(6)(iv) is not whether an input is primarily dedicated to production of the subject merchandise, but to the downstream product (which could be subject merchandise, or also an intermediate input to subject merchandise).[316]  Therefore, it is our practice to include in our calculations subsidies provided to cross-owned companies on inputs that could be used in the production of the downstream product.[317]  Thus, prior to verification, the Department requested full and complete information in the original and supplemental questionnaires from POSCO relating to all production facilities that provide inputs, in whole or in part, to the production of the downstream product, and the Department scheduled the verification based on the information provided by POSCO.  The Department finds that POSCO's belated assertion that the inputs provided by four cross-owned input suppliers should not be considered as primarily dedicated to downstream product is unsubstantiated, unreliable, and does not conform to our regulatory standard, expressed above.  Additionally, POSCO's argument that the inputs provided by the companies are negligible is irrelevant.  Ultimately, the materials could have been used in the production of subject merchandise, as the raw materials are listed in a table that POSCO provided at verification, demonstrating that each raw material is used in the production of hot-rolled steel.[318]

Moreover, in *Coated Paper from the PRC*, the Department faced a similar issue of whether to trace subsidized inputs to merchandise sold to the United States and merchandise sold to other markets.  The Department stated that it had "implemented tying regulations to attribute subsidies rather than tracing subsidies through the company.  By analogy, we will not trace subsidized

---

[314] *See* 19 CFR 351.525(b)(6).
[315] *See CORE from India*, and accompanying IDM at Comment 11.
[316] *See Supercalendered Paper From Canada*, and accompanying IDM at Comment 19.
[317] *See, e.g., Light-Walled Rectangular Pipe and Tube From The People's Republic of China:  Final Affirmative Countervailing Duty Investigation Determination*, 73 FR 16428 (June 24, 2008), and accompanying IDM at Comment 8.
[318] *See* POSCO VE-5 at 3-11.

inputs through a company's production process."[319]  Additionally, as the Department noted in *Coated Paper from the PRC*, the Department also did not trace subsidized inputs in *IPA from Israel*, in which the Department attributed input subsidies to all downstream products that the input could have been used to produce, regardless of whether the input was actually used to produce subject merchandise.[320]  Furthermore, as the Department also noted in *Coated Paper from the PRC*, the CIT in *Fabrique* upheld the Department's position that it is not appropriate to trace the benefit of a particular subsidy to specific items actually imported into the United States.[321]

We disagree with POSCO that it acted to the best of its abilities to comply with the Department's request for information on whether the inputs were primarily dedicated.  The Federal Circuit in *Nippon Steel* provided an explanation of the "failure to act to the best of its ability," stating that the ordinary meaning of "best" means "one's maximum effort," and that the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.[322]  The Federal Circuit acknowledged, however, that while there is no willfulness requirement, "deliberate concealment or inaccurate reporting" would certainly be sufficient to find that a respondent did not act to the best of its ability, although it indicated that inadequate inquiries to respond to agency questions may suffice as well.[323]  Compliance with the "best of its ability" standard is determined by assessing whether a respondent has put forth its maximum effort to provide the Department with full and complete answers to all inquiries in an investigation.[324]  The Federal Circuit further noted that, while the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.[325]  Accordingly, we find that POSCO did not act to the best of its abilities in responding to the Department's questionnaire about the inputs provided.  Because POSCO failed to report the necessary information and only after discovery at verification did it report on the last day that some of the inputs provided by the aforementioned affiliated companies were, in fact, used in the production of the subject merchandise,[326] the Department concludes, as AFA, pursuant to section s 776(a) and (b) of the Act, that inputs produced by POSCO Chemtech, POSCO P&S, POSCO M-Tech, and POS-HiMetal are primarily dedicated to the production of the downstream product, within the meaning of 19 CFR 351.525(b)(6)(iv).

Lastly, in response to Petitioner's request that the Department should have required a questionnaire response from POSCO Energy, the Department continues to disagree.[327]  Based on

---

[319] *See Coated Paper from the PRC*, and accompanying IDM at Comment 18.

[320] *Id.*, citing *Industrial Phosphoric Acid from Israel: Final Results of Countervailing Duty Administrative Review*, 63 FR 13626 (March 20, 1998) (*IPA from Israel*).

[321] *Id.*, citing *Fabrique*, 166 F. Supp. 2d at 603.  The CIT in *Fabrique* also cited the Federal Circuit's decision that "{i}t would be burdensome and unproductive for the Department of Commerce to attempt to trace the use and effect of a subsidy demonstrated to have been provided to producers of the subject merchandise."  *See Saarstahl A.G. v. United States* 78 F.3d 1539, 1543 (Fed. Cir. 1996).

[322] *See Nippon Steel*, 337 F.3d at 1382.

[323] *Id.* at 1380.

[324] *Id.* at 1382.

[325] *Id*.

[326] *See* POSCO VR at 5-17.

[327] *See* PDM at 3.

POSCO's explanation that POSCO Energy does not meet the criteria necessary for submitting a response pursuant to 19 CFR 351.525(b)(6), we do not find that POSCO Energy was required to submit a response. Further, the team fully verified the information submitted in POSCO's PQR[328] regarding transactions between POSCO Energy and POSCO,[329] and determined that the transactions do not fall under any of the attribution rules as set forth under 19 CFR 351.525(b)(6).

## Comment 6:  Whether to Apply AFA to POSCO Global R&D Center

**Petitioner argues:**

- Not until verification did POSCO discover that it has a Global R&D Center in Songdo International City, which is part of the Incheon FEZ.

- As POSCO withheld this information for the duration of the investigation the Department should not have accepted this information as a minor correction, however, the Department appropriately refused to verify the use or non-use of alleged FEZ programs. The Department should rely on AFA and presume that programs related to FEZs were used.

- Petitioner contends that as there are multiple programs related to FEZs under investigation, the Department should assign a rate of 1.83 percent to tax reduction and exemption programs, and 3.59 percent for exemptions and reductions of lease fees and grants.  This would assign POSCO a total AFA rate of 18.09 percent.[330]

**POSCO argues:**

- The GOK reported in its initial response that POSCO did not receive benefits under this FEZ program during the POI,[331] and the fact that the Department did not specifically verify this information does not call into question the accuracy or completeness.

- The benefits provided in FEZs are designed to attract foreign or foreign invested companies, and Korean companies generally would not receive benefits.  Therefore, because it is not a foreign company, POSCO would not be eligible to receive benefits under this program.

- Any benefits POSCO would have received from the Incheon FEZ would be tied to the R&D activities at the Global R&D Center.  POSCO does not produce hot-rolled steel or

---

[328] *See* Letter from POSCO, Re: Initial Questionnaire Response, dated November 2, 2016 (PQR).
[329] *See* POSCO VR at 5 and VE-5 at 14-15.
[330] *See Dynamic Random Access Memory Semiconductors From the Republic of Korea*, 76 FR 2336 (January 13, 2011) (*DRAMS from Korea*) and accompanying IDM at section I; *see also Steel Beams from Korea*, and accompanying IDM at Section I.A.2.
[331] *See* GOK PQR at 68.

have any other production at the Song-do facility. Thus, none of the benefits received would be attributed to the sale or production of the subject merchandise.

- Benefits received from this FEZ would be tied to R&D activities at the Song-do facility, and, pursuant to 19 CFR 351.525(b)(5), the benefits would not be countervailable in this investigation.[332]

- Citing *NTN Bearing* and *Koyo Seiko,* POSCO states that any application of AFA to this program is an abuse of discretion and inconsistent with the Department's past practice.[333]

- Consistent with CIT decisions and the Department's past practice, the Department cannot rely on information as AFA that is directly contradicted by evidence on the record.[334]

**Petitioner rebuts:**

- The Department did not verify the GOK's response regarding FEZ benefits; therefore, the Department cannot use the GOK's response to remedy POSCO's lack of cooperation.[335]

- It was appropriate for the Department to examine whether POSCO received benefits from being located in an FEZ based on information provided by POSCO rather than the GOK, because respondents are most likely to possess relevant information regarding the location of their own facilities.

- Respondents' failure to provide verifiable information regarding the claim that they have no facilities located in FEZs calls into question the veracity of the identical claim made by the GOK in its questionnaire response.

- POSCO is a foreign invested company and thus its claims that it could not benefit from the programs which intended to benefit foreign, or foreign-invested companies, are false. Further, there is no record evidence to support POSCO's claim that the FEZ programs are specific to foreign or foreign-invested companies.

- Citing *Nippon Steel*, the Department should apply AFA to the GOK with regard to FEZ benefits as the GOK did not provide accurate responses in its PQR.[336]

---

[332] *See* POSCO Case Brief at 22 (citing, *e.g.*; *NOES from Korea* and accompanying IDM at 18-19; and *Carbon Steel from Korea* and accompanying IDM at 24-25).

[333] *See* POSCO Case Brief at 22 (Citing *NTN Bearing*,74 F.3d 1204 at 1208  and *Koyo Seiko Co. v. United States*, 36 F.3d at 1565-1573 (Fed. Cir. 1994) (*Koyo Seiko*); *Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review*, 68 FR 19504 (April 21, 2003) and accompanying IDM at Comment 6).

[334] *See* POSCO Case Brief at 23 (citing, *e.g.*, *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) (*F.Lii de Cecco*) and *Dongguan Sunrise Furniture Co. v. United States*, 931 F. Supp. 2d 1346, 1353-54 (CIT 2013); *see also Line Pipe from Korea*, and accompanying IDM at Comment 2.

[335] *See* Petitioner Rebuttal Brief at 17 (citing 19 U.S.C.§1677m(i)(1)).

[336] *Id.* at 19 (Citing GOK PQR at Exhibit FEZ-1, page. 13 and *Nippon Steel* at 1382-83).

- As a foreign-invested company, POSCO could have benefitted from an FEZ, and POSCO Manufacturing is listed as being located in an FEZ as reported in the GOK PQR.

- No record evidence demonstrates the facility's operations; therefore, as AFA, the Department must infer that it provides research and development services related to the production of hot-rolled steel and countervail benefits under the FEZ program.

- POSCO's citations from *F. Lli De Cecco v. United States* are moot, as the *American Trade and Enforcement Effectiveness Act of 2015* now allows the Department to select an AFA rate that further promotes company cooperativeness.[337]

**POSCO rebuts:**

- The GOK reported that POSCO did not receive any benefits under the FEZ program during the POI,[338] and, consistent with the Department's practice, the Department should accept the accuracy of the GOK's statement[339] and confirm that no benefit was received by POSCO for this program.  Therefore, there is no basis to apply AFA to this program.

- Not relying on the GOK's statement (information on the record) would be inconsistent with section 776(c) of the Act, the SAA, and the Department's practice.[340]

- Petitioner's proposed AFA rates are overly punitive, and the Department should find that there is no basis to apply AFA as the programs from which POSCO would have received benefits were verified.[341]

- If the Department chooses not to rely on record information, it should apply tax and loan program rates calculated in the *Preliminary Determination*.  As such, the Department should apply a rate of 0.05 percent (calculated for RSTA Article 26), 0.01 percent (calculated for RSTA Article 78(4), 0.015 percent (calculated for the KEXIM Overseas Investment Credit Program), and 0.01 percent (calculated for RSTA Article 78(4)).[342]

**Department's Position:**

POSCO reported that it "has no facilities located in an FEZ" in its initial questionnaire

---

[337] *Id.* at 21 (Citing section 776(d) of the Act).
[338] *See* POSCO Rebuttal Brief at 34 (citing GOK PQR at 108).
[339] *Id.* at 34-35, (citing, *e.g.*, *OCTG from Turkey*, and accompanying IDM at Comment 9; *Line Pipe from Korea*, and accompanying IDM at 34).
[340] *Id.* at 35-36 (citing Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. 1 at 870 reprinted at 1994 U.S.C.C.A.N. 4040, 4199 (1994) at 870; and *Crawfish from China, Administrative Review*, and accompanying IDM at Comment 6).
[341] *Id* at 39 (citing POSCO VR at 15; *also citing e.g.*, *Line Pipe from Korea*, and accompanying IDM at Comment 2).
[342] *Id.* at 39 (citing  Memorandum to the File from Katie Marksberry, Re:  Preliminary Determination Calculation Memorandum for POSCO and Daewoo International Corporation (DWI), dated January 8, 2015 (POSCO Preliminary Calculation Memorandum) at Attachment 3.

response.[343]  At verification, however, POSCO presented, as a minor correction, information demonstrating that it has a Global R&D Center in Songdo International City, which is part of the Incheon FEZ.  As explained in the verification report, Department officials explained to company officials and counsel for POSCO that we would not verify as to the use or non-use of alleged FEZ programs as its response only stated the company had no facilities located in a FEZ.[344]  Additionally, in verifying non-use at POSCO, we did not review any information at POSCO with regard to its use or non-use of alleged programs in a FEZ.[345]  Because POSCO did not reveal the fact that it had a facility located in an FEZ until verification, the Department did not have an opportunity to follow up on its claim, or the GOK's claim prior to verification.  Instead, POSCO and the GOK responded affirmatively that POSCO did not have any facilities in an FEZ, precluding the Department from investigating the use or non-use of subsidies related to FEZs prior to verification. Accordingly, as described above, the application of facts available, pursuant to section 776(a)(1) and 776(a)(2)(A),(C) and (D) is warranted with respect to this program, and an adverse inference should be applied to POSCO, in accordance with section 776(b) of the Act, because POSCO did not act to the best of its ability in providing this information to the Department.

However, for the reasons set forth in the Department's position to Comment 5, above, we disagree with Petitioner that we should apply rates of 1.83 percent and 3.59 percent to certain benefits provided under the program.

With regard to POSCO's claim that record evidence demonstrates that POSCO did not receive any benefits due to its location in an FEZ, we disagree.  As discussed in Comment 8 below, the response submitted by the GOK states that "during the investigation period, none of the respondents received an {sic} benefit under this program."[346]  However, the GOK's response does not clarify if the "investigation period" it refers to is the POI or the entire 15-year AUL.  Therefore, we are unable to use the GOK's response to fill this "gap" in the record.  As such, we cannot determine that POSCO did not receive any benefits from this program.  Due to this discrepancy in the GOK's response, we do not agree with POSCO's claim that there is not contradicting information on the record.  Further, as discussed in Comment 8 below, POSCO's cite to *F. Lli De Cecco* is inapplicable.  Amendments to the Act arising from the TPEA are applicable to determinations made on or after August 6, 2015, and specifically state that the Department may assign the highest rate calculated for the same or similar program.[347]  As such, we are relying on our normal hierarchy for assigning AFA to POSCO's use of this program.

Further, we disagree with POSCO that it could not have benefitted from this program because of the program's designation to attract foreign investment.  The information on the record demonstrates that certain shareholders of POSCO do in fact appear to be foreign.[348]  As such,

---

[343] *See* POSCO PQR at 52.
[344] *See* POSCO/DWI Verification Report at 3
[345] *Id.* at 15.
[346] *See* GOK PQR at 68.
[347] *See* TPEA.
[348] *See* POSCO Affiliation Response at Exhibit 1,

POSCO could have been eligible to receive funding due to POSCO Global R&D Center's location in an FEZ.

POSCO also argues that it does not produce hot-rolled steel or have any other production at the POSCO Global R&D Center facility, and that any benefits received would have been in relation to R&D activities. Therefore, it claims, none of the benefits received would be related to the sale or production of the subject merchandise, and attributable to POSCO.[349] However, the purpose and operations of POSCO Global R&D Center were not verified by the Department. As such, we cannot solely rely on POSCO's claim that the facility is not related to production of the subject merchandise, and is instead solely related to R&D activities, to determine that POSCO would not have received benefits under the FEZ program.

### Comment 7: Whether to Apply AFA to Certain Loans Submitted at Verification

**Petitioner argues:**

- Petitioner states that at verification, POSCO tried to submit a list that contained a significant volume of new information that was omitted from POSCO's questionnaire responses, as a minor correction.

- Petitioner argues that the Department should use the loan rate of 3.59 percent and apply it to each unreported loan for a total AFA rate of 78.98 percent.[350]

- The GOK did not properly report a loan to POSCO and failed to report export factoring by DWI.

**POSCO argues:**

- POSCO and DWI disagree with the Department's decision not to accept the minor correction at verification and request that the Department reconsider.

- The Department has discretion to accept factual information at any time during an investigation pursuant to 19 C.F.R. 351.301(c)(4).

- The corrections presented by DWI at verification are minor in accordance with the Department's framework and past practice, as they correct information on the record, do not undermine the validity of the information previously reported, and do not constitute a major change to the calculations.[351]

---

[349] *See* POSCO Case Brief at 21.
[350] *See* Petitioner Case Brief at 76.
[351] See POSCO Case Brief at 27-28; (citing, *e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Melamine Institutional Dinnerware Products From Taiwan*, 62 FR 1726 (January 13, 1997), and accompanying IDM at Comment 2).

- The Department was able to fully verify selected KORES loan information during verification in accordance with its verification outline, substantiating DWI's response.

- Application of AFA in this case would be an abuse of the Department's discretion, especially because the Department has already verified other similar loans received by DWI from KORES and calculated *de minimis* benefits.

**Petitioner rebuts:**

- POSCO did not correct information already on the record by presenting the previously unreported loans.

- The minor correction directly undermines the validity and accuracy of DWI's questionnaire response.

- As the loan amounts are no longer on the record, the Department can no longer analyze whether the loans would have a meaningful impact on the benefit calculations.

- The Department's practice is to reject attempts to provide new factual information at verification.[352]

**POSCO rebuts:**

- The Department should reject Petitioner's request to apply AFA to DWI's loans and use the reported values in the calculation for the final determination.  The Department verified the reported loan program, calculated a benefit in the *Preliminary Determination*, and accepted the unreported loans at verification.

- If the Department chooses to apply AFA, the Department should apply the calculated rate of the KORES loan program from the Preliminary Determination, 0.01 percent, to each of the unreported loans, for a total of 0.22 percent.

- The fact that the GOK did not report export factoring by DWI is immaterial because 1) DWI reported the export factoring in its response, and 2) the Department was able to verify the information at the GOK.  Further, even when the Department applies AFA to a government's failure to report certain programs, the AFA is limited to financial contribution and specificity.  Here, DWI reported and the Department verified that its export factoring was tied to exports of non-subject merchandise.

- The fact that the GOK failed to report one of POSCO's loans in its initial questionnaire response is not a basis for the application of AFA because the Department verified the loan and collected the loan approval documents at verification.

---

[352] See POSCO Rebuttal Brief at 25 (citing, *e.g.*, *Dry Containers from China*, and accompanying IDM at 45).

**Department's Position:**

At verification, DWI presented a list of KORES loans that it had not previously reported as a minor correction. Due to the magnitude of change in the reported lending under the specified program, we determined that the submission did not constitute a minor correction, and instead, consisted of new factual information. As such, we did not accept the correction as minor.[353] Additionally, we did not verify the use of this program.

Thus, we find that DWI withheld necessary information requested by the Department regarding it use of this program and that as a result, necessary information is missing on the record. In accordance with sections 776(a)(1) and 776(a)(2) of the Act, we determine that the use of FA is warranted in determining the countervailability of these programs for the companies listed above. Moreover, because DWI failed to provide necessary information regarding program use, despite the Department's requests that it do so, we find that DWI failed to act to the best of its abilities in providing requested information that was in its possession, and that the application of AFA is warranted, pursuant to 776(b) of the Act, in determining the existence of a benefit.

With regard to POSCO's arguments that the loan program was verified and that the loans presented were "minor corrections," we disagree. As stated in POSCO's verification report, we verified the loans that had been previously reported in POSCO's PQR and SQR[354] prior to verification.[355] However, at no point during verification did we verify the loans that DWI presented as minor corrections.[356] Therefore, POSCO's claim that we verified the reported loan program in its entirety is simply incorrect.[357] We disagree further that the loans submitted by DWI constitute a minor correction. These "disbursements," as POSCO characterizes them, represented a significant change in the magnitude of the funding provided under the program as reported in the company's questionnaire responses. Consistent with past practice, the Department maintains the discretion to reject certain submissions if they are not minor in nature.[358] Therefore, the Department properly rejected the newly presented loan information.

For the reasons set forth in the Department's Position to Comment 5, above, we disagree with Petitioner that an AFA rate of 3.59 percent should be used. The AFA rate applied to this program is discussed in the "Adverse Facts Available" section, above. We disagree with Petitioner that a rate should be assigned to each of the loans that DWI presented. It is the Department's practice to assign a single program rate when applying AFA with regard to loan

---

[353] *See* POSCO VR at 3.
[354] *See* POSCO PQR; *see also* Letter from POSCO, Re: Supplemental Questionnaire Response, dated December 4, 2016 (SQR).
[355] *See* POSCO VR at 25-26.
[356] *Id.* at 8.
[357] *Id.*, at 26.
[358] *See, e.g., Certain Polyethylene Terephthalate Resin from the People's Republic of China; Final Affirmative Determination*, 81 FR 13337 (March 14, 2016) (*PET Resin from the PRC*), and accompanying IDM at Comment 5; and *53-Foot Domestic Dry Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 50 FR 21209 (April 17, 2015) (*Dry Containers from the PRC*), and accompanying IDM at Comment 3.

programs used by respondents.[359]  However, we already applied an adverse facts available inference to POSCO for both of these programs due to its failure to report certain cross-owned input suppliers.  *See* Comment 5 for further discussion.

With respect to the export factoring reported by DWI and not the GOK, we agree with POSCO that there is no basis for applying AFA to the GOK's response.  We were able to fully verify that the lending was tied to exports of non-subject merchandise.[360]  Additionally, the GOK provided a reasonable explanation for not including DWI's reported export factoring in its questionnaire responses, and Department officials were able to verify the lending approval documents at KEXIM.[361]  Additionally, the Department was able to verify the full universe of loans received by POSCO at KEXIM.[362]

## Comment 8:  Whether to Apply AFA to Hyundai Steel for Use of Certain Foreign Economic Zones (FEZs)

**Petitioner argues:**

- At verification, Hyundai Steel attempted to report the fact that one of its facilities was located in the Gwangyang Bay Area FEZ as a minor correction, whereas initially, Hyundai Steel reported that "it was not located" in an FEZ.[363]

- Petitioner argues that some of Hyundai Steel's income tax exemptions related to the FEZ may have been verified, but subsidies regarding exemptions and reductions of lease fees, grants, and acquisition and property tax exemptions have not.

- Accordingly, the Department should assign a rate of 3.59 percent for exemptions and reductions of lease fees and grants,[364] and the Department should assign a rate of 1.83 percent for acquisition and property tax benefits.  Petitioner argues that the total AFA rate assigned to Hyundai Steel should be 9.01 percent.

**Hyundai Steel argues:**

- The Department should rely on the evidence on the record and determine that Hyundai Steel reported all benefits it received under investigation.  Hyundai Steel's error in originally reporting that it was not located in an FEZ has no impact on the investigation because the GOK has filled any gap in the record by providing complete information regarding the FEZ program.

---

[359] *See Countervailing Duty Investigation of Certain Polyethylene Terephthalate Resin from the People's Republic of China:  Final Affirmative Determination*, 81 FR 13337 (March 14, 2016), and accompanying IDM at 18-19.
[360] *See* POSCO/DWI VR at 8.
[361] *See* GOK VR at 12.
[362] *See* GOK VR at Exhibit 9.
[363] See Petitioner Case Brief at 79.
[364] *See Steel Beams from Korea*, and accompanying IDM at Section I.A.2.

- Both Hyundai Steel and the GOK reported that the only benefits that Hyundai Steel received pursuant to its location were exemptions of local and property taxes for facilities located in certain Industrial Complexes.

- The GOK also reported that none of the respondents received any benefits for being located in an FEZ.

- Record evidence submitted by the GOK also indicates that benefits provided in FEZs are established for and only available to foreign companies or foreign-invested companies and the foreigners that relocate to Korea to build and support these businesses.

- The Department has previously clarified that, for unverified issues, it accepts the accuracy of the information submitted by that party.[365]

- To the extent that the Department finds a gap in the record with regard to the FEZ program, Hyundai Steel should not be penalized as it has cooperated fully and acted to the best of its ability.

- Given the record evidence from the GOK, the Department has an obligation to determine subsidy margins as accurately as possible.[366]

- Not relying on record information in favor of AFA would be inconsistent with 19 U.S.C. §1677e(c), which requires the department to corroborate information from independent sources.  The corroboration provision was not altered with the passage of the *American Trade and Enforcement Effectiveness Act* of 2015.

- Corroboration of information used as facts available is required by law.[367]  The Department has determined that this means it will "examine the reliability and relevance of information to be used" and "will consider information reasonably available to it to determine whether a margin continues to have relevance."[368]

- The courts have established that a rate is punitive if it is not based on facts and has been discredited by the agency's own investigation.[369]  Further, the courts have established that the Department is obligated to determine AFA rates that are supported by substantial evidence.[370]

---

[365] *See* Hyundai Case Brief at 5 (citing *OCTG from Turkey,* and accompanying IDM at Comment 10).
[366] *Id.* at 8 (citing, *e.g.*, *NTN Bearing*, 74 F.3d at 1204 and 1208;  *Koyo Seiko*, 36 F.3d 1565,  1573 (Fed. Cir. 1994); *Allied Tube v. United States*, 127 F. Supp. 2d 207, 218-219 (CIT 2000)).
[367] *Id.* at 9 (citing SAA, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) at 870).
[368] *Id* at 8-9 (citing *Freshwater Crawfish Tail Meat from the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review*, 68 FR 19504 (April 21, 2003), and accompanying IDM at Comment 6).
[369] *Id.* at 9-10 (citing *F. Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032-33 (Fed. Cir. 2000) (*F. Lli De Cecco*)).
[370] *Id.* at 9 (citing *Dongguan Sunrise Furniture Co. v. United States*, 931 F. Supp. 2d 1346, 1353-54 (CIT 2013) and *Gallant Ocean (Thai) Co. v. United States*, 602 F.3d 1319, 1325 (Fed. Cir. 2010)).

- In prior cases, such as *Line Pipe from Korea*, the Department determined AFA was not warranted when a respondent failed to report certain local tax exemptions because the information required to calculate the benefit for these programs was placed on the record by the GOK.

**Hyundai Steel rebuts:**

- Relying on the GOK's assertion that Hyundai Steel received no FEZ benefits would be consistent with Department practice in other cases.[371]

- Hyundai Steel accurately reported that the only benefits it received under the FEZ that were under investigation were exemptions of local property and acquisition taxes for being located in a designated Industrial Complex. Additionally, record evidence also indicates that benefits provided in FEZs are established for and only available to foreign companies or foreign-invested companies and such would not be available to Korean companies.

- If the Department determines to apply AFA, it should reject the punitive rates suggested by Petitioner and should instead rely on rates calculated within this investigation.

**Petitioner Rebuts:**

- Hyundai Steel provided information that could not be verified and it did not exert maximum effort to extract information from its records. Therefore it did not act to the best of its ability and the Department should make an adverse inference.

- Petitioner also note that Hyundai Steel's claim that only foreign enterprises could receive benefits under the FEZ program is undermined by the fact that it did receive benefits pursuant to its location in a special economic area.

**Department's Position:**

For this final determination, there is a gap in the record concerning non-use of the subsidies in FEZs program for Hyundai Steel, and we find that Hyundai Steel failed to act to the best of its ability in providing information that was requested of it. Therefore, pursuant to sections 776(a) and (b) of the Act, we are relying on adverse facts available to find that this program was used by Hyundai Steel.

Hyundai Steel reported that it was not located in an FEZ in its initial questionnaire response. This affirmative claim was later found to be incorrect at verification. During our verification of Hyundai Steel, company officials stated that Hyundai Steel's Suncheon factory is located is in an FEZ. This information was presented as a minor correction. At verification, the Department accepted evidence of the Suncheon factory's location in an FEZ (*i.e.*, a map); however, we did

---

[371] *See* Hyundai Rebuttal Brief at 6-7 (citing, *e.g., Line Pipe from Korea* and accompanying IDM at Comment 2).

not accept Hyundai Steel's narrative claim that it received no benefits pursuant to its FEZ location.[372]

The subsidy programs alleged to exist for firms in an FEZ include exemptions and reductions of lease fees, grants and financial support, and acquisition and property tax exemptions.  Because Hyundai Steel claimed it was not located in an FEZ in its questionnaire responses, we did not further examine the issue of whether it received exemptions or reduction of lease fees, grants and financial support pursuant to its location in an FEZ.  Moreover, these kinds of programs may not necessarily be easily discerned during the course of verification because certain of these types of assistance, such as reductions of lease fees and financial assistance, are not explicitly identified in a respondent's financial statements or income tax returns.  Therefore, we disagree with Hyundai Steel's claim that verified record evidence substantiates its claim that it reported all received benefits.  Moreover, the purpose of verification is to check the accuracy of the information on the record (*i.e.* the company's questionnaire response); it is not an opportunity to provide new factual information.

In its questionnaire response, the GOK stated that, "During the investigation period, none of the respondents received tax reductions or exemptions, lease-fee reductions or exemptions, or grants or financial support due to their location in an FEZ."[373]  However, the GOK uses the term "investigation period" throughout its initial questionnaire response to refer to the period of investigation.  Therefore, we do not have an affirmative claim of non-use of this program for the remainder of the 15-year AUL period from the GOK.

We further disagree that we have record evidence that these subsidy programs would not have been available to Hyundai Steel.  In the initial questionnaire, we asked the GOK to provide complete information, including eligibility, regarding subsidy programs in the FEZ.  As discussed above, the GOK provided sufficient information for the Department to find that programs in the FEZ are specific and provide a financial contribution.  However, the GOK provided very little support or description about the subsidies available to producers located in an FEZ.  The FEZ promotional brochure that was submitted by the GOK in its initial questionnaire response provided little to no information about the specific types of assistance that are available, nor does it provide information about program eligibility criteria.[374]  Because both mandatory respondents to this proceeding made affirmative claims that they were not located in an FEZ, consistent with our normal practice in countervailing duty investigations, we did not require the GOK to submit additional information about the FEZ program.

As described above in the "Adverse Facts Available" section, given the record deficiencies listed above, we do not have the necessary record information to determine whether Hyundai Steel used the subsidy programs available to producers located in FEZs.  These deficiencies resulted from Hyundai Steel's affirmative claims that it was not located in an FEZ.  Accordingly, as described above, the application of facts available, pursuant to section 776(a)(1) and 776(a)(2)(A),(C) and (D) is warranted with respect to this program, and an adverse inference

---

[372] *See* Hyundai Steel VR at 3.
[373] *See* GOK PQR at 68.
[374] *Id*., at Exhibit FEZ-1.

should be applied to Hyundai Steel, in accordance with section 776(b) of the Act, because Hyundai Steel did not act to the best of its ability in providing this information to the Department. As AFA, we are finding that this program was used by Hyundai Steel. We disagree with Hyundai Steel's reliance on *F. Lli De Cecco* for its argument that the AFA rate must accurately estimate the respondent's actual rate as corroborated by record information. Amendments to the Act arising from the TPEA are applicable to determinations made on or after August 6, 2015, and specifically state that the Department may assign the highest rate calculated for the same or similar program.[375]

Under the new section 776(d) of the Act, the Department may use any countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, use a CVD rate for a subsidy program from a proceeding that the administering authority considers reasonable to use, including the highest of such rates. The TPEA also makes clear that when selecting an AFA rate, the Department is not required to estimate what the countervailable subsidy rate would have been if the interested party failing to cooperate had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party. Moreover, the Federal Circuit recently clarified that that "accurate" represents no more than a "reliable guidepost{}" for a determination.[376] The Court held that a determination is "accurate" if it is correct as a mathematical and factual matter, thus supported by substantial evidence. As such, we are relying on our normal hierarchy for assigning AFA to Hyundai Steel's use of this program.

### Comment 9:  The Department Improperly Countervailed Property Tax Exemptions Received by the Pohang Plant under RSTA 78

**Hyundai Steel argues:**

- The record evidence shows that the subject merchandise is not produced at Hyundai Steel's Pohang Works. Therefore, in accordance with 19 CFR 351.525(b)(5) and the Department's practice, the Department should determine that benefits received under RSLTA Article 78 for the Pohang plant are tied to non-subject merchandise and are, thus, not countervailable.[377]

---

[375] *See* TPEA.
[376] *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1343 (Fed. Cir. 2016).
[377] *See* Hyundai Steel's Case Brief at 14-15 (citing, *e.g.*, *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea:  Preliminary Negative Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 81 FR 2172 (January 15, 2016), and accompanying IDM (January 8, 2016) at 38-39; *Non-Oriented Electrical Steel From the Republic of Korea: Final Negative Countervailing Duty Determination*, 79 FR 61605 (October 14, 2014), and accompanying IDM (October 6, 2014) at 18-19. In *Notice of Final Affirmative Countervailing Duty Determination: Polyethylene Terephthalate Film, Sheet, and Strip from India*, 67 FR 34905 (May 16, 2002), and accompanying IDM (May 6, 2001), the Department determined that any benefit from deferred taxes that were related to investments in facilities for non-subject merchandise were tied to non-subject product and not countervailable).

**Petitioner rebuts:**

- Hyundai does not point to record information to demonstrate that the purpose of the tax exemptions at the time of bestowal by the GOK was to benefit the production of certain products only.

- The tax exemptions were designed to benefit the company as a whole, not just certain segments based on the products they produce.

- In accordance with the *CVD Preamble*, in analyzing whether a benefit exists, the Department should consider what goes into a company, such as enhanced revenues and reduced-cost inputs in the broad sense of the term, and not with what the company does with the subsidy.[378]

**Department's Position:**

As noted in our *Preliminary Determination*, this is a regional subsidy.[379]  In the *CVD Preamble*,[380] the Department explicitly rejected the suggestion that regional subsidies should be tied to the production of products in that particular region.  We stated that if such a practice was adopted by the Department, that foreign companies could then easily escape the payments of countervailing duties by selling products that were produced within a subsidized region domestically, while exporting from a facility in an unsubsidized region.[381]  Furthermore, the Department does not tie subsidies to specific plants or entities within a firm.  We have previously stated that the statute and the regulations do not provide for, or require, the attribution of a domestic subsidy to a specific entity within a firm.[382]

**Comment 10:  The Department's Methodology For Attributing RSTA Article 22 Benefits Received by Hyundai Corporation to Hyundai Steel Was Incorrect**

**Hyundai Steel argues:**

- The Department improperly attributed the benefit received by Hyundai Corporation, a trading company of Hyundai Steel which is not cross-owned.  The Department divided the amount of the tax savings by the combined sales of Hyundai Corporation and Hyundai Steel, instead of attributing the amount to Hyundai Steel based on the ratio of Hyundai Corporation's exports to the United States of subject merchandise that was produced by Hyundai Steel during the POI.

---

[378] *See CVD Preamble*, 63 FR at 65360.
[379] *See* PDM at 20.
[380] *See CVD Preamble*, 63 FR 65404.
[381] *See also Supercalendered Paper from Canada*, and accompanying IDM at 161.
[382] *Id.*

- The Department's preliminary calculation memorandum correctly reflected the Department's practice,[383] but the actual calculation did not reflect the memorandum narrative.

- Using the correct calculation methodology, the benefit attributable to Hyundai Steel is zero, and the Department should revise its benefit calculation for Hyundai Steel under this program and determine that no benefit from this program is attributable to Hyundai Steel.

## Petitioner Rebuts:

- The Department should reject Hyundai Steel's argument because the Department's calculation comports with 19 C.F.R. 351.525(c). The Department used the same methodology to attribute benefits between POSCO and DWI.[384] There is no reason for the Department to depart from its preliminary methodology.

## Department's Position:

The Department inadvertently did not follow the methodology it outlined in its preliminary determination calculation memorandum in calculating the amount of the benefit received by Hyundai Corporation that is attributable to Hyundai Steel. In our preliminary determination calculation memorandum for Hyundai Steel we stated that:

> Pursuant to 19 CFR 351.525(c), benefits from subsidies provided to a trading company that exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm that is producing subject merchandise that is sold through the trading company, regardless of whether the trading company and the producing firm are affiliated. Thus, we are cumulating the benefits from subsidies received by Hyundai Corp with the benefits from subsidies received by Hyundai Steel based on the ratio of Hyundai Corp's exports to the United States of subject merchandise that was produced by Hyundai Steel during the POI (based on value).[385]

Accordingly, we agree with Hyundai Steel that the Department should revise its calculation of Hyundai Corporation's benefits that are attributable to Hyundai Steel. Therefore, consistent with the methodology described above, we attributed a portion of this subsidy rate to Hyundai Steel as represented by Hyundai Corp's exports of Hyundai Steel's subject merchandise (by value). The revised calculation of the benefit resulted in a rate that is less than 0.005 percent,[386] and therefore there is no benefit from this program is attributable to Hyundai Steel. Additionally, with respect

---

[383] *See* Hyundai Steel Case Brief at 16-17 (citing *Line Pipe from Korea IDM* at 5).
[384] *See* Memorandum from Katie Marksberry, to Catherine Bertrand, Program Manager, Re: Countervailing Duty Investigation: Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Preliminary Determination Calculation Memorandum for POSCO and Daewoo International Corporation, dated January 8, 2016.
[385] *See* Memorandum to Catherine Bertrand, Program Manager, from Bob Palmer, Senior International Trade Compliance Analyst, Re: Preliminary Determination Calculations for Hyundai Steel Co., Ltd., dated January 8, 2016, at 2.
[386] *See* Hyundai Steel Final Calculation Memorandum.

to Petitioner's argument that we used the same methodology in the *Preliminary Determination* with respect to POSCO and DWI, we have corrected this in this final determination.[387]

**Comment 11:  Whether Hyundai Steel Should Have Reported Additional ITIPA Grants**

**Petitioner Argues:**

- Hyundai Steel failed to report its involvement in three R&D projects under the Research and Development Grants under the Industrial Technology Innovation Promotion Act (ITIPA) program during the POI.

- The Department did not discover this failure until verification.  Therefore, because the information was not disclosed to the Department and could not be verified, the Department should apply AFA to these grants.

**Hyundai Steel Rebuts:**

- As part of its verification of the ITIPA R&D program, the Department verified completeness by examining the clearance account and searching for government funded R&D programs.

- The Department fully verified the amounts received as well as the fact that they were all received prior to the POI in 2012 and 2013.

- Whether these grants were treated as recurring or non-recurring they would be expensed in the year of receipt under the Department's 0.5 percent test and thus provide no benefits that would need to be reported for this investigation that covers 2014.

**Department's Position:**

In its initial questionnaire response, Hyundai Steel stated that "Hyundai Steel was involved in the following five R&D projects under the ITIPA for which Hyundai Steel received grants from the GOK during the POI."[388]  The Department did not ask any supplemental questions regarding this response, and did not request a response from Hyundai Steel for additional years in the 15-year AUL.  As stated by Petitioner, at verification, in order to test completeness, the Department queried Hyundai Steel's accounting system and determined that there were three additional projects which were not previously reported by Hyundai Steel.  Company officials explained at verification that the three additional projects were for the prior year and were paid at that time.[389] The Department did not discover any additional ITIPA projects during the POI.

The Department agrees with Hyundai Steel that the amounts received under these three additional projects were fully verified by the Department.  Verifiers observed in Hyundai Steel's

---

[387] *See* Attribution of Subsidies Section above.
[388] *See* Hyundai Steel Initial Questionnaire Response at 34.
[389] *See* Hyundai Steel Verification Report at 7.

accounts the amounts received as well as the dates. Accordingly, because the information is on the record and verified, the Department is able to determine that the projects would have been expensed in the year of receipt (*e.g.* 2012 and 2013). Therefore, in calculating a benefit for these grants to Hyundai Steel, we determine that these grants do not meet the 0.5 percent threshold for allocation over the AUL period, pursuant to 19 CFR 351.524(b)(2). Therefore, these grants received by Hyundai Steel offered zero measurable benefit during the AUL.[390]

## Comment 12: Whether Hyundai Steel Should Have Provided a Questionnaire Response for Hyundai Green Power

**Petitioner Argues:**

- Hyundai Steel submitted a correction at verification regarding a previously unreported affiliated company, Hyundai Green, which is 15 percent owned by Hyundai Steel.

- Hyundai Green Power's main business activates involve the production and sale of electricity and steam, and Hyundai Green Power produces steam that it sells to Hyundai Steel. As such, Hyundai Steel should effectively have control over Hyundai Green Power.

- Hyundai Green Power should have been included in this investigation based on the Department's regulations.[391]

**Hyundai Steel Rebuts:**

- Nucor makes a factual error in conflating Hyundai Green Power and Hyundai Green, which are two separate companies. Hyundai Steel's minor correction presented at verification related to Hyundai Green, which is a different company than Hyundai Green Power, which was originally reported in Hyundai Steel's affiliation response.

- As explained by Hyundai Steel at verification, Hyundai Green was inadvertently not earlier reported because it is not listed as a related party in Hyundai Steel's financial statements.[392]

- Hyundai Steel was not required to submit questionnaire responses for either Hyundai Green Power or Hyundai Green. Neither company is cross-owned under the Department's regulations. Specifically, Hyundai Steel has only a 29 percent ownership share in Hyundai Green Power, and only a 15 percent ownership share in Hyundai Green. There is no evidence on the record that indicates that Hyundai Steel could use or direct the assets of either company as required by 19 C.F.R. 351.525(b)(6)(vi).

---

[390] *See* Hyundai Steel Final Calculation Memo.
[391] *See* Petitioner Case Brief at 78 (citing 19 C.F.R. 351.525(b)(6)(ii)-(iv)).
[392] *See* Hyundai Steel Rebuttal Brief at 15 (citing Hyundai Steel VE-1).

**Department's Position:**

As a preliminary matter, the record is clear that Hyundai Green Power and Hyundai Green are two separate companies. Hyundai Steel reported that it is affiliated with Hyundai Green Power in its first affiliation questionnaire response,[393] and at verification reported that there was an additional, previously unreported affiliate named Hyundai Green.[394] In spite of the similarity between the two company names, Petitioner has not pointed to any evidence that these two companies are in fact, the same entity.[395] Additionally, there is no evidence on the record to support Petitioner's assertion that Hyundai Green or Hyundai Green Power should be considered cross-owned companies or be required to submit questionnaire responses. With respect to Hyundai Green, there is evidence on the record as to Hyundai Steel's 15 percent ownership,[396] and no other information that would indicate that it should have been reported as a cross-owned company. As for Hyundai Green Power, based on Hyundai Steel's explanation that Hyundai Green Power does not meet the criteria necessary for submitting a response pursuant to 19 CFR 351.525(b)(6), as well as the evidence verified by the Department,[397] we do not find that Hyundai Green Power was also required to submit a response. Specifically, the Department fully verified the information submitted in Hyundai's questionnaire responses with regard to the ownership percentages, as well as Hyundai Green Power's articles of association,[398] and confirmed that the company was properly not considered cross-owned.

## RECOMMENDATION

Based on our analysis, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final results of the review in the *Federal Register*.

✓
_____          _____
Agree                    Disagree


*Ronald K Lorentzen*
_____
Ronald Lorentzen
Acting Assistant Secretary
  for Enforcement and Compliance

*August 4, 2016*
_____
Date

---

[393] *See* Hyundai Steel Affiliation Response at 4.
[394] *See* Hyundai Steel Verification Report at 3.
[395] *See* Petitioner Case Brief at 77-78.
[396] *Id.* at VE-1, Attachment 6.
[397] *Id. at 4.*
[398] *Id.* at 4.

# EXHIBIT 33

Barcode:3853466-160 A-580-876 REV - Admin Review 12/1/17 - 11/30/18



Fair Trade Commission

# 𝕶𝖔𝖗𝖊𝖆 𝕱𝖆𝖎𝖗 𝕿𝖗𝖆𝖉𝖊 𝕮𝖔𝖒𝖒𝖎𝖘𝖘𝖎𝖔𝖓

Thursday, December 21, 2017                                    Cartel Investigation Bureau

                                                              Tel: +82-44-200-4533
                                                                   +82-44-200-4541

## <u>KFTC punishes six steel pipe manufacturers for rigging bids offered by Korea Gas Corporation</u>

Imposing corrective orders and fines of 92.1 billion won and referring them to the prosecution.

<Summary>

■ The Korea Fair Trade Commission (led by Chairman Kim Sang-jo, hereinafter referred to as the "KFTC") decided to impose corrective orders along with a penalty surcharge of 92.1 billion won on six steel pipe manufacturers for agreeing in advance who will submit a winning bid, bidding prices and the amount of steel pipes to be offered in bids for steel pipes arranged by Korea Gas Corporation and persecute all of them.

## 1. Details of violation

☐ (Overview of the bid rigging) Six steel pipe manufacturers* agreed in advance who will submit a winning bid, bid prices and the amount of steel pipes to be offered, during 33 bids arranged by Korea Gas Corporation (hereinafter referred to as "KOGAS") between January 2003 and December 2013.

\* Dongbu Incheon Steel, Dong Yang Steel Pipe, SeAH Steel, HiSteel, Hyundai Steel and Husteel

※ The total amount of 33 bids was 735 billion won (VAT excluded)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 6/25/19 2:51 PM, Submission Status: Approved

☐ (Background of the bid rigging) As KOGAS expanded constructions of gas main pipeline* from the early 2000s, it placed bids for a large amount of steel pipes. In order to prevent KOGAS from obtaining steel pipes at the lowest possible price through the lowest price bidding system and to secure equal and stable orders, the manufacturers colluded with each other.

* Constructions of main pipeline were needed as KOGAS imports liquefied natural gas (LNG) from overseas sand then re-supplies it to power plants and state-run gas providers nationwide.

☐ (Implementation of the bid rigging) On the bid opening day, the six manufacturers implemented the bid rigging in a way that the designated winner informed the other conspiring manufacturers of the bid price it will submit and then conspirators submitted a bid at a price set by the designated winner.

○ Regarding the allocation of the winning bids, before 2012, the allocation was made evenly among the conspirators as they agreed in advance. Since 2013, however, the allocation was not made as KOGAS did not allow the bid winner to outsource parts of the winning bids to other manufacturers.

* KOGAS placed bids from 2003 to 2010 through the face-to-face bidding method. Conspirators participating in the bidding were informed of the bid prices by the designated bid winner before they entered the KOGAS bid room. Since 2011, as the bidding was conducted through e-Bidding, the conspirators gathered in one place and submit the bids or they submitted the bids under the supervision of the staff of the designated bid winner.

## 2. Measures imposed

☐ The KFTC decided to impose corrective orders along with a penalty surcharge of 92.1 billion won on six steel pipe manufacturers and persecute all of them.

Barcode:3853466-161 A-580-876 REV - Admin Review 12/1/17 - 11/30/18

○ Corrective order: Cease and desist order

○ Penalty surcharges: A total of 92.165 billion  won

### Imposed penalty surcharges

| Company | Penalty amount | Company | Penalty amount |
|---|---|---|---|
| Dongbu Incheon Steel | 2,388 | HiSteel, | 4,515 |
| Dong Yang Steel Pipe | 21,444 | Hyundai Steel | 25,609 |
| SeAH Stee | 31,068 | Husteel | 7,141 |

(Unit: million won)

* Penalty surcharges can be adjusted according to the calculation of relevant sales.

○ Prosecution: Six manufacturers

※ *The Korean version of the documents is confirmed to be genuine and English version is only for reference.*

PUBLIC VERSION

# EXHIBIT 37

PUBLIC VERSION

April 29, 2019

**BY ELECTRONIC FILING**

The Honorable Wilbur L. Ross, Jr.   Case No.:  C-580-884
Secretary of Commerce      Total No. of Pages:  622
Attention: Enforcement and Compliance Second Administrative Review
APO/Dockets Unit, Room 18022   POR:  1/1/17 to 12/31/17
U.S. Department of Commerce    AD/CVD Operations, Office V
14th Street & Constitution Ave, NW
Washington, DC  20230      **PUBLIC DOCUMENT**

Re: **Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Petitioners' Allegation of Upstream Subsidies to Korean Steel Producers**

Dear Secretary Ross:

On behalf of United States Steel Corporation ("U. S. Steel") and Nucor Corporation (together, "Petitioners"), we hereby allege that Korean producers of hot-rolled steel flat products, including the mandatory respondent Hyundai Steel Company, benefited from upstream subsidies in the form of subsidized electricity during the period of review ("POR").  Petitioners request that Commerce investigate this upstream subsidy in the ongoing administrative review of the countervailing duty order on certain hot-rolled steel flat products from the Republic of Korea.[1]

---

[1] *Certain Hot-Rolled Steel Flat Products from Brazil and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders*, 81 Fed. Reg. 67,960 (Oct. 3, 2016).  Petitioners have made this same allegation in other flat-rolled steel proceedings and this submission contains additional factual information sought by Commerce in those proceedings.  *See* **Exhibit 14**.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 2

The ensuing upstream allegation, and factual information provided in support thereof, is timely

in accordance with 19 C.F.R. § 351.301(c)(2)(iv)(B) and Commerce's extension memorandum.[2]

As an initial matter, this allegation differs in material respects from previous allegations

that led to Commerce's finding that the Korea Electric Power Company ("KEPCO"), a state-

owned enterprise, does not provide electricity to Korean steel producers for less than adequate

remuneration.[3]  Specifically, Petitioners allege that the Government of Korea ("GOK")

subsidizes the electricity price that KEPCO passes on to end-users by adjusting downward the

---

[2] Memorandum from Commerce to The File, "Extension of Deadline to File New Subsidy Allegations" (Apr. 19, 2019).

[3] *See Welded Line Pipe From the Republic of Korea: Final Negative Countervailing Duty Determination*, 80 Fed. Reg. 61,365 (Oct. 13, 2015) and accompanying Issues and Decision Memorandum (hereinafter "*Welded Line Pipe Korea*"); *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35,310 (June 2, 2016) and accompanying Issues and Decision Memorandum (hereinafter "*CORE Korea*"); *Certain Cold-Rolled Steel Flat Products from Brazil, India, and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order (the Republic of Korea) and Countervailing Duty Orders (Brazil and India)*, 81 Fed. Reg. 64,436 (Sept. 20, 2016) and accompanying Issues and Decision Memorandum (hereinafter "*CRS Korea*"); *Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders*, 81 Fed. Reg. 67,960 (Oct. 3, 2016) and accompanying Issues and Decision Memorandum (hereinafter "*HRS Korea*").

In these cases, Commerce evaluated whether KEPCO provided electricity to respondent producers at less than adequate remuneration.  While Commerce found KEPCO to be an authority within the meaning of section 771(5)(B) of the Act, and found that it provided a financial contribution in the form of a provision of a good or service under section 771(5)(D)(iii) to producers of subject merchandise, Commerce found however that no benefit was conferred. Specifically, Commerce determined that the price of KEPCO's electricity tariff for industrial users (which applied to respondent producers of subject merchandise) was consistent with its standard pricing mechanism because the tariff allowed KEPCO to cover its cost of purchasing electricity from the KPX and applied to all industrial users.

This analysis is currently on appeal before the U.S. Court of Appeals for the Federal Circuit (Fed. Cir. No. 2018-1787).

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 3

prices the Korea Power Exchange ("KPX") pays the generation entities ("GENCOs") such that

the GENCOS' prices are no longer market-based.  This adjustment to the price at which the

electricity is acquired results in an upstream subsidy to KEPCO through the provision of a good

at less than adequate remuneration.  The subsidy is passed through to producers of the subject

merchandise using KEPCO's standard pricing mechanism.  The downward adjustments are made

by and through a Cost Evaluation Committee that includes representatives from the GOK, the

KPX, KEPCO, and the GENCOs, making it a financial contribution insofar as these entities are

all authorities within the meaning of the statute.[4]  Finally, this practice benefits the Korean steel

industry in light of the GOK's established policies and the steel industry's purchases of

electricity at rates that are cross-subsidized by other ratepayers.[5]

As provided for below and in accordance with Section 771A of the Tariff Act of 1930, as

amended ("the Act"), Petitioners hereby request that Commerce initiate an upstream subsidy

investigation in this administrative review concerning the provision of electricity for less than

adequate remuneration by the GENCOs through KEPCO to Korean steel producers.

## I.    OVERVIEW OF THE KOREAN ELECTRICITY MARKET

The Korean electricity market is a "heavily regulated industry" in which KEPCO acts "as

an intermediate holding company in a vertical control structure involving the" GOK, KEPCO, its

---

[4] *See Welded Line Pipe Korea* at 24; *CORE Korea* at 23; *CRS Korea* at 50; *HRS Korea* at 49.
The KPX is responsible for "setting the price of electricity, handling the trading and collecting
relevant data for the electricity market."  *See* KEPCO, *Securities and Exchange Commission:
Form 20-F* (2018) (hereinafter "SEC Form 20-F") at **Exhibit 1** at 34.  19 U.S.C. 1677(5)(B).

[5] *See Welded Line Pipe Korea* at 14 ("it is generally accepted that the rates for agricultural and
industrial users are set below cost, while those for other users are above cost.  This rate structure
generated cross-subsidization where residential and commercial consumers paid higher
electricity tariffs in order to subsidize agricultural and industrial consumers.").

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 4

wholly owned GENCOs, and the KPX.[6]  The GENCOs, which generate electricity, do not sell

their product directly to end-users.  Rather, the GENCOs are required by law to sell their product

to the KPX, at a price determined by the Cost Evaluation Committee.[7]  The KPX, a statutory

non-profit, then sells the discounted electricity to KEPCO for distribution to end users.[8]

KEPCO's standard price-setting philosophy and associated tariff rates are based upon the cost at

which KEPCO acquires the electricity from the KPX.

The primary government ministry for developing electricity policy in Korea is the

Ministry of Trade, Industry, and Energy ("MOTIE").[9]  KEPCO is the dominant electricity utility

and sole electricity distribution company, and "operates under the general supervision of"

MOTIE.[10]  As Commerce recognized in *Welded Line Pipe*, through its majority ownership in

KEPCO, the GOK "exercises significant control" over KEPCO's corporate decision-making and

"pursues government policy objectives through KEPCO's business and operations."[11]  Given this

extensive control exercised by the GOK, Commerce has repeatedly found KEPCO to be an

"authority" within the meaning of Section 771(5)(B) of the Act.[12]

---

[6] SEC Form 20-F at **Exhibit 1** at 166.

[7] *Id*. at **Exhibit 1** at 34.

[8] *See id*.

[9] *See Welded Line Pipe Korea* at 13.

[10] *Id*.

[11] *Id.* at 15.

[12] *See id.* at 15; *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Preliminary Negative Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 81 Fed. Reg. 2,172 (Jan. 15, 2016) and accompany Decision Memorandum at 29 (hereinafter "*Preliminary HRS Korea*").

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 5

KEPCO wholly owns the six GENCOs that generate substantially all of KEPCO-

distributed electricity.[13]  Because KEPCO is the "sole purchaser of electricity produced by the

generation subsidiaries" it "continue{s} to have significant influence over {the} generation

subsidiaries in the electricity industry,"[14] even though the GENCOs have their own management

structure, assets, and liabilities.[15]  In a recent filing with the U.S. Securities and Exchange

Commission, KEPCO explains that the GOK exercises the same control over the GENCOs as it

does over KEPCO:

> Ultimately, our control over our generation subsidiaries is derived from the fact
> that the Government owns the majority of our shares and ***effectively controls us***
> as the supervisor and regulator in a heavily regulated industry, ***and in effect also***
> ***exercises the same degree of control over our generation subsidiaries*** through
> our sole share ownership over our generation subsidiaries as well as its statutory
> power of direct appointment of the governing bodies of our generation
> subsidiaries. In effect, we are acting as an intermediate holding company in a
> vertical control structure involving the Government, us, and our generation
> subsidiaries, ***where the Government holds the ultimate control over both us***
> ***and our generation subsidiaries*** and exercises its such {sic} control over our
> generation subsidiaries in part through us acting as the sole shareholder and the
> parent company.[16]

The GOK's control over the GENCOs is further evidenced by the fact that the President of Korea

appoints the president of each GENCO.[17]  Therefore, the GENCOs are undoubtedly "authorities"

within the meaning of Section 771(5)(B) of the Act.

Additionally, the GOK controls the sole market operator, the KPX, which is responsible

for "setting the price of electricity, handling the trading and collecting relevant data for the

---

[13] *See Welded Line Pipe Korea* at 13; SEC Form 20-F at **Exhibit 1** at 29-30.

[14] *Id*. at **Exhibit 1** at 166.

[15] *See id*. at **Exhibit 1** at 31.

[16] *Id*. at **Exhibit 1** at 166 (emphasis supplied).

[17] *See id*. at **Exhibit 1** at 33.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 6

electricity market."[18]  This control is evidenced by several facts.  *First*, KEPCO and its six

wholly owned GENCOs collectively own 100% of the KPX's shares.[19]  *Second*, KEPCO is

entitled to elect three of the KPX's eleven directors and its representatives are on the board of

directors and in various committees, including those responsible for evaluating costs of

producing electricity.[20]  *Finally*, the MOTIE supervises and controls the KPX's "personnel,

policies, operations and finances" and has representatives on KPX's board of directors.[21]

Consequently, the KPX is not "independent" in any sense of the word; rather, the GOK owns,

regulates, and controls the operations of the KPX, including placing government-approved

individuals on its board of directors and in various committees.[22]  Accordingly, the KPX is

indisputably an "authority" within the meaning of Section 771(5)(B) of the Act.[23]

As discussed, electricity must be bought and sold through the KPX, the sole market

operator in Korea.[24]  Therefore, all electricity generators sell electricity to the KPX.  The KPX,

---

[18] *Id*. at **Exhibit 1** at 34.

[19] *See id*.

[20] *See id*.

[21] *Id*.

[22] *Guangdong Wireking Housewares & Hardware Co. v. United States*, 900 F. Supp. 2d 1362
(Ct. Int'l Trade, 2013) (citing Department of Commerce, *Countervailing Duties: Final Rule*. 63
Fed. Reg. 65348, 65402 (Nov. 25, 1998)) (Commerce has a "longstanding practice of treating
most government-owned corporations as the government itself").

[23] We note that Commerce has consistently treated KEPCO as a distinct authority, separate from
the KPX or its GENCOs.  Consequently, Commerce did not include the KPX or the GENCOs in
prior less than adequate remuneration analyses.  Commerce has confirmed this treatment in
recent appeals.  *See* United States, Defendant's Response to Plaintiff's Motion for Judgment
Upon the Agency Record at 26-29, submitted in *Nucor Corp. v. United States,* Slip Op. 18-7 (Ct.
Int'l Trade 2018), on appeal at (Fed. Cir. No. 2018-1787) at **Exhibit 13**.

[24] *See* SEC Form 20-F at **Exhibit 1** at 34-35.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 7

in turn, sells the electricity to KEPCO for distribution.[25]  However, the GENCOs do not set their own price of electricity when selling to the KPX.  Rather, the KPX is responsible "for setting the price of electricity…"[26]  Through its Cost Evaluation Committee, the KPX "allocate(s) which generation units will supply electricity for which hour and at what price."[27]

The electricity prices of the GENCOs have three principal components: (1) the marginal price, representing the variable costs of each GENCO, primarily fuel inputs; (2) an adjusted coefficient that reduces certain GENCOs' sale price of electricity, reflecting policy preferences of the GOK; and (3) the capacity price, representing the fixed costs of each GENCO.[28]  KEPCO admits that "{t}he variable cost (including the adjusted coefficient…) and the capacity price are determined in advance of trading by the {KPX's} Cost Evaluation Committee, which is comprised of representatives from" the MOTIE, the KPX, KEPCO, the GENCOs, and other individuals.[29]  In sum, while Commerce has previously focused on the price at which KEPCO sells electricity, it has never examined the price at which KPX acquires the electricity from the GENCOs.  A review of publicly available information demonstrates that this price is distorted, not subject to any standard pricing mechanism, and subject to refinement from the KPX Cost Evaluation Committee to keep electricity costs low for end-users like Korean steel producers.

---

[25] *See id.*

[26] *Id*. at **Exhibit 1** at 34.

[27] *Id*. at **Exhibit 1** at 35.

[28] *See id.* at **Exhibit 1** at 34-37.

[29] *Id*. at **Exhibit 1** at 35.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 8

## II.    UPSTREAM SUSBIDY LEGAL FRAMEWORK

Pursuant to Section 771A of the Act, an upstream subsidy is defined as any countervailable subsidy, other than an export subsidy, that: (1) is paid or bestowed by an authority with respect to an input product that is used in the same country as the authority in the manufacture or production of merchandise which is subject of a countervailing duty proceeding; (2) bestows a competitive benefit on the merchandise; and (3) has a significant effect on the cost of manufacturing or producing the merchandise.[30]  The statute mandates that Commerce "shall decide that a competitive benefit has been bestowed when the price for the input product…is lower than the price that the manufacturer or producer" of subject merchandise "would otherwise pay for the product in obtaining it from another seller in an arms-length transaction."[31]

Moreover, in the context of upstream subsidies, the specificity requirement of a subsidy only applies to the input producer.  Thus, "domestic subsidies given directly to the input producer…must be specifically provided, and domestic subsidies given directly to the downstream producer…must be specifically provided, but subsidized inputs purchased by downstream producers need not be specifically provided in order to be countervailable."[32]  In other words, so long as the subsidy provided to KEPCO by the KPX and the GENCOs is specific, there is no requirement that Korean steel producers specifically benefited.

---

[30] 19 U.S.C. § 1677-1.

[31] 19 U.S.C. § 1677-1(b)(1).

[32] *Final Affirmative Countervailing Duty Determination; Steel Wheels From Brazil*, 54 Fed. Reg. 15,523 (Apr. 18, 1989) (citing *Final Affirmative Countervailing Duty Determinations: Certain Steel Products From the Federal Republic of Germany*, 47 Fed. Reg. 39,345 (Sept. 7, 1982) (ultimately finding no benefit because the price of coal was higher than world market prices, not because it was not specifically provided to the steel industry)).

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 9

Commerce's regulations specify the substantive legal requirements for an initiation of an upstream subsidy allegation. Under 19 C.F.R. § 351.523(a)(1), before investigating the existence of an upstream subsidy, Commerce must have a reasonable basis to believe or suspect that all of the following conditions exist:

    i.    A countervailable subsidy, other than an export subsidy, is provided with respect to an input product;

    ii.    One of the following conditions exists: (1) the supplier of the input product and the producer of the subject merchandise are affiliated; (2) the price for the subsidized input product is lower than the price that the producer of the subject merchandise otherwise would pay another seller in an arm's-length transaction for an unsubsidized input product; or (3) the government sets the price of the input product so as to guarantee that the benefit provided with respect to the input product is passed through to producers of the subject merchandise; and

    iii.    The *ad valorem* countervailable subsidy rate on the input product, multiplied by the proportion of the total production costs of the subject merchandise accounted for by the input product, is equal to, or greater than, one percent.

As outlined in detail below, each of these conditions is satisfied. Specifically, the GOK provides a countervailable subsidy with respect to an input product (*i.e*., electricity) by ensuring the GENCOs provision of electricity to KEPCO via the KPX is for less than adequate remuneration. The price of electricity to KEPCO, and therefore to end users, is less than the price they would otherwise pay in a purely arms-length transaction. Moreover, the GOK, through the KPX, sets the price of electricity to ensure the benefit is passed through to producers of the subject merchandise. Finally, available evidence suggests the *ad valorem* subsidy rate is greater than one percent.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 10

### III.    THE KPX SETS THE GENCOS' PRICE OF ELECTRICITY AT BELOW MARKET PRICES, PROVIDING KEPCO WITH ELECTRICITY FOR LESS THAN ADEQUATE REMUNERATION

The KPX's Cost Evaluation Committee determines the GENCOs' variable price and fixed price components to their overall electricity price, and manipulates those prices by applying an adjusted coefficient to reflect the priorities of the government and to ensure the profitability of KEPCO.  Additionally, the KPX imposes a uniform rate of return on all six GENCOs, regardless of their different fuel inputs and operational efficiency, which caps the GENCOs' price of electricity to the KPX.  These measures provide KEPCO with electricity for less than adequate remuneration.

*First*, as part of setting the marginal price of each GENCO, the Cost Evaluation Committee applies an "adjusted coefficient," which reduces certain GENCOs' prices to the KPX and to KEPCO.  The KPX determines the marginal price for each GENCO through the use of the following equation, where marginal price (MP) is calculated as:

$$\underline{MP = Variable\ Cost + \{System\ MP - Variable\ Cost\} * Adjusted\ Coefficient}$$

When the KPX sets the adjusted coefficient below 1.0 for a particular GENCO, the marginal price falls below a market value and results in the provision of electricity for less than adequate remuneration.  Official documents from Korea Southern Power Co., Ltd. ("KOSPO") show that the "adjusted coefficient" for nuclear power and coal was less than 1 in late 2016.[33]  According the KHNP, the adjusted coefficient applicable to electricity generated from nuclear fuels was further adjusted downward in 2017, "which contributed to a decrease in {KHNP's} revenue in

---

[33] Korea Southern Power Co., Ltd., *KOSPO Investor Presentation* (2016) at **Exhibit 11** at 10.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 11

2017 compared to 2016."[34]  This benefit is significant because nuclear energy and coal represent, by far, the two largest energy inputs used in the generation of electricity in Korea.[35]  Stated differently, the KPX Cost Evaluation Committee reduces the marginal price to below a market-value through the adjusted coefficient.

The adjusted coefficient is an effective tool of government to adjust electricity pricing. KEPCO notes the adjusted coefficients "reflect the Government's prevailing energy policy objectives and have the effect of setting priorities in the fuel types to be used in electricity generation."[36]  These adjusted coefficients apply to all of the GENCOs and each different type of fuel.[37]  The ultimate purpose of the adjusted coefficient is to "prevent electricity trading from resulting in undue imbalances as to the relative financial results among generation subsidiaries as well as between" KEPCO and the GENCOs.[38]  These "imbalances"

> may arise from excessive profit taking by base load generators (on account of their inherently cheaper fuel cost structure compared to non-base load generators) as well as from fluctuations in fuel prices (it being the case that during times of rapid and substantial rises in fuel costs which are not offset by corresponding rises in electricity tariff rates charged by {KEPCO} to end-users, on a non consolidated basis {KEPCO's} profitability will decline compared to that our generation subsidiaries since our generation subsidiaries are entitled to sell electricity to {KEPCO} at cost plus a guaranteed margin).[39]

KEPCO further notes that

---

[34] Korea Hydro & Nuclear Power Co., Ltd ("KHNP"), *Offering Circular* (2018) at **Exhibit 8** at 81.

[35] *See* SEC Form 20-F at **Exhibit 1** at 38.

[36] *Id*. at **Exhibit 1** at 36.

[37] *See Id.*

[38] *Id*.

[39] *Id*.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 12

> the adjusted coefficient ***must be determined so that the price of electricity sold by our generation subsidiaries to us shall have the effect of ensuring a fair rate of return to us as a standalone entity***, which means any imbalance caused by excess profits taken by our generation subsidiaries to our loss must be corrected.  Since we and the generation subsidiaries participate in the determination in the adjusted coefficient, such determination process can be used as a way for us to exert indirect influence on our generation subsidiaries.[40]

In other words, the KPX adjusts certain GENCOs' sale price of electricity downward to reflect the policy preferences of the GOK with respect to fuel type and to ensure KEPCO and the other GENCOs are profitable (*i.e.* preventing "excessive profit taking").  As KEPCO admits, without this adjusted coefficient, KEPCO would not be able to return a profit on its sales of electricity to end-users under the established standard pricing mechanism.

KOSEP further notes in a *Offering Circular* that under certain circumstances, such as a rapid or sustained increase in fuel costs without a corresponding tariff rate increase, the KPX may also set the adjusted coefficient at a level "that would have the effect of lowering the fair investment return for the generation subsidiaries…and, in turn, the overall profitability of our operations."[41]  For example, in March 2013, the KPX imposed a price cap on the marginal price of electricity sold using liquefied natural gas ("LNG") and by oil generation units that differed from the actual cost of the fuel source.[42]  Since the adjusted coefficient is not publicly available for all GENCOs during the POR, it is reasonable to conclude that the GOK used the adjusted coefficient to limit or cap the level of profitability of specific GENCOs during the POR.  This

---

[40] *Id*. at **Exhibit 1** at 166.

[41] Korea South-East Power Co., Ltd ("KOSEP"), *Offering Circular* (2017) at **Exhibit 3** at 9.

[42] *Id*.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 13

action prevents arms-length, market-based transactions in the electricity market since KEPCO

merely passes through its acquisition costs to end-users through its standard pricing mechanism.

*Second*, the KPX applies a uniform rate of return to all six GENCOs, demonstrating that

the rate of return bears little resemblance to market forces.  For example, Korea East West Power

("KEWP") notes that "the overall margin for our operations is affected in part by the fair

investment return assigned to us (at a uniform rate for all of KEPCO's generation subsidiaries)

by the Cost Evaluation Committee."[43]  Thus, the KPX applies of a <u>uniform rate of return</u> to six

entirely different generation companies regardless of the fact that these six GENCOs use

different fuel inputs, have different assets and liabilities, different debt levels, and have varying

degrees of operational efficiency.

Take, for instance, KOSPO, which states it has the highest operational efficiency among

its GENCO peers.[44]  As shown in Table 1 below, this highest operational efficiency still comes at

a cost since its' per-unit electricity price ranks among the highest in relation to the other

GENCOs.  Moreover, this GENCO receives the same "reasonable return on investment" as less

efficient GENCOs.  How can the most efficient GENCO also have highest cost and price, yet

still not receive anything more than other GENCOs for return on investment?  Precisely because

the GOK specifically designed the Korean electricity market to ensure that "a supplier of

electricity cannot exercise control over the merit order system or its operation to such supplier's

strategic advantage."[45]  The imposition of a uniform rate of return prevents the GENCOs from

---

[43] Korea East-West Power Co., Ltd, "Offering Circular" (June 12, 2017) ("KEWP Offering Circular") at **Exhibit 7** at 38.

[44] *See* KOSPO Investor Presentation at **Exhibit 11** at 13-14.

[45] SEC Form 20-F at **Exhibit 1** at 35.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 14

engaging in arms-length transactions with the KPX and ensures the price KEPCO pays to purchase electricity is for less than adequate remuneration.

*Third*, through the Cost Evaluation Committee, the GOK distorts the capacity price for certain GENCOs to reflect government preferences for new investments and otherwise subsidizes the capacity price of other GENCOs through the provision of grants.  The Cost Evaluation Committee established the capacity price "to compensate {generation units} for the fixed costs of constructing generation facilities, provide incentives for construction of new generation units and maintain reliability of the nationwide electricity transmission network." [46] "{T}he capacity payment is paid to all available plants, regardless of whether they are actually called upon to produce." [47]  Moreover, the capacity price includes "incentives for construction of new generation units." [48]  And it also indemnifies certain GENCOs if the GOK decides to shift the electricity market away from a particular energy source, for example nuclear energy,[49] which would normally have the effect of stranding these fixed costs with the GENCO that originally bore the cost, but these stranded costs are reapportioned across the system.

The GENCOs' operations are also subsidized by the GOK through various grant programs specific to each GENCO.  These grants are outlined in independent auditor reports and Offering Circulars.  In these documents, grants include "a benefit from a government loan at a

---

[46] SEC Form 20-F at **Exhibit 1** at 36.

[47] Jung-Yeon Park et. al, *Investment Incentives in the Korean Electricity Market* (2007), 35(11) ENERGY POLICY 5819-5828 (2007) at **Exhibit 12** at 4, https://inis.iaea.org/search/search.aspx?orig_q=RN:39091647.

[48] SEC Form 20-F at **Exhibit 1** at 36.

[49] Song Jung-a, *South Korea's Political Winds Blow Ill for Nuclear Energy Industry*, FINANCIAL TIMES (Sept. 18, 2018) (noting the administration of Moon Jae-in seeks to move away from nuclear energy).

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 15

below-market interest rate."[50]  Other government grants may be "conditional to the company purchasing, constructing or otherwise acquiring non-current assets" or "as compensation for expenses or losses already incurred or for the purpose of giving immediate financial support to the company."[51]  KEPCO and five of the six GENCOs reported receiving significant government grants in various forms.

In filings with the Securities and Exchange Commission, KEPCO reported receiving government grants for land, buildings, structures, machinery, vehicles, equipment, tools, and construction-in-progress in the amount of ₩ 510,173,000 in 2016 and ₩ 522,330,000 in 2017.[52] Given the intertwined reporting obligation between KEPCO and its generation subsidiaries, it is reasonable to conclude that the GENCOs also received these benefits from the GOK.  However, the GENCOs also report receiving various specific forms of subsidies from the GOK:

- In an independent auditor's report for 2017 and 2016, Korea South-East Power Co., Ltd ("KOSEP")'s financial statements evidenced receiving government grants related to buildings, structures, machinery, vehicles, furniture and fixtures in the amount of ₩ 6,746,320,760 in 2017 and ₩ 7,132,887,721 in 2016.[53]  KOSEP also reported receiving a benefit under the Tax Incentive Limitation (or Control) Law related to research and human development in the amount of ~ ₩ 5,227,200,000 in 2017.[54]

- In a June 2017 Offering Circular, Korea East West Power Co., Ltd ("EWP")'s financial statements evidenced receiving government grants related to buildings and vehicles in the amount of ₩ 198,806,500 in 2017 and ₩ 200,949,083 in

---

[50] Korea South-East Power Co., Ltd. and Its Subsidiaries ("KOSEP"), *Consolidated Financial Statements and Independent Auditor's Report for the Years Ended December 31, 2017 and 2016* (2018) at **Exhibit 4** at 26-27.

[51] *Id*. at 26.

[52] SEC Form 20-F at **Exhibit 5** at F-107.

[53] KOSEP, *Consolidated Financial Statements and Independent Auditor's Report for the Years End December 31, 2017 and 2016* (2018) at **Exhibit 6** at 64.

[54] *Id*. at 80 (calculated by dividing the reserve for research and human development by the applicable income tax rate of 24.2%).

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 16

2016.[55]   EWP also reported receiving a benefit under the Tax Incentive Limitation Law related to research and human development in the amount of ~ ₩ 822,800,000 for the three months ended March 31, 2017.[56]

- In aa July 2018 Offering Circular, Korea Hydro & Nuclear Power Co., Ltd ("KHNP")'s financial statements evidenced receiving government grants related to buildings, structures, machineries, vehicles, fixtures and furniture in the amount of ₩ 27,088,000 in 2017 and ₩ 29,029,000 in 2016.[57]

- In a May 2018 Offering Circular, Korea Western Power Co., Ltd ("KOWEPO")'s financial statements evidenced receiving government grants related to buildings, structures, machinery, vehicles, equipment, tools, construction-in-progress, and finance lease assets in the amount of ₩ 91,941,000 in 2017 and ₩ 102,735,000 in 2016.[58]

- In an October 2017 Offering Circular, Korea Midland Power Co., Ltd ("KOMIPO") reported that up to June 30, 2017, it received government grants related to buildings, machinery, and vehicles in the amount of ₩ 27,116,000 and ₩ 28,275,000 in 2016.[59]

These are the illustrative grants that the GENCOs must include in their financial documents because without them and due to the GOK's distortive influence on the GENCOs' fixed costs, these GENCOs would not be able to sustain themselves and continue generating electricity.

---

[55] KEWP Offering Circular at **Exhibit 7** at F-27-29.

[56] *Id*. at F-40-41 (calculated by dividing the reserve for research and human development by the applicable income tax rate of 24.2%).

[57] Korea Hydro & Nuclear Power Co., Ltd ("KHNP"), *Offering Circular* (2018) at **Exhibit 8** at F-170.

[58] Korea Western Power Co, Ltd. ("KOWEPO"), *Offering Circular* (2018) at **Exhibit 9** at F-126.

[59] Korea Midland Power Co., Ltd ("KOMIPO"), *Final Offering Circular* (2018) at **Exhibit 10** at F-27.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 17

### A. Financial Contribution

When the adjusted coefficient is less than one, which it currently is for certain fuel types, the marginal price of electricity is less than a purely arms-length, or market-based, price, and KEPCO is acquiring electricity for less than adequate remuneration. Moreover, when the Cost Evaluation Committee adjusts the GENCOs' capacity prices to account for government preferences and otherwise provides certain GENCOs with grants, the fixed cost component of the electricity price is less than the GENCOs' actual fixed costs and KEPCO is acquiring electricity for less than adequate remuneration. Because the KPX is an "authority" within the meaning of the statute, KEPCO's purchase of electricity from the KPX for less than adequate remuneration constitutes a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(iii).

### B. Benefit

In accordance with 19 U.S.C. § 1677(5)(E)(iv), the provision of electricity confers a benefit to the extent that it is provided by the GENCOs and the KPX to KEPCO for less than adequate remuneration. Commerce has previously recognized that "{i}n an arm's length transaction, the seller generally attempts to maximize its total revenue by charging as high a price and selling as large a volume as the market will bear."[60] Additionally, "it is a basic principle of corporate finance and management that the primary function of a commercial enterprise is to maximize the financial return on its owners' investment."[61] However, the GOK

---

[60] *Final Affirmative Countervailing Duty Determinations: Certain Steel Products From the Federal Republic of Germany*, 47 Fed. Reg. 39,345 (Sept. 7, 1982)

[61] *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,132 (June 23, 2003). To be sure, Commerce was discussing the issue of privatization of government entities. However, its comments on fair-market-value are relevant to an analysis of arms-length transactions.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 18

specifically designed the Korean electricity market to ensure that "a supplier of electricity cannot exercise control over the merit order system or its operation to such supplier's strategic advantage."[62]  Put differently, the GOK designed the electricity market in Korea to prevent arms-length transactions between the GENCOs and the KPX and to limit the GENCOs' ability to maximize their financial return.

The result of this system is that the prices of all six of the KEPCO GENCOs were well below independent power producers ("IPPs") that also traded electricity through the KPX in 2017.[63]  As shown in Table 1, the difference in prices between the GENCOs and the IPPs is substantial, and demonstrates what prices would be without the KPX entrusting or directing the GENCOs to sell electricity to KEPCO at preferential prices.  For example, the two low-price leaders, KHNP and KOSEP, could raise their prices by more than 60% and 30%, respectively, and would still have unit prices to KEPCO below those of the IPPs.

---

[62] SEC Form 20-F at **Exhibit 1** at 35.

[63] *See id*. at **Exhibit 1** at 38.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 19

**Table 1**

| Generation Entity | Total Volume (%) | Unit Price (Won/kWh) |
|---|---|---|
| KHNP (Nuclear and Hydro) | 28.1 | 62.33 |
| KOSEP (Thermal & Renewables) | 12.8 | 77.77 |
| KOMIPO (Thermal & Renewables) | 9.7 | 87.75 |
| KOWEPO (Thermal & Renewables) | 8.7 | 91.85 |
| KOSPO (Thermal & Renewables) | 9.2 | 91.22 |
| EWP (Thermal & Renewables) | 9.3 | 92.15 |
| IPPs (Thermal & Renewables) | 22.2 | 100.81 |

*Source*: KEPCO's SEC Form 20-F at **Exhibit 1** at 38 (2017 data)

In fact, without government intervention through the KPX, KHNP could substantially increase

its revenue and profit by selling its generated electricity at any price below ₩ 77.77/kWh

without losing market share and maintaining its position as the lowest price in the market.

Moreover, in-country electricity prices are the best information available for determining

that KEPCO receives a benefit through the KPX's price-setting mechanism.  Importantly,

Commerce "does not apply a per se rule that a government's majority market share equates to

government distortion.  Rather, the Department will consider all relevant factors or measures that

may distort a market."[64]  Here, the GENCOs do not have the capacity to generate enough

electricity to meet electricity demand in Korea, which means KEPCO must purchase electricity

from private IPPs to meet total demand for electricity in the Korean market.  Accordingly, the

IPPs' unit price of electricity is a market-based price for electricity that can be used to determine

---

[64] *Supercalendered Paper from Canada: Final Results of Countervailing Duty Expedited Review*,
82 Fed. Reg. 18,896 (Dep't of Commerce Apr. 24, 2017) and accompanying Issues and Decision
Memorandum at Comment 13.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 20

whether the GENCOs' pricing is at a level that confers a benefit to KEPCO.  As demonstrated in

Table 1, KEPCO receives a benefit from each of the GENCOs because all six GENCOs have

prices below those of the IPPs.  Therefore, the KPX's price setting scheme ensures that the

GENCOs, particularly the nuclear and coal based GENCOs, supply electricity for less than

adequate remuneration.

### C.  Specificity

The KPX determines the price and amount of electricity to be provided to the only

distributor of electricity in Korea, KEPCO.  Accordingly, the provision of electricity for less than

adequate remuneration to KEPCO is specific in law pursuant to 19 U.S.C. § 1677(5A)(D)(i) and

in fact pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I).

### IV.  THE GOK'S SUBSIDY TO KEPCO IS PASSED THROUGH TO KOREAN STEEL MILLS CONFERRING A COMPETITIVE BENEFIT

Two of the three criteria specified by 19 C.F.R. § 351.523(a)(1)(ii) are met in this case,

though only one is required.  Specifically, the price for the subsidized input product is lower than

the price that the producer of the subject merchandise otherwise would pay another seller in an

arm's-length transaction for an unsubsidized input product and the government sets the price of

the input product so as to guarantee that the benefit provided with respect to the input product is

passed through to producers of the subject merchandise.

As stated, the GOK regulates the electricity market in Korea, sets prices, and controls all

the major entities involved in the generation, bidding and sale, and distribution of electricity.[65]

The purchase and sale of electricity is required by law to be made through the KPX, which is

---

[65] *See id.* at **Exhibit 1** at 29.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 21

owned by KEPCO and the GENCOs and controlled by the GOK.[66]  The KPX determines the

variable price, capacity price, rate of return, and applies an adjusted coefficient that sets the

GENCOs bid price provided to the KPX.[67]  Furthermore, because KEPCO must purchase

electricity from the IPPs, and because the IPPs are not subject to the adjusted coefficient or the

uniform rate of return imposed on the GENCOs, the IPPs are able to maximize their total

revenue by charging as high a price as the market will bear.  However, the KPX systematically

prevents the GENCOs from raising their prices.  Indeed, the unit prices in Table 1 above

demonstrate that the GENCOs prices are not arms-length transactions insofar as the GENCOs

could raise prices without losing market share but are prevented from doing so by the KPX.

Therefore, pursuant to 19 C.F.R. § 351.523(a)(1)(ii)(B), the price of the KPX-subsidized

electricity generated by the GENCOs that is obtained by KEPCO and passed on to the producers

of the subject merchandise is lower than the price that would otherwise be passed on to the steel

producers if KEPCO had acquired electricity at the prices charged by the IPPs.

Additionally, because the KPX is a government authority, the criterion in 19 C.F.R. §

351.523(a)(1)(ii)(C) is also satisfied in this case.  Specifically, the KPX sets the GENCOs' sale

price of electricity, which guarantees that the benefit resulting from the adjusted coefficient and

uniform rate of return is passed through to KEPCO and onto the producers of the subject

merchandise.  KEPCO, a government entity, establishes its tariff rates based upon the cost of the

"purchase price of electricity from the KPX."[68]  Therefore, the KPX subsidizes KEPCO's

---

[66] *Id*. at **Exhibit 1** at 34.

[67] *Id*. at **Exhibit 1** at 35.

[68] *HRS Korea* at 49.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 22

purchase price of electricity and KEPCO's tariff rates reflect that subsidized price.  Accordingly,

these facts satisfy the criterion in 19 C.F.R. § 351.523(a)(1)(ii)(C).

Therefore, there is a reasonable basis to believe or suspect that the price of electricity is

set by the GOK to guarantee that a benefit is provided and passed through to producers of subject

merchandise and that the subsidized price of electricity is lower than a price reflected by a purely

arms-length transaction.

## V.    THE AD VALOREM COUNTERVAILABLE SUBSIDY RATE ON ELECTRICITY IS GREATER THAN 1 PERCENT.

The final criterion in Commerce's regulations is that the *ad valorem* countervailable

subsidy rate on the input product, multiplied by the proportion of the total production costs of the

subject merchandise accounted for by the input product, is equal to, or greater than, one percent.

Petitioners' do not have access to the GENCOs' costs at a granular level to compare to

benchmark information regarding the cost to produce electricity in Korea.  Likewise, Petitioners'

do not have access to the current adjusted coefficient or KPX's cost data.  Nevertheless,

Petitioners' have attached their questionnaire response from the corrosion-resistant steel

countervailing duty administrative review, which includes, *inter alia*, a calculation

demonstrating the countervailable subsidy rate on the "input product" (*i.e.* electricity) multiplied

by the proportion of the total production costs of the subject merchandise accounted for by the

input product is equal to or greater than one percent.[69]

Given the integrated nature of the Korean electricity market and the various valves the

GOK is able to pull to reduce the price of electricity to end users, Commerce should issue the

---

[69] *See* **Exhibit 14** at 14 and Exhibit 6.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 23

KPX and the GENCOs questionnaires to collect additional information. Indeed, one of the most significant means by which the KPX reduces prices for the benefit of Korean steel producers is through the "adjusted coefficient," which as of 2016 was set below 1 for the two largest fuel inputs in the generation of electricity.[70] Accordingly, Commerce should also determine the adjusted coefficients applicable during the POR.

## VI.    CONCLUSION

The publicly available information contained in this submission establishes a reasonable basis to believe or suspect that subsidies, in the form of subsidized electricity sold to KEPCO, have been provided to Korean hot-rolled steel producers within the meaning of 19 C.F.R. § 351.523(a). Accordingly, Petitioners request that Commerce initiate an investigation of such subsidies.

*       *       *       *       *

---

[70] SEC Form 20-F at **Exhibit 1** at 38; *see also KOSPO Investor Presentation* at **Exhibit 11**.

Hon. Wilbur L. Ross, Jr.
April 29, 2019
Page 24

Please do not hesitate to contact the undersigned should you have any questions.

Respectfully submitted,

/s/  Christopher B. Weld                    /s/ Thomas M. Beline

Alan H. Price, Esq.                         Thomas M. Beline, Esq.
Christopher B. Weld, Esq.                   Sarah E. Shulman, Esq.
Derick G. Holt, Esq.                        Chase J. Dunn, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**                          **CASSIDY LEVY KENT (USA) LLP**
1776 K Street, NW                           900 19th Street, NW
Washington, DC 20006                        Suite 400
(202) 719-7000                              Washington, DC 20006
                                            (202) 567-2300

*Counsel to Nucor Corporation*              *Counsel to United States Steel Corporation*

PUBLIC VERSION

## COMPANY CERTIFICATION

I, Benjamin Blase Caryl, Counsel for International Trade and Public Policy, currently employed by United States Steel Corporation ("U. S. Steel"), certify that I prepared or otherwise supervised the preparation of the attached submission of "Petitioners' Allegation of Upstream Subsidies to Korean Steel Producers" filed on April 29, 2019, pursuant to the 1/1/17-12/31/17 administrative review under the countervailing duty order on *Certain Hot-Rolled Steel Flat Products from the Republic of Korea* (Case No. C-580-884). I certify that the public information and any business proprietary information of U. S. Steel contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____
Benjamin Blase Caryl

Date: _____4/29/19_____

PUBLIC VERSION

## REPRESENTATIVE CERTIFICATION

I, Thomas M. Beline, with Cassidy Levy Kent (USA) LLP, counsel to United States Steel Corporation, certify that I have read the attached submission of "Petitioners' Allegation of Upstream Subsidies to Korean Steel Producers" filed on April 29, 2019, pursuant to the 1/1/2017 to 12/31/2017 administrative review under the countervailing duty order on *Hot-Rolled Steel Flat Products from the Republic of Korea* (C-580-884). In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.


Signature: _____
                    Thomas M. Beline


Date: _____April 29 2019_____

## COMPANY CERTIFICATION

I, Douglas R. Gunson, Legal Counsel, currently employed by Nucor Corporation, certify that I prepared or otherwise supervised the preparation of the attached Petitioners' Allegation of Upstream Subsidies to Korean Steel Producers, filed April 29, 2019, pursuant to the 1/1/17-12/31/17 administrative review under the countervailing duty order on *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, Case. No. C-580-884. I certify that the public information and any business proprietary information of Nucor Corporation contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____
Douglas R. Gunson

Date: April 29, 2019

**PUBLIC VERSION**

## REPRESENTATIVE CERTIFICATION

I, Christopher B. Weld, with Wiley Rein LLP, counsel to Nucor Corporation, certify that I have read the attached submission of Petitioners' Allegation of Upstream Subsidies to Korean Steel Producers, filed April 29, 2019, pursuant to the 1/1/17-12/31/17 administrative review under the countervailing duty order on *Certain Hot-Rolled Steel Flat Products from Korea*, Case No. C-580-884. In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Christopher B. Weld, Esq.

Date:    April 29, 2019

*Hot-Rolled Steel Flat Products from the Republic of Korea*
*Case No. C-580-884 (Admin. Review 1/1/2017-12/31/2017)*

### U.S. DEPARTMENT OF COMMERCE
### PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2019, a copy of the foregoing submission is being

served, via hand-delivery or *international first-class mail, on the following parties:

Alan H. Price, Esq.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Brooke M. Ringel, Esq.
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, DC 20007-5108

Donald B. Cameron, Esq.
Morris, Manning & Martin, LLP
1401 I Street, NW Suite 600
Washington, DC 20005

Yong Sik Song
Embassy of the Republic of Korea
2450 Massachusetts Avenue, NW
Washington, DC 20008

Stephen A. Jones, Esq.
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

*Junghyun Park
Kim & Chang
39, Sajik-ro 8-gil, Jongno-gu,
Seoul 03170
Republic of Korea

Roger B. Schagrin, Esq.
Schagrin Associates
900 7th Street, NW
Suite 500
Washington, DC 20001

/s/ Callum Cleary
Callum Cleary
*International Trade Specialist*
CASSIDY LEVY KENT (USA) LLP

PUBLIC VERSION

# Exhibit 1

# SECURITIES AND EXCHANGE COMMISSION

# FORM 20-F

Annual and transition report of foreign private issuers pursuant to sections 13 or 15(d)

Filing Date: **2018-04-30** | Period of Report: **2017-12-31**
**SEC Accession No.** 0001193125-18-141125

(HTML Version on secdatabase.com)

# FILER

| | Mailing Address | Business Address |
|---|---|---|
| **KOREA ELECTRIC POWER CORP**<br>CIK:**887225**| IRS No.: **133442428** | Fiscal Year End: **1231**<br>Type: **20-F** | Act: **34** | File No.: **001-13372** | Film No.: **18786968**<br>SIC: **4911** Electric services | 400 KELBY STREET<br>16TH FLOOR<br>FORT LEE NJ 07024 | 167, SAMSEONG-DONG<br>GANGNAM-GU<br>SEOUL M5 135-791<br>2018948855 |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

11%, respectively, of the annual bituminous coal requirements of our generation subsidiaries in 2017. Approximately 82% of the bituminous coal requirements of our generation subsidiaries in 2017 were purchased under long-term contracts and the remaining 18% from the spot market. Pursuant to the terms of our long-term supply contracts, prices are adjusted periodically based on prevailing market conditions. In addition, our generation subsidiaries purchase a significant portion of their fuel requirements under contracts with limited duration. See Item 4.B. "Business Overview–Fuel."

The prices of our main fuel types, namely, bituminous coal, oil and liquefied natural gas, or LNG, fluctuate, sometimes significantly, in tandem with their international market prices. For example, the average daily spot price of "free on board" Newcastle coal 6300 GAR published by Platts increased from US$66.8 per ton in 2016 to US$88.3 per ton in 2017 and to US$93.4 per ton as of April 16, 2018. The prices of oil and LNG are substantially dependent on the price of crude oil, and according to Bloomberg (Bloomberg Ticker: PGCRDUBA), the average daily spot price of Dubai crude oil increased from US$41.4 per barrel in 2016 to US$53.1 per barrel in 2017 and to US$68.4 per barrel as of April 16, 2018. We cannot assure you that fuel prices will remain stable or will not significantly increase in the remainder of 2018 or thereafter. If fuel prices increase substantially in the future within a short span of time, our generation subsidiaries may be unable to secure requisite fuel supplies at prices commercially acceptable to them. In addition, any significant interruption or delay in the supply of fuel, bituminous coal in particular, from any of their suppliers may cause our generation subsidiaries to purchase fuel on the spot market at prices higher than the prices available under existing supply contracts, which would result in an increase in fuel costs.

Because the Government regulates the rates we charge for the electricity we sell to our customers (see Item 4.B. "Business Overview–Sales and Customers–Electricity Rates"), our ability to pass on fuel and other cost increases to our customers is limited. If fuel prices increase rapidly and substantially and the Government, out of concern for inflation or for other reasons, maintains the current level of electricity tariff or does not increase it to a level to sufficiently offset the impact of high fuel prices, the fuel price increases will negatively affect our profit margins or even cause us to suffer operating and/or net losses, and our business, financial condition, results of operations and cash flows would suffer.

The Government may also set or adjust electricity tariff rates to serve particular policy goals that may not be necessarily responsive to fuel price movements. For example, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate, in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, a new tariff structure was implemented to encourage energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods in the summer and the winter. Third, a temporary rate discount will apply during 2017 to 2019 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. The temporary rate discount to investments in energy storage systems and renewable energy was extended until 2020. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation, financial condition and cash flows.

In addition, partly because the Government may have to undergo a lengthy deliberative process to approve an increase in electricity tariff, which represents a key component of the consumer price index, the electricity tariff may not be adjusted to a level sufficient to ensure a fair rate of return to us in a timely manner or at all, and we cannot assure that any future tariff increase by the Government will be sufficient to fully offset the adverse impact on our results of operations from current or potential rises in fuel costs. On the other hand, if fuel prices decrease, the public may demand a corresponding decrease in electricity tariff rates, and as a result the

5

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

and the Stock Market Division of the Korea Exchange has prescribed a fixed range in which share prices are permitted to move on a daily basis. Like other securities markets, including those in developed markets, the Korean securities market has experienced problems including market manipulation, insider trading and settlement failures. The recurrence of these or similar problems could have a material adverse effect on the market price and liquidity of the securities of Korean companies, including our common stock and ADSs, in both the domestic and the international markets.

The Korean government has the ability to exert substantial influence over many aspects of the private sector business community, and in the past has exerted that influence from time to time. For example, the Korean government has promoted mergers to reduce what it considers excess capacity in a particular industry and has also encouraged private companies to publicly offer their securities. Similar actions in the future could have the effect of depressing or boosting the Korean securities market, whether or not intended to do so. Accordingly, actual or perceived actions or inactions by the Korean government may cause sudden movements in the market prices of the securities of Korean companies in the future, which may affect the market price and liquidity of our common stock and ADSs.

***Your dividend payments and the amount you may realize in connection with a sale of your ADSs will be affected by fluctuations in the exchange rate between the U.S. dollar and the Won.***

Investors who purchase the American depositary shares will be required to pay for them in U.S. dollars. Our outstanding shares are listed on the Korea Exchange and are quoted and traded in Won. Cash dividends, if any, in respect of the shares represented by the American depositary shares will be paid to the depositary bank in Won and then converted by the depositary bank into U.S. dollars, subject to certain conditions. Accordingly, fluctuations in the exchange rate between the Won and the U.S. dollar will affect, among other things, the amounts a registered holder or beneficial owner of the American depositary shares will receive from the depositary bank in respect of dividends, the U.S. dollar value of the proceeds which a holder or owner would receive upon sale in Korea of the shares obtained upon surrender of American depositary shares and the secondary market price of the American depositary shares.

***If the Government deems that certain emergency circumstances are likely to occur, it may restrict the depositary bank from converting and remitting dividends in U.S. dollars.***

If the Government deems that certain emergency circumstances are likely to occur, it may impose restrictions such as requiring foreign investors to obtain prior Government approval for the acquisition of Korean securities or for the repatriation of interest or dividends arising from Korean securities or sales proceeds from disposition of such securities. These emergency circumstances include any or all of the following:

sudden fluctuations in interest rates or exchange rates;

extreme difficulty in stabilizing the balance of payments; and

a substantial disturbance in the Korean financial and capital markets.

The depositary bank may not be able to secure such prior approval from the Government for the payment of dividends to foreign investors when the Government deems that there are emergency circumstances in the Korean financial markets.

## ITEM 4.    *INFORMATION ON THE COMPANY*

### Item 4.A. History and Development of the Company

**General Information**

Our legal and corporate name is Korea Electric Power Corporation. We were established by the Government on December 31, 1981 as a statutory juridical corporation in Korea under the Korea Electric Power Corporation

28

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

("KEPCO") Act as the successor to Korea Electric Company. Our registered office is located at 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea, and our telephone number is 82-61-345-4213. Our website address is www.kepco.co.kr.

Our agent in the United States is Korea Electric Power Corporation, North America Office, located at 7th Floor, Parker Plaza, 400 Kelby Street, Fort Lee, NJ 07024.

The Korean electric utility industry traces its origin to the establishment of the first electric utility company in Korea in 1898. On July 1, 1961, the industry was reorganized by the merger of Korea Electric Power Company, Seoul Electric Company and South Korea Electric Company, which resulted in the formation of Korea Electric Company. From 1976 to 1981, the Government acquired the private minority shareholdings in Korea Electric Company. After the Government acquired all the remaining shares of Korea Electric Company, Korea Electric Company was dissolved, and we were incorporated in 1981 and assumed the assets and liabilities of Korea Electric Company. We ceased to be wholly owned by the Government in 1989 when the Government sold 21% of our common stock. As of March 15, 2018, the last day on which our shareholders registry was closed, the Government maintained 51.1% ownership in aggregate of our common shares by direct holdings by the Government and indirect holdings through Korea Development Bank, a statutory banking institution wholly owned by the Government.

Under relevant laws of Korea, the Government is required to own, directly or indirectly, at least 51% of our capital. Direct or indirect ownership of more than 50% of our outstanding common stock enables the Government to control the approval of certain corporate matters relating to us that require a shareholders' resolution, including approval of dividends. The rights of the Government and Korea Development Bank as holders of our common stock are exercised by the Ministry of Trade, Industry and Energy, based on the Government's ownership of our common stock and a proxy received from Korea Development Bank, in consultation with the Ministry of Strategy and Finance.

We operate under the general supervision of the Ministry of Trade, Industry and Energy. The Ministry of Trade, Industry and Energy, in consultation with the Ministry of Strategy and Finance, is responsible for approving, subject to review by the Korea Electricity Commission, the electricity rates we charge our customers. See Item 4.B. "Business Overview–Sales and Customers–Electricity Rates." We furnish reports to officials of the Ministry of Trade, Industry and Energy, the Ministry of Strategy and Finance and other Government agencies and regularly consult with such officials on matters relating to our business and affairs. See Item 4.B. "Business Overview–Regulation." Our non-standing directors, who comprise a majority of our board of directors, must be appointed by the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee (which is established by law and chaired by the minister of the Ministry of Strategy and Finance and whose members consist of Government officials and others appointed by the President of the Republic based on recommendation by the minister of the Ministry of Strategy and Finance) from a pool of candidates recommended by the director nomination committee. Our president and standing directors who concurrently serve as members of our audit committee must be appointed by the President of the Republic upon the motion of the minister of the Ministry of Trade, Industry and Energy (in the case of our president) and the minister of the Ministry of Strategy and Finance (in the case of our standing directors who concurrently serve as members of the audit committee) and following the nomination by our director nomination committee, the review and resolution of the Public Agencies Operating Committee and an approval at the general meeting of shareholders. See Item 6.A. "Directors and Senior Management–Board of Directors" and Item 16G. "Corporate Governance–The Act on the Management of Public Institutions").

## Item 4.B. Business Overview

### Introduction

We are an integrated electric utility company engaged in the transmission and distribution of substantially all of the electricity in Korea. Through our six wholly-owned generation subsidiaries, we also generate the

29

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

substantial majority of electricity produced in Korea. As of December 31, 2017, we and our generation subsidiaries owned approximately 70.1% of the total electricity generation capacity in Korea (excluding plants generating electricity primarily for private or emergency use). In 2017, we sold to our customers 507,746 gigawatt-hours of electricity. We purchase electricity principally from our generation subsidiaries and, to a lesser extent, from independent power producers. Of the 520,230 gigawatt-hours of electricity we purchased in 2017, 28.1% was generated by KHNP, our wholly-owned nuclear and hydroelectric power generation subsidiary, 49.7% was generated by our wholly-owned five non-nuclear generation subsidiaries and 22.2% was generated by independent power producers that trade electricity to us through the cost-based pool system of power trading (excluding independent power producers that supply electricity under power purchase agreements with us). Our five non-nuclear generation subsidiaries are KOSEP, KOMIPO, KOWEPO, KOSPO and EWP, each of which is wholly owned by us and is incorporated in Korea. We derive substantially all of our revenues and profit from Korea, and substantially all of our assets are located in Korea.

In 2017, we had sales of Won 59,336 billion and net profit of Won 1,441 billion, compared to sales of Won 59,763 billion and net profit of Won 7,148 billion in 2016.

Our revenues are closely tied to demand for electricity in Korea. Demand for electricity in Korea increased at a compounded average growth rate of 1.7% per annum from 2013 to 2017, compared to the real gross domestic product, or GDP, which increased at a compounded average growth rate of 3.0% during the same period, according to the Bank of Korea. During 2017, the GDP growth rate was 3.1%, which was in tandem with the growth in demand for electricity in Korea during the same year, which also grew by 2.2%.

## Strategy

As our overall strategy, we seek to become a leading global energy enterprise by enhancing our global competitiveness and strengthening our contribution to the global environmental campaigns through continued development of "green" and "smart" power-related technologies. We also aim to adapt to the growing uncertainties in the global economy by selectively pursuing new business opportunities and through development of innovative technologies. We evaluate and renew our mid- to long-term strategy every five years, and in 2015 established the "Vision 2025 Mid- to Long-Term Strategy." Under this vision, we will aim for balanced growth among our domestic operations, overseas business and new energy industry initiatives.

*Strengthen competitiveness in our core operations.* We plan to enhance efficiency of our electricity generation, transmission and distribution networks and operation of related facilities. We will strategically focus on ensuring stable supply of electricity, making our electricity networks "smarter" and more intelligent through the use of advanced technology utilizing big data and the "Internet of Things" technology and creating new energy services related to our core operations in order to address changes in the business environment.

*Expand and develop new businesses.* In connection with our overseas business, we plan to selectively explore opportunities to develop renewable energy, smart transmission and distribution facilities and nuclear energy projects to diversify our businesses and provide suitable solutions meeting the different needs of various countries. Additionally, we plan to actively address climate change through the development of new energy related technologies such as smart grids and energy storage systems.

*Create a platform for future growth.* We plan to develop an ecosystem focused on new energy technologies. We have established Bitgaram Energy Valley in Gwangju and Jeollanamdo with the goal of facilitating the growth of the new energy industry and creating a global energy hub. In addition, we have selected ten core electricity-related technologies (including energy storage systems and "smart grid"-related technologies), and we plan to focus on the development of high value-added technologies.

*Strengthen our management system for sustainable growth.* We will continue to develop an innovative working culture and management system to promote efficiency. We will also focus on creating a low-carbon clean energy business environment, fostering a common set of shared values with local communities and developing a sustainable energy business model.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

**Government Ownership and Our Interactions with the Government**

The KEPCO Act requires that the Government own at least 51% of our capital stock. Direct or indirect ownership of more than 50% of our outstanding common stock enables the Government to control the approval of certain corporate matters which require a shareholders' resolution, including approval of dividends. The rights of the Government and Korea Development Bank as holders of our common stock are exercised by the Ministry of Trade, Industry and Energy in consultation with the Ministry of Strategy and Finance. We are currently not aware of any plans of the Government to cease to own, directly or indirectly, at least 51% of our outstanding common stock.

We play an important role in the implementation of the Government's national energy policy, which is established in consultation with us, among other parties. As an entity formed to serve public policy goals of the Government, we seek to maintain a fair level of profitability and strengthen our capital base in order to support the growth of our business in the long term.

The Government, through its various policy initiatives for the Korean energy industry as well as direct and indirect supervision of us and our industry, plays an important role in our business and operations. Most importantly, the electricity tariff rates we charge to our customers are regulated by the Government taking into account, among others, our needs to recover the costs of operations, make capital investments and recoup a fair return on capital invested by us, as well as the Government's overall policy considerations, such as inflation. See Item 4.B. "Business Overview–Sales and Customers–Electricity Rates."

In addition, pursuant to the Basic Plan determined by the Government, we and our generation subsidiaries have made, and plan to make, substantial expenditures for the construction of generation plants and other facilities to meet demand for electric power. See Item 5.B. "Liquidity and Capital Resources–Capital Requirements."

**Restructuring of the Electric Power Industry in Korea**

On January 21, 1999, the Ministry of Trade, Industry and Energy published the Restructuring Plan. The overall objectives of the Restructuring Plan consisted of: (i) introducing competition and thereby increasing efficiency in the Korean electric power industry, (ii) ensuring a long-term, inexpensive and stable electricity supply, and (iii) promoting consumer convenience through the expansion of consumer choice.

The following provides further details relating to the Restructuring Plan.

*Phase I*

During Phase I, which served as a preparatory stage for Phase II and lasted from the announcement of the Restructuring Plan in January 1999 until April 2001, we undertook steps to split our generation business units off into one wholly-owned nuclear generation subsidiary (namely, KHNP) and five wholly-owned non-nuclear generation subsidiaries (namely, KOSEP, KOMIPO, KOWEPO, KOSPO and EWP), each with its own management structure, assets and liabilities. These steps were completed upon approval at our shareholders' meeting in April 2001.

The Government's principal objectives in the split-off of the generation units into separate subsidiaries were to: (i) introduce competition and thereby increase efficiency in the electricity generation industry in Korea, and (ii) ensure a stable supply of electricity in Korea.

Following the implementation of Phase I, we have substantial monopoly with respect to the transmission and distribution of electricity in Korea.

31

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

While our ownership percentage of our generation subsidiaries will depend on further adjustments to the Restructuring Plan to be adopted by the Government, we plan to retain 100% ownership of our transmission and distribution business.

*Phase II*

At the outset of Phase II in April 2001, the Government introduced a cost-based competitive bidding pool system under which we purchase power from our generation subsidiaries and other independent power producers for transmission and distribution to customers. For a further description of this system, see "–Purchase of Electricity–Cost-based Pool System" below.

Pursuant to the Electricity Business Act amended in December 2000, the Government established the Korea Power Exchange in April 2001. The primary function of the Korea Power Exchange is to deal with the sale of electricity and implement regulations governing the electricity market to allow for electricity distribution through a competitive bidding process. The Government also established the Korea Electricity Commission in April 2001 to regulate the Korean electric power industry and ensure fair competition among industry participants. To facilitate this goal, the Korea Power Exchange established the Electricity Market Rules relating to the operation of the bidding pool system. To amend the Electricity Market Rules, the Korea Power Exchange must have the proposed amendment reviewed by the Korea Electricity Commission and then obtain the approval of the Ministry of Trade, Industry and Energy.

The Korea Electricity Commission's main functions include implementation of standards and measures necessary for electricity market operation and review of matters relating to licensing participants in the Korean electric power industry. The Korea Electricity Commission also acts as an arbitrator in tariff-related disputes among participants in the Korean electric power industry and investigates illegal or deceptive activities of the industry participants.

*Privatization of Generation Subsidiaries*

In April 2002, the Ministry of Trade, Industry and Energy released the basic privatization plan for five of our generation subsidiaries other than KHNP. Pursuant to this plan, we commenced the process of selling our equity interest in KOSEP in 2002. According to the original plan, this process was, in principle, to take the form of a sale of management control, potentially supplemented by an initial public offering as a way of broadening the investor base. In November 2003, KOSEP submitted its application to the Korea Exchange for a preliminary screening review, which was approved in December 2003. However, in June 2004, KOSEP made a request to the Korea Exchange to delay its stock listing due to unfavorable stock market conditions at that time.

In accordance with the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016, we considered a sale in the public market of a minority of our shares in our five non-nuclear generation subsidiaries, KEPCO KDN and KHNP gradually. However, the planned sales have been put on hold, primarily due to prevailing market conditions. In any event, we plan to maintain a controlling stake in each of these subsidiaries.

*Suspension of the Plan to Form and Privatize Distribution Subsidiaries*

In 2003, the Government established a Tripartite Commission consisting of representatives of the Government, leading businesses and labor unions in Korea to deliberate on ways to introduce competition in electricity distribution, such as by forming and privatizing new distribution subsidiaries. In 2004, the Tripartite Commission recommended not pursuing such privatization initiatives but instead creating independent business divisions within us to improve operational efficiency through internal competition. Following the adoption of such recommendation by the Government in 2004 and further studies by Korea Development Institute, in 2006 we created nine "strategic business units" (which, together with our other business units, were subsequently

32

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

restructured into 14 such units in February 2012) that have a greater degree of autonomy with respect to management, financial accounting and performance while having a common focus on increasing profitability.

*Initiatives to Improve the Structure of Electricity Generation*

In August 2010, the Ministry of Trade, Industry and Energy announced the Proposal for Improvement in the Structure of the Electric Power Industry in order to resolve uncertainty related to restructuring plans for the electric power industry and maintain competitiveness of the electric power industry. Key initiatives of the proposal included the following: (i) maintain the current structure of having six generation subsidiaries and designate the six generation subsidiaries as market-oriented public enterprises under the Act on the Management of Public Institutions in order to foster competition among the generation subsidiaries and promote efficiency in their operations, (ii) clarify the scope of the business of us and the six generation subsidiaries (namely, that we shall manage the financial structure and governance of the six generation subsidiaries and nuclear power plant and overseas resources development projects, while the six generation subsidiaries will have greater autonomy with respect to construction and management of generation units and procurement of fuel), (iii) create a nuclear power export business unit to systematically enhance our capabilities to win projects involving the construction and operation of nuclear power plants overseas, (iv) further rationalize the electricity tariff by adopting a fuel-cost based tariff system in 2011 and a voltage-based tariff system in a subsequent year, and (v) create separate accounting systems for electricity generation, transmission, distribution and sales with the aim of introducing competition in electricity sales in the intermediate future.

In January 2011, the Ministry of Strategy and Finance created a "joint cooperation unit" consisting of officers and employees selected from the five thermal power generation subsidiaries in order to reduce inefficiencies in areas such as fuel transportation, inventories, materials and equipment and construction, etc. and allow the thermal power generation subsidiaries to continue utilizing the benefits of economy of scale after split off of our generation business units into separate subsidiaries. The purpose of the joint cooperation unit was to give greater autonomy to the generation subsidiaries with regard to power plant construction and management and fuel procurements, and thereby enhance efficiency in operating power plants. The main functions of the joint cooperation unit are as follows: (i) maintain inventories of bituminous coal through volume exchanges and joint purchases, (ii) reduce shipping and demurrage expenses through joint operation and distribution of dedicated vessels, (iii) reduce costs by sharing information on generation material inventories and (iv) sharing human resources among the five thermal power generation subsidiaries for construction projects, among other things.

Furthermore, in January 2011 the six generation subsidiaries were officially designated as "market-oriented public enterprises," whereupon the President of Korea appoints the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary is subject to approval by the minister of the Ministry of Strategy and Finance; the president of each such subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Enterprise Management Evaluation Team which is established by the Public Agencies Operating Committee conducts performance evaluation of such subsidiaries. Previously, our president appointed the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary was subject to approval by our president; the president of each such subsidiary entered into a management contract with our president; and our evaluation committee conducted performance evaluation of such subsidiaries. For further details of the impact of the designation of our generation subsidiaries as "market-oriented public enterprises," see Item 16G.–Corporate Governance–The Act on the Management of Public Institutions.

*Proposal for Adjustment of Functions of Public Institutions (Energy Sector)*

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets

33

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies should take on greater responsibilities in overseas resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition. In accordance therewith, we transferred a substantial portion of our assets and liabilities in our overseas resource business to our generation subsidiaries as of December 31, 2016. In addition, this Proposal contemplated selling a minority stake in our generation subsidiaries and KEPCO KDN, but the planned sales have been put on hold, as discussed above in "–Privatization of Generation Subsidiaries."

**Purchase of Electricity**

*Cost-based Pool System*

Since April 2001, the purchase and sale of electricity in Korea is required to be made through the Korea Power Exchange, which is a statutory not-for-profit organization established under the Electricity Business Act with responsibilities for setting the price of electricity, handling the trading and collecting relevant data for the electricity market in Korea. The suppliers of electricity in Korea consist of our six generation subsidiaries, which were split-off from us in April 2001, and independent power producers, which numbered 17 (excluding renewable energy producers) as of December 31, 2017. We distribute electricity purchased through the Korea Power Exchange to end users.

*Our Relationship with the Korea Power Exchange*

The key features of our relationships with the Korea Power Exchange include the following: (i) we and our six generation subsidiaries are member corporations of the Korea Power Exchange and collectively own 100% of its share capital, (ii) three of the 11 members of the board of directors of the Korea Power Exchange are currently our or our subsidiaries' employees, and (iii) one of our employees is currently a member in three of the key committees of the Korea Power Exchange that are responsible for evaluating the costs of producing electricity, making rules for the Korea Power Exchange and gathering and disclosing information relating to the Korean electricity market.

Notwithstanding the foregoing relationships, however, we do not have control over the Korea Power Exchange or its policies since, among others, (i) the Korea Power Exchange, its personnel, policies, operations and finances are closely supervised and controlled by the Government, namely through the Ministry of Trade, Industry and Energy, and are subject to a host of laws and regulations, including, among others, the Electricity Business Act and the Act on the Management of Public Institutions, as well as the Articles of Incorporation of the Korea Power Exchange, (ii) we are entitled to elect no more than one-third of the Korea Power Exchange directors and our representatives represent only a minority of its board of directors and committees (with the other members being comprised of representatives of the Ministry of Trade, Industry and Energy, employees of the Korea Power Exchange, businesspersons and/or scholars), and (iii) the role of our representatives in the policy making process for the Korea Power Exchange is primarily advisory based on their technical expertise derived from their employment at us or our generation subsidiaries. Consistent with this view, the Finance Supervisory Service issued a ruling in 2005 that stated that we are not deemed to have significant influence or control over the decision-making process of the Korea Power Exchange relating to its business or financial affairs.

*Pricing Factors*

The price of electricity in the Korean electricity market is determined principally based on the cost of generating electricity using a system known as the "cost-based pool" system. Under the cost-based pool system,

34

[Table of Contents](#)

the price of electricity has two principal components, namely the marginal price (representing in principle the variable cost of generating electricity) and the capacity price (representing in principle the fixed cost of generating electricity).

Under the merit order system, the electricity purchase allocation, the system marginal price (as described below) and the final allocation adjustment are automatically determined based on an objective formula. The variable cost (including the adjusted coefficient as described below) and the capacity price are determined in advance of trading by the Cost Evaluation Committee, which is comprised of representatives from the Ministry of Trade, Industry and Energy, the Korea Power Exchange, us, generation companies, scholars and researchers. Accordingly, a supplier of electricity cannot exercise control over the merit order system or its operations to such supplier's strategic advantage.

*Marginal Price*

The primary purpose of the marginal price is to compensate the generation companies for fuel costs, which represents the principal component of the variable costs of generating electricity. We currently refer such marginal price as the "system marginal price."

The system marginal price represents, in effect, the marginal price of electricity at a given hour at which the projected demand for electricity and the projected supply of electricity for such hour intersect, as determined by the merit order system, which is a system used by the Korea Power Exchange to allocate which generation units will supply electricity for which hour and at what price. To elaborate, the projected demand for electricity for a given hour is determined by the Korea Power Exchange based on a forecast made one day prior to trading, and such forecast takes into account, among others, historical statistics relating to demand for electricity nationwide by day and by hour, seasonality and on-peak-hour versus off-peak hour demand analysis. The projected supply of electricity at a given hour is determined as the aggregate of the available capacity of all generation units that have submitted bids to supply electricity for such hour. These bids are submitted to the Korea Power Exchange one day prior to trading.

Under the merit order system, the generation unit with the lowest variable cost of producing electricity among all the generation units that have submitted a bid for a given hour is first awarded a purchase order for electricity up to the available capacity of such unit as indicated in its bid. The generation unit with the next lowest variable cost is then awarded a purchase order up to its available capacity in its bid, and so forth, until the projected demand for electricity for such hour is met. We refer to the variable cost of the generation unit that is the last to receive the purchase order for such hour as the system marginal price, which also represents the highest price at which electricity can be supplied at a given hour based on the demand and supply for such hour. Generation units whose variable costs exceed the system marginal price for a given hour do not receive purchase orders to supply electricity for such hour. The variable cost of each generation unit is determined by the Cost Evaluation Committee on a monthly basis and reflected in the following month based on the fuel costs two months prior to such determination. The purpose of the merit order system is to encourage generation units to reduce its electricity generation costs by making its generation process more efficient, sourcing fuels from most cost-effective sources or adopting other cost savings programs.

The final allocation of electricity supply is further adjusted on the basis of other factors, including the proximity of a generation unit to the geographical area to which power is being supplied, network and fuel constraints and the amount of power loss. This adjustment mechanism is designed to adjust for transmission losses in order to improve overall cost-efficiency in the transmission of electricity to end-users.

The price of electricity at which our generation subsidiaries sell electricity to us is determined using the following formula:

Variable cost + [System marginal price – Variable cost] * Adjusted coefficient

35

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

An adjusted coefficient applies in principle to all generation units operated by our generation subsidiaries and the coal-fired generation units operated by independent power producers. The adjusted coefficient applicable to the generation units operated by our generation subsidiaries is determined based on considerations of, among others, electricity tariff rates, the differential generation costs for different fuel types and the relative fair returns on investment in respect of us compared to our generation subsidiaries. The purpose of the adjusted coefficient here is to prevent electricity trading from resulting in undue imbalances as to the relative financial results among generation subsidiaries as well as between us (as the purchaser of electricity) and our generation subsidiaries (as sellers of electricity). Such imbalances may arise from excessive profit taking by base load generators (on account of their inherently cheaper fuel cost structure compared to non-base load generators) as well as from fluctuations in fuel prices (it being the case that during times of rapid and substantial rises in fuel costs which are not offset by corresponding rises in electricity tariff rates charged by us to end-users, on a non-consolidated basis our profitability will decline compared to that of our generation subsidiaries since our generation subsidiaries are entitled to sell electricity to us at cost plus a guaranteed margin). In comparison, the adjusted coefficient applicable to the coal-fired generation units operated by independent power producers is determined to enable such independent power producers to recover the total costs of building and operating such units.

The adjusted coefficient applicable to our generation subsidiaries is currently set at the highest level for the marginal price of electricity generated using nuclear fuel, followed by coal and (depending the prevailing relative market prices) oil and/or LNG. The differentiated adjusted coefficients reflect the Government's prevailing energy policy objectives and have the effect of setting priorities in the fuel types to be used in electricity generation.

The adjusted coefficient is determined by the Cost Evaluation Committee in principle on an annual basis, although in exceptional cases driven by external or structural factors such as rapid and substantial changes in fuel costs, adjustments to electricity tariff rates or changes in the electricity pricing structure, the adjusted coefficient may be adjusted on a quarterly basis.

Previously, it was contemplated that the vesting contract system would gradually replace the application of the adjusted coefficient. However, since the implementation of the vesting contract system has been suspended indefinitely, it is unlikely to impact the application of the adjusted coefficient in the foreseeable future.

*Capacity Price*

In addition to payment in respect of the variable cost of generating electricity, generation units receive payment in the form of capacity price, the purpose of which is to compensate them for the fixed costs of constructing generation facilities, provide incentives for construction of new generation units and maintain reliability of the nationwide electricity transmission network.

The capacity price is determined by the Cost Evaluation Committee as a function of the following factors: (i) reference capacity price, (ii) reserve capacity factor, (iii) time-of-the-day capacity coefficient and (iv) since October 2016, fuel switching factor. The reference capacity price and the time-of-the-day capacity coefficient are determined annually before the end of December for the subsequent 12-months period. The reserve capacity factor and the fuel switching factor are determined annually before the end of June for the subsequent 12-months period.

The reference capacity price refers to the Won amount per kilowatt-hour payable annually for annualized available capacity indicated in the bids submitted the day before trading (provided that such capacity is actually available on the relevant day of trading), and is determined based on the construction costs and maintenance costs of a standard generation unit and related transmission access facilities, and a base rate for loading electricity. Prior to October 2016, the same reference capacity price applied uniformly to all generation units. Since October 2016, the reference capacity price applies differentially to each generation unit depending on the start year of its commercial operation. Accordingly, the reference capacity price currently ranges from Won 9.15 to 10.07 per kilowatt hour.

36

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The reserve capacity factor relates to the requirement to maintain a standard capacity reserve margin in the range of 15% in order to prevent excessive capacity build-up as well as induce optimal capacity investment at the regional level. The capacity reserve margin is the ratio of peak demand to the total available capacity. Under this system, generation units in a region where available capacity is insufficient to meet demand for electricity as evidenced by failing to meet the standard capacity reserve margin receive increased capacity price. Conversely, generation units in a region where available capacity exceeds demand for electricity as evidenced by exceeding the standard capacity reserve margin receive reduced capacity price. Since October 2016, the reserve capacity factor also factors in the transmission loss per generation unit in order to favor transmission of electricity from a nearby generation unit.

The time-of-the-day capacity coefficient allows hourly and seasonal adjustments in order to incentivize our generation subsidiaries to operate their generation facilities at full capacity during periods of highest demand. For example, the capacity price paid differs depending on whether the relevant hour is an "on-peak" hour, a "mid-peak" hour or an "off-peak" hour (the capacity price being highest for the on-peak hours and lowest for the off-peak hours) and the capacity price paid is highest during the months of January, July and August when electricity usage is highest due to weather conditions.

The fuel switching factor, which was introduced in October 2016 to promote environmental sensitivities to climate change, seeks to encourage reduced carbon emission by penalizing generation units (mostly coal-fired units) for excessive carbon emission.

Other than subject to the aforementioned variations, the same capacity pricing mechanism applies to all generation units regardless of fuel types used.

*Vesting Contract System*

In May 2014, the Electricity Business Act was amended to introduce a "vesting contract" system in determining the price and quantity of electricity to be sold and purchased between the purchaser of electricity (namely, us) and the sellers of electricity (namely, our generation subsidiaries and independent power producers). Under the vesting contract system, electricity generators using base load fuels (such as nuclear, coal, hydro and by-product gas) at a particular generation unit were to be required to enter into a contract with the purchaser of electricity (namely, us), which specifies, among other things, the quantity of electricity to be generated and sold at a particular generation unit and the price at which such electricity is sold, subject to certain adjustments.

The vesting contract system was introduced principally to prevent excessive profit-taking by low-cost producers of electricity using base load fuels (such as nuclear, coal, hydro and by-product gas) by replacing the adjusted coefficient as the basis for determining the guaranteed return to generation companies, as well as to enhance the stability of electricity supply by requiring long-term contractual arrangements for the purchase and sale of electricity and promote cost savings, productivity enhancements and operational efficiency by providing incentives and penalties depending on the degree to which the generation companies could supply electricity at costs below the contracted electricity prices.

In order to minimize undue shock to the electricity trading market in Korea, the vesting contract system was to be implemented in phases starting with by-product gas-based electricity in 2015, which accounted for 1.8% of electricity purchased by us during such year. The rollout of the vesting contract system was further studied by a task force consisting of representatives from the Government, the Korea Power Exchange and generation companies.

Following such study, the Government announced in June 2016 that, due to changes in the electricity business environment (including an increase in generation capacity relative to peak usage, reduced fuel costs following a decline in oil prices and greater environmental concerns related to coal-fired electricity generation), it will indefinitely suspend any further rollout of the vesting contract system beyond by-product gas-based electricity, and revert to the adjusted coefficient-based electricity pricing adjustment mechanism.

37

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Power Trading Results*

The results of power trading, as effected through the Korea Power Exchange, for our generation subsidiaries and independent power producers in 2017 are as follows:

| Items | | Volume (Gigawatt hours) | Percentage of Total Volume (%) | Sales to KEPCO (in billions of Won) | Percentage of Total Sales (%) | Unit Price (Won/ kWh) |
|---|---|---|---|---|---|---|
| Generation Companies | KHNP | 146,221 | 28.1 | 9,113 | 21.0 | 62.33 |
| | KOSEP | 66,640 | 12.8 | 5,183 | 12.0 | 77.77 |
| | KOMIPO | 50,254 | 9.7 | 4,410 | 10.2 | 87.75 |
| | KOWEPO | 45,464 | 8.7 | 4,176 | 9.6 | 91.85 |
| | KOSPO | 47,659 | 9.2 | 4,347 | 10.0 | 91.22 |
| | EWP | 48,307 | 9.3 | 4,452 | 10.3 | 92.15 |
| | Others[1] | 115,685 | 22.2 | 11,662 | 26.9 | 100.81 |
| | Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |
| Energy Sources | Nuclear | 141,098 | 27.1 | 8,573 | 19.8 | 60.76 |
| | Bituminous coal | 224,834 | 43.2 | 17,755 | 41.0 | 78.97 |
| | Anthracite coal | 4,014 | 0.8 | 385 | 0.9 | 95.89 |
| | Oil | 5,735 | 1.1 | 949 | 2.2 | 165.40 |
| | LNG | 1,429 | 0.3 | 151 | 0.3 | 105.33 |
| | Combined-cycle | 116,111 | 22.3 | 13,012 | 30.0 | 112.07 |
| | Hydro | 2,255 | 0.4 | 219 | 0.5 | 96.95 |
| | Pumped-storage | 4,171 | 0.8 | 450 | 1.0 | 107.96 |
| | Others | 20,583 | 4.0 | 1,849 | 4.3 | 89.82 |
| | Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |
| Load | Base load | 360,356 | 69.3 | 25,938 | 59.8 | 71.98 |
| | Non-base load | 159,874 | 30.7 | 17,405 | 40.2 | 108.86 |
| | Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |

*Note:*

(1)    Others represent independent power producers that trade electricity through the cost-based pool system of power trading (excluding independent power producers that supply electricity under power purchase agreements with us).

*Power Purchased from Independent Power Producers Under Power Purchase Agreements*

In 2017, we purchased an aggregate of 10,702 gigawatt hours of electricity generated by independent power producers under existing power purchase agreements. These independent power producers had an aggregate generation capacity of 6,257 megawatts as of December 31, 2017.

**Power Generation**

As of December 31, 2017, we and our generation subsidiaries had a total of 679 generation units, including nuclear, thermal, hydroelectric and internal combustion units, representing total installed generation capacity of 82,132 megawatts. Our thermal units produce electricity using steam turbine generators fired by coal, oil and LNG. Our internal combustion units use oil or diesel-fired gas turbines and our combined-cycle units are primarily LNG-fired. We also purchase power from several generation plants not owned by our generation subsidiaries.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

rainfall and competing uses for available water supplies, including residential, commercial, industrial and agricultural consumption. Pumped storage enables us to increase the available supply of water for use during periods of peak electricity demand.

**Sales and Customers**

Our sales depend principally on the level of demand for electricity in Korea and the rates we charge for the electricity we sell to the end-users.

Demand for electricity in Korea grew at a compounded average rate of 1.7% per annum for the five years ended December 31, 2017. According to the Bank of Korea, the compounded growth rate for GDP was approximately 3.0% for the same period. The GDP growth rate was approximately 2.8%, 2.9% and 3.1% during 2015, 2016 and 2017, respectively.

The table below sets forth, for the periods indicated, the annual rate of growth in Korea's GDP and the annual rate of growth in electricity demand (measured by total annual electricity consumption) on a year-on-year basis.

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Growth in GDP | 2.9% | 3.3% | 2.8% | 2.9% | 3.1% |
| Growth in electricity consumption | 1.8% | 0.6% | 1.3% | 2.8% | 2.2% |

Electricity demand in Korea varies within each year for a variety of reasons other than the general growth in GDP demand. Electricity demand tends to be higher during daylight hours due to heightened commercial and industrial activities and electronic appliance use. Due to the use of air conditioning during the summer and heating during the winter, electricity demand is higher during these two seasons than the spring or the fall. Variation in weather conditions may also cause significant variation in electricity demand.

We do not use any marketing channels, including any special sales methods, to sell electricity to our customers, other than to install electricity meters on-site and take monthly readings of such meters, based upon which invoices are sent to our customers.

*Demand by the Type of Usage*

The table below sets forth consumption of electric power, and growth of such consumption on a year-on-year basis, by the type of usage (in gigawatt hours) for the periods indicated.

| | 2013 (GWh) | YoY growth (%) | 2014 (GWh) | YoY growth (%) | 2015 (GWh) | YoY growth (%) | 2016 (GWh) | YoY growth (%) | 2017 (GWh) | YoY growth (%) | % of Total 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Residential | 65,815 | 0.5 | 64,457 | (2.1 ) | 65,619 | 1.8 | 68,057 | 3.7 | 68,544 | 0.7 | 13.5 |
| Commercial | 102,196 | 0.6 | 100,761 | (1.4 ) | 103,679 | 2.9 | 108,617 | 4.8 | 111,298 | 2.5 | 21.9 |
| Educational | 7,947 | 1.1 | 7,438 | (6.4 ) | 7,691 | 3.4 | 8,079 | 5.1 | 8,316 | 2.9 | 1.6 |
| Industrial | 265,373 | 2.8 | 272,552 | 2.7 | 273,548 | 0.4 | 278,828 | 1.9 | 285,969 | 2.6 | 56.3 |
| Agricultural | 13,866 | 8.5 | 14,505 | 4.6 | 15,702 | 8.3 | 16,580 | 5.6 | 17,251 | 4.0 | 3.4 |
| Street lighting | 3,156 | (0.1 ) | 3,221 | 2.1 | 3,341 | 3.7 | 3,462 | 3.6 | 3,557 | 2.7 | 0.7 |
| Overnight Power | 16,496 | (6.4 ) | 14,658 | (11.1 ) | 14,075 | (4.0 ) | 13,416 | (4.7 ) | 12,811 | (4.5 ) | 2.5 |
| Total | 474,849 | 1.8 | 477,592 | 0.6 | 483,655 | 1.3 | 497,039 | 2.8 | 507,746 | 2.2 | 100.0 |

The industrial sector represents the largest segment of electricity consumption in Korea. Demand for electricity from the industrial sector was 285,969 gigawatt hours in 2017, representing a 2.6% increase from 2016, largely due to the continued export-based growth of the Korean economy, which resulted in increased

54

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

industrial output and greater utilization of industrial plants. Demand for electricity from the commercial sector depends largely on the level and scope of commercial activities in Korea, which in recent years have resulted in increased office building construction, office automation and use of air conditioners and heaters. Demand for electricity from the commercial sector increased to 111,298 gigawatt hours in 2017, representing a 2.5% increase from 2016 largely due to the recovery of market demand as a result of various Government policies to boost the economy. Demand for electricity from the residential sector is largely dependent on population growth and use of heaters, air conditioners and other electronic appliances. Demand for electricity from the residential sector increased to 68,544 gigawatt hours in 2017, representing a 0.7% increase compared to 2016, largely due to an increase in household electricity usage for air conditioning and heating.

### *Demand Management*

Our ability to provide adequate supply of electricity is principally measured by the facility reserve margin and the supply reserve margin. The facility reserve margin represents the difference between the peak usage during a year and the installed capacity at the time of such peak usage, expressed as a percentage of such installed capacity. The supply reserve margin represents the difference between the peak usage in a year and the average available capacity at the time of such peak usage, expressed as a percentage of such peak usage. The following table sets forth our facility reserve margin and supply reserve margin for the periods indicated.

|                        | 2013  | 2014  | 2015  | 2016   | 2017  |
|------------------------|-------|-------|-------|--------|-------|
| Facility reserve margin | 7.5%  | 16.3% | 19.4% | 17.6%  | 34.0% |
| Supply reserve margin   | 5.5%  | 11.5% | 11.6% | 8.5 %  | 12.3% |

While we seek to meet the growing demand for electricity in Korea primarily by continuing to expand our generation capacity, we have also implemented several measures to curtail electricity consumption, especially during peak periods. We apply time-of-use and seasonality tariff, which are structured so that higher tariffs are charged at the time and months of peak demand to select types of customers, and we also apply a progressive rate structure for the residential use of electricity. We have several demand management programs to control demand and induce power conservation during peak hours and peak seasons such as providing incentives for reducing power consumption during peak hours.

### *Electricity Rates*

The Electricity Business Act and the Price Stabilization Act of 1975, each as amended from time to time, prescribe the procedures for the approval and establishment of rates charged for the electricity we sell. We submit our proposals for revisions of rates or changes in the rate structure to the Ministry of Trade, Industry and Energy. The Ministry of Trade, Industry and Energy then reviews these proposals and, following consultation with the Ministry of Strategy and Finance and review by the Korea Electricity Commission, makes the final decision.

Under the Electricity Business Act and the Price Stabilization Act, electricity rates are established at levels that would enable us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations as well as receive a fair investment return on capital used in those operations.

In May 2014, in order to make conforming changes to the standards for determining the public utility rates and to further bolster the reasonableness of cost determination, the Ministry of Trade, Industry and Energy amended the standards for determining the electricity tariff rates. The main amendments include (i) recording as our cost of electricity (which forms part of our operating costs) the pretax income of our six generation subsidiaries (which was previously deducted from our operating costs), (ii) excluding from our rate base our equity interests in our six generation subsidiaries (which were previously included in the rate base discussed below), and (iii) when determining working capital, considering the actual time of our cost recovery (namely, the accounts receivable collection period and the accounts payable payment period).

55

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

following such designation, akin to the appointment process applicable to us, (i) the President of the Republic appoints the presidents and standing directors of our generation subsidiaries that concurrently serve as members of the audit committees; (ii) the selection of non-standing directors of these subsidiaries is subject to approval by the minister of the Ministry of Strategy and Finance; (iii) the president of each such generation subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Agencies Operating Committee conducts performance evaluation of such subsidiaries.

### *Our Control over the Generation Subsidiaries*

Designation of our generation subsidiaries as "market-oriented public enterprises" was intended to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them so as to provide improved service to the general public. Such designation also has had the effect of the Government exercising greater direct control over the appointment of the governing body of our generation subsidiaries (in ways that are similar how the Government exercises such control over us as our majority shareholder as well as our regulator).

In addition, the Government has imposed a number of regulations that further affect the respective operational boundaries between us and our generation subsidiaries, including as follows:

In August 2010, in furtherance of the Act on the Management of Public Institutions, the Ministry of Strategy and Finance announced the Proposal for the Improvement in the Structure of the Electric Power Industry, which was designed to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them. Key initiatives of the proposal included the following: (i) maintain the current structure of having six generation subsidiaries and designate the six generation subsidiaries as market-oriented public enterprises under the Act on the Management of Public Institutions in order to foster competition among the generation subsidiaries and promote efficiency in their operations, and (ii) clarify the scope of the business of us and the six generation subsidiaries (namely, that we shall manage the financial structure and governance of the six generation subsidiaries and nuclear power plant and overseas resources development projects, while the six generation subsidiaries will have greater autonomy with respect to construction and management of generation units and procurement of fuel, among others).

In January 2011, the Ministry of Strategy and Finance created a "joint cooperation unit" consisting of officers and employees selected from the five thermal power generation subsidiaries in order to reduce inefficiencies in areas such as fuel transportation, inventories, materials and equipment and construction, etc. and allow the thermal power generation subsidiaries to continue utilizing the benefits of economy of scale after split off of our generation business units into separate subsidiaries. The purpose of the joint cooperation unit was to give greater autonomy to the generation subsidiaries with regard to power plant construction and management and fuel procurements, and thereby enhance efficiency in operating power plants. The main functions of the joint cooperation unit are as follows: (i) maintain inventories of bituminous coal through volume exchanges and joint purchases, (ii) reduce shipping and demurrage expenses through joint operation and distribution of dedicated vessels, (iii) reduce costs by sharing information on generation material inventories and (iv) sharing human resources among the five thermal power generation subsidiaries for construction projects, among other things.

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies should take on greater responsibilities in overseas

165

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition.

However, notwithstanding these developments, we, also a government-controlled entity, remain as the sole shareholder of our generation subsidiaries and continue to exercise significant control over them in such capacity as the sole shareholder well as through other practical means as further described below.

First, as the sole shareholder, we continue to have the right, under the Act on the Management of Public Institutions, to approve or disapprove the appointment of key members of the governing body of our generation subsidiaries (namely, the president and the standing and non-standing directors) by way of a vote at the general shareholders meeting before such appointments are ultimately approved and made by the President of the Republic (in the case of the presidents and standing directors concurrently serving as audit committee members of the generation subsidiaries) or by the president of each generation subsidiary (in the case of other standing directors of such generation subsidiary). Our right to exercise such voting right as a shareholder is also protected by the Commercial Code of Korea.

Second, in practice we retain significant control over our generation subsidiaries through the following means:

We are the sole purchaser of electricity produced by the generation subsidiaries and continue to have near monopoly in terms of transmitting and distributing electricity in Korea. Accordingly, we continue to have significant influence over our generation subsidiaries in the electricity industry.

Pursuant to the Electricity Business Act, the adjusted coefficient must be determined so that the price of electricity sold by our generation subsidiaries to us shall have the effect of ensuring a fair rate of return to us as a standalone entity, which means any imbalance caused by excess profits taken by our generation subsidiaries to our loss must be corrected. Since we and the generation subsidiaries participate in the determination of the adjusted coefficient, such determination process can be used as a way for us to exert indirect influence on our generation subsidiaries.

Our president holds regular meetings (known as "CEO Meetings") with the presidents of our generation subsidiaries for which our president determines whether and when to convene such meetings, sets the agenda for such meetings and chairs such meetings. Since significant issues that jointly affect us and our generation subsidiaries are often discussed and decided at these meetings, the leadership role exercised by our president in such meetings is significant in setting the policies and direction for us and our generation subsidiaries as a whole.

We maintain and operate the Affiliated Company Management Team within the parent company organizational structure. The purpose of this team is to support and coordinate the management of the generation subsidiaries. Activities of the Affiliated Company Management Team include preparation of the CEO meetings, deliberation on major issues to be discussed at CEO Meetings, convening a general meeting of shareholders of the generation subsidiaries and coordination on the decision-making process for the general meeting of shareholders of the generation subsidiaries.

Ultimately, our control over our generation subsidiaries is derived from the fact that the Government owns the majority of our shares and effectively controls us as the supervisor and regulator in a heavily regulated industry, and in effect also exercises the same degree of control over our generation subsidiaries through our sole share ownership over our generation subsidiaries as well as its statutory power of direct appointment of the governing bodies of our generation subsidiaries. In effect, we are acting as an intermediate holding company in a vertical control structure involving the Government, us and our generation subsidiaries, where the Government holds the ultimate control over both us and our generation subsidiaries and exercises its such control over our generation subsidiaries in part through us acting as the sole shareholder and the parent company.

166

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

# Exhibit 2

ISSN 2233-4386

www.keei.re.kr



2017

# Energy Info.
# Korea

     



Korea Energy Economics Institute

# 10 Prices

Korea Energy Economics Institute

## Average Revenues per kWh Sold



won/kWh

Legend: Average, Residential, Industrial, Commercial, Agricultural



### 10-2. Average Revenues per kWh Sold

(Unit : won/kWh)

| | Average | Residential | Industrial | Commercial | Agricultural |
|---|---|---|---|---|---|
| 1981 | 64.31 | 74.61 | - | - | - |
| 1982 | 69.87 | 75.19 | - | - | - |
| 1983 | 67.71 | 73.26 | - | - | - |
| 1984 | 67.42 | 73.33 | - | - | - |
| 1985 | 67.92 | 73.42 | - | - | - |
| 1986 | 65.51 | 71.33 | - | - | - |
| 1987 | 63.48 | 71.75 | - | - | - |
| 1988 | 65.49 | 71.94 | - | - | 33.48 |
| 1989 | 55.43 | 69.13 | - | - | 32.70 |
| 1990 | 52.94 | 68.66 | - | - | 34.06 |
| 1991 | 54.23 | 73.03 | - | - | 33.80 |
| 1992 | 58.09 | 81.22 | - | - | 33.56 |
| 1993 | 58.90 | 82.29 | - | - | 35.82 |
| 1994 | 60.22 | 85.95 | 46.14 | 86.92 | 34.59 |
| 1995 | 61.28 | 86.47 | 47.14 | 89.00 | 36.17 |
| 1996 | 62.99 | 88.95 | 48.37 | 90.32 | 37.11 |
| 1997 | 65.26 | 92.05 | 49.86 | 93.19 | 38.96 |
| 1998 | 72.08 | 100.62 | 55.01 | 104.16 | 44.31 |
| 1999 | 71.59 | 103.07 | 54.78 | 102.45 | 44.04 |
| 2000 | 74.65 | 107.30 | 58.30 | 106.04 | 43.04 |
| 2001 | 77.06 | 111.71 | 61.56 | 107.99 | 43.51 |
| 2002 | 75.21 | 110.31 | 60.08 | 104.42 | 43.16 |
| 2003 | 74.68 | 107.96 | 60.30 | 100.59 | 43.45 |
| 2004 | 74.58 | 110.41 | 60.23 | 96.85 | 41.95 |
| 2005 | 74.46 | 110.82 | 60.25 | 95.24 | 41.67 |
| 2006 | 76.43 | 114.33 | 61.92 | 97.91 | 42.96 |
| 2007 | 77.85 | 114.31 | 64.56 | 97.68 | 42.45 |
| 2008 | 78.76 | 114.97 | 66.24 | 95.30 | 42.38 |
| 2009 | 83.59 | 114.45 | 73.69 | 98.50 | 42.13 |
| 2010 | 86.12 | 119.85 | 76.63 | 98.93 | 42.54 |
| 2011 | 89.32 | 119.99 | 81.23 | 101.69 | 42.72 |
| 2012 | 99.10 | 123.69 | 92.83 | 112.50 | 42.90 |
| 2013 | 106.33 | 127.02 | 100.70 | 121.98 | 45.51 |
| 2014 | 111.28 | 125.14 | 106.83 | 129.75 | 47.31 |
| 2015 | 111.57 | 123.69 | 107.41 | 130.46 | 47.31 |
| 2016 | 111.23 | 121.52 | 107.11 | 130.41 | 47.41 |

10

Prices

PUBLIC VERSION

# Exhibit 3

**OFFERING CIRCULAR**                                              **STRICTLY CONFIDENTIAL**



# Korea South-East Power Co., Ltd.

(incorporated with limited liability under the laws of the Republic of Korea)

## US$300,000,000 2.375% Notes due 2020

The US$300,000,00 2.375% Notes due 2020 (the "Notes") of Korea South-East Power Co., Ltd. (the "Company") will mature on April 12, 2020 (the "Maturity Date"). The Notes will bear interest at the rate of 2.375 % per annum from, and including, April 12, 2017 to, but excluding, the Maturity Date. Interest will be payable semi-annually in arrears on April 12 and October 12 of each year, commencing October 12, 2017. The Company may, at its option, redeem all, but not some only, of the Notes at any time at their principal amount plus accrued interest in the event of certain changes in tax law as described under "Description of the Notes — Optional Tax Redemption."

The Notes are rated "Aa2" by Moody's Investors Service, Inc. ("Moody's") and "AA" by S&P Global Ratings ("S&P"), a division of S&P Global Inc. A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organization.

The Notes will be unsecured and will be the direct, unconditional and unsubordinated general obligations of us and will rank *pari passu* among themselves and at least equally with all other outstanding unsecured and unsubordinated general obligations of us, except as may be required by mandatory provisions of law.

Approval in-principle has been received from the Singapore Exchange Securities Trading Limited (the "SGX-ST") for the listing and quotation of the Notes on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this Offering Circular. Approval in-principal from, admission to the Official List of, and the listing and quotation of the Notes on, the SGX-ST are not to be taken as an indication of the merits of the Company or the Notes.

**The Notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any other jurisdiction, and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S under the Securities Act ("Regulation S")) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the Notes are being offered and sold only outside the United States and to non-U.S. persons in offshore transactions in reliance on Regulation S and in compliance with applicable laws, regulations and directives. For further details about eligible offers and resale restrictions, see "Plan of Distribution" and "Transfer Restrictions."**

Investing in the Notes involves risks. See "Risk Factors" beginning on page 6 to read about certain risk factors you should consider before buying the Notes.

**Price: 99.816% per Note plus accrued interest, if any, from April 12, 2017.**

Delivery of the Notes in book-entry form will be made on or about April 12, 2017.

*Joint Bookrunners and Lead Managers*

**Citigroup**                    **HSBC**                    **UBS**

The date of this Offering Circular is April 5, 2017.

## TABLE OF CONTENTS

CERTAIN DEFINED TERMS AND CONVENTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     iv

ENFORCEABILITY OF CIVIL LIABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     v

PRESENTATION OF FINANCIAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     v

FORWARD-LOOKING STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     v

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

THE OFFERING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

SUMMARY FINANCIAL AND OTHER INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . .     5

RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

USE OF PROCEEDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     22

EXCHANGE RATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

CAPITALIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

THE KOREAN ELECTRICITY INDUSTRY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     34

MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     56

TERMS AND CONDITIONS OF THE NOTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     59

THE GLOBAL NOTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     74

TAXATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     78

PLAN OF DISTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     81

TRANSFER RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     87

LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     90

INDEPENDENT AUDITORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     90

GENERAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     91

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . .     F-1

***Our capacity expansion plans, which are based on Government projections on long-term supply and demand of electricity in Korea, may prove to be inadequate.***

We make plans for expanding or upgrading our generation capacity based on the Government's Basic National Energy Plan, as well as the Power Supply and Demand Basic Plan (the "Basic Plan"). The Basic Plan is announced and revised generally every two years by the Government.

In January 2014, the Government announced the Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, for the period from 2013 to 2035. The Second Basic National Energy Plan focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing electricity demand by 15% by 2035, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying the latest greenhouse gas emission reduction technologies to newly constructed generation units in order to further promote safety and environmental friendliness, (iv) strengthening exploration and procurement capabilities to enhance Korea's energy security and to ensure stable supply of energy and increasing the portion of electricity supplied from renewable sources to 11% by 2035, (v) reinforcing the system for stable supply of conventional energy, such as oil and gas and (vi) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of consumers in the low income group. In addition, the Second Basic National Energy Plan revised the target level of nuclear generation capacity in Korea's electricity supply mix to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008.

In July 2015, the Government announced the Seventh Basic Plan for the period 2015 to 2029, which focuses on, among other things, (i) ensuring a stable supply of electricity, (ii) increasing the portion of low carbon electricity supply sources, (iii) active consumer demand management, (iv) permanent closing of operations of the Kori #1 nuclear power unit, and (v) diversifying electricity supply sources by utilizing renewable energy sources.

We cannot assure you that the Second Basic National Energy Plan, the Seventh Basic Plan or any future plans to be subsequently adopted, will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable rates to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is a significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand, or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on our part, which may have a material adverse effect on our results of operations, financial condition and cash flows.

***We are dependent on fuel imported from overseas suppliers in currencies other than Won under contracts with varying quantity and duration, and rising fuel costs could adversely affect our results of operations.***

Fuel costs constituted 65.6%, 56.6% and 53.7% of our sales, and 75.5%, 71.1% and 65.4% of our cost of sales, in 2014, 2015 and 2016, respectively. A substantial majority of our fuel costs are incurred to purchase bituminous coal from sources outside of Korea at prices determined in part by prevailing market prices in currencies other than Won, primarily the U.S. dollar. In addition, we purchase a significant portion of our fuel requirements under contracts with limited quantity and duration. See "Business — Fuel."

Substantially all of our bituminous coal requirements are imported from approximately 39 suppliers located in Australia, Indonesia, Russia, China, Canada, South Africa, United States and Colombia under long-term or spot contracts. Approximately 86.8%, 84.1% and 95.9% of our bituminous coal requirements were purchased under long-term contracts in 2014, 2015 and 2016, respectively, with the remaining requirements being purchased on the spot market. Approximately 48.7%, 28.3% and 15.2% of our annual bituminous coal requirements were imported from Indonesia, Australia and Russia, respectively, in 2016. We purchase substantially all of our LNG from Korea Gas Corporation ("KOGAS") under a long-term supply contract.

In recent years, the prices of fuel, including bituminous coal and LNG, have fluctuated significantly. If fuel prices increase sharply within a short span of time, we may be unable to secure requisite fuel supplies at prices that we were able to obtain during prior periods. In addition, any significant interruption or delay in the supply of fuel (bituminous coal and LNG in particular) from any of our suppliers could cause us to purchase fuel on the spot market at prices higher than the prices available under existing supply contracts, resulting in an increase in fuel cost.

While increases in our fuel costs are fully passed through to KEPCO in its purchase of electricity from us under the current cost-based pool system, such pass-through is subject to a two-month time lag, and accordingly, fuel cost increases, including cost increases resulting from the depreciation of the Won against the U.S. dollar or other currencies, could adversely affect our results of operations if the price of electricity payable to us by KEPCO does not timely capture such fuel cost increases for the relevant financial reporting period. Furthermore, in determining the adjusted coefficient for the marginal price component of the price of electricity sold by us to KEPCO by way of KPX, the Cost Evaluation Committee, a committee composed of representatives from the Government, KEPCO and the Generation Subsidiaries, including us, considers various factors, including the market prices of fuels, electricity tariff rates and their impact on the relative fair investment returns for KEPCO and the Generation Subsidiaries, including us, among others. Therefore, in the event of a sustained or rapid rise in fuel costs which impact is not sufficiently offset by a corresponding rise in electricity tariff rates in a timely manner and as a result would significantly hurt KEPCO's profitability, the adjusted coefficient may be set at a level which would have the effect of lowering the fair investment return for the Generation Subsidiaries, including us, and, in turn, the overall profitability of our operations. For instance, in March 2013 the Cost Evaluation Committee imposed a price cap on the marginal price of electricity sold by us to KEPCO. Such price cap has affected our LNG generation units, which accounted for approximately 8.9% in aggregate of our installed capacity as of December 31, 2016. The price cap has had and may have a material adverse effect on our results of operation and financial condition. See "The Korean Electricity Industry — Power Purchase — Cost-based Pool System — Marginal Price."

***We anticipate substantial capital expenditures, which will require additional debt incurrence in the future.***

We anticipate that substantial capital expenditures will be required in the future for construction of additional generation facilities as discussed in "Business — Capital Investment Program." In 2014, 2015 and 2016, we spent Won 829.7 billion, Won 733.1 billion and Won 778.1 billion respectively, on capital expenditures on an accrual basis. We have budgeted Won 1,140.0 billion, Won 921.2 billion, Won 910.4 billion and Won 961.5 billion for capital expenditures for 2017, 2018, 2019 and 2020, respectively. The budgeted amounts may vary from the actual amounts of our capital expenditures for a variety of reasons, including changes in the number of units to be constructed and the timing of such construction, changes in rates of exchange between the Won and foreign currencies, changes in

PUBLIC VERSION

Exhibit 4

PUBLIC VERSION

# KOREA SOUTH-EAST POWER CO., LTD. AND ITS SUBSIDIARIES

## CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED
## DECEMBER 31, 2017 AND 2016

## ATTACHMENT: INDEPENDENT AUDITORS' REPORT

# KOREA SOUTH-EAST POWER CO., LTD.

PUBLIC VERSION

# Deloitte.

**Deloitte Anjin LLC**
9F., One IFC,
10, Gukjegeumyung-ro,
Youngdeungpo-gu, Seoul
07326, Korea

Tel: +82 (2) 6676 1000
Fax: +82 (2) 6674 2114
www.deloitteanjin.co.kr

## Independent Auditors' Report

English Translation of a Report Originally Issued in Korean

**To the Shareholder and the Board of Directors of**
**Korea South-East Power Co., Ltd.:**

We have audited the accompanying consolidated financial statements of Korea South-East Power Co., Ltd. (the "Company") and its subsidiaries. The consolidated financial statements consist of the consolidated statements of financial position as of December 31, 2017 and 2016, and the related consolidated statements of comprehensive income, consolidated statements of changes in equity and consolidated statements of cash flows, all expressed in Korean won, for the years ended December 31, 2017 and 2016, and a summary of significant accounting policies and other explanatory information.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the accompanying consolidated financial statements in accordance with Korean International Financial Reporting Standards ("K-IFRS") and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an audit opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with Korean Standards on Auditing . Those standards require that we comply with ethical requirements and plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee ("DTTL"), its network of member firms, and their related entities. DTTL and each of its member firms are legally separate and independent entities. DTTL (also referred to as "Deloitte Global") does not provide services to clients. Please see www.deloitte.com/kr/about to learn more about our global network of member firms.

Deloitte Touche Tohmatsu Limited is a private company limited by guarantee incorporated in England & Wales under company number 07271800, and its registered office is Hill House, 1 Little New Street, London, EC4a, 3TR, United Kingdom.

PUBLIC VERSION

# Deloitte.

**Opinion**

In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company and its subsidiaries as of December 31, 2017 and 2016, and their financial performance and their cash flows for the years ended December 31, 2017 and 2016, in accordance with K-IFRS.

**Emphasis of Matter**

As discussed in Note 2, the consolidated financial statements have been prepared in accordance with the Korean government-owned and Quasi-government Accounting Regulations and Standards, and as prescribed by these regulations, except as otherwise provided in these regulations and standards, K-IFRS have been applied for the preparation of the consolidated financial statements.

March 26, 2018

Notice to Readers

This report is effective as of March 26, 2018, the auditors' report date. Certain subsequent events or circumstances may have occurred between the auditors' report date and the time the auditors' report is read. Such events or circumstances could significantly affect the consolidated financial statements and may result in modifications to the auditors' report.

- exchange differences on transactions entered into in order to hedge certain foreign currency risks; and
- exchange differences on monetary items receivable from or payable to a foreign operation for which settlement is neither planned nor likely to occur (therefore forming part of the net investment in the foreign operation), which are recognized initially in other comprehensive income and reclassified from equity to profit or loss on disposal or partial disposal of the net investment.

For the purpose of presenting consolidated financial statements, the assets and liabilities of the Group's foreign operations are expressed in Korean won using exchange rates prevailing at the end of the reporting period. Income and expense items are translated at the average exchange rates for the period, unless exchange rates fluctuated significantly during that period, in which case the exchange rates at the dates of the transactions are used. Exchange differences arising, if any, are recognized in other comprehensive income and accumulated in equity (attributed to non-controlling interests as appropriate).

In case of disposal of a foreign operation (i.e., a disposal of the Group's entire interest in a foreign operation, or a disposal involving loss of control over a subsidiary that includes a foreign operation, or partial disposal of an interest in a joint arrangement or an associate that includes a foreign operation whose retained interest becomes a financial asset), all of the accumulated exchange differences in respect of that operation attributable to the owners of the Company are reclassified to profit or loss. Any exchange differences that have previously been attributed to non-controlling interests are derecognized, but they are not reclassified to profit or loss.

In case of a partial disposal (i.e., no loss of control) of a subsidiary that includes a foreign operation, the proportionate share of accumulated exchange differences is reattributed to non-controlling interests in equity and is not recognized in profit or loss. For all other partial disposals (i.e., partial disposals of associates or joint arrangements that do not result in the Group losing significant influence or joint control), the proportionate share of the accumulated exchange differences is reclassified to profit or loss.

Goodwill and fair value adjustments arising on the acquisition of a foreign operation are treated as assets and liabilities of the foreign operation and translated at the closing rate. Exchange differences arising are recognized in other comprehensive income.

(10)  Borrowing costs

Borrowing costs directly attributable to the acquisition, construction or production of qualifying assets, which are assets that necessarily take a substantial period to get ready for their intended use or sale, are added to the cost of those assets until the assets are substantially ready for their intended use or sale.

Investment income earned on the temporary investment of specific borrowings pending their expenditure on qualifying assets is deducted from the borrowing costs eligible for capitalization.

All other borrowing costs are recognized in profit or loss in the period in which they are incurred.

(11)  Government grants

Government grants are not recognized until there is reasonable assurance that the Group will comply with the conditions attached to them and that the grants will be received.

The benefit of a government loan at a below-market rate of interest is treated as a government grant, measured as the difference between proceeds received and the fair value of the loan based on prevailing market interest rates.

Government grants whose primary condition is that the Group purchase, construct or otherwise acquire long-term assets are deducted in calculating the carrying amount of the asset. The grant is recognized in profit or loss over the life of a depreciable asset as a reduced depreciation expense.

Government grants related to income are recognized in profit or loss on a systematic basis over the periods in which the Group recognizes as expenses the related costs for which the grants are intended to compensate. Government grants that are receivable as compensation for expenses or losses already incurred or for the purpose

PUBLIC VERSION

of giving immediate financial support to the Group with no future related costs are recognized in profit or loss in the period in which they become receivable.

(12)  Retirement benefit costs and termination benefits

Contributions to defined contribution retirement benefit plans are recognized as an expense when employees have rendered service entitling them to the contributions.

For defined benefit retirement benefit plans, the cost of providing benefits is determined using the projected unit credit method, with actuarial valuations being carried out at the end of each reporting period. Remeasurement, comprising actuarial gains and losses, the effect of the changes to the asset ceiling (if applicable) and the return on plan assets (excluding interest), is reflected immediately in the consolidated statements of financial position with a charge or credit recognized in other comprehensive income in the period in which it occurs. Remeasurement recognized in other comprehensive income is reflected immediately in retained earnings and will not be reclassified to profit or loss. Past service cost is recognized in profit or loss in the period of a plan amendment. Net interest is calculated by applying the discount rate at the beginning of the period to the net defined benefit liability or asset. Defined benefit costs are composed of service cost (including current service cost and past service cost, as well as gains and losses on curtailments and settlements), net interest expense (income) and remeasurement.

The Group presents the service cost and net interest expense (income) components in profit or loss and the remeasurement component in other comprehensive income. Curtailment gains and losses are accounted for as past service costs.

The retirement benefit obligation recognized in the consolidated statements of financial position represents the actual deficit or surplus in the Group's defined benefit plans. Any surplus resulting from this calculation is limited to the present value of any economic benefits available in the form of refunds from the plans or reductions in future contributions to the plans.

(13)  Taxation

Income tax expense represents the sum of the tax currently payable and deferred tax.

1) Current tax

The tax currently payable is based on taxable profit for the year. Taxable profit differs from profit as reported in the consolidated statements of profit or loss and comprehensive income because of items of income or expense that are taxable or deductible in other years and items that are never taxable or deductible. The Group's liability for current tax is calculated using tax rates that have been enacted or substantively enacted by the end of the reporting period.

2) Deferred tax

Deferred tax is recognized on temporary differences between the carrying amounts of assets and liabilities in the consolidated financial statements and the corresponding tax bases used in the computation of taxable profit. Deferred tax liabilities are generally recognized for all taxable temporary differences. Deferred tax assets are generally recognized for all deductible temporary differences to the extent it is probable that taxable profits will be available against which those deductible temporary differences can be utilized. Such deferred tax assets and liabilities are not recognized if the temporary difference arises from goodwill or from the initial recognition (other than in a business combination) of other assets and liabilities in a transaction that affects neither the taxable profit nor the accounting profit.

Deferred tax liabilities are recognized for taxable temporary differences associated with investments in subsidiaries and associates, and interests in joint ventures, except where the Group is able to control the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future. Deferred tax assets arising from deductible temporary differences associated with such investments and interests are only recognized to the extent it is probable that there will be sufficient taxable profits against which

PUBLIC VERSION

Exhibit 5

# SECURITIES AND EXCHANGE COMMISSION

# FORM 20-F

Annual and transition report of foreign private issuers pursuant to sections 13 or 15(d)

Filing Date: **2018-04-30** | Period of Report: **2017-12-31**
**SEC Accession No.** 0001193125-18-141125

(HTML Version on secdatabase.com)

## FILER

**KOREA ELECTRIC POWER CORP**

CIK:**887225**| IRS No.: **133442428** | Fiscal Year End: **1231**
Type: **20-F** | Act: **34** | File No.: **001-13372** | Film No.: **18786968**
SIC: **4911** Electric services

Mailing Address
*400 KELBY STREET*
*16TH FLOOR*
*FORT LEE NJ 07024*

Business Address
*167, SAMSEONG-DONG*
*GANGNAM-GU*
*SEOUL M5 135-791*
*2018948855*

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**18.    Property, Plant and Equipment**

**(1)    Property, plant and equipment as of December 31, 2016 and 2017 are as follows:**

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses(*) | Book value |
| | | | In millions of won | | |
| Land | ₩  12,969,741 | (3,204  ) | – | – | 12,966,537 |
| Buildings | 17,722,326 | (61,188  ) | (5,936,849  ) | (853  ) | 11,723,436 |
| Structures | 63,291,437 | (197,641  ) | (19,959,839 ) | (1,183  ) | 43,132,774 |
| Machinery | 67,769,168 | (111,064  ) | (24,344,832 ) | (2,391  ) | 43,310,881 |
| Ships | 4,175 | – | (3,625  ) | – | 550 |
| Vehicles | 247,751 | (107  ) | (176,781  ) | – | 70,863 |
| Equipment | 1,270,660 | (732  ) | (894,265  ) | – | 375,663 |
| Tools | 921,115 | (430  ) | (742,083  ) | – | 178,602 |
| Construction-in- progress | 27,334,368 | (135,807  ) | – | (38,108  ) | 27,160,453 |
| Finance lease assets | 2,390,779 | – | (1,984,426  ) | – | 406,353 |
| Asset retirement costs | 7,129,771 | – | (3,064,359  ) | – | 4,065,412 |
| Others | 10,361,294 | – | (8,009,762  ) | – | 2,351,532 |
| | ₩  211,412,585 | (510,173  ) | (65,116,821  ) | (42,535  ) | 145,743,056 |

(*)    The Company separately recognizes impairment loss on each asset, reflecting various factors such as physical impairment and others during the replacement.

| | 2017 | | | | |
|---|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses(*) | Book value |
| | | | In millions of won | | |
| Land | ₩  13,318,542 | (21,968  ) | – | – | 13,296,574 |
| Buildings | 18,777,678 | (63,539  ) | (6,722,376  ) | (1,776  ) | 11,989,987 |
| Structures | 66,184,484 | (196,414  ) | (22,071,667 ) | (8,039  ) | 43,908,364 |
| Machinery | 75,826,292 | (183,188  ) | (28,904,982 ) | (45,512  ) | 46,692,610 |
| Ships | 4,175 | – | (3,772  ) | – | 403 |
| Vehicles | 276,425 | (6,322  ) | (195,260  ) | (127  ) | 74,716 |
| Equipment | 1,440,870 | (761  ) | (1,020,192  ) | (6  ) | 419,911 |
| Tools | 1,010,537 | (1,027  ) | (809,842  ) | (32  ) | 199,636 |
| Construction-in-progress | 25,610,649 | (49,084  ) | – | (38,108  ) | 25,523,457 |
| Finance lease assets | 2,390,680 | (27  ) | (2,093,001  ) | – | 297,652 |
| Asset retirement costs | 9,395,821 | – | (3,356,337  ) | – | 6,039,484 |
| Others | 11,247,021 | – | (8,807,401  ) | – | 2,439,620 |
| | ₩  225,483,174 | (522,330  ) | (73,984,830 ) | (93,600  ) | 150,882,414 |

(*)    The Company separately recognizes impairment loss on each asset, reflecting various factors such as physical impairment and others during the replacement.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)     Changes in property, plant and equipment for the years ended December 31, 2016 and 2017 are as follows:

| | Beginning balance | Acquisition | Disposal | Depreciation | Impairment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| **2016** | | | | In millions of won | | | |
| Land | ₩ 12,396,460 | 13,973 | (52,569) | – | – | 611,877 | 12,969,741 |
| (Government grants) | (3,147) | – | 14 | – | – | (71) | (3,204) |
| Buildings | 9,676,432 | – | (9,020) | (676,866) | – | 2,794,078 | 11,784,624 |
| (Government grants) | (63,932) | – | 731 | 5,299 | – | (3,286) | (61,188) |
| Structures | 40,258,162 | 455 | (524,310) | (2,233,333) | – | 5,829,441 | 43,330,415 |
| (Government grants) | (193,119) | – | 2,597 | 9,491 | – | (16,610) | (197,641) |
| Machinery | 36,864,749 | 193,017 | (243,757) | (4,353,596) | – | 10,961,532 | 43,421,945 |
| (Government grants) | (108,935) | 33 | 1,210 | 12,272 | – | (15,578) | (111,064) |
| Ships | 786 | – | – | (281) | – | 45 | 550 |
| Vehicles | 60,472 | 2,493 | (34) | (27,615) | – | 35,654 | 70,970 |
| (Government grants) | (29) | (58) | (34) | 25 | – | (45) | (107) |
| Equipment | 310,571 | 67,134 | (323) | (128,084) | – | 127,097 | 376,395 |
| (Government grants) | (1,026) | – | – | 452 | – | (158) | (732) |
| Tools | 160,630 | 27,856 | (327) | (69,842) | – | 60,715 | 179,032 |
| (Government grants) | (691) | – | – | 295 | – | (34) | (430) |
| Construction-in-progress | 35,267,026 | 11,752,352 | (94,443) | – | – | (19,628,675) | 27,296,260 |
| (Government grants) | (139,898) | (28,434) | – | – | – | 32,525 | (135,807) |
| Finance lease assets | 511,509 | 34 | (31) | (96,254) | – | (8,905) | 406,353 |
| Asset retirement costs | 4,106,087 | – | – | (509,310) | – | 468,635 | 4,065,412 |
| Others | 2,259,244 | – | (9) | (813,248) | – | 905,545 | 2,351,532 |
| | ₩ 141,361,351 | 12,028,789 | (920,271) | (8,880,595) | – | 2,153,782 | 145,743,056 |

| | Beginning balance | Acquisition | Disposal | Depreciation | Impairment(*) | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| **2017** | | | | In millions of won | | | |
| Land | ₩ 12,969,741 | 32,773 | (8,961) | – | – | 324,989 | 13,318,542 |
| (Government grants) | (3,204) | – | 5 | – | – | (18,769) | (21,968) |
| Buildings | 11,784,624 | 40,592 | (19,715) | (794,804) | (923) | 1,043,752 | 12,053,526 |
| (Government grants) | (61,188) | (900) | 28 | 5,996 | – | (7,475) | (63,539) |
| Structures | 43,330,415 | 428 | (519,366) | (2,421,168) | (6,856) | 3,721,325 | 44,104,778 |
| (Government grants) | (197,641) | – | 1,905 | 10,011 | – | (10,689) | (196,414) |
| Machinery | 43,421,945 | 421,892 | (242,428) | (4,821,595) | (43,121) | 8,139,105 | 46,875,798 |
| (Government grants) | (111,064) | (10,834) | 489 | 17,390 | – | (79,169) | (183,188) |
| Ships | 550 | – | – | (147) | – | – | 403 |
| Vehicles | 70,970 | 3,447 | (174) | (34,236) | (127) | 41,158 | 81,038 |
| (Government grants) | (107) | (107) | 14 | 1,070 | – | (7,192) | (6,322) |
| Equipment | 376,395 | 53,529 | (413) | (158,614) | (6) | 149,781 | 420,672 |
| (Government grants) | (732) | (43) | – | 454 | – | (440) | (761) |
| Tools | 179,032 | 30,990 | (166) | (74,909) | (32) | 65,748 | 200,663 |
| (Government grants) | (430) | – | – | 354 | – | (951) | (1,027) |
| Construction-in-progress | 27,296,260 | 11,996,508 | (6,487) | – | – | (13,713,740) | 25,572,541 |
| (Government grants) | (135,807) | (42,728) | – | – | – | 129,451 | (49,084) |
| Finance lease assets | 406,353 | – | (29,696) | (107,390) | – | 28,412 | 297,679 |
| (Government grants) | – | – | – | 1 | – | (28) | (27) |
| Asset retirement costs | 4,065,412 | – | – | (518,565) | – | 2,492,637 | 6,039,484 |
| Others | 2,351,532 | 10,411 | (28) | (762,711) | – | 840,416 | 2,439,620 |
| | ₩ 145,743,056 | 12,535,958 | (824,993) | (9,658,863) | (51,065) | 3,138,321 | 150,882,414 |

(*)     Korea Midland Power Co., Ltd. and Korea Western Power Co., Ltd., 100% owned subsidiaries, have determined that there are impairment indicators for the shutdowns of certain power generation units and fire, and performed an impairment test over the individual assets. As a result, the Company recognized the amount of the carrying amount in excess of its recoverable amount as impairment loss in the consolidated statements of comprehensive income.

F-108

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

# Exhibit 6

PUBLIC VERSION

# KOREA SOUTH-EAST POWER CO., LTD. AND ITS SUBSIDIARIES

## CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED
## DECEMBER 31, 2017 AND 2016

## ATTACHMENT: INDEPENDENT AUDITORS' REPORT

# KOREA SOUTH-EAST POWER CO., LTD.

PUBLIC VERSION

# **Contents**

INDEPENDENT AUDITORS' REPORT ------------------------------------------------------------------""""4

CONSOLIDATED FINANCIAL STATEMENTS

    CONSOLIDATED STATEMENTS OF FINANCIAL POSITION -------------------------------------------""""7""

    CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME ----------------------------------""""9

    CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY --------------------------------------------"""';

    CONSOLIDATED STATEMENTS OF CASH FLOWS -------------------------------------------------------"""33

    NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -----------------------------------------------"35

PUBLIC VERSION

# Deloitte.

**Deloitte Anjin LLC**
9F., One IFC,
10, Gukjegeumyung-ro,
Youngdeungpo-gu, Seoul
07326, Korea

Tel: +82 (2) 6676 1000
Fax: +82 (2) 6674 2114
www.deloitteanjin.co.kr

## Independent Auditors' Report

English Translation of a Report Originally Issued in Korean

**To the Shareholder and the Board of Directors of**
**Korea South-East Power Co., Ltd.:**

We have audited the accompanying consolidated financial statements of Korea South-East Power Co., Ltd. (the "Company") and its subsidiaries. The consolidated financial statements consist of the consolidated statements of financial position as of December 31, 2017 and 2016, and the related consolidated statements of comprehensive income, consolidated statements of changes in equity and consolidated statements of cash flows, all expressed in Korean won, for the years ended December 31, 2017 and 2016, and a summary of significant accounting policies and other explanatory information.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of the accompanying consolidated financial statements in accordance with Korean International Financial Reporting Standards ("K-IFRS") and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express an audit opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with Korean Standards on Auditing . Those standards require that we comply with ethical requirements and plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee ("DTTL"), its network of member firms, and their related entities. DTTL and each of its member firms are legally separate and independent entities. DTTL (also referred to as "Deloitte Global") does not provide services to clients. Please see www.deloitte.com/kr/about to learn more about our global network of member firms.

Deloitte Touche Tohmatsu Limited is a private company limited by guarantee incorporated in England & Wales under company number 07271800, and its registered office is Hill House, 1 Little New Street, London, EC4a, 3TR, United Kingdom.

**Deloitte.**

PUBLIC VERSION

**Opinion**

In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company and its subsidiaries as of December 31, 2017 and 2016, and their financial performance and their cash flows for the years ended December 31, 2017 and 2016, in accordance with K-IFRS.

**Emphasis of Matter**

As discussed in Note 2, the consolidated financial statements have been prepared in accordance with the Korean government-owned and Quasi-government Accounting Regulations and Standards, and as prescribed by these regulations, except as otherwise provided in these regulations and standards, K-IFRS have been applied for the preparation of the consolidated financial statements.

March 26, 2018

Notice to Readers

This report is effective as of March 26, 2018, the auditors' report date. Certain subsequent events or circumstances may have occurred between the auditors' report date and the time the auditors' report is read. Such events or circumstances could significantly affect the consolidated financial statements and may result in modifications to the auditors' report.

15. **PROPERTY, PLANT AND EQUIPMENT:**

(1)   Property, plant and equipment as of December 31, 2017 and 2016, are as follows (Korean won):

| | December 31, 2017 | | | | |
|---|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses | Book value |
| Land | ₩ 1,219,339,989,653 | ₩ - | ₩ - | ₩ - | ₩ 1,219,339,989,653 |
| Buildings | 1,137,366,822,907 | (845,709,859) | (393,577,334,582) | - | 742,943,778,466 |
| Structures | 1,406,036,814,495 | (1,417,533,990) | (485,228,236,505) | - | 919,391,044,000 |
| Machinery | 6,704,243,030,108 | (4,428,653,996) | (2,611,419,665,624) | (2,365,738,857) | 4,086,028,971,631 |
| Vehicles | 21,388,844,217 | (49,214,582) | (16,077,430,795) | - | 5,262,198,840 |
| Furniture and fixtures | 51,607,168,851 | (5,208,333) | (37,790,322,944) | - | 13,811,637,574 |
| Tools and equipment | 44,149,797,424 | - | (35,250,104,426) | - | 8,899,692,998 |
| Finance leased asset | 641,755,750,158 | - | (315,592,200,785) | - | 326,163,549,373 |
| Construction in progress | 430,753,471,097 | - | - | - | 430,753,471,097 |
| | ₩ 11,656,641,688,910 | ₩ (6,746,320,760) | ₩ (3,894,935,295,661) | ₩ (2,365,738,857) | ₩ 7,752,594,333,632 |

| | December 31, 2016 | | | | |
|---|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses | Book value |
| Land | ₩ 1,213,568,109,401 | ₩ - | ₩ - | ₩ - | ₩ 1,213,568,109,401 |
| Buildings | 1,115,089,367,072 | (575,404,860) | (347,695,138,312) | - | 766,818,823,900 |
| Structures | 1,383,241,298,120 | (1,486,794,287) | (436,435,852,226) | - | 945,318,651,607 |
| Machinery | 6,249,893,130,191 | (4,979,240,659) | (2,125,908,567,443) | (2,365,738,857) | 4,116,639,583,232 |
| Vehicles | 20,014,873,627 | (73,739,582) | (14,567,762,568) | - | 5,373,371,477 |
| Furniture and fixtures | 39,180,157,654 | (17,708,333) | (31,834,175,439) | - | 7,328,273,882 |
| Tools and equipment | 41,802,681,659 | - | (27,754,379,005) | - | 14,048,302,654 |
| Construction in progress | 351,099,543,834 | - | - | - | 351,099,543,834 |
| Finance leased asset | 638,708,475,846 | - | (284,320,990,941) | - | 354,387,484,905 |
| | ₩ 11,052,597,637,404 | ₩ (7,132,887,721) | ₩ (3,268,516,865,934) | ₩ (2,365,738,857) | ₩ 7,774,582,144,892 |

**24.  RETAINED EARNINGS AND DIVIDENDS PAID:**

(1)   Details of retained earnings as of December 31, 2017 and 2016, are as follows (Korean won):

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Legal reserve (*) | ₩ 127,238,555,703 | ₩ 116,583,916,148 |
| Voluntary reserves | 2,314,346,229,734 | 1,918,386,761,180 |
| Retained earnings before appropriations | 1,172,095,000,082 | 1,508,597,815,352 |
|  | ₩ 3,613,679,785,519 | ₩ 3,543,568,492,680 |

(*) The Commercial Code of the Republic of Korea requires the Company to appropriate as a legal reserve an amount equal to a minimum of 10% of annual cash dividends paid until the reserve equals 50% of its issued capital stock. The reserve is not available for the payment of cash dividends, but may be transferred to capital stock through a resolution of the board of directors or used to reduce accumulated deficit, if any, with the ratification of the shareholder.

(2)   Details of voluntary reserves as of December 31, 2017 and 2016, are as follows (Korean won):

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Reserve for research and human development (*) | ₩ 21,600,000,000 | ₩ 28,800,000,000 |
| Sinking fund reserve | 662,909,036,332 | 461,329,302,055 |
| Reserve for business expansion | 1,629,837,193,402 | 1,428,257,459,125 |
|  | ₩ 2,314,346,229,734 | ₩ 1,918,386,761,180 |

(*) The reserve for research and human development is appropriated by the Company to use as qualified tax credits to reduce corporate tax liabilities. The reserve is available for cash dividends for a certain period as defined by the Tax Incentive Control Law of Korea.

(3)   Changes in retained earnings for the years ended December 31, 2017 and 2016, are as follows (Korean won):

|  | 2017 | 2016 |
|---|---|---|
| Beginning balance | ₩ 3,543,568,492,680 | 3,205,260,290,819 |
| Net income attributed to owner of the Company | 175,474,306,847 | 480,336,025,542 |
| Dividends paid | (106,546,395,540) | (124,168,719,240) |
| Dividends paid (hybrid securities) | (13,384,764,000) | (13,384,764,000) |
| Remeasurement of defined benefit liability | 14,568,145,532 | (4,474,340,441) |
| Ending balance | ₩ 3,613,679,785,519 | ₩ 3,543,568,492,680 |

PUBLIC VERSION

Exhibit 7

PUBLIC VERSION

**OFFERING CIRCULAR**                                          **STRICTLY CONFIDENTIAL**



# Korea East-West Power Co., Ltd.

*(incorporated with limited liability under the laws of the Republic of Korea)*

## US$500,000,000 2.625% Notes due 2022

The US$500,000,000 2.625% Notes due 2022 (the "Notes") of Korea East-West Power Co., Ltd. ("we" or "us") will mature on June 19, 2022 (the "Maturity Date"). The Notes will bear interest at the rate of 2.625% per annum from, and including, June 19, 2017 (the "Issue Date") to, but excluding, the Maturity Date. Interest will be payable in arrears on June 19 and December 19 in each year, commencing December 19, 2017. We may, at our option, redeem all, but not some only, of the Notes at any time at their principal amount plus accrued interest in the event of certain changes in tax law as described under "Terms and Conditions of the Notes — Optional Redemption Due to Changes in Tax Treatment".

The Notes are rated "Aa2" by Moody's Investors Service, Inc. ("Moody's) and "AA-" by Fitch Ratings Ltd ("Fitch"). A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organization.

The Notes will constitute our direct, unconditional, unsubordinated and unsecured obligations and shall at all times rank *pari passu* and without any preference or priority among themselves and with all of our other present and future direct, unconditional, unsubordinated and unsecured obligations, except as may be required by mandatory provisions of law.

Approval in-principle has been received from the Singapore Stock Exchange for the listing and quotation of the Notes on the Singapore Exchange Securities Trading Limited (the "Singapore Stock Exchange"). The Singapore Stock Exchange assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this Offering Circular. Approval in-principle from, admission to the Official List of, and listing and quotation of the Notes on, the Singapore Stock Exchange are not to be taken as an indication of our merits or the merits of the Notes.

**The Notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any other jurisdiction, and may not be offered or sold within the United States or to U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the Notes are being initially offered and sold in the United States only to qualified institutional buyers (as defined in Rule 144A under the Securities Act) and outside the United States to non-U.S. persons in reliance on Regulation S under the Securities Act, in each case, in compliance with applicable laws, regulations and directives. For further details about eligible offerees and resale restrictions, see "Plan of Distribution" and "Transfer Restrictions".**

**Investing in the Notes involves risks. See "Risk Factors" beginning on page 8 to read about certain risk factors you should consider before buying the Notes.**

### Price: 99.152% per Note plus accrued interest, if any, from June 19, 2017.

Delivery of the Notes in book-entry form will be made on or about June 19, 2017.

---

*Joint Bookrunners*

**BNP PARIBAS**                **Citigroup**                **Crédit Agricole CIB**

**Nomura**                                                          **UBS**

The date of this Offering Circular is June 12, 2017.

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| CERTAIN DEFINED TERMS AND CONVENTIONS | iii |
| ENFORCEABILITY OF CIVIL LIABILITIES | iv |
| PRESENTATION OF FINANCIAL INFORMATION | iv |
| FORWARD-LOOKING STATEMENTS | iv |
| SUMMARY | 1 |
| THE OFFERING | 2 |
| SUMMARY FINANCIAL AND OTHER INFORMATION | 5 |
| RISK FACTORS | 8 |
| USE OF PROCEEDS | 23 |
| EXCHANGE RATES | 24 |
| CAPITALIZATION | 25 |
| THE KOREAN ELECTRICITY INDUSTRY | 26 |
| SELECTED FINANCIAL AND OTHER INFORMATION | 35 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 38 |
| BUSINESS | 54 |
| MANAGEMENT | 79 |
| TERMS AND CONDITIONS OF THE NOTES | 82 |
| FORM OF THE NOTES | 96 |
| UNITED STATES TAXATION | 98 |
| KOREAN TAXATION | 100 |
| PLAN OF DISTRIBUTION | 103 |
| TRANSFER RESTRICTIONS | 110 |
| LEGAL MATTERS | 114 |
| INDEPENDENT AUDITORS | 114 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |

————————————

**You should rely only on the information contained in this Offering Circular or to which we have referred you. We have not authorized anyone to provide you with information that is different. This Offering Circular may only be used where it is legal to sell these securities. The information in this Offering Circular may only be accurate on the date of this Offering Circular.**

IN CONNECTION WITH THIS OFFERING, TO THE EXTENT PERMITTED BY, AND IN ACCORDANCE WITH, APPLICABLE LAWS AND REGULATIONS, EACH OF BNP PARIBAS, CITIGROUP GLOBAL MARKETS INC., CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK, NOMURA INTERNATIONAL PLC AND UBS AG HONG KONG BRANCH (THE "STABILIZING MANAGERS") (OR PERSONS ACTING ON BEHALF OF THE STABILIZING MANAGERS) MAY OVER-ALLOT OR EFFECT TRANSACTIONS WITH A VIEW TO SUPPORTING THE MARKET PRICE OF THE NOTES AT A LEVEL HIGHER THAN THAT WHICH MIGHT OTHERWISE PREVAIL. HOWEVER, THERE IS NO ASSURANCE THAT THE STABILIZING MANAGERS (OR PERSONS ACTING ON BEHALF OF THE STABILIZING MANAGERS) WILL UNDERTAKE STABILIZATION ACTION. ANY STABILIZATION ACTION MAY BEGIN ON OR AFTER THE DATE ON WHICH ADEQUATE PUBLIC DISCLOSURE OF THE TERMS OF THE OFFER OF THE NOTES IS MADE AND, IF BEGUN, MAY BE

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
## AND RESULTS OF OPERATIONS

*The following discussion should be read in conjunction with (i) our audited consolidated financial statements and notes thereto as of and for the years ended December 31, 2014, 2015 and 2016 and (ii) our unaudited consolidated interim financial statements and notes thereto as of and for the three months ended March 31, 2016 and 2017, all of which are included elsewhere in this Offering Circular. Our financial statements are prepared in accordance with K-IFRS, which may differ in certain respects from IFRS applied in other countries.*

*This discussion contains forward-looking statements that involve risks and uncertainties. Actual results and the timing of events may differ materially from those contained in these forward-looking statements due to a number of factors, including those discussed in the section entitled "Risk Factors" and elsewhere in this Offering Circular.*

**Overview**

We were established on April 2, 2001 as one of six Generation Subsidiaries of KEPCO. The Generation Subsidiaries generate over 80% of the electricity in Korea. As of March 31, 2017, we had a domestic generation capacity of 11,090 megawatts, or approximately 10.2% of the total electricity generation capacity in Korea (excluding plants generating electricity primarily for private or emergency use). In 2014, 2015, 2016 and the three months ended March 31, 2016 and 2017, we sold 48,585, 46,960, 49,292, 12,790 and 12,904 GWh of electricity, respectively, to KEPCO through the KPX. KEPCO is currently the sole electricity transmission and distribution company in Korea.

As of March 31, 2017, we had total installed generation capacity of 11,090 megawatts, of which 6,850 megawatts, 1,200 megawatts, 2,972 megawatts and 68 megawatts were attributable to our coal-fired units, oil-fired units, LNG-combined cycle units and renewable energy units, respectively.

We generated revenue of Won 4,573 billion, Won 4,114 billion, Won 4,247 billion, Won 1,318 billion and Won 1,443 billion in 2014, 2015, 2016 and the three months ended March 31, 2016 and 2017, respectively, and our profit for the period was Won 160 billion, Won 449 billion, Won 458 billion, Won 297 billion and Won 241 billion in 2014, 2015, 2016 and the three months ended March 31, 2016 and 2017, respectively.

The overall margin for our operations is affected in part by the fair investment return assigned to us (at a uniform rate for all of KEPCO's generation subsidiaries) by the Cost Evaluation Committee after fully passing through changes in fuel prices to KEPCO subject to a two-month lag. Considerations of our fair investment return are made by the Cost Evaluation Committee in determining the adjusted coefficient for the marginal price component of the price of electricity sold by us to KEPCO by way of KPX. In determining such coefficient, the Cost Evaluation Committee considers various factors, including the market prices of fuels, electricity tariff rates and their impacts on the relative fair investment returns for KEPCO and its generation subsidiaries, among others. Therefore, in the event of a sustained or rapid rise in fuel costs whose impact is not sufficiently offset by a corresponding rise in electricity tariff rates in a timely manner or in cases of other exceptional circumstances, the adjusted coefficient may be set at a level which would have the effect of lowering our fair investment return and, in turn, the overall profitability of our operations. See "The Korean Electricity Industry — Power Purchase — Cost-based Pool System — Marginal Price."

In March 2013 the Cost Evaluation Committee imposed a price cap on the marginal price of electricity sold by us to KEPCO. Such price cap has affected our LNG generation units, which accounted for approximately

26.8% in aggregate of our installed capacity as of March 31, 2017. The price cap has had and may have a material adverse effect on our results of operation and financial condition.

Since our inception, we, along with KEPCO and the other Generation Subsidiaries, have made substantial expenditures for the construction of generation plants and other facilities to meet increased demand for electric power. According to the Seventh Basic Plan released in July 2015, the consumption of electric power is expected to increase by 2.1% per annum from 2015 to 2029. Pursuant to the Seventh Basic Plan, we plan to continue to make expenditures to expand and enhance our generating system in the future. In September 2016, we completed construction of coal-fired units 9 and 10 at the Dangjin power plant complex, each with an aggregate installed capacity of 1,020.0 megawatts, which were our main capital expenditure projects in the past three years.

**Recent Accounting Changes**

***Amendments to K-IFRS No. 1007 'Statement of Cash Flows: Disclosure Initiative'***

These amendments require an entity to provide disclosure that enables users of financial statements to evaluate changes in liabilities arising from financing activities, including both changes arising from cash flows and non-cash changes. As we are not required to provide additional disclosure in the quarterly financial statements, we will disclose the financial impact of the adoption of amendments to K-IFRS No. 1007 in the notes to the consolidated financial statements as of and for the years ending December 31, 2017.

***Amendments to K-IFRS No. 1012 'Recognition of Deferred Tax Assets for Unrealized Losses'***

These amendments clarify that an entity needs to consider whether tax law restricts the sources of taxable profits against which it may make deductions on the reversal of that deductible temporary difference. In addition, the amendments provide guidance on how an entity should determine future taxable profit and explain the circumstances in which taxable profit may include the recovery of some assets for more than their carrying amount.

We have applied the amendments retrospectively. However, the amendments have no impact on our unaudited consolidated interim financial statements as of and for the three months ended March 31, 2016 and 2017, as we have no deductible temporary differences related to the amendments.

**Critical Accounting Policies**

Accounting estimates are an integral part of the financial statements prepared by our management and are based upon our management's current judgments. See Note 2 of our audited consolidated financial statements as of and for the years ended December 31, 2015 and 2016 and Note 2 of the our unaudited consolidated interim financial statements as of and for the three months ended March 31, 2016 and 2017 included elsewhere in this Offering Circular for summaries of our significant accounting policies that are critical to the portrayal of our financial condition since they require our management to make difficult, complex or subjective judgments, some of which may relate to matters that are inherently uncertain, and because of the possibility that future events affecting these estimates may differ significantly from management's current judgment. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following represents our critical accounting policies.

***Useful Lives of Property, Plant and Equipment***

Property, plant and equipment are stated at cost. We do not depreciate land. Depreciation is computed by the straight-line method, using rates based on the estimated useful lives. Net property, plant and equipment as of

March 31, 2017 totaled Won 6,961 billion representing 78.1% of total assets. Given the significance of property, plant and equipment and the associated depreciation expense to our financial statements, the determination of an asset's economic useful life is considered to be a critical accounting estimate.

Economic useful life is the duration of time the asset is expected to be productively employed by us, which may be less than its physical life. Management's assumptions on the following factors, among others, affect the determination of estimated economic useful life: wear and tear, obsolescence, technical standards, changes in market demand and technological changes. We apply the following useful lives for our property, plant and equipment:

|  | Method | Estimated Useful Life |
| --- | --- | --- |
| Buildings | Straight-line | 12-34 |
| Structures | Straight-line | 22-30 |
| Machinery | Straight-line | 6-24 |
| Ships | Straight-line | 3-8 |
| Vehicles | Straight-line | 4 |
| Financial Lease Assets | Straight-line | 8-30 |
| Others | Straight-line | 4-5 |

Generally, useful life is estimated at the time the asset is acquired and is based on historical experience with similar assets and takes into account anticipated technological or other changes. If technological changes were to occur more rapidly than anticipated or in a different form than anticipated or the assets experienced unexpected levels of wear and tear, the useful lives assigned to these assets may need to be shortened, resulting in the recognition of increased depreciation expenses in future periods.

We capitalize interest costs and other financial charges on borrowings associated with the manufacture, purchase, or construction of utility plant, incurred prior to the completion of acquisition, as part of the cost of qualifying assets. The calculation of capitalized interest includes transaction differences arising from foreign currency borrowings to the extent that they are regarded as an adjustment to interest costs, which is limited to the extent of interest cost calculated by the weighted average interest rate of local currency borrowings.

We review utility plant assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss is recognized when the expected estimated undiscounted future net cash flows from the use of the asset and its eventual disposition are less than its carrying amount.

### Impairment of Long-lived Assets

At the end of each reporting period, we review the carrying amounts of our tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, we estimate the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired. Recoverable

Korea East-West Power Co., Ltd. and its subsidiaries
Notes to the interim condensed consolidated financial statements
March 31, 2017 and 2016

16.   Property, plant and equipment

The acquisition cost and net book value of property, plant and equipment as at March 31, 2017 and December 31, 2016 are as follows (Korean won):

| | Mar. 31, 2017 | | | |
|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Book value |
| Land | ₩   803,449,718,690 | ₩                 - | ₩                 - | ₩  803,449,718,690 |
| Buildings | 1,212,378,912,200 | (197,723,166) | (358,042,396,768) | 854,138,792,266 |
| Structures | 1,350,161,056,929 | - | (491,729,544,247) | 858,431,512,682 |
| Machinery | 6,270,772,500,340 | - | (2,201,761,725,555) | 4,069,010,774,785 |
| Vehicles | 11,370,898,224 | (1,083,334) | (9,921,926,008) | 1,447,888,882 |
| Finance lease assets | 340,797,142,769 | - | (171,527,027,070) | 169,270,115,699 |
| Furniture and fixtures | 83,598,147,585 | - | (46,851,986,446) | 36,746,161,139 |
| Tools and equipment | 16,582,111,100 | - | (13,723,135,329) | 2,858,975,771 |
| Construction-in-progress | 165,645,534,697 | - | - | 165,645,534,697 |
| | ₩10,254,756,022,534 | ₩(198,806,500) | ₩(3,293,557,741,423) | ₩6,960,999,474,611 |

| | Dec. 31, 2016 | | | |
|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Book value |
| Land | ₩   803,507,895,587 | ₩                 - | ₩                 - | ₩  803,507,895,587 |
| Buildings | 1,128,697,703,662 | (199,740,749) | (344,121,393,498) | 784,376,569,415 |
| Structures | 1,564,530,507,264 | - | (482,439,270,082) | 1,082,091,237,182 |
| Machinery | 6,272,787,778,095 | - | (2,108,852,550,400) | 4,163,935,227,695 |
| Vehicles | 11,494,704,945 | (1,208,334) | (9,805,936,306) | 1,687,560,305 |
| Finance lease assets | 340,839,646,769 | - | (167,186,666,539) | 173,652,980,230 |
| Furniture and fixtures | 81,242,919,247 | - | (45,012,647,397) | 36,230,271,850 |
| Tools and equipment | 16,780,126,850 | - | (13,626,887,663) | 3,153,239,187 |
| Construction-in-progress | 85,384,502,760 | - | - | 85,384,502,760 |
| | ₩10,305,265,785,179 | ₩(200,949,083) | ₩(3,171,045,351,885) | ₩7,134,019,484,211 |

**Korea East-West Power Co., Ltd. and its subsidiaries**
**Notes to the interim condensed consolidated financial statements**
**March 31, 2017 and 2016**

### 16. Property, plant and equipment (cont'd)

Changes in the net book value of property, plant and equipment for the three months ended March 31, 2017 and the year ended December 31, 2016 are as follows (Korean won):

**2017**

| | Jan. 1 | Addition | Disposal/disuse | Depreciation | Others | Mar. 31 |
|---|---|---|---|---|---|---|
| Land | ₩ 803,507,895,587 | 108,820,573 | (191,577,273) | ₩ - | 24,579,803 | ₩ 803,449,718,690 |
| Buildings | 784,576,310,164 | 2,297,017 | - | (14,124,450,832) | 83,882,359,083 | 854,336,515,432 |
| (Government grant) | (199,740,749) | - | - | 2,017,583 | - | (197,723,166) |
| Structures | 1,082,091,237,182 | - | - | (9,558,902,024) | (214,100,822,476) | 858,431,512,682 |
| Machinery | 4,163,935,227,695 | 2,889,876,688 | (1,049,917,372) | (95,345,148,763) | (1,419,263,463) | 4,069,010,774,785 |
| Vehicles | 1,688,768,639 | - | - | (209,997,244) | (29,799,179) | 1,448,972,216 |
| (Government grant) | (1,208,334) | - | - | 125,000 | - | (1,083,334) |
| Finance lease assets | 173,652,980,230 | - | - | (4,352,679,274) | (30,185,257) | 169,270,115,699 |
| Furniture and fixtures | 36,230,271,850 | - | (2,389,983) | (3,741,528,119) | 4,259,807,391 | 36,746,161,139 |
| Tools and equipment | 3,153,239,187 | - | (8,000) | (306,317,674) | 12,122,258 | 2,858,975,771 |
| Construction-in-progress (*) | 85,384,502,760 | 74,732,708,969 | - | - | 5,528,322,968 | 165,645,534,697 |
| | ₩ 7,134,019,484,211 | ₩ 77,733,703,247 | ₩ (1,243,892,628) | ₩ (127,636,941,347) | ₩ (121,872,878,872) | ₩ 6,960,999,474,611 |

**2016**

| | Jan. 1 | Addition | Disposal/disuse | Depreciation | Others | Dec. 31 |
|---|---|---|---|---|---|---|
| Land | ₩ 798,910,009,759 | ₩ 51,850,381 | ₩ (712,209,136) | ₩ - | ₩ 5,258,244,583 | ₩ 803,507,895,587 |
| Buildings | 552,068,094,375 | 77,601,948 | (623,137,447) | (44,499,634,558) | 277,553,385,846 | 784,576,310,164 |
| (Government grant) | (207,811,082) | - | - | 8,070,333 | - | (199,740,749) |
| Structures | 471,255,791,888 | 73,074,085 | (50,566,467) | (43,514,190,596) | 654,327,128,272 | 1,082,091,237,182 |
| Machinery | 2,349,082,324,296 | 15,195,953,058 | (2,985,905,967) | (384,251,731,526) | 2,186,894,587,834 | 4,163,935,227,695 |
| Vehicles | 1,739,960,891 | - | (2,000) | (840,973,180) | 789,782,928 | 1,688,768,639 |
| (Government grant) | (1,708,334) | - | - | 375,000 | 125,000 | (1,208,334) |
| Finance lease assets | 189,454,700,694 | - | - | (17,137,389,729) | 1,335,669,265 | 173,652,980,230 |
| Furniture and fixtures | 33,703,352,932 | 1,023,471,752 | (664,208) | (11,687,433,626) | 13,191,545,000 | 36,230,271,850 |
| Tools and equipment | 2,844,922,909 | 19,830,000 | (17,000) | (1,077,880,659) | 1,366,383,937 | 3,153,239,187 |
| Construction-in-progress (*) | 2,746,151,209,480 | 432,758,228,206 | - | - | (3,093,524,934,926) | 85,384,502,760 |
| | ₩ 7,115,000,847,808 | ₩ 449,200,009,430 | ₩ (4,372,502,225) | ₩ (503,000,788,541) | ₩ 47,191,917,739 | ₩ 7,134,019,484,211 |

(*)  As the final settlement for the power generator No.9 and No.10 at the Dangjin plant was made during this period, the related amount was replaced.

(*)  As the construction of the power generator No.9 and No.10 at the Dangjin plant has been completed in July and September 2016, related construction-in-progress has been reclassified to buildings, structures and machinery.

**Korea East-West Power Co., Ltd. and its subsidiaries**
**Notes to the interim condensed consolidated financial statements**
**March 31, 2017 and 2016**

### 17.  Goodwill

Details of goodwill as at March 31, 2017 and December 31, 2016 are as follows (Korean won):

|  | Mar. 31, 2017 | Dec. 31, 2016 |
|---|---|---|
| Acquisition cost | ₩ 7,657,891,350 | ₩ 8,291,875,008 |
| Accumulated impairment loss | - | - |
| Book value | ₩ 7,657,891,350 | ₩ 8,291,875,008 |

Changes in goodwill for the three months ended March 31, 2017 and for the year ended December 31, 2016 are as follows (Korean won):

|  | 2017 | 2016 |
|---|---|---|
| Jan. 1 | ₩ 8,291,875,008 | ₩ 8,041,437,740 |
| Effect on exchange rates change | (633,983,658) | 250,437,268 |
| Mar. 31, 2017 and Dec. 31, 2016 | ₩ 7,657,891,350 | ₩ 8,291,875,008 |

### 18.  Intangible assets excluding goodwill

Intangible assets as at March 31, 2017 and December 31, 2016 are as follows (Korean won):

|  | Mar. 31, 2017 | | | | |
|---|---|---|---|---|---|
|  | Acquisition cost | Government grant | Accumulated amortization | Accumulated impairment loss | Book value |
| Software | ₩ 39,551,757,035 | ₩ - | ₩ (32,691,053,804) | ₩ - | ₩ 6,860,703,231 |
| Industrial property rights | 100,212,971 | - | (62,640,779) | - | 37,572,192 |
| Intangible assets before amortization | 9,575,941,179 | (5,634,618,107) | - | (3,941,323,072) | - |
| Usable and profitable donated assets | 225,429,427,625 | - | (198,757,126,954) | - | 26,672,300,671 |
| Others | 115,606,585,595 | - | (2,202,850,900) | (143,032,540) | 113,260,702,155 |
|  | ₩ 390,263,924,405 | ₩ (5,634,618,107) | ₩ (233,713,672,437) | ₩ (4,084,355,612) | ₩ 146,831,278,249 |

F-29

**Korea East-West Power Co., Ltd. and its subsidiaries**
**Notes to the interim condensed consolidated financial statements**
**March 31, 2017 and 2016**

## 26.  Issued capital

Details of issued capital as at March 31, 2017 and December 31, 2016 are as follows (Korean won in units except for per value in units):

|  |  |  |  | Mar. 31, 2017 | | |
|  |  |  |  | | Owned by | |
| Share class | Number of shares authorized | Number of shares issued | Par value | Government | Non-government | Total |
|---|---|---|---|---|---|---|
| Ordinary stock | 100,000,000 | 57,932,221 | ₩ 5,000 | ₩ - | ₩ 289,661,105,000 | ₩ 289,661,105,000 |

|  |  |  |  | Dec. 31, 2016 | | |
|  |  |  |  | | Owned by | |
| Share class | Number of shares authorized | Number of shares issued | Par value | Government | Non-government | Total |
|---|---|---|---|---|---|---|
| Ordinary stock | 100,000,000 | 57,932,221 | ₩ 5,000 | ₩ - | ₩ 289,661,105,000 | ₩ 289,661,105,000 |

There are no changes in the number of shares outstanding during the three months ended March 31, 2017 and the year ended December 31, 2016.

Details of share premium as at March 31, 2017 and December 31, 2016 are as follows (Korean won):

|  | Mar. 31, 2017 | Dec. 31, 2016 |
|---|---|---|
| Share premium | ₩ 1,928,937,669,310 | ₩ 1,928,937,669,310 |

## 27.  Retained earnings and dividends

Details of retained earnings as at March 31, 2017 and December 31, 2016 are as follows (Korean won):

|  | Mar. 31, 2017 | Dec. 31, 2016 |
|---|---|---|
| Legal reserves (*) | ₩ 59,534,482,040 | ₩ 49,437,482,040 |
| Voluntary reserves | 1,323,397,548,406 | 960,224,363,765 |
| Unappropriated retained earnings | 1,103,588,875,481 | 1,331,134,530,045 |
|  | ₩ 2,486,520,905,927 | ₩ 2,340,796,375,850 |

(*)   In accordance with the *Commercial Law*, an amount equal to at least 10% of cash dividend for each accounting period is required to be appropriated as a legal reserve until the reserve equals 50% of issued capital. The legal reserve cannot be used as a source for cash dividends and may be used to offset an accumulated deficit.

Details of voluntary reserves as at March 31, 2017 and December 31, 2016 are as follows (Korean won):

|  | Mar. 31, 2017 | Dec. 31, 2016 |
|---|---|---|
| Reserve for business expansion | ₩ 1,319,997,548,406 | ₩ 953,524,363,765 |
| Reserve for research and human resource development (*) | 3,400,000,000 | 6,700,000,000 |
|  | ₩ 1,323,397,548,406 | ₩ 960,224,363,765 |

F-40

**Korea East-West Power Co., Ltd. and its subsidiaries**
**Notes to the interim condensed consolidated financial statements**
**March 31, 2017 and 2016**

**27.  Retained earnings and dividends (cont'd)**

(*)    Pursuant to the revised *Tax Incentive Limitation Law*, the reserve for research and human development are provided in order to obtain tax benefits with respect the year for which the appropriations are proposed. These reserves may be utilized for cash dividends after the expiration of the specified grace period.

Changes in retained earnings for the three months ended March 31, 2017 and the year ended December 31, 2016 are as follows (Korean won):

|  | 2017 | 2016 |
|---|---|---|
| Beginning | ₩  2,340,796,375,850 | ₩  1,942,014,791,243 |
| Profit for the year | 240,182,500,678 | 457,188,466,617 |
| Dividend paid | (94,429,520,230) | (67,906,467,600) |
| Re-measurement gain (loss) on defined benefit plans | (38,234,012) | 9,741,693,236 |
| Changes in retained earnings in equity method | 9,783,641 | (242,107,646) |
| Ending | ₩  2,486,520,905,927 | ₩  2,340,796,375,850 |

Details of cash dividends declared for the three months ended March 31, 2017 and 2016 are as follows and dividends are recorded as dividends payable as at March 31, 2017 and 2016 (Korean won except for shares and dividend per share):

| Share class | Mar. 31, 2017 | | | | |
|---|---|---|---|---|---|
|  | Number of shares issued | Number of treasury shares | Number of dividend share | Dividends per share | Total dividends |
| Ordinary stock | 57,932,221 | - | 57,932,221 | ₩  1,630 | ₩  94,429,520,230 |

| Share class | Mar. 31, 2016 | | | | |
|---|---|---|---|---|---|
|  | Number of shares issued | Number of treasury shares | Number of dividend share | Dividends per share | Total dividends |
| Ordinary stock | 56,588,723 | - | 56,588,723 | ₩  1,200 | ₩  67,906,467,600 |

Changes in re-measurement of the net defined benefit liability for the three months ended March 31, 2017 and the year ended December 31, 2016 are as follows (Korean won):

|  | 2017 | 2016 |
|---|---|---|
| Beginning | ₩  (19,031,849,870) | ₩  (28,773,543,106) |
| Changes for the year | (50,440,649) | 12,851,838,042 |
| Tax effect | 12,206,637 | (3,110,144,806) |
| Ending | ₩  (19,070,083,882) | ₩  (19,031,849,870) |

PUBLIC VERSION

Exhibit 8

PUBLIC VERSION

**OFFERING CIRCULAR**

**CONFIDENTIAL**



**US$5,000,000,000**

# KOREA HYDRO & NUCLEAR POWER CO., LTD.

*(incorporated with limited liability under the laws of the Republic of Korea)*

## Global Medium Term Note Program

This offering circular (the "**Offering Circular**") replaces and supersedes in its entirety the previous offering circular dated July 3, 2017 describing the US$5,000,000,000 Global Medium Term Note Program (the "**Program**", as amended, supplemented or restated) of Korea Hydro & Nuclear Power Co., Ltd. (the "**Issuer**" or the "**Company**"). Any Notes (as defined below) issued under the Program on or after the date of this Offering Circular are issued subject to the provisions described herein. Under the Program, the Company may from time to time issue notes (the "**Notes**") denominated in any currency agreed between the Issuer and the relevant Dealer (as defined below).

The Notes may be issued in bearer or registered form (respectively "**Bearer Notes**" and "**Registered Notes**"). The maximum aggregate nominal amount of all Notes from time to time outstanding under the Program will not exceed US$5,000,000,000 (or its equivalent in other currencies calculated as described herein), subject to increase as described herein.

The Notes may be issued on a continuing basis to one or more of the Dealers specified under "*Summary*" and any additional Dealer appointed under the Program from time to time by the Issuer (each a "**Dealer**" and together the "**Dealers**"), which appointment may be for a specific issue or on an ongoing basis. References in this Offering Circular to the "relevant Dealer" shall, in the case of an issue of Notes being (or intended to be) subscribed by more than one Dealer, be to all Dealers agreeing to purchase such Notes.

Approval in-principle has been received from the Singapore Exchange Securities Trading Limited (the "**SGX-ST**") in connection with the Program and application will be made for the listing and quotation of Notes that may be issued under the Program, which Notes are agreed, at or prior to the time of issue thereof, to be so listed on the SGX-ST. Such permission will be granted when such Notes have been admitted for listing and quotation on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this Offering Circular. Approval in-principle from, admission to the Official List of, and the listing and quotation of any Notes on, the SGX-ST are not to be taken as an indication of the merits of the Issuer, the Program or the Notes.

Notice of the aggregate nominal amount of Notes, interest (if any) payable in respect of Notes, the issue price of Notes and any other terms and conditions not contained herein which are applicable to each Tranche (as defined under "*Terms and Conditions of the Notes*") of Notes will be set out in a pricing supplement (the "**Pricing Supplement**") which, with respect to Notes to be listed on the SGX-ST, will be submitted to the SGX-ST before the date of listing of the Notes of such Tranche.

The Program provides that Notes may be listed on such other or further stock exchange(s) as may be agreed between the Issuer and the relevant Dealer. The Issuer may also issue unlisted Notes.

Investing in the Notes involves certain risks that are described in the "*Risk Factors*" section beginning on page 59 of this Offering Circular.

---

The Notes of each Series will be in either bearer form, with or without interest coupons attached, or registered form, without interest coupons attached. Bearer Notes will be issued only outside the United States to non-U.S. persons in reliance on the exemption from registration provided by Regulation S under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and Registered Notes may be issued both outside the United States to non-U.S. persons in reliance on the exemption from registration provided by Regulation S and within the United States or to U.S. persons in private transactions (i) to "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act ("**QIBs**") or (ii) to "accredited investors" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that are institutions ("**Institutional Accredited Investors**") who agree to purchase the Notes for their own account and not with a view to the distribution thereof. Bearer Notes are subject to U.S. tax law requirements. Subject to certain exceptions, the Notes may not be offered or sold, or in the case of Bearer Notes delivered, in the United States or its possessions or to, or for the benefit of, U.S. persons (as defined in Regulation S under the Securities Act or, in the case of Bearer Notes, the U.S. Internal Revenue Code of 1986, as amended (the "**Code**")). See "*Form of the Notes*" for more description of the manner in which Notes will be issued. Notes are subject to certain restrictions on transfer. See "*Subscription and Sale and Transfer and Selling Restrictions*."

---

The Issuer may agree with any Dealer that Notes may be issued in a form not contemplated by the Terms and Conditions of the Notes herein, in which event (in the case of Notes intended to be listed on the SGX-ST) a supplementary Offering Circular, if appropriate, will be submitted to the SGX-ST and made available which will describe the effect of the agreement reached in relation to such Notes.

*Arranger*

**Citigroup**

*Dealers*

| | |
|---|---|
| **BofA Merrill Lynch** | **BNP PARIBAS** |
| **Citigroup** | **HSBC** |
| **Goldman Sachs International** | **Morgan Stanley** |
| **J.P. Morgan** | **UBS** |
| | **Standard Chartered Bank** |

---

The date of this Offering Circular is July 12, 2018.

## TABLE OF CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

FORM OF THE NOTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

TERMS AND CONDITIONS OF THE NOTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

USE OF PROCEEDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

EXCHANGE RATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

CAPITALIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76

SELECTED FINANCIAL DATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
    RESULTS OF OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80

THE KOREAN ELECTRICITY INDUSTRY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   96

BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  106

MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  131

RELATED PARTY TRANSACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  135

TAXATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  136

BOOK-ENTRY CLEARANCE SYSTEMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  149

SUBSCRIPTION AND SALE AND TRANSFER AND SELLING RESTRICTIONS . . . . . . . .  153

GENERAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  165

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . .  F-1

———————————

In connection with the issue of any Tranche of Notes, the Dealer or Dealers (if any) named as the Stabilizing Manager(s) (or persons acting on behalf of any Stabilizing Manager(s)) in the applicable Pricing Supplement may over-allot Notes or effect transactions with a view to supporting the market price of the Notes at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilizing Manager(s) (or persons acting on behalf of a Stabilizing Manager) will undertake stabilization action. Any stabilization action may begin on or after the date on which adequate public disclosure of the terms of the offer of the relevant Tranche of Notes is made and, if begun, may be ended at any time, but it must end (unless otherwise indicated in the applicable Pricing Supplement) no later than the earlier of 30 days after the issue date of the relevant Tranche of Notes and 60 days after the date of the allotment of the relevant Tranche of Notes. Any stabilization action or over-allotment must be conducted by the relevant Stabilizing Manager(s) (or person(s) acting on behalf of any Stabilizing Manager(s)) in accordance with all applicable laws and rules.

# INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Page

INDEPENDENT AUDITORS' REVIEW REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-2

UNAUDITED CONDENSED CONSOLIDATED INTERIM STATEMENTS OF
FINANCIAL POSITION AS OF MARCH 31, 2018 AND DECEMBER 31, 2017 . . . . .     F-4

UNAUDITED CONDENSED CONSOLIDATED INTERIM STATEMENTS OF
COMPREHENSIVE INCOME FOR THE THREE-MONTH PERIODS ENDED
MARCH 31, 2018 AND 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-6

UNAUDITED CONDENSED CONSOLIDATED INTERIM STATEMENTS OF
CHANGES IN EQUITY FOR THE THREE-MONTH PERIODS ENDED MARCH 31,
2018 AND 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-8

UNAUDITED CONDENSED CONSOLIDATED INTERIM STATEMENTS OF CASH
FLOWS FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2018 AND
2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-10

NOTES TO UNAUDITED CONDENSED CONSOLIDATED INTERIM FINANCIAL
STATEMENTS FOR THE THREE-MONTH PERIODS ENDED MARCH 31, 2018
AND 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-13

INDEPENDENT AUDITORS' REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-107

CONSOLIDATED STATEMENTS OF FINANCIAL POSITION AS OF DECEMBER 31,
2017 AND 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-109

CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME FOR THE YEARS
ENDED DECEMBER 31, 2017 AND 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-111

CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY FOR THE YEARS
ENDED DECEMBER 31, 2017 AND 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-113

CONSOLIDATED STATEMENTS OF CASH FLOWS FOR THE YEARS ENDED
DECEMBER 31, 2017 AND 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-115

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED
DECEMBER 31, 2017 AND 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-119

INDEPENDENT AUDITORS' REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-232

CONSOLIDATED STATEMENTS OF FINANCIAL POSITION
AS OF DECEMBER 31, 2016 AND 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-234

CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME FOR
THE YEARS ENDED DECEMBER 31, 2016 AND 2015 . . . . . . . . . . . . . . . . . . . . . .     F-236

CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY
FOR THE YEARS ENDED DECEMBER 31, 2016 AND 2015 . . . . . . . . . . . . . . . . . .     F-238

CONSOLIDATED STATEMENTS OF CASH FLOWS FOR THE YEARS
ENDED DECEMBER 31, 2016 AND 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-240

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS
ENDED DECEMBER 31, 2016 AND 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     F-244

In addition to capital expenditures related to the construction of power generation assets, we also incur significant cash expenditures following the establishment by the Government of KORAD, a separate corporate entity responsible for nuclear waste management, as a result of which we pay fees to KORAD for the disposal of low- and intermediate- level radioactive waste and spent fuel. See "*Business — Nuclear Safety Research and Development — Nuclear Waste Management.*"

Unexpected or prolonged shutdowns of our nuclear generation units may result in a significant loss of revenue. For example, following multiple earthquakes in Gyeongju city in September 2016, four nuclear generation units at the Wolsong site were shut down for approximately three months as part of a preventive and safety assurance program although these units were not directly affected by the earthquakes. Since then, we have engaged in more frequent and vigorous safety and maintenance inspections and improvement works across our nuclear generation units, which have depressed our utilization rates. The breakdown, failure or suspension of operation of a nuclear generation unit could result in a material loss of revenues and/or additional repair and maintenance costs, greater risk of litigation and increased social and political hostility to the use of nuclear power, which could have a material adverse impact on our reputation, business and results of operation and could lead to a decline in the market value of the Notes. See "*Risk Factors — Risk Relating to Our Business — Inherent in the operation of nuclear power generation facilities are numerous hazards and risks, any of which could result in a material loss of revenues or increased expenses.*"

We have established a provision for decommissioning costs related to nuclear plant operation (which costs principally consist of (i) costs related to spent fuel, (ii) costs related to radioactive waste, and (iii) costs related to dismantling nuclear plants) as a liability since 1983. The decommissioning costs of nuclear facilities are estimated based on the study by the Cost Determination Committee established by the MOTIE and as provided under the Radioactive-Waste Management Act, and are adjusted annually. The decommissioning costs are reviewed by the MOTIE every two years and the MOTIE is required to issue, every two years, guidelines relating to the accounting treatment of decommissioning, which we are required to adopt. The estimated decommissioning costs increased in 2017 based on the 2016 MOTIE guidelines as well as in consideration of overseas cases of decommissioning, inflation rate assumptions, changes in the operating environment and other criteria. We believe that the guidelines adopted to-date capture the substantial majority of the accounting adjustments required in connection with determining decommissioning costs and liabilities. As of March 31, 2018, we have accrued Won 15,962 billion for the cost of dismantling and decontaminating existing nuclear power plants, which consists of dismantling costs of nuclear plants of Won 13,099 billion and dismantling costs of spent fuel and radioactive waste of Won 2,863 billion. As of March 31, 2018, we hold Won 763 billion in beneficiary securities exclusively for the payment of decommissioning costs, which is the estimated cost of decommissioning one nuclear plant, and plan to maintain a similar amount of reserve going forward. See also "*Business — Nuclear Safety — Decommissioning" and "— Critical Accounting Policies — Retirement of Tangible Assets.*"

The adjusted coefficient is one of the factors in determining the price of electricity sold by us to KEPCO and is reset from time to time. The adjusted coefficient applicable to electricity generated from nuclear fuels was adjusted upwards in 2016, which contributed to an increase in our revenue in 2016 compared to 2015, and downwards in 2017, which contributed to a decrease in our revenue in 2017 compared to 2016.

**Recent Accounting Changes**

Starting from January 1, 2018, we have adopted K-IFRS No. 1109 'Financial Instruments" and K-IFRS No. 1115 'Revenue from Contracts with Customers.' See note 3(w) to our unaudited condensed consolidated interim financial statements as of March 31, 2018 and for the three months ended March 31, 2017 and 2018 included elsewhere in the Offering Circular.

KOREA HYDRO & NUCLEAR POWER CO., LTD. AND SUBSIDIARIES
Notes to the Consolidated Financial Statements, Continued
December 31, 2017

14. Property, Plant and Equipment

(a) Property, plant and equipment as of December 31, 2017 and 2016 are as follows:

(i) December 31, 2017

| (In millions of won) | Acquisition cost | Government grants | Accumulated depreciation | Carrying amount |
|---|---|---|---|---|
| Land | ₩ 2,528,803 | - | - | 2,528,803 |
| Buildings | 7,192,597 | (102) | (2,469,237) | 4,723,258 |
| Structures | 4,615,482 | (10,658) | (1,776,162) | 2,828,662 |
| Machineries | 22,532,048 | (15,011) | (8,774,888) | 13,742,149 |
| Ships | 1,965 | - | (1,566) | 399 |
| Vehicles | 38,184 | (249) | (31,181) | 6,754 |
| Fixtures and furniture | 447,492 | (284) | (322,413) | 124,795 |
| Tools | 375,615 | (784) | (310,316) | 64,515 |
| Construction-in-progress | 12,973,467 | - | - | 12,973,467 |
| Finance lease assets | 965,793 | - | (269,732) | 696,061 |
| Asset retirement costs | 9,137,989 | - | (3,186,978) | 5,951,011 |
| Loaded nuclear fuels | 11,497,725 | - | (9,076,210) | 2,421,515 |
| | ₩ 72,307,160 | (27,088) | (26,218,683) | 46,061,389 |

(ii) December 31, 2016

| (In millions of won) | Acquisition cost | Government grants | Accumulated depreciation | Carrying amount |
|---|---|---|---|---|
| Land | ₩ 2,443,574 | - | - | 2,443,574 |
| Buildings | 7,359,515 | (120) | (2,144,223) | 5,215,172 |
| Structures | 4,445,615 | (11,250) | (1,579,662) | 2,854,703 |
| Machineries | 21,782,541 | (17,056) | (7,468,645) | 14,296,840 |
| Ships | 1,965 | - | (1,462) | 503 |
| Vehicles | 32,896 | - | (28,028) | 4,868 |
| Fixtures and furniture | 395,578 | (324) | (278,156) | 117,098 |
| Tools | 340,250 | (279) | (288,031) | 51,940 |
| Construction-in-progress | 11,538,394 | - | - | 11,538,394 |
| Finance lease assets | 908,456 | - | (237,204) | 671,252 |
| Asset retirement costs | 6,869,769 | - | (2,906,423) | 3,963,346 |
| Loaded nuclear fuels | 10,589,945 | - | (8,246,512) | 2,343,433 |
| | ₩ 66,708,498 | (29,029) | (23,178,346) | 43,501,123 |

PUBLIC VERSION

Exhibit 9

PUBLIC VERSION

**OFFERING CIRCULAR**                                                   **CONFIDENTIAL**



# Korea Western Power Co., Ltd.

*(incorporated with limited liability under the laws of the Republic of Korea)*

## U.S.$2,000,000,000
## Global Medium Term Note Program

———————————

This offering circular (the "Offering Circular") replaces and supersedes in its entirety the previous offering circular dated September 5, 2014 describing the U.S.$2,000,000,000 Global Medium Term Note Program (the "Program") of Korea Western Power Co., Ltd. (the "Issuer" or the "Company"). Any Notes (as defined below) issued under the Program on or after the date of this Offering Circular are issued subject to the provisions described herein. Under the Program, the Issuer may from time to time issue notes (the "Notes") denominated in any currency agreed between the Issuer and the relevant Dealer (as defined below).

The Notes may be issued in bearer or registered form (respectively "Bearer Notes" and "Registered Notes"). The maximum aggregate nominal amount of all Notes from time to time outstanding under the Program will not exceed U.S.$2,000,000,000 (or its equivalent in other currencies calculated as described herein), subject to increase as described herein.

The Notes may be issued on a continuing basis to one or more of the Dealers specified under "*Summary*" and any additional Dealer appointed under the Program from time to time by the Issuer (each, a "Dealer" and together, the "Dealers"), which appointment may be for a specific issue or on an ongoing basis. References in this Offering Circular to the "relevant Dealer" shall, in the case of an issue of Notes being (or intended to be) subscribed by more than one Dealer, be to all Dealers agreeing to purchase such Notes.

Approval in-principle has been received from the Singapore Exchange Securities Trading Limited (the "SGX-ST") in connection with the Program and application will be made for the listing and quotation of Notes that may be issued pursuant to the Program, which Notes are agreed, at or prior to the time of issue thereof, to be so listed on the SGX-ST. Such permission will be granted when such Notes have been admitted for listing and quotation on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this Offering Circular. Approval in-principle from, admission to the Official List of, and the listing and quotation of any Notes on, the SGX-ST are not to be taken as an indication of the merits of the Issuer, the Program or the Notes.

Notice of the aggregate nominal amount of Notes, interest (if any) payable in respect of Notes, the issue price of Notes and any other terms and conditions not contained herein which are applicable to each Tranche (as defined under "*Terms and Conditions of the Notes*") of Notes will be set out in a pricing supplement (the "Pricing Supplement") which, with respect to Notes to be listed on the SGX-ST, will be delivered to the SGX-ST before the date of listing of the Notes of such Tranche.

The Program provides that Notes may be listed on such other or further stock exchange(s) as may be agreed between the Issuer and the relevant Dealer. The Issuer may also issue unlisted Notes.

Investing in the Notes involves certain risks that are described in the "*Risk Factors*" section beginning on page 63 of this Offering Circular.

The Notes of each Series will be in either bearer form, with or without interest coupons attached, or registered form, without interest coupons attached. Bearer Notes will be issued only outside the United States to non-U.S. persons in reliance on the exemption from registration provided by Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and Registered Notes may be issued both outside the United States to non-U.S. persons in reliance on the exemption from registration provided by Regulation S and within the United States or to U.S. persons in private transactions (i) to "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act ("QIBs") or (ii) to "accredited investors" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that are institutions ("Institutional Accredited Investors") who agree to purchase the Notes for their own account and not with a view to the distribution thereof. Bearer Notes are subject to U.S. tax law requirements. Subject to certain exceptions, the Notes may not be offered or sold, or in the case of Bearer Notes delivered, in the United States or its possessions or to, or for the benefit of, U.S. persons (as defined in Regulation S under the Securities Act or, in the case of Bearer Notes, the U.S. Internal Revenue Code of 1986, as amended (the "Code")). See "Form of the Notes" for additional description of the manner in which Notes will be issued. Notes are subject to certain restrictions on transfer. See "Subscription and Sale and Transfer and Selling Restrictions."

The Issuer may agree with any Dealer that Notes may be issued in a form not contemplated by the Terms and Conditions of the Notes herein, in which event (in the case of Notes intended to be listed on the SGX-ST) a supplementary Offering Circular, if appropriate, will be submitted to the SGX-ST and made available which will describe the effect of the agreement reached in relation to such Notes.

———————————

*Arranger*

**Citigroup**

*Dealers*

**BNP PARIBAS**              **Citigroup**              **HSBC**

———————————

The date of this Offering Circular is May 29, 2018.

## TABLE OF CONTENTS

|  | Pages |
| --- | --- |
| SUMMARY | 1 |
| FORM OF THE NOTES | 7 |
| TERMS AND CONDITIONS OF THE NOTES | 26 |
| USE OF PROCEEDS | 61 |
| EXCHANGE RATES | 62 |
| RISK FACTORS | 63 |
| CAPITALIZATION | 80 |
| SELECTED FINANCIAL AND OTHER DATA | 81 |
| THE KOREAN ELECTRICITY INDUSTRY | 84 |
| BUSINESS | 93 |
| MANAGEMENT | 117 |
| TAXATION | 121 |
| BOOK-ENTRY CLEARANCE SYSTEMS | 134 |
| SUBSCRIPTION AND SALE AND TRANSFER AND SELLING RESTRICTIONS | 138 |
| GENERAL INFORMATION | 149 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |

———————————————

In connection with the issue of any Tranche of Notes, the Dealer or Dealers (if any) named as the Stabilizing Manager(s) (or person(s) acting on behalf of any Stabilizing Manager(s)) in the applicable Pricing Supplement may over-allot Notes or effect transactions with a view to supporting the market price of the Notes at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilizing Manager(s) (or person(s) acting on behalf of the Stabilizing Managers) will undertake stabilization action. Any stabilization action may begin on or after the date on which adequate public disclosure of the terms of the offer of the relevant Tranche of Notes is made and, if begun, may be ended at any time, but it must end (unless otherwise indicated in the applicable pricing supplement) no later than the earlier of 30 days after the issue date of the relevant Tranche of Notes and 60 days after the date of the allotment of the relevant Tranche of Notes. Any stabilization action or over-allotment must be conducted by the relevant Stabilizing Manager(s) (or person(s) acting on behalf of any Stabilizing Manager(s)) in accordance with all applicable laws and rules.

## INDEX TO FINANCIAL STATEMENTS

*Page*

Independent Auditors' Review Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-2

Condensed Consolidated Interim Statements of Financial Position as of March 31, 2018 and
    March 31, 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-4

Condensed Consolidated Interim Statements of Comprehensive Income for the three months
    ended March 31, 2018 and 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-6

Condensed Consolidated Interim Statements of Changes in Equity for the three months ended
    March 31, 2018 and 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-7

Condensed Consolidated Interim Statements of Cash Flows for the three months ended March
    31, 2018 and 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-9

Notes to the Condensed Consolidated Interim Financial Statements . . . . . . . . . . . . . . . . . . . .    F-11

Independent Auditors' Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-76

Consolidated Statements of Financial Position as of December 31, 2017 and 2016 . . . . . . . .    F-78

Consolidated Statements of Comprehensive Income for the years ended December 31, 2017 and
    2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-80

Consolidated Statements of Changes in Equity for the years ended December 31, 2017 and
    2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-81

Consolidated Statements of Cash Flows for the years ended December 31, 2017 and 2016 . .    F-83

Notes to the Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-85

Independent Auditors' Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-168

Consolidated Statements of Financial Position as of December 31, 2016 and 2015 . . . . . . . .    F-170

Consolidated Statements of Comprehensive Income for the years ended December 31, 2016 and
    2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-172

Consolidated Statements of Changes in Equity for the years ended December 31, 2016 and
    2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-174

Consolidated Statements of Cash Flows for the years ended December 31, 2016 and 2015 . .    F-176

Notes to the Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-178

PUBLIC VERSION

KOREA WESTERN POWER CO., LTD. AND SUBSIDIARIES
Notes to the Consolidated Financial Statements
**For the years ended December 31, 2017 and 2016**

**16.  Property, Plant and Equipment**

(1) Property, plant and equipment as of December 31, 2017 and 2016 are as follows:

(i) As of December 31, 2017

*In millions of won*

| | | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment loss | Book value |
|---|---|---:|---:|---:|---:|---:|
| Land | ₩ | 627,949 | - | - | (443) | 627,949 |
| Buildings | | 1,488,451 | (7,126) | (399,495) | (443) | 1,081,387 |
| Structures | | 1,300,266 | (5,349) | (446,233) | (59) | 848,625 |
| Machinery | | 7,878,483 | (67,979) | (2,633,925) | (39,148) | 5,137,431 |
| Vehicles | | 8,401 | (13) | (6,969) | - | 1,419 |
| Equipment | | 98,377 | (258) | (66,250) | (6) | 31,863 |
| Tools | | 28,543 | (175) | (22,333) | - | 6,035 |
| Construction-in-progress | | 183,354 | (11,015) | - | (35,094) | 137,245 |
| Finance lease assets | | 326,013 | (26) | (82,792) | - | 243,195 |
| | ₩ | 11,939,837 | (91,941) | (3,657,997) | (74,750) | 8,115,149 |

(ii) As of December 31, 2016

*In millions of won*

| | | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment loss | Book value |
|---|---|---:|---:|---:|---:|---:|
| Land | ₩ | 627,556 | - | - | - | 627,556 |
| Buildings | | 1,385,484 | (764) | (337,205) | - | 1,047,515 |
| Structures | | 1,266,914 | - | (403,190) | - | 863,724 |
| Machinery | | 6,722,334 | (51) | (2,180,083) | - | 4,542,200 |
| Vehicles | | 8,275 | (13) | (6,205) | - | 2,057 |
| Equipment | | 91,129 | (73) | (57,036) | - | 34,020 |
| Tools | | 27,160 | - | (19,831) | - | 7,329 |
| Construction-in-progress | | 916,031 | (101,834) | - | (35,094) | 779,103 |
| Finance lease assets | | 320,937 | - | (70,074) | - | 250,863 |
| | ₩ | 11,365,820 | (102,735) | (3,073,624) | (35,094) | 8,154,367 |

Exhibit 10

**OFFERING CIRCULAR**                                                                                          **STRICTLY CONFIDENTIAL**



# KOREA MIDLAND POWER CO., LTD.
*(incorporated with limited liability under the laws of the Republic of Korea)*

### US$3,000,000,000 Euro Medium Term Notes Programme

This Offering Circular is prepared in relation to Korea Midland Power Co., Ltd. (the "**Company**" or the "**Issuer**")'s US$3,000,000,000 Euro Medium Term Note Programme (the "**Programme**", as amended, supplemented or restated) which is established on the date herein. Any Notes (as defined below) issued under the Programme on or after the date of this Offering Circular are issued subject to the provisions described herein.

Under the Programme, the Company may from time to time issue notes in bearer and/or registered form (respectively, "**Bearer Notes**" and "**Registered Notes**" and, together, the "**Notes**" which expression shall include Senior Notes (each as defined herein)) denominated in any currency agreed between the Company and the relevant Dealer (as defined below).

The maximum aggregate nominal amount of all Notes from time to time outstanding under the Programme will not exceed US$2,000,000,000 (or its equivalent in other currencies calculated as described herein). The Notes may be issued on a continuing basis to one or more of the dealers specified under "*Summary of the Programme*" and any additional dealer appointed under the Programme from time to time, which appointment may be for a specific issue or on an ongoing basis (each a "**Dealer**" and together the "**Dealers**"). References in this Offering Circular to the "relevant Dealer" shall, in the case of an issue of Notes being (or intended to be) subscribed by more than one Dealer, be to all Dealers agreeing to purchase such Notes.

Approval in-principle has been received from the Singapore Exchange Securities Trading Limited (the "**SGX-ST**") in connection with the Programme and application will be made for the listing and quotation of Notes that may be issued pursuant to the Programme and which are agreed at or prior to the time of issue thereof to be so listed on the SGX-ST. Such permission will be granted when such Notes have been admitted for listing and quotation on SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained herein. Approval in-principle from, admission to the Official List of, and listing and quotation of any of the Notes on, the SGX-ST are not to be taken as an indication of the merits of the Company, the Programme or the Notes. Notice of the aggregate nominal amount of Notes, interest (if any) payable in respect of Notes, the issue price of Notes and any other terms and conditions not contained herein which are applicable to each tranche of Notes will be set out in a pricing supplement (the "**Pricing Supplement**") which, with respect to Notes to be listed on the SGX-ST, will be submitted to the SGX-ST before the date of listing of the Notes of such tranche.

The Notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended, (the "**Securities Act**") or with any securities regulatory authority of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the Securities Act ("**Regulation S**")) except pursuant to an exemption from the registration requirements of the Securities Act. Bearer Notes are subject to U.S. tax law requirements and may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons (as defined in the U.S. Internal Revenue Code of 1986, as amended, and regulations thereunder (the "**Code**")). For a description of these and other restrictions on transfer, see "Subscription and Sale and Selling Restrictions".

In addition, if the Pricing Supplement (as defined in the Offering Circular) in respect of any Notes includes a legend entitled "*Prohibition of Sales to EEA Retail Investors*", the Notes are not intended, from the date of application of Regulation (EU) No 1286/2014 (the "**PRIIPs Regulation**"), to be offered, sold or otherwise made available to and, with effect from such date, should not be offered, sold or otherwise made available to any retail investor in the European Economic Area ("**EEA**"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU ("**MiFID II**"); (ii) a customer within the meaning of Directive 2002/92/EC ("**IMD**"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in Directive 2003/71/EC (as amended, the "Prospectus Directive"). Consequently no key information document required by the PRIIPs Regulation for offering or selling the Notes or otherwise making them available to retail investors in the EEA has been prepared and therefore offering or selling the Notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPS Regulation.

The Company may agree with any Dealer that Notes may be issued in a form not contemplated by the Terms and Conditions of the Notes herein, in which event a supplementary Offering Circular, if appropriate, will be made available which will describe the effect of the agreement reached in relation to such Notes.

See "*Risk Factors*" beginning on page 10 for a discussion of certain factors to be considered in connection with an investment in the Notes.

*Arranger*
**Nomura**

*Dealers*

| | | | |
|---|---|---|---|
| **BNP PARIBAS** | **Crédit Agricole CIB** | **Morgan Stanley** | **Société Générale Corporate & Investment Banking** |

The date of this Offering Circular is 20 October 2017.

# CONTENTS

**Page**

SUMMARY ...................................................................................................................... 2

SUMMARY OF THE PROGRAMME ................................................................................ 4

SUMMARY FINANCIAL INFORMATION ........................................................................ 8

RISK FACTORS .............................................................................................................. 10

USE OF PROCEEDS ...................................................................................................... 23

EXCHANGE RATES ........................................................................................................ 24

CAPITALIZATION ........................................................................................................... 25

THE KOREAN ELECTRICITY INDUSTRY ..................................................................... 26

SELECTED FINANCIAL AND OTHER DATA ................................................................. 33

BUSINESS ...................................................................................................................... 36

TERMS AND CONDITIONS OF THE NOTES ................................................................ 58

FORM OF PRICING SUPPLEMENT ............................................................................... 82

SUMMARY OF PROVISIONS RELATING TO THE NOTES WHILE IN GLOBAL FORM ............. 92

FORM OF THE NOTES ................................................................................................... 94

KOREAN TAXATION ....................................................................................................... 100

CLEARANCE AND SETTLEMENT ................................................................................. 103

SUBSCRIPTION AND SALE ........................................................................................... 104

LEGAL MATTERS ........................................................................................................... 109

INDEPENDENT AUDITORS ............................................................................................ 110

INDEX TO FINANCIAL STATEMENTS ........................................................................... F-1

## INDEX TO FINANCIAL STATEMENTS

|  | *Page* |
|---|---|
| **Independent Auditors' Review Reports** | F-2 |
| **Condensed Consolidated Interim Statements of Financial Position as of June 30, 2017 and December 31, 2016** | F-4 |
| **Condensed Consolidated Interim Statements of Comprehensive Income (Loss) for the three and six-month periods ended June 30, 2017 and 2016** | F-6 |
| **Condensed Consolidated Interim Statements of Changes in Equity for the six-month period ended June 30, 2016** | F-7 |
| **Condensed Consolidated Interim Statements of Cash Flows for the six-month periods ended June 30, 2017 and 2016** | F-9 |
| **Notes to the Unaudited Condensed Consolidated Interim Financial Statements** | F-11 |
| **Independent Auditors' Report** | F-79 |
| **Consolidated Statements of Financial Position as of December 31, 2016 and 2015** | F-81 |
| **Consolidated Statements of Comprehensive Income for the years ended December 31, 2016 and 2015** | F-83 |
| **Consolidated Statements of Changes in Equity for the year ended December 31, 2015** | F-84 |
| **Consolidated Statements of Cash Flows for the years ended December 31, 2016 and 2015** | F-86 |
| **Notes to the Consolidated Financial Statements** | F-88 |

## KOREA MIDLAND POWER CO., LTD. AND SUBSIDIARIES
## Notes to the Condensed Consolidated Interim Financial Statements
**June 30, 2017 and 2016**
(Unaudited)

### 14. Property, Plant and Equipment

(1) Property, plant and equipment as of June 30, 2017 and December 31, 2016 are as follows:

*In millions of won*

| | | June 30, 2017 | | | | |
|---|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses | Book value |
| Land | ₩ | 763,390 | - | - | - | 763,390 |
| Buildings | | 1,038,188 | (19,568) | (370,055) | - | 648,565 |
| Structures | | 962,451 | - | (311,321) | - | 651,130 |
| Machinery | | 5,647,439 | (7,536) | (2,366,439) | (23) | 3,273,441 |
| Ships | | 36 | - | (31) | - | 5 |
| Vehicles | | 12,640 | (12) | (10,551) | - | 2,077 |
| Equipment | | 63,151 | - | (47,526) | - | 15,625 |
| Tools | | 18,966 | - | (15,802) | - | 3,164 |
| Construction-in-progress | | 2,478,165 | - | - | - | 2,478,165 |
| Finance lease assets | | 77,764 | - | (32,355) | - | 45,409 |
| | ₩ | 11,062,190 | (27,116) | (3,154,080) | (23) | 7,880,971 |

*In millions of won*

| | | December 31, 2016 | | | | |
|---|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses | Book value |
| Land | ₩ | 763,390 | - | - | - | 763,390 |
| Buildings | | 912,100 | (20,418) | (351,561) | - | 540,121 |
| Structures | | 786,076 | - | (296,506) | - | 489,570 |
| Machinery | | 4,446,711 | (7,839) | (2,205,155) | (23) | 2,233,694 |
| Ships | | 36 | - | (29) | - | 7 |
| Vehicles | | 12,103 | (18) | (10,047) | - | 2,038 |
| Equipment | | 61,324 | - | (44,024) | - | 17,300 |
| Tools | | 16,930 | - | (15,074) | - | 1,856 |
| Construction-in-progress | | 3,396,352 | - | - | - | 3,396,352 |
| Finance lease assets | | 77,764 | - | (29,823) | - | 47,941 |
| | ₩ | 10,472,786 | (28,275) | (2,952,219) | (23) | 7,492,269 |

F-27

PUBLIC VERSION

# Exhibit 11



PUBLIC VERSION

PUBLIC VERSION

# Disclaimer

**This presentation material is being presented to you solely for your information only and may not be taken away by you and may not be reproduced, redistributed or passed on, directly or indirectly, to any other person or published, in whole or in part, for any purpose.**

This presentation material does not constitute or form a part of any offer or solicitation to purchase or subscribe for securities of Korea Southern Power Co., Ltd. ("KOSPO" or the "Company") in the United States or any jurisdiction in which such offer or solicitation or sale would be unlawful. Securities may not be offered or sold within the United States or to U.S. persons absent registration or an exemption from registration under the U.S. Securities Act of 1933, as amended, and the rules and regulations thereunder. Any public offering of securities to be made in the United States will be made by means of a prospectus, which will contain detailed information about the company making the offer and its management and financial statements. The Company does not intend to register any securities in the United States, and no public offering of securities will be made in the United States or in any other jurisdiction where such an offering is restricted or prohibited. Neither any part of this presentation nor any information or statement contained therein shall form the basis of or be relied upon in connection with any contract or commitment whatsoever. Any decision to purchase securities in the context of the offering of securities, if any, should be made solely on the basis of information contained in a published prospectus or other offering circular issued by the Company in connection with such an offering.

This presentation material has been prepared by the Company, solely for the use at this presentation and has not been independently verified. No representations or warranties, express or implied, are made as to, and no reliance should be placed on, the accuracy, fairness or completeness of the information presented or contained in this presentation. Neither the Company nor any of its affiliates, advisers or representatives accepts any responsibility whatsoever for any loss or damage arising from any information presented or contained in this presentation material. Unless otherwise stated, the information presented or contained in this presentation material is current as of the date hereof and is subject to change without notice and its accuracy is not guaranteed. Neither the Company nor any of its affiliates, advisers or representatives make any undertaking to update any such information subsequent to the date hereof. This presentation material should not be construed as legal, tax, investment or other advice.

Certain information and statements made in this presentation contain "forward-looking statements". Such forward-looking statements can be identified by the use of forward-looking terminology such as "anticipate," "believe," "considering," "depends," "estimate," "expect," "intend," "plan," "planning," "planned," "project," "trend," and similar expressions. All forward-looking statements are the Company's current expectation of future events and are subject to a number of factors that could cause actual results to differ materially from those described in the forward-looking statements. Caution should be taken with respect to such statements and you should not place undue reliance on any such forward-looking statements.

Certain industry and market data in this presentation was obtained from various trade associations, and the Company has not verified such data with independent sources. Accordingly, the Company makes no representations as to the accuracy or completeness of that data, and such data involves risks and uncertainties and is subject to change based on various factors.

This communication is being distributed outside the United States solely to non-US persons as defined under Regulation S.





# Table of Contents

1. Company Overview                                                    3

2. Electricity Industry Overview and Business Environment              7

3. Business/Operations Update                                          11

4. Financial Performance                                               18

   Appendix                                                            22



# Operation Overview

**PUBLIC VERSION**

## Electricity Generation by Load



0.5% 47 MW
2.2% 200 MW
43.4% 4,000 MW
53.9% 4,970 MW

■ Base  ■ Peak  ■ Renewable  ■ Middle

Source: Company Filing as of 1H 2016

## Fuel Mix



1.9% KRW 20.6 bn
5.4% KRW 59.4 bn
1.3% KRW 14.5 bn
2.3% KRW 25.9 bn
42.4% KRW 469.9 bn
46.7% KRW 517.2 bn

■ LNG  ■ Bituminous Coal  ■ B.C. Fuel Oil  ■ Wood Pellet  ■ Bio-oil  ■ Others

Source: Company Filing as of 1H2016

## Capacity Utilization

| Year | 2014 | 2015 | 1H 2016 |
|------|------|------|---------|
| Hadong | 89.4% | 90.8% | 93.1% |
| Shin-Incheon | 67.4% | 43.1% | 28.1% |
| Busan | 79.8% | 43.5% | 36.5% |
| Youngwol | 37.7% | 24.9% | 12.9% |
| Andong | 85.4% | 71.9% | 84.8% |
| Nam-Jeju | 94.7% | 93.1% | 96.7% |
| Hanlim | 19.1% | 11.5% | 7.0% |
| Hankyung | 94.4% | 87.8% | 89.9% |
| Seongsan | 93.2% | 94.2% | 98.3% |
| Total | 77.7% | 63.9% | 60.5% |

Source: Company Filing as of 1H 2016

## Shutdowns & Stoppages

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016. 9 |
|------|------|------|------|------|------|---------|
| Shutdowns (# of times) | 7 | 17 | 23 | 17 | 14 | 4 |
| Stoppage Time | 26:05 | 67:12 | 117:11 | 61:08 | 51.55 | 12.92 |

## Accolades for Operational Efficiency

- **'The 40th National Productivity Evaluation 2016**
  - Received presidential citation in the Public Institutions sector.

- **'Productivity Improvement Evaluation 2015'**
  - Received minister citation for outstanding performance among the affiliated organizations of the Ministry of Trade, Industry and Energy
  - *** World's Top Forced Outage Ratio: 0.028%,**

13



# Highest Operational Efficiency Among Peers

PUBLIC VERSION









Units in percentage (%)

14



# Electricity Pricing Mechanism

**PUBLIC VERSION**

## Power Pricing Mechanism (Power Price = CP + EP)

- **Capacity Payment (CP):** Fixed fee received to compensate for cost not covered by variable cost; CP is determined annually and is paid to each generation company for the amount of available generation capacity

- **Energy Price (EP):** Variable cost + [System marginal price – Variable cost] x Adjusted coefficient

- **System Marginal Price (SMP):** represents the power market price (KRW/kwh) payment made on a trading hourly basis to the company's supplied electricity (most expensive plant price where power demand and supply meet)

- Application of The Adjusted Coefficient of System Marginal Price ("SMP")
  - KOSPO can pass through 100% of its fuel cost through the energy price
  - Electricity Generation Cost Evaluation Committee annually determines The Adjusted Coefficient

- Adjusted Coefficient was readjusted with slight increase, which became effective in September 2016

## Power Price Comparison

| Price type | Price | Remarks |
|---|---|---|
| **Capacity Payment (CP)** | KRW  9.15~10.07/kwh | ■ CP can be adjusted in accordance with region, season and time |
| **Energy Price (EP)** | [Max {(SMP-Fuel Cost), 0} x  The Adjusted Coefficient  + Fuel Cost] | ■ Adjusted Coefficient (as of September 9, 2016)<br>  – Nuclear : 0.9309 ← 0.7191<br>  – Coal : 0.9472 ← 0.7208<br>  – Domestic Coal : 1.0000 ← 1.0000<br>  – Oil, LNG, etc.: 1.0000 ← 1.0000 |

***Electricity Pricing Mechanism allows us to pass 100% of the fuel cost to the electricity price***
***The Adjusted Coefficient of SMP achieves financial balance among KEPCO and Gencos***

*Source: Company data*
*Source: Korea Power Exchange Website*

10



PUBLIC VERSION

# Exhibit 12

# Investment Incentives in the Korean Electricity Market

**Jung-Yeon Park[a], Nam-sung Ahn[a], Yong-Beum Yoon [a], Kyung-ho Koh[a]**
**Derek W. Bunn[b]**

[a]Korean Electric Power Research Institute,
103-16 Munji-dong, Yuseong-ku, Daejeon 305-380, Korea
82-42-865-7643 / 7619
rose_park@naver.com

[b]London Business School, Sussex Place, Regents Park, London NW1 4SA, UK

**Abstract**

*This paper develops a model-based analysis of the effects of various capacity incentive systems on new investment in the Korean electricity market. The restructuring process in Korea allocated power generation to six firms, competing within a wholesale market, albeit strictly on a cost basis. Because of this cost-based pool, capacity payments were also introduced to encourage new investment. However, it is an open question whether the current fixed capacity payment scheme is enough to secure resource adequacy and consideration is being given to alternative mechanisms such as the use of LOLP. Using a detailed market simulation model, based on system dynamics, we compare these approaches in terms of how they may influence the investors' decisions and thereby determine the system reserve margin. The simulation results suggest that there may be serious problems is staying with the current fixed capacity payments in order to achieve resource adequacy. In contrast an LOLP based capacity mechanism may, in the longer term, increase the reserve margin compared to a fixed capacity payment. More generally, this paper indicates how crucial the effective modeling of the investment behavior of the independent power producers is for adequate policy support, even if they only constitute a fringe in a substantially centrally influenced market.*

Keywords: System dynamics; Electricity; Investment

## 1. Introduction

The government of South Korea has designed a cautiously staged progression towards full restructuring of its electricity sector, which it intends, ultimately, to culminate in full wholesale and retail competition. The nation is currently in an early stage of this process, where generation facilities have been allocated to six firms, who compete in a wholesale market, albeit strictly on a cost basis. However, the separation of distribution from the national utility, KEPCO, was halted after the California market crisis. To meet the growth in energy demand, resource adequacy continues to be a very fundamental and crucial political concern. Without firm central planning, there is no obligation on the generating companies to collectively maintain an adequate reserve margin, and so, whilst the government does produce a basic plan, this is only indicative based upon the reasonable, survey-based, inclinations of the firms to invest, together with some central estimates. New capacity investments in the 3rd long term basic plan (2006) are displayed in Table 1, for the six main generating companies, plus independent power producers (IPPs). Although this indicative plan does provide some coercive pressure on the six main generating companies to the extent that they are subsidiaries of KEPCO, their autonomous requirements to achieve profitability means that they will still evaluate each investment on its merits at the time. Furthermore, new investment by the IPPs is always essentially opportunistic. Thus, overall there is considerable uncertainty in the plan, such that, for example, even compared to the 2nd long term basic plan of 2004, there have already been several substantial delays and even cancellations.

As with most cost-based pools around the world, a fixed capacity payment was introduced to provide the additional financial return for new investment. The fixed payment system is controversial, however, as it is generally set in an ad hoc way for a period of time, not precisely and transparently linked to actual market conditions, and therefore presents an additional element of regulatory risk to market participants. Hence, an alternative, explicit formulaic approach, such as a linkage to the periodic loss of load probability, LOLP, has theoretical appeal and some market attraction. Although the dynamic properties of the LOLP based approach have been modeled before (eg Bunn and Larsen, 1992), a direct comparison with fixed payments remains under-researched.

**Table 1. The 3rd basic plan for new capacities (2006~2020), MW**

| Year | KHNP | | KOSEP | KOMIPO | | | WP | | KOSPO | | | KEWESPO | IPPs | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | hydro | nuclear | coal | coal | oil | LNG | coal | LNG | coal | oil | LNG | coal | coal | oil | LNG |
| 2006 | - | - | - | - | - | - | - | - | - | - | - | 500 | - | 14.3 | 989.2 |
| 2007 | - | - | - | - | - | - | 500 | - | - | 200 | - | 500 | - | - | - |
| 2008 | - | - | 870 | 500 | - | - | 500 | - | - | - | - | 500 | - | 664.9 | 500 |
| 2009 | - | - | - | 500 | 40 | - | - | - | 1,870 | - | - | - | - | - | 500 |
| 2010 | - | - | - | - | - | - | - | 700 | - | - | - | - | 200 | 953.2 | - |
| 2011 | 60 | 1,000 | - | - | - | 500 | - | - | - | - | 900 | - | 200 | 747.3 | 2,000 |
| 2012 | - | 2,000 | - | - | - | 500 | - | - | - | - | - | - | - | 100.3 | 2,250 |
| 2013 | - | 1,000 | - | - | - | 700 | - | - | - | - | - | - | - | - | 300 |
| 2014 | - | 1,400 | 870 | - | - | - | - | - | - | - | - | 1000 | - | - | 700 |
| 2015 | - | 1,400 | 870 | - | - | - | - | - | - | - | - | 1000 | - | - | - |
| 2016 | - | 1,400 | - | - | - | - | - | 300 | - | - | - | - | - | - | - |
| 2017 | - | 1,400 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2018 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2019 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2020 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | Total Capacity | | | | | | 33,599.2 | | |

Thus, in this study, a simulation model based on system dynamics is developed in order to analyze the effects of different capacity payments on investment decisions and hence the system reserve margin. Two cases are considered for this study. In the first, the reserve margin together with wholesale prices and fuel mix are estimated for a fixed capacity payment system. And in the second case, the reserve margin, wholesale prices and fuel mix were calculated with an LOLP based system. Then, these results are compared with the 3rd long term basic plan developed by the government. Even though new plants are included in the 3rd long term basic plan, if the expected return on investment is lower than their criteria, the companies will cancel or delay the new investment. In our model, we recognize that different investment criteria may be applied depending on technology and type of company, and a survey was undertaken to identify this aspect.

This paper is organized as follows; Section 2 gives an overview of the Korean wholesale power market and investigates some issues of the current fixed capacity payments. Section 3 presents the results of survey conducted to find out how generating companies make their investment decisions. In Section 4, the system dynamics model is

described and the experimental simulations are discussed in Section 5. Section 6 provides some conclusions.


## 2. Capacity payments in the Korean electricity market

In the current cost-based pool, the revenue of a generating company is composed of both an energy-related, system marginal price (SMP) and a fixed capacity payment (CP). The wholesale market clearing price, i.e. system marginal price (SMP), is determined by the production cost of the marginal unit needed to meet demand in each hour from the aggregate supply function submitted to the market by all generators. The capacity payment (CP) is paid to all available plants, regardless of whether they are actually called upon to produce. In the Korean system, there are two market segments depending upon whether the plant is providing baseload or peaking capacity. There is a separate energy price for each, baseload marginal price (BLMP) and SMP, as well as separate capacity payments. The CP is the price paid to the generating units that have submitted their hourly available capacities and is based on the pre-determined hourly and seasonal values. In 2006, the base load CP (20.49 won/kWh) was derived from the capital and a fixed O&M cost of a most recently planned 500 MW coal unit, whereas the peak load CP (7.17 won/kWh) reflected the capital and a fixed O&M cost of a standard gas turbine peaking unit. Thus, the fixed CP in the Korean market was designed to recover the capital cost of each unit, which the energy prices (BLMP & SMP) do not remunerate. However, these fixed capacity payments are not related directly to the market conditions, especially overall and local reserve margin considerations. In the short term, according to the 3rd basic plan, the reserve margin after 2011 will be over 20%, which may be excessive, but in the longer term, it is not clear that investment decisions will respond adequately to market conditions.


## 3. Investors' behavior in the Korean electricity market

A small representative series of interviews was conducted in order to acquire information regarding the investment decision-making criteria of the different generating companies. Table 2 summarizes the interview results.

**Table 2. Generating company investment criteria: Interview results**

| Genco | Nuclear company | 5 fossil fuel companies | IPPs |
|---|---|---|---|
| Investment Decision | KHNP can only invest if annual levelized cost of nuclear is lower than that of coal and LNG, but there are limitations due to site planning and the government's policy. | They would like to invest aggressively, but there are limitations due to site planning and the government's regulation of the competitive market. | Strategic investment intentions restrained due to difficulties in project financing and required return on investment. |
| Target | No target. It depends on government policy | Maintaining current market share | Growth and profits |
| Required Rate of Return | NA | 7% | 10% |

## 4. Model description

### 4.1. Model overview

The model presented here was developed to analyze the effects of capacity payment systems on generators' investment decisions. The model is based on system dynamics (SD), which is a branch of control and system theory applied to economical and managerial systems. Following Forrester (1961), the methodology[1] of SD is based on identifying the structure of the system and the logic of the inter-relationships among the different components in order to explore its dynamic responses. Figure 1 shows a simplified causal-loop diagram of an electricity market investment cycle, following Bunn and Larsen (1992) with an LOLP capacity payments system. Causal relationships between two variables are identified by arrows. The positive (negative) sign at the end of each arrow can be understand as the response to a small positive change in the source variable creating a positive (negative) variation on the target variable. The diagram shows the essential balancing feedback that governs the long-run development of the electricity market. Recall that the wholesale market price is composed of the marginal energy price (BLMP/SMP) and a capacity payment (CP). Market revenues influence investment decisions, and the construction of new plants will affect total capacities generated in the electricity market. Since market prices are very sensitive to the reserve

---

[1] A complete and modern reference book on the SD methodology can be found in Sterman (2000).

PUBLIC VERSION

margin, not only does this feedback creates a very responsive loop, it also means that prices and investments are very dependent upon what other companies are doing.



**Figure 1. Causal-loop diagram of the electricity market.**

Figure 2 gives an overview of the conceptual framework for the model in this paper. The model has three sub-modules: a price module, a capacity mechanism module, and an investment decision module. These modules are linked together by system dynamics modeling for a year-by-year simulation, extending over 30~50 years. The objective of this study is to make an estimate of long-term prospects for the Korean electricity market based. Many assumptions are taken from the 3rd basic long term plan, but we analyze the effects of different capacity mechanisms within this framework.

PUBLIC VERSION

**Figure 2. The conceptual framework for the SD model**

  In order that the modules could be developed and updated flexibly with detailed market data, the overall model was developed as a dynamic interaction of various Excel modules, controlled through Visual Basic programming.

## 4.2. Price modules

  This model is designed to reflect price formation in the current Korean cost based power pool. The price module is a core component in this model to determine SMP and calculate each company's revenue from the energy market year by year. The output from this module is used as an input for the capacity mechanism module and the investment decision module.

  The plants are aggregated into groups by technology and companies. Each year, the simulation shows the reserve margin, which is the difference between installed capacity and demand (expressed as a fraction of demand). The price module can determine a single market price as well as the dual BLMP/SMP pricing.

## 4.3. Capacity mechanism module

  The capacity mechanism module considers the inclusion of LOLP based capacity payments, as an alternative to fixed capacity payments. LOLP based capacity payment is calculated from LOLP, the value of loss of load (VOLL), and SMP by equation (1)

LOLP based capacity payment = LOLP (VOLL – SMP)                    (1)

Each year, as the simulation advances, a comparison between demand and capacity is made in order to evaluate the LOLP. Depending upon the reserve margin, which is the difference between installed capacity and demand (expressed as a fraction of demand), LOLP can be computed as the convolution of the probabilities of failure of the individual plants in the system. Figure 3 presents an estimate of LOLP as a function of reserve margin in the Korean electricity market.



**Figure 3. LOLP as a function of reserve margin**

Following industry discussions, we assume VOLL as 3,000 won/kWh, whilst the LOLP based capacity payment depends upon reserve margin, as above. The basic idea of the LOLP based capacity payment is that, when there are periods of excess capacity, the system should have relatively high reserve margin and low LOLP, on average, and there should be little economic incentive to invest in new capacity. Alternatively, when there is heavy demand relative to available capacity, LOLP will rise steeply as reserve margin declines and this should provide the required investment incentive.

4.4. Investment decision module

In the Investment module, it is assumed that investment will occur whenever the NPV of a new investment is positive or IRR is higher than the required rate of return (cost of capital). From the face-to-face interviews, it appeared that the six main generating companies will make a new investment if IRR is higher than 7% while IPPs will invest only if IRR is higher than 10%. However, as mentioned earlier, the strict implications of these for the nuclear and fossil power companies are dubious, because these are all

subsidiaries of KEPCO, and ultimate subject to the politicized intent of the KEPCO board. However, the investment decisions of the IPPs are quite individualistic and profit motivated. Apart from cost of capital, advantageous sites for quicker new build and project financing can be important factors for an investment decision, but they are not considered in this study. The output from this module, as new capacity build, goes into the price module and influences the total installed capacity, market price, reserve margin and fuel mix. This change affects generating companies' revenue again and hence the subsequent investment decisions are changed dynamically. These are therefore classic cyclic causal loops with feedback through the price module, the capacity mechanism module, and the investment decision module.

## 5. Simulation Results

The simulation was conducted for two cases and compared to the reference case.

1. The reference case is a 'base' case assumption that all companies including IPPs will build or retire their plants according to the basic plan without any change. This case reflects the current energy market rule (BLMP/SMP) and capacity mechanism (fixed dual capacity payments).

2. Case 1 presumes all companies will make investment decisions on their own criteria. They can delay or give up their planned construction if they decide that it isn't profitable. The energy market and capacity mechanism are identical to the current market design (dual energy market prices and fixed dual capacity payments).

3. Case 2 has different rules from the current market and allows companies to make their own investment decision. The market has a single energy market price (SMP) and LOLP based capacity payments.

PUBLIC VERSION

**Table 3. Summary of cases in the model analysis**

|  | Genco's Investment Decision | Energy Market | Capacity Payment |
|---|---|---|---|
| Reference Case | No | BLMP/SMP | Fixed CP (Baseload CP & Peakload CP) |
| Case 1 | Yes | BLMP/SMP | Fixed CP (Baseload CP & Peakload CP) |
| Case 2 | Yes | SMP | LOLP based CP = LOLP(VOLL-SMP) |

5.1. Reference case

In the reference case, a year-by-year simulation (2006~2020) is developed with output graphs for market price, reserve margin, fuel mix, and market shares for generators, based on the government's basic plan. The plants are aggregated into groups by technology (hydro, nuclear, domestic coal, coal, oil, and LNG) and generators (KHNP, KOSEP, KOMIPO, WP, KOSPO, KEWESPO, and IPPs).

According to the 3rd basic plan, reserve margin is increasing to 25.1% shown in Figure 4. On the assumption that the optimal reserve margin would be 14~18% in the Korean electricity market, the overinvestment of new capacity will have indeed become cause for concern after 2012. SMP is stable, however. Any changes in the fuel costs of oil and gas over the planning period were not considered in this model, otherwise SMP would follow them.



**Figure 4. SMP and reserve margin in the reference case**

Figure 5 shows the prospects for fuel mix and these are consistent with the government's guideline.



**Figure 5. Fuel mix in the reference case**

Figure 6 shows the market share profiles for the six main gencos and IPPs. KHNP, nuclear company, maintains a 30% market share in terms of the installed capacity. The IPPs increase market share, encouraged by the construction of new LNG plants, whilst, proportionally, the five fossil fuel companies decrease market share, mainly due to the retirement of oil and coal plants.



**Figure 6. Market share (Installed capacity based) in the reference case**

## 5.2. Case 1

In Case 1, generating companies are allowed to make an investment decision on its own merits. The energy market and capacity mechanism are identical to the current market design (dual energy market price and fixed dual capacity payments). This model

assumes that generating companies will not build new plants unless they estimate the IRR to be higher than the required rate of return.

The result of the simulation in this case shows that IPPs will decide not to build some of plants, while all the six main gencos follow the 3rd basic plan without any change. The change of IPPs' investment decision is shown in Figure 7. In this case, IPPs will abandon or delay building new plants in 2006, 2008, and 2014, and only build the two coal plants planned in 2010 and 2011, in the absence of further financial incentives. The changes of IPPs' investment decision would have an effect on the system reserve margin shown in Figure 8, to the extent that it could cause an overall problem of reliable supply in the electricity market.



**Figure 7. IPPs' investment decision in Case 1**



**Figure 8. Reserve margin in the Korean electricity market**

Thus, the fixed capacity payments paid to all the generating units that have submitted their available capacities do not seem to be efficacious for inducing generating company's appropriate investments, especially the LNG plants of IPPs. Furthermore, we see how sensitive this market is to the behaviour of IPPs.

## 5.2. Case 2

Case 2 also allows generating companies to make their own investment decisions. The market rule, however, is different from the current one. In this case, the market has a single energy market price (SMP) and a single LOLP based capacity payment. The result of the simulations in Case 2 shows that IPPs will still decide not to build some of plants, while all the six main gencos follow the 3rd basic plan without any change as well. The change of IPPs' investment is shown in Figure 9, where unlike Case 1, the IPPs do actually build many of plants planned.



**Figure 9. IPPs' investment decision in Case 2**

The system reserve margin in Case 2 is presented in Figure 8. Although LOLP based CP was slow to change the investment and reserve margin in the initial stage of the overall period, however, it makes an appropriate response in the longer-term between the unrealistic over-investment indicated in the national plan, and the under-investment that might follow if the IPPs were only induced by the fixed capacity mechanism

PUBLIC VERSION

## 6. Conclusions

A simulation model was developed to analyze the generating companies' investment decisions and the long-run reliability of supply in the Korean electricity market. The model is based on a system dynamics approach, where investment behaviours are conditioned by dynamic feedback formed by market price and capacity payments. The simulation results show that major fossil and nuclear companies, still partially under the influence of central planning, construct the new capacity indicated in the latest national long term basic plan for both a fixed capacity payment and LOLP based capacity payment systems. However, although the national plan suggests substantial IPP building, and in fact our model indicates a rather excessive reserve margin if that were followed, our model also shows that so much IPP capacity is inconsistent with their stated investment criteria, and that the IPPs may under the investment under the current fixed CP mechanism. The wholesale price decreases due to the excess supply and it leads to lower the IRR of IPPs. The return is too low for IPPs to invest. This leads to very low system reserve margin and causes concern about the long-term security. However, the LOLP based CP mechanism shows some improvement in reserve margin in the longer term to an appropriate a sustainable level.

Clearly, such model-based results are only indicative, but they do raise substantial questions about current misplaced confidence in the fixed capacity payment system. Further detailed research is essential in the Korean context.

More generally, this model shows how important it is to understand the fringe players in power markets. Reserve margins are very sensitive to market prices, and market prices in turn are very sensitive to reserve margins. Even in a market such as Korea where liberalization is progressing slowly, with the major portion of the market still under central planning influence, the performance of the IPP fringe appears to be crucial. An inability to model them effectively would ultimately undermine the usefulness of any long-term market model and the consequent insights into energy security.

## References

[1] Byoung-Hoon Lee, Hyeon-Hyo Ahn, "Electricity industry restructuring revisited: the case of Korea", *Energy Policy* 34, 1115~1126, 2006.

[2] Carlos Vazquez, "A market approach to long-term security of supply", *IEEE Transactions on Power Systems*, Vol. 17, No. 2, May 2002

[3] Derek W. Bunn, Erik R. Larsen, "Sensitivity of reserve margin to factors influencing investment behaviour in the electricity market of England and Wales", *Energy Policy*, 420~429, 1992.

[4] Fernando Olsina, Francisco Garces, H.-J. Haubrich, "Modeling long-term dynamics of electricity markets", *Energy Policy* 34, 1411~1433, 2006.

[5] Sterman, J., Business Dynamics: System Thinking and Modeling for a Complex World. McGraw-Hill/Irwin, Boston, 2000

PUBLIC VERSION

Exhibit 13

Case 1:20-cv-03898-CRK   Document 21-2   Filed 11/09/21   Page 303 of 2032
Case 1:16-cv-00164-CRK   Document 63   Filed 06/05/17   Page 3 of 41
PUBLIC VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| NUCOR CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| ARCELORMITTAL USA LLC, AK STEEL, | ) | |
| CORPORATION, and UNITED STATES | ) | |
| STEEL CORPORATION, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| v. | ) | |
| | ) | Consol. Court No. 16-00164 |
| UNITED STATES, | ) | |
| Defendant. | ) | PUBLIC DOCUMENT |
| | ) | |
| DONGKUK STEEL MILL CO., LTD., UNION | ) | |
| STEEL MANUFACTURING CO., LTD., and | ) | |
| GOVERNMENT OF KOREA, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

---

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD

---

CHAD A. READLER
**Acting Assistant Attorney General**

OF COUNSEL:

CATHERINE D. MILLER
**Attorney**
**U.S. Department of Commerce**
**Office of the Chief Counsel for Trade**
**Enforcement & Compliance**
**Washington, D.C. 20230**

JEANNE E. DAVIDSON
**Director**

CLAUDIA BURKE
**Assistant Director**

ELIZABETH SPECK
**Senior Trial Counsel**
**Department of Justice**
**Civil Division, Commercial Litigation Branch**
**P.O. Box 480, Ben Franklin Station**
**Washington, D.C. 20044**
**Telephone: (202) 616-5196**
**E-mail: elizabeth.speck@usdoj.gov**

June 5, 2017                    **Attorneys for Defendant**

PUBLIC VERSION

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 .................................................................. 2

   I.   Administrative Determination Under Review ...................................... 2

   II.   Issues Presented For Review ................................................................ 3

STATEMENT OF FACTS ........................................................................................ 3

SUMMARY OF ARGUMENT .................................................................................. 10

ARGUMENT ........................................................................................................ 11

   I.   Standard Of Review ............................................................................ 11

   II.   Commerce's Finding That The Provision Of Electricity For Less
      Than Adequate Remuneration Does Not Confer A Benefit And Is
      Not Countervailable Is In  Accordance With Law And Supported
      By Substantial Evidence ..................................................................... 12

      A.   Relevant Legal Framework .................................................... 13

      B.   Commerce Reasonably Determined That The Korean
            Government Did Not Subsidize The Respondents By
            Providing Electricity For Less Than Adequate
            Remuneration ......................................................................... 15

      C.   Commerce's Reliance On The Standard Pricing Mechanism
            To Measure Whether A Benefit Was Conferred On The
            Respondents Is In Accordance With The Law ......................... 20

      D.   Commerce Took Cost Into Account When Evaluating
            KEPCO's Standard Pricing Mechanism .................................. 23

      E.   Commerce Reasonably Determined That It Was Sufficient
            To Focus On KEPCO's Costs When Performing Its Tier 3
            Benchmark Analysis .............................................................. 26

   III.   Commerce Reasonably Determined That That An Adverse
       Inference Was Not Warranted ............................................................. 28

      A.   Legal Background ................................................................... 29

      B.   Commerce Reasonably Determined That The Korean
            Government Complied  With Commerce's Requests For
            Information ............................................................................. 30

CONCLUSION ...................................................................................................... 33

i

PUBLIC VERSION

**E.    Commerce Reasonably Determined That It Was Sufficient To Focus On KEPCO's Costs When Performing Its Tier 3 Benchmark Analysis**

The plaintiffs further contend that Commerce's determination is arbitrary and capricious because Commerce focused on KEPCO's tariff schedule and did not analyze whether the price that KEPCO pays to KPX accurately reflects the underlying costs of electricity.  Pls. Mem. at 24-29.  In other words, the plaintiffs maintain that Commerce's analysis should not have focused on the prices that KPX charges KEPCO for electricity, but, instead, should have examined whether the price that KPX sets adequately reflects the costs associated with different types of generators. *Id.*  Again, the plaintiffs' position merely reflects their disagreement with Commerce's decision to evaluate whether the Korean government's rates were set in accordance with market principles by focusing on KEPCO's standard pricing mechanism.  As explained in section II.D, above, under this approach, the only relevant costs are the costs or prices that KEPCO pays to KPX for electricity, and Commerce is not required to further examine other components that make up KPX's underlying costs.

As explained earlier in this brief, the relevant statutory framework focuses on whether an "authority" subsidizes a particular industry.  19 U.S.C. § 1677(5)(A).  Here, Commerce determined that KEPCO was the "relevant" authority for purposes of its countervailing duty analysis, and focused its analysis on whether prices were set in accordance with KEPCO's standard pricing mechanism, which, as explained in the preceding section, included the costs that KEPCO incurred in providing electricity.  PDM, P.R. 459, at 19.

Contrary to plaintiffs' contentions, Commerce explained its reasons for not focusing upon the same types of costs that plaintiffs maintain Commerce should have considered.  First, Commerce explained that the plaintiffs had failed to demonstrate that "the prevailing market conditions in Korea are that the utility companies have separate tariff rates that are differentiated

26

Case 1:20-cv-03898-CRK   Document 81-2   Filed 11/03/21   Page 806 of 2032
Case 1:16-cv-00164-CRK   Document 63   Filed 06/05/17   Page 33 of 41

PUBLIC VERSION

based upon the manner in which electricity is generated." IDM, P.R. 518, at 23. Commerce explained that it had examined the tariff schedule, and that it also did not support the plaintiffs' claims. *Id.*; *see also id.* at 18 (citing the tariff schedule in effect GOK IQR, C.R. 108-281, at 8-11; GOK SQR2, C.R. 497-99, at 8-9).

Commerce also did not find sufficient evidence in the record to support plaintiffs' claim that "KEPCO's costs of electricity used in developing its tariff schedule do not fully reflect its actual costs of electricity." *Id.* Commerce explained that it did not request the costs of the various generators because the relevant cost for purposes of its standard pricing mechanism analysis was KEPCO's "purchase price of electricity from KPX . . ." *Id.* (citing *Welded Line Pipe from the Republic of Korea: Final Negative Countervailing Duty Determination*, 80 Fed. Re. 61,365 (Dep't of Commerce Oct. 13, 2015) (final determination), and Issues and Decision Memorandum at 27). Therefore, it was not relevant to Commerce's analysis how costs were set prior to KEPCO's purchase of electricity from KPX. This is consistent with the Korean government's responses to Commerce's initial questionnaire, which explained that KPX is the electricity market through which KEPCO, the relevant "authority" for purposes of Commerce's analysis, purchases electricity. *See* GOK IQR, C.R. 108-281, at 7, 9.

Although the plaintiffs also claim that the various third-party reports that they placed on the record demonstrate that KEPCO did not recover its costs, Pls. Mem. at 33-34, those reports are not a substitute for the benchmark analysis Commerce is required to perform pursuant to 19 C.F.R. § 351.511(a)(2). In any event, as explained in the IDM, Commerce reviewed the National Assembly Report submitted from 2012 by the plaintiffs, but did not find it to be relevant to the investigation. IDM, P.R. 518, at 23-24. Specifically, Commerce explained that the "most important flaw" was that the National Assembly Report used data from 2012, which

27

Case 1:20-cv-03898-CRK   Document 81-2   Filed 11/03/21   Page 807 of 2032
Case 1:16-cv-00164-CRK   Document 63   Filed 06/08/17   Page 34 of 41
PUBLIC VERSION

predated the POI by two years, and that KEPCO's electricity tariffs had increased three times

since the date of the report.  *See* IDM, P.R. 518, at 24 (citing GOK IQR, C.R. 108-281, at Ex. E-

3, p.53).

Commerce's focus in this investigation was on the "industrial tariffs that were in effect

during 2014;" therefore, it was entirely reasonable for Commerce to characterize the National

Assembly Report as "outdated and not relevant to our POI."  IDM, P.R. 518, at 24.  Although the

plaintiffs claim that Commerce erred by "failing to address the information in the context

{presented in the petitioners' case brief}, Commerce is not required to consider otherwise

irrelevant evidence merely because the petitioners believe it *could* be probative when viewed in

the context presented by the plaintiffs.

Accordingly, although the plaintiffs might have reached a different conclusion in

analyzing the record, this does not establish that Commerce's decision was not supported by

substantial evidence.  *See Consol. Edison, v. NLRB,* 305 U.S. at 217 (recognizing that the court is

not free to disagree with Commerce's determination, so long as it is based on "more than a mere

scintilla" of substantial evidence).

## III.   Commerce Reasonably Determined That An Adverse Inference Was Not Warranted

Commerce reasonably determined that the application of facts available with adverse

inferences was not warranted because it found that the Korean government "did not withhold

information that was requested of it, did not fail to meet deadlines, and did not significantly

impede the proceeding, and did not provide unverifiable information."  IDM, P.R. 518, at 12.

Again, although the plaintiffs disagree with Commerce's decision not to apply adverse facts

available, their disagreement does not establish that Commerce's determination is not supported

PUBLIC VERSION

# Exhibit 14

April 15, 2019

**BY ELECTRONIC FILING**

| | |
|---|---|
| The Honorable Wilbur L. Ross, Jr. | Case No.:  C-580-879 |
| Secretary of Commerce | Total No. of Pages:  493 |
| Attention: Enforcement and Compliance | Second Administrative Review |
| APO/Dockets Unit, Room 18022 | POR:  1/1/17-12/31/17 |
| U.S. Department of Commerce | AD/CVD Operations, Office VII |
| 14th Street & Constitution Ave NW | |
| Washington, DC  20230 | **PUBLIC DOCUMENT** |

> **Re:    Certain Corrosion-Resistant Steel Products from the Republic of Korea:**
> **Petitioners' Response to Upstream Subsidy Questionnaire**

Dear Secretary Ross:

On behalf of United States Steel Corporation and Nucor Corporation ("Petitioners"), we

hereby respond to Commerce's supplemental questionnaire regarding Petitioners' upstream

subsidy allegation ("allegation") filed on March 4, 2019.[1]  This response is timely submitted

pursuant to the deadline established in Commerce's supplemental questionnaire, as extended.[2]

As discussed below, available record evidence establishes that the Korea Power Exchange

("KPX") entrusts and directs Korean Electricity Power Corporation's ("KEPCO") electricity

generation companies ("GENCOs") to provide electricity to KEPCO for less than adequate

remuneration ("LTAR"), which KEPCO passes on through its standard pricing mechanism to

steel producers in Korea, thereby conferring a countervailable upstream subsidy within the

---

[1] *See* Petitioners' Allegation of Upstream Subsidies to Korean Steel Producers (Mar. 4, 2019)
(Petitioners' Upstream Allegation").

[2] *See* Letter from Commerce to Petitioner's, "Supplemental Questionnaire for Upstream
Subsidies Allegation" (Apr. 4, 2019); Letter from Commerce to U. S. Steel, "Extension of Time
to Respond to Upstream Subsidy Allegation Supplemental Questionnaire" (Apr. 10, 2019).

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 2

meaning of Section 771A of the Tariff Act of 1930, as amended ("the Act"), 19 U.S.C. § 1677-1,

and Commerce's regulations at 19 CFR § 351.523.

<div align="center">

**QUESTIONNAIRE RESPONSE**

</div>

1. **With respect to 19 CFR 351.523(a)(1)(i), *i.e.*, that the Government of Korea, through KPX, is providing KEPCO with electricity for less than adequate remuneration (LTAR), please explain the following:**

   a. **Is the core basis of the LTAR allegation based upon the fact that the adjusted coefficient can be set at less than 1.0?**

The core basis of the LTAR allegation is that the KPX, through the Cost Evaluation

Committee, sets the GENCOs prices below fair value by applying an adjusted coefficient below

1.0.  This results in artificially depressed and suppressed electricity prices, which provides

KEPCO with electricity for LTAR.[3]

*First*, the GENCOs admit that reductions in the adjusted coefficient result in material

adverse effects to their financial performance and they are unable to sell electricity at their

preferred (*i.e.* market-based) prices.  For example, Korea Hydro & Nuclear Power Co, Ltd

("KHNP") states the adjusted coefficient was adjusted "downwards in 2017, which contributed

to a decrease in our revenue in 2017 compared to 2016."[4]  KHNP further notes that "the decrease

in the average unit price of electricity sold {in early 2018} was mainly due to a decrease in the

adjusted coefficient applicable to nuclear energy."[5]  According to Korea Midland Power Co., Ltd

("KOMIPO") the adjusted coefficient that applied to its electricity price was "significantly

---

[3] Petitioners' Upstream Subsidy Allegation at 10-12.

[4] Korea Hydro & Nuclear Power Co., Ltd, "Offering Circular" (July 12, 2018) ("KHNP Offering Circular") at **Exhibit 1** at 81.

[5] KHNP Offering Circular **Exhibit 1** at 85.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 3

reduced" in 2018, which resulted in "material adverse effect{s}" to its financial position.[6]

Plainly, the application of the adjusted coefficient is not something the GENCOs would accept in the normal course of business since it adversely affects their financial performance.  Rather, the KPX imposes this price constraint on the GENCOs in order to convey cheap electricity to KEPCO.

     *Second*, the GOK, through the KPX, often imposes "price caps" on certain fuel types, which limits certain GENCOs' abilities to increase sales prices to cover their marginal costs.  This mechanism effectively places a ceiling on the sales price of electricity and leaves all risk of fluctuating fuel prices with the GENCOs.  For example, Korea East-West Power Co., Ltd ("KEWP") recounts that

> in March 2013, the Cost Evaluation Committee imposed a price cap on the marginal price of electricity sold by us to KEPCO.  Such price cap has affected our LNG generation units…the price cap has had and may have a material adverse effect on our results of operation and financial condition.[7]

Likewise, KOMIPO also notes that the KPX Cost Evaluation Committee

> imposed a price cap on the marginal price of electricity sold by us to KEPCO.  Such a price cap has affected our LNG and oil generation units…In addition, in August 2018, the adjusted coefficient was significantly reduced.  Both the price cap and the reduction in the adjusted coefficient have had and may have a material adverse effect on our results of operation and financial condition.[8]

---

[6] Korea Midland Power Co., Ltd, "Offering Circular" (Jan. 11, 2019) ("KOMIPO Offering Circular") at **Exhibit 2** at 13-14.

[7] Korea East-West Power Co., Ltd, "Offering Circular" (June 12, 2017) ("KEWP Offering Circular") at **Exhibit 3** at 12.

[8] KOMIPO Offering Circular at **Exhibit 2** at 13.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 4

The best evidence that the adjusted coefficient and marginal cost price caps result in the provision of electricity for LTAR is by comparing the GENCOs' prices to KEPCO and the independent power producers ("IPPs") prices to KEPCO. The IPPs are also subject to the electricity regulatory framework in Korea (*i.e.* they bid to sell electricity through KPX), but their prices are not subject to the same draconian adjusted coefficient or price caps like the GENCOs. As noted below, the GENCOs cannot generate enough electricity to meet total electricity demand in Korea. Therefore, the IPPs are necessary suppliers of electricity to KEPCO and their prices are the best evidence of what market-based pricing for electricity is in Korea.

As shown in Table 1, the difference in prices between the GENCOs and the IPPs is substantial, and demonstrates what prices would be without the KPX entrusting or directing the GENCOs to sell electricity to KEPCO at preferential prices. For example, the two low-price leaders, KHNP and KOSEP, could raise their prices by more than 60% and 30%, respectively, and would still have unit prices to KEPCO below those of the IPPs.

**Table 1**

| Generation Entity | Total Volume (%) | Unit Price (Won/kWh) |
|---|---|---|
| KHNP (Nuclear and Hydro) | 28.1 | 62.33 |
| KOSEP (Thermal & Renewables) | 12.8 | 77.77 |
| KOMIPO (Thermal & Renewables) | 9.7 | 87.75 |
| KOWEPO (Thermal & Renewables) | 8.7 | 91.85 |
| KOSPO (Thermal & Renewables) | 9.2 | 91.22 |
| EWP (Thermal & Renewables) | 9.3 | 92.15 |
| IPPs (Thermal & Renewables) | 22.2 | 100.81 |

*Source*: KEPCO's SEC Form 20-F at **Exhibit 4** at 38 (2017 data)

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 5

Given the foregoing discussion, wherein certain GENCOs complained of material adverse effects

on their operations, these GENCOs would have the incentive to raise their prices to KEPCO to

avoid such adverse effects.  However, without the application of the adjusted coefficient and

resulting decrease in the GENCOs' electricity sales prices, KEPCO would not be profitable.  As

noted in Petitioners' upstream subsidy allegation, KEPCO admits that the "adjusted coefficient

must be determined so that the price of electricity sold by {the GENCOs} to {KEPCO} shall

have the effect of ensuring a fair rate of return to {KEPCO} as a standalone entity."[9]  Stated

differently, the KPX imposes the adjusted coefficient and other price caps on the GENCOs to

ensure their prices are sufficiently low to result in KEPCO being profitable.  The implicit

statement here is that if the GENCOs were able to set their own prices without the interference of

the KPX due to Korea's industrial policy, KEPCO could not charge the end-users a sufficient

price to remain profitable on the sale of electricity.

In sum, the GENCOs prices are inconsistent with market principles.  They are adversely

affected by the adjusted coefficient.  They are adversely affected by not being able to pass along

the cost of fuel to KEPCO and to the ultimate end-users.  Instead, the GOK requires the suppliers

of a good (*i.e.* the GENCOs) to sell their product at a level that ensures the purchaser of the good

(*i.e.* KEPCO) is profitable.  Without intervention from the KPX, the GENCOs would be free

price their electricity to avoid materially adverse effects, and their prices would more closely

approximate the IPPs prices.  Of course, were the GENCOs to increase their pricing, this would

necessitate that KEPCO raise its prices to industrial consumers or incur losses.  Given that the

KPX controls the outcome (*i.e.*, whether to raise prices or not), the explicit policy of the

---

[9] Petitioners' Upstream Allegation at 11 (citing KEPCO's Form 20-F at 166).

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 6

Government of Korea is to avoid passing along higher electricity costs to end-users, especially

those in the steel industry.  Therefore, the KPX is directing the GENCOs to sell electricity to

KEPCO for LTAR, which is a countervailable subsidy pursuant to section 771(5) of the Act.

While the adjusted coefficient is the core basis for the LTAR allegation, as discussed in

the subsequent questions, the KPX uses other measures to control the GENCOs prices, which

evinces a lack of market principles such that the prices the GENCOs provide electricity to

KEPCO are not fairly and freely established.

> **b.  How is the KPX price referenced in the question above not consistent with market principles, specifically with respect to your comparison of the GENCOs pricing to the independent power producers' pricing at pages 16 – 17 of your submission?**

As discussed above, the KPX applies an adjusted coefficient to the GENCOs sale price of

electricity to KEPCO, which lowers the price of electricity to be significantly less than the

market price that KEPCO would otherwise have to pay for electricity.  The reference in

Commerce's question to "market principles" appears to presuppose that a proper comparison of

what prices should have been to calculate a benefit to KEPCO must rely upon a constructed

benchmark.  However, Commerce need not construct a benchmark but should evaluate the

adequacy of remuneration using available in-country electricity prices.[10]

---

[10] *See* 19 C.F.R. § 351.511(a)(2)(i); *see also Countervailing Duties: Final Rule*, 62 Fed. Reg. 65,348, 65,378 (Dep't of Commerce Nov. 25, 1998) (noting that paragraph (a)(2)(iii), or "tier three" generally applies "in situations where the government is clearly the only source available to consumers in the country").  Here, the GENCOs are not the only source available, as KEPCO must purchase a substantial amount of electricity from the IPPs.  Therefore, the IPPs' prices are the best information available to compare the distorted GENCOs' prices.

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 7

        In-country electricity prices are the best information available for determining that

KEPCO receives a benefit through the KPX's price-setting mechanism.[11]  Importantly,

Commerce "does not apply a per se rule that a government's majority market share equates to

government distortion.  Rather, the Department will consider all relevant factors or measures that

may distort a market."[12]  Here, the GENCOs do not have the capacity to generate enough

electricity to meet electricity demand in Korea.[13]  Accordingly, KEPCO <u>must</u> purchase

electricity from private IPPs to meet total demand for electricity in the Korean market.  Because

KEPCO must purchase electricity from private suppliers, the IPPs are able to set prices

consistent with market principles (*i.e.* consistent with the dynamics of supply and demand absent

government interference).  Therefore, the presence of the GENCOs in the electricity generation

market does not meaningfully distort the IPPs electricity prices.  Nor can the presence of a

government purchaser of the good be a sufficient reason to determine that these are not valid

market prices.  Indeed, as discussed, there is not a sufficient volume of electricity generated from

government-directed assets and accordingly, the government must purchase electricity from the

IPPs.  Therefore, the IPPs' unit price of electricity is a market-based price for electricity that can

be used to determine whether the GENCOs' pricing is at a level that confers a benefit to KEPCO.

---

[11] *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,377-78 (Dep't of Commerce Nov. 25, 1998) (noting that, in determining whether a good or service is provided for less than adequate remuneration, Commerce's preference is "to compare the government price to market-determined prices stemming from *actual* transactions within the country.  Such market-determined prices include actual sales involving private sellers and actual imports").

[12] *Supercalendered Paper from Canada: Final Results of Countervailing Duty Expedited Review*, 82 Fed. Reg. 18,896 (Dep't of Commerce Apr. 24, 2017) and accompanying Issues and Decision Memorandum at Comment 13.

[13] *See* KEPCO's Form 20-F at **Exhibit 4** at 13 (noting the GENCOs "compete with independent power producers with respect to electricity generation" who accounted for "29.7 of total generation capacity" in 2017).

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 8

Moreover, the IPPs have long history in the Korean electricity market.  Since 2001,

KEPCO has purchased electricity generated from its GENCOs and IPPs.  Indeed, the IPPs

provide a substantial share of KEPCO's consumption of electricity.  For example, in 2017 the

IPPs accounted for 22.9% of KEPCO's electricity purchases by volume and 26.9% by total sales

value.[14]  By the end of 2017, the IPPs owned 29.7% of total electricity generation capacity in

Korea.[15]  In other words, the IPPs are established in the Korean market, necessary for KEPCO's

needs, and therefore provide a reasonable proxy for what a market-based price of electricity

would be without the substantial interference of the KPX.

In the Korean electricity market, the various IPPs are sellers that are free from the control

of the government.  That is, by competing with one another to supply the electricity that KEPCO

cannot acquire from the GENCOs, these IPPs set their prices in a market-oriented fashion –

through supply-side competition.  Indeed, the best evidence that the GENCOs pricing does not

reflect market principles is found in the IPPs' pricing, which is substantially higher than the

average unit value of each of the individual GENCOs.  Moreover, the IPPs are competing in a

regulated market and are still able to be a substantial source of electricity and command prices

that appear to cover their marginal costs and return a market-determined profit.  Plainly, through

the adjusted coefficient and other caps on marginal pricing imposed by the KPX, the GENCOs

do not sell electricity under market principles.

---

[14] KEPCO's Form 20-F at **Exhibit 4** at 38.

[15] *Id.* at **Exhibit 4** at 73.

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 9

    **c.   Even if the adjusted coefficient may have the effect of limiting the level of profitability of certain GENCOs (or taking excessive profits), please explain how this would be inconsistent with market principles in a regulated market for electricity, such as Korea, where electricity pricing, through the capacity price, is based on ensuring generators recover costs and a reasonable return on investment?**

As an initial matter, Petitioners' note that the capacity price <u>only</u> compensates the GENCOs for their fixed costs and does not necessarily result in the GENCOs recovering their total costs plus a reasonable return on investment.[16]  In addition to the capacity price, the price of electricity also includes the marginal price (*i.e.* fuel costs and the adjusted coefficient) and a "fair investment return," both of which are capped or reduced by applying the adjusted coefficient, as discussed above.

With reference to the statements of the GENCOs, Commerce can readily see that the rate of return is fictional and bears little resemblance to market forces.  For example, Korea East West Power ("KEWP") notes "the overall margin for our operations is affected in part by the fair investment return assigned to us (at a uniform rate for all of KEPCO's generation subsidiaries) by the Cost Evaluation Committee."[17]  As demonstrated in the parenthetical, the KPX applies a <u>uniform rate of return</u> to six entirely different generation companies regardless of the fact that these six GENCOs use different fuel inputs, have different assets and liabilities, different debt levels, and have varying degrees of operational efficiency.  Take, for instance, KOSPO, which states it has the highest operational efficiency among its GENCO peers.[18]  As shown in Table 1 above, this highest operational efficiency still comes at a cost since its' per-unit electricity price

---

[16] *See* Petitioners' Upstream Allegation at 7 (citing KEPCO's Form 20-F at 34-37).

[17] KEWP Offering Circular at **Exhibit 3** at 38.

[18] *See* KOSPO Investor Presentation at **Exhibit 5** at 14-15.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 10

ranks among the highest in relation to the other GENCOs.  Moreover, this GENCO receives the

same "reasonable return on investment" as less efficient GENCOs.  How can the most efficient

GENCO also be the highest cost and still not receive anything more than other GENCOs for

return on investment?

Additionally, the requirement that all GENCOs have the same "reasonable return on

investment" prevents the lowest price GENCOs, such as KHNP and KOSEP, from raising their

prices to return a profit reflective of their own operations and needs.  As shown in Table 1 above,

KHNP could raise its prices by nearly 25% and KOSEP could raise its prices by nearly 13%

without losing any market share to other GENCOs.  However, the KPX prevents KHNP and

KOSEP from raising their prices to ensure KEPCO remains profitable, which results the

provision of the electricity to KEPCO for LTAR that is passed along to end-users.  Indeed, this is

what KEPCO means when it states the GOK specifically designed the Korean electricity market

to ensure that "a supplier of electricity cannot exercise control over the merit order system or its

operation to such supplier's strategic advantage."[19]  Stated differently, the GOK has structured

the electricity market to prevent the GENCOs from setting their prices in a manner consistent

with market principles.  Accordingly, by applying a uniform level of return to each GENCO, and

ensuring KEPCO is profitable, the GENCOs electricity prices are inconsistent with market

principles.

Commerce has long held that "{i}n an arm's length transaction, the seller generally

attempts to maximize its total revenue by charging as high a price and selling as large a volume

---

[19] SEC Form 20-F at **Exhibit 4** at 35.

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 11

as the market will bear."[20]  Additionally, "it is a basic principle of corporate finance and

management that the primary function of a commercial enterprise is to maximize the financial

return on its owners' investment."[21]  Here, as noted above, the KPX systematically prevents the

GENCOs from maximizing their total revenue and financial return on investment by applying an

adjusted coefficient below 1.0, capping prices, and assigning a "uniform" rate of fair return to

each GENCO.  The reason the GENCOs do not raise their prices to maximize revenue and return

on investment is because the KPX systematically prevents them from doing so.  This is vastly

different from a regulated electricity market wherein rates are set using a cost of service model

with a statutory rate of return.  Simply, the KPX disregards the cost of service model for a price

that it deems KEPCO can pass along to customers and still turn a profit.

It is well-established that the GOK created the KPX system to ensure KEPCO can

continue its distribution operations while also providing industrial users with subsidized

electricity.[22]  If the KPX allowed the GENCOs to raise their prices to market-based prices,

KEPCO would have to raise electricity prices or sustain losses.  To prevent higher electricity

prices being incurred by consumers like steel producers or KEPCO from incurring losses, the

---

[20] *Final Affirmative Countervailing Duty Determinations: Certain Steel Products From the Federal Republic of Germany*, 47 Fed. Reg. 39,345 (Sept. 7, 1982).

[21] *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,132 (June 23, 2003).  To be sure, Commerce was discussing the issue of privatization of government entities.  However, its comments on fair-market-value are relevant to an analysis of arms-length transactions.

[22] *See* **Exhibit 4** at 166 ("Pursuant to the Electricity Business Act, the adjusted coefficient must be determined so that the price of electricity sold by our generation subsidiaries to us shall have the effect of ensuring a fair rate of return to {KEPCO} as a standalone entity.."); *Welded Line Pipe From the Republic of Korea: Final Negative Countervailing Duty Determination*, 80 Fed. Reg. 61,365 (Oct. 13, 2015) and accompanying Issues and Decision Memorandum at 14 ("it is generally accepted that the {electricity} rates for agricultural and industrial users are set below cost, while those of other users are above cost.").

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 12

KPX intervenes and renders supply and demand irrelevant.  Accordingly, the Korean regulatory

system provides no basis to conclude that it is based on market principles.

> **2.  Please explain how your allegation meets at least one of the three criteria specified
> in 19 CFR 351.523(a)(1)(ii). Provide a separate description and explanation for each
> of the criteria.**

Commerce's regulations stipulate that several criterion must be satisfied before it will initiate

an investigation into the existence of an upstream subsidy.  Pursuant to 19 C.F.R.

351.523(a)(1)(iii), one of the following conditions must exist:

> 1) the supplier of the input product and the producer of the subject
> merchandise are affiliated;
> 2) the price for the subsidized input product is lower than the price
> that the producer of the subject merchandise otherwise would
> pay another seller in an arm's-length transaction for an
> unsubsidized input product; or
> 3) the government sets the price of the input product so as to
> guarantee that the benefit provided with respect to the input
> product is passed through to producers of the subject
> merchandise

As noted above, Commerce has explained that "{i}n an arm's length transaction,

the seller generally attempts to maximize its total revenue by charging as high a price and

selling as large a volume as the market will bear."[23]  Thus, the arms-length test is not

necessarily about cost-recovery or profitability.  Rather, the test is whether the electricity

prices reflect a who "maxmiz{es} its total revenue by charging as high a price and selling

as large a volume as the market will bear."

Because KEPCO must purchase electricity from the IPPs, and because the IPPs

are not subject to the adjusted coefficient or the uniform rate of return imposed on the

---

[23] *Final Affirmative Countervailing Duty Determinations: Certain Steel Products From the
Federal Republic of Germany*, 47 Fed. Reg. 39,345 (Sept. 7, 1982)

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 13

GENCOs, the IPPs are able to maximize their total revenue by charging as high a price as

the market will bear.  However, the KPX systematically prevents the GENCOs from

raising their prices.  Indeed, the unit prices in Table 1 demonstrate that the GENCOs

prices are not arms-length transactions insofar as the GENCOs could raise prices without

losing market share.  Therefore, pursuant to 19 C.F.R. § 351.523(a)(1)(ii)(B), the price of

the KPX-subsidized electricity generated by the GENCOs that is obtained by KEPCO

and passed on to the producers of the subject merchandise is lower than the price that

would otherwise be passed on to the steel producers if KEPCO had otherwise acquired

electricity at the prices charged by the IPPs.

Moreover, because the KPX is a government authority,[24] the criterion in

19 C.F.R. § 351.523(a)(1)(ii)(C) is also satisfied in this case.  Specifically, the KPX sets

the GENCOs sale price of electricity, which guarantees that the benefit resulting from the

adjusted coefficient and uniform rate of return is passed through to KEPCO and onto the

producers of the subject merchandise.  KEPCO, a government entity, establishes its tariff

rates based upon the cost of the "purchase price of electricity from the KPX."[25]  Because

the KPX subsidizes KEPCO's purchase price of electricity, KEPCO's tariff rates reflect

that subsidized price.  Accordingly, these facts satisfy the criterion in 19 C.F.R. §

351.523(a)(1)(ii)(C).


3.  **Provide a complete copy of KEPCO's 2018 SEC Form 20-F**

---

[24] *See* Petitioners' Upstream Allegation at 5-6.

[25] *Countervailing Duty Investigation of Certain corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35,310 (Dep't of Commerce June 2, 2016) and accompanying Issues and Decision Memorandum at 23.

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 14

Petitioners' supply a complete copy of KEPCO's 2018 SEC Form 20-F at **Exhibit 4**.

4. **Per 19 CFR 351.523(a)(1)(iii) provide a calculation demonstrating the countervailable subsidy rate on the "input product" multiplied by the proportion of the total production costs of the subject merchandise accounted for by the input product is equal to or greater than one percent. Include an explanation of your calculation. If you are unable to find calculation components described in the regulation, explain your attempts to obtain this information and why the provided information is applicable. For example, if the annual reports and financial statements of the Korean producers do not have information regarding their cost of production and their cost of electricity or are not publicly able to available, as an alternative your clients' production costs (or other industry data) may be able to serve as a proxy as to the proportion of total production costs of subject merchandise accounted for by electricity. In addition, KEPCO's SEC Form 20-F or other public financial statements issued by KEPCO may have information on its electricity purchases from KPX and its total sales revenue and Exhibit 11 has adjustment coefficients as of September 9, 2016.**

Petitioners' submit a calculation in **Exhibit 6** that demonstrates the countervailable subsidy rate on the "input product" (*i.e.* electricity) multiplied by the proportion of the total production costs of the subject merchandise accounted for by the input product is equal to or greater than one percent.[26]

5. **Please Explain why electricity falls within the definition of "input product" as set forth under 19 CFR 351.523(b).**

An "input product" is defined in 19 U.S.C. § 1677-1 as "a product…that is used in the same country as the authority in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding." Commerce has "consistently found the provision of electricity to be the provision of a good, and not to be general infrastructure. Also, the Department's regulations explicitly categorize electricity within the provision of countervailable

---

[26] Petitioners' provide the data and calculation in excel format at **Exhibit 6.**

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 15

goods and services."[27]  As in previous cases, the "electricity at issue here is not general infrastructure, but a good that is bought and sold in the marketplace."[28]

Here, producers of corrosion resistant ("CORE") steel consume electricity in the manufacture or production of CORE.  As Hyundai Steel notes in its IQR, "electricity and fuel expenses" accounted for approximately 12% of its total expenses in 2017.[29]  For example, electricity is consumed in the production process through powering, just to name a few steps, the: dual uncoiler, seam welder, annealing furnaces, cooling tower, and recoiler.  Accordingly, electricity is a product used in the production of CORE that is the subject of this countervailing duty proceeding.

---

[27] *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35,308 (Dep't of Commerce June 2, 2016) and accompanying Issues and Decision Memorandum at Comment 4; *see also Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017) and accompanying Issues and Decision Memorandum at Comment 48 ("…the Department in prior CVD cases has determined that electricity is a good.").

[28] *Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products From Thailand*, 66 Fed. Reg. 50,410 (Dep't of Commerce Oct. 3, 2001) and accompanying Issues and Decision Memorandum at Comment 10.

[29] *See* Hyundai IQR at Exhibit 36 (Section 32 of Consolidated Financial Statements).

PUBLIC VERSION

Hon. Wilbur L. Ross, Jr.
April 15, 2019
Page 16

## <u>CONCLUSION</u>

Please do not hesitate to contact the undersigned with any questions concerning this

submission.

|  | Respectfully submitted, |
|---|---|
| /s/ Timothy C. Brightbill | /s/ Thomas M. Beline |

Alan H. Price, Esq.
Timothy C. Brightbill, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.
Chase J. Dunn, Esq.

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW
Suite 400
Washington, DC 20006
(202) 567-2300

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to Nucor Corporation*

*Counsel to United States Steel Corporation*

PUBLIC VERSION

## COMPANY CERTIFICATION

I, Benjamin Blase Caryl, Associate General Counsel of International Trade and Public Policy, currently employed by United States Steel Corporation ("U. S. Steel"), certify that I prepared or otherwise supervised the preparation of the attached submission of "Petitioners' Response to Upstream Subsidy Questionnaire" filed on April 15, 2019, pursuant to the 1/1/17-12/31/17 administrative review under the countervailing duty order on *Certain Corrosion-Resistant Steel Products from the Republic of Korea* (C-580-879). I certify that the public information and any business proprietary information of U. S. Steel contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signed: _____

Benjamin Blase Caryl

Dated: ____4/15/19_____

PUBLIC VERSION

## REPRESENTATIVE CERTIFICATION

I, Thomas M. Beline, with Cassidy Levy Kent (USA) LLP, counsel to United States Steel Corporation, certify that I have read the attached submission of "Petitioners' Response to Upstream Subsidy Questionnaire" filed on April 15, 2019, pursuant to the 1/1/17-12/31/17 administrative review under the countervailing duty order on *Certain Corrosion-Resistant Steel Products from the Republic of Korea* (C-580-879). In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Thomas M. Beline

Date: _____Apríl 15 2019_____

PUBLIC VERSION

## COMPANY CERTIFICATION

I, Douglas R. Gunson, Legal Counsel, currently employed by Nucor Corporation, certify that I prepared or otherwise supervised the preparation of the attached Petitioners' Response to Upstream Subsidy Questionnaire, filed April 15, 2019, pursuant to the 1/1/2017-12/31/2017 administrative review under the countervailing duty order on *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, Case. No. C-580-879. I certify that the public information and any business proprietary information of Nucor Corporation contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Douglas R. Gunson

Date: Apr. 15, 2019

## REPRESENTATIVE CERTIFICATION

I, Adam M. Teslik, with Wiley Rein LLP, counsel to Nucor Corporation, certify that I have read the attached submission of Petitioners' Response to Upstream Subsidy Questionnaire, filed April 15, 2019, pursuant to the 1/1/2017-12/31/2017 administrative review under the countervailing duty order on *Corrosion-Resistant Steel Products from the Republic of Korea,* Case No. C-580-879. In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____
Adam M. Teslik

Date: April 15, 2019

PUBLIC VERSION
*Corrosion-Resistant Steel Products from South Korea*
*Case No. C-580-879 (Admin. Review 1/1/17-12/31/17)*

### U.S. DEPARTMENT OF COMMERCE
### PUBLIC CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2019, a copy of the foregoing submission is being

served, via first-class mail or *international first-class mail, on the following parties:

Stephen A. Jones, Esq.
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

Alan H. Price, Esq.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Roger B. Schagrin, Esq.
Schagrin Associates
900 7th Street, NW
Suite 500
Washington, DC 20001

Brady W. Mills, Esq.
Morris, Manning & Martin, LLP
1401 I Street, NW
Suite 600
Washington, DC 20005

David E. Bond, Esq.
White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807

Yong Sik Song
Embassy of the Republic of Korea
2450 Massachusetts Avenue, NW
Washington, DC 20008

*Sungbum Lee, Esq.
Yoon & Yang LLC
34th floor, ASEM Tower, 517
Yeongdongdaero, Gangnamgu,
Seoul, South Korea

/s/ Callum Cleary
Callum Cleary
*International Trade Specialist*
**CASSIDY LEVY KENT (USA) LLP**

# Exhibit 1

PUBLIC VERSION

**OFFERING CIRCULAR**                                                    **CONFIDENTIAL**



US$5,000,000,000

# KOREA HYDRO & NUCLEAR POWER CO., LTD.

*(incorporated with limited liability under the laws of the Republic of Korea)*

### Global Medium Term Note Program

This offering circular (the "**Offering Circular**") replaces and supersedes in its entirety the previous offering circular dated July 3, 2017 describing the US$5,000,000,000 Global Medium Term Note Program (the "**Program**", as amended, supplemented or restated) of Korea Hydro & Nuclear Power Co., Ltd. (the "**Issuer**" or the "**Company**"). Any Notes (as defined below) issued under the Program on or after the date of this Offering Circular are issued subject to the provisions described herein. Under the Program, the Company may from time to time issue notes (the "**Notes**") denominated in any currency agreed between the Issuer and the relevant Dealer (as defined below).

The Notes may be issued in bearer or registered form (respectively "**Bearer Notes**" and "**Registered Notes**"). The maximum aggregate nominal amount of all Notes from time to time outstanding under the Program will not exceed US$5,000,000,000 (or its equivalent in other currencies calculated as described herein), subject to increase as described herein.

The Notes may be issued on a continuing basis to one or more of the Dealers specified under "*Summary*" and any additional Dealer appointed under the Program from time to time by the Issuer (each a "**Dealer**" and together the "**Dealers**"), which appointment may be for a specific issue or on an ongoing basis. References in this Offering Circular to the "relevant Dealer" shall, in the case of an issue of Notes being (or intended to be) subscribed by more than one Dealer, be to all Dealers agreeing to purchase such Notes.

Approval in-principle has been received from the Singapore Exchange Securities Trading Limited (the "**SGX-ST**") in connection with the Program and application will be made for the listing and quotation of Notes that may be issued under the Program, which Notes are agreed, at or prior to the time of issue thereof, to be so listed on the SGX-ST. Such permission will be granted when such Notes have been admitted for listing and quotation on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this Offering Circular. Approval in-principle from, admission to the Official List of, and the listing and quotation of any Notes on, the SGX-ST are not to be taken as an indication of the merits of the Issuer, the Program or the Notes.

Notice of the aggregate nominal amount of Notes, interest (if any) payable in respect of Notes, the issue price of Notes and any other terms and conditions not contained herein which are applicable to each Tranche (as defined under "*Terms and Conditions of the Notes*") of Notes will be set out in a pricing supplement (the "**Pricing Supplement**") which, with respect to Notes to be listed on the SGX-ST, will be submitted to the SGX-ST before the date of listing of the Notes of such Tranche.

The Program provides that Notes may be listed on such other or further stock exchange(s) as may be agreed between the Issuer and the relevant Dealer. The Issuer may also issue unlisted Notes.

Investing in the Notes involves certain risks that are described in the "*Risk Factors*" section beginning on page 59 of this Offering Circular.

——————————

The Notes of each Series will be in either bearer form, with or without interest coupons attached, or registered form, without interest coupons attached. Bearer Notes will be issued only outside the United States to non-U.S. persons in reliance on the exemption from registration provided by Regulation S under the U.S. Securities Act of 1933, as amended (the "**Securities Act**") and Registered Notes may be issued both outside the United States to non-U.S. persons in reliance on the exemption from registration provided by Regulation S and within the United States or to U.S. persons in private transactions (i) to "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act ("**QIBs**") or (ii) to "accredited investors" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that are institutions ("**Institutional Accredited Investors**") who agree to purchase the Notes for their own account and not with a view to the distribution thereof. Bearer Notes are subject to U.S. tax law requirements. Subject to certain exceptions, the Notes may not be offered or sold, or in the case of Bearer Notes delivered, in the United States or its possessions or to, or for the benefit of, U.S. persons (as defined in Regulation S under the Securities Act or, in the case of Bearer Notes, the U.S. Internal Revenue Code of 1986, as amended (the "**Code**")). See "*Form of the Notes*" for more description of the manner in which Notes will be issued. Notes are subject to certain restrictions on transfer. See "*Subscription and Sale and Transfer and Selling Restrictions*."

——————————

The Issuer may agree with any Dealer that Notes may be issued in a form not contemplated by the Terms and Conditions of the Notes herein, in which event (in the case of Notes intended to be listed on the SGX-ST) a supplementary Offering Circular, if appropriate, will be submitted to the SGX-ST and made available which will describe the effect of the agreement reached in relation to such Notes.

*Arranger*

**Citigroup**

*Dealers*

| | |
|---|---|
| **BofA Merrill Lynch** | **BNP PARIBAS** |
| **Citigroup** | **HSBC** |
| **Goldman Sachs International** | **Morgan Stanley** |
| **J.P. Morgan** | **UBS** |
| | **Standard Chartered Bank** |

——————————

The date of this Offering Circular is July 12, 2018.

In addition to capital expenditures related to the construction of power generation assets, we also incur significant cash expenditures following the establishment by the Government of KORAD, a separate corporate entity responsible for nuclear waste management, as a result of which we pay fees to KORAD for the disposal of low- and intermediate- level radioactive waste and spent fuel. See "*Business — Nuclear Safety Research and Development — Nuclear Waste Management.*"

Unexpected or prolonged shutdowns of our nuclear generation units may result in a significant loss of revenue. For example, following multiple earthquakes in Gyeongju city in September 2016, four nuclear generation units at the Wolsong site were shut down for approximately three months as part of a preventive and safety assurance program although these units were not directly affected by the earthquakes. Since then, we have engaged in more frequent and vigorous safety and maintenance inspections and improvement works across our nuclear generation units, which have depressed our utilization rates. The breakdown, failure or suspension of operation of a nuclear generation unit could result in a material loss of revenues and/or additional repair and maintenance costs, greater risk of litigation and increased social and political hostility to the use of nuclear power, which could have a material adverse impact on our reputation, business and results of operation and could lead to a decline in the market value of the Notes. See "*Risk Factors — Risk Relating to Our Business — Inherent in the operation of nuclear power generation facilities are numerous hazards and risks, any of which could result in a material loss of revenues or increased expenses.*"

We have established a provision for decommissioning costs related to nuclear plant operation (which costs principally consist of (i) costs related to spent fuel, (ii) costs related to radioactive waste, and (iii) costs related to dismantling nuclear plants) as a liability since 1983. The decommissioning costs of nuclear facilities are estimated based on the study by the Cost Determination Committee established by the MOTIE and as provided under the Radioactive-Waste Management Act, and are adjusted annually. The decommissioning costs are reviewed by the MOTIE every two years and the MOTIE is required to issue, every two years, guidelines relating to the accounting treatment of decommissioning, which we are required to adopt. The estimated decommissioning costs increased in 2017 based on the 2016 MOTIE guidelines as well as in consideration of overseas cases of decommissioning, inflation rate assumptions, changes in the operating environment and other criteria. We believe that the guidelines adopted to-date capture the substantial majority of the accounting adjustments required in connection with determining decommissioning costs and liabilities. As of March 31, 2018, we have accrued Won 15,962 billion for the cost of dismantling and decontaminating existing nuclear power plants, which consists of dismantling costs of nuclear plants of Won 13,099 billion and dismantling costs of spent fuel and radioactive waste of Won 2,863 billion. As of March 31, 2018, we hold Won 763 billion in beneficiary securities exclusively for the payment of decommissioning costs, which is the estimated cost of decommissioning one nuclear plant, and plan to maintain a similar amount of reserve going forward. See also "*Business — Nuclear Safety — Decommissioning" and "— Critical Accounting Policies — Retirement of Tangible Assets.*"

The adjusted coefficient is one of the factors in determining the price of electricity sold by us to KEPCO and is reset from time to time. The adjusted coefficient applicable to electricity generated from nuclear fuels was adjusted upwards in 2016, which contributed to an increase in our revenue in 2016 compared to 2015, and downwards in 2017, which contributed to a decrease in our revenue in 2017 compared to 2016.

## Recent Accounting Changes

Starting from January 1, 2018, we have adopted K-IFRS No. 1109 'Financial Instruments" and K-IFRS No. 1115 'Revenue from Contracts with Customers.' See note 3(w) to our unaudited condensed consolidated interim financial statements as of March 31, 2018 and for the three months ended March 31, 2017 and 2018 included elsewhere in the Offering Circular.

### K-IFRS No. 1109 'Financial Instruments'

K-IFRS No. 1109 sets out the requirements for recognizing and measuring financial assets, financial liabilities and certain contracts to buy or sell non-financial items. It replaces existing guidance in K-IFRS No. 1039 'Financial Instruments: Recognition and Measurement.'

K-IFRS No. 1109 includes a new classification and measurement of financial assets that reflect the business model in which assets are managed and their cash flow characteristics. Under K-IFRS No. 1109, financial assets are classified into three principal categories: measured at amortized cost, fair value through other comprehensive income ("FVOCI") and fair value through profit or loss ("FVTPL") based on the business model in which assets are managed and their cash flow characteristics. Under K-IFRS No. 1109, derivatives embedded in hybrid contracts where the host is a financial asset are not bifurcated. Instead, the hybrid financial instrument as a whole is assessed for classification.

Under K-IFRS No. 1109, the amount of change in the fair value attributable to changes in the credit risk of financial liabilities is presented in other comprehensive income ("OCI") rather than being recognized in profit or loss, and the OCI amount will not be reclassified (recycled) to profit or loss. However, if doing so creates or increases an accounting mismatch, the amount of change in the fair value is recognized in profit or loss. K-IFRS No. 1109 replaces the 'incurred loss' model in the existing standard with a forward-looking 'expected credit loss' model for debt instruments, lease receivables, contractual assets, loan commitments and financial guarantee contracts. When initially applying K-IFRS No. 1109, an entity may elect to continue to apply the hedge accounting requirements of K-IFRS No. 1039. We have elected to continue to apply the hedge accounting requirements of K-IFRS No. 1039.

### K-IFRS No. 1115 'Revenue from Contracts with Customers'

K-IFRS No. 1115 sets out a comprehensive framework for determining whether revenue is recognized, the extent of revenue recognized and when revenue is recognized. It replaces existing revenue recognition guidance, including K-IFRS No. 1018 'Revenue,' K-IFRS No. 1011 'Construction Contracts,' K-IFRS No. 2031 'Revenue-Barter transactions involving advertising services,' K-IFRS No. 2113 'Customer Loyalty Programs,' K-IFRS No. 2115 'Agreements for the construction of real estate,' and K-IFRS No. 2118 'Transfers of assets from customers.'

Existing K-IFRS standards and interpretations including K-IFRS No. 1018 provide revenue recognition guidance by transaction types such as sales of goods, rendering of services, interest income, royalty income, dividend income and construction revenue; however, under the new standard, K-IFRS No. 1115, the five-step approach (Step 1: Identify the contract(s) with a customer, Step 2: Identify the performance obligations in the contract, Step 3: Determine the transaction price, Step 4: Allocate the transaction price to the performance obligations in the contract and Step 5: Recognize revenue when the entity satisfied a performance obligation) is applied for all types of contracts or agreements.

### Critical Accounting Policies

We have prepared our consolidated financial statements in accordance with K-IFRS. These accounting principles require us to make certain estimates and judgments that affect the reported amounts in our consolidated financial statements. Critical accounting policies are defined as those that are both most important to the portrayal of our financial condition and results of operations and require our management's most difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of

matters that are inherently uncertain and may change in subsequent periods. Our estimates and judgments are based on historical experience, forecasted future events and various other assumptions that we believe to be reasonable under the circumstances. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting the estimate may differ significantly from the management's current judgments. We evaluate our estimates and judgments on an ongoing basis. We believe the following represents our critical accounting policies.

### *Property, Plant and Equipment*

Our property, plant and equipment are depreciated on a straight-line basis over their estimated useful lives or unit-of-production method (for loaded nuclear fuel and asset retirement costs of spent fuel). The depreciable lives and salvage residual values of these assets are estimated and reviewed at each reporting date. Such estimates are made based on management's knowledge of the useful lives, prior experience to reflect economic lives of these assets and takes into account anticipated technological or other changes lives and salvage residual values of these assets are estimated and reviewed at each reporting date and such estimates are made based on management's knowledge of the useful lives and prior experience to reflect economic lives of these assets. The estimated useful lives of our buildings are between 8 to 32 years, structures are between 8 to 50 years, machinery is between 6 to 32 years, loaded heavy water is 30 year, asset retirement costs of nuclear power plants is 30, 40 and 60 years and others are between 4 to 32 years. We review our depreciation methods, useful lives and residual values at the end of each financial year and makes adjustments, if appropriate.

At each reporting date, we review the carrying amounts of property, plant and equipment to determine whether there is any indication that the carrying amount of these assets may not be recoverable through continuing use. If any such indication exists, then the asset's recoverable amount is estimated. The recoverable amount is the greater of its value-in-use and its fair value less costs to sell. An impairment loss is recognized if the carrying amount exceeds its recoverable amount and impairment losses are recognized in profit or loss. No impairment loss was recognized in 2015, 2016 and 2017 and the three months ended March 31, 2017 and 2018.

Our estimates of the useful lives and recoverable amounts of our assets are based on historical trends adjusted to reflect our best estimate of future market and operating conditions. Our estimates include the expected future period in which the future cash flows are expected to be generated from continuing use of the assets that we review for impairment and cash outflows to prepare the assets for use that can be directly attributed or allocated on a reasonable and consistent basis.

While we believe that our estimates of the useful lives and recoverable amounts of our assets are reasonable, different assumptions regarding such estimates could produce different results, which could have a material impact on us. We review our depreciation methods, useful lives and residual values at the end of each financial year and makes adjustments, if appropriate. For further information regarding our assumptions, see note 3 to our audited financial statements as of and for the years ended December 31, 2016 and 2017 and note 3 to our unaudited condensed consolidated interim financial statements as of and for the three months ended March 31, 2017 and 2018, included elsewhere in the Offering Circular.

### *Retirement of Tangible Assets*

Provisions are recognized when we have a present obligation (legal or constructive) as a result of a past event, it is probable that we will be required to settle the obligation,

and a reliable estimate can be made of the amount of the obligation. The amount recognized as a provision is the best estimate of the consideration required to settle the present obligation at the end of the reporting period, taking into account the risks and uncertainties surrounding the obligation. When a provision is measured using the cash flows estimated to settle the present obligation, its carrying amount is the present value of those cash flows (where the effect of the time value of money is material).

Asset retirement obligations including the decommissioning costs of nuclear facilities are adjusted for changes in the estimate of expected undiscounted cash flows or discount rate as of each reporting date. The asset retirement obligations are remeasured at each reporting date using an updated discount rate that reflects the then current market conditions. As of March 31, 2018, we estimated our asset retirement obligations based on an average discount rate of 2.94% and average inflation rate of 1.21%. Due to changing market and economic conditions, the underlying key assumptions may differ from actual developments and may lead to significant changes in our retirement of tangible assets. See note 39 to our audited financial statements as of and for the years ended December 31, 2016 and 2017 and note 39 to our unaudited condensed consolidated interim financial statements as of and for the three months ended March 31, 2017 and 2018, included elsewhere in the Offering Circular.

### Deferred Income Tax Assets

In assessing the realization of deferred income tax assets, we consider whether it is probable that a portion or all of the deferred income tax assets will not be realized. The ultimate realization of our deferred income tax assets is dependent on whether we are able to generate future taxable income in specific tax jurisdictions during the periods in which temporary differences become deductible.

We have scheduled the expected future reversals of the temporary differences and projected future taxable income in making this assessment. However, the amount of deferred tax assets may be different if we do not realize estimated future taxable income during the carry forward periods as originally expected. See note 3 to our audited financial statements as of and for the years ended December 31, 2016 and 2017 and note 3 to our unaudited condensed consolidated interim financial statements as of and for the three months ended March 31, 2017 and 2018, included elsewhere in the Offering Circular.

### Retirement benefit plans

We offer defined benefit plans to our employees. The cost of providing benefits is determined using the Projected Unit Credit Method, with actuarial valuations being carried out at each reporting period. For actuarial valuations, discount rate, future salary increase and expected return on plan assets are estimated and these estimations are uncertain. The discount rates are determined by reference to the yield at the reporting date on high quality corporate bonds that have maturity dates approximating the terms of our benefits obligations and that are denominated in the same currency in which the benefits are expected to be paid. The expected rate of returns assumptions on plan assets are based on the rate used to discount the defined benefit obligation. Due to changing market and economic conditions, the underlying key assumptions may differ from actual developments and may lead to significant changes in our defined benefit plan. See note 39 to our audited financial statements as of and for the years ended December 31, 2016 and 2017 and note 39 to our unaudited condensed consolidated interim financial statements as of and for the three months ended March 31, 2017 and 2018, included elsewhere in the Offering Circular.

**Results of Operations**

### Results of Operations for the Years ended December 31, 2015, 2016 and 2017 and the Three Months Ended March 31, 2017 and 2018

The table below presents statement of comprehensive income information for the years/periods indicated.

| | For the Year Ended December 31, | | | | For the Three Months Ended March 31, | | |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2017[1] | 2017 | 2018 | 2018[1] |
| | (In billions of Won and millions of U.S. Dollars) | | | | | | |
| Revenue ........................................ | ₩10,747 | ₩11,277 | ₩ 9,511 | US$8,918 | ₩ 2,688 | ₩ 1,984 | US$1,860 |
| Cost of sales................................. | (6,784) | (7,229) | (7,892) | (7,400) | (1,899) | (1,758) | (1,648) |
| Gross profit.................................. | 3,963 | 4,048 | 1,619 | 1,518 | 789 | 226 | 212 |
| Selling and administrative expenses................................... | (172) | (201) | (222) | (208) | (49) | (43) | (40) |
| Operating profit ........................... | 3,791 | 3,847 | 1,397 | 1,310 | 740 | 183 | 172 |
| Other income ............................... | 38 | 32 | 37 | 35 | 7 | 8 | 8 |
| Other expenses............................. | (24) | (92) | (83) | (78) | (9) | (7) | (7) |
| Other profit, net............................ | 7 | 12 | 10 | 9 | 10 | 1 | 1 |
| Finance income ............................ | 246 | 128 | 426 | 399 | 271 | 27 | 25 |
| Finance expenses ......................... | (776) | (600) | (835) | (783) | (372) | (193) | (181) |
| Equity method gain (loss) of associates, net ....................... | (4) | (56) | 3 | 3 | (0) | 1 | 1 |
| Profit before income taxes........... | 3,278 | 3,271 | 955 | 895 | 647 | 20 | 19 |
| Income tax (expense) benefit....... | (822) | (799) | (92) | (86) | (79) | 45 | 42 |
| Profit for the period ..................... | 2,456 | 2,472 | 863 | 809 | 568 | 65 | 61 |
| Total other comprehensive income (loss), net of tax .......... | (17) | (27) | 24 | 23 | (1) | 1 | 1 |
| Total comprehensive income for the period................................. | ₩ 2,439 | ₩ 2,445 | ₩ 887 | US$ 832 | ₩ 567 | ₩ 66 | US$ 62 |

_____

Note:

(1)  We maintain our financial statements in Won. The Won financial information for the year ended December 31, 2017 and for the three months ended March 31, 2018 has been translated into U.S. dollars at the exchange rate of Won 1,066.5 to US$1.00, which was the Market Average Exchange Rate in effect on March 31, 2018.

### Three Months ended March 31, 2018 Compared to Three Months ended March 31, 2017

Our revenue, substantially all of which is derived from the sales of electric power to KEPCO, decreased by 26.2% to Won 1,984 billion for the three months ended March 31, 2018 from Won 2,688 billion for the three months ended March 31, 2017, mainly due to a 27.0% decrease in the volume of electricity sold to 27,706 GWh in the three months ended March 31, 2018 from 37,965 GWh in the three months ended March 31, 2017 and a 1.1% decrease in the average unit price of electricity sold to Won 68.58 per kWh in the three months ended March 31, 2018 from Won 69.32 per kWh in the three months ended March 31, 2017. The decrease in the volume of electricity sold was mainly due to regular safety and maintenance inspections and safety improvement works at our nuclear plants, which required closure of certain generation units at such plants during the first quarter of 2018. The decrease in the average unit price of electricity sold was mainly due to a decrease in the adjusted coefficient applicable to nuclear energy.

Cost of sales decreased by 7.4% to Won 1,758 billion in the three months ended March 31, 2018 from Won 1,899 billion in the three months ended March 31, 2017, primarily as a result of a 28.8% decrease in amortization of nuclear fuel to Won 205 billion in the three months ended March 31, 2018 from Won 288 billion in the three months ended March 31, 2017, a 13.3% decrease in repairs to Won 183 billion in the three months ended March 31, 2018 from Won 211 billion in the three months ended March 31, 2017, a 12.5% decrease in raw materials used to Won 161 billion in the three months ended March 31, 2018 from Won 184 billion in the three months ended March 31, 2017 and a 20.4% decrease in expense for other provisions to Won 90 billion in the three months ended March 31, 2018 from Won 113 billion in the three months ended March 31, 2017. The decrease in amortization of nuclear fuel was due to a decrease in the volume of electricity generated in the three months ended March 31, 2018 compared to the three months ended March 31, 2017 and a corresponding decrease in the rate of depreciation of nuclear fuel in accordance with the unit-of-production method. The decrease in repairs was primarily due to less capital intensive maintenance and safety improvement works being carried out in the three months ended March 31, 2018 compared to the three months ended March 31, 2017. The decrease in raw materials used was due to the decrease in the volume of electricity generated. The decrease in expense for other provisions was due to decreases in expenses related to our compliance with our RPS and reduction in expenses related to our greenhouse gas emission obligations.

As a result of the above factors, our gross profit decreased by 71.4% to Won 226 billion in the three months ended March 31, 2018 from Won 789 billion in the three months ended March 31, 2017. Our gross profit margin decreased to 11.4% in the three months ended March 31, 2018 from 29.4% in the three months ended March 31, 2017.

Our selling and administrative expenses decreased by 12.2% to Won 43 billion in the three months ended March 31, 2018 from Won 49 billion in the three months ended March 31, 2017. This decrease was primarily attributable to a decrease in other employee benefits, which returned to normal levels in the three months ended March 31, 2018 after paying back wages and benefits to employees in the three months ended March 31, 2017 in compliance with court rulings that expanded the scope of ordinary wages.

As a result of the above factors, our operating profit decreased by 75.3% to Won 183 billion in the three months ended March 31, 2018 from Won 740 billion in the three months ended March 31, 2017, and our operating profit margin decreased to 9.2% in the three months ended March 31, 2018 from 27.5% in the three months ended March 31, 2017.

We incurred net other income of Won 1 billion in the three months ended March 31, 2018 compared to net other expense of Won 2 billion in the three months ended March 31, 2017, due to various factors.

Our net other profit decreased by 90.0% to Won 1 billion in the three months ended March 31, 2018 from Won 10 billion in the three months ended March 31, 2017, primarily due to a decrease in net gain on foreign currency transactions to Won 1 billion in the three months ended March 31, 2018 from Won 7 billion in the three months ended March 31, 2017, largely due to the fluctuation of the exchange rates of Korean Won against major foreign currencies, especially the U.S. dollar.

Our net finance expense increased by 64.4% to Won 166 billion in the three months ended March 31, 2018 from Won 101 billion in the three months ended March 31, 2017, principally due to a significant decrease in net gain on foreign currency translations to Won 13 billion in the three months ended March 31, 2018 from Won 261 billion in the three months ended March 31, 2017, related primarily to a significant appreciation of the Korean Won against the U.S. dollar in the three months ended March 31, 2017 compared to a relatively stable exchange rate between the Korean Won and the U.S. dollar in the three

PUBLIC VERSION

# Exhibit 2

PUBLIC VERSION

**OFFERING CIRCULAR**                                    **STRICTLY CONFIDENTIAL**



# KOREA MIDLAND POWER CO., LTD.

*(incorporated with limited liability under the laws of the Republic of Korea)*

## U.S.$3,000,000,000 Euro Medium Term Notes Program

This Offering Circular replaces and supersedes the offering circular dated October 20, 2017 describing the Program (as defined below). Any Notes (as defined below) issued under the Program on or after the date of this Offering Circular are issued subject to the provisions described herein. This does not affect any Notes issued prior to the date of this Offering Circular.

Under this U.S.$3,000,000,000 Euro Medium Term Note Program (the "Program"), Korea Midland Power Co., Ltd. (the "Issuer") may from time to time issue notes in bearer and/or registered form (respectively, "Bearer Notes" and "Registered Notes" and, together, the "Notes") denominated in any currency agreed between the Issuer and the relevant Dealer (as defined below).

The maximum aggregate nominal amount of all Notes from time to time outstanding under the Program will not exceed U.S.$3,000,000,000 (or its equivalent in other currencies calculated as described herein). The Notes may be issued on a continuing basis to one or more of the dealers specified under "Summary of the Program" and any additional dealer appointed under the Program from time to time, which appointment may be for a specific issue or on an ongoing basis (each a "Dealer" and together the "Dealers"). References in this Offering Circular to the "relevant Dealer" shall, in the case of an issue of Notes being (or intended to be) subscribed by more than one Dealer, be to all Dealers agreeing to purchase such Notes.

Approval in-principle has been received from the Singapore Exchange Securities Trading Limited (the "Singapore Stock Exchange") in connection with the Program and application will be made for the listing and quotation of Notes that may be issued pursuant to the Program and which are agreed at or prior to the time of issue thereof to be so listed on the Singapore Stock Exchange. Such permission will be granted when such Notes have been admitted for listing and quotation on Singapore Stock Exchange. The Singapore Stock Exchange assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained herein. Approval in-principle from, admission to the Official List of, and listing and quotation of any of the Notes on, the Singapore Stock Exchange are not to be taken as an indication of the merits of the Issuer, the Program or the Notes. Notice of the aggregate nominal amount of Notes, interest (if any) payable in respect of Notes, the issue price of Notes and any other terms and conditions not contained herein which are applicable to each tranche of Notes will be set out in a pricing supplement (the "Pricing Supplement"), a copy of which, with respect to Notes to be listed on the Singapore Stock Exchange, will be submitted to the Singapore Stock Exchange before the date of listing of the Notes of such tranche.

Notification under Section 309B(1)(c) of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA") — Unless otherwise stated in the Pricing Supplement in respect of any Notes, the Issuer has determined, and hereby notifies all relevant persons (as defined in Section 309A(1) of the SFA) that the Notes to be issued under the Program shall be prescribed capital markets products (as defined in the Securities and Futures (Capital Markets Products) Regulations 2018 of Singapore) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

The Program provides that the Notes may be listed or admitted to trading on such other or further stock exchange(s) as may be agreed between the Issuer and the relevant Dealer. The Issuer may also issue unlisted Notes.

The Notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or with any securities regulatory authority of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the Securities Act ("Regulation S")) except pursuant to an exemption from the registration requirements of the Securities Act. Bearer Notes are subject to U.S. tax law requirements and may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons (as defined in the U.S. Internal Revenue Code of 1986, as amended, and regulations thereunder (the "Code")). For a description of these and other restrictions on transfer, see "Subscription and Sale — Selling Restrictions."

The Issuer may agree with any Dealer that Notes may be issued in a form not contemplated by the Terms and Conditions of the Notes herein, in which event a supplementary Offering Circular, if appropriate, will be made available which will describe the effect of the agreement reached in relation to such Notes.

**See "Risk Factors" beginning on page 10 for a discussion of certain factors to be considered in connection with an investment in the Notes.**

*Arranger*

**Citigroup**

*Dealers*

**BNP PARIBAS**                                    **HSBC**

The date of this Offering Circular is January 11, 2019.

PUBLIC VERSION

**RISK FACTORS**

*Prospective purchasers of the Notes should carefully consider all of the information contained in this Offering Circular, including our financial statements and related notes, in addition to the following risk factors. In particular, investors should pay attention to the fact that we are subject to the legal and regulatory environment of Korea which in many respects differs from that which prevails in other countries.*

**Risks Relating to Our Business**

***The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability.***

Since our establishment, the Government has introduced successive policy initiatives to foster efficiency in the Korean electric power industry and has adopted policy measures that have substantially modified our business and operations. However, these policy initiatives have not always been fully implemented as originally planned and in some cases have been amended or replaced by new initiatives, among others, due to economic or policy considerations or a change in administration. There can be no assurance that the initiatives and plans announced by the Government will be implemented as planned or at all, or that the implementation of any such plans will not have a negative effect on our business, results of operations or financial condition.

In June 2016, the Government announced plans to reform state-owned enterprises in the energy and resources development sector, including KEPCO, our parent company, and the electric power industry in general. The Government plan involves, among other things, the gradual liberalization of the electric power industry with respect to the distribution market, as well as the initial public offering of the Generation Subsidiaries, including us, in conjunction with the sale of minority interests (20% to 30%) in such subsidiaries, by 2020. See "The Korean Electricity Industry — Restructuring of the Electricity Industry in Korea."

In May 2017, Moon Jae-In was elected as President of Korea. Soon after assuming office, President Moon vowed to fulfill his campaign promises to reduce fine dust and pollutant emissions and ordered the (i) suspension of coal-fired generation units that have been in service for more than 30 years for the month of June 2017 and staggered, if not suspended, operations of such old coal-fired generation units during the spring season in 2018 and beyond when yellow dust storms are more frequent, (ii) accelerated decommissioning of such old coal-fired generation units and (iii) suspension of construction of new coal-fired generation units and reevaluation of coal-fired generation projects less than 10% into construction. Pursuant to such measures, we suspended the operations of our Boryeong units no. 1 and 2 during the spring season of 2018 and plan to continue to do so on an annual basis until their scheduled decommissioning by 2022. It is presently unclear how these measures will affect us as they are implemented, and it is uncertain whether the Government will accelerate the decommissioning of our Boryeong units no. 1 and 2. See "Business — Independent Power Producer and Community Energy System Projects." The implementation of these measures, which may reduce our sales and/or increase our costs, including capital expenditures, may have a material adverse effect on our business, results of operations and financial condition.

***Environmental regulations may adversely affect our operations.***

We are required to comply with numerous laws and regulations relating to the protection of the environment and land use in Korea. See "Business — Environment." These laws and regulations are constantly changing. While we believe we are in compliance with applicable environmental laws and regulations in all material respects and that we have obtained all material environmental approvals currently required to own and operate our facilities, we may incur significant costs as a result of these requirements.

In December 2010, the Government adopted the Renewable Portfolio Standard ("RPS"), under which each generation company, including us, is required to supply 10% of the total energy generated from such generation company in the form of renewable energy by 2023, with fines being levied on any generation

company failing to do so in the prescribed timeline. While we did not meet the RPS targets during the first two years of implementation in 2012 and 2013 and were levied fines of Won 48 billion and Won 11 billion, respectively, for non-compliance, we met the RPS targets of 3% for 2015, 3.5% for 2016 and 4% for 2017. While we intend to increase the proportion of generation capacity from renewable energy relative to generation capacity from non-renewable energy in order to meet our RPS targets, there is no assurance that we will be able to do so quickly enough to meet the RPS targets. Furthermore, while we expect that additional capital expenditures to increase generation capacity from renewable energy will be covered by a corresponding increase in electricity tariff levied on end-users, which will in turn increase the amount payable to us by KEPCO, there is no assurance that the Government will in fact raise the electricity tariff to a level sufficient to fully cover such additional capital expenditures or at all.

In addition, in 2015, the Government implemented a carbon emission trading system in order to reduce the emission of greenhouse gases by 37% from 2030 business-as-usual levels in accordance with the Act on Allocation and Trading of Greenhouse Gas Emission Allowances. Under the Government's emission trading system, the Government allocates emission allowance units to companies in certain industries, including generation companies, and such companies are allowed to emit levels of greenhouse gases based on the number of allowance units that have been allocated to them. If a company emits more than the amount of allowance units that have been allocated to it, the company must purchase additional allowance units on the emission trading system. In 2017, we emitted approximately 40.6 million tons of carbon equivalents, which was more than the 36.9 million tons in allowance units that had been allocated to us for that year, and as a result, we purchased 3.7 million tons in allowance units on the emission trading system and incurred an additional cost of Won 71 billion. Adhering to such annual emission reduction targets is expected to result in our incurring significant compliance costs.

In December 2016, the Ministry of Trade, Industry and Energy (the "MOTIE") and the five non-nuclear Generation Subsidiaries, including us, entered into an agreement to reduce fine dust and pollutant emissions from coal-fired generation units. The agreement calls for the Generation Subsidiaries to invest a total of Won 11.6 trillion in pollution reduction equipment in existing and new coal-fired generation units, as well as the decommissioning of old coal-fired generation units, including Boryeong units no. 1 and 2, by 2022.

Failure to comply with environmental laws and regulations could have a material adverse effect on us, including closure of individual facilities not in compliance, as well as the imposition of civil or criminal liability and the imposition of liens or fines, and expenditures to bring facilities into compliance.

***The introduction of the vesting contract system has been indefinitely suspended and may not achieve the desired benefits when fully implemented.***

On May 20, 2014, the Electricity Business Act was amended to introduce a vesting contract system to determine the price and quantity of electricity to be sold and purchased through the KPX between the purchaser of electricity (currently, KEPCO) and the sellers of electricity (namely, the Generation Subsidiaries (including us) and independent power producers ("IPPs")).

Under the vesting contract system, electricity generators using base load fuels (such as nuclear, coal, hydro and by-product gas) at a particular generation unit were to be required to enter into a contract with the purchaser of electricity (currently, KEPCO), which would specify, among other things, the quantity of electricity to be generated and sold from such generation unit and the price at which such electricity would be sold, subject to certain adjustments.

The introduction of the vesting contract system was intended principally to prevent excessive profit-taking by low-cost producers of electricity using base load fuels (such as nuclear, coal, hydro and by-product gas) by replacing the adjusted coefficient as the basis for determining the guaranteed return to generation companies, as well as to enhance the stability of electricity supply by requiring long-term contractual arrangements for the purchase and sale of electricity and promote cost savings, productivity enhancements and operational efficiency by providing incentives and penalties depending on the degree to which the generation companies could supply electricity at costs below the contracted electricity prices.

PUBLIC VERSION

In order to minimize undue shock to the electricity trading market in Korea, the vesting contract system was to be implemented in phases starting with by-product gas-based electricity in 2015. The rollout of the vesting contract system was further studied by a task force consisting of representatives from the Government, the KPX and generation companies. Following such study, the Government announced in June 2016 that, due to changes in the electricity business environment (including an increase in generation capacity relative to peak usage, reduced fuel costs following a decline in oil prices and greater environmental concerns related to coal- fired electricity generation), it will indefinitely suspend any further rollout of the vesting contract system beyond by-product gas-based electricity, and retain the adjusted coefficient-based electricity pricing adjustment mechanism. No assurance can be given that such system, if introduced, will not adversely affect our business, results of operation or financial condition in the future. See "The Korean Electricity Industry — Vesting Contract System."

***Our capacity expansion plans, which are based on Government projections on long-term supply and demand of electricity in Korea, may prove to be inadequate.***

We make plans for expanding or upgrading our generation capacity based on the Government's Basic National Energy Plan, as well as the Power Supply and Demand Basic Plan (the "Basic Plan"). The Basic Plan is announced and revised generally every two years by the Government.

In January 2014, the Government announced the Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, for the period from 2013 to 2035. The Second Basic National Energy Plan focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing electricity demand by 15% by 2035, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying the latest greenhouse gas emission reduction technologies to newly constructed generation units in order to further promote safety and environmental friendliness, (iv) strengthening exploration and procurement capabilities to enhance Korea's energy security and to ensure stable supply of energy and increasing the portion of electricity supplied from renewable sources to 11% by 2035, (v) reinforcing the system for stable supply of conventional energy, such as oil and gas and (vi) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of consumers in the low income group. In addition, the Second Basic National Energy Plan revised the target level of nuclear generation capacity in Korea's electricity supply mix to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008. In March 2018, the Government announced its plan to establish the Third Basic National Energy Plan, which is expected to take place in 2019.

In December 2017, the Government released the Eighth Basic Plan which serves as the guideline for stable medium- and long-term supply of electric power. The objectives of the Eighth Basic Plan include, among other things, (i) increasing efforts to address environmental and safety concerns, including reducing greenhouse gas emission and yellow dust, (ii) decreasing the portion of electricity supplied using nuclear and coal energy sources, (iii) increasing the portion of electricity supplied from renewable energy, in particular solar and wind power, and (iv) promoting the replacement of coal with LNG as an energy source by reducing the gap in expenses incurred in using the respective fuel types, for example, by adjusting the consumption tax rates applicable to the respective fuel types. Furthermore, the Eighth Basic Plan includes the following implementing measures: (i) six new nuclear generation units in planning stages will not be constructed, (ii) the extension of life of 10 decrepit nuclear generation units will not be granted, (iii) Wolsong #1 unit will not count as part of domestic energy generation capacity, (iv) seven decrepit coal-fired generation plants will be retired by 2022, (v) six other coal-fired generation plants shall be converted to LNG fuel use and (vi) domestic renewable energy generation capacity shall be expanded to 58.5 gigawatts by 2030. We decommissioned our Seocheon thermal anthracite coal-fired units in June 2017, and pursuant to the Eighth Basic Plan, we intend to decommission our Boryeong units no. 1 and 2 by 2022.

We cannot assure you that the Second Basic National Energy Plan, the Eighth Basic Plan or any future plans to be subsequently adopted, will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable rates to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is a significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand, or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on our part, which may have a material adverse effect on our results of operations, financial condition and cash flows.

***We are dependent on fuel imported from overseas suppliers in currencies other than Won under contracts with varying quantity and duration, and rising fuel costs, if not fully passed through to KEPCO, could adversely affect our results of operations.***

Fuel costs, which represent raw materials used of our cost of sales, constituted 65.3%, 61.0%, 68.2%, 66.4% and 72.3% of our sales, and 72.4%, 72.7%, 73.5%, 75.8% and 79.5% of our cost of sales, in 2015, 2016, 2017 and the nine months ended September 30, 2017 and 2018, respectively. Substantially all of the fuel we use comes from sources outside Korea, and the fuel cost is impacted by the exchange rates between the Won and the relevant foreign currency in which prices are set. In addition, we purchase a significant portion of our fuel requirements under contracts with limited quantity and duration. See "Business — Fuel."

Substantially all of our bituminous coal requirements are imported from approximately 26 suppliers located in Australia, Indonesia, South Africa, the United States, Russia and Colombia under long-term or spot contracts. Approximately 74%, 79%, 67%, 70% and 80% of our bituminous coal requirements were purchased under long-term contracts in 2015, 2016, 2017 and the nine months ended September 30, 2017 and 2018, respectively, with the remaining requirements being purchased on the spot market. Approximately 40%, 23%, 11%, 10%, 9% and 7% of our annual bituminous coal requirements were imported from Australia, Indonesia, South Africa, the United States, Russia and Colombia, respectively, in the nine months ended September 30, 2018. We purchase a substantial portion of our domestic LNG requirements from Korea Gas Corporation ("KOGAS") under a long-term supply contract.

In recent years, the prices of fuel, including bituminous coal, oil and LNG, have fluctuated significantly. If fuel prices increase sharply within a short span of time, we may be unable to secure requisite fuel supplies at prices that we were able to obtain during prior periods. In addition, any significant interruption or delay in the supply of fuel (bituminous coal and LNG in particular) from any of our suppliers could cause us to purchase fuel on the spot market at prices higher than the prices available under existing supply contracts, resulting in an increase in fuel cost.

While increases in our fuel costs are fully passed through to KEPCO in its purchase of electricity from us under the current cost-based pool system, such pass-through is subject to a two-month time lag, and accordingly, fuel cost increases, including cost increases resulting from the depreciation of the Won against the U.S. dollar or other currencies, could adversely affect our results of operations if the price of electricity payable to us by KEPCO does not timely capture such fuel cost increases for the relevant financial reporting period. Furthermore, in determining the adjusted coefficient for the marginal price component of the price of electricity sold by us to KEPCO by way of KPX, the Cost Evaluation Committee, a committee composed of representatives from the Government, KEPCO and the Generation Subsidiaries, including us, considers various factors, including the market prices of fuels, electricity tariff rates and their impact on the relative fair investment returns for KEPCO and the Generation Subsidiaries, including us, among others. Therefore, in the event of a sustained or rapid rise in fuel costs which impact is not sufficiently offset by a corresponding rise in electricity tariff rates in a timely manner and as a result would significantly hurt KEPCO's profitability, the adjusted coefficient may be set at a level which would have the effect of lowering the fair investment return for the Generation Subsidiaries, including us, and, in turn, the overall profitability of our operations. For instance, in March 2013 the Cost Evaluation Committee imposed a price cap on the marginal price of electricity sold by us to KEPCO. Such price cap has affected our LNG and oil generation units, which accounted for approximately 38.8% in aggregate of our installed capacity as of September 30, 2018. In

PUBLIC VERSION

addition, in August 2018, the adjusted coefficient was significantly reduced. Both the price cap and the reduction in the adjusted coefficient have had and may have a material adverse effect on our results of operation and financial condition. See "The Korean Electricity Industry — Power Purchase — Cost-based Pool System — Marginal Price."

*We anticipate substantial capital expenditures, which will require additional debt incurrence in the future.*

We anticipate that substantial capital expenditures will be required in the future for construction of additional generation facilities as discussed in "Business — Capital Investment Program." Our capital expenditures, which represent the sum of acquisition of property, plant and equipment, construction-in-progress and intangible assets in our statements of cash flows, were Won 1,286 billion in 2015, Won 1,151 billion in 2016, Won 1,086 billion in 2017, Won 829 billion for the nine months ended September 30, 2017 and Won 899 billion for the nine months ended September 30, 2018. We have budgeted Won 1,855 billion, Won 1,178 billion, Won 1,130 billion and Won 898 billion for capital expenditures for 2018, 2019, 2020 and 2021, respectively. The budgeted amounts may vary from the actual amounts of our capital expenditures for a variety of reasons, including changes in the number of units to be constructed and the timing of such construction, changes in rates of exchange between the Won and foreign currencies, changes in interest rates and other factors. For example, in December 2017, the Government announced its plans to increase the portion of renewable energy generated in Korea to 20% of the total energy generated in Korea by 2030, which calls for the Generation Subsidiaries, including us, to make significant investments in the construction and operation of power plants fueled by renewable energy. In preparation for such plans, we have estimated a total of approximately Won 3.5 trillion to be expended through 2030. Although we plan to fund a majority of our capital expenditures with net cash from operating activities, no assurance can be given that we will be able to do so. We expect that a portion of our future capital expenditures will need to be financed through foreign currency borrowings in the international capital markets, as well as borrowings of Korean Won in the domestic capital market. It is possible that the required financing may not be available to us or that the cost at which such financing may be available may not be acceptable to us. In addition to funding requirements relating to our capital investment program, payments of principal and interest on indebtedness will require considerable capital resources. If we are unable to obtain debt financing at acceptable rates on a timely basis, or at all, we may be unable to meet our funding requirements or debt repayment obligations, which could have a material adverse impact on our business and results of operations and could lead to a decline in the market value of the Notes.

Recently, in light of the general policy guidelines of the Government for public enterprises (including us) in general to reduce their respective overall debt levels, including by way of disposing of equity interests in unprofitable subsidiaries and other non-core assets, we are currently evaluating ways to reduce our debt levels. We cannot provide assurances that we will be able to successfully reduce debt burdens to a level contemplated by the Government or to a level that would be optimal for our capital structure. If we fail to reduce debt burdens to a level contemplated by the Government or the measures taken by us to reduce debt levels have unintended adverse consequences, such developments may have an adverse effect on our business, results of operation and financial condition.

*The movement of the Won against the U.S. dollar and other currencies may have a material adverse effect on us.*

The Won has fluctuated significantly against major currencies from time to time. Depreciation of the Won against the U.S. dollar and other foreign currencies typically results in a material increase in the cost of fuel and equipment purchased by us from overseas since the prices for substantially all of the fuel and a significant portion of the equipment we purchase are denominated in currencies other than the Won, generally inU.S. dollars. Changes in foreign exchange rates may also impact the cost of servicing our foreign currency-denominated debt. As of September 30, 2018, 10.9% of our long-term debt before accounting for swap transactions, was denominated in foreign currencies, 80.9% of which were in U.S. dollars. In addition, as is the case with LNG purchased from KOGAS, even if we make payments in Won for certain sources of fuel and equipment, some of these sources of fuel may originate from other countries and their prices may be affected accordingly by the exchange rates between the Won and foreign currencies, especially the U.S. dollar. Since substantially all of our sales are denominated in Won, we must generally obtain foreign

currencies through foreign currency-denominated financings or from foreign currency exchange markets to make such purchases or service such debt. As a result, any significant depreciation of the Won against the U.S. dollar or other major foreign currencies may have a material adverse effect on our profitability and results of operations.

***Our risk management procedures may not prevent losses in debt and foreign currency positions.***

We manage interest rate exposure in our debt positions by limiting our variable-rate and fixed-rate exposures to percentages of total debt and by monitoring the effects of market changes in interest rates. We also actively manage the risks inherent in our foreign currency positions, which incorporate both our foreign currency-denominated assets and debt. For example, we enter into foreign currency contracts to hedge all of our imported bituminous coal requirements purchased in U.S. dollars, which is our primary foreign currency exposure. In addition, we hedge all of our U.S. dollar debt exposure through foreign currency swap contracts. We measure the potential loss using risk analysis software and enter into derivatives to hedge the exposure when the possible loss reaches a certain percentage of our total capitalization. To the extent we have unhedged positions or our hedging and other risk management procedures do not work as planned, our results of operations and financial condition could be adversely affected.

***Unexpected events, including natural disasters, may increase our cost of doing business or disrupt our operations.***

The occurrence of one or more unexpected events, including fires, tornadoes, tsunamis, hurricanes, earthquakes, floods and other forms of severe weather in Korea or in other countries where we operate or where our suppliers or customers are located could adversely affect our operations and financial performance. In addition, the normal operations of our facilities may be interrupted by accidents caused by operating hazards, power supply disruptions, equipment failures, natural disasters or other events. Any interruption (partial or complete) to our operations at our facilities as a result of any such accidents or otherwise could materially and adversely affect our business, financial condition and results of operations. There can be no assurance that such events will not occur in the future or that our production capacity will not be materially and adversely impacted as a result of such events.

***Our insurance coverage may not be sufficient.***

We have obtained a general commercial insurance policy to insure against fire, natural disasters and mechanical accidents up to Won 14.6 trillion as well as construction insurance on certain new projects in Seoul, Shin Seocheon and Boryeong up to Won 650 billion, Won 1,000 billion and Won 260 billion, respectively. We also have marine cargo insurance in respect of imported fuel and procurement with insurance coverage of Won 1.5 trillion, as well as general vehicle insurance. We also maintain directors' and officers' liability insurance.

While we believe that we carry insurance coverage meeting the expected standards in our industry, our insurance and indemnity policies do not cover all of the assets that we own and operate and do not cover all types or amounts of loss which could arise in connection with the ownership and operation of our power plants. We do not maintain insurance for business interruptions, terrorist attacks or war. As a result, significant accidents with damages over our "per occurrence" amount limitations that affect our assets, or other events for which we are not insured, such as an act of terrorism, could have a material adverse impact on our business and results of operations and could lead to a decline in the market value of the Notes. See "Business — Insurance."

***An increase in consumption tax on our fuel sources may have a material adverse effect on our business, operations and profitability.***

Effective July 2014, largely based on policy considerations of tax equity among different types of fuel sources as well as environmental concerns, the Government applied consumption tax to bituminous coal, which previously had not been subject to consumption tax unlike other types of fuel such as LNG and bunker oil. Pursuant to the amended Individual Consumption Tax Act, effective as of April 1, 2018, the base tax rate (which is subject to certain adjustments) is Won 36 per kilogram for bituminous coal; however, due to concerns on the potential adverse effect on industrial activities, the applicable tax rate is applied differently

PUBLIC VERSION

# Exhibit 3

**OFFERING CIRCULAR**                                         **STRICTLY CONFIDENTIAL**



# Korea East-West Power Co., Ltd.

*(incorporated with limited liability under the laws of the Republic of Korea)*

## US$500,000,000 2.625% Notes due 2022

The US$500,000,000 2.625% Notes due 2022 (the "Notes") of Korea East-West Power Co., Ltd. ("we" or "us") will mature on June 19, 2022 (the "Maturity Date"). The Notes will bear interest at the rate of 2.625% per annum from, and including, June 19, 2017 (the "Issue Date") to, but excluding, the Maturity Date. Interest will be payable in arrears on June 19 and December 19 in each year, commencing December 19, 2017. We may, at our option, redeem all, but not some only, of the Notes at any time at their principal amount plus accrued interest in the event of certain changes in tax law as described under "Terms and Conditions of the Notes — Optional Redemption Due to Changes in Tax Treatment".

The Notes are rated "Aa2" by Moody's Investors Service, Inc. ("Moody's) and "AA-" by Fitch Ratings Ltd ("Fitch"). A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organization.

The Notes will constitute our direct, unconditional, unsubordinated and unsecured obligations and shall at all times rank *pari passu* and without any preference or priority among themselves and with all of our other present and future direct, unconditional, unsubordinated and unsecured obligations, except as may be required by mandatory provisions of law.

Approval in-principle has been received from the Singapore Stock Exchange for the listing and quotation of the Notes on the Singapore Exchange Securities Trading Limited (the "Singapore Stock Exchange"). The Singapore Stock Exchange assumes no responsibility for the correctness of any of the statements made, opinions expressed or reports contained in this Offering Circular. Approval in-principle from, admission to the Official List of, and listing and quotation of the Notes on, the Singapore Stock Exchange are not to be taken as an indication of our merits or the merits of the Notes.

**The Notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any other jurisdiction, and may not be offered or sold within the United States or to U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the Notes are being initially offered and sold in the United States only to qualified institutional buyers (as defined in Rule 144A under the Securities Act) and outside the United States to non-U.S. persons in reliance on Regulation S under the Securities Act, in each case, in compliance with applicable laws, regulations and directives. For further details about eligible offerees and resale restrictions, see "Plan of Distribution" and "Transfer Restrictions".**

**Investing in the Notes involves risks. See "Risk Factors" beginning on page 8 to read about certain risk factors you should consider before buying the Notes.**

### Price: 99.152% per Note plus accrued interest, if any, from June 19, 2017.

Delivery of the Notes in book-entry form will be made on or about June 19, 2017.

---

*Joint Bookrunners*

**BNP PARIBAS**                **Citigroup**                **Crédit Agricole CIB**

**Nomura**                                                  **UBS**

The date of this Offering Circular is June 12, 2017.

## RISK FACTORS

*Prospective purchasers of the Notes should carefully consider all of the information contained in this Offering Circular, including our financial statements and related notes, in addition to the following risk factors. In particular, investors should pay attention to the fact that we are subject to the legal and regulatory environment of Korea which in many respects differs from that which prevails in other countries.*

**Risks Relating to Our Business**

***The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability.***

Since our establishment, the Government has introduced successive policy initiatives to foster efficiency in the Korean electric power industry and has adopted policy measures that have substantially modified our business and operations. However, these policy initiatives have not always been fully implemented as originally planned and in some cases have been amended or replaced by new initiatives, among others, due to economic or policy considerations or a change in administration. There can be no assurance that the initiatives and plans announced by the Government will be implemented as planned or at all, or that the implementation of any such plans will not have a negative effect on our business, results of operations or financial condition.

In June 2016, the Government announced plans to reform state-owned enterprises in the energy and resources development sector, including KEPCO, our parent company, and the electric power industry in general. The Government plan involves, among other things, the gradual liberalization of the electric power industry with respect to the distribution market, as well as the initial public offering of the Generation Subsidiaries, including us, in conjunction with the sale of minority interests (20% to 30%) in such subsidiaries, by 2020. See "The Korean Electricity Industry — Restructuring of the Electricity Industry in Korea."

In May 2017, Moon Jae-In was elected as President of Korea. Soon after assuming office, President Moon vowed to fulfill his campaign promises to reduce fine dust and pollutant emissions and ordered the (i) suspension of coal-fired generation units that have been in service for more than 30 years (excluding our Honam units 1 and 2) for the month of June 2017 and staggered operations of such old coal-fired generation units during the spring season when yellow dust storms are more frequent, (ii) accelerated decommissioning of such old coal-fired generation units and (iii) suspension of construction of new coal-fired generation units and reevaluation of coal-fired generation projects less than 10% into construction. It is presently unclear how these measures will affect us if and when they are implemented. While our Honam units 1 and 2, which are our only units that have been in service for more than 30 years, have been excluded from the group of old coal-fired generation units slated for suspension, it is uncertain whether the Government will accelerate the decommissioning of our Honam units 1 and 2, which are currently scheduled to be decommissioned in January 2021. Furthermore, it is uncertain which standard the Government will use to determine whether more than 10% of the Dangjin Eco Power project, which involves the construction of coal-fired generation units and in which we hold a 34% equity interest, has been constructed. See "Business — Independent Power Producer and Community Energy System Projects." The implementation of these measures, which may reduce our revenues and/or increase our costs, including capital expenditures, may have a material adverse effect on our business, results of operations and financial condition.

***Environmental regulations may adversely affect our operations.***

We are required to comply with numerous laws and regulations relating to the protection of the environment and land use in Korea. See "Business — Environment." These laws and regulations are constantly

changing. While we believe we are in compliance with applicable environmental laws and regulations in all material respects and that we have obtained all material environmental approvals currently required to own and operate our facilities, we may incur significant costs as a result of these requirements.

In December 2010, the Government adopted the Renewable Portfolio Standard ("RPS"), under which each generation company, including us, is required to supply 10% of the total energy generated from such generation company in the form of renewable energy by 2023, with fines being levied on any generation company failing to do so in the prescribed timeline. While we did not meet the RPS targets during the first two years of implementation in 2012 and 2013 and were levied fines of Won 35.4 billion and Won 78.6 billion, respectively, for non-compliance, we did meet the RPS targets of 3% for 2014 and 2015 and 3.5% for 2016. While we intend to increase the proportion of generation capacity from renewable energy relative to generation capacity from non-renewable energy in order to meet our RPS targets, there is no assurance that we will be able to do so quickly enough to meet the RPS targets. Furthermore, while we expect that additional capital expenditures to increase generation capacity from renewable energy will be covered by a corresponding increase in electricity tariff levied on end-users, which will in turn increase the amount payable to us by KEPCO, there is no assurance that the Government will in fact raise the electricity tariff to a level sufficient to fully cover such additional capital expenditures or at all.

In addition, in 2015, the Government implemented a carbon emission trading system in order to reduce the emission of greenhouse gases by 37% from 2030 business-as-usual levels in accordance with the Act on Allocation and Trading of Greenhouse Gas Emission Allowances. Under the Government's emission trading system, the Government allocates emission allowance units to companies in certain industries, including generation companies, and such companies are allowed to emit levels of greenhouse gases based on the number of allowance units that have been allocated to them. If a company emits more than the amount of allowance units that have been allocated to it, the company must purchase additional allowance units on the emission trading system. In 2015, we emitted approximately 38 million tons of carbon equivalents, which was less than the amount of allowance units that had been allocated to us for that year. The Government is currently evaluating our 2016 carbon emission level. Adhering to such annual emission reduction targets is expected to result in our incurring significant compliance costs.

In December 2016, the MOTIE and the five non-nuclear Generation Subsidiaries, including us, entered into an agreement to reduce fine dust and pollutant emissions from coal-fired generation units. The agreement calls for the Generation Subsidiaries to invest a total of Won 11.6 trillion in pollution reduction equipment in existing and new coal-fired generation units, as well as the decommissioning of old coal-fired generation units, including our Honam units 1 and 2 by January 2021.

Failure to comply with environmental laws and regulations could have a material adverse effect on us, including closure of individual facilities not in compliance, as well as the imposition of civil or criminal liability and the imposition of liens or fines, and expenditures to bring facilities into compliance.

***The Vesting Contract System may not achieve desired benefits when fully implemented.***

On May 20, 2014, the Electricity Business Act was amended, with effect from November 21, 2014, to introduce a vesting contract system to determine the price and quantity of electricity to be sold and purchased through the KPX between the purchaser of electricity (currently, KEPCO) and the sellers of electricity (namely, the Generation Subsidiaries (including us) and independent power producers). The application of the adjusted coefficient under the cost-based pool system is planned to be gradually replaced by the vesting contract system.

Under the vesting contract system, electricity generators using base load fuels (such as nuclear, coal, hydro and by-product gas) at a particular generation unit will be required to enter into a contract with the purchaser of electricity (currently, KEPCO), which will specify, among other things, the quantity of electricity to be generated and sold from such generation unit and the price at which such electricity will be sold. The contracted quantity will be subject to annual adjustment in consideration of past generation amounts and maintenance and overhaul periods, among others. The contracted price will be subject to monthly adjustment largely depending on fuel price movements, provided that in the event of a drastic change in electricity tariff rates, inflation rate or the general market conditions of electricity supply and demand, the contracted price may be further adjusted on an as-needed basis. Generally, the contractual terms will be subject to prior consultation with the Korea Electricity Commission and approval by the Minister of the Ministry of Trade, Industry and Energy (the "MOTIE") in order to ensure fair and standardized application of the vesting contract system to all producers of electricity.

In addition to aiming to stabilize the electricity supply market, a key feature of the vesting contract system is to provide a settlement mechanism that is designed to incentivize producers of electricity to supply electricity at or exceeding the contracted quantity. Under this settlement mechanism, an electricity producer is required to settle, among others, the difference between the contracted price and the market price of electricity sold at a given hour through the KPX (namely, the system marginal price), as multiplied by the contracted quantity of electricity. For further details of this settlement mechanism, see "The Korean Electricity Industry — Vesting Contract System."

Under this settlement mechanism, assuming sale of electricity in the contracted quantity and further assuming the system marginal price being higher than the contracted price, the consideration to be received by the seller of electricity net of the settlement amount will effectively amount to the product of the contracted quantity multiplied by the contracted price. If the seller sells a quantity of electricity exceeding the contracted quantity at a given hour, under the settlement mechanism and assuming the system marginal price being higher than the contracted price, the seller is entitled to an extra return (effectively, an incentive) equal to the product of the excess quantity multiplied by the difference between the system marginal price and the contracted price. On the other hand, if the seller sells a quantity of electricity falling short of the contracted quantity at a given hour, under the settlement mechanism and assuming the system marginal price being higher than the contracted price, the seller is required to pay an amount (effectively, a penalty) equal to the product of the shortfall quantity multiplied by the difference between the system marginal price and the contracted price. The foregoing notions of incentive and penalty are intended to minimize the additional cost of purchasing electricity at the higher system marginal price in the event that the seller of electricity fails to deliver the contracted quantity of electricity. Details of the settlement mechanism in the event of the system marginal price being lower than the contracted price have not yet been finalized.

The vesting contract system was introduced principally in order to prevent excessive profit-taking by low-cost producers of electricity using base load fuels (such as nuclear, coal, hydro and by-product gas) by replacing the adjusted coefficient as the basis for determining the guaranteed return to generation companies, as well as to attain the following objectives. First, this system seeks to increase transactional certainty and stability of electricity supply and purchase by requiring that a relatively long-term (generally one-year) contract be entered into in relation to electricity supply, which had been previously made entirely through what was effectively a spot market. Second, in order to foster responsible management of electricity supply by generation companies, the generation companies will become subject to minimum supply requirements and will be rewarded or penalized depending on whether they meet these requirements. Third, the introduction of standard contractual prices is designed to encourage cost savings and productivity enhancements on the part of the generation companies, which will be rewarded or penalized depending on whether they can supply electricity at such standard contractual prices.

Since the vesting contract system and many of the related details are still being finalized, it presently remains unclear in what final form and when the vesting contract system will actually be fully implemented, whether the vesting contract system will be able to achieve the desired results and whether there will be any adverse unintended consequences from the application of the system. No assurance can be given that such system will not adversely affect our business, results of operation or financial condition in the future. See "The Korean Electricity Industry — Vesting Contract System."

***Our capacity expansion plans, which are based on Government projections on long-term supply and demand of electricity in Korea, may prove to be inadequate.***

We make plans for expanding or upgrading our generation capacity based on the Government's Basic National Energy Plan, as well as the Power Supply and Demand Basic Plan (the "Basic Plan"). The Basic Plan is announced and revised generally every two years by the Government.

In January 2014, the Government announced the Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, for the period from 2013 to 2035. The Second Basic National Energy Plan focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing electricity demand by 15% by 2035, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying the latest greenhouse gas emission reduction technologies to newly constructed generation units in order to further promote safety and environmental friendliness, (iv) strengthening exploration and procurement capabilities to enhance Korea's energy security and to ensure stable supply of energy and increasing the portion of electricity supplied from renewable sources to 11% by 2035, (v) reinforcing the system for stable supply of conventional energy, such as oil and gas and (vi) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of consumers in the low income group. In addition, the Second Basic National Energy Plan revised the target level of nuclear generation capacity in Korea's electricity supply mix to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008.

In July 2015, the Government announced the Seventh Basic Plan for the period 2015 to 2029, which focuses on, among other things, (i) ensuring a stable supply of electricity, (ii) increasing the portion of low carbon electricity supply sources, (iii) active consumer demand management, (iv) permanent closing of operations of the Kori #1 nuclear power unit, and (v) diversifying electricity supply sources by utilizing renewable energy sources.

We cannot assure you that the Second Basic National Energy Plan, the Seventh Basic Plan or any future plans to be subsequently adopted, will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable rates to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is a significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand, or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on our part, which may have a material adverse effect on our results of operations, financial condition and cash flows.

***We are dependent on fuel imported from overseas suppliers in currencies other than Won under contracts with varying quantity and duration, and rising fuel costs could adversely affect our results of operations.***

Fuel costs, which represent the sum of raw materials in use and power costs purchased of our cost of sales, constituted 75.3%, 63.1%, 60.0%, 52.5% and 59.5% of our revenue, and 81.4%, 76.2%, 73.1%, 77.3% and

79.6% of our cost of sales, in 2014, 2015, 2016 and the three months ended March 31, 2016 and 2017, respectively. A substantial majority of our fuel costs are incurred to purchase bituminous coal from sources outside of Korea at prices determined in part by prevailing market prices in currencies other than Won, primarily the U.S. dollar. In addition, we purchase a significant portion of our fuel requirements under contracts with limited quantity and duration. See "Business — Fuel."

Substantially all of our bituminous coal requirements are imported from approximately 25 suppliers located in Australia, Indonesia, Russia, South Africa, Colombia and the United States under long-term or spot contracts. Approximately 80.5%, 89.5%, 93.2%, 100.0% and 91.4% of our bituminous coal requirements were purchased under long-term contracts in 2014, 2015, 2016 and the three months ended March 31, 2016 and 2017, respectively, with the remaining requirements being purchased on the spot market. Approximately 31.6%, 30.4%, 18.9%, 11.2%, 4.9% and 3.1% of our annual bituminous coal requirements were imported from South Africa, Australia, Indonesia, Russia, United States and Columbia, respectively, in the three months ended March 31, 2017. We purchase oil through a competitive open bidding process with other bidders, including Korean refiners, on the spot market. We purchase all of our LNG for our domestic units from Korea Gas Corporation ("KOGAS") under a long-term supply contract.

In recent years, the prices of fuel, including bituminous coal and LNG, have fluctuated significantly. If fuel prices increase sharply within a short span of time, we may be unable to secure requisite fuel supplies at prices that we were able to obtain during prior periods. In addition, any significant interruption or delay in the supply of fuel (bituminous coal and LNG in particular) from any of our suppliers could cause us to purchase fuel on the spot market at prices higher than the prices available under existing supply contracts, resulting in an increase in fuel cost.

While increases in our fuel costs are fully passed through to KEPCO in its purchase of electricity from us under the current cost-based pool system, such pass-through is subject to a two-month time lag, and accordingly, fuel cost increases, including cost increases resulting from the depreciation of the Won against the U.S. dollar or other currencies, could adversely affect our results of operations if the price of electricity payable to us by KEPCO does not timely capture such fuel cost increases for the relevant financial reporting period. Furthermore, in determining the adjusted coefficient for the marginal price component of the price of electricity sold by us to KEPCO by way of KPX, the Cost Evaluation Committee, a committee composed of representatives from the Government, KEPCO and the Generation Subsidiaries, including us, considers various factors, including the market prices of fuels, electricity tariff rates and their impact on the relative fair investment returns for KEPCO and the Generation Subsidiaries, including us, among others. Therefore, in the event of a sustained or rapid rise in fuel costs which impact is not sufficiently offset by a corresponding rise in electricity tariff rates in a timely manner and as a result would significantly hurt KEPCO's profitability, the adjusted coefficient may be set at a level which would have the effect of lowering the fair investment return for the Generation Subsidiaries, including us, and, in turn, the overall profitability of our operations. For instance, in March 2013 the Cost Evaluation Committee imposed a price cap on the marginal price of electricity sold by us to KEPCO. Such price cap has affected our LNG generation units, which accounted for approximately 26.8% in aggregate of our installed capacity as of March 31, 2017. The price cap has had and may have a material adverse effect on our results of operation and financial condition. See "The Korean Electricity Industry — Power Purchase — Cost-based Pool System — Marginal Price."

***We anticipate substantial capital expenditures, which will require additional debt incurrence in the future.***

We anticipate that substantial capital expenditures will be required in the future for construction of additional generation facilities as discussed in "Business — Capital Investment Program." In 2014, 2015, 2016

and the three months ended March 31, 2016 and 2017, we spent Won 1,574 billion, Won 729 billion, Won 560 billion, Won 121 billion and Won 102 billion, respectively, on capital expenditures, which represent the sum of purchases of land, buildings, structures, machinery, vehicles and other property, plant and equipment and increase in construction-in-progress in our statements of cash flows and purchases of certain non-tangible assets related to project development, such as computer software. We have budgeted Won 787 billion, Won 828 billion, Won 837 billion and Won 963 billion for capital expenditures for 2017, 2018, 2019 and 2020, respectively. The budgeted amounts may vary from the actual amounts of our capital expenditures for a variety of reasons, including changes in the number of units to be constructed and the timing of such construction, changes in rates of exchange between the Won and foreign currencies, changes in interest rates and other factors. Although we plan to fund a majority of our capital expenditures with net cash from operating activities, no assurance can be given that we will be able to do so. We expect that a portion of our future capital expenditures will need to be financed through foreign currency borrowings in the international capital markets, as well as borrowings of Korean Won in the domestic capital market. It is possible that the required financing may not be available to us or that the cost at which such financing may be available may not be acceptable to us. In addition to funding requirements relating to our capital investment program, payments of principal and interest on indebtedness will require considerable capital resources. If we are unable to obtain debt financing at acceptable rates on a timely basis, or at all, we may be unable to meet our funding requirements or debt repayment obligations, which could have a material adverse impact on our business and results of operations and could lead to a decline in the market value of the Notes.

Recently, in light of the general policy guidelines of the Government for public enterprises (including us) in general to reduce their respective overall debt levels, including by way of disposing of equity interests in unprofitable subsidiaries and other non-core assets, we are currently evaluating ways to reduce our debt levels. We cannot provide assurances that we will be able to successfully reduce debt burdens to a level contemplated by the Government or to a level that would be optimal for our capital structure. If we fail to reduce debt burdens to a level contemplated by the Government or the measures taken by us to reduce debt levels have unintended adverse consequences, such developments may have an adverse effect on our business, results of operation and financial condition.

***The movement of the Won against the U.S. dollar and other currencies may have a material adverse effect on us.***

The Won has fluctuated significantly against major currencies from time to time. Depreciation of the Won against the U.S. dollar and other foreign currencies typically results in a material increase in the cost of fuel and equipment purchased by us from overseas since the prices for substantially all of the fuel and a significant portion of the equipment we purchase are denominated in currencies other than the Won, generally in U.S. dollars. Changes in foreign exchange rates may also impact the cost of servicing our foreign currency-denominated debt. As of March 31, 2017, approximately 57% of our long-term debt before accounting for swap transactions, was denominated in foreign currencies, principally U.S. dollars. In addition, as is the case with LNG purchased from KOGAS, even if we make payments in Won for certain sources of fuel and equipment, some of these sources of fuel may originate from other countries and their prices may be affected accordingly by the exchange rates between the Won and foreign currencies, especially the U.S. dollar. Since substantially all of our revenues are denominated in Won, we must generally obtain foreign currencies through foreign currency-denominated financings or from foreign currency exchange markets to make such purchases or service such debt. As a result, any significant depreciation of the Won against the U.S. dollar or other major foreign currencies may have a material adverse effect on our profitability and results of operations.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion should be read in conjunction with (i) our audited consolidated financial statements and notes thereto as of and for the years ended December 31, 2014, 2015 and 2016 and (ii) our unaudited consolidated interim financial statements and notes thereto as of and for the three months ended March 31, 2016 and 2017, all of which are included elsewhere in this Offering Circular. Our financial statements are prepared in accordance with K-IFRS, which may differ in certain respects from IFRS applied in other countries.*

*This discussion contains forward-looking statements that involve risks and uncertainties. Actual results and the timing of events may differ materially from those contained in these forward-looking statements due to a number of factors, including those discussed in the section entitled "Risk Factors" and elsewhere in this Offering Circular.*

**Overview**

We were established on April 2, 2001 as one of six Generation Subsidiaries of KEPCO. The Generation Subsidiaries generate over 80% of the electricity in Korea. As of March 31, 2017, we had a domestic generation capacity of 11,090 megawatts, or approximately 10.2% of the total electricity generation capacity in Korea (excluding plants generating electricity primarily for private or emergency use). In 2014, 2015, 2016 and the three months ended March 31, 2016 and 2017, we sold 48,585, 46,960, 49,292, 12,790 and 12,904 GWh of electricity, respectively, to KEPCO through the KPX. KEPCO is currently the sole electricity transmission and distribution company in Korea.

As of March 31, 2017, we had total installed generation capacity of 11,090 megawatts, of which 6,850 megawatts, 1,200 megawatts, 2,972 megawatts and 68 megawatts were attributable to our coal-fired units, oil-fired units, LNG-combined cycle units and renewable energy units, respectively.

We generated revenue of Won 4,573 billion, Won 4,114 billion, Won 4,247 billion, Won 1,318 billion and Won 1,443 billion in 2014, 2015, 2016 and the three months ended March 31, 2016 and 2017, respectively, and our profit for the period was Won 160 billion, Won 449 billion, Won 458 billion, Won 297 billion and Won 241 billion in 2014, 2015, 2016 and the three months ended March 31, 2016 and 2017, respectively.

The overall margin for our operations is affected in part by the fair investment return assigned to us (at a uniform rate for all of KEPCO's generation subsidiaries) by the Cost Evaluation Committee after fully passing through changes in fuel prices to KEPCO subject to a two-month lag. Considerations of our fair investment return are made by the Cost Evaluation Committee in determining the adjusted coefficient for the marginal price component of the price of electricity sold by us to KEPCO by way of KPX. In determining such coefficient, the Cost Evaluation Committee considers various factors, including the market prices of fuels, electricity tariff rates and their impacts on the relative fair investment returns for KEPCO and its generation subsidiaries, among others. Therefore, in the event of a sustained or rapid rise in fuel costs whose impact is not sufficiently offset by a corresponding rise in electricity tariff rates in a timely manner or in cases of other exceptional circumstances, the adjusted coefficient may be set at a level which would have the effect of lowering our fair investment return and, in turn, the overall profitability of our operations. See "The Korean Electricity Industry — Power Purchase — Cost-based Pool System — Marginal Price."

In March 2013 the Cost Evaluation Committee imposed a price cap on the marginal price of electricity sold by us to KEPCO. Such price cap has affected our LNG generation units, which accounted for approximately

26.8% in aggregate of our installed capacity as of March 31, 2017. The price cap has had and may have a material adverse effect on our results of operation and financial condition.

Since our inception, we, along with KEPCO and the other Generation Subsidiaries, have made substantial expenditures for the construction of generation plants and other facilities to meet increased demand for electric power. According to the Seventh Basic Plan released in July 2015, the consumption of electric power is expected to increase by 2.1% per annum from 2015 to 2029. Pursuant to the Seventh Basic Plan, we plan to continue to make expenditures to expand and enhance our generating system in the future. In September 2016, we completed construction of coal-fired units 9 and 10 at the Dangjin power plant complex, each with an aggregate installed capacity of 1,020.0 megawatts, which were our main capital expenditure projects in the past three years.

**Recent Accounting Changes**

***Amendments to K-IFRS No. 1007 'Statement of Cash Flows: Disclosure Initiative'***

These amendments require an entity to provide disclosure that enables users of financial statements to evaluate changes in liabilities arising from financing activities, including both changes arising from cash flows and non-cash changes. As we are not required to provide additional disclosure in the quarterly financial statements, we will disclose the financial impact of the adoption of amendments to K-IFRS No. 1007 in the notes to the consolidated financial statements as of and for the years ending December 31, 2017.

***Amendments to K-IFRS No. 1012 'Recognition of Deferred Tax Assets for Unrealized Losses'***

These amendments clarify that an entity needs to consider whether tax law restricts the sources of taxable profits against which it may make deductions on the reversal of that deductible temporary difference. In addition, the amendments provide guidance on how an entity should determine future taxable profit and explain the circumstances in which taxable profit may include the recovery of some assets for more than their carrying amount.

We have applied the amendments retrospectively. However, the amendments have no impact on our unaudited consolidated interim financial statements as of and for the three months ended March 31, 2016 and 2017, as we have no deductible temporary differences related to the amendments.

**Critical Accounting Policies**

Accounting estimates are an integral part of the financial statements prepared by our management and are based upon our management's current judgments. See Note 2 of our audited consolidated financial statements as of and for the years ended December 31, 2015 and 2016 and Note 2 of the our unaudited consolidated interim financial statements as of and for the three months ended March 31, 2016 and 2017 included elsewhere in this Offering Circular for summaries of our significant accounting policies that are critical to the portrayal of our financial condition since they require our management to make difficult, complex or subjective judgments, some of which may relate to matters that are inherently uncertain, and because of the possibility that future events affecting these estimates may differ significantly from management's current judgment. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following represents our critical accounting policies.

***Useful Lives of Property, Plant and Equipment***

Property, plant and equipment are stated at cost. We do not depreciate land. Depreciation is computed by the straight-line method, using rates based on the estimated useful lives. Net property, plant and equipment as of

March 31, 2017 totaled Won 6,961 billion representing 78.1% of total assets. Given the significance of property, plant and equipment and the associated depreciation expense to our financial statements, the determination of an asset's economic useful life is considered to be a critical accounting estimate.

Economic useful life is the duration of time the asset is expected to be productively employed by us, which may be less than its physical life. Management's assumptions on the following factors, among others, affect the determination of estimated economic useful life: wear and tear, obsolescence, technical standards, changes in market demand and technological changes. We apply the following useful lives for our property, plant and equipment:

| | Method | Estimated Useful Life |
|---|---|---|
| Buildings | Straight-line | 12-34 |
| Structures | Straight-line | 22-30 |
| Machinery | Straight-line | 6-24 |
| Ships | Straight-line | 3-8 |
| Vehicles | Straight-line | 4 |
| Financial Lease Assets | Straight-line | 8-30 |
| Others | Straight-line | 4-5 |

Generally, useful life is estimated at the time the asset is acquired and is based on historical experience with similar assets and takes into account anticipated technological or other changes. If technological changes were to occur more rapidly than anticipated or in a different form than anticipated or the assets experienced unexpected levels of wear and tear, the useful lives assigned to these assets may need to be shortened, resulting in the recognition of increased depreciation expenses in future periods.

We capitalize interest costs and other financial charges on borrowings associated with the manufacture, purchase, or construction of utility plant, incurred prior to the completion of acquisition, as part of the cost of qualifying assets. The calculation of capitalized interest includes transaction differences arising from foreign currency borrowings to the extent that they are regarded as an adjustment to interest costs, which is limited to the extent of interest cost calculated by the weighted average interest rate of local currency borrowings.

We review utility plant assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss is recognized when the expected estimated undiscounted future net cash flows from the use of the asset and its eventual disposition are less than its carrying amount.

***Impairment of Long-lived Assets***

At the end of each reporting period, we review the carrying amounts of our tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, we estimate the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired. Recoverable

40

PUBLIC VERSION

# Exhibit 4

# SECURITIES AND EXCHANGE COMMISSION

# FORM 20-F

Annual and transition report of foreign private issuers pursuant to sections 13 or 15(d)

Filing Date: **2018-04-30** | Period of Report: **2017-12-31**

**SEC Accession No.** 0001193125-18-141125

(HTML Version on secdatabase.com)

## FILER

**KOREA ELECTRIC POWER CORP**

CIK:**887225**| IRS No.: **133442428** | Fiscal Year End: **1231**

Type: **20-F** | Act: **34** | File No.: **001-13372** | Film No.: **18786968**

SIC: **4911** Electric services

| | Mailing Address | Business Address |
|---|---|---|
| | *400 KELBY STREET* | *167, SAMSEONG-DONG* |
| | *16TH FLOOR* | *GANGNAM-GU* |
| | *FORT LEE NJ 07024* | *SEOUL M5 135-791* |
| | | *2018948855* |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

As filed with the Securities and Exchange Commission on April 30, 2018

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form 20-F

**(Mark One)**

☐    REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☑    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2017

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☐    SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report

For the transition period from          to

Commission File Number: 001-13372

# KOREA ELECTRIC POWER CORPORATION
*(Exact name of registrant as specified in its charter)*

| N/A | The Republic of Korea |
|---|---|
| *(Translation of registrant's name into English)* | *(Jurisdiction of incorporation or organization)* |

55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea
*(Address of principal executive offices)*

Yoon Hye Cho, +82 61 345 4213, yoonhye.cho@kepco.co.kr, +82 61 345 4299
55 Jeollyeok-ro, Naju-si, Jeollanam-do, Korea
*(Name, telephone, e-mail and/or facsimile number and address of company contact person)*

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| **Title of each class:** | **Name of each exchange on which registered:** |
|---|---|
| Common stock, par value Won 5,000 per share | New York Stock Exchange* |
| American depositary shares, each representing | New York Stock Exchange |
| one-half of share of common stock | |

\*    Not for trading, but only in connection with the listing of American depositary shares on the New York Stock Exchange, pursuant to the requirements of the Securities and Exchange Commission.

Securities registered or to be registered pursuant to Section 12(g) of the Act:
None
Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
One Hundred Year 7.95% Zero-to-Full Debentures, due April 1, 2096
6% Debentures due December 1, 2026
7% Debentures due February 1, 2027
6 ¾% Debentures due August 1, 2027

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the last full fiscal year covered by the annual report:

641,964,077 shares of common stock, par value of Won 5,000 per share

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☑    No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.    Yes ☐    No ☑

Note–Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days:    Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files):    Yes ☑    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Large accelerated filer ☑    Accelerated filer ☐    Non-accelerated filer ☐    Emerging Growth Company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐    International Financial Reporting Standards as issued by the International Accounting Standards Board ☑    Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.    Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☑

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.    Yes ☐    No ☐

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| PART I |  |  | 2 |
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS |  | 2 |
| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE |  | 2 |
| ITEM 3. | KEY INFORMATION |  | 2 |
|  | Item 3A. | Selected Financial Data | 2 |
|  | Item 3B. | Capitalization and Indebtedness | 4 |
|  | Item 3C. | Reasons for the Offer and Use of Proceeds | 4 |
|  | Item 3D. | Risk Factors | 4 |
| ITEM 4. | INFORMATION ON THE COMPANY |  | 28 |
|  | Item 4A. | History and Development of the Company | 28 |
|  | Item 4B. | Business Overview | 29 |
|  | Item 4C. | Organizational Structure | 77 |
|  | Item 4D. | Property, Plant and Equipment | 81 |
| ITEM 4A. | UNRESOLVED STAFF COMMENTS |  | 81 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS |  | 81 |
|  | Item 5A. | Operating Results | 82 |
|  | Item 5B. | Liquidity and Capital Resources | 101 |
|  | Item 5C. | Research and Development, Patents and Licenses, etc. | 105 |
|  | Item 5D. | Trend Information | 107 |
|  | Item 5E. | Off-Balance Sheet Arrangements | 107 |
|  | Item 5F. | Tabular Disclosure of Contractual Obligations | 107 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES |  | 114 |
|  | Item 6A. | Directors and Senior Management | 114 |
|  | Item 6B. | Compensation | 117 |
|  | Item 6C. | Board Practices | 117 |
|  | Item 6D. | Employees | 118 |
|  | Item 6E. | Share Ownership | 119 |
| ITEM 7. | MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS |  | 119 |
|  | Item 7A. | Major Shareholders | 119 |
|  | Item 7B. | Related Party Transactions | 119 |
|  | Item 7C. | Interests of Experts and Counsel | 120 |
| ITEM 8. | FINANCIAL INFORMATION |  | 120 |
|  | Item 8A. | Consolidated Statements and Other Financial Information | 120 |
|  | Item 8B. | Significant Changes | 122 |
| ITEM 9. | THE OFFER AND LISTING |  | 122 |
|  | Item 9A. | Offer and Listing Details | 122 |
|  | Item 9B. | Plan of Distribution | 125 |
|  | Item 9C. | Markets | 125 |
|  | Item 9D. | Selling Shareholders | 128 |
|  | Item 9E. | Dilution | 128 |
|  | Item 9F. | Expenses of the Issue | 128 |
| ITEM 10. | ADDITIONAL INFORMATION |  | 128 |
|  | Item 10A. | Share Capital | 128 |
|  | Item 10B. | Memorandum and Articles of Incorporation | 129 |
|  | Item 10C. | Material Contracts | 136 |
|  | Item 10D. | Exchange Controls | 136 |
|  | Item 10E. | Taxation | 141 |
|  | Item 10F. | Dividends and Paying Agents | 152 |
|  | Item 10G. | Statements by Experts | 152 |
|  | Item 10H. | Documents on Display | 152 |
|  | Item 10I. | Subsidiary Information | 152 |

i

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| ITEM 11. | | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 152 |
| ITEM 12. | | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 157 |
| | Item 12A. | Debt Securities | 157 |
| | Item 12B. | Warrants and Rights | 158 |
| | Item 12C. | Other Securities | 158 |
| | Item 12D. | American Depositary Shares | 158 |
| PART II | | | 160 |
| ITEM 13. | | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 160 |
| ITEM 14. | | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 160 |
| ITEM 15. | | CONTROLS AND PROCEDURES | 160 |
| ITEM 16. | | [RESERVED] | 161 |
| ITEM 16A. | | AUDIT COMMITTEE FINANCIAL EXPERT | 161 |
| ITEM 16B. | | CODE OF ETHICS | 161 |
| ITEM 16C. | | PRINCIPAL AUDITOR FEES AND SERVICES | 162 |
| ITEM 16D. | | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEE | 162 |
| ITEM 16E. | | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 162 |
| ITEM 16F. | | CHANGE IN REGISTRANT`S CERTIFYING ACCOUNTANTS | 162 |
| ITEM 16G. | | CORPORATE GOVERNANCE | 162 |
| ITEM 16H. | | MINE SAFETY DISCLOSURE | 170 |
| PART III | | | 171 |
| ITEM 17. | | FINANCIAL STATEMENTS | 171 |
| ITEM 18. | | FINANCIAL STATEMENTS | 171 |
| ITEM 19. | | EXHIBITS | 171 |

ii

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### CERTAIN DEFINED TERMS AND CONVENTIONS

All references to "Korea" or the "Republic" in this annual report on Form 20-F, or this annual report, are references to the Republic of Korea. All references to the "Government" in this annual report are references to the government of the Republic. All references to "we," "us," "our," "ours," the "Company" or "KEPCO" in this annual report are references to Korea Electric Power Corporation and, as the context may require, its subsidiaries, and the possessive thereof, as applicable. All references to "the Ministry of Trade, Industry and Energy" and "the Ministry of Strategy and Finance" include the respective predecessors thereof. All references to "tons" are to metric tons, equal to 1,000 kilograms, or 2,204.6 pounds. Any discrepancies in any table between totals and the sums of the amounts listed are due to rounding. All references to "IFRS" in this annual report are references to the International Financial Reporting Standards as issued by the International Accounting Standard Board. Unless otherwise stated, all of our financial information presented in this annual report has been prepared on a consolidated basis and in accordance with IFRS.

In addition, in this annual report, all references to:

"EWP" are to Korea East-West Power Co., Ltd.,

"KHNP" are to Korea Hydro & Nuclear Power Co., Ltd.,

"KOMIPO" are to Korea Midland Power Co., Ltd.,

"KOSEP" are to Korea South-East Power Co., Ltd.,

"KOSPO" are to Korea Southern Power Co., Ltd., and

"KOWEPO" are to Korea Western Power Co., Ltd.,

each of which is our wholly-owned generation subsidiary.

### FORWARD-LOOKING STATEMENTS

This annual report includes "forward-looking statements" (as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934), including statements regarding our expectations and projections for future operating performance and business prospects. The words "believe," "expect," "anticipate," "estimate," "project" and similar words used in connection with any discussion of our future operation or financial performance identify forward-looking statements. In addition, all statements other than statements of historical facts included in this annual report are forward-looking statements. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to be correct. We caution you not to place undue reliance on the forward-looking statements, which speak only as of the date of this annual report.

This annual report discloses, under the caption Item 3.D. "Risk Factors" and elsewhere, important factors that could cause actual results to differ materially from our expectations ("Cautionary Statements"). All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the Cautionary Statements.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

**PART I**

ITEM 1.   *IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS*

    Not applicable.

ITEM 2.   *OFFER STATISTICS AND EXPECTED TIMETABLE*

    Not applicable.

ITEM 3.   *KEY INFORMATION*

**Item 3.A. Selected Financial Data**

    The selected consolidated financial data set forth below as of and for the years ended December 31, 2013, 2014, 2015, 2016 and 2017 have been derived from our audited consolidated financial statements which have been prepared in accordance with IFRS.

    You should read the following data with the more detailed information contained in Item 5. "Operating and Financial Review and Prospects" and our consolidated financial statements included in Item 18. "Financial Statements." Historical results do not necessarily predict future results.

**Consolidated Statement of Comprehensive Income (Loss) Data**

| | 2013 | 2014 | 2015 | 2016 | 2017[(1)] | 2017 |
|---|---|---|---|---|---|---|
| | (in billions of Won and millions of US$, except per share data)[(1)] | | | | | |
| Sales | ₩53,713 | ₩57,123 | ₩58,582 | ₩59,763 | ₩59,336 | $55,589 |
| Cost of sales | 50,596 | 49,763 | 45,458 | 45,550 | 52,099 | 48,809 |
| Gross profit | 3,117 | 7,360 | 13,124 | 14,213 | 7,237 | 6,780 |
| Selling and administrative expenses | 1,923 | 1,924 | 2,153 | 2,639 | 2,763 | 2,588 |
| Other income | 625 | 666 | 699 | 652 | 689 | 645 |
| Other gains | 129 | 107 | 8,611 | 70 | 157 | 147 |
| Operating profit | 1,948 | 6,209 | 20,281 | 12,296 | 5,320 | 4,984 |
| Finance expense, net | (2,302) | (2,255) | (1,832) | (1,646) | (1,596) | (1,496) |
| Income (loss) before income taxes | (396  ) | 4,229 | 18,656 | 10,513 | 3,614 | 3,386 |
| Income tax (expense) benefit | 571 | (1,430) | (5,239) | (3,365) | (2,173) | (2,036) |
| Profit for the period | 174 | 2,799 | 13,416 | 7,148 | 1,441 | 1,350 |
| Other comprehensive income (loss) | 186 | (358  ) | 34 | (2   ) | (95   ) | (89   ) |
| Total comprehensive income | 360 | 2,441 | 13,450 | 7,146 | 1,346 | 1,261 |
| Profit attributable to: | | | | | | |
|   Owners of the Company | 60 | 2,687 | 13,289 | 7,048 | 1,299 | 1,217 |
|   Non-controlling interests | 114 | 112 | 127 | 100 | 142 | 133 |
| Total comprehensive income attributable to: | | | | | | |
|   Owners of the Company | 245 | 2,336 | 13,308 | 7,042 | 1,230 | 1,152 |
|   Non-controlling interests | 115 | 105 | 142 | 104 | 116 | 109 |
| Earnings per share | | | | | | |
|   Basic[(2)] | 96 | 4,290 | 20,701 | 10,980 | 2,023 | 1.90 |
| Earnings per ADS | | | | | | |
|   Basic[(2)] | 48 | 2,145 | 10,351 | 5,490 | 1,012 | 0.95 |
| Dividends per share | 90 | 500 | 3,100 | 1,980 | 790 | 0.74 |

2

**Table of Contents**

**Consolidated Statements of Financial Position Data**

| | As of December 31, | | | | | 2017 |
|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2017** |
| | (in billions of Won and millions of US$, except share and per share data)[1] | | | | | |
| Net working capital deficit[3] | ₩(4,945) | ₩(4,780) | ₩(686) | ₩(5,031) | ₩(4,283) | $(4,013) |
| Property, plant and equipment, net | 129,638 | 135,812 | 141,361 | 145,743 | 150,882 | 141,355 |
| Total assets | 155,527 | 163,708 | 175,257 | 177,837 | 181,789 | 170,310 |
| Total shareholders' equity | 51,451 | 54,825 | 67,942 | 73,051 | 72,965 | 68,358 |
| Equity attributable to owners of the Company | 50,260 | 53,601 | 66,634 | 71,724 | 71,682 | 67,156 |
| Non-controlling interests | 1,191 | 1,224 | 1,308 | 1,327 | 1,283 | 1,202 |
| Share capital | 3,210 | 3,210 | 3,210 | 3,210 | 3210 | 3,007 |
| Number of common shares as adjusted to reflect any changes in capital stock | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 |
| Long-term debt (excluding current portion) | 52,801 | 55,720 | 50,907 | 44,700 | 45,624 | 42,743 |
| Other long term liabilities | 31,062 | 31,563 | 33,697 | 35,347 | 39,776 | 37,264 |

*Notes*:

(1)  The financial information denominated in Won as of and for the year ended December 31, 2017 has been translated into U.S. dollars at the exchange rate of Won 1,067.4 to US$1.00, which was the Noon Buying Rate as of December 29, 2017.

(2)  Basic earnings (loss) per share are calculated by dividing net income available to holders of our common shares by the weighted average number of common shares issued and outstanding for the relevant period. Basic earnings (loss) per ADS have been computed as if all of our issued and outstanding common shares are represented by ADSs during each of the years presented. Each ADS represents two common shares. Dilutive earnings (loss) per share were the same as basic earnings (loss) per share for the years ended December 31, 2013 through 2017 since there were no potential dilutive instruments.

(3)  Net working capital is defined as current assets minus current liabilities. For the periods indicated, current liabilities exceeded current assets, which resulted in working capital deficit for such periods.


**Currency Translations and Exchange Rates**

In this annual report, unless otherwise indicated, all references to "Won," "KRW" or "₩" are to the currency of Korea, all references to "U.S. dollars," "Dollars," "$" or "US$" are to the currency of the United States of America; all references to "Euro" or " " are references to the currency of the European Union; all references to "Yen" or "¥" are references to the currency of Japan; all references to "A$" are to the currency of Australia; and all references to "RMB" are to the currency of the People's Republic of China. Unless otherwise indicated, all translations from Won to U.S. dollars were made at Won 1,067.4 to US$1.00, which was the noon buying rate of the Federal Reserve Board (the "Noon Buying Rate") in effect as of December 29, 2017, which rates are available on the H.10 statistical release of the Federal Reserve Board. On April 16, 2018, the Noon Buying Rate was Won 1,071.6 to US$1.00. The exchange rate between the U.S. dollar and Korean Won may be highly volatile from time to time and the U.S. dollar amounts referred to in this annual report should not be relied upon as an accurate reflection of our results of operations. No representation is made that the Won or U.S. dollar amounts referred to in this annual report could have been or could be converted into U.S. dollars or Won, as the case may be, at any particular rate or at all.

3

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The following table sets forth, for the periods and dates indicated, certain information concerning the Noon Buying Rate in Won per US$1.00.

| Year Ended December 31, | At End of Period | Average(1) | High | Low |
|---|---|---|---|---|
| | | (Won per US$1.00) | | |
| 2013 | 1,055.3 | 1,094.6 | 1,161.3 | 1,050.1 |
| 2014 | 1,090.9 | 1,054.0 | 1,117.7 | 1,008.9 |
| 2015 | 1,169.3 | 1,133.7 | 1,196.4 | 1,063.0 |
| 2016 | 1,203.7 | 1,160.5 | 1,242.6 | 1,090.0 |
| 2017 | 1,067.4 | 1,141.6 | 1,207.2 | 1,067.4 |
| October | 1,115.7 | 1,130.9 | 1,146.5 | 1,115.7 |
| November | 1,084.8 | 1,099.8 | 1,120.0 | 1,079.3 |
| December | 1,067.4 | 1,082.9 | 1,094.6 | 1,067.4 |
| 2018 (through April 16) | 1,071.6 | 1,070.1 | 1,093.0 | 1,054.6 |
| January | 1,068.3 | 1,065.6 | 1,073.6 | 1,057.6 |
| February | 1,082.1 | 1,078.5 | 1,093.0 | 1,065.3 |
| March | 1,061.0 | 1,069.9 | 1,081.3 | 1,060.3 |
| April (through April 16) | 1,071.6 | 1,064.6 | 1,071.6 | 1,054.6 |

*Source: Federal Reserve Board*

*Note:*

(1)    The average rates for annual and interim periods were calculated by taking the simple average of the Noon Buying Rates on the last day of each month during the relevant period. The average rates for the monthly periods (or a portion thereof) were calculated by taking the simple average of the daily Noon Buying Rates during the relevant month (or a portion thereof).

### Item 3.B. Capitalization and Indebtedness

Not Applicable

### Item 3.C. Reasons for the Offer and Use of Proceeds

Not Applicable

### Item 3.D. Risk Factors

*Our business and operations are subject to various risks, many of which are beyond our control. If any of the risks described below actually occurs, our business, financial condition or results of operations could be seriously harmed.*

**Risks Relating to KEPCO**

***Increases in fuel prices will adversely affect our results of operations and profitability as we may not be able to pass on the increased cost to customers at a sufficient level or on a timely basis.***

In 2017, fuel costs constituted 31.7% of our cost of sales, and the ratio of fuel costs to our sales was 27.8%. Our generation subsidiaries purchase substantially all of the fuel that they use (except for anthracite coal) from suppliers outside Korea at prices determined in part by prevailing market prices in currencies other than Won. For example, most of the bituminous coal requirements (which accounted for approximately 52.2% of our fuel requirements in 2017 in terms of electricity output) are imported principally from Indonesia, Australia, Russia and, to a lesser extent, South Africa and others, which accounted for approximately 38%, 31%, 11%, 9% and

4

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

11%, respectively, of the annual bituminous coal requirements of our generation subsidiaries in 2017. Approximately 82% of the bituminous coal requirements of our generation subsidiaries in 2017 were purchased under long-term contracts and the remaining 18% from the spot market. Pursuant to the terms of our long-term supply contracts, prices are adjusted periodically based on prevailing market conditions. In addition, our generation subsidiaries purchase a significant portion of their fuel requirements under contracts with limited duration. See Item 4.B. "Business Overview–Fuel."

The prices of our main fuel types, namely, bituminous coal, oil and liquefied natural gas, or LNG, fluctuate, sometimes significantly, in tandem with their international market prices. For example, the average daily spot price of "free on board" Newcastle coal 6300 GAR published by Platts increased from US$66.8 per ton in 2016 to US$88.3 per ton in 2017 and to US$93.4 per ton as of April 16, 2018. The prices of oil and LNG are substantially dependent on the price of crude oil, and according to Bloomberg (Bloomberg Ticker: PGCRDUBA), the average daily spot price of Dubai crude oil increased from US$41.4 per barrel in 2016 to US$53.1 per barrel in 2017 and to US$68.4 per barrel as of April 16, 2018. We cannot assure you that fuel prices will remain stable or will not significantly increase in the remainder of 2018 or thereafter. If fuel prices increase substantially in the future within a short span of time, our generation subsidiaries may be unable to secure requisite fuel supplies at prices commercially acceptable to them. In addition, any significant interruption or delay in the supply of fuel, bituminous coal in particular, from any of their suppliers may cause our generation subsidiaries to purchase fuel on the spot market at prices higher than the prices available under existing supply contracts, which would result in an increase in fuel costs.

Because the Government regulates the rates we charge for the electricity we sell to our customers (see Item 4.B. "Business Overview–Sales and Customers–Electricity Rates"), our ability to pass on fuel and other cost increases to our customers is limited. If fuel prices increase rapidly and substantially and the Government, out of concern for inflation or for other reasons, maintains the current level of electricity tariff or does not increase it to a level to sufficiently offset the impact of high fuel prices, the fuel price increases will negatively affect our profit margins or even cause us to suffer operating and/or net losses, and our business, financial condition, results of operations and cash flows would suffer.

The Government may also set or adjust electricity tariff rates to serve particular policy goals that may not be necessarily responsive to fuel price movements. For example, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate, in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, a new tariff structure was implemented to encourage energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods in the summer and the winter. Third, a temporary rate discount will apply during 2017 to 2019 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. The temporary rate discount to investments in energy storage systems and renewable energy was extended until 2020. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation, financial condition and cash flows.

In addition, partly because the Government may have to undergo a lengthy deliberative process to approve an increase in electricity tariff, which represents a key component of the consumer price index, the electricity tariff may not be adjusted to a level sufficient to ensure a fair rate of return to us in a timely manner or at all, and we cannot assure that any future tariff increase by the Government will be sufficient to fully offset the adverse impact on our results of operations from current or potential rises in fuel costs. On the other hand, if fuel prices decrease, the public may demand a corresponding decrease in electricity tariff rates, and as a result the

5

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Government may decrease electricity tariff rates; however, we cannot assure you that the resulting tariff rate reduction will not be excessive and thus have a detrimental effect on our profit margins, results of operations or cash flows or that, if the fuel prices were to rise again subsequent to the tariff reduction, the tariff rates would be further adjusted upwards in a timely manner, in sufficient amounts or at all so as to fully offset the adverse impact from the increase in fuel prices.

***The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability.***

From time to time, the Government considers various policy initiatives to foster efficiency in the Korean electric power industry, and at times has adopted policy measures that have substantially modified our business and operations. For example, in January 1999, with the aim of introducing greater competition in the Korean electric power industry and thereby improving its efficiency, the Government announced a restructuring plan for the Korean electric power industry, or the Restructuring Plan. For a detailed description of the Restructuring Plan, see Item 4.B. "Business Overview−Restructuring of the Electric Power Industry in Korea." As part of this initiative, in April 2001 the Government established the Korea Power Exchange to enable the sale and purchase of electricity through a competitive bidding process, established the Korea Electricity Commission to ensure fair competition in the Korean electric power industry, and, in order to promote competition in electricity generation, split off our electricity generation business to form one nuclear generation company and five non-nuclear generation companies, in each case, to be wholly owned by us. In 2002, the Government introduced a plan to privatize one of our five non-nuclear generation subsidiaries, but this plan was suspended indefinitely in 2004 due to prevailing market conditions and other policy considerations.

In August 2010, the Ministry of Trade, Industry and Energy announced the Proposal for the Improvement in the Structure of the Electric Power Industry, which was designed to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them. Pursuant to this proposal, while our six generation subsidiaries continued to be our wholly-owned subsidiaries, in January 2011 the six generation subsidiaries were officially designated as "market-oriented public enterprises" (same as us) under the Act on the Management of Public Institutions, whereupon the President of Korea appoints the president and the standing director who is to become a member of the audit committee of each such subsidiary; the selection of non-standing directors of each such subsidiary is subject to approval by the minister of the Ministry of Strategy and Finance; the president of each such subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Agencies Operating Committee (which is comprised largely of Government officials and those recommended by Government officials) conducts performance evaluation of such subsidiaries. Previously, our president appointed the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary was subject to approval by our president; the president of each such subsidiary entered into a management contract with our president; and our evaluation committee conducted performance evaluation of such subsidiaries. As a result of these changes, our six generation subsidiaries took on additional operational responsibilities and management autonomy with respect to construction and management of generation units and procurement of fuel, while we as the parent company continued to oversee and coordinate, among others, finances, corporate governance, overseas businesses, including nuclear export technology and overseas resource development, that jointly affect us and our generation subsidiaries. See also Item 16G. "Corporate Governance−The Act on the Management of Public Institutions−Applications of the Act on Our Generation Subsidiaries,"

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies

6

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

should take on greater responsibilities in overseas resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition. In accordance therewith, we transferred a substantial portion of our assets and liabilities in our overseas resource business to our generation subsidiaries as of December 31, 2016. In addition, pursuant to this Proposal, we considered a sale in the public market of a minority of our shares in our five non-nuclear generation subsidiaries, KEPCO KDN and KHNP. However, the planned sales have been put on hold, primarily due to prevailing market conditions. In any event, we plan to maintain a controlling stake in each of these subsidiaries.

Other than as set forth above, we are not aware of any specific plans by the Government to resume the implementation of the Restructuring Plan or otherwise change the current structure of the electric power industry or the operations of us or our generation subsidiaries materially in the near future. However, for reasons relating to changes in policy considerations, socio-political, economic and market conditions and/or other factors, the Government may resume the implementation of the Restructuring Plan or initiate other steps that may change the structure of the Korean electric power industry or the operations of us or our generation subsidiaries materially. Any such measures may have a negative effect on our business, results of operations and financial condition. In addition, the Government, which beneficially owns a majority of our shares and exercises significant control over our business and operations, may from time to time pursue policy initiatives that could directly or indirectly impact our business and operations, and such initiatives may vary from the interest and objectives of our other shareholders.

***Our capacity expansion plans, which are principally based on projections on long-term supply and demand of electricity in Korea, may prove to be inadequate.***

We and our generation subsidiaries make plans for expanding or upgrading our generation capacity and transmission infrastructure based on the Basic Plan Relating to the Long-Term Supply and Demand of Electricity, or the Basic Plan, which is generally revised and announced every two years by the Government. In July 2015, the Government announced the Seventh Basic Plan relating to the future supply and demand of electricity, focusing on stable supply of electricity and increasing the portion of low carbon electricity supply sources, among others. In December 2017, the Government announced the Eighth Basic Plan to revise the Seventh Basic Plan, for the former to be effective for the period from 2017 to 2031. The Eighth Basic Plan focuses on, among other things, (i) decreasing the reliance on nuclear and coal-based supply sources, (ii) increasing utilization of renewable energy sources and (iii) balancing the existing cost-based pool system of purchase of electricity with an environmentally-focused pool system, in order to increase utilization of LNG energy sources, which are cleaner but more expensive than nuclear or coal energy sources. Furthermore, the Eighth Basic Plan includes the following implementing measures: (i) six new nuclear generation units in a planning stage would not be constructed, (ii) extension of life of 10 decrepit nuclear generation units would not be granted, (iii) Wolsong #1 unit is not counted as part of domestic energy generation capacity, (iv) seven decrepit coal-fired generation plants will be retired by 2022, (v) six other coal-fired generation plants shall be converted to LNG fuel use and (vi) domestic renewable energy generation capacity shall be expanded to 58.5 gigawatts by 2030.

In January 2014, prior to the announcement of the Seventh Basic Plan, the Ministry of Trade, Industry and Energy adopted the Second Basic National Energy Plan following consultations with representatives from civic groups, the power industry and academia. The Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, covers the period from 2014 to 2035 and focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing the growth of electricity demand by 15% by 2035 through efficiency enhancement programs compared to the projected growth in the absence of such efficiency enhancement programs, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying latest greenhouse gas

7

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

emission reduction technologies to newly constructed generation units in order to further promote safety and security, (iv) strengthening resource exploration and fuel procurement capabilities to enhance Korea's energy security, (v) ensuring stable supply of energy and increasing the portion of electricity supplied from renewable sources to 11% by 2035, (vi) reinforcing the system for stable supply of conventional energy, such as oil and gas, and (vii) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of consumers in the low income group. In addition, the Second Basic National Energy Plan revised the target level of electricity generated by nuclear sources as a percentage of total electricity generated to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008, which covered the period from 2008 to 2030. In March 2018, the Government announced its plan to establish the Third Basic National Energy Plan by the end of 2018.

We cannot assure that the Eighth Basic Plan, the Second Basic National Energy Plan, or their respective successor plans will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable costs to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand, or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on the part of us and our generation subsidiaries, among others, which may have a material adverse effect on our results of operations, financial condition and cash flows.

From time to time, we may experience temporary power shortages or circumstances bordering on power shortages due to factors beyond our control, such as extreme weather conditions. Such circumstances may lead to increased end-user complaints and greater public scrutiny, which may in turn require us to modify our capacity expansion plans, and if we were to substantially modify our capacity plans, this might result in additional capital expenditures and, as a result, have a material adverse effect on our results of operations, financial condition and cash flows.

Although the Government makes significant efforts to encourage conservation of electricity, including through public education campaigns, there is no assurance that such efforts will have the desired effect of substantially reducing the demand for electricity or improving efficient use thereof.

***We are subject to various environmental regulations and related government initiatives, including in relation to climate change, which could cause significant compliance costs and operational liabilities.***

We are subject to national, local and overseas environmental laws and regulations, including increasing pressure to reduce emission of carbon dioxide from our electricity generation activities as well as our natural resource development endeavors overseas. Our operations could expose us to the risk of substantial liability relating to environmental, health and safety issues, such as those resulting from the discharge of pollutants and carbon dioxide into the environment and the handling, storage and disposal of hazardous materials. We may be responsible for the investigation and remediation of environmental conditions at current or former operational sites. We may also be subject to related liabilities (including liabilities for environmental damage, third party property damage or personal injury) resulting from lawsuits brought by governments or private litigants. In the course of our operations, hazardous wastes may be generated, disposed of or treated at third party-owned or -operated sites. If those sites become contaminated, we could also be held responsible for the cost of investigation and remediation of such sites for any related liabilities, as well as for civil or criminal fines or penalties.

We intend to fully comply with our environmental obligations. However, our environmental measures, including the use of, or replacement with, environmentally friendly but more expensive parts and equipment and budgeting capital expenditures for the installation or modification of such facilities, may result in increased

8

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

operating costs and liquidity requirement. The actual cost of installation, replacement, modification and/or operation of such equipment and related liquidity requirement may depend on a variety of factors that are beyond our control. There is no assurance that we will continue to be in material compliance with legal or regulatory requirements or satisfy social norms and expectations in the future in relation to the environment, including in respect of climate change.

In recent years, partly driven by growing public awareness and sensitivity toward climate change and other environmental issues as well as in an effort to capture the economic and social potential associated with renewable energy and "new energy"-related industries (such as smart grids, energy storage systems and electrical vehicles, among others), the Government has introduced and implemented a number of new measures designed to reduce carbon emission, minimize environmental damage and spur related business opportunities. Some key examples of such Government initiatives pertinent to our and our generation subsidiaries' operations are as follows:

*Carbon Emission Trading System, Related Emission Reduction Targets and the Greenhouse Gas Reduction Roadmap.* In accordance with the Act on Allocation and Trading of Greenhouse Gas Emission Allowances, enacted in March 2013, the Government is currently in the process of implementing a carbon emission trading system under which the Government will allocate the amount of permitted carbon emission to companies by industry and a company whose business emits more carbon than the permitted amount may purchase the right to emit more carbon through the carbon emission trading exchange. This system is expected to be implemented in three stages. During the first phase (2015 to 2017), the Government set up and made a test run of the trading system to ensure its smooth operation; during this phase, the carbon emission rights were allocated without charge. During the second phase (2018 to 2020), the system will be applied to a limited scope of industries and companies, where the carbon emission right will be allocated at a relatively low price, but not freely. The amount of required reduction for the second phase of 2018 to 2020 is expected to be determined by June 2018. During the third phase (2021 to 2025), the Government plans to run the system on an expanded scale with aggressive carbon emission reduction targets. In December 2016, the Government announced the Climate Change Response Initiatives and 2030 National Greenhouse Gas Reduction Roadmap, which set forth the carbon emission trading system as one of the primary means to reach the emission and greenhouse gas reduction targets of the policies. The 2030 National Greenhouse Gas Reduction Roadmap sets forth a national reduction target of greenhouse gas by 219 million tons in the aggregate, amounting to a 25.7% reduction by 2030. The roadmap also set forth reduction targets for eight domestic sectors and the first three sectors with the largest reduction targets are electricity generation, industry and buildings. Our business is classified as part of the electricity generation sector, for which greenhouse gas reduction of 64.5 million tons is requested by year 2030. We are aiming to contribute to 80% of such reduction target for the sector, while such reduction target may change pursuant to an amendment to the 2030 National Greenhouse Gas Reduction Roadmap which the Government is expected to announce in 2018. Adhering to such emission and greenhouse gas reduction requirement is expected to result in our incurring significant compliance costs.

*Regulation of Decrepit Coal-Fired Generation Units.* As a measure to address the high level of particulate matter pollution, the Government temporarily suspended the operations of eight coal-fired generation units that are 30 years or older throughout the month of June 2017. Subsequently, in July 2017, two of these units were shut down completely and one unit switched fuel from coal to wood pallets. As part of the Comprehensive Measures against Particulate Matter and the Eighth Basic Plan, announced by the Government in September 2017 and December 2017, respectively, the Government set forth the following policy directions relating to coal-fired generation units: (i) two coal-fired generation units scheduled for construction and four existing coal-fired generation units shall convert to LNG fuel use, (ii) in principle, construction of new coal-fired generation units shall not be planned, (iii) seven of the coal-fired generation units that are 30 years or older will be shut down on an accelerated schedule, (iv) coal-fired generation units that are 30 years or older shall temporarily cease operations from March through June of each year, (v) coal-fired generation units shall be put through comprehensive functional and environmental upgrades and (vi) coal-fired generation units shall be

9

Table of Contents

subject to emission standards that are twice as more rigorous than the current standards to be in effect by the first half of 2018. Although such plans may be subject to change, compliance with such measures is expected to result in our incurring significant costs, including in connection with adherence to more stringent particulate matter pollution regulations, retrofitting and overall replacement of environmental facilities.

*Coal Consumption Tax.* In January 2014, largely based on policy considerations of tax equity among different fuel types as well as environmental concerns, the Ministry of Strategy and Finance announced that, effective July 1, 2014, consumption tax will apply to bituminous coal, which previously was not subject to consumption tax unlike other fuel types such as LNG or bunker oil. Pursuant to the amended Individual Consumption Tax Act effective as of April 1, 2018, which involved an increase of the unit tax rate for coal by Won 6 across the board, the base tax rate (which is subject to certain adjustments) is Won 36 per kilogram for bituminous coal; however, due to concerns on the potential adverse effect on industrial activities, the applicable tax rate is applied differently based on the net heat generation amount. The currently applicable tax rate for bituminous coal is Won 33 per kilogram for net heat generation of less than 5,000 kilocalories, Won 36 per kilogram for net heat generation of 5,000 to 5,500 kilocalories and Won 39 per kilogram for net heat generation of 5,500 kilocalories or more. In contrast, the currently applicable tax rate for LNG is Won 60 per kilogram. Since bituminous coal currently represents the largest fuel type for our electricity generation, accounting for approximately 52.2% of our entire fuel requirements in 2017 in terms of electricity output, we expect the coal consumption tax thereon will result in an increase of our overall fuel costs.

*Renewable Portfolio Standard.* Under this program, each of our generation subsidiaries is required to generate a specified percentage of total electricity to be generated by such generation subsidiary in a given year in the form of renewable energy or, in case of a shortfall, purchase a corresponding amount of a Renewable Energy Certificate (a form of renewable energy credit) from other generation companies whose renewable energy generation surpass such percentage. The target percentage was 3.0% in 2015, 3.5% in 2016, 4.0% in 2017, 5.0% in 2018 and will incrementally increase to 10.0% by 2023. Fines are to be levied on any subsidiary that fails to do so in the prescribed timeline. In 2016, all six of our generation subsidiaries met the target through renewable energy generation and/or the purchase of a Renewable Energy Certificate. Compliance by our generation subsidiaries of the 2017 target is currently under evaluation, and if any generation subsidiary is found to have failed to meet the target for 2017 or for subsequent years, such generation subsidiary may become subject to fines. Additionally, as the target percentage is subject to change, changes to the target percentage may result in additional expenses for our generation subsidiaries.

*Renewable Energy 3020 Plan.* In December 2017, the Ministry of Trade, Industry and Energy announced the Renewable Energy 3020 Plan, an initiative to increase the generation and use of renewable energy on a nationwide basis. The Government plans to increase the required percentage of total electricity to be generated from renewable energy sources from 7% in 2016 to 10.5% and 20% by 2022 and 2030, respectively. Moreover, the Government plans to increase the domestic renewable energy generation capacity to 63.8 gigawatts by 2030 through the expansion of solar and wind power generation capacities to 36.5 gigawatts and 17.7 gigawatts, respectively, by 2030.

*New Energy Industry Fund.* In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. We contributed Won 500 billion to the funds in 2016. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector.

*Environmental and safety considerations in electricity supply and demand planning.* In March 2017, the Electricity Business Act was amended to the effect that starting in June 2017, future national

10

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

planning for electricity supply and demand in Korea should consider the environmental and safety impacts of such planning. However, to-date, no specific guidelines have been provided by the Government as to how to implement this provision, and it is therefore difficult to assess in advance what impact such provision will have on our business, results of operations or financial condition.

Complying with these Government initiatives and operating programs in furtherance thereof has involved and will likely involve significant costs and resources on our part. We and our generation subsidiaries could also become subject to substantial fines and other forms of penalties for non-compliance. We expect that the additional costs associated with implementing and operating these programs and otherwise complying with these programs will be covered by a corresponding increase in electricity tariff. However, there is no assurance that, particularly given the wide-ranging policy priorities for the Government, it will in fact raise the electricity tariff to a level sufficient to fully cover such additional costs, do so on a timely basis or at all. If the Government does not do so or provide us and our generation subsidiaries with other forms of assistance to offset the costs involved, our results of operation, financial condition and cash flows may be materially and adversely affected.

See Item 4.B. "Business Overview−Environmental Programs."

***We may require a substantial amount of additional indebtedness to refinance existing debt and for future capital expenditures.***

We anticipate that a substantial amount of additional indebtedness will be required in the coming years in order to refinance existing debt, make capital expenditures for construction of generation plants and other facilities and/or make acquisitions, invest in renewable energy and the "new energy industry" projects and fund our overseas businesses. In 2015, 2016 and 2017, our capital expenditures in relation to the foregoing amounted to Won 15,750 billion, Won 13,950 billion and Won 13,711 billion, respectively, and our budgeted capital expenditures for 2018, 2019 and 2020 amount to Won 15,816 billion, Won 17,180 billion and Won 17,580 billion, respectively.

While we currently do not expect to face any material difficulties in procuring short-term borrowings to meet our liquidity and short-term capital requirements, there is no assurance that we will be able to do so. We expect that a portion of our long-term debt will need to be paid or refinanced through foreign currency-denominated borrowings and capital raising in international capital markets. Such financing may not be available on terms commercially acceptable to us or at all, especially if the global financial markets experience significant turbulence or a substantial reduction in liquidity or due to other factors beyond our control. If we are unable to obtain financing on commercially acceptable terms on a timely basis, or at all, we may be unable to meet our funding requirements for capital expenditures or debt repayment obligations, which could have a material adverse impact on our business, results of operations and financial condition.

In light of the general policy guideline of the Government for public institutions (including us and our generation subsidiaries) to reduce their respective overall debt levels, we and our generation subsidiaries have, in consultation with the Government and as approved by the Public Agencies Operating Committee, previously set for 2017 target debt-to-equity levels and undertaken various programs to reduce debt and improve the overall financial health. For further information, see Item 4.B. "Business Overview−Debt Reduction Program and Related Activities." Despite our best efforts, however, for reasons beyond our control, including macroeconomic environments, government regulations and market forces (such as international market prices for our fuels), we cannot assure whether we or our generation subsidiaries will be able to successfully reduce debt burdens or otherwise improve our financial health to a level contemplated by the Government or to a level that would be optimal for our capital structure. If we or our generation subsidiaries fail to do so or the measures taken by us or our generation subsidiaries to reduce debt levels or improve financial health have unintended adverse consequences, such developments may have an adverse effect on our business, results of operations and financial condition.

11

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*The movement of Won against the U.S. dollar and other currencies may have a material adverse effect on us.*

The Won has fluctuated significantly against major currencies from time to time. Even slight depreciation of Won against U.S. dollar and other foreign currencies may result in a material increase in the cost of fuel and equipment purchased by us from overseas since the prices for substantially all of the fuel materials and a significant portion of the equipment we purchase are denominated in currencies other than Won, generally in U.S. dollars. Changes in foreign exchange rates may also impact the cost of servicing our foreign currency-denominated debt. As of December 31, 2017, 19.4% of our long-term debt (including the current portion but excluding issue discounts and premium) without taking into consideration of swap transactions, was denominated in foreign currencies, principally U.S. dollars. In addition, even if we make payments in Won for certain fuel materials and equipment, some of these fuel materials may originate from other countries and their prices may be affected accordingly by the exchange rates between the Won and foreign currencies, especially the U.S. dollar. Since the substantial majority of our revenues are denominated in Won, we must generally obtain foreign currencies through foreign currency-denominated financings or from foreign currency exchange markets to make such purchases or service such debt. As a result, any significant depreciation of Won against the U.S. dollar or other major foreign currencies will have a material adverse effect on our profitability and results of operations.

*We may not be successful in implementing new business strategies.*

As part of our overall business strategy, we plan to (i) strengthen competitiveness in our core operations by enhancing efficiency of our generation, transmission and distribution networks and related facilities, (ii) expand and develop new businesses by diversifying our overseas business and actively addressing climate change, (iii) create a platform for future growth by developing an ecosystem focused on new energy technologies, and (iv) strengthen our management system for sustainable growth.

Due to their inherent uncertainties, such new and expanded strategic initiatives expose us to a number of risks and challenges, including the following:

new and expanded business activities may require unanticipated capital expenditures and involve additional compliance requirements;

new and expanded business activities may result in less growth or profit than we currently anticipate, and there can be no assurance that such business activities will become profitable at the level we desire or at all;

certain of our new and expanded businesses, particularly in the areas of renewable energy, require substantial government subsidies to become profitable, and such subsidies may be substantially reduced or entirely discontinued;

we may fail to identify and enter into new business opportunities in a timely fashion, putting us at a disadvantage vis-à-vis competitors, particularly in overseas markets; and

we may need to hire or retrain personnel to supervise and conduct the relevant business activities.

As part of our business strategy, we may also seek, evaluate or engage in potential acquisitions, joint ventures, strategic alliances, restructurings, combinations, rationalizations, divestments or other similar opportunities. The prospects of these initiatives are uncertain, and there can be no assurance that we will be able to successfully implement or grow new ventures, and these ventures may prove more difficult or costly than what we originally anticipated. In addition, we regularly review the profitability and growth potential of our existing and new businesses. As a result of such review, we may decide to exit from or to reduce the resources that we allocate to new or existing ventures in the future. There is a risk that these ventures may not achieve profitability or operational efficiencies to the extent originally anticipated, and we may fail to recover investments or expenditures that we have already made. Any of the foregoing may have a material adverse effect on our reputation, business, results of operations, financial condition and cash flows.

12

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

***We plan to pursue overseas expansion opportunities that may subject us to different or greater risks than those associated with our domestic operations.***

While our operations have, to-date, been primarily based in Korea, we and our generation subsidiaries may expand, on a selective and opportunistic basis, overseas operations in the future. In particular, we and our generation subsidiaries may further expand our project portfolio to include the construction and operation of conventional thermal generation units, nuclear generation units and renewable energy power plants, transmission and distribution and (primarily through our generation subsidiaries) mining and development of fuel sources.

Overseas operations often involve risks that are different from those we face in our domestic operations, including the following:

challenges of complying with multiple foreign laws and regulatory requirements, including tax laws and laws regulating our operations and investments;

volatility of overseas economic conditions, including fluctuations in foreign currency exchange rates;

difficulties in enforcing creditors' rights in foreign jurisdictions;

risk of expropriation and exercise of sovereign immunity where the counterparty is a foreign government;

difficulties in establishing, staffing and managing foreign operations;

differing labor regulations;

political and economic instability, natural calamities, war and terrorism;

lack of familiarity with local markets and competitive conditions;

changes in applicable laws and regulations in Korea that affect foreign operations; and

obstacles to the repatriation of earnings and cash.

Any failure by us to recognize or respond to these differences may adversely affect the success of our operations in those markets, which in turn could materially and adversely affect our business and results of operations.

Furthermore, while we seek to enter into overseas business opportunities in a prudent manner, some of our new international business ventures carry inherent risks that are different from our traditional business of electricity power generation, transmission and distribution. While the overseas businesses in the aggregate currently do not comprise a material portion of our overall business, as we are relatively inexperienced in these new types of overseas businesses, the actual revenues and profitability from, and investments and expenditures into, such ventures may be substantially different from what we plan or anticipate and may have a material adverse impact on our overall business, results of operations, financial condition and cash flows.

***An increase in electricity generated by and/or sourced from private power producers may erode our market position and hurt our business, growth prospects, revenues and profitability.***

As of December 31, 2017, we and our generation subsidiaries owned approximately 70.3% of the total electricity generation capacity in Korea (excluding plants generating electricity for private or emergency use). New entrants to the electricity business will erode our market share and create significant competition, which could have a material adverse impact on our financial condition and results of operations.

In particular, we compete with independent power producers with respect to electricity generation. The independent power producers accounted for 22.9% of total power generation in 2017 and 29.7% of total generation capacity as of December 31, 2017. As of December 31, 2017, there were 17 independent power

13

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

producers in Korea, excluding renewable energy producers. Private enterprises became permitted to own and operate coal-fired power plants in Korea only after the Ministry of Trade, Industry and Energy approved plans for independent power producers to construct coal-fired power plants under the Sixth Basic Plan announced in February 2013. Under the Eighth Basic Plan announced in December 2017, (i) six coal-fired units under construction with aggregate generation capacity of 6,260 megawatts are scheduled to be completed between 2021 and 2022, and (ii) two coal-fired units scheduled for construction shall be converted to LNG fuel use. Currently there are no additional plans for construction of coal-fired power plants by independent power producers beyond 2022. While it remains to be seen whether construction of these generation units will be completed as scheduled, if these units were to be completed as scheduled and/or independent power producers are permitted to build additional generation capacity (whether coal-fired or not), our market share in Korea may decrease, which may have a material adverse effect on our results of operations and financial condition.

In addition, under the Community Energy System adopted by the Government in 2004, a minimal amount of electricity is supplied directly to consumers on a localized basis by independent power producers outside the cost-based pool system used by our generation subsidiaries and most independent power producers to distribute electricity nationwide. The purpose of this system is to geographically decentralize electricity supply and thereby reduce transmission losses and improve the efficiency of energy use. These entities do not supply electricity on a national level but are licensed to supply electricity on a limited basis to their respective districts under the Community Energy System. As of March 31, 2018, the aggregate generation capacity of suppliers participating in the Community Energy System amounted to less than 1% of that of our generation subsidiaries in the aggregate. We currently do not expect the Community Energy System to be widely adopted, especially in light of the significant level of capital expenditure required for such direct supply. However, if the Community Energy System is widely adopted, it may erode our currently dominant market position in the generation and distribution of electricity in Korea and may have a material adverse effect on our business, results of operations and financial condition.

Our market dominance in the electricity distribution in Korea also may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows.

See also Item 4.B. "Business Overview–Competition."

***Labor unrest or increases in labor cost may adversely affect our operations.***

We and each of our generation subsidiaries have separate labor unions. As of December 31, 2017, approximately 69.0% of our and our generation subsidiaries' employees in the aggregate were members of these labor unions. Since a six-week labor strike in 2002 by union members of our generation subsidiaries in response to a proposed privatization of one of our generation subsidiaries, there has been no material labor dispute. However, we cannot assure you that there will not be a major labor strike or other material disruptions of operations by the labor unions of us and our generation subsidiaries if the Government resumes privatization or other restructuring initiatives or for other reasons, which may adversely affect our business and results of operations.

Furthermore, the Government, as part of a response to low fertility amidst an aging population in Korea and to make the lives of workers more stable, has pledged to reduce the number of non-permanent workers and increase the employment of permanent workers, in part by transitioning from non-permanent to permanent many positions in the public sector. According to guidelines announced by the Government in July 2017, we plan to

14

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

finalize measures, by the end of 2018, to transition non-permanent positions to permanent positions, including types and number of non-permanent positions to be transitioned and conditions of transition. Although a majority of our and our generation subsidiaries' workforce are permanent employees, approximately 31.7% of the workforce consists of non-permanent positions that are part-time or outsourced. If we or our generation subsidiaries, as a result of these Government policies or otherwise, are required to or decide to transition non-permanent positions to permanent positions, this may result in increased labor costs for us or our generation subsidiaries and may have a material adverse impact on us or our generation subsidiaries' financial condition and results of operations.

***Operation of nuclear power generation facilities inherently involves numerous hazards and risks, any of which could result in a material loss of revenues or increased expenses.***

Through KHNP, we currently operate 24 nuclear-fuel generation units. Operation of nuclear power plants is subject to certain hazards, including environmental hazards such as leaks, ruptures and discharge of toxic and radioactive substances and materials. These hazards can cause personal injuries or loss of life, severe damage to or destruction of property and natural resources, pollution or other environmental damage, clean-up responsibilities, regulatory investigation and penalties and suspension of operations. Nuclear power has a stable and relatively inexpensive cost structure (which is least costly among the fuel types used by our generation subsidiaries) and is the second largest source of Korea's electricity supply, accounting for 26.8% of electricity generated in Korea in 2017. Due to significantly lower unit fuel costs compared to those for thermal power plants, our nuclear power plants are generally operated at full capacity with only routine shutdowns for fuel replacement and maintenance, with limited exceptions.

From time to time, our nuclear generation units may experience unexpected shutdowns or maintenance-related stoppage. For example, following an earthquake in the vicinity in September 2016, four nuclear generation units at the Wolsong site were shut down for approximately three months as part of a preventive and safety assurance program although these units were not directly affected by the earthquake. Furthermore, the utilization rates of our nuclear generation units fell in 2017 as our nuclear generation units stopped operation for safety and maintenance inspection more frequently in 2017 as compared to 2016, due to the Government's strengthening of safety enhancement measures. We expect the utilization of our nuclear generation units will be similarly affected in 2018. Any prolonged or substantial breakdown, failure or suspension of operation of a nuclear unit could result in a material loss of revenues, an increase in fuel costs related to the use of alternative power sources, additional repair and maintenance costs, greater risk of litigation and increased social and political hostility to the use of nuclear power, any of which could have a material adverse impact on our financial condition and results of operations.

In addition, heightened concerns regarding the safety of operating nuclear generation units could impede with our ability to operating them for an extended period of time or at all. For example, the nuclear power plant at Wolsong #1 unit began operations in 1982 and ended its operations in 2012 pursuant to its 30-year operating license. In February 2015, the Nuclear Safety and Security Commission ("NSSC") evaluated the safety of operating Wolsong #1 unit and approved its extended operation until November 2022. However, a civic group filed a lawsuit to annul such decision, and in February 2017, the Seoul Administrative Court ruled against the NSSC. The NSSC appealed this decision, and the civic group filed an injunction to suspend the operation of the Wolsong #1 unit. The civic group's injunction was denied in July 2017. KHNP, which currently is operating the unit pursuant to the NSSC's initial decision, has joined this lawsuit. As of December 31, 2017, the book value of property, plant and equipment and provision for decommissioning costs of Wolsong #1 unit was Won 608 billion and Won 642 billion, respectively. We cannot assure you whether the courts will ultimately rule to grant the extension of life for Wolsong #1. In addition, it is reported that the Government will announce its decision by the first half of 2018 regarding the timing of the shutdown of Wolsong #1 unit. If Wolsong #1 unit is prohibited from operation, we may incur significant losses in connection with the property, plant and equipment of Wolsong #1 unit. In addition, the amount of provision may increase significantly, and the timing of actual cash outflows may be accelerated. There are seven other nuclear generation units whose life under their initial operating license

15

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

will expire in the next nine years, or by 2027. Thus, if the courts or the Government were to ultimately decide against the extension of life for Wolsong #1, we may find it more difficult to have the life of other nuclear units extended as well. The failure to extend the life of these units would result in a loss of revenues from such units and the increase in our overall fuel costs (as nuclear fuel is the cheapest compared to coal, LNG or oil), which could adversely affect our results of operation and financial condition. Furthermore, in September 2016, Greenpeace and 559 Korean nationals brought a lawsuit against the NSSC to revoke the permit the NSSC granted to KHNP in relation to the construction of Shin-Kori #5 and #6 nuclear generation units. This case is currently pending at the Seoul Administrative Court. If the construction of these new nuclear units is prohibited, we will experience a loss of revenues and an increase in fuel costs, which could adversely affect our results of operation and financial condition.

In order to prevent damages to the nuclear facilities such as a result of the tsunami and earthquake in March 2011 in Japan, KHNP prepared a comprehensive safety improvement plan including, but are not limited to, installing additional automatic shut-down systems for earthquakes, extending coastal barriers for seismic waves, procuring mobile power generators and storage batteries, installing passive hydrogen removers at nuclear facilities and improving the radiology emergency medical system. All follow-up measures were finalized in December 2015. KHNP also developed 10 additional supplementary safety measures by analysis of overseas plants and its current operations and implemented eight of such measures in 2017, with the two remaining measures to be implemented by 2020. However, there is no assurance that a similar or worse natural disaster may require the adoption and implementation of additional safety measures, which may be costly and have a material adverse impact on our financial condition and results of operations.

While releasing its five-year national governance plan in July 2017, the new Government led by President Moon Jae-in announced reforms indicating a shift away from previous energy policies. Subsequently, the Government unveiled its roadmap to denuclearization and shift in energy sources in October 2017 and announced the Eighth Basic Plan to implement such roadmap in December 2017. The Eighth Basic Plan focuses on, among other things, (i) decreasing the reliance on nuclear and coal-based supply sources, (ii) increasing utilization of renewable energy sources and (iii) balancing the existing cost-based pool system of purchase of electricity with an environmentally-focused pool system, in order to increase utilization of LNG energy sources, which are cleaner but more expensive than nuclear or coal energy sources. Accordingly, six new nuclear generation units in a planning stage (Shinhanwool #3 and #4, Chunji #1 and #2 and Singyu #1 and #2) would not be constructed, while five new nuclear plants under construction (Shin-Kori #4, #5, #6, Shin-Hanul #1 and #2) shall begin operation by 2023 upon completion of the construction. Future extensions of life of decrepit nuclear generation units would not be granted and the proportion of renewable energy sources would be increased. Such Government policies or any changes thereto may affect existing plans of our or our generation subsidiaries and have a material adverse impact on our or our generation subsidiaries' financial condition and results of operations.

***The construction and operation of our generation, transmission and distribution facilities involve difficulties, such as opposition from civic groups, which may have an adverse effect on us.***

From time to time, we encounter social and political opposition against construction and operation of our generation facilities (particularly nuclear units) and, to a lesser extent, our transmission and distribution facilities. For example, we recently faced intense opposition from local residents and civic groups to the construction of transmission lines in the Milyang area, which we resolved through various compensatory and other support programs. Such opposition delayed the schedule for completion of this project. Although we and the Government have undertaken various community programs to address concerns of residents in areas near our facilities, civic and community opposition could result in delayed construction or relocation of our planned facilities, which could have a material adverse impact on our business and results of operations.

16

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

Table of Contents

*Our risk management policies and procedures may not be fully effective at all times.*

In the course of our operations, we must manage a number of risks, such as regulatory risks, market risks and operational risks. Although we devote significant resources to developing and improving our risk management policies and procedures and expect to continue to do so in the future, our risk management practices may not be fully effective at all times in eliminating or mitigating risk exposures in all market environments or against all types of risk, including risks that are unidentified or unanticipated, such as natural disasters or employee misconduct. For example, in May 2013, the Nuclear Safety and Security Commission ("NSSC") of Korea discovered that certain parts used in several of our then-operating nuclear generation units had been supplied based on forged testing results. This discovery led to full internal investigation and investigation by the Prosecutor's Office, which in turn led to prosecutions and convictions of several current and former employees of KHNP on related and separate bribery charges, as well as termination of the then-president of KHNP as part of a broad disciplinary action. The incident also led to suspended operation of the related nuclear generation units for several months pending safety inspection. A similar incident involving forged testing results and bribery occurred also in November 2012. We and KHNP have fully cooperated with the authorities in terms of investigations as well as remedial and preventive measures, including enhanced internal compliance policies and procedures. We also believe we and our subsidiaries are in compliance in all material respects with internal compliance policies and procedures and all other additional safety measures initiated internally or required by regulatory and governmental agencies. However, we cannot assure you that, despite all precautionary and reform measures undertaken by us, these measures will prove to be fully effective at all times against all the risks we face or that an incident that that could cause harm to our reputation and operation will not happen in the future, including due to factors beyond our control.

*Our risk management procedures may not prevent losses in debt and foreign currency positions.*

We manage interest rate exposure for our debt instruments by limiting our variable rate debt exposure as a percentage of our total debt and closely monitoring the movements in market interest rates. We also actively manage currency exchange rate exposure for our foreign currency-denominated liabilities by measuring the potential loss therefrom using risk analysis software and entering into derivative contracts to hedge such exposure when the possible loss reaches a certain risk limit. To the extent we have unhedged positions or our hedging and other risk management procedures do not work as planned, our results of operations and financial condition may be adversely affected.

*The amount and scope of coverage of our insurance are limited.*

Substantial liability may result from the operations of our nuclear generation units, the use and handling of nuclear fuel and possible radioactive emissions associated with such nuclear fuel. KHNP carries insurance for its generation units and nuclear fuel transportation, and we believe that the level of insurance is generally adequate and is in compliance with relevant laws and regulations. In addition, KHNP is the beneficiary of Government indemnity which covers a portion of liability in excess of the insurance. However, such insurance is limited in terms of amount and scope of coverage and does not cover all types or amounts of losses which could arise in connection with the ownership and operation of nuclear plants. Accordingly, material adverse financial consequences could result from a serious accident or a natural disaster to the extent it is neither insured nor covered by the government indemnity.

In addition, our non-nuclear generation subsidiaries carry insurance covering certain risks, including fire, in respect of their key assets, including buildings and equipment located at their respective power plants, construction-in-progress and imported fuel and procurement in transit. Such insurance and indemnity, however, cover only a portion of the assets that these generation subsidiaries own and operate and do not cover all types or amounts of loss that could arise in connection with the ownership and operation of these power plants. In addition, unlike us, our generation subsidiaries are not permitted to self-insure, and accordingly have not self-insured, against risks of their uninsured assets or business. Accordingly, material adverse financial consequences could result from a serious accident to the extent it is uninsured.

17

PUBLIC VERSION

Table of Contents

In addition, because neither we nor our non-nuclear generation subsidiaries carry any insurance against terrorist attacks, an act of terrorism would result in significant financial losses. See Item 4.B. "Business Overview−Insurance."

***We may not be able to raise equity capital in the future without the participation of the Government.***

Under applicable laws, the Government is required to directly or indirectly own at least 51% of our issued capital stock. As of March 15, 2018, the last day on which our shareholders' registry was closed, the Government, directly and through Korea Development Bank (a statutory banking institution wholly owned by the Government), owned 51.1% of our issued capital stock. Accordingly, without changes in the existing Korean law, it may be difficult or impossible for us to undertake, without the participation of the Government, any equity financing in the future.

***We may be exposed to potential claims made by current or previous employees for unpaid wages for the past three years under the expanded scope of ordinary wages and become subject to additional labor costs arising from the broader interpretation of ordinary wages under such decision.***

Under the Labor Standards Act, an employee is legally entitled to "ordinary wages." Under the guidelines previously issued by the Ministry of Employment and Labor, ordinary wages include base salary and certain fixed monthly allowances for work performed overtime during night shifts and holidays. Prior to the Supreme Court decision described below, many companies in Korea had typically interpreted these guidelines as excluding from the scope of ordinary wages fixed bonuses that are paid other than on a monthly basis, namely on a bi-monthly, quarterly or semi-annual basis, although such interpretation had been a subject of controversy and had been overruled in a few court cases.

In December 2013, the Supreme Court of Korea ruled that regular bonuses fall under the category of ordinary wages on the condition that those bonuses are paid regularly and uniformly, and that any agreement which excludes such regular bonuses from ordinary wage is invalid. One of the key rulings provides that bonuses that are given to employees (i) on a regular and continuous basis and (ii) calculated according to the actual number of days worked (iii) that are not incentive-based must be included in the calculation of "ordinary wages." The Supreme Court further ruled that in spite of invalidity of such agreements, employees shall not retroactively claim additional wages incurred due to such court decision, in case that such claims bring to employees unexpected benefits which substantially exceeds the wage level agreed by employers and employees and cause an unpredicted increase in expenditures for their company, which would lead the company to material managerial difficulty or would be a threat to the existence of the company. In that case, the claim is not acceptable since it is unjust and is in breach of the principle of good faith.

As a result of such ruling by the Supreme Court of Korea, we and our subsidiaries became subject to a number of lawsuits filed by various industry-wide and company-specific labor unions based on claims that ordinary wage had been paid without including certain items that should have been included as ordinary wage. In July 2016, the court ruled against us, and in accordance with the court' s ruling, in August 2016 we paid Won 55.1 billion to the employees for three years of back pay plus interest. As of December 31, 2017, 49 lawsuits were pending against our subsidiaries for an aggregate claim amount of Won 170 billion, for which our subsidiaries set aside an aggregate amount of Won 56 billion to cover any potential future payments of additional ordinary wage in relation to the related lawsuits. We cannot presently assure you that the court will not rule against our subsidiaries in these lawsuits, or that the foregoing reserve amount will be sufficient to cover the amounts payable under the court rulings.

Additionally, since the issue of determining which labor costs should be additionally included as part of ordinary wages has not been fully resolved by the courts reviewing the lawsuits to which our subsidiaries are a party and other ordinary wage lawsuits filed against other companies, we cannot presently assure you that there will not be additional lawsuits in relation to ordinary wages and that we or our subsidiaries may not become

18

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

liable for greater amount of damages as a result of these lawsuits. Furthermore, court decisions or labor legislations expanding the definition of ordinary wages may prospectively increase the labor costs of us and our subsidiaries. As a result, there can be no assurance that the above-described lawsuits and circumstances will not have a material adverse effect on our results of operations. See Item 8.A. Consolidated Statements and Other Financial Information–Legal Proceedings.

*We are subject to cyber security risk.*

Recently, our activities have been subject to an increasing risk of cyber-attacks, the nature of which is continually evolving. For example, in December 2014, KHNP became subject to a cyber terror incident. According to the findings of the Prosecutor' s Office announced in March 2015, hackers suspected to be affiliated with North Korean authorities stole and distributed a mock blueprint for a hypothetical nuclear unit that had been devised for educational purposes, hacked into the computer network of former KHNP employees and threatened to shut down certain of KHNP' s nuclear plants. The hacking incident did not jeopardize our nuclear operation in any material respect and none of the stolen information was material to our nuclear operation or the national nuclear policy. In response to such incident, we and our subsidiaries have further bolstered anti-hacking and other preventive and remedial measures in relation to potential cyber terror. However, there is no assurance that a similar or more serious hacking or other forms of cyber terror will not happen with respect to us and our generation subsidiaries, which could have a material adverse impact on our business, financial condition and results of operations.

*We engage in limited activities relating to Iran and may become subject to sanctions under relevant laws and regulations of the United States and other jurisdictions as a result of such activities, which may adversely affect our business and reputation.*

The U.S. Department of the Treasury' s Office of Foreign Assets Control, or OFAC, administers and enforces certain laws and regulations (which we refer to as the OFAC sanctions) that impose restrictions upon activities or transactions within U.S. jurisdiction with certain countries, governments, entities and individuals that are the subject of OFAC sanctions, including Iran. Even though non-U.S. persons generally are not directly bound by OFAC sanctions, in recent years OFAC has asserted that such non-U.S. persons can be held liable on various legal theories if they engage in transactions completed in part in the United States or by U.S. persons (such as, for example, wiring an international payment that clears through a bank branch in New York). The European Union also enforces certain laws and regulations that impose restrictions upon nationals and entities of, and business conducted in, member states with respect to activities or transactions with certain countries, governments, entities and individuals that are the subject of such laws and regulations, including Iran. The United Nations Security Council and other governmental entities also impose similar sanctions.

In addition to the OFAC sanctions described above, the United States also maintains indirect sanctions under authority of, among others, the Iran Sanctions Act, the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, or CISADA, the National Defense Authorization Act for Fiscal Year 2012, or the NDAA, the Iran Threat Reduction and Syria Human Rights Act of 2012, or ITRA, various Executive Orders, the Iran Freedom and Counter-Proliferation Act of 2012, or IFCA, and the Countering America' s Adversaries Through Sanctions Act, or CAATSA. These indirect sanctions, which we refer to collectively as U.S. secondary sanctions, provide authority for the imposition of U.S. sanctions on foreign parties that provide services in support of certain Iranian activities in the energy, shipping and military sectors, among others.

On July 14, 2015, the so-called "P5+1" powers (consisting of the United States, the United Kingdom, Germany, France, Russia, and China) and the European Union, or the EU, entered into an agreement with Iran known as the Joint Comprehensive Plan of Action Regarding the Islamic Republic of Iran' s Nuclear Program, or the JCPOA. The JCPOA is intended to significantly restrict Iran' s ability to develop and produce nuclear weapons. Upon implementation of the JCPOA on January 16, 2016 the United States, the EU, and the UN suspended certain nuclear-related sanctions against Iran following an announcement by the International Atomic Energy Agency that Iran had fulfilled its initial obligations under the JCPOA.

19

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The U.S. secondary sanctions that were suspended on January 16, 2016 have not been repealed. Rather, certain waivers of statutory provisions were put into place, certain Presidential Executive Orders were revoked, and certain persons were removed from the relevant U.S. sanctions lists. Under the JCPOA, sanctions may be re-imposed if the United States or any other member of the P5+1 or the EU invokes provisions of the JCPOA for the re-imposition of sanctions. Additionally, the United States, the EU, or the UN may impose new sanctions against Iran or against persons conducting business in Iran even while the JCPOA remains in force.

Violations of OFAC sanctions via transactions with a U.S. jurisdictional nexus can result in substantial civil or criminal penalties. A range of sanctions may be imposed on companies that engage in sanctionable activities within the scope of U.S. secondary sanctions, including, among other things, the blocking of any property subject to U.S. jurisdiction in which the sanctioned company has an interest, which could include a prohibition on transactions or dealings involving securities of the sanctioned company or the sanctioned company effectively losing access to the U.S. financial system.

In Iran, we are currently engaged in limited business activities, none of which has progressed beyond the development stage. Our activities in Iran are coordinated by a representative office located in Tehran, Iran. None of our activities in Iran involve U.S. persons or our U.S. affiliates. Our counterparties in the projects described below are mostly Iranian governmental entities or Iranian state-owned enterprises.

We have not realized any revenue or profit from our activities in Iran. We also have not to-date made any investments in Iran, other than fees paid to our service providers in Iran for us to carry out certain of the projects listed below and expenses to run our representative office in Tehran in the ordinary course of business.

A summary of our current projects in Iran follows.

We have entered into cooperation agreements with Tavanir, an Iranian state-owned electricity provider, under which we will carry out (i) a pilot advanced metering infrastructure ("AMI") project, (ii) a project for modeling the installation of energy storage systems in Iran and (iii) a project for temporarily leasing our thermo auto analysis diagnosis system for free of charge. AMI enables checking the electricity usage amount remotely. The project is being conducted in Pak Dasht City and Hormuz Island, Iran. This pilot project involves installing approximately 2,500 smart meters. The development and production of AMI equipment and materials are complete, and we have obtained permission from the Ministry of Trade, Industry and Energy of Korea to export the equipment. We shipped the AMI equipment and materials to Iran in September 2017 and completed the installation in December 2017. We completed the trial run of the AMI system in March 2018 and we plan to hand over the operation of the system to Tavanir by May 2018. As for the project for the energy storage systems in Iran, we are currently in the process of collecting requisite data for the project, having selected the parties to participate in the installation of the energy storage systems. We plan to lease our thermo auto analysis diagnosis system to Tavanir for free of charge, for approximately two months ending in May 2018, after which we will retrieve the equipment to Korea.

We are in the process of negotiating various agreements with Tavanir under which we would provide consulting services relating to (i) installation of a distribution management system in Iran and (ii) development of a clean development mechanism (CDM) for the recovery and recycling of the sulfur hexafluoride gas in Iran for purposes of carbon emission reduction.

We are in the process of negotiating an agreement with Niroo Research Institute, a research organization affiliated with the Ministry of Energy of Iran, under which we would provide consulting services relating to improvement of Iran's electricity demand through load management, efficiency improvement and tariff system improvement.

We have participated in a feasibility study of the proposed adoption by Tavanir of a 765 kV electricity transmission network. Our task involved reviewing Tavanir's feasibility report. A final report summarizing our review of the feasibility report and a technical review of the transmission network was submitted in February 2017.

20

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

We engaged Mehr Renewable Energy Company for project design documentation services to register with United Nations Framework Convention on Climate Change our CDM business to be conducted in Iran.

We are in the process of negotiating a contract with Thermal Power Plant Holding Company of Iran under which we would build and operate combined cycle power plants at Zanjan and Neyzar, Iran.

We have submitted a draft proposal to the Ministry of Energy of Iran under which we would provide consulting services in relation to establishment of information and communication technology infrastructure in Iran.

We have submitted a draft proposal to the Iran Energy Efficiency Organization under which we would provide consulting services in relation to AMI security in Iran in December 2016.

We are in the process of conducting a feasibility study for a solar power project in Iran.

We are in the process of reviewing the feasibility of the rehabilitation of an old power plant in Iran.

KOWEPO is currently pursuing a "build, operate and transfer" project relating to a 500 megawatts combined cycle power plant in Sirjan, Kerman in Iran, through a consortium with Daewoo E&C, a Korean construction company, and Gohar Energy, an Iranian energy company. The consortium is currently in the process of preparing an application to Thermal Power Plant Holdings, a holding company for a state-run Iranian thermoelectric power plant, for the project.

Korea Electric Power Research Institute, which is operated by us, has entered into cooperation agreements with Iran's Niroo Research Institute regarding various joint research and development efforts relating to power plants, renewable energy, smart grids and other energy-related technologies.

To the extent any of our subsidiaries have dealings in or relating to Iran, we have internal policies and procedures, as well as a monitoring system, which are designed to prevent and detect violations of applicable laws, including applicable sanctions laws. We do not believe that our current activities relating to Iran violate OFAC sanctions or are sanctionable under U.S. secondary sanctions, and in any event, we believe we are in compliance with applicable sanctions laws. We believe we are not in violation of any laws concerning re-exports of U.S.-origin goods to Iran. Moreover, to the extent our activities were sanctionable under those U.S. secondary sanctions programs that were lifted pursuant to the JCPOA, we may face U.S. secondary sanctions if such sanctions are re-imposed.

There can be no assurances that the relevant relief pursuant to the JCPOA will continue to be available in the future, and even if it does, there is no guarantee that our activities relating to Iran will not be found to violate the OFAC sanctions or involve sanctionable activities under U.S. secondary sanctions, or that any other government will not determine that our activities violate applicable sanctions of other countries. Laws related to Iran sanctions are complex, dynamic, and subject to evolving interpretations by the regulatory authorities. The re-imposition or "snap-back" of U.S. sanctions pursuant to the JCPOA could also occur, and the scope of re-imposed sanctions would be determined at that time.

Certain institutional investors, including state and municipal governments in the United States and universities, as well as financial institutions, have proposed or adopted initiatives regarding investments in companies that do business with countries that are the target of OFAC sanctions, including Iran. Accordingly, as a result of our activities related to Iran, certain investors may not wish to invest in our shares or ADSs or do business with us. In September 2016, the New Jersey Department of the Treasury's Division of Investment notified of its preliminary determination of divestment pursuant to the New Jersey divestment laws. Such preliminary determination was reversed in February 2017 after we explained such determination was based on incorrect information about our business in Iran. As of February 2018, we were listed on the Iowa Public Employees' Retirement System's (IPERS) Iran Prohibited Companies List. Such divestment initiatives and the decision not to invest in, or to divest from our shares or ADSs may have a material negative impact our reputation and the value of our shares or ADSs.

Violations of sanctions can result in penalties or other consequences adverse to us. Certain of our counterparties may be subjected to sanctions. If we violate sanctions, we may ourselves be subjected to sanctions or penalties. Our business and results of operations may be adversely affected or we may suffer reputational

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

damage. In addition, such sanctions may prevent us from consummating or continuing any of the projects we are currently pursuing in Iran, which could adversely affect our results of operations. Also, at any time, certain investors may divest their interests in our shares if we are found to have violated or are suspected of violating applicable sanctions law arising from our operation in a sanctioned country such as Iran.

***We purchase goods and services from Russia and those activities may be adversely impacted in a material manner by economic sanctions concerning Russia imposed by the United States and other jurisdictions.***

The United States and the European Union have imposed economic sanctions concerning Russia. OFAC sanctions concerning Russia, *inter alia*, block the property of certain designated individuals and entities, target certain sectors of the Russian economy and prohibit certain transactions with certain targeted persons in targeted sectors of the Russian economy, and restrict investment in and trade with the Crimea region of Ukraine. Additionally, non-U.S. persons that engage in certain prohibited transactions concerning Russia or with certain sanctioned Russian persons or entities may be subject to secondary sanctions. In August 2017, the United States Congress passed CAATSA, which introduced a host of new U.S. secondary sanctions concerning Russia including, *inter alia*, for certain dealings with the Russian energy sector, support for Russia's energy export pipelines and engaging in a "significant transaction" with a person that is part of, or operates for or on behalf of, Russia's defense or intelligence sectors. Additionally, a non-U.S. person that knowingly facilitates a "significant transaction" or transactions for or on behalf of any person subject to sanctions imposed by the U.S. with respect to the Russian Federation or any child, spouse, parent, or sibling of such a sanctioned person may also be subject to secondary sanctions.

In 2017, we purchased 11% of our bituminous coal requirements from Russia. Additionally, we also purchase uranium and uranium separation services from a Russian supplier. In 2017, the total value of all goods and services purchased from Russia was approximately US$1 billion.

**Risks Relating to Korea and the Global Economy**

***Unfavorable financial and economic conditions in Korea and globally may have a material adverse impact on us.***

We are incorporated in Korea, where most of our assets are located and most of our income is generated. As a result, we are subject to political, economic, legal and regulatory risks specific to Korea, and our business, results of operations and financial condition are substantially dependent on the Korean consumers' demand for electricity, which are in turn largely dependent on developments relating to the Korean economy.

The Korean economy is closely integrated with, and is significantly affected by, developments in the global economy and financial markets. In recent years, adverse conditions and volatility in the worldwide financial markets, fluctuations in oil and commodity prices and the general weakness of the global economy have contributed to the uncertainty of global economic prospects in general and have adversely affected, and may continue to adversely affect, the Korean economy, which in turn could adversely affect our business, financial condition and results of operations. As the Korean economy is highly dependent on the health and direction of the global economy, the prices of our securities may be adversely affected by investors' reactions to developments in other countries. In addition, due to the ongoing volatility in the global financial markets, the value of the Won relative to the U.S. dollar has also fluctuated significantly in recent years, which in turn also may adversely affect our financial condition and results of operations.

Factors that determine economic and business cycles in the Korean or global economy are for the most part beyond our control and inherently uncertain. In light of the high level of interdependence of the global economy, any of the foregoing developments could have a material adverse effect on the Korean economy and financial markets, and in turn on our business and profitability.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

More specifically, factors that could have an adverse impact on Korea's economy in the future include, among others:

increases in inflation levels, volatility in foreign currency reserve levels, commodity prices (including oil prices), exchange rates (particularly against the U.S. dollar), interest rates, stock market prices and inflows and outflows of foreign capital, either directly, into the stock markets, through derivatives or otherwise, including as a result of increased uncertainty in the wake of a referendum in the United Kingdom in June 2016 that voted in favor of exiting from the European Union, commonly known as "Brexit";

difficulties in the financial sectors in Europe, China and elsewhere and increased sovereign default risks in select countries and the resulting adverse effects on the global financial markets;

adverse developments in the economies of countries and regions to which Korea exports goods and services (such as the United States, Europe, China and Japan), or in emerging market economies in Asia or elsewhere that could result in a loss of confidence in the Korean economy, including potentially as a result of the Brexit;

social and labor unrest or declining consumer confidence or spending resulting from lay-offs, increasing unemployment and lower levels of income;

uncertainty and volatility and further decreases in the market prices of Korean real estate;

a decrease in tax revenues and a substantial increase in the Government's expenditures for unemployment compensation and other social programs that together could lead to an increased Government budget deficit;

political uncertainty, including as a result of increasing strife among or within political parties in Korea, and political gridlock within the government or in the legislature, which prevents or disrupts timely and effective policy making to the detriment of Korean economy, as well as the impeachment and indictment of the former president following a series of scandals and social unrest, which also involved the investigation of several leading Korean conglomerates and arrest of their leaders on charges of bribery and other possible misconduct;

deterioration in economic or diplomatic relations between Korea and its trading partners or allies, including deterioration resulting from territorial or trade disputes or disagreements in foreign policy, including as a result of any potential renegotiation of free trade agreements, or the ongoing tension between Korean and China in relation to the decision to allow deployment by the United States of the Terminal High Altitude Defense system known as "THAAD" in Korea;

increases in social expenditures to support the aging population in Korea or decreases in economic productivity due to the declining population size in Korea;

any other development that has a material adverse effect in the global economy, such as an act of war, the spread of terrorism or a breakout of an epidemic such as SARS, avian flu, swine flu, Middle East Respiratory Syndrome, ebola or Zika virus, or natural disasters, earthquakes and tsunamis and the related disruptions in the relevant economies with global repercussions;

hostilities involving oil-producing countries in the Middle East and elsewhere and any material disruption in the supply of oil or a material increase in the price of oil resulting from such hostilities; and

an increase in the level of tensions or an outbreak of hostilities in the Korean peninsula or between North Korea and the United States.

Any future deterioration of the Korean economy could have an adverse effect on our business, financial condition and results of operations.

23

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Tensions with North Korea could have an adverse effect on us and the market value of our shares.*

Relations between Korea and North Korea have been tense throughout Korea`s modern history. The level of tension between the two Koreas has fluctuated and may increase abruptly as a result of current and future events. In particular, there continues to be uncertainty regarding the long-term stability of North Korea`s political leadership since the succession of Kim Jong-un to power following the death of his father in December 2011, which has raised concerns with respect to the political and economic future of the region. In February 2017, Kim Jong-un`s half-brother, Kim Jong-nam, was reported to have been assassinated in an international airport in Malaysia.

In addition, there continues to be heightened security tension in the region stemming from North Korea`s hostile military and diplomatic actions, including in respect of its nuclear weapons and long-range missile programs. Some examples from recent years include the following:

In November 2017, North Korea conducted a test launch of another intercontinental ballistic missile, which, due to its improved size, power and range of distance, may potentially enable North Korea to target the United States mainland.

Recently, on September 3, 2017, North Korea conducted its sixth nuclear test, claiming it had tested a hydrogen bomb that could be mounted on an intercontinental ballistic missile. In response, on September 12, 2017, the United Nations Security Council unanimously adopted a resolution imposing additional sanctions on North Korea including new limits on gas, petrol and oil imports, a ban on textile exports and measures to limit North Korean laborers from working abroad.

On August 29, 2017, North Korea tested an intermediate-range ballistic missile which flew directly over northern Japan before landing in the Pacific Ocean. In response, the United Nations Security Council unanimously adopted a statement condemning such launch, reiterating demands that North Korea halt its ballistic missile and nuclear weapons programs.

On July 4, 2017, North Korea tested its first intercontinental ballistic missile. In response, the U.S. government and the Government both issued statements condemning North Korea and conducted a joint military exercise on July 5, 2017. On July 28, 2017, North Korea tested a second intercontinental ballistic missile which landed in the Sea of Japan, inside Japan`s Economic Exclusion Zone. In response, on August 5, 2017, the United Nations Security Council unanimously adopted a resolution that strengthened sanctions on North Korea. The resolution includes a total ban on all exports of coal, iron, iron ore, lead, lead ore and seafood, which is expected to reduce North Korea`s export revenue by a third each year.

In March 2017, North Korea launched four mid-range missiles, which landed off the east coast of the Korean peninsula.

On September 9, 2016, North Korea conducted its fifth nuclear test, which has been the largest in scale among North Korea`s nuclear tests thus far. According to North Korean announcements, the test was successful in detonating a nuclear missile. The test created a sizable earthquake in South Korea. In response, in February 2017 the U.N. Security Council adopted Resolution 2321 (2016) against North Korea, the purpose of which is to strengthen its sanctions regime against North Korea and to condemn North Korea`s September 9, 2016 nuclear test in the strongest terms.

On February 10, 2016, in retaliation of North Korea`s recent launch of a long-range rocket, South Korea announced that it would halt its operations of the Kaesong Industrial Complex to impede North Korea`s utilization of funds from the industrial complex to finance its nuclear and missile programs. In response, North Korea announced on February 11, 2016 that it would expel all South Korean employees from the industrial complex and freeze all South Korean assets there.

On February 7, 2016, North Korea launched a rocket, claimed by them to be carrying a satellite intended for scientific observation. The launch was widely suspected by the international community to

24

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

be a cover for testing a long-range missile capable of carrying a nuclear warhead. On February 18, 2016, the President of the United States signed into law mandatory sanctions on North Korea to punish it for its recent nuclear and missile tests, human rights violations and cybercrimes. The bill, which marks the first measure by the United States to exclusively target North Korea, is intended to seize the assets of anyone engaging in business related to North Korea`s weapons program, and authorizes US$50 million over five years to transmit radio broadcasts into the country and support humanitarian assistance projects. On March 2, 2016, the United Nations Security Council voted unanimously to adopt a resolution to impose sanctions against North Korea, which include inspection of all cargo going to and from North Korea, a ban on all weapons trade and the expulsion of North Korean diplomats who engage in "illicit activities." Also, on March 4, 2016, the European Union announced that it would expand its sanctions on North Korea, adding additional companies and individuals to its list of sanction targets. On April 1, 2016, North Korea fired a short-range surface-to-air missile in apparent protest of these sanctions adopted by the United States and the United Nations Security Council.

On January 6, 2016, North Korea announced that it had successfully conducted its first hydrogen bomb test, hours after international monitors detected a 5.1 magnitude earthquake near a known nuclear testing site in the country. The claims have not been verified independently. The alleged test followed a statement made in the previous month by Kim Jong-un, who claimed that North Korea had developed a hydrogen bomb.

In August 2015, two Korean soldiers were injured in a landmine explosion near the South Korean demilitarized zone. Claiming the landmines were set by North Koreans, the South Korean army re-initiated its propaganda program toward North Korea utilizing loudspeakers near the demilitarized zone. In retaliation, the North Korean army fired artillery rounds on the loudspeakers, resulting in the highest level of military readiness for both Koreas. High-ranking officials from North and South Korea subsequently met for discussions and entered into an agreement on August 25, 2015 intending to deflate military tensions.

From time to time, North Korea has fired short- to medium-range missiles from the coast of the Korean peninsula into the sea. In March 2015, North Korea fired seven surface-to-air missiles into waters off its east coast in apparent protest of annual joint military exercises being held by Korea and the United States.

North Korea renounced its obligations under the Nuclear Non-Proliferation Treaty in January 2003 and conducted three rounds of nuclear tests between October 2006 to February 2013, which increased tensions in the region and elicited strong objections worldwide. In response, the United Nations Security Council unanimously passed resolutions that condemned North Korea for the nuclear tests and expanded sanctions against North Korea.

North Korea`s economy also faces severe challenges, including severe inflation and food shortages, which may further aggravate social and political tensions within North Korea. In addition, reunification of Korea and North Korea could occur in the future, which would entail significant economic commitment and expenditure by Korea that may outweigh any resulting economic benefits of reunification. On April 27, 2018, North Korea`s Kim Jong-un and the President of South Korea attended a summit held in the Demilitarized Zone of the Korean peninsula.

There can be no assurance that the level of tension on the Korean peninsula will not escalate in the future or that the political regime in North Korea may not suddenly collapse. Any further increase in tension or uncertainty relating to the military, political or economic stability in the Korean peninsula, including a breakdown of diplomatic negotiations over the North Korean nuclear program, occurrence of military hostilities, heightened concerns about the stability of North Korea`s political leadership or its actual collapse, a leadership crisis, a breakdown of high-level contacts or accelerated reunification could have a material adverse effect on our business, financial condition and results of operations, as well as the price of our common shares and our American depositary shares.

25

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*We are generally subject to Korean corporate governance and disclosure standards, which differ in significant respects from those in other countries.*

Companies in Korea, including us, are subject to corporate governance standards applicable to Korean public companies which differ in many respects from standards applicable in other countries, including the United States. As a reporting company registered with the Securities and Exchange Commission and listed on the New York Stock Exchange, we are, and will continue to be, subject to certain corporate governance standards as mandated by the Sarbanes-Oxley Act of 2002, as amended. However, foreign private issuers, including us, are exempt from certain corporate governance standards required under the Sarbanes-Oxley Act or the rules of the New York Stock Exchange. We and our generation subsidiaries are also subject to a number of special laws and regulations to Government-controlled entities, including the Act on the Management of Public Institutions. For a description of significant differences in corporate governance standards, see Item 16G. "Corporate Governance." There may also be less publicly available information about Korean companies, such as us, than is regularly made available by public or non-public companies in other countries. Such differences in corporate governance standards and less public information could result in less than satisfactory corporate governance practices or disclosure to investors in certain countries.

*You may not be able to enforce a judgment of a foreign court against us.*

We are a corporation with limited liability organized under the laws of Korea. Substantially all of our directors and officers and other persons named in this annual report reside in Korea, and all or a significant portion of the assets of our directors and officers and other persons named in this annual report and substantially all of our assets are located in Korea. As a result, it may not be possible for holders of the American depository shares to affect service of process within the United States, or to enforce against them or us in the United States judgments obtained in United States courts based on the civil liability provisions of the federal securities laws of the United States. There is doubt as to the enforceability in Korea, either in original actions or in actions for enforcement of judgments of United States courts, of civil liabilities predicated on the United States federal securities laws.

**Risks Relating to Our American Depositary Shares**

*There are restrictions on withdrawal and deposit of common shares under the depositary facility.*

Under the deposit agreement, holders of shares of our common stock may deposit those shares with the depositary bank's custodian in Korea and obtain American depositary shares, and holders of American depositary shares may surrender American depositary shares to the depositary bank and receive shares of our common stock. However, under current Korean laws and regulations, the depositary bank is required to obtain our prior consent for the number of shares to be deposited in any given proposed deposit which exceeds the difference between (i) the aggregate number of shares deposited by us for the issuance of American depositary shares (including deposits in connection with the initial and all subsequent offerings of American depositary shares and stock dividends or other distributions related to these American depositary shares) and (ii) the number of shares on deposit with the depositary bank at the time of such proposed deposit. We have consented to the deposit of outstanding shares of common stock as long as the number of American depositary shares outstanding at any time does not exceed 80,153,810 shares. As a result, if you surrender American depositary shares and withdraw shares of common stock, you may not be able to deposit the shares again to obtain American depositary shares.

*Ownership of our shares is restricted under Korean law.*

Under the Financial Investment Services and Capital Markets Act, with certain exceptions, a foreign investor may acquire shares of a Korean company without being subject to any single or aggregate foreign investment ceiling. As one such exception, certain designated public corporations, such as us, are subject to a 40% ceiling on acquisitions of shares by foreigners in the aggregate. The Financial Services Commission may

26

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

Table of Contents

impose other restrictions as it deems necessary for the protection of investors and the stabilization of the Korean securities and derivatives market.

In addition to the aggregate foreign investment ceiling, the Financial Investment Services and Capital Markets Act and our Articles of Incorporation set a 3% ceiling on acquisition by a single investor (whether domestic or foreign) of the shares of our common stock. Any person (with certain exceptions) who holds our issued and outstanding shares in excess of such 3% ceiling cannot exercise voting rights with respect to our shares exceeding such limit.

The ceiling on aggregate investment by foreigners applicable to us may be exceeded in certain limited circumstances, including as a result of acquisition of:

> shares by a depositary issuing depositary receipts representing such shares (whether newly issued shares or outstanding shares);

> shares by exercise of warrant, conversion right under convertible bonds, exchange right under exchangeable bonds or withdrawal right under depositary receipts issued outside of Korea;

> shares from the exercise of shareholders' rights; or

> shares by gift, inheritance or bequest.

A foreigner who has acquired our shares in excess of any ceiling described above may not exercise his voting rights with respect to our shares exceeding such limit and the Financial Services Commission may take necessary corrective action against him.

***Holders of our ADSs will not have preemptive rights in certain circumstances.***

The Korean Commercial Code and our Articles of Incorporation require us, with some exceptions, to offer shareholders the right to subscribe for new shares in proportion to their existing ownership percentage whenever new shares are issued. If we offer any rights to subscribe for additional shares of our common stock or any rights of any other nature, the depositary bank, after consultation with us, may make the rights available to you or use reasonable efforts to dispose of the rights on your behalf and make the net proceeds available to you. The depositary bank, however, is not required to make available to you any rights to purchase any additional shares unless it deems that doing so is lawful and feasible and:

> a registration statement filed by us under the U.S. Securities Act of 1933, as amended, is in effect with respect to those shares; or

> the offering and sale of those shares is exempt from or is not subject to the registration requirements of the U.S. Securities Act.

We are under no obligation to file any registration statement with the U.S. Securities and Exchange Commission in relation to the registration rights. If a registration statement is required for you to exercise preemptive rights but is not filed by us, you will not be able to exercise your preemptive rights for additional shares and you will suffer dilution of your equity interest in us.

***The market value of your investment in our ADSs may fluctuate due to the volatility of the Korean securities market.***

Our common stock is listed on the KRX KOSPI Division of the Korea Exchange, which has a smaller market capitalization and is more volatile than the securities markets in the United States and many European countries. The market value of ADSs may fluctuate in response to the fluctuation of the trading price of shares of our common stock on the Stock Market Division of the Korea Exchange. The Stock Market Division of the Korea Exchange has experienced substantial fluctuations in the prices and volumes of sales of listed securities

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

and the Stock Market Division of the Korea Exchange has prescribed a fixed range in which share prices are permitted to move on a daily basis. Like other securities markets, including those in developed markets, the Korean securities market has experienced problems including market manipulation, insider trading and settlement failures. The recurrence of these or similar problems could have a material adverse effect on the market price and liquidity of the securities of Korean companies, including our common stock and ADSs, in both the domestic and the international markets.

The Korean government has the ability to exert substantial influence over many aspects of the private sector business community, and in the past has exerted that influence from time to time. For example, the Korean government has promoted mergers to reduce what it considers excess capacity in a particular industry and has also encouraged private companies to publicly offer their securities. Similar actions in the future could have the effect of depressing or boosting the Korean securities market, whether or not intended to do so. Accordingly, actual or perceived actions or inactions by the Korean government may cause sudden movements in the market prices of the securities of Korean companies in the future, which may affect the market price and liquidity of our common stock and ADSs.

***Your dividend payments and the amount you may realize in connection with a sale of your ADSs will be affected by fluctuations in the exchange rate between the U.S. dollar and the Won.***

Investors who purchase the American depositary shares will be required to pay for them in U.S. dollars. Our outstanding shares are listed on the Korea Exchange and are quoted and traded in Won. Cash dividends, if any, in respect of the shares represented by the American depositary shares will be paid to the depositary bank in Won and then converted by the depositary bank into U.S. dollars, subject to certain conditions. Accordingly, fluctuations in the exchange rate between the Won and the U.S. dollar will affect, among other things, the amounts a registered holder or beneficial owner of the American depositary shares will receive from the depositary bank in respect of dividends, the U.S. dollar value of the proceeds which a holder or owner would receive upon sale in Korea of the shares obtained upon surrender of American depositary shares and the secondary market price of the American depositary shares.

***If the Government deems that certain emergency circumstances are likely to occur, it may restrict the depositary bank from converting and remitting dividends in U.S. dollars.***

If the Government deems that certain emergency circumstances are likely to occur, it may impose restrictions such as requiring foreign investors to obtain prior Government approval for the acquisition of Korean securities or for the repatriation of interest or dividends arising from Korean securities or sales proceeds from disposition of such securities. These emergency circumstances include any or all of the following:

sudden fluctuations in interest rates or exchange rates;

extreme difficulty in stabilizing the balance of payments; and

a substantial disturbance in the Korean financial and capital markets.

The depositary bank may not be able to secure such prior approval from the Government for the payment of dividends to foreign investors when the Government deems that there are emergency circumstances in the Korean financial markets.

## ITEM 4.     *INFORMATION ON THE COMPANY*

### Item 4.A. History and Development of the Company

**General Information**

Our legal and corporate name is Korea Electric Power Corporation. We were established by the Government on December 31, 1981 as a statutory juridical corporation in Korea under the Korea Electric Power Corporation

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

("KEPCO") Act as the successor to Korea Electric Company. Our registered office is located at 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea, and our telephone number is 82-61-345-4213. Our website address is www.kepco.co.kr.

Our agent in the United States is Korea Electric Power Corporation, North America Office, located at 7th Floor, Parker Plaza, 400 Kelby Street, Fort Lee, NJ 07024.

The Korean electric utility industry traces its origin to the establishment of the first electric utility company in Korea in 1898. On July 1, 1961, the industry was reorganized by the merger of Korea Electric Power Company, Seoul Electric Company and South Korea Electric Company, which resulted in the formation of Korea Electric Company. From 1976 to 1981, the Government acquired the private minority shareholdings in Korea Electric Company. After the Government acquired all the remaining shares of Korea Electric Company, Korea Electric Company was dissolved, and we were incorporated in 1981 and assumed the assets and liabilities of Korea Electric Company. We ceased to be wholly owned by the Government in 1989 when the Government sold 21% of our common stock. As of March 15, 2018, the last day on which our shareholders registry was closed, the Government maintained 51.1% ownership in aggregate of our common shares by direct holdings by the Government and indirect holdings through Korea Development Bank, a statutory banking institution wholly owned by the Government.

Under relevant laws of Korea, the Government is required to own, directly or indirectly, at least 51% of our capital. Direct or indirect ownership of more than 50% of our outstanding common stock enables the Government to control the approval of certain corporate matters relating to us that require a shareholders' resolution, including approval of dividends. The rights of the Government and Korea Development Bank as holders of our common stock are exercised by the Ministry of Trade, Industry and Energy, based on the Government's ownership of our common stock and a proxy received from Korea Development Bank, in consultation with the Ministry of Strategy and Finance.

We operate under the general supervision of the Ministry of Trade, Industry and Energy. The Ministry of Trade, Industry and Energy, in consultation with the Ministry of Strategy and Finance, is responsible for approving, subject to review by the Korea Electricity Commission, the electricity rates we charge our customers. See Item 4.B. "Business Overview–Sales and Customers–Electricity Rates." We furnish reports to officials of the Ministry of Trade, Industry and Energy, the Ministry of Strategy and Finance and other Government agencies and regularly consult with such officials on matters relating to our business and affairs. See Item 4.B. "Business Overview–Regulation." Our non-standing directors, who comprise a majority of our board of directors, must be appointed by the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee (which is established by law and chaired by the minister of the Ministry of Strategy and Finance and whose members consist of Government officials and others appointed by the President of the Republic based on recommendation by the minister of the Ministry of Strategy and Finance) from a pool of candidates recommended by the director nomination committee. Our president and standing directors who concurrently serve as members of our audit committee must be appointed by the President of the Republic upon the motion of the minister of the Ministry of Trade, Industry and Energy (in the case of our president) and the minister of the Ministry of Strategy and Finance (in the case of our standing directors who concurrently serve as members of the audit committee) and following the nomination by our director nomination committee, the review and resolution of the Public Agencies Operating Committee and an approval at the general meeting of shareholders. See Item 6.A. "Directors and Senior Management–Board of Directors" and Item 16G. "Corporate Governance–The Act on the Management of Public Institutions").

## Item 4.B. Business Overview

### Introduction

We are an integrated electric utility company engaged in the transmission and distribution of substantially all of the electricity in Korea. Through our six wholly-owned generation subsidiaries, we also generate the

29

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

substantial majority of electricity produced in Korea. As of December 31, 2017, we and our generation subsidiaries owned approximately 70.1% of the total electricity generation capacity in Korea (excluding plants generating electricity primarily for private or emergency use). In 2017, we sold to our customers 507,746 gigawatt-hours of electricity. We purchase electricity principally from our generation subsidiaries and, to a lesser extent, from independent power producers. Of the 520,230 gigawatt-hours of electricity we purchased in 2017, 28.1% was generated by KHNP, our wholly-owned nuclear and hydroelectric power generation subsidiary, 49.7% was generated by our wholly-owned five non-nuclear generation subsidiaries and 22.2% was generated by independent power producers that trade electricity to us through the cost-based pool system of power trading (excluding independent power producers that supply electricity under power purchase agreements with us). Our five non-nuclear generation subsidiaries are KOSEP, KOMIPO, KOWEPO, KOSPO and EWP, each of which is wholly owned by us and is incorporated in Korea. We derive substantially all of our revenues and profit from Korea, and substantially all of our assets are located in Korea.

In 2017, we had sales of Won 59,336 billion and net profit of Won 1,441 billion, compared to sales of Won 59,763 billion and net profit of Won 7,148 billion in 2016.

Our revenues are closely tied to demand for electricity in Korea. Demand for electricity in Korea increased at a compounded average growth rate of 1.7% per annum from 2013 to 2017, compared to the real gross domestic product, or GDP, which increased at a compounded average growth rate of 3.0% during the same period, according to the Bank of Korea. During 2017, the GDP growth rate was 3.1%, which was in tandem with the growth in demand for electricity in Korea during the same year, which also grew by 2.2%.

**Strategy**

As our overall strategy, we seek to become a leading global energy enterprise by enhancing our global competitiveness and strengthening our contribution to the global environmental campaigns through continued development of "green" and "smart" power-related technologies. We also aim to adapt to the growing uncertainties in the global economy by selectively pursuing new business opportunities and through development of innovative technologies. We evaluate and renew our mid- to long-term strategy every five years, and in 2015 established the "Vision 2025 Mid- to Long-Term Strategy." Under this vision, we will aim for balanced growth among our domestic operations, overseas business and new energy industry initiatives.

*Strengthen competitiveness in our core operations.* We plan to enhance efficiency of our electricity generation, transmission and distribution networks and operation of related facilities. We will strategically focus on ensuring stable supply of electricity, making our electricity networks "smarter" and more intelligent through the use of advanced technology utilizing big data and the "Internet of Things" technology and creating new energy services related to our core operations in order to address changes in the business environment.

*Expand and develop new businesses.* In connection with our overseas business, we plan to selectively explore opportunities to develop renewable energy, smart transmission and distribution facilities and nuclear energy projects to diversify our businesses and provide suitable solutions meeting the different needs of various countries. Additionally, we plan to actively address climate change through the development of new energy related technologies such as smart grids and energy storage systems.

*Create a platform for future growth.* We plan to develop an ecosystem focused on new energy technologies. We have established Bitgaram Energy Valley in Gwangju and Jeollanamdo with the goal of facilitating the growth of the new energy industry and creating a global energy hub. In addition, we have selected ten core electricity-related technologies (including energy storage systems and "smart grid"-related technologies), and we plan to focus on the development of high value-added technologies.

*Strengthen our management system for sustainable growth.* We will continue to develop an innovative working culture and management system to promote efficiency. We will also focus on creating a low-carbon clean energy business environment, fostering a common set of shared values with local communities and developing a sustainable energy business model.

30

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Government Ownership and Our Interactions with the Government**

The KEPCO Act requires that the Government own at least 51% of our capital stock. Direct or indirect ownership of more than 50% of our outstanding common stock enables the Government to control the approval of certain corporate matters which require a shareholders' resolution, including approval of dividends. The rights of the Government and Korea Development Bank as holders of our common stock are exercised by the Ministry of Trade, Industry and Energy in consultation with the Ministry of Strategy and Finance. We are currently not aware of any plans of the Government to cease to own, directly or indirectly, at least 51% of our outstanding common stock.

We play an important role in the implementation of the Government's national energy policy, which is established in consultation with us, among other parties. As an entity formed to serve public policy goals of the Government, we seek to maintain a fair level of profitability and strengthen our capital base in order to support the growth of our business in the long term.

The Government, through its various policy initiatives for the Korean energy industry as well as direct and indirect supervision of us and our industry, plays an important role in our business and operations. Most importantly, the electricity tariff rates we charge to our customers are regulated by the Government taking into account, among others, our needs to recover the costs of operations, make capital investments and recoup a fair return on capital invested by us, as well as the Government's overall policy considerations, such as inflation. See Item 4.B. "Business Overview–Sales and Customers–Electricity Rates."

In addition, pursuant to the Basic Plan determined by the Government, we and our generation subsidiaries have made, and plan to make, substantial expenditures for the construction of generation plants and other facilities to meet demand for electric power. See Item 5.B. "Liquidity and Capital Resources–Capital Requirements."

**Restructuring of the Electric Power Industry in Korea**

On January 21, 1999, the Ministry of Trade, Industry and Energy published the Restructuring Plan. The overall objectives of the Restructuring Plan consisted of: (i) introducing competition and thereby increasing efficiency in the Korean electric power industry, (ii) ensuring a long-term, inexpensive and stable electricity supply, and (iii) promoting consumer convenience through the expansion of consumer choice.

The following provides further details relating to the Restructuring Plan.

*Phase I*

During Phase I, which served as a preparatory stage for Phase II and lasted from the announcement of the Restructuring Plan in January 1999 until April 2001, we undertook steps to split our generation business units off into one wholly-owned nuclear generation subsidiary (namely, KHNP) and five wholly-owned non-nuclear generation subsidiaries (namely, KOSEP, KOMIPO, KOWEPO, KOSPO and EWP), each with its own management structure, assets and liabilities. These steps were completed upon approval at our shareholders' meeting in April 2001.

The Government's principal objectives in the split-off of the generation units into separate subsidiaries were to: (i) introduce competition and thereby increase efficiency in the electricity generation industry in Korea, and (ii) ensure a stable supply of electricity in Korea.

Following the implementation of Phase I, we have substantial monopoly with respect to the transmission and distribution of electricity in Korea.

31

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

While our ownership percentage of our generation subsidiaries will depend on further adjustments to the Restructuring Plan to be adopted by the Government, we plan to retain 100% ownership of our transmission and distribution business.

### Phase II

At the outset of Phase II in April 2001, the Government introduced a cost-based competitive bidding pool system under which we purchase power from our generation subsidiaries and other independent power producers for transmission and distribution to customers. For a further description of this system, see "–Purchase of Electricity–Cost-based Pool System" below.

Pursuant to the Electricity Business Act amended in December 2000, the Government established the Korea Power Exchange in April 2001. The primary function of the Korea Power Exchange is to deal with the sale of electricity and implement regulations governing the electricity market to allow for electricity distribution through a competitive bidding process. The Government also established the Korea Electricity Commission in April 2001 to regulate the Korean electric power industry and ensure fair competition among industry participants. To facilitate this goal, the Korea Power Exchange established the Electricity Market Rules relating to the operation of the bidding pool system. To amend the Electricity Market Rules, the Korea Power Exchange must have the proposed amendment reviewed by the Korea Electricity Commission and then obtain the approval of the Ministry of Trade, Industry and Energy.

The Korea Electricity Commission' s main functions include implementation of standards and measures necessary for electricity market operation and review of matters relating to licensing participants in the Korean electric power industry. The Korea Electricity Commission also acts as an arbitrator in tariff-related disputes among participants in the Korean electric power industry and investigates illegal or deceptive activities of the industry participants.

### Privatization of Generation Subsidiaries

In April 2002, the Ministry of Trade, Industry and Energy released the basic privatization plan for five of our generation subsidiaries other than KHNP. Pursuant to this plan, we commenced the process of selling our equity interest in KOSEP in 2002. According to the original plan, this process was, in principle, to take the form of a sale of management control, potentially supplemented by an initial public offering as a way of broadening the investor base. In November 2003, KOSEP submitted its application to the Korea Exchange for a preliminary screening review, which was approved in December 2003. However, in June 2004, KOSEP made a request to the Korea Exchange to delay its stock listing due to unfavorable stock market conditions at that time.

In accordance with the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016, we considered a sale in the public market of a minority of our shares in our five non-nuclear generation subsidiaries, KEPCO KDN and KHNP gradually. However, the planned sales have been put on hold, primarily due to prevailing market conditions. In any event, we plan to maintain a controlling stake in each of these subsidiaries.

### Suspension of the Plan to Form and Privatize Distribution Subsidiaries

In 2003, the Government established a Tripartite Commission consisting of representatives of the Government, leading businesses and labor unions in Korea to deliberate on ways to introduce competition in electricity distribution, such as by forming and privatizing new distribution subsidiaries. In 2004, the Tripartite Commission recommended not pursuing such privatization initiatives but instead creating independent business divisions within us to improve operational efficiency through internal competition. Following the adoption of such recommendation by the Government in 2004 and further studies by Korea Development Institute, in 2006 we created nine "strategic business units" (which, together with our other business units, were subsequently

32

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

restructured into 14 such units in February 2012) that have a greater degree of autonomy with respect to management, financial accounting and performance while having a common focus on increasing profitability.

*Initiatives to Improve the Structure of Electricity Generation*

In August 2010, the Ministry of Trade, Industry and Energy announced the Proposal for Improvement in the Structure of the Electric Power Industry in order to resolve uncertainty related to restructuring plans for the electric power industry and maintain competitiveness of the electric power industry. Key initiatives of the proposal included the following: (i) maintain the current structure of having six generation subsidiaries and designate the six generation subsidiaries as market-oriented public enterprises under the Act on the Management of Public Institutions in order to foster competition among the generation subsidiaries and promote efficiency in their operations, (ii) clarify the scope of the business of us and the six generation subsidiaries (namely, that we shall manage the financial structure and governance of the six generation subsidiaries and nuclear power plant and overseas resources development projects, while the six generation subsidiaries will have greater autonomy with respect to construction and management of generation units and procurement of fuel), (iii) create a nuclear power export business unit to systematically enhance our capabilities to win projects involving the construction and operation of nuclear power plants overseas, (iv) further rationalize the electricity tariff by adopting a fuel-cost based tariff system in 2011 and a voltage-based tariff system in a subsequent year, and (v) create separate accounting systems for electricity generation, transmission, distribution and sales with the aim of introducing competition in electricity sales in the intermediate future.

In January 2011, the Ministry of Strategy and Finance created a "joint cooperation unit" consisting of officers and employees selected from the five thermal power generation subsidiaries in order to reduce inefficiencies in areas such as fuel transportation, inventories, materials and equipment and construction, etc. and allow the thermal power generation subsidiaries to continue utilizing the benefits of economy of scale after split off of our generation business units into separate subsidiaries. The purpose of the joint cooperation unit was to give greater autonomy to the generation subsidiaries with regard to power plant construction and management and fuel procurements, and thereby enhance efficiency in operating power plants. The main functions of the joint cooperation unit are as follows: (i) maintain inventories of bituminous coal through volume exchanges and joint purchases, (ii) reduce shipping and demurrage expenses through joint operation and distribution of dedicated vessels, (iii) reduce costs by sharing information on generation material inventories and (iv) sharing human resources among the five thermal power generation subsidiaries for construction projects, among other things.

Furthermore, in January 2011 the six generation subsidiaries were officially designated as "market-oriented public enterprises," whereupon the President of Korea appoints the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary is subject to approval by the minister of the Ministry of Strategy and Finance; the president of each such subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Enterprise Management Evaluation Team which is established by the Public Agencies Operating Committee conducts performance evaluation of such subsidiaries. Previously, our president appointed the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary was subject to approval by our president; the president of each such subsidiary entered into a management contract with our president; and our evaluation committee conducted performance evaluation of such subsidiaries. For further details of the impact of the designation of our generation subsidiaries as "market-oriented public enterprises," see Item 16G.–Corporate Governance–The Act on the Management of Public Institutions.

*Proposal for Adjustment of Functions of Public Institutions (Energy Sector)*

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets

33

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies should take on greater responsibilities in overseas resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition. In accordance therewith, we transferred a substantial portion of our assets and liabilities in our overseas resource business to our generation subsidiaries as of December 31, 2016. In addition, this Proposal contemplated selling a minority stake in our generation subsidiaries and KEPCO KDN, but the planned sales have been put on hold, as discussed above in "–Privatization of Generation Subsidiaries."

**Purchase of Electricity**

***Cost-based Pool System***

Since April 2001, the purchase and sale of electricity in Korea is required to be made through the Korea Power Exchange, which is a statutory not-for-profit organization established under the Electricity Business Act with responsibilities for setting the price of electricity, handling the trading and collecting relevant data for the electricity market in Korea. The suppliers of electricity in Korea consist of our six generation subsidiaries, which were split-off from us in April 2001, and independent power producers, which numbered 17 (excluding renewable energy producers) as of December 31, 2017. We distribute electricity purchased through the Korea Power Exchange to end users.

*Our Relationship with the Korea Power Exchange*

The key features of our relationships with the Korea Power Exchange include the following: (i) we and our six generation subsidiaries are member corporations of the Korea Power Exchange and collectively own 100% of its share capital, (ii) three of the 11 members of the board of directors of the Korea Power Exchange are currently our or our subsidiaries' employees, and (iii) one of our employees is currently a member in three of the key committees of the Korea Power Exchange that are responsible for evaluating the costs of producing electricity, making rules for the Korea Power Exchange and gathering and disclosing information relating to the Korean electricity market.

Notwithstanding the foregoing relationships, however, we do not have control over the Korea Power Exchange or its policies since, among others, (i) the Korea Power Exchange, its personnel, policies, operations and finances are closely supervised and controlled by the Government, namely through the Ministry of Trade, Industry and Energy, and are subject to a host of laws and regulations, including, among others, the Electricity Business Act and the Act on the Management of Public Institutions, as well as the Articles of Incorporation of the Korea Power Exchange, (ii) we are entitled to elect no more than one-third of the Korea Power Exchange directors and our representatives represent only a minority of its board of directors and committees (with the other members being comprised of representatives of the Ministry of Trade, Industry and Energy, employees of the Korea Power Exchange, businesspersons and/or scholars), and (iii) the role of our representatives in the policy making process for the Korea Power Exchange is primarily advisory based on their technical expertise derived from their employment at us or our generation subsidiaries. Consistent with this view, the Finance Supervisory Service issued a ruling in 2005 that stated that we are not deemed to have significant influence or control over the decision-making process of the Korea Power Exchange relating to its business or financial affairs.

*Pricing Factors*

The price of electricity in the Korean electricity market is determined principally based on the cost of generating electricity using a system known as the "cost-based pool" system. Under the cost-based pool system,

34

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

the price of electricity has two principal components, namely the marginal price (representing in principle the variable cost of generating electricity) and the capacity price (representing in principle the fixed cost of generating electricity).

Under the merit order system, the electricity purchase allocation, the system marginal price (as described below) and the final allocation adjustment are automatically determined based on an objective formula. The variable cost (including the adjusted coefficient as described below) and the capacity price are determined in advance of trading by the Cost Evaluation Committee, which is comprised of representatives from the Ministry of Trade, Industry and Energy, the Korea Power Exchange, us, generation companies, scholars and researchers. Accordingly, a supplier of electricity cannot exercise control over the merit order system or its operations to such supplier's strategic advantage.

*Marginal Price*

The primary purpose of the marginal price is to compensate the generation companies for fuel costs, which represents the principal component of the variable costs of generating electricity. We currently refer such marginal price as the "system marginal price."

The system marginal price represents, in effect, the marginal price of electricity at a given hour at which the projected demand for electricity and the projected supply of electricity for such hour intersect, as determined by the merit order system, which is a system used by the Korea Power Exchange to allocate which generation units will supply electricity for which hour and at what price. To elaborate, the projected demand for electricity for a given hour is determined by the Korea Power Exchange based on a forecast made one day prior to trading, and such forecast takes into account, among others, historical statistics relating to demand for electricity nationwide by day and by hour, seasonality and on-peak-hour versus off-peak hour demand analysis. The projected supply of electricity at a given hour is determined as the aggregate of the available capacity of all generation units that have submitted bids to supply electricity for such hour. These bids are submitted to the Korea Power Exchange one day prior to trading.

Under the merit order system, the generation unit with the lowest variable cost of producing electricity among all the generation units that have submitted a bid for a given hour is first awarded a purchase order for electricity up to the available capacity of such unit as indicated in its bid. The generation unit with the next lowest variable cost is then awarded a purchase order up to its available capacity in its bid, and so forth, until the projected demand for electricity for such hour is met. We refer to the variable cost of the generation unit that is the last to receive the purchase order for such hour as the system marginal price, which also represents the highest price at which electricity can be supplied at a given hour based on the demand and supply for such hour. Generation units whose variable costs exceed the system marginal price for a given hour do not receive purchase orders to supply electricity for such hour. The variable cost of each generation unit is determined by the Cost Evaluation Committee on a monthly basis and reflected in the following month based on the fuel costs two months prior to such determination. The purpose of the merit order system is to encourage generation units to reduce its electricity generation costs by making its generation process more efficient, sourcing fuels from most cost-effective sources or adopting other cost savings programs.

The final allocation of electricity supply is further adjusted on the basis of other factors, including the proximity of a generation unit to the geographical area to which power is being supplied, network and fuel constraints and the amount of power loss. This adjustment mechanism is designed to adjust for transmission losses in order to improve overall cost-efficiency in the transmission of electricity to end-users.

The price of electricity at which our generation subsidiaries sell electricity to us is determined using the following formula:

Variable cost + [System marginal price - Variable cost] * Adjusted coefficient

35

Table of Contents

An adjusted coefficient applies in principle to all generation units operated by our generation subsidiaries and the coal-fired generation units operated by independent power producers. The adjusted coefficient applicable to the generation units operated by our generation subsidiaries is determined based on considerations of, among others, electricity tariff rates, the differential generation costs for different fuel types and the relative fair returns on investment in respect of us compared to our generation subsidiaries. The purpose of the adjusted coefficient here is to prevent electricity trading from resulting in undue imbalances as to the relative financial results among generation subsidiaries as well as between us (as the purchaser of electricity) and our generation subsidiaries (as sellers of electricity). Such imbalances may arise from excessive profit taking by base load generators (on account of their inherently cheaper fuel cost structure compared to non-base load generators) as well as from fluctuations in fuel prices (it being the case that during times of rapid and substantial rises in fuel costs which are not offset by corresponding rises in electricity tariff rates charged by us to end-users, on a non-consolidated basis our profitability will decline compared to that our generation subsidiaries since our generation subsidiaries are entitled to sell electricity to us at cost plus a guaranteed margin). In comparison, the adjusted coefficient applicable to the coal-fired generation units operated by independent power producers is determined to enable such independent power producers to recover the total costs of building and operating such units.

The adjusted coefficient applicable to our generation subsidiaries is currently set at the highest level for the marginal price of electricity generated using nuclear fuel, followed by coal and (depending the prevailing relative market prices) oil and/or LNG. The differentiated adjusted coefficients reflect the Government's prevailing energy policy objectives and have the effect of setting priorities in the fuel types to be used in electricity generation.

The adjusted coefficient is determined by the Cost Evaluation Committee in principle on an annual basis, although in exceptional cases driven by external or structural factors such as rapid and substantial changes in fuel costs, adjustments to electricity tariff rates or changes in the electricity pricing structure, the adjusted coefficient may be adjusted on a quarterly basis.

Previously, it was contemplated that the vesting contract system would gradually replace the application of the adjusted coefficient. However, since the implementation of the vesting contract system has been suspended indefinitely, it is unlikely to impact the application of the adjusted coefficient in the foreseeable future.

*Capacity Price*

In addition to payment in respect of the variable cost of generating electricity, generation units receive payment in the form of capacity price, the purpose of which is to compensate them for the fixed costs of constructing generation facilities, provide incentives for construction of new generation units and maintain reliability of the nationwide electricity transmission network.

The capacity price is determined by the Cost Evaluation Committee as a function of the following factors: (i) reference capacity price, (ii) reserve capacity factor, (iii) time-of-the-day capacity coefficient and (iv) since October 2016, fuel switching factor. The reference capacity price and the time-of-the-day capacity coefficient are determined annually before the end of December for the subsequent 12-months period. The reserve capacity factor and the fuel switching factor are determined annually before the end of June for the subsequent 12-months period.

The reference capacity price refers to the Won amount per kilowatt-hour payable annually for annualized available capacity indicated in the bids submitted the day before trading (provided that such capacity is actually available on the relevant day of trading), and is determined based on the construction costs and maintenance costs of a standard generation unit and related transmission access facilities, and a base rate for loading electricity. Prior to October 2016, the same reference capacity price applied uniformly to all generation units. Since October 2016, the reference capacity price applies differentially to each generation unit depending on the start year of its commercial operation. Accordingly, the reference capacity price currently ranges from Won 9.15 to 10.07 per kilowatt hour.

36

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The reserve capacity factor relates to the requirement to maintain a standard capacity reserve margin in the range of 15% in order to prevent excessive capacity build-up as well as induce optimal capacity investment at the regional level. The capacity reserve margin is the ratio of peak demand to the total available capacity. Under this system, generation units in a region where available capacity is insufficient to meet demand for electricity as evidenced by failing to meet the standard capacity reserve margin receive increased capacity price. Conversely, generation units in a region where available capacity exceeds demand for electricity as evidenced by exceeding the standard capacity reserve margin receive reduced capacity price. Since October 2016, the reserve capacity factor also factors in the transmission loss per generation unit in order to favor transmission of electricity from a nearby generation unit.

The time-of-the-day capacity coefficient allows hourly and seasonal adjustments in order to incentivize our generation subsidiaries to operate their generation facilities at full capacity during periods of highest demand. For example, the capacity price paid differs depending on whether the relevant hour is an "on-peak" hour, a "mid-peak" hour or an "off-peak" hour (the capacity price being highest for the on-peak hours and lowest for the off-peak hours) and the capacity price paid is highest during the months of January, July and August when electricity usage is highest due to weather conditions.

The fuel switching factor, which was introduced in October 2016 to promote environmental sensitivities to climate change, seeks to encourage reduced carbon emission by penalizing generation units (mostly coal-fired units) for excessive carbon emission.

Other than subject to the aforementioned variations, the same capacity pricing mechanism applies to all generation units regardless of fuel types used.

*Vesting Contract System*

In May 2014, the Electricity Business Act was amended to introduce a "vesting contract" system in determining the price and quantity of electricity to be sold and purchased between the purchaser of electricity (namely, us) and the sellers of electricity (namely, our generation subsidiaries and independent power producers). Under the vesting contract system, electricity generators using base load fuels (such as nuclear, coal, hydro and by-product gas) at a particular generation unit were to be required to enter into a contract with the purchaser of electricity (namely, us), which specifies, among other things, the quantity of electricity to be generated and sold at a particular generation unit and the price at which such electricity is sold, subject to certain adjustments.

The vesting contract system was introduced principally to prevent excessive profit-taking by low-cost producers of electricity using base load fuels (such as nuclear, coal, hydro and by-product gas) by replacing the adjusted coefficient as the basis for determining the guaranteed return to generation companies, as well as to enhance the stability of electricity supply by requiring long-term contractual arrangements for the purchase and sale of electricity and promote cost savings, productivity enhancements and operational efficiency by providing incentives and penalties depending on the degree to which the generation companies could supply electricity at costs below the contracted electricity prices.

In order to minimize undue shock to the electricity trading market in Korea, the vesting contract system was to be implemented in phases starting with by-product gas-based electricity in 2015, which accounted for 1.8% of electricity purchased by us during such year. The rollout of the vesting contract system was further studied by a task force consisting of representatives from the Government, the Korea Power Exchange and generation companies.

Following such study, the Government announced in June 2016 that, due to changes in the electricity business environment (including an increase in generation capacity relative to peak usage, reduced fuel costs following a decline in oil prices and greater environmental concerns related to coal-fired electricity generation), it will indefinitely suspend any further rollout of the vesting contract system beyond by-product gas-based electricity, and revert to the adjusted coefficient-based electricity pricing adjustment mechanism.

37

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### Power Trading Results

The results of power trading, as effected through the Korea Power Exchange, for our generation subsidiaries and independent power producers in 2017 are as follows:

| Items | | Volume (Gigawatt hours) | Percentage of Total Volume (%) | Sales to KEPCO (in billions of Won) | Percentage of Total Sales (%) | Unit Price (Won/ kWh) |
|---|---|---|---|---|---|---|
| Generation Companies | KHNP | 146,221 | 28.1 | 9,113 | 21.0 | 62.33 |
| | KOSEP | 66,640 | 12.8 | 5,183 | 12.0 | 77.77 |
| | KOMIPO | 50,254 | 9.7 | 4,410 | 10.2 | 87.75 |
| | KOWEPO | 45,464 | 8.7 | 4,176 | 9.6 | 91.85 |
| | KOSPO | 47,659 | 9.2 | 4,347 | 10.0 | 91.22 |
| | EWP | 48,307 | 9.3 | 4,452 | 10.3 | 92.15 |
| | Others(1) | 115,685 | 22.2 | 11,662 | 26.9 | 100.81 |
| | Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |
| Energy Sources | Nuclear | 141,098 | 27.1 | 8,573 | 19.8 | 60.76 |
| | Bituminous coal | 224,834 | 43.2 | 17,755 | 41.0 | 78.97 |
| | Anthracite coal | 4,014 | 0.8 | 385 | 0.9 | 95.89 |
| | Oil | 5,735 | 1.1 | 949 | 2.2 | 165.40 |
| | LNG | 1,429 | 0.3 | 151 | 0.3 | 105.33 |
| | Combined-cycle | 116,111 | 22.3 | 13,012 | 30.0 | 112.07 |
| | Hydro | 2,255 | 0.4 | 219 | 0.5 | 96.95 |
| | Pumped-storage | 4,171 | 0.8 | 450 | 1.0 | 107.96 |
| | Others | 20,583 | 4.0 | 1,849 | 4.3 | 89.82 |
| | Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |
| Load | Base load | 360,356 | 69.3 | 25,938 | 59.8 | 71.98 |
| | Non-base load | 159,874 | 30.7 | 17,405 | 40.2 | 108.86 |
| | Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |

*Note:*

(1) Others represent independent power producers that trade electricity through the cost-based pool system of power trading (excluding independent power producers that supply electricity under power purchase agreements with us).

### Power Purchased from Independent Power Producers Under Power Purchase Agreements

In 2017, we purchased an aggregate of 10,702 gigawatt hours of electricity generated by independent power producers under existing power purchase agreements. These independent power producers had an aggregate generation capacity of 6,257 megawatts as of December 31, 2017.

### Power Generation

As of December 31, 2017, we and our generation subsidiaries had a total of 679 generation units, including nuclear, thermal, hydroelectric and internal combustion units, representing total installed generation capacity of 82,132 megawatts. Our thermal units produce electricity using steam turbine generators fired by coal, oil and LNG. Our internal combustion units use oil or diesel-fired gas turbines and our combined-cycle units are primarily LNG-fired. We also purchase power from several generation plants not owned by our generation subsidiaries.

38

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The table below sets forth as of and for the year ended December 31, 2017 the number of units, installed capacity and the average capacity factor for each type of generating facilities owned by our generation subsidiaries.

| | Number of Units | Installed Capacity[1] (Megawatts) | Average Capacity Factor[2] (Percent) |
|---|---|---|---|
| Nuclear | 24 | 22,529 | 71.2 |
| Thermal: | | | |
|     Coal | 59 | 34,125 | 78.7 |
|     Oil | 11 | 2,950 | 20.3 |
|     LNG | 0 | 0 | 40.8 |
|         Total thermal | 70 | 37,075 | 71.2 |
| Internal combustion | 214 | 339 | 16.7 |
| Combined-cycle[3] | 111 | 16,018 | 26.3 |
| Integrated gasification combined cycle[4] | 2 | 346 | 42.4 |
| Hydro | 79 | 5,351 | 11.2 |
| Wind | 56 | 137 | 17.3 |
| Solar | 102 | 120 | 13.6 |
| Fuel cell | 17 | 47 | 67.1 |
| Biogas | 3 | 160 | 53.1 |
| Others[5] | 1 | 10 | 44.9 |
| Total | 679 | 82,132 | 58.5 |

*Notes:*

(1) Installed capacity represents the level of output that may be sustained continuously without significant risk of damage to plant and equipment.

(2) Average capacity factor represents the total number of kilowatt hours of electricity generated in the indicated period divided by the total number of kilowatt hours that would have been generated if the generation units were continuously operated at installed capacity, expressed as a percentage. Average capacity factor of the nuclear and coal-fired generation units represents the mean value of applicable average capacity factor for each fiscal quarter, as there were numerous shutdown and construction of units.

(3) Involves generation through gas and oil.

(4) Involves generation through coal and gasified coal.

(5) Includes waste-to-energy.

The expected useful life of a unit, assuming no substantial renovation, is approximately as follows: nuclear, over 40 years; thermal, over 30 years; internal combustion, over 25 years; and hydroelectric, over 55 years. Substantial renovation can extend the useful life of thermal units by up to 20 years.

We seek to achieve efficient use of fuels and diversification of generation capacity by fuel type. In the past, we relied principally upon oil-fired thermal generation units for electricity generation. Since the oil shock in 1974, however, Korea's power development plans have emphasized the construction of nuclear generation units. While nuclear units are more expensive to construct than thermal generation units of comparable capacity, nuclear fuel is less expensive than fossil fuels in terms of electricity output per unit cost. However, efficient operation of nuclear units requires that such plants be run continuously at relatively constant energy output levels. As it is impractical to store large quantities of electrical energy, we seek to maintain nuclear power production capacity at approximately the level at which demand for electricity is continuously stable. During those times when actual demand exceeds the usual level of electricity supply from nuclear power, we rely on units fired by fossil fuels and hydroelectric units, which can be started and shut down more quickly and efficiently than nuclear units, to meet the excess demand. Bituminous coal is currently the least expensive thermal fuel per kilowatt-hour of electricity produced, and therefore we seek to maximize the use of bituminous

39

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

coal for generation needs in excess of the stable demand level, except for meeting short-term surges in demand which require rapid start-up and shutdown. Thermal units fired by LNG, hydroelectric units and internal combustion units are the most efficient types of units for rapid start-ups and shutdowns, and therefore we use such units principally to meet short-term surges in demand. Anthracite coal is a less efficient fuel source than bituminous coal in terms of electricity output per unit cost.

Our generation subsidiaries have constructed and operated thermal and internal combustion units in order to help meet power demand. Subject to market conditions, our generation subsidiaries plan to continue to add additional thermal and internal combustion units. These units generally take less time to complete construction than nuclear units.

The high average age of our oil-fired thermal units is attributable to our reliance on oil-fired thermal units as the primary means of electricity generation until mid-1970s. Since then, we have diversified our fuel sources and constructed relatively few oil-fired thermal units compared to units of other fuel types.

The table below sets forth, for the periods indicated, the amount of electricity generated by facilities linked to our grid system and the amount of power used or lost in connection with transmission and distribution.

| | 2013 | 2014 | 2015 | 2016 | 2017 | % of 2017 Gross Generation(1) |
|---|---|---|---|---|---|---|
| | | | (in gigawatt hours, except percentages) | | | |
| Electricity generated by us and our generation subsidiaries: | | | | | | |
| Nuclear | 138,784 | 156,407 | 164,762 | 161,995 | 148,426 | 26.8 |
| Coal | 201,119 | 203,765 | 207,533 | 207,912 | 227,186 | 41.0 |
| Oil | 13,941 | 6,838 | 8,822 | 13,055 | 5,242 | 0.9 |
| LNG | 3,526 | 568 | 222 | 369 | 220 | 0.04 |
| Internal combustion | 741 | 656 | 633 | 573 | 496 | 0.1 |
| Combined-cycle | 84,561 | 68,134 | 45,923 | 46,477 | 36,957 | 6.7 |
| Hydro | 5,679 | 5,976 | 4,424 | 4,835 | 5,263 | 1.0 |
| Wind | 155 | 148 | 181 | 186 | 209 | 0.04 |
| Solar and fuel cells | 251 | 422 | 420 | 908 | 2,485 | 0.4 |
| **Total generation by us and our generation subsidiaries** | 448,757 | 442,914 | 432,920 | 436,310 | 426,484 | 77.1 |
| Electricity generated by IPPs: | | | | | | |
| Thermal | 55,923 | 63,088 | 72,316 | 83,789 | 103,745 | 18.7 |
| Hydro and other renewable | 12,468 | 15,968 | 17,106 | 20,342 | 23,238 | 4.2 |
| **Total generation by IPPs** | 68,391 | 79,056 | 89,422 | 104,131 | 126,983 | 22.9 |
| Gross generation | 517,148 | 521,970 | 522,343 | 540,441 | 553,467 | 100 |
| Auxiliary use(2) | 20,463 | 20,610 | 21,293 | 21,605 | 22,279 | 4.0 |
| Pumped-storage(3) | 5,408 | 6,644 | 4,824 | 4,716 | 5,477 | 1.0 |
| Total net generation(4) | 491,277 | 494,716 | 496,226 | 514,120 | 525,711 | 95.0 |
| Transmission and distribution losses(5) | 18,019 | 18,270 | 18,063 | 18,475 | 18,790 | 3.6 |

*IPPs = Independent power producers*

*Notes:*

(1)    Unless otherwise indicated, percentages are based on gross generation.

(2)    Auxiliary use represents electricity consumed by generation units in the course of generation.

40

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(3) Pumped storage represents electricity consumed during low demand periods in order to store water which is utilized to generate hydroelectric power during peak demand periods.

(4) Total net generation represents gross generation minus auxiliary and pumped-storage use.

(5) Transmission and distribution losses represents total transmission and distribution losses divided by total net generation.

The table below sets forth our total capacity at the end of, and peak and average loads during, the indicated periods.

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
|  |  |  | (Megawatts) |  |  |
| Total capacity | 82,296 | 93,216 | 94,102 | 100,180 | 116,657 |
| Peak load | 76,522 | 80,154 | 78,790 | 85,183 | 85,133 |
| Average load | 59,035 | 59,586 | 60,284 | 61,694 | 63,181 |

*Korea Hydro & Nuclear Power Co., Ltd.*

We commenced nuclear power generation activities in 1978 when our first nuclear generation unit, Kori #1, began commercial operation. On April 2, 2001, all of our nuclear and hydroelectric power generation assets and liabilities were transferred to KHNP.

KHNP owns and operates 24 nuclear generation units at four power plant complexes in Korea, located in Kori, Wolsong, Yonggwang (Hanbit) and Ulchin (Hanul), 51 hydroelectric generation units including 16 pumped storage hydro generation units as well as six solar generation units and one wind generation unit as of December 31, 2017.

The table below sets forth the number of units and installed capacity as of December 31, 2017 and the average capacity factor by types of generation units in 2017.

|  | Number of Units | Installed Capacity[1] | Average Capacity Factor[2] |
|---|---|---|---|
|  |  | (Megawatts) | (Percent) |
| Nuclear | 24 | 22,529 | 71.2 |
| Hydroelectric | 51 | 5,306 | 11.0 |
| Solar | 6 | 21 | 16.1 |
| Wind | 1 | 1 | 4.5 |
| Total | 82 | 27,858 |  |

*Notes*:

(1) Installed capacity represents the level of output that may be sustained continuously without significant risk of damage to plant and equipment.

(2) Average capacity factor represents the total number of kilowatt hours of electricity generated in the indicated period divided by the total number of kilowatt hours that would have been generated if the generation units were continuously operated at installed capacity, expressed as a percentage.

KHNP commenced commercial operation of Shin-Kori #3, with a 1,400 megawatt capacity, in December 2016. KHNP is currently building five additional nuclear generation units, three at the Shin-Kori and two at Shin-Hanul sites, each with a 1,400 megawatt capacity. KHNP expects to complete these units between 2018 and 2023. The initial phase of the decommissioning of Kori #1, which primarily involves safety inspections and the removal of spent fuels, has begun after its permanent shutdown in June 2017.

41

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Nuclear*

The table below sets forth certain information with respect to the nuclear generation units of KHNP as of December 31, 2017.

| Unit | Reactor Type(1) (Megawatts) | Reactor Design(2) | Turbine and Generation(3) | Commencement of Operations | Installed Capacity |
|---|---|---|---|---|---|
| Kori-2 | PWR | W | GEC | 1983 | 650 |
| Kori-3 | PWR | W | GEC, Hitachi | 1985 | 950 |
| Kori-4 | PWR | W | GEC, Hitachi | 1986 | 950 |
| Shin-Kori-1 | PWR | D, KEPCO E&C, W | D, GE | 2011 | 1,000 |
| Shin-Kori-2 | PWR | D, KEPCO E&C, W | D, GE | 2012 | 1,000 |
| Shin-Kori-3 | PWR | D, KEPCO E&C, W | D, GE | 2016 | 1,400 |
| Wolsong-1 | PHWR | AECL | P | 1983 | 679 |
| Wolsong-2 | PHWR | AECL, H, K | H, GE | 1997 | 700 |
| Wolsong-3 | PHWR | AECL, H | H, GE | 1998 | 700 |
| Wolsong-4 | PHWR | AECL, H | H, GE | 1999 | 700 |
| Shin-Wolsong-1 | PWR | D, KEPCO E&C, W | D, GE | 2012 | 1,000 |
| Shin-Wolsong-2 | PWR | D, KEPCO E&C, W | D, GE | 2015 | 1,000 |
| Hanbit-1 | PWR | W | W, D | 1986 | 950 |
| Hanbit-2 | PWR | W | W, D | 1987 | 950 |
| Hanbit-3 | PWR | H, CE, K | H, GE | 1995 | 1,000 |
| Hanbit-4 | PWR | H, CE, K | H, GE | 1996 | 1,000 |
| Hanbit-5 | PWR | D, CE, W, KEPCO E&C | D, GE | 2002 | 1,000 |
| Hanbit-6 | PWR | D, CE, W, KEPCO E&C | D, GE | 2002 | 1,000 |
| Hanul-1 | PWR | F | A | 1988 | 950 |
| Hanul-2 | PWR | F | A | 1989 | 950 |
| Hanul-3 | PWR | H, CE, K | H, GE | 1998 | 1,000 |
| Hanul-4 | PWR | H, CE, K | H, GE | 1999 | 1,000 |
| Hanul-5 | PWR | D, KEPCO E&C, W | D, GE | 2004 | 1,000 |
| Hanul-6 | PWR | D, KEPCO E&C, W | D, GE | 2005 | 1,000 |
| Total nuclear | | | | | 22,529 |

*Notes:*

(1)  "PWR" means pressurized light water reactor; "PHWR" means pressurized heavy water reactor.

(2)  "W" means Westinghouse Electric Company (U.S.A.); "AECL" means Atomic Energy Canada Limited (Canada); "F" means Framatome (France); "H" means Hanjung; "CE" means Combustion Engineering (U.S.A.); "D" means Doosan Heavy Industries; "K" means Korea Atomic Energy Research Institute; "KEPCO E&C" means KEPCO Engineering & Construction.

(3)  "GEC" means General Electric Company (U.K.); "P" means Parsons (Canada and U.K.); "W" means Westinghouse Electric Company (U.S.A.); "A" means Alstom (France); "H" means Hanjung; "GE" means General Electric (U.S.A.); "D" means Doosan Heavy Industries; "Hitachi" means Hitachi Ltd. (Japan).

42

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The table below sets forth the average capacity factor and average fuel cost per kilowatt for 2017 with respect to each nuclear generation unit of KHNP.

| Unit | Average Capacity Factor (Percent) | Average Fuel Cost Per kWh (Won) |
|---|---|---|
| Kori-1[1] | 99.7 | 15.21 |
| Kori-2 | 100.2 | 7.39 |
| Kori-3 | 4.9 | 35.01 |
| Kori-4 | 23.6 | 12.96 |
| Shin-Kori-1 | 5.8 | 25.93 |
| Shin-Kori-2 | 100.1 | 6.17 |
| Shin-Kori-3 | 102.0 | 6.20 |
| Wolsong-1 | 40.6 | 10.72 |
| Wolsong-2 | 90.6 | 9.19 |
| Wolsong-3 | 32.8 | 16.78 |
| Wolsong-4 | 99.3 | 9.49 |
| Shin-Wolsong-1 | 98.5 | 6.69 |
| Shin-Wolsong-2 | 71.7 | 7.05 |
| Hanbit-1 | 73.3 | 8.47 |
| Hanbit -2 | 77.1 | 6.66 |
| Hanbit -3 | 99.8 | 6.74 |
| Hanbit -4 | 37.5 | 10.64 |
| Hanbit -5 | 76.6 | 7.38 |
| Hanbit -6 | 52.7 | 8.19 |
| Hanul-1 | 75.3 | 7.23 |
| Hanul-2 | 89.0 | 6.77 |
| Hanul-3 | 92.4 | 6.89 |
| Hanul-4 | 93.8 | 6.39 |
| Hanul-5 | 76.3 | 6.73 |
| Hanul-6 | 78.2 | 7.88 |
| Total nuclear | 71.2 | 10.29 |

*Note:*

(1)    Kori-1 was permanently shutdown on June 18, 2017.

Under extended-cycle operations, nuclear units can be run continuously for periods longer than the conventional 12-month period between scheduled shutdowns for refueling and maintenance. Since 1987, we have adopted the mode of extended-cycle operations for all of our pressurized light water reactor units and plan to use it for our newly constructed units. The duration of shutdown for fuel replacement, maintenance and the evaluation period for approval to start after maintenance was 199.7 days per unit in 2017. In addition, KHNP's nuclear units experienced an average of 0.13 unplanned shutdowns per unit in 2017. In the ordinary course of operations, KHNP's nuclear units routinely experience damage and wear and tear, which are repaired during routine shutdown periods or during unplanned temporary suspensions of operations. No significant damage has occurred in any of KHNP's nuclear reactors, and no significant nuclear exposure or release incidents have occurred at any of KHNP's nuclear facilities since the first nuclear plant commenced operation in 1978.

43

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Hydroelectric*

The table below sets forth certain information relating to KHNP's pumped-storage and hydroelectric business units, including the installed capacity as of December 31, 2017 and the average capacity factor in 2017.

| Location of Unit | Number of Units | Classification | Year Built | Installed Capacity (Megawatts) | Average Capacity Factor (%) |
|---|---|---|---|---|---|
| Hwacheon | 4 | Dam waterway | 1944 | 108.0 | 17.62 |
| Chuncheon | 2 | Dam | 1965 | 62.3 | 18.46 |
| Euiam | 2 | Dam | 1967 | 48.0 | 28.47 |
| Cheongpyung | 4 | Dam | 1943 | 140.1 | 19.37 |
| Paldang | 4 | Dam | 1973 | 120.0 | 22.65 |
| Chilbo (Seomjingang) | 3 | Basin deviation | 1945 | 34.8 | 18.00 |
| Boseonggang | 2 | Basin deviation | 1937 | 4.5 | 46.28 |
| Kwoesan | 2 | Dam | 1957 | 2.6 | 17.70 |
| Anheung | 3 | Dam waterway | 1978 | 0.4 | 20.17 |
| Kangreung | 2 | Basin deviation | 1991 | 82.0 | 0 |
| Topyeong | 1 | Dam | 2011 | 0.04 | 4.39 |
| Muju | 1 | Dam | 2003 | 0.4 | 14.62 |
| Sancheong | 2 | Dam | 2001 | 1.0 | 18.80 |
| Yangyang | 2 | Dam | 2005 | 1.4 | 11.61 |
| Yecheon | 1 | Dam | 2011 | 0.9 | 15.15 |
| Cheongpeoung | 2 | Pumped Storage | 1980 | 400.0 | 7.62 |
| Samrangjin | 2 | Pumped Storage | 1985 | 600.0 | 9.20 |
| Muju | 2 | Pumped Storage | 1995 | 600.0 | 11.83 |
| Sancheong | 2 | Pumped Storage | 2001 | 700.0 | 9.54 |
| Yangyang | 4 | Pumped Storage | 2006 | 1,000.0 | 8.85 |
| Cheongsong | 2 | Pumped Storage | 2006 | 600.0 | 9.63 |
| Yecheon | 2 | Pumped Storage | 2011 | 800.0 | 13.53 |
| Total | 51 | | | 5,306.0 | 11.00 |

*Solar/Wind*

The table below sets forth certain information, including the installed capacity as of December 31, 2017 and the average capacity factor in 2017, of the solar and wind power units of KHNP.

| Location of Unit | Classification | Year Built | Installed Capacity (Megawatts) | Average Capacity Factor (Percent) |
|---|---|---|---|---|
| Yonggwang | Solar | 2008 | 13.9 | 16.3 |
| Yecheon | Solar | 2012 | 2.0 | 15.7 |
| Kori | Wind | 2008 | 0.8 | 4.5 |
| Kori | Solar | 2017 | 5.1 | 16.3 |
| Total | | | 21.8 | |

Korea Water Resources Corporation, which is a Government-owned entity, assumes full control of multi-purpose dams, while KHNP maintains the dams used for power generation. Existing hydroelectric power units have exploited most of the water resources in Korea available for commercially viable hydroelectric power generation. Consequently, we expect that no new major hydroelectric power plants will be built in the foreseeable future. Due to the ease of its start-up and shut-down mechanism, hydroelectric power generation is reserved for peak demand periods.

44

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Korea South-East Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of KOSEP.

| | Weighted Average Age of Units (Years) | Installed Capacity (Megawatts) | Average Capacity Factor (Percent) | Average Fuel Cost per kWh (Won) |
|---|---|---|---|---|
| Bituminous: | | | | |
| Samcheonpo #1, 2, 3, 4, 5, 6 | 26.2 | 3,240 | 80.5 | 53.63 |
| Yeongheung #1, 2, 3, 4, 5, 6 | 8.7 | 5,080 | 88.5 | 49.31 |
| Yeosu # 2 | 3.8 | 668 | 77.7 | 65.51 |
| Anthracite: | | | | |
| Yeongdong #1, 2 | 38.2 | 200 | 38.4 | 101.38 |
| Combined cycle and internal Combustion: | | | | |
| Bundang gas turbine #1,2,3,4,5,6,7,8; steam turbine #1, 2 | 23.4 | 922 | 28.0 | 123.43 |
| Hydro, Solar and other renewable energy | – | 234 | – | – |
| Total | 15.6 | 10,344 | 78.0 | 55.27 |

45

Table of Contents

*Korea Midland Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of KOMIPO.

| | Weighted Average Age of Units (Years) | Installed Capacity (Megawatts) | Average Capacity Factor (Percent) | Average Fuel Cost per kWh (Won) |
|---|---|---|---|---|
| Bituminous: | | | | |
| Boryeong #1, 2, 3, 4, 5, 6, 7, 8 | 22.9 | 4,000 | 85.50 | 48.46 |
| Shin Boryeong #1, 2 | 0.39 | 1,852 | 78.22 | 50.37 |
| Anthracite: | | | | |
| Seocheon #1, 2[1] | 33.5 | 400 | 68.69 | 72.38 |
| Oil-fired: | | | | |
| Jeju #2, 3 | 17.4 | 150 | 61.21 | 144.77 |
| LNG-fired: | | | | |
| Seoul #5[1] | 47.8 | 250 | 40.77 | 188.79 |
| Combined-cycle and internal combustion: | | | | |
| Boryeong gas turbine #1, 2, 3, 4, 5, 6 ; steam turbine #1, 2, 3, | 18.8 | 1,350 | 6.23 | 105.04 |
| Incheon gas turbine #1, 2, 3, 4,5,6 ; steam turbine #1, 2,3 | 12.8 | 1,462.4 | 46.80 | 90.77 |
| Sejong gas turbine #1,2 ; steam turbine #1 | 4.1 | 530.4 | 64.59 | 84.72 |
| Jeju Gas Turbine #3 | 23 | 55 | 0.5 | 689.41 |
| Jeju Internal Combustion Engine #1,2 | 10.6 | 80 | 34.64 | 97.15 |
| Wind: | | | | |
| Yangyang #1, 2 | 11.6 | 3.0 | 14.29 | – |
| Sejong Maebongsan Wind | – | 6.8 | 7.56 | – |
| Jeju Sangmyung Wind | 0.47 | 21 | 19.71 | – |
| Combined heat and power: | | | | |
| Wonju#1 | 2.7 | 10 | 44.82 | 38.17 |
| Hydroelectric: | | | | |
| Boryeong | 8.9 | 7.5 | 29.00 | – |
| Shin Boryeong | 0.2 | 5 | 27.69 | – |
| Photovoltaic ("PV") power and fuel cell generation: | | | | 40.60 |
| Boryeong (PV) site | 9.7 | 1.7 | 13.14 | |
| Shin Boryeong (PV) site | 0.2 | 2.9 | 15.93 | – |
| Seocheon (PV) site | 9.1 | 1.2 | 14.95 | – |
| Jeju (PV) site | 6.5 | 2.3 | 12.62 | – |
| Seoul (PV) site | 6.4 | 1.3 | 15.76 | – |
| Sejong (PV) site | 0.1 | 0.3 | 10.65 | – |
| Yeosu (PV) site | 5.9 | 2.2 | 16.55 | – |
| Incheon (PV) site | 6.1 | 0.3 | 15.50 | – |
| Boryeong (fuel cell) site | 9.4 | 0.3 | 82.43 | 173.35 |
| Shin Boryeong (fuel cell) site | 0.2 | 7.5 | 57.37 | 92.01 |
| Total | 15.0 | 10,203.2 | 62.13 | 60.28 |

*Note:*

(1)    Seocheon #1 and Seocheon #2 were shut down in July 2017 and Seoul #5 was shut down in April 2017.

46

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Korea Western Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of KOWEPO.

| | Weighted Average Age of Units (Years) | Installed Capacity (Megawatts) | Average Capacity Factor (Percent) | Average Fuel Cost per kWh (Won) |
|---|---|---|---|---|
| **Bituminous:** | | | | |
| Taean #1, 2, 3, 4, 5, 6, 7, 8, 9, 10 | 11.7 | 6,100 | 76.1 | 53.43 |
| **Oil-fired:** | | | | |
| Pyeongtaek #1, 2, 3, 4 | 36.1 | 1,400 | 8.8 | 110.61 |
| **Combined cycle:** | | | | |
| Pyeongtaek #1, 2 | 11.2 | 1,348.5 | 24.9 | 92.56 |
| Gunsan | 7.6 | 718.4 | 18.1 | 107.46 |
| West Incheon | 25.5 | 1,800 | 16.3 | 99.88 |
| **Hydroelectric:** | | | | |
| Taean | 9.3 | 2.2 | 17.9 | – |
| **Solar:** | | | | |
| Taean | 0.6 | 14.5 | 14.0 | – |
| Pyeongtaek | 1.0 | 2.9 | 13.3 | – |
| West Incheon | 0.5 | 1.19 | 13.6 | – |
| Gunsan | 2.2 | 0.95 | 13.3 | – |
| Samryangjin | 10.1 | 3.0 | 14.5 | – |
| Sejong City | 5.5 | 5.0 | 15.1 | – |
| Gyeonggi-do | 4.7 | 2.5 | 15.2 | – |
| Yeongam | 4.8 | 13.3 | 16.5 | – |
| **Fuel Cell:** | | | | |
| West Incheon 1 | 2.8 | 16.2 | 74.7 | – |
| West Incheon 2 | | | | |
| **Wind Power:** | | | | |
| Hwasun | 2.1 | 16 | 19.1 | – |
| **Integrated gasification combined cycle:** | | | | |
| Taean | 1.4 | 346.3 | 42.4 | 77.69 |
| Total | 15.9 | 11,791.0 | 48.6 | 61.93 |

47

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Korea Southern Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of KOSPO.

| | Weighted Average Age of Units (Years) | Installed Capacity (Megawatts) | Average Capacity Factor (Percent) | Average Fuel Cost per kWh (Won) |
|---|---|---|---|---|
| Bituminous: | | | | |
| Hadong #1, 2, 3, 4, 5, 6, 7, 8 | 16.3 | 4,000 | 88.1 | 50.4 |
| Samcheok #1 | 0.8 | 2,044 | 43.3 | 58.7 |
| Oil-fired: | | | | |
| Nam Jeju #3, 4 | 11.0 | 200 | 71.5 | 152.5 |
| Combined cycle: | | | | |
| Shin Incheon #1, 2, 3, 4 | 21.2 | 1,800 | 21.2 | 97.6 |
| Busan #1, 2, 3, 4 | 14.2 | 1,800 | 33.9 | 93.1 |
| Yeongwol #1 | 7.2 | 848 | 7.7 | 103.6 |
| Hallim | 21.5 | 105 | 11.2 | 163.5 |
| Andong #1 | 3.8 | 362 | 39.4 | 88.9 |
| Wind power: | | | | |
| Hankyung | 11.2 | 21 | 19.9 | 1.24 |
| Seongsan | 8.2 | 20 | 27.4 | 0.72 |
| Solar | 6.2 | 7 | 13.8 | 0.11 |
| Small Hydropower | 0.4 | 3 | 28.9 | – |
| Total | 12.7 | 11,210 | 51.8 | 63.9 |

48

Table of Contents

*Korea East-West Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of EWP.

| | Weighted Average Age of Units (Years) | Installed Capacity (Megawatts) | Average Capacity Factor (Percent) | Average Fuel Cost per kWh (Won) |
|---|---|---|---|---|
| **Bituminous:** | | | | |
| Dangjin #1, 2, 3, 4, 5, 6, 7, 8, 9, 10 | 10.3 | 6,040 | 66.7 | 80.97 |
| Honam #1, 2 | 44.7 | 500 | 78.5 | 93.77 |
| **Anthracite:** | | | | |
| Donghae #1, 2 | 18.8 | 400 | 72.5 | 99.65 |
| **Oil-fired:** | | | | |
| Ulsan #4, 5, 6 | 37.5 | 1,200 | 19.9 | 176.75 |
| **Combined cycle:** | | | | |
| Ulsan gas turbine #1, 2, 3, 4, 5, 6, 7, 8; steam turbine #1, 2, 3, 4 | 14.1 | 2,072 | 35.6 | 117.93 |
| Ilsan gas turbine #1, 2, 3, 4, 5, 6; steam turbine #1, 2 | 23.9 | 900 | 13.6 | 197.02 |
| **Mini hydro:** | | | | |
| Dangjin | 6.3 | 8.1 | 32.7 | 174.44 |
| **Photovoltaic:** | | | | |
| Dangjin | 6.6 | 1.0 | 14.0 | 395.60 |
| Ulsan | 6.1 | 0.6 | 14.0 | 367.43 |
| Kwangyang | 5.3 | 2.3 | 12.0 | 764.13 |
| Dangjin Storage Facility | 5.1 | 0.7 | 14.9 | 106.23 |
| Dangjin Waste Treatment Facility | 5.3 | 1.3 | 11.4 | 427.26 |
| Dangjin Intake Channel Facility | 4.5 | 1.0 | 13.5 | 104.18 |
| Dangjin Coal Depot Roof Facility | 0.6 | 3.4 | 11.3 | 141.49 |
| Donghae | 11.4 | 1.0 | 11.0 | 783.14 |
| Donghae Sewage Disposal Plant Facility | 0.1 | 4.4 | 0.1 | 933.36 |
| Soowon Environment Center Facility | 3.9 | 1.5 | 16.4 | 189.85 |
| Kwangyang Port Warehouse Facility | 3.6 | 1.1 | 16.1 | 196.29 |
| **Fuel cell:** | | | | |
| Ilsan # 1 | 8.3 | 2.4 | 69.8 | 296.41 |
| Ilsan # 2 | 6.8 | 2.8 | 82.9 | 295.71 |
| Ilsan # 3 | 4.8 | 2.8 | 82.7 | 283.85 |
| Ulsan | 4.3 | 2.8 | 75.9 | 207.66 |
| **Wind Power:** | | | | |
| YeongGwang Jisan | 5.3 | 3.0 | 11.6 | 55.13 |
| **Biomass:** | | | | |
| Donghae | 4.5 | 30.0 | 76.1 | 255.18 |
| Capital Landfill Cogeneration Facility | 3.8 | 5.0 | 0.0 | – |
| Total | 16.9 | 11,187 | 52.2 | 94.91 |

*Power Plant Remodeling and Recommissioning*

Our generation subsidiaries supplement power generation capacity through remodeling or recommissioning of thermal units. Recommissioning includes installation of anti-pollution devices, modification of control

49

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

systems and overall rehabilitation of existing equipment. The following table shows recent remodeling and recommissioning initiatives by our generation subsidiaries.

| Power Plant | Capacity | Completed (Year) | Extension | Company |
|---|---|---|---|---|
| Taean #1-10 | 5,050 MW (500 MW×8, 1,050 MW×2) | EP[1] upgrade (#2, 2016) EP[1] upgrade (#1, 3, 2017) SCR[2] upgrade (#2, 4, 7, 2016) SCR[2] upgrade (#1, 3, 8, 9, 10, 2017) FGD[5] upgrade, (#1, 3, 2017) | Anti-pollution | KOWEPO |
| Pyeongtaek #1-4 | 1,400 MW (350 MW×4) | Steam turbine upgrade (#2, 3, 2014) | 10-year performance-improvement | KOWEPO |
| Boryeong #1-2 | 1,000 MW (500 MW×2) | FGD upgrade (#1, 2, 2014) | Performance-improvement | KOMIPO |
| Boryeong #3-6 | 2,000 MW (500 MW×8) | Retrofit(#3, 2019) Retrofit(#5, 6, 2021) Retrofit(#4, 2023) FGD, EP, SCR upgrade (#3, 2019) FGD, EP, SCR upgrade (#5, 6, 2021) FGD, EP, SCR upgrade (#4, 2023) | Lifetime extension & Performance-improvement Performance-improvement | KOMIPO |
| Boryeong #7, 8 | 1,000 MW (500 MW×2) | FGD,EP upgrade (#7, 2025) FGD,EP upgrade (#8, 2026) | Performance-improvement | KOMIPO |
| Seocheon #1-2 | 400 MW (200 MW×2) | SCR[2] : 2012 | Anti-pollution | KOMIPO |
| Yeosu #1, 2 | 668.6MW (#1:340, #2:328.6MW) | Boiler Type Change (CFBC[3]:#1:2016, #2:2011) | 30 years | KOSEP |
| Samcheonpo #1-2 | 1,120 MW (560 MW ×2) | Boiler, EP, Draft System Upgrade (#1, 2: 2012) | 10 years Refurbishing-modernization | KOSEP |
| Yeongdong#1 | 125 MW (125 MW ×1) | Boiler, Hybrid SCR & EP, Draft System Retrofit (Biomass[4] #1: 2017) | Renewable energy | KOSEP |

*Notes:*

(1)    "EP" means an electrostatic precipitation system.
(2)    "SCR" means a selective catalytic reduction system.
(3)    "CFBC" means a circulating fluidized bed combustion system.
(4)    "Biomass" means wood pallet powered plant.
(5)    "FGD" means flue-gas desulfurization designed to remove sulfur oxides.

**Transmission and Distribution**

We currently transmit and distribute substantially all of the electricity in Korea.

As of December 31, 2017, our transmission system consisted of 33,955 circuit kilometers of lines of 765 kilovolts and others including high-voltage direct current lines, and we had 839 substations with aggregate installed transformer capacity of 311,869 megavolt-amperes.

As of December 31, 2017, our distribution system consisted of 115,945 megavolt-amperes of transformer capacity and 9,287,199 units of support with a total line length of 483,467 circuit kilometers.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

We make substantial investments in our transmission and distribution systems to minimize power interruptions and improve efficiency. Our current projects principally focus on increasing capabilities of the existing power networks and reducing our transmission and distribution loss, which was 3.57% of our gross generation in 2017. To cope with increasing damages to large-scale transmission and distribution facilities, we plan to reinforce stability of our transmission and distribution facilities through stricter design and material specifications. In addition, we also plan to expand underground transmission and distribution facilities to meet customer demand for more environment-friendly facilities. In order to reduce the interruption time in power distribution, which is an indicator of the quality of electricity transmission, we are also continuing to invest in automation of electricity transmission and development of new transmission technologies, among others.

Some of the facilities we own and use in our distribution system use rights of way and other concessions granted by municipal and local authorities in areas where our facilities are located. These concessions are generally renewed upon expiration.

**New Energy Industry Projects**

Certain of our new energy industry projects are described below.

*Advanced Metering Infrastructure*

In July 2012, the Government implemented a master plan to build out a smart grid, which includes the Advanced Metering Infrastructure ("AMI") roadmap. In accordance with such plan, we are in the process of installing "smart meters" and related communication networks and operating systems for 22 million households for target completion by 2020 as part of the "smart grid" initiative in an effort to enhance efficiency in the power electricity industry and alleviate growing energy shortage concerns. Smart meters refer to digital meters that record, on a real-time basis, electricity consumption within a household so that consumers will have a price-based incentive to enhance efficiency in their electricity usage. As of December 31, 2017, we have installed 5.2 million smart meter units, and plan to install an additional 17 million units by 2020. The AMI project is expected to cost Won 1.6 trillion through 2020.

*Smart Grids*

Smart grids refer to next-generation networks for electricity distribution that integrate information technology into existing power grids with the aim of enabling two-way real time exchange of information between electricity suppliers and consumers for optimal efficiency in electricity use. As part of our overall business strategy, we are currently developing and implementing smart grids based on advanced information technology, in order to promote more efficient allocation and use of electricity by consumers. We expect that such technology will improve efficiency and reduce electricity loss over the course of electricity transmission and distribution. We also expect that the smart grid initiative will significantly increase efficient energy consumption by providing real-time data to customers, which would in turn help to reduce greenhouse gas emission and decrease Korea's reliance on foreign energy sources.

Leveraging our experience gained through high-tech intelligent power transmission and distribution network, or "smart grid" test beds in Jeju Island from 2009 to 2013, we plan to expand our smart grid project. In 2014, we successfully implemented the KEPCO Building Energy Management System (K-BEMS), our smart grid technology, at our Guri-Namyangju branch. In recognition of our achievement, we were awarded an honorable mention from the International Smart Grid Action Network and a special prize from the Global Smart Grid Federation in 2015. By the end of 2017, we implemented smart grid technology in 120 of our branches, and we plan to expand implementation of smart grid technology to residential and industrial buildings.

*Energy Storage Systems*

In October 2013, as part of an endeavor to create new markets for energy demand management applications using information and communication technology, we established a business plan to roll out energy storage

51

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

systems for frequency regulation nationwide. These systems involve the establishment and operation of batteries and transformers with large-sized charge and discharge capabilities adjacent to substations to transmit electricity stably with regulated frequencies and optimize the efficiency of the substation operation. This system allows full conversion of reserve capacity for frequency regulation at existing low-cost generators into electricity storage and, if operated in sizable scale, offers opportunities for substantial cost savings in purchase of electricity.

In December 2014, we conducted a pilot project for this initiative by installing a 52 megawatts energy storage system at the Seo-Anseong substation and the Shin-Yongin substation. In July 2015, these substations began to commercially operate energy storage systems, and we expanded the energy storage capacity nationwide by an additional 184 megawatts in 2016 and an additional 140 megawatts in 2017, with a total capacity of 376 megawatts as of December 31, 2017. In addition, we completed construction of one of the world's largest indoor energy storage systems for frequency regulation in Gimje substation with a 48 megawatts capacity.

*Electric Vehicle Charging Infrastructure*

In order to promote the use of environment friendly electric vehicles, we plan to install 3,000 high-speed electric vehicle charging stations primarily in public space by 2022. We also plan to establish approximately 4,000 electric vehicle charging infrastructures in residential building complexes by the end of 2018.

*Other "New Energy" Initiatives*

In addition to the above, we are currently taking various initiatives in the "new energy" field, including conducting feasibility studies for diagnostic and/or preventive systems for our transmission networks using unmanned drone applications and smart sensors based on the "Internet of Things (IoT)" technology.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund. For further details, see "–Capital Investment Program."

**Fuel Sources and Requirements**

*Nuclear*

Uranium, the principal fuel source for nuclear power, accounted for 38.1%, 37.1% and 34.8% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively.

All uranium ore concentrates used by KHNP are imported from, and conversion and enrichment of such concentrates are provided by, sources outside Korea and are paid for with currencies other than Won, primarily U.S. dollars.

In order to ensure stable supply, KHNP enters into long-term and medium-term contracts with various suppliers and supplements such supplies with purchases in spot markets. In 2017, KHNP purchased 100%, or approximately 4,000 tons, of its uranium concentrate requirement under both long-term and spot supply contracts with suppliers in Canada, the United Kingdom, Kazakhstan, Germany, Niger, Australia and the United States. Under the long-term supply contracts, the purchase prices of uranium concentrates are adjusted annually based on base prices and spot market prices prevailing at the time of actual delivery. The conversion and enrichment services of uranium concentrates are provided by suppliers in Canada, France, Germany, Japan, China, Russia, the United Kingdom and the United States. A Korean supplier typically provides fabrication of fuel assemblies. Except for certain fixed contract prices, contract prices for processing of uranium are adjusted annually in accordance with the general rate of inflation. KHNP intends to obtain its uranium requirements in the future, in part, through purchases under medium- to long-term contracts and, in part, through spot market purchases.

52

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Coal*

Bituminous coal accounted for 46.2%, 45.9% and 52.2% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively, and anthracite coal accounted for 1.7%, 1.8% and 1.0% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively.

In 2017, our generation subsidiaries purchased approximately 92.8 million tons of bituminous coal, of which approximately 38%, 31%, 11%, 9% and 11% were imported from Indonesia, Australia, Russia, South Africa and others, respectively. Approximately 82% of the bituminous coal requirements of our generation subsidiaries in 2017 were purchased under long-term contracts with the remaining 18% purchased in the spot market. Some of our long-term contracts relate to specific generating plants and extend through the end of the projected useful lives of such plants, subject in some cases to periodic renewal. Pursuant to the terms of our long-term supply contracts, prices are adjusted periodically based on market conditions. The average cost of bituminous coal per ton purchased under such contracts amounted to Won 90,902, Won 89,118 and Won 98,891 in 2015, 2016 and 2017, respectively.

In 2017, our generation subsidiaries purchased approximately 0.9 million tons of anthracite coal. The prices for anthracite coal under such contracts are set by the Government. The average cost of anthracite coal per ton purchased under such contracts was Won 108,346, Won 96,121 and Won 124,036 in 2015, 2016 and 2017, respectively.

*Oil*

Oil accounted for 2.2%, 3.0% and 1.2% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively.

In 2017, our generation subsidiaries purchased approximately 7.1 million barrels of fuel oil, substantial portion of which was purchased from domestic refiners through competitive open bidding. Purchase prices are based on the spot market price in Singapore. The average cost per barrel was Won 67,517, Won 53,842 and Won 77,188 in 2015, 2016 and 2017, respectively.

*LNG*

LNG accounted for 10.7%, 10.7% and 8.7% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively. In 2017, for use in electricity generation we purchased approximately 4.8 million tons of LNG from Korea Gas Corporation, a Government-controlled entity in which we currently own a 21.57 equity interest (excluding treasury shares). In 2017, we purchased a substantial portion of our LNG requirements for use in power generation from Korea Gas Corporation. Under the terms of the LNG contract with Korea Gas Corporation, all of our five non-nuclear generation subsidiaries jointly and severally agreed to purchase a total of 5.05 million tons of LNG in 2017, subject to an automatic price adjustment annually based on a pre-determined formula if the actual purchased amount exceeds or falls short of the contracted amount. We believe the quantities of LNG provided under such contract will be adequate to meet the needs of our generation subsidiaries for LNG for the next several years. The LNG supply contracts between our generation subsidiaries and Korea Gas Corporation generally have a term of 20 years and provide for minimum purchase requirements for our generation subsidiaries, the specific terms of which are subject to negotiation between Korea Gas Corporation and our generation subsidiaries and approval by the Government. The average cost per ton of LNG under our contract with Korea Gas Corporation was Won 775,663, Won 594,662 and Won 655,127, in 2015, 2016 and 2017, respectively.

*Hydroelectric*

Hydroelectric power generation accounted for 1.0%, 1.1% and 1.2%, of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively. The availability of water for hydroelectric power depends on

53

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

rainfall and competing uses for available water supplies, including residential, commercial, industrial and agricultural consumption. Pumped storage enables us to increase the available supply of water for use during periods of peak electricity demand.

**Sales and Customers**

Our sales depend principally on the level of demand for electricity in Korea and the rates we charge for the electricity we sell to the end-users.

Demand for electricity in Korea grew at a compounded average rate of 1.7% per annum for the five years ended December 31, 2017. According to the Bank of Korea, the compounded growth rate for GDP was approximately 3.0% for the same period. The GDP growth rate was approximately 2.8%, 2.9% and 3.1% during 2015, 2016 and 2017, respectively.

The table below sets forth, for the periods indicated, the annual rate of growth in Korea's GDP and the annual rate of growth in electricity demand (measured by total annual electricity consumption) on a year-on-year basis.

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Growth in GDP | 2.9% | 3.3% | 2.8% | 2.9% | 3.1% |
| Growth in electricity consumption | 1.8% | 0.6% | 1.3% | 2.8% | 2.2% |

Electricity demand in Korea varies within each year for a variety of reasons other than the general growth in GDP demand. Electricity demand tends to be higher during daylight hours due to heightened commercial and industrial activities and electronic appliance use. Due to the use of air conditioning during the summer and heating during the winter, electricity demand is higher during these two seasons than the spring or the fall. Variation in weather conditions may also cause significant variation in electricity demand.

We do not use any marketing channels, including any special sales methods, to sell electricity to our customers, other than to install electricity meters on-site and take monthly readings of such meters, based upon which invoices are sent to our customers.

*Demand by the Type of Usage*

The table below sets forth consumption of electric power, and growth of such consumption on a year-on-year basis, by the type of usage (in gigawatt hours) for the periods indicated.

|  | 2013 (GWh) | YoY growth (%) | 2014 (GWh) | YoY growth (%) | 2015 (GWh) | YoY growth (%) | 2016 (GWh) | YoY growth (%) | 2017 (GWh) | YoY growth (%) | % of Total 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Residential | 65,815 | 0.5 | 64,457 | (2.1) | 65,619 | 1.8 | 68,057 | 3.7 | 68,544 | 0.7 | 13.5 |
| Commercial | 102,196 | 0.6 | 100,761 | (1.4) | 103,679 | 2.9 | 108,617 | 4.8 | 111,298 | 2.5 | 21.9 |
| Educational | 7,947 | 1.1 | 7,438 | (6.4) | 7,691 | 3.4 | 8,079 | 5.1 | 8,316 | 2.9 | 1.6 |
| Industrial | 265,373 | 2.8 | 272,552 | 2.7 | 273,548 | 0.4 | 278,828 | 1.9 | 285,969 | 2.6 | 56.3 |
| Agricultural | 13,866 | 8.5 | 14,505 | 4.6 | 15,702 | 8.3 | 16,580 | 5.6 | 17,251 | 4.0 | 3.4 |
| Street lighting | 3,156 | (0.1) | 3,221 | 2.1 | 3,341 | 3.7 | 3,462 | 3.6 | 3,557 | 2.7 | 0.7 |
| Overnight Power | 16,496 | (6.4) | 14,658 | (11.1) | 14,075 | (4.0) | 13,416 | (4.7) | 12,811 | (4.5) | 2.5 |
| Total | 474,849 | 1.8 | 477,592 | 0.6 | 483,655 | 1.3 | 497,039 | 2.8 | 507,746 | 2.2 | 100.0 |

The industrial sector represents the largest segment of electricity consumption in Korea. Demand for electricity from the industrial sector was 285,969 gigawatt hours in 2017, representing a 2.6% increase from 2016, largely due to the continued export-based growth of the Korean economy, which resulted in increased

54

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

industrial output and greater utilization of industrial plants. Demand for electricity from the commercial sector depends largely on the level and scope of commercial activities in Korea, which in recent years have resulted in increased office building construction, office automation and use of air conditioners and heaters. Demand for electricity from the commercial sector increased to 111,298 gigawatt hours in 2017, representing a 2.5% increase from 2016 largely due to the recovery of market demand as a result of various Government policies to boost the economy. Demand for electricity from the residential sector is largely dependent on population growth and use of heaters, air conditioners and other electronic appliances. Demand for electricity from the residential sector increased to 68,544 gigawatt hours in 2017, representing a 0.7% increase compared to 2016, largely due to an increase in household electricity usage for air conditioning and heating.

*Demand Management*

Our ability to provide adequate supply of electricity is principally measured by the facility reserve margin and the supply reserve margin. The facility reserve margin represents the difference between the peak usage during a year and the installed capacity at the time of such peak usage, expressed as a percentage of such installed capacity. The supply reserve margin represents the difference between the peak usage in a year and the average available capacity at the time of such peak usage, expressed as a percentage of such peak usage. The following table sets forth our facility reserve margin and supply reserve margin for the periods indicated.

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Facility reserve margin | 7.5% | 16.3% | 19.4% | 17.6% | 34.0% |
| Supply reserve margin | 5.5% | 11.5% | 11.6% | 8.5 % | 12.3% |

While we seek to meet the growing demand for electricity in Korea primarily by continuing to expand our generation capacity, we have also implemented several measures to curtail electricity consumption, especially during peak periods. We apply time-of-use and seasonality tariff, which are structured so that higher tariffs are charged at the time and months of peak demand to select types of customers, and we also apply a progressive rate structure for the residential use of electricity. We have several demand management programs to control demand and induce power conservation during peak hours and peak seasons such as providing incentives for reducing power consumption during peak hours.

*Electricity Rates*

The Electricity Business Act and the Price Stabilization Act of 1975, each as amended from time to time, prescribe the procedures for the approval and establishment of rates charged for the electricity we sell. We submit our proposals for revisions of rates or changes in the rate structure to the Ministry of Trade, Industry and Energy. The Ministry of Trade, Industry and Energy then reviews these proposals and, following consultation with the Ministry of Strategy and Finance and review by the Korea Electricity Commission, makes the final decision.

Under the Electricity Business Act and the Price Stabilization Act, electricity rates are established at levels that would enable us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations as well as receive a fair investment return on capital used in those operations.

In May 2014, in order to make conforming changes to the standards for determining the public utility rates and to further bolster the reasonableness of cost determination, the Ministry of Trade, Industry and Energy amended the standards for determining the electricity tariff rates. The main amendments include (i) recording as our cost of electricity (which forms part of our operating costs) the pretax income of our six generation subsidiaries (which was previously deducted from our operating costs), (ii) excluding from our rate base our equity interests in our six generation subsidiaries (which were previously included in the rate base discussed below), and (iii) when determining working capital, considering the actual time of our cost recovery (namely, the accounts receivable collection period and the accounts payable payment period).

55

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

For the purposes of rate approval, operating costs are defined as the sum of our operating expenses (which principally consists of cost of sales and selling and administrative expenses) and our adjusted income taxes.

Fair investment return represents an amount equal to the rate base multiplied by the rate of return.

Following the amendments to its computation methods in May 2014 as described above, the rate base is currently equal to the sum of:

net utility plant in service (which is equal to utility plant minus accumulated depreciation minus revaluation reserve);

the portion of working capital which is equal to the appropriate level of operating costs minus depreciation and other non-cash charges while taking into account the actual time of cost recovery; and

the portion of construction-in-progress which is charged from our retained earnings.

The amounts used for the variables in the rates are those projected by us for the periods to be covered by the rate approval.

For the purpose of determining the fair rate of return, the rate base is divided into two components in proportion to our total shareholders' equity and our total debt. The rate of return permitted in relation to the debt component of the rate base is set at a level designed to approximate the weighted average interest cost on all types of borrowing for the periods covered by the rate approval. The rate of return permitted in relation to the equity component of the rate base is set by applying the capital asset pricing model which takes account of the risk-free rate, the return on the Korea Stock Price Index, KOSPI, a Korean equity market index, and the correlation of the stock price of our company with KOSPI. In 2016, the approved rate of return on the debt component of the rate base was 0.9% while the approved rate of return on the equity component of the rate base was 3.34%. As a result of such approved rates of returns, the fair rate of return in 2016 was determined to be 4.24%. The fair rates of return for 2017 and 2018 have not yet been determined.

The Electricity Business Act and the Price Stabilization Act do not specify a basis for determining the reasonableness of our operating expenses or any other items (other than the level of the fair investment return) for the purposes of the rate calculation. However, the Government exercises substantial control over our budgeting and other financial and operating decisions.

In addition to the calculations described above, a variety of other factors are considered in setting overall tariff levels. These other factors include consumer welfare, our projected capital requirements, the effect of electricity tariff on inflation in Korea and the effect of tariff on demand for electricity.

From time to time, our actual rate of return on invested capital may differ significantly from the fair rate of return on invested capital assumed for the purposes of electricity tariff approvals, for reasons, among others, related to movements in fuel prices, exchange rates and demand for electricity that differ from what is assumed for determining our fair rate of return. For example, between 1987 and 1990, the actual rate of return was above the fair rate of return due to declining fuel costs and rising demand for electricity at a rate not anticipated for purposes of determining our fair rate of return. Similarly, depreciation of the Won against the U.S. dollar accounted for our actual rates of return being lower than the fair rate of return for the period from 1996 to 2000. For the period between 2006 and 2013, our actual rates of return were lower than the fair rate of return largely due to a general increase in fuel costs and additional facility investment costs incurred, the effects of which were not offset by timely increases in our tariff rates. Between 2014 and 2016, however, largely due to a decrease in fuel costs reflective of the drop in oil prices, our actual rate of return has surpassed the fair rate of return; however, substantially all of the resulting excess has been used to fund capital expenditure and repair and maintenance, as well as to offer tariff discounts to economically or otherwise disadvantaged households, and make investments in renewable energy and other environmental programs.

56

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Partly in response to the variance between our actual rates of return and the fair rates of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increases as such increases requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use from sector-specific tariff increases.

Prior to November 2013, the Government from time to time effected tariff increases that typically covered all sectors, namely, residential, commercial and industrial, mainly in response to sustained increases in fuel prices. No cross-sector tariff increase has been implemented since November 2013 largely due to a general decline in fuel prices and relatively stable exchange rates. However, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, the new tariff structure encourages energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods during the summer and the winter. Third, a temporary rate discount will apply during 2017 to 2019 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation and cash flows.

The tariff rates we charge for electricity vary among the different classes of consumers, which principally consist of industrial, commercial, residential, educational and agricultural consumers. The tariff also varies depending upon the voltage used, the season, the time of usage, the rate option selected by the user and, in the residential sector, the amount of electricity used per household, as well as other factors. For example, we adjust for seasonal tariff variations by applying higher rates when demand tends to rise such as during the months of June, July and August (when the demand tends to rise due to increased use of air conditioning) and November, December, January and February (when demand tends to rise due to increased use of heating), which reflects the policy of the Korean government to cope with the rise in electricity demand during peak seasons by encouraging a more efficient use of electricity by customers. In addition, we provide discounts on tariff rates to certain users such as low income households.

Our current tariff schedule, which became effective as of January 1, 2017 reflecting the adjustments outlined above, is summarized below by type of usage:

*Industrial.* The monthly basic charge varies from Won 5,550 per kilowatt to Won 9,810 per kilowatt depending on the type of contract, the voltage used and the rate option. The energy usage charge varies from Won 53.7 per kilowatt-hour to Won 196.6 per kilowatt-hour depending on the type of contract, the voltage used, the season, the time of day and the rate option.

*Commercial.* The monthly basic charge varies from Won 6,160 per kilowatt to Won 9,810 per kilowatt depending on the type of contract, the voltage used and the rate option. The energy usage charge varies from Won 53.7 per kilowatt-hour to Won 196.6 per kilowatt-hour depending on the type of contract, the voltage used, the season, the time of day and the rate option.

*Residential.* The monthly basic charge varies from Won 910 for electricity usage of less than 200 kilowatt hours to Won 7,300 for electricity usage in excess of 400 kilowatt hours. Residential tariff also includes an energy usage charge ranging from Won 93.3 to Won 280.6 per kilowatt-hour for electricity usage depending on the amount of usage and voltage. During the peak usage periods during the summer and the winter, namely the months of July and August and December to February, a higher

57

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

energy usage charge of Won 709.5 per kilowatt-hour applies to residential consumers whose monthly electricity consumption exceeds 1,000 kilowatts hour.

*Educational*. The monthly basic charge varies from Won 5,230 per kilowatt to Won 6,980 per kilowatt depending on the voltage used and the rate option. The energy usage charge varies from Won 43.8 per kilowatt-hour to Won 160.4 per kilowatt-hour depending on the voltage used, the season and the rate option.

*Agricultural*. The monthly basic charge varies from Won 360 per kilowatt to Won 1,210 per kilowatt depending on the type of usage. The energy usage charge varies from Won 21.6 per kilowatt-hour to Won 41.9 per kilowatt-hour depending on the type of contract, the voltage used and the season.

*Street-lighting*. The monthly basic charge is Won 6,290 per kilowatt and the energy usage charge is Won 85.9 per kilowatt-hour. For electricity capacity of less than 1 kilowatt or for places where the installation of the electricity meter is difficult, a fixed rate of Won 37.5 per watt applies, with the minimum monthly charge of Won 1,220.

In 2001, as part of implementing the Restructuring Plan, the Ministry of Trade, Industry and Energy established the Electric Power Industry Basis Fund to enable the Government to take over certain public services previously performed by us. In 2017, 3.7% of the tariff we collected from our customers was transferred to this fund prior to recognizing our sales revenue.

**Power Development Strategy**

We and our generation subsidiaries make plans for expanding or upgrading our generation capacity based on the Basic Plan, which is generally revised and announced every two years by the Government. In July 2015, the Government announced the Seventh Basic Plan relating to the future supply and demand of electricity, focusing on stable supply of electricity and increasing the portion of low carbon electricity supply sources, among others. To revise the Seventh Basic Plan, in December 2017, the Government announced the Eighth Basic Plan which are more environmentally focused than the Seventh Basic Plan and to be effective for the period from 2017 to 2031. The Eighth Basic Plan focuses on, among other things, (i) decreasing the reliance on nuclear and coal-based supply sources, (ii) increasing utilization of renewable energy sources and (iii) balancing the existing cost-based pool system of purchase of electricity with an environmentally-focused pool system, in order to increase utilization of LNG energy sources, which are cleaner but more expensive than nuclear or coal energy sources. Furthermore, the Eighth Basic Plan includes the following implementing measures: (i) six new nuclear generation units in a planning stage would not be constructed, (ii) extension of life of 10 decrepit nuclear generation units would not be granted, (iii) Wolsong #1 unit is not counted as part of domestic energy generation capacity, (iv) seven decrepit coal-fired generation plants will be retired by 2022, (v) six other coal-fired generation plants shall be converted to LNG fuel use and (vi) domestic renewable energy generation capacity shall be expanded to 58.5 gigawatts by 2030.

In January 2014, prior to the announcement of the Seventh Basic Plan, the Ministry of Trade, Industry and Energy adopted the Second Basic National Energy Plan following consultations with representatives from civic groups, the power industry and academia. The Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, covers the period from 2014 to 2035 and focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing the growth of electricity demand by 15% by 2035 through efficiency enhancement programs compared to the projected growth in the absence of such efficiency enhancement programs, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying latest greenhouse gas emission reduction technologies to newly constructed generation units in order to further promote safety and environmental friendliness, (iv) strengthening resource exploration and fuel procurement capabilities to enhance Korea's energy security, (v) ensuring stable supply of energy and increasing the portion of electricity supplied

58

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

from renewable sources to 11% by 2035, (vi) reinforcing the system for stable supply of conventional energy, such as oil and gas, and (vii) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of low-income consumers. In addition, the Second Basic National Energy Plan has revised the target level of electricity generated by nuclear sources as a percentage of total electricity generated to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008, which covered the period from 2008 to 2030. In March 2018, the Government announced its plan to establish the Third Basic National Energy Plan by the end of 2018.

We cannot assure that the Eighth Basic Plan, the Second Basic National Energy Plan or the respective plans to be subsequently adopted will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable costs to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on the part of us and our generation subsidiaries, among others, which may have a material adverse effect on our results of operations, financial condition and cash flows.

## Capital Investment Program

The table below sets forth, for each of the years ended December 31, 2015, 2016 and 2017, the amounts of capital expenditures for the construction of generation, transmission and distribution facilities.

| 2015 | 2016 | 2017 |
|------|------|------|
| | (In billions of Won) | |
| ₩15,750 | ₩13,950 | ₩13,711 |

The table below sets forth the currently estimated installed capacity for new or expanded generation units to be completed by our generation subsidiaries in each year from 2018 to 2021 based on the Eighth Basic Plan, as amended.

| Year | Number of Units | Type of Units | Total Installed Capacity |
|------|-----------------|---------------|--------------------------|
| | | | (Megawatts) |
| 2018 | 2 | Nuclear power | 2,800 |
| | 2 | LNG-combined | 240 |
| 2019 | 1 | Nuclear power | 1,400 |
| | 3 | LNG-combined | 1,315 |
| 2020 | 1 | Coal fired | 1,000 |
| | 1 | LNG-combined | 125 |
| 2021 | None | | |

For the period from 2022 to 2023, our generation subsidiaries currently plan to complete two additional nuclear units with an aggregate installed capacity of 2,800 megawatts.

As part of our capital investment program, we also intend to add new transmission lines and substations, continue to replace overhead lines with underground cables and improve the existing transmission and distribution systems.

The actual number and capacity of generation units and transmission and distribution facilities we construct and the timing of such construction are subject to change depending upon a variety of factors, including, among others, changes in the Basic Plan, demand growth projections, availability and cost of financing, changes in fuel prices and availability of fuel, ability to acquire necessary plant sites, environmental considerations and community opposition.

59

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The table below sets forth, for the period from 2018 to 2020, the budgeted amounts of capital expenditures pursuant to our capital investment program, which primarily consist of budgets for the construction of generation, transmission and distribution facilities and, to a lesser extent, renewable energy generation and new energy industry projects. The budgeted amounts may vary from the actual amounts of capital expenditures for a variety of reasons, including, among others, the implementation of the Eighth Basic Plan, changes in the number of units to be constructed, the actual timing of such construction, changes in rates of exchange between the Won and foreign currencies and changes in interest rates.

|  | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|
|  | (in billions of Won) | | | |
| Generation(1): |  |  |  |  |
| Nuclear | ₩4,076 | ₩4,243 | ₩3,491 | ₩11,810 |
| Thermal | 3,362 | 3,123 | 4,120 | 10,605 |
| Renewables and others | 891 | 1,789 | 1,857 | 4,537 |
| Sub-total | 8,329 | 9,155 | 9,468 | 26,952 |
| Transmission and Distribution: |  |  |  |  |
| Transmission | 2,938 | 3,529 | 3,433 | 9,900 |
| Distribution | 2,881 | 2,587 | 2,603 | 8,071 |
| Sub-total | 5,819 | 6,116 | 6,036 | 17,971 |
| Others(2) | 1,668 | 1,909 | 2,076 | 5,653 |
| Total | ₩15,816 | 17,180 | ₩17,580 | ₩50,576 |

*Notes:*

(1)    The budgeted amounts for our generation facilities are based on the Eighth Basic Plan.

(2)    Principally consists of investments in telecommunications and new energy industry projects, among others.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. We contributed Won 500 billion to the funds in 2016. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector.

Furthermore, as part of the Comprehensive Measures against Particulate Matter and the Eighth Basic Plan, announced by the Government in September 2017 and December 2017, respectively, the Government set forth the following policy directions relating to coal-fired generation units: (i) two coal-fired generation units scheduled for construction and four existing coal-fired generation units shall convert to LNG fuel use, (ii) in principle, construction of new coal-fired generation units shall not be planned, (iii) seven of the coal-fired generation units that are 30 years or older will be shut down on an accelerated schedule, (iv) coal-fired generation units that are 30 years or older shall temporarily cease operations from March through June of each year, (v) coal-fired generation units shall be put through comprehensive functional and environmental upgrades and (vi) coal-fired generation units shall be subject to emission standards that are twice as more rigorous than the current standards to be in effect by the first half of 2018. Compliance with such measures is expected to result in our incurring significant costs.

We have financed, and plan to finance in the future, our capital investment programs primarily through net cash provided by our operating activities and financing in the form of debt securities and loans from domestic financial institutions, and to a lesser extent, borrowings from overseas financial institutions. In addition, in order

60

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

to prepare for potential liquidity shortage, we and our generation subsidiaries maintain several credit facilities with domestic financial institutions in the aggregate amounts of Won 3,831 billion and US$383 million, the full amount of which was available as of December 31, 2017. We, KHNP, KOMIPO and KOWEPO also maintain global medium-term note programs in the aggregate amount of US$13.0 billion, of which approximately US$8.9 billion remains currently available for future drawdown. KOSEP also maintains an A$2 billion Australian dollar medium-term note program, of which approximately A$1.7 billion remains current available for future drawdown. See also Item 5.B. "Liquidity and Capital Resources–Capital Resources."

**Environmental Programs**

The Environmental Policy Basic Act, the Air Quality Preservation Act, the Water Quality Preservation Act, the Marine Pollution Prevention Act and the Waste Management Act, collectively referred in this annual report as the Environmental Acts, are the major laws of Korea that regulate atmospheric emissions, waste water, noise and other emissions from our facilities, including power generators and transmission and distribution units. Our existing facilities are currently in material compliance with the requirements of these environmental laws and international agreements, such as the United Nations Framework Convention on Climate Change, the Montreal Protocol on Substances that Deplete the Ozone Layer, the Stockholm Convention on Persistent Organic Pollutants and the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal. In order to foster coordination among us and our generation subsidiaries in respect of climate change, we and 11 of our electricity-related subsidiaries formed the CEO Coordination Committee in June 2016.

We continuously endeavor to contribute to sustainable growth (whether as an economy, a society or an ecosystem) by actively taking actions that befit our social responsibility as a corporate citizen in the energy industry. For example, in 2005, we became the first public company in Korea to join the United Nations Global Compact, an international voluntary initiative designed to hold a forum for corporations, United Nations agencies, labor and civic groups to promote reforms in economic, environmental and social policies. As part of our involvement with such initiative, we issue an annual report named the "Sustainability Report" to disclose our activities from the perspectives of economy, environment and society, in accordance with the reporting guidelines of the Global Reporting Initiative, the official collaborating center of the United Nations Environment Program that works in cooperation with United Nations Secretary General. In recognition of our efforts and achievements to reduce carbon emissions in response to global climate change, in May 2013, we obtained the Carbon Trust Standard certification issued by Carbon Trust, a British nonprofit organization with the goal of establishing a sustainable, low carbon economy. In 2015, we obtained recertification from Carbon Trust by satisfying even more rigorous evaluation criteria. We are also a participant of the Carbon Disclosure Project, an international organization that promotes transparency in informational disclosure of carbon management process, and in 2016 and 2017 we were recognized by the Carbon Disclosure Project and received honors in energy and utility sector. In 2015, 2016 and 2017, pursuant to the Dow Jones Sustainability Indices, which measures management performance in terms of contribution to sustainability, we were selected as one of the notable companies in the Asia Pacific in the global electricity utility sector. We aim to become a global leader in carbon management and reduction.

The table below sets forth the number of emission control equipment installed at thermal power plants by our generation subsidiaries as of December 31, 2017.

|  | KOSEP | KOMIPO | KOWEPO | KOSPO | EWP |
|---|---|---|---|---|---|
| Flue Gas Desulphurization System | 14 | 12 | 14 | 14 | 18 |
| Selective Non-catalytic Reduction System | 1 | – | – | – | 6 |
| Selective Catalytic Reduction System | 14 | 20 | 15 | 14 | 18 |
| Electrostatic Precipitation System | 16 | 14 | 14 | 14 | 18 |
| Low NO2 Combustion System | 20 | 26 | 30 | 30 | 27 |
| Total | 65 | 72 | 73 | 72 | 87 |

61

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

In accordance with the Act on Allocation and Trading of Greenhouse Gas Emission Allowances, enacted in March 2013, the Government is currently in the process of implementing a carbon emission trading system under which the Government will allocate the amount of permitted carbon emission to companies by industry and a company whose business emits more carbon than the permitted amount may purchase the right to emit more carbon through the carbon emission trading exchange. This system is expected to be implemented in three stages. During the first phase (2015 to 2017), the Government set up and made a test run of the trading system to ensure its smooth operation; during this phase, the carbon emission rights were allocated without charge. During the second phase (2018 to 2020), the system will be applied to a limited scope of industries and companies, where the carbon emission right will be allocated at a relatively low price, but not freely. During the third phase (2021 to 2025), the Government plans to run the system on an expanded scale with aggressive carbon emission reduction targets. The amount of required reduction for the second phase of 2018 to 2020 is expected to be determined by June 2018. During the third phase (2021 to 2025), the Government plans to run the system on an expanded scale with aggressive carbon emission reduction targets. In December 2016, the Government announced the Climate Change Response Initiatives and 2030 National Greenhouse Gas Reduction Roadmap, which set forth the carbon emission trading system as one of the primary means to reach the emission and greenhouse gas reduction targets of the policies. The 2030 National Greenhouse Gas Reduction Roadmap sets forth a national reduction target of greenhouse gas by 219 million tons in the aggregate, amounting to a 25.7% reduction by 2030. The roadmap also set forth reduction targets for eight domestic sectors and the first three sectors with the largest reduction targets are electricity generation, industry and buildings. Our business is classified as part of the electricity generation sector, for which greenhouse gas reduction of 64.5 million tons is requested by year 2030. We are aiming to contribute to 80% of such reduction target for the sector, while such reduction target may change pursuant to an amendment to the 2030 National Greenhouse Gas Reduction Roadmap which the Government is expected to announce in 2018. Adhering to such emission and greenhouse gas reduction requirement is expected to result in our incurring significant compliance costs.

The table below sets forth the amount of annual emission from all generating facilities of our generation subsidiaries for the periods indicated. The amount of $CO_2$ emissions may increase in the near future due to the construction of additional coal thermal power plants but is expected to decrease in the long-term, principally due to an increased use of nuclear power and renewable energy and the implementation of the carbon emission trading system.

| Year[1] | SOx (g/ MWh) | NOx (g/ MWh) | TSP[2] (g/ MWh) | $CO_2$ (kg/ MWh) |
|---|---|---|---|---|
| 2015 | 165 | 266 | 8 | 464 |
| 2016 | 156 | 246 | 7 | 477 |

*Notes:*

(1)  The amounts of annual emission for 2017 are expected to be determined in June 2018.

(2)  "TSP" means Total Suspended Particles.

In order to comply with the current and expected environmental standards and address related legal and social concerns, we intend to continue to install additional equipment, make related capital expenditures and undertake several environment-friendly measures to foster community goodwill. For example, under the Persistent Organic Pollutants Management Act enacted in 2007, we are required to remove polychlorinated biphenyl, or PCB, a toxin, from the insulating oil of our transformers by 2025. In addition, when constructing certain large new transmission and distribution facilities, we assess and disclose their environmental impact at the planning stage of such construction, as well as consult with local residents, environmental groups and technical experts to generate community support for such projects. We exercise additional caution in cases where such facilities are constructed near ecologically sensitive areas such as wetlands or preservation areas. We also make reasonable efforts to minimize any negative environmental impact, for example, by using more environment-friendly technology and hardware. In addition, we also undertake measures to minimize losses during the transmission and distribution process by making our power distribution network more energy-efficient in terms

62

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

of loss of power, as well as to lower consumption of energy, water and other natural resources. In addition, we and our subsidiaries acquired the ISO 14000 certification, an environmental management system widely adopted internationally, in 2007 and have made it a high priority to make our electricity generation and distribution more environmentally friendly. In addition to the ISO 14000 certification, we further reinforced our environmental management system by acquiring the ISO 14001 certification as well as a domestic "GMS (Green Management System), KS I 7001/7002" certification, which relates to the management of resources, energy, green house effects and social responsibilities, in 2013. In 2014, we were awarded the presidential award for environmental contributions as a corporate citizen, after scoring the highest among 102 corporations that competed for the award. In order to encourage the implementation of environment-friendly measures by other corporations and enhance environmental awareness at a social level, we have been disclosing our environment-related activities and achievements to the public through the Environment Information System managed by the Ministry of Environment since 2012.

Our environmental measures, including the use of environment-friendly but more expensive parts and equipment and allocation of capital expenditures for the installation of such facilities, may result in increased operating costs and liquidity requirement. The actual cost of installation and operation of such equipment and related liquidity requirement will depend on a variety of factors which may be beyond our control. There is no assurance that we will continue to be in material compliance with legal or social standards or requirements in the future in relation to the environment.

As part of our long-term strategic initiatives, we plan to take other measures designed to promote the generation and use of environmentally friendly, or green, energy. See Item 4.B. "Business Overview–Strategy."

Some of our generation facilities are powered by renewable energy sources, such as solar energy, wind power and hydraulic power. While such facilities are currently insignificant as a proportion of our total generation capacity or generation volume of our generation subsidiaries, we expect that the portion will increase in the future, especially since we are required to comply with the Renewable Portfolio Standard program as described below.

The following table sets forth the generation capacity and generation volume in 2017 of our generation facilities that are powered by renewable energy sources.

| | Generation Capacity (megawatts) | | Generation Volume (gigawatt-hours) | |
|---|---|---|---|---|
| Hydraulic Power[1] | 651 | | 1,076 | |
| Wind Power | 138 | | 209 | |
| Solar Energy, Fuel Cells and Biogas | 682 | | 2,485 | |
| Subtotal | 1,471 | | 3,770 | |
| As percentage of total[2] | 1.8 | % | 0.9 | % |

*Notes:*

(1)    Excluding generation capacity and volume of pumped storage, which is generally not classified as renewable energy.

(2)    As a percentage of the total generation capacity or total generation volume, as applicable, of us and our generation subsidiaries.

In order to deal with shortage of fuel and other resources and also to comply with various environmental standards, in 2012 the Government adopted the Renewable Portfolio Standard program, which replaced the Renewable Portfolio Agreement which had been in effect from 2006 to 2011. Under this program, each of our generation subsidiaries is required to generate a specified percentage of total electricity to be generated by such generation subsidiary in a given year in the form of renewable energy or, in case of a shortfall, purchase a corresponding amount of a Renewable Energy Certificate (a form of renewable energy credit) from other

63

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

generation companies whose renewable energy generation surpass such percentage. The target percentage was 3.5% in 2016, 4.0% in 2017 and 5.0% in 2018 and will incrementally increase to 10.0% by 2023. Fines are to be levied on any subsidiary that fails to do so in the prescribed timeline. In 2016, all six of our generation subsidiaries met the target through renewable energy generation and/or the purchase of a Renewable Energy Certificate. Compliance by our generation subsidiaries of the 2017 target is currently under evaluation, and if any generation subsidiary is found to have failed to meet the target for 2017 or for subsequent years, such generation subsidiary may become subject to fines. We expect that any additional costs required for implementation of the Renewable Portfolio Standard program will be covered by a corresponding increase in electricity tariff. However, there is no assurance that the Government will in fact raise the electricity tariff to a level sufficient to fully cover such additional costs or at all.

As to how we plan to finance our capital expenditures related to our environmental programs, see "–Capital Investment Program."

In March 2017, the Electricity Business Act was amended to the effect that starting in June 2017, future national planning for electricity supply and demand in Korea should consider the environmental and safety impacts of such planning. However, to-date, no specific guidelines have been provided by the Government as to how to implement this provision, and it is therefore difficult to assess in advance what impact such provision will have on our business, results of operations or financial condition. However, the amendment will likely lead to the expansion of our environmental programs.

Furthermore, under the new electricity rate structure effected by the Government effective January 1, 2017, a temporary rate discount will apply in the case of investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars during 2018 to 2020.

**Community Programs**

Building goodwill with local communities is important to us in light of concerns among the local residents and civic groups in Korea regarding construction and operation of generation units, particularly nuclear generation units. The Act for Supporting the Communities Surrounding Power Plants and the Act on the Compensation and Support for Areas Adjacent to Transmission and Substation Facilities require that the generation companies and the affected local governments carry out various activities up to a certain amount annually to address neighboring community concerns. Pursuant to these Acts, we and our generation subsidiaries, in conjunction with the affected local and municipal governments, undertake various programs, including scholarships and financial assistance to low-income residents.

Under the Act for Supporting the Communities Surrounding Power Plants, activities required to be undertaken under the Act are funded partly by the Electric Power Industry Basis Fund (see "–Sales and Customers–Electricity Rates") and partly by KHNP as part of its budget. KHNP is required to make annual contributions to the affected local communities in an amount equal to Won 0.25 per kilowatt-hour of electricity generated by its nuclear generation units during the one-year period before the immediately preceding fiscal year, Won 5 million per thousand kilowatts of hydroelectric generation capacity and Won 0.5 million per thousand kilowatts of pumped-storage generation capacity. In addition, under Korean tax law, KHNP is required to pay local tax levied on its nuclear generation units in an amount equal to Won 1 (effective January 1, 2015, which reflects an increase from the previous Won 0.5 per kilowatt-hour of their generation volume in the affected areas) and Won 2 per 10 cubic meters of water used for hydroelectric generation.

The Act on the Compensation and Support for Areas Adjacent to Transmission and Substation Facilities, enacted in January 2014 with effect from July 2014, prescribes measures to be taken by power generation or transmission companies with respect to the communities adjacent to transmission and substation facilities. Under this Act, those who own land or houses in the vicinity of transmission lines and substation may claim compensation for damages or compel purchase of such properties by the power generation or transmission

64

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

companies which are legally obligated in principle to pay for such damages or purchase such properties. In addition, under this Act, residents of communities adjacent to transmission and substation facilities are entitled to subsidies on electricity tariff as well as support for a variety of welfare projects and collective business ventures.

Prior to the construction of a generation unit, our generation subsidiaries perform an environmental impact assessment which is designed to evaluate public hazards, damage to the environment and concerns of local residents. A report reflecting this evaluation and proposing measures to address the problems identified must be submitted to and approved by the Ministry of Trade, Industry and Energy following agreement with related administrative bodies, including the Ministry of Environment prior to the construction of the unit. Our generation subsidiaries are then required to implement the measures reflected in the approved report. Despite these activities, civic community groups may still oppose the construction and operation of generation units (including nuclear units), and such opposition could adversely impact our construction plans for generation units (including nuclear units) and have a material adverse effect on our business, results of operations and cash flow.

Upon relocation of our corporate headquarters in November 2014, we developed and established Bitgaram Energy Valley as a smart energy hub city in Gwangju and Jeollanamdo, to attract and facilitate the growth of start-ups and research institutions related to new energy industries while contributing to the local economy, balanced regional development and job creation. To achieve this goal, we provide funding, business networks and research and development assistance to companies which entered into investment contracts with us. As of March 31, 2018, we had signed agreements with 280 companies relating to investments in the Bitgaram Energy Valley, and we currently aim to increase the total number of companies investing in the Bitgaram Energy Valley to 350 companies by the end of 2018 and 500 companies by the end of 2020.

**Nuclear Safety**

KHNP takes nuclear safety as its top priority and continues to focus on ensuring the safe and reliable operation of nuclear power plants. KHNP also focuses on enhancing corporate ethics and transparency in the operation of its plants.

KHNP has a corporate code of ethics and is firmly committed to enhancing nuclear safety, developing new technologies and improving transparency. KHNP has also established the "Statement of Safety Policy for Nuclear Power Plants" to ensure the highest level of nuclear safety. Furthermore, KHNP invests approximately 5% of its total annual sales into research and development for the enhancement of nuclear safety and operational performance.

KHNP implements comprehensive programs to monitor, ensure and improve safety of nuclear power plants. In order to enhance nuclear safety through risk-informed assessment, KHNP conducts probabilistic safety assessments, including for low power-shutdown states, for all its nuclear power plants. In order to systematically verify nuclear safety and identify the potential areas for safety improvements, KHNP performs periodic safety reviews on a 10-year frequency basis for all its operating units. These reviews have been completed for Kori #1, Hanbit #5 and #6, Hanul #1, #2, #3 and #4 and Wolsong #1, #3 and #4. Reviews for Kori #2, #3 and #4, Hanbit #1, #2, #3 and #4, Hanul #5 and #6 and Wolsong #2 are in progress. In order to enhance nuclear safety and plant performance, KHNP has established a maintenance effectiveness monitoring program based on the maintenance rules issued by the United States Nuclear Regulatory Commission, which covers all of KHNP`s nuclear power plants in commercial operation.

KHNP has developed the Risk Monitoring System for operating nuclear power plants, which it implements in all of its nuclear power plants. The Risk Monitoring System is intended to help ensure nuclear plant safety. In addition, KHNP has developed and implemented the Severe Accident Management Guidelines and is developing the Severe Accident Management Guidelines for Low Power-Shutdown States in order to manage severe accidents for all of its nuclear power plants.

65

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

KHNP conducts various activities to enhance nuclear safety such as quality assurance audits and reviews by the KHNP Nuclear Review. KHNP maintains a close relationship with international nuclear organizations in order to enhance nuclear safety. In particular, KHNP invites international safety review teams such as the World Association of Nuclear Operators ("WANO") Peer Review Team and the Expert Mission Team to its nuclear plants for purposes of meeting international standards for independent review of its facilities. KHNP actively exchanges relevant operational information and technical expertise with its peers in other countries. For example, KHNP conducted seven WANO Peer Reviews for Wolsong #3 and #4 in 2017. KHNP also invited WANO Follow-up Peer Review Team at Hanbit #1, #2, #3, #4, #5 and #6, Kori #1, #2, #3 and #4, Shin-Wolsong #1 and #2 in 2017. The recommendations and findings from this event were shared with KHNP' s other nuclear plants to implement improvements at such plants.

The average level of radiation dose per unit amounted to a relatively low level of 0.30 man-Sv in 2017, which was substantially lower than the global average of 0.63 man-Sv/year in 2017 as reported in the WANO performance indicator report.

In response to the damage to the nuclear facilities in Japan as a result of the tsunami and earthquake in March 2011, the Government conducted additional safety inspections on nuclear power plants by a group of experts from governmental authorities, civic groups and academia. As a result of such inspections, the Government required KHNP to perform 50 comprehensive safety improvement measures. The Government also established the Nuclear Safety & Security Commission in October 2011 for neutral and independent safety appraisals. KHNP developed ten additional measures through benchmarking of overseas cases and internal analysis of current operations. As of December 31, 2017, KHNP has completed implementation of all such measures.

From time to time, our nuclear generation units may experience unexpected shutdowns. For example, on September 12, 2016, multiple earthquakes including a magnitude 5.8 earthquake hit the city of Gyeongju, a home to KHNP' s headquarters and Wolsong Nuclear Power Plant. Although there was no material safety issues, KHNP had manually stopped the operations of Wolsong Nuclear Power Plant units #1, 2, 3, and 4 according to the safety guidelines. All units have resumed their operations on December 5, 2016, with the approval by the Nuclear Power Safety Commission. KHNP continues to implement measures to improve the safety by reinforcing seismic capability of its core facilities and performing stress tests across all its nuclear power plants. In 2017, KHNP finished the implementation of such measures for 21 units and enhanced seismic design of the core facilities to withstand a magnitude 7.0 earthquake (6.5 before implementation). Implementation of such measures for the remaining 3 units are expected to be finished in 2018. As for the units under construction (Shin-Kori#5 and #6), the core facilities will be able to withstand a magnitude 7.4 earthquake.

Low and intermediate level waste, or LILW, and spent fuels are stored in temporary storage facilities at each nuclear site of KHNP. The temporary LILW storage facilities at the nuclear sites had been sufficient to accommodate all LILWs produced up to 2015. Korea Radioactive Waste Agency ("KORAD") completed the construction of a LILW disposal facility in the city of Gyeongju, and government approval for its operations was obtained in December 2014.

In order to increase the storage capacity of temporary storage facilities for spent fuels, KHNP has been pursuing various projects, such as installing high-density racks in spent fuel pools and building dry storage facilities. Through these activities, we expect that the storage capacity for spent fuels in all nuclear sites will be sufficient to accommodate all the spent fuels produced by 2018. The policy for spent fuel management options is currently under development.

In 2009, the Radioactive Waste Management Act ("RWMA") was enacted in order to centralize management of the disposal of spent fuel and LILW and enhance the security and efficiency of related management processes. The RWMA designates KORAD to manage the disposal of spent fuels and LILW. Pursuant to the RWMA, the Government has established the Radioactive Waste Management Fund. The

66

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

management expense for LILW is paid when LILW is transferred to KORAD, and the charge for spent fuel is paid based on the quantity generated every quarter. LILW-related management costs and charges for spent fuel are reviewed by the Ministry of Trade, Industry and Energy every two years. In December 2017, after the review by the committee composed of Government officials, KHNP, Korea Radioactive Waste Management Corporation and experts in finance and accounting, LILW-related management costs were increased while charges for spent-fuel remained the same. The change in LILW-related management costs caused an increase in KHNP's expenses relating to radioactive waste.

All of KHNP's nuclear plants are currently in compliance with Korean law and regulations and the safety standards of the IAEA in all material respects. For a description of certain past incidents relating to quality assurance in respect of KHNP, see Item 3.D. "Risk Factors−Our risk management policies and procedures may not be fully effective at all times."

**Decommissioning**

Decommissioning of a nuclear power unit is the process whereby the unit is shut down at the end of its life, the fuel is removed and the unit is eventually dismantled. KHNP implements a dismantling policy under which dismantling would take place five to ten years after the unit's closure. KHNP renewed the operating license of Kori #1, the first nuclear power plant constructed in Korea, which commenced operation in 1978, for an additional ten years in 2007. At the recommendation of the Ministry of Trade, Industry and Energy, KHNP has decided not to renew the operating license of Kori #1 and the initial phase of decommissioning (namely, safety inspection and removal of spent fuels) of Kori #1 has begun after its permanent shutdown in June 2017. In February 2015, KHNP also renewed the operation license of Wolsong #1 (which originally expired in November 2012) for an additional ten years until 2022. In June 2015, reactivation of Wolsong #1 was approved by the NSSC after periodic inspection. However, a civic group has since then brought a lawsuit to reverse such approval, and in February 2017, a lower court ruled to annul the NSSC's approval, which ruling has since been appealed. At present, the outcome of this litigation remains uncertain. It is also reported that by the first half of 2018, the Government will announce the timing for the shutdown of the Wolsong #1 unit. As of December 31, 2017, The book value of property, plant and equipment and provision for decommissioning costs of Wolsong #1 unit is Won 608 billion and Won 642 billion, respectively. If Wolsong #1 unit is prohibited from operation, we may incur significant losses in connection with the property, plant and equipment of Wolsong #1 unit. In addition, the amount of provision for decommissioning expenses may increase significantly, and the timing of actual cash outflows may be accelerated. KHNP retains full financial and operational responsibility for decommissioning its units.

KHNP has accumulated decommissioning costs as a liability since 1983. The decommissioning costs of nuclear facilities are defined by the Radioactive-Waste Management Act, which requires KHNP to credit annual appropriations separately. These costs are estimated based on studies conducted by the relevant committees, and are reviewed by the Ministry of Trade, Industry and Energy every two years. In 2017, due to decreased actual discount rates and the increased decommissioning cost per unit, the total amount of allowances increased as of December 31, 2017, and, as a result, KHNP was required to accrue Won 15,864 billion for the costs of dismantling and decontaminating existing nuclear power plants as of December 31, 2017, which consisted of dismantling costs of nuclear plants of Won 13,007 billion and dismantling costs of spent fuel and radioactive waste of Won 2,856 billion. For accounting treatment of decommissioning costs, see Item 5.A. "Operating Results−Critical Accounting Policies−Decommissioning Costs."

**Overseas Activities**

We are engaged in a number of overseas activities. We believe that such activities help us diversify our revenue streams by leveraging the operational experience of us and our subsidiaries gathered from providing a full range of services, such as power plant construction and specialized engineering and maintenance services in Korea, as well as establishing strategic relationships with countries that are or may become providers of fuels.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Throughout the years, we have sought to expand our project portfolio to include the construction and operation of conventional thermal generation units, nuclear generation units and renewable energy power plants, transmission and distribution and mining and development of fuel sources. While strategically important, we believe that our overseas activities, as currently being conducted, are not in the aggregate significant in terms of scope or amount compared to our domestic activities. In addition, a number of the overseas contracts currently being pursued are based on non-binding memoranda of understanding and the details of such projects may significantly change during the course of negotiating the definitive agreements.

Below is a description of our major overseas projects.

### Generation projects

#### Nuclear Generation Project

In December 2009, following an international open bidding process, we entered into a prime contract for the original contract amount of US$18.6 billion with the Emirates Nuclear Energy Corporation (the "ENEC"), a state-owned nuclear energy provider of the United Arab Emirates ("UAE"), to design and construct four civil nuclear power generation units to be located in Barakah, a region approximately 270 kilometers from Abu Dhabi, for the UAE's peaceful nuclear energy program. Under the contract, we and our subcontractors, some of which are our subsidiaries, are to perform various duties including, among others, designing and constructing four nuclear power generation units each with a capacity of 1,400 megawatts, supplying nuclear fuel for three fuel cycles including initial loading, with each cycle currently projected to last for approximately 18 months, and providing technical support, training and education related to plant operation. In connection with the parties' execution of an amendment to the prime contract, the target completion dates for the four units were amended to range between December 2018 and December 2020.

On October 20, 2016, in order to foster a long-term strategic partnership and stable management of the units post-construction we entered into an investment agreement with ENEC to jointly establish Barakah One PJSC, a special purpose company which will oversee the operation and management of the nuclear power plant currently being constructed in Barakah, United Arab Emirates. Barakah One PJSC will be capitalized with loans in the amount of US$19.6 billion and equity of US$4.7 billion. We have a 18% equity interest in Barakah One PJSC, which will oversee the project. We also have a 18% equity interest in Nawah Energy, a subsidiary of ENEC, which will also be responsible for the operation and maintenance of the Barakah nuclear power plant.

#### Non-nuclear Generation Projects

We are currently engaged in three major power projects in the Philippines: (i) a "build, operate and transfer" of a 1,200-megawatt combined-cycle power plant project in Ilijan, construction of which began in November 1997 and was completed in June 2002 and which is being operated by us until 2022 (the project cost of the Ilijan project was US$721 million, for which project finance on a limited recourse basis was provided), (ii) ownership of a 39.6% equity interest in SPC Power Corporation, an independent power producer which owns a 107.8-megawatt diesel power plant and a 39.6% equity interest in two distribution companies in the Philippines, and (iii) a "build, operate and own" of a 200-megawatt CFBC coal power plant in Cebu for which construction began in February 2008 and was completed in May 2011, followed by operation thereof until 2036. The project cost of the Cebu project was US$451 million, for which project financing on a limited recourse basis was provided.

In April 2007, we formed a limited partnership with Shanxi International Electricity Group and Deutsche Bank in China to develop and operate power projects and coal mines in Shanxi province, China, which was approved by the Chinese government. The total capital investment in these projects amounted to US$1.33 billion, of which our capital investment was US$450 million. We are expected to participate in the operation of the project for a period of 50 years ending 2057. The total installed capacity of these projects is 6,532 megawatts and capacity under construction was 2,603 megawatts, and our equity interest in the partnership was 34%.

68

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

In October 2007, we invested US$9.1 million in KEPCO Energy Resource Nigeria Ltd. ("KERNL"), a joint venture with Energy Resource Ltd., a Nigerian company. In May 2007, KERNL entered into a share purchase agreement with the Nigerian government for the purchase of 70% of the equity capital of Egbin Power Plc in Nigeria, which owns and operates the Egbin power plant, a 1,320-megawatt gas-fired power plant in Lagos, Nigeria for a consideration of approximately US$407 million. The acquisition was completed in October 2013, and in June 2013, we entered into a contract with Egbin Power Plc for the operation and maintenance of the Egbin power plant. The contract price was US$315 million and we provided operation and maintenance services to Egbin Power Plc between November 2013 and February 2016. The contract with Egbin Power Plc was terminated in December 2017 due to a force majeure event.

In July 2008, a consortium consisting of us and Xenel of Saudi Arabia won the bid to "build, own and operate" a gas-fired power plant with installed capacity of 373 megawatts in Al Qatrana, near Amman, and we entered into definitive agreements in October 2009. Construction of this project was completed in December 2011, and the plant is currently in operation and will be operated until 2035. The total project cost was US$461 million, of which the consortium made an equity contribution of US$143 million and the remainder was funded with debt financing. We and Xenel own 80:20 equity interests in the project, respectively.

In December 2008, we formed a consortium with ACWA Power International of Saudi Arabia and submitted a bid for the 1,204 megawatt oil-fired power project in Rabigh, Saudi Arabia. In March 2009, we were selected as the preferred bidder, and in July 2009, we entered into a power purchase agreement with Saudi Electricity Company. Construction of the project was completed in April 2013, and we will participate in the operation of the plant for 20 years. The total project cost was approximately US$2.5 billion. We currently hold a 40.0% equity interest in the joint venture entity, Rabigh Electricity Company, which operates the project.

In August 2010, a consortium led by us was selected as the preferred bidder in an international auction for the construction and operation of the Norte II gas-fueled combined-cycle electricity generation facility in Chihuahua, Mexico, as ordered by the Commission Federal de Electricidad ("CFE") of Mexico. The consortium established a special purpose vehicle, KST Electric Power Company ("KST"), to act as the operating entity, and in September 2010, KST entered into a power purchase agreement with CFE in relation to the construction and operation of a 433-megawatt combined-cycle power plant at Chihuahua in Mexico. In October 2010, KST was licensed by the Mexican government as an independent power producer, which allows it to produce and sell electricity to CFE during the specified contract period. The project will be undertaken on a "build, own and operate" basis. The total cost of the project is approximately US$430 million. We hold a 56% equity interest in the consortium, with the remaining equity interests held by Samsung C&T (with a 34% equity interest) and Techint, a Mexico company (with a 10% equity interest). Approximately 22.5% of the total project costs is being financed through equity investments by the consortium and the remaining 77.5% through project financing. Commercial operation commenced in December 2013, and the operation period will run for 25 years until 2038. Our wholly-owned subsidiary, KEPCO Energy Service Company, currently manages the operation of the project.

In October 2010, a consortium including us was selected by Abu Dhabi Water & Electricity Authority ("ADWEA"), a state-run utilities provider in the UAE, as the preferred bidder in an international bidding for the construction and operation of the combined-cycle natural gas-fired electricity generation facilities in Shuweihat, UAE with aggregate capacity of 1,600 megawatts. Construction was completed in July 2014 and we will participate in the operation of the plant until 2039. The total project cost was approximately US$1.4 billion, of which 20% was financed through equity investments by the consortium members and the remaining 80% through debt financing. Equity interests in the consortium are owned by ADWEA (60.0%), Sumitomo (20.4%) and us (19.6%). The total amount of our equity investment in the project is approximately US$56 million.

In January 2012, a consortium consisting of us, Mitsubishi Corporation and Wartsila Development & Financial Services of Finland was selected by National Electric Power Corporation, a state-run electricity

69

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

provider in Jordan, to construct and operate a diesel engine power project in Almanakher with an expected total generation capacity of 573 megawatts. Construction of this project was completed in October 2014 and the plant is currently in operation and will be operated until 2039. The total project cost was approximately US$760 million, of which the consortium made an equity contribution of approximately US$190 million and the remainder was funded with debt financing. We, Mitsubishi Corporation and Wartsila Development & Financial Services own 60:35:5 equity interests in the project, respectively. Our equity investment in this project is US$104 million.

In March 2013, a consortium consisting of us and Marubeni, a Japanese corporation, was selected by the Ministry of Industry and Trade of Vietnam for the construction and operation of a 1,200 megawatt coal-fired power plant in Thanh Hoa province, Vietnam. We plan to commence construction in June 2018 with target completion by June 2022, followed by operation for 25 years. The total project cost is expected to be US$2.51 billion, of which 25% will be funded by equity contribution and the remaining 75% by debt financing. The share capital of the special purpose entity in charge of this project is US$590 million, and we and Marubeni each hold 50% equity interest in such entity.

On October 6, 2016, a consortium comprised of us, Marubeni Corporation and four local entities, with equity interest in the consortium of 24.5%, 24.5% and 51.0%, respectively, was notified that it has been selected by the Republic of South Africa Department of Energy as the preferred bidder for the construction and operation project of a coal-fired power plant in the Republic of South Africa. Once negotiations and financing arrangements are completed, the construction of the coal-fired power plant is expected to commence. The plant is expected to have an aggregate capacity of 630 megawatts, and construction is expected to take 52 months beginning in November 2018. The consortium plans to participate in the operation of the plant for a period of 30 years ending 2053. The total cost of the project is estimated to be around US$2.14 billion, of which our total capital investment is expected to be approximately US$133 million. In connection with the project, we plan to establish a holding company and a project company in the Republic of South Africa.

On September 28, 2017, we entered into a joint development agreement with Tadmax Resources Bhd, a Malaysian corporation, in relation to a gas-fired power plant with capacity of 1,200 megawatts in Pulau Indah, Malaysia. We obtained approval for this project from Malaysian Energy Commission, the project sponsor. We will hold a 25% equity interest in this project, and Tadmax Resources Bhd will hold a 75% equity interest in it. The total project cost is expected to be approximately US$1 billion, and we expect to invest approximately US$50 million for the equity interest. Upon closing of the financing, the construction for this project will begin in the fourth quarter of 2019, following the approval of the applicable tariff rates by the Malaysian Energy Commission, which is currently expected to occur in the fourth quarter of 2018. This project marks our first entry into the Malaysian power generation market. We expect to enter into a power purchase agreement with Tenaga Nasional Berhad for a term of 21 years, with a goal of generating a stable revenue stream from this project.

*Exploration and Production Projects*

In order to secure a more reliable supply of fuel for power generation and hedge against fluctuations in fuel price, from 2007 to 2016, we pursued overseas exploration and production projects, including five bituminous coal projects and five uranium projects involving investments of approximately Won 1.6 trillion. However, pursuant to the Government's Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced in June 2016, as of December 31, 2016, except for the Bylong project described below, we transferred all our assets and liabilities for our overseas resource business to our six generation subsidiaries, which are the end-consumers of fuels and are therefore expected to more responsively manage these projects. The amount of net assets that we transferred to our generation subsidiaries as of December 31, 2016 was Won 622 billion.

Some of the assets transferred include our equity interest in PT Adaro Energy TBK, which is one of the largest coal producers in Indonesia, as well as our 20% equity interest in PT. Bayan Resources Tbk pursuant to which we were entitled to an off-take of 7 million tons per year beginning in 2015.

70

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

One exception to the transfers on such date was our 90% equity interest in KEPCO Bylong Pty Ltd., for which we are currently processing a development permit from the New South Wales government and commercial production is scheduled to commence in 2019. We transferred 10% of our equity interest in the Bylong project to our five non-nuclear generation subsidiaries as of December 31, 2016, and we plan to gradually transfer the remainder of our interest in the Bylong project to them subject to the progress of the regulatory approval process and resource development phase of the project.

Our nuclear generation subsidiary, KHNP, is also pursuing development projects for procurements of uranium in countries including Canada, the United States and Niger.

*Renewable Energy Projects*

Our overseas renewable energy projects include the generation of electricity through renewable energy sources.

Since 2005, joint ventures between us and China Datang Corporation of the People's Republic of China have built and operated a number of wind farms in Inner Mongolia, Liaoning and Gansu provinces. We own 40% of these joint ventures, whose equity in the aggregate amount is approximately US$600 million. The projects are funded one-third by equity contributions and two-thirds by debt financing. As of December 31, 2017, the joint venture operated 22 wind farms with a total capacity of 1,017 megawatts and added 7-megawatt photovoltaic power station to the grid.

In December 2015, we entered into an agreement with the Ministry of Energy and Mineral Resources of Jordan to build, own and operate a wind farm with installed capacity of 89.1 megawatts in Fujeij, Ma'an, Jordan. Construction is currently underway with commercial operations expected to commence in October 2018. Total project cost is approximately US$184 million, of which 40% will be financed through equity investments by us and the remaining 60% through debt financing. We believe that this project will help us to further diversify our business portfolio in the Middle East from the existing focus on nuclear and thermal power plants to expand to renewable energy facilities.

In June 2015, we entered into a memorandum of understanding with Energy Product, a Japanese local developer, to build, own and operate photovoltaic power station with a capacity of 28 megawatts, together with a 13.7 megawatts-hour energy storage system, in Chitose, Hokkaido prefecture in Japan. The parties subsequently signed the joint development agreement and other definitive agreements. The power station, in which we own 80.1% interest, started commercial operation in July 2017. Total project cost is approximately JPY 11.3 billion, of which 20% was financed through 80:20 equity investments by us and EP. The remaining 80% is funded through debt financing.

In August 2016, we entered into a Purchase and Sale Agreement with Cogentrix Solar Holdings to operate a photovoltaic power station in Colorado, United States, with a capacity of 30 megawatts for 25 years. Total project cost is approximately US$85 million, of which 50.1% was financed through 50.1:49.9 equity investments by us and a private equity fund formed by us and National Pension Service. It was our first foray into the North American power market.

In June 2017, a consortium between us and LG CNS Co., Ltd. won a project to build, own and operate a photovoltaic power station in Guam, United States, with a capacity of 60 megawatts for 25 years, including 32 megawatts-hour energy storage system. The total project cost is approximately US$200 million, of which 23% will be financed through equity investment by us and LG CNS Co., Ltd., each holding 70% and 30% of equity interests, respectively, and the remaining 77% will be funded through debt financing. The consortium is expected to enter into a definite agreement with Guam Power Authority in the first half of 2018 and the construction of the project is expected to start by the second half of 2018. It is expected the power station will begin commercial operation by April 2021.

71

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Although renewable energy projects are currently insignificant as a proportion of our total overseas activities and our generation activities, we expect the portion of renewable energy projects to increase in the future as we seek to penetrate the overseas renewable energy market, diversify our businesses and actively address climate change. We expect to further diversify our business in the renewable energy sector to also include smart transmission and distribution facilities, smart grids and utilization of new energy related technologies.

**North Korea**

*Kaesong Complex*

Since 2005, we have provided electricity to the industrial complex located in Kaesong, North Korea, which was established pursuant to an agreement made during the summit meeting of the two Koreas in June 2000. The Kaesong complex is the largest economic project between the two Koreas and is designed to combine the Republic`s capital and entrepreneurial expertise with the availability of land and labor of North Korea. In March 2005, we built a 22.9 kilovolt distribution line from Munsan substation in Paju, Gyeonggi Province to the Kaesong complex and became the first to supply electricity to pilot zones such as ShinWon Ebenezer. In April 2006, we started to construct a 154 kilovolt, 16 kilometer transmission line connecting Munsan substation to the Kaesong complex as well as Pyunghwa substation in the complex and began operations in May 2007.

At the end of 2015, we supplied electricity to 254 units, including administrative agencies, support facilities and resident corporations, using a tariff structure identical to that of South Korea. However, we suspended power transmission to the Kaesong Industrial Complex since February 11, 2016 following the Government`s decision to halt operations of the industrial complex to impede North Korea`s utilization of funds from the industrial complex to finance its nuclear and missile programs. As of December 31, 2017, the book value of our facility located at the complex was Won 19 billion. For the year ended December 31, 2017, the amount of trade receivables from the companies residing in Kaesong complex was Won 3 billion. It is currently uncertain if we can exercise the property rights for our facility in the Kaesong complex. No assurance can be given that we will not experience any material losses as a result of the suspension of this project or failure of the project as a result of a breakdown or escalation of hostilities in the relationship between the Republic and North Korea. See Item 3.D. "Risk Factors–Risks Relating to Korea and the Global Economy–Tensions with North Korea could have an adverse effect on us and the market value of our shares."

**Insurance**

We and our generation subsidiaries carry insurance covering against certain risks, including fire, in respect of key assets, including buildings, equipment, machinery, construction-in-progress and procurement in transit, as well as, in the case of us, directors` and officers` liability insurance. We and our generation subsidiaries maintain casualty and liability insurance against risks related to our business to the extent we consider appropriate. Other than KHNP, neither we nor our generation subsidiaries separately insure against terrorist attacks. These insurance and indemnity policies, however, cover only a portion of the assets that we own and operate and do not cover all types or amounts of loss that could arise in connection with the ownership and operation of these assets.

Substantial liability may result from the operations of our nuclear generation units, the use and handling of nuclear fuel and possible radioactive emissions associated with such nuclear fuel. KHNP maintains property and liability insurance against risks of its business to the extent required by the related law and regulations or considered as appropriate and otherwise self-insures against such risks. KHNP carries insurance for its generation units against certain risks, including property damage, nuclear fuel transportation and liability insurance for personal injury and property damage. KHNP carries property damage insurance covering up to US$1 billion per accident for all properties within its plant complexes, which includes property insurance coverage for acts of terrorism up to US$300 million and for breakdown of machinery up to US$300 million. In addition to the insurance on operating nuclear power generation units, KHNP has construction insurance for

72

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

Shin-Kori #4, #5 and #6 and Shin-Hanul #1 and #2. KHNP maintains nuclear liability insurance for personal injury and third-party property damage for coverage of up to 300 million Special Drawing Rights, or SDRs, which amounts to approximately US$435 million, at the rate of 1 SDR = US$1.450660 as posted on the Internet homepage of the International Monetary Fund on April 9, 2018 per plant complex, for a total coverage of 1.5 billion SDRs. KHNP is also the beneficiary of a Government indemnity with respect to such risks for damage claims of up to Won 300 million SDRs per nuclear plant complex, for a total coverage of 1.5 billion SDRs. Under the Nuclear Damage Compensation Act of 1969, as amended, KHNP is liable only up to 300 million SDRs, per single accident per plant complex; provided that such limitation will not apply where KHNP intentionally causes harm or knowingly fails to prevent the harm from occurring. KHNP will receive the Government's support, subject to the approval of the National Assembly, if (i) the damages exceed the insurance coverage amount of 300 million SDRs and (ii) the Government deems such support to be necessary for the purposes of protecting damaged persons and supporting the development of nuclear energy business. KHNP carries insurance for its generation units and nuclear fuel transportation, and we believe that the level of insurance is generally adequate and is in compliance with relevant laws and regulations. In addition, KHNP is the beneficiary of Government indemnity which covers a portion of liability in excess of the insurance. However, such insurance is limited in terms of amount and scope of coverage and does not cover all types or amounts of losses which could arise in connection with the ownership and operation of nuclear plants. Accordingly, material adverse financial consequences could result from a serious accident or a natural disaster to the extent it is neither insured nor covered by the government indemnity. See Item 3.D. "Risk Factors–Risks Relating to KEPCO–The amount and scope of coverage of our insurance are limited."

**Competition**

As of December 31, 2017, we and our generation subsidiaries owned approximately 70.3% of the total electricity generation capacity in Korea (excluding plants generating electricity for private or emergency use). New entrants to the electricity business will erode our market share and create significant competition, which could have a material adverse impact on our financial condition and results of operations.

In particular, we compete with independent power producers with respect to electricity generation. The independent power producers accounted for 22.9% of total power generation in 2017 and 29.7% of total generation capacity as of December 31, 2017. As of December 31, 2017, there were 17 independent power producers in Korea, excluding renewable energy producers. Private enterprises became permitted to own and operate coal-fired power plants in Korea only after the Ministry of Trade, Industry and Energy approved plans for independent power producers to construct coal-fired power plants under the Sixth Basic Plan announced in February 2013. Under the Eighth Basic Plan announced in December 2017, six coal-fired units under construction with aggregate generation capacity of 6,260 megawatts are scheduled to be completed between 2021 and 2022. While it remains to be seen whether construction of these generation units will be completed as scheduled, if these units were to be completed as scheduled and/or independent power producers are permitted to build additional generation capacity (whether coal-fired or not), our market share in Korea may decrease, which may have a material adverse effect on our results of operations and financial condition.

In addition, under the Community Energy System adopted by the Government in 2004, a minimal amount of electricity is supplied directly to consumers on a localized basis by independent power producers outside the cost-based pool system used by our generation subsidiaries and most independent power producers to distribute electricity nationwide. The purpose of this system is to geographically decentralize electricity supply and thereby reduce transmission losses and improve the efficiency of energy use. These entities do not supply electricity on a national level but are licensed to supply electricity on a limited basis to their respective districts under the Community Energy System. As of March 31, 2018, the aggregate generation capacity of suppliers participating in the Community Energy System amounted to less than 1% of that of our generation subsidiaries in the aggregate. We currently do not expect the Community Energy System to be widely adopted, especially in light of the significant level of capital expenditure required for such direct supply. However, if the Community Energy System is widely adopted, it may erode our currently dominant market position in the generation and distribution

73

Table of Contents

of electricity in Korea and may have a material adverse effect on our business, results of operations and financial condition.

Our market dominance in the electricity distribution in Korea also may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows.

The electric power industry, which began its liberalization process with the establishment of our power generation subsidiaries in April 2001, may become further liberalized in accordance with the Restructuring Plan. See Item 4.B. "Business Overview–Restructuring of the Electric Power Industry in Korea."

In the residential sector, consumers may use natural gas, oil and coal for space and water heating and cooking. However, currently there is no practical substitute for electricity for lighting and other household appliances, which is available on commercially affordable terms.

In the commercial sector, electricity is the dominant energy source for lighting, office equipment and air conditioning. For its other uses, such as space and water heating, natural gas and, to a lesser extent, oil, provide competitive alternatives to electricity.

In the industrial sector, electricity is the dominant energy source for a number of industrial applications, including lighting and power for many types of industrial machinery and processes that are available on commercially affordable terms. For other uses, such as heating, electricity competes with oil and natural gas and potentially with gas-fired combined heating and power plants.

Regulation

We are a statutory juridical corporation established under the KEPCO Act for the purpose of ensuring a stable supply of electric power and further contributing toward the sound development of the national economy through facilitating development of electric power resources and carrying out proper and effective operation of the electricity business. The KEPCO Act (including the amendment thereto) prescribes that we engage in the following activities:

1.  development of electric power resources;

2.  generation, transmission, transformation and distribution of electricity and other related business activities;

3.  research and development of technology related to the businesses mentioned in items 1 and 2;

4.  overseas businesses related to the businesses mentioned in items 1 through 3;

5.  investments or contributions related to the businesses mentioned in items 1 through 4;

6.  businesses incidental to items 1 through 5;

7.  Development and operation of certain real estate held by us to the extent that:

    a.  it is necessary to develop certain real estate held by us due to external factors, such as relocation, consolidation, conversion to indoor or underground facilities or deterioration of our substation or office; or

74

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

b.   it is necessary to develop certain real estate held by us to accommodate development of relevant real estate due to such real estate being incorporated into or being adjacent to an area under planned urban development; and

8.   other activities entrusted by the Government.

The KEPCO Act currently requires that our profits be applied in the following order of priority:

☐   first, to make up any accumulated deficit;

☐   second, to set aside 20.0% or more of profits as a legal reserve until the accumulated reserve reaches one-half of our capital;

☐   third, to pay dividends to shareholders;

☐   fourth, to set aside a reserve for expansion of our business;

☐   fifth, to set aside a voluntary reserve for the equalization of dividends; and

☐   sixth, to carry forward surplus profit.

As of December 31, 2017, the legal reserve was Won 1,605 billion and the voluntary reserve was Won 34,834 billion, which consisted of reserve for business expansion of Won 29,017 billion, reserve for investment in social overhead capital of Won 5,277 billion, reserve for research and human development of Won 330 billion and reserve for equalizing dividends of Won 210 billion.

We are under the supervision of the Ministry of Trade, Industry and Energy, which has principal supervisory responsibility (in consultation with other Government agencies, such as the Ministry of Strategy and Finance, as applicable) over us with respect to the appointments of our directors and our other senior management as well as approval of electricity tariff rate adjustments, among others.

Because the Government owns part of our capital stock, the Government's Board of Audit and Inspection may audit our books.

The Electricity Business Act requires that licenses be obtained in relation to generation, transmission, distribution and sales of electricity, with limited exceptions. We hold the license to generate, transmit, distribute and sell electricity. Each of our six generation subsidiaries holds an electricity generation license. The Electricity Business Act governs the formulation and approval of electricity rates in Korea. See "–Sales and Customers–Electricity Rates" above.

Our operations are subject to various laws and regulations relating to environmental protection and safety.

**Debt Reduction Program and Related Activities**

In 2014, in light of the general policy guideline of the Government for public institutions (including us and our generation subsidiaries) to reduce their respective overall debt levels, we and our generation subsidiaries have, in consultation with the Ministry of Trade, Industry and Energy and as approved by the Public Agencies Operating Committee in June 2014, previously set for 2017 target debt-to-equity levels and undertook various programs to reduce debt and improve the overall financial health, including through rationalizing and applying stricter review to (from a profitability and efficiency perspective) various aspects of our operations (both domestic and overseas), inviting private sector investments, disposing of non-core assets (such as non-core or loss-generating overseas operations and real property unrelated to operations), reducing costs, exploring alternative ways to generate additional revenue and developing contingency plans for further cost savings. Such debt-reduction initiatives ended at the end of 2017 as initially planned. However, we plan to continue carry out similar initiatives to manage our level of debt.

75

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The following table summarizes the debt-to-equity ratio targets for 2017 and some of the actions that we and our generation subsidiaries undertook as part of such debt reduction program.

| Entity | Target Debt-to-Equity Level[1] | Actual Debt-to-Equity Level[1] | Other Related Activities |
|---|---|---|---|
| KEPCO | 96% by 2017 | 89.9% as of December 31, 2016; 91.0% as of December 31, 2017 | - Sale of non-core assets (real property) unrelated to operations<br>- Sale of its overseas resource development assets to its generation subsidiaries |
| KHNP | 117% by 2017 | 108% as of December 31, 2016; 114% as of December 31, 2017 | - Stricter review of new business projects<br>- Rationalization of the procurement process and other budget reduction efforts |
| EWP | 99% by 2017 | 101% as of December 31, 2016; 92.8% as of December 31, 2017 | - Proposed sale of shares in GS Donghae Electric Power Co., Ltd. and six other domestic and overseas companies |
| KOMIPO | 167% by 2017 | 152% as of December 31, 2016; 168% as of December 31, 2017 | - Construction project coordination<br>- Cost savings and other efficiency improvement efforts |
| KOSEP | 110% by 2017 | 101% as of December 31, 2016; 99.9% as of December 31, 2017 | - Cost savings and budget reduction efforts<br>- Discovering new business profit models |
| KOSPO | 139% by 2017 | 139% as of December 31, 2016; 135% as of December 31, 2017 | - Proposed sale of shares in domestic business that yield no revenues |
| KOWEPO | 149% by 2017 | 150% as of December 31, 2016; 148% as of December 31, 2017 | - Proposed sale of equity interests in Dongducheon Dream Power<br>- Obtaining private sector investment in Pyeongtaek combined cycle #3<br>- Accelerated construction of generation units |

*Note:*

(1)     Computed on a separate basis for KEPCO, EWP, and KOSPO.

Despite our best efforts, however, for reasons beyond our control, including macroeconomic environments, government regulations and market forces (such as international market prices for our fuels), we cannot assure whether we or our generation subsidiaries will be able to successfully reduce debt burdens or otherwise improve our financial health to a level contemplated by the Government or to a level that would be optimal for our capital structure. If we or our generation subsidiaries fail to do so or the measures taken by us or our generation subsidiaries to reduce debt levels or improve financial health have unintended adverse consequences, such developments may have an adverse effect on our business, results of operations and financial condition.

76

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Proposed Sale of Certain Power Plants and Equity Interests**

The following table summarizes our current plans for sale of certain of our assets. These sales will be made pursuant to the Government's plans to reduce debt levels and improve management efficiency of public enterprises. The consummation of these plans, however, is subject to, among others, related Government policies and market conditions.

| Equity Holdings | Primary Business | Fair Value(1) as of December 31, 2017 (in billions of Won) | Ownership Percentage as of December 31, 2017 | Ownership Percentage to be Sold |
|---|---|---|---|---|
| KEPCO Engineering & Construction Co., Inc. | Architectural engineering for utility plants | 598 | 65.77 | 14.77 |
| Korea Electric Power Industrial Development Co., Ltd. | Electricity metering | 39 | 29.00 | 29.00 |

*Note:*

(1)    Fair value has been computed as the product of the closing share price on December 31, 2017 multiplied by the number of shares owned by KEPCO.

*KEPCO Engineering & Construction Co., Inc.*

Pursuant to the Third Phase of the Public Institution Reform Plan announced by the Government in August 2008, we conducted the initial public offering of Korea Engineering and Construction Co., Inc., or KEPCO E&C formerly known as Korea Power Engineering Co., Ltd., in December 2009 for gross proceeds to us of Won 165 billion, following which we owned 77.9% of KEPCO E&C's shares. In furtherance of the Public Institution Reform Plan and to improve our financial profile, we sold our equity interests representing 3.1%, 4.0%, 4.5% and 0.54% of KEPCO E&C shares in November 2011, December 2013, December 2014 and December 2016, respectively, in each case to third party investors. We currently hold a 65.77% equity interest in KEPCO E&C.

*Korea Electric Power Industrial Development Co., Ltd.*

In 2003, we privatized Korea Electric Power Industrial Development, or KEPID, formerly our wholly-owned subsidiary, by selling 51.0% of its equity interest to Korea Freedom Federation. Pursuant to the Fifth Phase of the Public Institution Reform Plan announced by the Government in 2009, we sold 20% of the KEPID shares through additional listing. We currently plan to sell the remaining 29.0% of KEPID's equity interest based on, among others, considerations of economic and market conditions.

**Item 4.C.    Organizational Structure**

As of December 31, 2017, we had 100 subsidiaries, 56 associates and 45 joint ventures (not including any special purpose entities).

**Subsidiaries**

Our wholly-owned six generation subsidiaries are KHNP, KOSEP, KOMIPO, KOWEPO, KOSPO and EWP. Our non-generation subsidiaries include KEPCO E&C, KEPCO KPS, KEPCO NF, and KEPCO KDN. For a full list of our subsidiaries, including foreign subsidiaries, and their respective jurisdiction of incorporation, please see Exhibit 8.1 attached to this annual report.

**Associates and Joint Ventures**

An associate is an entity over which we have significant influence and that is neither a subsidiary nor a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

investee but does not have control or joint control over those policies. A joint venture is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint ventures) have rights to the net assets of the arrangement.

The table below sets forth each of our associates and joint ventures as of December 31, 2017 by name, the percentage of our shareholdings and their principal activities.

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| **Associates:** | | |
| Korea Gas Corporation[1] | 20 | Importing and wholesaling LNG |
| Korea Electric Power Industrial Development Co., Ltd. | 29 | Electricity metering and others |
| YTN Co., Ltd. | 21 | Broadcasting |
| Cheongna Energy Co., Ltd. | 44 | Generating and distributing vapor and hot/cold water |
| Gangwon Wind Power Co., Ltd.[2] | 15 | Power generation |
| Hyundai Green Power Co., Ltd. | 29 | Power generation |
| Korea Power Exchange[5] | 100 | Management of power market and others |
| AMEC Partners Korea Ltd.[3] | 19 | Resources development |
| Hyundai Energy Co., Ltd.[8] | 31 | Power generation |
| Ecollite Co., Ltd. | 36 | Artificial light-weight aggregate |
| Taebaek Wind Power Co., Ltd. | 25 | Power generation |
| Taeback Guinemi Wind Power Co., Ltd. | 25 | Power generation |
| Pyeongchang Wind Power Co., Ltd. | 25 | Power generation |
| Daeryun Power Co., Ltd.[3, 9] | 13 | Power generation |
| Changjuk Wind Power Co., Ltd. | 30 | Power generation |
| KNH Solar Co., Ltd. | 27 | Power generation |
| SPC Power Corporation | 38 | Power generation |
| Gemeng International Energy Co., Ltd. | 34 | Power generation |
| PT. Cirebon Electric Power | 28 | Power generation |
| KNOC Nigerian East Oil Co., Ltd.[4] | 15 | Resources development |
| KNOC Nigerian West Oil Co., Ltd.[4] | 15 | Resources development |
| PT Wampu Electric Power | 46 | Power generation |
| PT. Bayan Resources TBK | 20 | Resources development |
| S-Power Co., Ltd. | 49 | Power generation |
| Pioneer Gas Power Limited[7] | 39 | Power generation |
| Eurasia Energy Holdings | 40 | Power generation and resources development |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | 25 | Power generation |
| Hadong Mineral Fiber Co., Ltd.[3] | 8 | Recycling fly ashes |
| Green Biomass Co., Ltd.[11, 14] | 9 | Power generation |
| PT. Mutiara Jawa | 29 | Manufacturing and operating floating coal terminal |
| Samcheok Eco Materials Co., Ltd.[10] | 2 | Recycling fly ashes |
| Noeul Green Energy Co., Ltd. | 29 | Power generation |
| Naepo Green Energy Co., Ltd. | 42 | Power generation |
| Goseong Green Energy Co., Ltd.[2] | 1 | Power generation |
| Gangneung Eco Power Co., Ltd.[2] | 2 | Power generation |
| Shin Pyeongtaek Power Co., Ltd. | 40 | Power generation |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | 28 | Power generation |
| Dongducheon Dream Power Co., Ltd. | 34 | Power generation |
| Jinbhuvish Power Generation Pvt. Ltd.[2] | 5 | Power generation |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| SE Green Energy Co., Ltd. | 48 | Power generation |
| Daegu Photovoltaic Co., Ltd. | 29 | Power generation |
| Jeongam Wind Power Co., Ltd. | 40 | Power generation |
| Korea Power Engineering Service Co., Ltd. | 29 | Construction and service |
| Busan Green Energy Co., Ltd. | 29 | Power generation |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.)(2) | 19 | Power generation |
| Korea Electric Vehicle Charging Service | 28 | Electric vehicle charge service |
| Ulleungdo Natural Energy Co., Ltd. | 30 | Renewable power generation |
| Korea Nuclear Partners Co., Ltd. | 29 | Electric material agency |
| Tamra Offshore Wind Power Co., Ltd. | 27 | Power generation |
| Korea Electric Power Corporation Fund(12) | 98 | Developing electric enterprises |
| Energy Infra Asset Management Co., Ltd.(3) | 10 | Asset management |
| Daegu clean Energy Co., Ltd. | 28 | Renewable power generation |
| YaksuESS Co., Ltd | 29 | Installing ESS related equipment |
| Nepal Water & Energy Development Company Private Limited(15) | 62 | Construction and operation of utility plant |
| Gwangyang Green Energy Co., Ltd. | 20 | Power generation |
| PND solar., Ltd | 29 | Power generation |
| **Joint Ventures:** | | |
| KEPCO-Uhde Inc.(6) | 53 | Power generation |
| Eco Biomass Energy Sdn. Bhd.(6) | 62 | Power generation |
| Datang Chaoyang Renewable Power Co., Ltd. | 40 | Power generation |
| Shuweihat Asia Power Investment B.V. | 49 | Holding company |
| Shuweihat Asia Operation & Maintenance Company(6) | 55 | Maintenance of utility plant |
| Waterbury Lake Uranium L.P. | 36 | Resources development |
| ASM-BG Investicii AD | 50 | Power generation |
| RES Technology AD | 50 | Power generation |
| KV Holdings, Inc. | 40 | Power generation |
| KEPCO SPC Power Corporation(6) | 75 | Construction and operation of utility plant |
| Gansu Datang Yumen Wind Power Co., Ltd. | 40 | Power generation |
| Datang Chifeng Renewable Power Co., Ltd. | 40 | Power generation |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | 40 | Power generation |
| Rabigh Electricity Company | 40 | Power generation |
| Rabigh Operation & Maintenance Company Limited | 40 | Maintenance of utility plant |
| Jamaica Public Service Company Limited | 40 | Power generation |
| KW Nuclear Components Co., Ltd. | 45 | Manufacturing |
| Busan Shinho Solar Power Co., Ltd. | 25 | Power generation |
| GS Donghae Electric Power Co., Ltd. | 34 | Power generation |
| Global Trade Of Power System Co., Ltd. | 29 | Exporting products and technology of small or medium business by proxy |
| Expressway Solar-light Power Generation Co., Ltd. | 29 | Power generation |
| KODE NOVUS I LLC | 50 | Power generation |
| KODE NOVUS II LLC | 50 | Power generation |
| Daejung Offshore Wind Power Co., Ltd. | 50 | Power generation |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| Amman Asia Electric Power Company[6] | 60 | Power generation |
| KAPES, Inc.[6] | 51 | R&D |
| Dangjin Eco Power Co., Ltd. | 34 | Power generation |
| Honam Wind Power Co., Ltd. | 29 | Power generation |
| Chun-cheon Energy Co., Ltd. | 30 | Power generation |
| Yeonggwangbaeksu Wind Power Co., Ltd.[3] | 15 | Power generation |
| Nghi Son 2 Power Ltd. | 50 | Power generation |
| Kelar S.A[6] | 65 | Power generation |
| PT. Tanjung Power Indonesia | 35 | Power generation |
| Incheon New Power Co., Ltd. | 29 | Power generation |
| Seokmun Energy Co., Ltd. | 29 | Power generation |
| Daehan Wind Power PSC | 50 | Power generation |
| Barakah One Company[13] | 18 | Power generation |
| Nawah Energy Company[13] | 18 | Operation of utility plant |
| MOMENTUM | 33 | International thermonuclear experimental reactor construction management |
| Daegu Green Power Co., Ltd. | 29 | Power generation |
| Yeonggwang Wind Power Co., Ltd. | 41 | Power generation |
| Chester Solar IV SpA[6] | 82 | Power generation |
| Chester Solar V SpA[6] | 82 | Power generation |
| Diego de Almagro Solar SpA | 82 | Power generation |
| South Jamaica Power Company Limited | 20 | Power generation |

Notes:

(1) The effective percentage of ownership (excluding the treasury stocks) is 21.57%.

(2) We can exercise significant influence by virtue of our contractual right to appoint directors to the board of directors of this entity, and by strict decision criteria of our financial and operating policy of the board of directors.

(3) We can exercise significant influence by virtue of our contractual right to appoint a director to the board of directors of this entity.

(4) We can exercise significant influence by virtue of our contractual right to appoint one out of four members of the steering committee of this entity. Moreover, we have significant financial transactions with this entity to the effect that we can exercise significant influence on this entity.

(5) The Government regulates our ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between the Korea Power Exchange and our other subsidiaries. We can exercise significant influence by our right to nominate directors to the board of directors of this entity.

(6) According to the shareholder agreement, all critical financial and operating decisions must be agreed to by all ownership parties. For these reasons, these entities are classified as joint ventures.

(7) The reporting period of all associates and joint ventures ends in December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.

(8) As of December 31, 2017, 15.64% of ownership of Hyundai Energy Co., Ltd. was held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only do we have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank upon a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to us. In connection with this agreement, we applied the equity method on our 46.30% equity investment in Hyundai Energy Co., Ltd.

(9) Following the merger of Daeryun Energy Co., Ltd. into Daeryun Power Co., Ltd., its parent, our effective percentage of ownership decreased to 19.45% after accounting for stock purchase options.

(10) Our effective percentage of ownership (excluding the redeemable convertible preferred shares) is 25.54%.

80

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(11)  Our effective percentage of ownership is less than 20%, but we can exercise significant influence by virtue of our contractual right to appoint a director to the board of directors of this entity and the fact that a dominant portion of the investee' s sales transactions is generated from us.

(12)  Our effective percentage of ownership is more than 50% but we do not hold control over relevant business while we exercise significant influence by participating in the Investment Decision Committee. For this reason, this entity is classified as an associate.

(13)  Our effective percentage of ownership is less than 20%, but we have joint control over this entity as decisions on the major activities require the unanimous consent of the parties that collectively control the entity.

(14)  The percentage of ownership decreased since we did not participate in the capital increase of Green Biomass Co., Ltd. during the period.

(15)  Our effective percentage of ownership is more than 50%, but we do not control this entity according to the shareholders' agreement. For this reason, this entity is classified as an associate.

### Item 4.D.    Property, Plant and Equipment

Our property consists mainly of power generation, transmission and distribution equipment and facilities in Korea. See Item 4.B. "Business Overview–Power Generation," "–Transmission and Distribution" and "–Capital Investment Program." In addition, we own our corporate headquarters building complex at 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea. As of December 31, 2017, the net book value of our property, plant and equipment was Won 150,882 billion. As of December 31, 2017, investment property, which is accounted for separately from our property, plant and equipment, amounted to Won 285 billion. No significant amount of our properties is leased. There are no material encumbrances on our properties, including power generation, transmission and distribution equipment and facilities.

Pursuant to a Government plan announced in 2005, which mandated relocation of the headquarters of select government-invested enterprises from the Seoul metropolitan area to other provinces in Korea as part of an initiative to foster balanced economic growth in the provinces, we, our generation subsidiaries and our certain subsidiaries relocated our respective headquarters to the designated locations during 2014 and 2015. Our headquarters are currently located in Naju in Jeollanam-do Province while the headquarters of our six generation subsidiaries and other subsidiaries are various cities outside of Seoul across Korea.

In connection with the relocation of our headquarters, in September 2014 we entered into an agreement to sell the property housing our prior headquarters to a consortium consisting of members of the Hyundai Motor group for Won 10,550 billion through an open bidding. The sale was completed in September 2015.

During 2017, we completed the sales of 110 properties (including residential properties, storage spaces, and substation lots that are located in Korea) which are not directly related to our operations for an aggregate sale price of approximately Won 11.7 billion. The book value of such properties amounted to Won 7 billion, representing 0.09% of our total real properties as of December 31, 2017. The foregoing sales reflect our ongoing efforts to improve our financial soundness through debt reduction and enhance our management efficiency, selling noncore properties that have no direct relations to electricity facilities.

### ITEM 4A.    UNRESOLVED STAFF COMMENTS

We do not have any unresolved comments from the SEC staff regarding our periodic reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

### ITEM 5.    OPERATING AND FINANCIAL REVIEW AND PROSPECTS

*You should read the following discussion on our operating and financial review and prospects together with our consolidated financial statements and the related notes which appear elsewhere in this annual report. Our*

81

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*results of operations, financial condition and cash flows may materially change from time to time, for reasons including various policy initiatives (including changes to the Restructuring Plan) by the Government in relation to the Korean electric power industry, and accordingly our historical performance may not be indicative of our future performance. See Item 4.B. "Business Overview–Restructuring of the Electric Power Industry in Korea" and Item 3D. "Risk Factors–The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."*

### Item 5.A.    Operating Results

**Overview**

We are a predominant market participant in the Korean electric power industry, and our business is heavily regulated by the Government, including with respect to the rates we charge to customers for the electricity we sell. In addition, our business requires a high level of capital expenditures for the construction of electricity generation, transmission and distribution facilities and is subject to a number of variable factors, including demand for electricity in Korea and fluctuations in fuel costs, which are in turn impacted by the movements in the exchange rates between the Won and other currencies.

Under the Electricity Business Act and the Price Stabilization Act, the Government generally establishes electricity rates at levels that are expected to permit us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations in addition to receiving a fair investment return on capital used in those operations. For a detailed description of the fair investment return, see Item 4.B. "Business Overview–Sales and Customers–Electricity Rates." From 2014 to 2015, largely due to the general decline of fuel prices, relatively stable exchange rates, the sale of the properties in our previous headquarters and the greater use of coal relative to LNG (the former being a cheaper source of fuel) as a proportion of the fuels used to produce electricity, our gross profit, operating profit and net profit increased significantly.

If fuel prices were to rise substantially and rapidly in the future, such rise may have a material adverse effect on our results of operations and profitability. In part to address these concerns, the Government from time to time increases the electricity tariff rates. However, such increases may be insufficient to fully offset the adverse impact from the rise in fuel costs, and since such increases typically require lengthy public deliberations in order to be implemented, the tariff increases often occur with a significant time lag and as a result our results of operations and cash flows may suffer. On the other hand, if fuel prices decrease, substantial political pressure may lead the Government to lower the level of electricity tariff in a relatively shorter period of time due to the lack of public opposition, which could negatively affect our profit margins and in turn our financial condition and results of operations.

The results of our operations are largely affected by the following factors:

demand for electricity;

electricity rates we charge to our customers;

fuel costs; and

the exchange rates of Won against other foreign currencies, in particular the U.S. dollar.

***Demand for Electricity***

Our sales are largely dependent on the level of demand for electricity in Korea and the rates we charge for the electricity we sell.

82

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Demand for electricity in Korea grew at a compounded average rate of 1.7% per annum for the five years ended December 31, 2017. According to the Bank of Korea, the compounded growth rate for GDP was approximately 3.0% for the same period. The GDP growth rate was approximately 2.8%, 2.9% and 3.1% during 2015, 2016 and 2017, respectively.

The table below sets forth, for the periods indicated, the annual rate of growth in Korea' s GDP and the annual rate of growth in electricity demand (measured by total annual electricity consumption) on a year-on-year basis.

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Growth in GDP | 2.9% | 3.3% | 2.8% | 2.9% | 3.1% |
| Growth in electricity consumption | 1.8% | 0.6% | 1.3% | 2.8% | 2.2% |

Demand for electricity may be categorized either by the type of its usage or by the type of customers. The following describes the demand for electricity by the type of its usage, namely, industrial, commercial and residential:

The industrial sector represents the largest segment of electricity consumption in Korea. Demand for electricity from the industrial sector was 285,969 gigawatt hours in 2017, representing a 2.6% increase from 2016, largely due to the continued export-based growth of the Korean economy, which resulted in increased industrial output and greater utilization of industrial plants.

Demand for electricity from the commercial sector depends largely on the level and scope of commercial activities in Korea, which in recent years have resulted in increased office building construction, office automation and use of air conditioners and heaters. Demand for electricity from the commercial sector increased to 111,298 gigawatt hours in 2017, representing a 2.5% increase from 2016 largely due to the recovery of market demand as a result of various Government policies to boost the economy.

Demand for electricity from the residential sector is largely dependent on population growth and use of heaters, air conditioners and other electronic appliances. Demand for electricity from the residential sector increased to 68,544 gigawatt hours in 2017, representing a 0.7% increase compared to 2016, largely due to an increase in household electricity usage for air conditioning and heating. For a discussion on demand by the type of customers, see Item 4.B. "Business Overview–Sales and Customers–Demand by the Type of Usage."

Since our inception, we have had the predominant market share in terms of electricity generated in Korea. As for electricity we purchase from the market for transmission and distribution to our end-users, our generation subsidiaries accounted for 83.3%, 81.5% and 77.8% in 2015, 2016 and 2017, respectively, while the remainder was accounted for by independent power producers. As for transmission and distribution of electricity, we have historically handled, expect to continue to handle, substantially all of such activities in Korea.

We expect that we will continue to have a dominant market share in the generation, transmission and distribution of electricity in Korea for the foreseeable future, absent any substantial changes to the Restructuring Plan or other policy initiatives by the Government in relation to the Korean electric power industry, or an unexpected level of market penetration by independent power producers or localized electricity suppliers under the Community Energy System. However, our market dominance in the electricity distribution in Korea may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows. See Item 4.B. "Business Overview–Competition."

83

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Electricity Rates*

Under the Electricity Business Act and the Price Stabilization Act, electricity rates are established at levels that will permit us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations in addition to receiving a fair investment return on capital used in those operations. For further discussion of fair investment return, see Item 4.B. "Business Overview–Sales and Customers–Electricity Rates."

From time to time, our actual rate of return on invested capital may differ significantly from the fair rate of return on invested capital assumed for the purposes of electricity tariff approvals, for reasons, among others, related to movements in fuel prices, exchange rates and demand for electricity that differs from what is assumed for determining our fair rate of return. For example, between 1987 and 1990, the actual rate of return was above the fair rate of return due to declining fuel costs and rising demand for electricity. In contrast, depreciation of the Won against the U.S. dollar accounted for our actual rates of return being lower than the fair rate of return for the period from 1996 to 2000. Partly in response to the variance between our actual rates of return and the fair rate of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increase as such increase requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use through sector-specific tariff increases. For the period between 2006 and 2013, our actual rates of return were lower than the fair rate of return largely due to a general increase in fuel costs and additional facility investment costs incurred, the effects of which were not offset by timely increases in our tariff rates. Between 2014 and 2016, however, largely due to the decrease in fuel costs reflective of the drop in oil prices, our actual rate of return has surpassed the fair rate of return; however, substantially all of the resulting excess has been used to fund capital expenditure and repair and maintenance, as well as to offer tariff discounts to economically or otherwise disadvantaged households, and investments in renewable energy and other environmental programs.

Partly in response to the variance between our actual rates of return and the fair rates of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increases as such increases requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use from sector-specific tariff increases.

In the past, the Government effected tariff increases that typically covered all sectors, namely, residential, commercial and industrial. No cross-sector tariff increase has been implemented since November 2013, largely due to the downward trend in fuel costs. However, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, the new tariff structure encourages energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods during the summer and the winter. Third, a temporary rate discount will apply during 2018 to 2020 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation, financial condition and cash flows.

84

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Fuel Costs*

Our results of operations are also significantly affected by the cost of producing electricity, which is subject to a variety of factors, including, in particular, the cost of fuel.

Cost of fuel in any given year is a function of the volume of fuels consumed and the unit fuel cost for the various types of fuel used for generation of electricity which affects the cost structure for both our generation subsidiaries and independent power producers from whom we purchase electric power. A significant change in the unit fuel costs materially impacts the costs of electricity generated by our generation subsidiaries, which mainly comprise our fuel costs under the cost of sales, as well as, to our knowledge, the costs of electricity generated by the independent power producers that sell their electricity to us (see Item 4.A. "Purchase of Electricity–Cost-based Pool System"), which mainly comprise our purchased power costs under the cost of sales. We are however unable to provide a comparative analysis since the unit fuel cost information for independent power producers and their cost structures are proprietary information.

Fuel costs constituted 33.3%, 30.9% and 31.7% of our cost of sales, and the ratio of fuel costs to our sales was 25.9%, 23.4% and 27.8% in 2015, 2016 and 2017, respectively. Substantially all of the fuel (except for anthracite coal) used by our generation subsidiaries is imported from outside of Korea at prices determined in part by prevailing market prices in currencies other than Won. In addition, our generation subsidiaries purchase a significant portion of their fuel requirements under contracts with limited quantity and duration. Pursuant to the terms of our long-term supply contracts, prices are adjusted from time to time subject to prevailing market conditions. See Item 4.B. "Business Overview–Fuel."

Uranium accounted for 38.1%, 37.1% and 34.8% of our fuel requirements in 2015, 2016 and 2017, respectively. Coal accounted for 47.9%, 47.7% and 53.3% of our fuel requirements in 2015, 2016 and 2017, respectively. LNG accounted for 10.7%, 10.7% and 8.7% of our fuel requirements in 2015, 2016 and 2017, respectively. Oil accounted for 2.2%, 3.0% and 1.2% of our fuel requirements in 2015, 2016 and 2017, respectively. In each case, the fuel requirements are measured by the amount of electricity generated by us and our generation subsidiaries and do not include electricity purchased from independent power producers. In order to ensure stable supplies of fuel materials, our generation subsidiaries enter into long-term and medium-term contracts with various suppliers and supplement such supplies with fuel materials purchased on spot markets.

The price of bituminous coal, which represents our largest fuel requirement, fluctuates significantly from time to time. In 2017, approximately 82% of the bituminous coal requirements of our generation subsidiaries were purchased under long-term contracts and the remaining 18% purchased on the spot market. The average daily spot price of "free on board" Newcastle coal 6300 GAR published by Platts increased from US$66.8 per ton in 2016 to US$88.3 per ton in 2017 and to US$93.4 per ton as of April 16, 2018. If the price of bituminous coal were to sharply rise, our generation subsidiaries may not be able to secure their respective bituminous coal supplies at prices commercially acceptable to them. In addition, any significant interruption or delay in the supply of fuel, bituminous coal in particular, from any of their suppliers could cause our generation subsidiaries to purchase fuel on the spot market at prices higher than contracted, resulting in an increase in fuel cost.

From 2015 to 2017, the prices of oil and LNG fluctuated significantly. The prices of oil and LNG are substantially dependent on the price of crude oil, and according to Bloomberg (Bloomberg Ticker: PGCRDUBA), the average daily spot price of Dubai crude oil increased from US$41.4 per barrel in 2016 to US$53.1 per barrel in 2017 and to US$68.4 per barrel as of April 16, 2018.

Nuclear power has a stable and relatively low-cost structure and forms a significant portion of electricity supplied in Korea. Due to significantly lower unit fuel costs compared to those for thermal power plants, our nuclear power plants are generally operated at full capacity with only routine shutdowns for fuel replacement and maintenance, with limited exceptions. In case of shortage in electricity generation resulting from stoppages of the nuclear power plants, we seek to make up for such shortage with power generated by our thermal power plants.

85

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Because the Government heavily regulates the rates we charge for the electricity we sell (see Item 4.B. "Business Overview–Sales and Customers–Electricity Rates"), our ability to pass on such cost increases to our customers is limited. For example, from 2008 to 2012 we had consecutive net losses and, from time to time, operating losses, largely due to sustained rises in fuel costs that were neither timely nor sufficiently offset by a corresponding rise in electricity tariff rates. If fuel prices substantially increase and the Government, out of concern for inflation or for other reasons, maintains the current level of electricity tariff and does not increase it to a level to sufficiently offset the impact of rising fuel prices, the price increases will negatively affect our profit margins or even cause us to suffer net losses and our business, financial condition, results of operations and cash flows would suffer.

### Movements of the Won against the U.S. Dollar and Other Foreign Currencies

Korean Won has fluctuated significantly against major currencies from time to time. For fluctuations in exchange rates, see Item 3.A. "Selected Financial Data–Currency Translations and Exchange Rates." In particular, Korean Won underwent substantial fluctuations during the recent global financial crisis, and remains subject to significant volatility. The Noon Buying Rate per one U.S. dollar increased from Won 1,169.3 on December 31, 2015 to Won 1,203.7 on December 31, 2016, fell down to Won 1,067.4 on December 31, 2017 and to Won 1,071.6 on April 16, 2018 . In 2016 and 2017, the Won generally appreciated against U.S. dollar and other foreign currencies, and such appreciation may result in a significant decrease in the cost of fuel materials and equipment purchased from overseas as well as the cost of servicing our foreign currency debt. As of December 31, 2017, 19.4% of our long-term debt (including the current portion but excluding issue discounts and premium) without taking into consideration of swap transactions was denominated in foreign currencies, principally U.S. dollars. The prices for substantially all of the fuel materials and a significant portion of the equipment we purchase are stated in currencies other than Won, generally in U.S. dollars. Since a substantial portion of our revenues is denominated in Won, we must generally obtain foreign currencies through foreign currency-denominated financings or from foreign currency exchange markets to make such purchases or service such debt, fulfill our obligations under existing overseas investments and make new overseas investments. As a result, any significant depreciation of Won against U.S. dollar or other foreign currencies will have a material adverse effect on our profitability and results of operations. See Item 3.D. "Risk Factors–Risks Relating to KEPCO–The movement of Won against the U.S. dollar and other currencies may have a material adverse effect on us."

### Recent Accounting Changes

### New Amendments Adopted

New amendments to IFRS and other accounting standards are set forth below. These amendments had no impact on our consolidated financial statements included in this annual report.

Amendments to IAS 12–Income Taxes

We have adopted amendments to IAS 12 'Income Taxes' since January 2017. The amendments clarify that unrealized losses on fixed-rate debt instruments measured at fair value and measured at cost for tax purposes give rise to a deductible temporary difference regardless of whether the holder expects to recover the carrying amount of the debt instrument by sale or by use and that the estimate of probable future taxable profit may include the recovery of some of assets for more than their carrying amount. When we assess whether there will be sufficient taxable profit, we should compare the deductible temporary differences with future taxable profit that excludes tax deductions resulting from the reversal of those deductible temporary differences. We believe that there is no significant impact on our consolidated financial statements and did not retroactively restate the comparative consolidated financial statements for the prior period.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Amendments to IAS 7−Statement of Cash Flows

We have adopted amendments to IAS 'Statement of Cash Flows' since January 1, 2017. The amendments require changes in liabilities arising from financing activities to be disclosed. The amendments are not required to provide comparative information for prior periods when applying for the first time. Information about changes in liabilities arising from financing activities is included in Note 23 and Note 24 of the notes to our consolidated financial statements included in this annual report for further related information.

***New Standards and Amendments Not Yet Adopted***

The following new standards and amendments to existing IFRS and other standards are effective for annual periods beginning on January 1, 2017; however, we have not adopted such amendments yet. We will apply IFRS 9 'Financial Instruments' and IFRS 15 'Revenue from Contracts with Customers' for annual periods beginning on January 1, 2018 and we have conducted a detailed assessment upon adoption of these standards and based on the circumstance and information available up to the filing date of this annual report.

IFRS 9−Financial Instruments

IFRS 9 sets out the requirements for recognizing and measuring financial assets, financial liabilities and certain contracts to buy or sell non-financial items. It replaces existing guidance in IAS 39 'Financial Instruments: Recognition and Measurement'.

We will apply the exemption allowing it not to restate the comparative information for prior periods upon adoption of IFRS 9. We will retroactively apply the cumulative effect of the adoption of IFRS 9 in retained earnings as of the date of initial application (January 1, 2018).

Expected impacts on our consolidated financial statements are categorized as follows:

① Classification and measurement of financial assets

IFRS 9 includes a new classification and measurement of financial assets that reflects the business model in which assets are managed and their cash flow characteristics.

Under IFRS 9, financial assets are classified into three principal categories; measured at amortized cost, fair value through other comprehensive income (FVOCI) and fair value through profit or loss (FVTPL) based on the business model in which assets are managed and their cash flow characteristics. Under IFRS 9, derivatives embedded in hybrid contracts where the host is a financial asset are not bifurcated. Instead, the hybrid financial instrument as a whole is assessed for classification.

The criteria for classification and measurement of financial assets under IFRS 9 are as follows:

- A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is to hold assets to collect contractual cash flows; and 2) the contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

- A financial asset is measured at FVOCI if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and 2) the contractual terms of the financial asset give rise on specified dates to cash flow that are solely payments of principal and interest on the principal amount outstanding. On initial recognition of equity investment that is not held for trading, the company may irrevocably elect to present subsequent changes in fair value in other comprehensive income (OCI), and will not reclassify(recycle) the those items in OCI to profit or loss subsequently.

- A financial asset is measured at FVTPL if the contractual terms of the financial asset give rise to specified dates to cash flows that are not solely payments of principal and interest on the principal

87

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

amount outstanding, the debt instrument is held within a business model whose objective is to sell the asset, or the equity instruments that are not elected to be designated as measured at FVOCI.

As of December 31, 2017, We have financial assets at fair value through profit or loss amounting to Won 133,532 million, available-for-sale financial assets amounting to Won 699,833 million, held-to-maturity investments amounting to Won 3,144 million and loans and receivables amounting to Won 15,203,663 million.

Based on the result of the detailed assessment to date, the expected impacts on our financial assets (excluding derivative instruments) on the date of initial application (January 1, 2018) are as follows:

| Classification based on IAS 39 | Classification based on IFRS 9 | Amount based on IAS 39 | Amount based on IFRS 9 |
|---|---|---|---|
| | | In millions of won | |
| Financial assets at FVTPL | FVTPL | ₩111,512 | 111,512 |
| Loans and receivables | Amortized cost | 15,203,663 | 14,412,339 |
| Loans and receivables | FVTPL | – | 791,324 |
| Available-for-sale financial assets | FVOCI | 699,833 | 476,941 |
| Available-for-sale financial assets | FVTPL | – | 222,892 |
| Held-to-maturity investments | Amortized cost | 3,144 | 3,144 |
| Total financial assets (excluding derivative instruments) | | ₩16,018,152 | 16,018,152 |

Upon adoption of IFRS 9, Won 791,324 million of loans and receivables and Won 222,892 million of available-for-sale financial assets will be measured at FVTPL. We have elected to measure Won 476,941 million of the equity securities classified as available-for-sale financial assets as FVOCI under IFRS 9. Accordingly, from January 1, 2018, gains and losses from changes of fair value of the equity securities are recognized in other comprehensive income, impairment losses are not recognized in profit or loss, and gains and losses are not reclassified at disposal.

② Classification and measurement of financial liabilities

Under IFRS 9, the amount of change in the fair value attributable to the changes in the credit risk of the financial liabilities is presented in OCI, not recognized in profit or loss, and the OCI amount will not be reclassified (recycled) to profit or loss. However, if doing so creates or increase an accounting mismatch, the amount of change in the fair value is recognized in profit or loss.

We did not elect to designate financial liabilities as FVTPL and believes that there is no significant impact on our consolidated financial statements upon adoption of IFRS 9.

③ Impairment: Financial assets and contract assets

IFRS 9 replaces the 'incurred loss' model in the existing standard with a forward-looking 'expected credit loss' (ECL) model for debt instruments, lease receivables, contractual assets, loan commitments, financial guarantee contracts.

Under IFRS 9, impairment losses are likely to be recognized earlier than using the incurred loss model under the existing guidance in IAS 39 as loss allowances will be measured on either of the 12-month or lifetime ECL based on the extent of increase in credit risk since inception as shown in the below table.

| | Classification | Loss allowances |
|---|---|---|
| Stage 1 | Credit risk has not increased significantly since the initial recognition | 12-month ECL: ECLs that resulted from possible default events within the 12 months after the reporting date |
| Stage 2 | Credit risk has increased significantly since the initial recognition | Lifetime ECL: ECL that resulted from all possible default events over the expected life of a financial instrument |
| Stage 3 | Credit-impaired | |

88

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Under IFRS 9, an entity shall always measure the loss allowance at an amount equal to lifetime expected credit losses for trade receivables or contract assets that result from transactions that are within the scope of IFRS 15 and that do not contain a significant financing component in accordance with IFRS 15 and if the trade receivables or contract assets include a significant financing component, an entity may choose as its accounting policy to measure the loss allowance at an amount equal to lifetime expected credit losses.

As of December 31, 2017, we have debt instruments in financial assets measured at amortized cost amounting to Won 15,464,202 million (loans and receivables) and has recognized loss allowances of Won 260,539 million.

Under adoption of IFRS 9, we plan to elect to measure the loss allowance at an amount equal to lifetime expected credit losses for trade receivables, contract assets and lease receivables that include a significant financing component. Based on the result of the detailed assessment to date, the expected impacts on our loss allowances on the date of initial application (January 1, 2018) are as follows:

| Type | Amount based on IAS 39 (A) | Amount based on IFRS 9 (B) | Increase (decrease) (B-A) |
|---|---|---|---|
| | | In millions of won | |
| Trade and other receivables | ₩ 251,591 | 258,360 | 6,769 |
| Other financial assets | 8,948 | 8,948 | – |
| Total | ₩ 260,539 | 267,308 | 6,769 |

④   Hedge accounting

When initially applying IFRS 9, an entity may elect as its accounting policy to continue to apply the hedge accounting requirements of IAS 39. We plan to elect to continue apply the hedge accounting requirements of IAS 39.

As of December 31, 2017, We have asset and liabilities designated as hedged items amounting to Won 10,606 million and Won 277,130 million, respectively.

IFRS 15−Revenue from contract with customers

IFRS 15 sets out a comprehensive framework for determining whether revenue is recognized, the extent of revenue recognized, and when revenue is recognized. It replaces existing revenue recognition guidance, including IAS 18 'Revenue', IAS 11 'Construction Contracts', SIC-31 'Revenue-Barter transactions involving advertising services', IFRIC 13 'Customer Loyalty Programs', IFRIC 15 'Agreements for the construction of real estate', and IFRIC 18 'Transfers of assets from customers'.

We will retrospectively apply and recognize the cumulative effect of the adoption of IFRS 15 at the date of initial application (January 1, 2018) and has determined to retrospectively apply to only those contracts that were not completed as of the date of initial application (January 1, 2018). Accordingly, we will not restate the comparative periods.

Existing IFRS standards and interpretations including IAS 18 provide revenue recognition guidance by transaction types such as sales of goods, rendering of services, interest income, royalty income, dividend income and construction revenue; however, under the new standard, IFRS 15, the five-step approach (Step 1: Identify the contract(s) with a customer, Step 2: Identify the performance obligations in the contract, Step 3: Determine the transaction price, Step 4: Allocate the transaction price to the performance obligations in the contract, Step 5: Recognize revenue when the entity satisfied a performance obligation) is applied for all types of contracts or agreements.

89

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Expected impacts on the consolidated financial statements are categorized as follows:

① Identify the performance obligations in the contract

We are engaged in the generation, transmission and distribution of electricity and development of electric power resources, and electricity sales revenue accounts for 91.3% of consolidated revenue for the year ended December 31, 2017.

Under IFRS 15, supplying electricity is a series of distinct goods or services identified as a single performance obligation. We are also engaged in contracts with customers for transmission and distribution, provision of power generation byproducts, EPC business, O&M, etc. that are identified as different performance obligations for each contract.

Based on the result of the detailed assessment to date, we believe that the impact of identifying separate the performance obligations in the contract on our revenue is not significant.

② Variable consideration

We may be subject to a variation of consideration paid by the customer due to the progressive electricity billing system, discounts on electricity bills for policy purposes, penalties and delinquent payment, etc. In applying IFRS 15, we estimate an amount of variable consideration by using the expected value method that we expect to better predict the amount of consideration to which it will be entitled, and includes in the transaction price some or all of an amount of variable consideration only to the extent that it is highly probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

Based on the result of the detailed assessment to date, we believe that the impact of variable consideration on our revenue is not significant.

③ Performance obligations satisfied over time

We provide our customers with services such as EPC business, O&M, etc. over time. We recognize revenues based on the percentage-of-completion on a reasonable basis.

Under IFRS 15, an entity recognizes revenue over time if one of the following criteria is met:

(a) the customer simultaneously receives and consumes the benefits provided by the entity's performance as the entity performs;

(b) the entity's performance creates or enhances an asset that the customer controls as the asset is created or enhanced; or

(c) the entity's performance does not create an asset with an alternative use to the entity and the entity has an enforceable right to payment for performance completed to date.

Based on the result of the detailed assessment to date, the impact of the revenue recognition over time based on the percentage-of-completion on our revenue is not significant.

IFRS 16–Leases

IFRS 16 replaces IAS 17 'Leases', and IFRIC 4 'Determining whether an Arrangement contains a Lease'. This standard is effective for annual reporting periods beginning on or after January 1, 2019, with early adoption permitted if IFRS 15 'Revenue from Contracts with Customers' has also been applied.

Under IFRS 16, a lessee shall apply this standard to its leases either:

(a) retrospectively to each prior reporting period presented applying IAS 8 'Accounting Policies, Changes in Accounting Estimates and Errors'; or

90

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(b)    retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application.

We have not yet determined the transition approach for IFRS 16.

IFRS 16 provides a single lessee accounting model in which the lessee recognizes lease related assets and liabilities in the statement of financial position. A lessee is required to recognize a right-of-use asset representing its right to use the underlying leased asset and a lease liability representing its obligation to make lease payments. Lease recognition may be exempted for short-term leases and leases for which the underlying asset is of low value. Accounting for a lessor is similar to the existing standard that classifies each of its leases as either an operating lease or a finance lease.

Upon adoption of IFRS 16, the nature of the costs associated with the lease will change as the operating lease payments recognized based on a straight-line basis will change to depreciation expense of a right-of-use asset and interest expense of the lease liability and no significant impact is expected on our finance lease.

We plan to conduct a detailed assessment of the potential impact from the application of IFRS 16 during the year ending December 31, 2018.

IFRIC 22–Foreign Currency Transactions and Advance Consideration

IFRIC 22, published on December 8, 2016, clarifies the date of the transaction for the purpose of determining the exchange rate to use on initial recognition of the related asset, expense or income, when an entity has received or paid advance consideration in a foreign currency. IFRIC 22 is effective for annual reporting periods beginning on or after January 1, 2018, with earlier adoption permitted.

We are currently performing a detailed assessment of the impact resulting from the application of IFRIC 22 and plan to complete the assessment in advance of its effective date.

Amendments to IAS 40–Investment Property

The amendments clarify when an entity should transfer a property asset to, or from, investment property. The amendments are effective for annual periods beginning on or after January 1, 2018, with earlier adoption permitted.

We are currently performing a detailed assessment of the impact resulting from the application of amendments to IAS 40 and plan to complete the assessment in advance of its effective date.

**Critical Accounting Policies**

The following discussion and analysis are based on our consolidated financial statements included in this annual report. The fundamental objective of financial reporting is to provide useful information that allows a reader to comprehend our business activities. To aid in that understanding, our management has identified "critical accounting policies."

We make a number of estimates and judgments in preparing our consolidated financial statements. These estimates may differ from actual results and have a significant impact on our recorded assets, liabilities, revenues and expenses and related disclosure of contingent assets and liabilities. We consider an estimate to be a critical accounting estimate if it requires a high level of subjectivity and judgment, and a significant change in the estimate would have a material impact on our financial condition or results of operations. Further discussion of these critical accounting estimates and policies is included in the notes to our consolidated financial statements included in this annual report.

The accounting policies set out below have been applied consistently by us and our subsidiaries to all periods presented in the consolidated annual financial statements, unless otherwise indicated.

91

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Sale and Purchase of Electricity*

The Government approves the rates we charge to customers. Our utility rates are designed to recover our reasonable costs plus a fair investment return. We purchase electricity principally from our generation subsidiaries based on a competitive bidding process though the Korea Power Exchange.

We recognize electricity sales revenue based on power sold (transferred to the customer) up to the reporting date. To determine the amount of power sold, we make reasonable estimates on daily power volumes for residential, commercial, industrial and other uses. The differences between the current month's estimated amounts and actual (meter-read) amounts are adjusted (trued-up) during the next month period.

*Construction Contracts*

When the outcome of a construction contract can be estimated reliably, revenue and costs are recognized based on the stage of completion of the contract activity at the end of the reporting period, measured based on the proportion of contract costs incurred for work performed to date relative to the estimated total contract costs except where this would not be representative of the stage of completion, utilizing the cost-based input method. In applying the cost-based input method, it is necessary to use estimates and assumptions related to the total estimated costs expected to be incurred in the future, costs incurred which are not related to construction progress, changes in costs due to change of contract or design, etc. Total contract revenue is measured based on an agreed contract price; however, it may fluctuate due to the variation of construction work. The measurement of contract revenue is affected by various uncertainties resulting from unexpected future events. Variations in contract work, claims and incentive payments are included to the extent that the amount can be measured reliably and its receipt is considered probable.

When the outcome of a construction contract cannot be estimated reliably, contract revenue is recognized to the extent of contract costs incurred when it is probable the revenue will be realized. Contract costs are recognized as expenses in the period in which they are incurred. When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognized as an expense immediately. Total contract costs are estimated based on the estimates of future costs such as material costs, labor costs and construction period. The uncertainty of estimated total contract costs and changes in such estimates have an impact on the completion progress and contract revenue for each reporting period. Also, there is uncertainty in future estimates due to various internal and external factors such as fluctuation of market, the risk of business partner and the experience of project performance and others.

*Derivative Instruments*

We recognize rights and obligations arising from derivative instruments as assets and liabilities, which are stated at fair value. The gains and losses that result from the change in the fair value of derivative instruments are reported in current earnings. However, for derivative instruments designated as hedging the exposure of variable cash flows, the effective portions of the gains or losses on the hedging instruments are recorded as accumulated other comprehensive income (loss) and credited or charged to operations at the time the hedged transactions affect earnings, and the ineffective portions of the gains or losses are credited or charged immediately to operations.

Significant management judgment is involved in determining the fair value of estimated derivative instruments. The estimates and assumptions used by our management to determine fair value can be impacted by many factors, such as the estimated discount factor derived from observable market data, credit risk of the counterparty and the estimated cash flow based on settlement period, interest convention, and other contract information of the derivative instruments.

As of December 31, 2015 and 2016, we had Won 451 billion and Won 643 billion of net amounts as assets, respectively. As of December 31, 2017, we had Won 395 billion of net amounts as liabilities. Changes in the

92

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

estimated discount factor or cash flow, or changes in the assumptions and judgments by management underlying these estimates, may cause material revisions to the estimated total gain or loss effect of derivative instruments, which could have a material effect on the recorded asset or liability.

*Decommissioning Costs*

We recognize the fair value of estimated decommissioning costs as a liability in the period in which we incur a legal obligation associated with retirement of long-lived assets that result from acquisition, construction, development and/or normal use of the assets. We also recognize a corresponding asset that is depreciated over the life of the asset. Accretion expense consists of period-to-period changes in the liability for decommissioning costs resulting from the passage of time and revisions to either the timing or the amount of the original estimate of undiscounted cash flows. Depreciation and accretion expenses are included in the cost of electric power in the accompanying consolidated statements of comprehensive income.

Significant management judgment is involved in determining the fair value of estimated decommissioning costs. The estimates and assumptions used by our management to determine fair value can be impacted by many factors, such as the estimated decommissioning costs based on engineering studies commissioned and approved by the Korean government, and changes in assumed dates of decommissioning, inflation rate, discount rate, decommissioning technology, regulation and the general economy.

As of December 31, 2015, 2016 and 2017, we had a liability for decommissioning costs in the amounts of Won 12,562 billion, Won 13,050 billion and Won 15,985 billion, respectively. Changes in the estimated costs or timing of decommissioning, or changes in the assumptions and judgments by management underlying these estimates, may cause material revisions to the estimated total cost to decommission these facilities, which could have a material effect on the recorded liability. We used discount rates of 3.55%, 3.55% and 2.94% and inflation rates of 1.40%, 1.40% and 1.21% when calculating the decommissioning cost liability of nuclear plants recorded as of December 31, 2015, 2016 and 2017, respectively, and discount rate of 4.49% and inflation rate of 2.93% when calculating the decommissioning cost liability of spent fuel recorded as of December 31, 2015, 2016 and 2017. In addition, the following is a sensitivity analysis of the potential impact on decommissioning costs from a 0.1% increase or decrease in each of the inflation rate and the discount rate, assuming that all other aforementioned assumptions remain constant:

| | Sensitivity to inflation rate | | Sensitivity to discount rate | |
| --- | --- | --- | --- | --- |
| | +0.10% | -0.10% | +0.10% | -0.10% |
| | (in billions of Won) | | | |
| Increase (decrease) of liability for decommissioning costs | ₩ 342 | ₩(332) | ₩(314) | ₩ 323 |

See Notes 26 and 45 of the notes to our consolidated financial statements included in this annual report for further related information.

*Provision for Decontamination of Transformer*

Under the Persistent Organic Pollutants Management Act which was enacted in 2007, we are required to remove PCB from our transformers' insulating oil by 2025. We are also required to inspect the PCB levels in our transformers and dispose of any PCBs in excess of established safety standards.

As of December 31, 2015, 2016 and 2017, we had liabilities of Won 182 billion, Won 192 billion and Won 180 billion, respectively, for inspection and disposal costs related to the decontamination of existing transformers.

The estimates and assumptions used by our management to determine fair value can be affected by many factors, such as the estimated costs of inspection and disposal, inflation rate, discount rate, regulations and the general economy.

93

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Changes in the estimated costs or changes in the assumptions and judgments underlying these estimates may cause material revisions to the estimated total costs, which could have a material effect on our recorded liability. When calculating the provision for the decontamination of our transformers, we used a discount rate of 3.21% and an inflation rate of 2.65% as of December 31, 2015, a discount rate of 2.77% and an inflation rate of 1.29% as of December 31, 2016 and a discount rate of 2.55% and an inflation rate of 1.23% as of December 31, 2017.

### *Deferred Tax Assets*

In assessing the realizability of the deferred tax assets, our management considers whether it is probable that a portion or all of the deferred tax assets will not be realized. The ultimate realization of our deferred tax assets is dependent on whether we are able to generate future taxable income in specific tax jurisdictions during the periods in which temporary differences become deductible. Our management has scheduled the expected future reversals of the temporary differences and projected future taxable income in making this assessment. Based on these factors, our management believes that it is probable that we will realize the benefits of these temporary differences as of December 31, 2017. However, the amount of deferred tax assets that is realized may be different if we do not realize estimated future taxable income during the carry forward periods as originally expected.

In relation to the deferred tax assets recognized for tax loss, future taxable income is estimated considering the following: (i) five-year mid-to long-term financial forecasts of earnings before tax approved by management and submitted to the Ministry of Strategy and Finance, and (ii) average amount of tax adjustments for the recent three years.

For tax credits carried forward, similar to deferred tax assets recognized for tax loss, our management estimates the probability timing of future taxable profits in determining the probability of utilization of tax credits carried forward. In addition, our management considers the possible carry forward period and available tax credit or deductible temporary differences within the tax laws of each country in which the tax credits originated.

Similarly, our management also estimates the probability of utilization of temporary differences considering the probability of generating future taxable profits in the periods that the deductible temporary differences reverse. We do not recognize deferred tax assets for certain temporary differences associated with investments in subsidiaries, associates, and interests in joint ventures considering future dividends or disposals.

We recognize deferred tax assets and liabilities based on the differences between the financial statement carrying amounts and the tax bases of assets and liabilities at each separate taxpaying entity. Under IFRS, a deferred tax asset is recognized for temporary differences that will result in deductible amounts in future years and for carry forwards. If, based on the weight of available evidence, it is more likely that some or the entire portion of the deferred tax asset will not be realized, that portion is deducted directly from the deferred tax asset.

We believe that the accounting estimate related to the realizability of deferred tax asset is a "critical accounting estimate" because: (i) it requires management to make assessments about the timing of future events, including the probability of expected future taxable income and available tax planning opportunities, and (ii) the difference between these assessments and the actual performance could have a material impact on the realization of tax benefits as reported in our results of operations. Management' s assumptions require significant judgment because actual performance has fluctuated in the past and may continue to do so.

### *Useful Lives of Property, Plant and Equipment*

Property, plant and equipment are initially measured at cost and after initial recognition, are carried at cost less accumulated depreciation and accumulated impairment losses. The cost of property, plant and equipment includes expenditures arising directly from the construction or acquisition of the asset, any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management and the initial estimate of the costs of dismantling and removing the item and restoring the site on which it is located.

94

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Economic useful life is the duration of time the asset is expected to be productively employed by us, which may be less than its physical life. Management' s assumptions on the following factors, among others, affect the determination of estimated economic useful life: wear and tear, obsolescence, technical standards, changes in market demand and technological changes.

The estimated useful lives of our property, plant and equipment are as follows:

|  | Useful lives (years) |
|---|---|
| Buildings | 8 ~ 40 |
| Structures | 8 ~ 50 |
| Machinery | 2 ~ 32 |
| Vehicles | 3 ~ 8 |
| Loaded heavy water | 30 |
| Asset retirement costs | 18, 30, 40, 60 |
| Finance lease assets | 6 ~ 32 |
| Ships | 9 |
| Others | 4~15 |

A component that is significant compared to the total cost of property, plant and equipment is depreciated over its separate useful life. Depreciation methods, residual values and useful lives of property, plant and equipment are reviewed at the end of each reporting period and if change is deemed appropriate, it is treated as a change in accounting estimate. As a result of such annual review, useful lives of certain machinery were changed during 2016 and as a result, depreciation expenses increased by Won 160,985 million and Won 130,514 million for the years ended December 31, 2016 and 2017, respectively. Depreciation expenses are expected to increase by Won 91,197 million for the year ending December 31, 2018, and to decrease by Won 382,696 million for the years after December 31, 2018.

### Impairment of Long-lived Assets

At the end of each reporting period, we review the carrying amounts of tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, we estimate the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired. Recoverable amount is the higher of fair value less costs to sell or value in use. In assessing value in use, the estimated future cash flows are discounted to their present values using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or a cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (or the cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognized immediately in income or loss, unless the relevant asset is carried at a revalued amount, in which case the impairment loss is treated as a revaluation decrease.

In the event that an impairment loss subsequently reverses, the carrying amount of the asset (or a cash-generating unit) is increased to the revised estimate of its recoverable amount, ensuring that such carrying

95

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

amount increase does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or the cash-generating unit) in prior years. A reversal of an impairment loss is recognized immediately in income or loss, unless the relevant asset is carried at a revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

The assessment of impairment is a critical accounting estimate, because significant management judgment is required to determine: (i) whether an indicator of impairment has occurred, (ii) how assets should be grouped, and (iii) the recoverable amount of the asset or asset group in the case of impairment. If management's assumptions about these assets change as a result of events or circumstances, and management believes the assets may have declined in value, we may record impairment charges, resulting in lower profits. Our management uses its best estimate in making these evaluations and considers various factors, including the future prices of energy, fuel costs and other operating costs. However, actual market prices and operating costs could vary from those used in the impairment evaluations, and the impact of such variations could be material. We performed impairment tests on individual assets of KOSEP and EWP, both of which are wholly owned subsidiaries, for the year ended December 31, 2015 due to potential indicators of impairment. For the year ended December 31, 2016, there were no potential indicators of impairment, and we therefore did not perform an impairment test for such year. For the year ended December 31, 2017, we performed impairment tests on individual assets of KOMIPO and KOWEPO, both of which are wholly owned subsidiaries, due to potential indicators of impairment. Accordingly, we recognized the amount by which the carrying amount exceeds its recoverable amount as impairment loss on our consolidated statements of comprehensive income. See Note 18 of the notes to our consolidated financial statements included in this annual report for further information.

### Accrual for Loss Contingencies for Legal Claims

We are involved in legal proceedings regarding matters arising in the ordinary course of business. In relation to these matters, as of December 31, 2017, we and our subsidiaries were engaged in 565 lawsuits as a defendant and 185 lawsuits as a plaintiff. The total amount claimed against us and our subsidiaries was Won 478 billion and the total amount claimed by us was Won 691 billion as of December 31, 2017. As of December 31, 2017, our provisions for these legal claims amounted to Won 74 billion. These provisions are adjusted when events or circumstances cause these judgments or estimates to change.

Actual amounts of our liabilities as determined upon settlement of legal claims or by final decisions of the courts in relation thereto may be substantially different from the amounts of provisions recognized or contingent liabilities disclosed. If the actual amounts are higher than the amounts of related provisions, the resulting additional liabilities would adversely impact our results of operations, financial condition and cash flows.

### Consolidated Results of Operations

#### 2017 Compared to 2016

In 2017, our consolidated sales, which is principally derived from the sale of electric power, slightly decreased by 0.7% to Won 59,336 billion in 2017 from Won 59,763 billion in 2016, primarily reflecting a decrease in sales of construction services, which was partially offset by an increase in sales of electric power. Our sales of construction services decreased by 20.2% to Won 3,212 billion in 2017 from Won 4,027 billion in 2016, primarily due to a decrease in sales amount recorded from the ongoing construction of our nuclear complex construction projects in the United Arab Emirates as the construction projects progress over time. Our sale of electric power increased by 0.7% to Won 55,773 billion for 2017 from Won 55,379 billion for 2016, primarily due to an increase in the volume of electricity sold, which was partially offset by a decline in the average unit sales price. The volume of electricity sold increased by 2.2% to 507,746 gigawatt hours in 2017 from 497,039 gigawatt hours in 2016, primarily due to a 2.6% increase in the volume of electricity sold to the industrial sector, which represents the largest segment of electricity consumption in Korea, to 285,969 gigawatt hours in 2017 from 278,828 gigawatt hours in 2016, a 2.5% increase in the volume of electricity sold to the commercial sector,

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

which represents the second largest segment of electricity consumption in Korea, to 111,298 gigawatt hours in 2017 from 108,617 gigawatt hours in 2016, and a 0.7% increase in the volume of electricity sold to the residential sector to 68,544 gigawatt hours in 2017 from 68,057 gigawatt hours in 2016. The increase in the volume of electricity sold to the industrial sector was primarily due to the continued export-based growth of the Korean economy, which resulted in increased industrial output and greater utilization of industrial plants. The increase in the volume of electricity sold to the commercial sector was primarily due to the recovery of market demand as a result of various Government policies to boost the economy. The increase in the volume of electricity sold to the residential sector was primarily due to an increase in household electricity usage for air conditioning and heating. Average unit sales price decreased by 1.5% to Won 109.53 per kilowatt-hour in 2017 from Won 111.23 per kilowatt-hour in 2016, primarily due to the amendment to the progressive rate structure to ease the tariff burden on residential customers, effective as of January 1, 2017.

Our consolidated cost of sales, which is principally derived from the purchase of power from independent power producers and to a lesser extent, from raw materials used and depreciation, increased by 14.4%, to Won 52,099 billion in 2017 from Won 45,550 billion in 2016, primarily due to a 32.6% increase in power purchase, a 18.2% increase in raw materials used and a 8.7% increase in depreciation, which were offset by a 11.3% decrease in other cost of sales.

Power purchase, which accounted for 27.4% and 23.6% of our cost of sales in 2017 and 2016, respectively, increased by 32.6% to Won 14,264 billion in 2017 from Won 10,756 billion in 2016, primarily due to a 9.6% increase in the unit cost of power purchased from Won 95.2 per kilowatt-hour in 2016 to Won 104.3 per kilowatt-hour in 2017, largely resulting from a general increase in international market prices for the main fuel types, which led to an increase in the price of electricity generated by independent power producers.

Raw materials used, which accounted for 30.6% and 29.6% of our cost of sales in 2017 and 2016, respectively, increased by 18.2% to Won 15,925 billion in 2017 from Won 13,471 billion in 2016, largely due to a general increase in international market prices.

Depreciation expense, excluding amortization of nuclear fuel charged to fuel costs in the amounts of Won 1,069 billion and Won 1,085 billion in 2017 and 2016, respectively, increased by 10.1% to Won 8,393 billion in 2017 from Won 7,620 billion in 2016 primarily due to an increase of additional property, plant and equipment acquired in relation to new generation facilities pursuant to our capital investment program.

Other cost of sales decreased by 11.3% to Won 3,980 billion in 2017 from Won 4,488 billion in 2016 primarily due to a decrease in other cost of overseas sales.

As a cumulative result of the foregoing factors, our consolidated gross profit decreased by 49.1% to Won 7,237 billion in 2017 from Won 14,213 billion in 2016, and our consolidated gross profit margin decreased to 12.2% in 2017 from 23.8% in 2016. The decreases in our consolidated gross profit and consolidated gross profit margin were largely attributable to a 14.4% increase in our consolidated cost of sales (which was mainly due to a 32.6% increase in power purchase, a 18.2% increase in raw materials used and the 8.7% increase in depreciation, which were offset by a 11.3% decrease in other cost of sales and a 5.9% decrease in taxes and dues), which substantially outpaced the 0.7% decrease in our consolidated sales (which was primarily due to the 2.2% increase in the volume of electricity sold, as well as the 20.2% decrease in the sales of construction services).

Our consolidated selling and administrative expenses increased by 4.7% to Won 2,763 billion in 2017 from Won 2,639 billion in 2016, largely due to a 227.3% increase in bad debt expense to Won 127 billion in 2017 from Won 39 billion in 2016, which mainly related to KOSEP's accounts receivables with low possibility of collection from Hyundai Energy Co., Ltd. and a 230.4% increase in advertising expenses to Won 115 billion in 2017 from Won 35 billion in 2016, related to our sponsorships for the PyeongChang 2018 Winter Olympics and a 11.2% increase in commissions to Won 674 billion in 2017 from Won 606 billion in 2016, for electricity metering, which was offset by a 53.3% decrease in other expenses to Won 155 billion in 2017 from Won 332 billion in 2016, due to a decrease in costs for energy efficiency improvement project.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

Our consolidated other income, net of expenses, increased by 5.7% to Won 689 billion in 2017 from Won 652 billion in 2016, mainly as a result of an increase in income related to transfer of assets from customers.

Our consolidated net other gains increased significantly to Won 157 billion in 2017 from Won 70 billion in 2016, primarily due to an increase in net gain on foreign currency transaction, largely resulting from fluctuations in the value of Won against other foreign currencies in 2017.

As a cumulative result of the foregoing factors, our consolidated operating profit decreased by 56.7% to Won 5,320 billion in 2017 from Won 12,296 billion in 2016, and our consolidated operating income margin decreased to 9.0% in 2017 from 20.6% in 2016. These decreases were mainly due to a decrease in our consolidated sales and an increase in our cost of sales primarily as a result of increases in power purchase and raw materials due to increases in the fuel costs and the volume of electricity sold.

Our consolidated finance expenses, net, decreased by 3.0% to Won 1,597 billion in 2017 from Won 1,646 billion in 2016, primarily as a result of an increase in net losses on valuation of derivatives and an increase in net losses on transaction of derivatives, which were partially offset by an increase in net gains on foreign currency translation.

We recorded consolidated loss of associates or joint ventures using equity method of Won 108 billion in 2017 compared to a loss of Won 137 billion in 2016, primarily as a result of a decrease in profit of Korea Gas Corporation.

As a cumulative result of the foregoing factors, our consolidated income before income taxes decreased by 65.6% to Won 3,614 billion in 2017 from Won 10,513 billion in 2016.

Our income tax expense decreased by 35.4% to Won 2,173 billion in 2017 from Won 3,365 billion in 2016, largely as a result of the decrease in our profit before income taxes. Our effective tax expense rate, which represents tax expense as a percentage of profit before income taxes, increased from 32.0% in 2016 to 60.1% in 2017 primarily resulting from an adjustment for our recognition of deferred tax liabilities of Won 1,055 billion in 2017 due to 3.3% increase in tax rate, whereas we did not recognize such increase in 2016. Our recognition of deferred tax liabilities was mainly due to temporary differences regarding property, plant and equipment and investments in subsidiaries and associates. In 2017, the applicable statutory tax rate increased to 27.5% from the prior rate of 24.2% in 2016. See Note 41 to our financial statements included in this annual report.

As a cumulative result of the above factors, our consolidated profit decreased by 79.8% to Won 1,441 billion in 2017 from Won 7,148 billion in 2016. Our consolidated net profit margin also decreased to 2.4% in 2017 from 12.0% in 2016. Our profit attributable to the owners of the company was Won 1,299 billion in 2017 compared to Won 7,048 billion attributable to the owners of the company in 2016.

We reported consolidated other comprehensive loss of Won 95 billion in 2017 compared to consolidated other comprehensive loss of Won 2 billion in 2016, largely due to an increase in loss from equity method investments primarily in relation to Korea Gas Corporation, which was partially offset by our recognition of income from remeasurements of defined benefit liability (whereas we recognized loss from such remeasurements) in 2016.

As a cumulative result of the above factors, our consolidated total comprehensive income decreased by 81.2% to Won 1,346 billion in 2017 from Won 7,146 billion in 2016.

*2016 Compared to 2015*

In 2016, our consolidated sales, which is principally derived from the sale of electric power, increased by 2.0% to Won 59,763 billion from Won 58,582 billion in 2015, reflecting primarily a 2.8% increase in the volume

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

Table of Contents

of electricity sold from 483,655 gigawatt hours in 2015 to 497,039 gigawatt hours in 2016. The overall increase in the volume of electricity sold was primarily attributable to a 1.9% increase in the volume of electricity sold to the industrial sector, which represents the largest segment of electricity consumption in Korea, from 273,548 gigawatt hours in 2015 to 278,828 gigawatt hours in 2016, a 4.8% increase in the volume of electricity sold to the commercial sector, which represents the second largest segment of electricity consumption in Korea, from 103,679 gigawatt hours in 2015 to 108,617 gigawatt hours in 2016, and a 3.7% increase in the volume of electricity sold to the residential sector from 65,619 gigawatt hours in 2015 to 68,057 gigawatt hours in 2016. The increase in the volume of electricity sold to the industrial sector was primarily due to the general increase in demand for electricity as a result of the turnaround in industries such as semiconductors, chemicals and petrochemicals, which involved increased industrial output and greater capacity utilization of industrial plants. The increase in the volume of electricity sold to the commercial sector was primarily due to a rebound in the domestic economy and increased air conditioning use in commercial buildings during the summer. The increase in the volume of electricity sold to the residential sector was primarily due to the opening of new urban clusters with large-scale residential complexes as well as increased air conditioning use in residential buildings during the summer. Sales of construction services increased by 7.1% to Won 4,027 billion in 2016 from Won 3,761 billion in 2015 primarily due to an increase in sales recorded from the construction-in-progress of our nuclear complex construction projects in the United Arab Emirates.

Our consolidated cost of sales, which is principally derived from the costs related to the purchase of fuels for generation of electricity and to a lesser extent, from the purchase of power from independent power producers, depreciation and salaries, remained substantially flat, or increased by 0.2%, to Won 45,550 billion in 2016 from Won 45,458 billion in 2015, primarily due to a 15.6% increase in salaries, a 7.3% increase in depreciation and a 9.9% increase in other cost of sales, which were substantially offset by a 7.2% decrease in fuel costs and a 5.9% decrease in power purchase.

Fuel costs, which accounted for 30.9% and 33.3% of our consolidated cost of sales in 2016 and 2015, respectively, decreased by 7.2% to Won 14,067 billion in 2016 from Won 15,159 billion in 2015, largely due to a 24.3% decrease in unit fuel cost mainly resulting from the general decline in international market prices for our main fuel types, as well as an increased use of less expensive fuel sources such as coal and nuclear power, including due to the commencement of operation of one nuclear unit in 2016. Power purchase, which accounted for 23.6% and 25.1% of our cost of sales in 2016 and 2015, respectively, decreased by 5.9% to Won 10,756 billion in 2016 from Won 11,428 billion in 2015, primarily due to a 20.4% decrease in the unit cost of power purchased from Won 119.6 per kilowatt-hour in 2015 to Won 95.2 per kilowatt-hour in 2016, largely resulting from a general decline in international market prices for the main fuel types, which led to a decrease in the price of electricity generated by independent power producers. Depreciation expense, excluding amortization of nuclear fuel charged to fuel costs in the amounts of Won 1,085 billion and Won 1,057 billion in 2016 and in 2015, respectively, increased by 7.3% to Won 7,620 billion in 2016 from Won 7,102 billion in 2015 primarily due to an increase of additional property, plant and equipment acquired in relation to the construction of new generation facilities pursuant to our capital investment program.

Salaries recorded as cost of sales increased by 15.6% to Won 3,426 billion in 2016 from Won 2,962 billion in 2015 primarily due to an increase in base salary in tandem with the inflation rate and an increase in provision expenses related to the ordinary wage litigation for our generation subsidiaries as described in Item 8.A. "Consolidated Statements and Other Financial Information–Legal Proceedings." Other cost of sales increased by 9.9% to Won 4,488 billion in 2016 from Won 4,083 billion in 2015 primarily due to an increase in costs recorded from the construction-in-progress of our nuclear complex construction projects in the United Arab Emirates.

As a cumulative result of the foregoing factors, our consolidated gross profit increased by 8.3% to Won 14,213 billion in 2016 from Won 13,124 billion in 2015, and our consolidated gross profit margin increased to 23.8% in 2016 from 22.4% in 2015. The increases in our consolidated gross profit and consolidated gross profit margin were largely attributable to the 2.0% increase in our consolidated sales (which was primarily due to the

99

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

2.8% increase in the volume of electricity sold, as well as the 7.1% increase in the sales of construction services), which substantially outpaced the 0.2% increase in our consolidated cost of sales (which was mainly due to the 15.6% increase in salaries, the 7.3% increase in depreciation and the 9.9% increase in other cost of sales, which were substantially offset by the 7.2% decrease in fuel costs and the 5.9% decrease in power purchase).

Our consolidated selling and administrative expenses increased by 22.6% to Won 2,639 billion in 2016 from Won 2,153 billion in 2015, largely due to a 151.4% increase in other expenses, which mainly resulted from the commencement of a campaign to subsidize households for the use of electronic appliances with high energy efficiency and, to a lesser extent, an increase in salaries recorded as selling and administrative expenses.

Our consolidated other income, net of expenses, decreased by 6.7% to Won 652 billion in 2016 from Won 699 billion in 2015, mainly as a result of a decrease in compensation and reparations revenue, which relate to penalties collected from sub-contractors as a result of contractual breaches.

Our consolidated net other gains decreased significantly to Won 70 billion in 2016 from Won 8,611 billion in 2015, primarily as a result of a decrease in gains on disposal of property, plant and equipment. The decrease in gains on disposal of property, plant and equipment decreased largely due to the absence in 2016 of a disposal of property in magnitude comparable to the sale of our previous headquarters in 2015.

As a cumulative result of the foregoing factors, our consolidated operating profit decreased by 39.4% to Won 12,296 billion in 2016 from Won 20,281 billion in 2015, and our consolidated operating income margin decreased to 20.6% in 2016 from 34.6% in 2015. These decreases were mainly due to a significant decrease in our consolidated net other gains primarily as a result of a decrease in gains on disposal of property, plant and equipment due to the absence in 2016 of a disposal of property in magnitude comparable to the sale of our previous headquarters in 2015.

Our consolidated finance expenses, net, decreased by 10.2% to Won 1,646 billion in 2016 from Won 1,832 billion in 2015, primarily as a result of a decrease in interest expense and a decrease in net losses on foreign currency translation, which were partially offset by a decrease in net gains on valuation of derivatives.

We recorded consolidated loss of associates or joint ventures using equity method of Won 137 billion in 2016 compared to such gain of Won 207 billion in 2015, primarily as a result of a decrease in profit of Korea Gas Corporation.

As a cumulative result of the foregoing factors, our consolidated income before income taxes decreased by 43.6% to Won 10,513 billion in 2016 from Won 18,656 billion in 2015.

Our income tax expense decreased by 35.8% to Won 3,365 billion in 2016 from Won 5,239 billion in 2015, largely as a result of the decrease in our profit before income taxes. Our effective tax expense (benefit) rate, which represents tax expense (benefit) as a percentage of profit (loss) before income taxes, increased from 28.1% in 2015 to 32.0% in 2016 primarily due to an increase of adjustment in respect of prior years due to change in estimate. In 2016, the effective tax rate was higher than the statutory rate of 24.2%, primarily due to the recognition of deferred tax liabilities regarding our investments in subsidiaries, associates and joint ventures, primarily in connection with taxable temporary differences related to undistributed earnings. See Note 41 to our financial statements included in this annual report.

As a cumulative result of the above factors, our consolidated profit decreased by 46.7% to Won 7,148 billion in 2016 from Won 13,416 billion in 2015. Our consolidated net profit margin also decreased to 12.0% in 2016 from 22.9% in 2015. Our profit attributable to the owners of the company was Won 7,048 billion in 2016 compared to Won 13,289 billion attributable to the owners of the company in 2015.

We reported consolidated other comprehensive loss of Won 2 billion in 2016 compared to consolidated other comprehensive income of Won 34 billion in 2015, largely due to decrease in net change in other

100

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

comprehensive income from equity method investments primarily in relation to Gemeng International Energy Co., Ltd., which was partially offset by an increase in net change in the realized fair value of available-for-sale securities primarily in relation to PT Adaro Energy Tbk.

As a cumulative result of the above factors, our consolidated total comprehensive income decreased by 46.9% to Won 7,146 billion in 2016 from Won 13,450 billion in 2015.

**Inflation**

The effects of inflation in Korea on our financial condition and results of operations are reflected primarily in construction costs as well as in labor expenses. Inflation in Korea has not had a significant impact on our results of operations in recent years. It is possible that inflation in the future may have an adverse effect on our financial condition or results of operations.

**Segment Results**

We operate the following business segments: transmission and distribution, nuclear power generation and thermal power generation and all others. The transmission and distribution segment, which is operated by us, the parent company, consists of operations related to the transmission, distribution and sale to end-users of electricity purchased from our generation subsidiaries as well as from independent power producers. The power generation segment, which is operated by our one nuclear generation subsidiary and five non-nuclear generation subsidiaries, consists of operations related to the generation of electricity sold to us through the Korea Power Exchange. The transmission and distribution segment and the power generation segment together represent our electricity business. The remainder of our operation is categorized as "all others." The all other segment consists primarily of operations related to the plant maintenance and engineering service, information services, and sales of nuclear fuel, communication line leasing, overseas businesses and others. In 2015, 2016 and 2017, the unaffiliated revenues of the power generation segment (representing the six generation subsidiaries) and all our other revenues in the aggregate amounted to only 2.8%, 3.0% and 3.2% of our consolidated revenues, respectively, and the results of operations for our business segments substantially mirror our consolidated results of operations. For further information, see Note 4 of the notes to our consolidated financial statements included in this annual report.

**Item 5.B.    Liquidity and Capital Resources**

*We expect that our capital requirements, capital resources and liquidity position may change in the course of implementing the Restructuring Plan. See Item 4.B. "–Business Overview–Restructuring of the Electric Power Industry in Korea" and Item 3D. "Risk Factors–Risks Relating to KEPCO–The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."*

**Capital Requirements**

We anticipate that the following represent the major sources of our capital requirements in the short-term to intermediate future:

> capital expenditures pursuant to our capital investment program;

> working capital requirements, the largest component of which is fuel purchases;

> payment of principal and interest on our existing debt; and

> overseas investments.

In addition, if there were to occur unanticipated material changes to the Restructuring Plan, the Basic Plan or other major policy initiatives of the Government relating to the electric power industry, or natural disasters, such developments may require a significant amount of additional capital requirements.

101

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### Capital Expenditures

We anticipate that capital expenditures will be the most significant use of our funds for the next several years. Our capital expenditures relate primarily to the construction of new generation units, maintenance of existing generation units and expansion of our transmission and distribution systems. Our capital expenditures generally follow budgets established under the Basic Plan, which contains projections relating to the supply and demand of electricity of Korea based on which we plan the construction of additional generation units and transmission systems.

Our total capital expenditures for the construction of generation, transmission and distribution facilities were Won 15,750 billion, Won 13,950 billion and Won 13,711 billion in 2015, 2016 and 2017, respectively, and under our current budgets, are estimated to be approximately Won 15,816 billion, Won 17,180 billion and Won 17,580 billion in 2018, 2019 and 2020, respectively. We plan to finance our capital expenditures primarily through issuance of securities in the capital markets, borrowings from financial institutions and construction grants.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. We contributed Won 500 billion to the funds in 2016. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector.

Furthermore, as part of the Comprehensive Measures against Particulate Matter and the Eighth Basic Plan, announced by the Government in September 2017 and December 2017, respectively, the Government set forth the following policy directions relating to coal-fired generation units: (i) two coal-fired generation units scheduled for construction and four existing coal-fired generation units shall convert to LNG fuel use, (ii) in principle, construction of new coal-fired generation units shall not be planned, (iii) seven of the coal-fired generation units that are 30 years or older will be shut down on an accelerated schedule, (iv) coal-fired generation units that are 30 years or older shall temporarily cease operations from March through June of each year, (v) coal-fired generation units shall be put through comprehensive functional and environmental upgrades and (vi) coal-fired generation units shall be subject to emission standards that are twice as more rigorous than the current standards to be in effect by the first half of 2018. Compliance with such measures is expected to result in our incurring significant costs.

### Fuel Purchases

We require significant funds to finance our operations, principally in relation to the purchase of fuels by our generation subsidiaries for generation of electricity. In 2015, 2016 and 2017, fuel costs constituted 33.3%, 30.9% and 31.7% of our cost of sales and the ratio of fuel costs to our sales was 25.9%, 23.4% and 27.8%, respectively. We plan to fund our fuel purchases primarily with net operating cash, although in cases of rapid increases in fuel prices as is the case from time to time, we may also rely on borrowings from financial institutions and issuance of debt securities in the capital markets.

### Repayment of Existing Debt

Payments of principal and interest on indebtedness will require considerable resources. The table below sets forth the scheduled maturities of the outstanding interest-paying debt (excluding issue discounts and premium) without taking into consideration of swap transactions of us and our six wholly-owned generation subsidiaries as

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

of December 31, 2017 for each year from 2018 to 2022 and thereafter. As of December 31, 2017, such debt represented 95.6% of our outstanding debt on a consolidated basis.

| Year ended December 31 | Local Currency Borrowings | Foreign Currency Borrowings | Domestic Debentures | Foreign Debentures | Total |
|---|---|---|---|---|---|
| | | | (in billions of Won) | | |
| 2018 | 761 | – | 5,200 | 2,761 | 8,722 |
| 2019 | 8 | – | 5,220 | 1,402 | 6,630 |
| 2020 | 8 | – | 5,850 | 1,129 | 6,987 |
| 2021 | 208 | 8 | 3,690 | 857 | 4,763 |
| 2022 | 208 | 1 | 5,560 | 1,339 | 7,108 |
| Thereafter | 31 | – | 16,450 | 1,771 | 18,252 |
| Total | 1,224 | 9 | 41,970 | 9,259 | 52,462 |

We and our six wholly-owned generation subsidiaries incurred interest charges (including capitalized interest) in relation to our interest-paying debt of Won 2,846 billion, Won 2,490 billion and Won 2,287 billion in 2015, 2016 and 2017, respectively. We anticipate that interest charges will increase in future years because of, among other factors, anticipated increases in our long-term debt. See "–Capital Resources" below. The weighted average rates of interest on our and our six wholly-owned generation subsidiaries' debt were 3.87%, 3.69% and 3.20% in 2015, 2016 and 2017, respectively.

### Overseas Investments

As part of our revenue diversification and fuel procurement strategy, we plan to continue to make overseas investments on a selective basis, which will be funded primarily through foreign currency-denominated borrowings and debt securities issuances as well as net operating cash from such projects.

### Capital Resources

We have traditionally met our working capital and other capital requirements primarily from net cash provided by operating activities, issuance of debt securities and borrowings from financial institutions. Net cash provided by operating activities is primarily a function of electricity sales and fuel purchases and is also affected by increases and decreases in trade receivables, trade payables and inventory related to electricity sales and fuel purchases. Net cash provided by operating activities was Won 16,943 billion, Won 16,521 billion and Won 11,250 billion in 2015, 2016 and 2017, respectively.

As of December 31, 2015, 2016 and 2017, our long-term debt (excluding the current portion but including issue discounts and premium), without taking into consideration of swap transactions, amounted to Won 50,907 billion, Won 44,700 billion and Won 45,624 billion, respectively, representing 74.9%, 61.2% and 62.5% of shareholders' equity, respectively, as of such dates. As of December 31, 2015, 2016 and 2017, the current portions of our long-term debt were Won 7,243 billion, Won 8,134 billion and Won 8,085 billion, respectively. As of December 31, 2015, 2016 and 2017, our short-term borrowings amounted to Won 604 billion, Won 806 billion and Won 1,038 billion, respectively. See Note 23 of the notes to our consolidated financial statements included in this annual report. Total long-term debt (including the current portion but excluding issue discounts and premium), without taking into consideration of swap transactions, as of December 31, 2017 was Won 53,816 billion, of which Won 43,353 billion was denominated in Won and an equivalent of Won 10,463 billion was denominated in foreign currencies, primarily U.S. dollars. We, KHNP, KOMIPO and KOWEPO also maintain global medium-term note programs in the aggregate amount of US$13.0 billion, of which approximately US$8.9 billion remains currently available for future drawdown. KOSEP also maintains an A$2 billion Australian dollar medium-term note program, of which approximately A$1.7 billion remains current available for future drawdown.

Subject to the implementation of our capital expenditure plan and the sale of our interests in our generation subsidiaries and other subsidiaries, our long-term debt may increase or decrease in future years. Until recently, a

103

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

significant portion of our long-term debt was raised through foreign currency-denominated borrowings. Our foreign currency-denominated long-term debt (including the current portion but excluding issue discounts and premium), without taking into consideration of swap transactions, amounted to Won 12,219 billion and Won 10,463 billion as of December 31, 2016 and 2017, respectively.

Our ability to incur long-term debt in the future is subject to a variety of factors, many of which are beyond our control, including, the implementation of the Restructuring Plan and the amount of capital that other Korean entities may seek to raise in capital markets. Economic, political and other conditions in Korea may also affect investor demand for our securities and those of other Korean entities. In addition, our ability to incur debt will also be affected by the Government's policies relating to foreign currency borrowings, the liquidity of the Korean capital markets and our operating results and financial condition. In case of adverse developments in Korea, the price at which such financing may be available may not be acceptable to us.

We incur our short-term borrowings primarily through commercial papers sold to domestic financial institutions. We have not had, and we do not expect to have, any material difficulties in obtaining short-term borrowings. In addition, in order to prepare for potential liquidity shortage, we maintain several credit facilities with financial institutions, with Won-denominated facilities amounting to Won 3,831 billion in aggregate and foreign currency-denominated facilities amounting to US$1,911 million in aggregate. The full amount of these facilities was available as of December 31, 2017.

We may raise capital from time to time through the issuance of equity securities. However, there are certain restrictions on our ability to issue equity, including limitations on shareholdings by foreigners. In addition, without changes in the existing KEPCO Act which requires that the Government, directly or pursuant to the Korea Development Bank Act, through Korea Development Bank, own at least 51% of our capital stock, it may be difficult or impossible for us to undertake any equity financing other than sales of treasury stock without the participation of the Government. Even if we are able to conduct equity financing with the participation of the Government, prevailing market conditions may be such that we may not be able conduct equity financing on terms that are commercially acceptable to us. See Item 3D. "Risk Factors–Risks Relating to Korea and the Global Economy."

Our total shareholders' equity decreased by 0.1% from Won 73,051 billion as of December 31, 2016 to Won 72,965 billion as of December 31, 2017, mainly as a result of an increase in total comprehensive income.

## Liquidity

Our liquidity is substantially affected by our acquisition of property, plant and equipment, fuel purchases and schedule of repayment of debt. Our property, plant and equipment increased by 3.5% from Won 145,743 billion as of December 31, 2016 to Won 150,882 billion as of December 31, 2017. Although fuel costs increased by 17.5% from Won 14,067 billion in 2016 to Won 16,524 billion in 2017, our current trade and other payables which is closely related to fuel costs increased by 7.4% from Won 5,585 billion as of December 31, 2016 to Won 6,000 billion as of December 31, 2017. Our current financial liabilities increased by 2.8% from Won 8,942 billion as of December 31, 2016 to Won 9,195 billion as of December 31, 2017 according to our debt repayment schedule.

Our cash flows are also impacted by other factors. Our net cash provided by operating activities decreased by 31.9% from Won 16,521 billion in 2016 to Won 11,250 billion in 2017. The decrease in net cash provided by operating activities in 2017 compared to 2016 was mainly due to a decrease in profit for the period. Our cash flows from investing activities are affected by acquisition of and proceeds from disposals of financial assets. Our net cash used in investing activities increased by 30.7% from Won 9,646 billion in 2016 to Won 12,607 billion in 2017, mainly because our acquisition of financial assets outpaced disposals of financial assets. Our cash flows from financing activities are mainly affected by borrowings and issuance of debt securities and repayment thereof, as well as dividends paid. Our net cash used in financing activities was Won 7,637 billion in 2016 and

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

our net cash from financing activities was Won 746 billion in 2017, largely due to an increase in proceeds from long-term borrowings and debt securities.

Due to the capital-intensive nature of our business as well as significant volatility in fuel prices, from time to time we operate with working capital deficits, and we may have substantial working capital deficits in the future. As of December 31, 2015, 2016 and 2017, we had a working capital deficit of Won 686 billion, Won 5,031 billion and Won 4,283 billion, respectively. We have traditionally met our working capital and other capital requirements primarily with net cash provided by operating activities, issuance of debt securities, borrowings from financial institutions and construction grants. We also incur short-term borrowings primarily through commercial papers sold to domestic financial institutions. We have not had, and we do not expect to have, any material difficulties in obtaining short-term borrowings. See "–Capital Resources."

We may face liquidity concerns in the case of sudden and sharp depreciation of the Won against major foreign currencies or depreciation over a sustained period of time. While substantially all of our revenues and our cash and cash equivalents are denominated in Won, we pay for substantially all of our fuel purchases in foreign currencies and a substantial portion of our long-term debt is denominated in foreign currencies, and payment of principal and interest thereon is made in foreign currencies. In the past, we have incurred foreign currency debt principally due to the limited availability and the high cost of Won-denominated financing in Korea. However, in light of the increasing sophistication of the Korean capital markets and the recent increase in Won liquidity in the Korean financial markets, we plan to reduce the portion of our debt which is denominated in foreign currencies although we intend to continue to raise certain amounts of capital through long-term foreign currency debt for purposes of maintaining diversity in our funding sources as well as paying for overseas investments and fuel procurements in foreign currencies. As of December 31, 2017, 19.4% of our long-term debt (including the current portion but excluding issue discounts and premium) without taking into consideration of swap transactions was denominated in currencies other than Won.

We enter into currency swaps and other hedging arrangements with respect to our debt denominated in foreign currencies only to a limited extent due primarily to the limited size of the Korean market for such derivative arrangements. Such instruments include combined currency and interest rate swap agreements, interest rate swaps and foreign exchange agreements. We do not enter into derivative financial instruments in order to hedge market risk resulting from fluctuations in fuel costs. Our policy is to hold or issue derivative financial instruments for hedging purposes only. Our derivative financial instruments are entered into with major financial institutions, thereby minimizing the risk of credit loss. See Note 11 of the notes to our consolidated financial statements.

We paid dividends of Won 3,100 per share in respect of fiscal year 2015 and Won 1,980 per share in respect of fiscal year 2016. On April 20, 2018, we paid dividends of Won 790 per share in respect of fiscal year 2017.

**Other**

Our operations are materially affected by the policies and actions of the Government. See Item 4.B. "Business Overview–Regulation."

**Item 5.C. Research and Development, Patents and Licenses, etc.**

**Research and Development**

Our research and development program is focused on developing advanced electric power, renewable energy, smart grid and customer-friendly electricity service technologies that will enable us to become a global leader in the energy industry. In order to achieve our corporate vision of becoming a "Smart Energy Creator" in 2014, we adopted the KEPCO Technology Strategy, which emphasizes enhanced technological convergence and customer service. As part of such strategy, we seek to develop (i) clean and smart energy technology, including

105

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

in relation to low carbon emission in power generation, (ii) an efficient and intelligent power transmission and distribution grid system, (iii) technology that will enhance efficiency and responsiveness to consumer's electricity consumption patterns, and (iv) improvements in information, communication and technology, or ICT, for enhanced customer service.

In 2018, consistent with the Government guidelines, we plan to invest approximately 4.42% of our annual estimated net sales in the research and development of "creative smart" technologies, particularly with a focus on the following ten areas: carbon-related technology known as "carbon capture, utilization and storage ", offshore wind power, new power transmission technology, super conductor, smart grid, micro grid, new materials in electric power fields, ICT convergence, ICT integration and energy storage systems.

Our high-priority "creative smart energy" projects currently include the following:

acquiring integrated gasified process technology;

establishing high-tech smart grid and micro grid test beds in Jeju Island;

developing highly efficient absorbents for carbon capture;

commercializing offshore wind power plants;

obtaining high-voltage direct currents technology suitable for domestic operation; and

experimental testing of large-scale energy storage systems with capacities ranging from four to eight megawatts.

Our research and development activities also focus on the following:

in the thermal power generation sector, reducing the greenhouse effect, enhancing efficiency and reducing cost in power plant construction and operation as well as in our plant maintenance, including through improvements in damage analysis and environment-friendly inspections;

in the renewable energy sector, enhancing efficiency, lowering costs of power generation, identifying new energy sources and exploring new business opportunities;

in the electric power system sector, enhancing the stability and reliability in the operation of our electric power grid as well as enhancing efficiency in electricity distribution, including through build-out of large-sized electricity storage facilities and superconducting transmission cable grids, introducing preventive maintenance measures for substations and developing technologies related to system automation, power utilization and power line communication;

in the customer service sector, developing technologies enabling a greater range of business opportunities and heightened customer service in anticipation of the upcoming rollout of the smart grid system; and

in the technological convergence sector, identifying new business opportunities through convergence among technologies and businesses and maximizing synergy from such convergence in tandem with the promotion of creative economy in Korea as well as globally.

In addition, we cooperate closely with several other electric utility companies and research institutes, both foreign and domestic, on various projects to diversify the scope and scale of our research and development activities.

We and our six generation subsidiaries invested Won 660 billion, Won 530 billion and Won 975 billion in 2015, 2016 and 2017, respectively, and currently plan to invest Won 1,209 billion in 2018, on research and development. Our current focus in research and development is primarily in the area of ICT-based smart energy technological development. We had 1,056 employees engaged in research and development activities as of December 31, 2017. As a result of our research, we had 2,135 registered patents and 1,578 patent applications outstanding in Korea and abroad as of December 31, 2017.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### Item 5.D. Trend Information

Trends, uncertainties and events which could have a material impact on our sales, liquidity and capital resources are discussed above in Item 5.A. "Operating Results" and Item 5.B. "Liquidity and Capital Resources."

### Item 5.E. Off-Balance Sheet Arrangements

We had no significant off-balance sheet arrangements as of December 31, 2017.

### Item 5.F. Tabular Disclosure of Contractual Obligations

The following summarizes certain of the contractual obligations of us and our six wholly-owned generation subsidiaries as of December 31, 2017 and the effect such obligations are expected to have on liquidity and cash flow in future periods.

| Contractual Obligations[1] | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1–3 years (in billions of Won) | 3–5 years | After 5 years |
| Long-term debt[2] | ₩51,733 | ₩7,994 | ₩13,617 | ₩11,871 | ₩18,251 |
| Short-term borrowings | 729 | 729 | – | – | – |
| Interest payments[3] | 8,667 | 1,565 | 2,015 | 1,184 | 3,903 |
| Total | ₩61,129 | ₩10,288 | ₩15,632 | ₩13,055 | ₩22,154 |

*Notes:*

(1) Other than as set forth in this table, we have several other contractual obligations, including finance lease agreements and fuel purchase agreements. We believe the remaining annual payments under capital and operating lease agreements as of December 31, 2017 were immaterial. Contractual obligations related to payment of debt of us and our six wholly-owned generation subsidiaries represented 97.5% of our outstanding debt as of December 31, 2017 on a consolidated basis. As for fuel purchase agreements, our generation subsidiaries have entered into several contracts under which they are committed to purchasing minimum quantities of fuel, including approximately 80 million tons of bituminous coal annually. As for all uranium ore concentrates, in order to ensure stable supply, our subsidiary enters into long-term and medium-term contracts with various suppliers and supplements such supplies with purchases in spot markets. We negotiate annually with Korea Gas Corporation and other suppliers, to purchase LNG. The fuel purchase price is typically negotiated near or at time of purchase subject to prevailing market conditions. In 2017, we purchased fuel in the amount of Won 16.2 trillion.

(2) Includes the current portion.

(3) A portion of our debt carried a variable rate of interest. We used the interest rate in effect as of December 31, 2017 for the variable rate of interest in calculating the interest payments on debt for the periods indicated.

For a description of our commercial commitments and contingent liabilities, see Note 50 of the notes to our consolidated financial statements included in this annual report.

We entered into a power purchase agreement with GS EPS Co., Ltd. and three other non-renewable energy independent power producers that are not part of the Community Energy System, under which we are required to purchase all electricity generated by these companies to the extent such electricity is traded through the Korea Power Exchange. The purchase prices for such electricity are predetermined under the power purchase agreements, subject to annual adjustments. We purchased power from these companies in the amounts of Won 1,049 billion, Won 896 billion and Won 941 billion in 2015, 2016 and 2017, respectively.

107

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

We meet our coal requirements primarily through purchases of bituminous coal and anthracite coal under long-term supply contracts with domestic and foreign suppliers to purchase. Under these long-term supply contracts, purchase prices are adjusted periodically based on prevailing market conditions. We also purchase a substantial portion of our LNG requirements from Korea Gas Corporation, a related party. We have also entered into long-term transportation contracts with Pan Ocean Co., Ltd. and others.

We import all uranium ore concentrates from sources outside Korea (including the United Kingdom, Kazakhstan, France, Germany, Niger, Canada and Japan) through medium- to long-term contracts and pay for such concentrates with currencies other than Won, primarily U.S. dollars. Contract prices for processing of uranium are generally based on market prices. See Note 49 of the notes to our consolidated financial statements for further details of these contracts.

Under the Long-term Transmission and Substation Plan approved by the Ministry of Trade, Industry and Energy, we are liable for the construction of all of our power transmission facilities and the maintenance and repair expenses for such facilities.

Payment guarantee and short-term credit facilities from financial institutions as of December 31, 2017 were as follows:

*Payment guarantee*

| Description | Financial Institutions | Credit Lines (In millions of Won or thousands of USD, JPY, INR, CAD, SAR, NPR, ZAR and EUR) | |
|---|---|---|---|
| Payment of import letter of credits | Woori Bank and others | USD | 1,029,604 |
| | Shinhan Bank | INR | 47,489 |
| Inclusive credits | KEB Hana Bank | KRW | 258,000 |
| | Shinhan Bank and others | USD | 32,125 |
| Performance guarantees on Contract | KEB Hana Bank | EUR | 1,958 |
| | KEB Hana Bank and others | INR | 230,515 |
| | Korea Development Bank and others | JPY | 620,000 |
| | Seoul Guarantee Insurance and others | KRW | 104,248 |
| | Bank of Kathmandu | NPR | 32,633 |
| | KEB Hana Bank | SAR | 102,186 |
| | Standard Chartered and others | USD | 753,652 |
| | KEB Hana Bank | CAD | 168 |
| Guarantees for bid | SMBC and others | USD | 60,000 |
| | ABSA and others | ZAR | 55,730 |
| Warranty bond and others | KEB Hana Bank | INR | 157,830 |
| | Export-Import Bank of Korea and others | USD | 3,850,534 |
| Trade finance | BNP Paribas and others | USD | 800,000 |
| Other guarantees | Nonghyup Bank and others | KRW | 451,521 |
| | KEB Hana Bank and others | USD | 1,063,670 |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**
*Overdraft and Others*

| Description | Financial Institutions | Credit Lines | |
|---|---|---|---|
| | | (In millions of Won, thousands of USD or thousands of PHP) | |
| Overdraft | Nonghyup Bank and others | KRW | 1,835,000 |
| Commercial paper | Shinhan Bank and others | KRW | 1,100,000 |
| Limit amount available for card | KEB Hana Bank and others | KRW | 46,733 |
| | Banco de Oro | PHP | 5,000 |
| Loan limit | Kookmin Bank and others | KRW | 895,500 |
| | BNP Paribas and others | USD | 1,910,700 |

We provide a performance guarantee related to a construction contract to Kookmin Bank. Such guarantee is not recognized as a provision for financial guarantee because such performance guarantee does not meet the definition of a financial guarantee contract under IFRS.

In order to secure our status as a shareholder of Navanakom Electric Co., Ltd., we have signed a fund supplement contract. According to the contract, in case Navanakom Electric Co., Ltd. does not have sufficient funds for its operation or repayment of borrowings, we bear a payment obligation in proportion to our ownership.

We have outstanding borrowings with a limit of US$275,600 thousand from creditors such as International Finance Corporation. Regarding the borrowing contract, we have guaranteed capital contribution of US$69,808 thousand and additional contribution up to US$19 million for contingencies, if any. For one of the electricity purchasers, Central Power Purchasing Agency Guarantee Ltd., we have provided payment guarantee up to US$2,777 thousand, in case of a construction delay or insufficient contract volume after commencement of the construction.

We have provided PT. Perusahaan Listrik Negara performance guarantee up to US$2,293 thousand and Mizuho Bank and others investment guarantee up to US$43,500 thousand in proportion to our ownership in the electricity purchase contract with PT. Cirebon Energi Prasarana in relation to the second electric power generation business in Cirebon, Indonesia. In addition, we have provided the Bank of Tokyo Mitsubishi UFJ (BTMU) borrowing guarantee up to US$41,258 thousand in proportion to our ownership in the equity bridge loan guarantee with PT. Cirebon Energi Prasarana.

We have provided the Export-Import Bank of Korea and SMBC guarantee of mutual investment of US$401 thousand, which is equivalent to the ownership interest of PT Mega Power Mandiri, in order to guarantee the expenses related to hydroelectric power business of PT Wampu Electric Power, our associate.

We have provided the Export-Import Bank of Korea, BNP Paribas and ING Bank guarantee of mutual investment of US$2,440 thousand, which is equivalent to the ownership interest of PT BS Energy and PT Nusantara Hydro Alam, in order to guarantee the expenses related to hydroelectric power business of Tanggamus, Indonesia.

We have provided Samsung C&T Corporation bidding guarantee up to US$793 thousand to participate in the bidding of the Sri Lanka combined cycle project.

Existing guarantees provided by us to our associates and joint ventures as of December 31, 2017 are as follows.

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| KEPCO | Shuweihat Asia O&M Co., Ltd. | Performance guarantees | USD | 11,000 | SAPCO |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| KEPCO | KNOC Nigerian East Oil Co., Ltd. and KNOC Nigerian West Oil Co., Ltd. | Performance guarantees | USD | 34,650 | Korea National Oil Corporation (Nigerian government) |
| KEPCO | Rabigh Operation & Maintenance Company Limited | Performance guarantees and others | USD | 1,387 | RABEC |
| KEPCO | Nghi Son 2 Power Ltd. | Bidding guarantees | USD | 10,000 | SMBC Ho Chi Minh |
| KEPCO | Barakah One Company | Debt guarantees | USD | 900,000 | Export-Import Bank of Korea and others |
| | | Performance guarantees and others | USD | 3,404,275 | |
| KOWEPO | Cheongna Energy Co., Ltd. | Collateralized money invested | KRW | 27,211 | KEB Hana Bank and others |
| | | Guarantees for supplemental funding(1) | | – | |
| KOWEPO | Xe-Pian Xe-Namnoy Power Co., Ltd. | Payment guarantees for business reserve | USD | 2,500 | Krung Thai Bank |
| | | Collateralized money invested | USD | 62,253 | Krung Thai Bank |
| | | Impounding bonus guarantees | USD | 5,000 | SK E&C |
| KOWEPO | Rabigh O&M Co., Ltd. | Performance guarantees and others | SAR | 5,600 | Saudi Arabia British Bank |
| KOWEPO | Deagu Photovoltaic Co., Ltd. | Collateralized money invested | KRW | 1,230 | Korea Development Bank |
| KOWEPO | Dongducheon Dream Power Co., Ltd. | Collateralized money invested | KRW | 53,233 | Kookmin Bank and others |
| KOWEPO | PT. Mutiara Jawa | Collateralized money invested | USD | 2,610 | Woori Bank |
| KOWEPO | Heangbok Do Si Photovoltaic Power Co., Ltd. | Collateralized money invested | KRW | 194 | Nonghyup Bank |
| KOWEPO | Shin Pyeongtaek Power Co., Ltd. | Collateralized money invested | KRW | 43,920 | Kookmin Bank |
| EWP | Busan Shinho Solar Power Co., Ltd. | Collateralized money invested | KRW | 2,100 | Korea Development Bank and others |
| EWP | Seokmun Energy Co., Ltd. | Collateralized money invested | KRW | 15,370 | KEB Hana Bank and others |
| EWP | Chun-cheon Energy Co., Ltd. | Collateralized money invested | KRW | 52,700 | Kookmin Bank and others |
| | | Guarantees for supplemental funding(1) | KRW | 60,270 | Kookmin Bank and others |
| EWP | Honam Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,480 | Shinhan Bank and others |

110

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| EWP | GS-Donghae Electric Power Co., Ltd. | Collateralized money invested | KRW | 204,000 | Korea Development Bank and others |
| EWP | Yeonggwangbaeksu Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,000 | Kookmin Bank and others |
| EWP | Yeonggwang Wind Power Co., Ltd | Collateralized money invested | KRW | 15,375 | KEB Hana Bank and others |
| EWP | PT. Tanjung Power Indonesia | Debt guarantees | USD | 46,983 | The Bank of Tokyo-Mitsubishi and others |
| | | Other guarantees | USD | 3,150 | PT Adaro Indonesia |
| EWP Barbados 1 SRL | Jamaica Public Service Company Limited | Performance guarantees | USD | 14,400 | Societe Generale |
| | | Guarantees for supplemental funding and others[1][3] | USD | 60,000 | JCSD Trustee Services Limited and others |
| KOSPO | KNH Solar Co., Ltd. | Collateralized money invested | KRW | 1,296 | Shinhan Bank and Kyobo Life Insurance Co., Ltd. |
| | | Performance guarantees and guarantees for supplemental funding and others[1] | | – | |
| KOSPO | Daeryun Power Co., Ltd. | Collateralized money invested | KRW | 25,477 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others[1] | | – | |
| KOSPO | Changjuk Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,801 | Shinhan Bank |
| | | Guarantees for supplemental funding[1] | | – | |
| KOSPO | Daegu Green Power Co., Ltd. | Collateralized money invested | KRW | 46,226 | Shinhan Bank |
| KOSPO | Kelar S.A. | Performance guarantees | USD | 63,707 | KEB Hana Bank, SMBC, Mizuho Bank and others |
| KOSPO | DS Power Co., Ltd. | Collateralized money invested | KRW | 2,900 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others[1] | | – | |
| KOSPO | Pyeongchang Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,875 | Woori Bank and Shinhan Bank |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| | | Performance guarantees and guarantees for supplemental funding and others(1) | | – | |
| KOSPO | Taebaek Wind Power Co., Ltd. | Guarantees for supplemental funding and others(1) | | – | Shinhan Bank |
| KOSPO | Jeongam Wind Power Co., Ltd. | Collateralized money invested | KRW | 5,580 | SK Securities Co., Ltd. |
| | | Guarantees for supplemental funding and others(1) | | – | |
| KOSPO | Naepo Green Energy Co., Ltd. | Collateralized money invested | KRW | 29,200 | Hana Financial Investment Co., Ltd. and others |
| | | Guarantees for supplemental funding and others(1) | | – | |
| KEPCO E&C | DS Power Co., Ltd. | Collateralized money invested | KRW | 15,000 | Korea Development Bank and others |
| KOMIPO | Hyundai Green Power Co., Ltd. | Collateralized money invested | KRW | 87,003 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others(1) | | – | |
| KOMIPO | PT. Cirebon Electric Power | Debt guarantees | USD | 11,550 | Mizuho Bank |
| KOMIPO | PT. Wampu Electric Power | Debt guarantees | USD | 5,068 | SMBC |
| KOMIPO | Gangwon Wind Power Co., Ltd. | Collateralized money invested | KRW | 7,409 | IBK and others |
| KOMIPO | YaksuESS Co., Ltd. | Collateralized money invested | KRW | 210 | Hanwha Life Insurance Co., Ltd. |
| | | Guarantees for supplemental funding and others(1) | | – | |
| KOSEP | Hyundai Energy Co., Ltd. | Collateralized money invested | KRW | 47,067 | Korea Development Bank and others |
| | | Performance guarantees and guarantees for supplemental funding and others(1) | KRW | 78,600 | |
| KOSEP | RES Technology AD | Collateralized money invested | KRW | 15,595 | UniCredit Bulbank and others |

112

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| KOSEP | ASM-BG Investicii AD | Collateralized money invested | KRW | 16,101 | UniCredit Bulbank and others |
| KOSEP | Express Solar-light Power Generation Co., Ltd. | Guarantees for supplemental funding and others[1][2] | KRW | 2,500 | Woori Bank |
| KOSEP | S-Power Co., Ltd. | Collateralized money invested | KRW | 132,300 | Korea Development Bank and others |
| KOSEP USA, INC. | KODE NOVUS II LLC | Guarantees for supplemental funding and others[1] | – | | Korea Development Bank |
| KOSEP USA, INC. | KODE NOVUS I LLC | Guarantees for supplemental funding and others[1] | – | | The Export-Import Bank of Korea and others |
| KHNP | Yeongwol Energy Station Co., Ltd. | Collateralized money invested | KRW | 1,400 | Meritz Fire & Marine Insurance Co., Ltd. |
| KHNP | Noeul Green Energy Co., Ltd. | Collateralized money invested | KRW | 1,740 | KEB Hana Bank and others |
| KHNP | Busan Green Energy Co., Ltd. | Collateralized money invested | KRW | 5,243 | Shinhan Bank and others |
| KEPCO KPS | Incheon New Power Co., Ltd. | Collateralized money invested | KRW | 8,160 | Shinhan Bank |
| | | Guarantees for supplemental funding and others[1] | – | | |

*Note:*

(1) We guarantee to provide supplemental funding for businesses with respect to excessive business expenses or insufficient repayment of borrowings.

(2) We have granted the right to Hana Financial Investment Co., Ltd., as an agent for the creditors to Express Solar-light Power Generation Co., Ltd.("ESPG"), to the effect that in the event of acceleration of ESPG's payment obligations under certain borrowings to such creditors, Hana Financial my demand us to dispose of shares in ESPG held by us and apply the resulting proceeds to repayment of ESPG's obligations.

(3) This includes a guarantee for the shareholder's capital payment in connection with the business of 190MW has complex thermal power plant in Jamaica. EWP (Barbados) 1 SRL's capital contribution amount is USD 6,400 thousand and the total amount of guarantees is USD 27,000 thousand which consists of USD 12,000 thousand of EWP (Barbados) 1 SRL's contribution obligation and USD 15,000 thousand of SJEH's portion (50%) of contribution obligation.

Other than as described in this annual report and also in Notes 47 and 50 of the notes to our consolidated financial statements included in this annual report, we did not have any other material credit lines and guarantee commitments provided to any third parties as of December 31, 2017.

113

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

ITEM 6.    *DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES*

### Item 6.A. Directors and Senior Management

**Board of Directors**

Under the KEPCO Act, the Act on the Management of Public Institutions and our Articles of Incorporation, our board of directors, which is required to consist of not more than 15 directors, including the president, is vested with the authority over our management.

Pursuant to our Articles of Incorporation and the Act on the Management of Public Institutions, we have two types of directors: standing directors (*sangim-isa* in Korean) and non-standing directors (*bisangim-isa* in Korean). The standing directors refer to our directors who serve their directorship positions in full-time capacity. Many of our standing directors concurrently hold executive positions with us or our subsidiaries. The non-standing directors refer to our directors who do not serve their directorship positions in full-time capacity. The non-standing directors currently do not hold any executive positions with us or our subsidiaries.

Under our Articles of Incorporation, there may not be more than seven standing directors, including our president, and more than eight non-standing directors. The number of non-standing directors must exceed the number of standing directors, including our president. A senior non-standing director appointed by the Ministry of Strategy and Finance becomes our chairman of the board following the review and resolution of the Public Agencies Operating Committee.

Our president serves as our chief executive officer and represents us and administers our day-to-day business in all matters and bears the responsibility for the management's performance. Our president is appointed by the President of the Republic upon the motion of the Ministry of Trade, Industry and Energy following the nomination by our director nomination committee, the review and resolution of the Public Agencies Operating Committee pursuant to the Act on the Management of Public Institutions and an approval at the general meeting of our shareholders.

Our standing director who concurrently serve as members of the audit committee are appointed through the same appointment process applicable to our president, except that the motion for appointment is made by the Ministry of Strategy and Finance instead of the Ministry of Trade, Industry and Energy. Standing directors other than our president or those who concurrently serve as members of the audit committee are appointed by our president with the approval at the general meeting of our shareholders.

Our non-standing directors must be appointed by the minister of the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee and must have ample knowledge and experience in business management. Appointment of non-standing directors to become part of the audit committee is subject to approval at the general meeting of our shareholders. Government officials that are not part of the teaching staff in national and public schools are ineligible to become our non-standing directors.

The term of our president is three years, while that of our directors (standing or non-standing, but not the president) is two years. According to the Act on the Management of Public Institutions, our president's term cannot be terminated unless done so by the President of the Republic pursuant to the Act on the Management of Public Institutions or upon an event as specified in our Articles of Incorporation.

Attendance by a majority of the board members constitutes a voting quorum for our board meetings, and resolutions can be passed by a majority of the board members. In the event the president acts in violation of law or the Articles of Incorporation, is negligent in his duties, or otherwise is deemed to be significantly impeded in performing his official duties as president, the board of directors may by resolution request the minister of the Ministry of Trade, Industry and Energy to dismiss or recommend the dismissal of the president.

114

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Our non-standing directors may request any information necessary to fulfill their duties from our president, and except in special circumstances, our president must comply with such request.

The names, titles and outside occupations, if any, of the directors as of April 16, 2018 and the respective years in which they took office are set forth below.

| Name | Age | Title | Outside Occupation | Position Held Since |
|------|-----|-------|--------------------|--------------------|
| JongKap KIM | (67) | President, Chief Executive Officer and Standing Director | None | April 13, 2018 |
| Lee, Sung-Han | (61) | Standing Director and Member of the Audit Committee | Chaired Professor of College of Social Sciences, Dongguk University | May 2, 2016 |
| Kim, Si-Ho | (60) | Standing Director and Executive Vice President of Domestic Operations | None | August 27, 2015 |
| Hyun, Sang-Kwon | (60) | Standing Director and Executive Vice President, Chief Financial Officer and Strategy Officer | None | August 27, 2015 |
| Moon, Bong-Soo | (60) | Standing Director and Executive Vice President & Chief Power System Officer | None | January 10, 2017 |
| Sung, Tae-Hyun | (60) | Non-Standing Director | Professor of Electrical Engineering, Hanyang University | August 12, 2014 |
| Choi, Ki-Ryun | (72) | Non-Standing Director | Professor of Energy Systems Research, Ajou University | August 12, 2014 |
| Kim, Ji-Hong | (63) | Non-Standing Director | None | May 16, 2016 |
| Kim, Ju-Suen | (58) | Non-Standing Director and Member of the Audit Committee | Representative of Kim, Ju-Suen Law Office | August 6, 2015 |
| Kim, Chang-Joon | (75) | Non-Standing Director | Chairman of the Sport for All subcommittee, Korean Sport and Olympic Committee | March 19, 2018 |
| Yang, Bong-Ryull | (67) | Non-Standing Director | None | April 4, 2018 |
| Kim, Jwa-Kwan | (59) | Non-Standing Director | Professor of Environmental Engineering, Catholic University of Pusan | April 4, 2018 |
| Jung, Yeon-Gil | (53) | Non-Standing Director | Professor of New Materials Engineering, Changwon University | April 4, 2018 |

*JongKap KIM* has been our President and CEO since April 13, 2018. Prior to his current position, he served as the Chief Executive Officer of Siemens Korea, the Chief Executive Officer of SK Hynix, a Commissioner of Korean Intellectual Property Office, and a Vice Minister of Ministry of Trade, Industry and Energy. Mr. Kim received a Ph. D. in public administration from Sungkyunkwan University, M.A in Economics from Indiana University and M.B.A. from New York University.

*Lee, Sung-Han* has been our Standing Director since May 2, 2016. Mr. Lee also currently serves as the Chaired Professor of College of Social Sciences at Dongguk University. Mr. Lee previously served as the

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

Commissioner General of the Korean National Police Agency, Director General of the Korean National Policy Agency's Office of Audit and Inspection, and Consular at the Embassy of the Republic of Korea in the United States. Mr. Lee received a Ph.D in police administration from Dongguk University.

*Kim, Si-Ho* has been our Standing Director since August 27, 2015. Mr. Kim also currently serves as our Executive Vice President of Domestic Operations and previously served as Executive Vice President and Chief Operating Officer. Mr. Kim received a B.A. in law from Yeungnam University.

*Hyun, Sang-Kwon* has been our Standing Director since August 27, 2015. Mr. Hyun also currently serves as our Executive Vice President, Chief Financial Officer and Chief Strategy Officer, and previously served as our Vice President of Project Strategy & Planning. Mr. Hyun received an M.A. in public administration from Yonsei University Graduate School.

*Moon, Bong-Soo* has been our Standing Director since January 10, 2017. Mr. Moon also currently serves as our Executive Vice President and Chief Power System Officer and previously served as our Director General of Project Strategy & Planning Office. Mr. Moon received a B.A. in electrical engineering from Seoul National University.

*Sung, Tae-Hyun* has been our Non-Standing Director since August 12, 2014. Mr. Sung is currently Professor of Electrical Engineering at Hanyang University and previously served as senior researcher at KEPCO Research Institute. Mr. Sung received a B.S. in material engineering from Hanyang University and a Ph.D in material science and engineering from Tokyo Institute of Technology.

*Choi, Ki-Ryun* has been our Non-Standing Director since August 12, 2014. Mr. Choi is currently Professor of Energy Systems Research at Ajou University and previously served as head of New & Renewable Energy Center of Korea Energy Management Corporation. Mr. Choi received a B.S. in mining and minerals engineering from Seoul National University and a Ph.D in energy economics from University of Grenoble.

*Kim, Ji-Hong* has been our Non-Standing Director since May 16, 2016. Mr. Kim previously served as a member of the Banking Subcommittee of the Financial Development Council, Professor at Korea Development Institute and a non-standing director at KB Kookmin Bank. Mr. Kim received a B.A in economics from Seoul National University and a Ph.D. in economics from the University of California, Berkeley.

*Kim, Ju-Suen* has been our Non-Standing Director since August 6, 2015. Mr. Kim is currently an attorney-at-law at Kim, Ju-Suen Law Firm. Mr. Kim previously served as Chief Public Prosecutor at the Daejeon Prosecutor's Office Cheonan branch. Mr. Kim received a B.A. and M.A. in law from Dankook University.

*Kim, Chang-Joon* has been our Non-Standing Director since March 19, 2018. Mr. Kim is currently chairman of the Sport for All subcommittee of the Korean Sport and Olympic Committee. Mr. Kim previously served as a member of the Electricity Regulatory Commission (KOREC). Mr. Kim received a B.S. in veterinary science at Chonnam National University.

*Yang, Bong-Ryull* has been our Non-Standing Director since April 4, 2018. Mr. Yang previously served as the Ambassador of the Republic of Korea to Malaysia. Mr. Yang received a B.A. in politics at Seoul National University and a Ph.D. in business administration from Gwangju University.

*Kim, Jwa-Kwan* has been our Non-Standing Director since April 4, 2018. Mr. Kim is currently Professor of Environmental Engineering at Catholic University of Pusan. Mr. Kim previously served as a visiting professor at the Seoul National University Graduate School of Environmental Studies. Mr. Kim received a B.S. in environmental engineering from Pukyong National University and a Ph.D. in public administration from Seoul National University.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Jung, Yeon-Gil* has been our Non-Standing Director since April 4, 2018. Mr. Jung is currently Professor of New Materials Engineering at Changwon University. Mr. Jung previously served as vice-chairman of the Korean Ceramic Society. Mr. Jung received a B.S. and a Ph.D in material engineering from Hanyang University

The business address of our directors is 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea.

**Audit Committee**

Under the Act on the Management of Public Institutions, which took effect as of April 1, 2007, we are designated as a "market-oriented public enterprise" and, as such, are required to establish an audit committee in lieu of the pre-existing board of auditors upon expiration of the term of the last remaining member of the board of auditors. In September 2007, we amended our Articles of Incorporation to establish, in lieu of the pre-existing board of auditors, an audit committee meeting the requirements under the Sarbanes-Oxley Act. Under the Act on the Management of Public Institutions, the Korean Commercial Code and the amended Articles of Incorporation, we are required to maintain an audit committee consisting of three members, of which not less than two members are required to be non-standing directors. The roles and responsibilities of our audit committee members are to perform the functions of an audit committee meeting the requirements under the Sarbanes-Oxley Act. Our audit committee was established on December 8, 2008.

Lee, Sung-Han, a standing director, and Kim, Ju-Seun, a non-standing director, are currently members of our audit committee. Cho, Jeon-Hyeok' s term as a non-standing director and a member of the audit committee expired on March 24, 2017. Under Korean law, Cho, Jeon-Hyeok retains the rights and is subject to obligations as a member of the audit committee and a non-standing director, to the extent such rights and obligations are connected to performance of his duties as a member of the audit committee, until his successor to take his place at our audit committee is approved and appointed at a general meeting of the shareholders. Subject to approval and appointment at the next general meeting of the shareholders, which is expected to take place in June 2018, our audit committee will consist of Lee, Sung-Han, Kim, Ju-Seun (or his successor who will be approved and appointed at such meeting, if Kim, Ju-Seun' s term as a Non-Standing Director is not renewed) and the newly appointed non-standing director and member of the audit committee. All such members of the audit committee are independent within the meaning of the Korea Stock Exchange listing standards, the regulations promulgated under the Korean Commercial Code and the New York Stock Exchange listing standards.

**Item 6.B. Compensation**

The aggregate amount of remuneration paid to our standing and non-standing directors in the aggregate consist of (i) salaries and wages paid to standing and non-standing directors, which amounted to Won 1,271 million in aggregate in 2017, and (ii) accrued retirement and severance benefits for standing directors, which amounted to Won 54 million in 2017. Under the Act on the Management of Public Institution, our executive officers consist of the president and the standing and non-standing directors. Standing directors take executive positions with our company while non-standing directors do not. We do not have any other officer who is in charge of a principal business unit, division or function, any other officer who performs a policy making function or any other person who performs similar policy making functions for us.

**Item 6.C. Board Practices**

Under the Act on the Management of Public Institutions and our Articles of Incorporation, for appoints made after April 1, 2007, the term of office for our president is three years and the term of our office for our directors (whether standing or non-standing but not the president) is two years. Our president and directors may be reappointed for one or more additional terms of one year. In order to be reappointed, the president must be evaluated on the basis of his management performance; a standing director, on the basis of the performance of the duties for which he was elected to perform, or if the standing director has executed an incentive bonus contract, on the basis of his performance under the contract; and a non-standing director, on the basis of his performance of the duties for which he was elected to perform.

117

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Our board currently does not maintain a compensation committee. See Item 16G. "Corporate Governance." However, we currently maintain an audit committee meeting the requirements of the Sarbanes-Oxley Act to perform the roles and responsibilities of the compensation committee. Prior to the establishment of the audit committee on December 8, 2008 pursuant to the Act on the Management of Public Institutions, we maintained a board of auditors, which performed the roles and responsibilities required of an audit committee under the Sarbanes-Oxley Act, including the supervision of the financial and accounting audit by the independent registered public accountants.

Our president's management contract includes benefits upon termination of his employment. The amount for termination benefits payable equals the average value of compensation for one month times the number of years the president is employed by us, provided that the president is only eligible for termination benefits after more than one year of continuous service.

The termination benefits for our standing directors are determined in accordance with our internal regulations for executive compensation. Standing directors are eligible for benefits only upon termination of employment or death following one year of continuous service.

See also Item 16G. "Corporate Governance" for a further description of our board practices.

### Item 6.D. Employees

As of December 31, 2017, we and our generation subsidiaries had a total of 45,232 regular employees, almost all of whom are employed within Korea. Approximately 10.4% of our regular employees (including employees of our generation subsidiaries) are located at our head office.

The following table sets forth the number of and other information relating to our regular employees, not including directors or senior management, as of December 31, 2017.

| | KEPCO | KHNP | KOSEP | KOMIPO | KOWEPO | KOSPO | EWP | Total |
|---|---|---|---|---|---|---|---|---|
| Regular Employees | | | | | | | | |
| Administrative | 4,919 | 1,053 | 261 | 293 | 273 | 280 | 308 | 7,387 |
| Engineers | 11,096 | 9,355 | 1,890 | 2,105 | 1,848 | 1,644 | 2,087 | 30,025 |
| Others | 5,612 | 1,145 | 243 | 208 | 236 | 367 | 9 | 37,412 |
| Total | 21,627 | 11,553 | 2,394 | 2,606 | 2,357 | 2,291 | 2,404 | 45,232 |
| Head Office Employees | 1,745 | 1,259 | 331 | 343 | 374 | 329 | 333 | 4,714 |
| % of total | 8.1 % | 10.9 % | 13.8 % | 13.2 % | 15.9 % | 14.4 % | 13.9 % | 10.4 % |
| Members of Labor Union | 15,887 | 7,397 | 1,698 | 1,507 | 1,615 | 1,570 | 1,550 | 31,224 |
| % of total | 73.5 % | 64.0 % | 70.9 % | 57.8 % | 68.5 % | 68.5 % | 64.5 % | 69.0 % |

We and each of our generation subsidiaries have separate labor unions. Approximately 69.0% of our and our generation subsidiaries' employees in the aggregate are members of these labor unions, each of which negotiates a collective bargaining agreement for its members each year. Under applicable Korean law, an employee-employer cooperation committee comprised of an equal number of representatives of management and labor (which shall be no less than three and no more than ten representatives from each of management and labor) is required to be established. Accordingly, an employee-employer cooperation committee composed of eight representatives of management and eight representatives of labor has been established at us and at each of our generation subsidiaries. The committee meets periodically to discuss various labor issues.

Since our formation in 1981, our businesses had not been interrupted by any work stoppages or strikes except in early 2002, when employees belonging to our five non-nuclear generation subsidiaries went on strike for six weeks to protest the Government's decision to privatize such non-nuclear generation subsidiaries

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

according to the Restructuring Plan, which privatization plan has since been suspended indefinitely. See Item 3.D. "Risk Factors–Risks Relating to KEPCO–The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."

We believe our relations with our employees are generally good.

### Item 6.E. Share Ownership

None of our directors and members of our administrative, supervisory or management bodies own more than 0.1% of our common stock.

## ITEM 7.    *MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS*

### Item 7.A. Major Shareholders

The following table sets forth certain information relating to certain owners of our capital stock as of March 15, 2018, the date we last closed our shareholders' registry:

| Title of Class | Identity of Person or Group | Shares Owned | Percentage of Class(1) (%) |
|---|---|---|---|
| Common stock | Government | 116,841,794 | 18.2 |
| | Korea Development Bank[2] | 211,235,264 | 32.9 |
| | Subtotal | 328,077,058 | 51.1 |
| | National Pension Corporation | 36,460,422 | 5.7 |
| | Employee Stock Ownership Association | – | – |
| | Directors and executive officers as a group | – | – |
| | Public (non-Koreans) | 192,639,015 | 30.0 |
| | Common shares | 156,960,303 | 24.4 |
| | American depositary shares | 35,678,712 | 5.6 |
| | Public (Koreans) | 84,787,582 | 13.2 |
| | Total | 641,964,077 | 100.0 |

*Notes:*

(1) Percentages are based on issued shares of common stock.

(2) Korea Development Bank is a Government-controlled entity.

All of our shareholders have equal voting rights. See Item 10.B. "Memorandum and Articles of Incorporation–Description of Capital Stock–Voting Rights."

### Item 7.B. Related Party Transactions

We are engaged in a variety of transactions with our affiliates. We have related party transactions with Government-controlled entities such as Korea Gas Corporation, our consolidated subsidiaries and our equity investees. In addition, we engage in related party transactions with Korea Development Bank, one of our major shareholders. See Note 47 of the Notes to our consolidated financial statements included in this annual report for a description of transaction and balances with our related parties.

In the past three years, our related party transactions principally consisted of purchases of LNG from Korea Gas Corporation, sales of electricity to Korea District Heating Co., Ltd., and long-term borrowings from Korea Development Bank. In 2015, 2016 and 2017, we and our generation subsidiaries purchased LNG from Korea Gas Corporation in the aggregate amount of Won 4,599 billion, Won 3,633 billion and Won 3,246 billion, respectively. As of December 31, 2017, we had long-term borrowings from Korea Development Bank in the aggregate amount of Won 176 billion.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

We also engage in extensive transactions with our consolidated generation subsidiaries, including the purchase of electricity from them through Korea Power Exchange, sales of electricity to them, payment and receipt of commissions for services and receivables and payables transactions. These are eliminated in the consolidation process. We also provide guarantees for certain of our affiliates. See Item 5.F. "Tabular Disclosure of Contractual Obligations–Overdraft and Others." We also have certain relationships with the Korea Power Exchange. See Item 4.B. "Business Overview–Purchase of Electricity–Cost-based Pool System."

For a further description of our transactions with our affiliates, see Note 47 of the Notes to our consolidated financial statements included in this annual report.

### Item 7.C. Interests of Experts and Counsel

Not Applicable

### ITEM 8.    *FINANCIAL INFORMATION*

### Item 8.A. Consolidated Statements and Other Financial Information

We prepare our consolidated financial statements in compliance with requirements under Item 18. "Financial Statements."

### Legal Proceedings

As of December 31, 2017, we and our subsidiaries were engaged in 565 lawsuits as a defendant and 185 lawsuits as a plaintiff. As of the same date, the total amount of damages claimed against us and our subsidiaries was Won 478 billion, for which we have made a provision of Won 74 billion as of December 31, 2017, and the total amount claimed by us and our subsidiaries was Won 691 billion as of December 31, 2017. While the outcome of any of these lawsuits cannot presently be determined with certainty, our management currently believes that the final results from these lawsuits will not have a material adverse effect on our liquidity, financial position or results of operations.

The following are potentially significant claims pertaining to us and our subsidiaries.

In September 2013, Hyundai Engineering & Construction Co., Ltd. ("Hyundai E&C"), SK Engineering & Construction Co., Ltd. and GS Engineering & Construction Co., Ltd. filed a lawsuit against KHNP seeking from KHNP extra contractual payments in the total amount of Won 204 billion on grounds of design change under the construction contract relating to New Hanwool #1 and #2 units. In November 2016, the court ruled against KHNP, and KHNP has paid Won 217 billion of the claimed amounts in full and has subsequently appealed the ruling. The lawsuit is currently pending.

In December 2013, the Supreme Court of Korea ruled that regular bonuses fall under the category of ordinary wages on the condition that those bonuses are paid regularly and uniformly, and that any agreement which excludes such regular bonuses from ordinary wage is invalid. One of the key rulings provides that bonuses that are given to employees (i) on a regular and continuous basis and (ii) calculated according to the actual number of days worked (iii) that are not incentive-based must be included in the calculation of "ordinary wages." The Supreme Court further ruled that in spite of invalidity of such agreements, employees shall not retroactively claim additional wages incurred due to such court decision, in case that such claims bring to employees unexpected benefits which substantially exceeds the wage level agreed by employers and employees and cause an unpredicted increase in expenditures for their company, which would lead the company to material managerial difficulty or would be a threat to the existence of the company. In that case, the claim is not acceptable since it is unjust and is in breach of the principle of good faith. As a result of such ruling by the Supreme Court of Korea, we and our subsidiaries became subject to a number of lawsuits filed by various industry-wide and company-

120

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

specific labor unions based on claims that ordinary wage had been paid without including certain items that should have been included as ordinary wage. In July 2016, the court ruled against us, and in accordance with the court's ruling, in August 2016 we paid Won 55.1 billion to the employees for three years of back pay plus interest. As of December 31, 2017, however, 49 lawsuits were pending against our subsidiaries for an aggregate claim amount of Won 170 billion, for which our subsidiaries set aside an aggregate amount of Won 56 billion to cover any potential future payments of additional ordinary wage in relation to the related lawsuits. While the plaintiffs partially won in over 20 cases for which we appealed, all cases are currently on-going at various stages of proceedings. We cannot presently assure you that the courts will not ultimately rule against our subsidiaries in these lawsuits, or that the amount of our reserves against these lawsuits will be sufficient to cover the amounts actually payable under court rulings. Any of these developments would adversely affect our results of operations.

During the period from 2014 to 2017, certain residential customers filed class action lawsuits against us based on the claim that electricity tariffs, determined under the progressive rate structure, were excessive. As of December 31, 2017, we were subject to 13 such lawsuits brought by approximately 10,000 plaintiffs with an aggregate claim amount of Won 5.2 billion. Of these 13 lawsuits, two cases are currently pending in the third round of proceedings (for which we won all of the first and second rounds of proceedings) and five cases are currently pending in the second round of proceedings (for which we won all of the first rounds of proceedings, except for one case). Six cases are currently pending in the first round of proceedings.

In addition, our generation subsidiaries, currently and from time to time, are involved in lawsuits incidental to the conduct of their business. A significant number of such lawsuits are based on the claim that the construction and operation of the electricity generation units owned by our generation subsidiaries have impaired neighboring fish farms. Our generation subsidiaries normally pay compensation to the members of fishery associations near our power plant complex for expected losses and damages arising from the construction and operation of their power plants in advance. Despite such compensation paid by us, a claim may still be filed against our generation subsidiaries challenging the compensation paid by us.

The nuclear power plant at Wolsong #1 unit began operations in 1982 and ended its operations in 2012 pursuant to its 30-year operating license. In February 2015, the Nuclear Safety and Security Commission ("NSSC") evaluated the safety of operating Wolsong #1 unit and approved its extended operation until November 2022. However, a civic group filed a lawsuit to annul such decision, and in February 2017, the Seoul Administrative Court ruled against the NSSC. The NSSC appealed this decision, and the civic group has filed an injunction to suspend the operation of the Wolsong #1 unit. The civic group's injunction was denied in July 2017. KHNP, which currently is operating the unit pursuant to the NSSC's initial decision, has joined this lawsuit. As of December 31, 2017, the book value of property, plant and equipment and provision for decommissioning costs of Wolsong #1 unit was Won 608 billion and Won 642 billion, respectively. We cannot assure you whether the courts will ultimately rule to grant the extension of life for Wolsong #1. . In addition, it is reported that the Government will announce its decision by the first half of 2018 regarding the timing of the shutdown of Wolsong #1 unit. If Wolsong #1 unit is prohibited from operation, we may incur significant losses in connection with the property, plant and equipment of Wolsong #1 unit. In addition, the amount of provision may increase significantly, and the timing of actual cash outflows may be accelerated. There are seven other nuclear generation units whose life under their initial operating license will expire in the next nine years, or by 2027. Thus, if the courts or the Government were to ultimately decide against the extension of life for Wolsong #1, we may find it more difficult to have the life of other nuclear units extended as well. Furthermore, in September 2016, Greenpeace and 559 Korean nationals brought a lawsuit against the NSSC to revoke the permit the NSSC granted to KHNP in relation to the construction of Shin-Kori #5 and #6 nuclear generation units. This case is currently pending at the Seoul Administrative Court. The failure to extend the life of the generation units or proceed with the construction of new nuclear units would result in a loss of revenues and an increase in our overall fuel costs (as nuclear fuel is the cheapest compared to coal, LNG or oil), which could adversely affect our results of operation and financial condition.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

We and our subsidiaries are also involved in the following arbitrations, among others.

SAP Korea Ltd brought a breach of contract claim against us and KEPCO KDN Co., Ltd., one of our subsidiaries, in relation to the enterprise resource planning software serviced by SAP Korea. In that connection, arbitration was filed in the International Chamber of Commerce International Court of Arbitration. We have not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably determined.

Hyundai Samsung Joint Venture, one of our subcontractors, filed arbitration against us at the London Court of International Arbitration in 2016 in relation to certain disagreements involving the United Arab Emirates nuclear power plant construction project, but we have not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably determined.

Hyundai E&C, GS Engineering & Construction Corp., and Hansol SeenTec Co., Ltd. filed arbitration against us with the Korea Commercial Arbitration Board to request payment of additional construction costs. We have not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably determined. We currently expect an arbitral decision would be made in April 2018.

Halla Corporation filed arbitration against us with the Korea Commercial Arbitration Board to request payment of additional construction costs. As of December 31, 2017, the Company recognized Won 4.9 billion of provision in connection with this arbitral proceeding.

We do not believe such claims or proceedings, individually or in the aggregate, have had or will have a material adverse effect on us and our generation subsidiaries. However, we cannot assure you that this will be the case in the future, given the possibility that we may become subject to more legal and arbitral proceedings arising from changes in the environmental laws and regulations as they become applicable to us and our generation subsidiaries, and the related growth in demand for more compensation by actual and potential affected parties.

**Dividend Policy**

For our dividend policy, see Item 10.B. "Memorandum and Articles of Incorporation–Description of Capital Stock–Dividend Rights." For a description of the tax consequences of dividends paid to our shareholders, see Item 10.E. "Taxation–Korean Taxes–Shares or ADSs–Dividends on the Shares of Common Stock or ADSs" and Item 10.E. "Taxation–U.S. Federal Income Tax Consideration for U.S. Persons–Tax Consequences with Respect to Common Stock and ADSs–Distributions on Common Stock or ADSs."

**Item 8.B. Significant Changes**

Not Applicable

**ITEM 9.    *THE OFFER AND LISTING***

**Item 9.A. Offer and Listing Details**

Notes

We have issued the following registered notes and debentures, which are traded principally in the over-the-counter market:

☐  7.95% Zero-To-Full Debentures, due April 1, 2096 (the "7.95% Debentures");

☐  6% Debentures due December 1, 2026, (the "6% Debentures");

☐  7% Debentures due February 1, 2027 (the "7% Debentures"); and

122

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

6-3/4% Debentures due August 1, 2027 (the "6-3/4% Debentures," and together with the 7.95% Debentures, the 6% Debentures and the 7% Debentures, the "Registered Debt Securities").

Sales prices for the Registered Debt Securities are not regularly reported on any United States securities exchange or other United States securities quotation service.

### *Share Capital*

The principal trading market for our common stock is the Korea Exchange. Our common stock is also listed on the New York Stock Exchange in the form of ADSs. The ADSs have been issued by Citibank, N.A. as depositary and are listed on the New York Stock Exchange under the symbol "KEP." One ADS represents one-half of one share of our common stock. As of March 15, 2018, the date we last closed our shareholders' registry, 35,678,712 ADSs representing 5.6% shares of our common stock were outstanding.

123

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Common Stock*

    Shares of our common stock are listed on the KRX KOSPI Market of the Korea Exchange. The table below shows the high and low closing prices on the KRX KOSPI Market of the Korea Exchange for our common stock since 2013.

| Period | Price | |
|---|---|---|
| | High | Low |
| | (In Won) | |
| **2013** | | |
| First Quarter | 34,850 | 29,000 |
| Second Quarter | 32,600 | 24,850 |
| Third Quarter | 30,700 | 26,350 |
| Fourth Quarter | 34,750 | 27,250 |
| **2014** | | |
| First Quarter | 37,800 | 33,400 |
| Second Quarter | 41,900 | 37,050 |
| Third Quarter | 48,200 | 36,800 |
| Fourth Quarter | 49,450 | 40,350 |
| **2015** | | |
| First Quarter | 46,000 | 39,150 |
| Second Quarter | 48,500 | 42,450 |
| Third Quarter | 52,200 | 46,300 |
| Fourth Quarter | 53,300 | 47,500 |
| **2016** | | |
| First Quarter | 46,000 | 39,150 |
| Second Quarter | 63,000 | 57,400 |
| Third Quarter | 62,900 | 54,000 |
| Fourth Quarter | 54,500 | 43,200 |
| **2017** | | |
| First Quarter | 48,750 | 40,350 |
| Second Quarter | 46,700 | 40,800 |
| Third Quarter | 45,500 | 38,200 |
| Fourth Quarter | 41,100 | 37,350 |
| October | 41,100 | 37,350 |
| November | 39,150 | 37,450 |
| December | 39,250 | 37,850 |
| **2018** | | |
| First Quarter | 37,750 | 30,850 |
| January | 37,750 | 34,650 |
| February | 36,100 | 33,100 |
| March | 33,100 | 30,850 |
| April (through April 16) | 34,950 | 33,250 |

124

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*ADSs*

The table below shows the high and low closing prices on the New York Stock Exchange for the outstanding ADSs since 2013. Each ADS represents one-half of one share of our common stock.

| Period | Closing Price per ADS | |
|---|---|---|
| | High | Low |
| | (In US$) | |
| **2013** | | |
| First Quarter | 16.35 | 13.04 |
| Second Quarter | 14.70 | 10.70 |
| Third Quarter | 14.59 | 11.45 |
| Fourth Quarter | 16.61 | 12.77 |
| **2014** | | |
| First Quarter | 17.75 | 15.51 |
| Second Quarter | 20.56 | 17.66 |
| Third Quarter | 22.44 | 18.17 |
| Fourth Quarter | 22.87 | 18.90 |
| **2015** | | |
| First Quarter | 21.01 | 18.26 |
| Second Quarter | 22.53 | 19.29 |
| Third Quarter | 22.13 | 19.45 |
| Fourth Quarter | 23.31 | 20.28 |
| **2016** | | |
| First Quarter | 21.01 | 18.26 |
| Second Quarter | 26.90 | 24.67 |
| Third Quarter | 28.31 | 24.38 |
| Fourth Quarter | 24.34 | 18.48 |
| **2017** | | |
| First Quarter | 21.35 | 17.53 |
| Second Quarter | 20.80 | 17.82 |
| Third Quarter | 20.38 | 16.73 |
| Fourth Quarter | 18.22 | 16.60 |
| October | 18.22 | 16.60 |
| November | 17.79 | 16.93 |
| December | 18.22 | 17.45 |
| **2018** | | |
| First Quarter | 17.83 | 14.28 |
| January | 17.83 | 16.24 |
| February | 16.58 | 14.88 |
| March | 15.46 | 14.28 |
| April (through April 16) | 16.59 | 15.54 |

**Item 9.B. Plan of Distribution**

Not Applicable

**Item 9.C. Markets**

**The Korea Exchange**

The Korea Exchange began its operations in 1956, originally under the name of the Korea Stock Exchange. On January 27, 2005, pursuant to the Korea Securities and Futures Exchange Act, the Korea Exchange was

125

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

officially created through the consolidation of the Korea Stock Exchange, the Korea Futures Exchange, the KOSDAQ Stock Market, Inc., or KOSDAQ, and the KOSDAQ Committee within the Korea Securities Dealers Association, which was in charge of the management of the KOSDAQ. The KRX KOSPI Market of the Korea Exchange, formerly the Korea Stock Exchange, has a single trading floor located in Seoul. The Korea Exchange is a limited liability company, the shares of which are held by (i) securities companies and futures companies that were the members of the Korea Stock Exchange or the Korea Futures Exchange and (ii) the shareholders of the KOSDAQ.

As of March 30, 2018, the aggregate market value of equity securities listed on the KOSPI of the Korea Exchange was approximately Won 1,627,647 billion. The average daily trading volume of equity securities for the first quarter of 2018 was approximately 387 million shares with an average transaction value of Won 6,978 billion.

The Korea Exchange has the power in some circumstances to suspend trading of shares of a given company or to de-list a security. The Korea Exchange also restricts share price movements. All listed companies are required to file accounting reports annually, semi-annually and quarterly and to release immediately all information that may affect trading in a security.

The Government has in the past exerted, and continues to exert, substantial influence over many aspects of the private sector business community which can have the intention or effect of depressing or boosting the market. In the past, the Government has informally both encouraged and restricted the declaration and payment of dividends, induced mergers to reduce what it considers excess capacity in a particular industry and induced private companies to publicly offer their securities.

The Korea Exchange publishes the Korea Composite Stock Price Index, or KOSPI, every ten seconds, which is an index of all equity securities listed on the KRX KOSPI Market of the Korea Exchange. On January 1, 1983, the method of computing KOSPI was changed from the Dow Jones method to the aggregate value method. In the new method, the market capitalizations of all listed companies are aggregated, subject to certain adjustments, and this aggregate is expressed as a percentage of the aggregate market capitalization of all listed companies as of the base date, January 4, 1980.

Movements in KOSPI in the past five years are set out in the following table:

|  | Opening | High | Low | Closing |
|---|---|---|---|---|
| 2013 | 2,031.1 | 2,059.6 | 1,780.6 | 2,011.3 |
| 2014 | 1,967.2 | 2,082.6 | 1,886.9 | 1,915.6 |
| 2015 | 1,926.4 | 2,173.4 | 1,829.8 | 1,961.3 |
| 2016 | 1,918.8 | 2,068.7 | 1,835.3 | 2,026.5 |
| 2017 | 2,026.2 | 2,558.0 | 2,026.2 | 2,467.5 |
| 2018 (through April 16) | 2,479.7 | 2,598.2 | 2,363.8 | 2,457.5 |

*Source:* The Korea Exchange

Shares are quoted "ex-dividend" on the first trading day of the relevant company's accounting period; since the calendar year is the accounting period for the majority of listed companies, this may account for the drop in KOSPI between its closing level at the end of one calendar year and its opening level at the beginning of the following calendar year.

With certain exceptions, principally to take account of a share being quoted "ex-dividend" and "ex-rights," upward and downward movements in share prices of any category of shares on any day are limited under the

126

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

rules of the Korea Exchange to 30% of the previous day's closing price of the shares, rounded down as set out below:

| Previous Day's Closing Price (Won) | Rounded Down to (Won) |
|---|---|
| less than 5,000 | ₩ 5 |
| 5,000 to less than 10,000 | 10 |
| 10,000 to less than 50,000 | 50 |
| 50,000 to less than 100,000 | 100 |
| 100,000 to less than 500,000 | 500 |
| 500,000 or more | 1,000 |

As a consequence, if a particular closing price is the same as the price set by the fluctuation limit, the closing price may not reflect the price at which persons would have been prepared, or would be prepared to continue, if so permitted, to buy and sell shares. Orders are executed on an auction system with priority rules to deal with competing bids and offers.

Due to deregulation of restrictions on brokerage commission rates, the brokerage commission rate on equity securities transactions may be determined by the parties, subject to commission schedules being filed with the Korea Exchange by the securities companies. In addition, a securities transaction tax will generally be imposed on the transfer of shares or certain securities representing rights to subscribe for shares. A special agricultural and fishery tax of 0.15% of the sales prices will also be imposed on transfer of these shares and securities on the Korea Exchange. See Item 10.E. "Taxation–Korean Taxes."

The number of companies listed on the KRX KOSPI Market of the Korea Exchange since 2012, the corresponding total market capitalization at the end of the periods indicated and the average daily trading volume for those periods are set forth in the following table:

| Year | Number of Listed Companies | Total Market Capitalization on the Last Day for Each Period | | Average Daily Trading Volume, Value | | |
|---|---|---|---|---|---|---|
| | | (Millions of Won) | (Thousands of U.S. dollars)(1) | (Thousands of Shares) | (Millions of Won) | Thousands of U.S. dollars)(1) |
| 2013 | 777 | 1,185,973,724 | 1,123,826,138 | 328,325 | 3,993,422 | 3,784,158 |
| 2014 | 773 | 1,192,252,867 | 1,084,655,082 | 278,082 | 3,983,580 | 3,624,072 |
| 2015 | 770 | 1,242,832,089 | 1,060,436,936 | 455,256 | 5,351,734 | 4,566,326 |
| 2016 | 779 | 1,308,440,373 | 1,082,697,868 | 376,772 | 4,523,043 | 3,742,692 |
| 2017 | 774 | 1,605,820,912 | 1,498,806,153 | 340,463 | 5,335,418 | 4,979,856 |
| 2018 (through April 16) | 777 | 1,638,625,626 | 1,527,001,795 | 393,455 | 7,031,950 | 6,552,931 |

*Source*: The Korea Exchange

*Note*:

(1) Converted at the market average exchange rate as announced by Seoul Money Brokerage Services, Ltd. in Seoul at the end of the periods indicated.

The Korean securities markets are principally regulated by the Financial Services Commission and the Financial Investment Services and Capital Markets Act. The law imposes restrictions on insider trading and price manipulation, requires specified information to be made available by listed companies to investors and establishes rules regarding margin trading, proxy solicitation, takeover bids, acquisition of treasury shares and reporting requirements for shareholders holding substantial interests.

**Protection of Customer's Interest in Case of Insolvency of Financial Investment Companies with a Brokerage License**

Under Korean law, the relationship between a customer and a financial investment company with a brokerage license in connection with a securities sell or buy order is deemed to be consignment, and the

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

securities acquired by a consignment agent (i.e., the financial investment company with a brokerage license) through such sell or buy order are regarded as belonging to the customer insofar as the customer and the consignment agent's creditors are concerned. Therefore, in the event of bankruptcy or reorganization procedures involving a financial investment company with a brokerage license, the customer of such financial investment company is entitled to the proceeds of the securities sold by such financial investment company.

When a customer places a sell order with a financial investment company with a brokerage license which is not a member of the Korea Exchange and this financial investment company places a sell order with another financial investment company with a brokerage license which is a member of the Korea Exchange, the customer is still entitled to the proceeds of the securities sold received by the non-member company from the member company regardless of the bankruptcy or reorganization of the non-member company.

Likewise, when a customer places a buy order with a non-member company and the non-member company places a buy order with a member company, the customer has the legal right to the securities received by the non-member company from the member company because the purchased securities are regarded as belonging to the customer insofar as the customer and the non-member company's creditors are concerned.

Under the Financial Investment Services and Capital Markets Act, the Korea Exchange is obliged to indemnify any loss or damage incurred by a counterparty as a result of a breach by its members. If a financial investment company with a brokerage license which is a member of the Korea Exchange breaches its obligation in connection with a buy order, the Korea Exchange is obliged to pay the purchase price on behalf of the breaching member.

As the cash deposited with a financial investment company with a brokerage license is regarded as belonging to such financial investment company, which is liable to return the same at the request of its customer, the customer cannot take back deposited cash from the financial investment company with a brokerage license if a bankruptcy or reorganization procedure is instituted against such financial investment company and, therefore, can suffer from loss or damage as a result. However, the Depositor Protection Act provides that Korean Deposit Insurance Corporation will, upon the request of the investors, pay investors up to Won 50 million per depositor per financial institution in case of the such financial investment company's bankruptcy, liquidation, cancelation of securities business license or other insolvency events (collectively, the "Insolvency Events"). Pursuant to the Financial Investment Services and Capital Markets Act, subject to certain exceptions, financial investment companies with a brokerage license are required to deposit the cash received from their customers with the Korea Securities Finance Corporation, a special entity established pursuant to the Financial Investment Services and Capital Markets Act. Set-off or attachment of cash deposits by financial investment companies with a brokerage license is prohibited. The premiums related to this insurance under the Depositor Protection Act are paid by financial investment companies with a brokerage license.

**Item 9.D. Selling Shareholders**

Not Applicable

**Item 9.E. Dilution**

Not Applicable

**Item 9.F. Expenses of the Issue**

Not Applicable

**ITEM 10.   *ADDITIONAL INFORMATION***

**Item 10.A. Share Capital**

Not Applicable

128

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Item 10.B. Memorandum and Articles of Incorporation**

Set forth below is information relating to our capital stock, including brief summaries of material provisions of our Articles of Incorporation, the KEPCO Act, the Financial Investment Services and Capital Markets Act, the Korean Commercial Code and certain related laws of Korea, all currently in effect. The following summaries are qualified in their entirety by reference to our Articles of Incorporation and the applicable provisions of the KEPCO Act, Financial Investment Services and Capital Markets Act, the Korean Commercial Code, the Act on the Management of Public Institutions and certain related laws of Korea. On November 11, 2016, we amended our Articles of Incorporation to strike references to executive directors (while keeping references to Standing Directors), as executive directors have not been appointed since 2003 and the system of executive directors was deemed obsolete.

**Objects and Purposes**

We are a statutory juridical corporation established under the KEPCO Act for the purpose of ensuring "stabilization of the supply and demand of electric power, and further contributing toward the sound development of the national economy through expediting development of electric power resources and carrying out proper and effective operation of the electricity business." The KEPCO Act and our Articles of Incorporation contemplate that we engage in the following activities:

1.  development of electric power resources;

2.  generation, transmission, transformation and distribution of electricity and other related business activities;

3.  research and development of technology related to the businesses mentioned in items 1 and 2;

4.  overseas businesses related to the businesses mentioned in items 1 through 3;

5.  investments or contributions related to the businesses mentioned in items 1 through 4;

6.  businesses incidental to items 1 through 5;

7.  Development and operation of certain real estate held by us to the extent that:

    a.  it is necessary to develop certain real estate held by us due to external factors, such as relocation, consolidation, conversion to indoor or underground facilities or deterioration of our substation or office; or

    b.  it is necessary to develop certain real estate held by us to accommodate development of relevant real estate due to such real estate being incorporated into or being adjacent to an area under planned urban development; and

8.  other activities entrusted by the Government.

Our registered name is "Hankook Chollryuk Kongsa" in Korean and "Korea Electric Power Corporation" in English. Our registration number in the commercial registry office is 114671-0001456.

**Directors**

Under the KEPCO Act and our Articles of Incorporation, our board of directors consists of our president, standing directors and non-standing directors. A majority of the board members constitutes a voting quorum, and resolutions will be passed by a majority of the board members. Directors who have an interest in certain agenda proposed to the board may not vote on such issues.

The standards of remuneration for our officers, including directors, shall be determined by a resolution of the board of directors, provided that the maximum amount of remuneration to be paid to our officers shall be

129

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

determined by shareholder resolution and provided that the remuneration standards for the president and standing directors shall be determined by board resolution in accordance with the guideline thereon established by the minister of the Ministry of Strategy and Finance through review and resolution of our management committee. Directors who have an interest may not participate in the meeting of the board of directors for determining the remuneration for officers.

Neither the KEPCO Act nor our Articles of Incorporation have provisions relating to (i) borrowing powers exercisable by the directors and how such borrowing powers can be varied, (ii) retirement or non-retirement of directors under an age limit requirement, or (iii) the number of shares required for a director's qualification.

**Share Capital**

Currently, our authorized share capital is 1,200,000,000 shares, which consists of shares of common stock and shares of non-voting preferred stock, par value Won 5,000 per share. Under our Articles of Incorporation, we are authorized to issue up to 150,000,000 non-voting preferred shares. As of March 15, 2018, the last day on which our shareholders' registry was closed for purposes of identifying shareholders of record, 641,964,077 common shares were issued and no non-voting preferred shares have been issued. All of the issued and outstanding common shares are fully-paid and non-assessable and are in registered form. Share certificates are issued in denominations of 1, 5, 10, 50, 100, 500, 1,000 and 10,000 shares.

**Description of Capital Stock**

*Dividend Rights*

Under the KEPCO Act, we are authorized to pay preferential dividends on our shares held by public shareholders as opposed to those held by the Government. Dividends to public shareholders are distributed in proportion to the number of shares of the relevant class of capital stock owned by each public shareholder following approval by the shareholders at a general meeting of shareholders. Korea Development Bank may receive dividends in proportion to the numbers of our shares held by them. Under the Korean Commercial Code and our Articles of Incorporation, we will pay full annual dividends on newly issued shares.

Under our Articles of Incorporation, holders of non-voting preferred shares (of which there are currently none) are entitled to receive an amount not less than 8% of their par value as determined by a resolution of the board of directors at the time of their issuance. However, stock dividends shall be paid based on par value and may not exceed the amount equivalent to a half of the total amount of profit available for dividend payment.

We declare our dividend annually at the annual general meeting of shareholders which is held within three months after the end of the fiscal year. The annual dividend is paid to the shareholders on record as of the end of the fiscal year preceding the annual shareholders' meeting. Annual dividends may be distributed either in cash or in our shares. However, a dividend of shares must be distributed at par value, and dividends in shares may not exceed one-half of the annual dividend.

Under the Korean Commercial Code and our Articles of Incorporation, we do not have an obligation to pay any annual dividend unclaimed for five years from the payment date.

The KEPCO Act provides that we shall not pay an annual dividend unless we have made up any accumulated deficit and set aside as a legal reserve an amount equal to 20.0% or more of our net profit until our accumulated reserve reaches one-half of our stated capital.

*Distribution of Free Shares*

In addition to dividends in the form of shares to be paid out of retained or current earnings, the Korean Commercial Code permits us to distribute to our shareholders an amount transferred from our capital surplus or legal reserve to stated capital in the form of free shares.

130

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Voting Rights*

Holders of our common shares are entitled to one vote for each common share, except that voting rights with respect to any common shares held by us or by a corporate shareholder, more than one-tenth of whose outstanding capital stock is directly or indirectly owned by us, may not be exercised. Any person (with certain exceptions) who holds more than 3% of our issued and outstanding shares cannot exercise voting rights with respect to the shares in excess of this 3% limit. See "–Limitation on Shareholdings." Pursuant to the Korean Commercial Code, cumulative voting is permissible in relation to the appointment of directors. Under the Korean Commercial Code, a cumulative vote can be requested by the shareholders of a corporation representing at least 1% of the total voting shares of such corporation if the relevant shareholders' meeting is intended to elect more than two seats of the board of directors and the request for cumulative voting is made to the management of the corporation in writing at least six weeks in advance of the shareholders' meeting. Under this new voting method, each shareholder will have multiple voting rights corresponding to the number of directors to be appointed in such voting and may exercise all such voting rights to elect one director. Shareholders are entitled to vote cumulatively unless the Articles of Incorporation expressly prohibit cumulative voting. Our current Articles of Incorporation do not prohibit cumulative voting. Except as otherwise provided by law or our Articles of Incorporation, a resolution can be adopted at a general meeting of shareholders by affirmative majority vote of the voting shares of the shareholders present or represented at a meeting, which must also represent at least one-fourth of the voting shares then issued and outstanding. The holders of our non-voting preferred shares (other than enfranchised preferred shares (as described below)) are not entitled to vote on any resolution or to receive notice of any general meeting of shareholders unless the agenda of the meeting includes consideration of a resolution on which such holders are entitled to vote. If we are unable to pay any dividend to holders of non-voting preferred shares as provided in our Articles of Incorporation, the holders of non-voting preferred shares will become enfranchised and will be entitled to exercise voting rights until such dividends are paid. The holders of these "enfranchised preferred shares" have the same rights as holders of our common shares to request, receive notice of, attend and vote at a general meeting of shareholders. Pursuant to the KEPCO Act and our Articles of Incorporation, the appointment of standing directors, the president and standing statutory auditor are subject to shareholder approval.

Under the Korean Commercial Code, for the purpose of electing our statutory auditor, a shareholder (together with certain related persons) holding more than 3% of the total shares having voting rights may not exercise voting rights with respect to shares in excess of such 3% limit.

The Korean Commercial Code provides that the approval by holders of at least two-thirds of those shares having voting rights present or represented at a meeting, where such shares also represent at least one-third of the total issued and outstanding shares having voting rights, is required in order to, among other things:

> amend our Articles of Incorporation;

> remove a director or statutory auditor;

> effect any dissolution, merger, consolidation or spin-off of us;

> transfer the whole or any significant part of our business;

> effect the acquisition by us of all of the business of any other company;

> effect the acquisition by us of the business of another company that may have a material effect on our business;

> reduce capital; or

> issue any new shares at a price lower than their par value.

Under our Articles of Incorporation, an approval by the Ministry of Trade, Industry and Energy is required in order to amend the Articles of Incorporation. Any change to our authorized share capital requires an amendment to our Articles of Incorporation.

131

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

In addition, in the case of amendments to our Articles of Incorporation or any merger or consolidation of us or in certain other cases which affect the rights or interests of the non-voting preferred shares a resolution must be adopted by a meeting of the holders of non-voting preferred shares approving such event. This resolution may be adopted if approval is obtained from holders of at least two-thirds of those non-voting preferred shares present or represented at such meeting and such non-voting preferred shares also represent at least one-third of our total issued and outstanding non-voting preferred shares.

A shareholder may exercise his voting rights by proxy. The proxy shall present the power of attorney prior to the start of the general meeting of shareholders. Under the Financial Investment Services and Capital Markets Act and our Articles of Incorporation, no one other than us may solicit a proxy from shareholders.

Subject to the provisions of the deposit agreement, holders of our American Depositary Shares ("ADSs") are entitled to instruct the depositary, whose agent is the record holder of the underlying common shares, how to exercise voting rights relating to those underlying common shares.

*Preemptive Rights and Issuance of Additional Shares*

Authorized but unissued shares may be issued at such times and, unless otherwise provided in the Korean Commercial Code, upon such terms as our board of directors may determine. The new shares must be offered on uniform terms to all our shareholders who have preemptive rights and who are listed on the shareholders' register as of the record date. Subject to the limitations described under "–Limitation on Shareholdings" below and with certain other exceptions, all our shareholders are entitled to subscribe for any newly issued shares in proportion to their existing shareholdings. Under the Korean Commercial Code, we may vary, without shareholder approval, the terms of such preemptive rights for different classes of shares. Public notice of the preemptive rights to new shares and their transferability must be given not less than two weeks (excluding the period during which the shareholders' register is closed) prior to the record date. Our board of directors may determine how to distribute shares for which preemptive rights have not been exercised or where fractions of shares occur.

Our Articles of Incorporation provide that new shares that are (1) publicly offered pursuant to the Financial Investment Services and Capital Markets Act, (2) issued to members of our employee stock ownership association, (3) represented by depositary receipts, (4) issued through offering to public investors, or (5) issued to investors in kind under the State Property Act may be issued pursuant to a resolution of the board of directors to persons other than existing shareholders, who in such circumstances will not have preemptive rights.

Under our Articles of Incorporation, we may issue convertible bonds or bonds with warrants each up to an aggregate principal amount of Won 2,000 billion and Won 1,000 billion, respectively, to persons other than existing shareholders. However, the aggregate principal amount of convertible bonds and bonds with warrants so issued to persons other than existing shareholders may not exceed Won 2,000 billion.

Under the Financial Investment Services and Capital Markets Act and our Articles of Incorporation, members of our employee stock ownership association, whether or not they are our shareholders, have a preemptive right, subject to certain exceptions, to subscribe for up to 20.0% of any shares publicly offered pursuant to the Financial Investment Services and Capital Markets Act. This right is exercisable only to the extent that the total number of shares so acquired and held by members of our employee stock ownership association does not exceed 20.0% of the total number of shares then outstanding.

*Liquidation Rights*

In the event of our liquidation, the assets remaining after payment of all debts, liquidation expenses and taxes will be distributed among shareholders in proportion to the number of shares held. Holders of our non-voting preferred shares have no preference in liquidation.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

Table of Contents

*Rights of Dissenting Shareholders*

In certain limited circumstances (including, without limitation, the transfer of the whole or any significant part of our business or the merger, or consolidation upon a split-off of us with another company), dissenting holders of shares have the right to require us to purchase their shares. To exercise such right, shareholders must submit a written notice of their intention to dissent to us prior to the general meeting of shareholders or the class meeting of holders of non-voting preferred shares, as the case may be. Within 20 days after the date on which the relevant resolution is passed at such meeting, such dissenting shareholders must request us in writing to purchase their shares. We are obligated to purchase the shares of dissenting shareholders within one month after the expiration of such 20-day period. The purchase price for such shares must be determined through negotiation between the dissenting shareholders and us. Under the Financial Investment Services and Capital Markets Act, if we cannot agree on a price through negotiation, the purchase price will be the average of (1) the weighted average of the daily share price on the Korea Exchange for a two-month period before the date of adoption of the relevant board resolution, (2) the weighted average of the daily share price on the Korea Exchange for the one month period before such date and (3) the weighted average of the daily share price on the Korea Exchange for the one week period before such date. However, if we or dissenting shareholders who requested us to purchase their shares oppose such purchase price, the determination of a purchase price may be filed with a court. Holders of ADSs will not be able to exercise dissenter's rights unless they have withdrawn the underlying Common Stock and become our direct shareholders.

**Transfer of Shares**

Under the Korean Commercial Code, the transfer of shares is effected by delivery of share certificates, but in order to assert shareholders' rights against us, the transferee must have his name and address registered on our register of shareholders. For this purpose, shareholders are required to file one's name, address and seal with our transfer agent. Under our Articles of Incorporation, non-resident shareholders must appoint an agent authorized to receive notices on their behalf in Korea and file a mailing address in Korea. These requirements do not apply to the holders of ADSs. Under current Korean regulations, the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and internationally recognized foreign custodians are authorized to act as agents and provide related services for foreign shareholders. Our transfer agent is Kookmin Bank, located at 9-1, Namdaemun-ro, 2-ga, Chung-ku, Seoul, Korea. Certain foreign exchange controls and securities regulations apply to the transfer of our shares by non-residents of Korea or non-Koreans. See Item 9. "The Offer and Listing."

**Acquisition of Our Own Shares**

Under the Korean Commercial Code, we may acquire our own shares through (1) purchases on a stock exchange or (2) purchase of the shares in proportion to the number of shares held by each shareholder on equal terms and conditions, by a resolution at a Shareholders' meeting. The aggregate amount of the acquisition price shall not exceed the excess of our net assets, on a non-consolidated basis, over the sum of (1) our stated capital, (2) the total amount of our capital surplus reserve and earned surplus reserve which have accumulated up to the end of the previous fiscal year, (3) our earned surplus required to be accumulated for the then current fiscal year and (4) our net assets stated in the balance sheet as being increased as a result of the evaluation of the assets and liabilities in accordance with our accounting principles without being set off against any unrealized losses. In addition, under the Korean Commercial Code, we may not acquire our own shares if our net assets may fall short of the aggregate amount of the item (1) to (4) above, on a non-consolidated basis, as of the conclusion of the relevant business year of us. In general, our subsidiaries 50% or more whose shares are owned by us may not acquire our shares.

**General Meeting of Shareholders**

The ordinary general meeting of our shareholders is held within three months after the end of each fiscal year, and subject to board resolution or court approval, an extraordinary general meeting of our shareholders may

133

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

be held as necessary or at the request of shareholders holding an aggregate of 1.5% or more of our outstanding common shares for at least six consecutive months. Under the Korean Commercial Code, an extraordinary general meeting of shareholders may be convened at the request of our audit committee, subject to a board resolution or court approval. Holders of non-voting preferred shares may only request a general meeting of shareholders once the non-voting preferred shares have become enfranchised as described under "–Description of Capital Stock–Voting Rights" above. Written notices setting forth the date, place and agenda of the meeting must be given to shareholders at least two weeks prior to the date of the general meeting of shareholders. However, pursuant to the Korean Commercial Code and our Articles of Incorporation, with respect to holders of less than 1% of the total number of our issued and outstanding shares which are entitled to vote, notice may be given by placing at least two public notices at least two weeks in advance of the meeting in at least two daily newspapers published in Seoul or by placing a public notice in the electrical disclosure system of the Financial Supervisory Service or the Korea Exchange, at least two weeks in advance of the meeting. Currently, for giving such notice, we use an electronic disclosure system available for access at a website maintained by the Financial Supervisory Service (known as the Data Analysis, Retrieval and Transfer System, or DART). Shareholders not on the shareholders' register as of the record date are not entitled to receive notice of the general meeting of shareholders or attend or vote at such meeting. Holders of the enfranchised preferred shares on the shareholders' register as of the record date are entitled to receive notice of, and to attend and vote at, the general meetings. Otherwise, holders of non-voting preferred shares are not entitled to receive notice of general meetings of shareholders or vote at such meetings but may attend such meetings.

The general meeting of shareholders is held in Naju, Jeollanam-do.

**Register of Shareholders and Record Dates**

Our transfer agent, Kookmin Bank, maintains the register of our shareholders at its office in Seoul, Korea. It registers transfers of our shares on the register of shareholders upon presentation of the share certificates.

The record date for annual dividends is December 31. For the purpose of determining the holders of shares entitled to annual dividends, the register of shareholders may be closed from January 1 to January 31 of each year. Further, the Korean Commercial Code and our Articles of Incorporation permit us at least two weeks' public notice to set a record date and/or close the register of shareholders for not more than three months for the purpose of determining the shareholders entitled to certain rights pertaining to our shares. The trading of our shares and the delivery of certificates in respect of them may continue while the register of shareholders is closed.

**Annual Report**

At least one week prior to the annual general meeting of shareholders, our annual report and audited consolidated financial statements must be made available for inspection at our principal office and at all branch offices. Copies of annual reports, the audited non-consolidated financial statements and any resolutions adopted at the general meeting of shareholders will be available to our shareholders.

Under the Financial Investment Services and Capital Markets Act, we must file with the Financial Services Commission and the Korea Exchange an annual report within 90 days after the end of our fiscal year, a half-year report within 45 days after the end of the first six months of our fiscal year and quarterly reports within 45 days after the end of the first three months and nine months of our fiscal year. Following our adoption of IFRS starting in January 1, 2011 pursuant to regulatory requirements for listed companies in Korea, we are required to file half-year and quarterly reports containing interim financial statements and notes thereto on a consolidated basis as well as on a separate basis.

**Limitation on Shareholdings**

No person other than the Government, our employee stock ownership association and persons who obtain an approval from the Financial Services Commission may hold for its account more than 3% of our total issued and

134

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

outstanding shares. In calculating shareholdings for this purpose, shares held by your spouse and your certain relatives or by your certain affiliates (such spouses, relatives and affiliates are together referred to as "Affiliated Holders") are deemed to be held by you. If you hold our shares in violation of this 3% limit, you are not entitled to exercise the voting rights or preemptive rights of our shares in excess of such 3% limit and the Financial Services Commission may order you to take necessary corrective action. In addition, the KEPCO Act currently requires that the Government, directly or through Korea Development Bank, own not less than 51% of our capital. For other restrictions on shareholdings, see Item 9. "The Offer and Listing."

**Change of Control**

The KEPCO Act requires that the Government, directly or pursuant to the Korea Development Bank Act, through Korea Development Bank, own not less than 51% of our capital.

**Disclosure of Share Ownership**

Under the Financial Investment Services and Capital Markets Act, any person whose direct or beneficial ownership of a listed company's shares with voting rights, equity-related debt securities including convertible bonds, bonds with warrants, exchangeable bonds, certificates representing the rights to subscribe for common shares, derivatives-linked securities and depository receipts of the aforementioned securities (collectively referred to as "Equity Securities"), together with the Equity Securities directly or beneficially owned by certain related persons or by any person acting in concert with the person, accounts for 5% or more of our total outstanding Equity Securities is required to report the status and purpose (in terms of whether the purpose of shareholding is to participate in the management of the issuer) of the holdings and the material contents of the agreements relating to the Equity Securities and other matters prescribed by the Presidential Decree under the Financial Investment Services and Capital Markets Act to the Financial Services Commission of Korea and the Korea Exchange within five business days after reaching the 5% ownership interest threshold.

In addition, any change (i) in the purpose of the shareholding or in the ownership, (ii) the major terms and conditions of agreements relating to Equity Securities owned (such as trust agreements and collateral agreements) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, or (iii) the type of ownership (direct ownership or holding) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, must be reported to the Financial Services Commission of Korea and the Korea Exchange within five business days from the date of such change (or by the tenth day of the month following the month in which the change occurs, in the case of a person with no intent to seek management control). Notwithstanding the foregoing, certain professional investors designated by the Financial Services Commission may report such matters to the Financial Services Commission and the Korea Exchange by the tenth day of the month immediately following the end of the quarter in which such 5.0% ownership interest is reached or the change occurs.

When filing a report to the Financial Services Commission and the Korea Exchange in accordance with the reporting requirements described above, a copy of such report must be sent to the relevant listed company. Violation of these reporting requirements may subject a person to sanctions such as prohibition on the exercise of voting rights with respect to the Equity Securities for which the reporting requirement was violated or fines or imprisonment. Furthermore, the Financial Services Commission may order the disposal of the Equity Securities for which the reporting requirement was violated or may impose administrative fine.

A person reporting to the Financial Services Commission and the Korea Exchange that his purpose of holding the Equity Securities is to participate in the management of the listed company is prohibited from acquiring additional Equity Securities of the listed company and exercising voting rights during the period commencing from the date on which the event triggering the reporting requirements occurs to the fifth day from the date on which the report is made.

135

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### Item 10.C. Material Contracts

None.

### Item 10.D. Exchange Controls

**General**

The Foreign Exchange Transaction Act and the Presidential Decree and regulations under that Act and Decree, or collectively the Foreign Exchange Transaction Laws, regulate investment in Korean securities by non-residents and issuance of securities outside Korea by Korean companies. Non-residents may invest in Korean securities pursuant to the Foreign Exchange Transaction Laws. The Financial Services Commission has also adopted, pursuant to its authority under the Financial Investment Services and Capital Markets Act, regulations that regulate investment by foreigners in Korean securities and issuance of securities outside Korea by Korean companies.

Subject to certain limitations, the Ministry of Strategy and Finance has the authority to take the following actions under the Foreign Exchange Transaction Laws: (i) if the Government deems it necessary on account of war, armed conflict, natural disaster or grave, sudden and significant changes in domestic or foreign economic circumstances or similar events or circumstances, the Ministry of Strategy and Finance may temporarily suspend performance under any or all foreign exchange transactions, in whole or in part, to which the Foreign Exchange Transaction Laws apply (including suspension of payment and receipt of foreign exchange) or impose an obligation to deposit, safe-keep or sell any instruments of payment to the Bank of Korea or certain other governmental agencies or financial institutions, or effective from July 18, 2017, impose an obligation on resident creditors to collect and recover debts owed by non-resident debtors,, and (ii) if the Government concludes that the international balance of payments and international financial markets are experiencing or are likely to experience significant disruption or that the movement of capital between Korea and other countries are likely to adversely affect the Korean Won, exchange rates or other macroeconomic policies, the Ministry of Strategy and Finance may take action to require any person who intends to effect or effects a capital transaction to deposit all or a portion of the instruments of payment acquired in such transactions with the Bank of Korea or certain other governmental agencies or financial institutions.

**Government Review of Issuances of Debt Securities and ADSs and Report for Payments**

In order for us to issue debt securities of any series outside of the Republic, we are required to file a report with our designated foreign exchange bank or the Ministry of Strategy and Finance on the issuance of such debt securities, depending on the issuance amount. The Ministry of Strategy and Finance may at its discretion direct us to take measures as necessary to avoid undue exchange rate fluctuations before it accepts such report. Furthermore, in order for us to make payments of principal of or interest on the debt securities of any series and other amounts as provided in an indenture and such debt securities, we are required to present relevant documents to the designated foreign exchange bank at the time of each actual payment. The purpose of such presentation is to ensure that the actual remittance is consistent with the terms of the transaction reported to our designated foreign exchange bank or the Ministry of Strategy and Finance.

In order for us to offer for purchase shares of our common stock held in treasury in the form of ADSs or issue shares of our common stock represented by the ADSs, we are required to file a prior report of such offer or issuance with our designated foreign exchange bank or the Ministry of Strategy and Finance, depending on the offering amount. The Ministry of Strategy and Finance may at its discretion direct us to take measures as necessary to avoid undue exchange rate fluctuations before it accepts such report. No further Governmental approval is necessary for the initial offering and issuance of the ADSs.

In order for a depositary to acquire any existing shares of our common stock from holders of these shares of common stock (other than from us) for the purpose of issuance of depositary receipts representing these shares of

136

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

common stock, the depositary would be required to obtain our consent for the number of shares to be deposited in any given proposed deposit which exceeds the difference between (1) the aggregate number of shares deposited by us or with our consent for the issuance of ADSs (including deposits in connection with the initial and all subsequent offerings of ADSs and stock dividends or other distributions related to these ADSs) and (2) the number of shares on deposit with the depositary at the time of such proposed deposit. We may not grant this consent for the deposit of shares of our common stock in the future, if our consent is required. Therefore, a holder of ADSs who surrenders ADSs and withdraws shares of our common stock may not be permitted subsequently to deposit such shares and obtain ADSs.

In addition, we are also required to notify the Ministry of Strategy and Finance upon receipt of the full proceeds from the offering of ADSs. No additional Governmental approval is necessary for the offering and issuance of ADSs.

**Reporting Requirements for Holders of Substantial Interests**

Under the Financial Investment Services and Capital Markets Act, any person whose direct beneficial ownership of a listed company' s Equity Securities, together with the Equity Securities beneficially owned by certain related persons or by any person acting in concert with such person, accounts for 5% or more of our total outstanding Equity Securities is required to report the status and purpose (namely, whether the purposes of the share ownership is to participate in the management of the issuer) of the holdings and the material contents of the agreements relating to the Equity Securities and other matters prescribed by the Presidential Decree under the Financial Investment Services and Capital Markets Act to the Financial Services Commission and the Korea Exchange within five business days after reaching the 5% ownership interest and any change in ownership interest subsequent to the report which equals or exceeds 1.0% of the total outstanding Equity Securities is required to be reported to the Financial Services Commission and the Korea Exchange within five business days from the date of the change.

In addition, any change (i) in the purpose of the shareholding or in the ownership, (ii) the major terms and conditions of agreements relating to Equity Securities owned (such as trust agreements and collateral agreements) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, or (iii) the type of ownership (direct ownership or holding) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, must be reported to the Financial Services Commission of Korea and the Korea Exchange within five business days from the date of such change (or by the tenth day of the month following the month in which the change occurs, in the case of a person with no intent to seek management control). Notwithstanding the foregoing, certain professional investors designated by the Financial Services Commission may report such matters to the Financial Services Commission and the Korea Exchange by the tenth day of the month immediately following the end of the quarter in which such 5.0% ownership interest is reached or the change occurs.

When filing a report to the Financial Services Commission and the Korea Exchange in accordance with the reporting requirements described above, a copy of such report must be sent to the relevant listed company. Violation of these reporting requirements may subject a person to sanctions such as prohibition on the exercise of voting rights with respect to the Equity Securities for which the reporting requirement was violated or fines or imprisonment. Furthermore, the Financial Services Commission may order the disposal of the Equity Securities for which the reporting requirement was violated or may impose administrative fine.

A person reporting to the Financial Services Commission and the Korea Exchange that his purpose of holding the Equity Securities is to participate in the management of the listed company is prohibited from acquiring additional Equity Securities of the listed company and exercising voting rights during the period commencing from the date on which the event triggering the reporting requirements occurs to the fifth day from the date on which the report is made.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

In addition to the reporting requirements described above, any person whose direct or beneficial ownership of our voting stock and/or depository receipts for our voting stock accounts for 10.0% or more of the total issued and outstanding voting stock, whom we refer to as a major shareholder, must file a report to the Securities and Futures Commission and to the Korea Exchange within five business days after the date on which the person reached such shareholding limit. In addition, such person must file a report to the Securities and Futures Commission and to the Korea Exchange regarding any subsequent change in his/her shareholding. Such report on subsequent change in shareholding must be filed within five business days of the occurrence of any such change. Violation of these reporting requirements may subject a person to criminal sanctions such as fines and imprisonment.

**Restrictions Applicable to ADSs**

No Governmental approval is necessary for the sale and purchase of ADSs in the secondary market outside Korea or for the withdrawal of shares of our common stock underlying ADSs and the delivery inside Korea of the withdrawn shares. However, a foreigner who intends to acquire shares must obtain an Investment Registration Card from the Financial Supervisory Service as described below. The acquisition of shares by a foreigner must be reported by the foreigner or his standing proxy in Korea immediately to the Governor of the Financial Supervisory Service.

**Special Reporting Requirement for Companies Whose Securities Are Listed on Foreign Exchanges**

Under the regulations of the Financial Services Commission and the Korea Exchange, (i) if a company listed on the Korea Exchange has submitted a public disclosure of material matters to a foreign financial investment supervisory authority pursuant to the laws of the foreign jurisdiction, then it must submit a copy of the public disclosure and a Korean translation thereof to the Financial Services Commission of Korea and the Korea Exchange, and (ii) if a company listed on the Korea Exchange is approved for listing on a foreign stock market or determined to be de-listed from the foreign stock market or actually listed on, or de-listed from, a foreign stock market, then it must submit a copy of any document, which it submitted to or received from the relevant foreign government, foreign financial investment supervisory authority or the foreign stock market, and a Korean translation thereof to the Financial Services Commission of Korea and the Korea Exchange.

Persons who have acquired shares of our common stock as a result of the withdrawal of shares of common stock underlying ADSs may exercise their preemptive rights for new shares, participate in free distributions and receive dividends on shares of our common stock without any further governmental approval.

**Restrictions Applicable to Common Stock**

Under the Foreign Exchange Transaction Laws and the Regulations on Financial Investment Business (together, the "Investment Rules"), foreigners are permitted to invest, subject to certain exceptions and procedural requirements, in all shares of Korean companies unless prohibited by specific laws. Foreign investors may trade shares listed on the Korea Exchange only through the Korea Exchange except for certain limited circumstances. These circumstances include, among others, (1) odd-lot trading of shares, (2) acquisition of shares by a foreign company as a result of a merger, (3) acquisition or disposal of shares in connection with a tender offer, (4) acquisition of shares by exercise of warrant, conversion right under convertible bonds, exchange right under exchangeable bonds or withdrawal right under depositary receipts issued outside of Korea by a Korean company, such shares being "Converted Shares," (5) acquisition of shares through exercise of rights under securities issued outside of Korea, (6) acquisition of shares as a result of inheritance, donation, bequest or exercise of shareholders' rights (including preemptive rights or rights to participate in free distributions and receive dividends), (7) over-the-counter transactions between foreigners of a class of shares for which a ceiling on aggregate acquisition by foreigners (as explained below) exists and has been reached or exceeded, (8) acquisition of shares by direct investment under the Foreign Investment Promotion Law, (9) acquisition and disposal of shares on an overseas stock exchange market, if such shares are simultaneously listed on the KRX

138

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

KOSPI Market or the KRX KOSDAQ Market of the Korea Exchange and such overseas stock exchange, and (10) arm's length transactions between foreigners in the event all such foreigners belong to an investment group managed by the same person. For over-the-counter transactions of shares listed on the Korea Exchange outside the Korea Exchange between foreigners of a class of shares for which a ceiling on aggregate acquisition by foreigners exists and has been reached or exceeded, a financial investment company with a brokerage license in Korea must act as an intermediary. Odd-lot trading of shares listed on the Korea Exchange outside the Korea Exchange must involve a financial investment company with a dealing license in Korea as the other party. Foreign investors are prohibited from engaging in margin transactions with respect to shares subject to a ceiling on acquisition by foreigners.

The Investment Rules require a foreign investor who wishes to invest in or dispose of shares on the Korea Exchange (including Converted Shares) to register his/her identity with the Financial Supervisory Service prior to making any such investment or disposal unless he/she had previously registered. However, such registration requirement does not apply to foreign investors who acquire Converted Shares with the intention of selling them within three months from the date they were acquired. Upon registration, the Financial Supervisory Service will issue to the foreign investor an Investment Registration Card which must be presented each time the foreign investor opens a brokerage account with a financial investment company or financial institution in Korea. Foreigners eligible to obtain an Investment Registration Card include any foreign nationals who are individuals (with residence abroad for six months or more), foreign governments, foreign municipal authorities, foreign public institutions, international financial institutions or similar international organizations, corporations incorporated under foreign laws and any person in any additional category designated by the Decree of the Financial Services and Capital Markets Act. All Korean branches of a foreign corporation as a group are treated as a separate foreigner from the head office of the foreign corporation. However, a foreign branch of a Korean securities company, a foreign corporation or a depositary issuing depositary receipts may obtain one or more Investment Registration Cards in its name in certain circumstances as described in the relevant regulations.

Upon a foreign investor's purchase of shares through the Korea Exchange, no separate report by the investor is required because the Investment Registration Card system is designed to control and oversee foreign investment through a computer system. However, a foreign investor's acquisition or sale of shares outside the Korea Exchange (as discussed above) must be reported by the foreign investor or his standing proxy to the Governor of the Financial Supervisory Service at the time of each acquisition or sale. However, a foreign investor must ensure that any acquisition or sale by it of shares outside the Korea Exchange in the case of trades in connection with a tender offer, odd-lot trading of shares or trades of a class of shares for which the aggregate foreign ownership limit has been reached or exceeded, is reported to the Governor of the Financial Supervisory Service by the Korea Securities Depository, financial investment companies with a dealing or brokerage license or securities finance companies engaged to facilitate such transactions. In the event a foreign investor desires to acquire or sell shares outside the Korea Exchange and the circumstances in connection with such sale or acquisition do not fall within the exceptions made for certain limited circumstances described above, then the foreign investor must obtain the prior approval of the Governor. In addition, in the event a foreign investor acquires or sells shares outside the Korea Exchange, a prior report to the Governor of the Financial Supervisory Service may also be required in certain circumstances. A foreign investor may appoint one or more standing proxies from among the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and certain eligible foreign custodians which will exercise shareholders' rights or perform any matters related to the foregoing activities if the foreign investor does not perform these activities himself. However, a foreign investor may be exempted from complying with these standing proxy rules with the approval of the Governor of the Financial Supervisory Service in cases deemed inevitable by reason of conflict between the laws of Korea and those of the home country of the foreign investor.

Certificates evidencing shares of Korean companies must be kept in custody with an eligible custodian in Korea, the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and certain eligible

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

foreign custodians are eligible to be a custodian of shares for a non-resident or foreign investor. A foreign investor must ensure that his custodian deposits his shares with the Korea Securities Depository. Generally, a foreign investor may not permit any person, other than his/her standing proxy, to exercise rights relating to his shares or perform any tasks related thereto on his behalf. However, a foreign investor may be exempted from complying with this deposit requirement with the approval of the Governor of the Financial Supervisory Service in circumstances where compliance is made impracticable, including cases where such compliance would contravene the laws of the home country of the foreign investor.

Under the Investment Rules, with certain exceptions, a foreign investor may acquire shares of a Korean company without being subject to any single or aggregate foreign investment ceiling. However, certain designated public corporations are subject to a 40.0% ceiling on acquisitions of shares by foreigners in the aggregate and a ceiling on acquisitions of shares by a single foreign investor provided in the Articles of Incorporation of such corporations. Of the Korean companies listed on the Korea Exchange, we are so designated. The Financial Services Commission may impose other restrictions as it deems necessary for the protection of investors and the stabilization of the Korean securities and derivatives market. Generally, the ownership of Converted Shares constitutes foreign ownership for purposes of such aggregate foreign ownership limit. However, the acquisition of Converted Shares is one of the exceptions under which foreign investors may acquire shares of designated corporations in excess of the 40.0% ceiling.

In addition to the aggregate foreign investment ceiling set by the Financial Services Commission under authority of the Financial Investment Services and Capital Markets Act, our Articles of Incorporation set a 3% ceiling on acquisition by a single investor (whether domestic or foreign) of the shares of our common stock. Any person (with certain exceptions) who holds more than 3% of our issued and outstanding shares cannot exercise voting rights with respect to our shares in excess of this 3% limit.

The ceiling on aggregate investment by foreigners applicable to us may be exceeded in certain limited circumstances, including as a result of acquisition of:

shares by a depositary issuing depositary receipts representing such shares (whether newly issued shares or outstanding shares);

Converted Shares;

shares from the exercise of shareholders' rights; or

shares by gift, inheritance or bequest.

A foreigner who has acquired shares in excess of any ceiling described above may not exercise his voting rights with respect to the shares exceeding such limit and the Financial Services Commission may take necessary corrective action against him.

Under the Foreign Exchange Transaction Laws, a foreign investor who intends to acquire shares must designate a foreign exchange bank at which he must open a foreign currency account and a Won account exclusively for stock investments. No approval is required for remittance into Korea and deposit of foreign currency funds in the foreign currency account. Foreign currency funds may be transferred from the foreign currency account at the time required to place a deposit for, or settle the purchase price of, a stock purchase transaction to a Won account opened at a securities company. Funds in the foreign currency account may be remitted abroad without any governmental approval.

Dividends on shares of our common stock are paid in Won. No governmental approval is required for foreign investors to receive dividends on, or the Won proceeds of the sale of, any shares to be paid, received and retained in Korea. Dividends paid on, and the Won proceeds of the sale of, any shares held by a non-resident of Korea must be deposited either in a Won account with the investor's securities company or the investor's Won account. Funds in the investor's Won account may be transferred to his foreign currency account or withdrawn

140

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

for local living expenses, provided that any withdrawal of local living expenses in excess of a certain amount should be reported to the Governor of the Financial Supervisory Service. Funds in the investor's Won account may also be used for future investment in shares or for payment of the subscription price of new shares obtained through the exercise of preemptive rights.

Financial investment companies with a securities dealing, brokerage or collective investment license are allowed to open foreign currency accounts with foreign exchange banks exclusively for accommodating foreign investors' stock investments in Korea. Through these accounts, these securities companies and asset management companies may enter into foreign exchange transactions on a limited basis, such as conversion of foreign currency funds and Won funds, either as a counterparty to or on behalf of foreign investors without the foreign investors having to open their own accounts with foreign exchange banks.

### Item 10.E.  Taxation

**Korean Taxes**

The following summary describes the material Korean tax consequences of ownership of the Registered Debt Securities and ADSs. Persons considering the purchase of the Registered Debt Securities or ADSs should consult their own tax advisors with regard to the application of the Korean income tax laws to their particular situations as well as any tax consequences arising under the laws of any other taxing jurisdiction. Reference is also made to a tax treaty between the Republic and the United States entitled "Convention Between the United States of America and the Republic of Korea for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and the Encouragement of International Trade and Investment," signed on June 4, 1976 and entered into force on October 20, 1979.

The following summary of Korean tax considerations applies to you so long as you are not:

a resident of Korea;

a corporation having its head office, principal place of business or place of effective management in Korea; or

engaged in a trade or business in Korea through a permanent establishment or a fixed base to which the relevant income is attributable or with which the relevant income is effectively connected.

*Registered Debt Securities*

*Taxation of Interest*

Pursuant to the Special Tax Treatment Control Law ("STTCL"), when we make payments of interest to you on the Registered Debt Securities, no amount will be withheld from such payments for, or on account of, any income taxes of any kind imposed, levied, withheld or assessed by Korea or any political subdivision or taxing authority thereof or therein, provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL.

If the tax exemption under the STTCL referred to above were to cease to be in effect, the rate of income tax or corporation tax applicable to the interest on the Registered Debt Securities would be 14% of income for a non-resident without a permanent establishment in Korea. In addition, local income tax would be imposed at the rate of 10.0% of the income tax or corporation tax (which would increase the total tax rate to 15.4%), unless reduction is available under an applicable income tax treaty. If you are a qualified resident in a country that has entered into a tax treaty with Korea, you may qualify for an exemption or a reduced rate of Korean withholding tax. See the discussion under "–Shares or ADSs–Tax Treaties" below for an additional explanation on treaty benefits.

141

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

In order to obtain the benefits of an exemption or a reduced withholding tax rate under a tax treaty, you must submit to us, prior to the interest payment date, such evidence of tax residence as may be required by the Korean tax authorities in order to establish your entitlement to the benefits of the applicable tax treaty.

Furthermore, Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, an overseas investment vehicle (which is defined as an organization established in a foreign jurisdiction that manages funds collected through investment solicitation by acquiring, disposing or otherwise investing in proprietary targets and then distributes the proceeds thereof to investors) (the "Overseas Investment Vehicle") must obtain an application for a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Taxation of Capital Gains*

Korean tax laws currently exclude from Korean taxation gains made by a non-resident without a permanent establishment in Korea from the sale of a Registered Debt Security to another non-resident (except where a non-resident sells Registered Debt Securities to another non-resident who has a permanent establishment in Korea, if any). In addition, capital gains realized from the transfer of Registered Debt Securities outside Korea by non-residents with or without permanent establishments in Korea are currently exempt from taxation by virtue of the STTCL, provided that the issuance of such Registered Debt Securities is deemed to be an overseas issuance of foreign currency-denominated bonds under the STTCL. If you sell or otherwise dispose of a Registered Debt Security through other ways than those mentioned above, any gain realized on the transaction will be taxable at ordinary Korean withholding tax rates (which is the lesser of 22.0% (including local income tax) of the net gain or 11.0% (including local income tax) of the gross sale proceeds, subject to the production of satisfactory evidence of the acquisition cost of such Registered Debt Securities and certain direct transaction costs attributable to the disposal of such Registered Debt Securities), unless an exemption is available under an applicable income tax treaty. See the discussion under "–Shares or ADSs–Tax Treaties" below for an additional explanation on treaty benefits.

*Inheritance Tax and Gift Tax*

If you die while you are the holder of Registered Debt Securities, the subsequent transfer of the Registered Debt Securities by way of succession will be subject to Korean inheritance tax. Similarly, if you transfer Registered Debt Securities as a gift, the donee will be subject to Korean gift tax and you may be required to pay the gift tax if the donee fails to do so.

At present, Korea has not entered into any tax treaty relating to inheritance or gift taxes.

**Shares or ADSs**

*Dividends on the Shares of Common Stock or ADSs*

We will deduct Korean withholding tax from dividends (whether in cash or in shares) paid to you at a rate of 22% (inclusive of local income tax). If you are a qualified resident in a country that has entered into a tax treaty with Korea, you may qualify for a reduced rate of Korean withholding tax. See the discussion under "–Tax Treaties" below for an additional explanation on treaty benefits.

In order to obtain the benefits of a reduced withholding tax rate under a tax treaty, you must submit to the Korea Securities Depository, prior to the dividend payment date, such evidence of tax residence as may be

142

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

required by the Korean tax authorities in order to establish your entitlement to the benefits of the applicable tax treaty. Evidence of tax residence may be submitted to the Korea Securities Depository through the withholding tax agent. If we distribute to you free shares representing a transfer of certain capital reserves or asset revaluation reserves into paid-in capital, such distribution may be subject to Korean withholding tax.

Furthermore, Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for entitlement to a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

If you hold common shares or ADSs and receive the dividend through an account at the Korea Securities Depository held by a foreign depositary settlement institute, you are not required to submit the application for entitlement to a preferential tax rate. However, evidence of tax residence may need to be submitted to us through such foreign depositary settlement institute.

*Taxation of Capital Gains*

As a general rule, capital gains earned by non-residents upon the transfer of the common shares or ADSs would be subject to Korean income tax at a rate equal to the lesser of (i) 11.0% (including local income tax) of the gross proceeds realized or (ii) 22.0% (including local income tax) of the net realized gain (subject to the production of satisfactory evidence of the acquisition costs and certain direct transaction costs arising out of the transfer of such common shares or ADSs), unless such non-resident is exempt from Korean income taxation under an applicable Korean tax treaty into which Korea has entered with the non-resident's country of tax residence. Please see the discussion under "−Tax Treaties" below for an additional explanation on treaty benefits. Even if you do not qualify for any exemption under a tax treaty, you will not be subject to the foregoing income tax on capital gains if you qualify for the relevant Korean domestic tax law exemptions discussed in the following paragraphs.

You will not be subject to Korean income taxation on capital gains realized upon the transfer of our common stocks or ADSs through the Korea Exchange if you (i) have no permanent establishment in Korea and (ii) did not own or have not owned (together with any shares owned by any entity which you have a certain special relationship with and possibly including the shares represented by the ADSs) 25.0% or more of our total issued and outstanding shares at any time during the calendar year in which the sale occurs and during the five calendar years prior to the calendar year in which the sale occurs.

It should be noted that (i) capital gains earned by you (regardless of whether you have a permanent establishment in Korea) from the transfer of ADSs outside Korea will be exempted from Korean income taxation provided that ADSs are deemed to have been issued overseas under the STTCL, but (ii) if and when an owner of the underlying shares of stock transfers ADSs after conversion of the underlying shares into ADSs, the exemption described in (i) is not applicable.

If you are subject to tax on capital gains with respect to the sale of ADSs, or of shares of common stock which you acquired as a result of a withdrawal, the purchaser or, in the case of the sale of shares of common stock on the Korea Exchange or through an investment dealer or investment broker under the Financial Investment Services and Capital Markets Act, an investment dealer or investment broker is required to withhold Korean tax from the sales price in an amount equal to 11.0% (including local income tax) of the gross realization proceeds and to make payment of these amounts to the Korean tax authority, unless you establish your entitlement to an exemption under an applicable tax treaty or domestic tax law or produce satisfactory evidence of your acquisition cost and transaction costs for the shares of common stock or the ADSs.

143

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

However, if you transfer the ADSs following an exchange of the underlying shares of stock owned by you for ADSs to a purchaser who is a non-resident or a foreign company without a permanent establishment in Korea, you are obligated to file an income tax return and pay tax on gain realized from such transfer unless exempt under an applicable tax treaty or domestic law. Further, if you transfer the shares of common stock outside of Korea (excluding a transfer on a foreign exchange) to non-residents or foreign companies without permanent establishments in Korea, you are obligated to file an income tax return and pay income tax on capital gain realized from such transfer unless exempt under an applicable tax treaty or domestic law. If a purchaser or an investment dealer or investment broker, as the case may be, withholds and remits the tax on capital gains derived from transfer of shares of common stock or ADSs, your obligation to file an income tax return and pay income tax will not apply.

In order to obtain the benefit of an exemption from tax pursuant to a tax treaty, you must submit to the purchaser or the investment dealer or the investment broker, or through the ADS depositary, as the case may be, prior to or at the time of payment, such evidence of your tax residence as the Korean tax authorities may require in support of your claim for treaty benefits. Please see the discussion under "–Tax Treaties" below for an additional explanation on claiming treaty benefits. Furthermore, Korean tax laws require the beneficial owner to submit an application for tax exemption together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available exemption pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for tax exemption from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Tax Treaties*

Korea has entered into a number of income tax treaties with other countries (including the United States), which would reduce or exempt Korean withholding tax on dividends on, and capital gains on transfer of, shares of our common stock or ADSs. For example, under the Korea-United States income tax treaty, reduced rates of Korean withholding tax of 16.5% or 11.0% (respectively, including local income tax, depending on your status and shareholding ratio) on dividends and an exemption from Korean withholding tax on capital gains are available to residents of the United States that are beneficial owners of the relevant dividend income or capital gains. However, under Article 17 (Investment of Holding Companies) of the Korea-United States income tax treaty, such reduced rates and exemption do not apply if (i) you are a United States corporation, (ii) by reason of any special measures, the tax imposed on you by the United States with respect to such dividends or capital gains is substantially less than the tax generally imposed by the United States on corporate profits, and (iii) 25.0% or more of your capital is held of record or is otherwise determined, after consultation between competent authorities of the United States and Korea, to be owned directly or indirectly by one or more persons who are not individual residents of the United States. Also, under Article 16 (Capital Gains) of the Korea-United States income tax treaty, the exemption on capital gains does not apply if you are an individual, and (a) you maintain a fixed base in Korea for a period or periods aggregating 183 days or more during the taxable year and your ADSs or shares of common stock giving rise to capital gains are effectively connected with such fixed base or (b) you are present in Korea for a period or periods of 183 days or more during the taxable year.

You should inquire for yourself whether you are entitled to the benefit of an income tax treaty with Korea. It is the responsibility of the party claiming the benefits of an income tax treaty in respect of dividend payments or capital gains to submit to us, the purchaser or the investment dealer or the investment broker, as applicable, a certificate as to his tax residence. In the absence of sufficient proof, we, the purchaser or the investment dealer or the investment broker, as applicable, must withhold tax at the normal rates. Further, in order for you to obtain the benefit of a tax exemption on certain Korean source income (e.g., interest, dividends and capital gains) under an applicable tax treaty, Korean tax laws require you (or your agent) to submit an application for tax exemption (if there is no change in the content of such application, it is not required to submit such application again within a

144

Table of Contents

period of three years thereafter) along with a certificate of your tax residence issued by a competent authority of your country of tax residence. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for tax exemption from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner. The withholding obligor must submit the application and the report to the relevant tax office by the ninth day of the month following the date of the first payment of such income.

Furthermore, the Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate (if there is no change in the content of such application, it is not required to submit such application again within a period of three years thereafter) together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. If you hold the shares of common stock or ADSs and receive the dividend through an account at the Korea Securities Depository held by a foreign depositary settlement institute, you are not required to submit the application for entitlement to a preferential tax rate. However, evidence of tax residence may need to be submitted to us through such foreign depositary settlement institute.

Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Inheritance Tax and Gift Tax*

If you die while holding an ADS or donate an ADS, it is unclear whether, for Korean inheritance and gift tax purposes, you will be treated as the owner of the shares of common stock underlying the ADSs. If the tax authority interprets depositary receipts as the underlying share certificates, you may be treated as the owner of the shares of common stock and your heir or the donee (or in certain circumstances, you as the donor) will be subject to Korean inheritance or gift tax presently at the rate of 10.0% to 50.0%, depending on the value of the ADSs or shares of common stock.

If you die while holding a share of common stock or donate a share of common stock, your heir or donee (or in certain circumstances, you as the donor) will be subject to Korean inheritance or gift tax at the same rate as indicated above.

At present, Korea has not entered into any tax treaty relating to inheritance or gift taxes.

*Securities Transaction Tax*

If you transfer shares of common stock on the Stock Market of the Korea Exchange, you will be subject to securities transaction tax at the rate of 0.15% and an agriculture and fishery special surtax at the rate of 0.15% of the sale price of the shares of common stock. If your transfer of the shares of common stock is not made on the Stock Market of the Korea Exchange, subject to certain exceptions you will be subject to securities transaction tax at the rate of 0.5% and will not be subject to an agriculture and fishery special surtax.

Under the Securities Transaction Tax Law, depositary receipts (such as ADSs) constitute share certificates subject to the securities transaction tax. However, a transfer of depositary receipts listed on the New York Stock Exchange, NASDAQ National Market or other qualified foreign exchanges will be exempt from the securities transaction tax although depositary receipts, including ADSs, constitute share certificates subject to the securities transaction tax.

145

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

In principle, the securities transaction tax, if applicable, must be paid by the transferor of the shares or rights. When the transfer is effected through the Korea Securities Depository, the Korea Securities Depository is generally required to withhold and pay the tax to the tax authorities. When such transfer is made through an investment dealer or investment broker under the Financial Investment Services and Capital Markets Act only, such investment dealer or investment broker is required to withhold and pay the tax. Where the transfer is effected by a non-resident without a permanent establishment in Korea, other than through the Korea Securities Depository or an investment dealer or investment broker, the transferee is required to withhold the securities transaction tax for payment to the Korean tax authority.

**U.S. Federal Income Tax Considerations for U.S. Persons**

The following is a summary of certain U.S. federal income tax consequences for beneficial owners of the Registered Debt Securities, common stock and ADSs that are "U.S. Persons" (as defined below). For purposes of this summary, you are a "U.S. Person" if you are any of the following for U.S. federal income tax purposes:

an individual citizen or resident of the United States;

a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

a trust if (1) it is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) it has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This summary is based on current law, which is subject to change (perhaps retroactively), is for general purposes only and should not be considered tax advice. This summary does not represent a detailed description of the U.S. federal income tax consequences and does not address the effects of the Medicare contribution tax on net investment income or foreign, state, local or other tax considerations that may be relevant to you in light of your particular circumstances. The discussion set forth below is applicable to you if (i) you are a resident of the United States for purposes of the current income tax treaty between the United States and Korea (the "Treaty"), (ii) your Registered Debt Securities, common stock or ADSs are not, for purposes of the Treaty, effectively connected with a permanent establishment in Korea and (iii) you otherwise qualify for the full benefits of the Treaty. Except where noted, this summary deals only with Registered Debt Securities, common stock or ADSs held as capital assets, and it does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws (including if you are a dealer in securities or currencies, a financial institution, a regulated investment company, a real estate investment trust, an insurance company, a tax-exempt organization, a person holding the Registered Debt Securities, common stock or ADSs as part of a hedging, integrated or conversion transaction, constructive sale or straddle, a person owning 10.0% or more of our stock (by vote or value), a trader in securities that elects to use a mark-to-market method of accounting for your securities holdings, a person liable for the alternative minimum tax, a person required to accelerate the recognition of any item of gross income with respect to the Registered Debt Securities, common stock or ADSs as a result of such income being recognized on an applicable financial statement, a partnership or other pass-through entity (or an investor therein), or a U.S. Person whose "functional currency" is not the U.S. dollar). We cannot assure you that a change in law will not alter significantly the tax considerations that we describe in this summary.

If a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) holds the Registered Debt Securities, common stock or ADSs, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our Registered Debt Securities, common stock, or ADSs, you should consult your tax advisor.

146

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Because of the 100-year maturity of the One Hundred Year 7.95% Zero-to-Full Debentures, due April 1, 2096 (the "ZTF Debentures"), it is not certain whether the ZTF Debentures will be treated as debt for U.S. federal income tax purposes. The discussion below assumes that the ZTF Debentures (as well as the other Registered Debt Securities) will be treated as debt, except that a summary of the consequences to you if the ZTF Debentures were not treated as debt is provided under "Tax Consequences with Respect to Registered Debt Securities Generally–ZTF Debentures Treated as Equity" below.

The discussion of the tax consequences of ownership of common stock and ADSs below, is based, in part, upon representations made by the depositary to us and assumes that the deposit agreement, and all other related agreements, will be performed in accordance with their terms.

**You should consult your own tax advisor concerning the particular U.S. federal income tax consequences to you of the ownership of the Registered Debt Securities, common stock and ADSs, as well as the consequences to you arising under the laws of any other taxing jurisdiction.**

*Tax Consequences with Respect to Registered Debt Securities Generally*

*Payments*

Except as provided below with regard to original issue discount (as defined below) on the ZTF Debentures, interest on a Registered Debt Security will generally be taxable to you as ordinary income at the time it is paid or accrued in accordance with your method of accounting for tax purposes. Principal payments on an amortizing Registered Debt Security generally will constitute a tax-free return of capital to you.

Although interest payments to you are currently exempt from Korean taxation provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL (see–"Korean Taxes–Registered Debt Securities–Taxation of Interest," above), if the Korean law providing for the exemption is repealed, then, in addition to interest payments on the Registered Debt Securities and original issue discount on the ZTF Debentures, you will be required to include in income any additional amounts paid and any Korean tax withheld from interest payments notwithstanding that you in fact did not receive such withheld tax. You may be entitled to deduct or credit such Korean tax (up to the Treaty rate), subject to applicable limitations in the Internal Revenue Code of 1986, as amended (the "Code"). Your election to deduct or credit foreign taxes will apply to all of your foreign taxes for a particular taxable year. Interest income on a Registered Debt Security (including additional amounts and any Korean taxes withheld in respect thereof) and original issue discount on a ZTF Debenture generally will constitute foreign source income and generally will be considered passive category income for purposes of computing the foreign tax credit. You will generally be denied a foreign tax credit for Korean taxes imposed with respect to the Registered Debt Securities where you do not meet a minimum holding period requirement during which you are not protected from risk of loss. The rules governing the foreign tax credit are complex. Investors are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

*Original Issue Discount*

The ZTF Debentures were issued with original issue discount ("OID") for U.S. federal income tax purposes equal to the difference between (i) the sum of all scheduled amounts payable on the ZTF Debentures (including the interest payable on such ZTF Debentures) and (ii) the "issue price" of the ZTF Debentures. The "issue price" of each ZTF Debenture is the first price at which a substantial amount of the ZTF Debentures was sold to the public (other than to an underwriter, broker, placement agent or wholesaler). If you hold ZTF Debentures, then (subject to the discussion in "–Bond Premium" below) you generally must include OID in gross income (as ordinary income) in advance of the receipt of cash attributable to that income, regardless of your method of accounting. However, you generally will not be required to include separately in income cash payments received on the ZTF Debentures, even if denominated as interest.

147

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The amount of OID includible in income by the holder of a ZTF Debenture is the sum of the "daily portions" of OID with respect to the ZTF Debenture for each day during the taxable year or portion of the taxable year in which such holder held such ZTF Debenture, or "accrued OID" (for a discussion relevant to subsequent purchasers, see "–Market Discount" and "–Bond Premium," below). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a ZTF Debenture may be of any length and may vary in length over the term of the ZTF Debenture, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the product of the ZTF Debenture's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period). OID allocable to a final accrual period is the difference between the amount payable at maturity and the adjusted issue price at the beginning of the final accrual period. The "adjusted issue price" of a ZTF Debenture at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period (for subsequent purchasers, determined without regard to the amortization of any acquisition or bond premium, as described below) and reduced by any payments previously made on such ZTF Debenture. Under these rules, you will have to include in income increasingly greater amounts of OID in successive accrual periods. We are required to provide information returns stating the amount of OID accrued on ZTF Debentures held of record by persons other than corporations and other exempt holders.

As discussed above, although interest payments to you are currently exempt from Korean taxation provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL (see–"Korean Taxes–Registered Debt Securities–Taxation of Interest," above), if the Korean law providing for the exemption is repealed, then Korean withholding tax may be imposed at times that differ from the times at which you are required to include interest or OID in income for U.S. federal income tax purposes and this disparity may limit the amount of foreign tax credit available.

*Market Discount*

If you purchased a Registered Debt Security other than a ZTF Debenture for an amount that is less than its stated redemption price at maturity, or, in the case of a ZTF Debenture, its adjusted issue price, the amount of the difference will be treated as "market discount" for U.S. federal income tax purposes, unless that difference is less than a specified de minimis amount. Under the market discount rules, you will be required to treat any payment, other than qualified stated interest (as defined in the Code), on, or any gain on the sale, exchange, retirement or other disposition of, a Registered Debt Security as ordinary income to the extent of the market discount that you have not previously included in income and are treated as having accrued on the Registered Debt Security at the time of its payment or disposition. In addition, you may be required to defer, until the maturity of the Registered Debt Security or its earlier disposition in a taxable transaction, the deduction of all or a portion of the interest expense on any indebtedness attributable to the Registered Debt Security.

Any market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the Registered Debt Security, unless you elect to accrue on a constant interest method. Your election to accrue market discount on a constant interest method is to be made for the taxable year in which you acquired the Registered Debt Security, applies only to that Registered Debt Security and cannot be revoked. You may elect to include market discount in income currently as it accrues, on either a ratable or constant interest method, in which case the rule described above regarding deferral of interest deductions will not apply. Your election to include market discount in income currently, once made, applies to all market discount obligations acquired by you on or after the first taxable year to which your election applies and may not be revoked without the consent of the Internal Revenue Service (the "IRS"). You should consult your own tax advisor before making this election.

148

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Bond Premium*

    If you purchased a ZTF Debenture for an amount that is greater than its adjusted issue price but equal to or less than the sum of all amounts payable on the ZTF Debenture after the purchase date, you will be considered to have purchased that ZTF Debenture at an "acquisition premium." Under the acquisition premium rules, the amount of OID that you must include in gross income with respect to a ZTF Debenture for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.

    If you purchased a Registered Debt Security for an amount in excess of the sum of all amounts payable on the Registered Debt Security after the purchase date other than qualified stated interest, you will be considered to have purchased the Registered Debt Security at a "premium" and, if such Registered Debt Security is a ZTF Debenture, you will not be required to include any OID in income. You generally may elect to amortize the premium over the remaining term of the Registered Debt Security on a constant yield method as an offset to interest when includible in income under your regular accounting method. In the case of instruments that provide for alternative payment schedules, bond premium is calculated by assuming that (a) you will exercise or not exercise options in a manner that maximizes your yield, and (b) we will exercise or not exercise options in a manner that minimizes your yield (except that we will be assumed to exercise call options in a manner that maximizes your yield). If you do not elect to amortize bond premium, that premium will decrease the gain or increase the loss you would otherwise recognize on disposition of a Registered Debt Security. Your election to amortize premium on a constant yield method will also apply to all debt obligations held or subsequently acquired by you on or after the first day of the first taxable year to which the election applies. You may not revoke the election without the consent of the IRS. You should consult your own tax advisor before making this election.

*Sale, Exchange and Retirement of Registered Debt Securities*

    When you sell, exchange or retire a Registered Debt Security, you will recognize gain or loss equal to the difference between the amount you receive (not including an amount equal to any accrued qualified stated interest, which will be taxable as ordinary income to the extent not previously included in income) and your adjusted tax basis in the Registered Debt Security. Your tax basis in a Registered Debt Security other than a ZTF Debenture will generally be your cost of obtaining the Registered Debt Security increased by any market discount included in income and reduced by payments of principal you receive and any bond premium that you elect to amortize. Your adjusted tax basis in a ZTF Debenture will, in general, be your cost therefor, increased by any market discount and OID previously included in income and reduced by any cash payments on the ZTF Debenture and any bond premium that you elect to amortize. Your gain or loss realized on selling, exchanging or retiring a Registered Debt Security will generally be treated as United States source income. Consequently, you may not be able to use the foreign tax credit arising from any Korean tax imposed on the disposition of Registered Debt Securities unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from foreign sources. Except as described above with respect to market discount, your gain or loss will be capital gain or loss and will generally be long-term capital gain or loss if, at the time of the sale, exchange or retirement of a Registered Debt Security, you have held the Registered Debt Security for more than one year. If you are an individual and the Registered Debt Security being sold, exchanged or retired is a capital asset that you held for more than one year, you may be eligible for reduced rates of taxation on any capital gain recognized. Your ability to deduct capital losses is subject to limitations.

*ZTF Debentures Treated as Equity*

    If the ZTF Debentures were treated as equity for U.S. federal income tax purposes, amounts actually or deemed paid with respect to the ZTF Debentures would be deemed dividends for U.S. federal income tax purposes to the extent paid out of our current or accumulated earnings and profits (as determined for U.S. federal income tax purposes).

    You would include the amounts actually or deemed paid by us on the ZTF Debentures (before reduction for Korean withholding tax, if any) as dividend income when actually or constructively paid by us. Section 305 of

149

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

the Code, which would apply to the ZTF Debentures if they were treated as equity for U.S. federal income tax purposes, requires current accrual of dividends under principles similar to the accrual of OID. Amounts treated as dividends will not be eligible for the dividends received deduction generally allowed to U.S. corporations.

***Tax Consequences with Respect to Common Stock and ADSs***

In general, for U.S. federal income tax purposes, holders of ADSs will be treated as the owners of the underlying common stock that is represented by such ADSs. Accordingly, deposits or withdrawals of common stock by holders of ADSs will not be subject to U.S. federal income tax.

*Distributions on Common Stock or ADSs*

The gross amount of distributions (other than certain distributions of common stock or rights to subscribe for common stock) to holders of common stock or ADSs (including amounts withheld in respect of Korean withholding taxes) will be taxable dividends to such holders, to the extent paid out of our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Such income (including withheld taxes) will be includable in the gross income of a holder as ordinary income on the day actually or constructively received by the holder, in the case of common stock, or by the depositary, in the case of ADSs. Such dividends will not be eligible for the dividends received deduction allowed to corporations under the Code.

With respect to non-corporate U.S. Persons, certain dividends paid by a qualified foreign corporation and received by such holders may be subject to reduced rates of taxation. A qualified foreign corporation includes a foreign corporation that is eligible for the benefits of an income tax treaty with the United States, if such treaty contains an exchange of information provision and the United States Treasury Department had determined that the treaty is satisfactory for purposes of the legislation. The United States Treasury Department has determined that the Treaty, which contains an exchange of information provision, is (in the absence of additional guidance) satisfactory for these purposes. In addition, we believe we are eligible for the benefits of the Treaty. However, a foreign corporation is also treated as a qualified foreign corporation with respect to dividends paid by that corporation on shares (or ADSs backed by such shares) that are readily tradable on an established securities market in the United States. Shares of our common stock will generally not be considered readily tradable for these purposes. However, United States Treasury Department guidance indicates that our ADSs, which are listed on the New York Stock Exchange, are readily tradable on an established securities market in the United States. There can be no assurance that our ADSs will be considered readily tradable on an established securities market in later years. Non-corporate U.S. Persons that do not meet a minimum holding period requirement during which they are not protected from a risk of loss or that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. In addition, the rate reduction will not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. Holders should consult their own tax advisors regarding the application of the foregoing rules to their particular circumstances.

The amount of any dividend paid in Won will equal the United States dollar value of the Won received calculated by reference to the exchange rate in effect on the date the dividend is received by the holder, in the case of common stock, or by the depositary, in the case of ADSs, regardless of whether the Won are converted into U.S. dollars. If the Won received as a dividend are not converted into U.S. dollars on the date of receipt, a holder will have a basis in the Won equal to their U.S. dollar value on the date of receipt. Any gain or loss realized on a subsequent conversion or other disposition of the Won will be treated as United States source ordinary income or loss. The amount of any distribution of property other than cash will be the fair market value of such property on the date of distribution.

The maximum rate of withholding tax on dividends paid to you pursuant to the Treaty is 16.5%. You will be required to properly demonstrate your entitlement to the reduced rate of withholding under the Treaty (see

150

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

"–Korean Taxes–Shares or ADSs –Tax Treaties"). Subject to certain conditions and limitations, Korean withholding taxes (up to the Treaty rate) will be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. For purposes of calculating the foreign tax credit, dividends paid on the common stock or ADSs will be treated as foreign source income and will generally constitute passive category income. Further, in certain circumstances, if you have held common stock or ADSs for less than a specified minimum period during which you are not protected from risk of loss, or are obligated to make payments related to the dividends, you will not be allowed a foreign tax credit for foreign taxes imposed on dividends paid on common stock or ADSs. The rules governing the foreign tax credit are complex. Investors are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances including the possible adverse impact on creditability to the extent you are entitled to a refund of any Korean tax withheld or a reduced rate of withholding.

To the extent that the amount of any distribution exceeds our current and accumulated earnings and profits for a taxable year, as determined under U.S. federal income tax principles, the distribution will first be treated as a tax- free return of capital, causing a reduction in the adjusted basis of the common stock or ADSs (thereby increasing the amount of gain, or decreasing the amount of loss, to be recognized by the investor on a subsequent disposition of the common stock or ADSs), and the balance in excess of adjusted basis will be taxed as capital gain recognized on a sale or exchange of property. Consequently, such distributions in excess of our current and accumulated earnings and profits would not give rise to foreign source income and you generally would not be able to use the foreign tax credit arising from any Korean withholding tax imposed on such distributions unless such credit can be applied (subject to applicable limitations) against U.S. tax due on other foreign source income in the appropriate category for foreign tax credit purposes. However, we do not expect to keep earnings and profits in accordance with U.S. federal income tax principles. Therefore, you should expect that a distribution will generally be treated as a dividend (as discussed above).

Distributions of common stock or rights to subscribe for common stock that are received as part of a pro rata distribution to all of our shareholders generally will not be subject to U.S. federal income tax. Consequently such distributions will not give rise to foreign source income and you generally will not be able to use the foreign tax credit arising from any Korean withholding tax unless such credit can be applied (subject to applicable limitations) against U.S. tax due on other income derived from foreign sources. The basis of the new common stock or rights so received will be determined by allocating your basis in the old common stock between the old common stock and the new common stock or rights received, based on their relative fair market value on the date of distribution. However, the basis of the rights will be zero if (i) the fair market value of the rights is less than 15% of the fair market value of the old common stock at the time of distribution, unless the taxpayer timely elects to determine the basis of the old common stock and of the rights by allocating between the old common stock and the rights the adjusted basis of the old common stock or (ii) the rights are not exercised and thus expire.

*Sale, Exchange or Other Disposition of ADSs or Common Stock*

Upon the sale, exchange or other disposition of ADSs or common stock, you generally will recognize capital gain or loss equal to the difference between the amount realized upon the sale, exchange or other disposition and your adjusted tax basis in the ADSs or common stock. The capital gain or loss will be long-term capital gain or loss if at the time of sale, exchange or other disposition, the ADSs or common stock have been held by you for more than one year. Under current law, long-term capital gains of individuals are, under certain circumstances, taxed at lower rates than items of ordinary income. The deductibility of capital losses is subject to limitations. Any gain or loss recognized by you will generally be treated as U.S. source gain or loss. Consequently, you may not be able to use the foreign tax credit arising from any Korean tax imposed on the disposition of ADSs or common stock unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from foreign sources.

You should note that any Korean securities transaction tax will not be treated as a creditable foreign tax for U.S. federal income tax purposes, although you may be entitled to deduct such taxes, subject to applicable limitations under the Code.

151

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Passive Foreign Investment Company Rules*

Based upon the past and projected composition of our income and assets and the valuation of our assets, we do not believe that we were a passive foreign investment company (a "PFIC") for 2017, and we do not expect to be a PFIC in 2018 or to become one in the foreseeable future, although there can be no assurance in this regard. If, however, we become a PFIC, such characterization could result in adverse U.S. tax consequences to you if you are a U.S. investor. For example, if we become a PFIC, our U.S. investors may become subject to increased tax liabilities under U.S. tax laws and regulations and will become subject to burdensome reporting requirements. Our PFIC status is determined on an annual basis and depends on the composition of our income and assets. Specifically, we will be classified as a PFIC for U.S. tax purposes if either: (i) 75% or more of our gross income in a taxable year is passive income, or (ii) the average percentage of our assets by value in a taxable year which produce or are held for the production of passive income (which generally includes cash) is at least 50%. We cannot assure you that we will not be a PFIC for 2018 or any future taxable year.

### Information Reporting and Backup Withholding

In general, information reporting requirements will apply to principal, interest, OID and premium payments on Registered Debt Securities and dividend payments in respect of the common stock or ADSs or the proceeds received on the sale, exchange or redemption of the Registered Debt Securities, common stock or ADSs paid within the United States (and in certain cases, outside of the United States) to holders other than certain exempt recipients, and a backup withholding tax may apply to such amounts if you fail to provide an accurate taxpayer identification number or certification of exempt status or fail to report interest and dividends required to be shown on your U.S. federal income tax returns. The amount of any backup withholding from a payment to you will be allowed as a refund or a credit against your U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

### Item 10.F. Dividends and Paying Agents

Not Applicable

### Item 10.G.  Statements by Experts

Not Applicable

### Item 10.H.  Documents on Display

We are subject to the information requirements of the Exchange Act, and, in accordance therewith, are required to file reports, including annual reports on Form 20-F, and other information with the U.S. Securities and Exchange Commission. You may inspect and copy these materials, including this annual report and the exhibits thereto, at SEC's Public Reference Room 100 Fifth Street, N.E., Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference rooms. As a foreign private issuer, we are also required to make filings with the Commission by electronic means. Any filings we make electronically will be available to the public over the Internet at the Commission's web site at http://www.sec.gov.

### Item 10.I.  Subsidiary Information

Not Applicable

### ITEM 11.    *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

Our primary market risk exposures are to fluctuations in exchange rates, interest rates and fuel prices. We are exposed to foreign exchange risk related to foreign currency-denominated liabilities. As of December 31,

152

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

2017, 19.4% of our long-term debt (including the current portion but excluding issue discounts and premium), without taking into consideration of swap transactions, was denominated in foreign currencies, principally U.S. dollars. However, a substantial portion of our revenues is denominated in Won. As a result, changes in exchange rates, particularly between the Won and the U.S. dollar, significantly affect us due to our significant amounts of foreign currency-denominated debt and the effect of such changes on the amount of funds required by us to make interest and principal payments on such debt. In order to reduce the impact of foreign exchange rate fluctuations on our results of operations, we have recently been reducing and plan to continue to reduce the proportion of our debt which is denominated in foreign currencies.

We are also exposed to foreign exchange risk related to our purchases of fuel since we obtain substantially all of our fuel materials (other than anthracite coal) directly or indirectly from sources outside Korea. Prices for such fuel materials are quoted based on prices stated in, and in many cases are paid for in, currencies other than Won. In 2017, fuel costs represented 27.8% of our sales.

We are exposed to interest rate risk due to significant amounts of debt. Upward fluctuations in interest rates increase the cost of additional debt and the interest cost of outstanding floating rate borrowings. We are also exposed to fluctuations in prices of fuel materials. In 2017, for electricity generation, uranium accounted for 34.8% of our fuel requirements, coal accounted for 53.3%, LNG accounted for 8.7%, oil accounted for 1.2%, and others accounted for 2.0%, measured in each case by the amount of electricity we generated. In 2016, for electricity generation, uranium accounted for 37.1% of our fuel requirements, coal accounted for 47.7%, LNG accounted for 10.7%, oil accounted for 3.0% and others accounted for 1.5%, measured in each case by the amount of electricity we generated.

For additional discussions of our market risks, see Item 3.D. "Risk Factors" and Item 5.B. "Liquidity and Capital Resources–Liquidity."

We have entered into various swap contracts to hedge exchange rate risks arising from foreign currency-denominated debts. Details of currency swap contracts outstanding as of December 31, 2017 are as follows:

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts | | Contract interest rate | | Contract Exchange Rate |
|------|-------------|---------------|-----------------|------------------|------|------------------------|------|------------------------|
| | | | | Pay | Receive | Pay | Receive | |
| | | | | (KRW in millions, USD in thousands) | | | | |
| Trading | Deutsche Bank | 2013 | 2018 | KRW 110,412 | JPY 10,000,000 | 6.21% | 4.19% | 11.04 |
| | IBK | 2013 | 2018 | KRW 111,800 | USD 100,000 | 3.16% | 2.79% | 1,118.00 |
| | Bank of America | 2013 | 2018 | KRW 103,580 | JPY 10,000,000 | 7.05% | 4.19% | 10.36 |
| | Credit Suisse | 2014 | 2019 | KRW 118,632 | CHF 100,000 | 2.98% | 1.50% | 1,186.32 |
| | Standard Chartered | 2014 | 2019 | KRW 114,903 | CHF 100,000 | 4.00% | 1.50% | 1,149.03 |
| | Standard Chartered | 2014 | 2029 | KRW 102,470 | USD 100,000 | 3.14% | 3.57% | 1,024.70 |
| | Societe Generale | 2014 | 2024 | KRW 105,017 | USD 100,000 | 4.92% | 5.13% | 1,050.17 |
| | KEB Hana Bank | 2015 | 2024 | KRW 107,970 | USD 100,000 | 4.75% | 5.13% | 1,079.70 |
| | Credit Agricole | 2015 | 2024 | KRW 94,219 | USD 86,920 | 4.85% | 5.13% | 1,083.97 |
| | Citibank | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | JP Morgan | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | Bank of America | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | Shinhan Bank | 2016 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | HSBC | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| | KEB Hana Bank | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.87% | 3.00% | 1,117.70 |
| | Standard Chartered | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| | Deutsche Bank | 2012 | 2022 | KRW 55,885 | USD 50,000 | 2.79% | 3.00% | 1,117.70 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.63% | 3M Libor+ 0.84% | 1,081.40 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.57% | 3M Libor+ 0.84% | 1,081.40 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.57% | 3M Libor+ 0.84% | 1,081.40 |
| | HSBC | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.41% | 2.88% | 1,074.50 |

153

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts (KRW in millions, USD in thousands) | | Contract interest rate | | Contract Exchange Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | Pay | Receive | Pay | Receive | |
| | Standard Chartered | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.44% | 2.88% | 1,074.50 |
| | JP Morgan | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.48% | 2.88% | 1,074.50 |
| | Bank of America | 2014 | 2018 | KRW 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| | Citibank | 2014 | 2018 | KRW 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| | HSBC | 2014 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Standard Chartered | 2014 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Korea Development Bank | 2016 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Nomura | 2015 | 2025 | KRW 111,190 | USD 100,000 | 2.60% | 3.25% | 1,111.90 |
| | Korea Development Bank | 2015 | 2025 | KRW 111,190 | USD 100,000 | 2.62% | 3.25% | 1,111.90 |
| | Woori Bank | 2015 | 2025 | KRW 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| | KEB Hana Bank | 2015 | 2025 | KRW 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| | Woori Bank | 2017 | 2027 | KRW 111,610 | USD 100,000 | 2.25% | 3.13% | 1,116.10 |
| | KEB Hana Bank | 2017 | 2027 | KRW 111,610 | USD 100,000 | 2.31% | 3.13% | 1,116.10 |
| | Korea Development Bank | 2017 | 2027 | KRW 111,610 | USD 100,000 | 2.31% | 3.13% | 1,116.10 |
| Cash flow hedge | Citibank | 2013 | 2018 | KRW 54,570.00 | USD 50,000 | 2.90% | 3M Libor+ 1.01% | 1,091.40 |
| | Standard Chartered | 2013 | 2018 | KRW 54,570.00 | USD 50,000 | 2.90% | 3M Libor+ 1.01% | 1,091.40 |
| | Credit Suisse | 2013 | 2018 | KRW 111,410.00 | USD 100,000 | 3.22% | 3M Libor+ 1.50% | 1,114.10 |
| | HSBC | 2014 | 2020 | KRW 99,901.00 | AUD 100,000 | 3.52% | 5.75% | 999.01 |
| | HSBC | 2014 | 2020 | KRW 100,482.00 | AUD 100,000 | 3.48% | 5.75% | 1,004.82 |
| | Standard Chartered | 2013 | 2020 | USD 117,250 | AUD 125,000 | 1.25% | 3M Libor+ 5.75% | 0.94 |
| | Standard Chartered | 2014 | 2020 | KRW 126,032.00 | USD 117,250 | 3.55% | 3M Libor+ 1.25% | 1,074.90 |
| | Korea Development Bank | 2017 | 2020 | KRW 114,580.00 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| | KEB Hana Bank | 2017 | 2020 | KRW 114,580.00 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| | Export-Import Bank of Korea | 2017 | 2020 | KRW 114,580.00 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| | JP Morgan | 2014 | 2019 | KRW 107,190.00 | USD 100,000 | 3M Libor+ 3.25% | 2.75% | 1,071.90 |
| | Morgan Stanley | 2014 | 2019 | KRW 107,190.00 | USD 100,000 | 3M Libor+ 3.25% | 2.75% | 1,071.90 |
| | Deutsche Bank | 2014 | 2019 | KRW 107,190.00 | USD 100,000 | 3M Libor+ 3.25% | 2.75% | 1,071.90 |
| | Korea Development Bank | 2016 | 2021 | KRW 121,000.00 | USD 100,000 | 2.15% | 2.50% | 1,210.00 |
| | Morgan Stanley | 2016 | 2021 | KRW 121,000.00 | USD 100,000 | 3M Libor+ 2.10% | 2.50% | 1,210.00 |
| | BNP Paribas | 2016 | 2021 | KRW 121,000.00 | USD 100,000 | 3M Libor+ 2.10% | 2.50% | 1,210.00 |
| | Nomura | 2017 | 2037 | KRW 52,457.00 | EUR 40,000 | 2.60% | 1.70% | 1,311.42 |
| | Nomura | 2017 | 2037 | KRW 59,423.00 | SEK 450,000 | 2.62% | 2.36% | 132.05 |
| | Credit Agricole | 2013 | 2019 | KRW 118,343.00 | CHF 100,000 | 3.47% | 1.63% | 1,183.43 |
| | Morgan Stanley | 2013 | 2019 | KRW 59,172.00 | CHF 50,000 | 3.40% | 1.63% | 1,183.43 |
| | Nomura | 2013 | 2019 | KRW 59,172.00 | CHF 50,000 | 3.47% | 1.63% | 1,183.43 |
| | Morgan Stanley | 2013 | 2018 | KRW 107,360.00 | USD 100,000 | 3.27% | 2.88% | 1,073.60 |
| | Credit Agricole | 2013 | 2018 | KRW 107,360.00 | USD 100,000 | 3.34% | 2.88% | 1,073.60 |
| | JP Morgan | 2013 | 2018 | KRW 161,040.00 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| | Standard Chartered | 2013 | 2018 | KRW 161,040.00 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| | Standard Chartered | 2014 | 2019 | KRW 104,490.00 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| | Credit Agricole | 2014 | 2019 | KRW 104,490.00 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| | Morgan Stanley | 2014 | 2019 | KRW 104,490.00 | USD 100,000 | 2.70% | 2.63% | 1,044.90 |

154

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts | | Contract interest rate | | Contract Exchange Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | Pay | Receive | Pay | Receive | |
| | | | | (KRW in millions, USD in thousands) | | | | |
| | Standard Chartered | 2013 | 2018 | KRW 81,188.00 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Credit Agricole | 2013 | 2018 | KRW 81,188.00 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Deutsche Bank | 2013 | 2018 | KRW 81,188.00 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Citibank | 2013 | 2018 | KRW 81,188.00 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Societe Generale | 2013 | 2018 | KRW 106,190.00 | USD 100,000 | 3.48% | 2.63% | 1,061.90 |
| | BNP Paribas | 2013 | 2018 | KRW 53,095.00 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| | KEB Hana Bank | 2013 | 2018 | KRW 53,095.00 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| | Standard Chartered | 2013 | 2018 | KRW 106,030.00 | USD 100,000 | 3.48% | 2.63% | 1,060.30 |
| | BNP Paribas | 2013 | 2018 | KRW 53,015.00 | USD 50,000 | 3.48% | 2.63% | 1,060.30 |
| | KEB Hana Bank | 2013 | 2018 | KRW 31,809.00 | USD 30,000 | 3.48% | 2.63% | 1,060.30 |
| | Societe Generale | 2013 | 2018 | KRW 21,206.00 | USD 20,000 | 3.48% | 2.63% | 1,060.30 |
| | HSBC | 2013 | 2018 | KRW 53,015.00 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| | Nomura | 2013 | 2018 | KRW 53,015.00 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| | Credit Agricole | 2014 | 2020 | KRW 110,680.00 | USD 100,000 | 2.29% | 2.50% | 1,106.80 |
| | Societe Generale | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| | KEB Hana Bank | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| | KEB Hana Bank | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | Standard Chartered | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | HSBC | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | Nomura | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | BNP Paribas | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | HSBC | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | KEB Hana Bank | 2017 | 2022 | KRW 226,600.00 | USD 200,000 | 1.94% | 2.63% | 1,133.00 |
| | Korea Development Bank | 2017 | 2022 | KRW 113,300.00 | USD 100,000 | 1.94% | 2.63% | 1,133.00 |
| | Nomura | 2017 | 2022 | KRW 113,300.00 | USD 100,000 | 1.95% | 2.63% | 1,133.00 |
| | Woori Bank | 2017 | 2022 | KRW 56,650.00 | USD 50,000 | 1.95% | 2.63% | 1,133.00 |
| | Kookmin Bank | 2017 | 2022 | KRW 56,650.00 | USD 50,000 | 1.95% | 2.63% | 1,133.00 |

Under these currency swap contracts, we recognized net valuation loss of Won 844 billion in 2017.

Details of interest rate contracts outstanding as of December 31, 2017 are as follows:

| Type | Counterparty | Contract Year | Settlement Year | Notional Amount | Contract Interest Rate Per Annum | |
|---|---|---|---|---|---|---|
| | | | | (KRW in millions, USD in thousands) | Pay | Receive |
| Trading | JP Morgan | 2013 | 2018 | KRW 150,000 | 3.58% | 3M CD+0.31% |
| | Credit Suisse | 2014 | 2018 | KRW 25,000 | 2.98% | 1Y CMT+0.31% |
| | KEB Hana Bank | 2017 | 2022 | KRW 100,000 | 2.01% | 3M CD+0.24% |
| | KEB Hana Bank | 2017 | 2022 | KRW 100,000 | 2.06% | 3M CD+0.27% |
| | Nomura(1) | 2017 | 2037 | KRW 30,000 | 2.05% | 3.08% |
| | KEB Hana Bank | 2017 | 2021 | KRW 200,000 | 2.45% | 3M CD+0.32% |
| | Export-Import Bank of Korea | 2015 | 2031 | USD 15,893 | 2.67% | 6M USD Libor |
| | ING Bank | 2015 | 2031 | USD 7,861 | 2.67% | 6M USD Libor |
| | BNP Paribas | 2015 | 2031 | USD 7,861 | 2.67% | 6M USD Libor |
| Cash flow hedge | BNP Paribas | 2009 | 2027 | USD 92,120 | 4.16% | 6M USD Libor |
| | KFW | 2009 | 2027 | USD 92,120 | 4.16% | 6M USD Libor |
| | Credit Agricole | 2016 | 2033 | USD 96,297 | 3.98% ~ 4.10% | 6M USD Libor |
| | SMBC | 2016 | 2033 | USD 125,927 | 4.05% ~ 4.18% | 6M USD Libor |
| | Mizuho Bank | 2016 | 2019 | USD 36,890 | 1.56% | 1.35% |
| | SMBC | 2016 | 2019 | USD 36,890 | 1.56% | 1.35% |

155

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

_Note:_

(1)   2.05% of the contract interest rate for paying is applied for five years from the date of issuance, and 3M CD + 0.10% is applied thereafter.

Under these interest rate swap contracts, we recognized net valuation gain of Won 6,909 million in 2017.

We engage in transactions denominated in foreign currencies and consequently become exposed to fluctuations in exchange rates. The carrying amounts of our foreign currency-denominated monetary assets and monetary liabilities as of December 31, 2016 and 2017 were as follows:

| Type | Assets | | Liabilities | |
|------|------|------|------|------|
| | 2016 | 2017 | 2016 | 2017 |
| | (In thousands of USD, EUR, GBP and other foreign currencies) | | | |
| AED | 7,479 | 5,693 | 1,534 | 2,049 |
| AUD | 187 | 145 | 632,613 | 652,259 |
| BDT | 49,110 | 60,208 | 833 | 1,001 |
| BWP | 4,296 | 797 | 3,222 | – |
| CAD | – | 82 | – | 171 |
| CHF | – | – | 400,308 | 400,004 |
| CNY | – | 13,007 | – | 26,140 |
| EUR | 17,585 | 5,708 | 14,111 | 68,003 |
| GBP | 3 | 3 | 110 | 2,327 |
| IDR | 52,568 | 167,775 | – | – |
| INR | 1,059,092 | 1,228,259 | 161,631 | 227,078 |
| JOD | 1,746 | 1,624 | 5 | 5 |
| JPY | 520,746 | 799,501 | 20,442,504 | 21,624,128 |
| KZT | 12,157 | 359 | – | – |
| MGA | 3,408,579 | 2,762,572 | 150,430 | 319,581 |
| NOK | – | – | – | 482 |
| PHP | 415,818 | 189,261 | 136,700 | 125,431 |
| PKR | 274,090 | 251,190 | 5,051 | 4,676 |
| SAR | 1,149 | 1,191 | – | 44 |
| SEK | – | – | – | 449,002 |
| USD | 1,319,524 | 1,653,858 | 9,445,567 | 8,321,335 |
| UYU | 1,307 | 12,955 | 586 | 10,586 |
| ZAR | 386 | 361 | 75 | 4 |

The following analysis sets forth the sensitivity of our consolidated net income before income taxes (our "pre-tax income") to changes in exchange rates, interest rates, electricity rates and fuel costs. For purposes of this section, we and our related parties are deemed one entity. The range of changes in such risk categories represents our view of the changes that are reasonably possible over a one-year period, although it is difficult to predict such changes as a result of adverse economic developments in Korea. See Item 3.D. "Risk Factors–Risks Relating to Korea and the Global Economy–Unfavorable financial and economic conditions in Korea and globally may have a material adverse impact on us." The following discussion only addresses material market risks faced by us and does not discuss other risks which we face in the normal course of business, including country risk, credit risk and legal risk. Unless otherwise specified, all calculations are made under IFRS.

If Won depreciates against U.S. dollar and all other foreign currencies held by us by 10% and all other variables are held constant from their levels as of December 31, 2017, we estimate that our unrealized foreign exchange translation losses will increase by Won 844 billion in 2018. Such sensitivity analysis is conducted for

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

monetary assets and liabilities denominated in foreign currencies other than functional currency as of December 31, 2016 and 2017, without taking into consideration of swap transactions. To manage our foreign currency risk related to foreign currency-denominated receivables and payables, we have a policy of entering into currency forward agreements. In addition, to manage our foreign currency risk related to foreign currency-denominated expected sales transactions and purchase transactions, we enter into cross-currency swap agreements.

We are exposed to interest rate risk due to our borrowings with floating interest rates. If interest rates increase by 1% on all of our borrowings and debentures bearing variable interest and all other variables are held constant as of December 31, 2017, we estimate that our income before income taxes will decrease by Won 27 billion (not reflecting the fact that a portion of such interest may be capitalized under IFRS) in 2018. Such sensitivity analysis does not take into consideration interest rate swap transactions. To manage our interest rate risks, we, in addition to maintaining an appropriate mix of fixed and floating rate loans, have entered into certain interest rate swap agreements.

We are exposed to electricity rates risk due to the rate regulation by the Government, which considers the effect of electricity rate changes on the national economy. If the electricity rate rises by 1% and all other variables are held constant as of December 31, 2017, we estimate that our income before income taxes will increase by Won 546 billion in 2018.

We are exposed to fuel price risks due to the heavy influence of fuel costs on our sales and cost of sales. If the fuel prices of anthracite and bituminous coal, oil, LNG and others used for generation by us and our generation subsidiaries rise by 1% and all other variables are held constant as of December 31, 2017, we estimate that our income before income taxes will decrease by Won 165 billion in 2018.

The above discussion and the estimated amounts generated from the sensitivity analyzes referred to above include "forward-looking statements," which assume for analytical purposes that certain market conditions may occur. Accordingly, such forward-looking statements should not be considered projections by us of future events or losses.

See Note 45 of the notes to our consolidated financial statements included in this annual report for further related information.


## ITEM 12.    DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

### Item 12.A. Debt Securities

Of the four debt securities issued by us that are registered under the Exchange Act as set forth in the cover page of this annual report, the One Hundred Year 7.95% Zero-to-Full Debentures due April 1, 2096, were guaranteed by Korea Development Bank. However, such guarantee expired on April 1, 2016 by reason of the expiration of a put option period applicable to such debentures in accordance with the terms of such debentures.

Korea Development Bank, a statutory bank for the Korean government, is 100% beneficially owned by the Korean government. The voting rights in our equity interest held by Korea Development Bank are effectively exercised by the Korean government.

The guarantee by Korea Development Bank of our above-mentioned registered debt securities was itself a security registered under the Securities Act. Korea Development Bank is a Schedule B issuer and periodically files registration statements with the Commission. These registration statements typically include financial statements prepared in accordance with the applicable generally accepted accounting principles, currently the Korean International Financial Reporting Standards, and audited in accordance with generally accepted auditing standards in the Republic of Korea.

157

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Item 12.B. Warrants and Rights**

Not applicable.

**Item 12.C. Other Securities**

Not applicable.

**Item 12.D. American Depositary Shares**

Under the terms of the Deposit Agreement in respect of our ADSs, the holder and beneficiary owners of ADSs, any party depositing or withdrawing or surrendering ADSs or ADRs, whichever applicable, may be required to pay the following fees and charges to Citibank, N.A. acting as depositary for our ADSs:

| Item | Services | Fees |
|------|----------|------|
| 1 | Taxes and other governmental charges | As applicable |
| 2 | Registration of transfer of common shares generally on our shareholders' register, any institution authorized under the applicable law to effect book-entry transfers of securities (including Korea Securities Depositary), or any entity that presently carries out the duties of registrar for the common shares, and applicable to transfers of common shares to the name of the Depositary or its nominee on the making of deposits or withdrawals | A fee of US$1.50 or less per ADS |
| 3 | Cable, telex and facsimile transmission expenses | As applicable |
| 4 | Expenses incurred by the Depositary in the conversion of foreign currency | As applicable |
| 5 | Execution and delivery of ADRs and the surrender of ADRs | Fee of US$0.05 or less per ADS |
| 6 | Cash distribution made by the Depositary or its agent | Fee of US$0.02 or less per ADS |
| 7 | Fee for the distribution of proceeds of sales of securities or rights for distribution other than cash, common shares or rights to subscribe for shares, distribution in shares or distribution in rights to subscribe for shares | Lesser of (i) the fee for the execution and delivery of ADRs referred to above which would have been charged as a result of the deposit by the holders of securities or common shares received in exercise of rights distributed to them, but which securities or rights are instead sold by the Depositary and the net proceeds distributed and (ii) the amount of such proceeds |
| 8 | Depositary services performed in administering the ADRs (which fee shall be assessed against holders of ADSs as of the record date or dates and shall be payable at the sole discretion of the Depositary by billing such holders or by deducting such charge from one or more cash dividends or other cash distributions) | Fee of US$0.02 or less per ADS per calendar year |

158

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Depositary fees payable upon the issuance and cancelation of ADSs are typically paid to the depositary by the brokers (on behalf of their clients) receiving the newly-issued ADSs from the depositary and by the brokers (on behalf of their clients) delivering the ADSs to the depositary for cancelation. The brokers in turn charge these transaction fees to their clients.

Depositary fees payable in connection with distributions of cash or securities to ADS holders and the depositary services fee are charged by the depositary to the holders of record of ADSs as of the applicable ADS record date. The depositary fees payable for cash distributions are generally deducted from the cash being distributed. In the case of distributions other than cash (i.e., stock dividends, rights offerings), the depositary charges the applicable fee to the ADS record date holders concurrent with the distribution. In the case of ADSs registered in the name of the investor (whether certificated or un-certificated in direct registration), the depositary sends invoices to the applicable record date ADS holders. In the case of ADSs held in brokerage and custodian accounts via the central clearing and settlement system, the Depository Trust Company ("DTC"), the depositary generally collects its fees through the systems provided by DTC (whose nominee is the registered holder of the ADSs held in DTC) from the brokers and custodians holding ADSs in their DTC accounts. The brokers and custodians who hold their clients' ADSs in DTC accounts in turn charge their clients' accounts the amount of the fees paid to the depositary.

In the event of refusal to pay the depositary fees, the depositary may, under the terms of the Deposit Agreement, refuse the requested service until payment is received or may set-off the amount of the depositary fees from any distribution to be made to the ADS holder.

The fees and charges the ADS holders may be required to pay may vary over time and may be changed by us and by the depositary. The ADS holders will receive prior notice of such changes.

*Depositary Payments for the Fiscal Year 2017*

The following table sets forth our expenses incurred in 2017, which were reimbursed by Citibank, N.A. in the aggregate:

|  | (In thousands of U.S. dollars) |
|---|---|
| Reimbursement of legal fees | US$ 184 |
| Reimbursement of accounting fees | 146 |
| Contributions towards our investor relations and other financing efforts (including investor conferences, non-deal roadshows and market information services) | 896 |
| Other | 158 |
| Total | US$ 1,384 |

159

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

PART II

ITEM 13.    *DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES*

Not applicable.


ITEM 14.    *MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS*

Not applicable.


ITEM 15.    *CONTROLS AND PROCEDURES*

**Disclosure Control**

Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of December 31, 2017. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can provide only reasonable assurance of achieving their control objectives. Based upon our evaluation, our chief executive officer and chief financial officer concluded that the design and operation of our disclosure controls and procedures as of December 31, 2017 were effective to provide reasonable assurance that information required to be disclosed by us in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decision regarding required disclosure.


**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, for our company. Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we have evaluated the effectiveness of our internal control over financial reporting as of December 31, 2017 based on the framework established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements in accordance with generally accepted accounting principles and includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of a company's assets, (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with generally accepted accounting principles, and that a company's receipts and expenditures are being made only in accordance with authorizations of a company's management and directors, and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of a company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable assurance with respect to consolidated financial statement preparation and presentation and may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

160

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Following the overhaul in May 2013 by the Committee of Sponsoring Organization of the Treadway ("COSO") of the COSO Framework relating to internal controls and adoption of the 2013 Integrated Framework of the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework (2013)"), we have, effective January 1, 2014, adopted the COSO Framework (2013) and incorporated it into our internal control system for us and our subsidiaries in order to comply with the Sarbanes Oxley Act and to standardize our internal control system. As required by Section 404 of the Sarbanes-Oxley Act of 2002 and related rules as promulgated by the Securities and Exchange Commission, management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016 using criteria established by the COSO Framework (2013). Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2017 based on the criteria established by the COSO Framework (2013).

**Audit Report of the Independent Registered Public Accounting Firm**

KPMG Samjong Accounting Corp. has issued an audit report on the effectiveness of our internal control over financial reporting as of December 31, 2017, which is included elsewhere in this annual report.

**Changes in Internal Controls**

There were no changes in our internal control over financial reporting that occurred during the year ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Our adoption of the COSO Framework (2013) did not have, and is not reasonably likely to have, any material effect on our internal control over financial reporting.

We operate an integrated ERP system for a transparent and efficient management of the core ERP components, including personnel, accounting, procurement, construction and facilities maintenance. In addition, we also operate a strategic enterprise management system that includes business warehouse, management information and business planning and simulation systems. We continue to upgrade and improve the ERP system, which is being used as our core information infrastructure.

## ITEM 16.  *[RESERVED]*

## ITEM 16A.  AUDIT COMMITTEE FINANCIAL EXPERT

Our board of directors has determined that we have at least one "audit committee financial expert" as such term is defined by the regulations of the Securities and Exchange Commission issued pursuant to Section 407 of the Sarbanes-Oxley Act of 2002. Our audit committee financial expert is Cho, Jeon-Hyeok. Such member is independent within the meaning of the Korea Stock Exchange listing standards, the regulations promulgated under the Enforcement Decree of the Korean Commercial Code and the New York Stock Exchange listing standards.

## ITEM 16B.  CODE OF ETHICS

We have adopted a code of ethics for our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions as required under Section 406 of the Sarbanes-Oxley Act of 2002, together with an insider reporting system in compliance with Section 301 of the Sarbanes-Oxley Act. The code of ethics is available on our website www.kepco.co.kr. We have not granted any waiver, including an implicit waiver, from a provision of the code of ethics to any of the above-mentioned officers during our most recently completed fiscal year.

161

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### ITEM 16C.  PRINCIPAL AUDITOR FEES AND SERVICES

The following table sets forth the aggregate fees billed for each of the years ended December 31, 2016 and 2017 for professional services rendered by our principal auditors for such year, for various types of services and a brief description of the nature of such services. KPMG Samjong Accounting Corp., a Korean independent registered public accounting firm, was our principal auditors for the year ended December 31, 2017 and we currently expect KPMG Samjong Accounting Corp. to serve as our principal auditors for the year ended December 31, 2018.

| Type of Services | Aggregate Fees Billed During | | Nature of Services |
|---|---|---|---|
| | 2016 | 2017 | |
| | (In millions of Won) | | |
| Audit Fees | ₩ 3,296 | ₩ 3,051 | Audit service for KEPCO and its subsidiaries. |
| Audit-Related Fees | – | 410 | Comfort letter services. |
| Tax Fees | 176 | 67 | Tax return and consulting advisory service. |
| All Other Fees | – | 2 | All other services which do not meet the three categories above. |
| Total | ₩ 3,472 | ₩ 3,530 | |

United States law and regulations in effect since May 6, 2003 generally require all service of the principal auditors to be pre-approved by an independent audit committee or, if no such committee exists with respect to an issuer, by the entire board of directors. We have adopted the following policies and procedures for consideration and approval of requests to engage our principal auditors to perform audit and non-audit services. If the request relates to services that would impair the independence of our principal auditors, the request must be rejected. If the service request relates to audit and permitted non-audit services for us and our subsidiaries, it must be forwarded to our audit committee and receive pre-approval.

In addition, United States law and regulations permit the pre-approval requirement to be waived with respect to engagements for non-audit services aggregating no more than five percent of the total amount of revenues we paid to our principal auditors, if such engagements were not recognized by us at the time of engagement and were promptly brought to the attention of our audit committee or a designated member thereof and approved prior to the completion of the audit.

### ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEE

Not applicable.

### ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS

Neither we nor any "affiliated purchaser," as defined in Rule 10b-18(a)(3) of the Exchange Act, purchased any of our equity securities during the period covered by this annual report.

### ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT

Not applicable.

### ITEM 16G. CORPORATE GOVERNANCE

We are committed to high standards of corporate governance. We are in compliance with the corporate governance provisions of the KEPCO Act, the Act on the Management of Public Institutions, the Korean

162

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Commercial Code, the Financial Investment Services and Capital Markets Act of Korea and the Listing Rules of the Korea Exchange.We, like all other companies in Korea, must comply with the corporate governance provisions under the Korean Commercial Code, except to the extent the KEPCO Act and the Act on the Management of Public Institutions otherwise require. Our corporate governance is also affected by various regulatory guidelines, including those promulgated by the Ministry of Strategy and Finance. In addition, as a company listed on the Korea Exchange, we are subject to the Financial Investment Services and Capital Markets Act of Korea, unless the Financial Investment Services and Capital Markets Act of Korea otherwise provides.

**The Act on the Management of Public Institutions**

*General Provisions*

On April 1, 2007, the Act on the Management of Public Institutions took effect by abolishing and replacing the Government-invested Enterprise Management Basic Act, which was enacted in 1984. Unless stated otherwise therein, the Act on the Management of Public Institutions takes precedence over any other laws and regulations in the event of inconsistency. On April 2, 2007, pursuant to this Act the minister of the Ministry of Strategy and Finance designated us as a "market-oriented public enterprise" as defined under this Act, and we became subject to this Act accordingly. We incorporated the applicable provisions of this Act into our Articles of Incorporation by amendment thereto in September 2007.

The Act on the Management of Public Institutions sets out the rules for corporate governance for entities that are subject to this Act, including the appointment of their respective president and directors. Under this Act as it applies to us as a "market-oriented public enterprise", (i) a senior non-standing director as appointed by the minister of the Ministry of Strategy and Finance becomes the chairman of our board of directors following the review and resolution of the Public Agencies Operating Committee; (ii) our president and our standing directors who concurrently serve as members of our audit committee are appointed by the President of the Republic upon the motion of the Ministry of Trade, Industry and Energy (in the case of our president) or of the Ministry of Strategy and Finance (in the case of standing directors who concurrently serve as members of our audit committee), following the nomination by such enterprise's director nomination committee, the review and resolution of the Public Agencies Operating Committee pursuant to the Act on the Management of Public Institutions and an approval at the general meeting of our shareholders; (iii) our standing directors other than the president and those who also serve as audit committee members must be appointed by our president with the approval at the general meeting of our shareholders from a pool of candidates recommended by our director nomination committee; and (iv) our non-standing directors must be appointed by the minister of the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee, and must have ample knowledge and experience in business management.

The Public Agencies Operating Committee is established pursuant to the Act on the Management of Public Institutions and is comprised of one chairperson who is the Minister of the Ministry of Strategy and Finance and the following members: (i) one Vice Minister-level public official from the Office for Government Policy Coordination as nominated by the minister of the Office for Government Policy Coordination; (ii) one Vice Minister, Deputy Administrator or an equivalent public official of the related administrative agency as prescribed by Presidential Decree; (iii) one Vice Minister, Deputy Administrator, or an equivalent public official of the competent agency who does not fall under subclause (ii); and (iv) 11 or fewer persons commissioned by the President based on the recommendation of the Minister of the Ministry of Strategy and Finance from among persons in various fields including law, economy, press, academia, labor, who have good knowledge and experience in the operation and business administration of public institutions as well as good reputation for impartiality.

Our director nomination committee, which is also known as the Committee for Recommendation of Executive Officers, is comprised of non-standing directors and members appointed by the board of directors. The

163

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

number of members ranges from five to 15 persons and must be decided by a resolution of the board of directors; provided that, the number of members appointed by the board of directors must be less than half of the total number of members of our director nomination committee.

Under the Act on the Management of Public Institutions and our Articles of Incorporation, the term of office is three years for our president and two years for our directors (standing and non-standing) other than our president. Our directors (including the president) may be reappointed for one or more additional terms of one year. In order to be reappointed, the president must be evaluated on the basis of his management performance; a standing director, on the basis of the performance of the duties for which he was elected to perform, or if the standing director has executed an incentive bonus contract, on the basis of his performance under the contract; and a non-standing director, on the basis of the performance of the duties for which he was elected to perform.

Under the Act on the Management of Public Institutions and our Articles of Incorporation, a recommendation from the director nomination committee is required for the appointment of our executive officers, except in the case of reappointments. The director nomination committee consists of five to fifteen members, including private-sector members appointed by the board of directors. Non-standing directors must comprise at least a majority of the director nomination committee. One of the private-sector members must be able to represent our opinion and must not be currently employed by us. As required under the Act on the Management of Public Institutions, we established an audit committee. At least two-thirds of the audit committee members must be non-standing directors, and at least one committee member must be an expert in finance or accounting. According to the Act on the Management of Public Institutions, our president's term cannot be terminated unless done so by the President of the Republic pursuant to the Act on the Management of Public Institutions or upon an event as specified in our Articles of Incorporation.

As required under Act on the Management of Public Institutions, we submit to the Government by October 31 every year a report on our medium-to long-term management goals. Under the Act on the Management of Public Institutions, we are also required to give separate public notice of important management matters, such as our budget and financial statements, status of directors and annual reports. In addition, for purposes of providing a comparison of the management performances of government agencies, we are required to post on a designated website a notice on a standard form detailing our management performance. Following consultation with the minister of the Ministry of Trade, Industry and Energy and the review and resolution of the operating committee, the Ministry of Strategy and Finance must examine the adequacy and competency of government agencies and establish plans on merger, abolishment, restructuring and privatization of public agencies. In such case, the minister of the Ministry of Trade, Industry and Energy must execute these plans and submit a performance report to the Ministry of Strategy and Finance.

*Application of the Act to Our Generation Subsidiaries*

On January 24, 2011, the Ministry of Strategy and Finance changed the designation of our six generation subsidiaries from "other public institutions" to "market-oriented public enterprises", each as defined in the Act on the Management of Public Institutions, and all of our generation subsidiaries accordingly amended their respective articles of incorporation in 2011 to be in compliance with this Act. As "other public institutions", our generation subsidiaries previously were not subject to the same regulations under the Act on the Management of Public Institutions applicable to us with regards to corporate governance matters such as the appointment and dismissal of directors and the composition of the boards of directors. However, as "market-oriented public enterprises", our generation subsidiaries are currently subject to the same such regulations that are applicable to us.

Specifically, prior to such designation, (i) our president appointed the presidents and the statutory auditors of our generation subsidiaries; (ii) the selection of non-standing directors of each such subsidiary was subject to approval by our president; (iii) the president of each such subsidiary entered into a management contract with our president; and (iv) our evaluation committee conducted performance evaluation of such subsidiaries. However,

164

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

following such designation, akin to the appointment process applicable to us, (i) the President of the Republic appoints the presidents and standing directors of our generation subsidiaries that concurrently serve as members of the audit committees; (ii) the selection of non-standing directors of these subsidiaries is subject to approval by the minister of the Ministry of Strategy and Finance; (iii) the president of each such generation subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Agencies Operating Committee conducts performance evaluation of such subsidiaries.

### Our Control over the Generation Subsidiaries

Designation of our generation subsidiaries as "market-oriented public enterprises" was intended to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them so as to provide improved service to the general public. Such designation also has had the effect of the Government exercising greater direct control over the appointment of the governing body of our generation subsidiaries (in ways that are similar how the Government exercises such control over us as our majority shareholder as well as our regulator).

In addition, the Government has imposed a number of regulations that further affect the respective operational boundaries between us and our generation subsidiaries, including as follows:

In August 2010, in furtherance of the Act on the Management of Public Institutions, the Ministry of Strategy and Finance announced the Proposal for the Improvement in the Structure of the Electric Power Industry, which was designed to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them. Key initiatives of the proposal included the following: (i) maintain the current structure of having six generation subsidiaries and designate the six generation subsidiaries as market-oriented public enterprises under the Act on the Management of Public Institutions in order to foster competition among the generation subsidiaries and promote efficiency in their operations, and (ii) clarify the scope of the business of us and the six generation subsidiaries (namely, that we shall manage the financial structure and governance of the six generation subsidiaries and nuclear power plant and overseas resources development projects, while the six generation subsidiaries will have greater autonomy with respect to construction and management of generation units and procurement of fuel, among others).

In January 2011, the Ministry of Strategy and Finance created a "joint cooperation unit" consisting of officers and employees selected from the five thermal power generation subsidiaries in order to reduce inefficiencies in areas such as fuel transportation, inventories, materials and equipment and construction, etc. and allow the thermal power generation subsidiaries to continue utilizing the benefits of economy of scale after split off of our generation business units into separate subsidiaries. The purpose of the joint cooperation unit was to give greater autonomy to the generation subsidiaries with regard to power plant construction and management and fuel procurements, and thereby enhance efficiency in operating power plants. The main functions of the joint cooperation unit are as follows: (i) maintain inventories of bituminous coal through volume exchanges and joint purchases, (ii) reduce shipping and demurrage expenses through joint operation and distribution of dedicated vessels, (iii) reduce costs by sharing information on generation material inventories and (iv) sharing human resources among the five thermal power generation subsidiaries for construction projects, among other things.

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies should take on greater responsibilities in overseas

165

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition.

However, notwithstanding these developments, we, also a government-controlled entity, remain as the sole shareholder of our generation subsidiaries and continue to exercise significant control over them in such capacity as the sole shareholder well as through other practical means as further described below.

First, as the sole shareholder, we continue to have the right, under the Act on the Management of Public Institutions, to approve or disapprove the appointment of key members of the governing body of our generation subsidiaries (namely, the president and the standing and non-standing directors) by way of a vote at the general shareholders meeting before such appointments are ultimately approved and made by the President of the Republic (in the case of the presidents and standing directors concurrently serving as audit committee members of the generation subsidiaries) or by the president of each generation subsidiary (in the case of other standing directors of such generation subsidiary). Our right to exercise such voting right as a shareholder is also protected by the Commercial Code of Korea.

Second, in practice we retain significant control over our generation subsidiaries through the following means:

We are the sole purchaser of electricity produced by the generation subsidiaries and continue to have near monopoly in terms of transmitting and distributing electricity in Korea. Accordingly, we continue to have significant influence over our generation subsidiaries in the electricity industry.

Pursuant to the Electricity Business Act, the adjusted coefficient must be determined so that the price of electricity sold by our generation subsidiaries to us shall have the effect of ensuring a fair rate of return to us as a standalone entity, which means any imbalance caused by excess profits taken by our generation subsidiaries to our loss must be corrected. Since we and the generation subsidiaries participate in the determination of the adjusted coefficient, such determination process can be used as a way for us to exert indirect influence on our generation subsidiaries.

Our president holds regular meetings (known as "CEO Meetings") with the presidents of our generation subsidiaries for which our president determines whether and when to convene such meetings, sets the agenda for such meetings and chairs such meetings. Since significant issues that jointly affect us and our generation subsidiaries are often discussed and decided at these meetings, the leadership role exercised by our president in such meetings is significant in setting the policies and direction for us and our generation subsidiaries as a whole.

We maintain and operate the Affiliated Company Management Team within the parent company organizational structure. The purpose of this team is to support and coordinate the management of the generation subsidiaries. Activities of the Affiliated Company Management Team include preparation of the CEO meetings, deliberation on major issues to be discussed at CEO Meetings, convening a general meeting of shareholders of the generation subsidiaries and coordination on the decision-making process for the general meeting of shareholders of the generation subsidiaries.

Ultimately, our control over our generation subsidiaries is derived from the fact that the Government owns the majority of our shares and effectively controls us as the supervisor and regulator in a heavily regulated industry, and in effect also exercises the same degree of control over our generation subsidiaries through our sole share ownership over our generation subsidiaries as well as its statutory power of direct appointment of the governing bodies of our generation subsidiaries. In effect, we are acting as an intermediate holding company in a vertical control structure involving the Government, us and our generation subsidiaries, where the Government holds the ultimate control over both us and our generation subsidiaries and exercises its such control over our generation subsidiaries in part through us acting as the sole shareholder and the parent company.

166

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Differences in Korean/New York Stock Exchange Corporate Governance Practices**

We are a "foreign private issuer" (as such term is defined in Rule 3b-4 under the Exchange Act), and our ADSs are listed on the New York Stock Exchange, or NYSE. Under Section 303A of the NYSE Listed Company Manual, NYSE-listed companies that are foreign private issuers are permitted to follow home country practice in lieu of the corporate governance provisions specified by the NYSE with limited exceptions. Under the NYSE Listed Company Manual, we as a foreign private issuer are required to disclose significant differences between NYSE's corporate governance standards and those we follow under Korean law. The following summarizes some significant ways in which our corporate governance practices differ from those followed by U.S. companies listed on the NYSE under the listing rules of the NYSE.

*Majority of Independent Directors on the Board*

Under the NYSE listing rules, U.S. companies listed on the NYSE must have a board, the majority of which is comprised of independent directors satisfying the requirements of "independence" as set forth in Rule 10A-3 under the Exchange Act. No director qualifies as "independent" unless the board of directors affirmatively determines that the director has no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that has a relationship with us). The NYSE rules include detailed tests for determining director independence. As a foreign private issuer, we are exempt from this requirement. Under the Act on the Management of Public Institutions, more than one-half of our directors must be non-standing directors. For a discussion on qualifications of non-standing directors, see Item 6.A. "Directors and Senior Management–Board of Directors." The Financial Investment Services and Capital Markets Act of Korea deems a non-standing director nominated pursuant to other applicable laws (such as the Act on the Management of Public Institutions) as an "outside" or "non-executive" director. Under the Act on the Management of Public Institutions, a non-standing director is appointed by the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee and an approval at our general meeting shareholders, and must have ample knowledge and experience in business management. Government officials that are not part of the teaching staff in national and public schools are ineligible to become our non-standing directors.

*Executive Session*

Under the NYSE listing rules, non-management directors of U.S. companies listed on the NYSE are required to meet on a regular basis without management present and independent directors must meet separately at least once per year. While no such requirement currently exists under applicable Korean law, listing standards or our Articles of Incorporation, executive sessions were held from time to time in 2017 in order to promote the exchange of diverse opinions by non-standing directors.

*Audit Committee*

Under the NYSE listing rules, listed companies must have an audit committee that has a minimum of three members, and all audit committee members must satisfy the requirements of independence set forth in Section 303A.02 of the NYSE Listed Company Manual and Rule 10A-3 under the Exchange Act. Our audit committee members meet the requirements of independence set forth in Section 303A.02 of the NYSE Listed Company Manual and Rule 10A-3 under the Exchange Act. The audit committee must be directly responsible for the appointment, compensation, retention and oversight of the work of the independent registered public accountants. Our audit committee performs the roles and responsibilities required of an audit committee under the Sarbanes-Oxley Act, including the supervision of the audit by the independent registered public accountants. Under the Korea Exchange listing rules and the Korean Commercial Code, a large listed company must also establish an audit committee of which at least two-thirds of its members must be non-standing directors and whose chairman must be a non-standing director. Under the Act on the Management of Public Institutions, the Korean Commercial Code, the amended Articles of Incorporation and the Korea Exchange listing rules, we are required to maintain an audit committee consisting of three members, of which not less than two members are

167

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

required to be non-standing directors. Our audit committee is in compliance with the foregoing requirements under the Act on the Management of Public Institutions, the Korean Commercial Code, the amended Articles of Incorporation and the Korea Exchange listing rules.

### Nomination/Corporate Governance Committee

Under the NYSE listing rules, U.S. companies listed on the NYSE must have a nomination/corporate governance committee composed entirely of independent directors. In addition to identifying individuals qualified to become board members, this committee must develop and recommend to the board a set of corporate governance principles. Under the Act on the Management of Public Institutions, we are required to have a director nomination committee which consists of non-standing directors and ad hoc members appointed by our Board of Directors. Our standing directors and executives as well as governmental officials that are not part of the teaching staff in national and public schools are ineligible to become a member of our director nomination committee. There is no requirement to establish a corporate governance committee under applicable Korean law.

Pursuant to the NYSE listing standards, non-management directors must meet on a regular basis without management present and independent directors must meet separately at least once per year. No such requirement currently exists under applicable Korean law.

### Compensation Committee

Under the NYSE listing rules, U.S. companies listed on the NYSE are required to have a compensation committee which is composed entirely of independent directors. In January 2013, the SEC approved amendments to the listing rules of NYSE and NASDAQ regarding the independence of compensation committee members and the appointment, payment and oversight of compensation consultants. The listing rules were adopted as required by Section 952 of the Dodd-Frank Act and rule 10C-1 of the Exchange Act, which direct the national securities exchanges to prohibit the listing of any equity security of a company that is not in compliance with the rule's compensation committee director and advisor independence requirements. Certain elements of the listing rules became effective on July 1, 2013 and companies listed on the NYSE must comply with such listing rules by the earlier of the company's first annual meeting after January 15 or October 31, 2014.

No such requirement currently exists under applicable Korean law or listing standards, and we currently do not have a compensation committee.

### Corporate Governance Guidelines and Code of Business Conduct and Ethics

Under the NYSE listing rules, U.S. companies listed on the NYSE are required to establish corporate governance guidelines and to adopt a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers. As a foreign private issuer, we are exempt from this requirement. Pursuant to the requirements of the Sarbanes-Oxley Act, we have adopted a code of ethics applicable to our President & Chief Executive Officer and all other directors and executive officers including the Chief Financial Officer and the Chief Accounting Officer, as well as all financial, accounting and other officers that are involved in the preparation and disclosure of our consolidated financial statements and internal control of financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act. We have also adopted an insider reporting system in compliance with Section 301 of the Sarbanes-Oxley Act. The code of ethics applicable to our executive officers and financial officers are available on www.kepco.co.kr.

### Shareholder Approval of Equity Compensation Plans

Under the NYSE listing rules, shareholders of U.S. companies listed on the NYSE are required to approve all equity compensation plans. Under Korean law and regulations, stock options can be granted to employees to

168

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

the extent expressly permitted by the articles of incorporation. We currently do not have any equity compensation plans.

### Annual Certification of Compliance

Under the NYSE listing rules, a chief executive officer of a U.S. company listed on the NYSE must annually certify that he or she is not aware of any violation by the company of NYSE corporate governance standards. As a foreign private issuer, we are not subject to this requirement. However, in accordance with rules applicable to both U.S. companies and foreign private issuers, we are required to promptly notify the NYSE in writing if any executive officer becomes aware of any material noncompliance with the NYSE corporate governance standards applicable to us. In addition, foreign private issuers, including us, are required to submit to the NYSE an annual written affirmation relating to compliance with Sections 303A.06 and 303A.11 of the NYSE listed company manual, which are the NYSE corporate governance standards applicable to foreign private issuers. All written affirmations must be executed in the form provided by the NYSE, without modification. An annual written affirmation is required to be submitted to the NYSE within 30 days of filing with the SEC our annual report on Form 20-F. We have been in compliance with this requirement in all material respects and plan to submit such affirmation within the prescribed time line.

### Whistle Blower Protection

On May 25, 2011, the SEC adopted final rules to implement whistleblower provisions of the Dodd-Frank Act, which are applicable to foreign private issuers with securities registered under the U.S. securities laws. The final rules provide that any eligible whistleblower who voluntarily provides the SEC with original information that leads to the successful enforcement of an action brought by the SEC under U.S. securities laws must receive an award of between 10 and 30 percent of the total monetary sanctions collected if the sanctions exceed US$1,000,000. An eligible whistleblower is defined as someone who provides information about a possible violation of the securities laws that he or she reasonably believes has occurred, is ongoing, or is about to occur. The possible violation does not need to be material, probably or even likely, but the information must have a "facially plausible relationship to some securities law violation"; frivolous submissions would not qualify. The final rules also prohibit retaliation against the whistleblower. While the final rules do not require employees to first report allegations of wrongdoing through a company's corporate compliance system, they do seek to incentivize whistleblowers to utilize internal corporate compliance first by, among other things, (i) giving employees who first report information internally the benefit of the internal reporting date for purposes of the SEC program so long as the whistleblower submits the same information to the SEC within 120 days of the initial disclosure; (ii) clarifying that the SEC will consider, as part of the criteria for determining the amount of a whistleblower's award, whether the whistleblower effectively utilized the company's corporate compliance program or hindered the function of the program; and (iii) crediting a whistleblower who reports internally first and whose company passes the information along to the SEC, which would mean the whistleblower could receive a potentially higher award for information gathered in an internal investigation initiated as a result of the whistleblower's internal report.

In addition, the final rules address concerns that the whistleblower rules incentivize officers, directors and those with legal, audit, compliance or similar responsibilities to abuse these positions by making whistleblower complaints to the SEC with respect to information they obtained in these roles by generally providing that information obtained through a communication subject to attorney-client privilege or as a result of legal representation would not be eligible for a whistleblower award unless disclosure would be permitted by attorney conduct rules. Accordingly, officers and directors, auditors and compliance personnel and other persons in similar roles would not be eligible to receive awards for information received in these positions unless (x) they have a reasonable basis to believe that (1) disclosure of the information is necessary to prevent the entity from engaging in conduct that is likely to cause substantial injury to the financial interests of the entity or investors; or (2) the entity is engaging in conduct that will impede an investigation of the misconduct, for example, destroying documents or improperly influencing witnesses; or (y) 120 days have passed since the whistleblower provided

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

the information to senior responsible persons at the entity or 120 days have passed since the whistleblower received the information at a time when these people were already aware of the information.

In Korea, under the Financial Investment Services and Capital Markets Act, anyone may provide or furnish the Financial Services Commission or the Securities and Futures Commission with information on unfair trading or any other violation of the Financial Investment Services and Capital Markets Act. The Financial Services Commission shall keep the identity of the whistleblower confidential, and any institution, organization or company to which the whistleblower belongs may not treat the whistleblower unfavorably, directly or indirectly. In addition, the Financial Services Commission may also reward the whistleblower within the limit of the budget of the Financial Services Commission.

**ITEM 16H. MINE SAFETY DISCLOSURE**

Not applicable.

170

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

PART III

**ITEM 17.    *FINANCIAL STATEMENTS***

Not applicable.


**ITEM 18.    *FINANCIAL STATEMENTS***

Reference is made to Item 19. "Exhibits" for a list of all financial statements filed as part of this annual report.


**ITEM 19.    *EXHIBITS***

**(a) Financial Statements filed as part of this Annual Report**

See Index to Financial Statements on page F-1 of this annual report.


**(b) Exhibits filed as part of this Annual Report**

See Index of Exhibits beginning on page E-1 of this annual report.

171

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

## INDEX OF EXHIBITS

1.1    Articles of Incorporation, as last amended on November 11, 2016 (in English)*

2.1    Form of Deposit Agreement**

8.1    List of Subsidiaries

12.1    Certifications of our Chief Executive Officer required by Rule 13a-14(a) of the Exchange Act (Certifications under Section 302 of the Sarbanes-Oxley Act of 2002)

12.2    Certifications of our Chief Financial Officer required by Rule 13a-14(a) of the Exchange Act (Certifications under Section 302 of the Sarbanes-Oxley Act of 2002)

13.1    Certifications of our Chief Executive Officer required by Rule 13a-14(b) and Section 1350 of Chapter 63 of the United States Code (18 U.S.C. 1350) (Certifications under Section 906 of the Sarbanes-Oxley Act of 2002)

13.2    Certifications of our Chief Financial Officer required by Rule 13a-14(b) and Section 1350 of Chapter 63 of the United States Code (18 U.S.C. 1350) (Certifications under Section 906 of the Sarbanes-Oxley Act of 2002)

15.1    The Korea Electric Power Corporation Act, as amended on March 21, 2017 (in English)

15.2    Enforcement Decree of the Korea Electric Power Corporation Act, as amended on August 31, 2016 (in English)**

15.3    The Act on the Management of Public Institutions, as amended on Dec 27, 2016 (in English)

15.4    Enforcement Decree of the Act on the Management of Public Institutions, as amended on August 9, 2017 (in English)

101.1    Interactive Data Files (XBRL-Related Documents)

---

\*    Incorporated by reference to the Registrant's annual report on Form 20-F (No. 001-13372) previously filed on April 28, 2017.

\*\*    Incorporated by reference to the Registrant's Registration Statement on Form F-6 with respect to the ADSs, registered under Registration No. 333-196703.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this Annual Report on its behalf.

KOREA ELECTRIC POWER CORPORATION

By: _____/s/ JongKap KIM_____

Name:             JongKap KIM
Title:            President and Chief Executive Officer
Date:           April 30, 2018

173

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

## INDEX TO FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm KPMG Samjong Accounting Corp., on Consolidated Financial Statements | F-2 |
| Report of Independent Registered Public Accounting Firm KPMG Samjong Accounting Corp., on Internal Control Over Financial Reporting | F-3 |
| Consolidated Statements of Financial Position as of December 31, 2016 and 2017 | F-5 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2015, 2016 and 2017 | F-7 |
| Consolidated Statements of Changes in Equity for the Years Ended December 31, 2015, 2016 and 2017 | F-9 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2015, 2016 and 2017 | F-12 |
| Notes to the Consolidated Financial Statements | F-14 |

F-1

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC
ACCOUNTING FIRM ON CONSOLIDATED FINANCIAL STATEMENTS**

To the Shareholders and Board of Directors of
Korea Electric Power Corporation:

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated statements of financial position of Korea Electric Power Corporation and subsidiaries (the "Company") as of December 31, 2016 and 2017, the related consolidated statements of comprehensive income, changes in equity and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2016 and 2017, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2017, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated April 26, 2018 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ KPMG Samjong Accounting Corp.

We have served as the Company's auditor since 2013.

Seoul, Korea

April 26, 2018

F-2

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON**
**INTERNAL CONTROL OVER FINANCIAL REPORTING**

To the Shareholders and Board of Directors of
Korea Electric Power Corporation:

**Opinion on Internal Control Over Financial Reporting**

We have audited Korea Electric Power Corporation and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control–Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on the criteria established in Internal Control–Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated statements of financial position of the company as of December 31, 2016 and 2017, the related consolidated statements of comprehensive income, changes in equity and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes (collectively, the consolidated financial statements), and our report dated April 26, 2018 expressed an unqualified opinion on those consolidated financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

F-3

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ KPMG Samjong Accounting Corp.

Seoul, Korea

April 26, 2018

F-4

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Financial Position**
**As of December 31, 2016 and 2017**

| | Note | | 2016 | 2017 |
|---|---|---|---|---|
| | | | In millions of won | |
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | 5,6,7,45 | ₩ | 3,051,353 | 2,369,739 |
| Current financial assets, net | 5,10,11,12,45 | | 2,671,989 | 1,958,357 |
| Trade and other receivables, net | 5,8,14,20,45,46,47 | | 7,788,876 | 7,928,972 |
| Inventories, net | 13 | | 5,479,443 | 6,002,086 |
| Income tax refund receivables | 41 | | 19,163 | 100,590 |
| Current non-financial assets | 15 | | 631,860 | 753,992 |
| Assets held-for-sale | 42 | | 65,842 | 27,971 |
| **Total current assets** | | | 19,708,526 | 19,141,707 |
| Non-current assets | | | | |
| Non-current financial assets, net | 5,6,9,10,11,12,45 | | 2,657,494 | 2,038,913 |
| Non-current trade and other receivables, net | 5,8,14,45,46,47 | | 1,903,515 | 1,754,797 |
| Property, plant and equipment, net | 18,27,49 | | 145,743,056 | 150,882,414 |
| Investment properties, net | 19,27 | | 353,680 | 284,714 |
| Goodwill | 16 | | 2,582 | 2,582 |
| Intangible assets other than goodwill, net | 21,27,46 | | 980,821 | 1,187,121 |
| Investments in associates | 4,17 | | 4,092,252 | 3,837,421 |
| Investments in joint ventures | 4,17 | | 1,418,196 | 1,493,275 |
| Deferred tax assets | 41 | | 795,131 | 919,153 |
| Non-current non-financial assets | 15 | | 181,789 | 246,818 |
| **Total non-current assets** | | | 158,128,516 | 162,647,208 |
| **Total Assets** | 4 | ₩ | 177,837,042 | 181,788,915 |

(Continued)

F-5

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Financial Position, Continued**
**As of December 31, 2016 and 2017**

| | Note | | 2016 | 2017 |
|---|---|---|---|---|
| | | | In millions of won | |
| **Liabilities** | | | | |
| Current liabilities | | | | |
| Trade and other payables, net | 5,22,24,45,47 | ₩ | 5,585,411 | 5,999,521 |
| Current financial liabilities, net | 5,11,23,45,47 | | 8,942,329 | 9,194,552 |
| Income tax payables | 41 | | 1,843,288 | 508,402 |
| Current non-financial liabilities | 20,28,29 | | 6,368,210 | 5,584,308 |
| Current provisions | 26,45 | | 1,999,988 | 2,137,498 |
| **Total current liabilities** | | | 24,739,226 | 23,424,281 |
| Non-current liabilities | | | | |
| Non-current trade and other payables, net | 5,22,24,45,47 | | 3,558,175 | 3,223,480 |
| Non-current financial liabilities, net | 5,11,23,45,47 | | 44,835,562 | 45,980,899 |
| Non-current non-financial liabilities | 28,29 | | 7,591,605 | 8,072,434 |
| Employee benefits liabilities, net | 25,45 | | 1,686,258 | 1,483,069 |
| Deferred tax liabilities | 41 | | 8,948,520 | 10,415,397 |
| Non-current provisions | 26,45 | | 13,427,151 | 16,224,714 |
| **Total non-current liabilities** | | | 80,047,271 | 85,399,993 |
| **Total Liabilities** | 4 | ₩ | 104,786,497 | 108,824,274 |
| **Equity** | | | | |
| Contributed capital | 1,30,45 | | | |
| Share capital | | ₩ | 3,209,820 | 3,209,820 |
| Share premium | | | 843,758 | 843,758 |
| | | | 4,053,578 | 4,053,578 |
| Retained earnings | 31 | | | |
| Legal reserves | | | 1,604,910 | 1,604,910 |
| Voluntary reserves | | | 31,847,275 | 34,833,844 |
| Unappropriated retained earnings | | | 19,721,686 | 16,931,804 |
| | | | 53,173,871 | 53,370,558 |
| Other components of equity | 34 | | | |
| Other capital surplus | | | 1,235,146 | 1,233,793 |
| Accumulated other comprehensive loss | | | (33,875 ) | (271,457 ) |
| Other equity | | | 13,294,973 | 13,294,973 |
| | | | 14,496,244 | 14,257,309 |
| Equity attributable to owners of the controlling company | | | 71,723,693 | 71,681,445 |
| Non-controlling interests | 16, 33 | | 1,326,852 | 1,283,196 |
| **Total Equity** | | ₩ | 73,050,545 | 72,964,641 |
| **Total Liabilities and Equity** | | ₩ | 177,837,042 | 181,788,915 |

See accompanying notes to the consolidated financial statements.

F-6

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Comprehensive Income**
**For the years ended December 31, 2015, 2016 and 2017**

| | Note | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | In millions of won, except per share information | | |
| **Sales** | 4,35,45,47 | | | |
| Sales of goods | | ₩ 54,367,036 | 55,379,487 | 55,772,548 |
| Sales of construction services | 20 | 3,761,204 | 4,026,857 | 3,212,184 |
| Sales of services | | 453,487 | 356,743 | 351,157 |
| | | 58,581,727 | 59,763,087 | 59,335,889 |
| **Cost of sales** | 13,25,43,47 | | | |
| Cost of sales of goods | | (41,348,917 ) | (41,237,372 ) | (48,454,036 ) |
| Cost of sales of construction services | | (3,563,120 ) | (3,755,144 ) | (3,047,396 ) |
| Cost of sales of services | | (545,692 ) | (557,037 ) | (597,423 ) |
| | | (45,457,729 ) | (45,549,553 ) | (52,098,855 ) |
| **Gross profit** | | 13,123,998 | 14,213,534 | 7,237,034 |
| **Selling and administrative expenses** | 25,36,43,47 | (2,153,261 ) | (2,639,232 ) | (2,762,855 ) |
| **Other income** | 37 | 808,214 | 840,184 | 869,118 |
| **Other expenses** | 37 | (108,848 ) | (188,624 ) | (180,055 ) |
| **Other gains, net** | 38 | 8,610,773 | 70,498 | 156,627 |
| **Operating profit** | 4 | 20,280,876 | 12,296,360 | 5,319,869 |
| **Finance income** | 5,11,39 | 1,182,988 | 791,543 | 1,530,618 |
| **Finance expenses** | 5,11,40 | (3,015,457 ) | (2,437,087 ) | (3,127,952 ) |
| **Profit (loss) related to associates, joint ventures and subsidiaries** | 4,17 | | | |
| Share in profit of associates and joint ventures | | 280,794 | 224,435 | 241,537 |
| Gain on disposal of investments in associates and joint ventures | | 4,731 | 52 | 609 |
| Gain on disposal of investments in subsidiaries | 16 | 8,376 | – | – |
| Share in loss of associates and joint ventures | | (86,522 ) | (243,361 ) | (323,225 ) |
| Loss on disposal of investments in associates and joint ventures | | – | (2,935 ) | – |
| Impairment loss on investments in associates and joint ventures | 17 | – | (115,539 ) | (27,238 ) |
| | | 207,379 | (137,348 ) | (108,317 ) |
| **Profit before income tax** | | 18,655,786 | 10,513,468 | 3,614,218 |
| **Income tax expense** | 41 | (5,239,413 ) | (3,365,141 ) | (2,172,824 ) |
| **Profit for the period** | | ₩ 13,416,373 | 7,148,327 | 1,441,394 |

(Continued)

F-7

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Comprehensive Income, Continued**

**For the years ended December 31, 2015, 2016 and 2017**

| | Note | | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| | | | In millions of won, except per share information | | |
| **Other comprehensive income (loss)** | 5,11,25,31,34 | | | | |
| Items that will not be reclassified subsequently to profit or loss: | | | | | |
| Remeasurements of defined benefit liability, net of tax | 25,31 | ₩ | (87,861 ) | (75,926 ) | 170,337 |
| Share in other comprehensive loss of associates and joint ventures, net of tax | 31 | | (283 ) | (2,515 ) | 10,067 |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax | 34 | | 9,648 | 61,279 | (7,098 ) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax | 5,11,34 | | 4,409 | 28,414 | 20,868 |
| Foreign currency translation of foreign operations, net of tax | 34 | | 18,535 | 41,360 | (134,196 ) |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax | 34 | | 89,558 | (54,914 ) | (154,694 ) |
| **Other comprehensive income (loss), net of tax** | | | 34,006 | (2,302 ) | (94,716 ) |
| **Total comprehensive income for the period** | | ₩ | 13,450,379 | 7,146,025 | 1,346,678 |
| **Profit or loss attributable to:** | | | | | |
| Owners of the controlling company | 44 | ₩ | 13,289,127 | 7,048,581 | 1,298,720 |
| Non-controlling interests | | | 127,246 | 99,746 | 142,674 |
| | | ₩ | 13,416,373 | 7,148,327 | 1,441,394 |
| **Total comprehensive income attributable to:** | | | | | |
| Owners of the controlling company | | ₩ | 13,308,132 | 7,041,557 | 1,230,194 |
| Non-controlling interests | | | 142,247 | 104,468 | 116,484 |
| | | ₩ | 13,450,379 | 7,146,025 | 1,346,678 |
| **Earnings per share (in won)** | 44 | | | | |
| Basic and diluted earnings per share | | ₩ | 20,701 | 10,980 | 2,023 |

See accompanying notes to the consolidated financial statements.

F-8

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Changes in Equity**
**For the years ended December 31, 2015, 2016 and 2017**

| | Contributed capital | Retained earnings | Other components of equity | Subtotal | Non-controlling Interests | Total equity |
|---|---|---|---|---|---|---|
| | | | | Equity attributable to owners of the controlling company | | |
| | | | In millions of won | | | |
| Balance at January 1, 2015 ₩ | 4,053,578 | 35,303,647 | 14,244,106 | 53,601,331 | 1,223,679 | 54,825,010 |
| **Total comprehensive income (loss) for the period** | | | | | | |
| Profit for the period | – | 13,289,127 | – | 13,289,127 | 127,246 | 13,416,373 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | |
| Remeasurements of defined benefit liability, net of tax | – | (84,271 ) | – | (84,271 ) | (3,590 ) | (87,861 ) |
| Share in other comprehensive loss of associates and joint ventures, net of tax | – | (280 ) | – | (280 ) | (3 ) | (283 ) |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax | – | – | 9,744 | 9,744 | (96 ) | 9,648 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax | – | – | 3,157 | 3,157 | 1,252 | 4,409 |
| Foreign currency translation of foreign operations, net of tax | – | – | 1,179 | 1,179 | 17,356 | 18,535 |
| Share in other comprehensive income of associates and joint ventures, net of tax | – | – | 89,476 | 89,476 | 82 | 89,558 |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | |
| Dividends paid | – | (320,982 ) | – | (320,982 ) | (86,071 ) | (407,053 ) |
| Issuance of share capital by subsidiaries | – | – | 2,536 | 2,536 | 12,329 | 14,865 |
| Equity transaction within consolidation scope–other than issuance of share capital | – | – | 44,166 | 44,166 | 9,046 | 53,212 |
| Disposal of treasury stocks | – | – | (716 ) | (716 ) | 23,229 | 22,513 |
| Changes in consolidation scope | – | – | – | – | (16,455 ) | (16,455 ) |
| Dividends paid (hybrid bond) | – | – | – | – | 4 | 4 |
| Balance at December 31, 2015 ₩ | 4,053,578 | 48,187,241 | 14,393,648 | 66,634,467 | 1,308,008 | 67,942,475 |

(Continued)

F-9

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Changes in Equity, Continued**
**For the years ended December 31, 2015, 2016 and 2017**

| | | Equity attributable to owners of the controlling company | | | | Non-controlling Interests | Total equity |
|---|---|---|---|---|---|---|---|
| | | Contributed capital | Retained earnings | Other components of equity | Subtotal | | |
| | | In millions of won | | | | | |
| **Balance at January 1, 2016** | ₩ | 4,053,578 | 48,187,241 | 14,393,648 | 66,634,467 | 1,308,008 | 67,942,475 |
| **Total comprehensive income (loss) for the period** | | | | | | | |
| Profit for the period | | – | 7,048,581 | – | 7,048,581 | 99,746 | 7,148,327 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | | |
| Remeasurements of defined benefit liability, net of tax | | – | (69,330   ) | – | (69,330   ) | (6,596   ) | (75,926   ) |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax | | – | (2,532   ) | – | (2,532   ) | 17 | (2,515   ) |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax | | – | – | 61,275 | 61,275 | 4 | 61,279 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax | | – | – | 27,075 | 27,075 | 1,339 | 28,414 |
| Foreign currency translation of foreign operations, net of tax | | – | – | 31,406 | 31,406 | 9,954 | 41,360 |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax | | – | – | (54,918   ) | (54,918   ) | 4 | (54,914   ) |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | | |
| Dividends paid | | – | (1,990,089   ) | – | (1,990,089   ) | (99,982   ) | (2,090,071 ) |
| Issuance of shares of capital by subsidiaries and others | | – | – | 1,750 | 1,750 | 14,809 | 16,559 |
| Equity transaction within consolidation scope–other than issuance of share capital | | – | – | 36,008 | 36,008 | 12,299 | 48,307 |
| Changes in consolidation scope | | – | – | – | – | 3,705 | 3,705 |
| Dividends paid (hybrid bond) | | – | – | – | – | (16,455   ) | (16,455   ) |
| **Balance at December 31, 2016** | ₩ | 4,053,578 | 53,173,871 | 14,496,244 | 71,723,693 | 1,326,852 | 73,050,545 |

(Continued)

F-10

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Changes in Equity, Continued**
**For the years ended December 31, 2015, 2016 and 2017**

| | | Equity attributable to owners of the controlling company | | | | | |
|---|---|---|---|---|---|---|---|
| | | Contributed capital | Retained earnings | Other components of equity | Subtotal | Non-controlling Interests | Total equity |
| | | In millions of won | | | | | |
| **Balance at January 1, 2017** | ₩ | 4,053,578 | 53,173,871 | 14,496,244 | 71,723,693 | 1,326,852 | 73,050,545 |
| **Total comprehensive income (loss) for the period** | | | | | | | |
| Profit for the period | | – | 1,298,720 | – | 1,298,720 | 142,674 | 1,441,394 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | | |
| Remeasurements of defined benefit liability, net of tax | | – | 158,991 | – | 158,991 | 11,346 | 170,337 |
| Share in other comprehensive income of associates and joint ventures, net of tax | | – | 10,065 | – | 10,065 | 2 | 10,067 |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax | | – | – | (7,102 ) | (7,102 ) | 4 | (7,098 ) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax | | – | – | 19,614 | 19,614 | 1,254 | 20,868 |
| Foreign currency translation of foreign operations, net of tax | | – | – | (95,103 ) | (95,103 ) | (39,093 ) | (134,196 ) |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax | | – | – | (154,991 ) | (154,991 ) | 297 | (154,694 ) |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | | |
| Dividends paid | | – | (1,271,089 ) | – | (1,271,089 ) | (70,252 ) | (1,341,341 ) |
| Issuance of shares of capital by subsidiaries and others | | – | – | (1,378 ) | (1,378 ) | 18,381 | 17,003 |
| Changes in consolidation scope | | – | – | – | – | 7,337 | 7,337 |
| Dividends paid (hybrid bond) | | – | – | – | – | (15,856 ) | (15,856 ) |
| Repayment of hybrid bond | | – | – | – | – | (99,750 ) | (99,750 ) |
| Others | | – | – | 25 | 25 | – | 25 |
| **Balance at December 31, 2017** | ₩ | 4,053,578 | 53,370,558 | 14,257,309 | 71,681,445 | 1,283,196 | 72,964,641 |

See accompanying notes to the consolidated financial statements.

F-11

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

**Consolidated Statements of Cash Flows**
**For the years ended December 31, 2015, 2016 and 2017**

| | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | | In millions of won | |
| **Cash flows from operating activities** | | | | |
| Profit for the period | ₩ | 13,416,373 | 7,148,327 | 1,441,394 |
| Adjustments for: | | | | |
| Income tax expense | | 5,239,413 | 3,365,141 | 2,172,824 |
| Depreciation | | 8,269,118 | 8,881,273 | 9,660,039 |
| Amortization | | 72,266 | 79,715 | 113,672 |
| Employee benefit expense | | 314,692 | 373,753 | 391,360 |
| Bad debt expense | | 18,350 | 37,815 | 126,326 |
| Interest expense | | 2,015,684 | 1,752,868 | 1,789,552 |
| Loss on sale of financial assets | | 3,008 | 9 | 2,343 |
| Loss on disposal of property, plant and equipment | | 1,933 | 4,996 | 70,514 |
| Loss on abandonment of property, plant, and equipment | | 365,056 | 426,519 | 424,091 |
| Impairment loss on property, plant and equipment | | 30,344 | – | 51,067 |
| Impairment loss on intangible assets | | 22 | 3,945 | 20 |
| Loss on disposal of intangible assets | | 16 | 158 | 183 |
| Increase to provisions | | 1,602,724 | 1,782,732 | 1,690,120 |
| Loss (gain) on foreign currency translation, net | | 617,224 | 253,468 | (902,878 ) |
| Valuation and transaction loss (gain) on derivative instruments, net | | (708,120 ) | (231,630 ) | 1,043,628 |
| Share in loss (income) of associates and joint ventures, net | | (194,272 ) | 18,926 | 81,688 |
| Gain on disposal of financial assets | | (4 ) | (1,482 ) | (1,130 ) |
| Gain on disposal of property, plant and equipment | | (8,637,508 ) | (74,035 ) | (48,316 ) |
| Gain on disposal of intangible assets | | (32 ) | – | (564 ) |
| Gain on disposal of investments in associates and joint ventures | | (4,731 ) | (52 ) | (609 ) |
| Loss on disposal of investments in associates and joint ventures | | – | 2,935 | – |
| Gain on disposal of investments in subsidiaries | | (8,376 ) | – | – |
| Impairment loss on investments in associates and joint ventures | | – | 115,539 | 27,238 |
| Interest income | | (241,585 ) | (241,778 ) | (206,143 ) |
| Dividend income | | (14,069 ) | (9,446 ) | (11,477 ) |
| Impairment loss on available-for-sale financial assets | | 84,370 | 86,703 | 2,713 |
| Others, net | | (35,107 ) | 66,260 | 16,679 |
| | | 8,790,416 | 16,694,332 | 16,492,940 |
| | | | | |
| Changes in: | | | | |
| Trade receivables | | 715,498 | 200,529 | (218,328 ) |
| Non-trade receivables | | (17,102 ) | (68,322 ) | (31,807 ) |
| Accrued income | | 17,051 | 69,151 | 577,838 |
| Other receivables | | (9,441 ) | 10,093 | (1,271 ) |
| Other current assets | | 67,520 | (259,492 ) | 37,576 |
| Inventories | | (1,190,188 ) | (1,439,545 ) | (1,373,438 ) |
| Other non-current assets | | (31,465 ) | (2,792 ) | (46,079 ) |
| Trade payables | | (1,577,551 ) | 141,994 | 342,126 |
| Non-trade payables | | 38,223 | (8,379 ) | (214,704 ) |
| Accrued expenses | | (410,744 ) | (153,172 ) | (715,305 ) |
| Other payables | | 964 | – | 292 |
| Other current liabilities | | 870,945 | 284,417 | (126,323 ) |
| Other non-current liabilities | | 377,617 | 809,699 | 763,958 |
| Investments in associates and joint ventures (dividends received) | | 114,708 | 75,407 | 106,983 |
| Provisions | | (1,033,502 ) | (1,527,129 ) | (1,390,606 ) |
| Payments of employee benefit obligations | | (43,100 ) | (53,477 ) | (69,489 ) |
| Plan assets | | (214,449 ) | (312,125 ) | (325,080 ) |
| | | (2,325,016 ) | (2,233,143 ) | (2,683,657 ) |

(Continued)

F-12

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

## KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Consolidated Statements of Cash Flows, Continued
### For the years ended December 31, 2015, 2016 and 2017

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | In millions of won | | |
| Cash generated from operating activities ₩ | 19,881,773 | 21,609,516 | 15,250,677 |
| Dividends received (available-for-sale financial assets) | 38,565 | 10,294 | 10,590 |
| Interest paid | (2,176,040 ) | (2,041,379 ) | (1,886,303 ) |
| Interest received | 133,875 | 240,878 | 173,226 |
| Income taxes paid | (935,068 ) | (3,298,757 ) | (2,298,296 ) |
| **Net cash from operating activities** | 16,943,105 | 16,520,552 | 11,249,894 |
| **Cash flows from investing activities** | | | |
| Proceeds from disposals of associates and joint ventures | 22,058 | 46,644 | 10,542 |
| Acquisition of associates and joint ventures | (116,114 ) | (113,222 ) | (206,753 ) |
| Proceeds from disposals of property, plant and equipment | 9,843,796 | 207,960 | 85,801 |
| Acquisition of property, plant and equipment | (14,049,887 ) | (12,028,789 ) | (12,535,958 ) |
| Proceeds from disposals of intangible assets | 467 | 430 | 1,072 |
| Acquisition of intangible assets | (87,946 ) | (124,422 ) | (143,887 ) |
| Proceeds from disposals of financial assets | 242,856 | 10,876,017 | 5,296,680 |
| Acquisition of financial assets | (5,326,151 ) | (8,130,621 ) | (4,786,717 ) |
| Increase in loans | (153,570 ) | (206,092 ) | (218,698 ) |
| Collection of loans | 111,714 | 117,561 | 120,967 |
| Increase in deposits | (352,669 ) | (468,734 ) | (397,078 ) |
| Decrease in deposits | 185,154 | 161,166 | 110,383 |
| Receipt of government grants | 52,696 | 32,878 | 55,533 |
| Net cash inflow (outflow) from changes in consolidation scope | (968 ) | 3,754 | – |
| Other cash inflow (outflow) from investing activities, net | (145,406 ) | (20,400 ) | 1,414 |
| **Net cash used in investing activities** | (9,773,970 ) | (9,645,870 ) | (12,606,699 ) |
| **Cash flows from financing activities** | | | |
| Proceeds from (Repayment of) short-term borrowings, Net | (65,355 ) | (49,604 ) | 370,328 |
| Proceeds from long-term borrowings and debt securities | 4,178,454 | 2,302,060 | 10,098,067 |
| Repayment of long-term borrowings and debt securities | (8,960,706 ) | (7,750,047 ) | (8,198,882 ) |
| Payment of finance lease liabilities | (110,040 ) | (118,215 ) | (122,919 ) |
| Settlement of derivative instruments, net | 73,348 | 73,246 | 33,434 |
| Proceeds on disposal of partial interest in a subsidiary that does not involve loss of control | 67,914 | – | – |
| Change in non-controlling interest | 36,105 | 10,538 | 23,582 |
| Repayment of hybrid bond | – | – | (99,750 ) |
| Dividends paid (hybrid bond) | (16,455 ) | (16,455 ) | (15,856 ) |
| Dividends paid | (409,884 ) | (2,088,429 ) | (1,340,387 ) |
| Other cash outflow from financing activities, net | – | (570 ) | (2,023 ) |
| **Net cash from (used in) financing activities** | (5,206,619 ) | (7,637,476 ) | 745,594 |
| **Net increase (decrease) in cash and cash equivalents before effect of exchange rate fluctuations** | 1,962,516 | (762,794 ) | (611,211 ) |
| **Effect of exchange rate fluctuations on cash held** | 24,249 | 31,082 | (70,403 ) |
| **Net increase (decrease) in cash and cash equivalents** | 1,986,765 | (731,712 ) | (681,614 ) |
| **Cash and cash equivalents at January 1** | 1,796,300 | 3,783,065 | 3,051,353 |
| **Cash and cash equivalents at December 31 ₩** | 3,783,065 | 3,051,353 | 2,369,739 |

See accompanying notes to the consolidated financial statements.

F-13

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Notes to the Consolidated Financial Statements**
**December 31, 2017**

**1.    Reporting Entity (Description of the controlling company)**

Korea Electric Power Corporation ("KEPCO") was incorporated on January 1, 1982 in accordance with the Korea Electric Power Corporation Act (the "KEPCO Act") to engage in the generation, transmission and distribution of electricity and development of electric power resources in the Republic of Korea. KEPCO also provides power plant construction services. KEPCO' s stock was listed on the Korea Stock Exchange on August 10, 1989 and KEPCO listed its Depository Receipts (DR) on the New York Stock Exchange on October 27, 1994. KEPCO' s head office is located in Naju, Jeollanam-do.

As of December 31, 2017, KEPCO' s share capital amounts to ₩3,209,820 million and KEPCO' s shareholders are as follows:

|  | Number of shares | Percentage of ownership |  |
|---|---|---|---|
| Government of the Republic of Korea | 116,841,794 | 18.20 | % |
| Korea Development Bank | 211,235,264 | 32.90 | % |
| Foreign investors | 194,050,746 | 30.23 | % |
| Other | 119,836,273 | 18.67 | % |
|  | 641,964,077 | 100.00 | % |

In accordance with the Restructuring Plan enacted on January 21, 1999 by the Ministry of Trade, Industry and Energy, KEPCO spun off its power generation divisions on April 2, 2001, resulting in the establishment of six power generation subsidiaries.

**2.    Basis of Preparation**

The consolidated financial statements of Korea Electric Power Corporation and subsidiaries (the "Company") were authorized for issuance by the Board of Directors on February 23, 2018.

**(1)    Statement of compliance**

These consolidated financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB").

**(2)    Basis of measurement**

These consolidated financial statements have been prepared on the historical cost basis, except for the following material items in the consolidated statements of financial position:

derivative financial instruments are measured at fair value

available-for-sale financial assets are measured at fair value

liabilities for defined benefit plans are recognized at the net of the total present value of defined benefit obligations less the fair value of plan assets

**(3)    Functional and presentation currency**

These consolidated financial statements are presented in Korean won ("Won"), which is KEPCO' s functional and presentation currency.

F-14

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(4) Use of estimates and judgments**

The preparation of the consolidated financial statements in conformity with IFRS requires management to make judgments, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates.

Estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognized in the period in which the estimates are revised and in any future periods affected.

The following are the key assumptions concerning the future, and other key sources of estimation uncertainty at the end of the reporting period, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year.

(i)    Unbilled revenue

Energy delivered but not metered nor billed are calculated at the reporting date and is estimated based on consumption statistics and selling price estimates. Determination of the unbilled revenues at the end of the reporting period is sensitive to the estimated consumptions and prices based on statistics. Unbilled revenue recognized for the years ended December 31, 2016 and 2017 are ₩1,615,322 million and ₩1,672,385 million, respectively.

(ii)   Continuing operation of Wolsong Unit 1 nuclear power plant

Wolsong Unit 1 nuclear power plant of the Company commenced operations on November 21, 1982 and its 30-year of designed life was expired on November 20, 2012. On February 27, 2015, the Nuclear Safety and Security Commission (NSSC) evaluated the safety of operation on the Wolsong Unit 1 nuclear power plant and approved to continue its operation until November 20, 2022. As described in note 50, the lawsuit related to the validity of the approval of NSSC is currently ongoing.

According to the Eighth Basic Plan for Electricity Supply and Demand by the Ministry of Trade, Industry and Energy, Wolsong Unit 1 nuclear power plant is expected to go through a comprehensive evaluation for the feasibility of continuous operation including economic efficiency and acceptability of household and community in 2018.

The Korean government plans to refund to the Company for reasonable expenditures incurred in relation to the phase-out of nuclear power plants in accordance with the energy transformation policy established by Korean government. In doing so, after discussions with relevant government agencies and upon approval by the Congress, the Korean government is considering to use available resource including utilizing relevant fund to make the refund. Also, Korean government plans to establish relevant legal basis of providing refund including utilizing available resource, if necessary.

Information about critical judgments in applying accounting policies that have the most significant effect on the amounts recognized in the consolidated financial statements is included in the following notes:

Note 17 – Investments in Associates and Joint Ventures

Note 18 – Property, Plant and Equipment

Note 20 – Construction Services Contracts

Note 45 – Risk Management

Information about assumptions and estimation uncertainties that have a significant risk of resulting in a material adjustment within the next financial year is included in the following notes:

Note 41 – Income Taxes

Note 25 – Employment Benefits

F-15

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(5)    Changes in accounting policies**

(i)    Amendments to IAS 7 'Statement of Cash Flows'

The Company has adopted amendments to IAS 'Statement of Cash Flows' since January 1, 2017. The amendments require changes in liabilities arising from financing activities to be disclosed. The amendments are not required to provide comparative information for prior periods when applying the first time. Information about changes in liabilities arising from financing activities is included in note 23 and note 24.

(ii)    Amendments to IAS 12 'Income Taxes'

The Company has adopted amendments to IAS 12 'Income Taxes' since January 2017. The amendments clarify that unrealized losses on fixed-rate debt instruments measured at fair value and measured at cost for tax purposes give rise to a deductible temporary difference regardless of whether the holder expects to recover the carrying amount of the debt instrument by sale or by use and that the estimate of probable future taxable profit may include the recovery of some of assets for more than their carrying amount. When the Company assesses whether there will be sufficient taxable profit, the Company should compare the deductible temporary differences with future taxable profit that excludes tax deductions resulting from the reversal of those deductible temporary differences. The Company believes that there is no significant impact on the Company's consolidated financial statements and did not retroactively restate the comparative consolidated financial statements for the prior period.

**(6)    New standards and amendments not yet adopted**

The following new standards, including IFRS 9 'Financial Instruments' and IFRS 15 'Revenue from Contracts with Customers', interpretations and amendments to existing standards have been published but are not mandatory for the Company for annual periods beginning on January 1, 2017, and the Company has not early adopted them.

The Company will apply IFRS 9 'Financial Instruments' and IFRS 15 'Revenue from Contracts with Customers' for annual periods beginning on January 1, 2018. The Company has conducted a detailed assessment on adoption of these standards and based on the circumstance and information available when these financial statements were authorized for issuance.

(i)    IFRS 9 'Financial Instruments'

IFRS 9 sets out the requirements for recognizing and measuring financial assets, financial liabilities and certain contracts to buy or sell non-financial items. It replaces existing guidance in IAS 39 'Financial Instruments: Recognition and Measurement'.

The Company will apply the exemption allowing it not to restate the comparative information for prior periods upon adoption of IFRS 9. The Company will retroactively apply the cumulative effect of the adoption of IFRS 9 in retained earnings as of the date of initial application (January 1, 2018).

Expected impacts on the consolidated financial statements are categorized as follows:

①    Classification and measurement of financial assets

IFRS 9 includes a new classification and measurement of financial assets that reflects the business model in which assets are managed and their cash flow characteristics.

Under IFRS 9, financial assets are classified into three principal categories; measured at amortized cost, fair value through other comprehensive income (FVOCI) and fair value through profit or loss (FVTPL) based on the business model in which assets are managed and their cash flow characteristics. Under IFRS 9, derivatives embedded in hybrid contracts where the host is a financial asset are not bifurcated. Instead, the hybrid financial instrument as a whole is assessed for classification.

F-16

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The criteria for classification and measurement of financial assets under IFRS 9 are as follows:

A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is to hold assets to collect contractual cash flows; and 2) the contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

A financial asset is measured at FVOCI if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and 2) the contractual terms of the financial asset give rise on specified dates to cash flow that are solely payments of principal and interest on the principal amount outstanding. On initial recognition of equity investment that is not held for trading, the Company may irrevocably elect to present subsequent changes in fair value in OCI, and will not reclassify(recycle) the those items in OCI to profit or loss subsequently.

A financial asset is measured at FVTPL if the contractual terms of the financial asset give rise to specified dates to cash flows that are not solely payments of principal and interest on the principal amount outstanding, the debt instrument is held within a business model whose objective is to sell the asset, or the equity instruments that are not elected to be designated as measured at FVOCI.

As of December 31, 2017, the Company has financial assets at fair value through profit or loss amounting to ₩133,532 million, available-for-sale financial assets amounting to ₩699,833 million, held-to-maturity investments amounting to ₩3,144 million and loans and receivables amounting to ₩15,203,663 million.

Based on the result of the detailed assessment to date, the expected impacts on the Company's financial assets (excluding derivative instruments) on the date of initial application (January 1, 2018) are as follows:

| Classification based on IAS 39 | Classification based on IFRS 9 | | Amount based on IAS 39 | Amount based on IFRS 9 |
|---|---|---|---|---|
| | | | In millions of won | |
| Financial assets at FVTPL | FVTPL | ₩ | 111,512 | 111,512 |
| Loans and receivables | Amortized cost | | 15,203,663 | 14,412,339 |
| Loans and receivables | FVTPL | | – | 791,324 |
| Available-for-sale financial assets | FVOCI | | 699,833 | 476,941 |
| Available-for-sale financial assets | FVTPL | | – | 222,892 |
| Held-to-maturity investments | Amortized cost | | 3,144 | 3,144 |
| Total financial assets (excluding derivative instruments) | | ₩ | 16,018,152 | 16,018,152 |

Upon adoption of IFRS 9, ₩791,324 million of loans and receivables and ₩222,892 million of available-for-sale financial assets will be measured at FVTPL. The Company has elected to measure ₩476,941 million of the equity securities classified as available-for-sale financial assets as FVOCI under IFRS 9. Accordingly, from January 1, 2018, gains and losses from changes of fair value of the equity securities are recognized in other comprehensive income, impairment losses are not recognized in profit or loss, and gains and losses are not reclassified at disposal.

② Classification and measurement of financial liabilities

Under IFRS 9, the amount of change in the fair value attributable to the changes in the credit risk of the financial liabilities is presented in OCI, not recognized in profit or loss, and the OCI amount will not be reclassified (recycled) to profit or loss. However, if doing so creates or increase an accounting mismatch, the amount of change in the fair value is recognized in profit or loss.

F-17

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The Company did not elect to designate financial liabilities as FVTPL and believes that there is no significant impact on the Company's consolidated financial statements upon adoption of IFRS 9.

③    Impairment: Financial assets and contract assets

IFRS 9 replaces the 'incurred loss' model in the existing standard with a forward-looking 'expected credit loss' (ECL) model for debt instruments, lease receivables, contractual assets, loan commitments, financial guarantee contracts.

Under IFRS 9, impairment losses are likely to be recognized earlier than using the incurred loss model under the existing guidance in IAS 39 as loss allowances will be measured on either of the 12-month or lifetime ECL based on the extent of increase in credit risk since inception as shown in the below table.

| | Classification | | Loss allowances |
|---|---|---|---|
| Stage 1 | Credit risk has not increased significantly since the initial recognition | 12-month ECL: | ECLs that resulted from possible default events within the 12 months after the reporting date |
| Stage 2 | Credit risk has increased significantly since the initial recognition | Lifetime ECL: | ECL that resulted from all possible default events over the expected life of a financial instrument |
| Stage 3 | Credit-impaired | | |

Under IFRS 9, an entity shall always measure the loss allowance at an amount equal to lifetime expected credit losses for trade receivables or contract assets that result from transactions that are within the scope of IFRS 15 and that do not contain a significant financing component in accordance with IFRS 15 and if the trade receivables or contract assets include a significant financing component, an entity may choose as its accounting policy to measure the loss allowance at an amount equal to lifetime expected credit losses.

As of December 31, 2017, the Company has debt instruments in financial assets measured at amortized cost amounting to ₩15,464,202 million (loans and receivables) and has recognized loss allowances of ₩260,539 million.

Under adoption of IFRS 9, the Company plans to elect to measure the loss allowance at an amount equal to lifetime expected credit losses for trade receivables, contract assets and lease receivables that include a significant financing component. Based on the result of the detailed assessment to date, the expected impacts on the Company's loss allowances on the date of initial application (January 1, 2018) are as follows:

| Type | | Amount based on IAS 39 (A) | Amount based on IFRS 9 (B) | Increase (decrease) (B-A) |
|---|---|---|---|---|
| | | | In millions of won | |
| Trade and other receivables | ₩ | 251,591 | 258,360 | 6,769 |
| Other financial assets | | 8,948 | 8,948 | – |
| Total | ₩ | 260,539 | 267,308 | 6,769 |

④    Hedge accounting

When initially applying IFRS 9, an entity may elect as its accounting policy to continue to apply the hedge accounting requirements of IAS 39. The Company plans to elect to continue apply the hedge accounting requirements of IAS 39.

As of December 31, 2017, the Company has asset and liabilities designated as hedged items amounting to ₩10,606 million and ₩277,130 million, respectively.

F-18

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(ii)   IFRS 15 'Revenue from Contracts with Customers'

IFRS 15 sets out a comprehensive framework for determining whether revenue is recognized, the extent of revenue recognized, and when revenue is recognized. It replaces existing revenue recognition guidance, including IAS 18 'Revenue', IAS 11 'Construction Contracts', SIC-31 'Revenue-Barter transactions involving advertising services', IFRIC 13 'Customer Loyalty Programs', IFRIC 15 'Agreements for the construction of real estate', and IFRIC 18 'Transfers of assets from customers'.

The Company will retrospectively apply and recognize the cumulative effect of the adoption of IFRS 15 at the date of initial application (January 1, 2018) and has determined to retrospectively apply to only those contracts that were not completed as of the date of initial application (January 1, 2018). Accordingly, the Company will not restate the comparative periods.

Existing IFRS standards and interpretations including IAS 18 provide revenue recognition guidance by transaction types such as sales of goods, rendering of services, interest income, royalty income, dividend income and construction revenue; however, under the new standard, IFRS 15, the five-step approach (Step 1: Identify the contract(s) with a customer, Step 2: Identify the performance obligations in the contract, Step 3: Determine the transaction price, Step 4: Allocate the transaction price to the performance obligations in the contract, Step 5: Recognize revenue when the entity satisfied a performance obligation) is applied for all types of contracts or agreements.

Expected impacts on the consolidated financial statements are categorized as follows:

①   Identify the performance obligations in the contract

The Company is engaged in the generation, transmission and distribution of electricity and development of electric power resources, and electricity sales revenue accounts for 91.3% of consolidated revenue for the year ended December 31, 2017.

Under IFRS 15, supplying electricity is a series of distinct goods or services identified as a single performance obligation. The Company is also engaged in contracts with customers for transmission and distribution, provision of power generation byproducts, EPC business, O&M, etc. that are identified as different performance obligations for each contract.

Based on the result of the detailed assessment to date, the Company believes that the impact of identifying separate the performance obligations in the contract on the Company's revenue is not significant.

②   Variable consideration

The Company may be subject to a variation of consideration paid by the customer due to the progressive electricity billing system, discounts on electricity bills for policy purposes, penalties and delinquent payment, etc. In applying IFRS 15, the Company estimates an amount of variable consideration by using the expected value method that the Company expects to better predict the amount of consideration to which it will be entitled, and includes in the transaction price some or all of an amount of variable consideration only to the extent that it is highly probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

Based on the result of the detailed assessment to date, the Company believes that the impact of variable consideration on the Company's revenue is not significant.

③   Performance obligations satisfied over time

The Company provides its customers with services such as EPC business, O&M, etc. over time. The Company recognizes revenues based on the percentage-of-completion on a reasonable basis.

F-19

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Under IFRS 15, an entity recognizes revenue over time if one of the following criteria is met:

(a)    the customer simultaneously receives and consumes the benefits provided by the entity's performance as the entity performs;

(b)    the entity's performance creates or enhances an asset that the customer controls as the asset is created or enhanced; or

(c)    the entity's performance does not create an asset with an alternative use to the entity and the entity has an enforceable right to payment for performance completed to date.

Based on the result of the detailed assessment to date, the impact of the revenue recognition over time based on the percentage-of-completion on the Company's revenue is not significant.

(iii)    IFRS 16 'Leases'

IFRS 16 replaces IAS 17 'Leases', and IFRIC 4 'Determining whether an Arrangement contains a Lease'. This standard is effective for annual reporting periods beginning on or after January 1, 2019, with early adoption permitted if IFRS 15 'Revenue from Contracts with Customers' has also been applied.

Under IFRS 16, a lessee shall apply this standard to its leases either:

(a)    retrospectively to each prior reporting period presented applying IAS 8 'Accounting Policies, Changes in Accounting Estimates and Errors'; or

(b)    retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application.

The Company has not yet determined the transition approach for IFRS 16.

IFRS 16 provides a single lessee accounting model in which the lessee recognizes lease related assets and liabilities in the statement of financial position. A lessee is required to recognize a right-of-use asset representing its right to use the underlying leased asset and a lease liability representing its obligation to make lease payments. Lease recognition may be exempted for short-term leases and leases for which the underlying asset is of low value. Accounting for a lessor is similar to the existing standard that classifies each of its leases as either an operating lease or a finance lease.

Upon adoption of IFRS 16, the nature of the costs associated with the lease will change as the operating lease payments recognized based on a straight-line basis will change to depreciation expense of a right-of-use asset and interest expense of the lease liability and no significant impact is expected on the Company's finance lease.

The Company plans to conduct a detailed assessment of the potential impact from the application of IFRS 16 during the year ending December 31, 2018.

(iv)    IFRIC 22 'Foreign Currency Transactions and Advance Consideration'

IFRIC 22, published on December 8, 2016, clarifies the date of the transaction for the purpose of determining the exchange rate to use on initial recognition of the related asset, expense or income, when an entity has received or paid advance consideration in a foreign currency. IFRIC 22 is effective for annual reporting periods beginning on or after January 1, 2018, with earlier adoption permitted.

The Company is currently performing a detailed assessment of the impact resulting from the application of IFRIC 22 and plans to complete the assessment in advance of its effective date.

(v)    Amendments to IAS 40 'Investment Property'

The amendments clarify when an entity should transfer a property asset to, or from, investment property. The amendments are effective for annual periods beginning on or after January 1, 2018, with earlier adoption permitted.

F-20

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The Company is currently performing a detailed assessment of the impact resulting from the application of amendments to IAS 40 and plans to complete the assessment in advance of its effective date.

**3.    Significant Accounting Policies**

Except as described in note 2.(5), the Company applied the following significant accounting policies consistently for all periods presented.

**(1)    Basis of consolidation**

The consolidated financial statements are the financial statements of a group in which the assets, liabilities, equity, income, expenses and cash flows of the parent and its subsidiaries are presented as those of a single economic entity. Subsidiaries are controlled by the Company. The Company controls an entity when it is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity.

Income and expense of a subsidiary acquired or disposed of during the year are included in the consolidated statement of comprehensive income from the effective date of acquisition and up to the effective date of disposal, as appropriate. Total comprehensive income of subsidiaries is attributed to the owners of the Company and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance.

When necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with those of the Company.

Transactions within the Company are eliminated during the consolidation.

Changes in the Company's ownership interests in a subsidiary that do not result in the Company losing control over the subsidiary are accounted for as equity transactions. The carrying amounts of the Company's interests and the non-controlling interests are adjusted to reflect the changes in their relative interests in the subsidiary. Any difference between the amount by which the non-controlling interests are adjusted and the fair value of the consideration paid or received is recognized directly in equity and attributed to owners of the Company.

When the Company loses control of a subsidiary, the income or loss on disposal is calculated as the difference between (i) the aggregate of the fair value of the consideration received and the fair value of any retained interest and (ii) the previous carrying amount of the assets (including goodwill), and liabilities of the subsidiary and any non-controlling interests. When assets of the subsidiary are carried at revalued amounts or fair values and the related cumulative gain or loss has been recognized in other comprehensive income and accumulated in equity, the amounts previously recognized in other comprehensive income and accumulated in equity are accounted for as if the Company had directly disposed of the relevant assets (i.e. reclassified to income or loss or transferred directly to retained earnings). The fair value of any investment retained in the former subsidiary at the date when control is lost is recognized as the fair value on initial recognition for subsequent accounting under IAS 39 'Financial Instruments': Recognition and Measurement or, when applicable, the cost on initial recognition of an investment in an associate or a jointly controlled entity.

**(2)    Business combinations**

A business combination is accounted for by applying the acquisition method, unless it is a combination involving entities or businesses under common control.

The consideration transferred in a business combination is measured at fair value, which is calculated as the sum of the acquisition-date fair values of the assets transferred by the Company, liabilities incurred by the Company to the former owners of the acquiree and the equity interests issued by the Company in exchange for control of the acquiree. Acquisition-related costs are generally recognized in income or loss as incurred.

F-21

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

At the acquisition date, the identifiable assets acquired and the liabilities assumed are recognized at their fair value at the acquisition date, except that:

deferred tax assets or liabilities and liabilities or assets related to employee benefit arrangements are recognized and measured in accordance with IAS 12 'Income Taxes' and IAS 19 'Employee Benefits' respectively;

assets (or disposal groups) that are classified as held for sale in accordance with IFRS 5 'Non-current Assets Held for Sale' are measured in accordance with that standard.

Goodwill is measured as the excess of the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree, and the fair value of the acquirer's previously held equity interest in the acquiree (if any) over the net of the acquisition-date amounts of the identifiable assets acquired and the liabilities assumed. If, after reassessment, net of the acquisition-date amounts of the identifiable assets acquired and liabilities assumed exceeds the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree and the fair value of the acquirer's previously held interest in the acquiree (if any), the excess is recognized immediately in income or loss as a bargain purchase gain.

Non-controlling interest that is present on acquisition day and entitles the holder to a proportionate share of the entity's net assets in an event of liquidation, may be initially measured either at fair value or at the non-controlling interest's proportionate share of the recognized amounts of the acquiree's identifiable net assets. The choice of measurement can be elected on a transaction-by-transaction basis. Other types of non-controlling interests are measured at fair value or, when applicable, on the basis specified in other IFRSs. When the consideration transferred by the Company in a business combination includes assets or liabilities resulting from a contingent consideration arrangement, the contingent consideration is measured at its acquisition-date fair value and included as part of the consideration transferred in a business combination. Changes in the fair value of the contingent consideration that qualify as measurement period adjustments are adjusted retrospectively, with corresponding adjustments against goodwill. Measurement period adjustments are adjustments that arise from additional information obtained during the 'measurement period' (which cannot exceed one year from the acquisition date) about facts and circumstances that existed at the acquisition date.

The subsequent accounting for changes in the fair value of the contingent consideration that do not qualify as measurement period adjustments depends on how the contingent consideration is classified. Contingent consideration that is classified as equity is not re-measured at subsequent reporting dates and its subsequent settlement is accounted for within equity. Contingent consideration that is classified as an asset or a liability is re-measured at subsequent reporting dates in accordance with IAS 39 'Financial Instruments: Recognition and Measurement', or with IAS 37 'Provisions', Contingent Liabilities and Contingent Assets, as appropriate, with the corresponding gain or loss being recognized in income or loss.

When a business combination is achieved in stages, the Company's previously held equity interest in the acquiree is re-measured to fair value at the acquisition date (i.e. the date when the Company obtains control) and the resulting gain or loss, if any, is recognized in income or loss. Amounts arising from interests in the acquiree prior to the acquisition date that have previously been recognized in other comprehensive income are reclassified to income or loss where such treatment would be appropriate if that interest were disposed of.

If the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the Company reports provisional amounts for the items for which the accounting is incomplete. Those provisional amounts are adjusted during the measurement period (see above), or additional assets or liabilities are recognized, to reflect new information obtained about facts and circumstances that existed at the acquisition date that, if known, would have affected the amounts recognized at that date.

The assets and liabilities acquired under business combinations under common control are recognized at the carrying amounts recognized previously in the consolidated financial statements of the ultimate parent. The

F-22

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

difference between consideration transferred and carrying amounts of net assets acquired is recognized as part of share premium.

**(3)    Investments in associates**

An associate is an entity over which the Company has significant influence and that is neither a subsidiary nor an interest in a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the investee but does not control or joint control over those policies.

The results and assets and liabilities of associates are incorporated in these consolidated financial statements using the equity method of accounting. If the investment is classified as held for sale, in which case it is accounted for in accordance with IFRS 5 'Non-current Assets Held for Sale', any retained portion of an investment in associates that has not been classified as held for sale shall be accounted for using the equity method until disposal of the portion that is classified as held for sale takes place. If the Company holds 20% ~ 50% of the voting power of the investee, it is presumed that the Company has significant influence.

After the disposal takes place, the Company shall account for any retained interest in associates in accordance with IAS 39 'Financial Instruments: Recognition and Measurement' unless the retained interest continues to be an associates, in which case the entity uses the equity method.

Under the equity method, an investment in an associate is initially recognized in the consolidated statement of financial position at cost and adjusted thereafter to recognize the Company's share of the income or loss and other comprehensive income of the associate. When the Company's share of losses of an associate exceeds the Company's interest in that associate (which includes any long-term interests that, in substance, form part of the Company's net investment in the associate), the Company discontinues recognizing its share of further losses. Additional losses are recognized only to the extent that the Company has incurred legal or constructive obligations or made payments on behalf of the associate.

Any excess of the cost of acquisition over the Company's share of the net fair value of the identifiable assets, liabilities and contingent liabilities of an associate recognized at the date of acquisition is recognized as goodwill, which is included within the carrying amount of the investment. Any excess of the Company's share of the net fair value of the identifiable assets, liabilities and contingent liabilities over the cost of acquisition, after reassessment, is recognized immediately in income or loss. The requirements of IAS 39 ' Financial Instruments: Recognition and Measurement', are applied to determine whether it is necessary to recognize any impairment loss with respect to the Company's investment in an associate. When necessary, the entire carrying amount of the investment (including goodwill) is tested for impairment in accordance with IAS 36 'Impairment of Assets' as a single asset by comparing its recoverable amount (higher of value in use and fair value less costs to sell) with its carrying amount, any impairment loss recognized forms part of the carrying amount of the investment. Any reversal of that impairment loss is recognized in accordance with IAS 36 to the extent that the recoverable amount of the investment subsequently increases.

Upon disposal of an associate that results in the Company losing significant influence over that associate, any retained investment is measured at fair value at that date and the fair value is regarded as its fair value on initial recognition as a financial asset in accordance with IAS 39. The difference between the previous carrying amount of the associate attributable to the retained interest and its fair value is included in the determination of the gain or loss on disposal of the associate. In addition, the Company accounts for all amounts previously recognized in other comprehensive income in relation to that associate on the same basis as would be required if that associate had directly disposed of the related assets or liabilities. Therefore, if a gain or loss previously recognized in other comprehensive income by that associate would be reclassified to income or loss on the disposal of the related assets or liabilities, the Company reclassifies the gain or loss from equity to income or loss (as a reclassification adjustment) when it loses significant influence over that associate.

When the Company transacts with its associate, incomes and losses resulting from the transactions with the associate are recognized in the Company's consolidated financial statements only to the extent of interests in the associate that are not related to the Company.

F-23

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(4)   Joint arrangements**

A joint arrangement is an arrangement of which two or more parties have joint control. Joint control is the contractually agreed sharing of control of an arrangement, which exists only when decisions about the relevant activities require the unanimous consent of the parties sharing control. Joint arrangements are classified into two types–joint operations and joint ventures. A joint operation is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint operators) have rights to the assets, and obligations for the liabilities, relating to the arrangement. A joint venture is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint ventures) have rights to the net assets of the arrangement.

If the Company is a joint operator, the Company is to recognize and measure the assets and liabilities (and recognize the related revenues and expenses) in relation to its interest in the arrangement in accordance with relevant IFRSs applicable to the particular assets, liabilities, revenues and expenses. If the joint arrangement is a joint venture, the Company is to account for that investment using the equity method accounting in accordance with IAS 28 'Investment in Associates and Joint Ventures' (refer to note 3.(3)), except when the Company is applicable to the IFRS 5 'Non-current Assets Held for Sale'.

**(5)   Non-current assets held for sale**

Non-current assets and disposal groups are classified as held for sale if their carrying amount will be recovered principally through a sale transaction rather than through continuing use. This condition is regarded as met only when the sale is highly probable and the non-current asset (or disposal group) is available for immediate sale in its present condition. Management must be committed to the sale, which should be expected to qualify for recognition as a completed sale within one year from the date of classification.

When the Company is committed to a sale plan involving loss of control of a subsidiary, all of the assets and liabilities of that subsidiary are classified as held for sale when the criteria described above are met, regardless of whether the Company will retain a non-controlling interest in its former subsidiary after the sale.

Non-current assets (and disposal groups) classified as held for sale are measured at the lower of their previous carrying amount and fair value less costs to sell.

**(6)   Goodwill**

The Company measures goodwill which acquired in a business combination at the amount recognized at the date on which it obtains control of the acquiree (acquisition date) less any accumulated impairment losses. Goodwill acquired in a business combination is allocated to each CGU that is expected to benefit from the synergies arising from the business acquired.

The Company assesses at the end of each reporting period and whenever there is an indication that the asset may be impaired. An impairment loss is recognized if the carrying amount of an asset or a CGU exceeds its recoverable amount. Impairment losses are recognized in profit or loss.

Any impairment identified at the CGU level will first reduce the carrying value of goodwill and then be used to reduce the carrying amount of the other assets in the CGU on a pro rata basis. Except for impairment losses in respect of goodwill which are never reversed, an impairment loss is reversed if there has been a change in the estimates used to determine the recoverable amount. An impairment loss is reversed only to the extent that the asset's carrying amount does not exceed the carrying amount that would have been determined, net of depreciation or amortization, if no impairment loss had been recognized.

**(7)   Revenue recognition**

Revenue from the sale of goods, rendering of services or use of the Company assets is measured at the fair value of the consideration received or receivable, net of returns, trade discounts and volume rebates, which

F-24

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

are recognized as a reduction of revenue. Revenue is recognized when the amount of revenue can be measured reliably and it is probable that the economic benefits associated with the transaction will flow to the Company.

(i)   Sales of goods

The Korean government approves the utility rates charged to customers by the Company's power transmission and distribution division. The Company's utility rates are designed to recover the Company's reasonable costs plus a fair investment return.

The Company recognize revenue from electricity sales revenue based on power sold (transferred to the customer) up to the reporting date and the corresponding utility rate charged to customers. To determine the amount of power sold, the Company estimates daily power volumes of electricity for residential, commercial, general, etc. The differences between the current month's estimated amount and actual (meter-read) amount, is adjusted for (trued-up) during the subsequent month.

(ii)  Sales of services

Revenue from services rendered is recognized in profit or loss in proportion to the stage of completion of the transaction at the reporting date. The stage of completion is assessed by reference to surveys of work performed or services performed to date as a percentage of total services to be performed or the proportion that costs incurred to date bear to the estimated total costs of the transaction or other methods that reliably measures the services performed.

(iii) Dividend income and interest income

Dividend income is recognized in profit or loss on the date that the Company's right to receive payment is established, which in the case of quoted securities is the ex-dividend date.

Interest income is recognized as it accrues in profit or loss, using the effective interest method. Interest income is accrued on a time basis, by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount on initial recognition.

(iv)  Rental income

The Company's policy for recognition of revenue from operating leases is described in note 3.(9) below.

**(8)  Construction services revenue**

The Company provides services related to the construction of power plants related to facilities of its customers, mostly in foreign countries.

When the outcome of a construction contract can be estimated reliably, revenue and costs are recognized based on the stage of completion of the contract activity at the end of the reporting period, measured based on the proportion of contract costs incurred for work performed to date relative to the estimated total contract costs, except where this would not be representative of the stage of completion. Variations in contract work, claims and incentive payments are included to the extent that the amount can be measured reliably and its receipt is considered probable.

When the outcome of a construction contract cannot be estimated reliably, contract revenue is recognized to the extent of contract costs incurred when it is probable the revenue will be realized. Contract costs are recognized as expenses in the period in which they are incurred. When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognized as an expense immediately.

F-25

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

When contract costs incurred to date plus recognized income less recognized losses exceed progress billings, the surplus is presented as amounts due from customers for contract work. For contracts where progress billings exceed contract costs incurred to date plus recognized income less recognized losses, the surplus is presented as the amounts due to customers for contract work. Amounts received before the related work is performed are included in the consolidated statements of financial position, as a liability, as advance received. Amounts billed for work performed but not yet paid by the customer are included in the consolidated statements of financial position as accounts and other receivables.

**(9)    Leases**

The Company classifies and accounts for leases as either a finance or operating lease, depending on the terms. Leases where the Company assumes substantially all of the risks and rewards of ownership are classified as finance leases. All other leases are classified as operating leases.

(i)    The Company as lessor

Amounts due from lessees under finance leases are recognized as receivables at the amount of the Company's net investment in the leases. Finance lease income is allocated to accounting periods so as to reflect a constant periodic rate of return on the Company's net investment outstanding in respect of the leases.

Rental income from operating leases is recognized on a straight-line basis over the term of the relevant lease. Initial direct costs incurred in negotiating and arranging an operating lease are added to the carrying amount of the leased asset and recognized on a straight-line basis over the lease term.

(ii)    The Company as lessee

Leases are classified as finance leases whenever the terms of the lease transfer substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases.

Assets held under finance leases are initially recognized as assets of the Company at their fair value at the inception of the lease or, if lower, at the present value of the minimum lease payments. The corresponding liability to the lessor is included in the statement of financial position as a finance lease obligation.

Lease payments are apportioned between finance expenses and reduction of the lease obligation so as to achieve a constant rate of interest on the remaining balance of the liability. Finance expenses are recognized immediately in income or loss, unless they are directly attributable to qualifying assets, in which case they are capitalized in accordance with the Company's general policy on borrowing costs. Contingent rentals are recognized as expenses in the periods in which they are incurred.

Operating lease payments are recognized as an expense on a straight-line basis over the lease term, except where another systematic basis is more representative of the time pattern in which economic benefits from the leased asset are consumed. Contingent rentals arising under operating leases are recognized as an expense in the period in which they are incurred.

In the event that lease incentives are received to enter into operating leases, such incentives are recognized as a liability. The aggregate benefit of incentives is recognized as a reduction of rental expense on a straight-line basis, except where another systematic basis is more representative of the time pattern in which economic benefits from the leased asset are consumed.

(iii)    Determining whether an arrangement contains a lease

At inception of an arrangement, the Company determines whether the arrangement is or contains a lease.

F-26

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

At inception or on reassessment of an arrangement that contains a lease, the Company separates payments and other consideration required by the arrangement into those for the lease and those for other elements on the basis of their relative fair values. If the Company concludes for a finance lease that it is impracticable to separate the payments reliably, then an asset and a liability are recognized at an amount equal to the fair value of the underlying asset.

**(10)    Foreign currencies**

Transactions in foreign currencies are translated to the respective functional currencies of the Company entities at exchange rates at the dates of the transactions. Monetary assets and liabilities denominated in foreign currencies are retranslated to the functional currency using the reporting date's exchange rate. Non-monetary assets and liabilities denominated in foreign currencies that are measured at fair value are retranslated to the functional currency at the exchange rate at the date that the fair value was determined.

Exchange differences are recognized in profit or loss in the period in which they arise except for:

Exchange differences on foreign currency borrowings relating to assets under construction for future productive use, which are included in the cost of those assets when they are regarded as an adjustment to interest costs on those foreign currency borrowings;

Exchange differences on transactions entered into in order to hedge certain foreign currency risks (refer to note 3.(25)

Derivative financial instruments, including hedge accounting); and

Exchange differences on monetary items receivable from or payable to a foreign operation for which settlement is neither planned nor likely to occur (therefore forming part of the net investment in the foreign operation), which are recognized initially in other comprehensive income and reclassified from equity to income or loss on disposal or partial disposal of the net investment.

For the purpose of presenting financial statements, the assets and liabilities of the Company's foreign operations are expressed in Korean won using exchange rates prevailing at the end of the reporting period. Income and expense items are translated at the average exchange rates for the period, unless exchange rates fluctuated significantly during that period, in which case the exchange rates at the dates of the transactions are used. Exchange differences arising, if any, are recognized in other comprehensive income and accumulated in equity.

When a foreign operation is disposed of, the relevant amount in the translation is transferred to profit or loss as part of the gain or loss on disposal.

**(11)    Borrowing costs**

The Company capitalizes borrowing costs directly attributable to the acquisition, construction or production of a qualifying asset as part of the cost of that asset. Other borrowing costs are recognized in expense as incurred. A qualifying asset is an asset that requires a substantial period of time to get ready for its intended use or sale.

Investment income earned on the temporary investment of specific borrowings pending their expenditure on qualifying assets is deducted from the borrowing costs eligible for capitalization.

All other borrowing costs are recognized in income or loss in the period in which they are incurred.

**(12)    Government grants and income related to transfer of assets from customers**

Government grants are not recognized unless there is reasonable assurance that the Company will comply with the grant's conditions and that the grant will be received.

F-27

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Benefit from a government loan at a below-market interest rate is treated as a government grant, measured as the difference between proceeds received and the fair value of the loan based on prevailing market interest rates.

(i)     If the Company received grants related to assets

Government grants whose primary condition is that the Company purchase, construct or otherwise acquire long-term assets are deducted in calculating the carrying amount of the asset. The grant is recognized in profit or loss over the life of a depreciable asset as a reduced depreciation expense.

(ii)    If the Company received grants related to income

Government grants which are intended to compensate the Company for expenses incurred are recognized as other income (government grants) in profit or loss over the periods in which the Company recognizes the related costs as expenses.

The Company recovers a substantial amount of the cost related to its electric power distribution facilities from customers through the transfer of assets, while the remaining portion is recovered through electricity sales from such customers in the future. As such, the Company believes there exists a continued service obligation to the customers in accordance with IFRIC 18 'Transfer of Assets from Customers' when the Company receives an item of property, equipment, or cash for constructing or acquiring an item of property or equipment, in exchange for supplying electricity to customers. The Company defers the amounts received, which are subsequently recognized as other income on a straight-line basis over the estimated service period which does not exceed the transferred asset's useful life.

**(13)  Employee benefits**

When an employee has rendered service to the Company during a period, the Company recognizes the contribution payable to a defined contribution plan in exchange for that service as a liability (accrued expense).

For defined benefit pension plans and other post-employment benefits, the net periodic pension expense is actuarially determined by "Pension Actuarial System" developed by independent actuaries using the projected unit credit method. The present value of the defined benefit obligation is determined by discounting the estimated future cash outflows using interest rates of high-quality corporate bonds that are denominated in the currency in which the benefits will be paid and that have terms to maturity approximating the terms of the related pension liability. However, if there is not a deep market, market yields on government bonds are used.

Net defined benefit liability's measurement is composed of actuarial gains and losses, return on plan assets excluding net interest on net defined benefit liability, and any change in the effect of the asset ceiling, excluding net interest, which are immediately recognized in other comprehensive income. The actuarial gains or losses recognized in other comprehensive income which will not be reclassified into net profit or loss for later periods are immediately recognized in retained earnings. Past service cost will be recognized as expenses upon the earlier of the date of change or reduction to the plan, or the date of recognizing termination benefits.

The retirement benefit obligation recognized in the statement of financial position represents the present value of the defined benefit obligation as adjusted for unrecognized actuarial gains and losses and unrecognized past service cost, and as reduced by the fair value of plan assets. Any asset resulting from this calculation is limited to unrecognized actuarial losses and past service cost, plus the present value of available refunds and reductions in future contributions to the plan.

F-28

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(14)  Income taxes**

Income tax expense comprises current and deferred tax. Current tax and deferred tax are recognized in profit or loss except to the extent that it relates to a business combination, or items recognized directly in equity or in other comprehensive income.

(i)    Current tax

Current tax is the expected tax payable or receivable on the taxable profit or loss for the year, using tax rates enacted or substantively enacted at the end of the reporting period and any adjustment to tax payable in respect of previous years. The taxable profit is different from the accounting profit for the period since the taxable profit is calculated excluding the temporary differences, which will be taxable or deductible in determining taxable profit (tax loss) of future periods, and non-taxable or non-deductible items from the accounting profit.

(ii)   Deferred tax

Deferred tax is recognized, using the asset-liability method, in respect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. A deferred tax liability is recognized for all taxable temporary differences. A deferred tax asset is recognized for all deductible temporary differences to the extent that it is probable that taxable profit will be available against which they can be utilized. However, deferred tax is not recognized for the following temporary differences: taxable temporary differences arising on the initial recognition of goodwill, or the initial recognition of assets or liabilities in a transaction that is not a business combination and that affects neither accounting profit or loss nor taxable income.

The measurement of deferred tax liabilities and deferred tax assets reflects the tax consequences that would follow from the manner in which the Company expects, at the end of the reporting period, to recover or settle the carrying amount of its assets and liabilities. Deferred tax assets or deferred tax liabilities on investment properties measured at fair value, unless any contrary evidence exists, are measured using the assumption that the carrying amount of the property will be recovered entirely through sale.

The Company recognizes a deferred tax liability for all taxable temporary differences associated with investments in subsidiaries, associates, and interests in joint ventures, except to the extent that the Company is able to control the timing of the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future. The Company recognizes a deferred tax asset for all deductible temporary differences arising from investments in subsidiaries and associates, to the extent that it is probable that the temporary difference will reverse in the foreseeable future and taxable profit will be available against which the temporary difference can be utilized.

The carrying amount of a deferred tax asset is reviewed at the end of each reporting period and reduces the carrying amount to the extent that it is no longer probable that sufficient taxable profit will be available to allow the benefit of part or all of that deferred tax asset to be utilized.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply to the period when the asset is realized or the liability is settled, based on tax rates (and tax laws) that have been enacted or substantively enacted by the end of the reporting period. The measurement of deferred tax liabilities and deferred tax assets reflects the tax consequences that would follow from the manner in which the Company expects, at the end of the reporting period to recover or settle the carrying amount of its assets and liabilities.

Deferred tax assets and liabilities are offset only if there is a legally enforceable right to offset the related current tax liabilities and assets, and they relate to income taxes levied by the same tax authority and they intend to settle current tax liabilities and assets on a net basis.

F-29

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(iii)  Current and deferred tax for the year

Current and deferred tax are recognized in income or loss, except when they relate to items that are recognized in other comprehensive income or directly in equity, in which case, the current and deferred tax are also recognized in other comprehensive income or directly in equity respectively. Where current tax or deferred tax arises from the initial accounting for a business combination, the tax effect is included in the accounting for the business combination.

**(15)  Property, plant and equipment**

Property, plant and equipment are initially measured at cost and after initial recognition, are carried at cost less accumulated depreciation and accumulated impairment losses. The cost of property, plant and equipment includes expenditures arising directly from the construction or acquisition of the asset, any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management and the initial estimate of the costs of dismantling and removing the item and restoring the site on which it is located.

Subsequent costs are recognized in the carrying amount of property, plant and equipment at cost or, if appropriate, as separate items if it is probable that future economic benefits associated with the item will flow to the Company and the cost of the item can be measured reliably. The carrying amount of the replaced part is derecognized. The costs of the day-to-day servicing are recognized in profit or loss as incurred.

Property, plant and equipment, except for land, are depreciated on a straight-line basis over estimated useful lives that appropriately reflect the pattern in which the asset's future economic benefits are expected to be consumed. For loaded nuclear fuel related to long-term raw materials and spent nuclear fuels related to asset retirement costs, the Company uses the production method to measure and recognizes as expense the economic benefits of the assets.

The estimated useful lives of the Company's property, plant and equipment are as follows:

|  | Useful lives (years) |
|---|---|
| Buildings | 8 ~ 40 |
| Structures | 8 ~ 50 |
| Machinery | 2 ~ 32 |
| Vehicles | 3 ~ 8 |
| Loaded heavy water | 30 |
| Asset retirement costs | 18, 30, 40, 60 |
| Finance lease assets | 6 ~ 32 |
| Ships | 9 |
| Others | 4 ~ 15 |

A component that is significant compared to the total cost of property, plant and equipment is depreciated over its separate useful life.

Depreciation methods, residual values and useful lives of property, plant and equipment are reviewed at the end of each reporting period and if change is deemed appropriate, it is treated as a change in accounting estimate. As a result of such annual review, useful lives of certain machinery were changed during 2016. Depreciation expenses increased by ₩160,985 million for the year ended December 31, 2016. Depreciation expenses increased by ₩160,985 million and ₩130,514 million for the years ended December 31, 2016 and 2017, respectively. Depreciation expenses are expected to increase by ₩91,197 million for the year ending December 31, 2018, and to decrease by ₩382,696 million for the years after December 31, 2018.

Property, plant and equipment are derecognized on disposal, or when no future economic benefits are expected from its use or disposal. Gains or losses arising from derecognition of a property, plant and equipment, measured as the difference between the net disposal proceeds and the carrying amount of the asset, are recognized in income or loss when the asset is derecognized.

F-30

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(16) Investment property**

Property held for the purpose of earning rentals or benefiting from capital appreciation is classified as investment property. Investment property is initially measured at its cost. Transaction costs are included in the initial measurement. Subsequently, investment property is carried at depreciated cost less any accumulated impairment losses.

Subsequent costs are recognized in the carrying amount of investment property at cost or, if appropriate, as separate items if it is probable that future economic benefits associated with the item will flow to the Company and the cost of the item can be measured reliably. The carrying amount of the replaced part is derecognized. The costs of the day-to-day servicing are recognized in profit or loss as incurred.

Investment property except for land, are depreciated on a straight-line basis over 8 ~ 40 years as estimated useful lives.

The estimated useful lives, residual values and depreciation method are reviewed at the end of each reporting period, with the effect of any changes in estimate accounted for on a prospective basis.

An investment property is derecognized upon disposal or when the investment property is permanently withdrawn from use and no future economic benefits are expected from the disposal. Any gain or loss arising on derecognition of the property (calculated as the difference between the net disposal proceeds and the carrying amount of the asset) is included in income or loss in the period in which the property is derecognized.

**(17) Intangible assets**

(i)    Intangible assets acquired separately

Intangible assets with finite useful lives that are acquired separately are carried at cost less accumulated amortization and accumulated impairment losses. Amortization is recognized on a straight-line basis over their estimated useful lives. The estimated useful life and amortization method are reviewed at the end of each reporting period, with the effect of any changes in estimate being accounted for on a prospective basis. Intangible assets with indefinite useful lives that are acquired separately are carried at cost less accumulated impairment losses.

(ii)    Research and development

Expenditure on research activities is recognized as an expense in the period in which it is incurred.

An internally-generated intangible asset arising from development (or from the development phase of an internal project) is recognized if, and only if, all of the following have been demonstrated:

The technical feasibility of completing the intangible asset so that it will be available for use or sale;

The intention to complete the intangible asset and use or sell it;

The ability to use or sell the intangible asset;

How the intangible asset will generate probable future economic benefits;

The availability of adequate technical, financial and other resources to complete the development and to use or sell the intangible asset; and

The ability to measure reliably the expenditure attributable to the intangible asset during its development.

The amount initially recognized for internally-generated intangible assets is the sum of the expenditure incurred from the date when the intangible asset first meets the recognition criteria listed above. When the development expenditure does not meet the criteria listed above, an internally-generated intangible asset cannot be recognized and the expenditure is recognized in income or loss in the period in which it is incurred.

F-31

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Internally-generated intangible assets are reported at cost less accumulated amortization and accumulated impairment losses.

The estimated useful lives and amortization methods of the Company's intangible assets with finite useful lives are as follows:

| | Useful lives (years) | Amortization methods |
|---|---|---|
| Usage rights for donated assets | 10 ~ 20 | Straight line |
| Software | 4, 5 | Straight line |
| Industrial rights | 5, 10 | Straight line |
| Development expenses | 5 | Straight line |
| Leasehold rights | 10 | Straight line |
| Mining right | − | Unit of production |
| Others | 3 ~ 50 or Indefinite | Straight line |

(iii)   Intangible assets acquired in a business combination

Intangible assets that are acquired in a business combination are recognized separately from goodwill are initially recognized at their fair value at the acquisition date (which is regarded as their cost).

Subsequent to initial recognition, intangible assets acquired in a business combination are reported at cost less accumulated amortization and accumulated impairment losses, on the same basis as intangible assets that are acquired separately.

(iv)   Derecognition of intangible assets

An intangible asset is derecognized on disposal, or when no future economic benefits are expected from its use or disposal. Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the asset, and are recognized in income or loss when the asset is derecognized.

**(18)   Greenhouse gas emissions rights (allowances) and obligations**

In connection with Enforcement of Allocation and Trading of Greenhouse Gas Emissions Allowances, the Company applies the following accounting policies for greenhouse gas emissions rights and obligations.

(i)   Greenhouse gas emissions rights

Greenhouse gas emissions rights consist of the allowances received free of charge from the government and the ones purchased. The cost of the greenhouse gas emissions rights includes expenditures arising directly from the acquisition and any other costs incurred during normal course of the acquisition.

Greenhouse gas emissions rights are held by the Company to fulfill the legal obligation and recorded as intangible assets. To the extent that the portion to be submitted to the government within one year from the end of reporting period, the greenhouse gas emissions rights are classified as current assets. Greenhouse gas emissions rights recorded as intangible assets are initially measured at cost and substantially remeasured at cost less accumulated impairment losses.

Greenhouse gas emissions rights are derecognized on submission to the government or when no future economic benefits are expected from its use or disposal.

(ii)   Greenhouse gas emissions obligations

Greenhouse gas emissions obligations are the Company's present legal obligation to submit the greenhouse gas emissions allowances to the government and recognized when an outflow of resources is probable and a reliable estimate can be made of the amount of the obligation. Greenhouse gas emissions obligations are measured as the sum of the carrying amount of the allocated rights that will be submitted to the government and the best estimate of expenditure required to settle the obligation at the end of the reporting period for any excess emission.

F-32

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(19)  Impairment of non-financial assets other than goodwill**

At the end of each reporting period, the Company reviews the carrying amounts of its tangible and intangible assets with definite useful lives to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, the Company estimates the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired.

Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or a cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (or the cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognized immediately in profit or loss, unless the relevant asset is carried at a revalued amount, in which case the impairment loss is treated as a revaluation decrease.

When an impairment loss subsequently reverses, the carrying amount of the asset (or a cash-generating unit) is increased to the revised estimate of its recoverable amount, to the extent the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or cash-generating unit) in prior years. A reversal of an impairment loss is recognized immediately in profit or loss, unless the relevant asset is carried at a revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

**(20)  Inventories**

Inventories are measured at the lower of cost and net realizable value. Cost of inventories for inventories in transit are measured by using specific identification method. Cost of inventories, except for those in transit, are measured under the weighted average method and consists of the purchase price, cost of conversion and other costs incurred in bringing the inventories to their present location and condition.

Net realizable value is the estimated selling price in the ordinary course of business, less the estimated costs of completion and selling expenses. The amount of any write-down of inventories to net realizable value and all losses of inventories are recognized as an expense in the period the write-down or loss occurs. The amount of any reversal of any write-down of inventories, arising from an increase in net realizable value, are recognized as a reduction in the amount of inventories recognized as an expense in the period in which the reversal occurs.

**(21)  Provisions**

Provisions are recognized when the Company has a present legal or constructive obligation as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation.

The risks and uncertainties that inevitably surround many events and circumstances are taken into account in reaching the best estimate of a provision. Where the effect of the time value of money is material, provisions are determined at the present value of the expected future cash flows.

Where some or all of the expenditures required to settle a provision are expected to be reimbursed by another party, the reimbursement shall be recognized when, and only when, it is virtually certain that

F-33

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

reimbursement will be received if the entity settles the obligation. The reimbursement shall be treated as a separate asset.

Provisions are reviewed at the end of each reporting period and adjusted to reflect the current best estimates. If it is no longer probable that an outflow of resources embodying economic benefits will be required to settle the obligation, the provision is reversed.

(i)    Provision for employment benefits

The Company determines the provision for employment benefits as the incentive payments based on the results of the individual performance evaluation or management assessment.

(ii)    Provision for decommissioning costs of nuclear power plants

The Company records the fair value of estimated decommissioning costs as a liability in the period in which the Company incurs a legal obligation associated with retirement of long-lived assets that result from acquisition, construction, development and/or normal use of the assets. Accretion expense consists of period-to-period changes in the liability for decommissioning costs resulting from the passage of time and revisions to either the timing or the amount of the original estimate of undiscounted cash flows.

(iii)    Provision for disposal of spent nuclear fuel

Under the Radioactive Waste Management Act, the Company is levied to pay the spent nuclear fuel fund for the management of spent nuclear fuel. The Company recognizes the provision of present value of the payments.

(iv)    Provision for low and intermediate radioactive wastes

Under the Radioactive Waste Management Act, the Company recognizes the provision for the disposal of low and intermediate radioactive wastes in best estimate of the expenditure required to settle the present obligation.

(v)    Provision for Polychlorinated Biphenyls ("PCBs")

Under the regulation of Persistent Organic Pollutants Management Act, enacted in 2007, the Company is required to remove PCBs, a toxin, from the insulating oil of its transformers by 2025. As a result of the enactments, the Company is required to inspect the PCBs contents of transformers and dispose of PCBs in excess of safety standards under the legally settled procedures. The Company' s estimates and assumptions used to determine fair value can be affected by many factors, such as the estimated costs of inspection and disposal, inflation rate, discount rate, regulations and the general economy.

(vi)    Provisions for power plant regional support program

Power plant regional support programs consist of scholarship programs to local students, local economy support programs, local culture support programs, environment development programs, and local welfare programs. The Company recognizes the provision in relation to power plant regional support program.

(vii)    Provisions for transmission and transformation facilities-neighboring areas support program

The Company has present obligation to conduct transmission and transformation facilities-neighboring areas support program under Act on assistance to transmission and transformation facilities-neighboring areas. The Company recognizes the provision of estimated amount to fulfill the obligation.

F-34

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(viii)  Renewable Portfolio Standard ("RPS") provisions

RPS program is required to generate a specified percentage of total electricity to be generated in the form of renewable energy and provisions are recognized for the governmental regulations to require the production of energies from renewable energy sources such as solar, wind and biomass.

**(22)  Non-derivative financial assets**

The Company recognizes and measures non-derivative financial assets by the following four categories: financial assets at fair value through profit or loss, held-to-maturity investments, loans and receivables and available-for-sale financial assets. The Company recognizes financial assets in the statement of financial position when the Company becomes a party to the contractual provisions of the instrument. Upon initial recognition, non-derivative financial assets are measured at their fair value plus, in the case of a financial asset not at fair value through profit or loss, transaction costs that are directly attributable to the asset's acquisition or issuance.

A regular way purchase or sale of financial assets shall be recognized and derecognized, as applicable, using trade date accounting or settlement date accounting. A regular way purchase or sale is a purchase or sale of a financial asset under a contract whose terms require delivery of the asset within the time frame established generally by regulation or convention in the marketplace concerned.

(i)  Effective interest method

The effective interest method is a method of calculating the amortized cost of a debt instrument and of allocating interest income over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash receipts (including all fees and points paid or received that form an integral part of the effective interest rate, transaction costs and other premiums or discounts) through the expected life of the debt instrument, or, where appropriate, a shorter period, to the net carrying amount on initial recognition. Income is recognized on an effective interest basis for debt instruments other than those financial assets classified as financial assets at fair value through profit or loss.

(ii)  Financial assets at fair value through profit or loss (FVTPL)

A financial asset is classified as financial assets are classified at fair value through profit or loss if it is held for trading or is designated as such upon initial recognition. Upon initial recognition, transaction costs are recognized in profit or loss when incurred. A financial assets its acquired principally for the purpose of selling it in the near term are classified as a short-term financial assets held for trading and also all the derivatives including an embedded derivate that is not designated and effective as a hedging instrument are classified at the short-term trading financial asset as well. Financial assets at fair value through profit or loss are measured at fair value, and changes therein are recognized in profit or loss.

A financial asset is classified as held for trading if:

It has been acquired principally for the purpose of selling it in the near term; or

On initial recognition it is part of a portfolio of identified financial instruments that the Company manages together and has a recent actual pattern of short term profit taking; or

It is derivative, including an embedded derivative that is not designated and effective as a hedging instrument.

A financial asset other than a financial asset held for trading may be designated as at financial assets at fair value through profit or loss upon initial recognition if:

Such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or

The financial asset forms part of a group of financial assets or financial liabilities or both, which is managed and its' performance is evaluated on a fair value basis in accordance with the Company' s

F-35

Table of Contents

documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or

It forms a part of a contract containing one or more embedded derivatives, and with IAS No. 39, Financial Instruments; Recognition and Measurement permits the entire combined contract (asset or liability) to be designated as at financial assets at fair value through profit or loss.

Financial assets at fair value through profit or loss are stated at fair value, with any gains or losses arising on re-measurement recognized in income or loss. The net gain or loss recognized in income or loss incorporates any dividend or interest earned on the financial asset and is included in the 'finance income and finance expenses' line item in the consolidated statement of comprehensive income.

(iii)    Held-to-maturity investments

A non-derivative financial asset with a fixed or determinable payment and fixed maturity, for which the Company has the positive intention and ability to hold to maturity, are classified as held-to-maturity investments. Subsequent to initial recognition, held-to-maturity investments are measured at amortized cost using the effective interest method.

(iv)    Available-for-sale financial assets

Available-for-sale financial assets are those non-derivative financial assets that are designated as available-for-sale or are not classified as financial assets at fair value through profit or loss, held-to-maturity investments or loans and receivables.

Gains and losses arising from changes in fair value are recognized in other comprehensive income and accumulated in the valuation reserve. However, impairment losses, interest calculated using the effective interest method, and foreign exchange gains and losses on monetary assets are recognized in income or loss. Unquoted equity investments which are not traded in an active market, whose fair value cannot be measured reliably are carried at cost.

When a financial asset is derecognized or impairment losses are recognized, the cumulative gain or loss previously recognized in other comprehensive income is reclassified from equity to profit or loss.

Dividends on an available-for-sale equity instrument are recognized in profit or loss when the Company's right to receive payment is established.

The fair value of available-for-sale monetary assets denominated in a foreign currency is determined in that foreign currency and translated at the spot rate at the end of the reporting period. The foreign exchange gains and losses that are recognized in income or loss are determined based on the amortized cost of the monetary asset. Other foreign exchange gains and losses are recognized in other comprehensive income.

(v)    Loans and receivables

Loans and receivables are financial assets with fixed or determinable payments that are not quoted in an active market. Subsequent to initial recognition, loans and receivables are measured at amortized cost using the effective interest method except for loans and receivables of which the effect of discounting is immaterial.

(vi)    Impairment of financial assets

Financial assets, other than those at financial assets at fair value through profit or loss, are assessed for indicators of impairment at the end of each reporting period. Financial assets are considered to be impaired when there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the investment have been affected.

F-36

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

For listed and unlisted equity investments classified as available-for-sale financial asset, a significant or prolonged decline in the fair value of the security below its cost is considered to be objective evidence of impairment in addition to the criteria mentioned below.

For all other financial assets, objective evidence of impairment could include:

> Significant financial difficulty of the issuer or counterparty; or

> Breach of contract, such as a default or delinquency in interest or principal payments, or

> It becoming probable that the borrower will enter bankruptcy or financial re-organization; or

> The disappearance of an active market for that financial asset because of financial difficulties.

For certain categories of financial asset, such as trade receivables, assets that are assessed not to be impaired individually are, in addition, assessed for impairment on a collective basis. Objective evidence of impairment for a portfolio of receivables could include the Company's past experience of collecting payments, an increase in the number of delayed payments in the portfolio past the average credit period and, as well as observable changes in national or local economic conditions that correlate with default on receivables.

For financial assets recorded at amortized cost, the amount of the impairment loss recognized is the difference between the asset's carrying amount and the present value of estimated future cash flows, discounted at the financial asset's original effective interest rate.

For financial assets carried at cost, the amount of the impairment loss is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the current market rate of return for a similar financial asset. Such impairment loss will not be reversed in subsequent periods.

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of trade receivables, where the carrying amount is reduced through the use of an allowance account. When a trade receivable is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited against the allowance account. Changes in the carrying amount of the allowance account are recognized in income or loss.

When an available-for-sale financial asset is considered to be impaired, cumulative gains or losses previously recognized in other comprehensive income are reclassified to income or loss in the period.

For financial assets measured at amortized cost, if, in a subsequent period, the amount of the impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment was recognized, the previously recognized impairment loss is reversed through profit or loss to the extent that the carrying amount of the investment at the date the impairment is reversed does not exceed what the amortized cost would have been had the impairment not been recognized.

In respect of available-for-sale equity securities, impairment losses previously recognized in profit or loss are not reversed through profit or loss. Any increase in fair value subsequent to an impairment loss is recognized in other comprehensive income. In respect of available-for-sale debt securities, impairment losses are subsequently reversed through profit or loss if an increase in the fair value of the investment can be objectively related to an event occurring after the recognition of the impairment loss.

(vii)  De-recognition of financial assets

The Company derecognizes a financial asset when the contractual rights to the cash flows from the asset expire, or it transfers the rights to receive the contractual cash flows on the financial asset in a transaction in which substantially all the risks and rewards of ownership of the financial asset are transferred. Any interest in transferred financial assets that is created or retained by the Company is

F-37

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

recognized as a separate asset or liability. If the Company retains substantially all the risks and rewards of ownership of the transferred financial assets, the Company continues to recognize the transferred financial assets and recognizes financial liabilities for the consideration received.

On de-recognition of a financial asset in its entirety, the difference between the asset's carrying amount and the sum of the consideration received and receivable and the cumulative gain or loss that had been recognized in other comprehensive income and accumulated in equity is recognized in income or loss.

On de-recognition of a financial asset other than in its entirety (e.g. when the Company retains an option to repurchase part of a transferred asset), the Company allocates the previous carrying amount of the financial asset between the part it continues to recognize under continuing involvement, and the part it no longer recognizes on the basis of the relative fair values of those parts on the date of the transfer. The difference between the carrying amount allocated to the part that is no longer recognized and the sum of the consideration received for the part no longer recognized and any cumulative gain or loss allocated to it that had been recognized in other comprehensive income is recognized in income or loss. A cumulative gain or loss that had been recognized in other comprehensive income is allocated between the part that continues to be recognized and the part that is no longer recognized on the basis of the relative fair values of those parts.

**(23) Non-derivative financial liabilities and equity instruments issued by the Company**

(i)     Classification as debt or equity

Debt and equity instruments are classified as either financial liabilities or as equity in accordance with the substance of the contractual arrangement.

(ii)    Equity instruments

An equity instrument is any contract that evidences a residual interest in the assets of an entity after deducting all of its liabilities. Equity instruments issued by the Company are recognized at the proceeds received, net of direct issue costs.

Repurchase of the Company's own equity instruments is recognized and deducted directly in equity. No gain or loss is recognized in income or loss on the purchase, sale, issue or cancelation of the Company's own equity instruments.

(iii)   Financial liabilities

Financial liabilities are recognized when the Company becomes a party to the contractual provisions of the instruments. Financial liabilities are initially measured at fair value. Transaction cost that are directly attributable to the issue of financial liabilities are added to or deducted from the fair value of the financial liabilities, as appropriate, on initial recognition. Transaction cost directly attributable to acquisition of financial liabilities at fair value through profit or loss are recognized immediately in profit or loss.

Financial liabilities are classified as either financial liabilities at fair value through profit or loss or other financial liabilities.

(iv)    Financial liabilities at fair value through profit or loss (FVTPL)

Financial liabilities are classified as at financial liabilities at fair value through profit or loss when the financial liability is either held for trading or it is designated as financial liabilities at fair value through profit or loss.

A financial liability is classified as held for trading if:

It has been acquired principally for the purpose of repurchasing it in the near term; or

F-38

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

On initial recognition it is part of a portfolio of identified financial instruments that the Company manages together and has a recent actual pattern of short-term profit-taking; or

It is a derivative that is not designated and effective as a hedging instrument.

A financial liability other than a financial liability held for trading may be designated as at FVTPL upon initial recognition if:

Such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or

The financial liability forms part of a Company of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Company's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or

It forms part of a contract containing one or more embedded derivatives, and IAS 39 'Financial Instruments: Recognition and Measurement', permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial liabilities at fair value through profit or loss are stated at fair value, with any gains or losses arising on re-measurement recognized in income or loss. The net gain or loss recognized in income or loss incorporates any interest paid on the financial liability and is included in 'finance income and finance expenses'.

(v)    Other financial liabilities

Other financial liabilities, including borrowings, are initially measured at fair value, net of transaction costs.

Other financial liabilities are subsequently measured at amortized cost using the effective interest method, with interest expense recognized on an effective yield basis. The effective interest method is a method of calculating the amortized cost of a financial liability and of allocating interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments through the expected life of the financial liability, or (where appropriate) a shorter period, to the net carrying amount on initial recognition.

(vi)   Financial guarantee contract liabilities

Financial guarantee contract liabilities are initially measured at their fair values and, if not designated as at FVTPL, are subsequently measured at the higher of: (a) the amount of the obligation under the contract, as determined in accordance with IAS 37 'Provisions, Contingent Liabilities and Contingent Assets; or (b) the amount initially recognized less, cumulative amortization recognized in accordance with IAS 18 'Revenue'.

(vii)  De-recognition of financial liabilities

The Company derecognizes financial liabilities when, and only when, the Company's obligations are discharged, canceled or they expire. The difference between the carrying amount of the financial liability derecognized and the consideration paid and payable is recognized in income or loss.

**(24)  Service Concession Arrangements**

The Company recognizes revenues from construction services and operating services related to service concession arrangements in accordance with IAS 11 ' Construction Contracts' and IAS 18 'Revenue', respectively. If the Company performs more than one service under a single contract or arrangement, consideration received or receivable is allocated by reference to the relative fair values of the services delivered, when the amounts are separately identifiable.

F-39

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The Company recognizes a financial asset to the extent that it has an unconditional contractual right to receive cash or another financial asset for the construction services and an intangible asset to the extent that it receives a right (license) to charge users of the public service. Borrowing costs attributable to the arrangement are recognized as an expense in the period in which they are incurred unless the Company has a contractual right to receive an intangible asset (a right to charge users of the public service). In this case, borrowing costs attributable to the arrangement are capitalized during the construction phase of the arrangement.

**(25)  Derivative financial instruments, including hedge accounting**

The Company enters into a variety of derivative financial instruments to manage its exposure to interest rate and foreign exchange rate risk, including foreign exchange forward contracts, interest rate swaps and cross currency swaps and others.

Derivatives are initially recognized at fair value. Subsequent to initial recognition, derivatives are measured at fair value. The resulting gain or loss is recognized in income or loss immediately unless the derivative is designated and effective as a hedging instrument, in such case the timing of the recognition in income or loss depends on the nature of the hedge relationship.

A derivative with a positive fair value is recognized as a financial asset; a derivative with a negative fair value is recognized as a financial liability. A derivative is presented as a non-current asset or a non-current liability if the remaining maturity of the instrument is more than 12 months and it is not expected to be realized or settled within 12 months. Other derivatives are presented as current assets or current liabilities.

(i)    Separable embedded derivatives

Derivatives embedded in other financial instruments or other host contracts are treated as separate derivatives when their risks and characteristics are not closely related to those of the host contracts and when the host contracts are not measured at FVTPL.

An embedded derivative is presented as a non-current asset or a non-current liability if the remaining maturity of the hybrid instrument to which the embedded derivative is part of, is more than 12 months and it is not expected to be realized or settled within 12 months. All other embedded derivatives are presented as current assets or current liabilities.

(ii)   Hedge accounting

The Company designates certain hedging instruments, which include derivatives, embedded derivatives and non-derivatives in respect of foreign currency risk, as either fair value hedges or cash flow hedges. Hedges of foreign exchange risk on firm commitments are accounted for as cash flow hedges.

At the inception of the hedge relationship, the entity documents the relationship between the hedging instrument and the hedged item, along with its risk management objectives and its strategy for undertaking various hedge transactions. Furthermore, at the inception of the hedge and on an ongoing basis, the Company documents whether the hedging instrument is highly effective in offsetting changes in fair values or cash flows of the hedged item.

(iii)  Fair value hedges

Changes in the fair value of derivatives that are designated and qualify as fair value hedges are recognized in income or loss immediately, together with any changes in the fair value of the hedged asset or liability that are attributable to the hedged risk. The changes in the fair value of the hedging instrument and the change in the hedged item attributable to the hedged risk relating to the hedged items are recognized in the consolidated statements of comprehensive income.

F-40

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Hedge accounting is discontinued when the Company revokes the hedging relationship, when the hedging instrument expires or is sold, terminated, or exercised, or when it no longer qualifies for hedge accounting. The fair value adjustment to the carrying amount of the hedged item arising from the hedged risk is amortized as income or loss as of that date.

(iv)    Cash flow hedges

The effective portion of changes in the fair value of derivatives that are designated and qualify as cash flow hedges is recognized in other comprehensive income. The gain or loss relating to the ineffective portion is recognized immediately in income or loss, and is included in the 'finance income and expense'.

Amounts previously recognized in other comprehensive income and accumulated in equity are reclassified to income or loss in the periods when the hedged item is recognized in income or loss, in the same line of the consolidated statement of comprehensive income as the recognized hedged item. However, when the forecast transaction that is hedged results in the recognition of a non-financial asset or a non-financial liability, the gains and losses previously accumulated in equity are transferred from equity and included in the initial measurement of the cost of the non-financial asset or non-financial liability.

Hedge accounting is discontinued when the Company revokes the hedging relationship, when the hedging instrument expires or is sold, terminated, or exercised, or it no longer qualifies for hedge accounting. Any gain or loss accumulated in equity at that time remains in equity and is recognized when the forecast transaction is ultimately recognized in income or loss. When a forecast transaction is no longer expected to occur, the gain or loss accumulated in equity is recognized immediately in income or loss.

**4.    Segment, Geographic and Other Information**

**(1)    Segment determination and explanation of the measurements**

The Company's operating segments are its business components that generate discrete financial information that is reported to and regularly reviewed by the Company's the chief operating decision maker, the Chief Executive Officer, for the purpose of resource allocation and assessment of segment performance. The Company's reportable segments are 'Transmission and distribution', 'Electric power generation (Nuclear)', 'Electric power generation (Non-nuclear)', 'Plant maintenance & engineering service' and 'Others'; others mainly represent the business unit that manages the Company's foreign operations.

Segment operating profit (loss) is determined the same way that consolidated operating profit is determined under IFRS without any adjustment for corporate allocations. The accounting policies used by each segment are consistent with the accounting policies used in the preparation of the consolidated financial statements. Segment assets and liabilities are determined based on separate financial statements of the entities instead of on a consolidated basis. There are various transactions between the reportable segments, including sales of property, plant and equipment and so on, that are conducted on an arms-length basis at market prices that would be applicable to an independent third-party. For subsidiaries which are in a different segment from that of its immediate parent company, their carrying amount in separate financial statements is eliminated in the consolidating adjustments in the tables below. In addition, consolidation adjustments in the table below include adjustments of the amount of investment in associates and joint ventures from the cost basis amount reflected in segment assets to that determined using equity method in the consolidated financial statements.

F-41

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)  Financial information of the segments for the years ended December 31, 2015, 2016 and 2017, respectively, are as follows:

**2015**

In millions of won

| Segment | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit (loss) related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Transmission and distribution | ₩ 58,164,394 | 1,230,975 | 56,933,419 | 2,859,037 | 132,809 | 1,092,594 | 220,406 | 135,261 | 359,521 | 872,096 | 13,319,310 |
| Electric power generation (Nuclear) | 10,642,352 | 10,596,189 | 46,163 | 3,070,828 | 24,612 | 532,490 | (595 ) | 54,572 | – | 401,839 | 3,806,617 |
| Electric power generation (Non-nuclear) | 21,469,345 | 20,906,081 | 563,264 | 2,337,353 | 22,171 | 319,647 | (10,686 ) | 74,007 | 5,305 | 148,053 | 2,704,260 |
| Plant maintenance & engineering service | 2,533,887 | 2,016,699 | 517,188 | 85,662 | 12,293 | 542 | (1,746 ) | 74,542 | – | 174,912 | 332,531 |
| Others | 672,250 | 150,557 | 521,693 | 27,491 | 108,104 | 127,684 | – | 343 | 230 | 34 | 80,165 |
| Consolidation adjustments | (34,900,501) | (34,900,501) | – | (38,987 ) | (58,404 ) | (57,273 ) | – | (24,033 ) | – | 5,790 | 37,993 |
| | ₩ 58,581,727 | – | 58,581,727 | 8,341,384 | 241,585 | 2,015,684 | 207,379 | 314,692 | 365,056 | 1,602,724 | 20,280,876 |
| Finance income | | | | | | | | | | | 1,182,988 |
| Finance expense | | | | | | | | | | | (3,015,457) |
| Profit related to associates and joint ventures | | | | | | | | | | | 207,379 |
| Profit before income tax | | | | | | | | | | ₩ | 18,655,786 |

**2016**

In millions of won

| Segment | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit (loss) related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit (loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Transmission and distribution | ₩ 59,862,284 | 1,890,489 | 57,971,795 | 3,226,700 | 80,882 | 844,200 | (128,402 ) | 162,326 | 424,356 | 711,430 | 5,274,308 |
| Electric power generation (Nuclear) | 11,168,579 | 11,129,385 | 39,194 | 3,130,820 | 33,111 | 474,590 | (1,082 ) | 70,582 | – | 576,223 | 3,770,165 |
| Electric power generation (Non-nuclear) | 21,394,223 | 20,561,044 | 833,179 | 2,523,306 | 24,171 | 359,607 | (8,342 ) | 79,846 | 2,133 | 276,619 | 3,211,684 |
| Plant maintenance & engineering service | 2,618,388 | 2,190,207 | 428,181 | 98,843 | 10,672 | 2,156 | 478 | 86,268 | – | 221,301 | 210,680 |
| Others | 567,836 | 77,098 | 490,738 | 26,817 | 115,928 | 97,926 | – | 1,050 | 30 | 168 | 76,336 |
| Consolidation adjustments | (35,848,223) | (35,848,223) | – | (45,498 ) | (22,986 ) | (25,611 ) | – | (26,319 ) | – | (3,009 ) | (246,813 ) |
| | ₩ 59,763,087 | – | 59,763,087 | 8,960,988 | 241,778 | 1,752,868 | (137,348 ) | 373,753 | 426,519 | 1,782,732 | 12,296,360 |
| Finance income | | | | | | | | | | | 791,543 |
| Finance expense | | | | | | | | | | | (2,437,087) |
| Loss related to associates and joint ventures | | | | | | | | | | | (137,348 ) |
| Profit before income tax | | | | | | | | | | ₩ | 10,513,468 |

F-42

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Segment | | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit (loss) related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2017 | | | | | |
| | | | | | | In millions of won | | | | | | |
| Transmission and distribution | ₩ | 59,486,766 | 2,044,160 | 57,442,606 | 3,466,410 | 49,987 | 737,971 | (105,166) | 158,738 | 384,595 | 885,195 | 1,902,634 |
| Electric power generation (Nuclear) | | 9,415,752 | 9,359,468 | 56,284 | 3,267,510 | 21,034 | 487,503 | 3,637 | 80,809 | – | 801,800 | 1,347,794 |
| Electric power generation (Non-nuclear) | | 22,795,816 | 21,885,251 | 910,565 | 2,954,375 | 18,860 | 486,176 | (6,718) | 94,075 | 39,335 | 171,457 | 1,523,497 |
| Plant maintenance & engineering service | | 2,621,440 | 2,211,716 | 409,724 | 109,001 | 10,801 | 2,967 | (70) | 87,344 | 161 | 219,382 | 265,593 |
| Others | | 655,062 | 138,352 | 516,710 | 36,001 | 130,003 | 103,782 | – | 861 | – | (967) | 113,296 |
| Consolidation adjustments | | (35,638,947) | (35,638,947) | – | (59,586) | (24,542) | (28,847) | – | (30,467) | – | (386,747) | 167,055 |
| | ₩ | 59,335,889 | – | 59,335,889 | 9,773,711 | 206,143 | 1,789,552 | (108,317) | 391,360 | 424,091 | 1,690,120 | 5,319,869 |
| Finance income | | | | | | | | | | | | 1,530,618 |
| Finance expense | | | | | | | | | | | | (3,127,952) |
| Loss related to associates and joint ventures | | | | | | | | | | | | (108,317) |
| Profit before income tax | | | | | | | | | | | ₩ | 3,614,218 |

F-43

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(3)    Information related to segment assets and segment liabilities as of and for the years ended December 31, 2016 and 2017 are as follows:

| Segment | | 2016 | | | |
|---|---|---|---|---|---|
| | | Segment assets | Investments in associates and joint ventures | Acquisition of non-current assets | Segment liabilities |
| | | In millions of won | | | |
| Transmission and distribution | ₩ | 105,321,129 | 4,121,462 | 6,345,004 | 49,854,420 |
| Electric power generation (Nuclear) | | 52,782,915 | 15,384 | 1,945,610 | 27,366,938 |
| Electric power generation (Non-nuclear) | | 47,427,642 | 1,320,203 | 3,508,313 | 26,205,049 |
| Plant maintenance & engineering service | | 3,106,909 | 53,399 | 180,715 | 1,218,047 |
| Others | | 7,423,132 | – | 365,470 | 2,761,262 |
| Segment totals | | 216,061,727 | 5,510,448 | 12,345,112 | 107,405,716 |
| Consolidation adjustments: | | | | | |
| Elimination of inter-segment amounts | | (39,114,371 ) | – | (191,901 ) | (5,811,800 ) |
| Equity method adjustment | | 906,239 | – | – | – |
| Deferred taxes | | (5,830 ) | – | – | 4,301,404 |
| Others | | (10,723 ) | – | – | (1,108,823 ) |
| | | (38,224,685 ) | – | (191,901 ) | (2,619,219 ) |
| Consolidated totals | ₩ | 177,837,042 | 5,510,448 | 12,153,211 | 104,786,497 |

| Segment | | 2017 | | | |
|---|---|---|---|---|---|
| | | Segment assets | Investments in associates and joint ventures | Acquisition of non-current assets | Segment liabilities |
| | | In millions of won | | | |
| Transmission and distribution | ₩ | 106,540,154 | 3,366,309 | 6,606,512 | 50,757,798 |
| Electric power generation (Nuclear) | | 55,011,096 | 11,843 | 2,083,967 | 29,252,816 |
| Electric power generation (Non-nuclear) | | 47,938,084 | 1,904,224 | 3,250,524 | 26,337,295 |
| Plant maintenance & engineering service | | 3,273,959 | 48,320 | 145,779 | 1,176,627 |
| Others | | 7,798,400 | – | 569,447 | 3,013,743 |
| Segment totals | | 220,561,693 | 5,330,696 | 12,656,229 | 110,538,279 |
| Consolidation adjustments: | | | | | |
| Elimination of inter-segment amounts | | (39,517,829 ) | – | 23,616 | (5,239,156 ) |
| Equity method adjustment | | 754,314 | – | – | – |
| Deferred taxes | | 2,215 | – | – | 5,339,450 |
| Others | | (11,478 ) | – | – | (1,814,299 ) |
| | | (38,772,778 ) | – | 23,616 | (1,714,005 ) |
| Consolidated totals | ₩ | 181,788,915 | 5,330,696 | 12,679,845 | 108,824,274 |

F-44

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(4) Geographic information**

Electric sales, the main operations of the Company, are conducted in the Republic of Korea where the controlling company is located. The following information on revenue from external customers and non-current assets is determined by the location of the customers and of the assets:

| Geographical unit | | Revenue from external customers | | | Non-current assets(*2) | | |
|---|---|---|---|---|---|---|---|
| | | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 |
| | | In millions of won | | | | | |
| Domestic | ₩ | 54,351,076 | 55,310,011 | 55,652,807 | 143,788,043 | 148,297,677 | 153,436,810 |
| Overseas(*1) | | 4,230,651 | 4,453,076 | 3,683,082 | 4,526,395 | 4,474,699 | 4,497,535 |
| | ₩ | 58,581,727 | 59,763,087 | 59,335,889 | 148,314,438 | 152,772,376 | 157,934,345 |

(*1) Middle East and other Asian countries make up the majority of overseas revenue and non-current assets.

(*2) Amount excludes financial assets and deferred tax assets.

**(5) Information on significant customers**

There is no individual customer comprising more than 10% of the Company's revenue for the years ended December 31, 2015, 2016 and 2017.

F-45

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

5. **Classification of Financial Instruments**

(1) **Classification of financial assets as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | | |
|---|---|---|---|---|---|---|
| | Financial assets at fair value through profit or loss | Loans and receivables | Available-for-sale financial assets | Held-to-maturity investments | Derivative assets (using hedge accounting) | Total |
| | | | In millions of won | | | |
| **Current assets** | | | | | | |
| Cash and cash equivalents ₩ | – | 3,051,353 | – | – | – | 3,051,353 |
| Current financial assets | | | | | | |
| Held-to-maturity investments | – | – | – | 114 | – | 114 |
| Derivative assets | 79,709 | – | – | – | 113,574 | 193,283 |
| Other financial assets | – | 2,478,592 | – | – | – | 2,478,592 |
| Trade and other receivables | – | 7,788,876 | – | – | – | 7,788,876 |
| | 79,709 | 13,318,821 | – | 114 | 113,574 | 13,512,218 |
| **Non-current assets** | | | | | | |
| Non-current financial assets | | | | | | |
| Available-for-sale financial assets | – | – | 1,014,732 | – | – | 1,014,732 |
| Held-to-maturity investments | – | – | – | 3,130 | – | 3,130 |
| Derivative assets | 287,768 | – | – | – | 300,323 | 588,091 |
| Other financial assets | – | 1,051,541 | – | – | – | 1,051,541 |
| Trade and other receivables | – | 1,903,515 | – | – | – | 1,903,515 |
| | 287,768 | 2,955,056 | 1,014,732 | 3,130 | 300,323 | 4,561,009 |
| ₩ | 367,477 | 16,273,877 | 1,014,732 | 3,244 | 413,897 | 18,073,227 |

| | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | Financial assets at fair value through profit or loss | Loans and receivables | Available-for-sale financial assets | Held-to-maturity investments | Derivative assets (using hedge accounting) | Total |
| | | | In millions of won | | | |
| **Current assets** | | | | | | |
| Cash and cash equivalents ₩ | – | 2,369,739 | – | – | – | 2,369,739 |
| Current financial assets | | | | | | |
| Held-to-maturity investments | – | – | – | 5 | – | 5 |
| Derivative assets | 12,923 | – | – | – | 12 | 12,935 |
| Other financial assets | – | 1,945,417 | – | – | – | 1,945,417 |
| Trade and other receivables | – | 7,928,972 | – | – | – | 7,928,972 |
| | 12,923 | 12,244,128 | – | 5 | 12 | 12,257,068 |
| **Non-current assets** | | | | | | |
| Non-current financial assets | | | | | | |
| Available-for-sale financial assets | – | – | 699,833 | – | – | 699,833 |
| Held-to-maturity investments | – | – | – | 3,139 | – | 3,139 |
| Derivative assets | 9,097 | – | – | – | 10,594 | 19,691 |
| Other financial assets | 111,512 | 1,204,738 | – | – | – | 1,316,250 |
| Trade and other receivables | – | 1,754,797 | – | – | – | 1,754,797 |
| | 120,609 | 2,959,535 | 699,833 | 3,139 | 10,594 | 3,793,710 |
| ₩ | 133,532 | 15,203,663 | 699,833 | 3,144 | 10,606 | 16,050,778 |

F-46

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)    Classification of financial liabilities as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | |
| | Financial liabilities at fair value through profit or loss | Financial liabilities recognized at amortized cost | Derivative liabilities (using hedge accounting) | Total |
| | | In millions of won | | |
| **Current liabilities** | | | | |
| Borrowings ₩ | – | 1,115,521 | – | 1,115,521 |
| Debt securities | – | 7,823,557 | – | 7,823,557 |
| Derivative liabilities | 3,251 | – | – | 3,251 |
| Trade and other payables | – | 5,585,411 | – | 5,585,411 |
| | 3,251 | 14,524,489 | | 14,527,740 |
| **Non-current liabilities** | | | | |
| Borrowings | – | 1,773,891 | – | 1,773,891 |
| Debt securities | – | 42,926,236 | – | 42,926,236 |
| Derivative liabilities | 18,278 | – | 117,157 | 135,435 |
| Trade and other payables | – | 3,558,175 | – | 3,558,175 |
| | 18,278 | 48,258,302 | 117,157 | 48,393,737 |
| ₩ | 21,529 | 62,782,791 | 117,157 | 62,921,477 |

| | | 2017 | | |
| | Financial liabilities at fair value through profit or loss | Financial liabilities recognized at amortized cost | Derivative liabilities (using hedge accounting) | Total |
| | | In millions of won | | |
| **Current liabilities** | | | | |
| Borrowings ₩ | – | 1,165,985 | – | 1,165,985 |
| Debt securities | – | 7,957,300 | – | 7,957,300 |
| Derivative liabilities | 51,090 | – | 20,177 | 71,267 |
| Trade and other payables | – | 5,999,521 | – | 5,999,521 |
| | 51,090 | 15,122,806 | 20,177 | 15,194,073 |
| **Non-current liabilities** | | | | |
| Borrowings | – | 2,434,624 | – | 2,434,624 |
| Debt securities | – | 43,189,483 | – | 43,189,483 |
| Derivative liabilities | 99,839 | – | 256,953 | 356,792 |
| Trade and other payables | – | 3,223,480 | – | 3,223,480 |
| | 99,839 | 48,847,587 | 256,953 | 49,204,379 |
| ₩ | 150,929 | 63,970,393 | 277,130 | 64,398,452 |

F-47

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(3)    **Classification of comprehensive income (loss) from financial instruments for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | | | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| | | | | In millions of won | |
| Cash and cash equivalents | Interest income | ₩ | 54,687 | 61,380 | 35,474 |
| Available-for-sale financial assets | Dividends income | | 14,069 | 9,446 | 11,477 |
| | Impairment loss on available-for-sale financial assets | | (84,370 ) | (86,703 ) | (2,713 ) |
| | Gain (loss) on disposal of available-for-sale financial assets | | (3,004 ) | 1,473 | (1,213 ) |
| | Interest income | | 29 | – | – |
| Held-to-maturity investments | Interest income | | 99 | 97 | 82 |
| Loans and receivables | Interest income | | 28,586 | 25,106 | 30,014 |
| Trade and other receivables | Interest income | | 100,771 | 102,237 | 102,727 |
| Short-term financial instruments | Interest income | | 46,921 | 45,763 | 29,412 |
| Long-term financial instruments | Interest income | | 10,492 | 7,195 | 8,144 |
| Financial assets at fair value through profit or loss | Interest income | | – | – | 290 |
| | Gain (loss) on valuation of derivatives | | 220,285 | 113,671 | (214,100 ) |
| | Gain (loss) on transaction of derivatives | | 8,605 | (8,039 ) | (37,266 ) |
| | Gain on valuation of financial assets | | – | – | 12 |
| Derivative assets (using hedge accounting) | Gain (loss) on valuation of derivatives (profit or loss) | | 244,020 | 145,458 | (41,129 ) |
| | Gain (loss) on valuation of derivatives (equity, before tax)(*) | | (12,572 ) | 50,047 | 2,453 |
| | Gain (loss) on transaction of derivatives | | 2,818 | (13,994 ) | (58,299 ) |
| Financial liabilities carried at amortized cost | Interest expense of borrowings and debt securities | | (1,392,477 ) | (1,202,065 ) | (1,240,727 ) |
| | Loss on retirement of financial liabilities | | (33 ) | (23,000 ) | (5 ) |
| | Interest expense of trade and other payables | | (84,527 ) | (68,375 ) | (57,160 ) |
| | Interest expense of others | | (538,680 ) | (482,428 ) | (491,665 ) |
| | Gain (loss) on foreign currency transactions and translations | | (708,178 ) | (290,485 ) | 1,075,215 |
| Financial liabilities at fair value through profit or loss | Gain (loss) on valuation of derivatives | | 35,312 | 23,225 | (179,879 ) |
| | Gain (loss) on transaction of derivatives | | 107,454 | 17,045 | (27,175 ) |
| Derivative liabilities (using hedge accounting) | Gain (loss) on valuation of derivatives (profit or loss) | | 93,914 | 5,714 | (439,559 ) |
| | Gain (loss) on valuation of derivatives (equity, before tax)(*) | | 9,728 | (3,297 ) | 29,431 |
| | Loss on transaction of derivatives | | (4,288 ) | (51,450 ) | (46,221 ) |

(*)    Items are included in other comprehensive income or loss. All other income and gain amounts listed above are included in finance income, and all expense and losses listed above are included in finance expenses in the consolidated statements of comprehensive income or loss.

F-48

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**6. Restricted Deposits**

Restricted deposits as of December 31, 2016 and 2017 are as follows:

| | | | 2016 | 2017 |
|---|---|---|---|---|
| | | | In millions of won | |
| Cash and cash equivalents | Escrow accounts | ₩ | 91 | 53 |
| | Deposits for government project | | 16,457 | 15,365 |
| | Collateral provided for borrowings | | 80,327 | 79,569 |
| | Collateral provided for lawsuit | | 241 | 2 |
| | Deposits for transmission regional support program | | 2,137 | 2,320 |
| Short-term financial instruments | Bidding guarantees | | 118 | 119 |
| | Restriction on withdrawal related to 'win-win growth program' for small and medium enterprises | | 33,000 | 34,000 |
| Other current receivables | Deposit for lawsuit | | 16,000 | – |
| Financial assets at fair value through profit or loss | Decommissioning costs of nuclear power plants | | – | 108,512 |
| Non-current available-for-sale financial asset | Decommissioning costs of nuclear power plants | | 437,015 | 214,156 |
| Long-term financial instruments | Guarantee deposits for checking account | | 2 | 2 |
| | Guarantee deposits for banking accounts at oversea branches | | 342 | 302 |
| | Decommissioning costs of nuclear power plants | | 214,121 | 337,234 |
| | Funds for developing small and medium enterprises(*) | | 200,000 | 200,000 |
| | | ₩ | 999,851 | 991,634 |

(*1)   Deposits for small and medium enterprise at IBK and others for construction of Bitgaram Energy Valley and support for the high potential businesses as of December 31, 2017 and 2016.

**7. Cash and Cash Equivalents**

Cash and cash equivalents as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Cash | ₩ | 119 | 132 |
| Other demand deposits | | 1,725,785 | 968,966 |
| Short-term deposits classified as cash equivalents | | 120,594 | 559,239 |
| Short-term investments classified as cash equivalents | | 1,204,855 | 841,402 |
| | ₩ | 3,051,353 | 2,369,739 |

F-49

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

8.    **Trade and Other Receivables**

(1)    **Trade and other receivables as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | |
|---|---|---|---|---|
| | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | | In millions of won | | |
| **Current assets** | | | | |
| Trade receivables | ₩ 7,260,227 | (71,985) | – | 7,188,242 |
| Other receivables | 652,782 | (50,071) | (2,077) | 600,634 |
| | 7,913,009 | (122,056) | (2,077) | 7,788,876 |
| **Non-current assets** | | | | |
| Trade receivables | 491,509 | – | – | 491,509 |
| Other receivables | 1,455,860 | (37,590) | (6,264) | 1,412,006 |
| | 1,947,369 | (37,590) | (6,264) | 1,903,515 |
| | ₩ 9,860,378 | (159,646) | (8,341) | 9,692,391 |

| | | 2017 | | |
|---|---|---|---|---|
| | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | | In millions of won | | |
| **Current assets** | | | | |
| Trade receivables | ₩ 7,499,285 | (173,583) | – | 7,325,702 |
| Other receivables | 614,212 | (9,199) | (1,743) | 603,270 |
| | 8,113,497 | (182,782) | (1,743) | 7,928,972 |
| **Non-current assets** | | | | |
| Trade receivables | 449,191 | – | (414) | 448,777 |
| Other receivables | 1,380,983 | (68,809) | (6,154) | 1,306,020 |
| | 1,830,174 | (68,809) | (6,568) | 1,754,797 |
| | ₩ 9,943,671 | (251,591) | (8,311) | 9,683,769 |

F-50

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(2)   Other receivables as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | |
|---|---|---|---|---|---|
| | | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | | | In millions of won | | |
| **Current assets** | | | | | |
| Non-trade receivables | ₩ | 360,021 | (50,071) | – | 309,950 |
| Accrued income | | 62,063 | – | – | 62,063 |
| Deposits | | 193,720 | – | (2,077) | 191,643 |
| Finance lease receivables | | 12,225 | – | – | 12,225 |
| Others | | 24,753 | – | – | 24,753 |
| | | 652,782 | (50,071) | (2,077) | 600,634 |
| **Non-current assets** | | | | | |
| Non-trade receivables | | 80,393 | (26,942) | – | 53,451 |
| Accrued income | | 174 | – | – | 174 |
| Deposits | | 320,935 | – | (6,264) | 314,671 |
| Finance lease receivables | | 960,649 | – | – | 960,649 |
| Others | | 93,709 | (10,648) | – | 83,061 |
| | | 1,455,860 | (37,590) | (6,264) | 1,412,006 |
| | ₩ | 2,108,642 | (87,661) | (8,341) | 2,012,640 |

| | | 2017 | | | |
|---|---|---|---|---|---|
| | | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | | | In millions of won | | |
| **Current assets** | | | | | |
| Non-trade receivables | ₩ | 314,256 | (9,199) | – | 305,057 |
| Accrued income | | 54,002 | – | – | 54,002 |
| Deposits | | 228,317 | – | (1,743) | 226,574 |
| Finance lease receivables | | 13,067 | – | – | 13,067 |
| Others | | 4,570 | – | – | 4,570 |
| | | 614,212 | (9,199) | (1,743) | 603,270 |
| **Non-current assets** | | | | | |
| Non-trade receivables | | 112,983 | (59,117) | – | 53,866 |
| Accrued income | | 182 | – | – | 182 |
| Deposits | | 331,071 | – | (6,154) | 324,917 |
| Finance lease receivables | | 849,554 | – | – | 849,554 |
| Others | | 87,193 | (9,692) | – | 77,501 |
| | | 1,380,983 | (68,809) | (6,154) | 1,306,020 |
| | ₩ | 1,995,195 | (78,008) | (7,897) | 1,909,290 |

**(3)   Trade and other receivables are classified as loans and receivables, and are measured using the effective interest method. No interest is accrued for trade receivables related to electricity for the duration between the billing date and the payment due dates. But once trade receivables are overdue, the Company imposes a monthly interest rate of 1.5% on the overdue trade receivables. The Company holds deposits of three months' expected electricity usage for customers requesting temporary usage and customers with past defaulted payments.**

F-51

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(4)  Aging analysis of trade receivables as of December 31, 2016 and 2017 are as follows:**

|  |  | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won | |
| Trade receivables: (not overdue, not impaired) | ₩ | 7,592,363 | 7,698,604 |
| Trade receivables: (overdue, not impaired) |  | 820 | 7,117 |
| Less than 60 days |  | 820 | 7,117 |
| Trade receivables: (impairment reviewed) |  | 158,553 | 242,755 |
| 60 ~ 90 days |  | 44,277 | 39,070 |
| 90 ~ 120 days |  | 18,917 | 17,502 |
| 120 days ~ 1year |  | 42,534 | 55,242 |
| Over 1 year |  | 52,825 | 130,941 |
|  |  | 7,751,736 | 7,948,476 |
| Less: allowance for doubtful accounts |  | (71,985  ) | (173,583  ) |
| Less: present value discount |  | – | (414  ) |
|  | ₩ | 7,679,751 | 7,774,479 |

The Company assesses at the end of each reporting period whether there is any objective evidence that trade receivables are impaired, and provides allowances for doubtful accounts which includes impairment for trade receivables that are individually significant. The Company considers receivables as overdue if the receivables are outstanding 60 days after the maturity and sets an allowance based on past experience of collection.

**(5)  Aging analysis of other receivables as of December 31, 2016 and 2017 are as follows:**

|  |  | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won | |
| Other receivables: (not overdue, not impaired) | ₩ | 1,887,620 | 1,810,075 |
| Other receivables: (overdue, not impaired) |  | 46,887 | 47,532 |
| Less than 60 days |  | 46,887 | 47,532 |
| Other receivables: (impairment reviewed) |  | 174,135 | 137,588 |
| 60 ~ 90 days |  | 7,352 | 44 |
| 90 ~ 120 days |  | 2,160 | 1,017 |
| 120 days ~ 1year |  | 17,613 | 11,042 |
| Over 1 year |  | 147,010 | 125,485 |
|  |  | 2,108,642 | 1,995,195 |
| Less: allowance for doubtful accounts |  | (87,661  ) | (78,008  ) |
| Less: present value discount |  | (8,341  ) | (7,897  ) |
|  | ₩ | 2,012,640 | 1,909,290 |

F-52

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(6)  Changes in the allowance for doubtful accounts for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|
| | | Trade receivables | Other receivables | Trade receivables | Other receivables | Trade receivables | Other receivables |
| | | In millions of won | | | | | |
| Beginning balance | ₩ | 80,644 | 67,932 | 51,956 | 91,746 | 71,985 | 87,661 |
| Bad debt expense | | 1,308 | 18,473 | 38,719 | 233 | 126,714 | 1,778 |
| Write-off | | (28,978 ) | (888 ) | (18,939 ) | (928 ) | (32,995 ) | (3,129 ) |
| Reversal | | (1,018 ) | (413 ) | – | (5,489 ) | – | (2,166 ) |
| Others | | – | 6,642 | 249 | 2,099 | 7,879 | (6,136 ) |
| Ending balance | ₩ | 51,956 | 91,746 | 71,985 | 87,661 | 173,583 | 78,008 |

9.  Available-for-sale Financial Assets

(1)  Changes in available-for-sale financial assets for the years ended December 31, 2016 and 2017 are as follows:

| | | 2016 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Beginning balance | Acquisition | Disposal(*1) | Valuation | Impairment | Others | Ending balance |
| | | In millions of won | | | | | | |
| Listed | ₩ | 196,579 | – | (3,398 ) | 74,139 | (9,122 ) | 9,973 | 268,171 |
| Unlisted | | 387,900 | 449,484 | (1,828 ) | (12,346 ) | (77,581 ) | 932 | 746,561 |
| | | 584,479 | 449,484 | (5,226 ) | 61,793 | (86,703 ) | 10,905 | 1,014,732 |
| Short-term available-for-sale financial assets | | – | – | – | – | – | – | – |
| Long-term available-for-sale financial assets | ₩ | 584,479 | 449,484 | (5,226 ) | 61,793 | (86,703 ) | 10,905 | 1,014,732 |

(*1)  The Company recognized gain and loss on disposal of available-for-sale financial assets amounted to ₩1,482 million and ₩9 million, respectively, from the sales of shares of Kwanglim Co., Ltd., TONGYANG Inc., TONGYANG networks Inc., Nexolon Co., Ltd. and SsangYong E&C Co., Ltd. and from the partial sales of IBK-AUCTUS Green Growth Private Equity Firm, Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 and Korea investment–Hanwha KT Master Lease Private Special Investment Trust for the year ended December 31, 2016.

| | | 2017 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Beginning balance | Acquisition | Disposal(*1) | Valuation | Impairment | Others | Ending balance |
| | | In millions of won | | | | | | |
| Listed | ₩ | 268,171 | 106 | – | 8,156 | (97 ) | (1,883 ) | 274,453 |
| Unlisted | | 746,561 | 233,179 | (461,423 ) | (2,908 ) | (2,616 ) | (87,413 ) | 425,380 |
| | | 1,014,732 | 233,285 | (461,423 ) | 5,248 | (2,713 ) | (89,296 ) | 699,833 |
| Short-term available-for-sale financial assets | | – | – | – | – | – | – | – |
| Long-term available-for-sale financial assets | ₩ | 1,014,732 | 233,285 | (461,423 ) | 5,248 | (2,713 ) | (89,296 ) | 699,833 |

(*1)  The Company recognized gain and loss on disposal of available-for-sale financial assets amounted to ₩1,130 million and ₩2,343 million, respectively, from the partial sales of Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 and others for the year ended December 31, 2017.

F-53

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | Shares | Ownership | | Acquisition cost | Book value | Fair value |
|---|---|---|---|---|---|---|
| **2016** | | | | | | |
| | | | | | In millions of won | |
| **Listed** | | | | | | |
| Korea District Heating Corp. | 2,264,068 | 19.55 | % | ₩ 173,201 | 154,183 | 154,183 |
| Ssangyong Motor Co., Ltd. | 38,568 | 0.03 | % | 428 | 304 | 304 |
| Sungjee Construction. Co., Ltd. | 10,530 | 0.01 | % | 49 | 21 | 21 |
| Korea Line Corp. | 18 | 0.00 | % | 1 | – | – |
| Namkwang Engineering & Construction Co., Ltd. | 46 | 0.00 | % | 15 | – | – |
| Pumyang Construction Co., Ltd. | 7 | 0.00 | % | 2 | – | – |
| ELCOMTEC Co., Ltd. | 32,875 | 0.04 | % | 217 | 74 | 74 |
| PAN ocean Co., Ltd. | 1,492 | 0.00 | % | 14 | 7 | 7 |
| Borneo International Furniture Co., Ltd. | 64,037 | 0.28 | % | 97 | 103 | 103 |
| Dongbu Corporation | 1,229 | 0.02 | % | 12 | 12 | 12 |
| PT Adaro Energy Tbk | 480,000,000 | 1.50 | % | 71,554 | 73,061 | 73,061 |
| Energy Fuels Inc. | 1,711,814 | 2.59 | % | 16,819 | 3,385 | 3,385 |
| Baralaba Coal Company Limited(*6) | 99,763 | 0.07 | % | 18,445 | 42 | 42 |
| Denison Mines Corp. | 58,284,000 | 10.93 | % | 84,134 | 36,504 | 36,504 |
| Fission 3.0 | 300,000 | 0.17 | % | – | 16 | 16 |
| Fission Uranium Corp. | 800,000 | 0.17 | % | 785 | 459 | 459 |
| | | | | 365,773 | 268,171 | 268,171 |
| | | | | | | |
| **Unlisted(*1)** | | | | | | |
| K&C–Gyeongnam youth job creation Investment Fund | 24 | 10.00 | % | 1,207 | 1,207 | – |
| Korea investment–Korea EXIM Bank CERs Private Special Assets Investment Trust I | 1,758,731,002 | 14.18 | % | 1,752 | 571 | – |
| Troika Overseas Resource Development Private Equity Firm | 13,340,012,100 | 3.66 | % | 13,340 | 1,553 | – |
| IBK-AUCTUS Green Growth Private Equity firm | 152 | 6.29 | % | 41 | 41 | – |
| Global Dynasty Overseas Resource Development Private Equity Firm | 2,233,407,439 | 7.46 | % | 2,233 | 2,233 | – |
| Intellectual Discovery, Ltd. | 1,000,000 | 8.81 | % | 5,000 | 1,375 | – |
| Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 | 4,256,096,329 | 5.00 | % | 4,389 | 4,389 | – |
| Construction Guarantee(*2) | 571 | 0.02 | % | 601 | 819 | 819 |
| Plant & Mechanical Contractors Financial Cooperative of Korea | 50 | 0.01 | % | 36 | 36 | – |
| Fire Guarantee | 40 | 0.02 | % | 20 | 20 | – |
| Korea Software Financial Cooperative | 5,186 | 1.39 | % | 3,301 | 3,301 | – |
| Engineering Financial Cooperative | 486 | 0.05 | % | 60 | 60 | – |
| Electric Contractors Financial Cooperative | 800 | 0.03 | % | 152 | 152 | – |
| Korea Specialty Contractor Financial Cooperative | 476 | 0.01 | % | 417 | 417 | – |
| Information & Communication Financial Cooperative | 70 | 0.01 | % | 10 | 10 | – |
| Korea Electric Engineers Association | 400 | 0.24 | % | 40 | 40 | – |
| Korea investment–Investment Pool for Public funds 10(*5) | – | – | | 142,470 | 141,315 | 141,315 |

F-54

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | Shares | Ownership | | 2016 Acquisition cost | Book value In millions of won | Fair value |
|---|---|---|---|---|---|---|
| Samsung investment–Investment Pool for Public funds 2(*5) | – | – | ₩ | 213,710 | 211,920 | 211,920 |
| Samsung investment–Investment Pool for Public funds 1(*5) | – | – | | 53,220 | 53,212 | 53,212 |
| Korea investment–Hanwha KT Master Lease Private Special Investment Trust(*5) | – | – | | 30,560 | 30,568 | 30,568 |
| Hwan Young Steel Co., Ltd. | 10,916 | 0.14 | % | 1,092 | 97 | – |
| SAMBO AUTO. Co., Ltd. | 15,066 | 0.02 | % | 38 | 38 | – |
| Mobo Co., Ltd. | 504 | 0.00 | % | 14 | 14 | – |
| HANKOOK Silicon Co., Ltd. | 3,005,208 | 10.44 | % | 7,513 | 1,495 | – |
| Dae Kwang Semiconductor Co., Ltd. | 589 | 0.07 | % | 6 | 6 | – |
| Sanbon Department Store | 828 | 0.01 | % | 124 | 3 | – |
| Miju Steel Mfg. Co., Ltd. | 99,804 | 0.23 | % | 51 | 51 | – |
| BnB Sungwon Co., Ltd. | 589 | 0.07 | % | 15 | 15 | – |
| Hana Civil Engineering Co., Ltd. | 23 | 0.00 | % | 1 | 1 | – |
| KC Development Co., Ltd. | 839 | 0.02 | % | 6 | 6 | – |
| IMHWA Corp. | 329 | 0.11 | % | 5 | 5 | – |
| DALIM Special Vehicle Co., Ltd. | 58 | 0.08 | % | 10 | 10 | – |
| ASA JEONJU Co., Ltd. | 34,846 | 1.34 | % | 697 | 69 | – |
| Moonkyung Silica Co., Ltd. | 42 | 0.56 | % | – | – | – |
| Sungkwang Timber Co., Ltd. | 9 | 0.34 | % | 4 | 4 | – |
| Yongbo Co., Ltd. | 61 | 0.20 | % | 3 | 3 | – |
| HJ Steel Co., Ltd. | 218 | 0.07 | % | 2 | 2 | – |
| KS Remicon Co., Ltd. | 12 | 0.04 | % | 3 | 3 | – |
| SIN-E Steel Co., Ltd. | 109 | 0.08 | % | 33 | 33 | – |
| Joongang Platec Co., Ltd. | 3,591 | 0.75 | % | 72 | 35 | – |
| Pyungsan SI Ltd. | 434 | 0.01 | % | 9 | 9 | – |
| Samgong Development Co., Ltd. | 12 | 0.01 | % | 7 | 7 | – |
| Joongang Development Co., Ltd. | 540 | 0.12 | % | 8 | 8 | – |
| AJS Co., Ltd. | 12,906 | 0.23 | % | 32 | 32 | – |
| SHIN-E B&P Co., Ltd. | 119 | 0.13 | % | 10 | 10 | – |
| MSE Co., Ltd. | 429 | 0.13 | % | 9 | 9 | – |
| Ilrim Nano Tec Co., Ltd. | 1,520 | 0.07 | % | 15 | 15 | – |
| Youngjin Hi-Tech Co., Ltd. | 2,512 | 0.25 | % | 126 | 21 | – |
| Dong Woo International Co., Ltd. | 90 | 0.37 | % | 18 | 18 | – |
| Buyoung Co., Ltd. | 270 | 0.00 | % | 3 | 3 | – |
| Ilsuk Co., Ltd. | 152 | 0.17 | % | 10 | 10 | – |
| Dongyang Telecom Co., Ltd. | 1,760 | 0.01 | % | 11 | 11 | – |
| Han Young Construction Co., Ltd. | 35 | 0.03 | % | 3 | 3 | – |
| Jongwon Remicon Co., Ltd. | 31 | 0.18 | % | 13 | 13 | – |
| Ace Heat Treating Co., Ltd. | 477 | 1.43 | % | 72 | 72 | – |
| Zyle Daewoo Motor Sales Co., Ltd. | 22 | 0.00 | % | – | – | – |
| Daewoo Development Co., Ltd. | 8 | 0.00 | % | – | – | – |
| Seyang Inc. | 537 | 0.05 | % | 27 | 27 | – |
| Seungri Enterprise Co., Ltd. | 93 | 0.05 | % | 3 | 3 | – |
| Onggane Food Co., Ltd | 5 | 0.07 | % | 1 | 1 | – |
| Shin-E P&C Co., Ltd. | 12 | 0.00 | % | 1 | 1 | – |
| Ejung Ad Co., Ltd. | 132 | 0.09 | % | 3 | 3 | – |
| Solvus Co., Ltd. | 1,056 | 0.04 | % | 3 | 3 | – |
| Myung Co., Ltd. | 89 | 0.05 | % | 2 | 2 | – |
| Emotion Co., Ltd. | 167 | 0.61 | % | 8 | 8 | – |
| Youngdong Concrete Co., Ltd. | 32 | 0.32 | % | 7 | 7 | – |

F-55

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | Shares | Ownership | | | Acquisition cost | Book value | Fair value |
|---|---|---|---|---|---|---|---|
| | | | | | | In millions of won | |
| Shinil Engineering Co., Ltd. | 887 | 0.06 | % | ₩ | 3 | 3 | – |
| Biwang Industry Co., Ltd | 406 | 0.04 | % | | 2 | 2 | – |
| Huimun Co., Ltd. | 263 | 0.26 | % | | 4 | 4 | – |
| Young Sung Co., Ltd. | 89 | 0.40 | % | | 27 | 27 | – |
| Yuil Industrial Electronics Co., Ltd. | 804 | 0.32 | % | | 16 | 16 | – |
| DN TEK Inc. | 12,401 | 0.29 | % | | 62 | 6 | – |
| Daeyang F.M.S Corporation | 593 | 0.40 | % | | 23 | 23 | – |
| Kwang Jin Structure Co., Ltd. | 3,072 | 0.60 | % | | 31 | 31 | – |
| Woojin Industry Corporation | 3 | 0.00 | % | | 16 | 16 | – |
| Kwang Sung Industry Co., Ltd. | 325 | 0.35 | % | | 7 | 7 | – |
| Futech Mold Co., Ltd. | 274 | 0.27 | % | | 14 | 14 | – |
| Samcheonri Industrial Co., Ltd. | 533 | 0.98 | % | | 13 | 13 | – |
| Woojoo Environment Ind. Co., Ltd. | 101 | 0.11 | % | | 13 | 13 | – |
| Cheongatti Co., Ltd. | 57 | 0.10 | % | | 4 | 4 | – |
| Hyungji Esquire Co., Ltd. | 55 | 0.02 | % | | 22 | 22 | – |
| Kolmar Pharma Co., Ltd. | 1,426 | 0.01 | % | | 52 | 3 | – |
| Morado Co., Ltd. | 209 | 0.04 | % | | 2 | 2 | – |
| Myung Sung Tex Co., Ltd. | 20 | 0.00 | % | | 2 | 2 | – |
| Kwang Sung Co., Ltd. | 610 | 0.53 | % | | 31 | 31 | – |
| EverTechno. Co.,Ltd. | 29,424 | 0.73 | % | | 147 | 7 | – |
| Autowel Co.,Ltd. | 260 | 0.38 | % | | 13 | 13 | – |
| Woobang Construction Co., Ltd. | 8 | 0.00 | % | | 8 | 8 | – |
| Shin Pyung Co., Ltd. | 6 | 0.03 | % | | 3 | 3 | – |
| JMC Heavy Industries Co., Ltd. | 2,724 | 0.10 | % | | 27 | 27 | – |
| Najin Steel Co., Ltd. | 37 | 0.06 | % | | 5 | 5 | – |
| Sinkwang Industry Co., Ltd. | 1,091 | 1.68 | % | | 5 | 5 | – |
| Join Land Co., Ltd. | 33 | 0.00 | % | | 1 | 1 | – |
| Crystal Co., Ltd. | 22 | 0.07 | % | | 2 | 2 | – |
| Elephant & Friends Co., Ltd. | 563 | 0.61 | % | | 3 | 3 | – |
| Mireco Co., Ltd. | 109 | 0.25 | % | | 11 | 11 | – |
| L&K Industry Co., Ltd. | 1,615 | 0.60 | % | | 24 | 24 | – |
| JO Tech Co., Ltd. | 1,263 | 0.62 | % | | 25 | 25 | – |
| Kendae Printing Co., Ltd. | 422 | 0.60 | % | | 21 | 21 | – |
| Dauning Co., Ltd. | 231 | 0.41 | % | | 6 | 6 | – |
| Korea Trecision Co., Ltd. | 22 | 0.45 | % | | 5 | 5 | – |
| Ace Track Co., Ltd. | 3,130 | 1.08 | % | | 219 | 59 | – |
| Taebok Machinery Co., Ltd. | 109 | 1.08 | % | | 11 | 11 | – |
| Yooah Industry Co., Ltd. | 130 | 0.02 | % | | 13 | 13 | – |
| Yoo-A Construction Co., Ltd. | 105 | 0.20 | % | | 11 | 11 | – |
| Dung Hwan Co., Ltd. | 531 | 0.02 | % | | 5 | 5 | – |
| Hurim Biocell Co., Ltd. | 113 | 0.00 | % | | 5 | 5 | – |
| P. J, Trading Co., Ltd. | 12 | 0.04 | % | | – | – | – |
| Sunjin Power Tech Co., Ltd. | 4,941 | 0.92 | % | | 247 | 90 | – |
| Smart Power Co.,Ltd. | 133,333 | 5.55 | % | | 200 | 200 | – |
| Haseung Industries Co.,Ltd. | 55 | 0.62 | % | | 28 | 28 | – |
| Beer Yeast Korea Inc. | 1,388 | 0.43 | % | | 7 | 7 | – |
| Daeryung Corporation | 207 | 0.19 | % | | 10 | 10 | – |
| Korea Bio Red Ginseng Co.,Ltd. | 194 | 0.09 | % | | 10 | 10 | – |
| ENH Co.,Ltd. | 1,086 | 0.19 | % | | 54 | 54 | – |
| OCO Co.,Ltd. | 123 | 0.37 | % | | 11 | 11 | – |
| B CON Co.,Ltd. | 96 | 1.16 | % | | 6 | 6 | – |
| Chunil Metal Co., Ltd. | 11 | 0.15 | % | | 4 | 4 | – |
| Teakwang Tech Co., Ltd. | 2,460 | 0.11 | % | | 12 | 12 | – |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

|  | | Shares | Ownership | | | Acquisition cost | Book value | Fair value |
|---|---|---|---|---|---|---|---|---|
|  | | | | | | | In millions of won | |
| SsangMa Machine Co., Ltd. | | 4 | 0.05 | % | ₩ | 1 | 1 | – |
| SinJin Co., Ltd. | | 233 | 0.30 | % | | 9 | 9 | – |
| Ace Integration Co., Ltd | | 93 | 0.09 | % | | 21 | 21 | – |
| AceInti Agricultural Co., Ltd. | | 3 | 0.00 | % | | 1 | 1 | – |
| KyungDong Co., Ltd. | | 130 | 0.01 | % | | 1 | 1 | – |
| ChunWon Development Co., Ltd. | | 193 | 0.19 | % | | 39 | 39 | – |
| WonIl Co., Ltd. | | 999 | 0.15 | % | | 50 | 50 | – |
| SungLim Industrial Co., Ltd. | | 29 | 0.03 | % | | 1 | 1 | – |
| DaeHa Co., Ltd. | | 141 | 0.54 | % | | 11 | 11 | – |
| Korea Minerals Co., Ltd. | | 191 | 0.05 | % | | 135 | 135 | – |
| HyoDong Development Co., Ltd. | | 119 | 0.15 | % | | 24 | 24 | – |
| Haspe Tech Co., Ltd. | | 652 | 0.55 | % | | 20 | 20 | – |
| JoHyun Co., Ltd. | | 350 | 1.56 | % | | 18 | 18 | – |
| KC Co., Ltd. | | 5,107 | 0.17 | % | | 3 | 3 | – |
| SeongJi Industrial Co.,Ltd. | | 41 | 0.05 | % | | 1 | 1 | – |
| AREVA NC Expansion | | 1,077,124 | 13.49 | % | | 288,443 | 98,472 | 98,472 |
| Navanakorn Electric Co., Ltd.(*3) | | 8,885,600 | 26.93 | % | | 17,216 | 18,509 | – |
| PT. Kedap Saayq | | 671 | 10.00 | % | | 18,540 | – | – |
| Set Holding(*4) | | 1,100,220 | 2.50 | % | | 229,255 | 170,170 | 170,170 |
| PT. Cirebon Energi Prasarana | | 22,420 | 10.00 | % | | 2,612 | 2,709 | – |
| | | | | | | 1,040,553 | 746,561 | 706,476 |
| | | | | | ₩ | 1,406,326 | 1,014,732 | 974,647 |

(*1)   Investments in unlisted equity securities held by the Company for which a quoted market price does not exist in an active market and fair value cannot be measured reliably were measured at cost less impairment, if any.

(*2)   The Company has estimated the fair value of the investment in Construction Guarantee based upon the price which would be applied when the investment is returned. The Company has recognized the difference between its fair value and book value as a gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2016.

(*3)   Although the Company holds more than 20% of the equity shares of these investments, the Company cannot exercise significant influence.

(*4)   The Company has estimated the fair value of Set Holding by using the discounted cash flow method and has recognized the difference between its fair value and book value as gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2016.

(*5)   As of December 31, 2016, the Company invested in ₩437,015 million as beneficiary securities exclusively for payment of decommissioning cost of nuclear power plants. The Company has measured the fair value of the beneficiary securities based on its net asset value.

(*6)   The number of shares owned has changed due to the stock merge (500:1) during the year ended December 31, 2016

F-57

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | 2017 | | | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | | In millions of won | |
| **Listed** | | | | | |
| Korea District Heating Corp. | 2,264,068 | 19.55% | ₩ 173,201 | 165,277 | 165,277 |
| Ssangyong Motor Co., Ltd. | 38,568 | 0.03% | 428 | 197 | 197 |
| Sungjee Construction. Co., Ltd. | 10,530 | 0.01% | 49 | 8 | 8 |
| Korea Line Corp. | 18 | 0.00% | 1 | – | – |
| Namkwang Engineering & Construction Co., Ltd. | 46 | 0.00% | 15 | – | – |
| Pumyang Construction Co., Ltd.(*7) | 35 | 0.00% | 2 | – | – |
| ELCOMTEC Co., Ltd. | 32,875 | 0.04% | 217 | 72 | 72 |
| PAN ocean Co., Ltd. | 1,492 | 0.00% | 14 | 8 | 8 |
| Dongbu Corporation(*6) | 955 | 0.02% | 12 | 10 | 10 |
| KSP Co., Ltd. | 6,324 | 0.08% | 24 | 24 | 24 |
| STX Heavy Industries Co., Ltd. | 35,749 | 0.14% | 191 | 165 | 165 |
| PT Adaro Energy Tbk | 480,000,000 | 1.50% | 71,554 | 70,531 | 70,531 |
| Energy Fuels Inc. | 1,711,814 | 2.38% | 16,819 | 3,300 | 3,300 |
| Baralaba Coal Company Limited | 99,763 | 0.07% | 18,445 | 22 | 22 |
| Denison Mines Corp. | 58,284,000 | 10.42% | 84,134 | 34,292 | 34,292 |
| Fission 3.0 | 300,000 | 0.14% | – | 15 | 15 |
| Fission Uranium Corp. | 800,000 | 0.16% | 785 | 532 | 532 |
| | | | 365,891 | 274,453 | 274,453 |
| | | | | | |
| **Unlisted**(*1) | | | | | |
| Korea investment−Korea EXIM Bank CERs Private Special Asset Investment Trust I | 1,758,731,002 | 14.18% | 1,752 | 571 | – |
| Troika Overseas Resource Development Private Equity Firm | 13,340,012,100 | 3.66% | 13,340 | 1,553 | – |
| IBK-AUCTUS Green Growth Private Equity Firm | 152 | 6.29% | 41 | 41 | – |
| Global Dynasty Overseas Resource Development Private Equity Firm | 2,242,437,289 | 7.46% | 2,242 | 2,242 | – |
| Intellectual Discovery, Ltd. | 1,000,000 | 8.81% | 5,000 | 954 | – |
| Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 | 4,176,751,013 | 5.00% | 4,328 | 4,328 | – |
| Construction Guarantee(*2) | 571 | 0.02% | 601 | 833 | 833 |
| Plant & Mechanical Contractors Financial Cooperative of Korea | 144 | 0.03% | 126 | 126 | – |
| Fire Guarantee | 40 | 0.01% | 20 | 20 | – |
| Korea Software Financial Cooperative | 5,186 | 1.09% | 3,301 | 3,301 | – |
| Engineering Financial Cooperative | 486 | 0.05% | 60 | 60 | – |
| Electric Contractors Financial Cooperative | 1,000 | 0.04% | 216 | 216 | – |
| Korea Specialty Contractor Financial Cooperative | 476 | 0.01% | 417 | 417 | – |
| Information & Communication Financial Cooperative | 121 | 0.02% | 26 | 26 | – |
| Korea Electric Engineers Association | 400 | 0.24% | 40 | 40 | – |
| Samsung investment−Investment Pool for Public funds 1(*5) | – | – | 53,220 | 53,739 | 53,739 |
| Korea investment−Hanwha KT Master Lease Private Special Investment Trust(*5) | – | – | 26,586 | 26,591 | 26,591 |

F-58

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | | | | 2017 | | |
|---|---|---|---|---|---|---|
| | Shares | Ownership | | Acquisition cost | Book value | Fair value |
| | | | | | In millions of won | |
| Kyobo Royal-Class Repo Plus Fixed Income 1Y 2nd (*5) | – | – | ₩ | 33,000 | 33,008 | 33,008 |
| Kyobo Royal-Class Repo Plus Fixed Income 2Y 1st (*5) | – | – | | 50,000 | 50,399 | 50,399 |
| Kyobo Royal-Class Repo Plus A1 ABCP 1Y (*5) | – | – | | 50,000 | 50,419 | 50,419 |
| Hwan Young Steel Co., Ltd. | 10,916 | 0.14% | | 1,092 | 97 | – |
| SAMBO AUTO. Co., Ltd. | 15,066 | 0.02% | | 38 | 38 | – |
| Mobo Co., Ltd. | 504 | 0.00% | | 14 | 14 | – |
| Dae Kwang Semiconductor Co., Ltd. | 589 | 0.07% | | 6 | 6 | – |
| Sanbon Department Store | 828 | 0.01% | | 124 | 3 | – |
| Miju Steel Mfg. Co., Ltd. | 99,804 | 0.23% | | 50 | 50 | – |
| Sungwon Co., Ltd. (formerly, BnB Sungwon Co., Ltd.) | 589 | 0.07% | | 15 | 15 | – |
| Hana Civil Engineering Co., Ltd. | 23 | 0.00% | | 1 | 1 | – |
| KC Development Co., Ltd. | 839 | 0.02% | | 6 | 6 | – |
| IMHWA Corp. | 329 | 0.11% | | 5 | 5 | – |
| DALIM Special Vehicle Co., Ltd. | 58 | 0.08% | | 10 | 10 | – |
| ASA JEONJU Co., Ltd. | 34,846 | 1.34% | | 697 | 69 | – |
| Moonkyung Silica Co., Ltd. | 42 | 0.56% | | – | – | – |
| Sungkwang Timber Co., Ltd. | 9 | 0.34% | | 4 | 4 | – |
| Yongbo Co., Ltd. | 61 | 0.20% | | 3 | 3 | – |
| HJ Steel Co., Ltd. | 218 | 0.07% | | 2 | 2 | – |
| KS Remicon Co., Ltd. | 12 | 0.04% | | 3 | 3 | – |
| Joongang Platec Co., Ltd. | 3,591 | 0.75% | | 72 | 35 | – |
| Pyungsan SI Ltd. | 434 | 0.01% | | 9 | 9 | – |
| Samgong Development Co., Ltd. | 12 | 0.01% | | 7 | 7 | – |
| Joongang Development Co., Ltd. | 540 | 0.12% | | 8 | 8 | – |
| AJS Co., Ltd. | 12,906 | 0.23% | | 32 | 32 | – |
| SHIN-E B&P Co., Ltd. | 119 | 0.13% | | 10 | 10 | – |
| MSE Co., Ltd. | 429 | 0.13% | | 9 | 9 | – |
| Ilrim Nano Tec Co., Ltd. | 1,520 | 0.07% | | 15 | 15 | – |
| Youngjin Hi-Tech Co., Ltd. | 2,512 | 0.25% | | 126 | 21 | – |
| Buyoung Co., Ltd. | 270 | 0.00% | | 3 | 3 | – |
| Ilsuk Co., Ltd. | 152 | 0.17% | | 10 | 10 | – |
| Dongyang Telecom Co., Ltd. | 1,760 | 0.01% | | 11 | 11 | – |
| Jongwon Remicon Co., Ltd. | 31 | 0.18% | | 13 | 13 | – |
| Ace Heat Treating Co., Ltd. | 477 | 1.43% | | 72 | 72 | – |
| Zyle Daewoo Motor Sales Co., Ltd. | 22 | 0.00% | | – | – | – |
| Daewoo Development Co., Ltd. | 8 | 0.00% | | – | – | – |
| Seyang Inc. | 537 | 0.05% | | 27 | 27 | – |
| Seungri Enterprise Co., Ltd. | 93 | 0.05% | | 3 | 3 | – |
| Onggane Food Co., Ltd. | 5 | 0.07% | | 1 | 1 | – |
| Shin-E P&C Co., Ltd. | 12 | 0.00% | | 1 | 1 | – |
| Ejung Ad Co., Ltd. | 132 | 0.09% | | 3 | 3 | – |
| Solvus Co., Ltd. | 1,056 | 0.04% | | 3 | 3 | – |
| Myung Co., Ltd. | 89 | 0.05% | | 2 | 2 | – |
| Shinil Engineering Co., Ltd. | 887 | 0.06% | | 3 | 3 | – |
| Biwang Industry Co., Ltd | 406 | 0.04% | | 2 | 2 | – |
| Huimun Co., Ltd. | 263 | 0.26% | | 4 | 4 | – |
| Young Sung Co., Ltd. | 89 | 0.40% | | 26 | 26 | – |
| Yuil Industrial Electronics Co., Ltd. | 804 | 0.32% | | 15 | 15 | – |
| DN TEK Inc. | 12,401 | 0.29% | | 61 | 5 | – |

F-59

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | Shares | Ownership | 2017 Acquisition cost | Book value | Fair value |
|---|---|---|---|---|---|
| | | | | In millions of won | |
| Kwang Jin Structure Co., Ltd. | 3,072 | 0.60% | ₩ 31 | 31 | – |
| Woojin Industry Corporation | 3 | 0.00% | 16 | 16 | – |
| Kwang Sung Industry Co., Ltd. | 325 | 0.35% | 7 | 7 | – |
| Futech Mold Co., Ltd. | 274 | 0.27% | 14 | 14 | – |
| Woojoo Environment Ind. Co., Ltd. | 101 | 0.11% | 13 | 13 | – |
| Cheongatti Co., Ltd. | 57 | 0.10% | 4 | 4 | – |
| Hyungji Esquire Co., Ltd. | 55 | 0.02% | 22 | 22 | – |
| Kolmar Pharma Co., Ltd. | 1,426 | 0.01% | 52 | 3 | – |
| Morado Co., Ltd. | 209 | 0.04% | 2 | 2 | – |
| Myung Sung Tex Co., Ltd. | 20 | 0.00% | 2 | 2 | – |
| Kwang Sung Co., Ltd. | 610 | 0.53% | 31 | 31 | – |
| EverTechno. Co.,Ltd. | 29,424 | 0.73% | 148 | 7 | – |
| Autowel Co.,Ltd. | 260 | 0.38% | 14 | 14 | – |
| Woobang Construction Co., Ltd. | 8 | 0.00% | 8 | 8 | – |
| Shin Pyung Co., Ltd. | 6 | 0.03% | 3 | 3 | – |
| JMC Heavy Industries Co., Ltd. | 2,724 | 0.10% | 27 | 27 | – |
| Najin Steel Co., Ltd. | 37 | 0.06% | 5 | 5 | – |
| Sinkwang Industry Co., Ltd. | 1,091 | 1.68% | 5 | 5 | – |
| Crystal Co., Ltd. | 22 | 0.07% | 2 | 2 | – |
| Elephant & Friends Co., Ltd. | 563 | 0.61% | 3 | 3 | – |
| Mireco Co., Ltd. | 109 | 0.25% | 11 | 11 | – |
| L&K Industry Co., Ltd. | 1,615 | 0.60% | 24 | 24 | – |
| JO Tech Co., Ltd. | 1,263 | 0.62% | 25 | 25 | – |
| Kendae Printing Co., Ltd. | 422 | 0.60% | 21 | 21 | – |
| Dauning Co., Ltd. | 231 | 0.41% | 6 | 6 | – |
| Korea Trecision Co., Ltd. | 22 | 0.45% | 5 | 5 | – |
| Ace Track Co., Ltd. | 3,130 | 1.08% | 219 | 59 | – |
| Taebok Machinery Co., Ltd. | 109 | 1.08% | 11 | 11 | – |
| Yoo-A Construction Co., Ltd. | 105 | 0.20% | 11 | 11 | – |
| Dung Hwan Co., Ltd. | 531 | 0.02% | 5 | 5 | – |
| Hurim Biocell Co., Ltd. | 113 | 0.00% | 5 | 5 | – |
| Sunjin Power Tech Co., Ltd. | 4,941 | 0.92% | 247 | 32 | – |
| Smart Power Co.,Ltd. | 133,333 | 4.83% | 200 | 200 | – |
| Haseung Industries Co.,Ltd. | 55 | 0.62% | 28 | 28 | – |
| Beer Yeast Korea Inc. | 1,388 | 0.43% | 7 | 7 | – |
| Daeryung Corporation | 207 | 0.19% | 10 | 10 | – |
| Korea Bio Red Ginseng Co.,Ltd. | 194 | 0.09% | 10 | 10 | – |
| ENH Co.,Ltd. | 1,086 | 0.19% | 54 | 54 | – |
| B CON Co.,Ltd. | 96 | 1.16% | 6 | 6 | – |
| Chunil Metal Co.,Ltd. | 11 | 0.15% | 4 | 4 | – |
| SsangMa Machine Co., Ltd. | 4 | 0.05% | 1 | 1 | – |
| SinJin Co., Ltd. | 233 | 0.30% | 9 | 9 | – |
| Ace Integration Co., Ltd | 105 | 0.09% | 24 | 24 | – |
| AceInti Agricultural Co., Ltd. | 16 | 0.02% | 5 | 5 | – |
| KyungDong Co., Ltd. | 130 | 0.01% | 1 | 1 | – |
| ChunWon Development Co., Ltd. | 193 | 0.19% | 39 | 39 | – |
| WonIl Co., Ltd. | 999 | 0.15% | 50 | 50 | – |
| SungLim Industrial Co., Ltd. | 29 | 0.03% | 1 | 1 | – |
| Korea Minerals Co., Ltd. | 191 | 0.05% | 134 | 1 | – |
| HyoDong Development Co., Ltd. | 119 | 0.15% | 24 | 24 | – |
| Haspe Tech Co., Ltd. | 652 | 0.55% | 20 | 20 | – |
| JoHyun Co., Ltd. | 350 | 1.56% | 18 | 18 | – |
| KC Co., Ltd. | 5,107 | 0.17% | 3 | 3 | – |
| SeongJi Industrial Co.,Ltd. | 41 | 0.05% | 1 | 1 | – |

F-60

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | | | 2017 | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | | In millions of won | |
| DongKwang SD, Inc. | 524 | 0.23% | ₩ 13 | 13 | – |
| Dong Yang Metal Co., Ltd. | 2,951 | 1.97% | 15 | 15 | – |
| Seyang Precision Ind. Co., Ltd. | 829 | 0.23% | 41 | 41 | – |
| Dooriwon Food System Co., Ltd. | 13 | 0.27% | 1 | 1 | – |
| ShinShin Co., Ltd | 339 | 1.12% | 17 | 17 | – |
| Kitorang Co., Ltd. | 165 | 0.24% | 49 | 49 | – |
| Sung Kwang Co., Ltd. | 23 | 0.37% | 6 | 6 | – |
| Hyundai Metal Co., Ltd. | 3,757 | 5.60% | 1,416 | 1,416 | – |
| Shinheung petrol. Co. Ltd. | 699 | 0.14% | 7 | 7 | – |
| Force TEC Co., Ltd. | 3,501 | 0.02% | 18 | 18 | – |
| Haisung Industrial Systems Co., Ltd. | 10,751 | 0.24% | 54 | 54 | – |
| Samsung Tech Co., Ltd. | 486 | 1.28% | 97 | 97 | – |
| Tae Hyung Co., Ltd. | 28 | 0.43% | 20 | 20 | – |
| Samyangplant Co., Ltd. | 323 | 0.60% | 16 | 16 | – |
| Younil Metal Co., Ltd. | 41 | 0.21% | 21 | 21 | – |
| Myungjin Tech Co., Ltd. | 20 | 0.54% | 4 | 4 | – |
| Hankook Machine Tools Co., Ltd. | 719 | 0.14% | 72 | 72 | – |
| Hankook Precision Ind Co., Ltd. | 110 | 0.06% | 11 | 11 | – |
| Borneo International Furniture Co., Ltd. | 64,037 | 0.28% | 97 | 14 | – |
| CJ Paradise Co.,Ltd | 24 | 0.02% | 12 | 12 | – |
| Han Young Technology Company Co.,Ltd. | 35 | 0.00% | – | – | – |
| Jungdo Aluminium Co.,Ltd. | 8,527 | 0.35% | 128 | 128 | – |
| Ilheung Metal Co, Ltd. | 280 | 0.83% | 28 | 28 | – |
| STX Offshore & Shipbuilding Co., Ltd | 8,622 | 0.25% | 1,078 | 1,078 | – |
| Ptotronics Co., Ltd. | 151 | 0.07% | 2 | 2 | – |
| NFT Co., Ltd. | 136 | 0.40% | 8 | 8 | – |
| Echoroba Co.,Ltd. | 157 | 0.02% | 3 | 3 | – |
| Hyundaitech Co.,Ltd. | 1,363 | 0.87% | 27 | 27 | – |
| Eco Alux Co.,Ltd. | 239 | 0.22% | 48 | 48 | – |
| Daekyung Industry Co.,Ltd. | 9,112 | 0.94% | 13 | 13 | – |
| Dasan Material Co.Ltd. | 29 | 0.04% | – | – | – |
| Fish World Co.,Ltd. | 47 | 0.21% | 2 | 2 | – |
| SG Shinsung Engineering and Construction Co., Ltd. | 10 | 0.00% | 6 | 6 | – |
| Samdo Industry Electric Co.,Ltd. | 48 | 0.02% | 1 | 1 | – |
| Taejung Industries Co.,Ltd. | 9,268 | 0.30% | 5 | 5 | – |
| Shinsei Trading Co., Ltd. | 64 | 0.72% | 1 | 1 | – |
| Dynamic Co., Ltd. | 111 | 0.19% | 3 | 3 | – |
| Green Alchemy Co.,Ltd. | 38,202 | 1.48% | 191 | 191 | – |
| IQ Power Asia Inc. | 16,179 | 0.31% | 81 | 81 | – |
| Youone TBM Engineering & Construction Co., Ltd. | 227,854 | 0.27% | 31 | 31 | – |
| KM Leatech | 1,648 | 0.98% | 8 | 8 | – |
| Wonil T&I Co., Ltd. | 229 | 0.17% | 23 | 23 | – |
| Semist Co.,Ltd. | 555 | 0.80% | 3 | 3 | – |
| DS POWER Co., Ltd.(*8) | 580,000 | 2.34% | 2,900 | 1,223 | 1,223 |
| Navanakorn Electric Co., Ltd.(*3) | 4,442,800 | 26.93% | 17,216 | 16,410 | – |
| PT. Kedap Saayq | 671 | 10.00% | 18,540 | – | – |
| Set Holding(*4) | 1,100,220 | 2.50% | 229,255 | 171,242 | 171,242 |
| PT. Cirebon Energi Prasarana | 22,420 | 10.00% | 2,612 | 2,401 | – |
| | | | 522,782 | 425,380 | 387,454 |
| | | ₩ | 888,673 | 699,833 | 661,907 |

F-61

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(*1)   Investments in unlisted equity securities held by the Company for which a quoted market price does not exist in an active market and fair value cannot be measured reliably were measured at cost less impairment, if any.

(*2)   The Company has estimated the fair value of the investment in Construction Guarantee based upon the price which would be applied when the investment is returned. The Company has recognized the difference between its fair value and book value as a gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2017.

(*3)   Although the Company holds more than 20% of the equity shares of these investments, the Company cannot exercise significant influence.

(*4)   The Company has estimated the fair value of Set Holding by using the discounted cash flow method and has recognized the difference between its fair value and book value as gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2017.

(*5)   As of December 31, 2017, the Company invested in ₩285,769 million as beneficiary securities exclusively for payment of decommissioning cost of nuclear power plants. The Company has measured the fair value of the beneficiary securities based on its net asset value.

(*6)   The number of shares owned has changed due to the stock merge (9:7) during the year ended December 31, 2017.

(*7)   The number of shares increased due to the stock split (5:1).

(*8)   As described in note 17, this is reclassified to available-for-sale financial assets due to loss of significant influence of the Company.

**10.   Held-to-maturity Investments**

Held-to-maturity investments as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | | | |
|---|---|---|---|---|---|---|
| | | Beginning balance | Acquisition | Disposal | Others | Ending balance |
| | | | | In millions of won | | |
| Government bonds | ₩ | 3,623 | 149 | (528  ) | – | 3,244 |
| | ₩ | 3,623 | 149 | (528  ) | – | 3,244 |
| Current | ₩ | 380 | – | (380  ) | 114 | 114 |
| Non-current | | 3,243 | 149 | (148  ) | (114  ) | 3,130 |

| | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | | Beginning balance | Acquisition | Disposal | Others | Ending balance |
| | | | | In millions of won | | |
| Government bonds | ₩ | 3,244 | 250 | (350  ) | – | 3,144 |
| | ₩ | 3,244 | 250 | (350  ) | – | 3,144 |
| Current | ₩ | 114 | – | (113  ) | 4 | 5 |
| Non-current | | 3,130 | 250 | (237  ) | (4  ) | 3,139 |

F-62

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**11.  Derivatives**

**(1)  Derivatives as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| **Derivative assets** | | | | | |
| Currency forward | ₩ | 8,370 | 32,806 | 45 | – |
| Currency swap | | 184,913 | 540,057 | 12 | 15,711 |
| Interest rate swap | | – | 4,705 | – | 2,697 |
| Others(*1) | | – | 10,523 | 12,878 | 1,283 |
| | ₩ | 193,283 | 588,091 | 12,935 | 19,691 |
| **Derivative liabilities** | | | | | |
| Currency forward | ₩ | 1,153 | 34 | 7,862 | 1,278 |
| Currency swap | | – | 56,612 | 61,997 | 296,098 |
| Interest rate swap | | 2,098 | 78,789 | 1,408 | 59,416 |
| | ₩ | 3,251 | 135,435 | 71,267 | 356,792 |

(*1)  The Company has a put option to sell shares of DS POWER Co., Ltd, a related party of the Company, and the fair value of the option is recorded in 'Others' .

**(2)  Currency forward contracts which are not designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract Date | Maturity date | Contract amounts | | Contract exchange rate |
|---|---|---|---|---|---|
| | | | Pay | Receive | |
| | | | In millions of won and thousands of foreign currencies | | |
| KEB Hana Bank | 2014.04.10 | 2021.07.12 | 55,120 | USD 52,000 | 1,060.00 |
| KEB Hana Bank | 2014.04.28 | 2021.07.12 | 50,784 | USD 48,000 | 1,058.00 |
| Bank of America | 2014.04.29 | 2021.07.12 | 105,400 | USD 100,000 | 1,054.00 |
| KEB Hana Bank | 2014.05.09 | 2021.07.12 | 104,600 | USD 100,000 | 1,046.00 |
| KEB Hana Bank | 2017.12.22 | 2021.07.12 | 105,079 | USD 100,000 | 1,050.79 |
| Korea Development Bank | 2017.12.27 | 2021.07.12 | 104,849 | USD 100,000 | 1,048.49 |
| CCB | 2017.12.07 | 2018.01.11 | 10,921 | USD 10,000 | 1,092.14 |
| Morgan Stanley | 2017.11.27 | 2018.01.03 | 5,439 | USD 5,000 | 1,087.70 |
| Mizuho Bank | 2017.11.29 | 2018.01.05 | 5,402 | USD 5,000 | 1,080.32 |
| KEB Hana Bank | 2017.11.30 | 2018.01.08 | 5,437 | USD 5,000 | 1,087.35 |
| Mizuho Bank | 2017.12.05 | 2018.01.09 | 5,416 | USD 5,000 | 1,083.20 |
| Nova Scotia | 2017.12.11 | 2018.01.12 | 10,922 | USD 10,000 | 1,092.20 |
| Kookmin Bank | 2017.12.12 | 2018.01.15 | 3,270 | USD 3,000 | 1,090.15 |
| Kookmin Bank | 2017.12.13 | 2018.01.16 | 10,906 | USD 10,000 | 1,090.55 |
| Credit Suisse | 2017.12.14 | 2018.01.17 | 10,858 | USD 10,000 | 1,085.80 |
| Standard Chartered | 2017.12.14 | 2018.01.18 | 10,858 | USD 10,000 | 1,085.80 |
| Morgan Stanley | 2017.12.15 | 2018.01.19 | 10,884 | USD 10,000 | 1,088.39 |
| Nova Scotia | 2017.12.18 | 2018.01.22 | 10,881 | USD 10,000 | 1,088.14 |
| Standard Chartered | 2017.12.20 | 2018.01.22 | 5,413 | USD 5,000 | 1,082.60 |
| Mizuho Bank | 2017.12.21 | 2018.01.26 | 10,802 | USD 10,000 | 1,080.20 |
| Credit Suisse | 2017.12.22 | 2018.01.26 | 10,778 | USD 10,000 | 1,077.75 |
| KEB Hana Bank | 2017.12.28 | 2018.01.29 | 10,716 | USD 10,000 | 1,071.55 |
| CCB | 2017.12.28 | 2018.01.30 | 10,706 | USD 10,000 | 1,070.60 |
| Nova Scotia | 2017.12.29 | 2018.02.05 | 10,679 | USD 10,000 | 1,067.90 |
| Nova Scotia | 2017.12.05 | 2018.01.05 | 2,170 | USD 2,000 | 1,084.92 |
| Nova Scotia | 2017.12.05 | 2018.01.05 | 2,164 | USD 2,000 | 1,082.02 |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Counterparty | Contract Date | Maturity date | Contract amounts | | Contract exchange rate |
| --- | --- | --- | --- | --- | --- |
| | | | Pay | Receive | |
| | | | In millions of won and thousands of foreign currencies | | |
| Nova Scotia | 2017.12.07 | 2018.01.05 | 6,551 | USD 6,000 | 1,091.77 |
| Korea Development Bank | 2017.12.14 | 2018.01.10 | 11,950 | USD 11,000 | 1,086.35 |
| Societe Generale | 2017.12.14 | 2018.01.10 | 10,865 | USD 10,000 | 1,086.45 |
| BTMU | 2017.12.20 | 2018.01.16 | 11,906 | USD 11,000 | 1,082.35 |
| Korea Development Bank | 2017.12.20 | 2018.01.16 | 15,130 | USD 14,000 | 1,080.70 |
| CCB | 2017.12.21 | 2018.01.23 | 11,880 | USD 11,000 | 1,080.00 |
| Korea Development Bank | 2017.12.28 | 2018.01.31 | 11,782 | USD 11,000 | 1,071.10 |
| Nova Scotia | 2017.12.28 | 2018.01.23 | 33,209 | USD 31,000 | 1,071.25 |
| KEB Hana Bank | 2017.12.28 | 2018.01.23 | 10,712 | USD 10,000 | 1,071.15 |
| BTMU | 2017.12.28 | 2018.01.31 | 10,712 | USD 10,000 | 1,071.20 |
| BNP Paribas | 2017.11.15 | 2018.01.17 | 3,713 | USD 3,349 | 1,108.60 |
| Nova Scotia | 2017.11.15 | 2018.01.22 | 8,837 | USD 8,000 | 1,104.60 |
| BTMU | 2017.11.29 | 2018.02.01 | 7,568 | USD 7,000 | 1,081.20 |
| BNP Paribas | 2017.11.29 | 2018.02.01 | 7,557 | USD 7,000 | 1,079.60 |
| Credit Agricole | 2017.12.19 | 2018.01.22 | 5,429 | USD 5,000 | 1,085.75 |
| BTMU | 2017.12.20 | 2018.02.22 | 10,822 | USD 10,000 | 1,082.18 |
| KEB Hana Bank | 2017.12.20 | 2018.01.22 | 2,879 | USD 2,661 | 1,082.00 |
| BNP Paribas | 2017.12.20 | 2018.01.22 | 5,406 | USD 5,000 | 1,081.10 |
| Nonghyup Bank | 2017.12.21 | 2018.01.23 | 6,467 | USD 6,000 | 1,077.90 |
| Nova Scotia | 2017.12.27 | 2018.01.29 | 5,366 | USD 5,000 | 1,073.15 |
| Nova Scotia | 2017.12.27 | 2018.01.05 | 5,373 | USD 5,000 | 1,074.50 |
| KEB Hana Bank | 2017.11.23 | 2018.01.11 | 9,237 | USD 8,500 | 1,086.76 |
| Standard Chartered | 2017.12.13 | 2018.01.15 | 5,454 | USD 5,000 | 1,090.70 |
| Standard Chartered | 2017.12.08 | 2018.01.25 | 10,921 | USD 10,000 | 1,092.05 |
| Standard Chartered | 2017.10.31 | 2018.02.21 | 5,610 | USD 5,000 | 1,122.00 |
| Standard Chartered | 2017.11.29 | 2018.02.12 | 7,572 | USD 7,000 | 1,081.65 |
| Nova Scotia | 2017.12.20 | 2018.03.22 | 3,978 | USD 3,682 | 1,080.55 |
| Nova Scotia | 2017.12.20 | 2018.03.22 | 5,399 | USD 5,000 | 1,079.75 |
| Nova Scotia | 2017.12.20 | 2018.03.22 | 5,393 | USD 5,000 | 1,078.55 |
| Nova Scotia | 2017.12.20 | 2018.03.22 | 5,393 | USD 5,000 | 1,078.65 |
| Nova Scotia | 2017.12.14 | 2018.03.19 | 205 | USD 189 | 1,084.50 |
| Standard Chartered | 2017.12.19 | 2018.03.21 | 3,164 | USD 2,918 | 1,084.20 |
| Societe Generale | 2017.12.19 | 2018.03.21 | 1,177 | USD 1,087 | 1,082.90 |
| Societe Generale | 2017.12.19 | 2018.03.21 | 5,418 | USD 5,000 | 1,083.60 |
| Societe Generale | 2017.12.19 | 2018.03.21 | 5,421 | USD 5,000 | 1,084.20 |
| BNP Paribas | 2017.12.19 | 2018.03.21 | 5,413 | USD 5,000 | 1,082.60 |
| BNP Paribas | 2017.12.19 | 2018.03.21 | 5,419 | USD 5,000 | 1,083.70 |
| BNP Paribas | 2017.12.19 | 2018.03.21 | 5,422 | USD 5,000 | 1,084.30 |
| Nova Scotia | 2017.12.19 | 2018.03.21 | 5,427 | USD 5,000 | 1,085.40 |
| Nova Scotia | 2017.12.19 | 2018.03.21 | 5,430 | USD 5,000 | 1,085.90 |
| Nova Scotia | 2017.12.14 | 2018.03.19 | 5,428 | USD 5,000 | 1,085.50 |
| Standard Chartered | 2017.12.14 | 2018.03.19 | 5,428 | USD 5,000 | 1,085.50 |
| Nova Scotia | 2017.11.21 | 2018.02.26 | 5,266 | USD 4,826 | 1,091.10 |
| Nova Scotia | 2017.11.21 | 2018.02.26 | 5,461 | USD 5,000 | 1,092.10 |
| Nova Scotia | 2017.11.15 | 2018.02.21 | 1,755 | USD 1,587 | 1,106.10 |
| Nova Scotia | 2017.11.15 | 2018.02.21 | 5,536 | USD 5,000 | 1,107.10 |
| Nova Scotia | 2017.11.15 | 2018.02.21 | 4,462 | USD 4,027 | 1,108.10 |
| Nova Scotia | 2017.10.31 | 2018.02.06 | 711 | USD 638 | 1,112.80 |
| Nova Scotia | 2017.10.31 | 2018.02.05 | 194 | USD 173 | 1,117.80 |
| Nova Scotia | 2017.10.31 | 2018.02.05 | 5,594 | USD 5,000 | 1,118.80 |
| Nova Scotia | 2017.10.31 | 2018.02.02 | 5,604 | USD 5,000 | 1,120.80 |
| Nova Scotia | 2017.10.31 | 2018.02.02 | 5,599 | USD 5,000 | 1,119.80 |
| Nomura | 2017.10.31 | 2018.02.02 | 5,602 | USD 5,000 | 1,120.40 |

F-64

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

ో

Table of Contents

**(4)    Currency swap contracts which are designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract year | Contract amount | | Contract interest rate | | Contract exchange rate |
| --- | --- | --- | --- | --- | --- | --- |
| | | Pay | Receive | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | | |
| Citibank | 2013~2018 | 54,570 | USD 50,000 | 2.90% | 3M Libor+1.01% | 1,091.40 |
| Standard Chartered | 2013~2018 | 54,570 | USD 50,000 | 2.90% | 3M Libor+1.01% | 1,091.40 |
| Credit Suisse | 2013~2018 | 111,410 | USD 100,000 | 3.22% | 3M Libor+1.50% | 1,114.10 |
| HSBC | 2014~2020 | 99,901 | AUD 100,000 | 3.52% | 5.75% | 999.01 |
| HSBC | 2014~2020 | 100,482 | AUD 100,000 | 3.48% | 5.75% | 1,004.82 |
| Standard Chartered | 2013~2020 | USD 117,250 | AUD 125,000 | 3M Libor+1.25% | 5.75% | 0.94 |
| Standard Chartered | 2014~2020 | 126,032 | USD 117,250 | 3.55% | 3M Libor+1.25% | 1,074.90 |
| Korea Development Bank | 2017~2020 | 114,580 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| KEB Hana Bank | 2017~2020 | 114,580 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| Export-import bank of Korea | 2017~2020 | 114,580 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| JP Morgan | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Morgan Stanley | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Deutsche Bank | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Korea Development Bank | 2016~2021 | 121,000 | USD 100,000 | 2.15% | 2.50% | 1,210.00 |
| Morgan Stanley | 2016~2021 | 121,000 | USD 100,000 | 3M Libor+2.10% | 2.50% | 1,210.00 |
| BNP Paribas | 2016~2021 | 121,000 | USD 100,000 | 3M Libor+2.10% | 2.50% | 1,210.00 |
| Nomura | 2017~2037 | 52,457 | EUR 40,000 | 2.60% | 1.70% | 1,311.42 |
| Nomura | 2017~2037 | 59,423 | SEK 450,000 | 2.62% | 2.36% | 132.05 |
| Credit Agricole | 2013~2019 | 118,343 | CHF 100,000 | 3.47% | 1.63% | 1,183.43 |
| Morgan Stanley | 2013~2019 | 59,172 | CHF 50,000 | 3.40% | 1.63% | 1,183.43 |
| Nomura | 2013~2019 | 59,172 | CHF 50,000 | 3.47% | 1.63% | 1,183.43 |
| Morgan Stanley | 2013~2018 | 107,360 | USD 100,000 | 3.27% | 2.88% | 1,073.60 |
| Credit Agricole | 2013~2018 | 107,360 | USD 100,000 | 3.34% | 2.88% | 1,073.60 |
| JP Morgan | 2013~2018 | 161,040 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| Standard Chartered | 2013~2018 | 161,040 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| Standard Chartered | 2014~2019 | 104,490 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| Credit Agricole | 2014~2019 | 104,490 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| Morgan Stanley | 2014~2019 | 104,490 | USD 100,000 | 2.70% | 2.63% | 1,044.90 |
| Standard Chartered | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Credit Agricole | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Deutsche Bank | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Citibank | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Societe Generale | 2013~2018 | 106,190 | USD 100,000 | 3.48% | 2.63% | 1,061.90 |
| BNP Paribas | 2013~2018 | 53,095 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| KEB Hana Bank | 2013~2018 | 53,095 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| Standard Chartered | 2013~2018 | 106,030 | USD 100,000 | 3.48% | 2.63% | 1,060.30 |
| BNP Paribas | 2013~2018 | 53,015 | USD 50,000 | 3.48% | 2.63% | 1,060.30 |
| KEB Hana Bank | 2013~2018 | 31,809 | USD 30,000 | 3.48% | 2.63% | 1,060.30 |
| Societe Generale | 2013~2018 | 21,206 | USD 20,000 | 3.48% | 2.63% | 1,060.30 |
| HSBC | 2013~2018 | 53,015 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| Nomura | 2013~2018 | 53,015 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| Credit Agricole | 2014~2020 | 110,680 | USD 100,000 | 2.29% | 2.50% | 1,106.80 |
| Societe Generale | 2014~2020 | 55,340 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| KEB Hana Bank | 2014~2020 | 55,340 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| KEB Hana Bank | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| Standard Chartered | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| HSBC | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| Nomura | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| BNP Paribas | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |

F-66

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Counterparty | Contract year | Contract amount | | Contract interest rate | | Contract exchange rate |
|---|---|---|---|---|---|---|
| | | Pay | Receive | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | | |
| HSBC | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| KEB Hana Bank | 2017~2022 | 226,600 | USD 200,000 | 1.94% | 2.63% | 1,133.00 |
| Korea Development Bank | 2017~2022 | 113,300 | USD 100,000 | 1.94% | 2.63% | 1,133.00 |
| Nomura | 2017~2022 | 113,300 | USD 100,000 | 1.95% | 2.63% | 1,133.00 |
| Woori Bank | 2017~2022 | 56,650 | USD 50,000 | 1.95% | 2.63% | 1,133.00 |
| Kookmin Bank | 2017~2022 | 56,650 | USD 50,000 | 1.95% | 2.63% | 1,133.00 |

**(5)    Interest rate swap contracts which are not designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract year | Contract amount | Contract interest rate per annum | |
|---|---|---|---|---|
| | | | Pay | Receive |
| | | In millions of won | | |
| JP Morgan | 2013~2018 | ₩150,000 | 3.58% | 3M CD+0.31% |
| Credit Suisse | 2014~2018 | 25,000 | 2.98% | 1Y CMT+0.31% |
| KEB Hana Bank | 2017~2022 | 100,000 | 2.01% | 3M CD+0.24% |
| KEB Hana Bank | 2017~2022 | 100,000 | 2.06% | 3M CD+0.27% |
| Nomura(*1) | 2017~2037 | 30,000 | 2.05% | 3.08% |
| KEB Hana Bank | 2017~2021 | 200,000 | 2.45% | 3M CD+0.32% |
| Export-import bank of Korea | 2015~2031 | USD 15,893 | 2.67% | 6M USD Libor |
| ING Bank | 2015~2031 | USD 7,861 | 2.67% | 6M USD Libor |
| BNP Paribas | 2015~2031 | USD 7,861 | 2.67% | 6M USD Libor |

(*1)   2.05% of the contract interest rate for paying is applied for five years from the date of issuance, and 3M CD + 0.10% is applied thereafter.

**(6)    Interest rate swap contracts which are designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract year | Contract amount | Contract interest rate per annum | |
|---|---|---|---|---|
| | | | Pay | Receive |
| | | In millions of won | | |
| BNP Paribas | 2009~2027 | USD 92,120 | 4.16% | 6M USD Libor |
| KFW | 2009~2027 | USD 92,120 | 4.16% | 6M USD Libor |
| Credit Agricole | 2016~2033 | USD 96,297 | 3.98% ~ 4.10% | 6M USD Libor |
| SMBC | 2016~2033 | USD 125,927 | 4.05% ~ 4.18% | 6M USD Libor |
| Mizuho Bank | 2016~2019 | USD 36,890 | 1.56% | 1.35% |
| SMBC | 2016~2019 | USD 36,890 | 1.56% | 1.35% |

F-67

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(7)** **Gain and loss on valuation and transaction of derivatives for the years ended December 31, 2016 and 2017 are as follows and included in finance income and costs in the consolidated statements of comprehensive income (loss):**

| | | Net income effects of valuation gain (loss) | | | Net income effects of transaction gain (loss) | | | Accumulated other comprehensive income (loss) (*) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 |
| | | | | | In millions of won | | | | | |
| Currency forward | ₩ | 357 | 15,993 | (41,889 ) | 8,523 | 4,266 | (28,223 ) | – | – | – |
| Currency swap | | 431,565 | 253,035 | (843,747 ) | 75,752 | (68,266 ) | (137,376 ) | (6,926 ) | 40,031 | 26,810 |
| Interest rate swap | | 161,609 | 8,517 | 6,909 | 30,314 | 7,562 | (3,362 ) | 4,082 | 6,719 | 5,074 |
| Other derivatives | | – | 10,523 | 4,060 | – | – | – | – | – | – |
| | ₩ | 593,531 | 288,068 | (874,667 ) | 114,589 | (56,438 ) | (168,961 ) | (2,844 ) | 46,750 | 31,884 |

(*) For the year ended December 31, 2017, the net gain on valuation of derivatives applying cash flow hedge accounting of ₩20,868 million, net of tax, is included in other comprehensive income or loss.

**12.    Other Financial Assets**

**(1)    Other financial assets as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| Loans and receivables | ₩ | 198,133 | 683,353 | 244,309 | 711,069 |
| Allowance for doubtful accounts | | – | (4,532 ) | – | (8,948 ) |
| Present value discount | | (1,001 ) | (41,746 ) | (976 ) | (39,813 ) |
| Long / short-term financial instruments | | 2,281,460 | 414,466 | 1,702,084 | 542,430 |
| Financial assets at fair value through profit or loss | | – | – | – | 111,512 |
| | ₩ | 2,478,592 | 1,051,541 | 1,945,417 | 1,316,250 |

**(2)    Loans and receivables as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | |
|---|---|---|---|---|---|
| | | Face value | Allowance for doubtful accounts | Present value discount | Book value |
| | | In millions of won | | | |
| **Short-term loans and receivables** | | | | | |
| Loans for tuition | ₩ | 29,028 | – | (1,001 ) | 28,027 |
| Loans for housing | | 12,556 | – | – | 12,556 |
| Fisheries loan | | 352 | – | – | 352 |
| Other loans | | 156,197 | – | – | 156,197 |
| | | 198,133 | – | (1,001 ) | 197,132 |
| **Long-term loans and receivables** | | | | | |
| Loans for tuition | | 404,200 | – | (41,593 ) | 362,607 |
| Loans for housing | | 125,850 | – | – | 125,850 |
| Loans for related parties | | 91,249 | (4,532 ) | – | 86,717 |
| Fisheries loan | | 1,312 | – | (153 ) | 1,159 |
| Other loans | | 60,742 | – | – | 60,742 |
| | | 683,353 | (4,532 ) | (41,746 ) | 637,075 |
| | ₩ | 881,486 | (4,532 ) | (42,747 ) | 834,207 |

F-68

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | | 2017 | | | |
|---|---|---|---|---|---|
| | | Face value | Allowance for doubtful accounts | Present value discount | Book value |
| | | | In millions of won | | |
| **Short-term loans and receivables** | | | | | |
| Loans for tuition | ₩ | 33,763 | – | (976 ) | 32,787 |
| Loans for housing | | 14,126 | – | – | 14,126 |
| Fisheries loan | | 352 | – | – | 352 |
| Other loans | | 196,068 | – | – | 196,068 |
| | | 244,309 | – | (976 ) | 243,333 |
| **Long-term loans and receivables** | | | | | |
| Loans for tuition | | 408,803 | – | (39,716 ) | 369,087 |
| Loans for housing | | 140,452 | – | – | 140,452 |
| Loans for related parties | | 94,581 | (8,948 ) | – | 85,633 |
| Fisheries loan | | 960 | – | (97 ) | 863 |
| Other loans | | 66,273 | – | – | 66,273 |
| | | 711,069 | (8,948 ) | (39,813 ) | 662,308 |
| | ₩ | 955,378 | (8,948 ) | (40,789 ) | 905,641 |

(3)  **Changes in the allowance for doubtful accounts of loans and receivables for the year ended December 31, 2017 is as follows:**

| | | 2017 |
|---|---|---|
| | | In millions of won |
| **Beginning balance** | ₩ | 4,532 |
| Bad debt expense | | 2,465 |
| Other | | 1,951 |
| **Ending balance** | ₩ | 8,948 |

(4)  **Long-term and short-term financial instruments as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Current | Non-current | Current | Non-current |
| | | | In millions of won | | |
| Time deposits | ₩ | 1,820,391 | 30,000 | 1,479,034 | 2 |
| ABCP | | 351,800 | 132,600 | 145,000 | 65,600 |
| CP | | 16,000 | – | 58,050 | – |
| CD | | 60,443 | – | 10,000 | – |
| RP | | – | 1,521 | 10,000 | 1,634 |
| Others | | 32,826 | 250,345 | – | 475,194 |
| | ₩ | 2,281,460 | 414,466 | 1,702,084 | 542,430 |

F-69

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**13.  Inventories**

Inventories as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | |
|---|---|---|---|---|
| | | Acquisition cost | Valuation allowance | Book value |
| | | | In millions of won | |
| Raw materials | ₩ | 3,182,711 | (1,323 ) | 3,181,388 |
| Merchandise | | 20 | – | 20 |
| Work-in-progress | | 118,640 | – | 118,640 |
| Finished goods | | 57,659 | – | 57,659 |
| Supplies | | 1,289,160 | (4,553 ) | 1,284,607 |
| Inventories in transit | | 827,437 | – | 827,437 |
| Other inventories | | 9,692 | – | 9,692 |
| | ₩ | 5,485,319 | (5,876 ) | 5,479,443 |

| | | 2017 | | |
|---|---|---|---|---|
| | | Acquisition cost | Valuation allowance | Book value |
| | | | In millions of won | |
| Raw materials | ₩ | 3,528,835 | (2,829 ) | 3,526,006 |
| Merchandise | | 107 | – | 107 |
| Work-in-progress | | 138,709 | (1,028 ) | 137,681 |
| Finished goods | | 72,923 | (1,517 ) | 71,406 |
| Supplies | | 1,581,661 | (3,940 ) | 1,577,721 |
| Inventories in transit | | 679,358 | – | 679,358 |
| Other inventories | | 9,807 | – | 9,807 |
| | ₩ | 6,011,400 | (9,314 ) | 6,002,086 |

The allowance for loss on inventory valuation due to decrease in the net realizable value of inventory added to cost of sales was ₩533 million for the year ended December 31, 2015. The reversals of the allowance for loss on inventory valuation due to increase in the net realizable value of inventory deducted from cost of sales were ₩2,473 million and ₩437 million for the years ended December 31, 2016 and 2017, respectively.

The amounts of loss from inventory valuation included in other gains or losses for the years ended December 31, 2015, 2016 and 2017 were ₩1,318 million, ₩2,683 million and ₩3,875 million, respectively.

**14.  Finance Lease Receivables**

**(1)  Finance lease contracts**

The Company entered into a power purchase agreement ("PPA") with Jordan Electric Power Company to provide a 373MW level Qatrana gas combined power plant over a 25 year lease term, and accounts for the PPA as a finance lease. Also, the Company has fly-ash pipe conduit finance leases with an average lease term of 7 years. In addition, the Company entered into a PPA with the Comision Federal de Electricidad in Mexico to provide for 25 years (December 2013 to November 2038) of all electricity generated from the power plant after completion of its construction and collect rates consisting of fixed costs (to recover the capital) and variable costs during the contracted period.

F-70

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)    Finance lease receivables as of December 31, 2016 and 2017 are as follows and included in current and non-current trade and other receivables, net, in the consolidated statements of financial position:

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Minimum lease payments | Present value of minimum lease payments | Minimum lease payments | Present value of minimum lease payments |
| | | In millions of won | | | |
| Less than 1 year | ₩ | 55,708 | 12,225 | 49,542 | 13,067 |
| 1 ~ 5 years | | 423,152 | 214,176 | 381,181 | 203,990 |
| More than 5 years | | 1,690,492 | 746,473 | 1,398,449 | 645,564 |
| | ₩ | 2,169,352 | 972,874 | 1,829,172 | 862,621 |

(3)    There are no impaired finance lease receivables as of December 31, 2016 and 2017.

15.    Non-Financial Assets

Non-financial assets as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| Advance payment | ₩ | 93,279 | 71,238 | 109,743 | 43,872 |
| Prepaid expenses | | 228,142 | 78,066 | 251,715 | 90,118 |
| Others(*1) | | 310,439 | 32,485 | 392,534 | 112,828 |
| | ₩ | 631,860 | 181,789 | 753,992 | 246,818 |

(*1)    Details of others as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| Tax refund receivables | ₩ | 30,959 | 2,188 | 89,762 | 1,940 |
| Greenhouse gas emissions rights | | 145,105 | – | 135,211 | – |
| Other quick assets(*2) | | 134,375 | 30,297 | 167,561 | 110,888 |
| | ₩ | 310,439 | 32,485 | 392,534 | 112,828 |

(*2)    The Company has recognized ₩92,128 million of shares in Orano Expansion (formerly, AREVA NC Expansion) as non-current non-financial assets.

F-71

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**16.    Consolidated Subsidiaries**

**(1)    Consolidated subsidiaries as of December 31, 2016 and 2017 are as follows:**

| Subsidiaries | Key operation activities | Location | Percentage of ownership (%) | | | |
|---|---|---|---|---|---|---|
| | | | 2016 | | 2017 | |
| Korea Hydro & Nuclear Power Co., Ltd. | Power generation | KOREA | 100.00 | % | 100.00 | % |
| Korea South-East Power Co., Ltd. | Power generation | KOREA | 100.00 | % | 100.00 | % |
| Korea Midland Power Co., Ltd. | Power generation | KOREA | 100.00 | % | 100.00 | % |
| Korea Western Power Co., Ltd. | Power generation | KOREA | 100.00 | % | 100.00 | % |
| Korea Southern Power Co., Ltd. | Power generation | KOREA | 100.00 | % | 100.00 | % |
| Korea East-West Power Co., Ltd. | Power generation | KOREA | 100.00 | % | 100.00 | % |
| KEPCO Engineering & Construction Company, Inc.(*1) | Architectural engineering for utility plant and others | KOREA | 65.77 | % | 65.77 | % |
| KEPCO Plant Service & Engineering Co., Ltd. | Utility plant maintenance and others | KOREA | 51.00 | % | 51.00 | % |
| KEPCO Nuclear Fuel Co., Ltd. | Nuclear fuel | KOREA | 96.36 | % | 96.36 | % |
| KEPCO KDN Co., Ltd. | Electric power information technology and others | KOREA | 100.00 | % | 100.00 | % |
| Garolim Tidal Power Plant Co., Ltd.(*2) | Power generation | KOREA | 49.00 | % | 49.00 | % |
| KEPCO International HongKong Ltd. | Holding company | HONG KONG | 100.00 | % | 100.00 | % |
| KEPCO International Philippines Inc. | Holding company | PHILIPPINES | 100.00 | % | 100.00 | % |
| KEPCO Gansu International Ltd. | Holding company | HONG KONG | 100.00 | % | 100.00 | % |
| KEPCO Philippines Holdings Inc. | Holding company | PHILIPPINES | 100.00 | % | 100.00 | % |
| KEPCO Philippines Corporation | Operation of utility plant | PHILIPPINES | 100.00 | % | 100.00 | % |
| KEPCO Ilijan Corporation | Construction and operation of utility plant | PHILIPPINES | 51.00 | % | 51.00 | % |
| KEPCO Lebanon SARL | Operation of utility plant | LEBANON | 100.00 | % | 100.00 | % |
| KEPCO Neimenggu International Ltd. | Holding company | HONG KONG | 100.00 | % | 100.00 | % |
| KEPCO Shanxi International Ltd. | Holding company | HONG KONG | 100.00 | % | 100.00 | % |
| KOMIPO Global Pte Ltd. | Holding company | SINGAPORE | 100.00 | % | 100.00 | % |
| KEPCO Canada Energy Ltd. | Resources development | CANADA | 100.00 | % | 100.00 | % |
| KEPCO Netherlands B.V. | Holding company | NETHERLANDS | 100.00 | % | 100.00 | % |
| KOREA Imouraren Uranium Investment Corp. | Holding company | FRANCE | 100.00 | % | 100.00 | % |
| KEPCO Australia Pty., Ltd. | Resources development | AUSTRALIA | 100.00 | % | 100.00 | % |
| KOSEP Australia Pty., Ltd. | Resources development | AUSTRALIA | 100.00 | % | 100.00 | % |
| KOMIPO Australia Pty., Ltd. | Resources development | AUSTRALIA | 100.00 | % | 100.00 | % |
| KOWEPO Australia Pty., Ltd. | Resources development | AUSTRALIA | 100.00 | % | 100.00 | % |
| KOSPO Australia Pty., Ltd. | Resources development | AUSTRALIA | 100.00 | % | 100.00 | % |
| KEPCO Middle East Holding Company | Holding company | BAHRAIN | 100.00 | % | 100.00 | % |
| Qatrana Electric Power Company | Construction and operation of utility plant | JORDAN | 80.00 | % | 80.00 | % |
| KHNP Canada Energy, Ltd. | Holding company | CANADA | 100.00 | % | 100.00 | % |
| KEPCO Bylong Australia Pty., Ltd. | Resources development | AUSTRALIA | 100.00 | % | 100.00 | % |
| Korea Waterbury Uranium Limited Partnership | Resources development | CANADA | 79.64 | % | 79.64 | % |
| Korea Electric Power Nigeria Ltd. | Operation of utility plant | NIGERIA | 100.00 | % | 100.00 | % |
| KEPCO Holdings de Mexico | Holding company | MEXICO | 100.00 | % | 100.00 | % |
| KST Electric Power Company | Construction and operation of utility plant | MEXICO | 56.00 | % | 56.00 | % |
| KEPCO Energy Service Company | Operation of utility plant | MEXICO | 100.00 | % | 100.00 | % |
| KEPCO Netherlands S3 B.V. | Holding company | NETHERLANDS | 100.00 | % | 100.00 | % |
| PT. KOMIPO Pembangkitan Jawa Bali | Operation of utility plant | INDONESIA | 51.00 | % | 51.00 | % |
| PT. Cirebon Power Service(*2) | Operation of utility plant | INDONESIA | 27.50 | % | 27.50 | % |
| KOWEPO International Corporation | Operation of utility plant | PHILIPPINES | 99.99 | % | 99.99 | % |
| KOSPO Jordan LLC | Operation of utility plant | JORDAN | 100.00 | % | 100.00 | % |

F-72

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

**Table of Contents**

| Subsidiaries | Key operation activities | Location | Percentage of ownership (%) | | | |
|---|---|---|---|---|---|---|
| | | | 2016 | | 2017 | |
| EWP Philippines Corporation | Holding company | PHILIPPINES | 100.00 | % | 100.00 | % |
| EWP America Inc. | Holding company | USA | 100.00 | % | 100.00 | % |
| EWP Renewable Corporation | Holding company | USA | 100.00 | % | 100.00 | % |
| DG Fairhaven Power, LLC | Power generation | USA | 100.00 | % | 100.00 | % |
| DG Whitefield, LLC | Power generation | USA | 100.00 | % | 100.00 | % |
| Springfield Power, LLC | Power generation | USA | 100.00 | % | 100.00 | % |
| KNF Canada Energy Limited | Holding company | CANADA | 96.36 | % | 96.36 | % |
| PT KEPCO Resource Indonesia | Holding company | INDONESIA | 100.00 | % | 100.00 | % |
| EWP Barbados 1 SRL | Holding company | BARBADOS | 100.00 | % | 100.00 | % |
| California Power Holdings, LLC | Power generation | USA | 100.00 | % | 100.00 | % |
| Gyeonggi Green Energy Co., Ltd. | Power generation | KOREA | 62.01 | % | 62.01 | % |
| PT. Tanggamus Electric Power | Power generation | INDONESIA | 52.50 | % | 52.50 | % |
| Gyeongju Wind Power Co., Ltd. | Power generation | KOREA | 70.00 | % | 70.00 | % |
| KOMIPO America Inc. | Holding company | USA | 100.00 | % | 100.00 | % |
| EWPRC Biomass Holdings, LLC | Holding company | USA | 100.00% | | 100.00% | |
| KOSEP USA, INC. | Power generation | USA | 100.00% | | 100.00% | |
| PT. EWP Indonesia | Holding company | INDONESIA | 99.95% | | 99.96% | |
| KEPCO Netherlands J3 B.V. | Holding company | NETHERLANDS | 100.00% | | 100.00% | |
| Korea Offshore Wind Power Co., Ltd. | Power generation | KOREA | 100.00% | | 100.00% | |
| Global One Pioneer B.V. | Holding company | NETHERLANDS | 100.00% | | 100.00% | |
| Global Energy Pioneer B.V. | Holding company | NETHERLANDS | 100.00% | | 100.00% | |
| Mira Power Limited(*3) | Power generation | PAKISTAN | 76.00% | | 76.00% | |
| KOSEP Material Co., Ltd.(*4) | Recycling fly ashes | KOREA | 46.22% | | 86.22% | |
| Commerce and Industry Energy Co., Ltd.(*5) | Power generation | KOREA | 59.03% | | 59.03% | |
| KEPCO Singapore Holdings Pte., Ltd. | Holding company | SINGAPORE | 100.00% | | 100.00% | |
| KOWEPO India Private Limited | Holding company | INDIA | 100.00% | | 100.00% | |
| KEPCO KPS Philippines Corp. | Utility plant maintenance and others | PHILIPPINES | 51.00% | | 51.00% | |
| KOSPO Chile SpA | Holding company | CHILE | 100.00% | | 100.00% | |
| PT. KOWEPO Sumsel Operation And Maintenance Services | Utility plant maintenance and others | INDONESIA | 95.00% | | 95.00% | |
| HeeMang Sunlight Power Co., Ltd. | Operation of utility plant | KOREA | 100.00% | | 100.00% | |
| Fujeij Wind Power Company | Operation of utility plant | JORDAN | 100.00% | | 100.00% | |
| KOSPO Youngnam Power Co., Ltd. | Operation of utility plant | KOREA | 50.00% | | 50.00% | |
| HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) | Holding company | KOREA | 96.67% | | 96.67% | |
| Chitose Solar Power Plant LLC | Power generation | JAPAN | 80.10% | | 80.10% | |
| KEPCO Energy Solution Co. Ltd. | Energy service | KOREA | 100.00% | | 100.00% | |
| Solar School Plant Co., Ltd. | Power generation | KOREA | 100.00% | | 100.00% | |
| KOSPO Power Services Limitada | Utility plant maintenance and others | CHILE | 65.00% | | 65.00% | |
| Energy New Industry Specialized Investment Private Investment Trust | Holding company | KOREA | 99.75% | | 99.75% | |
| KOEN Bylong Pty., Ltd. | Resources development | AUSTRALIA | 100.00% | | 100.00% | |
| KOMIPO Bylong Pty., Ltd. | Resources development | AUSTRALIA | 100.00% | | 100.00% | |
| KOWEPO Bylong Pty., Ltd. | Resources development | AUSTRALIA | 100.00% | | 100.00% | |
| KOSPO Bylong Pty., Ltd. | Resources development | AUSTRALIA | 100.00% | | 100.00% | |
| EWP Bylong Pty., Ltd. | Resources development | AUSTRALIA | 100.00% | | 100.00% | |
| KOWEPO Lao International | Utility plant maintenance and others | LAOS | 100.00% | | 100.00% | |
| KEPCO US Inc. | Holding company | USA | – | | 100.00% | |
| KEPCO Alamosa LLC | Holding company | USA | – | | 50.10% | |
| Cogentrix Solar Services, LLC | Holding company | USA | – | | 50.10% | |
| Solar Investments I, LLC | Holding company | USA | – | | 50.10% | |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Subsidiaries | Key operation activities | Location | Percentage of ownership (%) | |
|---|---|---|---|---|
| | | | 2016 | 2017 |
| Cogentrix of Alamosa, LLC | Power generation | USA | – | 50.10% |
| KEPCO-LG CNS Mangilao Holdings LLC | Holding company | USA | – | 70.00% |
| Mangilao Investment LLC | Holding company | USA | – | 70.00% |
| KEPCO-LG CNS Mangilao Solar, LLC | Power generation | USA | – | 70.00% |
| Jeju Hanlim Offshore Wind Co., Ltd. | Power generation | KOREA | – | 70.22% |
| PT. Siborpa Eco Power | Construction and operation of utility plant | INDONESIA | – | 64.71% |
| BSK E-New Industry Fund VII | Holding company | KOREA | – | 81.47% |
| e-New Industry LB Fund 1 | Holding company | KOREA | – | 75.92% |
| Songhyun e-New Industry Fund | Holding company | KOREA | – | 80.45% |

(*1)   Considering treasury stocks, the effective percentage of ownership is 66.08%.

(*2)   These subsidiaries are included in the consolidated financial statements as the Company obtained the majority of the voting power through the shareholders' agreement.

(*3)   As of reporting date, the annual reporting period of all subsidiaries is December 31, except for Mira Power Limited which is November 30.

(*4)   The effective percentage of ownership has increased to 86.22% since Long Lasting Value exercised the put option to sell its investment to KOSEP during the year ended December 31, 2017.

(*5)   The Company guarantees a certain return on investment related to Commerce and Industry Energy Co., Ltd. for the financial investors. The financial investors have a right to sell their shares to the Company which can be exercised 84 months after the date of investment. Accordingly, the purchase price including the return on investment is classified as a liability.

**(2)   Subsidiaries newly included in or excluded from consolidation for the year ended December 31, 2017 are as follows:**

Subsidiaries included in consolidation during the year ended December 31, 2017.

| Subsidiary | Reason |
|---|---|
| KEPCO US Inc. | Newly established |
| KEPCO Alamosa LLC | Newly established |
| Cogentrix Solar Services, LLC | Newly established |
| Solar Investments I, LLC | Newly established |
| Cogentrix of Alamosa, LLC | Newly established |
| KEPCO-LG CNS Mangilao Holdings LLC | Newly established |
| Mangilao Investment LLC | Newly established |
| KEPCO-LG CNS Mangilao Solar, LLC | Newly established |
| Jeju Hanlim Offshore Wind Co., Ltd. | Newly established |
| PT. Siborpa Eco Power | Newly established |
| BSK E-New Industry Fund VII | Newly established |
| e-New Industry LB Fund 1 | Newly established |
| Songhyun e-New Industry Fund | Newly established |

There are no subsidiaries excluded from consolidation during the year ended December 31, 2017.

F-74

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(3)    **Summary of financial information of consolidated subsidiaries as of and for the years ended December 31, 2016 and 2017 are as follows:**

|  | 2016 | | | |
|---|---|---|---|---|
| **Subsidiaries** | **Total assets** | **Total liabilities** | **Sales** | **Profit (loss) for the period** |
|  | In millions of won | | | |
| Korea Hydro & Nuclear Power Co., Ltd. | ₩ 52,782,915 | 27,366,938 | 11,168,579 | 2,454,810 |
| Korea South-East Power Co., Ltd. | 9,773,778 | 4,794,330 | 5,093,598 | 531,061 |
| Korea Midland Power Co., Ltd. | 9,066,666 | 5,416,336 | 3,719,981 | 400,696 |
| Korea Western Power Co., Ltd. | 9,810,714 | 5,866,916 | 4,169,712 | 401,936 |
| Korea Southern Power Co., Ltd. | 9,806,023 | 5,637,950 | 4,200,035 | 426,337 |
| Korea East-West Power Co., Ltd. | 8,967,951 | 4,488,911 | 4,210,898 | 467,603 |
| KEPCO Engineering & Construction Company, Inc. | 786,596 | 364,676 | 506,012 | 17,796 |
| KEPCO Plant Service & Engineering Co., Ltd. | 1,086,421 | 301,490 | 1,214,304 | 86,657 |
| KEPCO Nuclear Fuel Co., Ltd. | 713,230 | 346,012 | 309,911 | 33,115 |
| KEPCO KDN Co., Ltd. | 519,901 | 205,869 | 588,160 | 43,127 |
| Garolim Tidal Power Plant Co., Ltd. | 632 | 346 | – | -24 |
| KEPCO International HongKong Ltd. | 173,138 | 41 | – | 4,532 |
| KEPCO International Philippines Inc. | 114,141 | 1,468 | – | 56,783 |
| KEPCO Gansu International Ltd. | 17,928 | 557 | – | (18 ) |
| KEPCO Philippines Holdings Inc. | 125,100 | 27 | – | 13,517 |
| KEPCO Philippines Corporation | 13,704 | 8,949 | – | (8,717 ) |
| KEPCO Ilijan Corporation | 558,030 | 58,449 | 116,667 | 51,552 |
| KEPCO Lebanon SARL | 1,458 | 10,312 | – | 810 |
| KEPCO Neimenggu International Ltd. | 186,636 | – | – | 7,082 |
| KEPCO Shanxi International Ltd. | 549,189 | 218,047 | – | 5,812 |
| KOMIPO Global Pte Ltd. | 223,082 | 1,095 | – | 36,764 |
| KEPCO Canada Energy Ltd. | 202 | 24 | – | (27,216 ) |
| KEPCO Netherlands B.V. | 128,014 | 35 | – | 224 |
| KOREA Imouraren Uranium Investment Corp. | 154,302 | 764 | – | (68,417 ) |
| KEPCO Australia Pty., Ltd. | 503,657 | 1,545 | 3,670 | (19,006 ) |
| KOSEP Australia Pty., Ltd. | 25,174 | 521 | 5,357 | 4,028 |
| KOMIPO Australia Pty., Ltd. | 25,413 | 10 | 5,388 | 4,023 |
| KOWEPO Australia Pty., Ltd. | 25,550 | 10 | 5,357 | 4,012 |
| KOSPO Australia Pty., Ltd. | 25,625 | 10 | 5,357 | 4,033 |
| KEPCO Middle East Holding Company | 128,846 | 125,008 | – | 6,840 |
| Qatrana Electric Power Company | 546,123 | 417,800 | 18,866 | 19,601 |
| KHNP Canada Energy, Ltd. | 54,374 | 46 | – | (6,304 ) |
| KEPCO Bylong Australia Pty., Ltd. | 220,721 | 277,358 | – | (2,357 ) |
| Korea Waterbury Uranium Limited Partnership | 20,882 | 149 | – | 2,348 |
| Korea Electric Power Nigeria Ltd. | 696 | 493 | 9,794 | 35 |
| KEPCO Holdings de Mexico | 262 | 19 | – | 251 |
| KST Electric Power Company | 596,823 | 539,459 | 146,295 | 17,322 |
| KEPCO Energy Service Company | 1,309 | 310 | 5,337 | 580 |
| KEPCO Netherlands S3 B.V. | 55,609 | 54 | – | 3,731 |
| PT. KOMIPO Pembangkitan Jawa Bali | 16,246 | 4,549 | 21,632 | 8,989 |
| PT. Cirebon Power Service | 3,456 | 1,228 | 7,463 | 301 |
| KOWEPO International Corporation | – | – | – | – |
| KOSPO Jordan LLC | 11,524 | 687 | 7,321 | 317 |
| EWP Philippines Corporation | 1,966 | 955 | – | (41 ) |
| EWP America Inc.(*) | 104,809 | 80,252 | 33,616 | (8,704 ) |
| KNF Canada Energy Limited | 1,967 | 20 | – | (46 ) |
| PT KEPCO Resource Indonesia | 913 | 18 | – | (341 ) |
| EWP Barbados 1 SRL | 267,859 | 425 | 1,656 | (902 ) |
| Gyeonggi Green Energy Co., Ltd. | 301,126 | 221,078 | 108,557 | 19,211 |
| PT. Tanggamus Electric Power | 184,861 | 167,641 | 40,903 | 2,041 |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

|  | 2016 | | | |
|---|---|---|---|---|
| **Subsidiaries** | **Total assets** | **Total liabilities** | **Sales** | **Profit (loss) for the period** |
|  | | | In millions of won | |
| Gyeongju Wind Power Co., Ltd. | ₩ 76,569 | 49,293 | 6,413 | 1,269 |
| KOMIPO America Inc. | 11,518 | 2,432 | – | (2,240 ) |
| KOSEP USA, INC. | 159 | 39,028 | 3,791 | (72,817 ) |
| PT. EWP Indonesia | 2,154 | 50 | – | 1,088 |
| KEPCO Netherlands J3 B.V. | 125,337 | 68 | – | 12,433 |
| Korea Offshore Wind Power Co., Ltd. | 37,826 | 2,048 | – | (4,960 ) |
| Global One Pioneer B.V. | 161 | 22 | – | (54 ) |
| Global Energy Pioneer B.V. | 338 | 22 | – | (59 ) |
| Mira Power Limited | 178,141 | 133,730 | – | (954 ) |
| KOSEP Material Co., Ltd. | 2,398 | 1,497 | 3,232 | (901 ) |
| Commerce and Industry Energy Co., Ltd. | 99,432 | 87,316 | 28,375 | (536 ) |
| KEPCO Singapore Holdings Pte., Ltd. | 2,568 | 13 | – | (33 ) |
| KOWEPO India Private Limited | 879 | – | – | 1 |
| KEPCO KPS Philippines Corp. | 7,897 | 1,213 | 12,843 | 2,060 |
| KOSPO Chile SpA | 6,656 | 4,787 | – | 125 |
| PT. KOWEPO Sumsel Operation and Maintenance Services | 1,439 | 700 | 6,165 | (96 ) |
| HeeMang Sunlight Power Co., Ltd. | 7,102 | 3,391 | 12 | (308 ) |
| Fujeij Wind Power Company | 47,935 | 46,636 | – | (873 ) |
| KOSPO Youngnam Power Co., Ltd. | 284,368 | 205,680 | – | (931 ) |
| HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) | 3,002 | – | – | 9 |
| Chitose Solar Power Plant LLC | 49,728 | 38,806 | – | (811 ) |
| KEPCO Energy Solution Co. Ltd. | 299,933 | 233 | – | (300 ) |
| Solar School Plant Co., Ltd. | 200,268 | 259 | 1 | 9 |
| KOSPO Power Services Limitada | 4,385 | 1,262 | 7,300 | 2,963 |
| Energy New Industry Specialized Investment Private Investment Trust | 501,275 | 33 | – | (7 ) |
| KOEN Bylong Pty., Ltd. | 6,135 | – | – | – |
| KOMIPO Bylong Pty., Ltd. | 6,135 | – | – | – |
| KOWEPO Bylong Pty., Ltd. | 6,135 | – | – | – |
| KOSPO Bylong Pty., Ltd. | 6,135 | – | – | – |
| EWP Bylong Pty., Ltd. | 6,135 | – | – | – |
| KOWEPO Lao International | 218 | 181 | – | (108 ) |

(*)    Financial information of EWP America Inc. includes that of six other subsidiaries, EWP Renewable Co., DG Fairhaven Power, LLC, DG Whitefield, LLC, Springfield Power, LLC, California Power Holdings, LLC, and EWPRC Biomass Holdings, LLC.

F-76

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2017**

| Subsidiaries | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|
| | | | In millions of won | |
| Korea Hydro & Nuclear Power Co., Ltd. | ₩ 55,011,096 | 29,252,816 | 9,415,751 | 854,346 |
| Korea South-East Power Co., Ltd. | 9,879,577 | 4,844,184 | 5,387,846 | 130,371 |
| Korea Midland Power Co., Ltd. | 9,893,822 | 6,148,173 | 4,167,009 | 104,591 |
| Korea Western Power Co., Ltd. | 9,660,426 | 5,739,534 | 4,199,079 | 110,939 |
| Korea Southern Power Co., Ltd. | 9,648,741 | 5,401,216 | 4,397,552 | 98,817 |
| Korea East-West Power Co., Ltd. | 8,855,518 | 4,204,187 | 4,644,330 | 217,599 |
| KEPCO Engineering & Construction Company, Inc. | 762,166 | 305,134 | 490,193 | 21,222 |
| KEPCO Plant Service & Engineering Co., Ltd. | 1,195,086 | 294,689 | 1,232,113 | 135,482 |
| KEPCO Nuclear Fuel Co., Ltd. | 792,187 | 421,088 | 279,664 | 4,557 |
| KEPCO KDN Co., Ltd. | 524,520 | 155,715 | 619,470 | 48,968 |
| Garolim Tidal Power Plant Co., Ltd. | 619 | 345 | – | (12 ) |
| KEPCO International HongKong Ltd. | 153,529 | 1 | – | 4,380 |
| KEPCO International Philippines Inc. | 102,323 | 886 | – | 47,201 |
| KEPCO Gansu International Ltd. | 11,567 | 493 | – | (29 ) |
| KEPCO Philippines Holdings Inc. | 127,922 | 2,621 | – | 43,218 |
| KEPCO Philippines Corporation | 6,293 | 114 | – | 2,098 |
| KEPCO Ilijan Corporation | 474,624 | 57,801 | 109,183 | 66,320 |
| KEPCO Lebanon SARL | 1,069 | 9,281 | – | (219 ) |
| KEPCO Neimenggu International Ltd. | 165,937 | – | – | 500 |
| KEPCO Shanxi International Ltd. | 497,990 | 193,309 | – | 3,796 |
| KOMIPO Global Pte Ltd. | 225,411 | 1,497 | – | 21,858 |
| KEPCO Canada Energy Ltd. | 132 | 22 | – | (32 ) |
| KEPCO Netherlands B.V. | 114,911 | 49 | – | 17,309 |
| KOREA Imouraren Uranium Investment Corp. | 151,278 | 131 | – | 1,490 |
| KEPCO Australia Pty., Ltd. | 466,654 | 569 | – | (568 ) |
| KOSEP Australia Pty., Ltd. | 27,076 | 333 | 12,096 | 1,601 |
| KOMIPO Australia Pty., Ltd. | 31,441 | 4,691 | 12,096 | 1,133 |
| KOWEPO Australia Pty., Ltd. | 31,586 | 4,691 | 12,096 | 1,232 |
| KOSPO Australia Pty., Ltd. | 29,472 | 4,221 | 12,096 | (2,759 ) |
| KEPCO Middle East Holding Company | 95,812 | 90,842 | – | 2,913 |
| Qatrana Electric Power Company | 460,206 | 327,401 | 18,892 | 23,310 |
| KHNP Canada Energy, Ltd. | 51,994 | 31 | – | (92 ) |
| KEPCO Bylong Australia Pty., Ltd. | 242,364 | 277,549 | – | 20,271 |
| Korea Waterbury Uranium Limited Partnership | 20,886 | 136 | – | (59 ) |
| Korea Electric Power Nigeria Ltd. | 238 | 76 | 2,164 | 29 |
| KEPCO Holdings de Mexico | 235 | 30 | – | (20 ) |
| KST Electric Power Company | 546,242 | 478,230 | 120,126 | 16,154 |
| KEPCO Energy Service Company | 1,793 | 451 | 6,773 | 976 |
| KEPCO Netherlands S3 B.V. | 46,642 | 53 | – | 2,382 |
| PT. KOMIPO Pembangkitan Jawa Bali | 11,261 | 4,769 | 20,956 | 4,666 |
| PT. Cirebon Power Service | 2,808 | 155 | 7,439 | 592 |
| KOWEPO International Corporation | – | 8 | – | (2 ) |
| KOSPO Jordan LLC | 24,077 | 13,594 | 7,331 | 953 |
| EWP Philippines Corporation | 1,708 | 836 | – | (17 ) |
| EWP America Inc.(*1) | 79,854 | 67,308 | 23,543 | (9,737 ) |
| KNF Canada Energy Limited | 1,884 | 31 | – | (43 ) |
| PT KEPCO Resource Indonesia | 491 | – | – | (311 ) |
| EWP Barbados 1 SRL | 235,096 | 450 | – | (2,585 ) |
| Gyeonggi Green Energy Co., Ltd. | 282,408 | 199,160 | 95,192 | 3,203 |
| PT. Tanggamus Electric Power | 179,317 | 160,144 | 34,281 | 4,640 |
| Gyeongju Wind Power Co., Ltd. | 112,279 | 82,124 | 7,219 | 2,400 |
| KOMIPO America Inc. | 10,505 | 521 | – | 2,071 |
| KOSEP USA, INC. | 184 | 9,065 | – | 26,997 |

F-77

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2017**

| Subsidiaries | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | | In millions of won | |
| PT. EWP Indonesia | ₩ | 2,035 | 23 | – | 1,916 |
| KEPCO Netherlands J3 B.V. | | 122,612 | 76 | – | 12,115 |
| Korea Offshore Wind Power Co., Ltd. | | 190,195 | 1,985 | – | (6,997 ) |
| Global One Pioneer B.V. | | 151 | 38 | – | (80 ) |
| Global Energy Pioneer B.V. | | 309 | 41 | – | (87 ) |
| Mira Power Limited | | 208,150 | 163,198 | – | 737 |
| KOSEP Material Co., Ltd. | | 2,751 | 1,448 | 3,128 | 320 |
| Commerce and Industry Energy Co., Ltd. | | 99,129 | 87,926 | 30,577 | (749 ) |
| KEPCO Singapore Holdings Pte., Ltd. | | 3,265 | 4 | – | (24 ) |
| KOWEPO India Private Limited | | 781 | – | – | (46 ) |
| KEPCO KPS Philippines Corp. | | 6,636 | 235 | 6,840 | 555 |
| KOSPO Chile SpA | | 133,570 | 50,109 | – | 1,066 |
| PT. KOWEPO Sumsel Operation And Maintenance Services | | 1,350 | 279 | 7,651 | 659 |
| HeeMang Sunlight Power Co., Ltd. | | 6,876 | 3,395 | 105 | (229 ) |
| Fujeij Wind Power Company | | 165,636 | 156,099 | – | 8,836 |
| KOSPO Youngnam Power Co.,Ltd. | | 412,785 | 333,302 | 68,973 | 939 |
| HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) | | 3,002 | – | – | 12 |
| Chitose Solar Power Plant LLC | | 136,098 | 121,622 | 7,083 | 4,100 |
| KEPCO Energy Solution Co. Ltd. | | 313,401 | 12,376 | 5,544 | 1,325 |
| Solar School Plant Co., Ltd. | | 201,482 | 599 | 67 | 874 |
| KOSPO Power Services Limitada | | 3,901 | 887 | 11,067 | 666 |
| Energy New Industry Specialized Investment Private Investment Trust(*3) | | 506,207 | 2,118 | – | 52 |
| KOEN Bylong Pty., Ltd. | | 5,875 | – | – | – |
| KOMIPO Bylong Pty., Ltd. | | 5,875 | – | – | – |
| KOWEPO Bylong Pty., Ltd. | | 5,875 | – | – | – |
| KOSPO Bylong Pty., Ltd. | | 5,875 | – | – | – |
| EWP Bylong Pty., Ltd. | | 5,875 | – | – | – |
| KOWEPO Lao International | | 3,259 | 1,452 | 3,624 | 1,881 |
| KEPCO US Inc. | | 16,913 | – | – | – |
| KEPCO Alamosa LLC | | 33,144 | 492 | – | (218 ) |
| Cogentrix Solar Services, LLC(*2) | | 84,458 | 53,116 | 8,958 | (112 ) |
| KEPCO-LG CNS Mangilao Holdings LLC | | 24,131 | 24,395 | – | (278 ) |
| Mangilao Investment LLC | | 24,131 | – | – | – |
| KEPCO-LG CNS Mangilao Solar, LLC | | 24,002 | 134 | – | (278 ) |
| Jeju Hanlim Offshore Wind Co., Ltd. | | 36 | – | – | – |
| PT. Siborpa Eco Power | | 11,562 | 214 | – | (518 ) |

(*1)   Financial information of EWP America Inc. includes that of six other subsidiaries, EWP Renewable Corporation, DG Fairhaven Power, LLC, DG Whitefield, LLC, Springfield Power, LLC, California Power Holdings, LLC, and EWPRC Biomass Holdings, LLC.

(*2)   Financial information of Cogentrix Solar Services, LLC includes that of two other subsidiaries, Solar Investments I, LLC and Cogentrix of Alamosa, LLC.

(*3)   Financial information of Energy New Industry Specialized Investment Private Investment Trust includes that of three other subsidiaries, BSK E-New Industry Fund VII, e-New Industry LB Fund 1 and Songhyun e-New Industry Fund.

F-78

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(4)    Significant restrictions on abilities to subsidiaries are as follows:**

| Company | Nature and extent of any significant restrictions |
|---|---|
| Gyeonggi Green Energy Co., Ltd. | Acquisition or disposal of assets of more than ₩35 billion, change in the capacity of cogeneration units (except for the change due to performance improvement of equipment, maintenance) will require unanimous consent of all directors. |
| KOSPO Youngnam Power Co., Ltd. | Dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. Shares cannot be wholly or partially transferred without prior written consent of financial institutions. |

**(5)    Details of non-controlling interest prior to intra-group eliminations as of and for the years ended December 31, 2016 and 2017 are as follows:**

| Description | 2016 KEPCO Ilijan Corporation | | KEPCO Plant Service & Engineering Co., Ltd. | | KEPCO Engineering & Construction Company, Inc. In millions of won | | Others | Total |
|---|---|---|---|---|---|---|---|---|
| Percentage of ownership | 49.00 | % | 49.00 | % | 33.92 | % | | |
| Current assets | ₩ 154,758 | | 553,924 | | 270,553 | | 1,211,510 | 2,190,745 |
| Non-current assets | 403,272 | | 532,497 | | 516,043 | | 2,379,882 | 3,831,694 |
| Current liabilities | (19,256 | ) | (264,506 | ) | (286,444 | ) | (297,510 ) | (867,716 ) |
| Non-current liabilities | (39,193 | ) | (36,984 | ) | (78,232 | ) | (1,919,924) | (2,074,333) |
| Net assets | 499,581 | | 784,931 | | 421,920 | | 1,373,958 | 3,080,390 |
| Book value of non-controlling interest | 244,794 | | 384,616 | | 143,115 | | 684,093 | 1,456,618 |
| Sales | 116,667 | | 1,214,304 | | 506,012 | | 674,461 | 2,511,444 |
| Profit for the period | 51,552 | | 86,657 | | 17,796 | | 102,170 | 258,175 |
| Profit for the period attributable to non-controlling interest | 25,260 | | 42,462 | | 6,036 | | 26,709 | 100,467 |
| Cash flows from operating activities | 102,546 | | 121,240 | | 18,748 | | 84,086 | 326,620 |
| Cash flows from investing activities | (117 | ) | 79,807 | | (7,556 | ) | (367,674 ) | (295,540 ) |
| Cash flows from financing activities before dividends to non-controlling interest | (56,863 | ) | (39,911 | ) | (1,634 | ) | 877,863 | 779,455 |
| Dividends to non-controlling interest | (55,705 | ) | (36,139 | ) | (2,539 | ) | (22,054 ) | (116,437 ) |
| Effect of exchange rate fluctuation | 1,529 | | 127 | | (854 | ) | 7,216 | 8,018 |
| Net increase (decrease) of cash and cash equivalents | (8,610 | ) | 125,124 | | 6,165 | | 579,437 | 702,116 |

F-79

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Description | | KEPCO Ilijan Corporation | | KEPCO Plant Service & Engineering Co., Ltd. | | KEPCO Engineering & Construction Company, Inc. | | Others | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | In millions of won | | | |
| Percentage of ownership | | 49.00 | % | 49.00 | % | 33.92 | % | | |
| Current assets | ₩ | 160,588 | | 623,934 | | 257,529 | | 1,269,175 | 2,311,226 |
| Non-current assets | | 314,036 | | 571,152 | | 504,637 | | 2,588,833 | 3,978,658 |
| Current liabilities | | (21,546 | ) | (278,562 | ) | (221,860 | ) | (394,320 ) | (916,288 ) |
| Non-current liabilities | | (36,255 | ) | (16,127 | ) | (83,274 | ) | (2,014,925 ) | (2,150,581 ) |
| Net assets | | 416,823 | | 900,397 | | 457,032 | | 1,448,763 | 3,223,015 |
| Book value of non-controlling interest | | 204,243 | | 441,194 | | 155,025 | | 612,245 | 1,412,707 |
| Sales | | 109,183 | | 1,232,113 | | 490,193 | | 719,087 | 2,550,576 |
| Profit for the period | | 66,320 | | 135,482 | | 21,222 | | 66,419 | 289,443 |
| Profit for the period attributable to non-controlling interest | | 32,497 | | 66,386 | | 7,199 | | 20,447 | 126,529 |
| Cash flows from operating activities | | 123,534 | | 129,801 | | 62,578 | | 60,021 | 375,934 |
| Cash flows from investing activities | | (5,276 | ) | (193,408 | ) | (8,622 | ) | (409,353 ) | (616,659 ) |
| Cash flows from financing activities before dividends to non-controlling interest | | (44,442 | ) | (15,606 | ) | (55,504 | ) | 339,432 | 223,880 |
| Dividends to non-controlling interest | | (48,855 | ) | (14,994 | ) | (1,419 | ) | (20,840 ) | (86,108 ) |
| Effect of exchange rate fluctuation | | (7,432 | ) | (1,267 | ) | (101 | ) | (24,206 ) | (33,006 ) |
| Net increase (decrease) of cash and cash equivalents | | 17,529 | | (95,474 | ) | (3,068 | ) | (54,946 ) | (135,959 ) |

**(6)  Changes in goodwill**

(i)  Details of goodwill as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Acquisition cost | ₩ | 2,582 | 2,582 |
| Accumulated impairment | | – | – |
| Carrying book value | ₩ | 2,582 | 2,582 |

(ii)  There are no changes in goodwill for the years ended December 31, 2016 and 2017.

**(7)  Disposals of subsidiaries**

KEPCO Canada Uranium Investment Limited Partnership was dissolved and the Company liquidated DG Kings Plaza, LLC during the year ended December 31, 2016.

(i)  The fair value of proceeds from disposal as of December 31, 2016 is as follows:

| | | 2016 |
|---|---|---|
| | | In millions of won |
| Cash received upon dissolution | ₩ | 898 |
| Net assets transferred due to dissolution | | 34,148 |
| | ₩ | 35,046 |

F-80

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(ii)   The carrying value of assets and liabilities of subsidiaries as at the date the Company lost its control during the year ended December 31, 2016 are as follows:

|  | | 2016 |
|---|---|---|
|  | | In millions of won |
| Current assets | | |
| Cash and cash equivalents | ₩ | 898 |
| Current financial assets, net | | 81 |
| Non-current assets | | |
| Available-for-sale financial assets | | 34,089 |
| Current liabilities | | |
| Current financial liabilities | | (22 ) |
| | ₩ | 35,046 |

(iii)   Gain from disposals of subsidiaries for the year ended December 31, 2016 is as follows:

|  | | 2016 |
|---|---|---|
|  | | In millions of won |
| Fair value of sale price | ₩ | 35,046 |
| Net assets disposed | | (35,046 ) |
| Non-controlling interests | | – |
| Realization of unrealized gain | | – |
| Other comprehensive income | | – |
| Gain from disposals of subsidiaries | ₩ | – |

(iv)   Net cash flow from sales of subsidiaries for the year ended December 31, 2016 is as follows:

|  | | 2016 |
|---|---|---|
|  | | In millions of won |
| Consideration received in cash | ₩ | 898 |
| Less: cash held by disposed subsidiaries | | (898 ) |
| Net cash flow | ₩ | – |

F-81

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(8)   Cash dividends received from subsidiaries for the years ended December 31, 2015, 2016 and 2017, respectively, are as follows:

| Subsidiaries | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | | In millions of won | |
| Korea Hydro & Nuclear Power Co., Ltd. | ₩ | 446,399 | 635,200 | 543,072 |
| Korea South-East Power Co., Ltd. | | 57,485 | 124,169 | 106,546 |
| Korea Midland Power Co., Ltd. | | 16,580 | 23,073 | 54,305 |
| Korea Western Power Co., Ltd. | | 22,749 | 36,238 | 66,992 |
| Korea Southern Power Co., Ltd. | | 10,272 | 17,849 | 60,630 |
| Korea East-West Power Co., Ltd. | | 25,280 | 67,906 | 94,430 |
| KEPCO Engineering & Construction Company, Inc. | | 14,574 | 5,069 | 2,765 |
| KEPCO Plant Service & Engineering Co., Ltd. | | 40,584 | 39,911 | 15,607 |
| KEPCO Nuclear Fuel Co., Ltd. | | 6,280 | 3,411 | 3,231 |
| KEPCO KDN Co., Ltd. | | 4,046 | 3,392 | 4,352 |
| KEPCO International HongKong Ltd. | | 25,826 | 9,107 | 4,304 |
| KEPCO International Philippines Inc. | | 32,891 | 61,862 | 44,906 |
| KEPCO Ilijan Corporation | | 38,128 | 57,979 | 50,849 |
| KEPCO Philippines Holdings Inc. | | 19,221 | 17,747 | 26,023 |
| KEPCO Neimenggu International Ltd. | | 25,338 | 10,735 | – |
| KOMIPO Global Pte Ltd. | | – | 10,432 | – |
| Qatrana Electric Power Company | | 16,857 | 8,331 | 5,939 |
| KOSPO Jordan LLC | | – | 1,095 | – |
| KEPCO Energy Service Company | | – | 294 | – |
| EWP Philippines Corporation | | 5,586 | – | – |
| KEPCO Netherlands S3 B.V. | | 1,382 | – | – |
| PT. KOMIPO Pembangkitan Jawa Bali | | 3,169 | 3,222 | 3,188 |
| KEPCO Netherlands J3 B.V. | | 19,254 | 12,507 | – |
| Gyeongju Wind Power Co., Ltd. | | 1,294 | 679 | – |
| Energy New Industry Specialized Investment Private Investment Trust | | – | – | 291 |
| HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) | | – | – | 11 |
| KOSPO Power Services Limitada | | – | – | 425 |
| Cogentrix Solar Services, LLC | | – | – | 344 |
| | ₩ | 833,195 | 1,150,208 | 1,088,210 |

F-82

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**17.    Investments in Associates and Joint Ventures**

**(1)    Investments in associates and joint ventures as of December 31, 2016 and 2017 are as follows:**

| | | | | 2016 | | | |
|---|---|---|---|---|---|---|---|
| Investees | Key operation activities | Location | Percentage of ownership | | Acquisition cost | Book value | |
| | | | | | In millions of won | | |
| <Associates> | | | | | | | |
| Korea Gas Corporation(*1) | Importing and wholesaling LNG | KOREA | 20.47 | % | ₩ 94,500 | 1,933,877 | |
| Korea Electric Power Industrial Development Co., Ltd. | Electricity metering and others | KOREA | 29.00 | % | 4,727 | 20,475 | |
| YTN Co., Ltd. | Broadcasting | KOREA | 21.43 | % | 59,000 | 38,156 | |
| Cheongna Energy Co., Ltd. | Generating and distributing vapor and hot/cold water | KOREA | 43.90 | % | 48,353 | 12,373 | |
| Gangwon Wind Power Co., Ltd.(*2) | Power generation | KOREA | 15.00 | % | 5,725 | 13,069 | |
| Hyundai Green Power Co., Ltd. | Power generation | KOREA | 29.00 | % | 88,885 | 115,998 | |
| Korea Power Exchange(*6) | Management of power market and others | KOREA | 100.00 | % | 127,839 | 223,238 | |
| AMEC Partners Korea Ltd.(*3) | Resources development | KOREA | 19.00 | % | 707 | 225 | |
| Hyundai Energy Co., Ltd.(*9) | Power generation | KOREA | 30.66 | % | 71,070 | 1,031 | |
| Ecollite Co., Ltd. | Artificial light-weight aggregate | KOREA | 36.10 | % | 1,516 | – | |
| Taebaek Wind Power Co., Ltd. | Power generation | KOREA | 25.00 | % | 3,810 | 4,750 | |
| Taebaek Guinemi Wind Power Co., Ltd. | Power generation | KOREA | 25.00 | % | 3,420 | 3,131 | |
| Pyeongchang Wind Power Co., Ltd. | Power generation | KOREA | 25.00 | % | 3,875 | 3,383 | |
| Daeryun Power Co., Ltd.(*3, 10) | Power generation | KOREA | 13.13 | % | 25,477 | 29,873 | |
| Changjuk Wind Power Co., Ltd. | Power generation | KOREA | 30.00 | % | 3,801 | 6,930 | |
| KNH Solar Co., Ltd. | Power generation | KOREA | 27.00 | % | 1,296 | 2,073 | |
| SPC Power Corporation | Power generation | PHILIPPINES | 38.00 | % | 20,635 | 56,818 | |
| Gemeng International Energy Co., Ltd. | Power generation | CHINA | 34.00 | % | 413,153 | 680,065 | |
| PT. Cirebon Electric Power | Power generation | INDONESIA | 27.50 | % | 40,365 | 96,658 | |
| KNOC Nigerian East Oil Co., Ltd.(*4) | Resources development | NIGERIA | 14.63 | % | 12 | – | |
| KNOC Nigerian West Oil Co., Ltd.(*4) | Resources development | NIGERIA | 14.63 | % | 12 | – | |
| PT Wampu Electric Power | Power generation | INDONESIA | 46.00 | % | 21,292 | 23,188 | |
| PT. Bayan Resources TBK | Resources development | INDONESIA | 20.00 | % | 615,860 | 402,667 | |
| S-Power Co., Ltd. | Power generation | KOREA | 49.00 | % | 132,300 | 123,912 | |
| Pioneer Gas Power Limited(*8) | Power generation | INDIA | 40.00 | % | 49,831 | 50,740 | |
| Eurasia Energy Holdings | Power generation and resources development | RUSSIA | 40.00 | % | 461 | – | |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | Power generation | LAOS | 25.00 | % | 49,119 | 51,544 | |
| Hadong Mineral Fiber Co., Ltd.(*17) | Recycling fly ashes | KOREA | 8.33 | % | 50 | – | |
| Green Biomass Co., Ltd.(*12) | Power generation | KOREA | 14.00 | % | 714 | 47 | |
| PT. Mutiara Jawa | Manufacturing and operating floating coal terminal | INDONESIA | 29.00 | % | 2,978 | – | |
| Samcheok Eco Materials Co., Ltd.(*3, 11) | Recycling fly ashes | KOREA | 2.35 | % | 686 | – | |
| Noeul Green Energy Co., Ltd. | Power generation | KOREA | 29.00 | % | 1,740 | 1,217 | |
| Naepo Green Energy Co., Ltd. | Power generation | KOREA | 25.00 | % | 29,200 | 25,438 | |
| Goseong Green Energy Co., Ltd.(*2) | Power generation | KOREA | 1.12 | % | 2,900 | 2,663 | |
| Gangneung Eco Power Co., Ltd.(*2) | Power generation | KOREA | 1.61 | % | 2,900 | 2,646 | |
| Shin Pyeongtaek Power Co., Ltd. | Power generation | KOREA | 40.00 | % | 40 | – | |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | Power generation | KOREA | 28.00 | % | 194 | 181 | |
| DS POWER Co., Ltd.(*2) | Power generation | KOREA | 14.44 | % | 17,900 | 7,190 | |
| Dongducheon Dream Power Co., Ltd. | Power generation | KOREA | 33.61 | % | 61,535 | 46,876 | |
| KS Solar Co., Ltd.(*3) | Power generation | KOREA | 19.00 | % | 637 | 604 | |
| Yeongwol Energy Station Co., Ltd.(*2) | Power generation | KOREA | 10.00 | % | 1,400 | – | |

F-83

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2016**

| Investees | Key operation activities | Location | Percentage of ownership | | Acquisition cost | Book value |
|---|---|---|---|---|---|---|
| | | | | | In millions of won | |
| Jinbhuvish Power Generation Pvt. Ltd.(*2) | Power generation | INDIA | 5.16 | % | ₩ 9,000 | – |
| SE Green Energy Co., Ltd. | Power generation support | KOREA | 47.76 | % | 3,821 | 3,525 |
| Daegu Photovoltaic Co., Ltd. | Power generation | KOREA | 29.00 | % | 1,230 | 1,700 |
| Jeongam Wind Power Co., Ltd. | Power generation | KOREA | 40.00 | % | 5,580 | 4,000 |
| Korea Power Engineering Service Co., Ltd. | Construction and service | KOREA | 29.00 | % | 290 | 2,810 |
| Busan Green Energy Co., Ltd. | Power generation | KOREA | 29.00 | % | 14,564 | 13,803 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.)(*2) | Power generation | KOREA | 18.87 | % | 1,000 | – |
| Korea Electric Vehicle Charging Service | Electric vehicle charge service | KOREA | 28.00 | % | 1,596 | 1,103 |
| Ulleungdo Natural Energy Co., Ltd. | Renewable power generation | KOREA | 29.85 | % | 8,000 | 6,894 |
| Korea Nuclear Partners Co., Ltd. | Electric material agency | KOREA | 29.00 | % | 290 | 248 |
| Tamra Offshore Wind Power Co., Ltd. | Power generation | KOREA | 27.00 | % | 8,910 | 7,015 |
| Korea Electric Power Corporation Fund(*13) | Developing electric enterprises | KOREA | 98.09 | % | 51,500 | 50,856 |
| Energy Infra Asset Management Co., Ltd.(*3) | Asset management | KOREA | 9.90 | % | 297 | 259 |
| Daegu clean Energy Co., Ltd. | Renewable power generation | KOREA | 28.00 | % | 140 | 140 |
| YaksuESS Co., Ltd | Installing ESS related equipment | KOREA | 29.00 | % | 210 | 196 |
| Nepal Water & Energy Development Company Private Limited(*14) | Construction and operation of utility plant | NEPAL | 52.77 | % | 18,568 | 18,667 |
| | | | | | 2,134,911 | 4,092,252 |
| **<Joint ventures>** | | | | | | |
| KEPCO-Uhde Inc.(*7) | Power generation | KOREA | 52.8 | % | 11,355 | 301 |
| Eco Biomass Energy Sdn. Bhd.(*7) | Power generation | MALAYSIA | 61.53 | % | 9,661 | – |
| Datang Chaoyang Renewable Power Co., Ltd. | Power generation | CHINA | 40.00 | % | 27,660 | 28,239 |
| Shuweihat Asia Power Investment B.V. | Holding company | NETHERLANDS | 49.00 | % | 46,037 | – |
| Shuweihat Asia Operation & Maintenance Company(*7) | Maintenance of utility plant | CAYMAN | 55.00 | % | 30 | 450 |
| Waterbury Lake Uranium L.P. | Resources development | CANADA | 36.97 | % | 26,602 | 21,314 |
| ASM-BG Investicii AD | Power generation | BULGARIA | 50.00 | % | 16,101 | 21,488 |
| RES Technology AD | Power generation | BULGARIA | 50.00 | % | 15,595 | 13,582 |
| KV Holdings, Inc. | Power generation | PHILIPPINES | 40.00 | % | 2,103 | 2,098 |
| KEPCO SPC Power Corporation(*7) | Construction and operation of utility plant | PHILIPPINES | 75.20 | % | 94,579 | 245,367 |
| Canada Korea Uranium Limited Partnership(*5) | Resources development | CANADA | 12.50 | % | 5,404 | – |
| Gansu Datang Yumen Wind Power Co., Ltd. | Power generation | CHINA | 40.00 | % | 16,621 | 12,821 |
| Datang Chifeng Renewable Power Co., Ltd. | Power generation | CHINA | 40.00 | % | 121,928 | 166,535 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | Power generation | CHINA | 40.00 | % | 10,858 | 10,843 |
| Rabigh Electricity Company | Power generation | SAUDI ARABIA | 40.00 | % | 109,743 | 97,802 |
| Rabigh Operation & Maintenance Company Limited | Maintenance of utility plant | SAUDI ARABIA | 40.00 | % | 70 | 4,427 |
| Jamaica Public Service Company Limited | Power generation | JAMAICA | 40.00 | % | 301,910 | 249,453 |
| KW Nuclear Components Co., Ltd. | Manufacturing | KOREA | 45.00 | % | 833 | 7,133 |
| Busan Shinho Solar Power Co., Ltd. | Power generation | KOREA | 25.00 | % | 2,100 | 3,814 |
| GS Donghae Electric Power Co., Ltd. | Power generation | KOREA | 34.00 | % | 204,000 | 205,948 |

F-84

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2016**

| Investees | Key operation activities | Location | Percentage of ownership | | Acquisition cost | Book value |
|---|---|---|---|---|---|---|
| | | | | | In millions of won | |
| Global Trade Of Power System Co., Ltd. | Exporting products and technology of small or medium business by proxy | KOREA | 29.00 | % | ₩  290 | 477 |
| Expressway Solar-light Power Generation Co., Ltd. | Power generation | KOREA | 29.00 | % | 1,856 | 2,343 |
| KODE NOVUS I LLC | Power generation | USA | 50.00 | % | 19,213 | – |
| KODE NOVUS II LLC | Power generation | USA | 50.00 | % | 12,756 | – |
| Daejung Offshore Wind Power Co., Ltd. | Power generation | KOREA | 49.90 | % | 4,990 | 3,015 |
| Amman Asia Electric Power Company(*7) | Power generation | JORDAN | 60.00 | % | 111,476 | 153,857 |
| KAPES, Inc.(*7) | R&D | KOREA | 51.00 | % | 5,629 | 4,758 |
| Dangjin Eco Power Co., Ltd. | Power generation | KOREA | 34.00 | % | 56,100 | 53,253 |
| Honam Wind Power Co., Ltd. | Power generation | KOREA | 29.00 | % | 3,480 | 4,451 |
| Chun-cheon Energy Co., Ltd. | Power generation | KOREA | 29.90 | % | 52,700 | 50,592 |
| Yeonggwangbaeksu Wind Power Co., Ltd.(*3) | Power generation | KOREA | 15.00 | % | 3,000 | 2,689 |
| Nghi Son 2 Power Ltd. | Power generation | VIETNAM | 50.00 | % | 1,788 | 229 |
| Kelar S.A(*7) | Power generation | CHILE | 65.00 | % | 4,180 | – |
| PT. Tanjung Power Indonesia | Power generation | INDONESIA | 35.00 | % | 746 | 1,946 |
| Incheon New Power Co., Ltd. | Power generation | KOREA | 29.00 | % | 461 | 563 |
| Seokmun Energy Co., Ltd. | Power generation | KOREA | 29.00 | % | 580 | 391 |
| Daehan Wind Power PSC | Power generation | JORDAN | 50.00 | % | 285 | 16 |
| Barakah One Company(*16) | Power generation | UAE | 18.00 | % | 118 | 116 |
| Nawah Energy Company(*16) | Operation of utility plant | UAE | 18.00 | % | 296 | 290 |
| MOMENTUM | International thermonuclear experimental reactor construction management | FRANCE | 33.33 | % | 1 | 67 |
| Daegu Green Power Co., Ltd.(*15) | Power generation | KOREA | 29.00 | % | 46,225 | 47,528 |
| | | | | | 1,349,360 | 1,418,196 |
| | | | | | ₩  3,484,271 | 5,510,448 |

(*1)   The effective percentage of ownership is 21.57% considering treasury stocks.

(*2)   The Company can exercise significant influence by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*3)   The Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity.

(*4)   The Company can exercise significant influence by virtue of its contractual right to appoint one out of four members of the steering committee of the entity. Moreover, the Company has significant financial transactions, which can affect its influence on the entity.

(*5)   The Company has joint control over the entity by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*6)   The Government regulates the Company's ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between KPX and the Company's other subsidiaries. The Company can exercise significant influence by its right to nominate directors to the board of directors of the entity.

(*7)   According to the shareholders' agreement, all critical financial and operating decisions must be agreed to by all ownership parties. For these reasons, the entities are classified as joint ventures.

(*8)   As of reporting date, the annual reporting period of all associates and joint ventures ends on December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.

(*9)   As of December 31, 2016, 15.64% of ownership of Hyundai Energy Co., Ltd. is held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only does the Company have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank with a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to the Company. In connection with this agreement, the Company applied the equity method on the investment in Hyundai Energy Co., Ltd. with 46.30% of ownership.

(*10)  The Company's percentage of ownership has decreased due to the acquisition of Daeryun Power Co., Ltd. and the effective percentage of ownership is 19.45% considering stock purchase options.

F-85

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

(*11)  The Company's effective percentage of ownership excluding the redeemable convertible preferred stock is 25.54%.

(*12)  The effective percentage of ownership is less than 20% but the Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity and the fact that the dominant portion of the investee's sales transactions is generated from the Company.

(*13)  The effective percentage of ownership is more than 50% but the Company does not hold control over relevant business while it exercises significant influence by participating in the Investment Decision Committee. For this reason, the entity is classified as an associate.

(*14)  The effective percentage of ownership is more than 50%, but the Company does not control the entity according to the shareholders' agreement. For this reason, the entity is classified as an associate.

(*15)  The entity is reclassified from associates to joint ventures since the terms of the shareholders' agreement had been amended.

(*16)  The effective percentage of ownership is less than 20%, but the Company has joint control over the entity as decisions on the major activities require the unanimous consent of the parties that collectively control the entity.

(*17)  Although the percentage of ownership temporarily decreased to 8.33% from the difference in timing of capital payment by shareholders, the Company can exercise significant influence by virtue of its right to appoint a director to the board of directors of the entity based on the shareholders' agreement. The percentage of ownership is 25.00% at the time of completion of capital payment.

**2017**

| Investees | Key operation activities | Location | Percentage of ownership | | Acquisition cost | Book value |
|---|---|---|---|---|---|---|
| | | | | | In millions of won | |
| **<Associates>** | | | | | | |
| Korea Gas Corporation(*1) | Importing and wholesaling LNG | KOREA | 20.47 | % | ₩ 94,500 | 1,618,868 |
| Korea Electric Power Industrial Development Co., Ltd. | Electricity metering and others | KOREA | 29.00 | % | 4,727 | 21,838 |
| YTN Co., Ltd. | Broadcasting | KOREA | 21.43 | % | 59,000 | 40,606 |
| Cheongna Energy Co., Ltd. | Generating and distributing vapor and hot/cold water | KOREA | 43.90 | % | 48,353 | 8,337 |
| Gangwon Wind Power Co., Ltd.(*2) | Power generation | KOREA | 15.00 | % | 5,725 | 13,855 |
| Hyundai Green Power Co., Ltd. | Power generation | KOREA | 29.00 | % | 88,885 | 114,806 |
| Korea Power Exchange(*5) | Management of power market and others | KOREA | 100.00 | % | 127,839 | 237,631 |
| AMEC Partners Korea Ltd.(*3) | Resources development | KOREA | 19.00 | % | 707 | 215 |
| Hyundai Energy Co., Ltd.(*8) | Power generation | KOREA | 30.66 | % | 71,070 | – |
| Ecollite Co., Ltd. | Artificial light-weight aggregate | KOREA | 36.10 | % | 1,516 | – |
| Taebaek Wind Power Co., Ltd. | Power generation | KOREA | 25.00 | % | 3,810 | 5,319 |
| Taeback Guinemi Wind Power Co., Ltd. | Power generation | KOREA | 25.00 | % | 3,420 | 3,089 |
| Pyeongchang Wind Power Co., Ltd. | Power generation | KOREA | 25.00 | % | 3,875 | 4,136 |
| Daeryun Power Co., Ltd.(*3, 9) | Power generation | KOREA | 13.13 | % | 25,477 | 25,113 |
| Changjuk Wind Power Co., Ltd. | Power generation | KOREA | 30.00 | % | 3,801 | 7,515 |
| KNH Solar Co., Ltd. | Power generation | KOREA | 27.00 | % | 1,296 | 2,218 |
| SPC Power Corporation | Power generation | PHILIPPINES | 38.00 | % | 20,635 | 52,283 |
| Gemeng International Energy Co., Ltd. | Power generation | CHINA | 34.00 | % | 413,153 | 649,973 |
| PT. Cirebon Electric Power | Power generation | INDONESIA | 27.50 | % | 40,365 | 97,410 |
| KNOC Nigerian East Oil Co., Ltd.(*4) | Resources development | NIGERIA | 14.63 | % | 12 | – |
| KNOC Nigerian West Oil Co., Ltd.(*4) | Resources development | NIGERIA | 14.63 | % | 12 | – |
| PT Wampu Electric Power | Power generation | INDONESIA | 46.00 | % | 21,292 | 29,403 |
| PT. Bayan Resources TBK | Resources development | INDONESIA | 20.00 | % | 615,860 | 451,831 |
| S-Power Co., Ltd. | Power generation | KOREA | 49.00 | % | 132,300 | 116,945 |
| Pioneer Gas Power Limited(*7) | Power generation | INDIA | 38.50 | % | 49,831 | 38,659 |
| Eurasia Energy Holdings | Power generation and resources development | RUSSIA | 40.00 | % | 461 | – |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | Power generation | LAOS | 25.00 | % | 71,481 | 61,779 |
| Hadong Mineral Fiber Co., Ltd.(*3) | Recycling fly ashes | KOREA | 8.33 | % | 50 | – |
| Green Biomass Co., Ltd.(*11, 14) | Power generation | KOREA | 8.80 | % | 714 | 208 |
| PT. Mutiara Jawa | Manufacturing and operating floating coal terminal | INDONESIA | 29.00 | % | 2,978 | – |
| Samcheok Eco Materials Co., Ltd.(*10) | Recycling fly ashes | KOREA | 2.35 | % | 686 | – |
| Noeul Green Energy Co., Ltd. | Power generation | KOREA | 29.00 | % | 1,740 | 2,067 |

F-86

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**2017**

| Investees | Key operation activities | Location | Percentage of ownership | | Acquisition cost | Book value |
|---|---|---|---|---|---|---|
| | | | | | In millions of won | |
| Naepo Green Energy Co., Ltd. | Power generation | KOREA | 41.67 | % ₩ | 29,200 | 20,598 |
| Goseong Green Energy Co., Ltd.(*2) | Power generation | KOREA | 1.12 | % | 2,900 | 2,597 |
| Gangneung Eco Power Co., Ltd.(*2) | Power generation | KOREA | 1.61 | % | 2,900 | 2,583 |
| Shin Pyeongtaek Power Co., Ltd. | Power generation | KOREA | 40.00 | % | 43,920 | 34,903 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | Power generation | KOREA | 28.00 | % | 194 | 187 |
| Dongducheon Dream Power Co., Ltd. | Power generation | KOREA | 33.61 | % | 111,134 | 53,233 |
| Jinbhuvish Power Generation Pvt. Ltd.(*2) | Power generation | INDIA | 5.16 | % | 9,000 | – |
| SE Green Energy Co., Ltd. | Power generation | KOREA | 47.76 | % | 3,821 | 3,476 |
| Daegu Photovoltai Co., Ltd. | Power generation | KOREA | 29.00 | % | 1,230 | 1,718 |
| Jeongam Wind Power Co., Ltd. | Power generation | KOREA | 40.00 | % | 5,580 | 3,763 |
| Korea Power Engineering Service Co., Ltd. | Construction and service | KOREA | 29.00 | % | 290 | 3,659 |
| Busan Green Energy Co., Ltd. | Power generation | KOREA | 29.00 | % | 5,243 | 7,363 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.)(*2) | Power generation | KOREA | 18.87 | % | 1,000 | – |
| Korea Electric Vehicle Charging Service | Electric vehicle charge service | KOREA | 28.00 | % | 2,604 | 1,749 |
| Ulleungdo Natural Energy Co., Ltd. | Renewable power generation | KOREA | 29.85 | % | 8,000 | 6,370 |
| Korea Nuclear Partners Co., Ltd. | Electric material agency | KOREA | 29.00 | % | 290 | 383 |
| Tamra Offshore Wind Power Co., Ltd. | Power generation | KOREA | 27.00 | % | 8,910 | 8,560 |
| Korea Electric Power Corporation Fund(*12) | Developing electric enterprises | KOREA | 98.09 | % | 51,500 | 47,974 |
| Energy Infra Asset Management Co., Ltd.(*3) | Asset management | KOREA | 9.90 | % | 297 | 476 |
| Daegu clean Energy Co., Ltd. | Renewable power generation | KOREA | 28.00 | % | 140 | 11 |
| YaksuESS Co., Ltd | Installing ESS related equipment | KOREA | 29.00 | % | 210 | 194 |
| Nepal Water & Energy Development Company Private Limited(*15) | Construction and operation of utility plant | NEPAL | 62.13 | % | 33,577 | 30,498 |
| Gwangyang Green Energy Co., Ltd. | Power generation | KOREA | 20.00 | % | 2,000 | 1,772 |
| PND solar., Ltd | Power generation | KOREA | 29.00 | % | 1,250 | 1,250 |
| | | | | | 2,240,761 | 3,837,421 |
| **<Joint ventures>** | | | | | | |
| KEPCO-Uhde Inc.(*6) | Power generation | KOREA | 52.80 | % | 11,355 | 258 |
| Eco Biomass Energy Sdn. Bhd.(*6) | Power generation | MALAYSIA | 61.53 | % | 14,439 | – |
| Datang Chaoyang Renewable Power Co., Ltd. | Power generation | CHINA | 40.00 | % | 27,660 | 27,262 |
| Shuweihat Asia Power Investment B.V. | Holding company | NETHERLANDS | 49.00 | % | 46,037 | 15,675 |
| Shuweihat Asia Operation & Maintenance Company(*6) | Maintenance of utility plant | CAYMAN | 55.00 | % | 30 | 663 |
| Waterbury Lake Uranium L.P. | Resources development | CANADA | 35.76 | % | 26,602 | 19,781 |
| ASM-BG Investicii AD | Power generation | BULGARIA | 50.00 | % | 16,101 | 21,202 |
| RES Technology AD | Power generation | BULGARIA | 50.00 | % | 15,595 | 14,375 |
| KV Holdings, Inc. | Power generation | PHILIPPINES | 40.00 | % | 2,103 | 1,918 |
| KEPCO SPC Power Corporation(*6) | Construction and operation of utility plant | PHILIPPINES | 75.20 | % | 94,579 | 217,094 |
| Gansu Datang Yumen Wind Power Co., Ltd. | Power generation | CHINA | 40.00 | % | 16,621 | 10,840 |
| Datang Chifeng Renewable Power Co., Ltd. | Power generation | CHINA | 40.00 | % | 121,928 | 171,055 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | Power generation | CHINA | 40.00 | % | 10,858 | 11,060 |
| Rabigh Electricity Company | Power generation | SAUDI ARABIA | 40.00 | % | 109,743 | 99,356 |
| Rabigh Operation & Maintenance Company Limited | Maintenance of utility plant | SAUDI ARABIA | 40.00 | % | 70 | 3,987 |

F-87

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

2017

| Investees | Key operation activities | Location | Percentage of ownership | | | Acquisition cost | Book value |
|---|---|---|---|---|---|---|---|
| | | | | | | In millions of won | |
| Jamaica Public Service Company Limited | Power generation | JAMAICA | 40.00 | % | ₩ | 301,910 | 221,153 |
| KW Nuclear Components Co., Ltd. | Manufacturing | KOREA | 45.00 | % | | 833 | 6,703 |
| Busan Shinho Solar Power Co., Ltd. | Power generation | KOREA | 25.00 | % | | 2,100 | 4,346 |
| GS Donghae Electric Power Co., Ltd. | Power generation | KOREA | 34.00 | % | | 204,000 | 220,727 |
| Global Trade Of Power System Co., Ltd. | Exporting products and technology of small or medium business by proxy | KOREA | 29.00 | % | | 290 | 577 |
| Expressway Solar-light Power Generation Co., Ltd. | Power generation | KOREA | 29.00 | % | | 1,856 | 2,463 |
| KODE NOVUS I LLC | Power generation | USA | 50.00 | % | | 19,213 | – |
| KODE NOVUS II LLC | Power generation | USA | 50.00 | % | | 12,756 | – |
| Daejung Offshore Wind Power Co., Ltd. | Power generation | KOREA | 49.90 | % | | 5,190 | 2,969 |
| Amman Asia Electric Power Company(*6) | Power generation | JORDAN | 60.00 | % | | 111,476 | 145,676 |
| KAPES, Inc.(*6) | R&D | KOREA | 51.00 | % | | 5,629 | 7,476 |
| Dangjin Eco Power Co., Ltd. | Power generation | KOREA | 34.00 | % | | 61,540 | 57,928 |
| Honam Wind Power Co., Ltd. | Power generation | KOREA | 29.00 | % | | 3,480 | 4,302 |
| Chun-cheon Energy Co., Ltd. | Power generation | KOREA | 29.90 | % | | 52,700 | 48,118 |
| Yeonggwangbaeksu Wind Power Co., Ltd.(*3) | Power generation | KOREA | 15.00 | % | | 3,000 | 2,734 |
| Nghi Son 2 Power Ltd. | Power generation | VIETNAM | 50.00 | % | | 2,781 | 183 |
| Kelar S.A(*6) | Power generation | CHILE | 65.00 | % | | 77,220 | 67,233 |
| PT. Tanjung Power Indonesia | Power generation | INDONESIA | 35.00 | % | | 746 | 1,776 |
| Incheon New Power Co., Ltd. | Power generation | KOREA | 29.00 | % | | 461 | 619 |
| Seokmun Energy Co., Ltd. | Power generation | KOREA | 29.00 | % | | 15,370 | 13,786 |
| Daehan Wind Power PSC | Power generation | JORDAN | 50.00 | % | | 285 | – |
| Barakah One Company(*13) | Power generation | UAE | 18.00 | % | | 118 | 626 |
| Nawah Energy Company(*13) | Operation of utility plant | UAE | 18.00 | % | | 296 | 258 |
| MOMENTUM | International thermonuclear experimental reactor construction management | FRANCE | 33.33 | % | | 1 | 391 |
| Daegu Green Power Co., Ltd. | Power generation | KOREA | 29.00 | % | | 46,225 | 42,391 |
| Yeonggwang Wind Power Co., Ltd. | Power generation | KOREA | 41.00 | % | | 15,375 | 15,294 |
| Chester Solar IV SpA(*6) | Power generation | CHILE | 81.82 | % | | 1,700 | 1,700 |
| Chester Solar V SpA(*6) | Power generation | CHILE | 81.82 | % | | 525 | 525 |
| Diego de Almagro Solar SpA(*6) | Power generation | CHILE | 81.82 | % | | 2,091 | 2,091 |
| South Jamaica Power Company Limited | Power generation | JAMAICA | 20.00 | % | | 7,090 | 6,704 |
| | | | | | | 1,469,978 | 1,493,275 |
| | | | | | ₩ | 3,710,739 | 5,330,696 |

(*1)    The effective percentage of ownership is 21.57% considering treasury stocks.

(*2)    The Company can exercise significant influence by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*3)    The Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity.

(*4)    The Company can exercise significant influence by virtue of its contractual right to appoint one out of four members of the steering committee of the entity. Moreover, the Company has significant financial transactions, which can affect its influence on the entity.

(*5)    The Government regulates the Company's ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between KPX and the Company's other subsidiaries. The Company can exercise significant influence by its right to nominate directors to the board of directors of the entity.

F-88

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(\*6)   According to the shareholders' agreement, all critical financial and operating decisions must be agreed to by all ownership parties. For these reasons, the entities are classified as joint ventures.

(\*7)   As of reporting date, the annual reporting period of all associates and joint ventures ends on December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.

(\*8)   As of December 31, 2017, 15.64% of ownership of Hyundai Energy Co., Ltd. is held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only does the Company have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank with a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to the Company. In connection with this agreement, the Company applied the equity method on the investment in Hyundai Energy Co., Ltd. with 46.30% of ownership.

(\*9)   The Company's percentage of ownership has decreased due to the acquisition of Daeryun Power Co., Ltd. and the effective percentage of ownership is 19.45% considering stock purchase options.

(\*10)  The Company's effective percentage of ownership excluding the redeemable convertible preferred stock is 25.54%.

(\*11)  The effective percentage of ownership is less than 20% but the Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity and the fact that the dominant portion of the investee's sales transactions is generated from the Company.

(\*12)  The effective percentage of ownership is more than 50% but the Company does not hold control over relevant business while it exercises significant influence by participating in the Investment Decision Committee. For this reason, the entity is classified as an associate.

(\*13)  The effective percentage of ownership is less than 20% but the Company has joint control over the entity as decisions on the major activities require the unanimous consent of the parties that collectively control the entity

(\*14)  The percentage of ownership decreased since the Company did not participate in the capital increase of Green Biomass Co., Ltd. during the period.

(\*15)  The effective percentage of ownership is more than 50% but the Company does not hold control over the entity according to the shareholders' agreement. For this reason, the entity is classified as an associate.

(2)   **The fair value of associates which are actively traded on the open market and have a readily available market value as of December 31, 2016 and 2017 are as follows:**

| Investees | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| **<Associates>** | | | |
| Korea Electric Power Industrial Development Co., Ltd. | ₩ | 45,474 | 38,667 |
| Korea Gas Corporation(\*) | | 915,705 | 804,195 |
| YTN Co., Ltd. | | 22,320 | 18,855 |
| SPC Power Corporation | | 70,253 | 72,616 |
| PT. Bayan Resources TBK | | 359,200 | 558,267 |

(\*)   The carrying amount of Korea Gas Corporation ("KOGAS") is ₩1,618,868 million as of December 31, 2017 and management has determined that there is objective evidence of impairment. As a result of the impairment test, the Company has not recognized any impairment loss as the value in use is greater than the carrying amount. The recoverable amount of KOGAS based on its value in use is calculated by considering the long-term natural gas supply and demand programs of future cash flows approved by Ministry of Trade, Industry & Energy and the discount rate of 4.94%.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(3)    Changes in investments in associates and joint ventures for the years ended December 31, 2016 and 2017 are as follows:

| | 2016 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
| | | | | In millions of won | | | | |
| <Associates> | | | | | | | | |
| Daegu Green Power Co., Ltd. ₩ | 80,267 | 3,347 | (34,422 ) | – | (1,814 ) | 148 | (47,526) | – |
| Korea Gas Corporation | 2,102,813 | – | – | (3,213 ) | (146,308) | (14,551 ) | (4,864 ) | 1,933,877 |
| Korea Electric Power Industrial Development Co., Ltd. | 18,994 | – | – | (1,598 ) | 4,491 | – | (1,412 ) | 20,475 |
| YTN Co., Ltd. | 38,365 | – | – | – | (227 ) | 32 | (14 ) | 38,156 |
| Cheongna Energy Co., Ltd. | 19,490 | – | – | – | (7,117 ) | – | – | 12,373 |
| Gangwon Wind Power Co., Ltd. | 12,890 | – | – | (1,136 ) | 1,270 | 45 | – | 13,069 |
| Hyundai Green Power Co., Ltd. | 113,664 | – | – | (8,888 ) | 11,222 | – | – | 115,998 |
| Korea Power Exchange | 208,735 | – | – | – | 15,847 | – | (1,344 ) | 223,238 |
| AMEC Partners Korea Ltd. | 230 | – | – | – | (5 ) | – | – | 225 |
| Hyundai Energy Co., Ltd. | 6,990 | – | – | – | (21,163 ) | – | 15,204 | 1,031 |
| Ecollite Co., Ltd. | – | – | – | – | – | – | – | – |
| Taebaek Wind Power Co., Ltd. | 4,956 | – | – | – | (206 ) | – | – | 4,750 |
| Taeback Guinemi Wind Power Co., Ltd. | 2,587 | 570 | – | – | (26 ) | – | – | 3,131 |
| Pyeongchang Wind Power Co., Ltd. | 3,402 | – | – | – | (19 ) | – | – | 3,383 |
| Daeryun Power Co., Ltd. | 36,156 | – | – | – | (6,282 ) | (1 ) | – | 29,873 |
| JinanJangsu Wind Power Co., Ltd. | 77 | – | (64 ) | – | (13 ) | – | – | – |
| Changjuk Wind Power Co., Ltd. | 6,143 | – | – | (190 ) | 977 | – | – | 6,930 |
| KNH Solar Co., Ltd. | 1,924 | – | – | – | 144 | 5 | – | 2,073 |
| SPC Power Corporation | 58,033 | – | – | (7,151 ) | 6,416 | (477 ) | (3 ) | 56,818 |
| Gemeng International Energy Co., Ltd. | 728,396 | – | – | (16,476 ) | 26,714 | (58,493 ) | (76 ) | 680,065 |
| PT. Cirebon Electric Power | 60,574 | – | – | (1,242 ) | 31,531 | 2,568 | 3,247 | 96,658 |
| KNOC Nigerian East Oil Co., Ltd. | – | – | – | – | (1,346 ) | (398 ) | 1,744 | – |
| KNOC Nigerian West Oil Co., Ltd. | – | – | – | – | (973 ) | (356 ) | 1,329 | – |
| Dolphin Property Limited | 61 | – | – | (35 ) | – | (69 ) | 43 | – |
| PT Wampu Electric Power | 18,963 | – | – | – | 3,493 | (3 ) | 735 | 23,188 |
| PT. Bayan Resources TBK(*2) | 525,066 | – | – | – | (23,257 ) | 208 | (99,350) | 402,667 |
| S-Power Co., Ltd. | 130,908 | – | – | – | (7,006 ) | – | 10 | 123,912 |
| Pioneer Gas Power Limited | 51,187 | – | – | – | (698 ) | 251 | – | 50,740 |
| Eurasia Energy Holdings | – | – | – | – | – | – | – | – |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | 31,863 | 16,402 | – | – | 1,576 | 1,703 | – | 51,544 |
| Busan Solar Co., Ltd. | 925 | – | (887 ) | – | (38 ) | – | – | – |
| Hadong Mineral Fiber Co., Ltd. | – | – | – | – | – | – | – | – |
| Green Biomass Co., Ltd. | – | – | – | – | (138 ) | – | 185 | 47 |
| PT. Mutiara Jawa | – | – | – | – | – | – | – | – |
| Samcheok Eco Materials Co., Ltd. | – | – | – | – | – | – | – | – |
| Noeul Green Energy Co., Ltd. | 295 | 1,340 | – | – | (418 ) | – | – | 1,217 |
| Naepo Green Energy Co., Ltd. | 26,746 | – | – | – | (1,308 ) | – | – | 25,438 |
| Goseong Green Energy Co., Ltd. | 2,670 | – | – | – | 71 | – | (78 ) | 2,663 |
| Gangneung Eco Power Co., Ltd. | 2,688 | – | – | – | 56 | – | (98 ) | 2,646 |
| Shin Pyeongtaek Power Co., Ltd. | – | – | – | – | – | – | – | – |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | 189 | – | – | – | (10 ) | – | 2 | 181 |
| DS POWER Co., Ltd. | 10,960 | – | – | – | (3,738 ) | – | (32 ) | 7,190 |
| Dongducheon Dream Power Co., Ltd. | 55,667 | – | – | – | (8,757 ) | – | (34 ) | 46,876 |
| KS Solar Co., Ltd. | 618 | – | – | – | (14 ) | – | – | 604 |
| Yeongwol Energy Station Co., Ltd.(*1) | 1,290 | – | – | – | 85 | 25 | (1,400 ) | – |

F-90

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

2016

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | | |
| Jinbhuvish Power Generation Pvt. Ltd.(*3)  ₩ | 8,350 | – | – | – | (49) | (198) | (8,103) | – |
| SE Green Energy Co., Ltd. | 3,575 | – | – | – | (50) | – | – | 3,525 |
| Daegu Photovoltaic Co., Ltd. | 1,886 | – | – | (411) | 225 | – | – | 1,700 |
| Jeongam Wind Power Co., Ltd. | 702 | 3,900 | – | – | (602) | – | – | 4,000 |
| Korea Power Engineering Service Co., Ltd. | 1,805 | – | – | – | 1,005 | – | – | 2,810 |
| Busan Green Energy Co., Ltd. | 14,512 | – | – | – | (709) | – | – | 13,803 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | 904 | – | – | – | (904) | – | – | – |
| Korea Electric Vehicle Charging Service | 1,446 | – | – | – | (343) | – | – | 1,103 |
| Ulleungdo Natural Energy Co., Ltd. | 7,417 | – | – | – | (516) | – | (7) | 6,894 |
| Korea Nuclear Partners Co., Ltd. | 289 | – | – | – | (41) | – | – | 248 |
| Tamra Offshore Wind Power Co., Ltd. | – | 8,910 | – | – | (1,895) | – | – | 7,015 |
| Korea Electric Power Corporation Fund | – | 51,500 | – | – | (644) | – | – | 50,856 |
| Energy Infra Asset Management Co., Ltd. | – | 297 | – | – | (38) | – | – | 259 |
| Daegu clean Energy Co., Ltd. | – | 140 | – | – | – | – | – | 140 |
| YaksuESS Co., Ltd | – | 210 | – | – | (14) | – | – | 196 |
| Nepal Water & Energy Development Company Private Limited | – | – | – | – | – | – | 18,667 | 18,667 |
| | 4,405,668 | 86,616 | (35,373) | (40,340) | (131,583) | (69,561) | (123,175) | 4,092,252 |
| **<Joint ventures>** | | | | | | | | |
| KEPCO-Uhde Inc.(*4) | 8,549 | – | – | – | (159) | – | (8,089) | 301 |
| Eco Biomass Energy Sdn. Bhd. | – | – | – | – | – | – | – | – |
| Datang Chaoyang Renewable Power Co., Ltd. | 27,640 | – | – | – | 1,417 | (818) | – | 28,239 |
| Shuweihat Asia Power Investment B.V. | 20,474 | – | (14,154) | (2,957) | 6,131 | (9,494) | – | – |
| Shuweihat Asia Operation & Maintenance Company | 486 | – | – | (931) | 941 | (46) | – | 450 |
| Waterbury Lake Uranium L.P. | 20,299 | – | – | – | – | 1,138 | (123) | 21,314 |
| ASM-BG Investicii AD | 20,203 | – | – | – | 1,508 | (223) | – | 21,488 |
| RES Technology AD | 13,789 | – | – | – | (68) | (139) | – | 13,582 |
| KV Holdings, Inc. | 2,010 | – | – | (302) | 429 | (39) | – | 2,098 |
| KEPCO SPC Power Corporation | 208,524 | – | – | (5,955) | 48,132 | (5,308) | (26) | 245,367 |
| Canada Korea Uranium Limited Partnership | – | – | – | – | – | – | – | – |
| Gansu Datang Yumen Wind Power Co., Ltd. | 16,107 | – | – | – | (2,836) | (450) | – | 12,821 |
| Datang Chifeng Renewable Power Co., Ltd. | 171,224 | – | – | (7,384) | 7,455 | (4,760) | – | 166,535 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | 10,580 | – | – | (440) | 1,002 | (299) | – | 10,843 |
| Rabigh Electricity Company | 59,368 | – | – | – | 18,961 | 19,473 | – | 97,802 |
| Rabigh Operation & Maintenance Company Limited | 3,586 | – | – | (1,934) | 2,253 | 229 | 293 | 4,427 |
| Jamaica Public Service Company Limited | 241,918 | – | – | – | – | 7,535 | – | 249,453 |
| KW Nuclear Components Co., Ltd. | 4,985 | – | – | (2,191) | 4,344 | – | (5) | 7,133 |
| Busan Shinho Solar Power Co., Ltd. | 3,678 | – | – | (185) | 321 | – | – | 3,814 |
| GS Donghae Electric Power Co., Ltd. | 200,379 | – | – | – | 5,575 | – | (6) | 205,948 |

F-91

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2016**

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | | |
| Global Trade Of Power System Co., Ltd. ₩ | 426 | – | – | – | 51 | – | – | 477 |
| Expressway Solar-light Power Generation Co., Ltd. | 2,100 | – | – | – | 243 | – | – | 2,343 |
| KODE NOVUS I LLC | – | – | – | – | – | – | – | – |
| KODE NOVUS II LLC | – | 258 | – | – | (260 ) | – | 2 | – |
| Daejung Offshore Wind Power Co., Ltd. | 3,352 | – | – | – | (337 ) | – | – | 3,015 |
| Amman Asia Electric Power Company | 137,668 | – | – | (12,684 ) | 17,811 | 11,062 | – | 153,857 |
| KAPES, Inc. | 4,501 | – | – | – | 311 | – | (54 ) | 4,758 |
| Dangjin Eco Power Co., Ltd. | 48,281 | 5,100 | – | – | (696 ) | (26 ) | 594 | 53,253 |
| Honam Wind Power Co., Ltd. | 3,926 | – | – | (104 ) | 629 | – | – | 4,451 |
| Nepal Water & Energy Development Company Private Limited | 17,765 | – | – | – | 359 | 543 | (18,667 ) | – |
| Chun-cheon Energy Co., Ltd. | 31,976 | 19,832 | – | – | (1,121 ) | (95 ) | – | 50,592 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | 2,668 | – | – | – | 16 | – | 5 | 2,689 |
| Nghi Son 2 Power Ltd. | 269 | 716 | – | – | (740 ) | (16 ) | – | 229 |
| Kelar S.A | – | – | – | – | – | – | – | – |
| PT. Tanjung Power Indonesia | 617 | – | – | – | 1,337 | – | (8 ) | 1,946 |
| Incheon New Power Co., Ltd. | 514 | – | – | – | 41 | 8 | – | 563 |
| Seokmun Energy Co., Ltd. | – | – | – | – | (197 ) | 793 | (205 ) | 391 |
| Daehan Wind Power PSC | – | 285 | – | – | (261 ) | (8 ) | – | 16 |
| Barakah One Company | – | 118 | – | – | – | – | (2 ) | 116 |
| Nawah Energy Company | – | 296 | – | – | – | – | (6 ) | 290 |
| MOMENTUM | – | 1 | – | – | 65 | – | 1 | 67 |
| Daegu Green Power Co., Ltd. | – | – | – | – | – | – | 47,528 | 47,528 |
| | 1,287,862 | 26,606 | (14,154 ) | (35,067 ) | 112,657 | 19,060 | 21,232 | 1,418,196 |
| ₩ | 5,693,530 | 113,222 | (49,527 ) | (75,407 ) | (18,926 ) | (50,501 ) | (101,943 ) | 5,510,448 |

(*1)  'Others' include ₩1,400 million of assets held-for-sale (note 42).

(*2)  It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩99,338 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

(*3)  Due to discontinuation of operations during the year ended December 31, 2016, the Company recognized an impairment loss of ₩8,103 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

(*4)  It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩8,099 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

F-92

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | | | | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Investees | | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
| | | | | | | In millions of won | | | |
| **<Associates>** | | | | | | | | | |
| Korea Gas Corporation | ₩ | 1,933,877 | – | – | – | (242,232) | (72,648 ) | (129 ) | 1,618,868 |
| Korea Electric Power Industrial Development Co., Ltd. | | 20,475 | – | – | (2.061 ) | 3,428 | 102 | (106 ) | 21,838 |
| YTN Co., Ltd. | | 38,156 | – | – | (135 ) | 1,095 | 929 | 561 | 40,606 |
| Cheongna Energy Co., Ltd. | | 12,373 | – | – | – | (4,036 ) | – | – | 8,337 |
| Gangwon Wind Power Co., Ltd. | | 13,069 | – | – | (852 ) | 1,638 | – | – | 13,855 |
| Hyundai Green Power Co., Ltd. | | 115,998 | – | – | (8,889 ) | 7,697 | – | – | 114,806 |
| Korea Power Exchange | | 223,238 | – | – | – | 8,831 | – | 5,562 | 237,631 |
| AMEC Partners Korea Ltd. | | 225 | – | – | – | (10 ) | – | – | 215 |
| Hyundai Energy Co., Ltd. | | 1,031 | – | – | – | (3,498 ) | – | 2,467 | – |
| Ecollite Co., Ltd. | | – | – | – | – | – | – | – | – |
| Taebaek Wind Power Co., Ltd. | | 4,750 | – | – | – | 569 | – | – | 5,319 |
| Taeback Guinemi Wind Power Co., Ltd. | | 3,131 | – | – | – | (42 ) | – | – | 3,089 |
| Pyeongchang Wind Power Co., Ltd. | | 3,383 | – | – | – | 753 | – | – | 4,136 |
| Daeryun Power Co., Ltd. | | 29,873 | – | – | – | (4,762 ) | – | 2 | 25,113 |
| Changjuk Wind Power Co., Ltd. | | 6,930 | – | – | (111 ) | 696 | – | – | 7,515 |
| KNH Solar Co., Ltd. | | 2,073 | – | – | – | 145 | – | – | 2,218 |
| SPC Power Corporation | | 56,818 | – | – | (5,562 ) | 4,310 | (3,276 ) | (7 ) | 52,283 |
| Gemeng International Energy Co., Ltd. | | 680,065 | – | – | (13,365 ) | 6,953 | (23,680 ) | – | 649,973 |
| PT. Cirebon Electric Power | | 96,658 | – | – | (550 ) | 10,685 | 2,232 | (11,615) | 97,410 |
| KNOC Nigerian East Oil Co., Ltd. | | – | – | – | – | (1,914 ) | 1,536 | 378 | – |
| KNOC Nigerian West Oil Co., Ltd. | | – | – | – | – | (1,712 ) | 1,407 | 305 | – |
| PT Wampu Electric Power | | 23,188 | – | – | – | 9,336 | – | (3,121 ) | 29,403 |
| PT. Bayan Resources TBK | | 402,667 | – | – | – | 34,122 | 14,982 | 60 | 451,831 |
| S-Power Co., Ltd. | | 123,912 | – | – | – | (6,982 ) | – | 15 | 116,945 |
| Pioneer Gas Power Limited | | 50,740 | – | – | – | (11,119 ) | (1,238 ) | 276 | 38,659 |
| Eurasia Energy Holdings | | – | – | – | – | – | – | – | – |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | | 51,544 | 22,362 | – | – | (4,264 ) | (7,863 ) | – | 61,779 |
| Hadong Mineral Fiber Co., Ltd. | | – | – | – | – | (31 ) | – | 31 | – |
| Green Biomass Co., Ltd. | | 47 | – | – | – | (112 ) | – | 273 | 208 |
| PT. Mutiara Jawa | | – | – | – | – | – | – | – | – |
| Samcheok Eco Materials Co., Ltd. | | – | – | – | – | – | – | – | – |
| Noeul Green Energy Co., Ltd. | | 1,217 | – | – | – | 850 | – | – | 2,067 |
| Naepo Green Energy Co., Ltd.(*2) | | 25,438 | – | – | – | (1,400 ) | – | (3,440 ) | 20,598 |
| Goseong Green Energy Co., Ltd. | | 2,663 | – | – | – | (66 ) | – | – | 2,597 |
| Gangneung Eco Power Co., Ltd. | | 2,646 | – | – | – | (63 ) | – | – | 2,583 |
| Shin Pyeongtaek Power Co., Ltd. | | – | 43,880 | – | – | (10,998 ) | (3,617 ) | 5,638 | 34,903 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | | 181 | – | – | – | 6 | – | – | 187 |
| DS POWER Co., Ltd.(*4) | | 7,190 | – | – | – | (1,321 ) | – | (5,869 ) | – |
| Dongducheon Dream Power Co., Ltd.(*1,3) | | 46,876 | – | – | – | (10,980 ) | – | 17,337 | 53,233 |
| KS Solar Co., Ltd. | | 604 | – | (613 ) | – | – | 9 | – | – |
| Jinbhuvish Power Generation Pvt. Ltd. | | – | – | – | – | – | – | – | – |
| SE Green Energy Co., Ltd. | | 3,525 | – | – | – | (49 ) | – | – | 3,476 |
| Daegu Photovoltaic Co., Ltd. | | 1,700 | – | – | (349 ) | 367 | – | – | 1,718 |
| Jeongam Wind Power Co., Ltd. | | 4,000 | – | – | – | (237 ) | – | – | 3,763 |
| Korea Power Engineering Service Co., Ltd. | | 2,810 | – | – | (191 ) | 1,030 | – | 10 | 3,659 |
| Busan Green Energy Co., Ltd. | | 13,803 | – | (9,320 ) | – | 2,884 | – | (4 ) | 7,363 |

F-93

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

|  | 2017 | | | | | | | |
| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
|  |  | | | | In millions of won | | | |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | ₩ – | – | – | – | – | – | – | – |
| Korea Electric Vehicle Charging Service | 1,103 | 1,008 | – | – | (362 ) | – | – | 1,749 |
| Ulleungdo Natural Energy Co., Ltd. | 6,894 | – | – | – | (524 ) | – | – | 6,370 |
| Korea Nuclear Partners Co., Ltd. | 248 | – | – | – | 135 | – | – | 383 |
| Tamra Offshore Wind Power Co., Ltd. | 7,015 | – | – | – | 1,545 | – | – | 8,560 |
| Korea Electric Power Corporation Fund | 50,856 | – | – | – | (2,171 ) | (711 ) | – | 47,974 |
| Energy Infra Asset Management Co., Ltd. | 259 | – | – | – | 217 | – | – | 476 |
| Daegu clean Energy Co., Ltd. | 140 | – | – | – | (129 ) | – | – | 11 |
| YaksuESS Co., Ltd | 196 | – | – | – | (2 ) | – | – | 194 |
| Nepal Water & Energy Development Company Private Limited | 18,667 | 15,009 | – | – | (677 ) | (2,501 ) | – | 30,498 |
| Gwangyang Green Energy Co., Ltd. | – | 2,000 | – | – | (228 ) | – | – | 1,772 |
| PND solar, Ltd | – | 1,250 | – | – | – | – | – | 1,250 |
|  | 4,092,252 | 85,509 | (9,933 ) | (32,065 ) | (212,629) | (94,337 ) | 8,624 | 3,837,421 |
| <Joint ventures> | | | | | | | | |
| KEPCO-Uhde Inc. | 301 | – | – | – | (43 ) | – | – | 258 |
| Eco Biomass Energy Sdn. Bhd. | – | – | – | – | – | – | – | – |
| Datang Chaoyang Renewable Power Co., Ltd. | 28,239 | – | – | (839 ) | 840 | (978 ) | – | 27,262 |
| Shuweihat Asia Power Investment B.V. | – | – | – | (1,707 ) | 4,275 | 12,457 | 650 | 15,675 |
| Shuweihat Asia Operation & Maintenance Company | 450 | – | – | (770 ) | 1,055 | (172 ) | 100 | 663 |
| Waterbury Lake Uranium L.P. | 21,314 | – | – | – | (23 ) | (949 ) | (561 ) | 19,781 |
| ASM-BG Investicii AD | 21,488 | – | – | (946 ) | (150 ) | 810 | – | 21,202 |
| RES Technology AD | 13,582 | – | – | – | 1,053 | (260 ) | – | 14,375 |
| KV Holdings, Inc. | 2,098 | – | – | – | 61 | (241 ) | – | 1,918 |
| KEPCO SPC Power Corporation | 245,367 | – | – | (37,443 ) | 42,359 | (33,230 ) | 41 | 217,094 |
| Canada Korea Uranium Limited partnership | – | – | – | – | – | – | – | – |
| Gansu Datang Yumen Wind Power Co., Ltd. | 12,821 | – | – | – | (1,299 ) | (682 ) | – | 10,840 |
| Datang Chifeng Renewable Power Co., Ltd. | 166,535 | – | – | – | 14,079 | (9,559 ) | – | 171,055 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | 10,843 | – | – | – | 837 | (620 ) | – | 11,060 |
| Rabigh Electricity Company | 97,802 | – | – | (18,112 ) | 35,769 | (15,227 ) | (876 ) | 99,356 |
| Rabigh Operation & Maintenance Company Limited | 4,427 | – | – | (2,130 ) | 2,236 | (546 ) | – | 3,987 |
| Jamaica Public Service Company Limited | 249,453 | – | – | – | – | (28,300 ) | – | 221,153 |
| KW Nuclear Components Co., Ltd. | 7,133 | – | – | (208 ) | (222 ) | – | – | 6,703 |
| Busan Shinho Solar Power Co., Ltd. | 3,814 | – | – | (63 ) | 595 | – | – | 4,346 |
| GS Donghae Electric Power Co., Ltd. | 205,948 | – | – | – | 14,714 | – | 65 | 220,727 |
| Global Trade Of Power System Co., Ltd. | 477 | – | – | – | 100 | – | – | 577 |
| Expressway Solar-light Power Generation Co., Ltd. | 2,343 | – | – | – | 120 | – | – | 2,463 |

F-94

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | | |
| KODE NOVUS I LLC ₩ | – | – | – | – | – | – | – | – |
| KODE NOVUS II LLC | – | – | – | – | – | – | – | – |
| Daejung Offshore Wind Power Co., Ltd. | 3,015 | 200 | – | – | (246 ) | – | – | 2,969 |
| Amman Asia Electric Power Company | 153,857 | – | – | (12,213 ) | 19,957 | (15,925 ) | – | 145,676 |
| KAPES, Inc. | 4,758 | – | – | – | 2,752 | – | (34 ) | 7,476 |
| Dangjin Eco Power Co., Ltd. | 53,253 | 5,440 | – | – | (752 ) | (3 ) | (10 ) | 57,928 |
| Honam Wind Power Co., Ltd. | 4,451 | – | – | (487 ) | 338 | – | – | 4,302 |
| Chun-cheon Energy Co., Ltd. | 50,592 | – | – | – | (2,474 ) | – | – | 48,118 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | 2,689 | – | – | – | 45 | – | – | 2,734 |
| Nghi Son 2 Power Ltd. | 229 | 993 | – | – | (1,039 ) | – | – | 183 |
| Kelar S.A | – | 73,040 | – | – | (633 ) | (5,175 ) | 1 | 67,233 |
| PT. Tanjung Power Indonesia | 1,946 | – | – | – | 2,112 | (2,281 ) | (1 ) | 1,776 |
| Incheon New Power Co., Ltd. | 563 | – | – | – | 56 | – | – | 619 |
| Seokmun Energy Co., Ltd. | 391 | 14,790 | – | – | (1,219 ) | (176 ) | – | 13,786 |
| Daehan Wind Power PSC | 16 | – | – | – | (40 ) | 22 | 2 | – |
| Barakah One Company | 116 | – | – | – | 570 | (60 ) | – | 626 |
| Nawah Energy Company | 290 | – | – | – | (5 ) | (27 ) | – | 258 |
| MOMENTUM | 67 | – | – | – | 321 | 3 | – | 391 |
| Daegu Green Power Co., Ltd. | 47,528 | – | – | – | (5,133 ) | – | (4 ) | 42,391 |
| Yeonggwang Wind Power Co., Ltd. | – | 15,375 | – | – | (25 ) | (56 ) | – | 15,294 |
| Chester Solar IV SpA | – | 1,700 | – | – | – | – | – | 1,700 |
| Chester Solar V SpA | – | 525 | – | – | – | – | – | 525 |
| Diego de Almagro Solar SpA | – | 2,091 | – | – | – | – | – | 2,091 |
| South Jamaica Power Company Limited | – | 7,090 | – | – | – | – | (386 ) | 6,704 |
| | 1,418,196 | 121,244 | – | (74,918 ) | 130,941 | (101,175 ) | (1,013 ) | 1,493,275 |
| ₩ | 5,510,448 | 206,753 | (9,933 ) | (106,983 ) | (81,688 ) | (195,512 ) | 7,611 | 5,330,696 |

(*1)  It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩23,798 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2017.

(*2)  It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩3,440 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2017.

(*3)  'Others' include ₩41,170 million of assets held-for-sale (note 42).

(*4)  'Others' include ₩4,438 million of assets held-for-sale (note 42), and also include ₩1,439 million of available-for-sale financial assets which is reclassified due to loss of significant influence.

F-95

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(4)   Summary of financial information of associates and joint ventures as of and for the years ended December 31, 2016 and 2017 are as follows:

| | | 2016 | | | |
|---|---|---|---|---|---|
| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
| | | | | In millions of won | |
| **<Associates>** | | | | | |
| Korea Gas Corporation | ₩ | 39,927,836 | 30,541,350 | 21,108,116 | (673,558 ) |
| Korea Electric Power Industrial Development Co., Ltd. | | 144,346 | 73,742 | 304,067 | 17,187 |
| YTN Co., Ltd. | | 304,536 | 126,324 | 130,690 | 2,051 |
| Cheongna Energy Co., Ltd. | | 469,843 | 447,216 | 46,484 | (16,127 ) |
| Gangwon Wind Power Co., Ltd. | | 102,550 | 15,753 | 22,774 | 8,133 |
| Hyundai Green Power Co., Ltd. | | 1,151,975 | 751,981 | 469,547 | 38,743 |
| Korea Power Exchange | | 255,533 | 32,295 | 101,222 | 15,087 |
| AMEC Partners Korea Ltd. | | 1,216 | 32 | 103 | (25 ) |
| Hyundai Energy Co., Ltd. | | 505,979 | 499,205 | 61,813 | (45,800 ) |
| Ecollite Co., Ltd. | | 2,157 | 336 | – | (105 ) |
| Taebaek Wind Power Co., Ltd. | | 43,162 | 24,162 | 5,741 | (2,796 ) |
| Taeback Guinemi Wind Power Co., Ltd. | | 12,523 | 1 | – | (106 ) |
| Pyeongchang Wind Power Co., Ltd. | | 75,440 | 61,909 | 3,997 | (45 ) |
| Daeryun Power Co., Ltd. | | 793,283 | 644,930 | 249,558 | (32,291 ) |
| Changjuk Wind Power Co., Ltd. | | 37,878 | 15,162 | 5,782 | 1,739 |
| KNH Solar Co., Ltd. | | 25,878 | 18,199 | 4,006 | 638 |
| SPC Power Corporation | | 191,562 | 42,042 | 73,674 | 42,617 |
| Gemeng International Energy Co., Ltd. | | 5,822,879 | 3,821,905 | 1,233,972 | 66,370 |
| PT. Cirebon Electric Power | | 988,975 | 637,491 | 265,813 | 114,653 |
| KNOC Nigerian East Oil Co., Ltd. | | 272,964 | 358,211 | – | (7,051 ) |
| KNOC Nigerian West Oil Co., Ltd. | | 165,396 | 243,713 | – | (6,562 ) |
| PT Wampu Electric Power | | 222,004 | 171,595 | 19,260 | 7,550 |
| PT. Bayan Resources TBK | | 945,436 | 845,963 | 593,441 | 402 |
| S-Power Co., Ltd. | | 886,841 | 629,992 | 453,606 | (14,885 ) |
| Pioneer Gas Power Limited | | 345,791 | 276,978 | 14,353 | 396 |
| Eurasia Energy Holdings | | 618 | 1,103 | – | – |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | | 772,699 | 543,472 | – | 6,458 |
| Hadong Mineral Fiber Co., Ltd. | | – | 20 | – | – |
| Green Biomass Co., Ltd. | | 9,336 | 9,001 | 2,892 | (972 ) |
| PT. Mutiara Jawa | | 28,104 | 34,671 | 7,175 | (1,361 ) |
| Samcheok Eco Materials Co., Ltd. | | 24,143 | 254 | – | (1,945 ) |
| Noeul Green Energy Co., Ltd. | | 115,062 | 110,866 | 203 | (1,155 ) |
| Naepo Green Energy Co., Ltd. | | 104,029 | 2,276 | 4,912 | (5,230 ) |
| Goseong Green Energy Co., Ltd. | | 356,546 | 110,753 | – | (5,489 ) |
| Gangneung Eco Power Co., Ltd. | | 176,805 | 6,503 | – | (3,494 ) |
| Shin Pyeongtaek Power Co., Ltd. | | 54,174 | 60,518 | – | (3,291 ) |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | | 2,937 | 2,297 | 427 | (47 ) |
| DS POWER Co., Ltd. | | 726,699 | 618,793 | 276,324 | (10,031 ) |
| Dongducheon Dream Power Co., Ltd. | | 1,670,945 | 1,427,773 | 946,379 | (27,936 ) |
| KS Solar Co., Ltd. | | 27,213 | 24,035 | 4,152 | (79 ) |
| Jinbhuvish Power Generation Pvt. Ltd. | | 70,273 | 14,513 | – | (950 ) |
| SE Green Energy Co., Ltd. | | 7,381 | – | – | (103 ) |
| Daegu Photovoltaic Co., Ltd. | | 18,909 | 13,047 | 3,317 | 739 |

F-96

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2016**

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| Jeongam Wind Power Co., Ltd. | ₩ | 13,199 | 3,199 | – | (1,496 ) |
| Korea Power Engineering Service Co., Ltd. | | 13,401 | 3,713 | 27,394 | 3,463 |
| Busan Green Energy Co., Ltd. | | 147,843 | 100,247 | – | (2,444 ) |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | | 11,340 | 12,037 | – | (5,489 ) |
| Korea Electric Vehicle Charging Service | | 10,545 | 6,604 | 5,177 | (1,225 ) |
| Ulleungdo Natural Energy Co., Ltd. | | 24,836 | 1,738 | – | (1,730 ) |
| Korea Nuclear Partners Co., Ltd. | | 1,363 | 507 | 372 | (140 ) |
| Tamra Offshore Wind Power Co., Ltd. | | 127,880 | 101,900 | 983 | (6,307 ) |
| Korea Electric Power Corporation Fund | | 51,970 | 128 | 3 | (647 ) |
| Energy Infra Asset Management Co., Ltd. | | 2,779 | 160 | 32 | (381 ) |
| Daegu clean Energy Co., Ltd. | | 500 | – | – | – |
| YaksuESS Co., Ltd | | 6,474 | 5,801 | – | (48 ) |
| Nepal Water & Energy Development Company Private Limited | | 43,788 | 10,477 | – | (703 ) |
| | | | | | |
| <Joint ventures> | | | | | |
| KEPCO-Uhde Inc. | | 624 | 33 | – | (16,855 ) |
| Eco Biomass Energy Sdn. Bhd. | | – | – | – | – |
| Datang Chaoyang Renewable Power Co., Ltd. | | 142,684 | 72,086 | 18,628 | 3,462 |
| Shuweihat Asia Power Investment B.V. | | 282 | 4 | – | 12,380 |
| Shuweihat Asia Operation & Maintenance Company | | 1,016 | 13 | 2,388 | 1,723 |
| Waterbury Lake Uranium L.P. | | 56,181 | 47 | – | – |
| ASM-BG Investicii AD | | 79,898 | 36,921 | 12,604 | 3,105 |
| RES Technology AD | | 68,553 | 41,389 | 7,798 | (139 ) |
| KV Holdings, Inc. | | 5,245 | 1 | – | 1,072 |
| KEPCO SPC Power Corporation | | 448,069 | 121,783 | 165,046 | 63,689 |
| Canada Korea Uranium Limited Partnership | | 285 | 144 | – | (59 ) |
| Gansu Datang Yumen Wind Power Co., Ltd. | | 89,517 | 57,464 | 4,263 | (6,815 ) |
| Datang Chifeng Renewable Power Co., Ltd. | | 813,804 | 397,344 | 99,795 | 19,042 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | | 62,600 | 35,493 | 8,742 | 2,505 |
| Rabigh Electricity Company | | 2,691,654 | 2,258,772 | 278,431 | 37,791 |
| Rabigh Operation & Maintenance Company Limited | | 25,032 | 13,965 | 25,607 | 4,870 |
| Jamaica Public Service Company Limited | | 1,291,008 | 659,296 | 827,298 | 25,324 |
| KW Nuclear Components Co., Ltd. | | 26,417 | 11,990 | 26,481 | 9,452 |
| Busan Shinho Solar Power Co., Ltd. | | 47,789 | 32,533 | 6,770 | 1,247 |
| GS Donghae Electric Power Co., Ltd. | | 1,952,297 | 1,346,568 | 19,851 | 16,396 |
| Global Trade Of Power System Co., Ltd. | | 1,661 | 18 | 2,667 | 205 |
| Expressway Solar-light Power Generation Co., Ltd. | | 20,790 | 12,710 | 3,395 | 960 |
| KODE NOVUS I LLC | | 14,286 | 104,252 | 2,362 | (50,151 ) |
| KODE NOVUS II LLC | | 3,236 | 50,267 | 810 | (22,582 ) |
| Daejung Offshore Wind Power Co., Ltd. | | 6,076 | 34 | – | (675 ) |
| Amman Asia Electric Power Company | | 881,164 | 624,590 | 13,631 | 29,684 |
| KAPES, Inc. | | 145,576 | 136,247 | 31,852 | 456 |
| Dangjin Eco Power Co., Ltd. | | 149,926 | 1,001 | – | (2,023 ) |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2016**

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| Honam Wind Power Co., Ltd. | ₩ | 41,614 | 26,375 | 6,776 | 2,171 |
| Chun-cheon Energy Co., Ltd. | | 548,306 | 379,113 | – | (3,684 ) |
| Yeonggwangbaeksu Wind Power Co., Ltd. | | 99,773 | 81,881 | 11,208 | (26 ) |
| Nghi Son 2 Power Ltd. | | 757 | 302 | – | (1,481 ) |
| Kelar S.A | | 617,803 | 712,124 | – | (4,109 ) |
| PT. Tanjung Power Indonesia | | 203,051 | 197,491 | 122,583 | 3,821 |
| Incheon New Power Co., Ltd. | | 7,902 | 5,961 | 2,985 | 168 |
| Seokmun Energy Co., Ltd. | | 235,905 | 234,556 | – | (543 ) |
| Daehan Wind Power PSC | | 750 | 714 | – | (523 ) |
| Barakah One Company | | 17,117,338 | 17,116,680 | – | – |
| Nawah Energy Company | | 1,645 | – | – | – |
| MOMENTUM | | 2,749 | 2,547 | 2,886 | 194 |
| Daegu Green Power Co., Ltd. | | 636,438 | 547,017 | 265,621 | (3,981 ) |

**2017**

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| <Associates> | | | | | |
| Korea Gas Corporation | ₩ | 37,139,439 | 28,999,025 | 22,172,305 | (1,205,110 ) |
| Korea Electric Power Industrial Development Co., Ltd. | | 155,033 | 79,730 | 334,547 | 16,126 |
| YTN Co., Ltd. | | 298,122 | 108,554 | 131,080 | 3,638 |
| Cheongna Energy Co., Ltd. | | 461,958 | 448,535 | 56,533 | (9,203 ) |
| Gangwon Wind Power Co., Ltd. | | 94,281 | 2,243 | 25,963 | 11,121 |
| Hyundai Green Power Co., Ltd. | | 1,150,729 | 754,846 | 477,373 | 26,543 |
| Korea Power Exchange | | 263,499 | 25,868 | 105,107 | 8,831 |
| AMEC Partners Korea Ltd. | | 1,135 | 4 | 1 | (53 ) |
| Hyundai Energy Co., Ltd. | | 474,939 | 511,486 | 92,992 | (43,317 ) |
| Ecollite Co., Ltd. | | 2,052 | 352 | – | (121 ) |
| Taebaek Wind Power Co., Ltd. | | 39,227 | 17,953 | 7,056 | 2,312 |
| Taeback Guinemi Wind Power Co., Ltd. | | 12,369 | 12 | – | (140 ) |
| Pyeongchang Wind Power Co., Ltd. | | 77,152 | 60,606 | 11,907 | 3,038 |
| Daeryun Power Co., Ltd. | | 779,258 | 655,377 | 156,508 | (23,978 ) |
| Changjuk Wind Power Co., Ltd. | | 35,794 | 10,745 | 6,981 | 2,317 |
| KNH Solar Co., Ltd. | | 24,432 | 16,215 | 3,947 | 628 |
| SPC Power Corporation | | 137,586 | – | 68,149 | 37,395 |
| Gemeng International Energy Co., Ltd. | | 6,496,294 | 4,584,608 | 1,334,833 | 21,769 |
| PT. Cirebon Electric Power | | 903,429 | 549,212 | 280,452 | 38,448 |
| KNOC Nigerian East Oil Co., Ltd. | | 241,808 | 329,639 | – | (10,754 ) |
| KNOC Nigerian West Oil Co., Ltd. | | 147,185 | 227,588 | – | (9,768 ) |
| PT Wampu Electric Power | | 212,095 | 148,177 | 779 | 8,114 |
| PT. Bayan Resources TBK | | 908,106 | 556,881 | 811,515 | 243,621 |
| S-Power Co., Ltd. | | 859,633 | 617,224 | 489,042 | (14,470 ) |
| Pioneer Gas Power Limited | | 339,271 | 296,898 | 8,215 | (27,796 ) |
| Eurasia Energy Holdings | | 548 | 978 | – | – |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | | 858,789 | 607,462 | – | (16,677 ) |
| Hadong Mineral Fiber Co., Ltd. | | 203 | 231 | – | (260 ) |
| Green Biomass Co., Ltd. | | 6,379 | 4,018 | 2,337 | (956 ) |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

2017

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| PT. Mutiara Jawa | ₩ | 27,098 | 29,670 | 13,574 | 3,455 |
| Samcheok Eco Materials Co., Ltd. | | 23,729 | 270 | 15 | (541 ) |
| Noeul Green Energy Co., Ltd. | | 127,980 | 120,852 | 43,099 | 2,932 |
| Naepo Green Energy Co., Ltd. | | 121,375 | 71,945 | 5,696 | (5,603 ) |
| Goseong Green Energy Co., Ltd. | | 1,081,238 | 841,330 | – | (5,811 ) |
| Gangneung Eco Power Co., Ltd. | | 186,765 | 20,344 | – | (3,407 ) |
| Shin Pyeongtaek Power Co., Ltd. | | 175,870 | 90,662 | – | (4,585 ) |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | | 2,782 | 2,120 | 451 | 22 |
| Dongducheon Dream Power Co., Ltd. | | 1,575,175 | 1,365,845 | 813,440 | (33,740 ) |
| Jinbhuvish Power Generation Pvt. Ltd. | | 66,047 | 13,640 | – | – |
| SE Green Energy Co., Ltd. | | 7,278 | – | – | (103 ) |
| Daegu Photovoltaic Co., Ltd. | | 17,262 | 11,339 | 3,714 | 1,263 |
| Jeongam Wind Power Co., Ltd. | | 67,427 | 58,019 | – | (580 ) |
| Korea Power Engineering Service Co., Ltd. | | 15,738 | 3,121 | 22,283 | 3,783 |
| Busan Green Energy Co., Ltd. | | 193,253 | 167,864 | 34,280 | 9,946 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | | 9,648 | 16,462 | – | (6,109 ) |
| Korea Electric Vehicle Charging Service | | 14,650 | 8,404 | 8,399 | (1,295 ) |
| Ulleungdo Natural Energy Co., Ltd. | | 25,842 | 4,501 | – | (1,758 ) |
| Korea Nuclear Partners Co., Ltd. | | 2,033 | 711 | 1,345 | 465 |
| Tamra Offshore Wind Power Co., Ltd. | | 163,740 | 132,036 | 4,392 | (191 ) |
| Korea Electric Power Corporation Fund | | 49,170 | 265 | 666 | (2,213 ) |
| Energy Infra Asset Management Co., Ltd. | | 5,240 | 431 | 5,807 | 2,203 |
| Daegu clean Energy Co., Ltd. | | 252 | 212 | – | (460 ) |
| YaksuESS Co., Ltd | | 7,105 | 6,437 | 381 | (6 ) |
| Nepal Water & Energy Development Company Private Limited | | 58,121 | 11,670 | – | (968 ) |
| Gwangyang Green Energy Co., Ltd. | | 20,165 | 11,393 | – | (1,139 ) |
| PND solar., Ltd | | 10,508 | 6,729 | – | (406 ) |
| **<Joint ventures>** | | | | | |
| KEPCO-Uhde Inc. | | 515 | 7 | – | (86 ) |
| Eco Biomass Energy Sdn. Bhd. | | – | – | – | – |
| Datang Chaoyang Renewable Power Co., Ltd. | | 138,463 | 70,309 | 17,776 | 2,149 |
| Shuweihat Asia Power Investment B.V. | | 32,001 | 10 | – | (170 ) |
| Shuweihat Asia Operation & Maintenance Company | | 1,220 | 14 | 2,580 | 1,918 |
| Waterbury Lake Uranium L.P. | | 55,563 | 250 | – | – |
| ASM-BG Investicii AD | | 87,110 | 44,706 | 12,611 | (262 ) |
| RES Technology AD | | 71,595 | 42,845 | 7,793 | 2,164 |
| KV Holdings, Inc. | | 4,795 | – | 671 | 677 |
| KEPCO SPC Power Corporation | | 318,911 | 30,222 | 186,725 | 57,364 |
| Gansu Datang Yumen Wind Power Co., Ltd. | | 81,960 | 54,859 | 6,938 | (3,253 ) |
| Datang Chifeng Renewable Power Co., Ltd. | | 762,605 | 334,843 | 113,329 | 35,294 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | | 60,913 | 33,264 | 8,442 | 2,094 |
| Rabigh Electricity Company | | 2,364,522 | 1,936,403 | 287,105 | 78,948 |
| Rabigh Operation & Maintenance Company Limited | | 19,992 | 10,025 | 22,668 | 5,668 |

F-99

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

|  | 2017 | | | |
|---|---|---|---|---|
| Investees | Total assets | Total liabilities | Sales | Profit (loss) for the period |
| | | In millions of won | | |
| Jamaica Public Service Company Limited | ₩ 1,276,279 | 752,617 | 946,365 | 24,601 |
| KW Nuclear Components Co., Ltd. | 25,693 | 10,221 | 6,486 | 1,493 |
| Busan Shinho Solar Power Co., Ltd. | 47,959 | 30,573 | 7,984 | 2,383 |
| GS Donghae Electric Power Co., Ltd. | 2,179,465 | 1,530,266 | 351,814 | 43,180 |
| Global Trade Of Power System Co., Ltd. | 3,576 | 1,586 | 4,079 | 365 |
| Expressway Solar-light Power Generation Co., Ltd. | 19,143 | 10,651 | 3,018 | 643 |
| KODE NOVUS I LLC | 755 | 108,132 | 14 | (8,117 ) |
| KODE NOVUS II LLC | 292 | 47,683 | – | (6,018 ) |
| Daejung Offshore Wind Power Co., Ltd. | 6,193 | 243 | – | (493 ) |
| Amman Asia Electric Power Company | 759,114 | 516,174 | 18,034 | 33,514 |
| KAPES, Inc. | 70,679 | 56,021 | 129,962 | 5,397 |
| Dangjin Eco Power Co., Ltd. | 163,197 | 521 | – | (2,182 ) |
| Honam Wind Power Co., Ltd. | 39,675 | 24,951 | 5,961 | 1,166 |
| Chun-cheon Energy Co., Ltd. | 699,652 | 538,733 | 164,294 | (8,145 ) |
| Yeonggwangbaeksu Wind Power Co., Ltd. | 94,810 | 76,621 | 11,124 | 297 |
| Nghi Son 2 Power Ltd. | 741 | 376 | – | (2,068 ) |
| Kelar S.A | 613,293 | 513,101 | 90,435 | 17,590 |
| PT. Tanjung Power Indonesia | 374,702 | 369,627 | 209,923 | 6,219 |
| Incheon New Power Co., Ltd. | 7,194 | 5,059 | 2,972 | 184 |
| Seokmun Energy Co., Ltd. | 247,735 | 200,197 | 35,135 | (3,939 ) |
| Daehan Wind Power PSC | 928 | 1,752 | – | (904 ) |
| Barakah One Company | 17,574,885 | 17,571,409 | – | (1,358 ) |
| Nawah Energy Company | 1,459 | 23 | – | (11 ) |
| MOMENTUM | 5,028 | 3,854 | 11,555 | 939 |
| Daegu Green Power Co., Ltd. | 602,809 | 531,103 | 256,359 | (17,700 ) |
| Yeonggwang Wind Power Co., Ltd. | 212,802 | 176,062 | – | (62 ) |
| Chester Solar IV SpA | 11,660 | 9,626 | 331 | 151 |
| Chester Solar V SpA | 2,081 | 1,569 | – | (49 ) |
| Diego de Almagro Solar SpA | 8,266 | 5,830 | – | (103 ) |
| South Jamaica Power Company Limited | 153,958 | 120,436 | – | (755 ) |

(5)    Financial information of associates and joint ventures reconciled to the Company's investments in consolidated financial statements as of December 31, 2016 and 2017 are as follows:

|  | 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
| | | | In millions of won | | | | |
| <Associates> | | | | | | | |
| Korea Gas Corporation | ₩ 9,386,486 | 21.57 % | 2,024,665 | – | – | (90,788) | 1,933,877 |
| Korea Electric Power Industrial Development Co., Ltd. | 70,604 | 29.00 % | 20,475 | – | – | – | 20,475 |
| YTN Co., Ltd. | 178,212 | 21.43 % | 38,191 | – | (30 ) | (5 ) | 38,156 |
| Cheongna Energy Co., Ltd. | 22,627 | 43.90 % | 9,933 | 2,584 | (144 ) | – | 12,373 |
| Gangwon Wind Power Co., Ltd. | 86,797 | 15.00 % | 13,020 | – | – | 49 | 13,069 |
| Hyundai Green Power Co., Ltd. | 399,994 | 29.00 % | 115,998 | – | – | – | 115,998 |
| Korea Power Exchange | 223,238 | 100.00 % | 223,238 | – | – | – | 223,238 |
| AMEC Partners Korea Ltd. | 1,184 | 19.00 % | 225 | – | – | – | 225 |
| Hyundai Energy Co., Ltd. | 6,774 | 46.30 % | 3,136 | – | (1,079 ) | (1,026 ) | 1,031 |
| Ecollite Co., Ltd. | 1,821 | 36.10 % | 657 | – | – | (657 ) | – |
| Taebaek Wind Power Co., Ltd. | 19,000 | 25.00 % | 4,750 | – | – | – | 4,750 |
| Taeback Guinemi Wind Power Co., Ltd. | 12,522 | 25.00 % | 3,131 | – | – | – | 3,131 |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Investees | Net assets | | Percentage of ownership(*) | | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **2016** | | | | |
| | | | | | | | In millions of won | | |
| Pyeongchang Wind Power Co., Ltd. | ₩ | 13,531 | 25.00 | % | 3,383 | – | – | – | 3,383 |
| Daeryun Power Co., Ltd. | | 148,353 | 19.45 | % | 28,855 | 1,014 | – | 4 | 29,873 |
| Changjuk Wind Power Co., Ltd. | | 22,716 | 30.00 | % | 6,815 | – | – | 115 | 6,930 |
| KNH Solar Co., Ltd. | | 7,679 | 27.00 | % | 2,073 | – | – | – | 2,073 |
| SPC Power Corporation | | 149,520 | 38.00 | % | 56,818 | – | – | – | 56,818 |
| Gemeng International Energy Co., Ltd. | | 2,000,974 | 34.00 | % | 680,331 | – | – | (266 ) | 680,065 |
| PT. Cirebon Electric Power | | 351,484 | 27.50 | % | 96,658 | – | – | – | 96,658 |
| KNOC Nigerian East Oil Co., Ltd. | | (85,247 ) | 14.63 | % | (12,472 ) | – | – | 12,472 | – |
| KNOC Nigerian West Oil Co., Ltd. | | (78,317 ) | 14.63 | % | (11,458 ) | – | – | 11,458 | – |
| PT Wampu Electric Power | | 50,409 | 46.00 | % | 23,188 | – | – | – | 23,188 |
| PT. Bayan Resources TBK | | 99,473 | 20.00 | % | 19,895 | 482,109 | – | (99,337) | 402,667 |
| S-Power Co., Ltd. | | 256,849 | 49.00 | % | 125,856 | – | (1,944 ) | – | 123,912 |
| Pioneer Gas Power Limited | | 68,813 | 40.00 | % | 27,525 | 23,147 | – | 68 | 50,740 |
| Eurasia Energy Holdings | | (485 ) | 40.00 | % | (194 ) | – | – | 194 | – |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | | 229,227 | 25.00 | % | 57,307 | (4,802 ) | (672 ) | (289 ) | 51,544 |
| Hadong Mineral Fiber Co., Ltd. | | (20 ) | 25.00 | % | (5 ) | – | – | 5 | – |
| Green Biomass Co., Ltd. | | 335 | 14.00 | % | 47 | – | – | – | 47 |
| PT. Mutiara Jawa | | (6,567 ) | 29.00 | % | (1,904 ) | 70 | – | 1,834 | – |
| Samcheok Eco Materials Co., Ltd. | | 23,889 | 2.35 | % | 561 | – | – | (561 ) | – |
| Noeul Green Energy Co., Ltd. | | 4,196 | 29.00 | % | 1,217 | – | – | – | 1,217 |
| Naepo Green Energy Co., Ltd. | | 101,753 | 25.00 | % | 25,438 | – | – | – | 25,438 |
| Goseong Green Energy Co., Ltd. | | 245,793 | 1.12 | % | 2,742 | – | (79 ) | – | 2,663 |
| Gangneung Eco Power Co., Ltd. | | 170,302 | 1.61 | % | 2,744 | – | (98 ) | – | 2,646 |
| Shin Pyeongtaek Power Co., Ltd. | | (6,344 ) | 40.00 | % | (2,538 ) | – | (3,380 ) | 5,918 | – |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | | 640 | 28.00 | % | 179 | – | – | 2 | 181 |
| DS POWER Co., Ltd. | | 107,906 | 14.44 | % | 15,582 | – | (7,302 ) | (1,090 ) | 7,190 |
| Dongducheon Dream Power Co., Ltd. | | 243,172 | 33.61 | % | 81,730 | – | (4,768 ) | (30,086) | 46,876 |
| KS Solar Co., Ltd. | | 3,178 | 19.00 | % | 604 | – | – | – | 604 |
| Jinbhuvish Power Generation Pvt. Ltd. | | 55,760 | 5.16 | % | 2,877 | – | – | (2,877 ) | – |
| SE Green Energy Co., Ltd. | | 7,381 | 47.76 | % | 3,525 | – | – | – | 3,525 |
| Daegu Photovoltaic Co., Ltd. | | 5,862 | 29.00 | % | 1,700 | – | – | – | 1,700 |
| Jeongam Wind Power Co., Ltd. | | 10,000 | 40.00 | % | 4,000 | – | – | – | 4,000 |
| Korea Power Engineering Service Co., Ltd. | | 9,688 | 29.00 | % | 2,810 | – | – | – | 2,810 |
| Busan Green Energy Co., Ltd. | | 47,596 | 29.00 | % | 13,803 | – | – | – | 13,803 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | | (697 ) | 18.87 | % | (132 ) | – | – | 132 | – |
| Korea Electric Vehicle Charging Service | | 3,941 | 28.00 | % | 1,103 | – | – | – | 1,103 |
| Ulleungdo Natural Energy Co., Ltd. | | 23,098 | 29.85 | % | 6,895 | – | – | (1 ) | 6,894 |
| Korea Nuclear Partners Co., Ltd. | | 856 | 29.00 | % | 248 | – | – | – | 248 |
| Tamra Offshore Wind Power Co., Ltd. | | 25,980 | 27.00 | % | 7,015 | – | – | – | 7,015 |
| Korea Electric Power Corporation Fund | | 51,842 | 98.09 | % | 50,852 | – | – | 4 | 50,856 |
| Energy Infra Asset Management Co., Ltd. | | 2,619 | 9.90 | % | 259 | – | – | – | 259 |
| Daegu clean Energy Co., Ltd. | | 500 | 28.00 | % | 140 | – | – | – | 140 |
| YaksuESS Co., Ltd. | | 673 | 29.00 | % | 195 | – | – | 1 | 196 |
| Nepal Water & Energy Development Company Private Limited | | 33,311 | 52.77 | % | 17,578 | 972 | – | 117 | 18,667 |
| **<Joint ventures>** | | | | | | | | | |
| KEPCO-Uhde Inc. | | 591 | 50.85 | % | 301 | – | – | – | 301 |
| Eco Biomass Energy Sdn. Bhd. | | – | 61.53 | % | – | – | – | – | – |
| Datang Chaoyang Renewable Power Co., Ltd. | | 70,598 | 40.00 | % | 28,239 | – | – | – | 28,239 |
| Shuweihat Asia Power Investment B.V. | | 278 | 49.00 | % | 136 | – | – | (136 ) | – |
| Shuweihat Asia Operation & Maintenance Company | | 1,003 | 55.00 | % | 552 | – | – | (102 ) | 450 |
| Waterbury Lake Uranium L.P. | | 56,134 | 36.97 | % | 20,753 | – | – | 561 | 21,314 |
| ASM-BG Investicii AD | | 42,977 | 50.00 | % | 21,489 | – | – | (1 ) | 21,488 |
| RES Technology AD | | 27,164 | 50.00 | % | 13,582 | – | – | – | 13,582 |
| KV Holdings, Inc. | | 5,244 | 40.00 | % | 2,098 | – | – | – | 2,098 |
| KEPCO SPC Power Corporation | | 326,286 | 75.20 | % | 245,367 | – | – | – | 245,367 |
| Canada Korea Uranium Limited Partnership | | 141 | 12.50 | % | 18 | – | – | (18 ) | – |

F-101

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2016**

| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | |
| Gansu Datang Yumen Wind Power Co., Ltd. | ₩ 32,053 | 40.00 % | 12,821 | – | – | – | 12,821 |
| Datang Chifeng Renewable Power Co., Ltd. | 416,460 | 40.00 % | 166,584 | – | – | (49) | 166,535 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | 27,107 | 40.00 % | 10,843 | – | – | – | 10,843 |
| Rabigh Electricity Company | 432,882 | 40.00 % | 173,153 | – | (75,311) | (40) | 97,802 |
| Rabigh Operation & Maintenance Company Limited | 11,067 | 40.00 % | 4,427 | – | – | – | 4,427 |
| Jamaica Public Service Company Limited | 631,712 | 40.00 % | 252,685 | (80,161) | – | 76,929 | 249,453 |
| KW Nuclear Components Co., Ltd. | 14,427 | 45.00 % | 6,492 | 90 | – | 551 | 7,133 |
| Busan Shinho Solar Power Co., Ltd. | 15,256 | 25.00 % | 3,814 | – | – | – | 3,814 |
| GS Donghae Electric Power Co., Ltd. | 605,729 | 34.00 % | 205,948 | – | – | – | 205,948 |
| Global Trade Of Power System Co., Ltd. | 1,643 | 29.00 % | 476 | – | – | 1 | 477 |
| Expressway Solar-light Power Generation Co., Ltd. | 8,080 | 29.00 % | 2,343 | – | – | – | 2,343 |
| KODE NOVUS I LLC | (89,966) | 50.00 % | (44,983) | 4,732 | – | 40,251 | – |
| KODE NOVUS II LLC | (47,031) | 50.00 % | (23,516) | – | – | 23,516 | – |
| Daejung Offshore Wind Power Co., Ltd. | 6,042 | 49.90 % | 3,015 | – | – | – | 3,015 |
| Amman Asia Electric Power Company | 256,574 | 60.00 % | 153,944 | – | – | (87) | 153,857 |
| KAPES, Inc. | 9,329 | 51.00 % | 4,758 | – | – | – | 4,758 |
| Dangjin Eco Power Co., Ltd. | 148,925 | 34.00 % | 50,635 | 2,618 | – | – | 53,253 |
| Honam Wind Power Co., Ltd. | 15,239 | 29.00 % | 4,419 | 32 | – | – | 4,451 |
| Chun-cheon Energy Co., Ltd. | 169,193 | 29.90 % | 50,589 | 3 | – | – | 50,592 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | 17,892 | 15.00 % | 2,684 | 5 | – | – | 2,689 |
| Nghi Son 2 Power Ltd. | 455 | 50.00 % | 228 | – | – | 1 | 229 |
| Kelar S.A | (94,321) | 65.00 % | (61,309) | 2,424 | – | 58,885 | – |
| PT. Tanjung Power Indonesia | 5,560 | 35.00 % | 1,946 | – | – | – | 1,946 |
| Incheon New Power Co., Ltd. | 1,941 | 29.00 % | 563 | – | – | – | 563 |
| Seokmun Energy Co., Ltd. | 1,349 | 29.00 % | 391 | – | – | – | 391 |
| Daehan Wind Power PSC | 36 | 50.00 % | 18 | – | – | (2) | 16 |
| Barakah One Company | 658 | 18.00 % | 118 | – | – | (2) | 116 |
| Nawah Energy Company | 1,645 | 18.00 % | 296 | – | – | (6) | 290 |
| MOMENTUM | 202 | 33.33 % | 67 | – | – | – | 67 |
| Daegu Green Power Co., Ltd. | 89,421 | 29.00 % | 25,932 | 84 | – | 21,512 | 47,528 |

(*)   The percentage of ownership shown above is after considering the treasury stocks and others.

**2017**

| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | |
| <Associates> | | | | | | | |
| Korea Gas Corporation | ₩ 8,140,414 | 21.57 % | 1,755,887 | – | – | (137,019) | 1,618,868 |
| Korea Electric Power Industrial Development Co., Ltd. | 75,303 | 29.00 % | 21,838 | – | – | – | 21,838 |
| YTN Co., Ltd. | 189,568 | 21.43 % | 40,624 | – | (18) | –. | 40,606 |
| Cheongna Energy Co., Ltd. | 13,423 | 43.90 % | 5,893 | 2,584 | (140) | – | 8,337 |
| Gangwon Wind Power Co., Ltd. | 92,038 | 15.00 % | 13,806 | – | – | 49 | 13,855 |
| Hyundai Green Power Co., Ltd. | 395,883 | 29.00 % | 114,806 | – | – | – | 114,806 |
| Korea Power Exchange | 237,631 | 100.00 % | 237,631 | – | – | – | 237,631 |
| AMEC Partners Korea Ltd. | 1,131 | 19.00 % | 215 | – | – | – | 215 |
| Hyundai Energy Co., Ltd. | (36,547) | 46.30 % | (16,921) | – | (1,037) | 17,958 | – |
| Ecollite Co., Ltd. | 1,700 | 36.10 % | 614 | – | – | (614) | – |
| Taebaek Wind Power Co., Ltd. | 21,274 | 25.00 % | 5,319 | – | – | – | 5,319 |
| Taebaek Guinemi Wind Power Co., Ltd. | 12,357 | 25.00 % | 3,089 | – | – | – | 3,089 |
| Pyeongchang Wind Power Co., Ltd. | 16,546 | 25.00 % | 4,136 | – | – | – | 4,136 |
| Daeryun Power Co., Ltd. | 123,881 | 19.45 % | 24,095 | 1,014 | – | 4 | 25,113 |
| Changjuk Wind Power Co., Ltd. | 25,049 | 30.00 % | 7,515 | – | – | – | 7,515 |
| KNH Solar Co., Ltd. | 8,217 | 27.00 % | 2,218 | – | – | – | 2,218 |
| SPC Power Corporation | 137,586 | 38.00 % | 52,283 | – | – | – | 52,283 |
| Gemeng International Energy Co., Ltd. | 1,911,686 | 34.00 % | 649,973 | – | – | – | 649,973 |
| PT. Cirebon Electric Power | 354,217 | 27.50 % | 97,410 | – | – | – | 97,410 |

F-102

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2017**

| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | |
| KNOC Nigerian East Oil Co., Ltd. ₩ | (87,831 ) | 14.63 % | (12,850 ) | – | – | 12,850 | – |
| KNOC Nigerian West Oil Co., Ltd. | (80,403 ) | 14.63 % | (11,763 ) | – | – | 11,763 | – |
| PT Wampu Electric Power | 63,918 | 46.00 % | 29,403 | – | – | – | 29,403 |
| PT. Bayan Resources TBK | 351,225 | 20.00 % | 70,245 | 482,109 | – | (100,523) | 451,831 |
| S-Power Co., Ltd. | 242,409 | 49.00 % | 118,780 | – | (1,835 ) | – | 116,945 |
| Pioneer Gas Power Limited | 42,373 | 38.50 % | 16,314 | 22,278 | – | 67 | 38,659 |
| Eurasia Energy Holdings | (430 ) | 40.00 % | (172 ) | – | – | 172 | – |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | 251,327 | 25.00 % | 62,832 | 74 | (838 ) | (289 ) | 61,779 |
| Hadong Mineral Fiber Co., Ltd. | (28 ) | 8.33 % | (2 ) | – | – | 2 | – |
| Green Biomass Co., Ltd. | 2,361 | 8.80 % | 208 | – | – | – | 208 |
| PT. Mutiara Jawa | (2,572 ) | 29.00 % | (746 ) | – | – | 746 | – |
| Samcheok Eco Materials Co., Ltd. | 23,459 | 2.35 % | 551 | – | – | (551 ) | – |
| Noeul Green Energy Co., Ltd. | 7,128 | 29.00 % | 2,067 | – | – | – | 2,067 |
| Naepo Green Energy Co., Ltd. | 49,430 | 41.67 % | 20,598 | – | – | – | 20,598 |
| Goseong Green Energy Co., Ltd. | 239,908 | 1.12 % | 2,676 | – | (79 ) | – | 2,597 |
| Gangneung Eco Power Co., Ltd. | 166,421 | 1.61 % | 2,681 | – | (98 ) | – | 2,583 |
| Shin Pyeongtaek Power Co., Ltd. | 85,208 | 40.00 % | 34,083 | 7,808 | (6,988 ) | – | 34,903 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | 662 | 28.00 % | 185 | – | – | 2 | 187 |
| Dongducheon Dream Power Co., Ltd. | 209,330 | 33.61 % | 70,356 | – | (4,409 ) | (12,714 ) | 53,233 |
| Jinbhuvish Power Generation Pvt. Ltd. | 52,407 | 5.16 % | 2,704 | – | – | (2,704 ) | – |
| SE Green Energy Co., Ltd. | 7,278 | 47.76 % | 3,476 | – | – | – | 3,476 |
| Daegu Photovoltaic Co., Ltd. | 5,923 | 29.00 % | 1,718 | – | – | – | 1,718 |
| Jeongam Wind Power Co., Ltd. | 9,408 | 40.00 % | 3,763 | – | – | – | 3,763 |
| Korea Power Engineering Service Co., Ltd. | 12,617 | 29.00 % | 3,659 | – | – | – | 3,659 |
| Busan Green Energy Co., Ltd. | 25,389 | 29.00 % | 7,363 | – | – | – | 7,363 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | (6,814 ) | 18.87 % | (1,286 ) | – | – | 1,286 | – |
| Korea Electric Vehicle Charging Service | 6,246 | 28.00 % | 1,749 | – | – | – | 1,749 |
| Ulleungdo Natural Energy Co., Ltd. | 21,341 | 29.85 % | 6,370 | – | – | – | 6,370 |
| Korea Nuclear Partners Co., Ltd. | 1,322 | 29.00 % | 383 | – | – | – | 383 |
| Tamra Offshore Wind Power Co., Ltd. | 31,704 | 27.00 % | 8,560 | – | – | – | 8,560 |
| Korea Electric Power Corporation Fund | 48,905 | 98.09 % | 47,971 | – | – | 3 | 47,974 |
| Energy Infra Asset Management Co., Ltd. | 4,809 | 9.90 % | 476 | – | – | – | 476 |
| Daegu clean Energy Co., Ltd. | 40 | 28.00 % | 11 | – | – | – | 11 |
| YaksuESS Co., Ltd | 668 | 29.00 % | 193 | – | – | 1 | 194 |
| Nepal Water & Energy Development Company Private Limited | 46,451 | 62.13 % | 28,860 | 972 | – | 666 | 30,498 |
| Gwangyang Green Energy Co., Ltd. | 8,772 | 20.00 % | 1,754 | 18 | – | – | 1,772 |
| PND solar., Ltd | 3,779 | 29.00 % | 1,096 | 154 | – | – | 1,250 |
| | | | | | | | |
| <Joint ventures> | | | | | | | |
| KEPCO-Uhde Inc. | 508 | 50.85 % | 258 | – | – | – | 258 |
| Eco Biomass Energy Sdn. Bhd. | – | 61.53 % | – | – | – | – | – |
| Datang Chaoyang Renewable Power Co., Ltd. | 68,154 | 40.00 % | 27,262 | – | – | – | 27,262 |
| Shuweihat Asia Power Investment B.V. | 31,991 | 49.00 % | 15,675 | – | – | – | 15,675 |
| Shuweihat Asia Operation & Maintenance Company | 1,206 | 55.00 % | 663 | – | – | – | 663 |
| Waterbury Lake Uranium L.P. | 55,313 | 35.76 % | 19,780 | – | – | 1 | 19,781 |
| ASM-BG Investicii AD | 42,404 | 50.00 % | 21,202 | – | – | – | 21,202 |
| RES Technology AD | 28,750 | 50.00 % | 14,375 | – | – | – | 14,375 |
| KV Holdings, Inc. | 4,795 | 40.00 % | 1,918 | – | – | – | 1,918 |
| KEPCO SPC Power Corporation | 288,689 | 75.20 % | 217,094 | – | – | – | 217,094 |
| Gansu Datang Yumen Wind Power Co., Ltd. | 27,101 | 40.00 % | 10,840 | – | – | – | 10,840 |
| Datang Chifeng Renewable Power Co., Ltd. | 427,762 | 40.00 % | 171,105 | – | – | (50 ) | 171,055 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | 27,649 | 40.00 % | 11,060 | – | – | – | 11,060 |
| Rabigh Electricity Company | 428,119 | 40.00 % | 171,248 | – | (70,978 ) | (914 ) | 99,356 |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | |
| Rabigh Operation & Maintenance Company Limited | ₩ 9,967 | 40.00 % | 3,987 | – | – | – | 3,987 |
| Jamaica Public Service Company Limited | 523,662 | 40.00 % | 209,464 | (80,161 ) | – | 91,850 | 221,153 |
| KW Nuclear Components Co., Ltd. | 15,472 | 45.00 % | 6,962 | – | – | (259 ) | 6,703 |
| Busan Shinho Solar Power Co., Ltd. | 17,386 | 25.00 % | 4,346 | – | – | – | 4,346 |
| GS Donghae Electric Power Co., Ltd. | 649,199 | 34.00 % | 220,727 | – | – | – | 220,727 |
| Global Trade Of Power System Co., Ltd. | 1,990 | 29.00 % | 577 | – | – | – | 577 |
| Expressway Solar-light Power Generation Co., Ltd. | 8,492 | 29.00 % | 2,463 | – | – | – | 2,463 |
| KODE NOVUS I LLC | (107,377 ) | 50.00 % | (53,689 ) | – | – | 53,689 | – |
| KODE NOVUS II LLC | (47,391 ) | 50.00 % | (23,696 ) | – | – | 23,696 | – |
| Daejung Offshore Wind Power Co., Ltd. | 5,950 | 49.90 % | 2,969 | – | – | – | 2,969 |
| Amman Asia Electric Power Company | 242,940 | 60.00 % | 145,764 | – | – | (88 ) | 145,676 |
| KAPES, Inc. | 14,658 | 51.00 % | 7,476 | – | – | – | 7,476 |
| Dangjin Eco Power Co., Ltd. | 162,676 | 34.00 % | 55,310 | 2,618 | – | – | 57,928 |
| Honam Wind Power Co., Ltd. | 14,724 | 29.00 % | 4,270 | 32 | – | – | 4,302 |
| Chun-cheon Energy Co., Ltd. | 160,919 | 29.90 % | 48,115 | 3 | – | – | 48,118 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | 18,189 | 15.00 % | 2,728 | 6 | – | – | 2,734 |
| Nghi Son 2 Power Ltd. | 365 | 50.00 % | 183 | – | – | – | 183 |
| Kelar S.A | 100,192 | 65.00 % | 65,125 | 2,424 | – | (316 ) | 67,233 |
| PT. Tanjung Power Indonesia | 5,075 | 35.00 % | 1,776 | – | – | – | 1,776 |
| Incheon New Power Co., Ltd. | 2,135 | 29.00 % | 619 | – | – | – | 619 |
| Seokmun Energy Co., Ltd. | 47,538 | 29.00 % | 13,786 | – | – | – | 13,786 |
| Daehan Wind Power PSC | (824 ) | 50.00 % | (412 ) | – | – | 412 | – |
| Barakah One Company | 3,476 | 18.00 % | 626 | – | – | – | 626 |
| Nawah Energy Company | 1,436 | 18.00 % | 258 | – | – | – | 258 |
| MOMENTUM | 1,174 | 33.33 % | 391 | – | – | – | 391 |
| Daegu Green Power Co., Ltd. | 71,706 | 29.00 % | 20,795 | – | 84 | 21,512 | 42,391 |
| Yeonggwang Wind Power Co., Ltd. | 36,740 | 41.00 % | 15,063 | 231 | – | – | 15,294 |
| Chester Solar IV SpA | 2,034 | 81.82 % | 1,664 | – | – | 36 | 1,700 |
| Chester Solar V SpA | 512 | 81.82 % | 419 | – | – | 106 | 525 |
| Diego de Almagro Solar SpA | 2,436 | 81.82 % | 1,993 | – | – | 98 | 2,091 |
| South Jamaica Power Company Limited | 33,522 | 20.00 % | 6,704 | – | – | – | 6,704 |

(*)   The percentage of ownership shown above is after considering the treasury stocks and others.

(6)   **As of December 31, 2016 and 2017, unrecognized equity interest in investments in associates and joint ventures whose book value has been reduced to zero due to accumulated losses are as follows:**

| | 2016 | | 2017 | |
|---|---|---|---|---|
| | Unrecognized equity interest | Accumulated unrecognized equity interest | Unrecognized equity interest | Accumulated unrecognized equity interest |
| | | In millions of won | | |
| Shin Pyeongtaek Power Co., Ltd. | ₩ 1,211 | 2,537 | (2,537 ) | – |
| Seokmun Energy Co., Ltd. | (205 ) | – | – | – |
| Kelar S.A | 43,920 | 61,309 | (61,309 ) | – |
| Hadong Mineral Fiber Co., Ltd. | – | 5 | (3 ) | 2 |
| PT. Mutiara Jawa | 554 | 1,905 | (1,159 ) | 746 |
| Eurasia Energy Holdings | 6 | 194 | (22 ) | 172 |
| KODE NOVUS I LLC | 22,194 | 44,983 | 8,706 | 53,689 |
| KODE NOVUS II LLC | 12,340 | 23,515 | 181 | 23,696 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | 132 | 132 | 1,154 | 1,286 |
| Daehan Wind Power PSC | – | – | 412 | 412 |

F-104

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(7)  As of December 31, 2017, shareholders' agreements on investments in associates and joint ventures that may cause future economic resource or cash outflows are as follows:**

(i)  Gemeng International Energy Co., Ltd.

Gemeng International Energy Co., Ltd., issued put options on 8% of its shares to its financial investors, KEPCO Woori Sprott PEF (NPS Co-Pa PEF). If the investment fund is not collected until the maturity date (December 25, 2023, two years extension is possible), PEF can exercise the option at strike price which is the same as a principal investment price (including operating fees ratio of below 1% per annum), and also, the Company provided a performance guarantee on this agreement.

(ii)  Hyundai Energy Co., Ltd.

The Company had placed guarantees for a fixed return on the investment to NH Power II Co., Ltd. and National Agricultural Cooperative Federation ("NACF") and had obtained the rights to acquire the investment securities in return preferentially. In addition, NH Power II Co., Ltd. and NACF have a right, which can be exercised for 30 days starting from 2 months to 1 month prior to 17 years after the termination date of the contract to sell their shares to the Company.

(iii)  Taebaek Wind Power Co., Ltd.

In case non-controlling shareholders decide to dispose of their shares in Taebaek Wind Power Co., Ltd. after the warrant period of defect repair for wind power generator has expired, the Company acquires those shares at fair value. The acquisition is to be made after the conditions of the acquisition are discussed among the parties involved, with consideration of various factors such as financial status and business situation.

(iv)  Pyeongchang Wind Power Co., Ltd.

In case non-controlling shareholders decide to dispose of their shares in Pyeongchang Wind Power Co., Ltd. after commercial operation of the power plant has started, the Company acquires those shares at fair value. The acquisition is to be made after the conditions of the acquisition are discussed among the parties involved, with the careful consideration of various factors such as financial status and business situation.

(v)  Jeongam Wind Power Co., Ltd.

In case non-controlling shareholders decide to dispose of their shares in Jeongam Wind Power Co., Ltd. after the construction of the power plant has been completed, the Company is obligated to acquire those shares at fair value.

(vi)  Daejung Offshore Wind Power Co., Ltd.

In case Samsung Heavy Industries Co., Ltd., a co-participant of the joint venture agreement, decides to dispose of its shares in Daejung Offshore Wind Power Co., Ltd., the Company is obligated to acquire those shares after evaluating the economic feasibility of the facilities installed by Samsung Heavy Industries Co., Ltd.

(vii)  Samcheok Eco Materials Co., Ltd.

The Company has the rights to purchase the stocks should preferred stockholders elect to sell their stocks on the expected sell date (3 years from preferred stock payment date) and is required to guarantee the promised yield when preferred stockholders sell their stocks.

(viii)  Hyundai Green Power Co., Ltd.

As of December 31, 2017, Hyundai Green Power Co., Ltd., an associate of the Company, which engages in the byproduct gas power generating business, entered into a project financing agreement with a limit of ₩919.2 billion with Korea Development Bank and others. At a certain period in the future, the Company has an appraisal right against the financial investors (Korea Development Bank

F-105

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

and others) and also has an obligation to sell its shares when claimed by the financial investors. At a certain period in the future, the Company has an appraisal right against Hyundai Steel Company and a third party designated by Hyundai Steel Company (collectively, "Hyundai Steel Company"), the operating investor of Hyundai Green Power Co., Ltd., according to the conditions of the agreement and also has an obligation to sell its shares when claimed by Hyundai Steel Company.

(8)  **Significant restrictions on its abilities to associates or joint ventures are as follows:**

| Company | Nature and extent of any significant restrictions |
| --- | --- |
| Daeryun Power Co., Ltd. | Principals on subordinated loans or dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. |
| Changjuk Wind Power Co., Ltd. | Principals on subordinated loans or dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. |
| Taebaek Wind Power Co., Ltd. | Financial institutions can reject or defer an approval with regard to the request for fund executions on subordinated loans of shareholders in order to pay senior loans based on the loan agreement. |
| Pyeongchang Wind Power Co., Ltd. | Principals on subordinated loans or dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. |
| Daegu Green Power Co., Ltd. | Principals on subordinated loans or dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. Shares cannot be wholly or partially transferred without prior written consent of financial institutions is obtained. |
| KNH Solar Co., Ltd. | Principal and interest, dividends to shareholders cannot be paid without written consent of financial institutions. |

F-106

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**18.    Property, Plant and Equipment**

**(1)    Property, plant and equipment as of December 31, 2016 and 2017 are as follows:**

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses(*) | Book value |
| | | | In millions of won | | |
| Land ₩ | 12,969,741 | (3,204 ) | – | – | 12,966,537 |
| Buildings | 17,722,326 | (61,188 ) | (5,936,849 ) | (853 ) | 11,723,436 |
| Structures | 63,291,437 | (197,641 ) | (19,959,839 ) | (1,183 ) | 43,132,774 |
| Machinery | 67,769,168 | (111,064 ) | (24,344,832 ) | (2,391 ) | 43,310,881 |
| Ships | 4,175 | – | (3,625 ) | – | 550 |
| Vehicles | 247,751 | (107 ) | (176,781 ) | – | 70,863 |
| Equipment | 1,270,660 | (732 ) | (894,265 ) | – | 375,663 |
| Tools | 921,115 | (430 ) | (742,083 ) | – | 178,602 |
| Construction-in- progress | 27,334,368 | (135,807 ) | – | (38,108 ) | 27,160,453 |
| Finance lease assets | 2,390,779 | – | (1,984,426 ) | – | 406,353 |
| Asset retirement costs | 7,129,771 | – | (3,064,359 ) | – | 4,065,412 |
| Others | 10,361,294 | – | (8,009,762 ) | – | 2,351,532 |
| ₩ | 211,412,585 | (510,173 ) | (65,116,821 ) | (42,535 ) | 145,743,056 |

(*)    The Company separately recognizes impairment loss on each asset, reflecting various factors such as physical impairment and others during the replacement.

| | 2017 | | | | |
|---|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses(*) | Book value |
| | | | In millions of won | | |
| Land ₩ | 13,318,542 | (21,968 ) | – | – | 13,296,574 |
| Buildings | 18,777,678 | (63,539 ) | (6,722,376 ) | (1,776 ) | 11,989,987 |
| Structures | 66,184,484 | (196,414 ) | (22,071,667 ) | (8,039 ) | 43,908,364 |
| Machinery | 75,826,292 | (183,188 ) | (28,904,982 ) | (45,512 ) | 46,692,610 |
| Ships | 4,175 | – | (3,772 ) | – | 403 |
| Vehicles | 276,425 | (6,322 ) | (195,260 ) | (127 ) | 74,716 |
| Equipment | 1,440,870 | (761 ) | (1,020,192 ) | (6 ) | 419,911 |
| Tools | 1,010,537 | (1,027 ) | (809,842 ) | (32 ) | 199,636 |
| Construction-in-progress | 25,610,649 | (49,084 ) | – | (38,108 ) | 25,523,457 |
| Finance lease assets | 2,390,680 | (27 ) | (2,093,001 ) | – | 297,652 |
| Asset retirement costs | 9,395,821 | – | (3,356,337 ) | – | 6,039,484 |
| Others | 11,247,021 | – | (8,807,401 ) | – | 2,439,620 |
| ₩ | 225,483,174 | (522,330 ) | (73,984,830 ) | (93,600 ) | 150,882,414 |

(*)    The Company separately recognizes impairment loss on each asset, reflecting various factors such as physical impairment and others during the replacement.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)   Changes in property, plant and equipment for the years ended December 31, 2016 and 2017 are as follows:

| | 2016 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Beginning balance | Acquisition | Disposal | Depreciation | Impairment | Others | Ending balance |
| | | | | In millions of won | | | |
| Land ₩ | 12,396,460 | 13,973 | (52,569) | – | – | 611,877 | 12,969,741 |
| (Government grants) | (3,147) | – | 14 | – | – | (71) | (3,204) |
| Buildings | 9,676,432 | – | (9,020) | (676,866) | – | 2,794,078 | 11,784,624 |
| (Government grants) | (63,932) | – | 731 | 5,299 | – | (3,286) | (61,188) |
| Structures | 40,258,162 | 455 | (524,310) | (2,233,333) | – | 5,829,441 | 43,330,415 |
| (Government grants) | (193,119) | – | 2,597 | 9,491 | – | (16,610) | (197,641) |
| Machinery | 36,864,749 | 193,017 | (243,757) | (4,353,596) | – | 10,961,532 | 43,421,945 |
| (Government grants) | (108,935) | (33) | 1,210 | 12,272 | – | (15,578) | (111,064) |
| Ships | 786 | – | – | (281) | – | 45 | 550 |
| Vehicles | 60,472 | 2,493 | (34) | (27,615) | – | 35,654 | 70,970 |
| (Government grants) | (29) | (58) | – | 25 | – | (45) | (107) |
| Equipment | 310,571 | 67,134 | (323) | (128,084) | – | 127,097 | 376,395 |
| (Government grants) | (1,026) | – | – | 452 | – | (158) | (732) |
| Tools | 160,630 | 27,856 | (327) | (69,842) | – | 60,715 | 179,032 |
| (Government grants) | (691) | – | – | 295 | – | (34) | (430) |
| Construction-in-progress | 35,267,026 | 11,752,352 | (94,443) | – | – | (19,628,675) | 27,296,260 |
| (Government grants) | (139,898) | (28,434) | – | – | – | 32,525 | (135,807) |
| Finance lease assets | 511,509 | 34 | (31) | (96,254) | – | (8,905) | 406,353 |
| Asset retirement costs | 4,106,087 | – | – | (509,310) | – | 468,635 | 4,065,412 |
| Others | 2,259,244 | – | (9) | (813,248) | – | 905,545 | 2,351,532 |
| ₩ | 141,361,351 | 12,028,789 | (920,271) | (8,880,595) | – | 2,153,782 | 145,743,056 |

| | 2017 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Beginning balance | Acquisition | Disposal | Depreciation | Impairment(*) | Others | Ending balance |
| | | | | In millions of won | | | |
| Land ₩ | 12,969,741 | 32,773 | (8,961) | – | – | 324,989 | 13,318,542 |
| (Government grants) | (3,204) | – | 5 | – | – | (18,769) | (21,968) |
| Buildings | 11,784,624 | 40,592 | (19,715) | (794,804) | (923) | 1,043,752 | 12,053,526 |
| (Government grants) | (61,188) | (900) | 28 | 5,996 | – | (7,475) | (63,539) |
| Structures | 43,330,415 | 428 | (519,366) | (2,421,168) | (6,856) | 3,721,325 | 44,104,778 |
| (Government grants) | (197,641) | – | 1,905 | 10,011 | – | (10,689) | (196,414) |
| Machinery | 43,421,945 | 421,892 | (242,428) | (4,821,595) | (43,121) | 8,139,105 | 46,875,798 |
| (Government grants) | (111,064) | (10,834) | 489 | 17,390 | – | (79,169) | (183,188) |
| Ships | 550 | – | – | (147) | – | – | 403 |
| Vehicles | 70,970 | 3,447 | (174) | (34,236) | (127) | 41,158 | 81,038 |
| (Government grants) | (107) | (107) | 14 | 1,070 | – | (7,192) | (6,322) |
| Equipment | 376,395 | 53,529 | (413) | (158,614) | (6) | 149,781 | 420,672 |
| (Government grants) | (732) | (43) | – | 454 | – | (440) | (761) |
| Tools | 179,032 | 30,990 | (166) | (74,909) | (32) | 65,748 | 200,663 |
| (Government grants) | (430) | – | – | 354 | – | (951) | (1,027) |
| Construction-in-progress | 27,296,260 | 11,996,508 | (6,487) | – | – | (13,713,740) | 25,572,541 |
| (Government grants) | (135,807) | (42,728) | – | – | – | 129,451 | (49,084) |
| Finance lease assets | 406,353 | – | (29,696) | (107,390) | – | 28,412 | 297,679 |
| (Government grants) | – | – | – | 1 | – | (28) | (27) |
| Asset retirement costs | 4,065,412 | – | – | (518,565) | – | 2,492,637 | 6,039,484 |
| Others | 2,351,532 | 10,411 | (28) | (762,711) | – | 840,416 | 2,439,620 |
| ₩ | 145,743,056 | 12,535,958 | (824,993) | (9,658,863) | (51,065) | 3,138,321 | 150,882,414 |

(*)   Korea Midland Power Co., Ltd. and Korea Western Power Co., Ltd., 100% owned subsidiaries, have determined that there are impairment indicators for the shutdowns of certain power generation units and fire, and performed an impairment test over the individual assets. As a result, the Company recognized the amount of the carrying amount in excess of its recoverable amount as impairment loss in the consolidated statements of comprehensive income.

F-108

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**19.  Investment Properties**

**(1)  Investment properties as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | |
|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated depreciation | Book value |
| | | | In millions of won | | |
| Land | ₩ | 336,421 | – | – | 336,421 |
| Buildings | | 29,168 | (64 ) | (11,845 ) | 17,259 |
| | ₩ | 365,589 | (64 ) | (11,845 ) | 353,680 |

| | | 2017 | | | |
|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated depreciation | Book value |
| | | | In millions of won | | |
| Land | ₩ | 264,205 | – | – | 264,205 |
| Buildings | | 36,165 | (83 ) | (15,573 ) | 20,509 |
| | ₩ | 300,370 | (83 ) | (15,573 ) | 284,714 |

**(2)  Changes in investment properties for the years ended December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | |
|---|---|---|---|---|---|
| | | Beginning balance | Depreciation | Others | Ending balance |
| | | | In millions of won | | |
| Land | ₩ | 253,960 | – | 82,461 | 336,421 |
| Buildings | | 15,963 | (679 ) | 2,039 | 17,323 |
| (Government grants) | | (13 ) | 1 | (52 ) | (64 ) |
| | ₩ | 269,910 | (678 ) | 84,448 | 353,680 |

| | | 2017 | | | |
|---|---|---|---|---|---|
| | | Beginning balance | Depreciation | Others | Ending balance |
| | | | In millions of won | | |
| Land | ₩ | 336,421 | – | (72,216) | 264,205 |
| Buildings | | 17,323 | (1,178 ) | 4,447 | 20,592 |
| (Government grants) | | (64 ) | 2 | (21 ) | (83 ) |
| | ₩ | 353,680 | (1,176 ) | (67,790) | 284,714 |

**(3)  Income and expenses related to investment properties for the years ended December 31, 2016 and 2017 are as follows:**

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Rental income | ₩ | 9,460 | 9,581 |
| Operating and maintenance expenses related to rental income | | (678 ) | (1,172 ) |
| | ₩ | 8,782 | 8,409 |

F-109

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(4)    **Fair value of investment properties as of December 31, 2016 and 2017 are as follows:**

|  | | 2016 | | 2017 | |
|---|---|---|---|---|---|
|  | | Book value | Fair value | Book value | Fair value |
|  | | In millions of won | | | |
| Land | ₩ | 336,421 | 374,042 | 264,205 | 309,241 |
| Buildings | | 17,259 | 20,708 | 20,509 | 23,319 |
|  | ₩ | 353,680 | 394,750 | 284,714 | 332,560 |

The fair values of the investment properties as of the reporting date were determined in consideration of the fluctuation on the publicly announced individual land price after the IFRS transition date (January 1, 2010).

(5)    **All of the Company's investment property is held under freehold interests.**

20.    **Construction Services Contracts**

(1)    **Changes in total contract amount in which revenue is not yet recognized for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | | | |
|---|---|---|---|---|---|
|  | | Beginning balance | Increase (decrease)(*) | Recognized as revenue | Ending balance |
|  | | In millions of won | | | |
| Nuclear power plant construction in UAE and others | ₩ | 17,081,074 | (1,011,031 ) | (3,761,204 ) | 12,308,839 |

(*)    For the year ended December 31, 2015, the increased balance of contracts from new orders and other is ₩412,617 million and the decreased balance of contracts due to changes in scope of construction work is ₩1,423,648 million.

|  | | 2016 | | | |
|---|---|---|---|---|---|
|  | | Beginning balance | Increase (decrease)(*) | Recognized as revenue | Ending balance |
|  | | In millions of won | | | |
| Nuclear power plant construction in UAE and others | ₩ | 12,308,839 | (1,045,094 ) | (4,026,857 ) | 7,236,888 |

(*)    For the year ended December 31, 2016, the increased balance of contracts from new orders and other is ₩718,118 million and the decreased balance of contracts due to changes in scope of construction work is ₩1,763,212 million.

|  | | 2017 | | | |
|---|---|---|---|---|---|
|  | | Beginning balance | Increase (decrease)(*) | Recognized as revenue | Ending balance |
|  | | In millions of won | | | |
| Nuclear power plant construction in UAE and others | ₩ | 7,236,888 | 151,891 | (3,212,184 ) | 4,176,595 |

(*)    For the year ended December 31, 2017, the increased balance of contracts from new orders and other is ₩438,142 million and the decreased balance of contracts due to changes in scope of construction work is ₩286,251 million.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)  **Accumulated earned revenue, expense and others related to the Company's construction contracts as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | |
|---|---|---|---|---|---|
| | | Accumulated earned revenue | Accumulated expense | Accumulated profit | Unearned advance receipts |
| | | | In millions of won | | |
| Nuclear power plant construction in UAE and others | ₩ | 15,314,737 | 14,396,890 | 917,847 | – |

| | | 2017 | | | |
|---|---|---|---|---|---|
| | | Accumulated earned revenue | Accumulated expense | Accumulated profit | Unearned advance receipts |
| | | | In millions of won | | |
| Nuclear power plant construction in UAE and others | ₩ | 18,236,992 | 16,937,772 | 1,299,220 | – |

(3)  **Gross amount due from customers recognized as assets and due to customers recognized as liabilities for contract work as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Assets(*1) | Liabilities(*2) | Assets(*1) | Liabilities(*2) |
| | | | In millions of won | | |
| Nuclear power plant construction in UAE and others | ₩ | 44,930 | 651,985 | 55,755 | 542,921 |

(*1)   Included in trade and other receivables, net, in the consolidated statements of financial position.

(*2)   Included in non-financial liabilities in the consolidated statements of financial position.

F-111

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**21.    Intangible Assets other than Goodwill**

**(1)    Intangible assets as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | | |
|---|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated amortization | Accumulated impairment losses | Book value |
| | | | | In millions of won | | |
| Software | ₩ | 458,382 | (595 ) | (365,161 ) | – | 92,626 |
| Licenses and franchises | | 3,398 | – | (3,398 ) | – | – |
| Copyrights, patents rights and other industrial rights | | 35,756 | – | (15,675 ) | – | 20,081 |
| Mining rights | | 549,371 | – | (10,511 ) | – | 538,860 |
| Development expenditures | | 785,966 | (5,152 ) | (723,561 ) | – | 57,253 |
| Intangible assets under Development | | 119,474 | (11,090 ) | – | (3,941 ) | 104,443 |
| Usage rights of donated assets and other | | 426,346 | (21 ) | (342,244 ) | – | 84,081 |
| Leasehold rights | | 23,350 | – | (18,718 ) | – | 4,632 |
| Greenhouse gas emissions rights | | 6,283 | – | – | – | 6,283 |
| Others | | 173,213 | – | (88,527 ) | (12,124 ) | 72,562 |
| | ₩ | 2,581,539 | (16,858 ) | (1,567,795 ) | (16,065 ) | 980,821 |

| | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated amortization | Accumulated impairment losses | Book value |
| | | | | In millions of won | | |
| Software | ₩ | 534,191 | (486 ) | (408,300 ) | – | 125,405 |
| Licenses and franchises | | 3,398 | – | (3,398 ) | – | – |
| Copyrights, patents rights and other industrial rights | | 43,857 | – | (19,876 ) | – | 23,981 |
| Mining rights | | 553,876 | – | (14,243 ) | – | 539,633 |
| Development expenditures | | 836,996 | (3,702 ) | (752,478 ) | – | 80,816 |
| Intangible assets under development | | 143,851 | (10,540 ) | – | (3,941 ) | 129,370 |
| Usage rights of donated assets and other | | 459,682 | (11 ) | (358,024 ) | – | 101,647 |
| Leasehold rights | | 24,306 | – | (19,262 ) | – | 5,044 |
| Others | | 297,289 | – | (103,995 ) | (12,069 ) | 181,225 |
| | ₩ | 2,897,446 | (14,739 ) | (1,679,576 ) | (16,010 ) | 1,187,121 |

F-112

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)     Changes in intangible assets for the years ended December 31, 2016 and 2017 are as follows:

| | 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Disposal | Amortization In millions of won | Impairment | Others | Ending balance |
| Software ₩ | 57,886 | 18,267 | – | (32,378 ) | – | 49,446 | 93,221 |
| (Government grants) | (699 ) | – | – | 249 | – | (145 ) | (595 ) |
| Copyrights, patents rights and other industrial rights | 21,875 | 85 | (39 ) | (2,697 ) | – | 857 | 20,081 |
| Mining rights | 499,537 | 26,311 | – | (899 ) | – | 13,911 | 538,860 |
| Development expenditures | 51,807 | 212 | – | (21,993 ) | – | 32,379 | 62,405 |
| (Government grants) | (6,835 ) | – | – | 2,771 | – | (1,088 ) | (5,152 ) |
| Intangible assets under development | 94,886 | 66,588 | – | – | (3,945 ) | (41,996) | 115,533 |
| (Government grants) | (10,483 ) | (1,597 ) | – | – | – | 990 | (11,090) |
| Usage rights of donated assets and other | 48,591 | – | – | (15,513 ) | – | 51,024 | 84,102 |
| (Government grants) | (32 ) | – | – | 11 | – | – | (21 ) |
| Leasehold rights | 745 | – | – | (351 ) | – | 4,238 | 4,632 |
| Greenhouse gas emissions rights | 805 | 6,283 | – | – | – | (805 ) | 6,283 |
| Others | 97,750 | 8,273 | (550 ) | (8,916 ) | 3 | (23,998) | 72,562 |
| (Government grants) | (1 ) | – | – | 1 | – | – | – |
| ₩ | 855,832 | 124,422 | (589 ) | (79,715 ) | (3,942 ) | 84,813 | 980,821 |

| | 2017 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Disposal | Amortization In millions of won | Impairment | Others | Ending balance |
| Software ₩ | 93,221 | 12,700 | (5 ) | (44,809 ) | – | 64,784 | 125,891 |
| (Government grants) | (595 ) | (17 ) | – | 255 | – | (129 ) | (486 ) |
| Copyrights, patents rights and other industrial rights | 20,081 | 30 | (7 ) | (3,350 ) | – | 7,227 | 23,981 |
| Mining rights | 538,860 | 26,751 | (272 ) | (4,640 ) | – | (21,066) | 539,633 |
| Development expenditures | 62,405 | 494 | – | (25,924 ) | – | 47,543 | 84,518 |
| (Government grants) | (5,152 ) | – | – | 2,811 | – | (1,361 ) | (3,702 ) |
| Intangible assets under development | 115,533 | 56,527 | – | – | (20 ) | (32,130) | 139,910 |
| (Government grants) | (11,090 ) | – | – | – | – | 550 | (10,540 ) |
| Usage rights of donated assets and other | 84,102 | – | – | (14,462 ) | – | 32,018 | 101,658 |
| (Government grants) | (21 ) | – | – | 10 | – | – | (11 ) |
| Leasehold rights | 4,632 | – | – | (545 ) | – | 957 | 5,044 |
| Greenhouse gas emissions rights | 6,283 | – | – | – | – | (6,283 ) | – |
| Others | 72,562 | 47,402 | (377 ) | (23,018 ) | 54 | 84,602 | 181,225 |
| (Government grants) | – | – | – | – | – | – | – |
| ₩ | 980,821 | 143,887 | (661 ) | (113,672 ) | 34 | 176,712 | 1,187,121 |

F-113

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(3)    Significant specific intangible assets as of December 31, 2016 and 2017 are as follows:**

|  | 2016 | | | |
| --- | --- | --- | --- | --- |
| Type | Description | Currency | Amount | Remaining useful years |
|  | In millions of won and thousands of Australian dollars | | | |
| Software | ERP system and others | KRW | 506 | 11 months ~ 1 year and 11 months |
|  | SCADA O/S (POWERON RELIANCE) | KRW | 4,206 | 3 years and 1 month |
| Copyrights, patents rights and other industrial rights | Smart technology verification and standard design project conducting right | KRW | 5,750 | 5 years and 9 months |
| Mining rights | Mining right of Bylong mine | AUD | 401,225 | – (*) |
| Development expenditures | Development of maintenance system for utility plant | KRW | 518 | 11 months |
| Intangible assets under development | Contributions to ARP NRC DC | KRW | 41,190 | – |
| Usage rights of donated assets and others | Sejong Haengbogdosi sharing charge | KRW | 44,502 | 9 years and 11 months |
|  | Dangjin power plant load facility usage right | KRW | 26,759 | 4 years and 3 months |
| Others | Sillim electricity supply facility usage right | KRW | 2,196 | 4 years and 11 months |

(*)    Mining rights are amortized using the units-of-production method and the amortization has not commenced yet.

|  | 2017 | | | |
| --- | --- | --- | --- | --- |
| Type | Description | Currency | Amount | Remaining useful lives |
|  | millions of won and thousands of Australian dollars | | | |
| Software | ERP system and others | KRW | 1,135 | 3 years and 2 months ~ 3 years and 4 months |
|  | AMI GATEWAY S/W | KRW | 3,528 | 3 years and 2 months |
| Copyrights, patents rights and other industrial rights | Smart technology verification and standard design project conducting right | KRW | 11,724 | 4 years and 9 months |
| Mining rights | Mining right of Bylong mine | AUD | 401,225 | – (*) |
| Development expenditures | Electricity sales information system | KRW | 29,391 | 4 years 3 months |
| Intangible assets under development | Contributions to ARP NRC DC | KRW | 46,458 | – |
| Usage rights of donated assets and others | Sejong Haengbogdosi sharing charge | KRW | 40,460 | 8 years and 11 months |
|  | Dangjin power plant load facility usage right | KRW | 20,463 | 3 years 3 months |
| Others | Occupancy and use of public waters | KRW | 103,269 | 18 years 11 months |

(*)    Mining rights are amortized using the units-of-production method and the amortization has not commenced yet.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(4)   For the years ended December 31, 2015, 2016 and 2017, the Company recognized research and development expenses of ₩611,220 million, ₩705,504 million and ₩721,437 million, respectively.

22.   **Trade and Other Payables**

Trade and other payables as of December 31, 2016 and 2017 are as follows:

|  | | 2016 | | 2017 | |
|---|---|---|---|---|---|
|  | | Current | Non-current | Current | Non-current |
|  | | | In millions of won | | |
| Trade payables | ₩ | 2,610,373 | – | 2,936,990 | – |
| Other trade payables | | 1,498,582 | 3,033,780 | 1,649,933 | 2,825,039 |
| Accrued expenses | | 1,152,933 | 2,161 | 1,087,844 | 1,951 |
| Leasehold deposits received | | 1,426 | 1,008 | 1,562 | 1,308 |
| Other deposits received | | 197,711 | 93,751 | 186,817 | 102,896 |
| Finance lease liabilities | | 121,176 | 420,003 | 131,792 | 286,468 |
| Dividends payable | | 3,204 | – | 4,448 | – |
| Others (*) | | 6 | 7,472 | 135 | 5,818 |
| | ₩ | 5,585,411 | 3,558,175 | 5,999,521 | 3,223,480 |

(*)   Details of others as of December 31, 2016 and 2017 are as follows:

|  | | 2016 | | 2017 | |
|---|---|---|---|---|---|
|  | | Current | Non-current | Current | Non-current |
|  | | | In millions of won | | |
| Advance received from local governments | ₩ | – | 7,472 | – | 5,818 |
| Others | | 6 | – | 135 | – |
| | ₩ | 6 | 7,472 | 135 | 5,818 |

23.   **Borrowings and Debt Securities**

(1)   Borrowings and debt securities as of December 31, 2016 and 2017 are as follows:

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | | In millions of won |
| **Current liabilities** | | | |
| Short-term borrowings | ₩ | 805,523 | 1,038,328 |
| Current portion of long-term borrowings | | 310,977 | 128,543 |
| Current portion of debt securities | | 7,825,310 | 7,961,182 |
| Less : Current portion of discount on long-term borrowings | | (979 ) | (886 ) |
| Less : Current portion of discount on debt securities | | (1,753 ) | (3,882 ) |
| | | 8,939,078 | 9,123,285 |
| **Non-current liabilities** | | | |
| Long-term borrowings | | 1,799,750 | 2,455,737 |
| Debt securities | | 43,012,960 | 43,270,825 |
| Less : Discount on long-term borrowings | | (25,859 ) | (21,113 ) |
| Less : Discount on debt securities | | (86,880 ) | (81,424 ) |
| Add: Premium on debt securities | | 156 | 82 |
| | | 44,700,127 | 45,624,107 |
| | ₩ | 53,639,205 | 54,747,392 |

F-115

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)  **Repayment schedule of borrowings and debt securities as of December 31, 2016 and 2017 are as follows:**

**2016**

| Type | | Borrowings | Debt Securities |
|---|---|---|---|
| | | In millions of won | |
| Less than 1 year | ₩ | 1,116,500 | 7,825,310 |
| 1~ 5 years | | 295,162 | 24,462,410 |
| Over 5 years | | 1,504,588 | 18,550,550 |
| | ₩ | 2,916,250 | 50,838,270 |

**2017**

| Type | | Borrowings | Debt Securities |
|---|---|---|---|
| | | In millions of won | |
| Less than 1 year | ₩ | 1,166,871 | 7,961,182 |
| 1~ 5 years | | 1,117,222 | 25,047,075 |
| Over 5 years | | 1,338,515 | 18,223,750 |
| | ₩ | 3,622,608 | 51,232,007 |

23.  **Borrowings and Debt Securities**

(3)  **Short-term borrowings as of December 31, 2016 and 2017 are as follows:**

**2016**

| Type | Creditor | Interest rate (%) | Maturity | Foreign currency | | Local currency |
|---|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | | |
| Local short-term borrowings | Woori Investment Bank and others | 1.54~2.51 | 2017.01.25~ 2017.09.13 | – | ₩ | 436,800 |
| Foreign short-term borrowings | SCNT and others | 1.58~6.50 | 2017.03.30~ 2017.12.03 | USD 35,086 | | 42,401 |
| Foreign short-term borrowings | Export-import Bank of Korea | 3M Libor+0.54~0.63 | 2017.05.17~ 2017.12.18 | AUD 311,174 | | 271,360 |
| Local bank overdraft | Nonghyup Bank | 2.45 | 2017.01.05 | – | | 37,000 |
| Local bank overdraft | Woori Bank | Standard overdraft rate+1.12 | 2017.02.25 | – | | 17,962 |
| | | | | | ₩ | 805,523 |

F-116

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Type | Creditor | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | **2017** | | | |
| | | In millions of won and thousands of foreign currencies | | | |
| Local short-term borrowings | KTB Investment and securities and others | 1.57~2.47 | 2018.01.12~ 2018.09.19 | – | ₩ 686,561 |
| Foreign short-term borrowings | SCNT and others | 4.60~6.50 | 2018.12.03 | USD 8,955 | 9,594 |
| Foreign short-term borrowings | Export-import Bank of Korea | 3M Libor+0.41~0.63 | 2018.12.18 | AUD 327,259 | 273,314 |
| Local bank overdraft | Nonghyup Bank | 3.04 | 2018.01.02 | | 51,300 |
| Local bank overdraft | Woori Bank | Standard overdraft rate+1.12 | 2018.02.27 | – | 17,559 |
| | | | | | ₩ 1,038,328 |

(4)    Long-term borrowings as of December 31, 2016 and 2017 are as follows:

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | **2016** | | | |
| | | In millions of won and thousands of foreign currencies | | | |
| **Local long-term borrowings** | | | | | |
| Korea Development Bank | Others | 0.50 | 2018~2044 | – | ₩ 5,663 |
| | Facility | 2.45~4.60 | 2023~2028 | – | 61,835 |
| | Facility | 1yr KoFC bond rate +0.31 | 2018 | – | 125,000 |
| | Operating funds | 2.75 | 2018 | – | 12,000 |
| KEB Hana Bank | Commercial Paper | 3M CD+0.14 | 2017 | – | 100,000 |
| | Facility | 4.60 | 2028 | – | 16,851 |
| | Facility | 3yr KTB rate -1.25 | 2017~2028 | – | 9,655 |
| IBK | PF Refinancing | CD+1.25 | 2030 | – | 22,500 |
| Export-Import Bank of Korea | Project loans | 1.50 | 2026 | – | 30,935 |
| Korea Resources Corporation | Development of power resources | 3yr KTB rate -2.25 | 2022~2025 | – | 14,039 |
| | Facility | 3yr KTB rate -2.25 | 2017~2024 | – | 3,842 |
| | Project loans | – | 2022~2025 | – | 3,733 |
| | Others | KTB rate -2.25 | 2024~2025 | – | 12,131 |
| Shinhan Bank and others | Collateral borrowing | 2.22 | 2017 | – | 30,000 |
| | Facility | CB rate+1.10 | 2028 | – | 25,276 |
| | Operating funds | 2.70~2.86 | 2017~2018 | – | 25,000 |
| | Others | 4.10 | 2035 | – | 55,000 |
| | Others | 3yr KTB rate+1.10 | 2035 | – | 55,000 |
| Kookmin Bank | Facility | MOR+0.62~0.79 | 2017~2023 | – | 45,000 |

F-117

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**2016**

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | | | In millions of won and thousands of foreign currencies | |
| Others | Facility | 1.75~4.60 | 2026~2029 | – | 146,472 |
| | Facility | CB rate+1.10~1.20 | 2022~2028 | – | 34,951 |
| | PF Refinancing | 4.10 | 2030 | – | 62,500 |
| | Others | 8.00 | 2036 | – | 102,347 |
| | Others | – | 2028 | – | 7,250 |
| | | | | | 1,006,980 |
| **Foreign long-term borrowings** | | | | | |
| Korea National Oil Corporation | Project loans | – | 2021~2023 | USD 8,744 | 10,567 |
| Export-Import Bank of Korea and others | | 3M Libor+2.75~3.70 | 2027 | JOD 178,892 | 305,332 |
| | Direct loan and others | | | | |
| | Commercial loan and others | 3M Libor+1.50~2.50 | 2030~2033 | USD 299,859 | 362,379 |
| | PF Loan | 6M Libor+2.50~2.70 | 2032 | USD 119,647 | 144,594 |
| SCNT and others | Shareholder's loan | 6.50~8.00 | 2023 | USD 40,618 | 49,086 |
| | Shareholder's loan | 8.00 | 2031 | JOD 7,128 | 12,166 |
| PT PJB | Shareholder's loan | 12.75 | 2019 | IDR 16,705,505 | 1,500 |
| Samsung Life Insurance and others | Syndicated Loan | 3.10 | 2032 | JPY 1,758,000 | 18,227 |
| Woori Bank and others | Syndicated Loan | JPY 6M Libor+2.10 | 2032 | JPY 1,172,000 | 12,151 |
| SMBC and others | Equity Bridge Loan | 1M Libor+0.90 | 2019 | USD 37,978 | 45,897 |
| IFC and others | Others | 6M Libor+5.00 | 2031 | PKR 11,706,160 | 134,972 |
| Others | Others | – | 2019 | USD 5,691 | 6,876 |
| | | | | | 1,103,747 |
| | | | | | 2,110,727 |
| Less : Discount of long-term borrowings | | | | | (26,838 ) |
| Less : Current portion of long-term borrowings | | | | | (310,977 ) |
| Add : Current portion of discount on long-term borrowings | | | | | 979 |
| | | | | | ₩1,773,891 |

**2017**

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | | | In millions of won and thousands of foreign currencies | |
| **Local long-term borrowings** | | | | | |
| Korea Development Bank | Others | 0.50 | 2018~2044 | – | ₩ 4,909 |
| | Facility | 2.45~4.60 | 2023~2028 | – | 68,883 |
| | Facility | 1yr KoFC bond rate +0.31 | 2018 | – | 25,000 |
| | Operating funds | 2.59~3.04 | 2018~2020 | – | 47,000 |
| | Operating funds | 1yr KoFC bond rate +0.95 | 2020 | – | 14,000 |
| KEB Hana Bank | Commercial Paper | 3M CD+0.24~0.32 | 2021~2022 | – | 400,000 |
| | Facility | 4.60 | 2028 | – | 15,038 |
| | Facility | 3yr KTB rate-1.25 | 2018~2028 | – | 8,947 |

F-118

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|------|--|-------------------|----------|------------------|----------------|
| | | | | 2017 | |
| | | | | In millions of won and thousands of foreign currencies | |
| IBK | PF Refinancing | CD+1.25 | 2030 | – | 22,500 |
| Export-Import Bank of Korea | Project loans | 1.50 | 2026 | – | 25,042 |
| | Operating funds | 2.21 | 2020 | – | 35,000 |
| Korea Energy Agency(*) | Development of power resources | 3yr KTB rate-2.25 | 2023~2025 | – | 6,765 |
| | Facility | 3yr KTB rate-2.25 | 2018~2024 | – | 3,121 |
| | Project loans | – | 2022~2025 | – | 3,733 |
| | Others | KTB rate -2.25 | 2024~2028 | – | 18,455 |
| Shinhan Bank | Collateral borrowing | 2.32 | 2019 | – | 30,000 |
| | Facility | CB rate +1.10 | 2028 | – | 22,557 |
| | Operating funds | 2.70 | 2018 | – | 15,000 |
| | Others | 4.10 | 2035 | – | 105,000 |
| | Others | Standard overdraft rate +1.10 | 2035 | – | 105,000 |
| Kookmin Bank | Facility | 3.16 | 2020 | – | 10,000 |
| | Facility | MOR+0.79 | 2023 | – | 35,000 |
| Others | Facility | 1.75~4.60 | 2026~2029 | – | 148,423 |
| | Facility | CB rate +1.10~1.20 | 2022~2028 | – | 46,278 |
| | PF Refinancing | 4.10 | 2030 | – | 62,500 |
| | Others | 4.50~8.00 | 2022~2039 | – | 102,346 |
| | | | | | 1,380,497 |
| **Foreign long-term borrowings** | | | | | |
| Korea Energy Agency(*) | Project loans | – | 2021~2023 | USD 8,744 | 9,368 |
| Export-Import Bank of Korea and others | Direct loan and others | 1M Libor+1.80~3.20 | 2036 | USD 64,913 | 69,548 |
| | Direct loan and others | 3M Libor+2.75~3.70 | 2027 | JOD 168,663 | 254,514 |
| | Commercial loan and others | 3M Libor+1.50~2.50 | 2030~2033 | USD 289,026 | 309,662 |
| | PF Loan | 6M Libor+1.70~2.50 | 2032 | USD 123,253 | 132,054 |
| SCNT and others | Shareholder' s loan | 6.50~8.00 | 2023 | USD 41,718 | 44,697 |
| | Shareholder' s loan | 8.00 | 2031 | JOD 5,136 | 7,750 |
| PT PJB | Shareholder' s loan | 12.75 | 2019 | IDR 10,932,568 | 864 |
| Samsung Life Insurance and others | Syndicated Loan | 3.10 | 2032 | JPY 5,325,000 | 50,540 |
| Woori Bank and others | Syndicated Loan | JPY 6M Libor+2.00 | 2032 | JPY 3,435,000 | 32,602 |
| SMBC and others | Equity Bridge Loan | 1M Libor+0.90 | 2019 | USD 70,986 | 76,054 |
| IFC and others | Others | 6M Libor+5.00 | 2031 | PKR 16,652,350 | 161,195 |
| Federal Financing Bank | PF loan | 2.39 | 2031 | USD 48,366 | 51,819 |
| Others | Others | – | 2019 | USD 2,907 | 3,116 |
| | | | | | 1,203,783 |
| | | | | | 2,584,280 |
| Less : Discount of long-term borrowings | | | | | (21,999    ) |
| Less : Current portion of long-term borrowings | | | | | (128,543    ) |
| Add : Current portion of discount on long-term borrowings | | | | | 886 |
| | | | | | ₩2,434,624 |

F-119

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(*)    As of July 1, 2017, loan business for energy-related projects has been integrated into Korea Energy Agency in accordance with the Korean government's restructuring of the public institutions.

(5)    Local debt securities as of December 31, 2016 and 2017 are as follows:

| | Issue date | Maturity | Interest rate (%) | | 2016 | 2017 |
|---|---|---|---|---|---|---|
| | | | In millions of won | | | |
| Electricity Bonds | 2009.12.03~ 2017.12.14 | 2018.01.07~ 2037.09.18 | 1.62~5.45 | ₩ | 19,860,000 | 20,700,000 |
| Electricity Bonds | 2013.06.25 | 2018.06.25 | 3M CD+0.31 | | 310,000 | 150,000 |
| Corporate Bonds(*1) | 2009.05.04~ 2017.11.10 | 2018.01.18~ 2047.10.17 | 1.36~5.84 | | 19,552,708 | 21,122,708 |
| | | | | | 39,722,708 | 41,972,708 |
| Less : Discount on local debt securities | | | | | (34,667 ) | (37,816 ) |
| Less : Current portion of local debt securities | | | | | (5,650,010 ) | (5,200,000 ) |
| Add : Current portion of discount on local debt securities | | | | | 728 | 923 |
| | | | | ₩ | 34,038,759 | 36,735,815 |

(*1)    Corporate Bonds of HeeMang Sunlight Power Co., Ltd (₩2,697 million) can be redeemed every March 31 after five years from its issue date, March 31, 2016.

F-120

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(6)   **Foreign debt securities as of December 31, 2016 and 2017 are as follows:**

| Type | Issue date | Maturity | Interest rate (%) | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | | 2016 | | |
| | | | In millions of won and thousands of foreign currencies | | |
| FY-96 | 1996.04.01~ 1996.12.06 | 2026.12.06~ 2096.04.01 | 6.00~8.37 | USD 249,068 ₩ | 300,999 |
| FY-97 | 1997.01.31~ 1997.08.04 | 2027.02.01~ 2027.08.01 | 6.75~7.00 | USD 314,717 | 380,335 |
| FY-04 | 2004.04.23 | 2034.04.23 | 5.13 | USD 286,920 | 346,743 |
| FY-08 | 2008.11.27 | 2018.11.27 | 4.19 | JPY 20,000,000 | 207,362 |
| FY-11 | 2011.07.13~ 2011.07.29 | 2017.01.30~ 2021.07.13 | 3.63~4.75 | USD 800,000 | 966,800 |
| FY-12 | 2012.05.10~ 2012.09.19 | 2017.05.10~ 2022.09.19 | 2.50~3.13 | USD 1,750,000 | 2,114,875 |
| FY-13 | 2013.02.05~ 2013.11.27 | 2018.02.05~ 2018.11.27 | 1.88~2.88 | USD 1,900,000 | 2,296,150 |
| FY-13 | 2013.09.26~ 2013.10.23 | 2019.03.26~ 2019.04.23 | 1.50~1.63 | CHF 400,000 | 472,532 |
| FY-13 | 2013.09.25 | 2020.09.25 | 5.75 | AUD 325,000 | 283,416 |
| FY-13 | 2013.02.20~ 2013.07.25 | 2018.02.20~ 2018.07.25 | 3M Libor+0.84~1.50 | USD 500,000 | 604,250 |
| FY-14 | 2014.02.11~ 2014.07.02 | 2019.02.11~ 2029.07.30 | 2.38~3.57 | USD 1,500,000 | 1,812,750 |
| FY-14 | 2014.01.28~ 2014.07.31 | 2017.01.28~ 2017.07.31 | 3M Libor+0.55~1.05 | USD 500,000 | 604,250 |
| FY-15 | 2015.06.15 | 2025.06.15 | 3.25 | USD 300,000 | 362,550 |
| FY-16 | 2016.01.21 | 2021.07.21 | 2.50 | USD 300,000 | 362,550 |
| | | | | | 11,115,562 |
| Less : Discount on foreign debt securities | | | | | (53,966 ) |
| Add : Premium on foreign debt securities | | | | | 156 |
| Less : Current portion of foreign debt securities | | | | | (2,175,300 ) |
| Add : Current portion of discount on foreign debt securities | | | | | 1,025 |
| | | | | ₩ | 8,887,477 |

F-121

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Type | Issue date | Maturity | Interest rate (%) | Foreign currency | Local currency |
|------|-----------|----------|-------------------|------------------|----------------|
| | | | 2017 | | |
| | | | In millions of won and thousands of foreign currencies | | |
| FY-96 | 1996.04.01~ 1996.12.06 | 2026.12.01~ 2096.04.01 | 6.00~8.37 | USD 249,070 | ₩ 266,854 |
| FY-97 | 1997.01.31~ 1997.08.04 | 2027.02.01~ 2027.08.01 | 6.75~7.00 | USD 314,717 | 337,188 |
| FY-04 | 2004.04.23 | 2034.04.23 | 5.13 | USD 286,920 | 307,406 |
| FY-08 | 2008.11.27 | 2018.11.27 | 4.19 | JPY 20,000,000 | 189,822 |
| FY-11 | 2011.07.13 | 2021.07.13 | 4.75 | USD 500,000 | 535,700 |
| FY-12 | 2012.09.19 | 2022.09.19 | 3 | USD 750,000 | 803,550 |
| FY-13 | 2013.02.05~ 2013.11.27 | 2018.02.05~ 2018.11.27 | 1.88~2.88 | USD 1,900,000 | 2,035,660 |
| FY-13 | 2013.09.26~ 2013.10.23 | 2019.03.26~ 2019.04.23 | 1.50~1.63 | CHF 400,000 | 437,888 |
| FY-13 | 2013.09.25 | 2020.09.25 | 5.75 | AUD 325,000 | 271,427 |
| FY-13 | 2013.02.20~ 2013.07.25 | 2018.02.20~ 2018.07.25 | 3M Libor+0.84~1.50 | USD 500,000 | 535,700 |
| FY-14 | 2014.02.11~ 2014.12.02 | 2019.02.11~ 2029.07.30 | 2.38~3.57 | USD 1,500,000 | 1,607,100 |
| FY-15 | 2015.06.15 | 2025.06.15 | 3.25 | USD 300,000 | 321,420 |
| FY-16 | 2016.01.21 | 2021.07.21 | 2.5 | USD 300,000 | 321,420 |
| FY-17 | 2017.04.12~ 2017.07.25 | 2020.04.12~ 2027.07.25 | 2.38~3.13 | USD 1,100,000 | 1,178,540 |
| FY-17 | 2017.10.30 | 2037.10.30 | 1.7 | EUR 40,000 | 51,170 |
| FY-17 | 2017.11.16 | 2037.11.16 | 2.36 | SEK 450,000 | 58,454 |
| | | | | | 9,259,299 |
| Less : Discount on foreign debt securities | | | | | (47,490 ) |
| Add : Premium on foreign debt securities | | | | | 82 |
| Less : Current portion of foreign debt securities | | | | | (2,761,182 ) |
| Add : Current portion of discount on foreign debt securities | | | | | 2,959 |
| | | | | | ₩ 6,453,668 |

(7)    **Changes in borrowings and debt securities for the year ended December 31, 2017 are as follows:**

| Beginning balance | Cash flow | Effect of exchange rate fluctuations | Others | Ending balance |
|-------------------|-----------|--------------------------------------|--------|----------------|
| | | In millions of won | | |
| 53,639,205 | 2,269,513 | (1,169,418) | 8,092 | 54,747,392 |

**24.    Finance Lease Liabilities**

**(1)    Lease contracts**

The Company enters into power purchase agreements ("PPA") with GS EPS and three other providers. The Company recognizes these PPAs as finance leases; under the PPAs, there is no transfer of ownership or bargain purchase option of the plants at the end of the agreement, however, the present value of the future minimum power purchase payments equals substantially all of the plants' respective fair values over a twenty-year period which makes up the major part of the respective plants' economic life.

F-122

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)    Finance lease liabilities as of December 31, 2016 and 2017 are as follows and are included in current and non-current trade and other payables, net, in the consolidated statements of financial position:

| | | 2016 | | 2017 | |
| | | Minimum lease payments | Present value of minimum lease payments | Minimum lease payments | Present value of minimum lease payments |
| | | In millions of won | | | |
| Less than 1 year | ₩ | 175,512 | 121,176 | 174,534 | 131,792 |
| 1 ~ 5 years | | 404,029 | 306,282 | 272,994 | 204,069 |
| More than 5 years | | 152,247 | 113,721 | 108,748 | 82,399 |
| | ₩ | 731,788 | 541,179 | 556,276 | 418,260 |

(3)    Current and non-current portion of financial lease liabilities as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
| | | In millions of won | |
| Current finance lease liabilities | ₩ | 121,176 | 131,792 |
| Non-current finance lease liabilities | | 420,003 | 286,468 |
| | ₩ | 541,179 | 418,260 |

(4)    Minimum lease payment and contingent rent payment recognized as an expense as a lessee for the years ended December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
| | | In millions of won | |
| Minimum lease payment | ₩ | 177,585 | 158,859 |
| Contingent rent payment | | (20,956 ) | (21,024 ) |

(5)    The Company does not have any irrevocable operating lease contracts as of December 31, 2016 and 2017.

(6)    Changes in finance lease liabilities for the year ended December 31, 2017 are as follows:

| Beginning balance | Cash flow | Ending balance |
| | In millions of won | |
| ₩541,179 | (122,919) | 418,260 |

25.    Employment Benefits

(1)    Employment benefit obligations as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
| | | In millions of won | |
| Net defined benefit obligations | ₩ | 1,678,470 | 1,476,201 |
| Other long-term employee benefit obligations | | 7,788 | 6,868 |
| | ₩ | 1,686,258 | 1,483,069 |

F-123

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)    Principal assumptions on actuarial valuation as of December 31, 2016 and 2017 are as follows:

|  | 2016 | 2017 |
|---|---|---|
| Discount rate | 2.45%~2.64% | 2.75%~2.90% |
| Future salary and benefit levels | 5.23% | 4.88% |
| Weighted average duration | 13.34 years | 13.40 years |

(3)    Details of expense relating to defined benefit plans for the years ended December 31, 2016 and 2017 are as follows:

|  |  | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  |  | | In millions of won | |
| Current service cost | ₩ | 315,811 | 378,930 | 392,820 |
| Interest cost |  | 63,808 | 67,104 | 79,524 |
| Expected return on plan assets |  | (22,557 ) | (23,612 ) | (31,307 ) |
| Loss from settlement |  | (641 ) | (706 ) | (1,055 ) |
|  | ₩ | 356,421 | 421,716 | 439,982 |

Expenses as described above are recognized in those items below in the financial statements.

|  |  | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  |  | | In millions of won | |
| Cost of sales | ₩ | 262,760 | 312,391 | 332,249 |
| Selling and administrative expenses |  | 51,932 | 61,362 | 59,111 |
| Others (Construction-in-progress and others) |  | 41,729 | 47,963 | 48,622 |
|  | ₩ | 356,421 | 421,716 | 439,982 |

In addition, for the years ended December 31, 2015, 2016 and 2017, employee benefit obligations expenses of ₩57,940 million, ₩62,435 million and ₩65,603 million, respectively, are recognized as cost of sales, and ₩9,971 million, ₩11,450 million and ₩11,983 million, respectively, are recognized as selling and administrative expenses, and ₩14,195 million, ₩14,024 million and ₩13,332 million, respectively, are recognized as construction-in-progress and others, relates to the Company's defined contribution plans.

(4)    Details of defined benefit obligations as of December 31, 2016 and 2017 are as follows:

|  |  | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won | |
| Present value of defined benefit obligation from funded plans | ₩ | 2,867,377 | 2,951,842 |
| Fair value of plan assets |  | (1,188,907 ) | (1,475,641 ) |
|  |  | 1,678,470 | 1,476,201 |
| Present value of defined benefit obligation from unfunded plans |  | – | – |
| Net liabilities incurred from defined benefit plans | ₩ | 1,678,470 | 1,476,201 |

F-124

Table of Contents

**(5)  Changes in the present value of defined benefit obligations for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance | ₩ | 2,426,414 | 2,867,377 |
| Current service cost | | 378,930 | 392,820 |
| Interest cost(*) | | 67,104 | 79,524 |
| Remeasurement component | | 120,993 | (258,223 ) |
| Loss from settlement | | (707 ) | (1,055 ) |
| Actual payments | | (125,233 ) | (128,707 ) |
| Others | | (124 ) | 106 |
| Ending balance | ₩ | 2,867,377 | 2,951,842 |

(*)   Corporate bond (AAA rated) yield at year-end is applied to measure the interest cost on employee benefit obligations.

**(6)  Changes in the fair value of plan assets for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance | ₩ | 930,632 | 1,188,907 |
| Expected return | | 23,612 | 31,307 |
| Remeasurement component | | (5,706 ) | (10,435 ) |
| Contributions by the employers | | 312,125 | 325,080 |
| Actual payments | | (71,756 ) | (59,218 ) |
| Ending balance | ₩ | 1,188,907 | 1,475,641 |

In addition, loss on accumulated remeasurement component amounting to ₩222,997 million and ₩43,513 million has been recognized as other comprehensive income or loss for the years ended December 31, 2016 and 2017, respectively.

**(7)  Details of the fair value of plan assets as of December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Equity instruments | ₩ | 86,054 | 79,204 |
| Debt instruments | | 383,654 | 517,040 |
| Bank deposit | | 305,670 | 293,477 |
| Others | | 413,529 | 585,920 |
|  | ₩ | 1,188,907 | 1,475,641 |

For the years ended December 31, 2016 and 2017, actual returns on plan assets amounted to ₩17,906 million and ₩20,872 million, respectively.

F-125

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(8)  **Remeasurement component recognized in other comprehensive income (loss) for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---:|---:|
|  | | In millions of won | |
| Actuarial gain from changes in financial assumptions | ₩ | (27,792 ) | (300,058) |
| Experience adjustments | | 148,785 | 41,835 |
| Expected return | | 5,706 | 10,435 |
|  | ₩ | 126,699 | (247,788) |

Remeasurement component recognized as other comprehensive income or loss is recorded in retained earnings.

**26.  Provisions**

(1)  **Provisions as of December 31, 2016 and 2017 are as follows:**

|  | | 2016 | | 2017 | |
|---|---|---:|---:|---:|---:|
|  | | Current | Non-current | Current | Non-current |
|  | | In millions of won | | | |
| Employment benefits | | | | | |
| Provisions for employment benefits | ₩ | 810,607 | – | 913,787 | – |
| Litigation | | | | | |
| Litigation provisions | | 79,359 | 118,878 | 48,621 | 24,955 |
| Decommissioning cost | | | | | |
| Nuclear plants | | – | 10,195,928 | – | 13,007,228 |
| Spent fuel | | – | 1,374,225 | – | 1,339,046 |
| Waste | | 2,566 | 1,476,936 | 11,494 | 1,626,877 |
| PCBs | | – | 191,744 | – | 180,087 |
| Other recovery provisions | | – | 507 | – | 6,659 |
| Others | | | | | |
| Power plant regional support program | | 152,851 | – | 153,756 | – |
| Transmission regional support program | | 282,608 | – | 243,365 | – |
| Provisions for tax | | 106 | 136 | 61 | – |
| Provisions for financial guarantee | | 458 | 29,207 | – | 23,475 |
| Provisions for RPS | | 417,404 | – | 271,624 | – |
| Provisions for greenhouse gas emissions obligations | | 249,644 | – | 414,252 | – |
| Others | | 4,385 | 39,590 | 80,538 | 16,387 |
|  | ₩ | 1,999,988 | 13,427,151 | 2,137,498 | 16,224,714 |

F-126

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(2)    Changes in provisions for the years ended December 31, 2016 and 2017 are as follows:**

| | 2016 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Beginning balance | Increase in provision | Payment | Reversal | Others | Ending balance |
| | In millions of won | | | | | |
| Employment benefits | | | | | | |
| Provisions for employment benefits | ₩ 718,365 | 1,047,342 | (947,982 ) | (7,108 ) | (10 ) | 810,607 |
| Litigation | | | | | | |
| Litigation provisions | 167,965 | 124,931 | (294,403 ) | (20,736 ) | 220,480 | 198,237 |
| Decommissioning cost | | | | | | |
| Nuclear plants | 9,684,286 | 513,383 | (1,741 ) | – | – | 10,195,928 |
| Spent fuel | 1,375,185 | 469,982 | (470,942 ) | – | – | 1,374,225 |
| Waste | 1,502,140 | 49,092 | (71,998 ) | – | 268 | 1,479,502 |
| PCBs | 182,400 | 30,675 | (21,331 ) | – | – | 191,744 |
| Other recovery provisions | 862 | – | – | (20 ) | (335 ) | 507 |
| Others | | | | | | |
| Power plant regional support program | 129,655 | 50,252 | (41,540 ) | – | 14,484 | 152,851 |
| Transmission regional support program | 228,785 | 253,664 | (199,841 ) | – | – | 282,608 |
| Provisions for tax | 136 | 125 | – | – | (19 ) | 242 |
| Provisions for financial guarantee | 4,288 | 29,741 | – | (4,298 ) | (66 ) | 29,665 |
| Provisions for RPS | 363,178 | 420,154 | (309,975 ) | (55,953 ) | – | 417,404 |
| Provisions for greenhouse gas emissions obligations | 78,829 | 298,618 | (116,336 ) | (11,467 ) | – | 249,644 |
| Others | 7,856 | 37,491 | (2,699 ) | (9 ) | 1,336 | 43,975 |
| | ₩ 14,443,930 | 3,325,450 | (2,478,788 ) | (99,591 ) | 236,138 | 15,427,139 |

| | 2017 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Beginning balance | Increase in provision | Payment | Reversal | Others | Ending balance |
| | In millions of won | | | | | |
| Employment benefits | | | | | | |
| Provisions for employment benefits | ₩ 810,607 | 984,896 | (880,255 ) | (1,461 ) | – | 913,787 |
| Litigation | | | | | | |
| Litigation provisions | 198,237 | 34,629 | (152,461 ) | (7,096 ) | 267 | 73,576 |
| Decommissioning cost | | | | | | |
| Nuclear plants | 10,195,928 | 2,818,033 | (6,733 ) | – | – | 13,007,228 |
| Spent fuel | 1,374,225 | 307,682 | (342,861 ) | – | – | 1,339,046 |
| Waste | 1,479,502 | 222,632 | (63,763 ) | – | – | 1,638,371 |
| PCBs | 191,744 | 5,309 | (14,266 ) | (2,700 ) | – | 180,087 |
| Other recovery provisions | 507 | 5,939 | – | – | 213 | 6,659 |
| Others | | | | | | |
| Power plant regional support program | 152,851 | 94,039 | (103,889 ) | – | 10,755 | 153,756 |
| Transmission regional support program | 282,608 | 143,178 | (182,421 ) | – | – | 243,365 |
| Provisions for tax | 242 | – | (25 ) | (136 ) | (20 ) | 61 |
| Provisions for financial guarantee | 29,665 | 3,760 | – | (9,945 ) | (5 ) | 23,475 |
| Provisions for RPS | 417,404 | 242,946 | (388,726 ) | – | – | 271,624 |
| Provisions for greenhouse gas emissions obligations | 249,644 | 422,666 | (256,758 ) | (1,300 ) | – | 414,252 |
| Others(*) | 43,975 | 6,639 | (3,348 ) | (26,477 ) | 76,136 | 96,925 |
| | ₩ 15,427,139 | 5,292,348 | (2,395,506 ) | (49,115 ) | 87,346 | 18,362,212 |

F-127

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(*)   As described in note 50.(1), the Company believes that the possibility of economic outflow is probable on the cost of construction suspension of Shin-Kori Unit 5 and 6 for three months. For this reason, the Company recognized ₩77,261 million of provision as addition to construction-in-progress.

**27.   Government Grants**

**(1)   Government grants as of December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Land | ₩ | (3,204 ) | (21,968 ) |
| Buildings | | (61,188 ) | (63,539 ) |
| Structures | | (197,641) | (196,414) |
| Machinery | | (111,064) | (183,188) |
| Vehicles | | (107 ) | (6,322 ) |
| Equipment | | (732 ) | (761 ) |
| Tools | | (430 ) | (1,027 ) |
| Construction-in-progress | | (135,807) | (49,084 ) |
| Finance lease assets | | – | (27 ) |
| Investment properties | | (64 ) | (83 ) |
| Software | | (595 ) | (486 ) |
| Development expenditures | | (5,152 ) | (3,702 ) |
| Intangible assets under development | | (11,090 ) | (10,540 ) |
| Usage rights of donated assets and other | | (21 ) | (11 ) |
| Other intangible assets other than goodwill | | – | – |
|  | ₩ | (527,095) | (537,152) |

**(2)   Changes in government grants for the years ended December 31, 2016 and 2017 are as follows:**

|  | | Beginning balance | Receipt | Acquisition | 2016 Offset the items of depreciation expense and others | Disposal | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
|  | | | | | In millions of won | | | |
| Cash | ₩ | – | (32,878) | – | – | – | 32,878 | – |
| Land | | (3,147 ) | – | – | – | 14 | (71 ) | (3,204 ) |
| Buildings | | (63,932 ) | – | – | 5,299 | 731 | (3,286 ) | (61,188 ) |
| Structures | | (193,119) | – | – | 9,491 | 2,597 | (16,610) | (197,641) |
| Machinery | | (108,935) | – | – | 12,272 | 1,210 | (15,611) | (111,064) |
| Vehicles | | (29 ) | – | – | 25 | – | (103 ) | (107 ) |
| Equipment | | (1,026 ) | – | – | 452 | – | (158 ) | (732 ) |
| Tools | | (691 ) | – | – | 295 | – | (34 ) | (430 ) |
| Construction-in-progress | | (139,898) | – | 32,525 | – | – | (28,434) | (135,807) |
| Investment properties | | (13 ) | – | – | 1 | – | (52 ) | (64 ) |
| Software | | (699 ) | – | – | 249 | – | (145 ) | (595 ) |
| Development expenditures | | (6,835 ) | – | – | 2,771 | – | (1,088 ) | (5,152 ) |
| Intangible assets under development | | (10,483 ) | – | 991 | – | – | (1,598 ) | (11,090 ) |
| Usage rights of donated assets and other | | (32 ) | – | – | 11 | – | – | (21 ) |
| Others | | (1 ) | – | – | 1 | – | – | – |
|  | ₩ | (528,840) | (32,878) | 33,516 | 30,867 | 4,552 | (34,312) | (527,095) |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | Beginning balance | Receipt | Acquisition | Offset the items of depreciation expense and others | Disposal | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | |
| Cash ₩ | – | (55,533) | – | – | – | 55,533 | – |
| Land | (3,204 ) | – | – | – | 5 | (18,769 ) | (21,968 ) |
| Buildings | (61,188 ) | – | – | 5,996 | 28 | (8,375 ) | (63,539 ) |
| Structures | (197,641) | – | – | 10,011 | 1,905 | (10,689 ) | (196,414) |
| Machinery | (111,064) | – | – | 17,390 | 489 | (90,003 ) | (183,188) |
| Vehicles | (107 ) | – | – | 1,070 | 14 | (7,299 ) | (6,322 ) |
| Equipment | (732 ) | – | – | 454 | – | (483 ) | (761 ) |
| Tools | (430 ) | – | – | 354 | – | (951 ) | (1,027 ) |
| Construction-in-progress | (135,807) | – | 129,451 | – | – | (42,728 ) | (49,084 ) |
| Finance lease assets | – | – | – | 1 | – | (28 ) | (27 ) |
| Investment properties | (64 ) | – | – | 2 | – | (21 ) | (83 ) |
| Software | (595 ) | – | – | 255 | – | (146 ) | (486 ) |
| Development expenditures | (5,152 ) | – | – | 2,811 | – | (1,361 ) | (3,702 ) |
| Intangible assets under development | (11,090 ) | – | – | – | – | 550 | (10,540 ) |
| Usage rights of donated assets and other | (21 ) | – | – | 10 | – | – | (11 ) |
| Others | – | – | – | – | – | – | – |
| ₩ | (527,095) | (55,533) | 129,451 | 38,354 | 2,441 | (124,770) | (537,152) |

## 28.  Deferred Revenues

Deferred revenue related to the Company's construction contracts for the years ended December 31, 2016 and 2017 are as follows which included in current and non-current non-financial liabilities in the consolidated statements of financial position:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Beginning balance ₩ | | 7,165,297 | 7,825,765 |
| Increase during the current year / period | | 1,087,765 | 978,389 |
| Recognized as revenue during the current year / period | | (427,297 ) | (478,973 ) |
| Ending balance ₩ | | 7,825,765 | 8,325,181 |

## 29.  Non-financial Liabilities

Non-financial liabilities as of December 31, 2016 and 2017 are as follows:

| | 2016 | | 2017 | |
|---|---|---|---|---|
| | Current | Non-current | Current | Non-current |
| | In millions of won | | | |
| Advance received ₩ | 4,498,739 | 148,404 | 3,772,713 | 181,612 |
| Unearned revenue | 26,084 | 41,936 | 41,593 | 19,718 |
| Deferred revenue | 445,018 | 7,380,747 | 476,631 | 7,848,550 |
| Withholdings | 263,263 | 10,781 | 164,370 | 10,529 |
| Others | 1,135,106 | 9,737 | 1,129,001 | 12,025 |
| ₩ | 6,368,210 | 7,591,605 | 5,584,308 | 8,072,434 |

F-129

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**30.  Contributed Capital**

**(1)  Details of shares issued as of December 31, 2016 and 2017 are as follows:**

| | Shares authorized | Shares issued | Par value per share | Owned by government(*) | Owned by others | Total |
|---|---|---|---|---|---|---|
| | | | 2016 | | | |
| | | | In millions of won except share information | | | |
| Common shares | 1,200,000,000 | 641,964,077 | ₩   5,000 | 1,640,385 | 1,569,435 | 3,209,820 |

(*)  Korea Development Bank's ownership of ₩1,056,176 million is included.

| | Shares authorized | Shares issued | Par value per share | Owned by government(*) | Owned by others | Total |
|---|---|---|---|---|---|---|
| | | | 2017 | | | |
| | | | In millions of won except share information | | | |
| Common shares | 1,200,000,000 | 641,964,077 | ₩   5,000 | 1,640,385 | 1,569,435 | 3,209,820 |

(*)  Korea Development Bank's ownership of ₩1,056,176 million is included.

**(2)  Details in number of outstanding capital stock for the years ended December 31, 2016 and 2017 are as follows.**

| | 2016 | 2017 |
|---|---|---|
| | Number of shares | |
| Beginning balance | 641,964,077 | 641,964,077 |
| Ending balance | 641,964,077 | 641,964,077 |

**(3)  Details of share premium as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Share premium | ₩ | 843,758 | 843,758 |

**31.  Retained Earnings and Dividends Paid**

**(1)  Details of retained earnings as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Legal reserve(*) | ₩ | 1,604,910 | 1,604,910 |
| Voluntary reserves | | 31,847,275 | 34,833,844 |
| Retained earnings before appropriations | | 19,721,686 | 16,931,804 |
| Retained earnings | ₩ | 53,173,871 | 53,370,558 |

(*)  The KEPCO Act requires KEPCO to appropriate a legal reserve equal to at least 20 percent of net income for each accounting period until the reserve equals 50 percent of KEPCO's common stock. The legal reserve is not available for cash dividends; however, this reserve may be credited to paid-in capital or offset against accumulated deficit by the resolution of the shareholders.

F-130

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(2)   Details of voluntary reserves as of December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Reserve for investment on social overhead capital | ₩ | 5,277,449 | 5,277,449 |
| Reserve for research and human development(*) | | 330,000 | 330,000 |
| Reserve for business expansion | | 26,029,826 | 29,016,395 |
| Reserve for equalizing dividends | | 210,000 | 210,000 |
|  | ₩ | 31,847,275 | 34,833,844 |

(*)   The reserve for research and human development is appropriated by KEPCO to use as qualified tax credits to reduce corporate tax liabilities. The reserve is available for cash dividends for a certain period as defined by the Restriction of Special Taxation Act of Korea.

**(3)   Changes in retained earnings for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance | ₩ | 48,187,241 | 53,173,871 |
| Net profit for the period attributed to owner of the Company | | 7,048,581 | 1,298,720 |
| Changes in equity method retained earnings | | (2,532 ) | 10,065 |
| Remeasurements of defined benefit liability, net of tax | | (69,330 ) | 158,991 |
| Dividend paid | | (1,990,089 ) | (1,271,089 ) |
| Ending balance | ₩ | 53,173,871 | 53,370,558 |

**(4)   Dividends paid for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2015 | | | |
|---|---|---|---|---|---|
| In millions of won | Number of shares issued | Number of treasury stocks | Number of shares eligible for dividends | Dividends paid per share | Dividends paid |
|  |  |  |  | (In won) | |
| Common shares | 641,964,077 | – | 641,964,077 ₩ | 500 | 320,982 |

|  | | 2016 | | | |
|---|---|---|---|---|---|
| In millions of won | Number of shares issued | Number of treasury stocks | Number of shares eligible for dividends | Dividends paid per share | Dividends paid |
|  |  |  |  | (In won) | |
| Common shares | 641,964,077 | – | 641,964,077 ₩ | 3,100 | 1,990,089 |

|  | | 2017 | | | |
|---|---|---|---|---|---|
| In millions of won | Number of shares issued | Number of treasury stocks | Number of shares eligible for dividends | Dividends paid per share | Dividends paid |
|  |  |  |  | (In won) | |
| Common shares | 641,964,077 | – | 641,964,077 ₩ | 1,980 | 1,271,089 |

**(5)   Changes in retained earnings of investments in associates and joint ventures for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance | ₩ | (2,411 ) | (4,943 ) |
| Changes | | (2,532 ) | 10,065 |
| Ending balance | ₩ | (4,943 ) | 5,122 |

F-131

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(6)  Changes in remeasurement components for the years ended December 31, 2016 and 2017 are as follows:

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance | ₩ | (202,878) | (222,997) |
| Changes | | (119,316) | 239,636 |
| Income tax effect | | 49,986 | (80,645 ) |
| Transfer to reserve for business expansion | | 49,211 | 20,493 |
| Ending balance | ₩ | (222,997) | (43,513 ) |

32.  **Statement of Appropriation of Retained Earnings**

For the year ended December 31, 2016, KEPCO's retained earnings were appropriated on March 21, 2017. For the year ended December 31, 2017, KEPCO's retained earnings were appropriated on March 30, 2018. Statements of appropriation of retained earnings of KEPCO, the controlling company, for the years ended December 31, 2016 and 2017 are as follows:

|  |  | | 2016 | 2017 |
|---|---|---|---|---|
|  |  | | In millions of won except for dividends per share | |
| I. | Retained earnings before appropriations | | – | |
|  | Unappropriated retained earnings carried over from prior years | ₩ | – | – |
|  | Net income | | 4,261,986 | 1,506,852 |
|  | Remeasurements of the defined benefit plan | | (4,328 ) | 72,723 |
|  |  | | 4,257,658 | 1,579,575 |
| II. | Transfer from voluntary reserves | | – | – |
| III. | Subtotal (I+II) | | 4,257,658 | 1,579,575 |
| IV. | Appropriations of retained earnings | | (4,257,658 ) | (1,579,575 ) |
|  | Legal reserve | | – | – |
|  | Dividends (government, individual) Current year–₩ 790 (16%) | | | |
|  | Amount of dividends per share (%) : Prior year–₩ 1,980 (40%) | | (1,271,089 ) | (507,152 ) |
|  | Reserve for business expansion | | (2,986,569 ) | (1,072,423 ) |
| V. | Unappropriated retained earnings to be carried over forward to subsequent year | | – | – |

33.  **Hybrid Bonds**

Hybrid bonds classified as equity (non-controlling interest) as of December 31, 2016 and 2017 are as follows:

| Issuer | Hybrid bond | Issued date | Maturity | Yield (%) | | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
|  | | In millions of won | | | | | |
| Korea Western Power Co., Ltd. | 1st hybrid bond | 2012.10.18 | – | – | ₩ | 100,000 | – |
| Korea South-East Power Co., Ltd. | 1st hybrid bond | 2012.12.07 | 2042.12.06 | 4.38 | | 170,000 | 170,000 |
| Korea South-East Power Co., Ltd. | 2nd hybrid bond | 2012.12.07 | 2042.12.06 | 4.44 | | 230,000 | 230,000 |
| Expense of issuance | | | | | | (1,340 ) | (1,090 ) |
|  | | | | | ₩ | 498,660 | 398,910 |

F-132

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Although these instruments have contractual maturity dates, the contractual agreements allow these subsidiaries to indefinitely extend the maturity dates and defer the payment of interest without modification to the other terms of the instruments. When the Company decides not to pay dividends on ordinary shares, they are not required to pay interest on the hybrid bonds.

Substantially, as these instruments have no contractual obligation to pay principal and interest, these instruments have been classified as equity (non-controlling interest) in the Company's consolidated financial statements.

Korea Western Power Co., Ltd., a subsidiary of the Company, repaid all of its hybrid bond classified as equity (non-controlling interest) in full during the year ended December 31, 2017.

**34.    Other Components of Equity**

**(1)    Other components of equity of the parent as of December 31, 2016 and 2017 are as follows:**

|  | 2016 | 2017 |
|---|---|---|
|  | In millions of won | |
| Other capital surplus | ₩ 1,235,146 | 1,233,793 |
| Accumulated other comprehensive loss | (33,875 ) | (271,457 ) |
| Other equity | 13,294,973 | 13,294,973 |
|  | ₩ 14,496,244 | 14,257,309 |

**(2)    Changes in other capital surplus for the years ended December 31, 2016 and 2017 are as follows:**

|  | 2016 | | | 2017 | | |
|---|---|---|---|---|---|---|
|  | Gains on disposal of Treasury stocks | Others | Subtotal | Gains on disposal of treasury stocks | Others | Subtotal |
|  | In millions of won | | | | | |
| Beginning balance | ₩ 387,524 | 809,864 | 1,197,388 | 387,524 | 847,622 | 1,235,146 |
| Disposal of subsidiary | – | 36,008 | 36,008 | – | – | – |
| Issuance of share capital of subsidiary | – | 1,750 | 1,750 | – | (1,378 ) | (1,378 ) |
| Others | – | – | – | – | 25 | 25 |
| Ending balance | ₩ 387,524 | 847,622 | 1,235,146 | 387,524 | 846,269 | 1,233,793 |

F-133

Table of Contents

(3)    Changes in accumulated other comprehensive income (loss) for the years ended December 31, 2016 and 2017 are as follows:

| | | 2016 | | | | |
|---|---|---|---|---|---|---|
| | | Available-for-sale financial asset valuation reserve | Shares in other comprehensive Income (loss) of investments in associates and joint ventures | Reserve for overseas operations translation credit | Reserve for gain (loss) on valuation of derivatives | Total |
| | | In millions of won | | | | |
| Beginning balance | ₩ | (24,905) | 276,373 | (254,462) | (95,719) | (98,713) |
| Changes in the unrealized fair value of available-for-sale financial assets, net of tax | | 61,275 | – | – | – | 61,275 |
| Shares in other comprehensive loss of associates and joint ventures, net of tax | | – | (54,918) | – | – | (54,918) |
| Foreign currency translation of foreign operations, net of tax | | – | – | 31,406 | – | 31,406 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax | | – | – | – | 27,075 | 27,075 |
| Ending balance | ₩ | 36,370 | 221,455 | (223,056) | (68,644) | (33,875) |

| | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | | Available-for-sale financial asset valuation reserve | Shares in other comprehensive Income (loss) of investments in associates and joint ventures | Reserve for overseas operations translation credit | Reserve for gain (loss) on valuation of derivatives | Total |
| | | In millions of won | | | | |
| Beginning balance | ₩ | 36,370 | 221,455 | (223,056) | (68,644) | (33,875) |
| Changes in the unrealized fair value of available-for-sale financial assets, net of tax | | (7,102) | – | – | – | (7,102) |
| Shares in other comprehensive loss of associates and joint ventures, net of tax | | – | (154,991) | – | – | (154,991) |
| Foreign currency translation of foreign operations, net of tax | | – | – | (95,103) | – | (95,103) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax | | – | – | – | 19,614 | 19,614 |
| Ending balance | ₩ | 29,268 | 66,464 | (318,159) | (49,030) | (271,457) |

(4)    Details of changes in other equity for the years ended December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Statutory revaluation reserve | ₩ | 13,295,098 | 13,295,098 |
| Changes in other equity | | (125) | (125) |
| | ₩ | 13,294,973 | 13,294,973 |

F-134

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**35.    Sales**

Details of sales for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|
| | | Domestic | Overseas | Domestic | Overseas | Domestic | Overseas |
| | | | | In millions of won | | | |
| Sales of goods | ₩ | 53,961,463 | 405,573 | 54,982,095 | 397,392 | 55,373,316 | 399,232 |
| Electricity | | 53,229,470 | – | 54,304,529 | – | 54,649,882 | – |
| Heat supply | | 204,987 | – | 181,597 | – | 205,838 | – |
| Others | | 527,006 | 405,573 | 495,969 | 397,392 | 517,596 | 399,232 |
| Sales of service | | 209,189 | 244,298 | 195,697 | 161,046 | 186,990 | 164,167 |
| Sales of construction services | | 180,424 | 3,580,780 | 132,219 | 3,894,638 | 92,501 | 3,119,683 |
| | ₩ | 54,351,076 | 4,230,651 | 55,310,011 | 4,453,076 | 55,652,807 | 3,683,082 |

**36.    Selling and Administrative Expenses**

**(1)    Selling and administrative expenses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | | In millions of won | |
| Salaries | ₩ | 655,432 | 734,930 | 735,383 |
| Retirement benefit expense | | 61,903 | 72,812 | 71,094 |
| Welfare and benefit expense | | 119,866 | 162,243 | 179,406 |
| Insurance expense | | 10,636 | 11,513 | 15,414 |
| Depreciation | | 102,867 | 169,431 | 190,245 |
| Amortization of intangible assets | | 40,465 | 35,171 | 44,990 |
| Bad debt expense | | 290 | 38,719 | 126,714 |
| Commission | | 562,171 | 605,879 | 673,740 |
| Advertising expense | | 30,085 | 34,658 | 114,519 |
| Training expense | | 4,988 | 6,314 | 7,027 |
| Vehicle maintenance expense | | 10,529 | 10,390 | 9,998 |
| Publishing expense | | 3,124 | 3,643 | 3,672 |
| Business promotion expense | | 3,338 | 3,477 | 3,700 |
| Rent expense | | 44,905 | 40,020 | 38,380 |
| Telecommunication expense | | 22,678 | 25,448 | 24,916 |
| Transportation expense | | 753 | 596 | 495 |
| Taxes and dues | | 55,970 | 46,531 | 48,395 |
| Expendable supplies expense | | 7,272 | 6,834 | 7,731 |
| Water, light and heating expense | | 9,558 | 9,720 | 10,545 |
| Repairs and maintenance expense | | 74,330 | 75,122 | 63,477 |
| Ordinary development expense | | 178,472 | 188,063 | 211,417 |
| Travel expense | | 14,388 | 16,115 | 16,658 |
| Clothing expense | | 5,751 | 8,273 | 8,410 |
| Survey and analysis expense | | 590 | 666 | 698 |
| Membership fee | | 1,040 | 1,132 | 1,122 |
| Others | | 131,860 | 331,532 | 154,709 |
| | ₩ | 2,153,261 | 2,639,232 | 2,762,855 |

F-135

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2)    **Other selling and administrative expenses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | | In millions of won | |
| Accommodation development expenses | ₩ | 28,134 | 186,896 | 55,799 |
| Miscellaneous wages | | 43,109 | 31,907 | 32,300 |
| Litigation and filing expenses | | 10,670 | 12,328 | 11,881 |
| Compensation for damages | | 9,032 | 60,341 | 12,297 |
| Outsourcing expenses | | 2,865 | 3,530 | 2,647 |
| Reward expenses | | 2,472 | 3,267 | 2,786 |
| Overseas market development expenses | | 1,541 | 2,177 | 1,876 |
| Others | | 34,037 | 31,086 | 35,123 |
|  | ₩ | 131,860 | 331,532 | 154,709 |

**37.    Other Income and Expense**

(1)    **Other income for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | | In millions of won | |
| Reversal of other provisions | ₩ | 6,355 | 22,034 | 35,265 |
| Reversal of other allowance for doubtful accounts | | 413 | 5,489 | 2,166 |
| Gains on government grants | | 204 | 111 | 430 |
| Gains on assets contributed | | 9,004 | 12,254 | 4,218 |
| Gains on liabilities exempted | | 2,588 | 1,959 | 3,166 |
| Compensation and reparations revenue | | 166,355 | 114,530 | 89,196 |
| Revenue from research contracts | | 5,342 | 13,143 | 12,580 |
| Income related to transfer of assets from customers | | 375,995 | 427,297 | 478,973 |
| Rental income | | 196,406 | 211,580 | 192,136 |
| Others | | 45,552 | 31,787 | 50,988 |
|  | ₩ | 808,214 | 840,184 | 869,118 |

(2)    **Details of others of other income for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | | In millions of won | |
| Refund of claim for rectification | ₩ | 7,623 | 8,722 | 9,655 |
| Adjustment of research project | | 4,090 | 4,148 | 3,884 |
| Maintenance expenses on lease building | | 324 | 354 | 135 |
| Training expenses | | 4,774 | 4,478 | 3,045 |
| Deposit redemption | | 430 | 991 | 34 |
| Reversal of expenses on litigation | | 219 | 893 | 360 |
| Revenue on royalty fee | | 2,739 | 2,486 | 2,888 |
| Reimbursement of insurance fee | | 11,797 | – | 1,498 |
| Gains on guarantee contracts | | 4,523 | 2,796 | 456 |
| Others | | 9,033 | 6,919 | 29,033 |
|  | ₩ | 45,552 | 31,787 | 50,988 |

F-136

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(3)    Other expense for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Compensation and indemnification expense | ₩ 16,959 | – | 37 |
| Accretion expenses of other provisions | 4,575 | 4,556 | 7,535 |
| Depreciation expenses on investment properties | 669 | 678 | 1,176 |
| Depreciation expenses on idle assets | 6,698 | 6,639 | 6,644 |
| Other bad debt expense | 18,473 | 4,585 | 1,778 |
| Donations | 34,134 | 114,094 | 119,421 |
| Others | 27,340 | 58,072 | 43,464 |
| | ₩ 108,848 | 188,624 | 180,055 |

(4)    Details of others of other expense for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Operating expenses related to the idle assets | ₩ 779 | 459 | 136 |
| Research grants | 1,392 | 1,461 | 1,180 |
| Supporting expenses on farming and fishing village | 14,626 | 15,201 | 11,956 |
| Operating expenses on fitness center | 2,912 | 2,706 | 3,498 |
| Expenses on adjustment of research and development grants | 709 | – | 806 |
| Taxes and dues | 1,105 | 4,582 | 2,270 |
| Expenses on R&D supporting | 146 | 690 | 5,459 |
| Moving expense | 3,191 | – | – |
| Others | 2,480 | 32,973 | 18,159 |
| | ₩ 27,340 | 58,072 | 43,464 |

F-137

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**38.    Other Gains (Losses)**

**(1)    Composition of other gains (losses) for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | | In millions of won | |
| Other gains | | | | |
| Gains on disposal of property, plant, and equipment | ₩ | 8,637,508 | 74,035 | 48,316 |
| Gains on disposal of intangible assets | | 32 | – | 564 |
| Reversal of impairment loss on intangible assets | | 275 | 3 | 54 |
| Gains on foreign currency translation | | 13,784 | 15,311 | 20,485 |
| Gains on foreign currency transaction | | 61,007 | 55,377 | 93,151 |
| Gains on insurance proceeds | | 30 | – | 400 |
| Others | | 162,128 | 187,792 | 269,562 |
| Other losses | | | | |
| Losses on disposal of property, plant and equipment | | (73,073 ) | (42,715 ) | (70,514 ) |
| Losses on disposal of intangible assets | | (16 ) | (158 ) | (183 ) |
| Impairment loss on property, plant and equipment | | (30,344 ) | – | (51,067 ) |
| Impairment loss on intangible assets | | (22 ) | (3,945 ) | (20 ) |
| Losses on foreign currency translation | | (15,097 ) | (23,835 ) | (25,495 ) |
| Losses on foreign currency transaction | | (75,615 ) | (72,058 ) | (36,241 ) |
| Others | | (69,824 ) | (119,309 ) | (92,385 ) |
| | ₩ | 8,610,773 | 70,498 | 156,627 |

**(2)    Details of others of other gains for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | | In millions of won | |
| Gains on disposal of inventories | ₩ | 10,758 | 9,494 | 6,024 |
| Gains on valuation of inventories | | 7 | 2 | – |
| Gains on proxy collection of TV license fee | | 38,529 | 38,991 | 39,711 |
| Gains on compensation of impaired electric poles | | – | 3,650 | 1,526 |
| Gains on compensation for infringement on contract | | 7,414 | 3,040 | 18,990 |
| Gains on harbor facilities dues | | 5,943 | 2,957 | 3,025 |
| Gains on technical fees | | 1,258 | 1,271 | 2,105 |
| Reversal of occupation development training fees | | 1,878 | 1,756 | 1,697 |
| Gains on disposal of waste | | 2,880 | 4,222 | 4,261 |
| Gains on insurance | | 11,865 | 3,786 | 10,410 |
| Gains on litigation | | 600 | – | – |
| Gains on tax rebate | | 1,661 | 5,226 | 2,161 |
| Gains on other commission | | 2,177 | 4,639 | 4,790 |
| Gains on research tasks | | 1,446 | 10 | – |
| Gains on settlement and others | | 2,803 | 2,188 | – |
| Gains on sales of greenhouse gas emissions rights | | 52 | 46 | – |
| Others | | 72,857 | 106,514 | 174,862 |
| | ₩ | 162,128 | 187,792 | 269,562 |

F-138

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(3)  Details of others of other losses for the years ended December 31, 2015, 2016 and 2017 are as follows:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won |  |
| Losses on valuation of inventories | ₩ 1,318 | 2,683 | 3,875 |
| Losses on disposal of inventories | 13,469 | 3,092 | 3,273 |
| Losses due to disaster | 263 | 1,522 | 5,374 |
| Losses on rounding adjustment of electric charge surtax | 1,251 | 1,260 | 1,253 |
| Losses on adjustments of levies | 13,928 | 1,184 | 1 |
| Forfeit of taxes and dues | 190 | 4,582 | 656 |
| Losses on litigation | 488 | 2,581 | – |
| Others | 38,917 | 102,405 | 77,953 |
|  | ₩ 69,824 | 119,309 | 92,385 |

## 39.  Finance Income

(1)  Finance income for the years ended December 31, 2015, 2016 and 2017 are as follows:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won |  |
| Interest income | ₩ 241,585 | 241,778 | 206,143 |
| Dividends income | 14,069 | 9,446 | 11,477 |
| Gains on disposal of financial assets | 4 | 1,482 | 1,130 |
| Gains on valuation of Financial assets at fair value through profit or loss | – | – | 12 |
| Gains on valuation of derivatives | 610,582 | 293,830 | 16,165 |
| Gains on transaction of derivatives | 151,851 | 45,549 | 29,257 |
| Gains on foreign currency translation | 127,372 | 161,905 | 1,115,832 |
| Gains on foreign currency transaction | 37,377 | 37,553 | 150,602 |
| Other finance income | 148 | – | – |
|  | ₩ 1,182,988 | 791,543 | 1,530,618 |

(2)  Interest income included in finance income for the years ended December 31, 2015, 2016 and 2017 are as follows:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won |  |
| Cash and cash equivalents | ₩ 54,687 | 61,380 | 35,474 |
| Available-for-sale financial assets | 29 | – | 290 |
| Held-to-maturity investments | 99 | 97 | 82 |
| Loans and receivables | 28,586 | 25,106 | 30,014 |
| Short-term financial instrument | 46,921 | 45,763 | 29,412 |
| Long-term financial instrument | 10,492 | 7,195 | 8,144 |
| Trade and other receivables | 100,771 | 102,237 | 102,727 |
|  | ₩ 241,585 | 241,778 | 206,143 |

F-139

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**40. Finance Expenses**

**(1) Finance expenses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | | In millions of won | |
| Interest expense | ₩ | 2,015,684 | 1,752,868 | 1,789,552 |
| Losses on sale of financial assets | | 3,008 | 9 | 2,343 |
| Impairment of available-for-sale financial assets | | 84,370 | 86,703 | 2,713 |
| Losses on valuation of derivatives | | 17,051 | 5,762 | 890,832 |
| Losses on transaction of derivatives | | 37,262 | 101,987 | 198,218 |
| Losses on foreign currency translation | | 743,283 | 406,849 | 207,944 |
| Losses on foreign currency transaction | | 113,723 | 57,889 | 35,175 |
| Losses on repayment of financial liabilities | | 33 | 23,000 | 5 |
| Other | | 1,043 | 2,020 | 1,170 |
|  | ₩ | 3,015,457 | 2,437,087 | 3,127,952 |

**(2) Interest expense included in finance expenses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | | In millions of won | |
| Trade and other payables | ₩ | 84,527 | 68,375 | 57,160 |
| Short-term borrowings | | 14,627 | 6,969 | 35,891 |
| Long-term borrowings | | 103,503 | 91,584 | 87,011 |
| Debt securities | | 2,177,855 | 1,922,900 | 1,698,232 |
| Other financial liabilities | | 538,680 | 482,428 | 491,665 |
|  | | 2,919,192 | 2,572,256 | 2,369,959 |
| Less: Capitalized borrowing costs | ₩ | (903,508 ) | (819,388 ) | (580,407 ) |
|  | | 2,015,684 | 1,752,868 | 1,789,552 |

Capitalization rates for the years ended December 31, 2015, 2016 and 2017 are 2.36%~4.25%, 2.29%~4.16% and 2.30%~3.60%, respectively.

**41. Income Taxes**

**(1) Income tax expense for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | | In millions of won | |
| **Current income tax expense** | | | | |
| Payment of income tax | ₩ | 2,682,779 | 2,689,640 | 881,583 |
| Adjustment due to changes in estimates related to prior years | | (23,248 ) | 231,113 | 4,484 |
| Current income tax directly recognized in equity | | 37,768 | 30,059 | (56,098 ) |
|  | | 2,697,299 | 2,950,812 | 829,969 |
| **Deferred income tax expense** | | | | |
| Generation and realization of temporary differences | | 48,878 | 509,762 | 1,283,012 |
| Changes of unrecognized tax losses, tax credit and temporary differences for prior periods | | 71,999 | (86,845 ) | 44,573 |
| Changes in deferred tax on tax losses carryforwards | | 2,374,237 | – | – |
| Tax credit carryforwards | | 47,000 | (8,588 ) | 15,270 |
|  | | 2,542,114 | 414,329 | 1,342,855 |
| Income tax expense | ₩ | 5,239,413 | 3,365,141 | 2,172,824 |

F-140

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(2) Reconciliation between actual income tax expense and amount computed by applying the statutory tax rate to income before income taxes for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Income before income tax | ₩ 18,655,786 | 10,513,468 | 3,614,218 |
| Income tax expense computed at applicable tax rate of 24.2% | 4,514,700 | 2,544,259 | 874,641 |
| Adjustments | | | |
| Effect of applying gradual tax rate | (4,147 ) | (5,082 ) | (5,082 ) |
| Effect of non-taxable income | (8,047 ) | (29,554 ) | (32,032 ) |
| Effect of non-deductible expenses | 17,734 | 22,258 | 15,032 |
| Effects of tax credits and deduction | (103,435 ) | (194,731 ) | (161,069 ) |
| Recognition (reversal) of unrecognized deferred tax asset, net | 71,999 | (86,845 ) | 44,573 |
| Effect of change in deferred tax due to change in tax rate (from 24.2% to 27.5%) | – | – | 1,055,154 |
| Deferred income tax related to investments in subsidiaries and associates | 784,793 | 862,956 | 394,145 |
| Others, net | (10,936 ) | 20,767 | (17,022 ) |
| | 747,961 | 589,769 | 1,293,699 |
| Adjustment in respect of prior years due to change in estimate | (23,248 ) | 231,113 | 4,484 |
| Income tax expense | ₩ 5,239,413 | 3,365,141 | 2,172,824 |
| Effective tax rate | 28 % | 32 % | 60 % |

(3) Income tax directly adjusted to shareholders' equity (except for accumulated other comprehensive income (loss)) for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Dividends of hybrid bond | ₩ 5,253 | 5,253 | 5,248 |
| Gain on disposal of investments in subsidiaries | (14,144) | (7,006) | – |
| Effect of change in effective tax rate | – | – | (25 ) |
| | ₩ (8,891) | (1,753) | 5,223 |

(4) Income tax recognized as other comprehensive income (loss) for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Income tax recognized as other comprehensive income (loss) | | | |
| Loss on valuation of available-for-sale financial assets | ₩ (6,315 ) | (8,143 ) | (2,551 ) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax | 7,253 | (18,335) | (11,016) |
| Remeasurement of defined benefit obligations | 42,913 | 49,986 | (80,645) |
| Investments in associates | 13,648 | 7,731 | 8,649 |
| Others | (10,840) | 573 | 24,242 |
| | ₩ 46,659 | 31,812 | (61,321) |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(5)  Changes in deferred income tax assets (liabilities) recognized in the statements of financial position for the years ended December 31, 2016 and 2017 are as follows:

| | | 2016 | | | |
|---|---|---|---|---|---|
| | Beginning balance | Amounts recognized in profit or loss | Amount recognized in other comprehensive income (loss) In millions of won | Amounts recognized directly in equity | Ending balance |
| **Deferred income tax on temporary differences** | | | | | |
| Employee benefits | ₩ 407,342 | 36,003 | 49,986 | – | 493,331 |
| Cash flow hedge | (29,013 ) | (6,235 ) | (18,335 ) | – | (53,583 ) |
| Investments in associates or subsidiaries | (6,449,998) | (717,072) | 7,731 | (7,006 ) | (7,166,345) |
| Property, plant and equipment | (5,495,786) | (31,532 ) | – | – | (5,527,318) |
| Finance lease | (272,430 ) | (73,001 ) | – | – | (345,431 ) |
| Intangible assets | 9,420 | (433 ) | – | – | 8,987 |
| Financial assets at fair value through profit or loss | (4 ) | (58 ) | – | – | (62 ) |
| Available-for-sale financial assets | (49,199 ) | (11,005 ) | (8,143 ) | – | (68,347 ) |
| Deferred revenue | 215,361 | (1,502 ) | – | – | 213,859 |
| Provisions | 3,372,423 | 210,948 | – | – | 3,583,371 |
| Doubtful receivables | 1,405 | 1,291 | – | – | 2,696 |
| Other finance liabilities | 26,298 | (1,302 ) | – | 5,253 | 30,249 |
| Gains or losses on foreign exchange translation | 128,714 | 10,224 | – | – | 138,938 |
| Allowance for doubtful accounts | 18,976 | (1,724 ) | – | – | 17,252 |
| Accrued income | (11,231 ) | 5,864 | – | – | (5,367 ) |
| Special deduction for property, plant and equipment | (194,347 ) | 38 | – | – | (194,309 ) |
| Reserve for research and human development | (20,688 ) | 7,805 | – | – | (12,883 ) |
| Others | 576,585 | 118,712 | 573 | – | 695,870 |
| | (7,766,172) | (452,979) | 31,812 | (1,753 ) | (8,189,092) |
| **Deferred income tax on unused tax losses and tax credit** | | | | | |
| Tax losses | (3 ) | 3 | – | – | – |
| Tax credit | 27,115 | 8,588 | – | – | 35,703 |
| | 27,112 | 8,591 | – | – | 35,703 |
| | ₩ (7,739,060) | (444,388) | 31,812 | (1,753 ) | (8,153,389) |

F-142

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | | Beginning balance | Amounts recognized in profit or loss | Amount recognized in other comprehensive income (loss) | Amounts recognized directly in equity | Ending balance |
| | | | | In millions of won | | |
| **Deferred income tax on temporary differences** | | | | | | |
| Employee benefits | ₩ | 493,331 | 86,008 | (80,645 ) | – | 498,694 |
| Cash flow hedge | | (53,583 ) | 130,044 | (11,016 ) | – | 65,445 |
| Investments in associates or subsidiaries | | (7,166,345) | (1,510,295) | 8,649 | (25 ) | (8,668,016) |
| Property, plant and equipment | | (5,527,318) | (1,333,122) | – | – | (6,860,440) |
| Finance lease | | (345,431 ) | (81,518 ) | – | – | (426,949 ) |
| Intangible assets | | 8,987 | (1,339 ) | – | – | 7,648 |
| Financial assets at fair value through profit or loss | | (62 ) | 952 | – | – | 890 |
| Available-for-sale financial assets | | (68,347 ) | 62,055 | (2,551 ) | – | (8,843 ) |
| Deferred revenue | | 213,859 | 16,852 | – | – | 230,711 |
| Provisions | | 3,583,371 | 1,239,462 | – | – | 4,822,833 |
| Doubtful receivables | | 2,696 | (2,637 ) | – | – | 59 |
| Other finance liabilities | | 30,249 | (2,742 ) | – | 5,248 | 32,755 |
| Gains or losses on foreign exchange translation | | 138,938 | (140,292 ) | – | – | (1,354 ) |
| Allowance for doubtful accounts | | 17,252 | 25,679 | – | – | 42,931 |
| Accrued income | | (5,367 ) | 3,542 | – | – | (1,825 ) |
| Special deduction for property, plant and equipment | | (194,309 ) | (6,618 ) | – | – | (200,927 ) |
| Reserve for research and human development | | (12,883 ) | 9,842 | – | – | (3,041 ) |
| Others | | 695,870 | 232,642 | 24,242 | – | 952,754 |
| | | (8,189,092) | (1,271,485) | (61,321 ) | 5,223 | (9,516,675) |
| **Deferred income tax on unused tax losses and tax credit** | | | | | | |
| Tax losses | | – | – | – | – | – |
| Tax credit | | 35,703 | (15,272 ) | – | – | 20,431 |
| | | 35,703 | (15,272 ) | – | – | 20,431 |
| | ₩ | (8,153,389) | (1,286,757) | (61,321 ) | 5,223 | (9,496,244) |

(6)    Deferred income tax assets (liabilities) recognized in the statements of financial position as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Deferred income tax assets | ₩ | 795,131 | 919,153 |
| Deferred income tax liabilities | | (8,948,520) | (10,415,397) |
| | ₩ | (8,153,389) | (9,496,244 ) |

F-143

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(7)  Details of deductible temporary differences, tax losses and unused tax credits for which no deferred income tax assets were recognized as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Deductible temporary differences | ₩ | 426,718 | 444,426 |

### 42.  Assets Held-for-Sale

Assets held-for-sale as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Land(*1) | ₩ | 2,907 | 2,765 |
| Building(*1) | | 20,366 | 19,369 |
| Investments in associates(*2, 3, 4) | | 42,569 | 5,837 |
| | ₩ | 65,842 | 27,971 |

(*1)  The board of directors of KEPCO Engineering & Construction Company, Inc., a subsidiary of the Company, determined to dispose the office building in Yongin as part of the government's plan to relocate state-run companies for balanced national development and moved the head office to Kimchun, Kyungsangbukdo, in 2015. As the Company believes the book value of Yongin office will be recovered by a disposal transaction rather than continuous operation, it reclassified buildings, land and structures as assets held-for-sale.

(*2)  The Company planned to dispose certain portion of its investment in Dongducheon Dream Power Co., Ltd. and had classified the relevant book value as non-current assets held-for-sale. However, due to uncertainty of sale, it reclassified the relevant book value to investments in associates during the year ended December 31, 2017.

(*3)  Korea Hydro & Nuclear Power Co., Ltd., a subsidiary of the Company, initiated efforts to sell its shares in Yeongwol Energy Station Co., Ltd. during the year ended December 31, 2016. KHNP won the first trial of the lawsuit against the counterparty on November 2, 2017. However, the planned sale period has been extended since the appeal is ongoing as of December 31, 2017. The Company expects the sale to occur in 2018.

(*4)  KEPCO Engineering & Construction Company, Inc., a subsidiary of the Company, exercised a put option to sell the shares of DS POWER Co., Ltd. on December 11, 2017 and the shares are expected to be sold on February 28, 2018. Thus, the Company reclassified the relevant book value to assets held-for-sale.

F-144

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**43.    Expenses Classified by Nature**

Expenses classified by nature for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | 2015 | | |
|---|---|---|---|
| | Selling and administrative expenses | Cost of sales | Total |
| | | In millions of won | |
| Raw materials used | ₩ – | 14,626,933 | 14,626,933 |
| Salaries | 655,432 | 2,962,476 | 3,617,908 |
| Retirement benefit expense | 61,903 | 320,700 | 382,603 |
| Welfare and benefit expense | 119,866 | 426,186 | 546,052 |
| Insurance expense | 10,636 | 83,910 | 94,546 |
| Depreciation | 102,867 | 8,158,884 | 8,261,751 |
| Amortization of intangible assets | 40,465 | 31,801 | 72,266 |
| Bad debt expense | 290 | – | 290 |
| Commission | 562,171 | 353,703 | 915,874 |
| Advertising expense | 30,085 | 8,498 | 38,583 |
| Training expense | 4,988 | 11,186 | 16,174 |
| Vehicle maintenance expense | 10,529 | 8,323 | 18,852 |
| Publishing expense | 3,124 | 3,981 | 7,105 |
| Business promotion expense | 3,338 | 4,312 | 7,650 |
| Rent expense | 44,905 | 142,054 | 186,959 |
| Telecommunication expense | 22,678 | 73,180 | 95,858 |
| Transportation expense | 753 | 5,336 | 6,089 |
| Taxes and dues | 55,970 | 397,161 | 453,131 |
| Expendable supplies expense | 7,272 | 29,874 | 37,146 |
| Water, light and heating expense | 9,558 | 26,870 | 36,428 |
| Repairs and maintenance expense | 74,330 | 1,771,760 | 1,846,090 |
| Ordinary development expense | 178,472 | 432,748 | 611,220 |
| Travel expense | 14,388 | 52,910 | 67,298 |
| Clothing expense | 5,751 | 4,135 | 9,886 |
| Survey and analysis expense | 590 | 3,071 | 3,661 |
| Membership fee | 1,040 | 6,401 | 7,441 |
| Power purchase | – | 11,428,027 | 11,428,027 |
| Others | 131,860 | 4,083,309 | 4,215,169 |
| | ₩ 2,153,261 | 45,457,729 | 47,610,990 |

F-145

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | Selling and administrative expenses | Cost of sales | Total |
|---|---|---|---|
| | | In millions of won | |
| Raw materials used | ₩ – | 13,470,586 | 13,470,586 |
| Salaries | 734,930 | 3,425,712 | 4,160,642 |
| Retirement benefit expense | 72,812 | 374,826 | 447,638 |
| Welfare and benefit expense | 162,243 | 507,691 | 669,934 |
| Insurance expense | 11,513 | 79,987 | 91,500 |
| Depreciation | 169,431 | 8,704,525 | 8,873,956 |
| Amortization of intangible assets | 35,171 | 44,544 | 79,715 |
| Bad debt expense | 38,719 | – | 38,719 |
| Commission | 605,879 | 423,179 | 1,029,058 |
| Advertising expense | 34,658 | 9,693 | 44,351 |
| Training expense | 6,314 | 13,347 | 19,661 |
| Vehicle maintenance expense | 10,390 | 7,016 | 17,406 |
| Publishing expense | 3,643 | 4,615 | 8,258 |
| Business promotion expense | 3,477 | 4,836 | 8,313 |
| Rent expense | 40,020 | 133,670 | 173,690 |
| Telecommunication expense | 25,448 | 75,925 | 101,373 |
| Transportation expense | 596 | 5,153 | 5,749 |
| Taxes and dues | 46,531 | 464,962 | 511,493 |
| Expendable supplies expense | 6,834 | 34,668 | 41,502 |
| Water, light and heating expense | 9,720 | 25,820 | 35,540 |
| Repairs and maintenance expense | 75,122 | 1,896,656 | 1,971,778 |
| Ordinary development expense | 188,063 | 517,441 | 705,504 |
| Travel expense | 16,115 | 63,611 | 79,726 |
| Clothing expense | 8,273 | 5,363 | 13,636 |
| Survey and analysis expense | 666 | 3,209 | 3,875 |
| Membership fee | 1,132 | 8,714 | 9,846 |
| Power purchase | – | 10,755,739 | 10,755,739 |
| Others | 331,532 | 4,488,065 | 4,819,597 |
| | ₩ 2,639,232 | 45,549,553 | 48,188,785 |

F-146

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | | 2017 | |
|---|---|---|---|
| | Selling and administrative expenses | Cost of sales | Total |
| | | In millions of won | |
| Raw materials used | ₩ – | 15,924,707 | 15,924,707 |
| Salaries | 735,383 | 3,479,591 | 4,214,974 |
| Retirement benefit expense | 71,094 | 397,852 | 468,946 |
| Welfare and benefit expense | 179,406 | 543,738 | 723,144 |
| Insurance expense | 15,414 | 90,677 | 106,091 |
| Depreciation | 190,245 | 9,461,974 | 9,652,219 |
| Amortization of intangible assets | 44,990 | 68,682 | 113,672 |
| Bad debt expense | 126,714 | – | 126,714 |
| Commission | 673,740 | 469,695 | 1,143,435 |
| Advertising expense | 114,519 | 10,917 | 125,436 |
| Training expense | 7,027 | 14,362 | 21,389 |
| Vehicle maintenance expense | 9,998 | 7,468 | 17,466 |
| Publishing expense | 3,672 | 4,248 | 7,920 |
| Business promotion expense | 3,700 | 4,973 | 8,673 |
| Rent expense | 38,380 | 148,509 | 186,889 |
| Telecommunication expense | 24,916 | 73,956 | 98,872 |
| Transportation expense | 495 | 9,145 | 9,640 |
| Taxes and dues | 48,395 | 437,643 | 486,038 |
| Expendable supplies expense | 7,731 | 31,994 | 39,725 |
| Water, light and heating expense | 10,545 | 30,150 | 40,695 |
| Repairs and maintenance expense | 63,477 | 2,047,943 | 2,111,420 |
| Ordinary development expense | 211,417 | 510,020 | 721,437 |
| Travel expense | 16,658 | 69,015 | 85,673 |
| Clothing expense | 8,410 | 4,985 | 13,395 |
| Survey and analysis expense | 698 | 3,661 | 4,359 |
| Membership fee | 1,122 | 8,482 | 9,604 |
| Power purchase | – | 14,264,331 | 14,264,331 |
| Others | 154,709 | 3,980,137 | 4,134,846 |
| | ₩ 2,762,855 | 52,098,855 | 54,861,710 |

**44. Earnings Per Share**

**(1)  Basic earnings per share for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| Type | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | | In won | |
| Basic earnings per share | ₩ | 20,701 | 10,980 | 2,023 |

**(2)  Diluted earnings per share for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| Type | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | | In won | |
| Diluted earnings per share | ₩ | 20,701 | 10,980 | 2,023 |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(3)  Basic earnings per share**

Net profit for the period and weighted average number of common shares used in the calculation of basic earnings per share for the years ended December 31, 2015, 2016 and 2017 are as follows:

| Type | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | In millions of won except number of shares | | |
| Net profit attributable to controlling interest | ₩ | 13,289,127 | 7,048,581 | 1,298,720 |
| Profit used in the calculation of total basic earnings per share | | 13,289,127 | 7,048,581 | 1,298,720 |
| Weighted average number of common shares | | 641,964,077 | 641,964,077 | 641,964,077 |

**(4)  Diluted earnings per share**

Diluted earnings per share is calculated by applying adjusted weighted average number of common shares under the assumption that all dilutive potential common shares are converted to common shares.

Earnings used in the calculation of total diluted earnings per share for the years ended December 31, 2015, 2016 and 2017 are as follows:

| Type | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | In millions of won | | |
| Profit used in the calculation of total diluted earnings per share | ₩ | 13,289,127 | 7,048,581 | 1,298,720 |

Weighted average common shares used in calculating diluted earnings per share are adjusted from weighted average common shares used in calculating basic earnings per share. Detailed information of the adjustment for the years ended December 31, 2015, 2016 and 2017 are as follows:

| Type | 2015 | 2016 | 2017 |
|---|---|---|---|
| | In number of shares | | |
| Weighted average number of common shares | 641,964,077 | 641,964,077 | 641,964,077 |
| Diluted weighted average number of shares | 641,964,077 | 641,964,077 | 641,964,077 |

**(5)  There are no potential dilutive instruments and diluted earnings per share are same as basic earnings per share for the years ended December 31, 2015, 2016 and 2017.**

**45.  Risk Management**

**(1)  Capital risk management**

The Company manages its capital to ensure that entities in the Company will be able to continue while maximizing the return to shareholder through the optimization of the debt and equity balance. The capital structure of the Company consists of net debt (offset by cash and cash equivalents) and equity. The Company's overall capital risk management strategy remains unchanged from that of the prior year.

Details of the Company's capital management accounts as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Total borrowings and debt securities | ₩ | 53,639,205 | 54,747,392 |
| Cash and cash equivalents | | 3,051,353 | 2,369,739 |
| Net borrowings and debt securities | | 50,587,852 | 52,377,653 |
| Total shareholder's equity | | 73,050,545 | 72,964,641 |
| Debt to equity ratio | | 69.25      % | 71.78      % |

F-148

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(2)    Financial risk management**

The Company is exposed to various risks related to its financial instruments, such as, market risk (currency risk, interest rate risk, price risk), credit risk. The Company monitors and manages the financial risks relating to the operations of the Company through internal risk reports which analyze exposures by degree and magnitude of risks. The Company uses derivative financial instruments to hedge certain risk exposures. The Company's overall financial risk management strategy remains unchanged from that of the prior year.

(i)    Credit risk

Credit risk is the risk of finance loss to the Company if a customer or counterparty to a financial instrument fails to meet its contractual obligations, and arises primarily from the sales activities, securities and derivatives. In addition, credit risk exposure may exist within financial guarantees and unused line of credits. As these financial institutions the Company makes transactions with are reputable financial institutions, the credit risk from them are considered limited. The Company decides credit transaction limits based on evaluation of client's credit, through information obtained from the credit bureau and disclosed financial position at committing contracts.

①    Credit risk management

Electricity sales, the main operations of the Company are the necessity for daily life and industrial activities of Korean nationals, and have importance as one of the national key industries. The Company dominates the domestic market supplying electricity to customers. The Company is not exposed to significant credit risk as customers of the Company are diverse and are from various industries and areas. The Company uses publicly available information and its own internal data related to trade receivables, to rate its major customers and to measure the credit risk that a counter party will default on a contractual obligation. For the incurred but not recognized loss, it is measured considering overdue period.

②    Impairment and allowance account

In accordance with the Company policies, individual material financial assets are assessed on a regular basis, trade receivables that are assessed not to be impaired individually are, in addition, assessed for impairment on a collective basis. Value of the acquired collateral (including the confirmation of feasibility) and estimated collectable amounts are included in this assessment.

Allowance for bad debts assessed on a collective basis are recognized for (i) the Company of assets which individually are not material and (ii) incurred but not recognized losses that are assessed using statistical methods, judgment and past experience.

Book values of the financial assets represent the maximum exposed amounts of the credit risk. Details of the Company's level of maximum exposure to credit risk as of December 31, 2016 and 2017 are as follows:

| | 2016 | 2017 |
|---|---|---|
| | In millions of won | |
| Cash and cash equivalents | ₩ 3,051,353 | 2,369,739 |
| Derivative assets (trading) | 367,477 | 22,020 |
| Available-for-sale financial assets | 1,014,732 | 699,833 |
| Held-to-maturity investments | 3,244 | 3,144 |
| Loans and receivables | 834,207 | 905,641 |
| Long-term/short-term financial instruments | 2,695,926 | 2,244,514 |
| Financial assets at fair value through profit or loss | – | 111,512 |
| Derivative assets (using hedge accounting) | 413,897 | 10,606 |
| Trade and other receivables | 9,692,391 | 9,683,769 |
| Financial guarantee contracts(*) | 1,396,152 | 1,154,862 |

F-149

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(\*)    Maximum exposure associated with the financial guarantee contracts is the maximum amounts of the obligation.

As of the reporting date, there are no financial assets and non-financial assets that were acquired through the exercise of the right of collateralized assets and reinforcement of credit arrangement.

(ii)    Market risk

Market risk is the risk that the Company's fair values of the financial instruments or future cash flows are affected by the changes in the market. Market risk consists of interest rate risk, currency risk and other price risk.

(iii)    Sensitivity analysis

Significant assets and liabilities with uncertainties in underlying assumptions

①    Defined benefit obligation

A sensitivity analysis of defined benefit obligation assuming a 1% increase and decrease movements in the actuarial valuation assumptions as of December 31, 2016 and 2017 are as follows:

| | | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|
| Type | Accounts | | 1% Increase | 1% Decrease | 1% Increase | 1% Decrease |
| | | | In millions of won | | | |
| Future salary increases | Increase (decrease) in defined benefit obligation | ₩ | 344,874 | (304,685 ) | 354,852 | (305,494 ) |
| Discount rate | Increase (decrease) in defined benefit obligation | | (305,031 ) | 371,689 | (313,597 ) | 377,148 |

Changes of employee benefits assuming a 1% increase and decrease movements in discount rate on plan asset for the years ended December 31, 2016 and 2017 are ₩9,096 million and ₩11,875 million, respectively.

②    Provisions

Changes in provisions due to movements in underlying assumptions as of December 31, 2016 and 2017 are as follows:

| Type | Accounts | 2016 | 2017 |
|---|---|---|---|
| PCBs | Inflation rate | 1.29% | 1.23% |
| | Discount rate | 2.77% | 2.55% |
| Nuclear plants | Inflation rate | 1.40% | 1.21% |
| | Discount rate | 3.55% | 2.94% |
| Spent fuel | Inflation rate | 2.93% | 2.93% |
| | Discount rate | 4.49% | 4.49% |

F-150

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

A sensitivity analysis of provisions assuming a 0.1% increase and decrease movements in the underlying assumptions as of December 31, 2016 and 2017 are as follows:

| Type | Accounts | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | 0.1% Increase | 0.1% Decrease | 0.1% Increase | 0.1% Decrease |
| | | In millions of won | | | |
| Discount rate | PCBs | ₩ (817 ) | 822 | (811 ) | 816 |
| | Nuclear plants | (209,277 ) | 215,139 | (262,949 ) | 270,370 |
| | Spent fuel | (52,353 ) | 54,387 | (51,015 ) | 52,997 |
| Inflation rate | PCBs | 834 | (830 ) | 826 | (822 ) |
| | Nuclear plants | 240,115 | (233,553 ) | 287,926 | (280,249 ) |
| | Spent fuel | 55,173 | (53,182 ) | 53,763 | (51,823 ) |

Management judgment effected by uncertainties in underlying assumptions

① Foreign currency risk

The Company undertakes transactions denominated in foreign currencies; consequently, exposures to exchange rate fluctuations arise. The carrying amounts of the Company's foreign currency denominated monetary assets and monetary liabilities as of December 31, 2016 and 2017 are as follows:

| Type | Assets | | Liabilities | |
|---|---|---|---|---|
| | 2016 | 2017 | 2016 | 2017 |
| | In thousands of foreign currencies | | | |
| AED | 7,479 | 5,693 | 1,534 | 2,049 |
| AUD | 187 | 145 | 632,613 | 652,259 |
| BDT | 49,110 | 60,208 | 833 | 1,001 |
| BWP | 4,296 | 797 | 3,222 | – |
| CAD | – | 82 | – | 171 |
| CHF | – | – | 400,308 | 400,004 |
| CNY | – | 13,007 | – | 26,140 |
| EUR | 17,585 | 5,708 | 14,111 | 68,003 |
| GBP | 3 | 3 | 110 | 2,327 |
| IDR | 52,568 | 167,775 | – | – |
| INR | 1,059,092 | 1,228,259 | 161,631 | 227,078 |
| JOD | 1,746 | 1,624 | 5 | 5 |
| JPY | 520,746 | 799,501 | 20,442,504 | 21,624,128 |
| KZT | 12,157 | 359 | – | – |
| MGA | 3,408,579 | 2,762,572 | 150,430 | 319,581 |
| NOK | – | – | – | 482 |
| PHP | 415,818 | 189,261 | 136,700 | 125,431 |
| PKR | 274,090 | 251,190 | 5,051 | 4,676 |
| SAR | 1,149 | 1,191 | – | 44 |
| SEK | – | – | – | 449,002 |
| USD | 1,319,524 | 1,653,858 | 9,445,567 | 8,321,335 |
| UYU | 1,307 | 12,955 | 586 | 10,586 |
| ZAR | 386 | 361 | 75 | 4 |

A sensitivity analysis on the Company's income for the period assuming a 10% increase and decrease in currency exchange rates as of December 31, 2016 and 2017 are as follows:

| Type | 2016 | | 2017 | |
|---|---|---|---|---|
| | 10% Increase | 10% Decrease | 10% Increase | 10% Decrease |
| | In millions of won | | | |
| Increase (decrease) of income before income tax | ₩ (1,101,372 ) | 1,101,372 | (844,122 ) | 844,122 |
| Increase (decrease) of shareholder's equity(*) | (1,101,372 ) | 1,101,372 | (844,122 ) | 844,122 |

(*) The effect on the shareholders' equity excluding the impact of income taxes.

F-151

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The sensitivity analysis above is conducted for monetary assets and liabilities denominated in foreign currencies other than functional currency, without consideration of hedge effect of related derivatives, as of December 31, 2016 and 2017.

To manage its foreign currency risk related to foreign currency denominated receivables and payables, the Company has a policy to enter into currency forward agreements. In addition, to manage its foreign currency risk related to foreign currency denominated expected sales transactions and purchase transactions, the Company enters into cross-currency swap agreements.

②     Interest rate risk

The Company is exposed to interest rate risk due to its borrowing with floating interest rates. A 1% increase or decrease is used when reporting interest rate risk internally to key management personnel and represents management's assessment of the reasonably possible change in interest rates.

The Company's borrowings and debt securities with floating interest rates as of December 31, 2016 and 2017 are as follows:

| Type | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Short-term borrowings | ₩ | 289,322 | 290,873 |
| Long-term borrowings | | 1,459,969 | 1,743,252 |
| Debt securities | | 1,518,500 | 685,700 |
| | ₩ | 3,267,791 | 2,719,825 |

A sensitivity analysis on the Company's long-term borrowings and debt securities assuming a 1% increase and decrease in interest rates, without consideration of hedge effect of related derivatives for the years ended December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | 1% Increase | 1% Decrease | 1% Increase | 1% Decrease |
| | | In millions of won | | | |
| Increase (decrease) of profit before income tax | ₩ | (32,678 ) | 32,678 | (27,198 ) | 27,198 |
| Increase (decrease) of shareholder's equity(*) | | (32,678 ) | 32,678 | (27,198 ) | 27,198 |

(*)     The effect on the shareholders' equity excluding the impact of income taxes.

To manage its interest rate risks, the Company enters into certain interest swap agreements or maintains an appropriate mix of fixed and floating rate borrowings.

③     Electricity rates risk

The Company is exposed to electricity rates risk due to the rate regulation of the government which considers the effect of electricity rate on the national economy.

A sensitivity analysis on the Company's income for the period assuming a 1% increase and decrease in price of electricity for the years ended December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | 1% Increase | 1% Decrease | 1% Increase | 1% Decrease |
| | | In millions of won | | | |
| Increase (decrease) of profit before income tax | ₩ | 543,045 | (543,045 ) | 546,499 | (546,499 ) |
| Increase (decrease) of shareholder's equity(*) | | 543,045 | (543,045 ) | 546,499 | (546,499 ) |

(*)     The effect on the shareholders' equity excluding the impact of income taxes.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(iv)   Liquidity risk

The Company has established an appropriate liquidity risk management framework for the management of the Company's short, medium and long-term funding and liquidity management requirements. The Company manages liquidity risk by continuously monitoring forecasted and actual cash flows, and by matching the maturity profiles of financial assets and liabilities.

In addition, the Company has established credit lines on its trade financing and bank overdrafts, and through payment guarantees it has received, it maintains an adequate credit (borrowing) line. In addition, the Company has the ability to utilize excess cash or long-term borrowings for major construction investments.

The following table shows the details of maturities of non-derivative financial liabilities as of December 31, 2016 and 2017. This table, based on the undiscounted cash flows of the non-derivative financial liabilities, has been completed based on the respective liabilities' earliest maturity date.

| Type | | 2016 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Less than 1 year | 1~2 Years | 2~5 Years | More than 5 years | Total |
| | | In millions of won | | | | |
| Borrowings and debt securities | ₩ | 10,613,185 | 9,786,209 | 19,353,498 | 24,461,835 | 64,214,727 |
| Finance lease liabilities | | 175,512 | 174,534 | 229,495 | 152,247 | 731,788 |
| Trade and other payables | | 5,464,234 | 307,222 | 660,426 | 2,170,525 | 8,602,407 |
| Financial guarantee contracts(*) | | 249,200 | 40,617 | 865,842 | 240,493 | 1,396,152 |
| | ₩ | 16,502,131 | 10,308,582 | 21,109,261 | 27,025,100 | 74,945,074 |

| Type | | 2017 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Less than 1 year | 1~2 Years | 2~5 Years | More than 5 years | Total |
| | | In millions of won | | | | |
| Borrowings and debt securities | ₩ | 10,748,437 | 7,948,320 | 21,331,394 | 22,694,867 | 62,723,018 |
| Finance lease liabilities | | 174,534 | 87,709 | 185,284 | 108,749 | 556,276 |
| Trade and other payables | | 5,867,729 | 301,165 | 698,289 | 1,937,558 | 8,804,741 |
| Financial guarantee contracts(*) | | 7,081 | 18,054 | 1,049,667 | 80,060 | 1,154,862 |
| | ₩ | 16,797,781 | 8,355,248 | 23,264,634 | 24,821,234 | 73,238,897 |

(*)   This represents the total guarantee amounts associated with the financial guarantee contracts. Financial guarantee liabilities which are recognized as of December 31, 2016 and 2017 are ₩29,665 million and ₩23,475 million, respectively.

The expected maturities for non-derivative financial assets as of December 31, 2016 and 2017 in detail are as follows:

| Type | | 2016 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Less than 1 year | 1~5 Years | More than 5 years | Other(*) | Total |
| | | In millions of won | | | | |
| Cash and cash equivalents | ₩ | 3,051,353 | – | – | – | 3,051,353 |
| Available-for-sale financial assets | | – | – | – | 1,014,732 | 1,014,732 |
| Held-to-maturity investments | | 114 | 3,126 | 4 | – | 3,244 |
| Loans and receivables | | 198,133 | 233,564 | 439,666 | 5,591 | 876,954 |
| Long-term/short-term financial instruments | | 2,281,460 | 200,001 | 214,122 | 343 | 2,695,926 |
| Trade and other receivables | | 7,790,953 | 915,679 | 919,901 | 74,199 | 9,700,732 |
| | ₩ | 13,322,013 | 1,352,370 | 1,573,693 | 1,094,865 | 17,342,941 |

F-153

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Type | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | | Less than 1 year | 1~5 Years | More than 5 years | Other(*) | Total |
| | | In millions of won | | | | |
| Cash and cash equivalents | ₩ | 2,369,739 | – | – | – | 2,369,739 |
| Available-for-sale financial assets | | – | – | 214,156 | 485,677 | 699,833 |
| Held-to-maturity investments | | 5 | 3,139 | – | – | 3,144 |
| Loans and receivables | | 244,309 | 261,672 | 429,628 | 10,821 | 946,430 |
| Long-term/short-term financial instruments | | 1,702,084 | 201,821 | 340,304 | 305 | 2,244,514 |
| Financial assets at fair value through profit or loss | | – | – | 111,512 | – | 111,512 |
| Trade and other receivables | | 7,930,715 | 920,539 | 788,795 | 52,031 | 9,692,080 |
| | ₩ | 12,246,852 | 1,387,171 | 1,884,395 | 548,834 | 16,067,252 |

(*)    The maturities cannot be presently determined.

Derivative liabilities classified by maturity periods which from reporting date to maturity date of contract as of December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | | | |
|---|---|---|---|---|---|---|
| | | Less than 1 year | 1~2 Years | 2~5 Years | More than 5 years | Total |
| | | In millions of won | | | | |
| Gross settlement | | | | | | |
| –Trading | ₩ | (3,081 ) | (24,044 ) | – | (2,799 ) | (29,924 ) |
| –Hedging | | (2,645 ) | (2,645 ) | (56,484 ) | (56,575 ) | (118,349 ) |
| | ₩ | (5,726 ) | (26,689 ) | (56,484 ) | (59,374 ) | (148,273 ) |

| Type | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | | Less than 1 year | 1~2 Years | 2~5 Years | More than 5 years | Total |
| | | In millions of won | | | | |
| Net settlement | | | | | | |
| –Trading | ₩ | (774 ) | – | – | – | (774 ) |
| Gross settlement | | | | | | |
| –Trading | | (51,496 ) | (19,887 ) | (16,597 ) | (4,967 ) | (92,947 ) |
| –Hedging | | (17,547 ) | (28,977 ) | (192,205 ) | (44,137 ) | (282,866 ) |
| | ₩ | (69,817 ) | (48,864 ) | (208,802 ) | (49,104 ) | (376,587 ) |

(3)    **Fair value risk**

The fair value of the Company's actively-traded financial instruments (i.e. short-term financial assets held for trading, available-for-sale financial assets, etc.) is based on the traded market-price as of the reporting period end. The fair value of the Company's financial assets is the amount which the asset could be exchanged for or the amount a liability could be settled for.

The fair values of financial instruments where no active market exists or where quoted prices are not otherwise available are determined by using valuation techniques. Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models. If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual market transactions, the Company uses that technique.

F-154

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

For trade receivables and payables, the Company considers the carrying value net of impairment as fair value. While for disclosure purposes, the fair value of financial liabilities is estimated by discounting a financial instruments with similar contractual cash flows based on the effective interest method.

(i)    Fair value and book value of financial assets and liabilities as of December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | 2017 | |
| --- | --- | --- | --- | --- | --- |
| | | Book value | Fair value | Book value | Fair value |
| | | | In millions of won | | |
| **Assets recognized at fair value** | | | | | |
| Available-for-sale financial assets(*1) | ₩ | 1,014,732 | 1,014,732 | 699,833 | 699,833 |
| Derivative assets (trading) | | 367,477 | 367,477 | 22,020 | 22,020 |
| Derivative assets (using hedge accounting) | | 413,897 | 413,897 | 10,606 | 10,606 |
| Long-term financial instruments | | 414,466 | 414,466 | 542,430 | 542,430 |
| Short-term financial instruments | | 2,281,460 | 2,281,460 | 1,702,084 | 1,702,084 |
| Financial assets at fair value through profit or loss | | – | – | 111,512 | 111,512 |
| | | 4,492,032 | 4,492,032 | 3,088,485 | 3,088,485 |
| **Assets carried at amortized cost** | | | | | |
| Held-to-maturity investments | | 3,244 | 3,244 | 3,144 | 3,144 |
| Loans and receivables | | 834,207 | 834,207 | 905,641 | 905,641 |
| Trade and other receivables | | 9,692,391 | 9,692,391 | 9,683,769 | 9,683,769 |
| Cash and cash equivalents | | 3,051,353 | 3,051,353 | 2,369,739 | 2,369,739 |
| | | 13,581,195 | 13,581,195 | 12,962,293 | 12,962,293 |
| **Liabilities recognized at fair value** | | | | | |
| Derivative liabilities (trading) | | 21,529 | 21,529 | 150,929 | 150,929 |
| Derivative liabilities (using hedge accounting) | | 117,157 | 117,157 | 277,130 | 277,130 |
| | | 138,686 | 138,686 | 428,059 | 428,059 |
| **Liabilities carried at amortized cost** | | | | | |
| Secured borrowings | | 744,565 | 744,565 | 1,055,554 | 1,055,554 |
| Unsecured bond | | 50,749,793 | 54,455,659 | 51,146,783 | 53,436,659 |
| Finance lease liabilities | | 541,179 | 541,179 | 418,260 | 418,260 |
| Unsecured borrowings | | 2,089,885 | 2,099,574 | 2,476,196 | 2,477,055 |
| Trade and other payables(*2) | | 8,602,407 | 8,602,407 | 8,804,741 | 8,804,741 |
| Bank overdraft | | 54,962 | 54,962 | 68,859 | 68,859 |
| | ₩ | 62,782,791 | 66,498,346 | 63,970,393 | 66,261,128 |

(*1)   Book values of equity securities held by the Company that were measured at cost as of December 31, 2016 and 2017 are ₩138,557 million and ₩37,926 million, respectively, as a quoted market price does not exist in an active market and its fair value cannot be measured reliably.

(*2)   Excludes finance lease liabilities.

(ii)    Interest rates used for determining fair value

The interest rates used to discount estimated cash flows, when applicable, are based on the government yield curve at the reporting date plus an adequate credit spread.

F-155

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The discount rate used for calculating fair value as of December 31, 2016 and 2017 are as follows:

| Type | 2016 | 2017 |
|------|------|------|
| Derivatives | 0.02% ~ 4.16% | 0.03% ~ 4.16% |
| Borrowings and debt securities | 0.02% ~ 4.38% | 0.08% ~ 4.38% |
| Finance lease | 9.00% ~ 10.83% | 9.00% ~ 10.83% |

(iii)   Fair value hierarchy

The following table provides an analysis of financial instruments that are measured subsequent to initial recognition at fair value, classified as Level 1, 2 or 3, based on the degree to which the fair value is observable.

Level 1: Unadjusted quoted prices in active markets for identical assets or liabilities;

Level 2: Inputs other than quoted prices that are observable for the asset or liability either directly or indirectly; and

Level 3: Inputs that are not based on observable market data.

Fair values of financial instruments by hierarchy level as of December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | | |
|------|---|---------|---------|---------|-------|
| | | Level 1 | Level 2 | Level 3 | Total |
| | | | In millions of won | | |
| **Financial assets at fair value** | | | | | |
| Available-for-sale financial assets | ₩ | 268,171 | 437,015 | 269,461 | 974,647 |
| Derivative assets | | – | 770,851 | 10,523 | 781,374 |
| | | 268,171 | 1,207,866 | 279,984 | 1,756,021 |
| **Financial liabilities at fair value** | | | | | |
| Derivative liabilities | | – | 138,686 | – | 138,686 |

| Type | | 2017 | | | |
|------|---|---------|---------|---------|-------|
| | | Level 1 | Level 2 | Level 3 | Total |
| | | | In millions of won | | |
| **Financial assets at fair value** | | | | | |
| Available-for-sale financial assets | ₩ | 274,453 | 214,156 | 173,298 | 661,907 |
| Derivative assets | | – | 18,466 | 14,160 | 32,626 |
| Financial assets at fair value through profit or loss | | – | 111,512 | – | 111,512 |
| | | 274,453 | 344,134 | 187,458 | 806,045 |
| **Financial liabilities at fair value** | | | | | |
| Derivative liabilities | | – | 428,059 | – | 428,059 |

The fair value of available-for-sale financial assets publicly traded is measured at the closing bid price quoted at the end of the reporting period. Meanwhile, the fair value of unquoted available-for-sale financial assets is calculated using the valuation results from an external pricing service in which weighted average borrowing rates of interest of evaluated companies are used as a discount rate. The fair value of derivatives is measured using valuation model which is determined at the present value of estimated future cash flows discounted at current market interest rate.

F-156

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Changes of financial assets and liabilities which are classified as level 3 for the years ended December 31, 2016 and 2017 are as follows:

| | | 2016 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Beginning balance | Acquisition | Reclassified category | Valuation | Disposal | Foreign currency translation | Ending balance |
| | | | | In millions of won | | | | |
| **Financial assets at fair value** | | | | | | | | |
| Available-for-sale financial assets | | | | | | | | |
| Unlisted securities | ₩ | 180,390 | – | 98,472 | (9,401 ) | – | – | 269,461 |

| | | 2017 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Beginning balance | Acquisition | Reclassified category | Valuation | Disposal | Foreign currency translation | Ending balance |
| | | | | In millions of won | | | | |
| **Financial assets at fair value** | | | | | | | | |
| Available-for-sale financial assets | | | | | | | | |
| Unlisted securities | ₩ | 269,461 | – | (92,128 ) | (6,201 ) | – | 2,166 | 173,298 |

**46.   Service Concession Arrangements**

**(1)   Gas Complex   Thermal Power Plant at Ilijan, Philippines (BOT)**

(i)   Significant terms and concession period of the arrangement

The Company has entered into a contract with National Power Corporation (the "NPC"), based in the Republic of the Philippines whereby the Company can collect the electricity rates which are composed of fixed costs and variable costs during the concession period from 2002 to 2022 after building, rehabilitating, and operating the power plant.

(ii)   Rights and classification of the arrangement

The Company has the rights to use and own the power plant during the concession period from 2002 to 2022. At the end of the concession period, the Company has an obligation to transfer its ownership of the power plant to NPC.

(iii)   The Company's expected future collections of service concession arrangements as of December 31, 2017 are as follows:

| Type | | Amounts |
|---|---|---|
| | | In millions of won |
| Less than 1 year | ₩ | 111,912 |
| 1 ~ 2 years | | 111,912 |
| 2 ~ 3 years | | 111,912 |
| Over 3 years | | 158,543 |
| | ₩ | 494,279 |

**(2)   Hydroelectric Power Generation at Semangka, Indonesia (BOT)**

(i)   Significant terms and concession period of the arrangement

The Company has entered into a contract with PT. Perusahaan Listrik Negara (the "PLN") whereby the Company provides electricity generated and charge tariff rates designed to recover capital cost, fixed

F-157

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

O&M cost, water usage cost, variable O&M cost and special facilities cost during the concession period after building, rehabilitating, and operating the power plant for approximately 30 years (2018~2048) subsequent to the completion of plant construction.

(ii)    Rights and classification of the arrangement

The Company has the rights to use and own the power plant during the concession period from 2018 to 2048. At the end of the concession period, PNL has an option to take over the ownership of the power plant from the Company.

(iii)    The Company's expected future collections of service concession arrangements as of December 31, 2017 are as follows:

| Type | | Amounts |
| --- | --- | --- |
| | | In millions of won |
| Less than 1 year | ₩ | 20,332 |
| 1 ~ 2 years | | 26,888 |
| 2 ~ 3 years | | 26,888 |
| Over 3 years | | 591,687 |
| | ₩ | 665,795 |

(iv)    Accumulated contract costs and profits related to the Company's contract in process as of December 31, 2017 were ₩145,613 million and ₩9,163 million, respectively. There are no amount due from customers and advance receipts in progress.

## 47.    Related Parties

(1)    Related parties of the Company as of December 31, 2017 are as follows:

| Type | Related party |
| --- | --- |
| Parent | Republic of Korea government |
| Subsidiaries (100 subsidiaries) | Korea Hydro & Nuclear Power Co., Ltd., Korea South-East Power Co., Ltd., Korea Midland Power Co., Ltd., Korea Western Power Co., Ltd., Korea Southern Power Co., Ltd., Korea East-West Power Co., Ltd., KEPCO Engineering & Construction Company, Inc., KEPCO Plant Service & Engineering Co., Ltd., KEPCO Nuclear Fuel Co., Ltd., KEPCO KDN Co., Ltd., Garolim Tidal Power Plant Co., Ltd., Gyeonggi Green Energy Co., Ltd., Korea Offshore Wind Power Co., Ltd., KOSEP Material Co., Ltd., KEPCO International HongKong Ltd., KEPCO International Philippines Inc., KEPCO Philippines Corporation, KEPCO Ilijan Corporation, KEPCO Gansu International Ltd., KEPCO Philippines Holdings Inc., KEPCO Lebanon SARL, KEPCO Neimenggu International Ltd., KEPCO Australia Pty., Ltd., KEPCO Shanxi International Ltd., KOMIPO Global Pte Ltd., KOSEP Australia Pty., Ltd., KOMIPO Australia Pty., Ltd., KOWEPO Australia Pty., Ltd., KOSPO Australia Pty., Ltd., KEPCO Canada Energy Ltd., KEPCO Netherlands B.V., KOREA Imouraren Uranium Investment Corp., KEPCO Middle East Holding Company, Qatrana Electric Power Company, Korea Electric Power Nigeria Ltd., KOWEPO International Corporation, KOSPO Jordan LLC, Korea Waterbury Uranium Limited Partnership, PT. Cirebon Power Service, EWP America Inc., KHNP Canada Energy, Ltd., KEPCO Bylong Australia Pty., Ltd., KNF Canada Energy Limited, KEPCO Holdings de Mexico, KST Electric Power |

F-158

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Table of Contents**

Company, KEPCO Energy Service Company, KEPCO Netherlands S3 B.V., PT. KOMIPO Pembangkitan Jawa Bali, PT KEPCO Resource Indonesia, EWP (Barbados) 1 SRL, PT. Tanggamus Electric Power, KOMIPO America Inc, KOSEP USA, INC., PT. EWP Indonesia, KEPCO Netherlands J3 B.V., Global One Pioneer B.V., Global Energy Pioneer B.V., Mira Power Limited, EWP Philippines Corporation, KEPCO Singapore Holdings Pte., Ltd., KOWEPO India Private Limited, KEPCO KPS Philippines Corp., KOSPO Chile SpA, PT. KOWEPO Sumsel Operation And Maintenance Services, Commerce and Industry Energy Co., Ltd., Gyeongju Wind Power Co., Ltd., California Power Holdings, LLC, DG Fairhaven Power, LLC, DG Whitefield, LLC, EWP Renewable Corporation, EWPRC Biomass Holdings, LLC, Springfield Power, LLC, HeeMang Sunlight Power Co., Ltd., Fujeij Wind Power Company, KOSPO Youngnam Power Co., Ltd., HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2), Chitose Solar Power Plant LLC., Solar School Plant Co., Ltd., KEPCO Energy Solution Co. Ltd., KOSPO Power Services Limitada, KOEN Bylong Pty., Ltd., KOWEPO Bylong Pty., Ltd., KOSPO Bylong Pty., Ltd., EWP Bylong Pty., Ltd., KOWEPO Lao International, KOMIPO Bylong Pty Ltd., Energy New Industry Specialized Investment Private Investment Trust., KEPCO US Inc., KEPCO Alamosa LLC, Cogentrix Solar Services, LLC, Solar Investments I, LLC, Cogentrix of Alamosa, LLC, KEPCO-LG CNS Mangilao Holdings LLC, Mangilao Investment LLC, KEPCO-LG CNS Mangilao Solar, LLC Jeju Hanlim Offshore Wind Co., Ltd., PT, Siborpa Eco Power, e-New Industry LB Fund 1, Songhyun e-New Industry Fund, BSK E-New Industry Fund VII

Associates
(56 associates)

Dongducheon Dream Power Co., Ltd., Korea Gas Corporation, SE Green Energy Co., Ltd., Daegu Photovoltaic Co., Ltd., Jeongam Wind Power Co., Ltd., Korea Power Engineering Service Co., Ltd., Heang Bok Do Si Photovoltaic Power Co., Ltd., Korea Electric Power Industrial Development Co., Ltd., Goseong Green Energy Co., Ltd., Gangneung Eco Power Co., Ltd., Shin Pyeongtaek Power Co., Ltd., Naepo Green Energy Co., Ltd., Noeul Green Energy Co., Ltd., YTN Co., Ltd., Cheongna Energy Co., Ltd., Samcheok Eco Materials Co., Ltd., Gangwon Wind Power Co., Ltd., Gwangyang Green Energy Co., Ltd., Hyundai Green Power Co., Ltd., Korea Power Exchange, AMEC Partners Korea Ltd., Hyundai Energy Co., Ltd., Ecollite Co., Ltd., Taebaek Wind Power Co., Ltd., Taeback Guinemi Wind Power Co., Ltd., Pyeongchang Wind Power Co., Ltd., Daeryun Power Co., Ltd., Changjuk Wind Power Co., Ltd., KNH Solar Co., Ltd., S-Power Co., Ltd., Hadong Mineral Fiber Co., Ltd., Green Biomass Co., Ltd., SPC Power Corporation, Gemeng International Energy Co., Ltd., PT. Cirebon Electric Power, KNOC Nigerian East Oil Co., Ltd., KNOC Nigerian West Oil Co., Ltd., PT Wampu Electric Power, PT. Bayan Resources TBK, Nepal Water & Energy Development Company Private Limited, Pioneer Gas Power Limited, Eurasia Energy Holdings, Xe-Pian Xe-Namnoy Power Co., Ltd., PT. Mutiara Jawa, Jinbhuvish Power Generation Pvt. Ltd., Busan Green Energy Co., Ltd., Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.), Korea Electric Vehicle Charging Service, Ulleungdo Natural Energy Co., Ltd., Korea

F-159

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

|  | Nuclear Partners Co., Ltd., Tamra Offshore Wind Power Co., Ltd., Korea Electric Power Corporation Fund, Energy Infra Asset Management Co., Ltd., Daegu clean Energy Co., Ltd., YaksuESS Co., Ltd, PND solar., Ltd |
| Joint ventures (45 joint ventures) | Daegu Green Power Co., Ltd., KEPCO SPC Power Corporation, Daejung Offshore Wind Power Co., Ltd., KAPES, Inc., Dangjin Eco Power Co., Ltd., Honam Wind Power Co., Ltd., Seokmun Energy Co., Ltd., Incheon New Power Co., Ltd., Chun-cheon Energy Co., Ltd., Yeonggwangbaeksu Wind Power Co., Ltd., KW Nuclear Components Co., Ltd., KEPCO-Uhde Inc., GS Donghae Electric Power Co., Ltd., Busan Shinho Solar Power Co., Ltd., Global Trade Of Power System Co., Ltd., Expressway Solar-light Power Generation Co., Ltd., Gansu Datang Yumen Wind Power Co., Ltd., Datang Chifeng Renewable Power Co., Ltd., Rabigh Electricity Company, Eco Biomass Energy Sdn. Bhd., Rabigh Operation & Maintenance Company Limited, Datang KEPCO Chaoyang Renewable Power Co., Ltd., Shuweihat Asia Power Investment B.V., Shuweihat Asia Operation & Maintenance Company, Waterbury Lake Uranium L.P., ASM-BG Investicii AD, RES Technology AD, Jamaica Public Service Company Limited, KV Holdings, Inc., Datang Chaoyang Renewable Power Co., Ltd., KODE NOVUS I LLC, KODE NOVUS II LLC, Amman Asia Electric Power Company, Kelar S.A, PT. Tanjung Power Indonesia, Nghi Son 2 Power Ltd., Daehan Wind Power PSC, MOMENTUM, Barakah One Company, Nawah Energy Company, Yeonggwang Wind Power Co., Ltd., Chester Solar IV SpA, Chester Solar V SpA, Diego de Almagro Solar SpA, South Jamaica Power Company Limited |
| Others (3 others) | Korea Development Bank, Yeongwol Energy Station Co., Ltd., DS POWER Co., Ltd. |

(2)    Transactions between the Company and its subsidiaries are eliminated during the consolidation and are not disclosed in notes.

(3)    Related party transactions for the years ended December 31, 2015, 2016 and 2017 are as follows:

<Sales and Others>

| | | Sales and others | | |
| Company name | Transaction type | 2015 | 2016 | 2017 |
| --- | --- | --- | --- | --- |
| | | | In millions of won | |
| <Associates> | | | | |
| Daegu Green Power Co., Ltd. | Electricity sales | ₩  1,055 | – | – |
| Dongducheon Dream Power Co., Ltd. | Electricity sales | 14,811 | 15,221 | 17,041 |
| Korea Gas Corporation | Electricity sales | 90,480 | 89,030 | 88,011 |
| Daegu Photovoltaic Co., Ltd. | Service | – | – | 349 |
| Jeongam Wind Power Co., Ltd. | Electricity sales | 8 | 6 | 30 |
| Korea Power Engineering Service Co., Ltd. | Service | 1,743 | 1,455 | 1,317 |
| KS Solar Co., Ltd. | Electricity sales | 21 | 20 | 5 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | Service | 1 | 2 | 2 |
| Korea Electric Power Industrial Development Co., Ltd. | Service | 12,361 | 10,723 | 14,044 |
| Goseong Green Energy Co., Ltd. | Electricity sales | 9,306 | 9,195 | 24,069 |
| Gangneung Eco Power Co., Ltd. | Service | 9,761 | 5,223 | 2,391 |
| Shin Pyeongtaek Power Co., Ltd. | Electricity sales | 11,344 | 3,579 | 9,025 |
| Naepo Green Energy Co., Ltd. | Electricity sales | 66 | 104 | 185 |

F-160

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Company name | Transaction type | | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| | | | | Sales and others | |
| | | | | In millions of won | |
| Noeul Green Energy Co., Ltd. | Electricity sales | ₩ | 45 | 177 | 32 |
| Samcheok Eco Materials Co., Ltd. | Electricity sales | | – | 64 | 237 |
| YTN Co., Ltd. | Electricity sales | | 1,753 | 1,785 | 1,987 |
| Busan Green Energy Co., Ltd. | Service | | 1 | 133 | 120 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | Electricity sales | | – | 6 | – |
| Korea Electric Vehicle Charging Service | Electricity sales | | 2 | 89 | 700 |
| Ulleungdo Natural Energy Co., Ltd. | Service | | 229 | 691 | 1,013 |
| Tamra Offshore Wind Power Co., Ltd. | Service | | – | 12 | 55 |
| Daegu clean Energy Co., Ltd. | Electricity sales | | – | – | 421 |
| Cheongna Energy Co., Ltd. | Service | | 21,081 | 6,831 | 7,980 |
| Gangwon Wind Power Co., Ltd. | Electricity sales | | 1,046 | 1,273 | 994 |
| Hyundai Green Power Co., Ltd. | Design service | | 15,401 | 14,835 | 14,280 |
| Korea Power Exchange | Service | | 4,272 | 7,141 | 8,446 |
| Hyundai Energy Co., Ltd. | Service | | 25,402 | 24,719 | 15,627 |
| Taebaek Wind Power Co., Ltd. | Service | | 872 | 796 | 813 |
| Pyeongchang Wind Power Co., Ltd. | Design service | | 72 | 497 | 1,176 |
| Daeryun Power Co., Ltd. | Electricity sales | | 1,731 | 1,516 | 1,796 |
| Changjuk Wind Power Co., Ltd. | Electricity sales | | 754 | 863 | 788 |
| KNH Solar Co., Ltd. | Electricity sales | | 17 | 17 | 17 |
| S-Power Co., Ltd. | Service | | 7,278 | 5,994 | 12,852 |
| Busan Solar Co., Ltd. | Electricity sales | | 16 | 8 | – |
| Green Biomass Co., Ltd. | Electricity sales | | 51 | 2 | – |
| SPC Power Corporation | Dividend income | | 1,433 | 8,346 | 5,562 |
| Gemeng International Energy Co., Ltd. | Dividend income | | 37,163 | 16,476 | 13,365 |
| PT. Cirebon Electric Power | Dividend income | | – | – | 550 |
| Dolphin Property Limited | Dividend income | | – | 35 | – |
| PT. Bayan Resources TBK | Service | | 164 | 160 | 717 |
| Nepal Water & Energy Development Company Private Limited | Service | | – | 375 | 900 |
| Pioneer Gas Power Limited | Service | | 274 | 164 | 62 |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | Service | | 584 | 773 | 661 |
| PT. Mutiara Jawa | Service | | – | – | 47 |
| **<Joint ventures>** | | | | | |
| Daegu Green Power Co., Ltd. | Electricity sales | | – | 768 | 1,131 |
| KEPCO SPC Power Corporation | Service | | 29,572 | 10,344 | 45,005 |
| Daejung Offshore Wind Power Co., Ltd. | Electricity sales | | 1 | 1 | 1 |
| KAPES, Inc. | Commission | | 1,315 | 1,176 | 1,420 |
| Dangjin Eco Power Co., Ltd. | Technical fee | | 334 | 1,787 | 670 |
| Honam Wind Power Co., Ltd. | Electricity sales | | 65 | 169 | 552 |
| Seokmun Energy Co., Ltd. | Service | | 2,395 | 1,627 | 1,765 |
| Incheon New Power Co., Ltd. | Construction revenue | | 388 | 524 | 539 |
| Chun-cheon Energy Co., Ltd. | Electricity sales | | 2,201 | 3,079 | 4,855 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | Electricity sales | | 927 | 1,591 | 1,654 |
| KW Nuclear Components Co., Ltd. | Service | | 1,948 | 3,327 | 644 |
| KEPCO-Uhde Inc. | Service | | – | 6 | 34 |
| GS Donghae Electric Power Co., Ltd. | Electricity sales | | 5,614 | 12,994 | 11,204 |
| Busan Shinho Solar Power Co., Ltd. | Electricity sales | | 24 | 210 | 87 |
| Datang Chifeng Renewable Power Co., Ltd. | Interest income | | 9,702 | 8,216 | 500 |
| Rabigh Electricity Company | Dividend income | | 565 | 699 | 19,179 |
| Rabigh Operation & Maintenance Company Limited | Dividend income | | 1,780 | 2,395 | 2,784 |

F-161

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Company name | Transaction type | Sales and others | | |
|---|---|---|---|---|
| | | 2015 | 2016 | 2017 |
| | | | In millions of won | |
| Datang Chaoyang Renewable Power Co., Ltd. | Dividend income | ₩ – | – | 839 |
| Shuweihat Asia Power Investment B.V. | Dividend income | – | 2,957 | 1,707 |
| Shuweihat Asia Operation & Maintenance Company | Electricity sales | 1,006 | 1,179 | 1,319 |
| ASM-BG Investicii AD | Service | – | 322 | 1,062 |
| Jamaica Public Service Company Limited | Service | 3,077 | 1,905 | – |
| KV Holdings, Inc. | Dividend income | – | 302 | – |
| Datang KEPCO Chaoyang Renewable Co., Ltd. | Dividend income | – | 440 | – |
| Amman Asia Electric Power Company | Service | 48,968 | 21,915 | 14,205 |
| Kelar S.A | Service | 6,229 | 1,702 | 570 |
| Nghi Son 2 Power Ltd. | Electricity sales | – | – | 2,693 |
| Barakah One Company | Electricity sales | – | 25,244 | 7,059 |
| Nawah Energy Company | Service | – | – | 34,421 |
| **<Others>** | | | | |
| Yeongwol Energy Station Co., Ltd. | Service | 814 | 858 | 830 |
| DS POWER Co., Ltd. | Service | 106,183 | 35,133 | 5,819 |
| Korea Development Bank | Electricity sales | 4,039 | 3,102 | 3,239 |
| | Interest income | 2,402 | 3,164 | 1,685 |

**<Purchase and Others>**

| Company name | Transaction type | Purchase and others | | |
|---|---|---|---|---|
| | | 2015 | 2016 | 2017 |
| | | | In millions of won | |
| **<Associates>** | | | | |
| Dongducheon Dream Power Co., Ltd. | Electricity purchase | ₩ 1,003,346 | 946,463 | 813,440 |
| Korea Gas Corporation | Purchase of power generation fuel | 4,598,763 | 3,633,198 | 3,245,519 |
| Daegu Photovoltaic Co., Ltd. | REC purchase | 3,978 | 3,243 | 3,646 |
| Korea Power Engineering Service Co., Ltd. | Service | 3,241 | 723 | 1,292 |
| KS Solar Co., Ltd. | REC purchase | 6,211 | 4,080 | 900 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | Rental fee and others | 479 | 410 | 570 |
| Korea Electric Power Industrial Development Co., Ltd. | Electricity metering service fee | 273,057 | 250,057 | 289,293 |
| Noeul Green Energy Co., Ltd. | Service | – | – | 15,862 |
| Samcheok Eco Materials Co., Ltd. | Electricity purchase | – | – | 14 |
| YTN Co., Ltd. | Advertisement fee | 440 | 554 | 731 |
| Busan Green Energy Co., Ltd. | Service | – | – | 12,189 |
| Korea Electric Vehicle Charging Service | Service | – | – | 1,093 |
| Ulleungdo Natural Energy Co., Ltd. | Electricity purchase | – | 60 | 119 |
| Tamra Offshore Wind Power Co., Ltd. | Electricity purchase | – | – | 2,105 |
| Cheongna Energy Co., Ltd. | Service | – | 73 | 59 |
| Gangwon Wind Power Co., Ltd. | Electricity purchase | 21,946 | 22,780 | 25,968 |
| Hyundai Green Power Co., Ltd. | Electricity purchase | 486,443 | 469,547 | 458,378 |
| Korea Power Exchange | Trading Fees | 79,283 | 91,433 | 207,855 |
| Hyundai Energy Co., Ltd. | Electricity purchase | 1,684 | 1,313 | 87,607 |
| Taebaek Wind Power Co., Ltd. | REC purchase | 6,626 | 5,741 | 6,534 |
| Pyeongchang Wind Power Co., Ltd. | Service | – | 1,594 | 4,033 |
| Daeryun Power Co., Ltd. | Electricity purchase | 274,379 | 244,023 | 146,189 |
| Changjuk Wind Power Co., Ltd. | Electricity purchase | 6,472 | 5,786 | 6,981 |

F-162

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Company name | Transaction type | | Purchase and others | | |
|---|---|---|---|---|---|
| | | | 2015 | 2016 | 2017 |
| | | | In millions of won | | |
| KNH Solar Co., Ltd. | Electricity purchase | ₩ | 4,598 | 4,006 | 3,947 |
| S-Power Co., Ltd. | Electricity purchase | | 614,658 | 437,206 | 457,329 |
| Busan Solar Co., Ltd. | Electricity purchase | | 4,055 | 1,079 | – |
| Green Biomass Co., Ltd. | Woodchip purchase | | 3,782 | 2,232 | 1,345 |
| Nepal Water & Energy Development Company Private Limited | Service | | – | – | 72 |
| <Joint ventures> | | | | | |
| Daegu Green Power Co., Ltd. | Electricity purchase | | 318,221 | 263,797 | 252,024 |
| KAPES, Inc. | Service | | 47,130 | 140,555 | 164,165 |
| Honam Wind Power Co., Ltd. | Electricity purchase | | 5,944 | 6,776 | 5,962 |
| Seokmun Energy Co., Ltd. | REC purchase | | – | – | 21,674 |
| Chun-cheon Energy Co., Ltd. | REC purchase | | – | – | 194,136 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | Electricity purchase | | 4,974 | 11,208 | 11,124 |
| GS Donghae Electric Power Co., Ltd. | Electricity purchase | | – | 903 | 351,367 |
| Busan Shinho Solar Power Co., Ltd. | REC purchase | | 7,565 | 6,770 | 7,984 |
| Global Trade Of Power System Co., Ltd. | Service | | 192 | 882 | 414 |
| Expressway Solar-light Power Generation Co., Ltd. | Electricity purchase | | 3,451 | 2,942 | 2,941 |
| Jamaica Public Service Company Limited | Service | | 106 | 127 | 154 |
| Amman Asia Electric Power Company | Service | | 125 | – | – |
| Barakah One Company | Service | | – | – | 2,631 |
| <Others> | | | | | |
| Yeongwol Energy Station Co., Ltd. | REC purchase | | 16,408 | 14,875 | 14,256 |
| Korea Development Bank | Interest expense | | 21,719 | 8,231 | 4,573 |
| | Dividend paid | | 96,087 | 654,829 | 418,407 |

(4)  **Receivables and payables arising from related party transactions as of December 31, 2016 and 2017 are as follows:**

| Company name | Type | | Receivables | | Payables | |
|---|---|---|---|---|---|---|
| | | | 2016 | 2017 | 2016 | 2017 |
| | | | In millions of won | | | |
| <Associates> | | | | | | |
| Dongducheon Dream Power Co., Ltd. | Trade receivables | ₩ | 1,073 | 2,230 | – | – |
| | Non-trade receivables and others | | – | 655 | – | – |
| | Trade payables | | – | – | 93,493 | 77,817 |
| Korea Gas Corporation | Trade receivables | | 8,739 | 9,833 | – | – |
| | Non-trade receivables and others | | 78 | 339 | – | – |
| | Trade payables | | – | – | 399,563 | 524,881 |
| | Non-trade payables and others | | – | – | 9,090 | 569 |
| Daegu Photovoltaic Co., Ltd. | Trade payables | | – | – | 56 | 71 |
| Jeongam Wind Power Co., Ltd. | Non-trade payables and others | | – | – | 4 | 4 |
| KS Solar Co., Ltd. | Trade receivables | | 2 | – | – | – |
| | Trade payables | | – | – | 53 | – |
| Korea Electric Power Industrial Development Co., Ltd. | Trade receivables | | 362 | 333 | – | – |
| | Non-trade receivables and others | | 47 | 42 | – | – |
| | Non-trade payables and others | | – | – | 18,628 | 18,006 |
| Goseong Green Energy Co., Ltd. | Non-trade receivables and others | | – | 19 | – | – |
| | Non-trade payables and others | | – | – | 3,900 | 7,140 |

F-163

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

| Company name | Type | | Receivables | | Payables | |
|---|---|---|---|---|---|---|
| | | | 2016 | 2017 | 2016 | 2017 |
| | | | In millions of won | | | |
| Gangneung Eco Power Co., Ltd. | Trade receivables | ₩ | 1 | 1 | – | – |
| | Non-trade receivables and others | | 2,137 | 4,747 | – | – |
| Shin Pyeongtaek Power Co., Ltd. | Non-trade receivables and others | | 215 | 210 | – | – |
| | Non-trade payables and others | | – | – | – | 52 |
| Naepo Green Energy Co., Ltd. | Trade receivables | | 14 | 17 | – | – |
| Noeul Green Energy Co., Ltd. | Trade receivables | | 18 | 3 | – | – |
| | Non-trade payables and others | | – | – | – | 2,041 |
| Samcheok Eco Materials Co., Ltd. | Trade receivables | | 21 | 20 | – | – |
| YTN Co., Ltd. | Trade receivables | | 165 | 98 | – | – |
| | Non-trade payables and others | | – | – | 132 | 209 |
| Busan Green Energy Co., Ltd. | Trade receivables | | 9 | 7 | – | – |
| | Non-trade receivables and others | | – | 1,691 | – | – |
| Korea Electric Vehicle Charging Service | Trade receivables | | 12 | 23 | – | – |
| | Trade payables | | – | – | – | 45 |
| Ulleungdo Natural Energy Co., Ltd. | Non-trade receivables and others | | 111 | – | – | – |
| Cheongna Energy Co., Ltd. | Trade receivables | | 165 | 182 | – | – |
| | Non-trade payables and others | | – | – | 82 | 1 |
| Gangwon Wind Power Co., Ltd. | Trade receivables | | 8 | 6 | – | – |
| | Trade payables | | – | – | 2,031 | 3,033 |
| Hyundai Green Power Co., Ltd. | Trade receivables | | 569 | 946 | – | – |
| | Trade payables | | – | – | 31,507 | 32,589 |
| Korea Power Exchange | Trade receivables | | 1,066 | 463 | – | – |
| | Non-trade receivables and others | | 53 | 128 | – | – |
| | Non-trade payables and others | | – | – | 1,235 | 1,142 |
| Hyundai Energy Co., Ltd. | Trade receivables | | 72 | 49 | – | – |
| | Non-trade receivables and others | | 68,798 | 6,598 | – | – |
| | Trade payables | | – | – | 86 | 223 |
| | Non-trade payables and others | | – | – | – | 13,796 |
| Ecollite Co., Ltd. | Non-trade receivables and others | | 210 | 210 | – | – |
| Taebaek Wind Power Co., Ltd. | Trade receivables | | – | 116 | – | – |
| | Non-trade receivables and others | | 112 | – | – | – |
| | Trade payables | | – | – | 386 | 533 |
| | Non-trade payables and others | | – | – | 304 | 121 |
| Pyeongchang Wind Power Co., Ltd. | Trade receivables | | 4 | 3 | – | – |
| | Non-trade receivables and others | | – | – | 255 | 163 |
| Daeryun Power Co., Ltd. | Trade receivables | | 140 | 162 | – | – |
| | Trade payables | | – | – | 21,646 | 15,706 |
| Changjuk Wind Power Co., Ltd. | Trade receivables | | 100 | 101 | – | – |
| | Trade payables | | – | – | 358 | 515 |
| | Non-trade payables and others | | – | – | 334 | 546 |
| KNH Solar Co., Ltd. | Trade receivables | | 1 | 1 | – | – |
| | Non-trade payables and others | | – | – | 204 | 193 |
| S-Power Co., Ltd. | Trade receivables | | 142 | 117 | – | – |
| | Non-trade receivables and others | | 393 | 5,183 | – | – |
| | Trade payables | | – | – | 51,844 | 25,061 |

F-164

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

## Table of Contents

| Company name | Type | | Receivables 2016 | Receivables 2017 | Payables 2016 | Payables 2017 |
|---|---|---|---|---|---|---|
| | | | | | In millions of won | |
| Green Biomass Co., Ltd. | Non-trade payables and others | ₩ | – | – | 113 | 85 |
| SPC Power Corporation | Non-trade receivables and others | | – | 76 | – | – |
| Nepal Water & Energy Development Company Private Limited | Non-trade receivables and others | | 889 | 227 | – | – |
| Pioneer Gas Power Limited | Non-trade receivables and others | | 82 | – | – | – |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | Non-trade receivables and others | | 58 | 53 | – | – |
| **\<Joint ventures\>** | | | | | | |
| Daegu Green Power Co., Ltd. | Trade receivables | | 52 | 98 | – | – |
| | Non-trade receivables and others | | 1 | 10 | – | – |
| | Trade payables | | – | – | 27,400 | 25,257 |
| KEPCO SPC Power Corporation | Non-trade receivables and others | | 2,349 | – | – | – |
| KAPES, Inc. | Non-trade receivables and others | | 235 | – | – | – |
| | Trade payables | | – | – | – | 55 |
| | Non-trade payables and others | | – | – | 11,992 | – |
| Dangjin Eco Power Co., Ltd. | Non-trade receivables and others | | 833 | 1,211 | – | – |
| | Non-trade payables and others | | – | – | – | 41 |
| Honam Wind Power Co., Ltd. | Trade payables | | – | – | 424 | 381 |
| | Non-trade payables and others | | – | – | 3,082 | 3,013 |
| Seokmun Energy Co., Ltd. | Trade receivables | | 114 | 93 | – | – |
| | Non-trade receivables and others | | 160 | 276 | – | – |
| | Non-trade payables and others | | – | – | – | 3,052 |
| Incheon New Power Co., Ltd. | Trade receivables | | 128 | 128 | – | – |
| Chun-cheon Energy Co., Ltd. | Trade receivables | | – | 129 | – | – |
| | Non-trade receivables and others | | 255 | 252 | – | – |
| | Trade payables | | – | – | – | 29,676 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | Trade receivables | | 6 | 7 | – | – |
| | Non-trade receivables and others | | 145 | 144 | – | – |
| | Trade payables | | – | – | 761 | 619 |
| | Non-trade payables and others | | – | – | 1,362 | 1,300 |
| KW Nuclear Components Co., Ltd. | Trade receivables | | – | 4 | – | – |
| KEPCO-Uhde Inc. | Non-trade receivables and others | | – | – | 4 | 4 |
| GS Donghae Electric Power Co., Ltd. | Trade receivables | | 775 | 450 | – | – |
| | Non-trade receivables and others | | 1,497 | 1,892 | – | – |
| | Trade payables | | – | – | – | 73,570 |
| | Non-trade payables and others | | – | – | 993 | – |
| Busan Shinho Solar Power Co., Ltd. | Trade receivables | | 3 | 2 | – | – |
| | Trade payables | | – | – | 129 | 159 |
| | Non-trade payables and others | | – | – | 670 | 811 |
| Datang Chifeng Renewable Power Co., Ltd. | Non-trade receivables and others | | 210 | 82 | – | – |
| Rabigh Operation & Maintenance Company Limited | Trade receivables | | 2,275 | – | – | – |
| | Non-trade receivables and others | | – | 869 | – | – |
| ASM-BG Investicii AD | Non-trade receivables and others | | 64 | 37 | – | – |

F-165

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Company name | Type | Receivables | | Payables | |
|---|---|---|---|---|---|
| | | 2016 | 2017 | 2016 | 2017 |
| | | | In millions of won | | |
| Jamaica Public Service Company Limited | Trade receivables | 615 | – | – | – |
| Amman Asia Electric Power Company | Trade receivables | 2,509 | 2,675 | – | – |
| Nawah Energy Company | Trade receivables | – | 10,419 | – | – |
| **<Others>** | | | | | |
| Yeongwol Energy Station Co., Ltd. | Trade receivables | 7,064 | 7,068 | – | – |
| | Trade payables | – | – | 229 | – |
| DS POWER Co., Ltd. | Trade receivables | 1,775 | 340 | – | – |
| Korea Development Bank | Accrued interest income | 672 | 204 | – | – |
| | Non-trade receivables and others | 217,481 | 501,029 | – | – |
| | Non-trade payables and others | – | – | 408 | 200 |
| | Derivatives | 25,306 | 569 | 3,278 | 22,398 |

(5)     **Loans and others arising from related party transactions as of December 31, 2016 and 2017 are as follows:**

| Type | Company name | Beginning balance | Loans | Collection | Others | Ending balance |
|---|---|---|---|---|---|---|
| | | | | In millions of won | | |
| Associates | KNOC Nigerian East Oil Co., Ltd., KNOC Nigerian West Oil Co., Ltd. | ₩ 29,282 | 169 | – | (3,110 ) | 26,341 |
| | (Allowance for doubtful accounts) | (18,191 ) | – | – | 1,640 | (16,551 ) |
| Associates | PT. Cirebon Electric Power | 26,733 | 2,199 | (7,876 ) | (5,620 ) | 15,436 |
| Associates | Xe-Pian Xe-Namnoy Power Co., Ltd. | 1,413 | – | – | – | 1,413 |
| Associates | PT Wampu Electric Power | 14,022 | 905 | – | (1,639 ) | 13,288 |
| Associates | Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | 9,396 | – | – | – | 9,396 |
| Associates | Hyundai Energy Co., Ltd. | 2,465 | – | – | – | 2,465 |
| | (Allowance for doubtful accounts) | – | – | – | (2,465 ) | (2,465 ) |
| Joint ventures | KEPCO SPC Power Corporation | 27,795 | – | (7,803 ) | (2,743 ) | 17,249 |
| Joint ventures | Datang Chifeng Renewable Power Co., Ltd. | 16,344 | – | (7,647 ) | (1,452 ) | 7,245 |
| Joint ventures | Rabigh Electricity Company | 2,641 | – | (2,496 ) | (145 ) | – |
| Joint ventures | KODE NOVUS II LLC | 4,532 | – | – | (514 ) | 4,018 |
| | (Allowance for doubtful accounts) | (4,532 ) | – | – | 514 | (4,018 ) |
| Joint ventures | Kelar S.A | – | 54,631 | (3,568 ) | (4,443 ) | 46,620 |
| Joint ventures | Daehan Wind Power PSC | 683 | 640 | – | (112 ) | 1,211 |
| Joint ventures | Chester Solar IV SpA | – | 4,802 | – | (195 ) | 4,607 |
| | | ₩ 112,583 | 63,346 | (29,390 ) | (20,284 ) | 126,255 |

F-166

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(6)    Borrowings arising from related party transactions as of December 31, 2016 and 2017 are as follows:**

| Related parties | Type | | Beginning balance | Borrowings | Repayment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | |
| Korea Development | Facility | ₩ | 207,993 | 27,324 | (141,434 ) | – | 93,883 |
| Bank | Others | | 5,663 | – | (754 ) | – | 4,909 |
| | Operating funds | | 37,000 | 49,000 | (25,000 ) | – | 61,000 |
| | Syndicated Loan | | 6,075 | 11,855 | – | (1,629 ) | 16,301 |

**(7)    Guarantees provided to associates or joint ventures as of December 31, 2017 are as follows:**

| Primary guarantor | Principal obligor | Type of guarantees | Credit limit | Guarantee |
|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | |
| Korea Electric Power Corporation | Shuweihat Asia Operation & Maintenance Company | Performance guarantees | USD 11,000 | SAPCO |
| Korea Electric Power Corporation | KNOC Nigeria East Oil Co., Ltd. and KNOC Nigerian West Oil Co., Ltd. | Performance guarantees | USD 34,650 | Korea National Oil Corporation (Nigerian government) |
| Korea Electric Power Corporation | Rabigh Operation & Maintenance Company Limited | Performance guarantees and others | USD 1,387 | RABEC |
| Korea Electric Power Corporation | Nghi Son 2 Power Ltd. | Bidding guarantees | USD 10,000 | SMBC Ho Chi Minh |
| Korea Electric Power Corporation | Barakah One Company | Debt guarantees | USD 900,000 | Export-Import Bank of Korea and others |
| | | Performance guarantees and others | USD 3,404,275 | |
| Korea Western Power Co., Ltd. | Cheongna Energy Co., Ltd. | Collateralized money invested | KRW 27,211 | KEB Hana Bank and others |
| | | Guarantees for supplemental funding and others (*1) | – | |
| Korea Western Power Co., Ltd. | Xe-Pian Xe-Namnoy Power Co., Ltd. | Payment guarantees for business reserve | USD 2,500 | Krung Thai Bank |
| | | Collateralized money invested | USD 62,253 | Krung Thai Bank |
| | | Impounding bonus guarantees | USD 5,000 | SK E&C |
| Korea Western Power Co., Ltd. | Rabigh Operation & Maintenance Company Limited | Performance guarantees and others | SAR 5,600 | Saudi Arabia British Bank |
| Korea Western Power Co., Ltd. | Daegu Photovoltaic Co., Ltd. | Collateralized money invested | KRW 1,230 | Korea Development Bank |
| Korea Western Power Co., Ltd. | Dongducheon Dream Power Co., Ltd. | Collateralized money invested | KRW 53,233 | Kookmin Bank and others |

F-167

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Primary guarantor | Principal obligor | Type of guarantees | Credit limit | Guarantee |
|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | |
| Korea Western Power Co., Ltd. | PT. Mutiara Jawa | Collateralized money invested | USD 2,610 | Woori Bank |
| Korea Western Power Co., Ltd. | Heang Bok Do Si Photovoltaic Power Co., Ltd. | Collateralized money invested | KRW 194 | Nonghyup Bank |
| Korea Western Power Co., Ltd. | Shin Pyeongtaek Power Co., Ltd. | Collateralized money invested | KRW 43,920 | Kookmin Bank |
| Korea East-West Power Co., Ltd. | Busan Shinho Solar Power Co., Ltd. | Collateralized money invested | KRW 2,100 | Korea Development Bank and others |
| Korea East-West Power Co., Ltd. | Seokmun Energy Co., Ltd. | Collateralized money invested | KRW 15,370 | Kookmin Bank and others |
| Korea East-West Power Co., Ltd. | Chun-cheon Energy Co., Ltd. | Collateralized money invested | KRW 52,700 | Kookmin Bank and others |
| | | Guarantees for supplemental funding(*1) | KRW 60,270 | Kookmin Bank and others |
| Korea East-West Power Co., Ltd. | Honam Wind Power Co., Ltd. | Collateralized money invested | KRW 3,480 | Shinhan Bank and others |
| Korea East-West Power Co., Ltd. | GS Donghae Electric Power Co., Ltd. | Collateralized money invested | KRW 204,000 | Korea Development Bank and others |
| Korea East-West Power Co., Ltd. | Yeonggwangbaeksu Wind Power Co., Ltd. | Collateralized money invested | KRW 3,000 | Kookmin Bank and others |
| Korea East-West Power Co., Ltd. | Yeonggwang Wind Power Co., Ltd. | Collateralized money invested | KRW 15,375 | KEB Hana Bank and others |
| Korea East-West Power Co., Ltd. | PT. Tanjung Power Indonesia | Debt guarantees | USD 46,983 | The Bank of Tokyo-Mitsubishi and others |
| | | Other guarantees | USD 3,150 | PT Adaro Indonesia |
| EWP Barbados 1 SRL | South Jamaica Power Company Limited | Performance guarantees | USD 14,400 | Societe Generale |
| | | Guarantees for supplemental funding and others(*1, 3) | USD 60,000 | JCSD Trustee Services Limited and others |
| Korea Southern Power Co., Ltd. | KNH Solar Co., Ltd. | Collateralized money invested | KRW 1,296 | Shinhan Bank and Kyobo Life Insurance Co., Ltd. |
| | | Performance guarantees and guarantees for supplemental funding and others(*1) | – | |
| Korea Southern Power Co., Ltd. | Daeryun Power Co., Ltd. | Collateralized money invested | KRW 25,477 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others(*1) | – | |

F-168

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Primary guarantor | Principal obligor | Type of guarantees | Credit limit | Guarantee |
|---|---|---|---|---|
| | | **In millions of won and thousands of foreign currencies** | | |
| Korea Southern Power Co., Ltd. | Changjuk Wind Power Co., Ltd. | Collateralized money invested<br><br>Guarantees for supplemental funding(*1) | KRW 3,801<br><br>– | Shinhan Bank |
| Korea Southern Power Co., Ltd. | Daegu Green Power Co., Ltd. | Collateralized money invested | KRW 46,226 | Shinhan Bank |
| Korea Southern Power Co., Ltd. | Kelar S.A | Performance guarantees | USD 63,707 | KEB Hana Bank, SMBC, Mizuho Bank and others |
| Korea Southern Power Co., Ltd. | DS POWER Co., Ltd. | Collateralized money invested<br>Guarantees for supplemental funding and others(*1) | KRW 2,900<br><br>– | Korea Development Bank and others |
| Korea Southern Power Co., Ltd. | Pyeongchang Wind Power Co., Ltd. | Collateralized money invested<br><br>Performance guarantees and guarantees for supplemental funding and others(*1) | KRW 3,875<br><br>– | Woori Bank and Shinhan Bank |
| Korea Southern Power Co., Ltd. | Taebaek Wind Power Co., Ltd. | Guarantees for supplemental funding and others(*1) | – | Shinhan Bank |
| Korea Southern Power Co., Ltd. | Jeongam Wind Power Co., Ltd | Collateralized money invested Guarantees for supplemental funding and others (*1) | KRW 5,580 | SK Securities Co., Ltd. |
| Korea Southern Power Co., Ltd. | Naepo Green Energy Co., Ltd. | Collateralized money invested<br><br>Guarantees for supplemental funding and others (*1) | KRW 29,200<br><br>– | Hana Financial Investment Co., Ltd. and others |
| KEPCO Engineering & Construction Company, Inc. | DS POWER Co., Ltd. | Collateralized money invested | KRW 15,000 | Korea Development Bank and others |
| Korea Midland Power Co., Ltd. | Hyundai Green Power Co., Ltd. | Collateralized money invested<br><br>Guarantees for supplemental funding and others (*1) | KRW 87,003<br><br>– | Korea Development Bank and others |
| Korea Midland Power Co., Ltd. | PT. Cirebon Electric Power | Debt guarantees | USD 11,550 | Mizuho Bank |
| Korea Midland Power Co., Ltd. | PT Wampu Electric Power | Debt guarantees | USD 5,068 | SMBC |
| Korea Midland Power Co., Ltd. | Gangwon Wind Power Co., Ltd. | Collateralized money invested | KRW 7,409 | IBK and others |
| Korea Midland Power Co., Ltd. | YaksuESS Co., Ltd | Collateralized money invested<br><br>Guarantees for supplemental funding and others (*1) | KRW 210<br><br>– | Hanwha Life Insurance Co., Ltd. |

F-169

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Primary guarantor | Principal obligor | Type of guarantees | Credit limit | Guarantee |
|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | |
| Korea South-East Power Co., Ltd. | Hyundai Energy Co., Ltd. | Collateralized money invested | KRW 47,067 | Korea Development Bank and others |
| | | Performance guarantees and guarantees for supplemental funding and others (*1) | KRW 78,600 | |
| Korea South-East Power Co., Ltd. | RES Technology AD | Collateralized money invested | KRW 15,595 | UniCredit Bulbank and others |
| Korea South-East Power Co., Ltd. | ASM-BG Investicii AD | Collateralized money invested | KRW 16,101 | UniCredit Bulbank and others |
| Korea South-East Power Co., Ltd. | Express Solar-light Power Generation Co., Ltd. | Guarantees for supplemental funding (*1, 2) | KRW 2,500 | Woori Bank |
| Korea South-East Power Co., Ltd. | S-Power Co., Ltd. | Collateralized money invested | KRW 132,300 | Korea Development Bank and others |
| KOSEP USA, INC. | KODE NOVUS II LLC | Guarantees for supplemental funding and others (*1) | − | Korea Development Bank |
| KOSEP USA, INC. | KODE NOVUS I LLC | Guarantees for supplemental funding and others (*1) | − | Export-Import Bank of Korea |
| Korea Hydro & Nuclear Power Co., Ltd. | Yeongwol Energy Station Co., Ltd. | Collateralized money invested | KRW 1,400 | Meritz Fire & Marine Insurance Co., Ltd. |
| Korea Hydro & Nuclear Power Co., Ltd. | Noeul Green Energy Co., Ltd., | Collateralized money invested | KRW 1,740 | KEB Hana Bank and others |
| Korea Hydro & Nuclear Power Co., Ltd. | Busan Green Energy Co., Ltd. | Collateralized money invested | KRW 5,243 | Shinhan Bank and others |
| KEPCO Plant Service & Engineering Co., Ltd. | Incheon New Power Co., Ltd. | Collateralized money invested | KRW 8,160 | Shinhan Bank |
| | | Guarantees for supplemental funding and others (*1) | − | |

(*1)  The Company guarantees to provide supplemental funding for business with respect to excessive business expenses or insufficient repayment of borrowings.

(*2)  The Company has granted the right to Hana Financial Investment Co., Ltd., as an agent for the creditors to Express Solar-light Power Generation Co., Ltd. ("ESPG"), to the effect that in the event of acceleration of ESPG's payment obligations under certain borrowings to such creditors, Hana Financial may demand the Company to dispose of shares in ESPG held by the Company and apply the resulting proceeds to repayment of ESPG's obligations.

(*3)  This includes a guarantee for the shareholder's capital payment in connection with the business of 190MW gas complex thermal power plant in Jamaica. EWP (Barbados) 1 SRL's capital contribution amount is

F-170

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

USD 6,400 thousand and the total amount of guarantees is USD 27,000 thousand which consists of USD 12,000 thousand of EWP (Barbados) 1 SRL's contribution obligation and USD 15,000 thousand of SJEH's portion (50%) of contribution obligation.

**(8)    As of December 31, 2017, there is no financial guarantee contract provided by related parties.**

**(9)    Derivatives transactions with related parties as of December 31, 2017 are as follows:**

    (i)    Currency Swap

In millions of won and thousands of U.S. dollars

| Counterparty | Contract year | Contract Amount | | Contract interest rate per annum | | Contract exchange rate |
| --- | --- | --- | --- | --- | --- | --- |
| | | Pay | Receive | Pay (%) | Receive (%) | |
| Korea Development Bank | 2016~2019 | ₩ 105,260 | USD 100,000 | 2.48 % | 2.38 % | ₩ 1,052.60 |
| | 2015~2025 | 111,190 | USD 100,000 | 2.62 % | 3.25 % | 1,111.90 |
| | 2017~2027 | 111,610 | USD 100,000 | 2.31 % | 3.13 % | 1,116.10 |
| | 2017~2020 | 114,580 | USD 100,000 | 1.75 % | 2.38 % | 1,145.80 |
| | 2016~2021 | 121,000 | USD 100,000 | 2.15 % | 2.50 % | 1,210.00 |
| | 2017~2022 | 113,300 | USD 100,000 | 1.94 % | 2.63 % | 1,133.00 |

    (ii)    Currency forward

In millions of won and thousands of foreign currencies

| Counterparty | Contract Date | Maturity date | Contract amounts | | Contract exchange rate |
| --- | --- | --- | --- | --- | --- |
| | | | Pay | Receive | |
| Korea Development Bank | 2017.12.27 | 2021.07.12 | ₩ 104,849 | USD 100,000 | ₩ 1,048.49 |
| | 2017.12.14 | 2018.01.10 | 11,950 | USD 11,000 | 1,086.35 |
| | 2017.12.20 | 2018.01.16 | 15,130 | USD 14,000 | 1,080.70 |
| | 2017.12.28 | 2018.01.31 | 11,782 | USD 11,000 | 1,071.10 |

**(10)    Salaries and other compensations to the key members of management of the Company for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| Type | | 2015 | 2016 | 2017 |
| --- | --- | --- | --- | --- |
| | | In millions of won | | |
| Salaries | ₩ | 1,271 | 1,463 | 1,271 |
| Employee benefits | | 59 | 33 | 54 |
| | ₩ | 1,330 | 1,496 | 1,325 |

**48.    Non-Cash Transactions**

    Significant non-cash investing and financing transactions for the years ended December 31, 2015, 2016 and 2017 are as follows:

| Transactions | | 2015 | 2016 | 2017 |
| --- | --- | --- | --- | --- |
| | | In millions of won | | |
| Transfer from construction-in-progress to other assets | ₩ | 10,491,054 | 19,971,599 | 13,676,233 |
| Recognition of asset retirement cost and related provision for decommissioning costs | | 699,673 | 470,941 | 2,494,802 |
| Transfer from provision for disposal of spent nuclear fuel to accrued expenses | | 491,755 | 283,675 | 342,861 |

F-171

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**49. Commitments for Expenditure**

**(1)  The commitments for acquisition of property, plant and equipment as of December 31, 2016 and 2017 are as follows:**

| Contracts | 2016 | | 2017 | |
|---|---|---|---|---|
| | Amounts | Balance | Amounts | Balance |
| | In millions of won | | | |
| Purchase of switch (25.8kV Eco) 11,395 | ₩ 40,226 | 28,072 | 40,226 | – |
| Purchase of switch (25.8kV Eco) 12,450 | – | – | 50,526 | 35,494 |
| Purchase of cable (PVC,1C,2000SQ) 153,000M and others (Shin-Bupyung-Youngseo) | 50,256 | 50,256 | 50,256 | 42,857 |
| Purchase of cable (PVC, 1C, 2500SQ) 103,374M and others (Bukdangjin-Shintangjung) | 42,500 | 42,500 | 42,500 | 29,987 |
| Purchase of GIS (362KV 6300A 63KA) 23CB – YoungseoS/S | – | – | 34,500 | 34,500 |
| Purchase of GIS (362KV 6300A 63KA) 26CB – Shin-gosungS/S | 36,950 | 19,897 | 36,950 | – |
| Purchase of GIS (362KV 6300A 63KA) 26CB – HwasungS/S | – | – | 40,000 | 29,231 |
| Purchase of GIS (362KV 6300A 63KA) 27CB – KwangyangS/S | 37,476 | 27,760 | 37,476 | 18,044 |
| Purchase of GIS (362KV 6300A 63KA) and 1 other 18CB – BukbusanS/S | 34,000 | 20,766 | 34,000 | – |
| Purchase of GIS (800KV 8000A 50KA) 10CB – Shin-JungbuS/S | 63,730 | 63,730 | 63,730 | 44,955 |
| Purchase of transformer (765/345/23kV 666.7MVA, 2TANK) 6 units - Shin-JungbuS/S | 37,500 | 37,500 | 37,500 | 37,500 |
| Purchase of cable (TR CNCE-W/AL,1C,400SQ) 4,500,000M | 71,986 | 50,593 | 71,986 | – |
| Purchase of Concrete Poles (10M, 350KGF) 104,755 and 6 others | 129,175 | 105,905 | 129,175 | – |
| Purchase of cable (TR CNCE-W/AL,1C,400SQ) 4,645,000M | – | – | 78,076 | 76,762 |
| Purchase of Concrete Poles (10M, 350KGF) 121,900 and 6 others | – | – | 133,387 | 112,981 |
| Advanced E-Type low voltage electricity meter 1,600,000 units | – | – | 65,408 | 64,592 |
| Purchase of Ground Switch (44-D-A125, 600AX4) and 1 other 4,016 units | – | – | 56,482 | 55,990 |
| Construction of Shin-Kori units (#3,4) | 6,856,150 | – | 7,363,514 | 93,637 |
| Construction of Shin-Kori units (#5,6) | 8,625,387 | 7,286,503 | 8,625,387 | 6,757,146 |
| Construction of Shin-Hanwool units (#1,2) | 7,982,342 | 1,157,700 | 7,982,342 | 1,015,813 |
| Construction of Shin-Hanwool units (#3,4) | 8,261,818 | 8,170,896 | 8,261,818 | 8,097,056 |
| Construction of Yeosu thermal power units (#1) | 174,291 | 1,139 | 174,291 | – |
| Other 27 contracts | 430,204 | 222,555 | 262,400 | 114,041 |
| Purchase of main machine for construction of Seoul Combined units (#1,2) | 360,500 | 300,663 | 361,203 | 99,031 |
| Construction of Seoul Combined units (#1,2) | 225,205 | 129,589 | 227,685 | 60,568 |
| Electricity construction of Shin-Boryeong units (#1,2) | 354,740 | 26,878 | 379,115 | – |
| Purchase of smoke eliminating machine for construction of Shin-Boryeong units (#1,2) | 121,093 | 2,023 | 169,544 | 36,417 |

F-172

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| Contracts | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Amounts | Balance | Amounts | Balance |
| | | In millions of won | | | |
| Purchase of coal handling machine for construction of Shin-Boryeong units (#1,2) | ₩ | 146,353 | 3,543 | 146,353 | – |
| Service of designing Shin-Boryeong units (#1,2) | | 126,038 | 24,333 | 127,810 | 16,371 |
| Purchase of main machine for construction of Shin-Boryeong units (#1,2) | | 851,132 | 10,746 | 866,065 | 4,981 |
| Construction of Shin-Boryeong units (#1,2) | | 288,438 | 17,828 | 316,190 | 23,100 |
| Purchase of furnace for construction of Shin-Seocheon thermal power plant | | – | – | 302,030 | 222,555 |
| Purchase of turbine generator for construction of Shin-Seocheon thermal power plant | | – | – | 104,402 | 83,522 |
| Electricity construction of Shin-Seocheon thermal power plant | | – | – | 200,453 | 196,993 |
| Purchase of main machine for Jeju LNG combined | | – | – | 166,287 | 15,409 |
| Purchase of coal handling machine for construction of Taean (#9,10) and IGCC units (conditional contract for installation) | | 192,945 | 38,218 | 193,375 | 5,129 |
| Purchase of furnace for construction of Taean units (#9,10) | | 584,148 | 46,059 | 566,945 | 33,817 |
| Service of designing Taean units (#9,10) | | 109,700 | 18,981 | 111,322 | 13,671 |
| Purchase of desulfurization machine for construction of Taean units (#9,10) | | 92,086 | 1,017 | – | – |
| Purchase of turbine generator for construction of Taean units (#9,10) | | 228,794 | 6,788 | 205,267 | 550 |
| Purchase of combined generating machine for construction of Taean IGCC units | | 208,972 | 2,102 | 190,923 | – |
| Purchase of oxygen plant for construction of Taean IGCC units | | 98,979 | 221 | 94,564 | 199 |
| Service of designing Taean IGCC plant units | | 44,802 | 3,342 | 44,802 | 2,669 |
| Purchase of gasification plant for construction of Taean IGCC units | | 457,991 | – | 456,037 | – |
| Construction of Samcheok units (#1,2) | | 457,943 | 15,851 | 488,347 | – |
| Purchase of furnace for construction of Samcheok units (#1,2) | | 1,091,303 | 51,594 | 1,082,641 | 5,963 |
| Purchase of coal handling machine for construction of Samcheok units (#1,2) | | 303,273 | 155 | 304,924 | 52,362 |
| Service of designing Samcheok units (#1,2) | | 114,047 | 36,510 | 114,047 | 4,745 |
| Purchase of main equipment | | 152,286 | 39,248 | 168,076 | – |
| Landscaping construction and other | | – | – | 63,110 | – |
| Construction of yard for Andong natural gas power plant | | 41,961 | 2,600 | 41,961 | – |
| Purchase of turbine main equipment for Samcheok units (#1,2) | | – | – | 215,333 | 874 |
| Service of designing Dangjin units (#9,10) | | 122,426 | 6,125 | 122,426 | – |

(2)  **As of December 31, 2017, details of contracts for inventory purchase commitment are as follows:**

The Company imports all of its uranium ore concentrates from sources outside Korea (including the United States, United Kingdom, Kazakhstan, France, Russia, South Africa, Canada and Australia) which are paid for with currencies other than Won, primarily in U.S. dollars. In order to ensure stable supply, the Company entered into long-term and medium-term contracts with various suppliers, and supplements such supplies

F-173

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

with purchases of fuels on spot markets. The long-term and medium-term contract periods vary among contractors and the stages of fuel manufacturing process. Contract prices for processing of uranium are generally based on market prices. Contract periods for ore concentrates, conversion, enrichment and design and fabrication are as follows:

| Type | Periods | Contracted amounts |
|---|---|---|
| Concentrate | 2017 ~ 2030 | 39,662 Ton U3O8 |
| Transformed | 2017 ~ 2030 | 22,934 Ton U |
| Enrichment | 2017 ~ 2029 | 25,530 Ton SWU |
| Molded | 2017 ~ 2022 | 2,004 Ton U |

**50.  Contingencies and Commitments**

**(1)  Ongoing litigations related with contingent liabilities and contingent assets as of December 31, 2016 and 2017 are as follows:**

| | 2016 | | 2017 | |
|---|---|---|---|---|
| | Number of cases | Claim amount | Number of cases | Claim amount |
| | | In millions of won | | |
| As the defendant | 675 | ₩636,433 | 565 | ₩477,719 |
| As the plaintiff | 193 | 489,605 | 185 | 690,934 |

As of December 31, 2017, among the litigations mentioned above, there are ongoing litigations of Korea Hydro & Nuclear Power Co., Ltd. ("KHNP"), a subsidiary of KEPCO, against KEPCO Engineering & Construction Company, Inc., a subsidiary of KEPCO, as a co-defendant (one case amounting to ₩62,744million).

A group of plaintiffs (consisting 2,167 individuals) filed a lawsuit against NSSC regarding NSSC's approval on May 18, 2015 of extending the operation of Wolsong Unit 1 nuclear power plant. The appeal was ongoing as of December 31, 2017. Also, Greenpeace and others filed an administrative litigation against NSSC requesting cancelation of the construction permit of Shin-Kori Unit 5 and 6 it was ongoing as of December 31, 2017. The Company joined these litigations as a stakeholder with the permission of the Court.

The book value of property, plant and equipment and provision for decommissioning costs of Wolsong Unit 1 nuclear power plant is ₩607,967 million and ₩642,015 million, respectively, as of December 31, 2017. If the continuance of operation of Wolsong Unit 1 nuclear power plant is annulled, significant losses may be incurred in connection with the property, plant and equipment of Wolsong Unit 1. In addition, the amount of provision may increase significantly, and the timing of actual cash outflows may be accelerated.

The Company suspended the construction of Shin-Kori Unit 5 and 6 starting from July 24, 2017 to October 24, 2017, which is the public debate period regarding whether to continue the construction for Shin-Kori Unit 5 and 6, and is in the process of reviewing the appropriateness of the additional costs requested by the suppliers that occurred during that period. The Company believes that the possibility of economic outflow is probable and recognized ₩77,261 million of provision as described in note 26.(2).

As of December 31, 2017, the Company has suspended the construction design of Shin-Hanwool Unit 3 and 4. The construction contract amount and the outstanding balance are described in note 49.(1), and the carrying amount of Shin-Hanwool Unit 3 and 4 is ₩159,008 million as of December 31, 2017.

The Company is the defendant against a number of claims. The followings are potentially significant claims pertaining to the Company.

①  Hyundai Engineering & Construction Co., Ltd.("Hyundai E&C"), SK Engineering & Construction Co., Ltd. and GS Engineering & Construction Co., Ltd. filed a lawsuit for increase in contract bill (formerly, amounted to ₩1,000 million) against KHNP in September 2013, in relation to the design changes on

F-174

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

the plant construction of Shin-Hanwool 1 & 2. Hyundai Engineering & Construction Co., Ltd. and two other companies increased the contract bill to ₩133,426 million in October 2014, ₩204,040 million in November 2015, and ₩204,564 million in January 2017, respectively, and submitted an application to demand extra contract payments due to the design changes. KHNP has paid ₩217,724 million of the claim amounts in full upon the first ruling in November 2016 and recognized the amount as addition to construction-in-progress accordingly.

② In December 2013, the Supreme Court of Korea ruled that regular bonuses also fall under the category of ordinary wages on the condition that those bonuses are paid regularly and uniformly. Also, the Supreme Court ruled that employees are entitled to retroactively demand certain wages based on the new ordinary wages that include regular bonuses as additional wages. However, the request may be limited to the extent of the principle of good faith.

The Company believes that the possibility of economic outflow is probable on the ongoing and the expected lawsuit. For this reason, the Company recognized ₩56,052 million of other provision in relation to the lawsuit as of December 31, 2017.

Except these significant ongoing claims, there are 10 arbitration cases pertaining to the Company as of December 31, 2017 and the significant arbitration cases are as follows:

① KEPCO and KEPCO KDN Co., Ltd., a subsidiary of KEPCO, have been accused of breach of contract in relation to ERP software, which is provided by SAP Korea Ltd. The litigation was filed in the International Chamber of Commerce International Court of Arbitration but the Company has not recognized any provision because the probability of economic benefit outflow is remote and the related amount cannot be reliably estimated.

② Hyundai Samsung Joint Venture (HSJV), one of the subcontractors of the Company, filed an arbitration against the Company at the London Court of International Arbitration (LCIA) in 2016 due to disagreements in UAE nuclear power plant construction project, but the Company has not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably estimated.

③ In prior years, Hyundai E&C, GS Engineering & Construction Corp., and Hansol SeenTec Co., Ltd. filed on arbitration against the Company to the Korea Commercial Arbitration Board in relation to the request for additional construction costs but the Company has not recognized any provision because the probability of economic benefit outflow is remote and the related amount cannot be reliably estimated.

④ In prior years, Halla Corporation filed on arbitration against the Company to the Korea Commercial Arbitration Board in relation to the request for additional construction costs and the Company filed on arbitration against Halla Corporation to the Korea Commercial Arbitration Board in relation to the request for a penalty payment for the delayed construction work. The Company has recognized ₩4,916 million of provision for the best estimate of the expenditure required to fulfill its obligations in relation to this arbitration as of December 31, 2017.

**(2)   Guarantees of borrowings provided to other companies as of December 31, 2016 and 2017 are as follows:**

① In order to secure its status as a shareholder of Navanakorn Electric Co., Ltd., the Company has signed a fund supplement contract. According to the contract, in case Navanakorn Electric Co., Ltd. does not have sufficient funds for its operation or repayment of borrowings, the Company bears a payment obligation in proportion to its ownership.

② The Company has outstanding borrowings with a limit of USD 275,600 thousand from its creditors such as International Finance Corporation. Regarding the borrowing contract, the Company has guaranteed capital contribution of USD 69,808 thousand and additional contribution up to USD 19,000 thousand for contingencies, if any. Moreover, for one of the electricity purchasers, Central

F-175

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Power Purchasing Agency Guarantee Ltd., the Company has provided payment guarantee up to USD 2,777 thousand, in case of construction delay or insufficient contract volume after commencement of the construction.

③ The Company has provided PT. Perusahaan Listrik Negara performance guarantee up to USD 2,293 thousand and Mizuho bank and others investment guarantee up to USD 43,500 thousand in proportion to its ownership in the electricity purchase contract with PT. Cirebon Energi Prasarana in relation to the second electric power generation business in Cirebon, Indonesia.

④ The Company has provided the Bank of Tokyo Mitsubishi UFJ (BTMU) borrowing guarantee up to USD 41,258 thousand in proportion to its ownership in the equity bridge loan guarantee with PT. Cirebon Energi Prasarana in relation to the second electric power generation business in Cirebon, Indonesia.

⑤ The Company has provided the Export-Import Bank of Korea, BNP Paribas and ING Bank guarantee of mutual investment of USD 2,440 thousand, which is equivalent to the ownership interest of PT BS Energy and PT Nusantara Hydro Alam, in order to guarantee the expenses related to hydroelectric power business of Tanggamus, Indonesia.

⑥ The Company has provided the Export-Import Bank of Korea and SMBC guarantee of mutual investment of USD 401 thousand, which is equivalent to the ownership interest of PT Mega Power Mandiri, in order to guarantee the expenses related to hydroelectric power business of PT Wampu Electric Power, an associate of the Company.

⑦ The Company has provided Samsung C&T Corporation bidding guarantee up to USD 793 thousand to participate in the bidding of the Sri Lanka combined cycle project.

F-176

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**(3)   Credit lines provided by financial institutions as of December 31, 2017 are as follows:**

| Commitments | Financial institutions | Currency | Limited amount | Exercised amount |
|---|---|---|---|---|
| | | | In millions of won and thousands of foreign currencies | |
| Commitments on bank-overdraft | Nonghyup Bank and others | KRW | 1,555,000 | 68,859 |
| Commitments on bank-daylight overdraft | Nonghyup Bank | KRW | 280,000 | – |
| Limit amount available for CP | Shinhan Bank and others | KRW | 1,100,000 | – |
| Limit amount available for card | KEB Hana Bank and others | KRW | 46,733 | 2,775 |
| | Banco de Oro | PHP | 5,000 | 5,000 |
| Loan limit | Kookmin Bank and others | KRW | 895,500 | 425,411 |
| | BNP Paribas and others | USD | 1,910,700 | 20,000 |
| Certification of payment on L/C | Woori Bank and others | USD | 1,029,604 | 233,166 |
| Certification of performance guarantee on contract | KEB Hana Bank | EUR | 1,958 | 1,958 |
| | KEB Hana Bank and others | INR | 230,515 | 230,515 |
| | Korea Development Bank and others | JPY | 620,000 | 620,000 |
| | Seoul Guarantee Insurance and others | KRW | 104,248 | 104,248 |
| | Bank of Kathmandu | NPR | 32,633 | 32,633 |
| | KEB Hana Bank | SAR | 102,186 | 87,991 |
| | Standard Chartered and others | USD | 753,652 | 696,806 |
| | KEB Hana Bank | CAD | 168 | 168 |
| Certification of bidding | SMBC and others | USD | 60,000 | 10,230 |
| | ABSA and others | ZAR | 55,730 | 55,730 |
| Advance payment bond, Warranty bond, Retention bond and others | KEB Hana Bank | INR | 157,830 | 157,830 |
| | Export-Import Bank of Korea and others | USD | 3,850,534 | 753,025 |
| Others | Nonghyup Bank and others | KRW | 451,521 | 15,037 |
| | KEB Hana Bank and others | USD | 1,063,670 | 758,536 |
| Inclusive credit | Shinhan Bank | INR | 47,489 | 47,489 |
| | KEB Hana Bank | KRW | 258,000 | 117,398 |
| | Shinhan Bank and others | USD | 32,125 | 16,155 |
| Trade finance | BNP Paribas and others | USD | 800,000 | – |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(4)   As of December 31, 2017, the blank check and assets provided as collaterals or pledges to financial institutions by the Company are follows:

| Guarantor | Guarantee | Type of guarantee | Currency | Amount | Description |
|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | |
| Korea East-West Power Co., Ltd. | Korea Development Bank and others | Shareholdings of Gyeongju Wind Power Co., Ltd. | KRW | 15,958 | Collateral for borrowings |
| Korea Midland Power Co.,Ltd. | IBK and others | Shareholdings of Commerce and Industry Energy Co., Ltd. | KRW | 13,605 | Collateral for borrowings |
| Korea Southern Power Co., Ltd. | Shinhan Bank and others | Shareholdings of KOSPO Youngnam Power Co., Ltd. | KRW | 40,000 | Collateral for borrowings |
| Korea South-East Power Co., Ltd. | International Finance Corporation and others | Shareholdings of Mira Power Limited | KRW | 44,192 | Collateral for borrowings |
| Korea Hydro & Nuclear Power Co., Ltd. | Korea Development Bank and others | Shareholdings of Gyeonggi Green Energy Co., Ltd. | KRW | 47,000 | Collateral for borrowings |
| Gyeonggi Green Energy Co., Ltd. | Korea Development Bank and others | Factory estate and others | KRW | 327,080 | Collateral for borrowings (*) |
| Commerce and Industry Energy Co., Ltd. | IBK and others | Land, buildings, structures and machinery and others | KRW | 110,500 | Collateral for borrowings |
| | | Cash and cash equivalents | KRW | 11,642 | |
| Gyeongju Wind Power Co., Ltd. | SK Securities Co., Ltd. and others | Property, plant and equipment and others | KRW | 97,980 | Collateral for borrowings |
| | | Existing or expected trade receivables | KRW | 4,800 | |
| | | Cash and cash equivalents | KRW | 8,769 | |
| KOSPO Youngnam Power Co., Ltd. | Shinhan Bank and others | Bank deposit and insurance claim | KRW | 396,120 | Collateral for borrowings |
| Qatrana Electric Power Company | The Islamic Development Bank and others | Finance Lease receivable and property, plant and equipment and others | JOD | 188,580 | Collateral for borrowings |
| KST Electric Power Company | Scotiabank Inverlat, S.A | Finance Lease receivable and others | USD | 289,026 | Collateral for borrowings |

(*)   The Company was provided with shares of Gyeonggi Green Energy Co., Ltd., one of its subsidiaries, from the investors as collateral related to long-term borrowings. Additionally, pledge for shares, pledge for transfer of rights of long-term borrowings, pledge for insurance claims and other pledges were established.

The Company has ₩1,197 million of project loans from Korea Resource Corporation as of December 31, 2017. The Company has provided a blank check as repayment guarantee.

F-178

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

(5)  The Company temporarily suspended operations of the Gangneung hydroelectric generating plant, with a carrying amount of ₩88,447 million as of December 31, 2017, to improve the quality of water used in generating electricity. The expenses related to the suspension of operations of ₩137 million and depreciation on the utility plant of ₩6,644 million are recorded in other expenses for the year ended December 31, 2017.

(6)  Due to the Korean government's announcement of suspension of operation in the Gaeseong Industrial District, it is uncertain if the Company can exercise the property rights for the Company's facility in the Gaeseong Industrial District as of December 31, 2017. The book value of facility is ₩18,724 million and the amount of trade receivables related to the companies residing in Gaeseong industrial complex is ₩2,911 million. The Company has entered into an insurance agreement covering up to ₩7,000 million with the Export-Import Bank of Korea related to Gaeseong industrial complex. The ultimate outcome of this event cannot be reasonably estimated.

**51.  Subsequent Events**

(1)  Subsequent to December 31, 2017, Korea Hydro & Nuclear Power Co., Ltd., Korea South-East Power Co., Ltd., Korea Midland Power Co., Ltd. and Korea Southern Power Co., Ltd. issued additional corporate bond, asset backed short-term bond, non-guaranteed bonds and foreign currency borrowings for funding facilities and operations as follows:

| Company Name | Type | Issue date | Maturity | Interest rate (%) | Amounts |
|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | |
| Korea Hydro & Nuclear Power Co., Ltd. | #48-1 corporate bond | 2018.03.13 | 2021.03.13 | 2.40 | ₩ 160,000 |
| | #48-2 corporate bond | 2018.03.13 | 2023.03.13 | 2.70 | 20,000 |
| | #48-3 corporate bond | 2018.03.13 | 2028.03.13 | 2.86 | 30,000 |
| | #48-4 corporate bond | 2018.03.13 | 2048.03.13 | 2.94 | 90,000 |
| | Global bond 9 | 2018.03.13 | 2028.03.13 | 3.35 | HKD 1,650,000 |
| Korea South-East Power Co., Ltd | Asset backed short-term bond | 2018.01.24 | 2018.04.10 | 1.79 | 190,000 |
| Korea Midland Power Co., Ltd | #41-1 non-guaranteed corporate bond | 2018.02.20 | 2023.02.20 | 2.72 | 60,000 |
| | #41-2 non-guaranteed corporate bond | 2018.02.20 | 2028.02.20 | 2.92 | 130,000 |
| Korea Southern Power Co., Ltd | #43-1 non-guaranteed bond | 2018.01.11 | 2021.01.11 | 2.32 | 120,000 |
| | #43-2 non-guaranteed bond | 2018.01.11 | 2023.01.11 | 2.57 | 20,000 |
| | #43-3 non-guaranteed bond | 2018.01.11 | 2028.01.11 | 2.76 | 60,000 |
| | Non-guaranteed foreign currency bond (Global bond 18) | 2018.01.29 | 2021.01.29 | 3.00 | USD 400,000 |

(2)  In January 2018, the Company sold all of its shares in KODE NOVUS II LLC and other investors in the joint venture sold all of their shares in KODE NOVUS I LLC and KODE NOVUS II LLC. In accordance with the agreement between the shareholders and the creditors of KODE NOVUS I LLC and KODE NOVUS II LLC, the Company's right to indemnity and supplemental funding obligations to the investors and creditors have been eliminated. Accordingly, the Company reversed the entire amount of the provisions for the right to indemnity.

F-179

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

Exhibit 8.1

### LIST OF SUBSIDIARIES

| Consolidated subsidiaries | Jurisdiction of Incorporation |
|---|---|
| 1. | Korea Hydro & Nuclear Power Co., Ltd. | Korea |
| 2. | Korea South-East Power Co., Ltd. | Korea |
| 3. | Korea Midland Power Co., Ltd. | Korea |
| 4. | Korea Western Power Co., Ltd. | Korea |
| 5. | Korea Southern Power Co., Ltd. | Korea |
| 6. | Korea East-West Power Co., Ltd. | Korea |
| 7. | KEPCO Engineering & Construction Company, Inc. | Korea |
| 8. | KEPCO Plant Service & Engineering Co., Ltd. | Korea |
| 9. | KEPCO Nuclear Fuel Co., Ltd. | Korea |
| 10. | KEPCO KDN Co., Ltd. | Korea |
| 11. | Garolim Tidal Power Plant Co., Ltd. | Korea |
| 12. | KEPCO International HongKong Ltd. | Hong Kong |
| 13. | KEPCO International Philippines Inc. | Philippines |
| 14. | KEPCO Gansu International Ltd. | Hong Kong |
| 15. | KEPCO Philippines Holdings Inc. | Philippines |
| 16. | KEPCO Philippines Corporation | Philippines |
| 17. | KEPCO Ilijan Corporation | Philippines |
| 18. | KEPCO Lebanon SARL | Lebanon |
| 19. | KEPCO Neimenggu International Ltd. | Hong Kong |
| 20. | KEPCO Shanxi International Ltd. | Hong Kong |
| 21. | KOMIPO Global Pte Ltd. | Singapore |
| 22. | KEPCO Canada Energy Ltd. | Canada |
| 23. | KEPCO Netherlands B.V. | Netherlands |
| 24. | KOREA Imouraren Uranium Investment Corp. | France |
| 25. | KEPCO Australia Pty., Ltd. | Australia |
| 26. | KOSEP Australia Pty., Ltd. | Australia |
| 27. | KOMIPO Australia Pty., Ltd. | Australia |
| 28. | KOWEPO Australia Pty., Ltd. | Australia |
| 29. | KOSPO Australia Pty., Ltd. | Australia |
| 30. | KEPCO Middle East Holding Company | Bahrain |
| 31. | Qatrana Electric Power Company | Jordan |
| 32. | KHNP Canada Energy, Ltd. | Canada |
| 33. | KEPCO Bylong Australia Pty., Ltd. | Australia |
| 34. | Korea Waterbury Uranium Limited Partnership | Canada |
| 35. | Korea Electric Power Nigeria Ltd. | Nigeria |
| 36. | KEPCO Holdings de Mexico | Mexico |
| 37. | KST Electric Power Company | Mexico |
| 38. | KEPCO Energy Service Company | Mexico |
| 39. | KEPCO Netherlands S3 B.V. | Netherlands |
| 40. | PT. KOMIPO Pembangkitan Jawa Bali | Indonesia |
| 41. | PT. Cirebon Power Service | Indonesia |
| 42. | KOWEPO International Corporation | Philippines |
| 43. | KOSPO Jordan LLC | Jordan |
| 44. | EWP Philippines Corporation | Philippines |
| 45. | EWP America Inc. | USA |
| 46. | EWP Renewable Corporation | USA |
| 47. | DG Fairhaven Power, LLC | USA |
| 48. | DG Whitefield, LLC | USA |
| 49. | Springfield Power, LLC | USA |

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

| | Consolidated subsidiaries | Jurisdiction of Incorporation |
|---|---|---|
| 50. | KNF Canada Energy Limited | Canada |
| 51. | PT KEPCO Resource Indonesia | Indonesia |
| 52. | EWP Barbados 1 SRL | Barbados |
| 53. | California Power Holdings, LLC | USA |
| 54. | Gyeonggi Green Energy Co., Ltd. | Korea |
| 55. | PT. Tanggamus Electric Power | Indonesia |
| 56. | Gyeongju Wind Power Co., Ltd. | Korea |
| 57. | KOMIPO America Inc. | USA |
| 58. | EWPRC Biomass Holdings, LLC | USA |
| 59. | KOSEP USA, INC. | USA |
| 60. | PT. EWP Indonesia | Indonesia |
| 61. | KEPCO Netherlands J3 B.V. | Netherlands |
| 62. | Korea Offshore Wind Power Co., Ltd. | Korea |
| 63 | Global One Pioneer B.V. | Netherlands |
| 64 | Global Energy Pioneer B.V. | Netherlands |
| 65. | Mira Power Limited | Pakistan |
| 66. | KOSEP Material Co., Ltd. | Korea |
| 67. | Commerce and Industry Energy Co., Ltd. | Korea |
| 68. | KEPCO Singapore Holdings Pte., Ltd. | Singapore |
| 69. | KOWEPO India Private Limited | India |
| 70. | KEPCO KPS Philippines Corp. | Philippines |
| 71. | KOSPO Chile SpA | Chile |
| 72. | PT. KOWEPO Sumsel Operation And Maintenance Services | Indonesia |
| 73. | HeeMang Sunlight Power Co., Ltd. | Korea |
| 74. | Fujeij Wind Power Company | Jordan |
| 75. | KOSPO Youngnam Power Co., Ltd. | Korea |
| 76. | HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) | Korea |
| 77. | Chitose Solar Power Plant LLC | Japan |
| 78. | KEPCO Energy Solution Co. Ltd. | Korea |
| 79. | Solar School Plant Co., Ltd. | Korea |
| 80. | KOSPO Power Services Limitada | Chile |
| 81. | Energy New Industry Specialized Investment Private Investment Trust | Korea |
| 82. | KOEN Bylong Pty., Ltd. | Australia |
| 83. | KOMIPO Bylong Pty., Ltd. | Australia |
| 84. | KOWEPO Bylong Pty., Ltd. | Australia |
| 85. | KOSPO Bylong Pty., Ltd. | Australia |
| 86. | EWP Bylong Pty., Ltd. | Australia |
| 87. | KOWEPO Lao International | Laos |
| 88. | KEPCO US Inc. | USA |
| 89. | KEPCO Alamosa LLC | USA |
| 90. | Cogentrix Solar Services, LLC | USA |
| 91. | Solar Investments I, LLC | USA |
| 92. | Cogentrix of Alamosa, LLC | USA |
| 93. | KEPCO-LG CNS Mangilao Holdings LLC | USA |
| 94. | Mangilao Investment LLC | USA |
| 95. | KEPCO-LG CNS Mangilao Solar, LLC | USA |
| 96. | Jeju Hanlim Offshore Wind Co., Ltd. | Korea |
| 97. | PT. Siborpa Eco Power | Indonesia |
| 98. | BSK E-New Industry Fund VII | Korea |
| 99. | e-New Industry LB Fund 1 | Korea |
| 100. | Songhyun e-New Industry Fund | Korea |

All of the foregoing entities do business under their respective names set forth above.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

**Exhibit 12.1**

## CERTIFICATIONS

I, JongKap KIM, certify that:

1.    I have reviewed this annual report on Form 20-F of Korea Electric Power Corporation (the "Company");

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this annual report;

4.    The Company' s other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the Company' s disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

   (d)    Disclosed in this annual report any change in the Company' s internal control over financial reporting that occurred during the period covered by the Annual Report that has materially affected, or is reasonably likely to materially affect, the Company' s internal control over financial reporting.

5.    The Company' s other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company' s auditors and the audit committee of the Company' s board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company' s ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company' s internal control over financial reporting.

Date: April 30, 2018

By:    _____/s/    JongKap KIM_____
Name:                JongKap KIM
Title:                President and Chief Executive Officer

PUBLIC VERSION

**Exhibit 12.2**

## CERTIFICATIONS

I, Hyun, Sang-Kwon, certify that:

1.    I have reviewed this annual report on Form 20-F of Korea Electric Power Corporation (the "Company");

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this annual report;

4.    The Company' s other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the Company' s disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    (d)    Disclosed in this annual report any change in the Company' s internal control over financial reporting that occurred during the period covered by the Annual Report that has materially affected, or is reasonably likely to materially affect, the Company' s internal control over financial reporting.

5.    The Company' s other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company' s auditors and the audit committee of the Company' s board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company' s ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company' s internal control over financial reporting.

Date: April 30, 2018

By:        /s/    Hyun, Sang-Kwon
Name:            Hyun, Sang-Kwon
Title:            Executive Vice President and
                 Chief Financial Officer

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**PUBLIC VERSION**

**Exhibit 13.1**

## CERTIFICATION OF PERIODIC FINANCIAL REPORT
## PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Annual Report of Korea Electric Power Corporation (the "Company") on Form 20-F for the fiscal year ended December 31, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, JongKap KIM, President and Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 30, 2018

By: _____/s/    JongKap KIM_____
Name:                        JongKap KIM
Title:                         President and Chief Executive Officer

PUBLIC VERSION

Exhibit 13.2

## CERTIFICATION OF PERIODIC FINANCIAL REPORT
## PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Annual Report of Korea Electric Power Corporation (the "Company") on Form 20-F for the fiscal year ended December 31, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Hyun, Sang-Kwon, Executive Vice President & Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 30, 2018


By: _____/s/    Hyun, Sang-Kwon_____
Name:                    Hyun, Sang-Kwon
Title:                    Executive Vice President and
                         Chief Financial Officer

PUBLIC VERSION

**Exhibit 15.1**

### KOREA ELECTRIC POWER CORPORATION ACT

Amended by

Act No. 3304, December 31, 1980
Act No. 3833, May 12, 1986
Act No. 4093, March 25, 1989
Act No. 4541, March 6, 1993
Act No. 5454, December 13, 1997
Act No. 5573, September 23, 1998
Act No. 6755, December 5, 2002
Act No. 8852, February 29, 2008
Act No. 9383, January 30, 2009
Act No. 9618, April 1, 2009
Act No. 10254, April 12, 2010
Act No. 11690, March 23, 2013
Act No. 12663, May 21, 2014
Act No. 14678, Mar. 21, 2017

**Article 1 (Purpose)**

The purposes of this Korea Electric Power Corporation Act (the "Act") are to enhance stable supply and demand of electric power and contribute to the development of the national economy by promoting development of power resources and managing rational operation of electricity business through establishment of the Korea Electric Power Corporation.

**Article 2 (Legal Personality)**

Korea Electric Power Corporation (the "Corporation") shall be a juridical person.

**Article 3 (Business Office)**

(1)    The location of the principal office of the Corporation shall be determined by the Corporation's articles of incorporation (the "Articles of Incorporation").

(2)    The Corporation may establish pursuant to the Articles of Incorporation branches or representative offices as necessary for the purpose of carrying out its business.

**Article 4 (Equity Capital)**

The equity capital of the Corporation shall be 6 trillion Won. The Government shall contribute at least fifty one percent (51%) of the Corporation's equity capital.

**Article 5 (Shares)**

(1)    The equity capital of the Corporation shall consist of shares ("Shares").

(2)    The Shares referred to in Paragraph (1) above shall be in registered form. The type, number and par value of the Shares shall be determined by the Articles of Incorporation.

**Article 6 (Government's Exercise of Shareholder Rights)**

The shareholder rights attached to Shares held by the Government shall be exercised by the Minister of the Ministry of Trade, Industry and Energy through consultation with the Minister of the Ministry of Strategy and Finance.

1

**Article 7 (Registration)**

(1)  The establishment of the Corporation shall be completed through registration of incorporation at the place where its principal office is located.

(2)  Any matters necessary for the registration of incorporation of the Corporation as referred to in under Paragraph (1) above and the registration of establishment, relocation, change or other matters relating to the Corporation's branches or business offices shall be determined by the Presidential Decree.

(3)  The Corporation shall not raise objections to a third party on any matters required for registration until after registration.

**Article 8 (Restriction on Use of Similar Name)**

Any person who is not incorporated pursuant to this Act shall not use the name of "Korea Electric Power Corporation" or any similar name thereto.

**Article 9 (Restrictions on the Representation Right of the President)**

The President may not represent the Corporation on any matters on which there is a conflict of interest between of the Corporation and the President, and on such matters the statutory auditor (or the audit committee if such committee has been established under the Public Agencies Management Act) may represent the Corporation.

**Article 10 (Officers)**

The Corporation's officers (except non-standing directors) shall be appointed by the resolution of the shareholders at the general meeting of shareholders.

**Article 11 (Appointment of Attorney-in-fact)**

Pursuant to its Articles of Incorporation, the President may appoint any employee as his attorney-in-fact with authority to perform all acts (whether in the court of law or otherwise) relating to all or any part of the business of the Corporation.

**Article 12 (Prohibition on Leakage of Confidential Information)**

No current or former officer or employee shall disclose or make fraudulent use of any confidential information which he/she comes to know in the course of his employment with the Corporation.

**Article 13 (Business)**

(1)  The Corporation shall conduct the following business activities in order to accomplish the purposes specified in Article 1 above:

　　1.  Development of electric power resources;

　　2.  Generation, transmission, transformation and distribution of electricity and other related business activities;

　　3.  Research and development of technology related to the businesses mentioned in Items 1 and 2;

　　4.  Overseas business related to the businesses mentioned in Items 1 through 3;

　　5.  Investments or contributions related to the businesses mentioned in Items 1 through 4;

　　6.  Businesses incidental to the businesses mentioned in Items 1 through 5;

2

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

7.  Businesses that meet one or more of the requirements designated by Presidential Decree in relation to making use of real property owned by the Corporation; and

8.  Other activities commissioned by the Government.

(2)  The scope and target of investment or contribution and any matters necessary thereto with respect to research and development stated in Item 3 of Paragraph (1) above shall be determined by the Presidential Decree.

(3)  The Corporation shall obtain the approval of the Minister of the Ministry of Trade, Industry and Energy to carry out any business mentioned in Item 7 of Paragraph (1) above.

(4)  If the Corporation carries out any businesses mentioned in Item 7 of Paragraph (1) above, it shall commission a contractor that is qualified to do so under Paragraph 1 of Article 42 of the State Property Act or Item 1 of Paragraph 2 of Article 43 of the Act on the Management of Public Property and Commodities to develop the relevant real property, or shall entrust a trustee qualifying under the Financial Investment Services and Capital Markets Act with the development of the relevant real property; provided, however, that, the Corporation may directly carry out such business if, as specified by the Presidential Decree, such commissioning or entrustment is difficult for commercial reasons.

### Article 14 (Disposition of Profit)

(1)  If the Corporation records a profit at the end of any fiscal year, the profit of such fiscal year shall be disposed of through a resolution of shareholders at a general meeting of shareholders in the following order of priority:

1.  Providing for any accumulated deficit as of the beginning of such fiscal year;

2.  Establishing a profit reserve of at least two-tenths of the profit until the accumulated reserve reaches one-half of the equity capital of the Corporation;

3.  Dividend to shareholders;

4.  Reserve for business expansion;

5.  Reserve for dividend equalization; and

6.  Carried-over earned surplus.

(2)  The income from the business mentioned in Item 7 of Paragraph 1 of Article 13 shall be used to fund the construction of environment-friendly facilities by relocating electricity transmission, transformation, distribution facilities as specified in Item 17 of Article 2 of the Electricity Business Act indoors or underground.

### Article 15 (Dividend on Shares)

If the Corporation pays dividend pursuant to Item 3 of Paragraph (1) of Article 14, the Corporation may pay preferential dividends on Shares not owned by the Government, notwithstanding the provision of Article 464 of the Commercial Code.

### Article 16 (Issuance of Debentures)

(1)  The Corporation may issue debentures by a resolution of the board of directors.

(2)  The issue amount of debentures shall not exceed two (2) times the sum of the equity capital and reserves of the Corporation.

(3)  The Government may guarantee repayment of the principal of and interest on the debentures issued by the Corporation.

3

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(4)    The statute of limitation shall be five (5) years with respect to the principal of the debentures and two (2) years with respect to the interest on the debentures.

(5)    Any other matters necessary for the issuance of debentures other than the matters set forth in Paragraphs (1) through (4) above shall be determined by the Presidential Decree.

### Article 17 (Special Exception in the case of Asset Revaluation)

The current value of assets of the Corporation subject to asset revaluation shall be determined as the value assessed by the Corporation pursuant to valuation methods prescribed by the Presidential Decree, notwithstanding the main text of Article 7, Paragraph (2) of the Asset Revaluation Act; provided, that this provision shall not apply to the evaluation of those assets subject to revaluation, as specified by the Presidential Decree.

### Article 18 (Supervision)

The Minister of the Ministry of Trade, Industry and Energy shall guide and supervise the business of the Corporation related to any of the following matters:

1.    General electricity supply under Article 6 of the Electricity Business Act;

2.    Medium- to long-term investment in electricity facilities for the electricity business under the Electricity Business Act;

3.    Proper conduct of the business under Paragraph 1 of Article 13 hereof; and

4.    Any other matters related to public interest and safety as designated by the Presidential Decree.

### Article 19 (Relationship to Other Laws)

(1)    If the sum of the number of Shares held by the Government and the number of Shares held by Korea Development Bank under the Korea Development Bank Act is 50% or more of the Corporation`s shares issued and outstanding, the total number of Shares held by the Government shall be deemed not less than 50% for the purpose of the application of other laws.

(2)    The provisions concerning stock corporation under the Commercial Code shall apply to the Corporation, unless otherwise provided for in this Act or the Public Agencies Management Act.

### Article 20 (Penalty)

Any person who discloses or make a fraudulent use of any confidential information he/she comes to know in the course of his/her official duty in breach of Article 12 hereof shall be punished with imprisonment of not more than two years or fine not more than 20 million Won. <Amended by Act No. 14678, Mar. 21, 2017>

### Article 21 (Fine)

(1)    Any person who uses the name of Korea Electric Power Corporation or other similar name in breach of Article 8 hereof shall be imposed a fine of not more than two million Won.

(2)    The fine specified in Paragraph (1) above shall be imposed and collected by the Minister of the Ministry of Trade, Industry and Energy.

<center>**ADDENDA**</center>

(1)    (Effective Date)

This Act shall be effective on and after the date of its promulgation.

<center>4</center>

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(2)    (Amendment of Other Laws)

This Act shall be amended by replacing the references to "Minister of Knowledge Economy" to "Minister of Trade, industry and Energy" in Article 6, Article 13, paragraph 3 and Article 21, paragraph 2 herein.

ADDENDA <No. 12633, May 21, 2014> (The Korea Development Bank Act)

Article 1 (Effective Date)

This Act shall be effective from the date of registration of merger under Article 4-6 of the Addenda. <Proviso omitted>

Articles 2 through 10 omitted

Article 11 (Amendment of other Laws)

(1)    through (9) omitted

(10) The Korea Electric Power Corporation Act shall be partially amended as follows.

"The Korea Finance Corporation under the Korea Finance Corporation Act" under Article 19(1) shall be changed to "The Korea Development Bank under the Korea Development Bank Act."

Article 12 omitted

ADDENDA <No. 14678, Mar. 21, 2017>

This Act shall be effective six months after the date of its promulgation.

5

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

Exhibit 15.3

## ACT ON THE MANAGEMENT OF PUBLIC INSTITUTIONS

Act No. 8258, Jan. 19, 2007
Amended by Act No. 8635, Aug. 3, 2007
Act No. 8696, Dec. 14, 2007
Act No. 8852, Feb. 29, 2008
Act No. 9277, Dec. 31, 2008
Act No. 9345, Jan. 30, 2009
Act No. 9513, Mar. 25, 2009
Act No. 9829, Dec. 29, 2009
Act No. 10286, May 17, 2010
Act No. 10896, Jul. 25, 2011
Act No. 11690, Mar. 23, 2013
Act No. 11845, May 28, 2013
Act No. 12268, Jan 21, 2014
Act No. 12673, May 28, 2014
Act No. 14076, Mar. 22, 2016
Act No. 14461, Dec. 27, 2016

## CHAPTER I GENERAL PROVISIONS

### Article 1 (Purpose)

The purpose of this Act is to provide for basic matters concerning the management of public institutions and necessary matters concerning the firm establishment of the system for self-controlling and accountable management with the aims of rationalizing their management, heightening transparency in management, and thus contributing to the improvement of public institutions' services to the people.

### Article 2 (Scope of Application, etc.)

(1)　This Act shall apply to the public institutions designated and publicly notified under the provisions of Articles 4 through 6.

(2)　As to public institutions, this Act shall apply in preference to any other Act, notwithstanding any pertinent provisions therein contrary to this Act, except as specifically provided for in this Act to follow the pertinent provisions in any other Act.

### Article 3 (Guarantee for Self-Controlling Management)

The Government shall guarantee the self-controlling management of public institutions to establish the accountable management system in public institutions.

### Article 4 (Public Institutions)

(1)　The Minister of Strategy and Finance may designate a legal entity, organization or institution (hereinafter referred to as an "institution") other than the State or a local government as a public institution, if it falls under any of the following subparagraphs: <Amended by Act No. 8852, Feb. 29, 2008>

　　1.　An institution established by direct operation of another Act with an investment by the Government;

　　2.　An organization to whom the amount of the Government grants (including the revenue from its commissioned affairs or monopoly, if it is an institution to whom some affairs of the Government are commissioned or a monopoly is granted by direct operation under Acts and subordinate statutes; hereinafter the same shall apply) exceeds one-half of the amount of its total revenue;

1

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

3.  An institution which the Government holds at least fifty percent of the outstanding shares in or secures practical control over in making decisions on its policies through the exercise of the power to appoint executives with at least thirty percent of such outstanding shares or otherwise;

4.  An institution which the Government together with an institution falling under any of subparagraphs 1 through 3 holds at least fifty percent of the outstanding shares in or secures practical control over in making decisions on its policies through the exercise of the power to appoint executives with at least thirty percent of such outstanding shares or otherwise;

5.  An institution which a single institution or two or more institutions falling under any of subparagraphs 1 through 4 hold at least fifty percent of the outstanding shares in or secure practical control over in making decisions on its policies through the exercise of the power to appoint executives with at least thirty percent of such outstanding shares or otherwise;

6.  An institution established by an institution failing under any of subparagraph 1 through 4 with an investment by the State or the establishing institution.

(2)  Notwithstanding the provisions of paragraph (1), the Minister of Strategy and Finance may not designate an institution as a public institution, if it falls under any of the following subparagraphs: <Amended by Act No. 8696, Dec. 14, 2007; Act No. 8852, Feb. 29, 2008>

1.  An institution established for the purpose of mutual aid, improvement of welfare, enhancement of interests, or maintenance of order in business transactions between its members;

2.  An institution established by a local government and run by the management in which the local government is involved;

3.  The Korea Broadcasting System under the Broadcasting Act and the Korea Educational Broadcasting System under the Korea Educational Broadcasting System Act.

(3)  Necessary matters concerning the criteria and method for calculating the amount of the Government grants and the amount of the total revenue under the provisions of paragraph (1) 2 and the criterion of the secured practical control under the provisions of subparagraphs 3 through 5 of the said paragraph shall be prescribed by Presidential Decree.

**Article 5 (Classification of Public Institutions)**

(1)  The Minister of Strategy and Finance shall classify public institutions into the categories of public corporation, quasi-governmental institution, and non-classified public institution for designation purpose, while the public corporations and quasi-governmental institutions shall be designated among public institutions whose prescribed number of personnel is at least fifty persons. <Amended by Act No. 8852, Feb. 29, 2008>

(2)  In designating public corporations and quasi-governmental institutions under the provisions of paragraph (1), the Minister of Strategy and Finance shall designate public corporations among those whose self-generating revenue reaches or exceeds 1/2 of the amount of its total revenue, while the Minister shall designate quasi-governmental institutions among public institutions not classified into public corporations. <Amended by Act No. 8852, Feb. 29, 2008>

(3)  The Minister of Strategy and Finance shall classify the public corporations and quasi-governmental institutions under the provisions of paragraphs (1) and (2) into the following subparagraphs, and shall designate them accordingly: <Amended by Act No. 8852, Feb. 29, 2008>

1.  Public corporations:

    (a)  Market-based public corporations: Public corporations whose asset size reaches or exceeds two trillion won and whose self-generating revenue out of the amount of total revenue reaches or exceeds the criterion prescribed by Presidential Decree;

2

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

    (b)    Quasi-market-based public corporations: Public corporations other than the market-based public corporations;

2.    Quasi-governmental institutions:

    (a)    Fund-management-based quasi-governmental institutions: Quasi-governmental institutions to which the management of a fund is assigned or commissioned under the National Finance Act;

    (b)    Commissioned-service-based quasi-governmental institutions: Quasi-governmental institutions other than the fund-management-based quasi-governmental institutions.

(4)    The Minister of Strategy and Finance shall designate the institutions not classified into either public corporations or quasi-governmental institutions among the public institutions under the provisions of paragraph (2) as non-classified public institutions. <Amended by Act No. 8852, Feb. 29, 2008>

(5)    The more specific criteria and method for determining the self-generating revenue and the total revenue under the provisions of paragraphs (2) and (3) shall be prescribed by Presidential Decree.


## Article 6 (Procedure for Designation of Public Institutions, etc.)

(1)    The Minister of Strategy and Finance shall newly designate public institutions, cancel the designation thereof or designate such public institutions by changing the classification within one month after the commencement of each fiscal year: Provided, That the Minister of Strategy and Finance may newly designate public institutions, cancel the designation thereof or designate such institutions by changing the classification, according to the following classification even in the middle of a fiscal year: <Amended by Act No. 9829, Dec. 29, 2009>

    1.    Where an institution falling under each subparagraph of Article 4 (1) is newly established: Newly designate;

    2.    Where an institution designated as a public institution is no longer subject to this Act due to privatization, consolidation, discontinuation or division of the institution or due to amendments, repeal, etc. of relevant Acts and subordinate statutes or where it becomes necessary to change the designation thereof: Cancel designation or designate by changing the classification.

(2)    In designating a new public corporation, quasi-governmental institution or non-classified public institution, or canceling or changing the designation under the provisions of paragraph (1), the Minister of Strategy and Finance shall consult with the administrative agency having control over the affairs of the prospective public corporation, a quasi-governmental institution or non-classified public institution (hereinafter referred to as the "competent agency") in accordance with relevant statutes, and then shall refer it to the committee for management of public institutions under the provisions of Article 8 for deliberation and resolution. <Amended by Act No. 8852, Feb. 29, 2008>

(3)    Whenever designating a new public corporation, quasi-governmental institution, or non-classified institution, or canceling or changing such designation under the provisions of paragraphs (1) and (2), the Minister of Strategy and Finance shall make a public notification thereof. In such cases, the list of existing public corporations, quasi-governmental etc. institutions, and non-classified public institutions may be publicly notified together, if considered necessary to do so. <Amended by Act No. 8852, Feb. 29, 2008>,

(4)    Necessary matters concerning the procedure, etc. for the designation (including changes in designation) of public corporations, quasi-governmental institutions, and non-classified public institutions, the cancelation of such designation, and the public notification shall be prescribed by Presidential Decree.


## Article 7 (Examination on Establishment of New Institution)

(1)    The head of the competent agency who desires to establish a new institution falling under any of the following subparagraphs, pursuant to Acts, shall request the Minister of Strategy and Finance to examine the

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

feasibility of the establishment of such a new establishment before making a prior announcement of such a legislative bill: <Amended by Act No. 8852, Feb. 29, 2008>

1.  An institution for which the ground for investment by the Government is specified in the legislative bill;

2.  An institution in which case the amount of the Government grants is estimated to exceed 1/2 of its total revenue;

3.  An institution specified as the one in which the Government alone or together with a public institution shall invest at least 30 percent of its capital.

(2)  The Minister of Strategy and Finance shall, upon receiving the request for examination under the provisions of paragraph (1), examine the needs, effects, etc. of new establishment of the institution, financial support by referring it to the committee for management of public institutions under the provisions of Article 8 for deliberation and resolution, and then shall notify the head of the competent agency of the results therefrom. <Amended by Act No. 8852, Feb. 29, 2008>

(3)  Necessary matters concerning the examination, etc. on the feasibility of the establishment of a new institution under the provisions of paragraphs (1) and (2) shall be prescribed by Presidential Decree.

## CHAPTER II COMMITTEE FOR MANAGEMENT OF PUBLIC INSTITUTIONS

### Article 8 (Establishment of Committee for Management of Public Institutions)

The committee for management of public institutions (hereinafter referred to as the "management committee") shall be established under the control of the Minister of Strategy and Finance for deliberation and resolution on the following matters concerning the management of public institutions: <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277, Dec. 31, 2008: Act No. 9829, Dec. 29, 2009, Act No. 14076, Mar. 22, 2016>

1.  Designation of public corporations, quasi-governmental institutions, and non-classified public institutions, and cancelation and change of such designation under the provisions of Articles 4 through 6;

2.  Examination on establishment of a new institution under the provisions of Article 7;

3.  Publication concerning the management of public institutions under Article 11 (1) 15;

4.  Personnel action, etc. based on a violation of the duty of publication, etc. under Article 12 (3);

5.  Adjustment, etc. of functions of public institutions under the provisions of Article 14;

6.  Assistance in innovation, etc. of public institutions under the provisions of Article 15;

7.  Appointment of the non-standing senior directors of market-based public corporations and quasimarket-based public corporations under the proviso to Article 21 (2);

8.  Appointment, etc. of executives of public corporations and quasi-governmental institutions under the provisions of Articles 25 and 26;

9.  Guidelines for remuneration under Article 33;

10.  Removal, recommendation of removal, etc. of the executives of public corporations and quasigovernmental institutions under the provisions of Article 35 (2);

11.  Evaluation, etc. of performance of duties of non-standing directors and auditors under the provisions of Article 36;

12.  Evaluation, etc. of business performance of public corporations and quasi-governmental institutions under the provisions of Article 48;

4

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

13. Guidelines for management of public institutions and quasi-governmental institutions under the provisions of Article 50;

14. Monitoring of the adequacy of supervision over public corporations and quasi-governmental institutions and improvement of such supervision under the provisions of Article 51 (4);

15. Other matters prescribed by Presidential Decree concerning the management of public institutions.

### Article 9 (Composition of Management Committee)

(1) The management committee shall be comprised of one chairperson and the following members, and the Minister of Strategy and Finance shall be the chairperson: <Amended by Act No. 8852, Feb. 29, 2008; Act No. 11690, Mar. 23, 2013>

1. One Vice-Minister-level public official of the Prime Minister᾽s Office as nominated by the Minister of the Prime Minister᾽s Office;

2. Vice Minister, Deputy Administrator, or an equivalent public official of the related administrative agency as prescribed by Presidential Decree;

3. Vice Minister, Deputy Administrator, or an equivalent public official of the competent agency who does not fall under subparagraph 2;

4. Eleven or less persons commissioned by the President on the recommendation of the Minister of Strategy and Finance from among people from various fields including law, economy, press, academia, labor, etc. with good knowledge and experience in the area of management and business administration of public institutions and also good reputation for impartiality.

(2) The term of office of the committee members under the provisions of paragraph (1) 4 shall be three years, and they may be consecutively appointed.

(3) The committee members under the provisions of paragraph (1) 4 shall perform their duties earnestly following their conscience for the establishment of self-controlling and accountable management system in public institutions and the enhancement of the efficiency in their management.

(4) A committee member under the provisions of paragraph (1) 4 may be dismissed if he/she falls under any of the following subparagraphs:

1. If he/she is unable to perform his/her duties due to physical or mental disability;

2. If he/she is found incompetent to his/her office on the ground of neglect of his/her duties, indecent manner, or otherwise;

3. If he/she is indicted in a criminal case in connection with his/her duties.

(5) The committee chairperson may recommend the President to dismiss a committee member under the provisions of paragraph (1) 4, if the committee member falls under any of the subparagraphs of paragraph (4): Provided, That the committee chairperson shall compulsorily recommend the President to dismiss a committee member who falls under paragraph (4) 1.

(6) Necessary matters concerning the composition of the management committee shall be prescribed by Presidential Decree.

### Article 10 (Management Committee᾽s Meeting)

(1) The management committee᾽s meeting shall be formed with 20 or less members including the chairperson, and the members who should attend the management committee᾽s meeting shall be designated by the chairperson among the members who fall under Article 9 (1) 2 and 3 depending upon the nature of the matters on the agenda, while the number of members who fall under subparagraph 4 of the said paragraph shall constitute a majority of the members of the meeting. <Amended by Act No. 8852, Feb. 29, 2008>

5

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(2)   The management committee's meeting shall be duly formed to open with the presence of a majority of the members of the meeting, and shall adopt a resolution with the affirmative vote of a majority of the members present at the meeting.

(3)   The Chairperson of the Board of Audit and Inspection and the head of the administrative agency concerned may present their opinions to the management committee, if considered necessary in relation to the deliberation and resolution by the management committee, and may dispatch a public official of the Board or the agency to appear before the management committee for speaking upon the request from the committee chairperson or the resolution of the management committee.

(4)   The management committee shall have one executive secretary for processing its affairs, and the executive secretary shall be appointed by the committee chairperson from among the public officials in the Senior Civil Service.

(5)   Necessary matters concerning the operation of the management committee shall be prescribed by Presidential Decree.

## CHAPTER III PUBLICATION, ETC. ON MANAGEMENT OF PUBLIC INSTITUTIONS

### Article 11 (Publication on Management)

(1)   A public institution shall publish the following matters: Provided, That if any of the following matters is information subject to non-disclosure under the Official Information Disclosure Act or the head of the competent agency has consulted with the Minister of Strategy and Finance thereon because it is deemed necessary for national security, the relevant matters may be excluded from disclosure: <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277, Dec. 31, 2008: Act No. 9829, Dec. 29, 2009; Act No. 14076, Mar. 22, 2016>

   1.   Business goals, budget, and management plan;

   2.   Statements on settlement of accounts;

   3.   Current status of executive officers and operating personnel (including the gender of such executive officers, types of employment workers, rate of non-regular workers converted to regular workers);

       Budget for personnel expenses and fringe benefits, and status of execution thereof (the budget for different types of allowances shall be disclosed by type);

   5.   Present status of the details of transactions and the interchange of human resources with subsidiaries;

   6.   Results of survey on customer satisfaction level conducted in accordance with the provisions of Article 13 (2);

   7.   Results of audit and appraisal of the actual performance of duties of audit commissioners of the audit committee under Article 36 (1);

   8.   Results of business performance evaluation under the provisions of Article 48 (limited to public corporations and quasi-governmental institutions);

   9.   Articles of association, the corporate bond register, internal regulations such as guidelines established and rules and minutes of directors' meeting;

   10.  Audit report prepared by the auditor or the audit committee (including matters pointed out, matters requesting disposition and a plan of measures for them);

   11.  The result of audit on public institutions by the heads of the competent authorities (including matters pointed out, matters requesting disposition and a plan of measures for them);

   12.  Details of the judgment on the liability for damages or the request for disciplinary action, correction, improvement, etc. under Articles 31 (Judgment on Liability for Damages) through 34-2

6

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(Recommendation, etc.) of the Board of Audit and Inspection Act or the request for correction under Article 16 (Disposition of Results of Inspection or Investigation) of the Act on the Inspection and Investigation of State Administration, if any, and the measures taken by the public institution, etc. for such judgment or demand;

13.   Status of operation of the disciplinary system, including information about the disciplinary system and disciplinary actions taken;

14.   Status of lawsuits, legal advice, attorneys and legal advisors;

15.   Other important matters concerning the management of the public institution, as requested by the Minister of Strategy and Finance to publish after deliberation and resolution by the management committee.

(2)   Every public institution shall publish the matters specified in each subparagraph of paragraph (1) on its Internet webpage, and shall keep necessary documents at its offices.

(3)   Every public institution shall, upon receiving a request for inspection or a copy of the matters published in accordance with the provisions of paragraph (1), allow the requesting person to inspect them or deliver him/her a copy or reproduced material. In such cases, the provisions of Article 17 (Defrayment of Expenses) of the Official Information Disclosure Act shall apply mutatis mutandis to the defrayment of expenses incurred therefrom.

(4)   Necessary matters concerning the publication on management of public institutions shall be prescribed by Presidential Decree.

**Article 12 (Consolidated Publication)**

(1)   The Minister of Strategy and Finance may prepare a separate standardized form for consolidating main items among the matters that shall be published by each public institution under the provisions of Article 11

(1)   and publish such items in the consolidated form (hereafter referred to as the "consolidated publication" in this Article). <Amended by Act No. 8852, Feb. 29, 2008>

(2)   The Minister of Strategy and Finance may request public institutions to submit necessary data for consolidated publication, and public institutions shall, in turn, comply with such a request unless there are extraordinary circumstances otherwise. <Amended by Act No. 8852, Feb. 29, 2008>

(3)   If a public institution fails to perform the duty to make the publication on management under the provisions of Article 11 or the consolidated publication under the provisions of paragraph (1) in good faith, or if it publishes a false fact, the Minister of Strategy and Finance may order the public institution to publish such failure in publication or false publication, order it to correct such false fact, etc., and request the head of the competent agency or the relevant public institution, after deliberation and resolution by the management committee, to make personnel disposition, etc. against the person concerned. <Amended by Act No. 8852, Feb. 29, 2008>

(4)   Necessary matters concerning the guidelines, method, etc. for the consolidated publication shall be prescribed by Presidential Decree.

**Article 13 (Customer Charter and Customer Satisfaction Level Survey)**

(1)   Every public institution that provides a direct service to the people shall establish and publish a customer charter containing the following descriptions:

1.   Fundamental duties;

2.   Details of the service provided and desirable level of the service;

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

3.    Procedures for processing complaints and correction for the service provided and liability for damages, etc.;

4.    Efforts, plans, etc. for improvement of the service provided.

(2)    Every public institution that provides a direct service to the people shall conduct a survey on customer satisfaction level at least once a year on those who have experienced the service provided by the institution. In this case, the Minister of Strategy and Finance may instruct public institutions to conduct a consolidated survey on customer satisfaction level and integrate the results of such survey for publication. <Amended by Act No. 8852, Feb. 29, 2008>

(3)    Necessary matters concerning the scope of public institutions bound to establish and publicly announce the customer charter or conduct the customer satisfaction level survey under the provisions of paragraphs (1) and (2), the establishment and ˙public announcement of the customer charter, the procedure, scope, etc. of the customer satisfaction level survey shall be prescribed by Presidential Decree.

## Article 14 (Adjustment of Functions of Public Institutions, etc.)

(1)    The Minister of Strategy and Finance shall examine the appropriateness of functions performed by public institutions after consultation with heads of the competent agencies and deliberation and resolution by the management committee, and shall establish a plan for consolidation, merger, or abolition of institutions, readjustment of their functions, privatization, etc. In such cases, the Minister of Strategy and Finance shall report the established plan to the competent Standing Committee of the National Assembly <Amended by Act No. 8852, Feb. 29, 2008; Act No. 14461, Dec. 27, 2016>

(2)    The heads of the competent agencies shall implement the plan as established under the provisions of paragraph (1), and shall submit the report on ˙their performances to the Minister of Strategy and Finance. <Amended by Act No. 8852, Feb. 29, 2008>

(3)    The Minister of Strategy and Finance may, if considered necessary as a result of an analysis on the details of the report submitted under the provisions of paragraph (2) and a confirmation and inspection of the actual state of the performances, demand the head of the competent agency, after deliberation and resolution by the management committee, to take necessary measures for smooth implementation of the plan. <Amended by Act No. 8852, Feb. 29, 2008>

(4)    Necessary matters concerning the establishment and implementation of the plan under the provisions of paragraphs (1) through (3) shall be prescribed by Presidential Decree.

## Article 15 (Innovation of Public Institutions)

(1)    Every public institution shall promote continuous innovation in management for enhancing the efficiency in management and improving the quality of public service.

(2)    The Minister of Strategy and Finance may take necessary measures including the establishment of related guidelines, rating of innovated levels, etc., after deliberation and resolution by the management committee, to assist in management innovation under the provisions of paragraph (1). <Amended by Act No. 8852, Feb. 29, 2008>

## CHAPTER IV MANAGEMENT OF PUBLIC CORPORATIONS AND QUASI-GOVERNMENTAL INSTITUTIONS

## SECTION 1 Articles of Association

## Article 16 (Mandatory Provisions of Articles of Association)

(1)    The articles of association of public corporations and quasi-governmental institutions shall contain the provisions concerning the following matters: Provided, That the provisions irrelevant to a certain public

8

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

corporation or quasi-governmental institution in light of its form, characteristics, or business affairs may be omitted: <Amended by Act No. 9277, Dec. 31, 2008>

1.  Purpose;

2.  Name;

3.  Location of principal office;

4.  Capital amount;

5.  Stock or investment certificates;

6.  Matters concerning executives and employees;

7.  General meeting of shareholders or investors;

8.  Management of the board of directors;

9.  Scope of business, details and the execution thereof;

10.  Accounting;

11.  Method of public notice;

12.  Issuance of corporate bonds;

13.  Amendment to the articles of association;

14.  Other matters prescribed by Presidential Decree.

(2)  Every public corporation and quasi-governmental institution shall obtain authorization for the articles of association under the provisions of paragraph (1) from the head of the competent agency within three months after it is designated as a public corporation or quasi-governmental institution in accordance with Article 6. The foregoing shall apply to an amendment, revision, or modification of any provisions in the articles of association as authorized.

**SECTION 2 Board of Directors**

**Article 17 (Establishment and Functions of Board of Directors)**

(1)  Every public corporation and quasi-governmental institution shall have the board of directors for deliberation and resolution on the following matters: <Amended by Act No. 10286, May 17, 2010>

1.  Business goals, budget, management plan and mid-and long-term financial management plan;

2.  Use of reserve fund and carry-over of budget;

3.  Settlement of accounts;

4.  Acquisition and disposition of fundamental assets;

5.  Borrowing of long-term loans, issuance of corporate bonds, and repayment plan for such loans or bonds;

6.  Selling prices for products and services;

7.  Appropriation of retained earnings;

8.  Investment in and contribution to other corporation, etc.;

9.  Guarantees for obligations of other corporation: Provided, That it shall exclude the guarantees for obligations provided by a public corporation and quasi-governmental institution that engage in a guarantee business under the relevant Act in the course of executing its business;

10.  Amendment of the articles of association;

9

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

11. Establishment and amendment of bylaws;

12. Remuneration for executives;

13. Matters that the head of the public corporation or quasi-governmental institution (hereinafter referred to as the "institution head") considers it necessary to refer to the board of directors for deliberation and resolution;

14. Other matters considered necessary by the board of directors,

(2) The institution head shall report the following matters to the board of directors:

1. Matters pointed out at the inspection of state administration, the accounting audit conducted under the provisions of Article 43 (1), or the audit conducted by the Board of Audit and Inspection under the provisions of Article 52, and the plan for measures to be taken for such matters and the results thereof;

2. Results of an collective agreement executed by the public corporation or quasi-governmental institution and the estimated budget required for such an agreement (limited to a case where a collective agreement is entered into);

3. Other matters on which the board of directors demands the institution head to report.

(3) Where any other Act requires a public corporation or quasi-governmental institution to have any organization in lieu of the board of directors to perform the functions under the provisions of paragraph (1) in providing for the establishment and management of the public corporation or the quasi-governmental institution, such organization in whatsoever name shall be deemed to be the board of directors, while the members of such an organization shall be deemed to be the directors under this Act, to whom this Act shall apply.

**Article 18 (Composition)**

(1) The board of directors shall be comprised of not more than 15 directors including the institution head: Provided, That it may be comprised of not less than fifteen directors if the institution falls under any of the followings:

1. A public corporation or quasi-governmental institution having the general meeting of members such as the general meeting of shareholders or the general meeting of investors and established as a federation of local or trade institutions under any other Act;

2. Where the number of directors as of the time when it is designated as a public corporation or quasigovernmental institution under the provisions of Article 6 exceeds 15 persons: Provided, That the foregoing shall be applicable only for the period of time during which the term of incumbent directors as of the time of designation under the proviso to Article 28 (1) is guaranteed;

3. Where the number of directors exceeds 15 persons as a consequence of appointment of non-standing directors in accordance with the provisions of the latter part of Article 25 (3),

(2) The chairperson of the board of directors of a market-based public corporation and quasi-market-based public corporation, the asset size of which is not less than two trillion won shall become a non-standing senior director under Article 21: Provided, That one of the non-standing directors shall act as chairperson on behalf of the chairperson, as provided for in the articles of association, if the chairperson is unable to perform his/her duties due to unavoidable reasons. <Amended by Act No. 9829, Dec. 29, 2009>

(3) In applying paragraph (2), if no non-standing director exists at the time an institution is designated as a market-based public corporation or quasi-market-based public corporation under Article 6, the person prescribed by Acts and subordinate statutes at the time the institution is designated as a market-based public corporation or a quasi-market-based public institution shall be the chairperson of the board of directors until non-standing directors are appointed in accordance with the second sentence of Article 25 (3). <Amended by Act No, 9829, Dec. 29, 2009>

10

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(4)    The institution head shall become the chairperson of the board of directors of a quasi-market-based public corporation, the asset size of which is less than two trillion won, or a quasi-governmental institution: Provided; That the concurrent holding of the office of the institution head and the office of the chairperson of the board of directors shall be prohibited, if there are provisions in any other Act that prohibit such concurrent holding of offices. <Amended by Act No. 9829, Dec. 29, 2009>

## Article 19 (Meeting)

(1)    The meeting of the board of directors shall be convened by the chairperson or at the request of at least 1/3 of incumbent directors, and the chairperson shall preside over the meeting.

(2)    A resolution at the directors' meeting shall be adopted by the affirmative vote of a majority of incumbent directors.

(3)    The institution head or a director who has a specific interest in a matter put on the agenda of the directors' meeting shall not participate in resolution on the matter. In this case, a director, etc. who is barred from participating in resolution shall not be included in the number of incumbent directors under the provisions of paragraph (2).

(4)    The auditor may attend the directors' meeting to present his/her opinion.

(5)    The provisions of Article 391 (Method of Resolution by Board of Directors) (2) and 391-3 (Minutes of Board of Directors) (1) and (2) of the Commercial Act shall apply mutatis mutandis respectively to the resolution of the board of directors via telecommunication means, the minutes of the directors' meeting, etc.

## Article 20 (Committees)

(1)    The board of directors of a public corporation may establish committees within the board of directors in accordance with the articles of association of the relevant public corporation. In such cases, the provisions of Article 393-2 (Committees of Board of Directors) of the Commercial Act shall apply mutatis mutandis to the matters concerning composition, power, etc. of such committees.

(2)    Any market-based public corporation and quasi-market-based public corporation, the asset size of which is not less than two trillion won shall establish an audit committee under the board of directors as the committee under paragraph (1), in lieu of an auditor under Article 24 (1): Provided, That if a public corporation which newly establish an audit committee has an auditor, the audit committee shall be established after expiration of the auditor's term of office. <Amended by Act No. 9829, Dec. 29, 2009>

(3)    A quasi-market-based public corporation, the asset size of which is less than two trillion won, and a quasigovernmental institution may have an audit committee in accordance with the provisions of other Act. <Amended by Act No. 9829, Dec. 29, 2009>

(4)    Except as otherwise provided herein, Articles 542-11 and 542-12 (3) through (6) of the Commercial Act shall apply mutatis mutandis to the composition, power, etc. of the audit committee. <Amended by Act No. 8635, Aug. 3, 2007; Act No. 9829, Dec. 29, 2009>

(5)    The audit committee shall audit business affairs and accounting in accordance with the provisions of Article 32 (5), and shall report the results thereof to the board of directors.

## Article 21 (Non-standing Senior Director)

(1)    Every public corporation and quasi-governmental institution shall have one non-standing senior director.

(2)    The non-standing senior director shall be elected by and among non-standing directors: Provided, That the non-standing senior director of a market-based public corporation and quasi-market-based public corporation, the asset size of which is not less than two trillion won, shall be appointed by the Minister of Strategy and Finance among non-standing directors after deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

11

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(3)  Necessary matters concerning the non-standing senior director's qualification, performance of duties, etc. shall be prescribed by Presidential Decree.

**Article 22 (Request for Removal, etc.)**

(1)  If it is found that the institution head commits an act in violation of a statute or the articles of association, neglects his/her duties, or he/she has a serious trouble in performing his/her duties as the institution head, the board of directors may request the head of the competent agency to remove or recommend to remove the institution head, after resolution to the effect by the board of directors.

(2)  A non-standing director may, if considered necessary, request the auditor or the audit committee to audit a specific case in connection with the management of the public corporation or quasi-governmental institution by a written request jointly signed by two or more non-standing directors. In this case, the auditor or audit committee shall take action in accordance with such a request, unless there is a particular reason otherwise.

(3)  Non-standing directors may demand the institution head to furnish them with materials necessary for performing their duties. In this case, the institution head shall comply with such a demand, unless there is a particular reason otherwise.

**Article 23 (Fund Management Deliberation Council)**

(1)  Notwithstanding the proviso to Article 74 (Fund Management Deliberation Council) (1) of the National Finance Act, every fund-management-based quasi-governmental institution shall have a deliberative organization for fund management (hereinafter referred to as the "fund management deliberation council"), independent of the board of directors of the quasi-governmental institution: Provided, That a fund management-based quasi-governmental institution shall not have the fund management deliberation council, if there is other statute that requires that an organization for deliberation on important policies for the fund managed by the fund-management-based quasi-governmental institution be established in the competent agency.

(2)  The matters concerning the functions, composition, and management of the fund management deliberation council under the provisions of the main sentence of paragraph (1) shall be governed by the National Finance Act.

(3)  Where a fund-management-based quasi-governmental institution has the fund management deliberation council established under the provisions of paragraph (1) and there is other statute that specifies some of the matters set forth in subparagraphs of Article 17 (1) as the matters subject to deliberation and resolution by the fund management deliberation council, the matters so specified may be excluded from the matters subject to deliberation and resolution under the provisions of Article 17 (1).

**SECTION 3 Executives**

**Article 24 (Executives)**

(1)  Every public corporation and quasi-governmental institution shall have directors including the institution head and auditors: Provided, That no auditor is required if there is an audit committee established under the provisions of Article 20 (2) and (3).

(2)  Directors shall be classified into standing and non-standing directors.

(3)  The number of standing directors of a public corporation and a quasi-governmental institution, the size of which meets or exceeds the criteria prescribed by Presidential Decree or which is prescribed by Presidential Decree considering the special characteristics of its business affairs, shall be less than 1/2 of the fixed number of directors including the institution head: Provided, That fixed number of standing directors, while the terms of office of the executives are guaranteed under the proviso to Article 28 (1), may equal or exceed 1/2 of the fixed number of directors including the institution head, if the fixed number of standing directors

12

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

at the time the corporation or institution is designated as a public corporation or quasi-governmental institution under Article 6 equals or exceeds 1/2 of the fixed number of directors including the institution head. <Amended by Act No. 9829, Dec. 29, 2009>

(4) The number of standing directors of a quasi-governmental institution, other than that under the main sentence of paragraph (3) shall be less than 2/3 of the fixed number of directors including the institution head: Provided, That the fixed number of standing directors, while the terms of office of the executives are guaranteed under the proviso to Article 28 (1), may equal or exceed 2/3 of the number of directors including the institution head, if the "fixed number" of standing directors at the time such institution is designated as a quasi-governmental institution under Article 6 equals or exceeds 2/3 of the fixed number of directors including the institution head. <Newly Inserted by Act No. 9829, Dec. 29, 2009>

(5) An auditor shall be a standing or non-standing position, as prescribed by other Acts, subordinate statutes or the articles of association. <Newly Inserted by Act No. 9829, Dec. 29, 2009>

## Article 25 (Appointment and Removal of Executives of Public Corporations)

(1) The head of a public corporation shall be appointed by the President on the recommendation of the head of the competent agency among a plural number of people recommended by the committee for recommendation of executives under the provisions of Article 29 (hereinafter referred to as the "executive recommendation committee") and then selected through the deliberation and resolution by the management committee: Provided, That the head of a public corporation. the size of which is below the criteria prescribed by Presidential Decree shall be appointed by the head of the competent agency among a plural number of people recommended by the executive recommendation committee and then selected through the deliberation and resolution by the management committee.

(2) Standing directors of a public corporation shall be appointed by the head of the public corporation: Provided, That a standing director who becomes an audit commissioner of the audit committee under Article 20 (2) and (3) (hereinafter referred to as "standing audit commissioner") shall be appointed either by the President or the Minister of Strategy and Finance. <Amended by Act No. 9829, Dec. 29, 2009>

(3) Non-standing directors of a public corporation shall be appointed by the Minister of Strategy and Finance after deliberation and resolution by the management committee among a plural number of people who have good knowledge and experience in the area of management (excluding public officials except teaching staff of national and public schools) as recommended by the executive recommendation committee. In such cases, a public corporation that has no non-standing director at the time of designation under the provisions of Article 6 shall appoint at least two non-standing directors within three months after designation. <Amended by Act No. 8852, Feb. 29, 2008>

(4) The auditor of a public corporation shall be appointed by the President on the recommendation of the Minister of Strategy and Finance among a plural number of people recommended by the executive recommendation committee and then selected through the deliberation and resolution by the management committee: Provided, That the auditor of a public corporation, the size of which is below the criteria prescribed by Presidential Decree shall be appointed by the Minister of Strategy and Finance among a plural number of people recommended by the executive recommendation committee and then selected through the deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008>

(5) The head of a public corporation shall not be removed earlier than the expiry of his/her term unless he/she is removed by the person who has the power to appoint him/her under Articles 22 (1), 35 (3), and 48 (8) or there is a ground for removal as specified in the articles of association. <Amended by Act No. 9277, Dec. 31, 2008; Act No. 9513, Mar: 25, 2009>

## Article 26 (Appointment and Removal of Executives of Quasi-Governmental Institutions)

(1) The head of a quasi-governmental institution shall be appointed by the head of the competent agency among a plural number of people recommended by the executive recommendation committee: Provided, That the

13

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

head of a quasi-governmental institution, the size of which meets or exceeds the criteria prescribed by Presidential Decree or which is specified by Presidential Decree considering the peculiarities of its business affairs, shall be appointed by President on the recommendation of the head of the competent agency among a plural number of people recommended by the executive recommendation committee.

(2)  Standing directors of a quasi-governmental institution shall be appointed by the head of the quasigovernmental institution, and, where other Acts and subordinate statutes require to establish a separate recommendation committee for standing directors, the provisions of such Acts and subordinate statutes shall govern the recommendation of standing directors: Provided, That a standing audit commissioner shall be appointed either by the President or the Minister of Strategy and Finance according to the procedures prescribed by paragraph (4). <Amended by Act No. 9829, Dec. 29, 2009>

(3)  Non-standing directors of a quasi-governmental institution (excluding those appointed as ex officio non-standing directors pursuant to other Acts and subordinate statutes or the articles of association of the quasigovernmental institution; hereafter the same shall apply in this paragraph) shall be appointed by the head of the competent agency, while the non-standing directors of a quasi-governmental institution, the size of which meets or exceeds the criteria prescribed by Presidential Decree or which is prescribed by Presidential Decree considering the special characteristics of its business affairs, shall be appointed by the head of competent agency from among a plural number of people recommended by the executive recommendation committee: Provided, That where other Acts and subordinate statutes provides for a separate procedure for the recommendation of non-standing directors, the provisions of such Acts and subordinate statutes shall govern the recommendation of non-standing directors. <Amended by Act No. 9829, Dec. 29, 2009>

(4)  The auditor of a quasi-governmental institution shall be appointed by the Minister of Strategy and Finance among a plural number of people recommended by the executive recommendation committee and selected through the deliberation and resolution by the management committee: Provided, That the auditor of a quasi-governmental institution shall, if its size exceeds the criteria prescribed by Presidential Decree or if it is specified by Presidential Decree considering the peculiarities of its business affairs, be appointed by the President on the recommendation of the Minister of Strategy and Finance among a plural number of people recommended by the executive recommendation committee and then selected through the deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008>

(5)  Article 25 (5) shall apply mutatis mutandis to the guarantee of the term of office for the head of a quasigovernmental institution. In such cases, "head of a public corporation" shall be read as "head of a quasigovernmental institution". <Amended by Act No. 9829, Dec. 29, 2009>

### Article 27 (Special Exception concerning Appointment of Executives of Public Corporations and Quasi-Governmental Institutions with General Meeting of Members)

The public corporations and quasi-governmental institutions that have the general meeting of members including the general meeting of shareholders and the general meeting of investors shall obtain the resolution of the general meeting of 'members in connection with the appointment of executives, if such resolution is required by other statute.

### Article 28 (Term of Office)

(1)  The term of office of the institution head appointed in accordance with the provisions of Articles 25 and 26 shall be three years, while the term of office of directors and auditors shall be two years: Provided, That the directors incumbent at the time the public institution is designated as a public corporation or quasigovernmental institution under the provisions of Article 6 shall be deemed to have been appointed under the provisions of Articles 25 and 26, and the relevant statute in force at the beginning of the terms of office of such directors shall apply to their terms.

14

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(2)   The executives of public corporations and quasi-governmental institutions may be appointed consecutively by one year. In such cases, the person who has the power to appoint executives shall decide whether to appoint directors consecutively, considering the matters as categorized in the following subparagraphs:

    1.   Institution head: Results of the business performance evaluation under the provisions of Article 48;

    2.   Standing directors: Results of the actual performance evaluation of the performance agreement executed under the provisions of Article 31 (7) and results of performance of other duties;

    3.   Non-standing directors and auditors: Results from the evaluation of performance of duties under the provisions of Article 36 and results of performance of other duties.

(3)   Consecutive appointment to an executive of a public corporation or quasi-governmental institution under the provisions of paragraph (2) does not require the recommendation process of the executive recommendation committee.

(4)   Whenever an institution head is appointed for a consecutive term in accordance with the provisions of paragraph (2), an agreement shall be made again in compliance with the provisions of Article 31 (3). In such cases, the consultation with the executive recommendation committee under the provisions of Article 31 (2) is not required.

(5)   Executives shall perform their duties until their successors are appointed, even after expiration of their terms.

**Article 29 (Executive Recommendation Committee)**

(1)   Every public corporation and quasi-governmental institution shall have the executive recommendation committee for recommending 'candidates for executives of the public corporation or quasi-governmental institution under Articles 25 and 26 and for negotiating the matters concerning the draft agreement with candidates for the institution head under Article 31 (2). <Amended by Act No. 982~ Dec. 29, 2009>

(2)   The executive recommendation committee shall be comprised of non-standing directors of the public corporation or quasi-governmental institution and the members appointed by the board of directors.

(3)   Neither executives and employees of a public corporation or quasi-governmental institution nor public officials may become members of the executive recommendation committee: Provided, That the foregoing shall not apply to non-standing directors of the public corporation or quasi-governmental institution, teaching staff under the Public Educational Officials Act, and public officials of the competent agency for the quasi-governmental institution.

(4)   The fixed number of the members appointed by the board of directors shall be less than 1/2 of the fixed number of the members of the executive recommendation committee: Provided, That if only one non-standing director exists at the time the executive recommendation committee is established, the fixed number of the members appointed by the board of directors may be 1/2 of the fixed number of the members of the executive recommendation committee. <Amended by Act No. 9829, Dec. 29, 2009>

(5)   The chairperson of the executive recommendation committee shall be elected by the committee members among non-standing directors of the public corporation or quasi-governmental institution, who are also the committee members.

(6)   If there is no non-standing director in a public corporation or a quasi-governmental institution at the time when the executive recommendation committee is established, the committee shall be comprised of outside members appointed by the board of directors, and the chairperson of the committee shall be elected by and among the outside members.

(7)   The executive recommendation committee shall prepare, retain and disclose the minutes containing details of deliberation, resolution, etc. at the meeting: Provided, That the foregoing shall not apply to the cases falling under any of subparagraphs of Article 9 (1) <Newly Inserted by Act No. 14461, Dec. 27, 2016.

15

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(8)    Necessary matters concerning the composition, management, etc. of the executive recommendation committee shall be prescribed by Presidential Decree. <Amended by Act No. 14461, Dec. 27, 2016>

## Article 30 (Criteria of Recommendation of Candidates for Executives)

(1)    The executive recommendation committee shall recommend the people, as candidates for the institution head, who have good knowledge and experience relating to corporate management and business affairs of the public corporation or quasi-governmental institution and competent ability for Chief Executive Officer.

(2)    The executive recommendation committee shall recommend the people, as candidates for directors other than the institution head and an auditor, who have good knowledge, experience, and competent ability necessary for performing their duties as a director or auditor of the public corporation or quasigovernmental institution.

(3)    The executive recommendation committee shall, when recommending candidates for executives, determine executive qualifications reflecting professionality, specialty, etc. of each institution and make recommendations in accordance therewith. In such cases, specific matters required for the preparation of executive qualifications shall be prescribed by the guidelines for management under Article 50. <Newly Inserted by Act No. 14461, Dec. 27, 2016>

(4)    In order to recommend candidates for executives, the executive recommendation committee may invite the general public for the candidacy as prescribed by Presidential Decree. <Amended by Act No. 14461, Dec. 27, 2016>

## Article 31 (Agreement with Institution Head, etc.)

(1)    In relation to the appointment of the institution head under the provisions of Articles 25 (1) and 26 (1), the board of directors shall prepare a draft agreement that contains the specific business goals that the institution head shall achieve during his/her term of office, the performance-based compensation, etc., and shall deliver the draft to the executive recommendation committee. In this case, the incumbent institution head may not participate in the directors' meeting for preparing such a draft agreement.

(2)    The executive recommendation committee shall, upon receiving the draft agreement in accordance with the provisions of paragraph (1), negotiate the terms and conditions of the agreement with the people whom the committee considers recommending as candidates for the institution head, and shall inform the head of the competent agency of the result therefrom. In this case, the executive recommendation committee may revise, amend, or modify the details, terms and conditions of the draft agreement partially, if necessary for negotiation with the candidates for the institution head.

(3)    The head of the competent agency shall execute an agreement with a person who shall be appointed to the institution head in accordance with the draft agreement as negotiated under the provisions of paragraph (2), but an agreement with the head of a public corporation shall be executed after prior consultation with the Minister of Strategy and Finance. In this case, the head of the competent agency may negotiate the terms and conditions of the agreement with the person who shall be appointed to the institution head to agree on the terms and conditions different from those of the draft agreement under the provisions of paragraphs (1) and (2). <Amended by Act No. 8852, Feb. 29,2008>

(4)    The institution head and the head of the competent agency may amend, revise, or modify the details, terms, or conditions of the agreement by negotiations, when unavoidable circumstances occur after the agreement is executed in accordance with the provisions of paragraph (3): Provided, That the head of the competent agency shall consult with the Minister of Strategy and Finance in advance, when he/she intends to agree with the head of a public corporation to amend, revise, or modify the details, terms, or conditions of the agreement. <Amended by Act No. 8852, Feb. 29, 2008>

(5)    The head of the competent agency shall execute the agreement under the provisions of paragraph (3) with the institution head incumbent at the time when the institution is designated as a public corporation or

16

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

quasigovernmental institution (excluding the case of change in designation) under Article 6, within three months after such designation: Provided, That the agreement under the provisions of paragraph (3) shall not be executed, if the remaining term is less than six months.

(6)    The Minister of Strategy and Finance or the head of the competent agency may evaluate the performance of the head of a public corporation or quasi-governmental institution on at least one occasion during his/her term of office based on the reports on the performance of the agreements entered into under paragraph (3) or (4). <Newly Inserted by Act No. 14076, Mar. 22, 2016>

(7)    The institution head may enter into a performance agreement with standing directors of the relevant institution (excluding a standing audit commissioner; hereafter the same shall apply in this paragraph) and evaluate their actual performance and may remove any standing director, if a result of evaluation of the director's actual performance shows poor performance. <Amended by Act No. 9829, Dec. 29, 2009; by Act No. 14076, Mar. 22, 2016>

## Article 32 (Executives' Duties, etc.)

(1)    The institution head shall represent the public corporation or quasi-governmental institution, have overall control over its business affairs, and take the responsibility for the business performance of the public corporation or quasi-governmental institution.

(2)    The institution head shall not represent the public corporation or quasi-governmental institution with respect to a matter in which the public corporation or quasi-governmental institution and he/she have conflicting interests. In such cases, the auditor or the audit committee shall represent the public corporation or quasigovernmental institution instead. <Amended by Act No. 9829, Dec. 29, 2009>

(3)    When the institution head is unable to perform his/her duties due to an unavoidable reason or cause, one of standing directors shall act on behalf of the institution head in accordance with the provisions of the articles of association, while a director prescribed by the articles of association shall act on behalf of the institution head if there is no standing director or if the standing director is unable to act on his/her behalf.

(4)    Directors shall deliberate on the matters brought up to the directors' meeting, and shall participate in resolution.

(5)    The auditor shall audit the business affairs and accounting of the public corporation or quasi-governmental institution in compliance with the audit guidelines prescribed by the Minister of Strategy and Finance, and shall present his/her opinion to the board of directors. In this case, the Board of Audit and Inspection may present its opinion concerning the audit guidelines to the Minister of Strategy and Finance. <Amended by Act No. 8852, Feb. 29, 2008>

(6)    The institution head shall assist, as necessary, the auditor or the audit committee in employment, placement, etc. of employees necessary for performing his/her/its duties. <Amended by Act No. 9829, Dec. 29, 2009>

## Article 33 (Guidelines for Remuneration for Executives)

(1)    The guidelines for remuneration for executives of a public corporation or quasi-governmental institution shall be determined by the board of directors in accordance with the guidelines for remuneration determined by the Minister of Strategy and Finance through the deliberation and resolution of the management committee, considering the following matters: <Amended by Act No. 9277, Dec. 31, 2008; Act No. 9829, Dec. 29, 2009, Act No. 14076, Mar. 22, 2016>

1.    Institution head: The business performance of the public corporation or quasi-governmental institution, the details of the agreements under Article 31 (3) and (4), and the performance level thereof;

2.    Standing directors (excluding standing audit commissioners): Results from the evaluation of actual execution of the performance agreement under Article 31 (7);

17

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

3.  Standing auditors and standing audit commissioners: Results from the evaluation of actual performance of duties under Article 36.

(2)  An interested executive shall not participate in the directors' meeting in which the guidelines for remuneration for executives under the provisions of paragraph (1) are established.

(3)  Notwithstanding the provisions of paragraph (1), the relevant statutes, etc. in force at the time of designation shall apply to the remuneration for the executive for the year in which the institution is designated as a public corporation or quasi-governmental institution under the provisions of Article 6 (excluding the year in which the designation is changed).


### Article 34 (Grounds for Disqualification)

(1)  A person who falls under any of the following subparagraphs shall not be qualified for an executive of a public corporation or quasi-governmental institution: <Amended by Act No. 9277, Dec. 31, 2008; Act No. 9513, Mar. 25, 2009>

1.  A person who falls under any of the subparagraphs of Article 33 (Disqualifications) of the State Public Officials Act;

2.  A person in whose case three years have not passed since he/she was removed from his/her office in accordance with Articles 22 (1), 31 (6), 35 (2) and (3), 36 (2) and 48 (4) and (8).

(2)  An executive shall be automatically discharged, if he/she falls under any subparagraph of paragraph (1) or if it is discovered that he/she has fallen under any subparagraph of paragraph (1) at the time of his/her appointment.

(3)  An act in which an executive discharged under the provisions of paragraph (2) was involved before he/she is discharged shall remain valid and effective.


### Article 35 (Liabilities, etc. of Directors and Auditors)

(1)  The provisions of Articles 382-3 (Directors' Duty to be Faithful), 382-4 (Directors' Duty to Keep Secret), 399 (Liability to Company), 400 (Release of Liability to Company) and 401 (Liability to Third Parties) of the Commercial Act shall apply mutatis mutandis to directors of public corporations and quasigovernmental institutions, while the provisions for release of liability to company in Articles 414 (Liability of Auditor) and 415 (Provisions Applicable Mutatis Mutandis) of the Commercial Act shall apply mutatis mutandis to auditors of public corporations and quasi governmental institutions (including auditors of the audit committee; hereafter the same shall apply in this Article).

(2)  If a non-standing director (excluding a non-standing director of a quasi-governmental institution; hereafter the same shall apply in this paragraph) or auditor (including a standing audit commissioner; hereafter the same shall apply in this paragraph) fails or neglects to perform his/her duties and responsibilities under paragraph (1) and his/her duties under Article 32, the Minister of Strategy and Finance may, following the deliberation and resolution of the management committee, remove the non-standing director or the auditor or suggest the person who has the power to appoint to remove the non-standing director or auditor and may also demand the relevant public corporation or quasi-governmental institution to claim compensation 'for damages. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

(3)  If the institution head, a standing director (excluding a standing audit commissioner; hereafter the same shall apply in this paragraph) or non-standing director of a quasi-governmental institution fails or neglects to perform his/her duties and responsibilities under paragraph (1) and his/her duties under Article 32, the head of the competent agency may remove the institution head, standing director or non-standing director of the quasi-government institution or suggest or demand the person who has the power to appoint to remove the institution head, standing director or non-standing director of the quasi-government institution, and may also demand the relevant public corporation or quasi-governmental institution to claim compensation for

18

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

damage: Provided, That if the head of the competent agency removes the institution head of a public corporation or recommends the person who has the power to appoint to remove the institution head of a public corporation, it shall undergo the deliberation and resolution of the management committee. <Amended by Act No. 9829, Dec. 29, 2009>

## Article 36 (Evaluation of Actual Performance of Duties of Non-Standing Directors and Auditors)

(1)  The Minister of Strategy and Finance may, in cases where it is necessary, evaluate the actual performance of duties of non-standing directors, an auditor, or auditors of the audit committee of a public corporation or quasi-governmental institution. <Amended by Act No. 8852, Feb. 29, 2008>

(2)  The Minister of Strategy and Finance may remove or recommend the person who has the power to appoint to remove a non-standing director, auditor, or auditor of the audit committee after deliberation and resolution by the management committee, if a result from the evaluation of actual performance of duties of the non-standing director, the auditor, or auditor of audit committee under the provisions of paragraph (1) shows poor performance. <Amended by Act No. 8852, Feb. 29, 2008>

(3)  The criteria and method for the evaluation of actual performance of duties under the provisions of paragraph (1) shall be prescribed by the Minister of Strategy and Finance after deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008>

## Article 37 (Prohibition of Executives and Employees from Taking Concurrent Offices)

(1)  Neither standing executives nor employees of a public corporation or quasi-governmental institution may engage in a business other than their duties for the purpose of making a profit.

(2)  If a standing executive of a public corporation or quasi-governmental institution obtains permission from the person who has the power to appoint or recommend him/her or if an employee of a public corporation or quasi-governmental institution obtains permission from the institution head, he/she may take a non-profit office concurrently.

(3)  The scope of the business for profit under the provisions of paragraph (1) shall be prescribed by Presidential Decree.

## SECTION 4 Budget and Accounting

## Article 38 (Fiscal Year)

The fiscal year of public corporations and quasi-governmental institutions shall conform to the State's fiscal year.

## Article 39 (Accounting Principles, etc.)

(1)  The accounting of public corporations and quasi-governmental institutions shall be based on accruals to clearly show business performance and increases, decreases, and changes in assets.

(2)  A public corporation or quasi-governmental institution may place an individual, legal entity, organization, etc. under restrictions on qualification for participating in a bid for a certain period of time not exceeding two years, if it is clearly foreseeable on its judgment that the individual, legal entity, organization, etc. will interfere with fair competition or proper performance of a contract.

(3)  Necessary matters concerning the accounting principles and restrictions on the qualification for bidding under the provisions of paragraphs (1) and (2) shall be prescribed by Ordinance of the Ministry of Strategy and Finance. <Amended by Act No. 8852, Feb. 29, 2008>

## Article 39-2 (Establishment, etc. of Mid-and Long-Term Financial Management Plan)

(1)  The heads of institutions falling under any of the falling subparagraphs shall annually establish mid-and long-term financial management plans-thereinafter referred to as "mid-and long-term financial management

19

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

plan") for five fiscal years or more, including the relevant year, have the plans finalized via the resolution by the board of directors, and submit them to the Minister of Strategy and Finance and the heads of competent administrative agencies by June 30: <Amended by Act No. 12268, Jan. 21, 2014>

1. Public corporations and quasi-governmental institutions with total asset size over two trillion won or those with a clause on government`s compensation for loss in the laws forming the basis of the foundation thereof;

2. Other public corporations and quasi-governmental institutions under the category prescribed by Presidential Decree, in consideration of the size of their asset and liabilities.

(2) The mid-and long-term financial plan shall include the following details:

1. Business goals under Article 46;

2. Business plans and investment directions;

3. Financial outlook, the grounds thereof, and management plans;

4. Liability management plans detailing the outlook for liability increase and/or decrease, the grounds thereof, management plans, etc.;

5. Evaluation and analysis on any change against the mid-and long-term financial management plan of the previous year, causes of changes and management plans, etc.;

6. Other matters prescribed by Presidential Decree.

(3) The Minister of Strategy and Finance may require of the head of the relevant institution that is a public corporation, and the head of the responsible institution may require of the relevant institution that is a quasigovernmental institution, to change the Mid- and Long-Term Financial Management Plan, respectively, considering the national policy directions, management and economic environments concerning the institutions establishing such Mid- and Long-Term Financial Management Plan. <Newly Inserted by Act No. 12268, Jan. 21, 2014>

(4) Matters, such as detailed methods for preparing a mid-and long-term financial management plan shall be prescribed by Presidential Decree. <Amended by Act No. 12268, Jan. 21, 2014>

[This Article Newly Inserted by Act No. 10286, May 17, 2010]

**Article 40 (Budget Compilation)**

(1) The budget of a public corporation or quasi-governmental institution shall be compiled with the separate parts of the general provisions, the estimated income statement, the estimated balance sheet, and the financial plan.

(2) The institution head shall-prepare a budget bill for the next fiscal year in accordance with the business goals under the provisions of Article 46 and the guidelines for management under the provisions of Article 50; and shall submit the bill to the board of directors of the public corporation or quasi-governmental institution no later than the beginning of the next fiscal year.

(3) The institution head shall conduct a preliminary feasibility study as prescribed by Presidential Decree, in order to compile a budget for a new investment project and capital investment: Provided, That such preliminary feasibility study need not be conducted for any of the following projects: : <Newly Inserted by Act No. 14076, Mar. 22, 2016>

1. A project for which the preliminary feasibility study is conducted under Article 38 of the National Finance Act among projects funded by the government budget;

2. A project related to inter-Korean exchanges and cooperation or a project implemented under an agreement or treaty entered into with another country;

20

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

3. A simple improvement and maintenance project implemented to increase the use of an existing facility, such as road maintenance and improvement of deteriorated waterworks;

4. A project that needs to be implemented urgently to support the recovery from a disaster defined under subparagraph 1 of Article 3 of the Framework Act on the Management of Disasters and Safety (hereinafter referred to as "disaster"), or to ensure the safety of facilities and to cope with health or food safety issues;

5. A project that needs to be implemented urgently to prevent a disaster, to which the consent of the competent Standing Committee of the National Assembly has been granted;

6. A project that should be implemented pursuant to the statutes;

7. A project that needs to be implemented as a national policy in order to ensure balanced regional development and to cope with urgent economic and social situations, and that meets both of the following requirements. In such cases, the details of a project exempt from the preliminary feasibility study and the grounds for exemption shall be reported without delay to the competent Standing Committee of the National Assembly:

    (a) A detailed project plan including the purpose, scale and implementation method of the project and other matters shall have been formulated;

    (b) The project shall have been confirmed at the meeting of the State Council because it needs to be implemented as a national policy.

(4) The budget bill prepared and submitted under the provisions of paragraph (2) shall be finally adopted by resolution of the board of directors: Provided, That if other Act requires a separate process in connection with the budget of a public corporation or quasi-governmental institution, such as a resolution by the general meeting of members including the general meeting of shareholders or investors or a resolution by the fund management deliberation council under the provisions of Article 23, the budget shall be finalized through such a process after resolution by the board of directors, while if other Act requires approval of the head of the competent agency for finalizing a budget of a quasi-governmental institution, such approval shall be obtained from the head of the competent agency after resolution by the board of directors. <Amended by Act No. 14076, Mar. 22, 2016>

(5) The budget already finalized at the time of designation as a public corporation or quasi-governmental institution under the provisions of Article 6 shall be deemed to have been prepared and finalized in accordance with the provisions of paragraphs (1) through (4). <Amended by Act No. 14076, Mar. 22, 2016>

(6) The institution head who intends to revise the finalized budget of the public corporation or quasi-governmental institution because of a change in business goals of the public corporation or quasi-governmental institution or any other unavoidable circumstances shall prepare and submit a bill of revised budget to the board of directors. In this case, paragraph (4) shall apply mutatis mutandis to the finalization of the bill of revised budget. <Amended by Act No. 14076, Mar. 22, 2016>

(7) When the budget is finalized or revised under the provisions of paragraphs (4) through (6), the public corporation or quasi-governmental institution shall report the details to the Minister of Strategy and Finance, the head of the competent agency, and the Chairperson of the Board of Audit and Inspection: Provided, That it shall be deemed to have been reported to the head of the competent agency, where approval under the proviso to paragraph (4) has been obtained from the head of the competent agency. <Amended by Act No. 14076, Mar. 22, 2016>

**Article 41 (Quasi-Budget)**

(1) If a public corporation or quasi-governmental institution fails to finalize its budget before the beginning of a fiscal year due to a natural disaster or any other inevitable cause or event, the public corporation or quasigovernmental institution may compile and manage a budget based on the budget for the preceding fiscal year (hereafter referred to as the "quasi-budget" in this Article).

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(2)    The quasi-budget shall become ineffective when the budget for the fiscal year is finally established. In this case, the budget already executed under the quasi-budget shall be deemed to have been executed under the budget for the corresponding fiscal year.

**Article 42 (Establishment of Management Plan)**

(1)    When the budget is finally established under the provisions of Article 40 (4) and (5), the public corporation or quasi-governmental institution shall establish a management plan, without delay, in accordance with the budget for the corresponding fiscal year after resolution by the board of directors: Provided, That the management plan already established at the time of designation as a public corporation or quasi-governmental institution in accordance with Article 6 shall be deemed to have been established under this Act. <Amended by Act No. 14076, Mar. 22, 2016>

(2)    When a public corporation or quasi-governmental institution revises the budget established in accordance with the provisions of Article 40 (6) it shall revise the management plan established in accordance with the provisions of paragraph (1), without delay, after resolution by the board of directors. <Amended by Act No. 14076, Mar. 22, 2016>

(3)    A public corporation or quasi-governmental institution shall submit the management plan established for the corresponding fiscal year under the provisions of paragraphs (1) and (2) to the Minister of Strategy and Finance (only in the cases of public corporations) and the head of the competent agency within two months after the budget is finalized in accordance with the provisions of Article 40 (4) through (6). <Amended by Act No. 8852, Feb. 29, 2008, Act No. 14076, Mar. 22, 2016>

**Article 43 (Submission of Statements on Settlement of Accounts)**

(1)    Every public corporation and quasi-governmental institution shall prepare the statements on the settlement of accounts for the corresponding fiscal year, without delay, at the end of the fiscal year, and shall take an accounting audit conducted by an accounting auditor (hereinafter referred to as "accounting auditor") appointed from among persons falling under any of the following subparagraphs. In such cases, every public corporation and quasi-governmental institution shall submit the statements on settlement of accounts within the period prescribed by the Rules of the Board of Audit and Inspection: <Amended by Act No. 9513, Mar. 25, 2009>

1.    An accounting firm (hereinafter referred to as "accounting firm") under Article 23 the Certified Public Accountant Act;

2.    An audit team (hereinafter referred to as "audit team") under Article 3 (1) 3 under the Act on External Audit of Stock Companies.

(2)    Each public corporation and quasi-governmental institution shall, respectively to the Minister of Strategy and Finance and the head of the competent agency, submit each of the following statements on the settlement of accounts prepared according to paragraph (1) no later than the last day of February of the following year and finalize the settlement of accounts by obtaining approval no later than the last day of March: Provided, That the settlement of accounts shall be finally approved by the general meeting of members, if the public corporation or quasi-governmental institution has the general meeting of members, such as the general meeting of shareholders or investors: <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9513, Mar. 25, 2009; Act No. 9829, Dec. 29, 2009>

1.    Financial statements (including the auditor's opinion by an accounting auditor) and accompanying documents;

2.    Other documents necessary for clarifying the details of the settlement of accounts.

(3)    The Minister of Strategy and Finance and the head of the competent agency shall submit, to the Board of Audit and Inspection, the statements on the settlement of accounts of the public corporation or quasigovernmental institution as finalized in accordance with paragraph (2) and other necessary documents

22

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(hereafter referred to as "statements, etc. on the settlement of accounts" in this Article) no later than May 10 every year. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

(4)  The Board of Audit and Inspection shall, upon receiving the statements, etc. on the settlement of accounts under paragraph (3), inspect the statements, etc. on the settlement of accounts submitted by the legal entities under Article 22 (1) 3 of the Board of Audit and Inspection Act and other public corporations and quasigovernmental institutions as specified by the Rule of the Board of Audit and Inspection, and shall submit the results thereof to the Minister of Strategy and Finance by no later than July 31. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

(5)  Necessary matters concerning the criteria for selection of an accounting firm and audit team qualified for accounting audits under paragraph (1), the procedures of accounting audits, and the audit by the Board of Audit and Inspection for the settlement of accounts under paragraph (4) shall be prescribed by the Rule of the Board of Audit and Inspection. <Amended by Act No. 9513, Mar. 25, 2009>

(6)  The Minister of Strategy and Finance shall report to the State Council the statements, etc. on the settlement of accounts under paragraph (3) along with the results of the audit conducted by the Board of Audit and Inspection under paragraph (4), and shall also submit them to the National Assembly by no later than August 20. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

(7)  Notwithstanding the provisions of paragraphs (1) through (6), the settlement of accounts for the year in which a public corporation or a quasi-governmental institution is designated under the provisions of Article 6 shall be governed by the statues in force at the time of such designation.

## Article 43-2 (Consultation on Transferring Capital of Public Corporation, etc.)

(1)  Where a public corporation intends to transfer the profit reserve, the accumulated fund for business expansion, other reserves or accumulated funds into the capital, it shall consult with the Minister of Strategy and Finance in advance before passing the relevant procedure such as the board of directors, a general meeting of stockholders, etc.

(2)  Where a public corporation has transferred the profit reserve, the accumulated fund for business expansion, other reserves or accumulated funds into the capital, it shall report the fact to the head of the competent agency.

[This Article Newly Inserted by Act No. 10896, Jul. 25, 2011]

[The Pre-existing Article 43-2 Moved to Article 43-3, Jul 25, 2011]

## Article 43-3 (Appointment, etc. of Accounting Auditors)

(1)  Any public corporation or quasi-governmental institution shall establish and operate an appointment committee for accounting auditors with its specialty and independence guaranteed (if an audit committee under Article 20 is established, it shall be deemed the appointment committee for accounting auditors) to appoint the accounting auditors. In such cases, all non-standing directors of the relevant public corporation or quasi-governmental institution shall be appointed as the members of the appointment committee for accounting auditors.

(2)  Matters concerning the composition and operation of the appointment committee for accounting auditors under paragraph (1) shall be prescribed, by Presidential Decree.

(3)  Articles 3 (3) through (5) and (7), 4 (7) and 9.(1) of the Act on External Audit of Stock Companies shall apply mutatis mutandis to grounds for disqualification, qualifications, appointment, powers, etc. of accounting auditors. In such cases, an "auditor," a "company" and the "auditor selection and appointment commission" shall be deemed an "accounting auditor," a "public corporation or quasi-governmental institution" and the "appointment committee for accounting auditors," respectively.

23

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(4)   Any accounting auditor and a certified public accountant, employee and other person under his/her control shall not disclose any confidential information acquired in the course of performing his/her duties concerning the accounting audits of a public corporation or quasi-governmental institutions: Provided, That this shall not apply to cases where special provisions exist pursuant to other Acts or the Rules of the Board of Audit and Inspection under Article 43 (5). <Amended by Act No. 10896, Jul. 25, 2011>

[This Article Newly Inserted by Act No. 9513, Mar. 25, 2009]

[This Article Moved from Article 43-2. The Pre-existing Article 43-3 Moved to Article 43-4, Jul. 25, 2011]

### Article 43-4 (Liability for Damage)

Article 17 (1) through (5) and (7) of the Act on External Audit of Stock Companies shall apply mutatis mutandis to liability of an accounting auditor, director, auditor, member of the audit committee or other person for damage to a public corporation, quasi-governmental institution or a third party. In such cases, an "auditor," a "company" and "Article 4" shall be deemed an "accounting auditor," a "public corporation or quasigovernmental institution" and "Article 43," respectively.

[This Article Newly Inserted by Act 9513, Mar. 25, 2009]

[This Article Moved from Article 43-3, Jul. 25, 2011]

### Article 44 (Commission of Purchasing Goods and Contracting Construction Works)

(1)   Where any public corporation or quasi-governmental institution intends to purchase competing products among small and medium enterprises under Article 6 of the Act on Facilitation of Purchase of Small and Medium Enterprise-Manufactured Products and Support for Development of their Markets for not less than the amount announced by the Minister of Strategy and Finance pursuant to Article 4 (1) of the Act on Contracts to which the State is a Party, the public corporation or quasi-governmental institution shall commission the purchase thereof to the Administrator of the Public Procurement Service or purchase them according to contracting methods under Article 5 of the Government Procurement Act: Provided, That this shall not apply to cases prescribed by Ordinance of the Ministry of Strategy and Finance considering the uniqueness, specialty, safety and other aspects of a product to be purchased. <Newly Inserted by Act No. 9829, Dec. 29, 2009>

(2)   A public corporation or quasi-governmental institution may commission the Administrator of the Public Procurement Service to purchase goods in demand or execute a contract for construction works, if considered necessary. <Amended by Act No. 9829, Dec. 29, 2009>

### Article 45 (Investment Method)

When the Government invests the capital in a public corporation or quasi-governmental institution, the Minister of Strategy and Finance shall decide on the period and method for such investment to implement it accordingly. <Amended by Act No. 8852, Feb. 29, 2008>

### SECTION 5 Evaluation and Supervision of Management

### Article 46 (Establishment of Management Goals)

(1)   The institution head shall set up medium and long-term management goals for not less than five fiscal years including the following year, considering the substance of business, the management environment, and the details, etc. of the agreements executed under the provisions of Article 31 (3) and (4), and shall submit them to the Minister of Strategy and Finance and the head of the competent agency by no later than October 31

24

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

every year after finalizing them through resolution by the board of directors. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 10286, May 17, 2010>

(2)    Notwithstanding the provisions of paragraph (1), with respect to the year in which the institution is designated as a public corporation or quasi-governmental institution (excluding a change in designation) under the provisions of Article 6, the institution head shall set up medium and long-term management goals for not less than three fiscal years including the corresponding year within three months after such designation, and shall submit them to the Minister of Strategy and Finance and the head of the competent agency after finalizing them through resolution by the board of directors. <Amended by Act No. 8852, Feb. 29, 2008>

(3)    Whenever the management goals set up under paragraphs (1) and (2) are changed, the head of institutions shall submit the details of the change to the Minister of Strategy and Finance and the head of the competent agency immediately after finalizing them through resolution by the board of directors. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 10286, May 17, 2010>

(4)    Considering the management environment, the economic situation, the direction of national policies, etc. of a public corporation or quasi-governmental institution, the Minister of Strategy and Finance may demand the head of a public corporation to change business goals, while the head of the competent agency may demand such a change to the head of a quasi-governmental institution. <Amended by Act No. 8852, Feb. 29, 2008>

### Article 47 (Report on Management Performance, etc.)

(1)    Every public corporation and quasi-governmental institution shall prepare a report describing the management performance for the preceding year (hereinafter referred to as the "management performance report") and a report on performance of the agreement executed by the institution head in accordance with the provisions of Article 31 (3) and (4), and shall submit them to the Minister of Strategy and Finance and the head of the competent agency by no later than March 20 each year. <Amended by Act No. 8852, Feb. 29, 2008>

(2)    The provisions of paragraph (1) shall not be applicable to the year in which the institution is designated as a public corporation or quasi-governmental institution under the provisions of Article 6 (excluding a change in designation).

(3)    The management performance report shall be accompanied by the statements on the settlement of accounts prepared according to Article 43 (1). <Amended by Act No. 9829, Dec. 29, 2009>

### Article 48 (Management Performance Evaluation)

(1)    The Minister of Strategy and Finance shall evaluate the management performance of a public corporation or quasi-governmental institution based on the report on the performance of the agreement under the provisions of Article 31 (3) and (4), the management goals under the provisions of Article 46 and the management performance report: Provided, That such management performance evaluation shall not be made in the year during which the institution is designated as a public corporation or quasi-governmental institution under the provisions of Article 6 (excluding a change in designation). <Amended by Act No. 8852, Feb. 29, 2008>

(2)    In making the management performance evaluation of a public corporation or quasi- governmental institution under the provisions of main sentence of paragraph (1), the Minister of Strategy and Finance shall utilize the results from the evaluations already made for the institutions subject to the evaluation of fund management under the provisions of Article 82 (Evaluation of Fund Management) of the National Finance Act and the institutions subject to the evaluation under Article 32 (Fostering Government-Invested Research Institutes, etc.) (3) of the Framework Act on Science and Technology. <Amended by Act No. 8852, Feb. 29, 2008, May 28, 2014>

25

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(3)   The Minister of Strategy and Finance may request a public corporation or quasi-governmental institution to submit relevant data, if necessary for the management performance evaluation under paragraph (1). <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277, Dec. 31, 2008>

(4)   In cases where a public corporation or quasi-government institution has failed to submit a report on the execution of an agreement under Article 31 (3) and (4), a management performance report and their attached documents or prepare and submit them falsely, the Minister of Strategy and Finance shall modify the result of management performance evaluation and the piece rate through the deliberation and resolution of the management committee, or take measures, such as caution, warning or such to the relevant institution, or request the head of the competent agency or institution head to take personnel measures for the related persons. In such cases, if the auditor or the audits of the audit committee has failed or neglected to perform the related duties, the Minister of Strategy and Finance may dismiss the relevant auditor or audits of the audit committee through the deliberation and resolution of the management committee or memorialize a person who has the power to appoint the institution head and standing directors to dismiss him/her. <Newly Inserted by Act No. 9277, Dec. 31, 2008>

(5)   Criteria and methods for the evaluation of management performance under paragraph (1) shall be prescribed by the Minister of Strategy and Finance through deliberation and resolution by the management committee, in such a manner that the following matters shall be included in the evaluation of a public corporation or quasi-governmental institution: <Amended by Act No. 14076, Mar. 22, 2016>

   1.   The rationality and achievement level of management goals;

   2.   The public nature and efficiency of major projects;

   3.   The adequacy of organizational and personnel management, including types of employment of employees;

   4.   Soundness in financial management and budget-saving efforts, including the implementation of the mid- and long-term financial management plan formulated under Article 39-2;

   5.   Results of the customer satisfaction survey conducted under Article 13 (2);

   6.   Operation of a rational performance-based payment system;

   7.   Other matters related to the management of the public corporation or quasi-governmental institution.

(6)   The Minister of Strategy and Finance may organize and operate a management evaluation team for public corporations and quasi-governmental institutions (hereinafter referred to as "management evaluation team") to ensure the efficient execution of management performance evaluation under paragraph (1) and to provide professional and technical research or consultation concerning management performance evaluation. <Newly Inserted by Act No. 9513, Mar. 25, 2009>

(7)   The Minister of Strategy and Finance shall finish the evaluation of the management performance of public corporations and quasi-governmental institutions by no later than June 20 each year, and shall report the results therefrom to the National Assembly and the President after deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277 Dec. 31, 2008; Act No. 9513 Mar. 25, 2009>

(8)   The Minister of Strategy and Finance may recommend or request the person who has the power to appoint the institution head and standing directors of a public corporation or a quasi-governmental institution to remove the institution head or the standing directors under the provisions of Articles 25 and 26 after deliberation and resolution by the management committee, if the results from the business performance evaluation under paragraph (7) show poor performance of the public corporation or quasi-governmental institution. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277, Dec. 31, 2008; Act No. 9513, Mar. 25, 2009>

(9)   The Minister of Strategy and Finance may request a public corporation or quasi-government institution which has caused the insolvent management due to the excessive appropriation of personnel expenses as a

26

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

result of the management performance evaluation under paragraph (1) and the violation of guidelines of operation under Article 50 (1) to take personnel or budgetary measures for securing of the responsibility for future management and improvement in management through the deliberation and resolution of the management committee. <Newly Inserted by Act No. 9277, Dec. 31, 2008; Act No. 9513 Mar. 25, 2009>

(10)  Necessary matters concerning the procedure for the management performance evaluation, the measures following the results from the management performance evaluation under paragraph (1), and composition, operation, etc. of the management evaluation team shall be prescribed by Presidential Decree. <Amended by Act No. 9277, Dec. 31, 2008; Act No. 9513, Mar. 25, 2009>

### Article 49 (Preparation of Annual Report)

The Minister of Strategy and Finance may prepare and publish an annual report concerning the business status, etc. of public corporations and quasi-governmental institutions every year, based on the management performance reports and the results from the management performance evaluation under the provisions of Article 48. <Amended by Act No. 8852, Feb. 29, 2008>

### Article 50 (Guidelines for Management)

(1)  The Minister of Strategy and Finance shall establish the guidelines for the following matters in connection with the daily affairs relating to the administration of public corporations and quasi-governmental institutions (hereinafter referred to: as the "management guidelines") after deliberation and resolution by the management committee, and shall notify the guidelines to the heads of public corporations, quasigovernmental institutions and competent agencies: <Amended by Act No. 8852, Feb. 29, 2008>

    1.  Matters concerning the administration of organization and the prescribed number and management of personnel;

    2.  Matters concerning the budget and the fund administration;

    3.  Other matters that the Minister of Strategy and Finance considers necessary for securing the financial soundness of public corporations and quasi-governmental institutions.

(2)  If necessary for transparent and fair personnel management, ethical management, etc. of public corporations and quasi-governmental institutions, the head of a relevant administrative agency accountable for the related policy may present the Minister of Strategy and Finance his/her opinion about the management guidelines under the provisions of paragraph (1). <Amended by Act No. 8852, Feb. 29, 2008>

### Article 51 (Supervision over Public Corporations and Quasi-Governmental Institutions)

(1)  The Minister of Strategy and Finance and the head of the competent agency shall limit their supervision over public corporations and quasi-governmental institutions to the matters and the extent specifically prescribed in this Act or other statute to ensure that self-controlling management of public corporations and quasi-governmental institutions is not undermined. <Amended by Act No. 8852, Feb. 29, 2008>

(2)  The Minister of Strategy and Finance shall supervise the matters concerning the compliance with the management guidelines for public corporations. <Amended by Act No. 8852, Feb. 29, 2008>

(3)  The head of the competent agency shall supervise the following matters of public corporations and quasigovernmental institutions:

    1.  Matters concerning proper execution of the business commissioned by the head of the competent agency to public corporations and quasi-governmental institutions under relevant statutes or the business directly related to their assigned business affairs and other matters prescribed by related statutes;

27

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

2.   Matters concerning the compliance with the' management guidelines for quasi-governmental institutions.

(4)   The Minister of Strategy and Finance and the head of the competent agency shall monitor whether the supervision under the provisions of paragraphs (2) and (3) is properly executed, as prescribed by Presidential Decree, and shall take measures necessary for improvement, after deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008>

### Article 51-2 (Consultations on Establishment, etc. of Funding or Investment Institutions)

(1)   Where a public corporation or quasi-governmental institution intends to establish a funding or investment institution or to fund or invest in other corporations, it shall hold a prior consultation with the head of the competent institution and the Minister of Strategy and Finance: Provided, That, where the public corporation or quasi-governmental institution has already followed the formalities equivalent to a prior consultation, or a public institution dealing with finance makes an investment, in specific cases prescribed by Presidential Decree, it need not hold a prior consultation.

(2)   Matters necessary for the prior consultation under paragraph (1) and other matters shall be prescribed by Presidential Decree. <Newly Inserted by Act No. 14076, Mar. 22, 2016>

### Article 52 (Audit by Board of Audit and Inspection)

(1)   The Board of Audit and Inspection may audit the business affairs and accounting of public corporations and quasi-governmental institutions in accordance with the Board of Audit and Inspection Act.

(2)   The Board of Audit and Inspection may commission or delegate the audit under the provisions of paragraph (1) to the head of a related administrative agency, etc.

(3)   Necessary matters concerning the scope of the heads of related administrative agencies, etc. to whom the Board of Audit and Inspection may commission or delegate the audit of public corporations and quasigovernmental institutions under the provisions of paragraph (2), the report on the results of the audit, the actions following the results, etc. shall be prescribed by the Rule of the Board of Audit and Inspection.

### Article 52-2 (Presentation of Audit Result to National Assembly)

(1)   A public corporation or a quasi-government institution shall present matters falling under the following subparagraphs to the competent standing committee of the National Assembly without delay:

1.   An audit report having synthesized the audit result executed by the auditor or the audit committee;

2.   Matters pointed out and matters requesting disposition in the audit executed by the Board of Audit and Inspection pursuant to Article 52 and a plan of measures for them.

(2)   The Minister of Strategy and Finance shall present the result of evaluation of the actual performance of duties of the auditor or the audits of the audit committee executed pursuant to Article 36 (1) to the National Assembly without delay."

[This Article Newly Inserted by Act No. 9277, Dec. 31, 2008]

## CHAPTER V SUPPLEMENTARY PROVISIONS

### Article 53 (Legal Fiction of Public Officials in Application of Penal Provisions)

A person who serves as an executive officer or employee of a public institution, a member of the management committee, or member of the executive recommendation committee, who is not a public official, shall be deemed a public official in application of Articles 129 through 132 of the Criminal Act. <Amended by Act No. 14076, Mar. 22, 2016>

28

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Article 53-2 (Notification by Investigation Agencies, etc. Upon Commencement and Completion of Investigations**

Upon commencing or completing an inquiry or investigation into a case related to the duties of an executive officer or employee of a public institution, the Board of Audit and Inspection of Korea, the Prosecutors' Office, the Korea National Police Agency, or any other investigation agency shall notify the head of the public institution of the relevant facts and results of the inquiry or investigation within 10 days. <Newly Inserted by Act No. 14076, Mar. 22, 2016>

**Article 53-3 (Restrictions on Voluntary Dismissal from Office)**

A person authorized to appoint or recommend executives officers of a public institution may elect to disapprove the voluntary dismissal of an executive officer who has applied for voluntary dismissal from office, if the executive officer is being investigated by the Prosecutors' Office, the Police Agency, or any other investigation agency, or audited by the Board of Audit and Inspection or any other audit agency in relation to his/her misconduct, or if a request has been made to the disciplinary committee of the public institution concerned to pass a resolution on a severe disciplinary action against the executive officer. <Newly Inserted by Act No. 14076, Mar. 22, 2016>

**Article 54 (Exercise, etc. of Minority Stockholders' Rights)**

Article 542-6 of the Commercial Act shall apply mutatis mutandis to the exercise of minority stockholder's rights in and a stockholder's proposal to public corporations and quasi-governmental institutions, stocks of which have not been listed in the securities exchange prescribed by the Presidential Decree. <Amended by Act No. 11845, May 28, 2013>

[This Article Wholly Amended by Act No. 9829, Dec. 29, 2009]

## CHAPTER VI PENAL PROVISIONS

**Article 55 (Penal Provisions)**

(1) If any accounting auditor, certified public accountant under an accounting auditor's control, auditor or member of the appointment committee for accounting auditors (referring to an audit commissioner if an audit committee is established) receives, requests for or promises money, valuables or gains after having received an illegal solicitation in respect of his/her duty, he/she shall be punished by imprisonment for not more than three years or by a fine not exceeding ten million won: Provided, That each of the aforesaid persons shall be punished by a fine not exceeding the amount equivalent to five times the economic gains acquired in respect of the duty in question, if five times the amount of the economic gains acquired in respect of the duty in question exceeds three million won in cases of imposition of a fine.

(2) Any person who promises, provides or indicates his/her intention to provide money, valuables or gains prescribed under paragraph (1) shall be also subject to paragraph (1).

(3) Money, valuables or gains prescribed under" paragraphs (1) and (2) shall be confiscated. Where all or any of the money, valuables or gains cannot be confiscated, the equivalent value shall be additionally collected.

[This Article Newly Inserted by Act No. 9513, Mar. 25, 2009]

**Article 56 (Penal Provisions)**

(1) Where any person under Article 635 (1) of the Commercial Act or any other person who is in charge of accounting of a public corporation or quasi-governmental institution prepares and announces a false financial statement, in violation of the accounting principles under Article 39 (1), shall be punished by imprisonment for not more than five years or by a fine not exceeding five million won.

29

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(2) Where any person under Article 635 (1) of the Commercial Act or any other person who is in charge of accounting of a public corporation or quasi-governmental institution or who is an accounting auditor or certified public accountant under his/her control performs any of the following acts, such person shall be punished by imprisonment for not more than three years or by a fine not exceeding 30 million won: <Amended by Act No. 10896, Jul. 25, 2011>

   1.   Where he/she fails to appoint an accounting auditor without justifiable grounds;

   2.   Where he/she omits to make an entry of any matter to be entered in the auditor' s opinion or makes any false entry;

   3.   Where he/she divulges confidential information, in violation of Article 43-3 (4);

   4.   Where he/she fails to prepare the statements on the settlement of accounts.

(3) Where any person under Article 635 (1) of the Commercial Act or any other person who is in charge of accounting of a public corporation or quasi-governmental institution or who is an accounting auditor or certified public accountant under his/her control performs any of the following acts, such person shall be punished by imprisonment for not more than two years or by a fine not exceeding 20 million won: <Amended by Act No. 10896, Jul. 25, 2011>

   1.   Where he/she presents false data to an accounting auditor or certified public accountant under his/her control or interferes with an accounting auditor in conducting a normal accounting audit by false or other illegal means;

   2.   Where he/she refuses, interferes with or challenges an accounting auditor' s requests for inspection, reproduction, submission, etc. of data or investigation under Article 43-3 (3) or fails to submit relevant data, without justifiable grounds;

   3.   Where he/she fails to submit the statements on the settlement of account to an accounting auditor, in violation of Article 43 (1).

   [This Article Newly Inserted by Act No. 9513, Mar. 25, 2009]


ADDENDA

Article 1 (Enforcement Date)

   This Act shall enter into force on April 1, 2007: Provided, That necessary actions for the composition of the management committee under the provisions of Article 9 and the designation of public corporations, quasigovernmental institutions, and non-classified public institutions to whom this Act shall apply for the first time after this Act enters into force may be done even before the enforcement of this Act.


Article 2 (Repeal of other Acts)

   The following Acts shall be repealed respectively:

   1.   The Framework Act on the Management of Government-Invested Institutions;

   2.   The Framework Act on the Management of Government-Affiliated Institutions.


Article 3 (Initial Designation and Classification of Public Institutions, etc.)

(1) The Minister of Planning and Budget shall designate the public corporations, quasi- governmental institutions, and non-classified public institutions to whom this Act shall apply, after consultation with the heads of the competent agencies and deliberation and resolution by the management committee, simultaneously with the enforcement of this Act, and shall publicly notify such designation.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(2)    In designating the public corporations and quasi-governmental institutions initially and publicly notifying such designation under the provisions of paragraph (1), the Minister of Planning and Budget shall designate the institutions whose prescribed number of personal is not less than 50 employees among the institutions subject to application of the Framework Act on the Management of Government-Invested Institutions, the Framework Act on the Management of Government-Affiliated Institutions, and the Act on the Improvement of Managerial Structure and Privatization of Public Enterprises at the time when this Act enters into force.

Article 4 (Transitional Measures)

(1)    Notwithstanding the provisions of Article 9 (2), the members of the management committee initially commissioned under the provisions of Article 9 (1) 4 may be given different terms of office for three years, two years, and one year respectively.

(2)    Notwithstanding the provisions of Article 31 (5), the agreement on management and performance already executed by the head of an institution designated as a public corporation or quasi-governmental institution for the first time after the enforcement of this Act in connection of his/her appointment at the time when he/she was appointed to the office shall be deemed to be the agreement entered into between the head of the competent agency and the institution head under this Act.

(3)    Notwithstanding the provisions of Article 46 (2), the management goals set up at the time of the enforcement of this Act by a public corporation or quasi-governmental institution designated for the first time after enforcement of this Act shall be deemed to have been set up in accordance with this Act.

(4)    Notwithstanding the proviso to Article 48 (1), the relevant provisions of the Framework Act on the Management of Government-Invested Institutions and the Framework Act on the Management of Government-Affiliated Institutions shall apply to the evaluation of the report and the evaluation of management performance of a public corporation' or quasi-governmental institution designated for the first time after the enforcement of this Act.

(5)    The matters resolved by the former committee for management of government-invested institutions and the former committee for management of government-affiliated institutions existing at the time of enforcement of this Act shall be deemed to have been resolved by the management committee under this Act.

Article 5 (Relations to other Acts and Subordinate Statutes)

In cases where any other Acts and subordinate statutes enforceable at the time when this Act enters into force have cited a government-invested or government-affiliated institution, it shall be deemed, until December 31, 2009, to have cited an institution identified as a government-invested or government affiliated institution under the Framework Act on the Management of Government-Invested Institutions or the Framework Act on the Management of Government-Affiliated Institutions enforceable at the time when this Act enters into force. <Amended by Act No. 9345, Jan. 30, 2009>

ADDENDA <Act No. 8635, Aug. 3, 2007>

Article 1 (Enforcement Date)

This Act shall enter into force one year and six months after the date of its promulgation. (Proviso Omitted.)

Articles 2 through 44 Omitted.

ADDENDUM <Act No. 8696, Dec. 14, 2007>

This Act shall enter into force on the date of its promulgation.

ADDENDA <Act No. 8852, Feb. 29, 2008> Article 1 (Enforcement Date)

This Act shall enter into force on the date of its promulgation. (Proviso Omitted.)

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

Articles 2 through 7 Omitted.

ADDENDUM <Act No. 9277, Dec. 31, 2008>

This Act shall enter into force three months after the date of its promulgation.

ADDENDUM <Act No. 9345, Jan. 30, 2009>

This Act shall enter into force on the date of its promulgation.

ADDENDA <Act No 9513, Mar. 25, 2009>

(1)    (Enforcement Date) This Act shall enter into force on January 1, 2010: Provided, That the amended provisions (limited to the parts amended under this Act) of Articles 25, 34 and 48 of the amended ACT ON THE MANAGEMENT OF PUBLIC INSTITUIONS (Act No. 9277) shall enter into force three months after the date of its promulgation.

(2)    (Applicability concerning Accounting Audits, Appointment of Accounting Auditors, Accounting Auditor' s Liability for Damage) The amended provisions of Articles 43, 43-2 and 43-3 shall apply beginning with the settlement of accounts for the fiscal year of 2010.

(3)    (Applicability concerning Composition and Operation of Management Evaluation Team) The amended provisions (limited to the parts amended under this Act) of Article 48 of the amended ACT ON THE MANAGEMENT OF PUBLIC INSTITUIONS (Act No. 9277) shall apply beginning with the first evaluation of management performance conducted after this Act enters into force.

ADDENDA <Act No. 9829, Dec. 29, 2009>

(1)    (Enforcement Date) This Act shall enter into force on the date of its promulgation: Provided, That the amended provisions of Articles 24, 26 (3) and 44 shall enter into force three months after the date of its promulgation.

(2)    (Applicability concerning Submission of Statements on Settlement of Accounts) The amended provisions of Article 43 shall apply beginning with the settlement of accounts for the fiscal year of 2010.

(3)    (Applicability concerning Appointment and Removal of Executives) Where the procedure of appointing and removing the executives of a public corporation and quasi-governmental institution is in progress at the time this Act enters into force, the, former provisions shall govern, notwithstanding the amended provisions of Articles 25 and 26.

ADDENDA <Act No. 10286, May 17, 2010>

(1)    (Enforcement Date) This Act shall enter into force on the date of its promulgation.

(2)    (Applicability concerning Mid-and Long-term Financial Management Plan) The amended provisions of Articles 39-2 and 46 shall apply beginning with mid-and long-term financial management plans and mid and long-term business goals to be established in 2012.

ADDENDA <Act No. 10896, Jul. 25, 2011>

This Act shall enter into force on the date of its promulgation.

ADDENDA <Act No. 12673, May 28, 2014>

Article 1 (Enforcement Date)

This Act shall enter into force on the date of its promulgation.

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Articles 2 through 3 Omitted.

Articles 4 (Amendment of other Act) <Act No. 12673, May 28, 2014> (The Framework Act on Science and Technology)

Article 1 (Effective Date)

This Act shall take effect on the date of its promulgation. <Proviso omitted>

Articles 2 and 3 omitted

Article 4 (Amendment of Other Acts)

(1)    The ACT ON THE MANAGEMENT OF PUBLIC INSTITUIONS is partially amended as follows.

   "under the provisions of Article 32 (Fostering Government-Invested Research Institutes, etc.) (2) of the Framework Act on Science and Technology" in Article 48(2) shall be changed to "under Article 32 (Fostering Government-Invested Research Institutes, etc.) (3) of the Framework Act on Science and Technology"

(2)    through (5) omitted

ADDENDA <Act No. 14076, Mar. 22, 2016>

   This Act shall enter into force six months after the date of its promulgation.

ADDENDA <Act No. 14461, Dec. 27, 2016>

   This Act shall enter into force six months after the date of its promulgation.

33

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Exhibit 15.4

### ENFORCEMENT DECREE OF THE ACT ON THE MANAGEMENT OF PUBLIC INSTITUIONS

Enforced on Oct. 15, 2011
Amended by Presidential Decree No. 23221, Oct. 14, 2011
Presidential Decree No. 11690, Mar. 23, 2013
Presidential Decree No. 24780, Oct. 2, 2013
Presidential Decree No. 25279, Mar. 24, 2014
Presidential Decree No. 25532, Aug. 6, 2014
Presidential Decree No. 25751, Nov. 19, 2014
Presidential Decree No. 27073, Mar. 31, 2016
Presidential Decree No. 27505, Sep. 22, 2016
Presidential Decree No. 28211, Jul. 26, 2017
Presidential Decree No. 28232, Aug. 9, 2017

### Article 1 (Purpose)

The purpose of this Decree is to provide for the matters delegated by the Act on the Management of Public Institutions and the matters necessary for the enforcement thereof.

### Article 2 (Amount of Total Revenue)

The term "amount of total revenue" in Articles 4 (1) 2 and Article 5 (2) and (3) 1 (a) of the Act on the Management of Public Institutions (hereinafter referred to as the "Act") means an amount calculated in accordance with the attached Table 1, excluding the amount of obligations to pay in the future from the revenue acquired by the institution as earnings from its business or granted as an aid by the State, a local government, a private sector, etc. and the derivative revenue yielded from such revenue.

### Article 3 (Amount of Government Aid)

The term "amount of the Government grants" in Article 4 (1) 2 of the Act means the aggregate of the following amounts out of the amount of total revenue:

1. The amount of revenue transferred from the Government including contributions and subsidies, and the amount of revenue transferred from a private sector, etc. in compliance with a mandatory provision of a statute including charges under the Framework Act on the Management of Charges;

2. The amount of revenue earned from a business specified by a statute as a business of the institution or commissioned on the ground prescribed for such commission by a statute or the amount of revenue earned from an monopoly provided for by a statute or granted on the ground prescribed by a statute. In this case, the amount of revenue means all revenues earned from a commissioned business or monopoly including fee, admission fee, use charge, insurance premium, contribution, charge, etc. in whatsoever name; and

3. The amount of derivative revenue yielded from the management of the revenues specified in subparagraphs 1 and 2.

### Article 4 (Criterion of Securing Practical Control)

The term "secure practical control over" in Article 4 (1) 3 through 5 of the Act means one of the following cases:

1. Where it is possible, because of the largest shares in possession, to control the institution by the exercise of shareholder rights in the light of the diversification of shares;

1

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

2. Where involvement in appointment (including approval and recommendation) of the head of the institution or a majority of members of its board of directors is secured by a statute or the articles of incorporation; or

3. Where an authority to approve the budget or business plan of the institution is secured by a statute or the articles of incorporation.

**Article 5 (Self-Generating Revenue)**

The term "self-generating revenue" in Article 5 (2) and (3) 1 (a) of the Act means the aggregate of the following revenues, excluding the amount falling under subparagraph 1 of Article 3 from calculation of the following revenues:

1. Revenue from the business for its original purpose: The amount of revenue directly generated from the business specified in the Act that provides for the ground for the establishment of the institution or its articles of incorporation, as calculated in accordance with the attached Table 2;

2. Revenue from other business: The amount of revenue generated from the business not specified in the Act that provides for the ground for the establishment of the institution or its articles of incorporation, as calculated in accordance with the attached Table 2; and

3. Revenue from any sources other than business: The amount of incidental revenue accrued derivatively from the business specified in subparagraphs 1 and 2 such as interest income accrued from the momentary fund management, as calculated in accordance with the attached Table 2.

**Article 6 (Method for Calculating Total Revenue, etc.)**

(1) The amount of total revenue under Articles 4 (1) 2 and 5 (2) and (3) 1 (a) of the Act, the amount of the Government grants under Article 4 (1) 2 of the Act, and the amount of self-generating revenue under Article 5 (2) and (3) 1 (a) of the Act (hereinafter referred to as the "amount of total revenue, etc.") shall be the average amount for the latest three years, calculated based on the financial statements for the settlement of accounts for the latest three years.

(2) In calculating total revenue, etc. in accordance with paragraph (1), an institution whose financial statements have been prepared for less than three years shall calculate its total revenue, etc. utilizing the financial statements for the corresponding period of time, while an institution whose financial statements have not been prepared yet shall prepare data equivalent to those statements based on its budget for such calculation.

(3) The financial statements under paragraph (1) shall be basically the financial statements prepared on the basis of accruals: Provided, That an institution that does not prepare such statements in accordance with accruals shall prepare data equivalent to those statements for such calculation.

(4) The prescribed number of personnel in applying Article 5 (1) of the Act, Article 3 (2) of the Addenda to the Act and Articles 21 and 22 of this Decree shall mean the prescribed number of personnel as of the end of the year immediately preceding the designation as a public institution or the appointment or removal of executives: Provided, That in cases of a public institution in which the prescribed number of personnel as of the end of the immediately preceding year does not exist due to reasons, such as being newly designated as a public institution under the proviso to the part, other than the subparagraphs of Article 6 (1) of the Act, it refers to the prescribed number on the day such reason arises. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(5) The asset size under Article 5 (3) 1 (a), the main sentence of the Article 18 (2) and (4), the main sentence of Article 20 (2) and (3) and the proviso to the Article 21 (2) of the Act and Article 22 (1) 2 of this Decree shall be calculated based on the financial statements for the settlement of accounts for the latest year: Provided, That in cases of a public institution, financial statements of which are not prepared due to reasons, such as being newly designated as a public institution under the proviso to the part, other than the

2

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

subparagraphs of Article 6 (1) of the Act, the asset size shall be calculated based on the budget of the year in which such reason arises. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(6) The amount of total revenue under Articles 21 and 22 (1) 1 shall be calculated based on the financial statements for the settlement of accounts for the latest year: Provided, That in cases of a public institution, financial statements of which are not prepared due to reasons, such as being newly designated as a public institution under the proviso to the part other than the subparagraphs of Article 6 (1) of the Act, the amount of total revenue shall be calculated based on the budget of the year in which such reason arises. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(7) The Minister of Strategy and Finance may prepare more specific guidelines for calculating total revenue, etc. to notify them to the administrative agencies that control the affairs of public corporations, quasigovernmental institutions, and non-classified public institutions under relevant statutes (hereinafter referred to as the "competent agencies"). <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

### Article 7 (Criterion of Designation of Market-based Public Corporations)

"Criterion prescribed by Presidential Decree" in Article 5 (3) 1 (a) of the Act means 85 percent.

### Article 8 (Procedure for Designation of Public Institutions. etc.)

(1) The head of the competent agency shall notify the Minister of Strategy and Finance of the institutions subject to designation of public institutions under Article 4 of the Act no later than one month before the beginning of each fiscal year. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2) If a change occurs in the legal personality, name, etc. of a public institution, or any reason for initial designation of or designation of a public institution by changing the classification or any reason for the cancelation of designation under the proviso to the part, other than the subparagraphs of Article 6 (1) of the Act occurs, the head of the competent agency shall immediately notify the details thereof to the Minister of Strategy and Finance. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

### Article 9 (Examination on Establishment of New Institution)

When the head of the competent agency requests the Minister of Strategy and Finance to examine the feasibility of the establishment of a new institution in accordance with Article 7 (1) of the Act, the head shall submit a plan containing the following descriptions and materials: <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

1. Scope and substance of the business of the institution;

2. Services and goods that the new institution will provide;

3. Annual revenue expected and budget of the Government grants required in the next five years;

4. Plan for the management of the organization and human resources for the next five years;

5. Current status of related institutions already established;

6. Other materials requested by the Minister of Strategy and Finance.

### Article 10 (Matter Subject to Deliberation and Resolution by Management Committee)

"Other matters prescribed by Presidential Decree concerning management of public institutions" in subparagraph 15 of Article 8 of the Act means the following matters: <Amended by Presidential Decree No. 28232, Aug. 9, 2017>

1. Matters concerning the items, guidelines, procedure, etc. for the consolidated publication under Article 16;

3

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

2.  Matters concerning the scope of public institutions that provide direct services to the people under Article 17 (1);

3.  Matters concerning the designation of the institutions exempt from the function adjustment. etc. under Article 18 (2);

4.  Matters concerning the request for evaluation of business performance under Article 27 (1);

5.  Matters concerning the management of the management evaluation team for public corporations and quasi-governmental institutions under Article 28 (4);

6.  Matters concerning the determination on whether to consider as actual revenue under subparagraph 3 (c) of attached Table 1.


**Article 11 (Composition of Management Committee)**

(1)  "Vice Minister, Deputy Administrator, or an equivalent public official of the related administrative agency as prescribed by Presidential Decree" in Article 9 (1) 2 of the Act means one of the following persons: <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Presidential Decree No. 11690, Mar. 23 2013; Presidential Decree No. 25751, Nov. 19, 2014; Presidential Decree No. 28211, Jul. 26, 2017 >

1.  One Vice-Minister of the Ministry of Strategy and Finance nominated by the Minister of the Ministry of Strategy and Finance;

2.  Vice-Minister of the Ministry of the Interior and Safety;

3.  One Vice-Minister level public official nominated by the Chairman of Anti-Corruption & Civil Rights Commission;

4.  Minister of Personnel Management

(2)  "People who have good knowledge and experience in the area of the management and business administration of public institutions" in Article 9 (1) 4 of the Act means the following persons: <Amended by Presidential Decree No. 20947, Jul. 29, 2008>

1.  Persons who have a career of working for a university, a college, or an officially recognized research institute as an adjunct professor or in an equivalent position for at least five years;

2.  Persons who have a career as a judge, a public prosecutor, or a lawyer for at least ten years;

3.  Persons who have a career of working for a public institution under the Act and this Decree or a stock-listed corporation under Article 9 (15) 3 of the Financial Investment Services and Capital Markets Act for at least twenty years and who have served as an executive for at least three years;

4.  Persons who have a career of engaging in the area of audit or accounting for the institutions enumerated in subparagraph 3 with a license of certified public accountant for at least ten years;

5.  Persons who have worked as a public official in the Senior Civil Service or a public official in political service;

6.  Other persons whose career, etc. relating to the management of a public institution are recognized as equivalent to the criteria set forth in subparagraphs 1 through 5.

(3)  The management committee may establish and run an advisory team composed of related specialists to give advices on specialized or technical matters relating to the management of public institutions.


**Article 12 (Management of Management Committee)**

(1)  The chairperson shall convene the meeting of the management committee and shall take the chair in the meeting.

4

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

(2)    If the chairperson is unable to perform his/her duties, the member designated by the chairperson shall act on behalf of the chairperson. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(3)    The management committee may request a public official concerned or an executive or an employee of a public institution to appear before the committee, submit materials, and present his/her opinion, whenever necessary for executing its business.

(4)    Allowances, travel expense, and other necessary expenses may be reimbursed to the committee members, other than public officials within the limit of its budget.

(5)    The chairperson shall send the materials related to the matters on the agenda brought up to the meeting of the management committee, in advance, to the Chairperson of the Board of Audit and Inspection and the heads of related administrative agencies pursuant to Article 10 (3) of the Act.

(6)    Other necessary matters concerning the management of the management committee shall be prescribed by the chairperson after resolution by the management committee.

(7)    The matters under paragraph (6) shall include the matters concerning the preparation and preservation of the minutes of meeting of the management committee and the disclosure of the contents of the minutes of meeting under the Official Information Disclosure Act.


**Article 13 (Exclusion, Challenge, Abstention of Members of Management Committee)**

(1)    A committee member shall be excluded from deliberation and resolution on any of the following matters:

1.    A matter in which the member has direct interests;

2.    A matter in which the member's spouse, relative by blood within the fourth degree, or relative by marriage within the second degree or an institution to which the member belongs has interests;

3.    A matter in which a person who acts as an advisor, a consultant, etc. for the member or an institution to which the member belongs has interests.

(2)    A person who has direct interests in a matter subject to deliberation and resolution by the management committee may file an application for challenge against a member, if there is any ground on which it is difficult to expect fairness in deliberation and resolution. In such cases, the chairperson shall decide whether to accept the application for challenge without referring it to the management committee for resolution.

(3)    A committee member may voluntarily abstain from deliberation and resolution on a case, if he/she falls under any of the grounds set forth in paragraph (t) or (2).


**Article 14 (Subcommittees)**

(1)    The management committee may have subcommittees composed of some of the committee members for carrying out its business in an efficient manner.

(2)    The chairperson and members of a subcommittee shall be appointed by the chairperson of the management committee.

(3)    The subcommittee shall review matters decided by a resolution of the management committee, and shall report the results thereof to the management committee.

(4)    Other necessary matters concerning the composition and management of subcommittees shall be prescribed by the chairperson after resolution by the management committee.


**Article 15 (Publication on Management)**

The publication on the matters specified in Article 11 (1) of the Act shall be made as follows: <Amended by Presidential Decree No. 22088, Mar. 26, 2010, Presidential Decree No. 27505, Sep. 22, 2016>

1.    The publication on management shall be made by posting and furnishing the data for the latest five years concerning the matters subject to publication;

5

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

2.   The statements on the settlement of accounts under Article 11 (1) 2 of the Act shall be posted and furnished within ninety days after the end of each business year;

3.   The information about the matters under Article 11 (1) 1 and 3 through 15 of the Act shall be posted and furnished without delay whenever such a matter arises.

## Article 16 (Consolidated Publication)

(1)   The Minister of Strategy and Finance shall prescribe the items subject to consolidated publication under Article 12 of the Act and the matters concerning the criteria and procedure therefor (hereinafter referred to as "criteria, etc. for consolidated publication") after deliberation and resolution by the management committee, and shall notify them to the heads of public institutions. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2)   Whenever revising the matters concerning the criteria, etc. for consolidated publication prescribed in accordance with paragraph (1), the Minister of Strategy and Finance shall finalize such revision after deliberation and resolution by the management committee, and shall notify it to the heads of public institutions no later than fourteen days before enforcing the criteria, etc. for consolidated publication as revised. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(3)   The head of a public institution shall publish the management information in accordance with the criteria, etc. for consolidated publication under paragraphs (1) and (2) in the Internet site designated by the Minister of Strategy and Finance. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

## Article 17 (Customer Charter, etc.)

(1)   The Minister of Strategy and Finance shall determine the scope of public institutions that provide direct service to the people, after deliberation and resolution by the management committee, and shall notify it to the heads of public institutions. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2)   Every public institution shall, upon establishing the customer charter under Article 13 (1) of the Act, announce it through the Internet, etc. or post it at a certain place to make it known to the people.

(3)   The heads of public institutions may request an independent specialized institution to conduct a survey on customer satisfaction level under Article 13 (2) of the Act.

## Article 18 (Adjustment of Functions of Public Institutions, etc.)

(1)   The Minister of Strategy and Finance may carry out adjustment of functions, etc. of public institutions under Article 14 of the Act step by step, considering the nature, peculiarities in business affairs, etc. of public institutions. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2)   The Minister of Strategy and Finance may exclude institutions that fall under any of the following subparagraphs among public institutions from those subject to adjustment of functions, etc., after deliberation and resolution by the management committee: <Amended by Presidential Decree No. 2072~ Feb. 29, 2008>

1.   An institution for which a relevant Act provides that it is necessary to guarantee independence of the Government and neutrality in executing the functions of the institution;

2.   An institution in which case three years have not passed yet since its establishment;

3.   An institution for which the management committee determines it is not proper to be subjected to adjustment of function, etc., considering the peculiarities in its business affairs, etc.

(3)   Where the Minister of Strategy and Finance deems necessary for the purpose of smooth development of the plan under Article 14(3) of the Act, it may order the head of the competent agency to consign disposal of

6

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

property owned by the Nation and public institutions to Korea Asset Management Corporation under the Act on the Efficient Disposal of Non-performing Assets, Etc. of Financial Company and the Establishment of Korea Asset Management Corporation (hereinafter referred to as "Korea Asset Management Corporation") after deliberation and resolution by the management committee: <Newly inserted by Presidential Decree on July 14, 2011; Presidential Decree No. 25279, Mar. 24 2014>

(4)  When consigning such property pursuant to paragraph (3), the head of the competent agency or the heads of public institutions shall conclude a consignment agreement containing each of the following subparagraphs with the Korea Asset Management Corporation. <Newly Inserted on July 14, 2011>

   1.  Purpose of assignment;

   2.  Consignment fees and expenses; and

   3.  Other matters necessary for the performance of consignment work.

### Article 19 (Non-Standing Senior Director)

(1)  The non-standing senior director under Article 21 of the Act shall be appointed from among the persons who have good knowledge and experience in operation and business administration of public institution and good reputation of impartiality and fall under any subparagraph of Article 11 (2).

(2)  The non-standing senior director may convene and preside over the non-standing directors' meeting to discuss the matters on the agenda of the directors' meeting and other matters concerning the management of the institution.

(3)  The head of a public institution or a quasi-governmental institution shall help the non-standing senior director carry out the affairs set forth in paragraph (2) as necessary.

### Article 20 (Excuse for Non-standing Senior Director's Request for Audit, etc.)

(1)  If it is difficult to comply with the non-standing director's request for audit under Article 22 (2) of the Act due to extraordinary circumstances, the auditor or the audit committee shall explain such circumstances to the non-standing senior director, and shall report it to the board of directors.

(2)  If it is difficult to comply with the non-standing director's demand for data under Article 22 (3) of the Act due to extraordinary circumstances, the head of a public corporation or a quasi-governmental institution shall explain such circumstances to the non-standing senior director, and shall report it to the board of directors.

### Article 21 (Appointment and Removal of Executives of Public Corporations)

   The term "public corporation, the size of which is below the criteria prescribed by Presidential Decree" in the provisos to Article 25 (1) and (4) of the Act means a public corporation whose total revenue under Article 2 is less than one hundred billion won or whose prescribed number of personnel is less than five hundred persons.

### Article 22 (Appointment and Removal of Executives of Quasi-Governmental Institutions)

(1)  "Criteria prescribed by Presidential Decree" in the provisos to Article 26 (1) and Article 26 (4) of the Act and "criteria prescribed by Presidential Decree" in the main sentences of the Articles 24 (3) and 26 (3) of the Act means the criteria of each of the following subparagraphs: <Amended by Presidential Decree No. 22088, Mar. 26, 2010>< Amended by Presidential Decree No. 27073, Mar. 31, 2016>

   1.  Commissioned-service-based quasi-governmental institutions: Whose total revenue under Article 2 shall be no less than one hundred billion won and whose prescribed number of personnel shall be no less than five hundred persons;

7

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

2. Fund-management-based quasi-governmental institutions: Whose asset size (including fund assets in commissioned management) shall be no less than one trillion won and whose prescribed number of personnel shall be no less than five hundred persons.

(2) "Quasi-governmental institution … which is prescribed by Presidential Decree" in the main sentences of Articles 24 (3), in the main sentences of Articles 26(3) and in the proviso to Article 26 (4) of the Act and "quasi-governmental institution … which is specified by Presidential Decree" in the proviso to Article 26 (1) of the Act means an institution under any of the following subparagraphs: <Amended by Presidential Decree No. 22088, Mar. 26, 2010>< Amended by Presidential Decree No. 27073, Mar. 31, 2016>

1. Independence Hall of Korea under the Independence Hall of Korea Act;

2. Korea Workers' Compensation & Welfare Corporation under the Industrial Accident Compensation;

3. Korea Consumer Agency under the Framework Act on Consumers;

4. Korea Housing Finance Corporation under the Korea Housing Finance Corporation Act;

5. Act on National Research Foundation of Korea;

6. Korea Student Aid Foundation under the Act on the Establishment, etc. of Korea Student Aid Foundation;

7. Korea International Cooperation Agency under the Korea International Cooperation Agency Act.

**Article 23 (Organization and Management of Executive Recommendation Committee)**

(1) Whenever there is a need to appoint a new executive due to expiration of an executive' s term or any other reason, the board of directors of a public corporation or a quasi-governmental institutions shall organize the executive recommendation committee under Article 29 of the Act (hereinafter referred to as the "recommendation committee") without delay.'

(2) The number of members of the executive recommendation committee shall be decided by a resolution of the board of directors within the range between five and fifteen persons: Provided, That the number of the members may be two or three persons, if the number of non-standing directors at the time of the organization of the recommendation committee is not more than two persons. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(3) The members appointed by the board of directors under Article 29 (2) of the Act shall be chosen among the people with good knowledge and experience from the various areas of law, economy, press, academia, labor, etc.: Provided, That such members shall include one person who can represent the opinions of the members of the public corporation or the quasi-governmental institution.

(4) The recommendation committee shall adopt a' resolution by the affirmative vote of a majority of its incumbent members.

(5) The recommendation committee may commission some of its works including invitation, search, etc. of candidates for executives to a specialized institution.

(6) Necessary matters concerning the management of the recommendation committee, such as the organization of the recommendation committee, the system for exclusion, challenge, or abstention of a member, etc. and the appointment of executives. in addition to the matters prescribed by the Act or this Decree shall be provided for by the articles of incorporation or the bylaws of the public corporation or the quasigovernmental institution.

**Article 24 (Invitation of Candidates for Executives)**

(1) When inviting candidates for executives publicly in accordance with Article 30 {4} of the Act, such invitation shall be publicly notified through the Internet homepage of the public corporation or the

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

quasigovernmental institution and one or more daily newspapers, and the period of time allowed for application shall be at least one week: Provided, That such period of time may be shortened with an approval of the head of the competent agency if there are unavoidable circumstances for prompt appointment. <Amended by Presidential Decree No. 22088, Mar. 26, 2010; Presidential Decree No. 28232, Aug. 9, 2017>

(2)    When publicly notifying the matters concerning the open invitation of candidates for executives under paragraph (1), a public corporation or a quasi-governmental institution shall request the competent agency, the Ministry of Strategy and Finance and the Ministry of Personnel Management to post such invitation on their homepages. <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Presidential Decree No. 11690, Mar. 23, 2013; Presidential Decree No. 25751, 2014>

### Article 24-2 (Request for Re-Recommendation of Candidates for Executives)

An appointing authority of or recommending authority for appointment of executives of a public corporation or quasi-government institution under Article 25 or 26 of the Act may make a request for the re-recommendation of candidates for executives to the recommendation committee, if the candidates for executives recommended by the recommendation committee fall under the grounds for disqualifications under Article 34 (1) of the Act or are deemed noticeably inappropriate for the management of public corporations or quasi-government institutions.

[This Article Newly Inserted by Presidential Decree No. 22088, Mar. 26, 2010]

### Article 25 (Restriction on Concurrent Offices of Executives and Employees)

The provisions of Article 25 of the State Public Officials Service Regulation shall apply mutatis mutandis to the scope of businesses for profit under Article 37 (3) of the Act.

### Article 25-2 (Establishment, etc. of Mid-and Long-Term Financial Management Plan)

(1)    "The public corporations and quasi-governmental institutions under the category prescribed by Presidential Decree" under Article 39-2 (1) 2 of the Act means a public corporation or a quasi-governmental institution corresponding to one of the following subparagraphs.

    1.    Public corporations and quasi-governmental institutions, with a clause on government's compensation for loss to such public corporations and quasi-governmental institutions in the laws forming the basis of the foundation thereof;

    2.    Of public corporations and quasi-governmental institutions with liabilities larger than assets, those designated and announced by the Minister of Strategy and Finance taking into account the size, reasons, and periods of capital impairment.

(2)    If the head of an institution falling under the categories prescribed in the subparagraphs of Article 39-2 (1) of the Act established a Mid- and Long-Term Financial Management Plan, it shall be in accordance with the guidance determined and announced by the Minister of Strategy and Finance considering each of the following subparagraphs.

    1.    The matters relating to specific items which have to be commonly included in the content;

    2.    The matters relating to the setting of criteria including assumptions to be commonly applied to various future estimates, evaluations, and analyzes;

    3.    The matters needed to keep the content objective; and

    4.    The matters relating to the financial management plan under Article 39-2 (2) 3 of the Act and the liability management plan under Subparagraph 4 of the same Article.

9

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(3)  The Minister of Strategy and Finance may consult with the head of the responsible institution in case necessary to prescribe the matters relating to the establishment guidance of the Mid- and Long-Term Financial Management Plan under Paragraph 2.

[This Article Newly Inserted by Presidential Decree No. 24780, Oct. 2, 2013]

**Article 25-3 (Preliminary Feasibility Study)**

(1)  If the head of a public corporation or quasi-governmental institution (hereinafter referred to as the "institution head" in this Article) intends to compile a budget for a new investment project and capital investment that meets all of the requirements under the following subparagraphs, the institution head shall file an application for preliminary feasibility study with the Minister of Strategy and Finance in accordance with the main sentence of Article 40 (3) of the Act:

   1.  The total project cost shall not be less than 100 billion won; and

   2.  The sum of the amount funded by the government and the amount borne by the public corporation shall not be less than 50 billion won.

(2)  If the institution head files an application for preliminary feasibility study under paragraph (1), the institution head shall also submit a project plan stating the name, overview and necessity, etc. of the project to the Minister of Strategy and Finance.

(3)  Upon receipt of the application under paragraph (1), the Minister of Strategy and Finance shall determine whether or not to conduct a preliminary feasibility study after consultation with related experts.

(4)  If the institution head intends to obtain a confirmation that a new investment project and capital investment that meets all of the requirements set forth in the subparagraphs of paragraph (1) is exempt from preliminary feasibility study under the proviso to Article 40 (3) of the Act, the institution head shall submit a request for confirmation of exemption from preliminary feasibility study stating the name, overview and necessity of the project and grounds, etc. for exemption of the project to the Minister of Strategy and Finance. Provided, That even in the case where the institution head intends to obtain confirmation from the Minister of Strategy and Finance that the project concerned is a project that needs to be implemented urgently to prevent a disaster, before obtaining the consent of the competent Standing Committee of the National Assembly under subparagraph 5 of Article 40 (3) of the Act, the institution head may submit a request for confirmation of exemption from preliminary feasibility study.

(5)  Upon receipt of a request for confirmation of exemption from the preliminary feasibility study under paragraph (4), if the Minister of Strategy and Finance confirms that the project concerned is one of the projects set forth in subparagraphs of Article 40 (3) of the Act after consultation with related experts, the Minister of Strategy and Finance shall notify the institution head of the results.

(6)  The Minister of Strategy and Finance shall establish guidelines on the criteria for selection of projects subject to a preliminary feasibility study, institution conducting the study, methods and procedures for the study, etc. in accordance with Article 40 (3) of the Act, and notify the institution head. [This Article Newly Inserted by Presidential Decree No. 27505, Sep. 22, 2016]

**Article 26 (Submission of Statements on Settlement of Accounts)**

(1)  <Deleted on October 14, 2011>.

(2)  Every quasi-governmental institution shall submit the final statements on the settlement of accounts to the Minister of Strategy and Finance within ten days after the statements are finalized in accordance with Article 43 (2) of the Act. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**Article 26-2 (Composition and Organization of Appointment Committee of Accounting Auditors)**

(1) Members of an appointment committee for accounting auditors under Article 43-2 (1) of the Act (excluding cases where audit committee is deemed an appointment committee for accounting auditors under the same paragraph) shall be comprised of all auditors and non-standing directors of the relevant public corporation or quasi-government institution.

(2) The chairperson of the appointment committee for accounting auditors shall be elected from among the members who are non-standing directors of the relevant public corporation or quasi-government institution.

(3) The chairperson shall convene and preside over the meetings of the appointment committee for accounting auditors.

(4) Meetings of the appointment committee for accounting auditors shall be held with the attendance of 2/3 of the incumbent members and require the consent of a majority of the members present for resolution.

(5) In addition to the matters specified in paragraphs (1) through (4), matters necessary for the operations, etc. of the appointment committee for accounting auditors shall be prescribed by the Minister of Strategy and Finance.

[This Article Newly Inserted by Presidential Decree No. 22088, Mar. 26, 2010)

**Article 27 (Business Performance Evaluation)**

(1) The Minister of Strategy and Finance may commission the business performance evaluation of public corporations and quasi-governmental institutions to a specialized institution, after resolution by the management committee, if considered necessary. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2) The Minister of Strategy and Finance shall prepare a manual for the business performance evaluation no later than the beginning of each fiscal year in accordance with the criteria and method for the business performance evaluation and with the measures to be taken following such evaluation pursuant to Article 48 of the Act: provided that, with respect to a public corporation or a quasi-governmental institution newly designated under Article 6 of the Act, the manual for the business performance evaluation shall be prepared within four months after such designation. <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Jul 14, 2011>

(3) The Minister of Strategy and Finance may take further actions, including but not limited to, deciding on the payment rate of bonus or making a suggestion or request for measures relating to personnel or budgetary matters taken pursuant to evaluation results of the review and resolution by the management committee. <Newly Inserted, Jul. 14, 2011>

**Article 28 (Composition and Management of Management Evaluation Team for Public Corporations and Quasi-Governmental Institutions)**

(1) The Minister of Strategy and Finance may organize and run the management evaluation team for public corporations and quasi-governmental institutions (hereinafter referred to as the "management evaluation team") from time to time with the persons commissioned among the following persons under Article 48 (6) of the Act: <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Jul 14, 2011>

    1. A professor of a college or a university who has expertise in management and business administration of public institutions;

    2. A person working for a government-invested research institute with a doctor's degree or recognized as having an equivalent qualification;

    3. A certified public accountant, a lawyer, or a specialist in management consulting with an experience of practice for at least five years;

11

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

4.    A person recognized otherwise as having good expertise and experience in management and business administration of public institutions.

(2)    The expenses required for the management evaluation team' s execution of missions may be reimbursed within the limit of the budget.

(3)    The management evaluation team shall be deemed to be dissolved when the missions assigned are completed.

(4)    Necessary matters concerning the composition and management of the management evaluation team in addition to the matters prescribed by this Decree shall be prescribed by the Minister of Strategy and Finance after resolution by the management committee. <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Presidential Decree No. 22088, Mar. 26, 2010>

## Article 29 (Monitoring Adequacy of Supervision)

The Minister of Strategy and Finance and the head of the competent agency may monitor the adequacy of the supervision over public corporations and quasi-governmental institutions under Article 51 (4) of the Act and take measures for improvement step by step, considering the nature, peculiarities in business affairs, etc. of each institution. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

## Article 29-2 (Prior Consultation on Funding or Investment)

(1)    "In specific cases prescribed by Presidential Decree" in the proviso to Article 51-2 (1) of the Act means the case where a public corporation or a quasi-governmental institution acquires equity in another corporation pursuant to the following decisions, etc.:

    1.    If a public institution dealing with finance makes an investment in accordance with any of the following:

        (a)    An authorization for a rehabilitation plan granted under Article 242 of the Debtor Rehabilitation and Bankruptcy Act;

        (b)    A resolution of the council of financial creditors on the readjustment of claims under Article 17 of the Corporate Restructuring Promotion Act;

        (c)    A resolution on the readjustment of claims passed by the council established to discuss credit risk assessments and restricting plans, etc. of companies subject to the improvement in financial structure among the financial creditors holding claims against such companies;

        (d)    An investment in a special purpose company, etc. to provide a guarantee for the special purpose company under Article 28-3 of the Korea Technology Finance Corporation Act or Article 23-3 of the Credit Guarantee Fund Act;

        (e)    A guarantee-linked investment under Article 28-4 of the Korea Technology Finance Corporation Act or Article 23-4 of the Credit Guarantee Fund Act;

        (f)    Any financing to insured financial companies under Article 38 of the Depositor Protection Act; or

        (g)    Any provision of public funds under the Special Act on the Management of Public Funds.

    2.    If an investment is made after prior consultation with the head of the competent agency and the Minister of Strategy and Finance is de facto performed through deliberation and resolution at a meeting operated with major officials at the minister level or higher as its members.

(2)    If establishment of a funding or investment institution or funding or investment in other corporations requires deliberation and resolution by the board of directors of a public corporation or a quasi-governmental institution, a prior consultation under Article 51-2 of the Act shall be held before deliberation and resolution by the board of directors.

12

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

(3)   If a public corporation or a quasi-governmental institution holds a prior consultation in order to establish a funding or investment institution or to fund or invest in other corporations under Article 51-2 of the Act, it shall submit a plan stating the following matters to the head of the competent agency and the Minister of Strategy and Finance:

1.   Purpose and necessary of funding or investment;

2.   Scope and details of business of the company subject to funding or investment;

3.   Amount and timing of funding or investment;

4.   Annual financial plans of the company subject to funding or investment for at least 5 years;

5.   Details of budget support, debt guarantees, indemnification of losses, etc. for the company subject to funding or investment by the government or a public corporation; and

6.   Other materials requested by the head of the competent agency or the Minister of Strategy and Finance. [This Article Newly Inserted by Presidential Decree No. 27505, Sep.22, 2016]

**Article 30 (Exercise, etc. of Minority Stockholders' Rights)**

The "securities exchange prescribed by the Presidential Decree" under Article 54 of the Act means securities exchange markets described under Article 176-9 (1) of the Enforcement Decree of the Financial Investment Services and Capital Markets Act.

[This Article Newly Inserted by Presidential Decree No. 24697, Aug. 27, 2013]

**Article 31 (Processing of Identification Information)**

The Minister of Strategy and Finance, the heads of responsible institutions and public corporations and quasi-governmental institutions may process data which include resident registration number pursuant to Article 19-1 of the Enforcement Decrees to Personal Information Act under unavoidable circumstances in which they need to perform affairs relating to the verification of causes for disqualification of executives in public corporations and quasi-governmental institutions.

[This Article Newly Inserted by Presidential Decree No. 25532, Aug. 6, 2014]

**ADDENDA <No. 25751, Nov. 19, 2014>**

Article 1 (Effective Date)

This Decree shall take effect on the date of its promulgation: Provided, That the amended portions of any Presidential Decree which is revised pursuant to Article 5 of the Addenda and promulgated before this Decree takes effect, but the effective date of which has yet to come, shall take effect from the date such Presidential Decree takes effect.

Articles 2 through 4 omitted

Article 5 (Amendment of Other Decrees)

(1)   Omitted

(2)   The Enforcement Decree of the Act on the Management of Public Institutions is partially amended as follows.

13

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Article 11-1 (2) shall be as follows, and Paragraph 4 shall be newly inserted in the same Article as follows.

2.    Vice-Minister of Government Administration and Home Affairs

4.    Minister of Personnel Management

"The Ministry of Security and Public Administration" in Article 24(2) shall be changed to "The Ministry of Personnel Management"

(3)    through <418> omitted

**ADDENDA <No. 27073, Mar. 31, 2016>**

This Decree shall take effect on the date of its promulgation.

**ADDENDA <No. 27505, Sep. 22, 2016>**

Article 1 (Effective Date)

This Decree shall take effect on Sep. 23, 2016.

Article 2 (Application of Preliminary Feasibility Study)

Article 25-3 of the Amended Decree shall be applied from when the application for preliminary feasibility study is filed after this Decree becomes effective.

**ADDENDA <No. 28211, Jul. 26, 2017>** (Organization of the Ministry of the Interior and Safety and its affiliated organizations)

Article 1 (Effective Date)

This Decree shall take effect on the date of its promulgation: Provided, That the amended portions of any Presidential Decree which is revised pursuant to Article 8 of the Addenda and promulgated before this Decree takes effect, but the effective date of which has yet to come, shall take effect from the date such Presidential Decree takes effect.

Articles 2 through 7 omitted

Article 8 (Amendment of Other Decrees)

(1)    and (2) omitted

(3)    The Enforcement Decree of the Act on the Management of Public Institutions is partially amended as follows.

Article 11 (1) 2 shall be as follows.

2.    Vice-Minister of the Ministry of the Interior and Safety

(4)    through <388> omitted

**ADDENDA <No. 28232, Aug. 9, 2017>**

This Decree shall take effect on the date of its promulgation.

14

Copyright © 2018 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

PUBLIC VERSION

# Exhibit 5



PUBLIC VERSION

**KOSPO Investor Presentation**

**November 2016**

Strictly Private & Confidential

PUBLIC VERSION

# Disclaimer

**This presentation material is being presented to you solely for your information only and may not be taken away by you and may not be reproduced, redistributed or passed on, directly or indirectly, to any other person or published, in whole or in part, for any purpose.**

This presentation material does not constitute or form a part of any offer or solicitation to purchase or subscribe for securities of Korea Southern Power Co., Ltd. ("KOSPO" or the "Company") in the United States or any jurisdiction in which such offer or solicitation or sale would be unlawful. Securities may not be offered or sold within the United States or to U.S. persons absent registration or an exemption from registration under the U.S. Securities Act of 1933, as amended, and the rules and regulations thereunder. Any public offering of securities to be made in the United States will be made by means of a prospectus, which will contain detailed information about the company making the offer and its management and financial statements. The Company does not intend to register any securities in the United States, and no public offering of securities will be made in the United States or in any other jurisdiction where such an offering is restricted or prohibited. Neither any part of this presentation nor any information or statement contained therein shall form the basis of or be relied upon in connection with any contract or commitment whatsoever. Any decision to purchase securities in the context of the offering of securities, if any, should be made solely on the basis of information contained in a published prospectus or other offering circular issued by the Company in connection with such an offering.

This presentation material has been prepared by the Company, solely for the use at this presentation and has not been independently verified. No representations or warranties, express or implied, are made as to, and no reliance should be placed on, the accuracy, fairness or completeness of the information presented or contained in this presentation. Neither the Company nor any of its affiliates, advisers or representatives accepts any responsibility whatsoever for any loss or damage arising from any information presented or contained in this presentation material. Unless otherwise stated, the information presented or contained in this presentation material is current as of the date hereof and is subject to change without notice and its accuracy is not guaranteed. Neither the Company nor any of its affiliates, advisers or representatives make any undertaking to update any such information subsequent to the date hereof. This presentation material should not be construed as legal, tax, investment or other advice.

Certain information and statements made in this presentation contain "forward-looking statements". Such forward-looking statements can be identified by the use of forward-looking terminology such as "anticipate," "believe," "considering," "depends," "estimate," "expect," "intend," "plan," "planning," "planned," "project," "trend," and similar expressions. All forward-looking statements are the Company's current expectation of future events and are subject to a number of factors that could cause actual results to differ materially from those described in the forward-looking statements. Caution should be taken with respect to such statements and you should not place undue reliance on any such forward-looking statements.

Certain industry and market data in this presentation was obtained from various trade associations, and the Company has not verified such data with independent sources. Accordingly, the Company makes no representations as to the accuracy or completeness of that data, and such data involves risks and uncertainties and is subject to change based on various factors.

This communication is being distributed outside the United States solely to non-US persons as defined under Regulation S.





# Table of Contents

1.  Company Overview                                                                 3

2.  Electricity Industry Overview and Business Environment                           7

3.  Business/Operations Update                                                       11

4.  Financial Performance                                                            18

    Appendix                                                                         22





1. Company Overview

# KOSPO at a Glance

**PUBLIC VERSION**

| Company Name | Korea Southern Power Co., Ltd. ("KOSPO") |
|---|---|
| Establishment Date | 2 April 2001 (spun off from KEPCO) |
| Ownership | 100% owned by KEPCO (51% owned by the Korean government) |
| Assets | KRW 9,571 bn (9,260 bn, 2015YE) |
| Sales | KRW 1,910 bn (4,332 bn, 2015YE) |
| Capacity of Equipment | 9,217 MW, 15 Power plants with 61 units |
| Electricity Sales | 21,290 GWh (46,819 GWh, 2015YE) |

## Market Share by Generation Capacity



- Others 25,941 26.2%
- KOSPO 9,217 9.3%
- KOSEP 9,979 10.1%
- KOMIPO 8,307 8.4%
- KOWEPO 9,326 9.4%
- EWP 9,139 9.2%
- KHNP 27,039 27.4%

**Total Generation Capacity: 98,948 MW**

## Ratings Equalized with Sovereign Credit Ratings



| | Moody's | S&P | Fitch |
|---|---|---|---|
| | Aa2 | AA | AA- |



| | Moody's | S&P | Fitch |
|---|---|---|---|
| | Aa2 | AA | AA- |



| | Moody's | S&P | Fitch |
|---|---|---|---|
| | Aa2 | -- | AA- |

## Market Share by Sales Volume



- Others 44,953 17.9%
- KOSPO 21,290 8.5%
- KOSEP 32,977 13.1%
- KOMIPO 21,033 8.4%
- KOWEPO 22,936 9.1%
- EWP 23,123 9.2%
- KHNP 84,491 33.7%

**Total Electricity Sales: 250,803 GWh**

Note : As of June 30, 2016 unless otherwise specified

**4**





# Credit Ratings

PUBLIC VERSION

**Moody's**



Aa3 → **Aa2**

*(as of Dec 21, 2015)*

KOSPO's rating is primarily driven by its close operational and ownership relationship with its parent, KEPCO, and by the strategic importance of the six gencos, including KOSPO, to Korea's economy as important power generators.

…we expect the government to maintain its tight control and supervision over all six gencos through KEPCO's majority ownership in them, because of the importance of the power sector and the gencos to the economy.

…we expect that both the government and KEPCO will take strong measures to contain any material widespread disruptions to KOSPO's operations if and when needed, given KOSPO's important role as a major power generator in Korea.

**Fitch**



A+ → **AA-**

*(as of Jul 3, 2013)*

Korea Southern Power Co., Ltd.'s (KOSPO) ratings are equalised with those of parent Korea Electric Power Corporation (KEPCO, AA-/Stable) due to their strong strategic and operational ties …

The higher selling price of its electricity to KEPCO relative to other gencos, together with low LNG costs, will continue to bolster KOSPO's margin in the short term despite declining revenue due to lower utilisation.

…the gencos have good access to funding in the domestic bond market supported by very strong operational and strategic ties with KEPCO, and therefore the Korean state. Fitch expects all gencos' financial risk to remain consistent with that of KEPCO in the foreseeable future.

***KOSPO's credit ratings is on par with the Republic of Korea***



# Key Credit Highlights

PUBLIC VERSION

**Aa2 rated Issuer on Par with Korea**

- Moody's upgraded KOSPO's ratings to Aa2 in December 2015 – in line with the Republic of Korea
- Fitch's ratings of AA- also reflects strong credit profile of KOSPO

**Supportive Regulatory / Industry Dynamics**

- Designated as "Market-oriented Public Enterprise" – direct government oversight with practically no privatization concerns
- Power consumption under constant growth with electricity tariffs still low
- 100% fuel cost pass-through pricing mechanism & higher Capacity Payments for enhanced profitability

**Effective Operations**

- Recognized for the highest operational efficiency including cost
- Significant market share in the domestic power supply market in terms of capacity and sales volume
- Long-term contracts with raw material suppliers to minimize cost volatility

**Solid Credit and Financial Profile**

- Continuous cash flows from operations
  - EBITDA Margin: 30.9%
- Competitive financials relative to other quasi-sovereign peers
- Balanced and flexible debt portfolio

*Source: Company Filing as of 1H 2016*





# 2. Electricity Industry Overview and Business Environment

# Government Vehicle as Korea's Power Generator

**PUBLIC VERSION**

## Restructuring & Privatization Overview

### Industry Restructuring

- KEPCO's generating assets were divided into six Gencos on April 2, 2001
- KEPCO remains the sole transmission and distribution company

### Privatization of Gencos Suspended

- Privatization plan for KEPCO and its Gencos was effectively suspended in July 2008

### Market Oriented Public Enterprise

- In 2011, the Gencos have been designated as market oriented public enterprises by the government to create a more efficient management structure and enhance their competitiveness

### Government's Plan to IPO

- Ministry of Strategy and Finance announced on June 14th 2016, that a total of 20~30% of shares in eight energy public enterprises to be listed starting in the first half of 2017, which will put those companies under market watch and eventually improve their financial soundness
- The government plans on retaining majority ownership and control for the gencos to serve the public good services
- Details of IPO have not been announced yet

## Domestic Power Industry Structure

**(Unit: KRW trillion)**

| Public Corporation Act | Electricity Business Law | Basic Plan for Energy Development | Environmental Policy Law |
|---|---|---|---|

**KEPCO**

Transmission & Distribution

Holding 100% Ownership of Gencos

Korea Government — **51% Ownership** → **KEPCO**
Assets: 103.6
Revenues: 28.8

**100% Ownership**

**Gencos**

**82.1% market share of sales volume**

| | KOSPO | KOSEP | KOMIPO | KOWEPO | EWP | KHNP |
|---|---|---|---|---|---|---|
| | Thermal & Renewable | Thermal & Renewable | Thermal & Renewable | Thermal & Renewable | Thermal & Renewable | Nuclear & Hydro |
| | Assets: 9.6 | Assets: 9.1 | Assets: 8.5 | Assets: 9.5 | Assets: 9.5 | Assets: 52.1 |
| | Revenues: 1.9 | Revenues: 2.4 | Revenues: 1.8 | Revenues: 2.0 | Revenues: 2.0 | Revenues: 5.6 |
| **As of 2015 YE** | Assets: 9.3 Revenues: **4.3** | Assets: 9.4 Revenues: 5.0 | Assets: 8.1 Revenues: 4.0 | Assets: 9.2 Revenues: **4.2** | Assets: 8.9 Revenues: 4.1 | Assets: 51.3 Revenues: 10.7 |

*Source: DART filing (as of 1H 2016), unless otherwise specified*

8



# Consumption & Demand Outlook

PUBLIC VERSION

## Power Demand Forecast (2015-2029)

(Unit: GWh/%)

Avg Consumption Growth Rate: 4.1%

Avg Expected Consumption Growth Rate: 2.1%

■ Electricity Demand

**The government plans on preparing for the nation's continuous increase in power consumption**

*Source:  The Seventh Basic Plan of Long Term Electricity Supply and Demand, July 2015 by Ministry of Trade, Industry and Energy*

9



# Electricity Pricing Mechanism

**PUBLIC VERSION**

## Power Pricing Mechanism (Power Price = CP + EP)

- **Capacity Payment (CP):** Fixed fee received to compensate for cost not covered by variable cost; CP is determined annually and is paid to each generation company for the amount of available generation capacity

- **Energy Price (EP):** Variable cost + [System marginal price – Variable cost] x Adjusted coefficient

- **System Marginal Price (SMP):** represents the power market price (KRW/kwh) payment made on a trading hourly basis to the company's supplied electricity (most expensive plant price where power demand and supply meet)

- Application of The Adjusted Coefficient of System Marginal Price ("SMP")
  - KOSPO can pass through 100% of its fuel cost through the energy price
  - Electricity Generation Cost Evaluation Committee annually determines The Adjusted Coefficient

- Adjusted Coefficient was readjusted with slight increase, which became effective in September 2016

## Power Price Comparison

| Price type | Price | Remarks |
|---|---|---|
| **Capacity Payment (CP)** | KRW  9.15~10.07/kwh | ■ CP can be adjusted in accordance with region, season and time |
| **Energy Price (EP)** | [Max {(SMP-Fuel Cost), 0} x<br><br>The Adjusted Coefficient<br><br>+ Fuel Cost] | ■ Adjusted Coefficient (as of September 9, 2016)<br>  – Nuclear : **0.9309** ← 0.7191<br>  – Coal : **0.9472** ← 0.7208<br>  – Domestic Coal : **1.0000** ← 1.0000<br>  – Oil, LNG, etc.: **1.0000** ← 1.0000 |

*Electricity Pricing Mechanism allows us to pass 100% of the fuel cost to the electricity price*
*The Adjusted Coefficient of SMP achieves financial balance among KEPCO and Gencos*

Source: Company data
Source: Korea Power Exchange Website

10



PUBLIC VERSION



# 3. Business & Operations

# Operation Overview

## Generation Capacity Portfolio

Total 9,217 MW



### Shin Incheon C/C

- Fuel Type: LNG
- Capacity: 1,800 MW
- Constructed: '97.7

### Nam Jeju T/P, D/P

- Fuel Type: B.C
- Capacity: 200 MW
- Constructed: '07.3

### Seong-san W/P

- Fuel Type: Wind
- Capacity: 20 MW
- Constructed: '10.9

### Han-gyeong W/P
- Fuel Type: Wind
- Capacity: 21 MW
- Constructed: '07.11

### Youngwol C/C

- Fuel Type: LNG
- Capacity: 848 MW
- Constructed: '10.10

### Andong C/C

- Fuel Type: LNG
- Capacity: 417 MW
- Constructed: '14.3

### Busan C/C

- Fuel Type: LNG
- Capacity: 1,800 MW
- Constructed: '04.3

### Hadong T/P

- Fuel Type: Coal
- Capacity: 4,000 MW
- Constructed: '09.5

| Plant Name | Base | Middle | Peak | | | | | Renewable | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Hadong | Nam-Jeju | Shin-Incheon | Busan | Youngwol | Hanlim | Andong | Wind Power | Solar Power | Hydro Power | |
| Capacity (MW) | 4,000 | 200 | G/T: 1,200 S/T: 600 | G/T: 1,200 S/T: 600 | G/T: 549 S/T: 299 | G/T: 70 S/T: 35 | G/T: 277 S/T: 140 | 41 | 6 | 0.06 | |
| Total | 4,000 | 200 | 4,970 | | | | | 47 | | | 9,217 |

12



# Operation Overview

**PUBLIC VERSION**

## Electricity Generation by Load



- 0.5% / 47 MW
- 2.2% / 200 MW
- 43.4% / 4,000 MW
- 53.9% / 4,970 MW

■ Base  ■ Peak  ■ Renewable  ■ Middle

Source: Company Filing as of 1H 2016

## Fuel Mix



- 1.9% / KRW 20.6 bn
- 5.4% / KRW 59.4 bn
- 1.3% / KRW 14.5 bn
- 2.3% / KRW 25.9 bn
- 42.4% / KRW 469.9 bn
- 46.7% / KRW 517.2 bn

■ LNG  ■ Bituminous Coal  ■ B.C. Fuel Oil  ■ Wood Pellet  ■ Bio-oil  ■ Others

Source: Company Filing as of 1H2016

## Capacity Utilization

| Year | 2014 | 2015 | 1H 2016 |
|---|---|---|---|
| Hadong | 89.4% | 90.8% | 93.1% |
| Shin-Incheon | 67.4% | 43.1% | 28.1% |
| Busan | 79.8% | 43.5% | 36.5% |
| Youngwol | 37.7% | 24.9% | 12.9% |
| Andong | 85.4% | 71.9% | 84.8% |
| Nam-Jeju | 94.7% | 93.1% | 96.7% |
| Hanlim | 19.1% | 11.5% | 7.0% |
| Hankyung | 94.4% | 87.8% | 89.9% |
| Seongsan | 93.2% | 94.2% | 98.3% |
| Total | 77.7% | 63.9% | 60.5% |

Source: Company Filing as of 1H 2016

## Shutdowns & Stoppages

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016. 9 |
|---|---|---|---|---|---|---|
| Shutdowns (# of times) | 7 | 17 | 23 | 17 | 14 | 4 |
| Stoppage Time | 26:05 | 67:12 | 117:11 | 61:08 | 51.55 | 12.92 |

## Accolades for Operational Efficiency

- **'The 40th National Productivity Evaluation 2016**
  - Received presidential citation in the Public Institutions sector.

- **'Productivity Improvement Evaluation 2015'**
  - Received minister citation for outstanding performance among the affiliated organizations of the Ministry of Trade, Industry and Energy
    *** World's Top Forced Outage Ratio: 0.028%,**

13



# Highest Operational Efficiency Among Peers

PUBLIC VERSION









Units in percentage (%)



# Fuel Procurement and Cost Management

**PUBLIC VERSION**

## Fuel Mix
**Total Amount***
KRW (bn)



■ LNG  ■ Bituminous Coal  ■ B.C.  ■ Others

*Total fuel purchase amount.

## Unit Price
KRW (Thousand/Ton)                                    KRW (per ℓ)



—— LNG (LHS)   —— Bituminous (LHS)   —— B.C. (RHS)   —— Kerosene (RHS)

Source: Company Filing as of 1H 2016
Note: Total amount denotes total fuel purchase amount.

## Strategy

| | |
|---|---|
| **Diversified Fuel Source** | • 8 Overseas countries<br>• (Indonesia, Australia, South Africa, Russia, China, the US, Canada and Colombia) |
| **Long-term Supply Contract** | • Term: 80%, Spot: 20% |
| **Procurement Strategy** | • Developing low calorie coal procurement<br>• Investing overseas coal mines (e.g. Indonesia, the US, etc.)<br>• Exclusive supply of LNG by KOGAS in consideration for termination to increase price competitiveness |
| **Managing Price Fluctuations** | • Bituminous Coal: Long-term and short-term contracts are balanced accordingly to price movements. Risk management via hedging contracts such as futures are also considered when necessary |

## BTC Long-term Contract (1H 2016)

| Country | Volume (MT/Year) | % Proportion |
|---|---|---|
| Australia | 3.49 | 58% |
| Indonesia | 2.22 | 36% |
| Russia | 0.24 | 4% |
| Canada | 0.15 | 2% |
| Grand Total | 6.10 | 100.0% |

15



# New Businesses

PUBLIC VERSION

## Domestic



### Samchuk #1, #2
- Fuel Type: Thermal
- Capacity: 2,044 MW
- Construction:96.2% complete

### Jeong-am
- Fuel Type: Wind Capacity: 32.2 MW
- Construction to be completed in Dec 2017

### Youngnam

- Fuel Type: Combined Cycle
- Capacity: 476 MW
- Construction:33.5% complete

### Tae-baek II
- Fuel Type: Wind
- Capacity: 19.8 MW
- Construction to be completed in Dec 2017

## Overseas



### Jordan

- Fuel Type: Wind
- Capacity: 49.5 MW
- Construction begins in Jun 2017

### Chile

- Fuel Type: LNG
- Capacity: 517 MW
- Construction: 99% complete

- Fuel Type: Solar
- Capacity: 39.7 MW
- BOD Approved

*Source:* Company Filing


KOREA SOUTHERN POWER CO.,LTD.

# Capacity Expansion Plan

PUBLIC VERSION

## CapEx Forecast by Year
(KRW bn)

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Total | 924.7 | 994.2 | 764.2 | 847.2 | 679.8 |
| Expansion | 410.9 | 106.6 | | | |
| Maintenance | 265.6 | 347.2 | 423.8 | 378.4 | 373.2 |
| Renewable Energy | 70.5 | 219.8 | 264.9 | 345.3 | 201.3 |
| Domestic Businesses | 25.0 | 1.0 | 5.0 | 26.4 | |
| Overseas Businesses (general) | 13.2 | 132.0 | 50.1 | 79.8 | 90.4 |
| Overseas Businesses (resource) | 120.3 | 167.9 | | | |
| Others (such as info-communications) | 19.2 | 19.7 | 20.4 | 17.3 | 14.9 |

Legend:
- ■ Expansion
- Maintenance
- ■ Renewable Energy
- ■ Domestic Businesses
- Overseas Businesses (general)
- Overseas Businesses (resource)
- ■ Others (such as info-communications)

Source: KOSPO's long-term financial projection.

17





# 4. Financial Performance

# Profitability Metrics

PUBLIC VERSION

## Revenue
(In KRW bn)



## EBITDA
(In KRW bn)



## EBITDA Margin



## Net Income
(In KRW bn)



Source: Company Filing





# Credit Metrics

## Total Debt/EBITDA
(x)



## EBITDA/Interest Expense
(x)



## Total Debt/Capitalization
(%)



## CFO/Total Debt
(%)



Source: Company Filing




# Debt Profile

PUBLIC VERSION

## Breakdown by Maturity



3-year ~ less than 5-year
KRW 1,108 bn — **24.7%**

5-year ~ less than 10-year
KRW 1,734 bn — **38.7%**

**36.6%**

10-year and beyond
KRW 1,642 bn

**Total: KRW 4,485 bn**

## Breakdown by Currency



Non-KRW
KRW 433 bn — **10.0%**

**90.0%**

KRW
KRW 4,052 bn

**Total: KRW 4,485 bn**

## Breakdown by Interest Rate



Floating Rate
KRW 110.8 bn — **2.5%**

**97.5%**

Fixed Rate
KRW 4,374.7 bn

**Total: KRW 4,485 bn**

## Redemption Profile
(KRW bn)



| 1H 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 and Onwards |
|---|---|---|---|---|---|---|---|---|---|---|
| 370 | 758 | 694 | 622 | 470 | 160 | 130 | 483 | 530 | 120 | 260 |

Source: Company Filing

21





PUBLIC VERSION

KOSPO
KOREA SOUTHERN POWER CO.,LTD.

# Appendix
## Historical Financial Statement

# Income Statement

PUBLIC VERSION

(In KRW bn)

|  | 2013 | 2014 | 2015 | 1H15 | 1H16 |
|---|---|---|---|---|---|
| Sales | 7,133 | 6,244 | 4,332 | 2,153 | 1,910 |
| Cost of Sales | 6,943 | 6,036 | 3,885 | 2,016 | 1,554 |
| Gross Profit | 190 | 208 | 447 | 137 | 355 |
| SG&A | 73 | 70 | 77 | 37 | 41 |
| Operating Income | 118 | 138 | 370 | 100 | 314 |
| EBITDA | 557 | 623 | 897 | 353 | 591 |
| Income before tax | 113 | 79 | 264 | 65 | 286 |
| Tax Expense | (7) | (15) | (43) | (11) | (63) |
| Net Income | 106 | 64 | 221 | 54 | 223 |

Source: Company Filing



23



# Cash Flow Statement

**PUBLIC VERSION**

(In KRW bn)

|                                          | 2013    | 2014    | 2015   | 1H15   | 1H16   |
|------------------------------------------|---------|---------|--------|--------|--------|
| CF from Operating Activities             | 418     | 431     | 646    | 395    | 487    |
| CF from Investing Activities             | (1,428) | (1,855) | (955)  | (503)  | (438)  |
| CF from Financing Activities             | 869     | 1,373   | 480    | 136    | (34)   |
| Changes in Cash Equiv.*                  | (142)   | (51)    | 171    | 28     | 15     |
| Cash and Cash Equiv. at Beginning of Period | 205  | 62      | 11     | 11     | 182    |
| Cash and Cash Equiv. at End of Period    | 62      | 11      | 182    | 39     | 197    |

Source: Company Filing
*Excluding impact from exchange rate changes.



24



# Balance Sheet

PUBLIC VERSION

(In KRW bn)

| | 2013 | 2014 | 2015 | 1H16 |
|---|---|---|---|---|
| **Current Assets** | 978 | 819 | 824 | 975 |
| Cash and Equivalents | 62 | 11 | 182 | 197 |
| Other Current Asset | 916 | 808 | 642 | 778 |
| Non-current Asset | 6,405 | 7,906 | 8,436 | 8,596 |
| Non-current Financial Asset | 50 | 39 | 58 | 51 |
| PPE | 6,172 | 7,633 | 8,157 | 8,276 |
| Intangible Asset | 31 | 30 | 25 | 21 |
| Other Non-Current Asset | 152 | 204 | 196 | 248 |
| **Total Assets** | **7,383** | **8,725** | **9,260** | **9,571** |
| **Current Liabilities** | 1,129 | 801 | 939 | 1,263 |
| Short-term Debt | 328 | 113 | 480 | 666 |
| Other Current Liabilities | 801 | 688 | 459 | 597 |
| Non-current Liabilities | 2,793 | 4,449 | 4,610 | 4,390 |
| Long-term Debt | 2,469 | 4,123 | 4,253 | 4,034 |
| Other Non-Current Liabilities | 324 | 326 | 357 | 356 |
| **Total Liabilities** | **3,923** | **5,250** | **5,549** | **5,653** |
| Total Debt | 2,797 | 4,236 | 5,192 | 4,700 |
| **Total Equity** | **3,460** | **3,475** | **3,711** | **3,918** |

Source: Company Filing

25



PUBLIC VERSION

# Exhibit 6

| | | KHNP | KOSEP | GENCOS KOMIPO | KOWEPO | KOSPO | EWP |
|---|---|---|---|---|---|---|---|
| Unit Price (won/kWh) | | 62.33 | 77.77 | 87.75 | 91.85 | 91.22 | 92.15 |
| Average IPP price (won/kWh) | | 100.81 | 100.81 | 100.81 | 100.81 | 100.81 | 100.81 |
| GENCO Volume Sold to KEPCO (kWh) | | 146,221,000,000 | 66,640,000,000 | 50,254,000,000 | 45,464,000,000 | 47,659,000,000 | 48,307,000,000 |
| Extended Cost to KEPCO (won) | $ | 9,113,954,930,000.00 | $ 5,182,592,800,000.00 | $ 4,409,788,500,000.00 | $ 4,175,868,400,000.00 | $ 4,347,453,980,000.00 | $ 4,451,490,050,000.00 |
| Extended Benefit to KEPCO (won) | $ | 5,626,584,080,000.00 | $ 1,535,385,600,000.00 | $ 656,317,240,000.00 | $ 407,357,440,000.00 | $ 457,049,810,000.00 | $ 418,338,620,000.00 |

*Source: KEPCO SEC Form 20-F at 38.*

| | | Ad Valorem Subsidy Rate for KEPCO | |
|---|---|---|---|
| Extended Benefit to KEPCO (won) (A) | $ | 9,101,032,790,000.00 | *Sum B8:G8* |
| KEPCO Cost of Sales (won) (B) | $ | 52,099,000,000,000.00 | *KEPCO SEC Form 20-K at 2.* |
| Ad Valorem Subsidy Rate (C) | | 17% | *A/B* |

| | | Upstream Subsidy Calculation | |
|---|---|---|---|
| Total Electricity and Fuel Expense (won) (D) | $ | 2,144,468,000,000.00 | *From Hyundai F/S at Exhibit 36 at P. 67* |
| Total Expenses (won) (E) | $ | 17,798,414,000,000.00 | *From Hyundai F/S at Exhibit 36 at P. 67* |
| Electricity Cost as Share of Total Expenses (F) | | 12% | *C/D* |
| Pass-Through Subsidy | | 2.1047453428045400% | *F*C* |

**Callum Cleary**

| | |
|---|---|
| **From:** | Thomas Beline |
| **Sent:** | Monday, April 29, 2019 3:47 PM |
| **To:** | Records |
| **Subject:** | FW: Electronic Submission Confirmation C-580-884 REV - Admin Review Letter By Cassidy Levy Kent (USA) LLP for Petitioners |

---

**From:** access@trade.gov
**Sent:** Monday, April 29, 2019 3:46:55 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Thomas Beline
**Cc:** Records
**Subject:** Electronic Submission Confirmation C-580-884 REV - Admin Review Letter By Cassidy Levy Kent (USA) LLP for Petitioners

<div style="border:1px solid black; display:inline-block; padding:4px;">

EXTERNAL SENDER!

</div>

Hello Thomas M. Beline,

Your ACCESS electronic submission has been successful. Please review the details below and if any information is incorrect contact the ACCESS Help Desk for assistance.

ACCESS ELECTRONIC SUBMISSION DETAILS

**Bar Code:** 3826786

**Submitter Info**
Filed On Behalf Of (collective entity): Petitioners
Filed By: tbeline@cassidylevy.com
Firm/Organization Name: Cassidy Levy Kent (USA) LLP
Filed Date-Time Stamp: 4/29/2019 3:46:45 PM

**Case & Segment Info**
Case Number: C-580-884
Case Title: Hot-Rolled Steel Flat Products From South Korea
Case Segment: REV - Admin Review
Segment Begin Date: 1/1/2017
Segment End Date: 12/31/2017

**Document Info**
Security Classification: Public Document
Document Type: Letter
Manual Submission: No

Bracketing Not Final/1 Day Lag Filing: **No**
(You must resubmit final version next business day)
Barcode of 1 Day Lag Submission:
Document Title - Document (Page Count):
2019-04-29 Petitioners Upstream Subsidy Allegation_Part1 - 2019-04-29 Petitioners Upstream Subsidy
Allegation_Part1.pdf (239)
2019-04-29 Petitioners Upstream Subsidy Allegation_Part2 - 2019-04-29 Petitioners Upstream Subsidy
Allegation_Part2.pdf (383)
Comments:

If you encounter any problems or if this email is sent in error, please contact the ACCESS Help Desk at (202)
482-3150 for assistance.

Thank You!

ACCESS HELP DESK
14th Street and Constitution Ave., NW
Washington, DC 20230
Phone: (202) 482-3150
Email: ACCESS@TRADE.GOV
Hours of Operation
Monday – Friday 8:00 a.m. – 5:00 p.m. EST

PUBLIC VERSION

# EXHIBIT 38

# EXHIBIT 97

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

Case 1:20-cv-03898-GRK  Document 81-2  Filed 11/03/21  Page 1306 of 2032

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

**PUBLIC VERSION**

ChosunMedia THE CHOSUNILBO **Business**

Business

# KEPCO Runs up Huge Quarterly Loss

By Ahn Joon-ho

August 14, 2018 10:50

The government's nuclear phase-out has triggered a surge in expensive liquefied natural gas-fueled power generation, causing power monopoly KEPCO its worst losses in six years

KEPCO's debt soared to a record W114.6 trillion, the power provider said in a public notice Monday (US$1=W1,134).



KEPCO posted a W687.1 billion loss in the second quarter, the third straight quarter of losses. First-half operating losses therefore swelled to W814.7 billion, the second worst on record since 2012.

The main reason was soaring international oil prices which hit US$100 a barrel. KEPCO also pointed to a drop in the number of nuclear reactors in operation due to maintenance, halted operations of aging coal-fired power plants and rising LNG power generation.

But experts said the main culprit was the drastic decline in nuclear plant operation to just 58.5 percent in the first half, down 15.9 percentage points from the same period of 2017. Nuclear power costs just 53 percent of LNG power.

But KEPCO said the operation rate of nuclear reactors will rise to 76 percent during the second half of this year, suggesting that earnings could improve.

On Ki-woon at Soongsil University said, "KEPCO knows very well that the only way to recover from the losses is to expand nuclear power generation."

Read this article in Korean

A man looks at a board showing electricity supply at the Korea Power Exchange in Uiwang, Gyeonggi Province on Aug. 8. /Newsis

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

8/30/2018

Korea Wins 4 Medals on 1st Day of Asian Games Judo Competition - The Chosunilbo (English Edition): Daily News from Korea - Business & Business

PUBLIC VERSION

Copyright © Chosunilbo & Chosun.com

Case 1:20-cv-03590-GBK   Document 81-2   Filed 11/03/21   Page 1307 of 2032

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

### PEOPLE



Korea Wins 4 Medals on 1st Day of Asian Games Judo Competition

Park Bo-young's Latest Film Gets off to Good Start

---

### Most Read        1 / 2



1  Pyeongchang Wakes up to Olympic Hangover

2  Singer Ordered to Pay Damages for Being Too Fat

3  Megan Fox to Star in Korean Movie

4  Flash Floods Wreak Havoc in Capital

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

8/30/2018                    KEPCO Runs up Huge Quarterly Loss - The Chosunilbo (English Edition): Daily News from Korea - Business & Business

Case 1:20-cv-03898-GBK   Document 81-2   Filed 11/03/21   Page 1308 of 2032

PUBLIC VERSION

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18



5 Coach Park Hang-seo Leads
  Vietnamese Football to New
  Heights



ChosunMedia
THE CHOSUNILBO        Copyright © Chosunilbo & Chosun.com. All rights reserved.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

# EXHIBIT 98

# Print

## KEPCO's operating loss widens in Q1

2018-05-15 14:55

**[THE INVESTOR]** State-owned Korea Electric Power Corp. said in a regulatory filing on May 15 that it logged an operating loss of 127.6 billion won (US$118.9 million) in the first quarter this year, marking two consecutive quarters in the red.

The continuing losses are mainly due to increasing power generation costs which were up 27 percent from a year earlier as the new government has vowed to reduce the country's reliance on nuclear power. As part of the anti-nuclear drive and transformation to a new energy era, the government has halted operations of eight nuclear reactors to conduct tightened safety check-ups. As a result, KEPCO has replaced nuclear power with more expensive LNG and coal.



Nuclear power used to account for 80 percent of the country's generation since 2000 but the number declined to 70 percent in the third quarter of 2017 and 65 percent in the fourth. In the first quarter of this year, the figure is estimated to reach less than 60 percent.

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

Analysts say KEPCO is likely to suffer from high costs in the coming months amid rising fuel prices.

"It seems inevitable that the company will show sluggish performance until the fourth quarter due to rising oil and coal prices," Huh Min-ho, an analyst with Shinhan Investment said in a report on May 15. "After the fourth quarter, the company's profit will see a recovery as some nuclear power plants currently under a safety checkup restart operations in the second half of the year," Huh said.

By Park Ga-young (gypark@heraldcorp.com)



Copyright Herald Corporation. All rights reserved.

# EXHIBIT 99

**KEPCO Electric Rates Table**

Source: Korea Electric Power Company, Electric Rates Table, Industrial Service (B).  Retrieved 5/7/2018.
https://home.kepco.co.kr/kepco/EN/F/htmlView/ENFBHP00103.do?menuCd=EN060201

| Classification | | Demand charge (won/kW) | Energy charge (won/kWh) | | | |
|---|---|---|---|---|---|---|
| | | | Time | Summer (Jun 1 - Aug 31) | Spring/Fall (Mar 1 - May 31 / Sep 1 - Oct 31) | Winter (Nov 1 - Feb 28) |
| High-Voltage A | option I | 7,220 | off-peak load | 61.6 | 61.6 | 68.6 |
| | | | mid-load | 114.5 | 84.1 | 114.7 |
| | | | peak-load | 196.6 | 114.8 | 172.2 |
| | option II | 8,320 | off-peak load | 56.1 | 56.1 | 63.1 |
| | | | mid-load | 109.0 | 78.6 | 109.2 |
| | | | peak-load | 191.1 | 109.3 | 166.7 |
| | option III | 9,810 | off-peak load | 55.2 | 55.2 | 62.5 |
| | | | mid-load | 108.4 | 77.3 | 108.6 |
| | | | peak-load | 178.7 | 101.0 | 155.5 |
| High-Voltage B | option I | 6,630 | off-peak load | 60.0 | 60.0 | 67.0 |
| | | | mid-load | 112.3 | 82.3 | 112.3 |
| | | | peak-load | 193.5 | 112.6 | 168.5 |
| | option II | 7,380 | off-peak load | 56.2 | 56.2 | 63.2 |
| | | | mid-load | 108.5 | 78.5 | 108.5 |
| | | | peak-load | 189.7 | 108.8 | 164.7 |
| | option III | 8,190 | off-peak load | 54.5 | 54.5 | 61.6 |
| | | | mid-load | 106.8 | 76.9 | 106.8 |
| | | | peak-load | 188.1 | 107.2 | 163.0 |
| High-Voltage C | option I | 6,590 | off-peak load | 59.5 | 59.5 | 66.4 |
| | | | mid-load | 112.4 | 82.4 | 112.0 |
| | | | peak-load | 193.3 | 112.8 | 168.6 |
| | option II | 7,520 | off-peak load | 54.8 | 54.8 | 61.7 |
| | | | mid-load | 107.7 | 77.7 | 107.3 |
| | | | peak-load | 188.6 | 108.1 | 163.9 |
| | option III | 8,090 | off-peak load | 53.7 | 53.7 | 60.6 |
| | | | mid-load | 106.6 | 76.6 | 106.2 |
| | | | peak-load | 187.5 | 107.0 | 162.8 |

Average demand charge     7,750   KRW/kW

| | |
|---|---|
| KW | 300 |
| working hr/day | 8 |
| days/month | 30 |
| demand/mth | 72,000 |

| | |
|---|---|
| Average Annual Energy Charge | 104.43 |
| Average Demand Charge per KwH consumed (72,000) | 0.11 |
| Average Total Effective Tariff, KRW/kWh | 104.54 |
| | |
| Exchange Rate, Won per USD, Jan 1 - Dec 31, 2017 | 0.000848129 |
| | |
| **Cost per KwH** | **$0.0887** |

PUBLIC VERSION

# EXHIBIT 100

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

Contact Us    Sitemap    LANGUAGE    Search

About KEPCO      Business      Investor Relations      Sustainability      Press Center      Foreign Residents

Foreign Residents    About Bill    Electric Rates Table

## Foreign Residents

FAQ

**About Bill**

Electric Rates Calculation

How to pay your Bill

Service Start and Termination

Electric Rates Table

# Electric Rates Table

Print    SNS

Residential Service      General Service      **Industrial Service**      Educational Service

Agricultural(lights) Service      Street Lights Service      Midnight Power Service      Rate Options Service

Rate Table Download

## Industrial Service (A) Ⅰ

Customers using electricity in mining, manufacturing, gas production and supply, water supply defined by the Water Supply and Waterworks Installation Act; and electric railroads

Contract demand of **4kW** or more and less than **300kW**

The date of application : 2013/ 11/ 21

| Classification | | Demand charge (won/kW) | Energy charge (won/kWh) | | |
|---|---|---|---|---|---|
| | | | summer (Jun.1~Aug.31) | spring/fall (Mar.1~May.31/ Sep.1~Oct.31) | winter (Nov.1~Feb.28) |
| Low Voltage | | 5,550 | 81.0 | 59.2 | 79.3 |
| High-Voltage A | option I | 6,490 | 89.6 | 65.9 | 89.5 |
| | option II | 7,470 | 84.8 | 61.3 | 83.0 |
| High-Voltage B | option I | 6,000 | 88.4 | 64.8 | 88.0 |
| | option II | 6,900 | 83.7 | 60.2 | 81.9 |

Low-voltage : 110V~380V, High-voltage A : 3,300~66,000V, High-voltage B : 154,000V, High-voltage C : 345,000V or higher

## Industrial Service (A) Ⅱ

Customers using electricity for mining, manufacturing, gas production and supply, water supply defined by the Water Supply and Waterworks Installation Act; and electric railroads

Contract demand of **4kW** or more and less than **300kW**

Customers with advanced meters and time of use rates

| Classification | | Demand charge (won/kW) | Energy charge (won/kWh) | | | |
|---|---|---|---|---|---|---|
| | | | Time period | summer (Jun.1~Aug.31) | spring/fall (Mar.1~May.31/ Sep.1~Oct.31) | winter (Nov.1~Feb.28) |
| High-Voltage A | option I | 6,490 | off-peak load | 60.5 | 60.5 | 67.9 |
| | | | mid-load | 86.3 | 65.3 | 84.8 |
| | | | peak-load | 119.8 | 84.5 | 114.2 |
| | option II | 7,470 | off-peak load | 55.6 | 55.6 | 63.0 |
| | | | mid-load | 81.4 | 60.4 | 79.9 |
| | | | peak-load | 119.8 | 79.6 | 109.3 |

| Classification | | Demand charge (won/kW) | Time period | Energy charge (won/kWh) | | |
|---|---|---|---|---|---|---|
| | | | | summer (Jun.1~Aug.31) | spring/fall (Mar.1~May.31/ Sep.1~Oct.31) | winter (Nov.1~Feb.28) |
| High-Voltage B | option I | 6,000 | off-peak load | 57.3 | 57.3 | 64.5 |
| | | | mid-load | 84.9 | 63.9 | 82.5 |
| | | | peak-load | 118.7 | 82.7 | 111.2 |
| | option II | 6,900 | off-peak load | 52.8 | 52.8 | 60.0 |
| | | | mid-load | 80.4 | 59.4 | 78.0 |
| | | | peak-load | 114.2 | 78.2 | 106.7 |

Low-voltage : 110V~380V, High-voltage A : 3,300~66,000V, High-voltage B : 154,000V, High-voltage C : 345,000V or higher

## Industrial Service (B)

Customers using electricity for mining, manufacturing, gas production and supply, water supply defined by the Water Supply and Waterworks Installation Act; and electric railroads.

Contract demand of **300kW** or more

| Classification | | Demand charge (won/kW) | Time period | Energy charge (won/kWh) | | |
|---|---|---|---|---|---|---|
| | | | | summer (Jun.1~Aug.31) | spring/fall (Mar.1~May.31/ Sep.1~Oct.31) | winter (Nov.1~Feb.28) |
| High-Voltage A | option I | 7,220 | off-peak load | 61.6 | 61.6 | 68.6 |
| | | | mid-load | 114.5 | 84.1 | 114.7 |
| | | | peak-load | 196.6 | 114.8 | 172.2 |
| | option II | 8,320 | off-peak load | 56.1 | 56.1 | 63.1 |
| | | | mid-load | 109.0 | 78.6 | 109.2 |
| | | | peak-load | 191.1 | 109.3 | 166.7 |
| | option III | 9,810 | off-peak load | 55.2 | 55.2 | 62.5 |
| | | | mid-load | 108.4 | 77.3 | 108.6 |
| | | | peak-load | 178.7 | 101.0 | 155.5 |
| High-Voltage B | option I | 6,630 | off-peak load | 60.0 | 60.0 | 67.0 |
| | | | mid-load | 112.3 | 82.3 | 112.3 |
| | | | peak-load | 193.5 | 112.6 | 168.5 |
| | option II | 7,380 | off-peak load | 56.2 | 56.2 | 63.2 |
| | | | mid-load | 108.5 | 78.5 | 108.5 |
| | | | peak-load | 189.7 | 108.8 | 164.7 |
| | option III | 8,190 | off-peak load | 54.5 | 54.5 | 61.6 |

**PUBLIC VERSION**

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

(Energy charge: won/kWh)

| Classification | | Demand charge (won/kW) | Time period | summer (Jun.1~Aug.31) | spring/fall (Mar.1~May.31/ Sep.1~Oct.31) | winter (Nov.1~Feb.28) |
|---|---|---|---|---|---|---|
| High-Voltage C | option I | 6,590 | mid-load | 106.8 | 76.9 | 106.8 |
| | | | peak-load | 188.1 | 107.2 | 163.0 |
| | | | off-peak load | 59.5 | 59.5 | 66.4 |
| | | | mid-load | 112.4 | 82.4 | 112.0 |
| | | | peak-load | 193.3 | 112.8 | 168.6 |
| | option II | 7,520 | off-peak load | 54.8 | 54.8 | 61.7 |
| | | | mid-load | 107.7 | 77.7 | 107.3 |
| | | | peak-load | 188.6 | 108.1 | 163.9 |
| | option III | 8,090 | off-peak load | 53.7 | 53.7 | 60.6 |
| | | | mid-load | 106.6 | 76.6 | 106.2 |
| | | | peak-load | 187.5 | 107.0 | 162.8 |

Low-voltage : 110V~380V, High-voltage A : 3,300~66,000V, High-voltage B : 154,000V, High-voltage C : 345,000V or higher

## Rate schedule of the season & Time

| Classification | Spring, Summer and Fall | Winter |
|---|---|---|
| | (Jun.1 ~ Aug.31), (Mar.1~May.31 / Sep.1~Oct.31) | (Nov.1 ~ Feb.28) |
| off-peak load | 23:00~09:00 | 23:00~09:00 |
| mid-load | 09:00~10:00 12:00~13:00 17:00~23:00 | 09:00~10:00 12:00~17:00 20:00~22:00 |
| peak-load | 10:00~12:00 13:00~17:00 | 10:00~12:00 17:00~20:00 22:00~23:00 |

**Program Download**

If you want to read the PDF file, you should install the PDF Viewer program, Acrobat Reader.     PDF Viewer Download

#55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58322, KOREA
Copyright@2013 KEPCO. All Rights Reserved.

certificate for
KOSHA 18001 & K-OHSMA 18001

See Company & Group

# EXHIBIT 101

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18



Quarterly statistics

# Energy prices and taxes

Second quarter 2017

Please note that this PDF
is subject to specific
restrictions that limit its use
and distribution. The terms
and conditions are available
online at http://www.iea.org/t&c

**International Energy Agency**
Secure · Sustainable · Together

2017

# NEW ZEALAND
## Table 1 - Average prices and taxes in NZ dollars

| | Low sulphur fuel oil for industry (per tonne) | | | | | High sulphur fuel oil for industry (per tonne) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | 737.5 | - | - | - | 737.5 | 599.0 | - | - | - | 599.0 |
| 2007 | 710.4 | - | - | - | 710.4 | 581.7 | - | - | - | 581.7 |
| 2008 | .. | .. | .. | .. | .. | 812.6 | - | - | - | 812.6 |
| 2009 | .. | .. | .. | .. | .. | 684.1 | - | - | - | 684.1 |
| 2010 | .. | .. | .. | .. | .. | 822.4 | - | - | - | 822.4 |
| 2011 | .. | .. | .. | .. | .. | 844.9 | - | - | - | 844.9 |
| 2012 | .. | .. | .. | .. | .. | 861.4 | - | - | - | 861.4 |
| 2013 | .. | .. | .. | .. | .. | 825.2 | - | - | - | 825.2 |
| 2014 | .. | .. | .. | .. | .. | 769.9 | - | - | - | 769.9 |
| 2015 | .. | .. | .. | .. | .. | 542.2 | - | - | - | 542.2 |
| 2016 | .. | .. | .. | .. | .. | 430.1 | - | - | - | 430.1 |
| 2Q2016 | .. | .. | .. | .. | .. | 428.0 | - | - | - | 428.0 |
| 3Q2016 | .. | .. | .. | .. | .. | 455.3 | - | - | - | 455.3 |
| 4Q2016 | .. | .. | .. | .. | .. | 396.8 | - | - | - | 396.8 |
| 1Q2017 | .. | .. | .. | .. | .. | 514.3 | - | - | - | 514.3 |
| 2Q2017 | .. | .. | .. | .. | .. | 565.3 | - | - | - | 565.3 |

| | Light fuel oil for industry (per 1000 litres) | | | | | Light fuel oil for households (per 1000 litres) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | 675.4 | - | - | - | 675.4 | .. | .. | .. | .. | .. |
| 2007 | 658.7 | - | - | - | 658.7 | .. | .. | .. | .. | .. |
| 2008 | 941.6 | - | - | - | 941.6 | .. | .. | .. | .. | .. |
| 2009 | 698.9 | - | - | - | 698.9 | .. | .. | .. | .. | .. |
| 2010 | 799.3 | - | - | - | 799.3 | .. | .. | .. | .. | .. |
| 2011 | 976.6 | - | - | - | 976.6 | .. | .. | .. | .. | .. |
| 2012 | 969.1 | - | - | - | 969.1 | .. | .. | .. | .. | .. |
| 2013 | 928.1 | - | - | - | 928.1 | .. | .. | .. | .. | .. |
| 2014 | 856.5 | - | - | - | 856.5 | .. | .. | .. | .. | .. |
| 2015 | 633.8 | - | - | - | 633.8 | .. | .. | .. | .. | .. |
| 2016 | 515.8 | - | - | - | 515.8 | .. | .. | .. | .. | .. |
| 2Q2016 | 522.0 | - | - | - | 522.0 | .. | .. | .. | .. | .. |
| 3Q2016 | 562.1 | - | - | - | 562.1 | .. | .. | .. | .. | .. |
| 4Q2016 | 620.3 | - | - | - | 620.3 | .. | .. | .. | .. | .. |
| 1Q2017 | 675.7 | - | - | - | 675.7 | .. | .. | .. | .. | .. |
| 2Q2017 | .. | | | | | .. | .. | .. | .. | .. |

| | Automotive diesel for commercial use (per litre) | | | | | Automotive diesel for non-commercial use (per litre) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | 1.003 | 0.004 | - | 0.004 | 1.007 | 1.003 | 0.004 | 0.126 | 0.129 | 1.133 |
| 2007 | 0.926 | 0.004 | - | 0.004 | 0.930 | 0.926 | 0.004 | 0.116 | 0.120 | 1.046 |
| 2008 | 1.290 | 0.004 | - | 0.004 | 1.293 | 1.290 | 0.004 | 0.162 | 0.165 | 1.455 |
| 2009 | 0.903 | 0.004 | - | 0.004 | 0.906 | 0.903 | 0.004 | 0.113 | 0.117 | 1.020 |
| 2010 | 0.982 | 0.004 | - | 0.004 | 0.986 | 1.034 | 0.004 | 0.136 | 0.140 | 1.174 |
| 2011 | 1.172 | 0.004 | - | 0.004 | 1.176 | 1.288 | 0.004 | 0.194 | 0.198 | 1.486 |
| 2012 | 1.178 | 0.004 | - | 0.004 | 1.182 | 1.303 | 0.004 | 0.196 | 0.200 | 1.502 |
| 2013 | 1.143 | 0.004 | - | 0.004 | 1.147 | 1.276 | 0.004 | 0.192 | 0.196 | 1.472 |
| 2014 | 1.049 | 0.004 | - | 0.004 | 1.053 | 1.225 | 0.004 | 0.184 | 0.188 | 1.414 |
| 2015 | 0.809 | 0.004 | - | 0.004 | 0.812 | 0.991 | 0.004 | 0.149 | 0.153 | 1.143 |
| 2016 | 0.648 | 0.005 | - | 0.005 | 0.653 | 0.876 | 0.005 | 0.132 | 0.137 | 1.013 |
| 2Q2016 | 0.658 | 0.004 | - | 0.004 | 0.662 | 0.874 | 0.004 | 0.132 | 0.135 | 1.009 |
| 3Q2016 | 0.652 | 0.005 | - | 0.005 | 0.657 | 0.889 | 0.005 | 0.134 | 0.139 | 1.028 |
| 4Q2016 | 0.693 | 0.005 | - | 0.005 | 0.699 | 0.964 | 0.005 | 0.145 | 0.151 | 1.115 |
| 1Q2017 | 0.758 | 0.005 | - | 0.005 | 0.764 | 1.029 | 0.005 | 0.155 | 0.160 | 1.189 |
| 2Q2017 | .. | .. | | .. | .. | .. | .. | .. | .. | .. |

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
PUBLIC VERSION

208 - ENERGY PRICES AND TAXES, 2nd Quarter 2017

# NEW ZEALAND
## Table 2 - Average prices and taxes in NZ dollars

| | Premium unleaded (96 RON) gasoline (per litre) | | | | | Regular unleaded (91 RON) gasoline (per litre) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | 0.956 | 0.482 | 0.180 | 0.662 | 1.618 | 0.898 | 0.482 | 0.173 | 0.655 | 1.553 |
| 2007 | 0.929 | 0.496 | 0.178 | 0.674 | 1.603 | 0.877 | 0.496 | 0.172 | 0.668 | 1.544 |
| 2008 | 1.153 | 0.515 | 0.209 | 0.724 | 1.878 | 1.095 | 0.515 | 0.201 | 0.717 | 1.812 |
| 2009 | 0.957 | 0.536 | 0.187 | 0.723 | 1.679 | 0.889 | 0.536 | 0.178 | 0.714 | 1.603 |
| 2010 | 1.077 | 0.569 | 0.216 | 0.785 | 1.861 | 0.971 | 0.591 | 0.205 | 0.796 | 1.768 |
| 2011 | 1.284 | 0.591 | 0.281 | 0.873 | 2.157 | 1.195 | 0.595 | 0.268 | 0.863 | 2.058 |
| 2012 | 1.313 | 0.600 | 0.287 | 0.887 | 2.200 | 1.221 | 0.600 | 0.273 | 0.873 | 2.094 |
| 2013 | 1.308 | 0.626 | 0.290 | 0.916 | 2.224 | 1.203 | 0.626 | 0.274 | 0.901 | 2.103 |
| 2014 | 1.277 | 0.656 | 0.290 | 0.946 | 2.223 | 1.157 | 0.656 | 0.272 | 0.928 | 2.085 |
| 2015 | 1.153 | 0.671 | 0.274 | 0.945 | 2.097 | 0.968 | 0.671 | 0.246 | 0.917 | 1.885 |
| 2016 | 1.055 | 0.673 | 0.259 | 0.932 | 1.987 | 0.859 | 0.673 | 0.230 | 0.903 | 1.762 |
| 2Q2016 | 1.015 | 0.671 | 0.253 | 0.924 | 1.939 | 0.877 | 0.671 | 0.232 | 0.904 | 1.781 |
| 3Q2016 | 0.979 | 0.673 | 0.248 | 0.921 | 1.900 | 0.852 | 0.673 | 0.229 | 0.901 | 1.753 |
| 4Q2016 | 1.045 | 0.676 | 0.258 | 0.934 | 1.979 | 0.910 | 0.676 | 0.238 | 0.914 | 1.824 |
| 1Q2017 | 1.110 | 0.686 | 0.269 | 0.956 | 2.066 | 0.964 | 0.686 | 0.248 | 0.934 | 1.898 |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

| | Premium leaded/lead replacement gasoline (per litre) | | | | | Natural gas for industry (per megawatt hour GCV) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | x | x | x | x | x | 27.00 | 1.75 | - | 1.75 | 28.75 |
| 2007 | x | x | x | x | x | 28.98 | 1.76 | - | 1.76 | 30.74 |
| 2008 | x | x | x | x | x | 28.11 | 1.76 | - | 1.76 | 29.87 |
| 2009 | x | x | x | x | x | 31.28 | 1.75 | - | 1.75 | 33.03 |
| 2010 | x | x | x | x | x | 27.15 | 1.76 | - | 1.76 | 28.91 |
| 2011 | x | x | x | x | x | 25.62 | 1.76 | - | 1.76 | 27.37 |
| 2012 | x | x | x | x | x | 26.41 | 1.75 | - | 1.75 | 28.17 |
| 2013 | x | x | x | x | x | 27.12 | 1.75 | - | 1.75 | 28.88 |
| 2014 | x | x | x | x | x | 25.04 | 1.74 | - | 1.74 | 26.78 |
| 2015 | x | x | x | x | x | 23.61 | 1.74 | - | 1.74 | 25.34 |
| 2016 | x | x | x | x | x | 20.34 | 1.73 | - | 1.73 | 22.07 |
| 2Q2016 | x | x | x | x | x | 19.74 | 1.73 | - | 1.73 | 21.47 |
| 3Q2016 | x | x | x | x | x | 19.68 | 1.73 | - | 1.73 | 21.41 |
| 4Q2016 | x | x | x | x | x | 21.80 | 1.73 | - | 1.73 | 23.54 |
| 1Q2017 | x | x | x | x | x | 23.47 | 1.73 | - | 1.73 | 25.20 |
| 2Q2017 | x | x | x | x | x | .. | .. | .. | .. | .. |

| | Natural gas for electricity generation (per megawatt hour GCV) | | | | | Natural gas for households (per megawatt hour GCV) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | c | c | c | c | c | 88.33 | 1.75 | 11.26 | 13.01 | 101.34 |
| 2007 | c | c | c | c | c | 109.99 | 1.76 | 13.97 | 15.73 | 125.72 |
| 2008 | c | c | c | c | c | 125.23 | 1.76 | 15.87 | 17.63 | 142.86 |
| 2009 | c | c | c | c | c | 102.33 | 1.75 | 13.01 | 14.77 | 117.10 |
| 2010 | c | c | c | c | c | 103.80 | 1.76 | 13.85 | 15.61 | 119.40 |
| 2011 | c | c | c | c | c | 112.45 | 1.76 | 17.13 | 18.89 | 131.34 |
| 2012 | c | c | c | c | c | 113.91 | 1.75 | 17.35 | 19.10 | 133.01 |
| 2013 | c | c | c | c | c | 116.75 | 1.75 | 17.78 | 19.53 | 136.28 |
| 2014 | c | c | c | c | c | 113.50 | 1.74 | 17.29 | 19.03 | 132.53 |
| 2015 | c | c | c | c | c | 113.79 | 1.74 | 17.33 | 19.06 | 132.86 |
| 2016 | c | c | c | c | c | 118.65 | 1.73 | 18.06 | 19.79 | 138.44 |
| 2Q2016 | c | c | c | c | c | 117.10 | 1.73 | 17.83 | 19.56 | 136.66 |
| 3Q2016 | c | c | c | c | c | 118.88 | 1.73 | 18.09 | 19.83 | 138.71 |
| 4Q2016 | c | c | c | c | c | 118.65 | 1.73 | 18.06 | 19.79 | 138.44 |
| 1Q2017 | c | c | c | c | c | 107.06 | 1.73 | 16.32 | 18.05 | 125.12 |
| 2Q2017 | c | c | c | c | c | .. | .. | .. | .. | .. |

Filed By: cyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

© OECD/IEA, 2017

**NEW ZEALAND**
**Table 3 - Average prices and taxes in NZ dollars**

| | Steam coal for industry (per tonne) | | | | | Steam coal for electricity generation (per tonne) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | c | c | c | c | c | c | c | c | c | c |
| 2007 | c | c | c | c | c | c | c | c | c | c |
| 2008 | c | c | c | c | c | c | c | c | c | c |
| 2009 | c | c | c | c | c | c | c | c | c | c |
| 2010 | c | c | c | c | c | c | c | c | c | c |
| 2011 | c | c | c | c | c | c | c | c | c | c |
| 2012 | c | c | c | c | c | c | c | c | c | c |
| 2013 | c | c | c | c | c | c | c | c | c | c |
| 2014 | c | c | c | c | c | c | c | c | c | c |
| 2015 | c | c | c | c | c | c | c | c | c | c |
| 2016 | c | c | c | c | c | c | c | c | c | c |
| 2Q2016 | c | c | c | c | c | c | c | c | c | c |
| 3Q2016 | c | c | c | c | c | c | c | c | c | c |
| 4Q2016 | c | c | c | c | c | c | c | c | c | c |
| 1Q2017 | c | c | c | c | c | c | c | c | c | c |
| 2Q2017 | c | c | c | c | c | c | c | c | c | c |

| | Steam coal for households (per tonne) | | | | | Coking coal for industry (per tonne) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | x | x | x | x | x | c | c | c | c | c |
| 2007 | x | x | x | x | x | c | c | c | c | c |
| 2008 | x | x | x | x | x | c | c | c | c | c |
| 2009 | x | x | x | x | x | c | c | c | c | c |
| 2010 | x | x | x | x | x | c | c | c | c | c |
| 2011 | x | x | x | x | x | c | c | c | c | c |
| 2012 | x | x | x | x | x | c | c | c | c | c |
| 2013 | x | x | x | x | x | c | c | c | c | c |
| 2014 | x | x | x | x | x | c | c | c | c | c |
| 2015 | x | x | x | x | x | c | c | c | c | c |
| 2016 | x | x | x | x | x | c | c | c | c | c |
| 2Q2016 | x | x | x | x | x | c | c | c | c | c |
| 3Q2016 | x | x | x | x | x | c | c | c | c | c |
| 4Q2016 | x | x | x | x | x | c | c | c | c | c |
| 1Q2017 | x | x | x | x | x | c | c | c | c | c |
| 2Q2017 | x | x | x | x | x | c | c | c | c | c |

| | Electricity for industry (per megawatt hour) | | | | | Electricity for households (per megawatt hour) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | GST | Total tax | Total price | Ex-tax price | Excise tax | GST | Total tax | Total price |
| 2006 | 93.0 | - | - | - | 93.0 | 177.2 | - | 22.1 | 22.1 | 199.3 |
| 2007 | 97.9 | - | - | - | 97.9 | 186.4 | - | 23.3 | 23.3 | 209.7 |
| 2008 | 108.0 | - | - | - | 108.0 | 195.8 | - | 24.5 | 24.5 | 220.3 |
| 2009 | 102.5 | - | - | - | 102.5 | 204.1 | - | 25.5 | 25.5 | 229.6 |
| 2010 | 97.8 | - | - | - | 97.8 | 215.0 | - | 28.2 | 28.2 | 243.2 |
| 2011 | 103.1 | - | - | - | 103.1 | 223.6 | - | 33.5 | 33.5 | 257.2 |
| 2012 | 109.4 | - | - | - | 109.4 | 232.5 | - | 34.9 | 34.9 | 267.4 |
| 2013 | 115.8 | - | - | - | 115.8 | 240.0 | - | 36.0 | 36.0 | 276.0 |
| 2014 | 120.7 | - | - | - | 120.7 | 247.5 | - | 37.1 | 37.1 | 284.7 |
| 2015 | .. | .. | .. | .. | .. | 244.5 | - | 36.7 | 36.7 | 281.2 |
| 2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 3Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 4Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 1Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

© OECD/IEA, 2017

Barcode:3814772-146 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

210 - ENERGY PRICES AND TAXES, 2nd Quarter 2017

## NEW ZEALAND
### Table 4 - Indices of energy prices

| | Oil products | | Electricity | | Natural gas | | Coal | |
|---|---|---|---|---|---|---|---|---|
| | Wholesale | Retail | Wholesale | Retail | Wholesale | Retail | Wholesale | Retail |
| | 4Q2010 = 100 | 2Q2006 = 100 | 4Q1997 = 100 | 2Q2006 = 100 | 4Q1997 = 100 | 2Q2006 = 100 | 4Q1997 = 100 | 2Q2006 = 100 |
| 1996 | 43.9 | 54.0 | 97.2 | 65.4 | 98.7 | 54.7 | 100.2 | 71.2 |
| 1997 | 43.8 | 54.1 | 99.0 | 68.2 | 99.5 | 58.6 | 100.2 | 74.1 |
| 1998 | 41.9 | 50.8 | 99.5 | 70.2 | 100.2 | 61.8 | 99.6 | 74.8 |
| 1999 | 43.3 | 51.1 | 96.2 | 71.5 | 100.9 | 62.7 | 100.0 | 74.9 |
| 2000 | 56.0 | 63.8 | 92.9 | 72.1 | 103.1 | 65.3 | 99.9 | 76.6 |
| 2001 | 58.9 | 62.5 | 95.3 | 72.1 | 109.1 | 68.4 | 101.4 | 80.3 |
| 2002 | 57.8 | 61.4 | 100.8 | 75.7 | 113.8 | 72.4 | 105.7 | 83.7 |
| 2003 | 57.4 | 62.8 | 104.4 | 80.5 | 126.6 | 77.9 | 113.1 | 85.4 |
| 2004 | 61.8 | 69.5 | 114.5 | 88.0 | 143.4 | 87.0 | 127.9 | 88.3 |
| 2005 | 72.3 | 78.7 | 126.3 | 94.4 | 159.0 | 94.2 | 143.7 | 94.7 |
| 2006 | 86.8 | 92.6 | 134.8 | 100.3 | 169.0 | 102.3 | 156.2 | 100.5 |
| 2007 | 90.6 | 92.0 | 124.6 | 106.9 | 187.3 | 110.4 | 177.4 | 103.5 |
| 2008 | 113.5 | 107.9 | 160.6 | 114.2 | 190.5 | 123.7 | 193.3 | 105.1 |
| 2009 | 91.5 | 95.7 | 147.7 | 119.7 | 193.3 | 126.6 | 211.0 | 108.6 |
| 2010 | 99.1 | 105.5 | 147.8 | 123.3 | 188.3 | 132.2 | 219.1 | 111.2 |
| 2011 | 117.2 | 122.9 | 147.0 | 129.7 | 188.0 | 136.9 | 227.1 | 114.8 |
| 2012 | 121.8 | 125.1 | 158.6 | 134.7 | 182.5 | 136.8 | 236.4 | 118.1 |
| 2013 | 115.2 | 125.7 | 157.9 | 139.8 | 179.9 | 136.3 | 243.6 | 117.9 |
| 2014 | 108.3 | 124.9 | 156.8 | 144.9 | 169.0 | 139.3 | 260.0 | 121.4 |
| 2015 | 80.8 | 113.2 | 154.2 | 146.4 | 166.8 | 138.8 | .. | 124.8 |
| 2016 | 64.4 | 106.0 | 150.6 | 148.8 | 172.7 | 143.1 | .. | 129.6 |
| 2Q2009 | 91.8 | 95.7 | 156.8 | 120.1 | 196.4 | 126.0 | 207.3 | 109.1 |
| 3Q2009 | 91.4 | 97.7 | 160.2 | 120.4 | 190.3 | 126.9 | 214.6 | 109.7 |
| 4Q2009 | 90.1 | 96.7 | 143.2 | 120.0 | 188.4 | 128.3 | 214.6 | 109.7 |
| 1Q2010 | 97.5 | 103.4 | 144.2 | 120.2 | 193.5 | 130.7 | 216.0 | 109.7 |
| 2Q2010 | 100.0 | 104.8 | 154.1 | 121.4 | 189.4 | 131.1 | 216.0 | 111.0 |
| 3Q2010 | 98.8 | 103.4 | 153.8 | 124.8 | 182.2 | 132.1 | 219.8 | 112.1 |
| 4Q2010 | 100.0 | 110.4 | 139.0 | 126.9 | 187.9 | 134.7 | 224.7 | 112.1 |
| 1Q2011 | 109.8 | 121.1 | 142.2 | 127.4 | 193.7 | 137.6 | 224.7 | 112.1 |
| 2Q2011 | 121.3 | 125.9 | 144.7 | 130.9 | 188.2 | 137.5 | 224.7 | 114.6 |
| 3Q2011 | 119.8 | 121.7 | 156.5 | 130.5 | 187.6 | 136.2 | 228.3 | 116.2 |
| 4Q2011 | 118.0 | 122.8 | 144.5 | 129.9 | 182.5 | 136.4 | 230.6 | 116.2 |
| 1Q2012 | 121.8 | 125.6 | 151.3 | 130.0 | 184.8 | 137.1 | 231.1 | 116.2 |
| 2Q2012 | 122.9 | 126.1 | 173.8 | 135.8 | 182.8 | 136.4 | 230.7 | 118.2 |
| 3Q2012 | 121.1 | 124.9 | 167.8 | 136.3 | 178.8 | 135.9 | 241.8 | 119.0 |
| 4Q2012 | 121.2 | 123.9 | 141.3 | 136.6 | 183.7 | 137.9 | 242.0 | 119.0 |
| 1Q2013 | 118.9 | 125.8 | 156.5 | 136.8 | 184.9 | 136.5 | 242.0 | 119.0 |
| 2Q2013 | 116.2 | 122.6 | 173.1 | 140.4 | 183.8 | 137.0 | 243.4 | 119.2 |
| 3Q2013 | 113.7 | 129.5 | 162.7 | 141.2 | 184.1 | 136.8 | 244.4 | 116.7 |
| 4Q2013 | 112.0 | 125.9 | 139.2 | 140.7 | 166.9 | 134.9 | 244.4 | 116.7 |
| 1Q2014 | 112.4 | 126.2 | 150.6 | 140.8 | 167.2 | 139.4 | 259.1 | 116.7 |
| 2Q2014 | 111.6 | 126.0 | 170.7 | 146.7 | 167.2 | 139.2 | 261.1 | 119.4 |
| 3Q2014 | 108.7 | 127.2 | 162.5 | 146.4 | 168.9 | 139.2 | 258.8 | 124.8 |
| 4Q2014 | 100.6 | 120.0 | 143.3 | 145.7 | 172.8 | 139.4 | 260.9 | 124.8 |
| 1Q2015 | 81.3 | 107.3 | 146.3 | 145.8 | 166.0 | 138.6 | 260.6 | 124.8 |
| 2Q2015 | 83.2 | 116.7 | 163.6 | 146.7 | 166.0 | 138.0 | .. | 126.1 |
| 3Q2015 | 83.6 | 118.6 | 164.6 | 146.6 | 165.7 | 138.1 | .. | 124.1 |
| 4Q2015 | 75.0 | 110.3 | 142.3 | 146.3 | 169.4 | 140.3 | .. | 124.1 |
| 1Q2016 | 61.3 | 101.8 | 148.5 | 146.6 | 176.1 | 140.2 | .. | 124.1 |
| 2Q2016 | 62.2 | 107.2 | 158.6 | 149.2 | 169.6 | 143.7 | .. | 130.6 |
| 3Q2016 | 63.7 | 105.4 | 157.6 | 149.9 | 172.8 | 143.8 | .. | 131.8 |
| 4Q2016 | 70.5 | 109.7 | 137.7 | 149.6 | 172.4 | 144.7 | .. | 131.8 |
| 1Q2017 | 73.2 | 114.2 | 144.5 | 149.8 | 173.9 | 144.1 | .. | 131.8 |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. |

Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

© OECD/IEA, 2017

# NEW ZEALAND

## Sources

Prices and taxes data for all energy products are provided on a quarterly basis by the **Ministry of Business, Innovation and Employment (MBIE)**.

Energy price indices are provided on a quarterly basis by **Statistics New Zealand**.

## Data collection methodology

Prior to 1Q1986, prices refer to the end of the quarter. From 1Q1986 to 4Q1989, prices refer to the second month of the quarter. From 1Q1990 onwards, prices refer to quarterly averages.

Data collection for all products covers the whole country. For all products, MBIE collects end-use prices and calculates the ex-tax price by subtracting the applicable taxes from the end-use prices.

### Oil products

From 3Q1987 onwards, oil product prices refer to market prices (no price control). Prior to 3Q1987, prices refer to retail prices set by Government regulation.

For high sulphur fuel oil, low sulphur fuel oil and automotive diesel for commercial users, prices are calculated based on a quarterly price survey of the four largest oil companies in the country and monthly sales data for the same companies collected by MBIE analysts. These two series are combined to obtain quarterly and annual average price series, weighted by each company's market share.

For automotive diesel for non-commercial users, premium unleaded (95 RON) gasoline and regular unleaded gasoline, quarterly prices are collected by Statistics New Zealand. Prices are net of discounts obtained through supermarkets and loyalty schemes.

Since 1998, electricity generation from heavy fuel oil, used for peak capacity, has been negligible.

### Natural gas

For industry and households, prices are calculated by dividing the total sales revenues by total consumption, based on data obtained in quarterly surveys of retailers.

For electricity generation, prices are confidential.

## Steam and coking coal

For steam and coking coal prices for industry and electricity generation, prices are confidential.

## Electricity

For industry and households, prices are calculated by adding sales revenues, obtained in quarterly surveys of electricity retailers, and dividing the total by sectoral consumption data obtained in the same survey.

For industry, MBIE supplements the information with quarterly data on large industrial consumers connected to the national grid and purchasing electricity directly in an open market, supplied by Transpower, the national grid operator.

Electricity distribution companies supply additional detailed information regarding directly invoiced customers on an annual basis. As these companies reconcile their financial accounts in March each year, there is a mismatch between the sources. In order to ensure consistency with historical series, MBIE can only produce annual electricity data.

## Energy price indices

For wholesale indices, quarterly data refer to the last month of each quarter. Retail indices refer to the Consumer Price Indices (CPIs) produced by Statistics New Zealand on a quarterly basis.

Annual figures are averages of the quarterly data shown.

Wholesale indices for oil products refer to Series PPIQ.SQUCC5110. Prices for premium motor spirit and diesel make up 64% of the index, with other (non-crude) petroleum oils making up a further 21% which include other fuel oils such as aviation fuel, light fuel oil and lubricating oils. Prices for this index are collected from the four major oil products retailers in New Zealand.

Retail indices for oil products refer to petrol (Series CPIQ.SE907202).

Wholesale indices for electricity refer to Series PPIQ.SPB17100M. Ninety quotes provided from 15 different electricity retailers, for a series of "model services" in which usage details of a firm (deemed to a representative customer) are provided to the retailer. The electricity retailer reports their estimate of the monthly charge for the middle month of the reference quarter. Three different sized models are provided to each retailer (for small, medium, and large electricity users) as well as separate quotes to take account of summer and winter pricing differences.

Retail indices for electricity refer to electricity (Series CPIQ.SE904501).

212 - ENERGY PRICES AND TAXES, 2nd Quarter 2017                                                NEW ZEALAND

Wholesale indices for natural gas refer to Series PPIQ.SPB12000E, compiled using the same methodology as commercial electricity index, but with a smaller number of price quotations.

Retail indices for natural gas refer to gas (Series CPIQ.SE904502).

Wholesale indices for coal refer to Series PPIQ.SPME110C, which uses 27 different price quotes. All report a price per tonne for a specified grade of coal from a specified mine or location. Prices are an average wholesale price for the middle month of the reference quarter.

Retail indices for coal refer to solid fuels (Series CPIQ.SE904503).

## Energy taxation

## GST

The Goods and services tax (*GST*) applies to all energy products. The GST is refunded for purchases for commercial consumers. Therefore, it is not included in prices shown for the industrial and electricity generation sectors, as well as for automotive fuels for commercial use.

| From | To | % |
| --- | --- | --- |
| 01.10.86 | 30.06.89 | 10.0 |
| 01.07.89 | 30.09.10 | 12.5 |
| 01.10.10 | now | 15.0 |

## Excise tax

The Energy (Fuels, Levies, and References) Act (1989/140) sets out the basic legal framework for the energy taxation system.

In general, excise taxes imposed on energy products are applied for the purposes of covering the costs incurred by the administration as a result of energy use.

Automotive diesel is not taxed at the pump, as diesel-powered vehicle owners are subject to annual Road User Charges (RUC), paid on a per-kilometer basis and contribute to the Accident Compensation Corporation (ACC) through annual licensing fees. These charges are not included in the excise tax column for automotive diesel. Similarly, bioethanol is subject to excise duty but biodiesel is subject to the RUC. The combination of levies is set so that the average gasoline-powered vehicle pays a similar amount to what is paid by diesel-powered vehicle owners.

Electricity and fuels used for electricity generation are not taxed. Fuels for heating and process uses are, in general, either not taxed or subject to a full refund, and are therefore not included in the excise tax column in this publication.

Levies are exclusive of goods and services tax under the Goods and Services Tax Act 1985.

**Tax applicability table (not exhaustive)**

| | HSFO/LSFO | LFO | Diesel | Gasoline | LPG | Natural gas | Steam coal | Coking coal | Electricity |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| National land transport fund | | | | × | × | | | | |
| Accident compensation corporation levy | | | | × | | | | | |
| Petroleum or engine fuel monitoring levy | | | × | × | | | | | |
| Local authorities fuel tax | | | × | × | | | | | |
| Energy resources levy | | | | | × | × | × | × | |
| Wholesale gas levy | | | | | | × | | | |

**National land transport fund**

Land transport funding is governed by the Land Transport Management Act 2003 and subsequent amendments.

The revenue collected goes to the National Land Transport Fund to fund the National Land Transport Programme, which focuses on building and maintaining New Zealand's transport network.

**Accident compensation corporation levy**

The Accident Compensation Corporation (ACC) levy was introduced on 1 July 2003, to cover the cost of accidents and rehabilitation for victims of accidents in public roads, and is financed by annual licensing fees and levies on road fuels.

**Petroleum or engine fuel monitoring levy**

An additional levy applies to transportation fuels. In 2016, the Energy (Fuels, Levies, and References) Act (1989/140) was amended to eliminate the previous maximum rate of 0.00045 NZD/l.

The Petroleum or engine fuel monitoring levy is a funding mechanism for New Zealand's IEA oil stockholding obligations, which were previously funded through general taxation.

**Local authorities fuel tax**

Cities and district councils impose an additional tax on transportation fuels, available for general local government expenditure. The tax rate, on a per litre basis, doesn't vary across the country and is relatively stable in time.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

© OECD/IEA, 2017

NEW ZEALAND | ENERGY PRICES AND TAXES, 2nd Quarter 2017 - **213**

## Energy resources levy

The Energy resources levy, established by the Energy Resources Levy Act (1976/71) applies to locally produced coal, as well as natural gas and LPG produced from certain fields.

Natural gas produced in fields discovered after 1 January 1986 is exempt.

Since its introduction on 1 January 1977, this levy has remained at a flat rate of 1.5 NZD/tonne for South Island lignite, 2 NZD/tonne for all other local coal qualities, and 0.45 NZD/GJ for natural gas.

## Wholesale gas levy

Under the Energy (Fuels, Levies, and References) Act (1989/140), natural gas used for electricity generation is exempt from levies. This Act also establishes a maximum tax rate of 0.02 NZD/GJ.

Under the Gas Levy (1992/124), the Gas Industry Company (the gas industry co-regulator) can recommend the natural gas levy rates imposed on industrial consumers on a per GJ basis.

Retail natural gas consumers are subject to a fixed annual levy independent of consumption.

## National land transport fund

| From | To | Gasoline (NZD/l) |
|------|------|------|
| 15.05.98 | 30.06.00 | 0.136 |
| 01.07.00 | 28.02.02 | 0.135 |
| 01.03.02 | 30.09.04 | 0.177 |
| 01.10.04 | 31.03.05 | 0.175 |
| 01.04.05 | 31.03.06 | 0.225 |
| 01.04.06 | 31.03.07 | 0.232 |
| 01.04.07 | 30.09.08 | 0.238 |
| 01.10.08 | 30.09.09 | 0.425 |
| 01.10.09 | 30.09.10 | 0.455 |
| 01.10.10 | 31.07.12 | 0.485 |
| 01.08.12 | 30.06.13 | 0.505 |
| 01.07.13 | 30.06.14 | 0.535 |
| 01.07.14 | 30.06.15 | 0.565 |
| 01.07.15 | now | 0.595 |

## Accident compensation corporation levy

| From | To | Gasoline (NZD/l) |
|------|------|------|
| 01.10.91 | 19.03.01 | 0.020 |
| 20.03.01 | 30.06.01 | 0.030 |
| 01.07.01 | 30.06.03 | 0.023 |
| 01.07.03 | 30.06.05 | 0.051 |
| 01.07.05 | 30.06.07 | 0.058 |
| 01.07.07 | 30.06.08 | 0.073 |
| 01.07.08 | 30.06.09 | 0.093 |
| 01.07.09 | 30.06.15 | 0.099 |
| 01.07.15 | now | 0.069 |

## Petroleum or engine fuel monitoring levy

| From | To | Automotive diesel (NZD/l) | Gasoline (NZD/l) |
|------|------|------|------|
| 01.01.89 | 30.09.08 | 0.00025 | 0.00025 |
| 01.10.08 | 30.06.16 | 0.00045 | 0.00045 |

© OECD/IEA, 2017

| From | To | Automotive diesel (NZD/l) | Gasoline (NZD/l) |
|------|-----|-----|-----|
| 01.07.16 | now | 0.00200 | 0.00200 |

**Local authorities fuel tax**

| From | To | Automotive diesel (NZD/l) | Gasoline (NZD/l) |
|------|-----|-----|-----|
| 01.02.71 | now | 0.0033 | 0.0066 |

**Wholesale gas levy**

| From | To | Natural gas industry (NZD/MWh) |
|------|-----|-----|
| 01.07.05 | 30.06.06 | 0.054 |
| 01.07.06 | 30.06.07 | 0.064 |
| 01.07.07 | 30.06.08 | 0.069 |
| 01.07.08 | 30.06.09 | 0.064 |
| 01.07.09 | 30.06.10 | 0.060 |
| 01.07.10 | 30.06.11 | 0.066 |
| 01.07.11 | 30.06.12 | 0.060 |
| 01.07.12 | 30.06.13 | 0.063 |
| 01.07.13 | 30.06.14 | 0.059 |
| 01.07.14 | 30.06.15 | 0.047 |
| 01.07.15 | 30.06.13 | 0.040 |
| 01.07.16 | now | 0.041 |

## Product specifications

|  | High sulphur fuel oil | Light fuel oil | Automotive diesel | Premium unleaded (95 RON) gasoline | Regular unleaded gasoline | Natural gas | Steam coal |
|------|-----|-----|-----|-----|-----|-----|-----|
| Quality | Heavy fuel oil | Blended heating oil | Automotive gasoil |  |  |  | Bituminous coal |
| Octane number |  |  |  | 95 | 91 |  |  |
| Density (kg/l) | 0.945 | 0.824 | 0.822 | 0.757 | 0.739 |  |  |
| Sulphur content (%) | <3 | <2 | <0.01 | <0.005 | <0.005 |  |  |
| NCV (kcal/kg) |  |  |  |  |  |  |  |
| GCV (kcal/m$^3$) | 10 129 | 10 366 | 10 297 | 10 466 | 10 296 |  | 6 836 |

Filed By: aprice@xileyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

© OECD/IEA, 2017



Quarterly statistics

# Energy prices and taxes

Second quarter 2017

Please note that this PDF
is subject to specific
restrictions that limit its use
and distribution. The terms
and conditions are available
online at http://www.iea.org/t&c

**International Energy Agency**
Secure
Sustainable
Together

2017

## ITALY
### Table 1 - Average prices and taxes in euros

| | Low sulphur fuel oil for industry (per tonne) | | | | | High sulphur fuel oil for industry (per tonne) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | 317.78 | 31.39 | - | 31.39 | 349.17 | .. | .. | .. | .. | .. |
| 2007 | 310.81 | 31.39 | - | 31.39 | 342.20 | .. | .. | .. | .. | .. |
| 2008 | 402.39 | 31.39 | - | 31.39 | 433.78 | .. | .. | .. | .. | .. |
| 2009 | 299.60 | 31.39 | - | 31.39 | 330.99 | .. | .. | .. | .. | .. |
| 2010 | 408.39 | 31.39 | - | 31.39 | 439.78 | .. | .. | .. | .. | .. |
| 2011 | 528.31 | 31.39 | - | 31.39 | 559.70 | .. | .. | .. | .. | .. |
| 2012 | 612.40 | 31.39 | - | 31.39 | 643.79 | .. | .. | .. | .. | .. |
| 2013 | 542.56 | 31.39 | - | 31.39 | 573.95 | .. | .. | .. | .. | .. |
| 2014 | 506.22 | 31.39 | - | 31.39 | 537.61 | .. | .. | .. | .. | .. |
| 2015 | 354.76 | 31.39 | - | 31.39 | 386.15 | .. | .. | .. | .. | .. |
| 2016 | 283.56 | 31.39 | - | 31.39 | 314.95 | .. | .. | .. | .. | .. |
| 2Q2016 | 255.78 | 31.39 | - | 31.39 | 287.17 | .. | .. | .. | .. | .. |
| 3Q2016 | 291.62 | 31.39 | - | 31.39 | 323.01 | .. | .. | .. | .. | .. |
| 4Q2016 | 331.31 | 31.39 | - | 31.39 | 362.70 | .. | .. | .. | .. | .. |
| 1Q2017 | 371.65 | 31.39 | - | 31.39 | 403.04 | .. | .. | .. | .. | .. |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

| | Light fuel oil for industry (per 1000 litres) | | | | | Light fuel oil for households (per 1000 litres) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | 517.81 | 403.21 | - | 403.21 | 921.02 | 517.81 | 403.21 | 184.20 | 587.41 | 1 105.22 |
| 2007 | 534.97 | 403.21 | - | 403.21 | 938.18 | 534.97 | 403.21 | 187.64 | 590.85 | 1 125.82 |
| 2008 | 625.09 | 403.21 | - | 403.21 | 1 028.30 | 625.09 | 403.21 | 205.66 | 608.87 | 1 233.96 |
| 2009 | 464.89 | 403.21 | - | 403.21 | 868.10 | 464.89 | 403.21 | 173.62 | 576.83 | 1 041.72 |
| 2010 | 573.21 | 403.21 | - | 403.21 | 976.42 | 573.21 | 403.21 | 195.28 | 598.49 | 1 171.71 |
| 2011 | 722.71 | 403.21 | - | 403.21 | 1 125.92 | 722.71 | 403.21 | 228.45 | 631.66 | 1 354.37 |
| 2012 | 799.08 | 403.21 | - | 403.21 | 1 202.29 | 799.08 | 403.21 | 252.48 | 655.69 | 1 454.76 |
| 2013 | 767.58 | 403.21 | - | 403.21 | 1 170.79 | 767.58 | 403.21 | 248.79 | 652.00 | 1 420.80 |
| 2014 | 727.12 | 403.21 | - | 403.21 | 1 130.33 | 727.12 | 403.21 | 248.67 | 651.88 | 1 379.00 |
| 2015 | 553.77 | 403.21 | - | 403.21 | 956.98 | 553.77 | 403.21 | 210.54 | 613.75 | 1 167.51 |
| 2016 | 494.17 | 403.21 | - | 403.21 | 897.38 | 494.17 | 403.21 | 197.42 | 600.63 | 1 094.81 |
| 2Q2016 | 494.94 | 403.21 | - | 403.21 | 898.15 | 494.94 | 403.21 | 197.59 | 600.80 | 1 095.74 |
| 3Q2016 | 501.73 | 403.21 | - | 403.21 | 904.94 | 501.73 | 403.21 | 199.09 | 602.30 | 1 104.03 |
| 4Q2016 | 540.85 | 403.21 | - | 403.21 | 944.06 | 540.85 | 403.21 | 207.69 | 610.90 | 1 151.76 |
| 1Q2017 | 581.92 | 403.21 | - | 403.21 | 985.13 | 581.92 | 403.21 | 216.73 | 619.94 | 1 201.86 |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

| | Automotive diesel for commercial use (per litre) | | | | | Automotive diesel for non-commercial use (per litre) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | 0.556 | 0.414 | - | 0.414 | 0.970 | 0.556 | 0.414 | 0.194 | 0.608 | 1.164 |
| 2007 | 0.550 | 0.420 | - | 0.420 | 0.970 | 0.550 | 0.420 | 0.194 | 0.614 | 1.164 |
| 2008 | 0.699 | 0.421 | - | 0.421 | 1.120 | 0.699 | 0.421 | 0.224 | 0.645 | 1.344 |
| 2009 | 0.478 | 0.423 | - | 0.423 | 0.901 | 0.478 | 0.423 | 0.180 | 0.603 | 1.081 |
| 2010 | 0.590 | 0.423 | - | 0.423 | 1.013 | 0.590 | 0.423 | 0.203 | 0.626 | 1.216 |
| 2011 | 0.745 | 0.459 | - | 0.459 | 1.204 | 0.745 | 0.459 | 0.244 | 0.703 | 1.448 |
| 2012 | 0.804 | 0.606 | - | 0.606 | 1.410 | 0.804 | 0.606 | 0.296 | 0.902 | 1.706 |
| 2013 | 0.750 | 0.617 | - | 0.617 | 1.367 | 0.750 | 0.617 | 0.291 | 0.908 | 1.658 |
| 2014 | 0.700 | 0.619 | - | 0.619 | 1.320 | 0.700 | 0.619 | 0.290 | 0.910 | 1.610 |
| 2015 | 0.535 | 0.617 | - | 0.617 | 1.153 | 0.535 | 0.617 | 0.254 | 0.871 | 1.406 |
| 2016 | 0.434 | 0.617 | - | 0.617 | 1.051 | 0.434 | 0.617 | 0.231 | 0.849 | 1.282 |
| 2Q2016 | 0.429 | 0.617 | - | 0.617 | 1.047 | 0.429 | 0.617 | 0.230 | 0.848 | 1.277 |
| 3Q2016 | 0.447 | 0.617 | - | 0.617 | 1.064 | 0.447 | 0.617 | 0.234 | 0.852 | 1.299 |
| 4Q2016 | 0.475 | 0.617 | - | 0.617 | 1.092 | 0.475 | 0.617 | 0.240 | 0.858 | 1.333 |
| 1Q2017 | 0.529 | 0.617 | - | 0.617 | 1.146 | 0.529 | 0.617 | 0.252 | 0.870 | 1.398 |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

© OECD/IEA, 2017

Barcode:3814772-147 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
PUBLIC VERSION

**158 -** ENERGY PRICES AND TAXES, 2nd Quarter 2017

## ITALY
### Table 2 - Average prices and taxes in euros

| | Premium unleaded (95 RON) gasoline (per litre) | | | | | Premium leaded/lead replacement gasoline (per litre) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | 0.507 | 0.564 | 0.214 | 0.778 | 1.286 | x | x | x | x | x |
| 2007 | 0.519 | 0.564 | 0.217 | 0.781 | 1.299 | x | x | x | x | x |
| 2008 | 0.588 | 0.562 | 0.230 | 0.792 | 1.381 | x | x | x | x | x |
| 2009 | 0.464 | 0.564 | 0.206 | 0.770 | 1.234 | x | x | x | x | x |
| 2010 | 0.573 | 0.564 | 0.227 | 0.791 | 1.364 | x | x | x | .x | x |
| 2011 | 0.696 | 0.598 | 0.262 | 0.860 | 1.555 | x | x | x | x | x |
| 2012 | 0.760 | 0.717 | 0.310 | 1.027 | 1.787 | x | x | x | x | x |
| 2013 | 0.714 | 0.728 | 0.306 | 1.035 | 1.749 | x | x | x | x | x |
| 2014 | 0.673 | 0.730 | 0.309 | 1.039 | 1.712 | x | x | x | x | x |
| 2015 | 0.532 | 0.728 | 0.277 | 1.006 | 1.538 | x | x | x | x | x |
| 2016 | 0.455 | 0.728 | 0.260 | 0.989 | 1.444 | x | x | x | x | x |
| 2Q2016 | 0.460 | 0.728 | 0.261 | 0.990 | 1.450 | x | x | x | x | x |
| 3Q2016 | 0.458 | 0.728 | 0.261 | 0.989 | 1.448 | x | x | x | x | x |
| 4Q2016 | 0.486 | 0.728 | 0.267 | 0.996 | 1.482 | x | x | x | x | x |
| 1Q2017 | 0.539 | 0.728 | 0.279 | 1.007 | 1.546 | x | x | x . | x | x |
| 2Q2017 | .. | .. | .. | .. | .. | x | x | x | x | x |

| | Automotive LPG for non-commercial use (per litre) | | | | | Natural gas for industry (per megawatt hour GCV) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | 0.390 | 0.149 | 0.108 | 0.257 | 0.647 | 27.07 | 4.06 | - | 4.06 | 31.12 |
| 2007 | 0.396 | 0.125 | 0.104 | 0.230 | 0.626 | 26.90 | 3.93 | - | 3.93 | 30.83 |
| 2008 | 0.443 | 0.124 | 0.113 | 0.238 | 0.681 | 33.86 | 4.16 | - | 4.16 | 38.02 |
| 2009 | 0.342 | 0.125 | 0.094 | 0.219 | 0.561 | 30.26 | 4.26 | - | 4.26 | 34.52 |
| 2010 | 0.426 | 0.125 | 0.110 | 0.235 | 0.661 | 29.15 | 2.20 | - | 2.20 | 31.36 |
| 2011 | 0.502 | 0.125 | 0.127 | 0.253 | 0.755 | 32.53 | 2.82 | - | 2.82 | 35.36 |
| 2012 | 0.533 | 0.147 | 0.143 | 0.290 | 0.823 | 38.81 | 3.78 | - | 3.78 | 42.59 |
| 2013 | 0.517 | 0.147 | 0.141 | 0.288 | 0.806 | 38.40 | 4.08 | - | 4.08 | 42.49 |
| 2014 | 0.484 | 0.147 | 0.139 | 0.286 | 0.770 | 34.77 | 3.58 | - | 3.58 | 38.35 |
| 2015 | 0.355 | 0.147 | 0.111 | 0.258 | 0.613 | 33.81 | 3.83 | .. | 3.83 | 37.64 |
| 2016 | 0.314 | 0.147 | 0.102 | 0.249 | 0.563 | 29.50 | 3.57 | .. | 3.57 | 33.08 |
| 2Q2016 | 0.306 | 0.147 | 0.100 | 0.247 | 0.552 | 31.49 | 4.46 | .. | 4.46 | 35.95 |
| 3Q2016 | 0.313 | 0.147 | 0.101 | 0.249 | 0.562 | 26.94 | 2.43 | .. | 2.43 | 29.36 |
| 4Q2016 | 0.325 | 0.147 | 0.104 | 0.251 | 0.576 | 26.94 | 2.43 | .. | 2.43 | 29.36 |
| 1Q2017 | 0.364 | 0.147 | 0.113 | 0.260 | 0.624 | .. | .. | .. | .. | .. |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

| | Natural gas for electricity generation (per megawatt hour GCV) | | | | | Natural gas for households (per megawatt hour GCV) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | c | c | c | c | c | 41.27 | - | - | 22.91 | 64.19 |
| 2007 | c | c | c | c | c | 41.63 | - | - | 22.16 | 63.79 |
| 2008 | c | c | c | c | c | 46.30 | - | - | 21.50 | 67.79 |
| 2009 | c | c | c | c | c | 43.53 | - | - | 22.05 | 65.57 |
| 2010 | c | c | c | c | c | 43.90 | 16.74 | 10.50 | 27.24 | 71.14 |
| 2011 | c | c | c | c | c | 49.27 | 16.42 | 11.12 | 27.54 | 76.81 |
| 2012 | c | c | c | c | c | 55.45 | 15.56 | 12.22 | 27.78 | 83.22 |
| 2013 | c | c | c | c | c | 59.18 | 15.71 | 12.96 | 28.67 | 87.85 |
| 2014 | c | c | c | c | c | 57.56 | 15.57 | 12.91 | 28.47 | 86.03 |
| 2015 | c | c | c | c | c | 54.58 | 15.65 | 12.47 | 28.11 | 82.69 |
| 2016 | c | c | c | c | c | 50.84 | 15.63 | 11.86 | 27.49 | 78.32 |
| 2Q2016 | c | c | c | c | c | 48.49 | 15.22 | 10.88 | 26.11 | 74.60 |
| 3Q2016 | c | c | c | c | c | 56.90 | 16.67 | 14.40 | 31.06 | 87.96 |
| 4Q2016 | c | c | c | c | c | 56.90 | 16.67 | 14.40 | 31.06 | 87.96 |
| 1Q2017 | c | c | c | c | c | .. | .. | .. | .. | .. |
| 2Q2017 | c | c | c | c | c | .. | .. | .. | .. | .. |

Filed By: wrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

© OECD/IEA, 2017

## ITALY
### Table 3 - Average prices and taxes in euros

| | Steam coal for industry (per tonne) | | | | | Steam coal for electricity generation (per tonne) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | 55.14 | - | - | - | 55.14 | 54.13 | - | - | - | 54.13 |
| 2007 | 62.64 | - | - | - | 62.64 | 62.04 | - | - | - | 62.04 |
| 2008 | 98.28 | - | - | - | 98.28 | 95.80 | - | - | - | 95.80 |
| 2009 | 82.06 | - | - | - | 82.06 | 74.07 | - | - | - | 74.07 |
| 2010 | 84.53 | - | - | - | 84.53 | 81.33 | - | - | - | 81.33 |
| 2011 | 100.81 | - | - | - | 100.81 | .. | .. | .. | .. | .. |
| 2012 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2013 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2014 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2015 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 3Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 4Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 1Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

| | Steam coal for households (per tonne) | | | | | Coking coal for industry (per tonne) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | .. | .. | .. | .. | .. | 89.31 | - | - | - | 89.31 |
| 2007 | .. | .. | .. | .. | .. | 86.12 | - | - | - | 86.12 |
| 2008 | .. | .. | .. | .. | .. | 129.90 | - | - | - | 129.90 |
| 2009 | .. | .. | .. | .. | .. | 103.94 | - | - | - | 103.94 |
| 2010 | .. | .. | .. | .. | .. | 133.21 | - | - | - | 133.21 |
| 2011 | .. | .. | .. | .. | .. | 173.97 | - | - | - | 173.97 |
| 2012 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2013 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2014 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2015 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 3Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 4Q2016 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 1Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

| | Electricity for industry (per megawatt hour) | | | | | Electricity for households (per megawatt hour) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ex-tax price | Excise tax | VAT | Total tax | Total price | Ex-tax price | Excise tax | VAT | Total tax | Total price |
| 2006 | 130.0 | 37.0 | - | 37.0 | 167.0 | 133.6 | 30.0 | 16.4 | 46.4 | 180.0 |
| 2007 | 132.0 | 41.0 | - | 41.0 | 173.0 | 134.0 | 37.0 | 17.0 | 54.0 | 188.0 |
| 2008 | .. | .. | .. | .. | 144.9 | .. | .. | 18.5 | .. | 205.3 |
| 2009 | .. | .. | .. | .. | 146.4 | .. | .. | 18.9 | .. | 209.5 |
| 2010 | .. | .. | .. | .. | 151.5 | .. | .. | 17.7 | .. | 199.6 |
| 2011 | 121.3 | 36.3 | - | 36.3 | 157.5 | 145.9 | 38.8 | 18.3 | 57.1 | 203.0 |
| 2012 | 126.0 | 49.5 | - | 49.5 | 175.4 | 156.4 | 48.8 | 20.8 | 69.6 | 226.0 |
| 2013 | 120.9 | 58.5 | - | 58.5 | 179.3 | 158.4 | 55.1 | 21.5 | 76.5 | 234.9 |
| 2014 | 113.2 | 64.4 | - | 64.4 | 177.7 | 160.2 | 61.7 | 22.3 | 84.0 | 244.3 |
| 2015 | 101.3 | 68.5 | - | 68.5 | 169.8 | 158.7 | 65.9 | 22.5 | 88.5 | 247.2 |
| 2016 | 96.7 | 70.3 | - | 70.3 | 167.1 | 158.8 | 68.0 | 22.8 | 90.8 | 249.6 |
| 2Q2016 | 95.4 | 70.7 | - | 70.7 | 166.2 | 159.0 | 69.0 | 22.9 | 92.0 | 250.9 |
| 3Q2016 | 98.0 | 69.9 | - | 69.9 | 167.9 | 158.7 | 66.8 | 22.6 | 89.5 | 248.2 |
| 4Q2016 | 98.0 | 69.9 | - | 69.9 | 167.9 | 158.7 | 66.8 | 22.6 | 89.5 | 248.2 |
| 1Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. | .. | .. |

© OECD/IEA, 2017

Barcode:3814772-147 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
PUBLIC VERSION
160 - ENERGY PRICES AND TAXES, 2nd Quarter 2017

## ITALY
### Table 4 - Indices of energy prices

| | Oil products | | Electricity | | Natural gas | | Coal | |
|---|---|---|---|---|---|---|---|---|
| | Wholesale 1995 = 100 | Retail 2015 = 100 | Wholesale | Retail 2015 = 100 | Wholesale | Retail 2015 = 100 | Wholesale 1995 = 100 | Retail 2015 = 100 |
| 1996 | 105.3 | 59.1 | .. | 66.0 | .. | 58.6 | 107.2 | .. |
| 1997 | 107.0 | 59.9 | .. | 63.9 | .. | 62.7 | 109.6 | .. |
| 1998 | 98.7 | 58.3 | .. | 65.0 | .. | 61.9 | .. | .. |
| 1999 | 106.5 | 60.7 | .. | 62.4 | .. | 60.9 | .. | .. |
| 2000 | 129.8 | 68.7 | .. | 67.5 | .. | 67.4 | .. | .. |
| 2001 | .. | 67.2 | .. | 69.6 | .. | 72.4 | .. | .. |
| 2002 | .. | 66.0 | .. | 68.6 | .. | 68.9 | .. | .. |
| 2003 | .. | 67.5 | .. | 70.6 | .. | 72.4 | .. | .. |
| 2004 | .. | 71.4 | .. | 68.3 | .. | 72.5 | .. | .. |
| 2005 | .. | 79.3 | .. | 71.0 | .. | 78.1 | .. | .. |
| 2006 | .. | 84.0 | .. | 79.9 | .. | 85.4 | .. | .. |
| 2007 | .. | 84.0 | .. | 83.7 | .. | 85.4 | .. | .. |
| 2008 | .. | 92.9 | .. | 91.8 | .. | 93.7 | .. | 91.4 |
| 2009 | .. | 79.8 | .. | 90.0 | .. | 92.3 | .. | 91.6 |
| 2010 | .. | 89.2 | .. | 83.9 | .. | 90.0 | .. | 93.6 |
| 2011 | .. | 102.9 | .. | 85.5 | .. | 98.0 | .. | 94.8 |
| 2012 | .. | 117.6 | .. | 97.5 | .. | 110.1 | .. | 96.1 |
| 2013 | .. | 115.4 | .. | 100.3 | .. | 111.2 | .. | 97.0 |
| 2014 | .. | 112.7 | .. | 101.2 | .. | 103.7 | .. | 97.7 |
| 2015 | .. | 100.0 | .. | 100.0 | .. | 100.0 | .. | 100.0 |
| 2016 | .. | 93.7 | .. | 99.3 | .. | 91.8 | .. | 99.0 |
| 2Q2009 | .. | 79.1 | .. | 89.9 | .. | 94.2 | .. | 91.3 |
| 3Q2009 | .. | 82.0 | .. | 89.3 | .. | 89.0 | .. | 91.7 |
| 4Q2009 | .. | 82.2 | .. | 89.3 | .. | 86.2 | .. | 92.1 |
| 1Q2010 | .. | 85.8 | .. | 85.9 | .. | 86.4 | .. | 93.1 |
| 2Q2010 | .. | 90.3 | .. | 83.5 | .. | 89.2 | .. | 93.5 |
| 3Q2010 | .. | 89.7 | .. | 83.2 | .. | 92.0 | .. | 93.8 |
| 4Q2010 | .. | 90.9 | .. | 82.9 | .. | 92.2 | .. | 93.9 |
| 1Q2011 | .. | 98.8 | .. | 82.3 | .. | 93.6 | .. | 94.2 |
| 2Q2011 | .. | 102.6 | .. | 85.5 | .. | 95.6 | .. | 94.5 |
| 3Q2011 | .. | 103.6 | .. | 87.1 | .. | 99.0 | .. | 94.7 |
| 4Q2011 | .. | 106.6 | .. | 87.2 | .. | 103.7 | .. | 95.9 |
| 1Q2012 | .. | 115.5 | .. | 91.5 | .. | 107.3 | .. | 96.3 |
| 2Q2012 | .. | 118.5 | .. | 97.9 | .. | 109.0 | .. | 96.2 |
| 3Q2012 | .. | 117.9 | .. | 99.6 | .. | 111.4 | .. | 95.9 |
| 4Q2012 | .. | 118.4 | .. | 101.0 | .. | 112.9 | .. | 95.8 |
| 1Q2013 | .. | 117.8 | .. | 100.3 | .. | 114.8 | .. | 96.7 |
| 2Q2013 | .. | 114.0 | .. | 99.7 | .. | 110.9 | .. | 96.8 |
| 3Q2013 | .. | 115.5 | .. | 100.9 | .. | 110.3 | .. | 96.9 |
| 4Q2013 | .. | 114.3 | .. | 100.4 | .. | 108.7 | .. | 97.7 |
| 1Q2014 | .. | 114.3 | .. | 101.4 | .. | 108.1 | .. | 97.6 |
| 2Q2014 | .. | 113.5 | .. | 100.6 | .. | 104.5 | .. | 97.6 |
| 3Q2014 | .. | 114.0 | .. | 100.6 | .. | 99.1 | .. | 97.8 |
| 4Q2014 | .. | 108.8 | .. | 102.2 | .. | 103.2 | .. | 97.7 |
| 1Q2015 | .. | 99.5 | .. | 100.0 | .. | 102.7 | .. | 100.0 |
| 2Q2015 | .. | 103.9 | .. | 99.2 | .. | 99.1 | .. | 100.3 |
| 3Q2015 | .. | 100.7 | .. | 99.0 | .. | 98.3 | .. | 100.0 |
| 4Q2015 | .. | 95.8 | .. | 101.8 | .. | 99.9 | .. | 99.8 |
| 1Q2016 | .. | 90.3 | .. | 101.5 | .. | 97.1 | .. | 99.3 |
| 2Q2016 | .. | 93.5 | .. | 97.4 | .. | 89.3 | .. | 99.2 |
| 3Q2016 | .. | 94.4 | .. | 98.5 | .. | 89.8 | .. | 98.8 |
| 4Q2016 | .. | 96.6 | .. | 99.8 | .. | 91.1 | .. | 98.8 |
| 1Q2017 | .. | 101.1 | .. | 100.4 | .. | 94.6 | .. | 98.9 |
| 2Q2017 | .. | .. | .. | .. | .. | .. | .. | .. |

Filed by: cwyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

© OECD/IEA, 2017

# ITALY

## Sources

Prices and taxes data for oil products, natural gas and electricity are provided on a quarterly basis by the **Ministry of Economic Development**.

Retail energy price indices are based on data published by **Eurostat**.

## Data collection methodology

From 1Q1990 onwards, prices refer to weekly averages of the quarter. From 1Q1985 to 4Q1989 prices refer to the second month of each quarter. Prior to 1Q1985, prices refer to the first month of each quarter.

### Oil products

From May 1994 onwards, oil product prices are completely deregulated and set by oil companies. From May 1986 until April 1994, prices for gasoline and light fuel oil followed EU averages automatically, while fuel oil prices were free market prices.

For heavy fuel oil for electricity generation, prices are confidential from 4Q1996 onwards. Prior to 4Q1996, prices refer to the annual and quarterly average expenditure per tonne incurred by ENEL for all oil consumed (including transport).

For low sulphur fuel oil, light fuel oil, automotive diesel, premium unleaded (95 RON) gasoline and automotive LPG, end-use and ex-tax prices are collected by the reporting agency through a weekly survey of the ten largest oil companies in the country and a selection of fuel traders, independent operators and around thirty supermarkets with fuel selling facilities. Companies report their weekly weighted average prices based on sales volumes recorded for different modes of self-service.

Excise taxes are then calculated by the reporting agency as the subtraction of the ex-tax prices from the end-use prices, including VAT when applicable.

The surveyed sample is estimated to cover over 95% of all sales for each of the products. The market share of each company is based on quantities sold in the previous year, collected by the Ministry through a monthly survey on consumption of petroleum products in Italy.

### Natural gas

Before the liberalisation of the gas market in Italy, the prices for natural gas sales were calculated in accordance with national agreements established between the Societá Nazionale Metanodotti (SNAM) and the most representative industrial association (Confindustria and Confapi).

As a result of liberalisation, new prices are negotiated between the different sellers and the buyers. Pricing systems are different for each seller but the access to public facilities (transmission networks, storages, liquefied natural gas (LNG) plants and local distribution networks) is regulated by tariffs determined based on criteria set by the Energy Regulator (*Autorità per l'energia elettrica e il gas*).

Data are bi-annual, therefore, prices for 1Q and 2Q are the same, as are those for 3Q and 4Q.

Prices for industry, from 1Q2010 onwards, are calculated by the Ministry based on the disaggregated data transmitted by individual electricity sales company pursuant to the Italian Regulatory Authority for Electricity Gas and Water Resolution 20 November 2008, ARG/elt 167/08 and subsequent amendments. Average prices are calculated as consumption-weighted averages of the average prices for each consumption band, which are consistent with the Eurostat methodology.

From 1Q2004 to 4Q2009, prices for industry refer to the weighted average of users with continuous contracts (*industria continuo*) and non-continuous contracts (*industria interrompibile*). Between 1Q2000 and 4Q2003, prices for industry were confidential. Prior to 4Q1999, prices for industry refer to the annual average revenues per MWh received by distributors from industry.

For households, tariffs charged by local distribution companies (LDCs) to companies that sell gas are determined on the basis of a procedure set by the Energy Regulator and have to be published by the LDCs. These prices differ from town to town. The commodity charge is updated every three months with reference to the average quotations of gasoil, LSFO and crude oil of the six months before the month of supply. Since January 2003, natural gas prices for households can be renegotiated by users. The Energy Regulator established a reference price that the selling company, previously acting as part of the local distribution company, must continue to offer to local customers unless they change their supplier.

Prices for households from 1Q2010 onwards, are calculated by the Ministry, based on the disaggregated data transmitted by individual natural gas sales companies pursuant to the Italian Regulatory Authority for Electricity Gas and Water Resolution of 4 June 2009, ARG/gas 64/09 and subsequent amendments. Average prices are calculated as consumption-weighted averages of the average prices per consumption band, which are consistent with the Eurostat methodology.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

From 1Q2004 to 4Q2009, prices for households refer to the weighted average of all users. Prices between 1Q2000 and 4Q2003 were confidential. Prior to 4Q1999, annual prices refer to annual average revenues per MWh received by distributors from households.

Price and tax information for electricity generation is confidential since 1995.

## Steam and coking coal

For steam coal for industry, prices refer to first month of each quarter, from 1Q1983 onwards. Prior to 1Q1983, prices refer to quarterly averages. Prices refer to the average import price including insurance and freight.

For steam coal for electricity generation, prices refer to half-yearly averages of hard coal imported from third countries, from 2002 onwards, generation. Prior to 2000, prices refer to annual and quarterly average expenditure per tonne incurred by ENEL for consumption of steam coal (including transport).

Steam coal prices for households refer to the wholesale price in Milan.

Coking coal prices for industry refer to the average import price including insurance and freight.

## Electricity

From 1Q2008 onwards, data are calculated by the Ministry, based on the disaggregated data transmitted by individual electricity sales company pursuant to the Italian Regulatory Authority for Electricity Gas and Water Resolution 20 November 2008, ARG/elt 167/08 and subsequent amendments. Average prices are calculated as consumption-weighted averages of the average prices per consumption band, which are consistent with the Eurostat methodology.

Data are bi-annual, therefore, prices for 1Q and 2Q are the same, as are those for 3Q and 4Q.

Until 4Q2007, prices for industry and households refer to annual average revenues received by ENEL Servizio Elettrico (ESE) from each consumer sector.

## Energy price indices

Annual and quarterly indices are 12-month and 3-month averages, respectively, of the Harmonised Indices of Consumer Prices (HICP) published by Eurostat.

Retail indices for oil products refer to a consumption-weighted average of the *liquid fuels* (cp0453) and *fuels and lubricants for personal transport equipment* (cp0722) series. Relative weights used for the calculations are taken from the associated item weights series (prc_hicp_inw), published by Eurostat.

Retail indices for electricity refer to the *electricity* (cp0451) series.

Retail indices for natural gas refer to the *gas* (cp0452) series.

Retail indices for coal refer to the *solid fuel* (cp0454) series.

## Energy taxation

## VAT

VAT (*IVA*) applies to all energy products. VAT is refunded for purchases for commercial purposes. Therefore, it is not included in prices shown for the industrial and electricity generation sectors, as well as for automotive fuels for commercial use.

VAT is levied at a reduced rate for electricity consumption in the residential sector, as well as in agriculture, manufacturing and extractive activities.

The reduced VAT rate also applies, since 2008, to residential natural gas consumption below 480m³/year, as well as in agriculture, manufacturing and extractive activities.

| From | To | General % | Reduced % |
|------|------|------|------|
| 01.01.78 | 31.12.80 | 14 | |
| 01.01.81 | 31.12.82 | 15 | |
| 01.01.83 | 19.03.85 | 18 | |
| 20.03.85 | 31.07.88 | 18 | 10 |
| 01.08.88 | 30.09.97 | 19 | 10 |
| 01.10.97 | 16.09.11 | 20 | 10 |
| 17.09.11 | 30.09.13 | 21 | 10 |
| 01.10.13 | now | 22 | 10 |

## Excise tax

The legal framework in place in Italy is consistent with the 2003 EU Energy Taxation Directive.

A single indirect tax, referred to as the excise duty, is levied on consumption of oil products, natural gas, coal and electricity. Additional regional tax components on electricity were abolished on 1 April 2012. Additional regional tax components on natural gas consumption are still in place.

**Tax applicability table (not exhaustive)**

| | HSFO/LSFO | LFO | Diesel | Gasoline | LPG | Natural gas | Steam coal | Coking coal | Electricity |
|---|---|---|---|---|---|---|---|---|---|
| Excise duties | x | x | x | x | x | x | x | | x |

Filed By: yrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

© OECD/IEA, 2017

ITALY                                                    ENERGY PRICES AND TAXES, 2nd Quarter 2017 - **163**

## Excise duties *(Accise)*

The current excise duty system in place for oil products, natural gas, coal and electricity in Italy was introduced by the Legislative Decree no.26 of 2 February 2007, which came in force on 1 June 2007.

For oil products, tax rates distinguish between final uses. The rates for heavy fuel oil shown in the tax tables at the end of section refer to light sulphur fuel oil (*olio combustibile BTZ*).

For natural gas, consumption by households in the south of Italy is taxed at a lower rate than in the rest of the country. This reduced rate covers the territories of the former Mezzogiorno Fund (*Cassa del Mezzogiorno*), as listed in Article 1 of the Presidential Decree no. 218 of 6 March 1978. Excise duty rates for natural gas used in industry are not regionalized. Tax rates for both industry and households vary for different consumption bands and are expressed in EUR/m$^3$.

In addition to the excise duties on natural gas, a regional component is levied in most regions of the country. These additional taxes cannot exceed 50% of the value of the national excise tax. Natural gas used for chemical reduction, metallurgical and mineralogical processes is exempt. Natural gas used for electricity production is taxed at a reduced rate.

Coal used for electricity generation is taxed at a rate of 2.60 EUR/tonne. Coal used in chemical reduction processed is exempt. Coke has the same tax treatment as coal.

For electricity in households, consumption below 150 kWh when capacity is below 3 kW is exempt from excise duties. The rates for electricity for households shown in the tax tables at the end of section refer to residential consumers with a monthly consumption exceeding 150 kWh.

For electricity in industry, the first 200 MWh of monthly electricity consumption are taxed proportionally to consumption. For users with a monthly consumption below 1 200 MWh, consumption beyond 200 MWh is taxed at a lower rate per MWh. For users with a monthly consumption exceeding 1 200 MWh, consumption beyond 200 MWh is taxed at a flat monthly fee amounting to 4 820 EUR as of November 2016. The rates for electricity for industry shown in the tax tables at the end of section refer to industrial consumers with a monthly consumption not exceeding 200 MWh.

Regional taxes on electricity, which had been levied in addition to the national tax, were abolished on 1 January 2012 for most regions. On 1 April 2012, regional taxes in the remaining autonomous provinces and special regional entities were abolished.

## Excise duties *(Accise)*

| From | To | Heavy fuel oil (EUR/tonne) | Light fuel oil (EUR/1000l) | Automotive diesel (EUR/l) | Gasoline (EUR/l) | Automotive LPG (EUR/l) | Coal industry (EUR/tonne) | Electricity households (EUR/MWh) | Electricity industry (EUR/MWh) |
|---|---|---|---|---|---|---|---|---|---|
| 01.01.09 | 05.04.11 | 31.39 | 403.21 | 0.423 | 0.564 | 0.125 | 4.6 | 4.7 | 3.1 |
| 06.04.11 | 27.06.11 | 31.39 | 403.21 | 0.430 | 0.571 | 0.125 | 4.6 | 4.7 | 3.1 |
| 28.06.11 | 30.06.11 | 31.39 | 403.21 | 0.470 | 0.611 | 0.125 | 4.6 | 4.7 | 3.1 |
| 01.07.11 | 31.10.11 | 31.39 | 403.21 | 0.472 | 0.613 | 0.125 | 4.6 | 4.7 | 3.1 |
| 01.11.11 | 31.12.11 | 31.39 | 403.21 | 0.481 | 0.622 | 0.125 | 4.6 | 4.7 | 3.1 |
| 01.01.12 | 31.05.12 | 31.39 | 403.21 | 0.593 | 0.704 | 0.147 | 4.6 | 22.7 | 12.1 |
| 01.06.12 | 07.06.12 | 31.39 | 403.21 | 0.593 | 0.704 | 0.147 | 4.6 | 22.7 | 12.5 |
| 08.06.12 | 10.08.12 | 31.39 | 403.21 | 0.613 | 0.724 | 0.147 | 4.6 | 22.7 | 12.5 |
| 11.08.12 | 28.14.14 | 31.39 | 403.21 | 0.617 | 0.728 | 0.147 | 4.6 | 22.7 | 12.5 |
| 01.03.14 | 31.12.14 | 31.39 | 403.21 | 0.620 | 0.731 | 0.147 | 4.6 | 22.7 | 12.5 |
| 01.01.15 | now | 31.39 | 403.21 | 0.617 | 0.728 | 0.147 | 4.6 | 22.7 | 12.5 |

© OECD/IEA, 2017

Barcode:3814772-147 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

164 - ENERGY PRICES AND TAXES, 2nd Quarter 2017                                                ITALY

## Product specifications

### Oil products

| | High sulphur fuel oil | Low sulphur fuel oil | Light fuel oil | Automotive diesel | Premium unleaded (98 RON) gasoline | Premium unleaded (95 RON) gasoline | Automotive LPG |
|---|---|---|---|---|---|---|---|
| Quality | Olio combustibile ATZ | Olio combustibile BTZ | Gasolio riscaldamento (Regime di sorveglianza "Fascia C") | Gasolio autotrazione | | | |
| Density (kg/l) | 0.94 - 0.97 | 0.94 - 0.97 | 0.82 - 0.84 | 0.82 - 0.84 | 0.72 - 0.76 | 0.72 - 0.76 | 0.549 |
| Sulphur content (%) | 3 - 4 | 1 | | | | | |
| Lead content (g/l) | | | | | ≤ 0.6 | ≤ 0.6 | |
| NCV (kcal/kg) | 9 600 | 9 800 | 10 210 | | | | |
| Delivery size | < 24 000 tonne/year | < 24 000 tonne/year | 2 – 5 kl | | | | |

### Natural gas and coal

| | Natural gas | Steam coal *industry* | Steam coal *electricity generation* | Steam coal *households* | Coking coal |
|---|---|---|---|---|---|
| Grain size | | | | | 0/30 mm |
| Volatile matter (%) | | | | | 21 |
| Ash content (%) | | 14 – 16 | | | 6 |
| Moisture content (%) | | | | | 5 |
| Sulphur content (%) | | 1 | | | 1 |
| NCV (kcal/kg) | | 6 162 | 5 900 | 5 900 | 6 650 |
| GCV (kcal/kg)* | 9 100 | 6 890 | | | 7 000 |

*kcal/m³ for natural gas*

Filed By: byrein.com, Filed Date: 4/3/19 6:26 PM, Submission Status: Approved

© OECD/IEA, 2017

PUBLIC VERSION

# EXHIBIT 102

### KOREA ELECTRIC POWER COMPANY

Source:  http://home.kepco.co.kr/kepco/EN/F/htmlView/ENFBHP00103.do?menuCd=EN060201

| Classification | | Demand charge (KRW/kW) | time period | Energy charge (KRW/kWh) | | |
|---|---|---|---|---|---|---|
| | | | | summer | spring/fall | winter |
| High-voltage (A) | Option I | 7,220 | off-peak | 61.6 | 61.6 | 68.6 |
| | | | mid-peak | 114.5 | 84.1 | 114.7 |
| | | | on-peak | 196.6 | 114.8 | 172.2 |
| | Option II | 8,320 | off-peak | 56.1 | 56.1 | 63.1 |
| | | | mid-peak | 109.0 | 78.6 | 109.2 |
| | | | on-peak | 191.1 | 109.3 | 166.7 |
| | Option III | 9,810 | off-peak | 55.2 | 55.2 | 62.5 |
| | | | mid-peak | 108.4 | 77.3 | 108.6 |
| | | | on-peak | 178.7 | 101.0 | 155.5 |
| High-voltage (B) | Option I | 6,630 | off-peak | 60.0 | 60.0 | 67.0 |
| | | | mid-peak | 112.3 | 82.3 | 112.3 |
| | | | on-peak | 193.5 | 112.6 | 168.5 |
| | Option II | 7,380 | off-peak | 56.2 | 56.2 | 63.2 |
| | | | mid-peak | 108.5 | 78.5 | 108.5 |
| | | | on-peak | 189.7 | 108.8 | 164.7 |
| | Option III | 8,190 | off-peak | 54.5 | 54.5 | 61.6 |
| | | | mid-peak | 106.8 | 76.9 | 106.8 |
| | | | on-peak | 188.1 | 107.2 | 163.0 |
| High-voltage (C) | Option I | 6,590 | off-peak | 59.5 | 59.5 | 66.4 |
| | | | mid-peak | 112.4 | 82.4 | 112.0 |
| | | | on-peak | 193.3 | 112.8 | 168.6 |
| | Option II | 7,520 | off-peak | 54.8 | 54.8 | 61.7 |
| | | | mid-peak | 107.7 | 77.7 | 107.3 |
| | | | on-peak | 188.6 | 108.1 | 163.9 |
| | Option III | 8,090 | off-peak | 53.7 | 53.7 | 60.6 |
| | | | mid-peak | 106.6 | 76.6 | 106.2 |
| | | | on-peak | 187.5 | 107.0 | 162.8 |

Industrial (B) · General (B): contract demand of 300kW or more

| Average demand Charge | 7,750 | KRW/kW |
|---|---|---|

| KW | 300 | |
|---|---|---|
| working hr/day | 8.0 | |
| days/month | 30 | |
| demand/mth | 72,000 | KwH |

| Average Annual Energy Charge | 104.43 |
|---|---|
| Average Demand Charge per KwH consumed (72,000) | 0.11 |
| **Average Total Effective Tariff, KRW/kWh** | **104.54** |

| Exchange Rate | 0.000881 Apr-Dec. 2015 |
|---|---|

| Cost per KwH | $ 0.0921 |
|---|---|

# EXHIBIT 103

KDI Policy Forum Vol. 252 (eng.), April 26, 2013

**Questions about Article**  Nam, Il-Chong (82-2-3299-1183, icnam@kdischool.ac.kr)

**Subscriptions**  Publication Officer (82-2-958-4325)

# Causes of the Crisis in the Electricity Industry and Future Policy Directions

▌**Nam, Il-Chong**  Professor at the KDI School of Public Policy and Management

☐ In 2001, South Korea restructured its electric power industry and introduced competition to the industry, but it has failed to establish an effective system of competition.

○ Since the restructuring took place in 2001, electric power is being produced and investment is being made in power generation facilities through competition between generation companies. However, due to structural problems in the market transaction system that determine the actual effectiveness of competition in the electric power industry, this competition is not taking place effectively.

○ Furthermore, the price regulation system for the transmission, distribution, and retailing of electricity, which remain under monopoly control, and the ownership structure of Korea Electric Power Corporation (KEPCO) and KEPCO's subsidiary generation companies remain stuck in the mindset of the government monopoly system that preceded the restructuring. As a result, KEPCO and its subsidiaries continue to experience internal inefficiency, and the distribution of resources within the power industry continues to be inefficient as well.

∗ This is translated version of *KDI Policy Forum* released on January 9, 2013.

∗∗ This article presents a summary of the major points of *Competition Policy for the Electricity Industry of Korea* by Nam, Il-Chong, a research monograph published in February 2012 by the Korea Development Institute.

Barcode:3814772-147 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

○ The chronic supply crisis, the unending inadequacy of facilities, the excessive consumption of power, KEPCO's large-scale accumulated deficit, the inefficient management of KEPCO and its subsidiary generation companies, and the frequent accidents that have occurred over the past few years are all caused by the failure of policies concerning management, regulation, and government-run companies in the power industry.

□ In order to normalize the power industry and increase its efficiency, it is necessary to strengthen policies governing competition in the power industry. It is also necessary to implement the kind of pricing and government-run company governance systems that are used in advanced countries, systems that are grounded in the profit motive and economic efficiency.

○ In the wholesale power market, direct price competition should be permitted under a price cap, just as in the PJM market in the eastern US. In the capacity market, the current spot market format should be converted to a forward contract market that takes into account the time required for investment in facilities.

○ The system must be changed to eliminate excessive profit, which violates market principles, without hampering competition. Vesting contracts should be introduced to baseload plants and other power generation facilities that were constructed in the past; entrance limitations should be abolished for the construction of additional baseload plants; and business operators should be chosen through competitive bidding in cases where there is some kind of entrance barrier resulting from location or environmental issues.

○ After introducing optimal rate-of-return regulations in the respective categories of transmission, distribution, and retailing, these regulations should be converted to price cap regulations early on. In addition, the governance structure of KEPCO and its subsidiary utilities must be reoriented toward maximizing the profit motive and giving management more discretion so that these government-run companies can compete with companies in the private sector.

○ The power industry as it exists today has dealt with instability for the 10 years that have passed since 2003. The structure of the industry must also be reoriented to maximize competition.

# 1. Restructuring Background and the Situation in the South Korean Power Industry Since the Restructuring

Through restructuring in 2001, South Korea separated its power generation market from the other three vertical markets (transmission, distribution, and retailing) that make up the electricity industry and then introduced competition in the power generation market. Since 2001, the Korea Electric Power Corporation (KEPCO) has only handled transmission, distribution, and retailing and has not been involved with producing electricity. Generation of power and investment in power generation facilities, on the other hand, has taken place through competition between KEPCO's six

subsidiaries; generation companies that are affiliated with large business groups such as SK, GS, and POSCO; and a number of other small- and medium-sized utilities. This reflects trends in nearly all of the most advanced economies and in the majority of developed economies, which introduced competition into the generation and retailing markets after the mid-1990s and have been operating stable systems of competition since the mid-2000s.

The biggest difference between before and after competition was introduced in Korea lies in the decision-making process for investing in power generation facilities. Under the monopoly system that preceded the introduction of competition, the government and the monopoly company were responsible for estimating the scale of power generation facilities that the country needed, determining what scale and what kind of facilities were needed, and deciding when the facilities should be constructed and when they should be phased out. At the same time, consumers had to bear 100% of the risk of the investment failing due to excessive investment, insufficient facilities, or the selection of inefficient kinds of generators. However, under a competitive system, decisions about investment are left to competition between companies trying to maximize their profits, and the risk that accompanies the resulting investment is split between the consumers, the utilities, and the retailers.

When we assess the electricity industry today, 11 years since a competitive system was introduced, it is hard to find any evidence that the industry is being run any more efficiently than before. Since competition was introduced, the issue of insufficient numbers of power plants and baseload generators has not improved and, indeed, has gotten worse, and the supply and demand crisis has continued. Furthermore, we continue to see cases of market failure that no one had predicted at the time of the restructuring, including excessive consumption of electricity, massive accumulated deficit at KEPCO, and inefficient management and frequent accidents at KEPCO's subsidiary utilities.

Then there is the fact that, in other countries that have introduced competition into the electricity industry, the wholesale electricity price and the amount of power generated by each generator are determined by price competition between utilities in the wholesale electricity market. In the wholesale electricity market in Korea, however—even today, 11 years after competition was introduced—unnatural competition can be seen. Severe restrictions are placed on price competition, and the government is interfering in the determination of prices.

The situation in the Korean electricity market since its restructuring is very discouraging when it is compared with the situation in other countries that have introduced competition in their electricity markets. This suggests that there is a major flaw in the way that the Korean electricity market has been run since restructuring. The greatest problem that exists in the Korean electricity market is the fact that effective competition is not occurring in the wholesale electricity market, which is being run according to a competitive system.

As a general rule, the electricity industry exhibits a number of characteristics that are rarely

seen in other industries. These include the fact that power cannot be stored; that, if production and consumption do not take place at nearly the same time every moment, the system collapses, leading to a long-term suspension of the electricity supply; that, practically speaking, it is difficult for the retail price to change along with the situation of the market; and that vast sums of money must be invested in facilities that will be used for thirty years or more, involving high risks and uncertainty about the future.

Consequently, in every country, competition in the electricity market is managed through sophisticated market trading systems. Just like the eastern US, Australia, and Spain, South Korea operates a dual market divided into an electricity market and a capacity market. In addition to the revenue obtained through selling the electricity they have produced, generation companies also receive compensation for the very fact that they possess generators. Consequently, the real effectiveness of competition and the real efficiency of investment in the electricity market are determined by the way in which the electricity price and capacity price are determined. However, the market trading system currently used in Korea is fundamentally different from those used in advanced economies in terms of both the electricity price and capacity price, and this system has serious structural flaws.

The Korean system of regulation for the electricity transmission, distribution, and retailing sectors (which, unlike the wholesale electricity market, are not competitive but monopolistic) and the governance of public enterprises in the electricity industry are also considerably different from the systems of advanced economies. These systems violate market economy principles and still show traces of the framework that existed before restructuring occurred. A considerable portion of the market failure that has occurred in the Korean electricity market since it was restructured has been caused, first, by inefficiency in the way that the prices of electricity transmission, distribution, and retailing are regulated and in the governance structure of government-run companies in the electricity industry and, second, by a lack of consistency in the system of competition in the wholesale electricity market.

## 2. Characteristics of the Market Trading System in the Korean Wholesale Electricity Market and the Major Problems Thereof

Unlike other countries, the market trading system in the Korean whole electricity market forbids mid-and long-term bilateral contracts between generation companies and retailers, and electricity trading can only be conducted using the spot market, which opens at one-hour intervals. Also unlike other countries, direct price competition is forbidden in the electricity market, which is a spot market. Only indirect price competition is permitted, which is based on the accounting cost for each generator. Under this system, each generation company reports the variable costs of power generation for each generator in its possession to the trade exchange. The trade exchange,

after using these figures to calculate the marginal cost of power generation for each generator, has the utilities make bids at the price equivalent to the marginal cost calculated for each generator.

The SMP (system marginal price) that is determined through such indirect price competition is applied as the retail price of electricity for all utilities except for KEPCO's subsidiary utilities. Utility companies that are subsidiaries of KEPCO are allowed to use low prices that are calculated by applying discount rates differentiated by the generator type through a correction factor system. In other words, the price of the same product, that is, electricity, which is being traded inside the same market, varies depending upon who owns the generation company and what kind of generator is producing it.

The capacity market is also being operated as a spot market for capacity. Generation companies receive an amount of money from KEPCO for the capacity of each generator they own, in addition to the revenues from the sale of energy. The capacity payment KEPCO pays for the capacity of a generator is equal to the per kw capacity price multiplied by the maximum capacity of the generator. The same capacity unit price has been used since it was first calculated using a highly unusual method at the time that competition was introduced to the system in 2001. In the capacity pricing system that was introduced in 2001, a 30-year annuity plus the fixed operating cost was set up as the amount for the spot capacity market. This was what was needed to motivate utilities to construct gas turbine generators in 2001. Despite the fact that the construction cost of generators and the fixed operating cost have increased since then, this price is still being used today with hardly any adjustments. The system for bidding in the electricity market, which we briefly explained above, and the way of determining the wholesale electricity price and the capacity price are greatly different from the systems that are used in advanced economies, both in their content and effectiveness, and they are hampered by the following problems.

First of all, direct price competition between generation companies is forbidden, and the system which is currently in place requires that the estimated cost be used as the bidding price, limiting competition between generation companies in the electricity market.

Second, varying the wholesale electricity price according to the ownership structure of the generation company and the generator type severely distorts the incentive to invest in power stations. Varying the price according to the ownership structure of the utility means that the profitability of the same investment will differ depending on the company, and this fundamentally distorts the incentive to invest in power generation facilities. This not only makes it impossible to guarantee the effectiveness of investment, but it also brings about the collapse of the market system itself. Furthermore, varying the wholesale electricity price according to the generator type distorts the process by which utilities decide what generator type to construct, and it is also more likely to lead to an inefficient generation mix.

We can understand the significance of the modification factor system currently in use in the Korean electricity market by considering what would happen if it were applied to the gasoline

market. In this hypothetical scenario, the government would require that different amounts of money be charged for the same quality of gasoline, depending on which gas company is refining it and on what kind of refining equipment is being used. Such market interference by the government in regard to prices would result in some oil companies being more profitable than others, and it would distort the motivation of oil companies to invest in oil refining equipment. It can be easily predicted that, if the government continued to interfere in the market in such a fashion, the gasoline market would soon cease to be a competitive market.

Third, while the capacity price in the spot market is ostensibly calculated according to the concept of the opportunity cost of generators, the current capacity price is in reality completely unrelated to that cost, and indeed that opportunity cost is not accounted for at all in the spot market. The capacity price system that was introduced in 2001 was based on a special kind of contract that pays out the same amount each year during a 30-year contract in order to encourage utilities to build new gas turbine generators in 2001. Essentially, this has the same effect as making a one-time payment to induce generation companies to build gas turbine generators that were new in 2001. The capacity price that was calculated according to this method has no relation to the spot opportunity cost of capacity in 2001, and it is very likely that this amount was much higher than the opportunity cost of capacity in 2011. As a result, the capacity price has borne no relation to the opportunity cost of capacity for each year since 2002. Or in other words, the capacity price that is being used at the present bears no relation whatsoever to the opportunity cost of capacity. This is impossible to justify according to economic theory, and the possibility that this capacity price will offer an appropriate incentive for investment in power generation facilities is in fact zero.

In summary, since the market trading system used in the Korean wholesale electricity market prevents price competition between generation companies that is based on the true marginal cost, it is hampering the effectiveness of the electricity market in the short term. Additionally, the system has failed in its attempt to encourage generation companies to use the profit that they gain from the sale of electricity and capacity to make appropriate investments in power generation facilities. The growing shortage of power plants and baseload generators, the increase in the hours of operation of peaking generators resulting from this insufficiency, the increase in the time spent determining the SMP of peaking plants (65% in 2001 → 93% in 2010) and the resulting increase in the SMP, all of which have appeared since the introduction of competition— the ultimate import of these phenomena is that the market trading system that has been used since 2001 has failed to give companies the incentive to invest effectively in power generation facilities. Furthermore, though more than 11 years have passed since competition was introduced to the industry, the fact that the electricity price is not being determined in the market according to market principles and that the government keeps interfering in the market to vary the price according to the utility and the generator type means that, in reality, Korea's attempt to introduce an effective competitive system into the wholesale electricity market has failed.

Korean economic policy for the electricity market since 2001 has also not been successful in effectively resolving the problems that arise in the process of converting the vertical combined monopoly system that preceded restructuring into a competitive market. All countries that have discontinued a monopoly system and introduced competition into their electricity market have experienced the phenomenon in which excessive profit or loss is incurred in the generators that were built during the monopoly period, which causes either the companies or the consumers to suffer losses. To circumvent this, steps must be taken to control profitability during the transitional period while the competitive system is still taking root. Methods should be used that prevent the previously constructed generators from incurring excessive profit or loss without having a negative effect on competition. The modification factor system in Korea is partially intended to prevent baseload reactors constructed before the restructuring from accruing excessive profits.

However, the form that this system takes and the economic effect it has are completely different from the transitional measures that have been used in advanced economies. This can be seen by observing that: the modification factor system is applied not only to baseload generators built before the restructuring but also to those built afterward and those that will be built in the future; the system directly manipulates prices in the spot market; the system also applies to gas hybrid generators that are not baseload plants; and the factor is frequently changed. Indeed, the system bears a strong resemblance to arbitrary interference in the market and has distorted the incentive to invest in construction of power stations since the restructuring.

## 3. Problems with the Price Regulation System

After the restructuring in 2001, KEPCO's role was reduced to the businesses of electricity transmission, distribution, and retailing. A price regulation system that would both provide KEPCO with an incentive to reduce costs and keep its profits at a reasonable level should be applied in these areas in which KEPCO has a monopoly. However, the public utility pricing system that is currently in place neither provides KEPCO with an incentive for reducing prices nor ensures that profits stay at an optimal level. The current system for regulating the price of public utilities does compensate for variable expenses, financial costs, and depreciation expenses and is based on the principles of an optimal rate-of-return regulation system, which seeks to secure an appropriate rate of return for invested capital. However, it permits a number of exceptions, and in reality it is being operated in a manner that is in fact unrelated to an optimal rate-of-return regulation system.

Since the method of calculating the optimal rate of return for electricity prices is unclear, it is impossible to calculate reasonable profit for capital investment and consequently also impossible to calculate the revenue requirement and the optimal level of electricity prices. Further, since the government has no obligation to reflect the optimal rate of return in its calculation of the electricity price even if that rate were known, electricity prices are being determined very

Barcode:3814772-147 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

arbitrarily. The current price regulation system for the services of electricity transmission, distribution, and retailing is incomplete and inefficient, and as such it is the cause of excessive consumption of electricity and the resulting waste of resources, distortions in the structure of the domestic electricity industry, and KEPCO's massive accumulated deficit and lack of competitiveness. Furthermore, while the price regulations on KEPCO since 2001 have naturally only applied to the services of electricity transmission, distribution, and retailing, the content of those regulations has tended to treat KEPCO, which is effectively a business dealing with transmission, distribution, and retailing, and KEPCO's subsidiary utilities, which are active in the competitive wholesale electricity market, as if they were one and the same. In other words, even after the restructuring, KEPCO and its subsidiary utilities have been linked together and treated as if they were a single company in a manner similar to the price regulation system that was used before the restructuring (when KEPCO had a monopoly in all four areas of power generation, transmission, deliberation, and retailing), and the pricing regulations are being applied, as it were, to this imaginary company. These regulatory practices are not only unreasonable as a price regulation system for electricity transmission, distribution, and retailing, but they also lack consistency with the electricity market structure since restructuring, causing a distortion in competition in the wholesale electricity market. In addition, since the price regulation system that is currently in place does not provide KEPCO with an incentive to reduce its production cost, it results in an unnecessary increase in cost, which in turn leads to a rise in prices.

## 4. Problems with the Governance Structure of Government-Run Companies

The basic objective of the restructuring and the introduction of competition into the electricity industry was to delegate investment in power generation facilities to companies competing with each other according to the profit motive and to reduce costs in the electricity market across the board and lower prices accordingly by introducing a transparent and efficient regulatory regime in the sectors that remained under a monopoly. A necessary condition for competition in the wholesale electricity market to effectively take place is maximizing utilities' profits. Putting into place a governance structure that is based on the profit motive is particularly important for KEPCO and its subsidiary utilities, which account for more than 80% of the electricity market in terms of the scale of power generation facilities and the amount of electricity generated.

However, the current system responsible for the corporate governance of government-run companies does not recognize KEPCO and its subsidiaries as commercial entities, treating them instead as public organizations that are tools for achieving the policy goals of the government and thus severely limiting profit motive and independent management. Despite the fact that KEPCO is a publicly listed company and that private shareholders own nearly half of its shares, severe limitations are placed on KEPCO's ability to exercise ownership rights over its subsidiaries, which

have a considerable influence on the value for KEPCO's shareholders. The weak presence of the profit motive at KEPCO and its subsidiary utilities and the fact that the corporate governance of these companies are more akin to that of a government-run company not only reduce the internal efficiency in these organizations but also lower the effectiveness of competition in the wholesale electricity market. These are a cause of inefficiency in the transmission, distribution, and retailing sectors as well.

## 5. Measures Necessary to Normalize the Electricity Industry

Not only does the instability in the electricity industry's current system of competition lead to inefficiency, but furthermore the system cannot even be long maintained in its current state. Rather than continue with the current system, it would be a better idea to either restore the government monopoly system or introduce an actual competitive system. And indeed, it is now necessary to choose one of these two alternatives. When we consider the fact that there is a global trend toward introducing competition into the electricity industry and that the majority of advanced and developed economies have succeeded in introducing competition and are now running stable competitive systems, it is more desirable for South Korea to join these countries in moving in the direction of expanding competition than regress toward a government monopoly system. Even if the current structure of the electricity industry is maintained as is, there would need to be sweeping changes in the competitive system in the wholesale electricity market, the regulation system for monopoly pricing, and the governance structure of government-run companies.

It is also necessary to change the market trading system for the wholesale electricity market in the following manner. First, the rules governing competition in the spot wholesale electricity market must be altered to permit direct price bidding under a price cap and to allow electricity to be traded at a single price by abolishing the modification factor.

Second, trading electricity through mid- and long-term bilateral contracts outside of the spot market must be permitted. Enabling a substantial portion of the total amount of electricity trading to take place through mid- and long-term contracts between generation companies and retailers is a highly effective way of spreading out the risk of investment in generators, which require huge amounts of capital, and the risk associated with fluctuations in the future price of electricity.

Third, the capacity market should continue to be operated separately as it is at present. That said, the distorted capacity price system that is currently being used must be abolished, the capacity market must be converted to the kind of forward contract market that is used in PJM in the eastern US and certain parts of Australia, and the capacity pricing system must be changed so that capacity prices can be determined by the conditions of forward contracts made through competition between utilities. The forward contract market system is a system that makes it obligatory for retailing companies to secure access to electricity a certain amount of time in

Barcode:3814772-147 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

PUBLIC VERSION

advance. This electricity is the amount that projections suggest will be needed to meet future demand. Such a system motivates retailing companies to take advantage of competition between generation companies (whose objective is to profit on their investments) in order to negotiate the lowest possible price for the electricity that they are obliged to secure. Since it leads to comparatively more effective competition in the investment market for power generating facilities by giving generation companies and potential investors relatively sufficient time to invest in such facilities, it is superior to the spot capacity market system currently used in Korea.

Fourth, KEPCO and its utilities must be required to sign vesting contracts in order to prevent the generation companies that dominate the market from abusing their dominant position while simultaneously keeping the generators that were constructed in the past, and in particular baseload plants, from reaping excessive profits in a situation where there are an insufficient number of baseload plants. Vesting contracts are a kind of bilateral contract that do not hinder competition in the wholesale electricity market while also ensuring that the profits earned by generators that were constructed in the past do not exceed an appropriate level. Such contracts have been used in the United Kingdom and other countries during the transitional period after restructuring, and they are still being used today in Australia and Singapore.

Fifth, it may prove that there is an entrance barrier to investment in coal generators that makes it likely for excessive profits to be made by coal generators that are yet to be constructed. In this case, these excessive profits must be eliminated by selling permits for the construction of new coal generators through competitive bidding, thus reducing the unnecessary burden on consumers. It will also be necessary to review the options for using the pressure of competition to eliminate the excessive profits garnered by nuclear power plants that will be constructed in the future and to reduce the associated costs.

The price regulation system for the monopolistic sectors of electricity transmission, distribution, and retailing needs to be converted into a price-cap regulation system at the earliest possible opportunity, after first normalizing the rate-of-return regulations based on the principle of guaranteeing an optimal rate of return. The governance style of KEPCO and its subsidiaries must also be converted to that of a commercial company that pursues profits. In regard to the governance of KEPCO, it is also necessary to permit independent management with the aim of maximizing the financial value for KEPCO's stockholders within the bounds of competition policy and regulation policy. KEPCO should be given the authority to manage itself with the object of maximizing company value for its subsidiary generation companies and all other subsidiaries. At the same time, action must be taken to prevent KEPCO from abusing this authority by engaging in anti-competitive behavior such as collusion and price fixing. The solution is strict enforcement of the laws concerning competition and the addition of punitive clauses related to anti-competitive practices to the management contracts of the KEPCO management. By revising the laws concerning the regulation of public utility pricing and the governance of government-run companies, it is possible to achieve improvement in the areas of pricing regulations and

governance in a comparatively short period of time.

The structure of the electricity industry must also be reoriented toward promoting competition. Some necessary changes include dividing KEPCO in its current form into retailing companies and transmission and distribution companies; permitting retailing companies to enter the power generation stage and allowing them complete ownership and control of certain subsidiary generation companies while forcing them to sever the ownership relationship with the other subsidiary generation companies; and permitting competition in the retailing sector of the industry.

The questions of whether transmission and distribution services should be split into separate companies, whether distribution companies should be divided by region, and whether transmission services and system operations should be integrated can be decided at a later point after further review.

# EXHIBIT 133

Barcode:3814772-165 A-580-880 REV - Admin Review 9/1/17 - 8/31/18
PUBLIC VERSION
As filed with the Securities and Exchange Commission on April 30, 2018

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 20-F

**(Mark One)**

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2017

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report
For the transition period from        to

Commission File Number: 001-13372

# KOREA ELECTRIC POWER CORPORATION
*(Exact name of registrant as specified in its charter)*

| N/A | The Republic of Korea |
|---|---|
| *(Translation of registrant's name into English)* | *(Jurisdiction of incorporation or organization)* |

55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea
*(Address of principal executive offices)*

Yoon Hye Cho, +82 61 345 4213, yoonhye.cho@kepco.co.kr, +82 61 345 4299
55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea
*(Name, telephone, e-mail and/or facsimile number and address of company contact person)*

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class: | Name of each exchange on which registered: |
|---|---|
| Common stock, par value Won 5,000 per share | New York Stock Exchange* |
| American depositary shares, each representing one-half of share of common stock | New York Stock Exchange |

\*   Not for trading, but only in connection with the listing of American depositary shares on the New York Stock Exchange, pursuant to the requirements of the Securities and Exchange Commission.

Securities registered or to be registered pursuant to Section 12(g) of the Act:
None

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
One Hundred Year 7.95% Zero-to-Full Debentures, due April 1, 2096
6% Debentures due December 1, 2026
7% Debentures due February 1, 2027
6¾% Debentures due August 1, 2027

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the last full fiscal year covered by the annual report:

641,964,077 shares of common stock, par value of Won 5,000 per share

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ☐   No ☑

Note—Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days:   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files):   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑        Accelerated filer ☐        Non-accelerated filer ☐        Emerging Growth Company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐        International Financial Reporting Standards as issued by the International Accounting Standards Board ☑        Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.   Item 17 ☐   Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15 of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

# TABLE OF CONTENTS

Page

PART I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    ITEM 1.     IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS . . . . . . . . . 2
    ITEM 2.     OFFER STATISTICS AND EXPECTED TIMETABLE . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    ITEM 3.     KEY INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
          Item 3A.    Selected Financial Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
          Item 3B.    Capitalization and Indebtedness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
          Item 3C.    Reasons for the Offer and Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . 4
          Item 3D.    Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    ITEM 4.     INFORMATION ON THE COMPANY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          Item 4A.    History and Development of the Company . . . . . . . . . . . . . . . . . . . . . . . . . 28
          Item 4B.    Business Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
          Item 4C.    Organizational Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
          Item 4D.    Property, Plant and Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    ITEM 4A.    UNRESOLVED STAFF COMMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    ITEM 5.     OPERATING AND FINANCIAL REVIEW AND PROSPECTS . . . . . . . . . . . . . . . . . 81
          Item 5A.    Operating Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
          Item 5B.    Liquidity and Capital Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
          Item 5C.    Research and Development, Patents and Licenses, etc. . . . . . . . . . . . . . . . 105
          Item 5D.    Trend Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
          Item 5E.    Off-Balance Sheet Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
          Item 5F.    Tabular Disclosure of Contractual Obligations . . . . . . . . . . . . . . . . . . . . 107
    ITEM 6.     DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES . . . . . . . . . . . . . . . . . 114
          Item 6A.    Directors and Senior Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
          Item 6B.    Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
          Item 6C.    Board Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
          Item 6D.    Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
          Item 6E.    Share Ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
    ITEM 7.     MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS . . . . . . . . . . . 119
          Item 7A.    Major Shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
          Item 7B.    Related Party Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
          Item 7C.    Interests of Experts and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
    ITEM 8.     FINANCIAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
          Item 8A.    Consolidated Statements and Other Financial Information . . . . . . . . . . . . 120
          Item 8B.    Significant Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
    ITEM 9.     THE OFFER AND LISTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
          Item 9A.    Offer and Listing Details . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
          Item 9B.    Plan of Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
          Item 9C.    Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
          Item 9D.    Selling Shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
          Item 9E.    Dilution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
          Item 9F.    Expenses of the Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
    ITEM 10.    ADDITIONAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
          Item 10A.   Share Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
          Item 10B.   Memorandum and Articles of Incorporation . . . . . . . . . . . . . . . . . . . . . . 129
          Item 10C.   Material Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136
          Item 10D.   Exchange Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136
          Item 10E.   Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
          Item 10F.   Dividends and Paying Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
          Item 10G.  Statements by Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
          Item 10H.  Documents on Display . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
          Item 10I.   Subsidiary Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

i

|  |  | Page |
|---|---|---|
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 152 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 157 |
| | Item 12A.   Debt Securities | 157 |
| | Item 12B.   Warrants and Rights | 158 |
| | Item 12C.   Other Securities | 158 |
| | Item 12D.   American Depositary Shares | 158 |
| PART II | | 160 |
| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 160 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 160 |
| ITEM 15. | CONTROLS AND PROCEDURES | 160 |
| ITEM 16. | [RESERVED] | 161 |
| ITEM 16A. | AUDIT COMMITTEE FINANCIAL EXPERT | 161 |
| ITEM 16B. | CODE OF ETHICS | 161 |
| ITEM 16C. | PRINCIPAL AUDITOR FEES AND SERVICES | 162 |
| ITEM 16D. | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEE | 162 |
| ITEM 16E. | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 162 |
| ITEM 16F. | CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANTS | 162 |
| ITEM 16G. | CORPORATE GOVERNANCE | 162 |
| ITEM 16H. | MINE SAFETY DISCLOSURE | 170 |
| PART III | | 171 |
| ITEM 17. | FINANCIAL STATEMENTS | 171 |
| ITEM 18. | FINANCIAL STATEMENTS | 171 |
| ITEM 19. | EXHIBITS | 171 |

ii

## CERTAIN DEFINED TERMS AND CONVENTIONS

All references to "Korea" or the "Republic" in this annual report on Form 20-F, or this annual report, are references to the Republic of Korea. All references to the "Government" in this annual report are references to the government of the Republic. All references to "we," "us," "our," "ours," the "Company" or "KEPCO" in this annual report are references to Korea Electric Power Corporation and, as the context may require, its subsidiaries, and the possessive thereof, as applicable. All references to "the Ministry of Trade, Industry and Energy" and "the Ministry of Strategy and Finance" include the respective predecessors thereof. All references to "tons" are to metric tons, equal to 1,000 kilograms, or 2,204.6 pounds. Any discrepancies in any table between totals and the sums of the amounts listed are due to rounding. All references to "IFRS" in this annual report are references to the International Financial Reporting Standards as issued by the International Accounting Standard Board. Unless otherwise stated, all of our financial information presented in this annual report has been prepared on a consolidated basis and in accordance with IFRS.

In addition, in this annual report, all references to:

- "EWP" are to Korea East-West Power Co., Ltd.,

- "KHNP" are to Korea Hydro & Nuclear Power Co., Ltd.,

- "KOMIPO" are to Korea Midland Power Co., Ltd.,

- "KOSEP" are to Korea South-East Power Co., Ltd.,

- "KOSPO" are to Korea Southern Power Co., Ltd., and

- "KOWEPO" are to Korea Western Power Co., Ltd.,

each of which is our wholly-owned generation subsidiary.

## FORWARD-LOOKING STATEMENTS

This annual report includes "forward-looking statements" (as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934), including statements regarding our expectations and projections for future operating performance and business prospects. The words "believe," "expect," "anticipate," "estimate," "project" and similar words used in connection with any discussion of our future operation or financial performance identify forward-looking statements. In addition, all statements other than statements of historical facts included in this annual report are forward-looking statements. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to be correct. We caution you not to place undue reliance on the forward-looking statements, which speak only as of the date of this annual report.

This annual report discloses, under the caption Item 3.D. "Risk Factors" and elsewhere, important factors that could cause actual results to differ materially from our expectations ("Cautionary Statements"). All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the Cautionary Statements.

1

# PART I

**ITEM 1.** *IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS*

Not applicable.

**ITEM 2.** *OFFER STATISTICS AND EXPECTED TIMETABLE*

Not applicable.

**ITEM 3.** *KEY INFORMATION*

### Item 3.A. Selected Financial Data

The selected consolidated financial data set forth below as of and for the years ended December 31, 2013, 2014, 2015, 2016 and 2017 have been derived from our audited consolidated financial statements which have been prepared in accordance with IFRS.

You should read the following data with the more detailed information contained in Item 5. "Operating and Financial Review and Prospects" and our consolidated financial statements included in Item 18. "Financial Statements." Historical results do not necessarily predict future results.

### Consolidated Statement of Comprehensive Income (Loss) Data

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 |
|---|---|---|---|---|---|---|
|  | (in billions of Won and millions of US$, except per share data)[1] | | | | | |
| Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩53,713 | ₩57,123 | ₩58,582 | ₩59,763 | ₩59,336 | $55,589 |
| Cost of sales . . . . . . . . . . . . . . . . . . . . . . . | 50,596 | 49,763 | 45,458 | 45,550 | 52,099 | 48,809 |
| Gross profit . . . . . . . . . . . . . . . . . . . . . . . | 3,117 | 7,360 | 13,124 | 14,213 | 7,237 | 6,780 |
| Selling and administrative expenses . . . . . . | 1,923 | 1,924 | 2,153 | 2,639 | 2,763 | 2,588 |
| Other income . . . . . . . . . . . . . . . . . . . . . . . | 625 | 666 | 699 | 652 | 689 | 645 |
| Other gains . . . . . . . . . . . . . . . . . . . . . . . . . | 129 | 107 | 8,611 | 70 | 157 | 147 |
| Operating profit . . . . . . . . . . . . . . . . . . . . . | 1,948 | 6,209 | 20,281 | 12,296 | 5,320 | 4,984 |
| Finance expense, net . . . . . . . . . . . . . . . . . | (2,302) | (2,255) | (1,832) | (1,646) | (1,596) | (1,496) |
| Income (loss) before income taxes . . . . . . . | (396) | 4,229 | 18,656 | 10,513 | 3,614 | 3,386 |
| Income tax (expense) benefit . . . . . . . . . . . | 571 | (1,430) | (5,239) | (3,365) | (2,173) | (2,036) |
| Profit for the period . . . . . . . . . . . . . . . . . . | 174 | 2,799 | 13,416 | 7,148 | 1,441 | 1,350 |
| Other comprehensive income (loss) . . . . . . | 186 | (358) | 34 | (2) | (95) | (89) |
| Total comprehensive income . . . . . . . . . . . | 360 | 2,441 | 13,450 | 7,146 | 1,346 | 1,261 |
| Profit attributable to: | | | | | | |
|    Owners of the Company . . . . . . . . . . | 60 | 2,687 | 13,289 | 7,048 | 1,299 | 1,217 |
|    Non-controlling interests . . . . . . . . . . | 114 | 112 | 127 | 100 | 142 | 133 |
| Total comprehensive income attributable to: | | | | | | |
|    Owners of the Company . . . . . . . . . . | 245 | 2,336 | 13,308 | 7,042 | 1,230 | 1,152 |
|    Non-controlling interests . . . . . . . . . . | 115 | 105 | 142 | 104 | 116 | 109 |
| Earnings per share | | | | | | |
|    Basic[2] . . . . . . . . . . . . . . . . . . . . . | 96 | 4,290 | 20,701 | 10,980 | 2,023 | 1.90 |
| Earnings per ADS | | | | | | |
|    Basic[2] . . . . . . . . . . . . . . . . . . . . . | 48 | 2,145 | 10,351 | 5,490 | 1,012 | 0.95 |
| Dividends per share . . . . . . . . . . . . . . . . . . | 90 | 500 | 3,100 | 1,980 | 790 | 0.74 |

2

**Consolidated Statements of Financial Position Data**

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2017 |
| | (in billions of Won and millions of US$, except share and per share data)[1] | | | | | |
| Net working capital deficit[3] ..... ₩ | (4,945) ₩ | (4,780) ₩ | (686) ₩ | (5,031) ₩ | (4,283) $ | (4,013) |
| Property, plant and equipment, net ........................ | 129,638 | 135,812 | 141,361 | 145,743 | 150,882 | 141,355 |
| Total assets ................. | 155,527 | 163,708 | 175,257 | 177,837 | 181,789 | 170,310 |
| Total shareholders' equity ....... | 51,451 | 54,825 | 67,942 | 73,051 | 72,965 | 68,358 |
| Equity attributable to owners of the Company ......... | 50,260 | 53,601 | 66,634 | 71,724 | 71,682 | 67,156 |
| Non-controlling interests .... | 1,191 | 1,224 | 1,308 | 1,327 | 1,283 | 1,202 |
| Share capital ................. | 3,210 | 3,210 | 3,210 | 3,210 | 3210 | 3,007 |
| Number of common shares as adjusted to reflect any changes in capital stock ... | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 |
| Long-term debt (excluding current portion) .................... | 52,801 | 55,720 | 50,907 | 44,700 | 45,624 | 42,743 |
| Other long term liabilities ....... | 31,062 | 31,563 | 33,697 | 35,347 | 39,776 | 37,264 |

*Notes*:

(1) The financial information denominated in Won as of and for the year ended December 31, 2017 has been translated into U.S. dollars at the exchange rate of Won 1,067.4 to US$1.00, which was the Noon Buying Rate as of December 29, 2017.

(2) Basic earnings (loss) per share are calculated by dividing net income available to holders of our common shares by the weighted average number of common shares issued and outstanding for the relevant period. Basic earnings (loss) per ADS have been computed as if all of our issued and outstanding common shares are represented by ADSs during each of the years presented. Each ADS represents two common shares. Dilutive earnings (loss) per share were the same as basic earnings (loss) per share for the years ended December 31, 2013 through 2017 since there were no potential dilutive instruments.

(3) Net working capital is defined as current assets minus current liabilities. For the periods indicated, current liabilities exceeded current assets, which resulted in working capital deficit for such periods.

**Currency Translations and Exchange Rates**

In this annual report, unless otherwise indicated, all references to "Won," "KRW" or "₩" are to the currency of Korea, all references to "U.S. dollars," "Dollars," "$" or "US$" are to the currency of the United States of America; all references to "Euro" or "€" are references to the currency of the European Union; all references to "Yen" or "¥" are references to the currency of Japan; all references to "A$" are to the currency of Australia; and all references to "RMB" are to the currency of the People's Republic of China. Unless otherwise indicated, all translations from Won to U.S. dollars were made at Won 1,067.4 to US$1.00, which was the noon buying rate of the Federal Reserve Board (the "Noon Buying Rate") in effect as of December 29, 2017, which rates are available on the H.10 statistical release of the Federal Reserve Board. On April 16, 2018, the Noon Buying Rate was Won 1,071.6 to US$1.00. The exchange rate between the U.S. dollar and Korean Won may be highly volatile from time to time and the U.S. dollar amounts referred to in this annual report should not be relied upon as an accurate reflection of our results of operations. No representation is made that the Won or U.S. dollar amounts referred to in this annual report could have been or could be converted into U.S. dollars or Won, as the case may be, at any particular rate or at all.

3

The following table sets forth, for the periods and dates indicated, certain information concerning the Noon Buying Rate in Won per US$1.00.

| Year Ended December 31, | At End of Period | Average[1] | High | Low |
|---|---|---|---|---|
| | | (Won per US$1.00) | | |
| 2013 | 1,055.3 | 1,094.6 | 1,161.3 | 1,050.1 |
| 2014 | 1,090.9 | 1,054.0 | 1,117.7 | 1,008.9 |
| 2015 | 1,169.3 | 1,133.7 | 1,196.4 | 1,063.0 |
| 2016 | 1,203.7 | 1,160.5 | 1,242.6 | 1,090.0 |
| 2017 | 1,067.4 | 1,141.6 | 1,207.2 | 1,067.4 |
| October | 1,115.7 | 1,130.9 | 1,146.5 | 1,115.7 |
| November | 1,084.8 | 1,099.8 | 1,120.0 | 1,079.3 |
| December | 1,067.4 | 1,082.9 | 1,094.6 | 1,067.4 |
| 2018 (through April 16) | 1,071.6 | 1,070.1 | 1,093.0 | 1,054.6 |
| January | 1,068.3 | 1,065.6 | 1,073.6 | 1,057.6 |
| February | 1,082.1 | 1,078.5 | 1,093.0 | 1,065.3 |
| March | 1,061.0 | 1,069.9 | 1,081.3 | 1,060.3 |
| April (through April 16) | 1,071.6 | 1,064.6 | 1,071.6 | 1,054.6 |

*Source: Federal Reserve Board*

*Note:*

(1) The average rates for annual and interim periods were calculated by taking the simple average of the Noon Buying Rates on the last day of each month during the relevant period. The average rates for the monthly periods (or a portion thereof) were calculated by taking the simple average of the daily Noon Buying Rates during the relevant month (or a portion thereof).

**Item 3.B. Capitalization and Indebtedness**

Not Applicable

**Item 3.C. Reasons for the Offer and Use of Proceeds**

Not Applicable

**Item 3.D. Risk Factors**

*Our business and operations are subject to various risks, many of which are beyond our control. If any of the risks described below actually occurs, our business, financial condition or results of operations could be seriously harmed.*

**Risks Relating to KEPCO**

***Increases in fuel prices will adversely affect our results of operations and profitability as we may not be able to pass on the increased cost to customers at a sufficient level or on a timely basis.***

In 2017, fuel costs constituted 31.7% of our cost of sales, and the ratio of fuel costs to our sales was 27.8%. Our generation subsidiaries purchase substantially all of the fuel that they use (except for anthracite coal) from suppliers outside Korea at prices determined in part by prevailing market prices in currencies other than Won. For example, most of the bituminous coal requirements (which accounted for approximately 52.2% of our fuel requirements in 2017 in terms of electricity output) are imported principally from Indonesia, Australia, Russia and, to a lesser extent, South Africa and others, which accounted for approximately 38%, 31%, 11%, 9% and

4

11%, respectively, of the annual bituminous coal requirements of our generation subsidiaries in 2017. Approximately 82% of the bituminous coal requirements of our generation subsidiaries in 2017 were purchased under long-term contracts and the remaining 18% from the spot market. Pursuant to the terms of our long-term supply contracts, prices are adjusted periodically based on prevailing market conditions. In addition, our generation subsidiaries purchase a significant portion of their fuel requirements under contracts with limited duration. See Item 4.B. "Business Overview—Fuel."

The prices of our main fuel types, namely, bituminous coal, oil and liquefied natural gas, or LNG, fluctuate, sometimes significantly, in tandem with their international market prices. For example, the average daily spot price of "free on board" Newcastle coal 6300 GAR published by Platts increased from US$66.8 per ton in 2016 to US$88.3 per ton in 2017 and to US$93.4 per ton as of April 16, 2018. The prices of oil and LNG are substantially dependent on the price of crude oil, and according to Bloomberg (Bloomberg Ticker: PGCRDUBA), the average daily spot price of Dubai crude oil increased from US$41.4 per barrel in 2016 to US$53.1 per barrel in 2017 and to US$68.4 per barrel as of April 16, 2018. We cannot assure you that fuel prices will remain stable or will not significantly increase in the remainder of 2018 or thereafter. If fuel prices increase substantially in the future within a short span of time, our generation subsidiaries may be unable to secure requisite fuel supplies at prices commercially acceptable to them. In addition, any significant interruption or delay in the supply of fuel, bituminous coal in particular, from any of their suppliers may cause our generation subsidiaries to purchase fuel on the spot market at prices higher than the prices available under existing supply contracts, which would result in an increase in fuel costs.

Because the Government regulates the rates we charge for the electricity we sell to our customers (see Item 4.B. "Business Overview—Sales and Customers—Electricity Rates"), our ability to pass on fuel and other cost increases to our customers is limited. If fuel prices increase rapidly and substantially and the Government, out of concern for inflation or for other reasons, maintains the current level of electricity tariff or does not increase it to a level to sufficiently offset the impact of high fuel prices, the fuel price increases will negatively affect our profit margins or even cause us to suffer operating and/or net losses, and our business, financial condition, results of operations and cash flows would suffer.

The Government may also set or adjust electricity tariff rates to serve particular policy goals that may not be necessarily responsive to fuel price movements. For example, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate, in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, a new tariff structure was implemented to encourage energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods in the summer and the winter. Third, a temporary rate discount will apply during 2017 to 2019 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. The temporary rate discount to investments in energy storage systems and renewable energy was extended until 2020. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation, financial condition and cash flows.

In addition, partly because the Government may have to undergo a lengthy deliberative process to approve an increase in electricity tariff, which represents a key component of the consumer price index, the electricity tariff may not be adjusted to a level sufficient to ensure a fair rate of return to us in a timely manner or at all, and we cannot assure that any future tariff increase by the Government will be sufficient to fully offset the adverse impact on our results of operations from current or potential rises in fuel costs. On the other hand, if fuel prices decrease, the public may demand a corresponding decrease in electricity tariff rates, and as a result the

5

Government may decrease electricity tariff rates; however, we cannot assure you that the resulting tariff rate reduction will not be excessive and thus have a detrimental effect on our profit margins, results of operations or cash flows or that, if the fuel prices were to rise again subsequent to the tariff reduction, the tariff rates would be further adjusted upwards in a timely manner, in sufficient amounts or at all so as to fully offset the adverse impact from the increase in fuel prices.

***The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability.***

From time to time, the Government considers various policy initiatives to foster efficiency in the Korean electric power industry, and at times have adopted policy measures that have substantially modified our business and operations. For example, in January 1999, with the aim of introducing greater competition in the Korean electric power industry and thereby improving its efficiency, the Government announced a restructuring plan for the Korean electric power industry, or the Restructuring Plan. For a detailed description of the Restructuring Plan, see Item 4.B. "Business Overview—Restructuring of the Electric Power Industry in Korea." As part of this initiative, in April 2001 the Government established the Korea Power Exchange to enable the sale and purchase of electricity through a competitive bidding process, established the Korea Electricity Commission to ensure fair competition in the Korean electric power industry, and, in order to promote competition in electricity generation, split off our electricity generation business to form one nuclear generation company and five non-nuclear generation companies, in each case, to be wholly owned by us. In 2002, the Government introduced a plan to privatize one of our five non-nuclear generation subsidiaries, but this plan was suspended indefinitely in 2004 due to prevailing market conditions and other policy considerations.

In August 2010, the Ministry of Trade, Industry and Energy announced the Proposal for the Improvement in the Structure of the Electric Power Industry, which was designed to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them. Pursuant to this proposal, while our six generation subsidiaries continued to be our wholly-owned subsidiaries, in January 2011 the six generation subsidiaries were officially designated as "market-oriented public enterprises" (same as us) under the Act on the Management of Public Institutions, whereupon the President of Korea appoints the president and the standing director who is to become a member of the audit committee of each such subsidiary; the selection of non-standing directors of each such subsidiary is subject to approval by the minister of the Ministry of Strategy and Finance; the president of each such subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Agencies Operating Committee (which is comprised largely of Government officials and those recommended by Government officials) conducts performance evaluation of such subsidiaries. Previously, our president appointed the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary was subject to approval by our president; the president of each such subsidiary entered into a management contract with our president; and our evaluation committee conducted performance evaluation of such subsidiaries. As a result of these changes, our six generation subsidiaries took on additional operational responsibilities and management autonomy with respect to construction and management of generation units and procurement of fuel, while we as the parent company continued to oversee and coordinate, among others, finances, corporate governance, overseas businesses, including nuclear export technology and overseas resource development, that jointly affect us and our generation subsidiaries. See also Item 16G. "Corporate Governance—The Act on the Management of Public Institutions—Applications of the Act on Our Generation Subsidiaries,"

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies

6

should take on greater responsibilities in overseas resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition. In accordance therewith, we transferred a substantial portion of our assets and liabilities in our overseas resource business to our generation subsidiaries as of December 31, 2016. In addition, pursuant to this Proposal, we considered a sale in the public market of a minority of our shares in our five non-nuclear generation subsidiaries, KEPCO KDN and KHNP. However, the planned sales have been put on hold, primarily due to prevailing market conditions. In any event, we plan to maintain a controlling stake in each of these subsidiaries.

Other than as set forth above, we are not aware of any specific plans by the Government to resume the implementation of the Restructuring Plan or otherwise change the current structure of the electric power industry or the operations of us or our generation subsidiaries materially in the near future. However, for reasons relating to changes in policy considerations, socio-political, economic and market conditions and/or other factors, the Government may resume the implementation of the Restructuring Plan or initiate other steps that may change the structure of the Korean electric power industry or the operations of us or our generation subsidiaries materially. Any such measures may have a negative effect on our business, results of operations and financial condition. In addition, the Government, which beneficially owns a majority of our shares and exercises significant control over our business and operations, may from time to time pursue policy initiatives that could directly or indirectly impact our business and operations, and such initiatives may vary from the interest and objectives of our other shareholders.

***Our capacity expansion plans, which are principally based on projections on long-term supply and demand of electricity in Korea, may prove to be inadequate.***

We and our generation subsidiaries make plans for expanding or upgrading our generation capacity and transmission infrastructure based on the Basic Plan Relating to the Long-Term Supply and Demand of Electricity, or the Basic Plan, which is generally revised and announced every two years by the Government. In July 2015, the Government announced the Seventh Basic Plan relating to the future supply and demand of electricity, focusing on stable supply of electricity and increasing the portion of low carbon electricity supply sources, among others. In December 2017, the Government announced the Eighth Basic Plan to revise the Seventh Basic Plan, for the former to be effective for the period from 2017 to 2031. The Eighth Basic Plan focuses on, among other things, (i) decreasing the reliance on nuclear and coal-based supply sources, (ii) increasing utilization of renewable energy sources and (iii) balancing the existing cost-based pool system of purchase of electricity with an environmentally-focused pool system, in order to increase utilization of LNG energy sources, which are cleaner but more expensive than nuclear or coal energy sources. Furthermore, the Eighth Basic Plan includes the following implementing measures: (i) six new nuclear generation units in a planning stage would not be constructed, (ii) extension of life of 10 decrepit nuclear generation units would not be granted, (iii) Wolsong #1 unit is not counted as part of domestic energy generation capacity, (iv) seven decrepit coal-fired generation plants will be retired by 2022, (v) six other coal-fired generation plants shall be converted to LNG fuel use and (vi) domestic renewable energy generation capacity shall be expanded to 58.5 gigawatts by 2030.

In January 2014, prior to the announcement of the Seventh Basic Plan, the Ministry of Trade, Industry and Energy adopted the Second Basic National Energy Plan following consultations with representatives from civic groups, the power industry and academia. The Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, covers the period from 2014 to 2035 and focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing the growth of electricity demand by 15% by 2035 through efficiency enhancement programs compared to the projected growth in the absence of such efficiency enhancement programs, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying latest greenhouse gas

7

emission reduction technologies to newly constructed generation units in order to further promote safety and security, (iv) strengthening resource exploration and fuel procurement capabilities to enhance Korea's energy security, (v) ensuring stable supply of energy and increasing the portion of electricity supplied from renewable sources to 11% by 2035, (vi) reinforcing the system for stable supply of conventional energy, such as oil and gas, and (vii) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of consumers in the low income group. In addition, the Second Basic National Energy Plan revised the target level of electricity generated by nuclear sources as a percentage of total electricity generated to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008, which covered the period from 2008 to 2030. In March 2018, the Government announced its plan to establish the Third Basic National Energy Plan by the end of 2018.

We cannot assure that the Eighth Basic Plan, the Second Basic National Energy Plan, or their respective successor plans will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable costs to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand, or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on the part of us and our generation subsidiaries, among others, which may have a material adverse effect on our results of operations, financial condition and cash flows.

From time to time, we may experience temporary power shortages or circumstances bordering on power shortages due to factors beyond our control, such as extreme weather conditions. Such circumstances may lead to increased end-user complaints and greater public scrutiny, which may in turn require us to modify our capacity expansion plans, and if we were to substantially modify our capacity plans, this might result in additional capital expenditures and, as a result, have a material adverse effect on our results of operations, financial condition and cash flows.

Although the Government makes significant efforts to encourage conservation of electricity, including through public education campaigns, there is no assurance that such efforts will have the desired effect of substantially reducing the demand for electricity or improving efficient use thereof.

***We are subject to various environmental regulations and related government initiatives, including in relation to climate change, which could cause significant compliance costs and operational liabilities.***

We are subject to national, local and overseas environmental laws and regulations, including increasing pressure to reduce emission of carbon dioxide from our electricity generation activities as well as our natural resource development endeavors overseas. Our operations could expose us to the risk of substantial liability relating to environmental, health and safety issues, such as those resulting from the discharge of pollutants and carbon dioxide into the environment and the handling, storage and disposal of hazardous materials. We may be responsible for the investigation and remediation of environmental conditions at current or former operational sites. We may also be subject to related liabilities (including liabilities for environmental damage, third party property damage or personal injury) resulting from lawsuits brought by governments or private litigants. In the course of our operations, hazardous wastes may be generated, disposed of or treated at third party-owned or -operated sites. If those sites become contaminated, we could also be held responsible for the cost of investigation and remediation of such sites for any related liabilities, as well as for civil or criminal fines or penalties.

We intend to fully comply with our environmental obligations. However, our environmental measures, including the use of, or replacement with, environmentally friendly but more expensive parts and equipment and budgeting capital expenditures for the installation or modification of such facilities, may result in increased

8

operating costs and liquidity requirement. The actual cost of installation, replacement, modification and/or operation of such equipment and related liquidity requirement may depend on a variety of factors that are beyond our control. There is no assurance that we will continue to be in material compliance with legal or regulatory requirements or satisfy social norms and expectations in the future in relation to the environment, including in respect of climate change.

In recent years, partly driven by growing public awareness and sensitivity toward climate change and other environmental issues as well as in an effort to capture the economic and social potential associated with renewable energy and "new energy"-related industries (such as smart grids, energy storage systems and electrical vehicles, among others), the Government has introduced and implemented a number of new measures designed to reduce carbon emission, minimize environmental damage and spur related business opportunities. Some key examples of such Government initiatives pertinent to our and our generation subsidiaries' operations are as follows:

- *Carbon Emission Trading System, Related Emission Reduction Targets and the Greenhouse Gas Reduction Roadmap.* In accordance with the Act on Allocation and Trading of Greenhouse Gas Emission Allowances, enacted in March 2013, the Government is currently in the process of implementing a carbon emission trading system under which the Government will allocate the amount of permitted carbon emission to companies by industry and a company whose business emits more carbon than the permitted amount may purchase the right to emit more carbon through the carbon emission trading exchange. This system is expected to be implemented in three stages. During the first phase (2015 to 2017), the Government set up and made a test run of the trading system to ensure its smooth operation; during this phase, the carbon emission rights were allocated without charge. During the second phase (2018 to 2020), the system will be applied to a limited scope of industries and companies, where the carbon emission right will be allocated at a relatively low price, but not freely. The amount of required reduction for the second phase of 2018 to 2020 is expected to be determined by June 2018. During the third phase (2021 to 2025), the Government plans to run the system on an expanded scale with aggressive carbon emission reduction targets. In December 2016, the Government announced the Climate Change Response Initiatives and 2030 National Greenhouse Gas Reduction Roadmap, which set forth the carbon emission trading system as one of the primary means to reach the emission and greenhouse gas reduction targets of the policies. The 2030 National Greenhouse Gas Reduction Roadmap sets forth a national reduction target of greenhouse gas by 219 million tons in the aggregate, amounting to a 25.7% reduction by 2030. The roadmap also set forth reduction targets for eight domestic sectors and the first three sectors with the largest reduction targets are electricity generation, industry and buildings. Our business is classified as part of the electricity generation sector, for which greenhouse gas reduction of 64.5 million tons is requested by year 2030. We are aiming to contribute to 80% of such reduction target for the sector, while such reduction target may change pursuant to an amendment to the 2030 National Greenhouse Gas Reduction Roadmap which the Government is expected to announce in 2018. Adhering to such emission and greenhouse gas reduction requirement is expected to result in our incurring significant compliance costs.

- *Regulation of Decrepit Coal-Fired Generation Units.* As a measure to address the high level of particulate matter pollution, the Government temporarily suspended the operations of eight coal-fired generation units that are 30 years or older throughout the month of June 2017. Subsequently, in July 2017, two of these units were shut down completely and one unit switched fuel from coal to wood pallets. As part of the Comprehensive Measures against Particulate Matter and the Eighth Basic Plan, announced by the Government in September 2017 and December 2017, respectively, the Government set forth the following policy directions relating to coal-fired generation units: (i) two coal-fired generation units scheduled for construction and four existing coal-fired generation units shall convert to LNG fuel use, (ii) in principle, construction of new coal-fired generation units shall not be planned, (iii) seven of the coal-fired generation units that are 30 years or older will be shut down on an accelerated schedule, (iv) coal-fired generation units that are 30 years or older shall temporarily cease operations from March through June of each year, (v) coal-fired generation units shall be put through comprehensive functional and environmental upgrades and (vi) coal-fired generation units shall be

9

subject to emission standards that are twice as more rigorous than the current standards to be in effect by the first half of 2018. Although such plans may be subject to change, compliance with such measures is expected to result in our incurring significant costs, including in connection with adherence to more stringent particulate matter pollution regulations, retrofitting and overall replacement of environmental facilities.

- *Coal Consumption Tax*. In January 2014, largely based on policy considerations of tax equity among different fuel types as well as environmental concerns, the Ministry of Strategy and Finance announced that, effective July 1, 2014, consumption tax will apply to bituminous coal, which previously was not subject to consumption tax unlike other fuel types such as LNG or bunker oil. Pursuant to the amended Individual Consumption Tax Act effective as of April 1, 2018, which involved an increase of the unit tax rate for coal by Won 6 across the board, the base tax rate (which is subject to certain adjustments) is Won 36 per kilogram for bituminous coal; however, due to concerns on the potential adverse effect on industrial activities, the applicable tax rate is applied differently based on the net heat generation amount. The currently applicable tax rate for bituminous coal is Won 33 per kilogram for net heat generation of less than 5,000 kilocalories, Won 36 per kilogram for net heat generation of 5,000 to 5,500 kilocalories and Won 39 per kilogram for net heat generation of 5,500 kilocalories or more. In contrast, the currently applicable tax rate for LNG is Won 60 per kilogram. Since bituminous coal currently represents the largest fuel type for our electricity generation, accounting for approximately 52.2% of our entire fuel requirements in 2017 in terms of electricity output, we expect the coal consumption tax thereon will result in an increase of our overall fuel costs.

- *Renewable Portfolio Standard*. Under this program, each of our generation subsidiaries is required to generate a specified percentage of total electricity to be generated by such generation subsidiary in a given year in the form of renewable energy or, in case of a shortfall, purchase a corresponding amount of a Renewable Energy Certificate (a form of renewable energy credit) from other generation companies whose renewable energy generation surpass such percentage. The target percentage was 3.0% in 2015, 3.5% in 2016, 4.0% in 2017, 5.0% in 2018 and will incrementally increase to 10.0% by 2023. Fines are to be levied on any subsidiary that fails to do so in the prescribed timeline. In 2016, all six of our generation subsidiaries met the target through renewable energy generation and/or the purchase of a Renewable Energy Certificate. Compliance by our generation subsidiaries of the 2017 target is currently under evaluation, and if any generation subsidiary is found to have failed to meet the target for 2017 or for subsequent years, such generation subsidiary may become subject to fines. Additionally, as the target percentage is subject to change, changes to the target percentage may result in additional expenses for our generation subsidiaries.

- *Renewable Energy 3020 Plan*. In December 2017, the Ministry of Trade, Industry and Energy announced the Renewable Energy 3020 Plan, an initiative to increase the generation and use of renewable energy on a nationwide basis. The Government plans to increase the required percentage of total electricity to be generated from renewable energy sources from 7% in 2016 to 10.5% by 2022 and 20% by 2030, respectively. Moreover, the Government plans to increase the domestic renewable energy generation capacity to 63.8 gigawatts by 2030 through the expansion of solar and wind power generation capacities to 36.5 gigawatts and 17.7 gigawatts, respectively, by 2030.

- *New Energy Industry Fund*. In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. We contributed Won 500 billion to the funds in 2016. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector.

- *Environmental and safety considerations in electricity supply and demand planning*. In March 2017, the Electricity Business Act was amended to the effect that starting in June 2017, future national

10

planning for electricity supply and demand in Korea should consider the environmental and safety impacts of such planning. However, to-date, no specific guidelines have been provided by the Government as to how to implement this provision, and it is therefore difficult to assess in advance what impact such provision will have on our business, results of operations or financial condition.

Complying with these Government initiatives and operating programs in furtherance thereof has involved and will likely involve significant costs and resources on our part. We and our generation subsidiaries could also become subject to substantial fines and other forms of penalties for non-compliance. We expect that the additional costs associated with implementing and operating these programs and otherwise complying with these programs will be covered by a corresponding increase in electricity tariff. However, there is no assurance that, particularly given the wide-ranging policy priorities for the Government, it will in fact raise the electricity tariff to a level sufficient to fully cover such additional costs, do so on a timely basis or at all. If the Government does not do so or provide us and our generation subsidiaries with other forms of assistance to offset the costs involved, our results of operation, financial condition and cash flows may be materially and adversely affected.

See Item 4.B. "Business Overview—Environmental Programs."

***We may require a substantial amount of additional indebtedness to refinance existing debt and for future capital expenditures.***

We anticipate that a substantial amount of additional indebtedness will be required in the coming years in order to refinance existing debt, make capital expenditures for construction of generation plants and other facilities and/or make acquisitions, invest in renewable energy and the "new energy industry" projects and fund our overseas businesses. In 2015, 2016 and 2017, our capital expenditures in relation to the foregoing amounted to Won 15,750 billion, Won 13,950 billion and Won 13,711 billion, respectively, and our budgeted capital expenditures for 2018, 2019 and 2020 amount to Won 15,816 billion, Won 17,180 billion and Won 17,580 billion, respectively.

While we currently do not expect to face any material difficulties in procuring short-term borrowings to meet our liquidity and short-term capital requirements, there is no assurance that we will be able to do so. We expect that a portion of our long-term debt will need to be paid or refinanced through foreign currency-denominated borrowings and capital raising in international capital markets. Such financing may not be available on terms commercially acceptable to us or at all, especially if the global financial markets experience significant turbulence or a substantial reduction in liquidity or due to other factors beyond our control. If we are unable to obtain financing on commercially acceptable terms on a timely basis, or at all, we may be unable to meet our funding requirements for capital expenditures or debt repayment obligations, which could have a material adverse impact on our business, results of operations and financial condition.

In light of the general policy guideline of the Government for public institutions (including us and our generation subsidiaries) to reduce their respective overall debt levels, we and our generation subsidiaries have, in consultation with the Government and as approved by the Public Agencies Operating Committee, previously set for 2017 target debt-to-equity levels and undertaken various programs to reduce debt and improve the overall financial health. For further information, see Item 4.B. "Business Overview—Debt Reduction Program and Related Activities." Despite our best efforts, however, for reasons beyond our control, including macroeconomic environments, government regulations and market forces (such as international market prices for our fuels), we cannot assure whether we or our generation subsidiaries will be able to successfully reduce debt burdens or otherwise improve our financial health to a level contemplated by the Government or to a level that would be optimal for our capital structure. If we or our generation subsidiaries fail to do so or the measures taken by us or our generation subsidiaries to reduce debt levels or improve financial health have unintended adverse consequences, such developments may have an adverse effect on our business, results of operations and financial condition.

11

***The movement of Won against the U.S. dollar and other currencies may have a material adverse effect on us.***

The Won has fluctuated significantly against major currencies from time to time. Even slight depreciation of Won against U.S. dollar and other foreign currencies may result in a material increase in the cost of fuel and equipment purchased by us from overseas since the prices for substantially all of the fuel materials and a significant portion of the equipment we purchase are denominated in currencies other than Won, generally in U.S. dollars. Changes in foreign exchange rates may also impact the cost of servicing our foreign currency-denominated debt. As of December 31, 2017, 19.4% of our long-term debt (including the current portion but excluding issue discounts and premium) without taking into consideration of swap transactions, was denominated in foreign currencies, principally U.S. dollars. In addition, even if we make payments in Won for certain fuel materials and equipment, some of these fuel materials may originate from other countries and their prices may be affected accordingly by the exchange rates between the Won and foreign currencies, especially the U.S. dollar. Since the substantial majority of our revenues are denominated in Won, we must generally obtain foreign currencies through foreign currency-denominated financings or from foreign currency exchange markets to make such purchases or service such debt. As a result, any significant depreciation of Won against the U.S. dollar or other major foreign currencies will have a material adverse effect on our profitability and results of operations.

***We may not be successful in implementing new business strategies.***

As part of our overall business strategy, we plan to (i) strengthen competitiveness in our core operations by enhancing efficiency of our generation, transmission and distribution networks and related facilities, (ii) expand and develop new businesses by diversifying our overseas business and actively addressing climate change, (iii) create a platform for future growth by developing an ecosystem focused on new energy technologies, and (iv) strengthen our management system for sustainable growth.

Due to their inherent uncertainties, such new and expanded strategic initiatives expose us to a number of risks and challenges, including the following:

- new and expanded business activities may require unanticipated capital expenditures and involve additional compliance requirements;

- new and expanded business activities may result in less growth or profit than we currently anticipate, and there can be no assurance that such business activities will become profitable at the level we desire or at all;

- certain of our new and expanded businesses, particularly in the areas of renewable energy, require substantial government subsidies to become profitable, and such subsidies may be substantially reduced or entirely discontinued;

- we may fail to identify and enter into new business opportunities in a timely fashion, putting us at a disadvantage vis-à-vis competitors, particularly in overseas markets; and

- we may need to hire or retrain personnel to supervise and conduct the relevant business activities.

As part of our business strategy, we may also seek, evaluate or engage in potential acquisitions, joint ventures, strategic alliances, restructurings, combinations, rationalizations, divestments or other similar opportunities. The prospects of these initiatives are uncertain, and there can be no assurance that we will be able to successfully implement or grow new ventures, and these ventures may prove more difficult or costly than what we originally anticipated. In addition, we regularly review the profitability and growth potential of our existing and new businesses. As a result of such review, we may decide to exit from or to reduce the resources that we allocate to new or existing ventures in the future. There is a risk that these ventures may not achieve profitability or operational efficiencies to the extent originally anticipated, and we may fail to recover investments or expenditures that we have already made. Any of the foregoing may have a material adverse effect on our reputation, business, results of operations, financial condition and cash flows.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

***We plan to pursue overseas expansion opportunities that may subject us to different or greater risks than those associated with our domestic operations.***

While our operations have, to-date, been primarily based in Korea, we and our generation subsidiaries may expand, on a selective and opportunistic basis, overseas operations in the future. In particular, we and our generation subsidiaries may further expand our project portfolio to include the construction and operation of conventional thermal generation units, nuclear generation units and renewable energy power plants, transmission and distribution and (primarily through our generation subsidiaries) mining and development of fuel sources.

Overseas operations often involve risks that are different from those we face in our domestic operations, including the following:

- challenges of complying with multiple foreign laws and regulatory requirements, including tax laws and laws regulating our operations and investments;

- volatility of overseas economic conditions, including fluctuations in foreign currency exchange rates;

- difficulties in enforcing creditors' rights in foreign jurisdictions;

- risk of expropriation and exercise of sovereign immunity where the counterparty is a foreign government;

- difficulties in establishing, staffing and managing foreign operations;

- differing labor regulations;

- political and economic instability, natural calamities, war and terrorism;

- lack of familiarity with local markets and competitive conditions;

- changes in applicable laws and regulations in Korea that affect foreign operations; and

- obstacles to the repatriation of earnings and cash.

Any failure by us to recognize or respond to these differences may adversely affect the success of our operations in those markets, which in turn could materially and adversely affect our business and results of operations.

Furthermore, while we seek to enter into overseas business opportunities in a prudent manner, some of our new international business ventures carry inherent risks that are different from our traditional business of electricity power generation, transmission and distribution. While the overseas businesses in the aggregate currently do not comprise a material portion of our overall business, as we are relatively inexperienced in these new types of overseas businesses, the actual revenues and profitability from, and investments and expenditures into, such ventures may be substantially different from what we plan or anticipate and may have a material adverse impact on our overall business, results of operations, financial condition and cash flows.

***An increase in electricity generated by and/or sourced from private power producers may erode our market position and hurt our business, growth prospects, revenues and profitability.***

As of December 31, 2017, we and our generation subsidiaries owned approximately 70.3% of the total electricity generation capacity in Korea (excluding plants generating electricity for private or emergency use). New entrants to the electricity business will erode our market share and create significant competition, which could have a material adverse impact on our financial condition and results of operations.

In particular, we compete with independent power producers with respect to electricity generation. The independent power producers accounted for 22.9% of total power generation in 2017 and 29.7% of total generation capacity as of December 31, 2017. As of December 31, 2017, there were 17 independent power

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

producers in Korea, excluding renewable energy producers. Private enterprises became permitted to own and operate coal-fired power plants in Korea only after the Ministry of Trade, Industry and Energy approved plans for independent power producers to construct coal-fired power plants under the Sixth Basic Plan announced in February 2013. Under the Eighth Basic Plan announced in December 2017, (i) six coal-fired units under construction with aggregate generation capacity of 6,260 megawatts are scheduled to be completed between 2021 and 2022, and (ii) two coal-fired units scheduled for construction shall be converted to LNG fuel use. Currently there are no additional plans for construction of coal-fired power plants by independent power producers beyond 2022. While it remains to be seen whether construction of these generation units will be completed as scheduled, if these units were to be completed as scheduled and/or independent power producers are permitted to build additional generation capacity (whether coal-fired or not), our market share in Korea may decrease, which may have a material adverse effect on our results of operations and financial condition.

In addition, under the Community Energy System adopted by the Government in 2004, a minimal amount of electricity is supplied directly to consumers on a localized basis by independent power producers outside the cost-based pool system used by our generation subsidiaries and most independent power producers to distribute electricity nationwide. The purpose of this system is to geographically decentralize electricity supply and thereby reduce transmission losses and improve the efficiency of energy use. These entities do not supply electricity on a national level but are licensed to supply electricity on a limited basis to their respective districts under the Community Energy System. As of March 31, 2018, the aggregate generation capacity of suppliers participating in the Community Energy System amounted to less than 1% of that of our generation subsidiaries in the aggregate. We currently do not expect the Community Energy System to be widely adopted, especially in light of the significant level of capital expenditure required for such direct supply. However, if the Community Energy System is widely adopted, it may erode our currently dominant market position in the generation and distribution of electricity in Korea and may have a material adverse effect on our business, results of operations and financial condition.

Our market dominance in the electricity distribution in Korea also may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows.

See also Item 4.B. "Business Overview—Competition."

***Labor unrest or increases in labor cost may adversely affect our operations.***

We and each of our generation subsidiaries have separate labor unions. As of December 31, 2017, approximately 69.0% of our and our generation subsidiaries' employees in the aggregate were members of these labor unions. Since a six-week labor strike in 2002 by union members of our generation subsidiaries in response to a proposed privatization of one of our generation subsidiaries, there has been no material labor dispute. However, we cannot assure you that there will not be a major labor strike or other material disruptions of operations by the labor unions of us and our generation subsidiaries if the Government resumes privatization or other restructuring initiatives or for other reasons, which may adversely affect our business and results of operations.

Furthermore, the Government, as part of a response to low fertility amidst an aging population in Korea and to make the lives of workers more stable, has pledged to reduce the number of non-permanent workers and increase the employment of permanent workers, in part by transitioning from non-permanent to permanent many positions in the public sector. According to guidelines announced by the Government in July 2017, we plan to

finalize measures, by the end of 2018, to transition non-permanent positions to permanent positions, including types and number of non-permanent positions to be transitioned and conditions of transition. Although a majority of our and our generation subsidiaries' workforce are permanent employees, approximately 31.7% of the workforce consists of non-permanent positions that are part-time or outsourced. If we or our generation subsidiaries, as a result of these Government policies or otherwise, are required to or decide to transition non-permanent positions to permanent positions, this may result in increased labor costs for us or our generation subsidiaries and may have a material adverse impact on us or our generation subsidiaries' financial condition and results of operations.

***Operation of nuclear power generation facilities inherently involves numerous hazards and risks, any of which could result in a material loss of revenues or increased expenses.***

Through KHNP, we currently operate 24 nuclear-fuel generation units. Operation of nuclear power plants is subject to certain hazards, including environmental hazards such as leaks, ruptures and discharge of toxic and radioactive substances and materials. These hazards can cause personal injuries or loss of life, severe damage to or destruction of property and natural resources, pollution or other environmental damage, clean-up responsibilities, regulatory investigation and penalties and suspension of operations. Nuclear power has a stable and relatively inexpensive cost structure (which is least costly among the fuel types used by our generation subsidiaries) and is the second largest source of Korea's electricity supply, accounting for 26.8% of electricity generated in Korea in 2017. Due to significantly lower unit fuel costs compared to those for thermal power plants, our nuclear power plants are generally operated at full capacity with only routine shutdowns for fuel replacement and maintenance, with limited exceptions.

From time to time, our nuclear generation units may experience unexpected shutdowns or maintenance-related stoppage. For example, following an earthquake in the vicinity in September 2016, four nuclear generation units at the Wolsong site were shut down for approximately three months as part of a preventive and safety assurance program although these units were not directly affected by the earthquake. Furthermore, the utilization rates of our nuclear generation units fell in 2017 as our nuclear generation units stopped operation for safety and maintenance inspection more frequently in 2017 as compared to 2016, due to the Government's strengthening of safety enhancement measures. We expect the utilization of our nuclear generation units will be similarly affected in 2018. Any prolonged or substantial breakdown, failure or suspension of operation of a nuclear unit could result in a material loss of revenues, an increase in fuel costs related to the use of alternative power sources, additional repair and maintenance costs, greater risk of litigation and increased social and political hostility to the use of nuclear power, any of which could have a material adverse impact on our financial condition and results of operations.

In addition, heightened concerns regarding the safety of operating nuclear generation units could impede with our ability to operating them for an extended period of time or at all. For example, the nuclear power plant at Wolsong #1 unit began operations in 1982 and ended its operations in 2012 pursuant to its 30-year operating license. In February 2015, the Nuclear Safety and Security Commission ("NSSC") evaluated the safety of operating Wolsong #1 unit and approved its extended operation until November 2022. However, a civic group filed a lawsuit to annul such decision, and in February 2017, the Seoul Administrative Court ruled against the NSSC. The NSSC appealed this decision, and the civic group filed an injunction to suspend the operation of the Wolsong #1 unit. The civic group's injunction was denied in July 2017. KHNP, which currently is operating the unit pursuant to the NSSC's initial decision, has joined this lawsuit. As of December 31, 2017, the book value of property, plant and equipment and provision for decommissioning costs of Wolsong #1 unit was Won 608 billion and Won 642 billion, respectively. We cannot assure you whether the courts will ultimately rule to grant the extension of life for Wolsong #1. In addition, it is reported that the Government will announce its decision by the first half of 2018 regarding the timing of the shutdown of Wolsong #1 unit. If Wolsong #1 unit is prohibited from operation, we may incur significant losses in connection with the property, plant and equipment of Wolsong #1 unit. In addition, the amount of provision may increase significantly, and the timing of actual cash outflows may be accelerated. There are seven other nuclear generation units whose life under their initial operating license

will expire in the next nine years, or by 2027. Thus, if the courts or the Government were to ultimately decide against the extension of life for Wolsong #1, we may find it more difficult to have the life of other nuclear units extended as well. The failure to extend the life of these units would result in a loss of revenues from such units and the increase in our overall fuel costs (as nuclear fuel is the cheapest compared to coal, LNG or oil), which could adversely affect our results of operation and financial condition. Furthermore, in September 2016, Greenpeace and 559 Korean nationals brought a lawsuit against the NSSC to revoke the permit the NSSC granted to KHNP in relation to the construction of Shin-Kori #5 and #6 nuclear generation units. This case is currently pending at the Seoul Administrative Court. If the construction of these new nuclear units is prohibited, we will experience a loss of revenues and an increase in fuel costs, which could adversely affect our results of operation and financial condition.

In order to prevent damages to the nuclear facilities such as a result of the tsunami and earthquake in March 2011 in Japan, KHNP prepared a comprehensive safety improvement plan including, but are not limited to, installing additional automatic shut-down systems for earthquakes, extending coastal barriers for seismic waves, procuring mobile power generators and storage batteries, installing passive hydrogen removers at nuclear facilities and improving the radiology emergency medical system. All follow-up measures were finalized in December 2015. KHNP also developed 10 additional supplementary safety measures by analysis of overseas plants and its current operations and implemented eight of such measures in 2017, with the two remaining measures to be implemented by 2020. However, there is no assurance that a similar or worse natural disaster may require the adoption and implementation of additional safety measures, which may be costly and have a material adverse impact on our financial condition and results of operations.

While releasing its five-year national governance plan in July 2017, the new Government led by President Moon Jae-in announced reforms indicating a shift away from previous energy policies. Subsequently, the Government unveiled its roadmap to denuclearization and shift in energy sources in October 2017 and announced the Eighth Basic Plan to implement such roadmap in December 2017. The Eighth Basic Plan focuses on, among other things, (i) decreasing the reliance on nuclear and coal-based supply sources, (ii) increasing utilization of renewable energy sources and (iii) balancing the existing cost-based pool system of purchase of electricity with an environmentally-focused pool system, in order to increase utilization of LNG energy sources, which are cleaner but more expensive than nuclear or coal energy sources. Accordingly, six new nuclear generation units in a planning stage (Shinhanwool #3 and #4, Chunji #1 and #2 and Singyu #1 and #2) would not be constructed, while five new nuclear plants under construction (Shin-Kori #4, #5, #6, Shin-Hanul #1 and #2) shall begin operation by 2023 upon completion of the construction. Future extensions of life of decrepit nuclear generation units would not be granted and the proportion of renewable energy sources would be increased. Such Government policies or any changes thereto may affect existing plans of our or our generation subsidiaries and have a material adverse impact on our or our generation subsidiaries' financial condition and results of operations.

***The construction and operation of our generation, transmission and distribution facilities involve difficulties, such as opposition from civic groups, which may have an adverse effect on us.***

From time to time, we encounter social and political opposition against construction and operation of our generation facilities (particularly nuclear units) and, to a lesser extent, our transmission and distribution facilities. For example, we recently faced intense opposition from local residents and civic groups to the construction of transmission lines in the Milyang area, which we resolved through various compensatory and other support programs. Such opposition delayed the schedule for completion of this project. Although we and the Government have undertaken various community programs to address concerns of residents in areas near our facilities, civic and community opposition could result in delayed construction or relocation of our planned facilities, which could have a material adverse impact on our business and results of operations.

16

*Our risk management policies and procedures may not be fully effective at all times.*

In the course of our operations, we must manage a number of risks, such as regulatory risks, market risks and operational risks. Although we devote significant resources to developing and improving our risk management policies and procedures and expect to continue to do so in the future, our risk management practices may not be fully effective at all times in eliminating or mitigating risk exposures in all market environments or against all types of risk, including risks that are unidentified or unanticipated, such as natural disasters or employee misconduct. For example, in May 2013, the Nuclear Safety and Security Commission ("NSSC") of Korea discovered that certain parts used in several of our then-operating nuclear generation units had been supplied based on forged testing results. This discovery led to full internal investigation and investigation by the Prosecutor's Office, which in turn led to prosecutions and convictions of several current and former employees of KHNP on related and separate bribery charges, as well as termination of the then-president of KHNP as part of a broad disciplinary action. The incident also led to suspended operation of the related nuclear generation units for several months pending safety inspection. A similar incident involving forged testing results and bribery occurred also in November 2012. We and KHNP have fully cooperated with the authorities in terms of investigations as well as remedial and preventive measures, including enhanced internal compliance policies and procedures. We also believe we and our subsidiaries are in compliance in all material respects with internal compliance policies and procedures and all other additional safety measures initiated internally or required by regulatory and governmental agencies. However, we cannot assure you that, despite all precautionary and reform measures undertaken by us, these measures will prove to be fully effective at all times against all the risks we face or that an incident that that could cause harm to our reputation and operation will not happen in the future, including due to factors beyond our control.

*Our risk management procedures may not prevent losses in debt and foreign currency positions.*

We manage interest rate exposure for our debt instruments by limiting our variable rate debt exposure as a percentage of our total debt and closely monitoring the movements in market interest rates. We also actively manage currency exchange rate exposure for our foreign currency-denominated liabilities by measuring the potential loss therefrom using risk analysis software and entering into derivative contracts to hedge such exposure when the possible loss reaches a certain risk limit. To the extent we have unhedged positions or our hedging and other risk management procedures do not work as planned, our results of operations and financial condition may be adversely affected.

*The amount and scope of coverage of our insurance are limited.*

Substantial liability may result from the operations of our nuclear generation units, the use and handling of nuclear fuel and possible radioactive emissions associated with such nuclear fuel. KHNP carries insurance for its generation units and nuclear fuel transportation, and we believe that the level of insurance is generally adequate and is in compliance with relevant laws and regulations. In addition, KHNP is the beneficiary of Government indemnity which covers a portion of liability in excess of the insurance. However, such insurance is limited in terms of amount and scope of coverage and does not cover all types or amounts of losses which could arise in connection with the ownership and operation of nuclear plants. Accordingly, material adverse financial consequences could result from a serious accident or a natural disaster to the extent it is neither insured nor covered by the government indemnity.

In addition, our non-nuclear generation subsidiaries carry insurance covering certain risks, including fire, in respect of their key assets, including buildings and equipment located at their respective power plants, construction-in-progress and imported fuel and procurement in transit. Such insurance and indemnity, however, cover only a portion of the assets that these generation subsidiaries own and operate and do not cover all types or amounts of loss that could arise in connection with the ownership and operation of these power plants. In addition, unlike us, our generation subsidiaries are not permitted to self-insure, and accordingly have not self-insured, against risks of their uninsured assets or business. Accordingly, material adverse financial consequences could result from a serious accident to the extent it is uninsured.

17

In addition, because neither we nor our non-nuclear generation subsidiaries carry any insurance against terrorist attacks, an act of terrorism would result in significant financial losses. See Item 4.B. "Business Overview—Insurance."

***We may not be able to raise equity capital in the future without the participation of the Government.***

Under applicable laws, the Government is required to directly or indirectly own at least 51% of our issued capital stock. As of March 15, 2018, the last day on which our shareholders' registry was closed, the Government, directly and through Korea Development Bank (a statutory banking institution wholly owned by the Government), owned 51.1% of our issued capital stock. Accordingly, without changes in the existing Korean law, it may be difficult or impossible for us to undertake, without the participation of the Government, any equity financing in the future.

***We may be exposed to potential claims made by current or previous employees for unpaid wages for the past three years under the expanded scope of ordinary wages and become subject to additional labor costs arising from the broader interpretation of ordinary wages under such decision.***

Under the Labor Standards Act, an employee is legally entitled to "ordinary wages." Under the guidelines previously issued by the Ministry of Employment and Labor, ordinary wages include base salary and certain fixed monthly allowances for work performed overtime during night shifts and holidays. Prior to the Supreme Court decision described below, many companies in Korea had typically interpreted these guidelines as excluding from the scope of ordinary wages fixed bonuses that are paid other than on a monthly basis, namely on a bi-monthly, quarterly or semi-annual basis, although such interpretation had been a subject of controversy and had been overruled in a few court cases.

In December 2013, the Supreme Court of Korea ruled that regular bonuses fall under the category of ordinary wages on the condition that those bonuses are paid regularly and uniformly, and that any agreement which excludes such regular bonuses from ordinary wage is invalid. One of the key rulings provides that bonuses that are given to employees (i) on a regular and continuous basis and (ii) calculated according to the actual number of days worked (iii) that are not incentive-based must be included in the calculation of "ordinary wages." The Supreme Court further ruled that in spite of invalidity of such agreements, employees shall not retroactively claim additional wages incurred due to such court decision, in case that such claims bring to employees unexpected benefits which substantially exceeds the wage level agreed by employers and employees and cause an unpredicted increase in expenditures for their company, which would lead the company to material managerial difficulty or would be a threat to the existence of the company. In that case, the claim is not acceptable since it is unjust and is in breach of the principle of good faith.

As a result of such ruling by the Supreme Court of Korea, we and our subsidiaries became subject to a number of lawsuits filed by various industry-wide and company-specific labor unions based on claims that ordinary wage had been paid without including certain items that should have been included as ordinary wage. In July 2016, the court ruled against us, and in accordance with the court's ruling, in August 2016 we paid Won 55.1 billion to the employees for three years of back pay plus interest. As of December 31, 2017, 49 lawsuits were pending against our subsidiaries for an aggregate claim amount of Won 170 billion, for which our subsidiaries set aside an aggregate amount of Won 56 billion to cover any potential future payments of additional ordinary wage in relation to the related lawsuits. We cannot presently assure you that the court will not rule against our subsidiaries in these lawsuits, or that the foregoing reserve amount will be sufficient to cover the amounts payable under the court rulings.

Additionally, since the issue of determining which labor costs should be additionally included as part of ordinary wages has not been fully resolved by the courts reviewing the lawsuits to which our subsidiaries are a party and other ordinary wage lawsuits filed against other companies, we cannot presently assure you that there will not be additional lawsuits in relation to ordinary wages and that we or our subsidiaries may not become

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

liable for greater amount of damages as a result of these lawsuits. Furthermore, court decisions or labor legislations expanding the definition of ordinary wages may prospectively increase the labor costs of us and our subsidiaries. As a result, there can be no assurance that the above-described lawsuits and circumstances will not have a material adverse effect on our results of operations. See Item 8.A. Consolidated Statements and Other Financial Information—Legal Proceedings.

*We are subject to cyber security risk.*

Recently, our activities have been subject to an increasing risk of cyber-attacks, the nature of which is continually evolving. For example, in December 2014, KHNP became subject to a cyber terror incident. According to the findings of the Prosecutor's Office announced in March 2015, hackers suspected to be affiliated with North Korean authorities stole and distributed a mock blueprint for a hypothetical nuclear unit that had been devised for educational purposes, hacked into the computer network of former KHNP employees and threatened to shut down certain of KHNP's nuclear plants. The hacking incident did not jeopardize our nuclear operation in any material respect and none of the stolen information was material to our nuclear operation or the national nuclear policy. In response to such incident, we and our subsidiaries have further bolstered anti-hacking and other preventive and remedial measures in relation to potential cyber terror. However, there is no assurance that a similar or more serious hacking or other forms of cyber terror will not happen with respect to us and our generation subsidiaries, which could have a material adverse impact on our business, financial condition and results of operations.

*We engage in limited activities relating to Iran and may become subject to sanctions under relevant laws and regulations of the United States and other jurisdictions as a result of such activities, which may adversely affect our business and reputation.*

The U.S. Department of the Treasury's Office of Foreign Assets Control, or OFAC, administers and enforces certain laws and regulations (which we refer to as the OFAC sanctions) that impose restrictions upon activities or transactions within U.S. jurisdiction with certain countries, governments, entities and individuals that are the subject of OFAC sanctions, including Iran. Even though non-U.S. persons generally are not directly bound by OFAC sanctions, in recent years OFAC has asserted that such non-U.S. persons can be held liable on various legal theories if they engage in transactions completed in part in the United States or by U.S. persons (such as, for example, wiring an international payment that clears through a bank branch in New York). The European Union also enforces certain laws and regulations that impose restrictions upon nationals and entities of, and business conducted in, member states with respect to activities or transactions with certain countries, governments, entities and individuals that are the subject of such laws and regulations, including Iran. The United Nations Security Council and other governmental entities also impose similar sanctions.

In addition to the OFAC sanctions described above, the United States also maintains indirect sanctions under authority of, among others, the Iran Sanctions Act, the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, or CISADA, the National Defense Authorization Act for Fiscal Year 2012, or the NDAA, the Iran Threat Reduction and Syria Human Rights Act of 2012, or ITRA, various Executive Orders, the Iran Freedom and Counter-Proliferation Act of 2012, or IFCA, and the Countering America's Adversaries Through Sanctions Act, or CAATSA. These indirect sanctions, which we refer to collectively as U.S. secondary sanctions, provide authority for the imposition of U.S. sanctions on foreign parties that provide services in support of certain Iranian activities in the energy, shipping and military sectors, among others.

On July 14, 2015, the so-called "P5+1" powers (consisting of the United States, the United Kingdom, Germany, France, Russia, and China) and the European Union, or the EU, entered into an agreement with Iran known as the Joint Comprehensive Plan of Action Regarding the Islamic Republic of Iran's Nuclear Program, or the JCPOA. The JCPOA is intended to significantly restrict Iran's ability to develop and produce nuclear weapons. Upon implementation of the JCPOA on January 16, 2016 the United States, the EU, and the UN suspended certain nuclear-related sanctions against Iran following an announcement by the International Atomic Energy Agency that Iran had fulfilled its initial obligations under the JCPOA.

19

The U.S. secondary sanctions that were suspended on January 16, 2016 have not been repealed. Rather, certain waivers of statutory provisions were put into place, certain Presidential Executive Orders were revoked, and certain persons were removed from the relevant U.S. sanctions lists. Under the JCPOA, sanctions may be re-imposed if the United States or any other member of the P5+1 or the EU invokes provisions of the JCPOA for the re-imposition of sanctions. Additionally, the United States, the EU, or the UN may impose new sanctions against Iran or against persons conducting business in Iran even while the JCPOA remains in force.

Violations of OFAC sanctions via transactions with a U.S. jurisdictional nexus can result in substantial civil or criminal penalties. A range of sanctions may be imposed on companies that engage in sanctionable activities within the scope of U.S. secondary sanctions, including, among other things, the blocking of any property subject to U.S. jurisdiction in which the sanctioned company has an interest, which could include a prohibition on transactions or dealings involving securities of the sanctioned company or the sanctioned company effectively losing access to the U.S. financial system.

In Iran, we are currently engaged in limited business activities, none of which has progressed beyond the development stage. Our activities in Iran are coordinated by a representative office located in Tehran, Iran. None of our activities in Iran involve U.S. persons or our U.S. affiliates. Our counterparties in the projects described below are mostly Iranian governmental entities or Iranian state-owned enterprises.

We have not realized any revenue or profit from our activities in Iran. We also have not to-date made any investments in Iran, other than fees paid to our service providers in Iran for us to carry out certain of the projects listed below and expenses to run our representative office in Tehran in the ordinary course of business.

A summary of our current projects in Iran follows.

- We have entered into cooperation agreements with Tavanir, an Iranian state-owned electricity provider, under which we will carry out (i) a pilot advanced metering infrastructure ("AMI") project, (ii) a project for modeling the installation of energy storage systems in Iran and (iii) a project for temporarily leasing our thermo auto analysis diagnosis system for free of charge. AMI enables checking the electricity usage amount remotely. The project is being conducted in Pak Dasht City and Hormuz Island, Iran. This pilot project involves installing approximately 2,500 smart meters. The development and production of AMI equipment and materials are complete, and we have obtained permission from the Ministry of Trade, Industry and Energy of Korea to export the equipment. We shipped the AMI equipment and materials to Iran in September 2017 and completed the installation in December 2017. We completed the trial run of the AMI system in March 2018 and we plan to hand over the operation of the system to Tavanir by May 2018. As for the project for the energy storage systems in Iran, we are currently in the process of collecting requisite data for the project, having selected the parties to participate in the installation of the energy storage systems. We plan to lease our thermo auto analysis diagnosis system to Tavanir for free of charge, for approximately two months ending in May 2018, after which we will retrieve the equipment to Korea.

- We are in the process of negotiating various agreements with Tavanir under which we would provide consulting services relating to (i) installation of a distribution management system in Iran and (ii) development of a clean development mechanism (CDM) for the recovery and recycling of the sulfur hexafluoride gas in Iran for purposes of carbon emission reduction.

- We are in the process of negotiating an agreement with Niroo Research Institute, a research organization affiliated with the Ministry of Energy of Iran, under which we would provide consulting services relating to improvement of Iran's electricity demand through load management, efficiency improvement and tariff system improvement.

- We have participated in a feasibility study of the proposed adoption by Tavanir of a 765 kV electricity transmission network. Our task involved reviewing Tavanir's feasibility report. A final report summarizing our review of the feasibility report and a technical review of the transmission network was submitted in February 2017.

- We engaged Mehr Renewable Energy Company for project design documentation services to register with United Nations Framework Convention on Climate Change our CDM business to be conducted in Iran.
- We are in the process of negotiating a contract with Thermal Power Plant Holding Company of Iran under which we would build and operate combined cycle power plants at Zanjan and Neyzar, Iran.
- We have submitted a draft proposal to the Ministry of Energy of Iran under which we would provide consulting services in relation to establishment of information and communication technology infrastructure in Iran.
- We have submitted a draft proposal to the Iran Energy Efficiency Organization under which we would provide consulting services in relation to AMI security in Iran in December 2016.
- We are in the process of conducting a feasibility study for a solar power project in Iran.
- We are in the process of reviewing the feasibility of the rehabilitation of an old power plant in Iran.
- KOWEPO is currently pursuing a "build, operate and transfer" project relating to a 500 megawatts combined cycle power plant in Sirjan, Kerman in Iran, through a consortium with Daewoo E&C, a Korean construction company, and Gohar Energy, an Iranian energy company. The consortium is currently in the process of preparing an application to Thermal Power Plant Holdings, a holding company for a state-run Iranian thermoelectric power plant, for the project.
- Korea Electric Power Research Institute, which is operated by us, has entered into cooperation agreements with Iran's Niroo Research Institute regarding various joint research and development efforts relating to power plants, renewable energy, smart grids and other energy-related technologies.

To the extent any of our subsidiaries have dealings in or relating to Iran, we have internal policies and procedures, as well as a monitoring system, which are designed to prevent and detect violations of applicable laws, including applicable sanctions laws. We do not believe that our current activities relating to Iran violate OFAC sanctions or are sanctionable under U.S. secondary sanctions, and in any event, we believe we are in compliance with applicable sanctions laws. We believe we are not in violation of any laws concerning re-exports of U.S.-origin goods to Iran. Moreover, to the extent our activities were sanctionable under those U.S. secondary sanctions programs that were lifted pursuant to the JCPOA, we may face U.S. secondary sanctions if such sanctions are re-imposed.

There can be no assurances that the relevant relief pursuant to the JCPOA will continue to be available in the future, and even if it does, there is no guarantee that our activities relating to Iran will not be found to violate the OFAC sanctions or involve sanctionable activities under U.S. secondary sanctions, or that any other government will not determine that our activities violate applicable sanctions of other countries. Laws related to Iran sanctions are complex, dynamic, and subject to evolving interpretations by the regulatory authorities. The re-imposition or "snap-back" of U.S. sanctions pursuant to the JCPOA could also occur, and the scope of re-imposed sanctions would be determined at that time.

Certain institutional investors, including state and municipal governments in the United States and universities, as well as financial institutions, have proposed or adopted initiatives regarding investments in companies that do business with countries that are the target of OFAC sanctions, including Iran. Accordingly, as a result of our activities related to Iran, certain investors may not wish to invest in our shares or ADSs or do business with us. In September 2016, the New Jersey Department of the Treasury's Division of Investment notified of its preliminary determination of divestment pursuant to the New Jersey divestment laws. Such preliminary determination was reversed in February 2017 after we explained such determination was based on incorrect information about our business in Iran. As of February 2018, we were listed on the Iowa Public Employees' Retirement System's (IPERS) Iran Prohibited Companies List. Such divestment initiatives and the decision not to invest in, or to divest from our shares or ADSs may have a material negative impact our reputation and the value of our shares or ADSs.

Violations of sanctions can result in penalties or other consequences adverse to us. Certain of our counterparties may be subjected to sanctions. If we violate sanctions, we may ourselves be subjected to sanctions or penalties. Our business and results of operations may be adversely affected or we may suffer reputational

damage. In addition, such sanctions may prevent us from consummating or continuing any of the projects we are currently pursuing in Iran, which could adversely affect our results of operations. Also, at any time, certain investors may divest their interests in our shares if we are found to have violated or are suspected of violating applicable sanctions law arising from our operation in a sanctioned country such as Iran.

***We purchase goods and services from Russia and those activities may be adversely impacted in a material manner by economic sanctions concerning Russia imposed by the United States and other jurisdictions.***

The United States and the European Union have imposed economic sanctions concerning Russia. OFAC sanctions concerning Russia, *inter alia*, block the property of certain designated individuals and entities, target certain sectors of the Russian economy and prohibit certain transactions with certain targeted persons in targeted sectors of the Russian economy, and restrict investment in and trade with the Crimea region of Ukraine. Additionally, non-U.S. persons that engage in certain prohibited transactions concerning Russia or with certain sanctioned Russian persons or entities may be subject to secondary sanctions. In August 2017, the United States Congress passed CAATSA, which introduced a host of new U.S. secondary sanctions concerning Russia including, *inter alia*, for certain dealings with the Russian energy sector, support for Russia's energy export pipelines and engaging in a "significant transaction" with a person that is part of, or operates for or on behalf of, Russia's defense or intelligence sectors. Additionally, a non-U.S. person that knowingly facilitates a "significant transaction" or transactions for or on behalf of any person subject to sanctions imposed by the U.S. with respect to the Russian Federation or any child, spouse, parent, or sibling of such a sanctioned person may also be subject to secondary sanctions.

In 2017, we purchased 11% of our bituminous coal requirements from Russia. Additionally, we also purchase uranium and uranium separation services from a Russian supplier. In 2017, the total value of all goods and services purchased from Russia was approximately US$1 billion.

**Risks Relating to Korea and the Global Economy**

***Unfavorable financial and economic conditions in Korea and globally may have a material adverse impact on us.***

We are incorporated in Korea, where most of our assets are located and most of our income is generated. As a result, we are subject to political, economic, legal and regulatory risks specific to Korea, and our business, results of operations and financial condition are substantially dependent on the Korean consumers' demand for electricity, which are in turn largely dependent on developments relating to the Korean economy.

The Korean economy is closely integrated with, and is significantly affected by, developments in the global economy and financial markets. In recent years, adverse conditions and volatility in the worldwide financial markets, fluctuations in oil and commodity prices and the general weakness of the global economy have contributed to the uncertainty of global economic prospects in general and have adversely affected, and may continue to adversely affect, the Korean economy, which in turn could adversely affect our business, financial condition and results of operations. As the Korean economy is highly dependent on the health and direction of the global economy, the prices of our securities may be adversely affected by investors' reactions to developments in other countries. In addition, due to the ongoing volatility in the global financial markets, the value of the Won relative to the U.S. dollar has also fluctuated significantly in recent years, which in turn also may adversely affect our financial condition and results of operations.

Factors that determine economic and business cycles in the Korean or global economy are for the most part beyond our control and inherently uncertain. In light of the high level of interdependence of the global economy, any of the foregoing developments could have a material adverse effect on the Korean economy and financial markets, and in turn on our business and profitability.

22

More specifically, factors that could have an adverse impact on Korea's economy in the future include, among others:

- increases in inflation levels, volatility in foreign currency reserve levels, commodity prices (including oil prices), exchange rates (particularly against the U.S. dollar), interest rates, stock market prices and inflows and outflows of foreign capital, either directly, into the stock markets, through derivatives or otherwise, including as a result of increased uncertainty in the wake of a referendum in the United Kingdom in June 2016 that voted in favor of exiting from the European Union, commonly known as "Brexit";

- difficulties in the financial sectors in Europe, China and elsewhere and increased sovereign default risks in select countries and the resulting adverse effects on the global financial markets;

- adverse developments in the economies of countries and regions to which Korea exports goods and services (such as the United States, Europe, China and Japan), or in emerging market economies in Asia or elsewhere that could result in a loss of confidence in the Korean economy, including potentially as a result of the Brexit;

- social and labor unrest or declining consumer confidence or spending resulting from lay-offs, increasing unemployment and lower levels of income;

- uncertainty and volatility and further decreases in the market prices of Korean real estate;

- a decrease in tax revenues and a substantial increase in the Government's expenditures for unemployment compensation and other social programs that together could lead to an increased Government budget deficit;

- political uncertainty, including as a result of increasing strife among or within political parties in Korea, and political gridlock within the government or in the legislature, which prevents or disrupts timely and effective policy making to the detriment of Korean economy, as well as the impeachment and indictment of the former president following a series of scandals and social unrest, which also involved the investigation of several leading Korean conglomerates and arrest of their leaders on charges of bribery and other possible misconduct;

- deterioration in economic or diplomatic relations between Korea and its trading partners or allies, including deterioration resulting from territorial or trade disputes or disagreements in foreign policy, including as a result of any potential renegotiation of free trade agreements, or the ongoing tension between Korean and China in relation to the decision to allow deployment by the United States of the Terminal High Altitude Defense system known as "THAAD" in Korea;

- increases in social expenditures to support the aging population in Korea or decreases in economic productivity due to the declining population size in Korea;

- any other development that has a material adverse effect in the global economy, such as an act of war, the spread of terrorism or a breakout of an epidemic such as SARS, avian flu, swine flu, Middle East Respiratory Syndrome, ebola or Zika virus, or natural disasters, earthquakes and tsunamis and the related disruptions in the relevant economies with global repercussions;

- hostilities involving oil-producing countries in the Middle East and elsewhere and any material disruption in the supply of oil or a material increase in the price of oil resulting from such hostilities; and

- an increase in the level of tensions or an outbreak of hostilities in the Korean peninsula or between North Korea and the United States.

Any future deterioration of the Korean economy could have an adverse effect on our business, financial condition and results of operations.

23

***Tensions with North Korea could have an adverse effect on us and the market value of our shares.***

Relations between Korea and North Korea have been tense throughout Korea's modern history. The level of tension between the two Koreas has fluctuated and may increase abruptly as a result of current and future events. In particular, there continues to be uncertainty regarding the long-term stability of North Korea's political leadership since the succession of Kim Jong-un to power following the death of his father in December 2011, which has raised concerns with respect to the political and economic future of the region. In February 2017, Kim Jong-un's half-brother, Kim Jong-nam, was reported to have been assassinated in an international airport in Malaysia.

In addition, there continues to be heightened security tension in the region stemming from North Korea's hostile military and diplomatic actions, including in respect of its nuclear weapons and long-range missile programs. Some examples from recent years include the following:

- In November 2017, North Korea conducted a test launch of another intercontinental ballistic missile, which, due to its improved size, power and range of distance, may potentially enable North Korea to target the United States mainland.

- Recently, on September 3, 2017, North Korea conducted its sixth nuclear test, claiming it had tested a hydrogen bomb that could be mounted on an intercontinental ballistic missile. In response, on September 12, 2017, the United Nations Security Council unanimously adopted a resolution imposing additional sanctions on North Korea including new limits on gas, petrol and oil imports, a ban on textile exports and measures to limit North Korean laborers from working abroad.

- On August 29, 2017, North Korea tested an intermediate-range ballistic missile which flew directly over northern Japan before landing in the Pacific Ocean. In response, the United Nations Security Council unanimously adopted a statement condemning such launch, reiterating demands that North Korea halt its ballistic missile and nuclear weapons programs.

- On July 4, 2017, North Korea tested its first intercontinental ballistic missile. In response, the U.S. government and the Government both issued statements condemning North Korea and conducted a joint military exercise on July 5, 2017. On July 28, 2017, North Korea tested a second intercontinental ballistic missile which landed in the Sea of Japan, inside Japan's Economic Exclusion Zone. In response, on August 5, 2017, the United Nations Security Council unanimously adopted a resolution that strengthened sanctions on North Korea. The resolution includes a total ban on all exports of coal, iron, iron ore, lead, lead ore and seafood, which is expected to reduce North Korea's export revenue by a third each year.

- In March 2017, North Korea launched four mid-range missiles, which landed off the east coast of the Korean peninsula.

- On September 9, 2016, North Korea conducted its fifth nuclear test, which has been the largest in scale among North Korea's nuclear tests thus far. According to North Korean announcements, the test was successful in detonating a nuclear missile. The test created a sizable earthquake in South Korea. In response, in February 2017 the U.N. Security Council adopted Resolution 2321 (2016) against North Korea, the purpose of which is to strengthen its sanctions regime against North Korea and to condemn North Korea's September 9, 2016 nuclear test in the strongest terms.

- On February 10, 2016, in retaliation of North Korea's recent launch of a long-range rocket, South Korea announced that it would halt its operations of the Kaesong Industrial Complex to impede North Korea's utilization of funds from the industrial complex to finance its nuclear and missile programs. In response, North Korea announced on February 11, 2016 that it would expel all South Korean employees from the industrial complex and freeze all South Korean assets there.

- On February 7, 2016, North Korea launched a rocket, claimed by them to be carrying a satellite intended for scientific observation. The launch was widely suspected by the international community to

24

be a cover for testing a long-range missile capable of carrying a nuclear warhead. On February 18, 2016, the President of the United States signed into law mandatory sanctions on North Korea to punish it for its recent nuclear and missile tests, human rights violations and cybercrimes. The bill, which marks the first measure by the United States to exclusively target North Korea, is intended to seize the assets of anyone engaging in business related to North Korea's weapons program, and authorizes US$50 million over five years to transmit radio broadcasts into the country and support humanitarian assistance projects. On March 2, 2016, the United Nations Security Council voted unanimously to adopt a resolution to impose sanctions against North Korea, which include inspection of all cargo going to and from North Korea, a ban on all weapons trade and the expulsion of North Korean diplomats who engage in "illicit activities." Also, on March 4, 2016, the European Union announced that it would expand its sanctions on North Korea, adding additional companies and individuals to its list of sanction targets. On April 1, 2016, North Korea fired a short-range surface-to-air missile in apparent protest of these sanctions adopted by the United States and the United Nations Security Council.

- On January 6, 2016, North Korea announced that it had successfully conducted its first hydrogen bomb test, hours after international monitors detected a 5.1 magnitude earthquake near a known nuclear testing site in the country. The claims have not been verified independently. The alleged test followed a statement made in the previous month by Kim Jong-un, who claimed that North Korea had developed a hydrogen bomb.

- In August 2015, two Korean soldiers were injured in a landmine explosion near the South Korean demilitarized zone. Claiming the landmines were set by North Koreans, the South Korean army re-initiated its propaganda program toward North Korea utilizing loudspeakers near the demilitarized zone. In retaliation, the North Korean army fired artillery rounds on the loudspeakers, resulting in the highest level of military readiness for both Koreas. High-ranking officials from North and South Korea subsequently met for discussions and entered into an agreement on August 25, 2015 intending to deflate military tensions.

- From time to time, North Korea has fired short- to medium-range missiles from the coast of the Korean peninsula into the sea. In March 2015, North Korea fired seven surface-to-air missiles into waters off its east coast in apparent protest of annual joint military exercises being held by Korea and the United States.

- North Korea renounced its obligations under the Nuclear Non-Proliferation Treaty in January 2003 and conducted three rounds of nuclear tests between October 2006 to February 2013, which increased tensions in the region and elicited strong objections worldwide. In response, the United Nations Security Council unanimously passed resolutions that condemned North Korea for the nuclear tests and expanded sanctions against North Korea.

North Korea's economy also faces severe challenges, including severe inflation and food shortages, which may further aggravate social and political tensions within North Korea. In addition, reunification of Korea and North Korea could occur in the future, which would entail significant economic commitment and expenditure by Korea that may outweigh any resulting economic benefits of reunification. On April 27, 2018, North Korea's Kim Jong-un and the President of South Korea attended a summit held in the Demilitarized Zone of the Korean peninsula.

There can be no assurance that the level of tension on the Korean peninsula will not escalate in the future or that the political regime in North Korea may not suddenly collapse. Any further increase in tension or uncertainty relating to the military, political or economic stability in the Korean peninsula, including a breakdown of diplomatic negotiations over the North Korean nuclear program, occurrence of military hostilities, heightened concerns about the stability of North Korea's political leadership or its actual collapse, a leadership crisis, a breakdown of high-level contacts or accelerated reunification could have a material adverse effect on our business, financial condition and results of operations, as well as the price of our common shares and our American depositary shares.

25

***We are generally subject to Korean corporate governance and disclosure standards, which differ in significant respects from those in other countries.***

Companies in Korea, including us, are subject to corporate governance standards applicable to Korean public companies which differ in many respects from standards applicable in other countries, including the United States. As a reporting company registered with the Securities and Exchange Commission and listed on the New York Stock Exchange, we are, and will continue to be, subject to certain corporate governance standards as mandated by the Sarbanes-Oxley Act of 2002, as amended. However, foreign private issuers, including us, are exempt from certain corporate governance standards required under the Sarbanes-Oxley Act or the rules of the New York Stock Exchange. We and our generation subsidiaries are also subject to a number of special laws and regulations to Government-controlled entities, including the Act on the Management of Public Institutions. For a description of significant differences in corporate governance standards, see Item 16G. "Corporate Governance." There may also be less publicly available information about Korean companies, such as us, than is regularly made available by public or non-public companies in other countries. Such differences in corporate governance standards and less public information could result in less than satisfactory corporate governance practices or disclosure to investors in certain countries.

***You may not be able to enforce a judgment of a foreign court against us.***

We are a corporation with limited liability organized under the laws of Korea. Substantially all of our directors and officers and other persons named in this annual report reside in Korea, and all or a significant portion of the assets of our directors and officers and other persons named in this annual report and substantially all of our assets are located in Korea. As a result, it may not be possible for holders of the American depository shares to affect service of process within the United States, or to enforce against them or us in the United States judgments obtained in United States courts based on the civil liability provisions of the federal securities laws of the United States. There is doubt as to the enforceability in Korea, either in original actions or in actions for enforcement of judgments of United States courts, of civil liabilities predicated on the United States federal securities laws.

### Risks Relating to Our American Depositary Shares

***There are restrictions on withdrawal and deposit of common shares under the depositary facility.***

Under the deposit agreement, holders of shares of our common stock may deposit those shares with the depositary bank's custodian in Korea and obtain American depositary shares, and holders of American depositary shares may surrender American depositary shares to the depositary bank and receive shares of our common stock. However, under current Korean laws and regulations, the depositary bank is required to obtain our prior consent for the number of shares to be deposited in any given proposed deposit which exceeds the difference between (i) the aggregate number of shares deposited by us for the issuance of American depositary shares (including deposits in connection with the initial and all subsequent offerings of American depositary shares and stock dividends or other distributions related to these American depositary shares) and (ii) the number of shares on deposit with the depositary bank at the time of such proposed deposit. We have consented to the deposit of outstanding shares of common stock as long as the number of American depositary shares outstanding at any time does not exceed 80,153,810 shares. As a result, if you surrender American depositary shares and withdraw shares of common stock, you may not be able to deposit the shares again to obtain American depositary shares.

***Ownership of our shares is restricted under Korean law.***

Under the Financial Investment Services and Capital Markets Act, with certain exceptions, a foreign investor may acquire shares of a Korean company without being subject to any single or aggregate foreign investment ceiling. As one such exception, certain designated public corporations, such as us, are subject to a 40% ceiling on acquisitions of shares by foreigners in the aggregate. The Financial Services Commission may

impose other restrictions as it deems necessary for the protection of investors and the stabilization of the Korean securities and derivatives market.

In addition to the aggregate foreign investment ceiling, the Financial Investment Services and Capital Markets Act and our Articles of Incorporation set a 3% ceiling on acquisition by a single investor (whether domestic or foreign) of the shares of our common stock. Any person (with certain exceptions) who holds our issued and outstanding shares in excess of such 3% ceiling cannot exercise voting rights with respect to our shares exceeding such limit.

The ceiling on aggregate investment by foreigners applicable to us may be exceeded in certain limited circumstances, including as a result of acquisition of:

- shares by a depositary issuing depositary receipts representing such shares (whether newly issued shares or outstanding shares);

- shares by exercise of warrant, conversion right under convertible bonds, exchange right under exchangeable bonds or withdrawal right under depositary receipts issued outside of Korea;

- shares from the exercise of shareholders' rights; or

- shares by gift, inheritance or bequest.

A foreigner who has acquired our shares in excess of any ceiling described above may not exercise his voting rights with respect to our shares exceeding such limit and the Financial Services Commission may take necessary corrective action against him.

### Holders of our ADSs will not have preemptive rights in certain circumstances.

The Korean Commercial Code and our Articles of Incorporation require us, with some exceptions, to offer shareholders the right to subscribe for new shares in proportion to their existing ownership percentage whenever new shares are issued. If we offer any rights to subscribe for additional shares of our common stock or any rights of any other nature, the depositary bank, after consultation with us, may make the rights available to you or use reasonable efforts to dispose of the rights on your behalf and make the net proceeds available to you. The depositary bank, however, is not required to make available to you any rights to purchase any additional shares unless it deems that doing so is lawful and feasible and:

- a registration statement filed by us under the U.S. Securities Act of 1933, as amended, is in effect with respect to those shares; or

- the offering and sale of those shares is exempt from or is not subject to the registration requirements of the U.S. Securities Act.

We are under no obligation to file any registration statement with the U.S. Securities and Exchange Commission in relation to the registration rights. If a registration statement is required for you to exercise preemptive rights but is not filed by us, you will not be able to exercise your preemptive rights for additional shares and you will suffer dilution of your equity interest in us.

### The market value of your investment in our ADSs may fluctuate due to the volatility of the Korean securities market.

Our common stock is listed on the KRX KOSPI Division of the Korea Exchange, which has a smaller market capitalization and is more volatile than the securities markets in the United States and many European countries. The market value of ADSs may fluctuate in response to the fluctuation of the trading price of shares of our common stock on the Stock Market Division of the Korea Exchange. The Stock Market Division of the Korea Exchange has experienced substantial fluctuations in the prices and volumes of sales of listed securities

27

and the Stock Market Division of the Korea Exchange has prescribed a fixed range in which share prices are permitted to move on a daily basis. Like other securities markets, including those in developed markets, the Korean securities market has experienced problems including market manipulation, insider trading and settlement failures. The recurrence of these or similar problems could have a material adverse effect on the market price and liquidity of the securities of Korean companies, including our common stock and ADSs, in both the domestic and the international markets.

The Korean government has the ability to exert substantial influence over many aspects of the private sector business community, and in the past has exerted that influence from time to time. For example, the Korean government has promoted mergers to reduce what it considers excess capacity in a particular industry and has also encouraged private companies to publicly offer their securities. Similar actions in the future could have the effect of depressing or boosting the Korean securities market, whether or not intended to do so. Accordingly, actual or perceived actions or inactions by the Korean government may cause sudden movements in the market prices of the securities of Korean companies in the future, which may affect the market price and liquidity of our common stock and ADSs.

***Your dividend payments and the amount you may realize in connection with a sale of your ADSs will be affected by fluctuations in the exchange rate between the U.S. dollar and the Won.***

Investors who purchase the American depositary shares will be required to pay for them in U.S. dollars. Our outstanding shares are listed on the Korea Exchange and are quoted and traded in Won. Cash dividends, if any, in respect of the shares represented by the American depositary shares will be paid to the depositary bank in Won and then converted by the depositary bank into U.S. dollars, subject to certain conditions. Accordingly, fluctuations in the exchange rate between the Won and the U.S. dollar will affect, among other things, the amounts a registered holder or beneficial owner of the American depositary shares will receive from the depositary bank in respect of dividends, the U.S. dollar value of the proceeds which a holder or owner would receive upon sale in Korea of the shares obtained upon surrender of American depositary shares and the secondary market price of the American depositary shares.

***If the Government deems that certain emergency circumstances are likely to occur, it may restrict the depositary bank from converting and remitting dividends in U.S. dollars.***

If the Government deems that certain emergency circumstances are likely to occur, it may impose restrictions such as requiring foreign investors to obtain prior Government approval for the acquisition of Korean securities or for the repatriation of interest or dividends arising from Korean securities or sales proceeds from disposition of such securities. These emergency circumstances include any or all of the following:

- sudden fluctuations in interest rates or exchange rates;
- extreme difficulty in stabilizing the balance of payments; and
- a substantial disturbance in the Korean financial and capital markets.

The depositary bank may not be able to secure such prior approval from the Government for the payment of dividends to foreign investors when the Government deems that there are emergency circumstances in the Korean financial markets.

## ITEM 4.   *INFORMATION ON THE COMPANY*

## Item 4.A. History and Development of the Company

### General Information

Our legal and corporate name is Korea Electric Power Corporation. We were established by the Government on December 31, 1981 as a statutory juridical corporation in Korea under the Korea Electric Power Corporation

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

("KEPCO") Act as the successor to Korea Electric Company. Our registered office is located at 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea, and our telephone number is 82-61-345-4213. Our website address is www.kepco.co.kr.

Our agent in the United States is Korea Electric Power Corporation, North America Office, located at 7th Floor, Parker Plaza, 400 Kelby Street, Fort Lee, NJ 07024.

The Korean electric utility industry traces its origin to the establishment of the first electric utility company in Korea in 1898. On July 1, 1961, the industry was reorganized by the merger of Korea Electric Power Company, Seoul Electric Company and South Korea Electric Company, which resulted in the formation of Korea Electric Company. From 1976 to 1981, the Government acquired the private minority shareholdings in Korea Electric Company. After the Government acquired all the remaining shares of Korea Electric Company, Korea Electric Company was dissolved, and we were incorporated in 1981 and assumed the assets and liabilities of Korea Electric Company. We ceased to be wholly owned by the Government in 1989 when the Government sold 21% of our common stock. As of March 15, 2018, the last day on which our shareholders registry was closed, the Government maintained 51.1% ownership in aggregate of our common shares by direct holdings by the Government and indirect holdings through Korea Development Bank, a statutory banking institution wholly owned by the Government.

Under relevant laws of Korea, the Government is required to own, directly or indirectly, at least 51% of our capital. Direct or indirect ownership of more than 50% of our outstanding common stock enables the Government to control the approval of certain corporate matters relating to us that require a shareholders' resolution, including approval of dividends. The rights of the Government and Korea Development Bank as holders of our common stock are exercised by the Ministry of Trade, Industry and Energy, based on the Government's ownership of our common stock and a proxy received from Korea Development Bank, in consultation with the Ministry of Strategy and Finance.

We operate under the general supervision of the Ministry of Trade, Industry and Energy. The Ministry of Trade, Industry and Energy, in consultation with the Ministry of Strategy and Finance, is responsible for approving, subject to review by the Korea Electricity Commission, the electricity rates we charge our customers. See Item 4.B. "Business Overview—Sales and Customers—Electricity Rates." We furnish reports to officials of the Ministry of Trade, Industry and Energy, the Ministry of Strategy and Finance and other Government agencies and regularly consult with such officials on matters relating to our business and affairs. See Item 4.B. "Business Overview—Regulation." Our non-standing directors, who comprise a majority of our board of directors, must be appointed by the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee (which is established by law and chaired by the minister of the Ministry of Strategy and Finance and whose members consist of Government officials and others appointed by the President of the Republic based on recommendation by the minister of the Ministry of Strategy and Finance) from a pool of candidates recommended by the director nomination committee. Our president and standing directors who concurrently serve as members of our audit committee must be appointed by the President of the Republic upon the motion of the minister of the Ministry of Trade, Industry and Energy (in the case of our president) and the minister of the Ministry of Strategy and Finance (in the case of our standing directors who concurrently serve as members of the audit committee) and following the nomination by our director nomination committee, the review and resolution of the Public Agencies Operating Committee and an approval at the general meeting of shareholders. See Item 6.A. "Directors and Senior Management—Board of Directors" and Item 16G. "Corporate Governance—The Act on the Management of Public Institutions").

**Item 4.B. Business Overview**

**Introduction**

We are an integrated electric utility company engaged in the transmission and distribution of substantially all of the electricity in Korea. Through our six wholly-owned generation subsidiaries, we also generate the

substantial majority of electricity produced in Korea. As of December 31, 2017, we and our generation subsidiaries owned approximately 70.1% of the total electricity generation capacity in Korea (excluding plants generating electricity primarily for private or emergency use). In 2017, we sold to our customers 507,746 gigawatt-hours of electricity. We purchase electricity principally from our generation subsidiaries and, to a lesser extent, from independent power producers. Of the 520,230 gigawatt-hours of electricity we purchased in 2017, 28.1% was generated by KHNP, our wholly-owned nuclear and hydroelectric power generation subsidiary, 49.7% was generated by our wholly-owned five non-nuclear generation subsidiaries and 22.2% was generated by independent power producers that trade electricity to us through the cost-based pool system of power trading (excluding independent power producers that supply electricity under power purchase agreements with us). Our five non-nuclear generation subsidiaries are KOSEP, KOMIPO, KOWEPO, KOSPO and EWP, each of which is wholly owned by us and is incorporated in Korea. We derive substantially all of our revenues and profit from Korea, and substantially all of our assets are located in Korea.

In 2017, we had sales of Won 59,336 billion and net profit of Won 1,441 billion, compared to sales of Won 59,763 billion and net profit of Won 7,148 billion in 2016.

Our revenues are closely tied to demand for electricity in Korea. Demand for electricity in Korea increased at a compounded average growth rate of 1.7% per annum from 2013 to 2017, compared to the real gross domestic product, or GDP, which increased at a compounded average growth rate of 3.0% during the same period, according to the Bank of Korea. During 2017, the GDP growth rate was 3.1%, which was in tandem with the growth in demand for electricity in Korea during the same year, which also grew by 2.2%.

## Strategy

As our overall strategy, we seek to become a leading global energy enterprise by enhancing our global competitiveness and strengthening our contribution to the global environmental campaigns through continued development of "green" and "smart" power-related technologies. We also aim to adapt to the growing uncertainties in the global economy by selectively pursuing new business opportunities and through development of innovative technologies. We evaluate and renew our mid- to long-term strategy every five years, and in 2015 established the "Vision 2025 Mid- to Long-Term Strategy." Under this vision, we will aim for balanced growth among our domestic operations, overseas business and new energy industry initiatives.

- *Strengthen competitiveness in our core operations.* We plan to enhance efficiency of our electricity generation, transmission and distribution networks and operation of related facilities. We will strategically focus on ensuring stable supply of electricity, making our electricity networks "smarter" and more intelligent through the use of advanced technology utilizing big data and the "Internet of Things" technology and creating new energy services related to our core operations in order to address changes in the business environment.

- *Expand and develop new businesses.* In connection with our overseas business, we plan to selectively explore opportunities to develop renewable energy, smart transmission and distribution facilities and nuclear energy projects to diversify our businesses and provide suitable solutions meeting the different needs of various countries. Additionally, we plan to actively address climate change through the development of new energy related technologies such as smart grids and energy storage systems.

- *Create a platform for future growth.* We plan to develop an ecosystem focused on new energy technologies. We have established Bitgaram Energy Valley in Gwangju and Jeollanamdo with the goal of facilitating the growth of the new energy industry and creating a global energy hub. In addition, we have selected ten core electricity-related technologies (including energy storage systems and "smart grid"-related technologies), and we plan to focus on the development of high value-added technologies.

- *Strengthen our management system for sustainable growth.* We will continue to develop an innovative working culture and management system to promote efficiency. We will also focus on creating a low-carbon clean energy business environment, fostering a common set of shared values with local communities and developing a sustainable energy business model.

**Government Ownership and Our Interactions with the Government**

The KEPCO Act requires that the Government own at least 51% of our capital stock. Direct or indirect ownership of more than 50% of our outstanding common stock enables the Government to control the approval of certain corporate matters which require a shareholders' resolution, including approval of dividends. The rights of the Government and Korea Development Bank as holders of our common stock are exercised by the Ministry of Trade, Industry and Energy in consultation with the Ministry of Strategy and Finance. We are currently not aware of any plans of the Government to cease to own, directly or indirectly, at least 51% of our outstanding common stock.

We play an important role in the implementation of the Government's national energy policy, which is established in consultation with us, among other parties. As an entity formed to serve public policy goals of the Government, we seek to maintain a fair level of profitability and strengthen our capital base in order to support the growth of our business in the long term.

The Government, through its various policy initiatives for the Korean energy industry as well as direct and indirect supervision of us and our industry, plays an important role in our business and operations. Most importantly, the electricity tariff rates we charge to our customers are regulated by the Government taking into account, among others, our needs to recover the costs of operations, make capital investments and recoup a fair return on capital invested by us, as well as the Government's overall policy considerations, such as inflation. See Item 4.B. "Business Overview—Sales and Customers—Electricity Rates."

In addition, pursuant to the Basic Plan determined by the Government, we and our generation subsidiaries have made, and plan to make, substantial expenditures for the construction of generation plants and other facilities to meet demand for electric power. See Item 5.B. "Liquidity and Capital Resources—Capital Requirements."

**Restructuring of the Electric Power Industry in Korea**

On January 21, 1999, the Ministry of Trade, Industry and Energy published the Restructuring Plan. The overall objectives of the Restructuring Plan consisted of: (i) introducing competition and thereby increasing efficiency in the Korean electric power industry, (ii) ensuring a long-term, inexpensive and stable electricity supply, and (iii) promoting consumer convenience through the expansion of consumer choice.

The following provides further details relating to the Restructuring Plan.

*Phase I*

During Phase I, which served as a preparatory stage for Phase II and lasted from the announcement of the Restructuring Plan in January 1999 until April 2001, we undertook steps to split our generation business units off into one wholly-owned nuclear generation subsidiary (namely, KHNP) and five wholly-owned non-nuclear generation subsidiaries (namely, KOSEP, KOMIPO, KOWEPO, KOSPO and EWP), each with its own management structure, assets and liabilities. These steps were completed upon approval at our shareholders' meeting in April 2001.

The Government's principal objectives in the split-off of the generation units into separate subsidiaries were to: (i) introduce competition and thereby increase efficiency in the electricity generation industry in Korea, and (ii) ensure a stable supply of electricity in Korea.

Following the implementation of Phase I, we have substantial monopoly with respect to the transmission and distribution of electricity in Korea.

31

While our ownership percentage of our generation subsidiaries will depend on further adjustments to the Restructuring Plan to be adopted by the Government, we plan to retain 100% ownership of our transmission and distribution business.

### Phase II

At the outset of Phase II in April 2001, the Government introduced a cost-based competitive bidding pool system under which we purchase power from our generation subsidiaries and other independent power producers for transmission and distribution to customers. For a further description of this system, see "—Purchase of Electricity—Cost-based Pool System" below.

Pursuant to the Electricity Business Act amended in December 2000, the Government established the Korea Power Exchange in April 2001. The primary function of the Korea Power Exchange is to deal with the sale of electricity and implement regulations governing the electricity market to allow for electricity distribution through a competitive bidding process. The Government also established the Korea Electricity Commission in April 2001 to regulate the Korean electric power industry and ensure fair competition among industry participants. To facilitate this goal, the Korea Power Exchange established the Electricity Market Rules relating to the operation of the bidding pool system. To amend the Electricity Market Rules, the Korea Power Exchange must have the proposed amendment reviewed by the Korea Electricity Commission and then obtain the approval of the Ministry of Trade, Industry and Energy.

The Korea Electricity Commission's main functions include implementation of standards and measures necessary for electricity market operation and review of matters relating to licensing participants in the Korean electric power industry. The Korea Electricity Commission also acts as an arbitrator in tariff-related disputes among participants in the Korean electric power industry and investigates illegal or deceptive activities of the industry participants.

### Privatization of Generation Subsidiaries

In April 2002, the Ministry of Trade, Industry and Energy released the basic privatization plan for five of our generation subsidiaries other than KHNP. Pursuant to this plan, we commenced the process of selling our equity interest in KOSEP in 2002. According to the original plan, this process was, in principle, to take the form of a sale of management control, potentially supplemented by an initial public offering as a way of broadening the investor base. In November 2003, KOSEP submitted its application to the Korea Exchange for a preliminary screening review, which was approved in December 2003. However, in June 2004, KOSEP made a request to the Korea Exchange to delay its stock listing due to unfavorable stock market conditions at that time.

In accordance with the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016, we considered a sale in the public market of a minority of our shares in our five non-nuclear generation subsidiaries, KEPCO KDN and KHNP gradually. However, the planned sales have been put on hold, primarily due to prevailing market conditions. In any event, we plan to maintain a controlling stake in each of these subsidiaries.

### Suspension of the Plan to Form and Privatize Distribution Subsidiaries

In 2003, the Government established a Tripartite Commission consisting of representatives of the Government, leading businesses and labor unions in Korea to deliberate on ways to introduce competition in electricity distribution, such as by forming and privatizing new distribution subsidiaries. In 2004, the Tripartite Commission recommended not pursuing such privatization initiatives but instead creating independent business divisions within us to improve operational efficiency through internal competition. Following the adoption of such recommendation by the Government in 2004 and further studies by Korea Development Institute, in 2006 we created nine "strategic business units" (which, together with our other business units, were subsequently

32

restructured into 14 such units in February 2012) that have a greater degree of autonomy with respect to management, financial accounting and performance evaluation while having a common focus on increasing profitability.

### Initiatives to Improve the Structure of Electricity Generation

In August 2010, the Ministry of Trade, Industry and Energy announced the Proposal for Improvement in the Structure of the Electric Power Industry in order to resolve uncertainty related to restructuring plans for the electric power industry and maintain competitiveness of the electric power industry. Key initiatives of the proposal included the following: (i) maintain the current structure of having six generation subsidiaries and designate the six generation subsidiaries as market-oriented public enterprises under the Act on the Management of Public Institutions in order to foster competition among the generation subsidiaries and promote efficiency in their operations, (ii) clarify the scope of the business of us and the six generation subsidiaries (namely, that we shall manage the financial structure and governance of the six generation subsidiaries and nuclear power plant and overseas resources development projects, while the six generation subsidiaries will have greater autonomy with respect to construction and management of generation units and procurement of fuel), (iii) create a nuclear power export business unit to systematically enhance our capabilities to win projects involving the construction and operation of nuclear power plants overseas, (iv) further rationalize the electricity tariff by adopting a fuel-cost based tariff system in 2011 and a voltage-based tariff system in a subsequent year, and (v) create separate accounting systems for electricity generation, transmission, distribution and sales with the aim of introducing competition in electricity sales in the intermediate future.

In January 2011, the Ministry of Strategy and Finance created a "joint cooperation unit" consisting of officers and employees selected from the five thermal power generation subsidiaries in order to reduce inefficiencies in areas such as fuel transportation, inventories, materials and equipment and construction, etc. and allow the thermal power generation subsidiaries to continue utilizing the benefits of economy of scale after split off of our generation business units into separate subsidiaries. The purpose of the joint cooperation unit was to give greater autonomy to the generation subsidiaries with regard to power plant construction and management and fuel procurements, and thereby enhance efficiency in operating power plants. The main functions of the joint cooperation unit are as follows: (i) maintain inventories of bituminous coal through volume exchanges and joint purchases, (ii) reduce shipping and demurrage expenses through joint operation and distribution of dedicated vessels, (iii) reduce costs by sharing information on generation material inventories and (iv) sharing human resources among the five thermal power generation subsidiaries for construction projects, among other things.

Furthermore, in January 2011 the six generation subsidiaries were officially designated as "market-oriented public enterprises," whereupon the President of Korea appoints the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary is subject to approval by the minister of the Ministry of Strategy and Finance; the president of each such subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Enterprise Management Evaluation Team which is established by the Public Agencies Operating Committee conducts performance evaluation of such subsidiaries. Previously, our president appointed the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary was subject to approval by our president; the president of each such subsidiary entered into a management contract with our president; and our evaluation committee conducted performance evaluation of such subsidiaries. For further details of the impact of the designation of our generation subsidiaries as "market-oriented public enterprises," see Item 16G.—Corporate Governance—The Act on the Management of Public Institutions.

### Proposal for Adjustment of Functions of Public Institutions (Energy Sector)

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets

33

and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies should take on greater responsibilities in overseas resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition. In accordance therewith, we transferred a substantial portion of our assets and liabilities in our overseas resource business to our generation subsidiaries as of December 31, 2016. In addition, this Proposal contemplated selling a minority stake in our generation subsidiaries and KEPCO KDN, but the planned sales have been put on hold, as discussed above in "—Privatization of Generation Subsidiaries."

**Purchase of Electricity**

*Cost-based Pool System*

Since April 2001, the purchase and sale of electricity in Korea is required to be made through the Korea Power Exchange, which is a statutory not-for-profit organization established under the Electricity Business Act with responsibilities for setting the price of electricity, handling the trading and collecting relevant data for the electricity market in Korea. The suppliers of electricity in Korea consist of our six generation subsidiaries, which were split-off from us in April 2001, and independent power producers, which numbered 17 (excluding renewable energy producers) as of December 31, 2017. We distribute electricity purchased through the Korea Power Exchange to end users.

*Our Relationship with the Korea Power Exchange*

The key features of our relationships with the Korea Power Exchange include the following: (i) we and our six generation subsidiaries are member corporations of the Korea Power Exchange and collectively own 100% of its share capital, (ii) three of the 11 members of the board of directors of the Korea Power Exchange are currently our or our subsidiaries' employees, and (iii) one of our employees is currently a member in three of the key committees of the Korea Power Exchange that are responsible for evaluating the costs of producing electricity, making rules for the Korea Power Exchange and gathering and disclosing information relating to the Korean electricity market.

Notwithstanding the foregoing relationships, however, we do not have control over the Korea Power Exchange or its policies since, among others, (i) the Korea Power Exchange, its personnel, policies, operations and finances are closely supervised and controlled by the Government, namely through the Ministry of Trade, Industry and Energy, and are subject to a host of laws and regulations, including, among others, the Electricity Business Act and the Act on the Management of Public Institutions, as well as the Articles of Incorporation of the Korea Power Exchange, (ii) we are entitled to elect no more than one-third of the Korea Power Exchange directors and our representatives represent only a minority of its board of directors and committees (with the other members being comprised of representatives of the Ministry of Trade, Industry and Energy, employees of the Korea Power Exchange, businesspersons and/or scholars), and (iii) the role of our representatives in the policy making process for the Korea Power Exchange is primarily advisory based on their technical expertise derived from their employment at us or our generation subsidiaries. Consistent with this view, the Finance Supervisory Service issued a ruling in 2005 that stated that we are not deemed to have significant influence or control over the decision-making process of the Korea Power Exchange relating to its business or financial affairs.

*Pricing Factors*

The price of electricity in the Korean electricity market is determined principally based on the cost of generating electricity using a system known as the "cost-based pool" system. Under the cost-based pool system,

the price of electricity has two principal components, namely the marginal price (representing in principle the variable cost of generating electricity) and the capacity price (representing in principle the fixed cost of generating electricity).

Under the merit order system, the electricity purchase allocation, the system marginal price (as described below) and the final allocation adjustment are automatically determined based on an objective formula. The variable cost (including the adjusted coefficient as described below) and the capacity price are determined in advance of trading by the Cost Evaluation Committee, which is comprised of representatives from the Ministry of Trade, Industry and Energy, the Korea Power Exchange, us, generation companies, scholars and researchers. Accordingly, a supplier of electricity cannot exercise control over the merit order system or its operations to such supplier's strategic advantage.

*Marginal Price*

The primary purpose of the marginal price is to compensate the generation companies for fuel costs, which represents the principal component of the variable costs of generating electricity. We currently refer such marginal price as the "system marginal price."

The system marginal price represents, in effect, the marginal price of electricity at a given hour at which the projected demand for electricity and the projected supply of electricity for such hour intersect, as determined by the merit order system, which is a system used by the Korea Power Exchange to allocate which generation units will supply electricity for which hour and at what price. To elaborate, the projected demand for electricity for a given hour is determined by the Korea Power Exchange based on a forecast made one day prior to trading, and such forecast takes into account, among others, historical statistics relating to demand for electricity nationwide by day and by hour, seasonality and on-peak-hour versus off-peak hour demand analysis. The projected supply of electricity at a given hour is determined as the aggregate of the available capacity of all generation units that have submitted bids to supply electricity for such hour. These bids are submitted to the Korea Power Exchange one day prior to trading.

Under the merit order system, the generation unit with the lowest variable cost of producing electricity among all the generation units that have submitted a bid for a given hour is first awarded a purchase order for electricity up to the available capacity of such unit as indicated in its bid. The generation unit with the next lowest variable cost is then awarded a purchase order up to its available capacity in its bid, and so forth, until the projected demand for electricity for such hour is met. We refer to the variable cost of the generation unit that is the last to receive the purchase order for such hour as the system marginal price, which also represents the highest price at which electricity can be supplied at a given hour based on the demand and supply for such hour. Generation units whose variable costs exceed the system marginal price for a given hour do not receive purchase orders to supply electricity for such hour. The variable cost of each generation unit is determined by the Cost Evaluation Committee on a monthly basis and reflected in the following month based on the fuel costs two months prior to such determination. The purpose of the merit order system is to encourage generation units to reduce its electricity generation costs by making its generation process more efficient, sourcing fuels from most cost-effective sources or adopting other cost savings programs.

The final allocation of electricity supply is further adjusted on the basis of other factors, including the proximity of a generation unit to the geographical area to which power is being supplied, network and fuel constraints and the amount of power loss. This adjustment mechanism is designed to adjust for transmission losses in order to improve overall cost-efficiency in the transmission of electricity to end-users.

The price of electricity at which our generation subsidiaries sell electricity to us is determined using the following formula:

Variable cost + [System marginal price – Variable cost] * Adjusted coefficient

An adjusted coefficient applies in principle to all generation units operated by our generation subsidiaries and the coal-fired generation units operated by independent power producers. The adjusted coefficient applicable to the generation units operated by our generation subsidiaries is determined based on considerations of, among others, electricity tariff rates, the differential generation costs for different fuel types and the relative fair returns on investment in respect of us compared to our generation subsidiaries. The purpose of the adjusted coefficient here is to prevent electricity trading from resulting in undue imbalances as to the relative financial results among generation subsidiaries as well as between us (as the purchaser of electricity) and our generation subsidiaries (as sellers of electricity). Such imbalances may arise from excessive profit taking by base load generators (on account of their inherently cheaper fuel cost structure compared to non-base load generators) as well as from fluctuations in fuel prices (it being the case that during times of rapid and substantial rises in fuel costs which are not offset by corresponding rises in electricity tariff rates charged by us to end-users, on a non-consolidated basis our profitability will decline compared to that our generation subsidiaries since our generation subsidiaries are entitled to sell electricity to us at cost plus a guaranteed margin). In comparison, the adjusted coefficient applicable to the coal-fired generation units operated by independent power producers is determined to enable such independent power producers to recover the total costs of building and operating such units.

The adjusted coefficient applicable to our generation subsidiaries is currently set at the highest level for the marginal price of electricity generated using nuclear fuel, followed by coal and (depending the prevailing relative market prices) oil and/or LNG. The differentiated adjusted coefficients reflect the Government's prevailing energy policy objectives and have the effect of setting priorities in the fuel types to be used in electricity generation.

The adjusted coefficient is determined by the Cost Evaluation Committee in principle on an annual basis, although in exceptional cases driven by external or structural factors such as rapid and substantial changes in fuel costs, adjustments to electricity tariff rates or changes in the electricity pricing structure, the adjusted coefficient may be adjusted on a quarterly basis.

Previously, it was contemplated that the vesting contract system would gradually replace the application of the adjusted coefficient. However, since the implementation of the vesting contract system has been suspended indefinitely, it is unlikely to impact the application of the adjusted coefficient in the foreseeable future.

*Capacity Price*

In addition to payment in respect of the variable cost of generating electricity, generation units receive payment in the form of capacity price, the purpose of which is to compensate them for the fixed costs of constructing generation facilities, provide incentives for construction of new generation units and maintain reliability of the nationwide electricity transmission network.

The capacity price is determined by the Cost Evaluation Committee as a function of the following factors: (i) reference capacity price, (ii) reserve capacity factor, (iii) time-of-the-day capacity coefficient and (iv) since October 2016, fuel switching factor. The reference capacity price and the time-of-the-day capacity coefficient are determined annually before the end of December for the subsequent 12-months period. The reserve capacity factor and the fuel switching factor are determined annually before the end of June for the subsequent 12-months period.

The reference capacity price refers to the Won amount per kilowatt-hour payable annually for annualized available capacity indicated in the bids submitted the day before trading (provided that such capacity is actually available on the relevant day of trading), and is determined based on the construction costs and maintenance costs of a standard generation unit and related transmission access facilities, and a base rate for loading electricity. Prior to October 2016, the same reference capacity price applied uniformly to all generation units. Since October 2016, the reference capacity price applies differentially to each generation unit depending on the start year of its commercial operation. Accordingly, the reference capacity price currently ranges from Won 9.15 to 10.07 per kilowatt hour.

36

The reserve capacity factor relates to the requirement to maintain a standard capacity reserve margin in the range of 15% in order to prevent excessive capacity build-up as well as induce optimal capacity investment at the regional level. The capacity reserve margin is the ratio of peak demand to the total available capacity. Under this system, generation units in a region where available capacity is insufficient to meet demand for electricity as evidenced by failing to meet the standard capacity reserve margin receive increased capacity price. Conversely, generation units in a region where available capacity exceeds demand for electricity as evidenced by exceeding the standard capacity reserve margin receive reduced capacity price. Since October 2016, the reserve capacity factor also factors in the transmission loss per generation unit in order to favor transmission of electricity from a nearby generation unit.

The time-of-the-day capacity coefficient allows hourly and seasonal adjustments in order to incentivize our generation subsidiaries to operate their generation facilities at full capacity during periods of highest demand. For example, the capacity price paid differs depending on whether the relevant hour is an "on-peak" hour, a "mid-peak" hour or an "off-peak" hour (the capacity price being highest for the on-peak hours and lowest for the off-peak hours) and the capacity price paid is highest during the months of January, July and August when electricity usage is highest due to weather conditions.

The fuel switching factor, which was introduced in October 2016 to promote environmental sensitivities to climate change, seeks to encourage reduced carbon emission by penalizing generation units (mostly coal-fired units) for excessive carbon emission.

Other than subject to the aforementioned variations, the same capacity pricing mechanism applies to all generation units regardless of fuel types used.

*Vesting Contract System*

In May 2014, the Electricity Business Act was amended to introduce a "vesting contract" system in determining the price and quantity of electricity to be sold and purchased between the purchaser of electricity (namely, us) and the sellers of electricity (namely, our generation subsidiaries and independent power producers). Under the vesting contract system, electricity generators using base load fuels (such as nuclear, coal, hydro and by-product gas) at a particular generation unit were to be required to enter into a contract with the purchaser of electricity (namely, us), which specifies, among other things, the quantity of electricity to be generated and sold at a particular generation unit and the price at which such electricity is sold, subject to certain adjustments.

The vesting contract system was introduced principally to prevent excessive profit-taking by low-cost producers of electricity using base load fuels (such as nuclear, coal, hydro and by-product gas) by replacing the adjusted coefficient as the basis for determining the guaranteed return to generation companies, as well as to enhance the stability of electricity supply by requiring long-term contractual arrangements for the purchase and sale of electricity and promote cost savings, productivity enhancements and operational efficiency by providing incentives and penalties depending on the degree to which the generation companies could supply electricity at costs below the contracted electricity prices.

In order to minimize undue shock to the electricity trading market in Korea, the vesting contract system was to be implemented in phases starting with by-product gas-based electricity in 2015, which accounted for 1.8% of electricity purchased by us during such year. The rollout of the vesting contract system was further studied by a task force consisting of representatives from the Government, the Korea Power Exchange and generation companies.

Following such study, the Government announced in June 2016 that, due to changes in the electricity business environment (including an increase in generation capacity relative to peak usage, reduced fuel costs following a decline in oil prices and greater environmental concerns related to coal-fired electricity generation), it will indefinitely suspend any further rollout of the vesting contract system beyond by-product gas-based electricity, and revert to the adjusted coefficient-based electricity pricing adjustment mechanism.

*Power Trading Results*

The results of power trading, as effected through the Korea Power Exchange, for our generation subsidiaries and independent power producers in 2017 are as follows:

| Items | Volume (Gigawatt hours) | Percentage of Total Volume (%) | Sales to KEPCO (in billions of Won) | Percentage of Total Sales (%) | Unit Price (Won/kWh) |
|---|---|---|---|---|---|
| **Generation Companies** | | | | | |
| KHNP | 146,221 | 28.1 | 9,113 | 21.0 | 62.33 |
| KOSEP | 66,640 | 12.8 | 5,183 | 12.0 | 77.77 |
| KOMIPO | 50,254 | 9.7 | 4,410 | 10.2 | 87.75 |
| KOWEPO | 45,464 | 8.7 | 4,176 | 9.6 | 91.85 |
| KOSPO | 47,659 | 9.2 | 4,347 | 10.0 | 91.22 |
| EWP | 48,307 | 9.3 | 4,452 | 10.3 | 92.15 |
| Others[1] | 115,685 | 22.2 | 11,662 | 26.9 | 100.81 |
| Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |
| **Energy Sources** | | | | | |
| Nuclear | 141,098 | 27.1 | 8,573 | 19.8 | 60.76 |
| Bituminous coal | 224,834 | 43.2 | 17,755 | 41.0 | 78.97 |
| Anthracite coal | 4,014 | 0.8 | 385 | 0.9 | 95.89 |
| Oil | 5,735 | 1.1 | 949 | 2.2 | 165.40 |
| LNG | 1,429 | 0.3 | 151 | 0.3 | 105.33 |
| Combined-cycle | 116,111 | 22.3 | 13,012 | 30.0 | 112.07 |
| Hydro | 2,255 | 0.4 | 219 | 0.5 | 96.95 |
| Pumped-storage | 4,171 | 0.8 | 450 | 1.0 | 107.96 |
| Others | 20,583 | 4.0 | 1,849 | 4.3 | 89.82 |
| Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |
| **Load** | | | | | |
| Base load | 360,356 | 69.3 | 25,938 | 59.8 | 71.98 |
| Non-base load | 159,874 | 30.7 | 17,405 | 40.2 | 108.86 |
| Total | 520,230 | 100.0 | 43,343 | 100.0 | 83.31 |

*Note:*

(1) Others represent independent power producers that trade electricity through the cost-based pool system of power trading (excluding independent power producers that supply electricity under power purchase agreements with us).


*Power Purchased from Independent Power Producers Under Power Purchase Agreements*

In 2017, we purchased an aggregate of 10,702 gigawatt hours of electricity generated by independent power producers under existing power purchase agreements. These independent power producers had an aggregate generation capacity of 6,257 megawatts as of December 31, 2017.


**Power Generation**

As of December 31, 2017, we and our generation subsidiaries had a total of 679 generation units, including nuclear, thermal, hydroelectric and internal combustion units, representing total installed generation capacity of 82,132 megawatts. Our thermal units produce electricity using steam turbine generators fired by coal, oil and LNG. Our internal combustion units use oil or diesel-fired gas turbines and our combined-cycle units are primarily LNG-fired. We also purchase power from several generation plants not owned by our generation subsidiaries.

38

The table below sets forth as of and for the year ended December 31, 2017 the number of units, installed capacity and the average capacity factor for each type of generating facilities owned by our generation subsidiaries.

| | Number of Units | Installed Capacity[1] | Average Capacity Factor[2] |
|---|---|---|---|
| | | (Megawatts) | (Percent) |
| Nuclear ............................................... | 24 | 22,529 | 71.2 |
| Thermal: | | | |
|     Coal ............................................. | 59 | 34,125 | 78.7 |
|     Oil ............................................. | 11 | 2,950 | 20.3 |
|     LNG ............................................. | 0 | 0 | 40.8 |
|         Total thermal ...................................... | 70 | 37,075 | 71.2 |
| Internal combustion ...................................... | 214 | 339 | 16.7 |
| Combined-cycle[3] ....................................... | 111 | 16,018 | 26.3 |
| Integrated gasification combined cycle[4] ...................... | 2 | 346 | 42.4 |
| Hydro ................................................ | 79 | 5,351 | 11.2 |
| Wind ................................................ | 56 | 137 | 17.3 |
| Solar ................................................ | 102 | 120 | 13.6 |
| Fuel cell ............................................. | 17 | 47 | 67.1 |
| Biogas ............................................... | 3 | 160 | 53.1 |
| Others[5] ............................................. | 1 | 10 | 44.9 |
| Total ................................................ | 679 | 82,132 | 58.5 |

Notes:

(1) Installed capacity represents the level of output that may be sustained continuously without significant risk of damage to plant and equipment.

(2) Average capacity factor represents the total number of kilowatt hours of electricity generated in the indicated period divided by the total number of kilowatt hours that would have been generated if the generation units were continuously operated at installed capacity, expressed as a percentage. Average capacity factor of the nuclear and coal-fired generation units represents the mean value of applicable average capacity factor for each fiscal quarter, as there were numerous shutdown and construction of units.

(3) Involves generation through gas and oil.

(4) Involves generation through coal and gasified coal.

(5) Includes waste-to-energy.

The expected useful life of a unit, assuming no substantial renovation, is approximately as follows: nuclear, over 40 years; thermal, over 30 years; internal combustion, over 25 years; and hydroelectric, over 55 years. Substantial renovation can extend the useful life of thermal units by up to 20 years.

We seek to achieve efficient use of fuels and diversification of generation capacity by fuel type. In the past, we relied principally upon oil-fired thermal generation units for electricity generation. Since the oil shock in 1974, however, Korea's power development plans have emphasized the construction of nuclear generation units. While nuclear units are more expensive to construct than thermal generation units of comparable capacity, nuclear fuel is less expensive than fossil fuels in terms of electricity output per unit cost. However, efficient operation of nuclear units requires that such plants be run continuously at relatively constant energy output levels. As it is impractical to store large quantities of electrical energy, we seek to maintain nuclear power production capacity at approximately the level at which demand for electricity is continuously stable. During those times when actual demand exceeds the usual level of electricity supply from nuclear power, we rely on units fired by fossil fuels and hydroelectric units, which can be started and shut down more quickly and efficiently than nuclear units, to meet the excess demand. Bituminous coal is currently the least expensive thermal fuel per kilowatt-hour of electricity produced, and therefore we seek to maximize the use of bituminous

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

coal for generation needs in excess of the stable demand level, except for meeting short-term surges in demand which require rapid start-up and shutdown. Thermal units fired by LNG, hydroelectric units and internal combustion units are the most efficient types of units for rapid start-ups and shutdowns, and therefore we use such units principally to meet short-term surges in demand. Anthracite coal is a less efficient fuel source than bituminous coal in terms of electricity output per unit cost.

Our generation subsidiaries have constructed and operated thermal and internal combustion units in order to help meet power demand. Subject to market conditions, our generation subsidiaries plan to continue to add additional thermal and internal combustion units. These units generally take less time to complete construction than nuclear units.

The high average age of our oil-fired thermal units is attributable to our reliance on oil-fired thermal units as the primary means of electricity generation until mid-1970s. Since then, we have diversified our fuel sources and constructed relatively few oil-fired thermal units compared to units of other fuel types.

The table below sets forth, for the periods indicated, the amount of electricity generated by facilities linked to our grid system and the amount of power used or lost in connection with transmission and distribution.

| | 2013 | 2014 | 2015 | 2016 | 2017 | % of 2017 Gross Generation[1] |
|---|---|---|---|---|---|---|
| | | | (in gigawatt hours, except percentages) | | | |
| **Electricity generated by us and our generation subsidiaries:** | | | | | | |
| Nuclear | 138,784 | 156,407 | 164,762 | 161,995 | 148,426 | 26.8 |
| Coal | 201,119 | 203,765 | 207,533 | 207,912 | 227,186 | 41.0 |
| Oil | 13,941 | 6,838 | 8,822 | 13,055 | 5,242 | 0.9 |
| LNG | 3,526 | 568 | 222 | 369 | 220 | 0.04 |
| Internal combustion | 741 | 656 | 633 | 573 | 496 | 0.1 |
| Combined-cycle | 84,561 | 68,134 | 45,923 | 46,477 | 36,957 | 6.7 |
| Hydro | 5,679 | 5,976 | 4,424 | 4,835 | 5,263 | 1.0 |
| Wind | 155 | 148 | 181 | 186 | 209 | 0.04 |
| Solar and fuel cells | 251 | 422 | 420 | 908 | 2,485 | 0.4 |
| **Total generation by us and our generation subsidiaries** | 448,757 | 442,914 | 432,920 | 436,310 | 426,484 | 77.1 |
| **Electricity generated by IPPs:** | | | | | | |
| Thermal | 55,923 | 63,088 | 72,316 | 83,789 | 103,745 | 18.7 |
| Hydro and other renewable | 12,468 | 15,968 | 17,106 | 20,342 | 23,238 | 4.2 |
| **Total generation by IPPs** | 68,391 | 79,056 | 89,422 | 104,131 | 126,983 | 22.9 |
| Gross generation | 517,148 | 521,970 | 522,343 | 540,441 | 553,467 | 100 |
| Auxiliary use[2] | 20,463 | 20,610 | 21,293 | 21,605 | 22,279 | 4.0 |
| Pumped-storage[3] | 5,408 | 6,644 | 4,824 | 4,716 | 5,477 | 1.0 |
| Total net generation[4] | 491,277 | 494,716 | 496,226 | 514,120 | 525,711 | 95.0 |
| Transmission and distribution losses[5] | 18,019 | 18,270 | 18,063 | 18,475 | 18,790 | 3.6 |

*IPPs = Independent power producers*

*Notes:*

(1)  Unless otherwise indicated, percentages are based on gross generation.
(2)  Auxiliary use represents electricity consumed by generation units in the course of generation.

40

(3)  Pumped storage represents electricity consumed during low demand periods in order to store water which is utilized to generate hydroelectric power during peak demand periods.

(4)  Total net generation represents gross generation minus auxiliary and pumped-storage use.

(5)  Transmission and distribution losses represents total transmission and distribution losses divided by total net generation.

The table below sets forth our total capacity at the end of, and peak and average loads during, the indicated periods.

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
|  |  |  | (Megawatts) |  |  |
| Total capacity | 82,296 | 93,216 | 94,102 | 100,180 | 116,657 |
| Peak load | 76,522 | 80,154 | 78,790 | 85,183 | 85,133 |
| Average load | 59,035 | 59,586 | 60,284 | 61,694 | 63,181 |

### *Korea Hydro & Nuclear Power Co., Ltd.*

We commenced nuclear power generation activities in 1978 when our first nuclear generation unit, Kori #1, began commercial operation. On April 2, 2001, all of our nuclear and hydroelectric power generation assets and liabilities were transferred to KHNP.

KHNP owns and operates 24 nuclear generation units at four power plant complexes in Korea, located in Kori, Wolsong, Yonggwang (Hanbit) and Ulchin (Hanul), 51 hydroelectric generation units including 16 pumped storage hydro generation units as well as six solar generation units and one wind generation unit as of December 31, 2017.

The table below sets forth the number of units and installed capacity as of December 31, 2017 and the average capacity factor by types of generation units in 2017.

|  | Number of Units | Installed Capacity[1] | Average Capacity Factor[2] |
|---|---|---|---|
|  |  | (Megawatts) | (Percent) |
| Nuclear | 24 | 22,529 | 71.2 |
| Hydroelectric | 51 | 5,306 | 11.0 |
| Solar | 6 | 21 | 16.1 |
| Wind | 1 | 1 | 4.5 |
| Total | 82 | 27,858 |  |

*Notes:*

(1)  Installed capacity represents the level of output that may be sustained continuously without significant risk of damage to plant and equipment.

(2)  Average capacity factor represents the total number of kilowatt hours of electricity generated in the indicated period divided by the total number of kilowatt hours that would have been generated if the generation units were continuously operated at installed capacity, expressed as a percentage.

KHNP commenced commercial operation of Shin-Kori #3, with a 1,400 megawatt capacity, in December 2016. KHNP is currently building five additional nuclear generation units, three at the Shin-Kori and two at Shin-Hanul sites, each with a 1,400 megawatt capacity. KHNP expects to complete these units between 2018 and 2023. The initial phase of the decommissioning of Kori #1, which primarily involves safety inspections and the removal of spent fuels, has begun after its permanent shutdown in June 2017.

41

*Nuclear*

The table below sets forth certain information with respect to the nuclear generation units of KHNP as of December 31, 2017.

| Unit | Reactor Type[1] (Megawatts) | Reactor Design[2] | Turbine and Generation[3] | Commencement of Operations | Installed Capacity |
|------|-----------------------------|-------------------|---------------------------|----------------------------|--------------------|
| Kori-2 . . . . . . . . . . . . | PWR | W | GEC | 1983 | 650 |
| Kori-3 . . . . . . . . . . . . | PWR | W | GEC, Hitachi | 1985 | 950 |
| Kori-4 . . . . . . . . . . . . | PWR | W | GEC, Hitachi | 1986 | 950 |
| Shin-Kori-1 . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2011 | 1,000 |
| Shin-Kori-2 . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2012 | 1,000 |
| Shin-Kori-3 . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2016 | 1,400 |
| Wolsong-1 . . . . . . . . | PHWR | AECL | P | 1983 | 679 |
| Wolsong-2 . . . . . . . . | PHWR | AECL, H, K | H, GE | 1997 | 700 |
| Wolsong-3 . . . . . . . . | PHWR | AECL, H | H, GE | 1998 | 700 |
| Wolsong-4 . . . . . . . . | PHWR | AECL, H | H, GE | 1999 | 700 |
| Shin-Wolsong-1 . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2012 | 1,000 |
| Shin-Wolsong-2 . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2015 | 1,000 |
| Hanbit-1 . . . . . . . . . . | PWR | W | W, D | 1986 | 950 |
| Hanbit-2 . . . . . . . . . . | PWR | W | W, D | 1987 | 950 |
| Hanbit-3 . . . . . . . . . . | PWR | H, CE, K | H, GE | 1995 | 1,000 |
| Hanbit-4 . . . . . . . . . . | PWR | H, CE, K | H, GE | 1996 | 1,000 |
| Hanbit-5 . . . . . . . . . . | PWR | D, CE, W, KEPCO E&C | D, GE | 2002 | 1,000 |
| Hanbit-6 . . . . . . . . . . | PWR | D, CE, W, KEPCO E&C | D, GE | 2002 | 1,000 |
| Hanul-1 . . . . . . . . . . . | PWR | F | A | 1988 | 950 |
| Hanul-2 . . . . . . . . . . . | PWR | F | A | 1989 | 950 |
| Hanul-3 . . . . . . . . . . . | PWR | H, CE, K | H, GE | 1998 | 1,000 |
| Hanul-4 . . . . . . . . . . . | PWR | H, CE, K | H, GE | 1999 | 1,000 |
| Hanul-5 . . . . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2004 | 1,000 |
| Hanul-6 . . . . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2005 | 1,000 |
| Total nuclear . . . . . . . . | | | | | 22,529 |

*Notes:*

(1) "PWR" means pressurized light water reactor; "PHWR" means pressurized heavy water reactor.

(2) "W" means Westinghouse Electric Company (U.S.A.); "AECL" means Atomic Energy Canada Limited (Canada); "F" means Framatome (France); "H" means Hanjung; "CE" means Combustion Engineering (U.S.A.); "D" means Doosan Heavy Industries; "K" means Korea Atomic Energy Research Institute; "KEPCO E&C" means KEPCO Engineering & Construction.

(3) "GEC" means General Electric Company (U.K.); "P" means Parsons (Canada and U.K.); "W" means Westinghouse Electric Company (U.S.A.); "A" means Alstom (France); "H" means Hanjung; "GE" means General Electric (U.S.A.); "D" means Doosan Heavy Industries; "Hitachi" means Hitachi Ltd. (Japan).

42

The table below sets forth the average capacity factor and average fuel cost per kilowatt for 2017 with respect to each nuclear generation unit of KHNP.

| Unit | Average Capacity Factor | Average Fuel Cost Per kWh |
|------|---|---|
| | (Percent) | (Won) |
| Kori-1[(1)] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99.7 | 15.21 |
| Kori-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.2 | 7.39 |
| Kori-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.9 | 35.01 |
| Kori-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.6 | 12.96 |
| Shin-Kori-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.8 | 25.93 |
| Shin-Kori-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.1 | 6.17 |
| Shin-Kori-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 102.0 | 6.20 |
| Wolsong-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40.6 | 10.72 |
| Wolsong-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 90.6 | 9.19 |
| Wolsong-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32.8 | 16.78 |
| Wolsong-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99.3 | 9.49 |
| Shin-Wolsong-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 98.5 | 6.69 |
| Shin-Wolsong-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71.7 | 7.05 |
| Hanbit-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 73.3 | 8.47 |
| Hanbit -2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77.1 | 6.66 |
| Hanbit -3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99.8 | 6.74 |
| Hanbit -4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37.5 | 10.64 |
| Hanbit -5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76.6 | 7.38 |
| Hanbit -6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52.7 | 8.19 |
| Hanul-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75.3 | 7.23 |
| Hanul-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 89.0 | 6.77 |
| Hanul-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 92.4 | 6.89 |
| Hanul-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 93.8 | 6.39 |
| Hanul-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76.3 | 6.73 |
| Hanul-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 78.2 | 7.88 |
| Total nuclear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71.2 | 10.29 |

*Note:*

(1)   Kori-1 was permanently shutdown on June 18, 2017.

Under extended-cycle operations, nuclear units can be run continuously for periods longer than the conventional 12-month period between scheduled shutdowns for refueling and maintenance. Since 1987, we have adopted the mode of extended-cycle operations for all of our pressurized light water reactor units and plan to use it for our newly constructed units. The duration of shutdown for fuel replacement, maintenance and the evaluation period for approval to start after maintenance was 199.7 days per unit in 2017. In addition, KHNP's nuclear units experienced an average of 0.13 unplanned shutdowns per unit in 2017. In the ordinary course of operations, KHNP's nuclear units routinely experience damage and wear and tear, which are repaired during routine shutdown periods or during unplanned temporary suspensions of operations. No significant damage has occurred in any of KHNP's nuclear reactors, and no significant nuclear exposure or release incidents have occurred at any of KHNP's nuclear facilities since the first nuclear plant commenced operation in 1978.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

*Hydroelectric*

The table below sets forth certain information relating to KHNP's pumped-storage and hydroelectric business units, including the installed capacity as of December 31, 2017 and the average capacity factor in 2017.

| Location of Unit | Number of Units | Classification | Year Built | Installed Capacity | Average Capacity Factor |
|---|---|---|---|---|---|
| | | | | (Megawatts) | (%) |
| Hwacheon . . . . . . . . . . | 4 | Dam waterway | 1944 | 108.0 | 17.62 |
| Chuncheon . . . . . . . . . | 2 | Dam | 1965 | 62.3 | 18.46 |
| Euiam . . . . . . . . . . . . . | 2 | Dam | 1967 | 48.0 | 28.47 |
| Cheongpyung . . . . . . . . | 4 | Dam | 1943 | 140.1 | 19.37 |
| Paldang . . . . . . . . . . . . | 4 | Dam | 1973 | 120.0 | 22.65 |
| Chilbo (Seomjingang) . . | 3 | Basin deviation | 1945 | 34.8 | 18.00 |
| Boseonggang . . . . . . . . | 2 | Basin deviation | 1937 | 4.5 | 46.28 |
| Kwoesan . . . . . . . . . . . | 2 | Dam | 1957 | 2.6 | 17.70 |
| Anheung . . . . . . . . . . . | 3 | Dam waterway | 1978 | 0.4 | 20.17 |
| Kangreung . . . . . . . . . . | 2 | Basin deviation | 1991 | 82.0 | 0 |
| Topyeong . . . . . . . . . . | 1 | Dam | 2011 | 0.04 | 4.39 |
| Muju . . . . . . . . . . . . . . | 1 | Dam | 2003 | 0.4 | 14.62 |
| Sancheong . . . . . . . . . . | 2 | Dam | 2001 | 1.0 | 18.80 |
| Yangyang . . . . . . . . . . | 2 | Dam | 2005 | 1.4 | 11.61 |
| Yecheon . . . . . . . . . . . | 1 | Dam | 2011 | 0.9 | 15.15 |
| Cheongpeoung . . . . . . . | 2 | Pumped Storage | 1980 | 400.0 | 7.62 |
| Samrangjin . . . . . . . . . | 2 | Pumped Storage | 1985 | 600.0 | 9.20 |
| Muju . . . . . . . . . . . . . . | 2 | Pumped Storage | 1995 | 600.0 | 11.83 |
| Sancheong . . . . . . . . . . | 2 | Pumped Storage | 2001 | 700.0 | 9.54 |
| Yangyang . . . . . . . . . . | 4 | Pumped Storage | 2006 | 1,000.0 | 8.85 |
| Cheongsong . . . . . . . . | 2 | Pumped Storage | 2006 | 600.0 | 9.63 |
| Yecheon . . . . . . . . . . . | 2 | Pumped Storage | 2011 | 800.0 | 13.53 |
| Total . . . . . . . . . . . . . . | 51 | | | 5,306.0 | 11.00 |

*Solar/Wind*

The table below sets forth certain information, including the installed capacity as of December 31, 2017 and the average capacity factor in 2017, of the solar and wind power units of KHNP.

| Location of Unit | Classification | Year Built | Installed Capacity | Average Capacity Factor |
|---|---|---|---|---|
| | | | (Megawatts) | (Percent) |
| Yonggwang . . . . . . . . . | Solar | 2008 | 13.9 | 16.3 |
| Yecheon . . . . . . . . . . . | Solar | 2012 | 2.0 | 15.7 |
| Kori . . . . . . . . . . . . . . | Wind | 2008 | 0.8 | 4.5 |
| Kori . . . . . . . . . . . . . . | Solar | 2017 | 5.1 | 16.3 |
| Total . . . . . . . . . . . . . . | | | 21.8 | |

Korea Water Resources Corporation, which is a Government-owned entity, assumes full control of multi-purpose dams, while KHNP maintains the dams used for power generation. Existing hydroelectric power units have exploited most of the water resources in Korea available for commercially viable hydroelectric power generation. Consequently, we expect that no new major hydroelectric power plants will be built in the foreseeable future. Due to the ease of its start-up and shut-down mechanism, hydroelectric power generation is reserved for peak demand periods.

44

*Korea South-East Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of KOSEP.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
|     Samcheonpo #1, 2, 3, 4, 5, 6 . . . . . . . . . . . . . . . . . . . . | 26.2 | 3,240 | 80.5 | 53.63 |
|     Yeongheung #1, 2, 3, 4, 5, 6 . . . . . . . . . . . . . . . . . . . . | 8.7 | 5,080 | 88.5 | 49.31 |
|     Yeosu # 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.8 | 668 | 77.7 | 65.51 |
| Anthracite: | | | | |
|     Yeongdong #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38.2 | 200 | 38.4 | 101.38 |
| Combined cycle and internal Combustion: | | | | |
|     Bundang gas turbine #1,2,3,4,5,6,7,8; steam | | | | |
|       turbine #1, 2  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.4 | 922 | 28.0 | 123.43 |
| Hydro, Solar and other renewable energy . . . . . . . . . . . . . . | — | 234 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15.6 | 10,344 | 78.0 | 55.27 |

*Korea Midland Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of KOMIPO.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
| Boryeong #1, 2, 3, 4, 5, 6, 7, 8 . . . . . . . . . . . . . . . . . | 22.9 | 4,000 | 85.50 | 48.46 |
| Shin Boryeong #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . | 0.39 | 1,852 | 78.22 | 50.37 |
| Anthracite: | | | | |
| Seocheon #1, 2[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33.5 | 400 | 68.69 | 72.38 |
| Oil-fired: | | | | |
| Jeju #2, 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17.4 | 150 | 61.21 | 144.77 |
| LNG-fired: | | | | |
| Seoul #5[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47.8 | 250 | 40.77 | 188.79 |
| Combined-cycle and internal combustion: | | | | |
| Boryeong gas turbine #1, 2, 3, 4, 5, 6 ; steam turbine #1, 2, 3, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18.8 | 1,350 | 6.23 | 105.04 |
| Incheon gas turbine #1, 2, 3, 4,5,6 ; steam turbine #1, 2,3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12.8 | 1,462.4 | 46.80 | 90.77 |
| Sejong gas turbine #1,2 ; steam turbine #1 . . . . . . . . . | 4.1 | 530.4 | 64.59 | 84.72 |
| Jeju Gas Turbine #3 . . . . . . . . . . . . . . . . . . . . . . . . | 23 | 55 | 0.5 | 689.41 |
| Jeju Internal Combustion Engine #1,2 . . . . . . . . . . . . | 10.6 | 80 | 34.64 | 97.15 |
| Wind: | | | | |
| Yangyang #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11.6 | 3.0 | 14.29 | — |
| Sejong Maebongsan Wind . . . . . . . . . . . . . . . . . . . . . | — | 6.8 | 7.56 | — |
| Jeju Sangmyung Wind . . . . . . . . . . . . . . . . . . . . . . . | 0.47 | 21 | 19.71 | — |
| Combined heat and power: | | | | |
| Wonju#1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.7 | 10 | 44.82 | 38.17 |
| Hydroelectric: | | | | |
| Boryeong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.9 | 7.5 | 29.00 | — |
| Shin Boryeong . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.2 | 5 | 27.69 | — |
| Photovoltaic ("PV") power and fuel cell generation: | | | | 40.60 |
| Boryeong (PV) site . . . . . . . . . . . . . . . . . . . . . . . . | 9.7 | 1.7 | 13.14 | |
| Shin Boryeong (PV) site . . . . . . . . . . . . . . . . . . . . | 0.2 | 2.9 | 15.93 | — |
| Seocheon (PV) site . . . . . . . . . . . . . . . . . . . . . . . . | 9.1 | 1.2 | 14.95 | — |
| Jeju (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.5 | 2.3 | 12.62 | — |
| Seoul (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.4 | 1.3 | 15.76 | — |
| Sejong (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.1 | 0.3 | 10.65 | — |
| Yeosu (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.9 | 2.2 | 16.55 | — |
| Incheon (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . | 6.1 | 0.3 | 15.50 | — |
| Boryeong (fuel cell) site . . . . . . . . . . . . . . . . . . . . | 9.4 | 0.3 | 82.43 | 173.35 |
| Shin Boryeong (fuel cell) site . . . . . . . . . . . . . . . . . | 0.2 | 7.5 | 57.37 | 92.01 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | 15.0 | 10,203.2 | 62.13 | 60.28 |

Note:

_____

(1)   Seocheon #1 and Seocheon #2 were shut down in July 2017 and Seoul #5 was shut down in April 2017.

46

*Korea Western Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of KOWEPO.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
| Taean #1, 2, 3, 4, 5, 6, 7, 8, 9, 10 . . . . . . . . . . . . . . . . . | 11.7 | 6,100 | 76.1 | 53.43 |
| Oil-fired: | | | | |
| Pyeongtaek #1, 2, 3, 4 . . . . . . . . . . . . . . . . . . . . . . . . . | 36.1 | 1,400 | 8.8 | 110.61 |
| Combined cycle: | | | | |
| Pyeongtaek #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11.2 | 1,348.5 | 24.9 | 92.56 |
| Gunsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.6 | 718.4 | 18.1 | 107.46 |
| West Incheon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25.5 | 1,800 | 16.3 | 99.88 |
| Hydroelectric: | | | | |
| Taean . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9.3 | 2.2 | 17.9 | — |
| Solar: | | | | |
| Taean . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.6 | 14.5 | 14.0 | — |
| Pyeongtaek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.0 | 2.9 | 13.3 | — |
| West Incheon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.5 | 1.19 | 13.6 | — |
| Gunsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.2 | 0.95 | 13.3 | — |
| Samryangjin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.1 | 3.0 | 14.5 | — |
| Sejong City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.5 | 5.0 | 15.1 | — |
| Gyeonggi-do . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.7 | 2.5 | 15.2 | — |
| Yeongam . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.8 | 13.3 | 16.5 | — |
| Fuel Cell: | | | | |
| West Incheon 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.8 | 16.2 | 74.7 | — |
| West Incheon 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| Wind Power: | | | | |
| Hwasun . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.1 | 16 | 19.1 | — |
| Integrated gasification combined cycle: | | | | |
| Taean . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.4 | 346.3 | 42.4 | 77.69 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15.9 | 11,791.0 | 48.6 | 61.93 |

47

*Korea Southern Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of KOSPO.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
| Hadong #1, 2, 3, 4, 5, 6, 7, 8 . . . . . . . . . . . . . . . . . . . . . . | 16.3 | 4,000 | 88.1 | 50.4 |
| Samcheok #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.8 | 2,044 | 43.3 | 58.7 |
| Oil-fired: | | | | |
| Nam Jeju #3, 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11.0 | 200 | 71.5 | 152.5 |
| Combined cycle: | | | | |
| Shin Incheon #1, 2, 3, 4 . . . . . . . . . . . . . . . . . . . . . . . . | 21.2 | 1,800 | 21.2 | 97.6 |
| Busan #1, 2, 3, 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14.2 | 1,800 | 33.9 | 93.1 |
| Yeongwol #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.2 | 848 | 7.7 | 103.6 |
| Hallim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21.5 | 105 | 11.2 | 163.5 |
| Andong #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.8 | 362 | 39.4 | 88.9 |
| Wind power: | | | | |
| Hankyung . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11.2 | 21 | 19.9 | 1.24 |
| Seongsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.2 | 20 | 27.4 | 0.72 |
| Solar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.2 | 7 | 13.8 | 0.11 |
| Small Hydropower . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.4 | 3 | 28.9 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12.7 | 11,210 | 51.8 | 63.9 |

48

*Korea East-West Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2017 and the average capacity factor and average fuel cost per kilowatt in 2017 based upon the net amount of electricity generated, of EWP.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
| Dangjin #1, 2, 3, 4, 5, 6, 7, 8, 9, 10 . . . . . . . . . . . . . . . | 10.3 | 6,040 | 66.7 | 80.97 |
| Honam #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44.7 | 500 | 78.5 | 93.77 |
| Anthracite: | | | | |
| Donghae #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18.8 | 400 | 72.5 | 99.65 |
| Oil-fired: | | | | |
| Ulsan #4, 5, 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37.5 | 1,200 | 19.9 | 176.75 |
| Combined cycle: | | | | |
| Ulsan gas turbine #1, 2, 3, 4, 5, 6, 7, 8; steam turbine #1, 2, 3, 4 . . . . . . . . . . . . . . . . . . . . . . . . | 14.1 | 2,072 | 35.6 | 117.93 |
| Ilsan gas turbine #1, 2, 3, 4, 5, 6; steam turbine #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.9 | 900 | 13.6 | 197.02 |
| Mini hydro: | | | | |
| Dangjin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.3 | 8.1 | 32.7 | 174.44 |
| Photovoltaic: | | | | |
| Dangjin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.6 | 1.0 | 14.0 | 395.60 |
| Ulsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.1 | 0.6 | 14.0 | 367.43 |
| Kwangyang . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.3 | 2.3 | 12.0 | 764.13 |
| Dangjin Storage Facility . . . . . . . . . . . . . . . . . . . | 5.1 | 0.7 | 14.9 | 106.23 |
| Dangjin Waste Treatment Facility . . . . . . . . . . . . . . | 5.3 | 1.3 | 11.4 | 427.26 |
| Dangjin Intake Channel Facility . . . . . . . . . . . . . . . | 4.5 | 1.0 | 13.5 | 104.18 |
| Dangjin Coal Depot Roof Facility . . . . . . . . . . . . . . | 0.6 | 3.4 | 11.3 | 141.49 |
| Donghae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11.4 | 1.0 | 11.0 | 783.14 |
| Donghae Sewage Disposal Plant Facility . . . . . . . . . . | 0.1 | 4.4 | 0.1 | 933.36 |
| Soowon Environment Center Facility . . . . . . . . . . . . | 3.9 | 1.5 | 16.4 | 189.85 |
| Kwangyang Port Warehouse Facility . . . . . . . . . . . . | 3.6 | 1.1 | 16.1 | 196.29 |
| Fuel cell: | | | | |
| Ilsan # 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.3 | 2.4 | 69.8 | 296.41 |
| Ilsan # 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.8 | 2.8 | 82.9 | 295.71 |
| Ilsan # 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.8 | 2.8 | 82.7 | 283.85 |
| Ulsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.3 | 2.8 | 75.9 | 207.66 |
| Wind Power: | | | | |
| YeongGwang Jisan . . . . . . . . . . . . . . . . . . . . . . . . | 5.3 | 3.0 | 11.6 | 55.13 |
| Biomass: | | | | |
| Donghae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.5 | 30.0 | 76.1 | 255.18 |
| Capital Landfill Cogeneration Facility . . . . . . . . . . . . | 3.8 | 5.0 | 0.0 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16.9 | 11,187 | 52.2 | 94.91 |

*Power Plant Remodeling and Recommissioning*

Our generation subsidiaries supplement power generation capacity through remodeling or recommissioning of thermal units. Recommissioning includes installation of anti-pollution devices, modification of control

49

systems and overall rehabilitation of existing equipment. The following table shows recent remodeling and recommissioning initiatives by our generation subsidiaries.

| Power Plant | Capacity | Completed (Year) | Extension | Company |
|---|---|---|---|---|
| Taean #1-10 . . . . . . . . . . | 5,050 MW (500 MW×8, 1,050 MW×2) | EP[1] upgrade (#2, 2016) EP[1] upgrade (#1, 3, 2017) SCR[2] upgrade (#2, 4, 7, 2016) SCR[2] upgrade (#1, 3, 8, 9, 10, 2017) FGD[5] upgrade, (#1, 3, 2017) | Anti-pollution | KOWEPO |
| Pyeongtaek #1-4 . . . . . . . | 1,400 MW (350 MW×4) | Steam turbine upgrade (#2, 3, 2014) | 10-year performance-improvement | KOWEPO |
| Boryeong #1-2 . . . . . . . . | 1,000 MW (500 MW×2) | FGD upgrade (#1, 2, 2014) | Performance-improvement | KOMIPO |
| Boryeong #3-6 . . . . . . . . | 2,000 MW (500 MW×8) | Retrofit(#3, 2019) Retrofit(#5, 6, 2021) Retrofit(#4, 2023) FGD, EP, SCR upgrade (#3, 2019) FGD, EP, SCR upgrade (#5, 6, 2021) FGD, EP, SCR upgrade (#4, 2023) | Lifetime extension & Performance-improvement Performance-improvement | KOMIPO |
| Boryeong #7, 8 . . . . . . . . | 1,000 MW (500 MW×2) | FGD,EP upgrade (#7, 2025) FGD,EP upgrade (#8, 2026) | Performance-improvement | KOMIPO |
| Seocheon #1-2 . . . . . . . . | 400 MW (200 MW×2) | SCR[2] : 2012 | Anti-pollution | KOMIPO |
| Yeosu #1, 2 . . . . . . . . . . | 668.6MW (#1:340, #2:328.6MW) | Boiler Type Change (CFBC[3]:#1:2016, #2:2011) | 30 years | KOSEP |
| Samcheonpo #1-2 . . . . . . | 1,120 MW (560 MW ×2) | Boiler, EP, Draft System Upgrade (#1, 2: 2012) | 10 years Refurbishing-modernization | KOSEP |
| Yeongdong#1 . . . . . . . . . | 125 MW (125 MW ×1) | Boiler, Hybrid SCR & EP, Draft System Retrofit (Biomass[4] #1: 2017) | Renewable energy | KOSEP |

_____

*Notes:*

(1)  "EP" means an electrostatic precipitation system.
(2)  "SCR" means a selective catalytic reduction system.
(3)  "CFBC" means a circulating fluidized bed combustion system.
(4)  "Biomass" means wood pallet powered plant.
(5)  "FGD" means flue-gas desulfurization designed to remove sulfur oxides.

**Transmission and Distribution**

We currently transmit and distribute substantially all of the electricity in Korea.

As of December 31, 2017, our transmission system consisted of 33,955 circuit kilometers of lines of 765 kilovolts and others including high-voltage direct current lines, and we had 839 substations with aggregate installed transformer capacity of 311,869 megavolt-amperes.

As of December 31, 2017, our distribution system consisted of 115,945 megavolt-amperes of transformer capacity and 9,287,199 units of support with a total line length of 483,467 circuit kilometers.

50

We make substantial investments in our transmission and distribution systems to minimize power interruptions and improve efficiency. Our current projects principally focus on increasing capabilities of the existing power networks and reducing our transmission and distribution loss, which was 3.57% of our gross generation in 2017. To cope with increasing damages to large-scale transmission and distribution facilities, we plan to reinforce stability of our transmission and distribution facilities through stricter design and material specifications. In addition, we also plan to expand underground transmission and distribution facilities to meet customer demand for more environment-friendly facilities. In order to reduce the interruption time in power distribution, which is an indicator of the quality of electricity transmission, we are also continuing to invest in automation of electricity transmission and development of new transmission technologies, among others.

Some of the facilities we own and use in our distribution system use rights of way and other concessions granted by municipal and local authorities in areas where our facilities are located. These concessions are generally renewed upon expiration.

**New Energy Industry Projects**

Certain of our new energy industry projects are described below.

*Advanced Metering Infrastructure*

In July 2012, the Government implemented a master plan to build out a smart grid, which includes the Advanced Metering Infrastructure ("AMI") roadmap. In accordance with such plan, we are in the process of installing "smart meters" and related communication networks and operating systems for 22 million households for target completion by 2020 as part of the "smart grid" initiative in an effort to enhance efficiency in the power electricity industry and alleviate growing energy shortage concerns. Smart meters refer to digital meters that record, on a real-time basis, electricity consumption within a household so that consumers will have a price-based incentive to enhance efficiency in their electricity usage. As of December 31, 2017, we have installed 5.2 million smart meter units, and plan to install an additional 17 million units by 2020. The AMI project is expected to cost Won 1.6 trillion through 2020.

*Smart Grids*

Smart grids refer to next-generation networks for electricity distribution that integrate information technology into existing power grids with the aim of enabling two-way real time exchange of information between electricity suppliers and consumers for optimal efficiency in electricity use. As part of our overall business strategy, we are currently developing and implementing smart grids based on advanced information technology, in order to promote more efficient allocation and use of electricity by consumers. We expect that such technology will improve efficiency and reduce electricity loss over the course of electricity transmission and distribution. We also expect that the smart grid initiative will significantly increase efficient energy consumption by providing real-time data to customers, which would in turn help to reduce greenhouse gas emission and decrease Korea's reliance on foreign energy sources.

Leveraging our experience gained through high-tech intelligent power transmission and distribution network, or "smart grid" test beds in Jeju Island from 2009 to 2013, we plan to expand our smart grid project. In 2014, we successfully implemented the KEPCO Building Energy Management System (K-BEMS), our smart grid technology, at our Guri-Namyangju branch. In recognition of our achievement, we were awarded an honorable mention from the International Smart Grid Action Network and a special prize from the Global Smart Grid Federation in 2015. By the end of 2017, we implemented smart grid technology in 120 of our branches, and we plan to expand implementation of smart grid technology to residential and industrial buildings.

*Energy Storage Systems*

In October 2013, as part of an endeavor to create new markets for energy demand management applications using information and communication technology, we established a business plan to roll out energy storage

51

systems for frequency regulation nationwide. These systems involve the establishment and operation of batteries and transformers with large-sized charge and discharge capabilities adjacent to substations to transmit electricity stably with regulated frequencies and optimize the efficiency of the substation operation. This system allows full conversion of reserve capacity for frequency regulation at existing low-cost generators into electricity storage and, if operated in sizable scale, offers opportunities for substantial cost savings in purchase of electricity.

In December 2014, we conducted a pilot project for this initiative by installing a 52 megawatts energy storage system at the Seo-Anseong substation and the Shin-Yongin substation. In July 2015, these substations began to commercially operate energy storage systems, and we expanded the energy storage capacity nationwide by an additional 184 megawatts in 2016 and an additional 140 megawatts in 2017, with a total capacity of 376 megawatts as of December 31, 2017. In addition, we completed construction of one of the world's largest indoor energy storage systems for frequency regulation in Gimje substation with a 48 megawatts capacity.

*Electric Vehicle Charging Infrastructure*

In order to promote the use of environment friendly electric vehicles, we plan to install 3,000 high-speed electric vehicle charging stations primarily in public space by 2022. We also plan to establish approximately 4,000 electric vehicle charging infrastructures in residential building complexes by the end of 2018.

*Other "New Energy" Initiatives*

In addition to the above, we are currently taking various initiatives in the "new energy" field, including conducting feasibility studies for diagnostic and/or preventive systems for our transmission networks using unmanned drone applications and smart sensors based on the "Internet of Things (IoT)" technology.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund. For further details, see "—Capital Investment Program."

**Fuel Sources and Requirements**

*Nuclear*

Uranium, the principal fuel source for nuclear power, accounted for 38.1%, 37.1% and 34.8% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively.

All uranium ore concentrates used by KHNP are imported from, and conversion and enrichment of such concentrates are provided by, sources outside Korea and are paid for with currencies other than Won, primarily U.S. dollars.

In order to ensure stable supply, KHNP enters into long-term and medium-term contracts with various suppliers and supplements such supplies with purchases in spot markets. In 2017, KHNP purchased 100%, or approximately 4,000 tons, of its uranium concentrate requirement under both long-term and spot supply contracts with suppliers in Canada, the United Kingdom, Kazakhstan, Germany, Niger, Australia and the United States. Under the long-term supply contracts, the purchase prices of uranium concentrates are adjusted annually based on base prices and spot market prices prevailing at the time of actual delivery. The conversion and enrichment services of uranium concentrates are provided by suppliers in Canada, France, Germany, Japan, China, Russia, the United Kingdom and the United States. A Korean supplier typically provides fabrication of fuel assemblies. Except for certain fixed contract prices, contract prices for processing of uranium are adjusted annually in accordance with the general rate of inflation. KHNP intends to obtain its uranium requirements in the future, in part, through purchases under medium- to long-term contracts and, in part, through spot market purchases.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

*Coal*

Bituminous coal accounted for 46.2%, 45.9% and 52.2% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively, and anthracite coal accounted for 1.7%, 1.8% and 1.0% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively.

In 2017, our generation subsidiaries purchased approximately 92.8 million tons of bituminous coal, of which approximately 38%, 31%, 11%, 9% and 11% were imported from Indonesia, Australia, Russia, South Africa and others, respectively. Approximately 82% of the bituminous coal requirements of our generation subsidiaries in 2017 were purchased under long-term contracts with the remaining 18% purchased in the spot market. Some of our long-term contracts relate to specific generating plants and extend through the end of the projected useful lives of such plants, subject in some cases to periodic renewal. Pursuant to the terms of our long-term supply contracts, prices are adjusted periodically based on market conditions. The average cost of bituminous coal per ton purchased under such contracts amounted to Won 90,902, Won 89,118 and Won 98,891 in 2015, 2016 and 2017, respectively.

In 2017, our generation subsidiaries purchased approximately 0.9 million tons of anthracite coal. The prices for anthracite coal under such contracts are set by the Government. The average cost of anthracite coal per ton purchased under such contracts was Won 108,346, Won 96,121 and Won 124,036 in 2015, 2016 and 2017, respectively.

*Oil*

Oil accounted for 2.2%, 3.0% and 1.2% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively.

In 2017, our generation subsidiaries purchased approximately 7.1 million barrels of fuel oil, substantial portion of which was purchased from domestic refiners through competitive open bidding. Purchase prices are based on the spot market price in Singapore. The average cost per barrel was Won 67,517, Won 53,842 and Won 77,188 in 2015, 2016 and 2017, respectively.

*LNG*

LNG accounted for 10.7%, 10.7% and 8.7% of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively. In 2017, for use in electricity generation we purchased approximately 4.8 million tons of LNG from Korea Gas Corporation, a Government-controlled entity in which we currently own a 21.57 equity interest (excluding treasury shares). In 2017, we purchased a substantial portion of our LNG requirements for use in power generation from Korea Gas Corporation. Under the terms of the LNG contract with Korea Gas Corporation, all of our five non-nuclear generation subsidiaries jointly and severally agreed to purchase a total of 5.05 million tons of LNG in 2017, subject to an automatic price adjustment annually based on a pre-determined formula if the actual purchased amount exceeds or falls short of the contracted amount. We believe the quantities of LNG provided under such contract will be adequate to meet the needs of our generation subsidiaries for LNG for the next several years. The LNG supply contracts between our generation subsidiaries and Korea Gas Corporation generally have a term of 20 years and provide for minimum purchase requirements for our generation subsidiaries, the specific terms of which are subject to negotiation between Korea Gas Corporation and our generation subsidiaries and approval by the Government. The average cost per ton of LNG under our contract with Korea Gas Corporation was Won 775,663, Won 594,662 and Won 655,127, in 2015, 2016 and 2017, respectively.

*Hydroelectric*

Hydroelectric power generation accounted for 1.0%, 1.1% and 1.2%, of our fuel requirements for electricity generation in 2015, 2016 and 2017, respectively. The availability of water for hydroelectric power depends on

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

rainfall and competing uses for available water supplies, including residential, commercial, industrial and agricultural consumption. Pumped storage enables us to increase the available supply of water for use during periods of peak electricity demand.

**Sales and Customers**

Our sales depend principally on the level of demand for electricity in Korea and the rates we charge for the electricity we sell to the end-users.

Demand for electricity in Korea grew at a compounded average rate of 1.7% per annum for the five years ended December 31, 2017. According to the Bank of Korea, the compounded growth rate for GDP was approximately 3.0% for the same period. The GDP growth rate was approximately 2.8%, 2.9% and 3.1% during 2015, 2016 and 2017, respectively.

The table below sets forth, for the periods indicated, the annual rate of growth in Korea's GDP and the annual rate of growth in electricity demand (measured by total annual electricity consumption) on a year-on-year basis.

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Growth in GDP | 2.9% | 3.3% | 2.8% | 2.9% | 3.1% |
| Growth in electricity consumption | 1.8% | 0.6% | 1.3% | 2.8% | 2.2% |

Electricity demand in Korea varies within each year for a variety of reasons other than the general growth in GDP demand. Electricity demand tends to be higher during daylight hours due to heightened commercial and industrial activities and electronic appliance use. Due to the use of air conditioning during the summer and heating during the winter, electricity demand is higher during these two seasons than the spring or the fall. Variation in weather conditions may also cause significant variation in electricity demand.

We do not use any marketing channels, including any special sales methods, to sell electricity to our customers, other than to install electricity meters on-site and take monthly readings of such meters, based upon which invoices are sent to our customers.

*Demand by the Type of Usage*

The table below sets forth consumption of electric power, and growth of such consumption on a year-on-year basis, by the type of usage (in gigawatt hours) for the periods indicated.

|  | 2013 (GWh) | YoY growth (%) | 2014 (GWh) | YoY growth (%) | 2015 (GWh) | YoY growth (%) | 2016 (GWh) | YoY growth (%) | 2017 (GWh) | YoY growth (%) | % of Total 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Residential | 65,815 | 0.5 | 64,457 | (2.1) | 65,619 | 1.8 | 68,057 | 3.7 | 68,544 | 0.7 | 13.5 |
| Commercial | 102,196 | 0.6 | 100,761 | (1.4) | 103,679 | 2.9 | 108,617 | 4.8 | 111,298 | 2.5 | 21.9 |
| Educational | 7,947 | 1.1 | 7,438 | (6.4) | 7,691 | 3.4 | 8,079 | 5.1 | 8,316 | 2.9 | 1.6 |
| Industrial | 265,373 | 2.8 | 272,552 | 2.7 | 273,548 | 0.4 | 278,828 | 1.9 | 285,969 | 2.6 | 56.3 |
| Agricultural | 13,866 | 8.5 | 14,505 | 4.6 | 15,702 | 8.3 | 16,580 | 5.6 | 17,251 | 4.0 | 3.4 |
| Street lighting | 3,156 | (0.1) | 3,221 | 2.1 | 3,341 | 3.7 | 3,462 | 3.6 | 3,557 | 2.7 | 0.7 |
| Overnight Power | 16,496 | (6.4) | 14,658 | (11.1) | 14,075 | (4.0) | 13,416 | (4.7) | 12,811 | (4.5) | 2.5 |
| Total | 474,849 | 1.8 | 477,592 | 0.6 | 483,655 | 1.3 | 497,039 | 2.8 | 507,746 | 2.2 | 100.0 |

The industrial sector represents the largest segment of electricity consumption in Korea. Demand for electricity from the industrial sector was 285,969 gigawatt hours in 2017, representing a 2.6% increase from 2016, largely due to the continued export-based growth of the Korean economy, which resulted in increased

54

industrial output and greater utilization of industrial plants. Demand for electricity from the commercial sector depends largely on the level and scope of commercial activities in Korea, which in recent years have resulted in increased office building construction, office automation and use of air conditioners and heaters. Demand for electricity from the commercial sector increased to 111,298 gigawatt hours in 2017, representing a 2.5% increase from 2016 largely due to the recovery of market demand as a result of various Government policies to boost the economy. Demand for electricity from the residential sector is largely dependent on population growth and use of heaters, air conditioners and other electronic appliances. Demand for electricity from the residential sector increased to 68,544 gigawatt hours in 2017, representing a 0.7% increase compared to 2016, largely due to an increase in household electricity usage for air conditioning and heating.

*Demand Management*

Our ability to provide adequate supply of electricity is principally measured by the facility reserve margin and the supply reserve margin. The facility reserve margin represents the difference between the peak usage during a year and the installed capacity at the time of such peak usage, expressed as a percentage of such installed capacity. The supply reserve margin represents the difference between the peak usage in a year and the average available capacity at the time of such peak usage, expressed as a percentage of such peak usage. The following table sets forth our facility reserve margin and supply reserve margin for the periods indicated.

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Facility reserve margin | 7.5% | 16.3% | 19.4% | 17.6% | 34.0% |
| Supply reserve margin | 5.5% | 11.5% | 11.6% | 8.5% | 12.3% |

While we seek to meet the growing demand for electricity in Korea primarily by continuing to expand our generation capacity, we have also implemented several measures to curtail electricity consumption, especially during peak periods. We apply time-of-use and seasonality tariff, which are structured so that higher tariffs are charged at the time and months of peak demand to select types of customers, and we also apply a progressive rate structure for the residential use of electricity. We have several demand management programs to control demand and induce power conservation during peak hours and peak seasons such as providing incentives for reducing power consumption during peak hours.

*Electricity Rates*

The Electricity Business Act and the Price Stabilization Act of 1975, each as amended from time to time, prescribe the procedures for the approval and establishment of rates charged for the electricity we sell. We submit our proposals for revisions of rates or changes in the rate structure to the Ministry of Trade, Industry and Energy. The Ministry of Trade, Industry and Energy then reviews these proposals and, following consultation with the Ministry of Strategy and Finance and review by the Korea Electricity Commission, makes the final decision.

Under the Electricity Business Act and the Price Stabilization Act, electricity rates are established at levels that would enable us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations as well as receive a fair investment return on capital used in those operations.

In May 2014, in order to make conforming changes to the standards for determining the public utility rates and to further bolster the reasonableness of cost determination, the Ministry of Trade, Industry and Energy amended the standards for determining the electricity tariff rates. The main amendments include (i) recording as our cost of electricity (which forms part of our operating costs) the pretax income of our six generation subsidiaries (which was previously deducted from our operating costs), (ii) excluding from our rate base our equity interests in our six generation subsidiaries (which were previously included in the rate base discussed below), and (iii) when determining working capital, considering the actual time of our cost recovery (namely, the accounts receivable collection period and the accounts payable payment period).

55

For the purposes of rate approval, operating costs are defined as the sum of our operating expenses (which principally consists of cost of sales and selling and administrative expenses) and our adjusted income taxes.

Fair investment return represents an amount equal to the rate base multiplied by the rate of return.

Following the amendments to its computation methods in May 2014 as described above, the rate base is currently equal to the sum of:

- net utility plant in service (which is equal to utility plant minus accumulated depreciation minus revaluation reserve);

- the portion of working capital which is equal to the appropriate level of operating costs minus depreciation and other non-cash charges while taking into account the actual time of cost recovery; and

- the portion of construction-in-progress which is charged from our retained earnings.

The amounts used for the variables in the rates are those projected by us for the periods to be covered by the rate approval.

For the purpose of determining the fair rate of return, the rate base is divided into two components in proportion to our total shareholders' equity and our total debt. The rate of return permitted in relation to the debt component of the rate base is set at a level designed to approximate the weighted average interest cost on all types of borrowing for the periods covered by the rate approval. The rate of return permitted in relation to the equity component of the rate base is set by applying the capital asset pricing model which takes account of the risk-free rate, the return on the Korea Stock Price Index, KOSPI, a Korean equity market index, and the correlation of the stock price of our company with KOSPI. In 2016, the approved rate of return on the debt component of the rate base was 0.9% while the approved rate of return on the equity component of the rate base was 3.34%. As a result of such approved rates of returns, the fair rate of return in 2016 was determined to be 4.24%. The fair rates of return for 2017 and 2018 have not yet been determined.

The Electricity Business Act and the Price Stabilization Act do not specify a basis for determining the reasonableness of our operating expenses or any other items (other than the level of the fair investment return) for the purposes of the rate calculation. However, the Government exercises substantial control over our budgeting and other financial and operating decisions.

In addition to the calculations described above, a variety of other factors are considered in setting overall tariff levels. These other factors include consumer welfare, our projected capital requirements, the effect of electricity tariff on inflation in Korea and the effect of tariff on demand for electricity.

From time to time, our actual rate of return on invested capital may differ significantly from the fair rate of return on invested capital assumed for the purposes of electricity tariff approvals, for reasons, among others, related to movements in fuel prices, exchange rates and demand for electricity that differ from what is assumed for determining our fair rate of return. For example, between 1987 and 1990, the actual rate of return was above the fair rate of return due to declining fuel costs and rising demand for electricity at a rate not anticipated for purposes of determining our fair rate of return. Similarly, depreciation of the Won against the U.S. dollar accounted for our actual rates of return being lower than the fair rate of return for the period from 1996 to 2000. For the period between 2006 and 2013, our actual rates of return were lower than the fair rate of return largely due to a general increase in fuel costs and additional facility investment costs incurred, the effects of which were not offset by timely increases in our tariff rates. Between 2014 and 2016, however, largely due to a decrease in fuel costs reflective of the drop in oil prices, our actual rate of return has surpassed the fair rate of return; however, substantially all of the resulting excess has been used to fund capital expenditure and repair and maintenance, as well as to offer tariff discounts to economically or otherwise disadvantaged households, and make investments in renewable energy and other environmental programs.

56

Partly in response to the variance between our actual rates of return and the fair rates of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increases as such increases requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use from sector-specific tariff increases.

Prior to November 2013, the Government from time to time effected tariff increases that typically covered all sectors, namely, residential, commercial and industrial, mainly in response to sustained increases in fuel prices. No cross-sector tariff increase has been implemented since November 2013 largely due to a general decline in fuel prices and relatively stable exchange rates. However, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, the new tariff structure encourages energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods during the summer and the winter. Third, a temporary rate discount will apply during 2017 to 2019 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation and cash flows.

The tariff rates we charge for electricity vary among the different classes of consumers, which principally consist of industrial, commercial, residential, educational and agricultural consumers. The tariff also varies depending upon the voltage used, the season, the time of usage, the rate option selected by the user and, in the residential sector, the amount of electricity used per household, as well as other factors. For example, we adjust for seasonal tariff variations by applying higher rates when demand tends to rise such as during the months of June, July and August (when the demand tends to rise due to increased use of air conditioning) and November, December, January and February (when demand tends to rise due to increased use of heating), which reflects the policy of the Korean government to cope with the rise in electricity demand during peak seasons by encouraging a more efficient use of electricity by customers. In addition, we provide discounts on tariff rates to certain users such as low income households.

Our current tariff schedule, which became effective as of January 1, 2017 reflecting the adjustments outlined above, is summarized below by the type of usage:

- *Industrial*. The monthly basic charge varies from Won 5,550 per kilowatt to Won 9,810 per kilowatt depending on the type of contract, the voltage used and the rate option. The energy usage charge varies from Won 53.7 per kilowatt-hour to Won 196.6 per kilowatt-hour depending on the type of contract, the voltage used, the season, the time of day and the rate option.

- *Commercial*. The monthly basic charge varies from Won 6,160 per kilowatt to Won 9,810 per kilowatt depending on the type of contract, the voltage used and the rate option. The energy usage charge varies from Won 53.7 per kilowatt-hour to Won 196.6 per kilowatt-hour depending on the type of contract, the voltage used, the season, the time of day and the rate option.

- *Residential*. The monthly basic charge varies from Won 910 for electricity usage of less than 200 kilowatt hours to Won 7,300 for electricity usage in excess of 400 kilowatt hours. Residential tariff also includes an energy usage charge ranging from Won 93.3 to Won 280.6 per kilowatt-hour for electricity usage depending on the amount of usage and voltage. During the peak usage periods during the summer and the winter, namely the months of July and August and December to February, a higher

energy usage charge of Won 709.5 per kilowatt-hour applies to residential consumers whose monthly electricity consumption exceeds 1,000 kilowatts hour.

- *Educational*. The monthly basic charge varies from Won 5,230 per kilowatt to Won 6,980 per kilowatt depending on the voltage used and the rate option. The energy usage charge varies from Won 43.8 per kilowatt-hour to Won 160.4 per kilowatt-hour depending on the voltage used, the season and the rate option.

- *Agricultural*. The monthly basic charge varies from Won 360 per kilowatt to Won 1,210 per kilowatt depending on the type of usage. The energy usage charge varies from Won 21.6 per kilowatt-hour to Won 41.9 per kilowatt-hour depending on the type of contract, the voltage used and the season.

- *Street-lighting*. The monthly basic charge is Won 6,290 per kilowatt and the energy usage charge is Won 85.9 per kilowatt-hour. For electricity capacity of less than 1 kilowatt or for places where the installation of the electricity meter is difficult, a fixed rate of Won 37.5 per watt applies, with the minimum monthly charge of Won 1,220.

In 2001, as part of implementing the Restructuring Plan, the Ministry of Trade, Industry and Energy established the Electric Power Industry Basis Fund to enable the Government to take over certain public services previously performed by us. In 2017, 3.7% of the tariff we collected from our customers was transferred to this fund prior to recognizing our sales revenue.

**Power Development Strategy**

We and our generation subsidiaries make plans for expanding or upgrading our generation capacity based on the Basic Plan, which is generally revised and announced every two years by the Government. In July 2015, the Government announced the Seventh Basic Plan relating to the future supply and demand of electricity, focusing on stable supply of electricity and increasing the portion of low carbon electricity supply sources, among others. To revise the Seventh Basic Plan, in December 2017, the Government announced the Eighth Basic Plan which are more environmentally focused than the Seventh Basic Plan and to be effective for the period from 2017 to 2031. The Eighth Basic Plan focuses on, among other things, (i) decreasing the reliance on nuclear and coal-based supply sources, (ii) increasing utilization of renewable energy sources and (iii) balancing the existing cost-based pool system of purchase of electricity with an environmentally-focused pool system, in order to increase utilization of LNG energy sources, which are cleaner but more expensive than nuclear or coal energy sources. Furthermore, the Eighth Basic Plan includes the following implementing measures: (i) six new nuclear generation units in a planning stage would not be constructed, (ii) extension of life of 10 decrepit nuclear generation units would not be granted, (iii) Wolsong #1 unit is not counted as part of domestic energy generation capacity, (iv) seven decrepit coal-fired generation plants will be retired by 2022, (v) six other coal-fired generation plants shall be converted to LNG fuel use and (vi) domestic renewable energy generation capacity shall be expanded to 58.5 gigawatts by 2030.

In January 2014, prior to the announcement of the Seventh Basic Plan, the Ministry of Trade, Industry and Energy adopted the Second Basic National Energy Plan following consultations with representatives from civic groups, the power industry and academia. The Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, covers the period from 2014 to 2035 and focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing the growth of electricity demand by 15% by 2035 through efficiency enhancement programs compared to the projected growth in the absence of such efficiency enhancement programs, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying latest greenhouse gas emission reduction technologies to newly constructed generation units in order to further promote safety and environmental friendliness, (iv) strengthening resource exploration and fuel procurement capabilities to enhance Korea's energy security, (v) ensuring stable supply of energy and increasing the portion of electricity supplied

58

from renewable sources to 11% by 2035, (vi) reinforcing the system for stable supply of conventional energy, such as oil and gas, and (vii) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of low-income consumers. In addition, the Second Basic National Energy Plan has revised the target level of electricity generated by nuclear sources as a percentage of total electricity generated to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008, which covered the period from 2008 to 2030. In March 2018, the Government announced its plan to establish the Third Basic National Energy Plan by the end of 2018.

We cannot assure that the Eighth Basic Plan, the Second Basic National Energy Plan or the respective plans to be subsequently adopted will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable costs to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on the part of us and our generation subsidiaries, among others, which may have a material adverse effect on our results of operations, financial condition and cash flows.

**Capital Investment Program**

The table below sets forth, for each of the years ended December 31, 2015, 2016 and 2017, the amounts of capital expenditures for the construction of generation, transmission and distribution facilities.

| 2015 | 2016 | 2017 |
|------|------|------|
| | (In billions of Won) | |
| ₩15,750 | ₩13,950 | ₩13,711 |

The table below sets forth the currently estimated installed capacity for new or expanded generation units to be completed by our generation subsidiaries in each year from 2018 to 2021 based on the Eighth Basic Plan, as amended.

| Year | Number of Units | Type of Units | Total Installed Capacity |
|------|-----------------|---------------|--------------------------|
| | | | (Megawatts) |
| 2018 . . . . . . . . . . . . . . . . . . . . . . . | 2 | Nuclear power | 2,800 |
| | 2 | LNG-combined | 240 |
| 2019 . . . . . . . . . . . . . . . . . . . . . . . | 1 | Nuclear power | 1,400 |
| | 3 | LNG-combined | 1,315 |
| 2020 . . . . . . . . . . . . . . . . . . . . . . . | 1 | Coal fired | 1,000 |
| | 1 | LNG-combined | 125 |
| 2021 . . . . . . . . . . . . . . . . . . . . . . . | None | | |

For the period from 2022 to 2023, our generation subsidiaries currently plan to complete two additional nuclear units with an aggregate installed capacity of 2,800 megawatts.

As part of our capital investment program, we also intend to add new transmission lines and substations, continue to replace overhead lines with underground cables and improve the existing transmission and distribution systems.

The actual number and capacity of generation units and transmission and distribution facilities we construct and the timing of such construction are subject to change depending upon a variety of factors, including, among others, changes in the Basic Plan, demand growth projections, availability and cost of financing, changes in fuel prices and availability of fuel, ability to acquire necessary plant sites, environmental considerations and community opposition.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

The table below sets forth, for the period from 2018 to 2020, the budgeted amounts of capital expenditures pursuant to our capital investment program, which primarily consist of budgets for the construction of generation, transmission and distribution facilities and, to a lesser extent, renewable energy generation and new energy industry projects. The budgeted amounts may vary from the actual amounts of capital expenditures for a variety of reasons, including, among others, the implementation of the Eighth Basic Plan, changes in the number of units to be constructed, the actual timing of such construction, changes in rates of exchange between the Won and foreign currencies and changes in interest rates.

|  | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|
|  |  | (in billions of Won) |  |  |
| Generation[1]: |  |  |  |  |
| Nuclear .......................................... | ₩ 4,076 | ₩ 4,243 | ₩ 3,491 | ₩11,810 |
| Thermal .......................................... | 3,362 | 3,123 | 4,120 | 10,605 |
| Renewables and others ........................... | 891 | 1,789 | 1,857 | 4,537 |
| Sub-total ..................................... | 8,329 | 9,155 | 9,468 | 26,952 |
| Transmission and Distribution: |  |  |  |  |
| Transmission .................................... | 2,938 | 3,529 | 3,433 | 9,900 |
| Distribution .................................... | 2,881 | 2,587 | 2,603 | 8,071 |
| Sub-total ..................................... | 5,819 | 6,116 | 6,036 | 17,971 |
| Others[2] ......................................... | 1,668 | 1,909 | 2,076 | 5,653 |
| Total ............................................. | ₩15,816 | 17,180 | ₩17,580 | ₩50,576 |

*Notes:*

(1)  The budgeted amounts for our generation facilities are based on the Eighth Basic Plan.
(2)  Principally consists of investments in telecommunications and new energy industry projects, among others.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. We contributed Won 500 billion to the funds in 2016. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector.

Furthermore, as part of the Comprehensive Measures against Particulate Matter and the Eighth Basic Plan, announced by the Government in September 2017 and December 2017, respectively, the Government set forth the following policy directions relating to coal-fired generation units: (i) two coal-fired generation units scheduled for construction and four existing coal-fired generation units shall convert to LNG fuel use, (ii) in principle, construction of new coal-fired generation units shall not be planned, (iii) seven of the coal-fired generation units that are 30 years or older will be shut down on an accelerated schedule, (iv) coal-fired generation units that are 30 years or older shall temporarily cease operations from March through June of each year, (v) coal-fired generation units shall be put through comprehensive functional and environmental upgrades and (vi) coal-fired generation units shall be subject to emission standards that are twice as more rigorous than the current standards to be in effect by the first half of 2018. Compliance with such measures is expected to result in our incurring significant costs.

We have financed, and plan to finance in the future, our capital investment programs primarily through net cash provided by our operating activities and financing in the form of debt securities and loans from domestic financial institutions, and to a lesser extent, borrowings from overseas financial institutions. In addition, in order

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:38 PM, Submission Status: Approved

to prepare for potential liquidity shortage, we and our generation subsidiaries maintain several credit facilities with domestic financial institutions in the aggregate amounts of Won 3,831 billion and US$383 million, the full amount of which was available as of December 31, 2017. We, KHNP, KOMIPO and KOWEPO also maintain global medium-term note programs in the aggregate amount of US$13.0 billion, of which approximately US$8.9 billion remains currently available for future drawdown. KOSEP also maintains an A$2 billion Australian dollar medium-term note program, of which approximately A$1.7 billion remains current available for future drawdown. See also Item 5.B. "Liquidity and Capital Resources—Capital Resources."

## Environmental Programs

The Environmental Policy Basic Act, the Air Quality Preservation Act, the Water Quality Preservation Act, the Marine Pollution Prevention Act and the Waste Management Act, collectively referred in this annual report as the Environmental Acts, are the major laws of Korea that regulate atmospheric emissions, waste water, noise and other emissions from our facilities, including power generators and transmission and distribution units. Our existing facilities are currently in material compliance with the requirements of these environmental laws and international agreements, such as the United Nations Framework Convention on Climate Change, the Montreal Protocol on Substances that Deplete the Ozone Layer, the Stockholm Convention on Persistent Organic Pollutants and the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal. In order to foster coordination among us and our generation subsidiaries in respect of climate change, we and 11 of our electricity-related subsidiaries formed the CEO Coordination Committee in June 2016.

We continuously endeavor to contribute to sustainable growth (whether as an economy, a society or an ecosystem) by actively taking actions that befit our social responsibility as a corporate citizen in the energy industry. For example, in 2005, we became the first public company in Korea to join the United Nations Global Compact, an international voluntary initiative designed to hold a forum for corporations, United Nations agencies, labor and civil groups to promote reforms in economic, environmental and social policies. As part of our involvement with such initiative, we issue an annual report named the "Sustainability Report" to disclose our activities from the perspectives of economy, environment and society, in accordance with the reporting guidelines of the Global Reporting Initiative, the official collaborating center of the United Nations Environment Program that works in cooperation with United Nations Secretary General. In recognition of our efforts and achievements to reduce carbon emissions in response to global climate change, in May 2013, we obtained the Carbon Trust Standard certification issued by Carbon Trust, a British nonprofit organization with the goal of establishing a sustainable, low carbon economy. In 2015, we obtained recertification from Carbon Trust by satisfying even more rigorous evaluation criteria. We are also a participant of the Carbon Disclosure Project, an international organization that promotes transparency in informational disclosure of carbon management process, and in 2016 and 2017 we were recognized by the Carbon Disclosure Project and received honors in energy and utility sector. In 2015, 2016 and 2017, pursuant to the Dow Jones Sustainability Indices, which measures management performance in terms of contribution to sustainability, we were selected as one of the notable companies in the Asia Pacific in the global electricity utility sector. We aim to become a global leader in carbon management and reduction.

The table below sets forth the number of emission control equipment installed at thermal power plants by our generation subsidiaries as of December 31, 2017.

|  | KOSEP | KOMIPO | KOWEPO | KOSPO | EWP |
|---|---|---|---|---|---|
| Flue Gas Desulphurization System ........................ | 14 | 12 | 14 | 14 | 18 |
| Selective Non-catalytic Reduction System .................. | 1 | — | — | — | 6 |
| Selective Catalytic Reduction System ..................... | 14 | 20 | 15 | 14 | 18 |
| Electrostatic Precipitation System ......................... | 16 | 14 | 14 | 14 | 18 |
| Low NO2 Combustion System ........................... | 20 | 26 | 30 | 30 | 27 |
| Total ........................................... | 65 | 72 | 73 | 72 | 87 |

61

In accordance with the Act on Allocation and Trading of Greenhouse Gas Emission Allowances, enacted in March 2013, the Government is currently in the process of implementing a carbon emission trading system under which the Government will allocate the amount of permitted carbon emission to companies by industry and a company whose business emits more carbon than the permitted amount may purchase the right to emit more carbon through the carbon emission trading exchange. This system is expected to be implemented in three stages. During the first phase (2015 to 2017), the Government set up and made a test run of the trading system to ensure its smooth operation; during this phase, the carbon emission rights were allocated without charge. During the second phase (2018 to 2020), the system will be applied to a limited scope of industries and companies, where the carbon emission right will be allocated at a relatively low price, but not freely. During the third phase (2021 to 2025), the Government plans to run the system on an expanded scale with aggressive carbon emission reduction targets. The amount of required reduction for the second phase of 2018 to 2020 is expected to be determined by June 2018. During the third phase (2021 to 2025), the Government plans to run the system on an expanded scale with aggressive carbon emission reduction targets. In December 2016, the Government announced the Climate Change Response Initiatives and 2030 National Greenhouse Gas Reduction Roadmap, which set forth the carbon emission trading system as one of the primary means to reach the emission and greenhouse gas reduction targets of the policies. The 2030 National Greenhouse Gas Reduction Roadmap sets forth a national reduction target of greenhouse gas by 219 million tons in the aggregate, amounting to a 25.7% reduction by 2030. The roadmap also set forth reduction targets for eight domestic sectors and the first three sectors with the largest reduction targets are electricity generation, industry and buildings. Our business is classified as part of the electricity generation sector, for which greenhouse gas reduction of 64.5 million tons is requested by year 2030. We are aiming to contribute to 80% of such reduction target for the sector, while such reduction target may change pursuant to an amendment to the 2030 National Greenhouse Gas Reduction Roadmap which the Government is expected to announce in 2018. Adhering to such emission and greenhouse gas reduction requirement is expected to result in our incurring significant compliance costs.

The table below sets forth the amount of annual emission from all generating facilities of our generation subsidiaries for the periods indicated. The amount of $CO_2$ emissions may increase in the near future due to the construction of additional coal thermal power plants but is expected to decrease in the long-term, principally due to an increased use of nuclear power and renewable energy and the implementation of the carbon emission trading system.

| Year[1] | SOx (g/MWh) | NOx (g/MWh) | TSP[2] (g/MWh) | $CO_2$ (kg/MWh) |
|---|---|---|---|---|
| 2015 | 165 | 266 | 8 | 464 |
| 2016 | 156 | 246 | 7 | 477 |

Notes:

(1)  The amounts of annual emission for 2017 are expected to be determined in June 2018.
(2)  "TSP" means Total Suspended Particles.

In order to comply with the current and expected environmental standards and address related legal and social concerns, we intend to continue to install additional equipment, make related capital expenditures and undertake several environment-friendly measures to foster community goodwill. For example, under the Persistent Organic Pollutants Management Act enacted in 2007, we are required to remove polychlorinated biphenyl, or PCB, a toxin, from the insulating oil of our transformers by 2025. In addition, when constructing certain large new transmission and distribution facilities, we assess and disclose their environmental impact at the planning stage of such construction, as well as consult with local residents, environmental groups and technical experts to generate community support for such projects. We exercise additional caution in cases where such facilities are constructed near ecologically sensitive areas such as wetlands or preservation areas. We also make reasonable efforts to minimize any negative environmental impact, for example, by using more environment-friendly technology and hardware. In addition, we also undertake measures to minimize losses during the transmission and distribution process by making our power distribution network more energy-efficient in terms

62

of loss of power, as well as to lower consumption of energy, water and other natural resources. In addition, we and our subsidiaries acquired the ISO 14000 certification, an environmental management system widely adopted internationally, in 2007 and have made it a high priority to make our electricity generation and distribution more environmentally friendly. In addition to the ISO 14000 certification, we further reinforced our environmental management system by acquiring the ISO 14001 certification as well as a domestic "GMS (Green Management System), KS I 7001/7002" certification, which relates to the management of resources, energy, green house effects and social responsibilities, in 2013. In 2014, we were awarded the presidential award for environmental contributions as a corporate citizen, after scoring the highest among 102 corporations that competed for the award. In order to encourage the implementation of environment-friendly measures by other corporations and enhance environmental awareness at a social level, we have been disclosing our environment-related activities and achievements to the public through the Environment Information System managed by the Ministry of Environment since 2012.

Our environmental measures, including the use of environment-friendly but more expensive parts and equipment and allocation of capital expenditures for the installation of such facilities, may result in increased operating costs and liquidity requirement. The actual cost of installation and operation of such equipment and related liquidity requirement will depend on a variety of factors which may be beyond our control. There is no assurance that we will continue to be in material compliance with legal or social standards or requirements in the future in relation to the environment.

As part of our long-term strategic initiatives, we plan to take other measures designed to promote the generation and use of environmentally friendly, or green, energy. See Item 4.B. "Business Overview—Strategy."

Some of our generation facilities are powered by renewable energy sources, such as solar energy, wind power and hydraulic power. While such facilities are currently insignificant as a proportion of our total generation capacity or generation volume of our generation subsidiaries, we expect that the portion will increase in the future, especially since we are required to comply with the Renewable Portfolio Standard program as described below.

The following table sets forth the generation capacity and generation volume in 2017 of our generation facilities that are powered by renewable energy sources.

|  | Generation Capacity (megawatts) | Generation Volume (gigawatt-hours) |
|---|---|---|
| Hydraulic Power[1] | 651 | 1,076 |
| Wind Power | 138 | 209 |
| Solar Energy, Fuel Cells and Biogas | 682 | 2,485 |
| Subtotal | 1,471 | 3,770 |
| As percentage of total[2] | 1.8% | 0.9% |

*Notes:*

(1) Excluding generation capacity and volume of pumped storage, which is generally not classified as renewable energy.

(2) As a percentage of the total generation capacity or total generation volume, as applicable, of us and our generation subsidiaries.

In order to deal with shortage of fuel and other resources and also to comply with various environmental standards, in 2012 the Government adopted the Renewable Portfolio Standard program, which replaced the Renewable Portfolio Agreement which had been in effect from 2006 to 2011. Under this program, each of our generation subsidiaries is required to generate a specified percentage of total electricity to be generated by such generation subsidiary in a given year in the form of renewable energy or, in case of a shortfall, purchase a corresponding amount of a Renewable Energy Certificate (a form of renewable energy credit) from other

63

generation companies whose renewable energy generation surpass such percentage. The target percentage was 3.5% in 2016, 4.0% in 2017 and 5.0% in 2018 and will incrementally increase to 10.0% by 2023. Fines are to be levied on any subsidiary that fails to do so in the prescribed timeline. In 2016, all six of our generation subsidiaries met the target through renewable energy generation and/or the purchase of a Renewable Energy Certificate. Compliance by our generation subsidiaries of the 2017 target is currently under evaluation, and if any generation subsidiary is found to have failed to meet the target for 2017 or for subsequent years, such generation subsidiary may become subject to fines. We expect that any additional costs required for implementation of the Renewable Portfolio Standard program will be covered by a corresponding increase in electricity tariff. However, there is no assurance that the Government will in fact raise the electricity tariff to a level sufficient to fully cover such additional costs or at all.

As to how we plan to finance our capital expenditures related to our environmental programs, see "—Capital Investment Program."

In March 2017, the Electricity Business Act was amended to the effect that starting in June 2017, future national planning for electricity supply and demand in Korea should consider the environmental and safety impacts of such planning. However, to-date, no specific guidelines have been provided by the Government as to how to implement this provision, and it is therefore difficult to assess in advance what impact such provision will have on our business, results of operations or financial condition. However, the amendment will likely lead to the expansion of our environmental programs.

Furthermore, under the new electricity rate structure effected by the Government effective January 1, 2017, a temporary rate discount will apply in the case of investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars during 2018 to 2020.

**Community Programs**

Building goodwill with local communities is important to us in light of concerns among the local residents and civic groups in Korea regarding construction and operation of generation units, particularly nuclear generation units. The Act for Supporting the Communities Surrounding Power Plants and the Act on the Compensation and Support for Areas Adjacent to Transmission and Substation Facilities require that the generation companies and the affected local governments carry out various activities up to a certain amount annually to address neighboring community concerns. Pursuant to these Acts, we and our generation subsidiaries, in conjunction with the affected local and municipal governments, undertake various programs, including scholarships and financial assistance to low-income residents.

Under the Act for Supporting the Communities Surrounding Power Plants, activities required to be undertaken under the Act are funded partly by the Electric Power Industry Basis Fund (see "—Sales and Customers—Electricity Rates") and partly by KHNP as part of its budget. KHNP is required to make annual contributions to the affected local communities in an amount equal to Won 0.25 per kilowatt-hour of electricity generated by its nuclear generation units during the one-year period before the immediately preceding fiscal year, Won 5 million per thousand kilowatts of hydroelectric generation capacity and Won 0.5 million per thousand kilowatts of pumped-storage generation capacity. In addition, under Korean tax law, KHNP is required to pay local tax levied on its nuclear generation units in an amount equal to Won 1 (effective January 1, 2015, which reflects an increase from the previous Won 0.5 per kilowatt-hour of their generation volume in the affected areas) and Won 2 per 10 cubic meters of water used for hydroelectric generation.

The Act on the Compensation and Support for Areas Adjacent to Transmission and Substation Facilities, enacted in January 2014 with effect from July 2014, prescribes measures to be taken by power generation or transmission companies with respect to the communities adjacent to transmission and substation facilities. Under this Act, those who own land or houses in the vicinity of transmission lines and substation may claim compensation for damages or compel purchase of such properties by the power generation or transmission

64

companies which are legally obligated in principle to pay for such damages or purchase such properties. In addition, under this Act, residents of communities adjacent to transmission and substation facilities are entitled to subsidies on electricity tariff as well as support for a variety of welfare projects and collective business ventures.

Prior to the construction of a generation unit, our generation subsidiaries perform an environmental impact assessment which is designed to evaluate public hazards, damage to the environment and concerns of local residents. A report reflecting this evaluation and proposing measures to address the problems identified must be submitted to and approved by the Ministry of Trade, Industry and Energy following agreement with related administrative bodies, including the Ministry of Environment prior to the construction of the unit. Our generation subsidiaries are then required to implement the measures reflected in the approved report. Despite these activities, civic community groups may still oppose the construction and operation of generation units (including nuclear units), and such opposition could adversely impact our construction plans for generation units (including nuclear units) and have a material adverse effect on our business, results of operations and cash flow.

Upon relocation of our corporate headquarters in November 2014, we developed and established Bitgaram Energy Valley as a smart energy hub city in Gwangju and Jeollanamdo, to attract and facilitate the growth of start-ups and research institutions related to new energy industries while contributing to the local economy, balanced regional development and job creation. To achieve this goal, we provide funding, business networks and research and development assistance to companies which entered into investment contracts with us. As of March 31, 2018, we had signed agreements with 280 companies relating to investments in the Bitgaram Energy Valley, and we currently aim to increase the total number of companies investing in the Bitgaram Energy Valley to 350 companies by the end of 2018 and 500 companies by the end of 2020.

**Nuclear Safety**

KHNP takes nuclear safety as its top priority and continues to focus on ensuring the safe and reliable operation of nuclear power plants. KHNP also focuses on enhancing corporate ethics and transparency in the operation of its plants.

KHNP has a corporate code of ethics and is firmly committed to enhancing nuclear safety, developing new technologies and improving transparency. KHNP has also established the "Statement of Safety Policy for Nuclear Power Plants" to ensure the highest level of nuclear safety. Furthermore, KHNP invests approximately 5% of its total annual sales into research and development for the enhancement of nuclear safety and operational performance.

KHNP implements comprehensive programs to monitor, ensure and improve safety of nuclear power plants. In order to enhance nuclear safety through risk-informed assessment, KHNP conducts probabilistic safety assessments, including for low power-shutdown states, for all its nuclear power plants. In order to systematically verify nuclear safety and identify the potential areas for safety improvements, KHNP performs periodic safety reviews on a 10-year frequency basis for all its operating units. These reviews have been completed for Kori #1, Hanbit #5 and #6, Hanul #1, #2, #3 and #4 and Wolsong #1, #3 and #4. Reviews for Kori #2, #3 and #4, Hanbit #1, #2, #3 and #4, Hanul #5 and #6 and Wolsong #2 are in progress. In order to enhance nuclear safety and plant performance, KHNP has established a maintenance effectiveness monitoring program based on the maintenance rules issued by the United States Nuclear Regulatory Commission, which covers all of KHNP's nuclear power plants in commercial operation.

KHNP has developed the Risk Monitoring System for operating nuclear power plants, which it implements in all of its nuclear power plants. The Risk Monitoring System is intended to help ensure nuclear plant safety. In addition, KHNP has developed and implemented the Severe Accident Management Guidelines and is developing the Severe Accident Management Guidelines for Low Power-Shutdown States in order to manage severe accidents for all of its nuclear power plants.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

KHNP conducts various activities to enhance nuclear safety such as quality assurance audits and reviews by the KHNP Nuclear Review. KHNP maintains a close relationship with international nuclear organizations in order to enhance nuclear safety. In particular, KHNP invites international safety review teams such as the World Association of Nuclear Operators ("WANO") Peer Review Team and the Expert Mission Team to its nuclear plants for purposes of meeting international standards for independent review of its facilities. KHNP actively exchanges relevant operational information and technical expertise with its peers in other countries. For example, KHNP conducted seven WANO Peer Reviews for Wolsong #3 and #4 in 2017. KHNP also invited WANO Follow-up Peer Review Team at Hanbit #1, #2, #3, #4, #5 and #6, Kori #1, #2, #3 and #4, Shin-Wolsong #1 and #2 in 2017. The recommendations and findings from this event were shared with KHNP's other nuclear plants to implement improvements at such plants.

The average level of radiation dose per unit amounted to a relatively low level of 0.30 man-Sv in 2017, which was substantially lower than the global average of 0.63 man-Sv/year in 2017 as reported in the WANO performance indicator report.

In response to the damage to the nuclear facilities in Japan as a result of the tsunami and earthquake in March 2011, the Government conducted additional safety inspections on nuclear power plants by a group of experts from governmental authorities, civic groups and academia. As a result of such inspections, the Government required KHNP to perform 50 comprehensive safety improvement measures. The Government also established the Nuclear Safety & Security Commission in October 2011 for neutral and independent safety appraisals. KHNP developed ten additional measures through benchmarking of overseas cases and internal analysis of current operations. As of December 31, 2017, KHNP has completed implementation of all such measures.

From time to time, our nuclear generation units may experience unexpected shutdowns. For example, on September 12, 2016, multiple earthquakes including a magnitude 5.8 earthquake hit the city of Gyeongju, a home to KHNP's headquarters and Wolsong Nuclear Power Plant. Although there was no material safety issues, KHNP had manually stopped the operations of Wolsong Nuclear Power Plant units #1, 2, 3, and 4 according to the safety guidelines. All units have resumed their operations on December 5, 2016, with the approval by the Nuclear Power Safety Commission. KHNP continues to implement measures to improve the safety by reinforcing seismic capability of its core facilities and performing stress tests across all its nuclear power plants. In 2017, KHNP finished the implementation of such measures for 21 units and enhanced seismic design of the core facilities to withstand a magnitude 7.0 earthquake (6.5 before implementation). Implementation of such measures for the remaining 3 units are expected to be finished in 2018. As for the units under construction (Shin-Kori#5 and #6), the core facilities will be able to withstand a magnitude 7.4 earthquake.

Low and intermediate level waste, or LILW, and spent fuels are stored in temporary storage facilities at each nuclear site of KHNP. The temporary LILW storage facilities at the nuclear sites had been sufficient to accommodate all LILWs produced up to 2015. Korea Radioactive Waste Agency ("KORAD") completed the construction of a LILW disposal facility in the city of Gyeongju, and government approval for its operations was obtained in December 2014.

In order to increase the storage capacity of temporary storage facilities for spent fuels, KHNP has been pursuing various projects, such as installing high-density racks in spent fuel pools and building dry storage facilities. Through these activities, we expect that the storage capacity for spent fuels in all nuclear sites will be sufficient to accommodate all the spent fuels produced by 2018. The policy for spent fuel management options is currently under development.

In 2009, the Radioactive Waste Management Act ("RWMA") was enacted in order to centralize management of the disposal of spent fuel and LILW and enhance the security and efficiency of related management processes. The RWMA designates KORAD to manage the disposal of spent fuels and LILW. Pursuant to the RWMA, the Government has established the Radioactive Waste Management Fund. The

66

management expense for LILW is paid when LILW is transferred to KORAD, and the charge for spent fuel is paid based on the quantity generated every quarter. LILW-related management costs and charges for spent fuel are reviewed by the Ministry of Trade, Industry and Energy every two years. In December 2017, after the review by the committee composed of Government officials, KHNP, Korea Radioactive Waste Management Corporation and experts in finance and accounting, LILW-related management costs were increased while charges for spent-fuel remained the same. The change in LILW-related management costs caused an increase in KHNP's expenses relating to radioactive waste.

All of KHNP's nuclear plants are currently in compliance with Korean law and regulations and the safety standards of the IAEA in all material respects. For a description of certain past incidents relating to quality assurance in respect of KHNP, see Item 3.D. "Risk Factors—Our risk management policies and procedures may not be fully effective at all times."

## Decommissioning

Decommissioning of a nuclear power unit is the process whereby the unit is shut down at the end of its life, the fuel is removed and the unit is eventually dismantled. KHNP implements a dismantling policy under which dismantling would take place five to ten years after the unit's closure. KHNP renewed the operating license of Kori #1, the first nuclear power plant constructed in Korea, which commenced operation in 1978, for an additional ten years in 2007. At the recommendation of the Ministry of Trade, Industry and Energy, KHNP has decided not to renew the operating license of Kori #1 and the initial phase of decommissioning (namely, safety inspection and removal of spent fuels) of Kori #1 has begun after its permanent shutdown in June 2017. In February 2015, KHNP also renewed the operation license of Wolsong #1 (which originally expired in November 2012) for an additional ten years until 2022. In June 2015, reactivation of Wolsong #1 was approved by the NSSC after periodic inspection. However, a civic group has since then brought a lawsuit to reverse such approval, and in February 2017, a lower court ruled to annul the NSSC's approval, which ruling has since been appealed. At present, the outcome of this litigation remains uncertain. It is also reported that by the first half of 2018, the Government will announce the timing for the shutdown of the Wolsong #1 unit. As of December 31, 2017, The book value of property, plant and equipment and provision for decommissioning costs of Wolsong #1 unit is Won 608 billion and Won 642 billion, respectively. If Wolsong #1 unit is prohibited from operation, we may incur significant losses in connection with the property, plant and equipment of Wolsong #1 unit. In addition, the amount of provision for decommissioning expenses may increase significantly, and the timing of actual cash outflows may be accelerated. KHNP retains full financial and operational responsibility for decommissioning its units.

KHNP has accumulated decommissioning costs as a liability since 1983. The decommissioning costs of nuclear facilities are defined by the Radioactive-Waste Management Act, which requires KHNP to credit annual appropriations separately. These costs are estimated based on studies conducted by the relevant committees, and are reviewed by the Ministry of Trade, Industry and Energy every two years. In 2017, due to decreased actual discount rates and the increased decommissioning cost per unit, the total amount of allowances increased as of December 31, 2017, and, as a result, KHNP was required to accrue Won 15,864 billion for the costs of dismantling and decontaminating existing nuclear power plants as of December 31, 2017, which consisted of dismantling costs of nuclear plants of Won 13,007 billion and dismantling costs of spent fuel and radioactive waste of Won 2,856 billion. For accounting treatment of decommissioning costs, see Item 5.A. "Operating Results—Critical Accounting Policies—Decommissioning Costs."

## Overseas Activities

We are engaged in a number of overseas activities. We believe that such activities help us diversify our revenue streams by leveraging the operational experience of us and our subsidiaries gathered from providing a full range of services, such as power plant construction and specialized engineering and maintenance services in Korea, as well as establishing strategic relationships with countries that are or may become providers of fuels.

Throughout the years, we have sought to expand our project portfolio to include the construction and operation of conventional thermal generation units, nuclear generation units and renewable energy power plants, transmission and distribution and mining and development of fuel sources. While strategically important, we believe that our overseas activities, as currently being conducted, are not in the aggregate significant in terms of scope or amount compared to our domestic activities. In addition, a number of the overseas contracts currently being pursued are based on non-binding memoranda of understanding and the details of such projects may significantly change during the course of negotiating the definitive agreements.

Below is a description of our major overseas projects.

### Generation projects

#### Nuclear Generation Project

In December 2009, following an international open bidding process, we entered into a prime contract for the original contract amount of US$18.6 billion with the Emirates Nuclear Energy Corporation (the "ENEC"), a state-owned nuclear energy provider of the United Arab Emirates ("UAE"), to design and construct four civil nuclear power generation units to be located in Barakah, a region approximately 270 kilometers from Abu Dhabi, for the UAE's peaceful nuclear energy program. Under the contract, we and our subcontractors, some of which are our subsidiaries, are to perform various duties including, among others, designing and constructing four nuclear power generation units each with a capacity of 1,400 megawatts, supplying nuclear fuel for three fuel cycles including initial loading, with each cycle currently projected to last for approximately 18 months, and providing technical support, training and education related to plant operation. In connection with the parties' execution of an amendment to the prime contract, the target completion dates for the four units were amended to range between December 2018 and December 2020.

On October 20, 2016, in order to foster a long-term strategic partnership and stable management of the units post-construction we entered into an investment agreement with ENEC to jointly establish Barakah One PJSC, a special purpose company which will oversee the operation and management of the nuclear power plant currently being constructed in Barakah, United Arab Emirates. Barakah One PJSC will be capitalized with loans in the amount of US$19.6 billion and equity of US$4.7 billion. We have a 18% equity interest in Barakah One PJSC, which will oversee the project. We also have a 18% equity interest in Nawah Energy, a subsidiary of ENEC, which will also be responsible for the operation and maintenance of the Barakah nuclear power plant.

#### Non-nuclear Generation Projects

We are currently engaged in three major power projects in the Philippines: (i) a "build, operate and transfer" of a 1,200-megawatt combined-cycle power plant project in Ilijan, construction of which began in November 1997 and was completed in June 2002 and which is being operated by us until 2022 (the project cost of the Ilijan project was US$721 million, for which project finance on a limited recourse basis was provided), (ii) ownership of a 39.6% equity interest in SPC Power Corporation, an independent power producer which owns a 107.8-megawatt diesel power plant and a 39.6% equity interest in two distribution companies in the Philippines, and (iii) a "build, operate and own" of a 200-megawatt CFBC coal power plant in Cebu for which construction began in February 2008 and was completed in May 2011, followed by operation thereof until 2036. The project cost of the Cebu project was US$451 million, for which project financing on a limited recourse basis was provided.

In April 2007, we formed a limited partnership with Shanxi International Electricity Group and Deutsche Bank in China to develop and operate power projects and coal mines in Shanxi province, China, which was approved by the Chinese government. The total capital investment in these projects amounted to US$1.33 billion, of which our capital investment was US$450 million. We are expected to participate in the operation of the project for a period of 50 years ending 2057. The total installed capacity of these projects is 6,532 megawatts and capacity under construction was 2,603 megawatts, and our equity interest in the partnership was 34%.

68

In October 2007, we invested US$9.1 million in KEPCO Energy Resource Nigeria Ltd. ("KERNL"), a joint venture with Energy Resource Ltd., a Nigerian company. In May 2007, KERNL entered into a share purchase agreement with the Nigerian government for the purchase of 70% of the equity capital of Egbin Power Plc in Nigeria, which owns and operates the Egbin power plant, a 1,320-megawatt gas-fired power plant in Lagos, Nigeria for a consideration of approximately US$407 million. The acquisition was completed in October 2013, and in June 2013, we entered into a contract with Egbin Power Plc for the operation and maintenance of the Egbin power plant. The contract price was US$315 million and we provided operation and maintenance services to Egbin Power Plc between November 2013 and February 2016. The contract with Egbin Power Plc was terminated in December 2017 due to a force majeure event.

In July 2008, a consortium consisting of us and Xenel of Saudi Arabia won the bid to "build, own and operate" a gas-fired power plant with installed capacity of 373 megawatts in Al Qatrana, near Amman, and we entered into definitive agreements in October 2009. Construction of this project was completed in December 2011, and the plant is currently in operation and will be operated until 2035. The total project cost was US$461 million, of which the consortium made an equity contribution of US$143 million and the remainder was funded with debt financing. We and Xenel own 80:20 equity interests in the project, respectively.

In December 2008, we formed a consortium with ACWA Power International of Saudi Arabia and submitted a bid for the 1,204 megawatt oil-fired power project in Rabigh, Saudi Arabia. In March 2009, we were selected as the preferred bidder, and in July 2009, we entered into a power purchase agreement with Saudi Electricity Company. Construction of the project was completed in April 2013, and we will participate in the operation of the plant for 20 years. The total project cost was approximately US$2.5 billion. We currently hold a 40.0% equity interest in the joint venture entity, Rabigh Electricity Company, which operates the project.

In August 2010, a consortium led by us was selected as the preferred bidder in an international auction for the construction and operation of the Norte II gas-fueled combined-cycle electricity generation facility in Chihuahua, Mexico, as ordered by the Commission Federal de Electricidad ("CFE") of Mexico. The consortium established a special purpose vehicle, KST Electric Power Company ("KST"), to act as the operating entity, and in September 2010, KST entered into a power purchase agreement with CFE in relation to the construction and operation of a 433-megawatt combined-cycle power plant at Chihuahua in Mexico. In October 2010, KST was licensed by the Mexican government as an independent power producer, which allows it to produce and sell electricity to CFE during the specified contract period. The project will be undertaken on a "build, own and operate" basis. The total cost of the project is approximately US$430 million. We hold a 56% equity interest in the consortium, with the remaining equity interests held by Samsung C&T (with a 34% equity interest) and Techint, a Mexico company (with a 10% equity interest). Approximately 22.5% of the total project costs is being financed through equity investments by the consortium and the remaining 77.5% through project financing. Commercial operation commenced in December 2013, and the operation period will run for 25 years until 2038. Our wholly-owned subsidiary, KEPCO Energy Service Company, currently manages the operation of the project.

In October 2010, a consortium including us was selected by Abu Dhabi Water & Electricity Authority ("ADWEA"), a state-run utilities provider in the UAE, as the preferred bidder in an international bidding for the construction and operation of the combined-cycle natural gas-fired electricity generation facilities in Shuweihat, UAE with aggregate capacity of 1,600 megawatts. Construction was completed in July 2014 and we will participate in the operation of the plant until 2039. The total project cost was approximately US$1.4 billion, of which 20% was financed through equity investments by the consortium members and the remaining 80% through debt financing. Equity interests in the consortium are owned by ADWEA (60.0%), Sumitomo (20.4%) and us (19.6%). The total amount of our equity investment in the project is approximately US$56 million.

In January 2012, a consortium consisting of us, Mitsubishi Corporation and Wartsila Development & Financial Services of Finland was selected by National Electric Power Corporation, a state-run electricity

69

provider in Jordan, to construct and operate a diesel engine power project in Almanakher with an expected total generation capacity of 573 megawatts. Construction of this project was completed in October 2014 and the plant is currently in operation and will be operated until 2039. The total project cost was approximately US$760 million, of which the consortium made an equity contribution of approximately US$190 million and the remainder was funded with debt financing. We, Mitsubishi Corporation and Wartsila Development & Financial Services own 60:35:5 equity interests in the project, respectively. Our equity investment in this project is US$104 million.

In March 2013, a consortium consisting of us and Marubeni, a Japanese corporation, was selected by the Ministry of Industry and Trade of Vietnam for the construction and operation of a 1,200 megawatt coal-fired power plant in Thanh Hoa province, Vietnam. We plan to commence construction in June 2018 with target completion by June 2022, followed by operation for 25 years. The total project cost is expected to be US$2.51 billion, of which 25% will be funded by equity contribution and the remaining 75% by debt financing. The share capital of the special purpose entity in charge of this project is US$590 million, and we and Marubeni each hold 50% equity interest in such entity.

On October 6, 2016, a consortium comprised of us, Marubeni Corporation and four local entities, with equity interest in the consortium of 24.5%, 24.5% and 51.0%, respectively, was notified that it has been selected by the Republic of South Africa Department of Energy as the preferred bidder for the construction and operation project of a coal-fired power plant in the Republic of South Africa. Once negotiations and financing arrangements are completed, the construction of the coal-fired power plant is expected to commence. The plant is expected to have an aggregate capacity of 630 megawatts, and construction is expected to take 52 months beginning in November 2018. The consortium plans to participate in the operation of the plant for a period of 30 years ending 2053. The total cost of the project is estimated to be around US$2.14 billion, of which our total capital investment is expected to be approximately US$133 million. In connection with the project, we plan to establish a holding company and a project company in the Republic of South Africa.

On September 28, 2017, we entered into a joint development agreement with Tadmax Resources Bhd, a Malaysian corporation, in relation to a gas-fired power plant with capacity of 1,200 megawatts in Pulau Indah, Malaysia. We obtained approval for this project from Malaysian Energy Commission, the project sponsor. We will hold a 25% equity interest in this project, and Tadmax Resources Bhd will hold a 75% equity interest in it. The total project cost is expected to be approximately US$1 billion, and we expect to invest approximately US$50 million for the equity interest. Upon closing of the financing, the construction for this project will begin in the fourth quarter of 2019, following the approval of the applicable tariff rates by the Malaysian Energy Commission, which is currently expected to occur in the fourth quarter of 2018. This project marks our first entry into the Malaysian power generation market. We expect to enter into a power purchase agreement with Tenaga Nasional Berhad for a term of 21 years, with a goal of generating a stable revenue stream from this project.

### Exploration and Production Projects

In order to secure a more reliable supply of fuel for power generation and hedge against fluctuations in fuel price, from 2007 to 2016, we pursued overseas exploration and production projects, including five bituminous coal projects and five uranium projects involving investments of approximately Won 1.6 trillion. However, pursuant to the Government's Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced in June 2016, as of December 31, 2016, except for the Bylong project described below, we transferred all our assets and liabilities for our overseas resource business to our six generation subsidiaries, which are the end-consumers of fuels and are therefore expected to more responsively manage these projects. The amount of net assets that we transferred to our generation subsidiaries as of December 31, 2016 was Won 622 billion.

Some of the assets transferred include our equity interest in PT Adaro Energy TBK, which is one of the largest coal producers in Indonesia, as well as our 20% equity interest in PT. Bayan Resources Tbk pursuant to which we were entitled to an off-take of 7 million tons per year beginning in 2015.

70

One exception to the transfers on such date was our 90% equity interest in KEPCO Bylong Pty Ltd., for which we are currently processing a development permit from the New South Wales government and commercial production is scheduled to commence in 2019. We transferred 10% of our equity interest in the Bylong project to our five non-nuclear generation subsidiaries as of December 31, 2016, and we plan to gradually transfer the remainder of our interest in the Bylong project to them subject to the progress of the regulatory approval process and resource development phase of the project.

Our nuclear generation subsidiary, KHNP, is also pursuing development projects for procurements of uranium in countries including Canada, the United States and Niger.

### Renewable Energy Projects

Our overseas renewable energy projects include the generation of electricity through renewable energy sources.

Since 2005, joint ventures between us and China Datang Corporation of the People's Republic of China have built and operated a number of wind farms in Inner Mongolia, Liaoning and Gansu provinces. We own 40% of these joint ventures, whose equity in the aggregate amount is approximately US$600 million. The projects are funded one-third by equity contributions and two-thirds by debt financing. As of December 31, 2017, the joint venture operated 22 wind farms with a total capacity of 1,017 megawatts and added 7-megawatt photovoltaic power station to the grid.

In December 2015, we entered into an agreement with the Ministry of Energy and Mineral Resources of Jordan to build, own and operate a wind farm with installed capacity of 89.1 megawatts in Fujeij, Ma'an, Jordan. Construction is currently underway with commercial operations expected to commence in October 2018. Total project cost is approximately US$184 million, of which 40% will be financed through equity investments by us and the remaining 60% through debt financing. We believe that this project will help us to further diversify our business portfolio in the Middle East from the existing focus on nuclear and thermal power plants to expand to renewable energy facilities.

In June 2015, we entered into a memorandum of understanding with Energy Product, a Japanese local developer, to build, own and operate photovoltaic power station with a capacity of 28 megawatts, together with a 13.7 megawatts-hour energy storage system, in Chitose, Hokkaido prefecture in Japan. The parties subsequently signed the joint development agreement and other definitive agreements. The power station, in which we own 80.1% interest, started commercial operation in July 2017. Total project cost is approximately JPY 11.3 billion, of which 20% was financed through 80:20 equity investments by us and EP. The remaining 80% is funded through debt financing.

In August 2016, we entered into a Purchase and Sale Agreement with Cogentrix Solar Holdings to operate a photovoltaic power station in Colorado, United States, with a capacity of 30 megawatts for 25 years. Total project cost is approximately US$85 million, of which 50.1% was financed through 50.1:49.9 equity investments by us and a private equity fund formed by us and National Pension Service. It was our first foray into the North American power market.

In June 2017, a consortium between us and LG CNS Co., Ltd. won a project to build, own and operate a photovoltaic power station in Guam, United States, with a capacity of 60 megawatts for 25 years, including 32 megawatts-hour energy storage system. The total project cost is approximately US$200 million, of which 23% will be financed through equity investment by us and LG CNS Co., Ltd., each holding 70% and 30% of equity interests, respectively, and the remaining 77% will be funded through debt financing. The consortium is expected to enter into a definite agreement with Guam Power Authority in the first half of 2018 and the construction of the project is expected to start by the second half of 2018. It is expected the power station will begin commercial operation by April 2021.

71

Although renewable energy projects are currently insignificant as a proportion of our total overseas activities and our generation activities, we expect the portion of renewable energy projects to increase in the future as we seek to penetrate the overseas renewable energy market, diversify our businesses and actively address climate change. We expect to further diversify our business in the renewable energy sector to also include smart transmission and distribution facilities, smart grids and utilization of new energy related technologies.

## North Korea

### Kaesong Complex

Since 2005, we have provided electricity to the industrial complex located in Kaesong, North Korea, which was established pursuant to an agreement made during the summit meeting of the two Koreas in June 2000. The Kaesong complex is the largest economic project between the two Koreas and is designed to combine the Republic's capital and entrepreneurial expertise with the availability of land and labor of North Korea. In March 2005, we built a 22.9 kilovolt distribution line from Munsan substation in Paju, Gyeonggi Province to the Kaesong complex and became the first to supply electricity to pilot zones such as ShinWon Ebenezer. In April 2006, we started to construct a 154 kilovolt, 16 kilometer transmission line connecting Munsan substation to the Kaesong complex as well as Pyunghwa substation in the complex and began operations in May 2007.

At the end of 2015, we supplied electricity to 254 units, including administrative agencies, support facilities and resident corporations, using a tariff structure identical to that of South Korea. However, we suspended power transmission to the Kaesong Industrial Complex since February 11, 2016 following the Government's decision to halt operations of the industrial complex to impede North Korea's utilization of funds from the industrial complex to finance its nuclear and missile programs. As of December 31, 2017, the book value of our facility located at the complex was Won 19 billion. For the year ended December 31, 2017, the amount of trade receivables from the companies residing in Kaesong complex was Won 3 billion. It is currently uncertain if we can secure the property rights for our facility in the Kaesong complex. No assurance can be given that we will not experience any material losses as a result of the suspension of this project or failure of the project as a result of a breakdown or escalation of hostilities in the relationship between the Republic and North Korea. See Item 3.D. "Risk Factors—Risks Relating to Korea and the Global Economy—Tensions with North Korea could have an adverse effect on us and the market value of our shares."

## Insurance

We and our generation subsidiaries carry insurance covering against certain risks, including fire, in respect of key assets, including buildings, equipment, machinery, construction-in-progress and procurement in transit, as well as, in the case of us, directors' and officers' liability insurance. We and our generation subsidiaries maintain casualty and liability insurance against risks related to our business to the extent we consider appropriate. Other than KHNP, neither we nor our generation subsidiaries separately insure against terrorist attacks. These insurance and indemnity policies, however, cover only a portion of the assets that we own and operate and do not cover all types or amounts of loss that could arise in connection with the ownership and operation of these assets.

Substantial liability may result from the operations of our nuclear generation units, the use and handling of nuclear fuel and possible radioactive emissions associated with such nuclear fuel. KHNP maintains property and liability insurance against risks of its business to the extent required by the related law and regulations or considered as appropriate and otherwise self-insures against such risks. KHNP carries insurance for its generation units against certain risks, including property damage, nuclear fuel transportation and liability insurance for personal injury and property damage. KHNP carries property damage insurance covering up to US$1 billion per accident for all properties within its plant complexes, which includes property insurance coverage for acts of terrorism up to US$300 million and for breakdown of machinery up to US$300 million. In addition to the insurance on operating nuclear power generation units, KHNP has construction insurance for

72

Shin-Kori #4, #5 and #6 and Shin-Hanul #1 and #2. KHNP maintains nuclear liability insurance for personal injury and third-party property damage for coverage of up to 300 million Special Drawing Rights, or SDRs, which amounts to approximately US$435 million, at the rate of 1 SDR = US$1.450660 as posted on the Internet homepage of the International Monetary Fund on April 9, 2018 per plant complex, for a total coverage of 1.5 billion SDRs. KHNP is also the beneficiary of a Government indemnity with respect to such risks for damage claims of up to Won 300 million SDRs per nuclear plant complex, for a total coverage of 1.5 billion SDRs. Under the Nuclear Damage Compensation Act of 1969, as amended, KHNP is liable only up to 300 million SDRs, per single accident per plant complex; provided that such limitation will not apply where KHNP intentionally causes harm or knowingly fails to prevent the harm from occurring. KHNP will receive the Government's support, subject to the approval of the National Assembly, if (i) the damages exceed the insurance coverage amount of 300 million SDRs and (ii) the Government deems such support to be necessary for the purposes of protecting damaged persons and supporting the development of nuclear energy business. KHNP carries insurance for its generation units and nuclear fuel transportation, and we believe that the level of insurance is generally adequate and is in compliance with relevant laws and regulations. In addition, KHNP is the beneficiary of Government indemnity which covers a portion of liability in excess of the insurance. However, such insurance is limited in terms of amount and scope of coverage and does not cover all types or amounts of losses which could arise in connection with the ownership and operation of nuclear plants. Accordingly, material adverse financial consequences could result from a serious accident or a natural disaster to the extent it is neither insured nor covered by the government indemnity. See Item 3.D. "Risk Factors—Risks Relating to KEPCO— The amount and scope of coverage of our insurance are limited."

## Competition

As of December 31, 2017, we and our generation subsidiaries owned approximately 70.3% of the total electricity generation capacity in Korea (excluding plants generating electricity for private or emergency use). New entrants to the electricity business will erode our market share and create significant competition, which could have a material adverse impact on our financial condition and results of operations.

In particular, we compete with independent power producers with respect to electricity generation. The independent power producers accounted for 22.9% of total power generation in 2017 and 29.7% of total generation capacity as of December 31, 2017. As of December 31, 2017, there were 17 independent power producers in Korea, excluding renewable energy producers. Private enterprises became permitted to own and operate coal-fired power plants in Korea only after the Ministry of Trade, Industry and Energy approved plans for independent power producers to construct coal-fired power plants under the Sixth Basic Plan announced in February 2013. Under the Eighth Basic Plan announced in December 2017, six coal-fired units under construction with aggregate generation capacity of 6,260 megawatts are scheduled to be completed between 2021 and 2022. While it remains to be seen whether construction of these generation units will be completed as scheduled, if these units were to be completed as scheduled and/or independent power producers are permitted to build additional generation capacity (whether coal-fired or not), our market share in Korea may decrease, which may have a material adverse effect on our results of operations and financial condition.

In addition, under the Community Energy System adopted by the Government in 2004, a minimal amount of electricity is supplied directly to consumers on a localized basis by independent power producers outside the cost-based pool system used by our generation subsidiaries and most independent power producers to distribute electricity nationwide. The purpose of this system is to geographically decentralize electricity supply and thereby reduce transmission losses and improve the efficiency of energy use. These entities do not supply electricity on a national level but are licensed to supply electricity on a limited basis to their respective districts under the Community Energy System. As of March 31, 2018, the aggregate generation capacity of suppliers participating in the Community Energy System amounted to less than 1% of that of our generation subsidiaries in the aggregate. We currently do not expect the Community Energy System to be widely adopted, especially in light of the significant level of capital expenditure required for such direct supply. However, if the Community Energy System is widely adopted, it may erode our currently dominant market position in the generation and distribution

of electricity in Korea and may have a material adverse effect on our business, results of operations and financial condition.

Our market dominance in the electricity distribution in Korea also may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows.

The electric power industry, which began its liberalization process with the establishment of our power generation subsidiaries in April 2001, may become further liberalized in accordance with the Restructuring Plan. See Item 4.B. "Business Overview—Restructuring of the Electric Power Industry in Korea."

In the residential sector, consumers may use natural gas, oil and coal for space and water heating and cooking. However, currently there is no practical substitute for electricity for lighting and other household appliances, which is available on commercially affordable terms.

In the commercial sector, electricity is the dominant energy source for lighting, office equipment and air conditioning. For its other uses, such as space and water heating, natural gas and, to a lesser extent, oil, provide competitive alternatives to electricity.

In the industrial sector, electricity is the dominant energy source for a number of industrial applications, including lighting and power for many types of industrial machinery and processes that are available on commercially affordable terms. For other uses, such as heating, electricity competes with oil and natural gas and potentially with gas-fired combined heating and power plants.

**Regulation**

We are a statutory juridical corporation established under the KEPCO Act for the purpose of ensuring a stable supply of electric power and further contributing toward the sound development of the national economy through facilitating development of electric power resources and carrying out proper and effective operation of the electricity business. The KEPCO Act (including the amendment thereto) prescribes that we engage in the following activities:

1. development of electric power resources;

2. generation, transmission, transformation and distribution of electricity and other related business activities;

3. research and development of technology related to the businesses mentioned in items 1 and 2;

4. overseas businesses related to the businesses mentioned in items 1 through 3;

5. investments or contributions related to the businesses mentioned in items 1 through 4;

6. businesses incidental to items 1 through 5;

7. Development and operation of certain real estate held by us to the extent that:

   a. it is necessary to develop certain real estate held by us due to external factors, such as relocation, consolidation, conversion to indoor or underground facilities or deterioration of our substation or office; or

74

b.  it is necessary to develop certain real estate held by us to accommodate development of relevant real estate due to such real estate being incorporated into or being adjacent to an area under planned urban development; and

8.  other activities entrusted by the Government.

The KEPCO Act currently requires that our profits be applied in the following order of priority:

- first, to make up any accumulated deficit;

- second, to set aside 20.0% or more of profits as a legal reserve until the accumulated reserve reaches one-half of our capital;

- third, to pay dividends to shareholders;

- fourth, to set aside a reserve for expansion of our business;

- fifth, to set aside a voluntary reserve for the equalization of dividends; and

- sixth, to carry forward surplus profit.

As of December 31, 2017, the legal reserve was Won 1,605 billion and the voluntary reserve was Won 34,834 billion, which consisted of reserve for business expansion of Won 29,017 billion, reserve for investment in social overhead capital of Won 5,277 billion, reserve for research and human development of Won 330 billion and reserve for equalizing dividends of Won 210 billion.

We are under the supervision of the Ministry of Trade, Industry and Energy, which has principal supervisory responsibility (in consultation with other Government agencies, such as the Ministry of Strategy and Finance, as applicable) over us with respect to the appointments of our directors and our other senior management as well as approval of electricity tariff rate adjustments, among others.

Because the Government owns part of our capital stock, the Government's Board of Audit and Inspection may audit our books.

The Electricity Business Act requires that licenses be obtained in relation to generation, transmission, distribution and sales of electricity, with limited exceptions. We hold the license to generate, transmit, distribute and sell electricity. Each of our six generation subsidiaries holds an electricity generation license. The Electricity Business Act governs the formulation and approval of electricity rates in Korea. See "—Sales and Customers—Electricity Rates" above.

Our operations are subject to various laws and regulations relating to environmental protection and safety.

**Debt Reduction Program and Related Activities**

In 2014, in light of the general policy guideline of the Government for public institutions (including us and our generation subsidiaries) to reduce their respective overall debt levels, we and our generation subsidiaries have, in consultation with the Ministry of Trade, Industry and Energy and as approved by the Public Agencies Operating Committee in June 2014, previously set for 2017 target debt-to-equity levels and undertook various programs to reduce debt and improve the overall financial health, including through rationalizing and applying stricter review to (from a profitability and efficiency perspective) various aspects of our operations (both domestic and overseas), inviting private sector investments, disposing of non-core assets (such as non-core or loss-generating overseas operations and real property unrelated to operations), reducing costs, exploring alternative ways to generate additional revenue and developing contingency plans for further cost savings. Such debt-reduction initiatives ended at the end of 2017 as initially planned. However, we plan to continue carry out similar initiatives to manage our level of debt.

75

The following table summarizes the debt-to-equity ratio targets for 2017 and some of the actions that we and our generation subsidiaries undertook as part of such debt reduction program.

| Entity | Target Debt-to-Equity Level[1] | Actual Debt-to-Equity Level[1] | Other Related Activities |
|---|---|---|---|
| KEPCO | 96% by 2017 | 89.9% as of December 31, 2016; 91.0% as of December 31, 2017 | - Sale of non-core assets (real property) unrelated to operations<br>- Sale of its overseas resource development assets to its generation subsidiaries |
| KHNP | 117% by 2017 | 108% as of December 31, 2016; 114% as of December 31, 2017 | - Stricter review of new business projects<br>- Rationalization of the procurement process and other budget reduction efforts |
| EWP | 99% by 2017 | 101% as of December 31, 2016; 92.8% as of December 31, 2017 | - Proposed sale of shares in GS Donghae Electric Power Co., Ltd. and six other domestic and overseas companies |
| KOMIPO | 167% by 2017 | 152% as of December 31, 2016; 168% as of December 31, 2017 | - Construction project coordination<br>- Cost savings and other efficiency improvement efforts |
| KOSEP | 110% by 2017 | 101% as of December 31, 2016; 99.9% as of December 31, 2017 | - Cost savings and budget reduction efforts<br>- Discovering new business profit models |
| KOSPO | 139% by 2017 | 139% as of December 31, 2016; 135% as of December 31, 2017 | - Proposed sale of shares in domestic business that yield no revenues |
| KOWEPO | 149% by 2017 | 150% as of December 31, 2016; 148% as of December 31, 2017 | - Proposed sale of equity interests in Dongducheon Dream Power<br>- Obtaining private sector investment in Pyeongtaek combined cycle #3<br>- Accelerated construction of generation units |

_____

*Note:*

(1) Computed on a separate basis for KEPCO, EWP, and KOSPO.

Despite our best efforts, however, for reasons beyond our control, including macroeconomic environments, government regulations and market forces (such as international market prices for our fuels), we cannot assure whether we or our generation subsidiaries will be able to successfully reduce debt burdens or otherwise improve our financial health to a level contemplated by the Government or to a level that would be optimal for our capital structure. If we or our generation subsidiaries fail to do so or the measures taken by us or our generation subsidiaries to reduce debt levels or improve financial health have unintended adverse consequences, such developments may have an adverse effect on our business, results of operations and financial condition.

76

**Proposed Sale of Certain Power Plants and Equity Interests**

The following table summarizes our current plans for sale of certain of our assets. These sales will be made pursuant to the Government's plans to reduce debt levels and improve management efficiency of public enterprises. The consummation of these plans, however, is subject to, among others, related Government policies and market conditions.

| Equity Holdings | Primary Business | Fair Value[1] as of December 31, 2017 | Ownership Percentage as of December 31, 2017 | Ownership Percentage to be Sold |
|---|---|---|---|---|
| | | (in billions of Won) | | |
| KEPCO Engineering & Construction Co., Inc. . . . . . . . . | Architectural engineering for utility plants | 598 | 65.77 | 14.77 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . | Electricity metering | 39 | 29.00 | 29.00 |

*Note:*

(1) Fair value has been computed as the product of the closing share price on December 31, 2017 multiplied by the number of shares owned by KEPCO.

*KEPCO Engineering & Construction Co., Inc.*

Pursuant to the Third Phase of the Public Institution Reform Plan announced by the Government in August 2008, we conducted the initial public offering of Korea Engineering and Construction Co., Inc., or KEPCO E&C formerly known as Korea Power Engineering Co., Ltd., in December 2009 for gross proceeds to us of Won 165 billion, following which we owned 77.9% of KEPCO E&C's shares. In furtherance of the Public Institution Reform Plan and to improve our financial profile, we sold our equity interests representing 3.1%, 4.0%, 4.5% and 0.54% of KEPCO E&C shares in November 2011, December 2013, December 2014 and December 2016, respectively, in each case to third party investors. We currently hold a 65.77% equity interest in KEPCO E&C.

*Korea Electric Power Industrial Development Co., Ltd.*

In 2003, we privatized Korea Electric Power Industrial Development, or KEPID, formerly our wholly-owned subsidiary, by selling 51.0% of its equity interest to Korea Freedom Federation. Pursuant to the Fifth Phase of the Public Institution Reform Plan announced by the Government in 2009, we sold 20% of the KEPID shares through additional listing. We currently plan to sell the remaining 29.0% of KEPID's equity interest based on, among others, considerations of economic and market conditions.

**Item 4.C.  Organizational Structure**

As of December 31, 2017, we had 100 subsidiaries, 56 associates and 45 joint ventures (not including any special purpose entities).

**Subsidiaries**

Our wholly-owned six generation subsidiaries are KHNP, KOSEP, KOMIPO, KOWEPO, KOSPO and EWP. Our non-generation subsidiaries include KEPCO E&C, KEPCO KPS, KEPCO NF, and KEPCO KDN. For a full list of our subsidiaries, including foreign subsidiaries, and their respective jurisdiction of incorporation, please see Exhibit 8.1 attached to this annual report.

**Associates and Joint Ventures**

An associate is an entity over which we have significant influence and that is neither a subsidiary nor a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

investee but does not have control or joint control over those policies. A joint venture is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint ventures) have rights to the net assets of the arrangement.

The table below sets forth each of our associates and joint ventures as of December 31, 2017 by name, the percentage of our shareholdings and their principal activities.

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| **Associates:** | | |
| Korea Gas Corporation[1] | 20 | Importing and wholesaling LNG |
| Korea Electric Power Industrial Development Co., Ltd. | 29 | Electricity metering and others |
| YTN Co., Ltd. | 21 | Broadcasting |
| Cheongna Energy Co., Ltd. | 44 | Generating and distributing vapor and hot/cold water |
| Gangwon Wind Power Co., Ltd.[2] | 15 | Power generation |
| Hyundai Green Power Co., Ltd. | 29 | Power generation |
| Korea Power Exchange[5] | 100 | Management of power market and others |
| AMEC Partners Korea Ltd.[3] | 19 | Resources development |
| Hyundai Energy Co., Ltd.[8] | 31 | Power generation |
| Ecollite Co., Ltd. | 36 | Artificial light-weight aggregate |
| Taebaek Wind Power Co., Ltd. | 25 | Power generation |
| Taeback Guinemi Wind Power Co., Ltd. | 25 | Power generation |
| Pyeongchang Wind Power Co., Ltd. | 25 | Power generation |
| Daeryun Power Co., Ltd.[3, 9] | 13 | Power generation |
| Changjuk Wind Power Co., Ltd. | 30 | Power generation |
| KNH Solar Co., Ltd. | 27 | Power generation |
| SPC Power Corporation | 38 | Power generation |
| Gemeng International Energy Co., Ltd. | 34 | Power generation |
| PT. Cirebon Electric Power | 28 | Power generation |
| KNOC Nigerian East Oil Co., Ltd.[4] | 15 | Resources development |
| KNOC Nigerian West Oil Co., Ltd.[4] | 15 | Resources development |
| PT Wampu Electric Power | 46 | Power generation |
| PT. Bayan Resources TBK | 20 | Resources development |
| S-Power Co., Ltd. | 49 | Power generation |
| Pioneer Gas Power Limited[7] | 39 | Power generation |
| Eurasia Energy Holdings | 40 | Power generation and resources development |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | 25 | Power generation |
| Hadong Mineral Fiber Co., Ltd.[3] | 8 | Recycling fly ashes |
| Green Biomass Co., Ltd.[11, 14] | 9 | Power generation |
| PT. Mutiara Jawa | 29 | Manufacturing and operating floating coal terminal |
| Samcheok Eco Materials Co., Ltd.[10] | 2 | Recycling fly ashes |
| Noeul Green Energy Co., Ltd. | 29 | Power generation |
| Naepo Green Energy Co., Ltd. | 42 | Power generation |
| Goseong Green Energy Co., Ltd.[2] | 1 | Power generation |
| Gangneung Eco Power Co., Ltd.[2] | 2 | Power generation |
| Shin Pyeongtaek Power Co., Ltd. | 40 | Power generation |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | 28 | Power generation |
| Dongducheon Dream Power Co., Ltd. | 34 | Power generation |
| Jinbhuvish Power Generation Pvt. Ltd.[2] | 5 | Power generation |

78

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| SE Green Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 48 | Power generation |
| Daegu Photovoltaic Co., Ltd. . . . . . . . . . . . . . . . . . . | 29 | Power generation |
| Jeongam Wind Power Co., Ltd. . . . . . . . . . . . . . . . | 40 | Power generation |
| Korea Power Engineering Service Co., Ltd. . . . . . . | 29 | Construction and service |
| Busan Green Energy Co., Ltd. . . . . . . . . . . . . . . . . | 29 | Power generation |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.)[2] . . . . . . . . . . . . . . . . . . . | 19 | Power generation |
| Korea Electric Vehicle Charging Service . . . . . . . . | 28 | Electric vehicle charge service |
| Ulleungdo Natural Energy Co., Ltd. . . . . . . . . . . . . | 30 | Renewable power generation |
| Korea Nuclear Partners Co., Ltd. . . . . . . . . . . . . . . | 29 | Electric material agency |
| Tamra Offshore Wind Power Co., Ltd. . . . . . . . . . . | 27 | Power generation |
| Korea Electric Power Corporation Fund[12] . . . . . . . | 98 | Developing electric enterprises |
| Energy Infra Asset Management Co., Ltd.[3] . . . . . . | 10 | Asset management |
| Daegu clean Energy Co., Ltd. . . . . . . . . . . . . . . . . . | 28 | Renewable power generation |
| YaksuESS Co., Ltd . . . . . . . . . . . . . . . . . . . . . . . . | 29 | Installing ESS related equipment |
| Nepal Water & Energy Development Company Private Limited[15] . . . . . . . . . . . . . . . . . . . . . . . . | 62 | Construction and operation of utility plant |
| Gwangyang Green Energy Co., Ltd. . . . . . . . . . . . . | 20 | Power generation |
| PND solar., Ltd . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | Power generation |
| **Joint Ventures:** | | |
| KEPCO-Uhde Inc.[6] . . . . . . . . . . . . . . . . . . . . . . . | 53 | Power generation |
| Eco Biomass Energy Sdn. Bhd.[6] . . . . . . . . . . . . . | 62 | Power generation |
| Datang Chaoyang Renewable Power Co., Ltd. . . . . | 40 | Power generation |
| Shuweihat Asia Power Investment B.V. . . . . . . . . . | 49 | Holding company |
| Shuweihat Asia Operation & Maintenance Company[6] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55 | Maintenance of utility plant |
| Waterbury Lake Uranium L.P. . . . . . . . . . . . . . . . . | 36 | Resources development |
| ASM-BG Investicii AD . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| RES Technology AD . . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| KV Holdings, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | Power generation |
| KEPCO SPC Power Corporation[6] . . . . . . . . . . . . . | 75 | Construction and operation of utility plant |
| Gansu Datang Yumen Wind Power Co., Ltd. . . . . . | 40 | Power generation |
| Datang Chifeng Renewable Power Co., Ltd. . . . . . . | 40 | Power generation |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | Power generation |
| Rabigh Electricity Company . . . . . . . . . . . . . . . . . . | 40 | Power generation |
| Rabigh Operation & Maintenance Company Limited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | Maintenance of utility plant |
| Jamaica Public Service Company Limited . . . . . . . | 40 | Power generation |
| KW Nuclear Components Co., Ltd. . . . . . . . . . . . . . | 45 | Manufacturing |
| Busan Shinho Solar Power Co., Ltd. . . . . . . . . . . . . | 25 | Power generation |
| GS Donghae Electric Power Co., Ltd. . . . . . . . . . . . | 34 | Power generation |
| Global Trade Of Power System Co., Ltd. . . . . . . . . | 29 | Exporting products and technology of small or medium business by proxy |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | Power generation |
| KODE NOVUS I LLC . . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| KODE NOVUS II LLC . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| Daejung Offshore Wind Power Co., Ltd. . . . . . . . . . | 50 | Power generation |

79

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| Amman Asia Electric Power Company[6] ........ | 60 | Power generation |
| KAPES, Inc.[6] ............................. | 51 | R&D |
| Dangjin Eco Power Co., Ltd. .................. | 34 | Power generation |
| Honam Wind Power Co., Ltd. ................ | 29 | Power generation |
| Chun-cheon Energy Co., Ltd. ................ | 30 | Power generation |
| Yeonggwangbaeksu Wind Power Co., Ltd.[3] ..... | 15 | Power generation |
| Nghi Son 2 Power Ltd. ....................... | 50 | Power generation |
| Kelar S.A[6] ................................. | 65 | Power generation |
| PT. Tanjung Power Indonesia ................. | 35 | Power generation |
| Incheon New Power Co., Ltd. ................. | 29 | Power generation |
| Seokmun Energy Co., Ltd. .................... | 29 | Power generation |
| Daehan Wind Power PSC .................... | 50 | Power generation |
| Barakah One Company[13] ................... | 18 | Power generation |
| Nawah Energy Company[13] ................. | 18 | Operation of utility plant |
| MOMENTUM ............................. | 33 | International thermonuclear experimental reactor construction management |
| Daegu Green Power Co., Ltd. ................ | 29 | Power generation |
| Yeonggwang Wind Power Co., Ltd. ........... | 41 | Power generation |
| Chester Solar IV SpA[6] ..................... | 82 | Power generation |
| Chester Solar V SpA[6] ...................... | 82 | Power generation |
| Diego de Almagro Solar SpA ................ | 82 | Power generation |
| South Jamaica Power Company Limited ........ | 20 | Power generation |

*Notes:*

(1)  The effective percentage of ownership (excluding the treasury stocks) is 21.57%.
(2)  We can exercise significant influence by virtue of our contractual right to appoint directors to the board of directors of this entity, and by strict decision criteria of our financial and operating policy of the board of directors.
(3)  We can exercise significant influence by virtue of our contractual right to appoint a director to the board of directors of this entity.
(4)  We can exercise significant influence by virtue of our contractual right to appoint one out of four members of the steering committee of this entity. Moreover, we have significant financial transactions with this entity to the effect that we can exercise significant influence on this entity.
(5)  The Government regulates our ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between the Korea Power Exchange and our other subsidiaries. We can exercise significant influence by our right to nominate directors to the board of directors of this entity.
(6)  According to the shareholder agreement, all critical financial and operating decisions must be agreed to by all ownership parties. For these reasons, these entities are classified as joint ventures.
(7)  The reporting period of all associates and joint ventures ends in December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.
(8)  As of December 31, 2017, 15.64% of ownership of Hyundai Energy Co., Ltd. was held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only do we have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank upon a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to us. In connection with this agreement, we applied the equity method on our 46.30% equity investment in Hyundai Energy Co., Ltd.
(9)  Following the merger of Daeryun Energy Co., Ltd. into Daeryun Power Co., Ltd., its parent, our effective percentage of ownership decreased to 19.45% after accounting for stock purchase options.
(10)  Our effective percentage of ownership (excluding the redeemable convertible preferred shares) is 25.54%.

80

(11) Our effective percentage of ownership is less than 20%, but we can exercise significant influence by virtue of our contractual right to appoint a director to the board of directors of this entity and the fact that a dominant portion of the investee's sales transactions is generated from us.

(12) Our effective percentage of ownership is more than 50% but we do not hold control over relevant business while we exercise significant influence by participating in the Investment Decision Committee. For this reason, this entity is classified as an associate.

(13) Our effective percentage of ownership is less than 20%, but we have joint control over this entity as decisions on the major activities require the unanimous consent of the parties that collectively control the entity.

(14) The percentage of ownership decreased since we did not participate in the capital increase of Green Biomass Co., Ltd. during the period.

(15) Our effective percentage of ownership is more than 50%, but we do not control this entity according to the shareholders' agreement. For this reason, this entity is classified as an associate.

## Item 4.D.  Property, Plant and Equipment

Our property consists mainly of power generation, transmission and distribution equipment and facilities in Korea. See Item 4.B. "Business Overview—Power Generation," "—Transmission and Distribution" and "—Capital Investment Program." In addition, we own our corporate headquarters building complex at 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea. As of December 31, 2017, the net book value of our property, plant and equipment was Won 150,882 billion. As of December 31, 2017, investment property, which is accounted for separately from our property, plant and equipment, amounted to Won 285 billion. No significant amount of our properties is leased. There are no material encumbrances on our properties, including power generation, transmission and distribution equipment and facilities.

Pursuant to a Government plan announced in 2005, which mandated relocation of the headquarters of select government-invested enterprises from the Seoul metropolitan area to other provinces in Korea as part of an initiative to foster balanced economic growth in the provinces, we, our generation subsidiaries and our certain subsidiaries relocated our respective headquarters to the designated locations during 2014 and 2015. Our headquarters are currently located in Naju in Jeollanam-do Province while the headquarters of our six generation subsidiaries and other subsidiaries are various cities outside of Seoul across Korea.

In connection with the relocation of our headquarters, in September 2014 we entered into an agreement to sell the property housing our prior headquarters to a consortium consisting of members of the Hyundai Motor group for Won 10,550 billion through an open bidding. The sale was completed in September 2015.

During 2017, we completed the sales of 110 properties (including residential properties, storage spaces, and substation lots that are located in Korea) which are not directly related to our operations for an aggregate sale price of approximately Won 11.7 billion. The book value of such properties amounted to Won 7 billion, representing 0.09% of our total real properties as of December 31, 2017. The foregoing sales reflect our ongoing efforts to improve our financial soundness through debt reduction and enhance our management efficiency, selling noncore properties that have no direct relations to electricity facilities.

## ITEM 4A. UNRESOLVED STAFF COMMENTS

We do not have any unresolved comments from the SEC staff regarding our periodic reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

## ITEM 5.  OPERATING AND FINANCIAL REVIEW AND PROSPECTS

*You should read the following discussion on our operating and financial review and prospects together with our consolidated financial statements and the related notes which appear elsewhere in this annual report. Our*

*results of operations, financial condition and cash flows may materially change from time to time, for reasons including various policy initiatives (including changes to the Restructuring Plan) by the Government in relation to the Korean electric power industry, and accordingly our historical performance may not be indicative of our future performance. See Item 4.B. "Business Overview—Restructuring of the Electric Power Industry in Korea" and Item 3D. "Risk Factors—The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."*

## Item 5.A.  Operating Results

### Overview

We are a predominant market participant in the Korean electric power industry, and our business is heavily regulated by the Government, including with respect to the rates we charge to customers for the electricity we sell. In addition, our business requires a high level of capital expenditures for the construction of electricity generation, transmission and distribution facilities and is subject to a number of variable factors, including demand for electricity in Korea and fluctuations in fuel costs, which are in turn impacted by the movements in the exchange rates between the Won and other currencies.

Under the Electricity Business Act and the Price Stabilization Act, the Government generally establishes electricity rates at levels that are expected to permit us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations in addition to receiving a fair investment return on capital used in those operations. For a detailed description of the fair investment return, see Item 4.B. "Business Overview—Sales and Customers—Electricity Rates." From 2014 to 2015, largely due to the general decline of fuel prices, relatively stable exchange rates, the sale of the properties in our previous headquarters and the greater use of coal relative to LNG (the former being a cheaper source of fuel) as a proportion of the fuels used to produce electricity, our gross profit, operating profit and net profit increased significantly.

If fuel prices were to rise substantially and rapidly in the future, such rise may have a material adverse effect on our results of operations and profitability. In part to address these concerns, the Government from time to time increases the electricity tariff rates. However, such increases may be insufficient to fully offset the adverse impact from the rise in fuel costs, and since such increases typically require lengthy public deliberations in order to be implemented, the tariff increases often occur with a significant time lag and as a result our results of operations and cash flows may suffer. On the other hand, if fuel prices decrease, substantial political pressure may lead the Government to lower the level of electricity tariff in a relatively shorter period of time due to the lack of public opposition, which could negatively affect our profit margins and in turn our financial condition and results of operations.

The results of our operations are largely affected by the following factors:

- demand for electricity;
- electricity rates we charge to our customers;
- fuel costs; and
- the exchange rates of Won against other foreign currencies, in particular the U.S. dollar.

### *Demand for Electricity*

Our sales are largely dependent on the level of demand for electricity in Korea and the rates we charge for the electricity we sell.

Demand for electricity in Korea grew at a compounded average rate of 1.7% per annum for the five years ended December 31, 2017. According to the Bank of Korea, the compounded growth rate for GDP was approximately 3.0% for the same period. The GDP growth rate was approximately 2.8%, 2.9% and 3.1% during 2015, 2016 and 2017, respectively.

The table below sets forth, for the periods indicated, the annual rate of growth in Korea's GDP and the annual rate of growth in electricity demand (measured by total annual electricity consumption) on a year-on-year basis.

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
| --- | --- | --- | --- | --- | --- |
| Growth in GDP | 2.9% | 3.3% | 2.8% | 2.9% | 3.1% |
| Growth in electricity consumption | 1.8% | 0.6% | 1.3% | 2.8% | 2.2% |

Demand for electricity may be categorized either by the type of its usage or by the type of customers. The following describes the demand for electricity by the type of its usage, namely, industrial, commercial and residential:

- The industrial sector represents the largest segment of electricity consumption in Korea. Demand for electricity from the industrial sector was 285,969 gigawatt hours in 2017, representing a 2.6% increase from 2016, largely due to the continued export-based growth of the Korean economy, which resulted in increased industrial output and greater utilization of industrial plants.

- Demand for electricity from the commercial sector depends largely on the level and scope of commercial activities in Korea, which in recent years have resulted in increased office building construction, office automation and use of air conditioners and heaters. Demand for electricity from the commercial sector increased to 111,298 gigawatt hours in 2017, representing a 2.5% increase from 2016 largely due to the recovery of market demand as a result of various Government policies to boost the economy.

- Demand for electricity from the residential sector is largely dependent on population growth and use of heaters, air conditioners and other electronic appliances. Demand for electricity from the residential sector increased to 68,544 gigawatt hours in 2017, representing a 0.7% increase compared to 2016, largely due to an increase in household electricity usage for air conditioning and heating. For a discussion on demand by the type of customers, see Item 4.B. "Business Overview—Sales and Customers—Demand by the Type of Usage."

Since our inception, we have had the predominant market share in terms of electricity generated in Korea. As for electricity we purchase from the market for transmission and distribution to our end-users, our generation subsidiaries accounted for 83.3%, 81.5% and 77.8% in 2015, 2016 and 2017, respectively, while the remainder was accounted for by independent power producers. As for transmission and distribution of electricity, we have historically handled, expect to continue to handle, substantially all of such activities in Korea.

We expect that we will continue to have a dominant market share in the generation, transmission and distribution of electricity in Korea for the foreseeable future, absent any substantial changes to the Restructuring Plan or other policy initiatives by the Government in relation to the Korean electric power industry, or an unexpected level of market penetration by independent power producers or localized electricity suppliers under the Community Energy System. However, our market dominance in the electricity distribution in Korea may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows. See Item 4.B. "Business Overview—Competition."

83

*Electricity Rates*

Under the Electricity Business Act and the Price Stabilization Act, electricity rates are established at levels that will permit us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations in addition to receiving a fair investment return on capital used in those operations. For further discussion of fair investment return, see Item 4.B. "Business Overview—Sales and Customers—Electricity Rates."

From time to time, our actual rate of return on invested capital may differ significantly from the fair rate of return on invested capital assumed for the purposes of electricity tariff approvals, for reasons, among others, related to movements in fuel prices, exchange rates and demand for electricity that differs from what is assumed for determining our fair rate of return. For example, between 1987 and 1990, the actual rate of return was above the fair rate of return due to declining fuel costs and rising demand for electricity. In contrast, depreciation of the Won against the U.S. dollar accounted for our actual rates of return being lower than the fair rate of return for the period from 1996 to 2000. Partly in response to the variance between our actual rates of return and the fair rate of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increase as such increase requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use through sector-specific tariff increases. For the period between 2006 and 2013, our actual rates of return were lower than the fair rate of return largely due to a general increase in fuel costs and additional facility investment costs incurred, the effects of which were not offset by timely increases in our tariff rates. Between 2014 and 2016, however, largely due to the decrease in fuel costs reflective of the drop in oil prices, our actual rate of return has surpassed the fair rate of return; however, substantially all of the resulting excess has been used to fund capital expenditure and repair and maintenance, as well as to offer tariff discounts to economically or otherwise disadvantaged households, and investments in renewable energy and other environmental programs.

Partly in response to the variance between our actual rates of return and the fair rates of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increases as such increases requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use from sector-specific tariff increases.

In the past, the Government effected tariff increases that typically covered all sectors, namely, residential, commercial and industrial. No cross-sector tariff increase has been implemented since November 2013, largely due to the downward trend in fuel costs. However, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, the new tariff structure encourages energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods during the summer and the winter. Third, a temporary rate discount will apply during 2018 to 2020 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation, financial condition and cash flows.

84

*Fuel Costs*

Our results of operations are also significantly affected by the cost of producing electricity, which is subject to a variety of factors, including, in particular, the cost of fuel.

Cost of fuel in any given year is a function of the volume of fuels consumed and the unit fuel cost for the various types of fuel used for generation of electricity which affects the cost structure for both our generation subsidiaries and independent power producers from whom we purchase electric power. A significant change in the unit fuel costs materially impacts the costs of electricity generated by our generation subsidiaries, which mainly comprise our fuel costs under the cost of sales, as well as, to our knowledge, the costs of electricity generated by the independent power producers that sell their electricity to us (see Item 4.A. "Purchase of Electricity—Cost-based Pool System"), which mainly comprise our purchased power costs under the cost of sales. We are however unable to provide a comparative analysis since the unit fuel cost information for independent power producers and their cost structures are proprietary information.

Fuel costs constituted 33.3%, 30.9% and 31.7% of our cost of sales, and the ratio of fuel costs to our sales was 25.9%, 23.4% and 27.8% in 2015, 2016 and 2017, respectively. Substantially all of the fuel (except for anthracite coal) used by our generation subsidiaries is imported from outside of Korea at prices determined in part by prevailing market prices in currencies other than Won. In addition, our generation subsidiaries purchase a significant portion of their fuel requirements under contracts with limited quantity and duration. Pursuant to the terms of our long-term supply contracts, prices are adjusted from time to time subject to prevailing market conditions. See Item 4.B. "Business Overview—Fuel."

Uranium accounted for 38.1%, 37.1% and 34.8% of our fuel requirements in 2015, 2016 and 2017, respectively. Coal accounted for 47.9%, 47.7% and 53.3% of our fuel requirements in 2015, 2016 and 2017, respectively. LNG accounted for 10.7%, 10.7% and 8.7% of our fuel requirements in 2015, 2016 and 2017, respectively. Oil accounted for 2.2%, 3.0% and 1.2% of our fuel requirements in 2015, 2016 and 2017, respectively. In each case, the fuel requirements are measured by the amount of electricity generated by us and our generation subsidiaries and do not include electricity purchased from independent power producers. In order to ensure stable supplies of fuel materials, our generation subsidiaries enter into long-term and medium-term contracts with various suppliers and supplement such supplies with fuel materials purchased on spot markets.

The price of bituminous coal, which represents our largest fuel requirement, fluctuates significantly from time to time. In 2017, approximately 82% of the bituminous coal requirements of our generation subsidiaries were purchased under long-term contracts and the remaining 18% purchased on the spot market. The average daily spot price of "free on board" Newcastle coal 6300 GAR published by Platts increased from US$66.8 per ton in 2016 to US$88.3 per ton in 2017 and to US$93.4 per ton as of April 16, 2018. If the price of bituminous coal were to sharply rise, our generation subsidiaries may not be able to secure their respective bituminous coal supplies at prices commercially acceptable to them. In addition, any significant interruption or delay in the supply of fuel, bituminous coal in particular, from any of their suppliers could cause our generation subsidiaries to purchase fuel on the spot market at prices higher than contracted, resulting in an increase in fuel cost.

From 2015 to 2017, the prices of oil and LNG fluctuated significantly. The prices of oil and LNG are substantially dependent on the price of crude oil, and according to Bloomberg (Bloomberg Ticker: PGCRDUBA), the average daily spot price of Dubai crude oil increased from US$41.4 per barrel in 2016 to US$53.1 per barrel in 2017 and to US$68.4 per barrel as of April 16, 2018.

Nuclear power has a stable and relatively low-cost structure and forms a significant portion of electricity supplied in Korea. Due to significantly lower unit fuel costs compared to those for thermal power plants, our nuclear power plants are generally operated at full capacity with only routine shutdowns for fuel replacement and maintenance, with limited exceptions. In case of shortage in electricity generation resulting from stoppages of the nuclear power plants, we seek to make up for such shortage with power generated by our thermal power plants.

85

Because the Government heavily regulates the rates we charge for the electricity we sell (see Item 4.B. "Business Overview—Sales and Customers—Electricity Rates"), our ability to pass on such cost increases to our customers is limited. For example, from 2008 to 2012 we had consecutive net losses and, from time to time, operating losses, largely due to sustained rises in fuel costs that were neither timely nor sufficiently offset by a corresponding rise in electricity tariff rates. If fuel prices substantially increase and the Government, out of concern for inflation or for other reasons, maintains the current level of electricity tariff and does not increase it to a level to sufficiently offset the impact of rising fuel prices, the price increases will negatively affect our profit margins or even cause us to suffer net losses and our business, financial condition, results of operations and cash flows would suffer.

### Movements of the Won against the U.S. Dollar and Other Foreign Currencies

Korean Won has fluctuated significantly against major currencies from time to time. For fluctuations in exchange rates, see Item 3.A. "Selected Financial Data—Currency Translations and Exchange Rates." In particular, Korean Won underwent substantial fluctuations during the recent global financial crisis, and remains subject to significant volatility. The Noon Buying Rate per one U.S. dollar increased from Won 1,169.3 on December 31, 2015 to Won 1,203.7 on December 31, 2016, fell down to Won 1,067.4 on December 31, 2017 and to Won 1,071.6 on April 16, 2018 . In 2016 and 2017, the Won generally appreciated against U.S. dollar and other foreign currencies, and such appreciation may result in a significant decrease in the cost of fuel materials and equipment purchased from overseas as well as the cost of servicing our foreign currency debt. As of December 31, 2017, 19.4% of our long-term debt (including the current portion but excluding issue discounts and premium) without taking into consideration of swap transactions was denominated in foreign currencies, principally U.S. dollars. The prices for substantially all of the fuel materials and a significant portion of the equipment we purchase are stated in currencies other than Won, generally in U.S. dollars. Since a substantial portion of our revenues is denominated in Won, we must generally obtain foreign currencies through foreign currency-denominated financings or from foreign currency exchange markets to make such purchases or service such debt, fulfill our obligations under existing overseas investments and make new overseas investments. As a result, any significant depreciation of Won against U.S. dollar or other foreign currencies will have a material adverse effect on our profitability and results of operations. See Item 3.D. "Risk Factors—Risks Relating to KEPCO—The movement of Won against the U.S. dollar and other currencies may have a material adverse effect on us."

### Recent Accounting Changes

#### New Amendments Adopted

New amendments to IFRS and other accounting standards are set forth below. These amendments had no impact on our consolidated financial statements included in this annual report.

- Amendments to IAS 12—Income Taxes

  We have adopted amendments to IAS 12 'Income Taxes' since January 2017. The amendments clarify that unrealized losses on fixed-rate debt instruments measured at fair value and measured at cost for tax purposes give rise to a deductible temporary difference regardless of whether the holder expects to recover the carrying amount of the debt instrument by sale or by use and that the estimate of probable future taxable profit may include the recovery of some of assets for more than their carrying amount. When we assess whether there will be sufficient taxable profit, we should compare the deductible temporary differences with future taxable profit that excludes tax deductions resulting from the reversal of those deductible temporary differences. We believe that there is no significant impact on our consolidated financial statements and did not retroactively restate the comparative consolidated financial statements for the prior period.

- Amendments to IAS 7—Statement of Cash Flows

  We have adopted amendments to IAS 'Statement of Cash Flows' since January 1, 2017. The amendments require changes in liabilities arising from financing activities to be disclosed. The amendments are not required to provide comparative information for prior periods when applying for the first time. Information about changes in liabilities arising from financing activities is included in Note 23 and Note 24 of the notes to our consolidated financial statements included in this annual report for further related information.

*New Standards and Amendments Not Yet Adopted*

The following new standards and amendments to existing IFRS and other standards are effective for annual periods beginning on January 1, 2017; however, we have not adopted such amendments yet. We will apply IFRS 9 'Financial Instruments' and IFRS 15 'Revenue from Contracts with Customers' for annual periods beginning on January 1, 2018 and we have conducted a detailed assessment upon adoption of these standards and based on the circumstance and information available up to the filing date of this annual report.

- IFRS 9—Financial Instruments

  IFRS 9 sets out the requirements for recognizing and measuring financial assets, financial liabilities and certain contracts to buy or sell non-financial items. It replaces existing guidance in IAS 39 'Financial Instruments: Recognition and Measurement'.

  We will apply the exemption allowing it not to restate the comparative information for prior periods upon adoption of IFRS 9. We will retroactively apply the cumulative effect of the adoption of IFRS 9 in retained earnings as of the date of initial application (January 1, 2018).

  Expected impacts on our consolidated financial statements are categorized as follows:

① Classification and measurement of financial assets

  IFRS 9 includes a new classification and measurement of financial assets that reflects the business model in which assets are managed and their cash flow characteristics.

  Under IFRS 9, financial assets are classified into three principal categories; measured at amortized cost, fair value through other comprehensive income (FVOCI) and fair value through profit or loss (FVTPL) based on the business model in which assets are managed and their cash flow characteristics. Under IFRS 9, derivatives embedded in hybrid contracts where the host is a financial asset are not bifurcated. Instead, the hybrid financial instrument as a whole is assessed for classification.

  The criteria for classification and measurement of financial assets under IFRS 9 are as follows:

  - A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is to hold assets to collect contractual cash flows; and 2) the contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

  - A financial asset is measured at FVOCI if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and 2) the contractual terms of the financial asset give rise on specified dates to cash flow that are solely payments of principal and interest on the principal amount outstanding. On initial recognition of equity investment that is not held for trading, the company may irrevocably elect to present subsequent changes in fair value in other comprehensive income (OCI), and will not reclassify(recycle) the those items in OCI to profit or loss subsequently.

  - A financial asset is measured at FVTPL if the contractual terms of the financial asset give rise to specified dates to cash flows that are not solely payments of principal and interest on the principal

87

amount outstanding, the debt instrument is held within a business model whose objective is to sell the asset, or the equity instruments that are not elected to be designated as measured at FVOCI.

As of December 31, 2017, We have financial assets at fair value through profit or loss amounting to Won 133,532 million, available-for-sale financial assets amounting to Won 699,833 million, held-to-maturity investments amounting to Won 3,144 million and loans and receivables amounting to Won 15,203,663 million.

Based on the result of the detailed assessment to date, the expected impacts on our financial assets (excluding derivative instruments) on the date of initial application (January 1, 2018) are as follows:

| Classification based on IAS 39 | Classification based on IFRS 9 | Amount based on IAS 39 | Amount based on IFRS 9 |
|---|---|---|---|
| | | In millions of won | |
| Financial assets at FVTPL | FVTPL . . . . . . . . . . . . . . | ₩    111,512 | 111,512 |
| Loans and receivables | Amortized cost . . . . . . . . | 15,203,663 | 14,412,339 |
| Loans and receivables | FVTPL . . . . . . . . . . . . . . | — | 791,324 |
| Available-for-sale financial assets | FVOCI . . . . . . . . . . . . . . | 699,833 | 476,941 |
| Available-for-sale financial assets | FVTPL . . . . . . . . . . . . . . | — | 222,892 |
| Held-to-maturity investments | Amortized cost . . . . . . . . . | 3,144 | 3,144 |
| Total financial assets (excluding derivative instruments) . . . . . . . . . . . . . | | ₩16,018,152 | 16,018,152 |

Upon adoption of IFRS 9, Won 791,324 million of loans and receivables and Won 222,892 million of available-for-sale financial assets will be measured at FVTPL. We have elected to measure Won 476,941 million of the equity securities classified as available-for-sale financial assets as FVOCI under IFRS 9. Accordingly, from January 1, 2018, gains and losses from changes of fair value of the equity securities are recognized in other comprehensive income, impairment losses are not recognized in profit or loss, and gains and losses are not reclassified at disposal.

② Classification and measurement of financial liabilities

Under IFRS 9, the amount of change in the fair value attributable to the changes in the credit risk of the financial liabilities is presented in OCI, not recognized in profit or loss, and the OCI amount will not be reclassified (recycled) to profit or loss. However, if doing so creates or increase an accounting mismatch, the amount of change in the fair value is recognized in profit or loss.

We did not elect to designate financial liabilities as FVTPL and believes that there is no significant impact on our consolidated financial statements upon adoption of IFRS 9.

③ Impairment: Financial assets and contract assets

IFRS 9 replaces the 'incurred loss' model in the existing standard with a forward-looking 'expected credit loss' (ECL) model for debt instruments, lease receivables, contractual assets, loan commitments, financial guarantee contracts.

Under IFRS 9, impairment losses are likely to be recognized earlier than using the incurred loss model under the existing guidance in IAS 39 as loss allowances will be measured on either of the 12-month or lifetime ECL based on the extent of increase in credit risk since inception as shown in the below table.

| Classification | Loss allowances |
|---|---|
| Stage 1 Credit risk has not increased significantly since the initial recognition | 12-month ECL: ECLs that resulted from possible default events within the 12 months after the reporting date |
| Stage 2 Credit risk has increased significantly since the initial recognition | Lifetime ECL: ECL that resulted from all possible default events over the expected life of a financial instrument |
| Stage 3 Credit-impaired | |

88

Under IFRS 9, an entity shall always measure the loss allowance at an amount equal to lifetime expected credit losses for trade receivables or contract assets that result from transactions that are within the scope of IFRS 15 and that do not contain a significant financing component in accordance with IFRS 15 and if the trade receivables or contract assets include a significant financing component, an entity may choose as its accounting policy to measure the loss allowance at an amount equal to lifetime expected credit losses.

As of December 31, 2017, we have debt instruments in financial assets measured at amortized cost amounting to Won 15,464,202 million (loans and receivables) and has recognized loss allowances of Won 260,539 million.

Under adoption of IFRS 9, we plan to elect to measure the loss allowance at an amount equal to lifetime expected credit losses for trade receivables, contract assets and lease liabilities that include a significant financing component. Based on the result of the detailed assessment to date, the expected impacts on our loss allowances on the date of initial application (January 1, 2018) are as follows:

| Type | Amount based on IAS 39 (A) | Amount based on IFRS 9 (B) | Increase (decrease) (B-A) |
|------|---------------------------|----------------------------|----------------------------|
| | | In millions of won | |
| Trade and other receivables ................. | ₩251,591 | 258,360 | 6,769 |
| Other financial assets ...................... | 8,948 | 8,948 | — |
| Total .................................... | ₩260,539 | 267,308 | 6,769 |

④  Hedge accounting

When initially applying IFRS 9, an entity may elect as its accounting policy to continue to apply the hedge accounting requirements of IAS 39. We plan to elect to continue apply the hedge accounting requirements of IAS 39.

As of December 31, 2017, We have asset and liabilities designated as hedged items amounting to Won 10,606 million and Won 277,130 million, respectively.

• IFRS 15—Revenue from contract with customers

IFRS 15 sets out a comprehensive framework for determining whether revenue is recognized, the extent of revenue recognized, and when revenue is recognized. It replaces existing revenue recognition guidance, including IAS 18 'Revenue', IAS 11 'Construction Contracts', SIC-31 'Revenue-Barter transactions involving advertising services', IFRIC 13 'Customer Loyalty Programs', IFRIC 15 'Agreements for the construction of real estate', and IFRIC 18 'Transfers of assets from customers'.

We will retrospectively apply and recognize the cumulative effect of the adoption of IFRS 15 at the date of initial application (January 1, 2018) and has determined to retrospectively apply to only those contracts that were not completed as of the date of initial application (January 1, 2018). Accordingly, we will not restate the comparative periods.

Existing IFRS standards and interpretations including IAS 18 provide revenue recognition guidance by transaction types such as sales of goods, rendering of services, interest income, royalty income, dividend income and construction revenue; however, under the new standard, IFRS 15, the five-step approach (Step 1: Identify the contract(s) with a customer, Step 2: Identify the performance obligations in the contract, Step 3: Determine the transaction price, Step 4: Allocate the transaction price to the performance obligations in the contract, Step 5: Recognize revenue when the entity satisfied a performance obligation) is applied for all types of contracts or agreements.

89

Expected impacts on the consolidated financial statements are categorized as follows:

① Identify the performance obligations in the contract

We are engaged in the generation, transmission and distribution of electricity and development of electric power resources, and electricity sales revenue accounts for 91.3% of consolidated revenue for the year ended December 31, 2017.

Under IFRS 15, supplying electricity is a series of distinct goods or services identified as a single performance obligation. We are also engaged in contracts with customers for transmission and distribution, provision of power generation byproducts, EPC business, O&M, etc. that are identified as different performance obligations for each contract.

Based on the result of the detailed assessment to date, we believe that the impact of identifying separate the performance obligations in the contract on our revenue is not significant.

② Variable consideration

We may be subject to a variation of consideration paid by the customer due to the progressive electricity billing system, discounts on electricity bills for policy purposes, penalties and delinquent payment, etc. In applying IFRS 15, we estimate an amount of variable consideration by using the expected value method that we expect to better predict the amount of consideration to which it will be entitled, and includes in the transaction price some or all of an amount of variable consideration only to the extent that it is highly probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

Based on the result of the detailed assessment to date, we believe that the impact of variable consideration on our revenue is not significant.

③ Performance obligations satisfied over time

We provide our customers with services such as EPC business, O&M, etc. over time. We recognize revenues based on the percentage-of-completion on a reasonable basis.

Under IFRS 15, an entity recognizes revenue over time if one of the following criteria is met:

(a) the customer simultaneously receives and consumes the benefits provided by the entity's performance as the entity performs;

(b) the entity's performance creates or enhances an asset that the customer controls as the asset is created or enhanced; or

(c) the entity's performance does not create an asset with an alternative use to the entity and the entity has an enforceable right to payment for performance completed to date.

Based on the result of the detailed assessment to date, the impact of the revenue recognition over time based on the percentage-of-completion on our revenue is not significant.

• IFRS 16—Leases

IFRS 16 replaces IAS 17 'Leases', and IFRIC 4 'Determining whether an Arrangement contains a Lease'. This standard is effective for annual reporting periods beginning on or after January 1, 2019, with early adoption permitted if IFRS 15 'Revenue from Contracts with Customers' has also been applied.

Under IFRS 16, a lessee shall apply this standard to its leases either:

(a) retrospectively to each prior reporting period presented applying IAS 8 'Accounting Policies, Changes in Accounting Estimates and Errors'; or

90

(b)  retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application.

We have not yet determined the transition approach for IFRS 16.

IFRS 16 provides a single lessee accounting model in which the lessee recognizes lease related assets and liabilities in the statement of financial position. A lessee is required to recognize a right-of-use asset representing its right to use the underlying leased asset and a lease liability representing its obligation to make lease payments. Lease recognition may be exempted for short-term leases and leases for which the underlying asset is of low value. Accounting for a lessor is similar to the existing standard that classifies each of its leases as either an operating lease or a finance lease.

Upon adoption of IFRS 16, the nature of the costs associated with the lease will change as the operating lease payments recognized based on a straight-line basis will change to depreciation expense of a right-of-use asset and interest expense of the lease liability and no significant impact is expected on our finance lease.

We plan to conduct a detailed assessment of the potential impact from the application of IFRS 16 during the year ending December 31, 2018.

- IFRIC 22—Foreign Currency Transactions and Advance Consideration

IFRIC 22, published on December 8, 2016, clarifies the date of the transaction for the purpose of determining the exchange rate to use on initial recognition of the related asset, expense or income, when an entity has received or paid advance consideration in a foreign currency. IFRIC 22 is effective for annual reporting periods beginning on or after January 1, 2018, with earlier adoption permitted.

We are currently performing a detailed assessment of the impact resulting from the application of IFRIC 22 and plan to complete the assessment in advance of its effective date.

- Amendments to IAS 40—Investment Property

The amendments clarify when an entity should transfer a property asset to, or from, investment property. The amendments are effective for annual periods beginning on or after January 1, 2018, with earlier adoption permitted.

We are currently performing a detailed assessment of the impact resulting from the application of amendments to IAS 40 and plan to complete the assessment in advance of its effective date.


**Critical Accounting Policies**

The following discussion and analysis are based on our consolidated financial statements included in this annual report. The fundamental objective of financial reporting is to provide useful information that allows a reader to comprehend our business activities. To aid in that understanding, our management has identified "critical accounting policies."

We make a number of estimates and judgments in preparing our consolidated financial statements. These estimates may differ from actual results and have a significant impact on our recorded assets, liabilities, revenues and expenses and related disclosure of contingent assets and liabilities. We consider an estimate to be a critical accounting estimate if it requires a high level of subjectivity or judgment, and a significant change in the estimate would have a material impact on our financial condition or results of operations. Further discussion of these critical accounting estimates and policies is included in the notes to our consolidated financial statements included in this annual report.

The accounting policies set out below have been applied consistently by us and our subsidiaries to all periods presented in the consolidated annual financial statements, unless otherwise indicated.

### Sale and Purchase of Electricity

The Government approves the rates we charge to customers. Our utility rates are designed to recover our reasonable costs plus a fair investment return. We purchase electricity principally from our generation subsidiaries based on a competitive bidding process though the Korea Power Exchange.

We recognize electricity sales revenue based on power sold (transferred to the customer) up to the reporting date. To determine the amount of power sold, we make reasonable estimates on daily power volumes for residential, commercial, industrial and other uses. The differences between the current month's estimated amounts and actual (meter-read) amounts are adjusted (trued-up) during the next month period.

### Construction Contracts

When the outcome of a construction contract can be estimated reliably, revenue and costs are recognized based on the stage of completion of the contract activity at the end of the reporting period, measured based on the proportion of contract costs incurred for work performed to date relative to the estimated total contract costs except where this would not be representative of the stage of completion, utilizing the cost-based input method. In applying the cost-based input method, it is necessary to use estimates and assumptions related to the total estimated costs expected to be incurred in the future, costs incurred which are not related to construction progress, changes in costs due to change of contract or design, etc. Total contract revenue is measured based on an agreed contract price; however, it may fluctuate due to the variation of construction work. The measurement of contract revenue is affected by various uncertainties resulting from unexpected future events. Variations in contract work, claims and incentive payments are included to the extent that the amount can be measured reliably and its receipt is considered probable.

When the outcome of a construction contract cannot be estimated reliably, contract revenue is recognized to the extent of contract costs incurred when it is probable the revenue will be realized. Contract costs are recognized as expenses in the period in which they are incurred. When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognized as an expense immediately. Total contract costs are estimated based on the estimates of future costs such as material costs, labor costs and construction period. The uncertainty of estimated total contract costs and changes in such estimates have an impact on the completion progress and contract revenue for each reporting period. Also, there is uncertainty in future estimates due to various internal and external factors such as fluctuation of market, the risk of business partner and the experience of project performance and others.

### Derivative Instruments

We recognize rights and obligations arising from derivative instruments as assets and liabilities, which are stated at fair value. The gains and losses that result from the change in the fair value of derivative instruments are reported in current earnings. However, for derivative instruments designated as hedging the exposure of variable cash flows, the effective portions of the gains or losses on the hedging instruments are recorded as accumulated other comprehensive income (loss) and credited or charged to operations at the time the hedged transactions affect earnings, and the ineffective portions of the gains or losses are credited or charged immediately to operations.

Significant management judgment is involved in determining the fair value of estimated derivative instruments. The estimates and assumptions used by our management to determine fair value can be impacted by many factors, such as the estimated discount factor derived from observable market data, credit risk of the counterparty and the estimated cash flow based on settlement period, interest convention, and other contract information of the derivative instruments.

As of December 31, 2015 and 2016, we had Won 451 billion and Won 643 billion of net amounts as assets, respectively. As of December 31, 2017, we had Won 395 billion of net amounts as liabilities. Changes in the

estimated discount factor or cash flow, or changes in the assumptions and judgments by management underlying these estimates, may cause material revisions to the estimated total gain or loss effect of derivative instruments, which could have a material effect on the recorded asset or liability.

*Decommissioning Costs*

We recognize the fair value of estimated decommissioning costs as a liability in the period in which we incur a legal obligation associated with retirement of long-lived assets that result from acquisition, construction, development and/or normal use of the assets. We also recognize a corresponding asset that is depreciated over the life of the asset. Accretion expense consists of period-to-period changes in the liability for decommissioning costs resulting from the passage of time and revisions to either the timing or the amount of the original estimate of undiscounted cash flows. Depreciation and accretion expenses are included in the cost of electric power in the accompanying consolidated statements of comprehensive income.

Significant management judgment is involved in determining the fair value of estimated decommissioning costs. The estimates and assumptions used by our management to determine fair value can be impacted by many factors, such as the estimated decommissioning costs based on engineering studies commissioned and approved by the Korean government, and changes in assumed dates of decommissioning, inflation rate, discount rate, decommissioning technology, regulation and the general economy.

As of December 31, 2015, 2016 and 2017, we had a liability for decommissioning costs in the amounts of Won 12,562 billion, Won 13,050 billion and Won 15,985 billion, respectively. Changes in the estimated costs or timing of decommissioning, or changes in the assumptions and judgments by management underlying these estimates, may cause material revisions to the estimated total cost to decommission these facilities, which could have a material effect on the recorded liability. We used discount rates of 3.55%, 3.55% and 2.94% and inflation rates of 1.40%, 1.40% and 1.21% when calculating the decommissioning cost liability of nuclear plants recorded as of December 31, 2015, 2016 and 2017, respectively, and discount rate of 4.49% and inflation rate of 2.93% when calculating the decommissioning cost liability of spent fuel recorded as of December 31, 2015, 2016 and 2017. In addition, the following is a sensitivity analysis of the potential impact on decommissioning costs from a 0.1% increase or decrease in each of the inflation rate and the discount rate, assuming that all other aforementioned assumptions remain constant:

| | Sensitivity to inflation rate | | Sensitivity to discount rate | |
|---|---|---|---|---|
| | +0.10% | -0.10% | +0.10% | -0.10% |
| | (in billions of Won) | | | |
| Increase (decrease) of liability for decommissioning costs . . . | ₩342 | ₩(332) | ₩(314) | ₩323 |

See Notes 26 and 45 of the notes to our consolidated financial statements included in this annual report for further related information.

*Provision for Decontamination of Transformer*

Under the Persistent Organic Pollutants Management Act which was enacted in 2007, we are required to remove PCB from our transformers' insulating oil by 2025. We are also required to inspect the PCB levels in our transformers and dispose of any PCBs in excess of established safety standards.

As of December 31, 2015, 2016 and 2017, we had liabilities of Won 182 billion, Won 192 billion and Won 180 billion, respectively, for inspection and disposal costs related to the decontamination of existing transformers.

The estimates and assumptions used by our management to determine fair value can be affected by many factors, such as the estimated costs of inspection and disposal, inflation rate, discount rate, regulations and the general economy.

93

Changes in the estimated costs or changes in the assumptions and judgments underlying these estimates may cause material revisions to the estimated total costs, which could have a material effect on our recorded liability. When calculating the provision for the decontamination of our transformers, we used a discount rate of 3.21% and an inflation rate of 2.65% as of December 31, 2015, a discount rate of 2.77% and an inflation rate of 1.29% as of December 31, 2016 and a discount rate of 2.55% and an inflation rate of 1.23% as of December 31, 2017.

*Deferred Tax Assets*

In assessing the realizability of the deferred tax assets, our management considers whether it is probable that a portion or all of the deferred tax assets will not be realized. The ultimate realization of our deferred tax assets is dependent on whether we are able to generate future taxable income in specific tax jurisdictions during the periods in which temporary differences become deductible. Our management has scheduled the expected future reversals of the temporary differences and projected future taxable income in making this assessment. Based on these factors, our management believes that it is probable that we will realize the benefits of these temporary differences as of December 31, 2017. However, the amount of deferred tax assets that is realized may be different if we do not realize estimated future taxable income during the carry forward periods as originally expected.

In relation to the deferred tax assets recognized for tax loss, future taxable income is estimated considering the following: (i) five-year mid-to long-term financial forecasts of earnings before tax approved by management and submitted to the Ministry of Strategy and Finance, and (ii) average amount of tax adjustments for the recent three years.

For tax credits carried forward, similar to deferred tax assets recognized for tax loss, our management estimates the probability timing of future taxable profits in determining the probability of utilization of tax credits carried forward. In addition, our management considers the possible carry forward period and available tax credit or deductible temporary differences within the tax laws of each country in which the tax credits originated.

Similarly, our management also estimates the probability of utilization of temporary differences considering the probability of generating future taxable profits in the periods that the deductible temporary differences reverse. We do not recognize deferred tax assets for certain temporary differences associated with investments in subsidiaries, associates, and interests in joint ventures considering future dividends or disposals.

We recognize deferred tax assets and liabilities based on the differences between the financial statement carrying amounts and the tax bases of assets and liabilities at each separate taxpaying entity. Under IFRS, a deferred tax asset is recognized for temporary differences that will result in deductible amounts in future years and for carry forwards. If, based on the weight of available evidence, it is more likely that some or the entire portion of the deferred tax asset will not be realized, that portion is deducted directly from the deferred tax asset.

We believe that the accounting estimate related to the realizability of deferred tax asset is a "critical accounting estimate" because: (i) it requires management to make assessments about the timing of future events, including the probability of expected future taxable income and available tax planning opportunities, and (ii) the difference between these assessments and the actual performance could have a material impact on the realization of tax benefits as reported in our results of operations. Management's assumptions require significant judgment because actual performance has fluctuated in the past and may continue to do so.

*Useful Lives of Property, Plant and Equipment*

Property, plant and equipment are initially measured at cost and after initial recognition, are carried at cost less accumulated depreciation and accumulated impairment losses. The cost of property, plant and equipment includes expenditures arising directly from the construction or acquisition of the asset, any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management and the initial estimate of the costs of dismantling and removing the item and restoring the site on which it is located.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

Economic useful life is the duration of time the asset is expected to be productively employed by us, which may be less than its physical life. Management's assumptions on the following factors, among others, affect the determination of estimated economic useful life: wear and tear, obsolescence, technical standards, changes in market demand and technological changes.

The estimated useful lives of our property, plant and equipment are as follows:

|  | Useful lives (years) |
|---|---|
| Buildings | 8 ~ 40 |
| Structures | 8 ~ 50 |
| Machinery | 2 ~ 32 |
| Vehicles | 3 ~ 8 |
| Loaded heavy water | 30 |
| Asset retirement costs | 18, 30, 40, 60 |
| Finance lease assets | 6 ~ 32 |
| Ships | 9 |
| Others | 4~15 |

A component that is significant compared to the total cost of property, plant and equipment is depreciated over its separate useful life. Depreciation methods, residual values and useful lives of property, plant and equipment are reviewed at the end of each reporting period and if change is deemed appropriate, it is treated as a change in accounting estimate. As a result of such annual review, useful lives of certain machinery were changed during 2016 and as a result, depreciation expenses increased by Won 160,985 million and Won 130,514 million for the years ended December 31, 2016 and 2017, respectively. Depreciation expenses are expected to increase by Won 91,197 million for the year ending December 31, 2018, and to decrease by Won 382,696 million for the years after December 31, 2018.

*Impairment of Long-lived Assets*

At the end of each reporting period, we review the carrying amounts of tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, we estimate the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired. Recoverable amount is the higher of fair value less costs to sell or value in use. In assessing value in use, the estimated future cash flows are discounted to their present values using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or a cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (or the cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognized immediately in income or loss, unless the relevant asset is carried at a revalued amount, in which case the impairment loss is treated as a revaluation decrease.

In the event that an impairment loss subsequently reverses, the carrying amount of the asset (or a cash-generating unit) is increased to the revised estimate of its recoverable amount, ensuring that such carrying

95

amount increase does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or the cash-generating unit) in prior years. A reversal of an impairment loss is recognized immediately in income or loss, unless the relevant asset is carried at a revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

The assessment of impairment is a critical accounting estimate, because significant management judgment is required to determine: (i) whether an indicator of impairment has occurred, (ii) how assets should be grouped, and (iii) the recoverable amount of the asset or asset group in the case of impairment. If management's assumptions about these assets change as a result of events or circumstances, and management believes the assets may have declined in value, we may record impairment charges, resulting in lower profits. Our management uses its best estimate in making these evaluations and considers various factors, including the future prices of energy, fuel costs and other operating costs. However, actual market prices and operating costs could vary from those used in the impairment evaluations, and the impact of such variations could be material. We performed impairment tests on individual assets of KOSEP and EWP, both of which are wholly owned subsidiaries, for the year ended December 31, 2015 due to potential indictors of impairment. For the year ended December 31, 2016, there were no potential indicators of impairment, and we therefore did not perform an impairment test for such year. For the year ended December 31, 2017, we performed impairment tests on individual assets of KOMIPO and KOWEPO, both of which are wholly owned subsidiaries, due to potential indicators of impairment. Accordingly, we recognized the amount by which the carrying amount exceeds its recoverable amount as impairment loss on our consolidated statements of comprehensive income. See Note 18 of the notes to our consolidated financial statements included in this annual report for further information.

### *Accrual for Loss Contingencies for Legal Claims*

We are involved in legal proceedings regarding matters arising in the ordinary course of business. In relation to these matters, as of December 31, 2017, we and our subsidiaries were engaged in 565 lawsuits as a defendant and 185 lawsuits as a plaintiff. The total amount claimed against us and our subsidiaries was Won 478 billion and the total amount claimed by us was Won 691 billion as of December 31, 2017. As of December 31, 2017, our provisions for these legal claims amounted to Won 74 billion. These provisions are adjusted when events or circumstances cause these judgments or estimates to change.

Actual amounts of our liabilities as determined upon settlement of legal claims or by final decisions of the courts in relation thereto may be substantially different from the amounts of provisions recognized or contingent liabilities disclosed. If the actual amounts are higher than the amounts of related provisions, the resulting additional liabilities would adversely impact our results of operations, financial condition and cash flows.

## Consolidated Results of Operations

### *2017 Compared to 2016*

In 2017, our consolidated sales, which is principally derived from the sale of electric power, slightly decreased by 0.7% to Won 59,336 billion in 2017 from Won 59,763 billion in 2016, primarily reflecting a decrease in sales of construction services, which was partially offset by an increase in sales of electric power. Our sales of construction services decreased by 20.2% to Won 3,212 billion in 2017 from Won 4,027 billion in 2016, primarily due to a decrease in sales amount recorded from the ongoing construction of our nuclear complex construction projects in the United Arab Emirates as the construction projects progress over time. Our sale of electric power increased by 0.7% to Won 55,773 billion for 2017 from Won 55,379 billion for 2016, primarily due to an increase in the volume of electricity sold, which was partially offset by a decline in the average unit sales price. The volume of electricity sold increased by 2.2% to 507,746 gigawatt hours in 2017 from 497,039 gigawatt hours in 2016, primarily due to a 2.6% increase in the volume of electricity sold to the industrial sector, which represents the largest segment of electricity consumption in Korea, to 285,969 gigawatt hours in 2017 from 278,828 gigawatt hours in 2016, a 2.5% increase in the volume of electricity sold to the commercial sector,

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

which represents the second largest segment of electricity consumption in Korea, to 111,298 gigawatt hours in 2017 from 108,617 gigawatt hours in 2016, and a 0.7% increase in the volume of electricity sold to the residential sector to 68,544 gigawatt hours in 2017 from 68,057 gigawatt hours in 2016. The increase in the volume of electricity sold to the industrial sector was primarily due to the continued export-based growth of the Korean economy, which resulted in increased industrial output and greater utilization of industrial plants. The increase in the volume of electricity sold to the commercial sector was primarily due to the recovery of market demand as a result of various Government policies to boost the economy. The increase in the volume of electricity sold to the residential sector was primarily due to an increase in household electricity usage for air conditioning and heating. Average unit sales price decreased by 1.5% to Won 109.53 per kilowatt-hour in 2017 from Won 111.23 per kilowatt-hour in 2016, primarily due to the amendment to the progressive rate structure to ease the tariff burden on residential customers, effective as of January 1, 2017.

Our consolidated cost of sales, which is principally derived from the purchase of power from independent power producers and to a lesser extent, from raw materials used and depreciation, increased by 14.4%, to Won 52,099 billion in 2017 from Won 45,550 billion in 2016, primarily due to a 32.6% increase in power purchase, a 18.2% increase in raw materials used and a 8.7% increase in depreciation, which were offset by a 11.3% decrease in other cost of sales.

Power purchase, which accounted for 27.4% and 23.6% of our cost of sales in 2017 and 2016, respectively, increased by 32.6% to Won 14,264 billion in 2017 from Won 10,756 billion in 2016, primarily due to a 9.6% increase in the unit cost of power purchased from Won 95.2 per kilowatt-hour in 2016 to Won 104.3 per kilowatt-hour in 2017, largely resulting from a general increase in international market prices for the main fuel types, which led to an increase in the price of electricity generated by independent power producers.

Raw materials used, which accounted for 30.6% and 29.6% of our cost of sales in 2017 and 2016, respectively, increased by 18.2% to Won 15,925 billion in 2017 from Won 13,471 billion in 2016, largely due to a general increase in international market prices.

Depreciation expense, excluding amortization of nuclear fuel charged to fuel costs in the amounts of Won 1,069 billion and Won 1,085 billion in 2017 and 2016, respectively, increased by 10.1% to Won 8,393 billion in 2017 from Won 7,620 billion in 2016 primarily due to an increase of additional property, plant and equipment acquired in relation to new generation facilities pursuant to our capital investment program.

Other cost of sales decreased by 11.3% to Won 3,980 billion in 2017 from Won 4,488 billion in 2016 primarily due to a decrease in other cost of overseas sales.

As a cumulative result of the foregoing factors, our consolidated gross profit decreased by 49.1% to Won 7,237 billion in 2017 from Won 14,213 billion in 2016, and our consolidated gross profit margin decreased to 12.2% in 2017 from 23.8% in 2016. The decreases in our consolidated gross profit and consolidated gross profit margin were largely attributable to a 14.4% increase in our consolidated cost of sales (which was mainly due to a 32.6% increase in power purchase, a 18.2% increase in raw materials used and the 8.7% increase in depreciation, which were offset by a 11.3% decrease in other cost of sales and a 5.9% decrease in taxes and dues), which substantially outpaced the 0.7% decrease in our consolidated sales (which was primarily due to the 2.2% increase in the volume of electricity sold, as well as the 20.2% decrease in the sales of construction services).

Our consolidated selling and administrative expenses increased by 4.7% to Won 2,763 billion in 2017 from Won 2,639 billion in 2016, largely due to a 227.3% increase in bad debt expense to Won 127 billion in 2017 from Won 39 billion in 2016, which mainly related to KOSEP's accounts receivables with low possibility of collection from Hyundai Energy Co., Ltd. and a 230.4% increase in advertising expenses to Won 115 billion in 2017 from Won 35 billion in 2016, related to our sponsorships for the PyeongChang 2018 Winter Olympics and a 11.2% increase in commissions to Won 674 billion in 2017 from Won 606 billion in 2016, for electricity metering, which was offset by a 53.3% decrease in other expenses to Won 155 billion in 2017 from Won 332 billion in 2016, due to a decrease in costs for energy efficiency improvement project.

97

Our consolidated other income, net of expenses, increased by 5.7% to Won 689 billion in 2017 from Won 652 billion in 2016, mainly as a result of an increase in income related to transfer of assets from customers.

Our consolidated net other gains increased significantly to Won 157 billion in 2017 from Won 70 billion in 2016, primarily due to an increase in net gain on foreign currency transaction, largely resulting from fluctuations in the value of Won against other foreign currencies in 2017.

As a cumulative result of the foregoing factors, our consolidated operating profit decreased by 56.7% to Won 5,320 billion in 2017 from Won 12,296 billion in 2016, and our consolidated operating income margin decreased to 9.0% in 2017 from 20.6% in 2016. These decreases were mainly due to a decrease in our consolidated sales and an increase in our cost of sales primarily as a result of increases in power purchase and raw materials due to increases in the fuel costs and the volume of electricity sold.

Our consolidated finance expenses, net, decreased by 3.0% to Won 1,597 billion in 2017 from Won 1,646 billion in 2016, primarily as a result of an increase in net losses on valuation of derivatives and an increase in net losses on transaction of derivatives, which were partially offset by an increase in net gains on foreign currency translation.

We recorded consolidated loss of associates or joint ventures using equity method of Won 108 billion in 2017 compared to a loss of Won 137 billion in 2016, primarily as a result of a decrease in profit of Korea Gas Corporation.

As a cumulative result of the foregoing factors, our consolidated income before income taxes decreased by 65.6% to Won 3,614 billion in 2017 from Won 10,513 billion in 2016.

Our income tax expense decreased by 35.4% to Won 2,173 billion in 2017 from Won 3,365 billion in 2016, largely as a result of the decrease in our profit before income taxes. Our effective tax expense rate, which represents tax expense as a percentage of profit before income taxes, increased from 32.0% in 2016 to 60.1% in 2017 primarily resulting from an adjustment for our recognition of deferred tax liabilities of Won 1,055 billion in 2017 due to 3.3% increase in tax rate, whereas we did not recognize such increase in 2016. Our recognition of deferred tax liabilities was mainly due to temporary differences regarding property, plant and equipment and investments in subsidiaries and associates. In 2017, the applicable statutory tax rate increased to 27.5% from the prior rate of 24.2% in 2016. See Note 41 to our financial statements included in this annual report.

As a cumulative result of the above factors, our consolidated profit decreased by 79.8% to Won 1,441 billion in 2017 from Won 7,148 billion in 2016. Our consolidated net profit margin also decreased to 2.4% in 2017 from 12.0% in 2016. Our profit attributable to the owners of the company was Won 1,299 billion in 2017 compared to Won 7,048 billion attributable to the owners of the company in 2016.

We reported consolidated other comprehensive loss of Won 95 billion in 2017 compared to consolidated other comprehensive loss of Won 2 billion in 2016, largely due to an increase in loss from equity method investments primarily in relation to Korea Gas Corporation, which was partially offset by our recognition of income from remeasurements of defined benefit liability (whereas we recognized loss from such remeasurements) in 2016.

As a cumulative result of the above factors, our consolidated total comprehensive income decreased by 81.2% to Won 1,346 billion in 2017 from Won 7,146 billion in 2016.

*2016 Compared to 2015*

In 2016, our consolidated sales, which is principally derived from the sale of electric power, increased by 2.0% to Won 59,763 billion from Won 58,582 billion in 2015, reflecting primarily a 2.8% increase in the volume

of electricity sold from 483,655 gigawatt hours in 2015 to 497,039 gigawatt hours in 2016. The overall increase in the volume of electricity sold was primarily attributable to a 1.9% increase in the volume of electricity sold to the industrial sector, which represents the largest segment of electricity consumption in Korea, from 273,548 gigawatt hours in 2015 to 278,828 gigawatt hours in 2016, a 4.8% increase in the volume of electricity sold to the commercial sector, which represents the second largest segment of electricity consumption in Korea, from 103,679 gigawatt hours in 2015 to 108,617 gigawatt hours in 2016, and a 3.7% increase in the volume of electricity sold to the residential sector from 65,619 gigawatt hours in 2015 to 68,057 gigawatt hours in 2016. The increase in the volume of electricity sold to the industrial sector was primarily due to the general increase in demand for electricity as a result of the turnaround in industries such as semiconductors, chemicals and petrochemicals, which involved increased industrial output and greater capacity utilization of industrial plants. The increase in the volume of electricity sold to the commercial sector was primarily due to a rebound in the domestic economy and increased air conditioning use in commercial buildings during the summer. The increase in the volume of electricity sold to the residential sector was primarily due to the opening of new urban clusters with large-scale residential complexes as well as increased air conditioning use in residential buildings during the summer. Sales of construction services increased by 7.1% to Won 4,027 billion in 2016 from Won 3,761 billion in 2015 primarily due to an increase in sales recorded from the construction-in-progress of our nuclear complex construction projects in the United Arab Emirates.

Our consolidated cost of sales, which is principally derived from the costs related to the purchase of fuels for generation of electricity and to a lesser extent, from the purchase of power from independent power producers, depreciation and salaries, remained substantially flat, or increased by 0.2%, to Won 45,550 billion in 2016 from Won 45,458 billion in 2015, primarily due to a 15.6% increase in salaries, a 7.3% increase in depreciation and a 9.9% increase in other cost of sales, which were substantially offset by a 7.2% decrease in fuel costs and a 5.9% decrease in power purchase.

Fuel costs, which accounted for 30.9% and 33.3% of our consolidated cost of sales in 2016 and 2015, respectively, decreased by 7.2% to Won 14,067 billion in 2016 from Won 15,159 billion in 2015, largely due to a 24.3% decrease in unit fuel cost mainly resulting from the general decline in international market prices for our main fuel types, as well as an increased use of less expensive fuel sources such as coal and nuclear power, including due to the commencement of operation of one nuclear unit in 2016. Power purchase, which accounted for 23.6% and 25.1% of our cost of sales in 2016 and 2015, respectively, decreased by 5.9% to Won 10,756 billion in 2016 from Won 11,428 billion in 2015, primarily due to a 20.4% decrease in the unit cost of power purchased from Won 119.6 per kilowatt-hour in 2015 to Won 95.2 per kilowatt-hour in 2016, largely resulting from a general decline in international market prices for the main fuel types, which led to a decrease in the price of electricity generated by independent power producers. Depreciation expense, excluding amortization of nuclear fuel charged to fuel costs in the amounts of Won 1,085 billion and Won 1,057 billion in 2016 and in 2015, respectively, increased by 7.3% to Won 7,620 billion in 2016 from Won 7,102 billion in 2015 primarily due to an increase of additional property, plant and equipment acquired in relation to the construction of new generation facilities pursuant to our capital investment program.

Salaries recorded as cost of sales increased by 15.6% to Won 3,426 billion in 2016 from Won 2,962 billion in 2015 primarily due to an increase in base salary in tandem with the inflation rate and an increase in provision expenses related to the ordinary wage litigation for our generation subsidiaries as described in Item 8.A. "Consolidated Statements and Other Financial Information—Legal Proceedings." Other cost of sales increased by 9.9% to Won 4,488 billion in 2016 from Won 4,083 billion in 2015 primarily due to an increase in costs recorded from the construction-in-progress of our nuclear complex construction projects in the United Arab Emirates.

As a cumulative result of the foregoing factors, our consolidated gross profit increased by 8.3% to Won 14,213 billion in 2016 from Won 13,124 billion in 2015, and our consolidated gross profit margin increased to 23.8% in 2016 from 22.4% in 2015. The increases in our consolidated gross profit and consolidated gross profit margin were largely attributable to the 2.0% increase in our consolidated sales (which was primarily due to the

2.8% increase in the volume of electricity sold, as well as the 7.1% increase in the sales of construction services), which substantially outpaced the 0.2% increase in our consolidated cost of sales (which was mainly due to the 15.6% increase in salaries, the 7.3% increase in depreciation and the 9.9% increase in other cost of sales, which were substantially offset by the 7.2% decrease in fuel costs and the 5.9% decrease in power purchase).

Our consolidated selling and administrative expenses increased by 22.6% to Won 2,639 billion in 2016 from Won 2,153 billion in 2015, largely due to a 151.4% increase in other expenses, which mainly resulted from the commencement of a campaign to subsidize households for the use of electronic appliances with high energy efficiency and, to a lesser extent, an increase in salaries recorded as selling and administrative expenses.

Our consolidated other income, net of expenses, decreased by 6.7% to Won 652 billion in 2016 from Won 699 billion in 2015, mainly as a result of a decrease in compensation and reparations revenue, which relate to penalties collected from sub-contractors as a result of contractual breaches.

Our consolidated net other gains decreased significantly to Won 70 billion in 2016 from Won 8,611 billion in 2015, primarily as a result of a decrease in gains on disposal of property, plant and equipment. The decrease in gains on disposal of property, plant and equipment decreased largely due to the absence in 2016 of a disposal of property in magnitude comparable to the sale of our previous headquarters in 2015.

As a cumulative result of the foregoing factors, our consolidated operating profit decreased by 39.4% to Won 12,296 billion in 2016 from Won 20,281 billion in 2015, and our consolidated operating income margin decreased to 20.6% in 2016 from 34.6% in 2015. These decreases were mainly due to a significant decrease in our consolidated net other gains primarily as a result of a decrease in gains on disposal of property, plant and equipment due to the absence in 2016 of a disposal of property in magnitude comparable to the sale of our previous headquarters in 2015.

Our consolidated finance expenses, net, decreased by 10.2% to Won 1,646 billion in 2016 from Won 1,832 billion in 2015, primarily as a result of a decrease in interest expense and a decrease in net losses on foreign currency translation, which were partially offset by a decrease in net gains on valuation of derivatives.

We recorded consolidated loss of associates or joint ventures using equity method of Won 137 billion in 2016 compared to such gain of Won 207 billion in 2015, primarily as a result of a decrease in profit of Korea Gas Corporation.

As a cumulative result of the foregoing factors, our consolidated income before income taxes decreased by 43.6% to Won 10,513 billion in 2016 from Won 18,656 billion in 2015.

Our income tax expense decreased by 35.8% to Won 3,365 billion in 2016 from Won 5,239 billion in 2015, largely as a result of the decrease in our profit before income taxes. Our effective tax expense (benefit) rate, which represents tax expense (benefit) as a percentage of profit (loss) before income taxes, increased from 28.1% in 2015 to 32.0% in 2016 primarily due to an increase of adjustment in respect of prior years due to change in estimate. In 2016, the effective tax rate was higher than the statutory rate of 24.2%, primarily due to the recognition of deferred tax liabilities regarding our investments in subsidiaries, associates and joint ventures, primarily in connection with taxable temporary differences related to undistributed earnings. See Note 41 to our financial statements included in this annual report.

As a cumulative result of the above factors, our consolidated profit decreased by 46.7% to Won 7,148 billion in 2016 from Won 13,416 billion in 2015. Our consolidated net profit margin also decreased to 12.0% in 2016 from 22.9% in 2015. Our profit attributable to the owners of the company was Won 7,048 billion in 2016 compared to Won 13,289 billion attributable to the owners of the company in 2015.

We reported consolidated other comprehensive loss of Won 2 billion in 2016 compared to consolidated other comprehensive income of Won 34 billion in 2015, largely due to decrease in net change in other

comprehensive income from equity method investments primarily in relation to Gemeng International Energy Co., Ltd., which was partially offset by an increase in net change in the realized fair value of available-for-sale securities primarily in relation to PT Adaro Energy Tbk.

As a cumulative result of the above factors, our consolidated total comprehensive income decreased by 46.9% to Won 7,146 billion in 2016 from Won 13,450 billion in 2015.

## Inflation

The effects of inflation in Korea on our financial condition and results of operations are reflected primarily in construction costs as well as in labor expenses. Inflation in Korea has not had a significant impact on our results of operations in recent years. It is possible that inflation in the future may have an adverse effect on our financial condition or results of operations.

## Segment Results

We operate the following business segments: transmission and distribution, nuclear power generation and thermal power generation and all others. The transmission and distribution segment, which is operated by us, the parent company, consists of operations related to the transmission, distribution and sale to end-users of electricity purchased from our generation subsidiaries as well as from independent power producers. The power generation segment, which is operated by our one nuclear generation subsidiary and five non-nuclear generation subsidiaries, consists of operations related to the generation of electricity sold to us through the Korea Power Exchange. The transmission and distribution segment and the power generation segment together represent our electricity business. The remainder of our operation is categorized as "all others." The all other segment consists primarily of operations related to the plant maintenance and engineering service, information services, and sales of nuclear fuel, communication line leasing, overseas businesses and others. In 2015, 2016 and 2017, the unaffiliated revenues of the power generation segment (representing the six generation subsidiaries) and all our other revenues in the aggregate amounted to only 2.8%, 3.0% and 3.2% of our consolidated revenues, respectively, and the results of operations for our business segments substantially mirror our consolidated results of operations. For further information, see Note 4 of the notes to our consolidated financial statements included in this annual report.

## Item 5.B.  Liquidity and Capital Resources

*We expect that our capital requirements, capital resources and liquidity position may change in the course of implementing the Restructuring Plan. See Item 4.B. "—Business Overview—Restructuring of the Electric Power Industry in Korea" and Item 3D. "Risk Factors—Risks Relating to KEPCO—The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."*

## Capital Requirements

We anticipate that the following represent the major sources of our capital requirements in the short-term to intermediate future:

- capital expenditures pursuant to our capital investment program;

- working capital requirements, the largest component of which is fuel purchases;

- payment of principal and interest on our existing debt; and

- overseas investments.

In addition, if there were to occur unanticipated material changes to the Restructuring Plan, the Basic Plan or other major policy initiatives of the Government relating to the electric power industry, or natural disasters, such developments may require a significant amount of additional capital requirements.

**Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved**

### Capital Expenditures

We anticipate that capital expenditures will be the most significant use of our funds for the next several years. Our capital expenditures relate primarily to the construction of new generation units, maintenance of existing generation units and expansion of our transmission and distribution systems. Our capital expenditures generally follow budgets established under the Basic Plan, which contains projections relating to the supply and demand of electricity of Korea based on which we plan the construction of additional generation units and transmission systems.

Our total capital expenditures for the construction of generation, transmission and distribution facilities were Won 15,750 billion, Won 13,950 billion and Won 13,711 billion in 2015, 2016 and 2017, respectively, and under our current budgets, are estimated to be approximately Won 15,816 billion, Won 17,180 billion and Won 17,580 billion in 2018, 2019 and 2020, respectively. We plan to finance our capital expenditures primarily through issuance of securities in the capital markets, borrowings from financial institutions and construction grants.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. We contributed Won 500 billion to the funds in 2016. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector.

Furthermore, as part of the Comprehensive Measures against Particulate Matter and the Eighth Basic Plan, announced by the Government in September 2017 and December 2017, respectively, the Government set forth the following policy directions relating to coal-fired generation units: (i) two coal-fired generation units scheduled for construction and four existing coal-fired generation units shall convert to LNG fuel use, (ii) in principle, construction of new coal-fired generation units shall not be planned, (iii) seven of the coal-fired generation units that are 30 years or older will be shut down on an accelerated schedule, (iv) coal-fired generation units that are 30 years or older shall temporarily cease operations from March through June of each year, (v) coal-fired generation units shall be put through comprehensive functional and environmental upgrades and (vi) coal-fired generation units shall be subject to emission standards that are twice as more rigorous than the current standards to be in effect by the first half of 2018. Compliance with such measures is expected to result in our incurring significant costs.

### Fuel Purchases

We require significant funds to finance our operations, principally in relation to the purchase of fuels by our generation subsidiaries for generation of electricity. In 2015, 2016 and 2017, fuel costs constituted 33.3%, 30.9% and 31.7% of our cost of sales and the ratio of fuel costs to our sales was 25.9%, 23.4% and 27.8%, respectively. We plan to fund our fuel purchases primarily with net operating cash, although in cases of rapid increases in fuel prices as is the case from time to time, we may also rely on borrowings from financial institutions and issuance of debt securities in the capital markets.

### Repayment of Existing Debt

Payments of principal and interest on indebtedness will require considerable resources. The table below sets forth the scheduled maturities of the outstanding interest-paying debt (excluding issue discounts and premium) without taking into consideration of swap transactions of us and our six wholly-owned generation subsidiaries as

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

of December 31, 2017 for each year from 2018 to 2022 and thereafter. As of December 31, 2017, such debt represented 95.6% of our outstanding debt on a consolidated basis.

| Year ended December 31 | Local Currency Borrowings | Foreign Currency Borrowings | Domestic Debentures | Foreign Debentures | Total |
|---|---|---|---|---|---|
| | (in billions of Won) | | | | |
| 2018 | 761 | — | 5,200 | 2,761 | 8,722 |
| 2019 | 8 | — | 5,220 | 1,402 | 6,630 |
| 2020 | 8 | — | 5,850 | 1,129 | 6,987 |
| 2021 | 208 | 8 | 3,690 | 857 | 4,763 |
| 2022 | 208 | 1 | 5,560 | 1,339 | 7,108 |
| Thereafter | 31 | — | 16,450 | 1,771 | 18,252 |
| Total | 1,224 | 9 | 41,970 | 9,259 | 52,462 |

We and our six wholly-owned generation subsidiaries incurred interest charges (including capitalized interest) in relation to our interest-paying debt of Won 2,846 billion, Won 2,490 billion and Won 2,287 billion in 2015, 2016 and 2017, respectively. We anticipate that interest charges will increase in future years because of, among other factors, anticipated increases in our long-term debt. See "—Capital Resources" below. The weighted average rates of interest on our and our six wholly-owned generation subsidiaries' debt were 3.87%, 3.69% and 3.20% in 2015, 2016 and 2017, respectively.

*Overseas Investments*

As part of our revenue diversification and fuel procurement strategy, we plan to continue to make overseas investments on a selective basis, which will be funded primarily through foreign currency-denominated borrowings and debt securities issuances as well as net operating cash from such projects.

**Capital Resources**

We have traditionally met our working capital and other capital requirements primarily from net cash provided by operating activities, issuance of debt securities and borrowings from financial institutions. Net cash provided by operating activities is primarily a function of electricity sales and fuel purchases and is also affected by increases and decreases in trade receivables, trade payables and inventory related to electricity sales and fuel purchases. Net cash provided by operating activities was Won 16,943 billion, Won 16,521 billion and Won 11,250 billion in 2015, 2016 and 2017, respectively.

As of December 31, 2015, 2016 and 2017, our long-term debt (excluding the current portion but including issue discounts and premium), without taking into consideration of swap transactions, amounted to Won 50,907 billion, Won 44,700 billion and Won 45,624 billion, respectively, representing 74.9%, 61.2% and 62.5% of shareholders' equity, respectively, as of such dates. As of December 31, 2015, 2016 and 2017, the current portions of our long-term debt were Won 7,243 billion, Won 8,134 billion and Won 8,085 billion, respectively. As of December 31, 2015, 2016 and 2017, our short-term borrowings amounted to Won 604 billion, Won 806 billion and Won 1,038 billion, respectively. See Note 23 of the notes to our consolidated financial statements included in this annual report. Total long-term debt (including the current portion but excluding issue discounts and premium), without taking into consideration of swap transactions, as of December 31, 2017 was Won 53,816 billion, of which Won 43,353 billion was denominated in Won and an equivalent of Won 10,463 billion was denominated in foreign currencies, primarily U.S. dollars. We, KHNP, KOMIPO and KOWEPO also maintain global medium-term note programs in the aggregate amount of US$13.0 billion, of which approximately US$8.9 billion remains currently available for future drawdown. KOSEP also maintains an A$2 billion Australian dollar medium-term note program, of which approximately A$1.7 billion remains current available for future drawdown.

Subject to the implementation of our capital expenditure plan and the sale of our interests in our generation subsidiaries and other subsidiaries, our long-term debt may increase or decrease in future years. Until recently, a

significant portion of our long-term debt was raised through foreign currency-denominated borrowings. Our foreign currency-denominated long-term debt (including the current portion but excluding issue discounts and premium), without taking into consideration of swap transactions, amounted to Won 12,219 billion and Won 10,463 billion as of December 31, 2016 and 2017, respectively.

Our ability to incur long-term debt in the future is subject to a variety of factors, many of which are beyond our control, including, the implementation of the Restructuring Plan and the amount of capital that other Korean entities may seek to raise in capital markets. Economic, political and other conditions in Korea may also affect investor demand for our securities and those of other Korean entities. In addition, our ability to incur debt will also be affected by the Government's policies relating to foreign currency borrowings, the liquidity of the Korean capital markets and our operating results and financial condition. In case of adverse developments in Korea, the price at which such financing may be available may not be acceptable to us.

We incur our short-term borrowings primarily through commercial papers sold to domestic financial institutions. We have not had, and we do not expect to have, any material difficulties in obtaining short-term borrowings. In addition, in order to prepare for potential liquidity shortage, we maintain several credit facilities with financial institutions, with Won-denominated facilities amounting to Won 3,831 billion in aggregate and foreign currency-denominated facilities amounting to US$1,911 million in aggregate. The full amount of these facilities was available as of December 31, 2017.

We may raise capital from time to time through the issuance of equity securities. However, there are certain restrictions on our ability to issue equity, including limitations on shareholdings by foreigners. In addition, without changes in the existing KEPCO Act which requires that the Government, directly or pursuant to the Korea Development Bank Act, through Korea Development Bank, own at least 51% of our capital stock, it may be difficult or impossible for us to undertake any equity financing other than sales of treasury stock without the participation of the Government. Even if we are able to conduct equity financing with the participation of the Government, prevailing market conditions may be such that we may not be able conduct equity financing on terms that are commercially acceptable to us. See Item 3D. "Risk Factors—Risks Relating to Korea and the Global Economy."

Our total shareholders' equity decreased by 0.1% from Won 73,051 billion as of December 31, 2016 to Won 72,965 billion as of December 31, 2017, mainly as a result of an increase in total comprehensive income.

**Liquidity**

Our liquidity is substantially affected by our acquisition of property, plant and equipment, fuel purchases and schedule of repayment of debt. Our property, plant and equipment increased by 3.5% from Won 145,743 billion as of December 31, 2016 to Won 150,882 billion as of December 31, 2017. Although fuel costs increased by 17.5% from Won 14,067 billion in 2016 to Won 16,524 billion in 2017, our current trade and other payables which is closely related to fuel costs increased by 7.4% from Won 5,585 billion as of December 31, 2016 to Won 6,000 billion as of December 31, 2017. Our current financial liabilities increased by 2.8% from Won 8,942 billion as of December 31, 2016 to Won 9,195 billion as of December 31, 2017 according to our debt repayment schedule.

Our cash flows are also impacted by other factors. Our net cash provided by operating activities decreased by 31.9% from Won 16,521 billion in 2016 to Won 11,250 billion in 2017. The decrease in net cash provided by operating activities in 2017 compared to 2016 was mainly due to a decrease in profit for the period. Our cash flows from investing activities are affected by acquisition of and proceeds from disposals of financial assets. Our net cash used in investing activities increased by 30.7% from Won 9,646 billion in 2016 to Won 12,607 billion in 2017, mainly because our acquisition of financial assets outpaced disposals of financial assets. Our cash flows from financing activities are mainly affected by borrowings and issuance of debt securities and repayment thereof, as well as dividends paid. Our net cash used in financing activities was Won 7,637 billion in 2016 and

our net cash from financing activities was Won 746 billion in 2017, largely due to an increase in proceeds from long-term borrowings and debt securities.

Due to the capital-intensive nature of our business as well as significant volatility in fuel prices, from time to time we operate with working capital deficits, and we may have substantial working capital deficits in the future. As of December 31, 2015, 2016 and 2017, we had a working capital deficit of Won 686 billion, Won 5,031 billion and Won 4,283 billion, respectively. We have traditionally met our working capital and other capital requirements primarily with net cash provided by operating activities, issuance of debt securities, borrowings from financial institutions and construction grants. We also incur short-term borrowings primarily through commercial papers sold to domestic financial institutions. We have not had, and we do not expect to have, any material difficulties in obtaining short-term borrowings. See "—Capital Resources."

We may face liquidity concerns in the case of sudden and sharp depreciation of the Won against major foreign currencies or depreciation over a sustained period of time. While substantially all of our revenues and our cash and cash equivalents are denominated in Won, we pay for substantially all of our fuel purchases in foreign currencies and a substantial portion of our long-term debt is denominated in foreign currencies, and payment of principal and interest thereon is made in foreign currencies. In the past, we have incurred foreign currency debt principally due to the limited availability and the high cost of Won-denominated financing in Korea. However, in light of the increasing sophistication of the Korean capital markets and the recent increase in Won liquidity in the Korean financial markets, we plan to reduce the portion of our debt which is denominated in foreign currencies although we intend to continue to raise certain amounts of capital through long-term foreign currency debt for purposes of maintaining diversity in our funding sources as well as paying for overseas investments and fuel procurements in foreign currencies. As of December 31, 2017, 19.4% of our long-term debt (including the current portion but excluding issue discounts and premium) without taking into consideration of swap transactions was denominated in currencies other than Won.

We enter into currency swaps and other hedging arrangements with respect to our debt denominated in foreign currencies only to a limited extent due primarily to the limited size of the Korean market for such derivative arrangements. Such instruments include combined currency and interest rate swap agreements, interest rate swaps and foreign exchange agreements. We do not enter into derivative financial instruments in order to hedge market risk resulting from fluctuations in fuel costs. Our policy is to hold or issue derivative financial instruments for hedging purposes only. Our derivative financial instruments are entered into with major financial institutions, thereby minimizing the risk of credit loss. See Note 11 of the notes to our consolidated financial statements.

We paid dividends of Won 3,100 per share in respect of fiscal year 2015 and Won 1,980 per share in respect of fiscal year 2016. On April 20, 2018, we paid dividends of Won 790 per share in respect of fiscal year 2017.

**Other**

Our operations are materially affected by the policies and actions of the Government. See Item 4.B. "Business Overview—Regulation."

**Item 5.C. Research and Development, Patents and Licenses, etc.**

**Research and Development**

Our research and development program is focused on developing advanced electric power, renewable energy, smart grid and customer-friendly electricity service technologies that will enable us to become a global leader in the energy industry. In order to achieve our corporate vision of becoming a "Smart Energy Creator" in 2014, we adopted the KEPCO Technology Strategy, which emphasizes enhanced technological convergence and customer service. As part of such strategy, we seek to develop (i) clean and smart energy technology, including

105

in relation to low carbon emission in power generation, (ii) an efficient and intelligent power transmission and distribution grid system, (iii) technology that will enhance efficiency and responsiveness to consumer's electricity consumption patterns, and (iv) improvements in information, communication and technology, or ICT, for enhanced customer service.

In 2018, consistent with the Government guidelines, we plan to invest approximately 4.42% of our annual estimated net sales in the research and development of "creative smart" technologies, particularly with a focus on the following ten areas: carbon-related technology known as "carbon capture, utilization and storage ", offshore wind power, new power transmission technology, super conductor, smart grid, micro grid, new materials in electric power fields, ICT convergence, ICT integration and energy storage systems.

Our high-priority "creative smart energy" projects currently include the following:

- acquiring integrated gasified process technology;

- establishing high-tech smart grid and micro grid test beds in Jeju Island;

- developing highly efficient absorbents for carbon capture;

- commercializing offshore wind power plants;

- obtaining high-voltage direct currents technology suitable for domestic operation; and

- experimental testing of large-scale energy storage systems with capacities ranging from four to eight megawatts.

Our research and development activities also focus on the following:

- in the thermal power generation sector, reducing the greenhouse effect, enhancing efficiency and reducing cost in power plant construction and operation as well as in our plant maintenance, including through improvements in damage analysis and environment-friendly inspections;

- in the renewable energy sector, enhancing efficiency, lowering costs of power generation, identifying new energy sources and exploring new business opportunities;

- in the electric power system sector, enhancing the stability and reliability in the operation of our electric power grid as well as enhancing efficiency in electricity distribution, including through build-out of large-sized electricity storage facilities and superconducting transmission cable grids, introducing preventive maintenance measures for substations and developing technologies related to system automation, power utilization and power line communication;

- in the customer service sector, developing technologies enabling a greater range of business opportunities and heightened customer service in anticipation of the upcoming rollout of the smart grid system; and

- in the technological convergence sector, identifying new business opportunities through convergence among technologies and businesses and maximizing synergy from such convergence in tandem with the promotion of creative economy in Korea as well as globally.

In addition, we cooperate closely with several other electric utility companies and research institutes, both foreign and domestic, on various projects to diversify the scope and scale of our research and development activities.

We and our six generation subsidiaries invested Won 660 billion, Won 530 billion and Won 975 billion in 2015, 2016 and 2017, respectively, and currently plan to invest Won 1,209 billion in 2018, on research and development. Our current focus in research and development is primarily in the area of ICT-based smart energy technological development. We had 1,056 employees engaged in research and development activities as of December 31, 2017. As a result of our research, we had 2,135 registered patents and 1,578 patent applications outstanding in Korea and abroad as of December 31, 2017.

106

**Item 5.D. Trend Information**

Trends, uncertainties and events which could have a material impact on our sales, liquidity and capital resources are discussed above in Item 5.A. "Operating Results" and Item 5.B. "Liquidity and Capital Resources."

**Item 5.E. Off-Balance Sheet Arrangements**

We had no significant off-balance sheet arrangements as of December 31, 2017.

**Item 5.F. Tabular Disclosure of Contractual Obligations**

The following summarizes certain of the contractual obligations of us and our six wholly-owned generation subsidiaries as of December 31, 2017 and the effect such obligations are expected to have on liquidity and cash flow in future periods.

| Contractual Obligations[1] | Total | Less than 1 year | 1–3 years | 3–5 years | After 5 years |
|---|---|---|---|---|---|
| | | (in billions of Won) | | | |
| Long-term debt[2] | ₩51,733 | ₩ 7,994 | ₩13,617 | ₩11,871 | ₩18,251 |
| Short-term borrowings | 729 | 729 | — | — | — |
| Interest payments[3] | 8,667 | 1,565 | 2,015 | 1,184 | 3,903 |
| Total | ₩61,129 | ₩10,288 | ₩15,632 | ₩13,055 | ₩22,154 |

*Notes:*

(1) Other than as set forth in this table, we have several other contractual obligations, including finance lease agreements and fuel purchase agreements. We believe the remaining annual payments under capital and operating lease agreements as of December 31, 2017 were immaterial. Contractual obligations related to payment of debt of us and our six wholly-owned generation subsidiaries represented 97.5% of our outstanding debt as of December 31, 2017 on a consolidated basis. As for fuel purchase agreements, our generation subsidiaries have entered into several contracts under which they are committed to purchasing minimum quantities of fuel, including approximately 80 million tons of bituminous coal annually. As for all uranium ore concentrates, in order to ensure stable supply, our subsidiary enters into long-term and medium-term contracts with various suppliers and supplements such supplies with purchases in spot markets. We negotiate annually with Korea Gas Corporation and other suppliers, to purchase LNG. The fuel purchase price is typically negotiated near or at time of purchase subject to prevailing market conditions. In 2017, we purchased fuel in the amount of Won 16.2 trillion.

(2) Includes the current portion.

(3) A portion of our debt carried a variable rate of interest. We used the interest rate in effect as of December 31, 2017 for the variable rate of interest in calculating the interest payments on debt for the periods indicated.

For a description of our commercial commitments and contingent liabilities, see Note 50 of the notes to our consolidated financial statements included in this annual report.

We entered into a power purchase agreement with GS EPS Co., Ltd. and three other non-renewable energy independent power producers that are not part of the Community Energy System, under which we are required to purchase all electricity generated by these companies to the extent such electricity is traded through the Korea Power Exchange. The purchase prices for such electricity are predetermined under the power purchase agreements, subject to annual adjustments. We purchased power from these companies in the amounts of Won 1,049 billion, Won 896 billion and Won 941 billion in 2015, 2016 and 2017, respectively.

107

We meet our coal requirements primarily through purchases of bituminous coal and anthracite coal under long-term supply contracts with domestic and foreign suppliers to purchase. Under these long-term supply contracts, purchase prices are adjusted periodically based on prevailing market conditions. We also purchase a substantial portion of our LNG requirements from Korea Gas Corporation, a related party. We have also entered into long-term transportation contracts with Pan Ocean Co., Ltd. and others.

We import all uranium ore concentrates from sources outside Korea (including the United Kingdom, Kazakhstan, France, Germany, Niger, Canada and Japan) through medium- to long-term contracts and pay for such concentrates with currencies other than Won, primarily U.S. dollars. Contract prices for processing of uranium are generally based on market prices. See Note 49 of the notes to our consolidated financial statements for further details of these contracts.

Under the Long-term Transmission and Substation Plan approved by the Ministry of Trade, Industry and Energy, we are liable for the construction of all of our power transmission facilities and the maintenance and repair expenses for such facilities.

Payment guarantee and short-term credit facilities from financial institutions as of December 31, 2017 were as follows:

### *Payment guarantee*

| Description | Financial Institutions | Credit Lines | |
|---|---|---|---|
| | | **(In millions of Won or thousands of USD, JPY, INR, CAD, SAR, NPR, ZAR and EUR)** | |
| Payment of import letter of credits . . . . . . . . . | Woori Bank and others | USD | 1,029,604 |
| | Shinhan Bank | INR | 47,489 |
| Inclusive credits . . . . . . . . . . . . . . . . . . . . . . | KEB Hana Bank | KRW | 258,000 |
| | Shinhan Bank and others | USD | 32,125 |
| Performance guarantees on Contract . . . . . . . | KEB Hana Bank | EUR | 1,958 |
| | KEB Hana Bank and others | INR | 230,515 |
| | Korea Development Bank and others | JPY | 620,000 |
| | Seoul Guarantee Insurance and others | KRW | 104,248 |
| | Bank of Kathmandu | NPR | 32,633 |
| | KEB Hana Bank | SAR | 102,186 |
| | Standard Chartered and others | USD | 753,652 |
| | KEB Hana Bank | CAD | 168 |
| Guarantees for bid . . . . . . . . . . . . . . . . . . . . . | SMBC and others | USD | 60,000 |
| | ABSA and others | ZAR | 55,730 |
| Warranty bond and others . . . . . . . . . . . . . . . | KEB Hana Bank | INR | 157,830 |
| | Export-Import Bank of Korea and others | USD | 3,850,534 |
| Trade finance . . . . . . . . . . . . . . . . . . . . . . . . . | BNP Paribas and others | USD | 800,000 |
| Other guarantees . . . . . . . . . . . . . . . . . . . . . | Nonghyup Bank and others | KRW | 451,521 |
| | KEB Hana Bank and others | USD | 1,063,670 |

108

*Overdraft and Others*

| Description | Financial Institutions | Credit Lines |
| --- | --- | --- |
| | | (In millions of Won, thousands of USD or thousands of PHP) |
| Overdraft . . . . . . . . . . . . . . . . . . . . . . . . . . . | Nonghyup Bank and others | KRW    1,835,000 |
| Commercial paper . . . . . . . . . . . . . . . . . . . . . | Shinhan Bank and others | KRW    1,100,000 |
| Limit amount available for card . . . . . . . . . . | KEB Hana Bank and others | KRW    46,733 |
| | Banco de Oro | PHP    5,000 |
| Loan limit . . . . . . . . . . . . . . . . . . . . . . . . . | Kookmin Bank and others | KRW    895,500 |
| | BNP Paribas and others | USD    1,910,700 |

We provide a performance guarantee related to a construction contract to Kookmin Bank. Such guarantee is not recognized as a provision for financial guarantee because such performance guarantee does not meet the definition of a financial guarantee contract under IFRS.

In order to secure our status as a shareholder of Navanakom Electric Co., Ltd., we have signed a fund supplement contract. According to the contract, in case Navanakom Electric Co., Ltd. does not have sufficient funds for its operation or repayment of borrowings, we bear a payment obligation in proportion to our ownership.

We have outstanding borrowings with a limit of US$275,600 thousand from creditors such as International Finance Corporation. Regarding the borrowing contract, we have guaranteed capital contribution of US$69,808 thousand and additional contribution up to US$19 million for contingencies, if any. For one of the electricity purchasers, Central Power Purchasing Agency Guarantee Ltd., we have provided payment guarantee up to US$2,777 thousand, in case of a construction delay or insufficient contract volume after commencement of the construction.

We have provided PT. Perusahaan Listrik Negara performance guarantee up to US$2,293 thousand and Mizuho Bank and others investment guarantee up to US$43,500 thousand in proportion to our ownership in the electricity purchase contract with PT. Cirebon Energi Prasarana in relation to the second electric power generation business in Cirebon, Indonesia. In addition, we have provided the Bank of Tokyo Mitsubishi UFJ (BTMU) borrowing guarantee up to US$41,258 thousand in proportion to our ownership in the equity bridge loan guarantee with PT. Cirebon Energi Prasarana.

We have provided the Export-Import Bank of Korea and SMBC guarantee of mutual investment of US$401 thousand, which is equivalent to the ownership interest of PT Mega Power Mandiri, in order to guarantee the expenses related to hydroelectric power business of PT Wampu Electric Power, our associate.

We have provided the Export-Import Bank of Korea, BNP Paribas and ING Bank guarantee of mutual investment of US$2,440 thousand, which is equivalent to the ownership interest of PT BS Energy and PT Nusantara Hydro Alam, in order to guarantee the expenses related to hydroelectric power business of Tanggamus, Indonesia.

We have provided Samsung C&T Corporation bidding guarantee up to US$793 thousand to participate in the bidding of the Sri Lanka combined cycle project.

Existing guarantees provided by us to our associates and joint ventures as of December 31, 2017 are as follows.

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
| --- | --- | --- | --- | --- | --- |
| KEPCO . . . . . . . . | Shuweihat Asia O&M Co., Ltd. | Performance guarantees | USD | 11,000 | SAPCO |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| KEPCO . . . . . . . . | KNOC Nigerian East Oil Co., Ltd. and KNOC Nigerian West Oil Co., Ltd. | Performance guarantees | USD | 34,650 | Korea National Oil Corporation (Nigerian government) |
| KEPCO . . . . . . . . | Rabigh Operation & Maintenance Company Limited | Performance guarantees and others | USD | 1,387 | RABEC |
| KEPCO . . . . . . . . | Nghi Son 2 Power Ltd. | Bidding guarantees | USD | 10,000 | SMBC Ho Chi Minh |
| KEPCO . . . . . . . . | Barakah One Company | Debt guarantees | USD | 900,000 | Export-Import Bank of Korea and others |
| | | Performance guarantees and others | USD | 3,404,275 | |
| KOWEPO . . . . . . | Cheongna Energy Co., Ltd. | Collateralized money invested | KRW | 27,211 | KEB Hana Bank and others |
| | | Guarantees for supplemental funding[1] | | — | |
| KOWEPO . . . . . . | Xe-Pian Xe-Namnoy Power Co., Ltd. | Payment guarantees for business reserve | USD | 2,500 | Krung Thai Bank |
| | | Collateralized money invested | USD | 62,253 | Krung Thai Bank |
| | | Impounding bonus guarantees | USD | 5,000 | SK E&C |
| KOWEPO . . . . . . | Rabigh O&M Co., Ltd. | Performance guarantees and others | SAR | 5,600 | Saudi Arabia British Bank |
| KOWEPO . . . . . . | Deagu Photovoltaic Co., Ltd. | Collateralized money invested | KRW | 1,230 | Korea Development Bank |
| KOWEPO . . . . . . | Dongducheon Dream Power Co., Ltd. | Collateralized money invested | KRW | 53,233 | Kookmin Bank and others |
| KOWEPO . . . . . . | PT. Mutiara Jawa | Collateralized money invested | USD | 2,610 | Woori Bank |
| KOWEPO . . . . . . | Heangbok Do Si Photovoltaic Power Co., Ltd. | Collateralized money invested | KRW | 194 | Nonghyup Bank |
| KOWEPO . . . . . . | Shin Pyeongtaek Power Co., Ltd. | Collateralized money invested | KRW | 43,920 | Kookmin Bank |
| EWP . . . . . . . . . | Busan Shinho Solar Power Co., Ltd. | Collateralized money invested | KRW | 2,100 | Korea Development Bank and others |
| EWP . . . . . . . . . | Seokmun Energy Co., Ltd. | Collateralized money invested | KRW | 15,370 | KEB Hana Bank and others |
| EWP . . . . . . . . . | Chun-cheon Energy Co., Ltd. | Collateralized money invested | KRW | 52,700 | Kookmin Bank and others |
| | | Guarantees for supplemental funding[1] | KRW | 60,270 | Kookmin Bank and others |
| EWP . . . . . . . . . | Honam Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,480 | Shinhan Bank and others |

110

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| EWP . . . . . . . . . . | GS-Donghae Electric Power Co., Ltd. | Collateralized money invested | KRW | 204,000 | Korea Development Bank and others |
| EWP . . . . . . . . . | Yeonggwangbaeksu Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,000 | Kookmin Bank and others |
| EWP . . . . . . . . . | Yeonggwang Wind Power Co., Ltd | Collateralized money invested | KRW | 15,375 | KEB Hana Bank and others |
| EWP . . . . . . . . . | PT. Tanjung Power Indonesia | Debt guarantees | USD | 46,983 | The Bank of Tokyo-Mitsubishi and others |
| | | Other guarantees | USD | 3,150 | PT Adaro Indonesia |
| EWP Barbados 1 SRL . . . . . . . | Jamaica Public Service Company Limited | Performance guarantees | USD | 14,400 | Societe Generale |
| | | Guarantees for supplemental funding and others[1][3] | USD | 60,000 | JCSD Trustee Services Limited and others |
| KOSPO | KNH Solar Co., Ltd. | Collateralized money invested | KRW | 1,296 | Shinhan Bank and Kyobo Life Insurance Co., Ltd. |
| | | Performance guarantees and guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . . | Daeryun Power Co., Ltd. | Collateralized money invested | KRW | 25,477 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . . | Changjuk Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,801 | Shinhan Bank |
| | | Guarantees for supplemental funding[1] | | — | |
| KOSPO . . . . . . . . | Daegu Green Power Co., Ltd. | Collateralized money invested | KRW | 46,226 | Shinhan Bank |
| KOSPO . . . . . . . . | Kelar S.A. | Performance guarantees | USD | 63,707 | KEB Hana Bank, SMBC, Mizuho Bank and others |
| KOSPO . . . . . . . . | DS Power Co., Ltd. | Collateralized money invested | KRW | 2,900 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . . | Pyeongchang Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,875 | Woori Bank and Shinhan Bank |

111

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| | | Performance guarantees and guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . . | Taebaek Wind Power Co., Ltd. | Guarantees for supplemental funding and others[1] | | — | Shinhan Bank |
| KOSPO . . . . . . . . | Jeongam Wind Power Co., Ltd. | Collateralized money invested | KRW | 5,580 | SK Securities Co., Ltd. |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . . | Naepo Green Energy Co., Ltd. | Collateralized money invested | KRW | 29,200 | Hana Financial Investment Co., Ltd. and others |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KEPCO E&C . . . | DS Power Co., Ltd. | Collateralized money invested | KRW | 15,000 | Korea Development Bank and others |
| KOMIPO . . . . . . . | Hyundai Green Power Co., Ltd. | Collateralized money invested | KRW | 87,003 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KOMIPO . . . . . . . | PT. Cirebon Electric Power | Debt guarantees | USD | 11,550 | Mizuho Bank |
| KOMIPO . . . . . . . | PT. Wampu Electric Power | Debt guarantees | USD | 5,068 | SMBC |
| KOMIPO . . . . . . . | Gangwon Wind Power Co., Ltd. | Collateralized money invested | KRW | 7,409 | IBK and others |
| KOMIPO . . . . . . . | YaksuESS Co., Ltd. | Collateralized money invested | KRW | 210 | Hanwha Life Insurance Co., Ltd. |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KOSEP . . . . . . . . | Hyundai Energy Co., Ltd. | Collateralized money invested | KRW | 47,067 | Korea Development Bank and others |
| | | Performance guarantees and guarantees for supplemental funding and others[1] | KRW | 78,600 | |
| KOSEP . . . . . . . . | RES Technology AD | Collateralized money invested | KRW | 15,595 | UniCredit Bulbank and others |

112

| Primary Guarantor (Providing Company) | Principal Obligor | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| KOSEP . . . . . . . . | ASM-BG Investicii AD | Collateralized money invested | KRW | 16,101 | UniCredit Bulbank and others |
| KOSEP . . . . . . . . | Express Solar-light Power Generation Co., Ltd. | Guarantees for supplemental funding and others[1][2] | KRW | 2,500 | Woori Bank |
| KOSEP . . . . . . . . | S-Power Co., Ltd. | Collateralized money invested | KRW | 132,300 | Korea Development Bank and others |
| KOSEP USA, INC. . . . . . . . . | KODE NOVUS II LLC | Guarantees for supplemental funding and others[1] | | — | Korea Development Bank |
| KOSEP USA, INC. . . . . . . . . | KODE NOVUS I LLC | Guarantees for supplemental funding and others[1] | | — | The Export-Import Bank of Korea and others |
| KHNP . . . . . . . . . | Yeongwol Energy Station Co., Ltd. | Collateralized money invested | KRW | 1,400 | Meritz Fire & Marine Insurance Co., Ltd. |
| KHNP . . . . . . . . . | Noeul Green Energy Co., Ltd. | Collateralized money invested | KRW | 1,740 | KEB Hana Bank and others |
| KHNP . . . . . . . . . | Busan Green Energy Co., Ltd. | Collateralized money invested | KRW | 5,243 | Shinhan Bank and others |
| KEPCO KPS . . . . | Incheon New Power Co., Ltd. | Collateralized money invested | KRW | 8,160 | Shinhan Bank |
| | | Guarantees for supplemental funding and others[1] | | — | |

_____

*Note:*

(1) We guarantee to provide supplemental funding for businesses with respect to excessive business expenses or insufficient repayment of borrowings.

(2) We have granted the right to Hana Financial Investment Co., Ltd., as an agent for the creditors to Express Solar-light Power Generation Co., Ltd.("ESPG"), to the effect that in the event of acceleration of ESPG's payment obligations under certain borrowings to such creditors, Hana Financial my demand us to dispose of shares in ESPG held by us and apply the resulting proceeds to repayment of ESPG's obligations.

(3) This includes a guarantee for the shareholder's capital payment in connection with the business of 190MW has complex thermal power plant in Jamaica. EWP (Barbados) 1 SRL's capital contribution amount is USD 6,400 thousand and the total amount of guarantees is USD 27,000 thousand which consists of USD 12,000 thousand of EWP (Barbados) 1 SRL's contribution obligation and USD 15,000 thousand of SJEH's portion (50%) of contribution obligation.

Other than as described in this annual report and also in Notes 47 and 50 of the notes to our consolidated financial statements included in this annual report, we did not have any other material credit lines and guarantee commitments provided to any third parties as of December 31, 2017.

113

## ITEM 6.   *DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES*

### Item 6.A. Directors and Senior Management

### Board of Directors

Under the KEPCO Act, the Act on the Management of Public Institutions and our Articles of Incorporation, our board of directors, which is required to consist of not more than 15 directors, including the president, is vested with the authority over our management.

Pursuant to our Articles of Incorporation and the Act on the Management of Public Institutions, we have two types of directors: standing directors (*sangim-isa* in Korean) and non-standing directors (*bisangim-isa* in Korean). The standing directors refer to our directors who serve their directorship positions in full-time capacity. Many of our standing directors concurrently hold executive positions with us or our subsidiaries. The non-standing directors refer to our directors who do not serve their directorship positions in full-time capacity. The non-standing directors currently do not hold any executive positions with us or our subsidiaries.

Under our Articles of Incorporation, there may not be more than seven standing directors, including our president, and more than eight non-standing directors. The number of non-standing directors must exceed the number of standing directors, including our president. A senior non-standing director appointed by the Ministry of Strategy and Finance becomes our chairman of the board following the review and resolution of the Public Agencies Operating Committee.

Our president serves as our chief executive officer and represents us and administers our day-to-day business in all matters and bears the responsibility for the management's performance. Our president is appointed by the President of the Republic upon the motion of the Ministry of Trade, Industry and Energy following the nomination by our director nomination committee, the review and resolution of the Public Agencies Operating Committee pursuant to the Act on the Management of Public Institutions and an approval at the general meeting of our shareholders.

Our standing director who concurrently serve as members of the audit committee are appointed through the same appointment process applicable to our president, except that the motion for appointment is made by the Ministry of Strategy and Finance instead of the Ministry of Trade, Industry and Energy. Standing directors other than our president or those who concurrently serve as members of the audit committee are appointed by our president with the approval at the general meeting of our shareholders.

Our non-standing directors must be appointed by the minister of the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee and must have ample knowledge and experience in business management. Appointment of non-standing directors to become part of the audit committee is subject to approval at the general meeting of our shareholders. Government officials that are not part of the teaching staff in national and public schools are ineligible to become our non-standing directors.

The term of our president is three years, while that of our directors (standing or non-standing, but not the president) is two years. According to the Act on the Management of Public Institutions, our president's term cannot be terminated unless done so by the President of the Republic pursuant to the Act on the Management of Public Institutions or upon an event as specified in our Articles of Incorporation.

Attendance by a majority of the board members constitutes a voting quorum for our board meetings, and resolutions can be passed by a majority of the board members. In the event the president acts in violation of law or the Articles of Incorporation, is negligent in his duties, or otherwise is deemed to be significantly impeded in performing his official duties as president, the board of directors may by resolution request the minister of the Ministry of Trade, Industry and Energy to dismiss or recommend the dismissal of the president.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

Our non-standing directors may request any information necessary to fulfill their duties from our president, and except in special circumstances, our president must comply with such request.

The names, titles and outside occupations, if any, of the directors as of April 16, 2018 and the respective years in which they took office are set forth below.

| Name | Age | Title | Outside Occupation | Position Held Since |
|---|---|---|---|---|
| JongKap KIM . . . . . . . . . | (67) | President, Chief Executive Officer and Standing Director | None | April 13, 2018 |
| Lee, Sung-Han . . . . . . . . | (61) | Standing Director and Member of the Audit Committee | Chaired Professor of College of Social Sciences, Dongguk University | May 2, 2016 |
| Kim, Si-Ho . . . . . . . . . . . | (60) | Standing Director and Executive Vice President of Domestic Operations | None | August 27, 2015 |
| Hyun, Sang-Kwon . . . . . . | (60) | Standing Director and Executive Vice President, Chief Financial Officer and Strategy Officer | None | August 27, 2015 |
| Moon, Bong-Soo . . . . . . . | (60) | Standing Director and Executive Vice President & Chief Power System Officer | None | January 10, 2017 |
| Sung, Tae-Hyun . . . . . . . . | (60) | Non-Standing Director | Professor of Electrical Engineering, Hanyang University | August 12, 2014 |
| Choi, Ki-Ryun . . . . . . . . . | (72) | Non-Standing Director | Professor of Energy Systems Research, Ajou University | August 12, 2014 |
| Kim, Ji-Hong . . . . . . . . . . | (63) | Non-Standing Director | None | May 16, 2016 |
| Kim, Ju-Suen . . . . . . . . . . | (58) | Non-Standing Director and Member of the Audit Committee | Representative of Kim, Ju-Suen Law Office | August 6, 2015 |
| Kim, Chang-Joon . . . . . . . | (75) | Non-Standing Director | Chairman of the Sport for All subcommittee, Korean Sport and Olympic Committee | March 19, 2018 |
| Yang, Bong-Ryull . . . . . . | (67) | Non-Standing Director | None | April 4, 2018 |
| Kim, Jwa-Kwan . . . . . . . . | (59) | Non-Standing Director | Professor of Environmental Engineering, Catholic University of Pusan | April 4, 2018 |
| Jung, Yeon-Gil . . . . . . . . . | (53) | Non-Standing Director | Professor of New Materials Engineering, Changwon University | April 4, 2018 |

*JongKap KIM* has been our President and CEO since April 13, 2018. Prior to his current position, he served as the Chief Executive Officer of Siemens Korea, the Chief Executive Officer of SK Hynix, a Commissioner of Korean Intellectual Property Office, and a Vice Minister of Ministry of Trade, Industry and Energy. Mr. Kim received a Ph. D. in public administration from Sungkyunkwan University, M.A in Economics from Indiana University and M.B.A. from New York University.

*Lee, Sung-Han* has been our Standing Director since May 2, 2016. Mr. Lee also currently serves as the Chaired Professor of College of Social Sciences at Dongguk University. Mr. Lee previously served as the

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

Commissioner General of the Korean National Police Agency, Director General of the Korean National Policy Agency's Office of Audit and Inspection, and Consular at the Embassy of the Republic of Korea in the United States. Mr. Lee received a Ph.D in police administration from Dongguk University.

*Kim, Si-Ho* has been our Standing Director since August 27, 2015. Mr. Kim also currently serves as our Executive Vice President of Domestic Operations and previously served as Executive Vice President and Chief Operating Officer. Mr. Kim received a B.A. in law from Yeungnam University.

*Hyun, Sang-Kwon* has been our Standing Director since August 27, 2015. Mr. Hyun also currently serves as our Executive Vice President, Chief Financial Officer and Chief Strategy Officer, and previously served as our Vice President of Project Strategy & Planning. Mr. Hyun received an M.A. in public administration from Yonsei University Graduate School.

*Moon, Bong-Soo* has been our Standing Director since January 10, 2017. Mr. Moon also currently serves as our Executive Vice President and Chief Power System Officer and previously served as our Director General of Project Strategy & Planning Office. Mr. Moon received a B.A. in electrical engineering from Seoul National University.

*Sung, Tae-Hyun* has been our Non-Standing Director since August 12, 2014. Mr. Sung is currently Professor of Electrical Engineering at Hanyang University and previously served as senior researcher at KEPCO Research Institute. Mr. Sung received a B.S. in material engineering from Hanyang University and a Ph.D in material science and engineering from Tokyo Institute of Technology.

*Choi, Ki-Ryun* has been our Non-Standing Director since August 12, 2014. Mr. Choi is currently Professor of Energy Systems Research at Ajou University and previously served as head of New & Renewable Energy Center of Korea Energy Management Corporation. Mr. Choi received a B.S. in mining and minerals engineering from Seoul National University and a Ph.D in energy economics from University of Grenoble.

*Kim, Ji-Hong* has been our Non-Standing Director since May 16, 2016. Mr. Kim previously served as a member of the Banking Subcommittee of the Financial Development Council, Professor at Korea Development Institute and a non-standing director at KB Kookmin Bank. Mr. Kim received a B.A in economics from Seoul National University and a Ph.D. in economics from the University of California, Berkeley.

*Kim, Ju-Suen* has been our Non-Standing Director since August 6, 2015. Mr. Kim is currently an attorney-at-law at Kim, Ju-Suen Law Firm. Mr. Kim previously served as Chief Public Prosecutor at the Daejeon Prosecutor's Office Cheonan branch. Mr. Kim received a B.A. and M.A. in law from Dankook University.

*Kim, Chang-Joon* has been our Non-Standing Director since March 19, 2018. Mr. Kim is currently chairman of the Sport for All subcommittee of the Korean Sport and Olympic Committee. Mr. Kim previously served as a member of the Electricity Regulatory Commission (KOREC). Mr. Kim received a B.S. in veterinary science at Chonnam National University.

*Yang, Bong-Ryull* has been our Non-Standing Director since April 4, 2018. Mr. Yang previously served as the Ambassador of the Republic of Korea to Malaysia. Mr. Yang received a B.A. in politics at Seoul National University and a Ph.D. in business administration from Gwangju University.

*Kim, Jwa-Kwan* has been our Non-Standing Director since April 4, 2018. Mr. Kim is currently Professor of Environmental Engineering at Catholic University of Pusan. Mr. Kim previously served as a visiting professor at the Seoul National University Graduate School of Environmental Studies. Mr. Kim received a B.S. in environmental engineering from Pukyong National University and a Ph.D. in public administration from Seoul National University.

*Jung, Yeon-Gil* has been our Non-Standing Director since April 4, 2018. Mr. Jung is currently Professor of New Materials Engineering at Changwon University. Mr. Jung previously served as vice-chairman of the Korean Ceramic Society. Mr. Jung received a B.S. and a Ph.D in material engineering from Hanyang University

The business address of our directors is 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea.

## Audit Committee

Under the Act on the Management of Public Institutions, which took effect as of April 1, 2007, we are designated as a "market-oriented public enterprise" and, as such, are required to establish an audit committee in lieu of the pre-existing board of auditors upon expiration of the term of the last remaining member of the board of auditors. In September 2007, we amended our Articles of Incorporation to establish, in lieu of the pre-existing board of auditors, an audit committee meeting the requirements under the Sarbanes-Oxley Act. Under the Act on the Management of Public Institutions, the Korean Commercial Code and the amended Articles of Incorporation, we are required to maintain an audit committee consisting of three members, of which not less than two members are required to be non-standing directors. The roles and responsibilities of our audit committee members are to perform the functions of an audit committee meeting the requirements under the Sarbanes-Oxley Act. Our audit committee was established on December 8, 2008.

Lee, Sung-Han, a standing director, and Kim, Ju-Seun, a non-standing director, are currently members of our audit committee. Cho, Jeon-Hyeok's term as a non-standing director and a member of the audit committee expired on March 24, 2017. Under Korean law, Cho, Jeon-Hyeok retains the rights and is subject to obligations as a member of the audit committee and a non-standing director, to the extent such rights and obligations are connected to performance of his duties as a member of the audit committee, until his successor to take his place at our audit committee is approved and appointed at a general meeting of the shareholders. Subject to approval and appointment at the next general meeting of the shareholders, which is expected to take place in June 2018, our audit committee will consist of Lee, Sung-Han, Kim, Ju-Seun (or his successor who will be approved and appointed at such meeting, if Kim, Ju-Seun's term as a Non-Standing Director is not renewed) and the newly appointed non-standing director and member of the audit committee. All such members of the audit committee are independent within the meaning of the Korea Stock Exchange listing standards, the regulations promulgated under the Korean Commercial Code and the New York Stock Exchange listing standards.

## Item 6.B. Compensation

The aggregate amount of remuneration paid to our standing and non-standing directors in the aggregate consist of (i) salaries and wages paid to standing and non-standing directors, which amounted to Won 1,271 million in aggregate in 2017, and (ii) accrued retirement and severance benefits for standing directors, which amounted to Won 54 million in 2017. Under the Act on the Management of Public Institution, our executive officers consist of the president and the standing and non-standing directors. Standing directors take executive positions with our company while non-standing directors do not. We do not have any other officer who is in charge of a principal business unit, division or function, any other officer who performs a policy making function or any other person who performs similar policy making functions for us.

## Item 6.C. Board Practices

Under the Act on the Management of Public Institutions and our Articles of Incorporation, for appoints made after April 1, 2007, the term of office for our president is three years and the term of our office for our directors (whether standing or non-standing but not the president) is two years. Our president and directors may be reappointed for one or more additional terms of one year. In order to be reappointed, the president must be evaluated on the basis of his management performance; a standing director, on the basis of the performance of the duties for which he was elected to perform, or if the standing director has executed an incentive bonus contract, on the basis of his performance under the contract; and a non-standing director, on the basis of his performance of the duties for which he was elected to perform.

117

Our board currently does not maintain a compensation committee. See Item 16G. "Corporate Governance." However, we currently maintain an audit committee meeting the requirements of the Sarbanes-Oxley Act to perform the roles and responsibilities of the compensation committee. Prior to the establishment of the audit committee on December 8, 2008 pursuant to the Act on the Management of Public Institutions, we maintained a board of auditors, which performed the roles and responsibilities required of an audit committee under the Sarbanes-Oxley Act, including the supervision of the financial and accounting audit by the independent registered public accountants.

Our president's management contract includes benefits upon termination of his employment. The amount for termination benefits payable equals the average value of compensation for one month times the number of years the president is employed by us, provided that the president is only eligible for termination benefits after more than one year of continuous service.

The termination benefits for our standing directors are determined in accordance with our internal regulations for executive compensation. Standing directors are eligible for benefits only upon termination of employment or death following one year of continuous service.

See also Item 16G. "Corporate Governance" for a further description of our board practices.

**Item 6.D. Employees**

As of December 31, 2017, we and our generation subsidiaries had a total of 45,232 regular employees, almost all of whom are employed within Korea. Approximately 10.4% of our regular employees (including employees of our generation subsidiaries) are located at our head office.

The following table sets forth the number of and other information relating to our regular employees, not including directors or senior management, as of December 31, 2017.

|  | KEPCO | KHNP | KOSEP | KOMIPO | KOWEPO | KOSPO | EWP | Total |
|---|---|---|---|---|---|---|---|---|
| Regular Employees |  |  |  |  |  |  |  |  |
| Administrative ............ | 4,919 | 1,053 | 261 | 293 | 273 | 280 | 308 | 7,387 |
| Engineers ................ | 11,096 | 9,355 | 1,890 | 2,105 | 1,848 | 1,644 | 2,087 | 30,025 |
| Others .................. | 5,612 | 1,145 | 243 | 208 | 236 | 367 | 9 | 37,412 |
| Total ................... | 21,627 | 11,553 | 2,394 | 2,606 | 2,357 | 2,291 | 2,404 | 45,232 |
| Head Office Employees ......... | 1,745 | 1,259 | 331 | 343 | 374 | 329 | 333 | 4,714 |
| % of total ............... | 8.1% | 10.9% | 13.8% | 13.2% | 15.9% | 14.4% | 13.9% | 10.4% |
| Members of Labor Union ........ | 15,887 | 7,397 | 1,698 | 1,507 | 1,615 | 1,570 | 1,550 | 31,224 |
| % of total ............... | 73.5% | 64.0% | 70.9% | 57.8% | 68.5% | 68.5% | 64.5% | 69.0% |

We and each of our generation subsidiaries have separate labor unions. Approximately 69.0% of our and our generation subsidiaries' employees in the aggregate are members of these labor unions, each of which negotiates a collective bargaining agreement for its members each year. Under applicable Korean law, an employee-employer cooperation committee comprised of an equal number of representatives of management and labor (which shall be no less than three and no more than ten representatives from each of management and labor) is required to be established. Accordingly, an employee-employer cooperation committee composed of eight representatives of management and eight representatives of labor has been established at us and at each of our generation subsidiaries. The committee meets periodically to discuss various labor issues.

Since our formation in 1981, our businesses had not been interrupted by any work stoppages or strikes except in early 2002, when employees belonging to our five non-nuclear generation subsidiaries went on strike for six weeks to protest the Government's decision to privatize such non-nuclear generation subsidiaries

according to the Restructuring Plan, which privatization plan has since been suspended indefinitely. See Item 3.D. "Risk Factors—Risks Relating to KEPCO—The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."

We believe our relations with our employees are generally good.

### Item 6.E. Share Ownership

None of our directors and members of our administrative, supervisory or management bodies own more than 0.1% of our common stock.

### ITEM 7.    *MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS*

### Item 7.A. Major Shareholders

The following table sets forth certain information relating to certain owners of our capital stock as of March 15, 2018, the date we last closed our shareholders' registry:

| Title of Class | Identity of Person or Group | Shares Owned | Percentage of Class[1] (%) |
|---|---|---|---|
| Common stock . . . . . | Government | 116,841,794 | 18.2 |
| | Korea Development Bank[2] | 211,235,264 | 32.9 |
| | Subtotal | 328,077,058 | 51.1 |
| | National Pension Corporation | 36,460,422 | 5.7 |
| | Employee Stock Ownership Association | — | — |
| | Directors and executive officers as a group | — | — |
| | Public (non-Koreans) | 192,639,015 | 30.0 |
| | Common shares | 156,960,303 | 24.4 |
| | American depositary shares | 35,678,712 | 5.6 |
| | Public (Koreans) | 84,787,582 | 13.2 |
| | Total | 641,964,077 | 100.0 |

*Notes:*

(1)  Percentages are based on issued shares of common stock.
(2)  Korea Development Bank is a Government-controlled entity.

All of our shareholders have equal voting rights. See Item 10.B. "Memorandum and Articles of Incorporation—Description of Capital Stock—Voting Rights."

### Item 7.B. Related Party Transactions

We are engaged in a variety of transactions with our affiliates. We have related party transactions with Government-controlled entities such as Korea Gas Corporation, our consolidated subsidiaries and our equity investees. In addition, we engage in related party transactions with Korea Development Bank, one of our major shareholders. See Note 47 of the Notes to our consolidated financial statements included in this annual report for a description of transaction and balances with our related parties.

In the past three years, our related party transactions principally consisted of purchases of LNG from Korea Gas Corporation, sales of electricity to Korea District Heating Co., Ltd., and long-term borrowings from Korea Development Bank. In 2015, 2016 and 2017, we and our generation subsidiaries purchased LNG from Korea Gas Corporation in the aggregate amount of Won 4,599 billion, Won 3,633 billion and Won 3,246 billion, respectively. As of December 31, 2017, we had long-term borrowings from Korea Development Bank in the aggregate amount of Won 176 billion.

We also engage in extensive transactions with our consolidated generation subsidiaries, including the purchase of electricity from them through Korea Power Exchange, sales of electricity to them, payment and receipt of commissions for services and receivables and payables transactions. These are eliminated in the consolidation process. We also provide guarantees for certain of our affiliates. See Item 5.F. "Tabular Disclosure of Contractual Obligations—Overdraft and Others." We also have certain relationships with the Korea Power Exchange. See Item 4.B. "Business Overview—Purchase of Electricity—Cost-based Pool System."

For a further description of our transactions with our affiliates, see Note 47 of the Notes to our consolidated financial statements included in this annual report.

## Item 7.C. Interests of Experts and Counsel

Not Applicable

## ITEM 8.   *FINANCIAL INFORMATION*

## Item 8.A. Consolidated Statements and Other Financial Information

We prepare our consolidated financial statements in compliance with requirements under Item 18. "Financial Statements."

## Legal Proceedings

As of December 31, 2017, we and our subsidiaries were engaged in 565 lawsuits as a defendant and 185 lawsuits as a plaintiff. As of the same date, the total amount of damages claimed against us and our subsidiaries was Won 478 billion, for which we have made a provision of Won 74 billion as of December 31, 2017, and the total amount claimed by us and our subsidiaries was Won 691 billion as of December 31, 2017. While the outcome of any of these lawsuits cannot presently be determined with certainty, our management currently believes that the final results from these lawsuits will not have a material adverse effect on our liquidity, financial position or results of operations.

The following are potentially significant claims pertaining to us and our subsidiaries.

In September 2013, Hyundai Engineering & Construction Co., Ltd. ("Hyundai E&C"), SK Engineering & Construction Co., Ltd. and GS Engineering & Construction Co., Ltd. filed a lawsuit against KHNP seeking from KHNP extra contractual payments in the total amount of Won 204 billion on grounds of design change under the construction contract relating to New Hanwool #1 and #2 units. In November 2016, the court ruled against KHNP, and KHNP has paid Won 217 billion of the claimed amounts in full and has subsequently appealed the ruling. The lawsuit is currently pending.

In December 2013, the Supreme Court of Korea ruled that regular bonuses fall under the category of ordinary wages on the condition that those bonuses are paid regularly and uniformly, and that any agreement which excludes such regular bonuses from ordinary wage is invalid. One of the key rulings provides that bonuses that are given to employees (i) on a regular and continuous basis and (ii) calculated according to the actual number of days worked (iii) that are not incentive-based must be included in the calculation of "ordinary wages." The Supreme Court further ruled that in spite of invalidity of such agreements, employees shall not retroactively claim additional wages incurred due to such court decision, in case that such claims bring to employees unexpected benefits which substantially exceeds the wage level agreed by employers and employees and cause an unpredicted increase in expenditures for their company, which would lead the company to material managerial difficulty or would be a threat to the existence of the company. In that case, the claim is not acceptable since it is unjust and is in breach of the principle of good faith. As a result of such ruling by the Supreme Court of Korea, we and our subsidiaries became subject to a number of lawsuits filed by various industry-wide and company-

120

specific labor unions based on claims that ordinary wage had been paid without including certain items that should have been included as ordinary wage. In July 2016, the court ruled against us, and in accordance with the court's ruling, in August 2016 we paid Won 55.1 billion to the employees for three years of back pay plus interest. As of December 31, 2017, however, 49 lawsuits were pending against our subsidiaries for an aggregate claim amount of Won 170 billion, for which our subsidiaries set aside an aggregate amount of Won 56 billion to cover any potential future payments of additional ordinary wage in relation to the related lawsuits. While the plaintiffs partially won in over 20 cases for which we appealed, all cases are currently on-going at various stages of proceedings. We cannot presently assure you that the courts will not ultimately rule against our subsidiaries in these lawsuits, or that the amount of our reserves against these lawsuits will be sufficient to cover the amounts actually payable under court rulings. Any of these developments would adversely affect our results of operations.

During the period from 2014 to 2017, certain residential customers filed class action lawsuits against us based on the claim that electricity tariffs, determined under the progressive rate structure, were excessive. As of December 31, 2017, we were subject to 13 such lawsuits brought by approximately 10,000 plaintiffs with an aggregate claim amount of Won 5.2 billion. Of these 13 lawsuits, two cases are currently pending in the third round of proceedings (for which we won all of the first and second rounds of proceedings) and five cases are currently pending in the second round of proceedings (for which we won all of the first rounds of proceedings, except for one case). Six cases are currently pending in the first round of proceedings.

In addition, our generation subsidiaries, currently and from time to time, are involved in lawsuits incidental to the conduct of their business. A significant number of such lawsuits are based on the claim that the construction and operation of the electricity generation units owned by our generation subsidiaries have impaired neighboring fish farms. Our generation subsidiaries normally pay compensation to the members of fishery associations near our power plant complex for expected losses and damages arising from the construction and operation of their power plants in advance. Despite such compensation paid by us, a claim may still be filed against our generation subsidiaries challenging the compensation paid by us.

The nuclear power plant at Wolsong #1 unit began operations in 1982 and ended its operations in 2012 pursuant to its 30-year operating license. In February 2015, the Nuclear Safety and Security Commission ("NSSC") evaluated the safety of operating Wolsong #1 unit and approved its extended operation until November 2022. However, a civic group filed a lawsuit to annul such decision, and in February 2017, the Seoul Administrative Court ruled against the NSSC. The NSSC appealed this decision, and the civic group has filed an injunction to suspend the operation of the Wolsong #1 unit. The civic group's injunction was denied in July 2017. KHNP, which currently is operating the unit pursuant to the NSSC's initial decision, has joined this lawsuit. As of December 31, 2017, the book value of property, plant and equipment and provision for decommissioning costs of Wolsong #1 unit was Won 608 billion and Won 642 billion, respectively. We cannot assure you whether the courts will ultimately rule to grant the extension of life for Wolsong #1. . In addition, it is reported that the Government will announce its decision by the first half of 2018 regarding the timing of the shutdown of Wolsong #1 unit. If Wolsong #1 unit is prohibited from operation, we may incur significant losses in connection with the property, plant and equipment of Wolsong #1 unit. In addition, the amount of provision may increase significantly, and the timing of actual cash outflows may be accelerated. There are seven other nuclear generation units whose life under their initial operating license will expire in the next nine years, or by 2027. Thus, if the courts or the Government were to ultimately decide against the extension of life for Wolsong #1, we may find it more difficult to have the life of other nuclear units extended as well. Furthermore, in September 2016, Greenpeace and 559 Korean nationals brought a lawsuit against the NSSC to revoke the permit the NSSC granted to KHNP in relation to the construction of Shin-Kori #5 and #6 nuclear generation units. This case is currently pending at the Seoul Administrative Court. The failure to extend the life of the generation units or proceed with the construction of new nuclear units would result in a loss of revenues and an increase in our overall fuel costs (as nuclear fuel is the cheapest compared to coal, LNG or oil), which could adversely affect our results of operation and financial condition.

121

We and our subsidiaries are also involved in the following arbitrations, among others.

- SAP Korea Ltd brought a breach of contract claim against us and KEPCO KDN Co., Ltd., one of our subsidiaries, in relation to the enterprise resource planning software serviced by SAP Korea. In that connection, arbitration was filed in the International Chamber of Commerce International Court of Arbitration. We have not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably determined.

- Hyundai Samsung Joint Venture, one of our subcontractors, filed arbitration against us at the London Court of International Arbitration in 2016 in relation to certain disagreements involving the United Arab Emirates nuclear power plant construction project, but we have not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably determined.

- Hyundai E&C, GS Engineering & Construction Corp., and Hansol SeenTec Co., Ltd. filed arbitration against us with the Korea Commercial Arbitration Board to request payment of additional construction costs. We have not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably determined. We currently expect an arbitral decision would be made in April 2018.

- Halla Corporation filed arbitration against us with the Korea Commercial Arbitration Board to request payment of additional construction costs. As of December 31, 2017, the Company recognized Won 4.9 billion of provision in connection with this arbitral proceeding.

We do not believe such claims or proceedings, individually or in the aggregate, have had or will have a material adverse effect on us and our generation subsidiaries. However, we cannot assure you that this will be the case in the future, given the possibility that we may become subject to more legal and arbitral proceedings arising from changes in the environmental laws and regulations as they become applicable to us and our generation subsidiaries, and the related growth in demand for more compensation by actual and potential affected parties.

**Dividend Policy**

For our dividend policy, see Item 10.B. "Memorandum and Articles of Incorporation—Description of Capital Stock—Dividend Rights." For a description of the tax consequences of dividends paid to our shareholders, see Item 10.E. "Taxation—Korean Taxes—Shares or ADSs—Dividends on the Shares of Common Stock or ADSs" and Item 10.E. "Taxation—U.S. Federal Income Tax Consideration for U.S. Persons—Tax Consequences with Respect to Common Stock and ADSs—Distributions on Common Stock or ADSs."

**Item 8.B. Significant Changes**

Not Applicable

**ITEM 9.    *THE OFFER AND LISTING***

**Item 9.A. Offer and Listing Details**

**Notes**

We have issued the following registered notes and debentures, which are traded principally in the over-the-counter market:

- 7.95% Zero-To-Full Debentures, due April 1, 2096 (the "7.95% Debentures");

- 6% Debentures due December 1, 2026, (the "6% Debentures");

- 7% Debentures due February 1, 2027 (the "7% Debentures"); and

122

- 6-3/4% Debentures due August 1, 2027 (the "6-3/4% Debentures," and together with the 7.95% Debentures, the 6% Debentures and the 7% Debentures, the "Registered Debt Securities").

Sales prices for the Registered Debt Securities are not regularly reported on any United States securities exchange or other United States securities quotation service.

### *Share Capital*

The principal trading market for our common stock is the Korea Exchange. Our common stock is also listed on the New York Stock Exchange in the form of ADSs. The ADSs have been issued by Citibank, N.A. as depositary and are listed on the New York Stock Exchange under the symbol "KEP." One ADS represents one-half of one share of our common stock. As of March 15, 2018, the date we last closed our shareholders' registry, 35,678,712 ADSs representing 5.6% shares of our common stock were outstanding.

123

*Common Stock*

Shares of our common stock are listed on the KRX KOSPI Market of the Korea Exchange. The table below shows the high and low closing prices on the KRX KOSPI Market of the Korea Exchange for our common stock since 2013.

| Period | Price High | Low |
|---|---|---|
| | (In Won) | |
| **2013** | | |
| First Quarter | 34,850 | 29,000 |
| Second Quarter | 32,600 | 24,850 |
| Third Quarter | 30,700 | 26,350 |
| Fourth Quarter | 34,750 | 27,250 |
| **2014** | | |
| First Quarter | 37,800 | 33,400 |
| Second Quarter | 41,900 | 37,050 |
| Third Quarter | 48,200 | 36,800 |
| Fourth Quarter | 49,450 | 40,350 |
| **2015** | | |
| First Quarter | 46,000 | 39,150 |
| Second Quarter | 48,500 | 42,450 |
| Third Quarter | 52,200 | 46,300 |
| Fourth Quarter | 53,300 | 47,500 |
| **2016** | | |
| First Quarter | 46,000 | 39,150 |
| Second Quarter | 63,000 | 57,400 |
| Third Quarter | 62,900 | 54,000 |
| Fourth Quarter | 54,500 | 43,200 |
| **2017** | | |
| First Quarter | 48,750 | 40,350 |
| Second Quarter | 46,700 | 40,800 |
| Third Quarter | 45,500 | 38,200 |
| Fourth Quarter | 41,100 | 37,350 |
| October | 41,100 | 37,350 |
| November | 39,150 | 37,450 |
| December | 39,250 | 37,850 |
| **2018** | | |
| First Quarter | 37,750 | 30,850 |
| January | 37,750 | 34,650 |
| February | 36,100 | 33,100 |
| March | 33,100 | 30,850 |
| April (through April 16) | 34,950 | 33,250 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

*ADSs*

The table below shows the high and low closing prices on the New York Stock Exchange for the outstanding ADSs since 2013. Each ADS represents one-half of one share of our common stock.

| Period | Closing Price per ADS | |
| --- | --- | --- |
| | High | Low |
| | (In US$) | |
| 2013 | | |
| First Quarter | 16.35 | 13.04 |
| Second Quarter | 14.70 | 10.70 |
| Third Quarter | 14.59 | 11.45 |
| Fourth Quarter | 16.61 | 12.77 |
| 2014 | | |
| First Quarter | 17.75 | 15.51 |
| Second Quarter | 20.56 | 17.66 |
| Third Quarter | 22.44 | 18.17 |
| Fourth Quarter | 22.87 | 18.90 |
| 2015 | | |
| First Quarter | 21.01 | 18.26 |
| Second Quarter | 22.53 | 19.29 |
| Third Quarter | 22.13 | 19.45 |
| Fourth Quarter | 23.31 | 20.28 |
| 2016 | | |
| First Quarter | 21.01 | 18.26 |
| Second Quarter | 26.90 | 24.67 |
| Third Quarter | 28.31 | 24.38 |
| Fourth Quarter | 24.34 | 18.48 |
| 2017 | | |
| First Quarter | 21.35 | 17.53 |
| Second Quarter | 20.80 | 17.82 |
| Third Quarter | 20.38 | 16.73 |
| Fourth Quarter | 18.22 | 16.60 |
| October | 18.22 | 16.60 |
| November | 17.79 | 16.93 |
| December | 18.22 | 17.45 |
| 2018 | | |
| First Quarter | 17.83 | 14.28 |
| January | 17.83 | 16.24 |
| February | 16.58 | 14.88 |
| March | 15.46 | 14.28 |
| April (through April 16) | 16.59 | 15.54 |

**Item 9.B. Plan of Distribution**

Not Applicable

**Item 9.C. Markets**

**The Korea Exchange**

The Korea Exchange began its operations in 1956, originally under the name of the Korea Stock Exchange. On January 27, 2005, pursuant to the Korea Securities and Futures Exchange Act, the Korea Exchange was

125

officially created through the consolidation of the Korea Stock Exchange, the Korea Futures Exchange, the KOSDAQ Stock Market, Inc., or KOSDAQ, and the KOSDAQ Committee within the Korea Securities Dealers Association, which was in charge of the management of the KOSDAQ. The KRX KOSPI Market of the Korea Exchange, formerly the Korea Stock Exchange, has a single trading floor located in Seoul. The Korea Exchange is a limited liability company, the shares of which are held by (i) securities companies and futures companies that were the members of the Korea Stock Exchange or the Korea Futures Exchange and (ii) the shareholders of the KOSDAQ.

As of March 30, 2018, the aggregate market value of equity securities listed on the KOSPI of the Korea Exchange was approximately Won 1,627,647 billion. The average daily trading volume of equity securities for the first quarter of 2018 was approximately 387 million shares with an average transaction value of Won 6,978 billion.

The Korea Exchange has the power in some circumstances to suspend trading of shares of a given company or to de-list a security. The Korea Exchange also restricts share price movements. All listed companies are required to file accounting reports annually, semi-annually and quarterly and to release immediately all information that may affect trading in a security.

The Government has in the past exerted, and continues to exert, substantial influence over many aspects of the private sector business community which can have the intention or effect of depressing or boosting the market. In the past, the Government has informally both encouraged and restricted the declaration and payment of dividends, induced mergers to reduce what it considers excess capacity in a particular industry and induced private companies to publicly offer their securities.

The Korea Exchange publishes the Korea Composite Stock Price Index, or KOSPI, every ten seconds, which is an index of all equity securities listed on the KRX KOSPI Market of the Korea Exchange. On January 1, 1983, the method of computing KOSPI was changed from the Dow Jones method to the aggregate value method. In the new method, the market capitalizations of all listed companies are aggregated, subject to certain adjustments, and this aggregate is expressed as a percentage of the aggregate market capitalization of all listed companies as of the base date, January 4, 1980.

Movements in KOSPI in the past five years are set out in the following table:

|  | Opening | High | Low | Closing |
|---|---|---|---|---|
| 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,031.1 | 2,059.6 | 1,780.6 | 2,011.3 |
| 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,967.2 | 2,082.6 | 1,886.9 | 1,915.6 |
| 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,926.4 | 2,173.4 | 1,829.8 | 1,961.3 |
| 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,918.8 | 2,068.7 | 1,835.3 | 2,026.5 |
| 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,026.2 | 2,558.0 | 2,026.2 | 2,467.5 |
| 2018 (through April 16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,479.7 | 2,598.2 | 2,363.8 | 2,457.5 |

*Source:* The Korea Exchange

Shares are quoted "ex-dividend" on the first trading day of the relevant company's accounting period; since the calendar year is the accounting period for the majority of listed companies, this may account for the drop in KOSPI between its closing level at the end of one calendar year and its opening level at the beginning of the following calendar year.

With certain exceptions, principally to take account of a share being quoted "ex-dividend" and "ex-rights," upward and downward movements in share prices of any category of shares on any day are limited under the

126

rules of the Korea Exchange to 30% of the previous day's closing price of the shares, rounded down as set out below:

| Previous Day's Closing Price (Won) | Rounded Down to (Won) |
|---|---|
| less than 5,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩     5 |
| 5,000 to less than 10,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |
| 10,000 to less than 50,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 |
| 50,000 to less than 100,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 |
| 100,000 to less than 500,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500 |
| 500,000 or more  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,000 |

As a consequence, if a particular closing price is the same as the price set by the fluctuation limit, the closing price may not reflect the price at which persons would have been prepared, or would be prepared to continue, if so permitted, to buy and sell shares. Orders are executed on an auction system with priority rules to deal with competing bids and offers.

Due to deregulation of restrictions on brokerage commission rates, the brokerage commission rate on equity securities transactions may be determined by the parties, subject to commission schedules being filed with the Korea Exchange by the securities companies. In addition, a securities transaction tax will generally be imposed on the transfer of shares or certain securities representing rights to subscribe for shares. A special agricultural and fishery tax of 0.15% of the sales prices will also be imposed on transfer of these shares and securities on the Korea Exchange. See Item 10.E. "Taxation—Korean Taxes."

The number of companies listed on the KRX KOSPI Market of the Korea Exchange since 2012, the corresponding total market capitalization at the end of the periods indicated and the average daily trading volume for those periods are set forth in the following table:

| Year | Number of Listed Companies | Total Market Capitalization on the Last Day for Each Period | | Average Daily Trading Volume, Value | | |
|---|---|---|---|---|---|---|
| | | (Millions of Won) | (Thousands of U.S. dollars)[1] | (Thousands of Shares) | (Millions of Won) | Thousands of U.S. dollars)[1] |
| 2013 . . . . . . . . . . . . . . . . . . . . | 777 | 1,185,973,724 | 1,123,826,138 | 328,325 | 3,993,422 | 3,784,158 |
| 2014 . . . . . . . . . . . . . . . . . . . . | 773 | 1,192,252,867 | 1,084,655,082 | 278,082 | 3,983,580 | 3,624,072 |
| 2015 . . . . . . . . . . . . . . . . . . . . | 770 | 1,242,832,089 | 1,060,436,936 | 455,256 | 5,351,734 | 4,566,326 |
| 2016 . . . . . . . . . . . . . . . . . . . . | 779 | 1,308,440,373 | 1,082,697,868 | 376,772 | 4,523,043 | 3,742,692 |
| 2017 . . . . . . . . . . . . . . . . . . . . | 774 | 1,605,820,912 | 1,498,806,153 | 340,463 | 5,335,418 | 4,979,856 |
| 2018 (through April 16) . . . . . | 777 | 1,638,625,626 | 1,527,001,795 | 393,455 | 7,031,950 | 6,552,931 |

*Source*: The Korea Exchange

*Note:*

(1)  Converted at the market average exchange rate as announced by Seoul Money Brokerage Services, Ltd. in Seoul at the end of the periods indicated.

The Korean securities markets are principally regulated by the Financial Services Commission and the Financial Investment Services and Capital Markets Act. The law imposes restrictions on insider trading and price manipulation, requires specified information to be made available by listed companies to investors and establishes rules regarding margin trading, proxy solicitation, takeover bids, acquisition of treasury shares and reporting requirements for shareholders holding substantial interests.

## Protection of Customer's Interest in Case of Insolvency of Financial Investment Companies with a Brokerage License

Under Korean law, the relationship between a customer and a financial investment company with a brokerage license in connection with a securities sell or buy order is deemed to be consignment, and the

127

securities acquired by a consignment agent (i.e., the financial investment company with a brokerage license) through such sell or buy order are regarded as belonging to the customer insofar as the customer and the consignment agent's creditors are concerned. Therefore, in the event of bankruptcy or reorganization procedures involving a financial investment company with a brokerage license, the customer of such financial investment company is entitled to the proceeds of the securities sold by such financial investment company.

When a customer places a sell order with a financial investment company with a brokerage license which is not a member of the Korea Exchange and this financial investment company places a sell order with another financial investment company with a brokerage license which is a member of the Korea Exchange, the customer is still entitled to the proceeds of the securities sold received by the non-member company from the member company regardless of the bankruptcy or reorganization of the non-member company.

Likewise, when a customer places a buy order with a non-member company and the non-member company places a buy order with a member company, the customer has the legal right to the securities received by the non-member company from the member company because the purchased securities are regarded as belonging to the customer insofar as the customer and the non-member company's creditors are concerned.

Under the Financial Investment Services and Capital Markets Act, the Korea Exchange is obliged to indemnify any loss or damage incurred by a counterparty as a result of a breach by its members. If a financial investment company with a brokerage license which is a member of the Korea Exchange breaches its obligation in connection with a buy order, the Korea Exchange is obliged to pay the purchase price on behalf of the breaching member.

As the cash deposited with a financial investment company with a brokerage license is regarded as belonging to such financial investment company, which is liable to return the same at the request of its customer, the customer cannot take back deposited cash from the financial investment company with a brokerage license if a bankruptcy or reorganization procedure is instituted against such financial investment company and, therefore, can suffer from loss or damage as a result. However, the Depositor Protection Act provides that Korean Deposit Insurance Corporation will, upon the request of the investors, pay investors up to Won 50 million per depositor per financial institution in case of the such financial investment company's bankruptcy, liquidation, cancelation of securities business license or other insolvency events (collectively, the "Insolvency Events"). Pursuant to the Financial Investment Services and Capital Markets Act, subject to certain exceptions, financial investment companies with a brokerage license are required to deposit the cash received from their customers with the Korea Securities Finance Corporation, a special entity established pursuant to the Financial Investment Services and Capital Markets Act. Set-off or attachment of cash deposits by financial investment companies with a brokerage license is prohibited. The premiums related to this insurance under the Depositor Protection Act are paid by financial investment companies with a brokerage license.

**Item 9.D. Selling Shareholders**

Not Applicable

**Item 9.E. Dilution**

Not Applicable

**Item 9.F. Expenses of the Issue**

Not Applicable

**ITEM 10.** *ADDITIONAL INFORMATION*

**Item 10.A. Share Capital**

Not Applicable

128

**Item 10.B. Memorandum and Articles of Incorporation**

Set forth below is information relating to our capital stock, including brief summaries of material provisions of our Articles of Incorporation, the KEPCO Act, the Financial Investment Services and Capital Markets Act, the Korean Commercial Code and certain related laws of Korea, all currently in effect. The following summaries are qualified in their entirety by reference to our Articles of Incorporation and the applicable provisions of the KEPCO Act, Financial Investment Services and Capital Markets Act, the Korean Commercial Code, the Act on the Management of Public Institutions and certain related laws of Korea. On November 11, 2016, we amended our Articles of Incorporation to strike references to executive directors (while keeping references to Standing Directors), as executive directors have not been appointed since 2003 and the system of executive directors was deemed obsolete.

**Objects and Purposes**

We are a statutory juridical corporation established under the KEPCO Act for the purpose of ensuring "stabilization of the supply and demand of electric power, and further contributing toward the sound development of the national economy through expediting development of electric power resources and carrying out proper and effective operation of the electricity business." The KEPCO Act and our Articles of Incorporation contemplate that we engage in the following activities:

1. development of electric power resources;

2. generation, transmission, transformation and distribution of electricity and other related business activities;

3. research and development of technology related to the businesses mentioned in items 1 and 2;

4. overseas businesses related to the businesses mentioned in items 1 through 3;

5. investments or contributions related to the businesses mentioned in items 1 through 4;

6. businesses incidental to items 1 through 5;

7. Development and operation of certain real estate held by us to the extent that:

   a. it is necessary to develop certain real estate held by us due to external factors, such as relocation, consolidation, conversion to indoor or underground facilities or deterioration of our substation or office; or

   b. it is necessary to develop certain real estate held by us to accommodate development of relevant real estate due to such real estate being incorporated into or being adjacent to an area under planned urban development; and

8. other activities entrusted by the Government.

Our registered name is "Hankook Chollryuk Kongsa" in Korean and "Korea Electric Power Corporation" in English. Our registration number in the commercial registry office is 114671-0001456.

**Directors**

Under the KEPCO Act and our Articles of Incorporation, our board of directors consists of our president, standing directors and non-standing directors. A majority of the board members constitutes a voting quorum, and resolutions will be passed by a majority of the board members. Directors who have an interest in certain agenda proposed to the board may not vote on such issues.

The standards of remuneration for our officers, including directors, shall be determined by a resolution of the board of directors, provided that the maximum amount of remuneration to be paid to our officers shall be

129

determined by shareholder resolution and provided that the remuneration standards for the president and standing directors shall be determined by board resolution in accordance with the guideline thereon established by the minister of the Ministry of Strategy and Finance through review and resolution of our management committee. Directors who have an interest may not participate in the meeting of the board of directors for determining the remuneration for officers.

Neither the KEPCO Act nor our Articles of Incorporation have provisions relating to (i) borrowing powers exercisable by the directors and how such borrowing powers can be varied, (ii) retirement or non-retirement of directors under an age limit requirement, or (iii) the number of shares required for a director's qualification.

## Share Capital

Currently, our authorized share capital is 1,200,000,000 shares, which consists of shares of common stock and shares of non-voting preferred stock, par value Won 5,000 per share. Under our Articles of Incorporation, we are authorized to issue up to 150,000,000 non-voting preferred shares. As of March 15, 2018, the last day on which our shareholders' registry was closed for purposes of identifying shareholders of record, 641,964,077 common shares were issued and no non-voting preferred shares have been issued. All of the issued and outstanding common shares are fully-paid and non-assessable and are in registered form. Share certificates are issued in denominations of 1, 5, 10, 50, 100, 500, 1,000 and 10,000 shares.

## Description of Capital Stock

### Dividend Rights

Under the KEPCO Act, we are authorized to pay preferential dividends on our shares held by public shareholders as opposed to those held by the Government. Dividends to public shareholders are distributed in proportion to the number of shares of the relevant class of capital stock owned by each public shareholder following approval by the shareholders at a general meeting of shareholders. Korea Development Bank may receive dividends in proportion to the numbers of our shares held by them. Under the Korean Commercial Code and our Articles of Incorporation, we will pay full annual dividends on newly issued shares.

Under our Articles of Incorporation, holders of non-voting preferred shares (of which there are currently none) are entitled to receive an amount not less than 8% of their par value as determined by a resolution of the board of directors at the time of their issuance. However, stock dividends shall be paid based on par value and may not exceed the amount equivalent to a half of the total amount of profit available for dividend payment.

We declare our dividend annually at the annual general meeting of shareholders which is held within three months after the end of the fiscal year. The annual dividend is paid to the shareholders on record as of the end of the fiscal year preceding the annual shareholders' meeting. Annual dividends may be distributed either in cash or in our shares. However, a dividend of shares must be distributed at par value, and dividends in shares may not exceed one-half of the annual dividend.

Under the Korean Commercial Code and our Articles of Incorporation, we do not have an obligation to pay any annual dividend unclaimed for five years from the payment date.

The KEPCO Act provides that we shall not pay an annual dividend unless we have made up any accumulated deficit and set aside as a legal reserve an amount equal to 20.0% or more of our net profit until our accumulated reserve reaches one-half of our stated capital.

### Distribution of Free Shares

In addition to dividends in the form of shares to be paid out of retained or current earnings, the Korean Commercial Code permits us to distribute to our shareholders an amount transferred from our capital surplus or legal reserve to stated capital in the form of free shares.

130

*Voting Rights*

Holders of our common shares are entitled to one vote for each common share, except that voting rights with respect to any common shares held by us or by a corporate shareholder, more than one-tenth of whose outstanding capital stock is directly or indirectly owned by us, may not be exercised. Any person (with certain exceptions) who holds more than 3% of our issued and outstanding shares cannot exercise voting rights with respect to the shares in excess of this 3% limit. See "—Limitation on Shareholdings." Pursuant to the Korean Commercial Code, cumulative voting is permissible in relation to the appointment of directors. Under the Korean Commercial Code, a cumulative vote can be requested by the shareholders of a corporation representing at least 1% of the total voting shares of such corporation if the relevant shareholders' meeting is intended to elect more than two seats of the board of directors and the request for cumulative voting is made to the management of the corporation in writing at least six weeks in advance of the shareholders' meeting. Under this new voting method, each shareholder will have multiple voting rights corresponding to the number of directors to be appointed in such voting and may exercise all such voting rights to elect one director. Shareholders are entitled to vote cumulatively unless the Articles of Incorporation expressly prohibit cumulative voting. Our current Articles of Incorporation do not prohibit cumulative voting. Except as otherwise provided by law or our Articles of Incorporation, a resolution can be adopted at a general meeting of shareholders by affirmative majority vote of the voting shares of the shareholders present or represented at a meeting, which must also represent at least one-fourth of the voting shares then issued and outstanding. The holders of our non-voting preferred shares (other than enfranchised preferred shares (as described below)) are not entitled to vote on any resolution or to receive notice of any general meeting of shareholders unless the agenda of the meeting includes consideration of a resolution on which such holders are entitled to vote. If we are unable to pay any dividend to holders of non-voting preferred shares as provided in our Articles of Incorporation, the holders of non-voting preferred shares will become enfranchised and will be entitled to exercise voting rights until such dividends are paid. The holders of these "enfranchised preferred shares" have the same rights as holders of our common shares to request, receive notice of, attend and vote at a general meeting of shareholders. Pursuant to the KEPCO Act and our Articles of Incorporation, the appointment of standing directors, the president and standing statutory auditor are subject to shareholder approval.

Under the Korean Commercial Code, for the purpose of electing our statutory auditor, a shareholder (together with certain related persons) holding more than 3% of the total shares having voting rights may not exercise voting rights with respect to shares in excess of such 3% limit.

The Korean Commercial Code provides that the approval by holders of at least two-thirds of those shares having voting rights present or represented at a meeting, where such shares also represent at least one-third of the total issued and outstanding shares having voting rights, is required in order to, among other things:

- amend our Articles of Incorporation;

- remove a director or statutory auditor;

- effect any dissolution, merger, consolidation or spin-off of us;

- transfer the whole or any significant part of our business;

- effect the acquisition by us of all of the business of any other company;

- effect the acquisition by us of the business of another company that may have a material effect on our business;

- reduce capital; or

- issue any new shares at a price lower than their par value.

Under our Articles of Incorporation, an approval by the Ministry of Trade, Industry and Energy is required in order to amend the Articles of Incorporation. Any change to our authorized share capital requires an amendment to our Articles of Incorporation.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

In addition, in the case of amendments to our Articles of Incorporation or any merger or consolidation of us or in certain other cases which affect the rights or interests of the non-voting preferred shares a resolution must be adopted by a meeting of the holders of non-voting preferred shares approving such event. This resolution may be adopted if approval is obtained from holders of at least two-thirds of those non-voting preferred shares present or represented at such meeting and such non-voting preferred shares also represent at least one-third of our total issued and outstanding non-voting preferred shares.

A shareholder may exercise his voting rights by proxy. The proxy shall present the power of attorney prior to the start of the general meeting of shareholders. Under the Financial Investment Services and Capital Markets Act and our Articles of Incorporation, no one other than us may solicit a proxy from shareholders.

Subject to the provisions of the deposit agreement, holders of our American Depositary Shares ("ADSs") are entitled to instruct the depositary, whose agent is the record holder of the underlying common shares, how to exercise voting rights relating to those underlying common shares.

### Preemptive Rights and Issuance of Additional Shares

Authorized but unissued shares may be issued at such times and, unless otherwise provided in the Korean Commercial Code, upon such terms as our board of directors may determine. The new shares must be offered on uniform terms to all our shareholders who have preemptive rights and who are listed on the shareholders' register as of the record date. Subject to the limitations described under "—Limitation on Shareholdings" below and with certain other exceptions, all our shareholders are entitled to subscribe for any newly issued shares in proportion to their existing shareholdings. Under the Korean Commercial Code, we may vary, without shareholder approval, the terms of such preemptive rights for different classes of shares. Public notice of the preemptive rights to new shares and their transferability must be given not less than two weeks (excluding the period during which the shareholders' register is closed) prior to the record date. Our board of directors may determine how to distribute shares for which preemptive rights have not been exercised or where fractions of shares occur.

Our Articles of Incorporation provide that new shares that are (1) publicly offered pursuant to the Financial Investment Services and Capital Markets Act, (2) issued to members of our employee stock ownership association, (3) represented by depositary receipts, (4) issued through offering to public investors, or (5) issued to investors in kind under the State Property Act may be issued pursuant to a resolution of the board of directors to persons other than existing shareholders, who in such circumstances will not have preemptive rights.

Under our Articles of Incorporation, we may issue convertible bonds or bonds with warrants each up to an aggregate principal amount of Won 2,000 billion and Won 1,000 billion, respectively, to persons other than existing shareholders. However, the aggregate principal amount of convertible bonds and bonds with warrants so issued to persons other than existing shareholders may not exceed Won 2,000 billion.

Under the Financial Investment Services and Capital Markets Act and our Articles of Incorporation, members of our employee stock ownership association, whether or not they are our shareholders, have a preemptive right, subject to certain exceptions, to subscribe for up to 20.0% of any shares publicly offered pursuant to the Financial Investment Services and Capital Markets Act. This right is exercisable only to the extent that the total number of shares so acquired and held by members of our employee stock ownership association does not exceed 20.0% of the total number of shares then outstanding.

### Liquidation Rights

In the event of our liquidation, the assets remaining after payment of all debts, liquidation expenses and taxes will be distributed among shareholders in proportion to the number of shares held. Holders of our non-voting preferred shares have no preference in liquidation.

132

*Rights of Dissenting Shareholders*

In certain limited circumstances (including, without limitation, the transfer of the whole or any significant part of our business or the merger, or consolidation upon a split-off of us with another company), dissenting holders of shares have the right to require us to purchase their shares. To exercise such right, shareholders must submit a written notice of their intention to dissent to us prior to the general meeting of shareholders or the class meeting of holders of non-voting preferred shares, as the case may be. Within 20 days after the date on which the relevant resolution is passed at such meeting, such dissenting shareholders must request us in writing to purchase their shares. We are obligated to purchase the shares of dissenting shareholders within one month after the expiration of such 20-day period. The purchase price for such shares must be determined through negotiation between the dissenting shareholders and us. Under the Financial Investment Services and Capital Markets Act, if we cannot agree on a price through negotiation, the purchase price will be the average of (1) the weighted average of the daily share price on the Korea Exchange for a two-month period before the date of adoption of the relevant board resolution, (2) the weighted average of the daily share price on the Korea Exchange for the one month period before such date and (3) the weighted average of the daily share price on the Korea Exchange for the one week period before such date. However, if we or dissenting shareholders who requested us to purchase their shares oppose such purchase price, the determination of a purchase price may be filed with a court. Holders of ADSs will not be able to exercise dissenter's rights unless they have withdrawn the underlying Common Stock and become our direct shareholders.

**Transfer of Shares**

Under the Korean Commercial Code, the transfer of shares is effected by delivery of share certificates, but in order to assert shareholders' rights against us, the transferee must have his name and address registered on our register of shareholders. For this purpose, shareholders are required to file one's name, address and seal with our transfer agent. Under our Articles of Incorporation, non-resident shareholders must appoint an agent authorized to receive notices on their behalf in Korea and file a mailing address in Korea. These requirements do not apply to the holders of ADSs. Under current Korean regulations, the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and internationally recognized foreign custodians are authorized to act as agents and provide related services for foreign shareholders. Our transfer agent is Kookmin Bank, located at 9-1, Namdaemun-ro, 2-ga, Chung-ku, Seoul, Korea. Certain foreign exchange controls and securities regulations apply to the transfer of our shares by non-residents of Korea or non-Koreans. See Item 9. "The Offer and Listing."

**Acquisition of Our Own Shares**

Under the Korean Commercial Code, we may acquire our own shares through (1) purchases on a stock exchange or (2) purchase of the shares in proportion to the number of shares held by each shareholder on equal terms and conditions, by a resolution at a Shareholders' meeting. The aggregate amount of the acquisition price shall not exceed the excess of our net assets, on a non-consolidated basis, over the sum of (1) our stated capital, (2) the total amount of our capital surplus reserve and earned surplus reserve which have accumulated up to the end of the previous fiscal year, (3) our earned surplus required to be accumulated for the then current fiscal year and (4) our net assets stated in the balance sheet as being increased as a result of the evaluation of the assets and liabilities in accordance with our accounting principles without being set off against any unrealized losses. In addition, under the Korean Commercial Code, we may not acquire our own shares if our net assets may fall short of the aggregate amount of the item (1) to (4) above, on a non-consolidated basis, as of the conclusion of the relevant business year of us. In general, our subsidiaries 50% or more of whose shares are owned by us may not acquire our shares.

**General Meeting of Shareholders**

The ordinary general meeting of our shareholders is held within three months after the end of each fiscal year, and subject to board resolution or court approval, an extraordinary general meeting of our shareholders may

be held as necessary or at the request of shareholders holding an aggregate of 1.5% or more of our outstanding common shares for at least six consecutive months. Under the Korean Commercial Code, an extraordinary general meeting of shareholders may be convened at the request of our audit committee, subject to a board resolution or court approval. Holders of non-voting preferred shares may only request a general meeting of shareholders once the non-voting preferred shares have become enfranchised as described under "—Description of Capital Stock—Voting Rights" above. Written notices setting forth the date, place and agenda of the meeting must be given to shareholders at least two weeks prior to the date of the general meeting of shareholders. However, pursuant to the Korean Commercial Code and our Articles of Incorporation, with respect to holders of less than 1% of the total number of our issued and outstanding shares which are entitled to vote, notice may be given by placing at least two public notices at least two weeks in advance of the meeting in at least two daily newspapers published in Seoul or by placing a public notice in the electrical disclosure system of the Financial Supervisory Service or the Korea Exchange, at least two weeks in advance of the meeting. Currently, for giving such notice, we use an electronic disclosure system available for access at a website maintained by the Financial Supervisory Service (known as the Data Analysis, Retrieval and Transfer System, or DART). Shareholders not on the shareholders' register as of the record date are not entitled to receive notice of the general meeting of shareholders or attend or vote at such meeting. Holders of the enfranchised preferred shares on the shareholders' register as of the record date are entitled to receive notice of, and to attend and vote at, the general meetings. Otherwise, holders of non-voting preferred shares are not entitled to receive notice of general meetings of shareholders or vote at such meetings but may attend such meetings.

The general meeting of shareholders is held in Naju, Jeollanam-do.

**Register of Shareholders and Record Dates**

Our transfer agent, Kookmin Bank, maintains the register of our shareholders at its office in Seoul, Korea. It registers transfers of our shares on the register of shareholders upon presentation of the share certificates.

The record date for annual dividends is December 31. For the purpose of determining the holders of shares entitled to annual dividends, the register of shareholders may be closed from January 1 to January 31 of each year. Further, the Korean Commercial Code and our Articles of Incorporation permit us at least two weeks' public notice to set a record date and/or close the register of shareholders for not more than three months for the purpose of determining the shareholders entitled to certain rights pertaining to our shares. The trading of our shares and the delivery of certificates in respect of them may continue while the register of shareholders is closed.

**Annual Report**

At least one week prior to the annual general meeting of shareholders, our annual report and audited consolidated financial statements must be made available for inspection at our principal office and at all branch offices. Copies of annual reports, the audited non-consolidated financial statements and any resolutions adopted at the general meeting of shareholders will be available to our shareholders.

Under the Financial Investment Services and Capital Markets Act, we must file with the Financial Services Commission and the Korea Exchange an annual report within 90 days after the end of our fiscal year, a half-year report within 45 days after the end of the first six months of our fiscal year and quarterly reports within 45 days after the end of the first three months and nine months of our fiscal year. Following our adoption of IFRS starting in January 1, 2011 pursuant to regulatory requirements for listed companies in Korea, we are required to file half-year and quarterly reports containing interim financial statements and notes thereto on a consolidated basis as well as on a separate basis.

**Limitation on Shareholdings**

No person other than the Government, our employee stock ownership association and persons who obtain an approval from the Financial Services Commission may hold for its account more than 3% of our total issued and

outstanding shares. In calculating shareholdings for this purpose, shares held by your spouse and your certain relatives or by your certain affiliates (such spouses, relatives and affiliates are together referred to as "Affiliated Holders") are deemed to be held by you. If you hold our shares in violation of this 3% limit, you are not entitled to exercise the voting rights or preemptive rights of our shares in excess of such 3% limit and the Financial Services Commission may order you to take necessary corrective action. In addition, the KEPCO Act currently requires that the Government, directly or through Korea Development Bank, own not less than 51% of our capital. For other restrictions on shareholdings, see Item 9. "The Offer and Listing."

**Change of Control**

The KEPCO Act requires that the Government, directly or pursuant to the Korea Development Bank Act, through Korea Development Bank, own not less than 51% of our capital.

**Disclosure of Share Ownership**

Under the Financial Investment Services and Capital Markets Act, any person whose direct or beneficial ownership of a listed company's shares with voting rights, equity-related debt securities including convertible bonds, bonds with warrants, exchangeable bonds, certificates representing the rights to subscribe for common shares, derivatives-linked securities and depository receipts of the aforementioned securities (collectively referred to as "Equity Securities"), together with the Equity Securities directly or beneficially owned by certain related persons or by any person acting in concert with the person, accounts for 5% or more of our total outstanding Equity Securities is required to report the status and purpose (in terms of whether the purpose of shareholding is to participate in the management of the issuer) of the holdings and the material contents of the agreements relating to the Equity Securities and other matters prescribed by the Presidential Decree under the Financial Investment Services and Capital Markets Act to the Financial Services Commission of Korea and the Korea Exchange within five business days after reaching the 5% ownership interest threshold.

In addition, any change (i) in the purpose of the shareholding or in the ownership, (ii) the major terms and conditions of agreements relating to Equity Securities owned (such as trust agreements and collateral agreements) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, or (iii) the type of ownership (direct ownership or holding) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, must be reported to the Financial Services Commission of Korea and the Korea Exchange within five business days from the date of such change (or by the tenth day of the month following the month in which the change occurs, in the case of a person with no intent to seek management control). Notwithstanding the foregoing, certain professional investors designated by the Financial Services Commission may report such matters to the Financial Services Commission and the Korea Exchange by the tenth day of the month immediately following the end of the quarter in which such 5.0% ownership interest is reached or the change occurs.

When filing a report to the Financial Services Commission and the Korea Exchange in accordance with the reporting requirements described above, a copy of such report must be sent to the relevant listed company. Violation of these reporting requirements may subject a person to sanctions such as prohibition on the exercise of voting rights with respect to the Equity Securities for which the reporting requirement was violated or fines or imprisonment. Furthermore, the Financial Services Commission may order the disposal of the Equity Securities for which the reporting requirement was violated or may impose administrative fine.

A person reporting to the Financial Services Commission and the Korea Exchange that his purpose of holding the Equity Securities is to participate in the management of the listed company is prohibited from acquiring additional Equity Securities of the listed company and exercising voting rights during the period commencing from the date on which the event triggering the reporting requirements occurs to the fifth day from the date on which the report is made.

**Item 10.C. Material Contracts**

None.


**Item 10.D. Exchange Controls**

**General**

The Foreign Exchange Transaction Act and the Presidential Decree and regulations under that Act and Decree, or collectively the Foreign Exchange Transaction Laws, regulate investment in Korean securities by non-residents and issuance of securities outside Korea by Korean companies. Non-residents may invest in Korean securities pursuant to the Foreign Exchange Transaction Laws. The Financial Services Commission has also adopted, pursuant to its authority under the Financial Investment Services and Capital Markets Act, regulations that regulate investment by foreigners in Korean securities and issuance of securities outside Korea by Korean companies.

Subject to certain limitations, the Ministry of Strategy and Finance has the authority to take the following actions under the Foreign Exchange Transaction Laws: (i) if the Government deems it necessary on account of war, armed conflict, natural disaster or grave, sudden and significant changes in domestic or foreign economic circumstances or similar events or circumstances, the Ministry of Strategy and Finance may temporarily suspend performance under any or all foreign exchange transactions, in whole or in part, to which the Foreign Exchange Transaction Laws apply (including suspension of payment and receipt of foreign exchange) or impose an obligation to deposit, safe-keep or sell any instruments of payment to the Bank of Korea or certain other governmental agencies or financial institutions, or effective from July 18, 2017, impose an obligation on resident creditors to collect and recover debts owed by non-resident debtors,, and (ii) if the Government concludes that the international balance of payments and international financial markets are experiencing or are likely to experience significant disruption or that the movement of capital between Korea and other countries are likely to adversely affect the Korean Won, exchange rates or other macroeconomic policies, the Ministry of Strategy and Finance may take action to require any person who intends to effect or effects a capital transaction to deposit all or a portion of the instruments of payment acquired in such transactions with the Bank of Korea or certain other governmental agencies or financial institutions.


**Government Review of Issuances of Debt Securities and ADSs and Report for Payments**

In order for us to issue debt securities of any series outside of the Republic, we are required to file a report with our designated foreign exchange bank or the Ministry of Strategy and Finance on the issuance of such debt securities, depending on the issuance amount. The Ministry of Strategy and Finance may at its discretion direct us to take measures as necessary to avoid undue exchange rate fluctuations before it accepts such report. Furthermore, in order for us to make payments of principal of or interest on the debt securities of any series and other amounts as provided in an indenture and such debt securities, we are required to present relevant documents to the designated foreign exchange bank at the time of each actual payment. The purpose of such presentation is to ensure that the actual remittance is consistent with the terms of the transaction reported to our designated foreign exchange bank or the Ministry of Strategy and Finance.

In order for us to offer for purchase shares of our common stock held in treasury in the form of ADSs or issue shares of our common stock represented by the ADSs, we are required to file a prior report of such offer or issuance with our designated foreign exchange bank or the Ministry of Strategy and Finance, depending on the offering amount. The Ministry of Strategy and Finance may at its discretion direct us to take measures as necessary to avoid undue exchange rate fluctuations before it accepts such report. No further Governmental approval is necessary for the initial offering and issuance of the ADSs.

In order for a depositary to acquire any existing shares of our common stock from holders of these shares of common stock (other than from us) for the purpose of issuance of depositary receipts representing these shares of

136

common stock, the depositary would be required to obtain our consent for the number of shares to be deposited in any given proposed deposit which exceeds the difference between (1) the aggregate number of shares deposited by us or with our consent for the issuance of ADSs (including deposits in connection with the initial and all subsequent offerings of ADSs and stock dividends or other distributions related to these ADSs) and (2) the number of shares on deposit with the depositary at the time of such proposed deposit. We may not grant this consent for the deposit of shares of our common stock in the future, if our consent is required. Therefore, a holder of ADSs who surrenders ADSs and withdraws shares of our common stock may not be permitted subsequently to deposit such shares and obtain ADSs.

In addition, we are also required to notify the Ministry of Strategy and Finance upon receipt of the full proceeds from the offering of ADSs. No additional Governmental approval is necessary for the offering and issuance of ADSs.

**Reporting Requirements for Holders of Substantial Interests**

Under the Financial Investment Services and Capital Markets Act, any person whose direct beneficial ownership of a listed company's Equity Securities, together with the Equity Securities beneficially owned by certain related persons or by any person acting in concert with such person, accounts for 5% or more of our total outstanding Equity Securities is required to report the status and purpose (namely, whether the purposes of the share ownership is to participate in the management of the issuer) of the holdings and the material contents of the agreements relating to the Equity Securities and other matters prescribed by the Presidential Decree under the Financial Investment Services and Capital Markets Act to the Financial Services Commission and the Korea Exchange within five business days after reaching the 5% ownership interest and any change in ownership interest subsequent to the report which equals or exceeds 1.0% of the total outstanding Equity Securities is required to be reported to the Financial Services Commission and the Korea Exchange within five business days from the date of the change.

In addition, any change (i) in the purpose of the shareholding or in the ownership, (ii) the major terms and conditions of agreements relating to Equity Securities owned (such as trust agreements and collateral agreements) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, or (iii) the type of ownership (direct ownership or holding) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, must be reported to the Financial Services Commission of Korea and the Korea Exchange within five business days from the date of such change (or by the tenth day of the month following the month in which the change occurs, in the case of a person with no intent to seek management control). Notwithstanding the foregoing, certain professional investors designated by the Financial Services Commission may report such matters to the Financial Services Commission and the Korea Exchange by the tenth day of the month immediately following the end of the quarter in which such 5.0% ownership interest is reached or the change occurs.

When filing a report to the Financial Services Commission and the Korea Exchange in accordance with the reporting requirements described above, a copy of such report must be sent to the relevant listed company. Violation of these reporting requirements may subject a person to sanctions such as prohibition on the exercise of voting rights with respect to the Equity Securities for which the reporting requirement was violated or fines or imprisonment. Furthermore, the Financial Services Commission may order the disposal of the Equity Securities for which the reporting requirement was violated or may impose administrative fine.

A person reporting to the Financial Services Commission and the Korea Exchange that his purpose of holding the Equity Securities is to participate in the management of the listed company is prohibited from acquiring additional Equity Securities of the listed company and exercising voting rights during the period commencing from the date on which the event triggering the reporting requirements occurs to the fifth day from the date on which the report is made.

137

In addition to the reporting requirements described above, any person whose direct or beneficial ownership of our voting stock and/or depository receipts for our voting stock accounts for 10.0% or more of the total issued and outstanding voting stock, whom we refer to as a major shareholder, must file a report to the Securities and Futures Commission and to the Korea Exchange within five business days after the date on which the person reached such shareholding limit. In addition, such person must file a report to the Securities and Futures Commission and to the Korea Exchange regarding any subsequent change in his/her shareholding. Such report on subsequent change in shareholding must be filed within five business days of the occurrence of any such change. Violation of these reporting requirements may subject a person to criminal sanctions such as fines and imprisonment.

**Restrictions Applicable to ADSs**

No Governmental approval is necessary for the sale and purchase of ADSs in the secondary market outside Korea or for the withdrawal of shares of our common stock underlying ADSs and the delivery inside Korea of the withdrawn shares. However, a foreigner who intends to acquire shares must obtain an Investment Registration Card from the Financial Supervisory Service as described below. The acquisition of shares by a foreigner must be reported by the foreigner or his standing proxy in Korea immediately to the Governor of the Financial Supervisory Service.

**Special Reporting Requirement for Companies Whose Securities Are Listed on Foreign Exchanges**

Under the regulations of the Financial Services Commission and the Korea Exchange, (i) if a company listed on the Korea Exchange has submitted a public disclosure of material matters to a foreign financial investment supervisory authority pursuant to the laws of the foreign jurisdiction, then it must submit a copy of the public disclosure and a Korean translation thereof to the Financial Services Commission of Korea and the Korea Exchange, and (ii) if a company listed on the Korea Exchange is approved for listing on a foreign stock market or determined to be de-listed from the foreign stock market or actually listed on, or de-listed from, a foreign stock market, then it must submit a copy of any document, which it submitted to or received from the relevant foreign government, foreign financial investment supervisory authority or the foreign stock market, and a Korean translation thereof to the Financial Services Commission of Korea and the Korea Exchange.

Persons who have acquired shares of our common stock as a result of the withdrawal of shares of common stock underlying ADSs may exercise their preemptive rights for new shares, participate in free distributions and receive dividends on shares of our common stock without any further governmental approval.

**Restrictions Applicable to Common Stock**

Under the Foreign Exchange Transaction Laws and the Regulations on Financial Investment Business (together, the "Investment Rules"), foreigners are permitted to invest, subject to certain exceptions and procedural requirements, in all shares of Korean companies unless prohibited by specific laws. Foreign investors may trade shares listed on the Korea Exchange only through the Korea Exchange except for certain limited circumstances. These circumstances include, among others, (1) odd-lot trading of shares, (2) acquisition of shares by a foreign company as a result of a merger, (3) acquisition or disposal of shares in connection with a tender offer, (4) acquisition of shares by exercise of warrant, conversion right under convertible bonds, exchange right under exchangeable bonds or withdrawal right under depositary receipts issued outside of Korea by a Korean company, such shares being "Converted Shares," (5) acquisition of shares through exercise of rights under securities issued outside of Korea, (6) acquisition of shares as a result of inheritance, donation, bequest or exercise of shareholders' rights (including preemptive rights or rights to participate in free distributions and receive dividends), (7) over-the-counter transactions between foreigners of a class of shares for which a ceiling on aggregate acquisition by foreigners (as explained below) exists and has been reached or exceeded, (8) acquisition of shares by direct investment under the Foreign Investment Promotion Law, (9) acquisition and disposal of shares on an overseas stock exchange market, if such shares are simultaneously listed on the KRX

138

KOSPI Market or the KRX KOSDAQ Market of the Korea Exchange and such overseas stock exchange, and (10) arm's length transactions between foreigners in the event all such foreigners belong to an investment group managed by the same person. For over-the-counter transactions of shares listed on the Korea Exchange outside the Korea Exchange between foreigners of a class of shares for which a ceiling on aggregate acquisition by foreigners exists and has been reached or exceeded, a financial investment company with a brokerage license in Korea must act as an intermediary. Odd-lot trading of shares listed on the Korea Exchange outside the Korea Exchange must involve a financial investment company with a dealing license in Korea as the other party. Foreign investors are prohibited from engaging in margin transactions with respect to shares subject to a ceiling on acquisition by foreigners.

The Investment Rules require a foreign investor who wishes to invest in or dispose of shares on the Korea Exchange (including Converted Shares) to register his/her identity with the Financial Supervisory Service prior to making any such investment or disposal unless he/she had previously registered. However, such registration requirement does not apply to foreign investors who acquire Converted Shares with the intention of selling them within three months from the date they were acquired. Upon registration, the Financial Supervisory Service will issue to the foreign investor an Investment Registration Card which must be presented each time the foreign investor opens a brokerage account with a financial investment company or financial institution in Korea. Foreigners eligible to obtain an Investment Registration Card include any foreign nationals who are individuals (with residence abroad for six months or more), foreign governments, foreign municipal authorities, foreign public institutions, international financial institutions or similar international organizations, corporations incorporated under foreign laws and any person in any additional category designated by the Decree of the Financial Services and Capital Markets Act. All Korean branches of a foreign corporation as a group are treated as a separate foreigner from the head office of the foreign corporation. However, a foreign branch of a Korean securities company, a foreign corporation or a depositary issuing depositary receipts may obtain one or more Investment Registration Cards in its name in certain circumstances as described in the relevant regulations.

Upon a foreign investor's purchase of shares through the Korea Exchange, no separate report by the investor is required because the Investment Registration Card system is designed to control and oversee foreign investment through a computer system. However, a foreign investor's acquisition or sale of shares outside the Korea Exchange (as discussed above) must be reported by the foreign investor or his standing proxy to the Governor of the Financial Supervisory Service at the time of each acquisition or sale. However, a foreign investor must ensure that any acquisition or sale by it of shares outside the Korea Exchange in the case of trades in connection with a tender offer, odd-lot trading of shares or trades of a class of shares for which the aggregate foreign ownership limit has been reached or exceeded, is reported to the Governor of the Financial Supervisory Service by the Korea Securities Depository, financial investment companies with a dealing or brokerage license or securities finance companies engaged to facilitate such transactions. In the event a foreign investor desires to acquire or sell shares outside the Korea Exchange and the circumstances in connection with such sale or acquisition do not fall within the exceptions made for certain limited circumstances described above, then the foreign investor must obtain the prior approval of the Governor. In addition, in the event a foreign investor acquires or sells shares outside the Korea Exchange, a prior report to the Governor of the Financial Supervisory Service may also be required in certain circumstances. A foreign investor may appoint one or more standing proxies from among the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and certain eligible foreign custodians which will exercise shareholders' rights or perform any matters related to the foregoing activities if the foreign investor does not perform these activities himself. However, a foreign investor may be exempted from complying with these standing proxy rules with the approval of the Governor of the Financial Supervisory Service in cases deemed inevitable by reason of conflict between the laws of Korea and those of the home country of the foreign investor.

Certificates evidencing shares of Korean companies must be kept in custody with an eligible custodian in Korea, the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and certain eligible

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

foreign custodians are eligible to be a custodian of shares for a non-resident or foreign investor. A foreign investor must ensure that his custodian deposits his shares with the Korea Securities Depository. Generally, a foreign investor may not permit any person, other than his/her standing proxy, to exercise rights relating to his shares or perform any tasks related thereto on his behalf. However, a foreign investor may be exempted from complying with this deposit requirement with the approval of the Governor of the Financial Supervisory Service in circumstances where compliance is made impracticable, including cases where such compliance would contravene the laws of the home country of the foreign investor.

Under the Investment Rules, with certain exceptions, a foreign investor may acquire shares of a Korean company without being subject to any single or aggregate foreign investment ceiling. However, certain designated public corporations are subject to a 40.0% ceiling on acquisitions of shares by foreigners in the aggregate and a ceiling on acquisitions of shares by a single foreign investor provided in the Articles of Incorporation of such corporations. Of the Korean companies listed on the Korea Exchange, we are so designated. The Financial Services Commission may impose other restrictions as it deems necessary for the protection of investors and the stabilization of the Korean securities and derivatives market. Generally, the ownership of Converted Shares constitutes foreign ownership for purposes of such aggregate foreign ownership limit. However, the acquisition of Converted Shares is one of the exceptions under which foreign investors may acquire shares of designated corporations in excess of the 40.0% ceiling.

In addition to the aggregate foreign investment ceiling set by the Financial Services Commission under authority of the Financial Investment Services and Capital Markets Act, our Articles of Incorporation set a 3% ceiling on acquisition by a single investor (whether domestic or foreign) of the shares of our common stock. Any person (with certain exceptions) who holds more than 3% of our issued and outstanding shares cannot exercise voting rights with respect to our shares in excess of this 3% limit.

The ceiling on aggregate investment by foreigners applicable to us may be exceeded in certain limited circumstances, including as a result of acquisition of:

- shares by a depositary issuing depositary receipts representing such shares (whether newly issued shares or outstanding shares);
- Converted Shares;
- shares from the exercise of shareholders' rights; or
- shares by gift, inheritance or bequest.

A foreigner who has acquired shares in excess of any ceiling described above may not exercise his voting rights with respect to the shares exceeding such limit and the Financial Services Commission may take necessary corrective action against him.

Under the Foreign Exchange Transaction Laws, a foreign investor who intends to acquire shares must designate a foreign exchange bank at which he must open a foreign currency account and a Won account exclusively for stock investments. No approval is required for remittance into Korea and deposit of foreign currency funds in the foreign currency account. Foreign currency funds may be transferred from the foreign currency account at the time required to place a deposit for, or settle the purchase price of, a stock purchase transaction to a Won account opened at a securities company. Funds in the foreign currency account may be remitted abroad without any governmental approval.

Dividends on shares of our common stock are paid in Won. No governmental approval is required for foreign investors to receive dividends on, or the Won proceeds of the sale of, any shares to be paid, received and retained in Korea. Dividends paid on, and the Won proceeds of the sale of, any shares held by a non-resident of Korea must be deposited either in a Won account with the investor's securities company or the investor's Won account. Funds in the investor's Won account may be transferred to his foreign currency account or withdrawn

140

for local living expenses, provided that any withdrawal of local living expenses in excess of a certain amount should be reported to the Governor of the Financial Supervisory Service. Funds in the investor's Won account may also be used for future investment in shares or for payment of the subscription price of new shares obtained through the exercise of preemptive rights.

Financial investment companies with a securities dealing, brokerage or collective investment license are allowed to open foreign currency accounts with foreign exchange banks exclusively for accommodating foreign investors' stock investments in Korea. Through these accounts, these securities companies and asset management companies may enter into foreign exchange transactions on a limited basis, such as conversion of foreign currency funds and Won funds, either as a counterparty to or on behalf of foreign investors without the foreign investors having to open their own accounts with foreign exchange banks.

## Item 10.E. Taxation

### Korean Taxes

The following summary describes the material Korean tax consequences of ownership of the Registered Debt Securities and ADSs. Persons considering the purchase of the Registered Debt Securities or ADSs should consult their own tax advisors with regard to the application of the Korean income tax laws to their particular situations as well as any tax consequences arising under the laws of any other taxing jurisdiction. Reference is also made to a tax treaty between the Republic and the United States entitled "Convention Between the United States of America and the Republic of Korea for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and the Encouragement of International Trade and Investment," signed on June 4, 1976 and entered into force on October 20, 1979.

The following summary of Korean tax considerations applies to you so long as you are not:

- a resident of Korea;

- a corporation having its head office, principal place of business or place of effective management in Korea; or

- engaged in a trade or business in Korea through a permanent establishment or a fixed base to which the relevant income is attributable or with which the relevant income is effectively connected.

### *Registered Debt Securities*

*Taxation of Interest*

Pursuant to the Special Tax Treatment Control Law ("STTCL"), when we make payments of interest to you on the Registered Debt Securities, no amount will be withheld from such payments for, or on account of, any income taxes of any kind imposed, levied, withheld or assessed by Korea or any political subdivision or taxing authority thereof or therein, provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL.

If the tax exemption under the STTCL referred to above were to cease to be in effect, the rate of income tax or corporation tax applicable to the interest on the Registered Debt Securities would be 14% of income for a non-resident without a permanent establishment in Korea. In addition, local income tax would be imposed at the rate of 10.0% of the income tax or corporation tax (which would increase the total tax rate to 15.4%), unless reduction is available under an applicable income tax treaty. If you are a qualified resident in a country that has entered into a tax treaty with Korea, you may qualify for an exemption or a reduced rate of Korean withholding tax. See the discussion under "—Shares or ADSs—Tax Treaties" below for an additional explanation on treaty benefits.

141

In order to obtain the benefits of an exemption or a reduced withholding tax rate under a tax treaty, you must submit to us, prior to the interest payment date, such evidence of tax residence as may be required by the Korean tax authorities in order to establish your entitlement to the benefits of the applicable tax treaty.

Furthermore, Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, an overseas investment vehicle (which is defined as an organization established in a foreign jurisdiction that manages funds collected through investment solicitation by acquiring, disposing or otherwise investing in proprietary targets and then distributes the proceeds thereof to investors) (the "Overseas Investment Vehicle") must obtain an application for a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Taxation of Capital Gains*

Korean tax laws currently exclude from Korean taxation gains made by a non-resident without a permanent establishment in Korea from the sale of a Registered Debt Security to another non-resident (except where a non-resident sells Registered Debt Securities to another non-resident who has a permanent establishment in Korea, if any). In addition, capital gains realized from the transfer of Registered Debt Securities outside Korea by non-residents with or without permanent establishments in Korea are currently exempt from taxation by virtue of the STTCL, provided that the issuance of such Registered Debt Securities is deemed to be an overseas issuance of foreign currency-denominated bonds under the STTCL. If you sell or otherwise dispose of a Registered Debt Security through other ways than those mentioned above, any gain realized on the transaction will be taxable at ordinary Korean withholding tax rates (which is the lesser of 22.0% (including local income tax) of the net gain or 11.0% (including local income tax) of the gross sale proceeds, subject to the production of satisfactory evidence of the acquisition cost of such Registered Debt Securities and certain direct transaction costs attributable to the disposal of such Registered Debt Securities), unless an exemption is available under an applicable income tax treaty. See the discussion under "—Shares or ADSs—Tax Treaties" below for an additional explanation on treaty benefits.

*Inheritance Tax and Gift Tax*

If you die while you are the holder of Registered Debt Securities, the subsequent transfer of the Registered Debt Securities by way of succession will be subject to Korean inheritance tax. Similarly, if you transfer Registered Debt Securities as a gift, the donee will be subject to Korean gift tax and you may be required to pay the gift tax if the donee fails to do so.

At present, Korea has not entered into any tax treaty relating to inheritance or gift taxes.

**Shares or ADSs**

*Dividends on the Shares of Common Stock or ADSs*

We will deduct Korean withholding tax from dividends (whether in cash or in shares) paid to you at a rate of 22% (inclusive of local income tax). If you are a qualified resident in a country that has entered into a tax treaty with Korea, you may qualify for a reduced rate of Korean withholding tax. See the discussion under "—Tax Treaties" below for an additional explanation on treaty benefits.

In order to obtain the benefits of a reduced withholding tax rate under a tax treaty, you must submit to the Korea Securities Depository, prior to the dividend payment date, such evidence of tax residence as may be

required by the Korean tax authorities in order to establish your entitlement to the benefits of the applicable tax treaty. Evidence of tax residence may be submitted to the Korea Securities Depository through the withholding tax agent. If we distribute to you free shares representing a transfer of certain capital reserves or asset revaluation reserves into paid-in capital, such distribution may be subject to Korean withholding tax.

Furthermore, Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for entitlement to a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

If you hold common shares or ADSs and receive the dividend through an account at the Korea Securities Depository held by a foreign depositary settlement institute, you are not required to submit the application for entitlement to a preferential tax rate. However, evidence of tax residence may need to be submitted to us through such foreign depositary settlement institute.

*Taxation of Capital Gains*

As a general rule, capital gains earned by non-residents upon the transfer of the common shares or ADSs would be subject to Korean income tax at a rate equal to the lesser of (i) 11.0% (including local income tax) of the gross proceeds realized or (ii) 22.0% (including local income tax) of the net realized gain (subject to the production of satisfactory evidence of the acquisition costs and certain direct transaction costs arising out of the transfer of such common shares or ADSs), unless such non-resident is exempt from Korean income taxation under an applicable Korean tax treaty into which Korea has entered with the non-resident's country of tax residence. Please see the discussion under "—Tax Treaties" below for an additional explanation on treaty benefits. Even if you do not qualify for any exemption under a tax treaty, you will not be subject to the foregoing income tax on capital gains if you qualify for the relevant Korean domestic tax law exemptions discussed in the following paragraphs.

You will not be subject to Korean income taxation on capital gains realized upon the transfer of our common stocks or ADSs through the Korea Exchange if you (i) have no permanent establishment in Korea and (ii) did not own or have not owned (together with any shares owned by any entity which you have a certain special relationship with and possibly including the shares represented by the ADSs) 25.0% or more of our total issued and outstanding shares at any time during the calendar year in which the sale occurs and during the five calendar years prior to the calendar year in which the sale occurs.

It should be noted that (i) capital gains earned by you (regardless of whether you have a permanent establishment in Korea) from the transfer of ADSs outside Korea will be exempted from Korean income taxation provided that ADSs are deemed to have been issued overseas under the STTCL, but (ii) if and when an owner of the underlying shares of stock transfers ADSs after conversion of the underlying shares into ADSs, the exemption described in (i) is not applicable.

If you are subject to tax on capital gains with respect to the sale of ADSs, or of shares of common stock which you acquired as a result of a withdrawal, the purchaser or, in the case of the sale of shares of common stock on the Korea Exchange or through an investment dealer or investment broker under the Financial Investment Services and Capital Markets Act, an investment dealer or investment broker is required to withhold Korean tax from the sales price in an amount equal to 11.0% (including local income tax) of the gross realization proceeds and to make payment of these amounts to the Korean tax authority, unless you establish your entitlement to an exemption under an applicable tax treaty or domestic tax law or produce satisfactory evidence of your acquisition cost and transaction costs for the shares of common stock or the ADSs.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

However, if you transfer the ADSs following an exchange of the underlying shares of stock owned by you for ADSs to a purchaser who is a non-resident or a foreign company without a permanent establishment in Korea, you are obligated to file an income tax return and pay tax on gain realized from such transfer unless exempt under an applicable tax treaty or domestic law. Further, if you transfer the shares of common stock outside of Korea (excluding a transfer on a foreign exchange) to non-residents or foreign companies without permanent establishments in Korea, you are obligated to file an income tax return and pay income tax on capital gain realized from such transfer unless exempt under an applicable tax treaty or domestic law. If a purchaser or an investment dealer or investment broker, as the case may be, withholds and remits the tax on capital gains derived from transfer of shares of common stock or ADSs, your obligation to file an income tax return and pay income tax will not apply.

In order to obtain the benefit of an exemption from tax pursuant to a tax treaty, you must submit to the purchaser or the investment dealer or the investment broker, or through the ADS depositary, as the case may be, prior to or at the time of payment, such evidence of your tax residence as the Korean tax authorities may require in support of your claim for treaty benefits. Please see the discussion under "—Tax Treaties" below for an additional explanation on claiming treaty benefits. Furthermore, Korean tax laws require the beneficial owner to submit an application for tax exemption together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available exemption pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for tax exemption from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Tax Treaties*

Korea has entered into a number of income tax treaties with other countries (including the United States), which would reduce or exempt Korean withholding tax on dividends on, and capital gains on transfer of, shares of our common stock or ADSs. For example, under the Korea-United States income tax treaty, reduced rates of Korean withholding tax of 16.5% or 11.0% (respectively, including local income tax, depending on your status and shareholding ratio) on dividends and an exemption from Korean withholding tax on capital gains are available to residents of the United States that are beneficial owners of the relevant dividend income or capital gains. However, under Article 17 (Investment of Holding Companies) of the Korea-United States income tax treaty, such reduced rates and exemption do not apply if (i) you are a United States corporation, (ii) by reason of any special measures, the tax imposed on you by the United States with respect to such dividends or capital gains is substantially less than the tax generally imposed by the United States on corporate profits, and (iii) 25.0% or more of your capital is held of record or is otherwise determined, after consultation between competent authorities of the United States and Korea, to be owned directly or indirectly by one or more persons who are not individual residents of the United States. Also, under Article 16 (Capital Gains) of the Korea-United States income tax treaty, the exemption on capital gains does not apply if you are an individual, and (a) you maintain a fixed base in Korea for a period or periods aggregating 183 days or more during the taxable year and your ADSs or shares of common stock giving rise to capital gains are effectively connected with such fixed base or (b) you are present in Korea for a period or periods of 183 days or more during the taxable year.

You should inquire for yourself whether you are entitled to the benefit of an income tax treaty with Korea. It is the responsibility of the party claiming the benefits of an income tax treaty in respect of dividend payments or capital gains to submit to us, the purchaser or the investment dealer or the investment broker, as applicable, a certificate as to his tax residence. In the absence of sufficient proof, we, the purchaser or the investment dealer or the investment broker, as applicable, must withhold tax at the normal rates. Further, in order for you to obtain the benefit of a tax exemption on certain Korean source income (e.g., interest, dividends and capital gains) under an applicable tax treaty, Korean tax laws require you (or your agent) to submit an application for tax exemption (if there is no change in the content of such application, it is not required to submit such application again within a

period of three years thereafter) along with a certificate of your tax residence issued by a competent authority of your country of tax residence. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for tax exemption from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner. The withholding obligor must submit the application and the report to the relevant tax office by the ninth day of the month following the date of the first payment of such income.

Furthermore, the Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate (if there is no change in the content of such application, it is not required to submit such application again within a period of three years thereafter) together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. If you hold the shares of common stock or ADSs and receive the dividend through an account at the Korea Securities Depository held by a foreign depositary settlement institute, you are not required to submit the application for entitlement to a preferential tax rate. However, evidence of tax residence may need to be submitted to us through such foreign depositary settlement institute.

Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Inheritance Tax and Gift Tax*

If you die while holding an ADS or donate an ADS, it is unclear whether, for Korean inheritance and gift tax purposes, you will be treated as the owner of the shares of common stock underlying the ADSs. If the tax authority interprets depositary receipts as the underlying share certificates, you may be treated as the owner of the shares of common stock and your heir or the donee (or in certain circumstances, you as the donor) will be subject to Korean inheritance or gift tax presently at the rate of 10.0% to 50.0%, depending on the value of the ADSs or shares of common stock.

If you die while holding a share of common stock or donate a share of common stock, your heir or donee (or in certain circumstances, you as the donor) will be subject to Korean inheritance or gift tax at the same rate as indicated above.

At present, Korea has not entered into any tax treaty relating to inheritance or gift taxes.

*Securities Transaction Tax*

If you transfer shares of common stock on the Stock Market of the Korea Exchange, you will be subject to securities transaction tax at the rate of 0.15% and an agriculture and fishery special surtax at the rate of 0.15% of the sale price of the shares of common stock. If your transfer of the shares of common stock is not made on the Stock Market of the Korea Exchange, subject to certain exceptions you will be subject to securities transaction tax at the rate of 0.5% and will not be subject to an agriculture and fishery special surtax.

Under the Securities Transaction Tax Law, depositary receipts (such as ADSs) constitute share certificates subject to the securities transaction tax. However, a transfer of depositary receipts listed on the New York Stock Exchange, NASDAQ National Market or other qualified foreign exchanges will be exempt from the securities transaction tax although depositary receipts, including ADSs, constitute share certificates subject to the securities transaction tax.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

In principle, the securities transaction tax, if applicable, must be paid by the transferor of the shares or rights. When the transfer is effected through the Korea Securities Depository, the Korea Securities Depository is generally required to withhold and pay the tax to the tax authorities. When such transfer is made through an investment dealer or investment broker under the Financial Investment Services and Capital Markets Act only, such investment dealer or investment broker is required to withhold and pay the tax. Where the transfer is effected by a non-resident without a permanent establishment in Korea, other than through the Korea Securities Depository or an investment dealer or investment broker, the transferee is required to withhold the securities transaction tax for payment to the Korean tax authority.

**U.S. Federal Income Tax Considerations for U.S. Persons**

The following is a summary of certain U.S. federal income tax consequences for beneficial owners of the Registered Debt Securities, common stock and ADSs that are "U.S. Persons" (as defined below). For purposes of this summary, you are a "U.S. Person" if you are any of the following for U.S. federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (1) it is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) it has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This summary is based on current law, which is subject to change (perhaps retroactively), is for general purposes only and should not be considered tax advice. This summary does not represent a detailed description of the U.S. federal income tax consequences and does not address the effects of the Medicare contribution tax on net investment income or foreign, state, local or other tax considerations that may be relevant to you in light of your particular circumstances. The discussion set forth below is applicable to you if (i) you are a resident of the United States for purposes of the current income tax treaty between the United States and Korea (the "Treaty"), (ii) your Registered Debt Securities, common stock or ADSs are not, for purposes of the Treaty, effectively connected with a permanent establishment in Korea and (iii) you otherwise qualify for the full benefits of the Treaty. Except where noted, this summary deals only with Registered Debt Securities, common stock or ADSs held as capital assets, and it does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws (including if you are a dealer in securities or currencies, a financial institution, a regulated investment company, a real estate investment trust, an insurance company, a tax-exempt organization, a person holding the Registered Debt Securities, common stock or ADSs as part of a hedging, integrated or conversion transaction, constructive sale or straddle, a person owning 10.0% or more of our stock (by vote or value), a trader in securities that elects to use a mark-to-market method of accounting for your securities holdings, a person liable for the alternative minimum tax, a person required to accelerate the recognition of any item of gross income with respect to the Registered Debt Securities, common stock or ADSs as a result of such income being recognized on an applicable financial statement, a partnership or other pass-through entity (or an investor therein), or a U.S. Person whose "functional currency" is not the U.S. dollar). We cannot assure you that a change in law will not alter significantly the tax considerations that we describe in this summary.

If a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) holds the Registered Debt Securities, common stock or ADSs, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our Registered Debt Securities, common stock, or ADSs, you should consult your tax advisor.

146

Because of the 100-year maturity of the One Hundred Year 7.95% Zero-to-Full Debentures, due April 1, 2096 (the "ZTF Debentures"), it is not certain whether the ZTF Debentures will be treated as debt for U.S. federal income tax purposes. The discussion below assumes that the ZTF Debentures (as well as the other Registered Debt Securities) will be treated as debt, except that a summary of the consequences to you if the ZTF Debentures were not treated as debt is provided under "Tax Consequences with Respect to Registered Debt Securities Generally—ZTF Debentures Treated as Equity" below.

The discussion of the tax consequences of ownership of common stock and ADSs below, is based, in part, upon representations made by the depositary to us and assumes that the deposit agreement, and all other related agreements, will be performed in accordance with their terms.

**You should consult your own tax advisor concerning the particular U.S. federal income tax consequences to you of the ownership of the Registered Debt Securities, common stock and ADSs, as well as the consequences to you arising under the laws of any other taxing jurisdiction.**

### Tax Consequences with Respect to Registered Debt Securities Generally

*Payments*

Except as provided below with regard to original issue discount (as defined below) on the ZTF Debentures, interest on a Registered Debt Security will generally be taxable to you as ordinary income at the time it is paid or accrued in accordance with your method of accounting for tax purposes. Principal payments on an amortizing Registered Debt Security generally will constitute a tax-free return of capital to you.

Although interest payments to you are currently exempt from Korean taxation provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL (see—"Korean Taxes—Registered Debt Securities—Taxation of Interest," above), if the Korean law providing for the exemption is repealed, then, in addition to interest payments on the Registered Debt Securities and original issue discount on the ZTF Debentures, you will be required to include in income any additional amounts paid and any Korean tax withheld from interest payments notwithstanding that you in fact did not receive such withheld tax. You may be entitled to deduct or credit such Korean tax (up to the Treaty rate), subject to applicable limitations in the Internal Revenue Code of 1986, as amended (the "Code"). Your election to deduct or credit foreign taxes will apply to all of your foreign taxes for a particular taxable year. Interest income on a Registered Debt Security (including additional amounts and any Korean taxes withheld in respect thereof) and original issue discount on a ZTF Debenture generally will constitute foreign source income and generally will be considered passive category income for purposes of computing the foreign tax credit. You will generally be denied a foreign tax credit for Korean taxes imposed with respect to the Registered Debt Securities where you do not meet a minimum holding period requirement during which you are not protected from risk of loss. The rules governing the foreign tax credit are complex. Investors are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

*Original Issue Discount*

The ZTF Debentures were issued with original issue discount ("OID") for U.S. federal income tax purposes equal to the difference between (i) the sum of all scheduled amounts payable on the ZTF Debentures (including the interest payable on such ZTF Debentures) and (ii) the "issue price" of the ZTF Debentures. The "issue price" of each ZTF Debenture is the first price at which a substantial amount of the ZTF Debentures was sold to the public (other than to an underwriter, broker, placement agent or wholesaler). If you hold ZTF Debentures, then (subject to the discussion in "—Bond Premium" below) you generally must include OID in gross income (as ordinary income) in advance of the receipt of cash attributable to that income, regardless of your method of accounting. However, you generally will not be required to include separately in income cash payments received on the ZTF Debentures, even if denominated as interest.

147

The amount of OID includible in income by the holder of a ZTF Debenture is the sum of the "daily portions" of OID with respect to the ZTF Debenture for each day during the taxable year or portion of the taxable year in which such holder held such ZTF Debenture, or "accrued OID" (for a discussion relevant to subsequent purchasers, see "—Market Discount" and "—Bond Premium," below). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a ZTF Debenture may be of any length and may vary in length over the term of the ZTF Debenture, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the product of the ZTF Debenture's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period). OID allocable to a final accrual period is the difference between the amount payable at maturity and the adjusted issue price at the beginning of the final accrual period. The "adjusted issue price" of a ZTF Debenture at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period (for subsequent purchasers, determined without regard to the amortization of any acquisition or bond premium, as described below) and reduced by any payments previously made on such ZTF Debenture. Under these rules, you will have to include in income increasingly greater amounts of OID in successive accrual periods. We are required to provide information returns stating the amount of OID accrued on ZTF Debentures held of record by persons other than corporations and other exempt holders.

As discussed above, although interest payments to you are currently exempt from Korean taxation provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL (see—"Korean Taxes—Registered Debt Securities—Taxation of Interest," above), if the Korean law providing for the exemption is repealed, then Korean withholding tax may be imposed at times that differ from the times at which you are required to include interest or OID in income for U.S. federal income tax purposes and this disparity may limit the amount of foreign tax credit available.

*Market Discount*

If you purchased a Registered Debt Security other than a ZTF Debenture for an amount that is less than its stated redemption price at maturity, or, in the case of a ZTF Debenture, its adjusted issue price, the amount of the difference will be treated as "market discount" for U.S. federal income tax purposes, unless that difference is less than a specified de minimis amount. Under the market discount rules, you will be required to treat any payment, other than qualified stated interest (as defined in the Code), on, or any gain on the sale, exchange, retirement or other disposition of, a Registered Debt Security as ordinary income to the extent of the market discount that you have not previously included in income and are treated as having accrued on the Registered Debt Security at the time of its payment or disposition. In addition, you may be required to defer, until the maturity of the Registered Debt Security or its earlier disposition in a taxable transaction, the deduction of all or a portion of the interest expense on any indebtedness attributable to the Registered Debt Security.

Any market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the Registered Debt Security, unless you elect to accrue on a constant interest method. Your election to accrue market discount on a constant interest method is to be made for the taxable year in which you acquired the Registered Debt Security, applies only to that Registered Debt Security and cannot be revoked. You may elect to include market discount in income currently as it accrues, on either a ratable or constant interest method, in which case the rule described above regarding deferral of interest deductions will not apply. Your election to include market discount in income currently, once made, applies to all market discount obligations acquired by you on or after the first taxable year to which your election applies and may not be revoked without the consent of the Internal Revenue Service (the "IRS"). You should consult your own tax advisor before making this election.

148

*Bond Premium*

If you purchased a ZTF Debenture for an amount that is greater than its adjusted issue price but equal to or less than the sum of all amounts payable on the ZTF Debenture after the purchase date, you will be considered to have purchased that ZTF Debenture at an "acquisition premium." Under the acquisition premium rules, the amount of OID that you must include in gross income with respect to a ZTF Debenture for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.

If you purchased a Registered Debt Security for an amount in excess of the sum of all amounts payable on the Registered Debt Security after the purchase date other than qualified stated interest, you will be considered to have purchased the Registered Debt Security at a "premium" and, if such Registered Debt Security is a ZTF Debenture, you will not be required to include any OID in income. You generally may elect to amortize the premium over the remaining term of the Registered Debt Security on a constant yield method as an offset to interest when includible in income under your regular accounting method. In the case of instruments that provide for alternative payment schedules, bond premium is calculated by assuming that (a) you will exercise or not exercise options in a manner that maximizes your yield, and (b) we will exercise or not exercise options in a manner that minimizes your yield (except that we will be assumed to exercise call options in a manner that maximizes your yield). If you do not elect to amortize bond premium, that premium will decrease the gain or increase the loss you would otherwise recognize on disposition of a Registered Debt Security. Your election to amortize premium on a constant yield method will also apply to all debt obligations held or subsequently acquired by you on or after the first day of the first taxable year to which the election applies. You may not revoke the election without the consent of the IRS. You should consult your own tax advisor before making this election.

*Sale, Exchange and Retirement of Registered Debt Securities*

When you sell, exchange or retire a Registered Debt Security, you will recognize gain or loss equal to the difference between the amount you receive (not including an amount equal to any accrued qualified stated interest, which will be taxable as ordinary income to the extent not previously included in income) and your adjusted tax basis in the Registered Debt Security. Your tax basis in a Registered Debt Security other than a ZTF Debenture will generally be your cost of obtaining the Registered Debt Security increased by any market discount included in income and reduced by payments of principal you receive and any bond premium that you elect to amortize. Your adjusted tax basis in a ZTF Debenture will, in general, be your cost therefor, increased by any market discount and OID previously included in income and reduced by any cash payments on the ZTF Debenture and any bond premium that you elect to amortize. Your gain or loss realized on selling, exchanging or retiring a Registered Debt Security will generally be treated as United States source income. Consequently, you may not be able to use the foreign tax credit arising from any Korean tax imposed on the disposition of Registered Debt Securities unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from foreign sources. Except as described above with respect to market discount, your gain or loss will be capital gain or loss and will generally be long-term capital gain or loss if, at the time of the sale, exchange or retirement of a Registered Debt Security, you have held the Registered Debt Security for more than one year. If you are an individual and the Registered Debt Security being sold, exchanged or retired is a capital asset that you held for more than one year, you may be eligible for reduced rates of taxation on any capital gain recognized. Your ability to deduct capital losses is subject to limitations.

*ZTF Debentures Treated as Equity*

If the ZTF Debentures were treated as equity for U.S. federal income tax purposes, amounts actually or deemed paid with respect to the ZTF Debentures would be deemed dividends for U.S. federal income tax purposes to the extent paid out of our current or accumulated earnings and profits (as determined for U.S. federal income tax purposes).

You would include the amounts actually or deemed paid by us on the ZTF Debentures (before reduction for Korean withholding tax, if any) as dividend income when actually or constructively paid by us. Section 305 of

149

the Code, which would apply to the ZTF Debentures if they were treated as equity for U.S. federal income tax purposes, requires current accrual of dividends under principles similar to the accrual of OID. Amounts treated as dividends will not be eligible for the dividends received deduction generally allowed to U.S. corporations.

### *Tax Consequences with Respect to Common Stock and ADSs*

In general, for U.S. federal income tax purposes, holders of ADSs will be treated as the owners of the underlying common stock that is represented by such ADSs. Accordingly, deposits or withdrawals of common stock by holders of ADSs will not be subject to U.S. federal income tax.

#### *Distributions on Common Stock or ADSs*

The gross amount of distributions (other than certain distributions of common stock or rights to subscribe for common stock) to holders of common stock or ADSs (including amounts withheld in respect of Korean withholding taxes) will be taxable dividends to such holders, to the extent paid out of our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Such income (including withheld taxes) will be includable in the gross income of a holder as ordinary income on the day actually or constructively received by the holder, in the case of common stock, or by the depositary, in the case of ADSs. Such dividends will not be eligible for the dividends received deduction allowed to corporations under the Code.

With respect to non-corporate U.S. Persons, certain dividends paid by a qualified foreign corporation and received by such holders may be subject to reduced rates of taxation. A qualified foreign corporation includes a foreign corporation that is eligible for the benefits of an income tax treaty with the United States, if such treaty contains an exchange of information provision and the United States Treasury Department had determined that the treaty is satisfactory for purposes of the legislation. The United States Treasury Department has determined that the Treaty, which contains an exchange of information provision, is (in the absence of additional guidance) satisfactory for these purposes. In addition, we believe we are eligible for the benefits of the Treaty. However, a foreign corporation is also treated as a qualified foreign corporation with respect to dividends paid by that corporation on shares (or ADSs backed by such shares) that are readily tradable on an established securities market in the United States. Shares of our common stock will generally not be considered readily tradable for these purposes. However, United States Treasury Department guidance indicates that our ADSs, which are listed on the New York Stock Exchange, are readily tradable on an established securities market in the United States. There can be no assurance that our ADSs will be considered readily tradable on an established securities market in later years. Non-corporate U.S. Persons that do not meet a minimum holding period requirement during which they are not protected from a risk of loss or that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. In addition, the rate reduction will not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. Holders should consult their own tax advisors regarding the application of the foregoing rules to their particular circumstances.

The amount of any dividend paid in Won will equal the United States dollar value of the Won received calculated by reference to the exchange rate in effect on the date the dividend is received by the holder, in the case of common stock, or by the depositary, in the case of ADSs, regardless of whether the Won are converted into U.S. dollars. If the Won received as a dividend are not converted into U.S. dollars on the date of receipt, a holder will have a basis in the Won equal to their U.S. dollar value on the date of receipt. Any gain or loss realized on a subsequent conversion or other disposition of the Won will be treated as United States source ordinary income or loss. The amount of any distribution of property other than cash will be the fair market value of such property on the date of distribution.

The maximum rate of withholding tax on dividends paid to you pursuant to the Treaty is 16.5%. You will be required to properly demonstrate your entitlement to the reduced rate of withholding under the Treaty (see

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

"—Korean Taxes—Shares or ADSs —Tax Treaties"). Subject to certain conditions and limitations, Korean withholding taxes (up to the Treaty rate) will be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. For purposes of calculating the foreign tax credit, dividends paid on the common stock or ADSs will be treated as foreign source income and will generally constitute passive category income. Further, in certain circumstances, if you have held common stock or ADSs for less than a specified minimum period during which you are not protected from risk of loss, or are obligated to make payments related to the dividends, you will not be allowed a foreign tax credit for foreign taxes imposed on dividends paid on common stock or ADSs. The rules governing the foreign tax credit are complex. Investors are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances including the possible adverse impact on creditability to the extent you are entitled to a refund of any Korean tax withheld or a reduced rate of withholding.

To the extent that the amount of any distribution exceeds our current and accumulated earnings and profits for a taxable year, as determined under U.S. federal income tax principles, the distribution will first be treated as a tax- free return of capital, causing a reduction in the adjusted basis of the common stock or ADSs (thereby increasing the amount of gain, or decreasing the amount of loss, to be recognized by the investor on a subsequent disposition of the common stock or ADSs), and the balance in excess of adjusted basis will be taxed as capital gain recognized on a sale or exchange of property. Consequently, such distributions in excess of our current and accumulated earnings and profits would not give rise to foreign source income and you generally would not be able to use the foreign tax credit arising from any Korean withholding tax imposed on such distributions unless such credit can be applied (subject to applicable limitations) against U.S. tax due on other foreign source income in the appropriate category for foreign tax credit purposes. However, we do not expect to keep earnings and profits in accordance with U.S. federal income tax principles. Therefore, you should expect that a distribution will generally be treated as a dividend (as discussed above).

Distributions of common stock or rights to subscribe for common stock that are received as part of a pro rata distribution to all of our shareholders generally will not be subject to U.S. federal income tax. Consequently such distributions will not give rise to foreign source income and you generally will not be able to use the foreign tax credit arising from any Korean withholding tax unless such credit can be applied (subject to applicable limitations) against U.S. tax due on other income derived from foreign sources. The basis of the new common stock or rights so received will be determined by allocating your basis in the old common stock between the old common stock and the new common stock or rights received, based on their relative fair market value on the date of distribution. However, the basis of the rights will be zero if (i) the fair market value of the rights is less than 15% of the fair market value of the old common stock at the time of distribution, unless the taxpayer timely elects to determine the basis of the old common stock and of the rights by allocating between the old common stock and the rights the adjusted basis of the old common stock or (ii) the rights are not exercised and thus expire.

*Sale, Exchange or Other Disposition of ADSs or Common Stock*

Upon the sale, exchange or other disposition of ADSs or common stock, you generally will recognize capital gain or loss equal to the difference between the amount realized upon the sale, exchange or other disposition and your adjusted tax basis in the ADSs or common stock. The capital gain or loss will be long-term capital gain or loss if at the time of sale, exchange or other disposition, the ADSs or common stock have been held by you for more than one year. Under current law, long-term capital gains of individuals are, under certain circumstances, taxed at lower rates than items of ordinary income. The deductibility of capital losses is subject to limitations. Any gain or loss recognized by you will generally be treated as U.S. source gain or loss. Consequently, you may not be able to use the foreign tax credit arising from any Korean tax imposed on the disposition of ADSs or common stock unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from foreign sources.

You should note that any Korean securities transaction tax will not be treated as a creditable foreign tax for U.S. federal income tax purposes, although you may be entitled to deduct such taxes, subject to applicable limitations under the Code.

*Passive Foreign Investment Company Rules*

Based upon the past and projected composition of our income and assets and the valuation of our assets, we do not believe that we were a passive foreign investment company (a "PFIC") for 2017, and we do not expect to be a PFIC in 2018 or to become one in the foreseeable future, although there can be no assurance in this regard. If, however, we become a PFIC, such characterization could result in adverse U.S. tax consequences to you if you are a U.S. investor. For example, if we become a PFIC, our U.S. investors may become subject to increased tax liabilities under U.S. tax laws and regulations and will become subject to burdensome reporting requirements. Our PFIC status is determined on an annual basis and depends on the composition of our income and assets. Specifically, we will be classified as a PFIC for U.S. tax purposes if either: (i) 75% or more of our gross income in a taxable year is passive income, or (ii) the average percentage of our assets by value in a taxable year which produce or are held for the production of passive income (which generally includes cash) is at least 50%. We cannot assure you that we will not be a PFIC for 2018 or any future taxable year.

### Information Reporting and Backup Withholding

In general, information reporting requirements will apply to principal, interest, OID and premium payments on Registered Debt Securities and dividend payments in respect of the common stock or ADSs or the proceeds received on the sale, exchange or redemption of the Registered Debt Securities, common stock or ADSs paid within the United States (and in certain cases, outside of the United States) to holders other than certain exempt recipients, and a backup withholding tax may apply to such amounts if you fail to provide an accurate taxpayer identification number or certification of exempt status or fail to report interest and dividends required to be shown on your U.S. federal income tax returns. The amount of any backup withholding from a payment to you will be allowed as a refund or a credit against your U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

### Item 10.F. Dividends and Paying Agents

Not Applicable

### Item 10.G. Statements by Experts

Not Applicable

### Item 10.H. Documents on Display

We are subject to the information requirements of the Exchange Act, and, in accordance therewith, are required to file reports, including annual reports on Form 20-F, and other information with the U.S. Securities and Exchange Commission. You may inspect and copy these materials, including this annual report and the exhibits thereto, at SEC's Public Reference Room 100 Fifth Street, N.E., Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference rooms. As a foreign private issuer, we are also required to make filings with the Commission by electronic means. Any filings we make electronically will be available to the public over the Internet at the Commission's web site at http://www.sec.gov.

### Item 10.I. Subsidiary Information

Not Applicable

## ITEM 11. *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

Our primary market risk exposures are to fluctuations in exchange rates, interest rates and fuel prices. We are exposed to foreign exchange risk related to foreign currency-denominated liabilities. As of December 31,

2017, 19.4% of our long-term debt (including the current portion but excluding issue discounts and premium), without taking into consideration of swap transactions, was denominated in foreign currencies, principally U.S. dollars. However, a substantial portion of our revenues is denominated in Won. As a result, changes in exchange rates, particularly between the Won and the U.S. dollar, significantly affect us due to our significant amounts of foreign currency-denominated debt and the effect of such changes on the amount of funds required by us to make interest and principal payments on such debt. In order to reduce the impact of foreign exchange rate fluctuations on our results of operations, we have recently been reducing and plan to continue to reduce the proportion of our debt which is denominated in foreign currencies.

We are also exposed to foreign exchange risk related to our purchases of fuel since we obtain substantially all of our fuel materials (other than anthracite coal) directly or indirectly from sources outside Korea. Prices for such fuel materials are quoted based on prices stated in, and in many cases are paid for in, currencies other than Won. In 2017, fuel costs represented 27.8% of our sales.

We are exposed to interest rate risk due to significant amounts of debt. Upward fluctuations in interest rates increase the cost of additional debt and the interest cost of outstanding floating rate borrowings. We are also exposed to fluctuations in prices of fuel materials. In 2017, for electricity generation, uranium accounted for 34.8% of our fuel requirements, coal accounted for 53.3%, LNG accounted for 8.7%, oil accounted for 1.2%, and others accounted for 2.0%, measured in each case by the amount of electricity we generated. In 2016, for electricity generation, uranium accounted for 37.1% of our fuel requirements, coal accounted for 47.7%, LNG accounted for 10.7%, oil accounted for 3.0% and others accounted for 1.5%, measured in each case by the amount of electricity we generated.

For additional discussions of our market risks, see Item 3.D. "Risk Factors" and Item 5.B. "Liquidity and Capital Resources—Liquidity."

We have entered into various swap contracts to hedge exchange rate risks arising from foreign currency-denominated debts. Details of currency swap contracts outstanding as of December 31, 2017 are as follows:

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts | | Contract interest rate | | Contract Exchange Rate |
|------|-------------|-------|-------|------|---------|------|---------|------|
| | | | | Pay | Receive | Pay | Receive | |
| | | | | (KRW in millions, USD in thousands) | | | | |
| Trading . . . | Deutsche Bank | 2013 | 2018 | KRW 110,412 | JPY 10,000,000 | 6.21% | 4.19% | 11.04 |
| | IBK | 2013 | 2018 | KRW 111,800 | USD 100,000 | 3.16% | 2.79% | 1,118.00 |
| | Bank of America | 2013 | 2018 | KRW 103,580 | JPY 10,000,000 | 7.05% | 4.19% | 10.36 |
| | Credit Suisse | 2014 | 2019 | KRW 118,632 | CHF 100,000 | 2.98% | 1.50% | 1,186.32 |
| | Standard Chartered | 2014 | 2019 | KRW 114,903 | CHF 100,000 | 4.00% | 1.50% | 1,149.03 |
| | Standard Chartered | 2014 | 2029 | KRW 102,470 | USD 100,000 | 3.14% | 3.57% | 1,024.70 |
| | Societe Generale | 2014 | 2024 | KRW 105,017 | USD 100,000 | 4.92% | 5.13% | 1,050.17 |
| | KEB Hana Bank | 2015 | 2024 | KRW 107,970 | USD 100,000 | 4.75% | 5.13% | 1,079.70 |
| | Credit Agricole | 2015 | 2024 | KRW 94,219 | USD 86,920 | 4.85% | 5.13% | 1,083.97 |
| | Citibank | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | JP Morgan | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | Bank of America | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | Shinhan Bank | 2016 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | HSBC | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| | KEB Hana Bank | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.87% | 3.00% | 1,117.70 |
| | Standard Chartered | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| | Deutsche Bank | 2012 | 2022 | KRW 55,885 | USD 50,000 | 2.79% | 3.00% | 1,117.70 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.63% | 3M Libor+ 0.84% | 1,081.40 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.57% | 3M Libor+ 0.84% | 1,081.40 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.57% | 3M Libor+ 0.84% | 1,081.40 |
| | HSBC | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.41% | 2.88% | 1,074.50 |

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts | | Contract interest rate | | Contract Exchange Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | Pay | Receive | Pay | Receive | |
| | | | | (KRW in millions, USD in thousands) | | | | |
| | Standard Chartered | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.44% | 2.88% | 1,074.50 |
| | JP Morgan | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.48% | 2.88% | 1,074.50 |
| | Bank of America | 2014 | 2018 | KRW 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| | Citibank | 2014 | 2018 | KRW 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| | HSBC | 2014 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Standard Chartered | 2014 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Korea Development Bank | 2016 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Nomura | 2015 | 2025 | KRW 111,190 | USD 100,000 | 2.60% | 3.25% | 1,111.90 |
| | Korea Development Bank | 2015 | 2025 | KRW 111,190 | USD 100,000 | 2.62% | 3.25% | 1,111.90 |
| | Woori Bank | 2015 | 2025 | KRW 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| | KEB Hana Bank | 2015 | 2025 | KRW 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| | Woori Bank | 2017 | 2027 | KRW 111,610 | USD 100,000 | 2.25% | 3.13% | 1,116.10 |
| | KEB Hana Bank | 2017 | 2027 | KRW 111,610 | USD 100,000 | 2.31% | 3.13% | 1,116.10 |
| | Korea Development Bank | 2017 | 2027 | KRW 111,610 | USD 100,000 | 2.31% | 3.13% | 1,116.10 |
| Cash flow hedge .. | Citibank | 2013 | 2018 | KRW 54,570.00 | USD 50,000 | 2.90% | 3M Libor+ 1.01% | 1,091.40 |
| | Standard Chartered | 2013 | 2018 | KRW 54,570.00 | USD 50,000 | 2.90% | 3M Libor+ 1.01% | 1,091.40 |
| | Credit Suisse | 2013 | 2018 | KRW 111,410.00 | USD 100,000 | 3.22% | 3M Libor+ 1.50% | 1,114.10 |
| | HSBC | 2014 | 2020 | KRW 99,901.00 | AUD 100,000 | 3.52% | 5.75% | 999.01 |
| | HSBC | 2014 | 2020 | KRW 100,482.00 | AUD 100,000 | 3.48% | 5.75% | 1,004.82 |
| | Standard Chartered | 2013 | 2020 | USD 117,250 | AUD 125,000 | 1.25% | 3M Libor+ 5.75% | 0.94 |
| | Standard Chartered | 2014 | 2020 | KRW 126,032.00 | USD 117,250 | 3.55% | 3M Libor+ 1.25% | 1,074.90 |
| | Korea Development Bank | 2017 | 2020 | KRW 114,580.00 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| | KEB Hana Bank | 2017 | 2020 | KRW 114,580.00 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| | Export-Import Bank of Korea | 2017 | 2020 | KRW 114,580.00 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| | JP Morgan | 2014 | 2019 | KRW 107,190.00 | USD 100,000 | 3M Libor+ 3.25% | 2.75% | 1,071.90 |
| | Morgan Stanley | 2014 | 2019 | KRW 107,190.00 | USD 100,000 | 3M Libor+ 3.25% | 2.75% | 1,071.90 |
| | Deutsche Bank | 2014 | 2019 | KRW 107,190.00 | USD 100,000 | 3M Libor+ 3.25% | 2.75% | 1,071.90 |
| | Korea Development Bank | 2016 | 2021 | KRW 121,000.00 | USD 100,000 | 2.15% | 2.50% | 1,210.00 |
| | Morgan Stanley | 2016 | 2021 | KRW 121,000.00 | USD 100,000 | 3M Libor+ 2.10% | 2.50% | 1,210.00 |
| | BNP Paribas | 2016 | 2021 | KRW 121,000.00 | USD 100,000 | 3M Libor+ 2.10% | 2.50% | 1,210.00 |
| | Nomura | 2017 | 2037 | KRW 52,457.00 | EUR 40,000 | 2.60% | 1.70% | 1,311.42 |
| | Nomura | 2017 | 2037 | KRW 59,423.00 | SEK 450,000 | 2.62% | 2.36% | 132.05 |
| | Credit Agricole | 2013 | 2019 | KRW 118,343.00 | CHF 100,000 | 3.47% | 1.63% | 1,183.43 |
| | Morgan Stanley | 2013 | 2019 | KRW 59,172.00 | CHF 50,000 | 3.40% | 1.63% | 1,183.43 |
| | Nomura | 2013 | 2019 | KRW 59,172.00 | CHF 50,000 | 3.47% | 1.63% | 1,183.43 |
| | Morgan Stanley | 2013 | 2018 | KRW 107,360.00 | USD 100,000 | 3.27% | 2.88% | 1,073.60 |
| | Credit Agricole | 2013 | 2018 | KRW 107,360.00 | USD 100,000 | 3.34% | 2.88% | 1,073.60 |
| | JP Morgan | 2013 | 2018 | KRW 161,040.00 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| | Standard Chartered | 2013 | 2018 | KRW 161,040.00 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| | Standard Chartered | 2014 | 2019 | KRW 104,490.00 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| | Credit Agricole | 2014 | 2019 | KRW 104,490.00 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| | Morgan Stanley | 2014 | 2019 | KRW 104,490.00 | USD 100,000 | 2.70% | 2.63% | 1,044.90 |

154

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts | | Contract interest rate | | Contract Exchange Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | Pay | Receive | Pay | Receive | |
| | | | | (KRW in millions, USD in thousands) | | | | |
| | Standard Chartered | 2013 | 2018 | KRW 81,188.00 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Credit Agricole | 2013 | 2018 | KRW 81,188.00 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Deutsche Bank | 2013 | 2018 | KRW 81,188.00 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Citibank | 2013 | 2018 | KRW 81,188.00 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Societe Generale | 2013 | 2018 | KRW 106,190.00 | USD 100,000 | 3.48% | 2.63% | 1,061.90 |
| | BNP Paribas | 2013 | 2018 | KRW 53,095.00 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| | KEB Hana Bank | 2013 | 2018 | KRW 53,095.00 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| | Standard Chartered | 2013 | 2018 | KRW 106,030.00 | USD 100,000 | 3.48% | 2.63% | 1,060.30 |
| | BNP Paribas | 2013 | 2018 | KRW 53,015.00 | USD 50,000 | 3.48% | 2.63% | 1,060.30 |
| | KEB Hana Bank | 2013 | 2018 | KRW 31,809.00 | USD 30,000 | 3.48% | 2.63% | 1,060.30 |
| | Societe Generale | 2013 | 2018 | KRW 21,206.00 | USD 20,000 | 3.48% | 2.63% | 1,060.30 |
| | HSBC | 2013 | 2018 | KRW 53,015.00 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| | Nomura | 2013 | 2018 | KRW 53,015.00 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| | Credit Agricole | 2014 | 2020 | KRW 110,680.00 | USD 100,000 | 2.29% | 2.50% | 1,106.80 |
| | Societe Generale | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| | KEB Hana Bank | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| | KEB Hana Bank | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | Standard Chartered | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | HSBC | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | Nomura | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | BNP Paribas | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | HSBC | 2014 | 2020 | KRW 55,340.00 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | KEB Hana Bank | 2017 | 2022 | KRW 226,600.00 | USD 200,000 | 1.94% | 2.63% | 1,133.00 |
| | Korea Development Bank | 2017 | 2022 | KRW 113,300.00 | USD 100,000 | 1.94% | 2.63% | 1,133.00 |
| | Nomura | 2017 | 2022 | KRW 113,300.00 | USD 100,000 | 1.95% | 2.63% | 1,133.00 |
| | Woori Bank | 2017 | 2022 | KRW 56,650.00 | USD 50,000 | 1.95% | 2.63% | 1,133.00 |
| | Kookmin Bank | 2017 | 2022 | KRW 56,650.00 | USD 50,000 | 1.95% | 2.63% | 1,133.00 |

Under these currency swap contracts, we recognized net valuation loss of Won 844 billion in 2017.

Details of interest rate contracts outstanding as of December 31, 2017 are as follows:

| Type | Counterparty | Contract Year | Settlement Year | Notional Amount | Contract Interest Rate Per Annum | |
|---|---|---|---|---|---|---|
| | | | | | Pay | Receive |
| | | | | (KRW in millions, USD in thousands) | | |
| Trading | JP Morgan | 2013 | 2018 | KRW 150,000 | 3.58% | 3M CD+0.31% |
| | Credit Suisse | 2014 | 2018 | KRW 25,000 | 2.98% | 1Y CMT+0.31% |
| | KEB Hana Bank | 2017 | 2022 | KRW 100,000 | 2.01% | 3M CD+0.24% |
| | KEB Hana Bank | 2017 | 2022 | KRW 100,000 | 2.06% | 3M CD+0.27% |
| | Nomura[1] | 2017 | 2037 | KRW 30,000 | 2.05% | 3.08% |
| | KEB Hana Bank | 2017 | 2021 | KRW 200,000 | 2.45% | 3M CD+0.32% |
| | Export-Import Bank of Korea | 2015 | 2031 | USD 15,893 | 2.67% | 6M USD Libor |
| | ING Bank | 2015 | 2031 | USD 7,861 | 2.67% | 6M USD Libor |
| | BNP Paribas | 2015 | 2031 | USD 7,861 | 2.67% | 6M USD Libor |
| Cash flow hedge | BNP Paribas | 2009 | 2027 | USD 92,120 | 4.16% | 6M USD Libor |
| | KFW | 2009 | 2027 | USD 92,120 | 4.16% | 6M USD Libor |
| | Credit Agricole | 2016 | 2033 | USD 96,297 | 3.98% ~ 4.10% | 6M USD Libor |
| | SMBC | 2016 | 2033 | USD 125,927 | 4.05% ~ 4.18% | 6M USD Libor |
| | Mizuho Bank | 2016 | 2019 | USD 36,890 | 1.56% | 1.35% |
| | SMBC | 2016 | 2019 | USD 36,890 | 1.56% | 1.35% |

155

_____

*Note:*

(1)  2.05% of the contract interest rate for paying is applied for five years from the date of issuance, and 3M CD + 0.10% is applied thereafter.

Under these interest rate swap contracts, we recognized net valuation gain of Won 6,909 million in 2017.

We engage in transactions denominated in foreign currencies and consequently become exposed to fluctuations in exchange rates. The carrying amounts of our foreign currency-denominated monetary assets and monetary liabilities as of December 31, 2016 and 2017 were as follows:

| Type | Assets | | Liabilities | |
|---|---|---|---|---|
| | 2016 | 2017 | 2016 | 2017 |
| | (In thousands of USD, EUR, GBP and other foreign currencies) | | | |
| AED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,479 | 5,693 | 1,534 | 2,049 |
| AUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 187 | 145 | 632,613 | 652,259 |
| BDT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 49,110 | 60,208 | 833 | 1,001 |
| BWP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,296 | 797 | 3,222 | — |
| CAD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 82 | — | 171 |
| CHF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 400,308 | 400,004 |
| CNY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 13,007 | — | 26,140 |
| EUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,585 | 5,708 | 14,111 | 68,003 |
| GBP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 3 | 110 | 2,327 |
| IDR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52,568 | 167,775 | — | — |
| INR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,059,092 | 1,228,259 | 161,631 | 227,078 |
| JOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,746 | 1,624 | 5 | 5 |
| JPY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 520,746 | 799,501 | 20,442,504 | 21,624,128 |
| KZT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,157 | 359 | — | — |
| MGA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,408,579 | 2,762,572 | 150,430 | 319,581 |
| NOK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 482 |
| PHP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 415,818 | 189,261 | 136,700 | 125,431 |
| PKR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 274,090 | 251,190 | 5,051 | 4,676 |
| SAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,149 | 1,191 | — | 44 |
| SEK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 449,002 |
| USD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,319,524 | 1,653,858 | 9,445,567 | 8,321,335 |
| UYU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,307 | 12,955 | 586 | 10,586 |
| ZAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 386 | 361 | 75 | 4 |

The following analysis sets forth the sensitivity of our consolidated net income before income taxes (our "pre-tax income") to changes in exchange rates, interest rates, electricity rates and fuel costs. For purposes of this section, we and our related parties are deemed one entity. The range of changes in such risk categories represents our view of the changes that are reasonably possible over a one-year period, although it is difficult to predict such changes as a result of adverse economic developments in Korea. See Item 3.D. "Risk Factors—Risks Relating to Korea and the Global Economy—Unfavorable financial and economic conditions in Korea and globally may have a material adverse impact on us." The following discussion only addresses material market risks faced by us and does not discuss other risks which we face in the normal course of business, including country risk, credit risk and legal risk. Unless otherwise specified, all calculations are made under IFRS.

If Won depreciates against U.S. dollar and all other foreign currencies held by us by 10% and all other variables are held constant from their levels as of December 31, 2017, we estimate that our unrealized foreign exchange translation losses will increase by Won 844 billion in 2018. Such sensitivity analysis is conducted for

156

monetary assets and liabilities denominated in foreign currencies other than functional currency as of December 31, 2016 and 2017, without taking into consideration of swap transactions. To manage our foreign currency risk related to foreign currency-denominated receivables and payables, we have a policy of entering into currency forward agreements. In addition, to manage our foreign currency risk related to foreign currency-denominated expected sales transactions and purchase transactions, we enter into cross-currency swap agreements.

We are exposed to interest rate risk due to our borrowings with floating interest rates. If interest rates increase by 1% on all of our borrowings and debentures bearing variable interest and all other variables are held constant as of December 31, 2017, we estimate that our income before income taxes will decrease by Won 27 billion (not reflecting the fact that a portion of such interest may be capitalized under IFRS) in 2018. Such sensitivity analysis does not take into consideration interest rate swap transactions. To manage our interest rate risks, we, in addition to maintaining an appropriate mix of fixed and floating rate loans, have entered into certain interest rate swap agreements.

We are exposed to electricity rates risk due to the rate regulation by the Government, which considers the effect of electricity rate changes on the national economy. If the electricity rate rises by 1% and all other variables are held constant as of December 31, 2017, we estimate that our income before income taxes will increase by Won 546 billion in 2018.

We are exposed to fuel price risks due to the heavy influence of fuel costs on our sales and cost of sales. If the fuel prices of anthracite and bituminous coal, oil, LNG and others used for generation by us and our generation subsidiaries rise by 1% and all other variables are held constant as of December 31, 2017, we estimate that our income before income taxes will decrease by Won 165 billion in 2018.

The above discussion and the estimated amounts generated from the sensitivity analyzes referred to above include "forward-looking statements," which assume for analytical purposes that certain market conditions may occur. Accordingly, such forward-looking statements should not be considered projections by us of future events or losses.

See Note 45 of the notes to our consolidated financial statements included in this annual report for further related information.


## ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

### Item 12.A. Debt Securities

Of the four debt securities issued by us that are registered under the Exchange Act as set forth in the cover page of this annual report, the One Hundred Year 7.95% Zero-to-Full Debentures due April 1, 2096, were guaranteed by Korea Development Bank. However, such guarantee expired on April 1, 2016 by reason of the expiration of a put option period applicable to such debentures in accordance with the terms of such debentures.

Korea Development Bank, a statutory bank for the Korean government, is 100% beneficially owned by the Korean government. The voting rights in our equity interest held by Korea Development Bank are effectively exercised by the Korean government.

The guarantee by Korea Development Bank of our above-mentioned registered debt securities was itself a security registered under the Securities Act. Korea Development Bank is a Schedule B issuer and periodically files registration statements with the Commission. These registration statements typically include financial statements prepared in accordance with the applicable generally accepted accounting principles, currently the Korean International Financial Reporting Standards, and audited in accordance with generally accepted auditing standards in the Republic of Korea.

**Item 12.B. Warrants and Rights**

Not applicable.

**Item 12.C. Other Securities**

Not applicable.

**Item 12.D. American Depositary Shares**

Under the terms of the Deposit Agreement in respect of our ADSs, the holder and beneficiary owners of ADSs, any party depositing or withdrawing or surrendering ADSs or ADRs, whichever applicable, may be required to pay the following fees and charges to Citibank, N.A. acting as depositary for our ADSs:

| Item | Services | Fees |
|---|---|---|
| 1 | Taxes and other governmental charges | As applicable |
| 2 | Registration of transfer of common shares generally on our shareholders' register, any institution authorized under the applicable law to effect book-entry transfers of securities (including Korea Securities Depository), or any entity that presently carries out the duties of registrar for the common shares, and applicable to transfers of common shares to the name of the Depositary or its nominee on the making of deposits or withdrawals | A fee of US$1.50 or less per ADS |
| 3 | Cable, telex and facsimile transmission expenses | As applicable |
| 4 | Expenses incurred by the Depositary in the conversion of foreign currency | As applicable |
| 5 | Execution and delivery of ADRs and the surrender of ADRs | Fee of US$0.05 or less per ADS |
| 6 | Cash distribution made by the Depositary or its agent | Fee of US$0.02 or less per ADS |
| 7 | Fee for the distribution of proceeds of sales of securities or rights for distribution other than cash, common shares or rights to subscribe for shares, distribution in shares or distribution in rights to subscribe for shares | Lesser of (i) the fee for the execution and delivery of ADRs referred to above which would have been charged as a result of the deposit by the holders of securities or common shares received in exercise of rights distributed to them, but which securities or rights are instead sold by the Depositary and the net proceeds distributed and (ii) the amount of such proceeds |
| 8 | Depositary services performed in administering the ADRs (which fee shall be assessed against holders of ADSs as of the record date or dates and shall be payable at the sole discretion of the Depositary by billing such holders or by deducting such charge from one or more cash dividends or other cash distributions) | Fee of US$0.02 or less per ADS per calendar year |

158

Depositary fees payable upon the issuance and cancelation of ADSs are typically paid to the depositary by the brokers (on behalf of their clients) receiving the newly-issued ADSs from the depositary and by the brokers (on behalf of their clients) delivering the ADSs to the depositary for cancelation. The brokers in turn charge these transaction fees to their clients.

Depositary fees payable in connection with distributions of cash or securities to ADS holders and the depositary services fee are charged by the depositary to the holders of record of ADSs as of the applicable ADS record date. The depositary fees payable for cash distributions are generally deducted from the cash being distributed. In the case of distributions other than cash (i.e., stock dividends, rights offerings), the depositary charges the applicable fee to the ADS record date holders concurrent with the distribution. In the case of ADSs registered in the name of the investor (whether certificated or un-certificated in direct registration), the depositary sends invoices to the applicable record date ADS holders. In the case of ADSs held in brokerage and custodian accounts via the central clearing and settlement system, the Depository Trust Company ("DTC"), the depositary generally collects its fees through the systems provided by DTC (whose nominee is the registered holder of the ADSs held in DTC) from the brokers and custodians holding ADSs in their DTC accounts. The brokers and custodians who hold their clients' ADSs in DTC accounts in turn charge their clients' accounts the amount of the fees paid to the depositary.

In the event of refusal to pay the depositary fees, the depositary may, under the terms of the Deposit Agreement, refuse the requested service until payment is received or may set-off the amount of the depositary fees from any distribution to be made to the ADS holder.

The fees and charges the ADS holders may be required to pay may vary over time and may be changed by us and by the depositary. The ADS holders will receive prior notice of such changes.

### Depositary Payments for the Fiscal Year 2017

The following table sets forth our expenses incurred in 2017, which were reimbursed by Citibank, N.A. in the aggregate:

|  | (In thousands of U.S. dollars) |
|---|---|
| Reimbursement of legal fees ........................................................ | US$ 184 |
| Reimbursement of accounting fees .................................................. | 146 |
| Contributions towards our investor relations and other financing efforts (including investor conferences, non-deal roadshows and market information services) ........................ | 896 |
| Other ............................................................................ | 158 |
| Total ............................................................................ | US$1,384 |

159

PART II

**ITEM 13.** *DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES*

Not applicable.

**ITEM 14.** *MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS*

Not applicable.

**ITEM 15.** *CONTROLS AND PROCEDURES*

**Disclosure Control**

Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of December 31, 2017. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can provide only reasonable assurance of achieving their control objectives. Based upon our evaluation, our chief executive officer and chief financial officer concluded that the design and operation of our disclosure controls and procedures as of December 31, 2017 were effective to provide reasonable assurance that information required to be disclosed by us in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decision regarding required disclosure.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, for our company. Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we have evaluated the effectiveness of our internal control over financial reporting as of December 31, 2017 based on the framework established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements in accordance with generally accepted accounting principles and includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of a company's assets, (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with generally accepted accounting principles, and that a company's receipts and expenditures are being made only in accordance with authorizations of a company's management and directors, and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of a company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable assurance with respect to consolidated financial statement preparation and presentation and may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Following the overhaul in May 2013 by the Committee of Sponsoring Organization of the Treadway ("COSO") of the COSO Framework relating to internal controls and adoption of the 2013 Integrated Framework of the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework (2013)"), we have, effective January 1, 2014, adopted the COSO Framework (2013) and incorporated it into our internal control system for us and our subsidiaries in order to comply with the Sarbanes Oxley Act and to standardize our internal control system. As required by Section 404 of the Sarbanes-Oxley Act of 2002 and related rules as promulgated by the Securities and Exchange Commission, management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016 using criteria established by the COSO Framework (2013). Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2017 based on the criteria established by the COSO Framework (2013).

**Audit Report of the Independent Registered Public Accounting Firm**

KPMG Samjong Accounting Corp. has issued an audit report on the effectiveness of our internal control over financial reporting as of December 31, 2017, which is included elsewhere in this annual report.

**Changes in Internal Controls**

There were no changes in our internal control over financial reporting that occurred during the year ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Our adoption of the COSO Framework (2013) did not have, and is not reasonably likely to have, any material effect on our internal control over financial reporting.

We operate an integrated ERP system for a transparent and efficient management of the core ERP components, including personnel, accounting, procurement, construction and facilities maintenance. In addition, we also operate a strategic enterprise management system that includes business warehouse, management information and business planning and simulation systems. We continue to upgrade and improve the ERP system, which is being used as our core information infrastructure.

**ITEM 16.** *[RESERVED]*

**ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT**

Our board of directors has determined that we have at least one "audit committee financial expert" as such term is defined by the regulations of the Securities and Exchange Commission issued pursuant to Section 407 of the Sarbanes-Oxley Act of 2002. Our audit committee financial expert is Cho, Jeon-Hyeok. Such member is independent within the meaning of the Korea Stock Exchange listing standards, the regulations promulgated under the Enforcement Decree of the Korean Commercial Code and the New York Stock Exchange listing standards.

**ITEM 16B. CODE OF ETHICS**

We have adopted a code of ethics for our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions as required under Section 406 of the Sarbanes-Oxley Act of 2002, together with an insider reporting system in compliance with Section 301 of the Sarbanes-Oxley Act. The code of ethics is available on our website www.kepco.co.kr. We have not granted any waiver, including an implicit waiver, from a provision of the code of ethics to any of the above-mentioned officers during our most recently completed fiscal year.

161

**ITEM 16C. PRINCIPAL AUDITOR FEES AND SERVICES**

The following table sets forth the aggregate fees billed for each of the years ended December 31, 2016 and 2017 for professional services rendered by our principal auditors for such year, for various types of services and a brief description of the nature of such services. KPMG Samjong Accounting Corp., a Korean independent registered public accounting firm, was our principal auditors for the year ended December 31, 2017 and we currently expect KPMG Samjong Accounting Corp. to serve as our principal auditors for the year ended December 31, 2018.

| Type of Services | Aggregate Fees Billed During | | Nature of Services |
|---|---|---|---|
| | **2016** | **2017** | |
| | (In millions of Won) | | |
| Audit Fees . . . . . . . . . . . . . . . . . . . . . . . | ₩3,296 | ₩3,051 | Audit service for KEPCO and its subsidiaries. |
| Audit-Related Fees . . . . . . . . . . . . . . . . . | — | 410 | Comfort letter services. |
| Tax Fees . . . . . . . . . . . . . . . . . . . . . . . . | 176 | 67 | Tax return and consulting advisory service. |
| All Other Fees . . . . . . . . . . . . . . . . . . . . . | — | 2 | All other services which do not meet the three categories above. |
| Total . . . . . . . . . . . . . . . . . . . . . . . | ₩3,472 | ₩3,530 | |

United States law and regulations in effect since May 6, 2003 generally require all service of the principal auditors to be pre-approved by an independent audit committee or, if no such committee exists with respect to an issuer, by the entire board of directors. We have adopted the following policies and procedures for consideration and approval of requests to engage our principal auditors to perform audit and non-audit services. If the request relates to services that would impair the independence of our principal auditors, the request must be rejected. If the service request relates to audit and permitted non-audit services for us and our subsidiaries, it must be forwarded to our audit committee and receive pre-approval.

In addition, United States law and regulations permit the pre-approval requirement to be waived with respect to engagements for non-audit services aggregating no more than five percent of the total amount of revenues we paid to our principal auditors, if such engagements were not recognized by us at the time of engagement and were promptly brought to the attention of our audit committee or a designated member thereof and approved prior to the completion of the audit.

**ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEE**

Not applicable.

**ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

Neither we nor any "affiliated purchaser," as defined in Rule 10b-18(a)(3) of the Exchange Act, purchased any of our equity securities during the period covered by this annual report.

**ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

Not applicable.

**ITEM 16G. CORPORATE GOVERNANCE**

We are committed to high standards of corporate governance. We are in compliance with the corporate governance provisions of the KEPCO Act, the Act on the Management of Public Institutions, the Korean

Commercial Code, the Financial Investment Services and Capital Markets Act of Korea and the Listing Rules of the Korea Exchange.We, like all other companies in Korea, must comply with the corporate governance provisions under the Korean Commercial Code, except to the extent the KEPCO Act and the Act on the Management of Public Institutions otherwise require. Our corporate governance is also affected by various regulatory guidelines, including those promulgated by the Ministry of Strategy and Finance. In addition, as a company listed on the Korea Exchange, we are subject to the Financial Investment Services and Capital Markets Act of Korea, unless the Financial Investment Services and Capital Markets Act of Korea otherwise provides.

**The Act on the Management of Public Institutions**

*General Provisions*

On April 1, 2007, the Act on the Management of Public Institutions took effect by abolishing and replacing the Government-invested Enterprise Management Basic Act, which was enacted in 1984. Unless stated otherwise therein, the Act on the Management of Public Institutions takes precedence over any other laws and regulations in the event of inconsistency. On April 2, 2007, pursuant to this Act the minister of the Ministry of Strategy and Finance designated us as a "market-oriented public enterprise" as defined under this Act, and we became subject to this Act accordingly. We incorporated the applicable provisions of this Act into our Articles of Incorporation by amendment thereto in September 2007.

The Act on the Management of Public Institutions sets out the rules for corporate governance for entities that are subject to this Act, including the appointment of their respective president and directors. Under this Act as it applies to us as a "market-oriented public enterprise", (i) a senior non-standing director as appointed by the minister of the Ministry of Strategy and Finance becomes the chairman of our board of directors following the review and resolution of the Public Agencies Operating Committee; (ii) our president and our standing directors who concurrently serve as members of our audit committee are appointed by the President of the Republic upon the motion of the Ministry of Trade, Industry and Energy (in the case of our president) or of the Ministry of Strategy and Finance (in the case of standing directors who concurrently serve as members of our audit committee), following the nomination by such enterprise's director nomination committee, the review and resolution of the Public Agencies Operating Committee pursuant to the Act on the Management of Public Institutions and an approval at the general meeting of our shareholders; (iii) our standing directors other than the president and those who also serve as audit committee members must be appointed by our president with the approval at the general meeting of our shareholders from a pool of candidates recommended by our director nomination committee; and (iv) our non-standing directors must be appointed by the minister of the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee, and must have ample knowledge and experience in business management.

The Public Agencies Operating Committee is established pursuant to the Act on the Management of Public Institutions and is comprised of one chairperson who is the Minister of the Ministry of Strategy and Finance and the following members: (i) one Vice Minister-level public official from the Office for Government Policy Coordination as nominated by the minister of the Office for Government Policy Coordination; (ii) one Vice Minister, Deputy Administrator or an equivalent public official of the related administrative agency as prescribed by Presidential Decree; (iii) one Vice Minister, Deputy Administrator, or an equivalent public official of the competent agency who does not fall under subclause (ii); and (iv) 11 or fewer persons commissioned by the President based on the recommendation of the Minister of the Ministry of Strategy and Finance from among persons in various fields including law, economy, press, academia, labor, who have good knowledge and experience in the operation and business administration of public institutions as well as good reputation for impartiality.

Our director nomination committee, which is also known as the Committee for Recommendation of Executive Officers, is comprised of non-standing directors and members appointed by the board of directors. The

163

number of members ranges from five to 15 persons and must be decided by a resolution of the board of directors; provided that, the number of members appointed by the board of directors must be less than half of the total number of members of our director nomination committee.

Under the Act on the Management of Public Institutions and our Articles of Incorporation, the term of office is three years for our president and two years for our directors (standing and non-standing) other than our president. Our directors (including the president) may be reappointed for one or more additional terms of one year. In order to be reappointed, the president must be evaluated on the basis of his management performance; a standing director, on the basis of the performance of the duties for which he was elected to perform, or if the standing director has executed an incentive bonus contract, on the basis of his performance under the contract; and a non-standing director, on the basis of his performance of the duties for which he was elected to perform.

Under the Act on the Management of Public Institutions and our Articles of Incorporation, a recommendation from the director nomination committee is required for the appointment of our executive officers, except in the case of reappointments. The director nomination committee consists of five to fifteen members, including private-sector members appointed by the board of directors. Non-standing directors must comprise at least a majority of the director nomination committee. One of the private-sector members must be able to represent our opinion and must not be currently employed by us. As required under the Act on the Management of Public Institutions, we established an audit committee. At least two-thirds of the audit committee members must be non-standing directors, and at least one committee member must be an expert in finance or accounting. According to the Act on the Management of Public Institutions, our president's term cannot be terminated unless done so by the President of the Republic pursuant to the Act on the Management of Public Institutions or upon an event as specified in our Articles of Incorporation.

As required under Act on the Management of Public Institutions, we submit to the Government by October 31 every year a report on our medium- to long-term management goals. Under the Act on the Management of Public Institutions, we are also required to give separate public notice of important management matters, such as our budget and financial statements, status of directors and annual reports. In addition, for purposes of providing a comparison of the management performances of government agencies, we are required to post on a designated website a notice on a standard form detailing our management performance. Following consultation with the minister of the Ministry of Trade, Industry and Energy and the review and resolution of the operating committee, the Ministry of Strategy and Finance must examine the adequacy and competency of government agencies and establish plans on merger, abolishment, restructuring and privatization of public agencies. In such case, the minister of the Ministry of Trade, Industry and Energy must execute these plans and submit a performance report to the Ministry of Strategy and Finance.

### Application of the Act to Our Generation Subsidiaries

On January 24, 2011, the Ministry of Strategy and Finance changed the designation of our six generation subsidiaries from "other public institutions" to "market-oriented public enterprises", each as defined in the Act on the Management of Public Institutions, and all of our generation subsidiaries accordingly amended their respective articles of incorporation in 2011 to be in compliance with this Act. As "other public institutions", our generation subsidiaries previously were not subject to the same regulations under the Act on the Management of Public Institutions applicable to us with regards to corporate governance matters such as the appointment and dismissal of directors and the composition of the boards of directors. However, as "market-oriented public enterprises", our generation subsidiaries are currently subject to the same such regulations that are applicable to us.

Specifically, prior to such designation, (i) our president appointed the presidents and the statutory auditors of our generation subsidiaries; (ii) the selection of non-standing directors of each such subsidiary was subject to approval by our president; (iii) the president of each such subsidiary entered into a management contract with our president; and (iv) our evaluation committee conducted performance evaluation of such subsidiaries. However,

following such designation, akin to the appointment process applicable to us, (i) the President of the Republic appoints the presidents and standing directors of our generation subsidiaries that concurrently serve as members of the audit committees; (ii) the selection of non-standing directors of these subsidiaries is subject to approval by the minister of the Ministry of Strategy and Finance; (iii) the president of each such generation subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Agencies Operating Committee conducts performance evaluation of such subsidiaries.

***Our Control over the Generation Subsidiaries***

Designation of our generation subsidiaries as "market-oriented public enterprises" was intended to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them so as to provide improved service to the general public. Such designation also has had the effect of the Government exercising greater direct control over the appointment of the governing body of our generation subsidiaries (in ways that are similar how the Government exercises such control over us as our majority shareholder as well as our regulator).

In addition, the Government has imposed a number of regulations that further affect the respective operational boundaries between us and our generation subsidiaries, including as follows:

- In August 2010, in furtherance of the Act on the Management of Public Institutions, the Ministry of Strategy and Finance announced the Proposal for the Improvement in the Structure of the Electric Power Industry, which was designed to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them. Key initiatives of the proposal included the following: (i) maintain the current structure of having six generation subsidiaries and designate the six generation subsidiaries as market-oriented public enterprises under the Act on the Management of Public Institutions in order to foster competition among the generation subsidiaries and promote efficiency in their operations, and (ii) clarify the scope of the business of us and the six generation subsidiaries (namely, that we shall manage the financial structure and governance of the six generation subsidiaries and nuclear power plant and overseas resources development projects, while the six generation subsidiaries will have greater autonomy with respect to construction and management of generation units and procurement of fuel, among others).

- In January 2011, the Ministry of Strategy and Finance created a "joint cooperation unit" consisting of officers and employees selected from the five thermal power generation subsidiaries in order to reduce inefficiencies in areas such as fuel transportation, inventories, materials and equipment and construction, etc. and allow the thermal power generation subsidiaries to continue utilizing the benefits of economy of scale after split off of our generation business units into separate subsidiaries. The purpose of the joint cooperation unit was to give greater autonomy to the generation subsidiaries with regard to power plant construction and management and fuel procurements, and thereby enhance efficiency in operating power plants. The main functions of the joint cooperation unit are as follows: (i) maintain inventories of bituminous coal through volume exchanges and joint purchases, (ii) reduce shipping and demurrage expenses through joint operation and distribution of dedicated vessels, (iii) reduce costs by sharing information on generation material inventories and (iv) sharing human resources among the five thermal power generation subsidiaries for construction projects, among other things.

- In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies should take on greater responsibilities in overseas

165

resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition.

However, notwithstanding these developments, we, also a government-controlled entity, remain as the sole shareholder of our generation subsidiaries and continue to exercise significant control over them in such capacity as the sole shareholder well as through other practical means as further described below.

First, as the sole shareholder, we continue to have the right, under the Act on the Management of Public Institutions, to approve or disapprove the appointment of key members of the governing body of our generation subsidiaries (namely, the president and the standing and non-standing directors) by way of a vote at the general shareholders meeting before such appointments are ultimately approved and made by the President of the Republic (in the case of the presidents and standing directors concurrently serving as audit committee members of the generation subsidiaries) or by the president of each generation subsidiary (in the case of other standing directors of such generation subsidiary). Our right to exercise such voting right as a shareholder is also protected by the Commercial Code of Korea.

Second, in practice we retain significant control over our generation subsidiaries through the following means:

- We are the sole purchaser of electricity produced by the generation subsidiaries and continue to have near monopoly in terms of transmitting and distributing electricity in Korea. Accordingly, we continue to have significant influence over our generation subsidiaries in the electricity industry.

- Pursuant to the Electricity Business Act, the adjusted coefficient must be determined so that the price of electricity sold by our generation subsidiaries to us shall have the effect of ensuring a fair rate of return to us as a standalone entity, which means any imbalance caused by excess profits taken by our generation subsidiaries to our loss must be corrected. Since we and the generation subsidiaries participate in the determination of the adjusted coefficient, such determination process can be used as a way for us to exert indirect influence on our generation subsidiaries.

- Our president holds regular meetings (known as "CEO Meetings") with the presidents of our generation subsidiaries for which our president determines whether and when to convene such meetings, sets the agenda for such meetings and chairs such meetings. Since significant issues that jointly affect us and our generation subsidiaries are often discussed and decided at these meetings, the leadership role exercised by our president in such meetings is significant in setting the policies and direction for us and our generation subsidiaries as a whole.

- We maintain and operate the Affiliated Company Management Team within the parent company organizational structure. The purpose of this team is to support and coordinate the management of the generation subsidiaries. Activities of the Affiliated Company Management Team include preparation of the CEO meetings, deliberation on major issues to be discussed at CEO Meetings, convening a general meeting of shareholders of the generation subsidiaries and coordination on the decision-making process for the general meeting of shareholders of the generation subsidiaries.

Ultimately, our control over our generation subsidiaries is derived from the fact that the Government owns the majority of our shares and effectively controls us as the supervisor and regulator in a heavily regulated industry, and in effect also exercises the same degree of control over our generation subsidiaries through our sole share ownership over our generation subsidiaries as well as its statutory power of direct appointment of the governing bodies of our generation subsidiaries. In effect, we are acting as an intermediate holding company in a vertical control structure involving the Government, us and our generation subsidiaries, where the Government holds the ultimate control over both us and our generation subsidiaries and exercises its such control over our generation subsidiaries in part through us acting as the sole shareholder and the parent company.

166

**Differences in Korean/New York Stock Exchange Corporate Governance Practices**

We are a "foreign private issuer" (as such term is defined in Rule 3b-4 under the Exchange Act), and our ADSs are listed on the New York Stock Exchange, or NYSE. Under Section 303A of the NYSE Listed Company Manual, NYSE-listed companies that are foreign private issuers are permitted to follow home country practice in lieu of the corporate governance provisions specified by the NYSE with limited exceptions. Under the NYSE Listed Company Manual, we as a foreign private issuer are required to disclose significant differences between NYSE's corporate governance standards and those we follow under Korean law. The following summarizes some significant ways in which our corporate governance practices differ from those followed by U.S. companies listed on the NYSE under the listing rules of the NYSE.

*Majority of Independent Directors on the Board*

Under the NYSE listing rules, U.S. companies listed on the NYSE must have a board, the majority of which is comprised of independent directors satisfying the requirements of "independence" as set forth in Rule 10A-3 under the Exchange Act. No director qualifies as "independent" unless the board of directors affirmatively determines that the director has no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that has a relationship with us). The NYSE rules include detailed tests for determining director independence. As a foreign private issuer, we are exempt from this requirement. Under the Act on the Management of Public Institutions, more than one-half of our directors must be non-standing directors. For a discussion on qualifications of non-standing directors, see Item 6.A. "Directors and Senior Management—Board of Directors." The Financial Investment Services and Capital Markets Act of Korea deems a non-standing director nominated pursuant to other applicable laws (such as the Act on the Management of Public Institutions) as an "outside" or "non-executive" director. Under the Act on the Management of Public Institutions, a non-standing director is appointed by the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee and an approval at our general meeting shareholders, and must have ample knowledge and experience in business management. Government officials that are not part of the teaching staff in national and public schools are ineligible to become our non-standing directors.

*Executive Session*

Under the NYSE listing rules, non-management directors of U.S. companies listed on the NYSE are required to meet on a regular basis without management present and independent directors must meet separately at least once per year. While no such requirement currently exists under applicable Korean law, listing standards or our Articles of Incorporation, executive sessions were held from time to time in 2017 in order to promote the exchange of diverse opinions by non-standing directors.

*Audit Committee*

Under the NYSE listing rules, listed companies must have an audit committee that has a minimum of three members, and all audit committee members must satisfy the requirements of independence set forth in Section 303A.02 of the NYSE Listed Company Manual and Rule 10A-3 under the Exchange Act. Our audit committee members meet the requirements of independence set forth in Section 303A.02 of the NYSE Listed Company Manual and Rule 10A-3 under the Exchange Act. The audit committee must be directly responsible for the appointment, compensation, retention and oversight of the work of the independent registered public accountants. Our audit committee performs the roles and responsibilities required of an audit committee under the Sarbanes-Oxley Act, including the supervision of the audit by the independent registered public accountants. Under the Korea Exchange listing rules and the Korean Commercial Code, a large listed company must also establish an audit committee of which at least two-thirds of its members must be non-standing directors and whose chairman must be a non-standing director. Under the Act on the Management of Public Institutions, the Korean Commercial Code, the amended Articles of Incorporation and the Korea Exchange listing rules, we are required to maintain an audit committee consisting of three members, of which not less than two members are

167

required to be non-standing directors. Our audit committee is in compliance with the foregoing requirements under the Act on the Management of Public Institutions, the Korean Commercial Code, the amended Articles of Incorporation and the Korea Exchange listing rules.

### *Nomination/Corporate Governance Committee*

Under the NYSE listing rules, U.S. companies listed on the NYSE must have a nomination/corporate governance committee composed entirely of independent directors. In addition to identifying individuals qualified to become board members, this committee must develop and recommend to the board a set of corporate governance principles. Under the Act on the Management of Public Institutions, we are required to have a director nomination committee which consists of non-standing directors and ad hoc members appointed by our Board of Directors. Our standing directors and executives as well as governmental officials that are not part of the teaching staff in national and public schools are ineligible to become a member of our director nomination committee. There is no requirement to establish a corporate governance committee under applicable Korean law.

Pursuant to the NYSE listing standards, non-management directors must meet on a regular basis without management present and independent directors must meet separately at least once per year. No such requirement currently exists under applicable Korean law.

### *Compensation Committee*

Under the NYSE listing rules, U.S. companies listed on the NYSE are required to have a compensation committee which is composed entirely of independent directors. In January 2013, the SEC approved amendments to the listing rules of NYSE and NASDAQ regarding the independence of compensation committee members and the appointment, payment and oversight of compensation consultants. The listing rules were adopted as required by Section 952 of the Dodd-Frank Act and rule 10C-1 of the Exchange Act, which direct the national securities exchanges to prohibit the listing of any equity security of a company that is not in compliance with the rule's compensation committee director and advisor independence requirements. Certain elements of the listing rules became effective on July 1, 2013 and companies listed on the NYSE must comply with such listing rules by the earlier of the company's first annual meeting after January 15 or October 31, 2014.

No such requirement currently exists under applicable Korean law or listing standards, and we currently do not have a compensation committee.

### *Corporate Governance Guidelines and Code of Business Conduct and Ethics*

Under the NYSE listing rules, U.S. companies listed on the NYSE are required to establish corporate governance guidelines and to adopt a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers. As a foreign private issuer, we are exempt from this requirement. Pursuant to the requirements of the Sarbanes-Oxley Act, we have adopted a code of ethics applicable to our President & Chief Executive Officer and all other directors and executive officers including the Chief Financial Officer and the Chief Accounting Officer, as well as all financial, accounting and other officers that are involved in the preparation and disclosure of our consolidated financial statements and internal control of financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act. We have also adopted an insider reporting system in compliance with Section 301 of the Sarbanes-Oxley Act. The code of ethics applicable to our executive officers and financial officers are available on www.kepco.co.kr.

### *Shareholder Approval of Equity Compensation Plans*

Under the NYSE listing rules, shareholders of U.S. companies listed on the NYSE are required to approve all equity compensation plans. Under Korean law and regulations, stock options can be granted to employees to

the extent expressly permitted by the articles of incorporation. We currently do not have any equity compensation plans.

### Annual Certification of Compliance

Under the NYSE listing rules, a chief executive officer of a U.S. company listed on the NYSE must annually certify that he or she is not aware of any violation by the company of NYSE corporate governance standards. As a foreign private issuer, we are not subject to this requirement. However, in accordance with rules applicable to both U.S. companies and foreign private issuers, we are required to promptly notify the NYSE in writing if any executive officer becomes aware of any material noncompliance with the NYSE corporate governance standards applicable to us. In addition, foreign private issuers, including us, are required to submit to the NYSE an annual written affirmation relating to compliance with Sections 303A.06 and 303A.11 of the NYSE listed company manual, which are the NYSE corporate governance standards applicable to foreign private issuers. All written affirmations must be executed in the form provided by the NYSE, without modification. An annual written affirmation is required to be submitted to the NYSE within 30 days of filing with the SEC our annual report on Form 20-F. We have been in compliance with this requirement in all material respects and plan to submit such affirmation within the prescribed time line.

### Whistle Blower Protection

On May 25, 2011, the SEC adopted final rules to implement whistleblower provisions of the Dodd-Frank Act, which are applicable to foreign private issuers with securities registered under the U.S. securities laws. The final rules provide that any eligible whistleblower who voluntarily provides the SEC with original information that leads to the successful enforcement of an action brought by the SEC under U.S. securities laws must receive an award of between 10 and 30 percent of the total monetary sanctions collected if the sanctions exceed US$1,000,000. An eligible whistleblower is defined as someone who provides information about a possible violation of the securities laws that he or she reasonably believes has occurred, is ongoing, or is about to occur. The possible violation does not need to be material, probably or even likely, but the information must have a "facially plausible relationship to some securities law violation"; frivolous submissions would not qualify. The final rules also prohibit retaliation against the whistleblower. While the final rules do not require employees to first report allegations of wrongdoing through a company's corporate compliance system, they do seek to incentivize whistleblowers to utilize internal corporate compliance first by, among other things, (i) giving employees who first report information internally the benefit of the internal reporting date for purposes of the SEC program so long as the whistleblower submits the same information to the SEC within 120 days of the initial disclosure; (ii) clarifying that the SEC will consider, as part of the criteria for determining the amount of a whistleblower's award, whether the whistleblower effectively utilized the company's corporate compliance program or hindered the function of the program; and (iii) crediting a whistleblower who reports internally first and whose company passes the information along to the SEC, which would mean the whistleblower could receive a potentially higher award for information gathered in an internal investigation initiated as a result of the whistleblower's internal report.

In addition, the final rules address concerns that the whistleblower rules incentivize officers, directors and those with legal, audit, compliance or similar responsibilities to abuse these positions by making whistleblower complaints to the SEC with respect to information they obtained in these roles by generally providing that information obtained through a communication subject to attorney-client privilege or as a result of legal representation would not be eligible for a whistleblower award unless disclosure would be permitted by attorney conduct rules. Accordingly, officers and directors, auditors and compliance personnel and other persons in similar roles would not be eligible to receive awards for information received in these positions unless (x) they have a reasonable basis to believe that (1) disclosure of the information is necessary to prevent the entity from engaging in conduct that is likely to cause substantial injury to the financial interests of the entity or investors; or (2) the entity is engaging in conduct that will impede an investigation of the misconduct, for example, destroying documents or improperly influencing witnesses; or (y) 120 days have passed since the whistleblower provided

169

the information to senior responsible persons at the entity or 120 days have passed since the whistleblower received the information at a time when these people were already aware of the information.

In Korea, under the Financial Investment Services and Capital Markets Act, anyone may provide or furnish the Financial Services Commission or the Securities and Futures Commission with information on unfair trading or any other violation of the Financial Investment Services and Capital Markets Act. The Financial Services Commission shall keep the identity of the whistleblower confidential, and any institution, organization or company to which the whistleblower belongs may not treat the whistleblower unfavorably, directly or indirectly. In addition, the Financial Services Commission may also reward the whistleblower within the limit of the budget of the Financial Services Commission.

## ITEM 16H. MINE SAFETY DISCLOSURE

Not applicable.

170

## PART III

**ITEM 17.** *FINANCIAL STATEMENTS*

Not applicable.

**ITEM 18.** *FINANCIAL STATEMENTS*

Reference is made to Item 19. "Exhibits" for a list of all financial statements filed as part of this annual report.

**ITEM 19.** *EXHIBITS*

**(a) Financial Statements filed as part of this Annual Report**

See Index to Financial Statements on page F-1 of this annual report.

**(b) Exhibits filed as part of this Annual Report**

See Index of Exhibits beginning on page E-1 of this annual report.

171

## INDEX OF EXHIBITS

1.1     Articles of Incorporation, as last amended on November 11, 2016 (in English)*

2.1     Form of Deposit Agreement**

8.1     List of Subsidiaries

12.1    Certifications of our Chief Executive Officer required by Rule 13a-14(a) of the Exchange Act
        (Certifications under Section 302 of the Sarbanes-Oxley Act of 2002)

12.2    Certifications of our Chief Financial Officer required by Rule 13a-14(a) of the Exchange Act
        (Certifications under Section 302 of the Sarbanes-Oxley Act of 2002)

13.1    Certifications of our Chief Executive Officer required by Rule 13a-14(b) and Section 1350 of Chapter
        63 of the United States Code (18 U.S.C. 1350) (Certifications under Section 906 of the Sarbanes-
        Oxley Act of 2002)

13.2    Certifications of our Chief Financial Officer required by Rule 13a-14(b) and Section 1350 of Chapter
        63 of the United States Code (18 U.S.C. 1350) (Certifications under Section 906 of the Sarbanes-
        Oxley Act of 2002)

15.1    The Korea Electric Power Corporation Act, as amended on March 21, 2017 (in English)

15.2    Enforcement Decree of the Korea Electric Power Corporation Act, as amended on August 31, 2016 (in
        English)**

15.3    The Act on the Management of Public Institutions, as amended on Dec 27, 2016 (in English)

15.4    Enforcement Decree of the Act on the Management of Public Institutions, as amended on August 9,
        2017 (in English)

101.1   Interactive Data Files (XBRL-Related Documents)

---

*       Incorporated by reference to the Registrant's annual report on Form 20-F (No. 001-13372) previously filed
        on April 28, 2017.

**      Incorporated by reference to the Registrant's Registration Statement on Form F-6 with respect to the ADSs,
        registered under Registration No. 333-196703.

172

PUBLIC VERSION

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this Annual Report on its behalf.

KOREA ELECTRIC POWER CORPORATION

By: _____/s/ JongKap KIM_____

Name:           JongKap KIM
Title:          President and Chief Executive Officer
Date:          April 30, 2018

173

## INDEX TO FINANCIAL STATEMENTS

Page

Report of Independent Registered Public Accounting Firm KPMG Samjong Accounting Corp., on Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-2

Report of Independent Registered Public Accounting Firm KPMG Samjong Accounting Corp., on Internal Control Over Financial Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-3

Consolidated Statements of Financial Position as of December 31, 2016 and 2017 . . . . . . . . . . . . . . . . . .    F-5

Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2015, 2016 and 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-7

Consolidated Statements of Changes in Equity for the Years Ended December 31, 2015, 2016 and 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-9

Consolidated Statements of Cash Flows for the Years Ended December 31, 2015, 2016 and 2017 . . . . . . .    F-12

Notes to the Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-14

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

### REPORT OF INDEPENDENT REGISTERED PUBLIC
### ACCOUNTING FIRM ON CONSOLIDATED FINANCIAL STATEMENTS

To the Shareholders and Board of Directors of
Korea Electric Power Corporation:

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated statements of financial position of Korea Electric Power Corporation and subsidiaries (the "Company") as of December 31, 2016 and 2017, the related consolidated statements of comprehensive income, changes in equity and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2016 and 2017, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2017, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated April 26, 2018 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ KPMG Samjong Accounting Corp.

We have served as the Company's auditor since 2013.

Seoul, Korea

April 26, 2018

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL CONTROL OVER FINANCIAL REPORTING

To the Shareholders and Board of Directors of
Korea Electric Power Corporation:

### Opinion on Internal Control Over Financial Reporting

We have audited Korea Electric Power Corporation and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on the criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated statements of financial position of the company as of December 31, 2016 and 2017, the related consolidated statements of comprehensive income, changes in equity and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes (collectively, the consolidated financial statements), and our report dated April 26, 2018 expressed an unqualified opinion on those consolidated financial statements.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### Definition and Limitations of Internal Control Over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

F-3

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ KPMG Samjong Accounting Corp.

Seoul, Korea

April 26, 2018

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

## KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Consolidated Statements of Financial Position
### As of December 31, 2016 and 2017

| | Note | | 2016 | 2017 |
|---|---|---|---|---|
| | | | **In millions of won** | |
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . | 5,6,7,45 | ₩ | 3,051,353 | 2,369,739 |
| Current financial assets, net . . . . . . . . . . . . . . . . . . | 5,10,11,12,45 | | 2,671,989 | 1,958,357 |
| Trade and other receivables, net . . . . . . . . . . . . . . . . | 5,8,14,20,45,46,47 | | 7,788,876 | 7,928,972 |
| Inventories, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | | 5,479,443 | 6,002,086 |
| Income tax refund receivables . . . . . . . . . . . . . . . . . | 41 | | 19,163 | 100,590 |
| Current non-financial assets . . . . . . . . . . . . . . . . . . . | 15 | | 631,860 | 753,992 |
| Assets held-for-sale . . . . . . . . . . . . . . . . . . . . . . . . . | 42 | | 65,842 | 27,971 |
| **Total current assets** . . . . . . . . . . . . . . . . . . . . . | | | 19,708,526 | 19,141,707 |
| Non-current assets | | | | |
| Non-current financial assets, net . . . . . . . . . . . . . . . | 5,6,9,10,11,12,45 | | 2,657,494 | 2,038,913 |
| Non-current trade and other receivables, net . . . . . . | 5,8,14,45,46,47 | | 1,903,515 | 1,754,797 |
| Property, plant and equipment, net . . . . . . . . . . . . . . | 18,27,49 | | 145,743,056 | 150,882,414 |
| Investment properties, net . . . . . . . . . . . . . . . . . . . . . | 19,27 | | 353,680 | 284,714 |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | | 2,582 | 2,582 |
| Intangible assets other than goodwill, net . . . . . . . . . | 21,27,46 | | 980,821 | 1,187,121 |
| Investments in associates . . . . . . . . . . . . . . . . . . . . . | 4,17 | | 4,092,252 | 3,837,421 |
| Investments in joint ventures . . . . . . . . . . . . . . . . . . . | 4,17 | | 1,418,196 | 1,493,275 |
| Deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 | | 795,131 | 919,153 |
| Non-current non-financial assets . . . . . . . . . . . . . . . . | 15 | | 181,789 | 246,818 |
| **Total non-current assets** . . . . . . . . . . . . . . . . . | | | 158,128,516 | 162,647,208 |
| **Total Assets** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | ₩ | 177,837,042 | 181,788,915 |

(Continued)

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Financial Position, Continued**
**As of December 31, 2016 and 2017**

| | Note | | 2016 | 2017 |
|---|---|---|---|---|
| | | | **In millions of won** | |
| **Liabilities** | | | | |
| Current liabilities | | | | |
|    Trade and other payables, net . . . . . . . . . . . . . . . . | 5,22,24,45,47 | ₩ | 5,585,411 | 5,999,521 |
|    Current financial liabilities, net . . . . . . . . . . . . . . . . | 5,11,23,45,47 | | 8,942,329 | 9,194,552 |
|    Income tax payables . . . . . . . . . . . . . . . . . . . . . . . | 41 | | 1,843,288 | 508,402 |
|    Current non-financial liabilities . . . . . . . . . . . . . . . | 20,28,29 | | 6,368,210 | 5,584,308 |
|    Current provisions . . . . . . . . . . . . . . . . . . . . . . . . . | 26,45 | | 1,999,988 | 2,137,498 |
|       **Total current liabilities** . . . . . . . . . . . . . . . . . | | | 24,739,226 | 23,424,281 |
| Non-current liabilities | | | | |
|    Non-current trade and other payables, net . . . . . . . . | 5,22,24,45,47 | | 3,558,175 | 3,223,480 |
|    Non-current financial liabilities, net . . . . . . . . . . . . | 5,11,23,45,47 | | 44,835,562 | 45,980,899 |
|    Non-current non-financial liabilities . . . . . . . . . . . . | 28,29 | | 7,591,605 | 8,072,434 |
|    Employee benefits liabilities, net . . . . . . . . . . . . . . | 25,45 | | 1,686,258 | 1,483,069 |
|    Deferred tax liabilities . . . . . . . . . . . . . . . . . . . . . | 41 | | 8,948,520 | 10,415,397 |
|    Non-current provisions . . . . . . . . . . . . . . . . . . . . . | 26,45 | | 13,427,151 | 16,224,714 |
|       **Total non-current liabilities** . . . . . . . . . . . . . | | | 80,047,271 | 85,399,993 |
| **Total Liabilities** . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | ₩ | 104,786,497 | 108,824,274 |
| **Equity** | | | | |
| Contributed capital . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,30,45 | | | |
|    Share capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ₩ | 3,209,820 | 3,209,820 |
|    Share premium . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 843,758 | 843,758 |
| | | | 4,053,578 | 4,053,578 |
| Retained earnings . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | | | |
|    Legal reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 1,604,910 | 1,604,910 |
|    Voluntary reserves . . . . . . . . . . . . . . . . . . . . . . . . | | | 31,847,275 | 34,833,844 |
|    Unappropriated retained earnings . . . . . . . . . . . . . . | | | 19,721,686 | 16,931,804 |
| | | | 53,173,871 | 53,370,558 |
| Other components of equity . . . . . . . . . . . . . . . . . . . . | 34 | | | |
|    Other capital surplus . . . . . . . . . . . . . . . . . . . . . . . | | | 1,235,146 | 1,233,793 |
|    Accumulated other comprehensive loss . . . . . . . . . . | | | (33,875) | (271,457) |
|    Other equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 13,294,973 | 13,294,973 |
| | | | 14,496,244 | 14,257,309 |
| Equity attributable to owners of the controlling company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 71,723,693 | 71,681,445 |
| Non-controlling interests . . . . . . . . . . . . . . . . . . . . . . | 16, 33 | | 1,326,852 | 1,283,196 |
| **Total Equity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ₩ | 73,050,545 | 72,964,641 |
| **Total Liabilities and Equity** . . . . . . . . . . . . . . . . . . | | ₩ | 177,837,042 | 181,788,915 |

See accompanying notes to the consolidated financial statements.

F-6

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Comprehensive Income**
**For the years ended December 31, 2015, 2016 and 2017**

| | Note | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | **In millions of won, except per share information** | | |
| **Sales** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,35,45,47 | | | |
| Sales of goods . . . . . . . . . . . . . . . . . . . . . | ₩ | 54,367,036 | 55,379,487 | 55,772,548 |
| Sales of construction services . . . . . . . . . . . | 20 | 3,761,204 | 4,026,857 | 3,212,184 |
| Sales of services . . . . . . . . . . . . . . . . . . . . | | 453,487 | 356,743 | 351,157 |
| | | 58,581,727 | 59,763,087 | 59,335,889 |
| **Cost of sales** . . . . . . . . . . . . . . . . . . . . . . . . | 13,25,43,47 | | | |
| Cost of sales of goods . . . . . . . . . . . . . . . . | | (41,348,917) | (41,237,372) | (48,454,036) |
| Cost of sales of construction services . . . . . | | (3,563,120) | (3,755,144) | (3,047,396) |
| Cost of sales of services . . . . . . . . . . . . . . | | (545,692) | (557,037) | (597,423) |
| | | (45,457,729) | (45,549,553) | (52,098,855) |
| **Gross profit** . . . . . . . . . . . . . . . . . . . . . . . . . | | 13,123,998 | 14,213,534 | 7,237,034 |
| **Selling and administrative expenses** . . . . . . . | 25,36,43,47 | (2,153,261) | (2,639,232) | (2,762,855) |
| **Other income** . . . . . . . . . . . . . . . . . . . . . . . | 37 | 808,214 | 840,184 | 869,118 |
| **Other expenses** . . . . . . . . . . . . . . . . . . . . . . | 37 | (108,848) | (188,624) | (180,055) |
| **Other gains, net** . . . . . . . . . . . . . . . . . . . . . | 38 | 8,610,773 | 70,498 | 156,627 |
| **Operating profit** . . . . . . . . . . . . . . . . . . . . . | 4 | 20,280,876 | 12,296,360 | 5,319,869 |
| **Finance income** . . . . . . . . . . . . . . . . . . . . . | 5,11,39 | 1,182,988 | 791,543 | 1,530,618 |
| **Finance expenses** . . . . . . . . . . . . . . . . . . . . | 5,11,40 | (3,015,457) | (2,437,087) | (3,127,952) |
| **Profit (loss) related to associates, joint** | | | | |
| **ventures and subsidiaries** . . . . . . . . . . . . . . | 4,17 | | | |
| Share in profit of associates and joint | | | | |
| ventures . . . . . . . . . . . . . . . . . . . . . . . . | | 280,794 | 224,435 | 241,537 |
| Gain on disposal of investments in | | | | |
| associates and joint ventures . . . . . . . . . . | | 4,731 | 52 | 609 |
| Gain on disposal of investments in | | | | |
| subsidiaries . . . . . . . . . . . . . . . . . . . . . . | 16 | 8,376 | — | — |
| Share in loss of associates and joint | | | | |
| ventures . . . . . . . . . . . . . . . . . . . . . . . . | | (86,522) | (243,361) | (323,225) |
| Loss on disposal of investments in | | | | |
| associates and joint ventures . . . . . . . . . . | | — | (2,935) | — |
| Impairment loss on investments in | | | | |
| associates and joint ventures . . . . . . . . . . | 17 | — | (115,539) | (27,238) |
| | | 207,379 | (137,348) | (108,317) |
| **Profit before income tax** . . . . . . . . . . . . . . . . | | 18,655,786 | 10,513,468 | 3,614,218 |
| **Income tax expense** . . . . . . . . . . . . . . . . . . . | 41 | (5,239,413) | (3,365,141) | (2,172,824) |
| **Profit for the period** . . . . . . . . . . . . . . . . . . | ₩ | 13,416,373 | 7,148,327 | 1,441,394 |

(Continued)

F-7

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Comprehensive Income, Continued**
**For the years ended December 31, 2015, 2016 and 2017**

| | Note | | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| | | | \multicolumn In millions of won, except per share information | | |
| Other comprehensive income (loss) . . . . . . . . | 5,11,25,31,34 | | | | |
| Items that will not be reclassified subsequently to profit or loss: | | | | | |
| Remeasurements of defined benefit liability, net of tax . . . . . . . . . . . . . . | 25,31 | ₩ | (87,861) | (75,926) | 170,337 |
| Share in other comprehensive loss of associates and joint ventures, net of tax . . . . . . . . . . . . . . . . . . . . . . . . | 31 | | (283) | (2,515) | 10,067 |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax . . . . . . . . . . . . . . | 34 | | 9,648 | 61,279 | (7,098) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax . . . . . . | 5,11,34 | | 4,409 | 28,414 | 20,868 |
| Foreign currency translation of foreign operations, net of tax . . . . . . . . . . . . | 34 | | 18,535 | 41,360 | (134,196) |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax . . . . . . . . . . . . . | 34 | | 89,558 | (54,914) | (154,694) |
| Other comprehensive income (loss), net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 34,006 | (2,302) | (94,716) |
| Total comprehensive income for the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ₩ | 13,450,379 | 7,146,025 | 1,346,678 |
| Profit or loss attributable to: | | | | | |
| Owners of the controlling company . . . . . . | 44 | ₩ | 13,289,127 | 7,048,581 | 1,298,720 |
| Non-controlling interests . . . . . . . . . . . . . . | | | 127,246 | 99,746 | 142,674 |
| | | ₩ | 13,416,373 | 7,148,327 | 1,441,394 |
| Total comprehensive income attributable to: | | | | | |
| Owners of the controlling company . . . . . . | | ₩ | 13,308,132 | 7,041,557 | 1,230,194 |
| Non-controlling interests . . . . . . . . . . . . . . | | | 142,247 | 104,468 | 116,484 |
| | | ₩ | 13,450,379 | 7,146,025 | 1,346,678 |
| Earnings per share (in won) . . . . . . . . . . . . . . | 44 | | | | |
| Basic and diluted earnings per share . . . . . . | | ₩ | 20,701 | 10,980 | 2,023 |

See accompanying notes to the consolidated financial statements.

F-8

### KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Consolidated Statements of Changes in Equity
### For the years ended December 31, 2015, 2016 and 2017

| | Equity attributable to owners of the controlling company | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Contributed capital | Retained earnings | Other components of equity | Subtotal | Non-controlling Interests | Total equity |
| | In millions of won | | | | | |
| **Balance at January 1, 2015** ............... ₩ | 4,053,578 | 35,303,647 | 14,244,106 | 53,601,331 | 1,223,679 | 54,825,010 |
| **Total comprehensive income (loss) for the period** | | | | | | |
| Profit for the period ................... | — | 13,289,127 | — | 13,289,127 | 127,246 | 13,416,373 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | |
| Remeasurements of defined benefit liability, net of tax ............. | — | (84,271) | — | (84,271) | (3,590) | (87,861) |
| Share in other comprehensive loss of associates and joint ventures, net of tax ........................... | — | (280) | — | (280) | (3) | (283) |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax ............... | — | — | 9,744 | 9,744 | (96) | 9,648 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax ........................... | — | — | 3,157 | 3,157 | 1,252 | 4,409 |
| Foreign currency translation of foreign operations, net of tax ..... | — | — | 1,179 | 1,179 | 17,356 | 18,535 |
| Share in other comprehensive income of associates and joint ventures, net of tax ........................ | — | — | 89,476 | 89,476 | 82 | 89,558 |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | |
| Dividends paid ...................... | — | (320,982) | — | (320,982) | (86,071) | (407,053) |
| Issuance of share capital by subsidiaries .. | — | — | 2,536 | 2,536 | 12,329 | 14,865 |
| Equity transaction within consolidation scope—other than issuance of share capital ......................... | — | — | 44,166 | 44,166 | 9,046 | 53,212 |
| Disposal of treasury stocks ............. | — | — | (716) | (716) | 23,229 | 22,513 |
| Changes in consolidation scope ......... | — | — | — | — | (16,455) | (16,455) |
| Dividends paid (hybrid bond) ........... | — | — | — | — | 4 | 4 |
| **Balance at December 31, 2015** ............ ₩ | 4,053,578 | 48,187,241 | 14,393,648 | 66,634,467 | 1,308,008 | 67,942,475 |

(Continued)

F-9

### KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

**Consolidated Statements of Changes in Equity, Continued**
**For the years ended December 31, 2015, 2016 and 2017**

| | Equity attributable to owners of the controlling company | | | | Non-controlling Interests | Total equity |
|---|---|---|---|---|---|---|
| | Contributed capital | Retained earnings | Other components of equity | Subtotal | | |
| | In millions of won | | | | | |
| **Balance at January 1, 2016** ............... ₩ | 4,053,578 | 48,187,241 | 14,393,648 | 66,634,467 | 1,308,008 | 67,942,475 |
| **Total comprehensive income (loss) for the period** | | | | | | |
| Profit for the period ................. | — | 7,048,581 | — | 7,048,581 | 99,746 | 7,148,327 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | |
| Remeasurements of defined benefit liability, net of tax ............. | — | (69,330) | — | (69,330) | (6,596) | (75,926) |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax ............. | — | (2,532) | — | (2,532) | 17 | (2,515) |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax ............... | — | — | 61,275 | 61,275 | 4 | 61,279 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax ........................... | — | — | 27,075 | 27,075 | 1,339 | 28,414 |
| Foreign currency translation of foreign operations, net of tax ..... | — | — | 31,406 | 31,406 | 9,954 | 41,360 |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax ............. | — | — | (54,918) | (54,918) | 4 | (54,914) |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | |
| Dividends paid ........................ | — | (1,990,089) | — | (1,990,089) | (99,982) | (2,090,071) |
| Issuance of shares of capital by subsidiaries and others .............. | — | — | 1,750 | 1,750 | 14,809 | 16,559 |
| Equity transaction within consolidation scope—other than issuance of share capital ............................ | — | — | 36,008 | 36,008 | 12,299 | 48,307 |
| Changes in consolidation scope ......... | — | — | — | — | 3,705 | 3,705 |
| Dividends paid (hybrid bond) ........... | — | — | — | — | (16,455) | (16,455) |
| **Balance at December 31, 2016** ............ ₩ | 4,053,578 | 53,173,871 | 14,496,244 | 71,723,693 | 1,326,852 | 73,050,545 |

(Continued)

F-10

## KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Consolidated Statements of Changes in Equity, Continued
### For the years ended December 31, 2015, 2016 and 2017

| | Equity attributable to owners of the controlling company | | | | | |
| | Contributed capital | Retained earnings | Other components of equity | Subtotal | Non-controlling Interests | Total equity |
|---|---|---|---|---|---|---|
| | | | In millions of won | | | |
| **Balance at January 1, 2017** ............... ₩ | 4,053,578 | 53,173,871 | 14,496,244 | 71,723,693 | 1,326,852 | 73,050,545 |
| **Total comprehensive income (loss) for the period** | | | | | | |
| Profit for the period .................. | — | 1,298,720 | — | 1,298,720 | 142,674 | 1,441,394 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | |
| Remeasurements of defined benefit liability, net of tax ............. | — | 158,991 | — | 158,991 | 11,346 | 170,337 |
| Share in other comprehensive income of associates and joint ventures, net of tax ....................... | — | 10,065 | — | 10,065 | 2 | 10,067 |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax ............... | — | — | (7,102) | (7,102) | 4 | (7,098) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax ........................... | — | — | 19,614 | 19,614 | 1,254 | 20,868 |
| Foreign currency translation of foreign operations, net of tax ..... | — | — | (95,103) | (95,103) | (39,093) | (134,196) |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax ............. | — | — | (154,991) | (154,991) | 297 | (154,694) |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | |
| Dividends paid ...................... | — | (1,271,089) | — | (1,271,089) | (70,252) | (1,341,341) |
| Issuance of shares of capital by subsidiaries and others .............. | — | — | (1,378) | (1,378) | 18,381 | 17,003 |
| Changes in consolidation scope ........ | — | — | — | — | 7,337 | 7,337 |
| Dividends paid (hybrid bond) ........... | — | — | — | — | (15,856) | (15,856) |
| Repayment of hybrid bond .............. | — | — | — | — | (99,750) | (99,750) |
| Others ............................... | — | — | 25 | 25 | — | 25 |
| **Balance at December 31, 2017** ............. ₩ | 4,053,578 | 53,370,558 | 14,257,309 | 71,681,445 | 1,283,196 | 72,964,641 |

See accompanying notes to the consolidated financial statements.

F-11

## KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Consolidated Statements of Cash Flows
### For the years ended December 31, 2015, 2016 and 2017

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| **Cash flows from operating activities** | | | |
| Profit for the period .................................................. ₩ | 13,416,373 | 7,148,327 | 1,441,394 |
| Adjustments for: | | | |
| Income tax expense ............................................ | 5,239,413 | 3,365,141 | 2,172,824 |
| Depreciation ..................................................... | 8,269,118 | 8,881,273 | 9,660,039 |
| Amortization ..................................................... | 72,266 | 79,715 | 113,672 |
| Employee benefit expense .................................... | 314,692 | 373,753 | 391,360 |
| Bad debt expense ............................................... | 18,350 | 37,815 | 126,326 |
| Interest expense ................................................ | 2,015,684 | 1,752,868 | 1,789,552 |
| Loss on sale of financial assets ............................. | 3,008 | 9 | 2,343 |
| Loss on disposal of property, plant and equipment ...... | 1,933 | 4,996 | 70,514 |
| Loss on abandonment of property, plant, and equipment .. | 365,056 | 426,519 | 424,091 |
| Impairment loss on property, plant and equipment ....... | 30,344 | — | 51,067 |
| Impairment loss on intangible assets ...................... | 22 | 3,945 | 20 |
| Loss on disposal of intangible assets ...................... | 16 | 158 | 183 |
| Increase to provisions ........................................ | 1,602,724 | 1,782,732 | 1,690,120 |
| Loss (gain) on foreign currency translation, net .......... | 617,224 | 253,468 | (902,878) |
| Valuation and transaction loss (gain) on derivative instruments, net .. | (708,120) | (231,630) | 1,043,628 |
| Share in loss (income) of associates and joint ventures, net ........... | (194,272) | 18,926 | 81,688 |
| Gain on disposal of financial assets ....................... | (4) | (1,482) | (1,130) |
| Gain on disposal of property, plant and equipment ...... | (8,637,508) | (74,035) | (48,316) |
| Gain on disposal of intangible assets ...................... | (32) | — | (564) |
| Gain on disposal of investments in associates and joint ventures ....... | (4,731) | (52) | (609) |
| Loss on disposal of investments in associates and joint ventures ....... | — | 2,935 | — |
| Gain on disposal of investments in subsidiaries .......... | (8,376) | — | — |
| Impairment loss on investments in associates and joint ventures ....... | — | 115,539 | 27,238 |
| Interest income ................................................. | (241,585) | (241,778) | (206,143) |
| Dividend income ............................................... | (14,069) | (9,446) | (11,477) |
| Impairment loss on available-for-sale financial assets ... | 84,370 | 86,703 | 2,713 |
| Others, net ...................................................... | (35,107) | 66,260 | 16,679 |
| | 8,790,416 | 16,694,332 | 16,492,940 |
| Changes in: | | | |
| Trade receivables .............................................. | 715,498 | 200,529 | (218,328) |
| Non-trade receivables ......................................... | (17,102) | (68,322) | (31,807) |
| Accrued income ................................................ | 17,051 | 69,151 | 577,838 |
| Other receivables .............................................. | (9,441) | 10,093 | (1,271) |
| Other current assets ........................................... | 67,520 | (259,492) | 37,576 |
| Inventories ...................................................... | (1,190,188) | (1,439,545) | (1,373,438) |
| Other non-current assets ...................................... | (31,465) | (2,792) | (46,079) |
| Trade payables ................................................. | (1,577,551) | 141,994 | 342,126 |
| Non-trade payables ............................................ | 38,223 | (8,379) | (214,704) |
| Accrued expenses .............................................. | (410,744) | (153,172) | (715,305) |
| Other payables ................................................. | 964 | — | 292 |
| Other current liabilities ....................................... | 870,945 | 284,417 | (126,323) |
| Other non-current liabilities .................................. | 377,617 | 809,699 | 763,958 |
| Investments in associates and joint ventures (dividends received) ..... | 114,708 | 75,407 | 106,983 |
| Provisions ....................................................... | (1,033,502) | (1,527,129) | (1,390,606) |
| Payments of employee benefit obligations ................. | (43,100) | (53,477) | (69,489) |
| Plan assets ...................................................... | (214,449) | (312,125) | (325,080) |
| | (2,325,016) | (2,233,143) | (2,683,657) |

(Continued)

F-12

## KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Consolidated Statements of Cash Flows, Continued
### For the years ended December 31, 2015, 2016 and 2017

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | *In millions of won* | | |
| Cash generated from operating activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 19,881,773 | 21,609,516 | 15,250,677 |
| Dividends received (available-for-sale financial assets) . . . . . . . . . . . . . . . . . . . . . . . . | 38,565 | 10,294 | 10,590 |
| Interest paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,176,040) | (2,041,379) | (1,886,303) |
| Interest received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 133,875 | 240,878 | 173,226 |
| Income taxes paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (935,068) | (3,298,757) | (2,298,296) |
| **Net cash from operating activities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,943,105 | 16,520,552 | 11,249,894 |
| **Cash flows from investing activities** | | | |
| Proceeds from disposals of associates and joint ventures . . . . . . . . . . . . . . . . . . . . . . . . | 22,058 | 46,644 | 10,542 |
| Acquisition of associates and joint ventures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (116,114) | (113,222) | (206,753) |
| Proceeds from disposals of property, plant and equipment . . . . . . . . . . . . . . . . . . . . . . | 9,843,796 | 207,960 | 85,801 |
| Acquisition of property, plant and equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (14,049,887) | (12,028,789) | (12,535,958) |
| Proceeds from disposals of intangible assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 467 | 430 | 1,072 |
| Acquisition of intangible assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (87,946) | (124,422) | (143,887) |
| Proceeds from disposals of financial assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 242,856 | 10,876,017 | 5,296,680 |
| Acquisition of financial assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (5,326,151) | (8,130,621) | (4,786,717) |
| Increase in loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (153,570) | (206,092) | (218,698) |
| Collection of loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 111,714 | 117,561 | 120,967 |
| Increase in deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (352,669) | (468,734) | (397,078) |
| Decrease in deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 185,154 | 161,166 | 110,383 |
| Receipt of government grants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52,696 | 32,878 | 55,533 |
| Net cash inflow (outflow) from changes in consolidation scope . . . . . . . . . . . . . . . . . . . | (968) | 3,754 | — |
| Other cash inflow (outflow) from investing activities, net . . . . . . . . . . . . . . . . . . . . . . . | (145,406) | (20,400) | 1,414 |
| **Net cash used in investing activities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (9,773,970) | (9,645,870) | (12,606,699) |
| **Cash flows from financing activities** | | | |
| Proceeds from (Repayment of) short-term borrowings, Net . . . . . . . . . . . . . . . . . . . . . | (65,355) | (49,604) | 370,328 |
| Proceeds from long-term borrowings and debt securities . . . . . . . . . . . . . . . . . . . . . . | 4,178,454 | 2,302,060 | 10,098,067 |
| Repayment of long-term borrowings and debt securities . . . . . . . . . . . . . . . . . . . . . . | (8,960,706) | (7,750,047) | (8,198,882) |
| Payment of finance lease liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (110,040) | (118,215) | (122,919) |
| Settlement of derivative instruments, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 73,348 | 73,246 | 33,434 |
| Proceeds on disposal of partial interest in a subsidiary that does not involve loss of control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67,914 | — | — |
| Change in non-controlling interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36,105 | 10,538 | 23,582 |
| Repayment of hybrid bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (99,750) |
| Dividends paid (hybrid bond) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16,455) | (16,455) | (15,856) |
| Dividends paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (409,884) | (2,088,429) | (1,340,387) |
| Other cash outflow from financing activities, net . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (570) | (2,023) |
| **Net cash from (used in) financing activities** . . . . . . . . . . . . . . . . . . . . . . . . . . . | (5,206,619) | (7,637,476) | 745,594 |
| **Net increase (decrease) in cash and cash equivalents before effect of exchange rate fluctuations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,962,516 | (762,794) | (611,211) |
| **Effect of exchange rate fluctuations on cash held** . . . . . . . . . . . . . . . . . . . . . . . . | 24,249 | 31,082 | (70,403) |
| **Net increase (decrease) in cash and cash equivalents** . . . . . . . . . . . . . . . . . . . . . | 1,986,765 | (731,712) | (681,614) |
| **Cash and cash equivalents at January 1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,796,300 | 3,783,065 | 3,051,353 |
| **Cash and cash equivalents at December 31** . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 3,783,065 | 3,051,353 | 2,369,739 |

See accompanying notes to the consolidated financial statements.

F-13

**PUBLIC VERSION**

Barcode:3814772-167 A-580-880 REV - Admin Review 9/1/17 - 8/31/18

## KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Notes to the Consolidated Financial Statements
### December 31, 2017

**1.  Reporting Entity (Description of the controlling company)**

Korea Electric Power Corporation ("KEPCO") was incorporated on January 1, 1982 in accordance with the Korea Electric Power Corporation Act (the "KEPCO Act") to engage in the generation, transmission and distribution of electricity and development of electric power resources in the Republic of Korea. KEPCO also provides power plant construction services. KEPCO's stock was listed on the Korea Stock Exchange on August 10, 1989 and KEPCO listed its Depository Receipts (DR) on the New York Stock Exchange on October 27, 1994. KEPCO's head office is located in Naju, Jeollanam-do.

As of December 31, 2017, KEPCO's share capital amounts to ₩3,209,820 million and KEPCO's shareholders are as follows:

|  | Number of shares | Percentage of ownership |
|---|---|---|
| Government of the Republic of Korea . . . . . . . . . . . . . . . . . . . . . . . . | 116,841,794 | 18.20% |
| Korea Development Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 211,235,264 | 32.90% |
| Foreign investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 194,050,746 | 30.23% |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 119,836,273 | 18.67% |
|  | 641,964,077 | 100.00% |

In accordance with the Restructuring Plan enacted on January 21, 1999 by the Ministry of Trade, Industry and Energy, KEPCO spun off its power generation divisions on April 2, 2001, resulting in the establishment of six power generation subsidiaries.

**2.  Basis of Preparation**

The consolidated financial statements of Korea Electric Power Corporation and subsidiaries (the "Company") were authorized for issuance by the Board of Directors on February 23, 2018.

**(1)  Statement of compliance**

These consolidated financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB").

**(2)  Basis of measurement**

These consolidated financial statements have been prepared on the historical cost basis, except for the following material items in the consolidated statements of financial position:

- derivative financial instruments are measured at fair value

- available-for-sale financial assets are measured at fair value

- liabilities for defined benefit plans are recognized at the net of the total present value of defined benefit obligations less the fair value of plan assets

**(3)  Functional and presentation currency**

These consolidated financial statements are presented in Korean won ("Won"), which is KEPCO's functional and presentation currency.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**(4)  Use of estimates and judgments**

The preparation of the consolidated financial statements in conformity with IFRS requires management to make judgments, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates.

Estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognized in the period in which the estimates are revised and in any future periods affected.

The following are the key assumptions concerning the future, and other key sources of estimation uncertainty at the end of the reporting period, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year.

(i)  Unbilled revenue

Energy delivered but not metered nor billed are calculated at the reporting date and is estimated based on consumption statistics and selling price estimates. Determination of the unbilled revenues at the end of the reporting period is sensitive to the estimated consumptions and prices based on statistics. Unbilled revenue recognized for the years ended December 31, 2016 and 2017 are ₩1,615,322 million and ₩1,672,385 million, respectively.

(ii)  Continuing operation of Wolsong Unit 1 nuclear power plant

Wolsong Unit 1 nuclear power plant of the Company commenced operations on November 21, 1982 and its 30-year of designed life was expired on November 20, 2012. On February 27, 2015, the Nuclear Safety and Security Commission (NSSC) evaluated the safety of operation on the Wolsong Unit 1 nuclear power plant and approved to continue its operation until November 20, 2022. As described in note 50, the lawsuit related to the validity of the approval of NSSC is currently ongoing.

According to the Eighth Basic Plan for Electricity Supply and Demand by the Ministry of Trade, Industry and Energy, Wolsong Unit 1 nuclear power plant is expected to go through a comprehensive evaluation for the feasibility of continuous operation including economic efficiency and acceptability of household and community in 2018.

The Korean government plans to refund to the Company for reasonable expenditures incurred in relation to the phase-out of nuclear power plants in accordance with the energy transformation policy established by Korean government. In doing so, after discussions with relevant government agencies and upon approval by the Congress, the Korean government is considering to use available resource including utilizing relevant fund to make the refund. Also, Korean government plans to establish relevant legal basis of providing refund including utilizing available resource, if necessary.

Information about critical judgments in applying accounting policies that have the most significant effect on the amounts recognized in the consolidated financial statements is included in the following notes:

• Note 17 – Investments in Associates and Joint Ventures

• Note 18 – Property, Plant and Equipment

• Note 20 – Construction Services Contracts

• Note 45 – Risk Management

Information about assumptions and estimation uncertainties that have a significant risk of resulting in a material adjustment within the next financial year is included in the following notes:

• Note 41 – Income Taxes

• Note 25 – Employment Benefits

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**(5)  Changes in accounting policies**

(i)  Amendments to IAS 7 'Statement of Cash Flows'

The Company has adopted amendments to IAS 'Statement of Cash Flows' since January 1, 2017. The amendments require changes in liabilities arising from financing activities to be disclosed. The amendments are not required to provide comparative information for prior periods when applying for the first time. Information about changes in liabilities arising from financing activities is included in note 23 and note 24.

(ii)  Amendments to IAS 12 'Income Taxes'

The Company has adopted amendments to IAS 12 'Income Taxes' since January 2017. The amendments clarify that unrealized losses on fixed-rate debt instruments measured at fair value and measured at cost for tax purposes give rise to a deductible temporary difference regardless of whether the holder expects to recover the carrying amount of the debt instrument by sale or by use and that the estimate of probable future taxable profit may include the recovery of some of assets for more than their carrying amount. When the Company assesses whether there will be sufficient taxable profit, the Company should compare the deductible temporary differences with future taxable profit that excludes tax deductions resulting from the reversal of those deductible temporary differences. The Company believes that there is no significant impact on the Company's consolidated financial statements and did not retroactively restate the comparative consolidated financial statements for the prior period.

**(6)  New standards and amendments not yet adopted**

The following new standards, including IFRS 9 'Financial Instruments' and IFRS 15 'Revenue from Contracts with Customers', interpretations and amendments to existing standards have been published but are not mandatory for the Company for annual periods beginning on January 1, 2017, and the Company has not early adopted them.

The Company will apply IFRS 9 'Financial Instruments' and IFRS 15 'Revenue from Contracts with Customers' for annual periods beginning on January 1, 2018. The Company has conducted a detailed assessment on adoption of these standards and based on the circumstance and information available when these financial statements were authorized for issuance.

(i)  IFRS 9 'Financial Instruments'

IFRS 9 sets out the requirements for recognizing and measuring financial assets, financial liabilities and certain contracts to buy or sell non-financial items. It replaces existing guidance in IAS 39 'Financial Instruments: Recognition and Measurement'.

The Company will apply the exemption allowing it not to restate the comparative information for prior periods upon adoption of IFRS 9. The Company will retroactively apply the cumulative effect of the adoption of IFRS 9 in retained earnings as of the date of initial application (January 1, 2018).

Expected impacts on the consolidated financial statements are categorized as follows:

①  Classification and measurement of financial assets

IFRS 9 includes a new classification and measurement of financial assets that reflects the business model in which assets are managed and their cash flow characteristics.

Under IFRS 9, financial assets are classified into three principal categories; measured at amortized cost, fair value through other comprehensive income (FVOCI) and fair value through profit or loss (FVTPL) based on the business model in which assets are managed and their cash flow characteristics. Under IFRS 9, derivatives embedded in hybrid contracts where the host is a financial asset are not bifurcated. Instead, the hybrid financial instrument as a whole is assessed for classification.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

The criteria for classification and measurement of financial assets under IFRS 9 are as follows:

- A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is to hold assets to collect contractual cash flows; and 2) the contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

- A financial asset is measured at FVOCI if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and 2) the contractual terms of the financial asset give rise on specified dates to cash flow that are solely payments of principal and interest on the principal amount outstanding. On initial recognition of equity investment that is not held for trading, the Company may irrevocably elect to present subsequent changes in fair value in OCI, and will not reclassify(recycle) the those items in OCI to profit or loss subsequently.

- A financial asset is measured at FVTPL if the contractual terms of the financial asset give rise to specified dates to cash flows that are not solely payments of principal and interest on the principal amount outstanding, the debt instrument is held within a business model whose objective is to sell the asset, or the equity instruments that are not elected to be designated as measured at FVOCI.

As of December 31, 2017, the Company has financial assets at fair value through profit or loss amounting to ₩133,532 million, available-for-sale financial assets amounting to ₩699,833 million, held-to-maturity investments amounting to ₩3,144 million and loans and receivables amounting to ₩15,203,663 million.

Based on the result of the detailed assessment to date, the expected impacts on the Company's financial assets (excluding derivative instruments) on the date of initial application (January 1, 2018) are as follows:

| Classification based on IAS 39 | Classification based on IFRS 9 | | Amount based on IAS 39 | Amount based on IFRS 9 |
|---|---|---|---|---|
| | | | In millions of won | |
| Financial assets at FVTPL | FVTPL ............... | ₩ | 111,512 | 111,512 |
| Loans and receivables | Amortized cost ......... | | 15,203,663 | 14,412,339 |
| Loans and receivables | FVTPL ............... | | — | 791,324 |
| Available-for-sale financial assets | FVOCI ................ | | 699,833 | 476,941 |
| Available-for-sale financial assets | FVTPL ............... | | — | 222,892 |
| Held-to-maturity investments | Amortized cost ......... | | 3,144 | 3,144 |
| Total financial assets (excluding derivative instruments) .......... | | ₩ | 16,018,152 | 16,018,152 |

Upon adoption of IFRS 9, ₩791,324 million of loans and receivables and ₩222,892 million of available-for-sale financial assets will be measured at FVTPL. The Company has elected to measure ₩476,941 million of the equity securities classified as available-for-sale financial assets as FVOCI under IFRS 9. Accordingly, from January 1, 2018, gains and losses from changes of fair value of the equity securities are recognized in other comprehensive income, impairment losses are not recognized in profit or loss, and gains and losses are not reclassified at disposal.

② Classification and measurement of financial liabilities

Under IFRS 9, the amount of change in the fair value attributable to the changes in the credit risk of the financial liabilities is presented in OCI, not recognized in profit or loss, and the OCI amount will not be reclassified (recycled) to profit or loss. However, if doing so creates or increase an accounting mismatch, the amount of change in the fair value is recognized in profit or loss.

F-17

The Company did not elect to designate financial liabilities as FVTPL and believes that there is no significant impact on the Company's consolidated financial statements upon adoption of IFRS 9.

③    Impairment: Financial assets and contract assets

IFRS 9 replaces the 'incurred loss' model in the existing standard with a forward-looking 'expected credit loss' (ECL) model for debt instruments, lease receivables, contractual assets, loan commitments, financial guarantee contracts.

Under IFRS 9, impairment losses are likely to be recognized earlier than using the incurred loss model under the existing guidance in IAS 39 as loss allowances will be measured on either of the 12-month or lifetime ECL based on the extent of increase in credit risk since inception as shown in the below table.

| Classification | | Loss allowances | |
|---|---|---|---|
| Stage 1 | Credit risk has not increased significantly since the initial recognition | 12-month ECL: | ECLs that resulted from possible default events within the 12 months after the reporting date |
| Stage 2 | Credit risk has increased significantly since the initial recognition | Lifetime ECL: | ECL that resulted from all possible default events over the expected life of a financial instrument |

Stage 3  Credit-impaired

Under IFRS 9, an entity shall always measure the loss allowance at an amount equal to lifetime expected credit losses for trade receivables or contract assets that result from transactions that are within the scope of IFRS 15 and that do not contain a significant financing component in accordance with IFRS 15 and if the trade receivables or contract assets include a significant financing component, an entity may choose as its accounting policy to measure the loss allowance at an amount equal to lifetime expected credit losses.

As of December 31, 2017, the Company has debt instruments in financial assets measured at amortized cost amounting to ₩15,464,202 million (loans and receivables) and has recognized loss allowances of ₩260,539 million.

Under adoption of IFRS 9, the Company plans to elect to measure the loss allowance at an amount equal to lifetime expected credit losses for trade receivables, contract assets and lease receivables that include a significant financing component. Based on the result of the detailed assessment to date, the expected impacts on the Company's loss allowances on the date of initial application (January 1, 2018) are as follows:

| Type | | Amount based on IAS 39 (A) | Amount based on IFRS 9 (B) | Increase (decrease) (B-A) |
|---|---|---|---|---|
| | | | In millions of won | |
| Trade and other receivables . . . . . . . . . . . . . | ₩ | 251,591 | 258,360 | 6,769 |
| Other financial assets . . . . . . . . . . . . . . . . . . | | 8,948 | 8,948 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 260,539 | 267,308 | 6,769 |

④    Hedge accounting

When initially applying IFRS 9, an entity may elect as its accounting policy to continue to apply the hedge accounting requirements of IAS 39. The Company plans to elect to continue apply the hedge accounting requirements of IAS 39.

As of December 31, 2017, the Company has asset and liabilities designated as hedged items amounting to ₩10,606 million and ₩277,130 million, respectively.

F-18

(ii)    IFRS 15 'Revenue from Contracts with Customers'

IFRS 15 sets out a comprehensive framework for determining whether revenue is recognized, the extent of revenue recognized, and when revenue is recognized. It replaces existing revenue recognition guidance, including IAS 18 'Revenue', IAS 11 'Construction Contracts', SIC-31 'Revenue-Barter transactions involving advertising services', IFRIC 13 'Customer Loyalty Programs', IFRIC 15 'Agreements for the construction of real estate', and IFRIC 18 'Transfers of assets from customers'.

The Company will retrospectively apply and recognize the cumulative effect of the adoption of IFRS 15 at the date of initial application (January 1, 2018) and has determined to retrospectively apply to only those contracts that were not completed as of the date of initial application (January 1, 2018). Accordingly, the Company will not restate the comparative periods.

Existing IFRS standards and interpretations including IAS 18 provide revenue recognition guidance by transaction types such as sales of goods, rendering of services, interest income, royalty income, dividend income and construction revenue; however, under the new standard, IFRS 15, the five-step approach (Step 1: Identify the contract(s) with a customer, Step 2: Identify the performance obligations in the contract, Step 3: Determine the transaction price, Step 4: Allocate the transaction price to the performance obligations in the contract, Step 5: Recognize revenue when the entity satisfied a performance obligation) is applied for all types of contracts or agreements.

Expected impacts on the consolidated financial statements are categorized as follows:

①    Identify the performance obligations in the contract

The Company is engaged in the generation, transmission and distribution of electricity and development of electric power resources, and electricity sales revenue accounts for 91.3% of consolidated revenue for the year ended December 31, 2017.

Under IFRS 15, supplying electricity is a series of distinct goods or services identified as a single performance obligation. The Company is also engaged in contracts with customers for transmission and distribution, provision of power generation byproducts, EPC business, O&M, etc. that are identified as different performance obligations for each contract.

Based on the result of the detailed assessment to date, the Company believes that the impact of identifying separate the performance obligations in the contract on the Company's revenue is not significant.

②    Variable consideration

The Company may be subject to a variation of consideration paid by the customer due to the progressive electricity billing system, discounts on electricity bills for policy purposes, penalties and delinquent payment, etc. In applying IFRS 15, the Company estimates an amount of variable consideration by using the expected value method that the Company expects to better predict the amount of consideration to which it will be entitled, and includes in the transaction price some or all of an amount of variable consideration only to the extent that it is highly probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

Based on the result of the detailed assessment to date, the Company believes that the impact of variable consideration on the Company's revenue is not significant.

③    Performance obligations satisfied over time

The Company provides its customers with services such as EPC business, O&M, etc. over time. The Company recognizes revenues based on the percentage-of-completion on a reasonable basis.

F-19

Under IFRS 15, an entity recognizes revenue over time if one of the following criteria is met:

(a)  the customer simultaneously receives and consumes the benefits provided by the entity's performance as the entity performs;

(b)  the entity's performance creates or enhances an asset that the customer controls as the asset is created or enhanced; or

(c)  the entity's performance does not create an asset with an alternative use to the entity and the entity has an enforceable right to payment for performance completed to date.

Based on the result of the detailed assessment to date, the impact of the revenue recognition over time based on the percentage-of-completion on the Company's revenue is not significant.

(iii)  IFRS 16 'Leases'

IFRS 16 replaces IAS 17 'Leases', and IFRIC 4 'Determining whether an Arrangement contains a Lease'. This standard is effective for annual reporting periods beginning on or after January 1, 2019, with early adoption permitted if IFRS 15 'Revenue from Contracts with Customers' has also been applied.

Under IFRS 16, a lessee shall apply this standard to its leases either:

(a)  retrospectively to each prior reporting period presented applying IAS 8 'Accounting Policies, Changes in Accounting Estimates and Errors'; or

(b)  retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application.

The Company has not yet determined the transition approach for IFRS 16.

IFRS 16 provides a single lessee accounting model in which the lessee recognizes lease related assets and liabilities in the statement of financial position. A lessee is required to recognize a right-of-use asset representing its right to use the underlying leased asset and a lease liability representing its obligation to make lease payments. Lease recognition may be exempted for short-term leases and leases for which the underlying asset is of low value. Accounting for a lessor is similar to the existing standard that classifies each of its leases as either an operating lease or a finance lease.

Upon adoption of IFRS 16, the nature of the costs associated with the lease will change as the operating lease payments recognized based on a straight-line basis will change to depreciation expense of a right-of-use asset and interest expense of the lease liability and no significant impact is expected on the Company's finance lease.

The Company plans to conduct a detailed assessment of the potential impact from the application of IFRS 16 during the year ending December 31, 2018.

(iv)  IFRIC 22 'Foreign Currency Transactions and Advance Consideration'

IFRIC 22, published on December 8, 2016, clarifies the date of the transaction for the purpose of determining the exchange rate to use on initial recognition of the related asset, expense or income, when an entity has received or paid advance consideration in a foreign currency. IFRIC 22 is effective for annual reporting periods beginning on or after January 1, 2018, with earlier adoption permitted.

The Company is currently performing a detailed assessment of the impact resulting from the application of IFRIC 22 and plans to complete the assessment in advance of its effective date.

(v)  Amendments to IAS 40 'Investment Property'

The amendments clarify when an entity should transfer a property asset to, or from, investment property. The amendments are effective for annual periods beginning on or after January 1, 2018, with earlier adoption permitted.

F-20

The Company is currently performing a detailed assessment of the impact resulting from the application of amendments to IAS 40 and plans to complete the assessment in advance of its effective date.

**3. Significant Accounting Policies**

Except as described in note 2.(5), the Company applied the following significant accounting policies consistently for all periods presented.

**(1) Basis of consolidation**

The consolidated financial statements are the financial statements of a group in which the assets, liabilities, equity, income, expenses and cash flows of the parent and its subsidiaries are presented as those of a single economic entity. Subsidiaries are controlled by the Company. The Company controls an entity when it is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity.

Income and expense of a subsidiary acquired or disposed of during the year are included in the consolidated statement of comprehensive income from the effective date of acquisition and up to the effective date of disposal, as appropriate. Total comprehensive income of subsidiaries is attributed to the owners of the Company and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance.

When necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with those of the Company.

Transactions within the Company are eliminated during the consolidation.

Changes in the Company's ownership interests in a subsidiary that do not result in the Company losing control over the subsidiary are accounted for as equity transactions. The carrying amounts of the Company's interests and the non-controlling interests are adjusted to reflect the changes in their relative interests in the subsidiary. Any difference between the amount by which the non-controlling interests are adjusted and the fair value of the consideration paid or received is recognized directly in equity and attributed to owners of the Company.

When the Company loses control of a subsidiary, the income or loss on disposal is calculated as the difference between (i) the aggregate of the fair value of the consideration received and the fair value of any retained interest and (ii) the previous carrying amount of the assets (including goodwill), and liabilities of the subsidiary and any non-controlling interests. When assets of the subsidiary are carried at revalued amounts or fair values and the related cumulative gain or loss has been recognized in other comprehensive income and accumulated in equity, the amounts previously recognized in other comprehensive income and accumulated in equity are accounted for as if the Company had directly disposed of the relevant assets (i.e. reclassified to income or loss or transferred directly to retained earnings). The fair value of any investment retained in the former subsidiary at the date when control is lost is recognized as the fair value on initial recognition for subsequent accounting under IAS 39 'Financial Instruments': Recognition and Measurement or, when applicable, the cost on initial recognition of an investment in an associate or a jointly controlled entity.

**(2) Business combinations**

A business combination is accounted for by applying the acquisition method, unless it is a combination involving entities or businesses under common control.

The consideration transferred in a business combination is measured at fair value, which is calculated as the sum of the acquisition-date fair values of the assets transferred by the Company, liabilities incurred by the Company to the former owners of the acquiree and the equity interests issued by the Company in exchange for control of the acquiree. Acquisition-related costs are generally recognized in income or loss as incurred.

F-21

At the acquisition date, the identifiable assets acquired and the liabilities assumed are recognized at their fair value at the acquisition date, except that:

- deferred tax assets or liabilities and liabilities or assets related to employee benefit arrangements are recognized and measured in accordance with IAS 12 ' Income Taxes' and IAS 19 ' Employee Benefits' respectively;

- assets (or disposal groups) that are classified as held for sale in accordance with IFRS 5 'Non-current Assets Held for Sale' are measured in accordance with that standard.

Goodwill is measured as the excess of the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree, and the fair value of the acquirer's previously held equity interest in the acquiree (if any) over the net of the acquisition-date amounts of the identifiable assets acquired and the liabilities assumed. If, after reassessment, net of the acquisition-date amounts of the identifiable assets acquired and liabilities assumed exceeds the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree and the fair value of the acquirer's previously held interest in the acquiree (if any), the excess is recognized immediately in income or loss as a bargain purchase gain.

Non-controlling interest that is present on acquisition day and entitles the holder to a proportionate share of the entity's net assets in an event of liquidation, may be initially measured either at fair value or at the non-controlling interest's proportionate share of the recognized amounts of the acquiree's identifiable net assets. The choice of measurement can be elected on a transaction-by-transaction basis. Other types of non-controlling interests are measured at fair value or, when applicable, on the basis specified in other IFRSs. When the consideration transferred by the Company in a business combination includes assets or liabilities resulting from a contingent consideration arrangement, the contingent consideration is measured at its acquisition-date fair value and included as part of the consideration transferred in a business combination. Changes in the fair value of the contingent consideration that qualify as measurement period adjustments are adjusted retrospectively, with corresponding adjustments against goodwill. Measurement period adjustments are adjustments that arise from additional information obtained during the 'measurement period' (which cannot exceed one year from the acquisition date) about facts and circumstances that existed at the acquisition date.

The subsequent accounting for changes in the fair value of the contingent consideration that do not qualify as measurement period adjustments depends on how the contingent consideration is classified. Contingent consideration that is classified as equity is not re-measured at subsequent reporting dates and its subsequent settlement is accounted for within equity. Contingent consideration that is classified as an asset or a liability is re-measured at subsequent reporting dates in accordance with IAS 39 'Financial Instruments: Recognition and Measurement', or with IAS 37 'Provisions', Contingent Liabilities and Contingent Assets, as appropriate, with the corresponding gain or loss being recognized in income or loss.

When a business combination is achieved in stages, the Company's previously held equity interest in the acquiree is re-measured to fair value at the acquisition date (i.e. the date when the Company obtains control) and the resulting gain or loss, if any, is recognized in income or loss. Amounts arising from interests in the acquiree prior to the acquisition date that have previously been recognized in other comprehensive income are reclassified to income or loss where such treatment would be appropriate if that interest were disposed of.

If the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the Company reports provisional amounts for the items for which the accounting is incomplete. Those provisional amounts are adjusted during the measurement period (see above), or additional assets or liabilities are recognized, to reflect new information obtained about facts and circumstances that existed at the acquisition date that, if known, would have affected the amounts recognized at that date.

The assets and liabilities acquired under business combinations under common control are recognized at the carrying amounts recognized previously in the consolidated financial statements of the ultimate parent. The

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

difference between consideration transferred and carrying amounts of net assets acquired is recognized as part of share premium.

**(3)  Investments in associates**

An associate is an entity over which the Company has significant influence and that is neither a subsidiary nor an interest in a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the investee but does not control or joint control over those policies.

The results and assets and liabilities of associates are incorporated in these consolidated financial statements using the equity method of accounting. If the investment is classified as held for sale, in which case it is accounted for in accordance with IFRS 5 'Non-current Assets Held for Sale', any retained portion of an investment in associates that has not been classified as held for sale shall be accounted for using the equity method until disposal of the portion that is classified as held for sale takes place. If the Company holds 20% ~ 50% of the voting power of the investee, it is presumed that the Company has significant influence.

After the disposal takes place, the Company shall account for any retained interest in associates in accordance with IAS 39 'Financial Instruments: Recognition and Measurement' unless the retained interest continues to be an associates, in which case the entity uses the equity method.

Under the equity method, an investment in an associate is initially recognized in the consolidated statement of financial position at cost and adjusted thereafter to recognize the Company's share of the income or loss and other comprehensive income of the associate. When the Company's share of losses of an associate exceeds the Company's interest in that associate (which includes any long-term interests that, in substance, form part of the Company's net investment in the associate), the Company discontinues recognizing its share of further losses. Additional losses are recognized only to the extent that the Company has incurred legal or constructive obligations or made payments on behalf of the associate.

Any excess of the cost of acquisition over the Company's share of the net fair value of the identifiable assets, liabilities and contingent liabilities of an associate recognized at the date of acquisition is recognized as goodwill, which is included within the carrying amount of the investment. Any excess of the Company's share of the net fair value of the identifiable assets, liabilities and contingent liabilities over the cost of acquisition, after reassessment, is recognized immediately in income or loss. The requirements of IAS 39 'Financial Instruments: Recognition and Measurement', are applied to determine whether it is necessary to recognize any impairment loss with respect to the Company's investment in an associate. When necessary, the entire carrying amount of the investment (including goodwill) is tested for impairment in accordance with IAS 36 'Impairment of Assets' as a single asset by comparing its recoverable amount (higher of value in use and fair value less costs to sell) with its carrying amount, any impairment loss recognized forms part of the carrying amount of the investment. Any reversal of that impairment loss is recognized in accordance with IAS 36 to the extent that the recoverable amount of the investment subsequently increases.

Upon disposal of an associate that results in the Company losing significant influence over that associate, any retained investment is measured at fair value at that date and the fair value is regarded as its fair value on initial recognition as a financial asset in accordance with IAS 39. The difference between the previous carrying amount of the associate attributable to the retained interest and its fair value is included in the determination of the gain or loss on disposal of the associate. In addition, the Company accounts for all amounts previously recognized in other comprehensive income in relation to that associate on the same basis as would be required if that associate had directly disposed of the related assets or liabilities. Therefore, if a gain or loss previously recognized in other comprehensive income by that associate would be reclassified to income or loss on the disposal of the related assets or liabilities, the Company reclassifies the gain or loss from equity to income or loss (as a reclassification adjustment) when it loses significant influence over that associate.

When the Company transacts with its associate, incomes and losses resulting from the transactions with the associate are recognized in the Company's consolidated financial statements only to the extent of interests in the associate that are not related to the Company.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**(4)    Joint arrangements**

A joint arrangement is an arrangement of which two or more parties have joint control. Joint control is the contractually agreed sharing of control of an arrangement, which exists only when decisions about the relevant activities require the unanimous consent of the parties sharing control. Joint arrangements are classified into two types—joint operations and joint ventures. A joint operation is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint operators) have rights to the assets, and obligations for the liabilities, relating to the arrangement. A joint venture is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint ventures) have rights to the net assets of the arrangement.

If the Company is a joint operator, the Company is to recognize and measure the assets and liabilities (and recognize the related revenues and expenses) in relation to its interest in the arrangement in accordance with relevant IFRSs applicable to the particular assets, liabilities, revenues and expenses. If the joint arrangement is a joint venture, the Company is to account for that investment using the equity method accounting in accordance with IAS 28 'Investment in Associates and Joint Ventures' (refer to note 3.(3)), except when the Company is applicable to the IFRS 5 'Non-current Assets Held for Sale'.

**(5)    Non-current assets held for sale**

Non-current assets and disposal groups are classified as held for sale if their carrying amount will be recovered principally through a sale transaction rather than through continuing use. This condition is regarded as met only when the sale is highly probable and the non-current asset (or disposal group) is available for immediate sale in its present condition. Management must be committed to the sale, which should be expected to qualify for recognition as a completed sale within one year from the date of classification.

When the Company is committed to a sale plan involving loss of control of a subsidiary, all of the assets and liabilities of that subsidiary are classified as held for sale when the criteria described above are met, regardless of whether the Company will retain a non-controlling interest in its former subsidiary after the sale.

Non-current assets (and disposal groups) classified as held for sale are measured at the lower of their previous carrying amount and fair value less costs to sell.

**(6)    Goodwill**

The Company measures goodwill which acquired in a business combination at the amount recognized at the date on which it obtains control of the acquiree (acquisition date) less any accumulated impairment losses. Goodwill acquired in a business combination is allocated to each CGU that is expected to benefit from the synergies arising from the business acquired.

The Company assesses at the end of each reporting period and whenever there is an indication that the asset may be impaired. An impairment loss is recognized if the carrying amount of an asset or a CGU exceeds its recoverable amount. Impairment losses are recognized in profit or loss.

Any impairment identified at the CGU level will first reduce the carrying value of goodwill and then be used to reduce the carrying amount of the other assets in the CGU on a pro rata basis. Except for impairment losses in respect of goodwill which are never reversed, an impairment loss is reversed if there has been a change in the estimates used to determine the recoverable amount. An impairment loss is reversed only to the extent that the asset's carrying amount does not exceed the carrying amount that would have been determined, net of depreciation or amortization, if no impairment loss had been recognized.

**(7)    Revenue recognition**

Revenue from the sale of goods, rendering of services or use of the Company assets is measured at the fair value of the consideration received or receivable, net of returns, trade discounts and volume rebates, which

F-24

are recognized as a reduction of revenue. Revenue is recognized when the amount of revenue can be measured reliably and it is probable that the economic benefits associated with the transaction will flow to the Company.

(i)    Sales of goods

The Korean government approves the utility rates charged to customers by the Company's power transmission and distribution division. The Company's utility rates are designed to recover the Company's reasonable costs plus a fair investment return.

The Company recognize revenue from electricity sales revenue based on power sold (transferred to the customer) up to the reporting date and the corresponding utility rate charged to customers. To determine the amount of power sold, the Company estimates daily power volumes of electricity for residential, commercial, general, etc. The differences between the current month's estimated amount and actual (meter-read) amount, is adjusted for (trued-up) during the subsequent month.

(ii)    Sales of services

Revenue from services rendered is recognized in profit or loss in proportion to the stage of completion of the transaction at the reporting date. The stage of completion is assessed by reference to surveys of work performed or services performed to date as a percentage of total services to be performed or the proportion that costs incurred to date bear to the estimated total costs of the transaction or other methods that reliably measures the services performed.

(iii)    Dividend income and interest income

Dividend income is recognized in profit or loss on the date that the Company's right to receive payment is established, which in the case of quoted securities is the ex-dividend date.

Interest income is recognized as it accrues in profit or loss, using the effective interest method. Interest income is accrued on a time basis, by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount on initial recognition.

(iv)    Rental income

The Company's policy for recognition of revenue from operating leases is described in note 3.(9) below.

**(8)   Construction services revenue**

The Company provides services related to the construction of power plants related to facilities of its customers, mostly in foreign countries.

When the outcome of a construction contract can be estimated reliably, revenue and costs are recognized based on the stage of completion of the contract activity at the end of the reporting period, measured based on the proportion of contract costs incurred for work performed to date relative to the estimated total contract costs, except where this would not be representative of the stage of completion. Variations in contract work, claims and incentive payments are included to the extent that the amount can be measured reliably and its receipt is considered probable.

When the outcome of a construction contract cannot be estimated reliably, contract revenue is recognized to the extent of contract costs incurred when it is probable the revenue will be realized. Contract costs are recognized as expenses in the period in which they are incurred. When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognized as an expense immediately.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

When contract costs incurred to date plus recognized income less recognized losses exceed progress billings, the surplus is presented as amounts due from customers for contract work. For contracts where progress billings exceed contract costs incurred to date plus recognized income less recognized losses, the surplus is presented as the amounts due to customers for contract work. Amounts received before the related work is performed are included in the consolidated statements of financial position, as a liability, as advance received. Amounts billed for work performed but not yet paid by the customer are included in the consolidated statements of financial position as accounts and other receivables.

**(9)  Leases**

The Company classifies and accounts for leases as either a finance or operating lease, depending on the terms. Leases where the Company assumes substantially all of the risks and rewards of ownership are classified as finance leases. All other leases are classified as operating leases.

(i)  The Company as lessor

Amounts due from lessees under finance leases are recognized as receivables at the amount of the Company's net investment in the leases. Finance lease income is allocated to accounting periods so as to reflect a constant periodic rate of return on the Company's net investment outstanding in respect of the leases.

Rental income from operating leases is recognized on a straight-line basis over the term of the relevant lease. Initial direct costs incurred in negotiating and arranging an operating lease are added to the carrying amount of the leased asset and recognized on a straight-line basis over the lease term.

(ii)  The Company as lessee

Leases are classified as finance leases whenever the terms of the lease transfer substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases.

Assets held under finance leases are initially recognized as assets of the Company at their fair value at the inception of the lease or, if lower, at the present value of the minimum lease payments. The corresponding liability to the lessor is included in the statement of financial position as a finance lease obligation.

Lease payments are apportioned between finance expenses and reduction of the lease obligation so as to achieve a constant rate of interest on the remaining balance of the liability. Finance expenses are recognized immediately in income or loss, unless they are directly attributable to qualifying assets, in which case they are capitalized in accordance with the Company's general policy on borrowing costs. Contingent rentals are recognized as expenses in the periods in which they are incurred.

Operating lease payments are recognized as an expense on a straight-line basis over the lease term, except where another systematic basis is more representative of the time pattern in which economic benefits from the leased asset are consumed. Contingent rentals arising under operating leases are recognized as an expense in the period in which they are incurred.

In the event that lease incentives are received to enter into operating leases, such incentives are recognized as a liability. The aggregate benefit of incentives is recognized as a reduction of rental expense on a straight-line basis, except where another systematic basis is more representative of the time pattern in which economic benefits from the leased asset are consumed.

(iii)  Determining whether an arrangement contains a lease

At inception of an arrangement, the Company determines whether the arrangement is or contains a lease.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

At inception or on reassessment of an arrangement that contains a lease, the Company separates payments and other consideration required by the arrangement into those for the lease and those for other elements on the basis of their relative fair values. If the Company concludes for a finance lease that it is impracticable to separate the payments reliably, then an asset and a liability are recognized at an amount equal to the fair value of the underlying asset.

**(10) Foreign currencies**

Transactions in foreign currencies are translated to the respective functional currencies of the Company entities at exchange rates at the dates of the transactions. Monetary assets and liabilities denominated in foreign currencies are retranslated to the functional currency using the reporting date's exchange rate. Non-monetary assets and liabilities denominated in foreign currencies that are measured at fair value are retranslated to the functional currency at the exchange rate at the date that the fair value was determined.

Exchange differences are recognized in profit or loss in the period in which they arise except for:

- Exchange differences on foreign currency borrowings relating to assets under construction for future productive use, which are included in the cost of those assets when they are regarded as an adjustment to interest costs on those foreign currency borrowings;

- Exchange differences on transactions entered into in order to hedge certain foreign currency risks (refer to note 3.(25)

  Derivative financial instruments, including hedge accounting); and

- Exchange differences on monetary items receivable from or payable to a foreign operation for which settlement is neither planned nor likely to occur (therefore forming part of the net investment in the foreign operation), which are recognized initially in other comprehensive income and reclassified from equity to income or loss on disposal or partial disposal of the net investment.

For the purpose of presenting financial statements, the assets and liabilities of the Company's foreign operations are expressed in Korean won using exchange rates prevailing at the end of the reporting period. Income and expense items are translated at the average exchange rates for the period, unless exchange rates fluctuated significantly during that period, in which case the exchange rates at the dates of the transactions are used. Exchange differences arising, if any, are recognized in other comprehensive income and accumulated in equity.

When a foreign operation is disposed of, the relevant amount in the translation is transferred to profit or loss as part of the gain or loss on disposal.

**(11) Borrowing costs**

The Company capitalizes borrowing costs directly attributable to the acquisition, construction or production of a qualifying asset as part of the cost of that asset. Other borrowing costs are recognized in expense as incurred. A qualifying asset is an asset that requires a substantial period of time to get ready for its intended use or sale.

Investment income earned on the temporary investment of specific borrowings pending their expenditure on qualifying assets is deducted from the borrowing costs eligible for capitalization.

All other borrowing costs are recognized in income or loss in the period in which they are incurred.

**(12) Government grants and income related to transfer of assets from customers**

Government grants are not recognized unless there is reasonable assurance that the Company will comply with the grant's conditions and that the grant will be received.

F-27

Benefit from a government loan at a below-market interest rate is treated as a government grant, measured as the difference between proceeds received and the fair value of the loan based on prevailing market interest rates.

(i)  If the Company received grants related to assets

Government grants whose primary condition is that the Company purchase, construct or otherwise acquire long-term assets are deducted in calculating the carrying amount of the asset. The grant is recognized in profit or loss over the life of a depreciable asset as a reduced depreciation expense.

(ii) If the Company received grants related to income

Government grants which are intended to compensate the Company for expenses incurred are recognized as other income (government grants) in profit or loss over the periods in which the Company recognizes the related costs as expenses.

The Company recovers a substantial amount of the cost related to its electric power distribution facilities from customers through the transfer of assets, while the remaining portion is recovered through electricity sales from such customers in the future. As such, the Company believes there exists a continued service obligation to the customers in accordance with IFRIC 18 'Transfer of Assets from Customers' when the Company receives an item of property, equipment, or cash for constructing or acquiring an item of property or equipment, in exchange for supplying electricity to customers. The Company defers the amounts received, which are subsequently recognized as other income on a straight-line basis over the estimated service period which does not exceed the transferred asset's useful life.

**(13) Employee benefits**

When an employee has rendered service to the Company during a period, the Company recognizes the contribution payable to a defined contribution plan in exchange for that service as a liability (accrued expense).

For defined benefit pension plans and other post-employment benefits, the net periodic pension expense is actuarially determined by "Pension Actuarial System" developed by independent actuaries using the projected unit credit method. The present value of the defined benefit obligation is determined by discounting the estimated future cash outflows using interest rates of high-quality corporate bonds that are denominated in the currency in which the benefits will be paid and that have terms to maturity approximating the terms of the related pension liability. However, if there is not a deep market, market yields on government bonds are used.

Net defined benefit liability's measurement is composed of actuarial gains and losses, return on plan assets excluding net interest on net defined benefit liability, and any change in the effect of the asset ceiling, excluding net interest, which are immediately recognized in other comprehensive income. The actuarial gains or losses recognized in other comprehensive income which will not be reclassified into net profit or loss for later periods are immediately recognized in retained earnings. Past service cost will be recognized as expenses upon the earlier of the date of change or reduction to the plan, or the date of recognizing termination benefits.

The retirement benefit obligation recognized in the statement of financial position represents the present value of the defined benefit obligation as adjusted for unrecognized actuarial gains and losses and unrecognized past service cost, and as reduced by the fair value of plan assets. Any asset resulting from this calculation is limited to unrecognized actuarial losses and past service cost, plus the present value of available refunds and reductions in future contributions to the plan.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**(14) Income taxes**

Income tax expense comprises current and deferred tax. Current tax and deferred tax are recognized in profit or loss except to the extent that it relates to a business combination, or items recognized directly in equity or in other comprehensive income.

(i)   Current tax

Current tax is the expected tax payable or receivable on the taxable profit or loss for the year, using tax rates enacted or substantively enacted at the end of the reporting period and any adjustment to tax payable in respect of previous years. The taxable profit is different from the accounting profit for the period since the taxable profit is calculated excluding the temporary differences, which will be taxable or deductible in determining taxable profit (tax loss) of future periods, and non-taxable or non-deductible items from the accounting profit.

(ii)  Deferred tax

Deferred tax is recognized, using the asset-liability method, in respect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. A deferred tax liability is recognized for all taxable temporary differences. A deferred tax asset is recognized for all deductible temporary differences to the extent that it is probable that taxable profit will be available against which they can be utilized. However, deferred tax is not recognized for the following temporary differences: taxable temporary differences arising on the initial recognition of goodwill, or the initial recognition of assets or liabilities in a transaction that is not a business combination and that affects neither accounting profit or loss nor taxable income.

The measurement of deferred tax liabilities and deferred tax assets reflects the tax consequences that would follow from the manner in which the Company expects, at the end of the reporting period, to recover or settle the carrying amount of its assets and liabilities. Deferred tax assets or deferred tax liabilities on investment properties measured at fair value, unless any contrary evidence exists, are measured using the assumption that the carrying amount of the property will be recovered entirely through sale.

The Company recognizes a deferred tax liability for all taxable temporary differences associated with investments in subsidiaries, associates, and interests in joint ventures, except to the extent that the Company is able to control the timing of the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future. The Company recognizes a deferred tax asset for all deductible temporary differences arising from investments in subsidiaries and associates, to the extent that it is probable that the temporary difference will reverse in the foreseeable future and taxable profit will be available against which the temporary difference can be utilized.

The carrying amount of a deferred tax asset is reviewed at the end of each reporting period and reduces the carrying amount to the extent that it is no longer probable that sufficient taxable profit will be available to allow the benefit of part or all of that deferred tax asset to be utilized.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply to the period when the asset is realized or the liability is settled, based on tax rates (and tax laws) that have been enacted or substantively enacted by the end of the reporting period. The measurement of deferred tax liabilities and deferred tax assets reflects the tax consequences that would follow from the manner in which the Company expects, at the end of the reporting period to recover or settle the carrying amount of its assets and liabilities.

Deferred tax assets and liabilities are offset only if there is a legally enforceable right to offset the related current tax liabilities and assets, and they relate to income taxes levied by the same tax authority and they intend to settle current tax liabilities and assets on a net basis.

F-29

(iii) Current and deferred tax for the year

Current and deferred tax are recognized in income or loss, except when they relate to items that are recognized in other comprehensive income or directly in equity, in which case, the current and deferred tax are also recognized in other comprehensive income or directly in equity respectively. Where current tax or deferred tax arises from the initial accounting for a business combination, the tax effect is included in the accounting for the business combination.

**(15) Property, plant and equipment**

Property, plant and equipment are initially measured at cost and after initial recognition, are carried at cost less accumulated depreciation and accumulated impairment losses. The cost of property, plant and equipment includes expenditures arising directly from the construction or acquisition of the asset, any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management and the initial estimate of the costs of dismantling and removing the item and restoring the site on which it is located.

Subsequent costs are recognized in the carrying amount of property, plant and equipment at cost or, if appropriate, as separate items if it is probable that future economic benefits associated with the item will flow to the Company and the cost of the item can be measured reliably. The carrying amount of the replaced part is derecognized. The costs of the day-to-day servicing are recognized in profit or loss as incurred.

Property, plant and equipment, except for land, are depreciated on a straight-line basis over estimated useful lives that appropriately reflect the pattern in which the asset's future economic benefits are expected to be consumed. For loaded nuclear fuel related to long-term raw materials and spent nuclear fuels related to asset retirement costs, the Company uses the production method to measure and recognizes as expense the economic benefits of the assets.

The estimated useful lives of the Company's property, plant and equipment are as follows:

|  | Useful lives (years) |
|---|---|
| Buildings | 8 ~ 40 |
| Structures | 8 ~ 50 |
| Machinery | 2 ~ 32 |
| Vehicles | 3 ~ 8 |
| Loaded heavy water | 30 |
| Asset retirement costs | 18, 30, 40, 60 |
| Finance lease assets | 6 ~ 32 |
| Ships | 9 |
| Others | 4 ~ 15 |

A component that is significant compared to the total cost of property, plant and equipment is depreciated over its separate useful life.

Depreciation methods, residual values and useful lives of property, plant and equipment are reviewed at the end of each reporting period and if change is deemed appropriate, it is treated as a change in accounting estimate. As a result of such annual review, useful lives of certain machinery were changed during 2016. Depreciation expenses increased by ₩160,985 million for the year ended December 31, 2016. Depreciation expenses increased by ₩160,985 million and ₩130,514 million for the years ended December 31, 2016 and 2017, respectively. Depreciation expenses are expected to increase by ₩91,197 million for the year ending December 31, 2018, and to decrease by ₩382,696 million for the years after December 31, 2018.

Property, plant and equipment are derecognized on disposal, or when no future economic benefits are expected from its use or disposal. Gains or losses arising from derecognition of a property, plant and equipment, measured as the difference between the net disposal proceeds and the carrying amount of the asset, are recognized in income or loss when the asset is derecognized.

**(16) Investment property**

Property held for the purpose of earning rentals or benefiting from capital appreciation is classified as investment property. Investment property is initially measured at its cost. Transaction costs are included in the initial measurement. Subsequently, investment property is carried at depreciated cost less any accumulated impairment losses.

Subsequent costs are recognized in the carrying amount of investment property at cost or, if appropriate, as separate items if it is probable that future economic benefits associated with the item will flow to the Company and the cost of the item can be measured reliably. The carrying amount of the replaced part is derecognized. The costs of the day-to-day servicing are recognized in profit or loss as incurred.

Investment property except for land, are depreciated on a straight-line basis over 8 ~ 40 years as estimated useful lives.

The estimated useful lives, residual values and depreciation method are reviewed at the end of each reporting period, with the effect of any changes in estimate accounted for on a prospective basis.

An investment property is derecognized upon disposal or when the investment property is permanently withdrawn from use and no future economic benefits are expected from the disposal. Any gain or loss arising on derecognition of the property (calculated as the difference between the net disposal proceeds and the carrying amount of the asset) is included in income or loss in the period in which the property is derecognized.

**(17) Intangible assets**

(i)   Intangible assets acquired separately

Intangible assets with finite useful lives that are acquired separately are carried at cost less accumulated amortization and accumulated impairment losses. Amortization is recognized on a straight-line basis over their estimated useful lives. The estimated useful life and amortization method are reviewed at the end of each reporting period, with the effect of any changes in estimate being accounted for on a prospective basis. Intangible assets with indefinite useful lives that are acquired separately are carried at cost less accumulated impairment losses.

(ii)  Research and development

Expenditure on research activities is recognized as an expense in the period in which it is incurred.

An internally-generated intangible asset arising from development (or from the development phase of an internal project) is recognized if, and only if, all of the following have been demonstrated:

- The technical feasibility of completing the intangible asset so that it will be available for use or sale;

- The intention to complete the intangible asset and use or sell it;

- The ability to use or sell the intangible asset;

- How the intangible asset will generate probable future economic benefits;

- The availability of adequate technical, financial and other resources to complete the development and to use or sell the intangible asset; and

- The ability to measure reliably the expenditure attributable to the intangible asset during its development.

The amount initially recognized for internally-generated intangible assets is the sum of the expenditure incurred from the date when the intangible asset first meets the recognition criteria listed above. When the development expenditure does not meet the criteria listed above, an internally-generated intangible asset cannot be recognized and the expenditure is recognized in income or loss in the period in which it is incurred.

F-31

Internally-generated intangible assets are reported at cost less accumulated amortization and accumulated impairment losses.

The estimated useful lives and amortization methods of the Company's intangible assets with finite useful lives are as follows:

|  | Useful lives (years) | Amortization methods |
|---|---|---|
| Usage rights for donated assets . . . . . . . . . . . . | 10 ~ 20 | Straight line |
| Software . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4, 5 | Straight line |
| Industrial rights . . . . . . . . . . . . . . . . . . . . . . . | 5, 10 | Straight line |
| Development expenses . . . . . . . . . . . . . . . . . . | 5 | Straight line |
| Leasehold rights . . . . . . . . . . . . . . . . . . . . . . . | 10 | Straight line |
| Mining right . . . . . . . . . . . . . . . . . . . . . . . . . . | — | Unit of production |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 ~ 50 or Indefinite | Straight line |

(iii) Intangible assets acquired in a business combination

Intangible assets that are acquired in a business combination are recognized separately from goodwill are initially recognized at their fair value at the acquisition date (which is regarded as their cost).

Subsequent to initial recognition, intangible assets acquired in a business combination are reported at cost less accumulated amortization and accumulated impairment losses, on the same basis as intangible assets that are acquired separately.

(iv) Derecognition of intangible assets

An intangible asset is derecognized on disposal, or when no future economic benefits are expected from its use or disposal. Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the asset, and are recognized in income or loss when the asset is derecognized.

**(18) Greenhouse gas emissions rights (allowances) and obligations**

In connection with Enforcement of Allocation and Trading of Greenhouse Gas Emissions Allowances, the Company applies the following accounting policies for greenhouse gas emissions rights and obligations.

(i) Greenhouse gas emissions rights

Greenhouse gas emissions rights consist of the allowances received free of charge from the government and the ones purchased. The cost of the greenhouse gas emissions rights includes expenditures arising directly from the acquisition and any other costs incurred during normal course of the acquisition.

Greenhouse gas emissions rights are held by the Company to fulfill the legal obligation and recorded as intangible assets. To the extent that the portion to be submitted to the government within one year from the end of reporting period, the greenhouse gas emissions rights are classified as current assets. Greenhouse gas emissions rights recorded as intangible assets are initially measured at cost and substantially remeasured at cost less accumulated impairment losses.

Greenhouse gas emissions rights are derecognized on submission to the government or when no future economic benefits are expected from its use or disposal.

(ii) Greenhouse gas emissions obligations

Greenhouse gas emissions obligations are the Company's present legal obligation to submit the greenhouse gas emissions allowances to the government and recognized when an outflow of resources is probable and a reliable estimate can be made of the amount of the obligation. Greenhouse gas emissions obligations are measured as the sum of the carrying amount of the allocated rights that will be submitted to the government and the best estimate of expenditure required to settle the obligation at the end of the reporting period for any excess emission.

F-32

**(19) Impairment of non-financial assets other than goodwill**

At the end of each reporting period, the Company reviews the carrying amounts of its tangible and intangible assets with definite useful lives to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, the Company estimates the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired.

Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or a cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (or the cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognized immediately in profit or loss, unless the relevant asset is carried at a revalued amount, in which case the impairment loss is treated as a revaluation decrease.

When an impairment loss subsequently reverses, the carrying amount of the asset (or a cash-generating unit) is increased to the revised estimate of its recoverable amount, to the extent the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or cash-generating unit) in prior years. A reversal of an impairment loss is recognized immediately in profit or loss, unless the relevant asset is carried at a revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

**(20) Inventories**

Inventories are measured at the lower of cost and net realizable value. Cost of inventories for inventories in transit are measured by using specific identification method. Cost of inventories, except for those in transit, are measured under the weighted average method and consists of the purchase price, cost of conversion and other costs incurred in bringing the inventories to their present location and condition.

Net realizable value is the estimated selling price in the ordinary course of business, less the estimated costs of completion and selling expenses. The amount of any write-down of inventories to net realizable value and all losses of inventories are recognized as an expense in the period the write-down or loss occurs. The amount of any reversal of any write-down of inventories, arising from an increase in net realizable value, are recognized as a reduction in the amount of inventories recognized as an expense in the period in which the reversal occurs.

**(21) Provisions**

Provisions are recognized when the Company has a present legal or constructive obligation as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation.

The risks and uncertainties that inevitably surround many events and circumstances are taken into account in reaching the best estimate of a provision. Where the effect of the time value of money is material, provisions are determined at the present value of the expected future cash flows.

Where some or all of the expenditures required to settle a provision are expected to be reimbursed by another party, the reimbursement shall be recognized when, and only when, it is virtually certain that

F-33

reimbursement will be received if the entity settles the obligation. The reimbursement shall be treated as a separate asset.

Provisions are reviewed at the end of each reporting period and adjusted to reflect the current best estimates. If it is no longer probable that an outflow of resources embodying economic benefits will be required to settle the obligation, the provision is reversed.

(i)    Provision for employment benefits

    The Company determines the provision for employment benefits as the incentive payments based on the results of the individual performance evaluation or management assessment.

(ii)   Provision for decommissioning costs of nuclear power plants

    The Company records the fair value of estimated decommissioning costs as a liability in the period in which the Company incurs a legal obligation associated with retirement of long-lived assets that result from acquisition, construction, development and/or normal use of the assets. Accretion expense consists of period-to-period changes in the liability for decommissioning costs resulting from the passage of time and revisions to either the timing or the amount of the original estimate of undiscounted cash flows.

(iii)  Provision for disposal of spent nuclear fuel

    Under the Radioactive Waste Management Act, the Company is levied to pay the spent nuclear fuel fund for the management of spent nuclear fuel. The Company recognizes the provision of present value of the payments.

(iv)   Provision for low and intermediate radioactive wastes

    Under the Radioactive Waste Management Act, the Company recognizes the provision for the disposal of low and intermediate radioactive wastes in best estimate of the expenditure required to settle the present obligation.

(v)    Provision for Polychlorinated Biphenyls ("PCBs")

    Under the regulation of Persistent Organic Pollutants Management Act, enacted in 2007, the Company is required to remove PCBs, a toxin, from the insulating oil of its transformers by 2025. As a result of the enactments, the Company is required to inspect the PCBs contents of transformers and dispose of PCBs in excess of safety standards under the legally settled procedures. The Company's estimates and assumptions used to determine fair value can be affected by many factors, such as the estimated costs of inspection and disposal, inflation rate, discount rate, regulations and the general economy.

(vi)   Provisions for power plant regional support program

    Power plant regional support programs consist of scholarship programs to local students, local economy support programs, local culture support programs, environment development programs, and local welfare programs. The Company recognizes the provision in relation to power plant regional support program.

(vii)  Provisions for transmission and transformation facilities-neighboring areas support program

    The Company has present obligation to conduct transmission and transformation facilities-neighboring areas support program under Act on assistance to transmission and transformation facilities-neighboring areas. The Company recognizes the provision of estimated amount to fulfill the obligation.

F-34

(viii) Renewable Portfolio Standard ("RPS") provisions

> RPS program is required to generate a specified percentage of total electricity to be generated in the form of renewable energy and provisions are recognized for the governmental regulations to require the production of energies from renewable energy sources such as solar, wind and biomass.

**(22) Non-derivative financial assets**

The Company recognizes and measures non-derivative financial assets by the following four categories: financial assets at fair value through profit or loss, held-to-maturity investments, loans and receivables and available-for-sale financial assets. The Company recognizes financial assets in the statement of financial position when the Company becomes a party to the contractual provisions of the instrument. Upon initial recognition, non-derivative financial assets are measured at their fair value plus, in the case of a financial asset not at fair value through profit or loss, transaction costs that are directly attributable to the asset's acquisition or issuance.

A regular way purchase or sale of financial assets shall be recognized and derecognized, as applicable, using trade date accounting or settlement date accounting. A regular way purchase or sale is a purchase or sale of a financial asset under a contract whose terms require delivery of the asset within the time frame established generally by regulation or convention in the marketplace concerned.

(i)    Effective interest method

> The effective interest method is a method of calculating the amortized cost of a debt instrument and of allocating interest income over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash receipts (including all fees and points paid or received that form an integral part of the effective interest rate, transaction costs and other premiums or discounts) through the expected life of the debt instrument, or, where appropriate, a shorter period, to the net carrying amount on initial recognition. Income is recognized on an effective interest basis for debt instruments other than those financial assets classified as financial assets at fair value through profit or loss.

(ii)   Financial assets at fair value through profit or loss (FVTPL)

> A financial asset is classified as financial assets at fair value through profit or loss if it is held for trading or is designated as such upon initial recognition. Upon initial recognition, transaction costs are recognized in profit or loss when incurred. A financial assets its acquired principally for the purpose of selling it in the near term are classified as a short-term financial assets held for trading and also all the derivatives including an embedded derivate that is not designated and effective as a hedging instrument are classified at the short-term trading financial asset as well. Financial assets at fair value through profit or loss are measured at fair value, and changes therein are recognized in profit or loss.

> A financial asset is classified as held for trading if:

> - It has been acquired principally for the purpose of selling it in the near term; or
> - On initial recognition it is part of a portfolio of identified financial instruments that the Company manages together and has a recent actual pattern of short term profit taking; or
> - It is derivative, including an embedded derivative that is not designated and effective as a hedging instrument.

> A financial asset other than a financial asset held for trading may be designated as at financial assets at fair value through profit or loss upon initial recognition if:

> - Such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or
> - The financial asset forms part of a group of financial assets or financial liabilities or both, which is managed and its' performance is evaluated on a fair value basis in accordance with the Company's

F-35

documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or

- It forms a part of a contract containing one or more embedded derivatives, and with IAS No. 39, Financial Instruments; Recognition and Measurement permits the entire combined contract (asset or liability) to be designated as at financial assets at fair value through profit or loss.

Financial assets at fair value through profit or loss are stated at fair value, with any gains or losses arising on re-measurement recognized in income or loss. The net gain or loss recognized in income or loss incorporates any dividend or interest earned on the financial asset and is included in the 'finance income and finance expenses' line item in the consolidated statement of comprehensive income.

(iii)  Held-to-maturity investments

A non-derivative financial asset with a fixed or determinable payment and fixed maturity, for which the Company has the positive intention and ability to hold to maturity, are classified as held-to-maturity investments. Subsequent to initial recognition, held-to-maturity investments are measured at amortized cost using the effective interest method.

(iv)  Available-for-sale financial assets

Available-for-sale financial assets are those non-derivative financial assets that are designated as available-for-sale or are not classified as financial assets at fair value through profit or loss, held-to-maturity investments or loans and receivables.

Gains and losses arising from changes in fair value are recognized in other comprehensive income and accumulated in the valuation reserve. However, impairment losses, interest calculated using the effective interest method, and foreign exchange gains and losses on monetary assets are recognized in income or loss. Unquoted equity investments which are not traded in an active market, whose fair value cannot be measured reliably are carried at cost.

When a financial asset is derecognized or impairment losses are recognized, the cumulative gain or loss previously recognized in other comprehensive income is reclassified from equity to profit or loss.

Dividends on an available-for-sale equity instrument are recognized in profit or loss when the Company's right to receive payment is established.

The fair value of available-for-sale monetary assets denominated in a foreign currency is determined in that foreign currency and translated at the spot rate at the end of the reporting period. The foreign exchange gains and losses that are recognized in income or loss are determined based on the amortized cost of the monetary asset. Other foreign exchange gains and losses are recognized in other comprehensive income.

(v)  Loans and receivables

Loans and receivables are financial assets with fixed or determinable payments that are not quoted in an active market. Subsequent to initial recognition, loans and receivables are measured at amortized cost using the effective interest method except for loans and receivables of which the effect of discounting is immaterial.

(vi)  Impairment of financial assets

Financial assets, other than those at financial assets at fair value through profit or loss, are assessed for indicators of impairment at the end of each reporting period. Financial assets are considered to be impaired when there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the investment have been affected.

F-36

For listed and unlisted equity investments classified as available-for-sale financial asset, a significant or prolonged decline in the fair value of the security below its cost is considered to be objective evidence of impairment in addition to the criteria mentioned below.

For all other financial assets, objective evidence of impairment could include:

- Significant financial difficulty of the issuer or counterparty; or

- Breach of contract, such as a default or delinquency in interest or principal payments, or

- It becoming probable that the borrower will enter bankruptcy or financial re-organization; or

- The disappearance of an active market for that financial asset because of financial difficulties.

For certain categories of financial asset, such as trade receivables, assets that are assessed not to be impaired individually are, in addition, assessed for impairment on a collective basis. Objective evidence of impairment for a portfolio of receivables could include the Company's past experience of collecting payments, an increase in the number of delayed payments in the portfolio past the average credit period and, as well as observable changes in national or local economic conditions that correlate with default on receivables.

For financial assets recorded at amortized cost, the amount of the impairment loss recognized is the difference between the asset's carrying amount and the present value of estimated future cash flows, discounted at the financial asset's original effective interest rate.

For financial assets carried at cost, the amount of the impairment loss is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the current market rate of return for a similar financial asset. Such impairment loss will not be reversed in subsequent periods.

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of trade receivables, where the carrying amount is reduced through the use of an allowance account. When a trade receivable is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited against the allowance account. Changes in the carrying amount of the allowance account are recognized in income or loss.

When an available-for-sale financial asset is considered to be impaired, cumulative gains or losses previously recognized in other comprehensive income are reclassified to income or loss in the period.

For financial assets measured at amortized cost, if, in a subsequent period, the amount of the impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment was recognized, the previously recognized impairment loss is reversed through profit or loss to the extent that the carrying amount of the investment at the date the impairment is reversed does not exceed what the amortized cost would have been had the impairment not been recognized.

In respect of available-for-sale equity securities, impairment losses previously recognized in profit or loss are not reversed through profit or loss. Any increase in fair value subsequent to an impairment loss is recognized in other comprehensive income. In respect of available-for-sale debt securities, impairment losses are subsequently reversed through profit or loss if an increase in the fair value of the investment can be objectively related to an event occurring after the recognition of the impairment loss.

(vii) De-recognition of financial assets

The Company derecognizes a financial asset when the contractual rights to the cash flows from the asset expire, or it transfers the rights to receive the contractual cash flows on the financial asset in a transaction in which substantially all the risks and rewards of ownership of the financial asset are transferred. Any interest in transferred financial assets that is created or retained by the Company is

F-37

recognized as a separate asset or liability. If the Company retains substantially all the risks and rewards of ownership of the transferred financial assets, the Company continues to recognize the transferred financial assets and recognizes financial liabilities for the consideration received.

On de-recognition of a financial asset in its entirety, the difference between the asset's carrying amount and the sum of the consideration received and receivable and the cumulative gain or loss that had been recognized in other comprehensive income and accumulated in equity is recognized in income or loss.

On de-recognition of a financial asset other than in its entirety (e.g. when the Company retains an option to repurchase part of a transferred asset), the Company allocates the previous carrying amount of the financial asset between the part it continues to recognize under continuing involvement, and the part it no longer recognizes on the basis of the relative fair values of those parts on the date of the transfer. The difference between the carrying amount allocated to the part that is no longer recognized and the sum of the consideration received for the part no longer recognized and any cumulative gain or loss allocated to it that had been recognized in other comprehensive income is recognized in income or loss. A cumulative gain or loss that had been recognized in other comprehensive income is allocated between the part that continues to be recognized and the part that is no longer recognized on the basis of the relative fair values of those parts.

**(23) Non-derivative financial liabilities and equity instruments issued by the Company**

(i)    Classification as debt or equity

Debt and equity instruments are classified as either financial liabilities or as equity in accordance with the substance of the contractual arrangement.

(ii)   Equity instruments

An equity instrument is any contract that evidences a residual interest in the assets of an entity after deducting all of its liabilities. Equity instruments issued by the Company are recognized at the proceeds received, net of direct issue costs.

Repurchase of the Company's own equity instruments is recognized and deducted directly in equity. No gain or loss is recognized in income or loss on the purchase, sale, issue or cancelation of the Company's own equity instruments.

(iii)  Financial liabilities

Financial liabilities are recognized when the Company becomes a party to the contractual provisions of the instruments. Financial liabilities are initially measured at fair value. Transaction cost that are directly attributable to the issue of financial liabilities are added to or deducted from the fair value of the financial liabilities, as appropriate, on initial recognition. Transaction cost directly attributable to acquisition of financial liabilities at fair value through profit or loss are recognized immediately in profit or loss.

Financial liabilities are classified as either financial liabilities at fair value through profit or loss or other financial liabilities.

(iv)   Financial liabilities at fair value through profit or loss (FVTPL)

Financial liabilities are classified as at financial liabilities at fair value through profit or loss when the financial liability is either held for trading or it is designated as financial liabilities at fair value through profit or loss.

A financial liability is classified as held for trading if:

- It has been acquired principally for the purpose of repurchasing it in the near term; or

F-38

- On initial recognition it is part of a portfolio of identified financial instruments that the Company manages together and has a recent actual pattern of short-term profit-taking; or

- It is a derivative that is not designated and effective as a hedging instrument.

A financial liability other than a financial liability held for trading may be designated as at FVTPL upon initial recognition if:

- Such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or

- The financial liability forms part of a Company of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Company's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or

- It forms part of a contract containing one or more embedded derivatives, and IAS 39 'Financial Instruments: Recognition and Measurement', permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial liabilities at fair value through profit or loss are stated at fair value, with any gains or losses arising on re-measurement recognized in income or loss. The net gain or loss recognized in income or loss incorporates any interest paid on the financial liability and is included in 'finance income and finance expenses'.

(v) Other financial liabilities

Other financial liabilities, including borrowings, are initially measured at fair value, net of transaction costs.

Other financial liabilities are subsequently measured at amortized cost using the effective interest method, with interest expense recognized on an effective yield basis. The effective interest method is a method of calculating the amortized cost of a financial liability and of allocating interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments through the expected life of the financial liability, or (where appropriate) a shorter period, to the net carrying amount on initial recognition.

(vi) Financial guarantee contract liabilities

Financial guarantee contract liabilities are initially measured at their fair values and, if not designated as at FVTPL, are subsequently measured at the higher of: (a) the amount of the obligation under the contract, as determined in accordance with IAS 37 'Provisions, Contingent Liabilities and Contingent Assets; or (b) the amount initially recognized less, cumulative amortization recognized in accordance with IAS 18 'Revenue'.

(vii) De-recognition of financial liabilities

The Company derecognizes financial liabilities when, and only when, the Company's obligations are discharged, canceled or they expire. The difference between the carrying amount of the financial liability derecognized and the consideration paid and payable is recognized in income or loss.

**(24) Service Concession Arrangements**

The Company recognizes revenues from construction services and operating services related to service concession arrangements in accordance with IAS 11 'Construction Contracts' and IAS 18 'Revenue', respectively. If the Company performs more than one service under a single contract or arrangement, consideration received or receivable is allocated by reference to the relative fair values of the services delivered, when the amounts are separately identifiable.

F-39

The Company recognizes a financial asset to the extent that it has an unconditional contractual right to receive cash or another financial asset for the construction services and an intangible asset to the extent that it receives a right (license) to charge users of the public service. Borrowing costs attributable to the arrangement are recognized as an expense in the period in which they are incurred unless the Company has a contractual right to receive an intangible asset (a right to charge users of the public service). In this case, borrowing costs attributable to the arrangement are capitalized during the construction phase of the arrangement.

**(25) Derivative financial instruments, including hedge accounting**

The Company enters into a variety of derivative financial instruments to manage its exposure to interest rate and foreign exchange rate risk, including foreign exchange forward contracts, interest rate swaps and cross currency swaps and others.

Derivatives are initially recognized at fair value. Subsequent to initial recognition, derivatives are measured at fair value. The resulting gain or loss is recognized in income or loss immediately unless the derivative is designated and effective as a hedging instrument, in such case the timing of the recognition in income or loss depends on the nature of the hedge relationship.

A derivative with a positive fair value is recognized as a financial asset; a derivative with a negative fair value is recognized as a financial liability. A derivative is presented as a non-current asset or a non-current liability if the remaining maturity of the instrument is more than 12 months and it is not expected to be realized or settled within 12 months. Other derivatives are presented as current assets or current liabilities.

(i)    Separable embedded derivatives

Derivatives embedded in other financial instruments or other host contracts are treated as separate derivatives when their risks and characteristics are not closely related to those of the host contracts and when the host contracts are not measured at FVTPL.

An embedded derivative is presented as a non-current asset or a non-current liability if the remaining maturity of the hybrid instrument to which the embedded derivative is part of, is more than 12 months and it is not expected to be realized or settled within 12 months. All other embedded derivatives are presented as current assets or current liabilities.

(ii)   Hedge accounting

The Company designates certain hedging instruments, which include derivatives, embedded derivatives and non-derivatives in respect of foreign currency risk, as either fair value hedges or cash flow hedges. Hedges of foreign exchange risk on firm commitments are accounted for as cash flow hedges.

At the inception of the hedge relationship, the entity documents the relationship between the hedging instrument and the hedged item, along with its risk management objectives and its strategy for undertaking various hedge transactions. Furthermore, at the inception of the hedge and on an ongoing basis, the Company documents whether the hedging instrument is highly effective in offsetting changes in fair values or cash flows of the hedged item.

(iii)  Fair value hedges

Changes in the fair value of derivatives that are designated and qualify as fair value hedges are recognized in income or loss immediately, together with any changes in the fair value of the hedged asset or liability that are attributable to the hedged risk. The changes in the fair value of the hedging instrument and the change in the hedged item attributable to the hedged risk relating to the hedged items are recognized in the consolidated statements of comprehensive income.

F-40

Hedge accounting is discontinued when the Company revokes the hedging relationship, when the hedging instrument expires or is sold, terminated, or exercised, or when it no longer qualifies for hedge accounting. The fair value adjustment to the carrying amount of the hedged item arising from the hedged risk is amortized as income or loss as of that date.

(iv) Cash flow hedges

The effective portion of changes in the fair value of derivatives that are designated and qualify as cash flow hedges is recognized in other comprehensive income. The gain or loss relating to the ineffective portion is recognized immediately in income or loss, and is included in the 'finance income and expense'.

Amounts previously recognized in other comprehensive income and accumulated in equity are reclassified to income or loss in the periods when the hedged item is recognized in income or loss, in the same line of the consolidated statement of comprehensive income as the recognized hedged item. However, when the forecast transaction that is hedged results in the recognition of a non-financial asset or a non-financial liability, the gains and losses previously accumulated in equity are transferred from equity and included in the initial measurement of the cost of the non-financial asset or non-financial liability.

Hedge accounting is discontinued when the Company revokes the hedging relationship, when the hedging instrument expires or is sold, terminated, or exercised, or it no longer qualifies for hedge accounting. Any gain or loss accumulated in equity at that time remains in equity and is recognized when the forecast transaction is ultimately recognized in income or loss. When a forecast transaction is no longer expected to occur, the gain or loss accumulated in equity is recognized immediately in income or loss.

## 4. Segment, Geographic and Other Information

### (1) Segment determination and explanation of the measurements

The Company's operating segments are its business components that generate discrete financial information that is reported to and regularly reviewed by the Company's the chief operating decision maker, the Chief Executive Officer, for the purpose of resource allocation and assessment of segment performance. The Company's reportable segments are 'Transmission and distribution', 'Electric power generation (Nuclear)', 'Electric power generation (Non-nuclear)', 'Plant maintenance & engineering service' and 'Others'; others mainly represent the business unit that manages the Company's foreign operations.

Segment operating profit (loss) is determined the same way that consolidated operating profit is determined under IFRS without any adjustment for corporate allocations. The accounting policies used by each segment are consistent with the accounting policies used in the preparation of the consolidated financial statements. Segment assets and liabilities are determined based on separate financial statements of the entities instead of on a consolidated basis. There are various transactions between the reportable segments, including sales of property, plant and equipment and so on, that are conducted on an arms-length basis at market prices that would be applicable to an independent third-party. For subsidiaries which are in a different segment from that of its immediate parent company, their carrying amount in separate financial statements is eliminated in the consolidating adjustments in the tables below. In addition, consolidation adjustments in the table below include adjustments of the amount of investment in associates and joint ventures from the cost basis amount reflected in segment assets to that determined using equity method in the consolidated financial statements.

(2) Financial information of the segments for the years ended December 31, 2015, 2016 and 2017, respectively, are as follows:

### 2015

In millions of won

| Segment | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit (loss) related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Transmission and distribution | ₩ 58,164,394 | 1,230,975 | 56,933,419 | 2,859,037 | 132,809 | 1,092,594 | 220,406 | 135,261 | 359,521 | 872,096 | 13,319,310 |
| Electric power generation (Nuclear) | 10,642,352 | 10,596,189 | 46,163 | 3,070,828 | 24,612 | 532,490 | (595) | 54,572 | — | 401,839 | 3,806,617 |
| Electric power generation (Non-nuclear) | 21,469,345 | 20,906,081 | 563,264 | 2,337,353 | 22,171 | 319,647 | (10,686) | 74,007 | 5,305 | 148,053 | 2,704,260 |
| Plant maintenance & engineering service | 2,533,887 | 2,016,699 | 517,188 | 85,662 | 12,293 | 542 | (1,746) | 74,542 | — | 174,912 | 332,531 |
| Others | 672,250 | 150,557 | 521,693 | 27,491 | 108,104 | 127,684 | — | 343 | 230 | 34 | 80,165 |
| Consolidation adjustments | (34,900,501) | (34,900,501) | — | (38,987) | (58,404) | (57,273) | — | (24,033) | — | 5,790 | 37,993 |
| | ₩ 58,581,727 | — | 58,581,727 | 8,341,384 | 241,585 | 2,015,684 | 207,379 | 314,692 | 365,056 | 1,602,724 | 20,280,876 |
| Finance income | | | | | | | | | | | 1,182,988 |
| Finance expense | | | | | | | | | | | (3,015,457) |
| Profit related to associates and joint ventures | | | | | | | | | | | 207,379 |
| Profit before income tax | | | | | | | | | | | ₩ 18,655,786 |

### 2016

In millions of won

| Segment | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit (loss) related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit (loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Transmission and distribution | ₩ 59,862,284 | 1,890,489 | 57,971,795 | 3,226,700 | 80,882 | 844,200 | (128,402) | 162,326 | 424,356 | 711,430 | 5,274,308 |
| Electric power generation (Nuclear) | 11,168,579 | 11,129,385 | 39,194 | 3,130,820 | 33,111 | 474,590 | (1,082) | 70,582 | — | 576,223 | 3,770,165 |
| Electric power generation (Non-nuclear) | 21,394,223 | 20,561,044 | 833,179 | 2,523,306 | 24,171 | 359,607 | (8,342) | 79,846 | 2,133 | 226,619 | 3,211,684 |
| Plant maintenance & engineering service | 2,618,388 | 2,190,207 | 428,181 | 98,843 | 10,672 | 2,156 | 478 | 86,268 | — | 221,301 | 210,680 |
| Others | 567,836 | 77,098 | 490,738 | 26,817 | 115,928 | 97,926 | — | 1,050 | 30 | 168 | 76,336 |
| Consolidation adjustments | (35,848,223) | (35,848,223) | — | (45,498) | (22,986) | (25,611) | — | (26,319) | — | (3,009) | (246,813) |
| | ₩ 59,763,087 | — | 59,763,087 | 8,960,988 | 241,778 | 1,752,868 | (137,348) | 373,753 | 426,519 | 1,782,732 | 12,296,360 |
| Finance income | | | | | | | | | | | 791,543 |
| Finance expense | | | | | | | | | | | (2,437,087) |
| Loss related to associates and joint ventures | | | | | | | | | | | (137,348) |
| Profit before income tax | | | | | | | | | | | ₩ 10,513,468 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**2017**

| Segment | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit (loss) related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | | | | | |
| Transmission and distribution ... ₩ | 59,486,766 | 2,044,160 | 57,442,606 | 3,466,410 | 49,987 | 737,971 | (105,166) | 158,738 | 384,595 | 885,195 | 1,902,634 |
| Electric power generation (Nuclear) ... | 9,415,752 | 9,359,468 | 56,284 | 3,267,510 | 21,034 | 487,503 | 3,637 | 80,809 | — | 801,800 | 1,347,794 |
| Electric power generation (Non-nuclear) ... | 22,795,816 | 21,885,251 | 910,565 | 2,954,375 | 18,860 | 486,176 | (6,718) | 94,075 | 39,335 | 171,457 | 1,523,497 |
| Plant maintenance & engineering service ... | 2,621,440 | 2,211,716 | 409,724 | 109,001 | 10,801 | 2,967 | (70) | 87,344 | 161 | 219,382 | 265,593 |
| Others ... | 655,062 | 138,352 | 516,710 | 36,001 | 130,003 | 103,782 | — | 861 | — | (967) | 113,296 |
| Consolidation adjustments ... | (35,638,947) | (35,638,947) | — | (59,586) | (24,542) | (28,847) | — | (30,467) | — | (386,747) | 167,055 |
| ₩ | 59,335,889 | — | 59,335,889 | 9,773,711 | 206,143 | 1,789,552 | (108,317) | 391,360 | 424,091 | 1,690,120 | 5,319,869 |
| Finance income ... | | | | | | | | | | | 1,530,618 |
| Finance expense ... | | | | | | | | | | | (3,127,952) |
| Loss related to associates and joint ventures ... | | | | | | | | | | | (108,317) |
| Profit before income tax ... | | | | | | | | | | ₩ | 3,614,218 |

F-43

(3)  **Information related to segment assets and segment liabilities as of and for the years ended December 31, 2016 and 2017 are as follows:**

| | 2016 | | | |
| Segment | Segment assets | Investments in associates and joint ventures | Acquisition of non-current assets | Segment liabilities |
|---|---|---|---|---|
| | | In millions of won | | |
| Transmission and distribution .......... ₩ | 105,321,129 | 4,121,462 | 6,345,004 | 49,854,420 |
| Electric power generation (Nuclear) ..... | 52,782,915 | 15,384 | 1,945,610 | 27,366,938 |
| Electric power generation (Non-nuclear) ................... | 47,427,642 | 1,320,203 | 3,508,313 | 26,205,049 |
| Plant maintenance & engineering service ........................ | 3,106,909 | 53,399 | 180,715 | 1,218,047 |
| Others ........................... | 7,423,132 | — | 365,470 | 2,761,262 |
| Segment totals ..................... | 216,061,727 | 5,510,448 | 12,345,112 | 107,405,716 |
| Consolidation adjustments: | | | | |
| Elimination of inter-segment amounts .................... | (39,114,371) | — | (191,901) | (5,811,800) |
| Equity method adjustment ......... | 906,239 | — | — | — |
| Deferred taxes .................. | (5,830) | — | — | 4,301,404 |
| Others ........................ | (10,723) | — | — | (1,108,823) |
| | (38,224,685) | — | (191,901) | (2,619,219) |
| Consolidated totals ................ ₩ | 177,837,042 | 5,510,448 | 12,153,211 | 104,786,497 |

| | 2017 | | | |
| Segment | Segment assets | Investments in associates and joint ventures | Acquisition of non-current assets | Segment liabilities |
|---|---|---|---|---|
| | | In millions of won | | |
| Transmission and distribution .......... ₩ | 106,540,154 | 3,366,309 | 6,606,512 | 50,757,798 |
| Electric power generation (Nuclear) ..... | 55,011,096 | 11,843 | 2,083,967 | 29,252,816 |
| Electric power generation (Non-nuclear) ................... | 47,938,084 | 1,904,224 | 3,250,524 | 26,337,295 |
| Plant maintenance & engineering service ........................ | 3,273,959 | 48,320 | 145,779 | 1,176,627 |
| Others ........................... | 7,798,400 | — | 569,447 | 3,013,743 |
| Segment totals ................... | 220,561,693 | 5,330,696 | 12,656,229 | 110,538,279 |
| Consolidation adjustments: | | | | |
| Elimination of inter-segment amounts .................... | (39,517,829) | — | 23,616 | (5,239,156) |
| Equity method adjustment ......... | 754,314 | — | — | — |
| Deferred taxes .................. | 2,215 | — | — | 5,339,450 |
| Others ........................ | (11,478) | — | — | (1,814,299) |
| | (38,772,778) | — | 23,616 | (1,714,005) |
| Consolidated totals ................ ₩ | 181,788,915 | 5,330,696 | 12,679,845 | 108,824,274 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**(4)  Geographic information**

Electric sales, the main operations of the Company, are conducted in the Republic of Korea where the controlling company is located. The following information on revenue from external customers and non-current assets is determined by the location of the customers and of the assets:

| Geographical unit | Revenue from external customers | | | Non-current assets(*2) | | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 |
| | In millions of won | | | | | |
| Domestic . . . . . . . . | ₩ 54,351,076 | 55,310,011 | 55,652,807 | 143,788,043 | 148,297,677 | 153,436,810 |
| Overseas(*1) . . . . . | 4,230,651 | 4,453,076 | 3,683,082 | 4,526,395 | 4,474,699 | 4,497,535 |
| | ₩ 58,581,727 | 59,763,087 | 59,335,889 | 148,314,438 | 152,772,376 | 157,934,345 |

(*1) Middle East and other Asian countries make up the majority of overseas revenue and non-current assets.

(*2) Amount excludes financial assets and deferred tax assets.

**(5)  Information on significant customers**

There is no individual customer comprising more than 10% of the Company's revenue for the years ended December 31, 2015, 2016 and 2017.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**5.    Classification of Financial Instruments**

**(1)    Classification of financial assets as of December 31, 2016 and 2017 are as follows:**

**2016**

| | Financial assets at fair value through profit or loss | Loans and receivables | Available-for-sale financial assets | Held-to-maturity investments | Derivative assets (using hedge accounting) | Total |
|---|---|---|---|---|---|---|
| | | | In millions of won | | | |
| **Current assets** | | | | | | |
| Cash and cash equivalents . . . . . . . . . ₩ | — | 3,051,353 | — | — | — | 3,051,353 |
| Current financial assets | | | | | | |
| Held-to-maturity investments . . . . | — | — | — | 114 | — | 114 |
| Derivative assets . . . . . . . . . . . . . . | 79,709 | — | — | — | 113,574 | 193,283 |
| Other financial assets . . . . . . . . . . | — | 2,478,592 | — | — | — | 2,478,592 |
| Trade and other receivables . . . . . | — | 7,788,876 | — | — | — | 7,788,876 |
| | 79,709 | 13,318,821 | — | 114 | 113,574 | 13,512,218 |
| **Non-current assets** | | | | | | |
| Non-current financial assets | | | | | | |
| Available-for-sale financial assets . . . . . . . . . . . . . . . . . . . . | — | — | 1,014,732 | — | — | 1,014,732 |
| Held-to-maturity investments . . . . | — | — | — | 3,130 | — | 3,130 |
| Derivative assets . . . . . . . . . . . . . . | 287,768 | — | — | — | 300,323 | 588,091 |
| Other financial assets . . . . . . . . . . | — | 1,051,541 | — | — | — | 1,051,541 |
| Trade and other receivables . . . . . | — | 1,903,515 | — | — | — | 1,903,515 |
| | 287,768 | 2,955,056 | 1,014,732 | 3,130 | 300,323 | 4,561,009 |
| ₩ | 367,477 | 16,273,877 | 1,014,732 | 3,244 | 413,897 | 18,073,227 |

**2017**

| | Financial assets at fair value through profit or loss | Loans and receivables | Available-for-sale financial assets | Held-to-maturity investments | Derivative assets (using hedge accounting) | Total |
|---|---|---|---|---|---|---|
| | | | In millions of won | | | |
| **Current assets** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . ₩ | — | 2,369,739 | — | — | — | 2,369,739 |
| Current financial assets | | | | | | |
| Held-to-maturity investments . . . . . . . . | — | — | — | 5 | — | 5 |
| Derivative assets . . . . . . . . . . . . . . . . . . | 12,923 | — | — | — | 12 | 12,935 |
| Other financial assets . . . . . . . . . . . . . . | — | 1,945,417 | — | — | — | 1,945,417 |
| Trade and other receivables . . . . . . . . . | — | 7,928,972 | — | — | — | 7,928,972 |
| | 12,923 | 12,244,128 | — | 5 | 12 | 12,257,068 |
| **Non-current assets** | | | | | | |
| Non-current financial assets | | | | | | |
| Available-for-sale financial assets . . . . | — | — | 699,833 | — | — | 699,833 |
| Held-to-maturity investments . . . . . . . . | — | — | — | 3,139 | — | 3,139 |
| Derivative assets . . . . . . . . . . . . . . . . . . | 9,097 | — | — | — | 10,594 | 19,691 |
| Other financial assets . . . . . . . . . . . . . . | 111,512 | 1,204,738 | — | — | — | 1,316,250 |
| Trade and other receivables . . . . . . . . . | — | 1,754,797 | — | — | — | 1,754,797 |
| | 120,609 | 2,959,535 | 699,833 | 3,139 | 10,594 | 3,793,710 |
| ₩ | 133,532 | 15,203,663 | 699,833 | 3,144 | 10,606 | 16,050,778 |

F-46

(2)  **Classification of financial liabilities as of December 31, 2016 and 2017 are as follows:**

| | 2016 | | | |
|---|---|---|---|---|
| | Financial liabilities at fair value through profit or loss | Financial liabilities recognized at amortized cost | Derivative liabilities (using hedge accounting) | Total |
| | In millions of won | | | |
| **Current liabilities** | | | | |
| Borrowings . . . . . . . . . . . . . . . . . ₩ | — | 1,115,521 | — | 1,115,521 |
| Debt securities . . . . . . . . . . . . . . . | — | 7,823,557 | — | 7,823,557 |
| Derivative liabilities . . . . . . . . . . . | 3,251 | — | — | 3,251 |
| Trade and other payables . . . . . . . | — | 5,585,411 | — | 5,585,411 |
| | 3,251 | 14,524,489 | | 14,527,740 |
| **Non-current liabilities** | | | | |
| Borrowings . . . . . . . . . . . . . . . . . | — | 1,773,891 | — | 1,773,891 |
| Debt securities . . . . . . . . . . . . . . . | — | 42,926,236 | — | 42,926,236 |
| Derivative liabilities . . . . . . . . . . . | 18,278 | — | 117,157 | 135,435 |
| Trade and other payables . . . . . . . | — | 3,558,175 | | 3,558,175 |
| | 18,278 | 48,258,302 | 117,157 | 48,393,737 |
| ₩ | 21,529 | 62,782,791 | 117,157 | 62,921,477 |

| | 2017 | | | |
|---|---|---|---|---|
| | Financial liabilities at fair value through profit or loss | Financial liabilities recognized at amortized cost | Derivative liabilities (using hedge accounting) | Total |
| | In millions of won | | | |
| **Current liabilities** | | | | |
| Borrowings . . . . . . . . . . . . . . . . . ₩ | — | 1,165,985 | — | 1,165,985 |
| Debt securities . . . . . . . . . . . . . . . | — | 7,957,300 | — | 7,957,300 |
| Derivative liabilities . . . . . . . . . . . | 51,090 | — | 20,177 | 71,267 |
| Trade and other payables . . . . . . . | — | 5,999,521 | — | 5,999,521 |
| | 51,090 | 15,122,806 | 20,177 | 15,194,073 |
| **Non-current liabilities** | | | | |
| Borrowings . . . . . . . . . . . . . . . . . | — | 2,434,624 | — | 2,434,624 |
| Debt securities . . . . . . . . . . . . . . . | — | 43,189,483 | — | 43,189,483 |
| Derivative liabilities . . . . . . . . . . . | 99,839 | — | 256,953 | 356,792 |
| Trade and other payables . . . . . . . | — | 3,223,480 | — | 3,223,480 |
| | 99,839 | 48,847,587 | 256,953 | 49,204,379 |
| ₩ | 150,929 | 63,970,393 | 277,130 | 64,398,452 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(3)  Classification of comprehensive income (loss) from financial instruments for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | | | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| Cash and cash equivalents . . . . . . . . . . | Interest income | ₩ | 54,687 | 61,380 | 35,474 |
| Available-for-sale financial assets . . . | Dividends income | | 14,069 | 9,446 | 11,477 |
| | Impairment loss on available-for-sale financial assets | | (84,370) | (86,703) | (2,713) |
| | Gain (loss) on disposal of available-for-sale financial assets | | (3,004) | 1,473 | (1,213) |
| | Interest income | | 29 | — | — |
| Held-to-maturity investments . . . . . . . | Interest income | | 99 | 97 | 82 |
| Loans and receivables . . . . . . . . . . . . | Interest income | | 28,586 | 25,106 | 30,014 |
| Trade and other receivables  . . . . . . . . | Interest income | | 100,771 | 102,237 | 102,727 |
| Short-term financial instruments . . . . . | Interest income | | 46,921 | 45,763 | 29,412 |
| Long-term financial instruments . . . . . | Interest income | | 10,492 | 7,195 | 8,144 |
| Financial assets at fair value through profit or loss  . . . . . . . . . . . . . . . . . | Interest income | | — | — | 290 |
| | Gain (loss) on valuation of derivatives | | 220,285 | 113,671 | (214,100) |
| | Gain (loss) on transaction of derivatives | | 8,605 | (8,039) | (37,266) |
| | Gain on valuation of financial assets | | — | — | 12 |
| Derivative assets (using hedge accounting)  . . . . . . . . . . . . . . . . . | Gain (loss) on valuation of derivatives (profit or loss) | | 244,020 | 145,458 | (41,129) |
| | Gain (loss) on valuation of derivatives (equity, before tax)(*) | | (12,572) | 50,047 | 2,453 |
| | Gain (loss) on transaction of derivatives | | 2,818 | (13,994) | (58,299) |
| Financial liabilities carried at amortized cost  . . . . . . . . . . . . . . . . | Interest expense of borrowings and debt securities | | (1,392,477) | (1,202,065) | (1,240,727) |
| | Loss on retirement of financial liabilities | | (33) | (23,000) | (5) |
| | Interest expense of trade and other payables | | (84,527) | (68,375) | (57,160) |
| | Interest expense of others | | (538,680) | (482,428) | (491,665) |
| | Gain (loss) on foreign currency transactions and translations | | (708,178) | (290,485) | 1,075,215 |
| Financial liabilities at fair value through profit or loss . . . . . . . . . . . | Gain (loss) on valuation of derivatives | | 35,312 | 23,225 | (179,879) |
| | Gain (loss) on transaction of derivatives | | 107,454 | 17,045 | (27,175) |
| Derivative liabilities (using hedge accounting)  . . . . . . . . . . . . . . . . . | Gain (loss) on valuation of derivatives (profit or loss) | | 93,914 | 5,714 | (439,559) |
| | Gain (loss) on valuation of derivatives (equity, before tax)(*) | | 9,728 | (3,297) | 29,431 |
| | Loss on transaction of derivatives | | (4,288) | (51,450) | (46,221) |

(*)  Items are included in other comprehensive income or loss. All other income and gain amounts listed above are included in finance income, and all expense and losses listed above are included in finance expenses in the consolidated statements of comprehensive income or loss.

**6.  Restricted Deposits**

**Restricted deposits as of December 31, 2016 and 2017 are as follows:**

|  |  |  | 2016 | 2017 |
|---|---|---|---|---|
|  |  |  | In millions of won | |
| Cash and cash equivalents . . . . . . . | Escrow accounts | ₩ | 91 | 53 |
|  | Deposits for government project |  | 16,457 | 15,365 |
|  | Collateral provided for borrowings |  | 80,327 | 79,569 |
|  | Collateral provided for lawsuit |  | 241 | 2 |
|  | Deposits for transmission regional support program |  | 2,137 | 2,320 |
| Short-term financial instruments . . | Bidding guarantees |  | 118 | 119 |
|  | Restriction on withdrawal related to 'win-win growth program' for small and medium enterprises |  | 33,000 | 34,000 |
| Other current receivables . . . . . . . . | Deposit for lawsuit |  | 16,000 | — |
| Financial assets at fair value through profit or loss . . . . . . . . . . | Decommissioning costs of nuclear power plants |  | — | 108,512 |
| Non-current available-for-sale financial asset . . . . . . . . . . . . . . | Decommissioning costs of nuclear power plants |  | 437,015 | 214,156 |
| Long-term financial instruments . . . | Guarantee deposits for checking account |  | 2 | 2 |
|  | Guarantee deposits for banking accounts at oversea branches |  | 342 | 302 |
|  | Decommissioning costs of nuclear power plants |  | 214,121 | 337,234 |
|  | Funds for developing small and medium enterprises(*) |  | 200,000 | 200,000 |
|  |  | ₩ | 999,851 | 991,634 |

(*1) Deposits for small and medium enterprise at IBK and others for construction of Bitgaram Energy Valley and support for the high potential businesses as of December 31, 2017 and 2016.

**7.  Cash and Cash Equivalents**

**Cash and cash equivalents as of December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 119 | 132 |
| Other demand deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,725,785 | 968,966 |
| Short-term deposits classified as cash equivalents . . . . . . . . . . . . . . . . . . . . . | | 120,594 | 559,239 |
| Short-term investments classified as cash equivalents . . . . . . . . . . . . . . . . . . | | 1,204,855 | 841,402 |
|  | ₩ | 3,051,353 | 2,369,739 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**8.  Trade and Other Receivables**

**(1)  Trade and other receivables as of December 31, 2016 and 2017 are as follows:**

| | 2016 | | | |
| --- | --- | --- | --- | --- |
| | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | In millions of won | | | |
| **Current assets** | | | | |
| Trade receivables . . . . . . . . . . . ₩ | 7,260,227 | (71,985) | — | 7,188,242 |
| Other receivables . . . . . . . . . . | 652,782 | (50,071) | (2,077) | 600,634 |
| | 7,913,009 | (122,056) | (2,077) | 7,788,876 |
| **Non-current assets** | | | | |
| Trade receivables . . . . . . . . . . | 491,509 | — | — | 491,509 |
| Other receivables . . . . . . . . . . | 1,455,860 | (37,590) | (6,264) | 1,412,006 |
| | 1,947,369 | (37,590) | (6,264) | 1,903,515 |
| ₩ | 9,860,378 | (159,646) | (8,341) | 9,692,391 |

| | 2017 | | | |
| --- | --- | --- | --- | --- |
| | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | In millions of won | | | |
| **Current assets** | | | | |
| Trade receivables . . . . . . . . . . . ₩ | 7,499,285 | (173,583) | — | 7,325,702 |
| Other receivables . . . . . . . . . . | 614,212 | (9,199) | (1,743) | 603,270 |
| | 8,113,497 | (182,782) | (1,743) | 7,928,972 |
| **Non-current assets** | | | | |
| Trade receivables . . . . . . . . . . | 449,191 | — | (414) | 448,777 |
| Other receivables . . . . . . . . . . | 1,380,983 | (68,809) | (6,154) | 1,306,020 |
| | 1,830,174 | (68,809) | (6,568) | 1,754,797 |
| ₩ | 9,943,671 | (251,591) | (8,311) | 9,683,769 |

F-50

(2) Other receivables as of December 31, 2016 and 2017 are as follows:

| | 2016 | | | |
|---|---|---|---|---|
| | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | In millions of won | | | |
| **Current assets** | | | | |
| Non-trade receivables . . . . . . . . . . . . . ₩ | 360,021 | (50,071) | — | 309,950 |
| Accrued income . . . . . . . . . . . . . . . . . | 62,063 | — | — | 62,063 |
| Deposits . . . . . . . . . . . . . . . . . . . . . | 193,720 | — | (2,077) | 191,643 |
| Finance lease receivables . . . . . . . . . . | 12,225 | — | — | 12,225 |
| Others . . . . . . . . . . . . . . . . . . . . . . . | 24,753 | — | — | 24,753 |
| | 652,782 | (50,071) | (2,077) | 600,634 |
| **Non-current assets** | | | | |
| Non-trade receivables . . . . . . . . . . . . . | 80,393 | (26,942) | — | 53,451 |
| Accrued income . . . . . . . . . . . . . . . . . | 174 | — | — | 174 |
| Deposits . . . . . . . . . . . . . . . . . . . . . | 320,935 | — | (6,264) | 314,671 |
| Finance lease receivables . . . . . . . . . . | 960,649 | — | — | 960,649 |
| Others . . . . . . . . . . . . . . . . . . . . . . . | 93,709 | (10,648) | — | 83,061 |
| | 1,455,860 | (37,590) | (6,264) | 1,412,006 |
| ₩ | 2,108,642 | (87,661) | (8,341) | 2,012,640 |

| | 2017 | | | |
|---|---|---|---|---|
| | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | In millions of won | | | |
| **Current assets** | | | | |
| Non-trade receivables . . . . . . . . . . . ₩ | 314,256 | (9,199) | — | 305,057 |
| Accrued income . . . . . . . . . . . . . . . . | 54,002 | — | — | 54,002 |
| Deposits . . . . . . . . . . . . . . . . . . . . . | 228,317 | — | (1,743) | 226,574 |
| Finance lease receivables . . . . . . . . . | 13,067 | — | — | 13,067 |
| Others . . . . . . . . . . . . . . . . . . . . . . . | 4,570 | — | — | 4,570 |
| | 614,212 | (9,199) | (1,743) | 603,270 |
| **Non-current assets** | | | | |
| Non-trade receivables . . . . . . . . . . . | 112,983 | (59,117) | — | 53,866 |
| Accrued income . . . . . . . . . . . . . . . | 182 | — | — | 182 |
| Deposits . . . . . . . . . . . . . . . . . . . . . | 331,071 | — | (6,154) | 324,917 |
| Finance lease receivables . . . . . . . . . | 849,554 | — | — | 849,554 |
| Others . . . . . . . . . . . . . . . . . . . . . . . | 87,193 | (9,692) | — | 77,501 |
| | 1,380,983 | (68,809) | (6,154) | 1,306,020 |
| ₩ | 1,995,195 | (78,008) | (7,897) | 1,909,290 |

(3) Trade and other receivables are classified as loans and receivables, and are measured using the effective interest method. No interest is accrued for trade receivables related to electricity for the duration between the billing date and the payment due dates. But once trade receivables are overdue, the Company imposes a monthly interest rate of 1.5% on the overdue trade receivables. The Company holds deposits of three months' expected electricity usage for customers requesting temporary usage and customers with past defaulted payments.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(4)  **Aging analysis of trade receivables as of December 31, 2016 and 2017 are as follows:**

|  | 2016 | 2017 |
|---|---|---|
|  | In millions of won | |
| Trade receivables: (not overdue, not impaired) . . . . . . | ₩ 7,592,363 | 7,698,604 |
| Trade receivables: (overdue, not impaired) . . . . . . . . | 820 | 7,117 |
|    Less than 60 days . . . . . . . . . . . . . . . . . . . . . . . . . | 820 | 7,117 |
| Trade receivables: (impairment reviewed) . . . . . . . . . . | 158,553 | 242,755 |
|    60 ~ 90 days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44,277 | 39,070 |
|    90 ~ 120 days . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,917 | 17,502 |
|    120 days ~ 1year . . . . . . . . . . . . . . . . . . . . . . . . | 42,534 | 55,242 |
|    Over 1 year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52,825 | 130,941 |
|  | 7,751,736 | 7,948,476 |
| Less: allowance for doubtful accounts . . . . . . . . . . . . . | (71,985) | (173,583) |
| Less: present value discount . . . . . . . . . . . . . . . . . . . . . | — | (414) |
|  | ₩ 7,679,751 | 7,774,479 |

The Company assesses at the end of each reporting period whether there is any objective evidence that trade receivables are impaired, and provides allowances for doubtful accounts which includes impairment for trade receivables that are individually significant. The Company considers receivables as overdue if the receivables are outstanding 60 days after the maturity and sets an allowance based on past experience of collection.

(5)  **Aging analysis of other receivables as of December 31, 2016 and 2017 are as follows:**

|  | 2016 | 2017 |
|---|---|---|
|  | In millions of won | |
| Other receivables: (not overdue, not impaired) . . . . . . | ₩ 1,887,620 | 1,810,075 |
| Other receivables: (overdue, not impaired) . . . . . . . . | 46,887 | 47,532 |
|    Less than 60 days . . . . . . . . . . . . . . . . . . . . . . . . . | 46,887 | 47,532 |
| Other receivables: (impairment reviewed) . . . . . . . . . . | 174,135 | 137,588 |
|    60 ~ 90 days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,352 | 44 |
|    90 ~ 120 days . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,160 | 1,017 |
|    120 days ~ 1year . . . . . . . . . . . . . . . . . . . . . . . . | 17,613 | 11,042 |
|    Over 1 year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 147,010 | 125,485 |
|  | 2,108,642 | 1,995,195 |
| Less: allowance for doubtful accounts . . . . . . . . . . . . . | (87,661) | (78,008) |
| Less: present value discount . . . . . . . . . . . . . . . . . . . . . | (8,341) | (7,897) |
|  | ₩ 2,012,640 | 1,909,290 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(6)  **Changes in the allowance for doubtful accounts for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|
| | Trade receivables | Other receivables | Trade receivables | Other receivables | Trade receivables | Other receivables |
| | In millions of won | | | | | |
| Beginning balance . . . . . . . . . . . . ₩ | 80,644 | 67,932 | 51,956 | 91,746 | 71,985 | 87,661 |
| Bad debt expense . . . . . . . . . . | 1,308 | 18,473 | 38,719 | 233 | 126,714 | 1,778 |
| Write-off . . . . . . . . . . . . . . . . . | (28,978) | (888) | (18,939) | (928) | (32,995) | (3,129) |
| Reversal . . . . . . . . . . . . . . . . . | (1,018) | (413) | — | (5,489) | — | (2,166) |
| Others . . . . . . . . . . . . . . . . . . | — | 6,642 | 249 | 2,099 | 7,879 | (6,136) |
| Ending balance . . . . . . . . . . . . . . ₩ | 51,956 | 91,746 | 71,985 | 87,661 | 173,583 | 78,008 |

9.  **Available-for-sale Financial Assets**

(1)  **Changes in available-for-sale financial assets for the years ended December 31, 2016 and 2017 are as follows:**

| | 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Disposal(*1) | Valuation | Impairment | Others | Ending balance |
| | In millions of won | | | | | | |
| Listed . . . . . . . . . . . . . . . . . ₩ | 196,579 | — | (3,398) | 74,139 | (9,122) | 9,973 | 268,171 |
| Unlisted . . . . . . . . . . . . . . . | 387,900 | 449,484 | (1,828) | (12,346) | (77,581) | 932 | 746,561 |
| | 584,479 | 449,484 | (5,226) | 61,793 | (86,703) | 10,905 | 1,014,732 |
| Short-term available-for-sale financial assets . . . . . . . . . | — | — | — | — | — | — | — |
| Long-term available-for-sale financial assets . . . . . . . . . ₩ | 584,479 | 449,484 | (5,226) | 61,793 | (86,703) | 10,905 | 1,014,732 |

(*1) The Company recognized gain and loss on disposal of available-for-sale financial assets amounted to ₩1,482 million and ₩9 million, respectively, from the sales of shares of Kwanglim Co., Ltd., TONGYANG Inc., TONGYANG networks Inc., Nexolon Co., Ltd. and SsangYong E&C Co., Ltd. and from the partial sales of IBK-AUCTUS Green Growth Private Equity Firm, Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 and Korea investment—Hanwha KT Master Lease Private Special Investment Trust for the year ended December 31, 2016.

| | 2017 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Disposal(*1) | Valuation | Impairment | Others | Ending balance |
| | In millions of won | | | | | | |
| Listed . . . . . . . . . . . . . . . . . ₩ | 268,171 | 106 | — | 8,156 | (97) | (1,883) | 274,453 |
| Unlisted . . . . . . . . . . . . . . . | 746,561 | 233,179 | (461,423) | (2,908) | (2,616) | (87,413) | 425,380 |
| | 1,014,732 | 233,285 | (461,423) | 5,248 | (2,713) | (89,296) | 699,833 |
| Short-term available-for-sale financial assets . . . . . . . . . | — | — | — | — | — | — | — |
| Long-term available-for-sale financial assets . . . . . . . . . ₩ | 1,014,732 | 233,285 | (461,423) | 5,248 | (2,713) | (89,296) | 699,833 |

(*1) The Company recognized gain and loss on disposal of available-for-sale financial assets amounted to ₩1,130 million and ₩2,343 million, respectively, from the partial sales of Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 and others for the year ended December 31, 2017.

F-53

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | In millions of won | | |
| **Listed** | | | | | |
| Korea District Heating Corp. . . . . . . . . . . | 2,264,068 | 19.55% | ₩ 173,201 | 154,183 | 154,183 |
| Ssangyong Motor Co., Ltd. . . . . . . . . . . . | 38,568 | 0.03% | 428 | 304 | 304 |
| Sungjee Construction. Co., Ltd. . . . . . . . . | 10,530 | 0.01% | 49 | 21 | 21 |
| Korea Line Corp. . . . . . . . . . . . . . . . . . . | 18 | 0.00% | 1 | — | — |
| Namkwang Engineering & Construction Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 46 | 0.00% | 15 | — | — |
| Pumyang Construction Co., Ltd. . . . . . . . | 7 | 0.00% | 2 | — | — |
| ELCOMTEC Co., Ltd. . . . . . . . . . . . . . . | 32,875 | 0.04% | 217 | 74 | 74 |
| PAN ocean Co., Ltd. . . . . . . . . . . . . . . . | 1,492 | 0.00% | 14 | 7 | 7 |
| Borneo International Furniture Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 64,037 | 0.28% | 97 | 103 | 103 |
| Dongbu Corporation . . . . . . . . . . . . . . . | 1,229 | 0.02% | 12 | 12 | 12 |
| PT Adaro Energy Tbk . . . . . . . . . . . . . . | 480,000,000 | 1.50% | 71,554 | 73,061 | 73,061 |
| Energy Fuels Inc. . . . . . . . . . . . . . . . . . | 1,711,814 | 2.59% | 16,819 | 3,385 | 3,385 |
| Baralaba Coal Company Limited(*6) . . . . | 99,763 | 0.07% | 18,445 | 42 | 42 |
| Denison Mines Corp. . . . . . . . . . . . . . . . | 58,284,000 | 10.93% | 84,134 | 36,504 | 36,504 |
| Fission 3.0 . . . . . . . . . . . . . . . . . . . . . . | 300,000 | 0.17% | — | 16 | 16 |
| Fission Uranium Corp. . . . . . . . . . . . . . . | 800,000 | 0.17% | 785 | 459 | 459 |
| | | | 365,773 | 268,171 | 268,171 |
| **Unlisted(*1)** | | | | | |
| K&C—Gyeongnam youth job creation Investment Fund . . . . . . . . . . . . . . . . . . | 24 | 10.00% | 1,207 | 1,207 | — |
| Korea investment—Korea EXIM Bank CERs Private Special Assets Investment Trust I . . . . . . . . . . . . . . . . . . . . . . . . | 1,758,731,002 | 14.18% | 1,752 | 571 | — |
| Troika Overseas Resource Development Private Equity Firm . . . . . . . . . . . . . . . | 13,340,012,100 | 3.66% | 13,340 | 1,553 | — |
| IBK-AUCTUS Green Growth Private Equity firm . . . . . . . . . . . . . . . . . . . . . | 152 | 6.29% | 41 | 41 | — |
| Global Dynasty Overseas Resource Development Private Equity Firm . . . . . | 2,233,407,439 | 7.46% | 2,233 | 2,233 | — |
| Intellectual Discovery, Ltd. . . . . . . . . . . . | 1,000,000 | 8.81% | 5,000 | 1,375 | — |
| Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 . . . . . . . . . . . . . . . . . . . . . . . | 4,256,096,329 | 5.00% | 4,389 | 4,389 | — |
| Construction Guarantee(*2) . . . . . . . . . . . | 571 | 0.02% | 601 | 819 | 819 |
| Plant & Mechanical Contractors Financial Cooperative of Korea . . . . . . . . . . . . . . | 50 | 0.01% | 36 | 36 | — |
| Fire Guarantee . . . . . . . . . . . . . . . . . . . | 40 | 0.02% | 20 | 20 | — |
| Korea Software Financial Cooperative . . . | 5,186 | 1.39% | 3,301 | 3,301 | — |
| Engineering Financial Cooperative . . . . . . | 486 | 0.05% | 60 | 60 | — |
| Electric Contractors Financial Cooperative . . . . . . . . . . . . . . . . . . . . | 800 | 0.03% | 152 | 152 | — |
| Korea Specialty Contractor Financial Cooperative . . . . . . . . . . . . . . . . . . . . | 476 | 0.01% | 417 | 417 | — |
| Information & Communication Financial Cooperative . . . . . . . . . . . . . . . . . . . . | 70 | 0.01% | 10 | 10 | — |
| Korea Electric Engineers Association . . . . | 400 | 0.24% | 40 | 40 | — |
| Korea investment—Investment Pool for Public funds 10(*5) . . . . . . . . . . . . . . . | — | — | 142,470 | 141,315 | 141,315 |

F-54

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | In millions of won | | |
| Samsung investment—Investment Pool for Public funds 2(*5) .................. | — | — | ₩ 213,710 | 211,920 | 211,920 |
| Samsung investment—Investment Pool for Public funds 1(*5) .................. | — | — | 53,220 | 53,212 | 53,212 |
| Korea investment—Hanwha KT Master Lease Private Special Investment Trust(*5) ........................... | — | — | 30,560 | 30,568 | 30,568 |
| Hwan Young Steel Co., Ltd. ........... | 10,916 | 0.14% | 1,092 | 97 | — |
| SAMBO AUTO. Co., Ltd. ............. | 15,066 | 0.02% | 38 | 38 | — |
| Mobo Co., Ltd. ...................... | 504 | 0.00% | 14 | 14 | — |
| HANKOOK Silicon Co., Ltd. .......... | 3,005,208 | 10.44% | 7,513 | 1,495 | — |
| Dae Kwang Semiconductor Co., Ltd. .... | 589 | 0.07% | 6 | 6 | — |
| Sanbon Department Store .............. | 828 | 0.01% | 124 | 3 | — |
| Miju Steel Mfg. Co., Ltd. ............. | 99,804 | 0.23% | 51 | 51 | — |
| BnB Sungwon Co., Ltd. .............. | 589 | 0.07% | 15 | 15 | — |
| Hana Civil Engineering Co., Ltd. ....... | 23 | 0.00% | 1 | 1 | — |
| KC Development Co., Ltd. ........... | 839 | 0.02% | 6 | 6 | — |
| IMHWA Corp. ...................... | 329 | 0.11% | 5 | 5 | — |
| DALIM Special Vehicle Co., Ltd. ....... | 58 | 0.08% | 10 | 10 | — |
| ASA JEONJU Co., Ltd. .............. | 34,846 | 1.34% | 697 | 69 | — |
| Moonkyung Silica Co., Ltd. ........... | 42 | 0.56% | — | — | — |
| Sungkwang Timber Co., Ltd. ........... | 9 | 0.34% | 4 | 4 | — |
| Yongbo Co., Ltd. .................... | 61 | 0.20% | 3 | 3 | — |
| HJ Steel Co., Ltd. ................... | 218 | 0.07% | 2 | 2 | — |
| KS Remicon Co., Ltd. ................ | 12 | 0.04% | 3 | 3 | — |
| SIN-E Steel Co., Ltd. ................ | 109 | 0.08% | 33 | 33 | — |
| Joongang Platec Co., Ltd. ............. | 3,591 | 0.75% | 72 | 35 | — |
| Pyungsan SI Ltd. .................... | 434 | 0.01% | 9 | 9 | — |
| Samgong Development Co., Ltd. ........ | 12 | 0.01% | 7 | 7 | — |
| Joongang Development Co., Ltd. ........ | 540 | 0.12% | 8 | 8 | — |
| AJS Co., Ltd. ....................... | 12,906 | 0.23% | 32 | 32 | — |
| SHIN-E B&P Co., Ltd. ............... | 119 | 0.13% | 10 | 10 | — |
| MSE Co., Ltd. ...................... | 429 | 0.13% | 9 | 9 | — |
| Ilrim Nano Tec Co., Ltd. ............. | 1,520 | 0.07% | 15 | 15 | — |
| Youngjin Hi-Tech Co., Ltd. ........... | 2,512 | 0.25% | 126 | 21 | — |
| Dong Woo International Co., Ltd. ....... | 90 | 0.37% | 18 | 18 | — |
| Buyoung Co., Ltd. ................... | 270 | 0.00% | 3 | 3 | — |
| Ilsuk Co., Ltd. ..................... | 152 | 0.17% | 10 | 10 | — |
| Dongyang Telecom Co., Ltd. ........... | 1,760 | 0.01% | 11 | 11 | — |
| Han Young Construction Co., Ltd. ...... | 35 | 0.03% | 3 | 3 | — |
| Jongwon Remicon Co., Ltd. ........... | 31 | 0.18% | 13 | 13 | — |
| Ace Heat Treating Co., Ltd. ........... | 477 | 1.43% | 72 | 72 | — |
| Zyle Daewoo Motor Sales Co., Ltd. ..... | 22 | 0.00% | — | — | — |
| Daewoo Development Co., Ltd. ......... | 8 | 0.00% | — | — | — |
| Seyang Inc. ......................... | 537 | 0.05% | 27 | 27 | — |
| Seungri Enterprise Co., Ltd. ........... | 93 | 0.05% | 3 | 3 | — |
| Onggane Food Co., Ltd ............... | 5 | 0.07% | 1 | 1 | — |
| Shin-E P&C Co., Ltd. ................ | 12 | 0.00% | 1 | 1 | — |
| Ejung Ad Co., Ltd. .................. | 132 | 0.09% | 3 | 3 | — |
| Solvus Co., Ltd. ..................... | 1,056 | 0.04% | 3 | 3 | — |
| Myung Co., Ltd. ..................... | 89 | 0.05% | 2 | 2 | — |
| Emotion Co., Ltd. ................... | 167 | 0.61% | 8 | 8 | — |
| Youngdong Concrete Co., Ltd. ......... | 32 | 0.32% | 7 | 7 | — |

F-55

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | In millions of won | | |
| Shinil Engineering Co., Ltd. . . . . . . . . . . . | 887 | 0.06% | ₩ 3 | 3 | — |
| Biwang Industry Co., Ltd . . . . . . . . . . . . . . | 406 | 0.04% | 2 | 2 | — |
| Huimun Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 263 | 0.26% | 4 | 4 | — |
| Young Sung Co., Ltd. . . . . . . . . . . . . . . . . | 89 | 0.40% | 27 | 27 | — |
| Yuil Industrial Electronics Co., Ltd. . . . . . | 804 | 0.32% | 16 | 16 | — |
| DN TEK Inc. . . . . . . . . . . . . . . . . . . . . . . . . | 12,401 | 0.29% | 62 | 6 | — |
| Daeyang F.M.S Corporation . . . . . . . . . . . | 593 | 0.40% | 23 | 23 | — |
| Kwang Jin Structure Co., Ltd. . . . . . . . . . . | 3,072 | 0.60% | 31 | 31 | — |
| Woojin Industry Corporation . . . . . . . . . . . | 3 | 0.00% | 16 | 16 | — |
| Kwang Sung Industry Co., Ltd. . . . . . . . . . | 325 | 0.35% | 7 | 7 | — |
| Futech Mold Co., Ltd. . . . . . . . . . . . . . . . . | 274 | 0.27% | 14 | 14 | — |
| Samcheonri Industrial Co., Ltd. . . . . . . . . | 533 | 0.98% | 13 | 13 | — |
| Woojoo Environment Ind. Co., Ltd. . . . . . | 101 | 0.11% | 13 | 13 | — |
| Cheongatti Co., Ltd. . . . . . . . . . . . . . . . . . . | 57 | 0.10% | 4 | 4 | — |
| Hyungji Esquire Co., Ltd. . . . . . . . . . . . . . | 55 | 0.02% | 22 | 22 | — |
| Kolmar Pharma Co., Ltd. . . . . . . . . . . . . . . | 1,426 | 0.01% | 52 | 3 | — |
| Morado Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 209 | 0.04% | 2 | 2 | — |
| Myung Sung Tex Co., Ltd. . . . . . . . . . . . . | 20 | 0.00% | 2 | 2 | — |
| Kwang Sung Co., Ltd. . . . . . . . . . . . . . . . . | 610 | 0.53% | 31 | 31 | — |
| EverTechno. Co.,Ltd. . . . . . . . . . . . . . . . . . | 29,424 | 0.73% | 147 | 7 | — |
| Autowel Co.,Ltd. . . . . . . . . . . . . . . . . . . . . | 260 | 0.38% | 13 | 13 | — |
| Woobang Construction Co., Ltd. . . . . . . . . | 8 | 0.00% | 8 | 8 | — |
| Shin Pyung Co., Ltd. . . . . . . . . . . . . . . . . . | 6 | 0.03% | 3 | 3 | — |
| JMC Heavy Industries Co., Ltd. . . . . . . . . | 2,724 | 0.10% | 27 | 27 | — |
| Najin Steel Co., Ltd. . . . . . . . . . . . . . . . . . | 37 | 0.06% | 5 | 5 | — |
| Sinkwang Industry Co., Ltd. . . . . . . . . . . . | 1,091 | 1.68% | 5 | 5 | — |
| Join Land Co., Ltd. . . . . . . . . . . . . . . . . . . | 33 | 0.00% | 1 | 1 | — |
| Crystal Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 22 | 0.07% | 2 | 2 | — |
| Elephant & Friends Co., Ltd. . . . . . . . . . . | 563 | 0.61% | 3 | 3 | — |
| Mireco Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 109 | 0.25% | 11 | 11 | — |
| L&K Industry Co., Ltd. . . . . . . . . . . . . . . . | 1,615 | 0.60% | 24 | 24 | — |
| JO Tech Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 1,263 | 0.62% | 25 | 25 | — |
| Kendae Printing Co., Ltd. . . . . . . . . . . . . . | 422 | 0.60% | 21 | 21 | — |
| Dauning Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 231 | 0.41% | 6 | 6 | — |
| Korea Trecision Co., Ltd. . . . . . . . . . . . . . | 22 | 0.45% | 5 | 5 | — |
| Ace Track Co., Ltd. . . . . . . . . . . . . . . . . . . | 3,130 | 1.08% | 219 | 59 | — |
| Taebok Machinery Co., Ltd. . . . . . . . . . . . | 109 | 1.08% | 11 | 11 | — |
| Yooah Industry Co., Ltd. . . . . . . . . . . . . . . | 130 | 0.02% | 13 | 13 | — |
| Yoo-A Construction Co., Ltd. . . . . . . . . . . | 105 | 0.20% | 11 | 11 | — |
| Dung Hwan Co., Ltd. . . . . . . . . . . . . . . . . . | 531 | 0.02% | 5 | 5 | — |
| Hurim Biocell Co., Ltd. . . . . . . . . . . . . . . . | 113 | 0.00% | 5 | 5 | — |
| P. J, Trading Co., Ltd. . . . . . . . . . . . . . . . . | 12 | 0.04% | — | — | — |
| Sunjin Power Tech Co., Ltd. . . . . . . . . . . . | 4,941 | 0.92% | 247 | 90 | — |
| Smart Power Co.,Ltd. . . . . . . . . . . . . . . . . . | 133,333 | 5.55% | 200 | 200 | — |
| Haseung Industries Co.,Ltd. . . . . . . . . . . . . | 55 | 0.62% | 28 | 28 | — |
| Beer Yeast Korea Inc. . . . . . . . . . . . . . . . . | 1,388 | 0.43% | 7 | 7 | — |
| Daeryung Corporation . . . . . . . . . . . . . . . . | 207 | 0.19% | 10 | 10 | — |
| Korea Bio Red Ginseng Co.,Ltd. . . . . . . . . | 194 | 0.09% | 10 | 10 | — |
| ENH Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 1,086 | 0.19% | 54 | 54 | — |
| OCO Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 123 | 0.37% | 11 | 11 | — |
| B CON Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . | 96 | 1.16% | 6 | 6 | — |
| Chunil Metal Co., Ltd. . . . . . . . . . . . . . . . . | 11 | 0.15% | 4 | 4 | — |
| Teakwang Tech Co., Ltd. . . . . . . . . . . . . . . | 2,460 | 0.11% | 12 | 12 | — |

F-56

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | In millions of won | | |
| SsangMa Machine Co., Ltd. . . . . . . . . . . . | 4 | 0.05% | ₩ 1 | 1 | — |
| SinJin Co., Ltd. . . . . . . . . . . . . . . . . . . | 233 | 0.30% | 9 | 9 | — |
| Ace Integration Co., Ltd . . . . . . . . . . . . . | 93 | 0.09% | 21 | 21 | — |
| AceInti Agricultural Co., Ltd. . . . . . . . . . | 3 | 0.00% | 1 | 1 | — |
| KyungDong Co., Ltd. . . . . . . . . . . . . . . . . | 130 | 0.01% | 1 | 1 | — |
| ChunWon Development Co., Ltd. . . . . . . . | 193 | 0.19% | 39 | 39 | — |
| WonIl Co., Ltd. . . . . . . . . . . . . . . . . . . . | 999 | 0.15% | 50 | 50 | — |
| SungLim Industrial Co., Ltd. . . . . . . . . . . | 29 | 0.03% | 1 | 1 | — |
| DaeHa Co., Ltd. . . . . . . . . . . . . . . . . . . . | 141 | 0.54% | 11 | 11 | — |
| Korea Minerals Co., Ltd. . . . . . . . . . . . . . | 191 | 0.05% | 135 | 135 | — |
| HyoDong Development Co., Ltd. . . . . . . . | 119 | 0.15% | 24 | 24 | — |
| Haspe Tech Co., Ltd. . . . . . . . . . . . . . . . . | 652 | 0.55% | 20 | 20 | — |
| JoHyun Co., Ltd. . . . . . . . . . . . . . . . . . . . | 350 | 1.56% | 18 | 18 | — |
| KC Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 5,107 | 0.17% | 3 | 3 | — |
| SeongJi Industrial Co.,Ltd. . . . . . . . . . . . | 41 | 0.05% | 1 | 1 | — |
| AREVA NC Expansion . . . . . . . . . . . . . . . | 1,077,124 | 13.49% | 288,443 | 98,472 | 98,472 |
| Navanakorn Electric Co., Ltd.(*3) . . . . . . . | 8,885,600 | 26.93% | 17,216 | 18,509 | — |
| PT. Kedap Saayq . . . . . . . . . . . . . . . . . . . | 671 | 10.00% | 18,540 | — | — |
| Set Holding(*4) . . . . . . . . . . . . . . . . . . . | 1,100,220 | 2.50% | 229,255 | 170,170 | 170,170 |
| PT. Cirebon Energi Prasarana . . . . . . . . . | 22,420 | 10.00% | 2,612 | 2,709 | — |
| | | | 1,040,553 | 746,561 | 706,476 |
| | | | ₩ 1,406,326 | 1,014,732 | 974,647 |

(*1) Investments in unlisted equity securities held by the Company for which a quoted market price does not exist in an active market and fair value cannot be measured reliably were measured at cost less impairment, if any.

(*2) The Company has estimated the fair value of the investment in Construction Guarantee based upon the price which would be applied when the investment is returned. The Company has recognized the difference between its fair value and book value as a gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2016.

(*3) Although the Company holds more than 20% of the equity shares of these investments, the Company cannot exercise significant influence.

(*4) The Company has estimated the fair value of Set Holding by using the discounted cash flow method and has recognized the difference between its fair value and book value as gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2016.

(*5) As of December 31, 2016, the Company invested in ₩437,015 million as beneficiary securities exclusively for payment of decommissioning cost of nuclear power plants. The Company has measured the fair value of the beneficiary securities based on its net asset value.

(*6) The number of shares owned has changed due to the stock merge (500:1) during the year ended December 31, 2016

F-57

|  | 2017 | | | | |
|---|---|---|---|---|---|
|  | Shares | Ownership | Acquisition cost | Book value | Fair value |
|  |  |  | In millions of won | | |
| **Listed** |  |  |  |  |  |
| Korea District Heating Corp. . . . . . . . . . . . . | 2,264,068 | 19.55% | ₩ 173,201 | 165,277 | 165,277 |
| Ssangyong Motor Co., Ltd. . . . . . . . . . . . . | 38,568 | 0.03% | 428 | 197 | 197 |
| Sungjee Construction. Co., Ltd. . . . . . . . . . . | 10,530 | 0.01% | 49 | 8 | 8 |
| Korea Line Corp. . . . . . . . . . . . . . . . . . . . | 18 | 0.00% | 1 | — | — |
| Namkwang Engineering & Construction Co., Ltd . . . . . . . . . . . . . . . . . . . . . . . . . | 46 | 0.00% | 15 | — | — |
| Pumyang Construction Co., Ltd.(*7) . . . . . . | 35 | 0.00% | 2 | — | — |
| ELCOMTEC Co., Ltd. . . . . . . . . . . . . . . . . | 32,875 | 0.04% | 217 | 72 | 72 |
| PAN ocean Co., Ltd. . . . . . . . . . . . . . . . . | 1,492 | 0.00% | 14 | 8 | 8 |
| Dongbu Corporation(*6) . . . . . . . . . . . . . . | 955 | 0.02% | 12 | 10 | 10 |
| KSP Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 6,324 | 0.08% | 24 | 24 | 24 |
| STX Heavy Industries Co., Ltd. . . . . . . . . . | 35,749 | 0.14% | 191 | 165 | 165 |
| PT Adaro Energy Tbk . . . . . . . . . . . . . . . . | 480,000,000 | 1.50% | 71,554 | 70,531 | 70,531 |
| Energy Fuels Inc. . . . . . . . . . . . . . . . . . . . | 1,711,814 | 2.38% | 16,819 | 3,300 | 3,300 |
| Baraluba Coal Company Limited . . . . . . . . | 99,763 | 0.07% | 18,445 | 22 | 22 |
| Denison Mines Corp. . . . . . . . . . . . . . . . . . | 58,284,000 | 10.42% | 84,134 | 34,292 | 34,292 |
| Fission 3.0 . . . . . . . . . . . . . . . . . . . . . . . | 300,000 | 0.14% | — | 15 | 15 |
| Fission Uranium Corp. . . . . . . . . . . . . . . . . | 800,000 | 0.16% | 785 | 532 | 532 |
|  |  |  | 365,891 | 274,453 | 274,453 |
| **Unlisted**(*1) |  |  |  |  |  |
| Korea investment—Korea EXIM Bank CERs Private Special Asset Investment Trust I . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,758,731,002 | 14.18% | 1,752 | 571 | — |
| Troika Overseas Resource Development Private Equity Firm . . . . . . . . . . . . . . . . . | 13,340,012,100 | 3.66% | 13,340 | 1,553 | — |
| IBK-AUCTUS Green Growth Private Equity Firm . . . . . . . . . . . . . . . . . . . . . . | 152 | 6.29% | 41 | 41 | — |
| Global Dynasty Overseas Resource Development Private Equity Firm . . . . . . | 2,242,437,289 | 7.46% | 2,242 | 2,242 | — |
| Intellectual Discovery, Ltd. . . . . . . . . . . . . . | 1,000,000 | 8.81% | 5,000 | 954 | — |
| Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,176,751,013 | 5.00% | 4,328 | 4,328 | — |
| Construction Guarantee(*2) . . . . . . . . . . . . | 571 | 0.02% | 601 | 833 | 833 |
| Plant & Mechanical Contractors Financial Cooperative of Korea . . . . . . . . . . . . . . . | 144 | 0.03% | 126 | 126 | — |
| Fire Guarantee . . . . . . . . . . . . . . . . . . . . . | 40 | 0.01% | 20 | 20 | — |
| Korea Software Financial Cooperative . . . . | 5,186 | 1.09% | 3,301 | 3,301 | — |
| Engineering Financial Cooperative . . . . . . . | 486 | 0.05% | 60 | 60 | — |
| Electric Contractors Financial Cooperative . . . . . . . . . . . . . . . . . . . . . . | 1,000 | 0.04% | 216 | 216 | — |
| Korea Specialty Contractor Financial Cooperative . . . . . . . . . . . . . . . . . . . . . . | 476 | 0.01% | 417 | 417 | — |
| Information & Communication Financial Cooperative . . . . . . . . . . . . . . . . . . . . . . | 121 | 0.02% | 26 | 26 | — |
| Korea Electric Engineers Association . . . . . | 400 | 0.24% | 40 | 40 | — |
| Samsung investment—Investment Pool for Public funds 1(*5) . . . . . . . . . . . . . . . . . | — | — | 53,220 | 53,739 | 53,739 |
| Korea investment—Hanwha KT Master Lease Private Special Investment Trust(*5) . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 26,586 | 26,591 | 26,591 |

F-58

| | 2017 | | | | |
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| --- | --- | --- | --- | --- | --- |
| | | | In millions of won | | |
| Kyobo Royal-Class Repo Plus Fixed Income 1Y 2nd (*5) .................. | — | — | ₩ 33,000 | 33,008 | 33,008 |
| Kyobo Royal-Class Repo Plus Fixed Income 2Y 1st (*5) ................. | — | — | 50,000 | 50,399 | 50,399 |
| Kyobo Royal-Class Repo Plus A1 ABCP 1Y (*5) ............................ | — | — | 50,000 | 50,419 | 50,419 |
| Hwan Young Steel Co., Ltd. ............. | 10,916 | 0.14% | 1,092 | 97 | — |
| SAMBO AUTO. Co., Ltd. ............... | 15,066 | 0.02% | 38 | 38 | — |
| Mobo Co., Ltd. ........................ | 504 | 0.00% | 14 | 14 | — |
| Dae Kwang Semiconductor Co., Ltd. ..... | 589 | 0.07% | 6 | 6 | — |
| Sanbon Department Store ............... | 828 | 0.01% | 124 | 3 | — |
| Miju Steel Mfg. Co., Ltd. .............. | 99,804 | 0.23% | 50 | 50 | — |
| Sungwon Co., Ltd. (formerly, BnB Sungwon Co., Ltd.) ................. | 589 | 0.07% | 15 | 15 | — |
| Hana Civil Engineering Co., Ltd. ........ | 23 | 0.00% | 1 | 1 | — |
| KC Development Co., Ltd. ............. | 839 | 0.02% | 6 | 6 | — |
| IMHWA Corp. ........................ | 329 | 0.11% | 5 | 5 | — |
| DALIM Special Vehicle Co., Ltd. ........ | 58 | 0.08% | 10 | 10 | — |
| ASA JEONJU Co., Ltd. ................. | 34,846 | 1.34% | 697 | 69 | — |
| Moonkyung Silica Co., Ltd. ............ | 42 | 0.56% | — | — | — |
| Sungkwang Timber Co., Ltd. ........... | 9 | 0.34% | 4 | 4 | — |
| Yongbo Co., Ltd. ..................... | 61 | 0.20% | 3 | 3 | — |
| HJ Steel Co., Ltd. .................... | 218 | 0.07% | 2 | 2 | — |
| KS Remicon Co., Ltd. ................. | 12 | 0.04% | 3 | 3 | — |
| Joongang Platec Co., Ltd. ............. | 3,591 | 0.75% | 72 | 35 | — |
| Pyungsan SI Ltd. ..................... | 434 | 0.01% | 9 | 9 | — |
| Samgong Development Co., Ltd. ........ | 12 | 0.01% | 7 | 7 | — |
| Joongang Development Co., Ltd. ........ | 540 | 0.12% | 8 | 8 | — |
| AJS Co., Ltd. ........................ | 12,906 | 0.23% | 32 | 32 | — |
| SHIN-E B&P Co., Ltd. ................ | 119 | 0.13% | 10 | 10 | — |
| MSE Co., Ltd. ....................... | 429 | 0.13% | 9 | 9 | — |
| Ilrim Nano Tec Co., Ltd. .............. | 1,520 | 0.07% | 15 | 15 | — |
| Youngjin Hi-Tech Co., Ltd. ............. | 2,512 | 0.25% | 126 | 21 | — |
| Buyoung Co., Ltd. .................... | 270 | 0.00% | 3 | 3 | — |
| Ilsuk Co., Ltd. ...................... | 152 | 0.17% | 10 | 10 | — |
| Dongyang Telecom Co., Ltd. ........... | 1,760 | 0.01% | 11 | 11 | — |
| Jongwon Remicon Co., Ltd. ............ | 31 | 0.18% | 13 | 13 | — |
| Ace Heat Treating Co., Ltd. ............ | 477 | 1.43% | 72 | 72 | — |
| Zyle Daewoo Motor Sales Co., Ltd. ...... | 22 | 0.00% | — | — | — |
| Daewoo Development Co., Ltd. ......... | 8 | 0.00% | — | — | — |
| Seyang Inc. ......................... | 537 | 0.05% | 27 | 27 | — |
| Seungri Enterprise Co., Ltd. ............ | 93 | 0.05% | 3 | 3 | — |
| Onggane Food Co., Ltd ................ | 5 | 0.07% | 1 | 1 | — |
| Shin-E P&C Co., Ltd. ................. | 12 | 0.00% | 1 | 1 | — |
| Ejung Ad Co., Ltd. ................... | 132 | 0.09% | 3 | 3 | — |
| Solvus Co., Ltd. ..................... | 1,056 | 0.04% | 3 | 3 | — |
| Myung Co., Ltd. ..................... | 89 | 0.05% | 2 | 2 | — |
| Shinil Engineering Co., Ltd. ............ | 887 | 0.06% | 3 | 3 | — |
| Biwang Industry Co., Ltd ............. | 406 | 0.04% | 2 | 2 | — |
| Huimun Co., Ltd. .................... | 263 | 0.26% | 4 | 4 | — |
| Young Sung Co., Ltd. ................. | 89 | 0.40% | 26 | 26 | — |
| Yuil Industrial Electronics Co., Ltd. ...... | 804 | 0.32% | 15 | 15 | — |
| DN TEK Inc. ........................ | 12,401 | 0.29% | 61 | 5 | — |

F-59

| | 2017 | | | | |
|---|---|---|---|---|---|
| | **Shares** | **Ownership** | **Acquisition cost** | **Book value** | **Fair value** |
| | | | In millions of won | | |
| Kwang Jin Structure Co., Ltd. . . . . . . . . . . | 3,072 | 0.60% | ₩ 31 | 31 | — |
| Woojin Industry Corporation . . . . . . . . . . | 3 | 0.00% | 16 | 16 | — |
| Kwang Sung Industry Co., Ltd. . . . . . . . . . | 325 | 0.35% | 7 | 7 | — |
| Futech Mold Co., Ltd. . . . . . . . . . . . . . . . . | 274 | 0.27% | 14 | 14 | — |
| Woojoo Environment Ind. Co., Ltd. . . . . . . | 101 | 0.11% | 13 | 13 | — |
| Cheongatti Co., Ltd. . . . . . . . . . . . . . . . . . | 57 | 0.10% | 4 | 4 | — |
| Hyungji Esquire Co., Ltd. . . . . . . . . . . . . . | 55 | 0.02% | 22 | 22 | — |
| Kolmar Pharma Co., Ltd. . . . . . . . . . . . . . | 1,426 | 0.01% | 52 | 3 | — |
| Morado Co., Ltd. . . . . . . . . . . . . . . . . . . . | 209 | 0.04% | 2 | 2 | — |
| Myung Sung Tex Co., Ltd. . . . . . . . . . . . . | 20 | 0.00% | 2 | 2 | — |
| Kwang Sung Co., Ltd. . . . . . . . . . . . . . . . . | 610 | 0.53% | 31 | 31 | — |
| EverTechno. Co.,Ltd. . . . . . . . . . . . . . . . . . | 29,424 | 0.73% | 148 | 7 | — |
| Autowel Co.,Ltd. . . . . . . . . . . . . . . . . . . . . | 260 | 0.38% | 14 | 14 | — |
| Woobang Construction Co., Ltd. . . . . . . . . | 8 | 0.00% | 8 | 8 | — |
| Shin Pyung Co., Ltd. . . . . . . . . . . . . . . . . . | 6 | 0.03% | 3 | 3 | — |
| JMC Heavy Industries Co., Ltd. . . . . . . . . | 2,724 | 0.10% | 27 | 27 | — |
| Najin Steel Co., Ltd. . . . . . . . . . . . . . . . . . | 37 | 0.06% | 5 | 5 | — |
| Sinkwang Industry Co., Ltd. . . . . . . . . . . . | 1,091 | 1.68% | 5 | 5 | — |
| Crystal Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 22 | 0.07% | 2 | 2 | — |
| Elephant & Friends Co., Ltd. . . . . . . . . . . . | 563 | 0.61% | 3 | 3 | — |
| Mireco Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 109 | 0.25% | 11 | 11 | — |
| L&K Industry Co., Ltd. . . . . . . . . . . . . . . . | 1,615 | 0.60% | 24 | 24 | — |
| JO Tech Co., Ltd. . . . . . . . . . . . . . . . . . . . | 1,263 | 0.62% | 25 | 25 | — |
| Kendae Printing Co., Ltd. . . . . . . . . . . . . . | 422 | 0.60% | 21 | 21 | — |
| Dauning Co., Ltd. . . . . . . . . . . . . . . . . . . . | 231 | 0.41% | 6 | 6 | — |
| Korea Trecision Co., Ltd. . . . . . . . . . . . . . | 22 | 0.45% | 5 | 5 | — |
| Ace Track Co., Ltd. . . . . . . . . . . . . . . . . . . | 3,130 | 1.08% | 219 | 59 | — |
| Taebok Machinery Co., Ltd. . . . . . . . . . . . | 109 | 1.08% | 11 | 11 | — |
| Yoo-A Construction Co., Ltd. . . . . . . . . . . | 105 | 0.20% | 11 | 11 | — |
| Dung Hwan Co., Ltd. . . . . . . . . . . . . . . . . | 531 | 0.02% | 5 | 5 | — |
| Hurim Biocell Co., Ltd. . . . . . . . . . . . . . . . | 113 | 0.00% | 5 | 5 | — |
| Sunjin Power Tech Co., Ltd. . . . . . . . . . . . | 4,941 | 0.92% | 247 | 32 | — |
| Smart Power Co.,Ltd. . . . . . . . . . . . . . . . . | 133,333 | 4.83% | 200 | 200 | — |
| Haseung Industries Co.,Ltd. . . . . . . . . . . . | 55 | 0.62% | 28 | 28 | — |
| Beer Yeast Korea Inc. . . . . . . . . . . . . . . . . | 1,388 | 0.43% | 7 | 7 | — |
| Daeryung Corporation . . . . . . . . . . . . . . . . | 207 | 0.19% | 10 | 10 | — |
| Korea Bio Red Ginseng Co.,Ltd. . . . . . . . . | 194 | 0.09% | 10 | 10 | — |
| ENH Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 1,086 | 0.19% | 54 | 54 | — |
| B CON Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . | 96 | 1.16% | 6 | 6 | — |
| Chunil Metal Co.,Ltd. . . . . . . . . . . . . . . . . | 11 | 0.15% | 4 | 4 | — |
| SsangMa Machine Co., Ltd. . . . . . . . . . . . . | 4 | 0.05% | 1 | 1 | — |
| SinJin Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 233 | 0.30% | 9 | 9 | — |
| Ace Integration Co., Ltd . . . . . . . . . . . . . . | 105 | 0.09% | 24 | 24 | — |
| AceInti Agricultural Co., Ltd. . . . . . . . . . . | 16 | 0.02% | 5 | 5 | — |
| KyungDong Co., Ltd. . . . . . . . . . . . . . . . . . | 130 | 0.01% | 1 | 1 | — |
| ChunWon Development Co., Ltd. . . . . . . . . | 193 | 0.19% | 39 | 39 | — |
| WonIl Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 999 | 0.15% | 50 | 50 | — |
| SungLim Industrial Co., Ltd. . . . . . . . . . . . | 29 | 0.03% | 1 | 1 | — |
| Korea Minerals Co., Ltd. . . . . . . . . . . . . . . | 191 | 0.05% | 134 | 1 | — |
| HyoDong Development Co., Ltd. . . . . . . . . | 119 | 0.15% | 24 | 24 | — |
| Haspe Tech Co., Ltd. . . . . . . . . . . . . . . . . . | 652 | 0.55% | 20 | 20 | — |
| JoHyun Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 350 | 1.56% | 18 | 18 | — |
| KC Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 5,107 | 0.17% | 3 | 3 | — |
| SeongJi Industrial Co.,Ltd. . . . . . . . . . . . . | 41 | 0.05% | 1 | 1 | — |

F-60

|  | 2017 | | | | |
|---|---|---|---|---|---|
|  | Shares | Ownership | Acquisition cost | Book value | Fair value |
|  |  |  | In millions of won | | |
| DongKwang SD, Inc. . . . . . . . . . . . . . . . . . | 524 | 0.23% | ₩ 13 | 13 | — |
| Dong Yang Metal Co., Ltd. . . . . . . . . . . . . | 2,951 | 1.97% | 15 | 15 | — |
| Seyang Precision Ind. Co., Ltd. . . . . . . . . . | 829 | 0.23% | 41 | 41 | — |
| Dooriwon Food System Co., Ltd. . . . . . . . | 13 | 0.27% | 1 | 1 | — |
| ShinShin Co., Ltd . . . . . . . . . . . . . . . . . . . | 339 | 1.12% | 17 | 17 | — |
| Kitorang Co., Ltd. . . . . . . . . . . . . . . . . . . | 165 | 0.24% | 49 | 49 | — |
| Sung Kwang Co., Ltd. . . . . . . . . . . . . . . . | 23 | 0.37% | 6 | 6 | — |
| Hyundai Metal Co., Ltd. . . . . . . . . . . . . . . | 3,757 | 5.60% | 1,416 | 1,416 | — |
| Shinheung petrol. Co. Ltd. . . . . . . . . . . . . | 699 | 0.14% | 7 | 7 | — |
| Force TEC Co., Ltd. . . . . . . . . . . . . . . . . | 3,501 | 0.02% | 18 | 18 | — |
| Haisung Industrial Systems Co., Ltd. . . . . . | 10,751 | 0.24% | 54 | 54 | — |
| Samsung Tech Co., Ltd. . . . . . . . . . . . . . . | 486 | 1.28% | 97 | 97 | — |
| Tae Hyung Co., Ltd. . . . . . . . . . . . . . . . . | 28 | 0.43% | 20 | 20 | — |
| Samyangplant Co., Ltd. . . . . . . . . . . . . . . . | 323 | 0.60% | 16 | 16 | — |
| Younil Metal Co., Ltd. . . . . . . . . . . . . . . . | 41 | 0.21% | 21 | 21 | — |
| Myungjin Tech Co., Ltd. . . . . . . . . . . . . . . | 20 | 0.54% | 4 | 4 | — |
| Hankook Machine Tools Co., Ltd. . . . . . . . | 719 | 0.14% | 72 | 72 | — |
| Hankook Precision Ind Co., Ltd. . . . . . . . . | 110 | 0.06% | 11 | 11 | — |
| Borneo International Furniture Co., Ltd. . . . | 64,037 | 0.28% | 97 | 14 | — |
| CJ Paradise Co.,Ltd . . . . . . . . . . . . . . . . . | 24 | 0.02% | 12 | 12 | — |
| Han Young Technology Company Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 35 | 0.00% | — | — | — |
| Jungdo Aluminium Co.,Ltd. . . . . . . . . . . . . | 8,527 | 0.35% | 128 | 128 | — |
| Ilheung Metal Co, Ltd. . . . . . . . . . . . . . . . | 280 | 0.83% | 28 | 28 | — |
| STX Offshore & Shipbuilding Co., Ltd . . . . | 8,622 | 0.25% | 1,078 | 1,078 | — |
| Ptotronics Co., Ltd. . . . . . . . . . . . . . . . . . | 151 | 0.07% | 2 | 2 | — |
| NFT Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 136 | 0.40% | 8 | 8 | — |
| Echoroba Co.,Ltd. . . . . . . . . . . . . . . . . . . | 157 | 0.02% | 3 | 3 | — |
| Hyundaitech Co.,Ltd. . . . . . . . . . . . . . . . . | 1,363 | 0.87% | 27 | 27 | — |
| Eco Alux Co.,Ltd. . . . . . . . . . . . . . . . . . . | 239 | 0.22% | 48 | 48 | — |
| Daekyung Industry Co.,Ltd. . . . . . . . . . . . . | 9,112 | 0.94% | 13 | 13 | — |
| Dasan Material Co.Ltd. . . . . . . . . . . . . . . . | 29 | 0.04% | — | — | — |
| Fish World Co.,Ltd. . . . . . . . . . . . . . . . . . | 47 | 0.21% | 2 | 2 | — |
| SG Shinsung Engineering and Construction Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 10 | 0.00% | 6 | 6 | — |
| Samdo Industry Electric Co.,Ltd. . . . . . . . . | 48 | 0.02% | 1 | 1 | — |
| Taejung Industries Co.,Ltd. . . . . . . . . . . . . | 9,268 | 0.30% | 5 | 5 | — |
| Shinsei Trading Co., Ltd. . . . . . . . . . . . . . | 64 | 0.72% | 1 | 1 | — |
| Dynamic Co., Ltd. . . . . . . . . . . . . . . . . . . | 111 | 0.19% | 3 | 3 | — |
| Green Alchemy Co.,Ltd. . . . . . . . . . . . . . . | 38,202 | 1.48% | 191 | 191 | — |
| IQ Power Asia Inc. . . . . . . . . . . . . . . . . . | 16,179 | 0.31% | 81 | 81 | — |
| Youone TBM Engineering & Construction Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 227,854 | 0.27% | 31 | 31 | — |
| KM Leatech . . . . . . . . . . . . . . . . . . . . . . | 1,648 | 0.98% | 8 | 8 | — |
| Wonil T&I Co., Ltd. . . . . . . . . . . . . . . . . | 229 | 0.17% | 23 | 23 | — |
| Semist Co.,Ltd. . . . . . . . . . . . . . . . . . . . . | 555 | 0.80% | 3 | 3 | — |
| DS POWER Co., Ltd.(*8) . . . . . . . . . . . . | 580,000 | 2.34% | 2,900 | 1,223 | 1,223 |
| Navanakorn Electric Co., Ltd.(*3) . . . . . . . | 4,442,800 | 26.93% | 17,216 | 16,410 | — |
| PT. Kedap Saayq . . . . . . . . . . . . . . . . . . . | 671 | 10.00% | 18,540 | | |
| Set Holding(*4) . . . . . . . . . . . . . . . . . . . . | 1,100,220 | 2.50% | 229,255 | 171,242 | 171,242 |
| PT. Cirebon Energi Prasarana . . . . . . . . . . | 22,420 | 10.00% | 2,612 | 2,401 | — |
|  |  |  | 522,782 | 425,380 | 387,454 |
|  |  |  | ₩ 888,673 | 699,833 | 661,907 |

F-61

(*1) Investments in unlisted equity securities held by the Company for which a quoted market price does not exist in an active market and fair value cannot be measured reliably were measured at cost less impairment, if any.

(*2) The Company has estimated the fair value of the investment in Construction Guarantee based upon the price which would be applied when the investment is returned. The Company has recognized the difference between its fair value and book value as a gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2017.

(*3) Although the Company holds more than 20% of the equity shares of these investments, the Company cannot exercise significant influence.

(*4) The Company has estimated the fair value of Set Holding by using the discounted cash flow method and has recognized the difference between its fair value and book value as gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2017.

(*5) As of December 31, 2017, the Company invested in ₩285,769 million as beneficiary securities exclusively for payment of decommissioning cost of nuclear power plants. The Company has measured the fair value of the beneficiary securities based on its net asset value.

(*6) The number of shares owned has changed due to the stock merge (9:7) during the year ended December 31, 2017.

(*7) The number of shares increased due to the stock split (5:1).

(*8) As described in note 17, this is reclassified to available-for-sale financial assets due to loss of significant influence of the Company.

## 10. Held-to-maturity Investments

### Held-to-maturity investments as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Beginning balance | Acquisition | Disposal | Others | Ending balance |
| | | In millions of won | | | | |
| Government bonds . . . . . . . . . . . . . . . | ₩ | 3,623 | 149 | (528) | — | 3,244 |
| | ₩ | 3,623 | 149 | (528) | — | 3,244 |
| Current . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 380 | — | (380) | 114 | 114 |
| Non-current . . . . . . . . . . . . . . . . . . . . | | 3,243 | 149 | (148) | (114) | 3,130 |

| | | 2017 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Beginning balance | Acquisition | Disposal | Others | Ending balance |
| | | In millions of won | | | | |
| Government bonds . . . . . . . . . . . . . . . | ₩ | 3,244 | 250 | (350) | — | 3,144 |
| | ₩ | 3,244 | 250 | (350) | — | 3,144 |
| Current . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 114 | — | (113) | 4 | 5 |
| Non-current . . . . . . . . . . . . . . . . . . . . | | 3,130 | 250 | (237) | (4) | 3,139 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**11. Derivatives**

**(1)  Derivatives as of December 31, 2016 and 2017 are as follows:**

|  | 2016 | | 2017 | |
|---|---|---|---|---|
|  | Current | Non-current | Current | Non-current |
|  | In millions of won | | | |
| **Derivative assets** | | | | |
| Currency forward . . . . . . . . . . . . . . . . ₩ | 8,370 | 32,806 | 45 | — |
| Currency swap . . . . . . . . . . . . . . . . . . . | 184,913 | 540,057 | 12 | 15,711 |
| Interest rate swap . . . . . . . . . . . . . . . . . | — | 4,705 | — | 2,697 |
| Others(*1) . . . . . . . . . . . . . . . . . . . . . . . | — | 10,523 | 12,878 | 1,283 |
|  ₩ | 193,283 | 588,091 | 12,935 | 19,691 |
| **Derivative liabilities** | | | | |
| Currency forward . . . . . . . . . . . . . . . . ₩ | 1,153 | 34 | 7,862 | 1,278 |
| Currency swap . . . . . . . . . . . . . . . . . . . | — | 56,612 | 61,997 | 296,098 |
| Interest rate swap . . . . . . . . . . . . . . . . . | 2,098 | 78,789 | 1,408 | 59,416 |
|  ₩ | 3,251 | 135,435 | 71,267 | 356,792 |

(*1) The Company has a put option to sell shares of DS POWER Co., Ltd, a related party of the Company, and the fair value of the option is recorded in 'Others'.

**(2)  Currency forward contracts which are not designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract Date | Maturity date | Contract amounts | | Contract exchange rate |
|---|---|---|---|---|---|
|  | | | Pay | Receive | |
|  | | In millions of won and thousands of foreign currencies | | | |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . . . . . | 2014.04.10 | 2021.07.12 | 55,120 | USD 52,000 | 1,060.00 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . . . . . | 2014.04.28 | 2021.07.12 | 50,784 | USD 48,000 | 1,058.00 |
| Bank of America . . . . . . . . . . . . . . . . . . . . . . . | 2014.04.29 | 2021.07.12 | 105,400 | USD 100,000 | 1,054.00 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . . . . . | 2014.05.09 | 2021.07.12 | 104,600 | USD 100,000 | 1,046.00 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.22 | 2021.07.12 | 105,079 | USD 100,000 | 1,050.79 |
| Korea Development Bank . . . . . . . . . . . . . . . . | 2017.12.27 | 2021.07.12 | 104,849 | USD 100,000 | 1,048.49 |
| CCB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.07 | 2018.01.11 | 10,921 | USD 10,000 | 1,092.14 |
| Morgan Stanley . . . . . . . . . . . . . . . . . . . . . . . . | 2017.11.27 | 2018.01.03 | 5,439 | USD 5,000 | 1,087.70 |
| Mizuho Bank . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.11.29 | 2018.01.05 | 5,402 | USD 5,000 | 1,080.32 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . . . . . | 2017.11.30 | 2018.01.08 | 5,437 | USD 5,000 | 1,087.35 |
| Mizuho Bank . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.05 | 2018.01.09 | 5,416 | USD 5,000 | 1,083.20 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.11 | 2018.01.12 | 10,922 | USD 10,000 | 1,092.20 |
| Kookmin Bank . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.12 | 2018.01.15 | 3,270 | USD 3,000 | 1,090.15 |
| Kookmin Bank . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.13 | 2018.01.16 | 10,906 | USD 10,000 | 1,090.55 |
| Credit Suisse . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.14 | 2018.01.17 | 10,858 | USD 10,000 | 1,085.80 |
| Standard Chartered . . . . . . . . . . . . . . . . . . . . . | 2017.12.14 | 2018.01.18 | 10,858 | USD 10,000 | 1,085.80 |
| Morgan Stanley . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.15 | 2018.01.19 | 10,884 | USD 10,000 | 1,088.39 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.18 | 2018.01.22 | 10,881 | USD 10,000 | 1,088.14 |
| Standard Chartered . . . . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.01.22 | 5,413 | USD 5,000 | 1,082.60 |
| Mizuho Bank . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.21 | 2018.01.26 | 10,802 | USD 10,000 | 1,080.20 |
| Credit Suisse . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.22 | 2018.01.26 | 10,778 | USD 10,000 | 1,077.75 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.28 | 2018.01.29 | 10,716 | USD 10,000 | 1,071.55 |
| CCB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.28 | 2018.01.30 | 10,706 | USD 10,000 | 1,070.60 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.29 | 2018.02.05 | 10,679 | USD 10,000 | 1,067.90 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.05 | 2018.01.05 | 2,170 | USD 2,000 | 1,084.92 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.05 | 2018.01.05 | 2,164 | USD 2,000 | 1,082.02 |

F-63

| Counterparty | Contract Date | Maturity date | Contract amounts | | Contract exchange rate |
|---|---|---|---|---|---|
| | | | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.07 | 2018.01.05 | 6,551 | USD 6,000 | 1,091.77 |
| Korea Development Bank . . . . . . . . . . . . . | 2017.12.14 | 2018.01.10 | 11,950 | USD 11,000 | 1,086.35 |
| Societe Generale . . . . . . . . . . . . . . . . . . | 2017.12.14 | 2018.01.10 | 10,865 | USD 10,000 | 1,086.45 |
| BTMU . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.01.16 | 11,906 | USD 11,000 | 1,082.35 |
| Korea Development Bank . . . . . . . . . . . . . | 2017.12.20 | 2018.01.16 | 15,130 | USD 14,000 | 1,080.70 |
| CCB . . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.21 | 2018.01.23 | 11,880 | USD 11,000 | 1,080.00 |
| Korea Development Bank . . . . . . . . . . . . . | 2017.12.28 | 2018.01.31 | 11,782 | USD 11,000 | 1,071.10 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.28 | 2018.01.23 | 33,209 | USD 31,000 | 1,071.25 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . | 2017.12.28 | 2018.01.23 | 10,712 | USD 10,000 | 1,071.15 |
| BTMU . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.28 | 2018.01.31 | 10,712 | USD 10,000 | 1,071.20 |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . | 2017.11.15 | 2018.01.17 | 3,713 | USD 3,349 | 1,108.60 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.11.15 | 2018.01.22 | 8,837 | USD 8,000 | 1,104.60 |
| BTMU . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.11.29 | 2018.02.01 | 7,568 | USD 7,000 | 1,081.20 |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . | 2017.11.29 | 2018.02.01 | 7,557 | USD 7,000 | 1,079.60 |
| Credit Agricole . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.01.22 | 5,429 | USD 5,000 | 1,085.75 |
| BTMU . . . . . . . . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.02.22 | 10,822 | USD 10,000 | 1,082.18 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.01.22 | 2,879 | USD 2,661 | 1,082.00 |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.01.22 | 5,406 | USD 5,000 | 1,081.10 |
| Nonghyup Bank . . . . . . . . . . . . . . . . . . | 2017.12.21 | 2018.01.23 | 6,467 | USD 6,000 | 1,077.90 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.27 | 2018.01.29 | 5,366 | USD 5,000 | 1,073.15 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.27 | 2018.01.05 | 5,373 | USD 5,000 | 1,074.50 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . | 2017.11.23 | 2018.01.11 | 9,237 | USD 8,500 | 1,086.76 |
| Standard Chartered . . . . . . . . . . . . . . . . | 2017.12.13 | 2018.01.15 | 5,454 | USD 5,000 | 1,090.70 |
| Standard Chartered . . . . . . . . . . . . . . . . | 2017.12.08 | 2018.01.25 | 10,921 | USD 10,000 | 1,092.05 |
| Standard Chartered . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.21 | 5,610 | USD 5,000 | 1,122.00 |
| Standard Chartered . . . . . . . . . . . . . . . . | 2017.11.29 | 2018.02.21 | 7,572 | USD 7,000 | 1,081.65 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.03.22 | 3,978 | USD 3,682 | 1,080.55 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.03.22 | 5,399 | USD 5,000 | 1,079.75 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.03.22 | 5,393 | USD 5,000 | 1,078.55 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.20 | 2018.03.22 | 5,393 | USD 5,000 | 1,078.65 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.14 | 2018.03.19 | 205 | USD 189 | 1,084.50 |
| Standard Chartered . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 3,164 | USD 2,918 | 1,084.20 |
| Societe Generale . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 1,177 | USD 1,087 | 1,082.90 |
| Societe Generale . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 5,418 | USD 5,000 | 1,083.60 |
| Societe Generale . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 5,421 | USD 5,000 | 1,084.20 |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 5,413 | USD 5,000 | 1,082.60 |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 5,419 | USD 5,000 | 1,083.70 |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 5,422 | USD 5,000 | 1,084.30 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 5,427 | USD 5,000 | 1,085.40 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.19 | 2018.03.21 | 5,430 | USD 5,000 | 1,085.90 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.12.14 | 2018.03.19 | 5,428 | USD 5,000 | 1,085.50 |
| Standard Chartered . . . . . . . . . . . . . . . . | 2017.12.14 | 2018.03.19 | 5,428 | USD 5,000 | 1,085.50 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.11.21 | 2018.02.26 | 5,266 | USD 4,826 | 1,091.10 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.11.21 | 2018.02.26 | 5,461 | USD 5,000 | 1,092.10 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.11.15 | 2018.02.21 | 1,755 | USD 1,587 | 1,106.10 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.11.15 | 2018.02.21 | 5,536 | USD 5,000 | 1,107.10 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.11.15 | 2018.02.21 | 4,462 | USD 4,027 | 1,108.10 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.06 | 711 | USD 638 | 1,112.80 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.05 | 194 | USD 173 | 1,117.80 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.05 | 5,594 | USD 5,000 | 1,118.80 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.02 | 5,604 | USD 5,000 | 1,120.80 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.02 | 5,599 | USD 5,000 | 1,119.80 |
| Nomura . . . . . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.02 | 5,602 | USD 5,000 | 1,120.40 |

F-64

| Counterparty | Contract Date | Maturity date | Contract amounts | | Contract exchange rate |
|---|---|---|---|---|---|
| | | | Pay | Receive | |
| | | | In millions of won and thousands of foreign currencies | | |
| Credit Agricole . . . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.02 | 5,604 | USD 5,000 | 1,120.70 |
| Credit Agricole . . . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.02 | 5,599 | USD 5,000 | 1,119.70 |
| Standard Chartered . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.02 | 5,604 | USD 5,000 | 1,120.70 |
| Standard Chartered . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.02 | 5,393 | USD 4,817 | 1,119.70 |
| Societe Generale . . . . . . . . . . . . . . . . . . . . | 2017.10.31 | 2018.02.02 | 861 | USD 768 | 1,120.80 |
| Nova Scotia . . . . . . . . . . . . . . . . . . . . . . . . | 2017.10.26 | 2018.01.30 | 923 | USD 822 | 1,123.40 |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . . . . | 2017.10.13 | 2018.01.18 | 652 | USD 579 | 1,125.60 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . . | 2017.11.27 | 2018.11.26 | JPY 40,000 | 398 | 9.94 |

**(3) Currency swap contracts which are not designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract year | Contract amount | | Contract interest rate | | Contract exchange rate |
|---|---|---|---|---|---|---|
| | | Pay | Receive | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | | |
| Deutsche Bank . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 110,412 | JPY 10,000,000 | 6.21% | 4.19% | 11.04 |
| IBK . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 111,800 | USD 100,000 | 3.16% | 2.79% | 1,118.00 |
| Bank of America . . . . . . . . . . . . . . . . . . . | 2013~2018 | 103,580 | JPY 10,000,000 | 7.05% | 4.19% | 10.36 |
| Credit Suisse . . . . . . . . . . . . . . . . . . . . . | 2014~2019 | 118,632 | CHF 100,000 | 2.98% | 1.50% | 1,186.32 |
| Standard Chartered . . . . . . . . . . . . . . . . . | 2014~2019 | 114,903 | CHF 100,000 | 4.00% | 1.50% | 1,149.03 |
| Standard Chartered . . . . . . . . . . . . . . . . . | 2014~2029 | 102,470 | USD 100,000 | 3.14% | 3.57% | 1,024.70 |
| Societe Generale . . . . . . . . . . . . . . . . . . . | 2014~2024 | 105,017 | USD 100,000 | 4.92% | 5.13% | 1,050.17 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . | 2015~2024 | 107,970 | USD 100,000 | 4.75% | 5.13% | 1,079.70 |
| Credit Agricole . . . . . . . . . . . . . . . . . . . | 2015~2024 | 94,219 | USD 86,920 | 4.85% | 5.13% | 1,083.97 |
| Citibank . . . . . . . . . . . . . . . . . . . . . . . . | 2012~2022 | 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| JP Morgan . . . . . . . . . . . . . . . . . . . . . . . | 2012~2022 | 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| Bank of America . . . . . . . . . . . . . . . . . . . | 2012~2022 | 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| Shinhan Bank . . . . . . . . . . . . . . . . . . . . . | 2016~2022 | 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| HSBC . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2012~2022 | 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . | 2012~2022 | 111,770 | USD 100,000 | 2.87% | 3.00% | 1,117.70 |
| Standard Chartered . . . . . . . . . . . . . . . . . | 2012~2022 | 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| Deutsche Bank . . . . . . . . . . . . . . . . . . . . | 2012~2022 | 55,885 | USD 50,000 | 2.79% | 3.00% | 1,117.70 |
| DBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 108,140 | USD 100,000 | 2.63% | 3M Libor+0.84% | 1,081.40 |
| DBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 108,140 | USD 100,000 | 2.57% | 3M Libor+0.84% | 1,081.40 |
| DBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 108,140 | USD 100,000 | 2.57% | 3M Libor+0.84% | 1,081.40 |
| HSBC . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 107,450 | USD 100,000 | 3.41% | 2.88% | 1,074.50 |
| Standard Chartered . . . . . . . . . . . . . . . . . | 2013~2018 | 107,450 | USD 100,000 | 3.44% | 2.88% | 1,074.50 |
| JP Morgan . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 107,450 | USD 100,000 | 3.48% | 2.88% | 1,074.50 |
| Bank of America . . . . . . . . . . . . . . . . . . . | 2014~2018 | 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| Citibank . . . . . . . . . . . . . . . . . . . . . . . . | 2014~2018 | 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| HSBC . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2014~2019 | 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| Standard Chartered . . . . . . . . . . . . . . . . . | 2014~2019 | 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| Korea Development Bank . . . . . . . . . . . | 2016~2019 | 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| Nomura . . . . . . . . . . . . . . . . . . . . . . . . . | 2015~2025 | 111,190 | USD 100,000 | 2.60% | 3.25% | 1,111.90 |
| Korea Development Bank . . . . . . . . . . . | 2015~2025 | 111,190 | USD 100,000 | 2.62% | 3.25% | 1,111.90 |
| Woori Bank . . . . . . . . . . . . . . . . . . . . . . | 2015~2025 | 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . | 2015~2025 | 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| Woori Bank . . . . . . . . . . . . . . . . . . . . . . | 2017~2027 | 111,610 | USD 100,000 | 2.25% | 3.13% | 1,116.10 |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . | 2017~2027 | 111,610 | USD 100,000 | 2.31% | 3.13% | 1,116.10 |
| Korea Development Bank . . . . . . . . . . . | 2017~2027 | 111,610 | USD 100,000 | 2.31% | 3.13% | 1,116.10 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**(4)** **Currency swap contracts which are designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract year | Contract amount | | Contract interest rate | | Contract exchange rate |
|---|---|---|---|---|---|---|
| | | Pay | Receive | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | | |
| Citibank . . . . . . . . . . . . . . . . | 2013~2018 | 54,570 | USD 50,000 | 2.90% | 3M Libor+1.01% | 1,091.40 |
| Standard Chartered . . . . . . . . | 2013~2018 | 54,570 | USD 50,000 | 2.90% | 3M Libor+1.01% | 1,091.40 |
| Credit Suisse . . . . . . . . . . . . | 2013~2018 | 111,410 | USD 100,000 | 3.22% | 3M Libor+1.50% | 1,114.10 |
| HSBC . . . . . . . . . . . . . . . . . | 2014~2020 | 99,901 | AUD 100,000 | 3.52% | 5.75% | 999.01 |
| HSBC . . . . . . . . . . . . . . . . . | 2014~2020 | 100,482 | AUD 100,000 | 3.48% | 5.75% | 1,004.82 |
| Standard Chartered . . . . . . . . | 2013~2020 | USD 117,250 | AUD 125,000 | 3M Libor+1.25% | 5.75% | 0.94 |
| Standard Chartered . . . . . . . . | 2014~2020 | 126,032 | USD 117,250 | 3.55% | 3M Libor+1.25% | 1,074.90 |
| Korea Development Bank . . . . | 2017~2020 | 114,580 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| KEB Hana Bank . . . . . . . . . . | 2017~2020 | 114,580 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| Export-import bank of Korea . . . . . . . . . . . . . . . . | 2017~2020 | 114,580 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| JP Morgan . . . . . . . . . . . . . . | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Morgan Stanley . . . . . . . . . . . | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Deutsche Bank . . . . . . . . . . . | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Korea Development Bank . . . . | 2016~2021 | 121,000 | USD 100,000 | 2.15% | 2.50% | 1,210.00 |
| Morgan Stanley . . . . . . . . . . . | 2016~2021 | 121,000 | USD 100,000 | 3M Libor+2.10% | 2.50% | 1,210.00 |
| BNP Paribas . . . . . . . . . . . . . | 2016~2021 | 121,000 | USD 100,000 | 3M Libor+2.10% | 2.50% | 1,210.00 |
| Nomura . . . . . . . . . . . . . . . . . | 2017~2037 | 52,457 | EUR 40,000 | 2.60% | 1.70% | 1,311.42 |
| Nomura . . . . . . . . . . . . . . . . . | 2017~2037 | 59,423 | SEK 450,000 | 2.62% | 2.36% | 132.05 |
| Credit Agricole . . . . . . . . . . . | 2013~2019 | 118,343 | CHF 100,000 | 3.47% | 1.63% | 1,183.43 |
| Morgan Stanley . . . . . . . . . . . | 2013~2019 | 59,172 | CHF 50,000 | 3.40% | 1.63% | 1,183.43 |
| Nomura . . . . . . . . . . . . . . . . . | 2013~2019 | 59,172 | CHF 50,000 | 3.47% | 1.63% | 1,183.43 |
| Morgan Stanley . . . . . . . . . . . | 2013~2018 | 107,360 | USD 100,000 | 3.27% | 2.88% | 1,073.60 |
| Credit Agricole . . . . . . . . . . . | 2013~2018 | 107,360 | USD 100,000 | 3.34% | 2.88% | 1,073.60 |
| JP Morgan . . . . . . . . . . . . . . | 2013~2018 | 161,040 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| Standard Chartered . . . . . . . . | 2013~2018 | 161,040 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| Standard Chartered . . . . . . . . | 2014~2019 | 104,490 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| Credit Agricole . . . . . . . . . . . | 2014~2019 | 104,490 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| Morgan Stanley . . . . . . . . . . . | 2014~2019 | 104,490 | USD 100,000 | 2.70% | 2.63% | 1,044.90 |
| Standard Chartered . . . . . . . . | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Credit Agricole . . . . . . . . . . . | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Deutsche Bank . . . . . . . . . . . | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Citibank . . . . . . . . . . . . . . . . | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Societe Generale . . . . . . . . . . | 2013~2018 | 106,190 | USD 100,000 | 3.48% | 2.63% | 1,061.90 |
| BNP Paribas . . . . . . . . . . . . . | 2013~2018 | 53,095 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| KEB Hana Bank . . . . . . . . . . | 2013~2018 | 53,095 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| Standard Chartered . . . . . . . . | 2013~2018 | 106,030 | USD 100,000 | 3.48% | 2.63% | 1,060.30 |
| BNP Paribas . . . . . . . . . . . . . | 2013~2018 | 53,015 | USD 50,000 | 3.48% | 2.63% | 1,060.30 |
| KEB Hana Bank . . . . . . . . . . | 2013~2018 | 31,809 | USD 30,000 | 3.48% | 2.63% | 1,060.30 |
| Societe Generale . . . . . . . . . . | 2013~2018 | 21,206 | USD 20,000 | 3.48% | 2.63% | 1,060.30 |
| HSBC . . . . . . . . . . . . . . . . . | 2013~2018 | 53,015 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| Nomura . . . . . . . . . . . . . . . . . | 2013~2018 | 53,015 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| Credit Agricole . . . . . . . . . . . | 2014~2020 | 110,680 | USD 100,000 | 2.29% | 2.50% | 1,106.80 |
| Societe Generale . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| KEB Hana Bank . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| KEB Hana Bank . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| Standard Chartered . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| HSBC . . . . . . . . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| Nomura . . . . . . . . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| BNP Paribas . . . . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |

F-66

| Counterparty | Contract year | Contract amount | | Contract interest rate | | Contract exchange rate |
|---|---|---|---|---|---|---|
| | | Pay | Receive | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | | |
| HSBC . . . . . . . . . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| KEB Hana Bank . . . . . . . . . . . . . | 2017~2022 | 226,600 | USD 200,000 | 1.94% | 2.63% | 1,133.00 |
| Korea Development Bank . . . . | 2017~2022 | 113,300 | USD 100,000 | 1.94% | 2.63% | 1,133.00 |
| Nomura . . . . . . . . . . . . . . . . | 2017~2022 | 113,300 | USD 100,000 | 1.95% | 2.63% | 1,133.00 |
| Woori Bank . . . . . . . . . . . . . . | 2017~2022 | 56,650 | USD 50,000 | 1.95% | 2.63% | 1,133.00 |
| Kookmin Bank . . . . . . . . . . . | 2017~2022 | 56,650 | USD 50,000 | 1.95% | 2.63% | 1,133.00 |

(5) **Interest rate swap contracts which are not designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract year | Contract amount | Contract interest rate per annum | |
|---|---|---|---|---|
| | | | Pay | Receive |
| | | In millions of won | | |
| JP Morgan . . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | ₩150,000 | 3.58% | 3M CD+0.31% |
| Credit Suisse . . . . . . . . . . . . . . . . . . . . . . | 2014~2018 | 25,000 | 2.98% | 1Y CMT+0.31% |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . | 2017~2022 | 100,000 | 2.01% | 3M CD+0.24% |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . | 2017~2022 | 100,000 | 2.06% | 3M CD+0.27% |
| Nomura(*1) . . . . . . . . . . . . . . . . . . . . . . | 2017~2037 | 30,000 | 2.05% | 3.08% |
| KEB Hana Bank . . . . . . . . . . . . . . . . . . . . | 2017~2021 | 200,000 | 2.45% | 3M CD+0.32% |
| Export-import bank of Korea . . . . . . . . . . . | 2015~2031 | USD 15,893 | 2.67% | 6M USD Libor |
| ING Bank . . . . . . . . . . . . . . . . . . . . . . . . | 2015~2031 | USD 7,861 | 2.67% | 6M USD Libor |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . . . | 2015~2031 | USD 7,861 | 2.67% | 6M USD Libor |

(*1) 2.05% of the contract interest rate for paying is applied for five years from the date of issuance, and 3M CD + 0.10% is applied thereafter.

(6) **Interest rate swap contracts which are designated as hedge instruments as of December 31, 2017 are as follows:**

| Counterparty | Contract year | Contract amount | Contract interest rate per annum | |
|---|---|---|---|---|
| | | | Pay | Receive |
| | | In millions of won | | |
| BNP Paribas . . . . . . . . . . . . . . . . | 2009~2027 | USD 92,120 | 4.16% | 6M USD Libor |
| KFW . . . . . . . . . . . . . . . . . . . . . . . | 2009~2027 | USD 92,120 | 4.16% | 6M USD Libor |
| Credit Agricole . . . . . . . . . . . . . . . | 2016~2033 | USD 96,297 | 3.98% ~ 4.10% | 6M USD Libor |
| SMBC . . . . . . . . . . . . . . . . . . . . . | 2016~2033 | USD 125,927 | 4.05% ~ 4.18% | 6M USD Libor |
| Mizuho Bank . . . . . . . . . . . . . . . | 2016~2019 | USD 36,890 | 1.56% | 1.35% |
| SMBC . . . . . . . . . . . . . . . . . . . . . | 2016~2019 | USD 36,890 | 1.56% | 1.35% |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(7)  Gain and loss on valuation and transaction of derivatives for the years ended December 31, 2016 and 2017 are as follows and included in finance income and costs in the consolidated statements of comprehensive income (loss):

| | Net income effects of valuation gain (loss) | | | Net income effects of transaction gain (loss) | | | Accumulated other comprehensive income (loss) (*) | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 |
| | In millions of won | | | | | | | | |
| Currency forward ..... ₩ | 357 | 15,993 | (41,889) | 8,523 | 4,266 | (28,223) | — | | — |
| Currency swap ....... | 431,565 | 253,035 | (843,747) | 75,752 | (68,266) | (137,376) | (6,926) | 40,031 | 26,810 |
| Interest rate swap ..... | 161,609 | 8,517 | 6,909 | 30,314 | 7,562 | (3,362) | 4,082 | 6,719 | 5,074 |
| Other derivatives ...... | — | 10,523 | 4,060 | — | — | — | — | — | — |
| ₩ | 593,531 | 288,068 | (874,667) | 114,589 | (56,438) | (168,961) | (2,844) | 46,750 | 31,884 |

(*)  For the year ended December 31, 2017, the net gain on valuation of derivatives applying cash flow hedge accounting of ₩20,868 million, net of tax, is included in other comprehensive income or loss.

## 12.  Other Financial Assets

(1)  Other financial assets as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | 2017 | |
| --- | --- | --- | --- | --- | --- |
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| Loans and receivables ........................ ₩ | | 198,133 | 683,353 | 244,309 | 711,069 |
| Allowance for doubtful accounts .............. | | — | (4,532) | — | (8,948) |
| Present value discount ........................ | | (1,001) | (41,746) | (976) | (39,813) |
| Long / short-term financial instruments .......... | | 2,281,460 | 414,466 | 1,702,084 | 542,430 |
| Financial assets at fair value through profit or loss .... | | — | — | — | 111,512 |
| ₩ | | 2,478,592 | 1,051,541 | 1,945,417 | 1,316,250 |

(2)  Loans and receivables as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | | |
| --- | --- | --- | --- | --- | --- |
| | | Face value | Allowance for doubtful accounts | Present value discount | Book value |
| | | In millions of won | | | |
| **Short-term loans and receivables** | | | | | |
| Loans for tuition ................. ₩ | | 29,028 | — | (1,001) | 28,027 |
| Loans for housing ................ | | 12,556 | — | — | 12,556 |
| Fisheries loan ................... | | 352 | — | — | 352 |
| Other loans ..................... | | 156,197 | — | — | 156,197 |
| | | 198,133 | — | (1,001) | 197,132 |
| **Long-term loans and receivables** | | | | | |
| Loans for tuition ................. | | 404,200 | — | (41,593) | 362,607 |
| Loans for housing ................ | | 125,850 | — | — | 125,850 |
| Loans for related parties ........... | | 91,249 | (4,532) | — | 86,717 |
| Fisheries loan ................... | | 1,312 | — | (153) | 1,159 |
| Other loans ..................... | | 60,742 | — | — | 60,742 |
| | | 683,353 | (4,532) | (41,746) | 637,075 |
| ₩ | | 881,486 | (4,532) | (42,747) | 834,207 |

F-68

|  |  | 2017 | | | |
|---|---|---|---|---|---|
|  |  | Face value | Allowance for doubtful accounts | Present value discount | Book value |
|  |  | In millions of won | | | |
| **Short-term loans and receivables** | | | | | |
| Loans for tuition . . . . . . . . . . . . . . . . | ₩ | 33,763 | — | (976) | 32,787 |
| Loans for housing . . . . . . . . . . . . . . . | | 14,126 | — | — | 14,126 |
| Fisheries loan . . . . . . . . . . . . . . . . . . | | 352 | — | — | 352 |
| Other loans . . . . . . . . . . . . . . . . . . . | | 196,068 | — | — | 196,068 |
| | | 244,309 | — | (976) | 243,333 |
| **Long-term loans and receivables** | | | | | |
| Loans for tuition . . . . . . . . . . . . . . . . | | 408,803 | — | (39,716) | 369,087 |
| Loans for housing . . . . . . . . . . . . . . . | | 140,452 | — | — | 140,452 |
| Loans for related parties . . . . . . . . . . | | 94,581 | (8,948) | — | 85,633 |
| Fisheries loan . . . . . . . . . . . . . . . . . . | | 960 | — | (97) | 863 |
| Other loans . . . . . . . . . . . . . . . . . . . | | 66,273 | — | — | 66,273 |
| | | 711,069 | (8,948) | (39,813) | 662,308 |
| | ₩ | 955,378 | (8,948) | (40,789) | 905,641 |

(3) Changes in the allowance for doubtful accounts of loans and receivables for the year ended December 31, 2017 is as follows:

|  |  | 2017 |
|---|---|---|
|  |  | In millions of won |
| **Beginning balance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 4,532 |
| Bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 2,465 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,951 |
| **Ending balance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 8,948 |

(4) Long-term and short-term financial instruments as of December 31, 2016 and 2017 are as follows:

|  |  | 2016 | | 2017 | |
|---|---|---|---|---|---|
|  |  | Current | Non-current | Current | Non-current |
|  |  | In millions of won | | | |
| Time deposits . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 1,820,391 | 30,000 | 1,479,034 | 2 |
| ABCP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 351,800 | 132,600 | 145,000 | 65,600 |
| CP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 16,000 | — | 58,050 | — |
| CD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 60,443 | — | 10,000 | — |
| RP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | — | 1,521 | 10,000 | 1,634 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 32,826 | 250,345 | — | 475,194 |
| | ₩ | 2,281,460 | 414,466 | 1,702,084 | 542,430 |

F-69

13. **Inventories**

Inventories as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | |
|---|---|---|---|---|
| | | Acquisition cost | Valuation allowance | Book value |
| | | In millions of won | | |
| Raw materials | ₩ | 3,182,711 | (1,323) | 3,181,388 |
| Merchandise | | 20 | — | 20 |
| Work-in-progress | | 118,640 | — | 118,640 |
| Finished goods | | 57,659 | — | 57,659 |
| Supplies | | 1,289,160 | (4,553) | 1,284,607 |
| Inventories in transit | | 827,437 | — | 827,437 |
| Other inventories | | 9,692 | — | 9,692 |
| | ₩ | 5,485,319 | (5,876) | 5,479,443 |

| | | 2017 | | |
|---|---|---|---|---|
| | | Acquisition cost | Valuation allowance | Book value |
| | | In millions of won | | |
| Raw materials | ₩ | 3,528,835 | (2,829) | 3,526,006 |
| Merchandise | | 107 | — | 107 |
| Work-in-progress | | 138,709 | (1,028) | 137,681 |
| Finished goods | | 72,923 | (1,517) | 71,406 |
| Supplies | | 1,581,661 | (3,940) | 1,577,721 |
| Inventories in transit | | 679,358 | — | 679,358 |
| Other inventories | | 9,807 | — | 9,807 |
| | ₩ | 6,011,400 | (9,314) | 6,002,086 |

The allowance for loss on inventory valuation due to decrease in the net realizable value of inventory added to cost of sales was ₩533 million for the year ended December 31, 2015. The reversals of the allowance for loss on inventory valuation due to increase in the net realizable value of inventory deducted from cost of sales were ₩2,473 million and ₩437 million for the years ended December 31, 2016 and 2017, respectively.

The amounts of loss from inventory valuation included in other gains or losses for the years ended December 31, 2015, 2016 and 2017 were ₩1,318 million, ₩2,683 million and ₩3,875 million, respectively.

14. **Finance Lease Receivables**

(1) **Finance lease contracts**

The Company entered into a power purchase agreement ("PPA") with Jordan Electric Power Company to provide a 373MW level Qatrana gas combined power plant over a 25 year lease term, and accounts for the PPA as a finance lease. Also, the Company has fly-ash pipe conduit finance leases with an average lease term of 7 years. In addition, the Company entered into a PPA with the Comision Federal de Electricidad in Mexico to provide for 25 years (December 2013 to November 2038) of all electricity generated from the power plant after completion of its construction and collect rates consisting of fixed costs (to recover the capital) and variable costs during the contracted period.

F-70

(2) Finance lease receivables as of December 31, 2016 and 2017 are as follows and included in current and non-current trade and other receivables, net, in the consolidated statements of financial position:

| | | 2016 | | 2017 | |
| | | Minimum lease payments | Present value of minimum lease payments | Minimum lease payments | Present value of minimum lease payments |
|---|---|---|---|---|---|
| | | In millions of won | | | |
| Less than 1 year .......... | ₩ | 55,708 | 12,225 | 49,542 | 13,067 |
| 1 ~ 5 years .............. | | 423,152 | 214,176 | 381,181 | 203,990 |
| More than 5 years ........ | | 1,690,492 | 746,473 | 1,398,449 | 645,564 |
| | ₩ | 2,169,352 | 972,874 | 1,829,172 | 862,621 |

(3) There are no impaired finance lease receivables as of December 31, 2016 and 2017.

15. Non-Financial Assets

Non-financial assets as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | 2017 | |
| | | Current | Non-current | Current | Non-current |
|---|---|---|---|---|---|
| | | In millions of won | | | |
| Advance payment ........................ | ₩ | 93,279 | 71,238 | 109,743 | 43,872 |
| Prepaid expenses ........................ | | 228,142 | 78,066 | 251,715 | 90,118 |
| Others(*1) .............................. | | 310,439 | 32,485 | 392,534 | 112,828 |
| | ₩ | 631,860 | 181,789 | 753,992 | 246,818 |

(*1) Details of others as of December 31, 2016 and 2017 are as follows:

| | | 2016 | | 2017 | |
| | | Current | Non-current | Current | Non-current |
|---|---|---|---|---|---|
| | | In millions of won | | | |
| Tax refund receivables ..................... | ₩ | 30,959 | 2,188 | 89,762 | 1,940 |
| Greenhouse gas emissions rights ............. | | 145,105 | — | 135,211 | — |
| Other quick assets(*2) .................... | | 134,375 | 30,297 | 167,561 | 110,888 |
| | ₩ | 310,439 | 32,485 | 392,534 | 112,828 |

(*2) The Company has recognized ₩92,128 million of shares in Orano Expansion (formerly, AREVA NC Expansion) as non-current non-financial assets.

F-71

## 16. Consolidated Subsidiaries

(1) Consolidated subsidiaries as of December 31, 2016 and 2017 are as follows:

| Subsidiaries | Key operation activities | Location | Percentage of ownership (%) | |
|---|---|---|---|---|
| | | | 2016 | 2017 |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea South-East Power Co., Ltd. . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea Midland Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea Western Power Co., Ltd. . . . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea Southern Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea East-West Power Co., Ltd. . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| KEPCO Engineering & Construction Company, Inc.(*1) . . . . . . . . . . . . . . . . | Architectural engineering for utility plant and others | KOREA | 65.77% | 65.77% |
| KEPCO Plant Service & Engineering Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Utility plant maintenance and others | KOREA | 51.00% | 51.00% |
| KEPCO Nuclear Fuel Co., Ltd. . . . . . . . . . | Nuclear fuel | KOREA | 96.36% | 96.36% |
| KEPCO KDN Co., Ltd. . . . . . . . . . . . . . . | Electric power information technology and others | KOREA | 100.00% | 100.00% |
| Garolim Tidal Power Plant Co., Ltd.(*2) . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.00% | 49.00% |
| KEPCO International HongKong Ltd. . . . . | Holding company | HONG KONG | 100.00% | 100.00% |
| KEPCO International Philippines Inc. . . . . | Holding company | PHILIPPINES | 100.00% | 100.00% |
| KEPCO Gansu International Ltd. . . . . . . . . | Holding company | HONG KONG | 100.00% | 100.00% |
| KEPCO Philippines Holdings Inc. . . . . . . . | Holding company | PHILIPPINES | 100.00% | 100.00% |
| KEPCO Philippines Corporation . . . . . . . . | Operation of utility plant | PHILIPPINES | 100.00% | 100.00% |
| KEPCO Ilijan Corporation . . . . . . . . . . . . | Construction and operation of utility plant | PHILIPPINES | 51.00% | 51.00% |
| KEPCO Lebanon SARL . . . . . . . . . . . . . . | Operation of utility plant | LEBANON | 100.00% | 100.00% |
| KEPCO Neimenggu International Ltd. . . . . | Holding company | HONG KONG | 100.00% | 100.00% |
| KEPCO Shanxi International Ltd. . . . . . . . | Holding company | HONG KONG | 100.00% | 100.00% |
| KOMIPO Global Pte Ltd. . . . . . . . . . . . . . | Holding company | SINGAPORE | 100.00% | 100.00% |
| KEPCO Canada Energy Ltd. . . . . . . . . . . . | Resources development | CANADA | 100.00% | 100.00% |
| KEPCO Netherlands B.V. . . . . . . . . . . . . . | Holding company | NETHERLANDS | 100.00% | 100.00% |
| KOREA Imouraren Uranium Investment Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . | Holding company | FRANCE | 100.00% | 100.00% |
| KEPCO Australia Pty., Ltd. . . . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOSEP Australia Pty., Ltd. . . . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOMIPO Australia Pty., Ltd. . . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOWEPO Australia Pty., Ltd. . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOSPO Australia Pty., Ltd. . . . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KEPCO Middle East Holding Company . . | Holding company | BAHRAIN | 100.00% | 100.00% |
| Qatrana Electric Power Company . . . . . . . | Construction and operation of utility plant | JORDAN | 80.00% | 80.00% |
| KHNP Canada Energy, Ltd. . . . . . . . . . . . | Holding company | CANADA | 100.00% | 100.00% |
| KEPCO Bylong Australia Pty., Ltd. . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| Korea Waterbury Uranium Limited Partnership . . . . . . . . . . . . . . . . . . . . . | Resources development | CANADA | 79.64% | 79.64% |
| Korea Electric Power Nigeria Ltd. . . . . . . | Operation of utility plant | NIGERIA | 100.00% | 100.00% |
| KEPCO Holdings de Mexico . . . . . . . . . . | Holding company | MEXICO | 100.00% | 100.00% |
| KST Electric Power Company . . . . . . . . . | Construction and operation of utility plant | MEXICO | 56.00% | 56.00% |
| KEPCO Energy Service Company . . . . . . . | Operation of utility plant | MEXICO | 100.00% | 100.00% |
| KEPCO Netherlands S3 B.V. . . . . . . . . . . | Holding company | NETHERLANDS | 100.00% | 100.00% |
| PT. KOMIPO Pembangkitan Jawa Bali . . . | Operation of utility plant | INDONESIA | 51.00% | 51.00% |
| PT. Cirebon Power Service(*2) . . . . . . . . . | Operation of utility plant | INDONESIA | 27.50% | 27.50% |
| KOWEPO International Corporation . . . . . | Operation of utility plant | PHILIPPINES | 99.99% | 99.99% |
| KOSPO Jordan LLC . . . . . . . . . . . . . . . . | Operation of utility plant | JORDAN | 100.00% | 100.00% |

F-72

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| Subsidiaries | Key operation activities | Location | Percentage of ownership (%) | |
| | | | 2016 | 2017 |
|---|---|---|---|---|
| EWP Philippines Corporation .......... | Holding company | PHILIPPINES | 100.00% | 100.00% |
| EWP America Inc. .................... | Holding company | USA | 100.00% | 100.00% |
| EWP Renewable Corporation ........... | Holding company | USA | 100.00% | 100.00% |
| DG Fairhaven Power, LLC ............. | Power generation | USA | 100.00% | 100.00% |
| DG Whitefield, LLC .................. | Power generation | USA | 100.00% | 100.00% |
| Springfield Power, LLC .............. | Power generation | USA | 100.00% | 100.00% |
| KNF Canada Energy Limited .......... | Holding company | CANADA | 96.36% | 96.36% |
| PT KEPCO Resource Indonesia ......... | Holding company | INDONESIA | 100.00% | 100.00% |
| EWP Barbados 1 SRL ................. | Holding company | BARBADOS | 100.00% | 100.00% |
| California Power Holdings, LLC ....... | Power generation | USA | 100.00% | 100.00% |
| Gyeonggi Green Energy Co., Ltd. ...... | Power generation | KOREA | 62.01% | 62.01% |
| PT. Tanggamus Electric Power ........ | Power generation | INDONESIA | 52.50% | 52.50% |
| Gyeongju Wind Power Co., Ltd. ....... | Power generation | KOREA | 70.00% | 70.00% |
| KOMIPO America Inc. ................ | Holding company | USA | 100.00% | 100.00% |
| EWPRC Biomass Holdings, LLC ....... | Holding company | USA | 100.00% | 100.00% |
| KOSEP USA, INC. ................... | Power generation | USA | 100.00% | 100.00% |
| PT. EWP Indonesia .................. | Holding company | INDONESIA | 99.95% | 99.96% |
| KEPCO Netherlands J3 B.V. .......... | Holding company | NETHERLANDS | 100.00% | 100.00% |
| Korea Offshore Wind Power Co., Ltd. ... | Power generation | KOREA | 100.00% | 100.00% |
| Global One Pioneer B.V. ............. | Holding company | NETHERLANDS | 100.00% | 100.00% |
| Global Energy Pioneer B.V. ........... | Holding company | NETHERLANDS | 100.00% | 100.00% |
| Mira Power Limited(*3) .............. | Power generation | PAKISTAN | 76.00% | 76.00% |
| KOSEP Material Co., Ltd.(*4) ......... | Recycling fly ashes | KOREA | 46.22% | 86.22% |
| Commerce and Industry Energy Co., Ltd.(*5) ...................... | Power generation | KOREA | 59.03% | 59.03% |
| KEPCO Singapore Holdings Pte., Ltd. ... | Holding company | SINGAPORE | 100.00% | 100.00% |
| KOWEPO India Private Limited ........ | Holding company | INDIA | 100.00% | 100.00% |
| KEPCO KPS Philippines Corp. ......... | Utility plant maintenance and others | PHILIPPINES | 51.00% | 51.00% |
| KOSPO Chile SpA ................... | Holding company | CHILE | 100.00% | 100.00% |
| PT. KOWEPO Sumsel Operation And Maintenance Services ............... | Utility plant maintenance and others | INDONESIA | 95.00% | 95.00% |
| HeeMang Sunlight Power Co., Ltd. ...... | Operation of utility plant | KOREA | 100.00% | 100.00% |
| Fujeij Wind Power Company ........... | Operation of utility plant | JORDAN | 100.00% | 100.00% |
| KOSPO Youngnam Power Co., Ltd. ...... | Operation of utility plant | KOREA | 50.00% | 50.00% |
| HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) ................. | Holding company | KOREA | 96.67% | 96.67% |
| Chitose Solar Power Plant LLC ......... | Power generation | JAPAN | 80.10% | 80.10% |
| KEPCO Energy Solution Co. Ltd. ....... | Energy service | KOREA | 100.00% | 100.00% |
| Solar School Plant Co., Ltd. ........... | Power generation | KOREA | 100.00% | 100.00% |
| KOSPO Power Services Limitada ....... | Utility plant maintenance and others | CHILE | 65.00% | 65.00% |
| Energy New Industry Specialized Investment Private Investment Trust ... | Holding company | KOREA | 99.75% | 99.75% |
| KOEN Bylong Pty., Ltd. ............. | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOMIPO Bylong Pty., Ltd. ........... | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOWEPO Bylong Pty., Ltd. ........... | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOSPO Bylong Pty., Ltd. ............. | Resources development | AUSTRALIA | 100.00% | 100.00% |
| EWP Bylong Pty., Ltd. ............... | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOWEPO Lao International ........... | Utility plant maintenance and others | LAOS | 100.00% | 100.00% |
| KEPCO US Inc. ..................... | Holding company | USA | — | 100.00% |
| KEPCO Alamosa LLC ................ | Holding company | USA | — | 50.10% |
| Cogentrix Solar Services, LLC ......... | Holding company | USA | — | 50.10% |
| Solar Investments I, LLC .............. | Holding company | USA | — | 50.10% |

F-73

| Subsidiaries | Key operation activities | Location | Percentage of ownership (%) | |
|---|---|---|---|---|
| | | | 2016 | 2017 |
| Cogentrix of Alamosa, LLC . . . . . . . . . . . | Power generation | USA | — | 50.10% |
| KEPCO-LG CNS Mangilao Holdings LLC . . . . . . . . . . . . . . . . . . . . . . . . | Holding company | USA | — | 70.00% |
| Mangilao Investment LLC . . . . . . . . . . . . . | Holding company | USA | — | 70.00% |
| KEPCO-LG CNS Mangilao Solar, LLC . . | Power generation | USA | — | 70.00% |
| Jeju Hanlim Offshore Wind Co., Ltd. . . . . | Power generation | KOREA | — | 70.22% |
| PT. Siborpa Eco Power . . . . . . . . . . . . . . . . | Construction and operation of utility plant | INDONESIA | — | 64.71% |
| BSK E-New Industry Fund VII . . . . . . . . . | Holding company | KOREA | — | 81.47% |
| e-New Industry LB Fund 1 . . . . . . . . . . . . . | Holding company | KOREA | — | 75.92% |
| Songhyun e-New Industry Fund . . . . . . . . . | Holding company | KOREA | — | 80.45% |

(*1)  Considering treasury stocks, the effective percentage of ownership is 66.08%.

(*2)  These subsidiaries are included in the consolidated financial statements as the Company obtained the majority of the voting power through the shareholders' agreement.

(*3)  As of reporting date, the annual reporting period of all subsidiaries is December 31, except for Mira Power Limited which is November 30.

(*4)  The effective percentage of ownership has increased to 86.22% since Long Lasting Value exercised the put option to sell its investment to KOSEP during the year ended December 31, 2017.

(*5)  The Company guarantees a certain return on investment related to Commerce and Industry Energy Co., Ltd. for the financial investors. The financial investors have a right to sell their shares to the Company which can be exercised 84 months after the date of investment. Accordingly, the purchase price including the return on investment is classified as a liability.

**(2)  Subsidiaries newly included in or excluded from consolidation for the year ended December 31, 2017 are as follows:**

Subsidiaries included in consolidation during the year ended December 31, 2017.

| Subsidiary | Reason |
|---|---|
| KEPCO US Inc. | Newly established |
| KEPCO Alamosa LLC | Newly established |
| Cogentrix Solar Services, LLC | Newly established |
| Solar Investments I, LLC | Newly established |
| Cogentrix of Alamosa, LLC | Newly established |
| KEPCO-LG CNS Mangilao Holdings LLC | Newly established |
| Mangilao Investment LLC | Newly established |
| KEPCO-LG CNS Mangilao Solar, LLC | Newly established |
| Jeju Hanlim Offshore Wind Co., Ltd. | Newly established |
| PT. Siborpa Eco Power | Newly established |
| BSK E-New Industry Fund VII | Newly established |
| e-New Industry LB Fund 1 | Newly established |
| Songhyun e-New Industry Fund | Newly established |

There are no subsidiaries excluded from consolidation during the year ended December 31, 2017.

F-74

(3)  **Summary of financial information of consolidated subsidiaries as of and for the years ended December 31, 2016 and 2017 are as follows:**

| Subsidiaries | 2016 Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|
| | In millions of won | | | |
| Korea Hydro & Nuclear Power Co., Ltd. ............ ₩ | 52,782,915 | 27,366,938 | 11,168,579 | 2,454,810 |
| Korea South-East Power Co., Ltd. ................. | 9,773,778 | 4,794,330 | 5,093,598 | 531,061 |
| Korea Midland Power Co., Ltd. ................... | 9,066,666 | 5,416,336 | 3,719,981 | 400,696 |
| Korea Western Power Co., Ltd. ................... | 9,810,714 | 5,866,916 | 4,169,712 | 401,936 |
| Korea Southern Power Co., Ltd. .................. | 9,806,023 | 5,637,950 | 4,200,035 | 426,337 |
| Korea East-West Power Co., Ltd. ................. | 8,967,951 | 4,488,911 | 4,210,898 | 467,603 |
| KEPCO Engineering & Construction Company, Inc. ... | 786,596 | 364,676 | 506,012 | 17,796 |
| KEPCO Plant Service & Engineering Co., Ltd. ...... | 1,086,421 | 301,490 | 1,214,304 | 86,657 |
| KEPCO Nuclear Fuel Co., Ltd. .................... | 713,230 | 346,012 | 309,911 | 33,115 |
| KEPCO KDN Co., Ltd. ........................... | 519,901 | 205,869 | 588,160 | 43,127 |
| Garolim Tidal Power Plant Co., Ltd. .............. | 632 | 346 | — | -24 |
| KEPCO International HongKong Ltd. .............. | 173,138 | 41 | — | 4,532 |
| KEPCO International Philippines Inc. .............. | 114,141 | 1,468 | — | 56,783 |
| KEPCO Gansu International Ltd. .................. | 17,928 | 557 | — | (18) |
| KEPCO Philippines Holdings Inc. ................. | 125,100 | 27 | — | 13,517 |
| KEPCO Philippines Corporation .................. | 13,704 | 8,949 | — | (8,717) |
| KEPCO Ilijan Corporation ...................... | 558,030 | 58,449 | 116,667 | 51,552 |
| KEPCO Lebanon SARL .......................... | 1,458 | 10,312 | — | 810 |
| KEPCO Neimenggu International Ltd. .............. | 186,636 | — | — | 7,082 |
| KEPCO Shanxi International Ltd. .................. | 549,189 | 218,047 | — | 5,812 |
| KOMIPO Global Pte Ltd. ........................ | 223,082 | 1,095 | — | 36,764 |
| KEPCO Canada Energy Ltd. ...................... | 202 | 24 | — | (27,216) |
| KEPCO Netherlands B.V. ........................ | 128,014 | 35 | — | 224 |
| KOREA Imouraren Uranium Investment Corp. ....... | 154,302 | 764 | — | (68,417) |
| KEPCO Australia Pty., Ltd. ...................... | 503,657 | 1,545 | 3,670 | (19,006) |
| KOSEP Australia Pty., Ltd. ...................... | 25,174 | 521 | 5,357 | 4,028 |
| KOMIPO Australia Pty., Ltd. ..................... | 25,413 | 10 | 5,388 | 4,023 |
| KOWEPO Australia Pty., Ltd. .................... | 25,550 | 10 | 5,357 | 4,012 |
| KOSPO Australia Pty., Ltd. ...................... | 25,625 | 10 | 5,357 | 4,033 |
| KEPCO Middle East Holding Company ............. | 128,846 | 125,008 | — | 6,840 |
| Qatrana Electric Power Company ................. | 546,123 | 417,800 | 18,866 | 19,601 |
| KHNP Canada Energy, Ltd. ...................... | 54,374 | 46 | — | (6,304) |
| KEPCO Bylong Australia Pty., Ltd. ............... | 220,721 | 277,358 | — | (2,357) |
| Korea Waterbury Uranium Limited Partnership ...... | 20,882 | 149 | — | 2,348 |
| Korea Electric Power Nigeria Ltd. ................ | 696 | 493 | 9,794 | 35 |
| KEPCO Holdings de Mexico ..................... | 262 | 19 | — | 251 |
| KST Electric Power Company ................... | 596,823 | 539,459 | 146,295 | 17,322 |
| KEPCO Energy Service Company ................. | 1,309 | 310 | 5,337 | 580 |
| KEPCO Netherlands S3 B.V. ..................... | 55,609 | 54 | — | 3,731 |
| PT. KOMIPO Pembangkitan Jawa Bali ............. | 16,246 | 4,549 | 21,632 | 8,989 |
| PT. Cirebon Power Service ...................... | 3,456 | 1,228 | 7,463 | 301 |
| KOWEPO International Corporation .............. | — | — | — | — |
| KOSPO Jordan LLC ............................ | 11,524 | 687 | 7,321 | 317 |
| EWP Philippines Corporation ................... | 1,966 | 955 | — | (41) |
| EWP America Inc.(*) ........................... | 104,809 | 80,252 | 33,616 | (8,704) |
| KNF Canada Energy Limited ..................... | 1,967 | 20 | — | (46) |
| PT KEPCO Resource Indonesia ................... | 913 | 18 | — | (341) |
| EWP Barbados 1 SRL ........................... | 267,859 | 425 | 1,656 | (902) |
| Gyeonggi Green Energy Co., Ltd. ................. | 301,126 | 221,078 | 108,557 | 19,211 |
| PT. Tanggamus Electric Power .................... | 184,861 | 167,641 | 40,903 | 2,041 |

F-75

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

|  | 2016 | | | |
|---|---|---|---|---|
| Subsidiaries | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|  | In millions of won | | | |
| Gyeongju Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . ₩ | 76,569 | 49,293 | 6,413 | 1,269 |
| KOMIPO America Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,518 | 2,432 | — | (2,240) |
| KOSEP USA, INC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 159 | 39,028 | 3,791 | (72,817) |
| PT. EWP Indonesia . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,154 | 50 | — | 1,088 |
| KEPCO Netherlands J3 B.V. . . . . . . . . . . . . . . . . . . . . | 125,337 | 68 | — | 12,433 |
| Korea Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . | 37,826 | 2,048 | — | (4,960) |
| Global One Pioneer B.V. . . . . . . . . . . . . . . . . . . . . . . . | 161 | 22 | — | (54) |
| Global Energy Pioneer B.V. . . . . . . . . . . . . . . . . . . . . | 338 | 22 | — | (59) |
| Mira Power Limited . . . . . . . . . . . . . . . . . . . . . . . . . . | 178,141 | 133,730 | — | (954) |
| KOSEP Material Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 2,398 | 1,497 | 3,232 | (901) |
| Commerce and Industry Energy Co., Ltd. . . . . . . . . . . | 99,432 | 87,316 | 28,375 | (536) |
| KEPCO Singapore Holdings Pte., Ltd. . . . . . . . . . . . . . | 2,568 | 13 | — | (33) |
| KOWEPO India Private Limited . . . . . . . . . . . . . . . . . | 879 | — | — | 1 |
| KEPCO KPS Philippines Corp. . . . . . . . . . . . . . . . . . . | 7,897 | 1,213 | 12,843 | 2,060 |
| KOSPO Chile SpA . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,656 | 4,787 | — | 125 |
| PT. KOWEPO Sumsel Operation and Maintenance Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,439 | 700 | 6,165 | (96) |
| HeeMang Sunlight Power Co., Ltd. . . . . . . . . . . . . . . . | 7,102 | 3,391 | 12 | (308) |
| Fujeij Wind Power Company . . . . . . . . . . . . . . . . . . . . | 47,935 | 46,636 | — | (873) |
| KOSPO Youngnam Power Co., Ltd. . . . . . . . . . . . . . . . | 284,368 | 205,680 | — | (931) |
| HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) . . . . . . . . . . . . . . | 3,002 | — | — | 9 |
| Chitose Solar Power Plant LLC . . . . . . . . . . . . . . . . . . | 49,728 | 38,806 | — | (811) |
| KEPCO Energy Solution Co. Ltd. . . . . . . . . . . . . . . . . | 299,933 | 233 | — | (300) |
| Solar School Plant Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 200,268 | 259 | 1 | 9 |
| KOSPO Power Services Limitada . . . . . . . . . . . . . . . . | 4,385 | 1,262 | 7,300 | 2,963 |
| Energy New Industry Specialized Investment Private Investment Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 501,275 | 33 | — | (7) |
| KOEN Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| KOMIPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| KOWEPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| KOSPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| EWP Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| KOWEPO Lao International . . . . . . . . . . . . . . . . . . . . . | 218 | 181 | — | (108) |

(*)  Financial information of EWP America Inc. includes that of six other subsidiaries, EWP Renewable Co., DG Fairhaven Power, LLC, DG Whitefield, LLC, Springfield Power, LLC, California Power Holdings, LLC, and EWPRC Biomass Holdings, LLC.

F-76

|  | | 2017 | | | |
| Subsidiaries | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
|  | | In millions of won | | | |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . . . . . . . . . | ₩ | 55,011,096 | 29,252,816 | 9,415,751 | 854,346 |
| Korea South-East Power Co., Ltd. . . . . . . . . . . . . . . . . . . . | | 9,879,577 | 4,844,184 | 5,387,846 | 130,371 |
| Korea Midland Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 9,893,822 | 6,148,173 | 4,167,009 | 104,591 |
| Korea Western Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 9,660,426 | 5,739,534 | 4,199,079 | 110,939 |
| Korea Southern Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | | 9,648,741 | 5,401,216 | 4,397,552 | 98,817 |
| Korea East-West Power Co., Ltd. . . . . . . . . . . . . . . . . . . . | | 8,855,518 | 4,204,187 | 4,644,330 | 217,599 |
| KEPCO Engineering & Construction Company, Inc. . . . . . | | 762,166 | 305,134 | 490,193 | 21,222 |
| KEPCO Plant Service & Engineering Co., Ltd. . . . . . . . . . | | 1,195,086 | 294,689 | 1,232,113 | 135,482 |
| KEPCO Nuclear Fuel Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 792,187 | 421,088 | 279,664 | 4,557 |
| KEPCO KDN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 524,520 | 155,715 | 619,470 | 48,968 |
| Garolim Tidal Power Plant Co., Ltd. . . . . . . . . . . . . . . . . . | | 619 | 345 | — | (12) |
| KEPCO International HongKong Ltd. . . . . . . . . . . . . . . . . . | | 153,529 | 1 | — | 4,380 |
| KEPCO International Philippines Inc. . . . . . . . . . . . . . . . . . | | 102,323 | 886 | — | 47,201 |
| KEPCO Gansu International Ltd. . . . . . . . . . . . . . . . . . . . . | | 11,567 | 493 | — | (29) |
| KEPCO Philippines Holdings Inc. . . . . . . . . . . . . . . . . . . . | | 127,922 | 2,621 | — | 43,218 |
| KEPCO Philippines Corporation . . . . . . . . . . . . . . . . . . . . | | 6,293 | 114 | — | 2,098 |
| KEPCO Ilijan Corporation . . . . . . . . . . . . . . . . . . . . . . . . . | | 474,624 | 57,801 | 109,183 | 66,320 |
| KEPCO Lebanon SARL . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,069 | 9,281 | — | (219) |
| KEPCO Neimenggu International Ltd. . . . . . . . . . . . . . . . . | | 165,937 | — | — | 500 |
| KEPCO Shanxi International Ltd. . . . . . . . . . . . . . . . . . . . . | | 497,990 | 193,309 | — | 3,796 |
| KOMIPO Global Pte Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | | 225,411 | 1,497 | — | 21,858 |
| KEPCO Canada Energy Ltd. . . . . . . . . . . . . . . . . . . . . . . . | | 132 | 22 | — | (32) |
| KEPCO Netherlands B.V. . . . . . . . . . . . . . . . . . . . . . . . . . | | 114,911 | 49 | — | 17,309 |
| KOREA Imouraren Uranium Investment Corp. . . . . . . . . . | | 151,278 | 131 | — | 1,490 |
| KEPCO Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | | 466,654 | 569 | — | (568) |
| KOSEP Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | | 27,076 | 333 | 12,096 | 1,601 |
| KOMIPO Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . | | 31,441 | 4,691 | 12,096 | 1,133 |
| KOWEPO Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . | | 31,586 | 4,691 | 12,096 | 1,232 |
| KOSPO Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | | 29,472 | 4,221 | 12,096 | (2,759) |
| KEPCO Middle East Holding Company . . . . . . . . . . . . . . . | | 95,812 | 90,842 | — | 2,913 |
| Qatrana Electric Power Company . . . . . . . . . . . . . . . . . . . . | | 460,206 | 327,401 | 18,892 | 23,310 |
| KHNP Canada Energy, Ltd. . . . . . . . . . . . . . . . . . . . . . . . | | 51,994 | 31 | — | (92) |
| KEPCO Bylong Australia Pty., Ltd. . . . . . . . . . . . . . . . . . | | 242,364 | 277,549 | — | 20,271 |
| Korea Waterbury Uranium Limited Partnership . . . . . . . . . | | 20,886 | 136 | — | (59) |
| Korea Electric Power Nigeria Ltd. . . . . . . . . . . . . . . . . . . . | | 238 | 76 | 2,164 | 29 |
| KEPCO Holdings de Mexico . . . . . . . . . . . . . . . . . . . . . . . | | 235 | 30 | — | (20) |
| KST Electric Power Company . . . . . . . . . . . . . . . . . . . . . . | | 546,242 | 478,230 | 120,126 | 16,154 |
| KEPCO Energy Service Company . . . . . . . . . . . . . . . . . . . | | 1,793 | 451 | 6,773 | 976 |
| KEPCO Netherlands S3 B.V. . . . . . . . . . . . . . . . . . . . . . . . | | 46,642 | 53 | — | 2,382 |
| PT. KOMIPO Pembangkitan Jawa Bali . . . . . . . . . . . . . . . | | 11,261 | 4,769 | 20,956 | 4,666 |
| PT. Cirebon Power Service . . . . . . . . . . . . . . . . . . . . . . . . | | 2,808 | 155 | 7,439 | 592 |
| KOWEPO International Corporation . . . . . . . . . . . . . . . . . | | — | 8 | — | (2) |
| KOSPO Jordan LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 24,077 | 13,594 | 7,331 | 953 |
| EWP Philippines Corporation . . . . . . . . . . . . . . . . . . . . . . | | 1,708 | 836 | — | (17) |
| EWP America Inc.(*1) . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 79,854 | 67,308 | 23,543 | (9,737) |
| KNF Canada Energy Limited . . . . . . . . . . . . . . . . . . . . . . . | | 1,884 | 31 | — | (43) |
| PT KEPCO Resource Indonesia . . . . . . . . . . . . . . . . . . . . | | 491 | — | — | (311) |
| EWP Barbados 1 SRL . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 235,096 | 450 | — | (2,585) |
| Gyeonggi Green Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . | | 282,408 | 199,160 | 95,192 | 3,203 |
| PT. Tanggamus Electric Power . . . . . . . . . . . . . . . . . . . . . | | 179,317 | 160,144 | 34,281 | 4,640 |
| Gyeongju Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | | 112,279 | 82,124 | 7,219 | 2,400 |
| KOMIPO America Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 10,505 | 521 | — | 2,071 |
| KOSEP USA, INC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 184 | 9,065 | — | 26,997 |

F-77

| | | 2017 | | |
|---|---|---|---|---|
| **Subsidiaries** | **Total assets** | **Total liabilities** | **Sales** | **Profit (loss) for the period** |
| | In millions of won | | | |
| PT. EWP Indonesia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W | 2,035 | 23 | — | 1,916 |
| KEPCO Netherlands J3 B.V. . . . . . . . . . . . . . . . . . . . . . | 122,612 | 76 | — | 12,115 |
| Korea Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . | 190,195 | 1,985 | — | (6,997) |
| Global One Pioneer B.V. . . . . . . . . . . . . . . . . . . . . . . . . | 151 | 38 | — | (80) |
| Global Energy Pioneer B.V. . . . . . . . . . . . . . . . . . . . . . | 309 | 41 | — | (87) |
| Mira Power Limited . . . . . . . . . . . . . . . . . . . . . . . . . . . | 208,150 | 163,198 | — | 737 |
| KOSEP Material Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 2,751 | 1,448 | 3,128 | 320 |
| Commerce and Industry Energy Co., Ltd. . . . . . . . . . . . . | 99,129 | 87,926 | 30,577 | (749) |
| KEPCO Singapore Holdings Pte., Ltd. . . . . . . . . . . . . . . | 3,265 | 4 | — | (24) |
| KOWEPO India Private Limited . . . . . . . . . . . . . . . . . . . | 781 | — | — | (46) |
| KEPCO KPS Philippines Corp. . . . . . . . . . . . . . . . . . . . | 6,636 | 235 | 6,840 | 555 |
| KOSPO Chile SpA . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 133,570 | 50,109 | — | 1,066 |
| PT. KOWEPO Sumsel Operation And Maintenance | | | | |
| Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,350 | 279 | 7,651 | 659 |
| HeeMang Sunlight Power Co., Ltd. . . . . . . . . . . . . . . . . . | 6,876 | 3,395 | 105 | (229) |
| Fujeij Wind Power Company . . . . . . . . . . . . . . . . . . . . . | 165,636 | 156,099 | — | 8,836 |
| KOSPO Youngnam Power Co.,Ltd. . . . . . . . . . . . . . . . . . | 412,785 | 333,302 | 68,973 | 939 |
| HI Carbon Professional Private Special Asset Investment | | | | |
| Trust 1 (formerly, Global One Carbon Private Equity | | | | |
| Investment Trust 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,002 | — | — | 12 |
| Chitose Solar Power Plant LLC . . . . . . . . . . . . . . . . . . . | 136,098 | 121,622 | 7,083 | 4,100 |
| KEPCO Energy Solution Co. Ltd. . . . . . . . . . . . . . . . . . . | 313,401 | 12,376 | 5,544 | 1,325 |
| Solar School Plant Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 201,482 | 599 | 67 | 874 |
| KOSPO Power Services Limitada . . . . . . . . . . . . . . . . . . | 3,901 | 887 | 11,067 | 666 |
| Energy New Industry Specialized Investment Private | | | | |
| Investment Trust(*3) . . . . . . . . . . . . . . . . . . . . . . . . . . | 506,207 | 2,118 | — | 52 |
| KOEN Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 5,875 | — | — | — |
| KOMIPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 5,875 | — | — | — |
| KOWEPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . | 5,875 | — | — | — |
| KOSPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 5,875 | — | — | — |
| EWP Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 5,875 | — | — | — |
| KOWEPO Lao International . . . . . . . . . . . . . . . . . . . . . . | 3,259 | 1,452 | 3,624 | 1,881 |
| KEPCO US Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,913 | — | — | — |
| KEPCO Alamosa LLC . . . . . . . . . . . . . . . . . . . . . . . . . | 33,144 | 492 | — | (218) |
| Cogentrix Solar Services, LLC(*2) . . . . . . . . . . . . . . . . . | 84,458 | 53,116 | 8,958 | (112) |
| KEPCO-LG CNS Mangilao Holdings LLC . . . . . . . . . . . | 24,131 | 24,395 | — | (278) |
| Mangilao Investment LLC . . . . . . . . . . . . . . . . . . . . . . . | 24,131 | — | — | — |
| KEPCO-LG CNS Mangilao Solar, LLC . . . . . . . . . . . . . | 24,002 | 134 | — | (278) |
| Jeju Hanlim Offshore Wind Co., Ltd. . . . . . . . . . . . . . . . | 36 | — | — | — |
| PT. Siborpa Eco Power . . . . . . . . . . . . . . . . . . . . . . . . . | 11,562 | 214 | — | (518) |

(*1) Financial information of EWP America Inc. includes that of six other subsidiaries, EWP Renewable Corporation, DG Fairhaven Power, LLC, DG Whitefield, LLC, Springfield Power, LLC, California Power Holdings, LLC, and EWPRC Biomass Holdings, LLC.

(*2) Financial information of Cogentrix Solar Services, LLC includes that of two other subsidiaries, Solar Investments I, LLC and Cogentrix of Alamosa, LLC.

(*3) Financial information of Energy New Industry Specialized Investment Private Investment Trust includes that of three other subsidiaries, BSK E-New Industry Fund VII, e-New Industry LB Fund 1 and Songhyun e-New Industry Fund.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**(4)  Significant restrictions on abilities to subsidiaries are as follows:**

| Company | Nature and extent of any significant restrictions |
|---|---|
| Gyeonggi Green Energy Co., Ltd. . . . . . . | Acquisition or disposal of assets of more than ₩35 billion, change in the capacity of cogeneration units (except for the change due to performance improvement of equipment, maintenance) will require unanimous consent of all directors. |
| KOSPO Youngnam Power Co., Ltd. . . . . | Dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. Shares cannot be wholly or partially transferred without prior written consent of financial institutions. |

**(5)  Details of non-controlling interest prior to intra-group eliminations as of and for the years ended December 31, 2016 and 2017 are as follows:**

| Description | | KEPCO Ilijan Corporation | KEPCO Plant Service & Engineering Co., Ltd. | KEPCO Engineering & Construction Company, Inc. | Others | Total |
|---|---|---|---|---|---|---|
| | | | | 2016 | | |
| | | | | In millions of won | | |
| Percentage of ownership . . . . . . . . . . . . . . . . . . . . . . . | | 49.00% | 49.00% | 33.92% | | |
| Current assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 154,758 | 553,924 | 270,553 | 1,211,510 | 2,190,745 |
| Non-current assets . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 403,272 | 532,497 | 516,043 | 2,379,882 | 3,831,694 |
| Current liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . | | (19,256) | (264,506) | (286,444) | (297,510) | (867,716) |
| Non-current liabilities . . . . . . . . . . . . . . . . . . . . . . . . | | (39,193) | (36,984) | (78,232) | (1,919,924) | (2,074,333) |
| Net assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 499,581 | 784,931 | 421,920 | 1,373,958 | 3,080,390 |
| Book value of non-controlling interest . . . . . . . . . . . . | | 244,794 | 384,616 | 143,115 | 684,093 | 1,456,618 |
| Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 116,667 | 1,214,304 | 506,012 | 674,461 | 2,511,444 |
| Profit for the period  . . . . . . . . . . . . . . . . . . . . . . . . . | | 51,552 | 86,657 | 17,796 | 102,170 | 258,175 |
| Profit for the period attributable to non-controlling interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 25,260 | 42,462 | 6,036 | 26,709 | 100,467 |
| Cash flows from operating activities  . . . . . . . . . . . . . | | 102,546 | 121,240 | 18,748 | 84,086 | 326,620 |
| Cash flows from investing activities  . . . . . . . . . . . . . | | (117) | 79,807 | (7,556) | (367,674) | (295,540) |
| Cash flows from financing activities before dividends to non-controlling interest  . . . . . . . . . . . . . . . . . . . . | | (56,863) | (39,911) | (1,634) | 877,863 | 779,455 |
| Dividends to non-controlling interest . . . . . . . . . . . . . | | (55,705) | (36,139) | (2,539) | (22,054) | (116,437) |
| Effect of exchange rate fluctuation . . . . . . . . . . . . . . . | | 1,529 | 127 | (854) | 7,216 | 8,018 |
| Net increase (decrease) of cash and cash equivalents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | (8,610) | 125,124 | 6,165 | 579,437 | 702,116 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| Description | | KEPCO Ilijan Corporation | KEPCO Plant Service & Engineering Co., Ltd. | KEPCO Engineering & Construction Company, Inc. | Others | Total |
|---|---|---|---|---|---|---|
| | | | | In millions of won | | |
| Percentage of ownership . . . . . . . . . . . . . . . | | 49.00% | 49.00% | 33.92% | | |
| Current assets . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 160,588 | 623,934 | 257,529 | 1,269,175 | 2,311,226 |
| Non-current assets . . . . . . . . . . . . . . . . . . . . | | 314,036 | 571,152 | 504,637 | 2,588,833 | 3,978,658 |
| Current liabilities . . . . . . . . . . . . . . . . . . . . | | (21,546) | (278,562) | (221,860) | (394,320) | (916,288) |
| Non-current liabilities . . . . . . . . . . . . . . . . . | | (36,255) | (16,127) | (83,274) | (2,014,925) | (2,150,581) |
| Net assets . . . . . . . . . . . . . . . . . . . . . . . . . . | | 416,823 | 900,397 | 457,032 | 1,448,763 | 3,223,015 |
| Book value of non-controlling interest . . . . . | | 204,243 | 441,194 | 155,025 | 612,245 | 1,412,707 |
| Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 109,183 | 1,232,113 | 490,193 | 719,087 | 2,550,576 |
| Profit for the period . . . . . . . . . . . . . . . . . . | | 66,320 | 135,482 | 21,222 | 66,419 | 289,443 |
| Profit for the period attributable to non-controlling interest . . . . . . . . . . . . . . | | 32,497 | 66,386 | 7,199 | 20,447 | 126,529 |
| Cash flows from operating activities . . . . . . | | 123,534 | 129,801 | 62,578 | 60,021 | 375,934 |
| Cash flows from investing activities . . . . . . | | (5,276) | (193,408) | (8,622) | (409,353) | (616,659) |
| Cash flows from financing activities before dividends to non-controlling interest . . . . | | (44,442) | (15,606) | (55,504) | 339,432 | 223,880 |
| Dividends to non-controlling interest . . . . . | | (48,855) | (14,994) | (1,419) | (20,840) | (86,108) |
| Effect of exchange rate fluctuation . . . . . . . | | (7,432) | (1,267) | (101) | (24,206) | (33,006) |
| Net increase (decrease) of cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . | | 17,529 | (95,474) | (3,068) | (54,946) | (135,959) |

**(6)  Changes in goodwill**

    (i)  Details of goodwill as of December 31, 2016 and 2017 are as follows:

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Acquisition cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 2,582 | 2,582 |
| Accumulated impairment . . . . . . . . . . . . . . . . . . . . . . . . | | — | — |
| Carrying book value . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 2,582 | 2,582 |

    (ii)  There are no changes in goodwill for the years ended December 31, 2016 and 2017.

**(7)  Disposals of subsidiaries**

KEPCO Canada Uranium Investment Limited Partnership was dissolved and the Company liquidated DG Kings Plaza, LLC during the year ended December 31, 2016.

    (i)  The fair value of proceeds from disposal as of December 31, 2016 is as follows:

| | | 2016 |
|---|---|---|
| | | In millions of won |
| Cash received upon dissolution . . . . . . . . . . . . . . . . . . . . | ₩ | 898 |
| Net assets transferred due to dissolution . . . . . . . . . . . . . | | 34,148 |
| | ₩ | 35,046 |

F-80

(ii)  The carrying value of assets and liabilities of subsidiaries as at the date the Company lost its control during the year ended December 31, 2016 are as follows:

|  | | 2016 |
|---|---|---|
|  | | In millions of won |
| Current assets | | |
|     Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . | ₩ | 898 |
|     Current financial assets, net . . . . . . . . . . . . . . . . . . . | | 81 |
| Non-current assets | | |
|     Available-for-sale financial assets . . . . . . . . . . . . . . | | 34,089 |
| Current liabilities | | |
|     Current financial liabilities . . . . . . . . . . . . . . . . . . . . | | (22) |
|  | ₩ | 35,046 |

(iii)  Gain from disposals of subsidiaries for the year ended December 31, 2016 is as follows:

|  | | 2016 |
|---|---|---|
|  | | In millions of won |
| Fair value of sale price . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 35,046 |
| Net assets disposed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | (35,046) |
| Non-controlling interests . . . . . . . . . . . . . . . . . . . . . . . . . | | — |
| Realization of unrealized gain . . . . . . . . . . . . . . . . . . . . | | — |
| Other comprehensive income . . . . . . . . . . . . . . . . . . . . . . | | — |
| Gain from disposals of subsidiaries . . . . . . . . . . . . . . . . | ₩ | — |

(iv)  Net cash flow from sales of subsidiaries for the year ended December 31, 2016 is as follows:

|  | | 2016 |
|---|---|---|
|  | | In millions of won |
| Consideration received in cash . . . . . . . . . . . . . . . . . . . . . . | ₩ | 898 |
| Less: cash held by disposed subsidiaries . . . . . . . . . . . . . | | (898) |
| Net cash flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | — |

F-81

(8) **Cash dividends received from subsidiaries for the years ended December 31, 2015, 2016 and 2017, respectively, are as follows:**

| Subsidiaries | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| | | In millions of won | | |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . . . . . . . . . . | ₩ | 446,399 | 635,200 | 543,072 |
| Korea South-East Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | | 57,485 | 124,169 | 106,546 |
| Korea Midland Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 16,580 | 23,073 | 54,305 |
| Korea Western Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 22,749 | 36,238 | 66,992 |
| Korea Southern Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 10,272 | 17,849 | 60,630 |
| Korea East-West Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | | 25,280 | 67,906 | 94,430 |
| KEPCO Engineering & Construction Company, Inc. . . . . . . . | | 14,574 | 5,069 | 2,765 |
| KEPCO Plant Service & Engineering Co., Ltd. . . . . . . . . . . | | 40,584 | 39,911 | 15,607 |
| KEPCO Nuclear Fuel Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | | 6,280 | 3,411 | 3,231 |
| KEPCO KDN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 4,046 | 3,392 | 4,352 |
| KEPCO International HongKong Ltd. . . . . . . . . . . . . . . . . . | | 25,826 | 9,107 | 4,304 |
| KEPCO International Philippines Inc. . . . . . . . . . . . . . . . . . | | 32,891 | 61,862 | 44,906 |
| KEPCO Ilijan Corporation . . . . . . . . . . . . . . . . . . . . . . . . . | | 38,128 | 57,979 | 50,849 |
| KEPCO Philippines Holdings Inc. . . . . . . . . . . . . . . . . . . . . | | 19,221 | 17,747 | 26,023 |
| KEPCO Neimenggu International Ltd. . . . . . . . . . . . . . . . . . | | 25,338 | 10,735 | — |
| KOMIPO Global Pte Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | | — | 10,432 | — |
| Qatrana Electric Power Company . . . . . . . . . . . . . . . . . . . . . | | 16,857 | 8,331 | 5,939 |
| KOSPO Jordan LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | — | 1,095 | — |
| KEPCO Energy Service Company . . . . . . . . . . . . . . . . . . . . | | — | 294 | — |
| EWP Philippines Corporation . . . . . . . . . . . . . . . . . . . . . . . | | 5,586 | — | — |
| KEPCO Netherlands S3 B.V. . . . . . . . . . . . . . . . . . . . . . . . . | | 1,382 | — | — |
| PT. KOMIPO Pembangkitan Jawa Bali . . . . . . . . . . . . . . . . | | 3,169 | 3,222 | 3,188 |
| KEPCO Netherlands J3 B.V. . . . . . . . . . . . . . . . . . . . . . . . . | | 19,254 | 12,507 | — |
| Gyeongju Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 1,294 | 679 | — |
| Energy New Industry Specialized Investment Private Investment Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | — | — | 291 |
| HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | — | — | 11 |
| KOSPO Power Services Limitada . . . . . . . . . . . . . . . . . . . . . | | — | — | 425 |
| Cogentrix Solar Services, LLC . . . . . . . . . . . . . . . . . . . . . . | | — | — | 344 |
| | ₩ | 833,195 | 1,150,208 | 1,088,210 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

## 17.  Investments in Associates and Joint Ventures

**(1)  Investments in associates and joint ventures as of December 31, 2016 and 2017 are as follows:**

|  | | | | 2016 | |
| Investees | Key operation activities | Location | Percentage of ownership | Acquisition cost | Book value |
|---|---|---|---|---|---|
|  | | | | In millions of won | |
| **<Associates>** | | | | | |
| Korea Gas Corporation(*1) . . . . . . . . . . | Importing and wholesaling LNG | KOREA | 20.47% | ₩    94,500 | 1,933,877 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . | Electricity metering and others | KOREA | 29.00% | 4,727 | 20,475 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . | Broadcasting | KOREA | 21.43% | 59,000 | 38,156 |
| Cheongna Energy Co., Ltd. . . . . . . . . . . | Generating and distributing vapor and hot/cold water | KOREA | 43.90% | 48,353 | 12,373 |
| Gangwon Wind Power Co., Ltd.(*2) . . . . | Power generation | KOREA | 15.00% | 5,725 | 13,069 |
| Hyundai Green Power Co., Ltd. . . . . . . . | Power generation | KOREA | 29.00% | 88,885 | 115,998 |
| Korea Power Exchange(*6) . . . . . . . . . . | Management of power market and others | KOREA | 100.00% | 127,839 | 223,238 |
| AMEC Partners Korea Ltd.(*3) . . . . . . . | Resources development | KOREA | 19.00% | 707 | 225 |
| Hyundai Energy Co., Ltd.(*9) . . . . . . . . | Power generation | KOREA | 30.66% | 71,070 | 1,031 |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . . . | Artificial light-weight aggregate | KOREA | 36.10% | 1,516 | |
| Taebaek Wind Power Co., Ltd. . . . . . . . | Power generation | KOREA | 25.00% | 3,810 | 4,750 |
| Taeback Guinemi Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 25.00% | 3,420 | 3,131 |
| Pyeongchang Wind Power Co., Ltd. . . . . | Power generation | KOREA | 25.00% | 3,875 | 3,383 |
| Daeryun Power Co., Ltd.(*3, 10) . . . . . . | Power generation | KOREA | 13.13% | 25,477 | 29,873 |
| Changjuk Wind Power Co., Ltd. . . . . . . . | Power generation | KOREA | 30.00% | 3,801 | 6,930 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . | Power generation | KOREA | 27.00% | 1,296 | 2,073 |
| SPC Power Corporation  . . . . . . . . . . . . | Power generation | PHILIPPINES | 38.00% | 20,635 | 56,818 |
| Gemeng International Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 34.00% | 413,153 | 680,065 |
| PT. Cirebon Electric Power . . . . . . . . . . | Power generation | INDONESIA | 27.50% | 40,365 | 96,658 |
| KNOC Nigerian East Oil Co., Ltd.(*4) . . . . . . . . . . . . . . . . . . . . . . | Resources development | NIGERIA | 14.63% | 12 | — |
| KNOC Nigerian West Oil Co., Ltd.(*4) . . . . . . . . . . . . . . . . . . . . . . | Resources development | NIGERIA | 14.63% | 12 | — |
| PT Wampu Electric Power . . . . . . . . . . . | Power generation | INDONESIA | 46.00% | 21,292 | 23,188 |
| PT. Bayan Resources TBK  . . . . . . . . . . | Resources development | INDONESIA | 20.00% | 615,860 | 402,667 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.00% | 132,300 | 123,912 |
| Pioneer Gas Power Limited(*8) . . . . . . . | Power generation | INDIA | 40.00% | 49,831 | 50,740 |
| Eurasia Energy Holdings . . . . . . . . . . . . | Power generation and resources development | RUSSIA | 40.00% | 461 | |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . | Power generation | LAOS | 25.00% | 49,119 | 51,544 |
| Hadong Mineral Fiber Co., Ltd.(*17) . . . | Recycling fly ashes | KOREA | 8.33% | 50 | — |
| Green Biomass Co., Ltd.(*12) . . . . . . . . | Power generation | KOREA | 14.00% | 714 | 47 |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . . . | Manufacturing and operating floating coal terminal | INDONESIA | 29.00% | 2,978 | — |
| Samcheok Eco Materials Co., Ltd.(*3, 11) . . . . . . . . . . . . . . . . . . . . | Recycling fly ashes | KOREA | 2.35% | 686 | — |
| Noeul Green Energy Co., Ltd. . . . | Power generation | KOREA | 29.00% | 1,740 | 1,217 |
| Naepo Green Energy Co., Ltd. . . . . . . . . | Power generation | KOREA | 25.00% | 29,200 | 25,438 |
| Goseong Green Energy Co., Ltd.(*2) . . . | Power generation | KOREA | 1.12% | 2,900 | 2,663 |
| Gangneung Eco Power Co., Ltd.(*2) . . . | Power generation | KOREA | 1.61% | 2,900 | 2,646 |
| Shin Pyeongtaek Power Co., Ltd. . . . . . . | Power generation | KOREA | 40.00% | 40 | — |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 28.00% | 194 | 181 |
| DS POWER Co., Ltd.(*2) . . . . . . . . . . . | Power generation | KOREA | 14.44% | 17,900 | 7,190 |
| Dongducheon Dream Power Co., Ltd. . . | Power generation | KOREA | 33.61% | 61,535 | 46,876 |
| KS Solar Co., Ltd.(*3) . . . . . . . . . . . . . | Power generation | KOREA | 19.00% | 637 | 604 |
| Yeongwol Energy Station Co., Ltd.(*2) . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 10.00% | 1,400 | — |

F-83

|  |  |  | 2016 |  |  |
|---|---|---|---|---|---|
| Investees | Key operation activities | Location | Percentage of ownership | Acquisition cost | Book value |
|  |  |  |  | In millions of won | |
| Jinbhuvish Power Generation Pvt. Ltd.(*2) ........................ | Power generation | INDIA | 5.16% | ₩ 9,000 | — |
| SE Green Energy Co., Ltd. .......... | Power generation support | KOREA | 47.76% | 3,821 | 3,525 |
| Daegu Photovoltaic Co., Ltd. ........ | Power generation | KOREA | 29.00% | 1,230 | 1,700 |
| Jeongam Wind Power Co., Ltd........ | Power generation | KOREA | 40.00% | 5,580 | 4,000 |
| Korea Power Engineering Service Co., Ltd............................. | Construction and service | KOREA | 29.00% | 290 | 2,810 |
| Busan Green Energy Co., Ltd. ......... | Power generation | KOREA | 29.00% | 14,564 | 13,803 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.)(*2) .... | Power generation | KOREA | 18.87% | 1,000 | — |
| Korea Electric Vehicle Charging Service ........................ | Electric vehicle charge service | KOREA | 28.00% | 1,596 | 1,103 |
| Ulleungdo Natural Energy Co., Ltd. ... | Renewable power generation | KOREA | 29.85% | 8,000 | 6,894 |
| Korea Nuclear Partners Co., Ltd. ..... | Electric material agency | KOREA | 29.00% | 290 | 248 |
| Tamra Offshore Wind Power Co., Ltd............................. | Power generation | KOREA | 27.00% | 8,910 | 7,015 |
| Korea Electric Power Corporation Fund(*13) ...................... | Developing electric enterprises | KOREA | 98.09% | 51,500 | 50,856 |
| Energy Infra Asset Management Co., Ltd.(*3) ........................ | Asset management | KOREA | 9.90% | 297 | 259 |
| Daegu clean Energy Co., Ltd. ......... | Renewable power generation | KOREA | 28.00% | 140 | 140 |
| YaksuESS Co., Ltd ................. | Installing ESS related equipment | KOREA | 29.00% | 210 | 196 |
| Nepal Water & Energy Development Company Private Limited(*14) ...... | Construction and operation of utility plant | NEPAL | 52.77% | 18,568 | 18,667 |
|  |  |  |  | 2,134,911 | 4,092,252 |
| <Joint ventures> |  |  |  |  |  |
| KEPCO-Uhde Inc.(*7) ............. | Power generation | KOREA | 52.8% | 11,355 | 301 |
| Eco Biomass Energy Sdn. Bhd.(*7) .... | Power generation | MALAYSIA | 61.53% | 9,661 | — |
| Datang Chaoyang Renewable Power Co., Ltd............................. | Power generation | CHINA | 40.00% | 27,660 | 28,239 |
| Shuweihat Asia Power Investment B.V. ........................... | Holding company | NETHERLANDS | 49.00% | 46,037 | — |
| Shuweihat Asia Operation & Maintenance Company(*7) ........ | Maintenance of utility plant | CAYMAN | 55.00% | 30 | 450 |
| Waterbury Lake Uranium L.P. ........ | Resources development | CANADA | 36.97% | 26,602 | 21,314 |
| ASM-BG Investicii AD .............. | Power generation | BULGARIA | 50.00% | 16,101 | 21,488 |
| RES Technology AD ................ | Power generation | BULGARIA | 50.00% | 15,595 | 13,582 |
| KV Holdings, Inc. .................. | Power generation | PHILIPPINES | 40.00% | 2,103 | 2,098 |
| KEPCO SPC Power Corporation(*7) ... | Construction and operation of utility plant | PHILIPPINES | 75.20% | 94,579 | 245,367 |
| Canada Korea Uranium Limited Partnership(*5) ................. | Resources development | CANADA | 12.50% | 5,404 | — |
| Gansu Datang Yumen Wind Power Co., Ltd............................. | Power generation | CHINA | 40.00% | 16,621 | 12,821 |
| Datang Chifeng Renewable Power Co., Ltd............................. | Power generation | CHINA | 40.00% | 121,928 | 166,535 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. ................. | Power generation | CHINA | 40.00% | 10,858 | 10,843 |
| Rabigh Electricity Company ......... | Power generation | SAUDI ARABIA | 40.00% | 109,743 | 97,802 |
| Rabigh Operation & Maintenance Company Limited ............... | Maintenance of utility plant | SAUDI ARABIA | 40.00% | 70 | 4,427 |
| Jamaica Public Service Company Limited ........................ | Power generation | JAMAICA | 40.00% | 301,910 | 249,453 |
| KW Nuclear Components Co., Ltd. .... | Manufacturing | KOREA | 45.00% | 833 | 7,133 |
| Busan Shinho Solar Power Co., Ltd. ... | Power generation | KOREA | 25.00% | 2,100 | 3,814 |
| GS Donghae Electric Power Co., Ltd. ... | Power generation | KOREA | 34.00% | 204,000 | 205,948 |

F-84

|  |  |  | 2016 |  |  |  |
| Investees | Key operation activities | Location | Percentage of ownership | | Acquisition cost | Book value |
|  |  |  |  |  | In millions of won | |
| Global Trade Of Power System Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Exporting products and technology of small or medium business by proxy | KOREA | 29.00% | ₩ | 290 | 477 |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . . . | Power generation | KOREA | 29.00% | | 1,856 | 2,343 |
| KODE NOVUS I LLC . . . . . . . . . . . . . | Power generation | USA | 50.00% | | 19,213 | — |
| KODE NOVUS II LLC . . . . . . . . . . . . . | Power generation | USA | 50.00% | | 12,756 | — |
| Daejung Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.90% | | 4,990 | 3,015 |
| Amman Asia Electric Power Company(*7) . . . . . . . . . . . . . . . . . . . . | Power generation | JORDAN | 60.00% | | 111,476 | 153,857 |
| KAPES, Inc.(*7) . . . . . . . . . . . . . . . . . . | R&D | KOREA | 51.00% | | 5,629 | 4,758 |
| Dangjin Eco Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 34.00% | | 56,100 | 53,253 |
| Honam Wind Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 29.00% | | 3,480 | 4,451 |
| Chun-cheon Energy Co., Ltd. . . . . . . . . | Power generation | KOREA | 29.90% | | 52,700 | 50,592 |
| Yeonggwangbaeksu Wind Power Co., Ltd.(*3) . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 15.00% | | 3,000 | 2,689 |
| Nghi Son 2 Power Ltd. . . . . . . . . . . . . . | Power generation | VIETNAM | 50.00% | | 1,788 | 229 |
| Kelar S.A(*7) . . . . . . . . . . . . . . . . . . . . | Power generation | CHILE | 65.00% | | 4,180 | — |
| PT. Tanjung Power Indonesia . . . . . . . . | Power generation | INDONESIA | 35.00% | | 746 | 1,946 |
| Incheon New Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 29.00% | | 461 | 563 |
| Seokmun Energy Co., Ltd. . . . . . . . . . . | Power generation | KOREA | 29.00% | | 580 | 391 |
| Daehan Wind Power PSC . . . . . . . . . . . | Power generation | JORDAN | 50.00% | | 285 | 16 |
| Barakah One Company(*16) . . . . . . . . . | Power generation | UAE | 18.00% | | 118 | 116 |
| Nawah Energy Company(*16) . . . . . . . . | Operation of utility plant | UAE | 18.00% | | 296 | 290 |
| MOMENTUM . . . . . . . . . . . . . . . . . . . . | International thermonuclear experimental reactor construction management | FRANCE | 33.33% | | 1 | 67 |
| Daegu Green Power Co., Ltd.(*15) . . . . . | Power generation | KOREA | 29.00% | | 46,225 | 47,528 |
|  |  |  |  | | 1,349,360 | 1,418,196 |
|  |  |  |  | ₩ | 3,484,271 | 5,510,448 |

(*1)  The effective percentage of ownership is 21.57% considering treasury stocks.

(*2)  The Company can exercise significant influence by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*3)  The Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity.

(*4)  The Company can exercise significant influence by virtue of its contractual right to appoint one out of four members of the steering committee of the entity. Moreover, the Company has significant financial transactions, which can affect its influence on the entity.

(*5)  The Company has joint control over the entity by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*6)  The Government regulates the Company's ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between KPX and the Company's other subsidiaries. The Company can exercise significant influence by its right to nominate directors to the board of directors of the entity.

(*7)  According to the shareholders' agreement, all critical financial and operating decisions must be agreed by all ownership parties. For these reasons, the entities are classified as joint ventures.

(*8)  As of reporting date, the annual reporting period of all associates and joint ventures ends on December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.

(*9)  As of December 31, 2016, 15.64% of ownership of Hyundai Energy Co., Ltd. is held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only does the Company have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank with a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to the Company. In connection with this agreement, the Company applied the equity method on the investment in Hyundai Energy Co., Ltd. with 46.30% of ownership.

(*10) The Company's percentage of ownership has decreased due to the acquisition of Daeryun Power Co., Ltd. and the effective percentage of ownership is 19.45% considering stock purchase options.

F-85

(*11) The Company's effective percentage of ownership excluding the redeemable convertible preferred stock is 25.54%.

(*12) The effective percentage of ownership is less than 20% but the Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity and the fact that the dominant portion of the investee's sales transactions is generated from the Company.

(*13) The effective percentage of ownership is more than 50% but the Company does not hold control over relevant business while it exercises significant influence by participating in the Investment Decision Committee. For this reason, the entity is classified as an associate.

(*14) The effective percentage of ownership is more than 50%, but the Company does not control the entity according to the shareholders' agreement. For this reason, the entity is classified as an associate.

(*15) The entity is reclassified from associates to joint ventures since the terms of the shareholders' agreement had been amended.

(*16) The effective percentage of ownership is less than 20%, but the Company has joint control over the entity as decisions on the major activities require the unanimous consent of the parties that collectively control the entity.

(*17) Although the percentage of ownership temporarily decreased to 8.33% from the difference in timing of capital payment by shareholders, the Company can exercise significant influence by virtue of its right to appoint a director to the board of directors of the entity based on the shareholders' agreement. The percentage of ownership is 25.00% at the time of completion of capital payment.

|  |  |  | 2017 |  |  |
| --- | --- | --- | --- | --- | --- |
| Investees | Key operation activities | Location | Percentage of ownership | Acquisition cost | Book value |
|  |  |  |  | In millions of won | |
| **\<Associates\>** |  |  |  |  |  |
| Korea Gas Corporation(*1) . . . . . . . . . . . . | Importing and wholesaling LNG | KOREA | 20.47% | ₩ 94,500 | 1,618,868 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . . . . | Electricity metering and others | KOREA | 29.00% | 4,727 | 21,838 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . . | Broadcasting | KOREA | 21.43% | 59,000 | 40,606 |
| Cheongna Energy Co., Ltd. . . . . . . . . . . | Generating and distributing vapor and hot/cold water | KOREA | 43.90% | 48,353 | 8,337 |
| Gangwon Wind Power Co., Ltd.(*2) . . . . . | Power generation | KOREA | 15.00% | 5,725 | 13,855 |
| Hyundai Green Power Co., Ltd. . . . . . . . | Power generation | KOREA | 29.00% | 88,885 | 114,806 |
| Korea Power Exchange(*5) . . . . . . . . . . . | Management of power market and others | KOREA | 100.00% | 127,839 | 237,631 |
| AMEC Partners Korea Ltd.(*3) . . . . . . . . | Resources development | KOREA | 19.00% | 707 | 215 |
| Hyundai Energy Co., Ltd.(*8) . . . . . . . . . | Power generation | KOREA | 30.66% | 71,070 | — |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . . . . | Artificial light-weight aggregate | KOREA | 36.10% | 1,516 | — |
| Taebaek Wind Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 25.00% | 3,810 | 5,319 |
| Taeback Guinemi Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 25.00% | 3,420 | 3,089 |
| Pyeongchang Wind Power Co., Ltd. . . . . . | Power generation | KOREA | 25.00% | 3,875 | 4,136 |
| Daeryun Power Co., Ltd.(*3, 9) . . . . . . . . | Power generation | KOREA | 13.13% | 25,477 | 25,113 |
| Changjuk Wind Power Co., Ltd. . . . . . . . | Power generation | KOREA | 30.00% | 3,801 | 7,515 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . | Power generation | KOREA | 27.00% | 1,296 | 2,218 |
| SPC Power Corporation . . . . . . . . . . . . . | Power generation | PHILIPPINES | 38.00% | 20,635 | 52,283 |
| Gemeng International Energy Co., Ltd. . . . | Power generation | CHINA | 34.00% | 413,153 | 649,973 |
| PT. Cirebon Electric Power . . . . . . . . . . | Power generation | INDONESIA | 27.50% | 40,365 | 97,410 |
| KNOC Nigerian East Oil Co., Ltd.(*4) . . . | Resources development | NIGERIA | 14.63% | 12 | — |
| KNOC Nigerian West Oil Co., Ltd.(*4) . . . | Resources development | NIGERIA | 14.63% | 12 | — |
| PT Wampu Electric Power . . . . . . . . . . . | Power generation | INDONESIA | 46.00% | 21,292 | 29,403 |
| PT. Bayan Resources TBK . . . . . . . . . . . | Resources development | INDONESIA | 20.00% | 615,860 | 451,831 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.00% | 132,300 | 116,945 |
| Pioneer Gas Power Limited(*7) . . . . . . . . | Power generation | INDIA | 38.50% | 49,831 | 38,659 |
| Eurasia Energy Holdings . . . . . . . . . . . . . | Power generation and resources development | RUSSIA | 40.00% | 461 | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . . | Power generation | LAOS | 25.00% | 71,481 | 61,779 |
| Hadong Mineral Fiber Co., Ltd.(*3) . . . . . | Recycling fly ashes | KOREA | 8.33% | 50 | — |
| Green Biomass Co., Ltd.(*11, 14) . . . . . . . | Power generation | KOREA | 8.80% | 714 | 208 |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . . . . | Manufacturing and operating floating coal terminal | INDONESIA | 29.00% | 2,978 | — |
| Samcheok Eco Materials Co., Ltd.(*10) . . | Recycling fly ashes | KOREA | 2.35% | 686 | — |
| Noeul Green Energy Co., Ltd. . . . . . . . . . | Power generation | KOREA | 29.00% | 1,740 | 2,067 |

F-86

**2017**

| Investees | Key operation activities | Location | Percentage of ownership | Acquisition cost | Book value |
|---|---|---|---|---|---|
| | | | | In millions of won | |
| Naepo Green Energy Co., Ltd. . . . . . . . . | Power generation | KOREA | 41.67% | ₩ 29,200 | 20,598 |
| Goseong Green Energy Co., Ltd.(*2) . . . . | Power generation | KOREA | 1.12% | 2,900 | 2,597 |
| Gangneung Eco Power Co., Ltd.(*2) . . . . . | Power generation | KOREA | 1.61% | 2,900 | 2,583 |
| Shin Pyeongtaek Power Co., Ltd. . . . . . . | Power generation | KOREA | 40.00% | 43,920 | 34,903 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 28.00% | 194 | 187 |
| Dongducheon Dream Power Co., Ltd. . . . . | Power generation | KOREA | 33.61% | 111,134 | 53,233 |
| Jinbhuvish Power Generation Pvt. Ltd.(*2) . . . . . . . . . . . . . . . . . . . . . . . | Power generation | INDIA | 5.16% | 9,000 | — |
| SE Green Energy Co., Ltd. . . . . . . . . . . | Power generation | KOREA | 47.76% | 3,821 | 3,476 |
| Daegu Photovoltaic Co., Ltd. . . . . . . . . . | Power generation | KOREA | 29.00% | 1,230 | 1,718 |
| Jeongam Wind Power Co., Ltd. . . . . . . . | Power generation | KOREA | 40.00% | 5,580 | 3,763 |
| Korea Power Engineering Service Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | Construction and service | KOREA | 29.00% | 290 | 3,659 |
| Busan Green Energy Co., Ltd. . . . . . . . . | Power generation | KOREA | 29.00% | 5,243 | 7,363 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.)(*2) . . . . | Power generation | KOREA | 18.87% | 1,000 | — |
| Korea Electric Vehicle Charging Service . . . . . . . . . . . . . . . . . . . . . . . | Electric vehicle charge service | KOREA | 28.00% | 2,604 | 1,749 |
| Ulleungdo Natural Energy Co., Ltd. . . . . . | Renewable power generation | KOREA | 29.85% | 8,000 | 6,370 |
| Korea Nuclear Partners Co., Ltd. . . . . . . . | Electric material agency | KOREA | 29.00% | 290 | 383 |
| Tamra Offshore Wind Power Co., Ltd. . . . | Power generation | KOREA | 27.00% | 8,910 | 8,560 |
| Korea Electric Power Corporation Fund(*12) . . . . . . . . . . . . . . . . . . . . . . | Developing electric enterprises | KOREA | 98.09% | 51,500 | 47,974 |
| Energy Infra Asset Management Co., Ltd.(*3) . . . . . . . . . . . . . . . . . . . . . | Asset management | KOREA | 9.90% | 297 | 476 |
| Daegu clean Energy Co., Ltd. . . . . . . . . | Renewable power generation | KOREA | 28.00% | 140 | 11 |
| YaksuESS Co., Ltd . . . . . . . . . . . . . . . | Installing ESS related equipment | KOREA | 29.00% | 210 | 194 |
| Nepal Water & Energy Development Company Private Limited(*15) . . . . . . . | Construction and operation of utility plant | NEPAL | 62.13% | 33,577 | 30,498 |
| Gwangyang Green Energy Co., Ltd. . . . . . | Power generation | KOREA | 20.00% | 2,000 | 1,772 |
| PND solar., Ltd . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 29.00% | 1,250 | 1,250 |
| | | | | 2,240,761 | 3,837,421 |
| **<Joint ventures>** | | | | | |
| KEPCO-Uhde Inc.(*6) . . . . . . . . . . . . . . | Power generation | KOREA | 52.80% | 11,355 | 258 |
| Eco Biomass Energy Sdn. Bhd.(*6) . . . . . | Power generation | MALAYSIA | 61.53% | 14,439 | — |
| Datang Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | 27,660 | 27,262 |
| Shuweihat Asia Power Investment B.V. . . | Holding company | NETHERLANDS | 49.00% | 46,037 | 15,675 |
| Shuweihat Asia Operation & Maintenance Company(*6) . . . . . . . . . . . . . . . . . . . . | Maintenance of utility plant | CAYMAN | 55.00% | 30 | 663 |
| Waterbury Lake Uranium L.P. . . . . . . . . | Resources development | CANADA | 35.76% | 26,602 | 19,781 |
| ASM-BG Investicii AD . . . . . . . . . . . . . | Power generation | BULGARIA | 50.00% | 16,101 | 21,202 |
| RES Technology AD . . . . . . . . . . . . . . . | Power generation | BULGARIA | 50.00% | 15,595 | 14,375 |
| KV Holdings, Inc. . . . . . . . . . . . . . . . . | Power generation | PHILIPPINES | 40.00% | 2,103 | 1,918 |
| KEPCO SPC Power Corporation(*6) . . . . | Construction and operation of utility plant | PHILIPPINES | 75.20% | 94,579 | 217,094 |
| Gansu Datang Yumen Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | 16,621 | 10,840 |
| Datang Chifeng Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | 121,928 | 171,055 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | 10,858 | 11,060 |
| Rabigh Electricity Company . . . . . . . . . . | Power generation | SAUDI ARABIA | 40.00% | 109,743 | 99,356 |
| Rabigh Operation & Maintenance Company Limited . . . . . . . . . . . . . . . | Maintenance of utility plant | SAUDI ARABIA | 40.00% | 70 | 3,987 |

F-87

| Investees | Key operation activities | Location | Percentage of ownership | Acquisition cost | Book value |
|---|---|---|---|---|---|
| **2017** | | | | | |
| | | | | In millions of won | |
| Jamaica Public Service Company Limited | Power generation | JAMAICA | 40.00% | ₩ 301,910 | 221,153 |
| KW Nuclear Components Co., Ltd. | Manufacturing | KOREA | 45.00% | 833 | 6,703 |
| Busan Shinho Solar Power Co., Ltd. | Power generation | KOREA | 25.00% | 2,100 | 4,346 |
| GS Donghae Electric Power Co., Ltd. | Power generation | KOREA | 34.00% | 204,000 | 220,727 |
| Global Trade Of Power System Co., Ltd. | Exporting products and technology of small or medium business by proxy | KOREA | 29.00% | 290 | 577 |
| Expressway Solar-light Power Generation Co., Ltd. | Power generation | KOREA | 29.00% | 1,856 | 2,463 |
| KODE NOVUS I LLC | Power generation | USA | 50.00% | 19,213 | — |
| KODE NOVUS II LLC | Power generation | USA | 50.00% | 12,756 | — |
| Daejung Offshore Wind Power Co., Ltd. | Power generation | KOREA | 49.90% | 5,190 | 2,969 |
| Amman Asia Electric Power Company(*6) | Power generation | JORDAN | 60.00% | 111,476 | 145,676 |
| KAPES, Inc.(*6) | R&D | KOREA | 51.00% | 5,629 | 7,476 |
| Dangjin Eco Power Co., Ltd. | Power generation | KOREA | 34.00% | 61,540 | 57,928 |
| Honam Wind Power Co., Ltd. | Power generation | KOREA | 29.00% | 3,480 | 4,302 |
| Chun-cheon Energy Co., Ltd. | Power generation | KOREA | 29.90% | 52,700 | 48,118 |
| Yeonggwangbaeksu Wind Power Co., Ltd.(*3) | Power generation | KOREA | 15.00% | 3,000 | 2,734 |
| Nghi Son 2 Power Ltd. | Power generation | VIETNAM | 50.00% | 2,781 | 183 |
| Kelar S.A(*6) | Power generation | CHILE | 65.00% | 77,220 | 67,233 |
| PT. Tanjung Power Indonesia | Power generation | INDONESIA | 35.00% | 746 | 1,776 |
| Incheon New Power Co., Ltd. | Power generation | KOREA | 29.00% | 461 | 619 |
| Seokmun Energy Co., Ltd. | Power generation | KOREA | 29.00% | 15,370 | 13,786 |
| Daehan Wind Power PSC | Power generation | JORDAN | 50.00% | 285 | — |
| Barakah One Company(*13) | Power generation | UAE | 18.00% | 118 | 626 |
| Nawah Energy Company(*13) | Operation of utility plant | UAE | 18.00% | 296 | 258 |
| MOMENTUM | International thermonuclear experimental reactor construction management | FRANCE | 33.33% | 1 | 391 |
| Daegu Green Power Co., Ltd. | Power generation | KOREA | 29.00% | 46,225 | 42,391 |
| Yeonggwang Wind Power Co., Ltd. | Power generation | KOREA | 41.00% | 15,375 | 15,294 |
| Chester Solar IV SpA(*6) | Power generation | CHILE | 81.82% | 1,700 | 1,700 |
| Chester Solar V SpA(*6) | Power generation | CHILE | 81.82% | 525 | 525 |
| Diego de Almagro Solar SpA(*6) | Power generation | CHILE | 81.82% | 2,091 | 2,091 |
| South Jamaica Power Company Limited | Power generation | JAMAICA | 20.00% | 7,090 | 6,704 |
| | | | | 1,469,978 | 1,493,275 |
| | | | | ₩ 3,710,739 | 5,330,696 |

(*1)  The effective percentage of ownership is 21.57% considering treasury stocks.

(*2)  The Company can exercise significant influence by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*3)  The Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity.

(*4)  The Company can exercise significant influence by virtue of its contractual right to appoint one out of four members of the steering committee of the entity. Moreover, the Company has significant financial transactions, which can affect its influence on the entity.

(*5)  The Government regulates the Company's ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between KPX and the Company's other subsidiaries. The Company can exercise significant influence by its right to nominate directors to the board of directors of the entity.

F-88

(*6)   According to the shareholders' agreement, all critical financial and operating decisions must be agreed to by all ownership parties. For these reasons, the entities are classified as joint ventures.

(*7)   As of reporting date, the annual reporting period of all associates and joint ventures ends on December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.

(*8)   As of December 31, 2017, 15.64% of ownership of Hyundai Energy Co., Ltd. is held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only does the Company have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank with a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to the Company. In connection with this agreement, the Company applied the equity method on the investment in Hyundai Energy Co., Ltd. with 46.30% of ownership.

(*9)   The Company's percentage of ownership has decreased due to the acquisition of Daeryun Power Co., Ltd. and the effective percentage of ownership is 19.45% considering stock purchase options.

(*10)  The Company's effective percentage of ownership excluding the redeemable convertible preferred stock is 25.54%.

(*11)  The effective percentage of ownership is less than 20% but the Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity and the fact that the dominant portion of the investee's sales transactions is generated from the Company.

(*12)  The effective percentage of ownership is more than 50% but the Company does not hold control over relevant business while it exercises significant influence by participating in the Investment Decision Committee. For this reason, the entity is classified as an associate.

(*13)  The effective percentage of ownership is less than 20% but the Company has joint control over the entity as decisions on the major activities require the unanimous consent of the parties that collectively control the entity

(*14)  The percentage of ownership decreased since the Company did not participate in the capital increase of Green Biomass Co., Ltd. during the period.

(*15)  The effective percentage of ownership is more than 50% but the Company does not hold control over the entity according to the shareholders' agreement. For this reason, the entity is classified as an associate.

(2)   **The fair value of associates which are actively traded on the open market and have a readily available market value as of December 31, 2016 and 2017 are as follows:**

| Investees | 2016 | 2017 |
|---|---|---|
| | In millions of won | |
| **<Associates>** | | |
| Korea Electric Power Industrial Development Co., Ltd. ................ | ₩  45,474 | 38,667 |
| Korea Gas Corporation(*) ........................................ | 915,705 | 804,195 |
| YTN Co., Ltd. .................................................. | 22,320 | 18,855 |
| SPC Power Corporation ......................................... | 70,253 | 72,616 |
| PT. Bayan Resources TBK ....................................... | 359,200 | 558,267 |

(*)   The carrying amount of Korea Gas Corporation ("KOGAS") is ₩1,618,868 million as of December 31, 2017 and management has determined that there is objective evidence of impairment. As a result of the impairment test, the Company has not recognized any impairment loss as the value in use is greater than the carrying amount. The recoverable amount of KOGAS based on its value in use is calculated by considering the long-term natural gas supply and demand programs of future cash flows approved by Ministry of Trade, Industry & Energy and the discount rate of 4.94%.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(3)  Changes in investments in associates and joint ventures for the years ended December 31, 2016 and 2017 are as follows:

| | | | | | | 2016 | | |
| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | | |
| **\<Associates\>** | | | | | | | | |
| Daegu Green Power Co., Ltd. ...... | ₩ 80,267 | 3,347 | (34,422) | — | (1,814) | 148 | (47,526) | — |
| Korea Gas Corporation ........... | 2,102,813 | — | — | (3,213) | (146,308) | (14,551) | (4,864) | 1,933,877 |
| Korea Electric Power Industrial Development Co., Ltd. ......... | 18,994 | — | — | (1,598) | 4,491 | — | (1,412) | 20,475 |
| YTN Co., Ltd. .................. | 38,365 | — | — | — | (227) | 32 | (14) | 38,156 |
| Cheongna Energy Co., Ltd. ....... | 19,490 | — | — | — | (7,117) | — | — | 12,373 |
| Gangwon Wind Power Co., Ltd. ... | 12,890 | — | — | (1,136) | 1,270 | 45 | — | 13,069 |
| Hyundai Green Power Co., Ltd. .... | 113,664 | — | — | (8,888) | 11,222 | — | — | 115,998 |
| Korea Power Exchange .......... | 208,735 | — | — | — | 15,847 | — | (1,344) | 223,238 |
| AMEC Partners Korea Ltd. ....... | 230 | — | — | — | (5) | — | — | 225 |
| Hyundai Energy Co., Ltd. ........ | 6,990 | — | — | — | (21,163) | — | 15,204 | 1,031 |
| Ecollite Co., Ltd. .............. | — | — | — | — | — | — | — | — |
| Taebaek Wind Power Co., Ltd. .... | 4,956 | — | — | — | (206) | — | — | 4,750 |
| Taeback Guinemi Wind Power Co., Ltd. ....................... | 2,587 | 570 | — | — | (26) | — | — | 3,131 |
| Pyeongchang Wind Power Co., Ltd. ....................... | 3,402 | — | — | — | (19) | — | — | 3,383 |
| Daeryun Power Co., Ltd. ......... | 36,156 | — | — | — | (6,282) | (1) | — | 29,873 |
| JinanJangsu Wind Power Co., Ltd. ....................... | 77 | — | (64) | — | (13) | — | — | — |
| Changjuk Wind Power Co., Ltd. ... | 6,143 | — | — | (190) | 977 | — | — | 6,930 |
| KNH Solar Co., Ltd. ............ | 1,924 | — | — | — | 144 | 5 | — | 2,073 |
| SPC Power Corporation .......... | 58,033 | — | — | (7,151) | 6,416 | (477) | (3) | 56,818 |
| Gemeng International Energy Co., Ltd. ....................... | 728,396 | — | — | (16,476) | 26,714 | (58,493) | (76) | 680,065 |
| PT. Cirebon Electric Power ....... | 60,574 | — | — | (1,242) | 31,511 | 2,568 | 3,247 | 96,658 |
| KNOC Nigerian East Oil Co., Ltd. ....................... | — | — | — | — | (1,346) | (398) | 1,744 | — |
| KNOC Nigerian West Oil Co., Ltd. ....................... | — | — | — | — | (973) | (356) | 1,329 | — |
| Dolphin Property Limited ........ | 61 | — | — | (35) | — | (69) | 43 | — |
| PT Wampu Electric Power ........ | 18,963 | — | — | — | 3,493 | (3) | 735 | 23,188 |
| PT. Bayan Resources TBK(*2) .... | 525,066 | — | — | — | (23,257) | 208 | (99,350) | 402,667 |
| S-Power Co., Ltd. .............. | 130,908 | — | — | — | (7,006) | — | 10 | 123,912 |
| Pioneer Gas Power Limited ....... | 51,187 | — | — | — | (698) | 251 | — | 50,740 |
| Eurasia Energy Holdings ........ | — | — | — | — | — | — | — | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. ....................... | 31,863 | 16,402 | — | — | 1,576 | 1,703 | — | 51,544 |
| Busan Solar Co., Ltd. ........... | 925 | — | (887) | — | (38) | — | — | — |
| Hadong Mineral Fiber Co., Ltd. .... | — | — | — | — | — | — | — | — |
| Green Biomass Co., Ltd. ......... | — | — | — | — | (138) | — | 185 | 47 |
| PT. Mutiara Jawa ............... | — | — | — | — | — | — | — | — |
| Samcheok Eco Materials Co., Ltd. ....................... | 295 | — | — | — | (418) | — | — | 1,217 |
| Noeul Green Energy Co., Ltd. ..... | 295 | 1,340 | — | — | (418) | — | — | 1,217 |
| Naepo Green Energy Co., Ltd. ..... | 26,746 | — | — | — | (1,308) | — | — | 25,438 |
| Goseong Green Energy Co., Ltd. ... | 2,670 | — | — | — | 71 | — | (78) | 2,663 |
| Gangneung Eco Power Co., Ltd. .... | 2,688 | — | — | — | 56 | — | (98) | 2,646 |
| Shin Pyeongtaek Power Co., Ltd. .... | — | — | — | — | — | — | — | — |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. ............. | 189 | — | — | — | (10) | — | 2 | 181 |
| DS POWER Co., Ltd. ............ | 10,960 | — | — | — | (3,738) | — | (32) | 7,190 |
| Dongducheon Dream Power Co., Ltd. ....................... | 55,667 | — | — | — | (8,757) | — | (34) | 46,876 |
| KS Solar Co., Ltd. .............. | 618 | — | — | — | (14) | — | — | 604 |
| Yeongwol Energy Station Co., Ltd.(*1) ................... | 1,290 | — | — | — | 85 | 25 | (1,400) | — |

F-90

**2016**

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | | |
| Jinbhuvish Power Generation Pvt. Ltd.(*3) | ₩ 8,350 | — | — | — | (49) | (198) | (8,103) | — |
| SE Green Energy Co., Ltd. | 3,575 | — | — | — | (50) | — | — | 3,525 |
| Daegu Photovoltaic Co., Ltd. | 1,886 | — | — | (411) | 225 | — | — | 1,700 |
| Jeongam Wind Power Co., Ltd. | 702 | 3,900 | — | — | (602) | — | — | 4,000 |
| Korea Power Engineering Service Co., Ltd. | 1,805 | — | — | — | 1,005 | — | — | 2,810 |
| Busan Green Energy Co., Ltd. | 14,512 | — | — | — | (709) | — | — | 13,803 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | 904 | — | — | — | (904) | — | — | — |
| Korea Electric Vehicle Charging Service | 1,446 | — | — | — | (343) | — | — | 1,103 |
| Ulleungdo Natural Energy Co., Ltd. | 7,417 | — | — | — | (516) | — | (7) | 6,894 |
| Korea Nuclear Partners Co., Ltd. | 289 | — | — | — | (41) | — | — | 248 |
| Tamra Offshore Wind Power Co., Ltd. | — | 8,910 | — | — | (1,895) | — | — | 7,015 |
| Korea Electric Power Corporation Fund | — | 51,500 | — | — | (644) | — | — | 50,856 |
| Energy Infra Asset Management Co., Ltd. | — | 297 | — | — | (38) | — | — | 259 |
| Daegu clean Energy Co., Ltd. | — | 140 | — | — | — | — | — | 140 |
| YaksuESS Co., Ltd | — | 210 | — | — | (14) | — | — | 196 |
| Nepal Water & Energy Development Company Private Limited | — | — | — | — | — | — | 18,667 | 18,667 |
| | 4,405,668 | 86,616 | (35,373) | (40,340) | (131,583) | (69,561) | (123,175) | 4,092,252 |
| **<Joint ventures>** | | | | | | | | |
| KEPCO-Uhde Inc.(*4) | 8,549 | — | — | — | (159) | — | (8,089) | 301 |
| Eco Biomass Energy Sdn. Bhd. | | | | | | | | |
| Datang Chaoyang Renewable Power Co., Ltd. | 27,640 | — | — | — | 1,417 | (818) | — | 28,239 |
| Shuweihat Asia Power Investment B.V. | 20,474 | — | (14,154) | (2,957) | 6,131 | (9,494) | — | — |
| Shuweihat Asia Operation & Maintenance Company | 486 | — | — | (931) | 941 | (46) | — | 450 |
| Waterbury Lake Uranium L.P. | 20,299 | — | — | — | — | 1,138 | (123) | 21,314 |
| ASM-BG Investicii AD | 20,203 | — | — | — | 1,508 | (223) | — | 21,488 |
| RES Technology AD | 13,789 | — | — | — | (68) | (139) | — | 13,582 |
| KV Holdings, Inc. | 2,010 | — | — | (302) | 429 | (39) | — | 2,098 |
| KEPCO SPC Power Corporation | 208,524 | — | — | (5,955) | 48,132 | (5,308) | (26) | 245,367 |
| Canada Korea Uranium Limited Partnership | — | — | — | — | — | — | — | — |
| Gansu Datang Yumen Wind Power Co., Ltd. | 16,107 | — | — | — | (2,836) | (450) | — | 12,821 |
| Datang Chifeng Renewable Power Co., Ltd. | 171,224 | — | — | (7,384) | 7,455 | (4,760) | — | 166,535 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | 10,580 | — | — | (440) | 1,002 | (299) | — | 10,843 |
| Rabigh Electricity Company | 59,368 | — | — | — | 18,961 | 19,473 | — | 97,802 |
| Rabigh Operation & Maintenance Company Limited | 3,586 | — | — | (1,934) | 2,253 | 229 | 293 | 4,427 |
| Jamaica Public Service Company Limited | 241,918 | — | — | — | — | 7,535 | — | 249,453 |
| KW Nuclear Components Co., Ltd. | 4,985 | — | — | (2,191) | 4,344 | — | (5) | 7,133 |
| Busan Shinho Solar Power Co., Ltd. | 3,678 | — | — | (185) | 321 | — | — | 3,814 |
| GS Donghae Electric Power Co., Ltd. | 200,379 | — | — | — | 5,575 | — | (6) | 205,948 |

F-91

**2016**

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | | |
| Global Trade Of Power System Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | ₩ 426 | — | — | — | 51 | — | — | 477 |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . | 2,100 | — | — | — | 243 | — | — | 2,343 |
| KODE NOVUS I LLC . . . . . . . . . . | — | — | — | — | — | — | — | — |
| KODE NOVUS II LLC . . . . . . . . . | — | 258 | — | — | (260) | — | 2 | — |
| Daejung Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 3,352 | — | — | — | (337) | — | — | 3,015 |
| Amman Asia Electric Power Company . . . . . . . . . . . . . . . . . . . | 137,668 | — | — | (12,684) | 17,811 | 11,062 | — | 153,857 |
| KAPES, Inc. . . . . . . . . . . . . . . . . . . | 4,501 | — | — | — | 311 | — | (54) | 4,758 |
| Dangjin Eco Power Co., Ltd. . . . . . . | 48,281 | 5,100 | — | — | (696) | (26) | 594 | 53,253 |
| Honam Wind Power Co., Ltd. . . . . . | 3,926 | — | — | (104) | 629 | — | — | 4,451 |
| Nepal Water & Energy Development Company Private Limited . . . . . . . | 17,765 | — | — | — | 359 | 543 | (18,667) | — |
| Chun-cheon Energy Co., Ltd. . . . . . . | 31,976 | 19,832 | — | — | (1,121) | (95) | — | 50,592 |
| Yeonggwangbaeksu Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 2,668 | — | — | — | 16 | — | 5 | 2,689 |
| Nghi Son 2 Power Ltd. . . . . . . . . . . | 269 | 716 | — | — | (740) | (16) | — | 229 |
| Kelar S.A . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | — | — | — |
| PT. Tanjung Power Indonesia . . . . . | 617 | — | — | — | 1,337 | — | (8) | 1,946 |
| Incheon New Power Co., Ltd. . . . . . | 514 | — | — | — | 41 | 8 | — | 563 |
| Seokmun Energy Co., Ltd. . . . . . . . . | — | — | — | — | (197) | 793 | (205) | 391 |
| Daehan Wind Power PSC . . . . . . . . . | — | 285 | — | — | (261) | (8) | — | 16 |
| Barakah One Company . . . . . . . . . . | — | 118 | — | — | — | — | (2) | 116 |
| Nawah Energy Company . . . . . . . . . | — | 296 | — | — | — | — | (6) | 290 |
| MOMENTUM . . . . . . . . . . . . . . . . . | — | 1 | — | — | 65 | — | 1 | 67 |
| Daegu Green Power Co., Ltd. . . . . . | — | — | — | — | — | — | 47,528 | 47,528 |
| | 1,287,862 | 26,606 | (14,154) | (35,067) | 112,657 | 19,060 | 21,232 | 1,418,196 |
| | ₩ 5,693,530 | 113,222 | (49,527) | (75,407) | (18,926) | (50,501) | (101,943) | 5,510,448 |

(*1) 'Others' include ₩1,400 million of assets held-for-sale (note 42).

(*2) It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩99,338 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

(*3) Due to discontinuation of operations during the year ended December 31, 2016, the Company recognized an impairment loss of ₩8,103 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

(*4) It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩8,099 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

F-92

**2017**

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | | |
| **\<Associates\>** | | | | | | | | |
| Korea Gas Corporation . . . . . . . . . . . | ₩ 1,933,877 | — | — | — | (242,232) | (72,648) | (129) | 1,618,868 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . | 20,475 | — | — | (2,061) | 3,428 | 102 | (106) | 21,838 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . | 38,156 | — | — | (135) | 1,095 | 929 | 561 | 40,606 |
| Cheongna Energy Co., Ltd. . . . . . . . . | 12,373 | — | — | — | (4,036) | — | — | 8,337 |
| Gangwon Wind Power Co., Ltd. . . . . . | 13,069 | — | — | (852) | 1,638 | — | — | 13,855 |
| Hyundai Green Power Co., Ltd. . . . . | 115,998 | — | — | (8,889) | 7,697 | — | — | 114,806 |
| Korea Power Exchange . . . . . . . . . . . | 223,238 | — | — | — | 8,831 | — | 5,562 | 237,631 |
| AMEC Partners Korea Ltd. . . . . . . . . | 225 | — | — | — | (10) | — | — | 215 |
| Hyundai Energy Co., Ltd. . . . . . . . . . | 1,031 | — | — | — | (3,498) | — | 2,467 | — |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . | — | — | — | — | — | — | — | — |
| Taebaek Wind Power Co., Ltd. . . . . . | 4,750 | — | — | — | 569 | — | — | 5,319 |
| Taeback Guinemi Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 3,131 | — | — | — | (42) | — | — | 3,089 |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 3,383 | — | — | — | 753 | — | — | 4,136 |
| Daeryun Power Co., Ltd. . . . . . . . . . | 29,873 | — | — | — | (4,762) | — | 2 | 25,113 |
| Changjuk Wind Power Co., Ltd. . . . . | 6,930 | — | — | (111) | 696 | — | — | 7,515 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . | 2,073 | — | — | — | 145 | — | — | 2,218 |
| SPC Power Corporation . . . . . . . . . . | 56,818 | — | — | (5,562) | 4,310 | (3,276) | (7) | 52,283 |
| Gemeng International Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 680,065 | — | — | (13,365) | 6,953 | (23,680) | — | 649,973 |
| PT. Cirebon Electric Power . . . . . . . . | 96,658 | — | — | (550) | 10,685 | 2,232 | (11,615) | 97,410 |
| KNOC Nigerian East Oil Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | (1,914) | 1,536 | 378 | — |
| KNOC Nigerian West Oil Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | (1,712) | 1,407 | 305 | — |
| PT Wampu Electric Power . . . . . . . . | 23,188 | — | — | — | 9,336 | — | (3,121) | 29,403 |
| PT. Bayan Resources TBK . . . . . . . . | 402,667 | — | — | — | 34,122 | 14,982 | 60 | 451,831 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . | 123,912 | — | — | — | (6,982) | — | 15 | 116,945 |
| Pioneer Gas Power Limited . . . . . . . . | 50,740 | — | — | — | (11,119) | (1,238) | 276 | 38,659 |
| Eurasia Energy Holdings . . . . . . . . . . | — | — | — | — | — | — | — | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 51,544 | 22,362 | — | — | (4,264) | (7,863) | — | 61,779 |
| Hadong Mineral Fiber Co., Ltd. . . . . | — | — | — | — | (31) | — | 31 | — |
| Green Biomass Co., Ltd. . . . . . . . . . . | 47 | — | — | — | (112) | — | 273 | 208 |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . | — | — | — | — | — | — | — | — |
| Samcheok Eco Materials Co., Ltd. . . | — | — | — | — | — | — | — | — |
| Noeul Green Energy Co., Ltd. . . . . . . | 1,217 | — | — | — | 850 | — | — | 2,067 |
| Naepo Green Energy Co., Ltd.(*2) . . . . . . . . . . . . . . . . . . . . . | 25,438 | — | — | — | (1,400) | — | (3,440) | 20,598 |
| Goseong Green Energy Co., Ltd. . . . | 2,663 | — | — | — | (66) | — | — | 2,597 |
| Gangneung Eco Power Co., Ltd. . . . . | 2,646 | — | — | — | (63) | — | — | 2,583 |
| Shin Pyeongtaek Power Co., Ltd. . . . | — | 43,880 | — | — | (10,998) | (3,617) | 5,638 | 34,903 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . . . . . . . . . . . . . | 181 | — | — | — | 6 | — | — | 187 |
| DS POWER Co., Ltd.(*4) . . . . . . . . . | 7,190 | — | — | — | (1,321) | — | (5,869) | — |
| Dongducheon Dream Power Co., Ltd.(*1,3) . . . . . . . . . . . . . . . . . . . | 46,876 | — | — | — | (10,980) | — | 17,337 | 53,233 |
| KS Solar Co., Ltd. . . . . . . . . . . . . . . | 604 | — | (613) | — | — | 9 | — | — |
| Jinbhuvish Power Generation Pvt. Ltd. . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | — | — | — |
| SE Green Energy Co., Ltd. . . . . . . . . | 3,525 | — | — | — | (49) | — | — | 3,476 |
| Daegu Photovoltaic Co., Ltd. . . . . . . | 1,700 | — | — | (349) | 367 | — | — | 1,718 |
| Jeongam Wind Power Co., Ltd. . . . . . | 4,000 | — | — | — | (237) | — | — | 3,763 |
| Korea Power Engineering Service Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 2,810 | — | — | (191) | 1,030 | — | 10 | 3,659 |
| Busan Green Energy Co., Ltd. . . . . . | 13,803 | — | (9,320) | — | 2,884 | — | (4) | 7,363 |

F-93

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**2017**

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | | |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) . . . . . . . . . . . . . . . . . . . . . . . ₩ | — | — | — | — | — | — | — | — |
| Korea Electric Vehicle Charging Service . . . . . . . . . . . . . . . . . . . . . . | 1,103 | 1,008 | — | — | (362) | — | — | 1,749 |
| Ulleungdo Natural Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 6,894 | — | — | — | (524) | — | — | 6,370 |
| Korea Nuclear Partners Co., Ltd. . . . | 248 | — | — | — | 135 | — | — | 383 |
| Tamra Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 7,015 | — | — | — | 1,545 | — | — | 8,560 |
| Korea Electric Power Corporation Fund . . . . . . . . . . . . . . . . . . . . . . | 50,856 | — | — | — | (2,171) | (711) | — | 47,974 |
| Energy Infra Asset Management Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 259 | — | — | — | 217 | — | — | 476 |
| Daegu clean Energy Co., Ltd. . . . . . . | 140 | — | — | — | (129) | — | — | 11 |
| YaksuESS Co., Ltd . . . . . . . . . . . . . . | 196 | — | — | — | (2) | — | — | 194 |
| Nepal Water & Energy Development Company Private Limited . . . . . . . . | 18,667 | 15,009 | — | — | (677) | (2,501) | — | 30,498 |
| Gwangyang Green Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | — | 2,000 | — | — | (228) | — | — | 1,772 |
| PND solar., Ltd . . . . . . . . . . . . . . . . | — | 1,250 | — | — | — | — | — | 1,250 |
| | 4,092,252 | 85,509 | (9,933) | (32,065) | (212,629) | (94,337) | 8,624 | 3,837,421 |
| | | | | | | | | |
| **<Joint ventures>** | | | | | | | | |
| KEPCO-Uhde Inc. . . . . . . . . . . . . . . | 301 | — | — | — | (43) | — | — | 258 |
| Eco Biomass Energy Sdn. Bhd. . . . . . | — | — | — | — | — | — | — | — |
| Datang Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 28,239 | — | — | (839) | 840 | (978) | — | 27,262 |
| Shuweihat Asia Power Investment B.V. . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (1,707) | 4,275 | 12,457 | 650 | 15,675 |
| Shuweihat Asia Operation & Maintenance Company . . . . . . . . . | 450 | — | — | (770) | 1,055 | (172) | 100 | 663 |
| Waterbury Lake Uranium L.P. . . . . . | 21,314 | — | — | — | (23) | (949) | (561) | 19,781 |
| ASM-BG Investicii AD . . . . . . . . . . . | 21,488 | — | — | (946) | (150) | 810 | — | 21,202 |
| RES Technology AD . . . . . . . . . . . . . | 13,582 | — | — | — | 1,053 | (260) | — | 14,375 |
| KV Holdings, Inc. . . . . . . . . . . . . . . | 2,098 | — | — | — | 61 | (241) | — | 1,918 |
| KEPCO SPC Power Corporation . . . | 245,367 | — | — | (37,443) | 42,359 | (33,230) | 41 | 217,094 |
| Canada Korea Uranium Limited partnership . . . . . . . . . . . . . . . . . . | | | | | | | | |
| Gansu Datang Yumen Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 12,821 | — | — | — | (1,299) | (682) | — | 10,840 |
| Datang Chifeng Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 166,535 | — | — | — | 14,079 | (9,559) | — | 171,055 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. . . . . . . | 10,843 | — | — | — | 837 | (620) | — | 11,060 |
| Rabigh Electricity Company . . . . . . . | 97,802 | — | — | (18,112) | 35,769 | (15,227) | (876) | 99,356 |
| Rabigh Operation & Maintenance Company Limited . . . . . . . . . . . . . | 4,427 | — | — | (2,130) | 2,236 | (546) | — | 3,987 |
| Jamaica Public Service Company Limited . . . . . . . . . . . . . . . . . . . . | 249,453 | — | — | — | — | (28,300) | — | 221,153 |
| KW Nuclear Components Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 7,133 | — | — | (208) | (222) | — | — | 6,703 |
| Busan Shinho Solar Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 3,814 | — | — | (63) | 595 | — | — | 4,346 |
| GS Donghae Electric Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 205,948 | — | — | — | 14,714 | — | 65 | 220,727 |
| Global Trade Of Power System Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 477 | — | — | — | 100 | — | — | 577 |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . | 2,343 | — | — | — | 120 | — | — | 2,463 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**2017**

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | | |
| KODE NOVUS I LLC .......... ₩ | — | — | — | — | — | — | — | — |
| KODE NOVUS II LLC ........... | — | — | — | — | — | — | — | — |
| Daejung Offshore Wind Power Co., Ltd. ...................... | 3,015 | 200 | — | — | (246) | — | — | 2,969 |
| Amman Asia Electric Power Company ................... | 153,857 | — | — | (12,213) | 19,957 | (15,925) | — | 145,676 |
| KAPES, Inc. ................... | 4,758 | — | — | — | 2,752 | — | (34) | 7,476 |
| Dangjin Eco Power Co., Ltd. ...... | 53,253 | 5,440 | — | — | (752) | (3) | (10) | 57,928 |
| Honam Wind Power Co., Ltd. ...... | 4,451 | — | — | (487) | 338 | — | — | 4,302 |
| Chun-cheon Energy Co., Ltd. ...... | 50,592 | — | — | — | (2,474) | — | — | 48,118 |
| Yeonggwangbaeksu Wind Power Co., Ltd. ................... | 2,689 | — | — | — | 45 | — | — | 2,734 |
| Nghi Son 2 Power Ltd. ........... | 229 | 993 | — | — | (1,039) | — | — | 183 |
| Kelar S.A ..................... | — | 73,040 | — | — | (633) | (5,175) | 1 | 67,233 |
| PT. Tanjung Power Indonesia ...... | 1,946 | — | — | — | 2,112 | (2,281) | (1) | 1,776 |
| Incheon New Power Co., Ltd. ...... | 563 | — | — | — | 56 | — | — | 619 |
| Seokmun Energy Co., Ltd. ........ | 391 | 14,790 | — | — | (1,219) | (176) | — | 13,786 |
| Daehan Wind Power PSC ......... | 16 | — | — | — | (40) | 22 | 2 | — |
| Barakah One Company ........... | 116 | — | — | — | 570 | (60) | — | 626 |
| Nawah Energy Company .......... | 290 | — | — | — | (5) | (27) | — | 258 |
| MOMENTUM ................... | 67 | — | — | — | 321 | 3 | — | 391 |
| Daegu Green Power Co., Ltd. ...... | 47,528 | — | — | — | (5,133) | — | (4) | 42,391 |
| Yeonggwang Wind Power Co., Ltd. ...................... | — | 15,375 | — | — | (25) | (56) | — | 15,294 |
| Chester Solar IV SpA ............ | — | 1,700 | — | — | — | — | — | 1,700 |
| Chester Solar V SpA ............ | — | 525 | — | — | — | — | — | 525 |
| Diego de Almagro Solar SpA ...... | — | 2,091 | — | — | — | — | — | 2,091 |
| South Jamaica Power Company Limited .................... | — | 7,090 | — | — | — | — | (386) | 6,704 |
| | 1,418,196 | 121,244 | — | (74,918) | 130,941 | (101,175) | (1,013) | 1,493,275 |
| ₩ | 5,510,448 | 206,753 | (9,933) | (106,983) | (81,688) | (195,512) | 7,611 | 5,330,696 |

(*1) It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩23,798 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2017.

(*2) It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩3,440 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2017.

(*3) 'Others' include ₩41,170 million of assets held-for-sale (note 42).

(*4) 'Others' include ₩4,438 million of assets held-for-sale (note 42), and also include ₩1,439 million of available-for-sale financial assets which is reclassified due to loss of significant influence.

F-95

**(4)  Summary of financial information of associates and joint ventures as of and for the years ended December 31, 2016 and 2017 are as follows:**

| | | 2016 | | |
|---|---|---|---|---|
| Investees | Total assets | Total liabilities | Sales | Profit (loss) for the period |
| | | In millions of won | | |
| **<Associates>** | | | | |
| Korea Gas Corporation . . . . . . . . . . . . . . . . . . . . ₩ | 39,927,836 | 30,541,350 | 21,108,116 | (673,558) |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 144,346 | 73,742 | 304,067 | 17,187 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 304,536 | 126,324 | 130,690 | 2,051 |
| Cheongna Energy Co., Ltd. . . . . . . . . . . . . . . . . . | 469,843 | 447,216 | 46,484 | (16,127) |
| Gangwon Wind Power Co., Ltd. . . . . . . . . . . . . . | 102,550 | 15,753 | 22,774 | 8,133 |
| Hyundai Green Power Co., Ltd. . . . . . . . . . . . . . . | 1,151,975 | 751,981 | 469,547 | 38,743 |
| Korea Power Exchange . . . . . . . . . . . . . . . . . . . . | 255,533 | 32,295 | 101,222 | 15,087 |
| AMEC Partners Korea Ltd. . . . . . . . . . . . . . . . . . | 1,216 | 32 | 103 | (25) |
| Hyundai Energy Co., Ltd. . . . . . . . . . . . . . . . . . . | 505,979 | 499,205 | 61,813 | (45,800) |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 2,157 | 336 | — | (105) |
| Taebaek Wind Power Co., Ltd. . . . . . . . . . . . . . | 43,162 | 24,162 | 5,741 | (2,796) |
| Taeback Guinemi Wind Power Co., Ltd. . . . . . . . | 12,523 | 1 | — | (106) |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . . . . | 75,440 | 61,909 | 3,997 | (45) |
| Daeryun Power Co., Ltd. . . . . . . . . . . . . . . . . . . . | 793,283 | 644,930 | 249,558 | (32,291) |
| Changjuk Wind Power Co., Ltd. . . . . . . . . . . . . . | 37,878 | 15,162 | 5,782 | 1,739 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 25,878 | 18,199 | 4,006 | 638 |
| SPC Power Corporation . . . . . . . . . . . . . . . . . . . . | 191,562 | 42,042 | 73,674 | 42,617 |
| Gemeng International Energy Co., Ltd. . . . . . . . . . | 5,822,879 | 3,821,905 | 1,233,972 | 66,370 |
| PT. Cirebon Electric Power . . . . . . . . . . . . . . . . . | 988,975 | 637,491 | 265,813 | 114,653 |
| KNOC Nigerian East Oil Co., Ltd. . . . . . . . . . . . | 272,964 | 358,211 | — | (7,051) |
| KNOC Nigerian West Oil Co., Ltd. . . . . . . . . . . . | 165,396 | 243,713 | — | (6,562) |
| PT Wampu Electric Power . . . . . . . . . . . . . . . . . | 222,004 | 171,595 | 19,260 | 7,550 |
| PT. Bayan Resources TBK . . . . . . . . . . . . . . . . . | 945,436 | 845,963 | 593,441 | 402 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 886,841 | 629,992 | 453,606 | (14,885) |
| Pioneer Gas Power Limited . . . . . . . . . . . . . . . . . | 345,791 | 276,978 | 14,353 | 396 |
| Eurasia Energy Holdings . . . . . . . . . . . . . . . . . . . | 618 | 1,103 | — | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . . . . . . . | 772,699 | 543,472 | — | 6,458 |
| Hadong Mineral Fiber Co., Ltd. . . . . . . . . . . . . . . | — | 20 | — | — |
| Green Biomass Co., Ltd. . . . . . . . . . . . . . . . . . . . | 9,336 | 9,001 | 2,892 | (972) |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . . . . . . . . . . | 28,104 | 34,671 | 7,175 | (1,361) |
| Samcheok Eco Materials Co., Ltd. . . . . . . . . . . . . | 24,143 | 254 | — | (1,945) |
| Noeul Green Energy Co., Ltd. . . . . . . . . . . . . . . . | 115,062 | 110,866 | 203 | (1,155) |
| Naepo Green Energy Co., Ltd. . . . . . . . . . . . . . . . | 104,029 | 2,276 | 4,912 | (5,230) |
| Goseong Green Energy Co., Ltd. . . . . . . . . . . . . . | 356,546 | 110,753 | — | (5,489) |
| Gangneung Eco Power Co., Ltd. . . . . . . . . . . . . . | 176,805 | 6,503 | — | (3,494) |
| Shin Pyeongtaek Power Co., Ltd. . . . . . . . . . . . . . | 54,174 | 60,518 | — | (3,291) |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . | 2,937 | 2,297 | 427 | (47) |
| DS POWER Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 726,699 | 618,793 | 276,324 | (10,031) |
| Dongducheon Dream Power Co., Ltd. . . . . . . . . . . | 1,670,945 | 1,427,773 | 946,379 | (27,936) |
| KS Solar Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 27,213 | 24,035 | 4,152 | (79) |
| Jinbhuvish Power Generation Pvt. Ltd. . . . . . . . . . | 70,273 | 14,513 | — | (950) |
| SE Green Energy Co., Ltd. . . . . . . . . . . . . . . . . . . | 7,381 | — | — | (103) |
| Daegu Photovoltaic Co., Ltd. . . . . . . . . . . . . . . . . | 18,909 | 13,047 | 3,317 | 739 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**2016**

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | In millions of won | | | |
| Jeongam Wind Power Co., Ltd. . . . . . . . . . . . . . . . | ₩ | 13,199 | 3,199 | — | (1,496) |
| Korea Power Engineering Service Co., Ltd. . . . . . | | 13,401 | 3,713 | 27,394 | 3,463 |
| Busan Green Energy Co., Ltd. . . . . . . . . . . . . . . . | | 147,843 | 100,247 | — | (2,444) |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) . . . . . . . . . . . . . . . . . . . . | | 11,340 | 12,037 | — | (5,489) |
| Korea Electric Vehicle Charging Service . . . . . . . | | 10,545 | 6,604 | 5,177 | (1,225) |
| Ulleungdo Natural Energy Co., Ltd. . . . . . . . . . . . | | 24,836 | 1,738 | — | (1,730) |
| Korea Nuclear Partners Co., Ltd. . . . . . . . . . . . . . | | 1,363 | 507 | 372 | (140) |
| Tamra Offshore Wind Power Co., Ltd. . . . . . . . . . | | 127,880 | 101,900 | 983 | (6,307) |
| Korea Electric Power Corporation Fund . . . . . . . . | | 51,970 | 128 | 3 | (647) |
| Energy Infra Asset Management Co., Ltd. . . . . . . . | | 2,779 | 160 | 32 | (381) |
| Daegu clean Energy Co., Ltd. . . . . . . . . . . . . . . . | | 500 | — | — | — |
| YaksuESS Co., Ltd . . . . . . . . . . . . . . . . . . . . . . . | | 6,474 | 5,801 | — | (48) |
| Nepal Water & Energy Development Company Private Limited . . . . . . . . . . . . . . . . . . . . . . . . . | | 43,788 | 10,477 | — | (703) |
| **<Joint ventures>** | | | | | |
| KEPCO-Uhde Inc. . . . . . . . . . . . . . . . . . . . . . . . . | | 624 | 33 | — | (16,855) |
| Eco Biomass Energy Sdn. Bhd. . . . . . . . . . . . . . . | | — | — | — | — |
| Datang Chaoyang Renewable Power Co., Ltd. . . . | | 142,684 | 72,086 | 18,628 | 3,462 |
| Shuweihat Asia Power Investment B.V. . . . . . . . . | | 282 | 4 | — | 12,380 |
| Shuweihat Asia Operation & Maintenance Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,016 | 13 | 2,388 | 1,723 |
| Waterbury Lake Uranium L.P. . . . . . . . . . . . . . . . | | 56,181 | 47 | — | — |
| ASM-BG Investicii AD . . . . . . . . . . . . . . . . . . . . | | 79,898 | 36,921 | 12,604 | 3,105 |
| RES Technology AD . . . . . . . . . . . . . . . . . . . . . . | | 68,553 | 41,389 | 7,798 | (139) |
| KV Holdings, Inc. . . . . . . . . . . . . . . . . . . . . . . . . | | 5,245 | 1 | — | 1,072 |
| KEPCO SPC Power Corporation . . . . . . . . . . . . . | | 448,069 | 121,783 | 165,046 | 63,689 |
| Canada Korea Uranium Limited Partnership . . . . . | | 285 | 144 | — | (59) |
| Gansu Datang Yumen Wind Power Co., Ltd. . . . . | | 89,517 | 57,464 | 4,263 | (6,815) |
| Datang Chifeng Renewable Power Co., Ltd. . . . . . | | 813,804 | 397,344 | 99,795 | 19,042 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 62,600 | 35,493 | 8,742 | 2,505 |
| Rabigh Electricity Company . . . . . . . . . . . . . . . . | | 2,691,654 | 2,258,772 | 278,431 | 37,791 |
| Rabigh Operation & Maintenance Company Limited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 25,032 | 13,965 | 25,607 | 4,870 |
| Jamaica Public Service Company Limited . . . . . . | | 1,291,008 | 659,296 | 827,298 | 25,324 |
| KW Nuclear Components Co., Ltd. . . . . . . . . . . . . | | 26,417 | 11,990 | 26,481 | 9,452 |
| Busan Shinho Solar Power Co., Ltd. . . . . . . . . . . . | | 47,789 | 32,533 | 6,770 | 1,247 |
| GS Donghae Electric Power Co., Ltd. . . . . . . . . . | | 1,952,297 | 1,346,568 | 19,851 | 16,396 |
| Global Trade Of Power System Co., Ltd. . . . . . . . | | 1,661 | 18 | 2,667 | 205 |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 20,790 | 12,710 | 3,395 | 960 |
| KODE NOVUS I LLC . . . . . . . . . . . . . . . . . . . . . | | 14,286 | 104,252 | 2,362 | (50,151) |
| KODE NOVUS II LLC . . . . . . . . . . . . . . . . . . . . | | 3,236 | 50,267 | 810 | (22,582) |
| Daejung Offshore Wind Power Co., Ltd. . . . . . . . . | | 6,076 | 34 | — | (675) |
| Amman Asia Electric Power Company . . . . . . . . . | | 881,164 | 624,590 | 13,631 | 29,684 |
| KAPES, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 145,576 | 136,247 | 31,852 | 456 |
| Dangjin Eco Power Co., Ltd. . . . . . . . . . . . . . . . . | | 149,926 | 1,001 | — | (2,023) |

F-97

**2016**

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| Honam Wind Power Co., Ltd. . . . . . . . . . . . . . . . . | ₩ | 41,614 | 26,375 | 6,776 | 2,171 |
| Chun-cheon Energy Co., Ltd. . . . . . . . . . . . . . . . | | 548,306 | 379,113 | — | (3,684) |
| Yeonggwangbaeksu Wind Power Co., Ltd. . . . . . . | | 99,773 | 81,881 | 11,208 | (26) |
| Nghi Son 2 Power Ltd. . . . . . . . . . . . . . . . . . . . . | | 757 | 302 | — | (1,481) |
| Kelar S.A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 617,803 | 712,124 | — | (4,109) |
| PT. Tanjung Power Indonesia . . . . . . . . . . . . . . . | | 203,051 | 197,491 | 122,583 | 3,821 |
| Incheon New Power Co., Ltd. . . . . . . . . . . . . . . . | | 7,902 | 5,961 | 2,985 | 168 |
| Seokmun Energy Co., Ltd. . . . . . . . . . . . . . . . . . . | | 235,905 | 234,556 | — | (543) |
| Daehan Wind Power PSC . . . . . . . . . . . . . . . . . . | | 750 | 714 | — | (523) |
| Barakah One Company . . . . . . . . . . . . . . . . . . . . | | 17,117,338 | 17,116,680 | — | — |
| Nawah Energy Company . . . . . . . . . . . . . . . . . . . | | 1,645 | — | — | — |
| MOMENTUM . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 2,749 | 2,547 | 2,886 | 194 |
| Daegu Green Power Co., Ltd. . . . . . . . . . . . . . . . | | 636,438 | 547,017 | 265,621 | (3,981) |

**2017**

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| **<Associates>** | | | | | |
| Korea Gas Corporation . . . . . . . . . . . . . . . . . . . . | ₩ | 37,139,439 | 28,999,025 | 22,172,305 | (1,205,110) |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 155,033 | 79,730 | 334,547 | 16,126 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 298,122 | 108,554 | 131,080 | 3,638 |
| Cheongna Energy Co., Ltd. . . . . . . . . . . . . . . . . . | | 461,958 | 448,535 | 56,533 | (9,203) |
| Gangwon Wind Power Co., Ltd. . . . . . . . . . . . . . | | 94,281 | 2,243 | 25,963 | 11,121 |
| Hyundai Green Power Co., Ltd. . . . . . . . . . . . . . . | | 1,150,729 | 754,846 | 477,373 | 26,543 |
| Korea Power Exchange . . . . . . . . . . . . . . . . . . . . | | 263,499 | 25,868 | 105,107 | 8,831 |
| AMEC Partners Korea Ltd. . . . . . . . . . . . . . . . . . | | 1,135 | 4 | 1 | (53) |
| Hyundai Energy Co., Ltd. . . . . . . . . . . . . . . . . . . | | 474,939 | 511,486 | 92,992 | (43,317) |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | | 2,052 | 352 | — | (121) |
| Taebaek Wind Power Co., Ltd. . . . . . . . . . . . . . . | | 39,227 | 17,953 | 7,056 | 2,312 |
| Taeback Guinemi Wind Power Co., Ltd. . . . . . . . | | 12,369 | 12 | — | (140) |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . . . . | | 77,152 | 60,606 | 11,907 | 3,038 |
| Daeryun Power Co., Ltd. . . . . . . . . . . . . . . . . . . . | | 779,258 | 655,377 | 156,508 | (23,978) |
| Changjuk Wind Power Co., Ltd. . . . . . . . . . . . . . | | 35,794 | 10,745 | 6,981 | 2,317 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | | 24,432 | 16,215 | 3,947 | 628 |
| SPC Power Corporation . . . . . . . . . . . . . . . . . . . | | 137,586 | — | 68,149 | 37,395 |
| Gemeng International Energy Co., Ltd. . . . . . . . . | | 6,496,294 | 4,584,608 | 1,334,833 | 21,769 |
| PT. Cirebon Electric Power . . . . . . . . . . . . . . . . . | | 903,429 | 549,212 | 280,452 | 38,448 |
| KNOC Nigerian East Oil Co., Ltd. . . . . . . . . . . . | | 241,808 | 329,639 | — | (10,754) |
| KNOC Nigerian West Oil Co., Ltd. . . . . . . . . . . . | | 147,185 | 227,588 | — | (9,768) |
| PT Wampu Electric Power . . . . . . . . . . . . . . . . . . | | 212,095 | 148,177 | 779 | 8,114 |
| PT. Bayan Resources TBK . . . . . . . . . . . . . . . . . . | | 908,106 | 556,881 | 811,515 | 243,621 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | | 859,633 | 617,224 | 489,042 | (14,470) |
| Pioneer Gas Power Limited . . . . . . . . . . . . . . . . . | | 339,271 | 296,898 | 8,215 | (27,796) |
| Eurasia Energy Holdings . . . . . . . . . . . . . . . . . . . | | 548 | 978 | — | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . . . . . . . | | 858,789 | 607,462 | — | (16,677) |
| Hadong Mineral Fiber Co., Ltd. . . . . . . . . . . . . . | | 203 | 231 | — | (260) |
| Green Biomass Co., Ltd. . . . . . . . . . . . . . . . . . . . | | 6,379 | 4,018 | 2,337 | (956) |

F-98

**2017**

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| PT. Mutiara Jawa ........................... | ₩ | 27,098 | 29,670 | 13,574 | 3,455 |
| Samcheok Eco Materials Co., Ltd. ............. | | 23,729 | 270 | 15 | (541) |
| Noeul Green Energy Co., Ltd. ................. | | 127,980 | 120,852 | 43,099 | 2,932 |
| Naepo Green Energy Co., Ltd. ................. | | 121,375 | 71,945 | 5,696 | (5,603) |
| Goseong Green Energy Co., Ltd. .............. | | 1,081,238 | 841,330 | — | (5,811) |
| Gangneung Eco Power Co., Ltd. ............... | | 186,765 | 20,344 | — | (3,407) |
| Shin Pyeongtaek Power Co., Ltd. .............. | | 175,870 | 90,662 | — | (4,585) |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. .. | | 2,782 | 2,120 | 451 | 22 |
| Dongducheon Dream Power Co., Ltd. .......... | | 1,575,175 | 1,365,845 | 813,440 | (33,740) |
| Jinbhuvish Power Generation Pvt. Ltd. ......... | | 66,047 | 13,640 | — | — |
| SE Green Energy Co., Ltd. .................... | | 7,278 | — | — | (103) |
| Daegu Photovoltaic Co., Ltd. ................. | | 17,262 | 11,339 | 3,714 | 1,263 |
| Jeongam Wind Power Co., Ltd. ................ | | 67,427 | 58,019 | — | (580) |
| Korea Power Engineering Service Co., Ltd. ..... | | 15,738 | 3,121 | 22,283 | 3,783 |
| Busan Green Energy Co., Ltd. ................. | | 193,253 | 167,864 | 34,280 | 9,946 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) ...................... | | 9,648 | 16,462 | — | (6,109) |
| Korea Electric Vehicle Charging Service ....... | | 14,650 | 8,404 | 8,399 | (1,295) |
| Ulleungdo Natural Energy Co., Ltd. ........... | | 25,842 | 4,501 | — | (1,758) |
| Korea Nuclear Partners Co., Ltd. .............. | | 2,033 | 711 | 1,345 | 465 |
| Tamra Offshore Wind Power Co., Ltd. ......... | | 163,740 | 132,036 | 4,392 | (191) |
| Korea Electric Power Corporation Fund ........ | | 49,170 | 265 | 666 | (2,213) |
| Energy Infra Asset Management Co., Ltd. ....... | | 5,240 | 431 | 5,807 | 2,203 |
| Daegu clean Energy Co., Ltd. ................. | | 252 | 212 | — | (460) |
| YaksuESS Co., Ltd ......................... | | 7,105 | 6,437 | 381 | (6) |
| Nepal Water & Energy Development Company Private Limited ........................... | | 58,121 | 11,670 | — | (968) |
| Gwangyang Green Energy Co., Ltd. ............ | | 20,165 | 11,393 | — | (1,139) |
| PND solar., Ltd ............................ | | 10,508 | 6,729 | — | (406) |
| **\<Joint ventures\>** | | | | | |
| KEPCO-Uhde Inc. .......................... | | 515 | 7 | — | (86) |
| Eco Biomass Energy Sdn. Bhd. ............... | | — | — | — | — |
| Datang Chaoyang Renewable Power Co., Ltd. ... | | 138,463 | 70,309 | 17,776 | 2,149 |
| Shuweihat Asia Power Investment B.V. ......... | | 32,001 | 10 | — | (170) |
| Shuweihat Asia Operation & Maintenance Company ................................. | | 1,220 | 14 | 2,580 | 1,918 |
| Waterbury Lake Uranium L.P. ................. | | 55,563 | 250 | — | — |
| ASM-BG Investicii AD ...................... | | 87,110 | 44,706 | 12,611 | (262) |
| RES Technology AD ........................ | | 71,595 | 42,845 | 7,793 | 2,164 |
| KV Holdings, Inc. .......................... | | 4,795 | — | 671 | 677 |
| KEPCO SPC Power Corporation .............. | | 318,911 | 30,222 | 186,725 | 57,364 |
| Gansu Datang Yumen Wind Power Co., Ltd. .... | | 81,960 | 54,859 | 6,938 | (3,253) |
| Datang Chifeng Renewable Power Co., Ltd. .... | | 762,605 | 334,843 | 113,329 | 35,294 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. ..................................... | | 60,913 | 33,264 | 8,442 | 2,094 |
| Rabigh Electricity Company .................. | | 2,364,522 | 1,936,403 | 287,105 | 78,948 |
| Rabigh Operation & Maintenance Company Limited ................................. | | 19,992 | 10,025 | 22,668 | 5,668 |

| Investees | | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|---|
| | | | 2017 | | |
| | | | In millions of won | | |
| Jamaica Public Service Company Limited ...... | ₩ | 1,276,279 | 752,617 | 946,365 | 24,601 |
| KW Nuclear Components Co., Ltd. ............ | | 25,693 | 10,221 | 6,486 | 1,493 |
| Busan Shinho Solar Power Co., Ltd. .......... | | 47,959 | 30,573 | 7,984 | 2,383 |
| GS Donghae Electric Power Co., Ltd. .......... | | 2,179,465 | 1,530,266 | 351,814 | 43,180 |
| Global Trade Of Power System Co., Ltd. ....... | | 3,576 | 1,586 | 4,079 | 365 |
| Expressway Solar-light Power Generation Co., Ltd. ...................................... | | 19,143 | 10,651 | 3,018 | 643 |
| KODE NOVUS I LLC ...................... | | 755 | 108,132 | 14 | (8,117) |
| KODE NOVUS II LLC ..................... | | 292 | 47,683 | — | (6,018) |
| Daejung Offshore Wind Power Co., Ltd. ........ | | 6,193 | 243 | — | (493) |
| Amman Asia Electric Power Company ......... | | 759,114 | 516,174 | 18,034 | 33,514 |
| KAPES, Inc. ............................ | | 70,679 | 56,021 | 129,962 | 5,397 |
| Dangjin Eco Power Co., Ltd. ................. | | 163,197 | 521 | — | (2,182) |
| Honam Wind Power Co., Ltd. ............... | | 39,675 | 24,951 | 5,961 | 1,166 |
| Chun-cheon Energy Co., Ltd. ............... | | 699,652 | 538,733 | 164,294 | (8,145) |
| Yeonggwangbaeksu Wind Power Co., Ltd. ...... | | 94,810 | 76,621 | 11,124 | 297 |
| Nghi Son 2 Power Ltd. ..................... | | 741 | 376 | — | (2,068) |
| Kelar S.A ............................... | | 613,293 | 513,101 | 90,435 | 17,590 |
| PT. Tanjung Power Indonesia ................ | | 374,702 | 369,627 | 209,923 | 6,219 |
| Incheon New Power Co., Ltd. ............... | | 7,194 | 5,059 | 2,972 | 184 |
| Seokmun Energy Co., Ltd. .................. | | 247,735 | 200,197 | 35,135 | (3,939) |
| Daehan Wind Power PSC ................... | | 928 | 1,752 | — | (904) |
| Barakah One Company ................... | | 17,574,885 | 17,571,409 | — | (1,358) |
| Nawah Energy Company ................... | | 1,459 | 23 | — | (11) |
| MOMENTUM ........................... | | 5,028 | 3,854 | 11,555 | 939 |
| Daegu Green Power Co., Ltd. ................ | | 602,809 | 531,103 | 256,359 | (17,700) |
| Yeonggwang Wind Power Co., Ltd. ........... | | 212,802 | 176,062 | — | (62) |
| Chester Solar IV SpA ..................... | | 11,660 | 9,626 | 331 | 151 |
| Chester Solar V SpA ..................... | | 2,081 | 1,569 | — | (49) |
| Diego de Almagro Solar SpA ............... | | 8,266 | 5,830 | — | (103) |
| South Jamaica Power Company Limited ........ | | 153,958 | 120,436 | — | (755) |

(5)  **Financial information of associates and joint ventures reconciled to the Company's investments in consolidated financial statements as of December 31, 2016 and 2017 are as follows:**

| Investees | | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|---|
| | | | | 2016 | | | | |
| | | | | In millions of won | | | | |
| <Associates> | | | | | | | | |
| Korea Gas Corporation ................. | ₩ | 9,386,486 | 21.57% | 2,024,665 | — | — | (90,788) | 1,933,877 |
| Korea Electric Power Industrial Development Co., Ltd. ................. | | 70,604 | 29.00% | 20,475 | — | — | — | 20,475 |
| YTN Co., Ltd. ......................... | | 178,212 | 21.43% | 38,191 | — | (30) | (5) | 38,156 |
| Cheongna Energy Co., Ltd. .............. | | 22,627 | 43.90% | 9,933 | 2,584 | (144) | — | 12,373 |
| Gangwon Wind Power Co., Ltd. .......... | | 86,797 | 15.00% | 13,020 | — | — | 49 | 13,069 |
| Hyundai Green Power Co., Ltd. .......... | | 399,994 | 29.00% | 115,998 | — | — | — | 115,998 |
| Korea Power Exchange ................. | | 223,238 | 100.00% | 223,238 | — | — | — | 223,238 |
| AMEC Partners Korea Ltd. .............. | | 1,184 | 19.00% | 225 | — | — | — | 225 |
| Hyundai Energy Co., Ltd. ............... | | 6,774 | 46.30% | 3,136 | — | (1,079) | (1,026) | 1,031 |
| Ecollite Co., Ltd. ..................... | | 1,821 | 36.10% | 657 | — | — | (657) | — |
| Taebaek Wind Power Co., Ltd. ........... | | 19,000 | 25.00% | 4,750 | — | — | — | 4,750 |
| Taeback Guinemi Wind Power Co., Ltd. ... | | 12,522 | 25.00% | 3,131 | — | — | — | 3,131 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|
| | | | 2016 | | | | |
| | | | In millions of won | | | | |
| Pyeongchang Wind Power Co., Ltd. ....... ₩ | 13,531 | 25.00% | 3,383 | — | — | — | 3,383 |
| Daeryun Power Co., Ltd. ................ | 148,353 | 19.45% | 28,855 | 1,014 | — | 4 | 29,873 |
| Changjuk Wind Power Co., Ltd. .......... | 22,716 | 30.00% | 6,815 | — | — | 115 | 6,930 |
| KNH Solar Co., Ltd. ................. | 7,679 | 27.00% | 2,073 | — | — | — | 2,073 |
| SPC Power Corporation ................ | 149,520 | 38.00% | 56,818 | — | — | — | 56,818 |
| Gemeng International Energy Co., Ltd. .... | 2,000,974 | 34.00% | 680,331 | — | — | (266) | 680,065 |
| PT. Cirebon Electric Power ............. | 351,484 | 27.50% | 96,658 | — | — | — | 96,658 |
| KNOC Nigerian East Oil Co., Ltd. ........ | (85,247) | 14.63% | (12,472) | — | — | 12,472 | — |
| KNOC Nigerian West Oil Co., Ltd. ....... | (78,317) | 14.63% | (11,458) | — | — | 11,458 | — |
| PT Wampu Electric Power .............. | 50,409 | 46.00% | 23,188 | — | — | — | 23,188 |
| PT. Bayan Resources TBK .............. | 99,473 | 20.00% | 19,895 | 482,109 | — | (99,337) | 402,667 |
| S-Power Co., Ltd. .................... | 256,849 | 49.00% | 125,856 | — | (1,944) | — | 123,912 |
| Pioneer Gas Power Limited .............. | 68,813 | 40.00% | 27,525 | 23,147 | — | 68 | 50,740 |
| Eurasia Energy Holdings .............. | (485) | 40.00% | (194) | — | — | 194 | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. ...... | 229,227 | 25.00% | 57,307 | (4,802) | (672) | (289) | 51,544 |
| Hadong Mineral Fiber Co., Ltd. .......... | (20) | 25.00% | (5) | — | — | 5 | — |
| Green Biomass Co., Ltd. ............... | 335 | 14.00% | 47 | — | — | — | 47 |
| PT. Mutiara Jawa .................... | (6,567) | 29.00% | (1,904) | 70 | — | 1,834 | — |
| Samcheok Eco Materials Co., Ltd. ........ | 23,889 | 2.35% | 561 | — | — | (561) | — |
| Nocul Green Energy Co., Ltd. ........... | 4,196 | 29.00% | 1,217 | — | — | — | 1,217 |
| Naepo Green Energy Co., Ltd. ........... | 101,753 | 25.00% | 25,438 | — | — | — | 25,438 |
| Goseong Green Energy Co., Ltd. ......... | 245,793 | 1.12% | 2,742 | — | (79) | — | 2,663 |
| Gangneung Eco Power Co., Ltd. .......... | 170,302 | 1.61% | 2,744 | — | (98) | — | 2,646 |
| Shin Pyeongtaek Power Co., Ltd. ......... | (6,344) | 40.00% | (2,538) | — | (3,380) | 5,918 | — |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. ............................ | 640 | 28.00% | 179 | — | — | 2 | 181 |
| DS POWER Co., Ltd. ................. | 107,906 | 14.44% | 15,582 | — | (7,302) | (1,090) | 7,190 |
| Dongducheon Dream Power Co., Ltd. ...... | 243,172 | 33.61% | 81,730 | — | (4,768) | (30,086) | 46,876 |
| KS Solar Co., Ltd. ................... | 3,178 | 19.00% | 604 | — | — | — | 604 |
| Jinbhuvish Power Generation Pvt. Ltd. ..... | 55,760 | 5.16% | 2,877 | — | — | (2,877) | — |
| SE Green Energy Co., Ltd. ............. | 7,381 | 47.76% | 3,525 | — | — | — | 3,525 |
| Daegu Photovoltaic Co., Ltd. ........... | 5,862 | 29.00% | 1,700 | — | — | — | 1,700 |
| Jeongam Wind Power Co., Ltd. .......... | 10,000 | 40.00% | 4,000 | — | — | — | 4,000 |
| Korea Power Engineering Service Co., Ltd. ............................ | 9,688 | 29.00% | 2,810 | — | — | — | 2,810 |
| Busan Green Energy Co., Ltd. ........... | 47,596 | 29.00% | 13,803 | — | — | — | 13,803 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) ......... | (697) | 18.87% | (132) | — | — | 132 | — |
| Korea Electric Vehicle Charging Service ... | 3,941 | 28.00% | 1,103 | — | — | — | 1,103 |
| Ulleungdo Natural Energy Co., Ltd. ....... | 23,098 | 29.85% | 6,895 | — | — | (1) | 6,894 |
| Korea Nuclear Partners Co., Ltd. ........ | 856 | 29.00% | 248 | — | — | — | 248 |
| Tamra Offshore Wind Power Co., Ltd. ..... | 25,980 | 27.00% | 7,015 | — | — | — | 7,015 |
| Korea Electric Power Corporation Fund .... | 51,842 | 98.09% | 50,852 | — | — | 4 | 50,856 |
| Energy Infra Asset Management Co., Ltd. .. | 2,619 | 9.90% | 259 | — | — | — | 259 |
| Daegu clean Energy Co., Ltd. ........... | 500 | 28.00% | 140 | — | — | — | 140 |
| YaksuESS Co., Ltd .................. | 673 | 29.00% | 195 | — | — | 1 | 196 |
| Nepal Water & Energy Development Company Private Limited ............. | 33,311 | 52.77% | 17,578 | 972 | — | 117 | 18,667 |
| **<Joint ventures>** | | | | | | | |
| KEPCO-Uhde Inc. ................... | 591 | 50.85% | 301 | — | — | — | 301 |
| Eco Biomass Energy Sdn. Bhd. .......... | — | 61.53% | — | — | — | — | — |
| Datang Chaoyang Renewable Power Co., Ltd. ............................ | 70,598 | 40.00% | 28,239 | — | — | — | 28,239 |
| Shuweihat Asia Power Investment B.V. .... | 278 | 49.00% | 136 | — | — | (136) | — |
| Shuweihat Asia Operation & Maintenance Company ...................... | 1,003 | 55.00% | 552 | — | — | (102) | 450 |
| Waterbury Lake Uranium L.P. ........... | 56,134 | 36.97% | 20,753 | — | — | 561 | 21,314 |
| ASM-BG Investicii AD ................ | 42,977 | 50.00% | 21,489 | — | — | (1) | 21,488 |
| RES Technology AD ................. | 27,164 | 50.00% | 13,582 | — | — | — | 13,582 |
| KV Holdings, Inc. ................... | 5,244 | 40.00% | 2,098 | — | — | — | 2,098 |
| KEPCO SPC Power Corporation ......... | 326,286 | 75.20% | 245,367 | — | — | — | 245,367 |
| Canada Korea Uranium Limited Partnership ..................... | 141 | 12.50% | 18 | — | — | (18) | — |

F-101

**2016**

| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|
| | | | In millions of won | | | | |
| Gansu Datang Yumen Wind Power Co., Ltd. | ₩ 32,053 | 40.00% | 12,821 | — | — | — | 12,821 |
| Datang Chifeng Renewable Power Co., Ltd. | 416,460 | 40.00% | 166,584 | — | — | (49) | 166,535 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. | 27,107 | 40.00% | 10,843 | — | — | — | 10,843 |
| Rabigh Electricity Company | 432,882 | 40.00% | 173,153 | — | (75,311) | (40) | 97,802 |
| Rabigh Operation & Maintenance Company Limited | 11,067 | 40.00% | 4,427 | — | — | — | 4,427 |
| Jamaica Public Service Company Limited | 631,712 | 40.00% | 252,685 | (80,161) | — | 76,929 | 249,453 |
| KW Nuclear Components Co., Ltd. | 14,427 | 45.00% | 6,492 | 90 | — | 551 | 7,133 |
| Busan Shinho Solar Power Co., Ltd. | 15,256 | 25.00% | 3,814 | — | — | — | 3,814 |
| GS Donghae Electric Power Co., Ltd. | 605,729 | 34.00% | 205,948 | — | — | — | 205,948 |
| Global Trade Of Power System Co., Ltd. | 1,643 | 29.00% | 476 | — | — | 1 | 477 |
| Expressway Solar-light Power Generation Co., Ltd. | 8,080 | 29.00% | 2,343 | — | — | — | 2,343 |
| KODE NOVUS I LLC | (89,966) | 50.00% | (44,983) | 4,732 | — | 40,251 | — |
| KODE NOVUS II LLC | (47,031) | 50.00% | (23,516) | — | — | 23,516 | — |
| Daejung Offshore Wind Power Co., Ltd. | 6,042 | 49.90% | 3,015 | — | — | — | 3,015 |
| Amman Asia Electric Power Company | 256,574 | 60.00% | 153,944 | — | — | (87) | 153,857 |
| KAPES, Inc. | 9,329 | 51.00% | 4,758 | — | — | — | 4,758 |
| Dangjin Eco Power Co., Ltd. | 148,925 | 34.00% | 50,635 | 2,618 | — | — | 53,253 |
| Honam Wind Power Co., Ltd. | 15,239 | 29.00% | 4,419 | 32 | — | — | 4,451 |
| Chun-cheon Energy Co., Ltd. | 169,193 | 29.00% | 50,589 | 3 | — | — | 50,592 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | 17,892 | 15.00% | 2,684 | 5 | — | — | 2,689 |
| Nghi Son 2 Power Ltd. | 455 | 50.00% | 228 | — | — | 1 | 229 |
| Kelar S.A | (94,321) | 65.00% | (61,309) | 2,424 | — | 58,885 | — |
| PT. Tanjung Power Indonesia | 5,560 | 35.00% | 1,946 | — | — | — | 1,946 |
| Incheon New Power Co., Ltd. | 1,941 | 29.00% | 563 | — | — | — | 563 |
| Seokmun Energy Co., Ltd. | 1,349 | 29.00% | 391 | — | — | — | 391 |
| Daehan Wind Power PSC | 36 | 50.00% | 18 | — | — | (2) | 16 |
| Barakah One Company | 658 | 18.00% | 118 | — | — | (2) | 116 |
| Nawah Energy Company | 1,645 | 18.00% | 296 | — | — | (6) | 290 |
| MOMENTUM | 202 | 33.33% | 67 | — | — | — | 67 |
| Daegu Green Power Co., Ltd. | 89,421 | 29.00% | 25,932 | 84 | — | 21,512 | 47,528 |

(*)  The percentage of ownership shown above is after considering the treasury stocks and others.

**2017**

| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|
| | | | In millions of won | | | | |
| <Associates> | | | | | | | |
| Korea Gas Corporation | ₩ 8,140,414 | 21.57% | 1,755,887 | — | — | (137,019) | 1,618,868 |
| Korea Electric Power Industrial Development Co., Ltd. | 75,303 | 29.00% | 21,838 | — | — | — | 21,838 |
| YTN Co., Ltd. | 189,568 | 21.43% | 40,624 | — | (18) | — | 40,606 |
| Cheongna Energy Co., Ltd. | 13,423 | 43.90% | 5,893 | 2,584 | (140) | — | 8,337 |
| Gangwon Wind Power Co., Ltd. | 92,038 | 15.00% | 13,806 | — | — | 49 | 13,855 |
| Hyundai Green Power Co., Ltd. | 395,883 | 29.00% | 114,806 | — | — | — | 114,806 |
| Korea Power Exchange | 237,631 | 100.00% | 237,631 | — | — | — | 237,631 |
| AMEC Partners Korea Ltd. | 1,131 | 19.00% | 215 | — | — | — | 215 |
| Hyundai Energy Co., Ltd. | (36,547) | 46.30% | (16,921) | — | (1,037) | 17,958 | — |
| Ecollite Co., Ltd. | 1,700 | 36.10% | 614 | — | — | (614) | — |
| Taebaek Wind Power Co., Ltd. | 21,274 | 25.00% | 5,319 | — | — | — | 5,319 |
| Taebaek Guinemi Wind Power Co., Ltd. | 12,357 | 25.00% | 3,089 | — | — | — | 3,089 |
| Pyeongchang Wind Power Co., Ltd. | 16,546 | 25.00% | 4,136 | — | — | — | 4,136 |
| Daeryun Power Co., Ltd. | 123,881 | 19.45% | 24,095 | 1,014 | — | 4 | 25,113 |
| Changjuk Wind Power Co., Ltd. | 25,049 | 30.00% | 7,515 | — | — | — | 7,515 |
| KNH Solar Co., Ltd. | 8,217 | 27.00% | 2,218 | — | — | — | 2,218 |
| SPC Power Corporation | 137,586 | 38.00% | 52,283 | — | — | — | 52,283 |
| Gemeng International Energy Co., Ltd. | 1,911,686 | 34.00% | 649,973 | — | — | — | 649,973 |
| PT. Cirebon Electric Power | 354,217 | 27.50% | 97,410 | — | — | — | 97,410 |

F-102

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**2017**

| Investees | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|
| | | | In millions of won | | | | |
| KNOC Nigerian East Oil Co., Ltd. ....... ₩ | (87,831) | 14.63% | (12,850) | — | — | 12,850 | — |
| KNOC Nigerian West Oil Co., Ltd. ...... | (80,403) | 14.63% | (11,763) | — | — | 11,763 | — |
| PT Wampu Electric Power ............. | 63,918 | 46.00% | 29,403 | — | — | — | 29,403 |
| PT. Bayan Resources TBK .............. | 351,225 | 20.00% | 70,245 | 482,109 | — | (100,523) | 451,831 |
| S-Power Co., Ltd. .................... | 242,409 | 49.00% | 118,780 | — | (1,835) | — | 116,945 |
| Pioneer Gas Power Limited ............ | 42,373 | 38.50% | 16,314 | 22,278 | — | 67 | 38,659 |
| Eurasia Energy Holdings .............. | (430) | 40.00% | (172) | — | — | 172 | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. .... | 251,327 | 25.00% | 62,832 | 74 | (838) | (289) | 61,779 |
| Hadong Mineral Fiber Co., Ltd. ........ | (28) | 8.33% | (2) | — | — | 2 | — |
| Green Biomass Co., Ltd. ............... | 2,361 | 8.80% | 208 | — | — | — | 208 |
| PT. Mutiara Jawa ..................... | (2,572) | 29.00% | (746) | — | — | 746 | — |
| Samcheok Eco Materials Co., Ltd. ....... | 23,459 | 2.35% | 551 | — | — | (551) | — |
| Noeul Green Energy Co., Ltd. ........... | 7,128 | 29.00% | 2,067 | — | — | — | 2,067 |
| Naepo Green Energy Co., Ltd. .......... | 49,430 | 41.67% | 20,598 | — | — | — | 20,598 |
| Goseong Green Energy Co., Ltd. ........ | 239,908 | 1.12% | 2,676 | — | (79) | — | 2,597 |
| Gangneung Eco Power Co., Ltd. ........ | 166,421 | 1.61% | 2,681 | — | (98) | — | 2,583 |
| Shin Pyeongtaek Power Co., Ltd. ........ | 85,208 | 40.00% | 34,083 | 7,808 | (6,988) | — | 34,903 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. .............................. | 662 | 28.00% | 185 | — | — | 2 | 187 |
| Dongducheon Dream Power Co., Ltd. ... | 209,330 | 33.61% | 70,356 | — | (4,409) | (12,714) | 53,233 |
| Jinbhuvish Power Generation Pvt. Ltd. .... | 52,407 | 5.16% | 2,704 | — | — | (2,704) | — |
| SE Green Energy Co., Ltd. ............. | 7,278 | 47.76% | 3,476 | — | — | — | 3,476 |
| Daegu Photovoltaic Co., Ltd. ........... | 5,923 | 29.00% | 1,718 | — | — | — | 1,718 |
| Jeongam Wind Power Co., Ltd. ......... | 9,408 | 40.00% | 3,763 | — | — | — | 3,763 |
| Korea Power Engineering Service Co., Ltd. .............................. | 12,617 | 29.00% | 3,659 | — | — | — | 3,659 |
| Busan Green Energy Co., Ltd. .......... | 25,389 | 29.00% | 7,363 | — | — | — | 7,363 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) ......... | (6,814) | 18.87% | (1,286) | — | — | 1,286 | — |
| Korea Electric Vehicle Charging Service ... | 6,246 | 28.00% | 1,749 | — | — | — | 1,749 |
| Ulleungdo Natural Energy Co., Ltd. ..... | 21,341 | 29.85% | 6,370 | — | — | — | 6,370 |
| Korea Nuclear Partners Co., Ltd. ....... | 1,322 | 29.00% | 383 | — | — | — | 383 |
| Tamra Offshore Wind Power Co., Ltd. .... | 31,704 | 27.00% | 8,560 | — | — | — | 8,560 |
| Korea Electric Power Corporation Fund ... | 48,905 | 98.09% | 47,971 | — | — | 3 | 47,974 |
| Energy Infra Asset Management Co., Ltd. .............................. | 4,809 | 9.90% | 476 | — | — | — | 476 |
| Daegu clean Energy Co., Ltd. ........... | 40 | 28.00% | 11 | — | — | — | 11 |
| YaksuESS Co., Ltd ................... | 668 | 29.00% | 193 | — | — | 1 | 194 |
| Nepal Water & Energy Development Company Private Limited ........... | 46,451 | 62.13% | 28,860 | 972 | — | 666 | 30,498 |
| Gwangyang Green Energy Co., Ltd. ...... | 8,772 | 20.00% | 1,754 | 18 | — | — | 1,772 |
| PND solar., Ltd ..................... | 3,779 | 29.00% | 1,096 | 154 | — | — | 1,250 |
| **\<Joint ventures\>** | | | | | | | |
| KEPCO-Uhde Inc. .................... | 508 | 50.85% | 258 | — | — | — | 258 |
| Eco Biomass Energy Sdn. Bhd. .......... | — | 61.53% | — | — | — | — | — |
| Datang Chaoyang Renewable Power Co., Ltd. .............................. | 68,154 | 40.00% | 27,262 | — | — | — | 27,262 |
| Shuweihat Asia Investment B.V. .... | 31,991 | 49.00% | 15,675 | — | — | — | 15,675 |
| Shuweihat Asia Operation & Maintenance Company ......................... | 1,206 | 55.00% | 663 | — | — | — | 663 |
| Waterbury Lake Uranium L.P. ......... | 55,313 | 35.76% | 19,780 | — | — | 1 | 19,781 |
| ASM-BG Investicii AD ................. | 42,404 | 50.00% | 21,202 | — | — | — | 21,202 |
| RES Technology AD .................. | 28,750 | 50.00% | 14,375 | — | — | — | 14,375 |
| KV Holdings, Inc. .................... | 4,795 | 40.00% | 1,918 | — | — | — | 1,918 |
| KEPCO SPC Power Corporation ........ | 288,689 | 75.20% | 217,094 | — | — | — | 217,094 |
| Gansu Datang Yumen Wind Power Co., Ltd. .............................. | 27,101 | 40.00% | 10,840 | — | — | — | 10,840 |
| Datang Chifeng Renewable Power Co., Ltd. .............................. | 427,762 | 40.00% | 171,105 | — | — | (50) | 171,055 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. ................... | 27,649 | 40.00% | 11,060 | — | — | — | 11,060 |
| Rabigh Electricity Company ............ | 428,119 | 40.00% | 171,248 | — | (70,978) | (914) | 99,356 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| Investees | | Net assets | Percentage of ownership(*) | Share in net assets | Investment differential | Intercompany transaction | Others | Book value |
|---|---|---|---|---|---|---|---|---|
| | | | | **2017** | | | | |
| | | | | **In millions of won** | | | | |
| Rabigh Operation & Maintenance Company Limited . . . . . . . . . . . . . . . . . . | ₩ | 9,967 | 40.00% | 3,987 | — | — | — | 3,987 |
| Jamaica Public Service Company Limited . . . . . . . . . . . . . . . . . . . . . . . | | 523,662 | 40.00% | 209,464 | (80,161) | — | 91,850 | 221,153 |
| KW Nuclear Components Co., Ltd. . . . . . . | | 15,472 | 45.00% | 6,962 | — | — | (259) | 6,703 |
| Busan Shinho Solar Power Co., Ltd. . . . . . . | | 17,386 | 25.00% | 4,346 | — | — | — | 4,346 |
| GS Donghae Electric Power Co., Ltd. . . . . . | | 649,199 | 34.00% | 220,727 | — | — | — | 220,727 |
| Global Trade Of Power System Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,990 | 29.00% | 577 | — | — | — | 577 |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | | 8,492 | 29.00% | 2,463 | — | — | — | 2,463 |
| KODE NOVUS I LLC . . . . . . . . . . . . . . . | | (107,377) | 50.00% | (53,689) | — | — | 53,689 | — |
| KODE NOVUS II LLC . . . . . . . . . . . . . . | | (47,391) | 50.00% | (23,696) | — | — | 23,696 | — |
| Daejung Offshore Wind Power Co., Ltd. . . | | 5,950 | 49.90% | 2,969 | — | — | — | 2,969 |
| Amman Asia Electric Power Company . . . . | | 242,940 | 60.00% | 145,764 | — | — | (88) | 145,676 |
| KAPES, Inc. . . . . . . . . . . . . . . . . . . . . . . | | 14,658 | 51.00% | 7,476 | — | — | — | 7,476 |
| Dangjin Eco Power Co., Ltd. . . . . . . . . . . . | | 162,676 | 34.00% | 55,310 | 2,618 | — | — | 57,928 |
| Honam Wind Power Co., Ltd. . . . . . . . . . . | | 14,724 | 29.00% | 4,270 | 32 | — | — | 4,302 |
| Chun-cheon Energy Co., Ltd. . . . . . . . . . . | | 160,919 | 29.90% | 48,115 | 3 | — | — | 48,118 |
| Yeonggwangbaeksu Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | | 18,189 | 15.00% | 2,728 | 6 | — | — | 2,734 |
| Nghi Son 2 Power Ltd. . . . . . . . . . . . . . . . | | 365 | 50.00% | 183 | — | — | — | 183 |
| Kelar S.A . . . . . . . . . . . . . . . . . . . . . . . . . | | 100,192 | 65.00% | 65,125 | 2,424 | — | (316) | 67,233 |
| PT. Tanjung Power Indonesia . . . . . . . . . . | | 5,075 | 35.00% | 1,776 | — | — | — | 1,776 |
| Incheon New Power Co., Ltd. . . . . . . . . . . | | 2,135 | 29.00% | 619 | — | — | — | 619 |
| Seokmun Energy Co., Ltd. . . . . . . . . . . . . | | 47,538 | 29.00% | 13,786 | — | — | — | 13,786 |
| Daehan Wind Power PSC . . . . . . . . . . . . . | | (824) | 50.00% | (412) | — | — | 412 | — |
| Barakah One Company . . . . . . . . . . . . . . . | | 3,476 | 18.00% | 626 | — | — | — | 626 |
| Nawah Energy Company . . . . . . . . . . . . . . | | 1,436 | 18.00% | 258 | — | — | — | 258 |
| MOMENTUM . . . . . . . . . . . . . . . . . . . . . | | 1,174 | 33.33% | 391 | — | — | — | 391 |
| Daegu Green Power Co., Ltd. . . . . . . . . . . | | 71,706 | 29.00% | 20,795 | — | 84 | 21,512 | 42,391 |
| Yeonggwang Wind Power Co., Ltd. . . . . . . | | 36,740 | 41.00% | 15,063 | 231 | — | — | 15,294 |
| Chester Solar IV SpA . . . . . . . . . . . . . . . | | 2,034 | 81.82% | 1,664 | — | — | 36 | 1,700 |
| Chester Solar V SpA . . . . . . . . . . . . . . . . | | 512 | 81.82% | 419 | — | — | 106 | 525 |
| Diego de Almagro Solar SpA . . . . . . . . . . | | 2,436 | 81.82% | 1,993 | — | — | 98 | 2,091 |
| South Jamaica Power Company Limited . . | | 33,522 | 20.00% | 6,704 | — | — | — | 6,704 |

(*) The percentage of ownership shown above is after considering the treasury stocks and others.

**(6)** As of December 31, 2016 and 2017, unrecognized equity interest in investments in associates and joint ventures whose book value has been reduced to zero due to accumulated losses are as follows:

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Unrecognized equity interest | Accumulated unrecognized equity interest | Unrecognized equity interest | Accumulated unrecognized equity interest |
| | | **In millions of won** | | | |
| Shin Pyeongtaek Power Co., Ltd. . . . . . . . . . . . . . | ₩ | 1,211 | 2,537 | (2,537) | — |
| Seokmun Energy Co., Ltd. . . . . . . . . . . . . . . . . . | | (205) | — | — | — |
| Kelar S.A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 43,920 | 61,309 | (61,309) | — |
| Hadong Mineral Fiber Co., Ltd. . . . . . . . . . . . . . | | — | 5 | (3) | 2 |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . . . . . . . . . | | 554 | 1,905 | (1,159) | 746 |
| Eurasia Energy Holdings . . . . . . . . . . . . . . . . . . | | 6 | 194 | (22) | 172 |
| KODE NOVUS I LLC . . . . . . . . . . . . . . . . . . . . . | | 22,194 | 44,983 | 8,706 | 53,689 |
| KODE NOVUS II LLC . . . . . . . . . . . . . . . . . . . . | | 12,340 | 23,515 | 181 | 23,696 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) . . . . . . . . . . . . . . . . . . . | | 132 | 132 | 1,154 | 1,286 |
| Daehan Wind Power PSC . . . . . . . . . . . . . . . . . . | | — | — | 412 | 412 |

F-104

**(7) As of December 31, 2017, shareholders' agreements on investments in associates and joint ventures that may cause future economic resource or cash outflows are as follows:**

(i) Gemeng International Energy Co., Ltd.

Gemeng International Energy Co., Ltd., issued put options on 8% of its shares to its financial investors, KEPCO Woori Sprott PEF (NPS Co-Pa PEF). If the investment fund is not collected until the maturity date (December 25, 2023, two years extension is possible), PEF can exercise the option at strike price which is the same as a principal investment price (including operating fees ratio of below 1% per annum), and also, the Company provided a performance guarantee on this agreement.

(ii) Hyundai Energy Co., Ltd.

The Company had placed guarantees for a fixed return on the investment to NH Power II Co., Ltd. and National Agricultural Cooperative Federation ("NACF") and had obtained the rights to acquire the investment securities in return preferentially. In addition, NH Power II Co., Ltd. and NACF have a right, which can be exercised for 30 days starting from 2 months to 1 month prior to 17 years after the termination date of the contract to sell their shares to the Company.

(iii) Taebaek Wind Power Co., Ltd.

In case non-controlling shareholders decide to dispose of their shares in Taebaek Wind Power Co., Ltd. after the warrant period of defect repair for wind power generator has expired, the Company acquires those shares at fair value. The acquisition is to be made after the conditions of the acquisition are discussed among the parties involved, with consideration of various factors such as financial status and business situation.

(iv) Pyeongchang Wind Power Co., Ltd.

In case non-controlling shareholders decide to dispose of their shares in Pyeongchang Wind Power Co., Ltd. after commercial operation of the power plant has started, the Company acquires those shares at fair value. The acquisition is to be made after the conditions of the acquisition are discussed among the parties involved, with the careful consideration of various factors such as financial status and business situation.

(v) Jeongam Wind Power Co., Ltd.

In case non-controlling shareholders decide to dispose of their shares in Jeongam Wind Power Co., Ltd. after the construction of the power plant has been completed, the Company is obligated to acquire those shares at fair value.

(vi) Daejung Offshore Wind Power Co., Ltd.

In case Samsung Heavy Industries Co., Ltd., a co-participant of the joint venture agreement, decides to dispose of its shares in Daejung Offshore Wind Power Co., Ltd., the Company is obligated to acquire those shares after evaluating the economic feasibility of the facilities installed by Samsung Heavy Industries Co., Ltd.

(vii) Samcheok Eco Materials Co., Ltd.

The Company has the rights to purchase the stocks should preferred stockholders elect to sell their stocks on the expected sell date (3 years from preferred stock payment date) and is required to guarantee the promised yield when preferred stockholders sell their stocks.

(viii) Hyundai Green Power Co., Ltd.

As of December 31, 2017, Hyundai Green Power Co., Ltd., an associate of the Company, which engages in the byproduct gas power generating business, entered into a project financing agreement with a limit of ₩919.2 billion with Korea Development Bank and others. At a certain period in the future, the Company has an appraisal right against the financial investors (Korea Development Bank

F-105

and others) and also has an obligation to sell its shares when claimed by the financial investors. At a certain period in the future, the Company has an appraisal right against Hyundai Steel Company and a third party designated by Hyundai Steel Company (collectively, "Hyundai Steel Company"), the operating investor of Hyundai Green Power Co., Ltd., according to the conditions of the agreement and also has an obligation to sell its shares when claimed by Hyundai Steel Company.

**(8)  Significant restrictions on its abilities to associates or joint ventures are as follows:**

| Company | Nature and extent of any significant restrictions |
|---|---|
| Daeryun Power Co., Ltd. | Principals on subordinated loans or dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. |
| Changjuk Wind Power Co., Ltd. | Principals on subordinated loans or dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. |
| Taebaek Wind Power Co., Ltd. | Financial institutions can reject or defer an approval with regard to the request for fund executions on subordinated loans of shareholders in order to pay senior loans based on the loan agreement. |
| Pyeongchang Wind Power Co., Ltd. | Principals on subordinated loans or dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. |
| Daegu Green Power Co., Ltd. | Principals on subordinated loans or dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. Shares cannot be wholly or partially transferred without prior written consent of financial institutions is obtained. |
| KNH Solar Co., Ltd. | Principal and interest, dividends to shareholders cannot be paid without written consent of financial institutions. |

F-106

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

18.  **Property, Plant and Equipment**

(1)  **Property, plant and equipment as of December 31, 2016 and 2017 are as follows:**

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses(*) | Book value |
| | In millions of won | | | | |
| Land . . . . . . . . . . . . . . . . . . . . . . ₩ | 12,969,741 | (3,204) | — | — | 12,966,537 |
| Buildings . . . . . . . . . . . . . . . . | 17,722,326 | (61,188) | (5,936,849) | (853) | 11,723,436 |
| Structures . . . . . . . . . . . . . . . . . | 63,291,437 | (197,641) | (19,959,839) | (1,183) | 43,132,774 |
| Machinery . . . . . . . . . . . . . . . . . | 67,769,168 | (111,064) | (24,344,832) | (2,391) | 43,310,881 |
| Ships . . . . . . . . . . . . . . . . . . . . . | 4,175 | — | (3,625) | — | 550 |
| Vehicles . . . . . . . . . . . . . . . . . . | 247,751 | (107) | (176,781) | — | 70,863 |
| Equipment . . . . . . . . . . . . . . . . . | 1,270,660 | (732) | (894,265) | — | 375,663 |
| Tools . . . . . . . . . . . . . . . . . . . . | 921,115 | (430) | (742,083) | — | 178,602 |
| Construction-in- progress . . . . . . . | 27,334,368 | (135,807) | — | (38,108) | 27,160,453 |
| Finance lease assets . . . . . . . . . . . | 2,390,779 | — | (1,984,426) | — | 406,353 |
| Asset retirement costs . . . . . . . . . . | 7,129,771 | — | (3,064,359) | — | 4,065,412 |
| Others . . . . . . . . . . . . . . . . . . . | 10,361,294 | — | (8,009,762) | — | 2,351,532 |
| ₩ | 211,412,585 | (510,173) | (65,116,821) | (42,535) | 145,743,056 |

(*)  The Company separately recognizes impairment loss on each asset, reflecting various factors such as physical impairment and others during the replacement.

| | 2017 | | | | |
|---|---|---|---|---|---|
| | Acquisition cost | Government grants | Accumulated depreciation | Accumulated impairment losses(*) | Book value |
| | In millions of won | | | | |
| Land . . . . . . . . . . . . . . . . . . . . . ₩ | 13,318,542 | (21,968) | — | — | 13,296,574 |
| Buildings . . . . . . . . . . . . . . . . . | 18,777,678 | (63,539) | (6,722,376) | (1,776) | 11,989,987 |
| Structures . . . . . . . . . . . . . . . . | 66,184,484 | (196,414) | (22,071,667) | (8,039) | 43,908,364 |
| Machinery . . . . . . . . . . . . . . . . . | 75,826,292 | (183,188) | (28,904,982) | (45,512) | 46,692,610 |
| Ships . . . . . . . . . . . . . . . . . . . . | 4,175 | — | (3,772) | — | 403 |
| Vehicles . . . . . . . . . . . . . . . . . . | 276,425 | (6,322) | (195,260) | (127) | 74,716 |
| Equipment . . . . . . . . . . . . . . . . . | 1,440,870 | (761) | (1,020,192) | (6) | 419,911 |
| Tools . . . . . . . . . . . . . . . . . . . . | 1,010,537 | (1,027) | (809,842) | (32) | 199,636 |
| Construction-in-progress . . . . . | 25,610,649 | (49,084) | — | (38,108) | 25,523,457 |
| Finance lease assets . . . . . . . . | 2,390,680 | (27) | (2,093,001) | — | 297,652 |
| Asset retirement costs . . . . . . . . | 9,395,821 | — | (3,356,337) | — | 6,039,484 |
| Others . . . . . . . . . . . . . . . . . . . | 11,247,021 | — | (8,807,401) | — | 2,439,620 |
| ₩ | 225,483,174 | (522,330) | (73,984,830) | (93,600) | 150,882,414 |

(*)  The Company separately recognizes impairment loss on each asset, reflecting various factors such as physical impairment and others during the replacement.

F-107

(2) **Changes in property, plant and equipment for the years ended December 31, 2016 and 2017 are as follows:**

| | Beginning balance | Acquisition | Disposal | Depreciation | Impairment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | | **2016** | | | |
| | | | | In millions of won | | | |
| Land . . . . . . . . . . . . . . ₩ | 12,396,460 | 13,973 | (52,569) | — | — | 611,877 | 12,969,741 |
| (Government grants) . . . | (3,147) | — | 14 | — | — | (71) | (3,204) |
| Buildings . . . . . . . . . . . . | 9,676,432 | — | (9,020) | (676,866) | — | 2,794,078 | 11,784,624 |
| (Government grants) . . . | (63,932) | — | 731 | 5,299 | — | (3,286) | (61,188) |
| Structures . . . . . . . . . . . | 40,258,162 | 455 | (524,310) | (2,233,333) | — | 5,829,441 | 43,330,415 |
| (Government grants) . . . | (193,119) | — | 2,597 | 9,491 | — | (16,610) | (197,641) |
| Machinery . . . . . . . . . . . | 36,864,749 | 193,017 | (243,757) | (4,353,596) | — | 10,961,532 | 43,421,945 |
| (Government grants) . . . | (108,935) | (33) | 1,210 | 12,272 | — | (15,578) | (111,064) |
| Ships . . . . . . . . . . . . . . | 786 | — | — | (281) | — | 45 | 550 |
| Vehicles . . . . . . . . . . . . | 60,472 | 2,493 | (34) | (27,615) | — | 35,654 | 70,970 |
| (Government grants) . . . | (29) | (58) | — | 25 | — | (45) | (107) |
| Equipment . . . . . . . . . . . | 310,571 | 67,134 | (323) | (128,084) | — | 127,097 | 376,395 |
| (Government grants) . . . | (1,026) | — | — | 452 | — | (158) | (732) |
| Tools . . . . . . . . . . . . . . | 160,630 | 27,856 | (327) | (69,842) | — | 60,715 | 179,032 |
| (Government grants) . . . | (691) | — | — | 295 | — | (34) | (430) |
| Construction-in-progress . . . | 35,267,026 | 11,752,352 | (94,443) | — | — | (19,628,675) | 27,296,260 |
| (Government grants) . . . | (139,898) | (28,434) | — | — | — | 32,525 | (135,807) |
| Finance lease assets . . . . . . | 511,509 | 34 | (31) | (96,254) | — | (8,905) | 406,353 |
| Asset retirement costs . . . . . | 4,106,087 | — | — | (509,310) | — | 468,635 | 4,065,412 |
| Others . . . . . . . . . . . . . . | 2,259,244 | — | (9) | (813,248) | — | 905,545 | 2,351,532 |
| ₩ | 141,361,351 | 12,028,789 | (920,271) | (8,880,595) | — | 2,153,782 | 145,743,056 |

| | Beginning balance | Acquisition | Disposal | Depreciation | Impairment(*) | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | | **2017** | | | |
| | | | | In millions of won | | | |
| Land . . . . . . . . . . . . . . ₩ | 12,969,741 | 32,773 | (8,961) | — | — | 324,989 | 13,318,542 |
| (Government grants) . . . | (3,204) | — | 5 | — | — | (18,769) | (21,968) |
| Buildings . . . . . . . . . . . . | 11,784,624 | 40,592 | (19,715) | (794,804) | (923) | 1,043,752 | 12,053,526 |
| (Government grants) . . . | (61,188) | (900) | 28 | 5,996 | — | (7,475) | (63,539) |
| Structures . . . . . . . . . . . | 43,330,415 | 428 | (519,366) | (2,421,168) | (6,856) | 3,721,325 | 44,104,778 |
| (Government grants) . . . | (197,641) | — | 1,905 | 10,011 | — | (10,689) | (196,414) |
| Machinery . . . . . . . . . . . | 43,421,945 | 421,892 | (242,428) | (4,821,595) | (43,121) | 8,139,105 | 46,875,798 |
| (Government grants) . . . | (111,064) | (10,834) | 489 | 17,390 | — | (79,169) | (183,188) |
| Ships . . . . . . . . . . . . . . | 550 | — | — | (147) | — | — | 403 |
| Vehicles . . . . . . . . . . . . | 70,970 | 3,447 | (174) | (34,236) | (127) | 41,158 | 81,038 |
| (Government grants) . . . | (107) | (107) | 14 | 1,070 | — | (7,192) | (6,322) |
| Equipment . . . . . . . . . . . | 376,395 | 53,529 | (413) | (158,614) | (6) | 149,781 | 420,672 |
| (Government grants) . . . | (732) | (43) | — | 454 | — | (440) | (761) |
| Tools . . . . . . . . . . . . . . | 179,032 | 30,990 | (166) | (74,909) | (32) | 65,748 | 200,663 |
| (Government grants) . . . | (430) | — | — | 354 | — | (951) | (1,027) |
| Construction-in-progress . . . | 27,296,260 | 11,996,508 | (6,487) | — | — | (13,713,740) | 25,572,541 |
| (Government grants) . . . | (135,807) | (42,728) | — | — | — | 129,451 | (49,084) |
| Finance lease assets . . . . . . | 406,353 | — | (29,696) | (107,390) | — | 28,412 | 297,679 |
| (Government grants) . . . | — | — | — | 1 | — | (28) | (27) |
| Asset retirement costs . . . . . | 4,065,412 | — | — | (518,565) | — | 2,492,637 | 6,039,484 |
| Others . . . . . . . . . . . . . . | 2,351,532 | 10,411 | (28) | (762,711) | — | 840,416 | 2,439,620 |
| ₩ | 145,743,056 | 12,535,958 | (824,993) | (9,658,863) | (51,065) | 3,138,321 | 150,882,414 |

(*) Korea Midland Power Co., Ltd. and Korea Western Power Co., Ltd., 100% owned subsidiaries, have determined that there are impairment indicators for the shutdowns of certain power generation units and fire, and performed an impairment test over the individual assets. As a result, the Company recognized the amount of the carrying amount in excess of its recoverable amount as impairment loss in the consolidated statements of comprehensive income.

F-108

**19. Investment Properties**

**(1) Investment properties as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | |
|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated depreciation | Book value |
| | | In millions of won | | | |
| Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 336,421 | — | — | 336,421 |
| Buildings . . . . . . . . . . . . . . . . . . . . . . . . . | | 29,168 | (64) | (11,845) | 17,259 |
| | ₩ | 365,589 | (64) | (11,845) | 353,680 |

| | | 2017 | | | |
|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated depreciation | Book value |
| | | In millions of won | | | |
| Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 264,205 | — | — | 264,205 |
| Buildings . . . . . . . . . . . . . . . . . . . . . . . . . | | 36,165 | (83) | (15,573) | 20,509 |
| | ₩ | 300,370 | (83) | (15,573) | 284,714 |

**(2) Changes in investment properties for the years ended December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | |
|---|---|---|---|---|---|
| | | Beginning balance | Depreciation | Others | Ending balance |
| | | In millions of won | | | |
| Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 253,960 | — | 82,461 | 336,421 |
| Buildings . . . . . . . . . . . . . . . . . . . . . . . . . | | 15,963 | (679) | 2,039 | 17,323 |
| (Government grants) . . . . . . . . . . . . . . | | (13) | 1 | (52) | (64) |
| | ₩ | 269,910 | (678) | 84,448 | 353,680 |

| | | 2017 | | | |
|---|---|---|---|---|---|
| | | Beginning balance | Depreciation | Others | Ending balance |
| | | In millions of won | | | |
| Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 336,421 | — | (72,216) | 264,205 |
| Buildings . . . . . . . . . . . . . . . . . . . . . . . . . | | 17,323 | (1,178) | 4,447 | 20,592 |
| (Government grants) . . . . . . . . . . . . . . | | (64) | 2 | (21) | (83) |
| | ₩ | 353,680 | (1,176) | (67,790) | 284,714 |

**(3) Income and expenses related to investment properties for the years ended December 31, 2016 and 2017 are as follows:**

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Rental income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 9,460 | 9,581 |
| Operating and maintenance expenses related to rental income . . . . . . . . . . | | (678) | (1,172) |
| | ₩ | 8,782 | 8,409 |

F-109

**(4)  Fair value of investment properties as of December 31, 2016 and 2017 are as follows:**

|  |  | 2016 | | 2017 | |
|---|---|---|---|---|---|
|  |  | Book value | Fair value | Book value | Fair value |
|  |  | In millions of won | | | |
| Land ................................... | ₩ | 336,421 | 374,042 | 264,205 | 309,241 |
| Buildings ............................... |  | 17,259 | 20,708 | 20,509 | 23,319 |
|  | ₩ | 353,680 | 394,750 | 284,714 | 332,560 |

The fair values of the investment properties as of the reporting date were determined in consideration of the fluctuation on the publicly announced individual land price after the IFRS transition date (January 1, 2010).

**(5)  All of the Company's investment property is held under freehold interests.**

**20.  Construction Services Contracts**

**(1)  Changes in total contract amount in which revenue is not yet recognized for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  |  | 2015 | | | |
|---|---|---|---|---|---|
|  |  | Beginning balance | Increase (decrease)(*) | Recognized as revenue | Ending balance |
|  |  | In millions of won | | | |
| Nuclear power plant construction in UAE and others .............. | ₩ | 17,081,074 | (1,011,031) | (3,761,204) | 12,308,839 |

(*)  For the year ended December 31, 2015, the increased balance of contracts from new orders and other is ₩412,617 million and the decreased balance of contracts due to changes in scope of construction work is ₩1,423,648 million.

|  |  | 2016 | | | |
|---|---|---|---|---|---|
|  |  | Beginning balance | Increase (decrease)(*) | Recognized as revenue | Ending balance |
|  |  | In millions of won | | | |
| Nuclear power plant construction in UAE and others .............. | ₩ | 12,308,839 | (1,045,094) | (4,026,857) | 7,236,888 |

(*)  For the year ended December 31, 2016, the increased balance of contracts from new orders and other is ₩718,118 million and the decreased balance of contracts due to changes in scope of construction work is ₩1,763,212 million.

|  |  | 2017 | | | |
|---|---|---|---|---|---|
|  |  | Beginning balance | Increase (decrease)(*) | Recognized as revenue | Ending balance |
|  |  | In millions of won | | | |
| Nuclear power plant construction in UAE and others .............. | ₩ | 7,236,888 | 151,891 | (3,212,184) | 4,176,595 |

(*)  For the year ended December 31, 2017, the increased balance of contracts from new orders and other is ₩438,142 million and the decreased balance of contracts due to changes in scope of construction work is ₩286,251 million.

F-110

(2) **Accumulated earned revenue, expense and others related to the Company's construction contracts as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | |
|---|---|---|---|---|
| | Accumulated earned revenue | Accumulated expense | Accumulated profit | Unearned advance receipts |
| | In millions of won | | | |
| Nuclear power plant construction in UAE and others . . . . . . . . . . . ₩ | 15,314,737 | 14,396,890 | 917,847 | — |

| | | 2017 | | |
|---|---|---|---|---|
| | Accumulated earned revenue | Accumulated expense | Accumulated profit | Unearned advance receipts |
| | In millions of won | | | |
| Nuclear power plant construction in UAE and others . . . . . . . . . . . ₩ | 18,236,992 | 16,937,772 | 1,299,220 | — |

(3) **Gross amount due from customers recognized as assets and due to customers recognized as liabilities for contract work as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Assets(*1) | Liabilities(*2) | Assets(*1) | Liabilities(*2) |
| | | In millions of won | | | |
| Nuclear power plant construction in UAE and others . . . . . . . . . . . . . ₩ | | 44,930 | 651,985 | 55,755 | 542,921 |

(*1) Included in trade and other receivables, net, in the consolidated statements of financial position.

(*2) Included in non-financial liabilities in the consolidated statements of financial position.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**21. Intangible Assets other than Goodwill**

**(1) Intangible assets as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | | |
|---|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated amortization | Accumulated impairment losses | Book value |
| | | In millions of won | | | | |
| Software . . . . . . . . . . . . . . . . . . | ₩ | 458,382 | (595) | (365,161) | — | 92,626 |
| Licenses and franchises . . . . . . . | | 3,398 | — | (3,398) | — | — |
| Copyrights, patents rights and other industrial rights . . . . . . . | | 35,756 | — | (15,675) | — | 20,081 |
| Mining rights . . . . . . . . . . . . . . | | 549,371 | — | (10,511) | — | 538,860 |
| Development expenditures . . . . | | 785,966 | (5,152) | (723,561) | — | 57,253 |
| Intangible assets under Development . . . . . . . . . . . . . | | 119,474 | (11,090) | — | (3,941) | 104,443 |
| Usage rights of donated assets and other . . . . . . . . . . . . . . . . | | 426,346 | (21) | (342,244) | — | 84,081 |
| Leasehold rights . . . . . . . . . . . . | | 23,350 | — | (18,718) | — | 4,632 |
| Greenhouse gas emissions rights . . . . . . . . . . . . . . . . . | | 6,283 | — | — | — | 6,283 |
| Others . . . . . . . . . . . . . . . . . . . . | | 173,213 | — | (88,527) | (12,124) | 72,562 |
| | ₩ | 2,581,539 | (16,858) | (1,567,795) | (16,065) | 980,821 |

| | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | | Acquisition cost | Government grants | Accumulated amortization | Accumulated impairment losses | Book value |
| | | In millions of won | | | | |
| Software . . . . . . . . . . . . . . . . . . | ₩ | 534,191 | (486) | (408,300) | — | 125,405 |
| Licenses and franchises . . . . . . . | | 3,398 | — | (3,398) | — | — |
| Copyrights, patents rights and other industrial rights . . . . . . . | | 43,857 | — | (19,876) | — | 23,981 |
| Mining rights . . . . . . . . . . . . . . | | 553,876 | — | (14,243) | — | 539,633 |
| Development expenditures . . . . | | 836,996 | (3,702) | (752,478) | — | 80,816 |
| Intangible assets under development . . . . . . . . . . . . . . | | 143,851 | (10,540) | — | (3,941) | 129,370 |
| Usage rights of donated assets and other . . . . . . . . . . . . . . . . | | 459,682 | (11) | (358,024) | — | 101,647 |
| Leasehold rights . . . . . . . . . . . . | | 24,306 | — | (19,262) | — | 5,044 |
| Others . . . . . . . . . . . . . . . . . . . . | | 297,289 | — | (103,995) | (12,069) | 181,225 |
| | ₩ | 2,897,446 | (14,739) | (1,679,576) | (16,010) | 1,187,121 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(2)   Changes in intangible assets for the years ended December 31, 2016 and 2017 are as follows:

**2016**

| | Beginning balance | Acquisition | Disposal | Amortization | Impairment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | |
| Software ₩ | 57,886 | 18,267 | — | (32,378) | | 49,446 | 93,221 |
| (Government grants) | (699) | — | | 249 | — | (145) | (595) |
| Copyrights, patents rights and other industrial rights | 21,875 | 85 | (39) | (2,697) | — | 857 | 20,081 |
| Mining rights | 499,537 | 26,311 | — | (899) | — | 13,911 | 538,860 |
| Development expenditures | 51,807 | 212 | — | (21,993) | — | 32,379 | 62,405 |
| (Government grants) | (6,835) | — | — | 2,771 | — | (1,088) | (5,152) |
| Intangible assets under development | 94,886 | 66,588 | — | — | (3,945) | (41,996) | 115,533 |
| (Government grants) | (10,483) | (1,597) | — | — | — | 990 | (11,090) |
| Usage rights of donated assets and other | 48,591 | — | — | (15,513) | — | 51,024 | 84,102 |
| (Government grants) | (32) | — | — | 11 | — | — | (21) |
| Leasehold rights | 745 | — | — | (351) | — | 4,238 | 4,632 |
| Greenhouse gas emissions rights | 805 | 6,283 | — | — | — | (805) | 6,283 |
| Others | 97,750 | 8,273 | (550) | (8,916) | 3 | (23,998) | 72,562 |
| (Government grants) | (1) | — | — | 1 | — | — | — |
| ₩ | 855,832 | 124,422 | (589) | (79,715) | (3,942) | 84,813 | 980,821 |

**2017**

| | Beginning balance | Acquisition | Disposal | Amortization | Impairment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | | In millions of won | | | |
| Software ₩ | 93,221 | 12,700 | (5) | (44,809) | | 64,784 | 125,891 |
| (Government grants) | (595) | (17) | — | 255 | — | (129) | (486) |
| Copyrights, patents rights and other industrial rights | 20,081 | 30 | (7) | (3,350) | — | 7,227 | 23,981 |
| Mining rights | 538,860 | 26,751 | (272) | (4,640) | — | (21,066) | 539,633 |
| Development expenditures | 62,405 | 494 | — | (25,924) | — | 47,543 | 84,518 |
| (Government grants) | (5,152) | — | — | 2,811 | — | (1,361) | (3,702) |
| Intangible assets under development | 115,533 | 56,527 | — | — | (20) | (32,130) | 139,910 |
| (Government grants) | (11,090) | — | — | — | — | 550 | (10,540) |
| Usage rights of donated assets and other | 84,102 | — | — | (14,462) | — | 32,018 | 101,658 |
| (Government grants) | (21) | — | — | 10 | — | — | (11) |
| Leasehold rights | 4,632 | — | — | (545) | — | 957 | 5,044 |
| Greenhouse gas emissions rights | 6,283 | — | — | — | — | (6,283) | — |
| Others | 72,562 | 47,402 | (377) | (23,018) | 54 | 84,602 | 181,225 |
| (Government grants) | | | | | | | |
| ₩ | 980,821 | 143,887 | (661) | (113,672) | 34 | 176,712 | 1,187,121 |

F-113

**(3) Significant specific intangible assets as of December 31, 2016 and 2017 are as follows:**

2016

| Type | Description | Currency | Amount | Remaining useful years |
|---|---|---|---|---|
| | In millions of won and thousands of Australian dollars | | | |
| Software . . . . . . . . . . . | ERP system and others | KRW | 506 | 11 months ~ 1 year and 11 months |
| | SCADA O/S (POWERON RELIANCE) | KRW | 4,206 | 3 years and 1 month |
| Copyrights, patents rights and other industrial rights . . . . . | Smart technology verification and standard design project conducting right | KRW | 5,750 | 5 years and 9 months |
| Mining rights . . . . . . . . | Mining right of Bylong mine | AUD | 401,225 | — (*) |
| Development expenditures . . . . . . . | Development of maintenance system for utility plant | KRW | 518 | 11 months |
| Intangible assets under development . . . . . . . | Contributions to ARP NRC DC | KRW | 41,190 | — |
| Usage rights of donated assets and others . . . | Sejong Haengbogdosi sharing charge | KRW | 44,502 | 9 years and 11 months |
| | Dangjin power plant load facility usage right | KRW | 26,759 | 4 years and 3 months |
| Others . . . . . . . . . . . . . | Sillim electricity supply facility usage right | KRW | 2,196 | 4 years and 11 months |

(*)  Mining rights are amortized using the units-of-production method and the amortization has not commenced yet.

2017

| Type | Description | Currency | Amount | Remaining useful lives |
|---|---|---|---|---|
| | millions of won and thousands of Australian dollars | | | |
| Software . . . . . . . . . . . | ERP system and others | KRW | 1,135 | 3 years and 2 months ~ 3 years and 4 months |
| | AMI GATEWAY S/W | KRW | 3,528 | 3 years and 2 months |
| Copyrights, patents rights and other industrial rights . . . . | Smart technology verification and standard design project conducting right | KRW | 11,724 | 4 years and 9 months |
| Mining rights . . . . . . . . | Mining right of Bylong mine | AUD | 401,225 | — (*) |
| Development expenditures . . . . . . . | Electricity sales information system | KRW | 29,391 | 4 years 3 months |
| Intangible assets under development . . . . . . . | Contributions to ARP NRC DC | KRW | 46,458 | — |
| Usage rights of donated assets and others . . . . | Sejong Haengbogdosi sharing charge | KRW | 40,460 | 8 years and 11 months |
| | Dangjin power plant load facility usage right | KRW | 20,463 | 3 years 3 months |
| Others . . . . . . . . . . . . . | Occupancy and use of public waters | KRW | 103,269 | 18 years 11 months |

(*)  Mining rights are amortized using the units-of-production method and the amortization has not commenced yet.

F-114

(4) For the years ended December 31, 2015, 2016 and 2017, the Company recognized research and development expenses of ₩611,220 million, ₩705,504 million and ₩721,437 million, respectively.

## 22. Trade and Other Payables

Trade and other payables as of December 31, 2016 and 2017 are as follows:

|  | | 2016 | | 2017 | |
|---|---|---|---|---|---|
|  | | Current | Non-current | Current | Non-current |
|  | | In millions of won | | | |
| Trade payables | ₩ | 2,610,373 | — | 2,936,990 | — |
| Other trade payables | | 1,498,582 | 3,033,780 | 1,649,933 | 2,825,039 |
| Accrued expenses | | 1,152,933 | 2,161 | 1,087,844 | 1,951 |
| Leasehold deposits received | | 1,426 | 1,008 | 1,562 | 1,308 |
| Other deposits received | | 197,711 | 93,751 | 186,817 | 102,896 |
| Finance lease liabilities | | 121,176 | 420,003 | 131,792 | 286,468 |
| Dividends payable | | 3,204 | — | 4,448 | — |
| Others (*) | | 6 | 7,472 | 135 | 5,818 |
|  | ₩ | 5,585,411 | 3,558,175 | 5,999,521 | 3,223,480 |

(*) Details of others as of December 31, 2016 and 2017 are as follows:

|  | | 2016 | | 2017 | |
|---|---|---|---|---|---|
|  | | Current | Non-current | Current | Non-current |
|  | | In millions of won | | | |
| Advance received from local governments | ₩ | — | 7,472 | — | 5,818 |
| Others | | 6 | — | 135 | — |
|  | ₩ | 6 | 7,472 | 135 | 5,818 |

## 23. Borrowings and Debt Securities

(1) Borrowings and debt securities as of December 31, 2016 and 2017 are as follows:

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| **Current liabilities** | | | |
| Short-term borrowings | ₩ | 805,523 | 1,038,328 |
| Current portion of long-term borrowings | | 310,977 | 128,543 |
| Current portion of debt securities | | 7,825,310 | 7,961,182 |
| Less : Current portion of discount on long-term borrowings | | (979) | (886) |
| Less : Current portion of discount on debt securities | | (1,753) | (3,882) |
|  | | 8,939,078 | 9,123,285 |
| **Non-current liabilities** | | | |
| Long-term borrowings | | 1,799,750 | 2,455,737 |
| Debt securities | | 43,012,960 | 43,270,825 |
| Less : Discount on long-term borrowings | | (25,859) | (21,113) |
| Less : Discount on debt securities | | (86,880) | (81,424) |
| Add: Premium on debt securities | | 156 | 82 |
|  | | 44,700,127 | 45,624,107 |
|  | ₩ | 53,639,205 | 54,747,392 |

F-115

(2) **Repayment schedule of borrowings and debt securities as of December 31, 2016 and 2017 are as follows:**

| 2016 | | |
|---|---|---|
| Type | Borrowings | Debt Securities |
| | In millions of won | |
| Less than 1 year ........................................... ₩ | 1,116,500 | 7,825,310 |
| 1~ 5 years ................................................... | 295,162 | 24,462,410 |
| Over 5 years ................................................ | 1,504,588 | 18,550,550 |
| ₩ | 2,916,250 | 50,838,270 |

| 2017 | | |
|---|---|---|
| Type | Borrowings | Debt Securities |
| | In millions of won | |
| Less than 1 year ........................................... ₩ | 1,166,871 | 7,961,182 |
| 1~ 5 years ................................................... | 1,117,222 | 25,047,075 |
| Over 5 years ................................................ | 1,338,515 | 18,223,750 |
| ₩ | 3,622,608 | 51,232,007 |

**23. Borrowings and Debt Securities**

(3) **Short-term borrowings as of December 31, 2016 and 2017 are as follows:**

| 2016 | | | | | |
|---|---|---|---|---|---|
| Type | Creditor | Interest rate (%) | Maturity | Foreign currency | Local currency |
| | | In millions of won and thousands of foreign currencies | | | |
| Local short-term borrowings .... | Woori Investment Bank and others | 1.54~2.51 | 2017.01.25~ 2017.09.13 | — | ₩ 436,800 |
| Foreign short-term borrowings .... | SCNT and others | 1.58~6.50 | 2017.03.30~ 2017.12.03 | USD 35,086 | 42,401 |
| Foreign short-term borrowings .... | Export-import Bank of Korea | 3M Libor+0.54~0.63 | 2017.05.17~ 2017.12.18 | AUD 311,174 | 271,360 |
| Local bank overdraft ...... | Nonghyup Bank | 2.45 | 2017.01.05 | — | 37,000 |
| Local bank overdraft ...... | Woori Bank | Standard overdraft rate+1.12 | 2017.02.25 | — | 17,962 |
| | | | | | ₩ 805,523 |

F-116

| | | | | 2017 | |
| Type | Creditor | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | | In millions of won and thousands of foreign currencies | | |
| Local short-term borrowings  . . . . | KTB Investment and securities and others | 1.57~2.47 | 2018.01.12~ 2018.09.19 | — | ₩  686,561 |
| Foreign short-term borrowings  . . . . | SCNT and others | 4.60~6.50 | 2018.12.03 | USD 8,955 | 9,594 |
| Foreign short-term borrowings  . . . . | Export-import Bank of Korea | 3M Libor+0.41~0.63 | 2018.12.18 | AUD 327,259 | 273,314 |
| Local bank overdraft  . . . . . . | Nonghyup Bank | 3.04 | 2018.01.02 | | 51,300 |
| Local bank overdraft  . . . . . . | Woori Bank | Standard overdraft rate+1.12 | 2018.02.27 | — | 17,559 |
| | | | | ₩ | 1,038,328 |

**(4)  Long-term borrowings as of December 31, 2016 and 2017 are as follows:**

| | | | 2016 | | |
| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | |
| **Local long-term borrowings** | | | | | |
| Korea Development Bank  . . . . . . . . . . . . . | Others | 0.50 | 2018~2044 | — | ₩    5,663 |
| | Facility | 2.45~4.60 | 2023~2028 | — | 61,835 |
| | Facility | 1yr KoFC bond rate +0.31 | 2018 | — | 125,000 |
| | Operating funds | 2.75 | 2018 | — | 12,000 |
| KEB Hana Bank  . . . . . . | Commercial Paper | 3M CD+0.14 | 2017 | — | 100,000 |
| | Facility | 4.60 | 2028 | — | 16,851 |
| | Facility | 3yr KTB rate -1.25 | 2017~2028 | — | 9,655 |
| IBK  . . . . . . . . . . . . . . . | PF Refinancing | CD+1.25 | 2030 | — | 22,500 |
| Export-Import Bank of Korea  . . . . . . . . . . . . | Project loans | 1.50 | 2026 | — | 30,935 |
| Korea Resources Corporation  . . . . . . . . | Development of power resources | 3yr KTB rate -2.25 | 2022~2025 | — | 14,039 |
| | Facility | 3yr KTB rate -2.25 | 2017~2024 | — | 3,842 |
| | Project loans | — | 2022~2025 | — | 3,733 |
| | Others | KTB rate -2.25 | 2024~2025 | — | 12,131 |
| Shinhan Bank and others  . . . . . . . . . . . . . | Collateral borrowing | 2.22 | 2017 | — | 30,000 |
| | Facility | CB rate+1.10 | 2028 | — | 25,276 |
| | Operating funds | 2.70~2.86 | 2017~2018 | — | 25,000 |
| | Others | 4.10 | 2035 | — | 55,000 |
| | Others | 3yr KTB rate+1.10 | 2035 | — | 55,000 |
| Kookmin Bank  . . . . . . . | Facility | MOR+0.62~0.79 | 2017~2023 | — | 45,000 |

F-117

**2016**

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | |
| Others . . . . . . . . . . . . . | Facility | 1.75~4.60 | 2026~2029 | — | 146,472 |
| | Facility | CB rate+1.10~1.20 | 2022~2028 | — | 34,951 |
| | PF Refinancing | 4.10 | 2030 | — | 62,500 |
| | Others | 8.00 | 2036 | — | 102,347 |
| | Others | — | 2028 | — | 7,250 |
| | | | | | 1,006,980 |

**Foreign long-term borrowings**

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| Korea National Oil Corporation . . . . . . . . | Project loans | — | 2021~2023 | USD 8,744 | 10,567 |
| Export-Import Bank of Korea and others . . . . | Direct loan and others | 3M Libor+2.75~ 3.70 | 2027 | JOD 178,892 | 305,332 |
| | Commercial loan and others | 3M Libor+1.50~ 2.50 | 2030~2033 | USD 299,859 | 362,379 |
| | PF Loan | 6M Libor+2.50~ 2.70 | 2032 | USD 119,647 | 144,594 |
| SCNT and others . . . . . . | Shareholder's loan | 6.50~8.00 | 2023 | USD 40,618 | 49,086 |
| | Shareholder's loan | 8.00 | 2031 | JOD 7,128 | 12,166 |
| PT PJB . . . . . . . . . . . . . | Shareholder's loan | 12.75 | 2019 | IDR 16,705,505 | 1,500 |
| Samsung Life Insurance and others . . . . . . . . . | Syndicated Loan | 3.10 | 2032 | JPY 1,758,000 | 18,227 |
| Woori Bank and others . . . . . . . . . . . . | Syndicated Loan | JPY 6M Libor+2.10 | 2032 | JPY 1,172,000 | 12,151 |
| SMBC and others . . . . . | Equity Bridge Loan | 1M Libor+0.90 | 2019 | USD 37,978 | 45,897 |
| IFC and others . . . . . . . . | Others | 6M Libor+5.00 | 2031 | PKR 11,706,160 | 134,972 |
| Others . . . . . . . . . . . . . | Others | — | 2019 | USD 5,691 | 6,876 |
| | | | | | 1,103,747 |
| | | | | | 2,110,727 |

Less : Discount of long-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . (26,838)
Less : Current portion of long-term borrowings . . . . . . . . . . . . . . . . . . . (310,977)
Add : Current portion of discount on long-term borrowings . . . . . . . . . 979

₩1,773,891

**2017**

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | |
| **Local long-term borrowings** | | | | | |
| Korea Development Bank . . . . . . . . . . . . . | Others | 0.50 | 2018~2044 | — ₩ | 4,909 |
| | Facility | 2.45~4.60 | 2023~2028 | — | 68,883 |
| | Facility | 1yr KoFC bond rate +0.31 | 2018 | — | 25,000 |
| | Operating funds | 2.59~3.04 | 2018~2020 | — | 47,000 |
| | Operating funds | 1yr KoFC bond rate +0.95 | 2020 | — | 14,000 |
| KEB Hana Bank . . . . . . | Commercial Paper | 3M CD+0.24~0.32 | 2021~2022 | — | 400,000 |
| | Facility | 4.60 | 2028 | — | 15,038 |
| | Facility | 3yr KTB rate-1.25 | 2018~2028 | — | 8,947 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**2017**

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | |
| IBK ................ | PF Refinancing | CD+1.25 | 2030 | — | 22,500 |
| Export-Import Bank of Korea ........... | Project loans | 1.50 | 2026 | — | 25,042 |
| | Operating funds | 2.21 | 2020 | — | 35,000 |
| Korea Energy Agency(*) ......... | Development of power resources | 3yr KTB rate-2.25 | 2023~2025 | — | 6,765 |
| | Facility | 3yr KTB rate-2.25 | 2018~2024 | — | 3,121 |
| | Project loans | — | 2022~2025 | — | 3,733 |
| | Others | KTB rate -2.25 | 2024~2028 | — | 18,455 |
| Shinhan Bank ......... | Collateral borrowing | 2.32 | 2019 | — | 30,000 |
| | Facility | CB rate +1.10 | 2028 | — | 22,557 |
| | Operating funds | 2.70 | 2018 | — | 15,000 |
| | Others | 4.10 | 2035 | — | 105,000 |
| | Others | Standard overdraft rate +1.10 | 2035 | — | 105,000 |
| Kookmin Bank ........ | Facility | 3.16 | 2020 | — | 10,000 |
| | Facility | MOR+0.79 | 2023 | — | 35,000 |
| Others .............. | Facility | 1.75~4.60 | 2026~2029 | — | 148,423 |
| | Facility | CB rate +1.10~1.20 | 2022~2028 | — | 46,278 |
| | PF Refinancing | 4.10 | 2030 | — | 62,500 |
| | Others | 4.50~8.00 | 2022~2039 | — | 102,346 |
| | | | | | 1,380,497 |

**Foreign long-term borrowings**

| Type | | Interest rate (%) | Maturity | Foreign currency | Local currency |
|---|---|---|---|---|---|
| Korea Energy Agency(*) ......... | Project loans | — | 2021~2023 | USD 8,744 | 9,368 |
| Export-Import Bank of Korea and others ...... | Direct loan and others | 1M Libor+1.80~3.20 | 2036 | USD 64,913 | 69,548 |
| | Direct loan and others | 3M Libor+2.75~3.70 | 2027 | JOD 168,663 | 254,514 |
| | Commercial loan and others | 3M Libor+1.50~2.50 | 2030~2033 | USD 289,026 | 309,662 |
| | PF Loan | 6M Libor+1.70~2.50 | 2032 | USD 123,253 | 132,054 |
| SCNT and others ...... | Shareholder's loan | 6.50~8.00 | 2023 | USD 41,718 | 44,697 |
| | Shareholder's loan | 8.00 | 2031 | JOD 5,136 | 7,750 |
| PT PJB .............. | Shareholder's loan | 12.75 | 2019 | IDR 10,932,568 | 864 |
| Samsung Life Insurance and others ......... | Syndicated Loan | 3.10 | 2032 | JPY 5,325,000 | 50,540 |
| Woori Bank and others ............. | Syndicated Loan | JPY 6M Libor+2.00 | 2032 | JPY 3,435,000 | 32,602 |
| SMBC and others ...... | Equity Bridge Loan | 1M Libor+0.90 | 2019 | USD 70,986 | 76,054 |
| IFC and others ........ | Others | 6M Libor+5.00 | 2031 | PKR 16,652,350 | 161,195 |
| Federal Financing Bank .............. | PF loan | 2.39 | 2031 | USD 48,366 | 51,819 |
| Others .............. | Others | — | 2019 | USD 2,907 | 3,116 |
| | | | | | 1,203,783 |
| | | | | | 2,584,280 |

Less : Discount of long-term borrowings ....................... (21,999)
Less : Current portion of long-term borrowings ................... (128,543)
Add : Current portion of discount on long-term borrowings .......... 886

₩2,434,624

F-119

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(*)   As of July 1, 2017, loan business for energy-related projects has been integrated into Korea Energy Agency in accordance with the Korean government's restructuring of the public institutions.

**(5)  Local debt securities as of December 31, 2016 and 2017 are as follows:**

| | Issue date | Maturity | Interest rate (%) | | 2016 | 2017 |
|---|---|---|---|---|---|---|
| | | | In millions of won | | | |
| Electricity Bonds . . . . . . . . . . . . | 2009.12.03~ | 2018.01.07~ | | | | |
| | 2017.12.14 | 2037.09.18 | 1.62~5.45 | ₩ | 19,860,000 | 20,700,000 |
| Electricity Bonds . . . . . . . . . . . . | 2013.06.25 | 2018.06.25 | 3M CD+0.31 | | 310,000 | 150,000 |
| Corporate Bonds(*1) . . . . . . . . . | 2009.05.04~ | 2018.01.18~ | | | | |
| | 2017.11.10 | 2047.10.17 | 1.36~5.84 | | 19,552,708 | 21,122,708 |
| | | | | | 39,722,708 | 41,972,708 |
| Less : Discount on local debt securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | (34,667) | (37,816) |
| Less : Current portion of local debt securities . . . . . . . . . . . . . . . . . . . . . . . . | | | | | (5,650,010) | (5,200,000) |
| Add : Current portion of discount on local debt securities . . . . . . . . . . . . . . . . . | | | | | 728 | 923 |
| | | | | ₩ | 34,038,759 | 36,735,815 |

(*1) Corporate Bonds of HeeMang Sunlight Power Co., Ltd (₩2,697 million) can be redeemed every March 31 after five years from its issue date, March 31, 2016.

F-120

**(6) Foreign debt securities as of December 31, 2016 and 2017 are as follows:**

| Type | Issue date | Maturity | Interest rate (%) | Foreign currency | Local currency |
|---|---|---|---|---|---|
| | | | **2016** | | |
| | | | In millions of won and thousands of foreign currencies | | |
| FY-96 . . . . . . . . | 1996.04.01~ | 2026.12.06~ | 6.00~8.37 | | |
| | 1996.12.06 | 2096.04.01 | | USD 249,068 | ₩    300,999 |
| FY-97 . . . . . . . . | 1997.01.31~ | 2027.02.01~ | 6.75~7.00 | | |
| | 1997.08.04 | 2027.08.01 | | USD 314,717 | 380,335 |
| FY-04 . . . . . . . . | 2004.04.23 | 2034.04.23 | 5.13 | USD 286,920 | 346,743 |
| FY-08 . . . . . . . . | 2008.11.27 | 2018.11.27 | 4.19 | JPY 20,000,000 | 207,362 |
| FY-11 . . . . . . . . | 2011.07.13~ | 2017.01.30~ | 3.63~4.75 | | |
| | 2011.07.29 | 2021.07.13 | | USD 800,000 | 966,800 |
| FY-12 . . . . . . . . | 2012.05.10~ | 2017.05.10~ | 2.50~3.13 | | |
| | 2012.09.19 | 2022.09.19 | | USD 1,750,000 | 2,114,875 |
| FY-13 . . . . . . . . | 2013.02.05~ | 2018.02.05~ | 1.88~2.88 | | |
| | 2013.11.27 | 2018.11.27 | | USD 1,900,000 | 2,296,150 |
| FY-13 . . . . . . . . | 2013.09.26~ | 2019.03.26~ | 1.50~1.63 | | |
| | 2013.10.23 | 2019.04.23 | | CHF 400,000 | 472,532 |
| FY-13 . . . . . . . . | 2013.09.25 | 2020.09.25 | 5.75 | AUD 325,000 | 283,416 |
| FY-13 . . . . . . . . | 2013.02.20~ | 2018.02.20~ | 3M Libor+0.84~1.50 | | |
| | 2013.07.25 | 2018.07.25 | | USD 500,000 | 604,250 |
| FY-14 . . . . . . . . | 2014.02.11~ | 2019.02.11~ | 2.38~3.57 | | |
| | 2014.12.02 | 2029.07.30 | | USD 1,500,000 | 1,812,750 |
| FY-14 . . . . . . . . | 2014.01.28~ | 2017.01.28~ | 3M Libor+0.55~1.05 | | |
| | 2014.07.31 | 2017.07.31 | | USD 500,000 | 604,250 |
| FY-15 . . . . . . . . | 2015.06.15 | 2025.06.15 | 3.25 | USD 300,000 | 362,550 |
| FY-16 . . . . . . . . | 2016.01.21 | 2021.07.21 | 2.50 | USD 300,000 | 362,550 |
| | | | | | 11,115,562 |

Less : Discount on foreign debt securities . . . . . . . . . . . . . . . . . . . . .    (53,966)
Add : Premium on foreign debt securities . . . . . . . . . . . . . . . . . . . . .    156
Less : Current portion of foreign debt securities . . . . . . . . . . . . . . . .    (2,175,300)
Add : Current portion of discount on foreign debt securities . . . . . . .    1,025

                                                                              ₩    8,887,477

F-121

| Type | Issue date | Maturity | Interest rate (%) | Foreign currency | Local currency |
| --- | --- | --- | --- | --- | --- |
| | | | **2017** | | |
| | | | **In millions of won and thousands of foreign currencies** | | |
| FY-96 . . . . . . . . | 1996.04.01~ | 2026.12.01~ | 6.00~8.37 | | |
| | 1996.12.06 | 2096.04.01 | | USD 249,070 | ₩ 266,854 |
| FY-97 . . . . . . . . | 1997.01.31~ | 2027.02.01~ | 6.75~7.00 | | |
| | 1997.08.04 | 2027.08.01 | | USD 314,717 | 337,188 |
| FY-04 . . . . . . . . | 2004.04.23 | 2034.04.23 | 5.13 | USD 286,920 | 307,406 |
| FY-08 . . . . . . . . | 2008.11.27 | 2018.11.27 | 4.19 | JPY 20,000,000 | 189,822 |
| FY-11 . . . . . . . . | 2011.07.13 | 2021.07.13 | 4.75 | USD 500,000 | 535,700 |
| FY-12 . . . . . . . . | 2012.09.19 | 2022.09.19 | 3 | USD 750,000 | 803,550 |
| FY-13 . . . . . . . . | 2013.02.05~ | 2018.02.05~ | 1.88~2.88 | | |
| | 2013.11.27 | 2018.11.27 | | USD 1,900,000 | 2,035,660 |
| FY-13 . . . . . . . . | 2013.09.26~ | 2019.03.26~ | 1.50~1.63 | | |
| | 2013.10.23 | 2019.04.23 | | CHF 400,000 | 437,888 |
| FY-13 . . . . . . . . | 2013.09.25 | 2020.09.25 | 5.75 | AUD 325,000 | 271,427 |
| FY-13 . . . . . . . . | 2013.02.20~ | 2018.02.20~ | 3M Libor+0.84~1.50 | | |
| | 2013.07.25 | 2018.07.25 | | USD 500,000 | 535,700 |
| FY-14 . . . . . . . . | 2014.02.11~ | 2019.02.11~ | 2.38~3.57 | | |
| | 2014.12.02 | 2029.07.30 | | USD 1,500,000 | 1,607,100 |
| FY-15 . . . . . . . . | 2015.06.15 | 2025.06.15 | 3.25 | USD 300,000 | 321,420 |
| FY-16 . . . . . . . . | 2016.01.21 | 2021.07.21 | 2.5 | USD 300,000 | 321,420 |
| FY-17 . . . . . . . . | 2017.04.12~ | 2020.04.12~ | 2.38~3.13 | | |
| | 2017.07.25 | 2027.07.25 | | USD 1,100,000 | 1,178,540 |
| FY-17 . . . . . . . . | 2017.10.30 | 2037.10.30 | 1.7 | EUR 40,000 | 51,170 |
| FY-17 . . . . . . . . | 2017.11.16 | 2037.11.16 | 2.36 | SEK 450,000 | 58,454 |
| | | | | | 9,259,299 |

| | |
| --- | --- |
| Less : Discount on foreign debt securities . . . . . . . . . . . . . . . . . . . . . | (47,490) |
| Add : Premium on foreign debt securities . . . . . . . . . . . . . . . . . . . . | 82 |
| Less : Current portion of foreign debt securities . . . . . . . . . . . . . . . . | (2,761,182) |
| Add : Current portion of discount on foreign debt securities . . . . . . . | 2,959 |
| | ₩ 6,453,668 |

**(7)  Changes in borrowings and debt securities for the year ended December 31, 2017 are as follows:**

| Beginning balance | Cash flow | Effect of exchange rate fluctuations | Others | Ending balance |
| --- | --- | --- | --- | --- |
| | | **In millions of won** | | |
| 53,639,205 | 2,269,513 | (1,169,418) | 8,092 | 54,747,392 |

## 24.  Finance Lease Liabilities

**(1)  Lease contracts**

The Company enters into power purchase agreements ("PPA") with GS EPS and three other providers. The Company recognizes these PPAs as finance leases; under the PPAs, there is no transfer of ownership or bargain purchase option of the plants at the end of the agreement, however, the present value of the future minimum power purchase payments equals substantially all of the plants' respective fair values over a twenty-year period which makes up the major part of the respective plants' economic life.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(2)  **Finance lease liabilities as of December 31, 2016 and 2017 are as follows and are included in current and non-current trade and other payables, net, in the consolidated statements of financial position:**

|  |  | 2016 | | 2017 | |
|---|---|---|---|---|---|
|  |  | Minimum lease payments | Present value of minimum lease payments | Minimum lease payments | Present value of minimum lease payments |
|  |  | In millions of won | | | |
| Less than 1 year . . . . . . . . . . | ₩ | 175,512 | 121,176 | 174,534 | 131,792 |
| 1 ~ 5 years . . . . . . . . . . . . . |  | 404,029 | 306,282 | 272,994 | 204,069 |
| More than 5 years  . . . . . . . |  | 152,247 | 113,721 | 108,748 | 82,399 |
|  | ₩ | 731,788 | 541,179 | 556,276 | 418,260 |

(3)  **Current and non-current portion of financial lease liabilities as of December 31, 2016 and 2017 are as follows:**

|  |  | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won | |
| Current finance lease liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 121,176 | 131,792 |
| Non-current finance lease liabilities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | 420,003 | 286,468 |
|  | ₩ | 541,179 | 418,260 |

(4)  **Minimum lease payment and contingent rent payment recognized as an expense as a lessee for the years ended December 31, 2016 and 2017 are as follows:**

|  |  | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won | |
| Minimum lease payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 177,585 | 158,859 |
| Contingent rent payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (20,956) | (21,024) |

(5)  **The Company does not have any irrevocable operating lease contracts as of December 31, 2016 and 2017.**

(6)  **Changes in finance lease liabilities for the year ended December 31, 2017 are as follows:**

| Beginning balance | Cash flow | Ending balance |
|---|---|---|
|  | In millions of won | |
| ₩541,179 | (122,919) | 418,260 |

25.  **Employment Benefits**

(1)  **Employment benefit obligations as of December 31, 2016 and 2017 are as follows:**

|  |  | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won | |
| Net defined benefit obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 1,678,470 | 1,476,201 |
| Other long-term employee benefit obligations . . . . . . . . . . . . . . . . . . |  | 7,788 | 6,868 |
|  | ₩ | 1,686,258 | 1,483,069 |

F-123

(2) **Principal assumptions on actuarial valuation as of December 31, 2016 and 2017 are as follows:**

|  | 2016 | 2017 |
|---|---|---|
| Discount rate | 2.45%~2.64% | 2.75%~2.90% |
| Future salary and benefit levels | 5.23% | 4.88% |
| Weighted average duration | 13.34 years | 13.40 years |

(3) **Details of expense relating to defined benefit plans for the years ended December 31, 2016 and 2017 are as follows:**

|  |  | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  |  | In millions of won | | |
| Current service cost | ₩ | 315,811 | 378,930 | 392,820 |
| Interest cost | | 63,808 | 67,104 | 79,524 |
| Expected return on plan assets | | (22,557) | (23,612) | (31,307) |
| Loss from settlement | | (641) | (706) | (1,055) |
|  | ₩ | 356,421 | 421,716 | 439,982 |

**Expenses as described above are recognized in those items below in the financial statements.**

|  |  | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  |  | In millions of won | | |
| Cost of sales | ₩ | 262,760 | 312,391 | 332,249 |
| Selling and administrative expenses | | 51,932 | 61,362 | 59,111 |
| Others (Construction-in-progress and others) | | 41,729 | 47,963 | 48,622 |
|  | ₩ | 356,421 | 421,716 | 439,982 |

In addition, for the years ended December 31, 2015, 2016 and 2017, employee benefit obligations expenses of ₩57,940 million, ₩62,435 million and ₩65,603 million, respectively, are recognized as cost of sales, and ₩9,971 million, ₩11,450 million and ₩11,983 million, respectively, are recognized as selling and administrative expenses, and ₩14,195 million, ₩14,024 million and ₩13,332 million, respectively, are recognized as construction-in-progress and others, relates to the Company's defined contribution plans.

(4) **Details of defined benefit obligations as of December 31, 2016 and 2017 are as follows:**

|  |  | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won | |
| Present value of defined benefit obligation from funded plans | ₩ | 2,867,377 | 2,951,842 |
| Fair value of plan assets | | (1,188,907) | (1,475,641) |
|  | | 1,678,470 | 1,476,201 |
| Present value of defined benefit obligation from unfunded plans | | — | — |
| Net liabilities incurred from defined benefit plans | ₩ | 1,678,470 | 1,476,201 |

F-124

(5)  **Changes in the present value of defined benefit obligations for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance | ₩ | 2,426,414 | 2,867,377 |
| Current service cost | | 378,930 | 392,820 |
| Interest cost(*) | | 67,104 | 79,524 |
| Remeasurement component | | 120,993 | (258,223) |
| Loss from settlement | | (707) | (1,055) |
| Actual payments | | (125,233) | (128,707) |
| Others | | (124) | 106 |
| Ending balance | ₩ | 2,867,377 | 2,951,842 |

(*)  Corporate bond (AAA rated) yield at year-end is applied to measure the interest cost on employee benefit obligations.

(6)  **Changes in the fair value of plan assets for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance | ₩ | 930,632 | 1,188,907 |
| Expected return | | 23,612 | 31,307 |
| Remeasurement component | | (5,706) | (10,435) |
| Contributions by the employers | | 312,125 | 325,080 |
| Actual payments | | (71,756) | (59,218) |
| Ending balance | ₩ | 1,188,907 | 1,475,641 |

In addition, loss on accumulated remeasurement component amounting to ₩222,997 million and ₩43,513 million has been recognized as other comprehensive income or loss for the years ended December 31, 2016 and 2017, respectively.

(7)  **Details of the fair value of plan assets as of December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Equity instruments | ₩ | 86,054 | 79,204 |
| Debt instruments | | 383,654 | 517,040 |
| Bank deposit | | 305,670 | 293,477 |
| Others | | 413,529 | 585,920 |
|  | ₩ | 1,188,907 | 1,475,641 |

For the years ended December 31, 2016 and 2017, actual returns on plan assets amounted to ₩17,906 million and ₩20,872 million, respectively.

F-125

(8) **Remeasurement component recognized in other comprehensive income (loss) for the years ended December 31, 2016 and 2017 are as follows:**

|  | 2016 | 2017 |
|---|---|---|
|  | In millions of won | |
| Actuarial gain from changes in financial assumptions . . . . . . . . . . . . . . . ₩ | (27,792) | (300,058) |
| Experience adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 148,785 | 41,835 |
| Expected return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,706 | 10,435 |
|  ₩ | 126,699 | (247,788) |

Remeasurement component recognized as other comprehensive income or loss is recorded in retained earnings.

## 26. Provisions

(1) **Provisions as of December 31, 2016 and 2017 are as follows:**

|  | 2016 | | 2017 | |
|---|---|---|---|---|
|  | Current | Non-current | Current | Non-current |
|  | In millions of won | | | |
| **Employment benefits** |  |  |  |  |
| Provisions for employment benefits . . . . . . . . . . . . . . . . . ₩ | 810,607 | — | 913,787 | — |
| **Litigation** |  |  |  |  |
| Litigation provisions . . . . . . . . . . . | 79,359 | 118,878 | 48,621 | 24,955 |
| **Decommissioning cost** |  |  |  |  |
| Nuclear plants . . . . . . . . . . . . . . . | — | 10,195,928 | — | 13,007,228 |
| Spent fuel . . . . . . . . . . . . . . . . . . . | — | 1,374,225 | — | 1,339,046 |
| Waste . . . . . . . . . . . . . . . . . . . . . . | 2,566 | 1,476,936 | 11,494 | 1,626,877 |
| PCBs . . . . . . . . . . . . . . . . . . . . . . | — | 191,744 | — | 180,087 |
| Other recovery provisions . . . . . . . | — | 507 | — | 6,659 |
| **Others** |  |  |  |  |
| Power plant regional support program . . . . . . . . . . . . . . . . . . | 152,851 | — | 153,756 | — |
| Transmission regional support program . . . . . . . . . . . . . . . . . . | 282,608 | — | 243,365 | — |
| Provisions for tax . . . . . . . . . . . . . | 106 | 136 | 61 | — |
| Provisions for financial guarantee . . . . . . . . . . . . . . . . . | 458 | 29,207 | — | 23,475 |
| Provisions for RPS . . . . . . . . . . . . | 417,404 | — | 271,624 | — |
| Provisions for greenhouse gas emissions obligations . . . . . . . . | 249,644 | — | 414,252 | — |
| Others . . . . . . . . . . . . . . . . . . . . . . | 4,385 | 39,590 | 80,538 | 16,387 |
|  ₩ | 1,999,988 | 13,427,151 | 2,137,498 | 16,224,714 |

F-126

(2)  Changes in provisions for the years ended December 31, 2016 and 2017 are as follows:

| | 2016 | | | | | |
|---|---|---|---|---|---|---|
| | Beginning balance | Increase in provision | Payment | Reversal | Others | Ending balance |
| | | | In millions of won | | | |
| Employment benefits | | | | | | |
| Provisions for employment benefits ... ₩ | 718,365 | 1,047,342 | (947,982) | (7,108) | (10) | 810,607 |
| Litigation | | | | | | |
| Litigation provisions .............. | 167,965 | 124,931 | (294,403) | (20,736) | 220,480 | 198,237 |
| Decommissioning cost | | | | | | |
| Nuclear plants .................... | 9,684,286 | 513,383 | (1,741) | — | — | 10,195,928 |
| Spent fuel ........................ | 1,375,185 | 469,982 | (470,942) | — | — | 1,374,225 |
| Waste ........................... | 1,502,140 | 49,092 | (71,998) | — | 268 | 1,479,502 |
| PCBs ........................... | 182,400 | 30,675 | (21,331) | — | — | 191,744 |
| Other recovery provisions ........... | 862 | — | — | (20) | (335) | 507 |
| Others | | | | | | |
| Power plant regional support program ...................... | 129,655 | 50,252 | (41,540) | — | 14,484 | 152,851 |
| Transmission regional support program ...................... | 228,785 | 253,664 | (199,841) | — | — | 282,608 |
| Provisions for tax ................... | 136 | 125 | — | — | (19) | 242 |
| Provisions for financial guarantee ..... | 4,288 | 29,741 | — | (4,298) | (66) | 29,665 |
| Provisions for RPS ................. | 363,178 | 420,154 | (309,975) | (55,953) | — | 417,404 |
| Provisions for greenhouse gas emissions obligations ............. | 78,829 | 298,618 | (116,336) | (11,467) | — | 249,644 |
| Others ........................... | 7,856 | 37,491 | (2,699) | (9) | 1,336 | 43,975 |
| ₩ | 14,443,930 | 3,325,450 | (2,478,788) | (99,591) | 236,138 | 15,427,139 |

| | 2017 | | | | | |
|---|---|---|---|---|---|---|
| | Beginning balance | Increase in provision | Payment | Reversal | Others | Ending balance |
| | | | In millions of won | | | |
| Employment benefits | | | | | | |
| Provisions for employment benefits ... ₩ | 810,607 | 984,896 | (880,255) | (1,461) | — | 913,787 |
| Litigation | | | | | | |
| Litigation provisions .............. | 198,237 | 34,629 | (152,461) | (7,096) | 267 | 73,576 |
| Decommissioning cost | | | | | | |
| Nuclear plants .................... | 10,195,928 | 2,818,033 | (6,733) | — | — | 13,007,228 |
| Spent fuel ........................ | 1,374,225 | 307,682 | (342,861) | — | — | 1,339,046 |
| Waste ........................... | 1,479,502 | 222,632 | (63,763) | — | — | 1,638,371 |
| PCBs ........................... | 191,744 | 5,309 | (14,266) | (2,700) | — | 180,087 |
| Other recovery provisions ........... | 507 | 5,939 | — | — | 213 | 6,659 |
| Others | | | | | | |
| Power plant regional support program ...................... | 152,851 | 94,039 | (103,889) | — | 10,755 | 153,756 |
| Transmission regional support program ...................... | 282,608 | 143,178 | (182,421) | — | — | 243,365 |
| Provisions for tax ................... | 242 | — | (25) | (136) | (20) | 61 |
| Provisions for financial guarantee ..... | 29,665 | 3,760 | — | (9,945) | (5) | 23,475 |
| Provisions for RPS ................. | 417,404 | 242,946 | (388,726) | — | — | 271,624 |
| Provisions for greenhouse gas emissions obligations ............. | 249,644 | 422,666 | (256,758) | (1,300) | — | 414,252 |
| Others(*) ........................ | 43,975 | 6,639 | (3,348) | (26,477) | 76,136 | 96,925 |
| ₩ | 15,427,139 | 5,292,348 | (2,395,506) | (49,115) | 87,346 | 18,362,212 |

F-127

(*)  As described in note 50.(1), the Company believes that the possibility of economic outflow is probable on the cost of construction suspension of Shin-Kori Unit 5 and 6 for three months. For this reason, the Company recognized ₩77,261 million of provision as addition to construction-in-progress.

### 27.  Government Grants

(1)  Government grants as of December 31, 2016 and 2017 are as follows:

|  |  | 2016 | 2017 |
|---|---|---|---|
|  |  | In millions of won | |
| Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | (3,204) | (21,968) |
| Buildings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (61,188) | (63,539) |
| Structures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (197,641) | (196,414) |
| Machinery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (111,064) | (183,188) |
| Vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (107) | (6,322) |
| Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (732) | (761) |
| Tools . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (430) | (1,027) |
| Construction-in-progress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (135,807) | (49,084) |
| Finance lease assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | — | (27) |
| Investment properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (64) | (83) |
| Software . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (595) | (486) |
| Development expenditures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (5,152) | (3,702) |
| Intangible assets under development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (11,090) | (10,540) |
| Usage rights of donated assets and other . . . . . . . . . . . . . . . . . . . . . . . . . . |  | (21) | (11) |
| Other intangible assets other than goodwill . . . . . . . . . . . . . . . . . . . . . . . . |  | — | — |
|  | ₩ | (527,095) | (537,152) |

(2)  Changes in government grants for the years ended December 31, 2016 and 2017 are as follows:

| | | | | 2016 | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Receipt | Acquisition | Offset the items of depreciation expense and others | Disposal | Others | Ending balance |
| | | | | In millions of won | | | |
| Cash . . . . . . . . . . . . . . . . . . . . . . ₩ | — | (32,878) | — | — | — | 32,878 | — |
| Land . . . . . . . . . . . . . . . . . . . . . . | (3,147) | — | — | — | 14 | (71) | (3,204) |
| Buildings . . . . . . . . . . . . . . . . . . . | (63,932) | — | — | 5,299 | 731 | (3,286) | (61,188) |
| Structures . . . . . . . . . . . . . . . . . . | (193,119) | — | — | 9,491 | 2,597 | (16,610) | (197,641) |
| Machinery . . . . . . . . . . . . . . . . . . | (108,935) | — | — | 12,272 | 1,210 | (15,611) | (111,064) |
| Vehicles . . . . . . . . . . . . . . . . . . . . | (29) | — | — | 25 | — | (103) | (107) |
| Equipment . . . . . . . . . . . . . . . . . . | (1,026) | — | — | 452 | — | (158) | (732) |
| Tools . . . . . . . . . . . . . . . . . . . . . . . | (691) | — | — | 295 | — | (34) | (430) |
| Construction-in-progress . . . . . . | (139,898) | — | 32,525 | — | — | (28,434) | (135,807) |
| Investment properties . . . . . . . . | (13) | — | — | 1 | — | (52) | (64) |
| Software . . . . . . . . . . . . . . . . . . . . | (699) | — | — | 249 | — | (145) | (595) |
| Development expenditures . . . . . | (6,835) | — | — | 2,771 | — | (1,088) | (5,152) |
| Intangible assets under development . . . . . . . . . . . . . | (10,483) | — | 991 | — | — | (1,598) | (11,090) |
| Usage rights of donated assets and other . . . . . . . . . . . . . . . . | (32) | — | — | 11 | — | — | (21) |
| Others . . . . . . . . . . . . . . . . . . . . . | (1) | — | — | 1 | — | — | — |
| ₩ | (528,840) | (32,878) | 33,516 | 30,867 | 4,552 | (34,312) | (527,095) |

F-128

| | | | 2017 | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Receipt | Acquisition | Offset the items of depreciation expense and others | Disposal | Others | Ending balance |
| | | | | In millions of won | | | |
| Cash .................... ₩ | — | (55,533) | — | — | — | 55,533 | — |
| Land .................... | (3,204) | — | — | — | 5 | (18,769) | (21,968) |
| Buildings ............... | (61,188) | — | — | 5,996 | 28 | (8,375) | (63,539) |
| Structures .............. | (197,641) | — | — | 10,011 | 1,905 | (10,689) | (196,414) |
| Machinery .............. | (111,064) | — | — | 17,390 | 489 | (90,003) | (183,188) |
| Vehicles ................ | (107) | — | — | 1,070 | 14 | (7,299) | (6,322) |
| Equipment .............. | (732) | — | — | 454 | — | (483) | (761) |
| Tools ................... | (430) | — | — | 354 | — | (951) | (1,027) |
| Construction-in-progress ... | (135,807) | — | 129,451 | — | — | (42,728) | (49,084) |
| Finance lease assets ....... | — | — | — | 1 | — | (28) | (27) |
| Investment properties ...... | (64) | — | — | 2 | — | (21) | (83) |
| Software ................ | (595) | — | — | 255 | — | (146) | (486) |
| Development expenditures ... | (5,152) | — | — | 2,811 | — | (1,361) | (3,702) |
| Intangible assets under development ............. | (11,090) | — | — | — | — | 550 | (10,540) |
| Usage rights of donated assets and other ............... | (21) | — | — | 10 | — | — | (11) |
| Others .................. | — | — | — | — | — | — | — |
| ₩ | (527,095) | (55,533) | 129,451 | 38,354 | 2,441 | (124,770) | (537,152) |

## 28. Deferred Revenues

Deferred revenue related to the Company's construction contracts for the years ended December 31, 2016 and 2017 are as follows which included in current and non-current non-financial liabilities in the consolidated statements of financial position:

| | 2016 | 2017 |
|---|---|---|
| | In millions of won | |
| Beginning balance ........................................ ₩ | 7,165,297 | 7,825,765 |
| Increase during the current year / period ................... | 1,087,765 | 978,389 |
| Recognized as revenue during the current year / period .......... | (427,297) | (478,973) |
| Ending balance ......................................... ₩ | 7,825,765 | 8,325,181 |

## 29. Non-financial Liabilities

Non-financial liabilities as of December 31, 2016 and 2017 are as follows:

| | 2016 | | 2017 | |
|---|---|---|---|---|
| | Current | Non-current | Current | Non-current |
| | In millions of won | | | |
| Advance received ................. ₩ | 4,498,739 | 148,404 | 3,772,713 | 181,612 |
| Unearned revenue ................. | 26,084 | 41,936 | 41,593 | 19,718 |
| Deferred revenue ................. | 445,018 | 7,380,747 | 476,631 | 7,848,550 |
| Withholdings .................... | 263,263 | 10,781 | 164,370 | 10,529 |
| Others ......................... | 1,135,106 | 9,737 | 1,129,001 | 12,025 |
| ₩ | 6,368,210 | 7,591,605 | 5,584,308 | 8,072,434 |

F-129

**30. Contributed Capital**

**(1) Details of shares issued as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | | | | |
|---|---|---|---|---|---|---|
| | Shares authorized | Shares issued | Par value per share | Owned by government(*) | Owned by others | Total |
| | | | In millions of won except share information | | | |
| Common shares ....... | 1,200,000,000 | 641,964,077 ₩ | 5,000 | 1,640,385 | 1,569,435 | 3,209,820 |

(*) Korea Development Bank's ownership of ₩1,056,176 million is included.

| | | 2017 | | | | |
|---|---|---|---|---|---|---|
| | Shares authorized | Shares issued | Par value per share | Owned by government(*) | Owned by others | Total |
| | | | In millions of won except share information | | | |
| Common shares ....... | 1,200,000,000 | 641,964,077 ₩ | 5,000 | 1,640,385 | 1,569,435 | 3,209,820 |

(*) Korea Development Bank's ownership of ₩1,056,176 million is included.

**(2) Details in number of outstanding capital stock for the years ended December 31, 2016 and 2017 are as follows.**

| | 2016 | 2017 |
|---|---|---|
| | Number of shares | |
| Beginning balance ......................................... | 641,964,077 | 641,964,077 |
| Ending balance ............................................ | 641,964,077 | 641,964,077 |

**(3) Details of share premium as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Share premium ............................................. | ₩ | 843,758 | 843,758 |

**31. Retained Earnings and Dividends Paid**

**(1) Details of retained earnings as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Legal reserve(*) ........................................ | ₩ | 1,604,910 | 1,604,910 |
| Voluntary reserves ....................................... | | 31,847,275 | 34,833,844 |
| Retained earnings before appropriations ..................... | | 19,721,686 | 16,931,804 |
| Retained earnings ........................................ | ₩ | 53,173,871 | 53,370,558 |

(*) The KEPCO Act requires KEPCO to appropriate a legal reserve equal to at least 20 percent of net income for each accounting period until the reserve equals 50 percent of KEPCO's common stock. The legal reserve is not available for cash dividends; however, this reserve may be credited to paid-in capital or offset against accumulated deficit by the resolution of the shareholders.

F-130

(2) **Details of voluntary reserves as of December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Reserve for investment on social overhead capital . . . . . . . . . . . . . | ₩ | 5,277,449 | 5,277,449 |
| Reserve for research and human development(*) . . . . . . . . . . . . . . | | 330,000 | 330,000 |
| Reserve for business expansion . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 26,029,826 | 29,016,395 |
| Reserve for equalizing dividends . . . . . . . . . . . . . . . . . . . . . . . . . | | 210,000 | 210,000 |
|  | ₩ | 31,847,275 | 34,833,844 |

(*) The reserve for research and human development is appropriated by KEPCO to use as qualified tax credits to reduce corporate tax liabilities. The reserve is available for cash dividends for a certain period as defined by the Restriction of Special Taxation Act of Korea.

(3) **Changes in retained earnings for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 48,187,241 | 53,173,871 |
| Net profit for the period attributed to owner of the Company . . . . . . . | | 7,048,581 | 1,298,720 |
| Changes in equity method retained earnings . . . . . . . . . . . . . . . . . . . . | | (2,532) | 10,065 |
| Remeasurements of defined benefit liability, net of tax . . . . . . . . . . . . | | (69,330) | 158,991 |
| Dividend paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | (1,990,089) | (1,271,089) |
| Ending balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 53,173,871 | 53,370,558 |

(4) **Dividends paid for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2015 | | | | |
|---|---|---|---|---|---|---|
| In millions of won | | Number of shares issued | Number of treasury stocks | Number of shares eligible for dividends | Dividends paid per share | Dividends paid |
|  | | | | | (In won) | |
| Common shares . . . . . . . . . . | | 641,964,077 | — | 641,964,077 | ₩    500 | 320,982 |

|  | | 2016 | | | | |
|---|---|---|---|---|---|---|
| In millions of won | | Number of shares issued | Number of treasury stocks | Number of shares eligible for dividends | Dividends paid per share | Dividends paid |
|  | | | | | (In won) | |
| Common shares . . . . . . . . . . | | 641,964,077 | — | 641,964,077 | ₩    3,100 | 1,990,089 |

|  | | 2017 | | | | |
|---|---|---|---|---|---|---|
| In millions of won | | Number of shares issued | Number of treasury stocks | Number of shares eligible for dividends | Dividends paid per share | Dividends paid |
|  | | | | | (In won) | |
| Common shares . . . . . . . . . . | | 641,964,077 | — | 641,964,077 | ₩    1,980 | 1,271,089 |

(5) **Changes in retained earnings of investments in associates and joint ventures for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | (2,411) | (4,943) |
| Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | (2,532) | 10,065 |
| Ending balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | (4,943) | 5,122 |

F-131

**(6)   Changes in remeasurement components for the years ended December 31, 2016 and 2017 are as follows:**

|  | | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Beginning balance | ₩ | (202,878) | (222,997) |
| Changes | | (119,316) | 239,636 |
| Income tax effect | | 49,986 | (80,645) |
| Transfer to reserve for business expansion | | 49,211 | 20,493 |
| Ending balance | ₩ | (222,997) | (43,513) |

**32.   Statement of Appropriation of Retained Earnings**

For the year ended December 31, 2016, KEPCO's retained earnings were appropriated on March 21, 2017. For the year ended December 31, 2017, KEPCO's retained earnings were appropriated on March 30, 2018. Statements of appropriation of retained earnings of KEPCO, the controlling company, for the years ended December 31, 2016 and 2017 are as follows:

|  |  | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won except for dividends per share | |
| I. | Retained earnings before appropriations | | |
|  | Unappropriated retained earnings carried over from prior years   ₩ | — | — |
|  | Net income | 4,261,986 | 1,506,852 |
|  | Remeasurements of the defined benefit plan | (4,328) | 72,723 |
|  |  | 4,257,658 | 1,579,575 |
| II. | Transfer from voluntary reserves | — | — |
| III. | Subtotal (I+II) | 4,257,658 | 1,579,575 |
| IV. | Appropriations of retained earnings | (4,257,658) | (1,579,575) |
|  | Legal reserve | — | — |
|  | Dividends (government, individual) | | |
|  | Amount of dividends per share (%) :   Current year—₩ 790 (16%) | | |
|  | Prior year—₩ 1,980 (40%) | (1,271,089) | (507,152) |
|  | Reserve for business expansion | (2,986,569) | (1,072,423) |
| V. | Unappropriated retained earnings to be carried over forward to subsequent year | — | — |

**33.   Hybrid Bonds**

Hybrid bonds classified as equity (non-controlling interest) as of December 31, 2016 and 2017 are as follows:

| Issuer | Hybrid bond | Issued date | Maturity | Yield (%) | 2016 | 2017 |
|---|---|---|---|---|---|---|
|  | | In millions of won | | | | |
| Korea Western Power Co., Ltd. | 1st hybrid bond | 2012.10.18 | — | — | ₩ 100,000 | — |
| Korea South-East Power Co., Ltd. | 1st hybrid bond | 2012.12.07 | 2042.12.06 | 4.38 | 170,000 | 170,000 |
| Korea South-East Power Co., Ltd. | 2nd hybrid bond | 2012.12.07 | 2042.12.06 | 4.44 | 230,000 | 230,000 |
| Expense of issuance | | | | | (1,340) | (1,090) |
|  | | | | | ₩ 498,660 | 398,910 |

F-132

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

Although these instruments have contractual maturity dates, the contractual agreements allow these subsidiaries to indefinitely extend the maturity dates and defer the payment of interest without modification to the other terms of the instruments. When the Company decides not to pay dividends on ordinary shares, they are not required to pay interest on the hybrid bonds.

Substantially, as these instruments have no contractual obligation to pay principal and interest, these instruments have been classified as equity (non-controlling interest) in the Company's consolidated financial statements.

Korea Western Power Co., Ltd., a subsidiary of the Company, repaid all of its hybrid bond classified as equity (non-controlling interest) in full during the year ended December 31, 2017.

**34. Other Components of Equity**

**(1)  Other components of equity of the parent as of December 31, 2016 and 2017 are as follows:**

|  | 2016 | 2017 |
|---|---|---|
|  | In millions of won | |
| Other capital surplus ............................................. ₩ | 1,235,146 | 1,233,793 |
| Accumulated other comprehensive loss ............................ | (33,875) | (271,457) |
| Other equity ................................................... | 13,294,973 | 13,294,973 |
|  ₩ | 14,496,244 | 14,257,309 |

**(2)  Changes in other capital surplus for the years ended December 31, 2016 and 2017 are as follows:**

|  | 2016 | | | 2017 | | |
|---|---|---|---|---|---|---|
|  | Gains on disposal of Treasury stocks | Others | Subtotal | Gains on disposal of treasury stocks | Others | Subtotal |
|  | In millions of won | | | | | |
| Beginning balance .............. ₩ | 387,524 | 809,864 | 1,197,388 | 387,524 | 847,622 | 1,235,146 |
| Disposal of subsidiary ........... | — | 36,008 | 36,008 | — | — | — |
| Issuance of share capital of subsidiary .................... | — | 1,750 | 1,750 | — | (1,378) | (1,378) |
| Others ......................... | — | — | — | — | 25 | 25 |
| Ending balance ................. ₩ | 387,524 | 847,622 | 1,235,146 | 387,524 | 846,269 | 1,233,793 |

F-133

(3)  **Changes in accumulated other comprehensive income (loss) for the years ended December 31, 2016 and 2017 are as follows:**

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Available-for-sale financial asset valuation reserve | Shares in other comprehensive Income (loss) of investments in associates and joint ventures | Reserve for overseas operations translation credit | Reserve for gain (loss) on valuation of derivatives | Total |
| | In millions of won | | | | |
| Beginning balance . . . . . . . . . . . . . . . . . ₩ | (24,905) | 276,373 | (254,462) | (95,719) | (98,713) |
| Changes in the unrealized fair value of available-for-sale financial assets, net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . | 61,275 | — | — | — | 61,275 |
| Shares in other comprehensive loss of associates and joint ventures, net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (54,918) | — | — | (54,918) |
| Foreign currency translation of foreign operations, net of tax . . . . . . . . . . . . . . | — | — | 31,406 | — | 31,406 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax . . . . . . . . . . . . . . | — | — | — | 27,075 | 27,075 |
| Ending balance . . . . . . . . . . . . . . . . . . . . ₩ | 36,370 | 221,455 | (223,056) | (68,644) | (33,875) |

| | 2017 | | | | |
|---|---|---|---|---|---|
| | Available-for-sale financial asset valuation reserve | Shares in other comprehensive Income (loss) of investments in associates and joint ventures | Reserve for overseas operations translation credit | Reserve for gain (loss) on valuation of derivatives | Total |
| | In millions of won | | | | |
| Beginning balance . . . . . . . . . . . . . . . . . ₩ | 36,370 | 221,455 | (223,056) | (68,644) | (33,875) |
| Changes in the unrealized fair value of available-for-sale financial assets, net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . | (7,102) | — | — | — | (7,102) |
| Shares in other comprehensive loss of associates and joint ventures, net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (154,991) | — | — | (154,991) |
| Foreign currency translation of foreign operations, net of tax . . . . . . . . . . . . . . | — | — | (95,103) | — | (95,103) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax . . . . . . . . . . . . . . | — | — | — | 19,614 | 19,614 |
| Ending balance . . . . . . . . . . . . . . . . . . . . ₩ | 29,268 | 66,464 | (318,159) | (49,030) | (271,457) |

(4)  **Details of changes in other equity for the years ended December 31, 2016 and 2017 are as follows:**

| | 2016 | 2017 |
|---|---|---|
| | In millions of won | |
| Statutory revaluation reserve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 13,295,098 | 13,295,098 |
| Changes in other equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (125) | (125) |
| | ₩ 13,294,973 | 13,294,973 |

F-134

**35. Sales**

Details of sales for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|
| | Domestic | Overseas | Domestic | Overseas | Domestic | Overseas |
| | | | In millions of won | | | |
| Sales of goods . . . . . . . . . . . . . ₩ | 53,961,463 | 405,573 | 54,982,095 | 397,392 | 55,373,316 | 399,232 |
| Electricity . . . . . . . . . . . . | 53,229,470 | — | 54,304,529 | — | 54,649,882 | — |
| Heat supply . . . . . . . . . . | 204,987 | — | 181,597 | — | 205,838 | — |
| Others . . . . . . . . . . . . . . | 527,006 | 405,573 | 495,969 | 397,392 | 517,596 | 399,232 |
| Sales of service . . . . . . . . . . . | 209,189 | 244,298 | 195,697 | 161,046 | 186,990 | 164,167 |
| Sales of construction | | | | | | |
| services . . . . . . . . . . . . . . | 180,424 | 3,580,780 | 132,219 | 3,894,638 | 92,501 | 3,119,683 |
| ₩ | 54,351,076 | 4,230,651 | 55,310,011 | 4,453,076 | 55,652,807 | 3,683,082 |

**36. Selling and Administrative Expenses**

**(1) Selling and administrative expenses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Salaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 655,432 | 734,930 | 735,383 |
| Retirement benefit expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61,903 | 72,812 | 71,094 |
| Welfare and benefit expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 119,866 | 162,243 | 179,406 |
| Insurance expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,636 | 11,513 | 15,414 |
| Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 102,867 | 169,431 | 190,245 |
| Amortization of intangible assets . . . . . . . . . . . . . . . . . . . . . . . | 40,465 | 35,171 | 44,990 |
| Bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 290 | 38,719 | 126,714 |
| Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 562,171 | 605,879 | 673,740 |
| Advertising expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30,085 | 34,658 | 114,519 |
| Training expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,988 | 6,314 | 7,027 |
| Vehicle maintenance expense . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,529 | 10,390 | 9,998 |
| Publishing expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,124 | 3,643 | 3,672 |
| Business promotion expense . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,338 | 3,477 | 3,700 |
| Rent expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44,905 | 40,020 | 38,380 |
| Telecommunication expense . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22,678 | 25,448 | 24,916 |
| Transportation expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 753 | 596 | 495 |
| Taxes and dues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55,970 | 46,531 | 48,395 |
| Expendable supplies expense . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,272 | 6,834 | 7,731 |
| Water, light and heating expense . . . . . . . . . . . . . . . . . . . . . . . | 9,558 | 9,720 | 10,545 |
| Repairs and maintenance expense . . . . . . . . . . . . . . . . . . . . . . | 74,330 | 75,122 | 63,477 |
| Ordinary development expense . . . . . . . . . . . . . . . . . . . . . . . . . | 178,472 | 188,063 | 211,417 |
| Travel expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,388 | 16,115 | 16,658 |
| Clothing expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,751 | 8,273 | 8,410 |
| Survey and analysis expense . . . . . . . . . . . . . . . . . . . . . . . . . . | 590 | 666 | 698 |
| Membership fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,040 | 1,132 | 1,122 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 131,860 | 331,532 | 154,709 |
| ₩ | 2,153,261 | 2,639,232 | 2,762,855 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(2) **Other selling and administrative expenses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | In millions of won | | |
| Accommodation development expenses | ₩ | 28,134 | 186,896 | 55,799 |
| Miscellaneous wages | | 43,109 | 31,907 | 32,300 |
| Litigation and filing expenses | | 10,670 | 12,328 | 11,881 |
| Compensation for damages | | 9,032 | 60,341 | 12,297 |
| Outsourcing expenses | | 2,865 | 3,530 | 2,647 |
| Reward expenses | | 2,472 | 3,267 | 2,786 |
| Overseas market development expenses | | 1,541 | 2,177 | 1,876 |
| Others | | 34,037 | 31,086 | 35,123 |
|  | ₩ | 131,860 | 331,532 | 154,709 |

## 37. Other Income and Expense

(1) **Other income for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | In millions of won | | |
| Reversal of other provisions | ₩ | 6,355 | 22,034 | 35,265 |
| Reversal of other allowance for doubtful accounts | | 413 | 5,489 | 2,166 |
| Gains on government grants | | 204 | 111 | 430 |
| Gains on assets contributed | | 9,004 | 12,254 | 4,218 |
| Gains on liabilities exempted | | 2,588 | 1,959 | 3,166 |
| Compensation and reparations revenue | | 166,355 | 114,530 | 89,196 |
| Revenue from research contracts | | 5,342 | 13,143 | 12,580 |
| Income related to transfer of assets from customers | | 375,995 | 427,297 | 478,973 |
| Rental income | | 196,406 | 211,580 | 192,136 |
| Others | | 45,552 | 31,787 | 50,988 |
|  | ₩ | 808,214 | 840,184 | 869,118 |

(2) **Details of others of other income for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | | 2015 | 2016 | 2017 |
|---|---|---|---|---|
|  | | In millions of won | | |
| Refund of claim for rectification | ₩ | 7,623 | 8,722 | 9,655 |
| Adjustment of research project | | 4,090 | 4,148 | 3,884 |
| Maintenance expenses on lease building | | 324 | 354 | 135 |
| Training expenses | | 4,774 | 4,478 | 3,045 |
| Deposit redemption | | 430 | 991 | 34 |
| Reversal of expenses on litigation | | 219 | 893 | 360 |
| Revenue on royalty fee | | 2,739 | 2,486 | 2,888 |
| Reimbursement of insurance fee | | 11,797 | — | 1,498 |
| Gains on guarantee contracts | | 4,523 | 2,796 | 456 |
| Others | | 9,033 | 6,919 | 29,033 |
|  | ₩ | 45,552 | 31,787 | 50,988 |

F-136

(3) Other expense for the years ended December 31, 2015, 2016 and 2017 are as follows:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | In millions of won | | |
| Compensation and indemnification expense .............. ₩ | 16,959 | — | 37 |
| Accretion expenses of other provisions ................... | 4,575 | 4,556 | 7,535 |
| Depreciation expenses on investment properties ........... | 669 | 678 | 1,176 |
| Depreciation expenses on idle assets .................... | 6,698 | 6,639 | 6,644 |
| Other bad debt expense .............................. | 18,473 | 4,585 | 1,778 |
| Donations ........................................ | 34,134 | 114,094 | 119,421 |
| Others ........................................... | 27,340 | 58,072 | 43,464 |
|  | ₩ 108,848 | 188,624 | 180,055 |

(4) Details of others of other expense for the years ended December 31, 2015, 2016 and 2017 are as follows:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | In millions of won | | |
| Operating expenses related to the idle assets .............. ₩ | 779 | 459 | 136 |
| Research grants ...................................... | 1,392 | 1,461 | 1,180 |
| Supporting expenses on farming and fishing village ......... | 14,626 | 15,201 | 11,956 |
| Operating expenses on fitness center .................... | 2,912 | 2,706 | 3,498 |
| Expenses on adjustment of research and development grants ........................................... | 709 | — | 806 |
| Taxes and dues ...................................... | 1,105 | 4,582 | 2,270 |
| Expenses on R&D supporting ......................... | 146 | 690 | 5,459 |
| Moving expense ..................................... | 3,191 | — | — |
| Others ........................................... | 2,480 | 32,973 | 18,159 |
|  | ₩ 27,340 | 58,072 | 43,464 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**38.  Other Gains (Losses)**

**(1)  Composition of other gains (losses) for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Other gains | | | |
| Gains on disposal of property, plant, and equipment . . . . ₩ | 8,637,508 | 74,035 | 48,316 |
| Gains on disposal of intangible assets . . . . . . . . . . . . . . | 32 | — | 564 |
| Reversal of impairment loss on intangible assets . . . . . . . | 275 | 3 | 54 |
| Gains on foreign currency translation . . . . . . . . . . . . . . . | 13,784 | 15,311 | 20,485 |
| Gains on foreign currency transaction . . . . . . . . . . . . . . . | 61,007 | 55,377 | 93,151 |
| Gains on insurance proceeds . . . . . . . . . . . . . . . . . . . . . | 30 | — | 400 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 162,128 | 187,792 | 269,562 |
| Other losses | | | |
| Losses on disposal of property, plant and equipment . . . . | (73,073) | (42,715) | (70,514) |
| Losses on disposal of intangible assets . . . . . . . . . . . . . . | (16) | (158) | (183) |
| Impairment loss on property, plant and equipment . . . . . . | (30,344) | — | (51,067) |
| Impairment loss on intangible assets . . . . . . . . . . . . . . . . | (22) | (3,945) | (20) |
| Losses on foreign currency translation . . . . . . . . . . . . . . | (15,097) | (23,835) | (25,495) |
| Losses on foreign currency transaction . . . . . . . . . . . . . . | (75,615) | (72,058) | (36,241) |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (69,824) | (119,309) | (92,385) |
|  ₩ | 8,610,773 | 70,498 | 156,627 |

**(2)  Details of others of other gains for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Gains on disposal of inventories . . . . . . . . . . . . . . . . . . . . . . ₩ | 10,758 | 9,494 | 6,024 |
| Gains on valuation of inventories . . . . . . . . . . . . . . . . . . . . | 7 | 2 | — |
| Gains on proxy collection of TV license fee . . . . . . . . . . . . . . | 38,529 | 38,991 | 39,711 |
| Gains on compensation of impaired electric poles . . . . . . . . . . | — | 3,650 | 1,526 |
| Gains on compensation for infringement on contract . . . . . . . . | 7,414 | 3,040 | 18,990 |
| Gains on harbor facilities dues . . . . . . . . . . . . . . . . . . . . . . . . | 5,943 | 2,957 | 3,025 |
| Gains on technical fees . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,258 | 1,271 | 2,105 |
| Reversal of occupation development training fees . . . . . . . . . . | 1,878 | 1,756 | 1,697 |
| Gains on disposal of waste . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,880 | 4,222 | 4,261 |
| Gains on insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,865 | 3,786 | 10,410 |
| Gains on litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 600 | — | — |
| Gains on tax rebate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,661 | 5,226 | 2,161 |
| Gains on other commission . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,177 | 4,639 | 4,790 |
| Gains on research tasks . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,446 | 10 | — |
| Gains on settlement and others . . . . . . . . . . . . . . . . . . . . . . | 2,803 | 2,188 | — |
| Gains on sales of greenhouse gas emissions rights . . . . . . . . . . | 52 | 46 | — |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72,857 | 106,514 | 174,862 |
|  ₩ | 162,128 | 187,792 | 269,562 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(3) **Details of others of other losses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | In millions of won | | |
| Losses on valuation of inventories . . . . . . . . . . . . . . . . . . . . . ₩ | 1,318 | 2,683 | 3,875 |
| Losses on disposal of inventories . . . . . . . . . . . . . . . . . . . . . | 13,469 | 3,092 | 3,273 |
| Losses due to disaster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 263 | 1,522 | 5,374 |
| Losses on rounding adjustment of electric charge surtax . . . . | 1,251 | 1,260 | 1,253 |
| Losses on adjustments of levies . . . . . . . . . . . . . . . . . . . . . . . | 13,928 | 1,184 | 1 |
| Forfeit of taxes and dues . . . . . . . . . . . . . . . . . . . . . . . . . . . | 190 | 4,582 | 656 |
| Losses on litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 488 | 2,581 | — |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38,917 | 102,405 | 77,953 |
| ₩ | 69,824 | 119,309 | 92,385 |

**39. Finance Income**

(1) **Finance income for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | In millions of won | | |
| Interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 241,585 | 241,778 | 206,143 |
| Dividends income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,069 | 9,446 | 11,477 |
| Gains on disposal of financial assets . . . . . . . . . . . . . . . . . . . | 4 | 1,482 | 1,130 |
| Gains on valuation of Financial assets at fair value through profit or loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 12 |
| Gains on valuation of derivatives . . . . . . . . . . . . . . . . . . . . . . | 610,582 | 293,830 | 16,165 |
| Gains on transaction of derivatives . . . . . . . . . . . . . . . . . . . . | 151,851 | 45,549 | 29,257 |
| Gains on foreign currency translation . . . . . . . . . . . . . . . . . . | 127,372 | 161,905 | 1,115,832 |
| Gains on foreign currency transaction . . . . . . . . . . . . . . . . . . | 37,377 | 37,553 | 150,602 |
| Other finance income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 148 | — | — |
| ₩ | 1,182,988 | 791,543 | 1,530,618 |

(2) **Interest income included in finance income for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | In millions of won | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 54,687 | 61,380 | 35,474 |
| Available-for-sale financial assets . . . . . . . . . . . . . . . . . . . . . | 29 | — | 290 |
| Held-to-maturity investments . . . . . . . . . . . . . . . . . . . . . . . . . | 99 | 97 | 82 |
| Loans and receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,586 | 25,106 | 30,014 |
| Short-term financial instrument . . . . . . . . . . . . . . . . . . . . . . . | 46,921 | 45,763 | 29,412 |
| Long-term financial instrument . . . . . . . . . . . . . . . . . . . . . . . | 10,492 | 7,195 | 8,144 |
| Trade and other receivables . . . . . . . . . . . . . . . . . . . . . . . . . | 100,771 | 102,237 | 102,727 |
| ₩ | 241,585 | 241,778 | 206,143 |

F-139

**40. Finance Expenses**

**(1) Finance expenses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 2,015,684 | 1,752,868 | 1,789,552 |
| Losses on sale of financial assets . . . . . . . . . . . . . . . . . . . . . | 3,008 | 9 | 2,343 |
| Impairment of available-for-sale financial assets . . . . . . . . . | 84,370 | 86,703 | 2,713 |
| Losses on valuation of derivatives . . . . . . . . . . . . . . . . . . . | 17,051 | 5,762 | 890,832 |
| Losses on transaction of derivatives . . . . . . . . . . . . . . . . . . | 37,262 | 101,987 | 198,218 |
| Losses on foreign currency translation . . . . . . . . . . . . . . . . | 743,283 | 406,849 | 207,944 |
| Losses on foreign currency transaction . . . . . . . . . . . . . . . . | 113,723 | 57,889 | 35,175 |
| Losses on repayment of financial liabilities . . . . . . . . . . . . | 33 | 23,000 | 5 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,043 | 2,020 | 1,170 |
|  | ₩ 3,015,457 | 2,437,087 | 3,127,952 |

**(2) Interest expense included in finance expenses for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| Trade and other payables . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 84,527 | 68,375 | 57,160 |
| Short-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,627 | 6,969 | 35,891 |
| Long-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 103,503 | 91,584 | 87,011 |
| Debt securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,177,855 | 1,922,900 | 1,698,232 |
| Other financial liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . | 538,680 | 482,428 | 491,665 |
|  | 2,919,192 | 2,572,256 | 2,369,959 |
| Less: Capitalized borrowing costs . . . . . . . . . . . . . . . . . . . ₩ | (903,508) | (819,388) | (580,407) |
|  | 2,015,684 | 1,752,868 | 1,789,552 |

Capitalization rates for the years ended December 31, 2015, 2016 and 2017 are 2.36%~4.25%, 2.29%~4.16% and 2.30%~3.60%, respectively.

**41. Income Taxes**

**(1) Income tax expense for the years ended December 31, 2015, 2016 and 2017 are as follows:**

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
|  | | In millions of won | |
| **Current income tax expense** | | | |
| Payment of income tax . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 2,682,779 | 2,689,640 | 881,583 |
| Adjustment due to changes in estimates related to prior years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (23,248) | 231,113 | 4,484 |
| Current income tax directly recognized in equity . . . . . | 37,768 | 30,059 | (56,098) |
|  | 2,697,299 | 2,950,812 | 829,969 |
| **Deferred income tax expense** | | | |
| Generation and realization of temporary differences . . | 48,878 | 509,762 | 1,283,012 |
| Changes of unrecognized tax losses, tax credit and temporary differences for prior periods . . . . . . . . . . . | 71,999 | (86,845) | 44,573 |
| Changes in deferred tax on tax losses carryforwards . . | 2,374,237 | — | — |
| Tax credit carryforwards . . . . . . . . . . . . . . . . . . . . . . . . | 47,000 | (8,588) | 15,270 |
|  | 2,542,114 | 414,329 | 1,342,855 |
| Income tax expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 5,239,413 | 3,365,141 | 2,172,824 |

F-140

(2) **Reconciliation between actual income tax expense and amount computed by applying the statutory tax rate to income before income taxes for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | **In millions of won** | | |
| Income before income tax . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 18,655,786 | 10,513,468 | 3,614,218 |
| Income tax expense computed at applicable tax rate of | | | |
| 24.2% . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,514,700 | 2,544,259 | 874,641 |
| Adjustments | | | |
| Effect of applying gradual tax rate . . . . . . . . . . . . . . . . . | (4,147) | (5,082) | (5,082) |
| Effect of non-taxable income . . . . . . . . . . . . . . . . . . . . . . | (8,047) | (29,554) | (32,032) |
| Effect of non-deductible expenses . . . . . . . . . . . . . . . . . | 17,734 | 22,258 | 15,032 |
| Effects of tax credits and deduction . . . . . . . . . . . . . . . . | (103,435) | (194,731) | (161,069) |
| Recognition (reversal) of unrecognized deferred tax asset, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71,999 | (86,845) | 44,573 |
| Effect of change in deferred tax due to change in tax rate (from 24.2% to 27.5%) . . . . . . . . . . . . . . . . . . . . . . . | — | — | 1,055,154 |
| Deferred income tax related to investments in subsidiaries and associates . . . . . . . . . . . . . . . . . . . . . | 784,793 | 862,956 | 394,145 |
| Others, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (10,936) | 20,767 | (17,022) |
| | 747,961 | 589,769 | 1,293,699 |
| Adjustment in respect of prior years due to change in estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (23,248) | 231,113 | 4,484 |
| Income tax expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 5,239,413 | 3,365,141 | 2,172,824 |
| Effective tax rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28% | 32% | 60% |

(3) **Income tax directly adjusted to shareholders' equity (except for accumulated other comprehensive income (loss)) for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | **In millions of won** | | |
| Dividends of hybrid bond . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 5,253 | 5,253 | 5,248 |
| Gain on disposal of investments in subsidiaries . . . . . . . . . . | (14,144) | (7,006) | — |
| Effect of change in effective tax rate . . . . . . . . . . . . . . . . . . | — | — | (25) |
| ₩ | (8,891) | (1,753) | 5,223 |

(4) **Income tax recognized as other comprehensive income (loss) for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| | 2015 | 2016 | 2017 |
|---|---|---|---|
| | **In millions of won** | | |
| Income tax recognized as other comprehensive income (loss) | | | |
| Loss on valuation of available-for-sale financial assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | (6,315) | (8,143) | (2,551) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax . . . . . . . | 7,253 | (18,335) | (11,016) |
| Remeasurement of defined benefit obligations . . . . . . . . | 42,913 | 49,986 | (80,645) |
| Investments in associates . . . . . . . . . . . . . . . . . . . . . . . . | 13,648 | 7,731 | 8,649 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (10,840) | 573 | 24,242 |
| ₩ | 46,659 | 31,812 | (61,321) |

F-141

**(5)  Changes in deferred income tax assets (liabilities) recognized in the statements of financial position for the years ended December 31, 2016 and 2017 are as follows:**

| | 2016 | | | | |
|---|---|---|---|---|---|
| | Beginning balance | Amounts recognized in profit or loss | Amount recognized in other comprehensive income (loss) | Amounts recognized directly in equity | Ending balance |
| | | | In millions of won | | |
| **Deferred income tax on temporary differences** | | | | | |
| Employee benefits . . . . . . . . . . . . . . W | 407,342 | 36,003 | 49,986 | — | 493,331 |
| Cash flow hedge . . . . . . . . . . . . . . . | (29,013) | (6,235) | (18,335) | — | (53,583) |
| Investments in associates or subsidiaries . . . . . . . . . . . . . . . . . | (6,449,998) | (717,072) | 7,731 | (7,006) | (7,166,345) |
| Property, plant and equipment . . . . . | (5,495,786) | (31,532) | — | — | (5,527,318) |
| Finance lease . . . . . . . . . . . . . . . . . . | (272,430) | (73,001) | — | — | (345,431) |
| Intangible assets . . . . . . . . . . . . . . . | 9,420 | (433) | — | — | 8,987 |
| Financial assets at fair value through profit or loss . . . . . . . . . . . . . . . . . | (4) | (58) | — | — | (62) |
| Available-for-sale financial assets . . | (49,199) | (11,005) | (8,143) | — | (68,347) |
| Deferred revenue . . . . . . . . . . . . . . . | 215,361 | (1,502) | — | — | 213,859 |
| Provisions . . . . . . . . . . . . . . . . . . . . | 3,372,423 | 210,948 | — | — | 3,583,371 |
| Doubtful receivables . . . . . . . . . . . . | 1,405 | 1,291 | — | — | 2,696 |
| Other finance liabilities . . . . . . . . . . | 26,298 | (1,302) | — | 5,253 | 30,249 |
| Gains or losses on foreign exchange translation . . . . . . . . . . . . . . . . . . . | 128,714 | 10,224 | — | — | 138,938 |
| Allowance for doubtful accounts . . . | 18,976 | (1,724) | — | — | 17,252 |
| Accrued income  . . . . . . . . . . . . . . . | (11,231) | 5,864 | — | — | (5,367) |
| Special deduction for property, plant and equipment . . . . . . . . . . . . . . . . | (194,347) | 38 | — | — | (194,309) |
| Reserve for research and human development . . . . . . . . . . . . . . . . . | (20,688) | 7,805 | — | — | (12,883) |
| Others . . . . . . . . . . . . . . . . . . . . . . . | 576,585 | 118,712 | 573 | — | 695,870 |
| | (7,766,172) | (452,979) | 31,812 | (1,753) | (8,189,092) |
| **Deferred income tax on unused tax losses and tax credit** | | | | | |
| Tax losses . . . . . . . . . . . . . . . . . . . . | (3) | 3 | — | — | — |
| Tax credit . . . . . . . . . . . . . . . . . . . . . | 27,115 | 8,588 | — | — | 35,703 |
| | 27,112 | 8,591 | — | — | 35,703 |
| W | (7,739,060) | (444,388) | 31,812 | (1,753) | (8,153,389) |

F-142

| | | | 2017 | | |
|---|---|---|---|---|---|
| | Beginning balance | Amounts recognized in profit or loss | Amount recognized in other comprehensive income (loss) | Amounts recognized directly in equity | Ending balance |
| | | | In millions of won | | |
| **Deferred income tax on temporary differences** | | | | | |
| Employee benefits .............. ₩ | 493,331 | 86,008 | (80,645) | — | 498,694 |
| Cash flow hedge ................ | (53,583) | 130,044 | (11,016) | — | 65,445 |
| Investments in associates or subsidiaries .................. | (7,166,345) | (1,510,295) | 8,649 | (25) | (8,668,016) |
| Property, plant and equipment ..... | (5,527,318) | (1,333,122) | — | — | (6,860,440) |
| Finance lease ................... | (345,431) | (81,518) | — | — | (426,949) |
| Intangible assets ............... | 8,987 | (1,339) | — | — | 7,648 |
| Financial assets at fair value through profit or loss ................. | (62) | 952 | — | — | 890 |
| Available-for-sale financial assets .. | (68,347) | 62,055 | (2,551) | — | (8,843) |
| Deferred revenue ............... | 213,859 | 16,852 | — | — | 230,711 |
| Provisions ..................... | 3,583,371 | 1,239,462 | — | — | 4,822,833 |
| Doubtful receivables ............. | 2,696 | (2,637) | — | — | 59 |
| Other finance liabilities .......... | 30,249 | (2,742) | — | 5,248 | 32,755 |
| Gains or losses on foreign exchange translation ................. | 138,938 | (140,292) | — | — | (1,354) |
| Allowance for doubtful accounts ... | 17,252 | 25,679 | — | — | 42,931 |
| Accrued income ................. | (5,367) | 3,542 | — | — | (1,825) |
| Special deduction for property, plant and equipment ................. | (194,309) | (6,618) | — | — | (200,927) |
| Reserve for research and human development ................. | (12,883) | 9,842 | — | — | (3,041) |
| Others ........................ | 695,870 | 232,642 | 24,242 | — | 952,754 |
| | (8,189,092) | (1,271,485) | (61,321) | 5,223 | (9,516,675) |
| **Deferred income tax on unused tax losses and tax credit** | | | | | |
| Tax losses ..................... | — | — | — | — | — |
| Tax credit ..................... | 35,703 | (15,272) | — | — | 20,431 |
| | 35,703 | (15,272) | — | — | 20,431 |
| ₩ | (8,153,389) | (1,286,757) | (61,321) | 5,223 | (9,496,244) |

(6) **Deferred income tax assets (liabilities) recognized in the statements of financial position as of December 31, 2016 and 2017 are as follows:**

| | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Deferred income tax assets ................................ ₩ | | 795,131 | 919,153 |
| Deferred income tax liabilities ............................ | | (8,948,520) | (10,415,397) |
| ₩ | | (8,153,389) | (9,496,244) |

F-143

(7)  Details of deductible temporary differences, tax losses and unused tax credits for which no deferred income tax assets were recognized as of December 31, 2016 and 2017 are as follows:

|  | 2016 | 2017 |
|---|---|---|
|  | In millions of won | |
| Deductible temporary differences ................................. ₩ | 426,718 | 444,426 |

### 42. Assets Held-for-Sale

Assets held-for-sale as of December 31, 2016 and 2017 are as follows:

|  | 2016 | 2017 |
|---|---|---|
|  | In millions of won | |
| Land(*1) ................................................. ₩ | 2,907 | 2,765 |
| Building(*1) ................................................. | 20,366 | 19,369 |
| Investments in associates(*2, 3, 4) ................................ | 42,569 | 5,837 |
|  | 65,842 | 27,971 |

(*1)  The board of directors of KEPCO Engineering & Construction Company, Inc., a subsidiary of the Company, determined to dispose the office building in Yongin as part of the government's plan to relocate state-run companies for balanced national development and moved the head office to Kimchun, Kyungsangbukdo, in 2015. As the Company believes the book value of Yongin office will be recovered by a disposal transaction rather than continuous operation, it reclassified buildings, land and structures as assets held-for-sale.

(*2)  Korea Western Power Co., Ltd., a subsidiary of the Company, planned to dispose certain portion of its investment in Dongducheon Dream Power Co., Ltd. and had classified the relevant book value as non-current assets held-for-sale. However, due to uncertainty of sale, it reclassified the relevant book value to investments in associates during the year ended December 31, 2017.

(*3)  Korea Hydro & Nuclear Power Co., Ltd., a subsidiary of the Company, initiated efforts to sell its shares in Yeongwol Energy Station Co., Ltd. during the year ended December 31, 2016. KHNP won the first trial of the lawsuit against the counterparty on November 2, 2017. However, the planned sale period has been extended since the appeal is ongoing as of December 31, 2017. The Company expects the sale to occur in 2018.

(*4)  KEPCO Engineering & Construction Company, Inc., a subsidiary of the Company, exercised a put option to sell the shares of DS POWER Co., Ltd. on December 11, 2017 and the shares are expected to be sold on February 28, 2018. Thus, the Company reclassified the relevant book value to assets held-for-sale.

**43. Expenses Classified by Nature**

Expenses classified by nature for the years ended December 31, 2015, 2016 and 2017 are as follows:

| | 2015 | | |
| --- | --- | --- | --- |
| | Selling and administrative expenses | Cost of sales | Total |
| | In millions of won | | |
| Raw materials used .................................. ₩ | — | 14,626,933 | 14,626,933 |
| Salaries ............................................ | 655,432 | 2,962,476 | 3,617,908 |
| Retirement benefit expense ............................ | 61,903 | 320,700 | 382,603 |
| Welfare and benefit expense ........................... | 119,866 | 426,186 | 546,052 |
| Insurance expense .................................... | 10,636 | 83,910 | 94,546 |
| Depreciation ........................................ | 102,867 | 8,158,884 | 8,261,751 |
| Amortization of intangible assets ....................... | 40,465 | 31,801 | 72,266 |
| Bad debt expense .................................... | 290 | — | 290 |
| Commission ......................................... | 562,171 | 353,703 | 915,874 |
| Advertising expense .................................. | 30,085 | 8,498 | 38,583 |
| Training expense ..................................... | 4,988 | 11,186 | 16,174 |
| Vehicle maintenance expense ........................... | 10,529 | 8,323 | 18,852 |
| Publishing expense ................................... | 3,124 | 3,981 | 7,105 |
| Business promotion expense ............................ | 3,338 | 4,312 | 7,650 |
| Rent expense ........................................ | 44,905 | 142,054 | 186,959 |
| Telecommunication expense ............................ | 22,678 | 73,180 | 95,858 |
| Transportation expense ................................ | 753 | 5,336 | 6,089 |
| Taxes and dues ...................................... | 55,970 | 397,161 | 453,131 |
| Expendable supplies expense ........................... | 7,272 | 29,874 | 37,146 |
| Water, light and heating expense ........................ | 9,558 | 26,870 | 36,428 |
| Repairs and maintenance expense ....................... | 74,330 | 1,771,760 | 1,846,090 |
| Ordinary development expense .......................... | 178,472 | 432,748 | 611,220 |
| Travel expense ...................................... | 14,388 | 52,910 | 67,298 |
| Clothing expense .................................... | 5,751 | 4,135 | 9,886 |
| Survey and analysis expense ........................... | 590 | 3,071 | 3,661 |
| Membership fee ..................................... | 1,040 | 6,401 | 7,441 |
| Power purchase ...................................... | — | 11,428,027 | 11,428,027 |
| Others ............................................. | 131,860 | 4,083,309 | 4,215,169 |
| | ₩ 2,153,261 | 45,457,729 | 47,610,990 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| | 2016 | | |
| --- | --- | --- | --- |
| | Selling and administrative expenses | Cost of sales | Total |
| | | In millions of won | |
| Raw materials used ............................ ₩ | — | 13,470,586 | 13,470,586 |
| Salaries ..................................... | 734,930 | 3,425,712 | 4,160,642 |
| Retirement benefit expense ...................... | 72,812 | 374,826 | 447,638 |
| Welfare and benefit expense ..................... | 162,243 | 507,691 | 669,934 |
| Insurance expense ............................. | 11,513 | 79,987 | 91,500 |
| Depreciation ................................. | 169,431 | 8,704,525 | 8,873,956 |
| Amortization of intangible assets ................. | 35,171 | 44,544 | 79,715 |
| Bad debt expense .............................. | 38,719 | — | 38,719 |
| Commission .................................. | 605,879 | 423,179 | 1,029,058 |
| Advertising expense ........................... | 34,658 | 9,693 | 44,351 |
| Training expense .............................. | 6,314 | 13,347 | 19,661 |
| Vehicle maintenance expense .................... | 10,390 | 7,016 | 17,406 |
| Publishing expense ............................ | 3,643 | 4,615 | 8,258 |
| Business promotion expense ..................... | 3,477 | 4,836 | 8,313 |
| Rent expense ................................. | 40,020 | 133,670 | 173,690 |
| Telecommunication expense ...................... | 25,448 | 75,925 | 101,373 |
| Transportation expense ......................... | 596 | 5,153 | 5,749 |
| Taxes and dues ............................... | 46,531 | 464,962 | 511,493 |
| Expendable supplies expense ..................... | 6,834 | 34,668 | 41,502 |
| Water, light and heating expense ................. | 9,720 | 25,820 | 35,540 |
| Repairs and maintenance expense ................. | 75,122 | 1,896,656 | 1,971,778 |
| Ordinary development expense .................... | 188,063 | 517,441 | 705,504 |
| Travel expense ................................ | 16,115 | 63,611 | 79,726 |
| Clothing expense .............................. | 8,273 | 5,363 | 13,636 |
| Survey and analysis expense ..................... | 666 | 3,209 | 3,875 |
| Membership fee ............................... | 1,132 | 8,714 | 9,846 |
| Power purchase ............................... | — | 10,755,739 | 10,755,739 |
| Others ...................................... | 331,532 | 4,488,065 | 4,819,597 |
| ₩ | 2,639,232 | 45,549,553 | 48,188,785 |

F-146

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| | 2017 | | |
| | Selling and administrative expenses | Cost of sales | Total |
|---|---|---|---|
| | | In millions of won | |
| Raw materials used ..................................... ₩ | — | 15,924,707 | 15,924,707 |
| Salaries ................................................. | 735,383 | 3,479,591 | 4,214,974 |
| Retirement benefit expense ........................... | 71,094 | 397,852 | 468,946 |
| Welfare and benefit expense .......................... | 179,406 | 543,738 | 723,144 |
| Insurance expense .................................... | 15,414 | 90,677 | 106,091 |
| Depreciation ......................................... | 190,245 | 9,461,974 | 9,652,219 |
| Amortization of intangible assets .................... | 44,990 | 68,682 | 113,672 |
| Bad debt expense .................................... | 126,714 | — | 126,714 |
| Commission ......................................... | 673,740 | 469,695 | 1,143,435 |
| Advertising expense ................................. | 114,519 | 10,917 | 125,436 |
| Training expense .................................... | 7,027 | 14,362 | 21,389 |
| Vehicle maintenance expense ........................ | 9,998 | 7,468 | 17,466 |
| Publishing expense .................................. | 3,672 | 4,248 | 7,920 |
| Business promotion expense ......................... | 3,700 | 4,973 | 8,673 |
| Rent expense ........................................ | 38,380 | 148,509 | 186,889 |
| Telecommunication expense .......................... | 24,916 | 73,956 | 98,872 |
| Transportation expense .............................. | 495 | 9,145 | 9,640 |
| Taxes and dues ...................................... | 48,395 | 437,643 | 486,038 |
| Expendable supplies expense ......................... | 7,731 | 31,994 | 39,725 |
| Water, light and heating expense .................... | 10,545 | 30,150 | 40,695 |
| Repairs and maintenance expense .................... | 63,477 | 2,047,943 | 2,111,420 |
| Ordinary development expense ....................... | 211,417 | 510,020 | 721,437 |
| Travel expense ....................................... | 16,658 | 69,015 | 85,673 |
| Clothing expense .................................... | 8,410 | 4,985 | 13,395 |
| Survey and analysis expense ......................... | 698 | 3,661 | 4,359 |
| Membership fee ..................................... | 1,122 | 8,482 | 9,604 |
| Power purchase ...................................... | — | 14,264,331 | 14,264,331 |
| Others .............................................. | 154,709 | 3,980,137 | 4,134,846 |
| ₩ | 2,762,855 | 52,098,855 | 54,861,710 |

## 44. Earnings Per Share

**(1)  Basic earnings per share for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| Type | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In won | |
| Basic earnings per share ..................................... ₩ | 20,701 | 10,980 | 2,023 |

**(2)  Diluted earnings per share for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| Type | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | In won | |
| Diluted earnings per share ..................................... ₩ | 20,701 | 10,980 | 2,023 |

F-147

**(3)   Basic earnings per share**

Net profit for the period and weighted average number of common shares used in the calculation of basic earnings per share for the years ended December 31, 2015, 2016 and 2017 are as follows:

| Type | 2015 | 2016 | 2017 |
|------|------|------|------|
| | **In millions of won except number of shares** | | |
| Net profit attributable to controlling interest  . . . . . . ₩ | 13,289,127 | 7,048,581 | 1,298,720 |
| Profit used in the calculation of total basic earnings per share  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,289,127 | 7,048,581 | 1,298,720 |
| Weighted average number of common shares  . . . . . | 641,964,077 | 641,964,077 | 641,964,077 |

**(4)   Diluted earnings per share**

Diluted earnings per share is calculated by applying adjusted weighted average number of common shares under the assumption that all dilutive potential common shares are converted to common shares.

Earnings used in the calculation of total diluted earnings per share for the years ended December 31, 2015, 2016 and 2017 are as follows:

| Type | 2015 | 2016 | 2017 |
|------|------|------|------|
| | | **In millions of won** | |
| Profit used in the calculation of total diluted earnings per share  . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 13,289,127 | 7,048,581 | 1,298,720 |

Weighted average common shares used in calculating diluted earnings per share are adjusted from weighted average common shares used in calculating basic earnings per share. Detailed information of the adjustment for the years ended December 31, 2015, 2016 and 2017 are as follows:

| Type | 2015 | 2016 | 2017 |
|------|------|------|------|
| | | **In number of shares** | |
| Weighted average number of common shares  . . . . . . . | 641,964,077 | 641,964,077 | 641,964,077 |
| Diluted weighted average number of shares . . . . . . . . . | 641,964,077 | 641,964,077 | 641,964,077 |

**(5)   There are no potential dilutive instruments and diluted earnings per share are same as basic earnings per share for the years ended December 31, 2015, 2016 and 2017.**

**45.   Risk Management**

**(1)   Capital risk management**

The Company manages its capital to ensure that entities in the Company will be able to continue while maximizing the return to shareholder through the optimization of the debt and equity balance. The capital structure of the Company consists of net debt (offset by cash and cash equivalents) and equity. The Company's overall capital risk management strategy remains unchanged from that of the prior year.

Details of the Company's capital management accounts as of December 31, 2016 and 2017 are as follows:

| | 2016 | 2017 |
|------|------|------|
| | **In millions of won** | |
| Total borrowings and debt securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 53,639,205 | 54,747,392 |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,051,353 | 2,369,739 |
| Net borrowings and debt securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50,587,852 | 52,377,653 |
| Total shareholder's equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 73,050,545 | 72,964,641 |
| Debt to equity ratio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69.25% | 71.78% |

**(2)  Financial risk management**

The Company is exposed to various risks related to its financial instruments, such as, market risk (currency risk, interest rate risk, price risk), credit risk. The Company monitors and manages the financial risks relating to the operations of the Company through internal risk reports which analyze exposures by degree and magnitude of risks. The Company uses derivative financial instruments to hedge certain risk exposures. The Company's overall financial risk management strategy remains unchanged from that of the prior year.

(i)  Credit risk

Credit risk is the risk of finance loss to the Company if a customer or counterparty to a financial instrument fails to meet its contractual obligations, and arises primarily from the sales activities, securities and derivatives. In addition, credit risk exposure may exist within financial guarantees and unused line of credits. As these financial institutions the Company makes transactions with are reputable financial institutions, the credit risk from them are considered limited. The Company decides credit transaction limits based on evaluation of client's credit, through information obtained from the credit bureau and disclosed financial position at committing contracts.

①  Credit risk management

Electricity sales, the main operations of the Company are the necessity for daily life and industrial activities of Korean nationals, and have importance as one of the national key industries. The Company dominates the domestic market supplying electricity to customers. The Company is not exposed to significant credit risk as customers of the Company are diverse and are from various industries and areas. The Company uses publicly available information and its own internal data related to trade receivables, to rate its major customers and to measure the credit risk that a counter party will default on a contractual obligation. For the incurred but not recognized loss, it is measured considering overdue period.

②  Impairment and allowance account

In accordance with the Company policies, individual material financial assets are assessed on a regular basis, trade receivables that are assessed not to be impaired individually are, in addition, assessed for impairment on a collective basis. Value of the acquired collateral (including the confirmation of feasibility) and estimated collectable amounts are included in this assessment.

Allowance for bad debts assessed on a collective basis are recognized for (i) the Company of assets which individually are not material and (ii) incurred but not recognized losses that are assessed using statistical methods, judgment and past experience.

Book values of the financial assets represent the maximum exposed amounts of the credit risk. Details of the Company's level of maximum exposure to credit risk as of December 31, 2016 and 2017 are as follows:

|  | 2016 | 2017 |
|---|---|---|
|  | In millions of won | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 3,051,353 | 2,369,739 |
| Derivative assets (trading) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 367,477 | 22,020 |
| Available-for-sale financial assets  . . . . . . . . . . . . . . . . . . . . . . | 1,014,732 | 699,833 |
| Held-to-maturity investments  . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,244 | 3,144 |
| Loans and receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 834,207 | 905,641 |
| Long-term/short-term financial instruments . . . . . . . . . . . . . . . . | 2,695,926 | 2,244,514 |
| Financial assets at fair value through profit or loss . . . . . . . . . . . | — | 111,512 |
| Derivative assets (using hedge accounting)  . . . . . . . . . . . . . . . . | 413,897 | 10,606 |
| Trade and other receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,692,391 | 9,683,769 |
| Financial guarantee contracts(*) . . . . . . . . . . . . . . . . . . . . . . . . . | 1,396,152 | 1,154,862 |

F-149

(\*)   Maximum exposure associated with the financial guarantee contracts is the maximum amounts of the obligation.

As of the reporting date, there are no financial assets and non-financial assets that were acquired through the exercise of the right of collateralized assets and reinforcement of credit arrangement.

(ii)   Market risk

Market risk is the risk that the Company's fair values of the financial instruments or future cash flows are affected by the changes in the market. Market risk consists of interest rate risk, currency risk and other price risk.

(iii)   Sensitivity analysis

Significant assets and liabilities with uncertainties in underlying assumptions

①   Defined benefit obligation

A sensitivity analysis of defined benefit obligation assuming a 1% increase and decrease movements in the actuarial valuation assumptions as of December 31, 2016 and 2017 are as follows:

| Type | Accounts | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | 1% Increase | 1% Decrease | 1% Increase | 1% Decrease |
| | | In millions of won | | | |
| Future salary increases . . . . . . . . | Increase (decrease) in defined benefit obligation | ₩ 344,874 | (304,685) | 354,852 | (305,494) |
| Discount rate . . . . . . . | Increase (decrease) in defined benefit obligation | (305,031) | 371,689 | (313,597) | 377,148 |

Changes of employee benefits assuming a 1% increase and decrease movements in discount rate on plan asset for the years ended December 31, 2016 and 2017 are ₩9,096 million and ₩11,875 million, respectively.

②   Provisions

Changes in provisions due to movements in underlying assumptions as of December 31, 2016 and 2017 are as follows:

| Type | Accounts | 2016 | 2017 |
|---|---|---|---|
| PCBs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Inflation rate | 1.29% | 1.23% |
| | Discount rate | 2.77% | 2.55% |
| Nuclear plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Inflation rate | 1.40% | 1.21% |
| | Discount rate | 3.55% | 2.94% |
| Spent fuel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Inflation rate | 2.93% | 2.93% |
| | Discount rate | 4.49% | 4.49% |

F-150

A sensitivity analysis of provisions assuming a 0.1% increase and decrease movements in the underlying assumptions as of December 31, 2016 and 2017 are as follows:

| Type | Accounts | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | 0.1% Increase | 0.1% Decrease | 0.1% Increase | 0.1% Decrease |
| | | In millions of won | | | |
| Discount rate ........ | PCBs  ₩ | (817) | 822 | (811) | 816 |
| | Nuclear plants | (209,277) | 215,139 | (262,949) | 270,370 |
| | Spent fuel | (52,353) | 54,387 | (51,015) | 52,997 |
| Inflation rate ........ | PCBs | 834 | (830) | 826 | (822) |
| | Nuclear plants | 240,115 | (233,553) | 287,926 | (280,249) |
| | Spent fuel | 55,173 | (53,182) | 53,763 | (51,823) |

Management judgment effected by uncertainties in underlying assumptions

① Foreign currency risk

The Company undertakes transactions denominated in foreign currencies; consequently, exposures to exchange rate fluctuations arise. The carrying amounts of the Company's foreign currency denominated monetary assets and monetary liabilities as of December 31, 2016 and 2017 are as follows:

| Type | Assets | | Liabilities | |
|---|---|---|---|---|
| | 2016 | 2017 | 2016 | 2017 |
| | In thousands of foreign currencies | | | |
| AED ......................... | 7,479 | 5,693 | 1,534 | 2,049 |
| AUD ......................... | 187 | 145 | 632,613 | 652,259 |
| BDT ......................... | 49,110 | 60,208 | 833 | 1,001 |
| BWP ......................... | 4,296 | 797 | 3,222 | — |
| CAD ......................... | — | 82 | — | 171 |
| CHF ......................... | — | — | 400,308 | 400,004 |
| CNY ......................... | — | 13,007 | — | 26,140 |
| EUR ......................... | 17,585 | 5,708 | 14,111 | 68,003 |
| GBP ......................... | 3 | 3 | 110 | 2,327 |
| IDR ......................... | 52,568 | 167,775 | — | — |
| INR ......................... | 1,059,092 | 1,228,259 | 161,631 | 227,078 |
| JOD ......................... | 1,746 | 1,624 | 5 | 5 |
| JPY ......................... | 520,746 | 799,501 | 20,442,504 | 21,624,128 |
| KZT ......................... | 12,157 | 359 | — | — |
| MGA ......................... | 3,408,579 | 2,762,572 | 150,430 | 319,581 |
| NOK ......................... | — | — | — | 482 |
| PHP ......................... | 415,818 | 189,261 | 136,700 | 125,431 |
| PKR ......................... | 274,090 | 251,190 | 5,051 | 4,676 |
| SAR ......................... | 1,149 | 1,191 | — | 44 |
| SEK ......................... | — | — | — | 449,002 |
| USD ......................... | 1,319,524 | 1,653,858 | 9,445,567 | 8,321,335 |
| UYU ......................... | 1,307 | 12,955 | 586 | 10,586 |
| ZAR ......................... | 386 | 361 | 75 | 4 |

A sensitivity analysis on the Company's income for the period assuming a 10% increase and decrease in currency exchange rates as of December 31, 2016 and 2017 are as follows:

| Type | 2016 | | 2017 | |
|---|---|---|---|---|
| | 10% Increase | 10% Decrease | 10% Increase | 10% Decrease |
| | In millions of won | | | |
| Increase (decrease) of income before income tax ............................ ₩ | (1,101,372) | 1,101,372 | (844,122) | 844,122 |
| Increase (decrease) of shareholder's equity(*) ............................. | (1,101,372) | 1,101,372 | (844,122) | 844,122 |

(*) The effect on the shareholders' equity excluding the impact of income taxes.

F-151

The sensitivity analysis above is conducted for monetary assets and liabilities denominated in foreign currencies other than functional currency, without consideration of hedge effect of related derivatives, as of December 31, 2016 and 2017.

To manage its foreign currency risk related to foreign currency denominated receivables and payables, the Company has a policy to enter into currency forward agreements. In addition, to manage its foreign currency risk related to foreign currency denominated expected sales transactions and purchase transactions, the Company enters into cross-currency swap agreements.

②    Interest rate risk

The Company is exposed to interest rate risk due to its borrowing with floating interest rates. A 1% increase or decrease is used when reporting interest rate risk internally to key management personnel and represents management's assessment of the reasonably possible change in interest rates.

The Company's borrowings and debt securities with floating interest rates as of December 31, 2016 and 2017 are as follows:

| Type | | 2016 | 2017 |
|---|---|---|---|
| | | In millions of won | |
| Short-term borrowings ........................................... | ₩ | 289,322 | 290,873 |
| Long-term borrowings ........................................... | | 1,459,969 | 1,743,252 |
| Debt securities ................................................ | | 1,518,500 | 685,700 |
| | ₩ | 3,267,791 | 2,719,825 |

A sensitivity analysis on the Company's long-term borrowings and debt securities assuming a 1% increase and decrease in interest rates, without consideration of hedge effect of related derivatives for the years ended December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | 1% Increase | 1% Decrease | 1% Increase | 1% Decrease |
| | | In millions of won | | | |
| Increase (decrease) of profit before income tax ... | ₩ | (32,678) | 32,678 | (27,198) | 27,198 |
| Increase (decrease) of shareholder's equity(*) .... | | (32,678) | 32,678 | (27,198) | 27,198 |

(*)   The effect on the shareholders' equity excluding the impact of income taxes.

To manage its interest rate risks, the Company enters into certain interest swap agreements or maintains an appropriate mix of fixed and floating rate borrowings.

③    Electricity rates risk

The Company is exposed to electricity rates risk due to the rate regulation of the government which considers the effect of electricity rate on the national economy.

A sensitivity analysis on the Company's income for the period assuming a 1% increase and decrease in price of electricity for the years ended December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | 1% Increase | 1% Decrease | 1% Increase | 1% Decrease |
| | | In millions of won | | | |
| Increase (decrease) of profit before income tax .... | ₩ | 543,045 | (543,045) | 546,499 | (546,499) |
| Increase (decrease) of shareholder's equity(*) ..... | | 543,045 | (543,045) | 546,499 | (546,499) |

(*)   The effect on the shareholders' equity excluding the impact of income taxes.

F-152

(iv) Liquidity risk

The Company has established an appropriate liquidity risk management framework for the management of the Company's short, medium and long-term funding and liquidity management requirements. The Company manages liquidity risk by continuously monitoring forecasted and actual cash flows, and by matching the maturity profiles of financial assets and liabilities.

In addition, the Company has established credit lines on its trade financing and bank overdrafts, and through payment guarantees it has received, it maintains an adequate credit (borrowing) line. In addition, the Company has the ability to utilize excess cash or long-term borrowings for major construction investments.

The following table shows the details of maturities of non-derivative financial liabilities as of December 31, 2016 and 2017. This table, based on the undiscounted cash flows of the non-derivative financial liabilities, has been completed based on the respective liabilities' earliest maturity date.

| Type | 2016 | | | | |
| | Less than 1 year | 1~2 Years | 2~5 Years | More than 5 years | Total |
|---|---|---|---|---|---|
| | In millions of won | | | | |
| Borrowings and debt securities . . . . | ₩10,613,185 | 9,786,209 | 19,353,498 | 24,461,835 | 64,214,727 |
| Finance lease liabilities . . . . . . . . . | 175,512 | 174,534 | 229,495 | 152,247 | 731,788 |
| Trade and other payables . . . . . . . . | 5,464,234 | 307,222 | 660,426 | 2,170,525 | 8,602,407 |
| Financial guarantee contracts(*) . . . | 249,200 | 40,617 | 865,842 | 240,493 | 1,396,152 |
| | ₩16,502,131 | 10,308,582 | 21,109,261 | 27,025,100 | 74,945,074 |

| Type | 2017 | | | | |
| | Less than 1 year | 1~2 Years | 2~5 Years | More than 5 years | Total |
|---|---|---|---|---|---|
| | In millions of won | | | | |
| Borrowings and debt securities . . . . | ₩10,748,437 | 7,948,320 | 21,331,394 | 22,694,867 | 62,723,018 |
| Finance lease liabilities . . . . . . . . . | 174,534 | 87,709 | 185,284 | 108,749 | 556,276 |
| Trade and other payables . . . . . . . . | 5,867,729 | 301,165 | 698,289 | 1,937,558 | 8,804,741 |
| Financial guarantee contracts(*) . . . | 7,081 | 18,054 | 1,049,667 | 80,060 | 1,154,862 |
| | ₩16,797,781 | 8,355,248 | 23,264,634 | 24,821,234 | 73,238,897 |

(*) This represents the total guarantee amounts associated with the financial guarantee contracts. Financial guarantee liabilities which are recognized as of December 31, 2016 and 2017 are ₩29,665 million and ₩23,475 million, respectively.

The expected maturities for non-derivative financial assets as of December 31, 2016 and 2017 in detail are as follows:

| Type | 2016 | | | | |
| | Less than 1 year | 1~5 Years | More than 5 years | Other(*) | Total |
|---|---|---|---|---|---|
| | In millions of won | | | | |
| Cash and cash equivalents . . . . . . . . . . | ₩ 3,051,353 | — | — | — | 3,051,353 |
| Available-for-sale financial assets . . . . | — | — | — | 1,014,732 | 1,014,732 |
| Held-to-maturity investments . . . . . . . . | 114 | 3,126 | 4 | — | 3,244 |
| Loans and receivables . . . . . . . . . . . . . | 198,133 | 233,564 | 439,666 | 5,591 | 876,954 |
| Long-term/short-term financial instruments . . . . . . . . . . . . . . . . . . . | 2,281,460 | 200,001 | 214,122 | 343 | 2,695,926 |
| Trade and other receivables . . . . . . . . . | 7,790,953 | 915,679 | 919,901 | 74,199 | 9,700,732 |
| | ₩ 13,322,013 | 1,352,370 | 1,573,693 | 1,094,865 | 17,342,941 |

F-153

| Type | | Less than 1 year | 1~5 Years | More than 5 years | Other(*) | Total |
|---|---|---|---|---|---|---|
| | | | | In millions of won | | |
| Cash and cash equivalents . . . . . . . | ₩ | 2,369,739 | — | — | — | 2,369,739 |
| Available-for-sale financial assets . . . . . . . . . . . . . . . . . . . | | — | — | 214,156 | 485,677 | 699,833 |
| Held-to-maturity investments . . . . . | | 5 | 3,139 | — | — | 3,144 |
| Loans and receivables . . . . . . . . . . | | 244,309 | 261,672 | 429,628 | 10,821 | 946,430 |
| Long-term/short-term financial instruments . . . . . . . . . . . . . . . . | | 1,702,084 | 201,821 | 340,304 | 305 | 2,244,514 |
| Financial assets at fair value through profit or loss . . . . . . . . . | | — | — | 111,512 | — | 111,512 |
| Trade and other receivables . . . . . . | | 7,930,715 | 920,539 | 788,795 | 52,031 | 9,692,080 |
| | ₩ | 12,246,852 | 1,387,171 | 1,884,395 | 548,834 | 16,067,252 |

(*) The maturities cannot be presently determined.

Derivative liabilities classified by maturity periods which from reporting date to maturity date of contract as of December 31, 2016 and 2017 are as follows:

| Type | | Less than 1 year | 1~2 Years | 2~5 Years | More than 5 years | Total |
|---|---|---|---|---|---|---|
| | | | | In millions of won | | |
| Gross settlement | | | | | | |
| —Trading . . . . . . . . . . . . . . . . . . . . . | ₩ | (3,081) | (24,044) | — | (2,799) | (29,924) |
| —Hedging . . . . . . . . . . . . . . . . . . | | (2,645) | (2,645) | (56,484) | (56,575) | (118,349) |
| | ₩ | (5,726) | (26,689) | (56,484) | (59,374) | (148,273) |

| Type | | Less than 1 year | 1~2 Years | 2~5 Years | More than 5 years | Total |
|---|---|---|---|---|---|---|
| | | | | In millions of won | | |
| Net settlement | | | | | | |
| —Trading . . . . . . . . . . . . . . . . . . . . . | ₩ | (774) | — | — | — | (774) |
| Gross settlement | | | | | | |
| —Trading . . . . . . . . . . . . . . . . . . | | (51,496) | (19,887) | (16,597) | (4,967) | (92,947) |
| —Hedging . . . . . . . . . . . . . . . . . . . . | | (17,547) | (28,977) | (192,205) | (44,137) | (282,866) |
| | ₩ | (69,817) | (48,864) | (208,802) | (49,104) | (376,587) |

**(3) Fair value risk**

The fair value of the Company's actively-traded financial instruments (i.e. short-term financial assets held for trading, available-for-sale financial assets, etc.) is based on the traded market-price as of the reporting period end. The fair value of the Company's financial assets is the amount which the asset could be exchanged for or the amount a liability could be settled for.

The fair values of financial instruments where no active market exists or where quoted prices are not otherwise available are determined by using valuation techniques. Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models. If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual market transactions, the Company uses that technique.

F-154

For trade receivables and payables, the Company considers the carrying value net of impairment as fair value. While for disclosure purposes, the fair value of financial liabilities is estimated by discounting a financial instruments with similar contractual cash flows based on the effective interest method.

(i)  Fair value and book value of financial assets and liabilities as of December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| | | Book value | Fair value | Book value | Fair value |
| | | | In millions of won | | |
| **Assets recognized at fair value** | | | | | |
| Available-for-sale financial assets(*1) . . . . . . . . . . . . . . . . . . . . . | ₩ | 1,014,732 | 1,014,732 | 699,833 | 699,833 |
| Derivative assets (trading) . . . . . . . . . . | | 367,477 | 367,477 | 22,020 | 22,020 |
| Derivative assets (using hedge accounting) . . . . . . . . . . . . . . . . . . | | 413,897 | 413,897 | 10,606 | 10,606 |
| Long-term financial instruments . . . . . | | 414,466 | 414,466 | 542,430 | 542,430 |
| Short-term financial instruments . . . . . | | 2,281,460 | 2,281,460 | 1,702,084 | 1,702,084 |
| Financial assets at fair value through profit or loss . . . . . . . . . . . . . . . . . | | — | — | 111,512 | 111,512 |
| | | 4,492,032 | 4,492,032 | 3,088,485 | 3,088,485 |
| **Assets carried at amortized cost** | | | | | |
| Held-to-maturity investments . . . . . . . | | 3,244 | 3,244 | 3,144 | 3,144 |
| Loans and receivables . . . . . . . . . . . . . | | 834,207 | 834,207 | 905,641 | 905,641 |
| Trade and other receivables . . . . . . . . . | | 9,692,391 | 9,692,391 | 9,683,769 | 9,683,769 |
| Cash and cash equivalents . . . . . . . . . . | | 3,051,353 | 3,051,353 | 2,369,739 | 2,369,739 |
| | | 13,581,195 | 13,581,195 | 12,962,293 | 12,962,293 |
| **Liabilities recognized at fair value** | | | | | |
| Derivative liabilities (trading) . . . . . . . | | 21,529 | 21,529 | 150,929 | 150,929 |
| Derivative liabilities (using hedge accounting) . . . . . . . . . . . . . . . . . . | | 117,157 | 117,157 | 277,130 | 277,130 |
| | | 138,686 | 138,686 | 428,059 | 428,059 |
| **Liabilities carried at amortized cost** | | | | | |
| Secured borrowings . . . . . . . . . . . . . . . | | 744,565 | 744,565 | 1,055,554 | 1,055,554 |
| Unsecured bond . . . . . . . . . . . . . . . . . . | | 50,749,793 | 54,455,659 | 51,146,783 | 53,436,659 |
| Finance lease liabilities . . . . . . . . . . . . | | 541,179 | 541,179 | 418,260 | 418,260 |
| Unsecured borrowings . . . . . . . . . . . . . | | 2,089,885 | 2,099,574 | 2,476,196 | 2,477,055 |
| Trade and other payables(*2) . . . . . . . | | 8,602,407 | 8,602,407 | 8,804,741 | 8,804,741 |
| Bank overdraft . . . . . . . . . . . . . . . . . . . | | 54,962 | 54,962 | 68,859 | 68,859 |
| | ₩ | 62,782,791 | 66,498,346 | 63,970,393 | 66,261,128 |

(*1) Book values of equity securities held by the Company that were measured at cost as of December 31, 2016 and 2017 are ₩138,557 million and ₩37,926 million, respectively, as a quoted market price does not exist in an active market and its fair value cannot be measured reliably.

(*2) Excludes finance lease liabilities.

(ii)  Interest rates used for determining fair value

The interest rates used to discount estimated cash flows, when applicable, are based on the government yield curve at the reporting date plus an adequate credit spread.

F-155

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

The discount rate used for calculating fair value as of December 31, 2016 and 2017 are as follows:

| Type | 2016 | 2017 |
|------|------|------|
| Derivatives | 0.02% ~ 4.16% | 0.03% ~ 4.16% |
| Borrowings and debt securities | 0.02% ~ 4.38% | 0.08% ~ 4.38% |
| Finance lease | 9.00% ~ 10.83% | 9.00% ~ 10.83% |

(iii) Fair value hierarchy

The following table provides an analysis of financial instruments that are measured subsequent to initial recognition at fair value, classified as Level 1, 2 or 3, based on the degree to which the fair value is observable.

Level 1: Unadjusted quoted prices in active markets for identical assets or liabilities;

Level 2: Inputs other than quoted prices that are observable for the asset or liability either directly or indirectly; and

Level 3: Inputs that are not based on observable market data.

Fair values of financial instruments by hierarchy level as of December 31, 2016 and 2017 are as follows:

| Type | | 2016 | | | |
|------|---|---------|---------|---------|---------|
| | | Level 1 | Level 2 | Level 3 | Total |
| | | In millions of won | | | |
| **Financial assets at fair value** | | | | | |
| Available-for-sale financial assets | ₩ | 268,171 | 437,015 | 269,461 | 974,647 |
| Derivative assets | | — | 770,851 | 10,523 | 781,374 |
| | | 268,171 | 1,207,866 | 279,984 | 1,756,021 |
| **Financial liabilities at fair value** | | | | | |
| Derivative liabilities | | — | 138,686 | — | 138,686 |

| Type | | 2017 | | | |
|------|---|---------|---------|---------|---------|
| | | Level 1 | Level 2 | Level 3 | Total |
| | | In millions of won | | | |
| **Financial assets at fair value** | | | | | |
| Available-for-sale financial assets | ₩ | 274,453 | 214,156 | 173,298 | 661,907 |
| Derivative assets | | — | 18,466 | 14,160 | 32,626 |
| Financial assets at fair value through profit or loss | | — | 111,512 | — | 111,512 |
| | | 274,453 | 344,134 | 187,458 | 806,045 |
| **Financial liabilities at fair value** | | | | | |
| Derivative liabilities | | — | 428,059 | — | 428,059 |

The fair value of available-for-sale financial assets publicly traded is measured at the closing bid price quoted at the end of the reporting period. Meanwhile, the fair value of unquoted available-for-sale financial assets is calculated using the valuation results from an external pricing service in which weighted average borrowing rates of interest of evaluated companies are used as a discount rate. The fair value of derivatives is measured using valuation model which is determined at the present value of estimated future cash flows discounted at current market interest rate.

F-156

Changes of financial assets and liabilities which are classified as level 3 for the years ended December 31, 2016 and 2017 are as follows:

| | | 2016 | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Reclassified category | Valuation | Disposal | Foreign currency translation | Ending balance |
| | | | In millions of won | | | | |
| **Financial assets at fair value** | | | | | | | |
| Available-for-sale financial assets | | | | | | | |
| Unlisted securities . . . . . . . . . . . . | ₩ 180,390 | — | 98,472 | (9,401) | — | — | 269,461 |

| | | 2017 | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Reclassified category | Valuation | Disposal | Foreign currency translation | Ending balance |
| | | | In millions of won | | | | |
| **Financial assets at fair value** | | | | | | | |
| Available-for-sale financial assets | | | | | | | |
| Unlisted securities . . . . . . . . . . . . | ₩ 269,461 | — | (92,128) | (6,201) | — | 2,166 | 173,298 |

## 46. Service Concession Arrangements

**(1)  Gas Complex • Thermal Power Plant at Ilijan, Philippines (BOT)**

(i)   Significant terms and concession period of the arrangement

The Company has entered into a contract with National Power Corporation (the "NPC"), based in the Republic of the Philippines whereby the Company can collect the electricity rates which are composed of fixed costs and variable costs during the concession period from 2002 to 2022 after building, rehabilitating, and operating the power plant.

(ii)   Rights and classification of the arrangement

The Company has the rights to use and own the power plant during the concession period from 2002 to 2022. At the end of the concession period, the Company has an obligation to transfer its ownership of the power plant to NPC.

(iii)   The Company's expected future collections of service concession arrangements as of December 31, 2017 are as follows:

| Type | | Amounts |
|---|---|---|
| | | In millions of won |
| Less than 1 year  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 111,912 |
| 1 ~ 2 years  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 111,912 |
| 2 ~ 3 years  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 111,912 |
| Over 3 years  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 158,543 |
| | ₩ | 494,279 |

**(2)  Hydroelectric Power Generation at Semangka, Indonesia (BOT)**

(i)   Significant terms and concession period of the arrangement

The Company has entered into a contract with PT. Perusahaan Listrik Negara (the "PLN") whereby the Company provides electricity generated and charge tariff rates designed to recover capital cost, fixed

F-157

O&M cost, water usage cost, variable O&M cost and special facilities cost during the concession period after building, rehabilitating, and operating the power plant for approximately 30 years (2018~2048) subsequent to the completion of plant construction.

(ii) Rights and classification of the arrangement

The Company has the rights to use and own the power plant during the concession period from 2018 to 2048. At the end of the concession period, PNL has an option to take over the ownership of the power plant from the Company.

(iii) The Company's expected future collections of service concession arrangements as of December 31, 2017 are as follows:

| Type | | Amounts |
|------|---|---------|
| | | In millions of won |
| Less than 1 year ................................. | ₩ | 20,332 |
| 1 ~ 2 years ....................................... | | 26,888 |
| 2 ~ 3 years ....................................... | | 26,888 |
| Over 3 years ...................................... | | 591,687 |
| | ₩ | 665,795 |

(iv) Accumulated contract costs and profits related to the Company's contract in process as of December 31, 2017 were ₩145,613 million and ₩9,163 million, respectively. There are no amount due from customers and advance receipts in progress.

**47. Related Parties**

**(1) Related parties of the Company as of December 31, 2017 are as follows:**

| Type | Related party |
|------|---------------|
| Parent | Republic of Korea government |
| Subsidiaries (100 subsidiaries) | Korea Hydro & Nuclear Power Co., Ltd., Korea South-East Power Co., Ltd., Korea Midland Power Co., Ltd., Korea Western Power Co., Ltd., Korea Southern Power Co., Ltd., Korea East-West Power Co., Ltd., KEPCO Engineering & Construction Company, Inc., KEPCO Plant Service & Engineering Co., Ltd., KEPCO Nuclear Fuel Co., Ltd., KEPCO KDN Co., Ltd., Garolim Tidal Power Plant Co., Ltd., Gyeonggi Green Energy Co., Ltd., Korea Offshore Wind Power Co., Ltd., KOSEP Material Co., Ltd., KEPCO International HongKong Ltd., KEPCO International Philippines Inc., KEPCO Philippines Corporation, KEPCO Ilijan Corporation, KEPCO Gansu International Ltd., KEPCO Philippines Holdings Inc., KEPCO Lebanon SARL, KEPCO Neimenggu International Ltd., KEPCO Australia Pty., Ltd., KEPCO Shanxi International Ltd., KOMIPO Global Pte Ltd., KOSEP Australia Pty., Ltd., KOMIPO Australia Pty., Ltd., KOWEPO Australia Pty., Ltd., KOSPO Australia Pty., Ltd., KEPCO Canada Energy Ltd., KEPCO Netherlands B.V., KOREA Imouraren Uranium Investment Corp., KEPCO Middle East Holding Company, Qatrana Electric Power Company, Korea Electric Power Nigeria Ltd., KOWEPO International Corporation, KOSPO Jordan LLC, Korea Waterbury Uranium Limited Partnership, PT. Cirebon Power Service, EWP America Inc., KHNP Canada Energy, Ltd., KEPCO Bylong Australia Pty., Ltd., KNF Canada Energy Limited, KEPCO Holdings de Mexico, KST Electric Power |

F-158

Company, KEPCO Energy Service Company, KEPCO Netherlands S3 B.V., PT. KOMIPO Pembangkitan Jawa Bali, PT KEPCO Resource Indonesia, EWP (Barbados) 1 SRL, PT. Tanggamus Electric Power, KOMIPO America Inc, KOSEP USA, INC., PT. EWP Indonesia, KEPCO Netherlands J3 B.V., Global One Pioneer B.V., Global Energy Pioneer B.V., Mira Power Limited, EWP Philippines Corporation, KEPCO Singapore Holdings Pte., Ltd., KOWEPO India Private Limited, KEPCO KPS Philippines Corp., KOSPO Chile SpA, PT. KOWEPO Sumsel Operation And Maintenance Services, Commerce and Industry Energy Co., Ltd., Gyeongju Wind Power Co., Ltd., California Power Holdings, LLC, DG Fairhaven Power, LLC, DG Whitefield, LLC, EWP Renewable Corporation, EWPRC Biomass Holdings, LLC, Springfield Power, LLC, HeeMang Sunlight Power Co., Ltd., Fujeij Wind Power Company, KOSPO Youngnam Power Co., Ltd., HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2), Chitose Solar Power Plant LLC., Solar School Plant Co., Ltd., KEPCO Energy Solution Co. Ltd., KOSPO Power Services Limitada, KOEN Bylong Pty., Ltd., KOWEPO Bylong Pty., Ltd., KOSPO Bylong Pty., Ltd., EWP Bylong Pty., Ltd., KOWEPO Lao International, KOMIPO Bylong Pty Ltd., Energy New Industry Specialized Investment Private Investment Trust., KEPCO US Inc., KEPCO Alamosa LLC, Cogentrix Solar Services, LLC, Solar Investments I, LLC, Cogentrix of Alamosa, LLC, KEPCO-LG CNS Mangilao Holdings LLC, Mangilao Investment LLC, KEPCO-LG CNS Mangilao Solar, LLC Jeju Hanlim Offshore Wind Co., Ltd., PT, Siborpa Eco Power, e-New Industry LB Fund 1, Songhyun e-New Industry Fund, BSK E-New Industry Fund VII

Associates
(56 associates)

Dongducheon Dream Power Co., Ltd., Korea Gas Corporation, SE Green Energy Co., Ltd., Daegu Photovoltaic Co., Ltd., Jeongam Wind Power Co., Ltd., Korea Power Engineering Service Co., Ltd., Heang Bok Do Si Photovoltaic Power Co., Ltd., Korea Electric Power Industrial Development Co., Ltd., Goseong Green Energy Co., Ltd., Gangneung Eco Power Co., Ltd., Shin Pyeongtaek Power Co., Ltd., Naepo Green Energy Co., Ltd., Noeul Green Energy Co., Ltd., YTN Co., Ltd., Cheongna Energy Co., Ltd., Samcheok Eco Materials Co., Ltd., Gangwon Wind Power Co., Ltd., Gwangyang Green Energy Co., Ltd., Hyundai Green Power Co., Ltd., Korea Power Exchange, AMEC Partners Korea Ltd., Hyundai Energy Co., Ltd., Ecollite Co., Ltd., Taebaek Wind Power Co., Ltd., Taeback Guinemi Wind Power Co., Ltd., Pyeongchang Wind Power Co., Ltd., Daeryun Power Co., Ltd., Changjuk Wind Power Co., Ltd., KNH Solar Co., Ltd., S-Power Co., Ltd., Hadong Mineral Fiber Co., Ltd., Green Biomass Co., Ltd., SPC Power Corporation, Gemeng International Energy Co., Ltd., PT. Cirebon Electric Power, KNOC Nigerian East Oil Co., Ltd., KNOC Nigerian West Oil Co., Ltd., PT Wampu Electric Power, PT. Bayan Resources TBK, Nepal Water & Energy Development Company Private Limited, Pioneer Gas Power Limited, Eurasia Energy Holdings, Xe-Pian Xe-Namnoy Power Co., Ltd., PT. Mutiara Jawa, Jinbhuvish Power Generation Pvt. Ltd., Busan Green Energy Co., Ltd., Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.), Korea Electric Vehicle Charging Service, Ulleungdo Natural Energy Co., Ltd., Korea

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| | |
|---|---|
| | Nuclear Partners Co., Ltd., Tamra Offshore Wind Power Co., Ltd., Korea Electric Power Corporation Fund, Energy Infra Asset Management Co., Ltd., Daegu clean Energy Co., Ltd., YaksuESS Co., Ltd, PND solar., Ltd |
| Joint ventures (45 joint ventures) | Daegu Green Power Co., Ltd., KEPCO SPC Power Corporation, Daejung Offshore Wind Power Co., Ltd., KAPES, Inc., Dangjin Eco Power Co., Ltd., Honam Wind Power Co., Ltd., Seokmun Energy Co., Ltd., Incheon New Power Co., Ltd., Chun-cheon Energy Co., Ltd., Yeonggwangbaeksu Wind Power Co., Ltd., KW Nuclear Components Co., Ltd., KEPCO-Uhde Inc., GS Donghae Electric Power Co., Ltd., Busan Shinho Solar Power Co., Ltd., Global Trade Of Power System Co., Ltd., Expressway Solar-light Power Generation Co., Ltd., Gansu Datang Yumen Wind Power Co., Ltd., Datang Chifeng Renewable Power Co., Ltd., Rabigh Electricity Company, Eco Biomass Energy Sdn. Bhd., Rabigh Operation & Maintenance Company Limited, Datang KEPCO Chaoyang Renewable Power Co., Ltd., Shuweihat Asia Power Investment B.V., Shuweihat Asia Operation & Maintenance Company, Waterbury Lake Uranium L.P., ASM-BG Investicii AD, RES Technology AD, Jamaica Public Service Company Limited, KV Holdings, Inc., Datang Chaoyang Renewable Power Co., Ltd., KODE NOVUS I LLC, KODE NOVUS II LLC, Amman Asia Electric Power Company, Kelar S.A, PT. Tanjung Power Indonesia, Nghi Son 2 Power Ltd., Daehan Wind Power PSC, MOMENTUM, Barakah One Company, Nawah Energy Company, Yeonggwang Wind Power Co., Ltd., Chester Solar IV SpA, Chester Solar V SpA, Diego de Almagro Solar SpA, South Jamaica Power Company Limited |
| Others (3 others) | Korea Development Bank, Yeongwol Energy Station Co., Ltd., DS POWER Co., Ltd. |

(2)  **Transactions between the Company and its subsidiaries are eliminated during the consolidation and are not disclosed in notes.**

(3)  **Related party transactions for the years ended December 31, 2015, 2016 and 2017 are as follows:**

<Sales and Others>

| Company name | Transaction type | Sales and others | | |
|---|---|---|---|---|
| | | 2015 | 2016 | 2017 |
| | | In millions of won | | |
| <Associates> | | | | |
| Daegu Green Power Co., Ltd. . . . . . . . . . . . . . | Electricity sales | ₩  1,055 | — | — |
| Dongducheon Dream Power Co., Ltd. . . . . . . . . | Electricity sales | 14,811 | 15,221 | 17,041 |
| Korea Gas Corporation  . . . . . . . . . . . . . . . . . | Electricity sales | 90,480 | 89,030 | 88,011 |
| Daegu Photovoltaic Co., Ltd.  . . . . . . . . . . . . . | Service | — | — | 349 |
| Jeongam Wind Power Co., Ltd.  . . . . . . . . . . . . | Electricity sales | 8 | 6 | 30 |
| Korea Power Engineering Service Co., Ltd.  . . . | Service | 1,743 | 1,455 | 1,317 |
| KS Solar Co., Ltd.  . . . . . . . . . . . . . . . . . . . . . | Electricity sales | 21 | 20 | 5 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Service | 1 | 2 | 2 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | Service | 12,361 | 10,723 | 14,044 |
| Goseong Green Energy Co., Ltd. . . . . . . . . . . . | Electricity sales | 9,306 | 9,195 | 24,069 |
| Gangneung Eco Power Co., Ltd.  . . . . . . . . . . . | Service | 9,761 | 5,223 | 2,391 |
| Shin Pyeongtaek Power Co., Ltd.  . . . . . . . . . . | Electricity sales | 11,344 | 3,579 | 9,025 |
| Naepo Green Energy Co., Ltd.  . . . . . . . . . . . . | Electricity sales | 66 | 104 | 185 |

F-160

| Company name | Transaction type | Sales and others | | |
|---|---|---|---|---|
| | | 2015 | 2016 | 2017 |
| | | In millions of won | | |
| Noeul Green Energy Co., Ltd. . . . . . . . . . . . . . | Electricity sales | ₩ 45 | 177 | 32 |
| Samcheok Eco Materials Co., Ltd. . . . . . . . . . | Electricity sales | — | 64 | 237 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | Electricity sales | 1,753 | 1,785 | 1,987 |
| Busan Green Energy Co., Ltd. . . . . . . . . . . . . . | Service | 1 | 133 | 120 |
| Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) . . . . . . . . . . . . . . . . | Electricity sales | — | 6 | — |
| Korea Electric Vehicle Charging Service . . . . . | Electricity sales | 2 | 89 | 700 |
| Ulleungdo Natural Energy Co., Ltd. . . . . . . . . | Service | 229 | 691 | 1,013 |
| Tamra Offshore Wind Power Co., Ltd. . . . . . . . | Service | — | 12 | 55 |
| Daegu clean Energy Co., Ltd. . . . . . . . . . . . . . | Electricity sales | — | — | 421 |
| Cheongna Energy Co., Ltd. . . . . . . . . . . . . . . . | Service | 21,081 | 6,831 | 7,980 |
| Gangwon Wind Power Co., Ltd. . . . . . . . . . . . | Electricity sales | 1,046 | 1,273 | 994 |
| Hyundai Green Power Co., Ltd. . . . . . . . . . . . | Design service | 15,401 | 14,835 | 14,280 |
| Korea Power Exchange . . . . . . . . . . . . . . . . . | Service | 4,272 | 7,141 | 8,446 |
| Hyundai Energy Co., Ltd. . . . . . . . . . . . . . . . . | Service | 25,402 | 24,719 | 15,627 |
| Taebaek Wind Power Co., Ltd. . . . . . . . . . . . . | Service | 872 | 796 | 813 |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . . . | Design service | 72 | 497 | 1,176 |
| Daeryun Power Co., Ltd. . . . . . . . . . . . . . . . . | Electricity sales | 1,731 | 1,516 | 1,796 |
| Changjuk Wind Power Co., Ltd. . . . . . . . . . . . | Electricity sales | 754 | 863 | 788 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . . . . . | Electricity sales | 17 | 17 | 17 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | Service | 7,278 | 5,994 | 12,852 |
| Busan Solar Co., Ltd. . . . . . . . . . . . . . . . . . . | Electricity sales | 16 | 8 | — |
| Green Biomass Co., Ltd. . . . . . . . . . . . . . . . . | Electricity sales | 51 | 2 | — |
| SPC Power Corporation . . . . . . . . . . . . . . . . . | Dividend income | 1,433 | 8,346 | 5,562 |
| Gemeng International Energy Co., Ltd. . . . . . . . | Dividend income | 37,163 | 16,476 | 13,365 |
| PT. Cirebon Electric Power . . . . . . . . . . . . . . . | Dividend income | — | — | 550 |
| Dolphin Property Limited . . . . . . . . . . . . . . . . | Dividend income | — | 35 | — |
| PT. Bayan Resources TBK . . . . . . . . . . . . . . . | Service | 164 | 160 | 717 |
| Nepal Water & Energy Development Company Private Limited . . . . . . . . . . . . . . . . . . . . . | Service | — | 375 | 900 |
| Pioneer Gas Power Limited . . . . . . . . . . . . . . . | Service | 274 | 164 | 62 |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . . . . . | Service | 584 | 773 | 661 |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . . . . . . . . | Service | — | — | 47 |
| **\<Joint ventures\>** | | | | |
| Daegu Green Power Co., Ltd. . . . . . . . . . . . . . | Electricity sales | — | 768 | 1,131 |
| KEPCO SPC Power Corporation . . . . . . . . . . . | Service | 29,572 | 10,344 | 45,005 |
| Daejung Offshore Wind Power Co., Ltd. . . . . . | Electricity sales | 1 | 1 | 1 |
| KAPES, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . | Commission | 1,315 | 1,176 | 1,420 |
| Dangjin Eco Power Co., Ltd. . . . . . . . . . . . . . . | Technical fee | 334 | 1,787 | 670 |
| Honam Wind Power Co., Ltd. . . . . . . . . . . . . . | Electricity sales | 65 | 169 | 552 |
| Seokmun Energy Co., Ltd. . . . . . . . . . . . . . . . | Service | 2,395 | 1,627 | 1,765 |
| Incheon New Power Co., Ltd. . . . . . . . . . . . . . | Construction revenue | 388 | 524 | 539 |
| Chun-cheon Energy Co., Ltd. . . . . . . . . . . . . . | Electricity sales | 2,201 | 3,079 | 4,855 |
| Yeonggwangbaeksu Wind Power Co., Ltd. . . . . | Electricity sales | 927 | 1,591 | 1,654 |
| KW Nuclear Components Co., Ltd. . . . . . . . . . . | Service | 1,948 | 3,327 | 644 |
| KEPCO-Uhde Inc. . . . . . . . . . . . . . . . . . . . . . | Service | — | 6 | 34 |
| GS Donghae Electric Power Co., Ltd. . . . . . . . | Electricity sales | 5,614 | 12,994 | 11,204 |
| Busan Shinho Solar Power Co., Ltd. . . . . . . . . | Electricity sales | 24 | 210 | 87 |
| Datang Chifeng Renewable Power Co., Ltd. . . . | Interest income | 9,702 | 8,216 | 500 |
| Rabigh Electricity Company . . . . . . . . . . . . . . | Dividend income | 565 | 699 | 19,179 |
| Rabigh Operation & Maintenance Company Limited . . . . . . . . . . . . . . . . . . . . . . . . . . . | Dividend income | 1,780 | 2,395 | 2,784 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

| Company name | Transaction type | Sales and others | | |
| --- | --- | --- | --- | --- |
| | | 2015 | 2016 | 2017 |
| | | In millions of won | | |
| Datang Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Dividend income | ₩ — | — | 839 |
| Shuweihat Asia Power Investment B.V. . . . . . . | Dividend income | — | 2,957 | 1,707 |
| Shuweihat Asia Operation & Maintenance Company . . . . . . . . . . . . . . . . . . . . . . . . | Electricity sales | 1,006 | 1,179 | 1,319 |
| ASM-BG Investicii AD . . . . . . . . . . . . . . . . . . | Service | — | 322 | 1,062 |
| Jamaica Public Service Company Limited . . . . | Service | 3,077 | 1,905 | — |
| KV Holdings, Inc. . . . . . . . . . . . . . . . . . . . . . . | Dividend income | — | 302 | — |
| Datang KEPCO Chaoyang Renewable Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Dividend income | — | 440 | — |
| Amman Asia Electric Power Company . . . . . . . | Service | 48,968 | 21,915 | 14,205 |
| Kelar S.A . . . . . . . . . . . . . . . . . . . . . . . . . . . | Service | 6,229 | 1,702 | 570 |
| Nghi Son 2 Power Ltd. . . . . . . . . . . . . . . . . . . | Electricity sales | — | — | 2,693 |
| Barakah One Company . . . . . . . . . . . . . . . . . . | Electricity sales | — | 25,244 | 7,059 |
| Nawah Energy Company . . . . . . . . . . . . . . . . . | Service | — | — | 34,421 |
| **\<Others\>** | | | | |
| Yeongwol Energy Station Co., Ltd. . . . . . . . . . . | Service | 814 | 858 | 830 |
| DS POWER Co., Ltd. . . . . . . . . . . . . . . . . . . . | Service | 106,183 | 35,133 | 5,819 |
| Korea Development Bank . . . . . . . . . . . . . . . . | Electricity sales | 4,039 | 3,102 | 3,239 |
| | Interest income | 2,402 | 3,164 | 1,685 |

**\<Purchase and Others\>**

| Company name | Transaction type | Purchase and others | | |
| --- | --- | --- | --- | --- |
| | | 2015 | 2016 | 2017 |
| | | In millions of won | | |
| **\<Associates\>** | | | | |
| Dongducheon Dream Power Co., Ltd. . . . . . . . | Electricity purchase | ₩ 1,003,346 | 946,463 | 813,440 |
| Korea Gas Corporation . . . . . . . . . . . . . . . . . . . | Purchase of power generation fuel | 4,598,763 | 3,633,198 | 3,245,519 |
| Daegu Photovoltaic Co., Ltd. . . . . . . . . . . . . . . | REC purchase | 3,978 | 3,243 | 3,646 |
| Korea Power Engineering Service Co., Ltd. . . . | Service | 3,241 | 723 | 1,292 |
| KS Solar Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | REC purchase | 6,211 | 4,080 | 900 |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Rental fee and others | 479 | 410 | 570 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | Electricity metering service fee | 273,057 | 250,057 | 289,293 |
| Noeul Green Energy Co., Ltd. . . . . . . . . . . . . . | Service | — | — | 15,862 |
| Samcheok Eco Materials Co., Ltd. . . . . . . . . . . | Electricity purchase | — | — | 14 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | Advertisement fee | 440 | 554 | 731 |
| Busan Green Energy Co., Ltd. . . . . . . . . . . . . . | Service | — | — | 12,189 |
| Korea Electric Vehicle Charging Service . . . . . . | Service | — | — | 1,093 |
| Ulleungdo Natural Energy Co., Ltd. . . . . . . . . . | Electricity purchase | — | 60 | 119 |
| Tamra Offshore Wind Power Co., Ltd. . . . . . . . | Electricity purchase | — | — | 2,105 |
| Cheongna Energy Co., Ltd. . . . . . . . . . . . . . . . | Service | — | 73 | 59 |
| Gangwon Wind Power Co., Ltd. . . . . . . . . . . . | Electricity purchase | 21,946 | 22,780 | 25,968 |
| Hyundai Green Power Co., Ltd. . . . . . . . . . . . . | Electricity purchase | 486,443 | 469,547 | 458,378 |
| Korea Power Exchange . . . . . . . . . . . . . . . . . . | Trading Fees | 79,283 | 91,433 | 207,855 |
| Hyundai Energy Co., Ltd. . . . . . . . . . . . . . . . . | Electricity purchase | 1,684 | 1,313 | 87,607 |
| Taebaek Wind Power Co., Ltd. . . . . . . . . . . . . | REC purchase | 6,626 | 5,741 | 6,534 |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . . . | Service | — | 1,594 | 4,033 |
| Daeryun Power Co., Ltd. . . . . . . . . . . . . . . . . . | Electricity purchase | 274,379 | 244,023 | 146,189 |
| Changjuk Wind Power Co., Ltd. . . . . . . . . . . . | Electricity purchase | 6,472 | 5,786 | 6,981 |

F-162

| Company name | Transaction type | | Purchase and others | | |
| --- | --- | --- | --- | --- | --- |
| | | | 2015 | 2016 | 2017 |
| | | | In millions of won | | |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | Electricity purchase | ₩ | 4,598 | 4,006 | 3,947 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Electricity purchase | | 614,658 | 437,206 | 457,329 |
| Busan Solar Co., Ltd. . . . . . . . . . . . . . . . . . . | Electricity purchase | | 4,055 | 1,079 | — |
| Green Biomass Co., Ltd. . . . . . . . . . . . . . . . | Woodchip purchase | | 3,782 | 2,232 | 1,345 |
| Nepal Water & Energy Development Company Private Limited . . . . . . . . . . . . . . . . . . . . . . | Service | | — | — | 72 |
| <Joint ventures> | | | | | |
| Daegu Green Power Co., Ltd. . . . . . . . . . . . . . . | Electricity purchase | | 318,221 | 263,797 | 252,024 |
| KAPES, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . | Service | | 47,130 | 140,555 | 164,165 |
| Honam Wind Power Co., Ltd. . . . . . . . . . . . . | Electricity purchase | | 5,944 | 6,776 | 5,962 |
| Seokmun Energy Co., Ltd. . . . . . . . . . . . . . . . | REC purchase | | — | — | 21,674 |
| Chun-cheon Energy Co., Ltd. . . . . . . . . . . . . . | REC purchase | | — | — | 194,136 |
| Yeonggwangbaeksu Wind Power Co., Ltd. . . . . | Electricity purchase | | 4,974 | 11,208 | 11,124 |
| GS Donghae Electric Power Co., Ltd. . . . . . . . | Electricity purchase | | — | 903 | 351,367 |
| Busan Shinho Solar Power Co., Ltd. . . . . . . . . | REC purchase | | 7,565 | 6,770 | 7,984 |
| Global Trade Of Power System Co., Ltd. . . . . . | Service | | 192 | 882 | 414 |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Electricity purchase | | 3,451 | 2,942 | 2,941 |
| Jamaica Public Service Company Limited . . . . . | Service | | 106 | 127 | 154 |
| Amman Asia Electric Power Company . . . . . . | Service | | 125 | — | — |
| Barakah One Company . . . . . . . . . . . . . . . . . . | Service | | — | — | 2,631 |
| <Others> | | | | | |
| Yeongwol Energy Station Co., Ltd. | REC purchase | | 16,408 | 14,875 | 14,256 |
| Korea Development Bank . . . . . . . . . . . . . . . | Interest expense | | 21,719 | 8,231 | 4,573 |
| | Dividend paid | | 96,087 | 654,829 | 418,407 |

**(4)  Receivables and payables arising from related party transactions as of December 31, 2016 and 2017 are as follows:**

| Company name | Type | | Receivables | | Payables | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | 2016 | 2017 | 2016 | 2017 |
| | | | In millions of won | | | |
| <Associates> | | | | | | |
| Dongducheon Dream Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | Trade receivables | ₩ | 1,073 | 2,230 | — | — |
| | Non-trade receivables and others | | — | 655 | — | — |
| | Trade payables | | — | — | 93,493 | 77,817 |
| Korea Gas Corporation . . . . . . . . . . | Trade receivables | | 8,739 | 9,833 | — | — |
| | Non-trade receivables and others | | 78 | 339 | — | — |
| | Trade payables | | — | — | 399,563 | 524,881 |
| | Non-trade payables and others | | — | — | 9,090 | 569 |
| Daegu Photovoltaic Co., Ltd. . . . . . | Trade payables | | — | — | 56 | 71 |
| Jeongam Wind Power Co., Ltd. . . . | Non-trade payables and others | | — | — | 4 | 4 |
| KS Solar Co., Ltd. . . . . . . . . . . . . | Trade receivables | | 2 | — | — | — |
| | Trade payables | | — | — | 53 | — |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . | Trade receivables | | 362 | 333 | — | — |
| | Non-trade receivables and others | | 47 | 42 | — | — |
| | Non-trade payables and others | | — | — | 18,628 | 18,006 |
| Goseong Green Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Non-trade receivables and others | | — | 19 | — | — |
| | Non-trade payables and others | | — | — | 3,900 | 7,140 |

F-163

| Company name | Type | | Receivables | | Payables | |
|---|---|---|---|---|---|---|
| | | | 2016 | 2017 | 2016 | 2017 |
| | | | In millions of won | | | |
| Gangneung Eco Power Co., Ltd. . . . | Trade receivables | ₩ | 1 | 1 | — | — |
| | Non-trade receivables and others | | 2,137 | 4,747 | — | — |
| Shin Pyeongtaek Power Co., Ltd. . . . | Non-trade receivables and others | | 215 | 210 | — | — |
| | Non-trade payables and others | | — | — | — | 52 |
| Naepo Green Energy Co., Ltd. . . . | Trade receivables | | 14 | 17 | — | — |
| Noeul Green Energy Co., Ltd. . . . . . | Trade receivables | | 18 | 3 | — | — |
| | Non-trade payables and others | | — | — | — | 2,041 |
| Samcheok Eco Materials Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | Trade receivables | | 21 | 20 | — | — |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . | Trade receivables | | 165 | 98 | — | — |
| | Non-trade payables and others | | — | — | 132 | 209 |
| Busan Green Energy Co., Ltd. . . . . . | Trade receivables | | 9 | 7 | — | — |
| | Non-trade receivables and others | | — | 1,691 | — | — |
| Korea Electric Vehicle Charging Service . . . . . . . . . . . . . . . . . . . . . | Trade receivables | | 12 | 23 | — | — |
| | Trade payables | | — | — | — | 45 |
| Ulleungdo Natural Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | Non-trade receivables and others | | 111 | — | — | — |
| Cheongna Energy Co., Ltd. . . . . . . . | Trade receivables | | 165 | 182 | — | — |
| . . . . . . . . . . . . . . . . . . . . . . . . . . | Non-trade payables and others | | — | — | 82 | 1 |
| Gangwon Wind Power Co., Ltd. . . . | Trade receivables | | 8 | 6 | — | — |
| | Trade payables | | — | — | 2,031 | 3,033 |
| Hyundai Green Power Co., Ltd. . . . . | Trade receivables | | 569 | 946 | — | — |
| | Trade payables | | — | — | 31,507 | 32,589 |
| Korea Power Exchange . . . . . . . . . . | Trade receivables | | 1,066 | 463 | — | — |
| | Non-trade receivables and others | | 53 | 128 | — | — |
| | Non-trade payables and others | | — | — | 1,235 | 1,142 |
| Hyundai Energy Co., Ltd. . . . . . . . . | Trade receivables | | 72 | 49 | — | — |
| | Non-trade receivables and others | | 68,798 | 6,598 | — | — |
| | Trade payables | | — | — | 86 | 223 |
| | Non-trade payables and others | | — | — | — | 13,796 |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . | Non-trade receivables and others | | 210 | 210 | — | — |
| Taebaek Wind Power Co., Ltd. . . . . | Trade receivables | | — | 116 | — | — |
| | Non-trade receivables and others | | 112 | — | — | — |
| | Trade payables | | — | — | 386 | 533 |
| | Non-trade payables and others | | — | — | 304 | 121 |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | Trade receivables | | 4 | 3 | — | — |
| | Non-trade payables and others | | — | — | 255 | 163 |
| Daeryun Power Co., Ltd. . . . . . . . . | Trade receivables | | 140 | 162 | — | — |
| | Trade payables | | — | — | 21,646 | 15,706 |
| Changjuk Wind Power Co., Ltd. . . . | Trade receivables | | 100 | 101 | — | — |
| | Trade payables | | — | — | 358 | 515 |
| | Non-trade payables and others | | — | — | 334 | 546 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . | Trade receivables | | 1 | 1 | — | — |
| | Non-trade payables and others | | — | — | 204 | 193 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . | Trade receivables | | 142 | 117 | — | — |
| | Non-trade receivables and others | | 393 | 5,183 | — | — |
| | Trade payables | | — | — | 51,844 | 25,061 |

F-164

| Company name | Type | Receivables 2016 | Receivables 2017 | Payables 2016 | Payables 2017 |
|---|---|---|---|---|---|
| | | In millions of won | | | |
| Green Biomass Co., Ltd. | Non-trade payables and others ₩ | — | — | 113 | 85 |
| SPC Power Corporation | Non-trade receivables and others | — | 76 | — | — |
| Nepal Water & Energy Development Company Private Limited | Non-trade receivables and others | 889 | 227 | — | — |
| Pioneer Gas Power Limited | Non-trade receivables and others | 82 | — | — | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | Non-trade receivables and others | 58 | 53 | — | — |
| **\<Joint ventures\>** | | | | | |
| Daegu Green Power Co., Ltd. | Trade receivables | 52 | 98 | — | — |
| | Non-trade receivables and others | 1 | 10 | — | — |
| | Trade payables | — | — | 27,400 | 25,257 |
| KEPCO SPC Power Corporation | Non-trade receivables and others | 2,349 | — | — | — |
| KAPES, Inc. | Non-trade receivables and others | 235 | — | — | — |
| | Trade payables | — | — | — | 55 |
| | Non-trade payables and others | — | — | 11,992 | — |
| Dangjin Eco Power Co., Ltd. | Non-trade receivables and others | 833 | 1,211 | — | — |
| | Non-trade payables and others | — | — | — | 41 |
| Honam Wind Power Co., Ltd. | Trade payables | — | — | 424 | 381 |
| | Non-trade payables and others | — | — | 3,082 | 3,013 |
| Seokmun Energy Co., Ltd. | Trade receivables | 114 | 93 | — | — |
| | Non-trade receivables and others | 160 | 276 | — | — |
| | Non-trade payables and others | — | — | — | 3,052 |
| Incheon New Power Co., Ltd. | Trade receivables | 128 | 128 | — | — |
| Chun-cheon Energy Co., Ltd. | Trade receivables | — | 129 | — | — |
| | Non-trade receivables and others | 255 | 252 | — | — |
| | Trade payables | — | — | — | 29,676 |
| Yeonggwangbaeksu Wind Power Co., Ltd. | Trade receivables | 6 | 7 | — | — |
| | Non-trade receivables and others | 145 | 144 | — | — |
| | Trade payables | — | — | 761 | 619 |
| | Non-trade payables and others | — | — | 1,362 | 1,300 |
| KW Nuclear Components Co., Ltd. | Trade receivables | — | 4 | — | — |
| KEPCO-Uhde Inc. | Non-trade payables and others | — | — | 4 | 4 |
| GS Donghae Electric Power Co., Ltd. | Trade receivables | 775 | 450 | — | — |
| | Non-trade receivables and others | 1,497 | 1,892 | — | — |
| | Trade payables | — | — | — | 73,570 |
| | Non-trade payables and others | — | — | 993 | — |
| Busan Shinho Solar Power Co., Ltd. | Trade receivables | 3 | 2 | — | — |
| | Trade payables | — | — | 129 | 159 |
| | Non-trade payables and others | — | — | 670 | 811 |
| Datang Chifeng Renewable Power Co., Ltd. | Non-trade receivables and others | 210 | 82 | — | — |
| Rabigh Operation & Maintenance Company Limited | Trade receivables | 2,275 | — | — | — |
| | Non-trade receivables and others | — | 869 | — | — |
| ASM-BG Investicii AD | Non-trade receivables and others | 64 | 37 | — | — |

F-165

| Company name | Type | Receivables | | Payables | |
|---|---|---|---|---|---|
| | | 2016 | 2017 | 2016 | 2017 |
| | | In millions of won | | | |
| Jamaica Public Service Company Limited . . . . . . . . . . . . . . . . . . . | Trade receivables | 615 | — | — | — |
| Amman Asia Electric Power Company . . . . . . . . . . . . . . . . . . | Trade receivables | 2,509 | 2,675 | — | — |
| Nawah Energy Company . . . . . . . | Trade receivables | — | 10,419 | — | — |
| **<Others>** | | | | | |
| Yeongwol Energy Station Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | Trade receivables | 7,064 | 7,068 | — | — |
| | Trade payables | — | — | 229 | — |
| DS POWER Co., Ltd. . . . . . . . . . . | Trade receivables | 1,775 | 340 | — | — |
| Korea Development Bank . . . . . . | Accrued interest income | 672 | 204 | — | — |
| | Non-trade receivables and others | 217,481 | 501,029 | — | — |
| | Non-trade payables and others | — | — | 408 | 200 |
| | Derivatives | 25,306 | 569 | 3,278 | 22,398 |

**(5)  Loans and others arising from related party transactions as of December 31, 2016 and 2017 are as follows:**

| Type | Company name | Beginning balance | Loans | Collection | Others | Ending balance |
|---|---|---|---|---|---|---|
| | | In millions of won | | | | |
| Associates . . . . . . . . | KNOC Nigerian East Oil Co., Ltd., KNOC Nigerian West Oil Co., Ltd. | ₩ 29,282 | 169 | — | (3,110) | 26,341 |
| | (Allowance for doubtful accounts) | (18,191) | — | — | 1,640 | (16,551) |
| Associates . . . . . . . . | PT. Cirebon Electric Power | 26,733 | 2,199 | (7,876) | (5,620) | 15,436 |
| Associates . . . . . . . . | Xe-Pian Xe-Namnoy Power Co., Ltd. | 1,413 | — | — | — | 1,413 |
| Associates . . . . . . . . | PT Wampu Electric Power | 14,022 | 905 | — | (1,639) | 13,288 |
| Associates . . . . . . . . | Gunsan Bio Energy Co., Ltd. (formerly, Jungbu Bio Energy Co., Ltd.) | 9,396 | — | — | — | 9,396 |
| Associates . . . . . . . . | Hyundai Energy Co., Ltd. | 2,465 | — | — | — | 2,465 |
| | (Allowance for doubtful accounts) | — | — | — | (2,465) | (2,465) |
| Joint ventures . . . . . . . | KEPCO SPC Power Corporation | 27,795 | — | (7,803) | (2,743) | 17,249 |
| Joint ventures . . . . . . . | Datang Chifeng Renewable Power Co., Ltd. | 16,344 | — | (7,647) | (1,452) | 7,245 |
| Joint ventures . . . . . . . | Rabigh Electricity Company | 2,641 | — | (2,496) | (145) | — |
| Joint ventures . . . . . . . | KODE NOVUS II LLC | 4,532 | — | — | (514) | 4,018 |
| | (Allowance for doubtful accounts) | (4,532) | — | — | 514 | (4,018) |
| Joint ventures . . . . . . . | Kelar S.A | — | 54,631 | (3,568) | (4,443) | 46,620 |
| Joint ventures . . . . . . . | Daehan Wind Power PSC | 683 | 640 | — | (112) | 1,211 |
| Joint ventures . . . . . . . | Chester Solar IV SpA | — | 4,802 | — | (195) | 4,607 |
| | | ₩ 112,583 | 63,346 | (29,390) | (20,284) | 126,255 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

**(6)  Borrowings arising from related party transactions as of December 31, 2016 and 2017 are as follows:**

| Related parties | Type | | Beginning balance | Borrowings | Repayment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | In millions of won | | | | |
| Korea Development . . . . . . . . . . . | Facility | ₩ | 207,993 | 27,324 | (141,434) | — | 93,883 |
| Bank . . . . . . . . . . . . . . . . . . . . . . | Others | | 5,663 | — | (754) | — | 4,909 |
| | Operating funds | | 37,000 | 49,000 | (25,000) | — | 61,000 |
| | Syndicated Loan | | 6,075 | 11,855 | — | (1,629) | 16,301 |

**(7)  Guarantees provided to associates or joint ventures as of December 31, 2017 are as follows:**

| Primary guarantor | Principal obligor | Type of guarantees | Credit limit | Guarantee |
|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | |
| Korea Electric Power Corporation . . . . . . . | Shuweihat Asia Operation & Maintenance Company | Performance guarantees | USD 11,000 | SAPCO |
| Korea Electric Power Corporation . . . . . . . | KNOC Nigerian East Oil Co., Ltd. and KNOC Nigerian West Oil Co., Ltd. | Performance guarantees | USD 34,650 | Korea National Oil Corporation (Nigerian government) |
| Korea Electric Power Corporation . . . . . . | Rabigh Operation & Maintenance Company Limited | Performance guarantees and others | USD 1,387 | RABEC |
| Korea Electric Power Corporation . . . . . . . | Nghi Son 2 Power Ltd. | Bidding guarantees | USD 10,000 | SMBC Ho Chi Minh |
| Korea Electric Power Corporation . . . . . . . | Barakah One Company | Debt guarantees | USD 900,000 | Export-Import Bank of Korea and others |
| | | Performance guarantees and others | USD 3,404,275 | |
| Korea Western Power Co., Ltd. . . . . . . . . | Cheongna Energy Co., Ltd. | Collateralized money invested | KRW 27,211 | KEB Hana Bank and others |
| | | Guarantees for supplemental funding and others (*1) | — | |
| Korea Western Power Co., Ltd. . . . . . . . . | Xe-Pian Xe-Namnoy Power Co., Ltd. | Payment guarantees for business reserve | USD 2,500 | Krung Thai Bank |
| | | Collateralized money invested | USD 62,253 | Krung Thai Bank |
| | | Impounding bonus guarantees | USD 5,000 | SK E&C |
| Korea Western Power Co., Ltd. . . . . . . . . | Rabigh Operation & Maintenance Company Limited | Performance guarantees and others | SAR 5,600 | Saudi Arabia British Bank |
| Korea Western Power Co., Ltd. . . . . . . . . | Daegu Photovoltaic Co., Ltd. | Collateralized money invested | KRW 1,230 | Korea Development Bank |
| Korea Western Power Co., Ltd. . . . . . . . . | Dongducheon Dream Power Co., Ltd. | Collateralized money invested | KRW 53,233 | Kookmin Bank and others |

F-167

| Primary guarantor | Principal obligor | Type of guarantees | Credit limit | Guarantee |
|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | |
| Korea Western Power Co., Ltd. . . . . . . . . | PT. Mutiara Jawa | Collateralized money invested | USD 2,610 | Woori Bank |
| Korea Western Power Co., Ltd. . . . . . . . . | Heang Bok Do Si Photovoltaic Power Co., Ltd. | Collateralized money invested | KRW 194 | Nonghyup Bank |
| Korea Western Power Co., Ltd. . . . . . . . . | Shin Pyeongtaek Power Co., Ltd. | Collateralized money invested | KRW 43,920 | Kookmin Bank |
| Korea East-West Power Co., Ltd. . . . . | Busan Shinho Solar Power Co., Ltd. | Collateralized money invested | KRW 2,100 | Korea Development Bank and others |
| Korea East-West Power Co., Ltd. . . . . | Seokmun Energy Co., Ltd. | Collateralized money invested | KRW 15,370 | Kookmin Bank and others |
| Korea East-West Power Co., Ltd. . . . . | Chun-cheon Energy Co., Ltd. | Collateralized money invested | KRW 52,700 | Kookmin Bank and others |
| | | Guarantees for supplemental funding(*1) | KRW 60,270 | Kookmin Bank and others |
| Korea East-West Power Co., Ltd. . . . . | Honam Wind Power Co., Ltd. | Collateralized money invested | KRW 3,480 | Shinhan Bank and others |
| Korea East-West Power Co., Ltd. . . . . | GS Donghae Electric Power Co., Ltd. | Collateralized money invested | KRW 204,000 | Korea Development Bank and others |
| Korea East-West Power Co., Ltd. . . . . | Yeonggwangbaeksu Wind Power Co., Ltd. | Collateralized money invested | KRW 3,000 | Kookmin Bank and others |
| Korea East-West Power Co., Ltd. . . . . | Yeonggwang Wind Power Co., Ltd. | Collateralized money invested | KRW 15,375 | KEB Hana Bank and others |
| Korea East-West Power Co., Ltd. . . . . | PT. Tanjung Power Indonesia | Debt guarantees | USD 46,983 | The Bank of Tokyo-Mitsubishi and others |
| | | Other guarantees | USD 3,150 | PT Adaro Indonesia |
| EWP Barbados 1 SRL . . . . . . . . . . . . | South Jamaica Power Company Limited | Performance guarantees | USD 14,400 | Societe Generale |
| | | Guarantees for supplemental funding and others(*1, 3) | USD 60,000 | JCSD Trustee Services Limited and others |
| Korea Southern Power Co., Ltd. . . . . . . . . | KNH Solar Co., Ltd. | Collateralized money invested | KRW 1,296 | Shinhan Bank and Kyobo Life Insurance Co., Ltd. |
| | | Performance guarantees and guarantees for supplemental funding and others(*1) | — | |
| Korea Southern Power Co., Ltd. . . . . . . . . | Daeryun Power Co., Ltd. | Collateralized money invested | KRW 25,477 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others(*1) | — | |

F-168

| Primary guarantor | Principal obligor | Type of guarantees | Credit limit | Guarantee |
|---|---|---|---|---|
| **In millions of won and thousands of foreign currencies** | | | | |
| Korea Southern Power Co., Ltd. . . . . . . . . | Changjuk Wind Power Co., Ltd. | Collateralized money invested | KRW 3,801 | Shinhan Bank |
| | | Guarantees for supplemental funding(*1) | — | |
| Korea Southern Power Co., Ltd. . . . . . . . . | Daegu Green Power Co., Ltd. | Collateralized money invested | KRW 46,226 | Shinhan Bank |
| Korea Southern Power Co., Ltd. . . . . . . . . | Kelar S.A | Performance guarantees | USD 63,707 | KEB Hana Bank, SMBC, Mizuho Bank and others |
| Korea Southern Power Co., Ltd. . . . . . . . . | DS POWER Co., Ltd. | Collateralized money invested | KRW 2,900 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others(*1) | — | |
| Korea Southern Power Co., Ltd. . . . . . . . . | Pyeongchang Wind Power Co., Ltd. | Collateralized money invested | KRW 3,875 | Woori Bank and Shinhan Bank |
| | | Performance guarantees and guarantees for supplemental funding and others(*1) | — | |
| Korea Southern Power Co., Ltd. . . . . . . . . | Taebaek Wind Power Co., Ltd. | Guarantees for supplemental funding and others(*1) | — | Shinhan Bank |
| Korea Southern Power Co., Ltd. . . . . . . . . | Jeongam Wind Power Co., Ltd | Collateralized money invested | KRW 5,580 | SK Securities Co., Ltd. |
| | | Guarantees for supplemental funding and others (*1) | — | |
| Korea Southern Power Co., Ltd. . . . . . . . . | Naepo Green Energy Co., Ltd. | | KRW 29,200 | Hana Financial Investment Co., Ltd. and others |
| | | Guarantees for supplemental funding and others (*1) | — | |
| KEPCO Engineering & Construction Company, Inc. . . . . . | DS POWER Co., Ltd. | Collateralized money invested | KRW 15,000 | Korea Development Bank and others |
| Korea Midland Power Co., Ltd. . . . . . . . . | Hyundai Green Power Co., Ltd. | Collateralized money invested | KRW 87,003 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others (*1) | — | |
| Korea Midland Power Co., Ltd. . . . . . . . . | PT. Cirebon Electric Power | Debt guarantees | USD 11,550 | Mizuho Bank |
| Korea Midland Power Co., Ltd. . . . . . . . . | PT Wampu Electric Power | Debt guarantees | USD 5,068 | SMBC |
| Korea Midland Power Co., Ltd. . . . . . . . . | Gangwon Wind Power Co., Ltd. | Collateralized money invested | KRW 7,409 | IBK and others |
| Korea Midland Power Co., Ltd. . . . . . . . . | YaksuESS Co., Ltd | Collateralized money invested | KRW 210 | Hanwha Life Insurance Co., Ltd. |
| | | Guarantees for supplemental funding and others (*1) | — | |

F-169

| Primary guarantor | Principal obligor | Type of guarantees | Credit limit | Guarantee |
|---|---|---|---|---|
| | | **In millions of won and thousands of foreign currencies** | | |
| Korea South-East Power Co., Ltd. . . . . | Hyundai Energy Co., Ltd. | Collateralized money invested | KRW 47,067 | Korea Development Bank and others |
| | | Performance guarantees and guarantees for supplemental funding and others (*1) | KRW 78,600 | |
| Korea South-East Power Co., Ltd. . . . . | RES Technology AD | Collateralized money invested | KRW 15,595 | UniCredit Bulbank and others |
| Korea South-East Power Co., Ltd. . . . . | ASM-BG Investicii AD | Collateralized money invested | KRW 16,101 | UniCredit Bulbank and others |
| Korea South-East Power Co., Ltd. . . . . | Express Solar-light Power Generation Co., Ltd. | Guarantees for supplemental funding (*1, 2) | KRW 2,500 | Woori Bank |
| Korea South-East Power Co., Ltd. . . . . | S-Power Co., Ltd. | Collateralized money invested | KRW 132,300 | Korea Development Bank and others |
| KOSEP USA, INC. . . . | KODE NOVUS II LLC | Guarantees for supplemental funding and others (*1) | — | Korea Development Bank |
| KOSEP USA, INC. . . . | KODE NOVUS I LLC | Guarantees for supplemental funding and others (*1) | — | Export-Import Bank of Korea and others |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . . . . . . . | Yeongwol Energy Station Co., Ltd. | Collateralized money invested | KRW 1,400 | Meritz Fire & Marine Insurance Co., Ltd. |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . . . . . . . | Noeul Green Energy Co., Ltd., | Collateralized money invested | KRW 1,740 | KEB Hana Bank and others |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . . . . . . . | Busan Green Energy Co., Ltd. | Collateralized money invested | KRW 5,243 | Shinhan Bank and others |
| KEPCO Plant Service & Engineering Co., Ltd. . . . . . . . . . . . . | Incheon New Power Co., Ltd. | Collateralized money invested | KRW 8,160 | Shinhan Bank |
| | | Guarantees for supplemental funding and others (*1) | — | |

(*1) The Company guarantees to provide supplemental funding for business with respect to excessive business expenses or insufficient repayment of borrowings.

(*2) The Company has granted the right to Hana Financial Investment Co., Ltd., as an agent for the creditors to Express Solar-light Power Generation Co., Ltd. ("ESPG"), to the effect that in the event of acceleration of ESPG's payment obligations under certain borrowings to such creditors, Hana Financial may demand the Company to dispose of shares in ESPG held by the Company and apply the resulting proceeds to repayment of ESPG's obligations.

(*3) This includes a guarantee for the shareholder's capital payment in connection with the business of 190MW gas complex thermal power plant in Jamaica. EWP (Barbados) 1 SRL's capital contribution amount is

F-170

USD 6,400 thousand and the total amount of guarantees is USD 27,000 thousand which consists of USD 12,000 thousand of EWP (Barbados) 1 SRL's contribution obligation and USD 15,000 thousand of SJEH's portion (50%) of contribution obligation.

**(8)  As of December 31, 2017, there is no financial guarantee contract provided by related parties.**

**(9)  Derivatives transactions with related parties as of December 31, 2017 are as follows:**

    (i)  Currency Swap

In millions of won and thousands of U.S. dollars

| Counterparty | Contract year | Contract Amount Pay | Contract Amount Receive | Contract interest rate per annum Pay (%) | Contract interest rate per annum Receive (%) | Contract exchange rate |
|---|---|---|---|---|---|---|
| Korea Development Bank . . . . . . . . . . . . . . . . | 2016~2019 ₩ | 105,260 | USD 100,000 | 2.48% | 2.38% ₩ | 1,052.60 |
| | 2015~2025 | 111,190 | USD 100,000 | 2.62% | 3.25% | 1,111.90 |
| | 2017~2027 | 111,610 | USD 100,000 | 2.31% | 3.13% | 1,116.10 |
| | 2017~2020 | 114,580 | USD 100,000 | 1.75% | 2.38% | 1,145.80 |
| | 2016~2021 | 121,000 | USD 100,000 | 2.15% | 2.50% | 1,210.00 |
| | 2017~2022 | 113,300 | USD 100,000 | 1.94% | 2.63% | 1,133.00 |

    (ii)  Currency forward

In millions of won and thousands of foreign currencies

| Counterparty | Contract Date | Maturity date | Contract amounts Pay | Contract amounts Receive | Contract exchange rate |
|---|---|---|---|---|---|
| Korea Development Bank . . . . . . . . . | 2017.12.27 | 2021.07.12 ₩ | 104,849 | USD 100,000 ₩ | 1,048.49 |
| | 2017.12.14 | 2018.01.10 | 11,950 | USD 11,000 | 1,086.35 |
| | 2017.12.20 | 2018.01.16 | 15,130 | USD 14,000 | 1,080.70 |
| | 2017.12.28 | 2018.01.31 | 11,782 | USD 11,000 | 1,071.10 |

**(10)  Salaries and other compensations to the key members of management of the Company for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| Type | 2015 | 2016 | 2017 |
|---|---|---|---|
| | In millions of won | | |
| Salaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 1,271 | 1,463 | 1,271 |
| Employee benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59 | 33 | 54 |
| ₩ | 1,330 | 1,496 | 1,325 |

**48.  Non-Cash Transactions**

**Significant non-cash investing and financing transactions for the years ended December 31, 2015, 2016 and 2017 are as follows:**

| Transactions | 2015 | 2016 | 2017 |
|---|---|---|---|
| | In millions of won | | |
| Transfer from construction-in-progress to other assets . . . . . . . ₩ | 10,491,054 | 19,971,599 | 13,676,233 |
| Recognition of asset retirement cost and related provision for decommissioning costs . . . . . . . . . . . . . . . . . . . . . . . . . . | 699,673 | 470,941 | 2,494,802 |
| Transfer from provision for disposal of spent nuclear fuel to accrued expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 491,755 | 283,675 | 342,861 |

F-171

**49. Commitments for Expenditure**

(1) The commitments for acquisition of property, plant and equipment as of December 31, 2016 and 2017 are as follows:

| Contracts | 2016 | | 2017 | |
|---|---|---|---|---|
| | Amounts | Balance | Amounts | Balance |
| | In millions of won | | | |
| Purchase of switch (25.8kV Eco) 11,395 . . . . . . . . . . . . ₩ | 40,226 | 28,072 | 40,226 | — |
| Purchase of switch (25.8kV Eco) 12,450 . . . . . . . . . . . . | — | — | 50,526 | 35,494 |
| Purchase of cable (PVC,1C,2000SQ) 153,000M and others (Shin-Bupyung-Youngseo) . . . . . . . . . . . . . . | 50,256 | 50,256 | 50,256 | 42,857 |
| Purchase of cable (PVC, 1C, 2500SQ) 103,374M and others (Bukdangjin-Shintangjung) . . . . . . . . . . . . . . | 42,500 | 42,500 | 42,500 | 29,987 |
| Purchase of GIS (362KV 6300A 63KA) 23CB – YoungseoS/S . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 34,500 | 34,500 |
| Purchase of GIS (362KV 6300A 63KA) 26CB – Shin-gosungS/S . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36,950 | 19,897 | 36,950 | — |
| Purchase of GIS (362KV 6300A 63KA) 26CB – HwasungS/S . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 40,000 | 29,231 |
| Purchase of GIS (362KV 6300A 63KA) 27CB – KwangyangS/S . . . . . . . . . . . . . . . . . . . . . . . . . . | 37,476 | 27,760 | 37,476 | 18,044 |
| Purchase of GIS (362KV 6300A 63KA) and 1 other 18CB – BukbusanS/S . . . . . . . . . . . . . . . . . . . . | 34,000 | 20,766 | 34,000 | — |
| Purchase of GIS (800KV 8000A 50KA) 10CB – Shin-JungbuS/S . . . . . . . . . . . . . . . . . . . . . . . . . . | 63,730 | 63,730 | 63,730 | 44,955 |
| Purchase of transformer (765/345/23kV 666.7MVA, 2TANK) 6 units – Shin-JungbuS/S . . . . . . . . . . . . | 37,500 | 37,500 | 37,500 | 37,500 |
| Purchase of cable (TR CNCE-W/AL,1C,400SQ) 4,500,000M . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71,986 | 50,593 | 71,986 | — |
| Purchase of Concrete Poles (10M, 350KGF) 104,755 and 6 others . . . . . . . . . . . . . . . . . . . . . . . . . | 129,175 | 105,905 | 129,175 | — |
| Purchase of cable (TR CNCE-W/AL,1C,400SQ) 4,645,000M . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 78,076 | 76,762 |
| Purchase of Concrete Poles (10M, 350KGF) 121,900 and 6 others . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 133,387 | 112,981 |
| Advanced E-Type low voltage electricity meter 1,600,000 units . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 65,408 | 64,592 |
| Purchase of Ground Switch (44-D-A125, 600AX4) and 1 other 4,016 units . . . . . . . . . . . . . . . . . . . . . . . | — | — | 56,482 | 55,990 |
| Construction of Shin-Kori units (#3,4) . . . . . . . . . . . . . . | 6,856,150 | — | 7,363,514 | 93,637 |
| Construction of Shin-Kori units (#5,6) . . . . . . . . . . | 8,625,387 | 7,286,503 | 8,625,387 | 6,757,146 |
| Construction of Shin-Hanwool units (#1,2) . . . . . . . . . . | 7,982,342 | 1,157,700 | 7,982,342 | 1,015,813 |
| Construction of Shin-Hanwool units (#3,4) . . . . . . . . . . | 8,261,818 | 8,170,896 | 8,261,818 | 8,097,056 |
| Construction of Yeosu thermal power units (#1) . . . . . . . | 174,291 | 1,139 | 174,291 | — |
| Other 27 contracts . . . . . . . . . . . . . . . . . . . . . . . . . . | 430,204 | 222,555 | 262,400 | 114,041 |
| Purchase of main machine for construction of Seoul Combined units (#1,2) . . . . . . . . . . . . . . . . . . . . | 360,500 | 300,663 | 361,203 | 99,031 |
| Construction of Seoul Combined units (#1,2) . . . . . . . . | 225,205 | 129,589 | 227,685 | 60,568 |
| Electricity construction of Shin-Boryeong units (#1,2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 354,740 | 26,878 | 379,115 | — |
| Purchase of smoke eliminating machine for construction of Shin-Boryeong units (#1,2) . . . . . . . . . . . . . . . . . | 121,093 | 2,023 | 169,544 | 36,417 |

| Contracts | 2016 | | 2017 | |
| --- | --- | --- | --- | --- |
| | Amounts | Balance | Amounts | Balance |
| | In millions of won | | | |
| Purchase of coal handling machine for construction of Shin-Boryeong units (#1,2) . . . . . . . . . . . . . . . . . . . . . . . | ₩ 146,353 | 3,543 | 146,353 | — |
| Service of designing Shin-Boryeong units (#1,2) . . . . . . . . | 126,038 | 24,333 | 127,810 | 16,371 |
| Purchase of main machine for construction of Shin-Boryeong units (#1,2) . . . . . . . . . . . . . . . . . . . . . . . . . | 851,132 | 10,746 | 866,065 | 4,981 |
| Construction of Shin-Boryeong units (#1,2) . . . . . . . . . . . . | 288,438 | 17,828 | 316,190 | 23,100 |
| Purchase of furnace for construction of Shin-Seocheon thermal power plant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 302,030 | 222,555 |
| Purchase of turbine generator for construction of Shin-Seocheon thermal power plant . . . . . . . . . . . . . . . . . . . . . | — | — | 104,402 | 83,522 |
| Electricity construction of Shin-Seocheon thermal power plant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 200,453 | 196,993 |
| Purchase of main machine for Jeju LNG combined . . . . . . | — | — | 166,287 | 15,409 |
| Purchase of coal handling machine for construction of Taean (#9,10) and IGCC units (conditional contract for installation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 192,945 | 38,218 | 193,375 | 5,129 |
| Purchase of furnace for construction of Taean units (#9,10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 584,148 | 46,059 | 566,945 | 33,817 |
| Service of designing Taean units (#9,10) . . . . . . . . . . . . . . | 109,700 | 18,981 | 111,322 | 13,671 |
| Purchase of desulfurization machine for construction of Taean units (#9,10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 92,086 | 1,017 | — | — |
| Purchase of turbine generator for construction of Taean units (#9,10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 228,794 | 6,788 | 205,267 | 550 |
| Purchase of combined generating machine for construction of Taean IGCC units . . . . . . . . . . . . . . . . . . . . . . . . . . . | 208,972 | 2,102 | 190,923 | — |
| Purchase of oxygen plant for construction of Taean IGCC units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 98,979 | 221 | 94,564 | 199 |
| Service of designing Taean IGCC plant units . . . . . . . . . . . | 44,802 | 3,342 | 44,802 | 2,669 |
| Purchase of gasification plant for construction of Taean IGCC units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 457,991 | — | 456,037 | — |
| Construction of Samcheok units (#1,2) . . . . . . . . . . . . . . . | 457,943 | 15,851 | 488,347 | — |
| Purchase of furnace for construction of Samcheok units (#1,2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,091,303 | 51,594 | 1,082,641 | 5,963 |
| Purchase of coal handling machine for construction of Samcheok units (#1,2) . . . . . . . . . . . . . . . . . . . . . . . . . | 303,273 | 155 | 304,924 | 52,362 |
| Service of designing Samcheok units (#1,2) . . . . . . . . . . . | 114,047 | 36,510 | 114,047 | 4,745 |
| Purchase of main equipment . . . . . . . . . . . . . . . . . . . . . . | 152,286 | 39,248 | 168,076 | — |
| Landscaping construction and other . . . . . . . . . . . . . . . . | — | — | 63,110 | — |
| Construction of yard for Andong natural gas power plant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41,961 | 2,600 | 41,961 | — |
| Purchase of turbine main equipment for Samcheok units (#1,2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 215,333 | 874 |
| Service of designing Dangjin units (#9,10) . . . . . . . . . . . | 122,426 | 6,125 | 122,426 | — |

(2) **As of December 31, 2017, details of contracts for inventory purchase commitment are as follows:**

The Company imports all of its uranium ore concentrates from sources outside Korea (including the United States, United Kingdom, Kazakhstan, France, Russia, South Africa, Canada and Australia) which are paid for with currencies other than Won, primarily in U.S. dollars. In order to ensure stable supply, the Company entered into long-term and medium-term contracts with various suppliers, and supplements such supplies

F-173

with purchases of fuels on spot markets. The long-term and medium-term contract periods vary among contractors and the stages of fuel manufacturing process. Contract prices for processing of uranium are generally based on market prices. Contract periods for ore concentrates, conversion, enrichment and design and fabrication are as follows:

| Type | Periods | Contracted amounts |
|------|---------|-------------------|
| Concentrate | 2017 ~ 2030 | 39,662 Ton U3O8 |
| Transformed | 2017 ~ 2030 | 22,934 Ton U |
| Enrichment | 2017 ~ 2029 | 25,530 Ton SWU |
| Molded | 2017 ~ 2022 | 2,004 Ton U |

**50. Contingencies and Commitments**

**(1) Ongoing litigations related with contingent liabilities and contingent assets as of December 31, 2016 and 2017 are as follows:**

| | 2016 | | 2017 | |
|---|---|---|---|---|
| | Number of cases | Claim amount | Number of cases | Claim amount |
| | | In millions of won | | |
| As the defendant | 675 | ₩636,433 | 565 | ₩477,719 |
| As the plaintiff | 193 | 489,605 | 185 | 690,934 |

As of December 31, 2017, among the litigations mentioned above, there are ongoing litigations of Korea Hydro & Nuclear Power Co., Ltd. ("KHNP"), a subsidiary of KEPCO, against KEPCO Engineering & Construction Company, Inc., a subsidiary of KEPCO, as a co-defendant (one case amounting to ₩62,744million).

A group of plaintiffs (consisting 2,167 individuals) filed a lawsuit against NSSC regarding NSSC's approval on May 18, 2015 of extending the operation of Wolsong Unit 1 nuclear power plant. The appeal was ongoing as of December 31, 2017. Also, Greenpeace and others filed an administrative litigation against NSSC requesting cancelation of the construction permit of Shin-Kori Unit 5 and 6 it was ongoing as of December 31, 2017. The Company joined these litigations as a stakeholder with the permission of the Court.

The book value of property, plant and equipment and provision for decommissioning costs of Wolsong Unit 1 nuclear power plant is ₩607,967 million and ₩642,015 million, respectively, as of December 31, 2017. If the continuance of operation of Wolsong Unit 1 nuclear power plant is annulled, significant losses may be incurred in connection with the property, plant and equipment of Wolsong Unit 1. In addition, the amount of provision may increase significantly, and the timing of actual cash outflows may be accelerated.

The Company suspended the construction of Shin-Kori Unit 5 and 6 starting from July 24, 2017 to October 24, 2017, which is the public debate period regarding whether to continue the construction for Shin-Kori Unit 5 and 6, and is in the process of reviewing the appropriateness of the additional costs requested by the suppliers that occurred during that period. The Company believes that the possibility of economic outflow is probable and recognized ₩77,261 million of provision as described in note 26.(2).

As of December 31, 2017, the Company has suspended the construction design of Shin-Hanwool Unit 3 and 4. The construction contract amount and the outstanding balance are described in note 49.(1), and the carrying amount of Shin-Hanwool Unit 3 and 4 is ₩159,008 million as of December 31, 2017.

The Company is the defendant against a number of claims. The followings are potentially significant claims pertaining to the Company.

① Hyundai Engineering & Construction Co., Ltd.("Hyundai E&C"), SK Engineering & Construction Co., Ltd. and GS Engineering & Construction Co., Ltd. filed a lawsuit for increase in contract bill (formerly, amounted to ₩1,000 million) against KHNP in September 2013, in relation to the design changes on

F-174

the plant construction of Shin-Hanwool 1 & 2. Hyundai Engineering & Construction Co., Ltd. and two other companies increased the contract bill to ₩133,426 million in October 2014, ₩204,040 million in November 2015, and ₩204,564 million in January 2017, respectively, and submitted an application to demand extra contract payments due to the design changes. KHNP has paid ₩217,724 million of the claim amounts in full upon the first ruling in November 2016 and recognized the amount as addition to construction-in-progress accordingly.

② In December 2013, the Supreme Court of Korea ruled that regular bonuses also fall under the category of ordinary wages on the condition that those bonuses are paid regularly and uniformly. Also, the Supreme Court ruled that employees are entitled to retroactively demand certain wages based on the new ordinary wages that include regular bonuses as additional wages. However, the request may be limited to the extent of the principle of good faith.

The Company believes that the possibility of economic outflow is probable on the ongoing and the expected lawsuit. For this reason, the Company recognized ₩56,052 million of other provision in relation to the lawsuit as of December 31, 2017.

Except these significant ongoing claims, there are 10 arbitration cases pertaining to the Company as of December 31, 2017 and the significant arbitration cases are as follows:

① KEPCO and KEPCO KDN Co., Ltd., a subsidiary of KEPCO, have been accused of breach of contract in relation to ERP software, which is provided by SAP Korea Ltd. The litigation was filed in the International Chamber of Commerce International Court of Arbitration but the Company has not recognized any provision because the probability of economic benefit outflow is remote and the related amount cannot be reliably estimated.

② Hyundai Samsung Joint Venture (HSJV), one of the subcontractors of the Company, filed an arbitration against the Company at the London Court of International Arbitration (LCIA) in 2016 due to disagreements in UAE nuclear power plant construction project, but the Company has not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably estimated.

③ In prior years, Hyundai E&C, GS Engineering & Construction Corp., and Hansol SeenTec Co., Ltd. filed on arbitration against the Company to the Korea Commercial Arbitration Board in relation to the request for additional construction costs but the Company has not recognized any provision because the probability of economic benefit outflow is remote and the related amount cannot be reliably estimated.

④ In prior years, Halla Corporation filed on arbitration against the Company to the Korea Commercial Arbitration Board in relation to the request for additional construction costs and the Company filed on arbitration against Halla Corporation to the Korea Commercial Arbitration Board in relation to the request for a penalty payment for the delayed construction work. The Company has recognized ₩4,916 million of provision for the best estimate of the expenditure required to fulfill its obligations in relation to this arbitration as of December 31, 2017.

**(2) Guarantees of borrowings provided to other companies as of December 31, 2016 and 2017 are as follows:**

① In order to secure its status as a shareholder of Navanakorn Electric Co., Ltd., the Company has signed a fund supplement contract. According to the contract, in case Navanakorn Electric Co., Ltd. does not have sufficient funds for its operation or repayment of borrowings, the Company bears a payment obligation in proportion to its ownership.

② The Company has outstanding borrowings with a limit of USD 275,600 thousand from its creditors such as International Finance Corporation. Regarding the borrowing contract, the Company has guaranteed capital contribution of USD 69,808 thousand and additional contribution up to USD 19,000 thousand for contingencies, if any. Moreover, for one of the electricity purchasers, Central

F-175

Power Purchasing Agency Guarantee Ltd., the Company has provided payment guarantee up to USD 2,777 thousand, in case of construction delay or insufficient contract volume after commencement of the construction.

③ The Company has provided PT. Perusahaan Listrik Negara performance guarantee up to USD 2,293 thousand and Mizuho bank and others investment guarantee up to USD 43,500 thousand in proportion to its ownership in the electricity purchase contract with PT. Cirebon Energi Prasarana in relation to the second electric power generation business in Cirebon, Indonesia.

④ The Company has provided the Bank of Tokyo Mitsubishi UFJ (BTMU) borrowing guarantee up to USD 41,258 thousand in proportion to its ownership in the equity bridge loan guarantee with PT. Cirebon Energi Prasarana in relation to the second electric power generation business in Cirebon, Indonesia.

⑤ The Company has provided the Export-Import Bank of Korea, BNP Paribas and ING Bank guarantee of mutual investment of USD 2,440 thousand, which is equivalent to the ownership interest of PT BS Energy and PT Nusantara Hydro Alam, in order to guarantee the expenses related to hydroelectric power business of Tanggamus, Indonesia.

⑥ The Company has provided the Export-Import Bank of Korea and SMBC guarantee of mutual investment of USD 401 thousand, which is equivalent to the ownership interest of PT Mega Power Mandiri, in order to guarantee the expenses related to hydroelectric power business of PT Wampu Electric Power, an associate of the Company.

⑦ The Company has provided Samsung C&T Corporation bidding guarantee up to USD 793 thousand to participate in the bidding of the Sri Lanka combined cycle project.

F-176

**(3)   Credit lines provided by financial institutions as of December 31, 2017 are as follows:**

| Commitments | Financial institutions | Currency | Limited amount | Exercised amount |
|---|---|---|---|---|
| | | | In millions of won and thousands of foreign currencies | |
| Commitments on bank-overdraft . . . . . . . . . . . . | Nonghyup Bank and others | KRW | 1,555,000 | 68,859 |
| Commitments on bank-daylight overdraft . . . . . . | Nonghyup Bank | KRW | 280,000 | — |
| Limit amount available for CP . . . . . . . . . . . . . . | Shinhan Bank and others | KRW | 1,100,000 | — |
| Limit amount available for card . . . . . . . . . . . . . | KEB Hana Bank and others | KRW | 46,733 | 2,775 |
| | Banco de Oro | PHP | 5,000 | 5,000 |
| Loan limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Kookmin Bank and others | KRW | 895,500 | 425,411 |
| | BNP Paribas and others | USD | 1,910,700 | 20,000 |
| Certification of payment on L/C  . . . . . . . . . . . . | Woori Bank and others | USD | 1,029,604 | 233,166 |
| Certification of performance guarantee on | KEB Hana Bank | EUR | 1,958 | 1,958 |
| contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | KEB Hana Bank and others | INR | 230,515 | 230,515 |
| | Korea Development Bank and others | JPY | 620,000 | 620,000 |
| | Seoul Guarantee Insurance and others | KRW | 104,248 | 104,248 |
| | Bank of Kathmandu | NPR | 32,633 | 32,633 |
| | KEB Hana Bank | SAR | 102,186 | 87,991 |
| | Standard Chartered and others | USD | 753,652 | 696,806 |
| | KEB Hana Bank | CAD | 168 | 168 |
| Certification of bidding  . . . . . . . . . . . . . . . . . . . | SMBC and others | USD | 60,000 | 10,230 |
| | ABSA and others | ZAR | 55,730 | 55,730 |
| Advance payment bond, Warranty bond, | KEB Hana Bank | INR | 157,830 | 157,830 |
| Retention bond and others  . . . . . . . . . . . . . . . | Export-Import Bank of Korea and others | USD | 3,850,534 | 753,025 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Nonghyup Bank and others | KRW | 451,521 | 15,037 |
| | KEB Hana Bank and others | USD | 1,063,670 | 758,536 |
| Inclusive credit . . . . . . . . . . . . . . . . . . . . . . . . . | Shinhan Bank | INR | 47,489 | 47,489 |
| | KEB Hana Bank | KRW | 258,000 | 117,398 |
| | Shinhan Bank and others | USD | 32,125 | 16,155 |
| Trade finance  . . . . . . . . . . . . . . . . . . . . . . . . . | BNP Paribas and others | USD | 800,000 | — |

F-177

**(4)** As of December 31, 2017, the blank check and assets provided as collaterals or pledges to financial institutions by the Company are follows:

| Guarantor | Guarantee | Type of guarantee | Currency | Amount | Description |
|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | |
| Korea East-West Power Co., Ltd. . . . . . . . . . | Korea Development Bank and others | Shareholdings of Gyeongju Wind Power Co., Ltd. | KRW | 15,958 | Collateral for borrowings |
| Korea Midland Power Co.,Ltd. . . . . . . . . . . | IBK and others | Shareholdings of Commerce and Industry Energy Co., Ltd. | KRW | 13,605 | Collateral for borrowings |
| Korea Southern Power Co., Ltd. . . . . . . . . . | Shinhan Bank and others | Shareholdings of KOSPO Youngnam Power Co., Ltd. | KRW | 40,000 | Collateral for borrowings |
| Korea South-East Power Co., Ltd. . . . . . . . . . | International Finance Corporation and others | Shareholdings of Mira Power Limited | KRW | 44,192 | Collateral for borrowings |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . | Korea Development Bank and others | Shareholdings of Gyeonggi Green Energy Co., Ltd. | KRW | 47,000 | Collateral for borrowings |
| Gyeonggi Green Energy Co., Ltd. . . . . . . . . . | Korea Development Bank and others | Factory estate and others | KRW | 327,080 | Collateral for borrowings (*) |
| Commerce and Industry Energy Co., Ltd. . . . . | IBK and others | Land, buildings, structures and machinery and others | KRW | 110,500 | Collateral for borrowings |
| | | Cash and cash equivalents | KRW | 11,642 | |
| Gyeongju Wind Power Co.,Ltd. . . . . . . . . . | SK Securities Co., Ltd. and others | Property, plant and equipment and others | KRW | 97,980 | Collateral for borrowings |
| | | Existing or expected trade receivables | KRW | 4,800 | |
| | | Cash and cash equivalents | KRW | 8,769 | |
| KOSPO Youngnam . . . Power Co., Ltd. . . . . . . . | Shinhan Bank and others | Bank deposit and insurance claim | KRW | 396,120 | Collateral for borrowings |
| Qatrana Electric Power Company . . . . . . . . . | The Islamic Development Bank and others | Finance Lease receivable and property, plant and equipment and others | JOD | 188,580 | Collateral for borrowings |
| KST Electric Power Company . . . . . . . . . . | Scotiabank Inverlat, S.A | Finance Lease receivable and others | USD | 289,026 | Collateral for borrowings |

(*) The Company was provided with shares of Gyeonggi Green Energy Co., Ltd., one of its subsidiaries, from the investors as collateral related to long-term borrowings. Additionally, pledge for shares, pledge for transfer of rights of long-term borrowings, pledge for insurance claims and other pledges were established.

The Company has ₩1,197 million of project loans from Korea Resource Corporation as of December 31, 2017. The Company has provided a blank check as repayment guarantee.

F-178

**(5)** The Company temporarily suspended operations of the Gangneung hydroelectric generating plant, with a carrying amount of ₩88,447 million as of December 31, 2017, to improve the quality of water used in generating electricity. The expenses related to the suspension of operations of ₩137 million and depreciation on the utility plant of ₩6,644 million are recorded in other expenses for the year ended December 31, 2017.

**(6)** Due to the Korean government's announcement of suspension of operation in the Gaeseong Industrial District, it is uncertain if the Company can exercise the property rights for the Company's facility in the Gaeseong Industrial District as of December 31, 2017. The book value of facility is ₩18,724 million and the amount of trade receivables related to the companies residing in Gaeseong industrial complex is ₩2,911 million. The Company has entered into an insurance agreement covering up to ₩7,000 million with the Export-Import Bank of Korea related to Gaeseong industrial complex. The ultimate outcome of this event cannot be reasonably estimated.

**51. Subsequent Events**

(1) Subsequent to December 31, 2017, Korea Hydro & Nuclear Power Co., Ltd., Korea South-East Power Co., Ltd., Korea Midland Power Co., Ltd. and Korea Southern Power Co., Ltd. issued additional corporate bond, asset backed short-term bond, non-guaranteed bonds and foreign currency borrowings for funding facilities and operations as follows:

| Company Name | Type | Issue date | Maturity | Interest rate (%) | Amounts |
|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | |
| Korea Hydro & Nuclear | | | | | |
| Power Co., Ltd. . . . . . . | #48-1 corporate bond | 2018.03.13 | 2021.03.13 | 2.40 | ₩  160,000 |
| | #48-2 corporate bond | 2018.03.13 | 2023.03.13 | 2.70 | 20,000 |
| | #48-3 corporate bond | 2018.03.13 | 2028.03.13 | 2.86 | 30,000 |
| | #48-4 corporate bond | 2018.03.13 | 2048.03.13 | 2.94 | 90,000 |
| | Global bond 9 | 2018.03.13 | 2028.03.13 | 3.35 | HKD 1,650,000 |
| Korea South-East Power | | | | | |
| Co., Ltd . . . . . . . . . . . | Asset backed short-term bond | 2018.01.24 | 2018.04.10 | 1.79 | 190,000 |
| Korea Midland Power | | | | | |
| Co., Ltd . . . . . . . . . . . | #41-1 non-guaranteed corporate bond | 2018.02.20 | 2023.02.20 | 2.72 | 60,000 |
| | #41-2 non-guaranteed corporate bond | 2018.02.20 | 2028.02.20 | 2.92 | 130,000 |
| Korea Southern | | | | | |
| Power Co., Ltd  . . . . . . . | #43-1 non-guaranteed bond | 2018.01.11 | 2021.01.11 | 2.32 | 120,000 |
| | #43-2 non-guaranteed bond | 2018.01.11 | 2023.01.11 | 2.57 | 20,000 |
| | #43-3 non-guaranteed bond | 2018.01.11 | 2028.01.11 | 2.76 | 60,000 |
| | Non-guaranteed foreign currency bond (Global bond 18) | 2018.01.29 | 2021.01.29 | 3.00 | USD 400,000 |

(2) In January 2018, the Company sold all of its shares in KODE NOVUS II LLC and other investors in the joint venture sold all of their shares in KODE NOVUS I LLC and KODE NOVUS II LLC. In accordance with the agreement between the shareholders and the creditors of KODE NOVUS I LLC and KODE NOVUS II LLC, the Company's right to indemnity and supplemental funding obligations to the investors and creditors have been eliminated. Accordingly, the Company reversed the entire amount of the provisions for the right to indemnity.

F-179

Exhibit 8.1

## LIST OF SUBSIDIARIES

| | Consolidated subsidiaries | Jurisdiction of Incorporation |
|---|---|---|
| 1. | Korea Hydro & Nuclear Power Co., Ltd. | Korea |
| 2. | Korea South-East Power Co., Ltd. | Korea |
| 3. | Korea Midland Power Co., Ltd. | Korea |
| 4. | Korea Western Power Co., Ltd. | Korea |
| 5. | Korea Southern Power Co., Ltd. | Korea |
| 6. | Korea East-West Power Co., Ltd. | Korea |
| 7. | KEPCO Engineering & Construction Company, Inc. | Korea |
| 8. | KEPCO Plant Service & Engineering Co., Ltd. | Korea |
| 9. | KEPCO Nuclear Fuel Co., Ltd. | Korea |
| 10. | KEPCO KDN Co., Ltd. | Korea |
| 11. | Garolim Tidal Power Plant Co., Ltd. | Korea |
| 12. | KEPCO International HongKong Ltd. | Hong Kong |
| 13. | KEPCO International Philippines Inc. | Philippines |
| 14. | KEPCO Gansu International Ltd. | Hong Kong |
| 15. | KEPCO Philippines Holdings Inc. | Philippines |
| 16. | KEPCO Philippines Corporation | Philippines |
| 17. | KEPCO Ilijan Corporation | Philippines |
| 18. | KEPCO Lebanon SARL | Lebanon |
| 19. | KEPCO Neimenggu International Ltd. | Hong Kong |
| 20. | KEPCO Shanxi International Ltd. | Hong Kong |
| 21. | KOMIPO Global Pte Ltd. | Singapore |
| 22. | KEPCO Canada Energy Ltd. | Canada |
| 23. | KEPCO Netherlands B.V. | Netherlands |
| 24. | KOREA Imouraren Uranium Investment Corp. | France |
| 25. | KEPCO Australia Pty., Ltd. | Australia |
| 26. | KOSEP Australia Pty., Ltd. | Australia |
| 27. | KOMIPO Australia Pty., Ltd. | Australia |
| 28. | KOWEPO Australia Pty., Ltd. | Australia |
| 29. | KOSPO Australia Pty., Ltd. | Australia |
| 30. | KEPCO Middle East Holding Company | Bahrain |
| 31. | Qatrana Electric Power Company | Jordan |
| 32. | KHNP Canada Energy, Ltd. | Canada |
| 33. | KEPCO Bylong Australia Pty., Ltd. | Australia |
| 34. | Korea Waterbury Uranium Limited Partnership | Canada |
| 35. | Korea Electric Power Nigeria Ltd. | Nigeria |
| 36. | KEPCO Holdings de Mexico | Mexico |
| 37. | KST Electric Power Company | Mexico |
| 38. | KEPCO Energy Service Company | Mexico |
| 39. | KEPCO Netherlands S3 B.V. | Netherlands |
| 40. | PT. KOMIPO Pembangkitan Jawa Bali | Indonesia |
| 41. | PT. Cirebon Power Service | Indonesia |
| 42. | KOWEPO International Corporation | Philippines |
| 43. | KOSPO Jordan LLC | Jordan |
| 44. | EWP Philippines Corporation | Philippines |
| 45. | EWP America Inc. | USA |
| 46. | EWP Renewable Corporation | USA |
| 47. | DG Fairhaven Power, LLC | USA |
| 48. | DG Whitefield, LLC | USA |
| 49. | Springfield Power, LLC | USA |

| | Consolidated subsidiaries | Jurisdiction of Incorporation |
|---|---|---|
| 50. | KNF Canada Energy Limited | Canada |
| 51. | PT KEPCO Resource Indonesia | Indonesia |
| 52. | EWP Barbados 1 SRL | Barbados |
| 53. | California Power Holdings, LLC | USA |
| 54. | Gyeonggi Green Energy Co., Ltd. | Korea |
| 55. | PT. Tanggamus Electric Power | Indonesia |
| 56. | Gyeongju Wind Power Co., Ltd. | Korea |
| 57. | KOMIPO America Inc. | USA |
| 58. | EWPRC Biomass Holdings, LLC | USA |
| 59. | KOSEP USA, INC. | USA |
| 60. | PT. EWP Indonesia | Indonesia |
| 61. | KEPCO Netherlands J3 B.V. | Netherlands |
| 62. | Korea Offshore Wind Power Co., Ltd. | Korea |
| 63 | Global One Pioneer B.V. | Netherlands |
| 64 | Global Energy Pioneer B.V. | Netherlands |
| 65. | Mira Power Limited | Pakistan |
| 66. | KOSEP Material Co., Ltd. | Korea |
| 67. | Commerce and Industry Energy Co., Ltd. | Korea |
| 68. | KEPCO Singapore Holdings Pte., Ltd. | Singapore |
| 69. | KOWEPO India Private Limited | India |
| 70. | KEPCO KPS Philippines Corp. | Philippines |
| 71. | KOSPO Chile SpA | Chile |
| 72. | PT. KOWEPO Sumsel Operation And Maintenance Services | Indonesia |
| 73. | HeeMang Sunlight Power Co., Ltd. | Korea |
| 74. | Fujeij Wind Power Company | Jordan |
| 75. | KOSPO Youngnam Power Co., Ltd. | Korea |
| 76. | HI Carbon Professional Private Special Asset Investment Trust 1 (formerly, Global One Carbon Private Equity Investment Trust 2) | Korea |
| 77. | Chitose Solar Power Plant LLC | Japan |
| 78. | KEPCO Energy Solution Co. Ltd. | Korea |
| 79. | Solar School Plant Co., Ltd. | Korea |
| 80. | KOSPO Power Services Limitada | Chile |
| 81. | Energy New Industry Specialized Investment Private Investment Trust | Korea |
| 82. | KOEN Bylong Pty., Ltd. | Australia |
| 83. | KOMIPO Bylong Pty., Ltd. | Australia |
| 84. | KOWEPO Bylong Pty., Ltd. | Australia |
| 85. | KOSPO Bylong Pty., Ltd. | Australia |
| 86. | EWP Bylong Pty., Ltd. | Australia |
| 87. | KOWEPO Lao International | Laos |
| 88. | KEPCO US Inc. | USA |
| 89. | KEPCO Alamosa LLC | USA |
| 90. | Cogentrix Solar Services, LLC | USA |
| 91. | Solar Investments I, LLC | USA |
| 92. | Cogentrix of Alamosa, LLC | USA |
| 93. | KEPCO-LG CNS Mangilao Holdings LLC | USA |
| 94. | Mangilao Investment LLC | USA |
| 95. | KEPCO-LG CNS Mangilao Solar, LLC | USA |
| 96. | Jeju Hanlim Offshore Wind Co., Ltd. | Korea |
| 97. | PT. Siborpa Eco Power | Indonesia |
| 98. | BSK E-New Industry Fund VII | Korea |
| 99. | e-New Industry LB Fund 1 | Korea |
| 100. | Songhyun e-New Industry Fund | Korea |

All of the foregoing entities do business under their respective names set forth above.

Exhibit 12.1

## CERTIFICATIONS

I, JongKap KIM, certify that:

1.  I have reviewed this annual report on Form 20-F of Korea Electric Power Corporation (the "Company");

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this annual report;

4.  The Company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    (d) Disclosed in this annual report any change in the Company's internal control over financial reporting that occurred during the period covered by the Annual Report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

5.  The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: April 30, 2018

By: _____/s/    JongKap KIM_____
Name:                    JongKap KIM
Title:         President and Chief Executive Officer

Exhibit 12.2

## CERTIFICATIONS

I, Hyun, Sang-Kwon, certify that:

1.  I have reviewed this annual report on Form 20-F of Korea Electric Power Corporation (the "Company");

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this annual report;

4.  The Company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

    (d) Disclosed in this annual report any change in the Company's internal control over financial reporting that occurred during the period covered by the Annual Report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

5.  The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: April 30, 2018

By: _____/s/    Hyun, Sang-Kwon_____

Name:          Hyun, Sang-Kwon
Title:         Executive Vice President and
               Chief Financial Officer

**Exhibit 13.1**

## CERTIFICATION OF PERIODIC FINANCIAL REPORT
## PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Annual Report of Korea Electric Power Corporation (the "Company") on Form 20-F for the fiscal year ended December 31, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, JongKap KIM, President and Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 30, 2018

By: _____ /s/    JongKap KIM _____

Name:        JongKap KIM

Title:        President and Chief Executive Officer

**Exhibit 13.2**

### CERTIFICATION OF PERIODIC FINANCIAL REPORT
### PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Annual Report of Korea Electric Power Corporation (the "Company") on Form 20-F for the fiscal year ended December 31, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Hyun, Sang-Kwon, Executive Vice President & Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 30, 2018

By: _____/s/    Hyun, Sang-Kwon_____

Name:         Hyun, Sang-Kwon
Title:         Executive Vice President and
               Chief Financial Officer

Exhibit 15.1

## KOREA ELECTRIC POWER CORPORATION ACT

|                | Act No. 3304, December 31, 1980 |
|----------------|---------------------------------|
| Amended by     | Act No. 3833, May 12, 1986      |
|                | Act No. 4093, March 25, 1989    |
|                | Act No. 4541, March 6, 1993     |
|                | Act No. 5454, December 13, 1997 |
|                | Act No. 5573, September 23, 1998|
|                | Act No. 6755, December 5, 2002  |
|                | Act No. 8852, February 29, 2008 |
|                | Act No. 9383, January 30, 2009  |
|                | Act No. 9618, April 1, 2009     |
|                | Act No. 10254, April 12, 2010   |
|                | Act No. 11690, March 23, 2013   |
|                | Act No. 12663, May 21, 2014     |
|                | Act No. 14678, Mar. 21, 2017    |

**Article 1 (Purpose)**

The purposes of this Korea Electric Power Corporation Act (the "Act") are to enhance stable supply and demand of electric power and contribute to the development of the national economy by promoting development of power resources and managing rational operation of electricity business through establishment of the Korea Electric Power Corporation.

**Article 2 (Legal Personality)**

Korea Electric Power Corporation (the "Corporation") shall be a juridical person.

**Article 3 (Business Office)**

(1) The location of the principal office of the Corporation shall be determined by the Corporation's articles of incorporation (the "Articles of Incorporation").

(2) The Corporation may establish pursuant to the Articles of Incorporation branches or representative offices as necessary for the purpose of carrying out its business.

**Article 4 (Equity Capital)**

The equity capital of the Corporation shall be 6 trillion Won. The Government shall contribute at least fifty one percent (51%) of the Corporation's equity capital.

**Article 5 (Shares)**

(1) The equity capital of the Corporation shall consist of shares ("Shares").

(2) The Shares referred to in Paragraph (1) above shall be in registered form. The type, number and par value of the Shares shall be determined by the Articles of Incorporation.

**Article 6 (Government's Exercise of Shareholder Rights)**

The shareholder rights attached to Shares held by the Government shall be exercised by the Minister of the Ministry of Trade, Industry and Energy through consultation with the Minister of the Ministry of Strategy and Finance.

1

**Article 7 (Registration)**

(1) The establishment of the Corporation shall be completed through registration of incorporation at the place where its principal office is located.

(2) Any matters necessary for the registration of incorporation of the Corporation as referred to in under Paragraph (1) above and the registration of establishment, relocation, change or other matters relating to the Corporation's branches or business offices shall be determined by the Presidential Decree.

(3) The Corporation shall not raise objections to a third party on any matters required for registration until after registration.

**Article 8 (Restriction on Use of Similar Name)**

Any person who is not incorporated pursuant to this Act shall not use the name of "Korea Electric Power Corporation" or any similar name thereto.

**Article 9 (Restrictions on the Representation Right of the President)**

The President may not represent the Corporation on any matters on which there is a conflict of interest between of the Corporation and the President, and on such matters the statutory auditor (or the audit committee if such committee has been established under the Public Agencies Management Act) may represent the Corporation.

**Article 10 (Officers)**

The Corporation's officers (except non-standing directors) shall be appointed by the resolution of the shareholders at the general meeting of shareholders.

**Article 11 (Appointment of Attorney-in-fact)**

Pursuant to its Articles of Incorporation, the President may appoint any employee as his attorney-in-fact with authority to perform all acts (whether in the court of law or otherwise) relating to all or any part of the business of the Corporation.

**Article 12 (Prohibition on Leakage of Confidential Information)**

No current or former officer or employee shall disclose or make fraudulent use of any confidential information which he/she comes to know in the course of his employment with the Corporation.

**Article 13 (Business)**

(1) The Corporation shall conduct the following business activities in order to accomplish the purposes specified in Article 1 above:

   1. Development of electric power resources;

   2. Generation, transmission, transformation and distribution of electricity and other related business activities;

   3. Research and development of technology related to the businesses mentioned in Items 1 and 2;

   4. Overseas business related to the businesses mentioned in Items 1 through 3;

   5. Investments or contributions related to the businesses mentioned in Items 1 through 4;

   6. Businesses incidental to the businesses mentioned in Items 1 through 5;

2

7.     Businesses that meet one or more of the requirements designated by Presidential Decree in relation to making use of real property owned by the Corporation; and

8.     Other activities commissioned by the Government.

(2)   The scope and target of investment or contribution and any matters necessary thereto with respect to research and development stated in Item 3 of Paragraph (1) above shall be determined by the Presidential Decree.

(3)   The Corporation shall obtain the approval of the Minister of the Ministry of Trade, Industry and Energy to carry out any business mentioned in Item 7 of Paragraph (1) above.

(4)   If the Corporation carries out any businesses mentioned in Item 7 of Paragraph (1) above, it shall commission a contractor that is qualified to do so under Paragraph 1 of Article 42 of the State Property Act or Item 1 of Paragraph 2 of Article 43 of the Act on the Management of Public Property and Commodities to develop the relevant real property, or shall entrust a trustee qualifying under the Financial Investment Services and Capital Markets Act with the development of the relevant real property; provided, however, that, the Corporation may directly carry out such business if, as specified by the Presidential Decree, such commissioning or entrustment is difficult for commercial reasons.

**Article 14 (Disposition of Profit)**

(1)   If the Corporation records a profit at the end of any fiscal year, the profit of such fiscal year shall be disposed of through a resolution of shareholders at a general meeting of shareholders in the following order of priority:

1.     Providing for any accumulated deficit as of the beginning of such fiscal year;

2.     Establishing a profit reserve of at least two-tenths of the profit until the accumulated reserve reaches one-half of the equity capital of the Corporation;

3.     Dividend to shareholders;

4.     Reserve for business expansion;

5.     Reserve for dividend equalization; and

6.     Carried-over earned surplus.

(2)   The income from the business mentioned in Item 7 of Paragraph 1 of Article 13 shall be used to fund the construction of environment-friendly facilities by relocating electricity transmission, transformation, distribution facilities as specified in Item 17 of Article 2 of the Electricity Business Act indoors or underground.

**Article 15 (Dividend on Shares)**

    If the Corporation pays dividend pursuant to Item 3 of Paragraph (1) of Article 14, the Corporation may pay preferential dividends on Shares not owned by the Government, notwithstanding the provision of Article 464 of the Commercial Code.

**Article 16 (Issuance of Debentures)**

(1)   The Corporation may issue debentures by a resolution of the board of directors.

(2)   The issue amount of debentures shall not exceed two (2) times the sum of the equity capital and reserves of the Corporation.

(3)   The Government may guarantee repayment of the principal of and interest on the debentures issued by the Corporation.

3

(4)  The statute of limitation shall be five (5) years with respect to the principal of the debentures and two (2) years with respect to the interest on the debentures.

(5)  Any other matters necessary for the issuance of debentures other than the matters set forth in Paragraphs (1) through (4) above shall be determined by the Presidential Decree.

**Article 17 (Special Exception in the case of Asset Revaluation)**

The current value of assets of the Corporation subject to asset revaluation shall be determined as the value assessed by the Corporation pursuant to valuation methods prescribed by the Presidential Decree, notwithstanding the main text of Article 7, Paragraph (2) of the Asset Revaluation Act; provided, that this provision shall not apply to the evaluation of those assets subject to revaluation, as specified by the Presidential Decree.

**Article 18 (Supervision)**

The Minister of the Ministry of Trade, Industry and Energy shall guide and supervise the business of the Corporation related to any of the following matters:

1.  General electricity supply under Article 6 of the Electricity Business Act;

2.  Medium- to long-term investment in electricity facilities for the electricity business under the Electricity Business Act;

3.  Proper conduct of the business under Paragraph 1 of Article 13 hereof; and

4.  Any other matters related to public interest and safety as designated by the Presidential Decree.

**Article 19 (Relationship to Other Laws)**

(1)  If the sum of the number of Shares held by the Government and the number of Shares held by Korea Development Bank under the Korea Development Bank Act is 50% or more of the Corporation's shares issued and outstanding, the total number of Shares held by the Government shall be deemed not less than 50% for the purpose of the application of other laws.

(2)  The provisions concerning stock corporation under the Commercial Code shall apply to the Corporation, unless otherwise provided for in this Act or the Public Agencies Management Act.

**Article 20 (Penalty)**

Any person who discloses or make a fraudulent use of any confidential information he/she comes to know in the course of his/her official duty in breach of Article 12 hereof shall be punished with imprisonment of not more than two years or fine not more than 20 million Won. <Amended by Act No. 14678, Mar. 21, 2017>

**Article 21 (Fine)**

(1)  Any person who uses the name of Korea Electric Power Corporation or other similar name in breach of Article 8 hereof shall be imposed a fine of not more than two million Won.

(2)  The fine specified in Paragraph (1) above shall be imposed and collected by the Minister of the Ministry of Trade, Industry and Energy.

**ADDENDA**

(1)  (Effective Date)

This Act shall be effective on and after the date of its promulgation.

4

(2)   (Amendment of Other Laws)

This Act shall be amended by replacing the references to "Minister of Knowledge Economy" to "Minister of Trade, industry and Energy" in Article 6, Article 13, paragraph 3 and Article 21, paragraph 2 herein.

ADDENDA <No. 12633, May 21, 2014> (The Korea Development Bank Act)

Article 1 (Effective Date)

This Act shall be effective from the date of registration of merger under Article 4-6 of the Addenda. <Proviso omitted>

Articles 2 through 10 omitted

Article 11 (Amendment of other Laws)

(1)   through (9) omitted

(10) The Korea Electric Power Corporation Act shall be partially amended as follows.

"The Korea Finance Corporation under the Korea Finance Corporation Act" under Article 19(1) shall be changed to "The Korea Development Bank under the Korea Development Bank Act."

Article 12 omitted

ADDENDA <No. 14678, Mar. 21, 2017>

This Act shall be effective six months after the date of its promulgation.

5

Exhibit 15.3

## ACT ON THE MANAGEMENT OF PUBLIC INSTITUTIONS

Act No. 8258, Jan. 19, 2007
Amended by Act No. 8635, Aug. 3, 2007
Act No. 8696, Dec. 14, 2007
Act No. 8852, Feb. 29, 2008
Act No. 9277, Dec. 31, 2008
Act No. 9345, Jan. 30, 2009
Act No. 9513, Mar. 25, 2009
Act No. 9829, Dec. 29, 2009
Act No. 10286, May 17, 2010
Act No. 10896, Jul. 25, 2011
Act No. 11690, Mar. 23, 2013
Act No. 11845, May 28, 2013
Act No. 12268, Jan 21, 2014
Act No. 12673, May 28, 2014
Act No. 14076, Mar. 22, 2016
Act No. 14461, Dec. 27, 2016

## CHAPTER I GENERAL PROVISIONS

### Article 1 (Purpose)

The purpose of this Act is to provide for basic matters concerning the management of public institutions and necessary matters concerning the firm establishment of the system for self-controlling and accountable management with the aims of rationalizing their management, heightening transparency in management, and thus contributing to the improvement of public institutions' services to the people.

### Article 2 (Scope of Application, etc.)

(1)  This Act shall apply to the public institutions designated and publicly notified under the provisions of Articles 4 through 6.

(2)  As to public institutions, this Act shall apply in preference to any other Act, notwithstanding any pertinent provisions therein contrary to this Act, except as specifically provided for in this Act to follow the pertinent provisions in any other Act.

### Article 3 (Guarantee for Self-Controlling Management)

The Government shall guarantee the self-controlling management of public institutions to establish the accountable management system in public institutions.

### Article 4 (Public Institutions)

(1)  The Minister of Strategy and Finance may designate a legal entity, organization or institution (hereinafter referred to as an "institution") other than the State or a local government as a public institution, if it falls under any of the following subparagraphs: <Amended by Act No. 8852, Feb. 29, 2008>

    1.  An institution established by direct operation of another Act with an investment by the Government;

    2.  An organization to whom the amount of the Government grants (including the revenue from its commissioned affairs or monopoly, if it is an institution to whom some affairs of the Government are commissioned or a monopoly is granted by direct operation under Acts and subordinate statutes; hereinafter the same shall apply) exceeds one-half of the amount of its total revenue;

1

3. An institution which the Government holds at least fifty percent of the outstanding shares in or secures practical control over in making decisions on its policies through the exercise of the power to appoint executives with at least thirty percent of such outstanding shares or otherwise;

4. An institution which the Government together with an institution falling under any of subparagraphs 1 through 3 holds at least fifty percent of the outstanding shares in or secures practical control over in making decisions on its policies through the exercise of the power to appoint executives with at least thirty percent of such outstanding shares or otherwise;

5. An institution which a single institution or two or more institutions falling under any of subparagraphs 1 through 4 hold at least fifty percent of the outstanding shares in or secure practical control over in making decisions on its policies through the exercise of the power to appoint executives with at least thirty percent of such outstanding shares or otherwise;

6. An institution established by an institution failing under any of subparagraph 1 through 4 with an investment by the State or the establishing institution.

(2) Notwithstanding the provisions of paragraph (1), the Minister of Strategy and Finance may not designate an institution as a public institution, if it falls under any of the following subparagraphs: <Amended by Act No. 8696, Dec. 14, 2007; Act No. 8852, Feb. 29, 2008>

1. An institution established for the purpose of mutual aid, improvement of welfare, enhancement of interests, or maintenance of order in business transactions between its members;

2. An institution established by a local government and run by the management in which the local government is involved;

3. The Korea Broadcasting System under the Broadcasting Act and the Korea Educational Broadcasting System under the Korea Educational Broadcasting System Act.

(3) Necessary matters concerning the criteria and method for calculating the amount of the Government grants and the amount of the total revenue under the provisions of paragraph (1) 2 and the criterion of the secured practical control under the provisions of subparagraphs 3 through 5 of the said paragraph shall be prescribed by Presidential Decree.

**Article 5 (Classification of Public Institutions)**

(1) The Minister of Strategy and Finance shall classify public institutions into the categories of public corporation, quasi-governmental institution, and non-classified public institution for designation purpose, while the public corporations and quasi-governmental institutions shall be designated among public institutions whose prescribed number of personnel is at least fifty persons. <Amended by Act No. 8852, Feb. 29, 2008>

(2) In designating public corporations and quasi-governmental institutions under the provisions of paragraph (1), the Minister of Strategy and Finance shall designate public corporations among those whose self-generating revenue reaches or exceeds 1/2 of the amount of its total revenue, while the Minister shall designate quasi-governmental institutions among public institutions not classified into public corporations. <Amended by Act No. 8852, Feb. 29, 2008>

(3) The Minister of Strategy and Finance shall classify the public corporations and quasi-governmental institutions under the provisions of paragraphs (1) and (2) into the following subparagraphs, and shall designate them accordingly: <Amended by Act No. 8852, Feb. 29, 2008>

1. Public corporations:

   (a) Market-based public corporations: Public corporations whose asset size reaches or exceeds two trillion won and whose self-generating revenue out of the amount of total revenue reaches or exceeds the criterion prescribed by Presidential Decree;

2

(b)  Quasi-market-based public corporations: Public corporations other than the market-based public corporations;

2.  Quasi-governmental institutions:

(a)  Fund-management-based quasi-governmental institutions: Quasi-governmental institutions to which the management of a fund is assigned or commissioned under the National Finance Act;

(b)  Commissioned-service-based quasi-governmental institutions: Quasi-governmental institutions other than the fund-management-based quasi-governmental institutions.

(4)  The Minister of Strategy and Finance shall designate the institutions not classified into either public corporations or quasi-governmental institutions among the public institutions under the provisions of paragraph (2) as non-classified public institutions. <Amended by Act No. 8852, Feb. 29, 2008>

(5)  The more specific criteria and method for determining the self-generating revenue and the total revenue under the provisions of paragraphs (2) and (3) shall be prescribed by Presidential Decree.

## Article 6 (Procedure for Designation of Public Institutions, etc.)

(1)  The Minister of Strategy and Finance shall newly designate public institutions, cancel the designation thereof or designate such public institutions by changing the classification within one month after the commencement of each fiscal year: Provided, That the Minister of Strategy and Finance may newly designate public institutions, cancel the designation thereof or designate such institutions by changing the classification, according to the following classification even in the middle of a fiscal year: <Amended by Act No. 9829, Dec. 29, 2009>

1.  Where an institution falling under each subparagraph of Article 4 (1) is newly established: Newly designate;

2.  Where an institution designated as a public institution is no longer subject to this Act due to privatization, consolidation, discontinuation or division of the institution or due to amendments, repeal, etc. of relevant Acts and subordinate statutes or where it becomes necessary to change the designation thereof: Cancel designation or designate by changing the classification.

(2)  In designating a new public corporation, quasi-governmental institution or non-classified public institution, or canceling or changing the designation under the provisions of paragraph (1), the Minister of Strategy and Finance shall consult with the administrative agency having control over the affairs of the prospective public corporation, a quasi-governmental institution or non-classified public institution (hereinafter referred to as the "competent agency") in accordance with relevant statutes, and then shall refer it to the committee for management of public institutions under the provisions of Article 8 for deliberation and resolution. <Amended by Act No. 8852, Feb. 29, 2008>

(3)  Whenever designating a new public corporation, quasi-governmental institution, or non-classified institution, or canceling or changing such designation under the provisions of paragraphs (1) and (2), the Minister of Strategy and Finance shall make a public notification thereof. In such cases, the list of existing public corporations, quasi-governmental institutions, and non-classified public institutions may be publicly notified together, if considered necessary to do so. <Amended by Act No. 8852, Feb. 29, 2008>,

(4)  Necessary matters concerning the procedure, etc. for the designation (including changes in designation) of public corporations, quasi-governmental institutions, and non-classified public institutions, the cancelation of such designation, and the public notification shall be prescribed by Presidential Decree.

## Article 7 (Examination on Establishment of New Institution)

(1)  The head of the competent agency who desires to establish a new institution falling under any of the following subparagraphs, pursuant to Acts, shall request the Minister of Strategy and Finance to examine the

3

feasibility of the establishment of such a new establishment before making a prior announcement of such a legislative bill: <Amended by Act No. 8852, Feb. 29, 2008>

1.  An institution for which the ground for investment by the Government is specified in the legislative bill;

2.  An institution in which case the amount of the Government grants is estimated to exceed 1/2 of its total revenue;

3.  An institution specified as the one in which the Government alone or together with a public institution shall invest at least 30 percent of its capital.

(2)  The Minister of Strategy and Finance shall, upon receiving the request for examination under the provisions of paragraph (1), examine the needs, effects, etc. of new establishment of the institution, financial support by referring it to the committee for management of public institutions under the provisions of Article 8 for deliberation and resolution, and then shall notify the head of the competent agency of the results therefrom. <Amended by Act No. 8852, Feb. 29, 2008>

(3)  Necessary matters concerning the examination, etc. on the feasibility of the establishment of a new institution under the provisions of paragraphs (1) and (2) shall be prescribed by Presidential Decree.


## CHAPTER II COMMITTEE FOR MANAGEMENT OF PUBLIC INSTITUTIONS

### Article 8 (Establishment of Committee for Management of Public Institutions)

The committee for management of public institutions (hereinafter referred to as the "management committee") shall be established under the control of the Minister of Strategy and Finance for deliberation and resolution on the following matters concerning the management of public institutions: <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277, Dec. 31, 2008: Act No. 9829, Dec. 29, 2009, Act No. 14076, Mar. 22, 2016>

1.  Designation of public corporations, quasi-governmental institutions, and non-classified public institutions, and cancelation and change of such designation under the provisions of Articles 4 through 6;

2.  Examination on establishment of a new institution under the provisions of Article 7;

3.  Publication concerning the management of public institutions under Article 11 (1) 15;

4.  Personnel action, etc. based on a violation of the duty of publication, etc. under Article 12 (3);

5.  Adjustment, etc. of functions of public institutions under the provisions of Article 14;

6.  Assistance in innovation, etc. of public institutions under the provisions of Article 15;

7.  Appointment of the non-standing senior directors of market-based public corporations and quasimarket-based public corporations under the proviso to Article 21 (2);

8.  Appointment, etc. of executives of public corporations and quasi-governmental institutions under the provisions of Articles 25 and 26;

9.  Guidelines for remuneration under Article 33;

10. Removal, recommendation of removal, etc. of the executives of public corporations and quasigovernmental institutions under the provisions of Article 35 (2);

11. Evaluation, etc. of performance of duties of non-standing directors and auditors under the provisions of Article 36;

12. Evaluation, etc. of business performance of public corporations and quasi-governmental institutions under the provisions of Article 48;

4

13. Guidelines for management of public institutions and quasi-governmental institutions under the provisions of Article 50;

14. Monitoring of the adequacy of supervision over public corporations and quasi-governmental institutions and improvement of such supervision under the provisions of Article 51 (4);

15. Other matters prescribed by Presidential Decree concerning the management of public institutions.

## Article 9 (Composition of Management Committee)

(1) The management committee shall be comprised of one chairperson and the following members, and the Minister of Strategy and Finance shall be the chairperson: <Amended by Act No. 8852, Feb. 29, 2008; Act No. 11690, Mar. 23, 2013>

1. One Vice-Minister-level public official of the Prime Minister's Office as nominated by the Minister of the Prime Minister's Office;

2. Vice Minister, Deputy Administrator, or an equivalent public official of the related administrative agency as prescribed by Presidential Decree;

3. Vice Minister, Deputy Administrator, or an equivalent public official of the competent agency who does not fall under subparagraph 2;

4. Eleven or less persons commissioned by the President on the recommendation of the Minister of Strategy and Finance from among people from various fields including law, economy, press, academia, labor, etc. with good knowledge and experience in the area of management and business administration of public institutions and also good reputation for impartiality.

(2) The term of office of the committee members under the provisions of paragraph (1) 4 shall be three years, and they may be consecutively appointed.

(3) The committee members under the provisions of paragraph (1) 4 shall perform their duties earnestly following their conscience for the establishment of self-controlling and accountable management system in public institutions and the enhancement of the efficiency in their management.

(4) A committee member under the provisions of paragraph (1) 4 may be dismissed if he/she falls under any of the following subparagraphs:

1. If he/she is unable to perform his/her duties due to physical or mental disability;

2. If he/she is found incompetent to his/her office on the ground of neglect of his/her duties, indecent manner, or otherwise;

3. If he/she is indicted in a criminal case in connection with his/her duties.

(5) The committee chairperson may recommend the President to dismiss a committee member under the provisions of paragraph (1) 4, if the committee member falls under any of the subparagraphs of paragraph (4): Provided, That the committee chairperson shall compulsorily recommend the President to dismiss a committee member who falls under paragraph (4) 1.

(6) Necessary matters concerning the composition of the management committee shall be prescribed by Presidential Decree.

## Article 10 (Management Committee's Meeting)

(1) The management committee's meeting shall be formed with 20 or less members including the chairperson, and the members who should attend the management committee's meeting shall be designated by the chairperson among the members who fall under Article 9 (1) 2 and 3 depending upon the nature of the matters on the agenda, while the number of members who fall under subparagraph 4 of the said paragraph shall constitute a majority of the members of the meeting. <Amended by Act No. 8852, Feb. 29, 2008>

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(2) The management committee's meeting shall be duly formed to open with the presence of a majority of the members of the meeting, and shall adopt a resolution with the affirmative vote of a majority of the members present at the meeting.

(3) The Chairperson of the Board of Audit and Inspection and the head of the administrative agency concerned may present their opinions to the management committee, if considered necessary in relation to the deliberation and resolution by the management committee, and may dispatch a public official of the Board or the agency to appear before the management committee for speaking upon the request from the committee chairperson or the resolution of the management committee.

(4) The management committee shall have one executive secretary for processing its affairs, and the executive secretary shall be appointed by the committee chairperson from among the public officials in the Senior Civil Service.

(5) Necessary matters concerning the operation of the management committee shall be prescribed by Presidential Decree.


## CHAPTER III PUBLICATION, ETC. ON MANAGEMENT OF PUBLIC INSTITUTIONS

### Article 11 (Publication on Management)

(1) A public institution shall publish the following matters: Provided, That if any of the following matters is information subject to non-disclosure under the Official Information Disclosure Act or the head of the competent agency has consulted with the Minister of Strategy and Finance thereon because it is deemed necessary for national security, the relevant matters may be excluded from disclosure: <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277, Dec. 31, 2008: Act No. 9829, Dec. 29, 2009; Act No. 14076, Mar. 22, 2016>

1. Business goals, budget, and management plan;

2. Statements on settlement of accounts;

3. Current status of executive officers and operating personnel (including the gender of such executive officers, types of employment workers, rate of non-regular workers converted to regular workers);

   Budget for personnel expenses and fringe benefits, and status of execution thereof (the budget for different types of allowances shall be disclosed by type);

5. Present status of the details of transactions and the interchange of human resources with subsidiaries;

6. Results of survey on customer satisfaction level conducted in accordance with the provisions of Article 13 (2);

7. Results of audit and appraisal of the actual performance of duties of audit commissioners of the audit committee under Article 36 (1);

8. Results of business performance evaluation under the provisions of Article 48 (limited to public corporations and quasi-governmental institutions);

9. Articles of association, the corporate bond register, internal regulations such as guidelines established and rules and minutes of directors' meeting;

10. Audit report prepared by the auditor or the audit committee (including matters pointed out, matters requesting disposition and a plan of measures for them);

11. The result of audit on public institutions by the heads of the competent authorities (including matters pointed out, matters requesting disposition and a plan of measures for them);

12. Details of the judgment on the liability for damages or the request for disciplinary action, correction, improvement, etc. under Articles 31 (Judgment on Liability for Damages) through 34-2

6

(Recommendation, etc.) of the Board of Audit and Inspection Act or the request for correction under Article 16 (Disposition of Results of Inspection or Investigation) of the Act on the Inspection and Investigation of State Administration, if any, and the measures taken by the public institution, etc. for such judgment or demand;

13. Status of operation of the disciplinary system, including information about the disciplinary system and disciplinary actions taken;

14. Status of lawsuits, legal advice, attorneys and legal advisors;

15. Other important matters concerning the management of the public institution, as requested by the Minister of Strategy and Finance to publish after deliberation and resolution by the management committee.

(2) Every public institution shall publish the matters specified in each subparagraph of paragraph (1) on its Internet webpage, and shall keep necessary documents at its offices.

(3) Every public institution shall, upon receiving a request for inspection or a copy of the matters published in accordance with the provisions of paragraph (1), allow the requesting person to inspect them or deliver him/her a copy or reproduced material. In such cases, the provisions of Article 17 (Defrayment of Expenses) of the Official Information Disclosure Act shall apply mutatis mutandis to the defrayment of expenses incurred therefrom.

(4) Necessary matters concerning the publication on management of public institutions shall be prescribed by Presidential Decree.


**Article 12 (Consolidated Publication)**

(1) The Minister of Strategy and Finance may prepare a separate standardized form for consolidating main items among the matters that shall be published by each public institution under the provisions of Article 11

(1) and publish such items in the consolidated form (hereafter referred to as the "consolidated publication" in this Article). <Amended by Act No. 8852, Feb. 29, 2008>

(2) The Minister of Strategy and Finance may request public institutions to submit necessary data for consolidated publication, and public institutions shall, in turn, comply with such a request unless there are extraordinary circumstances otherwise. <Amended by Act No. 8852, Feb. 29, 2008>

(3) If a public institution fails to perform the duty to make the publication on management under the provisions of Article 11 or the consolidated publication under the provisions of paragraph (1) in good faith, or if it publishes a false fact, the Minister of Strategy and Finance may order the public institution to publish such failure in publication or false publication, order it to correct such false fact, etc., and request the head of the competent agency or the relevant public institution, after deliberation and resolution by the management committee, to make personnel disposition, etc. against the person concerned. <Amended by Act No. 8852, Feb. 29, 2008>

(4) Necessary matters concerning the guidelines, method, etc. for the consolidated publication shall be prescribed by Presidential Decree.


**Article 13 (Customer Charter and Customer Satisfaction Level Survey)**

(1) Every public institution that provides a direct service to the people shall establish and publish a customer charter containing the following descriptions:

1. Fundamental duties;

2. Details of the service provided and desirable level of the service;

7

3.  Procedures for processing complaints and correction for the service provided and liability for damages, etc.;

4.  Efforts, plans, etc. for improvement of the service provided.

(2) Every public institution that provides a direct service to the people shall conduct a survey on customer satisfaction level at least once a year on those who have experienced the service provided by the institution. In this case, the Minister of Strategy and Finance may instruct public institutions to conduct a consolidated survey on customer satisfaction level and integrate the results of such survey for publication. <Amended by Act No. 8852, Feb. 29, 2008>

(3) Necessary matters concerning the scope of public institutions bound to establish and publicly announce the customer charter or conduct the customer satisfaction level survey under the provisions of paragraphs (1) and (2), the establishment and 'public announcement of the customer charter, the procedure, scope, etc. of the customer satisfaction level survey shall be prescribed by Presidential Decree.

**Article 14 (Adjustment of Functions of Public Institutions, etc.)**

(1) The Minister of Strategy and Finance shall examine the appropriateness of functions performed by public institutions after consultation with heads of the competent agencies and deliberation and resolution by the management committee, and shall establish a plan for consolidation, merger, or abolition of institutions, readjustment of their functions, privatization, etc. In such cases, the Minister of Strategy and Finance shall report the established plan to the competent Standing Committee of the National Assembly <Amended by Act No. 8852, Feb. 29, 2008; Act No. 14461, Dec. 27, 2016>

(2) The heads of the competent agencies shall implement the plan as established under the provisions of paragraph (1), and shall submit the report on 'their performances to the Minister of Strategy and Finance. <Amended by Act No. 8852, Feb. 29, 2008>

(3) The Minister of Strategy and Finance may, if considered necessary as a result of an analysis on the details of the report submitted under the provisions of paragraph (2) and a confirmation and inspection of the actual state of the performances, demand the head of the competent agency, after deliberation and resolution by the management committee, to take necessary measures for smooth implementation of the plan. <Amended by Act No. 8852, Feb. 29, 2008>

(4) Necessary matters concerning the establishment and implementation of the plan under the provisions of paragraphs (1) through (3) shall be prescribed by Presidential Decree.

**Article 15 (Innovation of Public Institutions)**

(1) Every public institution shall promote continuous innovation in management for enhancing the efficiency in management and improving the quality of public service.

(2) The Minister of Strategy and Finance may take necessary measures including the establishment of related guidelines, rating of innovated levels, etc., after deliberation and resolution by the management committee, to assist in management innovation under the provisions of paragraph (1). <Amended by Act No. 8852, Feb. 29, 2008>

**CHAPTER IV MANAGEMENT OF PUBLIC CORPORATIONS AND QUASI-GOVERNMENTAL INSTITUTIONS**

**SECTION 1 Articles of Association**

**Article 16 (Mandatory Provisions of Articles of Association)**

(1) The articles of association of public corporations and quasi-governmental institutions shall contain the provisions concerning the following matters: Provided, That the provisions irrelevant to a certain public

8

corporation or quasi-governmental institution in light of its form, characteristics, or business affairs may be omitted: <Amended by Act No. 9277, Dec. 31, 2008>

1. Purpose;

2. Name;

3. Location of principal office;

4. Capital amount;

5. Stock or investment certificates;

6. Matters concerning executives and employees;

7. General meeting of shareholders or investors;

8. Management of the board of directors;

9. Scope of business, details and the execution thereof;

10. Accounting;

11. Method of public notice;

12. Issuance of corporate bonds;

13. Amendment to the articles of association;

14. Other matters prescribed by Presidential Decree.

(2) Every public corporation and quasi-governmental institution shall obtain authorization for the articles of association under the provisions of paragraph (1) from the head of the competent agency within three months after it is designated as a public corporation or quasi-governmental institution in accordance with Article 6. The foregoing shall apply to an amendment, revision, or modification of any provisions in the articles of association as authorized.


**SECTION 2 Board of Directors**

**Article 17 (Establishment and Functions of Board of Directors)**

(1) Every public corporation and quasi-governmental institution shall have the board of directors for deliberation and resolution on the following matters: <Amended by Act No. 10286, May 17, 2010>

1. Business goals, budget, management plan and mid-and long-term financial management plan;

2. Use of reserve fund and carry-over of budget;

3. Settlement of accounts;

4. Acquisition and disposition of fundamental assets;

5. Borrowing of long-term loans, issuance of corporate bonds, and repayment plan for such loans or bonds;

6. Selling prices for products and services;

7. Appropriation of retained earnings;

8. Investment in and contribution to other corporation, etc.;

9. Guarantees for obligations of other corporation: Provided, That it shall exclude the guarantees for obligations provided by a public corporation and quasi-governmental institution that engage in a guarantee business under the relevant Act in the course of executing its business;

10. Amendment of the articles of association;

9

11. Establishment and amendment of bylaws;

12. Remuneration for executives;

13. Matters that the head of the public corporation or quasi-governmental institution (hereinafter referred to as the "institution head") considers it necessary to refer to the board of directors for deliberation and resolution;

14. Other matters considered necessary by the board of directors,

(2) The institution head shall report the following matters to the board of directors:

1. Matters pointed out at the inspection of state administration, the accounting audit conducted under the provisions of Article 43 (1), or the audit conducted by the Board of Audit and Inspection under the provisions of Article 52, and the plan for measures to be taken for such matters and the results thereof;

2. Results of an collective agreement executed by the public corporation or quasi-governmental institution and the estimated budget required for such an agreement (limited to a case where a collective agreement is entered into);

3. Other matters on which the board of directors demands the institution head to report.

(3) Where any other Act requires a public corporation or quasi-governmental institution to have any organization in lieu of the board of directors to perform the functions under the provisions of paragraph (1) in providing for the establishment and management of the public corporation or the quasi-governmental institution, such organization in whatsoever name shall be deemed to be the board of directors, while the members of such an organization shall be deemed to be the directors under this Act, to whom this Act shall apply.

**Article 18 (Composition)**

(1) The board of directors shall be comprised of not more than 15 directors including the institution head: Provided, That it may be comprised of not less than fifteen directors if the institution falls under any of the followings:

1. A public corporation or quasi-governmental institution having the general meeting of members such as the general meeting of shareholders or the general meeting of investors and established as a federation of local or trade institutions under any other Act;

2. Where the number of directors as of the time when it is designated as a public corporation or quasigovernmental institution under the provisions of Article 6 exceeds 15 persons: Provided, That the foregoing shall be applicable only for the period of time during which the term of incumbent directors as of the time of designation under the proviso to Article 28 (1) is guaranteed;

3. Where the number of directors exceeds 15 persons as a consequence of appointment of non-standing directors in accordance with the provisions of the latter part of Article 25 (3),

(2) The chairperson of the board of directors of a market-based public corporation and quasi-market-based public corporation, the asset size of which is not less than two trillion won shall become a non-standing senior director under Article 21: Provided, That one of the non-standing directors shall act as chairperson on behalf of the chairperson, as provided for in the articles of association, if the chairperson is unable to perform his/her duties due to unavoidable reasons. <Amended by Act No. 9829, Dec. 29, 2009>

(3) In applying paragraph (2), if no non-standing director exists at the time an institution is designated as a market-based public corporation or quasi-market-based public corporation under Article 6, the person prescribed by Acts and subordinate statutes at the time the institution is designated as a market-based public corporation or a quasi-market-based public institution shall be the chairperson of the board of directors until non-standing directors are appointed in accordance with the second sentence of Article 25 (3). <Amended by Act No, 9829, Dec. 29, 2009>

10

(4) The institution head shall become the chairperson of the board of directors of a quasi-market-based public corporation, the asset size of which is less than two trillion won, or a quasi-governmental institution: Provided; That the concurrent holding of the office of the institution head and the office of the chairperson of the board of directors shall be prohibited, if there are provisions in any other Act that prohibit such concurrent holding of offices. <Amended by Act No. 9829, Dec. 29, 2009>

### Article 19 (Meeting)

(1) The meeting of the board of directors shall be convened by the chairperson or at the request of at least 1/3 of incumbent directors, and the chairperson shall preside over the meeting.

(2) A resolution at the directors' meeting shall be adopted by the affirmative vote of a majority of incumbent directors.

(3) The institution head or a director who has a specific interest in a matter put on the agenda of the directors' meeting shall not participate in resolution on the matter. In this case, a director, etc. who is barred from participating in resolution shall not be included in the number of incumbent directors under the provisions of paragraph (2).

(4) The auditor may attend the directors' meeting to present his/her opinion.

(5) The provisions of Article 391 (Method of Resolution by Board of Directors) (2) and 391-3 (Minutes of Board of Directors) (1) and (2) of the Commercial Act shall apply mutatis mutandis respectively to the resolution of the board of directors via telecommunication means, the minutes of the directors' meeting, etc.

### Article 20 (Committees)

(1) The board of directors of a public corporation may establish committees within the board of directors in accordance with the articles of association of the relevant public corporation. In such cases, the provisions of Article 393-2 (Committees of Board of Directors) of the Commercial Act shall apply mutatis mutandis to the matters concerning composition, power, etc. of such committees.

(2) Any market-based public corporation and quasi-market-based public corporation, the asset size of which is not less than two trillion won shall establish an audit committee under the board of directors as the committee under paragraph (1), in lieu of an auditor under Article 24 (1): Provided, That if a public corporation which shall newly establish an audit committee has an auditor, the audit committee shall be established after expiration of the auditor's term of office. <Amended by Act No. 9829, Dec. 29, 2009>

(3) A quasi-market-based public corporation, the asset size of which is less than two trillion won, and a quasigovernmental institution may have an audit committee in accordance with the provisions of other Act. <Amended by Act No. 9829, Dec. 29, 2009>

(4) Except as otherwise provided herein, Articles 542-11 and 542-12 (3) through (6) of the Commercial Act shall apply mutatis mutandis to the composition, power, etc. of the audit committee. <Amended by Act No. 8635, Aug. 3, 2007; Act No. 9829, Dec. 29, 2009>

(5) The audit committee shall audit business affairs and accounting in accordance with the provisions of Article 32 (5), and shall report the results thereof to the board of directors.

### Article 21 (Non-standing Senior Director)

(1) Every public corporation and quasi-governmental institution shall have one non-standing senior director.

(2) The non-standing senior director shall be elected by and among non-standing directors: Provided, That the non-standing senior director of a market-based public corporation and quasi-market-based public corporation, the asset size of which is not less than two trillion won, shall be appointed by the Minister of Strategy and Finance among non-standing directors after deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(3)  Necessary matters concerning the non-standing senior director's qualification, performance of duties, etc. shall be prescribed by Presidential Decree.

**Article 22 (Request for Removal, etc.)**

(1)  If it is found that the institution head commits an act in violation of a statute or the articles of association, neglects his/her duties, or he/she has a serious trouble in performing his/her duties as the institution head, the board of directors may request the head of the competent agency to remove or recommend to remove the institution head, after resolution to the effect by the board of directors.

(2)  A non-standing director may, if considered necessary, request the auditor or the audit committee to audit a specific case in connection with the management of the public corporation or quasi-governmental institution by a written request jointly signed by two or more non-standing directors. In this case, the auditor or audit committee shall take action in accordance with such a request, unless there is a particular reason otherwise.

(3)  Non-standing directors may demand the institution head to furnish them with materials necessary for performing their duties. In this case, the institution head shall comply with such a demand, unless there is a particular reason otherwise.

**Article 23 (Fund Management Deliberation Council)**

(1)  Notwithstanding the proviso to Article 74 (Fund Management Deliberation Council) (1) of the National Finance Act, every fund-management-based quasi-governmental institution shall have a deliberative organization for fund management (hereinafter referred to as the "fund management deliberation council"), independent of the board of directors of the quasi-governmental institution: Provided, That a fund management-based quasi-governmental institution shall not have the fund management deliberation council, if there is other statute that requires that an organization for deliberation on important policies for the fund managed by the fund-management-based quasi-governmental institution be established in the competent agency.

(2)  The matters concerning the functions, composition, and management of the fund management deliberation council under the provisions of the main sentence of paragraph (1) shall be governed by the National Finance Act.

(3)  Where a fund-management-based quasi-governmental institution has the fund management deliberation council established under the provisions of paragraph (1) and there is other statute that specifies some of the matters set forth in subparagraphs of Article 17 (1) as the matters subject to deliberation and resolution by the fund management deliberation council, the matters so specified may be excluded from the matters subject to deliberation and resolution under the provisions of Article 17 (1).

**SECTION 3 Executives**

**Article 24 (Executives)**

(1)  Every public corporation and quasi-governmental institution shall have directors including the institution head and auditors: Provided, That no auditor is required if there is an audit committee established under the provisions of Article 20 (2) and (3).

(2)  Directors shall be classified into standing and non-standing directors.

(3)  The number of standing directors of a public corporation and a quasi-governmental institution, the size of which meets or exceeds the criteria prescribed by Presidential Decree or which is prescribed by Presidential Decree considering the special characteristics of its business affairs, shall be less than 1/2 of the fixed number of directors including the institution head: Provided, That fixed number of standing directors, while the terms of office of the executives are guaranteed under the proviso to Article 28 (1), may equal or exceed 1/2 of the fixed number of directors including the institution head, if the fixed number of standing directors

12

at the time the corporation or institution is designated as a public corporation or quasi-governmental institution under Article 6 equals or exceeds 1/2 of the fixed number of directors including the institution head. <Amended by Act No. 9829, Dec. 29, 2009>

(4)   The number of standing directors of a quasi-governmental institution, other than that under the main sentence of paragraph (3) shall be less than 2/3 of the fixed number of directors including the institution head: Provided, That the fixed number of standing directors, while the terms of office of the executives are guaranteed under the proviso to Article 28 (1), may equal or exceed 2/3 of the number of directors including the institution head, if the "fixed number" of standing directors at the time such institution is designated as a quasi-governmental institution under Article 6 equals or exceeds 2/3 of the fixed number of directors including the institution head. <Newly Inserted by Act No. 9829, Dec. 29, 2009>

(5)   An auditor shall be a standing or non-standing position, as prescribed by other Acts, subordinate statutes or the articles of association. <Newly Inserted by Act No. 9829, Dec. 29, 2009>

### Article 25 (Appointment and Removal of Executives of Public Corporations)

(1)   The head of a public corporation shall be appointed by the President on the recommendation of the head of the competent agency among a plural number of people recommended by the committee for recommendation of executives under the provisions of Article 29 (hereinafter referred to as the "executive recommendation committee") and then selected through the deliberation and resolution by the management committee: Provided, That the head of a public corporation. the size of which is below the criteria prescribed by Presidential Decree shall be appointed by the head of the competent agency among a plural number of people recommended by the executive recommendation committee and then selected through the deliberation and resolution by the management committee.

(2)   Standing directors of a public corporation shall be appointed by the head of the public corporation: Provided, That a standing director who becomes an audit commissioner of the audit committee under Article 20 (2) and (3) (hereinafter referred to as "standing audit commissioner") shall be appointed either by the President or the Minister of Strategy and Finance. <Amended by Act No. 9829, Dec. 29, 2009>

(3)   Non-standing directors of a public corporation shall be appointed by the Minister of Strategy and Finance after deliberation and resolution by the management committee among a plural number of people who have good knowledge and experience in the area of management (excluding public officials except teaching staff of national and public schools) as recommended by the executive recommendation committee. In such cases, a public corporation that has no non-standing director at the time of designation under the provisions of Article 6 shall appoint at least two non-standing directors within three months after designation. <Amended by Act No. 8852, Feb. 29, 2008>

(4)   The auditor of a public corporation shall be appointed by the President on the recommendation of the Minister of Strategy and Finance among a plural number of people recommended by the executive recommendation committee and then selected through the deliberation and resolution by the management committee: Provided, That the auditor of a public corporation, the size of which is below the criteria prescribed by Presidential Decree shall be appointed by the Minister of Strategy and Finance among a plural number of people recommended by the executive recommendation committee and then selected through the deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008>

(5)   The head of a public corporation shall not be removed earlier than the expiry of his/her term unless he/she is removed by the person who has the power to appoint him/her under Articles 22 (1), 35 (3), and 48 (8) or there is a ground for removal as specified in the articles of association. <Amended by Act No. 9277, Dec. 31, 2008; Act No. 9513, Mar: 25, 2009>

### Article 26 (Appointment and Removal of Executives of Quasi-Governmental Institutions)

(1)   The head of a quasi-governmental institution shall be appointed by the head of the competent agency among a plural number of people recommended by the executive recommendation committee: Provided, That the

13

head of a quasi-governmental institution, the size of which meets or exceeds the criteria prescribed by Presidential Decree or which is specified by Presidential Decree considering the peculiarities of its business affairs, shall be appointed by President on the recommendation of the head of the competent agency among a plural number of people recommended by the executive recommendation committee.

(2)  Standing directors of a quasi-governmental institution shall be appointed by the head of the quasigovernmental institution, and, where other Acts and subordinate statutes require to establish a separate recommendation committee for standing directors, the provisions of such Acts and subordinate statutes shall govern the recommendation of standing directors: Provided, That a standing audit commissioner shall be appointed either by the President or the Minister of Strategy and Finance according to the procedures prescribed by paragraph (4). <Amended by Act No. 9829, Dec. 29, 2009>

(3)  Non-standing directors of a quasi-governmental institution (excluding those appointed as ex officio non-standing directors pursuant to other Acts and subordinate statutes or the articles of association of the quasigovernmental institution; hereafter the same shall apply in this paragraph) shall be appointed by the head of the competent agency, while the non-standing directors of a quasi-governmental institution, the size of which meets or exceeds the criteria prescribed by Presidential Decree or which is prescribed by Presidential Decree considering the special characteristics of its business affairs, shall be appointed by the head of competent agency from among a plural number of people recommended by the executive recommendation committee: Provided, That where other Acts and subordinate statutes provides for a separate procedure for the recommendation of non-standing directors, the provisions of such Acts and subordinate statutes shall govern the recommendation of non-standing directors. <Amended by Act No. 9829, Dec. 29, 2009>

(4)  The auditor of a quasi-governmental institution shall be appointed by the Minister of Strategy and Finance among a plural number of people recommended by the executive recommendation committee and selected through the deliberation and resolution by the management committee: Provided, That the auditor of a quasi-governmental institution shall, if its size exceeds the criteria prescribed by Presidential Decree or if it is specified by Presidential Decree considering the peculiarities of its business affairs, be appointed by the President on the recommendation of the Minister of Strategy and Finance among a plural number of people recommended by the executive recommendation committee and then selected through the deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008>

(5)  Article 25 (5) shall apply mutatis mutandis to the guarantee of the term of office for the head of a quasigovernmental institution. In such cases, "head of a public corporation" shall be read as "head of a quasigovernmental institution". <Amended by Act No. 9829, Dec. 29, 2009>

### Article 27 (Special Exception concerning Appointment of Executives of Public Corporations and Quasi-Governmental Institutions with General Meeting of Members)

The public corporations and quasi-governmental institutions that have the general meeting of members including the general meeting of shareholders and the general meeting of investors shall obtain the resolution of the general meeting of 'members in connection with the appointment of executives, if such resolution is required by other statute.

### Article 28 (Term of Office)

(1)  The term of office of the institution head appointed in accordance with the provisions of Articles 25 and 26 shall be three years, while the term of office of directors and auditors shall be two years: Provided, That the directors incumbent at the time the public institution is designated as a public corporation or quasigovernmental institution under the provisions of Article 6 shall be deemed to have been appointed under the provisions of Articles 25 and 26, and the relevant statute in force at the beginning of the terms of office of such directors shall apply to their terms.

14

(2) The executives of public corporations and quasi-governmental institutions may be appointed consecutively by one year. In such cases, the person who has the power to appoint executives shall decide whether to appoint directors consecutively, considering the matters as categorized in the following subparagraphs:

1. Institution head: Results of the business performance evaluation under the provisions of Article 48;

2. Standing directors: Results of the actual performance evaluation of the performance agreement executed under the provisions of Article 31 (7) and results of performance of other duties;

3. Non-standing directors and auditors: Results from the evaluation of performance of duties under the provisions of Article 36 and results of performance of other duties.

(3) Consecutive appointment to an executive of a public corporation or quasi-governmental institution under the provisions of paragraph (2) does not require the recommendation process of the executive recommendation committee.

(4) Whenever an institution head is appointed for a consecutive term in accordance with the provisions of paragraph (2), an agreement shall be made again in compliance with the provisions of Article 31 (3). In such cases, the consultation with the executive recommendation committee under the provisions of Article 31 (2) is not required.

(5) Executives shall perform their duties until their successors are appointed, even after expiration of their terms.

**Article 29 (Executive Recommendation Committee)**

(1) Every public corporation and quasi-governmental institution shall have the executive recommendation committee for recommending 'candidates for executives of the public corporation or quasi-governmental institution under Articles 25 and 26 and for negotiating the matters concerning the draft agreement with candidates for the institution head under Article 31 (2). <Amended by Act No. 982~ Dec. 29, 2009>

(2) The executive recommendation committee shall be comprised of non-standing directors of the public corporation or quasi-governmental institution and the members appointed by the board of directors.

(3) Neither executives and employees of a public corporation or quasi-governmental institution nor public officials may become members of the executive recommendation committee: Provided, That the foregoing shall not apply to non-standing directors of the public corporation or quasi-governmental institution, teaching staff under the Public Educational Officials Act, and public officials of the competent agency for the quasi-governmental institution.

(4) The fixed number of the members appointed by the board of directors shall be less than 1/2 of the fixed number of the members of the executive recommendation committee: Provided, That if only one non-standing director exists at the time the executive recommendation committee is established, the fixed number of the members appointed by the board of directors may be 1/2 of the fixed number of the members of the executive recommendation committee. <Amended by Act No. 9829, Dec. 29, 2009>

(5) The chairperson of the executive recommendation committee shall be elected by the committee members among non-standing directors of the public corporation or quasi-governmental institution, who are also the committee members.

(6) If there is no non-standing director in a public corporation or a quasi-governmental institution at the time when the executive recommendation committee is established, the committee shall be comprised of outside members appointed by the board of directors, and the chairperson of the committee shall be elected by and among the outside members.

(7) The executive recommendation committee shall prepare, retain and disclose the minutes containing details of deliberation, resolution, etc. at the meeting: Provided, That the foregoing shall not apply to the cases falling under any of subparagraphs of Article 9 (1) <Newly Inserted by Act No. 14461, Dec. 27, 2016.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(8)  Necessary matters concerning the composition, management, etc. of the executive recommendation committee shall be prescribed by Presidential Decree. <Amended by Act No. 14461, Dec. 27, 2016>

**Article 30 (Criteria of Recommendation of Candidates for Executives)**

(1)  The executive recommendation committee shall recommend the people, as candidates for the institution head, who have good knowledge and experience relating to corporate management and business affairs of the public corporation or quasi-governmental institution and competent ability for Chief Executive Officer.

(2)  The executive recommendation committee shall recommend the people, as candidates for directors other than the institution head and an auditor, who have good knowledge, experience, and competent ability necessary for performing their duties as a director or auditor of the public corporation or quasigovernmental institution.

(3)  The executive recommendation committee shall, when recommending candidates for executives, determine executive qualifications reflecting professionality, specialty, etc. of each institution and make recommendations in accordance therewith. In such cases, specific matters required for the preparation of executive qualifications shall be prescribed by the guidelines for management under Article 50. <Newly Inserted by Act No. 14461, Dec. 27, 2016>

(4)  In order to recommend candidates for executives, the executive recommendation committee may invite the general public for the candidacy as prescribed by Presidential Decree. <Amended by Act No. 14461, Dec. 27, 2016>

**Article 31 (Agreement with Institution Head, etc.)**

(1)  In relation to the appointment of the institution head under the provisions of Articles 25 (1) and 26 (1), the board of directors shall prepare a draft agreement that contains the specific business goals that the institution head shall achieve during his/her term of office, the performance-based compensation, etc., and shall deliver the draft to the executive recommendation committee. In this case, the incumbent institution head may not participate in the directors' meeting for preparing such a draft agreement.

(2)  The executive recommendation committee shall, upon receiving the draft agreement in accordance with the provisions of paragraph (1),·negotiate the terms and conditions of the agreement with the people whom the committee considers recommending as candidates for the institution head, and shall inform the head of the competent agency of the result therefrom. In this case, the executive recommendation committee may revise, amend, or modify the details, terms and conditions of the draft agreement partially, if necessary for negotiation with the candidates for the institution head.

(3)  The head of the competent agency shall execute an agreement with a person who shall be appointed to the institution head in accordance with the draft agreement as negotiated under the provisions of paragraph (2), but an agreement with the head of a public corporation shall be executed after prior consultation with the Minister of Strategy and Finance. In this case, the head of the competent agency may negotiate the terms and conditions of the agreement with the person who shall be appointed to the institution head to agree on the terms and conditions different from those of the draft agreement under the provisions of paragraphs (1) and (2). <Amended by Act No. 8852, Feb. 29,2008>

(4)  The institution head and the head of the competent agency may amend, revise, or modify the details, terms, or conditions of the agreement by negotiations, when unavoidable circumstances occur after the agreement is executed in accordance with the provisions of paragraph (3): Provided, That the head of the competent agency shall consult with the Minister of Strategy and Finance in advance, when he/she intends to agree with the head of a public corporation to amend, revise, or modify the details, terms, or conditions of the agreement. <Amended by Act No. 8852, Feb. 29, 2008>

(5)  The head of the competent agency shall execute the agreement under the provisions of paragraph (3) with the institution head incumbent at the time when the institution is designated as a public corporation or

16

quasigovernmental institution (excluding the case of change in designation) under Article 6, within three months after such designation: Provided, That the agreement under the provisions of paragraph (3) shall not be executed, if the remaining term is less than six months.

(6) The Minister of Strategy and Finance or the head of the competent agency may evaluate the performance of the head of a public corporation or quasi-governmental institution on at least one occasion during his/her term of office based on the reports on the performance of the agreements entered into under paragraph (3) or (4). <Newly Inserted by Act No. 14076, Mar. 22, 2016>

(7) The institution head may enter into a performance agreement with standing directors of the relevant institution (excluding a standing audit commissioner; hereafter the same shall apply in this paragraph) and evaluate their actual performance and may remove any standing director, if a result of evaluation of the director's actual performance shows poor performance. <Amended by Act No. 9829, Dec. 29, 2009; by Act No. 14076, Mar. 22, 2016>

**Article 32 (Executives' Duties, etc.)**

(1) The institution head shall represent the public corporation or quasi-governmental institution, have overall control over its business affairs, and take the responsibility for the business performance of the public corporation or quasi-governmental institution.

(2) The institution head shall not represent the public corporation or quasi-governmental institution with respect to a matter in which the public corporation or quasi-governmental institution and he/she have conflicting interests. In such cases, the auditor or the audit committee shall represent the public corporation or quasigovernmental institution instead. <Amended by Act No. 9829, Dec. 29, 2009>

(3) When the institution head is unable to perform his/her duties due to an unavoidable reason or cause, one of standing directors shall act on behalf of the institution head in accordance with the provisions of the articles of association, while a director prescribed by the articles of association shall act on behalf of the institution head if there is no standing director or if the standing director is unable to act on his/her behalf.

(4) Directors shall deliberate on the matters brought up to the directors' meeting, and shall participate in resolution.

(5) The auditor shall audit the business affairs and accounting of the public corporation or quasi-governmental institution in compliance with the audit guidelines prescribed by the Minister of Strategy and Finance, and shall present his/her opinion to the board of directors. In this case, the Board of Audit and Inspection may present its opinion concerning the audit guidelines to the Minister of Strategy and Finance. <Amended by Act No. 8852, Feb. 29, 2008>

(6) The institution head shall assist, as necessary, the auditor or the audit committee in employment, placement, etc. of employees necessary for performing his/her/its duties. <Amended by Act No. 9829, Dec. 29, 2009>

**Article 33 (Guidelines for Remuneration for Executives)**

(1) The guidelines for remuneration for executives of a public corporation or quasi-governmental institution shall be determined by the board of directors in accordance with the guidelines for remuneration determined by the Minister of Strategy and Finance through the deliberation and resolution of the management committee, considering the following matters: <Amended by Act No. 9277, Dec. 31, 2008; Act No. 9829, Dec. 29, 2009, and Act No. 14076, Mar. 22, 2016>

  1. Institution head: The business performance of the public corporation or quasi-governmental institution, the details of the agreements under Article 31 (3) and (4), and the performance level thereof;

  2. Standing directors (excluding standing audit commissioners): Results from the evaluation of actual execution of the performance agreement under Article 31 (7);

3. Standing auditors and standing audit commissioners: Results from the evaluation of actual performance of duties under Article 36.

(2) An interested executive shall not participate in the directors' meeting in which the guidelines for remuneration for executives under the provisions of paragraph (1) are established.

(3) Notwithstanding the provisions of paragraph (1), the relevant statutes, etc. in force at the time of designation shall apply to the remuneration for the executive for the year in which the institution is designated as a public corporation or quasi-governmental institution under the provisions of Article 6 (excluding the year in which the designation is changed).

**Article 34 (Grounds for Disqualification)**

(1) A person who falls under any of the following subparagraphs shall not be qualified for an executive of a public corporation or quasi-governmental institution: <Amended by Act No. 9277, Dec. 31, 2008; Act No. 9513, Mar. 25, 2009>

1. A person who falls under any of the subparagraphs of Article 33 (Disqualifications) of the State Public Officials Act;

2. A person in whose case three years have not passed since he/she was removed from his/her office in accordance with Articles 22 (1), 31 (6), 35 (2) and (3), 36 (2) and 48 (4) and (8).

(2) An executive shall be automatically discharged, if he/she falls under any subparagraph of paragraph (1) or if it is discovered that he/she has fallen under any subparagraph of paragraph (1) at the time of his/her appointment.

(3) An act in which an executive discharged under the provisions of paragraph (2) was involved before he/she is discharged shall remain valid and effective.

**Article 35 (Liabilities, etc. of Directors and Auditors)**

(1) The provisions of Articles 382-3 (Directors' Duty to be Faithful), 382-4 (Directors' Duty to Keep Secret), 399 (Liability to Company), 400 (Release of Liability to Company) and 401 (Liability to Third Parties) of the Commercial Act shall apply mutatis mutandis to directors of public corporations and quasigovernmental institutions, while the provisions for release of liability to company in Articles 414 (Liability of Auditor) and 415 (Provisions Applicable Mutatis Mutandis) of the Commercial Act shall apply mutatis mutandis to auditors of public corporations and quasi governmental institutions (including auditors of the audit committee; hereafter the same shall apply in this Article).

(2) If a non-standing director (excluding a non-standing director of a quasi-governmental institution; hereafter the same shall apply in this paragraph) or auditor (including a standing audit commissioner; hereafter the same shall apply in this paragraph) fails or neglects to perform his/her duties and responsibilities under paragraph (1) and his/her duties under Article 32, the Minister of Strategy and Finance may, following the deliberation and resolution of the management committee, remove the non-standing director or the auditor or suggest the person who has the power to appoint to remove the non-standing director or auditor and may also demand the relevant public corporation or quasi-governmental institution to claim compensation 'for damages. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

(3) If the institution head, a standing director (excluding a standing audit commissioner; hereafter the same shall apply in this paragraph) or non-standing director of a quasi-governmental institution fails or neglects to perform his/her duties and responsibilities under paragraph (1) and his/her duties under Article 32, the head of the competent agency may remove the institution head, standing director or non-standing director of the quasi-government institution or suggest or demand the person who has the power to appoint to remove the institution head, standing director or non-standing director of the quasi-government institution, and may also demand the relevant public corporation or quasi-governmental institution to claim compensation for

18

damage: Provided, That if the head of the competent agency removes the institution head of a public corporation or recommends the person who has the power to appoint to remove the institution head of a public corporation, it shall undergo the deliberation and resolution of the management committee. <Amended by Act No. 9829, Dec. 29, 2009>

### Article 36 (Evaluation of Actual Performance of Duties of Non-Standing Directors and Auditors)

(1)  The Minister of Strategy and Finance may, in cases where it is necessary, evaluate the actual performance of duties of non-standing directors, an auditor, or auditors of the audit committee of a public corporation or quasi-governmental institution. <Amended by Act No. 8852, Feb. 29, 2008>

(2)  The Minister of Strategy and Finance may remove or recommend the person who has the power to appoint to remove a non-standing director, auditor, or auditor of the audit committee after deliberation and resolution by the management committee, if a result from the evaluation of actual performance of duties of the non-standing director, the auditor, or auditor of audit committee under the provisions of paragraph (1) shows poor performance. <Amended by Act No. 8852, Feb. 29, 2008>

(3)  The criteria and method for the evaluation of actual performance of duties under the provisions of paragraph (1) shall be prescribed by the Minister of Strategy and Finance after deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008>

### Article 37 (Prohibition of Executives and Employees from Taking Concurrent Offices)

(1)  Neither standing executives nor employees of a public corporation or quasi-governmental institution may engage in a business other than their duties for the purpose of making a profit.

(2)  If a standing executive of a public corporation or quasi-governmental institution obtains permission from the person who has the power to appoint or recommend him/her or if an employee of a public corporation or quasi-governmental institution obtains permission from the institution head, he/she may take a non-profit office concurrently.

(3)  The scope of the business for profit under the provisions of paragraph (1) shall be prescribed by Presidential Decree.

### SECTION 4 Budget and Accounting

### Article 38 (Fiscal Year)

The fiscal year of public corporations and quasi-governmental institutions shall conform to the State's fiscal year.

### Article 39 (Accounting Principles, etc.)

(1)  The accounting of public corporations and quasi-governmental institutions shall be based on accruals to clearly show business performance and increases, decreases, and changes in assets.

(2)  A public corporation or quasi-governmental institution may place an individual, legal entity, organization, etc. under restrictions on qualification for participating in a bid for a certain period of time not exceeding two years, if it is clearly foreseeable on its judgment that the individual, legal entity, organization, etc. will interfere with fair competition or proper performance of a contract.

(3)  Necessary matters concerning the accounting principles and restrictions on the qualification for bidding under the provisions of paragraphs (1) and (2) shall be prescribed by Ordinance of the Ministry of Strategy and Finance. <Amended by Act No. 8852, Feb. 29, 2008>

### Article 39-2 (Establishment, etc. of Mid-and Long-Term Financial Management Plan)

(1)  The heads of institutions falling under any of the falling subparagraphs shall annually establish mid-and long-term financial management plans-thereinafter referred to as "mid-and long-term financial management

19

plan") for five fiscal years or more, including the relevant year, have the plans finalized via the resolution by the board of directors, and submit them to the Minister of Strategy and Finance and the heads of competent administrative agencies by June 30: <Amended by Act No. 12268, Jan. 21, 2014>

1. Public corporations and quasi-governmental institutions with total asset size over two trillion won or those with a clause on government's compensation for loss in the laws forming the basis of the foundation thereof;

2. Other public corporations and quasi-governmental institutions under the category prescribed by Presidential Decree, in consideration of the size of their asset and liabilities.

(2) The mid-and long-term financial plan shall include the following details:

1. Business goals under Article 46;

2. Business plans and investment directions;

3. Financial outlook, the grounds thereof, and management plans;

4. Liability management plans detailing the outlook for liability increase and/or decrease, the grounds thereof, management plans, etc.;

5. Evaluation and analysis on any change against the mid-and long-term financial management plan of the previous year, causes of changes and management plans, etc.;

6. Other matters prescribed by Presidential Decree.

(3) The Minister of Strategy and Finance may require of the head of the relevant institution that is a public corporation, and the head of the responsible institution may require of the relevant institution that is a quasigovernmental institution, to change the Mid- and Long-Term Financial Management Plan, respectively, considering the national policy directions, management and economic environments concerning the institutions establishing such Mid- and Long-Term Financial Management Plan. <Newly Inserted by Act No. 12268, Jan. 21, 2014>

(4) Matters, such as detailed methods for preparing a mid-and long-term financial management plan shall be prescribed by Presidential Decree. <Amended by Act No. 12268, Jan. 21, 2014>

[This Article Newly Inserted by Act No. 10286, May 17, 2010]

**Article 40 (Budget Compilation)**

(1) The budget of a public corporation or quasi-governmental institution shall be compiled with the separate parts of the general provisions, the estimated income statement, the estimated balance sheet, and the financial plan.

(2) The institution head shall-prepare a budget bill for the next fiscal year in accordance with the business goals under the provisions of Article 46 and the guidelines for management under the provisions of Article 50; and shall submit the bill to the board of directors of the public corporation or quasi-governmental institution no later than the beginning of the next fiscal year.

(3) The institution head shall conduct a preliminary feasibility study as prescribed by Presidential Decree, in order to compile a budget for a new investment project and capital investment: Provided, That such preliminary feasibility study need not be conducted for any of the following projects: : <Newly Inserted by Act No. 14076, Mar. 22, 2016>

1. A project for which the preliminary feasibility study is conducted under Article 38 of the National Finance Act among projects funded by the government budget;

2. A project related to inter-Korean exchanges and cooperation or a project implemented under an agreement or treaty entered into with another country;

20

3.  A simple improvement and maintenance project implemented to increase the use of an existing facility, such as road maintenance and improvement of deteriorated waterworks;

4.  A project that needs to be implemented urgently to support the recovery from a disaster defined under subparagraph 1 of Article 3 of the Framework Act on the Management of Disasters and Safety (hereinafter referred to as "disaster"), or to ensure the safety of facilities and to cope with health or food safety issues;

5.  A project that needs to be implemented urgently to prevent a disaster, to which the consent of the competent Standing Committee of the National Assembly has been granted;

6.  A project that should be implemented pursuant to the statutes;

7.  A project that needs to be implemented as a national policy in order to ensure balanced regional development and to cope with urgent economic and social situations, and that meets both of the following requirements. In such cases, the details of a project exempt from the preliminary feasibility study and the grounds for exemption shall be reported without delay to the competent Standing Committee of the National Assembly:

    (a)  A detailed project plan including the purpose, scale and implementation method of the project and other matters shall have been formulated;

    (b)  The project shall have been confirmed at the meeting of the State Council because it needs to be implemented as a national policy.

(4)  The budget bill prepared and submitted under the provisions of paragraph (2) shall be finally adopted by resolution of the board of directors: Provided, That if other Act requires a separate process in connection with the budget of a public corporation or quasi-governmental institution, such as a resolution by the general meeting of members including the general meeting of shareholders or investors or a resolution by the fund management deliberation council under the provisions of Article 23, the budget shall be finalized through such a process after resolution by the board of directors, while if other Act requires approval of the head of the competent agency for finalizing a budget of a quasi-governmental institution, such approval shall be obtained from the head of the competent agency after resolution by the board of directors. <Amended by Act No. 14076, Mar. 22, 2016>

(5)  The budget already finalized at the time of designation as a public corporation or quasi-governmental institution under the provisions of Article 6 shall be deemed to have been prepared and finalized in accordance with the provisions of paragraphs (1) through (4). <Amended by Act No. 14076, Mar. 22, 2016>

(6)  The institution head who intends to revise the finalized budget of the public corporation or quasi-governmental institution because of a change in business goals of the public corporation or quasi-governmental institution or any other unavoidable circumstances shall prepare and submit a bill of revised budget to the board of directors. In this case, paragraph (4) shall apply mutatis mutandis to the finalization of the bill of revised budget. <Amended by Act No. 14076, Mar. 22, 2016>

(7)  When the budget is finalized or revised under the provisions of paragraphs (4) through (6), the public corporation or quasi-governmental institution shall report the details to the Minister of Strategy and Finance, the head of the competent agency, and the Chairperson of the Board of Audit and Inspection: Provided, That it shall be deemed to have been reported to the head of the competent agency, where approval under the proviso to paragraph (4) has been obtained from the head of the competent agency. <Amended by Act No. 14076, Mar. 22, 2016>

**Article 41 (Quasi-Budget)**

(1)  If a public corporation or quasi-governmental institution fails to finalize its budget before the beginning of a fiscal year due to a natural disaster or any other inevitable cause or event, the public corporation or quasigovernmental institution may compile and manage a budget based on the budget for the preceding fiscal year (hereafter referred to as the "quasi-budget" in this Article).

21

(2) The quasi-budget shall become ineffective when the budget for the fiscal year is finally established. In this case, the budget already executed under the quasi-budget shall be deemed to have been executed under the budget for the corresponding fiscal year.

**Article 42 (Establishment of Management Plan)**

(1) When the budget is finally established under the provisions of Article 40 (4) and (5), the public corporation or quasi-governmental institution shall establish a management plan, without delay, in accordance with the budget for the corresponding fiscal year after resolution by the board of directors: Provided, That the management plan already established at the time of designation as a public corporation or quasi-governmental institution in accordance with Article 6 shall be deemed to have been established under this Act. <Amended by Act No. 14076, Mar. 22, 2016>

(2) When a public corporation or quasi-governmental institution revises the budget established in accordance with the provisions of Article 40 (6) it shall revise the management plan established in accordance with the provisions of paragraph (1), without delay, after resolution by the board of directors. <Amended by Act No. 14076, Mar. 22, 2016>

(3) A public corporation or quasi-governmental institution shall submit the management plan established for the corresponding fiscal year under the provisions of paragraphs (1) and (2) to the Minister of Strategy and Finance (only in the cases of public corporations) and the head of the competent agency within two months after the budget is finalized in accordance with the provisions of Article 40 (4) through (6). <Amended by Act No. 8852, Feb. 29, 2008, Act No. 14076, Mar. 22, 2016>

**Article 43 (Submission of Statements on Settlement of Accounts)**

(1) Every public corporation and quasi-governmental institution shall prepare the statements on the settlement of accounts for the corresponding fiscal year, without delay, at the end of the fiscal year, and shall take an accounting audit conducted by an accounting auditor (hereinafter referred to as "accounting auditor") appointed from among persons falling under any of the following subparagraphs. In such cases, every public corporation and quasi-governmental institution shall submit the statements on settlement of accounts within the period prescribed by the Rules of the Board of Audit and Inspection: <Amended by Act No. 9513, Mar. 25, 2009>

   1. An accounting firm (hereinafter referred to as "accounting firm") under Article 23 the Certified Public Accountant Act;

   2. An audit team (hereinafter referred to as "audit team") under Article 3 (1) 3 under the Act on External Audit of Stock Companies.

(2) Each public corporation and quasi-governmental institution shall, respectively to the Minister of Strategy and Finance and the head of the competent agency, submit each of the following statements on the settlement of accounts prepared according to paragraph (1) no later than the last day of February of the following year and finalize the settlement of accounts by obtaining approval no later than the last day of March: Provided, That the settlement of accounts shall be finally approved by the general meeting of members, if the public corporation or quasi-governmental institution has the general meeting of members, such as the general meeting of shareholders or investors: <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9513, Mar. 25, 2009; Act No. 9829, Dec. 29, 2009>

   1. Financial statements (including the auditor's' opinion by an accounting auditor) and accompanying documents;

   2. Other documents necessary for clarifying the details of the settlement of accounts.

(3) The Minister of Strategy and Finance and the head of the competent agency shall submit, to the Board of Audit and Inspection, the statements on the settlement of accounts of the public corporation or quasigovernmental institution as finalized in accordance with paragraph (2) and other necessary documents

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

(hereafter referred to as "statements, etc. on the settlement of accounts" in this Article) no later than May 10 every year. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

(4) The Board of Audit and Inspection shall, upon receiving the statements, etc. on the settlement of accounts under paragraph (3), inspect the statements, etc. on the settlement of accounts submitted by the legal entities under Article 22 (1) 3 of the Board of Audit and Inspection Act and other public corporations and quasigovernmental institutions as specified by the Rule of the Board of Audit and Inspection, and shall submit the results thereof to the Minister of Strategy and Finance by no later than July 31. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

(5) Necessary matters concerning the criteria for selection of an accounting firm and audit team qualified for accounting audits under paragraph (1), the procedures of accounting audits, and the audit by the Board of Audit and Inspection for the settlement of accounts under paragraph (4) shall be prescribed by the Rule of the Board of Audit and Inspection. <Amended by Act No. 9513, Mar. 25, 2009>

(6) The Minister of Strategy and Finance shall report to the State Council the statements, etc. on the settlement of accounts under paragraph (3) along with the results of the audit conducted by the Board of Audit and Inspection under paragraph (4), and shall also submit them to the National Assembly by no later than August 20. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9829, Dec. 29, 2009>

(7) Notwithstanding the provisions of paragraphs (1) through (6), the settlement of accounts for the year in which a public corporation or a quasi-governmental institution is designated under the provisions of Article 6 shall be governed by the statues in force at the time of such designation.

## Article 43-2 (Consultation on Transferring Capital of Public Corporation, etc.)

(1) Where a public corporation intends to transfer the profit reserve, the accumulated fund for business expansion, other reserves or accumulated funds into the capital, it shall consult with the Minister of Strategy and Finance in advance before passing the relevant procedure such as the board of directors, a general meeting of stockholders, etc.

(2) Where a public corporation has transferred the profit reserve, the accumulated fund for business expansion, other reserves or accumulated funds into the capital, it shall report the fact to the head of the competent agency.

[This Article Newly Inserted by Act No. 10896, Jul. 25, 2011]

[The Pre-existing Article 43-2 Moved to Article 43-3, Jul 25, 2011]

## Article 43-3 (Appointment, etc. of Accounting Auditors)

(1) Any public corporation or quasi-governmental institution shall establish and operate an appointment committee for accounting auditors with its specialty and independence guaranteed (if an audit committee under Article 20 is established, it shall be deemed the appointment committee for accounting auditors) to appoint the accounting auditors. In such cases, all non-standing directors of the relevant public corporation or quasi-governmental institution shall be appointed as the members of the appointment committee for accounting auditors.

(2) Matters concerning the composition and operation of the appointment committee for accounting auditors under paragraph (1) shall be prescribed, by Presidential Decree.

(3) Articles 3 (3) through (5) and (7), 4 (7) and 9.(1) of the Act on External Audit of Stock Companies shall apply mutatis mutandis to grounds for disqualification, qualifications, appointment, powers, etc. of accounting auditors. In such cases, an "auditor," a "company" and the "auditor selection and appointment commission" shall be deemed an "accounting auditor," a "public corporation or quasi-governmental institution" and the "appointment committee for accounting auditors," respectively.

23

(4) Any accounting auditor and a certified public accountant, employee and other person under his/her control shall not disclose any confidential information acquired in the course of performing his/her duties concerning the accounting audits of a public corporation or quasi-governmental institutions: Provided, That this shall not apply to cases where special provisions exist pursuant to other Acts or the Rules of the Board of Audit and Inspection under Article 43 (5). <Amended by Act No. 10896, Jul. 25, 2011>

[This Article Newly Inserted by Act No. 9513, Mar. 25, 2009]

[This Article Moved from Article 43-2. The Pre-existing Article 43-3 Moved to Article 43-4, Jul. 25, 2011]

**Article 43-4 (Liability for Damage)**

Article 17 (1) through (5) and (7) of the Act on External Audit of Stock Companies shall apply mutatis mutandis to liability of an accounting auditor, director, auditor, member of the audit committee or other person for damage to a public corporation, quasi-governmental institution or a third party. In such cases, an "auditor," a "company" and "Article 4" shall be deemed an "accounting auditor," a "public corporation or quasigovernmental institution" and "Article 43," respectively.

[This Article Newly Inserted by Act 9513, Mar. 25, 2009]

[This Article Moved from Article 43-3, Jul. 25, 2011]

**Article 44 (Commission of Purchasing Goods and Contracting Construction Works)**

(1) Where any public corporation or quasi-governmental institution intends to purchase competing products among small and medium enterprises under Article 6 of the Act on Facilitation of Purchase of Small and Medium Enterprise-Manufactured Products and Support for Development of their Markets for not less than the amount announced by the Minister of Strategy and Finance pursuant to Article 4 (1) of the Act on Contracts to which the State is a Party, the public corporation or quasi-governmental institution shall commission the purchase thereof to the Administrator of the Public Procurement Service or purchase them according to contracting methods under Article 5 of the Government Procurement Act: Provided, That this shall not apply to cases prescribed by Ordinance of the Ministry of Strategy and Finance considering the uniqueness, specialty, safety and other aspects of a product to be purchased. <Newly Inserted by Act No. 9829, Dec. 29, 2009>

(2) A public corporation or quasi-governmental institution may commission the Administrator of the Public Procurement Service to purchase goods in demand or execute a contract for construction works, if considered necessary. <Amended by Act No. 9829, Dec. 29, 2009>

**Article 45 (Investment Method)**

When the Government invests the capital in a public corporation or quasi-governmental institution, the Minister of Strategy and Finance shall decide on the period and method for such investment to implement it accordingly. <Amended by Act No. 8852, Feb. 29, 2008>

**SECTION 5 Evaluation and Supervision of Management**

**Article 46 (Establishment of Management Goals)**

(1) The institution head shall set up medium and long-term management goals for not less than five fiscal years including the following year, considering the substance of business, the management environment, and the details, etc. of the agreements executed under the provisions of Article 31 (3) and (4), and shall submit them to the Minister of Strategy and Finance and the head of the competent agency by no later than October 31

24

every year after finalizing them through resolution by the board of directors. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 10286, May 17, 2010>

(2) Notwithstanding the provisions of paragraph (1), with respect to the year in which the institution is designated as a public corporation or quasi-governmental institution (excluding a change in designation) under the provisions of Article 6, the institution head shall set up medium and long-term management goals for not less than three fiscal years including the corresponding year within three months after such designation, and shall submit them to the Minister of Strategy and Finance and the head of the competent agency after finalizing them through resolution by the board of directors. <Amended by Act No. 8852, Feb. 29, 2008>

(3) Whenever the management goals set up under paragraphs (1) and (2) are changed, the head of institutions shall submit the details of the change to the Minister of Strategy and Finance and the head of the competent agency immediately after finalizing them through resolution by the board of directors. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 10286, May 17, 2010>

(4) Considering the management environment, the economic situation, the direction of national policies, etc. of a public corporation or quasi-governmental institution, the Minister of Strategy and Finance may demand the head of a public corporation to change business goals, while the head of the competent agency may demand such a change to the head of a quasi-governmental institution. <Amended by Act No. 8852, Feb. 29, 2008>

**Article 47 (Report on Management Performance, etc.)**

(1) Every public corporation and quasi-governmental institution shall prepare a report describing the management performance for the preceding year (hereinafter referred to as the "management performance report") and a report on performance of the agreement executed by the institution head in accordance with the provisions of Article 31 (3) and (4), and shall submit them to the Minister of Strategy and Finance and the head of the competent agency by no later than March 20 each year. <Amended by Act No. 8852, Feb. 29, 2008>

(2) The provisions of paragraph (1) shall not be applicable to the year in which the institution is designated as a public corporation or quasi-governmental institution under the provisions of Article 6 (excluding a change in designation).

(3) The management performance report shall be accompanied by the statements on the settlement of accounts prepared according to Article 43 (1). <Amended by Act No. 9829, Dec. 29, 2009>

**Article 48 (Management Performance Evaluation)**

(1) The Minister of Strategy and Finance shall evaluate the management performance of a public corporation or quasi-governmental institution based on the report on the performance of the agreement under the provisions of Article 31 (3) and (4), the management goals under the provisions of Article 46 and the management performance report: Provided, That such management performance evaluation shall not be made in the year during which the institution is designated as a public corporation or quasi-governmental institution under the provisions of Article 6 (excluding a change in designation). <Amended by Act No. 8852, Feb. 29, 2008>

(2) In making the management performance evaluation of a public corporation or quasi- governmental institution under the provisions of main sentence of paragraph (1), the Minister of Strategy and Finance shall utilize the results from the evaluations already made for the institutions subject to the evaluation of fund management under the provisions of Article 82 (Evaluation of Fund Management) of the National Finance Act and the institutions subject to the evaluation under Article 32 (Fostering Government-Invested Research Institutes, etc.) (3) of the Framework Act on Science and Technology. <Amended by Act No. 8852, Feb. 29, 2008, May 28, 2014>

(3) The Minister of Strategy and Finance may request a public corporation or quasi-governmental institution to submit relevant data, if necessary for the management performance evaluation under paragraph (1). <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277, Dec. 31, 2008>

(4) In cases where a public corporation or quasi-government institution has failed to submit a report on the execution of an agreement under Article 31 (3) and (4), a management performance report and their attached documents or prepare and submit them falsely, the Minister of Strategy and Finance shall modify the result of management performance evaluation and the piece rate through the deliberation and resolution of the management committee, or take measures, such as caution, warning or such to the relevant institution, or request the head of the competent agency or institution head to take personnel measures for the related persons. In such cases, if the auditor or the audits of the audit committee has failed or neglected to perform the related duties, the Minister of Strategy and Finance may dismiss the relevant auditor or audits of the audit committee through the deliberation and resolution of the management committee or memorialize a person who has the power to appoint the institution head and standing directors to dismiss him/her. <Newly Inserted by Act No. 9277, Dec. 31, 2008>

(5) Criteria and methods for the evaluation of management performance under paragraph (1) shall be prescribed by the Minister of Strategy and Finance through deliberation and resolution by the management committee, in such a manner that the following matters shall be included in the evaluation of a public corporation or quasi-governmental institution: <Amended by Act No. 14076, Mar. 22, 2016>

    1.   The rationality and achievement level of management goals;

    2.   The public nature and efficiency of major projects;

    3.   The adequacy of organizational and personnel management, including types of employment of employees;

    4.   Soundness in financial management and budget-saving efforts, including the implementation of the mid- and long-term financial management plan formulated under Article 39-2;

    5.   Results of the customer satisfaction survey conducted under Article 13 (2);

    6.   Operation of a rational performance-based payment system;

    7.   Other matters related to the management of the public corporation or quasi-governmental institution.

(6) The Minister of Strategy and Finance may organize and operate a management evaluation team for public corporations and quasi-governmental institutions (hereinafter referred to as "management evaluation team") to ensure the efficient execution of management performance evaluation under paragraph (1) and to provide professional and technical research or consultation concerning management performance evaluation. <Newly Inserted by Act No. 9513, Mar. 25, 2009>

(7) The Minister of Strategy and Finance shall finish the evaluation of the management performance of public corporations and quasi-governmental institutions by no later than June 20 each year, and shall report the results therefrom to the National Assembly and the President after deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277 Dec. 31, 2008; Act No. 9513 Mar. 25, 2009>

(8) The Minister of Strategy and Finance may recommend or request the person who has the power to appoint the institution head and standing directors of a public corporation or a quasi-governmental institution to remove the institution head or the standing directors under the provisions of Articles 25 and 26 after deliberation and resolution by the management committee, if the results from the business performance evaluation under paragraph (7) show poor performance of the public corporation or quasi-governmental institution. <Amended by Act No. 8852, Feb. 29, 2008; Act No. 9277, Dec. 31, 2008; Act No. 9513, Mar. 25, 2009>

(9) The Minister of Strategy and Finance may request a public corporation or quasi-government institution which has caused the insolvent management due to the excessive appropriation of personnel expenses as a

26

result of the management performance evaluation under paragraph (1) and the violation of guidelines of operation under Article 50 (1) to take personnel or budgetary measures for securing of the responsibility for future management and improvement in management through the deliberation and resolution of the management committee. <Newly Inserted by Act No. 9277, Dec. 31, 2008; Act No. 9513 Mar. 25, 2009>

(10) Necessary matters concerning the procedure for the management performance evaluation, the measures following the results from the management performance evaluation under paragraph (1), and composition, operation, etc. of the management evaluation team shall be prescribed by Presidential Decree. <Amended by Act No. 9277, Dec. 31, 2008; Act No. 9513, Mar. 25, 2009>

**Article 49 (Preparation of Annual Report)**

The Minister of Strategy and Finance may prepare and publish an annual report concerning the business status, etc. of public corporations and quasi-governmental institutions every year, based on the management performance reports and the results from the management performance evaluation under the provisions of Article 48. <Amended by Act No. 8852, Feb. 29, 2008>

**Article 50 (Guidelines for Management)**

(1) The Minister of Strategy and Finance shall establish the guidelines for the following matters in connection with the daily affairs relating to the administration of public corporations and quasi-governmental institutions (hereinafter referred to: as the "management guidelines") after deliberation and resolution by the management committee, and shall notify the guidelines to the heads of public corporations, quasigovernmental institutions and competent agencies: <Amended by Act No. 8852, Feb. 29, 2008>

　　1. Matters concerning the administration of organization and the prescribed number and management of personnel;

　　2. Matters concerning the budget and the fund administration;

　　3. Other matters that the Minister of Strategy and Finance considers necessary for securing the financial soundness of public corporations and quasi-governmental institutions.

(2) If necessary for transparent and fair personnel management, ethical management, etc. of public corporations and quasi-governmental institutions, the head of a relevant administrative agency accountable for the related policy may present the Minister of Strategy and Finance his/her opinion about the management guidelines under the provisions of paragraph (1). <Amended by Act No. 8852, Feb. 29, 2008>

**Article 51 (Supervision over Public Corporations and Quasi-Governmental Institutions)**

(1) The Minister of Strategy and Finance and the head of the competent agency shall limit their supervision over public corporations and quasi-governmental institutions to the matters and the extent specifically prescribed in this Act or other statute to ensure that self-controlling management of public corporations and quasi-governmental institutions is not undermined. <Amended by Act No. 8852, Feb. 29, 2008>

(2) The Minister of Strategy and Finance shall supervise the matters concerning the compliance with the management guidelines for public corporations. <Amended by Act No. 8852, Feb. 29, 2008>

(3) The head of the competent agency shall supervise the following matters of public corporations and quasigovernmental institutions:

　　1. Matters concerning proper execution of the business commissioned by the head of the competent agency to public corporations and quasi-governmental institutions under relevant statutes or the business directly related to their assigned business affairs and other matters prescribed by related statutes;

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:41 PM, Submission Status: Approved

2.  Matters concerning the compliance with the' management guidelines for quasi-governmental institutions.

(4)  The Minister of Strategy and Finance and the head of the competent agency shall monitor whether the supervision under the provisions of paragraphs (2) and (3) is properly executed, as prescribed by Presidential Decree, and shall take measures necessary for improvement, after deliberation and resolution by the management committee. <Amended by Act No. 8852, Feb. 29, 2008>

### Article 51-2 (Consultations on Establishment, etc. of Funding or Investment Institutions)

(1)  Where a public corporation or quasi-governmental institution intends to establish a funding or investment institution or to fund or invest in other corporations, it shall hold a prior consultation with the head of the competent institution and the Minister of Strategy and Finance: Provided, That, where the public corporation or quasi-governmental institution has already followed the formalities equivalent to a prior consultation, or a public institution dealing with finance makes an investment, in specific cases prescribed by Presidential Decree, it need not hold a prior consultation.

(2)  Matters necessary for the prior consultation under paragraph (1) and other matters shall be prescribed by Presidential Decree. <Newly Inserted by Act No. 14076, Mar. 22, 2016>

### Article 52 (Audit by Board of Audit and Inspection)

(1)  The Board of Audit and Inspection may audit the business affairs and accounting of public corporations and quasi-governmental institutions in accordance with the Board of Audit and Inspection Act.

(2)  The Board of Audit and Inspection may commission or delegate the audit under the provisions of paragraph (1) to the head of a related administrative agency, etc.

(3)  Necessary matters concerning the scope of the heads of related administrative agencies, etc. to whom the Board of Audit and Inspection may commission or delegate the audit of public corporations and quasigovernmental institutions under the provisions of paragraph (2), the report on the results of the audit, the actions following the results, etc. shall be prescribed by the Rule of the Board of Audit and Inspection.

### Article 52-2 (Presentation of Audit Result to National Assembly)

(1)  A public corporation or a quasi-government institution shall present matters falling under the following subparagraphs to the competent standing committee of the National Assembly without delay:

1.  An audit report having synthesized the audit result executed by the auditor or the audit committee;

2.  Matters pointed out and matters requesting disposition in the audit executed by the Board of Audit and Inspection pursuant to Article 52 and a plan of measures for them.

(2)  The Minister of Strategy and Finance shall present the result of evaluation of the actual performance of duties of the auditor or the audits of the audit committee executed pursuant to Article 36 (1) to the National Assembly without delay."

[This Article Newly Inserted by Act No. 9277, Dec. 31, 2008]

### CHAPTER V SUPPLEMENTARY PROVISIONS

### Article 53 (Legal Fiction of Public Officials in Application of Penal Provisions)

A person who serves as an executive officer or employee of a public institution, a member of the management committee, or member of the executive recommendation committee, who is not a public official, shall be deemed a public official in application of Articles 129 through 132 of the Criminal Act. <Amended by Act No. 14076, Mar. 22, 2016>

28

**Article 53-2 (Notification by Investigation Agencies, etc. Upon Commencement and Completion of Investigations**

Upon commencing or completing an inquiry or investigation into a case related to the duties of an executive officer or employee of a public institution, the Board of Audit and Inspection of Korea, the Prosecutors' Office, the Korea National Police Agency, or any other investigation agency shall notify the head of the public institution of the relevant facts and results of the inquiry or investigation within 10 days. <Newly Inserted by Act No. 14076, Mar. 22, 2016>

**Article 53-3 (Restrictions on Voluntary Dismissal from Office)**

A person authorized to appoint or recommend executives officers of a public institution may elect to disapprove the voluntary dismissal of an executive officer who has applied for voluntary dismissal from office, if the executive officer is being investigated by the Prosecutors' Office, the Police Agency, or any other investigation agency, or audited by the Board of Audit and Inspection or any other audit agency in relation to his/ her misconduct, or if a request has been made to the disciplinary committee of the public institution concerned to pass a resolution on a severe disciplinary action against the executive officer. <Newly Inserted by Act No. 14076, Mar. 22, 2016>

**Article 54 (Exercise, etc. of Minority Stockholders' Rights)**

Article 542-6 of the Commercial Act shall apply mutatis mutandis to the exercise of minority stockholder's rights in and a stockholder's proposal to public corporations and quasi-governmental institutions, stocks of which have not been listed in the securities exchange prescribed by the Presidential Decree. <Amended by Act No. 11845, May 28, 2013>

[This Article Wholly Amended by Act No. 9829, Dec. 29, 2009]

## CHAPTER VI PENAL PROVISIONS

**Article 55 (Penal Provisions)**

(1) If any accounting auditor, certified public accountant under an accounting auditor's control, auditor or member of the appointment committee for accounting auditors (referring to an audit commissioner if an audit committee is established) receives, requests for or promises money, valuables or gains after having received an illegal solicitation in respect of his/her duty, he/she shall be punished by imprisonment for not more than three years or by a fine not exceeding ten million won: Provided, That each of the aforesaid persons shall be punished by a fine not exceeding the amount equivalent to five times the economic gains acquired in respect of the duty in question, if five times the amount of the economic gains acquired in respect of the duty in question exceeds three million won in cases of imposition of a fine.

(2) Any person who promises, provides or indicates his/her intention to provide money, valuables or gains prescribed under paragraph (1) shall be also subject to paragraph (1).

(3) Money, valuables or gains prescribed under" paragraphs (1) and (2) shall be confiscated. Where all or any of the money, valuables or gains cannot be confiscated, the equivalent value shall be additionally collected.

[This Article Newly Inserted by Act No. 9513, Mar. 25, 2009]

**Article 56 (Penal Provisions)**

(1) Where any person under Article 635 (1) of the Commercial Act or any other person who is in charge of accounting of a public corporation or quasi-governmental institution prepares and announces a false financial statement, in violation of the accounting principles under Article 39 (1), shall be punished by imprisonment for not more than five years or by a fine not exceeding five million won.

29

(2) Where any person under Article 635 (1) of the Commercial Act or any other person who is in charge of accounting of a public corporation or quasi-governmental institution or who is an accounting auditor or certified public accountant under his/her control performs any of the following acts, such person shall be punished by imprisonment for not more than three years or by a fine not exceeding 30 million won: <Amended by Act No. 10896, Jul. 25, 2011>

    1.    Where he/she fails to appoint an accounting auditor without justifiable grounds;

    2.    Where he/she omits to make an entry of any matter to be entered in the auditor's opinion or makes any false entry;

    3.    Where he/she divulges confidential information, in violation of Article 43-3 (4);

    4.    Where he/she fails to prepare the statements on the settlement of accounts.

(3) Where any person under Article 635 (1) of the Commercial Act or any other person who is in charge of accounting of a public corporation or quasi-governmental institution or who is an accounting auditor or certified public accountant under his/her control performs any of the following acts, such person shall be punished by imprisonment for not more than two years or by a fine not exceeding 20 million won: <Amended by Act No. 10896, Jul. 25, 2011>

    1.    Where he/she presents false data to an accounting auditor or certified public accountant under his/her control or interferes with an accounting auditor in conducting a normal accounting audit by false or other illegal means;

    2.    Where he/she refuses, interferes with or challenges an accounting auditor's requests for inspection, reproduction, submission, etc. of data or investigation under Article 43-3 (3) or fails to submit relevant data, without justifiable grounds;

    3.    Where he/she fails to submit the statements on the settlement of account to an accounting auditor, in violation of Article 43 (1).

[This Article Newly Inserted by Act No. 9513, Mar. 25, 2009]


ADDENDA

Article 1 (Enforcement Date)

    This Act shall enter into force on April 1, 2007: Provided, That necessary actions for the composition of the management committee under the provisions of Article 9 and the designation of public corporations, quasigovernmental institutions, and non-classified public institutions to whom this Act shall apply for the first time after this Act enters into force may be done even before the enforcement of this Act.


Article 2 (Repeal of other Acts)

    The following Acts shall be repealed respectively:

    1.    The Framework Act on the Management of Government-Invested Institutions;

    2.    The Framework Act on the Management of Government-Affiliated Institutions.


Article 3 (Initial Designation and Classification of Public Institutions, etc.)

(1) The Minister of Planning and Budget shall designate the public corporations, quasi- governmental institutions, and non-classified public institutions to whom this Act shall apply, after consultation with the heads of the competent agencies and deliberation and resolution by the management committee, simultaneously with the enforcement of this Act, and shall publicly notify such designation.

(2)  In designating the public corporations and quasi-governmental institutions initially and publicly notifying such designation under the provisions of paragraph (1), the Minister of Planning and Budget shall designate the institutions whose prescribed number of personal is not less than 50 employees among the institutions subject to application of the Framework Act on the Management of Government-Invested Institutions, the Framework Act on the Management of Government-Affiliated Institutions, and the Act on the Improvement of Managerial Structure and Privatization of Public Enterprises at the time when this Act enters into force.

Article 4 (Transitional Measures)

(1)  Notwithstanding the provisions of Article 9 (2), the members of the management committee initially commissioned under the provisions of Article 9 (1) 4 may be given different terms of office for three years, two years, and one year respectively.

(2)  Notwithstanding the provisions of Article 31 (5), the agreement on management and performance already executed by the head of an institution designated as a public corporation or quasi-governmental institution for the first time after the enforcement of this Act in connection with his/her appointment at the time when he/she was appointed to the office shall be deemed to be the agreement entered into between the head of the competent agency and the institution head under this Act.

(3)  Notwithstanding the provisions of Article 46 (2), the management goals set up at the time of the enforcement of this Act by a public corporation or quasi-governmental institution designated for the first time after enforcement of this Act shall be deemed to have been set up in accordance with this Act.

(4)  Notwithstanding the proviso to Article 48 (1), the relevant provisions of the Framework Act on the Management of Government-Invested Institutions and the Framework Act on the Management of Government-Affiliated Institutions shall apply to the evaluation of the report and the evaluation of management performance of a public corporation' or quasi-governmental institution designated for the first time after the enforcement of this Act.

(5)  The matters resolved by the former committee for management of government-invested institutions and the former committee for management of government-affiliated institutions existing at the time of enforcement of this Act shall be deemed to have been resolved by the management committee under this Act.

Article 5 (Relations to other Acts and Subordinate Statutes)

In cases where any other Acts and subordinate statutes enforceable at the time when this Act enters into force have cited a government-invested or government-affiliated institution, it shall be deemed, until December 31, 2009, to have cited an institution identified as a government-invested or government affiliated institution under the Framework Act on the Management of Government-Invested Institutions or the Framework Act on the Management of Government-Affiliated Institutions enforceable at the time when this Act enters into force. <Amended by Act No. 9345, Jan. 30, 2009>

ADDENDA <Act No. 8635, Aug. 3, 2007>

Article 1 (Enforcement Date)

This Act shall enter into force one year and six months after the date of its promulgation. (Proviso Omitted.)

Articles 2 through 44 Omitted.

ADDENDUM <Act No. 8696, Dec. 14, 2007>

This Act shall enter into force on the date of its promulgation.

ADDENDA <Act No. 8852, Feb. 29, 2008> Article 1 (Enforcement Date)

This Act shall enter into force on the date of its promulgation. (Proviso Omitted.)

31

Articles 2 through 7 Omitted.

ADDENDUM <Act No. 9277, Dec. 31, 2008>

This Act shall enter into force three months after the date of its promulgation.

ADDENDUM <Act No. 9345, Jan. 30, 2009>

This Act shall enter into force on the date of its promulgation.

ADDENDA <Act No. 9513, Mar. 25, 2009>

(1) (Enforcement Date) This Act shall enter into force on January 1, 2010: Provided, That the amended provisions (limited to the parts amended under this Act) of Articles 25, 34 and 48 of the amended ACT ON THE MANAGEMENT OF PUBLIC INSTITUIONS (Act No. 9277) shall enter into force three months after the date of its promulgation.

(2) (Applicability concerning Accounting Audits, Appointment of Accounting Auditors, Accounting Auditor's Liability for Damage) The amended provisions of Articles 43, 43-2 and 43-3 shall apply beginning with the settlement of accounts for the fiscal year of 2010.

(3) (Applicability concerning Composition and Operation of Management Evaluation Team) The amended provisions (limited to the parts amended under this Act) of Article 48 of the amended ACT ON THE MANAGEMENT OF PUBLIC INSTITUIONS (Act No. 9277) shall apply beginning with the first evaluation of management performance conducted after this Act enters into force.

ADDENDA <Act No. 9829, Dec. 29, 2009>

(1) (Enforcement Date) This Act shall enter into force on the date of its promulgation: Provided, That the amended provisions of Articles 24, 26 (3) and 44 shall enter into force three months after the date of its promulgation.

(2) (Applicability concerning Submission of Statements on Settlement of Accounts) The amended provisions of Article 43 shall apply beginning with the settlement of accounts for the fiscal year of 2010.

(3) (Applicability concerning Appointment and Removal of Executives) Where the procedure of appointing and removing the executives of a public corporation and quasi-governmental institution is in progress at the time this Act enters into force, the, former provisions shall govern, notwithstanding the amended provisions of Articles 25 and 26.

ADDENDA <Act No. 10286, May 17, 2010>

(1) (Enforcement Date) This Act shall enter into force on the date of its promulgation.

(2) (Applicability concerning Mid-and Long-term Financial Management Plan) The amended provisions of Articles 39-2 and 46 shall apply beginning with mid-and long-term financial management plans and mid and long-term business goals to be established in 2012.

ADDENDA <Act No. 10896, Jul. 25, 2011>

This Act shall enter into force on the date of its promulgation.

ADDENDA <Act No. 12673, May 28, 2014>

Article 1 (Enforcement Date)

This Act shall enter into force on the date of its promulgation.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Articles 2 through 3 Omitted.

Articles 4 (Amendment of other Act) <Act No. 12673, May 28, 2014> (The Framework Act on Science and Technology)

Article 1 (Effective Date)

This Act shall take effect on the date of its promulgation. <Proviso omitted>

Articles 2 and 3 omitted

Article 4 (Amendment of Other Acts)

(1)   The ACT ON THE MANAGEMENT OF PUBLIC INSTITUIONS is partially amended as follows.

"under the provisions of Article 32 (Fostering Government-Invested Research Institutes, etc.) (2) of the Framework Act on Science and Technology" in Article 48(2) shall be changed to "under Article 32 (Fostering Government-Invested Research Institutes, etc.) (3) of the Framework Act on Science and Technology"

(2)   through (5) omitted

ADDENDA <Act No. 14076, Mar. 22, 2016>

This Act shall enter into force six months after the date of its promulgation.

ADDENDA <Act No. 14461, Dec. 27, 2016>

This Act shall enter into force six months after the date of its promulgation.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Exhibit 15.4

## ENFORCEMENT DECREE OF THE ACT ON THE MANAGEMENT OF PUBLIC INSTITUIONS

Enforced on Oct. 15, 2011
Amended by Presidential Decree No. 23221, Oct. 14, 2011
Presidential Decree No. 11690, Mar. 23, 2013
Presidential Decree No. 24780, Oct. 2, 2013
Presidential Decree No. 25279, Mar. 24, 2014
Presidential Decree No. 25532, Aug. 6, 2014
Presidential Decree No. 25751, Nov. 19, 2014
Presidential Decree No. 27073, Mar. 31, 2016
Presidential Decree No. 27505, Sep. 22, 2016
Presidential Decree No. 28211, Jul. 26, 2017
Presidential Decree No. 28232, Aug. 9, 2017

**Article 1 (Purpose)**

The purpose of this Decree is to provide for the matters delegated by the Act on the Management of Public Institutions and the matters necessary for the enforcement thereof.

**Article 2 (Amount of Total Revenue)**

The term "amount of total revenue" in Articles 4 (1) 2 and Article 5 (2) and (3) 1 (a) of the Act on the Management of Public Institutions (hereinafter referred to as the "Act") means an amount calculated in accordance with the attached Table 1, excluding the amount of obligations to pay in the future from the revenue acquired by the institution as earnings from its business or granted as an aid by the State, a local government, a private sector, etc. and the derivative revenue yielded from such revenue.

**Article 3 (Amount of Government Aid)**

The term "amount of the Government grants" in Article 4 (1) 2 of the Act means the aggregate of the following amounts out of the amount of total revenue:

1. The amount of revenue transferred from the Government including contributions and subsidies, and the amount of revenue transferred from a private sector, etc. in compliance with a mandatory provision of a statute including charges under the Framework Act on the Management of Charges;

2. The amount of revenue earned from a business specified by a statute as a business of the institution or commissioned on the ground prescribed for such commission by a statute or the amount of revenue earned from an monopoly provided for by a statute or granted on the ground prescribed by a statute. In this case, the amount of revenue means all revenues earned from a commissioned business or monopoly including fee, admission fee, use charge, insurance premium, contribution, charge, etc. in whatsoever name; and

3. The amount of derivative revenue yielded from the management of the revenues specified in subparagraphs 1 and 2.

**Article 4 (Criterion of Securing Practical Control)**

The term "secure practical control over" in Article 4 (1) 3 through 5 of the Act means one of the following cases:

1. Where it is possible, because of the largest shares in possession, to control the institution by the exercise of shareholder rights in the light of the diversification of shares;

1

2.     Where involvement in appointment (including approval and recommendation) of the head of the institution or a majority of members of its board of directors is secured by a statute or the articles of incorporation; or

3.     Where an authority to approve the budget or business plan of the institution is secured by a statute or the articles of incorporation.

**Article 5 (Self-Generating Revenue)**

The term "self-generating revenue" in Article 5 (2) and (3) 1 (a) of the Act means the aggregate of the following revenues, excluding the amount falling under subparagraph 1 of Article 3 from calculation of the following revenues:

1.     Revenue from the business for its original purpose: The amount of revenue directly generated from the business specified in the Act that provides for the ground for the establishment of the institution or its articles of incorporation, as calculated in accordance with the attached Table 2;

2.     Revenue from other business: The amount of revenue generated from the business not specified in the Act that provides for the ground for the establishment of the institution or its articles of incorporation, as calculated in accordance with the attached Table 2; and

3.     Revenue from any sources other than business: The amount of incidental revenue accrued derivatively from the business specified in subparagraphs 1 and 2 such as interest income accrued from the momentary fund management, as calculated in accordance with the attached Table 2.

**Article 6 (Method for Calculating Total Revenue, etc.)**

(1)     The amount of total revenue under Articles 4 (1) 2 and 5 (2) and (3) 1 (a) of the Act, the amount of the Government grants under Article 4 (1) 2 of the Act, and the amount of self-generating revenue under Article 5 (2) and (3) 1 (a) of the Act (hereinafter referred to as the "amount of total revenue, etc.") shall be the average amount for the latest three years, calculated based on the financial statements for the settlement of accounts for the latest three years.

(2)     In calculating total revenue, etc. in accordance with paragraph (1), an institution whose financial statements have been prepared for less than three years shall calculate its total revenue, etc. utilizing the financial statements for the corresponding period of time, while an institution whose financial statements have not been prepared yet shall prepare data equivalent to those statements based on its budget for such calculation.

(3)     The financial statements under paragraph (1) shall be basically the financial statements prepared on the basis of accruals: Provided, That an institution that does not prepare such statements in accordance with accruals shall prepare data equivalent to those statements for such calculation.

(4)     The prescribed number of personnel in applying Article 5 (1) of the Act, Article 3 (2) of the Addenda to the Act and Articles 21 and 22 of this Decree shall mean the prescribed number of personnel as of the end of the year immediately preceding the designation as a public institution or the appointment or removal of executives: Provided, That in cases of a public institution in which the prescribed number of personnel as of the end of the immediately preceding year does not exist due to reasons, such as being newly designated as a public institution under the proviso to the part, other than the subparagraphs of Article 6 (1) of the Act, it refers to the prescribed number on the day such reason arises. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(5)     The asset size under Article 5 (3) 1 (a), the main sentence of the Article 18 (2) and (4), the main sentence of Article 20 (2) and (3) and the proviso to the Article 21 (2) of the Act and Article 22 (1) 2 of this Decree shall be calculated based on the financial statements for the settlement of accounts for the latest year: Provided, That in cases of a public institution, financial statements of which are not prepared due to reasons, such as being newly designated as a public institution under the proviso to the part, other than the

2

subparagraphs of Article 6 (1) of the Act, the asset size shall be calculated based on the budget of the year in which such reason arises. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(6)   The amount of total revenue under Articles 21 and 22 (1) 1 shall be calculated based on the financial statements for the settlement of accounts for the latest year: Provided, That in cases of a public institution, financial statements of which are not prepared due to reasons, such as being newly designated as a public institution under the proviso to the part other than the subparagraphs of Article 6 (1) of the Act, the amount of total revenue shall be calculated based on the budget of the year in which such reason arises. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(7)   The Minister of Strategy and Finance may prepare more specific guidelines for calculating total revenue, etc. to notify them to the administrative agencies that control the affairs of public corporations, quasigovernmental institutions, and non-classified public institutions under relevant statutes (hereinafter referred to as the "competent agencies"). <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

**Article 7 (Criterion of Designation of Market-based Public Corporations)**

"Criterion prescribed by Presidential Decree" in Article 5 (3) 1 (a) of the Act means 85 percent.

**Article 8 (Procedure for Designation of Public Institutions. etc.)**

(1)   The head of the competent agency shall notify the Minister of Strategy and Finance of the institutions subject to designation of public institutions under Article 4 of the Act no later than one month before the beginning of each fiscal year. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2)   If a change occurs in the legal personality, name, etc. of a public institution, or any reason for initial designation of or designation of a public institution by changing the classification or any reason for the cancelation of designation under the proviso to the part, other than the subparagraphs of Article 6 (1) of the Act occurs, the head of the competent agency shall immediately notify the details thereof to the Minister of Strategy and Finance. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

**Article 9 (Examination on Establishment of New Institution)**

When the head of the competent agency requests the Minister of Strategy and Finance to examine the feasibility of the establishment of a new institution in accordance with Article 7 (1) of the Act, the head shall submit a plan containing the following descriptions and materials: <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

1.   Scope and substance of the business of the institution;

2.   Services and goods that the new institution will provide;

3.   Annual revenue expected and budget of the Government grants required in the next five years;

4.   Plan for the management of the organization and human resources for the next five years;

5.   Current status of related institutions already established;

6.   Other materials requested by the Minister of Strategy and Finance.

**Article 10 (Matter Subject to Deliberation and Resolution by Management Committee)**

"Other matters prescribed by Presidential Decree concerning management of public institutions" in subparagraph 15 of Article 8 of the Act means the following matters: <Amended by Presidential Decree No. 28232, Aug. 9, 2017>

1.   Matters concerning the items, guidelines, procedure, etc. for the consolidated publication under Article 16;

3

2.  Matters concerning the scope of public institutions that provide direct services to the people under Article 17 (1);

3.  Matters concerning the designation of the institutions exempt from the function adjustment. etc. under Article 18 (2);

4.  Matters concerning the request for evaluation of business performance under Article 27 (1);

5.  Matters concerning the management of the management evaluation team for public corporations and quasi-governmental institutions under Article 28 (4);

6.  Matters concerning the determination on whether to consider as actual revenue under subparagraph 3 (c) of attached Table 1.

**Article 11 (Composition of Management Committee)**

(1)  "Vice Minister, Deputy Administrator, or an equivalent public official of the related administrative agency as prescribed by Presidential Decree" in Article 9 (1) 2 of the Act means one of the following persons: <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Presidential Decree No. 11690, Mar. 23 2013; Presidential Decree No. 25751, Nov. 19, 2014; Presidential Decree No. 28211, Jul. 26, 2017 >

1.  One Vice-Minister of the Ministry of Strategy and Finance nominated by the Minister of the Ministry of Strategy and Finance;

2.  Vice-Minister of the Ministry of the Interior and Safety;

3.  One Vice-Minister level public official nominated by the Chairman of Anti-Corruption & Civil Rights Commission;

4.  Minister of Personnel Management

(2)  "People who have good knowledge and experience in the area of the management and business administration of public institutions" in Article 9 (1) 4 of the Act means the following persons: <Amended by Presidential Decree No. 20947, Jul. 29, 2008>

1.  Persons who have a career of working for a university, a college, or an officially recognized research institute as an adjunct professor or in an equivalent position for at least five years;

2.  Persons who have a career as a judge, a public prosecutor, or a lawyer for at least ten years;

3.  Persons who have a career of working for a public institution under the Act and this Decree or a stock-listed corporation under Article 9 (15) 3 of the Financial Investment Services and Capital Markets Act for at least twenty years and who have served as an executive for at least three years;

4.  Persons who have a career of engaging in the area of audit or accounting for the institutions enumerated in subparagraph 3 with a license of certified public accountant for at least ten years;

5.  Persons who have worked as a public official in the Senior Civil Service or a public official in political service;

6.  Other persons whose career, etc. relating to the management of a public institution are recognized as equivalent to the criteria set forth in subparagraphs 1 through 5.

(3)  The management committee may establish and run an advisory team composed of related specialists to give advices on specialized or technical matters relating to the management of public institutions.

**Article 12 (Management of Management Committee)**

(1)  The chairperson shall convene the meeting of the management committee and shall take the chair in the meeting.

4

(2) If the chairperson is unable to perform his/her duties, the member designated by the chairperson shall act on behalf of the chairperson. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(3) The management committee may request a public official concerned or an executive or an employee of a public institution to appear before the committee, submit materials, and present his/her opinion, whenever necessary for executing its business.

(4) Allowances, travel expense, and other necessary expenses may be reimbursed to the committee members, other than public officials within the limit of its budget.

(5) The chairperson shall send the materials related to the matters on the agenda brought up to the meeting of the management committee, in advance, to the Chairperson of the Board of Audit and Inspection and the heads of related administrative agencies pursuant to Article 10 (3) of the Act.

(6) Other necessary matters concerning the management of the management committee shall be prescribed by the chairperson after resolution by the management committee.

(7) The matters under paragraph (6) shall include the matters concerning the preparation and preservation of the minutes of meeting of the management committee and the disclosure of the contents of the minutes of meeting under the Official Information Disclosure Act.

**Article 13 (Exclusion, Challenge, Abstention of Members of Management Committee)**

(1) A committee member shall be excluded from deliberation and resolution on any of the following matters:

    1. A matter in which the member has direct interests;

    2. A matter in which the member's spouse, relative by blood within the fourth degree, or relative by marriage within the second degree or an institution to which the member belongs has interests;

    3. A matter in which a person who acts as an advisor, a consultant, etc. for the member or an institution to which the member belongs has interests.

(2) A person who has direct interests in a matter subject to deliberation and resolution by the management committee may file an application for challenge against a member, if there is any ground on which it is difficult to expect fairness in deliberation and resolution. In such cases, the chairperson shall decide whether to accept the application for challenge without referring it to the management committee for resolution.

(3) A committee member may voluntarily abstain from deliberation and resolution on a case, if he/she falls under any of the grounds set forth in paragraph (t) or (2).

**Article 14 (Subcommittees)**

(1) The management committee may have subcommittees composed of some of the committee members for carrying out its business in an efficient manner.

(2) The chairperson and members of a subcommittee shall be appointed by the chairperson of the management committee.

(3) The subcommittee shall review matters decided by a resolution of the management committee, and shall report the results thereof to the management committee.

(4) Other necessary matters concerning the composition and management of subcommittees shall be prescribed by the chairperson after resolution by the management committee.

**Article 15 (Publication on Management)**

The publication on the matters specified in Article 11 (1) of the Act shall be made as follows: <Amended by Presidential Decree No. 22088, Mar. 26, 2010, Presidential Decree No. 27505, Sep. 22, 2016>

    1. The publication on management shall be made by posting and furnishing the data for the latest five years concerning the matters subject to publication;

5

2.  The statements on the settlement of accounts under Article 11 (1) 2 of the Act shall be posted and furnished within ninety days after the end of each business year;

3.  The information about the matters under Article 11 (1) 1 and 3 through 15 of the Act shall be posted and furnished without delay whenever such a matter arises.

**Article 16 (Consolidated Publication)**

(1)  The Minister of Strategy and Finance shall prescribe the items subject to consolidated publication under Article 12 of the Act and the matters concerning the criteria and procedure therefor (hereinafter referred to as "criteria, etc. for consolidated publication") after deliberation and resolution by the management committee, and shall notify them to the heads of public institutions. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2)  Whenever revising the matters concerning the criteria, etc. for consolidated publication prescribed in accordance with paragraph (1), the Minister of Strategy and Finance shall finalize such revision after deliberation and resolution by the management committee, and shall notify it to the heads of public institutions no later than fourteen days before enforcing the criteria, etc. for consolidated publication as revised. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(3)  The head of a public institution shall publish the management information in accordance with the criteria, etc. for consolidated publication under paragraphs (1) and (2) in the Internet site designated by the Minister of Strategy and Finance. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

**Article 17 (Customer Charter, etc.)**

(1)  The Minister of Strategy and Finance shall determine the scope of public institutions that provide direct service to the people, after deliberation and resolution by the management committee, and shall notify it to the heads of public institutions. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2)  Every public institution shall, upon establishing the customer charter under Article 13 (1) of the Act, announce it through the Internet, etc. or post it at a certain place to make it known to the people.

(3)  The heads of public institutions may request an independent specialized institution to conduct a survey on customer satisfaction level under Article 13 (2) of the Act.

**Article 18 (Adjustment of Functions of Public Institutions, etc.)**

(1)  The Minister of Strategy and Finance may carry out adjustment of functions, etc. of public institutions under Article 14 of the Act step by step, considering the nature, peculiarities in business affairs, etc. of public institutions. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2)  The Minister of Strategy and Finance may exclude institutions that fall under any of the following subparagraphs among public institutions from those subject to adjustment of functions, etc., after deliberation and resolution by the management committee: <Amended by Presidential Decree No. 2072~ Feb. 29, 2008>

1.  An institution for which a relevant Act provides that it is necessary to guarantee independence of the Government and neutrality in executing the functions of the institution;

2.  An institution in which case three years have not passed yet since its establishment;

3.  An institution for which the management committee determines it is not proper to be subjected to adjustment of function, etc., considering the peculiarities in its business affairs, etc.

(3)  Where the Minister of Strategy and Finance deems necessary for the purpose of smooth development of the plan under Article 14(3) of the Act, it may order the head of the competent agency to consign disposal of

6

property owned by the Nation and public institutions to Korea Asset Management Corporation under the Act on the Efficient Disposal of Non-performing Assets, Etc. of Financial Company and the Establishment of Korea Asset Management Corporation (hereinafter referred to as "Korea Asset Management Corporation") after deliberation and resolution by the management committee: <Newly inserted by Presidential Decree on July 14, 2011; Presidential Decree No. 25279, Mar. 24 2014>

(4) When consigning such property pursuant to paragraph (3), the head of the competent agency or the heads of public institutions shall conclude a consignment agreement containing each of the following subparagraphs with the Korea Asset Management Corporation. <Newly Inserted on July 14, 2011>

    1.   Purpose of assignment;

    2.   Consignment fees and expenses; and

    3.   Other matters necessary for the performance of consignment work.

**Article 19 (Non-Standing Senior Director)**

(1) The non-standing senior director under Article 21 of the Act shall be appointed from among the persons who have good knowledge and experience in operation and business administration of public institution and good reputation of impartiality and fall under any subparagraph of Article 11 (2).

(2) The non-standing senior director may convene and preside over the non-standing directors' meeting to discuss the matters on the agenda of the directors' meeting and other matters concerning the management of the institution.

(3) The head of a public institution or a quasi-governmental institution shall help the non-standing senior director carry out the affairs set forth in paragraph (2) as necessary.

**Article 20 (Excuse for Non-standing Senior Director's Request for Audit, etc.)**

(1) If it is difficult to comply with the non-standing director's request for audit under Article 22 (2) of the Act due to extraordinary circumstances, the auditor or the audit committee shall explain such circumstances to the non-standing senior director, and shall report it to the board of directors.

(2) If it is difficult to comply with the non-standing director's demand for data under Article 22 (3) of the Act due to extraordinary circumstances, the head of a public corporation or a quasi-governmental institution shall explain such circumstances to the non-standing senior director, and shall report it to the board of directors.

**Article 21 (Appointment and Removal of Executives of Public Corporations)**

    The term "public corporation, the size of which is below the criteria prescribed by Presidential Decree" in the provisos to Article 25 (1) and (4) of the Act means a public corporation whose total revenue under Article 2 is less than one hundred billion won or whose prescribed number of personnel is less than five hundred persons.

**Article 22 (Appointment and Removal of Executives of Quasi-Governmental Institutions)**

(1) "Criteria prescribed by Presidential Decree" in the provisos to Article 26 (1) and Article 26 (4) of the Act and "criteria prescribed by Presidential Decree" in the main sentences of the Articles 24 (3) and 26 (3) of the Act means the criteria of each of the following subparagraphs: <Amended by Presidential Decree No. 22088, Mar. 26, 2010>< Amended by Presidential Decree No. 27073, Mar. 31, 2016>

    1.   Commissioned-service-based quasi-governmental institutions: Whose total revenue under Article 2 shall be no less than one hundred billion won and whose prescribed number of personnel shall be no less than five hundred persons;

2. Fund-management-based quasi-governmental institutions: Whose asset size (including fund assets in commissioned management) shall be no less than one trillion won and whose prescribed number of personnel shall be no less than five hundred persons.

(2) "Quasi-governmental institution …. which is prescribed by Presidential Decree" in the main sentences of Articles 24 (3), in the main sentences of Articles 26(3) and in the proviso to Article 26 (4) of the Act and "quasi-governmental institution …. which is specified by Presidential Decree" in the proviso to Article 26 (1) of the Act means an institution under any of the following subparagraphs: <Amended by Presidential Decree No. 22088, Mar. 26, 2010>< Amended by Presidential Decree No. 27073, Mar. 31, 2016>

1. Independence Hall of Korea under the Independence Hall of Korea Act;

2. Korea Workers' Compensation & Welfare Corporation under the Industrial Accident Compensation;

3. Korea Consumer Agency under the Framework Act on Consumers;

4. Korea Housing Finance Corporation under the Korea Housing Finance Corporation Act;

5. Act on National Research Foundation of Korea;

6. Korea Student Aid Foundation under the Act on the Establishment, etc. of Korea Student Aid Foundation;

7. Korea International Cooperation Agency under the Korea International Cooperation Agency Act.

**Article 23 (Organization and Management of Executive Recommendation Committee)**

(1) Whenever there is a need to appoint a new executive due to expiration of an executive's term or any other reason, the board of directors of a public corporation or a quasi-governmental institutions shall organize the executive recommendation committee under Article 29 of the Act (hereinafter referred to as the "recommendation committee") without delay.'

(2) The number of members of the executive recommendation committee shall be decided by a resolution of the board of directors within the range between five and fifteen persons: Provided, That the number of the members may be two or three persons, if the number of non-standing directors at the time of the organization of the recommendation committee is not more than two persons. <Amended by Presidential Decree No. 22088, Mar. 26, 2010>

(3) The members appointed by the board of directors under Article 29 (2) of the Act shall be chosen among the people with good knowledge and experience from the various areas of law, economy, press, academia, labor, etc.: Provided, That such members shall include one person who can represent the opinions of the members of the public corporation or the quasi-governmental institution.

(4) The recommendation committee shall adopt a' resolution by the affirmative vote of a majority of its incumbent members.

(5) The recommendation committee may commission some of its works including invitation, search, etc. of candidates for executives to a specialized institution.

(6) Necessary matters concerning the management of the recommendation committee, such as the organization of the recommendation committee, the system for exclusion, challenge, or abstention of a member, etc. and the appointment of executives. in addition to the matters prescribed by the Act or this Decree shall be provided for by the articles of incorporation or the bylaws of the public corporation or the quasigovernmental institution.

**Article 24 (Invitation of Candidates for Executives)**

(1) When inviting candidates for executives publicly in accordance with Article 30 {4} of the Act, such invitation shall be publicly notified through the Internet homepage of the public corporation or the

8

quasigovernmental institution and one or more daily newspapers, and the period of time allowed for application shall be at least one week: Provided, That such period of time may be shortened with an approval of the head of the competent agency if there are unavoidable circumstances for prompt appointment. <Amended by Presidential Decree No. 22088, Mar. 26, 2010; Presidential Decree No. 28232, Aug. 9, 2017>

(2)  When publicly notifying the matters concerning the open invitation of candidates for executives under paragraph (1), a public corporation or a quasi-governmental institution shall request the competent agency, the Ministry of Strategy and Finance and the Ministry of Personnel Management to post such invitation on their homepages. <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Presidential Decree No. 11690, Mar. 23, 2013; Presidential Decree No. 25751, 2014>

## Article 24-2 (Request for Re-Recommendation of Candidates for Executives)

An appointing authority of or recommending authority for appointment of executives of a public corporation or quasi-government institution under Article 25 or 26 of the Act may make a request for the re-recommendation of candidates for executives to the recommendation committee, if the candidates for executives recommended by the recommendation committee fall under the grounds for disqualifications under Article 34 (1) of the Act or are deemed noticeably inappropriate for the management of public corporations or quasi-government institutions.

[This Article Newly Inserted by Presidential Decree No. 22088, Mar. 26, 2010)

## Article 25 (Restriction on Concurrent Offices of Executives and Employees)

The provisions of Article 25 of the State Public Officials Service Regulation shall apply mutatis mutandis to the scope of businesses for profit under Article 37 (3) of the Act.

## Article 25-2 (Establishment, etc. of Mid-and Long-Term Financial Management Plan)

(1)  "The public corporations and quasi-governmental institutions under the category prescribed by Presidential Decree" under Article 39-2 (1) 2 of the Act means a public corporation or a quasi-governmental institution corresponding to one of the following subparagraphs.

1.  Public corporations and quasi-governmental institutions, with a clause on government's compensation for loss to such public corporations and quasi-governmental institutions in the laws forming the basis of the foundation thereof;

2.  Of public corporations and quasi-governmental institutions with liabilities larger than assets, those designated and announced by the Minister of Strategy and Finance taking into account the size, reasons, and periods of capital impairment.

(2)  If the head of an institution falling under the categories prescribed in the subparagraphs of Article 39-2 (1) of the Act established a Mid- and Long-Term Financial Management Plan, it shall be in accordance with the guidance determined and announced by the Minister of Strategy and Finance considering each of the following subparagraphs.

1.  The matters relating to specific items which have to be commonly included in the content;

2.  The matters relating to the setting of criteria including assumptions to be commonly applied to various future estimates, evaluations, and analyzes;

3.  The matters needed to keep the content objective; and

4.  The matters relating to the financial management plan under Article 39-2 (2) 3 of the Act and the liability management plan under Subparagraph 4 of the same Article.

9

(3) The Minister of Strategy and Finance may consult with the head of the responsible institution in case necessary to prescribe the matters relating to the establishment guidance of the Mid- and Long-Term Financial Management Plan under Paragraph 2.

[This Article Newly Inserted by Presidential Decree No. 24780, Oct. 2, 2013]

**Article 25-3 (Preliminary Feasibility Study)**

(1) If the head of a public corporation or quasi-governmental institution (hereinafter referred to as the "institution head" in this Article) intends to compile a budget for a new investment project and capital investment that meets all of the requirements under the following subparagraphs, the institution head shall file an application for preliminary feasibility study with the Minister of Strategy and Finance in accordance with the main sentence of Article 40 (3) of the Act:

    1. The total project cost shall not be less than 100 billion won; and

    2. The sum of the amount funded by the government and the amount borne by the public corporation shall not be less than 50 billion won.

(2) If the institution head files an application for preliminary feasibility study under paragraph (1), the institution head shall also submit a project plan stating the name, overview and necessity, etc. of the project to the Minister of Strategy and Finance.

(3) Upon receipt of the application under paragraph (1), the Minister of Strategy and Finance shall determine whether or not to conduct a preliminary feasibility study after consultation with related experts.

(4) If the institution head intends to obtain a confirmation that a new investment project and capital investment that meets all of the requirements set forth in the subparagraphs of paragraph (1) is exempt from preliminary feasibility study under the proviso to Article 40 (3) of the Act, the institution head shall submit a request for confirmation of exemption from preliminary feasibility study stating the name, overview and necessity of the project and grounds, etc. for exemption of the project to the Minister of Strategy and Finance. Provided, That even in the case where the institution head intends to obtain confirmation from the Minister of Strategy and Finance that the project concerned is a project that needs to be implemented urgently to prevent a disaster, before obtaining the consent of the competent Standing Committee of the National Assembly under subparagraph 5 of Article 40 (3) of the Act, the institution head may submit a request for confirmation of exemption from preliminary feasibility study.

(5) Upon receipt of a request for confirmation of exemption from the preliminary feasibility study under paragraph (4), if the Minister of Strategy and Finance confirms that the project concerned is one of the projects set forth in subparagraphs of Article 40 (3) of the Act after consultation with related experts, the Minister of Strategy and Finance shall notify the institution head of the results.

(6) The Minister of Strategy and Finance shall establish guidelines on the criteria for selection of projects subject to a preliminary feasibility study, institution conducting the study, methods and procedures for the study, etc. in accordance with Article 40 (3) of the Act, and notify the institution head. [This Article Newly Inserted by Presidential Decree No. 27505, Sep. 22, 2016]

**Article 26 (Submission of Statements on Settlement of Accounts)**

(1) <Deleted on October 14, 2011>.

(2) Every quasi-governmental institution shall submit the final statements on the settlement of accounts to the Minister of Strategy and Finance within ten days after the statements are finalized in accordance with Article 43 (2) of the Act. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**Article 26-2 (Composition and Organization of Appointment Committee of Accounting Auditors)**

(1) Members of an appointment committee for accounting auditors under Article 43-2 (1) of the Act (excluding cases where audit committee is deemed an appointment committee for accounting auditors under the same paragraph) shall be comprised of all auditors and non-standing directors of the relevant public corporation or quasi-government institution.

(2) The chairperson of the appointment committee for accounting auditors shall be elected from among the members who are non-standing directors of the relevant public corporation or quasi-government institution.

(3) The chairperson shall convene and preside over the meetings of the appointment committee for accounting auditors.

(4) Meetings of the appointment committee for accounting auditors shall be held with the attendance of 2/3 of the incumbent members and require the consent of a majority of the members present for resolution.

(5) In addition to the matters specified in paragraphs (1) through (4), matters necessary for the operations, etc. of the appointment committee for accounting auditors shall be prescribed by the Minister of Strategy and Finance.

[This Article Newly Inserted by Presidential Decree No. 22088, Mar. 26, 2010]


**Article 27 (Business Performance Evaluation)**

(1) The Minister of Strategy and Finance may commission the business performance evaluation of public corporations and quasi-governmental institutions to a specialized institution, after resolution by the management committee, if considered necessary. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

(2) The Minister of Strategy and Finance shall prepare a manual for the business performance evaluation no later than the beginning of each fiscal year in accordance with the criteria and method for the business performance evaluation and with the measures to be taken following such evaluation pursuant to Article 48 of the Act: provided that, with respect to a public corporation or a quasi-governmental institution newly designated under Article 6 of the Act, the manual for the business performance evaluation shall be prepared within four months after such designation. <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Jul 14, 2011>

(3) The Minister of Strategy and Finance may take further actions, including but not limited to, deciding on the payment rate of bonus or making a suggestion or request for measures relating to personnel or budgetary matters taken pursuant to evaluation results of the review and resolution by the management committee. <Newly Inserted, Jul. 14, 2011>


**Article 28 (Composition and Management of Management Evaluation Team for Public Corporations and Quasi-Governmental Institutions)**

(1) The Minister of Strategy and Finance may organize and run the management evaluation team for public corporations and quasi-governmental institutions (hereinafter referred to as the "management evaluation team") from time to time with the persons commissioned among the following persons under Article 48 (6) of the Act: <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Jul 14, 2011>

　　1. A professor of a college or a university who has expertise in management and business administration of public institutions;

　　2. A person working for a government-invested research institute with a doctor's degree or recognized as having an equivalent qualification;

　　3. A certified public accountant, a lawyer, or a specialist in management consulting with an experience of practice for at least five years;

11

4.   A person recognized otherwise as having good expertise and experience in management and business administration of public institutions.

(2)   The expenses required for the management evaluation team's execution of missions may be reimbursed within the limit of the budget.

(3)   The management evaluation team shall be deemed to be dissolved when the missions assigned are completed.

(4)   Necessary matters concerning the composition and management of the management evaluation team in addition to the matters prescribed by this Decree shall be prescribed by the Minister of Strategy and Finance after resolution by the management committee. <Amended by Presidential Decree No. 20720, Feb. 29, 2008; Presidential Decree No. 22088, Mar. 26, 2010>

**Article 29 (Monitoring Adequacy of Supervision)**

The Minister of Strategy and Finance and the head of the competent agency may monitor the adequacy of the supervision over public corporations and quasi-governmental institutions under Article 51 (4) of the Act and take measures for improvement step by step, considering the nature, peculiarities in business affairs, etc. of each institution. <Amended by Presidential Decree No. 20720, Feb. 29, 2008>

**Article 29-2 (Prior Consultation on Funding or Investment)**

(1)   "In specific cases prescribed by Presidential Decree" in the proviso to Article 51-2 (1) of the Act means the case where a public corporation or a quasi-governmental institution acquires equity in another corporation pursuant to the following decisions, etc.:

1.   If a public institution dealing with finance makes an investment in accordance with any of the following:

(a)   An authorization for a rehabilitation plan granted under Article 242 of the Debtor Rehabilitation and Bankruptcy Act;

(b)   A resolution of the council of financial creditors on the readjustment of claims under Article 17 of the Corporate Restructuring Promotion Act;

(c)   A resolution on the readjustment of claims passed by the council established to discuss credit risk assessments and restricting plans, etc. of companies subject to the improvement in financial structure among the financial creditors holding claims against such companies;

(d)   An investment in a special purpose company, etc. to provide a guarantee for the special purpose company under Article 28-3 of the Korea Technology Finance Corporation Act or Article 23-3 of the Credit Guarantee Fund Act;

(e)   A guarantee-linked investment under Article 28-4 of the Korea Technology Finance Corporation Act or Article 23-4 of the Credit Guarantee Fund Act;

(f)   Any financing to insured financial companies under Article 38 of the Depositor Protection Act; or

(g)   Any provision of public funds under the Special Act on the Management of Public Funds.

2.   If an investment is made after prior consultation with the head of the competent agency and the Minister of Strategy and Finance is de facto performed through deliberation and resolution at a meeting operated with major officials at the minister level or higher as its members.

(2)   If establishment of a funding or investment institution or funding or investment in other corporations requires deliberation and resolution by the board of directors of a public corporation or a quasi-governmental institution, a prior consultation under Article 51-2 of the Act shall be held before deliberation and resolution by the board of directors.

12

(3)  If a public corporation or a quasi-governmental institution holds a prior consultation in order to establish a funding or investment institution or to fund or invest in other corporations under Article 51-2 of the Act, it shall submit a plan stating the following matters to the head of the competent agency and the Minister of Strategy and Finance:

1.  Purpose and necessary of funding or investment;

2.  Scope and details of business of the company subject to funding or investment;

3.  Amount and timing of funding or investment;

4.  Annual financial plans of the company subject to funding or investment for at least 5 years;

5.  Details of budget support, debt guarantees, indemnification of losses, etc. for the company subject to funding or investment by the government or a public corporation; and

6.  Other materials requested by the head of the competent agency or the Minister of Strategy and Finance.
[This Article Newly Inserted by Presidential Decree No. 27505, Sep.22, 2016]

**Article 30 (Exercise, etc. of Minority Stockholders' Rights)**

The "securities exchange prescribed by the Presidential Decree" under Article 54 of the Act means securities exchange markets described under Article 176-9 (1) of the Enforcement Decree of the Financial Investment Services and Capital Markets Act.

[This Article Newly Inserted by Presidential Decree No. 24697, Aug. 27, 2013]

**Article 31 (Processing of Identification Information)**

The Minister of Strategy and Finance, the heads of responsible institutions and public corporations and quasi-governmental institutions may process data which include resident registration number pursuant to Article 19-1 of the Enforcement Decrees to Personal Information Act under unavoidable circumstances in which they need to perform affairs relating to the verification of causes for disqualification of executives in public corporations and quasi-governmental institutions.

[This Article Newly Inserted by Presidential Decree No. 25532, Aug. 6, 2014]

**ADDENDA <No. 25751, Nov. 19, 2014>**

Article 1 (Effective Date)

This Decree shall take effect on the date of its promulgation: Provided, That the amended portions of any Presidential Decree which is revised pursuant to Article 5 of the Addenda and promulgated before this Decree takes effect, but the effective date of which has yet to come, shall take effect from the date such Presidential Decree takes effect.

Articles 2 through 4 omitted

Article 5 (Amendment of Other Decrees)

(1)  Omitted

(2)  The Enforcement Decree of the Act on the Management of Public Institutions is partially amended as follows.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Article 11-1 (2) shall be as follows, and Paragraph 4 shall be newly inserted in the same Article as follows.

2.   Vice-Minister of Government Administration and Home Affairs

4.   Minister of Personnel Management

"The Ministry of Security and Public Administration" in Article 24(2) shall be changed to "The Ministry of Personnel Management"

(3)   through <418> omitted

**ADDENDA <No. 27073, Mar. 31, 2016>**

This Decree shall take effect on the date of its promulgation.

**ADDENDA <No. 27505, Sep. 22, 2016>**

Article 1 (Effective Date)

This Decree shall take effect on Sep. 23, 2016.

Article 2 (Application of Preliminary Feasibility Study)

Article 25-3 of the Amended Decree shall be applied from when the application for preliminary feasibility study is filed after this Decree becomes effective.

**ADDENDA <No. 28211, Jul. 26, 2017>** (Organization of the Ministry of the Interior and Safety and its affiliated organizations)

Article 1 (Effective Date)

This Decree shall take effect on the date of its promulgation: Provided, That the amended portions of any Presidential Decree which is revised pursuant to Article 8 of the Addenda and promulgated before this Decree takes effect, but the effective date of which has yet to come, shall take effect from the date such Presidential Decree takes effect.

Articles 2 through 7 omitted

Article 8 (Amendment of Other Decrees)

(1)   and (2) omitted

(3)   The Enforcement Decree of the Act on the Management of Public Institutions is partially amended as follows.

Article 11 (1) 2 shall be as follows.

2.   Vice-Minister of the Ministry of the Interior and Safety

(4)   through <388> omitted

**ADDENDA <No. 28232, Aug. 9, 2017>**

This Decree shall take effect on the date of its promulgation.

14

# EXHIBIT 134

As filed with the Securities and Exchange Commission on April 28, 2017

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

### Form 20-F

(Mark One)

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☑ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2016

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report

For the transition period from _____ to _____

Commission File Number: 001-13372

# KOREA ELECTRIC POWER CORPORATION
### (Exact name of registrant as specified in its charter)

| N/A | The Republic of Korea |
|---|---|
| *(Translation of registrant's name into English)* | *(Jurisdiction of incorporation or organization)* |

**55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea**
*(Address of principal executive offices)*

**Yoon Hye Cho, +82 61 345 4213, yoonhye.cho@kepco.co.kr, +82 61 345 4299**
*(Name, telephone, e-mail and/or facsimile number and address of company contact person)*

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class: | Name of each exchange on which registered: |
|---|---|
| Common stock, par value Won 5,000 per share | New York Stock Exchange* |
| American depositary shares, each representing one-half share of common stock | New York Stock Exchange |

* Not for trading, but only in connection with the listing of American depositary shares on the New York Stock Exchange, pursuant to the requirements of the Securities and Exchange Commission.

Securities registered or to be registered pursuant to Section 12(g) of the Act:
None

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
One Hundred Year 7.95% Zero-to-Full Debentures, due April 1, 2096
6% Debentures due December 1, 2026
7% Debentures due February 1, 2027
6¾% Debentures due August 1, 2027

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the last full fiscal year covered by the annual report:
641,964,077 shares of common stock, par value of Won 5,000 per share

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ☐   No ☑

Note—Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days:   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files):   Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑      Accelerated filer ☐      Non-accelerated filer ☐      Emerging Growth Company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐      International Financial Reporting Standards as issued by the International Accounting Standards Board ☑      Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.   Item 17 ☐   Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| PART I | | | 2 |
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | | 2 |
| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE | | 2 |
| ITEM 3. | KEY INFORMATION | | 2 |
| | Item 3.A. | Selected Financial Data | 2 |
| | Item 3.B. | Capitalization and Indebtedness | 4 |
| | Item 3.C. | Reasons for the Offer and Use of Proceeds | 4 |
| | Item 3.D. | Risk Factors | 4 |
| ITEM 4. | INFORMATION ON THE COMPANY | | 26 |
| | Item 4.A. | History and Development of the Company | 26 |
| | Item 4.B. | Business Overview | 27 |
| | Item 4.C. | Organizational Structure | 77 |
| | Item 4.D. | Property, Plant and Equipment | 80 |
| ITEM 4A. | UNRESOLVED STAFF COMMENTS | | 81 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS | | 81 |
| | Item 5.A. | Operating Results | 81 |
| | Item 5.B. | Liquidity and Capital Resources | 96 |
| | Item 5.C. | Research and Development, Patents and Licenses, etc. | 100 |
| | Item 5.D. | Trend Information | 102 |
| | Item 5.E. | Off-Balance Sheet Arrangements | 102 |
| | Item 5.F. | Tabular Disclosure of Contractual Obligations | 102 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | | 109 |
| | Item 6.A. | Directors and Senior Management | 109 |
| | Item 6.B. | Compensation | 112 |
| | Item 6.C. | Board Practices | 112 |
| | Item 6.D. | Employees | 113 |
| | Item 6.E. | Share Ownership | 114 |
| ITEM 7. | MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | | 114 |
| | Item 7.A. | Major Shareholders | 114 |
| | Item 7.B. | Related Party Transactions | 114 |
| | Item 7.C. | Interests of Experts and Counsel | 115 |
| ITEM 8. | FINANCIAL INFORMATION | | 115 |
| | Item 8.A. | Consolidated Statements and Other Financial Information | 115 |
| | Item 8.B. | Significant Changes | 117 |
| ITEM 9. | THE OFFER AND LISTING | | 117 |
| | Item 9.A. | Offer and Listing Details | 117 |
| | Item 9.B. | Plan of Distribution | 119 |
| | Item 9.C. | Markets | 119 |
| | Item 9.D. | Selling Shareholders | 122 |
| | Item 9.E. | Dilution | 122 |
| | Item 9.F. | Expenses of the Issue | 122 |
| ITEM 10. | ADDITIONAL INFORMATION | | 123 |
| | Item 10.A. | Share Capital | 123 |
| | Item 10.B. | Memorandum and Articles of Incorporation | 123 |
| | Item 10.C. | Material Contracts | 130 |
| | Item 10.D. | Exchange Controls | 130 |
| | Item 10.E. | Taxation | 135 |
| | Item 10.F. | Dividends and Paying Agents | 146 |
| | Item 10.G. | Statements by Experts | 146 |
| | Item 10.H. | Documents on Display | 147 |
| | Item 10.I. | Subsidiary Information | 147 |

i

|  |  | **Page** |
|---|---|---|
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK .. | 147 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES .......... | 152 |
|  | Item 12.A.  Debt Securities ................................................ | 152 |
|  | Item 12.B.  Warrants and Rights ........................................... | 152 |
|  | Item 12.C.  Other Securities .............................................. | 152 |
|  | Item 12.D.  American Depositary Shares ................................... | 153 |
| PART II | ......................................................................... | 155 |
| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES .............. | 155 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS ..................................................... | 155 |
| ITEM 15. | CONTROLS AND PROCEDURES ......................................... | 155 |
| ITEM 16. | [RESERVED] ......................................................... | 156 |
| ITEM 16A. | AUDIT COMMITTEE FINANCIAL EXPERT ............................... | 156 |
| ITEM 16B. | CODE OF ETHICS ..................................................... | 156 |
| ITEM 16C. | PRINCIPAL AUDITOR FEES AND SERVICES .............................. | 157 |
| ITEM 16D. | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEE .... | 157 |
| ITEM 16E. | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS ...................................................... | 157 |
| ITEM 16F. | CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT ................... | 157 |
| ITEM 16G. | CORPORATE GOVERNANCE ............................................ | 158 |
| ITEM 16H. | MINE SAFETY DISCLOSURE ........................................... | 165 |
| PART III | ......................................................................... | 166 |
| ITEM 17. | FINANCIAL STATEMENTS .............................................. | 166 |
| ITEM 18. | FINANCIAL STATEMENTS .............................................. | 166 |
| ITEM 19. | EXHIBITS ............................................................ | 166 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

## CERTAIN DEFINED TERMS AND CONVENTIONS

All references to "Korea" or the "Republic" in this annual report on Form 20-F, or this annual report, are references to the Republic of Korea. All references to the "Government" in this annual report are references to the government of the Republic. All references to "we," "us," "our," "ours," the "Company" or "KEPCO" in this annual report are references to Korea Electric Power Corporation and, as the context may require, its subsidiaries, and the possessive thereof, as applicable. All references to "the Ministry of Trade, Industry and Energy" and "the Ministry of Strategy and Finance" include the respective predecessors thereof. All references to "tons" are to metric tons, equal to 1,000 kilograms, or 2,204.6 pounds. Any discrepancies in any table between totals and the sums of the amounts listed are due to rounding. All references to "IFRS" in this annual report are references to the International Financial Reporting Standards as issued by the International Accounting Standard Board. Unless otherwise stated, all of our financial information presented in this annual report has been prepared on a consolidated basis and in accordance with IFRS.

In addition, in this annual report, all references to:

- "EWP" are to Korea East-West Power Co., Ltd.,

- "KHNP" are to Korea Hydro & Nuclear Power Co., Ltd.,

- "KOMIPO" are to Korea Midland Power Co., Ltd.,

- "KOSEP" are to Korea South-East Power Co., Ltd.,

- "KOSPO" are to Korea Southern Power Co., Ltd., and

- "KOWEPO" are to Korea Western Power Co., Ltd.,

each of which is our wholly-owned generation subsidiary.

## FORWARD-LOOKING STATEMENTS

This annual report includes "forward-looking statements" (as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934), including statements regarding our expectations and projections for future operating performance and business prospects. The words "believe," "expect," "anticipate," "estimate," "project" and similar words used in connection with any discussion of our future operation or financial performance identify forward-looking statements. In addition, all statements other than statements of historical facts included in this annual report are forward-looking statements. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to be correct. We caution you not to place undue reliance on the forward-looking statements, which speak only as of the date of this annual report.

This annual report discloses, under the caption Item 3.D. "Risk Factors" and elsewhere, important factors that could cause actual results to differ materially from our expectations ("Cautionary Statements"). All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the Cautionary Statements.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

## PART I

**ITEM 1.** *IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS*

Not applicable.

**ITEM 2.** *OFFER STATISTICS AND EXPECTED TIMETABLE*

Not applicable.

**ITEM 3.** *KEY INFORMATION*

**Item 3.A. Selected Financial Data**

The selected consolidated financial data set forth below as of and for the years ended December 31, 2012, 2013, 2014, 2015 and 2016 have been derived from our audited consolidated financial statements which have been prepared in accordance with IFRS.

You should read the following data with the more detailed information contained in Item 5. "Operating and Financial Review and Prospects" and our consolidated financial statements included in Item 18. "Financial Statements." Historical results do not necessarily predict future results.

**Consolidated Statement of Comprehensive Income (Loss) Data**

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2016 |
|---|---|---|---|---|---|---|
| | (in billions of Won and millions of US$, except per share data)[1] | | | | | |
| Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩49,121 | ₩53,713 | ₩57,123 | ₩58,582 | ₩59,763 | $49,649 |
| Cost of sales . . . . . . . . . . . . . . . . . . . . . . | 48,460 | 50,596 | 49,763 | 45,458 | 45,550 | 37,842 |
| Gross profit . . . . . . . . . . . . . . . . . . . . . . . | 661 | 3,117 | 7,360 | 13,124 | 14,213 | 11,807 |
| Selling and administrative expenses . . . . . . | 1,780 | 1,923 | 1,924 | 2,153 | 2,639 | 2,192 |
| Other income (expense) . . . . . . . . . . . . . . . | 601 | 625 | 666 | 699 | 652 | 542 |
| Other gains (losses) . . . . . . . . . . . . . . . . . . | (1,782) | 129 | 107 | 8,611 | 70 | 58 |
| Operating profit (loss) . . . . . . . . . . . . . . . | (2,300) | 1,948 | 6,209 | 20,281 | 12,296 | 10,215 |
| Finance income (expense), net . . . . . . . . . . | (1,940) | (2,302) | (2,255) | (1,832) | (1,646) | (1,367) |
| Income (loss) before income taxes . . . . . . . | (4,063) | (396) | 4,229 | 18,656 | 10,513 | 8,734 |
| Income tax (expense) benefit . . . . . . . . . . . | 985 | 571 | (1,430) | (5,239) | (3,365) | (2,796) |
| Profit (loss) for the period . . . . . . . . . . . . . | (3,078) | 174 | 2,799 | 13,416 | 7,148 | 5,938 |
| Other comprehensive income (loss) . . . . . . | (322) | 186 | (358) | 34 | (2) | (2) |
| Total comprehensive income (loss) . . . . . . . | (3,400) | 360 | 2,441 | 13,450 | 7,146 | 5,936 |
| Profit (loss) attributable to: | | | | | | |
| Owners of the Company . . . . . . . . . . | (3,167) | 60 | 2,687 | 13,289 | 7,048 | 5,855 |
| Non-controlling interests . . . . . . . . . . . | 89 | 114 | 112 | 127 | 100 | 83 |
| Total comprehensive income (loss) attributable to: | | | | | | |
| Owners of the Company . . . . . . . . . . | (3,448) | 245 | 2,336 | 13,308 | 7,042 | 5,850 |
| Non-controlling interests . . . . . . . . . . . | 48 | 115 | 105 | 142 | 104 | 86 |
| Earnings (loss) per share | | | | | | |
| Basic[2] . . . . . . . . . . . . . . . . . . . . . . . . | (5,083) | 96 | 4,290 | 20,701 | 10,980 | 9.12 |
| Earnings (loss) per ADS | | | | | | |
| Basic[2] . . . . . . . . . . . . . . . . . . . . . . . . | (2,542) | 48 | 2,145 | 10,351 | 5,490 | 4.56 |
| Dividends per share . . . . . . . . . . . . . . . . . . | — | 90 | 500 | 3,100 | 1,980 | 1.64 |

2

**Consolidated Statements of Financial Position Data**

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2016 |
| | (in billions of Won and millions of US$, except share and per share data)[1] | | | | | |
| Net working capital deficit[3] . . . . . ₩ | (4,884) ₩ | (4,945) ₩ | (4,780) ₩ | (686) ₩ | (5,031) $ | (4,180) |
| Property, plant and equipment, net . . . . . . . . . . . . . . . . . . . . . . . . . | 122,376 | 129,638 | 135,812 | 141,361 | 145,743 | 121,079 |
| Total assets . . . . . . . . . . . . . . . . . . . | 146,153 | 155,527 | 163,708 | 175,257 | 177,837 | 147,742 |
| Total shareholders' equity . . . . . . . | 51,064 | 51,451 | 54,825 | 67,942 | 73,051 | 60,688 |
| Equity attributable to owners of the Company . . . . . . . . . | 49,889 | 50,260 | 53,601 | 66,634 | 71,724 | 59,586 |
| Non-controlling interests . . . . | 1,175 | 1,191 | 1,224 | 1,308 | 1,327 | 1,102 |
| Share capital . . . . . . . . . . . . . . . . . | 3,210 | 3,210 | 3,210 | 3,210 | 3,210 | 2,667 |
| Number of common shares as adjusted to reflect any changes in capital stock . . . | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 | 641,964,077 |
| Long-term debt (excluding current portion) . . . . . . . . . . . . . . . . . . . | 45,525 | 52,801 | 55,720 | 50,907 | 44,700 | 37,135 |
| Other long term liabilities . . . . . . . | 30,747 | 31,062 | 31,563 | 33,697 | 35,347 | 29,365 |

*Notes*:

(1) The financial information denominated in Won as of and for the year ended December 31, 2016 has been translated into U.S. dollars at the exchange rate of Won 1,203.7 to US$1.00, which was the Noon Buying Rate as of December 30, 2016.

(2) Basic earnings (loss) per share are calculated by dividing net income available to holders of our common shares by the weighted average number of common shares issued and outstanding for the relevant period. Basic earnings (loss) per ADS have been computed as if all of our issued and outstanding common shares are represented by ADSs during each of the years presented. Each ADS represents two common shares. Dilutive earnings (loss) per share is not presented as such amount was anti-dilutive for the year ended December 31, 2012, and such amount was the same as basic earnings (loss) per share for the years ended December 31, 2013 through 2016 since there were no potential dilutive instruments.

(3) Net working capital is defined as current assets minus current liabilities. For the periods indicated, current liabilities exceeded current assets, which resulted in working capital deficit for such periods.

**Currency Translations and Exchange Rates**

In this annual report, unless otherwise indicated, all references to "Won," "KRW" or "₩" are to the currency of Korea, all references to "U.S. dollars," "Dollars," "$" or "US$" are to the currency of the United States of America; all references to "Euro" or "€" are references to the currency of the European Union; all references to "Yen" or "¥" are references to the currency of Japan; all references to "A$" are to the currency of Australia; and all references to "RMB" are to the currency of the People's Republic of China. Unless otherwise indicated, all translations from Won to U.S. dollars were made at Won 1,203.7 to US$1.00, which was the noon buying rate of the Federal Reserve Board (the "Noon Buying Rate") in effect as of December 30, 2016, which rates are available on the H.10 statistical release of the Federal Reserve Board. On April 14, 2017, the Noon Buying Rate was Won 1,136.7 to US$1.00. The exchange rate between the U.S. dollar and Korean Won may be highly volatile from time to time and the U.S. dollar amounts referred to in this annual report should not be relied upon as an accurate reflection of our results of operations. No representation is made that the Won or U.S. dollar amounts referred to in this annual report could have been or could be converted into U.S. dollars or Won, as the case may be, at any particular rate or at all.

3

The following table sets forth, for the periods and dates indicated, certain information concerning the Noon Buying Rate in Won per US$1.00.

| Year Ended December 31, | At End of Period | Average[1] | High | Low |
|---|---|---|---|---|
| | | (Won per US$1.00) | | |
| 2012 | 1,063.2 | 1,119.6 | 1,185.0 | 1,063.2 |
| 2013 | 1,055.3 | 1,094.6 | 1,161.3 | 1,050.1 |
| 2014 | 1,090.9 | 1,054.0 | 1,117.7 | 1,008.9 |
| 2015 | 1,169.3 | 1,133.7 | 1,196.4 | 1,063.0 |
| 2016 | 1,203.7 | 1,160.5 | 1,242.6 | 1,090.0 |
| October | 1,145.4 | 1,128.6 | 1,146.5 | 1,104.8 |
| November | 1,175.9 | 1,162.7 | 1,181.6 | 1,131.4 |
| December | 1,203.7 | 1,183.1 | 1,212.2 | 1,161.7 |
| 2017 (through April 14) | 1,136.7 | 1,147.6 | 1,207.2 | 1,108.3 |
| January | 1,151.5 | 1,179.1 | 1,207.0 | 1,151.5 |
| February | 1,129.2 | 1,140.5 | 1,154.5 | 1,129.2 |
| March | 1,117.5 | 1,133.9 | 1,158.1 | 1,108.3 |
| April (through April 14) | 1,136.7 | 1,133.0 | 1,147.8 | 1,117.7 |

*Source: Federal Reserve Board*

*Note:*

(1)  The average rates for annual and interim periods were calculated by taking the simple average of the Noon Buying Rates on the last day of each month during the relevant period. The average rates for the monthly periods (or a portion thereof) were calculated by taking the simple average of the daily Noon Buying Rates during the relevant month (or a portion thereof).

**Item 3.B. Capitalization and Indebtedness**

Not Applicable

**Item 3.C. Reasons for the Offer and Use of Proceeds**

Not Applicable

**Item 3.D. Risk Factors**

*Our business and operations are subject to various risks, many of which are beyond our control. If any of the risks described below actually occurs, our business, financial condition or results of operations could be seriously harmed.*

**Risks Relating to KEPCO**

***Increases in fuel prices will adversely affect our results of operations and profitability as we may not be able to pass on the increased cost to customers at a sufficient level or on a timely basis.***

In 2016, fuel costs constituted 30.9% of our cost of sales and the ratio of fuel costs to our sales was 23.4%. Our generation subsidiaries purchase substantially all of the fuel that they use (except for anthracite coal) from suppliers outside Korea at prices determined in part by prevailing market prices in currencies other than Won. For example, most of the bituminous coal requirements (which accounted for approximately 45.9% of our fuel requirements in 2016 in terms of electricity output) are imported principally from Indonesia, Australia, Russia

4

and, to a lesser extent, South Africa and others, which accounted for approximately 40%, 37%, 15%, 2% and 6%, respectively, of the annual bituminous coal requirements of our generation subsidiaries in 2016. Approximately 82% of the bituminous coal requirements of our generation subsidiaries in 2016 were purchased under long-term contracts and the remaining 18% from the spot market. Pursuant to the terms of our long-term supply contracts, prices are adjusted periodically based on prevailing market conditions. In addition, our generation subsidiaries purchase a significant portion of their fuel requirements under contracts with limited duration. See Item 4.B. "Business Overview—Fuel."

The prices of our main fuel types, namely, bituminous coal, oil and liquefied natural gas, or LNG, fluctuate, sometimes significantly, in tandem with their international market prices. For example, the average daily spot price of "free on board" Newcastle coal 6300 GAR published by Platts increased from US$58.0 per ton in 2015 to US$66.8 per ton in 2016 and to US$84.4 per ton as of April 13, 2017. The prices of oil and LNG are substantially dependent on the price of crude oil, and according to Bloomberg (Bloomberg Ticker: PGCRDUBA), the average daily spot price of Dubai crude oil declined from US$51.1 per barrel in 2015 to US$41.4 per barrel in 2016 but rebounded to US$54.2 per barrel as of April 14, 2017. We cannot assure you that fuel prices will remain stable or will not significantly increase in the remainder of 2017 or thereafter. If fuel prices increase substantially in the future within a short span of time, our generation subsidiaries may be unable to secure requisite fuel supplies at prices commercially acceptable to them. In addition, any significant interruption or delay in the supply of fuel, bituminous coal in particular, from any of their suppliers may cause our generation subsidiaries to purchase fuel on the spot market at prices higher than the prices available under existing supply contracts, which would result in an increase in fuel costs.

Because the Government regulates the rates we charge for the electricity we sell to our customers (see Item 4.B. "Business Overview—Sales and Customers—Electricity Rates"), our ability to pass on fuel and other cost increases to our customers is limited. If fuel prices increase rapidly and substantially and the Government, out of concern for inflation or for other reasons, maintains the current level of electricity tariff or does not increase it to a level to sufficiently offset the impact of high fuel prices, the fuel price increases will negatively affect our profit margins or even cause us to suffer operating and/or net losses, and our business, financial condition, results of operations and cash flows would suffer.

The Government may also set or adjust electricity tariff rates to serve particular policy goals that may not be necessarily responsive to fuel price movements. For example, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate, in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, the new tariff structure encourages energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods in the summer and the winter. Third, a temporary rate discount will apply during 2017 to 2019 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation, financial condition and cash flows.

In addition, partly because the Government may have to undergo a lengthy deliberative process to approve an increase in electricity tariff, which represents a key component of the consumer price index, the electricity tariff may not be adjusted to a level sufficient to ensure a fair rate of return to us in a timely manner or at all, and we cannot assure that any future tariff increase by the Government will be sufficient to fully offset the adverse impact on our results of operations from current or potential rises in fuel costs. On the other hand, if fuel prices decrease, the public may demand a corresponding decrease in electricity tariff rates, and as a result the

5

Government may decrease electricity tariff rates; however, we cannot assure you that the resulting tariff rate reduction will not be excessive and thus have a detrimental effect on our profit margins, results of operations or cash flows or that, if the fuel prices were to rise again subsequent to the tariff reduction, the tariff rates would be further adjusted upwards in a timely manner, in sufficient amounts or at all so as to fully offset the adverse impact from the increase in fuel prices.

***The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability.***

From time to time, the Government considers various policy initiatives to foster efficiency in the Korean electric power industry, and at times have adopted policy measures that have substantially modified our business and operations. For example, in January 1999, with the aim of introducing greater competition in the Korean electric power industry and thereby improving its efficiency, the Government announced a restructuring plan for the Korean electric power industry, or the Restructuring Plan. For a detailed description of the Restructuring Plan, see Item 4.B. "Business Overview—Restructuring of the Electric Power Industry in Korea." As part of this initiative, in April 2001 the Government established the Korea Power Exchange to enable the sale and purchase of electricity through a competitive bidding process, established the Korea Electricity Commission to ensure fair competition in the Korean electric power industry, and, in order to promote competition in electricity generation, split off our electricity generation business to form one nuclear generation company and five non-nuclear generation companies, in each case, to be wholly owned by us. In 2002, the Government introduced a plan to privatize one of our five non-nuclear generation subsidiaries, but this plan was suspended indefinitely in 2003 due to prevailing market conditions and other policy considerations.

In August 2010, the Ministry of Trade, Industry and Energy announced the Proposal for the Improvement in the Structure of the Electric Power Industry, which was designed to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them. Pursuant to this proposal, while our six generation subsidiaries continued to be our wholly-owned subsidiaries, in January 2011 the six generation subsidiaries were officially designated as "market-oriented public enterprises" (same as us) under the Act on the Management of Public Institutions, whereupon the President of Korea appoints the president and the standing director who is to become a member of the audit committee of each such subsidiary; the selection of non-standing directors of each such subsidiary is subject to approval by the minister of the Ministry of Strategy and Finance; the president of each such subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Agencies Operating Committee (which is comprised largely of Government officials and those recommended by Government officials) conducts performance evaluation of such subsidiaries. Previously, our president appointed the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary was subject to approval by our president; the president of each such subsidiary entered into a management contract with our president; and our evaluation committee conducted performance evaluation of such subsidiaries. As a result of these changes, our six generation subsidiaries took on additional operational responsibilities and management autonomy with respect to construction and management of generation units and procurement of fuel, while we as the parent company continued to oversee and coordinate, among others, finances, corporate governance, overseas businesses, including nuclear export technology and overseas resource development, that jointly affect us and our generation subsidiaries. See also Item 16.G. "Corporate Governance—The Act on the Management of Public Institutions—Applications of the Act on Our Generation Subsidiaries,"

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies

6

should take on greater responsibilities in overseas resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition. In accordance therewith, we transferred a substantial portion of our assets and liabilities in our overseas resource business to our generation subsidiaries as of December 31, 2016. In addition, pursuant to this Proposal, we are considering a sale in the public market of a minority of our shares in our five generation subsidiaries, KEPCO KDN and KHNP gradually and in that order, subject to prevailing market conditions and other policy considerations. Accordingly, we are currently taking steps in preparation of a potential sale of a minority of our shares in KOSEP and EWP through public offerings by the end of 2017, but whether and when such sale would occur will be subject to prevailing market conditions and considerations of public policy. In any event, we plan to maintain a controlling stake in each of these subsidiaries.

Other than as set forth above, we are not aware of any specific plans by the Government to resume the implementation of the Restructuring Plan or otherwise change the current structure of the electric power industry or the operations of us or our generation subsidiaries materially in the near future. However, for reasons relating to changes in policy considerations, socio-political, economic and market conditions and/or other factors, the Government may resume the implementation of the Restructuring Plan or initiate other steps that may change the structure of the Korean electric power industry or the operations of us or our generation subsidiaries materially. Any such measures may have a negative effect on our business, results of operations and financial condition. In addition, the Government, which beneficially owns a majority of our shares and exercises significant control over our business and operations, may from time to time pursue policy initiatives that could directly or indirectly impact our business and operations, and such initiatives may vary from the interest and objectives of our other shareholders.

***Our capacity expansion plans, which are principally based on projections on long-term supply and demand of electricity in Korea, may prove to be inadequate.***

We and our generation subsidiaries make plans for expanding or upgrading our generation capacity and transmission infrastructure based on the Basic Plan Relating to the Long-Term Supply and Demand of Electricity, or the Basic Plan, which is generally revised and announced every two years by the Government. In July 2015, the Government announced the Seventh Basic Plan relating to the future supply and demand of electricity. The Seventh Basic Plan, which is effective for the period from 2015 to 2029, focuses on, among other things, (i) ensuring a stable supply of electricity, (ii) increasing the portion of low carbon electricity supply sources, (iii) active consumer demand management, (iv) permanent closing of operations of the Kori #1 nuclear power unit, and (v) diversifying electricity supply sources through greater utilization of renewable energy sources.

In January 2014, prior to the announcement of the Seventh Basic Plan, the Ministry of Trade, Industry and Energy adopted the Second Basic National Energy Plan following consultations with representatives from civic groups, the power industry and academia. The Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, covers the period from 2014 to 2035 and focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing the growth of electricity demand by 15% by 2035 through efficiency enhancement programs compared to the projected growth in the absence of such efficiency enhancement programs, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying latest greenhouse gas emission reduction technologies to newly constructed generation units in order to further promote safety and security, (iv) strengthening resource exploration and fuel procurement capabilities to enhance Korea's energy security, (v) ensuring stable supply of energy and increasing the portion of electricity supplied from renewable sources to 11% by 2035, (vi) reinforcing the system for stable supply of conventional energy, such as oil and gas, and (vii) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of

7

consumers in the low income group. In addition, the Second Basic National Energy Plan revised the target level of electricity generated by nuclear sources as a percentage of total electricity generated to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008, which covered the period from 2008 to 2030.

We cannot assure that the Seventh Basic Plan, the Second Basic National Energy Plan, or their respective successor plans will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable costs to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand, or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on the part of us and our generation subsidiaries, among others, which may have a material adverse effect on our results of operations, financial condition and cash flows.

From time to time, we may experience temporary power shortages or circumstances bordering on power shortages due to factors beyond our control, such as extreme weather conditions. Such circumstances may lead to increased end-user complaints and greater public scrutiny, which may in turn require us to modify our capacity expansion plans, and if we were to substantially modify our capacity plans, this might result in additional capital expenditures and, as a result, have a material adverse effect on our results of operations, financial condition and cash flows.

Although the Government makes significant efforts to encourage conservation of electricity, including through public education campaigns, there is no assurance that such efforts will have the desired effect of substantially reducing the demand for electricity or improving efficient use thereof.

***We are subject to various environmental regulations and related government initiatives, including in relation to climate change, which could cause significant compliance costs and operational liabilities.***

We are subject to national, local and overseas environmental laws and regulations, including increasing pressure to reduce emission of carbon dioxide from our electricity generation activities as well as our natural resource development endeavors overseas. Our operations could expose us to the risk of substantial liability relating to environmental, health and safety issues, such as those resulting from the discharge of pollutants and carbon dioxide into the environment and the handling, storage and disposal of hazardous materials. We may be responsible for the investigation and remediation of environmental conditions at current or former operational sites. We may also be subject to related liabilities (including liabilities for environmental damage, third party property damage or personal injury) resulting from lawsuits brought by governments or private litigants. In the course of our operations, hazardous wastes may be generated, disposed of or treated at third party-owned or -operated sites. If those sites become contaminated, we could also be held responsible for the cost of investigation and remediation of such sites for any related liabilities, as well as for civil or criminal fines or penalties.

We intend to fully comply with our environmental obligations. However, our environmental measures, including the use of, or replacement with, environmentally friendly but more expensive parts and equipment and budgeting capital expenditures for the installation or modification of such facilities, may result in increased operating costs and liquidity requirement. The actual cost of installation, replacement, modification and/or operation of such equipment and related liquidity requirement may depend on a variety of factors that are beyond our control. There is no assurance that we will continue to be in material compliance with legal or regulatory requirements or satisfy social norms and expectations in the future in relation to the environment, including in respect of climate change.

In recent years, partly driven by growing public awareness and sensitivity toward climate change and other environmental issues as well as in an effort to capture the economic and social potential associated with

renewable energy and "new energy"—related industries (such as smart grids, energy storage systems and electrical vehicles, among others), the Government has introduced and implemented a number of new measures designed to reduce carbon emission, minimize environmental damage and spur related business opportunities. Some key examples of such Government initiatives pertinent to our and our generation subsidiaries' operations as follows:

- *Carbon Emission Trading System and Related Emission Reduction Targets.* In accordance with the Act on Allocation and Trading of Greenhouse Gas Emission Allowances, enacted in March 2013, the Government is currently in the process of implementing a carbon emission trading system under which the Government will allocate the amount of permitted carbon emission to companies by industry and a company whose business emits more carbon than the permitted amount may purchase the right to emit more carbon through the carbon emission trading exchange. This system is expected to be implemented in three stages. During the first phase (2015 to 2017), the Government will set up and make a test run of the trading system to ensure its smooth operation; during this phase, the carbon emission rights will be allocated without charge. During the second phase (2018 to 2020), the system will be applied to a limited scope of industries and companies, where the carbon emission right will be allocated at a relatively low price, but not freely. During the third phase (2021 to 2025), the Government plans to run the system on an expanded scale with aggressive carbon emission reduction targets. As part of the implementation of this trading system, we are obligated to reduce, on a consolidated basis, approximately 200 million tons of carbon emissions, amounting to a 23.7% reduction, per year during the first phase of 2015 to 2017. The amount of required reduction for the second phase of 2018 to 2020 is expected to be determined in June 2017. Adhering to such emission reduction requirement is expected to result in our incurring significant compliance costs.

- *Regulation of Decrepit Coal-Fired Generation Units.* According to a plan announced in July 2016 by the Ministry of Trade, Industry and Energy in relation to coal-fired electricity generation units, 10 of our coal generation units that are 30 years or older will be required to be shut down or convert to another fuel use, 43 of our such units that are less than 30 years old will be subject to retrofitting and overall replacement of environmental facilities, and 20 of our such units currently under construction will be subject to more rigorous emission standards. In addition, the Government indicated that it would not allow any new construction of additional coal-fired generation units after 2019, which means that LNG is likely to be used more in the future as the substitute for coal, and since LNG is a more expensive fuel source than fuel, this regulation is expected to drive up the average cost of generating electricity. Compliance with such measures is expected to result in our incurring significant costs.

- *Coal Consumption Tax.* In January 2014, largely based on policy considerations of tax equity among different fuel types as well as environmental concerns, the Ministry of Strategy and Finance announced that, effective July 1, 2014, consumption tax will apply to bituminous coal, which previously was not subject to consumption tax unlike other fuel types such as LNG or bunker oil. Pursuant to the amended Individual Consumption Tax Act effective as of April 1, 2017, which involved an increase of the unit tax rate for coal by Won 6 across the board, the base tax rate (which is subject to certain adjustments) is Won 30 per kilogram for bituminous coal; however, due to concerns on the potential adverse effect on industrial activities, the applicable tax rate is applied differently based on the net heat generation amount. The currently applicable tax rate for bituminous coal is Won 27 per kilogram for net heat generation of less than 5,000 kilocalories, Won 30 per kilogram for net heat generation of 5,000 to 5,500 kilocalories and Won 33 per kilogram for net heat generation of 5,500 kilocalories or more. In contrast, the currently applicable tax rate for LNG is Won 60 per kilogram. Since bituminous coal currently represents the largest fuel type for our electricity generation, accounting for approximately 45.9% of our entire fuel requirements in 2016 in terms of electricity output, we expect the coal consumption tax thereon will result in an increase of our overall fuel costs.

- *Renewable Portfolio Standard.* Under this program, each of our generation subsidiaries is required to generate a specified percentage of total electricity to be generated by such generation subsidiary in a given year in the form of renewable energy or, in case of a shortfall, purchase a corresponding amount

9

of a Renewable Energy Certificate (a form of renewable energy credit) from other generation companies whose renewable energy generation surpass such percentage. The target percentage was 3.0% in 2015 and 3.5% in 2016 and will incrementally increase to 10.0% by 2023. Fines are to be levied on any subsidiary that fails to do so in the prescribed timeline. In 2015, all six of our generation subsidiaries met the target through renewable energy generation and/or the purchase of a Renewable Energy Certificate. Compliance by our generation subsidiaries of the 2016 target is currently under evaluation, and if any generation subsidiary is found to have failed to meet the target for 2016 or for subsequent years, such generation subsidiary may become subject to fines.

- *New Energy Industry Fund.* In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector. The total size of these funds was US$1 trillion as of December 31, 2016; these funds were funded from our budget for new energy industry projects, which totaled US$6.4 trillion in 2016 and were expended in research and development, efficiency improvements and educational solar power projects, among others. Our budget for new energy industry projects in 2017 amounts to US$5.6 trillion, of which US$1 trillion has been earmarked for potential additional commitments to the New Energy Industry Fund.

- *Environmental and safety considerations in electricity supply and demand planning.* In March 2017, the Electricity Business Act was amended to the effect that starting in June 2017, future national planning for electricity supply and demand in Korea should consider the environmental and safety impacts of such planning. However, to-date, no specific guidelines have been provided by the Government as to how to implement this provision, and it is therefore difficult to assess in advance what impact such provision will have on our business, results of operations or financial condition.

Complying with these Government initiatives and operating programs in furtherance thereof has involved and will likely involve significant costs and resources on our part. We and our generation subsidiaries could also become subject to substantial fines and other forms of penalties for non-compliance. We expect that the additional costs associated with implementing and operating these programs and otherwise complying with these programs will be covered by a corresponding increase in electricity tariff. However, there is no assurance that, particularly given the wide-ranging policy priorities for the Government, it will in fact raise the electricity tariff to a level sufficient to fully cover such additional costs, do so on a timely basis or at all. If the Government does not do so or provide us and our generation subsidiaries with other forms of assistance to offset the costs involved, our results of operation, financial condition and cash flows may be materially and adversely affected.

See Item 4.B. "Business Overview—Environmental Programs."

***We may require a substantial amount of additional indebtedness to refinance existing debt and for future capital expenditures.***

We anticipate that a substantial amount of additional indebtedness will be required in the coming years in order to refinance existing debt, make capital expenditures for construction of generation plants and other facilities and/or make acquisitions, invest in renewable energy and the "new energy industry" projects and fund our overseas businesses. In 2014, 2015 and 2016, our capital expenditures in relation to the foregoing amounted to Won 16,629 billion, Won 15,750 billion and Won 13,950 billion, respectively, and our budgeted capital expenditures for 2017, 2018 and 2019 amount to Won 14,889 billion, Won 15,860 billion and Won 16,071 billion, respectively.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

While we currently do not expect to face any material difficulties in procuring short-term borrowings to meet our liquidity and short-term capital requirements, there is no assurance that we will be able to do so. We expect that a portion of our long-term debt will need to be paid or refinanced through foreign currency-denominated borrowings and capital raising in international capital markets. Such financing may not be available on terms commercially acceptable to us or at all, especially if the global financial markets experience significant turbulence or a substantial reduction in liquidity or due to other factors beyond our control. If we are unable to obtain financing on commercially acceptable terms on a timely basis, or at all, we may be unable to meet our funding requirements for capital expenditures or debt repayment obligations, which could have a material adverse impact on our business, results of operations and financial condition.

In light of the general policy guideline of the Government for public institutions (including us and our generation subsidiaries) to reduce their respective overall debt levels, we and our generation subsidiaries have, in consultation with the Government and as approved by the Public Agencies Operating Committee, set target debt-to-equity levels and undertaken various programs to reduce debt and improve the overall financial health by the end of 2017. For further information, see Item 4.B. "Business Overview—Debt Reduction Program and Related Activities." Despite our best efforts, however, for reasons beyond our control, including macroeconomic environments, government regulations and market forces (such as international market prices for our fuels), we cannot assure whether we or our generation subsidiaries will be able to successfully reduce debt burdens or otherwise improve our financial health to a level contemplated by the Government or to a level that would be optimal for our capital structure. If we or our generation subsidiaries fail to do so or the measures taken by us or our generation subsidiaries to reduce debt levels or improve financial health have unintended adverse consequences, such developments may have an adverse effect on our business, results of operations and financial condition.

***The movement of Won against the U.S. dollar and other currencies may have a material adverse effect on us.***

The Won has fluctuated significantly against major currencies from time to time. Even slight depreciation of Won against U.S. dollar and other foreign currencies may result in a material increase in the cost of fuel and equipment purchased by us from overseas since the prices for substantially all of the fuel materials and a significant portion of the equipment we purchase are denominated in currencies other than Won, generally in U.S. dollars. Changes in foreign exchange rates may also impact the cost of servicing our foreign currency-denominated debt. As of December 31, 2016, approximately 23.1% of our long-term debt (including the current portion but excluding issue discounts and premium) before accounting for swap transactions, was denominated in foreign currencies, principally U.S. dollars. In addition, even if we make payments in Won for certain fuel materials and equipment, some of these fuel materials may originate from other countries and their prices may be affected accordingly by the exchange rates between the Won and foreign currencies, especially the U.S. dollar. Since the substantial majority of our revenues are denominated in Won, we must generally obtain foreign currencies through foreign currency-denominated financings or from foreign currency exchange markets to make such purchases or service such debt. As a result, any significant depreciation of Won against the U.S. dollar or other major foreign currencies will have a material adverse effect on our profitability and results of operations.

***We may not be successful in implementing new business strategies.***

As part of our overall business strategy, we plan to (i) strengthen competitiveness in our core operations by enhancing efficiency of our generation, transmission and distribution networks and related facilities, (ii) expand and develop new businesses by diversifying our overseas business and actively addressing climate change, (iii) create a platform for future growth by developing an ecosystem focused on new energy technologies, and (iv) strengthen our management system for sustainable growth.

Due to their inherent uncertainties, such new and expanded strategic initiatives expose us to a number of risks and challenges, including the following:

- new and expanded business activities may require unanticipated capital expenditures and involve additional compliance requirements;

11

- new and expanded business activities may result in less growth or profit than we currently anticipate, and there can be no assurance that such business activities will become profitable at the level we desire or at all;

- certain of our new and expanded businesses, particularly in the areas of renewable energy, require substantial government subsidies to become profitable, and such subsidies may be substantially reduced or entirely discontinued;

- we may fail to identify and enter into new business opportunities in a timely fashion, putting us at a disadvantage vis-à-vis competitors, particularly in overseas markets; and

- we may need to hire or retrain personnel to supervise and conduct the relevant business activities.

As part of our business strategy, we may also seek, evaluate or engage in potential acquisitions, joint ventures, strategic alliances, restructurings, combinations, rationalizations, divestments or other similar opportunities. The prospects of these initiatives are uncertain, and there can be no assurance that we will be able to successfully implement or grow new ventures, and these ventures may prove more difficult or costly than what we originally anticipated. In addition, we regularly review the profitability and growth potential of our existing and new businesses. As a result of such review, we may decide to exit from or to reduce the resources that we allocate to new or existing ventures in the future. There is a risk that these ventures may not achieve profitability or operational efficiencies to the extent originally anticipated, and we may fail to recover investments or expenditures that we have already made. Any of the foregoing may have a material adverse effect on our reputation, business, results of operations, financial condition and cash flows.

***We plan to pursue overseas expansion opportunities that may subject us to different or greater risks than those associated with our domestic operations.***

While our operations have, to-date, been primarily based in Korea, we and our generation subsidiaries may expand, on a selective and opportunistic basis, overseas operations in the future. In particular, we and our generation subsidiaries may further diversify the geographic focus of our operations from Asia to the rest of the world, including the resource-rich Middle East, Australia and Africa, as well as expand our project portfolio to include the construction and operation of conventional thermal generation units, nuclear generation units and renewable energy power plants and (primarily through our generation subsidiaries) mining and development of fuel sources.

Overseas operations often involve risks that are different from those we face in our domestic operations, including the following:

- challenges of complying with multiple foreign laws and regulatory requirements, including tax laws and laws regulating our operations and investments;

- volatility of overseas economic conditions, including fluctuations in foreign currency exchange rates;

- difficulties in enforcing creditors' rights in foreign jurisdictions;

- risk of expropriation and exercise of sovereign immunity where the counterparty is a foreign government;

- difficulties in establishing, staffing and managing foreign operations;

- differing labor regulations;

- political and economic instability, natural calamities, war and terrorism;

- lack of familiarity with local markets and competitive conditions;

- changes in applicable laws and regulations in Korea that affect foreign operations; and

- obstacles to the repatriation of earnings and cash.

Any failure by us to recognize or respond to these differences may adversely affect the success of our operations in those markets, which in turn could materially and adversely affect our business and results of operations.

Furthermore, while we seek to enter into overseas business opportunities in a prudent manner, some of our new international business ventures, such as mining and resource exploration, carry inherent risks that are different from our traditional business of electricity power generation, transmission and distribution. While the overseas businesses in the aggregate currently do not comprise a material portion of our overall business, as we are relatively inexperienced in these new types of overseas businesses, the actual revenues and profitability from, and investments and expenditures into, such ventures may be substantially different from what we plan or anticipate and may have a material adverse impact on our overall business, results of operations, financial condition and cash flows.

***An increase in electricity generated by and/or sourced from private power producers may erode our market position and hurt our business, growth prospects, revenues and profitability.***

As of December 31, 2016, we and our generation subsidiaries owned approximately 74.7% of the total electricity generation capacity in Korea (excluding plants generating electricity for private or emergency use). New entrants to the electricity business will erode our market share and create significant competition, which could have a material adverse impact on our financial condition and results of operations.

In particular, we compete with independent power producers with respect to electricity generation. The independent power producers accounted for 19.3% of total power generation in 2016 and 25.3% of total generation capacity as of December 31, 2016. As of December 31, 2016, there were 17 independent power producers in Korea, excluding renewable energy producers. Private enterprises became permitted to own and operate coal-fired power plants in Korea only after the Ministry of Trade, Industry and Energy approved plans for independent power producers to construct coal-fired power plants under the Sixth Basic Plan announced in February 2013. Under the Seventh Basic Plan announced in July 2015 as subsequently amended, eight coal-fired units with aggregate generation capacity of 7,420 megawatts are scheduled to be completed between 2017 and 2022, currently with no further plans for construction of coal-fired power plants by independent power producers beyond 2022. While it remains to be seen whether construction of these generation units will be completed as scheduled, if these units were to be completed as scheduled and/or independent power producers are permitted to build additional generation capacity (whether coal-fired or not), our market share in Korea may decrease, which may have a material adverse effect on our results of operations and financial condition.

In addition, under the Community Energy System adopted by the Government in 2004, a minimal amount of electricity is supplied directly to consumers on a localized basis by independent power producers outside the cost-based pool system used by our generation subsidiaries and most independent power producers to distribute electricity nationwide. The purpose of this system is to geographically decentralize electricity supply and thereby reduce transmission losses and improve the efficiency of energy use. These entities do not supply electricity on a national level but are licensed to supply electricity on a limited basis to their respective districts under the Community Energy System. As of March 31, 2017, the aggregate generation capacity of suppliers participating in the Community Energy System amounted to less than 1% of that of our generation subsidiaries in the aggregate. We currently do not expect the Community Energy System to be widely adopted, especially in light of the significant level of capital expenditure required for such direct supply. However, if the Community Energy System is widely adopted, it may erode our currently dominant market position in the generation and distribution of electricity in Korea and may have a material adverse effect on our business, results of operations and financial condition.

Our market dominance in the electricity distribution in Korea also may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the

private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows.

See also Item 4.B. "Business Overview—Competition."

***Labor unrest may adversely affect our operations.***

We and each of our generation subsidiaries have separate labor unions. As of December 31, 2016, approximately 69.5% of our and our generation subsidiaries' employees in the aggregate were members of these labor unions. Since a six-week labor strike in 2002 by union members of our generation subsidiaries in response to a proposed privatization of one of our generation subsidiaries, there has been no material labor dispute. However, we cannot assure you that there will not be a major labor strike or other material disruptions of operations by the labor unions of us and our generation subsidiaries if the Government resumes privatization or other restructuring initiatives or for other reasons. For example, the Government is currently contemplating a public offering of minority stakes in our six generation subsidiaries and KEPCO KDN, subject to prevailing market conditions and public policy considerations. In addition, in 2016, we and our generation subsidiaries expanded the scope of employees who will be subject to a performance pay system, under which a greater portion of their annual compensation will vary with performance level, rather than be fixed in advance. At some of our generation subsidiaries, these changes were made without union approval, and there is ongoing litigation to nullify these changes. If this issue is not resolved favorably to the employees affected by the recent changes to the compensation system, this could potentially result in some labor unrest. We cannot assure you that any incident of labor unrest will not lead to a major labor strike or other material disruptions of operations by the labor unions of us and our generation subsidiaries, which may adversely affect our business and results of operations.

***Operation of nuclear power generation facilities inherently involves numerous hazards and risks, any of which could result in a material loss of revenues or increased expenses.***

Through KHNP, we currently operate 25 nuclear-fuel generation units. Operation of nuclear power plants is subject to certain hazards, including environmental hazards such as leaks, ruptures and discharge of toxic and radioactive substances and materials. These hazards can cause personal injuries or loss of life, severe damage to or destruction of property and natural resources, pollution or other environmental damage, clean-up responsibilities, regulatory investigation and penalties and suspension of operations. Nuclear power has a stable and relatively inexpensive cost structure (which is least costly among the fuel types used by our generation subsidiaries) and is the second largest source of Korea's electricity supply, accounting for 30.0% of electricity generated in Korea in 2016. Due to significantly lower unit fuel costs compared to those for thermal power plants, our nuclear power plants are generally operated at full capacity with only routine shutdowns for fuel replacement and maintenance, with limited exceptions.

From time to time, our nuclear generation units may experience unexpected shutdowns. For example, following an earthquake in the vicinity in September 2016, four nuclear generation units at the Wolsong site were shut down for approximately three months as part of a preventive and safety assurance program although these units were not directly affected by the earthquake. Any prolonged or substantial breakdown, failure or suspension of operation of a nuclear unit could result in a material loss of revenues, an increase in fuel costs related to the use of alternative power sources, additional repair and maintenance costs, greater risk of litigation and increased social and political hostility to the use of nuclear power, any of which could have a material adverse impact on our financial condition and results of operations.

In addition, heightened concerns regarding the safety of operating nuclear generation units could impede with our ability to operating them for an extended period of time or at all. For example, the nuclear power plant

14

at Wolsong #1 unit began operations in 1982 and ended its operations in 2012 pursuant to its 30-year operating license. In February 2015, the Nuclear Safety and Security Commission ("NSSC") evaluated the safety of operating Wolsong #1 unit and approved its extended operation until November 2022. However, a civic group filed a lawsuit to annul such decision, and in February 2017, the Seoul Administrative Court ruled against the NSSC. The NSSC appealed this decision, and the civic group has filed an injunction to suspend the operation of the Wolsong #1 unit. KHNP, which currently is operating the unit pursuant to the NSSC initial decision, has joined this lawsuit. We cannot assure you whether the courts will ultimately rule to grant the extension of life for Wolsong #1. There are seven other nuclear generation units whose life under their initial operating license will expire in the next ten years, or by 2027. Thus, if the courts were to ultimately rule against the extension of life for Wolsong #1, we may find it more difficult to have the life of other nuclear units extended as well. The failure to extend the life of these units would result in a loss of revenues from such units and the increase in our overall fuel costs (as nuclear fuel is the cheapest compared to coal, LNG or oil), which could adversely affect our results of operation and financial condition. Furthermore, in September 2016, Greenpeace and 559 Korean nationals brought a lawsuit against the NSSC to revoke the permit the NSSC granted to KHNP in relation to the construction of Shin-Kori #5 and #6 nuclear generation units. This case is currently pending at the Seoul Administrative Court. If the courts were to ultimately rule against the construction of these new nuclear units, we will similarly experience a loss of revenues and an increase in fuel costs), which could adversely affect our results of operation and financial condition.

In order to prevent damages to the nuclear facilities such as a result of the tsunami and earthquake in March 2011 in Japan, KHNP prepared a comprehensive safety improvement plan including, but are not limited to, installing additional automatic shut-down systems for earthquakes, extending coastal barriers for seismic waves, procuring mobile power generators and storage batteries, installing passive hydrogen removers at nuclear facilities and improving the radiology emergency medical system. All follow-up measures were finalized in December 2015. However, there is no assurance that a similar or worse natural disaster may require the adoption and implementation of additional safety measures, which may be costly and have a material adverse impact on our financial condition and results of operations.

### *The construction and operation of our generation, transmission and distribution facilities involve difficulties, such as opposition from civic groups, which may have an adverse effect on us.*

From time to time, we encounter social and political opposition against construction and operation of our generation facilities (particularly nuclear units) and, to a lesser extent, our transmission and distribution facilities. For example, we recently faced intense opposition from local residents and civic groups to the construction of transmission lines in the Milyang area, which we resolved through various compensatory and other support programs. Such opposition delayed the schedule for completion of this project. Although we and the Government have undertaken various community programs to address concerns of residents in areas near our facilities, civic and community opposition could result in delayed construction or relocation of our planned facilities, which could have a material adverse impact on our business and results of operations.

### *Our risk management policies and procedures may not be fully effective at all times.*

In the course of our operations, we must manage a number of risks, such as regulatory risks, market risks and operational risks. Although we devote significant resources to developing and improving our risk management policies and procedures and expect to continue to do so in the future, our risk management practices may not be fully effective at all times in eliminating or mitigating risk exposures in all market environments or against all types of risk, including risks that are unidentified or unanticipated, such as natural disasters or employee misconduct. For example, in May 2013, the Nuclear Safety and Security Commission ("NSSC") of Korea discovered that certain parts used in several of our then-operating nuclear generation units had been supplied based on forged testing results. This discovery led to full internal investigation and investigation by the Prosecutor's Office, which in turn led to prosecutions and convictions of several current and former employees of KHNP on related and separate bribery charges, as well as termination of the then-president of KHNP as part of

a broad disciplinary action. The incident also led to suspended operation of the related nuclear generation units for several months pending safety inspection. A similar incident involving forged testing results and bribery occurred also in November 2012. We and KHNP have fully cooperated with the authorities in terms of investigations as well as remedial and preventive measures, including enhanced internal compliance policies and procedures. We also believe we and our subsidiaries are in compliance in all material respects with internal compliance policies and procedures and all other additional safety measures initiated internally or required by regulatory and governmental agencies. However, we cannot assure you that, despite all precautionary and reform measures undertaken by us, these measures will prove to be fully effective at all times against all the risks we face or that an incident that that could cause harm to our reputation and operation will not happen in the future, including due to factors beyond our control.

***Our risk management procedures may not prevent losses in debt and foreign currency positions.***

We manage interest rate exposure for our debt instruments by limiting our variable rate debt exposure as a percentage of our total debt and closely monitoring the movements in market interest rates. We also actively manage currency exchange rate exposure for our foreign currency-denominated liabilities by measuring the potential loss therefrom using risk analysis software and entering into derivative contracts to hedge such exposure when the possible loss reaches a certain risk limit. To the extent we have unhedged positions or our hedging and other risk management procedures do not work as planned, our results of operations and financial condition may be adversely affected.

***The amount and scope of coverage of our insurance are limited.***

Substantial liability may result from the operations of our nuclear generation units, the use and handling of nuclear fuel and possible radioactive emissions associated with such nuclear fuel. KHNP carries insurance for its generation units and nuclear fuel transportation, and we believe that the level of insurance is generally adequate and is in compliance with relevant laws and regulations. In addition, KHNP is the beneficiary of Government indemnity which covers a portion of liability in excess of the insurance. However, such insurance is limited in terms of amount and scope of coverage and does not cover all types or amounts of losses which could arise in connection with the ownership and operation of nuclear plants. Accordingly, material adverse financial consequences could result from a serious accident or a natural disaster to the extent it is neither insured nor covered by the government indemnity.

In addition, our non-nuclear generation subsidiaries carry insurance covering certain risks, including fire, in respect of their key assets, including buildings and equipment located at their respective power plants, construction-in-progress and imported fuel and procurement in transit. Such insurance and indemnity, however, cover only a portion of the assets that these generation subsidiaries own and operate and do not cover all types or amounts of loss that could arise in connection with the ownership and operation of these power plants. In addition, unlike us, our generation subsidiaries are not permitted to self-insure, and accordingly have not self-insured, against risks of their uninsured assets or business. Accordingly, material adverse financial consequences could result from a serious accident to the extent it is uninsured.

In addition, because neither we nor our non-nuclear generation subsidiaries carry any insurance against terrorist attacks, an act of terrorism would result in significant financial losses. See Item 4.B. "Business Overview—Insurance."

***We may not be able to raise equity capital in the future without the participation of the Government.***

Under applicable laws, the Government is required to directly or indirectly own at least 51% of our issued capital stock. As of December 31, 2016, the last day on which our shareholders' registry was closed, the Government, directly and through Korea Development Bank (a statutory banking institution wholly owned by the Government), owned 51.1% of our issued capital stock. Accordingly, without changes in the existing Korean

law, it may be difficult or impossible for us to undertake, without the participation of the Government, any equity financing in the future.

***We may be exposed to potential claims made by current or previous employees for unpaid wages for the past three years under the expanded scope of ordinary wages and become subject to additional labor costs arising from the broader interpretation of ordinary wages under such decision.***

Under the Labor Standards Act, an employee is legally entitled to "ordinary wages." Under the guidelines previously issued by the Ministry of Employment and Labor, ordinary wages include base salary and certain fixed monthly allowances for work performed overtime during night shifts and holidays. Prior to the Supreme Court decision described below, many companies in Korea had typically interpreted these guidelines as excluding from the scope of ordinary wages fixed bonuses that are paid other than on a monthly basis, namely on a bi-monthly, quarterly or semi-annual basis, although such interpretation had been a subject of controversy and had been overruled in a few court cases.

In December 2013, the Supreme Court of Korea ruled that regular bonuses fall under the category of ordinary wages on the condition that those bonuses are paid regularly and uniformly, and that any agreement which excludes such regular bonuses from ordinary wage is invalid. One of the key rulings provides that bonuses that are given to employees (i) on a regular and continuous basis and (ii) calculated according to the actual number of days worked (iii) that are not incentive-based must be included in the calculation of "ordinary wages." The Supreme Court further ruled that in spite of invalidity of such agreements, employees shall not retroactively claim additional wages incurred due to such court decision, in case that such claims bring to employees unexpected benefits which substantially exceeds the wage level agreed by employers and employees and cause an unpredicted increase in expenditures for their company, which would lead the company to material managerial difficulty or would be a threat to the existence of the company. In that case, the claim is not acceptable since it is unjust and is in breach of the principle of good faith.

As a result of such ruling by the Supreme Court of Korea, we and our subsidiaries became subject to a number of lawsuits filed by various industry-wide and company-specific labor unions based on claims that ordinary wage had been paid without including certain items that should have been included as ordinary wage. In July 2016, the court ruled against us, and in accordance with the court's ruling, in August 2016 we paid Won 55.1 billion to the employees for three years of back pay plus interest. As of December 31, 2016, 30 lawsuits were pending against our subsidiaries for an aggregate claim amount of Won 198 billion, for which our subsidiaries set aside an aggregate amount of Won 179 billion to cover any potential future payments of additional ordinary wage in relation to the related lawsuits. We cannot presently assure you that the court will not rule against our subsidiaries in these lawsuits, or that the foregoing reserve amount will be sufficient to cover the amounts payable under the court rulings. In such cases, it would adversely affect our results of operations. See Item 8.A. Consolidated Statements and Other Financial Information—Legal Proceedings.

***We are subject to cyber security risk.***

Recently, our activities have been subject to an increasing risk of cyber-attacks, the nature of which is continually evolving. For example, in December 2014, KHNP became subject to a cyber terror incident. According to the findings of the Prosecutor's Office announced in March 2015, hackers suspected to be affiliated with North Korean authorities stole and distributed a mock blueprint for a hypothetical nuclear unit that had been devised for educational purposes, hacked into the computer network of former KHNP employees and threatened to shut down certain of KHNP's nuclear plants. The hacking incident did not jeopardize our nuclear operation in any material respect and none of the stolen information was material to our nuclear operation or the national nuclear policy. In response to such incident, we and our subsidiaries have further bolstered anti-hacking and other preventive and remedial measures in relation to potential cyber terror. However, there is no assurance that a similar or more serious hacking or other forms of cyber terror will not happen with respect to us and our generation subsidiaries, which could have a material adverse impact on our business, financial condition and results of operations.

17

***We engage in limited activities relating to Iran and may become subject to sanctions under relevant laws and regulations of the United States and other jurisdictions as a result of such activities, which may adversely affect our business and reputation.***

The U.S. Department of the Treasury's Office of Foreign Assets Control, or OFAC, administers and enforces certain laws and regulations (which we refer to as the OFAC sanctions) that impose restrictions upon activities or transactions within U.S. jurisdiction with certain countries, governments, entities and individuals that are the subject of OFAC sanctions, including Iran. Even though non-U.S. persons generally are not directly bound by the OFAC sanctions, in recent years the OFAC has asserted that such non-U.S. persons can be held liable on various legal theories if they engage in transactions completed in part in the United States or by U.S. persons (such as, for example, wiring an international payment that clears through a bank branch in New York). The European Union also enforces certain laws and regulations that impose restrictions upon nationals and entities of, and business conducted in, member states with respect to activities or transactions with certain countries, governments, entities and individuals that are the subject of such laws and regulations, including Iran. The United Nations Security Council and other governmental entities also impose similar sanctions.

In addition to the OFAC sanctions described above, the United States also maintains indirect sanctions under authority of, among others, the Iran Sanctions Act, the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, or CISADA, the National Defense Authorization Act for Fiscal Year 2012, or the NDAA, the Iran Threat Reduction and Syria Human Rights Act of 2012, or ITRA, various Executive Orders, and the Iran Freedom and Counter-Proliferation Act of 2012, or IFCA. These indirect sanctions, which we refer to collectively as U.S. secondary sanctions, provide authority for the imposition of U.S. sanctions on foreign parties that provide services in support of certain Iranian activities in the energy, shipping and military sectors, among others.

On July 14, 2015, the so-called "P5+1" powers (consisting of the United States, the United Kingdom, Germany, France, Russia, and China) and the European Union, or the EU, entered into an agreement with Iran known as the Joint Comprehensive Plan of Action Regarding the Islamic Republic of Iran's Nuclear Program, or the JCPOA. The JCPOA is intended to significantly restrict Iran's ability to develop and produce nuclear weapons. Upon implementation of the JCPOA on January 16, 2016 the United States, the EU, and the UN suspended certain nuclear-related sanctions against Iran following an announcement by the International Atomic Energy Agency that Iran had fulfilled its initial obligations under the JCPOA.

The U.S. secondary sanctions that were suspended on January 16, 2016 have not been repealed. Rather, certain waivers of statutory provisions were put into place, certain Presidential Executive Orders were revoked, and certain persons were removed from the relevant U.S. denied parties lists. Under the JCPOA, sanctions may be re-imposed if the United States or any other member of the P5+1 or the EU invokes provisions of the JCPOA for the re-imposition of sanctions. Additionally, the United States, the EU, or the UN may impose new sanctions against Iran or against persons conducting business in Iran even while the JCPOA remains in force.

Violations of OFAC sanctions via transactions with a U.S. jurisdictional nexus can result in substantial civil or criminal penalties. A range of sanctions may be imposed on companies that engage in sanctionable activities within the scope of U.S. secondary sanctions, including, among other things, the blocking of any property subject to U.S. jurisdiction in which the sanctioned company has an interest, which could include a prohibition on transactions or dealings involving securities of the sanctioned company pursuant to CISADA.

In Iran, we are currently engaged in limited business activities, none of which has progressed beyond the early development stage. Our activities in Iran are managed by a representative office located in Tehran, Iran. None of our activities in Iran involve U.S. persons or our U.S. affiliates. Our counterparties in the projects described below are Iranian governmental entities or Iranian state-owned enterprises.

Since all of our activities in Iran are at the early development stage, we have not realized any revenue or profit from such activities. We also have not to-date made any investments in Iran, other than incur expenses to run our representative office in Tehran in the ordinary course of business.

18

A summary of our current projects in Iran follows.

- We have entered into a cooperation agreement with Tavanir, an Iranian state-owned electricity provider, under which we would carry out a pilot "advanced metering infrastructure (AMI)" project. AMI enables checking the electricity usage amount remotely. The project is being conducted in Pak Dasht City and Hormuz Island, Iran. This project involves installing over approximately 2,500 smart meters. The development and production of AMI equipment and materials are complete, and we have obtained permission from the Ministry of Trade, Energy and Industry of Korea to export the equipment. We currently plan to ship the AMI equipment and materials to Iran during April 2017, install them in May 2017, and complete the project by July 2017.

- We are in the process of negotiating various agreements with Tavanir under which we would provide consulting services relating to (i) improvement of Iran's electricity demand through load management, efficiency improvement and tariff system improvement, (ii) formation of a roadmap for intelligent electricity transmission system in Iran by improving transmission reliability and implementing automation, (iii) reduction of electricity loss during transmission in the electricity system of Iran, (iv) development of a clean development mechanism (CDM) for the recovery and recycling of the sulfur hexafluoride gas in Iran for purposes of carbon emission reduction, and (v) modeling the installation of energy storage systems in Iran. Funding for the last project will be provided by the Ministry of Trade, Industry and Energy of Korea under its Official Development Aid program.

- We have participated in a feasibility study of the proposed adoption by Tavanir of a 765 kV electricity transmission network. Our task involved reviewing Tavanir's feasibility report. A final report summarizing our review of the feasibility report and a technical review of the transmission network was submitted in February 2017.

- We are in the process of negotiating a contract with Thermal Power Plant Holding Company of Iran under which we would build and operate combined cycle power plants at Zanjan and Neyzar, Iran.

- We have submitted a draft proposal to the Iran Energy Efficiency Organization under which we would provide consulting services in relation to AMI security in Iran.

- We are in the process of conducting a feasibility study for a solar power project in Iran.

- Our wholly-owned subsidiary, Korea Western Power, is currently pursuing a "build, operate and transfer" project relating to a 500 megawatts combined cycle power plant in Sirjan, Kerman in Iran, through a consortium with Daewoo E&C, a Korean construction company, and Gohar Energy, an Iranian energy company. The consortium is currently conducting a feasibility study.

- Korea Electric Power Research Institute, which is operated by us, has entered into cooperation agreements with Iran's Niroo Research Institute regarding various joint research and development efforts relating to power plants and renewable energy.

We also discontinued the following projects in Iran after feasibility studies: (i) a pilot project to replace aged transformers (30 years or older) in Teheran in cooperation with Tavanir, and (ii) a pilot project for installation, in cooperation with Tavanir, of a remote control system for air conditioning in public institutions in Teheran. We also withdrew from a proposed project sponsored by Thermal Power Plant Holding Company for the rehabilitation, operation, maintenance, and management of the Bandar-Abbas power plant in Homorzgan, Dogerdan due to unavailability of financing.

We have internal policies and procedures, as well as a monitoring system, which are designed to prevent and detect violations of applicable laws, including applicable sanctions laws. We do not believe that our current activities relating to Iran violate OFAC sanctions or are sanctionable under U.S. secondary sanctions, and in any event, we believe we are in compliance with applicable sanctions laws. As noted above, for the pilot AMI project, we are in the process of exporting a limited amount of U.S.-origin goods to Iran. We believe we are not in violation of any laws concerning re-exports of U.S.-origin goods to Iran. Moreover, to the extent our activities

19

were sanctionable under those U.S. secondary sanctions programs that were lifted pursuant to the JCPOA, U.S. authorities have indicated that sanctions will not be imposed pursuant to the suspended U.S. secondary sanctions.

Nevertheless, there can be no assurances that the relevant relief will continue to be available in the future, and even if it does, there is no guarantee that our activities relating to Iran will not be found to violate the OFAC sanctions or involve sanctionable activities under U.S. secondary sanctions, or that any other government will not determine that our activities violate applicable sanctions of other countries. Laws related to Iran sanctions are complex, dynamic, and subject to evolving interpretations by the regulatory authorities. The re-imposition or "snap-back" of U.S. sanctions pursuant to the JCPOA could also occur, and the scope of re-imposed sanctions would be determined at that time, although sanctions would not be retroactively applied to activities properly engaged in while sanctions relief was in effect.

Violations of sanctions can result in penalties or other consequences adverse to us. Certain of our counterparties may be subjected to sanctions. If we violate the sanctions we may ourselves be subjected to sanctions or penalties. Our business and results of operations may be adversely affected or we may suffer reputational damage. In addition, such sanctions may prevent us from consummating or continuing any of the projects we are currently pursuing in Iran, which could adversely affect our results of operations. Also, at any time, certain investors may divest their interests in our shares if we are found to have violated or are suspected of violating applicable sanctions law arising from our operation in a sanctioned country such as Iran.

**Risks Relating to Korea and the Global Economy**

***Unfavorable financial and economic conditions in Korea and globally may have a material adverse impact on us.***

We are incorporated in Korea, where most of our assets are located and most of our income is generated. As a result, we are subject to political, economic, legal and regulatory risks specific to Korea, and our business, results of operations and financial condition are substantially dependent on the Korean consumers' demand for electricity, which are in turn largely dependent on developments relating to the Korean economy.

The Korean economy is closely integrated with, and is significantly affected by, developments in the global economy and financial markets. In recent years, adverse conditions and volatility in the worldwide financial markets, fluctuations in oil and commodity prices and the general weakness of the global economy have contributed to the uncertainty of global economic prospects in general and have adversely affected, and may continue to adversely affect, the Korean economy, which in turn could adversely affect our business, financial condition and results of operations. As the Korean economy is highly dependent on the health and direction of the global economy, the prices of our securities may be adversely affected by investors' reactions to developments in other countries. In addition, due to the ongoing volatility in the global financial markets, the value of the Won relative to the U.S. dollar has also fluctuated significantly in recent years, which in turn also may adversely affect our financial condition and results of operations.

Factors that determine economic and business cycles in the Korean or global economy are for the most part beyond our control and inherently uncertain. In light of the high level of interdependence of the global economy, any of the foregoing developments could have a material adverse effect on the Korean economy and financial markets, and in turn on our business and profitability.

More specifically, factors that could have an adverse impact on Korea's economy in the future include, among others:

- increases in inflation levels, volatility in foreign currency reserve levels, commodity prices (including oil prices), exchange rates (particularly against the U.S. dollar), interest rates, stock market prices and inflows and outflows of foreign capital, either directly, into the stock markets, through derivatives or

otherwise, including as a result of increased uncertainty in the wake of a referendum in the United Kingdom in June 2016 that voted in favor of exiting from the European Union, commonly known as "Brexit";

- difficulties in the financial sectors in Europe, China and elsewhere and increased sovereign default risks in select countries and the resulting adverse effects on the global financial markets;

- adverse developments in the economies of countries and regions to which Korea exports goods and services (such as the United States, Europe, China and Japan), or in emerging market economies in Asia or elsewhere that could result in a loss of confidence in the Korean economy, including potentially as a result of the Brexit;

- social and labor unrest or declining consumer confidence or spending resulting from lay-offs, increasing unemployment and lower levels of income;

- uncertainty and volatility and further decreases in the market prices of Korean real estate;

- a decrease in tax revenues and a substantial increase in the Government's expenditures for unemployment compensation and other social programs that together could lead to an increased Government budget deficit;

- political uncertainty, including as a result of increasing strife among or within political parties in Korea, and political gridlock within the government or in the legislature, which prevents or disrupts timely and effective policy making to the detriment of Korean economy, as well as the upcoming special presidential election in May 2017 following the impeachment and indictment of the most recent president following a series of scandals and social unrest, which also involved the investigation of several leading Korean conglomerates and arrest of their leaders on charges of bribery and other possible misconduct;

- deterioration in economic or diplomatic relations between Korea and its trading partners or allies, including deterioration resulting from territorial or trade disputes or disagreements in foreign policy, including as a result of any potential renegotiation of free trade agreements, or the ongoing tension between Korean and China in relation to the decision to allow deployment by the United States of the Terminal High Altitude Defense system known as "THAAD" in Korea;

- increases in social expenditures to support the aging population in Korea or decreases in economic productivity due to the declining population size in Korea;

- any other development that has a material adverse effect in the global economy, such as an act of war, the spread of terrorism or a breakout of an epidemic such as SARS, avian flu, swine flu, Middle East Respiratory Syndrome, ebola or Zika virus, or natural disasters, earthquakes and tsunamis and the related disruptions in the relevant economies with global repercussions;

- hostilities involving oil-producing countries in the Middle East and elsewhere and any material disruption in the supply of oil or a material increase in the price of oil resulting from such hostilities; and

- an increase in the level of tensions or an outbreak of hostilities in the Korean peninsula or between North Korea and the United States.

Any future deterioration of the Korean economy could have an adverse effect on our business, financial condition and results of operations.

*Political and societal unrest surrounding the impeachment of a former president and an upcoming special presidential election could adversely affect the Korean economy and our business.*

In November 2016, the Korean prosecutor's office indicted a confidant of President Park Geun-hye who had allegedly used her ties with the President to extort donations from Korean business groups for personal benefit,

21

as well as a number of current and former presidential aides, on charges of, among others, abuse of power, coercion and leaking classified documents. On December 9, 2016, the National Assembly voted in favor of impeaching President Park for a number of alleged constitutional and criminal violations. President Park was suspended from power immediately, with the prime minister simultaneously taking over the role of acting President. On March 10, 2017, the Constitutional Court unanimously upheld the parliamentary vote to impeach President Park on grounds, among others, of abuse of power and failure to uphold the Constitution, which triggered her immediate dismissal. On March 31, 2017, the Seoul Central District Court issued an arrest warrant for former President Park in connection with such investigation. In connection with its investigation of former President Park, the special independent prosecutor also conducted related investigations of several large Korean business groups and members of their senior management for bribery, embezzlement and other possible misconduct, which the Korean prosecutor's office has continued following the end of the special independent prosecutor's term. These developments lead to mass rallies across Korea between those in support of former President Park and those against.

A special election to elect a new President is scheduled to be held on May 9, 2017. It is presently unclear who will be elected as the new president and what policies the new administration will pursue, including those that may affect the energy industry and our business.

Therefore, we cannot assure you that the events described above will not have a material adverse effect on the Korean economy and our business, financial condition and results of operations.

***Tensions with North Korea could have an adverse effect on us and the market value of our shares.***

Relations between Korea and North Korea have been tense throughout Korea's modern history. The level of tension between the two Koreas has fluctuated and may increase abruptly as a result of current and future events. In particular, there continues to be uncertainty regarding the long-term stability of North Korea's political leadership since the succession of Kim Jong-un to power following the death of his father in December 2011, which has raised concerns with respect to the political and economic future of the region.

In addition, there continues to be heightened security tension in the region stemming from North Korea's hostile military and diplomatic actions, including in respect of its nuclear weapons and long-range missile programs. Some examples from recent years include the following:

- In March 2017, North Korea launched four mid-range missiles, which landed off the east coast of the Korean peninsula.

- On September 9, 2016, North Korea conducted its fifth nuclear test, which has been the largest in scale among North Korea's nuclear tests thus far. According to North Korean announcements, the test was successful in detonating a nuclear missile. The test created a sizable earthquake in South Korea. In response, in February 2017 the U.N. Security Council adopted Resolution 2321 (2016) against North Korea, the purpose of which is to strengthen its sanctions regime against North Korea and to condemn North Korea's September 9, 2016 nuclear test in the strongest terms.

- On February 10, 2016, in retaliation of North Korea's recent launch of a long-range rocket, South Korea announced that it would halt its operations of the Kaesong Industrial Complex to impede North Korea's utilization of funds from the industrial complex to finance its nuclear and missile programs. In response, North Korea announced on February 11, 2016 that it would expel all South Korean employees from the industrial complex and freeze all South Korean assets there.

- On February 7, 2016, North Korea launched a rocket, claimed by them to be carrying a satellite intended for scientific observation. The launch was widely suspected by the international community to be a cover for testing a long-range missile capable of carrying a nuclear warhead. On February 18, 2016, the President of the United States signed into law mandatory sanctions on North Korea to punish

22

it for its recent nuclear and missile tests, human rights violations and cybercrimes. The bill, which marks the first measure by the United States to exclusively target North Korea, is intended to seize the assets of anyone engaging in business related to North Korea's weapons program, and authorizes US$50 million over five years to transmit radio broadcasts into the country and support humanitarian assistance projects. On March 2, 2016, the United Nations Security Council voted unanimously to adopt a resolution to impose sanctions against North Korea, which include inspection of all cargo going to and from North Korea, a ban on all weapons trade and the expulsion of North Korean diplomats who engage in "illicit activities." Also, on March 4, 2016, the European Union announced that it would expand its sanctions on North Korea, adding additional companies and individuals to its list of sanction targets. On April 1, 2016, North Korea fired a short-range surface-to-air missile in apparent protest of these sanctions adopted by the United States and the United Nations Security Council.

- On January 6, 2016, North Korea announced that it had successfully conducted its first hydrogen bomb test, hours after international monitors detected a 5.1 magnitude earthquake near a known nuclear testing site in the country. The claims have not been verified independently. The alleged test followed a statement made in the previous month by Kim Jong-un, who claimed that North Korea had developed a hydrogen bomb.

- In August 2015, two Korean soldiers were injured in a landmine explosion near the South Korean demilitarized zone. Claiming the landmines were set by North Koreans, the South Korean army re-initiated its propaganda program toward North Korea utilizing loudspeakers near the demilitarized zone. In retaliation, the North Korean army fired artillery rounds on the loudspeakers, resulting in the highest level of military readiness for both Koreas. High-ranking officials from North and South Korea subsequently met for discussions and entered into an agreement on August 25, 2015 intending to deflate military tensions.

- From time to time, North Korea has fired short- to medium-range missiles from the coast of the Korean peninsula into the sea. In March 2015, North Korea fired seven surface-to-air missiles into waters off its east coast in apparent protest of annual joint military exercises being held by Korea and the United States.

- North Korea renounced its obligations under the Nuclear Non-Proliferation Treaty in January 2003 and conducted three rounds of nuclear tests between October 2006 to February 2013, which increased tensions in the region and elicited strong objections worldwide. In response, the United Nations Security Council unanimously passed resolutions that condemned North Korea for the nuclear tests and expanded sanctions against North Korea.

North Korea's economy also faces severe challenges, including severe inflation and food shortages, which may further aggravate social and political tensions within North Korea. In addition, reunification of Korea and North Korea could occur in the future, which would entail significant economic commitment and expenditure by Korea that may outweigh any resulting economic benefits of reunification.

There can be no assurance that the level of tension on the Korean peninsula will not escalate in the future or that the political regime in North Korea may not suddenly collapse. Any further increase in tension or uncertainty relating to the military, political or economic stability in the Korean peninsula, including a breakdown of diplomatic negotiations over the North Korean nuclear program, occurrence of military hostilities, heightened concerns about the stability of North Korea's political leadership or its actual collapse, a leadership crisis, a breakdown of high-level contacts or accelerated reunification could have a material adverse effect on our business, financial condition and results of operations, as well as the price of our common shares and our American depositary shares.

***We are generally subject to Korean corporate governance and disclosure standards, which differ in significant respects from those in other countries.***

Companies in Korea, including us, are subject to corporate governance standards applicable to Korean public companies which differ in many respects from standards applicable in other countries, including the

23

United States. As a reporting company registered with the Securities and Exchange Commission and listed on the New York Stock Exchange, we are, and will continue to be, subject to certain corporate governance standards as mandated by the Sarbanes-Oxley Act of 2002, as amended. However, foreign private issuers, including us, are exempt from certain corporate governance standards required under the Sarbanes-Oxley Act or the rules of the New York Stock Exchange. We and our generation subsidiaries are also subject to a number of special laws and regulations to Government-controlled entities, including the Act on the Management of Public Institutions. For a description of significant differences in corporate governance standards, see Item 16.G. "Corporate Governance." There may also be less publicly available information about Korean companies, such as us, than is regularly made available by public or non-public companies in other countries. Such differences in corporate governance standards and less public information could result in less than satisfactory corporate governance practices or disclosure to investors in certain countries.

*You may not be able to enforce a judgment of a foreign court against us.*

We are a corporation with limited liability organized under the laws of Korea. Substantially all of our directors and officers and other persons named in this annual report reside in Korea, and all or a significant portion of the assets of our directors and officers and other persons named in this annual report and substantially all of our assets are located in Korea. As a result, it may not be possible for holders of the American depository shares to affect service of process within the United States, or to enforce against them or us in the United States judgments obtained in United States courts based on the civil liability provisions of the federal securities laws of the United States. There is doubt as to the enforceability in Korea, either in original actions or in actions for enforcement of judgments of United States courts, of civil liabilities predicated on the United States federal securities laws.

**Risks Relating to Our American Depositary Shares**

*There are restrictions on withdrawal and deposit of common shares under the depositary facility.*

Under the deposit agreement, holders of shares of our common stock may deposit those shares with the depositary bank's custodian in Korea and obtain American depositary shares, and holders of American depositary shares may surrender American depositary shares to the depositary bank and receive shares of our common stock. However, under current Korean laws and regulations, the depositary bank is required to obtain our prior consent for the number of shares to be deposited in any given proposed deposit which exceeds the difference between (i) the aggregate number of shares deposited by us for the issuance of American depositary shares (including deposits in connection with the initial and all subsequent offerings of American depositary shares and stock dividends or other distributions related to these American depositary shares) and (ii) the number of shares on deposit with the depositary bank at the time of such proposed deposit. We have consented to the deposit of outstanding shares of common stock as long as the number of American depositary shares outstanding at any time does not exceed 80,153,810 shares. As a result, if you surrender American depositary shares and withdraw shares of common stock, you may not be able to deposit the shares again to obtain American depositary shares.

*Ownership of our shares is restricted under Korean law.*

Under the Financial Investment Services and Capital Markets Act, with certain exceptions, a foreign investor may acquire shares of a Korean company without being subject to any single or aggregate foreign investment ceiling. As one such exception, certain designated public corporations, such as us, are subject to a 40% ceiling on acquisitions of shares by foreigners in the aggregate. The Financial Services Commission may impose other restrictions as it deems necessary for the protection of investors and the stabilization of the Korean securities and derivatives market.

In addition to the aggregate foreign investment ceiling, the Financial Investment Services and Capital Markets Act and our Articles of Incorporation set a 3% ceiling on acquisition by a single investor (whether

24

domestic or foreign) of the shares of our common stock. Any person (with certain exceptions) who holds our issued and outstanding shares in excess of such 3% ceiling cannot exercise voting rights with respect to our shares exceeding such limit.

The ceiling on aggregate investment by foreigners applicable to us may be exceeded in certain limited circumstances, including as a result of acquisition of:

- shares by a depositary issuing depositary receipts representing such shares (whether newly issued shares or outstanding shares);

- shares by exercise of warrant, conversion right under convertible bonds, exchange right under exchangeable bonds or withdrawal right under depositary receipts issued outside of Korea;

- shares from the exercise of shareholders' rights; or

- shares by gift, inheritance or bequest.

A foreigner who has acquired our shares in excess of any ceiling described above may not exercise his voting rights with respect to our shares exceeding such limit and the Financial Services Commission may take necessary corrective action against him.

***Holders of our ADSs will not have preemptive rights in certain circumstances.***

The Korean Commercial Code and our Articles of Incorporation require us, with some exceptions, to offer shareholders the right to subscribe for new shares in proportion to their existing ownership percentage whenever new shares are issued. If we offer any rights to subscribe for additional shares of our common stock or any rights of any other nature, the depositary bank, after consultation with us, may make the rights available to you or use reasonable efforts to dispose of the rights on your behalf and make the net proceeds available to you. The depositary bank, however, is not required to make available to you any rights to purchase any additional shares unless it deems that doing so is lawful and feasible and:

- a registration statement filed by us under the U.S. Securities Act of 1933, as amended, is in effect with respect to those shares; or

- the offering and sale of those shares is exempt from or is not subject to the registration requirements of the U.S. Securities Act.

We are under no obligation to file any registration statement with the U.S. Securities and Exchange Commission in relation to the registration rights. If a registration statement is required for you to exercise preemptive rights but is not filed by us, you will not be able to exercise your preemptive rights for additional shares and you will suffer dilution of your equity interest in us.

***The market value of your investment in our ADSs may fluctuate due to the volatility of the Korean securities market.***

Our common stock is listed on the KRX KOSPI Division of the Korea Exchange, which has a smaller market capitalization and is more volatile than the securities markets in the United States and many European countries. The market value of ADSs may fluctuate in response to the fluctuation of the trading price of shares of our common stock on the Stock Market Division of the Korea Exchange. The Stock Market Division of the Korea Exchange has experienced substantial fluctuations in the prices and volumes of sales of listed securities and the Stock Market Division of the Korea Exchange has prescribed a fixed range in which share prices are permitted to move on a daily basis. Like other securities markets, including those in developed markets, the Korean securities market has experienced problems including market manipulation, insider trading and settlement failures. The recurrence of these or similar problems could have a material adverse effect on the market price and liquidity of the securities of Korean companies, including our common stock and ADSs, in both the domestic and the international markets.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

The Korean government has the ability to exert substantial influence over many aspects of the private sector business community, and in the past has exerted that influence from time to time. For example, the Korean government has promoted mergers to reduce what it considers excess capacity in a particular industry and has also encouraged private companies to publicly offer their securities. Similar actions in the future could have the effect of depressing or boosting the Korean securities market, whether or not intended to do so. Accordingly, actual or perceived actions or inactions by the Korean government may cause sudden movements in the market prices of the securities of Korean companies in the future, which may affect the market price and liquidity of our common stock and ADSs.

***Your dividend payments and the amount you may realize in connection with a sale of your ADSs will be affected by fluctuations in the exchange rate between the U.S. dollar and the Won.***

Investors who purchase the American depositary shares will be required to pay for them in U.S. dollars. Our outstanding shares are listed on the Korea Exchange and are quoted and traded in Won. Cash dividends, if any, in respect of the shares represented by the American depositary shares will be paid to the depositary bank in Won and then converted by the depositary bank into U.S. dollars, subject to certain conditions. Accordingly, fluctuations in the exchange rate between the Won and the U.S. dollar will affect, among other things, the amounts a registered holder or beneficial owner of the American depositary shares will receive from the depositary bank in respect of dividends, the U.S. dollar value of the proceeds which a holder or owner would receive upon sale in Korea of the shares obtained upon surrender of American depositary shares and the secondary market price of the American depositary shares.

***If the Government deems that certain emergency circumstances are likely to occur, it may restrict the depositary bank from converting and remitting dividends in U.S. dollars.***

If the Government deems that certain emergency circumstances are likely to occur, it may impose restrictions such as requiring foreign investors to obtain prior Government approval for the acquisition of Korean securities or for the repatriation of interest or dividends arising from Korean securities or sales proceeds from disposition of such securities. These emergency circumstances include any or all of the following:

- sudden fluctuations in interest rates or exchange rates;

- extreme difficulty in stabilizing the balance of payments; and

- a substantial disturbance in the Korean financial and capital markets.

The depositary bank may not be able to secure such prior approval from the Government for the payment of dividends to foreign investors when the Government deems that there are emergency circumstances in the Korean financial markets.

## ITEM 4.   *INFORMATION ON THE COMPANY*

### Item 4.A. History and Development of the Company

### General Information

Our legal and corporate name is Korea Electric Power Corporation. We were established by the Government on December 31, 1981 as a statutory juridical corporation in Korea under the Korea Electric Power Corporation ("KEPCO") Act as the successor to Korea Electric Company. Our registered office is located at 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea, and our telephone number is 82-61-345-4213. Our website address is www.kepco.co.kr.

Our agent in the United States is Korea Electric Power Corporation, North America Office, located at 7th Floor, Parker Plaza, 400 Kelby Street, Fort Lee, NJ 07024.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

The Korean electric utility industry traces its origin to the establishment of the first electric utility company in 1898. On July 1, 1961, the industry was reorganized by the merger of Korea Electric Power Company, Seoul Electric Company and South Korea Electric Company, which resulted in the formation of Korea Electric Company. From 1976 to 1981, the Government acquired the private minority shareholdings in Korea Electric Company. After the Government acquired all the remaining shares of Korea Electric Company, Korea Electric Company was dissolved, and we were incorporated in 1981 and assumed the assets and liabilities of Korea Electric Company. We ceased to be wholly owned by the Government in 1989 when the Government sold 21% of our common stock. As of December 31, 2016, the last day on which our shareholders registry was closed, the Government maintained 51.1% ownership in aggregate of our common shares by direct holdings by the Government and indirect holdings through Korea Development Bank, a statutory banking institution wholly owned by the Government.

Under relevant laws of Korea, the Government is required to own, directly or indirectly, at least 51% of our capital. Direct or indirect ownership of more than 50% of our outstanding common stock enables the Government to control the approval of certain corporate matters relating to us that require a shareholders' resolution, including approval of dividends. The rights of the Government and Korea Development Bank as holders of our common stock are exercised by the Ministry of Trade, Industry and Energy, based on the Government's ownership of our common stock and a proxy received from Korea Development Bank, in consultation with the Ministry of Strategy and Finance.

We operate under the general supervision of the Ministry of Trade, Industry and Energy. The Ministry of Trade, Industry and Energy, in consultation with the Ministry of Strategy and Finance, is responsible for approving, subject to review by the Korea Electricity Commission, the electricity rates we charge our customers. See Item 4.B. "Business Overview—Sales and Customers—Electricity Rates." We furnish reports to officials of the Ministry of Trade, Industry and Energy, the Ministry of Strategy and Finance and other Government agencies and regularly consult with such officials on matters relating to our business and affairs. See Item 4.B. "Business Overview—Regulation." Our non-standing directors, who comprise a majority of our board of directors, must be appointed by the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee (which is established by law and chaired by the minister of the Ministry of Strategy and Finance and whose members consist of Government officials and others appointed by the President of the Republic based on recommendation by the minister of the Ministry of Strategy and Finance) from a pool of candidates recommended by the director nomination committee and an approval at the general meeting of shareholders. Our president and standing directors who concurrently serve as members of our audit committee must be appointed by the President of the Republic upon the motion of the minister of the Ministry of Trade, Industry and Energy (in the case of our president) and the minister of the Ministry of Strategy and Finance (in the case of our standing directors who concurrently serve as members of the audit committee) and following the nomination by our director nomination committee, the review and resolution of the Public Agencies Operating Committee and an approval at the general meeting of shareholders. See Item 6.A. "Directors and Senior Management—Board of Directors" and Item 16.G. "Corporate Governance—The Act on the Management of Public Institutions")

## Item 4.B. Business Overview

### Introduction

We are an integrated electric utility company engaged in the transmission and distribution of substantially all of the electricity in Korea. Through our six wholly-owned generation subsidiaries, we also generate the substantial majority of electricity produced in Korea. As of December 31, 2016, we and our generation subsidiaries owned approximately 74.7% of the total electricity generation capacity in Korea (excluding plants generating electricity primarily for private or emergency use). In 2016, we sold to our customers approximately 497,039 gigawatt-hours of electricity. We purchase electricity principally from our generation subsidiaries and, to a lesser extent, from independent power producers. Of the 508,879 gigawatt-hours of electricity we purchased

27

in 2016, 31.2% was generated by KHNP, our wholly-owned nuclear and hydroelectric power generation subsidiary, 50.3% was generated by our wholly-owned five non-nuclear generation subsidiaries and 18.5% was generated by independent power producers that trade electricity to us through the cost-based pool system of power trading (excluding independent power producers that supply electricity under power purchase agreements with us). Our five non-nuclear generation subsidiaries are KOSEP, KOMIPO, KOWEPO, KOSPO and EWP, each of which is wholly owned by us and is incorporated in Korea. We derive substantially all of our revenues and profit from Korea, and substantially all of our assets are located in Korea.

In 2016, we had sales of Won 59,763 billion and net profit of Won 7,148 billion, compared to sales of Won 58,582 billion and net profit of Won 13,416 billion in 2015 .

Our revenues are closely tied to demand for electricity in Korea. Demand for electricity in Korea increased at a compounded average growth rate of 1.6% per annum from 2012 to 2016, compared to the real gross domestic product, or GDP, which increased at a compounded average growth rate of 3.0% during the same period, according to the Bank of Korea. During 2016, the GDP growth rate was 2.8%, which was in tandem with the growth in demand for electricity in Korea during the same year, which also grew by 2.8%.

**Strategy**

As our overall strategy, we seek to become a leading global energy enterprise by enhancing our global competitiveness and strengthening our contribution to the global environmental campaigns through continued development of "green" and "smart" power-related technologies. We also aim to adapt to the growing uncertainties in the global economy by selectively pursuing new business opportunities and through development of innovative technologies. We evaluate and renew our mid- to long-term strategy every five years, and in 2015 established the "Vision 2025 Mid- to Long-Term Strategy." Under this vision, we will aim for balanced growth among our domestic operations, overseas business and new energy industry initiatives.

- *Strengthen competitiveness in our core operations.* We plan to enhance efficiency of our electricity generation, transmission and distribution networks and operation of related facilities. We will strategically focus on ensuring stable supply of electricity, making our electricity networks "smarter" and more intelligent through the use of advanced technology utilizing big data and the "Internet of Things" technology and creating new energy services related to our core operations in order to address changes in the business environment.

- *Expand and develop new businesses.* In connection with our overseas business, we plan to selectively explore opportunities to develop renewable energy, smart transmission and distribution facilities and nuclear energy projects to diversify our businesses and provide suitable solutions meeting the different needs of various countries. Additionally, we plan to actively address climate change through the development of new energy related technologies such as smart grids and energy storage systems.

- *Create a platform for future growth.* We plan to develop an ecosystem focused on new energy technologies. We have established Bitgaram Energy Valley in Naju with the goal of facilitating the growth of the new energy industry and creating a global energy hub. In addition, we have selected ten core electricity-related technologies (including energy storage systems and "smart grid"-related technologies), and we plan to focus on the development of high value-added technologies.

- *Strengthen our management system for sustainable growth.* We will continue to develop an innovative working culture and management system to promote efficiency. We will also focus on creating a low-carbon clean energy business environment, fostering a common set of shared values with local communities and developing a sustainable energy business model.

**Recent Developments**

*Proposal for Adjustment of Functions of Public Institutions (Energy Sector)*

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by

discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies should take on greater responsibilities in overseas resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination; (ii) KHNP should take a greater role in export of nuclear technology; and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition. In accordance therewith, we transferred a substantial portion of our assets and liabilities in our overseas resource business to our generation subsidiaries as of December 31, 2016. In addition, pursuant to this Proposal, we are considering a sale in the public market of a minority of our shares in our five non-nuclear generation subsidiaries, KEPCO KDN and KHNP gradually and in that order, subject to prevailing market conditions and other policy considerations. Accordingly, we are currently taking steps in preparation of a potential sale of a minority of our shares in KOSEP and EWP through public offerings by the end of 2017, but whether and when such sale would occur will be subject to prevailing market conditions and considerations of public policy. In any event, we plan to maintain a controlling stake in each of these subsidiaries.

### Amendments to the Electricity Business Act

In March 2017, the Electricity Business Act was amended to the effect that starting in June 2017, future national planning for electricity supply and demand in Korea should consider the environmental and safety impacts of such planning. However, to-date, no specific guidelines have been provided by the Government as to how to implement this provision, and it is therefore difficult to assess in advance what impact such provision will have on our business, results of operations or financial condition.

### Carbon Emission Trading System and Related Emission Reduction Targets

In accordance with the Act on Allocation and Trading of Greenhouse Gas Emission Allowances, enacted in March 2013, the Government is currently in the process of implementing a carbon emission trading system under which the Government will allocate the amount of permitted carbon emission to companies by industry and a company whose business emits more carbon than the permitted amount may purchase the right to emit more carbon through the carbon emission trading exchange. This system is expected to be implemented in three stages. During the first phase (2015 to 2017), the Government will set up and make a test run of the trading system to ensure its smooth operation; during this phase, the carbon emission rights will be allocated without charge. During the second phase (2018 to 2020), the system will be applied to a limited scope of industries and companies, where the carbon emission right will be allocated at a relatively low price, but not freely. During the third phase (2021 to 2025), the Government plans to run the system on an expanded scale with aggressive carbon emission reduction targets. As part of the implementation of this trading system, we are obligated to reduce, on a consolidated basis, approximately 200 million tons of carbon emissions, amounting to a 23.7% reduction, per year during the first phase of 2015 to 2017. The amount of required reduction for the second phase of 2018 to 2020 is expected to be determined in June 2017. Adhering to such emission reduction requirement is expected to result in our incurring significant compliance costs.

### Regulations of Decrepit Coal-Fired Generation Units

According to a plan announced in July 2016 by the Ministry of Trade, Industry and Energy in relation to coal-fired electricity generation units, 10 of our coal generation units that are 30 years or older will be required to be shut down or convert to another fuel use, 43 of our such units that are less than 30 years old will be subject to retrofitting and overall replacement of environmental facilities, and 20 of our such units currently under construction will be subject to more rigorous emission standards. In addition, the Government indicated that it would not allow any new construction of additional coal-fired generation units after 2019, which means that LNG is likely to be used more in the future as the substitute for coal, and since LNG is a more expensive fuel source than fuel, this regulation is expected to drive up the average cost of generating electricity. Compliance with such measures is expected to result in our incurring significant costs.

*New Energy Industry Fund*

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector. The total size of these funds was US$1 trillion as of December 31, 2016; these funds were funded from our budget for new energy industry projects, which totaled US$6.4 trillion in 2016 and were expended in research and development, efficiency improvements and educational solar power projects, among others. Our budget for new energy industry projects in 2017 amounts to US$5.6 trillion, of which US$1 trillion has been earmarked for potential additional commitments to the New Energy Industry Fund.

*Suspension of the Vesting Contract System*

In June 2016, the Government announced that, due to changes in the electricity business environment (including an increase in generation capacity relative to peak usage, reduced fuel costs following a decline in oil prices and greater environmental concerns related to coal-fired electricity generation), any further rollout of the vesting contract system beyond the relatively minor market of by-product gas-based electricity would be suspended indefinitely and the electricity pricing adjustment mechanism will revert to the adjusted coefficient-based system. The vesting contract system had previously been introduced in May 2014 to provide an alternative mechanism for determining the price and quantity of electricity to be sold and purchased between the purchaser of electricity (namely, us) and the sellers of electricity (namely, our generation subsidiaries and independent power producers). Under the vesting contract system, electricity generators using base load fuels (such as nuclear, coal, hydro and by-product gas) at a particular generation unit were to be required to enter into a contract with the purchaser of electricity (namely, us), which specifies, among other things, the quantity of electricity to be generated and sold at a particular generation unit and the price at which such electricity is sold, subject to certain adjustments. As a result of this suspension, we expect that the existing electricity pricing adjustment mechanism by way of adjusted coefficients will stay for the foreseeable future. See Item 4.B. "Business—Purchase of Electricity—Vesting Contract System."

*Changes to the Computation of Capacity Price*

In October 2016, the Cost Evaluation Committee slightly modified the way capacity price (which is paid to generation units primarily to cover their fixed construction and maintenance costs) is determined, including by varying the reference capacity price based on the start year of commercial operation for each generation unit and by introducing the concept of transmission loss and carbon emission amounts in determining the capacity price. For more details, see "—Purchase of Electricity—Cost-based Pool System—Capacity Price."

*Overseas Business*

On April 4, 2016, we were selected as the preferred bidder and entered into a purchase and sale agreement with Cogentrix Solar Holdings, LLC on August 26, 2016 to acquire the entire interest in a photovoltaic power plant with an aggregate capacity of 30 megawatts located in Alamosa County, Colorado, through a consortium with the COPA fund, a corporate partnership fund established by local institutional investors including the National Pension Service. The transaction closed on April 12, 2017. we hold a 50.1% equity interest in the consortium. We plan to operate the power plant for 26 years from 2016 to 2042.

On October 10, 2016, a consortium comprised of us, Marubeni Corporation and four local entities, with equity interest in the consortium of 24.5%, 24.5% and 51.0%, respectively, was notified that it has been selected

by the Republic of South Africa Department of Energy as the preferred bidder for the construction and operation project of a coal-fired power plant in the Republic of South Africa. Once negotiations and financing arrangements are completed, the construction of the coal-fired power plant is expected to commence. The plant is expected to have an aggregate capacity of 630 megawatts, and construction is expected to take 52 months beginning in September 2017. The consortium plans to participate in the operation of the plant for a period of 30 years ending 2052. The total cost of the project is estimated to be around US$2.14 billion, of which our total capital investment is expected to be approximately US$133 million. In connection with the project, we plan to establish a holding company and a project company in the Republic of South Africa.

On October 20, 2016, we entered into an investment agreement with Emirates Nuclear Energy Corporation ("ENEC") to jointly establish Barakah One PJSC, a special purpose company which will oversee the operation and management of the nuclear power plant currently being constructed in Barakah, United Arab Emirates. Barakah One PJSC will be capitalized with loans in the amount of US$19.6 billion and equity of US$4.7 billion. We have a 18% equity interest in Barakah One PJSC, which will oversee the project. We also have an 18% equity interest in Nawah Energy, a subsidiary of ENEC, which will also be responsible for the operation and maintenance of the Barakah nuclear power plant.

## Government Ownership and Our Interactions with the Government

The KEPCO Act requires that the Government own at least 51% of our capital stock. Direct or indirect ownership of more than 50% of our outstanding common stock enables the Government to control the approval of certain corporate matters which require a shareholders' resolution, including approval of dividends. The rights of the Government and Korea Development Bank as holders of our common stock are exercised by the Ministry of Trade, Industry and Energy in consultation with the Ministry of Strategy and Finance. We are currently not aware of any plans of the Government to cease to own, directly or indirectly, at least 51% of our outstanding common stock.

We play an important role in the implementation of the Government's national energy policy, which is established in consultation with us, among other parties. As an entity formed to serve public policy goals of the Government, we seek to maintain a fair level of profitability and strengthen our capital base in order to support the growth of our business in the long term.

The Government, through its various policy initiatives for the Korean energy industry as well as direct and indirect supervision of us and our industry, plays an important role in our business and operations. Most importantly, the electricity tariff rates we charge to our customers are regulated by the Government taking into account, among others, our needs to recover the costs of operations, make capital investments and recoup a fair return on capital invested by us, as well as the Government's overall policy considerations, such as inflation. See Item 4.B. "Business Overview—Sales and Customers—Electricity Rates."

In addition, pursuant to the Basic Plan determined by the Government, we and our generation subsidiaries have made, and plan to make, substantial expenditures for the construction of generation plants and other facilities to meet demand for electric power. See Item 5.B. "Liquidity and Capital Resources—Capital Requirements."

## Restructuring of the Electric Power Industry in Korea

On January 21, 1999, the Ministry of Trade, Industry and Energy published the Restructuring Plan. The overall objectives of the Restructuring Plan consisted of: (i) introducing competition and thereby increasing efficiency in the Korean electric power industry, (ii) ensuring a long-term, inexpensive and stable electricity supply, and (iii) promoting consumer convenience through the expansion of consumer choice.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

The following provides further details relating to the Restructuring Plan.

### Phase I

During Phase I, which served as a preparatory stage for Phase II and lasted from the announcement of the Restructuring Plan in January 1999 until April 2001, we undertook steps to split our generation business units off into one wholly-owned nuclear generation subsidiary (namely, KHNP) and five wholly-owned non-nuclear generation subsidiaries (namely, KOSEP, KOMIPO, KOWEPO, KOSPO and EWP), each with its own management structure, assets and liabilities. These steps were completed upon approval at our shareholders' meeting in April 2001.

The Government's principal objectives in the split-off of the generation units into separate subsidiaries were to: (i) introduce competition and thereby increase efficiency in the electricity generation industry in Korea, and (ii) ensure a stable supply of electricity in Korea.

Following the implementation of Phase I, we have substantial monopoly with respect to the transmission and distribution of electricity in Korea.

While our ownership percentage of our generation subsidiaries will depend on further adjustments to the Restructuring Plan to be adopted by the Government, we plan to retain 100% ownership of our transmission and distribution business.

### Phase II

At the outset of Phase II in April 2001, the Government introduced a cost-based competitive bidding pool system under which we purchase power from our generation subsidiaries and other independent power producers for transmission and distribution to customers. For a further description of this system, see "—Purchase of Electricity—Cost-based Pool System" below.

Pursuant to the Electricity Business Act amended in December 2000, the Government established the Korea Power Exchange in April 2001. The primary function of the Korea Power Exchange is to deal with the sale of electricity and implement regulations governing the electricity market to allow for electricity distribution through a competitive bidding process. The Government also established the Korea Electricity Commission in April 2001 to regulate the Korean electric power industry and ensure fair competition among industry participants. To facilitate this goal, the Korea Power Exchange established the Electricity Market Rules relating to the operation of the bidding pool system. To amend the Electricity Market Rules, the Korea Power Exchange must have the proposed amendment reviewed by the Korea Electricity Commission and then obtain the approval of the Ministry of Trade, Industry and Energy.

The Korea Electricity Commission's main functions include implementation of standards and measures necessary for electricity market operation and review of matters relating to licensing participants in the Korean electric power industry. The Korea Electricity Commission also acts as an arbitrator in tariff-related disputes among participants in the Korean electric power industry and investigates illegal or deceptive activities of the industry participants.

### Privatization of Generation Subsidiaries

In April 2002, the Ministry of Trade, Industry and Energy released the basic privatization plan for five of our generation subsidiaries other than KHNP. Pursuant to this plan, we commenced the process of selling our equity interest in KOSEP in 2002. According to the original plan, this process was, in principle, to take the form of a sale of management control, potentially supplemented by an initial public offering as a way of broadening the investor base. In November 2003, KOSEP submitted its application to the Korea Exchange for a preliminary screening review, which was approved in December 2003. However, in June 2004, KOSEP made a request to the Korea Exchange to delay its stock listing due to unfavorable stock market conditions at that time.

32

In accordance with the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016, we are considering a sale in the public market of a minority of our shares in our five non-nuclear generation subsidiaries, KEPCO KDN and KHNP gradually and in that order, subject to prevailing market conditions and other policy considerations. Accordingly, we are currently taking steps in preparation of a potential sale of a minority of our shares in KOSEP and EWP through public offerings by the end of 2017, but whether and when such sale would occur will be subject to prevailing market conditions and considerations of public policy. In any event, we plan to maintain a controlling stake in each of these subsidiaries.

### Suspension of the Plan to Form and Privatize Distribution Subsidiaries

In 2003, the Government established a Tripartite Commission consisting of representatives of the Government, leading businesses and labor unions in Korea to deliberate on ways to introduce competition in electricity distribution, such as by forming and privatizing new distribution subsidiaries. In 2004, the Tripartite Commission recommended not pursuing such privatization initiatives but instead creating independent business divisions within us to improve operational efficiency through internal competition. Following the adoption of such recommendation by the Government in 2004 and further studies by Korea Development Institute, in 2006 we created nine "strategic business units" (which, together with our other business units, were subsequently restructured into 14 such units in February 2012) that have a greater degree of autonomy with respect to management, financial accounting and performance evaluation while having a common focus on increasing profitability.

### Initiatives to Improve the Structure of Electricity Generation

In August 2010, the Ministry of Trade, Industry and Energy announced the Proposal for Improvement in the Structure of the Electric Power Industry in order to resolve uncertainty related to restructuring plans for the electric power industry and maintain competitiveness of the electric power industry. Key initiatives of the proposal included the following: (i) maintain the current structure of having six generation subsidiaries and designate the six generation subsidiaries as market-oriented public enterprises under the Act on the Management of Public Institutions in order to foster competition among the generation subsidiaries and promote efficiency in their operations, (ii) clarify the scope of the business of us and the six generation subsidiaries (namely, that we shall manage the financial structure and governance of the six generation subsidiaries and nuclear power plant and overseas resources development projects, while the six generation subsidiaries will have greater autonomy with respect to construction and management of generation units and procurement of fuel), (iii) create a nuclear power export business unit to systematically enhance our capabilities to win projects involving the construction and operation of nuclear power plants overseas, (iv) further rationalize the electricity tariff by adopting a fuel-cost based tariff system in 2011 and a voltage-based tariff system in a subsequent year, and (v) create separate accounting systems for electricity generation, transmission, distribution and sales with the aim of introducing competition in electricity sales in the intermediate future.

In January 2011, the Ministry of Strategy and Finance created a "joint cooperation unit" consisting of officers and employees selected from the five thermal power generation subsidiaries in order to reduce inefficiencies in areas such as fuel transportation, inventories, materials and equipment and construction, etc. and allow the thermal power generation subsidiaries to continue utilizing the benefits of economy of scale after split off of our generation business units into separate subsidiaries. The purpose of the joint cooperation unit was to give greater autonomy to the generation subsidiaries with regard to power plant construction and management and fuel procurements, and thereby enhance efficiency in operating power plants. The main functions of the joint cooperation unit are as follows: (i) maintain inventories of bituminous coal through volume exchanges and joint purchases, (ii) reduce shipping and demurrage expenses through joint operation and distribution of dedicated vessels, (iii) reduce costs by sharing information on generation material inventories and (iv) sharing human resources among the five thermal power generation subsidiaries for construction projects, among other things.

Furthermore, in January 2011 the six generation subsidiaries were officially designated as "market-oriented public enterprises," whereupon the President of Korea appoints the president and the statutory auditor of each

such subsidiary; the selection of non-standing directors of each such subsidiary is subject to approval by the minister of the Ministry of Strategy and Finance; the president of each such subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Enterprise Management Evaluation Team (which is established by the Public Agencies Operating Committee) conducts performance evaluation of such subsidiaries. Previously, our president appointed the president and the statutory auditor of each such subsidiary; the selection of non-standing directors of each such subsidiary was subject to approval by our president; the president of each such subsidiary entered into a management contract with our president; and our evaluation committee conducted performance evaluation of such subsidiaries. For further details of the impact of the designation of our generation subsidiaries as "market-oriented public enterprises," see Item 16.G.—Corporate Governance—The Act on the Management of Public Institutions.

### Proposal for Adjustment of Functions of Public Institutions (Energy Sector)

In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries include the following: (i) the generation companies should take on greater responsibilities in overseas resource exploration and production projects as these involve procurement of fuels necessary for electricity generation while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition. In accordance therewith, we transferred a substantial portion of our assets and liabilities in our overseas resource business to our generation subsidiaries as of December 31, 2016. In addition, this Proposal contemplates selling a minority stake in our generation subsidiaries and KEPCO KDN as discussed above in "—Privatization of Generation Subsidiaries".

### Purchase of Electricity

### Cost-based Pool System

Since April 2001, the purchase and sale of electricity in Korea is required to be made through the Korea Power Exchange, which is a statutory not-for-profit organization established under the Electricity Business Act with responsibilities for setting the price of electricity, handling the trading and collecting relevant data for the electricity market in Korea. The suppliers of electricity in Korea consist of our six generation subsidiaries, which were split-off from us in April 2001, and independent power producers, which numbered 17 (excluding renewable energy producers) as of December 31, 2016. We distribute electricity purchased through the Korea Power Exchange to end users.

### Our Relationship with the Korea Power Exchange

The key features of our relationships with the Korea Power Exchange include the following: (i) we and our six generation subsidiaries are member corporations of the Korea Power Exchange and collectively own 100% of its share capital, (ii) three of the 11 members of the board of directors of the Korea Power Exchange are currently our or our subsidiaries' employees, and (iii) one of our employees is currently a member in three of the key committees of the Korea Power Exchange that are responsible for evaluating the costs of producing electricity, making rules for the Korea Power Exchange and gathering and disclosing information relating to the Korean electricity market.

Notwithstanding the foregoing relationships, however, we do not have control over the Korea Power Exchange or its policies since, among others, (i) the Korea Power Exchange, its personnel, policies, operations and finances are closely supervised and controlled by the Government, namely through the Ministry of Trade,

34

Industry and Energy, and are subject to a host of laws and regulations, including, among others, the Electricity Business Act and the Act on the Management of Public Institutions, as well as the Articles of Incorporation of the Korea Power Exchange, (ii) we are entitled to elect no more than one-third of the Korea Power Exchange directors and our representatives represent only a minority of its board of directors and committees (with the other members being comprised of representatives of the Ministry of Trade, Industry and Energy, employees of the Korea Power Exchange, businesspersons and/or scholars) and (iii) the role of our representatives in the policy making process for the Korea Power Exchange is primarily advisory based on their technical expertise derived from their employment at us or our generation subsidiaries. Consistent with this view, the Finance Supervisory Service issued a ruling in 2005 that stated that we are not deemed to have significant influence or control over the decision-making process of the Korea Power Exchange relating to its business or financial affairs.

*Pricing Factors*

The price of electricity in the Korean electricity market is determined principally based on the cost of generating electricity using a system known as the "cost-based pool" system. Under the cost-based pool system, the price of electricity has two principal components, namely the marginal price (representing in principle the variable cost of generating electricity) and the capacity price (representing in principle the fixed cost of generating electricity).

Under the merit order system, the electricity purchase allocation, the system marginal price (as described below) and the final allocation adjustment are automatically determined based on an objective formula. The variable cost (including the adjusted coefficient as described below) and the capacity price are determined in advance of trading by the Cost Evaluation Committee, which is comprised of representatives from the Ministry of Trade, Industry and Energy, the Korea Power Exchange, us, generation companies, scholars and researchers. Accordingly, a supplier of electricity cannot exercise control over the merit order system or its operations to such supplier's strategic advantage.

*Marginal Price*

The primary purpose of the marginal price is to compensate the generation companies for fuel costs, which represents the principal component of the variable costs of generating electricity. We currently refer such marginal price as the "system marginal price."

The system marginal price represents, in effect, the marginal price of electricity at a given hour at which the projected demand for electricity and the projected supply of electricity for such hour intersect, as determined by the merit order system, which is a system used by the Korea Power Exchange to allocate which generation units will supply electricity for which hour and at what price. To elaborate, the projected demand for electricity for a given hour is determined by the Korea Power Exchange based on a forecast made one day prior to trading, and such forecast takes into account, among others, historical statistics relating to demand for electricity nationwide by day and by hour, seasonality and on-peak-hour versus off-peak hour demand analysis. The projected supply of electricity at a given hour is determined as the aggregate of the available capacity of all generation units that have submitted bids to supply electricity for such hour. These bids are submitted to the Korea Power Exchange one day prior to trading.

Under the merit order system, the generation unit with the lowest variable cost of producing electricity among all the generation units that have submitted a bid for a given hour is first awarded a purchase order for electricity up to the available capacity of such unit as indicated in its bid. The generation unit with the next lowest variable cost is then awarded a purchase order up to its available capacity in its bid, and so forth, until the projected demand for electricity for such hour is met. We refer to the variable cost of the generation unit that is the last to receive the purchase order for such hour as the system marginal price, which also represents the highest price at which electricity can be supplied at a given hour based on the demand and supply for such hour.

35

Generation units whose variable costs exceed the system marginal price for a given hour do not receive purchase orders to supply electricity for such hour. The variable cost of each generation unit is determined by the Cost Evaluation Committee on a monthly basis and reflected in the following month based on the fuel costs two months prior to such determination. The purpose of the merit order system is to encourage generation units to reduce its electricity generation costs by making its generation process more efficient, sourcing fuels from most cost-effective sources or adopting other cost savings programs.

The final allocation of electricity supply is further adjusted on the basis of other factors, including the proximity of a generation unit to the geographical area to which power is being supplied, network and fuel constraints and the amount of power loss. This adjustment mechanism is designed to adjust for transmission losses in order to improve overall cost-efficiency in the transmission of electricity to end-users.

The price of electricity at which our generation subsidiaries sell electricity to us is determined using the following formula:

Variable cost + [System marginal price – Variable cost] * Adjusted coefficient

An adjusted coefficient applies in principle to all generation units operated by our generation subsidiaries and the coal-fired generation units operated by independent power producers. The adjusted coefficient applicable to the generation units operated by our generation subsidiaries is determined based on considerations of, among others, electricity tariff rates, the differential generation costs for different fuel types and the relative fair returns on investment in respect of us compared to our generation subsidiaries. The purpose of the adjusted coefficient here is to prevent electricity trading from resulting in undue imbalances as to the relative financial results among generation subsidiaries as well as between us (as the purchaser of electricity) and our generation subsidiaries (as sellers of electricity). Such imbalances may arise from excessive profit taking by base load generators (on account of their inherently cheaper fuel cost structure compared to non-base load generators) as well as from fluctuations in fuel prices (it being the case that during times of rapid and substantial rises in fuel costs which are not offset by corresponding rises in electricity tariff rates charged by us to end-users, on a non-consolidated basis our profitability will decline compared to that our generation subsidiaries since our generation subsidiaries are entitled to sell electricity to us at cost plus a guaranteed margin). In comparison, the adjusted coefficient applicable to the coal-fired generation units operated by independent power producers is determined to enable such independent power producers to recover the total costs of building and operating such units.

The adjusted coefficient applicable to our generation subsidiaries is currently set at the highest level for the marginal price of electricity generated using nuclear fuel, followed by coal and (depending the prevailing relative market prices) oil and/or LNG. The differentiated adjusted coefficients reflect the Government's prevailing energy policy objectives and have the effect of setting priorities in the fuel types to be used in electricity generation.

The adjusted coefficient is determined by the Cost Evaluation Committee in principle on an annual basis, although in exceptional cases driven by external or structural factors such as rapid and substantial changes in fuel costs, adjustments to electricity tariff rates or changes in the electricity pricing structure, the adjusted coefficient may be adjusted on a quarterly basis.

Previously, it was contemplated that the vesting contract system would gradually replace the application of the adjusted coefficient. However, since the implementation of the vesting contract system has been suspended indefinitely, it is unlikely to impact the application of the adjusted coefficient in the foreseeable future.

*Capacity Price*

In addition to payment in respect of the variable cost of generating electricity, generation units receive payment in the form of capacity price, the purpose of which is to compensate them for the fixed costs of constructing generation facilities, provide incentives for construction of new generation units and maintain reliability of the nationwide electricity transmission network.

The capacity price is determined by the Cost Evaluation Committee as a function of the following factors: (i) reference capacity price, (ii) reserve capacity factor, (iii) time-of-the-day capacity coefficient and (iv) since October 2016, fuel switching factor. The reference capacity price and the time-of-the-day capacity coefficient are determined annually before the end of December for the subsequent 12-months period. The reserve capacity factor and the fuel switching factor are determined annually before the end of June for the subsequent 12-months period.

The reference capacity price refers to the Won amount per kilowatt-hour payable annually for annualized available capacity indicated in the bids submitted the day before trading (provided that such capacity is actually available on the relevant day of trading), and is determined based on the construction costs and maintenance costs of a standard generation unit and related transmission access facilities, and a base rate for loading electricity. Prior to October 2016, the same reference capacity price applied uniformly to all generation units. Since October 2016, the reference capacity price applies differentially to each generation unit depending on the start year of its commercial operation. Accordingly, the reference capacity price currently ranges from Won 9.15 to 10.07 per kilowatt hour.

The reserve capacity factor relates to the requirement to maintain a standard capacity reserve margin in the range of 15% in order to prevent excessive capacity build-up as well as induce optimal capacity investment at the regional level. The capacity reserve margin is the ratio of peak demand to the total available capacity. Under this system, generation units in a region where available capacity is insufficient to meet demand for electricity as evidenced by failing to meet the standard capacity reserve margin receive increased capacity price. Conversely, generation units in a region where available capacity exceeds demand for electricity as evidenced by exceeding the standard capacity reserve margin receive reduced capacity price. Since October 2016, the reserve capacity factor also factors in the transmission loss per generation unit in order to favor transmission of electricity from a nearby generation unit.

The time-of-the-day capacity coefficient allows hourly and seasonal adjustments in order to incentivize our generation subsidiaries to operate their generation facilities at full capacity during periods of highest demand. For example, the capacity price paid differs depending on whether the relevant hour is an "on-peak" hour, a "mid-peak" hour or an "off-peak" hour (the capacity price being highest for the on-peak hours and lowest for the off-peak hours) and the capacity price paid is highest during the months of January, July and August when electricity usage is highest due to weather conditions.

The fuel switching factor, which was introduced in October 2016 to promote environmental sensitivities to climate change, seeks to encourage reduced carbon emission by penalizing generation units (mostly coal-fired units) for excessive carbon emission.

Other than subject to the aforementioned variations, the same capacity pricing mechanism applies to all generation units regardless of fuel types used.

*Vesting Contract System*

In May 2014, the Electricity Business Act was amended to introduce a "vesting contract" system in determining the price and quantity of electricity to be sold and purchased between the purchaser of electricity (namely, us) and the sellers of electricity (namely, our generation subsidiaries and independent power producers). Under the vesting contract system, electricity generators using base load fuels (such as nuclear, coal, hydro and by-product gas) at a particular generation unit were to be required to enter into a contract with the purchaser of electricity (namely, us), which specifies, among other things, the quantity of electricity to be generated and sold at a particular generation unit and the price at which such electricity is sold, subject to certain adjustments.

The vesting contract system was introduced principally to prevent excessive profit-taking by low-cost producers of electricity using base load fuels (such as nuclear, coal, hydro and by-product gas) by replacing the

37

adjusted coefficient as the basis for determining the guaranteed return to generation companies, as well as to enhance the stability of electricity supply by requiring long-term contractual arrangements for the purchase and sale of electricity and promote cost savings, productivity enhancements and operational efficiency by providing incentives and penalties depending on the degree to which the generation companies could supply electricity at costs below the contracted electricity prices.

In order to minimize undue shock to the electricity trading market in Korea, the vesting contract system was to be implemented in phases starting with by-product gas-based electricity in 2015, which accounted for 1.8% of electricity purchased by us during such year. The rollout of the vesting contract system was further studied by a task force consisting of representatives from the Government, the Korea Power Exchange and generation companies.

Following such study, the Government announced in June 2016 that, due to changes in the electricity business environment (including an increase in generation capacity relative to peak usage, reduced fuel costs following a decline in oil prices and greater environmental concerns related to coal-fired electricity generation), it will indefinitely suspend any further rollout of the vesting contract system beyond by-product gas-based electricity, and revert to the adjusted coefficient-based electricity pricing adjustment mechanism.

### Power Trading Results

The results of power trading, as effected through the Korea Power Exchange, for our generation subsidiaries and independent power producers in 2016 are as follows:

| | Items | Volume (Gigawatt hours) | Percentage of Total Volume (%) | Sales to KEPCO (in billions of Won) | Percentage of Total Sales (%) | Unit Price (Won/kWh) |
|---|---|---|---|---|---|---|
| Generation Companies . . . | KHNP . . . . . . . . . . . . . | 158,668 | 31.2 | 10,949 | 27.0 | 69.00 |
| | KOSEP . . . . . . . . . . . | 67,721 | 13.3 | 4,847 | 12.0 | 71.58 |
| | KOMIPO . . . . . . . . . . | 42,896 | 8.4 | 3,621 | 8.9 | 84.42 |
| | KOWEPO . . . . . . . . . . | 48,380 | 9.5 | 4,141 | 10.2 | 85.60 |
| | KOSPO . . . . . . . . . . . | 47,969 | 9.4 | 4,155 | 10.3 | 86.63 |
| | EWP . . . . . . . . . . . . . | 49,260 | 9.7 | 4,169 | 10.3 | 84.62 |
| | Others[1] . . . . . . . . . . | 93,985 | 18.5 | 8,632 | 21.3 | 91.84 |
| | Total . . . . . . . . . . | 508,879 | 100.0 | 40,514 | 100.0 | 79.61 |
| Energy Sources  . . . . . . . | Nuclear . . . . . . . . . . . . | 154,175 | 30.3 | 10,489 | 25.9 | 68.03 |
| | Bituminous coal . . . . . . | 199,505 | 39.2 | 14,732 | 36.4 | 73.84 |
| | Anthracite coal . . . . . . . | 7,071 | 1.4 | 626 | 1.5 | 88.57 |
| | Oil . . . . . . . . . . . . . . . . | 13,262 | 2.6 | 1,462 | 3.6 | 110.27 |
| | LNG . . . . . . . . . . . . . . | 989 | 0.2 | 113 | 0.3 | 114.54 |
| | Combined-cycle . . . . . . | 110,721 | 21.8 | 10,989 | 27.0 | 99.25 |
| | Hydro . . . . . . . . . . . . . | 2,140 | 0.4 | 186 | 0.5 | 87.01 |
| | Pumped-storage . . . . . . | 3,617 | 0.7 | 385 | 1.0 | 106.35 |
| | Others . . . . . . . . . . . . . | 17,399 | 3.4 | 1,532 | 3.8 | 88.05 |
| | Total . . . . . . . . . . | 508,879 | 100.0 | 40,514 | 100.0 | 79.61 |
| Load . . . . . . . . . . . . . . . . | Base load . . . . . . . . . . | 352,313 | 69.2 | 25,213 | 62.2 | 71.56 |
| | Non-base load  . . . . . . | 156,566 | 30.8 | 15,301 | 37.8 | 97.72 |
| | Total . . . . . . . . . . | 508,897 | 100.0 | 40,514 | 100.0 | 79.61 |

*Note:*

(1) Others represent independent power producers that trade electricity through the cost-based pool system of power trading (excluding independent power producers that supply electricity under power purchase agreements with us).

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

***Power Purchased from Independent Power Producers Under Power Purchase Agreements***

In 2016, we purchased an aggregate of 9,719 gigawatt hours of electricity generated by independent power producers under existing power purchase agreements. These independent power producers had an aggregate generation capacity of 5,481 megawatts as of December 31, 2016.

***Power Generation***

As of December 31, 2016, we and our generation subsidiaries had a total of 655 generation units, including nuclear, thermal, hydroelectric and internal combustion units, representing total installed generation capacity of 79,217 megawatts. Our thermal units produce electricity using steam turbine generators fired by coal, oil and LNG. Our internal combustion units use oil or diesel-fired gas turbines and our combined-cycle units are primarily LNG-fired. We also purchase power from several generation plants not owned by our generation subsidiaries.

The table below sets forth as of and for the year ended December 31, 2016 the number of units, installed capacity and the average capacity factor for each type of generating facilities owned by our generation subsidiaries.

| | Number of Units | Installed Capacity[1] | Average Capacity Factor[2] |
|---|---|---|---|
| | | (Megawatts) | (Percent) |
| Nuclear | 25 | 23,116 | 79.7 |
| Thermal: | | | |
|     Coal[3] | 58 | 30,546 | 86.5 |
|     Oil | 11 | 2,950 | 50.4 |
|     LNG | 1 | 250 | 16.7 |
|         Total thermal | 70 | 33,746 | 82.5 |
| Internal combustion | 207 | 329 | 19.8 |
| Combined-cycle[4] | 93 | 16,018 | 33.0 |
| Integrated gasification combined cycle[5] | 2 | 346 | 11.9 |
| Hydro | 76 | 5,350 | 10.3 |
| Wind | 48 | 138 | 15.4 |
| Solar | 88 | 90 | 12.9 |
| Fuel cell | 16 | 39 | 67.5 |
| Biogas | 2 | 35 | 58.4 |
| Others[6] | 28 | 10 | 44.0 |
| Total | 655 | 79,217 | 65.5 |

*Notes:*

(1) Installed capacity represents the level of output that may be sustained continuously without significant risk of damage to plant and equipment.

(2) Average capacity factor represents the total number of kilowatt hours of electricity generated in the indicated period divided by the total number of kilowatt hours that would have been generated if the generation units were continuously operated at installed capacity, expressed as a percentage.

(3) As for coal generation units for which construction was completed in the second half of 2016, the average capacity factors for these units reflect the period during which such units were in operation following the completion of construction. Such units (together with their respective installed capacities and construction completion dates are as follows: Dangjin #9 (1,020 megawatts, completed in July 2016), Dangjin # 10 (1,020 megawatts, completed in September 2016), Taean #9 (1,050 megawatts, completed in October 2016), Yeosu #1 (350 megawatts, completed in August 2016) and Samcheok Green #1 (1,022 megawatts, completed in December 2016).

39

(4)  Involves generation through coal and oil.
(5)  Involves generation through coal and gasified coal.
(6)  Includes waste-to-energy.

The expected useful life of a unit, assuming no substantial renovation, is approximately as follows: nuclear, over 40 years; thermal, over 30 years; internal combustion, over 25 years; and hydroelectric, over 55 years. Substantial renovation can extend the useful life of thermal units by up to 20 years.

We seek to achieve efficient use of fuels and diversification of generation capacity by fuel type. In the past, we relied principally upon oil-fired thermal generation units for electricity generation. Since the oil shock in 1974, however, Korea's power development plans have emphasized the construction of nuclear generation units. While nuclear units are more expensive to construct than thermal generation units of comparable capacity, nuclear fuel is less expensive than fossil fuels in terms of electricity output per unit cost. However, efficient operation of nuclear units requires that such plants be run continuously at relatively constant energy output levels. As it is impractical to store large quantities of electrical energy, we seek to maintain nuclear power production capacity at approximately the level at which demand for electricity is continuously stable. During those times when actual demand exceeds the usual level of electricity supply from nuclear power, we rely on units fired by fossil fuels and hydroelectric units, which can be started and shut down more quickly and efficiently than nuclear units, to meet the excess demand. Bituminous coal is currently the least expensive thermal fuel per kilowatt-hour of electricity produced, and therefore we seek to maximize the use of bituminous coal for generation needs in excess of the stable demand level, except for meeting short-term surges in demand which require rapid start-up and shutdown. Thermal units fired by LNG, hydroelectric units and internal combustion units are the most efficient types of units for rapid start-ups and shutdowns, and therefore we use such units principally to meet short-term surges in demand. Anthracite coal is a less efficient fuel source than bituminous coal in terms of electricity output per unit cost.

Our generation subsidiaries have constructed and operated thermal and internal combustion units in order to help meet power demand. Subject to market conditions, our generation subsidiaries plan to continue to add additional thermal and internal combustion units. These units generally take less time to complete construction than nuclear units.

The high average age of our oil-fired thermal units is attributable to our reliance on oil-fired thermal units as the primary means of electricity generation until mid-1970s. Since then, we have diversified our fuel sources and constructed relatively few oil-fired thermal units compared to units of other fuel types.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

The table below sets forth, for the periods indicated, the amount of electricity generated by facilities linked to our grid system and the amount of power used or lost in connection with transmission and distribution.

| | 2012 | 2013 | 2014 | 2015 | 2016 | % of 2016 Gross Generation[1] |
|---|---|---|---|---|---|---|
| | | *(in gigawatt hours, except percentages)* | | | | |
| Electricity generated by us and our generation subsidiaries: | | | | | | |
| Nuclear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 150,327 | 138,784 | 156,407 | 164,762 | 161,995 | 30.0 |
| Coal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 199,330 | 201,119 | 203,765 | 207,533 | 207,912 | 38.4 |
| Oil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,553 | 13,941 | 6,838 | 8,822 | 13,055 | 2.4 |
| LNG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,453 | 3,526 | 568 | 222 | 369 | 0.1 |
| Internal combustion . . . . . . . . . . . . . . . . . . . . | 752 | 741 | 656 | 633 | 573 | 0.1 |
| Combined-cycle . . . . . . . . . . . . . . . . . . . . . . . | 75,751 | 84,561 | 68,134 | 45,923 | 46,477 | 8.6 |
| Hydro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,140 | 5,679 | 5,976 | 4,424 | 4,835 | 0.9 |
| Wind . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 127 | 155 | 148 | 181 | 186 | 0.1 |
| Solar and fuel cells . . . . . . . . . . . . . . . . . . . . . | 83 | 251 | 422 | 420 | 908 | 0.1 |
| **Total generation by us and our generation subsidiaries** . . . . . . . . . . . | 448,516 | 448,757 | 442,914 | 432,920 | 436,310 | 80.7 |
| Electricity generated by IPPs: | | | | | | |
| Thermal . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48,043 | 55,923 | 63,088 | 72,316 | 83,789 | 15.5 |
| Hydro and other renewable . . . . . . . . . . . . . . | 13,015 | 12,468 | 15,968 | 17,106 | 20,342 | 3.8 |
| **Total generation by IPPs** . . . . . . . . . . . | 61,058 | 68,391 | 79,056 | 89,422 | 104,131 | 19.3 |
| Gross generation . . . . . . . . . . . . . . . . . . . . . . . | 509,574 | 517,148 | 521,970 | 522,343 | 540,441 | 100.0 |
| Auxiliary use[2] . . . . . . . . . . . . . . . . . . . . . . . | 20,154 | 20,463 | 20,610 | 21,293 | 21,605 | 4.0 |
| Pumped-storage[3] . . . . . . . . . . . . . . . . . . . . . | 4,789 | 5,408 | 6,644 | 4,824 | 4,716 | 0.9 |
| Total net generation[4] . . . . . . . . . . . . . . . . . . | 484,631 | 491,277 | 494,716 | 496,226 | 514,120 | 95.1 |
| Transmission and distribution losses[5] . . . . . . . | 17,292 | 18,019 | 18,270 | 18,063 | 18,475 | 3.6 |

*IPPs = Independent power producers*

*Notes:*

(1)  Unless otherwise indicated, percentages are based on gross generation.
(2)  Auxiliary use represents electricity consumed by generation units in the course of generation.
(3)  Pumped storage represents electricity consumed during low demand periods in order to store water which is utilized to generate hydroelectric power during peak demand periods.
(4)  Total net generation represents gross generation minus auxiliary and pumped-storage use.
(5)  Transmission and distribution losses represents total transmission and distribution losses divided by total net generation.

The table below sets forth our total capacity at the end of, and peak and average loads during, the indicated periods.

| | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| | | *(Megawatts)* | | | |
| Total capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 81,806 | 82,296 | 93,216 | 94,102 | 100,180 |
| Peak load . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75,987 | 76,522 | 80,154 | 78,790 | 85,183 |
| Average load . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58,012 | 59,035 | 59,586 | 60,284 | 61,694 |

41

*Korea Hydro & Nuclear Power Co., Ltd.*

We commenced nuclear power generation activities in 1978 when our first nuclear generation unit, Kori #1, began commercial operation. On April 2, 2001, all of our nuclear and hydroelectric power generation assets and liabilities were transferred to KHNP.

KHNP owns and operates 25 nuclear generation units at four power plant complexes in Korea, located in Kori, Wolsong, Yonggwang (Hanbit) and Ulchin (Hanul), 51 hydroelectric generation units including 16 pumped storage hydro generation units as well as five solar generation units and one wind generation unit as of December 31, 2016.

The table below sets forth the number of units and installed capacity as of December 31, 2016 and the average capacity factor by types of generation units in 2016.

|  | Number of Units | Installed Capacity[1] | Average Capacity Factor[2] |
|---|---|---|---|
|  |  | (Megawatts) | (Percent) |
| Nuclear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 | 23,116 | 79.7 |
| Hydroelectric . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51 | 5,306 | 9.58 |
| Solar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 16 | 13.5 |
| Wind . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 1 | 6.7 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82 | 28,439 |  |

Notes:

(1) Installed capacity represents the level of output that may be sustained continuously without significant risk of damage to plant and equipment.
(2) Average capacity factor represents the total number of kilowatt hours of electricity generated in the indicated period divided by the total number of kilowatt hours that would have been generated if the generation units were continuously operated at installed capacity, expressed as a percentage.

KHNP commenced commercial operation of Shin-Kori #3, with a 1,400 megawatt capacity, in December 2016. KHNP is currently building five additional nuclear generation units, three at the Shin-Kori and two at Shin-Hanul sites, each with a 1,400 megawatt capacity. KHNP expects to complete these units between 2017 and 2022. In addition, KHNP plans to build four additional nuclear units between 2017 and 2027, two at the Shin-Hanul sites, each with a 1,400 megawatt capacity, and two at the Chunji site, each with a 1,500 megawatt capacity. Under the Seventh Basic Plan, KHNP plans to build two additional nuclear units between 2028 and 2029, each with a 1,500 megawatt capacity, at sites which have yet to be determined. We plan to begin the decommissioning process of Kori #1 in June 2017.

*Nuclear*

The table below sets forth certain information with respect to the nuclear generation units of KHNP as of December 31, 2016.

| Unit | Reactor Type[1] (Megawatts) | Reactor Design[2] | Turbine and Generation[3] | Commencement of Operations | Installed Capacity |
|------|------|------|------|------|------|
| Kori-1 . . . . . . . . . . . . . | PWR | W | GEC, Hitachi, D | 1978 | 587 |
| Kori-2 . . . . . . . . . . . . . | PWR | W | GEC | 1983 | 650 |
| Kori-3 . . . . . . . . . . . . . | PWR | W | GEC, Hitachi | 1985 | 950 |
| Kori-4 . . . . . . . . . . . . . | PWR | W | GEC, Hitachi | 1986 | 950 |
| Shin-Kori-1 . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2011 | 1,000 |
| Shin-Kori-2 . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2012 | 1,000 |
| Shin-Kori-3 . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2016 | 1,400 |
| Wolsong-1 . . . . . . . . | PHWR | AECL | P | 1983 | 679 |
| Wolsong-2 . . . . . . . . | PHWR | AECL, H, K | H, GE | 1997 | 700 |
| Wolsong-3 . . . . . . . . | PHWR | AECL, H | H, GE | 1998 | 700 |
| Wolsong-4 . . . . . . . . | PHWR | AECL, H | H, GE | 1999 | 700 |
| Shin-Wolsong-1 . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2012 | 1,000 |
| Shin-Wolsong-2 . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2015 | 1,000 |
| Hanbit-1 . . . . . . . . . . | PWR | W | W, D | 1986 | 950 |
| Hanbit-2 . . . . . . . . . . | PWR | W | W, D | 1987 | 950 |
| Hanbit-3 . . . . . . . . . . | PWR | H, CE, K | H, GE | 1995 | 1,000 |
| Hanbit-4 . . . . . . . . . . | PWR | H, CE, K | H, GE | 1996 | 1,000 |
| Hanbit-5 . . . . . . . . . . | PWR | D, CE, W, KEPCO E&C | D, GE | 2002 | 1,000 |
| Hanbit-6 . . . . . . . . . . | PWR | D, CE, W, KEPCO E&C | D, GE | 2002 | 1,000 |
| Hanul-1 . . . . . . . . . . . | PWR | F | A | 1988 | 950 |
| Hanul-2 . . . . . . . . . . . | PWR | F | A | 1989 | 950 |
| Hanul-3 . . . . . . . . . . . | PWR | H, CE, K | H, GE | 1998 | 1,000 |
| Hanul-4 . . . . . . . . . . . | PWR | H, CE, K | H, GE | 1999 | 1,000 |
| Hanul-5 . . . . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2004 | 1,000 |
| Hanul-6 . . . . . . . . . . . | PWR | D, KEPCO E&C, W | D, GE | 2005 | 1,000 |
| Total nuclear . . . . . . . | | | | | 23,116 |

*Notes:*

(1) "PWR" means pressurized light water reactor; "PHWR" means pressurized heavy water reactor.

(2) "W" means Westinghouse Electric Company (U.S.A.); "AECL" means Atomic Energy Canada Limited (Canada); "F" means Framatome (France); "H" means Hanjung; "CE" means Combustion Engineering (U.S.A.); "D" means Doosan Heavy Industries; "K" means Korea Atomic Energy Research Institute; "KEPCO E&C" means KEPCO Engineering & Construction.

(3) "GEC" means General Electric Company (U.K.); "P" means Parsons (Canada and U.K.); "W" means Westinghouse Electric Company (U.S.A.); "A" means Alstom (France); "H" means Hanjung; "GE" means General Electric (U.S.A.); "D" means Doosan Heavy Industries; "Hitachi" means Hitachi Ltd. (Japan).

The table below sets forth the average capacity factor and average fuel cost per kilowatt for 2016 with respect to each nuclear generation unit of KHNP.

| Unit | Average Capacity Factor | Average Fuel Cost Per kWh |
|------|------|------|
| | (Percent) | (Won) |
| Kori-1 | 89.5 | 8.5 |
| Kori-2 | 66.9 | 8.9 |
| Kori-3 | 100.2 | 7.0 |
| Kori-4 | 87.8 | 7.5 |
| Shin-Kori-1 | 99.6 | 5.8 |
| Shin-Kori-2 | 75.9 | 5.8 |
| Shin-Kori-3 | 102.4 | 6.2 |
| Wolsong-1 | 53.3 | 10.8 |
| Wolsong-2 | 74.4 | 9.8 |
| Wolsong-3 | 70.9 | 10.9 |
| Wolsong-4 | 75.8 | 9.8 |
| Shin-Wolsong-1 | 84.7 | 5.7 |
| Shin-Wolsong-2 | 82.9 | 6.7 |
| Hanbit-1 | 73.4 | 8.3 |
| Hanbit -2 | 34.1 | 6.7 |
| Hanbit -3 | 79.8 | 7.3 |
| Hanbit -4 | 99.6 | 6.9 |
| Hanbit -5 | 99.2 | 6.0 |
| Hanbit -6 | 86.8 | 6.6 |
| Hanul-1 | 81.2 | 6.9 |
| Hanul-2 | 86.6 | 6.9 |
| Hanul-3 | 52.7 | 7.8 |
| Hanul-4 | 60.7 | 5.8 |
| Hanul-5 | 78.4 | 6.7 |
| Hanul-6 | 100.2 | 6.4 |
| Total nuclear | 79.7 | 7.2 |

Under extended-cycle operations, nuclear units can be run continuously for periods longer than the conventional 12-month period between scheduled shutdowns for refueling and maintenance. Since 1987, we have adopted the mode of extended-cycle operations for all of our pressurized light water reactor units and plan to use it for our newly constructed units. The duration of shutdown for fuel replacement and maintenance was 75.9 days per unit in 2016. In addition, KHNP's nuclear units experienced an average of 0.2 unplanned shutdowns per unit in 2016. In the ordinary course of operations, KHNP's nuclear units routinely experience damage and wear and tear, which are repaired during routine shutdown periods or during unplanned temporary suspensions of operations. No significant damage has occurred in any of KHNP's nuclear reactors, and no significant nuclear exposure or release incidents have occurred at any of KHNP's nuclear facilities since the first nuclear plant commenced operation in 1978.

*Hydroelectric*

The table below sets forth certain information relating to KHNP's pumped-storage and hydroelectric business units, including the installed capacity as of December 31, 2016 and the average capacity factor in 2016.

| Location of Unit | Number of Units | Classification | Year Built | Installed Capacity | Average Capacity Factor |
|---|---|---|---|---|---|
| | | | | (Megawatts) | (%) |
| Hwacheon . . . . . . . . . . . | 4 | Dam waterway | 1944 | 108.0 | 13.7 |
| Chuncheon . . . . . . . . . . | 2 | Dam | 1965 | 62.3 | 15.8 |
| Euiam . . . . . . . . . . . . . . | 2 | Dam | 1967 | 48.0 | 23.5 |
| Cheongpyung . . . . . . . . | 4 | Dam | 1943 | 140.1 | 16.1 |
| Paldang . . . . . . . . . . . . . | 4 | Dam | 1973 | 120.0 | 25.0 |
| Seomjingang . . . . . . . . . | 3 | Basin deviation | 1945 | 34.8 | 17.7 |
| Boseonggang . . . . . . . . . | 2 | Basin deviation | 1937 | 4.5 | 60.8 |
| Kwoesan . . . . . . . . . . . . | 2 | Dam | 1957 | 2.6 | 31.7 |
| Anheung . . . . . . . . . . . | 3 | Dam waterway | 1978 | 0.4 | 28.2 |
| Kangreung . . . . . . . . . . | 2 | Basin deviation | 1991 | 82.0 | 0 |
| Topyeong . . . . . . . . . . . | 1 | Dam | 2011 | 0.04 | 22.2 |
| Muju . . . . . . . . . . . . . . | 1 | Dam | 2003 | 0.4 | 28.0 |
| Sancheong . . . . . . . . . . | 2 | Dam | 2001 | 1.0 | 40.5 |
| Yangyang . . . . . . . . . . . | 2 | Dam | 2005 | 1.4 | 16.7 |
| Yecheon . . . . . . . . . . . | 1 | Dam | 2011 | 0.9 | 11.8 |
| Cheongpeoung . . . . . . . | 2 | Pumped Storage | 1980 | 400.0 | 4.3 |
| Samrangjin . . . . . . . . . | 2 | Pumped Storage | 1985 | 600.0 | 7.6 |
| Muju . . . . . . . . . . . . . . | 2 | Pumped Storage | 1995 | 600.0 | 7.3 |
| Sancheong . . . . . . . . . . | 2 | Pumped Storage | 2001 | 700.0 | 11.1 |
| Yangyang . . . . . . . . . . . | 4 | Pumped Storage | 2006 | 1,000.0 | 7.6 |
| Cheongsong . . . . . . . . . | 2 | Pumped Storage | 2006 | 600.0 | 11.4 |
| Yecheon . . . . . . . . . . . | 2 | Pumped Storage | 2011 | 800.0 | 10.3 |
| Total . . . . . . . . . . . . . . | 51 | | | 5,306 | 9.6 |

*Solar/Wind*

The table below sets forth certain information, including the installed capacity as of December 31, 2016 and the average capacity factor in 2016, of the solar and wind power units of KHNP.

| Location of Unit | Classification | Year Built | Installed Capacity | Average Capacity Factor |
|---|---|---|---|---|
| | | | (Megawatts) | (Percent) |
| Yonggwang . . . . . . . . . | Solar | 2008 | 13.9 | 13.3 |
| Yecheon . . . . . . . . . . . | Solar | 2012 | 2.0 | 15.0 |
| Kori . . . . . . . . . . . . . . | Wind | 2008 | 0.8 | 6.7 |
| Total . . . . . . . . . . . . . . | | | 16.7 | |

Korea Water Resources Corporation, which is a Government-owned entity, assumes full control of multi-purpose dams, while KHNP maintains the dams used for power generation. Existing hydroelectric power units have exploited most of the water resources in Korea available for commercially viable hydroelectric power generation. Consequently, we expect that no new major hydroelectric power plants will be built in the foreseeable future. Due to the ease of its start-up and shut-down mechanism, hydroelectric power generation is reserved for peak demand periods.

45

*Korea South-East Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2016 and the average capacity factor and average fuel cost per kilowatt in 2016 based upon the net amount of electricity generated, of KOSEP.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
|     Samchunpo #1, 2, 3, 4, 5, 6 . . . . . . . . . . . . . . . . . . . . . . | 25.7 | 3,240 | 87.4 | 39.3 |
|     Yong Hung #1, 2, 3, 4, 5, 6 . . . . . . . . . . . . . . . . . . . . . . | 8.2 | 5,080 | 86.5 | 36.2 |
|     Yosu # 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.5 | 668 | 82.8 | 46.9 |
| Anthracite: | | | | |
|     Yongdong #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.4 | 325 | 73.6 | 50.8 |
| Combined cycle and internal Combustion: | | | | |
|     Bundang gas turbine #1,2,3,4,5,6,7,8; steam turbine #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.4 | 922 | 27.0 | 115.9 |
| Hydro, Solar and other renewable energy . . . . . . . . . . . . . . . | — | 95 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15.2 | 10,331 | 80.3 | 40.7 |

46

*Korea Midland Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2016 and the average capacity factor and average fuel cost per kilowatt in 2016 based upon the net amount of electricity generated, of KOMIPO.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
| Boryeong #1, 2, 3, 4, 5, 6, 7, 8 . . . . . . . . . . . . . . . . | 21.9 | 4,000 | 87.6 | 36.5 |
| Anthracite: | | | | |
| Seocheon #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33.5 | 400 | 77.8 | 54.9 |
| Oil-fired: | | | | |
| Jeju #2, 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16.4 | 150 | 59.9 | 149.5 |
| LNG-fired: | | | | |
| Seoul #4, 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47.8 | 250 | 16.7 | 154.0 |
| Combined-cycle and internal combustion: | | | | |
| Boryeong gas turbine #1, 2, 3, 4, 5, 6 ; steam turbine #1, 2, 3, . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17.8 | 1,350 | 8.1 | 90.5 |
| Incheon gas turbine #1, 2, 3, 4,5,6 ; steam turbine #1, 2,3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11.8 | 1,462.7 | 44.2 | 85.0 |
| Sejong gas turbine #1,2 ; steam turbine #1 . . . . . . . | 3.1 | 530.4 | 59.9 | 79.9 |
| Jeju Gas Turbine #3 . . . . . . . . . . . . . . . . . . . . . . . | 39.1 | 55 | 0.2 | 595.6 |
| Jeju Internal Combustion . . . . . . . . . . . . . . . . . . . . | | | | |
| Engine #1,2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9.6 | 80 | 45.9 | 82.0 |
| Wind: | | | | |
| Yangyang #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.6 | 3.0 | 18.4 | -12.5 |
| Sejong Maebongsan Wind . . . . . . . . . . . . . . . . . . . | | 6.8 | | — |
| Jeju Sangmyung Wind . . . . . . . . . . . . . . . . . . . . . . | | 21 | | — |
| Combined heat and power: | | | | |
| Wonju#1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.7 | 10 | 45.1 | 106.1 |
| Hydroelectric: | | | | |
| Boryeong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.9 | 12.5 | 29.2 | — |
| Photovoltaic ("PV") power and fuel cell generation: | | | | |
| Boryeong (PV) site . . . . . . . . . . . . . . . . . . . . . . . . | 8.7 | 3.5 | 14.0 | — |
| Seocheon (PV) site . . . . . . . . . . . . . . . . . . . . . . . . | 8.1 | 1.2 | 14.2 | — |
| Jeju (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.5 | 2.3 | 12.2 | — |
| Seoul (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.4 | 1.3 | 15.1 | — |
| Yeosu (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.9 | 2.2 | 14.7 | — |
| Incheon (PV) site . . . . . . . . . . . . . . . . . . . . . . . . . | 5.1 | 0.3 | 14.1 | — |
| Boryeong (fuel cell) site . . . . . . . . . . . . . . . . . . . . | 8.4 | 0.3 | 69.5 | 170.3 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18.2 | 8,343.0 | 60.9 | 51.0 |

47

*Korea Western Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2016 and the average capacity factor and average fuel cost per kilowatt in 2016 based upon the net amount of electricity generated, of KOWEPO.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
| Taean #1, 2, 3, 4, 5, 6, 7, 8, 9 . . . . . . . . . . . . . . . . . . . | 13.0 | 5,050 | 86.5 | 39.3 |
| Oil-fired: | | | | |
| Pyeongtaek #1, 2, 3, 4 . . . . . . . . . . . . . . . . . . . . . . . . . | 35.1 | 1,400 | 42.2 | 74.9 |
| Combined cycle: | | | | |
| Pyeongtaek #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.2 | 1,348.5 | 42.9 | 76.4 |
| Gunsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.6 | 718.4 | 42.8 | 86.4 |
| West Incheon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24.5 | 1,800 | 25.3 | 83.4 |
| Hydroelectric: | | | | |
| Taean . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9.3 | 2.2 | 18.6 | — |
| Solar: | | | | |
| Taean . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11.4 | 0.1 | 11.9 | — |
| Taean 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.9 | 0.6 | 20.7 | — |
| Taean 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.5 | 1.8 | 12.9 | — |
| Gunsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.5 | 0.3 | 13.7 | — |
| Samryangjin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9.1 | 3.0 | 13.0 | — |
| Sejong City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.5 | 5.0 | 14.4 | — |
| Gyeonggi-do . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.7 | 2.5 | 14.3 | — |
| Yeongam . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.8 | 13.3 | 15.0 | — |
| Pyeongtaek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.1 | 0.4 | 12.1 | — |
| Fuel Cell: | | | | |
| West Incheon 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.3 | 11.2 | 77.4 | — |
| West Incheon 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.6 | 5 | 74.3 | 116.5[1] |
| Wind Power: | | | | |
| Hwasun . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.1 | 16 | 18.0 | — |
| Integrated gasification combined cycle: | | | | |
| Taean . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.4 | 346.3 | 22.2 | 48.3 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16.6 | 10,724.6 | 58.2 | 53.3 |

*Note:*

(1)   Represents average fuel cost per kWh for West Incheon 1 and West Incheon 2 on an aggregated basis.

*Korea Southern Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2016 and the average capacity factor and average fuel cost per kilowatt in 2016 based upon the net amount of electricity generated, of KOSPO.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| **Bituminous:** | | | | |
| Hadong #1, 2, 3, 4, 5, 6, 7, 8 . . . . . . . . . . . . . . . . . . . . | 15.3 | 4,000 | 102.2 | 39.8 |
| Samcheok#1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.04 | 1,022 | 90.2 | 44.0 |
| **Oil-fired:** | | | | |
| Nam Jeju #3, 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.0 | 200 | 83.4 | 140.8 |
| **Combined cycle:** | | | | |
| Shin Incheon #1, 2, 3, 4 . . . . . . . . . . . . . . . . . . . . . . . | 20.2 | 1,800 | 34.5 | 85.0 |
| Busan #1, 2, 3, 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13.2 | 1,800 | 49.3 | 81.2 |
| Yeongwol #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.2 | 848 | 11.4 | 86.3 |
| Hallim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20.5 | 105 | 6.9 | 162.3 |
| Andong#1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.8 | 362 | 79.7 | 76.5 |
| **Wind power:** | | | | |
| Hankyung . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.2 | 21 | 25.7 | — |
| Seongsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.2 | 20 | 26.6 | — |
| Solar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.2 | 6 | 12.6 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12.9 | 10,184 | 66.7 | 55.8 |

49

*Korea East-West Power Co., Ltd.*

The table below sets forth, by fuel type, the weighted average age and installed capacity as of December 31, 2016 and the average capacity factor and average fuel cost per kilowatt in 2016 based upon the net amount of electricity generated, of EWP.

| | Weighted Average Age of Units | Installed Capacity | Average Capacity Factor | Average Fuel Cost per kWh |
|---|---|---|---|---|
| | (Years) | (Megawatts) | (Percent) | (Won) |
| Bituminous: | | | | |
| Dangjin #1, 2, 3, 4, 5, 6, 7, 8, 9, 10 . . . . . . . . . . . . . . . . . . . | 9.3 | 5,860 | 72.2 | 59.1 |
| Honam #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43.7 | 500 | 75.4 | 76.3 |
| Anthracite: | | | | |
| Donghae #1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17.8 | 400 | 83.2 | 95.0 |
| Oil-fired: | | | | |
| Ulsan #4, 5, 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36.5 | 1,200 | 54.4 | 131.8 |
| Combined cycle: | | | | |
| Ulsan gas turbine #1, 2, 3, 4, 5, 6; steam turbine #1, 2, 3 . . . | 13.1 | 2,072 | 33.5 | 140.4 |
| Ilsan gas turbine #1, 2, 3, 4, 5, 6; steam turbine #1, 2 . . . . . | 22.9 | 900 | 15.3 | 247.5 |
| Mini hydro: | | | | |
| Dangjin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.3 | 8.1 | 34.2 | 183.8 |
| Photovoltaic: | | | | |
| Dangjin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.6 | 1.0 | 14.0 | — |
| Ulsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.1 | 0.6 | 12.5 | — |
| Kwangyang . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.3 | 2.3 | 10.9 | — |
| Dangjin Storage Facility . . . . . . . . . . . . . . . . . . . . . . . | 3.3 | 14.8 | 14.4 | — |
| Dangjin Waste Treatment Facility . . . . . . . . . . . . . . . . . . | 4.3 | 1.3 | 11.7 | — |
| Dangjin Intake Channel Facility . . . . . . . . . . . . . . . . . . . | 3.5 | 0.9 | 13.2 | — |
| Donghae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10.4 | 1.0 | 11.5 | — |
| Soowon Environment Center Facility . . . . . . . . . . . . . . . . . | 2.9 | 1.5 | 15.9 | |
| Kwangyang Port Warehouse Facility . . . . . . . . . . . . . . . . . | 2.6 | 1.1 | 14.8 | |
| Fuel cell: | | | | |
| Ilsan # 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.3 | 2.4 | 79.9 | — |
| Ilsan # 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.8 | 2.8 | 83.0 | — |
| Ilsan # 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.8 | 2.8 | 81.9 | |
| Ulsan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.3 | 2.8 | 68.2 | |
| Wind Power: | | | | |
| YeongGwang Jisan . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.3 | 3.0 | 12.7 | — |
| Biomass: | | | | |
| Donghae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.5 | 30.0 | 68.1 | — |
| Capital Landfill Cogeneration Facility . . . . . . . . . . . . . . . | 2.8 | 5.0 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15.9 | 10,999 | 57.1 | 82.0 |

50

*Power Plant Remodeling and Recommissioning*

Our generation subsidiaries supplement power generation capacity through remodeling or recommissioning of thermal units. Recommissioning includes installation of anti-pollution devices, modification of control systems and overall rehabilitation of existing equipment. The following table shows recent remodeling and recommissioning initiatives by our generation subsidiaries.

| Power Plant | Capacity | Completed (Year) | Extension | Company |
|---|---|---|---|---|
| Taean#1-9 . . . . . . . . . . . . . | 5,050 MW (500 MW×8, 1,050 MW×1) | EP[1] upgrade (#2, 2016) EP[1] upgrade (#1,3, 2017) SCR[2] upgrade (#2,4,7, 2016) SCR[2] upgrade (#1,3,4,8,9, 2017) FGD upgrade, (#1,2017) | Anti-pollution | KOWEPO |
| Pyeongtaek#1-4 . . . . . . . . | 1,400 MW (350 MW×4) | Steam turbine upgrade (#2, 3, 2014) | 10-year performance-improvement | KOWEPO |
| Boryeong#1-8 . . . . . . . . . . | 4,000 MW (500 MW×8) | FGD upgrade (#1,2, 2014) | Performance-improvement | KOMIPO |
| Seocheon#1-2 . . . . . . . . . . | 400 MW (200 MW×2) | SCR[2] : 2012 | Anti-pollution | KOMIPO |
| Yosu #1, 2 . . . . . . . . . . . . | 668.6MW (#1:340, #2:328.6MW) | Boiler Type Change (CFBC[3]:#1:2016, #2:2011) | 30 years | KOSEP |
| Samcheonpo#1-2 . . . . . . . . | 1,120 MW (560 MW ×2) | Boiler, EP, Draft System Upgrade (#1,2: 2012) | 10 years Refurbishing-modernization | KOSEP |

_____

*Notes:*

(1)  "EP" means an electrostatic precipitation system.
(2)  "SCR" means a selective catalytic reduction system.
(3)  "CFBC" means a circulating fluidized bed combustion system.


**Transmission and Distribution**

We currently transmit and distribute substantially all of the electricity in Korea.

As of December 31, 2016, our transmission system consisted of 33,630 circuit kilometers of lines of 765 kilovolts and others including high-voltage direct current lines, and we had 830 substations with aggregate installed transformer capacity of 305,418 megavolt-amperes.

As of December 31, 2016, our distribution system consisted of 112,751 megavolt-amperes of transformer capacity and 9,122,344 units of support with a total line length of 474,099 circuit kilometers.

We make substantial investments in our transmission and distribution systems to minimize power interruptions and improve efficiency. Our current projects principally focus on increasing capabilities of the existing power networks and reducing our transmission and distribution loss, which was 3.59% of our gross generation in 2016. To cope with increasing damages to large-scale transmission and distribution facilities, we plan to reinforce stability of our transmission and distribution facilities through stricter design and material specifications. In addition, we also plan to expand underground transmission and distribution facilities to meet customer demand for more environment-friendly facilities. In order to reduce the interruption time in power distribution, which is an indicator of the quality of electricity transmission, we are also continuing to invest in automation of electricity transmission and development of new transmission technologies, among others.

51

Some of the facilities we own and use in our distribution system use rights of way and other concessions granted by municipal and local authorities in areas where our facilities are located. These concessions are generally renewed upon expiration.

**New Energy Industry Projects**

Certain of our new energy industry projects are described below.

*Advanced Metering Infrastructure*

In July 2012, the Government implemented a master plan to build out a smart grid, which includes the Advanced Metering Infrastructure ("AMI") roadmap. In accordance with such plan, we are in the process of installing "smart meters" and related communication networks and operating systems for 22 million households for target completion by 2020 as part of the "smart grid" initiative in an effort to enhance efficiency in the power electricity industry and alleviate growing energy shortage concerns. Smart meters refer to digital meters that record, on a real-time basis, electricity consumption within a household so that consumers will have a price-based incentive to enhance efficiency in their electricity usage. As of December 31, 2016, we have installed 3.3 million smart meter units, and plan to install an additional 4.5 million units in 2017. The AMI project is expected to cost Won 1.7 trillion through 2020.

*Smart Grids*

Smart grids refer to next-generation networks for electricity distribution that integrate information technology into existing power grids with the aim of enabling two-way real time exchange of information between electricity suppliers and consumers for optimal efficiency in electricity use. As part of our overall business strategy, we are currently developing and implementing smart grids based on advanced information technology, in order to promote more efficient allocation and use of electricity by consumers. We expect that such technology will improve efficiency and reduce electricity loss over the course of electricity transmission and distribution. We also expect that the smart grid initiative will significantly increase efficient energy consumption by providing real-time data to customers, which would in turn help to reduce greenhouse gas emission and decrease Korea's reliance on foreign energy sources.

Leveraging our experience gained through high-tech intelligent power transmission and distribution network, or "smart grid" test beds in Jeju Island from 2009 to 2013, we plan to expand our smart grid project. In 2014, we successfully implemented smart grid technology at our Guri-Namyangju branch. In recognition of our achievement, we were awarded an honorable mention from the International Smart Grid Action Network and a special prize from the Global Smart Grid Federation in 2015. By the end of 2015, we implemented smart grid technology in most of our branches, and we plan to continue implementing smart grid technology to our existing plants and buildings as well as to new branches in the future. The smart grid project is scheduled to be completed in 2030.

*Energy Storage Systems*

In October 2013, as part of an endeavor to create new markets for energy demand management applications using information and communication technology, we established a business plan to roll out energy storage systems for frequency regulation nationwide. These systems involve the establishment and operation of batteries and transformers with large-sized charge and discharge capabilities adjacent to substations to transmit electricity stably with regulated frequencies and optimize the efficiency of the substation operation. This system allows full conversion of reserve capacity for frequency regulation at existing low-cost generators into electricity storage and, if operated in sizable scale, offers opportunities for substantial cost savings in purchase of electricity.

In December 2014, we conducted a pilot project for this initiative by installing a 52 megawatts energy storage system at the Seo-Anseong substation and the Shin-Yongin substation. In July 2015, these substations

52

began to commercially operate energy storage systems, and we expanded the energy storage capacity nationwide by an additional 184 megawatts in 2015 and an additional 140 megawatts in 2016, with a view to expanding the capacity to 500 megawatts by the end of 2017. In addition, we are currently constructing one of the world's largest indoor energy storage system for frequency regulation in Gimje substation with a 48 megawatts capacity, which is due for completion by the end of 2017.

*Electric Vehicle Charging Infrastructure*

In order to promote the use of environment friendly electric vehicles, we installed 447 high-speed electric vehicle charging stations in 2016. We had 1,386 electric vehicle charging stations as of December 31, 2016, and we plan to expand our electric vehicle charging infrastructure to approximately 3,000 charging stations by 2020.

*Other "New Energy" Initiatives*

In addition to the above, we are currently taking various initiatives in the "new energy" field, including conducting feasibility studies for diagnostic and/or preventive systems for our transmission networks using unmanned drone applications and smart sensors based on the "Internet of Things (IoT)" technology.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund. For further details, see "—Recent Developments— New Energy Industry Fund."

*Nuclear*

Uranium, the principal fuel source for nuclear power, accounted for 35.3%, 38.1% and 37.1% of our fuel requirements for electricity generation in 2014, 2015 and 2016, respectively.

All uranium ore concentrates used by KHNP are imported from, and conversion and enrichment of such concentrates are provided by, sources outside Korea and are paid for with currencies other than Won, primarily U.S. dollars.

In order to ensure stable supply, KHNP enters into long-term and medium-term contracts with various suppliers and supplements such supplies with purchases in spot markets. In 2016, KHNP purchased 100%, or approximately 4,200 tons, of its uranium concentrate requirement under both long-term and spot supply contracts with suppliers in the United Kingdom, Kazakhstan, France, Germany, and the United States. Under the long-term supply contracts, the purchase prices of uranium concentrates are adjusted annually based on base prices and spot market prices prevailing at the time of actual delivery. The conversion and enrichment services of uranium concentrates are provided by suppliers in Canada, France, Germany, Japan, China, Russia, the United Kingdom and the United States. A Korean supplier typically provides fabrication of fuel assemblies. Except for certain fixed contract prices, contract prices for processing of uranium are adjusted annually in accordance with the general rate of inflation. KHNP intends to obtain its uranium requirements in the future, in part, through purchases under medium- to long-term contracts and, in part, through spot market purchases.

*Coal*

Bituminous coal accounted for 44.1%, 46.2% and 45.9% of our fuel requirements for electricity generation in 2014, 2015 and 2016, respectively, and anthracite coal accounted for 1.9%, 1.7% and 1.8% of our fuel requirements for electricity generation in 2014, 2015 and 2016, respectively.

In 2016, our generation subsidiaries purchased approximately 75 million tons of bituminous coal, of which approximately 40%, 37%, 15%, 2% and 6% were imported from Indonesia, Australia, Russia, South Africa and others, respectively. Approximately 82% of the bituminous coal requirements of our generation subsidiaries in

53

2016 were purchased under long-term contracts with the remaining 18% purchased in the spot market. Some of our long-term contracts relate to specific generating plants and extend through the end of the projected useful lives of such plants, subject in some cases to periodic renewal. Pursuant to the terms of our long-term supply contracts, prices are adjusted periodically based on market conditions. The average cost of bituminous coal per ton purchased under such contracts amounted to Won 92,206, Won 90,902 and Won 89,118 in 2014, 2015 and 2016, respectively.

In 2016, our generation subsidiaries purchased approximately 2.19 million tons of anthracite coal. The prices for anthracite coal under such contracts are set by the Government. The average cost of anthracite coal per ton purchased under such contracts was Won 108,118, Won 108,346 and Won 96,121 in 2014, 2015 and 2016, respectively.

*Oil*

Oil accounted for 1.7%, 2.2% and 3.0% of our fuel requirements for electricity generation in 2014, 2015 and 2016, respectively.

In 2016, our generation subsidiaries purchased approximately 18.4 million barrels of fuel oil, substantially all of which was purchased from domestic refiners through competitive open bidding. Purchase prices are based on the spot market price in Singapore. The average cost per barrel was Won 117,692, Won 67,517 and Won 53,842 in 2014, 2015 and 2016, respectively.

*LNG*

LNG accounted for 10.7%, 19.7% and 10.7% of our fuel requirements for electricity generation in 2014, 2015 and 2016, respectively. In 2016, for use in electricity generation we purchased approximately 6.6 million tons of LNG from Korea Gas Corporation, a Government-controlled entity in which we currently own a 21.57 equity interest (excluding treasury shares). In 2016, we purchased a substantial portion of our LNG requirements for use in power generation from Korea Gas Corporation. Under the terms of the LNG contract with Korea Gas Corporation, all of our five non-nuclear generation subsidiaries jointly and severally agreed to purchase a total of 6.6 million tons of LNG in 2016, subject to an automatic price adjustment annually based on a pre-determined formula if the actual purchased amount exceeds or falls short of the contracted amount. We believe the quantities of LNG provided under such contract will be adequate to meet the needs of our generation subsidiaries for LNG for the next several years. The LNG supply contracts between our generation subsidiaries and Korea Gas Corporation generally have a term of 20 years and provide for minimum purchase requirements for our generation subsidiaries, the specific terms of which are subject to negotiation between Korea Gas Corporation and our generation subsidiaries and approval by the Government. The average cost per ton of LNG under our contract with Korea Gas Corporation was Won 1,059,640, Won 775,663 and Won 594,662, in 2014, 2015 and 2016, respectively.

*Hydroelectric*

Hydroelectric power generation accounted for 1.3%, 1.0% and 1.1%, of our fuel requirements for electricity generation in 2014, 2015 and 2016, respectively. The availability of water for hydroelectric power depends on rainfall and competing uses for available water supplies, including residential, commercial, industrial and agricultural consumption. Pumped storage enables us to increase the available supply of water for use during periods of peak electricity demand.

**Sales and Customers**

Our sales depend principally on the level of demand for electricity in Korea and the rates we charge for the electricity we sell to the end-users.

54

Demand for electricity in Korea grew at a compounded average rate of 1.6 % per annum for the five years ended December 31, 2016. According to the Bank of Korea, the compounded growth rate for GDP was approximately 3.0 % for the same period. The GDP growth rate was approximately 3.3%, 2.8% and 2.8 % during 2014, 2015 and 2016, respectively.

The table below sets forth, for the periods indicated, the annual rate of growth in Korea's GDP and the annual rate of growth in electricity demand (measured by total annual electricity consumption) on a year-on-year basis.

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Growth in GDP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.3% | 2.9% | 3.3% | 2.8% | 2.8% |
| Growth in electricity consumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.5% | 1.8% | 0.6% | 1.3% | 2.8% |

Electricity demand in Korea varies within each year for a variety of reasons other than the general growth in GDP demand. Electricity demand tends to be higher during daylight hours due to heightened commercial and industrial activities and electronic appliance use. Due to the use of air conditioning during the summer and heating during the winter, electricity demand is higher during these two seasons than the spring or the fall. Variation in weather conditions may also cause significant variation in electricity demand.

We do not use any marketing channels, including any special sales methods, to sell electricity to our customers, other than to install electricity meters on-site and take monthly readings of such meters, based upon which invoices are sent to our customers.

### Demand by the Type of Usage

The table below sets forth consumption of electric power, and growth of such consumption on a year-on-year basis, by the type of usage (in gigawatt hours) for the periods indicated.

|  | 2012 (GWh) | YoY growth (%) | 2013 (GWh) | YoY growth (%) | 2014 (GWh) | YoY growth (%) | 2015 (GWh) | YoY growth (%) | 2016 (GWh) | YoY growth (%) | % of Total 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Residential . . . . . . . . | 65,484 | 3.1 | 65,815 | 0.5 | 64,457 | (2.1) | 65,619 | 1.8 | 68,057 | 3.7 | 13.7 |
| Commercial . . . . . . . . | 101,593 | 2.1 | 102,196 | 0.6 | 100,761 | (1.4) | 103,679 | 2.9 | 108,617 | 4.8 | 21.9 |
| Educational . . . . . . . . | 7,860 | 3.9 | 7,947 | 1.1 | 7,438 | (6.4) | 7,691 | 3.4 | 8,079 | 5.1 | 1.6 |
| Industrial . . . . . . . . . . | 258,102 | 2.6 | 265,373 | 2.8 | 272,552 | 2.7 | 273,548 | 0.4 | 278,828 | 1.9 | 56.1 |
| Agricultural . . . . . . . . | 12,776 | 13.8 | 13,866 | 8.5 | 14,505 | 4.6 | 15,702 | 8.3 | 16,580 | 5.6 | 3.3 |
| Street lighting . . . . . . . | 3,158 | 0.4 | 3,156 | (0.1) | 3,221 | 2.1 | 3,341 | 3.7 | 3,462 | 3.6 | 0.7 |
| Overnight Power . . . . . | 17,620 | (5.3) | 16,496 | (6.4) | 14,658 | (11.1) | 14,075 | (4.0) | 13,416 | (4.7) | 2.7 |
| Total . . . . . . . . . | 466,593 | 2.5 | 474,849 | 1.8 | 477,592 | 0.6 | 483,655 | 1.3 | 497,039 | 2.8 | 100.0 |

The industrial sector represents the largest segment of electricity consumption in Korea. Demand for electricity from the industrial sector was 278,828 gigawatt hours in 2016, representing a 1.9% increase from 2015, largely due to the turnaround in industries such as semiconductors, chemicals and petrochemicals that are heavy users of electricity. Demand for electricity from the commercial sector depends largely on the level and scope of commercial activities in Korea, which in recent years have resulted in increased office building construction, office automation and use of air conditioners. Demand for electricity from the commercial sector increased to 108,617 gigawatt hours in 2016, representing a 4.8% increase from 2015 largely due to a rebound in the domestic economy and increased air conditioning use in commercial buildings during the summer. Demand for electricity from the residential sector is largely dependent on population growth and use of heaters, air conditioners and other electronic appliances. In 2016, we distributed electricity to approximately 22 million households, which represent substantially all of the households in Korea. Demand for electricity from the

55

residential sector increased to 68,057 gigawatt hours in 2016, representing a 3.7% increase compared to 2015, largely due to the opening of new urban clusters with large-scale residential complexes as well as increased air conditioning use in residential buildings during the summer.

*Demand Management*

Our ability to provide adequate supply of electricity is principally measured by the facility reserve margin and the supply reserve margin. The facility reserve margin represents the difference between the peak usage during a year and the installed capacity at the time of such peak usage, expressed as a percentage of such installed capacity. The supply reserve margin represents the difference between the peak usage in a year and the average available capacity at the time of such peak usage, expressed as a percentage of such peak usage. The following table sets forth our facility reserve margin and supply reserve margin for the periods indicated.

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Facility reserve margin | 7.7% | 7.5% | 16.3% | 19.4% | 17.6% |
| Supply reserve margin | 5.2% | 5.5% | 11.5% | 11.6% | 8.5% |

While we seek to meet the growing demand for electricity in Korea primarily by continuing to expand our generation capacity, we have also implemented several measures to curtail electricity consumption, especially during peak periods. We apply time-of-use and seasonality tariff, which are structured so that higher tariffs are charged at the time and months of peak demand to select types of customers, and we also apply a progressive rate structure for the residential use of electricity. We have several demand management programs to control demand and induce power conservation during peak hours and peak seasons such as providing incentives for reducing power consumption during peak hours.

*Electricity Rates*

The Electricity Business Act and the Price Stabilization Act of 1975, each as amended from time to time, prescribe the procedures for the approval and establishment of rates charged for the electricity we sell. We submit our proposals for revisions of rates or changes in the rate structure to the Ministry of Trade, Industry and Energy. The Ministry of Trade, Industry and Energy then reviews these proposals and, following consultation with the Ministry of Strategy and Finance and review by the Korea Electricity Commission, makes the final decision.

Under the Electricity Business Act and the Price Stabilization Act, electricity rates are established at levels that would enable us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations as well as receive a fair investment return on capital used in those operations.

In May 2014, in order to make conforming changes to the standards for determining the public utility rates and to further bolster the reasonableness of cost determination, the Ministry of Trade, Industry and Energy amended the standards for determining the electricity tariff rates. The main amendments include (i) recording as our cost of electricity (which forms part of our operating costs) the pretax income of our six generation subsidiaries (which was previously deducted from our operating costs), (ii) excluding from our rate base our equity interests in our six generation subsidiaries (which were previously included in the rate base discussed below), and (iii) when determining working capital, considering the actual time of our cost recovery (namely, the accounts receivable collection period and the accounts payable payment period).

For the purposes of rate approval, operating costs are defined as the sum of our operating expenses (which principally consists of cost of sales and selling and administrative expenses) and our adjusted income taxes.

Fair investment return represents an amount equal to the rate base multiplied by the rate of return.

Following the amendments to its computation methods in May 2014 as described above, the rate base is currently equal to the sum of:

- net utility plant in service (which is equal to utility plant minus accumulated depreciation minus revaluation reserve);

- the portion of working capital which is equal to the appropriate level of operating costs minus depreciation and other non-cash charges while taking into account the actual time of cost recovery; and

- the portion of construction-in-progress which is charged from our retained earnings.

The amounts used for the variables in the rates are those projected by us for the periods to be covered by the rate approval.

For the purpose of determining the fair rate of return, the rate base is divided into two components in proportion to our total shareholders' equity and our total debt. The rate of return permitted in relation to the debt component of the rate base is set at a level designed to approximate the weighted average interest cost on all types of borrowing for the periods covered by the rate approval. The rate of return permitted in relation to the equity component of the rate base is set by applying the capital asset pricing model which takes account of the risk-free rate, the return on the Korea Stock Price Index, KOSPI, a Korean equity market index, and the correlation of the stock price of our company with KOSPI. In 2015, the approved rate of return on the debt component of the rate base was 1.12 % while the approved rate of return on the equity component of the rate base was 2.88 %. As a result of such approved rates of returns, the fair rate of return in 2015 was determined to be 4.00 %. The fair rates of return for 2016 and 2017 have not yet been determined.

The Electricity Business Act and the Price Stabilization Act do not specify a basis for determining the reasonableness of our operating expenses or any other items (other than the level of the fair investment return) for the purposes of the rate calculation. However, the Government exercises substantial control over our budgeting and other financial and operating decisions.

In addition to the calculations described above, a variety of other factors are considered in setting overall tariff levels. These other factors include consumer welfare, our projected capital requirements, the effect of electricity tariff on inflation in Korea and the effect of tariff on demand for electricity.

From time to time, our actual rate of return on invested capital may differ significantly from the fair rate of return on invested capital assumed for the purposes of electricity tariff approvals, for reasons, among others, related to movements in fuel prices, exchange rates and demand for electricity that differ from what is assumed for determining our fair rate of return. For example, between 1987 and 1990, the actual rate of return was above the fair rate of return due to declining fuel costs and rising demand for electricity at a rate not anticipated for purposes of determining our fair rate of return. Similarly, depreciation of the Won against the U.S. dollar accounted for our actual rates of return being lower than the fair rate of return for the period from 1996 to 2000. For the period between 2006 and 2013, our actual rates of return were lower than the fair rate of return largely due to a general increase in fuel costs and additional facility investment costs incurred, the effects of which were not offset by timely increases in our tariff rates. Since 2014, however, largely due to a decrease in fuel costs reflective of the drop in oil prices, our actual rate of return has surpassed the fair rate of return; however, substantially all of the resulting excess has been used to fund capital expenditure and repair and maintenance, as well as to offer tariff discounts to economically or otherwise disadvantaged households, and make investments in renewable energy and other environmental programs.

Partly in response to the variance between our actual rates of return and the fair rates of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increases as such increases requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use from sector-specific tariff increases.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Prior to November 2013, the Government from time to time effected tariff increases that typically covered all sectors, namely, residential, commercial and industrial, mainly in response to sustained increases in fuel prices. No cross-sector tariff increase has been implemented since November 2013 largely due to a general decline in fuel prices and relatively stable exchange rates. However, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, the new tariff structure encourages energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods during the summer and the winter. Third, a temporary rate discount will apply during 2017 to 2019 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation and cash flows.

The tariff rates we charge for electricity vary among the different classes of consumers, which principally consist of industrial, commercial, residential, educational and agricultural consumers. The tariff also varies depending upon the voltage used, the season, the time of usage, the rate option selected by the user and, in the residential sector, the amount of electricity used per household, as well as other factors. For example, we adjust for seasonal tariff variations by applying higher rates when demand tends to rise such as during the months of June, July and August (when the demand tends to rise due to increased use of air conditioning) and November, December, January and February (when demand tends to rise due to increased use of heating), which reflects the policy of the Korean government to cope with the rise in electricity demand during peak seasons by encouraging a more efficient use of electricity by customers. In addition, we provide discounts on tariff rates to certain users such as low income households.

Our current tariff schedule, which became effective as of January 1, 2017 reflecting the adjustments outlined above, is summarized below by the type of usage:

- *Industrial*. The monthly basic charge varies from Won 5,550 per kilowatt to 9,810 per kilowatt depending on the type of contract, the voltage used and the rate option. The energy usage charge varies from Won 53.7 per kilowatt-hour to Won 196.6 per kilowatt-hour depending on the type of contract, the voltage used, the season, the time of day and the rate option.

- *Commercial*. The monthly basic charge varies from Won 6,160 per kilowatt to 9,810 per kilowatt depending on the type of contract, the voltage used and the rate option. The energy usage charge varies from Won 53.7 per kilowatt-hour to Won 196.6 per kilowatt-hour depending on the type of contract, the voltage used, the season, the time of day and the rate option.

- *Residential*. The monthly basic charge varies from Won 910 for electricity usage of less than 200 kilowatt hours to Won 7,300 for electricity usage in excess of 400 kilowatt hours. Residential tariff also includes an energy usage charge ranging from Won 93.3 to Won 280.6 per kilowatt-hour for electricity usage depending on the amount of usage and voltage. During the peak usage periods during the summer and the winter, namely the months of July and August and December to February, a higher energy usage charge of Won 709.5 per kilowatt-hour applies to residential consumers whose monthly electricity consumption exceeds 1,000 kilowatts hour.

- *Educational*. The monthly basic charge varies from Won 5,230 per kilowatt to 6,980 per kilowatt depending on the voltage used and the rate option. The energy usage charge varies from Won 43.8 per kilowatt-hour to Won 160.4 per kilowatt-hour depending on the voltage used, the season and the rate option.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

- *Agricultural*. The monthly basic charge varies from Won 360 per kilowatt to Won 1,210 per kilowatt depending on the type of usage. The energy usage charge varies from Won 21.6 per kilowatt-hour to Won 41.9 per kilowatt-hour depending on the type of contract, the voltage used and the season.

- *Street-lighting*. The monthly basic charge is Won 6,290 per kilowatt and the energy usage charge is Won 85.9 per kilowatt-hour. For electricity capacity of less than 1 kilowatt or for places where the installation of the electricity meter is difficult, a fixed rate of Won 37.5 per watt applies, with the minimum monthly charge of Won 1,220.

In 2001, as part of implementing the Restructuring Plan, the Ministry of Trade, Industry and Energy established the Electric Power Industry Basis Fund to enable the Government to take over certain public services previously performed by us. In 2016, 3.7% of the tariff we collected from our customers was transferred to this fund prior to recognizing our sales revenue.

**Power Development Strategy**

We and our generation subsidiaries make plans for expanding or upgrading our generation capacity based on the Basic Plan, which is generally revised and announced every two years by the Government. In July 2015, the Government announced the Seventh Basic Plan relating to the future supply and demand of electricity. The Seventh Basic Plan, which is effective for the period from 2015 to 2029, focuses on, among other things, (i) ensuring a stable supply of electricity, (ii) increasing the portion of low carbon electricity supply sources, (iii) active consumer demand management, (iv) permanent closing of operations of the Kori #1 nuclear power unit, and (v) diversifying electricity supply sources through greater utilization of renewable energy sources.

In January 2014, prior to the announcement of the Seventh Basic Plan, the Ministry of Trade, Industry and Energy adopted the Second Basic National Energy Plan following consultations with representatives from civic groups, the power industry and academia. The Second Basic National Energy Plan, which is a comprehensive plan that covers the entire spectrum of energy industries in Korea, covers the period from 2014 to 2035 and focuses on the following six key tasks: (i) shifting the focus of energy policy to demand management with a goal of reducing the growth of electricity demand by 15% by 2035 through efficiency enhancement programs compared to the projected growth in the absence of such efficiency enhancement programs, (ii) establishing a geographically decentralized electricity generation system so as to reduce transmission losses with a goal of supplying at least 15% of total electricity through such system by 2035, (iii) applying latest greenhouse gas emission reduction technologies to newly constructed generation units in order to further promote safety and environmental friendliness, (iv) strengthening resource exploration and fuel procurement capabilities to enhance Korea's energy security, (v) ensuring stable supply of energy and increasing the portion of electricity supplied from renewable sources to 11% by 2035, (vi) reinforcing the system for stable supply of conventional energy, such as oil and gas, and (vii) introducing in 2015 an energy voucher system in lieu of a tariff discount system for the benefit of low-income consumers. In addition, the Second Basic National Energy Plan has revised the target level of electricity generated by nuclear sources as a percentage of total electricity generated to 29%, compared to 41% under the First Basic National Energy Plan announced in 2008, which covered the period from 2008 to 2030.

We cannot assure that the Seventh Basic Plan, the Second Basic National Energy Plan or the respective plans to be subsequently adopted will successfully achieve their intended goals, the foremost of which is to ensure, through carefully calibrated capacity expansion and other means, balanced overall electricity supply and demand in Korea at affordable costs to end users while promoting efficiency and environmental friendliness in the consumption and production of electricity. If there is significant variance between the projected electricity supply and demand considered in planning our capacity expansions and the actual electricity supply and demand or if these plans otherwise fail to meet their intended goals or have other unintended consequences, this may result in inefficient use of our capital, mispricing of electricity and undue financing costs on the part of us and our generation subsidiaries, among others, which may have a material adverse effect on our results of operations, financial condition and cash flows.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**Capital Investment Program**

The table below sets forth, for each of the years ended December 31, 2014, 2015 and 2016, the amounts of capital expenditures for the construction of generation, transmission and distribution facilities.

| 2014 | 2015 | 2016 |
|------|------|------|
| | (In billions of Won) | |
| ₩16,629 | ₩15,750 | ₩13,950 |

The table below sets forth the currently estimated installed capacity for new or expanded generation units to be completed by our generation subsidiaries in each year from 2017 to 2021 based on the Seventh Basic Plan, as amended.

| Year | Number of Units | Type of Units | Total Installed Capacity |
|------|-----------------|---------------|--------------------------|
| | | | (Megawatts) |
| 2017 . . . . . . . . . . . . . . . . . . . . . . . | 2 | Nuclear power | 2,800 |
| | 1 | Coal-fired | 1,000 |
| | 3 | LNG-combined | 1,270 |
| 2018 . . . . . . . . . . . . . . . . . . . . . . . | 1 | Nuclear power | 1,400 |
| | 1 | LNG-combined | 200 |
| 2019 . . . . . . . . . . . . . . . . . . . . . . . | 1 | Coal-fired | 1,000 |
| 2020 . . . . . . . . . . . . . . . . . . . . . . . | None | | |
| 2021 . . . . . . . . . . . . . . . . . . . . . . . | 1 | Nuclear power | 1,400 |

For the period from 2022 to 2029, our generation subsidiaries currently plan to complete seven additional nuclear units with an aggregate installed capacity of 10,200 megawatts.

As part of our capital investment program, we also intend to add new transmission lines and substations, continue to replace overhead lines with underground cables and improve the existing transmission and distribution systems.

The actual number and capacity of generation units and transmission and distribution facilities we construct and the timing of such construction are subject to change depending upon a variety of factors, including, among others, changes in the Basic Plan, demand growth projections, availability and cost of financing, changes in fuel prices and availability of fuel, ability to acquire necessary plant sites, environmental considerations and community opposition.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

The table below sets forth, for the period from 2017 to 2019, the budgeted amounts of capital expenditures pursuant to our capital investment program, which primarily consist of budgets for the construction of generation, transmission and distribution facilities and, to a lesser extent, renewable energy generation and new energy industry projects. The budgeted amounts may vary from the actual amounts of capital expenditures for a variety of reasons, including, among others, the implementation of the Seventh Basic Plan, changes in the number of units to be constructed, the actual timing of such construction, changes in rates of exchange between the Won and foreign currencies and changes in interest rates.

| | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|
| | | (in billions of Won) | | |
| Generation[1]: | | | | |
| Nuclear | ₩ 3,954 | ₩ 5,103 | ₩ 5,194 | ₩14,251 |
| Thermal | 3,166 | 3,007 | 2,635 | 8,808 |
| Sub-total | 7,120 | 8,110 | 7,829 | 23,059 |
| Transmission and Distribution: | | | | |
| Transmission | 2,772 | 3,142 | 3,185 | 9,009 |
| Distribution | 3,009 | 2,156 | 2,297 | 7,462 |
| Sub-total | 5,781 | 5,298 | 5,482 | 16,561 |
| Others[2] | 1,988 | 2,452 | 2,760 | 7,200 |
| Total | ₩14,889 | ₩15,860 | ₩16,071 | ₩46,820 |

*Notes:*

(1) The budgeted amounts for our generation facilities are based on the Seventh Basic Plan.
(2) Principally consists of investments in renewable energy generation and new energy industry projects, among others.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating funds sponsored by government-affiliated energy companies. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector. The total size of these funds was US$1 trillion in 2016, which was funded from our budget for new energy industry projects, which totaled US$6.4 trillion in 2016 and was expended in research and development, efficiency improvements and educational solar power projects, among others. Our budget for new energy industry projects in 2017 amounts to US$5.6 trillion, of which US$1 trillion has been earmarked for potential additional commitments to the New Energy Industry Fund.

Furthermore, according to a plan announced in July 2016 by the Ministry of Trade, Industry and Energy in relation to coal-fired electricity generation units, 10 of our coal generation units that are 30 years or older will be required to be shut down or convert to another fuel use, 43 of our such units that are less than 30 years old will be subject to retrofitting and overall replacement of environmental facilities, and 20 of our such units currently under construction will be subject to more rigorous emission standards. In addition, the Government indicated that it would not allow any new construction of additional coal-fired generation units after 2019, which means that LNG is likely to be used more in the future as the substitute for coal, and since LNG is a more expensive fuel source than fuel, this regulation is expected to drive up the average cost of generating electricity. Compliance with such measures is expected to result in our incurring significant costs.

We have financed, and plan to finance in the future, our capital investment programs primarily through net cash provided by our operating activities and financing in the form of debt securities and loans from domestic

financial institutions, and to a lesser extent, borrowings from overseas financial institutions. In addition, in order to prepare for potential liquidity shortage, we and our generation subsidiaries maintain several credit facilities with domestic financial institutions in the aggregate amounts of Won 3,747 billion and US$696 million, the full amount of which was available as of December 31, 2016. we, KHNP, KOSEP and KOWEPO also maintain global medium-term note programs in the aggregate amount of US$11.4 billion, of which approximately US$4.8 billion remains currently available for future drawdown. KOSEP also maintains an A$2 billion Australian dollar medium-term note program, of which approximately A$1.7 billion remains current available for future drawdown. See also Item 5.B. "Liquidity and Capital Resources—Capital Resources."

**Environmental Programs**

The Environmental Policy Basic Act, the Air Quality Preservation Act, the Water Quality Preservation Act, the Marine Pollution Prevention Act and the Waste Management Act, collectively referred in this annual report as the Environmental Acts, are the major laws of Korea that regulate atmospheric emissions, waste water, noise and other emissions from our facilities, including power generators and transmission and distribution units. Our existing facilities are currently in material compliance with the requirements of these environmental laws and international agreements, such as the United Nations Framework Convention on Climate Change, the Montreal Protocol on Substances that Deplete the Ozone Layer, the Stockholm Convention on Persistent Organic Pollutants and the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal. In order to foster coordination among us and our generation subsidiaries in respect of climate change, we and 11 of our electricity-related subsidiaries formed the CEO Coordination Committee in June 2016.

We continuously endeavor to contribute to sustainable growth (whether as an economy, a society or an ecosystem) by actively taking actions that befit our social responsibility as a corporate citizen in the energy industry. For example, in 2005, we became the first public company in Korea to join the United Nations Global Compact, an international voluntary initiative designed to hold a forum for corporations, United Nations agencies, labor and civic groups to promote reforms in economic, environmental and social policies. As part of our involvement with such initiative, we issue an annual report named the "Sustainability Report" to disclose our activities from the perspectives of economy, environment and society, in accordance with the reporting guidelines of the Global Reporting Initiative, the official collaborating center of the United Nations Environment Program that works in cooperation with United Nations Secretary General. In recognition of our efforts and achievements to reduce carbon emissions in response to global climate change, in May 2013, we obtained the Carbon Trust Standard certification issued by Carbon Trust, a British nonprofit organization with the goal of establishing a sustainable, low carbon economy. In 2015, we obtained recertification from Carbon Trust by satisfying even more rigorous evaluation criteria. We are also a participant of the Carbon Disclosure Project, an international organization that promotes transparency in informational disclosure of carbon management process, and in 2016 we were recognized by the Carbon Disclosure Project for scoring the highest in the energy and utility sector in relation to climate change response. In 2014, 2015 and 2016 we were selected as the best company in the global electricity utility sector in the Dow Jones Sustainability Indices, which measures management performance in terms of contribution to sustainability. We aim to become a global leader in carbon management and reduction.

The table below sets forth the number of emission control equipment installed at thermal power plants by our generation subsidiaries as of December 31, 2016.

| | KOSEP | KOMIPO | KOWEPO | KOSPO | EWP |
|---|---|---|---|---|---|
| Flue Gas Desulphurization System | 14 | 14 | 14 | 11 | 15 |
| Selective Non-catalytic Reduction System | — | 2 | — | — | 3 |
| Selective Catalytic Reduction System | 12 | 19 | 15 | 12 | 18 |
| Electrostatic Precipitation System | 16 | 16 | 14 | 12 | 18 |
| Low NO2 Combustion System | 18 | 32 | 30 | 30 | 30 |
| Total | 60 | 83 | 73 | 65 | 84 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

The table below sets forth the amount of annual emission from all generating facilities of our generation subsidiaries for the periods indicated. The amount of CO2 emissions may increase in the near future due to the construction of additional coal thermal power plants but is expected to decrease in the long-term, principally due to an increased use of nuclear power and renewable energy and the implementation of the carbon emission trading system.

| Year | Sox (g/MWh) | NOx (g/MWh) | Dust (g/MWh) | CO2 (kg/MWh) |
|------|------|------|------|------|
| 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170 | 291 | 8 | 471 |
| 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 164 | 266 | 8 | 455 |
| 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 246 | 395 | 11 | 747 |

In order to comply with the current and expected environmental standards and address related legal and social concerns, we intend to continue to install additional equipment, make related capital expenditures and undertake several environment-friendly measures to foster community goodwill. For example, under the Persistent Organic Pollutants Management Act enacted in 2007, we are required to remove polychlorinated biphenyl, or PCB, a toxin, from the insulating oil of our transformers by 2025. In addition, when constructing certain large new transmission and distribution facilities, we assess and disclose their environmental impact at the planning stage of such construction, as well as consult with local residents, environmental groups and technical experts to generate community support for such projects. We exercise additional caution in cases where such facilities are constructed near ecologically sensitive areas such as wetlands or preservation areas. We also make reasonable efforts to minimize any negative environmental impact, for example, by using more environment-friendly technology and hardware. In addition, we also undertake measures to minimize losses during the transmission and distribution process by making our power distribution network more energy-efficient in terms of loss of power, as well as to lower consumption of energy, water and other natural resources. In addition, we and our subsidiaries acquired the ISO 14000 certification, an environmental management system widely adopted internationally, in 2013 and have made it a high priority to make our electricity generation and distribution more environmentally friendly. In addition to the ISO 14000 certification, we further reinforced our environmental management system by acquiring the ISO 14001 certification as well as a domestic "GMS (Green Management System), KS I 7001/7002" certification, which relates to the management of resources, energy, green house effects and social responsibilities, in 2013. In 2014, we were awarded the presidential award for environmental contributions as a corporate citizen, after scoring the highest among 102 corporations that competed for the award. In order to encourage the implementation of environment-friendly measures by other corporations and enhance environmental awareness at a social level, we have been disclosing our environment-related activities and achievements to the public through the Environment Information System managed by the Ministry of Environment since 2012.

Our environmental measures, including the use of environment-friendly but more expensive parts and equipment and allocation of capital expenditures for the installation of such facilities, may result in increased operating costs and liquidity requirement. The actual cost of installation and operation of such equipment and related liquidity requirement will depend on a variety of factors which may be beyond our control. There is no assurance that we will continue to be in material compliance with legal or social standards or requirements in the future in relation to the environment.

As part of our long-term strategic initiatives, we plan to take other measures designed to promote the generation and use of environmentally friendly, or green, energy. See Item 4.B. "Business Overview—Strategy."

Some of our generation facilities are powered by renewable energy sources, such as solar energy, wind power and hydraulic power. While such facilities are currently insignificant as a proportion of our total generation capacity or generation volume of our generation subsidiaries, we expect that the portion will increase in the future, especially since we are required to comply with the Renewable Portfolio Standard program as described below.

The following table sets forth the generation capacity and generation volume in 2016 of our generation facilities that are powered by renewable energy sources.

| | Generation Capacity (megawatts) | Generation Volume (gigawatt-hours) |
|---|---|---|
| Hydraulic Power ............................................... | 5,350 | 4,835 |
| Wind Power ................................................... | 138 | 186 |
| Solar Energy, Fuel Cells and Biogas ............................. | 174 | 908 |
| Subtotal ................................................... | 5,662 | 5,929 |
| As percentage of total[1] ....................................... | 7.2% | 1.4% |

*Note:*

(1)  As a percentage of the total generation capacity or total generation volume, as applicable, of us and our generation subsidiaries.

In order to deal with shortage of fuel and other resources and also to comply with various environmental standards, in 2012 the Government adopted the Renewable Portfolio Standard program, which replaced the Renewable Portfolio Agreement which had been in effect from 2006 to 2011. Under this program, each of our generation subsidiaries is required to generate a specified percentage of total electricity to be generated by such generation subsidiary in a given year in the form of renewable energy or, in case of a shortfall, purchase a corresponding amount of a Renewable Energy Certificate (a form of renewable energy credit) from other generation companies whose renewable energy generation surpass such percentage. The target percentage was 3.0% in 2015 and 3.5% in 2016 and will incrementally increase to 10.0% by 2023. Fines are to be levied on any subsidiary that fails to do so in the prescribed timeline. In 2015, all six of our generation subsidiaries met the target through renewable energy generation and/or the purchase of a Renewable Energy Certificate. Compliance by our generation subsidiaries of the 2016 target is currently under evaluation, and if any generation subsidiary is found to have failed to meet the target for 2016 or for subsequent years, such generation subsidiary may become subject to fines. We expect that any additional costs required for implementation of the Renewable Portfolio Standard program will be covered by a corresponding increase in electricity tariff. However, there is no assurance that the Government will in fact raise the electricity tariff to a level sufficient to fully cover such additional costs or at all.

As to how we plan to finance our capital expenditures related to our environmental programs, see "—Capital Investment Program."

In March 2017, the Electricity Business Act was amended to the effect that starting in June 2017, future national planning for electricity supply and demand in Korea should consider the environmental and safety impacts of such planning. However, to-date, no specific guidelines have been provided by the Government as to how to implement this provision, and it is therefore difficult to assess in advance what impact such provision will have on our business, results of operations or financial condition. However, the amendment will likely lead to the expansion of our environmental programs.

Furthermore, under the new electricity rate structure effected by the Government effective January 1, 2017, a temporary rate discount will apply in the case of investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars during 2017 to 2019.

**Community Programs**

Building goodwill with local communities is important to us in light of concerns among the local residents and civic groups in Korea regarding construction and operation of generation units, particularly nuclear generation units. The Act for Supporting the Communities Surrounding Power Plants and the Act on the Compensation and Support for Areas Adjacent to Transmission and Substation Facilities require that the

64

generation companies and the affected local governments carry out various activities up to a certain amount annually to address neighboring community concerns. Pursuant to these Acts, we and our generation subsidiaries, in conjunction with the affected local and municipal governments, undertake various programs, including scholarships and financial assistance to low-income residents.

Under the Act for Supporting the Communities Surrounding Power Plants, activities required to be undertaken under the Act are funded partly by the Electric Power Industry Basis Fund (see "—Sales and Customers—Electricity Rates") and partly by KHNP as part of its budget. KHNP is required to make annual contributions to the affected local communities in an amount equal to Won 0.25 per kilowatt-hour of electricity generated by its nuclear generation units during the one-year period before the immediately preceding fiscal year, Won 5 million per thousand kilowatts of hydroelectric generation capacity and Won 0.5 million per thousand kilowatts of pumped-storage generation capacity. In addition, under Korean tax law, KHNP is required to pay local tax levied on its nuclear generation units in an amount equal to Won 1 (effective January 1, 2015, which reflects an increase from Won 0.5 previously per kilowatt-hour of their generation volume in the affected areas) and Won 2 per 10 cubic meters of water used for hydroelectric generation.

The Act on the Compensation and Support for Areas Adjacent to Transmission and Substation Facilities, enacted in January 2014 with effect from July 2014, prescribes measures to be taken by power generation or transmission companies with respect to the communities adjacent to transmission and substation facilities. Under this Act, those who own land or houses in the vicinity of transmission lines and substation may claim compensation for damages or compel purchase of such properties by the power generation or transmission companies which are legally obligated in principle to pay for such damages or purchase such properties. In addition, under this Act, residents of communities adjacent to transmission and substation facilities are entitled to subsidies on electricity tariff as well as support for a variety of welfare projects and collective business ventures.

Prior to the construction of a generation unit, our generation subsidiaries perform an environmental impact assessment which is designed to evaluate public hazards, damage to the environment and concerns of local residents. A report reflecting this evaluation and proposing measures to address the problems identified must be submitted to and approved by the Ministry of Trade, Industry and Energy following agreement with related administrative bodies, including the Ministry of Environment prior to the construction of the unit. Our generation subsidiaries are then required to implement the measures reflected in the approved report. Despite these activities, civic community groups may still oppose the construction and operation of generation units (including nuclear units), and such opposition could adversely impact our construction plans for generation units (including nuclear units) and have a material adverse effect on our business, results of operations and cash flow.

Upon relocation of our corporate headquarters in November 2014, we developed and established Bitgaram Energy Valley as a smart energy hub city in Naju, to attract and facilitate the growth of start-ups and research institutions related to new energy industries while contributing to the local economy, balanced regional development and job creation. To achieve this goal, we provide funding, business networks and research and development assistance to qualified start-ups and research institutions in the new energy industries. As of March 31, 2017, we had signed agreements with 200 companies relating to investments in the Bitgaram Energy Valley, and we currently aim to increase the total number of companies investing in the Bitgaram Energy Valley to 250 companies by the end of 2017 and 500 companies by the end of 2020.

**Nuclear Safety**

KHNP takes nuclear safety as its top priority and continues to focus on ensuring the safe and reliable operation of nuclear power plants. KHNP also focuses on enhancing corporate ethics and transparency in the operation of its plants.

KHNP has a corporate code of ethics and is firmly committed to enhancing nuclear safety, developing new technologies and improving transparency. KHNP has also established the "Statement of Safety Policy for

Nuclear Power Plants" to ensure the highest level of nuclear safety. Furthermore, KHNP invests approximately 5% of its total annual sales into research and development for the enhancement of nuclear safety and operational performance.

KHNP implements comprehensive programs to monitor, ensure and improve safety of nuclear power plants. In order to enhance nuclear safety through risk-informed assessment, KHNP conducts probabilistic safety assessments, including for low power-shutdown states, for all its nuclear power plants. In order to systematically verify nuclear safety and identify the potential areas for safety improvements, KHNP performs periodic safety reviews on a 10-year frequency basis for all its operating units. These reviews have been completed for Kori #1, 2, 3 and 4, Hanbit #1, 2, 3, 4, 5 and 6, Hanul #1, 2, 3 and 4 and Wolsong #1, 2, 3 and 4. Reviews for Hanul #5 and 6 are in progress. In order to enhance nuclear safety and plant performance, KHNP has established a maintenance effectiveness monitoring program based on the maintenance rules issued by the United States Nuclear Regulatory Commission, which covers all of KHNP's nuclear power plants in commercial operation.

KHNP has developed the Risk Monitoring System for operating nuclear power plants, which it implements in all of its nuclear power plants. The Risk Monitoring System is intended to help ensure nuclear plant safety. In addition, KHNP has developed and implemented the Severe Accident Management Guidelines and is developing the Severe Accident Management Guidelines for Low Power-Shutdown States in order to manage severe accidents for all of its nuclear power plants.

KHNP conducts various activities to enhance nuclear safety such as quality assurance audits and reviews by the KHNP Nuclear Review. KHNP maintains a close relationship with international nuclear organizations in order to enhance nuclear safety. In particular, KHNP invites international safety review teams such as the World Association of Nuclear Operators ("WANO") Peer Review Team and the Expert Mission Team to its nuclear plants for purposes of meeting international standards for independent review of its facilities. KHNP actively exchanges relevant operational information and technical expertise with its peers in other countries. For example, KHNP conducted five WANO Peer Reviews Hanul #5, and #6 and WANO Pre Start-up Review for Shin-Kori#4 in 2016. KHNP also invited WANO Follow-up Peer Review Team at Wolsong #1, #2, #3 and #4, Hanul #1, #2, #3 and #4, Shin-Kori #1, and #2 in 2016. The recommendations and findings from this event were shared with KHNP's other nuclear plants to implement improvements at such plants.

The average level of radiation dose per unit amounted to a relatively low level of 0.44 man-Sv in 2016, which was substantially lower than the global average of 0.72 man-Sv/year in 2015 as reported in the WANO performance indicator report.

In response to the damage to the nuclear facilities in Japan as a result of the tsunami and earthquake in March 2011, the Government conducted additional safety inspections on nuclear power plants by a group of experts from governmental authorities, civic groups and academia. As a result of such inspections, the Government required KHNP to perform 50 comprehensive safety improvement measures. The Government also established the Nuclear Safety & Security Commission in October 2011 for neutral and independent safety appraisals. KHNP developed ten additional measures through benchmarking of overseas cases and internal analysis of current operations. As of December 31, 2016, KHNP has completed implementation of all such measures.

From time to time, our nuclear generation units may experience unexpected shutdowns. For example, on September 12, 2016, multiple earthquakes including a magnitude 5.8 earthquake hit the city of Gyeongju, a home to KHNP's headquarters and Wolsong Nuclear Power Plant. Although there was no material safety issues, KHNP had manually stopped the operations of Wolsong Nuclear Power Plant units #1, 2, 3, and 4 according to the safety guidelines. All units have resumed their operations on December 5, 2016, with the approval by the Nuclear Power Safety Commission. KHNP continues to implement measures to improve the safety by reinforcing seismic capability of its core facilities and performing stress tests across all its nuclear power plants.

66

Low and intermediate level waste, or LILW, and spent fuels are stored in temporary storage facilities at each nuclear site of KHNP. The temporary LILW storage facilities at the nuclear sites had been sufficient to accommodate all LILWs produced up to 2015. Korea Radioactive Waste Agency ("KORAD") completed the construction of a LILW disposal facility in the city of Gyeongju, and government approval for its operations was obtained in December 2014.

In order to increase the storage capacity of temporary storage facilities for spent fuels, KHNP has been pursuing various projects, such as installing high-density racks in spent fuel pools and building dry storage facilities. Through these activities, we expect that the storage capacity for spent fuels in all nuclear sites will be sufficient to accommodate all the spent fuels produced by 2017. The policy for spent fuel management options is currently under development.

In 2009, the Radioactive Waste Management Act ("RWMA") was enacted in order to centralize management of the disposal of spent fuel and LILW and enhance the security and efficiency of related management processes. The RWMA designates KORAD to manage the disposal of spent fuels and LILW. Pursuant to the RWMA, the Government has established the Radioactive Waste Management Fund. The management expense for LILW is paid when LILW is transferred to KORAD, and the charge for spent fuel is paid based on the quantity generated every quarter. LILW-related management costs and charges for spent fuel are reviewed by the Ministry of Trade, Industry and Energy every two years. In December 2014, such costs and charges were increased by a committee composed of Government officials, KHNP, Korea Radioactive Waste Management Corporation and experts in finance and accounting. The committee is currently assessing the costs and charges for the two-year period starting from the second quarter of 2017. If such costs and charges are determined to be higher than previous years, this may result in an increase in future expenses that KHNP may incur in relation to radioactive waste.

All of KHNP's nuclear plants are currently in compliance with Korean law and regulations and the safety standards of the IAEA in all material respects. For a description of certain past incidents relating to quality assurance in respect of KHNP, see Item 3.D. "Risk Factors—Our risk management policies and procedures may not be fully effective at all times."

**Decommissioning**

Decommissioning of a nuclear power unit is the process whereby the unit is shut down at the end of its life, the fuel is removed and the unit is eventually dismantled. KHNP implements a dismantling policy under which dismantling would take place five to ten years after the unit's closure. KHNP renewed the operating license of Kori #1, the first nuclear power plant constructed in Korea, which commenced operation in 1978, for an additional ten years in 2007. At the recommendation of the Ministry of Trade, Industry and Energy, KHNP has decided not to renew the operating license of Kori #1. Therefore decommissioning of Kori #1 will begin upon expiration of the operating license in June 2017. In February 2015, KHNP also renewed the operation license of Wolsong #1 (which originally expired in November 2012) for an additional ten years until 2022. In June 2015, reactivation of Wolsong #1 was approved by the NSSC after periodic inspection. However, a civic group has since then brought a lawsuit to reverse such approval, and in February 2017, a lower court ruled to annul the NSSC's approval, which ruling has since been appealed. At present, the outcome of this litigation remains uncertain. The initial phase of decommissioning (namely, safety inspection and removal of spent fuels) of KHNP's nuclear power generation units is expected to commence after June 2017. KHNP retains full financial and operational responsibility for decommissioning its units.

KHNP has accumulated decommissioning costs as a liability since 1983. The decommissioning costs of nuclear facilities are defined by the Radioactive-Waste Management Act, which requires KHNP to credit annual appropriations separately. These costs are estimated based on studies conducted by the relevant committees, and are reviewed by the Ministry of Trade, Industry and Energy every two years. In 2016, due to decreased discount rates and the commencement of operation of Shin-Kori #3, the total amount of allowances increased as of

67

December 31, 2016, and, as a result, KHNP was required to accrue Won 12,946 billion for the costs of dismantling and decontaminating existing nuclear power plants as of December 31, 2016, which consisted of dismantling costs of nuclear plants of Won 10,196 billion and dismantling costs of spent fuel and radioactive waste of Won 2,750 billion. For accounting treatment of decommissioning costs, see Item 5.A. "Operating Results—Critical Accounting Policies—Decommissioning Costs."

**Overseas Activities**

We are engaged in a number of overseas activities. We believe that such activities help us diversify our revenue streams by leveraging the operational experience of us and our subsidiaries gathered from providing a full range of services, such as power plant construction and specialized engineering and maintenance services in Korea, as well as establishing strategic relationships with countries that are or may become providers of fuels.

Throughout the years, we have sought to diversify the geographic focus of our operations from Asia to the rest of the world, including the resource-rich Middle East, Australia and Africa, as well as expand our project portfolio to include the construction and operation of conventional thermal generation units, nuclear generation units and renewable energy power plants and mining and development of fuel sources. While strategically important, we believe that our overseas activities, as currently being conducted, are not in the aggregate significant in terms of scope or amount compared to our domestic activities. In addition, a number of the overseas contracts currently being pursued are based on non-binding memoranda of understanding and the details of such projects may significantly change during the course of negotiating the definitive agreements.

Below is a description of our major overseas projects.

*Generation projects*

*Nuclear Generation Project*

In December 2009, following an international open bidding process, we entered into a prime contract with the Emirates Nuclear Energy Corporation (the "ENEC"), a state-owned nuclear energy provider of the United Arab Emirates ("UAE"), to design and construct four civil nuclear power generation units to be located in Barakah, a region approximately 270 kilometers from Abu Dhabi, for the UAE's peaceful nuclear energy program. Under the contract, we and our subcontractors, some of which are our subsidiaries, are to perform various duties including, among others, designing and constructing four nuclear power generation units each with a capacity of 1,400 megawatts, supplying nuclear fuel for three fuel cycles including initial loading, with each cycle currently projected to last for approximately 18 months, and providing technical support, training and education related to plant operation. The contract amount for the project is US$18.6 billion, with the term of the contract to last from December 27, 2009 to May 1, 2020. The original target completion dates for the four units are May 2017, May 2018, May 2019 and May 2020. ENEC and we are currently negotiating to adjust the target completion dates, taking into account the preparation for operation of Unit #1 and UAE's power supply and demand conditions.

On October 20, 2016, in order to foster a long-term strategic partnership and stable management of the units post-construction we entered into an investment agreement with ENEC to jointly establish Barakah One PJSC, a special purpose company which will oversee the operation and management of the nuclear power plant currently being constructed in Barakah, United Arab Emirates. Barakah One PJSC will be capitalized with loans in the amount of US$19.6 billion and equity of US$4.7 billion. We have a 18% equity interest in Barakah One PJSC, which will oversee the project. We also have a 18% equity interest in Nawah Energy, a subsidiary of ENEC, which will also be responsible for the operation and maintenance of the Barakah nuclear power plant.

*Non-nuclear Generation Projects*

We are currently engaged in three major power projects in the Philippines: (i) a "build, operate and transfer" of a 1,200-megawatt combined-cycle power plant project in Ilijan, construction of which began in November

68

1997 and was completed in June 2002 and which is being operated by us until 2022 (the project cost of the Ilijan project was US$721 million, for which project finance on a limited recourse basis was provided), (ii) ownership of a 39.6% equity interest in SPC Power Corporation, an independent power producer which owns a 107.8-megawatt diesel power plant and a 39.6% equity interest in two distribution companies in the Philippines, and (iii) a "build, operate and own" of a 200-megawatt CFBC coal power plant in Cebu for which construction began in February 2008 and was completed in May 2011, followed by operation thereof until 2036. The project cost of the Cebu project was US$451 million, for which project financing on a limited recourse basis was provided.

In April 2007, we formed a limited partnership with Shanxi International Electricity Group and Deutsche Bank in China to develop and operate power projects and coal mines in Shanxi province, China, which was approved by the Chinese government. The total capital investment in these projects amounted to US$1.33 billion, of which our capital investment was US$450 million. We are expected to participate in the operation of the project for a period of 50 years ending 2056. The total installed capacity of these projects is 6,532 megawatts and capacity under construction was 2,288 megawatts, and our equity interest in the partnership was 34%.

In October 2007, we invested US$9.1 million in KEPCO Energy Resource Nigeria Ltd. ("KERNL"), a joint venture with Energy Resource Ltd., a Nigerian company. We currently own 30.0% of KERNL's equity capital. In May 2007, KERNL entered into a share purchase agreement with the Nigerian government for the purchase of 70% of the equity capital of Egbin Power Plc in Nigeria, which owns and operates the Egbin power plant, a 1,320-megawatt gas-fired power plant in Lagos, Nigeria for a consideration of approximately US$407 million. The acquisition was completed in October 2013, and in June 2013, we entered into a contract with Egbin Power Plc for the operation and maintenance of the Egbin power plant. The contract price was US$315 million. In November 2013, we commenced operation and maintenance services for a term of five years, which will expire in October 2018.

In July 2008, a consortium consisting of us and Xenel of Saudi Arabia won the bid to "build, own and operate" a gas-fired power plant with installed capacity of 373 megawatts in Al Qatrana, near Amman, and we entered into definitive agreements in October 2009. Construction of this project was completed in December 2011, and the plant is currently in operation and will be operation until 2035. The total project cost was US$461 million, of which the consortium made an equity contribution of US$143 million and the remainder was funded with debt financing. We and Xenel own 80:20 equity interests in the project, respectively.

In December 2008, we formed a consortium with ACWA Power International of Saudi Arabia and submitted a bid for the 1,204 megawatt oil-fired power project in Rabigh, Saudi Arabia. In March 2009, we were selected as the preferred bidder, and in July 2009, we entered into a power purchase agreement with Saudi Electricity Company. Construction of the project was completed in April 2013, and we will participate in the operation of the plant for 20 years. This project has an estimated project cost of US$2.5 billion. We currently hold a 40.0% equity interest in the joint venture entity, Rabigh Electricity Company, which will oversee the project.

In August 2010, a consortium led by us was selected as the preferred bidder in an international auction for the construction and operation of the Norte II gas-fueled combined-cycle electricity generation facility in Chihuahua, Mexico, as ordered by the Commission Federal de Electricidad ("CFE") of Mexico. The consortium established a special purpose vehicle, KST Electric Power Company ("KST"), to act as the operating entity, and in September 2010, KST entered into a power purchase agreement with CFE in relation to the construction and operation of a 433-megawatt combined-cycle power plant at Chihuahua in Mexico. In October 2010, KST was licensed by the Mexican government as an independent power producer, which allows it to produce and sell electricity to CFE during the specified contract period. The project will be undertaken on a "build, own and operate" basis. The total cost of the project is approximately US$430 million. We hold a 56% equity interest in the consortium, with the remaining equity interests held by Samsung C&T (with a 34% equity interest) and Techint, a Mexico company (with a 10% equity interest). Approximately 22.5% of the total project costs is being

69

financed through equity investments by the consortium and the remaining 77.5% through project financing. Commercial operation commenced in December 2013, and the operation period will run for 25 years until 2038. Our wholly-owned subsidiary, KEPCO Energy Service Company, currently manages the operation of the project.

In October 2010, a consortium including us was selected by Abu Dhabi Water & Electricity Authority ("ADWEA"), a state-run utilities provider in the UAE, as the preferred bidder in an international bidding for the construction and operation of the combined-cycle natural gas-fired electricity generation facilities in Shuweihat, UAE with aggregate capacity of 1,600 megawatts. Construction was completed in July 2014 and we will participate in the operation of the plant until 2039. The total project cost is estimated to be US$1.5 billion, of which approximately 20% will be financed through equity investments by the consortium members and the remaining 80% through project financing. Equity interests in the consortium are owned by ADWEA (60.0%), Sumitomo (20.4%) and us (19.6%). The total amount of our equity investment in the project is approximately US$56 million.

In January 2012, a consortium consisting of us, Mitsubishi Corporation and Wartsila Development & Financial Services of Finland was selected by National Electric Power Corporation, a state-run electricity provider in Jordan, to construct and operate a diesel engine power project in Almanakher with an expected total generation capacity of 573 megawatts. Construction of this project was completed in October 2014 and the plant is currently in operation and will be operation until 2039. The total project cost was approximately US$760 million, of which the consortium made an equity contribution of approximately US$190 million and the remainder was funded with debt financing. We, Mitsubishi Corporation and Wartsila Development & Financial Services own 60:35:5 equity interests in the project, respectively. Our equity investment in this project is US$104 million.

In March 2013, a consortium consisting of us and Marubeni, a Japanese corporation, was selected by the Ministry of Industry and Trade of Vietnam for the construction and operation of a 1,200 megawatt coal-fired power plant in Thanh Hoa province, Vietnam. We will commence construction in December 2017 with target completion by December 2021, followed by operation for 25 years. The total project cost is expected to be US$2.34 billion, of which 25% will be funded by equity contribution and the remaining 75% by debt financing. The share capital of the special purpose entity in charge of this project is US$574 million, and we and Marubeni each hold 50% equity interest in such entity.

### *Exploration and Production Projects*

In order to secure a more reliable supply of fuel for power generation and hedge against fluctuations in fuel price, from 2007 to 2016 we pursued overseas exploration and production projects, including five bituminous coal projects and five uranium projects involving investments of approximately Won 1.6 trillion. However, pursuant to the Government's Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced in June 2016, as of December 31, 2016, except for the Bylong project described below, we transferred all our assets and liabilities for our overseas resource business to our six generation subsidiaries, which are the end-consumers of fuels and are therefore expected to more responsively manage these projects. The amount of net assets that we transferred to our generation subsidiaries as of December 31, 2016 was Won 622 billion.

Some of the assets transferred include our equity interest in PT Adaro Energy TBK, which is one of the largest coal producers in Indonesia as well as our 20% equity interest in PT. Bayan Resources Tbk pursuant to which we were entitled to an off-take of 7 million tons per year beginning in 2015.

One exception to the transfers on such date was our 90% equity interest in KEPCO Bylong Pty Ltd., for which we are currently processing a development permit from the New South Wales government and commercial production is scheduled to commence in 2019. We transferred 10% of our equity interest in the Bylong project to our five non-nuclear generation subsidiaries as of December 31, 2016, and we plan to gradually transfer the remainder of our interest in the Bylong project to them subject to the progress of the regulatory approval process and resource development phase of the project.

70

Our nuclear generation subsidiary, KHNP, is also pursuing development projects for procurements of uranium in countries including Canada, the United States and Niger.

*Renewable Energy Projects*

Our overseas renewable energy projects include the generation of electricity through renewable energy sources.

Since 2005, joint ventures between us and China Datang Corporation of the People's Republic of China have built and operated a number of wind farms in Inner Mongolia, Liaoning and Gansu provinces. We own 40% of these joint ventures, whose equity in the aggregate amount is approximately US$600 million. The projects are funded one-third by equity contributions and two-thirds by debt financing. As of December 31, 2016, the joint venture operated 22 wind farms with a total capacity of 1,017 megawatts.

In December 2015, we entered into an agreement with the Ministry of Energy and Mineral Resources of Jordan to build, own and operate a wind farm with installed capacity of 89.1 megawatts in Fujeij, Ma'an, Jordan. Construction is currently underway with commercial operations expected to commence in October 2018. Total project cost is approximately US$184 million, of which 40% will be financed through equity investments by us and the remaining 60% through debt financing. We believe that this project will help us to further diversify our business portfolio in the Middle East from the existing focus on nuclear and thermal power plants to expand to renewable energy facilities.

In June 2015, we entered into a memorandum of understanding with Energy Product, a Japanese local developer, to build, own and operate photovoltaic power station with a capacity of 28 megawatts, together with a 13.7 megawatts-hour energy storage system, in Chitose, Hokkaido prefecture in Japan. The parties subsequently signed the joint development agreement and other definitive agreements. The power station is due for substantial completion by July 2017. Total project cost is approximately JPY 11.3 billion, of which 20% was financed through 80:20 equity investments by us and EP. The remaining 80% is funded through debt financing.

Although renewable energy projects are currently insignificant as a proportion of our total overseas activities and our generation activities, we expect the portion of renewable energy projects to increase in the future as we seek to penetrate the overseas renewable energy market, diversify our businesses and actively address climate change. We expect to further diversify our business in the renewable energy sector to also include smart transmission and distribution facilities, smart grids and utilization of new energy related technologies.

## North Korea

*Kaesong Complex*

Since 2005, we have provided electricity to the industrial complex located in Kaesong, North Korea, which was established pursuant to an agreement made during the summit meeting of the two Koreas in June 2000. The Kaesong complex is the largest economic project between the two Koreas and is designed to combine the Republic's capital and entrepreneurial expertise with the availability of land and labor of North Korea. In March 2005, we built a 22.9 kilovolt distribution line from Munsan substation in Paju, Gyeonggi Province to the Kaesong complex and became the first to supply electricity to pilot zones such as ShinWon Ebenezer. In April 2006, we started to construct a 154 kilovolt, 16 kilometer transmission line connecting Munsan substation to the Kaesong complex as well as Pyunghwa substation in the complex and began operations in May 2007.

At the end of 2015, we supplied electricity to 254 units, including administrative agencies, support facilities and resident corporations, using a tariff structure identical to that of South Korea. However, we suspended power transmission to the Kaesong Industrial Complex since February 11, 2016 following the Government's decision to

71

halt operations of the industrial complex to impede North Korea's utilization of funds from the industrial complex to finance its nuclear and missile programs. No assurance can be given that we will not experience any material losses as a result of the suspension of this project or failure of the project as a result of a breakdown or escalation of hostilities in the relationship between the Republic and North Korea. See Item 3.D. "Risk Factors— Risks Relating to Korea and the Global Economy—Tensions with North Korea could have an adverse effect on us and the market value of our shares."

**Insurance**

We and our generation subsidiaries carry insurance covering against certain risks, including fire, in respect of key assets, including buildings, equipment, machinery, construction-in-progress and procurement in transit, as well as, in the case of us, directors' and officers' liability insurance. We and our generation subsidiaries maintain casualty and liability insurance against risks related to our business to the extent we consider appropriate. Other than KHNP, neither we nor our generation subsidiaries separately insure against terrorist attacks. These insurance and indemnity policies, however, cover only a portion of the assets that we own and operate and do not cover all types or amounts of loss that could arise in connection with the ownership and operation of these assets.

Substantial liability may result from the operations of our nuclear generation units, the use and handling of nuclear fuel and possible radioactive emissions associated with such nuclear fuel. KHNP maintains property and liability insurance against risks of its business to the extent required by the related law and regulations or considered as appropriate and otherwise self-insures against such risks. KHNP carries insurance for its generation units against certain risks, including property damage, nuclear fuel transportation and liability insurance for personal injury and property damage. KHNP carries property damage insurance covering up to US$1 billion per accident for all properties within its plant complexes, which includes property insurance coverage for acts of terrorism up to US$300 million and for breakdown of machinery up to US$300 million. In addition to the insurance on operating nuclear power generation units, KHNP has construction insurance for Shin-Kori #4, #5 and #6 and Shin-Hanul #1 and #2. KHNP maintains nuclear liability insurance for personal injury and third-party property damage for coverage of up to 300 million Special Drawing Rights, or SDRs, which amounts to approximately US$418 million, at the rate of 1 SDR = US$1.393380 as posted on the Internet homepage of the International Monetary Fund on July 29, 2016 per plant complex, for a total coverage of 1.5 billion SDRs. KHNP is also the beneficiary of a Government indemnity with respect to such risks for damage claims of up to Won 300 million SDRs per nuclear plant complex, for a total coverage of 1.5 billion SDRs. Under the Nuclear Damage Compensation Act of 1969, as amended, KHNP is liable only up to 300 million SDRs, per single accident per plant complex; provided that such limitation will not apply where KHNP intentionally causes harm or knowingly fails to prevent the harm from occurring. KHNP will receive the Government's support, subject to the approval of the National Assembly, if (i) the damages exceed the insurance coverage amount of 300 million SDRs and (ii) the Government deems such support to be necessary for the purposes of protecting damaged persons and supporting the development of nuclear energy business. KHNP carries insurance for its generation units and nuclear fuel transportation, and we believe that the level of insurance is generally adequate and is in compliance with relevant laws and regulations. In addition, KHNP is the beneficiary of Government indemnity which covers a portion of liability in excess of the insurance. However, such insurance is limited in terms of amount and scope of coverage and does not cover all types or amounts of losses which could arise in connection with the ownership and operation of nuclear plants. Accordingly, material adverse financial consequences could result from a serious accident or a natural disaster to the extent it is neither insured nor covered by the government indemnity. See Item 3.D. "Risk Factors—Risks Relating to KEPCO— The amount and scope of coverage of our insurance are limited."

**Competition**

As of December 31, 2016, we and our generation subsidiaries owned approximately 74.7% of the total electricity generation capacity in Korea (excluding plants generating electricity for private or emergency use). New entrants to the electricity business will erode our market share and create significant competition, which could have a material adverse impact on our financial condition and results of operations.

72

In particular, we compete with independent power producers with respect to electricity generation. The independent power producers accounted for 19.3% of total power generation in 2016 and 25.3% of total generation capacity as of December 31, 2016. As of December 31, 2016, there were 17 independent power producers in Korea, excluding renewable energy producers. Private enterprises became permitted to own and operate coal-fired power plants in Korea only after the Ministry of Trade, Industry and Energy approved plans for independent power producers to construct coal-fired power plants under the Sixth Basic Plan announced in February 2013. Under the Seventh Basic Plan announced in July 2015 as subsequently amended, eight coal-fired units with aggregate generation capacity of 7,420 megawatts are scheduled to be completed between 2017 and 2022, currently with no further plans for construction of coal-fired power plants by independent power producers beyond 2022. While it remains to be seen whether construction of these generation units will be completed as scheduled, if these units were to be completed as scheduled and/or independent power producers are permitted to build additional generation capacity (whether coal-fired or not), our market share in Korea may decrease, which may have a material adverse effect on our results of operations and financial condition.

In addition, under the Community Energy System adopted by the Government in 2004, a minimal amount of electricity is supplied directly to consumers on a localized basis by independent power producers outside the cost-based pool system used by our generation subsidiaries and most independent power producers to distribute electricity nationwide. The purpose of this system is to geographically decentralize electricity supply and thereby reduce transmission losses and improve the efficiency of energy use. These entities do not supply electricity on a national level but are licensed to supply electricity on a limited basis to their respective districts under the Community Energy System. As of March 31, 2017, the aggregate generation capacity of suppliers participating in the Community Energy System amounted to less than 1% of that of our generation subsidiaries in the aggregate. We currently do not expect the Community Energy System to be widely adopted, especially in light of the significant level of capital expenditure required for such direct supply. However, if the Community Energy System is widely adopted, it may erode our currently dominant market position in the generation and distribution of electricity in Korea and may have a material adverse effect on our business, results of operations and financial condition.

Our market dominance in the electricity distribution in Korea also may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows.

The electric power industry, which began its liberalization process with the establishment of our power generation subsidiaries in April 2001, may become further liberalized in accordance with the Restructuring Plan. See Item 4.B. "Business Overview—Restructuring of the Electric Power Industry in Korea."

In the residential sector, consumers may use natural gas, oil and coal for space and water heating and cooking. However, currently there is no practical substitute for electricity for lighting and other household appliances, which is available on commercially affordable terms.

In the commercial sector, electricity is the dominant energy source for lighting, office equipment and air conditioning. For its other uses, such as space and water heating, natural gas and, to a lesser extent, oil, provide competitive alternatives to electricity.

In the industrial sector, electricity is the dominant energy source for a number of industrial applications, including lighting and power for many types of industrial machinery and processes that are available on commercially affordable terms. For other uses, such as heating, electricity competes with oil and natural gas and potentially with gas-fired combined heating and power plants.

73

**Regulation**

We are a statutory juridical corporation established under the KEPCO Act for the purpose of ensuring a stable supply of electric power and further contributing toward the sound development of the national economy through facilitating development of electric power resources and carrying out proper and effective operation of the electricity business. The KEPCO Act (including the amendment thereto) prescribes that we engage in the following activities:

1. development of electric power resources;

2. generation, transmission, transformation and distribution of electricity and other related business activities;

3. research and development of technology related to the businesses mentioned in items 1 and 2;

4. overseas businesses related to the businesses mentioned in items 1 through 3;

5. investments or contributions related to the businesses mentioned in items 1 through 4;

6. businesses incidental to items 1 through 5;

7. Development and operation of certain real estate held by us to the extent that:

   a. it is necessary to develop certain real estate held by us due to external factors, such as relocation, consolidation, conversion to indoor or underground facilities or deterioration of our substation or office; or

   b. it is necessary to develop certain real estate held by us to accommodate development of relevant real estate due to such real estate being incorporated into or being adjacent to an area under planned urban development; and

8. other activities entrusted by the Government.

The KEPCO Act currently requires that our profits be applied in the following order of priority:

- first, to make up any accumulated deficit;

- second, to set aside 20.0% or more of profits as a legal reserve until the accumulated reserve reaches one-half of our capital;

- third, to pay dividends to shareholders;

- fourth, to set aside a reserve for expansion of our business;

- fifth, to set aside a voluntary reserve for the equalization of dividends; and

- sixth, to carry forward surplus profit.

As of December 31, 2016, the legal reserve was Won 1,605 billion and the voluntary reserve was Won 31,847 billion, which consisted of reserve for business expansion of Won 26,030 billion, reserve for investment in social overhead capital of Won 5,277 billion, reserve for research and human development of Won 330 billion and reserve for equalizing dividends of Won 210 billion.

We are under the supervision of the Ministry of Trade, Industry and Energy, which has principal supervisory responsibility (in consultation with other Government agencies, such as the Ministry of Strategy and Finance, as applicable) over us with respect to the appointments of our directors and our other senior management as well as approval of electricity tariff rate adjustments, among others.

Because the Government owns part of our capital stock, the Government's Board of Audit and Inspection may audit our books.

74

The Electricity Business Act requires that licenses be obtained in relation to generation, transmission, distribution and sales of electricity, with limited exceptions. We hold the license to generate, transmit, distribute and sell electricity. Each of our six generation subsidiaries holds an electricity generation license. The Electricity Business Act governs the formulation and approval of electricity rates in Korea. See "—Sales and Customers—Electricity Rates" above.

Our operations are subject to various laws and regulations relating to environmental protection and safety.

**Debt Reduction Program and Related Activities**

In 2014, in light of the general policy guideline of the Government for public institutions (including us and our generation subsidiaries) to reduce their respective overall debt levels, we and our generation subsidiaries have, in consultation with the Ministry of Trade, Industry and Energy and as approved by the Public Agencies Operating Committee in June 2014, set target debt-to-equity levels to be met by the end of 2017 and undertaken various programs to reduce debt and improve the overall financial health, including through rationalizing and applying stricter review to (from a profitability and efficiency perspective) various aspects of our operations (both domestic and overseas), inviting private sector investments, disposing of non-core assets (such as non-core or loss-generating overseas operations and real property unrelated to operations), reducing costs, exploring alternative ways to generate additional revenue and developing contingency plans for further cost savings.

The following table summarizes the debt-to-equity ratio targets to be met by the end of 2017 and some of the actions that we and our generation subsidiaries have undertaken or plan to undertake as part of such debt reduction program.

| Entity | Target Debt-to-Equity Level[1] | Actual Debt-to-Equity Level[1] | Other Related Activities |
|---|---|---|---|
| KEPCO | 92% by 2017 | 99.9% as of December 31, 2015; 89.9% as of December 31, 2016 | - Proposed sale of shares in KPS<br>- Sale of its overseas resource development assets to its generation subsidiaries |
| KHNP | 110% by 2017 | 117% as of December 31, 2015; 108% as of December 31, 2016 | - Stricter review of new business projects<br>- Rationalization of the procurement process and other budget reduction efforts |
| EWP | 107% by 2017 | 121% as of December 31, 2015; 101% as of December 31, 2016 | - Proposed sale of shares in GS Donghae Electric Power Co., Ltd. and six other domestic and overseas companies |
| KOMIPO | 170% by 2017 | 149% as of December 31, 2015; 152% as of December 31, 2016 | - Construction project coordination<br>- Cost savings and other efficiency improvement efforts |
| KOSEP | 129% by 2017 | 111% as of December 31, 2015;101% as of December 31, 2016 | - Cost savings and budget reduction efforts<br>- Discovering new business profit models |
| KOSPO | 143% by 2017 | 150% as of December 31, 2015; 139% as of December 31, 2016 | - Proposed sale of real properties that yield no revenues |
| KOWEPO | 153% by 2017 | 164% as of December 31, 2015; 150% as of December 31, 2016 | - Proposed sale of equity interests in Dongducheon Dream Power<br>- Obtaining private sector investment in Pyeongtaek combined cycle #3<br>- Accelerated construction of generation units |

————————

*Note:*

(1) Computed on a separate basis for KEPCO, EWP, and KOSPO.

75

Despite our best efforts, however, for reasons beyond our control, including macroeconomic environments, government regulations and market forces (such as international market prices for our fuels), we cannot assure whether we or our generation subsidiaries will be able to successfully reduce debt burdens or otherwise improve our financial health to a level contemplated by the Government or to a level that would be optimal for our capital structure. If we or our generation subsidiaries fail to do so or the measures taken by us or our generation subsidiaries to reduce debt levels or improve financial health have unintended adverse consequences, such developments may have an adverse effect on our business, results of operations and financial condition.

**Proposed Sale of Certain Power Plants and Equity Interests**

The following table summarizes our current plans for sale of certain of our assets. These sales will be made pursuant to the Government's plans to reduce debt levels and improve management efficiency of public enterprises. The consummation of these plans, however, is subject to, among others, related Government policies and market conditions.

| Equity Holdings | Primary Business | Fair Value[1] as of December 31, 2016 | Ownership Percentage as of December 31, 2016 | Ownership Percentage to be Sold |
|---|---|---|---|---|
| | | (in billions of Won) | | |
| KEPCO Plant Service & Engineering Co., Ltd . . . . . . . . . | Utility plant maintenance | 1,244 | 51.0% | — |
| KEPCO Engineering & Construction Co., Inc. . . . . . . . . | Architectural engineering for utility plants | 595 | 65.77% | 14.77% |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . | Electricity metering | 45 | 29.00% | 29.00% |

Note:

(1) Fair value has been computed as the product of the closing share price on December 31, 2016 multiplied by the number of outstanding shares.

*KEPCO Plant Service & Engineering Co., Ltd.*

In December 2007, we completed the initial public offering of KEPCO KPS, formerly our wholly-owned subsidiary, by listing approximately 20.0% of its equity interest on the Korea Stock Exchange. Pursuant to the Public Institution Reform Plan, we sold through block sales to third party investors an aggregate of 29% shares in KEPCO KPS on various occasions during the period from December 2012 to November 2016. Following such sale, we hold a 51.0% equity interest in KEPCO KPS. We currently do not have plans to further reduce our equity interest in KEPCO KPS.

*KEPCO Engineering & Construction Co., Inc.*

Pursuant to the Third Phase of the Public Institution Reform Plan announced by the Government in August 2008, we conducted the initial public offering of Korea Engineering and Construction Co., Inc., or KEPCO E&C formerly known as Korea Power Engineering Co., Ltd., in December 2009 for gross proceeds to us of Won 165 billion, following which we owned 77.9% of KEPCO E&C's shares. In furtherance of the Public Institution Reform Plan and to improve our financial profile, we sold our equity interests representing 3.1%, 4.0%, 4.5% and 0.54% of KEPCO E&C shares in November 2011, December 2013, December 2014 and December 2016, respectively, in each case to third party investors. We currently hold a 65.77% equity interest in KEPCO E&C.

*Korea Electric Power Industrial Development Co., Ltd.*

In 2003, we privatized Korea Electric Power Industrial Development, or KEPID, formerly our wholly-owned subsidiary, by selling 51.0% of its equity interest to Korea Freedom Federation. Pursuant to the Fifth

Phase of the Public Institution Reform Plan announced by the Government in 2009, we sold 20% of the KEPID shares through additional listing. We currently plan to sell the remaining 29.0% of KEPID's equity interest based on, among others, considerations of economic and market conditions.

## Item 4.C. Organizational Structure

As of December 31, 2016, we had 87 subsidiaries, 57 associates and 41 joint ventures (not including any special purpose entities).

## Subsidiaries

Our wholly-owned six generation subsidiaries are KHNP, KOSEP, KOMIPO, KOWEPO, KOSPO and EWP. Our non-generation subsidiaries include KEPCO E&C, KEPCO KPS, KEPCO NF, and KEPCO KDN. For a full list of our subsidiaries, including foreign subsidiaries, and their respective jurisdiction of incorporation, please see Exhibit 8.1 attached to this annual report.

## Associates and Joint Ventures

An associate is an entity over which we have significant influence and that is neither a subsidiary nor a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the investee but does not have control or joint control over those policies. A joint venture is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint ventures) have rights to the net assets of the arrangement.

The table below sets forth each of our associates and joint ventures as of December 31, 2016 by name, the percentage of our shareholdings and their principal activities.

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| **Associates:** | | |
| Korea Gas Corporation[1] . . . . . . . . . . . . . . . . . . . . . | 20 | Importing and wholesaling LNG |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | Electricity metering |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | Broadcasting |
| Cheongna Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 44 | Generating and distributing vapor and hot/cold water |
| Gangwon Wind Power Co., Ltd.[2] . . . . . . . . . . . . . | 15 | Power generation |
| Hyundai Green Power Co., Ltd. . . . . . . . . . . . . . . . . | 29 | Power generation |
| AMEC Partners Korea Ltd.[3] . . . . . . . . . . . . . . . . . | 19 | Resources development |
| KNOC Nigerian East Oil Co., Ltd.[4] . . . . . . . . . . . . | 15 | Resources development |
| KNOC Nigerian West Oil Co., Ltd. [4] . . . . . . . . . . . | 15 | Resources development |
| Korea Power Exchange[6] . . . . . . . . . . . . . . . . . . . . . | 100 | Management of power market |
| Pioneer Gas Power Limited[8] . . . . . . . . . . . . . . . . . . | 40 | Power generation |
| Hyundai Energy Co., Ltd.[9] . . . . . . . . . . . . . . . . . . . | 31 | Power generation |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | Artificial light-weight aggregate |
| Taebaek Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . | 25 | Power generation |
| Taeback Guinemi Wind Power Co., Ltd. (formerly, Muju Wind Power Co., Ltd.) . . . . . . . . . . . . . . . . | 25 | Power generation |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . . . . . . . . | 25 | Power generation |
| Daeryun Power Co., Ltd.[3][10] . . . . . . . . . . . . . . . . . | 13 | Power generation |
| Changjuk Wind Power Co., Ltd. . . . . . . . . . . . . . . . . | 30 | Power generation |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 27 | Power generation |

77

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| SPC Power Corporation | 38 | Power generation |
| Gemeng International Energy Co., Ltd. | 34 | Power generation |
| PT. Cirebon Electric Power | 28 | Power generation |
| PT Wampu Electric Power | 46 | Power generation |
| PT. Bayan Resources TBK | 20 | Resources development |
| S-Power Co., Ltd. | 49 | Power generation |
| Eurasia Energy Holdings | 40 | Power generation and resources development |
| Xe-Pian Xe-Namnoy Power Co., Ltd. | 25 | Power generation |
| Samcheok Eco Materials Co., Ltd.(3) (11) | 2 | Recycling fly ashes |
| Green Biomass Co., Ltd.(12) | 14 | Power generation |
| Korea Electric Power Corporation Fund(13) | 98 | Developing electric enterprises |
| Nepal Water & Energy Development Company Private Limited(14) | 53 | Construction and operation of utility plant |
| Hadong Mineral Fiber Co., Ltd.(17) | 8 | Recycling fly ashes |
| PT. Mutiara Jawa | 29 | Manufacturing and operating floating coal terminal |
| Noeul Green Energy Co., Ltd. | 29 | Power generation |
| Naepo Green Energy Co., Ltd. | 25 | Power generation |
| Goseong Green Energy Co., Ltd.(2) | 1 | Power generation |
| Gangneung Eco Power Co., Ltd.(2) | 2 | Power generation |
| Shin Pyeongtaek Power Co., Ltd. | 40 | Power generation |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. | 28 | Power generation |
| DS POWER Co., Ltd.(2) | 14 | Power generation |
| Dongducheon Dream Power Co., Ltd. | 34 | Power generation |
| KS Solar Co., Ltd.(3) | 19 | Power generation |
| Yeongwol Energy Station Co., Ltd.(2) | 10 | Power generation |
| Jinbhuvish Power Generation Pvt. Ltd.(2) | 5 | Power generation |
| SE Green Energy Co., Ltd. | 48 | Power generation support |
| Daegu Photovoltaic Co., Ltd. | 29 | Power generation |
| Jeongam Wind Power Co., Ltd. | 40 | Power generation |
| Korea Power Engineering Service Co., Ltd. | 29 | Construction and service |
| Busan Green Energy Co., Ltd. | 29 | Power generation |
| Jungbu Bio Energy Co., Ltd.(2) | 19 | Power generation |
| Korea Electric Vehicle Charging Service | 28 | Electric vehicle charge service |
| Ulleungdo Natural Energy Co., Ltd. | 30 | Renewable power generation |
| Korea Nuclear Partners Co., Ltd. | 29 | Electric material agency |
| Tamra Offshore Wind Power Co., Ltd. | 27 | Power generation |
| Energy Infra Asset Management Co., Ltd.(3) | 10 | Asset management |
| Daegu clean Energy Co., Ltd. | 28 | Renewable power generation |
| YaksuESS Co., Ltd | 29 | Installing ESS related equipment |

**Joint Ventures:**

| | | |
|---|---|---|
| Canada Korea Uranium Limited Partnership(5) | 13 | Resources development |
| KEPCO-Uhde Inc.(7) | 53 | Power generation |
| Eco Biomass Energy Sdn. Bhd.(7) | 62 | Power generation |
| Datang Chaoyang Renewable Power Co., Ltd. | 40 | Power generation |
| Shuweihat Asia Power Investment B.V. | 49 | Holding company |
| Shuweihat Asia Operation & Maintenance Company(7) | 55 | Maintenance of utility plant |
| Waterbury Lake Uranium L.P. | 37 | Resources development |

78

| | Ownership (Percent) | Principal Activities |
|---|---|---|
| ASM-BG Investicii AD . . . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| RES Technology AD . . . . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| KV Holdings, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | Power generation |
| KEPCO SPC Power Corporation[7] . . . . . . . . . . . . . . | 75 | Construction and operation of utility plant |
| Gansu Datang Yumen Wind Power Co., Ltd. . . . . . . . | 40 | Power generation |
| Datang Chifeng Renewable Power Co., Ltd. . . . . . . . | 40 | Power generation |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | Power generation |
| Rabigh Electricity Company . . . . . . . . . . . . . . . . . . . | 40 | Power generation |
| Rabigh Operation & Maintenance Company . . . . . . . | 40 | Maintenance of utility plant |
| Jamaica Public Service Company Limited . . . . . . . . . | 40 | Power generation |
| KW Nuclear Components Co., Ltd. . . . . . . . . . . . . . . | 45 | Manufacturing |
| Busan Shinho Solar Power Co., Ltd. . . . . . . . . . . . . | 25 | Power generation |
| GS Donghae Electric Power Co., Ltd. . . . . . . . . . . . | 34 | Power generation |
| Global Trade Of Power System Co., Ltd. . . . . . . . . . . | 29 | Exporting products and technology of small or medium business by proxy |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | Power generation |
| KODE NOVUS I LLC . . . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| KODE NOVUS II LLC . . . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| Daejung Offshore Wind Power Co., Ltd. . . . . . . . . . . | 50 | Power generation |
| Amman Asia Electric Power Company[7] . . . . . . . . . | 60 | Power generation |
| KAPES, Inc. (formerly, KEPCO-ALSTOM Power Electronics Systems, Inc.)[7] . . . . . . . . . . . . . . . . . . . | 51 | R&D |
| Dangjin Eco Power Co., Ltd. . . . . . . . . . . . . . . . . . . | 34 | Power generation |
| Honam Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . | 29 | Power generation |
| Chun-cheon Energy Co., Ltd. . . . . . . . . . . . . . . . . . . | 30 | Power generation |
| Yeonggwangbaeksu Wind Power Co., Ltd.[3] . . . . . . | 15 | Power generation |
| Nghi Son 2 Power Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| Kelar S.A[7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 65 | Power generation |
| PT. Tanjung Power Indonesia . . . . . . . . . . . . . . . . . . | 35 | Power generation |
| Incheon New Power Co., Ltd. . . . . . . . . . . . . . . . . . . | 29 | Power generation |
| Seokmun Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 29 | Power generation |
| Daehan Wind Power PSC . . . . . . . . . . . . . . . . . . . . . | 50 | Power generation |
| Daegu Green Power Co., Ltd.[15] . . . . . . . . . . . . . . . | 29 | Power generation |
| Barakah One Company[16] . . . . . . . . . . . . . . . . . . . | 18 | Power generation |
| Nawah Energy Company[16] . . . . . . . . . . . . . . . . . . | 18 | Operation of utility plant |
| Momentum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33 | International thermonuclear experimental reactor construction management |

_____

*Notes:*

(1) The effective percentage of ownership (excluding the treasury stocks) is 21.57%.

(2) We can exercise significant influence by virtue of our contractual right to appoint directors to the board of directors of this entity, and by strict decision criteria of our financial and operating policy of the board of directors.

(3) We can exercise significant influence by virtue of our contractual right to appoint a director to the board of directors of this entity.

(4) We can exercise significant influence by virtue of our contractual right to appoint one out of four members of the steering committee of this entity. Moreover, we have significant financial transactions with this entity to the effect that we can exercise significant influence on this entity.

(5) We have joint control on the associates by virtue of our contractual right to appoint directors to the board of directors of this entity, and by strict decision criteria of our financial and operating policy of the board of directors.

79

(6) The Government regulates our ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between the Korea Power Exchange and our other subsidiaries. We can exercise significant influence by our right to nominate directors to the board of directors of this entity.

(7) According to the shareholder agreement, all critical financial and operating decisions must be agreed to by all ownership parties. For these reasons, these entities are classified as joint ventures.

(8) The reporting period of all associates and joint ventures ends in December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.

(9) As of December 31, 2016, 15.64% of ownership of Hyundai Energy Co., Ltd. was held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only do we have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank upon a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to us. In connection with this agreement, we applied the equity method on our 46.30% equity investment in Hyundai Energy Co., Ltd.

(10) Following the merger of Daeryun Energy Co., Ltd. into Daeryun Power Co., Ltd., its parent, our effective percentage of ownership decreased to 19.45% after accounting for stock purchase options.

(11) Our effective percentage of ownership (excluding the redeemable convertible preferred shares) is 25.54%.

(12) Our effective percentage of ownership is less than 20%, but we can exercise significant influence by virtue of our contractual right to appoint a director to the board of directors of this entity and the fact that a dominant portion of the investee's sales transactions is generated from us.

(13) Our effective percentage of ownership is more than 50% but we do not hold control over relevant business while we exercise significant influence by participating in the Investment Decision Committee. For this reason, this entity is classified as an associate.

(14) Our effective percentage of ownership is more than 50%, but we do not control this entity according to the shareholders' agreement. For this reason, this entity is classified as an associate.

(15) This entity is reclassified from associates to joint ventures since the terms of the shareholders' agreement had been amended.

(16) Our effective percentage of ownership is less than 20%, but we have joint control over this entity as decisions on the major activities require the unanimous consent of the parties that collectively control the entity.

(17) Although our percentage of ownership temporarily decreased to 8.33% from the difference in timing of capital payment by shareholders, we can exercise significant influence by virtue of our right to appoint a director to the board of directors of this entity based on the shareholders' agreement. Our percentage of ownership is 25.00% at the time of completion of capital payment.


**Item 4.D. Property, Plant and Equipment**

Our property consists mainly of power generation, transmission and distribution equipment and facilities in Korea. See Item 4.B. "Business Overview—Power Generation," "—Transmission and Distribution" and "—Capital Investment Program." In addition, we own our corporate headquarters building complex at 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea. As of December 31, 2016, the net book value of our property, plant and equipment was Won 145,743 billion. As of December 31, 2016, investment property, which is accounted for separately from our property, plant and equipment, amounted to Won 354 billion. No significant amount of our properties is leased. There are no material encumbrances on our properties, including power generation, transmission and distribution equipment and facilities.

Pursuant to a Government plan announced in 2005, which mandated relocation of the headquarters of select government-invested enterprises from the Seoul metropolitan area to other provinces in Korea as part of an initiative to foster balanced economic growth in the provinces, we, our generation subsidiaries and our certain subsidiaries relocated our respective headquarters to the designated locations during 2014 and 2015. Our headquarters are currently located in Naju in Jeollanam-do Province while the headquarters of our six generation subsidiaries and other subsidiaries are various cities outside of Seoul across Korea.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

In connection with the relocation of our headquarters, in September 2014 we entered into an agreement to sell the property housing our prior headquarters to a consortium consisting of members of the Hyundai Motor group for Won 10,550 billion through an open bidding. The sale was completed in September 2015.

During 2016, we completed the sales of 117 properties (including residential properties, storage spaces, and substation lots that are located in Korea) which are not directly related to our operations for an aggregate sale price of approximately Won 36 billion. The book value of such properties amounted to Won 18 billion, representing 0.2% of our total assets as of December 31, 2016. The foregoing sales reflect our ongoing efforts to improve our financial soundness through debt reduction and enhance our management efficiency, selling noncore properties that have no direct relations to electricity facilities.

## ITEM 4A. UNRESOLVED STAFF COMMENTS

We do not have any unresolved comments from the SEC staff regarding our periodic reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

## ITEM 5.  OPERATING AND FINANCIAL REVIEW AND PROSPECTS

*You should read the following discussion on our operating and financial review and prospects together with our consolidated financial statements and the related notes which appear elsewhere in this annual report. Our results of operations, financial condition and cash flows may materially change from time to time, for reasons including various policy initiatives (including changes to the Restructuring Plan) by the Government in relation to the Korean electric power industry, and accordingly our historical performance may not be indicative of our future performance. See Item 4.B. "Business Overview—Restructuring of the Electric Power Industry in Korea" and Item 3D. "Risk Factors—The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."*

### Item 5.A. Operating Results

### Overview

We are a predominant market participant in the Korean electric power industry, and our business is heavily regulated by the Government, including with respect to the rates we charge to customers for the electricity we sell. In addition, our business requires a high level of capital expenditures for the construction of electricity generation, transmission and distribution facilities and is subject to a number of variable factors, including demand for electricity in Korea and fluctuations in fuel costs, which are in turn impacted by the movements in the exchange rates between the Won and other currencies.

Under the Electricity Business Act and the Price Stabilization Act, the Government generally establishes electricity rates at levels that are expected to permit us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations in addition to receiving a fair investment return on capital used in those operations. For a detailed description of the fair investment return, see Item 4.B. "Business Overview—Sales and Customers—Electricity Rates." From 2014 to 2015, largely due to the general decline of fuel prices, relatively stable exchange rates,, the sale of the properties in our previous headquarters and the greater use of coal relative to LNG (the former being a cheaper source of fuel) as a proportion of the fuels used to produce electricity, our gross profit, operating profit and net profit increased significantly.

If fuel prices were to rise substantially and rapidly in the future, such rise may have a material adverse effect on our results of operations and profitability. In part to address these concerns, the Government from time to time increases the electricity tariff rates. However, such increases may be insufficient to fully offset the adverse impact from the rise in fuel costs, and since such increases typically require lengthy public deliberations in order

to be implemented, the tariff increases often occur with a significant time lag and as a result our results of operations and cash flows may suffer. On the other hand, if fuel prices decrease, substantial political pressure may lead the Government to lower the level of electricity tariff in a relatively shorter period of time due to the lack of public opposition, which could negatively affect our profit margins and in turn our financial condition and results of operations.

The results of our operations are largely affected by the following factors:

- demand for electricity;
- electricity rates we charge to our customers;
- fuel costs; and
- the exchange rates of Won against other foreign currencies, in particular the U.S. dollar.

### Demand for Electricity

Our sales are largely dependent on the level of demand for electricity in Korea and the rates we charge for the electricity we sell.

Demand for electricity in Korea grew at a compounded average rate of 1.6% per annum for the five years ended December 31, 2016. According to the Bank of Korea, the compounded growth rate for GDP was approximately 3.0% for the same period. The GDP growth rate was approximately 3.3%, 2.8% and 2.8% during 2014, 2015 and 2016, respectively.

The table below sets forth, for the periods indicated, the annual rate of growth in Korea's GDP and the annual rate of growth in electricity demand (measured by total annual electricity consumption) on a year-on-year basis.

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Growth in GDP | 2.3% | 2.9% | 3.3% | 2.8% | 2.8% |
| Growth in electricity consumption | 2.5% | 1.8% | 0.6% | 1.3% | 2.8% |

Demand for electricity may be categorized either by the type of its usage or by the type of customers. The following describes the demand for electricity by the type of its usage, namely, industrial, commercial and residential:

- The industrial sector represents the largest segment of electricity consumption in Korea. Demand for electricity from the industrial sector was 278,828 gigawatt hours in 2016, representing a 1.9% increase from 2015, largely due to the turnaround in industries such as semiconductors, chemicals and petrochemicals that are heavy users of electricity.

- Demand for electricity from the commercial sector depends largely on the level and scope of commercial activities in Korea, which in recent years have resulted in increased office building construction, office automation and use of air conditioners. Demand for electricity from the commercial sector increased to 108,617 gigawatt hours in 2016, representing a 4.8% increase from 2015 largely due to a rebound in the domestic economy and increased air conditioning use in commercial buildings during the summer.

- Demand for electricity from the residential sector is largely dependent on population growth and use of heaters, air conditioners and other electronic appliances. In 2016, we distributed electricity to approximately 22 million households, which represent substantially all of the households in Korea. Demand for electricity from the residential sector increased to 68,057 gigawatt hours in 2016, representing a 3.7% increase compared to 2015, largely due to the opening of new urban clusters with large-scale residential complexes as well as increased air conditioning use in residential buildings during the summer.

82

For a discussion on demand by the type of customers, see Item 4.B.. "Business Overview—Sales and Customers—Demand by the Type of Usage."

Since our inception, we have had the predominant market share in terms of electricity generated in Korea. As for electricity we purchase from the market for transmission and distribution to our end-users, our generation subsidiaries accounted for 86.2%, 83.3% and 81.5% in 2014, 2015 and 2016, respectively, while the remainder was accounted for by independent power producers. As for transmission and distribution of electricity, we have historically handled, expect to continue to handle, substantially all of such activities in Korea.

We expect that we will continue to have a dominant market share in the generation, transmission and distribution of electricity in Korea for the foreseeable future, absent any substantial changes to the Restructuring Plan or other policy initiatives by the Government in relation to the Korean electric power industry, or an unexpected level of market penetration by independent power producers or localized electricity suppliers under the Community Energy System. However, our market dominance in the electricity distribution in Korea may face potential erosion in light of the recent Proposal for Adjustment of Functions of Public Institutions (Energy Sector) announced by the Government in June 2016. This proposal contemplates a gradual opening of the electricity trading market to the private sector although no detailed roadmap has been provided for such opening. It is currently premature to predict to what extent, or in what direction, the liberalization of the electricity trading market will happen. Nonetheless, any significant liberalization of the electricity trading market may result in substantial reduction of our market share in electricity distribution in Korea, which would have a material adverse effect on our business, results of operation and cash flows. See Item 4.B. "Business Overview—Competition."

*Electricity Rates*

Under the Electricity Business Act and the Price Stabilization Act, electricity rates are established at levels that will permit us to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations in addition to receiving a fair investment return on capital used in those operations. For further discussion of fair investment return, see Item 4.B. "Business Overview—Sales and Customers—Electricity Rates."

From time to time, our actual rate of return on invested capital may differ significantly from the fair rate of return on invested capital assumed for the purposes of electricity tariff approvals, for reasons, among others, related to movements in fuel prices, exchange rates and demand for electricity that differs from what is assumed for determining our fair rate of return. For example, between 1987 and 1990, the actual rate of return was above the fair rate of return due to declining fuel costs and rising demand for electricity. In contrast, depreciation of the Won against the U.S. dollar accounted for our actual rates of return being lower than the fair rate of return for the period from 1996 to 2000. Partly in response to the variance between our actual rates of return and the fair rate of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for the tariff increase as such increase requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use through sector-specific tariff increases. For the period between 2006 and 2013, our actual rates of return were lower than the fair rate of return largely due to a general increase in fuel costs and additional facility investment costs incurred, the effects of which were not offset by timely increases in our tariff rates. Since 2014, however, largely due to the decrease in fuel costs reflective of the drop in oil prices, our actual rate of return has surpassed the fair rate of return; however, substantially all of the resulting excess has been used to fund capital expenditure and repair and maintenance, as well as to offer tariff discounts to economically or otherwise disadvantaged households, and investments in renewable energy and other environmental programs.

Partly in response to the variance between our actual rates of return and the fair rates of return, the Government from time to time increases the electricity tariff rates, but there typically is a significant time lag for

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

the tariff increases as such increases requires a series of deliberative processes and administrative procedures and the Government also has to consider other policy considerations, such as the inflationary effect of overall tariff increases and the efficiency of energy use from sector-specific tariff increases.

In the past, the Government effected tariff increases that typically covered all sectors, namely, residential, commercial and industrial. No cross-sector tariff increase has been implemented since November 2013, largely due to the downward trend in fuel costs. However, effective January 1, 2017, the Government made several adjustments to the existing rate structure in order to ease the burden of electricity tariff on residential consumers as well as promote the use of renewable energy. First, the progressive rate structure applicable to the residential sector, which applies a gradient of increasing tariff rates for heavier electricity usage, was changed from a six-tiered structure with the highest rate being no more than 11.7 times the lowest rate (which gradient system has been in place since 2005) into a three-tiered structure with the highest rate being no more than three times the lowest rate in order to reflect the changes in the pattern of electricity consumption and reduce the electricity charges payable by consumers. Second, the new tariff structure encourages energy saving by offering rate discounts to residential consumers that voluntarily reduce electricity consumption while charging special high rates to residential consumers with heavy electricity consumption during peak usage periods during the summer and the winter. Third, a temporary rate discount will apply during 2017 to 2019 to investments in environmentally friendly facilities such as energy storage systems, renewable energy and electric cars. Such adjustments may lower our revenues from the sale of electricity and accordingly have a material adverse effect on our results of operation, financial condition and cash flows.

*Fuel Costs*

Our results of operations are also significantly affected by the cost of producing electricity, which is subject to a variety of factors, including, in particular, the cost of fuel.

Cost of fuel in any given year is a function of the volume of fuels consumed and the unit fuel cost for the various types of fuel used for generation of electricity which affects the cost structure for both our generation subsidiaries and independent power producers from whom we purchase electric power. A significant change in the unit fuel costs materially impacts the costs of electricity generated by our generation subsidiaries, which mainly comprise our fuel costs under the cost of sales, as well as, to our knowledge, the costs of electricity generated by the independent power producers that sell their electricity to us (see Item 4.A. "Purchase of Electricity—Cost-based Pool System"), which mainly comprise our purchased power costs under the cost of sales. We are however unable to provide a comparative analysis since the unit fuel cost information for independent power producers and their cost structures are proprietary information.

Fuel costs constituted 41.4%, 33.3% and 30.9% of our cost of sales, and the ratio of fuel costs to our sales was 36.1%, 25.9% and 23.4% in 2014, 2015 and 2016, respectively. Substantially all of the fuel (except for anthracite coal) used by our generation subsidiaries is imported from outside of Korea at prices determined in part by prevailing market prices in currencies other than Won. In addition, our generation subsidiaries purchase a significant portion of their fuel requirements under contracts with limited quantity and duration. Pursuant to the terms of our long-term supply contracts, prices are adjusted from time to time subject to prevailing market conditions. See Item 4.B. "Business Overview—Fuel."

Uranium accounted for 35.3%, 38.1% and 37.1% of our fuel requirements in 2014, 2015 and 2016, respectively. Coal accounted for 46.0%, 47.9% and 47.7% of our fuel requirements in 2014, 2015 and 2016, respectively. LNG accounted for 15.5%, 10.7% and 10.8% of our fuel requirements in 2014, 2015 and 2016, respectively. Oil accounted for 1.7%, 2.2% and 3.0% of our fuel requirements in 2014, 2015 and 2016, respectively. In each case, the fuel requirements are measured by the amount of electricity generated by us and our generation subsidiaries and do not include electricity purchased from independent power producers. In order to ensure stable supplies of fuel materials, our generation subsidiaries enter into long-term and medium-term contracts with various suppliers and supplement such supplies with fuel materials purchased on spot markets.

The price of bituminous coal, which represents our largest fuel requirement, fluctuates significantly from time to time. In 2016, approximately 82% of the bituminous coal requirements of our generation subsidiaries were purchased under long-term contracts and the remaining 18% purchased on the spot market. The average daily spot price of "free on board" Newcastle coal 6300 GAR published by Platts increased from US$58.0 per ton in 2015 to US$66.8 per ton in 2016 and to US$84.4 per ton as of April 13, 2017. If the price of bituminous coal were to sharply rise, our generation subsidiaries may not be able to secure their respective bituminous coal supplies at prices commercially acceptable to them. In addition, any significant interruption or delay in the supply of fuel, bituminous coal in particular, from any of their suppliers could cause our generation subsidiaries to purchase fuel on the spot market at prices higher than contracted, resulting in an increase in fuel cost.

From 2014 to 2016, the prices of oil and LNG fell significantly. The prices of oil and LNG are substantially dependent on the price of crude oil, and according to Bloomberg (Bloomberg Ticker: PGCRDUBA), the average daily spot price of Dubai crude oil declined from US$51.1 per barrel in 2015 to US$41.4 per barrel in 2016 but rebounded to US$54.2 per barrel as of April 14, 2017.

Nuclear power has a stable and relatively low-cost structure and forms a significant portion of electricity supplied in Korea. Due to significantly lower unit fuel costs compared to those for thermal power plants, our nuclear power plants are generally operated at full capacity with only routine shutdowns for fuel replacement and maintenance, with limited exceptions. In case of shortage in electricity generation resulting from stoppages of the nuclear power plants, we seek to make up for such shortage with power generated by our thermal power plants.

Because the Government heavily regulates the rates we charge for the electricity we sell (see Item 4.B. "Business Overview—Sales and Customers—Electricity Rates"), our ability to pass on such cost increases to our customers is limited. For example, from 2008 to 2012 we had consecutive net losses and, from time to time, operating losses, largely due to sustained rises in fuel costs that were neither timely nor sufficiently offset by a corresponding rise in electricity tariff rates. If fuel prices substantially increase and the Government, out of concern for inflation or for other reasons, maintains the current level of electricity tariff and does not increase it to a level to sufficiently offset the impact of rising fuel prices, the price increases will negatively affect our profit margins or even cause us to suffer net losses and our business, financial condition, results of operations and cash flows would suffer.

### *Movements of the Won against the U.S. Dollar and Other Foreign Currencies*

Korean Won has fluctuated significantly against major currencies from time to time. For fluctuations in exchange rates, see Item 3.A. "Selected Financial Data—Currency Translations and Exchange Rates." In particular, Korean Won underwent substantial fluctuations during the recent global financial crisis, and remains subject to significant volatility. The Noon Buying Rate per one U.S. dollar increased from Won 1,090.9 on December 31, 2014 to Won 1,169.3 on December 31, 2015 and to Won 1,203.7 on December 31, 2016 and fell down to Won 1,136.7 on April 14, 2017. In 2015 and 2016, the Won generally depreciated against U.S. dollar and other foreign currencies, and such depreciation may result in a significant increase in the cost of fuel materials and equipment purchased from overseas as well as the cost of servicing our foreign currency debt. As of December 31, 2016, approximately 23.1% of our long-term debt (including the current portion but excluding issue discounts and premium) before accounting for swap transactions was denominated in foreign currencies, principally U.S. dollars. The prices for substantially all of the fuel materials and a significant portion of the equipment we purchase are stated in currencies other than Won, generally in U.S. dollars. Since a substantial portion of our revenues is denominated in Won, we must generally obtain foreign currencies through foreign currency-denominated financings or from foreign currency exchange markets to make such purchases or service such debt, fulfill our obligations under existing overseas investments and make new overseas investments. As a result, any significant depreciation of Won against U.S. dollar or other foreign currencies will have a material adverse effect on our profitability and results of operations. See Item 3.D. "Risk Factors—Risks Relating to KEPCO—The movement of Won against the U.S. dollar and other currencies may have a material adverse effect on us."

**Recent Accounting Changes**

*New Amendments Adopted*

New amendments to IFRS and other accounting standards are set forth below. These amendments had no impact on our consolidated financial statements included in this annual report.

- Amendments to IAS 16—Property, Plant and Equipment

- Amendments to IAS 38—Intangible Assets

- Amendments to IFRS 11—Joint Arrangements

See Note 2 of the notes to our consolidated financial statements included in this annual report for further related information.

*New Standards and Amendments Not Yet Adopted*

The following new standards and amendments to existing IFRS and other standards are effective for annual periods beginning after January 1, 2016; however, we have not adopted such amendments yet and are currently in the process of evaluating the impact on our consolidated financial statements upon the adoption of these amendments.

- IFRS 9—Financial Instruments. Under the existing guidance in IAS 39, the impairment loss is recognized only if there is an objective evidence using 'incurred loss' model. Since IFRS 9 replaces the 'incurred loss' model in the existing standard with a forward-looking 'expected credit loss' (ECL) model, the loss allowances may increase upon the adoption of this new standard.

- IFRS 15—Revenue from contract with customers. Upon the adoption of this new standard, the timing of revenue recognition may be changed depending on whether the performance obligations in the contract are identified and the duration of such obligations under certain contracts such as operation and maintenance contracts.

- IFRS 16—Leases. Upon the adoption of this new standard, a right-of-use asset will be recognized as a 'right-of-use' model is applied to all leases, and the related lease liability may increase.

- Amendments to IAS 12—Income Taxes

- Amendments to IFRS 2—Share-based Payment

- Amendments to IAS 7—Statement of Cash Flows

- IFRIC 22—Foreign Currency Transactions and Advance Consideration

- Amendments to IAS 40—Investment Property

See Note 2 of the notes to our consolidated financial statements included in this annual report for further related information.

**Critical Accounting Policies**

The following discussion and analysis are based on our consolidated financial statements included in this annual report. The fundamental objective of financial reporting is to provide useful information that allows a reader to comprehend our business activities. To aid in that understanding, our management has identified "critical accounting policies."

We make a number of estimates and judgments in preparing our consolidated financial statements. These estimates may differ from actual results and have a significant impact on our recorded assets, liabilities, revenues

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

and expenses and related disclosure of contingent assets and liabilities. We consider an estimate to be a critical accounting estimate if it requires a high level of subjectivity or judgment, and a significant change in the estimate would have a material impact on our financial condition or results of operations. Further discussion of these critical accounting estimates and policies is included in the notes to our consolidated financial statements included in this annual report.

The accounting policies set out below have been applied consistently by us and our subsidiaries to all periods presented in the consolidated annual financial statements, unless otherwise indicated.

### Sale and Purchase of Electricity

The Government approves the rates we charge to customers. Our utility rates are designed to recover our reasonable costs plus a fair investment return. We purchase electricity principally from our generation subsidiaries based on a competitive bidding process though the Korea Power Exchange.

We recognize electricity sales revenue based on power sold (transferred to the customer) up to the reporting date. To determine the amount of power sold, we make reasonable estimates on daily power volumes for residential, commercial, industrial and other uses. The differences between the current month's estimated amounts and actual (meter-read) amounts are adjusted (trued-up) during the next month period.

### Construction Contracts

When the outcome of a construction contract can be estimated reliably, revenue and costs are recognized based on the stage of completion of the contract activity at the end of the reporting period, measured based on the proportion of contract costs incurred for work performed to date relative to the estimated total contract costs except where this would not be representative of the stage of completion, utilizing the cost-based input method. In applying the cost-based input method, it is necessary to use estimates and assumptions related to the total estimated costs expected to be incurred in the future, costs incurred which are not related to construction progress, changes in costs due to change of contract or design, etc. Total contract revenue is measured based on an agreed contract price; however, it may fluctuate due to the variation of construction work. The measurement of contract revenue is affected by various uncertainties resulting from unexpected future events. Variations in contract work, claims and incentive payments are included to the extent that the amount can be measured reliably and its receipt is considered probable.

When the outcome of a construction contract cannot be estimated reliably, contract revenue is recognized to the extent of contract costs incurred when it is probable the revenue will be realized. Contract costs are recognized as expenses in the period in which they are incurred. When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognized as an expense immediately.

### Derivative Instruments

We recognize rights and obligations arising from derivative instruments as assets and liabilities, which are stated at fair value. The gains and losses that result from the change in the fair value of derivative instruments are reported in current earnings. However, for derivative instruments designated as hedging the exposure of variable cash flows, the effective portions of the gains or losses on the hedging instruments are recorded as accumulated other comprehensive income (loss) and credited or charged to operations at the time the hedged transactions affect earnings, and the ineffective portions of the gains or losses are credited or charged immediately to operations.

Significant management judgment is involved in determining the fair value of estimated derivative instruments. The estimates and assumptions used by our management to determine fair value can be impacted by many factors, such as the estimated discount factor derived from observable market data, credit risk of the counterparty and the estimated cash flow based on settlement period, interest convention, and other contract information of the derivative instruments.

87

As of December 31, 2014, we had Won 618 billion of net amounts as assets, and as of December 31, 2015, we had Won 451 billion of net amounts as liabilities. As of December 31, 2016, we had Won 643 billion of net amounts as assets. Changes in the estimated discount factor or cash flow, or changes in the assumptions and judgments by management underlying these estimates, may cause material revisions to the estimated total gain or loss effect of derivative instruments, which could have a material effect on the recorded asset or liability.

*Decommissioning Costs*

We recognize the fair value of estimated decommissioning costs as a liability in the period in which we incur a legal obligation associated with retirement of long-lived assets that result from acquisition, construction, development and/or normal use of the assets. We also recognize a corresponding asset that is depreciated over the life of the asset. Accretion expense consists of period-to-period changes in the liability for decommissioning costs resulting from the passage of time and revisions to either the timing or the amount of the original estimate of undiscounted cash flows. Depreciation and accretion expenses are included in the cost of electric power in the accompanying consolidated statements of comprehensive income.

Significant management judgment is involved in determining the fair value of estimated decommissioning costs. The estimates and assumptions used by our management to determine fair value can be impacted by many factors, such as the estimated decommissioning costs based on engineering studies commissioned and approved by the Korean government, and changes in assumed dates of decommissioning, inflation rate, discount rate, decommissioning technology, regulation and the general economy.

As of December 31, 2014, 2015 and 2016, we had a liability for decommissioning costs in the amounts of Won 13,234 billion, Won 12,562 billion and Won 13,050 billion, respectively. Changes in the estimated costs or timing of decommissioning, or changes in the assumptions and judgments by management underlying these estimates, may cause material revisions to the estimated total cost to decommission these facilities, which could have a material effect on the recorded liability. We used discount rates of 4.49%, 3.55% and 3.55% and inflation rates of 2.93%, 1.40% and 1.40% when calculating the decommissioning cost liability of nuclear plants recorded as of December 31, 2014, 2015 and 2016, respectively, and discount rate of 4.49% and inflation rate of 2.93% when calculating the decommissioning cost liability of spent fuel recorded as of December 31, 2014, 2015 and 2016. In addition, the following is a sensitivity analysis of the potential impact on decommissioning costs from a 0.10% increase or decrease in each of the inflation rate and the discount rate, assuming that all other aforementioned assumptions remain constant:

|  | Sensitivity to inflation rate | | Sensitivity to discount rate | |
| --- | --- | --- | --- | --- |
|  | +0.10% | -0.10% | +0.10% | -0.10% |
|  | | (in billions of Won) | | |
| Increase (decrease) of liability for decommissioning costs . . . | ₩295 | ₩(287) | ₩(262) | ₩270 |

See Notes 26 and 45 of the notes to our consolidated financial statements included in this annual report for further related information.

*Provision for Decontamination of Transformer*

Under the Persistent Organic Pollutants Management Act which was enacted in 2007, we are required to remove PCB from our transformers' insulating oil by 2025. We are also required to inspect the PCB levels in our transformers and dispose of any PCBs in excess of established safety standards.

As of December 31, 2014, 2015 and 2016, we had liabilities of Won 200 billion, Won 182 billion and Won 192 billion, respectively, for inspection and disposal costs related to the decontamination of existing transformers.

The estimates and assumptions used by our management to determine fair value can be affected by many factors, such as the estimated costs of inspection and disposal, inflation rate, discount rate, regulations and the general economy.

Changes in the estimated costs or changes in the assumptions and judgments underlying these estimates may cause material revisions to the estimated total costs, which could have a material effect on our recorded liability. When calculating the provision for the decontamination of our transformers, we used a discount rate of 3.78% and an inflation rate of 2.79% as of December 31, 2014, a discount rate of 3.21% and an inflation rate of 2.65% as of December 31, 2015 and a discount rate of 2.77% and an inflation rate of 1.29% as of December 31, 2016.

### Deferred Tax Assets

In assessing the realizability of the deferred tax assets, our management considers whether it is probable that a portion or all of the deferred tax assets will not be realized. The ultimate realization of our deferred tax assets is dependent on whether we are able to generate future taxable income in specific tax jurisdictions during the periods in which temporary differences become deductible. Our management has scheduled the expected future reversals of the temporary differences and projected future taxable income in making this assessment. Based on these factors, our management believes that it is probable that we will realize the benefits of these temporary differences as of December 31, 2016. However, the amount of deferred tax assets that is realized may be different if we do not realize estimated future taxable income during the carry forward periods as originally expected.

In relation to the deferred tax assets recognized for tax loss, future taxable income is estimated considering the followings: (i) five-year mid-to long-term financial forecasts of earnings before tax approved by management and submitted to the Ministry of Strategy and Finance, and (ii) average amount of tax adjustments for the recent three years.

For tax credits carried forward, similar to deferred tax assets recognized for tax loss, our management estimates the probability timing of future taxable profits in determining the probability of utilization of tax credits carried forward. In addition, our management considers the possible carry forward period and available tax credit or deductible temporary differences within the tax laws of each country in which the tax credits originated.

Similarly, our management also estimates the probability of utilization of temporary differences considering the probability of generating future taxable profits in the periods that the deductible temporary differences reverse. We do not recognize deferred tax assets for certain temporary differences associated with investments in subsidiaries, associates, and interests in joint ventures considering future dividends or disposals.

We recognize deferred tax assets and liabilities based on the differences between the financial statement carrying amounts and the tax bases of assets and liabilities at each separate taxpaying entity. Under IFRS, a deferred tax asset is recognized for temporary difference that will result in deductible amounts in future years and for carry forwards. If, based on the weight of available evidence, it is more likely that some or the entire portion of the deferred tax asset will not be realized, that portion is deducted directly from the deferred tax asset.

We believe that the accounting estimate related to the realizability of deferred tax asset is a "critical accounting estimate" because: (i) it requires management to make assessments about the timing of future events, including the probability of expected future taxable income and available tax planning opportunities, and (ii) the difference between these assessments and the actual performance could have a material impact on the realization of tax benefits as reported in our results of operations. Management's assumptions require significant judgment because actual performance has fluctuated in the past and may continue to do so.

### Useful Lives of Property, Plant and Equipment

Property, plant and equipment are initially measured at cost and after initial recognition, are carried at cost less accumulated depreciation and accumulated impairment losses. The cost of property, plant and equipment

89

includes expenditures arising directly from the construction or acquisition of the asset, any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management and the initial estimate of the costs of dismantling and removing the item and restoring the site on which it is located.

Economic useful life is the duration of time the asset is expected to be productively employed by us, which may be less than its physical life. Management's assumptions on the following factors, among others, affect the determination of estimated economic useful life: wear and tear, obsolescence, technical standards, changes in market demand and technological changes.

The estimated useful lives of our property, plant and equipment are as follows:

|  | Useful lives (years) |
|---|---|
| Buildings | 8 ~ 40 |
| Structures | 8 ~ 50 |
| Machinery | 2 ~ 32 |
| Vehicles | 3 ~ 8 |
| Loaded heavy water | 30 |
| Asset retirement costs | 18, 30, 40, 60 |
| Finance lease assets | 6 ~ 32 |
| Ships | 9 |
| Others | 4 ~ 15 |

A component that is significant compared to the total cost of property, plant and equipment is depreciated over its separate useful life.

Depreciation methods, residual values and useful lives of property, plant and equipment are reviewed at the end of each reporting period and if change is deemed appropriate, it is treated as a change in accounting estimate. As a result of such annual review, useful lives of certain machinery were changed during 2016 and as a result, depreciation expenses increased by Won 160,985 million for the year ended December 31, 2016. Depreciation expenses are expected to increase by Won 130,514 million and Won 91,197 million for the years ending December 31, 2017 and 2018, respectively, and to decrease by Won 382,696 million for the years after December 31, 2018.

*Impairment of Long-lived Assets*

At the end of each reporting period, we review the carrying amounts of tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, we estimate the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired. Recoverable amount is the higher of fair value less costs to sell or value in use. In assessing value in use, the estimated future cash flows are discounted to their present values using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

90

If the recoverable amount of an asset (or a cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (or the cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognized immediately in income or loss, unless the relevant asset is carried at a revalued amount, in which case the impairment loss is treated as a revaluation decrease.

In the event that an impairment loss subsequently reverses, the carrying amount of the asset (or a cash-generating unit) is increased to the revised estimate of its recoverable amount, ensuring that such carrying amount increase does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or the cash-generating unit) in prior years. A reversal of an impairment loss is recognized immediately in income or loss, unless the relevant asset is carried at a revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

The assessment of impairment is a critical accounting estimate, because significant management judgment is required to determine: (i) whether an indicator of impairment has occurred, (ii) how assets should be grouped, and (iii) the recoverable amount of the asset or asset group in the case of impairment. If management's assumptions about these assets change as a result of events or circumstances, and management believes the assets may have declined in value, we may record impairment charges, resulting in lower profits. Our management uses its best estimate in making these evaluations and considers various factors, including the future prices of energy, fuel costs and other operating costs. However, actual market prices and operating costs could vary from those used in the impairment evaluations, and the impact of such variations could be material. We performed impairment tests on individual assets of KOSEP and EWP, both of which are wholly owned subsidiaries, for the year ended December 31, 2015 due to potential indictors of impairment. For the year ended December 31, 2016, there were no potential indicators of impairment, and we therefore did not perform an impairment test for such year. Accordingly, we recognized the amount by which the carrying amount exceeds its recoverable amount as impairment loss on our consolidated statements of comprehensive income. See Note 18 of the notes to our consolidated financial statements included in this annual report for further information.

*Accrual for Loss Contingencies for Legal Claims*

We are involved in legal proceedings regarding matters arising in the ordinary course of business. In relation to these matters, as of December 31, 2016, we and our subsidiaries were engaged in 675 lawsuits as a defendant and 193 lawsuits as a plaintiff. The total amount claimed against us and our subsidiaries was Won 636 billion and the total amount claimed by us was Won 490 billion as of December 31, 2016. As of December 31, 2016, our provisions for these legal claims amounted to Won 198 billion. These provisions are adjusted when events or circumstances cause these judgments or estimates to change.

Actual amounts of our liabilities as determined upon settlement of legal claims or by final decisions of the courts in relation thereto may be substantially different from the amounts of provisions recognized or contingent liabilities disclosed. If the actual amounts are higher than the amounts of related provisions, the resulting additional liabilities would adversely impact our results of operations, financial condition and cash flows.

## Consolidated Results of Operations

### 2016 Compared to 2015

In 2016, our consolidated sales, which is principally derived from the sale of electric power, increased by 2.0% to Won 59,763 billion from Won 58,582 billion in 2015, reflecting primarily a 2.8% increase in the volume of electricity sold from 483,655 gigawatt hours in 2015 to 497,039 gigawatt hours in 2016. The overall increase in the volume of electricity sold was primarily attributable to a 1.9% increase in the volume of electricity sold to the industrial sector, which represents the largest segment of electricity consumption in Korea, from 273,548 gigawatt hours in 2015 to 278,828 gigawatt hours in 2016, a 4.8% increase in the volume of electricity sold to the commercial sector, which represents the second largest segment of electricity consumption in Korea, from

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

103,679 gigawatt hours in 2015 to 108,617 gigawatt hours in 2016, and a 3.7% increase in the volume of electricity sold to the residential sector from 65,619 gigawatt hours in 2015 to 68,057 gigawatt hours in 2016. The increase in the volume of electricity sold to the industrial sector was primarily due to the general increase in demand for electricity as a result of the turnaround in industries such as semiconductors, chemicals and petrochemicals, which involved increased industrial output and greater capacity utilization of industrial plants. The increase in the volume of electricity sold to the commercial sector was primarily due to a rebound in the domestic economy and increased air conditioning use in commercial buildings during the summer. The increase in the volume of electricity sold to the residential sector was primarily due to the opening of new urban clusters with large-scale residential complexes as well as increased air conditioning use in residential buildings during the summer. Sales of construction services increased by 7.1% to Won 4,027 billion in 2016 from Won 3,761 billion in 2015 primarily due to an increase in sales recorded from the construction-in-progress of our nuclear complex construction projects in the United Arab Emirates.

Our consolidated cost of sales, which is principally derived from the costs related to the purchase of fuels for generation of electricity and to a lesser extent, from the purchase of power from independent power producers, depreciation and salaries, remained substantially flat, or increased by 0.2%, to Won 45,550 billion in 2016 from Won 45,458 billion in 2015, primarily due to a 15.6% increase in salaries, a 7.3% increase in depreciation and a 9.9% increase in other cost of sales, which were substantially offset by a 7.2% decrease in fuel costs and a 5.9% decrease in power purchase.

Fuel costs, which accounted for 30.9% and 33.3% of our consolidated cost of sales in 2016 and 2015, respectively, decreased by 7.2% to Won 14,067 billion in 2016 from Won 15,159 billion in 2015, largely due to a 24.3% decrease in unit fuel cost mainly resulting from the general decline in international market prices for our main fuel types, as well as an increased use of less expensive fuel sources such as coal and nuclear power, including due to the commencement of operation of one nuclear unit in 2016. Power purchase, which accounted for 23.6% and 25.1% of our cost of sales in 2016 and 2015, respectively, decreased by 5.9% to Won 10,756 billion in 2016 from Won 11,428 billion in 2015, primarily due to a 20.4% decrease in the unit cost of power purchased from Won 119.6 per kilowatt-hour in 2015 to Won 95.2 per kilowatt-hour in 2016, largely resulting from a general decline in international market prices for the main fuel types, which led to a decrease in the price of electricity generated by independent power producers. Depreciation expense, excluding amortization of nuclear fuel charged to fuel costs in the amounts of Won 1,085 billion and Won 1,057 billion in 2016 and in 2015, respectively, increased by 7.3% to Won 7,620 billion in 2016 from Won 7,102 billion in 2015 primarily due to an increase of additional property, plant and equipment acquired in relation to the construction of new generation facilities pursuant to our capital investment program.

Salaries recorded as cost of sales increased by 15.6% to Won 3,426 billion in 2016 from Won 2,962 billion in 2015 primarily due to an increase in base salary in tandem with the inflation rate and an increase in provision expenses related to the ordinary wage litigation for our generation subsidiaries as described in Item 8.A. "Consolidated Statements and Other Financial Information—Legal Proceedings." Other cost of sales increased by 9.9% to Won 4,488 billion in 2016 from Won 4,083 billion in 2015 primarily due to an increase in costs recorded from the construction-in-progress of our nuclear complex construction projects in the United Arab Emirates.

As a cumulative result of the foregoing factors, our consolidated gross profit increased by 8.3% to Won 14,213 billion in 2016 from Won 13,124 billion in 2015, and our consolidated gross profit margin increased to 23.8% in 2016 from 22.4%% in 2015. The increases in our consolidated gross profit and consolidated gross profit margin were largely attributable to the 2.0% increase in our consolidated sales (which was primarily due to the 2.8% increase in the volume of electricity sold, as well as the 7.1% increase in the sales of construction services), which substantially outpaced the 0.2% increase in our consolidated cost of sales (which was mainly due to the 15.6% increase in salaries, the 7.3% increase in depreciation and the 9.9% increase in other cost of sales, which were substantially offset by the 7.2% decrease in fuel costs and the 5.9% decrease in power purchase).

Our consolidated selling and administrative expenses increased by 22.6% to Won 2,639 billion in 2016 from Won 2,153 billion in 2015, largely due to a 151.4% increase in other expenses, which mainly resulted from the commencement of a campaign to subsidize households for the use of electronic appliances with high energy efficiency and, to a lesser extent, an increase in salaries recorded as selling and administrative expenses.

Our consolidated other income, net of expenses, decreased by 6.7% to Won 652 billion in 2016 from Won 699 billion in 2015, mainly as a result of a decrease in compensation and reparations revenue, which relate to penalties collected from sub-contractors as a result of contractual breaches.

Our consolidated net other gains decreased significantly to Won 70 billion in 2016 from Won 8,611 billion in 2015, primarily as a result of a decrease in gains on disposal of property, plant and equipment. The decrease in gains on disposal of property, plant and equipment decreased largely due to the absence in 2016 of a disposal of property in magnitude comparable to the sale of our previous headquarters in 2015.

As a cumulative result of the foregoing factors, our consolidated operating profit decreased by 39.4% to Won 12,296 billion in 2016 from Won 20,281 billion in 2015, and our consolidated operating income margin decreased to 20.6% in 2016 from 34.6% in 2015. These decreases were mainly due to a significant decrease in our consolidated net other gains primarily as a result of a decrease in gains on disposal of property, plant and equipment due to the absence in 2016 of a disposal of property in magnitude comparable to the sale of our previous headquarters in 2015.

Our consolidated finance expenses, net, decreased by 10.2% to Won 1,646 billion in 2016 from Won 1,832 billion in 2015, primarily as a result of a decrease in interest expense and a decrease in net losses on foreign currency translation, which were partially offset by a decrease in net gains on valuation of derivatives.

We recorded consolidated loss of associates or joint ventures using equity method of Won 137 billion in 2016 compared to such gain of Won 207 billion in 2015, primarily as a result of a decrease in profit of Korea Gas Corporation.

As a cumulative result of the foregoing factors, our consolidated income before income taxes decreased by 43.6% to Won 10,513 billion in 2016 from Won 18,656 billion in 2015.

Our income tax expense decreased by 35.8% to Won 3,365 billion in 2016 from Won 5,239 billion in 2015, largely as a result of the decrease in our profit before income taxes. Our effective tax expense (benefit) rate, which represents tax expense (benefit) as a percentage of profit (loss) before income taxes, increased from 28.1% in 2015 to 32.0% in 2016 primarily due to an increase of adjustment in respect of prior years due to change in estimate. In 2016, the effective tax rate was higher than the statutory rate of 24.2%, primarily due to the recognition of deferred tax liabilities regarding our investments in subsidiaries, associates and joint ventures primarily in connection with taxable temporary differences related to undistributed earnings. See Note 41 to our financial statements included in this annual report.

As a cumulative result of the above factors, our consolidated profit decreased by 46.7% to Won 7,148 billion in 2016 from Won 13,416 billion in 2015. Our consolidated net profit margin also decreased to 12.0% in 2016 from 22.9% in 2015. Our profit attributable to the owners of the company was Won 7,048 billion in 2016 compared to Won 13,289 billion attributable to the owners of the company in 2015.

We reported consolidated other comprehensive loss of Won 2 billion in 2016 compared to consolidated other comprehensive income of Won 34 billion in 2015, largely due to decrease in net change in other comprehensive income from equity method investments primarily in relation to Gemeng International Energy Co., Ltd, which was partially offset by an increase in net change in the realized fair value of available-for-sale securities primarily in relation to PT Adaro Energy Tbk.

As a cumulative result of the above factors, our consolidated total comprehensive income decreased by 46.9% to Won 7,146 billion in 2016 from Won 13,450 billion in 2015.

***2015 Compared to 2014***

In 2015, our consolidated sales, which is principally derived from the sale of electric power, increased by 2.6% to Won 58,582 billion from Won 57,123 billion in 2014, reflecting primarily a 0.3% increase in our average electricity tariff rates in 2015 compared to 2014 and a 1.3% increase in the volume of electricity sold from 477,592 gigawatt hours in 2014 to 483,655 gigawatt hours in 2015. The overall increase in the volume of electricity sold was primarily attributable to a 0.4% increase in the volume of electricity sold to the industrial sector, which represents the largest segment of electricity consumption in Korea, from 272,552 gigawatt hours in 2014 to 273,548 gigawatt hours in 2015, a 2.9% increase in the volume of electricity sold to the commercial sector, which represents the second largest segment of electricity consumption in Korea, from 100,761 gigawatt hours in 2014 to 103,679 gigawatt hours in 2015, and a 1.8% increase in the volume of electricity sold to the residential sector from 64,457 gigawatt hours in 2014 to 65,619 gigawatt hours in 2015. The increase in the volume of electricity sold to the industrial sector was primarily due to the general increase in demand for electricity as a result of continued export-led growth of the Korean economy, which involved increased industrial output and greater capacity utilization of industrial plants. The increase in the volume of electricity sold to the commercial sector was primarily due to the recovery of market demand as a result of various government policies to boost the economy. The increase in the volume of electricity sold to the residential sector was primarily due to an increase in household electricity usage for air conditioning and heating. Sales of construction services increased by 26.8% to Won 3,761 billion in 2015 from Won 2,965 billion primarily due to an increase in sales recorded from the construction-in-progress of our nuclear complex construction projects in the United Arab Emirates.

Our consolidated cost of sales, which is principally derived from the costs related to the purchase of fuels for generation of electricity and to a lesser extent, from the purchase of power from independent power producers, depreciation and salaries, decreased by 8.7% to Won 45,458 billion in 2015 from Won 49,763 billion in 2014, primarily due to a 26.4% decrease in fuel costs and a 9.3% decrease in purchased power, which was partially offset by a 5.7% increase in depreciation, a 12.5% increase in salaries and a 22.8% increase in other cost of sales.

Fuel costs, which accounted for 33.3% and 41.4% of our consolidated cost of sales in 2015 and 2014, respectively, decreased by 26.4% to Won 15,159 billion in 2015 from Won 20,595 billion in 2014 largely due to a 28.7% decrease in unit fuel cost mainly resulting from the general decline in international market prices for our main fuel types, as well as an increased use of less expensive fuel sources such as coal and nuclear power due to the operational commencement of one nuclear generation unit and two coal generation units and the resumption of one nuclear generation unit in 2015. Purchased power, which accounted for 25.1% and 25.3% of our cost of sales in 2015 and 2014, respectively, decreased by 9.3% to Won 11,428 billion in 2015 from Won 12,602 billion in 2014, primarily due to a 22.7% decrease in the cost of power purchased from Won 154.70 per kilowatt-hour in 2014 to Won 119.60 per kilowatt-hour in 2015, primarily due to a general decline in international market prices for our main fuel types. Depreciation expense, excluding amortization of nuclear fuel charged to fuel costs in the amounts of Won 1,057 billion and Won 957 billion in 2015 and in 2014, respectively, increased by 5.0% to Won 7,102 billion in 2015 from Won 6,763 billion in 2014 primarily due to an increase of additional property, plant and equipment related to the construction of new generation facilities pursuant to our capital investment program.

Salaries recorded as cost of sales increased by 12.5% to Won 2,962 billion in 2015 from Won 2,634 billion in 2014 primarily due to an increase in base salary in tandem with the inflation rate and an increase in provision expenses related to the ordinary wage litigation as described in Item 8.A. "Consolidated Statements and Other Financial Information—Legal Proceedings." Other cost of sales increased by 22.8% to Won 8,805 billion in 2015 from Won 7,169 billion in 2014 primarily due to an increase in costs related to our nuclear complex construction projects in the United Arab Emirates.

As a cumulative result of the foregoing factors, our consolidated gross profit increased by 78.3% to Won 13,124 billion in 2015 from Won 7,360 billion in 2014, and our consolidated gross profit margin increased to 22.4% in 2015 from 12.9% in 2014. The increases in our consolidated gross profit and consolidated gross profit margin were largely attributable to the 2.6% increase in our consolidated sales (which was primarily due to the 0.3% increase in our average electricity tariff rates and the 1.3% increase in the volume of electricity sold, as well as the 26.8% overall increase in the sales of construction services) and the 8.7% decrease in our consolidated cost of sales (which was mainly due to the 26.4% decrease in fuel costs partially offset by the 22.8% increase in other cost of sales).

Our consolidated selling and administrative expenses increased by 11.9% to Won 2,153 billion in 2015 from Won 1,924 billion in 2014, largely due to an increase in salaries recorded as selling and administrative expenses, which was partially offset by a decrease in bad debt expense.

Our consolidated other income, net of expenses, increased by 5.0% to Won 699 billion in 2015 from Won 666 billion in 2014, mainly as a result of an increase in revenue related to the transfer of assets from customers, which were substantially offset by a decrease in gains from the electricity infrastructure development fund.

Our consolidated net other gains increased significantly to Won 8,611 billion in 2015 from Won 107 billion in 2014, primarily as a result of an increase in gains on disposal of property, plant and equipment. The gains on disposal of property, plant and equipment increased largely due to the sale of the properties in our previous headquarters in 2015.

As a cumulative result of the foregoing factors, our consolidated operating profit increased more than threefold to Won 20,281 billion in 2015 from Won 6,209 billion in 2014, and our consolidated operating income margin increased to 34.6% in 2015 from 10.9% in 2014. These increases were mainly due to the 2.6% increase in our consolidated sales and the 8.7% decrease in our consolidated cost of sales as well as a significant increase in our consolidated net other gains primarily as a result of an increase in gains on disposal of property, plant and equipment due to the sale of the properties in our previous headquarters.

Our consolidated finance expenses, net, decreased by 18.8% to Won 1,832 billion in 2015 from Won 2,255 billion in 2014, primarily as a result of a decrease in interest expense and an increase in net gains on valuation derivatives, which was partially offset by an increase in net losses on foreign currency translation.

Our consolidated profit of associates or joint ventures using equity method decreased by 24.7% to Won 207 billion in 2015 from Won 275 billion in 2014, primarily as a result of a decrease in profit of Korea Gas Corporation.

As a cumulative result of the foregoing factors, our consolidated income before income taxes increased to Won 18,656 billion in 2015 from Won 4,229 billion in 2014.

Our income tax expense increased to Won 5,239 billion in 2015 from Won 1,430 billion in 2014, largely as a result of an increase in our profit before income taxes. Our effective tax expense (benefit) rate, which represents tax expense (benefit) as a percentage of profit (loss) before income taxes, decreased from 33.8% in 2014 to 28.1% in 2015 primarily due to an increase in profit which is not subject to deferred income tax. In 2015, the effective tax rate was higher than the statutory rate of 24.2%, primarily due to the recognition of deferred tax liabilities regarding our investments in subsidiaries, associates and joint ventures primarily in connection with taxable temporary differences related to undistributed earnings. See Note 41 to our financial statements included in this annual report.

As a cumulative result of the above factors, our consolidated profit increased to Won 13,416 billion in 2015 from Won 2,799 billion in 2014. Our consolidated net profit margin also increased to 22.9% in 2015 from 4.9% in 2014. Our profit attributable to the owners of the company was Won 13,289 billion in 2015 compared to Won 2,687 billion attributable to the owners of the company in 2014.

95

We had consolidated other comprehensive income of Won 34 billion in 2015 compared to consolidated other comprehensive loss of Won 358 billion in 2014, largely as a result of increased actuarial gains on retirement benefit obligations, net of tax (related to changes in future salary increases), valuation gains on available-for-sale securities (primarily Korea District Heating Corp. and Set Holding) and gains on valuation of derivatives using cash flow hedge accounting, share in other comprehensive income of associates and joint ventures, net of tax.

As a cumulative result of the above factors, our consolidated total comprehensive income increased to Won 13,450 billion in 2015 from Won 2,441 billion in 2014.

**Inflation**

The effects of inflation in Korea on our financial condition and results of operations are reflected primarily in construction costs as well as in labor expenses. Inflation in Korea has not had a significant impact on our results of operations in recent years. It is possible that inflation in the future may have an adverse effect on our financial condition or results of operations.

**Segment Results**

We operate the following business segments: transmission and distribution, nuclear power generation and thermal power generation and all others. The transmission and distribution segment, which is operated by us, the parent company, consists of operations related to the transmission, distribution and sale to end-users of electricity purchased from our generation subsidiaries as well as from independent power producers. The power generation segment, which is operated by our one nuclear generation subsidiary and five non-nuclear generation subsidiaries, consists of operations related to the generation of electricity sold to us through the Korea Power Exchange. The transmission and distribution segment and the power generation segment together represent our electricity business. The remainder of our operation is categorized as "all others." The all other segment consists primarily of operations related to the plant maintenance and engineering service, information services, and sales of nuclear fuel, communication line leasing, overseas businesses and others. In 2014, 2015 and 2016, the unaffiliated revenues of the power generation segment (representing the six generation subsidiaries) and all our other revenues in the aggregate amounted to only 2.8%, 2.8% and 3.0% of our consolidated revenues, respectively, and the results of operations for our business segments substantially mirror our consolidated results of operations. For further information, see Note 4 of the notes to our consolidated financial statements included in this annual report.

**Item 5.B. Liquidity and Capital Resources**

*We expect that our capital requirements, capital resources and liquidity position may change in the course of implementing the Restructuring Plan. See Item 4.B. "—Business Overview—Restructuring of the Electric Power Industry in Korea" and Item 3D. "Risk Factors—Risks Relating to KEPCO—The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."*

**Capital Requirements**

We anticipate that the following represent the major sources of our capital requirements in the short-term to intermediate future:

• capital expenditures pursuant to our capital investment program;

• working capital requirements, the largest component of which is fuel purchases;

• payment of principal and interest on our existing debt; and

• overseas investments.

In addition, if there were to occur unanticipated material changes to the Restructuring Plan, the Basic Plan or other major policy initiatives of the Government relating to the electric power industry, or natural disasters, such developments may require a significant amount of additional capital requirements.

### Capital Expenditures

We anticipate that capital expenditures will be the most significant use of our funds for the next several years. Our capital expenditures relate primarily to the construction of new generation units, maintenance of existing generation units and expansion of our transmission and distribution systems. Our capital expenditures generally follow budgets established under the Basic Plan, which contains projections relating to the supply and demand of electricity of Korea based on which we plan the construction of additional generation units and transmission systems.

Our total capital expenditures for the construction of generation, transmission and distribution facilities were Won 16,629 billion, Won 15,750 billion and Won 13,950 billion in 2014, 2015 and 2016, respectively, and under our current budgets, are estimated to be approximately Won 14,307 billion, Won 13,842 billion and Won 16,071 billion in 2017, 2018 and 2019, respectively. We plan to finance our capital expenditures primarily through issuance of securities in the capital markets, borrowings from financial institutions and construction grants.

In January 2016, the Ministry of Trade, Industry and Energy announced an initiative to promote the new energy industry by creating the New Energy Industry Fund, which is made up of funds sponsored by government-affiliated energy companies. The purpose of these funds is to invest in substantially all frontiers of the new energy industry, including renewable energy, energy storage systems, electric vehicles, small-sized self-sustaining electricity generation grids known as "micro-grids", among others, as well as invest in start-up companies, ventures, small- to medium-sized enterprise and project businesses that engage in these businesses but have not previously attracted sufficient capital from the private sector. The total size of these funds was US$1 trillion as of December 31, 2016; these funds were funded from our budget for new energy industry projects, which totaled US$6.4 trillion in 2016 and were expended in research and development, efficiency improvements and educational solar power projects, among others. Our budget for new energy industry projects in 2017 amounts to US$5.6 trillion, of which US$1 trillion has been earmarked for potential additional commitments to the New Energy Industry Fund.

Furthermore, according to a plan announced in July 2016 by the Ministry of Trade, Industry and Energy in relation to coal-fired electricity generation units, 10 of our coal generation units that are 30 years or older will be required to be shut down or convert to another fuel use, 43 of our such units that are less than 30 years old will be subject to retrofitting and overall replacement of environmental facilities, and 20 of our such units currently under construction will be subject to more rigorous emission standards. Compliance with such measures is expected to result in our incurring significant costs.

### Fuel Purchases

We require significant funds to finance our operations, principally in relation to the purchase of fuels by our generation subsidiaries for generation of electricity. In 2014, 2015 and 2016, fuel costs constituted 41.4%, 33.3% and 30.9% of our cost of sales and the ratio of fuel costs to our sales was 36.1%, 25.9% and 23.4%, respectively. We plan to fund our fuel purchases primarily with net operating cash, although in cases of rapid increases in fuel prices as is the case from time to time, we may also rely on borrowings from financial institutions and issuance of debt securities in the capital markets.

### Repayment of Existing Debt

Payments of principal and interest on indebtedness will require considerable resources. The table below sets forth the scheduled maturities of the outstanding interest-paying debt (excluding issue discounts and premium)

before accounting for swap transactions of us and our six wholly-owned generation subsidiaries as of December 31, 2016 for each year from 2017 to 2021 and thereafter. As of December 31, 2016, such debt represented 96.0% of our outstanding debt on a consolidated basis.

| Year ended December 31 | Local Currency Borrowings | Foreign Currency Borrowings | Domestic Debentures | Foreign Debentures | Total |
|---|---|---|---|---|---|
| | (in billions of Won) | | | | |
| 2017 | 598 | 40 | 5,650 | 2,175 | 8,463 |
| 2018 | 33 | — | 5,200 | 3,108 | 8,341 |
| 2019 | 9 | — | 4,200 | 1,560 | 5,769 |
| 2020 | 9 | — | 4,820 | 888 | 5,717 |
| 2021 | 9 | 9 | 3,720 | 967 | 4,705 |
| Thereafter | 40 | 2 | 16,130 | 2,418 | 18,590 |
| Total | 698 | 51 | 39,720 | 11,116 | 51,585 |

We and our six wholly-owned generation subsidiaries incurred interest charges (including capitalized interest) in relation to our interest-paying debt of Won 3,121 billion, Won 2,846 billion and Won 2,490 billion in 2014, 2015 and 2016, respectively. We anticipate that interest charges will increase in future years because of, among other factors, anticipated increases in our long-term debt. See "—Capital Resources" below. The weighted average rates of interest on our and our six wholly-owned generation subsidiaries' debt were 3.93%, 3.87% and 3.69% in 2014, 2015 and 2016, respectively.

*Overseas Investments*

As part of our revenue diversification and fuel procurement strategy, we plan to continue to make overseas investments on a selective basis, which will be funded primarily through foreign currency-denominated borrowings and debt securities issuances as well as net operating cash from such projects.

**Capital Resources**

We have traditionally met our working capital and other capital requirements primarily from net cash provided by operating activities, issuance of debt securities and borrowings from financial institutions. Net cash provided by operating activities is primarily a function of electricity sales and fuel purchases and is also affected by increases and decreases in trade receivables, trade payables and inventory related to electricity sales and fuel purchases. Net cash provided by operating activities was Won 12,046 billion, Won 16,943 billion and Won 16,521 billion in 2014, 2015 and 2016, respectively.

As of December 31, 2014, 2015 and 2016, our long-term debt (excluding the current portion but including issue discounts and premium), before accounting for swap transactions, amounted to Won 55,720 billion, Won 50,907 billion and Won 44,700 billion, respectively, representing 101.6%, 74.9% and 61.2% of shareholders' equity, respectively, as of such dates. As of December 31, 2014, 2015 and 2016, the current portions of our long-term debt were Won 6,446 billion, Won 7,243 billion and Won 8,134 billion, respectively. As of December 31, 2014, 2015 and 2016, our short-term borrowings amounted to Won 659 billion, Won 604 billion and Won 806 billion, respectively. See Note 23 of the notes to our consolidated financial statements included in this annual report. Total long-term debt (including the current portion but excluding issue discounts and premium), before accounting for swap transactions, as of December 31, 2016 was Won 52,949 billion, of which Won 40,730 billion was denominated in Won and an equivalent of Won 12,219 billion was denominated in foreign currencies, primarily U.S. dollars. In addition, we, KHNP and KOWEPO also maintain U.S. dollar-denominated global medium-term note programs in the aggregate amount of US$10 billion, of which approximately US$6.6 billion remains currently available for future drawdown. KOSEP also maintains an A$2 billion Australian dollar medium-term note program, of which approximately A$1.7 billion remains current available for future drawdown.

98

Subject to the implementation of our capital expenditure plan and the sale of our interests in our generation subsidiaries and other subsidiaries, our long-term debt may increase or decrease in future years. Until recently, a significant portion of our long-term debt was raised through foreign currency-denominated borrowings. Our foreign currency-denominated long-term debt (including the current portion but excluding issue discounts and premium), before accounting for swap transactions, amounted to Won 12,366 billion and Won 12,219 billion as of December 31, 2015 and 2016, respectively.

Our ability to incur long-term debt in the future is subject to a variety of factors, many of which are beyond our control, including, the implementation of the Restructuring Plan and the amount of capital that other Korean entities may seek to raise in capital markets. Economic, political and other conditions in Korea may also affect investor demand for our securities and those of other Korean entities. In addition, our ability to incur debt will also be affected by the Government's policies relating to foreign currency borrowings, the liquidity of the Korean capital markets and our operating results and financial condition. In case of adverse developments in Korea, the price at which such financing may be available may not be acceptable to us.

We incur our short-term borrowings primarily through commercial papers sold to domestic financial institutions. We have not had, and we do not expect to have, any material difficulties in obtaining short-term borrowings. In addition, in order to prepare for potential liquidity shortage, we maintain several credit facilities with financial institutions, with Won-denominated facilities amounting to Won 3,747 billion in aggregate and foreign currency-denominated facilities amounting to US$1,954 million in aggregate. The full amount of these facilities was available as of December 31, 2016.

We may raise capital from time to time through the issuance of equity securities. However, there are certain restrictions on our ability to issue equity, including limitations on shareholdings by foreigners. In addition, without changes in the existing KEPCO Act which requires that the Government, directly or pursuant to the Korea Development Bank Act, through Korea Development Bank, own at least 51% of our capital stock, it may be difficult or impossible for us to undertake any equity financing other than sales of treasury stock without the participation of the Government. Even if we are able to conduct equity financing with the participation of the Government, prevailing market conditions may be such that we may not be able conduct equity financing on terms that are commercially acceptable to us. See Item 3D. "Risk Factors—Risks Relating to Korea and the Global Economy."

Our total shareholders' equity increased by 7.5% from Won 67,942 billion as of December 31, 2015 to Won 73,051 billion as of December 31, 2016, mainly as a result of an increase in total comprehensive income.

**Liquidity**

Our liquidity is substantially affected by our acquisition of property, plant and equipment, fuel purchases and schedule of repayment of debt. Our property, plant and equipment increased by 3.1% from Won 141,361 billion as of December 31, 2015 to Won 145,743 billion as of December 31, 2016. Although fuel costs decreased by 7.2% from Won 15,159 billion in 2015 to Won 14,067 billion in 2016, our current trade and other payables which is closely related to fuel costs increased by 17.9% from Won 4,736 billion as of December 31, 2015 to Won 5,585 billion as of December 31, 2016. Our current financial liabilities increased by 13.8% from Won 7,857 billion as of December 31, 2015 to Won 8,942 billion as of December 31, 2016 according to our debt repayment schedule.

Our cash flows are also impacted by other factors. Our net cash provided by operating activities decreased by 2.5% from Won 16,943 billion in 2015 to Won 16,521 billion in 2016. The decrease in net cash provided by operating activities in 2016 compared to 2015 was mainly due to an increase in income taxes paid. Our cash flows from investing activities are affected by acquisitions of property, plant and equipment. Our net cash used in investing activities decreased by 1.3% from Won 9,774 billion in 2015 to Won 9,646 billion in 2016. Our cash

flows from financing activities are mainly affected by borrowings and issuance of debt securities and repayment thereof, as well as dividends paid. Our net cash used in financing activities increased by 46.7% from Won 5,207 billion in 2015 to Won 7,637 billion in 2016, largely due to an increase in dividends paid.

Due to the capital-intensive nature of our business as well as significant volatility in fuel prices, from time to time we operate with working capital deficits, and we may have substantial working capital deficits in the future. As of December 31, 2014, 2015 and 2016, we had a working capital deficit of Won 4,780 billion, Won 686 billion and Won 5,031 billion, respectively. We have traditionally met our working capital and other capital requirements primarily with net cash provided by operating activities, issuance of debt securities, borrowings from financial institutions and construction grants. We also incur short-term borrowings primarily through commercial papers sold to domestic financial institutions. We have not had, and we do not expect to have, any material difficulties in obtaining short-term borrowings. See "—Capital Resources."

We may face liquidity concerns in the case of sudden and sharp depreciation of the Won against major foreign currencies or depreciation over a sustained period of time. While substantially all of our revenues are denominated in Won, we pay for substantially all of our fuel purchases in foreign currencies and a substantial portion of our long-term debt is denominated in foreign currencies, and payment of principal and interest thereon is made in foreign currencies. In the past, we have incurred foreign currency debt principally due to the limited availability and the high cost of Won-denominated financing in Korea. However, in light of the increasing sophistication of the Korean capital markets and the recent increase in Won liquidity in the Korean financial markets, we plan to reduce the portion of our debt which is denominated in foreign currencies although we intend to continue to raise certain amounts of capital through long-term foreign currency debt for purposes of maintaining diversity in our funding sources as well as paying for overseas investments and fuel procurements in foreign currencies. As of December 31, 2016, approximately 23.1% of our long-term debt (including the current portion but excluding issue discounts and premium) before accounting for swap transactions was denominated in currencies other than Won.

We enter into currency swaps and other hedging arrangements with respect to our debt denominated in foreign currencies only to a limited extent due primarily to the limited size of the Korean market for such derivative arrangements. Such instruments include combined currency and interest rate swap agreements, interest rate swaps and foreign exchange agreements. We do not enter into derivative financial instruments in order to hedge market risk resulting from fluctuations in fuel costs. Our policy is to hold or issue derivative financial instruments for hedging purposes only. Our derivative financial instruments are entered into with major financial institutions, thereby minimizing the risk of credit loss. See Note 11 of the notes to our consolidated financial statements.

We paid dividends of Won 500 per share in respect of fiscal year 2014 and Won 3,100 per share in respect of fiscal year 2015. On April 20, 2017, we paid dividends of Won 1,980 per share in respect of fiscal year 2016.

## Other

Our operations are materially affected by the policies and actions of the Government. See Item 4.B. "Business Overview—Regulation."

## Item 5.C. Research and Development, Patents and Licenses, etc.

### Research and Development

Our research and development program is focused on developing advanced electric power, renewable energy, smart grid and customer-friendly electricity service technologies that will enable us to become a global leader in the energy industry. In order to achieve our corporate vision of becoming a "Smart Energy Creator" in 2014, we adopted the KEPCO Technology Strategy, which emphasizes enhanced technological convergence and customer service. As part of such strategy, we seek to develop (i) clean and smart energy technology, including

in relation to low carbon emission in power generation, (ii) an efficient and intelligent power transmission and distribution grid system, (iii) technology that will enhance efficiency and responsiveness to consumer's electricity consumption patterns, and (iv) improvements in information, communication and technology, or ICT, for enhanced customer service.

In 2017, consistent with the Government guidelines, we plan to invest approximately 7.3 % of our annual revenue in the research and development of "creative smart" technologies, particularly with a focus on the following ten areas: carbon-related technology known as "carbon capture, utilization and storage ", offshore wind power, new power transmission technology, super conductor, smart grid, micro grid, new materials in electric power fields, ICT convergence, ICT integration and energy storage systems.

Our high-priority "creative smart energy" projects currently include the following:

- acquiring integrated gasified process technology;
- establishing high-tech smart grid and micro grid test beds in Jeju Island;
- developing highly efficient absorbents for carbon capture;
- commercializing offshore wind power plants;
- obtaining high-voltage direct currents technology suitable for domestic operation; and
- experimental testing of large-scale energy storage systems with capacities ranging from four to eight megawatts.

Our research and development activities also focus on the following:

- in the thermal power generation sector, reducing the greenhouse effect, enhancing efficiency and reducing cost in power plant construction and operation as well as in our plant maintenance, including through improvements in damage analysis and environment-friendly inspections;
- in the renewable energy sector, enhancing efficiency, lowering costs of power generation, identifying new energy sources and exploring new business opportunities;
- in the electric power system sector, enhancing the stability and reliability in the operation of our electric power grid as well as enhancing efficiency in electricity distribution, including through build-out of large-sized electricity storage facilities and superconducting transmission cable grids, introducing preventive maintenance measures for substations and developing technologies related to system automation, power utilization and power line communication;
- in the customer service sector, developing technologies enabling a greater range of business opportunities and heightened customer service in anticipation of the upcoming rollout of the smart grid system; and
- in the technological convergence sector, identifying new business opportunities through convergence among technologies and businesses and maximizing synergy from such convergence in tandem with the promotion of creative economy in Korea as well as globally.

In addition, we cooperate closely with several other electric utility companies and research institutes, both foreign and domestic, on various projects to diversify the scope and scale of our research and development activities.

We and our six generation subsidiaries invested Won 638 billion, Won 660 billion and Won 530 billion in 2014, 2015 and 2016, respectively, and currently plan to invest Won 639 billion in 2017, on research and development. Our current focus in research and development is primarily in the area of ICT-based smart energy technological development. We had 1,056 employees engaged in research and development activities as of December 31, 2016. As a result of our research, we had 2,469 registered patents and 2,363 patent applications outstanding in Korea and abroad as of December 31, 2016.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**Item 5.D. Trend Information**

Trends, uncertainties and events which could have a material impact on our sales, liquidity and capital resources are discussed above in Item 5.A. "Operating Results" and Item 5.B. "Liquidity and Capital Resources."

**Item 5.E. Off-Balance Sheet Arrangements**

We had no significant off-balance sheet arrangements as of December 31, 2016.

**Item 5.F. Tabular Disclosure of Contractual Obligations**

The following summarizes certain of the contractual obligations of us and our six wholly-owned generation subsidiaries as of December 31, 2016 and the effect such obligations are expected to have on liquidity and cash flow in future periods.

| Contractual Obligations[1] | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1–3 years | 3–5 years | After 5 years |
| | (in billions of Won) | | | | |
| Long-term debt[2] ......................... | 51,157 | 8,036 | 14,110 | 10,421 | 18,590 |
| Short-term borrowings ..................... | 428 | 428 | — | — | — |
| Interest payments[3] ........................ | 10,094 | 1,623 | 2,578 | 1,743 | 4,150 |
| Total ................................. | ₩ 61,679 | ₩10,087 | ₩ 16,688 | ₩ 12,164 | ₩ 22,740 |

*Notes:*

(1) Other than as set forth in this table, we have several other contractual obligations, including finance lease agreements and fuel purchase agreements. We believe the remaining annual payments under capital and operating lease agreements as of December 31, 2016 were immaterial. Contractual obligations related to payment of debt of us and our six wholly-owned generation subsidiaries represented 96.1% of our outstanding debt as of December 31, 2016 on a consolidated basis. As for fuel purchase agreements, our generation subsidiaries have entered into several contracts under which they are committed to purchasing minimum quantities of fuel, including approximately 80 million tons of bituminous coal annually, approximately 34,719 tons of U3O8, a uranium ore concentrate, by 2030, and a quantity of LNG to be annually negotiated with Korea Gas Corporation, among others. The fuel purchase price is typically negotiated near or at the time of purchase subject to prevailing market conditions. In 2016, we purchased fuel in the amount of Won 12.6 trillion.

(2) Includes the current portion.

(3) A portion of our debt carried a variable rate of interest. We used the interest rate in effect as of December 31, 2016 for the variable rate of interest in calculating the interest payments on debt for the periods indicated.

For a description of our commercial commitments and contingent liabilities, see Note 50 of the notes to our consolidated financial statements included in this annual report.

We entered into a power purchase agreement with GS EPS Co., Ltd. and three other non-renewable energy independent power producers that are not part of the Community Energy System, under which we are required to purchase all electricity generated by these companies to the extent such electricity is traded through the Korea Power Exchange. The purchase prices for such electricity are predetermined under the power purchase agreements, subject to annual adjustments. We purchased power from these companies in the amounts of Won 1,980 billion, Won 1,049 billion and Won 896 billion in 2014, 2015 and 2016, respectively.

We meet our coal requirements primarily through purchases of bituminous coal and anthracite coal under long-term supply contracts with domestic and foreign suppliers to purchase. Under these long-term supply contracts, purchase prices are adjusted periodically based on prevailing market conditions. We also purchase a substantial portion of our LNG requirements from Korea Gas Corporation, a related party. We have also entered into long-term transportation contracts with Pan Ocean Co., Ltd. and others.

102

We import all uranium ore concentrates from sources outside Korea (including the United Kingdom, Kazakhstan, France, Germany, Niger, Canada and Japan) through medium- to long-term contracts and pay for such concentrates with currencies other than Won, primarily U.S. dollars. Contract prices for processing of uranium are generally based on market prices. See Note 49 of the notes to our consolidated financial statements for further details of these contracts.

Under the Long-term Transmission and Substation Plan approved by the Ministry of Trade, Industry and Energy, we are liable for the construction of all of our power transmission facilities and the maintenance and repair expenses for such facilities.

Payment guarantee and short-term credit facilities from financial institutions as of December 31, 2016 were as follows:

### Payment guarantee

| Description | Financial Institutions | Credit Lines | |
|---|---|---|---|
| | | **(In millions of Won or thousands of USD, JPY, INR, GBP, SAR, NPR, AED and EUR)** | |
| Payment of import letter of credits . . . . . . . . . | Shinhan Bank[(1)] | KRW | 19,721 |
| | Woori Bank and others | USD | 881,380 |
| Inclusive credits . . . . . . . . . . . . . . . . . . . . . . . | Shinhan Bank | INR | 47,489 |
| | KEB Hana Bank | KRW | 258,000 |
| | HSBC and others | USD | 332,510 |
| Performance guarantees on guarantees . . . . . . | Kookmin Bank and others | EUR | 21,291 |
| | KEB Hana Bank | INR | 236,443 |
| | Seoul Guarantee Insurance and others | KRW | 93,781 |
| | Bank of Kathmandu | NPR | 32,633 |
| | KEB Hana Bank and others | USD | 634,223 |
| Guarantees for bid . . . . . . . . . . . . . . . . . . . . . | SMBC and others | USD | 18,660 |
| Warranty bond and others . . . . . . . . . . . . . . . | Bank of Kathmandu | NPR | 7,176 |
| | KEB Hana Bank | SAR | 95,756 |
| | HSBC and others | USD | 3,615,443 |
| Trade finance | BNP Paribas and others | USD | 750,000 |
| Other guarantees . . . . . . . . . . . . . . . . . . . . . | Export-Import Bank of Korea | EUR | 1,400 |
| | KEB Hana Bank | INR | 157,830 |
| | KEB Hana Bank | JPY | 756,669 |
| | Nonghyup Bank and others | KRW | 277,336 |
| | KEB Hana Bank | SAR | 2,240 |
| | KEB Hana Bank and others | USD | 1,111,636 |

_____

*Note:*

(1) We were provided with a guarantee of ₩198 million from Daewoo Engineering & Construction Co. Ltd. for some of these commitments.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

*Overdraft and Others*

| Description | Financial Institutions | Credit Lines | |
|---|---|---|---|
| | | **(In millions of Won or thousands of USD)** | |
| Overdraft . . . . . . . . . . . . . . . . . . . . . . . . . . . | Nonghyup Bank and others | KRW | 1,915,000 |
| Commercial paper . . . . . . . . . . . . . . . . . . . . | Shinhan Bank and others | KRW | 700,000 |
| Limit amount available for card  . . . . . . . . . . | KEB Hana Bank and others | KRW | 46,323 |
| | Banco de Oro | PHP | 5,000 |
| Loan limit  . . . . . . . . . . . . . . . . . . . . . . . . . | Kookmin Bank and others | KRW | 1,132,282 |
| | BNP Paribas and others | USD | 1,954,150 |

We provide a performance guarantee related to a construction contract to Kookmin Bank. Such guarantee is not recognized as a provision for financial guarantee because such performance guarantee does not meet the definition of a financial guarantee contract under IFRS.

In order to secure our status as a shareholder of Navanacom Electric Co., Ltd., we have signed a fund supplement contract. According to the contract, in case Navanacom Electric Co., Ltd. does not have sufficient funds for its operation or repayment of borrowings, we bear a payment obligation in proportion to our ownership.

We have outstanding borrowings with a limit of US$275.6 million from creditors such as International Finance Corporation. Regarding the borrowing contract, we have guaranteed capital contribution of US$69.8 million and additional contribution up to US$19 million for contingencies, if any. For one of the electricity purchasers, Central Power Purchasing Agency Guarantee Ltd., we have provided payment guarantee up to US$2,110 thousand, in case of a construction delay or insufficient contract volume after commencement of the construction.

We have provided PT. Perusahaan Listrik Negara performance guarantee up to USD 917 thousand in proportion to our ownership in the electricity purchase contract with PT. Cirebon Energi Prasarana in relation to the second electric power generation business in Cirebon, Indonesia. Also, in relation to the business, we have provided Limited Notice To Proceed 2 ("LNTP 2") Offshore performance payment guarantee amounting to USD 2,784 thousand to Hyundai Engineering Co. Ltd., Toshiba Corporation and MHPS, and LNTP 2 Onshore performance payment guarantee amounting to USD 380 thousand to Hyundai E&C and Toshiba Asia Pacific Indonesia (TAPI) based on the interest owned by us to progress the construction.

We have provided the Export-Import Bank of Korea and SMBC guarantee of mutual investment of USD 401 thousand, which is equivalent to the ownership interest of PT Mega Power Mandiri, in order to guarantee the expenses related to hydroelectric power business of PT Wampu Electric Power, our associate.

We have provided the Export-Import Bank of Korea, BNP Paribas and ING Bank guarantee of mutual investment of USD 2,684 thousand, which is equivalent to the ownership interest of PT BS Energy and PT Nusantara Hydro Alam, in order to guarantee the expenses related to hydroelectric power business of Tanggamus, Indonesia.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Existing guarantees provided by us to our associates and joint ventures as of December 31, 2016 are as follows.

| Primary Guarantor (Providing Company) | Secondary Guarantor (Provided Company) | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| KEPCO . . . . . . . . | KEPCO SPC Power Corporation | Debt guarantees | USD | 71,192 | SMBC, Export-Import Bank of Korea and ADB |
| KEPCO . . . . . . . . | Shuweihat Asia O&M Co., Ltd. | Performance guarantees | USD | 11,000 | SAPCO |
| KEPCO . . . . . . . . | KNOC Nigerian East Oil Co., Ltd. and KNOC Nigerian West Oil Co., Ltd. | Performance guarantees | USD | 34,650 | Korea National Oil Corporation (Nigerian government) |
| KEPCO . . . . . . . . | Rabigh Operation & Maintenance Company | Performance guarantees and others | USD | 1,387 | RABEC |
| KEPCO . . . . . . . . | Nghi Son 2 Power Ltd. | Bidding guarantees | USD | 10,000 | SMBC Ho Chi Minh |
| KEPCO . . . . . . . . | Barakah One Company | Debt guarantees | USD | 90,000 | Export-Import Bank of Korea |
| | | Performance guarantees and others | USD | 3,404,275 | |
| KOWEPO . . . . . . | Cheongna Energy Co., Ltd. | Collateralized money invested | KRW | 27,211 | KEB Hana Bank and others |
| | | Guarantees for supplemental funding[1] | | — | |
| KOWEPO . . . . . . | Xe-Pian Xe-Namnoy Power Co., Ltd. | Payment guarantees for business reserve | USD | 2,500 | Krung Thai Bank |
| | | Collateralized money invested | USD | 43,276 | |
| | | Impounding bonus guarantees | USD | 5,000 | SK E&C |
| KOWEPO . . . . . . | Rabigh O&M Co., Ltd. | Performance guarantees and others | SAR | 5,600 | Saudi Arabia British Bank |
| KOWEPO . . . . . . | Deagu Photovoltaic Co., Ltd. | Collateralized money invested | KRW | 1,230 | IBK |
| KOWEPO . . . . . . | Dongducheon Dream Power Co., Ltd. | Collateralized money invested | KRW | 111,134 | Kookmin Bank and others |
| KOWEPO . . . . . . | PT. Mutiara Jawa | Collateralized money invested | USD | 2,610 | Woori Bank |
| KOWEPO . . . . . . | Heangbok Do Si Photovoltaic Power Co., Ltd. | Collateralized money invested | KRW | 194 | Nonghyup Bank |
| KOWEPO . . . . . . | Shin Pyeongtaek Power Co., Ltd. | Collateralized money invested | KRW | 40 | Kookmin Bank |
| EWP . . . . . . . . . | Busan Shinho Solar Power Co., Ltd. | Collateralized money invested | KRW | 2,100 | Heungkuk Life Insurance Co., Ltd. and others |

105

| Primary Guarantor (Providing Company) | Secondary Guarantor (Provided Company) | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| EWP . . . . . . . . . | Seokmun Energy Co., Ltd. | Collateralized money invested | KRW | 580 | KEB Hana Bank and others |
| | | Guarantees for supplemental funding[1] | KRW | 15,370 | |
| EWP . . . . . . . . . | Chun-cheon Energy Co., Ltd. | Collateralized money invested | KRW | 52,700 | Kookmin Bank and others |
| | | Guarantees for supplemental funding[1] | KRW | 60,270 | |
| EWP . . . . . . . . . | Honam Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,480 | Shinhan Bank |
| EWP . . . . . . . . . | GS-Donghae Electric Power Co., Ltd. | Collateralized money invested | KRW | 204,000 | Korea Development Bank and others |
| EWP . . . . . . . . . | Yeonggwangbaeksu Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,000 | Hyundai Marine & Fire Insurance Co., Ltd. and others |
| EWP . . . . . . . . . | PT. Tanjung Power Indonesia | Debt guarantees | USD | 49,221 | The Bank of Tokyo-Mitsubishi |
| KOSPO . . . . . . . | KNH Solar Co., Ltd. | Collateralized money invested | KRW | 1,296 | Shinhan Bank and Kyobo Life Insurance Co., Ltd. |
| | | Performance guarantees and guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . | Daeryun Power Co., Ltd. | Collateralized money invested | KRW | 25,477 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . | Changjuk Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,801 | Shinhan Bank and Woori Bank |
| | | Guarantees for supplemental funding[1] | | — | |
| KOSPO . . . . . . . | Daegu Green Power Co., Ltd. | Collateralized money invested | KRW | 46,226 | Shinhan Bank |
| KOSPO . . . . . . . | KS Solar Corp. Ltd. | Collateralized money invested | KRW | 637 | Shinhan Capital Co., Ltd. |

106

| Primary Guarantor (Providing Company) | Secondary Guarantor (Provided Company) | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| KOSPO . . . . . . . . | Kelar S.A. | Performance guarantees[1] | USD | 50,700 | KEB Hana Bank, SMBC, Mizuho Bank, BTMU, Natixis |
| | | Debt guarantees | USD | 132,600 | BANCO SANTANDER-CHILE, SMBC, Mizuho Bank |
| KOSPO . . . . . . . . | DS Power Co., Ltd. | Collateralized money invested | KRW | 2,900 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . . | Pyoungchang Wind Power Co., Ltd. | Collateralized money invested | KRW | 3,875 | Woori Bank and Shinhan Bank |
| | | Performance guarantees and guarantees for supplemental funding and others[1] | | — | |
| KOSPO . . . . . . . . | Taebaek Wind Power Co., Ltd. | Guarantees for supplemental funding and others[1] | | — | Shinhan Bank |
| KEPCO E&C  . . . | DS Power Co., Ltd. | Collateralized money invested | KRW | 15,000 | Korea Development Bank and others |
| KOMIPO . . . . . . . | Hyundai Green Power Co., Ltd. | Collateralized money invested | KRW | 87,003 | Korea Development Bank and others |
| | | Guarantees for supplemental funding and others[1] | | — | |
| KOMIPO . . . . . . . | PT. Cirebon Electric Power | Debt guarantees | USD | 9,653 | Mizuho Bank |
| KOMIPO . . . . . . . | PT. Wampu Electric Power | Debt guarantees | | 5,367 | SMBC |
| KOMIPO . . . . . . . | Gangwon Wind Power Co., Ltd. | Collateralized money invested | KRW | 7,409 | IBK and others |
| KOSEP . . . . . . . . | Hyundai Energy Co., Ltd. | Collateralized money invested | KRW | 47,067 | Korea Development Bank and others |
| | | Performance guarantees and guarantees for supplemental funding and others[1] | KRW | 78,600 | |

| Primary Guarantor (Providing Company) | Secondary Guarantor (Provided Company) | Type of Guarantees | Currency | Credit Limit | Guarantee (Final Provided Company) |
|---|---|---|---|---|---|
| KOSEP . . . . . . . . | RES Technology AD | Collateralized money invested | KRW | 15,595 | Korea Development Bank and others |
| | | Debt guarantees | EUR | 4,271 | |
| KOSEP . . . . . . . . | ASM-BG Investicii AD | Collateralized money invested | KRW | 16,101 | Korea Development Bank and others |
| | | Debt guarantees | EUR | 4,175 | |
| KOSEP . . . . . . . . | Express Solar-light Power Generation Co., Ltd. | Guarantees for supplemental funding and others[1][2] | KRW | 2,500 | Woori Bank |
| KOSEP . . . . . . . . | S-Power Co., Ltd. | Collateralized money invested | KRW | 132,300 | Korea Development Bank and others |
| KOSEP USA, INC. . . . . . . . . | KODE NOVUS II LLC | Guarantees for supplemental funding and others[1] | | 3,750 | Korea Development Bank |
| KOSEP USA, INC. . . . . . . . . | KODE NOVUS I LLC | Guarantees for supplemental funding and others[1] | | — | The Export-Import Bank of Korea and others |
| KHNP . . . . . . . . . | Yeongwol Energy Station Co., Ltd. | Collateralized money invested | KRW | 1,400 | Meritz Fire & Marine Insurance Co., Ltd. |
| KHNP . . . . . . . . . | Noeul Green Energy Co., Ltd. | Collateralized money invested | KRW | 1,740 | KEB Hana Bank and others |
| KHNP . . . . . . . . . | Busan Green Energy Co., Ltd. | Collateralized money invested | KRW | 14,564 | Shinhan Bank and others |
| KEPCO KPS . . . . | Incheon New Power Co., Ltd. | Collateralized money invested Guarantees for supplemental funding and others[1] | KRW | 6,800 | Shinhan Bank |

_____

*Note:*

(1) We guarantee to provide supplemental funding for businesses with respect to excessive business expenses or insufficient repayment of borrowings.

(2) We have granted the right to Hana Financial Investment Co., Ltd., as an agent for the creditors to Express Solar-light Power Generation Co., Ltd. ("ESPG"), to the effect that in the event of acceleration of ESPG's payment obligations under certain borrowings to such creditors, Hana Financial may demand us to dispose of shares in ESPG held by us and apply the resulting proceeds to repayment of ESPG's obligations.

Other than as described in this annual report and also in Notes 47 and 50 of the notes to our consolidated financial statements included in this annual report, we did not have any other material credit lines and guarantee commitments provided to any third parties as of December 31, 2016.

We are subject to legal proceedings. For a description of our legal proceedings, see Item 8.A. "Consolidated Statements and Other Financial Information—Legal Proceedings."

## ITEM 6.   DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

### Item 6.A. Directors and Senior Management

### Board of Directors

Under the KEPCO Act, the Act on the Management of Public Institutions and our Articles of Incorporation, our board of directors, which is required to consist of not more than 15 directors, including the president, is vested with the authority over our management.

Pursuant to our Articles of Incorporation and the Act on the Management of Public Institutions, we have two types of directors: standing directors (*sangim-isa* in Korean) and non-standing directors (*bisangim-isa* in Korean). The standing directors refer to our directors who serve their directorship positions in full-time capacity. Many of our standing directors concurrently hold executive positions with us or our subsidiaries. The non-standing directors refer to our directors who do not serve their directorship positions in full-time capacity. The non-standing directors currently do not hold any executive positions with us or our subsidiaries.

Under our Articles of Incorporation, there may not be more than seven standing directors, including our president, and more than eight non-standing directors. The number of non-standing directors must exceed the number of standing directors, including our president. A senior non-standing director appointed by the Ministry of Strategy and Finance becomes our chairman of the board following the review and resolution of the Public Agencies Operating Committee.

Our president serves as our chief executive officer and represents us and administers our day-to-day business in all matters and bears the responsibility for the management's performance. Our president is appointed by the President of the Republic upon the motion of the Ministry of Trade, Industry and Energy following the nomination by our director nomination committee, the review and resolution of the Public Agencies Operating Committee pursuant to the Act on the Management of Public Institutions and an approval at the general meeting of our shareholders.

Our standing director who concurrently serve as members of the audit committee are appointed through the same appointment process applicable to our president, except that the motion for appointment is made by the Ministry of Strategy and Finance instead of the Ministry of Trade, Industry and Energy. Standing directors other than our president or those who concurrently serve as members of the audit committee are appointed by our president with the approval at the general meeting of our shareholders.

Our non-standing directors must be appointed by the minister of the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee and must have ample knowledge and experience in business management, and subject to approval at the general meeting of our shareholders. Government officials that are not part of the teaching staff in national and public schools are ineligible to become our non-standing directors.

The term of our president is three years, while that of our directors (standing or non-standing, but not the president) is two years. According to the Act on the Management of Public Institutions, our president's term cannot be terminated unless done so by the President of the Republic pursuant to the Act on the Management of Public Institutions or upon an event as specified in our Articles of Incorporation.

Attendance by a majority of the board members constitutes a voting quorum for our board meetings, and resolutions can be passed by a majority of the board members. In the event the president acts in violation of law or the Articles of Incorporation, is negligent in his duties, or otherwise is deemed to be significantly impeded in performing his official duties as president, the board of directors may by resolution request the minister of the Ministry of Trade, Industry and Energy to dismiss or recommend the dismissal of the president.

Our non-standing directors may request any information necessary to fulfill their duties from our president, and except in special circumstances, our president must comply with such request.

109

The names, titles and outside occupations, if any, of the directors as of April 15, 2017 and the respective years in which they took office are set forth below.

| Name | Age | Title | Outside Occupation | Position Held Since |
|------|-----|-------|-------------------|---------------------|
| Cho, Hwan-Eik ........ | (67) | President, Chief Executive Officer and Standing Director | None | December 17, 2012 |
| Lee, Sung-Han ......... | (60) | Standing Director and Member of the Audit Committee | Chaired Professor of College of Social Sciences, Dongguk University | May 2, 2016 |
| Kim, Si-Ho ............ | (59) | Standing Director and Executive Vice President of Domestic Operations | None | August 27, 2015 |
| Lyu, Hyang-Reol ....... | (59) | Standing Director and Executive Vice President of Overseas Operations | None | December 10, 2015 |
| Hyun, Sang-Kwon ...... | (59) | Standing Director and Executive Vice President, Chief Financial Officer and Strategy Officer | None | August 27, 2015 |
| Park, Sung-Chul ........ | (57) | Standing Director and Executive Vice President & Chief Sales Officer | None | July 26, 2016 |
| Moon, Bong-Soo ....... | (59) | Standing Director and Executive Vice President & Chief Power System Officer | None | January 10, 2017 |
| Cho, Jeon-Hyeok ....... | (56) | Non-Standing Director and Member of the Audit Committee | Chairman of Incheon City Committee of Barun Political Party | February 14, 2014 |
| Lee, Kang-Hee ......... | (74) | Non-Standing Director | Director of the Republic of Korea Parliamentarian Society | February 14, 2014 |
| Koo, Ja-Yoon .......... | (65) | Non-Standing Director | Chairman of Conseil International des Grands Reseaux Electriques Korea National Committee | September 2, 2014 |
| Ahn, Choong-Yong ..... | (76) | Non-Standing Director | Chairman of Korea Commission for Corporate Partnership | December 3, 2014 |
| Sung, Tae-Hyun ........ | (58) | Non-Standing Director and Member of the Audit Committee | Professor of Electrical Engineering, Hanyang University | August 12, 2014 |
| Choi, Ki-Ryun ......... | (70) | Non-Standing Director | Professor of Energy Systems Research, Ajou University | August 12, 2014 |
| Kim, Ji-Hong .......... | (61) | Non-Standing Director | None | May 16, 2016 |
| Kim, Ju-Suen .......... | (56) | Non-Standing Director and Member of the Audit Committee | Representative of Kim, Ju-Suen Law Office | August 6, 2015 |

*Cho, Hwan-Eik* has been our President, Chief Executive Officer and Standing Director since December 17, 2012. Prior to his current position, he served as Chair-professor at Hanyang University, President of the Korea Trade-Investment Promotion Agency, CEO of Korea Export Insurance Corporation and Vice Minister of the Ministry of Commerce. Mr. Cho received a Ph.D. in business administration from Hanyang University.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

*Lee, Sung-Han* has been our Standing Director since May 2, 2016. Mr. Lee also currently serves as the Chaired Professor of College of Social Sciences at Dongguk University. Mr. Lee previously served as the Commissioner General of the Korean National Police Agency, Director General of the Korean National Policy Agency's Office of Audit and Inspection, and Consular at the Embassy of the Republic of Korea in the United States. Mr. Lee received a Ph.D in police administration from Dongguk University.

*Kim, Si-Ho* has been our Standing Director since August 27, 2015. Mr. Kim also currently serves as our Executive Vice President of Domestic Operations and previously served as Executive Vice President and Chief Operating Officer. Mr. Kim received a B.A. in law from Yeungnam University.

*Lyu, Hyang-Reol* has been our Standing Director since December 10, 2015. Mr. Lyu also currently serves as our Executive Vice President of Overseas Operations and previously served as our President of KEPCO Ilijan Corporation, Philippines. Mr. Lyu received master's degrees in business administration from Yonsei University and Helsinki School of Economics.

*Hyun, Sang-Kwon* has been our Standing Director since August 27, 2015. Mr. Hyun also currently serves as our Executive Vice President, Chief Financial Officer and Chief Strategy Officer, and previously served as our Vice President of Project Strategy & Planning. Mr. Hyun received an M.A. in public administration from Yonsei University Graduate School.

*Park, Sung-Chul* has been our Standing Director since August 27, 2015. Mr. Park also currently serves as our Executive Vice President and Chief Sales Officer and previously served as Vice President of Seongnam District Division. Mr. Park received an M.A. in electrical engineering from Yonsei University Graduate School.

*Moon, Bong-Soo* has been our Standing Director since January 10, 2017. Mr. Moon also currently serves as our Executive Vice President and Chief Power System Officer and previously served as our Director General of Project Strategy & Planning Office. Mr. Moon received a B.A. in electrical engineering from Seoul National University.

*Cho, Jeon-Hyeok* has been our Non-Standing Director since February 14, 2014. Mr. Cho is currently the Chairman of Incheon City Committee of Barun Political Party. Mr. Cho previously served as a Professor of the Department of Economics, National University of Incheon and Chief Executive Officer of Naeil Venture Capital. Mr. Cho received a Ph.D. in economic theory and financial economics from University of Wisconsin at Madison.

*Lee, Kang-Hee* has been our Non-Standing Director since February 14, 2014. Mr. Lee is currently the director of the Republic of Korea Parliamentarian Society. Mr. Lee previously served as a member of the National Assembly for two terms and a member of the Advisory Board on Democratic Peaceful Unification.

*Koo, Ja-Yoon* has been our Non-Standing Director since September 2, 2014. Mr. Koo is currently Chairman of Conseil International des Grands Reseaux Electriques Korea National Committee and previously served as Professor of Electronics & System Engineering at Hanyang University. Mr. Koo received a B.S. in Electrical Engineering from Seoul National University and a Ph.D. in Electrical Engineering from ENSIEG.

*Ahn, Choong-Yong* has been our Non-Standing Director since December 3, 2014. Mr. Ahn is currently Chairman of Korea Commission for Corporate Partnership and Chaired Professor of Graduate School of International Studies at Chungang University and previously served as the foreign investment ombudsman for Korea Trade-Investment Promotion Agency (KOTRA). Mr. Ahn received a B.A. in Economics from Kyoungpook National University and a Ph.D. in Economics from Ohio State University.

*Sung, Tae-Hyun* has been our Non-Standing Director since August 12, 2014. Mr. Sung is currently Professor of Electrical Engineering at Hanyang University and previously served as senior researcher at KEPCO Research Institute. Mr. Sung received a B.S. in Material Engineering from Hanyang University and a Ph.D in Material Science and Engineering from Tokyo Institute of Technology.

*Choi, Ki-Ryun* has been our Non-Standing Director since August 12, 2014. Mr. Choi is currently Professor of Energy Systems Research at Ajou University and previously served as head of New & Renewable Energy Center of Korea Energy Management Corporation. Mr. Choi received a B.S. in Mining and Minerals Engineering from Seoul National University and a Ph.D in Energy Economics from University of Grenoble.

*Kim, Ji-Hong* has been our Non-Standing Director since May 16, 2016. Mr. Choi previously served as a member of the Banking Subcommittee of the Financial Development Council, Professor at Korea Development Institute and a non-standing director at KB Kookmin Bank.

*Kim, Ju-Suen* has been our Non-Standing Director since August 6, 2015. Mr. Kim is currently an attorney-at-law at Kim, Ju-Suen Law Firm. Mr. Kim previously served as Chief Public Prosecutor at the Daejeon Prosecutor's Office Cheonan branch. Mr. Kim received a B.A. and M.A. in law from Dankook University.

The business address of our directors is 55 Jeollyeok-ro, Naju-si, Jeollanam-do, 58217, Korea.

**Audit Committee**

Under the Act on the Management of Public Institutions, which took effect as of April 1, 2007, we are designated as a "market-oriented public enterprise" and, as such, are required to establish an audit committee in lieu of the pre-existing board of auditors upon expiration of the term of the last remaining member of the board of auditors. In September 2007, we amended our Articles of Incorporation to establish, in lieu of the pre-existing board of auditors, an audit committee meeting the requirements under the Sarbanes-Oxley Act. Under the Act on the Management of Public Institutions, the Korean Commercial Code and the amended Articles of Incorporation, we are required to maintain an audit committee consisting of three members, of which not less than two members are required to be non-standing directors. The roles and responsibilities of our audit committee members are to perform the functions of an audit committee meeting the requirements under the Sarbanes-Oxley Act. Our audit committee was established on December 8, 2008.

Our audit committee currently consists of Lee, Sung-Han, a standing director, and Cho, Jeon-Hyeok and Kim, Ju-Seun, both non-standing directors. All such members of the audit committee are independent within the meaning of the Korea Stock Exchange listing standards, the regulations promulgated under the Korean Commercial Code and the New York Stock Exchange listing standards.

**Item 6.B. Compensation**

The aggregate amount of remuneration paid to our standing and non-standing directors in the aggregate consist of (i) salaries and wages paid to standing and non-standing directors, which amounted to Won 1,696 million in aggregate in 2016, and (ii) accrued retirement and severance benefits for standing directors, which amounted to Won 15 million in 2016. Under the Act on the Management of Public Institution, our executive officers consist of the president and the standing and non-standing directors. Standing directors take executive positions with our company while non-standing directors do not. We do not have any other officer who is in charge of a principal business unit, division or function, any other officer who performs a policy making function or any other person who performs similar policy making functions for us.

**Item 6.C. Board Practices**

Under the Act on the Management of Public Institutions and our Articles of Incorporation, for appoints made after April 1, 2007, the term of office for our president is three years and the term of our office for our

directors (whether standing or non-standing but not the president) is two years. Our president and directors may be reappointed for one or more additional terms of one year. In order to be reappointed, the president must be evaluated on the basis of his management performance; a standing director, on the basis of the performance of the duties for which he was elected to perform, or if the standing director has executed an incentive bonus contract, on the basis of his performance under the contract; and a non-standing director, on the basis of his performance of the duties for which he was elected to perform.

Our board currently does not maintain a compensation committee. See Item 16.G. "Corporate Governance." However, we currently maintain an audit committee meeting the requirements of the Sarbanes-Oxley Act to perform the roles and responsibilities of the compensation committee. Prior to the establishment of the audit committee on December 8, 2008 pursuant to the Act on the Management of Public Institutions, we maintained a board of auditors, which performed the roles and responsibilities required of an audit committee under the Sarbanes-Oxley Act, including the supervision of the financial and accounting audit by the independent registered public accountants.

Our president's management contract includes benefits upon termination of his employment. The amount for termination benefits payable equals the average value of compensation for one month times the number of years the president is employed by us, provided that the president is only eligible for termination benefits after more than one year of continuous service.

The termination benefits for our standing directors are determined in accordance with our internal regulations for executive compensation. Standing directors are eligible for benefits only upon termination of employment or death following one year of continuous service.

See also Item 16.G. "Corporate Governance" for a further description of our board practices.

**Item 6.D. Employees**

As of December 31, 2016, we and our generation subsidiaries had a total of 43,688 regular employees, almost all of whom are employed within Korea. Approximately 9.9% of our regular employees (including employees of our generation subsidiaries) are located at our head office.

The following table sets forth the number of and other information relating to our regular employees, not including directors or senior management, as of December 31, 2016.

| | KEPCO | KHNP | KOSEP | KOMIPO | KOWEPO | KOSPO | EWP | Total |
|---|---|---|---|---|---|---|---|---|
| Regular Employees | | | | | | | | |
| Administrative . . . . . . . . . . . . | 4,791 | 1,047 | 276 | 307 | 261 | 255 | 262 | 7,199 |
| Engineers . . . . . . . . . . . . . . . | 10,440 | 9,141 | 1,788 | 2,002 | 1,744 | 1,716 | 1,942 | 28,773 |
| Others . . . . . . . . . . . . . . . . . . | 5,726 | 1,174 | 201 | 143 | 173 | 166 | 133 | 7,716 |
| Total . . . . . . . . . . . . . . . . . . . | 20,957 | 11,362 | 2,265 | 2,452 | 2,178 | 2,137 | 2,337 | 43,688 |
| Head Office Employees . . . . . . . . . | 1,652 | 1,196 | 295 | 303 | 265 | 277 | 316 | 4,304 |
| % of total . . . . . . . . . . . . . . . | 7.9 | 10.5 | 13.0 | 12.4 | 12.2 | 13.0 | 13.5 | 9.9 |
| Members of Labor Union . . . . . . . . | 15,596 | 7,415 | 1,445 | 1,439 | 1,475 | 1,361 | 1,642 | 30,373 |
| % of total . . . . . . . . . . . . . . . | 74.4 | 65.3 | 63.8 | 58.7 | 67.7 | 63.7 | 70.3 | 69.5 |

We and each of our generation subsidiaries have separate labor unions. Approximately 69.5% of our and our generation subsidiaries' employees in the aggregate are members of these labor unions, each of which negotiates a collective bargaining agreement for its members each year. Under applicable Korean law, an employee-employer cooperation committee comprised of an equal number of representatives of management and labor (which shall be no less than three and no more than ten representatives from each of management and labor) is

113

required to be established. Accordingly, an employee-employer cooperation committee composed of eight representatives of management and eight representatives of labor has been established at us and at each of our generation subsidiaries. The committee meets periodically to discuss various labor issues.

Since our formation in 1981, our businesses had not been interrupted by any work stoppages or strikes except in early 2002, when employees belonging to our five non-nuclear generation subsidiaries went on strike for six weeks to protest the Government's decision to privatize such non-nuclear generation subsidiaries according to the Restructuring Plan, which privatization plan has since been suspended indefinitely. See Item 3.D. "Risk Factors—Risks Relating to KEPCO—The Government may adopt policy measures to substantially restructure the Korean electric power industry or our operational structure, which may have a material adverse effect on our business, operations and profitability."

We believe our relations with our employees are generally good.

## Item 6.E. Share Ownership

None of our directors and members of our administrative, supervisory or management bodies own more than 0.1% of our common stock.

## ITEM 7.　*MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS*

### Item 7.A. Major Shareholders

The following table sets forth certain information relating to certain owners of our capital stock as of December 31, 2016, the date we last closed our shareholders' registry:

| Title of Class | Identity of Person or Group | Shares Owned | Percentage of Class[1] (%) |
|---|---|---|---|
| Common stock . . . . . | Government | 116,841,794 | 18.2 |
| | Korea Development Bank[2] | 211,235,264 | 32.9 |
| | Subtotal | 328,077,058 | 51.1 |
| | National Pension Corporation | 41,705,930 | 6.5 |
| | Employee Stock Ownership Association | — | — |
| | Directors and executive officers as a group | — | — |
| | Public (non-Koreans) | 197,308,414 | 30.7 |
| | Common shares | 161,040,488 | 25.1 |
| | American depositary shares | 36,267,926 | 5.6 |
| | Public (Koreans) | 74,872,675 | 11.7 |
| | Total | 641,964,077 | 100.0 |

_____
*Notes:*

(1)  Percentages are based on issued shares of common stock.
(2)  Korea Development Bank is a Government-controlled entity.

All of our shareholders have equal voting rights. See Item 10.B. "Memorandum and Articles of Incorporation—Description of Capital Stock—Voting Rights."

### Item 7.B. Related Party Transactions

We are engaged in a variety of transactions with our affiliates. We have related party transactions with Government-controlled entities such as Korea Gas Corporation, our consolidated subsidiaries and our equity investees. In addition, we engage in related party transactions with Korea Development Bank, one of our major shareholders. See Note 47 of the Notes to our consolidated financial statements included in this annual report for a description of transaction and balances with our related parties.

114

In the past three years, our related party transactions principally consisted of purchases of LNG from Korea Gas Corporation, sales of electricity to Korea District Heating Co., Ltd., and long-term borrowings from Korea Development Bank. In 2014, 2015 and 2016, we and our generation subsidiaries purchased LNG from Korea Gas Corporation in the aggregate amount of Won 10,135 billion, Won 4,599 billion and Won 3,633 billion, respectively. As of December 31, 2016, we had long-term borrowings from Korea Development Bank in the aggregate amount of Won 204 billion.

We also engage in extensive transactions with our consolidated generation subsidiaries, including the purchase of electricity from them through Korea Power Exchange, sales of electricity to them, payment and receipt of commissions for services and receivables and payables transactions. These are eliminated in the consolidation process. We also provide guarantees for certain of our affiliates. See Item 5.F. "Tabular Disclosure of Contractual Obligations—Overdraft and Others." We also have certain relationships with the Korea Power Exchange. See Item 4.B. "Business Overview—Purchase of Electricity—Cost-based Pool System."

For a further description of our transactions with our affiliates, see Note 47 of the Notes to our consolidated financial statements included in this annual report.

## Item 7.C. Interests of Experts and Counsel

Not Applicable

## ITEM 8.   *FINANCIAL INFORMATION*

## Item 8.A. Consolidated Statements and Other Financial Information

We prepare our consolidated financial statements in compliance with requirements under Item 18. "Financial Statements."

## Legal Proceedings

As of December 31, 2016, we and our subsidiaries were engaged in 675 lawsuits as a defendant and 193 lawsuits as a plaintiff. As of the same date, the total amount of damages claimed against us and our subsidiaries was Won 636 billion, for which we have made a provision of Won 198 billion as of December 31, 2016, and the total amount claimed by us and our subsidiaries was Won 490 billion as of December 31, 2016. While the outcome of any of these lawsuits cannot presently be determined with certainty, our management currently believes that the final results from these lawsuits will not have a material adverse effect on our liquidity, financial position or results of operations.

The following are potentially significant claims pertaining to us and our subsidiaries.

In September 2013, Hyundai Engineering & Construction Co., Ltd., SK Engineering & Construction Co., Ltd. and GS Engineering & Construction Co., Ltd. filed a lawsuit against KHNP seeking from KHNP extra contractual payments in the total amount of Won 204 billion on grounds of design change under the construction contract relating to New Hanwool #1 and #2 units. In November 2016, the court ruled against KHNP, and KHNP has paid Won 217 billion of the claimed amounts in full and has subsequently appealed the ruling. The lawsuit is currently pending.

In December 2013, the Supreme Court of Korea ruled that regular bonuses fall under the category of ordinary wages on the condition that those bonuses are paid regularly and uniformly, and that any agreement which excludes such regular bonuses from ordinary wage is invalid. One of the key rulings provides that bonuses that are given to employees (i) on a regular and continuous basis and (ii) calculated according to the actual number of days worked (iii) that are not incentive-based must be included in the calculation of "ordinary wages."

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

The Supreme Court further ruled that in spite of invalidity of such agreements, employees shall not retroactively claim additional wages incurred due to such court decision, in case that such claims bring to employees unexpected benefits which substantially exceeds the wage level agreed by employers and employees and cause an unpredicted increase in expenditures for their company, which would lead the company to material managerial difficulty or would be a threat to the existence of the company. In that case, the claim is not acceptable since it is unjust and is in breach of the principle of good faith. As a result of such ruling by the Supreme Court of Korea, we and our subsidiaries became subject to a number of lawsuits filed by various industry-wide and company-specific labor unions based on claims that ordinary wage had been paid without including certain items that should have been included as ordinary wage. In July 2016, the court ruled against us, and in accordance with the court's ruling, in August 2016 we paid Won 55.1 billion to the employees for three years of back pay plus interest. As of December 31, 2016, however, 30 lawsuits were pending against our subsidiaries for an aggregate claim amount of Won 198 billion, for which our subsidiaries set aside an aggregate amount of Won 179 billion to cover any potential future payments of additional ordinary wage in relation to the related lawsuits. With respect to two of such lawsuits, in February 2017, the Seoul District Court ruled partially against one of our generation subsidiaries. Other cases are currently pending. We cannot presently assure you that the courts will not ultimately rule against our subsidiaries in these lawsuits, or that the amount of our reserves against these lawsuits will be sufficient to cover the amounts actually payable under court rulings. Any of these developments would adversely affect our results of operations.

During the period from 2014 to 2016, certain residential customers filed class action lawsuits against us based on the claim that electricity tariffs, determined under the progressive rate structure, were excessive. As of December 31, 2016, we were subject to 12 such lawsuits brought by 9,237 plaintiffs with an aggregate claim amount of Won 5.1 billion. No similar lawsuit has been filed since the progressive rate structure was amended effective January 1, 2017 to ease the tariff burden on residential customers.

In addition, our generation subsidiaries, currently and from time to time, are involved in lawsuits incidental to the conduct of their business. A significant number of such lawsuits are based on the claim that the construction and operation of the electricity generation units owned by our generation subsidiaries have impaired neighboring fish farms. Our generation subsidiaries normally pay compensation to the members of fishery associations near our power plant complex for expected losses and damages arising from the construction and operation of their power plants in advance. Despite such compensation paid by us, a claim may still be filed against our generation subsidiaries challenging the compensation paid by us.

The nuclear power plant at Wolsong #1 unit began operations in 1982 and ended its operations in 2012 pursuant to its 30-year operating license. In February 2015, the Nuclear Safety and Security Commission ("NSSC") evaluated the safety of operating Wolsong #1 unit and approved its extended operation until November 2022. However, a civic group filed a lawsuit to annul such decision by the NSSC's decision, and in February 2017, the Seoul Administrative Court ruled against the NSSC. The NSSC appealed this decision, and the civic group has filed an injunction to suspend the operation of the Wolsong #1 unit. KHNP, which currently is operating the unit pursuant to the NSSC's initial decision, has joined this lawsuit. We cannot assure you whether the courts will ultimately rule to grant the extension of life for Wolsong #1. There are seven other nuclear generation units whose life under their initial operating license will expire in the next ten years, or by 2027. Thus, if the courts were to ultimately rule against the extension of life for Wolsong #1, we may find it more difficult to have the life of other nuclear units extended as well. The failure to extend the life of these units would result in loss of revenue from such units and the increase in our overall fuel costs (as nuclear fuel is the cheapest compared to coal, LNG or oil), which could adversely affect our results of operation and financial condition.

We and our subsidiaries are also involved in the following arbitrations, among others.

- SAP Korea Ltd brought a breach of contract claim against us and KEPCO KDN Co., Ltd., one of our subsidiaries, in relation to the enterprise resource planning software serviced by SAP Korea. In that connection, arbitration was filed in the International Chamber of Commerce International Court of Arbitration.

116

- Hyundai Samsung Joint Venture, one of our subcontractors, filed arbitration against us at the London Court of International Arbitration in 2016 in relation to certain disagreements involving the United Arab Emirates nuclear power plant construction project, but we have not recognized any losses because the probability of economic benefit outflow is remote and the related amount cannot be reasonably determined.

- Hyundai E&C, GS Engineering & Construction Corp., and Hansol SeenTec Co., Ltd. filed arbitration against us with the Korea Commercial Arbitration Board to request payment of additional construction costs.

- Halla Corporation filed arbitration against us with the Korea Commercial Arbitration Board to request payment of additional construction costs.

We do not believe such claims or proceedings, individually or in the aggregate, have had or will have a material adverse effect on us and our generation subsidiaries. However, we cannot assure you that this will be the case in the future, given the possibility that we may become subject to more legal and arbitral proceedings arising from changes in the environmental laws and regulations as they become applicable to us and our generation subsidiaries, and the related growth in demand for more compensation by actual and potential affected parties.

**Dividend Policy**

For our dividend policy, see Item 10.B. "Memorandum and Articles of Incorporation—Description of Capital Stock—Dividend Rights." For a description of the tax consequences of dividends paid to our shareholders, see Item 10.E. "Taxation—Korean Taxes—Shares or ADSs—Dividends on the Shares of Common Stock or ADSs" and Item 10.E. "Taxation—U.S. Federal Income and Estate Tax Consideration for U.S. Persons—Tax Consequences with Respect to Common Stock and ADSs—Distributions on Common Stock or ADSs."

**Item 8.B. Significant Changes**

Not Applicable

**ITEM 9.   *THE OFFER AND LISTING***

**Item 9.A. Offer and Listing Details**

**Notes**

We have issued the following registered notes and debentures, which are traded principally in the over-the-counter market:

- 7.95% Zero-To-Full Debentures, due April 1, 2096 (the "7.95% Debentures");

- 6% Debentures due December 1, 2026, (the "6% Debentures");

- 7% Debentures due February 1, 2027 (the "7% Debentures"); and

- 6-3/4% Debentures due August 1, 2027 (the "6-3/4% Debentures," and together with the 7.40% Debentures, the 7.95% Debentures, the 6% Debentures and the 7% Debentures, the "Registered Debt Securities").

Sales prices for the Registered Debt Securities are not regularly reported on any United States securities exchange or other United States securities quotation service.

*Share Capital*

The principal trading market for our common stock is the Korea Exchange. Our common stock is also listed on the New York Stock Exchange in the form of ADSs. The ADSs have been issued by Citibank, N.A. as

depositary and are listed on the New York Stock Exchange under the symbol "KEP." One ADS represents one-half of one share of our common stock. As of December 31, 2016, the date we last closed our shareholders' registry, 72,535,852 ADSs representing 5.65% shares of our common stock were outstanding.

### Common Stock

Shares of our common stock are listed on the KRX KOSPI Market of the Korea Exchange. The table below shows the high and low closing prices on the KRX KOSPI Market of the Korea Exchange for our common stock since 2012.

| Period | Price | |
|---|---|---|
| | **High** | **Low** |
| | (In Won) | |
| **2012** | | |
| First Quarter | 27,900 | 22,250 |
| Second Quarter | 25,850 | 21,450 |
| Third Quarter | 27,900 | 23,750 |
| Fourth Quarter | 30,450 | 26,200 |
| **2013** | | |
| First Quarter | 34,850 | 29,000 |
| Second Quarter | 32,600 | 24,850 |
| Third Quarter | 30,700 | 26,350 |
| Fourth Quarter | 34,750 | 27,250 |
| **2014** | | |
| First Quarter | 37,800 | 33,400 |
| Second Quarter | 41,900 | 37,050 |
| Third Quarter | 48,200 | 36,800 |
| Fourth Quarter | 49,450 | 40,350 |
| **2015** | | |
| First Quarter | 46,000 | 39,150 |
| Second Quarter | 48,500 | 42,450 |
| Third Quarter | 52,200 | 46,300 |
| Fourth Quarter | 53,300 | 47,500 |
| **2016** | | |
| First Quarter | 46,000 | 39,150 |
| Second Quarter | 63,000 | 57,400 |
| Third Quarter | 62,900 | 54,000 |
| Fourth Quarter | 54,500 | 43,200 |
| October | 54,500 | 49,250 |
| November | 49,400 | 45,750 |
| December | 47,000 | 43,200 |
| **2017** | | |
| First Quarter | 48,750 | 40,350 |
| January | 44,000 | 42,250 |
| February | 44,100 | 40,350 |
| March | 48,750 | 41,500 |
| April (through April 14) | 46,700 | 44,550 |

118

*ADSs*

The table below shows the high and low closing prices on the New York Stock Exchange for the outstanding ADSs since 2012. Each ADS represents one-half of one share of our common stock.

| Period | Closing Price per ADS | |
| --- | --- | --- |
| | High | Low |
| | (In US$) | |
| **2012** | | |
| First Quarter | 12.45 | 9.73 |
| Second Quarter | 11.18 | 9.36 |
| Third Quarter | 12.42 | 10.37 |
| Fourth Quarter | 13.97 | 11.65 |
| **2013** | | |
| First Quarter | 16.35 | 13.04 |
| Second Quarter | 14.70 | 10.70 |
| Third Quarter | 14.59 | 11.45 |
| Fourth Quarter | 16.61 | 12.77 |
| **2014** | | |
| First Quarter | 17.75 | 15.51 |
| Second Quarter | 20.56 | 17.66 |
| Third Quarter | 22.44 | 18.17 |
| Fourth Quarter | 22.87 | 18.90 |
| **2015** | | |
| First Quarter | 21.01 | 18.26 |
| Second Quarter | 22.53 | 19.29 |
| Third Quarter | 22.13 | 19.45 |
| Fourth Quarter | 23.31 | 20.28 |
| **2016** | | |
| First Quarter | 21.01 | 18.26 |
| Second Quarter | 26.90 | 24.67 |
| Third Quarter | 28.31 | 24.38 |
| Fourth Quarter | 24.34 | 18.48 |
| October | 24.34 | 21.80 |
| November | 21.54 | 19.69 |
| December | 19.72 | 18.48 |
| **2017** | | |
| First Quarter | 21.35 | 17.53 |
| January | 18.80 | 17.81 |
| February | 19.20 | 17.53 |
| March | 21.35 | 17.80 |
| April (through April 13) | 20.85 | 19.23 |

**Item 9.B. Plan of Distribution**

Not Applicable

**Item 9.C. Markets**

**The Korea Exchange**

The Korea Exchange began its operations in 1956, originally under the name of the Korea Stock Exchange. On January 27, 2005, pursuant to the Korea Securities and Futures Exchange Act, the Korea Exchange was

119

officially created through the consolidation of the Korea Stock Exchange, the Korea Futures Exchange, the KOSDAQ Stock Market, Inc., or KOSDAQ, and the KOSDAQ Committee within the Korea Securities Dealers Association, which was in charge of the management of the KOSDAQ. The KRX KOSPI Market of the Korea Exchange, formerly the Korea Stock Exchange, has a single trading floor located in Seoul. The Korea Exchange is a limited liability company, the shares of which are held by (i) securities companies and futures companies that were the members of the Korea Stock Exchange or the Korea Futures Exchange and (ii) the shareholders of the KOSDAQ.

As of March 31, 2017 the aggregate market value of equity securities listed on the KOSPI of the Korea Exchange was approximately Won 1,400,962 billion. The average daily trading volume of equity securities for the first quarter of 2017 was approximately 393 million shares with an average transaction value of Won 4,556 billion.

The Korea Exchange has the power in some circumstances to suspend trading of shares of a given company or to de-list a security. The Korea Exchange also restricts share price movements. All listed companies are required to file accounting reports annually, semi-annually and quarterly and to release immediately all information that may affect trading in a security.

The Government has in the past exerted, and continues to exert, substantial influence over many aspects of the private sector business community which can have the intention or effect of depressing or boosting the market. In the past, the Government has informally both encouraged and restricted the declaration and payment of dividends, induced mergers to reduce what it considers excess capacity in a particular industry and induced private companies to publicly offer their securities.

The Korea Exchange publishes the Korea Composite Stock Price Index, or KOSPI, every ten seconds, which is an index of all equity securities listed on the KRX KOSPI Market of the Korea Exchange. On January 1, 1983, the method of computing KOSPI was changed from the Dow Jones method to the aggregate value method. In the new method, the market capitalizations of all listed companies are aggregated, subject to certain adjustments, and this aggregate is expressed as a percentage of the aggregate market capitalization of all listed companies as of the base date, January 4, 1980.

Movements in KOSPI in the past five years are set out in the following table:

|  | Opening | High | Low | Closing |
|---|---|---|---|---|
| 2012 | 1,826.4 | 2,049.3 | 1,769.3 | 1,982.3 |
| 2013 | 2,031.1 | 2,059.6 | 1,780.6 | 2,011.3 |
| 2014 | 1,967.2 | 2,082.6 | 1,886.9 | 1,915.6 |
| 2015 | 1,926.4 | 2,173.4 | 1,829.8 | 1,961.3 |
| 2016 | 1,918.8 | 2,068.7 | 1,835.3 | 2,026.5 |
| 2017 (through April 14) | 2,026.2 | 2,178.4 | 2,026.2 | 2,134.9 |

*Source:* The Korea Exchange

Shares are quoted "ex-dividend" on the first trading day of the relevant company's accounting period; since the calendar year is the accounting period for the majority of listed companies, this may account for the drop in KOSPI between its closing level at the end of one calendar year and its opening level at the beginning of the following calendar year.

120

With certain exceptions, principally to take account of a share being quoted "ex-dividend" and "ex-rights," upward and downward movements in share prices of any category of shares on any day are limited under the rules of the Korea Exchange to 30% of the previous day's closing price of the shares, rounded down as set out below:

| Previous Day's Closing Price (Won) | Rounded Down to (Won) |
|---|---|
| less than 5,000 ..................................................... | ₩       5 |
| 5,000 to less than 10,000 ............................................ | 10 |
| 10,000 to less than 50,000 ........................................... | 50 |
| 50,000 to less than 100,000 .......................................... | 100 |
| 100,000 to less than 500,000 ......................................... | 500 |
| 500,000 or more ..................................................... | 1,000 |

As a consequence, if a particular closing price is the same as the price set by the fluctuation limit, the closing price may not reflect the price at which persons would have been prepared, or would be prepared to continue, if so permitted, to buy and sell shares. Orders are executed on an auction system with priority rules to deal with competing bids and offers.

Due to deregulation of restrictions on brokerage commission rates, the brokerage commission rate on equity securities transactions may be determined by the parties, subject to commission schedules being filed with the Korea Exchange by the securities companies. In addition, a securities transaction tax will generally be imposed on the transfer of shares or certain securities representing rights to subscribe for shares. A special agricultural and fishery tax of 0.15% of the sales prices will also be imposed on transfer of these shares and securities on the Korea Exchange. See Item 10.E. "Taxation—Korean Taxes."

The number of companies listed on the KRX KOSPI Market of the Korea Exchange since 2012, the corresponding total market capitalization at the end of the periods indicated and the average daily trading volume for those periods are set forth in the following table:

| Year | Number of Listed Companies | Total Market Capitalization on the Last Day for Each Period | | Average Daily Trading Volume, Value | | |
|---|---|---|---|---|---|---|
| | | (Millions of Won) | (Thousands of U.S. dollars)[1] | (Thousands of Shares) | (Millions of Won) | Thousands of U.S. dollars[1] |
| 2012 ..................... | 784 | 1,154,294,166 | 1,077,671,708 | 486,480 | 4,823,643 | 4,503,448 |
| 2013 ..................... | 777 | 1,185,973,724 | 1,123,826,138 | 328,325 | 3,993,422 | 3,784,158 |
| 2014 ..................... | 773 | 1,192,252,867 | 1,084,655,082 | 319,661 | 3,891,322 | 3,540,140 |
| 2015 ..................... | 770 | 1,242,832,089 | 1,060,436,936 | 455,256 | 5,351,734 | 4,566,326 |
| 2016 ..................... | 779 | 1,308,440,373 | 1,581,250,191 | 343,486 | 4,269,948 | 5,160,232 |
| 2017 (through April 14) ...... | 773 | 1,385,279,447 | 1,223,853,209 | 402,868 | 4,538,953 | 4,010,030 |

*Source:* The Korea Exchange

*Note:*

(1)   Converted at the market average exchange rate as announced by Seoul Money Brokerage Services, Ltd. in Seoul at the end of the periods indicated.

The Korean securities markets are principally regulated by the Financial Services Commission and the Financial Investment Services and Capital Markets Act. The law imposes restrictions on insider trading and price manipulation, requires specified information to be made available by listed companies to investors and establishes rules regarding margin trading, proxy solicitation, takeover bids, acquisition of treasury shares and reporting requirements for shareholders holding substantial interests.

121

**Protection of Customer's Interest in Case of Insolvency of Financial Investment Companies with a Brokerage License**

Under Korean law, the relationship between a customer and a financial investment company with a brokerage license in connection with a securities sell or buy order is deemed to be consignment, and the securities acquired by a consignment agent (i.e., the financial investment company with a brokerage license) through such sell or buy order are regarded as belonging to the customer insofar as the customer and the consignment agent's creditors are concerned. Therefore, in the event of bankruptcy or reorganization procedures involving a financial investment company with a brokerage license, the customer of such financial investment company is entitled to the proceeds of the securities sold by such financial investment company.

When a customer places a sell order with a financial investment company with a brokerage license which is not a member of the Korea Exchange and this financial investment company places a sell order with another financial investment company with a brokerage license which is a member of the Korea Exchange, the customer is still entitled to the proceeds of the securities sold received by the non-member company from the member company regardless of the bankruptcy or reorganization of the non-member company.

Likewise, when a customer places a buy order with a non-member company and the non-member company places a buy order with a member company, the customer has the legal right to the securities received by the non-member company from the member company because the purchased securities are regarded as belonging to the customer insofar as the customer and the non-member company's creditors are concerned.

Under the Financial Investment Services and Capital Markets Act, the Korea Exchange is obliged to indemnify any loss or damage incurred by a counterparty as a result of a breach by its members. If a financial investment company with a brokerage license which is a member of the Korea Exchange breaches its obligation in connection with a buy order, the Korea Exchange is obliged to pay the purchase price on behalf of the breaching member.

As the cash deposited with a financial investment company with a brokerage license is regarded as belonging to such financial investment company, which is liable to return the same at the request of its customer, the customer cannot take back deposited cash from the financial investment company with a brokerage license if a bankruptcy or reorganization procedure is instituted against such financial investment company and, therefore, can suffer from loss or damage as a result. However, the Depositor Protection Act provides that Korean Deposit Insurance Corporation will, upon the request of the investors, pay investors up to Won 50 million per depositor per financial institution in case of the such financial investment company's bankruptcy, liquidation, cancelation of securities business license or other insolvency events (collectively, the "Insolvency Events"). Pursuant to the Financial Investment Services and Capital Markets Act, subject to certain exceptions, financial investment companies with a brokerage license are required to deposit the cash received from their customers with the Korea Securities Finance Corporation, a special entity established pursuant to the Financial Investment Services and Capital Markets Act. Set-off or attachment of cash deposits by financial investment companies with a brokerage license is prohibited. The premiums related to this insurance under the Depositor Protection Act are paid by financial investment companies with a brokerage license.

**Item 9.D. Selling Shareholders**

Not Applicable

**Item 9.E. Dilution**

Not Applicable

**Item 9.F. Expenses of the Issue**

Not Applicable

**ITEM 10.** *ADDITIONAL INFORMATION*

**Item 10.A. Share Capital**

Not Applicable

**Item 10.B. Memorandum and Articles of Incorporation**

Set forth below is information relating to our capital stock, including brief summaries of material provisions of our Articles of Incorporation, the KEPCO Act, the Financial Investment Services and Capital Markets Act, the Korean Commercial Code and certain related laws of Korea, all currently in effect. The following summaries are qualified in their entirety by reference to our Articles of Incorporation and the applicable provisions of the KEPCO Act, Financial Investment Services and Capital Markets Act, the Korean Commercial Code, the Act on the Management of Public Institutions and certain related laws of Korea. On November 11, 2016, we amended our Articles of Incorporation to strike references to executive directors (while keeping references to Standing Directors), as executive directors have not been appointed since 2003 and the system of executive directors was deemed obsolete.

**Objects and Purposes**

We are a statutory juridical corporation established under the KEPCO Act for the purpose of ensuring "stabilization of the supply and demand of electric power, and further contributing toward the sound development of the national economy through expediting development of electric power resources and carrying out proper and effective operation of the electricity business." The KEPCO Act and our Articles of Incorporation contemplate that we engage in the following activities:

1. development of electric power resources;

2. generation, transmission, transformation and distribution of electricity and other related business activities;

3. research and development of technology related to the businesses mentioned in items 1 and 2;

4. overseas businesses related to the businesses mentioned in items 1 through 3;

5. investments or contributions related to the businesses mentioned in items 1 through 4;

6. businesses incidental to items 1 through 5;

7. Development and operation of certain real estate held by us to the extent that:

   a. it is necessary to develop certain real estate held by us due to external factors, such as relocation, consolidation, conversion to indoor or underground facilities or deterioration of our substation or office; or

   b. it is necessary to develop certain real estate held by us to accommodate development of relevant real estate due to such real estate being incorporated into or being adjacent to an area under planned urban development; and

8. other activities entrusted by the Government.

Our registered name is "Hankook Chollryuk Kongsa" in Korean and "Korea Electric Power Corporation" in English. Our registration number in the commercial registry office is 114671-0001456.

**Directors**

Under the KEPCO Act and our Articles of Incorporation, our board of directors consists of our president, standing directors and non-standing directors. A majority of the board members constitutes a voting quorum, and resolutions will be passed by a majority of the board members. Directors who have an interest in certain agenda proposed to the board may not vote on such issues.

123

The standards of remuneration for our officers, including directors, shall be determined by a resolution of the board of directors, provided that the maximum amount of remuneration to be paid to our officers shall be determined by shareholder resolution and provided that the remuneration standards for the president and standing directors shall be determined by board resolution in accordance with the guideline thereon established by the minister of the Ministry of Strategy and Finance through review and resolution of our management committee. Directors who have an interest may not participate in the meeting of the board of directors for determining the remuneration for officers.

Neither the KEPCO Act nor our Articles of Incorporation have provisions relating to (i) borrowing powers exercisable by the directors and how such borrowing powers can be varied, (ii) retirement or non-retirement of directors under an age limit requirement, or (iii) the number of shares required for a director's qualification.

**Share Capital**

Currently, our authorized share capital is 1,200,000,000 shares, which consists of shares of common stock and shares of non-voting preferred stock, par value Won 5,000 per share. Under our Articles of Incorporation, we are authorized to issue up to 150,000,000 non-voting preferred shares. As of December 31, 2016, the last day on which our shareholders' registry was closed for purposes of identifying shareholders of record, 641,964,077 common shares were issued and no non-voting preferred shares have been issued. All of the issued and outstanding common shares are fully-paid and non-assessable and are in registered form. Share certificates are issued in denominations of 1, 5, 10, 50, 100, 500, 1,000 and 10,000 shares.

**Description of Capital Stock**

*Dividend Rights*

Under the KEPCO Act, we are authorized to pay preferential dividends on our shares held by public shareholders as opposed to those held by the Government. Dividends to public shareholders are distributed in proportion to the number of shares of the relevant class of capital stock owned by each public shareholder following approval by the shareholders at a general meeting of shareholders. Korea Development Bank may receive dividends in proportion to the numbers of our shares held by them. Under the Korean Commercial Code and our Articles of Incorporation, we will pay full annual dividends on newly issued shares.

Under our Articles of Incorporation, holders of non-voting preferred shares (of which there are currently none) are entitled to receive an amount not less than 8% of their par value as determined by a resolution of the board of directors at the time of their issuance. However, if the dividends on our common shares exceed the dividends on our non-voting preferred shares, the holders of non-voting preferred shares will be entitled to participate in the distribution of such excess amount with the holders of the common shares at an equal rate.

We declare our dividend annually at the annual general meeting of shareholders which is held within three months after the end of the fiscal year. The annual dividend is paid to the shareholders on record as of the end of the fiscal year preceding the annual shareholders' meeting. Annual dividends may be distributed either in cash or in our shares. However, stock dividends shall be paid based on par value and may not exceed the amount equivalent to a half of the total amount of profit available for dividend payment.

Under the Korean Commercial Code and our Articles of Incorporation, we do not have an obligation to pay any annual dividend unclaimed for five years from the payment date.

The KEPCO Act provides that we shall not pay an annual dividend unless we have made up any accumulated deficit and set aside as a legal reserve an amount equal to 20.0% or more of our net profit until our accumulated reserve reaches one-half of our stated capital.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

*Distribution of Free Shares*

In addition to dividends in the form of shares to be paid out of retained or current earnings, the Korean Commercial Code permits us to distribute to our shareholders an amount transferred from our capital surplus or legal reserve to stated capital in the form of free shares.

*Voting Rights*

Holders of our common shares are entitled to one vote for each common share, except that voting rights with respect to any common shares held by us or by a corporate shareholder, more than one-tenth of whose outstanding capital stock is directly or indirectly owned by us, may not be exercised. Any person (with certain exceptions) who holds more than 3% of our issued and outstanding shares cannot exercise voting rights with respect to the shares in excess of this 3% limit. See "—Limitation on Shareholdings." Pursuant to the Korean Commercial Code, cumulative voting is permissible in relation to the appointment of directors. Under the Korean Commercial Code, a cumulative vote can be requested by the shareholders of a corporation representing at least 1% of the total voting shares of such corporation if the relevant shareholders' meeting is intended to elect more than two seats of the board of directors and the request for cumulative voting is made to the management of the corporation in writing at least six weeks in advance of the shareholders' meeting. Under this new voting method, each shareholder will have multiple voting rights corresponding to the number of directors to be appointed in such voting and may exercise all such voting rights to elect one director. Shareholders are entitled to vote cumulatively unless the Articles of Incorporation expressly prohibit cumulative voting. Our current Articles of Incorporation do not prohibit cumulative voting. Except as otherwise provided by law or our Articles of Incorporation, a resolution can be adopted at a general meeting of shareholders by affirmative majority vote of the voting shares of the shareholders present or represented at a meeting, which must also represent at least one-fourth of the voting shares then issued and outstanding. The holders of our non-voting preferred shares (other than enfranchised preferred shares (as described below)) are not entitled to vote on any resolution or to receive notice of any general meeting of shareholders unless the agenda of the meeting includes consideration of a resolution on which such holders are entitled to vote. If we are unable to pay any dividend to holders of non-voting preferred shares as provided in our Articles of Incorporation, the holders of non-voting preferred shares will become enfranchised and will be entitled to exercise voting rights until such dividends are paid. The holders of these "enfranchised preferred shares" have the same rights as holders of our common shares to request, receive notice of, attend and vote at a general meeting of shareholders. Pursuant to the KEPCO Act and our Articles of Incorporation, the appointment of standing directors, the president and standing statutory auditor are subject to shareholder approval.

Under the Korean Commercial Code, for the purpose of electing our statutory auditor, a shareholder (together with certain related persons) holding more than 3% of the total shares having voting rights may not exercise voting rights with respect to shares in excess of such 3% limit.

The Korean Commercial Code provides that the approval by holders of at least two-thirds of those shares having voting rights present or represented at a meeting, where such shares also represent at least one-third of the total issued and outstanding shares having voting rights, is required in order to, among other things:

- amend our Articles of Incorporation;

- remove a director or statutory auditor;

- effect any dissolution, merger, consolidation or spin-off of us;

- transfer the whole or any significant part of our business;

- effect the acquisition by us of all of the business of any other company;

- effect the acquisition by us of the business of another company that may have a material effect on our business;

- reduce capital; or

- issue any new shares at a price lower than their par value.

125

Under our Articles of Incorporation, an approval by the Ministry of Trade, Industry and Energy is required in order to amend the Articles of Incorporation. Any change to our authorized share capital requires an amendment to our Articles of Incorporation.

In addition, in the case of amendments to our Articles of Incorporation or any merger or consolidation of us or in certain other cases which affect the rights or interests of the non-voting preferred shares a resolution must be adopted by a meeting of the holders of non-voting preferred shares approving such event. This resolution may be adopted if approval is obtained from holders of at least two-thirds of those non-voting preferred shares present or represented at such meeting and such non-voting preferred shares also represent at least one-third of our total issued and outstanding non-voting preferred shares.

A shareholder may exercise his voting rights by proxy. The proxy shall present the power of attorney prior to the start of the general meeting of shareholders. Under the Financial Investment Services and Capital Markets Act and our Articles of Incorporation, no one other than us may solicit a proxy from shareholders.

Subject to the provisions of the deposit agreement, holders of our American Depositary Shares ("ADSs") are entitled to instruct the depositary, whose agent is the record holder of the underlying common shares, how to exercise voting rights relating to those underlying common shares.

### *Preemptive Rights and Issuance of Additional Shares*

Authorized but unissued shares may be issued at such times and, unless otherwise provided in the Korean Commercial Code, upon such terms as our board of directors may determine. The new shares must be offered on uniform terms to all our shareholders who have preemptive rights and who are listed on the shareholders' register as of the record date. Subject to the limitations described under "—Limitation on Shareholdings" below and with certain other exceptions, all our shareholders are entitled to subscribe for any newly issued shares in proportion to their existing shareholdings. Under the Korean Commercial Code, we may vary, without shareholder approval, the terms of such preemptive rights for different classes of shares. Public notice of the preemptive rights to new shares and their transferability must be given not less than two weeks (excluding the period during which the shareholders' register is closed) prior to the record date. Our board of directors may determine how to distribute shares for which preemptive rights have not been exercised or where fractions of shares occur.

Our Articles of Incorporation provide that new shares that are (1) publicly offered pursuant to the Financial Investment Services and Capital Markets Act, (2) issued to members of our employee stock ownership association, (3) represented by depositary receipts, (4) issued through offering to public investors, or (5) issued to investors in kind under the State Property Act may be issued pursuant to a resolution of the board of directors to persons other than existing shareholders, who in such circumstances will not have preemptive rights.

Under our Articles of Incorporation, we may issue convertible bonds or bonds with warrants each up to an aggregate principal amount of Won 2,000 billion and Won 1,000 billion, respectively, to persons other than existing shareholders. However, the aggregate principal amount of convertible bonds and bonds with warrants so issued to persons other than existing shareholders may not exceed Won 2,000 billion.

Under the Financial Investment Services and Capital Markets Act and our Articles of Incorporation, members of our employee stock ownership association, whether or not they are our shareholders, have a preemptive right, subject to certain exceptions, to subscribe for up to 20.0% of any shares publicly offered pursuant to the Financial Investment Services and Capital Markets Act. This right is exercisable only to the extent that the total number of shares so acquired and held by members of our employee stock ownership association does not exceed 20.0% of the total number of shares then outstanding.

126

*Liquidation Rights*

In the event of our liquidation, the assets remaining after payment of all debts, liquidation expenses and taxes will be distributed among shareholders in proportion to the number of shares held. Holders of our non-voting preferred shares have no preference in liquidation.

*Rights of Dissenting Shareholders*

In certain limited circumstances (including, without limitation, the transfer of the whole or any significant part of our business or the merger, or consolidation upon a split-off of us with another company), dissenting holders of shares have the right to require us to purchase their shares. To exercise such right, shareholders must submit a written notice of their intention to dissent to us prior to the general meeting of shareholders or the class meeting of holders of non-voting preferred shares, as the case may be. Within 20 days after the date on which the relevant resolution is passed at such meeting, such dissenting shareholders must request us in writing to purchase their shares. We are obligated to purchase the shares of dissenting shareholders within one month after the expiration of such 20-day period. The purchase price for such shares must be determined through negotiation between the dissenting shareholders and us. Under the Financial Investment Services and Capital Markets Act, if we cannot agree on a price through negotiation, the purchase price will be the average of (1) the weighted average of the daily share price on the Korea Exchange for a two-month period before the date of adoption of the relevant board resolution, (2) the weighted average of the daily share price on the Korea Exchange for the one month period before such date and (3) the weighted average of the daily share price on the Korea Exchange for the one week period before such date. However, if we or dissenting shareholders who requested us to purchase their shares oppose such purchase price, the determination of a purchase price may be filed with a court. Holders of ADSs will not be able to exercise dissenter's rights unless they have withdrawn the underlying Common Stock and become our direct shareholders.

**Transfer of Shares**

Under the Korean Commercial Code, the transfer of shares is effected by delivery of share certificates, but in order to assert shareholders' rights against us, the transferee must have his name and address registered on our register of shareholders. For this purpose, shareholders are required to file one's name, address and seal with our transfer agent. Under our Articles of Incorporation, non-resident shareholders must appoint an agent authorized to receive notices on their behalf in Korea and file a mailing address in Korea. These requirements do not apply to the holders of ADSs. Under current Korean regulations, the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and internationally recognized foreign custodians are authorized to act as agents and provide related services for foreign shareholders. Our transfer agent is Kookmin Bank, located at 9-1, Namdaemun-ro, 2-ga, Chung-ku, Seoul, Korea. Certain foreign exchange controls and securities regulations apply to the transfer of our shares by non-residents of Korea or non-Koreans. See Item 9. "The Offer and Listing."

**Acquisition of Our Own Shares**

Under the Korean Commercial Code, we may acquire our own shares through (1) purchases on a stock exchange or (2) purchase of the shares in proportion to the number of shares held by each shareholder on equal terms and conditions, by a resolution at a Shareholders' meeting. The aggregate amount of the acquisition price shall not exceed the excess of our net assets, on a non-consolidated basis, over the sum of (1) our stated capital, (2) the total amount of our capital surplus reserve and earned surplus reserve which have accumulated up to the end of the previous fiscal year, (3) our earned surplus required to be accumulated for the then current fiscal year and (4) our net assets stated in the balance sheet as being increased as a result of the evaluation of the assets and liabilities in accordance with our accounting principles without being set off against any unrealized losses. In addition, under the Korean Commercial Code, we may not acquire our own shares if our net assets may fall short

127

of the aggregate amount of the item (1) to (4) above, on a non-consolidated basis, as of the conclusion of the relevant business year of us. In general, our subsidiaries 50% or more of whose shares are owned by us may not acquire our shares.

**General Meeting of Shareholders**

The ordinary general meeting of our shareholders is held within three months after the end of each fiscal year, and subject to board resolution or court approval, an extraordinary general meeting of our shareholders may be held as necessary or at the request of shareholders holding an aggregate of 1.5% or more of our outstanding common shares for at least six consecutive months. Under the Korean Commercial Code, an extraordinary general meeting of shareholders may be convened at the request of our audit committee, subject to a board resolution or court approval. Holders of non-voting preferred shares may only request a general meeting of shareholders once the non-voting preferred shares have become enfranchised as described under "—Description of Capital Stock—Voting Rights" above. Written notices setting forth the date, place and agenda of the meeting must be given to shareholders at least two weeks prior to the date of the general meeting of shareholders. However, pursuant to the Korean Commercial Code and our Articles of Incorporation, with respect to holders of less than 1% of the total number of our issued and outstanding shares which are entitled to vote, notice may be given by placing at least two public notices at least two weeks in advance of the meeting in at least two daily newspapers published in Seoul or by placing a public notice in the electrical disclosure system of the Financial Supervisory Service or the Korea Exchange, at least two weeks in advance of the meeting. Currently, for giving such notice, we use an electronic disclosure system available for access at a website maintained by the Financial Supervisory Service (known as the Data Analysis, Retrieval and Transfer System, or DART). Shareholders not on the shareholders' register as of the record date are not entitled to receive notice of the general meeting of shareholders or attend or vote at such meeting. Holders of the enfranchised preferred shares on the shareholders' register as of the record date are entitled to receive notice of, and to attend and vote at, the general meetings. Otherwise, holders of non-voting preferred shares are not entitled to receive notice of general meetings of shareholders or vote at such meetings but may attend such meetings.

The general meeting of shareholders is held in Naju, Jeollanam-do.

**Register of Shareholders and Record Dates**

Our transfer agent, Kookmin Bank, maintains the register of our shareholders at its office in Seoul, Korea. It registers transfers of our shares on the register of shareholders upon presentation of the share certificates.

The record date for annual dividends is December 31. For the purpose of determining the holders of shares entitled to annual dividends, the register of shareholders may be closed from January 1 to January 31 of each year. Further, the Korean Commercial Code and our Articles of Incorporation permit us at least two weeks' public notice to set a record date and/or close the register of shareholders for not more than three months for the purpose of determining the shareholders entitled to certain rights pertaining to our shares. The trading of our shares and the delivery of certificates in respect of them may continue while the register of shareholders is closed.

**Annual Report**

At least one week prior to the annual general meeting of shareholders, our annual report and audited consolidated financial statements must be made available for inspection at our principal office and at all branch offices. Copies of annual reports, the audited non-consolidated financial statements and any resolutions adopted at the general meeting of shareholders will be available to our shareholders.

Under the Financial Investment Services and Capital Markets Act, we must file with the Financial Services Commission and the Korea Exchange an annual report within 90 days after the end of our fiscal year, a half-year

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

report within 45 days after the end of the first six months of our fiscal year and quarterly reports within 45 days after the end of the first three months and nine months of our fiscal year. Following our adoption of IFRS starting in January 1, 2011 pursuant to regulatory requirements for listed companies in Korea, we are required to file half-year and quarterly reports containing interim financial statements and notes thereto on a consolidated basis as well as on a separate basis.

## Limitation on Shareholdings

No person other than the Government, our employee stock ownership association and persons who obtain an approval from the Financial Services Commission may hold for its account more than 3% of our total issued and outstanding shares. In calculating shareholdings for this purpose, shares held by your spouse and your certain relatives or by your certain affiliates (such spouses, relatives and affiliates are together referred to as "Affiliated Holders") are deemed to be held by you. If you hold our shares in violation of this 3% limit, you are not entitled to exercise the voting rights or preemptive rights of our shares in excess of such 3% limit and the Financial Services Commission may order you to take necessary corrective action. In addition, the KEPCO Act currently requires that the Government, directly or through Korea Development Bank, own not less than 51% of our capital. For other restrictions on shareholdings, see Item 9. "The Offer and Listing."

## Change of Control

The KEPCO Act requires that the Government, directly or pursuant to the Korea Development Bank Act, through Korea Development Bank, own not less than 51% of our capital.

## Disclosure of Share Ownership

Under the Financial Investment Services and Capital Markets Act, any person whose direct or beneficial ownership of a listed company's shares with voting rights, equity-related debt securities including convertible bonds, bonds with warrants, exchangeable bonds, certificates representing the rights to subscribe for common shares, derivatives-linked securities and depository receipts of the aforementioned securities (collectively referred to as "Equity Securities"), together with the Equity Securities directly or beneficially owned by certain related persons or by any person acting in concert with the person, accounts for 5% or more of our total outstanding Equity Securities is required to report the status and purpose (in terms of whether the purpose of shareholding is to participate in the management of the issuer) of the holdings and the material contents of the agreements relating to the Equity Securities and other matters prescribed by the Presidential Decree under the Financial Investment Services and Capital Markets Act to the Financial Services Commission of Korea and the Korea Exchange within five business days after reaching the 5% ownership interest threshold.

In addition, any change (i) in the purpose of the shareholding or in the ownership, (ii) the major terms and conditions of agreements relating to Equity Securities owned (such as trust agreements and collateral agreements) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, or (iii) the type of ownership (direct ownership or holding) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, must be reported to the Financial Services Commission of Korea and the Korea Exchange within five business days from the date of such change (or by the tenth day of the month following the month in which the change occurs, in the case of a person with no intent to seek management control). Notwithstanding the foregoing, certain professional investors designated by the Financial Services Commission may report such matters to the Financial Services Commission and the Korea Exchange by the tenth day of the month immediately following the end of the quarter in which such 5.0% ownership interest is reached or the change occurs.

When filing a report to the Financial Services Commission and the Korea Exchange in accordance with the reporting requirements described above, a copy of such report must be sent to the relevant listed company. Violation of these reporting requirements may subject a person to sanctions such as prohibition on the exercise of

voting rights with respect to the Equity Securities for which the reporting requirement was violated or fines or imprisonment. Furthermore, the Financial Services Commission may order the disposal of the Equity Securities for which the reporting requirement was violated or may impose administrative fine.

A person reporting to the Financial Services Commission and the Korea Exchange that his purpose of holding the Equity Securities is to participate in the management of the listed company is prohibited from acquiring additional Equity Securities of the listed company and exercising voting rights during the period commencing from the date on which the event triggering the reporting requirements occurs to the fifth day from the date on which the report is made.

## Item 10.C. Material Contracts

None.

## Item 10.D. Exchange Controls

### General

The Foreign Exchange Transaction Act and the Presidential Decree and regulations under that Act and Decree, or collectively the Foreign Exchange Transaction Laws, regulate investment in Korean securities by non-residents and issuance of securities outside Korea by Korean companies. Non-residents may invest in Korean securities pursuant to the Foreign Exchange Transaction Laws. The Financial Services Commission has also adopted, pursuant to its authority under the Financial Investment Services and Capital Markets Act, regulations that regulate investment by foreigners in Korean securities and issuance of securities outside Korea by Korean companies.

Subject to certain limitations, the Ministry of Strategy and Finance has the authority to take the following actions under the Foreign Exchange Transaction Laws: (i) if the Government deems it necessary on account of war, armed conflict, natural disaster or grave, sudden and significant changes in domestic or foreign economic circumstances or similar events or circumstances, the Ministry of Strategy and Finance may temporarily suspend performance under any or all foreign exchange transactions, in whole or in part, to which the Foreign Exchange Transaction Laws apply (including suspension of payment and receipt of foreign exchange) or impose an obligation to deposit, safe-keep or sell any instruments of payment to the Bank of Korea or certain other governmental agencies or financial institutions, or effective from July 18, 2017, impose an obligation on resident creditors to collect and recover debts owed by non-resident debtors,, and (ii) if the Government concludes that the international balance of payments and international financial markets are experiencing or are likely to experience significant disruption or that the movement of capital between Korea and other countries are likely to adversely affect the Korean Won, exchange rates or other macroeconomic policies, the Ministry of Strategy and Finance may take action to require any person who intends to effect or effects a capital transaction to deposit all or a portion of the instruments of payment acquired in such transactions with the Bank of Korea or certain other governmental agencies or financial institutions.

### Government Review of Issuances of Debt Securities and ADSs and Report for Payments

In order for us to issue debt securities of any series outside of the Republic, we are required to file a report with our designated foreign exchange bank or the Ministry of Strategy and Finance on the issuance of such debt securities, depending on the issuance amount. The Ministry of Strategy and Finance may at its discretion direct us to take measures as necessary to avoid undue exchange rate fluctuations before it accepts such report. Furthermore, in order for us to make payments of principal of or interest on the debt securities of any series and other amounts as provided in an indenture and such debt securities, we are required to present relevant documents to the designated foreign exchange bank at the time of each actual payment. The purpose of such presentation is to ensure that the actual remittance is consistent with the terms of the transaction reported to our designated foreign exchange bank or the Ministry of Strategy and Finance.

130

In order for us to offer for purchase shares of our common stock held in treasury in the form of ADSs or issue shares of our common stock represented by the ADSs, we are required to file a prior report of such offer or issuance with our designated foreign exchange bank or the Ministry of Strategy and Finance, depending on the offering amount. The Ministry of Strategy and Finance may at its discretion direct us to take measures as necessary to avoid undue exchange rate fluctuations before it accepts such report. No further Governmental approval is necessary for the initial offering and issuance of the ADSs.

In order for a depositary to acquire any existing shares of our common stock from holders of these shares of common stock (other than from us) for the purpose of issuance of depositary receipts representing these shares of common stock, the depositary would be required to obtain our consent for the number of shares to be deposited in any given proposed deposit which exceeds the difference between (1) the aggregate number of shares deposited by us or with our consent for the issuance of ADSs (including deposits in connection with the initial and all subsequent offerings of ADSs and stock dividends or other distributions related to these ADSs) and (2) the number of shares on deposit with the depositary at the time of such proposed deposit. We may not grant this consent for the deposit of shares of our common stock in the future, if our consent is required. Therefore, a holder of ADSs who surrenders ADSs and withdraws shares of our common stock may not be permitted subsequently to deposit such shares and obtain ADSs.

In addition, we are also required to notify the Ministry of Strategy and Finance upon receipt of the full proceeds from the offering of ADSs. No additional Governmental approval is necessary for the offering and issuance of ADSs.

**Reporting Requirements for Holders of Substantial Interests**

Under the Financial Investment Services and Capital Markets Act, any person whose direct beneficial ownership of a listed company's Equity Securities, together with the Equity Securities beneficially owned by certain related persons or by any person acting in concert with such person, accounts for 5% or more of our total outstanding Equity Securities is required to report the status and purpose (namely, whether the purposes of the share ownership is to participate in the management of the issuer) of the holdings and the material contents of the agreements relating to the Equity Securities and other matters prescribed by the Presidential Decree under the Financial Investment Services and Capital Markets Act to the Financial Services Commission and the Korea Exchange within five business days after reaching the 5% ownership interest and any change in ownership interest subsequent to the report which equals or exceeds 1.0% of the total outstanding Equity Securities is required to be reported to the Financial Services Commission and the Korea Exchange within five business days from the date of the change.

In addition, any change (i) in the purpose of the shareholding or in the ownership, (ii) the major terms and conditions of agreements relating to Equity Securities owned (such as trust agreements and collateral agreements) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, or (iii) the type of ownership (direct ownership or holding) to the extent the number of relevant Equity Securities is 1% or more of the total outstanding Equity Securities, must be reported to the Financial Services Commission of Korea and the Korea Exchange within five business days from the date of such change (or by the tenth day of the month following the month in which the change occurs, in the case of a person with no intent to seek management control). Notwithstanding the foregoing, certain professional investors designated by the Financial Services Commission may report such matters to the Financial Services Commission and the Korea Exchange by the tenth day of the month immediately following the end of the quarter in which such 5.0% ownership interest is reached or the change occurs.

When filing a report to the Financial Services Commission and the Korea Exchange in accordance with the reporting requirements described above, a copy of such report must be sent to the relevant listed company. Violation of these reporting requirements may subject a person to sanctions such as prohibition on the exercise of voting rights with respect to the Equity Securities for which the reporting requirement was violated or fines or

imprisonment. Furthermore, the Financial Services Commission may order the disposal of the Equity Securities for which the reporting requirement was violated or may impose administrative fine.

A person reporting to the Financial Services Commission and the Korea Exchange that his purpose of holding the Equity Securities is to participate in the management of the listed company is prohibited from acquiring additional Equity Securities of the listed company and exercising voting rights during the period commencing from the date on which the event triggering the reporting requirements occurs to the fifth day from the date on which the report is made.

In addition to the reporting requirements described above, any person whose direct or beneficial ownership of our voting stock and/or depository receipts for our voting stock accounts for 10.0% or more of the total issued and outstanding voting stock, whom we refer to as a major shareholder, must file a report to the Securities and Futures Commission and to the Korea Exchange within five business days after the date on which the person reached such shareholding limit. In addition, such person must file a report to the Securities and Futures Commission and to the Korea Exchange regarding any subsequent change in his/her shareholding. Such report on subsequent change in shareholding must be filed within five business days of the occurrence of any such change. Violation of these reporting requirements may subject a person to criminal sanctions such as fines and imprisonment.

**Restrictions Applicable to ADSs**

No Governmental approval is necessary for the sale and purchase of ADSs in the secondary market outside Korea or for the withdrawal of shares of our common stock underlying ADSs and the delivery inside Korea of the withdrawn shares. However, a foreigner who intends to acquire shares must obtain an Investment Registration Card from the Financial Supervisory Service as described below. The acquisition of shares by a foreigner must be reported by the foreigner or his standing proxy in Korea immediately to the Governor of the Financial Supervisory Service.

**Special Reporting Requirement for Companies Whose Securities Are Listed on Foreign Exchanges**

Under the regulations of the Financial Services Commission and the Korea Exchange, (i) if a company listed on the Korea Exchange has submitted a public disclosure of material matters to a foreign financial investment supervisory authority pursuant to the laws of the foreign jurisdiction, then it must submit a copy of the public disclosure and a Korean translation thereof to the Financial Services Commission of Korea and the Korea Exchange, and (ii) if a company listed on the Korea Exchange is approved for listing on a foreign stock market or determined to be de-listed from the foreign stock market or actually listed on, or de-listed from, a foreign stock market, then it must submit a copy of any document, which it submitted to or received from the relevant foreign government, foreign financial investment supervisory authority or the foreign stock market, and a Korean translation thereof to the Financial Services Commission of Korea and the Korea Exchange.

Persons who have acquired shares of our common stock as a result of the withdrawal of shares of common stock underlying ADSs may exercise their preemptive rights for new shares, participate in free distributions and receive dividends on shares of our common stock without any further governmental approval.

**Restrictions Applicable to Common Stock**

Under the Foreign Exchange Transaction Laws and the Regulations on Financial Investment Business (together, the "Investment Rules"), foreigners are permitted to invest, subject to certain exceptions and procedural requirements, in all shares of Korean companies unless prohibited by specific laws. Foreign investors may trade shares listed on the Korea Exchange only through the Korea Exchange except for certain limited circumstances. These circumstances include, among others, (1) odd-lot trading of shares, (2) acquisition of shares by a foreign company as a result of a merger, (3) acquisition or disposal of shares in connection with a tender

132

offer, (4) acquisition of shares by exercise of warrant, conversion right under convertible bonds, exchange right under exchangeable bonds or withdrawal right under depositary receipts issued outside of Korea by a Korean company, such shares being "Converted Shares," (5) acquisition of shares through exercise of rights under securities issued outside of Korea, (6) acquisition of shares as a result of inheritance, donation, bequest or exercise of shareholders' rights (including preemptive rights or rights to participate in free distributions and receive dividends), (7) over-the-counter transactions between foreigners of a class of shares for which a ceiling on aggregate acquisition by foreigners (as explained below) exists and has been reached or exceeded, (8) acquisition of shares by direct investment under the Foreign Investment Promotion Law, (9) acquisition and disposal of shares on an overseas stock exchange market, if such shares are simultaneously listed on the KRX KOSPI Market or the KRX KOSDAQ Market of the Korea Exchange and such overseas stock exchange, and (10) arm's length transactions between foreigners in the event all such foreigners belong to an investment group managed by the same person. For over-the-counter transactions of shares listed on the Korea Exchange outside the Korea Exchange between foreigners of a class of shares for which a ceiling on aggregate acquisition by foreigners exists and has been reached or exceeded, a financial investment company with a brokerage license in Korea must act as an intermediary. Odd-lot trading of shares listed on the Korea Exchange outside the Korea Exchange must involve a financial investment company with a dealing license in Korea as the other party. Foreign investors are prohibited from engaging in margin transactions with respect to shares subject to a ceiling on acquisition by foreigners.

The Investment Rules require a foreign investor who wishes to invest in or dispose of shares on the Korea Exchange (including Converted Shares) to register his/her identity with the Financial Supervisory Service prior to making any such investment or disposal unless he/she had previously registered. However, such registration requirement does not apply to foreign investors who acquire Converted Shares with the intention of selling them within three months from the date they were acquired. Upon registration, the Financial Supervisory Service will issue to the foreign investor an Investment Registration Card which must be presented each time the foreign investor opens a brokerage account with a financial investment company or financial institution in Korea. Foreigners eligible to obtain an Investment Registration Card include any foreign nationals who are individuals (with residence abroad for six months or more), foreign governments, foreign municipal authorities, foreign public institutions, international financial institutions or similar international organizations, corporations incorporated under foreign laws and any person in any additional category designated by the Decree of the Financial Services and Capital Markets Act. All Korean branches of a foreign corporation as a group are treated as a separate foreigner from the head office of the foreign corporation. However, a foreign branch of a Korean securities company, a foreign corporation or a depositary issuing depositary receipts may obtain one or more Investment Registration Cards in its name in certain circumstances as described in the relevant regulations.

Upon a foreign investor's purchase of shares through the Korea Exchange, no separate report by the investor is required because the Investment Registration Card system is designed to control and oversee foreign investment through a computer system. However, a foreign investor's acquisition or sale of shares outside the Korea Exchange (as discussed above) must be reported by the foreign investor or his standing proxy to the Governor of the Financial Supervisory Service at the time of each acquisition or sale. However, a foreign investor must ensure that any acquisition or sale by it of shares outside the Korea Exchange in the case of trades in connection with a tender offer, odd-lot trading of shares or trades of a class of shares for which the aggregate foreign ownership limit has been reached or exceeded, is reported to the Governor of the Financial Supervisory Service by the Korea Securities Depository, financial investment companies with a dealing or brokerage license or securities finance companies engaged to facilitate such transactions. In the event a foreign investor desires to acquire or sell shares outside the Korea Exchange and the circumstances in connection with such sale or acquisition do not fall within the exceptions made for certain limited circumstances described above, then the foreign investor must obtain the prior approval of the Governor. In addition, in the event a foreign investor acquires or sells shares outside the Korea Exchange, a prior report to the Governor of the Financial Supervisory Service may also be required in certain circumstances. A foreign investor may appoint one or more standing proxies from among the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and

133

certain eligible foreign custodians which will exercise shareholders' rights or perform any matters related to the foregoing activities if the foreign investor does not perform these activities himself. However, a foreign investor may be exempted from complying with these standing proxy rules with the approval of the Governor of the Financial Supervisory Service in cases deemed inevitable by reason of conflict between the laws of Korea and those of the home country of the foreign investor.

Certificates evidencing shares of Korean companies must be kept in custody with an eligible custodian in Korea, the Korea Securities Depository, foreign exchange banks (including domestic branches of foreign banks), financial investment companies with a dealing, brokerage or collective investment license and certain eligible foreign custodians are eligible to be a custodian of shares for a non-resident or foreign investor. A foreign investor must ensure that his custodian deposits his shares with the Korea Securities Depository. Generally, a foreign investor may not permit any person, other than his/her standing proxy, to exercise rights relating to his shares or perform any tasks related thereto on his behalf. However, a foreign investor may be exempted from complying with this deposit requirement with the approval of the Governor of the Financial Supervisory Service in circumstances where compliance is made impracticable, including cases where such compliance would contravene the laws of the home country of the foreign investor.

Under the Investment Rules, with certain exceptions, a foreign investor may acquire shares of a Korean company without being subject to any single or aggregate foreign investment ceiling. However, certain designated public corporations are subject to a 40.0% ceiling on acquisitions of shares by foreigners in the aggregate and a ceiling on acquisitions of shares by a single foreign investor provided in the Articles of Incorporation of such corporations. Of the Korean companies listed on the Korea Exchange, we are so designated. The Financial Services Commission may impose other restrictions as it deems necessary for the protection of investors and the stabilization of the Korean securities and derivatives market. Generally, the ownership of Converted Shares constitutes foreign ownership for purposes of such aggregate foreign ownership limit. However, the acquisition of Converted Shares is one of the exceptions under which foreign investors may acquire shares of designated corporations in excess of the 40.0% ceiling.

In addition to the aggregate foreign investment ceiling set by the Financial Services Commission under authority of the Financial Investment Services and Capital Markets Act, our Articles of Incorporation set a 3% ceiling on acquisition by a single investor (whether domestic or foreign) of the shares of our common stock. Any person (with certain exceptions) who holds more than 3% of our issued and outstanding shares cannot exercise voting rights with respect to our shares in excess of this 3% limit.

The ceiling on aggregate investment by foreigners applicable to us may be exceeded in certain limited circumstances, including as a result of acquisition of:

- shares by a depositary issuing depositary receipts representing such shares (whether newly issued shares or outstanding shares);

- Converted Shares;

- shares from the exercise of shareholders' rights; or

- shares by gift, inheritance or bequest.

A foreigner who has acquired shares in excess of any ceiling described above may not exercise his voting rights with respect to the shares exceeding such limit and the Financial Services Commission may take necessary corrective action against him.

Under the Foreign Exchange Transaction Laws, a foreign investor who intends to acquire shares must designate a foreign exchange bank at which he must open a foreign currency account and a Won account exclusively for stock investments. No approval is required for remittance into Korea and deposit of foreign currency funds in the foreign currency account. Foreign currency funds may be transferred from the foreign

134

currency account at the time required to place a deposit for, or settle the purchase price of, a stock purchase transaction to a Won account opened at a securities company. Funds in the foreign currency account may be remitted abroad without any governmental approval.

Dividends on shares of our common stock are paid in Won. No governmental approval is required for foreign investors to receive dividends on, or the Won proceeds of the sale of, any shares to be paid, received and retained in Korea. Dividends paid on, and the Won proceeds of the sale of, any shares held by a non-resident of Korea must be deposited either in a Won account with the investor's securities company or the investor's Won account. Funds in the investor's Won account may be transferred to his foreign currency account or withdrawn for local living expenses, provided that any withdrawal of local living expenses in excess of a certain amount should be reported to the Governor of the Financial Supervisory Service. Funds in the investor's Won account may also be used for future investment in shares or for payment of the subscription price of new shares obtained through the exercise of preemptive rights.

Financial investment companies with a securities dealing, brokerage or collective investment license are allowed to open foreign currency accounts with foreign exchange banks exclusively for accommodating foreign investors' stock investments in Korea. Through these accounts, these securities companies and asset management companies may enter into foreign exchange transactions on a limited basis, such as conversion of foreign currency funds and Won funds, either as a counterparty to or on behalf of foreign investors without the foreign investors having to open their own accounts with foreign exchange banks.

**Item 10.E. Taxation**

**Korean Taxes**

The following summary describes the material Korean tax consequences of ownership of the Registered Debt Securities and ADSs. Persons considering the purchase of the Registered Debt Securities or ADSs should consult their own tax advisors with regard to the application of the Korean income tax laws to their particular situations as well as any tax consequences arising under the laws of any other taxing jurisdiction. Reference is also made to a tax treaty between the Republic and the United States entitled "Convention Between the Government of the Republic of Korea and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and the Encouragement of International Trade and Investment," signed on June 4, 1976 and entered into force on October 20, 1979.

The following summary of Korean tax considerations applies to you so long as you are not:

- a resident of Korea;

- a corporation having its head office, principal place of business or place of effective management in Korea; or

- engaged in a trade or business in Korea through a permanent establishment or a fixed base to which the relevant income is attributable or with which the relevant income is effectively connected.

*Registered Debt Securities*

*Taxation of Interest*

Pursuant to the Special Tax Treatment Control Law ("STTCL"), when we make payments of interest to you on the Registered Debt Securities, no amount will be withheld from such payments for, or on account of, any income taxes of any kind imposed, levied, withheld or assessed by Korea or any political subdivision or taxing authority thereof or therein, provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL.

135

If the tax exemption under the STTCL referred to above were to cease to be in effect, the rate of income tax or corporation tax applicable to the interest on the Registered Debt Securities would be 14% of income for a non-resident without a permanent establishment in Korea. In addition, local income tax would be imposed at the rate of 10.0% of the income tax or corporation tax (which would increase the total tax rate to 15.4%), unless reduction is available under an applicable income tax treaty. If you are a qualified resident in a country that has entered into a tax treaty with Korea, you may qualify for an exemption or a reduced rate of Korean withholding tax. See the discussion under "—Shares or ADSs—Tax Treaties" below for an additional explanation on treaty benefits.

In order to obtain the benefits of an exemption or a reduced withholding tax rate under a tax treaty, you must submit to us, prior to the interest payment date, such evidence of tax residence as may be required by the Korean tax authorities in order to establish your entitlement to the benefits of the applicable tax treaty.

Furthermore, Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, an overseas investment vehicle (which is defined as an organization established in a foreign jurisdiction that manages funds collected through investment solicitation by acquiring, disposing or otherwise investing in proprietary targets and then distributes the proceeds thereof to investors) (the "Overseas Investment Vehicle") must obtain an application for a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Taxation of Capital Gains*

Korean tax laws currently exclude from Korean taxation gains made by a non-resident without permanent establishment in Korea from the sale of a Registered Debt Security to another non-resident (except where a non-resident sells Registered Debt Securities to another non-resident who has permanent establishments in Korea, if any). In addition, capital gains realized from the transfer of Registered Debt Securities outside Korea by non-residents with or without permanent establishments in Korea are currently exempt from taxation by virtue of the STTCL, provided that the issuance of such Registered Debt Securities is deemed to be an overseas issuance of foreign currency-denominated bonds under the STTCL. If you sell or otherwise dispose of a Registered Debt Security through other ways than those mentioned above, any gain realized on the transaction will be taxable at ordinary Korean withholding tax rates (which is the lesser of 22.0% (including local income tax) of the net gain or 11.0% (including local income tax) of the gross sale proceeds, subject to the production of satisfactory evidence of the acquisition cost of such Registered Debt Securities and certain direct transaction costs attributable to the disposal of such Registered Debt Securities), unless an exemption is available under an applicable income tax treaty. See the discussion under "—Shares or ADSs—Tax Treaties" below for an additional explanation on treaty benefits.

*Inheritance Tax and Gift Tax*

If you die while you are the holder of Registered Debt Securities, the subsequent transfer of the Registered Debt Securities by way of succession will be subject to Korean inheritance tax. Similarly, if you transfer Registered Debt Securities as a gift, the donee will be subject to Korean gift tax and you may be required to pay the gift tax if the donee fails to do so.

At present, Korea has not entered into any tax treaty relating to inheritance or gift taxes.

136

*Shares or ADSs*

*Dividends on the Shares of Common Stock or ADSs*

We will deduct Korean withholding tax from dividends (whether in cash or in shares) paid to you at a rate of 22% (inclusive of local income tax). If you are a qualified resident in a country that has entered into a tax treaty with Korea, you may qualify for a reduced rate of Korean withholding tax. See the discussion under "—Tax Treaties" below for an additional explanation on treaty benefits.

In order to obtain the benefits of a reduced withholding tax rate under a tax treaty, you must submit to us, prior to the dividend payment date, such evidence of tax residence as may be required by the Korean tax authorities in order to establish your entitlement to the benefits of the applicable tax treaty. Evidence of tax residence may be submitted to us through the ADS depositary. If we distribute to you free shares representing a transfer of certain capital reserves or asset revaluation reserves into paid-in capital, such distribution may be subject to Korean withholding tax.

Furthermore, Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for entitlement to a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

If you hold common shares or ADSs and receive the dividend through an account at the Korea Securities Depository held by a foreign depositary settlement institute, you are not required to submit the application for entitlement to a preferential tax rate. However, evidence of tax residence may need to be submitted to us through such foreign depositary settlement institute.

*Taxation of Capital Gains*

As a general rule, capital gains earned by non-residents upon the transfer of the common shares or ADSs would be subject to Korean income tax at a rate equal to the lesser of (i) 11.0% (including local income tax) of the gross proceeds realized or (ii) 22.0% (including local income tax) of the net realized gain (subject to the production of satisfactory evidence of the acquisition costs and certain direct transaction costs arising out of the transfer of such common shares or ADSs), unless such non-resident is exempt from Korean income taxation under an applicable Korean tax treaty into which Korea has entered with the non-resident's country of tax residence. Please see the discussion under "—Tax Treaties" below for an additional explanation on treaty benefits. Even if you do not qualify for any exemption under a tax treaty, you will not be subject to the foregoing income tax on capital gains if you qualify for the relevant Korean domestic tax law exemptions discussed in the following paragraphs.

You will not be subject to Korean income taxation on capital gains realized upon the transfer of our common stocks or ADSs through the Korea Exchange if you (i) have no permanent establishment in Korea and (ii) did not own or have not owned (together with any shares owned by any entity which you have a certain special relationship with and possibly including the shares represented by the ADSs) 25.0% or more of our total issued and outstanding shares at any time during the calendar year in which the sale occurs and during the five calendar years prior to the calendar year in which the sale occurs.

It should be noted that (i) capital gains earned by you (regardless of whether you have a permanent establishment in Korea) from the transfer of ADSs outside Korea will be exempted from Korean income taxation provided that ADSs are deemed to have been issued overseas under the STTCL, but (ii) if and when an owner of the underlying shares of stock transfers ADSs after conversion of the underlying shares into ADSs, the exemption described in (i) is not applicable.

137

If you are subject to tax on capital gains with respect to the sale of ADSs, or of shares of common stock which you acquired as a result of a withdrawal, the purchaser or, in the case of the sale of shares of common stock on the Korea Exchange or through an investment dealer or investment broker under the Financial Investment Services and Capital Markets Act, an investment dealer or investment broker is required to withhold Korean tax from the sales price in an amount equal to 11.0% (including local income tax) of the gross realization proceeds and to make payment of these amounts to the Korean tax authority, unless you establish your entitlement to an exemption under an applicable tax treaty or domestic tax law or produce satisfactory evidence of your acquisition cost and transaction costs for the shares of common stock or the ADSs.

However, if you transfer the ADSs following an exchange of the underlying shares of stock owned by you for ADSs to a purchaser who is a non-residents or a foreign company without permanent establishment in Korea, you are obligated to file an income tax return and pay tax on gain realized from such transfer unless exempt under an applicable tax treaty or domestic law. Further, if you transfer the shares of common stock outside of Korea (excluding a transfer on a foreign exchange) to non-residents or foreign companies without having permanent establishments in Korea, you are obligated to file an income tax return and pay income tax on capital gain realized from such transfer unless exempt under an applicable tax treaty or domestic law. If a purchaser or an investment dealer or investment broker, as the case may be, withholds and remits the tax on capital gains derived from transfer of shares of common stock or ADSs, your obligation to file an income tax return and pay income tax will be exempt.

In order to obtain the benefit of an exemption from tax pursuant to a tax treaty, you must submit to the purchaser or the investment dealer or the investment broker, or through the ADS depositary, as the case may be, prior to or at the time of payment, such evidence of your tax residence as the Korean tax authorities may require in support of your claim for treaty benefits. Please see the discussion under "—Tax Treaties" below for an additional explanation on claiming treaty benefits. Furthermore, Korean tax laws require the beneficial owner to submit an application for tax exemption together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available exemption pursuant to the relevant tax treaty. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for tax exemption from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Tax Treaties*

Korea has entered into a number of income tax treaties with other countries (including the United States), which would reduce or exempt Korean withholding tax on dividends on, and capital gains on transfer of, shares of our common stock or ADSs. For example, under the Korea-United States income tax treaty, reduced rates of Korean withholding tax of 16.5% or 11.0% (respectively, including local income tax, depending on your shareholding ratio) on dividends and an exemption from Korean withholding tax on capital gains are available to residents of the United States that are beneficial owners of the relevant dividend income or capital gains. However, under Article 17 (Investment of Holding Companies) of the Korea-United States income tax treaty, such reduced rates and exemption do not apply if (i) you are a United States corporation, (ii) by reason of any special measures, the tax imposed on you by the United States with respect to such dividends or capital gains is substantially less than the tax generally imposed by the United States on corporate profits, and (iii) 25.0% or more of your capital is held of record or is otherwise determined, after consultation between competent authorities of the United States and Korea, to be owned directly or indirectly by one or more persons who are not individual residents of the United States. Also, under Article 16 (Capital Gains) of the Korea-United States income tax treaty, the exemption on capital gains does not apply if you are an individual, and (a) you maintain a fixed base in Korea for a period or periods aggregating 183 days or more during the taxable year and your ADSs or shares of common stock giving rise to capital gains are effectively connected with such fixed base or (b) you are present in Korea for a period or periods of 183 days or more during the taxable year.

138

You should inquire for yourself whether you are entitled to the benefit of an income tax treaty with Korea. It is the responsibility of the party claiming the benefits of an income tax treaty in respect of dividend payments or capital gains to submit to us, the purchaser or the investment dealer or the investment broker, as applicable, a certificate as to his tax residence. In the absence of sufficient proof, we, the purchaser or the investment dealer or the investment broker, as applicable, must withhold tax at the normal rates. Further, in order for you to obtain the benefit of a tax exemption on certain Korean source income (e.g., interest, dividends and capital gains) under an applicable tax treaty, Korean tax laws require you (or your agent) to submit an application for tax exemption (if there is no change in the content of such application, it is not required to submit such application again within a period of three years thereafter) along with a certificate of your tax residence issued by a competent authority of your country of tax residence. Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for tax exemption from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner. The withholding obligor must submit the application and the report to the relevant tax office by the ninth day of the month following the date of the first payment of such income.

Furthermore, the Korean tax laws require the beneficial owner to submit an application for entitlement to a preferential tax rate (if there is no change in the content of such application, it is not required to submit such application again within a period of three years thereafter) together with evidence of tax residence (including a certificate of tax residence of the beneficial owner issued by a competent authority of the country of tax residence of the beneficial owner) to a withholding obligor paying Korean source income in order to benefit from the available reduced tax rate pursuant to the relevant tax treaty. If you hold the shares of common stock or ADSs and receive the dividend through an account at the Korea Securities Depository held by a foreign depositary settlement institute, you are not required to submit the application for entitlement to a preferential tax rate. However, evidence of tax residence may need to be submitted to us through such foreign depositary settlement institute.

Under Korean tax laws and subject to certain exceptions, the Overseas Investment Vehicle must obtain an application for a preferential tax rate from the beneficial owner and forward it to the withholding obligor along with an overseas investment vehicle report (prepared by the Overseas Investment Vehicle) which includes a detailed statement on the beneficial owner.

*Inheritance Tax and Gift Tax*

If you die while holding an ADS or donate an ADS, it is unclear whether, for Korean inheritance and gift tax purposes, you will be treated as the owner of the shares of common stock underlying the ADSs. If the tax authority interprets depositary receipts as the underlying share certificates, you may be treated as the owner of the shares of common stock and your heir or the donee (or in certain circumstances, you as the donor) will be subject to Korean inheritance or gift tax presently at the rate of 10.0% to 50.0%, depending on the value of the ADSs or shares of common stock.

If you die while holding a share of common stock or donate a share of common stock, your heir or donee (or in certain circumstances, you as the donor) will be subject to Korean inheritance or gift tax at the same rate as indicated above.

At present, Korea has not entered into any tax treaty relating to inheritance or gift taxes.

*Securities Transaction Tax*

If you transfer shares of common stock on the Stock Market of the Korea Exchange, you will be subject to securities transaction tax at the rate of 0.15% and an agriculture and fishery special surtax at the rate of 0.15% of

139

the sale price of the shares of common stock. If your transfer of the shares of common stock is not made on the Stock Market of the Korea Exchange, subject to certain exceptions you will be subject to securities transaction tax at the rate of 0.5% and will not be subject to an agriculture and fishery special surtax.

Under the Securities Transaction Tax Law, depositary receipts (such as ADSs) constitute share certificates subject to the securities transaction tax. However, a transfer of depositary receipts listed on the New York Stock Exchange, NASDAQ National Market or other qualified foreign exchanges will be exempt from the securities transaction tax although depositary receipts, including ADSs, constitute share certificates subject to the securities transaction tax.

In principle, the securities transaction tax, if applicable, must be paid by the transferor of the shares or rights. When the transfer is effected through the Korea Securities Depository, the Korea Securities Depository is generally required to withhold and pay the tax to the tax authorities. When such transfer is made through an investment dealer or investment broker under the Financial Investment Services and Capital Markets Act only, such investment dealer or investment broker is required to withhold and pay the tax. Where the transfer is effected by a non-resident without a permanent establishment in Korea, other than through the Korea Securities Depository or an investment dealer or investment broker, the transferee is required to withhold the securities transaction tax for payment to the Korean tax authority.

**U.S. Federal Income and Estate Tax Considerations for U.S. Persons**

The following is a summary of certain U.S. Federal income and estate tax consequences for beneficial owners of the Registered Debt Securities, common stock and ADSs that are "U.S. Persons (as defined below)." For purposes of this summary, you are a "U.S. Person" if you are any of the following for U.S. Federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation, or other entity treated as a corporation for U.S. Federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. Federal income taxation regardless of its source; or

- a trust if (1) it is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) it has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This summary is based on current law, which is subject to change (perhaps retroactively), is for general purposes only and should not be considered tax advice. This summary does not represent a detailed description of the U.S. Federal income and estate tax consequences and does not address the effects of the Medicare contribution tax on net investment income or foreign, state, local or other tax considerations that may be relevant to you in light of your particular circumstances. The discussion set forth below is applicable to you if (i) you are a resident of the United States for purposes of the current income tax treaty between the United States and Korea (the "Treaty"), (ii) your Registered Debt Securities, common stock or ADSs are not, for purposes of the Treaty, effectively connected with a permanent establishment in Korea and (iii) you otherwise qualify for the full benefits of the Treaty. Except where noted, this summary deals only with Registered Debt Securities, common stock or ADSs held as capital assets, and it does not represent a detailed description of the U.S. Federal income and estate tax consequences applicable to you if you are subject to special treatment under the U.S. Federal income tax laws (including if you are a dealer in securities or currencies, a financial institution, a regulated investment company, a real estate investment trust, an insurance company, a tax-exempt organization, a person holding the Registered Debt Securities, common stock or ADSs as part of a hedging, integrated or conversion transaction, constructive sale or straddle, a person owning 10.0% or more of our voting stock, a trader in securities that elects to use a mark-to-market method of accounting for your securities holdings, a person liable

140

for the alternative minimum tax, an investor in a pass-through entity, or a U.S. Person whose "functional currency" is not the U.S. dollar). We cannot assure you that a change in law will not alter significantly the tax considerations that we describe in this summary.

If a partnership holds the Registered Debt Securities, common stock or ADSs, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our Registered Debt Securities, common stock, or ADSs, you should consult your tax advisor.

Because of the 100-year maturity of the One Hundred Year 7.95% Zero-to-Full Debentures, due April 1, 2096 (the "ZTF Debentures"), it is not certain whether the ZTF Debentures will be treated as debt for U.S. Federal income tax purposes. The discussion below assumes that the ZTF Debentures (as well as the other Registered Debt Securities) will be treated as debt, except that a summary of the consequences to you if the ZTF Debentures were not treated as debt is provided under "Tax Consequences with Respect to Registered Debt Securities Generally—ZTF Debentures Treated as Equity" below.

The discussion of the tax consequences of ownership of common stock and ADSs below, is based, in part, upon representations made by the Depositary to us and assumes that the deposit agreement, and all other related agreements, will be performed in accordance with their terms.

**You should consult your own tax advisor concerning the particular U.S. Federal income and estate tax consequences to you of the ownership of the Registered Debt Securities, common stock and ADSs, as well as the consequences to you arising under the laws of any other taxing jurisdiction.**

### *Tax Consequences with Respect to Registered Debt Securities Generally*

*Payments*

Except as provided below with regard to original issue discount (as defined below) on the ZTF Debentures, interest on a Registered Debt Security will generally be taxable to you as ordinary income at the time it is paid or accrued in accordance with your method of accounting for tax purposes. Principal payments on an amortizing Registered Debt Security generally will constitute a tax-free return of capital to you.

Although interest payments to you are currently exempt from Korean taxation provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL (see—"Korean Taxes—Registered Debt Securities—Taxation of Interest," above), if the Korean law providing for the exemption is repealed, then, in addition to interest payments on the Registered Debt Securities and original issue discount on the ZTF Debentures, you will be required to include in income any additional amounts paid and any Korean tax withheld from interest payments notwithstanding that you in fact did not receive such withheld tax. You may be entitled to deduct or credit such Korean tax (up to the Treaty rate), subject to applicable limitations in the Internal Revenue Code of 1986, as amended (the "Code"). Your election to deduct or credit foreign taxes will apply to all of your foreign taxes for a particular taxable year. Interest income on a Registered Debt Security (including additional amounts and any Korean taxes withheld in respect thereof) and original issue discount on a ZTF Debenture generally will constitute foreign source income and generally will be considered passive category income for purposes of computing the foreign tax credit. You will generally be denied a foreign tax credit for Korean taxes imposed with respect to the Registered Debt Securities where you do not meet a minimum holding period requirement during which you are not protected from risk of loss. The rules governing the foreign tax credit are complex. Investors are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

*Original Issue Discount*

The ZTF Debentures were issued with original issue discount ("OID") for U.S. Federal income tax purposes equal to the difference between (i) the sum of all scheduled amounts payable on the ZTF Debentures (including

141

the interest payable on such ZTF Debentures) and (ii) the "issue price" of the ZTF Debentures. The "issue price" of each ZTF Debenture is the first price at which a substantial amount of the ZTF Debentures was sold to the public (other than to an underwriter, broker, placement agent or wholesaler). If you hold ZTF Debentures, then (subject to the discussion in "—Bond Premium" below) you generally must include OID in gross income in advance of the receipt of cash attributable to that income, regardless of your method of accounting. However, you generally will not be required to include separately in income cash payments received on the ZTF Debentures, even if denominated as interest.

The amount of OID includible in income by the holder of a ZTF Debenture is the sum of the "daily portions" of OID with respect to the ZTF Debenture for each day during the taxable year or portion of the taxable year in which such holder held such ZTF Debenture, or accrued OID (for a discussion relevant to subsequent purchasers, see "—Market Discount" and "—Bond Premium," below). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a ZTF Debenture may be of any length and may vary in length over the term of the ZTF Debenture, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the product of the ZTF Debenture's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period). OID allocable to a final accrual period is the difference between the amount payable at maturity and the adjusted issue price at the beginning of the final accrual period. The "adjusted issue price" of a ZTF Debenture at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period (for subsequent purchasers, determined without regard to the amortization of any acquisition or bond premium, as described below) and reduced by any payments previously made on such ZTF Debenture. Under these rules, you will have to include in income increasingly greater amounts of OID in successive accrual periods. We are required to provide information returns stating the amount of OID accrued on ZTF Debentures held of record by persons other than corporations and other exempt holders.

As discussed above, although interest payments to you are currently exempt from Korean taxation provided that Registered Debt Securities are deemed to be foreign currency-denominated bonds issued outside of Korea for the purpose of the STTCL (see—"Korean Taxes—Registered Debt Securities—Taxation of Interest," above), if the Korean law providing for the exemption is repealed, then Korean withholding tax may be imposed at times that differ from the times at which you are required to include interest or OID in income for U.S. Federal income tax purposes and this disparity may limit the amount of foreign tax credit available.

*Market Discount*

If you purchased a Registered Debt Security other than a ZTF Debenture for an amount that is less than its stated redemption price at maturity, or, in the case of a ZTF Debenture, its adjusted issue price, the amount of the difference will be treated as "market discount" for U.S. Federal income tax purposes, unless that difference is less than a specified de minimis amount. Under the market discount rules, you will be required to treat any payment, other than qualified stated interest (as defined in the Code), on, or any gain on the sale, exchange, retirement or other disposition of, a Registered Debt Security as ordinary income to the extent of the market discount that you have not previously included in income and are treated as having accrued on the Registered Debt Security at the time of its payment or disposition. In addition, you may be required to defer, until the maturity of the Registered Debt Security or its earlier disposition in a taxable transaction, the deduction of all or a portion of the interest expense on any indebtedness attributable to the Registered Debt Security.

Any market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the Registered Debt Security, unless you elect to accrue on a constant interest method. Your election to accrue market discount on a constant interest method is to be made for the taxable year in which you acquired the Registered Debt Security, applies only to that Registered Debt Security and cannot be revoked. You

may elect to include market discount in income currently as it accrues, on either a ratable or constant interest method, in which case the rule described above regarding deferral of interest deductions will not apply. Your election to include market discount in income currently, once made, applies to all market discount obligations acquired by you on or after the first taxable year to which your election applies and may not be revoked without the consent of the Internal Revenue Service (the "IRS"). You should consult your own tax advisor before making this election.

*Bond Premium*

If you purchased a ZTF Debenture for an amount that is greater than its adjusted issue price but equal to or less than the sum of all amounts payable on the ZTF Debenture after the purchase date, you will be considered to have purchased that ZTF Debenture at an "acquisition premium." Under the acquisition premium rules, the amount of OID that you must include in gross income with respect to a ZTF Debenture for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.

If you purchased a Registered Debt Security for an amount in excess of the sum of all amounts payable on the Registered Debt Security after the purchase date other than qualified stated interest, you will be considered to have purchased the Registered Debt Security at a "premium" and, if such Registered Debt Security is a ZTF Debenture, you will not be required to include any OID in income. You generally may elect to amortize the premium over the remaining term of the Registered Debt Security on a constant yield method as an offset to interest when includible in income under your regular accounting method. In the case of instruments that provide for alternative payment schedules, bond premium is calculated by assuming that (a) you will exercise or not exercise options in a manner that maximizes your yield, and (b) we will exercise or not exercise options in a manner that minimizes your yield (except that we will be assumed to exercise call options in a manner that maximizes your yield). If you do not elect to amortize bond premium, that premium will decrease the gain or increase the loss you would otherwise recognize on disposition of a Registered Debt Security. Your election to amortize premium on a constant yield method will also apply to all debt obligations held or subsequently acquired by you on or after the first day of the first taxable year to which the election applies. You may not revoke the election without the consent of the IRS. You should consult your own tax advisor before making this election.

*Sale, Exchange and Retirement of Registered Debt Securities*

When you sell, exchange or retire a Registered Debt Security, you will recognize gain or loss equal to the difference between the amount you receive (not including an amount equal to any accrued qualified stated interest, which will be taxable as ordinary income to the extent not previously included in income) and your adjusted tax basis in the Registered Debt Security. Your tax basis in a Registered Debt Security other than a ZTF Debenture will generally be your cost of obtaining the Registered Debt Security increased by any market discount included in income and reduced by payments of principal you receive and any bond premium that you elect to amortize. Your adjusted tax basis in a ZTF Debenture will, in general, be your cost therefor, increased by any market discount and OID previously included in income and reduced by any cash payments on the ZTF Debentures and any bond premium that you elect to amortize. Your gain or loss realized on selling, exchanging or retiring a Registered Debt Security will generally be treated as United States source income. Consequently, you may not be able to use the foreign tax credit arising from any Korean tax imposed on the disposition of Registered Debt Securities unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from foreign sources. Except as described above with respect to market discount, your gain or loss will be capital gain or loss and will generally be long-term capital gain or loss if, at the time of the sale, exchange or retirement of a Registered Debt Security, you have held the Registered Debt Security for more than one year. If you are an individual and the Registered Debt Security being sold, exchanged or retired is a capital asset that you held for more than one year, you may be eligible for reduced rates of taxation on any capital gain recognized. Your ability to deduct capital losses is subject to limitations.

143

*ZTF Debentures Treated as Equity*

If the ZTF Debentures were treated as equity for U.S. Federal income tax purposes, amounts actually or deemed paid with respect to the ZTF Debentures would be deemed dividends for U.S. Federal income tax purposes to the extent paid out of our current or accumulated earnings and profits (as determined for U.S. Federal income tax purposes).

You would include the amounts actually or deemed paid by us on the ZTF Debentures (before reduction for Korean withholding tax, if any) as dividend income when actually or constructively paid by us. Section 305 of the Code, which would apply to the ZTF Debentures if they were treated as equity for U.S. Federal income tax purposes, requires current accrual of dividends under principles similar to the accrual of OID. Amounts treated as dividends will not be eligible for the dividends received deduction generally allowed to U.S. corporations.

### Tax Consequences with Respect to Common Stock and ADSs

In general, for U.S. Federal income tax purposes, holders of ADSs will be treated as the owners of the underlying common stock that is represented by such ADSs. Accordingly, deposits or withdrawals of common stock by holders of ADSs will not be subject to U.S. Federal income tax.

*Distributions on Common Stock or ADSs*

The gross amount of distributions (other than certain distributions of common stock or rights to subscribe for common stock) to holders of common stock or ADSs (including amounts withheld in respect of Korean withholding taxes) will be taxable dividends to such holders, to the extent paid out of our current or accumulated earnings and profits, as determined under U.S. Federal income tax principles. Such income (including withheld taxes) will be includable in the gross income of a holder as ordinary income on the day actually or constructively received by the holder, in the case of common stock, or by the Depositary, in the case of ADSs. Such dividends will not be eligible for the dividends received deduction allowed to corporations under the Code.

With respect to non-corporate U.S. Persons, certain dividends paid by a qualified foreign corporation and received by such holders may be subject to reduced rates of taxation. A qualified foreign corporation includes a foreign corporation that is eligible for the benefits of an income tax treaty with the United States, if such treaty contains an exchange of information provision and the United States Treasury Department had determined that the treaty is satisfactory for purposes of the legislation. The United States Treasury Department has determined that the Treaty, which contains an exchange of information provision, is (in the absence of additional guidance) satisfactory for these purposes. In addition, we believe we are eligible for the benefits of the Treaty. However, a foreign corporation is also treated as a qualified foreign corporation with respect to dividends paid by that corporation on shares (or ADSs backed by such shares) that are readily tradable on an established securities market in the United States. Shares of our common stock will generally not be considered readily tradable for these purposes. However, United States Treasury Department guidance indicates that our ADSs, which are listed on the New York Stock Exchange, are readily tradable on an established securities market in the United States. There can be no assurance that our ADSs will be considered readily tradable on an established securities market in later years. Non-corporate U.S. Persons that do not meet a minimum holding period requirement during which they are not protected from a risk of loss or that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. In addition, the rate reduction will not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. Holders should consult their own tax advisors regarding the application of the foregoing rules to their particular circumstances.

The amount of any dividend paid in Won will equal the United States dollar value of the Won received calculated by reference to the exchange rate in effect on the date the dividend is received by the holder, in the

144

case of common stock, or by the Depositary, in the case of ADSs, regardless of whether the Won are converted into U.S. dollars. If the Won received as a dividend are not converted into U.S. dollars on the date of receipt, a holder will have a basis in the Won equal to their U.S. dollar value on the date of receipt. Any gain or loss realized on a subsequent conversion or other disposition of the Won will be treated as United States source ordinary income or loss. The amount of any distribution of property other than cash will be the fair market value of such property on the date of distribution.

The maximum rate of withholding tax on dividends paid to you pursuant to the Treaty is 16.5%. You will be required to properly demonstrate to us and the Korean tax authorities your entitlement to the reduced rate of withholding under the Treaty. Subject to certain conditions and limitations, Korean withholding taxes (up to the Treaty rate) will be treated as foreign taxes eligible for credit against your U.S. Federal income tax liability. For purposes of calculating the foreign tax credit, dividends paid on the common stock or ADSs will be treated as foreign source income and will generally constitute passive category income. Further, in certain circumstances, if you have held common stock or ADSs for less than a specified minimum period during which you are not protected from risk of loss, or are obligated to make payments related to the dividends, you will not be allowed a foreign tax credit for foreign taxes imposed on dividends paid on common stock or ADSs. The rules governing the foreign tax credit are complex. Investors are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances including the possible adverse impact on creditability to the extent you are entitled to a refund of any Korean tax withheld or a reduced rate of withholding.

To the extent that the amount of any distribution exceeds our current and accumulated earnings and profits for a taxable year, as determined under U.S. Federal income tax principles, the distribution will first be treated as a tax-free return of capital, causing a reduction in the adjusted basis of the common stock or ADSs (thereby increasing the amount of gain, or decreasing the amount of loss, to be recognized by the investor on a subsequent disposition of the common stock or ADSs), and the balance in excess of adjusted basis will be taxed as capital gain recognized on a sale or exchange of property. Consequently, such distributions in excess of our current and accumulated earnings and profits would not give rise to foreign source income and you generally would not be able to use the foreign tax credit arising from any Korean withholding tax imposed on such distributions unless such credit can be applied (subject to applicable limitations) against U.S. tax due on other foreign source income in the appropriate category for foreign tax credit purposes. However, we do not expect to keep earnings and profits in accordance with U.S. Federal income tax principles. Therefore, you should expect that a distribution will generally be treated as a dividend (as discussed above).

Distributions of common stock or rights to subscribe for common stock that are received as part of a pro rata distribution to all of our shareholders generally will not be subject to U.S. Federal income tax. Consequently such distributions will not give rise to foreign source income and you generally will not be able to use the foreign tax credit arising from any Korean withholding tax unless such credit can be applied (subject to applicable limitations) against U.S. tax due on other income derived from foreign sources. The basis of the new common stock or rights so received will be determined by allocating your basis in the old common stock between the old common stock and the new common stock or rights received, based on their relative fair market value on the date of distribution. However, the basis of the rights will be zero if (i) the fair market value of the rights is less than 15% of the fair market value of the old common stock at the time of distribution, unless the taxpayer timely elects to determine the basis of the old common stock and of the rights by allocating between the old common stock and the rights the adjusted basis of the old common stock or (ii) the rights are not exercised and thus expire.

*Sale, Exchange or Other Disposition of ADSs or Common Stock*

Upon the sale, exchange or other disposition of ADSs or common stock, you generally will recognize capital gain or loss equal to the difference between the amount realized upon the sale, exchange or other disposition and your adjusted tax basis in the ADSs or common stock. The capital gain or loss will be long-term capital gain or loss if at the time of sale, exchange or other disposition, the ADSs or common stock have been held by you for more than one year. Under current law, long-term capital gains of individuals are, under certain

145

circumstances, taxed at lower rates than items of ordinary income. The deductibility of capital losses is subject to limitations. Any gain or loss recognized by you will generally be treated as U.S. source gain or loss. Consequently, you may not be able to use the foreign tax credit arising from any Korean tax imposed on the disposition of ADSs or common stock unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from foreign sources.

You should note that any Korean securities transaction tax will not be treated as a creditable foreign tax for U.S. Federal income tax purposes, although you may be entitled to deduct such taxes, subject to applicable limitations under the Code.

*Passive Foreign Investment Company Rules*

Based upon the past and projected composition of our income and valuation of our assets, we do not believe that we were a PFIC for 2016, and we do not expect to be a PFIC in 2017 or to become one in the foreseeable future, although there can be no assurance in this regard. If, however, we become a PFIC, such characterization could result in adverse U.S. tax consequences to you if you are a U.S. investor. For example, if we become a PFIC, our U.S. investors will become subject to increased tax liabilities under U.S. tax laws and regulations and will become subject to burdensome reporting requirements. Our PFIC status is determined on an annual basis and depends on the composition of our income and assets. Specifically, we will be classified as a PFIC for U.S. tax purposes if either: (i) 75% or more of our gross income in a taxable year is passive income, or (ii) the average percentage of our assets by value in a taxable year which produce or are held for the production of passive income (which generally includes cash) is at least 50%. We cannot assure you that we will not be a PFIC for 2017 or any future taxable year.

**Estate and Gift Taxation**

As discussed above in "—Korean Taxes—Registered Debt Securities—Inheritance Tax and Gift Tax" and "—Korean Taxes—Shares or ADSs—Inheritance Tax and Gift Tax," Korea may impose an inheritance tax on your heir who receives ADSs and will impose an inheritance tax on an heir who receives common stock or Registered Debt Securities. The amount of any inheritance tax paid to Korea may be eligible for credit against the amount of U.S. Federal estate tax imposed on your estate. Prospective purchasers should consult their personal tax advisors to determine whether and to what extent they may be entitled to such credit. Korea also imposes a gift tax on the donation of any property located within Korea. The Korean gift tax generally will not be treated as a creditable foreign tax for United States tax purposes.

**Information Reporting and Backup Withholding**

In general, information reporting requirements will apply to principal, interest, OID and premium payments on Registered Debt Securities and dividend payments in respect of the common stock or ADSs or the proceeds received on the sale, exchange or redemption of the Registered Debt Securities, common stock or ADSs paid within the United States (and in certain cases, outside of the United States) to holders other than certain exempt recipients, and a backup withholding tax may apply to such amounts if you fail to provide an accurate taxpayer identification number or to report interest and dividends required to be shown on your U.S. Federal income tax returns. The amount of any backup withholding from a payment to you will be allowed as a refund or a credit against your U.S. Federal income tax liability, provided the required information is timely furnished to the IRS.

## Item 10.F. Dividends and Paying Agents

Not Applicable

## Item 10.G. Statements by Experts

Not Applicable

146

**Item 10.H. Documents on Display**

We are subject to the information requirements of the Exchange Act, and, in accordance therewith, are required to file reports, including annual reports on Form 20-F, and other information with the U.S. Securities and Exchange Commission. You may inspect and copy these materials, including this annual report and the exhibits thereto, at SEC's Public Reference Room 100 Fifth Street, N.E., Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference rooms. As a foreign private issuer, we are also required to make filings with the Commission by electronic means. Any filings we make electronically will be available to the public over the Internet at the Commission's web site at http://www.sec.gov.

**Item 10.I. Subsidiary Information**

Not Applicable

**ITEM 11. *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK***

Our primary market risk exposures are to fluctuations in exchange rates, interest rates and fuel prices. We are exposed to foreign exchange risk related to foreign currency-denominated liabilities. As of December 31, 2016, approximately 23.1% of our long-term debt (including the current portion but excluding issue discounts and premium), before accounting for swap transactions, was denominated in foreign currencies, principally U.S. dollars. However, a substantial portion of our revenues is denominated in Won. As a result, changes in exchange rates, particularly between the Won and the U.S. dollar, significantly affect us due to our significant amounts of foreign currency-denominated debt and the effect of such changes on the amount of funds required by us to make interest and principal payments on such debt. In order to reduce the impact of foreign exchange rate fluctuations on our results of operations, we have recently been reducing and plan to continue to reduce the proportion of our debt which is denominated in foreign currencies.

We are also exposed to foreign exchange risk related to our purchases of fuel since we obtain substantially all of our fuel materials (other than anthracite coal) directly or indirectly from sources outside Korea. Prices for such fuel materials are quoted based on prices stated in, and in many cases are paid for in, currencies other than Won. In 2016, fuel costs represented 23.4% of our sales.

We are exposed to interest rate risk due to significant amounts of debt. Upward fluctuations in interest rates increase the cost of additional debt and the interest cost of outstanding floating rate borrowings. We are also exposed to fluctuations in prices of fuel materials. In 2016, for electricity generation, uranium accounted for 37.1% of our fuel requirements, coal accounted for 47.7%, LNG accounted for 10.8%, oil accounted for 3.0%, and others accounted for 1.3%, measured in each case by the amount of electricity we generated. In 2015, for electricity generation, uranium accounted for 38.1% of our fuel requirements, coal accounted for 47.9%, LNG accounted for 10.7%, oil accounted for 2.3% and others accounted for 1.0%, measured in each case by the amount of electricity we generated.

For additional discussions of our market risks, see Item 3.D. "Risk Factors" and Item 5.B. "Liquidity and Capital Resources—Liquidity."

We have entered into various swap contracts to hedge exchange rate risks arising from foreign currency-denominated debts. Details of currency swap contracts outstanding as of December 31, 2016 are as follows:

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts | | Contract interest rate | | Contract Exchange Rate |
|------|------|------|------|------|------|------|------|------|
| | | | | Pay | Receive | Pay | Receive | |
| | | | | (KRW in millions, USD in thousands) | | | | |
| Trading . . . | Deutsche Bank | 2013 | 2018 | KRW 110,412 | JPY 10,000,000 | 6.21% | 4.19% | 11.04 |
| | IBK | 2013 | 2018 | KRW 111,800 | USD 100,000 | 3.16% | 2.79% | 1,118.00 |
| | Bank of America | 2013 | 2018 | KRW 103,580 | JPY 10,000,000 | 7.05% | 4.19% | 10.36 |
| | Credit Suisse | 2014 | 2019 | KRW 118,632 | CHF 100,000 | 2.98% | 1.50% | 1,186.32 |
| | Standard Chartered | 2014 | 2019 | KRW 114,903 | CHF 100,000 | 4.00% | 1.50% | 1,149.03 |
| | Standard Chartered | 2014 | 2029 | KRW 102,470 | USD 100,000 | 3.14% | 3.57% | 1,024.70 |
| | Standard Chartered | 2014 | 2017 | KRW 51,215 | USD 50,000 | 2.24% | 3M Libor + 0.55% | 1,024.30 |
| | Mizuho Bank | 2014 | 2017 | KRW 153,645 | USD 150,000 | 2.35% | 3M Libor + 0.65% | 1,024.30 |
| | Societe Generale | 2014 | 2024 | KRW 105,017 | USD 100,000 | 4.92% | 5.13% | 1,050.17 |
| | KEB Hana Bank | 2015 | 2024 | KRW 107,970 | USD 100,000 | 4.75% | 5.13% | 1,079.70 |
| | Credit Agricole | 2015 | 2024 | KRW 94,219 | USD 86,920 | 4.85% | 5.13% | 1,083.97 |
| | Citibank | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | JP Morgan | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | Bank of America | 2012 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | Shinhan Bank | 2016 | 2022 | KRW 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| | HSBC | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| | KEB Hana Bank | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.87% | 3.00% | 1,117.70 |
| | Standard Chartered | 2012 | 2022 | KRW 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| | Deutsche Bank | 2012 | 2022 | KRW 55,885 | USD 50,000 | 2.79% | 3.00% | 1,117.70 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.63% | 3M Libor + 0.84% | 1,081.40 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.57% | 3M Libor + 0.84% | 1,081.40 |
| | DBS | 2013 | 2018 | KRW 108,140 | USD 100,000 | 2.57% | 3M Libor + 0.84% | 1,081.40 |
| | HSBC | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.41% | 2.88% | 1,074.50 |
| | Standard Chartered | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.44% | 2.88% | 1,074.50 |
| | JP Morgan | 2013 | 2018 | KRW 107,450 | USD 100,000 | 3.48% | 2.88% | 1,074.50 |
| | Bank of America | 2014 | 2018 | KRW 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| | Citibank | 2014 | 2018 | KRW 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| | JP Morgan | 2014 | 2017 | KRW 102,670 | USD 100,000 | 2.89% | 3M Libor + 0.78% | 1,026.70 |
| | Deutsche Bank | 2014 | 2017 | KRW 102,670 | USD 100,000 | 2.89% | 3M Libor + 0.78% | 1,026.70 |
| | HSBC | 2014 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Standard Chartered | 2014 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Korea Development Bank | 2016 | 2019 | KRW 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| | Nomura | 2015 | 2025 | KRW 111,190 | USD 100,000 | 2.60% | 3.25% | 1,111.90 |
| | Korea Development Bank | 2015 | 2025 | KRW 111,190 | USD 100,000 | 2.62% | 3.25% | 1,111.90 |
| | Woori Bank | 2015 | 2025 | KRW 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| | KEB Hana Bank | 2015 | 2025 | KRW 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| Cash flow hedge . . | Standard Chartered | 2011 | 2017 | KRW 105,260 | USD 100,000 | 3.99% | 3.63% | 1,052.60 |
| | Barclays Bank PLC | 2011 | 2017 | KRW 105,260 | USD 100,000 | 3.99% | 3.63% | 1,052.60 |
| | Citibank | 2011 | 2017 | KRW 105,260 | USD 100,000 | 3.99% | 3.63% | 1,052.60 |
| | Citibank | 2013 | 2018 | KRW 54,570 | USD 50,000 | 2.90% | 3M Libor + 1.01% | 1,091.40 |

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts | | Contract interest rate | | Contract Exchange Rate |
|---|---|---|---|---|---|---|---|---|
| | | | | Pay | Receive | Pay | Receive | |
| | | | | (KRW in millions, USD in thousands) | | | | |
| | Standard Chartered | 2013 | 2018 | KRW 54,570 | USD 50,000 | 2.90% | 3M Libor + 1.01% | 1,091.40 |
| | Credit Suisse | 2013 | 2018 | KRW 111,410 | USD 100,000 | 3.22% | 3M Libor + 1.50% | 1,114.10 |
| | HSBC | 2014 | 2020 | KRW 99,901 | AUD 100,000 | 3.52% | 5.75% | 999.01 |
| | HSBC | 2014 | 2020 | KRW 100,482 | AUD 100,000 | 3.48% | 5.75% | 1,004.82 |
| | Standard Chartered | 2013 | 2020 | USD 117,250 | AUD 125,000 | 3M Libor + 1.25% | 5.75% | 0.94 |
| | Standard Chartered | 2014 | 2020 | KRW 126,032 | USD 117,250 | 3.55% | 3M Libor + 1.25% | 1,074.90 |
| | JP Morgan | 2014 | 2019 | KRW 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| | Morgan Stanley | 2014 | 2019 | KRW 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| | Deutsche Bank | 2014 | 2019 | KRW 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| | Korea Development Bank | 2016 | 2021 | KRW 121,000 | USD 100,000 | 2.15% | 2.50% | 1,210.00 |
| | Morgan Stanley | 2016 | 2021 | KRW 121,000 | USD 100,000 | 3M Libor+2.10% | 2.50% | 1,210.00 |
| | BNP Paribas | 2016 | 2021 | KRW 121,000 | USD 100,000 | 3M Libor+2.10% | 2.50% | 1,210.00 |
| | Morgan Stanley | 2012 | 2017 | KRW 285,000 | USD 250,000 | 3.76% | 3.13% | 1,140.00 |
| | Credit Agricole | 2012 | 2017 | KRW 142,500 | USD 125,000 | 3.83% | 3.13% | 1,140.00 |
| | JP Morgan | 2012 | 2017 | KRW 142,500 | USD 125,000 | 3.83% | 3.13% | 1,140.00 |
| | Credit Agricole | 2013 | 2019 | KRW 118,343 | CHF 100,000 | 3.47% | 1.63% | 1,183.43 |
| | Morgan Stanley | 2013 | 2019 | KRW 59,172 | CHF 50,000 | 3.40% | 1.63% | 1,183.43 |
| | Nomura | 2013 | 2019 | KRW 59,172 | CHF 50,000 | 3.47% | 1.63% | 1,183.43 |
| | Morgan Stanley | 2013 | 2018 | KRW 107,360 | USD 100,000 | 3.27% | 2.88% | 1,073.60 |
| | Credit Agricole | 2013 | 2018 | KRW 107,360 | USD 100,000 | 3.34% | 2.88% | 1,073.60 |
| | JP Morgan | 2013 | 2018 | KRW 161,040 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| | Standard Chartered | 2013 | 2018 | KRW 161,040 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| | Standard Chartered | 2014 | 2019 | KRW 104,490 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| | Credit Agricole | 2014 | 2019 | KRW 104,490 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| | Morgan Stanley | 2014 | 2019 | KRW 104,490 | USD 100,000 | 2.70% | 2.63% | 1,044.90 |
| | Barclays Bank PLC | 2013 | 2018 | KRW 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Credit Agricole | 2013 | 2018 | KRW 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Deutsche Bank | 2013 | 2018 | KRW 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Citibank | 2013 | 2018 | KRW 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| | Standard Chartered | 2014 | 2017 | KRW 54,205 | USD 50,000 | 2.93% | 3M Libor + 1.05% | 1,084.10 |
| | Credit Agricole | 2014 | 2017 | KRW 54,205 | USD 50,000 | 2.93% | 3M Libor + 1.05% | 1,084.10 |
| | HSBC | 2012 | 2017 | KRW 115,140 | USD 100,000 | 3.38% | 2.50% | 1,151.40 |
| | BNP Paribas | 2012 | 2017 | KRW 115,140 | USD 100,000 | 3.38% | 2.50% | 1,151.40 |
| | KEB Hana Bank | 2012 | 2017 | KRW 115,140 | USD 100,000 | 3.38% | 2.50% | 1,151.40 |
| | Barclays Bank PLC | 2012 | 2017 | KRW 57,570 | USD 50,000 | 3.38% | 2.50% | 1,151.40 |
| | Standard Chartered | 2012 | 2017 | KRW 57,570 | USD 50,000 | 3.38% | 2.50% | 1,151.40 |
| | Nomura | 2012 | 2017 | KRW 57,570 | USD 50,000 | 3.38% | 2.50% | 1,151.40 |
| | Credit Agricole | 2012 | 2017 | KRW 57,570 | USD 50,000 | 3.38% | 2.50% | 1,151.40 |
| | Societe Generale | 2013 | 2018 | KRW 106,190 | USD 100,000 | 3.48% | 2.63% | 1,061.90 |
| | BNP Paribas | 2013 | 2018 | KRW 53,095 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| | KEB Hana Bank | 2013 | 2018 | KRW 53,095 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| | Standard Chartered | 2013 | 2018 | KRW 106,030 | USD 100,000 | 3.48% | 2.63% | 1,060.30 |

149

| Type | Counterparty | Contract Year | Settlement Year | Contract amounts | | Contract interest rate | | Contract Exchange Rate |
|------|-------------|---------------|-----------------|-----|-----|-----|-----|-----|
| | | | | Pay | Receive | Pay | Receive | |
| | | | | (KRW in millions, USD in thousands) | | | | |
| | Barclays Bank | | | | | | | |
| | PLC | 2013 | 2018 | KRW 53,015 | USD 50,000 | 3.48% | 2.63% | 1,060.30 |
| | KEB Hana Bank | 2013 | 2018 | KRW 31,809 | USD 30,000 | 3.48% | 2.63% | 1,060.30 |
| | Societe Generale | 2013 | 2018 | KRW 21,206 | USD 20,000 | 3.48% | 2.63% | 1,060.30 |
| | HSBC | 2013 | 2018 | KRW 53,015 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| | Nomura | 2013 | 2018 | KRW 53,015 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| | Credit Agricole | 2014 | 2020 | KRW 110,680 | USD 100,000 | 2.29% | 2.50% | 1,106.80 |
| | Societe Generale | 2014 | 2020 | KRW 55,340 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| | KEB Hana Bank | 2014 | 2020 | KRW 55,340 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| | KEB Hana Bank | 2014 | 2020 | KRW 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | Standard Chartered | 2014 | 2020 | KRW 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | HSBC | 2014 | 2020 | KRW 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | Nomura | 2014 | 2020 | KRW 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | Barclays Bank | | | | | | | |
| | PLC | 2014 | 2020 | KRW 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| | HSBC | 2014 | 2020 | KRW 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |

Under these currency swap contracts, we recognized net valuation gain of Won 253,035 million in 2016.

Details of interest rate contracts outstanding as of December 31, 2016 are as follows:

| Type | Counterparty | Contract Year | Settlement Year | Notional Amount | Contract Interest Rate Per Annum | |
|------|-------------|---------------|-----------------|-----------------|------|------|
| | | | | | Pay | Receive |
| | | | | (KRW in millions, USD in thousands) | | |
| Trading | Standard Chartered | 2012 | 2017 | KRW 160,000 | 3.57% | 3M CD + 0.32% |
| | JP Morgan | 2013 | 2018 | KRW 150,000 | 3.58% | 3M CD + 0.31% |
| | Credit Suisse | 2014 | 2018 | KRW 200,000 | 2.98% | 1Y CMT + 0.31% |
| | Korea Development Bank[1] | 2014 | 2029 | KRW 40,000 | 3M CD – 0.03% | 4.65% |
| | Export-Import Bank of Korea | 2015 | 2031 | USD 15,893 | 2.67% | 6M USD Libor |
| | ING Bank | 2015 | 2031 | USD 7,861 | 2.67% | 6M USD Libor |
| | BNP Paribas | 2015 | 2031 | USD 7,861 | 2.67% | 6M USD Libor |
| Cash flow hedge | BNP Paribas | 2009 | 2027 | USD 94,790 | 4.16% | 6M USD Libor |
| | KFW | 2009 | 2027 | USD 94,790 | 4.16% | 6M USD Libor |
| | Credit Agricole | 2016 | 2033 | USD 99,694 | 3.98% ~ 4.10% | 6M USD Libor |
| | SMBC | 2016 | 2033 | USD 130,369 | 4.05% ~ 4.18% | 6M USD Libor |

_Note:_

(1)  This contract is an interest rate swap hedging on Electricity Bonds 885, and the bank would notify us of the early termination every year on the early termination nonfiction date (every year on April 28 from 2017 until 2028). The contract will be terminated if the early termination is notified.

Under these interest rate swap contracts, we recognized net valuation gain of Won 8,517 million in 2016.

150

We engage in transactions denominated in foreign currencies and consequently become exposed to fluctuations in exchange rates. The carrying amounts of our foreign currency-denominated monetary assets and monetary liabilities as of December 31, 2015 and 2016 were as follows:

| Type | Assets | | Liabilities | |
|---|---|---|---|---|
| | 2015 | 2016 | 2015 | 2016 |
| | (In thousands of USD, EUR, GBP and other foreign currencies) | | | |
| AED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,481 | 7,479 | 1,705 | 1,534 |
| AUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 158 | 187 | 595,284 | 632,613 |
| BDT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43,332 | 49,110 | 889 | 833 |
| BWP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 301 | 4,296 | — | 3,222 |
| CAD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 858 | — |
| CHF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 400,029 | 400,308 |
| CNY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 26,140 | — |
| EUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,141 | 17,585 | 33,552 | 14,111 |
| GBP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 3 | 99 | 110 |
| IDR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 52,568 | — | — |
| INR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 972,175 | 1,059,092 | 206,159 | 161,631 |
| JOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,972 | 1,746 | — | 5 |
| JPY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,425,163 | 520,746 | 20,325,211 | 20,442,504 |
| KZT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47,177 | 12,157 | — | — |
| MGA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,768,360 | 3,408,579 | 151,729 | 150,430 |
| MXN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,704 | — | — | — |
| PHP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 489,309 | 415,818 | 77,337 | 136,700 |
| PKR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 211,212 | 274,090 | 12,928 | 5,051 |
| SAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,083 | 1,149 | — | — |
| TWD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 30 | — |
| USD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,260,094 | 1,319,524 | 9,331,854 | 9,445,567 |
| UYU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,307 | — | 586 |
| ZAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 238 | 386 | — | 75 |

The following analysis sets forth the sensitivity of our consolidated net income before income taxes (our "pre-tax income") to changes in exchange rates, interest rates, electricity rates and fuel costs. For purposes of this section, we and our related parties are deemed one entity. The range of changes in such risk categories represents our view of the changes that are reasonably possible over a one-year period, although it is difficult to predict such changes as a result of adverse economic developments in Korea. See Item 3.D. "Risk Factors—Risks Relating to Korea and the Global Economy—Unfavorable financial and economic conditions in Korea and globally may have a material adverse impact on us." The following discussion only addresses material market risks faced by us and does not discuss other risks which we face in the normal course of business, including country risk, credit risk and legal risk. Unless otherwise specified, all calculations are made under IFRS.

If Won depreciates against U.S. dollar and all other foreign currencies held by us by 10% and all other variables are held constant from their levels as of December 31, 2016, we estimate that our unrealized foreign exchange translation losses will increase by Won 1,101 billion in 2017. Such sensitivity analysis is conducted for monetary assets and liabilities denominated in foreign currencies other than functional currency as of December 31, 2016 and 2015, before accounting for swap transactions. To manage our foreign currency risk related to foreign currency-denominated receivables and payables, we have a policy of entering into currency forward agreements. In addition, to manage our foreign currency risk related to foreign currency-denominated expected sales transactions and purchase transactions, we enter into cross-currency swap agreements.

We are exposed to interest rate risk due to our borrowings with floating interest rates. If interest rates increase by 1% on all of our borrowings and debentures bearing variable interest and all other variables are held

151

constant as of December 31, 2016, we estimate that our income before income taxes will decrease by Won 33 billion (not reflecting the fact that a portion of such interest may be capitalized under IFRS) in 2017. Such sensitivity analysis does not take into consideration interest rate swap transactions. To manage our interest rate risks, we, in addition to maintaining an appropriate mix of fixed and floating rate loans, have entered into certain interest rate swap agreements.

We are exposed to electricity rates risk due to the rate regulation by the Government, which considers the effect of electricity rate changes on the national economy. If the electricity rate rises by 1% and all other variables are held constant as of December 31, 2016, we estimate that our income before income taxes will increase by Won 543 billion in 2017.

We are exposed to fuel price risks due to the heavy influence of fuel costs on our sales and cost of sales. If the fuel prices of anthracite and bituminous coal, oil, LNG and others used for generation by us and our generation subsidiaries rise by 1% and all other variables are held constant as of December 31, 2016, we estimate that our income before income taxes will decrease by Won 141 billion in 2017.

The above discussion and the estimated amounts generated from the sensitivity analyzes referred to above include "forward-looking statements," which assume for analytical purposes that certain market conditions may occur. Accordingly, such forward-looking statements should not be considered projections by us of future events or losses.

See Note 45 of the notes to our consolidated financial statements included in this annual report for further related information.

## ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

### Item 12.A. Debt Securities

Of the four debt securities issued by us that are registered under the Exchange Act as set forth in the cover page of this annual report, the One Hundred Year 7.95% Zero-to-Full Debentures due April 1, 2096, were guaranteed by Korea Development Bank. However, such guarantee expired on April 1, 2016 by reason of the expiration of a put option period applicable to such debentures in accordance with the terms of such debentures.

Korea Development Bank, a statutory bank for the Korean government, is 100% beneficially owned by the Korean government. The voting rights in our equity interest held by Korea Development Bank are effectively exercised by the Korean government.

The guarantee by Korea Development Bank of our above-mentioned registered debt securities was itself a security registered under the Securities Act. Korea Development Bank is a Schedule B issuer and periodically files registration statements with the Commission. These registration statements typically include financial statements prepared in accordance with the applicable generally accepted accounting principles, currently the Korean International Financial Reporting Standards, and audited in accordance with generally accepted auditing standards in the Republic of Korea.

### Item 12.B. Warrants and Rights

Not applicable.

### Item 12.C. Other Securities

Not applicable.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**Item 12.D. American Depositary Shares**

Under the terms of the Deposit Agreement in respect of our ADSs, the holder and beneficiary owners of ADSs, any party depositing or withdrawing or surrendering ADSs or ADRs, whichever applicable, may be required to pay the following fees and charges to Citibank, N.A. acting as depositary for our ADSs:

| Item | Services | Fees |
|------|----------|------|
| 1 | Taxes and other governmental charges | As applicable |
| 2 | Registration of transfer of common shares generally on our shareholders' register, any institution authorized under the applicable law to effect book-entry transfers of securities (including Korea Securities Depositary), or any entity that presently carries out the duties of registrar for the common shares, and applicable to transfers of common shares to the name of the Depositary or its nominee on the making of deposits or withdrawals | A fee of US$1.50 or less per ADS |
| 3 | Cable, telex and facsimile transmission expenses | As applicable |
| 4 | Expenses incurred by the Depositary in the conversion of foreign currency | As applicable |
| 5 | Execution and delivery of ADRs and the surrender of ADRs | Fee of US$0.05 or less per ADS |
| 6 | Cash distribution made by the Depositary or its agent | Fee of US$0.02 or less per ADS |
| 7 | Fee for the distribution of proceeds of sales of securities or rights for distribution other than cash, common shares or rights to subscribe for shares, distribution in shares or distribution in rights to subscribe for shares | Lesser of (i) the fee for the execution and delivery of ADRs referred to above which would have been charged as a result of the deposit by the holders of securities or common shares received in exercise of rights distributed to them, but which securities or rights are instead sold by the Depositary and the net proceeds distributed and (ii) the amount of such proceeds |
| 8 | Depositary services performed in administering the ADRs (which fee shall be assessed against holders of ADSs as of the record date or dates and shall be payable at the sole discretion of the Depositary by billing such holders or by deducting such charge from one or more cash dividends or other cash distributions) | Fee of US$0.02 or less per ADS per calendar year |

Depositary fees payable upon the issuance and cancelation of ADSs are typically paid to the depositary by the brokers (on behalf of their clients) receiving the newly-issued ADSs from the depositary and by the brokers (on behalf of their clients) delivering the ADSs to the depositary for cancelation. The brokers in turn charge these transaction fees to their clients.

Depositary fees payable in connection with distributions of cash or securities to ADS holders and the depositary services fee are charged by the depositary to the holders of record of ADSs as of the applicable ADS record date. The depositary fees payable for cash distributions are generally deducted from the cash being

153

distributed. In the case of distributions other than cash (i.e., stock dividends, rights offerings), the depositary charges the applicable fee to the ADS record date holders concurrent with the distribution. In the case of ADSs registered in the name of the investor (whether certificated or un-certificated in direct registration), the depositary sends invoices to the applicable record date ADS holders. In the case of ADSs held in brokerage and custodian accounts via the central clearing and settlement system, the Depository Trust Company ("DTC"), the depositary generally collects its fees through the systems provided by DTC (whose nominee is the registered holder of the ADSs held in DTC) from the brokers and custodians holding ADSs in their DTC accounts. The brokers and custodians who hold their clients' ADSs in DTC accounts in turn charge their clients' accounts the amount of the fees paid to the depositary.

In the event of refusal to pay the depositary fees, the depositary may, under the terms of the Deposit Agreement, refuse the requested service until payment is received or may set-off the amount of the depositary fees from any distribution to be made to the ADS holder.

The fees and charges the ADS holders may be required to pay may vary over time and may be changed by us and by the depositary. The ADS holders will receive prior notice of such changes.

### Depositary Payments for the Fiscal Year 2016

The following table sets forth our expenses incurred in 2016, which were reimbursed by Citibank, N.A. in the aggregate:

|  | (In thousands of U.S. dollars) |
|---|---|
| Reimbursement of legal fees | US$ 387 |
| Reimbursement of accounting fees | 273 |
| Contributions towards our investor relations and other financing efforts (including investor conferences, non-deal roadshows and market information services) | 1,375 |
| Other | 151 |
| Total | US$2,186 |

154

## PART II

### ITEM 13. *DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES*

Not applicable.

### ITEM 14. *MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS*

Not applicable.

### ITEM 15. *CONTROLS AND PROCEDURES*

**Disclosure Control**

Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we have evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of December 31, 2016. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can provide only reasonable assurance of achieving their control objectives. Based upon our evaluation, our chief executive officer and chief financial officer concluded that the design and operation of our disclosure controls and procedures as of December 31, 2016 were effective to provide reasonable assurance that information required to be disclosed by us in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decision regarding required disclosure.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, for our company. Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we have evaluated the effectiveness of our internal control over financial reporting as of December 31, 2016 based on the framework established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements in accordance with generally accepted accounting principles and includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of a company's assets, (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with generally accepted accounting principles, and that a company's receipts and expenditures are being made only in accordance with authorizations of a company's management and directors, and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of a company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable assurance with respect to consolidated financial statement preparation and presentation and may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Following the overhaul in May 2013 by the Committee of Sponsoring Organization of the Treadway ("COSO") of the COSO Framework relating to internal controls and adoption of the 2013 Integrated Framework of the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework (2013)"), we have, effective January 1, 2014, adopted the COSO Framework (2013) and incorporated it into our internal control system for us and our subsidiaries in order to comply with the Sarbanes Oxley Act and to standardize our internal control system. As required by Section 404 of the Sarbanes-Oxley Act of 2002 and related rules as promulgated by the Securities and Exchange Commission, management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016 using criteria established by the COSO Framework (2013). Based on this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2016 based on the criteria established by the COSO Framework (2013).

### Audit Report of the Independent Registered Public Accounting Firm

KPMG Samjong Accounting Corp. has issued an audit report on the effectiveness of our internal control over financial reporting, which is included elsewhere in this annual report.

### Changes in Internal Controls

There were no changes in our internal control over financial reporting that occurred during the year ended December 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Our adoption of the COSO Framework (2013) did not have, and is not reasonably likely to have, any material effect on our internal control over financial reporting.

We operate an integrated ERP system for a transparent and efficient management of the core ERP components, including personnel, accounting, procurement, construction and facilities maintenance. In addition, we also operate a strategic enterprise management system that includes business warehouse, management information and business planning and simulation systems. We continue to upgrade and improve the ERP system, which is being used as our core information infrastructure.

### ITEM 16. *[RESERVED]*

### ITEM 16.A. AUDIT COMMITTEE FINANCIAL EXPERT

Our board of directors has determined that we have at least one "audit committee financial expert" as such term is defined by the regulations of the Securities and Exchange Commission issued pursuant to Section 407 of the Sarbanes-Oxley Act of 2002. Our audit committee financial expert is Cho, Jeon-Hyeok. Such member currently remains a member of the audit committee and is independent within the meaning of the Korea Stock Exchange listing standards, the regulations promulgated under the Enforcement Decree of the Korean Commercial Code and the New York Stock Exchange listing standards. For biographic information of our audit committee financial expert, Cho, Jeon-Hyeok, see Item 6.A. "Directors and Senior Management."

### ITEM 16.B. CODE OF ETHICS

We have adopted a code of ethics for our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions as required under Section 406 of the Sarbanes-Oxley Act of 2002, together with an insider reporting system in compliance with Section 301 of the Sarbanes-Oxley Act. The code of ethics is available on our website www.kepco.co.kr. We have not granted any waiver, including an implicit waiver, from a provision of the code of ethics to any of the above-mentioned officers during our most recently completed fiscal year.

**ITEM 16.C. PRINCIPAL AUDITOR FEES AND SERVICES**

The following table sets forth the aggregate fees billed for each of the years ended December 31, 2015 and 2016 for professional services rendered by our principal auditors for such year, for various types of services and a brief description of the nature of such services. KPMG Samjong Accounting Corp., a Korean independent registered public accounting firm, was our principal auditors for the year ended December 31, 2016 and we currently expect KPMG Samjong Accounting Corp. to serve as our principal auditors for the year ended December 31, 2017.

| Type of Services | Aggregate Fees Billed During | | Nature of Services |
| --- | --- | --- | --- |
| | 2015 | 2016 | |
| | (In millions of Won) | | |
| Audit Fees . . . . . . . . . . . . . . . . . . . . . . . . | ₩3,004 | ₩3,296 | Audit service for KEPCO and its subsidiaries. |
| Audit-Related Fees . . . . . . . . . . . . . . . . . | 98 | — | Accounting advisory service. |
| Tax Fees . . . . . . . . . . . . . . . . . . . . . . . . | 12 | — | Tax return and consulting advisory service. |
| All Other Fees . . . . . . . . . . . . . . . . . . . . . | — | — | All other services which do not meet the three categories above. |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | ₩3,114 | ₩3,296 | |

United States law and regulations in effect since May 6, 2003 generally require all service of the principal auditors to be pre-approved by an independent audit committee or, if no such committee exists with respect to an issuer, by the entire board of directors. We have adopted the following policies and procedures for consideration and approval of requests to engage our principal auditors to perform audit and non-audit services. If the request relates to services that would impair the independence of our principal auditors, the request must be rejected. If the service request relates to audit and permitted non-audit services for us and our subsidiaries, it must be forwarded to our audit committee and receive pre-approval.

In addition, United States law and regulations permit the pre-approval requirement to be waived with respect to engagements for non-audit services aggregating no more than five percent of the total amount of revenues we paid to our principal auditors, if such engagements were not recognized by us at the time of engagement and were promptly brought to the attention of our audit committee or a designated member thereof and approved prior to the completion of the audit.

**ITEM 16.D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEE**

Not applicable.

**ITEM 16.E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

Neither we nor any "affiliated purchaser," as defined in Rule 10b-18(a)(3) of the Exchange Act, purchased any of our equity securities during the period covered by this annual report.

**ITEM 16.F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

Not applicable.

## ITEM 16.G. CORPORATE GOVERNANCE

We are committed to high standards of corporate governance. We are in compliance with the corporate governance provisions of the KEPCO Act, the Act on the Management of Public Institutions, the Korean Commercial Code, the Financial Investment Services and Capital Markets Act of Korea and the Listing Rules of the Korea Exchange. We, like all other companies in Korea, must comply with the corporate governance provisions under the Korean Commercial Code, except to the extent the KEPCO Act and the Act on the Management of Public Institutions otherwise require. Our corporate governance is also affected by various regulatory guidelines, including those promulgated by the Ministry of Strategy and Finance. In addition, as a company listed on the Korea Exchange, we are subject to the Financial Investment Services and Capital Markets Act of Korea, unless the Financial Investment Services and Capital Markets Act of Korea otherwise provides.

### The Act on the Management of Public Institutions

*General Provisions*

On April 1, 2007, the Act on the Management of Public Institutions took effect by abolishing and replacing the Government-invested Enterprise Management Basic Act, which was enacted in 1984. Unless stated otherwise therein, the Act on the Management of Public Institutions takes precedence over any other laws and regulations in the event of inconsistency. On April 2, 2007, pursuant to this Act the minister of the Ministry of Strategy and Finance designated us as a "market-oriented public enterprise" as defined under this Act, and we became subject to this Act accordingly. We incorporated the applicable provisions of this Act into our Articles of Incorporation by amendment thereto in September 2007.

The Act on the Management of Public Institutions sets out the rules for corporate governance for entities that are subject to this Act, including the appointment of their respective president and directors. Under this Act as it applies to us as a "market-oriented public enterprise", (i) a senior non-standing director as appointed by the minister of the Ministry of Strategy and Finance becomes the chairman of our board of directors following the review and resolution of the Public Agencies Operating Committee; (ii) our president and our standing directors who concurrently serve as members of our audit committee are appointed by the President of the Republic upon the motion of the Ministry of Trade, Industry and Energy (in the case of our president) or of the Ministry of Strategy and Finance (in the case of standing directors who concurrently serve as members of our audit committee), following the nomination by such enterprise's director nomination committee, the review and resolution of the Public Agencies Operating Committee pursuant to the Act on the Management of Public Institutions and an approval at the general meeting of our shareholders; (iii) our standing directors other than the president and those who also serve as audit committee members must be appointed by our president with the approval at the general meeting of our shareholders from a pool of candidates recommended by our director nomination committee; and (iv) our non-standing directors must be appointed by the minister of the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee and an approval at the general meeting of our shareholders, and must have ample knowledge and experience in business management.

The Public Agencies Operating Committee is established pursuant to the Act on the Management of Public Institutions and is comprised of one chairperson who is the Minister of the Ministry of Strategy and Finance and the following members: (i) one Vice Minister-level public official from the Office for Government Policy Coordination as nominated by the minister of the Office for Government Policy Coordination; (ii) one Vice Minister, Deputy Administrator or an equivalent public official of the related administrative agency as prescribed by Presidential Decree; (iii) one Vice Minister, Deputy Administrator, or an equivalent public official of the competent agency who does not fall under subclause (ii); and (iv) 11 or fewer persons commissioned by the President based on the recommendation of the Minister of the Ministry of Strategy and Finance from among persons in various fields including law, economy, press, academia, labor, who have good knowledge and experience in the operation and business administration of public institutions as well as good reputation for impartiality.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Our director nomination committee, which is also known as the Committee for Recommendation of Executive Officers, is comprised of non-standing directors and members appointed by the board of directors. The number of members ranges from five to 15 persons and must be decided by a resolution of the board of directors; provided that, the number of members appointed by the board of directors must be less than half of the total number of members of our director nomination committee.

Under the Act on the Management of Public Institutions and our Articles of Incorporation, the term of office is three years for our president and two years for our directors (standing and non-standing) other than our president. Our directors (including the president) may be reappointed for one or more additional terms of one year. In order to be reappointed, the president must be evaluated on the basis of his management performance; a standing director, on the basis of the performance of the duties for which he was elected to perform, or if the standing director has executed an incentive bonus contract, on the basis of his performance under the contract; and a non-standing director, on the basis of his performance of the duties for which he was elected to perform.

Under the Act on the Management of Public Institutions and our Articles of Incorporation, a recommendation from the director nomination committee is required for the appointment of our executive officers, except in the case of reappointments. The director nomination committee consists of five to fifteen members, including private-sector members appointed by the board of directors. Non-standing directors must comprise at least a majority of the director nomination committee. One of the private-sector members must be able to represent our opinion and must not be currently employed by us. As required under the Act on the Management of Public Institutions, we established an audit committee. At least two-thirds of the audit committee members must be non-standing directors, and at least one committee member must be an expert in finance or accounting. According to the Act on the Management of Public Institutions, our president's term cannot be terminated unless done so by the President of the Republic pursuant to the Act on the Management of Public Institutions or upon an event as specified in our Articles of Incorporation.

As required under Act on the Management of Public Institutions, we submit to the Government by October 31 every year a report on our medium- to long-term management goals. Under the Act on the Management of Public Institutions, we are also required to give separate public notice of important management matters, such as our budget and financial statements, status of directors and annual reports. In addition, for purposes of providing a comparison of the management performances of government agencies, we are required to post on a designated website a notice on a standard form detailing our management performance. Following consultation with the minister of the Ministry of Trade, Industry and Energy and the review and resolution of the operating committee, the Ministry of Strategy and Finance must examine the adequacy and competency of government agencies and establish plans on merger, abolishment, restructuring and privatization of public agencies. In such case, the minister of the Ministry of Trade, Industry and Energy must execute these plans and submit a performance report to the Ministry of Strategy and Finance.

### Application of the Act to Our Generation Subsidiaries

On January 24, 2011, the Ministry of Strategy and Finance changed the designation of our six generation subsidiaries from "other public institutions" to "market-oriented public enterprises", each as defined in the Act on the Management of Public Institutions, and all of our generation subsidiaries accordingly amended their respective articles of incorporation in 2011 to be in compliance with this Act. As "other public institutions", our generation subsidiaries previously were not subject to the same regulations under the Act on the Management of Public Institutions applicable to us with regards to corporate governance matters such as the appointment and dismissal of directors and the composition of the boards of directors. However, as "market-oriented public enterprises", our generation subsidiaries are currently subject to the same such regulations that are applicable to us.

Specifically, prior to such designation, (i) our president appointed the presidents and the statutory auditors of our generation subsidiaries; (ii) the selection of non-standing directors of each such subsidiary was subject to

159

approval by our president; (iii) the president of each such subsidiary entered into a management contract with our president; and (iv) our evaluation committee conducted performance evaluation of such subsidiaries. However, following such designation, akin to the appointment process applicable to us, (i) the President of the Republic appoints the presidents and standing directors of our generation subsidiaries that concurrently serve as members of the audit committees; (ii) the selection of non-standing directors of these subsidiaries is subject to approval by the minister of the Ministry of Strategy and Finance; (iii) the president of each such generation subsidiary is required to enter into a management contract directly with the minister of the Ministry of Trade, Industry and Energy; and the Public Agencies Operating Committee conducts performance evaluation of such subsidiaries.

### *Our Control over the Generation Subsidiaries*

Designation of our generation subsidiaries as "market-oriented public enterprises" was intended to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them so as to provide improved service to the general public. Such designation also has had the effect of the Government exercising greater direct control over the appointment of the governing body of our generation subsidiaries (in ways that are similar to how the Government exercises such control over us as our majority shareholder as well as our regulator).

In addition, the Government has imposed a number of regulations that further affect the respective operational boundaries between us and our generation subsidiaries, including as follows:

- In August 2010, in furtherance of the Act on the Management of Public Institutions, the Ministry of Strategy and Finance announced the Proposal for the Improvement in the Structure of the Electric Power Industry, which was designed to promote responsible management by and improve operational efficiency of government-affiliated electricity companies by fostering competition among them. Key initiatives of the proposal included the following: (i) maintain the current structure of having six generation subsidiaries and designate the six generation subsidiaries as market-oriented public enterprises under the Act on the Management of Public Institutions in order to foster competition among the generation subsidiaries and promote efficiency in their operations, and (ii) clarify the scope of the business of us and the six generation subsidiaries (namely, that we shall manage the financial structure and governance of the six generation subsidiaries and nuclear power plant and overseas resources development projects, while the six generation subsidiaries will have greater autonomy with respect to construction and management of generation units and procurement of fuel), among others.

- In January 2011, the Ministry of Strategy and Finance created a "joint cooperation unit" consisting of officers and employees selected from the five thermal power generation subsidiaries in order to reduce inefficiencies in areas such as fuel transportation, inventories, materials and equipment and construction, etc. and allow the thermal power generation subsidiaries to continue utilizing the benefits of economy of scale after split off of our generation business units into separate subsidiaries. The purpose of the joint cooperation unit was to give greater autonomy to the generation subsidiaries with regard to power plant construction and management and fuel procurements, and thereby enhance efficiency in operating power plants. The main functions of the joint cooperation unit are as follows: (i) maintain inventories of bituminous coal through volume exchanges and joint purchases, (ii) reduce shipping and demurrage expenses through joint operation and distribution of dedicated vessels, (iii) reduce costs by sharing information on generation material inventories and (iv) sharing human resources among the five thermal power generation subsidiaries for construction projects, among other things.

- In June 2016, the Government announced the Proposal for Adjustment of Functions of Public Institutions (Energy Sector) for the purpose of streamlining the operations of government-affiliated energy companies by discouraging them from engaging in overlapping or similar businesses with each other, reducing non-core assets and activities and improving management and operational efficiency. The initiatives contemplated in this proposal that would affect us and our generation subsidiaries

160

include the following: (i) the generation companies should take on greater responsibilities in overseas resource exploration and production projects (as these involve procurement of fuels necessary for electricity generation), while fostering cooperation among each other through closer coordination, (ii) KHNP should take a greater role in export of nuclear technology, and (iii) the current system of retail sale of electricity to end-users should be liberalized to encourage more competition.

However, notwithstanding these developments, we, also a government-controlled entity, remain as the sole shareholder of our generation subsidiaries and continue to exercise significant control over them in such capacity as the sole shareholder well as through other practical means as further described below.

First, as the sole shareholder, we continue to have the right, under the Act on the Management of Public Institutions, to approve or disapprove the appointment of key members of the governing body of our generation subsidiaries (namely, the president and the standing and non-standing directors) by way of a vote at the general shareholders meeting before such appointments are ultimately approved and made by the President of the Republic (in the case of the presidents and standing directors concurrently serving as audit committee members of the generation subsidiaries) or by the president of each generation subsidiary (in the case of other standing directors of such generation subsidiary). Our right to exercise such voting right as a shareholder is also protected by the Commercial Code of Korea.

Second, in practice we retain significant control over our generation subsidiaries through the following means:

- We are the sole purchaser of electricity produced and sold by the generation subsidiaries and continue to have near monopoly in terms of transmitting and distributing electricity in Korea. Accordingly, we continue to have significant influence over our generation subsidiaries in the electricity industry.

- Pursuant to the Electricity Business Act, the adjusted coefficient must be determined so that the price of electricity sold by our generation subsidiaries to us shall have the effect of ensuring a fair rate of return to us as a standalone entity, which means any imbalance caused by excess profits taken by our generation subsidiaries to our loss must be corrected. Since we and the generation subsidiaries participate in the determination of the adjusted coefficient, such determination process can be used as a way for us to exert indirect influence on our generation subsidiaries.

- Our president holds regular meetings (known as "CEO Meetings") with the presidents of our generation subsidiaries for which our president determines whether and when to convene such meetings, sets the agenda for such meetings and chairs such meetings. Since significant issues that jointly affect us and our generation subsidiaries are often discussed and decided at these meetings, the leadership role exercised by our president in such meetings is significant in setting the policies and direction for us and our generation subsidiaries as a whole.

- We maintain and operate the Affiliated Company Management Team within the parent company organizational structure. The purpose of this team is to support and coordinate the management of the generation subsidiaries. Activities of the Affiliated Company Management Team include preparation of the CEO Meetings, deliberation of major issues to be discussed at CEO Meetings, convening a general meeting of shareholders of the generation subsidiaries and coordination on the decision-making process for the general meeting of shareholders of our generation subsidiaries.

- We also maintain and operate the Committee of Investment Review, which reviews all material domestic and overseas investment projects of our generation subsidiaries before such projects are presented to the board of directors of our generation subsidiaries for approval. Such advance presentation to this Committee is required under the internal regulations of our generation subsidiaries. Accordingly, each generation subsidiary must submit a business plan to us two weeks prior to the meeting of the board of directors of the generation subsidiary for any investment project that is not already covered by the Seventh Basic Plan. Our president selects the chairman of this Committee, typically from the pool of our department heads, as well as its other members.

In addition, our control over our generation subsidiaries is derived from the fact that the Government owns the majority of our shares and effectively controls us as the supervisor and regulator in a heavily regulated industry, and in effect also exercises the same degree of control over our generation subsidiaries through our sole share ownership over our generation subsidiaries as well as its statutory power of direct appointment of the governing bodies of our generation subsidiaries. In effect, we are acting as an intermediate holding company in a vertical control structure involving the Government, us and our generation subsidiaries, where the Government holds the ultimate control over both us and our generation subsidiaries and exercises its such control over our generation subsidiaries in part through us acting as the sole shareholder and the parent company of our generation subsidiaries.

**Differences in Korean/New York Stock Exchange Corporate Governance Practices**

We are a "foreign private issuer" (as such term is defined in Rule 3b-4 under the Exchange Act), and our ADSs are listed on the New York Stock Exchange, or NYSE. Under Section 303A of the NYSE Listed Company Manual, NYSE-listed companies that are foreign private issuers are permitted to follow home country practice in lieu of the corporate governance provisions specified by the NYSE with limited exceptions. Under the NYSE Listed Company Manual, we as a foreign private issuer are required to disclose significant differences between NYSE's corporate governance standards and those we follow under Korean law. The following summarizes some significant ways in which our corporate governance practices differ from those followed by U.S. companies listed on the NYSE under the listing rules of the NYSE.

*Majority of Independent Directors on the Board*

Under the NYSE listing rules, U.S. companies listed on the NYSE must have a board, the majority of which is comprised of independent directors satisfying the requirements of "independence" as set forth in Rule 10A-3 under the Exchange Act. No director qualifies as "independent" unless the board of directors affirmatively determines that the director has no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that has a relationship with us). The NYSE rules include detailed tests for determining director independence. As a foreign private issuer, we are exempt from this requirement. Under the Act on the Management of Public Institutions, more than one-half of our directors must be non-standing directors. For a discussion on qualifications of non-standing directors, see Item 6.A. "Directors and Senior Management—Board of Directors." The Financial Investment Services and Capital Markets Act of Korea deems a non-standing director nominated pursuant to other applicable laws (such as the Act on the Management of Public Institutions) as an "outside" or "non-executive" director. Under the Act on the Management of Public Institutions, a non-standing director is appointed by the Ministry of Strategy and Finance following the review and resolution of the Public Agencies Operating Committee from a pool of candidates recommended by the director nomination committee and an approval at our general meeting shareholders, and must have ample knowledge and experience in business management. Government officials that are not part of the teaching staff in national and public schools are ineligible to become our non-standing directors.

*Executive Session*

Under the NYSE listing rules, non-management directors of U.S. companies listed on the NYSE are required to meet on a regular basis without management present and independent directors must meet separately at least once per year. While no such requirement currently exists under applicable Korean law, listing standards or our Articles of Incorporation, executive sessions were held from time to time in 2016 in order to promote the exchange of diverse opinions by non-standing directors.

*Audit Committee*

Under the NYSE listing rules, listed companies must have an audit committee that has a minimum of three members, and all audit committee members must satisfy the requirements of independence set forth in Section 303A.02 of the NYSE Listed Company Manual and Rule 10A-3 under the Exchange Act. Our audit committee

162

members meet the requirements of independence set forth in Section 303A.02 of the NYSE Listed Company Manual and Rule 10A-3 under the Exchange Act. The audit committee must be directly responsible for the appointment, compensation, retention and oversight of the work of the independent registered public accountants. Our audit committee performs the roles and responsibilities required of an audit committee under the Sarbanes-Oxley Act, including the supervision of the audit by the independent registered public accountants. Under the Korea Exchange listing rules and the Korean Commercial Code, a large listed company must also establish an audit committee of which at least two-thirds of its members must be non-standing directors and whose chairman must be a non-standing director. Under the Act on the Management of Public Institutions, the Korean Commercial Code, the amended Articles of Incorporation and the Korea Exchange listing rules, we are required to maintain an audit committee consisting of three members, of which not less than two members are required to be non-standing directors. Our audit committee is in compliance with the foregoing requirements under the Act on the Management of Public Institutions, the Korean Commercial Code, the amended Articles of Incorporation and the Korea Exchange listing rules.

### Nomination/Corporate Governance Committee

Under the NYSE listing rules, U.S. companies listed on the NYSE must have a nomination/corporate governance committee composed entirely of independent directors. In addition to identifying individuals qualified to become board members, this committee must develop and recommend to the board a set of corporate governance principles. Under the Act on the Management of Public Institutions, we are required to have a director nomination committee which consists of non-standing directors and ad hoc members appointed by our Board of Directors. Our standing directors and executives as well as governmental officials that are not part of the teaching staff in national and public schools are ineligible to become a member of our director nomination committee. There is no requirement to establish a corporate governance committee under applicable Korean law.

Pursuant to the NYSE listing standards, non-management directors must meet on a regular basis without management present and independent directors must meet separately at least once per year. No such requirement currently exists under applicable Korean law.

### Compensation Committee

Under the NYSE listing rules, U.S. companies listed on the NYSE are required to have a compensation committee which is composed entirely of independent directors. In January 2013, the SEC approved amendments to the listing rules of NYSE and NASDAQ regarding the independence of compensation committee members and the appointment, payment and oversight of compensation consultants. The listing rules were adopted as required by Section 952 of the Dodd-Frank Act and rule 10C-1 of the Exchange Act, which direct the national securities exchanges to prohibit the listing of any equity security of a company that is not in compliance with the rule's compensation committee director and advisor independence requirements. Certain elements of the listing rules became effective on July 1, 2013 and companies listed on the NYSE must comply with such listing rules by the earlier of the company's first annual meeting after January 15 or October 31, 2014.

No such requirement currently exists under applicable Korean law or listing standards, and we currently do not have a compensation committee.

### Corporate Governance Guidelines and Code of Business Conduct and Ethics

Under the NYSE listing rules, U.S. companies listed on the NYSE are required to establish corporate governance guidelines and to adopt a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers. As a foreign private issuer, we are exempt from this requirement. Pursuant to the requirements of the Sarbanes-Oxley Act, we have adopted a code of ethics applicable to our President & Chief Executive Officer and all other directors and executive officers including the Chief Financial Officer and the Chief Accounting Officer, as well as all financial, accounting and

other officers that are involved in the preparation and disclosure of our consolidated financial statements and internal control of financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act. We have also adopted an insider reporting system in compliance with Section 301 of the Sarbanes-Oxley Act. The code of ethics applicable to our executive officers and financial officers are available on www.kepco.co.kr.

### Shareholder Approval of Equity Compensation Plans

Under the NYSE listing rules, shareholders of U.S. companies listed on the NYSE are required to approve all equity compensation plans. Under Korean law and regulations, stock options can be granted to employees to the extent expressly permitted by the articles of incorporation. We currently do not have any equity compensation plans.

### Annual Certification of Compliance

Under the NYSE listing rules, a chief executive officer of a U.S. company listed on the NYSE must annually certify that he or she is not aware of any violation by the company of NYSE corporate governance standards. As a foreign private issuer, we are not subject to this requirement. However, in accordance with rules applicable to both U.S. companies and foreign private issuers, we are required to promptly notify the NYSE in writing if any executive officer becomes aware of any material noncompliance with the NYSE corporate governance standards applicable to us. In addition, foreign private issuers, including us, are required to submit to the NYSE an annual written affirmation relating to compliance with Sections 303A.06 and 303A.11 of the NYSE listed company manual, which are the NYSE corporate governance standards applicable to foreign private issuers. All written affirmations must be executed in the form provided by the NYSE, without modification. An annual written affirmation is required to be submitted to the NYSE within 30 days of filing with the SEC our annual report on Form 20-F. We have been in compliance with this requirement in all material respects and plan to submit such affirmation within the prescribed time line.

### Whistle Blower Protection

On May 25, 2011, the SEC adopted final rules to implement whistleblower provisions of the Dodd-Frank Act, which are applicable to foreign private issuers with securities registered under the U.S. securities laws. The final rules provide that any eligible whistleblower who voluntarily provides the SEC with original information that leads to the successful enforcement of an action brought by the SEC under U.S. securities laws must receive an award of between 10 and 30 percent of the total monetary sanctions collected if the sanctions exceed US$1,000,000. An eligible whistleblower is defined as someone who provides information about a possible violation of the securities laws that he or she reasonably believes has occurred, is ongoing, or is about to occur. The possible violation does not need to be material, probably or even likely, but the information must have a "facially plausible relationship to some securities law violation"; frivolous submissions would not qualify. The final rules also prohibit retaliation against the whistleblower. While the final rules do not require employees to first report allegations of wrongdoing through a company's corporate compliance system, they do seek to incentivize whistleblowers to utilize internal corporate compliance first by, among other things, (i) giving employees who first report information internally the benefit of the internal reporting date for purposes of the SEC program so long as the whistleblower submits the same information to the SEC within 120 days of the initial disclosure; (ii) clarifying that the SEC will consider, as part of the criteria for determining the amount of a whistleblower's award, whether the whistleblower effectively utilized the company's corporate compliance program or hindered the function of the program; and (iii) crediting a whistleblower who reports internally first and whose company passes the information along to the SEC, which would mean the whistleblower could receive a potentially higher award for information gathered in an internal investigation initiated as a result of the whistleblower's internal report.

In addition, the final rules address concerns that the whistleblower rules incentivize officers, directors and those with legal, audit, compliance or similar responsibilities to abuse these positions by making whistleblower

complaints to the SEC with respect to information they obtained in these roles by generally providing that information obtained through a communication subject to attorney-client privilege or as a result of legal representation would not be eligible for a whistleblower award unless disclosure would be permitted by attorney conduct rules. Accordingly, officers and directors, auditors and compliance personnel and other persons in similar roles would not be eligible to receive awards for information received in these positions unless (x) they have a reasonable basis to believe that (1) disclosure of the information is necessary to prevent the entity from engaging in conduct that is likely to cause substantial injury to the financial interests of the entity or investors; or (2) the entity is engaging in conduct that will impede an investigation of the misconduct, for example, destroying documents or improperly influencing witnesses; or (y) 120 days have passed since the whistleblower provided the information to senior responsible persons at the entity or 120 days have passed since the whistleblower received the information at a time when these people were already aware of the information.

In Korea, under the Financial Investment Services and Capital Markets Act, anyone may provide or furnish the Financial Services Commission or the Securities and Futures Commission with information on unfair trading or any other violation of the Financial Investment Services and Capital Markets Act. The Financial Services Commission shall keep the identity of the whistleblower confidential, and any institution, organization or company to which the whistleblower belongs may not treat the whistleblower unfavorably, directly or indirectly. In addition, the Financial Services Commission may also reward the whistleblower within the limit of the budget of the Financial Services Commission.

**ITEM 16.H. MINE SAFETY DISCLOSURE**

Not applicable.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

## PART III

**ITEM 17.** *FINANCIAL STATEMENTS*

Not applicable.

**ITEM 18.** *FINANCIAL STATEMENTS*

Reference is made to Item 19. "Exhibits" for a list of all financial statements filed as part of this annual report.

**ITEM 19.** *EXHIBITS*

**(a) Financial Statements filed as part of this Annual Report**

See Index to Financial Statements on page F-1 of this annual report.

**(b) Exhibits filed as part of this Annual Report**

See Index of Exhibits beginning on page E-1 of this annual report.

166

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this Annual Report on its behalf.

KOREA ELECTRIC POWER CORPORATION

By:  _____ /s/   Cho, Hwan-Eik _____

Name:         Cho, Hwan-Eik
Title:        President and Chief Executive Officer
Date:         April 28, 2017

167

## INDEX TO FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm KPMG Samjong Accounting Corp. on Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-2 |
| Report of Independent Registered Public Accounting Firm KPMG Samjong Accounting Corp. on Internal Control Over Financial Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-3 |
| Consolidated Statements of Financial Position as of December 31, 2015 and 2016 . . . . . . . . . . . . . . . . . . | F-4 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2014, 2015 and 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-6 |
| Consolidated Statements of Changes in Equity for the Years Ended December 31, 2014, 2015 and 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-8 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2014, 2015 and 2016 . . . . . . . | F-11 |
| Notes to the Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-13 |

## REPORT OF INDEPENDENT REGISTERED PUBLIC
## ACCOUNTING FIRM ON CONSOLIDATED FINANCIAL STATEMENTS

To the Shareholders and Board of Directors of
Korea Electric Power Corporation:

We have audited the accompanying consolidated statements of financial position of Korea Electric Power Corporation and subsidiaries (the "Company") as of December 31, 2015 and 2016, and the related consolidated statements of comprehensive income, changes in equity and cash flows for each of the years in the three-year period ended December 31, 2016. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of the other auditors provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Korea Electric Power Corporation and subsidiaries as of December 31, 2015 and 2016 and of the consolidated results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2016, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2016, based on the criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated April 28, 2017 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG Samjong Accounting Corp.

KPMG Samjong Accounting Corp.

Seoul, Korea

April 28, 2017

F-2

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON
INTERNAL CONTROL OVER FINANCIAL REPORTING**

To the Shareholders and Board of Directors of
Korea Electric Power Corporation:

We have audited Korea Electric Power Corporation and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the group's assets that could have a material effect on the financial statements.

Because of the inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on the criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statements of financial position of Korea Electric Power Corporation and subsidiaries as of December 31, 2015 and 2016, and the related consolidated statements of comprehensive income, changes in equity and cash flows for each of the years in the three-year period ended December 31, 2016 and our report dated April 28, 2017 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG Samjong Accounting Corp.

KPMG Samjong Accounting Corp.

Seoul, Korea

April 28, 2017

F-3

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Financial Position**
**As of December 31, 2015 and 2016**

| | Note | | 2015 | 2016 |
|---|---|---|---|---|
| | | | **In millions of won** | |
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . | 5,6,7,45 | ₩ | 3,783,065 | 3,051,353 |
| Current financial assets, net . . . . . . . . . . . . . . . . . . | 5,10,11,12,45 | | 5,335,621 | 2,671,989 |
| Trade and other receivables, net . . . . . . . . . . . . . . . . | 5,8,14,20,45,46,47 | | 7,473,548 | 7,788,876 |
| Inventories, net . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | | 4,946,413 | 5,479,443 |
| Income tax refund receivables . . . . . . . . . . . . . . . . . . | 41 | | 9,081 | 19,163 |
| Current non-financial assets . . . . . . . . . . . . . . . . . . . | 15 | | 397,950 | 631,860 |
| Assets held-for-sale . . . . . . . . . . . . . . . . . . . . . . . . . | 42 | | 79,647 | 65,842 |
| Total current assets . . . . . . . . . . . . . . . . . . . . | | | 22,025,325 | 19,708,526 |
| Non-current assets | | | | |
| Non-current financial assets, net . . . . . . . . . . . . . . . | 5,6,9,10,11,12,45 | | 2,495,554 | 2,657,494 |
| Non-current trade and other receivables, net . . . . . . | 5,8,14,45,46,47 | | 1,798,419 | 1,903,515 |
| Property, plant and equipment, net . . . . . . . . . . . . . | 18,27,49 | | 141,361,351 | 145,743,056 |
| Investment properties, net . . . . . . . . . . . . . . . . . . . . | 19,27 | | 269,910 | 353,680 |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | | 2,582 | 2,582 |
| Intangible assets other than goodwill, net . . . . . . . . | 21,27,46 | | 855,832 | 980,821 |
| Investments in associates . . . . . . . . . . . . . . . . . . . . . | 4,17 | | 4,405,668 | 4,092,252 |
| Investments in joint ventures . . . . . . . . . . . . . . . . . . | 4,17 | | 1,287,862 | 1,418,196 |
| Deferred tax assets . . . . . . . . . . . . . . . . . . . . . . . . . | 41 | | 623,623 | 795,131 |
| Non-current non-financial assets . . . . . . . . . . . . . . . | 15 | | 131,233 | 181,789 |
| Total non-current assets . . . . . . . . . . . . . . | | | 153,232,034 | 158,128,516 |
| **Total Assets** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | ₩ | 175,257,359 | 177,837,042 |
| **Liabilities** | | | | |
| Current liabilities | | | | |
| Trade and other payables, net . . . . . . . . . . . . . . . . . . | 5,22,24,45,47 | ₩ | 4,735,697 | 5,585,411 |
| Current financial liabilities, net . . . . . . . . . . . . . . . . | 5,11,23,45,47 | | 7,857,198 | 8,942,329 |
| Income tax payables . . . . . . . . . . . . . . . . . . . . . . . . | 41 | | 2,218,060 | 1,843,288 |
| Current non-financial liabilities . . . . . . . . . . . . . . . . | 20,28,29 | | 6,320,711 | 6,368,210 |
| Current provisions . . . . . . . . . . . . . . . . . . . . . . . . . | 26,45 | | 1,579,176 | 1,999,988 |
| Total current liabilities . . . . . . . . . . . . . . . . . | | | 22,710,842 | 24,739,226 |
| Non-current liabilities | | | | |
| Non-current trade and other payables, net . . . . . . . . | 5,22,24,45,47 | | 3,718,435 | 3,558,175 |
| Non-current financial liabilities, net . . . . . . . . . . . . . | 5,11,23,45,47 | | 51,062,811 | 44,835,562 |
| Non-current non-financial liabilities . . . . . . . . . . . . . | 28,29 | | 7,092,252 | 7,591,605 |
| Employee benefits liabilities, net . . . . . . . . . . . . . . . | 25,45 | | 1,503,107 | 1,686,258 |
| Deferred tax liabilities . . . . . . . . . . . . . . . . . . . . . . | 41 | | 8,362,683 | 8,948,520 |
| Non-current provisions . . . . . . . . . . . . . . . . . . . . . . | 26,45 | | 12,864,754 | 13,427,151 |
| Total non-current liabilities . . . . . . . . . . . . . | | | 84,604,042 | 80,047,271 |
| **Total Liabilities** . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | ₩ | 107,314,884 | 104,786,497 |

(Continued)

F-4

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Financial Position, Continued**
**As of December 31, 2015 and 2016**

| | Note | | 2015 | 2016 |
|---|---|---|---|---|
| | | | In millions of won | |
| **Equity** | | | | |
| Contributed capital . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,30,45 | | | |
|    Share capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ₩ | 3,209,820 | 3,209,820 |
|    Share premium . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 843,758 | 843,758 |
| | | | 4,053,578 | 4,053,578 |
| Retained earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | | | |
|    Legal reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 1,604,910 | 1,604,910 |
|    Voluntary reserves . . . . . . . . . . . . . . . . . . . . . . . . . | | | 23,720,167 | 31,847,275 |
|    Unappropriated retained earnings . . . . . . . . . . . . . . | | | 22,862,164 | 19,721,686 |
| | | | 48,187,241 | 53,173,871 |
| Other components of equity . . . . . . . . . . . . . . . . . . . . . | 34 | | | |
|    Other capital surplus . . . . . . . . . . . . . . . . . . . . . . . | | | 1,197,388 | 1,235,146 |
|    Accumulated other comprehensive loss . . . . . . . . . . | | | (98,713) | (33,875) |
|    Other equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 13,294,973 | 13,294,973 |
| | | | 14,393,648 | 14,496,244 |
| Equity attributable to owners of the controlling<br>   company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 66,634,467 | 71,723,693 |
| Non-controlling interests . . . . . . . . . . . . . . . . . . . . . . . | 16, 33 | | 1,308,008 | 1,326,852 |
| **Total Equity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ₩ | 67,942,475 | 73,050,545 |
| **Total Liabilities and Equity** . . . . . . . . . . . . . . . . . . . . | | ₩ | 175,257,359 | 177,837,042 |

See accompanying notes to the consolidated financial statements.

F-5

## KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Consolidated Statements of Comprehensive Income
### For the years ended December 31, 2014, 2015 and 2016

| | Note | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| | | In millions of won, except per share information | | |
| **Sales** ................................. | 4,35,45,47 | | | |
| Sales of goods ....................... | ₩ | 53,706,828 | 54,367,036 | 55,379,487 |
| Sales of construction services ........... | 20 | 2,965,185 | 3,761,204 | 4,026,857 |
| Sales of services ..................... | | 451,013 | 453,487 | 356,743 |
| | | 57,123,026 | 58,581,727 | 59,763,087 |
| **Cost of sales** .......................... | 13,25,43,47 | | | |
| Cost of sales of goods ................. | | (46,509,555) | (41,348,917) | (41,237,372) |
| Cost of sales of construction services ..... | | (2,752,610) | (3,563,120) | (3,755,144) |
| Cost of sales of services ............... | | (500,787) | (545,692) | (557,037) |
| | | (49,762,952) | (45,457,729) | (45,549,553) |
| **Gross profit** ........................... | | 7,360,074 | 13,123,998 | 14,213,534 |
| **Selling and administrative expenses** ........ | 25,36,43,47 | (1,924,366) | (2,153,261) | (2,639,232) |
| **Other income** ........................... | 37 | 754,186 | 808,214 | 840,184 |
| **Other expenses** ......................... | 37 | (88,220) | (108,848) | (188,624) |
| **Other gains, net** ....................... | 38 | 107,396 | 8,610,773 | 70,498 |
| **Operating profit** ....................... | 4 | 6,209,070 | 20,280,876 | 12,296,360 |
| **Finance income** ........................ | 5,11,39 | 885,290 | 1,182,988 | 791,543 |
| **Finance expenses** ...................... | 5,11,40 | (3,140,038) | (3,015,457) | (2,437,087) |
| **Profit (loss) related to associates, joint ventures and subsidiaries** ............... | 4,17 | | | |
| Share in profit of associates and joint ventures .......................... | | 319,506 | 280,794 | 224,435 |
| Gain on disposal of investments in associates and joint ventures .......... | | 47,072 | 4,731 | 52 |
| Gain on disposal of investments in subsidiaries ...................... | 16 | 40,449 | 8,376 | — |
| Share in loss of associates and joint ventures .......................... | | (78,493) | (86,522) | (243,361) |
| Loss on disposal of investments in associates and joint ventures .......... | | (1,254) | — | (2,935) |
| Impairment loss on investments in associates and joint ventures .......... | 17 | (52,279) | — | (115,539) |
| Loss on disposal of subsidiaries ......... | | (17) | — | — |
| | | 274,984 | 207,379 | (137,348) |
| **Profit before income tax** ................. | | 4,229,306 | 18,655,786 | 10,513,468 |
| **Income tax expense** ..................... | 41 | (1,430,339) | (5,239,413) | (3,365,141) |
| **Profit for the period** ................... | ₩ | 2,798,967 | 13,416,373 | 7,148,327 |

(Continued)

F-6

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Comprehensive Income, Continued**
**For the years ended December 31, 2014, 2015 and 2016**

| | Note | | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| | | | In millions of won, except per share information | | |
| Other comprehensive income (loss) . . . . . . . . | 5,11,25,31,34 | | | | |
| Items that will not be reclassified subsequently to profit or loss: | | | | | |
| Remeasurements of defined benefit liability, net of tax . . . . . . . . . . . . . . | 25,31 | ₩ | (108,430) | (87,861) | (75,926) |
| Share in other comprehensive loss of associates and joint ventures, net of tax . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | | (1,899) | (283) | (2,515) |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax . . . . . . . . . . . . . . | 34 | | (97,251) | 9,648 | 61,279 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax . . . . . . | 5,11,34 | | (84,793) | 4,409 | 28,414 |
| Foreign currency translation of foreign operations, net of tax . . . . . . . . . . . . | 34 | | (70,576) | 18,535 | 41,360 |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax . . . . . . . . . . . . . | 34 | | 5,228 | 89,558 | (54,914) |
| Other comprehensive income (loss), net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | (357,721) | 34,006 | (2,302) |
| Total comprehensive income for the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | ₩ | 2,441,246 | 13,450,379 | 7,146,025 |
| Profit or loss attributable to: | | | | | |
| Owners of the controlling company . . . . . . | 44 | ₩ | 2,686,873 | 13,289,127 | 7,048,581 |
| Non-controlling interests . . . . . . . . . . . . . . | | | 112,094 | 127,246 | 99,746 |
| | | ₩ | 2,798,967 | 13,416,373 | 7,148,327 |
| Total comprehensive income attributable to: | | | | | |
| Owners of the controlling company . . . . . . | | ₩ | 2,335,827 | 13,308,132 | 7,041,557 |
| Non-controlling interests . . . . . . . . . . . . . . | | | 105,419 | 142,247 | 104,468 |
| | | ₩ | 2,441,246 | 13,450,379 | 7,146,025 |
| Earnings per share . . . . . . . . . . . . . . . . . . . . . | 44 | | | | |
| Basic and diluted earnings per share . . . . . . | | ₩ | 4,290 | 20,701 | 10,980 |

See accompanying notes to the consolidated financial statements.

F-7

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Changes in Equity**
**For the years ended December 31, 2014, 2015 and 2016**

| | Equity attributable to owners of the controlling company | | | | Non-controlling Interests | Total equity |
|---|---|---|---|---|---|---|
| | Contributed capital | Retained earnings | Other components of equity | Subtotal | | |
| | In millions of won | | | | | |
| **Balance at January 1, 2014** ............... ₩ | 4,053,578 | 32,766,086 | 13,440,004 | 50,259,668 | 1,191,068 | 51,450,736 |
| **Total comprehensive income for the period** | | | | | | |
| Profit for the period ................... | — | 2,686,873 | — | 2,686,873 | 112,094 | 2,798,967 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | |
| Remeasurements of defined benefit liability, net of tax ............. | — | (91,340) | — | (91,340) | (17,090) | (108,430) |
| Share in other comprehensive loss of associates and joint ventures, net of tax .......................... | — | (1,899) | — | (1,899) | — | (1,899) |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax ............... | — | — | (97,263) | (97,263) | 12 | (97,251) |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax .......................... | — | — | (80,218) | (80,218) | (4,575) | (84,793) |
| Foreign currency translation of foreign operations, net of tax ..... | — | — | (84,962) | (84,962) | 14,386 | (70,576) |
| Share in other comprehensive income of associates and joint ventures, net of tax .......................... | — | — | 4,636 | 4,636 | 592 | 5,228 |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | |
| Dividends paid ...................... | — | (56,073) | — | (56,073) | (130,969) | (187,042) |
| Issuance of share capital by subsidiaries .. | — | — | (1,235) | (1,235) | 7,453 | 6,218 |
| Equity transaction within consolidation scope—other than issuance of share capital .......................... | — | — | 237,159 | 237,159 | 72,452 | 309,611 |
| Disposal of treasury stocks ............. | — | — | 825,985 | 825,985 | — | 825,985 |
| Changes in consolidation scope ......... | — | — | — | — | (5,281) | (5,281) |
| Dividends paid (hybrid securities) ....... | — | — | — | — | (16,463) | (16,463) |
| **Balance at December 31, 2014** ............. ₩ | 4,053,578 | 35,303,647 | 14,244,106 | 53,601,331 | 1,223,679 | 54,825,010 |

(Continued)

F-8

## KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES

### Consolidated Statements of Changes in Equity, Continued
### For the years ended December 31, 2014, 2015 and 2016

| | Equity attributable to owners of the controlling company | | | | Non-controlling Interests | Total equity |
|---|---|---|---|---|---|---|
| | Contributed capital | Retained earnings | Other components of equity | Subtotal | | |
| | In millions of won | | | | | |
| **Balance at January 1, 2015** .............. ₩ | 4,053,578 | 35,303,647 | 14,244,106 | 53,601,331 | 1,223,679 | 54,825,010 |
| **Total comprehensive income for the period** | | | | | | |
| Profit for the period .................. | — | 13,289,127 | — | 13,289,127 | 127,246 | 13,416,373 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | |
| Remeasurements of defined benefit liability, net of tax ............. | — | (84,271) | — | (84,271) | (3,590) | (87,861) |
| Share in other comprehensive loss of associates and joint ventures, net of tax .......................... | — | (280) | — | (280) | (3) | (283) |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax ............... | — | — | 9,744 | 9,744 | (96) | 9,648 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax ......................... | — | — | 3,157 | 3,157 | 1,252 | 4,409 |
| Foreign currency translation of foreign operations, net of tax ..... | — | — | 1,179 | 1,179 | 17,356 | 18,535 |
| Share in other comprehensive income of associates and joint ventures, net of tax ......................... | — | — | 89,476 | 89,476 | 82 | 89,558 |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | |
| Dividends paid ...................... | — | (320,982) | — | (320,982) | (86,071) | (407,053) |
| Issuance of shares of capital by subsidiaries and others ............. | — | — | 2,536 | 2,536 | 12,329 | 14,865 |
| Equity transaction within consolidation scope—other than issuance of share capital ......................... | — | — | 44,166 | 44,166 | 9,046 | 53,212 |
| Changes in consolidation scope ......... | — | — | (716) | (716) | 23,229 | 22,513 |
| Dividends paid (hybrid securities) ....... | — | — | — | — | (16,455) | (16,455) |
| Others ............................... | — | — | — | — | 4 | 4 |
| **Balance at December 31, 2015** ............. ₩ | 4,053,578 | 48,187,241 | 14,393,648 | 66,634,467 | 1,308,008 | 67,942,475 |

(Continued)

F-9

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Changes in Equity, Continued**
**For the years ended December 31, 2014, 2015 and 2016**

| | Equity attributable to owners of the controlling company | | | | Non-controlling Interests | Total equity |
|---|---|---|---|---|---|---|
| | Contributed capital | Retained earnings | Other components of equity | Subtotal | | |
| | In millions of won | | | | | |
| **Balance at January 1, 2016** .............. ₩ | 4,053,578 | 48,187,241 | 14,393,648 | 66,634,467 | 1,308,008 | 67,942,475 |
| **Total comprehensive income for the period** | | | | | | |
| Profit for the period .................. | — | 7,048,581 | — | 7,048,581 | 99,746 | 7,148,327 |
| Items that will not be reclassified subsequently to profit or loss: | | | | | | |
| Remeasurements of defined benefit liability, net of tax ............. | — | (69,330) | — | (69,330) | (6,596) | (75,926) |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax ........... | — | (2,532) | — | (2,532) | 17 | (2,515) |
| Items that are or may be reclassified subsequently to profit or loss: | | | | | | |
| Net change in the unrealized fair value of available-for-sale financial assets, net of tax ............... | — | — | 61,275 | 61,275 | 4 | 61,279 |
| Net change in the unrealized fair value of derivatives using cash flow hedge accounting, net of tax .......................... | — | — | 27,075 | 27,075 | 1,339 | 28,414 |
| Foreign currency translation of foreign operations, net of tax ..... | — | — | 31,406 | 31,406 | 9,954 | 41,360 |
| Share in other comprehensive income (loss) of associates and joint ventures, net of tax ............. | — | — | (54,918) | (54,918) | 4 | (54,914) |
| **Transactions with owners of the Company, recognized directly in equity** | | | | | | |
| Dividends paid ...................... | — | (1,990,089) | — | (1,990,089) | (99,982) | (2,090,071) |
| Issuance of shares of capital by subsidiaries and others .............. | — | — | 1,750 | 1,750 | 14,809 | 16,559 |
| Equity transaction within consolidation scope—other than issuance of share capital .......................... | — | — | 36,008 | 36,008 | 12,299 | 48,307 |
| Changes in consolidation scope ....... | — | — | — | — | 3,705 | 3,705 |
| Dividends paid (hybrid securities) ....... | — | — | — | — | (16,455) | (16,455) |
| Balance at December 31, 2016 .............. ₩ | 4,053,578 | 53,173,871 | 14,496,244 | 71,723,693 | 1,326,852 | 73,050,545 |

See accompanying notes to the consolidated financial statements.

F-10

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Cash Flows**
**For the years ended December 31, 2014, 2015 and 2016**

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| | In millions of won | | |
| **Cash flows from operating activities** | | | |
| Profit for the period ............................................ ₩ | 2,798,967 | 13,416,373 | 7,148,327 |
| **Adjustments for:** | | | |
| Income tax expense ............................................ | 1,430,339 | 5,239,413 | 3,365,141 |
| Depreciation ................................................... | 7,797,046 | 8,269,118 | 8,881,273 |
| Amortization ................................................... | 76,413 | 72,266 | 79,715 |
| Employee benefit expense ...................................... | 121,406 | 314,692 | 373,753 |
| Bad debt expense .............................................. | 54,999 | 18,350 | 37,815 |
| Interest expense .............................................. | 2,351,624 | 2,015,684 | 1,752,868 |
| Loss on sale of financial assets ............................. | 2,700 | 3,008 | 9 |
| Loss on disposal of property, plant and equipment ............ | 50,152 | 1,933 | 4,996 |
| Loss on abandonment of property, plant, and equipment ........ | 309,451 | 365,056 | 426,519 |
| Impairment loss on property, plant and equipment ............. | 38,107 | 30,344 | — |
| Impairment loss on intangible assets ......................... | 42 | 22 | 3,945 |
| Loss on disposal of intangible assets ........................ | 18 | 16 | 158 |
| Accretion expense to provisions, net ......................... | 1,295,150 | 1,602,724 | 1,782,732 |
| Loss on foreign currency translation, net .................... | 351,660 | 617,224 | 253,468 |
| Valuation and transaction gain on derivative instruments, net ... | (143,239) | (708,120) | (231,630) |
| Share in loss (income) of associates and joint ventures, net ... | (241,013) | (194,272) | 18,926 |
| Gain on disposal of financial assets ......................... | (98,065) | (4) | (1,482) |
| Gain on disposal of property, plant and equipment ............ | (85,775) | (8,637,508) | (74,035) |
| Gain on disposal of intangible assets ........................ | (4) | (32) | — |
| Gain on disposal of investments in associates and joint ventures ... | (47,072) | (4,731) | (52) |
| Loss on disposal of investments in associates and joint ventures ... | 1,254 | — | 2,935 |
| Gain on disposal of investments in subsidiaries .............. | (40,449) | (8,376) | — |
| Loss on disposal of investments in subsidiaries .............. | 17 | — | — |
| Impairment loss on investments in associates and joint ventures ... | 52,279 | — | 115,539 |
| Interest income ............................................... | (191,456) | (241,585) | (241,778) |
| Dividends income .............................................. | (14,193) | (14,069) | (9,446) |
| Impairment loss on available-for-sale securities ............. | 79,618 | 84,370 | 86,703 |
| Others, net ................................................... | (20,303) | (35,107) | 66,260 |
| | 13,130,706 | 8,790,416 | 16,694,332 |
| **Changes in:** | | | |
| Trade receivables ............................................. | 96,294 | 715,498 | 200,529 |
| Non-trade receivables ......................................... | 9,063 | (17,102) | (68,322) |
| Accrued income ................................................ | (207,155) | 17,051 | 69,151 |
| Other receivables ............................................. | (906) | (9,441) | 10,093 |
| Other current assets .......................................... | 75,410 | 67,520 | (259,492) |
| Inventories ................................................... | (1,146,221) | (1,190,188) | (1,439,545) |
| Other non-current assets ...................................... | 47,119 | (31,465) | (2,792) |
| Trade payables ................................................ | (257,614) | (1,577,551) | 141,994 |
| Non-trade payables ............................................ | (102,526) | 38,223 | (8,379) |
| Accrued expenses .............................................. | (107,277) | (410,744) | (153,172) |
| Other payables ................................................ | — | 964 | — |
| Other current liabilities ..................................... | 2,249,714 | 870,945 | 284,417 |
| Other non-current liabilities ................................. | (317,437) | 377,617 | 809,699 |
| Investments in associates and joint ventures ................. | 47,120 | 114,708 | 75,407 |
| Provisions .................................................... | (675,569) | (1,033,502) | (1,527,129) |
| Payments of employee benefit obligations ..................... | (860,179) | (43,100) | (53,477) |
| Plan assets ................................................... | (231,342) | (214,449) | (312,125) |
| | (1,381,506) | (2,325,016) | (2,233,143) |

(Continued)

F-11

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Consolidated Statements of Cash Flows, Continued**
**For the years ended December 31, 2014, 2015 and 2016**

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| | *In millions of won* | | |
| **Cash generated from operating activities** ₩ | 14,548,167 | 19,881,773 | 21,609,516 |
| Dividends received | 13,518 | 38,565 | 10,294 |
| Interest paid | (2,460,457) | (2,176,040) | (2,041,379) |
| Interest received | 167,269 | 133,875 | 240,878 |
| Income taxes paid | (222,805) | (935,068) | (3,298,757) |
| **Net cash from operating activities** | 12,045,692 | 16,943,105 | 16,520,552 |
| **Cash flows from investing activities** | | | |
| Proceeds from disposals of associates and joint ventures | 232,228 | 22,058 | 46,644 |
| Acquisition of associates and joint ventures | (248,223) | (116,114) | (113,222) |
| Proceeds from disposals of property, plant and equipment | 111,260 | 9,843,796 | 207,960 |
| Acquisition of property, plant and equipment | (14,547,499) | (14,049,887) | (12,028,789) |
| Proceeds from disposals of intangible assets | 1,819 | 467 | 430 |
| Acquisition of intangible assets | (68,624) | (87,946) | (124,422) |
| Proceeds from disposals of financial assets | 1,060,117 | 242,856 | 10,876,017 |
| Acquisition of financial assets | (975,104) | (5,326,151) | (8,130,621) |
| Increase in loans | (135,001) | (153,570) | (206,092) |
| Collection of loans | 101,037 | 111,714 | 117,561 |
| Increase in deposits | (335,518) | (352,669) | (468,734) |
| Decrease in deposits | 227,354 | 185,154 | 161,166 |
| Receipt of government grants | 108,681 | 52,696 | 32,878 |
| Usage of government grants | (36,464) | (13,372) | (33,516) |
| Net cash inflow (outflow) from changes in consolidation scope | 44,319 | (968) | 3,754 |
| Other cash inflow (outflow) from investing activities, net | (715) | (132,034) | 13,116 |
| **Net cash used in investing activities** | (14,460,333) | (9,773,970) | (9,645,870) |
| **Cash flows from financing activities** | | | |
| Proceeds (Repayment of) from short-term borrowings, net | 59,421 | (65,355) | (49,604) |
| Proceeds from long-term borrowings and debt securities | 9,566,625 | 4,178,454 | 2,302,060 |
| Repayment of long-term borrowings and debt securities | (8,119,325) | (8,960,706) | (7,750,047) |
| Payment of finance lease liabilities | (115,532) | (110,040) | (118,215) |
| Settlement of derivative instruments, net | (444,243) | 73,348 | 73,246 |
| Disposal of treasury stocks | 852,962 | — | — |
| Proceeds on disposal of partial interest in a subsidiary that does not involve loss of control | 376,477 | 67,914 | — |
| Change in non-controlling interest | 12,595 | 36,105 | 10,538 |
| Dividends paid (hybrid bond) | (16,463) | (16,455) | (16,455) |
| Dividends paid | (186,985) | (409,884) | (2,088,429) |
| Other cash outflow from financing activities, net | (356) | — | (570) |
| **Net cash from (used in) financing activities** | 1,985,176 | (5,206,619) | (7,637,476) |
| **Net increase (decrease) in cash and cash equivalents before effect of exchange rate fluctuations** | (429,465) | 1,962,516 | (762,794) |
| **Effect of exchange rate fluctuations on cash held** | (6,548) | 24,249 | 31,082 |
| **Net increase (decrease) in cash and cash equivalents** | (436,013) | 1,986,765 | (731,712) |
| **Cash and cash equivalents at January 1** | 2,232,313 | 1,796,300 | 3,783,065 |
| **Cash and cash equivalents at December 31** ₩ | 1,796,300 | 3,783,065 | 3,051,353 |

See accompanying notes to the consolidated financial statements.

F-12

**KOREA ELECTRIC POWER CORPORATION AND SUBSIDIARIES**

**Notes to the Consolidated Financial Statements**
**December 31, 2016**

**1.    Reporting Entity (Description of the controlling company)**

Korea Electric Power Corporation ("KEPCO") was incorporated on January 1, 1982 in accordance with the Korea Electric Power Corporation Act (the "KEPCO Act") to engage in the generation, transmission and distribution of electricity and development of electric power resources in the Republic of Korea. KEPCO also provides power plant construction services. KEPCO's stock was listed on the Korea Stock Exchange on August 10, 1989 and KEPCO listed its Depository Receipts (DR) on the New York Stock Exchange on October 27, 1994. KEPCO's head office is located in Naju, Jeollanam-do.

As of December 31, 2016, KEPCO's share capital amounts to ₩3,209,820 million and KEPCO's shareholders are as follows:

|  | Number of shares | Percentage of ownership |
|---|---|---|
| Government of the Republic of Korea .......................... | 116,841,794 | 18.20% |
| Korea Development Bank ................................. | 211,235,264 | 32.90% |
| Foreign investors ...................................... | 197,308,414 | 30.74% |
| Other ................................................ | 116,578,605 | 18.16% |
|  | 641,964,077 | 100.00% |

In accordance with the Restructuring Plan enacted on January 21, 1999 by the Ministry of Trade, Industry and Energy, KEPCO spun off its power generation divisions on April 2, 2001, resulting in the establishment of six power generation subsidiaries.

**2.    Basis of Preparation**

The consolidated financial statements of Korea Electric Power Corporation and subsidiaries (the "Company") were authorized for issuance by the Board of Directors on February 17, 2017.

**(1)    Statement of compliance**

These consolidated financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB").

**(2)    Basis of measurement**

These consolidated financial statements have been prepared on the historical cost basis, except for the following material items in the consolidated statements of financial position:

- derivative financial instruments are measured at fair value

- available-for-sale financial assets are measured at fair value

- liabilities for defined benefit plans are recognized at the net of the total present value of defined benefit obligations less the fair value of plan assets

**(3)    Functional and presentation currency**

These consolidated financial statements are presented in Korean won ("Won"), which is KEPCO's functional and presentation currency.

F-13

**(4)   Use of estimates and judgments**

The preparation of the consolidated financial statements in conformity with IFRS requires management to make judgments, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates.

Estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognized in the period in which the estimates are revised and in any future periods affected.

The following are the key assumptions concerning the future, and other key sources of estimation uncertainty at the end of the reporting period, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year.

(i)   Unbilled revenue

Energy delivered but not metered nor billed are calculated at the reporting date are estimated based on consumption statistics and selling price estimates. Determination of the unbilled revenues at the end of the reporting period is sensitive to the estimated consumptions and prices based on statistics. Unbilled revenue recognized as of December 31, 2015 and 2016 are ₩1,599,592 million and ₩1,615,322 million, respectively.

(ii)   Continuing operation of Wolsong Unit 1 nuclear power plant

Wolsong Unit 1 nuclear power plant of the Company commenced operations on November 21, 1982 and ended its operations on November 20, 2012 pursuant to its 30-year operating license. On February 27, 2015, the Nuclear Safety and Security Commission (NSSC) evaluated the safety of operation on the Wolsong Unit 1 nuclear power plant and approved to continue its operation until November 20, 2022. As described in note 50, the lawsuit related to the validity of the approval of NSSC is currently ongoing. The consolidated financial statements were prepared based on the judgment of the Company that the approval of NSSC is valid and Wolsong Unit 1 nuclear power plant will be operating until 2022.

Information about critical judgments in applying accounting policies that have the most significant effect on the amounts recognized in the consolidated financial statements is included in the following notes:

- Note 17 – Investments in Associates and Joint Ventures
- Note 18 – Property, Plant and Equipment
- Note 20 – Construction Services Contracts
- Note 45 – Risk Management

Information about assumptions and estimation uncertainties that have a significant risk of resulting in a material adjustment within the next financial year is included in the following notes:

- Note 41 – Income taxes
- Note 25 – Employment benefits

**(5)   Changes in accounting policies**

(i)   IAS 16, 'Property, Plant and Equipment'

The Company has adopted amendments to IAS 16, 'Property, Plant and Equipment', since January 1, 2016. Amendments to IAS 16, 'Property, Plant and Equipment', specify that the use of revenue-based methods to calculate the depreciation of an asset is not appropriate.

Upon adoption of the amendments, there is no significant impact on the Company's consolidated financial statements.

F-14

(ii)  IAS 38, 'Intangible Assets'

The Company has adopted amendments to IAS 38, 'Intangible Assets', since January 1, 2016. Amendments to IAS 38, 'Intangible Assets', introduce a rebuttable presumption that the use of revenue-based amortization methods for intangible assets is inappropriate. This presumption can be rebutted only when revenue and the consumption of the economic benefits of the intangible asset are highly correlated, or when the intangible asset is expressed as a measure of revenue.

Upon adoption of the amendments, there is no significant impact on the Company's consolidated financial statements.

(iii)  IFRS 11, 'Joint Arrangement'

The Company has adopted amendments to IFRS 11, 'Joint Arrangement', since January 1, 2016. Amendments to IFRS 11, 'Joint Arrangement', require an investor to apply the principles of business combination accounting when it acquires an interest in a joint operation that constitutes a business as defined in IFRS 3, 'Business Combinations'.

Upon adoption of the amendments, there is no significant impact on the Company's consolidated financial statements.

**(6)  New standards and amendments not yet adopted**

The following new standards, interpretations and amendments to existing standards are effective for annual periods beginning after January 1, 2016, and the Company has not early adopted them yet. The management is in the process of evaluating the potential impact on the consolidated financial statements upon the adoption of the new standards, interpretations and the amendments.

(i)  IFRS 9, 'Financial Instruments'

IFRS 9, 'Financial Instruments', is effective for annual periods beginning on or after January 1, 2018, with earlier adoption permitted. It replaces existing guidance in IAS 39, 'Financial Instruments: Recognition and Measurement'. The Company plans to adopt IFRS 9 for the year beginning on January 1, 2018. IFRS 9 will generally be applied retrospectively; however the Company plans to take advantage of the exemption allowing it not to restate the comparative information for prior periods with respect to classification and measurement including impairment changes. New hedge accounting requirements will generally be applied prospectively except for certain exemptions including the accounting for the time value of options.

Key features of the new standard, IFRS 9, are 1) classification and measurement of financial assets that reflects the business model in which the assets are managed and their cash flow characteristics, 2) impairment methodology that reflects 'expected credit loss' (ECL) model for financial assets, and 3) expanded scope of hedged items and hedging instruments which qualify for hedge accounting and changes in assessment method for effect of hedging relationships.

IFRS 9 will require the Company to assess the financial impact from application of IFRS 9 and revise its accounting processes and internal controls related to financial instruments. Actual impact of adopting IFRS 9 will be dependent on the financial instruments the Company holds and economic conditions at that time as well as accounting policy elections and judgment that it will make in the future.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

The Company has not initiated any changes in internal controls processes or accounting processing systems, and has not performed an assessment of the impact resulting from the application of IFRS 9. The Company is currently performing a detailed assessment of the potential impact from the application of IFRS 9 and plans to complete the assessment in advance of its effective date. Expected impacts on the consolidated financial statements are generally categorized as follows:

1    Classification and measurement of financial assets

Under IFRS 9, financial assets are classified into three principal categories; measured at amortized cost, fair value through other comprehensive income (FVOCI) and fair value through profit or loss (FVTPL) based on the business model in which assets are managed and their cash flow characteristics. Under IFRS 9, derivatives embedded in hybrid contracts where the host is a financial asset are not bifurcated. Instead, the hybrid financial instrument as a whole is assessed for classification.

As there are additional requirements for a financial asset to be classified as measured at amortized costs or FVOCI under IFRS 9 compared to the existing guidance in IAS 39, the adoption of IFRS 9 would potentially increase the proportion of financial assets that are measured at FVTPL, increasing volatility in the Company's profit or loss.

The criteria for classification and measurement of financial assets under IFRS 9 are as follows:

- A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is to hold assets to collect contractual cash flows; and 2) the contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

- A financial asset is measured at FVOCI if it meets both of the following conditions and is not designated as at FVTPL: 1) the asset is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and 2) the contractual terms of the financial asset give rise on specified dates to cash flow that are solely payments of principal and interest on the principal amount outstanding.

- On initial recognition of equity investment that is not held for trading, the Company may irrevocably elect to present subsequent changes in fair value in OCI, and will not reclassify (recycle) the those items in OCI to profit or loss subsequently.

- A financial asset is measured at FVTPL if the contractual terms of the financial asset give rise to specified dates to cash flows that are not solely payments of principal and interest on the principal amount outstanding, the debt instrument is held within a business model whose objective is to sell the asset, or the equity instruments that are not elected to be designated as measured at FVOCI.

As of December 31, 2016, the Company has loans and receivables amounting to ₩16,273,877 million, available-for-sale financial assets amounting to ₩1,014,732 million, and financial assets at fair value through profit or loss amounting to ₩367,477 million.

2    Classification and measurement of financial liabilities

Under IFRS 9, the amount of change in the fair value attributable to the changes in the credit risk of the financial liabilities is presented in OCI, not recognized in profit or loss, and the OCI amount will not be reclassified (recycled) to profit or loss. However, if doing so creates or increase an accounting mismatch, the amount of change in the fair value is recognized in profit or loss.

As a portion of fair value change which was recognized in profit or loss under the existing standard, IAS 39, will be presented in OCI under IFRS 9, profit or loss related to valuation of the same financial liabilities is likely to decrease.

F-16

The Company does not have any financial liability designated as at FVTPL as of December 31, 2016.

3    Impairment: Financial assets and contract assets

IFRS 9 replaces the 'incurred loss' model in the existing standard with a forward-looking 'expected credit loss' (ECL) model for debt instruments, lease receivables, contractual assets, loan commitments, financial guarantee contracts.

Under IFRS 9, impairment losses are likely to be recognized earlier than using the incurred loss model under the existing guidance in IAS 39 as loss allowances will be measured on either of the 12-month or lifetime ECL based on the extent of increase in credit risk since inception as shown in the below table.

|  | Classification | Loss allowances |
|---|---|---|
| Stage 1 | Credit risk has not increased significantly since the initial recognition | 12-month ECL: ECLs that resulted from possible default events within the 12 months after the reporting date |
| Stage 2 | Credit risk has increase significantly since the initial recognition | Lifetime ECL: ECL that resulted from all possible default events over the expected life of a financial instrument |
| Stage 3 | Credit-impaired | |

Under IFRS 9, financial assets of which the credit was impaired at the initial recognition, cumulative changes in lifetime ECL since the initial recognition are recognized as loss allowances.

As of December 31, 2016, the Company has debt instruments in financial assets measured at amortized cost amounting to ₩16,438,054 million (loans and receivables) and has recognized loss allowances of ₩164,177 million.

4    Hedge accounting

IFRS 9 retains the mechanics of hedge accounting (fair value hedge, cash flow hedge, hedging on net investment in a foreign operation) which was defined in the existing guidance in IFRS 9, but provides principle-based and less complex guidance in hedging which focuses on the risk management activities. More hedged items and hedging instruments would qualify for hedge accounting, more qualitative and forward-looking approach will be taken to assessing hedge effectiveness, and qualitative threshold (80~125%) is removed under IFRS 9.

Certain transactions which were not qualified for hedge accounting under the existing standard will likely quality for hedge accounting under IFRS 9, decreasing volatility in the Company's profits or loss.

As of December 31, 2016, the Company has asset and liabilities designated as hedged items amounting to ₩413,897 million and ₩117,157 million, respectively.

When initially applying IFRS 9, the Company may choose as its accounting policy to continue to apply the hedge accounting requirements of IAS 39.

(ii)    IFRS 15, 'Revenue from Contracts with Customers'

IFRS 15, 'Revenue from Contracts from Customers', is effective for annual periods beginning on or after January 1, 2018, with earlier adoption permitted.

It replaces existing revenue recognition guidance, including IAS 18, 'Revenue', IAS 11, 'Construction Contracts', SIC-31, 'Revenue-Barter transactions involving advertising services', IFRIC 13 'Customer Loyalty Programs', IFRIC 15, 'Agreements for the construction of real estate', and IFRIC 18, 'Transfers of assets from customers'.

F-17

Existing IFRS standards and interpretations including IAS 18 provide revenue recognition guidance by transaction types such as sales of goods, rendering of services, interest income, royalty income, dividend income and construction revenue; however, under the new standard, IFRS 15, the five-step approach (Step 1: Identify the contract(s) with a customer, Step 2: Identify the performance obligations in the contract, Step 3: Determine the transaction price, Step 4: Allocate the transaction price to the performance obligations in the contract, Step 5: Recognize revenue when the entity satisfied a performance obligation) is applied for all types of contracts or agreements.

The Company is currently performing a detailed assessment of the impact resulting from the application of IFRS 15 and plans to complete the assessment in advance of its effective date.

(iii)  IFRS 16, 'Leases'

IFRS 16, published in January 2016, replaces existing guidance in IAS 17, 'Leases'. It eliminates the current dual accounting model for lessees, which distinguishes between on-balance sheet finance leases and off-balance sheet operating leases. Instead, there is a single, on-balance sheet accounting model that is similar to current finance lease accounting. Lessor accounting remains similar to current practice (i.e. lessors continue to classify leases as finance and operating leases). IFRS 16 is effective for annual reporting periods beginning on or after January 1, 2019, with early adoption permitted if IFRS 15 'Revenue from Contracts with Customers' has also been applied.

(iv)  Amendments to IAS 12, 'Income Taxes'

The amendments clarify that unrealized losses on fixed-rate debt instruments measured at fair value and measured at cost for tax purposes give rise to a deductible temporary difference regardless of whether the holder expects to recover the carrying amount of the debt instrument by sale or by use and that the estimate of probable future taxable profit may include the recovery of some of assets for more than their carrying amount. When the Company assesses whether there will be sufficient taxable profit, the Company should compare the deductible temporary differences with future taxable profit that excludes tax deductions resulting from the reversal of those deductible temporary differences. The amendments are effective for annual periods beginning on or after January 1, 2017.

The adoption of the amendments is not expected to have a significant impact on the Company's consolidated financial statements.

(v)  Amendments to IFRS 2, 'Share-based Payment'

The amendments include: 1) when measuring the fair value of share-based payment, the effects of vesting and non-vesting conditions on the measurement of cash-settled share-based payment should be consistent with the measurement of equity-settled share-based payment, 2) Share-based payment transaction in which the company settles the share-based payment arrangement net by withholding a specified portion of the equity instruments per statutory tax withholding requirements would be classified as equity-settled in its entirety, if otherwise would be classified as equity-settled without the net settlement feature, and 3) when a cash-settled share-based payment changes to an equity-settled share-based payment because of modifications of the terms and conditions, the original liability recognized is derecognized and the equity-settled share-based payment is recognized at the modification date fair value. Any difference between the carrying amount of the liability at the modification date and the amount recognized in equity at the same date would be recognized in profit and loss immediately. The amendments are effective for annual periods beginning on or after January 1, 2018.

The adoption of the amendments is not expected to have a significant impact on the Company's consolidated financial statements.

F-18

(vi)  Amendments to IAS 7, 'Statement of Cash Flows'

The amendments require changes in liabilities arising from financing activities to be disclosed. The amendments are effective for annual periods beginning on or after January 1, 2017.

To satisfy the new disclosure requirements, the Company intends to present a reconciliation between the opening and closing balances for liabilities with changes arising from financing activities.

(vii)  IFRIC 22, 'Foreign Currency Transactions and Advance Consideration

IFRIC 22, published on December 8, 2016, clarifies the date of the transaction for the purpose of determining the exchange rate to use on initial recognition of the related asset, expense or income, when an entity has received or paid advance consideration in a foreign currency. IFRIC 22 is effective for annual reporting periods beginning on or after January 1, 2018, with earlier adoption permitted.

The Company is currently performing a detailed assessment of the impact resulting from the application of IFRIC 22 and plans to complete the assessment in advance of its effective date.

(viii)  Amendments to IAS 40, 'Investment Property'

The amendments clarify when an entity should transfer a property asset to, or from, investment property. The amendments are effective for annual periods beginning on or after January 1, 2018, with earlier adoption permitted.

The Company is currently performing a detailed assessment of the impact resulting from the application of amendments to IAS 40 and plans to complete the assessment in advance of its effective date.

**3.  Significant Accounting Policies**

Except as described in note 2.(5), the Company applied the following significant accounting policies consistently for all periods presented.

**(1)  Basis of consolidation**

The consolidated financial statements are the financial statements of a group in which the assets, liabilities, equity, income, expenses and cash flows of the parent and its subsidiaries are presented as those of a single economic entity. Subsidiaries are controlled by the Company. The Company controls an entity when it is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity.

Income and expense of a subsidiary acquired or disposed of during the year are included in the consolidated statement of comprehensive income from the effective date of acquisition and up to the effective date of disposal, as appropriate. Total comprehensive income of subsidiaries is attributed to the owners of the Company and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance.

When necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with those of the Company.

Transactions within the Company are eliminated during the consolidation.

Changes in the Company's ownership interests in a subsidiary that do not result in the Company losing control over the subsidiary are accounted for as equity transactions. The carrying amounts of the Company's interests and the non-controlling interests are adjusted to reflect the changes in their relative interests in the subsidiary. Any difference between the amount by which the non-controlling interests are adjusted and the fair value of the consideration paid or received is recognized directly in equity and attributed to owners of the Company.

F-19

When the Company loses control of a subsidiary, the income or loss on disposal is calculated as the difference between (i) the aggregate of the fair value of the consideration received and the fair value of any retained interest and (ii) the previous carrying amount of the assets (including goodwill), and liabilities of the subsidiary and any non-controlling interests. When assets of the subsidiary are carried at revalued amounts or fair values and the related cumulative gain or loss has been recognized in other comprehensive income and accumulated in equity, the amounts previously recognized in other comprehensive income and accumulated in equity are accounted for as if the Company had directly disposed of the relevant assets (i.e. reclassified to income or loss or transferred directly to retained earnings). The fair value of any investment retained in the former subsidiary at the date when control is lost is recognized as the fair value on initial recognition for subsequent accounting under IAS 39, 'Financial Instruments': Recognition and Measurement or, when applicable, the cost on initial recognition of an investment in an associate or a jointly controlled entity.

**(2)  Business combinations**

A business combination is accounted for by applying the acquisition method, unless it is a combination involving entities or businesses under common control.

The consideration transferred in a business combination is measured at fair value, which is calculated as the sum of the acquisition-date fair values of the assets transferred by the Company, liabilities incurred by the Company to the former owners of the acquiree and the equity interests issued by the Company in exchange for control of the acquiree. Acquisition-related costs are generally recognized in income or loss as incurred.

At the acquisition date, the identifiable assets acquired and the liabilities assumed are recognized at their fair value at the acquisition date, except that:

- deferred tax assets or liabilities and liabilities or assets related to employee benefit arrangements are recognized and measured in accordance with IAS 12, ' Income Taxes' and IAS 19, ' Employee Benefits' respectively;

- Assets (or disposal groups) that are classified as held for sale in accordance with IFRS 5, 'Non-current Assets Held for Sale' are measured in accordance with that standard.

Goodwill is measured as the excess of the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree, and the fair value of the acquirer's previously held equity interest in the acquiree (if any) over the net of the acquisition-date amounts of the identifiable assets acquired and the liabilities assumed. If, after reassessment, net of the acquisition-date amounts of the identifiable assets acquired and liabilities assumed exceeds the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree and the fair value of the acquirer's previously held interest in the acquiree (if any), the excess is recognized immediately in income or loss as a bargain purchase gain.

Non-controlling interest that is present on acquisition day and entitles the holder to a proportionate share of the entity's net assets in an event of liquidation, may be initially measured either at fair value or at the non-controlling interest's proportionate share of the recognized amounts of the acquiree's identifiable net assets. The choice of measurement can be elected on a transaction-by-transaction basis. Other types of non-controlling interests are measured at fair value or, when applicable, on the basis specified in other IFRSs. When the consideration transferred by the Company in a business combination includes assets or liabilities resulting from a contingent consideration arrangement, the contingent consideration is measured at its acquisition-date fair value and included as part of the consideration transferred in a business combination. Changes in the fair value of the contingent consideration that qualify as measurement period adjustments are adjusted retrospectively, with corresponding adjustments against goodwill. Measurement period adjustments are adjustments that arise from additional information obtained during the 'measurement period' (which cannot exceed one year from the acquisition date) about facts and circumstances that existed at the acquisition date.

F-20

The subsequent accounting for changes in the fair value of the contingent consideration that do not qualify as measurement period adjustments depends on how the contingent consideration is classified. Contingent consideration that is classified as equity is not re-measured at subsequent reporting dates and its subsequent settlement is accounted for within equity. Contingent consideration that is classified as an asset or a liability is re-measured at subsequent reporting dates in accordance with IAS 39, 'Financial Instruments: Recognition and Measurement', or with IAS 37, 'Provisions', Contingent Liabilities and Contingent Assets, as appropriate, with the corresponding gain or loss being recognized in income or loss.

When a business combination is achieved in stages, the Company's previously held equity interest in the acquiree is re-measured to fair value at the acquisition date (i.e. the date when the Company obtains control) and the resulting gain or loss, if any, is recognized in income or loss. Amounts arising from interests in the acquiree prior to the acquisition date that have previously been recognized in other comprehensive income are reclassified to income or loss where such treatment would be appropriate if that interest were disposed of.

If the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the Company reports provisional amounts for the items for which the accounting is incomplete. Those provisional amounts are adjusted during the measurement period (see above), or additional assets or liabilities are recognized, to reflect new information obtained about facts and circumstances that existed at the acquisition date that, if known, would have affected the amounts recognized at that date.

The assets and liabilities acquired under business combinations under common control are recognized at the carrying amounts recognized previously in the consolidated financial statements of the ultimate parent. The difference between consideration transferred and carrying amounts of net assets acquired is recognized as part of share premium.

**(3)    Investments in associates**

An associate is an entity over which the Company has significant influence and that is neither a subsidiary nor an interest in a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the investee but does not control or joint control over those policies.

The results and assets and liabilities of associates are incorporated in these consolidated financial statements using the equity method of accounting. If the investment is classified as held for sale, in which case it is accounted for in accordance with IFRS 5 'Non-current Assets Held for Sale', any retained portion of an investment in associates that has not been classified as held for sale shall be accounted for using the equity method until disposal of the portion that is classified as held for sale takes place. If the Company holds 20% ~ 50% of the voting power of the investee, it is presumed that the Company has significant influence.

After the disposal takes place, the Company shall account for any retained interest in associates in accordance with IAS 39 'Financial Instruments: Recognition and Measurement' unless the retained interest continues to be an associates, in which case the entity uses the equity method.

Under the equity method, an investment in an associate is initially recognized in the consolidated statement of financial position at cost and adjusted thereafter to recognize the Company's share of the income or loss and other comprehensive income of the associate. When the Company's share of losses of an associate exceeds the Company's interest in that associate (which includes any long-term interests that, in substance, form part of the Company's net investment in the associate), the Company discontinues recognizing its share of further losses. Additional losses are recognized only to the extent that the Company has incurred legal or constructive obligations or made payments on behalf of the associate.

Any excess of the cost of acquisition over the Company's share of the net fair value of the identifiable assets, liabilities and contingent liabilities of an associate recognized at the date of acquisition is recognized as goodwill, which is included within the carrying amount of the investment. Any excess of the Company's

F-21

share of the net fair value of the identifiable assets, liabilities and contingent liabilities over the cost of acquisition, after reassessment, is recognized immediately in income or loss. The requirements of IAS 39,'Financial Instruments: Recognition and Measurement', are applied to determine whether it is necessary to recognize any impairment loss with respect to the Company's investment in an associate. When necessary, the entire carrying amount of the investment (including goodwill) is tested for impairment in accordance with IAS 36 'Impairment of Assets' as a single asset by comparing its recoverable amount (higher of value in use and fair value less costs to sell) with its carrying amount, any impairment loss recognized forms part of the carrying amount of the investment. Any reversal of that impairment loss is recognized in accordance with IAS 36 to the extent that the recoverable amount of the investment subsequently increases.

Upon disposal of an associate that results in the Company losing significant influence over that associate, any retained investment is measured at fair value at that date and the fair value is regarded as its fair value on initial recognition as a financial asset in accordance with IAS 39. The difference between the previous carrying amount of the associate attributable to the retained interest and its fair value is included in the determination of the gain or loss on disposal of the associate. In addition, the Company accounts for all amounts previously recognized in other comprehensive income in relation to that associate on the same basis as would be required if that associate had directly disposed of the related assets or liabilities. Therefore, if a gain or loss previously recognized in other comprehensive income by that associate would be reclassified to income or loss on the disposal of the related assets or liabilities, the Company reclassifies the gain or loss from equity to income or loss (as a reclassification adjustment) when it loses significant influence over that associate.

When the Company transacts with its associate, incomes and losses resulting from the transactions with the associate are recognized in the Company's consolidated financial statements only to the extent of interests in the associate that are not related to the Company.

**(4) Joint arrangements**

A joint arrangement is an arrangement of which two or more parties have joint control. Joint control is the contractually agreed sharing of control of an arrangement, which exists only when decisions about the relevant activities require the unanimous consent of the parties sharing control. Joint arrangements are classified into two types—joint operations and joint ventures. A joint operation is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint operators) have rights to the assets, and obligations for the liabilities, relating to the arrangement. A joint venture is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. joint ventures) have rights to the net assets of the arrangement.

If the Company is a joint operator, the Company is to recognize and measure the assets and liabilities (and recognize the related revenues and expenses) in relation to its interest in the arrangement in accordance with relevant IFRSs applicable to the particular assets, liabilities, revenues and expenses. If the joint arrangement is a joint venture, the Company is to account for that investment using the equity method accounting in accordance with IAS 28, 'Investment in Associates and Joint Ventures' (refer to note 3.(3)), except when the Company is applicable to the IFRS 5, 'Non-current Assets Held for Sale'.

**(5) Non-current assets held for sale**

Non-current assets and disposal groups are classified as held for sale if their carrying amount will be recovered principally through a sale transaction rather than through continuing use. This condition is regarded as met only when the sale is highly probable and the non-current asset (or disposal group) is available for immediate sale in its present condition. Management must be committed to the sale, which should be expected to qualify for recognition as a completed sale within one year from the date of classification.

F-22

When the Company is committed to a sale plan involving loss of control of a subsidiary, all of the assets and liabilities of that subsidiary are classified as held for sale when the criteria described above are met, regardless of whether the Company will retain a non-controlling interest in its former subsidiary after the sale.

Non-current assets (and disposal groups) classified as held for sale are measured at the lower of their previous carrying amount and fair value less costs to sell.

**(6)  Goodwill**

The Company measures goodwill which acquired in a business combination at the amount recognized at the date on which it obtains control of the acquiree (acquisition date) less any accumulated impairment losses. Goodwill acquired in a business combination is allocated to each CGU that is expected to benefit from the synergies arising from the business acquired.

The Company assesses at the end of each reporting period whether there is any indication that an asset may be impaired. An impairment loss is recognized if the carrying amount of an asset or a CGU exceeds its recoverable amount. Impairment losses are recognized in profit or loss.

Any impairment identified at the CGU level will first reduce the carrying value of goodwill and then be used to reduce the carrying amount of the other assets in the CGU on a pro rata basis. Except for impairment losses in respect of goodwill which are never reversed, an impairment loss is reversed if there has been a change in the estimates used to determine the recoverable amount. An impairment loss is reversed only to the extent that the asset's carrying amount does not exceed the carrying amount that would have been determined, net of depreciation or amortization, if no impairment loss had been recognized.

**(7)  Revenue recognition**

Revenue from the sale of goods, rendering of services or use of the Company assets is measured at the fair value of the consideration received or receivable, net of returns, trade discounts and volume rebates, which are recognized as a reduction of revenue. Revenue is recognized when the amount of revenue can be measured reliably and it is probable that the economic benefits associated with the transaction will flow to the Company.

(i)  Sales of goods

The Korean government approves the utility rates charged to customers by the Company's power transmission and distribution division. The Company's utility rates are designed to recover the Company's reasonable costs plus a fair investment return.

The Company recognize revenue from electricity sales revenue based on power sold (transferred to the customer) up to the reporting date. To determine the amount of power sold, the Company estimates daily power volumes of electricity for residential, commercial, general, etc. The differences between the current month's estimated amount and actual (meter-read) amount, is adjusted for (trued-up) during the subsequent month.

(ii)  Sales of other services

Revenue from services rendered is recognized in profit or loss in proportion to the stage of completion of the transaction at the reporting date. The stage of completion is assessed by reference to surveys of work performed or services performed to date as a percentage of total services to be performed or the proportion that costs incurred to date bear to the estimated total costs of the transaction or other methods that reliably measures the services performed.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(iii) Dividend income and interest income

Dividend income is recognized in profit or loss on the date that the Company's right to receive payment is established, which in the case of quoted securities is the ex-dividend date.

Interest income is recognized as it accrues in profit or loss, using the effective interest method. Interest income is accrued on a time basis, by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount on initial recognition.

(iv) Rental income

The Company's policy for recognition of revenue from operating leases is described in note 3 (9) below.

(v) Deferral of revenue—Transfer of Assets from Customers

The Company recovers a substantial amount of the cost related to its electric power distribution facilities from customers through the transfer of assets, while the remaining portion is recovered through electricity sales from such customers in the future. As such, the Company believes there exists a continued service obligation to the customers in accordance with IFRIC 18, 'Transfer of Assets from Customers' when the Company receives an item of property, equipment, or cash for constructing or acquiring an item of property or equipment, in exchange for supplying electricity to customers. The Company defers the amounts received, which are subsequently recognized as revenue on a straight-line basis over the estimated service period which does not exceed the transferred asset's useful life.

**(8) Construction services revenue**

The Company provides services related to the construction of power plants related to facilities of its customers, mostly in foreign countries.

When the outcome of a construction contract can be estimated reliably, revenue and costs are recognized based on the stage of completion of the contract activity at the end of the reporting period, measured based on the proportion of contract costs incurred for work performed to date relative to the estimated total contract costs, except where this would not be representative of the stage of completion. Variations in contract work, claims and incentive payments are included to the extent that the amount can be measured reliably and its receipt is considered probable.

When the outcome of a construction contract cannot be estimated reliably, contract revenue is recognized to the extent of contract costs incurred when it is probable the revenue will be realized. Contract costs are recognized as expenses in the period in which they are incurred. When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognized as an expense immediately.

When contract costs incurred to date plus recognized income less recognized losses exceed progress billings, the surplus is presented as amounts due from customers for contract work. For contracts where progress billings exceed contract costs incurred to date plus recognized income less recognized losses, the surplus is presented as the amounts due to customers for contract work. Amounts received before the related work is performed are included in the consolidated statements of financial position, as a liability, as advance received. Amounts billed for work performed but not yet paid by the customer are included in the consolidated statements of financial position as accounts and other receivables.

**(9) Leases**

The Company classifies and accounts for leases as either a finance or operating lease, depending on the terms. Leases where the Company assumes substantially all of the risks and rewards of ownership are classified as finance leases. All other leases are classified as operating leases.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(i)  The Company as lessor

Amounts due from lessees under finance leases are recognized as receivables at the amount of the Company's net investment in the leases. Finance lease income is allocated to accounting periods so as to reflect a constant periodic rate of return on the Company's net investment outstanding in respect of the leases.

Rental income from operating leases is recognized on a straight-line basis over the term of the relevant lease. Initial direct costs incurred in negotiating and arranging an operating lease are added to the carrying amount of the leased asset and recognized on a straight-line basis over the lease term.

(ii)  The Company as lessee

Leases are classified as finance leases whenever the terms of the lease transfer substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases.

Assets held under finance leases are initially recognized as assets of the Company at their fair value at the inception of the lease or, if lower, at the present value of the minimum lease payments. The corresponding liability to the lessor is included in the statement of financial position as a finance lease obligation.

Lease payments are apportioned between finance expenses and reduction of the lease obligation so as to achieve a constant rate of interest on the remaining balance of the liability. Finance expenses are recognized immediately in income or loss, unless they are directly attributable to qualifying assets, in which case they are capitalized in accordance with the Company's general policy on borrowing costs. Contingent rentals are recognized as expenses in the periods in which they are incurred.

Operating lease payments are recognized as an expense on a straight-line basis over the lease term, except where another systematic basis is more representative of the time pattern in which economic benefits from the leased asset are consumed. Contingent rentals arising under operating leases are recognized as an expense in the period in which they are incurred.

In the event that lease incentives are received to enter into operating leases, such incentives are recognized as a liability. The aggregate benefit of incentives is recognized as a reduction of rental expense on a straight-line basis, except where another systematic basis is more representative of the time pattern in which economic benefits from the leased asset are consumed.

(iii)  Determining whether an arrangement contains a lease

At inception of an arrangement, the Company determines whether the arrangement is or contains a lease.

At inception or on reassessment of an arrangement that contains a lease, the Company separates payments and other consideration required by the arrangement into those for the lease and those for other elements on the basis of their relative fair values. If the Company concludes for a finance lease that it is impracticable to separate the payments reliably, then an asset and a liability are recognized at an amount equal to the fair value of the underlying asset.

**(10) Foreign currencies**

Transactions in foreign currencies are translated to the respective functional currencies of the Company entities at exchange rates at the dates of the transactions. Monetary assets and liabilities denominated in foreign currencies are retranslated to the functional currency using the reporting date's exchange rate. Non-monetary assets and liabilities denominated in foreign currencies that are measured at fair value are retranslated to the functional currency at the exchange rate at the date that the fair value was determined.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Exchange differences are recognized in profit or loss in the period in which they arise except for:

- Exchange differences on foreign currency borrowings relating to assets under construction for future productive use, which are included in the cost of those assets when they are regarded as an adjustment to interest costs on those foreign currency borrowings;

- Exchange differences on transactions entered into in order to hedge certain foreign currency risks (refer to note 3.(25);

  Derivative financial instruments, including hedge accounting); and

- Exchange differences on monetary items receivable from or payable to a foreign operation for which settlement is neither planned nor likely to occur (therefore forming part of the net investment in the foreign operation), which are recognized initially in other comprehensive income and reclassified from equity to income or loss on disposal or partial disposal of the net investment.

For the purpose of presenting financial statements, the assets and liabilities of the Company's foreign operations are expressed in Korean won using exchange rates prevailing at the end of the reporting period. Income and expense items are translated at the average exchange rates for the period, unless exchange rates fluctuated significantly during that period, in which case the exchange rates at the dates of the transactions are used. Exchange differences arising, if any, are recognized in other comprehensive income and accumulated in equity.

When a foreign operation is disposed of, the relevant amount in the translation is transferred to profit or loss as part of the gain or loss on disposal.

**(11) Borrowing costs**

The Company capitalizes borrowing costs directly attributable to the acquisition, construction or production of a qualifying asset as part of the cost of that asset. Other borrowing costs are recognized in expense as incurred. A qualifying asset is an asset that requires a substantial period of time to get ready for its intended use or sale.

Investment income earned on the temporary investment of specific borrowings pending their expenditure on qualifying assets is deducted from the borrowing costs eligible for capitalization.

All other borrowing costs are recognized in income or loss in the period in which they are incurred.

**(12) Government grants**

Government grants are not recognized unless there is reasonable assurance that the Company will comply with the grant's conditions and that the grant will be received.

Benefit from a government loan at a below-market interest rate is treated as a government grant, measured as the difference between proceeds received and the fair value of the loan based on prevailing market interest rates.

(i)   If the Company received grants related to assets

Government grants whose primary condition is that the Company purchase, construct or otherwise acquire long-term assets are deducted in calculating the carrying amount of the asset. The grant is recognized in profit or loss over the life of a depreciable asset as a reduced depreciation expense.

(ii)   If the Company received grants related to income

Government grants which are intended to compensate the Company for expenses incurred are recognized as other income (government grants) in profit or loss over the periods in which the Company recognizes the related costs as expenses.

F-26

**(13) Employee benefits**

When an employee has rendered service to the Company during a period, the Company recognizes the contribution payable to a defined contribution plan in exchange for that service as a liability (accrued expense).

For defined benefit pension plans and other post-employment benefits, the net periodic pension expense is actuarially determined by "Pension Actuarial System" developed by independent actuaries using the projected unit credit method. The present value of the defined benefit obligation is determined by discounting the estimated future cash outflows using interest rates of high-quality corporate bonds that are denominated in the currency in which the benefits will be paid and that have terms to maturity approximating the terms of the related pension liability. However, if there is not a deep market, market yields on government bonds are used.

Net defined benefit liability's measurement is composed of actuarial gains and losses, return on plan assets excluding net interest on net defined benefit liability, and any change in the effect of the asset ceiling, excluding net interest, which are immediately recognized in other comprehensive income. The actuarial gains or losses recognized in other comprehensive income which will not be reclassified into net profit or loss for later periods are immediately recognized in retained earnings. Past service cost will be recognized as expenses upon the earlier of the date of change or reduction to the plan, or the date of recognizing termination benefits.

The retirement benefit obligation recognized in the statement of financial position represents the present value of the defined benefit obligation as adjusted for unrecognized actuarial gains and losses and unrecognized past service cost, and as reduced by the fair value of plan assets. Any asset resulting from this calculation is limited to unrecognized actuarial losses and past service cost, plus the present value of available refunds and reductions in future contributions to the plan.

**(14) Income taxes**

Income tax expense comprises current and deferred tax. Current tax and deferred tax are recognized in profit or loss except to the extent that it relates to a business combination, or items recognized directly in equity or in other comprehensive income.

(i)    Current tax

Current tax is the expected tax payable or receivable on the taxable profit or loss for the year, using tax rates enacted or substantively enacted at the end of the reporting period and any adjustment to tax payable in respect of previous years. The taxable profit is different from the accounting profit for the period since the taxable profit is calculated excluding the temporary differences, which will be taxable or deductible in determining taxable profit (tax loss) of future periods, and non-taxable or non-deductible items from the accounting profit.

(ii)    Deferred tax

Deferred tax is recognized, using the asset-liability method, in respect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. A deferred tax liability is recognized for all taxable temporary differences. A deferred tax asset is recognized for all deductible temporary differences to the extent that it is probable that taxable profit will be available against which they can be utilized. However, deferred tax is not recognized for the following temporary differences: taxable temporary differences arising on the initial recognition of goodwill, or the initial recognition of assets or liabilities in a transaction that is not a business combination and that affects neither accounting profit or loss nor taxable income.

The measurement of deferred tax liabilities and deferred tax assets reflects the tax consequences that would follow from the manner in which the Company expects, at the end of the reporting period, to

F-27

recover or settle the carrying amount of its assets and liabilities. Deferred tax assets or deferred tax liabilities on investment properties measured at fair value, unless any contrary evidence exists, are measured using the assumption that the carrying amount of the property will be recovered entirely through sale.

The Company recognizes a deferred tax liability for all taxable temporary differences associated with investments in subsidiaries, associates, and interests in joint ventures, except to the extent that the Company is able to control the timing of the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future. The Company recognizes a deferred tax asset for all deductible temporary differences arising from investments in subsidiaries and associates, to the extent that it is probable that the temporary difference will reverse in the foreseeable future and taxable profit will be available against which the temporary difference can be utilized.

The carrying amount of a deferred tax asset is reviewed at the end of each reporting period and reduces the carrying amount to the extent that it is no longer probable that sufficient taxable profit will be available to allow the benefit of part or all of that deferred tax asset to be utilized.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply to the period when the asset is realized or the liability is settled, based on tax rates (and tax laws) that have been enacted or substantively enacted by the end of the reporting period. The measurement of deferred tax liabilities and deferred tax assets reflects the tax consequences that would follow from the manner in which the Company expects, at the end of the reporting period to recover or settle the carrying amount of its assets and liabilities.

Deferred tax assets and liabilities are offset only if there is a legally enforceable right to offset the related current tax liabilities and assets, and they relate to income taxes levied by the same tax authority and they intend to settle current tax liabilities and assets on a net basis.

(iii) Current and deferred tax for the year

Current and deferred tax are recognized in income or loss, except when they relate to items that are recognized in other comprehensive income or directly in equity, in which case, the current and deferred tax are also recognized in other comprehensive income or directly in equity respectively. Where current tax or deferred tax arises from the initial accounting for a business combination, the tax effect is included in the accounting for the business combination.

**(15) Property, plant and equipment**

Property, plant and equipment are initially measured at cost and after initial recognition, are carried at cost less accumulated depreciation and accumulated impairment losses. The cost of property, plant and equipment includes expenditures arising directly from the construction or acquisition of the asset, any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management and the initial estimate of the costs of dismantling and removing the item and restoring the site on which it is located.

Subsequent costs are recognized in the carrying amount of property, plant and equipment at cost or, if appropriate, as separate items if it is probable that future economic benefits associated with the item will flow to the Company and the cost of the item can be measured reliably. The carrying amount of the replaced part is derecognized. The costs of the day-to-day servicing are recognized in profit or loss as incurred.

Property, plant and equipment, except for land, are depreciated on a straight-line basis over estimated useful lives that appropriately reflect the pattern in which the asset's future economic benefits are expected to be consumed. For loaded nuclear fuel related to long-term raw materials and spent nuclear fuels related to asset retirement costs, the Company uses the production method to measure and recognizes as expense the economic benefits of the assets.

F-28

The estimated useful lives of the Company's property, plant and equipment are as follows:

| | Useful lives (years) |
|---|---|
| Buildings | 8 ~ 40 |
| Structures | 8 ~ 50 |
| Machinery | 2 ~ 32 |
| Vehicles | 3 ~ 8 |
| Loaded heavy water | 30 |
| Asset retirement costs | 18, 30, 40, 60 |
| Finance lease assets | 6 ~ 32 |
| Ships | 9 |
| Others | 4 ~ 15 |

A component that is significant compared to the total cost of property, plant and equipment is depreciated over its separate useful life.

Depreciation methods, residual values and useful lives of property, plant and equipment are reviewed at the end of each reporting period and if change is deemed appropriate, it is treated as a change in accounting estimate. As a result of such annual review, useful lives of certain machinery were changed during 2016. Depreciation expenses increased by ₩160,985 million for the year ended December 31, 2016. Depreciation expenses are expected to increase by ₩130,514 million and ₩91,197 million for the years ending December 31, 2017 and 2018, respectively, and to decrease by ₩382,696 million for the years after December 31, 2018.

Property, plant and equipment are derecognized on disposal, or when no future economic benefits are expected from its use or disposal. Gains or losses arising from derecognition of a property, plant and equipment, measured as the difference between the net disposal proceeds and the carrying amount of the asset, are recognized in income or loss when the asset is derecognized.

**(16) Investment property**

Property held for the purpose of earning rentals or benefiting from capital appreciation is classified as investment property. Investment property is initially measured at its cost. Transaction costs are included in the initial measurement. Subsequently, investment property is carried at depreciated cost less any accumulated impairment losses.

Subsequent costs are recognized in the carrying amount of investment property at cost or, if appropriate, as separate items if it is probable that future economic benefits associated with the item will flow to the Company and the cost of the item can be measured reliably. The carrying amount of the replaced part is derecognized. The costs of the day-to-day servicing are recognized in profit or loss as incurred.

Investment property except for land, are depreciated on a straight-line basis over 8 ~ 40 years as estimated useful lives.

The estimated useful lives, residual values and depreciation method are reviewed at the end of each reporting period, with the effect of any changes in estimate accounted for on a prospective basis.

An investment property is derecognized upon disposal or when the investment property is permanently withdrawn from use and no future economic benefits are expected from the disposal. Any gain or loss arising on derecognition of the property (calculated as the difference between the net disposal proceeds and the carrying amount of the asset) is included in income or loss in the period in which the property is derecognized.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**(17) Intangible assets**

(i)  Intangible assets acquired separately

Intangible assets with finite useful lives that are acquired separately are carried at cost less accumulated amortization and accumulated impairment losses. Amortization is recognized on a straight-line basis over their estimated useful lives. The estimated useful life and amortization method are reviewed at the end of each reporting period, with the effect of any changes in estimate being accounted for on a prospective basis. Intangible assets with indefinite useful lives that are acquired separately are carried at cost less accumulated impairment losses.

(ii)  Research and development

Expenditure on research activities is recognized as an expense in the period in which it is incurred.

An internally-generated intangible asset arising from development (or from the development phase of an internal project) is recognized if, and only if, all of the following have been demonstrated:

•  The technical feasibility of completing the intangible asset so that it will be available for use or sale;

•  The intention to complete the intangible asset and use or sell it;

•  The ability to use or sell the intangible asset;

•  How the intangible asset will generate probable future economic benefits;

•  The availability of adequate technical, financial and other resources to complete the development and to use or sell the intangible asset; and

•  The ability to measure reliably the expenditure attributable to the intangible asset during its development.

The amount initially recognized for internally-generated intangible assets is the sum of the expenditure incurred from the date when the intangible asset first meets the recognition criteria listed above. When the development expenditure does not meet the criteria listed above, an internally-generated intangible asset cannot be recognized and the expenditure is recognized in income or loss in the period in which it is incurred.

Internally-generated intangible assets are reported at cost less accumulated amortization and accumulated impairment losses.

The estimated useful lives and amortization methods of the Company's intangible assets with finite useful lives are as follows:

|  | Useful lives (years) | Amortization methods |
|---|---|---|
| Usage rights for donated assets . . . . . . . . . . . . . | 10 ~ 20 | Straight |
| Software  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4, 5 | Straight |
| Industrial rights . . . . . . . . . . . . . . . . . . . . . . . . . | 5, 10 | Straight |
| Development expenses  . . . . . . . . . . . . . . . . . . . | 5 | Straight |
| Leasehold rights  . . . . . . . . . . . . . . . . . . . . . . . . | 10 | Straight |
| Mining right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | Unit of production |
| Others  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 ~ 50 or Indefinite | Straight |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(iii)  Intangible assets acquired in a business combination

Intangible assets that are acquired in a business combination are recognized separately from goodwill are initially recognized at their fair value at the acquisition date (which is regarded as their cost).

Subsequent to initial recognition, intangible assets acquired in a business combination are reported at cost less accumulated amortization and accumulated impairment losses, on the same basis as intangible assets that are acquired separately.

(iv)  Derecognition of intangible assets

An intangible asset is derecognized on disposal, or when no future economic benefits are expected from its use or disposal. Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the asset, and are recognized in income or loss when the asset is derecognized.

## (18) Greenhouse gas emissions rights (allowances) and obligations

In connection with Enforcement of Allocation and Trading of Greenhouse Gas Emissions Allowances, the Company applies the following accounting policies for greenhouse gas emissions rights and obligations.

(i)  Greenhouse gas emissions rights

Greenhouse gas emissions rights consist of the allowances received free of charge from the government and the ones purchased. The cost of the greenhouse gas emissions rights includes expenditures arising directly from the acquisition and any other costs incurred during normal course of the acquisition.

Greenhouse gas emissions rights are held by the Company to fulfill the legal obligation and recorded as intangible assets. To the extent that the portion to be submitted to the government within one year from the end of reporting period, the greenhouse gas emissions rights are classified as current assets. Greenhouse gas emissions rights recorded as intangible assets are initially measured at cost and substantially remeasured at cost less accumulated impairment losses.

Greenhouse gas emissions rights are derecognized on submission to the government or when no future economic benefits are expected from its use or disposal.

(ii)  Greenhouse gas emissions obligations

Greenhouse gas emissions obligations are the Company's present legal obligation to submit the greenhouse gas emissions allowances to the government and recognized when an outflow of resources is probable and a reliable estimate can be made of the amount of the obligation. Greenhouse gas emissions obligations are measured as the sum of the carrying amount of the allocated rights that will be submitted to the government and the best estimate of expenditure required to settle the obligation at the end of the reporting period for any excess emission.

## (19) Impairment of non-financial assets other than goodwill

At the end of each reporting period, the Company reviews the carrying amounts of its tangible and intangible assets with definite useful lives to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, the Company estimates the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired.

Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or a cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (or the cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognized immediately in profit or loss, unless the relevant asset is carried at a revalued amount, in which case the impairment loss is treated as a revaluation decrease.

When an impairment loss subsequently reverses, the carrying amount of the asset (or a cash-generating unit) is increased to the revised estimate of its recoverable amount, to the extent the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or cash-generating unit) in prior years. A reversal of an impairment loss is recognized immediately in profit or loss, unless the relevant asset is carried at a revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

**(20) Inventories**

Inventories are measured at the lower of cost and net realizable value. Cost of inventories for inventories in transit are measured by using specific identification method. Cost of inventories, except for those in transit, are measured under the weighted average method and consists of the purchase price, cost of conversion and other costs incurred in bringing the inventories to their present location and condition.

Net realizable value is the estimated selling price in the ordinary course of business, less the estimated costs of completion and selling expenses. The amount of any write-down of inventories to net realizable value and all losses of inventories are recognized as an expense in the period the write-down or loss occurs. The amount of any reversal of any write-down of inventories, arising from an increase in net realizable value, are recognized as a reduction in the amount of inventories recognized as an expense in the period in which the reversal occurs.

**(21) Provisions**

Provisions are recognized when the Company has a present legal or constructive obligation as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation.

The risks and uncertainties that inevitably surround many events and circumstances are taken into account in reaching the best estimate of a provision. Where the effect of the time value of money is material, provisions are determined at the present value of the expected future cash flows.

Where some or all of the expenditures required to settle a provision are expected to be reimbursed by another party, the reimbursement shall be recognized when, and only when, it is virtually certain that reimbursement will be received if the entity settles the obligation. The reimbursement shall be treated as a separate asset.

Provisions are reviewed at the end of each reporting period and adjusted to reflect the current best estimates. If it is no longer probable that an outflow of resources embodying economic benefits will be required to settle the obligation, the provision is reversed.

(i)   Provision for employment benefits

The Company determines the provision for employment benefits as the incentive payments based on the results of the individual performance evaluation or management assessment.

F-32

(ii)  Provision for decommissioning costs of nuclear power plants

The Company records the fair value of estimated decommissioning costs as a liability in the period in which the Company incurs a legal obligation associated with retirement of long-lived assets that result from acquisition, construction, development and/or normal use of the assets. Accretion expense consists of period-to-period changes in the liability for decommissioning costs resulting from the passage of time and revisions to either the timing or the amount of the original estimate of undiscounted cash flows.

(iii)  Provision for disposal of spent nuclear fuel

Under the Radioactive Waste Management Act, the Company is levied to pay the spent nuclear fuel fund for the management of spent nuclear fuel. The Company recognizes the provision of present value of the payments.

(iv)  Provision for low and intermediate radioactive wastes

Under the Radioactive Waste Management Act, the Company recognizes the provision for the disposal of low and intermediate radioactive wastes in best estimate of the expenditure required to settle the present obligation.

(v)  Provision for Polychlorinated Biphenyls ("PCBs")

Under the regulation of Persistent Organic Pollutants Management Act, enacted in 2007, the Company is required to remove PCBs, a toxin, from the insulating oil of its transformers by 2025. As a result of the enactments, the Company is required to inspect the PCBs contents of transformers and dispose of PCBs in excess of safety standards under the legally settled procedures. The Company's estimates and assumptions used to determine fair value can be affected by many factors, such as the estimated costs of inspection and disposal, inflation rate, discount rate, regulations and the general economy.

(vi)  Provisions for power plant regional support program

Power plant regional support programs consist of scholarship programs to local students, local economy support programs, local culture support programs, environment development programs, and local welfare programs. The Company recognizes the provision in relation to power plant regional support program.

(vii)  Provisions for transmission and transformation facilities-neighboring areas support program

The Company has present obligation to conduct transmission and transformation facilities-neighboring areas support program under Act on assistance to transmission and transformation facilities-neighboring areas. The Company recognizes the provision of estimated amount to fulfill the obligation.

(viii)  Renewable Portfolio Standard ("RPS") provisions

RPS program is required to generate a specified percentage of total electricity to be generated in the form of renewable energy and provisions are recognized for the governmental regulations to require the production of energies from renewable energy sources such as solar, wind and biomass.

**(22) Non-derivative financial assets**

The Company recognizes and measures non-derivative financial assets by the following four categories: financial assets at fair value through profit or loss, held-to-maturity investments, loans and receivables and available-for-sale financial assets. The Company recognizes financial assets in the statement of financial position when the Company becomes a party to the contractual provisions of the instrument. Upon initial

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

recognition, non-derivative financial assets are measured at their fair value plus, in the case of a financial asset not at fair value through profit or loss, transaction costs that are directly attributable to the asset's acquisition or issuance.

A regular way purchase or sale of financial assets shall be recognized and derecognized, as applicable, using trade date accounting or settlement date accounting. A regular way purchase or sale is a purchase or sale of a financial asset under a contract whose terms require delivery of the asset within the time frame established generally by regulation or convention in the marketplace concerned.

(i)    Effective interest method

The effective interest method is a method of calculating the amortized cost of a debt instrument and of allocating interest income over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash receipts (including all fees and points paid or received that form an integral part of the effective interest rate, transaction costs and other premiums or discounts) through the expected life of the debt instrument, or, where appropriate, a shorter period, to the net carrying amount on initial recognition. Income is recognized on an effective interest basis for debt instruments other than those financial assets classified as financial assets at fair value through profit or loss.

(ii)    Financial assets at fair value through profit or loss (FVTPL)

A financial asset is classified as financial assets are classified at fair value through profit or loss if it is held for trading or is designated as such upon initial recognition. Upon initial recognition, transaction costs are recognized in profit or loss when incurred. A financial assets its acquired principally for the purpose of selling it in the near term are classified as a short-term financial assets held for trading and also all the derivatives including an embedded derivate that is not designated and effective as a hedging instrument are classified at the short-term trading financial asset as well. Financial assets at fair value through profit or loss are measured at fair value, and changes therein are recognized in profit or loss.

A financial asset is classified as held for trading if:

- It has been acquired principally for the purpose of selling it in the near term; or

- On initial recognition it is part of a portfolio of identified financial instruments that the Company manages together and has a recent actual pattern of short term profit taking; or

- It is derivative, including an embedded derivative that is not designated and effective as a hedging instrument.

A financial asset other than a financial asset held for trading may be designated as at financial assets at fair value through profit or loss upon initial recognition if:

- Such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or

- The financial asset forms part of a group of financial assets or financial liabilities or both, which is managed and its' performance is evaluated on a fair value basis in accordance with the Company's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or

- It forms a part of a contract containing one or more embedded derivatives, and with IAS No. 39, Financial Instruments; Recognition and Measurement permits the entire combined contract (asset or liability) to be designated as at financial assets at fair value through profit or loss.

Financial assets at fair value through profit or loss are stated at fair value, with any gains or losses arising on re-measurement recognized in income or loss. The net gain or loss recognized in income or loss incorporates any dividend or interest earned on the financial asset and is included in the 'finance income and finance expenses' line item in the consolidated statement of comprehensive income.

F-34

(iii)  Held-to-maturity investments

A non-derivative financial asset with a fixed or determinable payment and fixed maturity, for which the Company has the positive intention and ability to hold to maturity, are classified as held-to-maturity investments. Subsequent to initial recognition, held-to-maturity investments are measured at amortized cost using the effective interest method.

(iv)  Available-for-sale financial assets

Available-for-sale financial assets are those non-derivative financial assets that are designated as available-for-sale or are not classified as financial assets at fair value through profit or loss, held-to-maturity investments or loans and receivables.

Gains and losses arising from changes in fair value are recognized in other comprehensive income and accumulated in the valuation reserve. However, impairment losses, interest calculated using the effective interest method, and foreign exchange gains and losses on monetary assets are recognized in income or loss. Unquoted equity investments which are not traded in an active market, whose fair value cannot be measured reliably are carried at cost.

When a financial asset is derecognized or impairment losses are recognized, the cumulative gain or loss previously recognized in other comprehensive income is reclassified from equity to profit or loss.

Dividends on an available-for-sale equity instrument are recognized in profit or loss when the Company's right to receive payment is established.

The fair value of available-for-sale monetary assets denominated in a foreign currency is determined in that foreign currency and translated at the spot rate at the end of the reporting period. The foreign exchange gains and losses that are recognized in income or loss are determined based on the amortized cost of the monetary asset. Other foreign exchange gains and losses are recognized in other comprehensive income.

(v)  Loans and receivables

Loans and receivables are financial assets with fixed or determinable payments that are not quoted in an active market. Subsequent to initial recognition, loans and receivables are measured at amortized cost using the effective interest method except for loans and receivables of which the effect of discounting is immaterial.

(vi)  Impairment of financial assets

Financial assets, other than those at financial assets at fair value through profit or loss, are assessed for indicators of impairment at the end of each reporting period. Financial assets are considered to be impaired when there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the investment have been affected.

For listed and unlisted equity investments classified as available-for-sale financial asset, a significant or prolonged decline in the fair value of the security below its cost is considered to be objective evidence of impairment in addition to the criteria mentioned below.

For all other financial assets, objective evidence of impairment could include:

- Significant financial difficulty of the issuer or counterparty; or

- Breach of contract, such as a default or delinquency in interest or principal payments, or

- It becoming probable that the borrower will enter bankruptcy or financial re-organization; or

- The disappearance of an active market for that financial asset because of financial difficulties.

F-35

For certain categories of financial asset, such as trade receivables, assets that are assessed not to be impaired individually are, in addition, assessed for impairment on a collective basis. Objective evidence of impairment for a portfolio of receivables could include the Company's past experience of collecting payments, an increase in the number of delayed payments in the portfolio past the average credit period and, as well as observable changes in national or local economic conditions that correlate with default on receivables.

For financial assets recorded at amortized cost, the amount of the impairment loss recognized is the difference between the asset's carrying amount and the present value of estimated future cash flows, discounted at the financial asset's original effective interest rate.

For financial assets carried at cost, the amount of the impairment loss is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the current market rate of return for a similar financial asset. Such impairment loss will not be reversed in subsequent periods.

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of trade receivables, where the carrying amount is reduced through the use of an allowance account. When a trade receivable is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited against the allowance account. Changes in the carrying amount of the allowance account are recognized in income or loss.

When an available-for-sale financial asset is considered to be impaired, cumulative gains or losses previously recognized in other comprehensive income are reclassified to income or loss in the period.

For financial assets measured at amortized cost, if, in a subsequent period, the amount of the impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment was recognized, the previously recognized impairment loss is reversed through profit or loss to the extent that the carrying amount of the investment at the date the impairment is reversed does not exceed what the amortized cost would have been had the impairment not been recognized.

In respect of available-for-sale equity securities, impairment losses previously recognized in profit or loss are not reversed through profit or loss. Any increase in fair value subsequent to an impairment loss is recognized in other comprehensive income. In respect of available-for-sale debt securities, impairment losses are subsequently reversed through profit or loss if an increase in the fair value of the investment can be objectively related to an event occurring after the recognition of the impairment loss.

(vii) De-recognition of financial assets

The Company derecognizes a financial asset when the contractual rights to the cash flows from the asset expire, or it transfers the rights to receive the contractual cash flows on the financial asset in a transaction in which substantially all the risks and rewards of ownership of the financial asset are transferred. Any interest in transferred financial assets that is created or retained by the Company is recognized as a separate asset or liability. If the Company retains substantially all the risks and rewards of ownership of the transferred financial assets, the Company continues to recognize the transferred financial assets and recognizes financial liabilities for the consideration received.

On de-recognition of a financial asset in its entirety, the difference between the asset's carrying amount and the sum of the consideration received and receivable and the cumulative gain or loss that had been recognized in other comprehensive income and accumulated in equity is recognized in income or loss.

On de-recognition of a financial asset other than in its entirety (e.g. when the Company retains an option to repurchase part of a transferred asset), the Company allocates the previous carrying amount of the financial asset between the part it continues to recognize under continuing involvement, and the part it no longer recognizes on the basis of the relative fair values of those parts on the date of the

F-36

transfer. The difference between the carrying amount allocated to the part that is no longer recognized and the sum of the consideration received for the part no longer recognized and any cumulative gain or loss allocated to it that had been recognized in other comprehensive income is recognized in income or loss. A cumulative gain or loss that had been recognized in other comprehensive income is allocated between the part that continues to be recognized and the part that is no longer recognized on the basis of the relative fair values of those parts.

**(23) Non-derivative financial liabilities and equity instruments issued by the Company**

(i)   Classification as debt or equity

Debt and equity instruments are classified as either financial liabilities or as equity in accordance with the substance of the contractual arrangement.

(ii)   Equity instruments

An equity instrument is any contract that evidences a residual interest in the assets of an entity after deducting all of its liabilities. Equity instruments issued by the Company are recognized at the proceeds received, net of direct issue costs.

Repurchase of the Company's own equity instruments is recognized and deducted directly in equity. No gain or loss is recognized in income or loss on the purchase, sale, issue or cancelation of the Company's own equity instruments.

(iii)   Financial liabilities

Financial liabilities are recognized when the Company becomes a party to the contractual provisions of the instruments. Financial liabilities are initially measured at fair value. Transaction cost that are directly attributable to the issue of financial liabilities are added to or deducted from the fair value of the financial liabilities, as appropriate, on initial recognition. Transaction cost directly attributable to acquisition of financial liabilities at fair value through profit or loss are recognized immediately in profit or loss.

Financial liabilities are classified as either financial liabilities at fair value through profit or loss or other financial liabilities.

(iv)   Financial liabilities at fair value through profit or loss (FVTPL)

Financial liabilities are classified as at financial liabilities at fair value through profit or loss when the financial liability is either held for trading or it is designated as financial liabilities at fair value through profit or loss.

A financial liability is classified as held for trading if:

• It has been acquired principally for the purpose of repurchasing it in the near term; or

• On initial recognition it is part of a portfolio of identified financial instruments that the Company manages together and has a recent actual pattern of short-term profit-taking; or

• It is a derivative that is not designated and effective as a hedging instrument.

A financial liability other than a financial liability held for trading may be designated as at FVTPL upon initial recognition if:

• Such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or

• The financial liability forms part of a Company of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Company's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

- It forms part of a contract containing one or more embedded derivatives, and IAS 39, 'Financial Instruments: Recognition and Measurement', permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial liabilities at fair value through profit or loss are stated at fair value, with any gains or losses arising on re-measurement recognized in income or loss. The net gain or loss recognized in income or loss incorporates any interest paid on the financial liability and is included in 'finance income and finance expenses'.

(v)  Other financial liabilities

Other financial liabilities, including borrowings, are initially measured at fair value, net of transaction costs.

Other financial liabilities are subsequently measured at amortized cost using the effective interest method, with interest expense recognized on an effective yield basis. The effective interest method is a method of calculating the amortized cost of a financial liability and of allocating interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments through the expected life of the financial liability, or (where appropriate) a shorter period, to the net carrying amount on initial recognition.

(vi)  Financial guarantee contract liabilities

Financial guarantee contract liabilities are initially measured at their fair values and, if not designated as at FVTPL, are subsequently measured at the higher of: (a) the amount of the obligation under the contract, as determined in accordance with IAS 37, 'Provisions, Contingent Liabilities and Contingent Assets; or (b) the amount initially recognized less, cumulative amortization recognized in accordance with IAS 18, 'Revenue'.

(vii) De-recognition of financial liabilities

The Company derecognizes financial liabilities when, and only when, the Company's obligations are discharged, canceled or they expire. The difference between the carrying amount of the financial liability derecognized and the consideration paid and payable is recognized in income or loss.

**(24)  Service Concession Arrangements**

The Company recognizes revenues from construction services and operating services related to service concession arrangements in accordance with IAS 11, 'Construction Contracts' and IAS 18, 'Revenue', respectively. If the Company performs more than one service under a single contract or arrangement, consideration received or receivable is allocated by reference to the relative fair values of the services delivered, when the amounts are separately identifiable.

The Company recognizes a financial asset to the extent that it has an unconditional contractual right to receive cash or another financial asset for the construction services and an intangible asset to the extent that it receives a right (license) to charge users of the public service. Borrowing costs attributable to the arrangement are recognized as an expense in the period in which they are incurred unless the Company has a contractual right to receive an intangible asset (a right to charge users of the public service). In this case, borrowing costs attributable to the arrangement are capitalized during the construction phase of the arrangement.

**(25)  Derivative financial instruments, including hedge accounting**

The Company enters into a variety of derivative financial instruments to manage its exposure to interest rate and foreign exchange rate risk, including foreign exchange forward contracts, interest rate swaps and cross currency swaps and others.

F-38

Derivatives are initially recognized at fair value. Subsequent to initial recognition, derivatives are measured at fair value. The resulting gain or loss is recognized in income or loss immediately unless the derivative is designated and effective as a hedging instrument, in such case the timing of the recognition in income or loss depends on the nature of the hedge relationship.

A derivative with a positive fair value is recognized as a financial asset; a derivative with a negative fair value is recognized as a financial liability. A derivative is presented as a non-current asset or a non-current liability if the remaining maturity of the instrument is more than 12 months and it is not expected to be realized or settled within 12 months. Other derivatives are presented as current assets or current liabilities.

(i)     Separable embedded derivatives

Derivatives embedded in other financial instruments or other host contracts are treated as separate derivatives when their risks and characteristics are not closely related to those of the host contracts and when the host contracts are not measured at FVTPL.

An embedded derivative is presented as a non-current asset or a non-current liability if the remaining maturity of the hybrid instrument to which the embedded derivative is part of, is more than 12 months and it is not expected to be realized or settled within 12 months. All other embedded derivatives are presented as current assets or current liabilities.

(ii)    Hedge accounting

The Company designates certain hedging instruments, which include derivatives, embedded derivatives and non-derivatives in respect of foreign currency risk, as either fair value hedges or cash flow hedges. Hedges of foreign exchange risk on firm commitments are accounted for as cash flow hedges.

At the inception of the hedge relationship, the entity documents the relationship between the hedging instrument and the hedged item, along with its risk management objectives and its strategy for undertaking various hedge transactions. Furthermore, at the inception of the hedge and on an ongoing basis, the Company documents whether the hedging instrument is highly effective in offsetting changes in fair values or cash flows of the hedged item.

(iii)   Fair value hedges

Changes in the fair value of derivatives that are designated and qualify as fair value hedges are recognized in income or loss immediately, together with any changes in the fair value of the hedged asset or liability that are attributable to the hedged risk. The changes in the fair value of the hedging instrument and the change in the hedged item attributable to the hedged risk relating to the hedged items are recognized in the consolidated statements of comprehensive income.

Hedge accounting is discontinued when the Company revokes the hedging relationship, when the hedging instrument expires or is sold, terminated, or exercised, or when it no longer qualifies for hedge accounting. The fair value adjustment to the carrying amount of the hedged item arising from the hedged risk is amortized as income or loss as of that date.

(iv)    Cash flow hedges

The effective portion of changes in the fair value of derivatives that are designated and qualify as cash flow hedges is recognized in other comprehensive income. The gain or loss relating to the ineffective portion is recognized immediately in income or loss, and is included in the 'finance income and expense'.

Amounts previously recognized in other comprehensive income and accumulated in equity are reclassified to income or loss in the periods when the hedged item is recognized in income or loss, in the same line of the consolidated statement of comprehensive income as the recognized hedged item. However, when the forecast transaction that is hedged results in the recognition of a non-financial asset

or a non-financial liability, the gains and losses previously accumulated in equity are transferred from equity and included in the initial measurement of the cost of the non-financial asset or non-financial liability.

Hedge accounting is discontinued when the Company revokes the hedging relationship, when the hedging instrument expires or is sold, terminated, or exercised, or it no longer qualifies for hedge accounting. Any gain or loss accumulated in equity at that time remains in equity and is recognized when the forecast transaction is ultimately recognized in income or loss. When a forecast transaction is no longer expected to occur, the gain or loss accumulated in equity is recognized immediately in income or loss.

**4.    Segment, Geographic and Other Information**

**(1)    Segment determination and explanation of the measurements**

The Company's operating segments are its business components that generate discrete financial information that is reported to and regularly reviewed by the Company's the chief operating decision maker, the Chief Executive Officer, for the purpose of resource allocation and assessment of segment performance. The Company's reportable segments are 'Transmission and distribution', 'Electric power generation (Nuclear)', 'Electric power generation (Non-nuclear)', 'Plant maintenance & engineering service' and 'Others'; others mainly represent the business unit that manages the Company's foreign operations.

Segment operating profit (loss) is determined the same way that consolidated operating profit is determined under IFRS without any adjustment for corporate allocations. The accounting policies used by each segment are consistent with the accounting policies used in the preparation of the consolidated financial statements. Segment assets and liabilities are determined based on separate financial statements of the entities instead of on a consolidated basis. There are various transactions between the reportable segments, including sales of property, plant and equipment and so on, that are conducted on an arms-length basis at market prices that would be applicable to an independent third-party. For subsidiaries which are in a different segment from that of its immediate parent company, their carrying amount in separate financial statements is eliminated in the consolidating adjustments in the tables below. In addition, consolidation adjustments in the table below include adjustments of the amount of investment in associates and joint ventures from the cost basis amount reflected in segment assets to that determined using equity method in the consolidated financial statements.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(2)  Financial information of the segments for the years ended December 31, 2014, 2015 and 2016, respectively, are as follows:

**2014**

| Segment | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit (loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | | | | | |
| Transmission and distribution | 56,982,583 | 1,445,914 | 55,536,669 | 2,717,040 | 28,798 | 1,394,131 | 231,502 | 8,408 | 309,442 | 290,444 | 2,050,726 |
| Electric power generation (Nuclear) | 9,379,564 | 9,364,451 | 15,113 | 2,905,115 | 21,995 | 582,353 | 1,227 | 42,667 | — | 719,794 | 2,544,378 |
| Electric power generation (Non-nuclear) | 25,067,653 | 24,680,221 | 387,432 | 2,189,202 | 30,528 | 308,731 | 40,260 | 38,417 | — | 147,892 | 1,385,687 |
| Plant maintenance & engineering service | 2,620,713 | 1,887,954 | 732,759 | 70,374 | 16,033 | 223 | 1,995 | 39,983 | — | 139,965 | 335,076 |
| Others | 537,578 | 86,525 | 451,053 | 26,983 | 109,427 | 79,175 | | 1,026 | 9 | 33 | 95,803 |
| Consolidation adjustments | (37,465,065) | (37,465,065) | — | (35,255) | (15,325) | (12,989) | | (9,095) | | (2,978) | (202,600) |
| | 57,123,026 | — | 57,123,026 | 7,873,459 | 191,456 | 2,351,624 | 274,984 | 121,406 | 309,451 | 1,295,150 | 6,209,070 |
| Finance income | | | | | | | | | | | 885,290 |
| Finance expense | | | | | | | | | | | (3,140,038) |
| Profit related to associates and joint ventures | | | | | | | | | | | 274,984 |
| Profit before income tax | | | | | | | | | | | ₩ 4,229,306 |

**2015**

| Segment | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit (loss) related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit (loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | | | | | |
| Transmission and distribution | 58,164,394 | 1,230,975 | 56,933,419 | 2,859,037 | 132,809 | 1,092,594 | 220,406 | 135,261 | 359,521 | 872,096 | 13,319,310 |
| Electric power generation (Nuclear) | 10,642,352 | 10,596,189 | 46,163 | 3,070,828 | 24,612 | 532,490 | (595) | 54,572 | — | 401,839 | 3,806,617 |
| Electric power generation (Non-nuclear) | 21,469,345 | 20,906,081 | 563,264 | 2,337,353 | 22,171 | 319,647 | (10,686) | 74,007 | 5,305 | 148,053 | 2,704,260 |
| Plant maintenance & engineering service | 2,533,887 | 2,016,699 | 517,188 | 85,662 | 12,293 | 542 | (1,746) | 74,542 | — | 174,912 | 332,531 |
| Others | 672,250 | 150,557 | 521,693 | 27,491 | 108,104 | 127,684 | | 343 | 230 | 34 | 80,165 |
| Consolidation adjustments | (34,900,501) | (34,900,501) | — | (38,987) | (58,404) | (57,273) | | (24,033) | | 5,790 | 37,993 |
| | 58,581,727 | — | 58,581,727 | 8,341,384 | 241,585 | 2,015,684 | 207,379 | 314,692 | 365,056 | 1,602,724 | 20,280,876 |
| Finance income | | | | | | | | | | | 1,182,988 |
| Finance expense | | | | | | | | | | | (3,015,457) |
| Profit related to associates and joint ventures | | | | | | | | | | | 207,379 |
| Profit before income tax | | | | | | | | | | | ₩ 18,655,786 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

|  | | | | | 2016 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Segment | Total segment revenue | Intersegment revenue | Revenue from external customers | Depreciation and amortization | Interest income | Interest expense | Profit (loss) related to associates and joint ventures | Employee benefit expense | Loss on abandonment of property, plant, and equipment | Increase in provisions, net | Operating profit (loss) |
|  | | | | | In millions of won | | | | | | |
| Transmission and distribution . . . . . . . . . . . . . | ₩ 59,862,284 | 1,890,489 | 57,971,795 | 3,226,700 | 80,882 | 844,200 | (128,402) | 162,326 | 424,356 | 711,430 | 5,274,308 |
| Electric power generation (Nuclear) . . . . . . . | 11,168,579 | 11,129,385 | 39,194 | 3,130,820 | 33,111 | 474,590 | (1,082) | 70,582 | — | 576,223 | 3,770,165 |
| Electric power generation (Non-nuclear) . . . . . | 21,394,223 | 20,561,044 | 833,179 | 2,523,306 | 24,171 | 359,607 | (8,342) | 79,846 | 2,133 | 276,619 | 3,211,684 |
| Plant maintenance & engineering service . . . . . | 2,618,388 | 2,190,207 | 428,181 | 98,843 | 10,672 | 2,156 | 478 | 86,268 | — | 221,301 | 210,680 |
| Others . . . . . . . . . . . . . . . . . . . . . . | 567,836 | 77,098 | 490,738 | 26,817 | 115,928 | 97,926 | — | 1,050 | 30 | 168 | 76,336 |
| Consolidation adjustments . . . . . . . . . . . . . | (35,848,223) | (35,848,223) | — | (45,498) | (22,986) | (25,611) | — | (26,319) | — | (3,009) | (246,813) |
|  | ₩ 59,763,087 | — | 59,763,087 | 8,960,988 | 241,778 | 1,752,868 | (137,348) | 373,753 | 426,519 | 1,782,732 | 12,296,360 |
| Finance income . . . . . . . . . . . . . . . . . . . | | | | | | | | | | | 791,543 |
| Finance expense . . . . . . . . . . . . . . . . . . | | | | | | | | | | | (2,437,087) |
| Loss related to associates and joint ventures . . . . | | | | | | | | | | | (137,348) |
| Profit before income tax . . . . . . . . . . . . . . | | | | | | | | | | | ₩ 10,513,468 |

F-42

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(3) **Information related to segment assets and segment liabilities as of and for the years ended December 31, 2015 and 2016 are as follows:**

| Segment | 2015 | | | |
| | Segment assets | Investments in associates and joint ventures | Acquisition of non-current assets | Segment liabilities |
|---|---|---|---|---|
| | In millions of won | | | |
| Transmission and distribution . . . . . . . . . . . | ₩ 106,306,250 | 4,338,888 | 5,885,919 | 53,125,589 |
| Electric power generation (Nuclear) . . . . . . . | 51,043,890 | 16,385 | 2,647,304 | 27,386,113 |
| Electric power generation (Non-nuclear) . . . . | 44,453,545 | 1,283,432 | 5,063,195 | 25,587,071 |
| Plant maintenance & engineering service . . . | 2,990,862 | 54,825 | 249,627 | 1,172,351 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,962,546 | — | 144,846 | 2,312,658 |
| Segment totals . . . . . . . . . . . . . . . . . . . . . . | 210,757,093 | 5,693,530 | 13,990,891 | 109,583,782 |
| Consolidation adjustments: | | | | |
| Elimination of inter-segment | | | | |
| amounts . . . . . . . . . . . . . . . . . . . . . . | (36,505,833) | — | 146,942 | 1,339,753 |
| Equity method adjustment . . . . . . . . . . . | 1,050,574 | — | — | — |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . | — | — | — | (3,603,808) |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . | (44,475) | — | — | (4,843) |
| | (35,499,734) | — | 146,942 | (2,268,898) |
| Consolidated totals . . . . . . . . . . . . . . . . . . . . | ₩ 175,257,359 | 5,693,530 | 14,137,833 | 107,314,884 |

| Segment | 2016 | | | |
| | Segment assets | Investments in associates and joint ventures | Acquisition of non-current assets | Segment liabilities |
|---|---|---|---|---|
| | In millions of won | | | |
| Transmission and distribution . . . . . . . . . . . | ₩ 105,321,129 | 4,121,462 | 6,345,004 | 49,854,420 |
| Electric power generation (Nuclear) . . . . . . . | 52,782,915 | 15,384 | 1,945,610 | 27,366,938 |
| Electric power generation (Non-nuclear) . . . . | 47,427,642 | 1,320,203 | 3,508,313 | 26,205,049 |
| Plant maintenance & engineering service . . . | 3,106,909 | 53,399 | 180,715 | 1,218,047 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,423,132 | — | 365,470 | 2,761,262 |
| Segment totals . . . . . . . . . . . . . . . . . . . . . . | 216,061,727 | 5,510,448 | 12,345,112 | 107,405,716 |
| Consolidation adjustments: | | | | |
| Elimination of inter-segment | | | | |
| amounts . . . . . . . . . . . . . . . . . . . . . . | (39,114,371) | — | (191,901) | (5,811,800) |
| Equity method adjustment . . . . . . . . . . . | 906,239 | — | — | — |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . | (5,830) | — | — | 4,301,404 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . | (10,723) | — | — | (1,108,823) |
| | (38,224,685) | — | (191,901) | (2,619,219) |
| Consolidated totals . . . . . . . . . . . . . . . . . . . . | ₩ 177,837,042 | 5,510,448 | 12,153,211 | 104,786,497 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**(4)  Geographic information**

The following information on revenue from external customers and non-current assets is determined by the location of the customers and of the assets:

| Geographical unit | Revenue from external customers | | | Non-current assets(*2) | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2014 | 2015 | 2016 |
| | In millions of won | | | | | |
| Domestic . . . . . . . . | ₩ 53,893,877 | 54,351,076 | 55,310,011 | 136,053,940 | 143,788,043 | 148,297,677 |
| Overseas(*1) . . . . . | 3,229,149 | 4,230,651 | 4,453,076 | 6,542,282 | 4,526,395 | 4,474,699 |
| | ₩ 57,123,026 | 58,581,727 | 59,763,087 | 142,596,222 | 148,314,438 | 152,772,376 |

(*1)  Middle East and other Asian countries make up the majority of overseas revenue and non-current assets.

(*2)  Amount excludes financial assets and deferred tax assets.

**(5)  Information on significant customers**

There is no individual customer comprising more than 10% of the Company's revenue for the years ended December 31, 2014, 2015 and 2016.

F-44

**5. Classification of Financial Instruments**

**(1) Classification of financial assets as of December 31, 2015 and 2016 are as follows:**

**2015**

| | Financial assets at fair value through profit or loss | Loans and receivables | Available-for-sale financial assets | Held-to-maturity investments | Derivative assets (using hedge accounting) | Total |
|---|---|---|---|---|---|---|
| | | | In millions of won | | | |
| **Current assets** | | | | | | |
| Cash and cash equivalents ......... ₩ | — | 3,783,065 | — | — | — | 3,783,065 |
| Current financial assets | | | | | | |
|   Held-to-maturity investments .... | — | — | — | 381 | — | 381 |
|   Derivative assets .............. | 1,498 | — | — | — | 95,759 | 97,257 |
|   Other financial assets .......... | — | 5,237,983 | — | — | — | 5,237,983 |
|   Trade and other receivables ..... | — | 7,473,548 | — | — | — | 7,473,548 |
| | 1,498 | 16,494,596 | — | 381 | 95,759 | 16,592,234 |
| **Non-current assets** | | | | | | |
| Non-current financial assets | | | | | | |
|   Available-for-sale financial assets ..................... | — | — | 584,479 | — | — | 584,479 |
|   Held-to-maturity investments .... | — | — | — | 3,242 | — | 3,242 |
|   Derivative assets .............. | 253,510 | — | — | — | 266,383 | 519,893 |
|   Other financial assets .......... | — | 1,387,940 | — | — | — | 1,387,940 |
|   Trade and other receivables ..... | — | 1,798,419 | — | — | — | 1,798,419 |
| | 253,510 | 3,186,359 | 584,479 | 3,242 | 266,383 | 4,293,973 |
| ₩ | 255,008 | 19,680,955 | 584,479 | 3,623 | 362,142 | 20,886,207 |

**2016**

| | Financial assets at fair value through profit or loss | Loans and receivables | Available-for-sale financial assets | Held-to-maturity investments | Derivative assets (using hedge accounting) | Total |
|---|---|---|---|---|---|---|
| | | | In millions of won | | | |
| **Current assets** | | | | | | |
| Cash and cash equivalents ......... ₩ | — | 3,051,353 | — | — | — | 3,051,353 |
| Current financial assets | | | | | | |
|   Held-to-maturity investments .... | — | — | — | 114 | — | 114 |
|   Derivative assets .............. | 79,709 | — | — | — | 113,574 | 193,283 |
|   Other financial assets .......... | — | 2,478,592 | — | — | — | 2,478,592 |
|   Trade and other receivables ..... | — | 7,788,876 | — | — | — | 7,788,876 |
| | 79,709 | 13,318,821 | — | 114 | 113,574 | 13,512,218 |
| **Non-current assets** | | | | | | |
| Non-current financial assets | | | | | | |
|   Available-for-sale financial assets ..................... | — | — | 1,014,732 | — | — | 1,014,732 |
|   Held-to-maturity investments .... | — | — | — | 3,130 | — | 3,130 |
|   Derivative assets .............. | 287,768 | — | — | — | 300,323 | 588,091 |
|   Other financial assets .......... | — | 1,051,541 | — | — | — | 1,051,541 |
|   Trade and other receivables ..... | — | 1,903,515 | — | — | — | 1,903,515 |
| | 287,768 | 2,955,056 | 1,014,732 | 3,130 | 300,323 | 4,561,009 |
| ₩ | 367,477 | 16,273,877 | 1,014,732 | 3,244 | 413,897 | 18,073,227 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**(2)  Classification of financial liabilities as of December 31, 2015 and 2016 are as follows:**

| | 2015 | | | |
|---|---|---|---|---|
| | Financial liabilities at fair value through profit or loss | Financial liabilities recognized at amortized cost | Derivative liabilities (using hedge accounting) | Total |
| | In millions of won | | | |
| **Current liabilities** | | | | |
| Borrowings . . . . . . . . . . . . . . . . . ₩ | — | 1,144,027 | — | 1,144,027 |
| Debt securities . . . . . . . . . . . . . . | — | 6,702,926 | — | 6,702,926 |
| Derivative liabilities . . . . . . . . . . . | 9,487 | — | 758 | 10,245 |
| Trade and other payables . . . . . . . | — | 4,735,697 | — | 4,735,697 |
| | 9,487 | 12,582,650 | 758 | 12,592,895 |
| **Non-current liabilities** | | | | |
| Borrowings . . . . . . . . . . . . . . . . . | — | 1,932,259 | — | 1,932,259 |
| Debt securities . . . . . . . . . . . . . . | — | 48,974,287 | — | 48,974,287 |
| Derivative liabilities . . . . . . . . . . . | 39,524 | — | 116,741 | 156,265 |
| Trade and other payables . . . . . . . | — | 3,718,435 | | 3,718,435 |
| | 39,524 | 54,624,981 | 116,741 | 54,781,246 |
| ₩ | 49,011 | 67,207,631 | 117,499 | 67,374,141 |

| | 2016 | | | |
|---|---|---|---|---|
| | Financial liabilities at fair value through profit or loss | Financial liabilities recognized at amortized cost | Derivative liabilities (using hedge accounting) | Total |
| | In millions of won | | | |
| **Current liabilities** | | | | |
| Borrowings . . . . . . . . . . . . . . . . . ₩ | — | 1,115,521 | — | 1,115,521 |
| Debt securities . . . . . . . . . . . . . . | — | 7,823,557 | — | 7,823,557 |
| Derivative liabilities . . . . . . . . . . . | 3,251 | — | — | 3,251 |
| Trade and other payables . . . . . . . | — | 5,585,411 | — | 5,585,411 |
| | 3,251 | 14,524,489 | | 14,527,740 |
| **Non-current liabilities** | | | | |
| Borrowings . . . . . . . . . . . . . . . . . | — | 1,773,891 | — | 1,773,891 |
| Debt securities . . . . . . . . . . . . . . | — | 42,926,236 | — | 42,926,236 |
| Derivative liabilities . . . . . . . . . . . | 18,278 | — | 117,157 | 135,435 |
| Trade and other payables . . . . . . . | — | 3,558,175 | — | 3,558,175 |
| | 18,278 | 48,258,302 | 117,157 | 48,393,737 |
| ₩ | 21,529 | 62,782,791 | 117,157 | 62,921,477 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(3)  **Classification of comprehensive income (loss) from financial instruments for the years ended December 31, 2014, 2015 and 2016 are as follows:**

| | | | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| | | | In millions of won | | |
| Cash and cash equivalents . . . . . . . . . . . . | Interest income | ₩ | 56,384 | 54,687 | 61,380 |
| Available-for-sale financial assets . . . . . . | Dividends income | | 14,193 | 14,069 | 9,446 |
| | Impairment loss on available-for-sale financial assets | | (79,618) | (84,370) | (86,703) |
| | Gain (loss) on disposal of available-for-sale financial assets | | 95,365 | (3,004) | 1,473 |
| | Interest income | | 382 | 29 | — |
| Held-to-maturity investments . . . . . . . . . | Interest income | | 89 | 99 | 97 |
| Loans and receivables . . . . . . . . . . . . . . | Interest income | | 29,507 | 28,586 | 25,106 |
| Trade and other receivables . . . . . . . . . . | Interest income | | 99,680 | 100,771 | 102,237 |
| Short-term financial instruments . . . . . . . | Interest income | | 5,199 | 46,921 | 45,763 |
| Long-term financial instruments . . . . . . . | Interest income | | 215 | 10,492 | 7,195 |
| Financial assets at fair value through profit or loss . . . . . . . . . . . . . . . . . . . . . | Gain on valuation of derivatives | | 59,164 | 220,285 | 113,671 |
| | Gain (loss) on transaction of derivatives | | (24,746) | 8,605 | (8,039) |
| Derivative assets (using hedge accounting) . . . . . . . . . . | Gain on valuation of derivatives (profit or loss) | | 88,809 | 244,020 | 145,458 |
| | Gain (loss) on valuation of derivatives (equity, before tax)(*) | | (60,284) | (12,572) | 50,047 |
| | Gain (loss) on transaction of derivatives | | 818 | 2,818 | (13,994) |
| Financial liabilities carried at amortized cost . . . . . . . . . . . . . . . . . . . . . . . . . . | Interest expense of borrowings and debt securities | | (1,664,682) | (1,392,477) | (1,202,065) |
| | Loss on retirement of financial liabilities | | (199) | (33) | (23,000) |
| | Interest expense of trade and other payables | | (98,407) | (84,527) | (68,375) |
| | Interest expense of others | | (588,535) | (538,680) | (482,428) |
| | Loss on foreign currency transactions and translations | | (271,953) | (708,178) | (290,485) |
| Financial liabilities at fair value through profit or loss . . . . . . . . . . . . . . . . . . . . . | Gain on valuation of derivatives | | 10,494 | 35,312 | 23,225 |
| | Gain (loss) on transaction of derivatives | | (38,909) | 107,454 | 17,045 |
| Derivative liabilities (using hedge accounting) . . . . . . . . . . | Gain on valuation of derivatives (profit or loss) | | 51,788 | 93,914 | 5,714 |
| | Gain (loss) on valuation of derivatives (equity, before tax)(*) | | (76,013) | 9,728 | (3,297) |
| | Loss on transaction of derivatives | | (4,180) | (4,288) | (51,450) |

(*)  Items are included in other comprehensive income or loss. All other income and gain amounts listed above are included in finance income, and all expense and losses listed above are included in finance expenses in the consolidated statements of comprehensive income or loss.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**6.    Restricted Deposits**

Restricted deposits as of December 31, 2015 and 2016 are as follows:

|  |  |  | 2015 | 2016 |
|---|---|---|---|---|
|  |  |  | In millions of won | |
| Cash and cash equivalents . . . . . . . . . . | Escrow accounts | ₩ | 4,828 | 91 |
|  | Deposits for government project |  | 5,839 | 16,457 |
|  | Collateral provided for borrowings |  | 6,839 | 80,327 |
|  | Collateral provided for lawsuit |  | 641 | 241 |
|  | Deposits for transmission regional support program |  | 204 | 2,137 |
|  | Pledge |  | 740 | — |
| Non-current available-for-sale financial asset . . . . . . . . . . . . . . . . . . . . . . . . . | Decommissioning costs of nuclear power plants |  | — | 437,015 |
| Short-term financial instruments . . . . . . | Bidding guarantees |  | — | 118 |
|  | Restriction on withdrawal related to 'win-win growth program' for small and medium enterprises |  | 18,000 | 33,000 |
| Other current receivables . . . . . . . . . . . . | Deposit for lawsuit |  | — | 16,000 |
| Long-term financial instruments . . . . . . | Guarantee deposits for checking account |  | 2 | 2 |
|  | Guarantee deposits for banking accounts at oversea branches |  | 333 | 342 |
|  | Decommissioning costs of nuclear power plants |  | 652,700 | 214,121 |
|  | Collateral provided for borrowings |  | 20 | — |
|  | Funds for developing small and medium enterprises(*1) |  | 100,000 | 200,000 |
|  |  | ₩ | 790,146 | 999,851 |

(*1) Deposits for small and medium enterprise at IBK for construction of Bitgaram Energy Valley and support for the high potential businesses as of December 31, 2016.

**7.    Cash and Cash Equivalents**

Cash and cash equivalents as of December 31, 2015 and 2016 are as follows:

|  | 2015 | 2016 |
|---|---|---|
|  | In millions of won | |
| Cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩    109 | 119 |
| Other demand deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,309,396 | 1,725,785 |
| Short-term deposits classified as cash equivalents . . . . . . . . . . . . . . . . . . . . . . | 374,575 | 120,594 |
| Short-term investments classified as cash equivalents . . . . . . . . . . . . . . . . . . . . | 2,098,985 | 1,204,855 |
|  | ₩ 3,783,065 | 3,051,353 |

F-48

8.  **Trade and Other Receivables**

(1)  **Trade and other receivables as of December 31, 2015 and 2016 are as follows:**

| | 2015 | | | |
|---|---|---|---|---|
| | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | In millions of won | | | |
| **Current assets** | | | | |
| Trade receivables . . . . . . . . . . . ₩ | 6,862,762 | (51,956) | (14) | 6,810,792 |
| Other receivables . . . . . . . . . . | 718,717 | (52,778) | (3,183) | 662,756 |
| | 7,581,479 | (104,734) | (3,197) | 7,473,548 |
| **Non-current assets** | | | | |
| Trade receivables . . . . . . . . . . | 447,010 | — | — | 447,010 |
| Other receivables . . . . . . . . . . | 1,396,107 | (38,968) | (5,730) | 1,351,409 |
| | 1,843,117 | (38,968) | (5,730) | 1,798,419 |
| ₩ | 9,424,596 | (143,702) | (8,927) | 9,271,967 |

| | 2016 | | | |
|---|---|---|---|---|
| | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
| | In millions of won | | | |
| **Current assets** | | | | |
| Trade receivables . . . . . . . . . . . ₩ | 7,260,227 | (71,985) | — | 7,188,242 |
| Other receivables . . . . . . . . . . | 652,782 | (50,071) | (2,077) | 600,634 |
| | 7,913,009 | (122,056) | (2,077) | 7,788,876 |
| **Non-current assets** | | | | |
| Trade receivables . . . . . . . . . . | 491,509 | — | — | 491,509 |
| Other receivables . . . . . . . . . . | 1,455,860 | (37,590) | (6,264) | 1,412,006 |
| | 1,947,369 | (37,590) | (6,264) | 1,903,515 |
| ₩ | 9,860,378 | (159,646) | (8,341) | 9,692,391 |

F-49

**(2)  Other receivables as of December 31, 2015 and 2016 are as follows:**

|  | 2015 | | | |
|---|---|---|---|---|
|  | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
|  | In millions of won | | | |
| **Current assets** | | | | |
| Non-trade receivables ................ ₩ | 330,669 | (52,778) | — | 277,891 |
| Accrued income ..................... | 88,256 | — | — | 88,256 |
| Deposits .......................... | 235,745 | — | (3,183) | 232,562 |
| Finance lease receivables ............. | 12,098 | — | — | 12,098 |
| Others ............................ | 51,949 | — | — | 51,949 |
|  | 718,717 | (52,778) | (3,183) | 662,756 |
| **Non-current assets** | | | | |
| Non-trade receivables ................ | 93,782 | (31,829) | — | 61,953 |
| Accrued income ..................... | 582 | — | — | 582 |
| Deposits .......................... | 256,745 | — | (5,730) | 251,015 |
| Finance lease receivables ............. | 941,710 | — | — | 941,710 |
| Others ............................ | 103,288 | (7,139) | — | 96,149 |
|  | 1,396,107 | (38,968) | (5,730) | 1,351,409 |
|  | ₩ 2,114,824 | (91,746) | (8,913) | 2,014,165 |

|  | 2016 | | | |
|---|---|---|---|---|
|  | Gross amount | Allowance for doubtful accounts | Present value discount | Book value |
|  | In millions of won | | | |
| **Current assets** | | | | |
| Non-trade receivables ............. ₩ | 360,021 | (50,071) | — | 309,950 |
| Accrued income ................... | 62,063 | — | — | 62,063 |
| Deposits ......................... | 193,720 | — | (2,077) | 191,643 |
| Finance lease receivables ............ | 12,225 | — | — | 12,225 |
| Others ........................... | 24,753 | — | — | 24,753 |
|  | 652,782 | (50,071) | (2,077) | 600,634 |
| **Non-current assets** | | | | |
| Non-trade receivables ............. | 80,393 | (26,942) | — | 53,451 |
| Accrued income ................... | 174 | — | — | 174 |
| Deposits ......................... | 320,935 | — | (6,264) | 314,671 |
| Finance lease receivables ............ | 960,649 | — | — | 960,649 |
| Others ........................... | 93,709 | (10,648) | — | 83,061 |
|  | 1,455,860 | (37,590) | (6,264) | 1,412,006 |
|  | ₩ 2,108,642 | (87,661) | (8,913) | 2,012,640 |

**(3)**  Trade and other receivables are classified as loans and receivables, and are measured using the effective interest method. No interest is accrued for trade receivables related to electricity for the duration between the billing date and the payment due dates. But once trade receivables are overdue, the Company imposes a monthly interest rate of 1.5% on the overdue trade receivables. The Company holds deposits of three months' expected electricity usage for customers requesting temporary usage and customers with past defaulted payments.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(4)    **Aging analysis of trade receivables as of December 31, 2015 and 2016 are as follows:**

|  | 2015 | 2016 |
|---|---|---|
|  | **In millions of won** | |
| Trade receivables: (not overdue, not impaired) . . . . . . | ₩ 7,198,403 | 7,592,363 |
| Trade receivables: (overdue, not impaired) . . . . . . . . | 891 | 820 |
| Less than 60 days . . . . . . . . . . . . . . . . . . . . . . . | 891 | 820 |
| Trade receivables: (impairment reviewed) . . . . . . . . . | 110,478 | 158,553 |
| 60 ~ 90 days . . . . . . . . . . . . . . . . . . . . . . . . . . | 31,973 | 44,277 |
| 90 ~ 120 days . . . . . . . . . . . . . . . . . . . . . . . . . | 11,010 | 18,917 |
| 120 days ~ 1 year . . . . . . . . . . . . . . . . . . . . . . . | 35,097 | 42,534 |
| Over 1 year . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32,398 | 52,825 |
|  | 7,309,772 | 7,751,736 |
| Less: allowance for doubtful accounts . . . . . . . . . . . . | (51,956) | (71,985) |
| Less: present value discount . . . . . . . . . . . . . . . . . . . | (14) | — |
|  | ₩ 7,257,802 | 7,679,751 |

The Company assesses at the end of each reporting period whether there is any objective evidence that trade receivables are impaired, and provides allowances for doubtful accounts which includes impairment for trade receivables that are individually significant. The Company considers receivables as overdue if the receivables are outstanding 60 days after the maturity and sets an allowance based on past experience of collection.

(5)    **Aging analysis of other receivables as of December 31, 2015 and 2016 are as follows:**

|  | 2015 | 2016 |
|---|---|---|
|  | **In millions of won** | |
| Other receivables: (not overdue, not impaired) . . . . . . | ₩ 1,918,132 | 1,887,620 |
| Other receivables: (overdue, not impaired) . . . . . . . . | 20,249 | 46,887 |
| Less than 60 days . . . . . . . . . . . . . . . . . . . . . . . | 20,249 | 46,887 |
| Other receivables: (impairment reviewed) . . . . . . . . . | 176,443 | 174,135 |
| 60 ~ 90 days . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,409 | 7,352 |
| 90 ~ 120 days . . . . . . . . . . . . . . . . . . . . . . . . . | 10,097 | 2,160 |
| 120 days ~ 1 year . . . . . . . . . . . . . . . . . . . . . . . | 21,433 | 17,613 |
| Over 1 year . . . . . . . . . . . . . . . . . . . . . . . . . . . | 142,504 | 147,010 |
|  | 2,114,824 | 2,108,642 |
| Less: allowance for doubtful accounts . . . . . . . . . . . . | (91,746) | (87,661) |
| Less: present value discount . . . . . . . . . . . . . . . . . . . | (8,913) | (8,341) |
|  | ₩ 2,014,165 | 2,012,640 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(6) **Changes in the allowance for doubtful accounts for the years ended December 31, 2014, 2015 and 2016 are as follows:**

| | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|
| | Trade receivables | Other receivables | Trade receivables | Other receivables | Trade receivables | Other receivables |
| | | | In millions of won | | | |
| Beginning balance ............ ₩ | 65,024 | 69,887 | 80,644 | 67,932 | 51,956 | 91,746 |
| Bad debt expense ........... | 39,018 | 15,981 | 1,308 | 18,473 | 38,719 | 233 |
| Write-off .................. | (23,398) | (7,534) | (28,978) | (888) | (18,939) | (928) |
| Reversal .................. | — | (241) | (1,018) | (413) | — | (5,489) |
| Others .................... | — | (10,161) | — | 6,642 | 249 | 2,099 |
| Ending balance .............. ₩ | 80,644 | 67,932 | 51,956 | 91,746 | 71,985 | 87,661 |

9. **Available-for-sale Financial Assets**

(1) **Changes in available-for-sale financial assets for the years ended December 31, 2015 and 2016 are as follows:**

| | 2015 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Disposal | Valuation | Impairment | Others | Ending Balance |
| | | | | In millions of won | | | |
| **Listed:** | | | | | | | |
| Korea District Heating Corp............ ₩ | 127,241 | — | — | 3,169 | — | — | 130,410 |
| Kwanglim Co., Ltd. .................. | 128 | — | — | 134 | — | — | 262 |
| Ssangyong Motor Co., Ltd. ............. | 357 | — | — | (58) | — | — | 299 |
| Sungjee Construction. Co., Ltd. ......... | 5 | — | — | — | — | — | 5 |
| Korea Line Corp. .................... | — | — | — | — | — | — | — |
| Namkwang Engineering & Construction Co., Ltd. .......................... | 2 | — | — | (3) | — | 2 | 1 |
| Pumyang Construction Co., Ltd. ......... | — | — | — | — | — | — | — |
| ELCOMTEC Co., Ltd. ................ | 48 | — | — | 5 | — | — | 53 |
| PAN ocean Co., Ltd. ................. | 5 | — | — | 1 | — | — | 6 |
| Borneo International Furniture Co., Ltd. ... | 4 | — | — | 7 | — | 92 | 103 |
| TONGYANG Inc. .................... | 66 | — | — | 140 | — | 11 | 217 |
| TONGYANG networks Inc. ............. | 3 | — | — | 3 | — | — | 6 |
| Nexolon Co., Ltd. ................... | — | — | — | 59 | — | 3,137 | 3,196 |
| PT Adaro Energy Tbk ................. | 44,109 | — | — | (23,097) | (23,206) | 23,206 | 21,012 |
| Energy Fuels Inc. .................... | 11,568 | — | — | (4,866) | (9,391) | 8,615 | 5,926 |
| Baralaba Coal Company Limited (formerly, Cockatoo Coal Limited) ............. | 628 | — | — | (572) | (572) | 558 | 42 |
| Denison Mines Corp. ................. | 62,339 | — | — | (22,187) | (20,154) | 14,459 | 34,457 |
| Fission 3.0(*1) ..................... | 61 | — | (57) | 11 | — | 15 | 30 |
| Fission Uranium Corp. ............... | 651 | — | — | (28) | — | (69) | 554 |
| | 247,215 | — | (57) | (47,282) | (53,323) | 50,026 | 196,579 |
| **Unlisted:** | | | | | | | |
| K&C—Gyeongnam youth job creation Investment Fund(*1) ............... | 1,340 | — | (133) | — | — | — | 1,207 |
| Hanwha Electric Power Venture Fund(*1) ......................... | 1,804 | — | (1,804) | — | — | — | — |
| Korea Investment—Korea EXIM Bank CERs Private Special Asset Investment Trust I(*1) ...................... | 4,752 | — | (3,000) | — | (1,181) | — | 571 |

F-52

|  | 2015 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | Beginning balance | Acquisition | Disposal | Valuation | Impairment | Others | Ending Balance |
|  | In millions of won | | | | | | |
| Troika Overseas Resource Development Private Equity Firm | ₩ 13,340 | — | — | — | (11,787) | — | 1,553 |
| IBK-AUCTUS Green Growth Private Equity firm(*1) | 2,325 | — | (1,470) | — | — | — | 855 |
| Global Dynasty Overseas Resource Development Private Equity Firm | 2,233 | — | — | — | — | — | 2,233 |
| Intellectual Discovery, Ltd. | 5,000 | — | — | — | (3,625) | — | 1,375 |
| Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1(*1) | 498 | 802 | (231) | — | — | — | 1,069 |
| Construction Guarantee | 795 | — | — | 10 | — | — | 805 |
| Plant & Mechanical Contractors Financial Cooperative of Korea | 36 | — | — | — | — | — | 36 |
| Fire Guarantee | 20 | — | — | — | — | — | 20 |
| Korea Software Financial Cooperative | 301 | — | — | — | — | — | 301 |
| Engineering Financial Cooperative | 60 | — | — | — | — | — | 60 |
| Electric Contractors Financial Cooperative | 152 | — | — | — | — | — | 152 |
| Korea Specialty Contractor Financial Cooperative | 417 | — | — | — | — | — | 417 |
| Information & Communication Financial Cooperative | 10 | — | — | — | — | — | 10 |
| Korea Electric Engineers Association | 40 | — | — | — | — | — | 40 |
| Hwan Young Steel Co., Ltd. | 97 | — | — | — | — | — | 97 |
| Woobang ENC Co., Ltd | 22 | — | — | — | — | — | 22 |
| Dongnam Co., Ltd. | 72 | — | — | — | — | — | 72 |
| SAMBO AUTO. Co., Ltd. | 38 | — | — | — | — | — | 38 |
| Mobo Co., Ltd. | 14 | — | — | — | — | — | 14 |
| Poonglim Industrial Co., Ltd. | 78 | — | — | — | — | 15 | 93 |
| HANKOOK Silicon Co., Ltd. | 7,513 | — | — | — | — | — | 7,513 |
| Kun Young Engineering & Construction Co., Ltd. | 5 | — | — | — | — | — | 5 |
| Pumyang Asset Management Co., Ltd. | 3 | — | — | — | — | — | 3 |
| Dae Kwang Semiconductor Co., Ltd. | 6 | — | — | — | — | — | 6 |
| Sanbon Department Store | 124 | — | — | — | (121) | — | 3 |
| Woori Ascon Co., Ltd. | 10 | — | — | — | — | — | 10 |
| Miju Steel Mfg. Co., Ltd. | 51 | — | — | — | — | — | 51 |
| BnB Sungwon Co., Ltd. | 15 | — | — | — | — | — | 15 |
| Hana Civil Engineering Co., Ltd. | 1 | — | — | — | — | — | 1 |
| KC Development Co., Ltd. | 6 | — | — | — | — | — | 6 |
| IMHWA Corp. | 5 | — | — | — | — | — | 5 |
| IXELON Co., Ltd. | 23 | — | — | — | (23) | — | — |
| DAIM Special Vehicle Co., Ltd. | 10 | — | — | — | — | — | 10 |
| ASA KIMJE Co., Ltd. | 465 | — | — | — | (465) | — | — |
| ASA JEONJU Co., Ltd. | 697 | — | — | — | (628) | — | 69 |
| KYUNGWON Co., Ltd. | 14 | — | — | — | — | — | 14 |
| Moonkyung Silica Co., Ltd. | — | — | — | — | — | — | — |
| Yousung Remicon Co., Ltd. | 4 | — | — | — | — | — | 4 |
| Sungkwang Timber Co., Ltd. | 4 | — | — | — | — | — | 4 |
| Yongbo Co., Ltd. | 3 | — | — | — | — | — | 3 |
| HJ Steel Co., Ltd. | — | — | — | — | — | 2 | 2 |
| Ildong Air Conditioning Co., Ltd. | — | — | — | — | (2) | 2 | — |

F-53

|  | 2015 | | | | | | |
|---|---|---|---|---|---|---|---|
|  | Beginning balance | Acquisition | Disposal | Valuation | Impairment | Others | Ending Balance |
|  | In millions of won | | | | | | |
| KS Remicon Co., Ltd. . . . . . . . . . . . . . . . . ₩ | — | — | — | — | — | 3 | 3 |
| Sewoong Heavy Industries Co., Ltd. . . . . . . | — | — | — | — | — | 40 | 40 |
| SIN-E Steel Co., Ltd. . . . . . . . . . . . . . . . . . | — | — | — | — | — | 33 | 33 |
| Joongang Platec Co., Ltd. . . . . . . . . . . . . . | — | — | — | — | — | 72 | 72 |
| Hangjin Steel Co., Ltd. . . . . . . . . . . . . . . . | — | — | — | — | (116) | 116 | — |
| Pyungsan SI Ltd. . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 9 | 9 |
| Samgong Development Co., Ltd. . . . . . . . . | — | — | — | — | — | 7 | 7 |
| Joongang Development Co., Ltd. . . . . . . . . | — | — | — | — | — | 8 | 8 |
| AJS Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 32 | 32 |
| SHIN-E B&P Co., Ltd. . . . . . . . . . . . . . . . . | — | — | — | — | — | 10 | 10 |
| MSE Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 9 | 9 |
| Ilrim Nano Tec Co., Ltd. . . . . . . . . . . . . . . | — | — | — | — | — | 15 | 15 |
| Kwang Myeong Electronics Technology Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 11 | 11 |
| Youngjin Hi-Tech Co., Ltd. . . . . . . . . . . . . | — | — | — | — | (105) | 126 | 21 |
| Dong Woo International Co., Ltd. . . . . . . . . | — | — | — | — | — | 18 | 18 |
| Bench Mark Construction Co., Ltd. . . . . . . | — | — | — | — | — | — | — |
| Buyoung Co., Ltd. . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 3 | 3 |
| Ilsuk Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 10 | 10 |
| Dongyang Telecom Co., Ltd. . . . . . . . . . . . | — | — | — | — | — | 11 | 11 |
| Han Young Construction Co., Ltd. . . . . . . . | — | — | — | — | — | 3 | 3 |
| Jongwon Remicon Co., Ltd. . . . . . . . . . . . . | — | — | — | — | — | 13 | 13 |
| Ace Heat Treating Co., Ltd. . . . . . . . . . . . . | — | — | — | — | — | 72 | 72 |
| Zyle Daewoo Motor Sales Co., Ltd. . . . . . . | — | — | — | — | — | — | — |
| Daewoo Development Co., Ltd. . . . . . . . . . | — | — | — | — | — | — | — |
| Daewoo Songdo Development Co., Ltd. . . . | — | — | — | — | (2) | 2 | — |
| Seyang Inc. . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 27 | 27 |
| Seungri Enterprise Co., Ltd. . . . . . . . . . . . . | — | — | — | — | — | 3 | 3 |
| Onggane Food Co., Ltd . . . . . . . . . . . . . . . | — | — | — | — | — | 1 | 1 |
| Shin-E P&C Co., Ltd. . . . . . . . . . . . . . . . . . | — | — | — | — | — | 1 | 1 |
| Montista Telecom Co., Ltd. . . . . . . . . . . . . | — | — | — | — | (3) | 3 | — |
| Ejung Ad Co., Ltd. . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 3 | 3 |
| Solvus Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 3 | 3 |
| Myung Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 2 | 2 |
| Emotion Co., Ltd. . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 8 | 8 |
| Youngdong Concrete Co., Ltd. . . . . . . . . . . | — | — | — | — | — | 7 | 7 |
| Shinil Engineering Co., Ltd. . . . . . . . . . . . . | — | — | — | — | — | 3 | 3 |
| Korea Castiron Industrial Co., Ltd. . . . . . . . | — | — | — | — | — | 22 | 22 |
| FFG DMC Co., Ltd. . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 17 | 17 |
| Daeseong Metal Co., Ltd. . . . . . . . . . . . . . . | — | — | — | — | — | 47 | 47 |
| Biwang Industry Co., Ltd . . . . . . . . . . . . . . | — | — | — | — | — | 2 | 2 |
| Huimun Co., Ltd. . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 4 | 4 |
| Sunun IT F Co., Ltd. . . . . . . . . . . . . . . . . . | — | — | — | — | — | 8 | 8 |
| Young Sung Co., Ltd. . . . . . . . . . . . . . . . . . | — | — | — | — | — | 27 | 27 |
| Yuil Industrial Electronics Co., Ltd. . . . . . . | — | — | — | — | — | 16 | 16 |
| DN TEK Inc. . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | 62 | 62 |
| Daeyang F.M.S Corporation . . . . . . . . . . . . | — | — | — | — | — | 3 | 3 |
| Kwang Jin Structure Co., Ltd. . . . . . . . . . . . | — | — | — | — | — | 31 | 31 |
| Woojin Industry Corporation . . . . . . . . . . . | — | — | — | — | — | 16 | 16 |
| Kwang Sung Industry Co., Ltd. . . . . . . . . . . | — | — | — | — | — | 7 | 7 |
| Matsaeng Food Co., Ltd. . . . . . . . . . . . . . . | — | — | — | — | — | 6 | 6 |
| Futech Mold Co., Ltd. . . . . . . . . . . . . . . . . | — | — | — | — | — | 14 | 14 |
| Samcheonri Industrial Co., Ltd. . . . . . . . . | — | — | — | — | — | 13 | 13 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| | 2015 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Disposal | Valuation | Impairment | Others | Ending Balance |
| | | | In millions of won | | | | |
| Woojoo Environment Ind. Co., Ltd. ...... ₩ | — | — | — | — | — | 13 | 13 |
| Cheongatti Co., Ltd. .................. | — | — | — | — | — | 4 | 4 |
| Hyungji Esquire Co., Ltd. ............. | — | — | — | — | — | 21 | 21 |
| Kolmar Pharma Co., Ltd. ............. | — | — | — | — | — | 52 | 52 |
| Morado Co., Ltd. .................... | — | — | — | — | — | 2 | 2 |
| Myung Sung Tex Co., Ltd. ........... | — | — | — | — | — | 2 | 2 |
| Areva nc Expansion ................ | 227,876 | — | — | — | — | (57,758) | 170,118 |
| Navanakorn Electric Co., Ltd. ......... | 16,836 | — | — | — | — | 1,115 | 17,951 |
| PT. Kedap Saayq ................... | 12,989 | — | — | — | (12,989) | — | — |
| Set Holding ........................ | 167,832 | — | — | 11,753 | — | — | 179,585 |
| PT. Cirebon Energi Prasarana .......... | — | 635 | — | — | — | — | 635 |
| | 467,936 | 1,437 | (6,638) | 11,763 | (31,047) | (55,551) | 387,900 |
| ₩ | 715,151 | 1,437 | (6,695) | (35,519) | (84,370) | (5,525) | 584,479 |

(*1) The Company recognized gain and loss on disposal of available-for-sale financial assets amounting to ₩4 million and ₩3,008 million, respectively, from the sales of shares of Fission 3.0. K&C- Gyeongnam Youth Job Creation Investment Fund, Korea Investment—Korea EXIM Bank CERs Private Special Asset Investment Trust 1, IBK-AUCTUS Green Growth Private Equity Firm and others and from the liquidation of Hanwha Electric Power Venture fund for the year ended December 31, 2015.

| | 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Beginning balance | Acquisition | Disposal | Valuation | Impairment | Others | Ending balance |
| | | | In millions of won | | | | |
| **Listed:** | | | | | | | |
| Korea District Heating Corp. ........... ₩ | 130,410 | — | — | 23,773 | — | — | 154,183 |
| Kwanglim Co., Ltd.(*1) ................ | 262 | — | (214) | 598 | — | (646) | — |
| Ssangyong Motor Co., Ltd. ............ | 299 | — | — | 5 | — | — | 304 |
| Sungjee Construction. Co., Ltd. ......... | 5 | — | — | 16 | — | — | 21 |
| Korea Line Corp. .................... | — | — | — | — | — | — | — |
| Namkwang Engineering & Construction Co., Ltd. ........................... | 1 | — | — | (1) | — | — | — |
| Pumyang Construction Co., Ltd. ........ | — | — | — | — | — | — | — |
| ELCOMTEC Co., Ltd. ................ | 53 | — | — | 21 | — | — | 74 |
| PAN ocean Co., Ltd. ................ | 6 | — | — | 1 | — | — | 7 |
| Borneo International Furniture Co., Ltd. ................................ | 103 | — | — | — | — | — | 103 |
| TONGYANG Inc.(*1) ................ | 217 | — | (44) | 25 | — | (198) | — |
| TONGYANG networks Inc.(*1) ........ | 6 | — | (3) | — | — | (3) | — |
| Nexolon Co., Ltd.(*1) ................ | 3,196 | — | (3,137) | 569 | — | (628) | — |
| Dongbu Corporation, ................ | — | — | — | — | — | 12 | 12 |
| PT Adaro Energy Tbk ................ | 21,012 | — | — | 52,049 | — | — | 73,061 |
| Energy Fuels Inc. ................... | 5,926 | — | — | (2,775) | (3,273) | 3,507 | 3,385 |
| Baralaba Coal Company Limited (formerly, Cockatoo Coal Limited) .... | 42 | — | — | — | — | — | 42 |
| Denison Mines Corp. ................. | 34,457 | — | — | — | (5,849) | 7,896 | 36,504 |
| Fission 3.0 ......................... | 30 | — | — | (16) | — | 2 | 16 |
| Fission Uranium Corp. ................ | 554 | — | — | (126) | — | 31 | 459 |
| | 196,579 | — | (3,398) | 74,139 | (9,122) | 9,973 | 268,171 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| | Beginning balance | Acquisition | Disposal | Valuation | Impairment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | | 2016 | | | |
| | | | In millions of won | | | | |
| **Unlisted:** | | | | | | | |
| K&C—Gyeongnam youth job creation Investment Fund ................ ₩ | 1,207 | — | — | — | — | — | 1,207 |
| Korea investment—Korea EXIM Bank CERs Private Special Asset Investment Trust I ......................... | 571 | — | — | — | — | — | 571 |
| Troika Overseas Resource Development Private Equity Firm ............... | 1,553 | — | — | — | — | — | 1,553 |
| IBK-AUCTUS Green Growth Private Equity firm(*1) ................... | 855 | — | (814) | — | — | — | 41 |
| Global Dynasty Overseas Resource Development Private Equity Firm ..... | 2,233 | — | — | — | — | — | 2,233 |
| Intellectual Discovery, Ltd. ........... | 1,375 | — | — | — | — | — | 1,375 |
| Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1(*1) ..................... | 1,069 | 3,685 | (365) | — | — | — | 4,389 |
| Construction Guarantee ............... | 805 | — | — | 14 | — | — | 819 |
| Plant & Mechanical Contractors Financial Cooperative of Korea ............... | 36 | — | — | — | — | — | 36 |
| Fire Guarantee ..................... | 20 | — | — | — | — | — | 20 |
| Korea Software Financial Cooperative ... | 301 | 3,000 | — | — | — | — | 3,301 |
| Engineering Financial Cooperative ...... | 60 | — | — | — | — | — | 60 |
| Electric Contractors Financial Cooperative ...................... | 152 | — | — | — | — | — | 152 |
| Korea Specialty Contractor Financial Cooperative ...................... | 417 | — | — | — | — | — | 417 |
| Information & Communication Financial Cooperative ...................... | 10 | — | — | — | — | — | 10 |
| Korea Electric Engineers Association .... | 40 | — | — | — | — | — | 40 |
| Korea investment—Investment Pool for Public funds 10 ................... | — | 142,470 | — | (1,155) | — | — | 141,315 |
| Samsung investment—Investment Pool for Public funds 2 .................... | — | 213,710 | — | (1,790) | — | — | 211,920 |
| Samsung investment—Investment Pool for Public funds 1 .................... | — | 53,220 | — | (8) | — | — | 53,212 |
| Korea investment—Hanwha KT Mater Lease Private Special Investment Trust(*1) ...................... | — | 31,200 | (640) | 8 | — | — | 30,568 |
| Onggane Food Co., Ltd. ............... | 1 | — | — | — | — | — | 1 |
| Shin-E P&C Co., Ltd. ................ | 1 | — | — | — | — | — | 1 |
| Ejung Ad Co., Ltd. .................... | 3 | — | — | — | — | — | 3 |
| Solvus Co., Ltd. ..................... | 3 | — | — | — | — | — | 3 |
| Myung Co., Ltd. ..................... | 2 | — | — | — | — | — | 2 |
| Emotion Co., Ltd. .................... | 8 | — | — | — | — | — | 8 |
| Youngdong Concrete Co., Ltd. ......... | 7 | — | — | — | — | — | 7 |
| Shinil Engineering Co., Ltd. .......... | 3 | — | — | — | — | — | 3 |
| Korea Castiron Industrial Co., Ltd. ...... | 22 | — | — | — | (22) | — | — |
| FFG DMC Co., Ltd. .................. | 17 | — | — | — | (68) | 51 | — |
| Daeseong Metal Co., Ltd. ............. | 47 | — | — | — | — | (47) | — |
| Biwang Industry Co., Ltd .............. | 2 | — | — | — | — | — | 2 |
| Huimun Co., Ltd. .................... | 4 | — | — | — | — | — | 4 |
| Sunun IT F Co., Ltd. ................. | 8 | — | — | — | — | (8) | — |

F-56

| | Beginning balance | Acquisition | Disposal | Valuation | Impairment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | |
| Young Sung Co., Ltd. ................. W | 27 | — | — | — | — | — | 27 |
| Yuil Industrial Electronics Co., Ltd. ...... | 16 | — | — | — | — | — | 16 |
| DN TEK Inc. ....................... | 62 | — | — | — | (56) | — | 6 |
| Daeyang F.M.S Corporation ........... | 3 | — | — | — | — | 20 | 23 |
| Kwang Jin Structure Co., Ltd. .......... | 31 | — | — | — | — | — | 31 |
| Woojin Industry Corporation ........... | 16 | — | — | — | — | — | 16 |
| Kwang Sung Industry Co., Ltd. ......... | 7 | — | — | — | — | — | 7 |
| Matsaeng Food Co., Ltd. ............. | 6 | — | — | — | — | (6) | — |
| Futech Mold Co., Ltd. ................ | 14 | — | — | — | — | — | 14 |
| Samcheonri Industrial Co., Ltd. ........ | 13 | — | — | — | — | — | 13 |
| Woojoo Environment Ind. Co., Ltd. ...... | 13 | — | — | — | — | — | 13 |
| Cheongatti Co., Ltd. ................. | 4 | — | — | — | — | — | 4 |
| Hyungji Esquire Co., Ltd. ............. | 21 | — | — | — | — | 1 | 22 |
| Kolmar Pharma Co., Ltd. ............. | 52 | — | — | — | (49) | — | 3 |
| Morado Co., Ltd. ................... | 2 | — | — | — | — | — | 2 |
| Myung Sung Tex Co., Ltd. ........... | 2 | — | — | — | — | — | 2 |
| Kwang Sung Co., Ltd. ............... | — | — | — | — | — | 31 | 31 |
| EverTechno. Co.,Ltd. ................ | — | — | — | — | (140) | 147 | 7 |
| Autowel Co.,Ltd. ................... | — | — | — | — | — | 13 | 13 |
| Woobang Construction Co., Ltd. ........ | — | — | — | — | — | 8 | 8 |
| Shin Pyung Co., Ltd. ................ | — | — | — | — | — | 3 | 3 |
| JMC Heavy Industries Co., Ltd. ........ | — | — | — | — | — | 27 | 27 |
| Najin Steel Co., Ltd. ................ | — | — | — | — | — | 5 | 5 |
| Kunyang Food Co., Ltd. .............. | — | — | — | — | (1) | 1 | — |
| Sinkwang Industry Co., Ltd. ........... | — | — | — | — | — | 5 | 5 |
| Join Land Co., Ltd. ................. | — | — | — | — | — | 1 | 1 |
| Crystal Co., Ltd. ................... | — | — | — | — | — | 2 | 2 |
| Elephant & Friends Co., Ltd. ........... | — | — | — | — | — | 3 | 3 |
| Mireco Co., Ltd. ................... | — | — | — | — | — | 11 | 11 |
| L&K Industry Co., Ltd. ............... | — | — | — | — | — | 24 | 24 |
| JO Tech Co., Ltd. .................. | — | — | — | — | — | 25 | 25 |
| Samwoo EMC Co., Ltd. .............. | — | — | — | — | (117) | 117 | — |
| Kendae Printing Co., Ltd. ............. | — | — | — | — | — | 21 | 21 |
| Golden Tech Co., Ltd. ............... | — | — | — | — | (114) | 114 | — |
| Dauning Co., Ltd. .................. | — | — | — | — | — | 6 | 6 |
| Korea Trecision Co., Ltd. ............. | — | — | — | — | — | 5 | 5 |
| Buhmwoo Chemical Corp. ............. | — | — | — | — | (20) | 20 | — |
| Ace Track Co., Ltd. ................. | — | — | — | — | (160) | 219 | 59 |
| Taebok Machinery Co., Ltd. ........... | — | — | — | — | — | 11 | 11 |
| Yooah Industry Co., Ltd. ............. | — | — | — | — | — | 13 | 13 |
| Yoo-A Construction Co., Ltd. .......... | — | — | — | — | — | 11 | 11 |
| Dung Hwan Co., Ltd. ................ | — | — | — | — | — | 5 | 5 |
| Dongjin Metal Co., Ltd. .............. | — | — | — | — | (27) | 27 | — |
| Hurim Biocell Co., Ltd. .............. | — | — | — | — | — | 5 | 5 |
| P. J, Trading Co., LTd. ............... | — | — | — | — | — | — | — |
| Sunjin Power Tech Co., Ltd. ........... | — | — | — | — | (157) | 247 | 90 |
| Smart Power Co.,Ltd. ................ | — | 200 | — | — | — | — | 200 |
| Sunjin Inprecision Co.,Ltd. ............ | — | — | — | — | (169) | 169 | — |
| Haseung Industries Co.,Ltd. ............ | — | — | — | — | — | 28 | 28 |
| Beer Yeast Korea Inc. ................ | — | — | — | — | — | 7 | 7 |
| Daeryung Corporation ................ | — | — | — | — | — | 10 | 10 |
| Korea Bio Red Ginseng Co.,Ltd. ........ | — | — | — | — | — | 10 | 10 |
| ESGI Co.,Ltd. ..................... | — | — | — | — | (120) | 120 | — |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| | 2016 | | | | | | |
| | Beginning balance | Acquisition | Disposal | Valuation | Impairment | Others | Ending balance |
|---|---|---|---|---|---|---|---|
| | | | In millions of won | | | | |
| ENH Co.,Ltd. ........................ | — | — | — | — | (55) | 55 | — |
| HS Development Co.,Ltd. ............. | — | — | — | — | — | 54 | 54 |
| OCO Co.,Ltd. ....................... | — | — | — | — | — | 11 | 11 |
| B CON Co.,Ltd. ..................... | — | — | — | — | — | 6 | 6 |
| Doosun Co.,Ltd. .................... | — | — | — | — | (62) | 62 | — |
| CheonIl Metal Co., Ltd. ............. | — | — | — | — | — | 4 | 4 |
| Teakwang Tech Co., Ltd. ............. | — | — | — | — | — | 12 | 12 |
| SsangMa Machine Co., Ltd. ........... | — | — | — | — | — | 1 | 1 |
| SinJin Co., Ltd. ..................... | — | — | — | — | — | 9 | 9 |
| Ace Integration Co., Ltd ............. | — | — | — | — | — | 21 | 21 |
| AceInti Agricultural Co., Ltd. ......... | — | — | — | — | — | 1 | 1 |
| KyungDong Co., Ltd. ................. | — | — | — | — | — | 1 | 1 |
| ChunWon Development Co., Ltd. ....... | — | — | — | — | — | 39 | 39 |
| WonIl Co., Ltd. ..................... | — | — | — | — | — | 50 | 50 |
| SungLim Industrial Co., Ltd. .......... | — | — | — | — | — | 1 | 1 |
| DaeHa Co., Ltd. .................... | — | — | — | — | — | 11 | 11 |
| Korea Minerals Co., Ltd. ............. | — | — | — | — | — | 135 | 135 |
| HyoDong Development Co., Ltd. ....... | — | — | — | — | — | 24 | 24 |
| Haspe Tech Co., Ltd. ................ | — | — | — | — | — | 20 | 20 |
| JoHyun Co., Ltd. .................... | — | — | — | — | — | 18 | 18 |
| KC Co., Ltd. ....................... | — | — | — | — | — | 3 | 3 |
| SeongJi Industrial Co.,Ltd. ........... | — | — | — | — | — | 1 | 1 |
| SsangYong E&C Co., Ltd.(*1) ........ | — | — | (9) | — | — | 9 | — |
| Areva nc Expansion .................. | 170,118 | — | — | — | (69,927) | (1,719) | 98,472 |
| Navanakorn Electric Co., Ltd. ......... | 17,951 | — | — | — | — | 558 | 18,509 |
| PT. Kedap Saayq .................... | — | — | — | — | — | — | — |
| Set Holding ........................ | 179,585 | — | — | (9,415) | — | — | 170,170 |
| PT. Cirebon Energi Prasarana .......... | 635 | 1,999 | — | — | — | 75 | 2,709 |
| | 387,900 | 449,484 | (1,828) | (12,346) | (77,581) | 932 | 746,561 |
| ₩ | 584,479 | 449,484 | (5,226) | 61,793 | (86,703) | 10,905 | 1,014,732 |

(*1) The Company recognized gain and loss on disposal of available-for-sale financial assets amounting to ₩1,482 million and ₩9 million, respectively, from the sales of shares of Kwanglim Co., Ltd., TONGYANG Inc., TONGYANG networks Inc., Nexolon Co., Ltd. and SsangYong E&C Co., Ltd. and from the partial sales of IBK-AUCTUS Green Growth Private Equity Firm, Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 and Korea investment—Hanwha KT Mater Lease Private Special Investment Trust for the year ended December 31, 2016.

F-58

(2)  Available-for-sale financial assets of December 31, 2015 and 2016 are as follows:

| | 2015 | | | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | In millions of won | | |
| **Listed** | | | | | |
| Korea District Heating Corp. . . . . . . . . . . . . . . . | 2,264,068 | 19.55% | ₩ 173,201 | 130,410 | 130,410 |
| Kwanglim Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 84,515 | 0.44% | 386 | 262 | 262 |
| Ssangyong Motor Co., Ltd. . . . . . . . . . . . . . . . | 38,568 | 0.03% | 428 | 299 | 299 |
| Sungjee Construction. Co., Ltd. . . . . . . . . . . . . . | 1,053 | 0.01% | 49 | 5 | 5 |
| Korea Line Corp. . . . . . . . . . . . . . . . . . . . . . . | 18 | 0.00% | 1 | — | — |
| Namkwang Engineering & Construction Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 232 | 0.00% | 15 | 1 | 1 |
| Pumyang Construction Co., Ltd. . . . . . . . . . . . . | 7 | 0.00% | 2 | — | — |
| ELCOMTEC Co., Ltd. . . . . . . . . . . . . . . . . . . . | 32,875 | 0.04% | 217 | 53 | 53 |
| PAN ocean Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 1,492 | 0.00% | 14 | 6 | 6 |
| Borneo International Furniture Co., Ltd. . . . . . . . | 64,037 | 0.28% | 97 | 103 | 103 |
| TONGYANG Inc. . . . . . . . . . . . . . . . . . . . . . . | 78,511 | 0.03% | 45 | 217 | 217 |
| TONGYANG networks Inc. . . . . . . . . . . . . . . . | 4,422 | 0.01% | 3 | 6 | 6 |
| Nexolon Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 3,665,367 | 2.59% | 3,138 | 3,196 | 3,196 |
| PT Adaro Energy Tbk . . . . . . . . . . . . . . . . . . . | 480,000,000 | 1.50% | 71,554 | 21,012 | 21,012 |
| Energy Fuels Inc. . . . . . . . . . . . . . . . . . . . . . . | 1,711,814 | 3.79% | 16,819 | 5,926 | 5,926 |
| Baralaba Coal Company Limited (formerly, Cockatoo Coal Limited) . . . . . . . . . . . . . . . . | 49,881,423 | 0.07% | 18,445 | 42 | 42 |
| Denison Mines Corp. . . . . . . . . . . . . . . . . . . . . | 58,284,000 | 11.24% | 84,134 | 34,457 | 34,457 |
| Fission 3.0 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 300,000 | 0.17% | — | 30 | 30 |
| Fission Uranium Corp. . . . . . . . . . . . . . . . . . . . | 800,000 | 0.21% | 785 | 554 | 554 |
| | | | 369,333 | 196,579 | 196,579 |
| **Unlisted(*1)** | | | | | |
| K&C—Gyeongnam youth job creation Investment Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 | 10.00% | 1,207 | 1,207 | — |
| Korea Investment—Korea EXIM Bank CERs Private Special Asset Investment Trust I . . . . . . | 1,758,731,002 | 14.18% | 1,752 | 571 | — |
| Troika Overseas Resource Development Private Equity Firm . . . . . . . . . . . . . . . . . . . . . . . . | 13,340,012,100 | 3.66% | 13,340 | 1,553 | — |
| IBK-AUCTUS Green Growth Private Equity firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 233 | 6.30% | 855 | 855 | — |
| Global Dynasty Overseas Resource Development Private Equity Firm . . . . . . . . . . . . . . . . . . . | 2,233,407,439 | 7.46% | 2,233 | 2,233 | — |
| Intellectual Discovery, Ltd. . . . . . . . . . . . . . . . . | 1,000,000 | 8.81% | 5,000 | 1,375 | — |
| Hanwha-KOSEP New Renewable Energy Private Special Assets Investment Trust 1 . . . . . . . . . . | 1,069,432,095 | 5.00% | 1,069 | 1,069 | — |
| Construction Guarantee(*2) . . . . . . . . . . . . . . . . | 571 | 0.02% | 601 | 805 | 805 |
| Plant & Mechanical Contractors Financial Cooperative of Korea . . . . . . . . . . . . . . . . . . . | 50 | 0.01% | 36 | 36 | — |
| Fire Guarantee . . . . . . . . . . . . . . . . . . . . . . . . | 40 | 0.02% | 20 | 20 | — |
| Korea Software Financial Cooperative . . . . . . . . | 301 | 0.15% | 301 | 301 | — |
| Engineering Financial Cooperative . . . . . . . . . . . | 528 | 0.10% | 60 | 60 | — |
| Electric Contractors Financial Cooperative . . . . . . | 800 | 0.03% | 152 | 152 | — |
| Korea Specialty Contractor Financial Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . | 476 | 0.01% | 417 | 417 | — |
| Information & Communication Financial Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . | 70 | 0.01% | 10 | 10 | — |
| Korea Electric Engineers Association . . . . . . . . . . | 400 | 0.26% | 40 | 40 | — |

F-59

| | 2015 | | | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | In millions of won | | |
| Hwan Young Steel Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 10,916 | 0.14% ₩ | 1,092 | 97 | — |
| Woobang ENC Co., Ltd . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 0.00% | 22 | 22 | — |
| Dongnam Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,070 | 0.46% | 72 | 72 | — |
| SAMBO AUTO. Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 15,066 | 0.02% | 38 | 38 | — |
| Mobo Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 504 | 0.00% | 14 | 14 | — |
| Poonglim Industrial Co., Ltd. . . . . . . . . . . . . . . . . . . | 1,915 | 0.01% | 93 | 93 | — |
| HANKOOK Silicon Co., Ltd. . . . . . . . . . . . . . . . . . . | 7,513,022 | 10.44% | 7,513 | 7,513 | — |
| Kun Young Engineering & Construction Co., Ltd. . . . . | 100 | 0.00% | 5 | 5 | — |
| Pumyang Asset Management Co., Ltd. . . . . . . . . . . . . . | 13 | 0.00% | 3 | 3 | — |
| Dae Kwang Semiconductor Co., Ltd. . . . . . . . . . . . . . . | 589 | 0.07% | 6 | 6 | — |
| Sanbon Department Store . . . . . . . . . . . . . . . . . . . . . . | 828 | 0.01% | 124 | 3 | — |
| Woori Ascon Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 25 | 0.34% | 10 | 10 | — |
| Miju Steel Mfg. Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 99,804 | 0.23% | 51 | 51 | — |
| BnB Sungwon Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 589 | 0.07% | 15 | 15 | — |
| Hana Civil Engineering Co., Ltd. . . . . . . . . . . . . . . . . | 23 | 0.00% | 1 | 1 | — |
| KC Development Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 839 | 0.02% | 6 | 6 | — |
| IMHWA Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 329 | 0.11% | 5 | 5 | — |
| IXELON Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,292 | 0.02% | 23 | — | — |
| DAIM Special Vehicle Co., Ltd. . . . . . . . . . . . . . . . . . | 58 | 0.08% | 10 | 10 | — |
| ASA KIMJE Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 23,245 | 1.11% | 465 | — | — |
| ASA JEONJU Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 34,846 | 1.34% | 697 | 69 | — |
| KYUNGWON Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 2,812 | 0.17% | 14 | 14 | — |
| Moonkyung Silica Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 42 | 0.56% | — | — | — |
| Yousung Remicon Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 8 | 0.26% | 4 | 4 | — |
| Sungkwang Timber Co., Ltd. . . . . . . . . . . . . . . . . . . . | 9 | 0.34% | 4 | 4 | — |
| Yongbo Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 | 0.20% | 3 | 3 | — |
| HJ Steel Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 218 | 0.07% | 2 | 2 | — |
| Ildong Air Conditioning Co., Ltd. . . . . . . . . . . . . . . . . | 218 | 0.16% | 3 | — | — |
| KS Remicon Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 0.04% | 3 | 3 | — |
| Sewoong Heavy Industries Co., Ltd. . . . . . . . . . . . . . . | 7,931 | 0.10% | 40 | 40 | — |
| SIN-E Steel Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 109 | 0.08% | 33 | 33 | — |
| Joongang Platec Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 3,591 | 0.75% | 72 | 72 | — |
| Hangjin Steel Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 116 | 1.08% | 116 | — | — |
| Pyungsan SI Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 434 | 0.01% | 9 | 9 | — |
| Samgong Development Co., Ltd. . . . . . . . . . . . . . . . . . | 12 | 0.01% | 7 | 7 | — |
| Joongang Development Co., Ltd. . . . . . . . . . . . . . . . . . | 540 | 0.12% | 8 | 8 | — |
| AJS Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,906 | 0.23% | 32 | 32 | — |
| SHIN-E B&P Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 119 | 0.13% | 10 | 10 | — |
| MSE Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 429 | 0.13% | 9 | 9 | — |
| Ilrim Nano Tec Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 1,520 | 0.07% | 15 | 15 | — |
| Kwang Myeong Electronics Technology Co., Ltd. . . . . | 113 | 0.37% | 11 | 11 | — |
| Youngjin Hi-Tech Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 2,512 | 0.25% | 126 | 21 | — |
| Dong Woo International Co., Ltd. . . . . . . . . . . . . . . . . | 90 | 0.37% | 18 | 18 | — |
| Bench Mark Construction Co., Ltd. . . . . . . . . . . . . . . | 2 | 0.00% | — | — | — |
| Buyoung Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 270 | 0.00% | 3 | 3 | — |
| Ilsuk Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 152 | 0.17% | 10 | 10 | — |
| Dongyang Telecom Co., Ltd. . . . . . . . . . . . . . . . . . . . | 1,760 | 0.01% | 11 | 11 | — |
| Han Young Construction Co., Ltd. . . . . . . . . . . . . . . . | 35 | 0.03% | 3 | 3 | — |
| Jongwon Remicon Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 31 | 0.18% | 13 | 13 | — |
| Ace Heat Treating Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 477 | 1.43% | 72 | 72 | — |
| Zyle Daewoo Motor Sales Co., Ltd. . . . . . . . . . . . . . . | 22 | 0.00% | — | — | — |
| Daewoo Development Co., Ltd. . . . . . . . . . . . . . . . . . | 8 | 0.00% | — | — | — |
| Daewoo Songdo Development Co., Ltd. . . . . . . . . . . . | 301 | 0.00% | 2 | — | — |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| | 2015 | | | | |
|---|---|---|---|---|---|
| | Shares | Ownership | Acquisition cost | Book value | Fair value |
| | | | In millions of won | | |
| Seyang Inc. ................................. | 537 | 0.05% | ₩ 27 | 27 | — |
| Seungri Enterprise Co., Ltd. ...................... | 93 | 0.05% | 3 | 3 | — |
| Onggane Food Co., Ltd ........................ | 5 | 0.07% | 1 | 1 | — |
| Shin-E P&C Co., Ltd. ......................... | 12 | 0.00% | 1 | 1 | — |
| Montista Telecom Co., Ltd. ...................... | 5,409 | 0.00% | 3 | — | — |
| Ejung Ad Co., Ltd. ........................... | 132 | 0.09% | 3 | 3 | — |
| Solvus Co., Ltd. ............................. | 1,056 | 0.04% | 3 | 3 | — |
| Myung Co., Ltd. ............................. | 89 | 0.05% | 2 | 2 | — |
| Emotion Co., Ltd. ............................ | 167 | 0.61% | 8 | 8 | — |
| Youngdong Concrete Co., Ltd. .................... | 32 | 0.32% | 7 | 7 | — |
| Shinil Engineering Co., Ltd. ..................... | 887 | 0.06% | 3 | 3 | — |
| Korea Castiron Industrial Co., Ltd. ............... | 617 | 1.86% | 22 | 22 | — |
| FFG DMC Co., Ltd. .......................... | 12 | 0.00% | 17 | 17 | — |
| Daeseong Metal Co., Ltd. ....................... | 518 | 2.37% | 47 | 47 | — |
| Biwang Industry Co., Ltd ....................... | 406 | 0.04% | 2 | 2 | — |
| Huimun Co., Ltd. ............................ | 263 | 0.26% | 4 | 4 | — |
| Sunun IT F Co., Ltd. ......................... | 133 | 0.52% | 8 | 8 | — |
| Young Sung Co., Ltd. ......................... | 89 | 0.40% | 27 | 27 | — |
| Yuil Industrial Electronics Co., Ltd. ............... | 804 | 0.32% | 16 | 16 | — |
| DN TEK Inc. .............................. | 12,401 | 0.29% | 62 | 62 | — |
| Daeyang F.M.S Corporation ..................... | 84 | 0.05% | 3 | 3 | — |
| Kwang Jin Structure Co., Ltd. ................... | 3,072 | 0.60% | 31 | 31 | — |
| Woojin Industry Corporation .................... | 3 | 0.00% | 16 | 16 | — |
| Kwang Sung Industry Co., Ltd. .................. | 325 | 0.35% | 7 | 7 | — |
| Matsaeng Food Co., Ltd. ....................... | 277 | 0.56% | 6 | 6 | — |
| Futech Mold Co., Ltd. ........................ | 274 | 0.27% | 14 | 14 | — |
| Samcheonri Industrial Co., Ltd. .................. | 533 | 0.98% | 13 | 13 | — |
| Woojoo Environment Ind. Co., Ltd. ............... | 101 | 0.11% | 13 | 13 | — |
| Cheongatti Co., Ltd. .......................... | 57 | 0.10% | 4 | 4 | — |
| Hyungji Esquire Co., Ltd. ...................... | 52 | 0.02% | 21 | 21 | — |
| Kolmar Pharma Co., Ltd. ....................... | 1,426 | 0.01% | 52 | 52 | — |
| Morado Co., Ltd. ............................ | 209 | 0.04% | 2 | 2 | — |
| Myung Sung Tex Co., Ltd. ...................... | 20 | 0.00% | 2 | 2 | — |
| Areva nc Expansion .......................... | 1,077,124 | 13.49% | 288,443 | 170,118 | — |
| Navanakorn Electric Co., Ltd.(*3) ................ | 4,442,800 | 29.00% | 17,216 | 17,951 | — |
| PT. Kedap Saayq ............................ | 671 | 10.00% | 18,540 | — | — |
| Set Holding(*4) ............................. | 1,100,220 | 2.50% | 229,255 | 179,585 | 179,585 |
| PT. Cirebon Energi Prasarana ................... | 420 | 10.00% | 635 | 635 | — |
| | | | 592,550 | 387,900 | 180,390 |
| | | ₩ | 961,883 | 584,479 | 376,969 |

(*1) Book values of unlisted equity securities held by the Company for which a quoted market price does not exist in an active market and fair value cannot be measured reliably were measured at cost.

(*2) The Company has estimated the fair value of the investment in Construction Guarantee based upon the price which would be applied when the investment is returned. The Company has recognized the difference between its fair value and book value as a gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2015.

(*3) Although the Company holds more than 20% of the equity shares of these investments, the Company cannot exercise significant influence.

(*4) The Company has estimated the fair value of Set Holding by using the discounted cash flow method and has recognized the difference between its fair value and book value as gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2015.

|  | 2016 | | | | |
|---|---|---|---|---|---|
|  | Shares | Ownership | Acquisition cost | Book value | Fair value |
|  | | | In millions of won | | |
| **Listed** | | | | | |
| Korea District Heating Corp. . . . . . . . . . . . . . . | 2,264,068 | 19.55% ₩ | 173,201 | 154,183 | 154,183 |
| Ssangyong Motor Co., Ltd. . . . . . . . . . . . . . . . | 38,568 | 0.03% | 428 | 304 | 304 |
| Sungjee Construction. Co., Ltd. . . . . . . . . . . . . | 10,530 | 0.01% | 49 | 21 | 21 |
| Korea Line Corp. . . . . . . . . . . . . . . . . . . . . . . | 18 | 0.00% | 1 | — | — |
| Namkwang Engineering & Construction | | | | | |
| Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46 | 0.00% | 15 | — | — |
| Pumyang Construction Co., Ltd. . . . . . . . . . . . . | 7 | 0.00% | 2 | — | — |
| ELCOMTEC Co., Ltd. . . . . . . . . . . . . . . . . . . . | 32,875 | 0.04% | 217 | 74 | 74 |
| PAN ocean Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 1,492 | 0.00% | 14 | 7 | 7 |
| Borneo International Furniture Co., Ltd. . . . . . . . | 64,037 | 0.28% | 97 | 103 | 103 |
| Dongbu Corporation, . . . . . . . . . . . . . . . . . . . . | 1,229 | 0.02% | 12 | 12 | 12 |
| PT Adaro Energy Tbk . . . . . . . . . . . . . . . . . . . | 480,000,000 | 1.50% | 71,554 | 73,061 | 73,061 |
| Energy Fuels Inc. . . . . . . . . . . . . . . . . . . . . . . | 1,711,814 | 2.59% | 16,819 | 3,385 | 3,385 |
| Baralaba Coal Company Limited (formerly, | | | | | |
| Cockatoo Coal Limited)(*6) . . . . . . . . . | 99,763 | 0.07% | 18,445 | 42 | 42 |
| Denison Mines Corp. . . . . . . . . . . . . . . . . . . . . | 58,284,000 | 10.93% | 84,134 | 36,504 | 36,504 |
| Fission 3.0 . . . . . . . . . . . . . . . . . . . . . . . . . . | 300,000 | 0.17% | — | 16 | 16 |
| Fission Uranium Corp. . . . . . . . . . . . . . . . . . . . | 800,000 | 0.17% | 785 | 459 | 459 |
| | | | 365,773 | 268,171 | 268,171 |
| **Unlisted (*1)** | | | | | |
| K&C—Gyeongnam youth job creation | | | | | |
| Investment Fund . . . . . . . . . . . . . . . . . . . . . . | 24 | 10.00% | 1,207 | 1,207 | — |
| Korea investment – Korea EXIM Bank CERs | | | | | |
| Private Special Asset Investment Trust I . . . . . | 1,758,731,002 | 14.18% | 1,752 | 571 | — |
| Troika Overseas Resource Development Private | | | | | |
| Equity Firm . . . . . . . . . . . . . . . . . . . . . . . . . | 13,340,012,100 | 3.66% | 13,340 | 1,553 | — |
| IBK-AUCTUS Green Growth Private Equity | | | | | |
| firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 152 | 6.29% | 41 | 41 | — |
| Global Dynasty Overseas Resource | | | | | |
| Development Private Equity Firm . . . . . . . . . . | 2,233,407,439 | 7.46% | 2,233 | 2,233 | — |
| Intellectual Discovery, Ltd. . . . . . . . . . . . . . . . | 1,000,000 | 8.81% | 5,000 | 1,375 | — |
| Hanwha-KOSEP New Renewable Energy | | | | | |
| Private Special Assets Investment Trust 1 . . . . | 4,256,096,329 | 5.00% | 4,389 | 4,389 | — |
| Construction Guarantee(*2) . . . . . . . . . . . . . . . | 571 | 0.02% | 601 | 819 | 819 |
| Plant & Mechanical Contractors Financial | | | | | |
| Cooperative of Korea . . . . . . . . . . . . . . . . . . . | 50 | 0.01% | 36 | 36 | — |
| Fire Guarantee . . . . . . . . . . . . . . . . . . . . . . . . | 40 | 0.02% | 20 | 20 | — |
| Korea Software Financial Cooperative . . . . . . . . | 5,186 | 1.39% | 3,301 | 3,301 | — |
| Engineering Financial Cooperative . . . . . . . . . . | 486 | 0.05% | 60 | 60 | — |
| Electric Contractors Financial Cooperative . . . . . | 800 | 0.03% | 152 | 152 | — |
| Korea Specialty Contractor Financial | | | | | |
| Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . | 476 | 0.01% | 417 | 417 | — |
| Information & Communication Financial | | | | | |
| Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . | 70 | 0.01% | 10 | 10 | — |
| Korea Electric Engineers Association . . . . . . . . . | 400 | 0.24% | 40 | 40 | — |

F-62

| | Shares | Ownership | | Acquisition cost | Book value | Fair value |
|---|---|---|---|---|---|---|
| | | | | **2016** | | |
| | | | | In millions of won | | |
| Korea investment—Investment Pool for Public funds 10(*5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | ₩ | 142,470 | 141,315 | 141,315 |
| Samsung investment—Investment Pool for Public funds 2(*5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | | 213,710 | 211,920 | 211,920 |
| Samsung investment—Investment Pool for Public funds 1(*5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | | 53,220 | 53,212 | 53,212 |
| Korea investment—Hanwha KT Mater Lease Private Special Investment Trust (*5) . . . . . . . . . . | — | — | | 30,560 | 30,568 | 30,568 |
| Hwan Young Steel Co., Ltd. . . . . . . . . . . . . . . . . . . . | 10,916 | 0.14% | | 1,092 | 97 | — |
| SAMBO AUTO. Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 15,066 | 0.02% | | 38 | 38 | — |
| Mobo Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 504 | 0.00% | | 14 | 14 | — |
| HANKOOK Silicon Co., Ltd. . . . . . . . . . . . . . . . . . . | 3,005,208 | 10.44% | | 7,513 | 1,495 | — |
| Dae Kwang Semiconductor Co., Ltd. . . . . . . . . . . . | 589 | 0.07% | | 6 | 6 | — |
| Sanbon Department Store . . . . . . . . . . . . . . . . . . . . . | 828 | 0.01% | | 124 | 3 | — |
| Miju Steel Mfg. Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 99,804 | 0.23% | | 51 | 51 | — |
| BnB Sungwon Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 589 | 0.07% | | 15 | 15 | — |
| Hana Civil Engineering Co., Ltd. . . . . . . . . . . . . . . | 23 | 0.00% | | 1 | 1 | — |
| KC Development Co., Ltd. . . . . . . . . . . . . . . . . . . . | 839 | 0.02% | | 6 | 6 | — |
| IMHWA Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 329 | 0.11% | | 5 | 5 | — |
| DALIM Special Vehicle Co., Ltd. . . . . . . . . . . . . . . | 58 | 0.08% | | 10 | 10 | — |
| ASA JEONJU Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 34,846 | 1.34% | | 697 | 69 | — |
| Moonkyung Silica Co., Ltd. . . . . . . . . . . . . . . . . . . . | 42 | 0.56% | | — | — | — |
| Sungkwang Timber Co., Ltd. . . . . . . . . . . . . . . . . . . | 9 | 0.34% | | 4 | 4 | — |
| Yongbo Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 | 0.20% | | 3 | 3 | — |
| HJ Steel Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | 218 | 0.07% | | 2 | 2 | — |
| KS Remicon Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 12 | 0.04% | | 3 | 3 | — |
| SIN-E Steel Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 109 | 0.08% | | 33 | 33 | — |
| Joongang Platec Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 3,591 | 0.75% | | 72 | 35 | — |
| Pyungsan SI Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 434 | 0.01% | | 9 | 9 | — |
| Samgong Development Co., Ltd. . . . . . . . . . . . . . . . | 12 | 0.01% | | 7 | 7 | — |
| Joongang Development Co., Ltd. . . . . . . . . . . . . . . . | 540 | 0.12% | | 8 | 8 | — |
| AJS Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,906 | 0.23% | | 32 | 32 | — |
| SHIN-E B&P Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 119 | 0.13% | | 10 | 10 | — |
| MSE Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 429 | 0.13% | | 9 | 9 | — |
| Ilrim Nano Tec Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 1,520 | 0.07% | | 15 | 15 | — |
| Youngjin Hi-Tech Co., Ltd. . . . . . . . . . . . . . . . . . . . | 2,512 | 0.25% | | 126 | 21 | — |
| Dong Woo International Co., Ltd. . . . . . . . . . . . . . . | 90 | 0.37% | | 18 | 18 | — |
| Buyoung Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | 270 | 0.00% | | 3 | 3 | — |
| Ilsuk Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 152 | 0.17% | | 10 | 10 | — |
| Dongyang Telecom Co., Ltd. . . . . . . . . . . . . . . . . . . | 1,760 | 0.01% | | 11 | 11 | — |
| Han Young Construction Co., Ltd. . . . . . . . . . . . . . | 35 | 0.03% | | 3 | 3 | — |
| Jongwon Remicon Co., Ltd. . . . . . . . . . . . . . . . . . . | 31 | 0.18% | | 13 | 13 | — |
| Ace Heat Treating Co., Ltd. . . . . . . . . . . . . . . . . . . | 477 | 1.43% | | 72 | 72 | — |
| Zyle Daewoo Motor Sales Co., Ltd. . . . . . . . . . . . | 22 | 0.00% | | — | — | — |
| Daewoo Development Co., Ltd. . . . . . . . . . . . . . . . | 8 | 0.00% | | — | — | — |
| Seyang Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 537 | 0.05% | | 27 | 27 | — |
| Seungri Enterprise Co., Ltd. . . . . . . . . . . . . . . . . . . | 93 | 0.05% | | 3 | 3 | — |
| Onggane Food Co., Ltd . . . . . . . . . . . . . . . . . . . . . . | 5 | 0.07% | | 1 | 1 | — |
| Shin-E P&C Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 12 | 0.00% | | 1 | 1 | — |
| Ejung Ad Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 132 | 0.09% | | 3 | 3 | — |
| Solvus Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,056 | 0.04% | | 3 | 3 | — |
| Myung Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 89 | 0.05% | | 2 | 2 | — |
| Emotion Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | 167 | 0.61% | | 8 | 8 | — |

F-63

|  | 2016 | | | | |
|---|---|---|---|---|---|
|  | Shares | Ownership | Acquisition cost | Book value | Fair value |
|  |  |  | In millions of won | | |
| Youngdong Concrete Co., Ltd. . . . . . . . . . . . . . . . . | 32 | 0.32% ₩ | 7 | 7 | — |
| Shinil Engineering Co., Ltd. . . . . . . . . . . . . . . . . . . | 887 | 0.06% | 3 | 3 | — |
| Biwang Industry Co., Ltd . . . . . . . . . . . . . . . . . . . . | 406 | 0.04% | 2 | 2 | — |
| Huimun Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | 263 | 0.26% | 4 | 4 | — |
| Young Sung Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 89 | 0.40% | 27 | 27 | — |
| Yuil Industrial Electronics Co., Ltd. . . . . . . . . . . . . | 804 | 0.32% | 16 | 16 | — |
| DN TEK Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,401 | 0.29% | 62 | 6 | — |
| Daeyang F.M.S Corporation . . . . . . . . . . . . . . . . . . | 593 | 0.40% | 23 | 23 | — |
| Kwang Jin Structure Co., Ltd. . . . . . . . . . . . . . . . . | 3,072 | 0.60% | 31 | 31 | — |
| Woojin Industry Corporation . . . . . . . . . . . . . . . . . | 3 | 0.00% | 16 | 16 | — |
| Kwang Sung Industry Co., Ltd. . . . . . . . . . . . . . . . | 325 | 0.35% | 7 | 7 | — |
| Futech Mold Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 274 | 0.27% | 14 | 14 | — |
| Samcheonri Industrial Co., Ltd. . . . . . . . . . . . . . . . | 533 | 0.98% | 13 | 13 | — |
| Woojoo Environment Ind. Co., Ltd. . . . . . . . . . . . . | 101 | 0.11% | 13 | 13 | — |
| Cheongatti Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 57 | 0.10% | 4 | 4 | — |
| Hyungji Esquire Co., Ltd. . . . . . . . . . . . . . . . . . . . | 55 | 0.02% | 22 | 22 | — |
| Kolmar Pharma Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 1,426 | 0.01% | 52 | 3 | — |
| Morado Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | 209 | 0.04% | 2 | 2 | — |
| Myung Sung Tex Co., Ltd. . . . . . . . . . . . . . . . . . . . | 20 | 0.00% | 2 | 2 | — |
| Kwang Sung Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 610 | 0.53% | 31 | 31 | — |
| EverTechno. Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 29,424 | 0.73% | 147 | 7 | — |
| Autowel Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | 260 | 0.38% | 13 | 13 | — |
| Woobang Construction Co., Ltd. . . . . . . . . . . . . . . . | 8 | 0.00% | 8 | 8 | — |
| Shin Pyung Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 6 | 0.03% | 3 | 3 | — |
| JMC Heavy Industries Co., Ltd. . . . . . . . . . . . . . . . | 2,724 | 0.10% | 27 | 27 | — |
| Najin Steel Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 37 | 0.06% | 5 | 5 | — |
| Sinkwang Industry Co., Ltd. . . . . . . . . . . . . . . . . . . | 1,091 | 1.68% | 5 | 5 | — |
| Join Land Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 33 | 0.00% | 1 | 1 | — |
| Crystal Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 0.07% | 2 | 2 | — |
| Elephant & Friends Co., Ltd. . . . . . . . . . . . . . . . . . | 563 | 0.61% | 3 | 3 | — |
| Mireco Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | 109 | 0.25% | 11 | 11 | — |
| L&K Industry Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 1,615 | 0.60% | 24 | 24 | — |
| JO Tech Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 1,263 | 0.62% | 25 | 25 | — |
| Kendae Printing Co., Ltd. . . . . . . . . . . . . . . . . . . . | 422 | 0.60% | 21 | 21 | — |
| Dauning Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 231 | 0.41% | 6 | 6 | — |
| Korea Trecision Co., Ltd. . . . . . . . . . . . . . . . . . . . | 22 | 0.45% | 5 | 5 | — |
| Ace Track Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 3,130 | 1.08% | 219 | 59 | — |
| Taebok Machinery Co., Ltd. . . . . . . . . . . . . . . . . . . | 109 | 1.08% | 11 | 11 | — |
| Yooah Industry Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 130 | 0.02% | 13 | 13 | — |
| Yoo-A Construction Co., Ltd. . . . . . . . . . . . . . . . . . | 105 | 0.20% | 11 | 11 | — |
| Dung Hwan Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 531 | 0.02% | 5 | 5 | — |
| Hurim Biocell Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 113 | 0.00% | 5 | 5 | — |
| P. J, Trading Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 12 | 0.04% | — | — | — |
| Sunjin Power Tech Co., Ltd. . . . . . . . . . . . . . . . . . . | 4,941 | 0.92% | 247 | 90 | — |
| Smart Power Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 133,333 | 5.55% | 200 | 200 | — |
| Haseung Industries Co.,Ltd. . . . . . . . . . . . . . . . . . . | 55 | 0.62% | 28 | 28 | — |
| Beer Yeast Korea Inc. . . . . . . . . . . . . . . . . . . . . . . | 1,388 | 0.43% | 7 | 7 | — |
| Daeryung Corporation . . . . . . . . . . . . . . . . . . . . . . | 207 | 0.19% | 10 | 10 | — |
| Korea Bio Red Ginseng Co.,Ltd. . . . . . . . . . . . . . . | 194 | 0.09% | 10 | 10 | — |
| ENH Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,086 | 0.19% | 54 | 54 | — |
| OCO Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123 | 0.37% | 11 | 11 | — |
| B CON Co.,Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 96 | 1.16% | 6 | 6 | — |
| Teakwang Tech Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 11 | 0.15% | 4 | 4 | — |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| | Shares | Ownership | Acquisition cost | Book value | Fair value |
|---|---|---|---|---|---|
| | | | **2016** | | |
| | | | In millions of won | | |
| SsangMa Machine Co., Ltd. . . . . . . . . . . . . . . . . . | 2,460 | 0.11% | ₩ 12 | 12 | — |
| SinJin Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 0.05% | 1 | 1 | — |
| Ace Integration Co., Ltd . . . . . . . . . . . . . . . . . . . | 233 | 0.30% | 9 | 9 | — |
| AceInti Agricultural Co., Ltd. . . . . . . . . . . . . . . . | 93 | 0.09% | 21 | 21 | — |
| Teakwang Tech Co., Ltd. . . . . . . . . . . . . . . . . . . | 3 | 0.00% | 1 | 1 | — |
| KyungDong Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 130 | 0.01% | 1 | 1 | — |
| ChunWon Development Co., Ltd. . . . . . . . . . . . . | 193 | 0.19% | 39 | 39 | — |
| WonIl Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 999 | 0.15% | 50 | 50 | — |
| SungLim Industrial Co., Ltd. . . . . . . . . . . . . . . . | 29 | 0.03% | 1 | 1 | — |
| DaeHa Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 141 | 0.54% | 11 | 11 | — |
| Korea Minerals Co., Ltd. . . . . . . . . . . . . . . . . . . | 191 | 0.05% | 135 | 135 | — |
| HyoDong Development Co., Ltd. . . . . . . . . . . . . . | 119 | 0.15% | 24 | 24 | — |
| Haspe Tech Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | 652 | 0.55% | 20 | 20 | — |
| JoHyun Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 350 | 1.56% | 18 | 18 | — |
| KC Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 5,107 | 0.17% | 3 | 3 | — |
| SeongJi Industrial Co.,Ltd. . . . . . . . . . . . . . . . | 41 | 0.05% | 1 | 1 | — |
| Areva nc Expansion . . . . . . . . . . . . . . . . . . . . . | 1,077,124 | 13.49% | 288,443 | 98,472 | 98,472 |
| Navanakorn Electric Co., Ltd.(*3) . . . . . . . . . | 8,885,600 | 26.93% | 17,216 | 18,509 | — |
| PT. Kedap Saayq . . . . . . . . . . . . . . . . . . . . . . . | 671 | 10.00% | 18,540 | — | — |
| Set Holding(*4) . . . . . . . . . . . . . . . . . . . . . . . . | 1,100,220 | 2.50% | 229,255 | 170,170 | 170,170 |
| PT. Cirebon Energi Prasarana . . . . . . . . . . . . . | 22,420 | 10.00% | 2,612 | 2,709 | — |
| | | | 1,040,553 | 746,561 | 706,476 |
| | | | ₩ 1,406,326 | 1,014,732 | 974,647 |

(*1) Book values of unlisted equity securities held by the Company for which a quoted market price does not exist in an active market and fair value cannot be measured reliably were measured at cost.

(*2) The Company has estimated the fair value of the investment in Construction Guarantee based upon the price which would be applied when the investment is returned. The Company has recognized the difference between its fair value and book value as a gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2016.

(*3) Although the Company holds more than 20% of the equity shares of these investments, the Company cannot exercise significant influence.

(*4) The Company has estimated the fair value of Set Holding by using the discounted cash flow method and has recognized the difference between its fair value and book value as gain or loss on valuation of available-for-sale financial assets in other comprehensive income or loss during the year ended December 31, 2016.

(*5) As of December 31, 2016, the Company invested in ₩437,015 million as beneficiary securities exclusively for payment of decommissioning cost of nuclear power plants. The Company has measured the fair value of the beneficiary securities based on its net asset value.

(*6) The number of shares has changed due to the merger of shares (500:1) during the year ended December 31, 2016.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**10.  Held-to-maturity Investments**

**Held-to-maturity investments as of December 31, 2015 and 2016 are as follows:**

| | | 2015 | | | |
| --- | --- | --- | --- | --- | --- |
| | Beginning balance | Acquisition | Disposal | Others | Ending balance |
| | | In millions of won | | | |
| Government bonds . . . . . . . . . . . . . . . . . . . . ₩ | 3,601 | 432 | (410) | — | 3,623 |
| Corporate bonds . . . . . . . . . . . . . . . . . . . . . | 13 | — | — | (13) | — |
| ₩ | 3,614 | 432 | (410) | (13) | 3,623 |
| Current . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 265 | — | (186) | 301 | 380 |
| Non-current . . . . . . . . . . . . . . . . . . . . . . . | 3,349 | 432 | (224) | (314) | 3,243 |

| | | 2016 | | | |
| --- | --- | --- | --- | --- | --- |
| | Beginning balance | Acquisition | Disposal | Others | Ending balance |
| | | In millions of won | | | |
| Government bonds . . . . . . . . . . . . . . . . . . . . ₩ | 3,623 | 149 | (528) | — | 3,244 |
| ₩ | 3,623 | 149 | (528) | — | 3,244 |
| Current . . . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 380 | — | (380) | 114 | 114 |
| Non-current . . . . . . . . . . . . . . . . . . . . . . . | 3,243 | 149 | (148) | (114) | 3,130 |

**11.  Derivatives**

**(1)  Derivatives as of December 31, 2015 and 2016 are as follows:**

| | | 2015 | | 2016 | |
| --- | --- | --- | --- | --- | --- |
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| **Derivative assets** | | | | | |
| Currency forward  . . . . . . . . . . . . . . . . ₩ | | 1,498 | 24,896 | 8,370 | 32,806 |
| Currency swap . . . . . . . . . . . . . . . . . . . . | | 95,759 | 491,219 | 184,913 | 540,057 |
| Interest rate swap . . . . . . . . . . . . . . . . . | | — | 3,778 | — | 4,705 |
| Others(*1) . . . . . . . . . . . . . . . . . . . . . . | | — | — | — | 10,523 |
| ₩ | | 97,257 | 519,893 | 193,283 | 588,091 |
| **Derivative liabilities** | | | | | |
| Currency forward  . . . . . . . . . . . . . . . . ₩ | | 1,142 | — | 1,153 | 34 |
| Currency swap . . . . . . . . . . . . . . . . . . . . | | 758 | 66,976 | — | 56,612 |
| Interest rate swap . . . . . . . . . . . . . . . . . | | 8,345 | 89,289 | 2,098 | 78,789 |
| ₩ | | 10,245 | 156,265 | 3,251 | 135,435 |

(*1) The Company has a put option to sell shares of DS POWER Co., Ltd, a related party of the Company, and the fair value of the option is recorded in 'Others'. (Note 17)

F-66

(2)  **Currency forward contracts which are not designated as hedge instruments as of December 31, 2016 are as follows:**

| Counterparty | Contract Date | Maturity date | Contract amounts Pay | Receive | Contract exchange rate |
|---|---|---|---|---|---|
| | | | In millions of won and thousands of foreign currencies | | |
| KEB Hana Bank ............... | 2014.04.10 | 2021.07.12 | ₩    55,120 | USD 52,000 | 1,060.00 |
| KEB Hana Bank ............... | 2014.04.28 | 2021.07.12 | 50,784 | USD 48,000 | 1,058.00 |
| Bank of America ............... | 2014.04.29 | 2021.07.12 | 105,400 | USD 100,000 | 1,054.00 |
| KEB Hana Bank ............... | 2014.05.09 | 2021.07.12 | 104,600 | USD 100,000 | 1,046.00 |
| JP Morgan .................... | 2016.12.09 | 2017.01.09 | 35,215 | USD 30,219 | 1,165.31 |
| Woori Bank .................. | 2016.12.08 | 2017.01.09 | 59,657 | USD 51,411 | 1,160.40 |
| Standard Chartered ........... | 2016.12.06 | 2017.01.03 | 11,712 | USD 10,000 | 1,171.20 |
| Nova Scotia .................. | 2016.12.08 | 2017.01.09 | 11,590 | USD 10,000 | 1,159.00 |
| BNP Paribas ................. | 2016.12.13 | 2017.01.17 | 2,681 | USD 2,300 | 1,165.65 |
| BNP Paribas ................. | 2016.12.14 | 2017.01.17 | 4,673 | USD 4,000 | 1,168.20 |
| BTMU ....................... | 2016.12.08 | 2017.01.12 | 11,594 | USD 10,000 | 1,159.40 |
| BTMU ....................... | 2016.12.12 | 2017.01.17 | 11,704 | USD 10,000 | 1,170.40 |
| BTMU ....................... | 2016.12.14 | 2017.01.17 | 2,330 | USD 2,000 | 1,165.10 |
| Mizuho Bank ................. | 2016.12.08 | 2017.01.12 | 11,594 | USD 10,000 | 1,159.35 |
| Nonghyup Bank .............. | 2016.12.12 | 2017.01.17 | 5,852 | USD 5,000 | 1,170.40 |
| Societe Generale ............. | 2016.12.12 | 2017.01.17 | 3,979 | USD 3,400 | 1,170.40 |
| Societe Generale ............. | 2016.12.15 | 2017.01.19 | 14,160 | USD 12,000 | 1,180.00 |
| Societe Generale ............. | 2016.12.28 | 2017.01.31 | 8,212 | USD 6,800 | 1,207.60 |
| BNP Paribas ................. | 2016.11.22 | 2017.01.25 | 2,351 | USD 2,000 | 1,175.40 |
| BNP Paribas ................. | 2016.11.25 | 2017.01.31 | 2,353 | USD 2,000 | 1,176.40 |
| Citibank .................... | 2016.11.25 | 2017.01.31 | 1,029 | USD 874 | 1,177.85 |
| Mizuho Bank ................. | 2016.12.30 | 2017.03.03 | 9,596 | USD 8,000 | 1,199.45 |
| HSBC ....................... | 2016.11.18 | 2017.05.22 | 4,717 | USD 4,000 | 1,179.35 |
| HSBC ....................... | 2016.11.22 | 2017.01.25 | 7,046 | USD 6,000 | 1,174.32 |
| HSBC ....................... | 2016.12.07 | 2017.02.09 | 4,669 | USD 4,000 | 1,167.15 |
| HSBC ....................... | 2016.12.15 | 2017.01.25 | USD 2,489 | 2,923 | 1,174.32 |
| HSBC ....................... | 2016.12.28 | 2017.02.09 | USD 3,424 | 3,997 | 1,167.15 |
| HSBC ....................... | 2016.12.29 | 2017.01.25 | USD 2,693 | 3,162 | 1,174.32 |
| HSBC ....................... | 2016.12.30 | 2017.03.03 | 3,605 | USD 3,000 | 1,201.55 |
| HSBC ....................... | 2016.12.30 | 2017.03.03 | 8,396 | USD 7,000 | 1,199.45 |
| Standard Chartered ........... | 2016.12.13 | 2017.02.15 | 871 | USD 748 | 1,163.60 |
| Nova Scotia .................. | 2016.11.22 | 2017.01.31 | 7,080 | USD 6,000 | 1,180.03 |
| Nova Scotia .................. | 2016.11.24 | 2017.01.31 | 3,004 | USD 2,540 | 1,182.55 |
| Nova Scotia .................. | 2016.12.26 | 2017.02.28 | 2,397 | USD 2,000 | 1,198.70 |
| Nova Scotia .................. | 2016.12.30 | 2017.03.03 | 6,017 | USD 5,000 | 1,203.30 |
| Nova Scotia .................. | 2016.12.30 | 2017.03.03 | 9,597 | USD 8,000 | 1,199.60 |
| Nonghyup Bank .............. | 2016.11.22 | 2017.01.25 | 2,446 | USD 2,083 | 1,174.73 |
| Nonghyup Bank .............. | 2016.12.27 | 2017.02.28 | 2,410 | USD 2,000 | 1,205.20 |
| Credit Agricole .............. | 2016.11.21 | 2017.01.23 | 1,182 | USD 1,000 | 1,181.55 |
| Credit Agricole .............. | 2016.12.26 | 2017.02.28 | 2,397 | USD 2,000 | 1,198.25 |
| Societe Generale ............. | 2016.11.22 | 2017.01.25 | 2,352 | USD 2,000 | 1,175.90 |
| Societe Generale ............. | 2016.11.30 | 2017.02.02 | 1,167 | USD 1,000 | 1,166.70 |
| Societe Generale ............. | 2016.12.29 | 2017.02.02 | USD 913 | 1,065 | 1,166.70 |
| Societe Generale ............. | 2016.12.06 | 2017.02.08 | 1,168 | USD 1,000 | 1,167.65 |
| Societe Generale ............. | 2016.12.23 | 2017.02.27 | 4,807 | USD 4,000 | 1,201.78 |
| Mizuho Bank ................. | 2016.12.12 | 2017.01.10 | 19,887 | USD 17,000 | 1,169.83 |
| Credit Agricole .............. | 2016.12.19 | 2017.01.13 | 8,302 | USD 7,000 | 1,186.05 |
| Standard Chartered ........... | 2016.12.15 | 2017.01.13 | 16,503 | USD 14,000 | 1,178.76 |
| KEB Hana Bank ............... | 2016.12.29 | 2017.01.05 | 341 | EUR 270 | 1,262.26 |
| KEB Hana Bank ............... | 2016.08.26 | 2017.02.16 | 4,812 | EUR 3,800 | 1,266.30 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| Counterparty | Contract Date | Maturity date | Contract amounts Pay | Contract amounts Receive | Contract exchange rate |
|---|---|---|---|---|---|
| | | | In millions of won and thousands of foreign currencies | | |
| KEB Hana Bank . . . . . . . . . . . . . . . | 2016.09.07 | 2017.09.06 | ₩ 3,121 | EUR 2,500 | 1,248.20 |
| KEB Hana Bank . . . . . . . . . . . . . . . | 2016.08.26 | 2017.08.09 | 1,280 | CNY 7,800 | 164.13 |
| KEB Hana Bank . . . . . . . . . . . . . . . | 2016.09.07 | 2017.09.06 | 834 | CNY 5,200 | 160.48 |
| Societe Generale . . . . . . . . . . . . . . | 2016.12.14 | 2017.06.16 | 2,245 | USD 1,929 | 1,163.90 |
| Nova Scotia . . . . . . . . . . . . . . . . . . | 2016.12.13 | 2017.06.15 | 2,328 | USD 2,000 | 1,164.20 |
| Nomura . . . . . . . . . . . . . . . . . . . . . | 2016.12.07 | 2017.06.12 | 1,000 | USD 858 | 1,165.10 |
| Nova Scotia . . . . . . . . . . . . . . . . . . | 2016.11.16 | 2017.05.18 | 23 | USD 20 | 1,166.50 |
| Societe Generale . . . . . . . . . . . . . . | 2016.11.30 | 2017.06.02 | 771 | USD 661 | 1,166.70 |
| Nova Scotia . . . . . . . . . . . . . . . . . . | 2016.12.07 | 2017.06.09 | 737 | USD 631 | 1,167.70 |
| Nomura . . . . . . . . . . . . . . . . . . . . . | 2016.12.01 | 2017.06.05 | 5,839 | USD 5,000 | 1,167.80 |
| Credit Suisse . . . . . . . . . . . . . . . . . | 2016.11.29 | 2017.06.01 | 5,840 | USD 5,000 | 1,167.90 |
| Nova Scotia . . . . . . . . . . . . . . . . . . | 2016.12.07 | 2017.06.09 | 3,505 | USD 3,000 | 1,168.20 |
| Societe Generale . . . . . . . . . . . . . . | 2016.11.28 | 2017.05.31 | 2,047 | USD 1,751 | 1,168.50 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2016.12.29 | 2017.07.03 | 4,241 | USD 3,513 | 1,207.40 |
| Nova Scotia . . . . . . . . . . . . . . . . . . | 2016.12.15 | 2017.03.20 | USD 15,000 | 17,678 | 1,178.50 |
| Nova Scotia . . . . . . . . . . . . . . . . . . | 2016.12.16 | 2017.03.20 | USD 3,000 | 3,552 | 1,184.00 |
| Nova Scotia . . . . . . . . . . . . . . . . . . | 2016.12.20 | 2017.03.22 | USD 3,000 | 3,571 | 1,190.40 |
| Nova Scotia . . . . . . . . . . . . . . . . . . | 2016.12.23 | 2017.03.27 | USD 3,000 | 3,606 | 1,202.00 |
| KEB Hana Bank . . . . . . . . . . . . . . . | 2015.08.26 | 2017.07.31 | JPY 630,000 | 6,377 | 10.12 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2015.02.12 | 2017.01.10 | IDR 6,567,882 | USD 486 | 13,525.00 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2015.02.12 | 2017.02.10 | IDR 6,567,882 | USD 486 | 13,525.00 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2015.02.12 | 2017.03.10 | IDR 6,567,882 | USD 486 | 13,525.00 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2015.02.12 | 2017.04.10 | IDR 6,567,882 | USD 486 | 13,525.00 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2015.02.12 | 2017.05.10 | IDR 6,567,882 | USD 486 | 13,525.00 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2015.02.12 | 2017.06.12 | IDR 6,567,882 | USD 486 | 13,525.00 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2015.02.12 | 2017.07.10 | IDR 6,567,882 | USD 486 | 13,525.00 |
| BNP Paribas . . . . . . . . . . . . . . . . . | 2015.02.12 | 2017.08.10 | IDR 2,889,868 | USD 214 | 13,525.00 |

**(3)  Currency swap contracts which are not designated as hedge instruments as of December 31, 2016 are as follows:**

| Counterparty | Contract year | Contract amount Pay | Contract amount Receive | Contract interest rate Pay | Contract interest rate Receive | Contract exchange rate |
|---|---|---|---|---|---|---|
| | | In millions of won and thousands of foreign currencies | | | | |
| Deutsche Bank . . . . . . . . . . . . . . . | 2013~2018 | ₩110,412 | JPY 10,000,000 | 6.21% | 4.19% | 11.04 |
| IBK . . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 111,800 | USD 100,000 | 3.16% | 2.79% | 1,118.00 |
| Bank of America . . . . . . . . . . . . . . | 2013~2018 | 103,580 | JPY 10,000,000 | 7.05% | 4.19% | 10.36 |
| Credit Suisse . . . . . . . . . . . . . . . . . | 2014~2019 | 118,632 | CHF 100,000 | 2.98% | 1.50% | 1,186.32 |
| Standard Chartered . . . . . . . . . . . . . | 2014~2019 | 114,903 | CHF 100,000 | 4.00% | 1.50% | 1,149.03 |
| Standard Chartered . . . . . . . . . . . . . | 2014~2029 | 102,470 | USD 100,000 | 3.14% | 3.57% | 1,024.70 |
| Standard Chartered . . . . . . . . . . . . . | 2014~2017 | 51,215 | USD 50,000 | 2.24% | 3M Libor + 0.55% | 1,024.30 |
| Mizuho Bank . . . . . . . . . . . . . . . . . | 2014~2017 | 153,645 | USD 150,000 | 2.35% | 3M Libor + 0.65% | 1,024.30 |
| Societe Generale . . . . . . . . . . . . . . | 2014~2024 | 105,017 | USD 100,000 | 4.92% | 5.13% | 1,050.17 |
| KEB Hana Bank . . . . . . . . . . . . . . . | 2015~2024 | 107,970 | USD 100,000 | 4.75% | 5.13% | 1,079.70 |
| Credit Agricole . . . . . . . . . . . . . . . | 2015~2024 | 94,219 | USD 86,920 | 4.85% | 5.13% | 1,083.97 |
| Citibank . . . . . . . . . . . . . . . . . . . . | 2012~2022 | 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| JP Morgan . . . . . . . . . . . . . . . . . . . | 2012~2022 | 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| Bank of America . . . . . . . . . . . . . . | 2012~2022 | 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| Shinhan Bank . . . . . . . . . . . . . . . . . | 2016~2022 | 112,930 | USD 100,000 | 2.79% | 3.00% | 1,129.30 |
| HSBC . . . . . . . . . . . . . . . . . . . . . . . | 2012~2022 | 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| KEB Hana Bank . . . . . . . . . . . . . . . | 2012~2022 | 111,770 | USD 100,000 | 2.87% | 3.00% | 1,117.70 |
| Standard Chartered . . . . . . . . . . . . . | 2012~2022 | 111,770 | USD 100,000 | 2.89% | 3.00% | 1,117.70 |
| Deutsche Bank . . . . . . . . . . . . . . . | 2012~2022 | 55,885 | USD 50,000 | 2.79% | 3.00% | 1,117.70 |

| Counterparty | Contract year | Contract amount | | Contract interest rate | | Contract exchange rate |
|---|---|---|---|---|---|---|
| | | Pay | Receive | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | | |
| DBS . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | ₩108,140 | USD 100,000 | 2.63% | 3M Libor+0.84% | 1,081.40 |
| DBS . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 108,140 | USD 100,000 | 2.57% | 3M Libor+0.84% | 1,081.40 |
| DBS . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 108,140 | USD 100,000 | 2.57% | 3M Libor+0.84% | 1,081.40 |
| HSBC . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 107,450 | USD 100,000 | 3.41% | 2.88% | 1,074.50 |
| Standard Chartered . . . . . . . . . . . . . | 2013~2018 | 107,450 | USD 100,000 | 3.44% | 2.88% | 1,074.50 |
| JP Morgan . . . . . . . . . . . . . . . | 2013~2018 | 107,450 | USD 100,000 | 3.48% | 2.88% | 1,074.50 |
| Bank of America . . . . . . . . . . . . . | 2014~2018 | 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| Citibank . . . . . . . . . . . . . . . . . . . | 2014~2018 | 107,450 | USD 100,000 | 3.09% | 2.88% | 1,074.50 |
| JP Morgan . . . . . . . . . . . . . . . | 2014~2017 | 102,670 | USD 100,000 | 2.89% | 3M Libor+0.78% | 1,026.70 |
| Deutsche Bank . . . . . . . . . . . . . | 2014~2017 | 102,670 | USD 100,000 | 2.89% | 3M Libor+0.78% | 1,026.70 |
| HSBC . . . . . . . . . . . . . . . . . . . . | 2014~2019 | 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| Standard Chartered . . . . . . . . . . . . . | 2014~2019 | 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| Korea Development Bank . . . . . . . . . | 2016~2019 | 105,260 | USD 100,000 | 2.48% | 2.38% | 1,052.60 |
| Nomura . . . . . . . . . . . . . . . . . | 2015~2025 | 111,190 | USD 100,000 | 2.60% | 3.25% | 1,111.90 |
| Korea Development Bank . . . . . . . . . | 2015~2025 | 111,190 | USD 100,000 | 2.62% | 3.25% | 1,111.90 |
| Woori Bank . . . . . . . . . . . . . . . . | 2015~2025 | 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |
| KEB Hana Bank . . . . . . . . . . . . . . | 2015~2025 | 55,595 | USD 50,000 | 2.62% | 3.25% | 1,111.90 |

**(4)  Currency swap contracts which are designated as hedge instruments as of December 31, 2016 are as follows:**

| Counterparty | Contract year | Contract amount | | Contract interest rate | | Contract exchange rate |
|---|---|---|---|---|---|---|
| | | Pay | Receive | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | | |
| Standard Chartered . . . . . . | 2011~2017 | ₩ 105,260 | USD 100,000 | 3.99% | 3.63% | 1,052.60 |
| Barclays Bank PLC . . . . . . | 2011~2017 | 105,260 | USD 100,000 | 3.99% | 3.63% | 1,052.60 |
| Citibank . . . . . . . . . . . . . | 2011~2017 | 105,260 | USD 100,000 | 3.99% | 3.63% | 1,052.60 |
| Citibank . . . . . . . . . . . . . | 2013~2018 | 54,570 | USD 50,000 | 2.90% | 3M Libor+1.01% | 1,091.40 |
| Standard Chartered . . . . . . | 2013~2018 | 54,570 | USD 50,000 | 2.90% | 3M Libor+1.01% | 1,091.40 |
| Credit Suisse . . . . . . . . . . | 2013~2018 | 111,410 | USD 100,000 | 3.22% | 3M Libor+1.50% | 1,114.10 |
| HSBC . . . . . . . . . . . . . | 2014~2020 | 99,901 | AUD 100,000 | 3.52% | 5.75% | 999.01 |
| HSBC . . . . . . . . . . . . . | 2014~2020 | 100,482 | AUD 100,000 | 3.48% | 5.75% | 1,004.82 |
| Standard Chartered . . . . . . | 2013~2020 | USD 117,250 | AUD 125,000 | 3M Libor+1.25% | 5.75% | 0.94 |
| Standard Chartered . . . . . . | 2014~2020 | 126,032 | USD 117,250 | 3.55% | 3M Libor+1.25% | 1,074.90 |
| JP Morgan . . . . . . . . . . | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Morgan Stanley . . . . . . . . | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Deutsche Bank . . . . . . . . . | 2014~2019 | 107,190 | USD 100,000 | 3M Libor+3.25% | 2.75% | 1,071.90 |
| Korea Development Bank . . . . . . . . . . . . . . | 2016~2021 | 121,000 | USD 100,000 | 2.15% | 2.50% | 1,210.00 |
| Morgan Stanley . . . . . . . . | 2016~2021 | 121,000 | USD 100,000 | 3M Libor+2.10% | 2.50% | 1,210.00 |
| BNP Paribas . . . . . . . . . . | 2016~2021 | 121,000 | USD 100,000 | 3M Libor+2.10% | 2.50% | 1,210.00 |
| Morgan Stanley . . . . . . . . | 2012~2017 | 285,000 | USD 250,000 | 3.76% | 3.13% | 1,140.00 |
| Credit Agricole . . . . . . . . | 2012~2017 | 142,500 | USD 125,000 | 3.83% | 3.13% | 1,140.00 |
| JP Morgan . . . . . . . . . . . . | 2012~2017 | 142,500 | USD 125,000 | 3.83% | 3.13% | 1,140.00 |
| Credit Agricole . . . . . . . . | 2013~2019 | 118,343 | CHF 100,000 | 3.47% | 1.63% | 1,183.43 |
| Morgan Stanley . . . . . . . . | 2013~2019 | 59,172 | CHF 50,000 | 3.40% | 1.63% | 1,183.43 |
| Nomura . . . . . . . . . . . . . | 2013~2019 | 59,172 | CHF 50,000 | 3.47% | 1.63% | 1,183.43 |
| Morgan Stanley . . . . . . . . | 2013~2018 | 107,360 | USD 100,000 | 3.27% | 2.88% | 1,073.60 |
| Credit Agricole . . . . . . . . | 2013~2018 | 107,360 | USD 100,000 | 3.34% | 2.88% | 1,073.60 |
| JP Morgan . . . . . . . . . . . . | 2013~2018 | 161,040 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| Standard Chartered . . . . . . | 2013~2018 | 161,040 | USD 150,000 | 3.34% | 2.88% | 1,073.60 |
| Standard Chartered . . . . . . | 2014~2019 | 104,490 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |
| Credit Agricole . . . . . . . . | 2014~2019 | 104,490 | USD 100,000 | 2.77% | 2.63% | 1,044.90 |

F-69

| Counterparty | Contract year | Contract amount | | Contract interest rate | | Contract exchange rate |
|---|---|---|---|---|---|---|
| | | Pay | Receive | Pay | Receive | |
| | | In millions of won and thousands of foreign currencies | | | | |
| Morgan Stanley . . . . . . . . . | 2014~2019 | ₩ 104,490 | USD 100,000 | 2.70% | 2.63% | 1,044.90 |
| Barclays Bank PLC . . . . . . | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Credit Agricole . . . . . . . . | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Deutsche Bank . . . . . . . . | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Citibank . . . . . . . . . . . . . | 2013~2018 | 81,188 | USD 75,000 | 2.65% | 1.88% | 1,082.50 |
| Standard Chartered . . . . . . | 2014~2017 | 54,205 | USD 50,000 | 2.93% | 3M Libor+1.05% | 1,084.10 |
| Credit Agricole . . . . . . . . | 2014~2017 | 54,205 | USD 50,000 | 2.93% | 3M Libor+1.05% | 1,084.10 |
| HSBC . . . . . . . . . . . . . . | 2012~2017 | 115,140 | USD 100,000 | 3.38% | 2.50% | 1,151.40 |
| BNP Paribas . . . . . . . . . . | 2012~2017 | 115,140 | USD 100,000 | 3.38% | 2.50% | 1,151.40 |
| KEB Hana Bank . . . . . . . . | 2012~2017 | 115,140 | USD 100,000 | 3.38% | 2.50% | 1,151.40 |
| Barclays Bank PLC . . . . . . | 2012~2017 | 57,570 | USD 50,000 | 3.38% | 2.50% | 1,151.40 |
| Standard Chartered . . . . . . | 2012~2017 | 57,570 | USD 50,000 | 3.38% | 2.50% | 1,151.40 |
| Nomura . . . . . . . . . . . . . . | 2012~2017 | 57,570 | USD 50,000 | 3.38% | 2.50% | 1,151.40 |
| Credit Agricole . . . . . . . . | 2012~2017 | 57,570 | USD 50,000 | 3.38% | 2.50% | 1,151.40 |
| Societe Generale . . . . . . . . | 2013~2018 | 106,190 | USD 100,000 | 3.48% | 2.63% | 1,061.90 |
| BNP Paribas . . . . . . . . . . | 2013~2018 | 53,095 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| KEB Hana Bank . . . . . . . . | 2013~2018 | 53,095 | USD 50,000 | 3.48% | 2.63% | 1,061.90 |
| Standard Chartered . . . . . . | 2013~2018 | 106,030 | USD 100,000 | 3.48% | 2.63% | 1,060.30 |
| Barclays Bank PLC . . . . . . | 2013~2018 | 53,015 | USD 50,000 | 3.48% | 2.63% | 1,060.30 |
| KEB Hana Bank . . . . . . . . | 2013~2018 | 31,809 | USD 30,000 | 3.48% | 2.63% | 1,060.30 |
| Societe Generale . . . . . . . . | 2013~2018 | 21,206 | USD 20,000 | 3.48% | 2.63% | 1,060.30 |
| HSBC . . . . . . . . . . . . . . | 2013~2018 | 53,015 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| Nomura . . . . . . . . . . . . . . | 2013~2018 | 53,015 | USD 50,000 | 3.47% | 2.63% | 1,060.30 |
| Credit Agricole . . . . . . . . | 2014~2020 | 110,680 | USD 100,000 | 2.29% | 2.50% | 1,106.80 |
| Societe Generale . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| KEB Hana Bank . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.16% | 2.50% | 1,106.80 |
| KEB Hana Bank . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| Standard Chartered . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| HSBC . . . . . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| Nomura . . . . . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| Barclays Bank PLC . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |
| HSBC . . . . . . . . . . . . . . | 2014~2020 | 55,340 | USD 50,000 | 2.21% | 2.50% | 1,106.80 |

(5) **Interest rate swap contracts which are not designated as hedge instruments as of December 31, 2016 are as follows:**

| Counterparty | Contract year | Contract amount | Contract interest rate per annum | |
|---|---|---|---|---|
| | | | Pay | Receive |
| | | In millions of won | | |
| Standard Chartered . . . . . . . . . . . . . . . . . . . . | 2012~2017 | ₩160,000 | 3.57% | 3M CD + 0.32% |
| JP Morgan . . . . . . . . . . . . . . . . . . . . . . . . | 2013~2018 | 150,000 | 3.58% | 3M CD + 0.31% |
| Credit Suisse . . . . . . . . . . . . . . . . . . . . . . | 2014~2018 | 200,000 | 2.98% | 1Y CMT + 0.31% |
| Korea Development Bank(*) . . . . . . . . . . . . . | 2014~2029 | 40,000 | 3M CD – 0.03% | 4.65% |
| Export-Import Bank of Korea . . . . . . . . . . . . | 2015~2031 | USD 15,893 | 2.67% | 6M USD Libor |
| ING Bank . . . . . . . . . . . . . . . . . . . . . . . . . | 2015~2031 | USD 7,861 | 2.67% | 6M USD Libor |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . . . . | 2015~2031 | USD 7,861 | 2.67% | 6M USD Libor |

(*) The contract is an interest rate swap hedging on Electricity Bonds 885, and the banks would notify the Company of the early termination every year on the early termination notification date (every year on April 28, from 2017 until 2028). The contract will be terminated if the early termination is notified.

**(6) Interest rate swap contracts which are designated as hedge instruments as of December 31, 2016 are as follows:**

| Counterparty | Contract year | Contract amount | Contract interest rate per annum | |
|---|---|---|---|---|
| | | | Pay | Receive |
| | | | In thousands of U.S. dollars | |
| BNP Paribas . . . . . . . . . . . . . . . . . . . . . | 2009~2027 | USD 94,790 | 4.16% | 6M USD Libor |
| KFW . . . . . . . . . . . . . . . . . . . . . . . . . . | 2009~2027 | USD 94,790 | 4.16% | 6M USD Libor |
| Credit Agricole . . . . . . . . . . . . . . . . . . | 2016~2033 | USD 99,694 | 3.98% ~ 4.10% | 6M USD Libor |
| SMBC . . . . . . . . . . . . . . . . . . . . . . . . . | 2016~2033 | USD 130,369 | 4.05% ~ 4.18% | 6M USD Libor |

**(7) Gain and loss on valuation and transaction of derivatives for the years ended December 31, 2015 and 2016 are as follows and included in finance income and costs in the consolidated statements of comprehensive income (loss):**

| | Net income effects of valuation gain (loss) | | Net income effects of transaction gain (loss) | | Accumulated other comprehensive income (loss)(*) | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2015 | 2016 | 2015 | 2016 |
| | In millions of won | | | | | |
| Currency forward . . . . . . . . . . . . . . . . . . . . . . . . . ₩ | 357 | 15,993 | 8,523 | 4,266 | — | — |
| Currency swap . . . . . . . . . . . . . . . . . . . . . . . . . . | 431,565 | 253,035 | 75,752 | (68,266) | (6,926) | 40,031 |
| Interest rate swap . . . . . . . . . . . . . . . . . . . . . . . . | 161,609 | 8,517 | 30,314 | 7,562 | 4,082 | 6,719 |
| Other derivatives . . . . . . . . . . . . . . . . . . . . . . . . . | — | 10,523 | — | — | — | — |
| ₩ | 593,531 | 288,068 | 114,589 | (56,438) | (2,844) | 46,750 |

(*)   As of December 31, 2016, the net gain on valuation of derivatives using cash flow hedge accounting of ₩28,414 million, net of tax, is included in other comprehensive income or loss.

## 12. Other Financial Assets

**(1) Other financial assets as of December 31, 2015 and 2016 are as follows:**

| | 2015 | | 2016 | |
|---|---|---|---|---|
| | Current | Non-current | Current | Non-current |
| | In millions of won | | | |
| Loans and receivables . . . . . . . . . . . . . . . . . . . . ₩ | 106,013 | 678,126 | 198,133 | 683,353 |
| Allowance for doubtful accounts . . . . . . . . . . . | — | — | — | (4,532) |
| Present value discount . . . . . . . . . . . . . . . . . . . . | (859) | (48,223) | (1,001) | (41,746) |
| Long / short-term financial instruments . . . . . . | 5,132,829 | 758,037 | 2,281,460 | 414,466 |
| ₩ | 5,237,983 | 1,387,940 | 2,478,592 | 1,051,541 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**(2) Loans and receivables as of December 31, 2015 and 2016 are as follows:**

| | 2015 | | |
|---|---|---|---|
| | **Face value** | **Present value discount** | **Book value** |
| | In millions of won | | |
| **Short-term loans and receivables** | | | |
| Loans for tuition ........................... ₩ | 29,210 | (859) | 28,351 |
| Loans for housing ......................... | 11,170 | — | 11,170 |
| Fisheries loan ............................ | 6,032 | — | 6,032 |
| Other loans .............................. | 59,601 | — | 59,601 |
| | 106,013 | (859) | 105,154 |
| **Long-term loans and receivables** | | | |
| Loans for tuition ........................... | 390,738 | (47,822) | 342,916 |
| Loans for housing ......................... | 132,239 | — | 132,239 |
| Loans for related parties ..................... | 99,768 | — | 99,768 |
| Fisheries loan ............................ | 1,664 | (401) | 1,263 |
| Other loans .............................. | 53,717 | — | 53,717 |
| | 678,126 | (48,223) | 629,903 |
| ₩ | 784,139 | (49,082) | 735,057 |

| | 2016 | | | |
|---|---|---|---|---|
| | **Face value** | **Allowance for doubtful accounts** | **Present value discount** | **Book value** |
| | In millions of won | | | |
| **Short-term loans and receivables** | | | | |
| Loans for tuition ............... ₩ | 29,028 | — | (1,001) | 28,027 |
| Loans for housing .............. | 12,556 | — | — | 12,556 |
| Fisheries loan ................. | 352 | — | — | 352 |
| Other loans ................... | 156,197 | — | — | 156,197 |
| | 198,133 | — | (1,001) | 197,132 |
| **Long-term loans and receivables** | | | | |
| Loans for tuition ............... | 404,200 | — | (41,593) | 362,607 |
| Loans for housing .............. | 125,850 | — | — | 125,850 |
| Loans for related parties ......... | 91,249 | (4,532) | — | 86,717 |
| Fisheries loan ................. | 1,312 | — | (153) | 1,159 |
| Other loans ................... | 60,742 | — | — | 60,742 |
| | 683,353 | (4,532) | (41,746) | 637,075 |
| ₩ | 881,486 | (4,532) | (42,747) | 834,207 |

**(3) Changes in the allowance for doubtful accounts of Loans and receivables for the year ended December 31, 2016 is as follows:**

| | 2016 |
|---|---|
| | In millions of won |
| **Beginning balance** ............................................... ₩ | — |
| Bad debt expense ............................................ | 4,352 |
| Other ..................................................... | 180 |
| **Ending balance** ................................................. ₩ | 4,532 |

F-72

**(4)** Long-term and short-term financial instruments as of December 31, 2015 and 2016 are as follows:

| | | 2015 | | 2016 | |
|---|---|---|---|---|---|
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| Time deposits . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 2,131,089 | 3 | 1,820,391 | 30,000 |
| ABCP . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 2,598,791 | 5,000 | 351,800 | 132,600 |
| CP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 48,350 | — | 16,000 | |
| CD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 163,649 | — | 60,443 | — |
| RP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | — | 652,700 | — | 1,521 |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 190,950 | 100,334 | 32,826 | 250,345 |
| | ₩ | 5,132,829 | 758,037 | 2,281,460 | 414,466 |

**13. Inventories**

Inventories as of December 31, 2015 and 2016 are as follows:

| | | 2015 | | |
|---|---|---|---|---|
| | | Acquisition cost | Valuation allowance | Book value |
| | | | In millions of won | |
| Raw materials . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 3,304,220 | (1,238) | 3,302,982 |
| Work-in-progress . . . . . . . . . . . . . . . . . . . . . | | 133,226 | — | 133,226 |
| Finished goods . . . . . . . . . . . . . . . . . . . . . . | | 51,073 | — | 51,073 |
| Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,062,307 | (4,428) | 1,057,879 |
| Inventories in transit . . . . . . . . . . . . . . . . . . . | | 392,340 | — | 392,340 |
| Other inventories . . . . . . . . . . . . . . . . . . . . . | | 8,913 | — | 8,913 |
| | ₩ | 4,952,079 | (5,666) | 4,946,413 |

| | | 2016 | | |
|---|---|---|---|---|
| | | Acquisition cost | Valuation allowance | Book value |
| | | | In millions of won | |
| Raw materials . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 3,182,711 | (1,323) | 3,181,388 |
| Merchandise . . . . . . . . . . . . . . . . . . . . . . . . | | 20 | — | 20 |
| Work-in-progress . . . . . . . . . . . . . . . . . . . . . | | 118,640 | — | 118,640 |
| Finished goods . . . . . . . . . . . . . . . . . . . . . . | | 57,659 | — | 57,659 |
| Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,289,160 | (4,553) | 1,284,607 |
| Inventories in transit . . . . . . . . . . . . . . . . . . . | | 827,437 | — | 827,437 |
| Other inventories . . . . . . . . . . . . . . . . . . . . . | | 9,692 | — | 9,692 |
| | ₩ | 5,485,319 | (5,876) | 5,479,443 |

The reversal of the allowance for loss on inventory valuation due to increase in the net realizable value of inventory deducted from cost of sales was ₩3,029 million for the year ended December 31, 2014. The allowance for loss on inventory valuation due to decrease in the net realizable value of inventory added to cost of sales was ₩533 million for the year ended December 31, 2015. The reversal of the allowance for loss on inventory valuation due to increase in the net realizable value of inventory deducted from cost of sales was ₩2,473 million for the year ended December 31, 2016. The amounts of loss from inventory valuation included in other gains or losses for the years ended December 31, 2014, 2015 and 2016 were ₩2,709 million, ₩1,318 million and ₩2,683 million, respectively.

**14.  Finance Lease Receivables**

**(1)  Finance lease contracts**

The Company entered into a power purchase agreement ("PPA") with Jordan Electric Power Company to provide a 373MW level Qatrana gas combined power plant over a 25 year lease term, and accounts for the PPA as a finance lease. Also, the Company has fly-ash pipe conduit finance leases with an average lease term of 7 years. In addition, the Company entered into a PPA with the Comision Federal de Electricidad in Mexico to provide for 25 years of all electricity generated from the power plant after completion of its construction and collect rates consisting of fixed costs (to recover the capital) and variable costs during the contracted period.

**(2)  Finance lease receivables as of December 31, 2015 and 2016 are as follows and included in current and non-current trade and other receivables, net, in the consolidated statements of financial position:**

| | | 2015 | | 2016 | |
|---|---|---|---|---|---|
| | | Minimum lease payments | Present value of minimum lease payments | Minimum lease payments | Present value of minimum lease payments |
| | | In millions of won | | | |
| Less than 1 year . . . . . . . . . . . | ₩ | 98,488 | 12,098 | 55,708 | 12,225 |
| 1 ~ 5 years . . . . . . . . . . . . . . . | | 407,426 | 203,699 | 423,152 | 214,176 |
| More than 5 years . . . . . . . . . . | | 1,689,281 | 738,011 | 1,690,492 | 746,473 |
| | ₩ | 2,195,195 | 953,808 | 2,169,352 | 972,874 |

**(3)  There are no impaired finance lease receivables as of December 31, 2015 and 2016.**

**15.  Non-Financial Assets**

Non-financial assets as of December 31, 2015 and 2016 are as follows:

| | | 2015 | | 2016 | |
|---|---|---|---|---|---|
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| Advance payment . . . . . . . . . . . . . . . . . . . . . . . | ₩ | 102,842 | 25,172 | 93,279 | 71,238 |
| Prepaid expenses  . . . . . . . . . . . . . . . . . . . . . . | | 159,378 | 85,105 | 228,142 | 78,066 |
| Others(*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 135,730 | 20,956 | 310,439 | 32,485 |
| | ₩ | 397,950 | 131,233 | 631,860 | 181,789 |

(*)  Details of others as of December 31, 2015 and 2016 are as follows:

| | | 2015 | | 2016 | |
|---|---|---|---|---|---|
| | | Current | Non-current | Current | Non-current |
| | | In millions of won | | | |
| Tax refund receivables . . . . . . . . . . . . . . . . . . . . | ₩ | 39,158 | 2,658 | 30,959 | 2,188 |
| Greenhouse gas emissions rights  . . . . . . . . . . . . | | 51,158 | — | 145,105 | — |
| Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 45,414 | 18,298 | 134,375 | 30,297 |
| | ₩ | 135,730 | 20,956 | 310,439 | 32,485 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**16. Consolidated Subsidiaries**

**(1) Consolidated subsidiaries as of December 31, 2015 and 2016 are as follows:**

| Subsidiaries | Key operation activities | Location | Percentage of ownership (%) 2015 | 2016 |
|---|---|---|---|---|
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea South-East Power Co., Ltd. . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea Midland Power Co., Ltd. . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea Western Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea Southern Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| Korea East-West Power Co., Ltd. . . . . . . . | Power generation | KOREA | 100.00% | 100.00% |
| KEPCO Engineering & Construction Company, Inc.(*1) . . . . . . . . . . . . . . . | Architectural engineering for utility plant and others | KOREA | 66.32% | 65.77% |
| KEPCO Plant Service & Engineering Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | Utility plant maintenance and others | KOREA | 52.48% | 51.00% |
| KEPCO Nuclear Fuel Co., Ltd. . . . . . . . . | Nuclear fuel | KOREA | 96.36% | 96.36% |
| KEPCO KDN Co., Ltd. . . . . . . . . . . . . . . | Electric power information technology and others | KOREA | 100.00% | 100.00% |
| Garolim Tidal Power Plant Co., Ltd.(*2) . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.00% | 49.00% |
| KEPCO International HongKong Ltd. . . . | Holding company | HONG KONG | 100.00% | 100.00% |
| KEPCO International Philippines Inc. . . . | Holding company | PHILIPPINES | 100.00% | 100.00% |
| KEPCO Gansu International Ltd. . . . . . . . | Holding company | HONG KONG | 100.00% | 100.00% |
| KEPCO Philippines Holdings Inc. . . . . . . | Holding company | PHILIPPINES | 100.00% | 100.00% |
| KEPCO Philippines Corporation . . . . . . . | Operation of utility plant | PHILIPPINES | 100.00% | 100.00% |
| KEPCO Ilijan Corporation . . . . . . . . . . . | Utility plant rehabilitation and operation | PHILIPPINES | 51.00% | 51.00% |
| KEPCO Lebanon SARL . . . . . . . . . . . . . . | Operation of utility plant | LEBANON | 100.00% | 100.00% |
| KEPCO Neimenggu International Ltd. . . . | Holding company | HONG KONG | 100.00% | 100.00% |
| KEPCO Shanxi International Ltd. . . . . . . | Holding company | HONG KONG | 100.00% | 100.00% |
| KOMIPO Global Pte Ltd. . . . . . . . . . . . . . | Holding company | SINGAPORE | 100.00% | 100.00% |
| KEPCO Canada Energy Ltd. . . . . . . . . . . | Resources development | CANADA | 100.00% | 100.00% |
| KEPCO Netherlands B.V. . . . . . . . . . . . . | Holding company | NETHERLANDS | 100.00% | 100.00% |
| KOREA Imouraren Uranium Investment Corp. . . . . . . . . . . . . . . . . . . . . . . . . | Resources development | FRANCE | 100.00% | 100.00% |
| KEPCO Australia Pty., Ltd. . . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOSEP Australia Pty., Ltd. . . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOMIPO Australia Pty., Ltd. . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOWEPO Australia Pty., Ltd. . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KOSPO Australia Pty., Ltd. . . . . . . . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| KEPCO Middle East Holding Company . . . . . . . . . . . . . . . . . . . . . . | Holding company | BAHRAIN | 100.00% | 100.00% |
| Qatrana Electric Power Company . . . . . . | Construction and operation of utility plant | JORDAN | 80.00% | 80.00% |
| KHNP Canada Energy, Ltd. . . . . . . . . . . | Resources development | CANADA | 100.00% | 100.00% |
| KEPCO Bylong Australia Pty., Ltd. . . . . . | Resources development | AUSTRALIA | 100.00% | 100.00% |
| Korea Waterbury Uranium Limited Partnership . . . . . . . . . . . . . . . . . . . | Resources development | CANADA | 79.64% | 79.64% |
| KEPCO Canada Uranium Investment Limited Partnership . . . . . . . . . . . . . . | Resources development | CANADA | 100.00% | — |
| Korea Electric Power Nigeria Ltd. . . . . . . | Operation of utility plant | NIGERIA | 100.00% | 100.00% |
| KEPCO Holdings de Mexico . . . . . . . . . . | Holding company | MEXICO | 100.00% | 100.00% |
| KST Electric Power Company . . . . . . . . . | Construction and operation of utility plant | MEXICO | 56.00% | 56.00% |
| KEPCO Energy Service Company . . . . . . | Operation of utility plant | MEXICO | 100.00% | 100.00% |
| KEPCO Netherlands S3 B.V. . . . . . . . . . . | Holding company | NETHERLANDS | 100.00% | 100.00% |

F-75

| Subsidiaries | Key operation activities | Location | Percentage of ownership (%) | |
|---|---|---|---|---|
| | | | 2015 | 2016 |
| PT. KOMIPO Pembangkitan Jawa Bali | Operation of utility plant | INDONESIA | 51.00% | 51.00% |
| PT. Cirebon Power Service(*2) | Operation of utility plant | INDONESIA | 27.50% | 27.50% |
| KOWEPO International Corporation | Operation of utility plant | PHILIPPINES | 99.99% | 99.99% |
| KOSPO Jordan LLC | Operation of utility plant | JORDAN | 100.00% | 100.00% |
| EWP Philippines Corporation | Operation of utility plant | PHILIPPINES | 100.00% | 100.00% |
| EWP America Inc. | Holding company | USA | 100.00% | 100.00% |
| EWP Renewable Co. | Holding company | USA | 100.00% | 100.00% |
| DG Fairhaven Power, LLC | Power generation | USA | 100.00% | 100.00% |
| DG Kings Plaza, LLC | Power generation | USA | 100.00% | — |
| DG Whitefield, LLC | Power generation | USA | 100.00% | 100.00% |
| Springfield Power, LLC | Power generation | USA | 100.00% | 100.00% |
| KNF Canada Energy Limited | Resources development | CANADA | 96.36% | 96.36% |
| PT KEPCO Resource Indonesia | Holding company | INDONESIA | 100.00% | 100.00% |
| EWP Barbados 1 SRL | Holding company | BARBADOS | 100.00% | 100.00% |
| California Power Holdings, LLC | Power generation | USA | 100.00% | 100.00% |
| Gyeonggi Green Energy Co., Ltd. | Power generation | KOREA | 62.01% | 62.01% |
| PT. Tanggamus Electric Power | Power generation | INDONESIA | 52.50% | 52.50% |
| Gyeongju Wind Power Co., Ltd. | Power generation | KOREA | 70.00% | 70.00% |
| KOMIPO America Inc. | Holding company | USA | 100.00% | 100.00% |
| EWPRC Biomass Holdings, LLC | Holding company | USA | 100.00% | 100.00% |
| KOSEP USA, INC. | Power generation | USA | 100.00% | 100.00% |
| PT. EWP Indonesia | Holding company | INDONESIA | 99.95% | 99.95% |
| KEPCO Netherlands J3 B.V. | Holding company | NETHERLANDS | 100.00% | 100.00% |
| Korea Offshore Wind Power Co., Ltd. | Operation of utility plant | KOREA | 100.00% | 100.00% |
| Global One Pioneer B.V. | Holding company | NETHERLANDS | 100.00% | 100.00% |
| Global Energy Pioneer B.V. | Holding company | NETHERLANDS | 100.00% | 100.00% |
| Mira Power Limited(*3) | Power generation | PAKISTAN | 76.00% | 76.00% |
| KOSEP Material Co., Ltd.(*4) | Power generation | KOREA | 46.22% | 46.22% |
| Commerce and Industry Energy Co., Ltd.(*5) | Power generation | KOREA | 59.03% | 59.03% |
| KEPCO Singapore Holdings Pte., Ltd. | Holding company | SINGAPORE | 100.00% | 100.00% |
| KOWEPO India Private Limited | Holding company | INDIA | 100.00% | 100.00% |
| KEPCO KPS Philippines Corp. | Utility plant maintenance and others | PHILIPPINES | 52.48% | 51.00% |
| KOSPO Chile SpA | Holding company | CHILE | 100.00% | 100.00% |
| PT. KOWEPO Sumsel Operation and Maintenance Services | Utility plant maintenance and others | INDONESIA | 95.00% | 95.00% |
| HeeMang Sunlight Power Co., Ltd. | Power generation | KOREA | 100.00% | 100.00% |
| Fujeij Wind Power Company | Operation of utility plant | JORDAN | 100.00% | 100.00% |
| KOSPO Youngnam Power Co., Ltd. | Operation of utility plant | KOREA | 50.00% | 50.00% |
| Global One Carbon Private Equity Investment Trust 2 | Holding company | KOREA | — | 96.67% |
| Chitose Solar Power Plant LLC | Power generation | JAPAN | — | 80.10% |
| KEPCO Energy Solution Co. Ltd. | Energy service | KOREA | — | 100.00% |
| Solar School Plant Co., Ltd. | Power generation | KOREA | — | 100.00% |
| KOSPO Power Services Limitada | Utility plant maintenance and others | CHILE | — | 65.00% |
| Energy New Industry Specialized Investment Private Investment Trust | Holding company | KOREA | — | 99.75% |
| KOEN Bylong Pty., Ltd. | Resources development | AUSTRALIA | — | 100.00% |
| KOMIPO Bylong Pty., Ltd. | Resources development | AUSTRALIA | — | 100.00% |
| KOWEPO Bylong Pty., Ltd. | Resources development | AUSTRALIA | — | 100.00% |
| KOSPO Bylong Pty., Ltd. | Resources development | AUSTRALIA | — | 100.00% |
| EWP Bylong Pty., Ltd. | Resources development | AUSTRALIA | — | 100.00% |
| KOWEPO Lao International | Utility plant maintenance and others | LAOS | — | 100.00% |

F-76

(*1)  Considering treasury stocks, the effective percentage of ownership is 66.08%.

(*2)  These subsidiaries are included in the consolidated financial statements as the Company obtained the majority of the voting power through the shareholders' agreement.

(*3)  As of reporting date, the reporting period of all subsidiaries is December 31, except for Mira Power Limited which is November 30.

(*4)  According to the shareholders' agreement reached in April 2014, Korea South-East Power Co., Ltd. ("KOSEP") signed a contract with Long Lasting Value ("LLV") to guarantee the principal and certain rate of return on LLV's shares in KOSEP Material Co., Ltd. Moreover, LLV has put options to sell their investment to KOSEP. Therefore, the Company accounted for this agreement as KOSEP acquiring the shares of KOSEP Material from LLV. As such, the effective percentage of ownership is 86.20% as of December 31, 2016.

(*5)  The Company guarantees a certain return on investment related to Commerce and Industry Energy Co., Ltd. for the financial investors. The financial investors have a right to sell their shares to the Company which can be exercised 84 months after the date of investment. Accordingly, the purchase price including the return on investment is classified as a liability.

**(2)  Subsidiaries newly included in or excluded from consolidation for the year ended December 31, 2016 are as follows:**

(i)  Subsidiaries newly included in consolidation

| Subsidiary | Reason |
|---|---|
| Global One Carbon Private Equity Investment Trust 2 | Newly Established |
| Chitose Solar Power Plant LLC | Newly Established |
| KEPCO Energy Solution Co. Ltd. | Newly Established |
| Solar School Plant Co., Ltd. | Newly Established |
| KOSPO Power Services Limitada | Newly Established |
| Energy New Industry Specialized Investment Private Investment Trust | Newly Established |
| KOEN Bylong Pty., Ltd. | Newly Established |
| KOMIPO Bylong Pty., Ltd. | Newly Established |
| KOWEPO Bylong Pty., Ltd. | Newly Established |
| KOSPO Bylong Pty., Ltd. | Newly Established |
| EWP Bylong Pty., Ltd. | Newly Established |
| KOWEPO Lao International | Newly Established |

(ii)  Subsidiaries excluded from consolidation

| Subsidiary | Reason |
|---|---|
| KEPCO Canada Uranium Investment Limited Partnership | Dissolved |
| DG Kings Plaza, LLC | Liquidated |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**(3)  Summary of financial information of consolidated subsidiaries as of and for the years ended December 31, 2015 and 2016 are as follows:**

| Subsidiaries | 2015 | | | |
| | Total assets | Total liabilities | Sales | Profit (loss) for the period |
| --- | ---: | ---: | ---: | ---: |
| | In millions of won | | | |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . .₩ | 51,043,890 | 27,386,113 | 10,642,352 | 2,465,244 |
| Korea South-East Power Co., Ltd. . . . . . . . . . . . | 9,326,835 | 4,859,827 | 4,961,711 | 601,204 |
| Korea Midland Power Co., Ltd. . . . . . . . . . . . . | 7,857,199 | 4,648,144 | 3,927,443 | 226,244 |
| Korea Western Power Co., Ltd. . . . . . . . . . . . . | 9,225,791 | 5,719,032 | 4,214,540 | 294,617 |
| Korea Southern Power Co., Ltd. . . . . . . . . . . . | 9,216,084 | 5,525,865 | 4,317,995 | 224,757 |
| Korea East-West Power Co., Ltd. . . . . . . . . . . . | 8,828,603 | 4,836,904 | 4,047,655 | 454,942 |
| KEPCO Engineering & Construction Company, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 855,156 | 438,371 | 657,603 | 31,047 |
| KEPCO Plant Service & Engineering Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,029,304 | 246,342 | 1,171,082 | 168,632 |
| KEPCO Nuclear Fuel Co., Ltd. . . . . . . . . . . . . . | 666,677 | 328,364 | 253,524 | 35,115 |
| KEPCO KDN Co., Ltd. . . . . . . . . . . . . . . . . . | 439,725 | 159,275 | 451,678 | 33,578 |
| Garolim Tidal Power Plant Co., Ltd. . . . . . . . . . | 655 | 346 | — | (76) |
| KEPCO International HongKong Ltd. . . . . . . . . . | 172,686 | 18 | — | 4,993 |
| KEPCO International Philippines Inc. . . . . . . . . | 115,594 | 1,542 | — | 38,541 |
| KEPCO Gansu International Ltd. . . . . . . . . . . . . | 17,405 | 540 | — | (6) |
| KEPCO Philippines Holdings Inc. . . . . . . . . . . . | 132,094 | 26 | — | 24,690 |
| KEPCO Philippines Corporation . . . . . . . . . . . . | 13,998 | 218 | — | 265 |
| KEPCO Ilijan Corporation . . . . . . . . . . . . . . . . | 603,865 | 58,572 | 126,234 | 54,596 |
| KEPCO Lebanon SARL . . . . . . . . . . . . . . . . . . | 741 | 10,182 | — | (1,541) |
| KEPCO Neimenggu International Ltd. . . . . . . . . | 184,860 | 348 | — | 8,027 |
| KEPCO Shanxi International Ltd. . . . . . . . . . . . | 562,652 | 242,270 | — | 22,949 |
| KOMIPO Global Pte Ltd. . . . . . . . . . . . . . . . . . | 187,885 | 29 | — | 16,572 |
| KEPCO Canada Energy Ltd. . . . . . . . . . . . . . . . | 55,945 | 23 | — | (64) |
| KEPCO Netherlands B.V. . . . . . . . . . . . . . . . . . | 169,496 | 61 | — | 1,409 |
| KOREA Imouraren Uranium Investment Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 224,499 | 263 | — | 5,964 |
| KEPCO Australia Pty., Ltd. . . . . . . . . . . . . . . . | 510,892 | 2,541 | 4,510 | 168 |
| KOSEP Australia Pty., Ltd. . . . . . . . . . . . . . . . | 18,180 | 1,581 | 4,729 | 346 |
| KOMIPO Australia Pty., Ltd. . . . . . . . . . . . . . . | 17,397 | 559 | 4,729 | 349 |
| KOWEPO Australia Pty., Ltd. . . . . . . . . . . . . . . | 18,320 | 1,578 | 4,729 | 353 |
| KOSPO Australia Pty., Ltd. . . . . . . . . . . . . . . . | 18,358 | 1,567 | 4,729 | 356 |
| KEPCO Middle East Holding Company . . . . . . . | 147,618 | 150,798 | — | 14,142 |
| Qatrana Electric Power Company . . . . . . . . . . . | 521,206 | 412,587 | 17,844 | 31,767 |
| KHNP Canada Energy, Ltd. . . . . . . . . . . . . . . . | 42,731 | 22 | — | (123) |
| KEPCO Bylong Australia Pty., Ltd. . . . . . . . . . | 183,468 | 236,545 | — | (23,352) |
| Korea Waterbury Uranium Limited Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,370 | 699 | — | (48) |
| KEPCO Canada Uranium Investment Limited Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . | 38,804 | 14 | — | (26,171) |
| Korea Electric Power Nigeria Ltd. . . . . . . . . . . | 1,721 | 1,179 | 55,768 | 309 |
| KEPCO Holdings de Mexico . . . . . . . . . . . . . . | 39 | 34 | — | (13) |
| KST Electric Power Company . . . . . . . . . . . . . | 564,358 | 529,439 | 97,879 | 14,631 |
| KEPCO Energy Service Company . . . . . . . . . . . | 1,435 | 604 | 6,034 | 875 |
| KEPCO Netherlands S3 B.V. . . . . . . . . . . . . . . | 66,251 | 189 | — | 716 |
| PT. KOMIPO Pembangkitan Jawa Bali . . . . . . . | 16,536 | 6,170 | 20,143 | 8,047 |
| PT. Cirebon Power Service . . . . . . . . . . . . . . . | 2,795 | 1,010 | 6,663 | 459 |
| KOWEPO International Corporation . . . . . . . . . | — | — | — | — |
| KOSPO Jordan LLC . . . . . . . . . . . . . . . . . . . . | 12,998 | 1,117 | 9,840 | 2,693 |
| EWP Philippines Corporation . . . . . . . . . . . . . | 2,664 | 1,592 | — | 258 |
| EWP America Inc.(*) . . . . . . . . . . . . . . . . . . . | 115,562 | 82,167 | 59,124 | 3,227 |
| KNF Canada Energy Limited . . . . . . . . . . . . . . | 1,874 | 18 | — | (66) |

F-78

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**2015**

| Subsidiaries | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|
| | | In millions of won | | |
| PT KEPCO Resource Indonesia . . . . . . . . . . . . . . . . . . . . . .W | 1,210 | — | — | (217) |
| EWP Barbados 1 SRL . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 260,638 | 370 | 2,829 | 273 |
| Gyeonggi Green Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . | 315,299 | 249,608 | 104,674 | (4,111) |
| PT. Tanggamus Electric Power . . . . . . . . . . . . . . . . . . . . . | 106,892 | 91,416 | 60,044 | (7,138) |
| Gyeongju Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | 62,600 | 27,822 | 5,993 | 968 |
| KOMIPO America Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,487 | 2,480 | — | 218 |
| KOSEP USA, INC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40,035 | 4,178 | 4,975 | 153 |
| PT. EWP Indonesia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,039 | 15 | — | (374) |
| KEPCO Netherlands J3 B.V. . . . . . . . . . . . . . . . . . . . . . . | 121,492 | 81 | — | 18,858 |
| Korea Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . . | 7,579 | 2,317 | — | (4,213) |
| Global One Pioneer B.V. . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | 20 | — | (48) |
| Global Energy Pioneer B.V. . . . . . . . . . . . . . . . . . . . . . . . | 42 | 20 | — | (48) |
| Mira Power Limited . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 110,918 | 66,963 | — | (1,581) |
| KOSEP Material Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 29,768 | 28,013 | 26,310 | (17,665) |
| Commerce and Industry Energy Co., Ltd. . . . . . . . . . . . . . | 99,638 | 86,727 | 24,774 | (3,387) |
| KEPCO Singapore Holdings Pte., Ltd. . . . . . . . . . . . . . . . | 1,817 | — | — | (9) |
| KOWEPO India Private Limited . . . . . . . . . . . . . . . . . . . . | 911 | 10 | — | (105) |
| KEPCO KPS Philippines Corp. . . . . . . . . . . . . . . . . . . . . . | 5,688 | 953 | 14,278 | 1,677 |
| KOSPO Chile SpA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 133 | 4,642 | — | (942) |
| PT. KOWEPO Sumsel Operation and Maintenance Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,053 | 51 | 5,405 | 1,762 |
| HeeMang Sunlight Power Co., Ltd. . . . . . . . . . . . . . . . . . . | 4,711 | — | — | (9) |
| Fujeij Wind Power Company . . . . . . . . . . . . . . . . . . . . . . . | 83 | — | — | — |
| KOSPO Youngnam Power Co., Ltd. . . . . . . . . . . . . . . . . . | 82,173 | 32,166 | — | 7 |

(*) Financial information of EWP America Inc. includes that of seven other subsidiaries, EWP Renewable Co., DG Fairhaven Power, LLC, DG Kings Plaza, LLC, DG Whitefield, LLC, Springfield Power, LLC, California Power Holdings, LLC, and EWPRC Biomass Holdings, LLC.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

|  | 2016 | | | |
| Subsidiaries | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|
|  | In millions of won | | | |
| Korea Hydro & Nuclear Power Co., Ltd. . . . . . . . . . . . . . ₩ | 52,782,915 | 27,366,938 | 11,168,579 | 2,454,810 |
| Korea South-East Power Co., Ltd. . . . . . . . . . . . . . . . . . | 9,773,778 | 4,794,330 | 5,093,598 | 531,061 |
| Korea Midland Power Co., Ltd. . . . . . . . . . . . . . . . . . . . | 9,066,666 | 5,416,336 | 3,719,981 | 400,696 |
| Korea Western Power Co., Ltd. . . . . . . . . . . . . . . . . . . . | 9,810,714 | 5,866,916 | 4,169,712 | 401,936 |
| Korea Southern Power Co., Ltd. . . . . . . . . . . . . . . . . . . | 9,806,023 | 5,637,950 | 4,200,035 | 426,337 |
| Korea East-West Power Co., Ltd. . . . . . . . . . . . . . . . . . | 8,967,951 | 4,488,911 | 4,210,898 | 467,603 |
| KEPCO Engineering & Construction Company, Inc. . . . | 786,596 | 364,676 | 506,012 | 17,796 |
| KEPCO Plant Service & Engineering Co., Ltd. . . . . . . . | 1,086,421 | 301,490 | 1,214,304 | 86,657 |
| KEPCO Nuclear Fuel Co., Ltd. . . . . . . . . . . . . . . . . . . . | 713,230 | 346,012 | 309,911 | 33,115 |
| KEPCO KDN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 519,901 | 205,869 | 588,160 | 43,127 |
| Garolim Tidal Power Plant Co., Ltd. . . . . . . . . . . . . . . . | 632 | 346 | — | -24 |
| KEPCO International HongKong Ltd. . . . . . . . . . . . . . . . | 173,138 | 41 | — | 4,532 |
| KEPCO International Philippines Inc. . . . . . . . . . . . . . . | 114,141 | 1,468 | — | 56,783 |
| KEPCO Gansu International Ltd. . . . . . . . . . . . . . . . . . . | 17,928 | 557 | — | (18) |
| KEPCO Philippines Holdings Inc. . . . . . . . . . . . . . . . . . | 125,100 | 27 | — | 13,517 |
| KEPCO Philippines Corporation . . . . . . . . . . . . . . . . . . | 13,704 | 8,949 | — | (8,717) |
| KEPCO Ilijan Corporation . . . . . . . . . . . . . . . . . . . . . . | 558,030 | 58,449 | 116,667 | 51,552 |
| KEPCO Lebanon SARL . . . . . . . . . . . . . . . . . . . . . . . . | 1,458 | 10,312 | — | 810 |
| KEPCO Neimenggu International Ltd. . . . . . . . . . . . . . . | 186,636 | — | — | 7,082 |
| KEPCO Shanxi International Ltd. . . . . . . . . . . . . . . . . . | 549,189 | 218,047 | — | 5,812 |
| KOMIPO Global Pte Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 223,082 | 1,095 | — | 36,764 |
| KEPCO Canada Energy Ltd. . . . . . . . . . . . . . . . . . . . . . | 202 | 24 | — | (27,216) |
| KEPCO Netherlands B.V. . . . . . . . . . . . . . . . . . . . . . . . | 128,014 | 35 | — | 224 |
| KOREA Imouraren Uranium Investment Corp. . . . . . . . | 154,302 | 764 | — | (68,417) |
| KEPCO Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . | 503,657 | 1,545 | 3,670 | (19,006) |
| KOSEP Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . | 25,174 | 521 | 5,357 | 4,028 |
| KOMIPO Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . | 25,413 | 10 | 5,388 | 4,023 |
| KOWEPO Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . | 25,550 | 10 | 5,357 | 4,012 |
| KOSPO Australia Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . | 25,625 | 10 | 5,357 | 4,033 |
| KEPCO Middle East Holding Company . . . . . . . . . . . . . | 128,846 | 125,008 | — | 6,840 |
| Qatrana Electric Power Company . . . . . . . . . . . . . . . . . | 546,123 | 417,800 | 18,866 | 19,601 |
| KHNP Canada Energy, Ltd. . . . . . . . . . . . . . . . . . . . . . | 54,374 | 46 | — | (6,304) |
| KEPCO Bylong Australia Pty., Ltd. . . . . . . . . . . . . . . . | 220,721 | 277,358 | — | (2,357) |
| Korea Waterbury Uranium Limited Partnership . . . . . . . | 20,882 | 149 | — | 2,348 |
| Korea Electric Power Nigeria Ltd. . . . . . . . . . . . . . . . . . | 696 | 493 | 9,794 | 35 |
| KEPCO Holdings de Mexico . . . . . . . . . . . . . . . . . . . . . | 262 | 19 | — | 251 |
| KST Electric Power Company . . . . . . . . . . . . . . . . . . . . | 596,823 | 539,459 | 146,295 | 17,322 |
| KEPCO Energy Service Company . . . . . . . . . . . . . . . . . | 1,309 | 310 | 5,337 | 580 |
| KEPCO Netherlands S3 B.V. . . . . . . . . . . . . . . . . . . . . | 55,609 | 54 | — | 3,731 |
| PT. KOMIPO Pembangkitan Jawa Bali . . . . . . . . . . . . . | 16,246 | 4,549 | 21,632 | 8,989 |
| PT. Cirebon Power Service . . . . . . . . . . . . . . . . . . . . . . | 3,456 | 1,228 | 7,463 | 301 |
| KOWEPO International Corporation . . . . . . . . . . . . . . . | — | — | — | — |
| KOSPO Jordan LLC . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,524 | 687 | 7,321 | 317 |
| EWP Philippines Corporation . . . . . . . . . . . . . . . . . . . | 1,966 | 955 | — | (41) |
| EWP America Inc.(*) . . . . . . . . . . . . . . . . . . . . . . . . . . | 104,809 | 80,252 | 33,616 | (8,704) |
| KNF Canada Energy Limited . . . . . . . . . . . . . . . . . . . . | 1,967 | 20 | — | (46) |
| PT KEPCO Resource Indonesia . . . . . . . . . . . . . . . . . . | 913 | 18 | — | (341) |
| EWP Barbados 1 SRL . . . . . . . . . . . . . . . . . . . . . . . . . | 267,859 | 425 | 1,656 | (902) |
| Gyeonggi Green Energy Co., Ltd. . . . . . . . . . . . . . . . . . | 301,126 | 221,078 | 108,557 | 19,211 |
| PT. Tanggamus Electric Power . . . . . . . . . . . . . . . . . . . | 184,861 | 167,641 | 40,903 | 2,041 |
| Gyeongju Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . | 76,569 | 49,293 | 6,413 | 1,269 |
| KOMIPO America Inc. . . . . . . . . . . . . . . . . . . . . . . . . . | 11,518 | 2,432 | — | (2,240) |
| KOSEP USA, INC. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 159 | 39,028 | 3,791 | (72,817) |
| PT. EWP Indonesia . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,154 | 50 | — | 1,088 |
| KEPCO Netherlands J3 B.V. . . . . . . . . . . . . . . . . . . . . | 125,337 | 68 | — | 12,433 |

F-80

**2016**

| Subsidiaries | Total assets | Total liabilities | Sales | Profit (loss) for the period |
|---|---|---|---|---|
| | In millions of won | | | |
| Korea Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . ₩ | 37,826 | 2,048 | — | (4,960) |
| Global One Pioneer B.V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 161 | 22 | — | (54) |
| Global Energy Pioneer B.V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 338 | 22 | — | (59) |
| Mira Power Limited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 178,141 | 133,730 | — | (954) |
| KOSEP Material Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,398 | 1,497 | 3,232 | (901) |
| Commerce and Industry Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . | 99,432 | 87,316 | 28,375 | (536) |
| KEPCO Singapore Holdings Pte., Ltd. . . . . . . . . . . . . . . . . . . . . . | 2,568 | 13 | — | (33) |
| KOWEPO India Private Limited . . . . . . . . . . . . . . . . . . . . . . . . . . | 879 | — | — | 1 |
| KEPCO KPS Philippines Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,897 | 1,213 | 12,843 | 2,060 |
| KOSPO Chile SpA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,656 | 4,787 | — | 125 |
| PT. KOWEPO Sumsel Operation and Maintenance Services . . . . . | 1,439 | 700 | 6,165 | (96) |
| HeeMang Sunlight Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | 7,102 | 3,391 | 12 | (308) |
| Fujeij Wind Power Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47,935 | 46,636 | — | (873) |
| KOSPO Youngnam Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 284,368 | 205,680 | — | (931) |
| Global One Carbon Private Equity Investment Trust 2 . . . . . . . . . | 3,002 | — | — | 9 |
| Chitose Solar Power Plant LLC . . . . . . . . . . . . . . . . . . . . . . . . . . | 49,728 | 38,806 | — | (811) |
| KEPCO Energy Solution Co. Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . | 299,933 | 233 | — | (300) |
| Solar School Plant Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 200,268 | 259 | 1 | 9 |
| KOSPO Power Services Limitada . . . . . . . . . . . . . . . . . . . . . . . . . | 4,385 | 1,262 | 7,300 | 2,963 |
| Energy New Industry Specialized Investment Private Investment Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 501,275 | 33 | — | (7) |
| KOEN Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| KOMIPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| KOWEPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| KOSPO Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| EWP Bylong Pty., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,135 | — | — | — |
| KOWEPO Lao International . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 218 | 181 | — | (108) |

(*)  Financial information of EWP America Inc. includes that of six other subsidiaries, EWP Renewable Co., DG Fairhaven Power, LLC, DG Whitefield, LLC, Springfield Power, LLC, California Power Holdings, LLC, and EWPRC Biomass Holdings, LLC.

**(4)  Significant restrictions on abilities to subsidiaries are as follows:**

| Company | Nature and extent of any significant restrictions |
|---|---|
| Gyeonggi Green Energy Co., Ltd. . . . . . . | Acquisition or disposal of assets of more than ₩35 billion, change in the capacity of cogeneration units (except for the change due to performance improvement of equipment, maintenance) will require unanimous consent of all directors. |
| KOSPO Youngnam Power Co., Ltd. . . . . | Dividends can only be paid when all conditions of the loan agreement are satisfied or prior written consent of financial institutions is obtained. Shares cannot be wholly or partially transferred without prior written consent of financial institutions. |

F-81

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(5) **Details of non-controlling interest prior to intra-group eliminations as of and for the years ended December 31, 2015 and 2016 are as follows:**

| Description | 2015 | | | | |
| | KEPCO Ilijan Corporation | KEPCO Plant Service & Engineering Co., Ltd. | KEPCO Engineering & Construction Company, Inc. | Others | Total |
|---|---|---|---|---|---|
| | In millions of won | | | | |
| Percentage of ownership ...................... | 49.00% | 47.52% | 33.37% | | |
| Current assets ......................... ₩ | 161,855 | 547,152 | 341,559 | 631,442 | 1,682,008 |
| Non-current assets ........................... | 442,010 | 482,152 | 513,597 | 1,976,302 | 3,414,061 |
| Current liabilities ......................... | (22,522) | (195,030) | (342,315) | (296,152) | (856,019) |
| Non-current liabilities ....................... | (36,050) | (51,312) | (96,056) | (1,566,200) | (1,749,618) |
| Net assets .................................. | 545,293 | 782,962 | 416,785 | 745,392 | 2,490,432 |
| Book value of non-controlling interest ........... | 267,194 | 372,064 | 139,081 | 644,787 | 1,423,126 |
| Sales ..................................... | 126,234 | 1,171,082 | 657,603 | 637,544 | 2,592,463 |
| Profit for the period ........................ | 54,596 | 168,632 | 31,047 | 61,554 | 315,829 |
| Profit for the period attributable to non-controlling interest ................................ | 26,752 | 78,852 | 10,360 | 11,802 | 127,766 |
| Cash flows from operating activities ............. | 83,697 | 140,625 | 11,280 | (29,888) | 205,714 |
| Cash flows from investing activities ............. | (16,021) | (104,477) | (134,874) | (178,241) | (433,613) |
| Cash flows from financing activities before dividends to non-controlling interest ........... | (39,730) | (40,581) | 69,955 | 226,976 | 216,620 |
| Dividends to non-controlling interest ........... | (36,080) | (34,569) | (7,300) | (24,577) | (102,526) |
| Effect of exchange rate fluctuation .............. | 4,123 | 3 | (51) | 6,399 | 10,474 |
| Net increase (decrease) of cash and cash equivalents ................................ | (4,011) | (38,999) | (60,990) | 669 | (103,331) |

| Description | 2016 | | | | |
| | KEPCO Ilijan Corporation | KEPCO Plant Service & Engineering Co., Ltd. | KEPCO Engineering & Construction Company, Inc. | Others | Total |
|---|---|---|---|---|---|
| | In millions of won | | | | |
| Percentage of ownership ...................... | 49.00% | 49.00% | 33.92% | | |
| Current assets ............................. ₩ | 154,758 | 553,924 | 270,553 | 1,211,510 | 2,190,745 |
| Non-current assets ........................... | 403,272 | 532,497 | 516,043 | 2,379,882 | 3,831,694 |
| Current liabilities ........................... | (19,256) | (264,506) | (286,444) | (297,510) | (867,716) |
| Non-current liabilities ....................... | (39,193) | (36,984) | (78,232) | (1,919,924) | (2,074,333) |
| Net assets ................................. | 499,581 | 784,931 | 421,920 | 1,373,958 | 3,080,390 |
| Book value of non-controlling interest ........... | 244,794 | 384,616 | 143,115 | 684,093 | 1,456,618 |
| Sales ..................................... | 116,667 | 1,214,304 | 506,012 | 674,461 | 2,511,444 |
| Profit for the period ........................ | 51,552 | 86,657 | 17,796 | 102,170 | 258,175 |
| Profit for the period attributable to non-controlling interest ................................ | 25,260 | 42,462 | 6,036 | 26,709 | 100,467 |
| Cash flows from operating activities ............. | 102,546 | 121,240 | 18,748 | 84,086 | 326,620 |
| Cash flows from investing activities ............. | (117) | 79,807 | (7,556) | (367,674) | (295,540) |
| Cash flows from financing activities before dividends to non-controlling interest ........... | (56,863) | (39,911) | (1,634) | 877,863 | 779,455 |
| Dividends to non-controlling interest ........... | (55,705) | (36,139) | (2,539) | (22,054) | (116,437) |
| Effect of exchange rate fluctuation .............. | 1,529 | 127 | (854) | 7,216 | 8,018 |
| Net increase (decrease) of cash and cash equivalents ................................ | (8,610) | 125,124 | 6,165 | 579,437 | 702,116 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**(6)  Changes in goodwill**

(i)  Details of goodwill as of December 31, 2015 and 2016 are as follows:

| | | 2015 | 2016 |
|---|---|---|---|
| | | In millions of won | |
| Acquisition cost | ₩ | 2,582 | 2,582 |
| Accumulated impairment | | — | — |
| Carrying book value | ₩ | 2,582 | 2,582 |

(ii)  There are no changes in goodwill for the years ended December 31, 2015 and 2016.

**(7)  Disposals of subsidiaries**

KEPCO Canada Uranium Investment Limited Partnership was dissolved and the Company liquidated DG Kings Plaza, LLC during the year ended December 31, 2016. The Company disposed of the shares of Boulder Solar Power, LLC and liquidated KOWEPO America LLC during the year ended December 31, 2015.

(i)  The fair value of consideration as of December 31, 2015 and 2016 are as follows:

| | | 2015 | 2016 |
|---|---|---|---|
| | | In millions of won | |
| Consideration received in cash | ₩ | 10,664 | 898 |
| Fair value of remaining shares after disposal | | 13,860 | — |
| Net assets transferred due to dissolution | | — | 34,148 |
| | ₩ | 24,524 | 35,046 |

(ii)  The carrying value of assets and liabilities of subsidiaries as at the date the Company lost its control during the years ended December 31, 2015 and 2016 are as follows:

| | | 2015 | 2016 |
|---|---|---|---|
| | | In millions of won | |
| Current assets | | | |
| Cash and cash equivalents | ₩ | 10,071 | 898 |
| Current financial assets, net | | 1,077 | 81 |
| Non-current assets | | | |
| Available-for-sale financial assets | | — | 34,089 |
| Property, plant and equipment, net | | 2,460 | — |
| Other | | 2,893 | — |
| Current liabilities | | | |
| Current financial liabilities | | — | (22) |
| Current non-financial liabilities | | (7) | — |
| | ₩ | 16,494 | 35,046 |

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(iii) Gain from disposals of subsidiaries for the years ended December 31, 2015 and 2016 are as follows:

|  | 2015 | 2016 |
|---|---|---|
|  | In millions of won | |
| Fair value of sale price . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ 24,524 | 35,046 |
| Net assets disposed . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16,494) | (35,046) |
| Non-controlling interests . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Realization of unrealized gain . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Other comprehensive income(*1) . . . . . . . . . . . . . . . . . . | 346 | — |
| Gain from disposals of subsidiaries(*2) . . . . . . . . . . . . . . | ₩ 8,376 | — |

(*1) This represents the amount subsequently reclassified from other comprehensive income to profit for the period when the Company lost its control of the subsidiaries.

(*2) Gain from disposals of subsidiaries is included in the consolidated financial statements of comprehensive income.

(iv) Net cash flow from sales of subsidiaries for the years ended December 31, 2015 and 2016 are as follows:

|  | 2015 | 2015 |
|---|---|---|
|  | In millions of won | |
| Consideration received in cash . . . . . . . . . . . . . . . . . . . . . . . | ₩ 10,664 | 898 |
| Less: cash held by disposed subsidiaries . . . . . . . . . . . . . . . | (10,071) | (898) |
| Net cash flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ₩ 593 | — |

F-84

**(8)** **Cash dividends received from subsidiaries for the years ended December 31, 2014, 2015 and 2016, respectively, are as follows:**

| Subsidiaries | | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| | | In millions of won | | |
| Korea Hydro & Nuclear Power Co., Ltd. ................. | ₩ | — | 446,399 | 635,200 |
| Korea South-East Power Co., Ltd. ...................... | | 34,800 | 57,485 | 124,169 |
| Korea Midland Power Co., Ltd. ........................ | | 12,244 | 16,580 | 23,073 |
| Korea Western Power Co., Ltd. ........................ | | 32,048 | 22,749 | 36,238 |
| Korea Southern Power Co., Ltd. ....................... | | 30,800 | 10,272 | 17,849 |
| Korea East-West Power Co., Ltd. ...................... | | 8,100 | 25,280 | 67,906 |
| KEPCO Engineering & Construction Company, Inc. ........ | | 10,996 | 14,574 | 5,069 |
| KEPCO Plant Service & Engineering Co., Ltd. ........... | | 43,095 | 40,584 | 39,911 |
| KEPCO Nuclear Fuel Co., Ltd. ......................... | | 5,936 | 6,280 | 3,411 |
| KEPCO KDN Co., Ltd. ................................. | | 3,424 | 4,046 | 3,392 |
| Korea Engineering & Power Services Co., Ltd. ........... | | 1,573 | — | — |
| KEPCO International HongKong Ltd. ..................... | | 74,927 | 25,826 | 9,107 |
| KEPCO International Philippines Inc. ................... | | 100,122 | 32,891 | 61,862 |
| KEPCO Ilijan Corporation ............................. | | 101,647 | 38,128 | 57,979 |
| KEPCO Philippines Holdings Inc. ...................... | | 2,811 | 19,221 | 17,747 |
| KEPCO Neimenggu International Ltd. .................... | | 6,308 | 25,338 | 10,735 |
| KOMIPO Global Pte Ltd. .............................. | | — | — | 10,432 |
| Qatrana Electric Power Company ....................... | | — | 16,857 | 8,331 |
| KOSPO Jordan LLC ................................... | | 446 | — | 1,095 |
| KEPCO Energy Service Company ........................ | | — | — | 294 |
| EWP Philippines Corporation .......................... | | — | 5,586 | — |
| KEPCO Netherlands S3 B.V. ........................... | | — | 1,382 | — |
| PT. KOMIPO Pembangkitan Jawa Bali ................... | | 2,827 | 3,169 | 3,222 |
| KEPCO Netherlands J3 B.V. ........................... | | — | 19,254 | 12,507 |
| Gyeongju Wind Power Co., Ltd. ........................ | | 651 | 1,294 | 679 |
| | ₩ | 472,755 | 833,195 | 1,150,208 |

F-85

## 17. Investments in Associates and Joint Ventures

**(1)  Investments in associates and joint ventures as of December 31, 2015 and 2016 are as follows:**

|  | | | | 2015 | | |
|---|---|---|---|---|---|---|
| Investees | Key operation activities | Location | Percentage of ownership | Acquisition cost | | Book value |
|  | | | | In millions of won | | |
| **\<Associates\>** | | | | | | |
| Daegu Green Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 47.80% | ₩ | 76,193 | 80,267 |
| Korea Gas Corporation(*1) . . . . . . . . . . | Importing and wholesaling LNG | KOREA | 20.47% | | 94,500 | 2,102,813 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . | Electricity metering and others | KOREA | 29.00% | | 4,727 | 18,994 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . | Broadcasting | KOREA | 21.43% | | 59,000 | 38,365 |
| Cheongna Energy Co., Ltd. . . . . . . . . . . | Generating and distributing vapor and hot/cold water | KOREA | 43.90% | | 48,353 | 19,490 |
| Gangwon Wind Power Co., Ltd.(*2) . . . . | Power generation | KOREA | 15.00% | | 5,725 | 12,890 |
| Hyundai Green Power Co., Ltd. . . . . . . . | Power generation | KOREA | 29.00% | | 88,885 | 113,664 |
| Korea Power Exchange(*6) . . . . . . . . . . | Management of power market and others | KOREA | 100.00% | | 127,839 | 208,735 |
| AMEC Partners Korea Ltd.(*3) . . . . . . . | Resources development | KOREA | 19.00% | | 707 | 230 |
| Hyundai Energy Co., Ltd.(*9) . . . . . . . . | Power generation | KOREA | 30.66% | | 30,118 | 6,990 |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . . . . | Artificial light-weight aggregate | KOREA | 36.10% | | 1,516 | — |
| Taebaek Wind Power Co., Ltd. . . . . . . . . | Power generation | KOREA | 25.00% | | 3,810 | 4,956 |
| Taeback Guinemi Wind Power Co., Ltd. (formerly, Muju Wind Power Co., Ltd.) . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 25.00% | | 2,850 | 2,587 |
| Pyeongchang Wind Power Co., Ltd. . . . . | Power generation | KOREA | 25.00% | | 3,875 | 3,402 |
| Daeryun Power Co., Ltd.(*3, 10) . . . . . . | Power generation | KOREA | 13.13% | | 25,477 | 36,156 |
| JinanJangsu Wind Power Co., Ltd. . . . . . | Power generation | KOREA | 25.00% | | 100 | 77 |
| Changjuk Wind Power Co., Ltd. . . . . . . . | Power generation | KOREA | 30.00% | | 3,801 | 6,143 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . | Power generation | KOREA | 27.00% | | 1,296 | 1,924 |
| SPC Power Corporation . . . . . . . . . . . . . | Power generation | PHILIPPINES | 38.00% | | 20,635 | 58,033 |
| Gemeng International Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 34.00% | | 413,153 | 728,396 |
| PT. Cirebon Electric Power . . . . . . . . . . | Power generation | INDONESIA | 27.50% | | 40,365 | 60,574 |
| KNOC Nigerian East Oil Co., Ltd.(*4) . . . . . . . . . . . . . . . . . . . . . . . | Resources development | NIGERIA | 14.63% | | 12 | — |
| KNOC Nigerian West Oil Co., Ltd.(*4) . . . . . . . . . . . . . . . . . . . . . . . | Resources development | NIGERIA | 14.63% | | 12 | — |
| Dolphin Property Limited(*4) . . . . . . . . | Rental company | NIGERIA | 15.00% | | 12 | 61 |
| PT Wampu Electric Power . . . . . . . . . . . | Power generation | INDONESIA | 46.00% | | 21,292 | 18,963 |
| PT. Bayan Resources TBK . . . . . . . . . . . | Resources development | INDONESIA | 20.00% | | 615,860 | 525,066 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.00% | | 132,300 | 130,908 |
| Pioneer Gas Power Limited(*8) . . . . . . . | Power generation | INDIA | 40.00% | | 49,831 | 51,187 |
| Eurasia Energy Holdings . . . . . . . . . . . . | Power generation and resources development | RUSSIA | 40.00% | | 461 | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . | Power generation | LAOS | 25.00% | | 32,717 | 31,863 |
| Busan Solar Co., Ltd.(*3) . . . . . . . . . . . | Power generation | KOREA | 19.80% | | 793 | 925 |
| Hadong Mineral Fiber Co., Ltd. . . . . . . . | Recycling fly ashes | KOREA | 25.00% | | 50 | — |
| Green Biomass Co., Ltd.(*12) . . . . . . . . | Power generation | KOREA | 14.00% | | 714 | — |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . . . . | Manufacturing and operating floating coal terminal | INDONESIA | 29.00% | | 2,978 | — |
| Samcheok Eco Materials Co., Ltd.(*3, 11) . . . . . . . . . . . . . . . . . . . | Recycling fly ashes | KOREA | 2.67% | | 686 | — |
| Noeul Green Energy Co., Ltd. . . . . . . . . | Power generation | KOREA | 20.00% | | 400 | 295 |
| Naepo Green Energy Co., Ltd. . . . . . . . . | Power generation | KOREA | 25.00% | | 29,200 | 26,746 |
| Goseong Green Energy Co., Ltd.(*2) . . . | Power generation | KOREA | 2.90% | | 2,900 | 2,670 |
| Gangneung Eco Power Co., Ltd.(*2) . . . | Power generation | KOREA | 3.72% | | 2,900 | 2,688 |
| Shin Pyeongtaek Power Co., Ltd. . . . . . . | Power generation | KOREA | 40.00% | | 40 | — |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 28.00% | | 194 | 189 |
| DS POWER Co., Ltd.(*2) . . . . . . . . . . . | Power generation | KOREA | 14.44% | | 17,900 | 10,960 |

F-86

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

**2015**

| Investees | Key operation activities | Location | Percentage of ownership | | Acquisition cost | Book value |
|---|---|---|---|---|---|---|
| | | | | | **In millions of won** | |
| Dongducheon Dream Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 33.61% | ₩ | 61,535 | 55,667 |
| KS Solar Co., Ltd.(*3) . . . . . . . . . . . | Power generation | KOREA | 19.00% | | 637 | 618 |
| Yeongwol Energy Station Co., Ltd.(*2) . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 10.00% | | 1,400 | 1,290 |
| Jinbhuvish Power Generation Pvt. Ltd.(*2) . . . . . . . . . . . . . . . . . . . . | Power generation | INDIA | 5.16% | | 9,000 | 8,350 |
| SE Green Energy Co., Ltd. . . . . . . . | Power generation | KOREA | 47.76% | | 3,821 | 3,575 |
| Daegu Photovoltaic Co., Ltd. . . . . . . | Power generation | KOREA | 29.00% | | 1,230 | 1,886 |
| Jeongam Wind Power Co., Ltd. . . . . . | Power generation | KOREA | 40.00% | | 1,680 | 702 |
| Korea Power Engineering Service Co., Ltd. . . . . . . . . . . . . . . . . . . . . | Construction and service | KOREA | 29.00% | | 290 | 1,805 |
| Busan Green Energy Co., Ltd. . . . . . . | Power generation | KOREA | 29.00% | | 14,564 | 14,512 |
| Jungbu Bio Energy Co., Ltd.(*2) . . . . | Power generation | KOREA | 18.87% | | 1,000 | 904 |
| Korea Electric Vehicle Charging Service . . . . . . . . . . . . . . . . . . . . . . | Electric vehicle charge service | KOREA | 28.00% | | 1,596 | 1,446 |
| Ulleungdo Natural Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Renewable power generation | KOREA | 29.85% | | 8,000 | 7,417 |
| Korea Nuclear Partners Co., Ltd. . . . . | Electric material agency | KOREA | 29.00% | | 290 | 289 |
| | | | | | 2,069,220 | 4,405,668 |
| **<Joint ventures>** | | | | | | |
| KEPCO-Uhde Inc.(*7) . . . . . . . . . . . | Power generation | KOREA | 52.80% | | 11,355 | 8,549 |
| Eco Biomass Energy Sdn. Bhd.(*7) . . . . . . . . . . . . . . . . . . . . | Power generation | MALAYSIA | 61.53% | | 9,661 | — |
| Datang Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | | 27,660 | 27,640 |
| Shuweihat Asia Power Investment B.V. . . . . . . . . . . . . . . . . . . . . . . | Holding company | NETHERLANDS | 49.00% | | 60,191 | 20,474 |
| Shuweihat Asia Operation & Maintenance Company(*7) . . . . . | Maintenance of utility plant | CAYMAN | 55.00% | | 30 | 486 |
| Waterbury Lake Uranium L.P. . . . . . . | Resources development | CANADA | 40.00% | | 26,602 | 20,299 |
| ASM-BG Investicii AD . . . . . . . . . . | Power generation | BULGARIA | 50.00% | | 16,101 | 20,203 |
| RES Technology AD . . . . . . . . . . . . | Power generation | BULGARIA | 50.00% | | 15,595 | 13,789 |
| KV Holdings, Inc. . . . . . . . . . . . . . . | Power generation | PHILIPPINES | 40.00% | | 2,103 | 2,010 |
| KEPCO SPC Power Corporation(*7) . . . . . . . . . . . . . . | Construction and operation of utility plant | PHILIPPINES | 75.20% | | 94,579 | 208,524 |
| Canada Korea Uranium Limited Partnership(*5) . . . . . . . . | Resources development | CANADA | 12.50% | | 5,404 | — |
| KEPCO Energy Resource Nigeria Limited . . . . . . . . . . . . . . . . . . . . . . | Holding company | NIGERIA | 30.00% | | 8,463 | — |
| Gansu Datang Yumen Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | | 16,621 | 16,107 |
| Datang Chifeng Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | | 121,928 | 171,224 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. . . . . . . | Power generation | CHINA | 40.00% | | 10,858 | 10,580 |
| Rabigh Electricity Company . . . . . . . | Power generation | SAUDI ARABIA | 40.00% | | 109,743 | 59,368 |
| Rabigh Operation & Maintenance Company . . . . . . . . . . . . . . . . . . . . | Maintenance of utility plant | SAUDI ARABIA | 40.00% | | 70 | 3,586 |
| Jamaica Public Service Company Limited . . . . . . . . . . . . . . . . . . . . . . | Power generation | JAMAICA | 40.00% | | 301,910 | 241,918 |
| KW Nuclear Components Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Manufacturing | KOREA | 45.00% | | 833 | 4,985 |
| Busan Shinho Solar Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 25.00% | | 2,100 | 3,678 |
| GS Donghae Electric Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 34.00% | | 204,000 | 200,379 |
| Global Trade Of Power System Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Exporting products and technology of small or medium business by proxy | KOREA | 29.00% | | 290 | 426 |

F-87

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| Investees | Key operation activities | Location | 2015 Percentage of ownership | | Acquisition cost | Book value |
|---|---|---|---|---|---|---|
| | | | | | In millions of won | |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . . | Power generation | KOREA | 29.00% | ₩ | 1,856 | 2,100 |
| KODE NOVUS I LLC . . . . . . . . . . . | Power generation | USA | 50.00% | | 19,213 | — |
| KODE NOVUS II LLC . . . . . . . . . . | Power generation | USA | 49.00% | | 12,498 | — |
| Daejung Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.90% | | 4,990 | 3,352 |
| Amman Asia Electric Power Company(*7) . . . . . . . . . . . . . . . . . | Power generation | JORDAN | 60.00% | | 111,476 | 137,668 |
| KAPES, Inc. (formerly, KEPCO-ALSTOM Power Electronics Systems, Inc.)(*7) . . . . . . . . . . . . . | R&D | KOREA | 51.00% | | 5,629 | 4,501 |
| Dangjin Eco Power Co., Ltd. . . . . . . | Power generation | KOREA | 34.00% | | 51,000 | 48,281 |
| Honam Wind Power Co., Ltd. . . . . . . | Power generation | KOREA | 29.00% | | 3,480 | 3,926 |
| Nepal Water & Energy Development Company Private Limited(*7) . . . . | Construction and operation of utility plant | NEPAL | 52.77% | | 18,568 | 17,765 |
| Chun-cheon Energy Co., Ltd. . . . . . . | Power generation | KOREA | 29.90% | | 32,868 | 31,976 |
| Yeonggwangbaeksu Wind Power Co., Ltd.(*3) . . . . . . . . . . . . . . . . . | Power generation | KOREA | 15.00% | | 3,000 | 2,668 |
| Nghi Son 2 Power Ltd. . . . . . . . . . . . | Power generation | VIETNAM | 50.00% | | 1,072 | 269 |
| Kelar S.A(*7) . . . . . . . . . . . . . . . . . . | Power generation | CHILE | 65.00% | | 4,180 | — |
| PT. Tanjung Power Indonesia . . . . . . | Power generation | INDONESIA | 35.00% | | 746 | 617 |
| Incheon New Power Co., Ltd. . . . . . . | Power generation | KOREA | 29.00% | | 461 | 514 |
| Seokmun Energy Co., Ltd. . . . . . . . . | Power generation | KOREA | 29.00% | | 580 | — |
| | | | | | 1,317,714 | 1,287,862 |
| | | | | ₩ | 3,386,934 | 5,693,530 |

(*1)   The effective percentage of ownership is 21.57% considering treasury stocks.

(*2)   The Company can exercise significant influence by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*3)   The Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity.

(*4)   The Company can exercise significant influence by virtue of its contractual right to appoint one out of four members of the steering committee of the entity. Moreover, the Company has significant financial transactions, which can affect its influence on the entity.

(*5)   The Company has joint control over the entity by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*6)   The Government regulates the Company's ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between KPX and the Company's other subsidiaries. The Company can exercise significant influence by its right to nominate directors to the board of directors of the entity.

(*7)   According to the shareholders' agreement, all critical financial and operating decisions must be agreed to by all ownership parties. For these reasons, the entities are classified as joint ventures.

(*8)   As of reporting date, the reporting period of all associates and joint ventures ends in December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.

(*9)   As of December 31, 2015, 15.64% of ownership of Hyundai Energy Co., Ltd. is held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only does the Company have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank with a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to the Company. In connection with this agreement, the Company applied the equity method on the investment in Hyundai Energy Co., Ltd. with 46.30% of ownership.

(*10) The Company's percentage of ownership has decreased due to the acquisition of Daeryun Power Co., Ltd. and the effective percentage of ownership is 19.45% considering stock purchase options.

(*11) The Company's effective percentage of ownership excluding the redeemable convertible preferred stock is 25.54%.

(*12) The effective percentage of ownership is less than 20% but the Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity and the fact that the dominant portion of the investee's sales transactions is generated from the Company.

F-88

**2016**

| Investees | Key operation activities | Location | Percentage of ownership | Acquisition cost | Book value |
|---|---|---|---|---|---|
| | | | | In millions of won | |
| **<Associates>** | | | | | |
| Korea Gas Corporation(*1) . . . . . . . . . . . . . . | Importing and wholesaling LNG | KOREA | 20.47% | ₩ 94,500 | 1,933,877 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . | Electricity metering and others | KOREA | 29.00% | 4,727 | 20,475 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | Broadcasting | KOREA | 21.43% | 59,000 | 38,156 |
| Cheongna Energy Co., Ltd. . . . . . . . . . . . . . . | Generating and distributing vapor and hot/cold water | KOREA | 43.90% | 48,353 | 12,373 |
| Gangwon Wind Power Co., Ltd.(*2) . . . . . . | Power generation | KOREA | 15.00% | 5,725 | 13,069 |
| Hyundai Green Power Co., Ltd. . . . . . . . . . . | Power generation | KOREA | 29.00% | 88,885 | 115,998 |
| Korea Power Exchange(*6) . . . . . . . . . . . . . . | Management of power market and others | KOREA | 100.00% | 127,839 | 223,238 |
| AMEC Partners Korea Ltd.(*3) . . . . . . . . . | Resources development | KOREA | 19.00% | 707 | 225 |
| Hyundai Energy Co., Ltd.(*9) . . . . . . . . . . . . | Power generation | KOREA | 30.66% | 71,070 | 1,031 |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . . . . . . | Artificial light-weight aggregate | KOREA | 36.10% | 1,516 | — |
| Taebaek Wind Power Co., Ltd. . . . . . . . . . . | Power generation | KOREA | 25.00% | 3,810 | 4,750 |
| Taebaek Guinemi Wind Power Co., Ltd. (formerly, Muju Wind Power Co., Ltd.) . . . | Power generation | KOREA | 25.00% | 3,420 | 3,131 |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . | Power generation | KOREA | 25.00% | 3,875 | 3,383 |
| Daeryun Power Co., Ltd.(*3, 10) . . . . . . . . . | Power generation | KOREA | 13.13% | 25,477 | 29,873 |
| Changjuk Wind Power Co., Ltd. . . . . . . . . . . | Power generation | KOREA | 30.00% | 3,801 | 6,930 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 27.00% | 1,296 | 2,073 |
| SPC Power Corporation | Power generation | PHILIPPINES | 38.00% | 20,635 | 56,818 |
| Gemeng International Energy Co., Ltd. . . . . . | Power generation | CHINA | 34.00% | 413,153 | 680,065 |
| PT. Cirebon Electric Power . . . . . . . . . . . . . . | Power generation | INDONESIA | 27.50% | 40,365 | 96,658 |
| KNOC Nigerian East Oil Co., Ltd.(*4) . . . . . . | Resources development | NIGERIA | 14.63% | 12 | — |
| KNOC Nigerian West Oil Co., Ltd.(*4) . . . . . | Resources development | NIGERIA | 14.63% | 12 | — |
| PT Wampu Electric Power . . . . . . . . . . . . . . | Power generation | INDONESIA | 46.00% | 21,292 | 23,188 |
| PT. Bayan Resources TBK . . . . . . . . . . . . . . | Resources development | INDONESIA | 20.00% | 615,860 | 402,667 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.00% | 132,300 | 123,912 |
| Pioneer Gas Power Limited(*8) . . . . . . . . . . | Power generation | INDIA | 40.00% | 49,831 | 50,740 |
| Eurasia Energy Holdings . . . . . . . . . . . . . . . . | Power generation and resources development | RUSSIA | 40.00% | 461 | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . . . . . | Power generation | LAOS | 25.00% | 49,119 | 51,544 |
| Hadong Mineral Fiber Co., Ltd.(*17) . . . . . . | Recycling fly ashes | KOREA | 8.33% | 50 | — |
| Green Biomass Co., Ltd.(*12) . . . . . . . . . . . . | Power generation | KOREA | 14.00% | 714 | 47 |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . . . . . . . | Manufacturing and operating floating coal terminal | INDONESIA | 29.00% | 2,978 | — |
| Samcheok Eco Materials Co., Ltd.(*3, 11) . . . | Recycling fly ashes | KOREA | 2.35% | 686 | — |
| Noeul Green Energy Co., Ltd. . . . . . . . . . . . . | Power generation | KOREA | 29.00% | 1,740 | 1,217 |
| Naepo Green Energy Co., Ltd. . . . . . . . . . . . . | Power generation | KOREA | 25.00% | 29,200 | 25,438 |
| Goseong Green Energy Co., Ltd.(*2) . . . . . . . | Power generation | KOREA | 1.12% | 2,900 | 2,663 |
| Gangneung Eco Power Co., Ltd.(*2) . . . . . . . | Power generation | KOREA | 1.61% | 2,900 | 2,646 |
| Shin Pyeongtaek Power Co., Ltd. . . . . . . . . . | Power generation | KOREA | 40.00% | 40 | — |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 28.00% | 194 | 181 |
| DS POWER Co., Ltd.(*2) . . . . . . . . . . . . . . . | Power generation | KOREA | 14.44% | 17,900 | 7,190 |
| Dongducheon Dream Power Co., Ltd. . . . . . . | Power generation | KOREA | 33.61% | 61,535 | 46,876 |
| KS Solar Co., Ltd.(*3) . . . . . . . . . . . . . . . . . | Power generation | KOREA | 19.00% | 637 | 604 |
| Yeongwol Energy Station Co., Ltd.(*2) . . . . . | Power generation | KOREA | 10.00% | 1,400 | — |
| Jinbhuvish Power Generation Pvt. Ltd.(*2) . . | Power generation | INDIA | 5.16% | 9,000 | — |
| SE Green Energy Co., Ltd. . . . . . . . . . . . . . . | Power generation support | KOREA | 47.76% | 3,821 | 3,525 |
| Daegu Photovoltaic Co., Ltd. . . . . . . . . . . . . | Power generation | KOREA | 29.00% | 1,230 | 1,700 |
| Jeongam Wind Power Co., Ltd. . . . . . . . . . . | Power generation | KOREA | 40.00% | 5,580 | 4,000 |
| Korea Power Engineering Service Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Construction and service | KOREA | 29.00% | 290 | 2,810 |
| Busan Green Energy Co., Ltd. . . . . . . . . . . | Power generation | KOREA | 29.00% | 14,564 | 13,803 |
| Jungbu Bio Energy Co., Ltd.(*2) . . . . . . . . . | Power generation | KOREA | 18.87% | 1,000 | — |

|  |  |  | 2016 |  |  |
|---|---|---|---|---|---|
| Investees | Key operation activities | Location | Percentage of ownership | Acquisition cost | Book value |
|  |  |  |  | In millions of won | |
| Korea Electric Vehicle Charging Service . . . . . . . . . . . . . . . . . . . . . | Electric vehicle charge service | KOREA | 28.00% | ₩ 1,596 | 1,103 |
| Ulleungdo Natural Energy Co., Ltd. . . . . . | Renewable power generation | KOREA | 29.85% | 8,000 | 6,894 |
| Korea Nuclear Partners Co., Ltd. . . . . . . . | Electric material agency | KOREA | 29.00% | 290 | 248 |
| Tamra Offshore Wind Power Co., Ltd. . . . | Power generation | KOREA | 27.00% | 8,910 | 7,015 |
| Korea Electric Power Corporation Fund(*13) . . . . . . . . . . . . . . . . . . . . . . | Developing electric enterprises | KOREA | 98.09% | 51,500 | 50,856 |
| Energy Infra Asset Management Co., Ltd.(*3) . . . . . . . . . . . . . . . . . . . . . . . . | Asset management | KOREA | 9.90% | 297 | 259 |
| Daegu clean Energy Co., Ltd. . . . . . . . . . | Renewable power generation | KOREA | 28.00% | 140 | 140 |
| YaksuESS Co., Ltd . . . . . . . . . . . . . . . . | Installing ESS related equipment | KOREA | 29.00% | 210 | 196 |
| Nepal Water & Energy Development Company Private Limited(*14) . . . . . . . | Construction and operation of utility plant | NEPAL | 52.77% | 18,568 | 18,667 |
|  |  |  |  | 2,134,911 | 4,092,252 |
| **<Joint ventures>** |  |  |  |  |  |
| KEPCO-Uhde Inc.(*7) . . . . . . . . . . . . . . | Power generation | KOREA | 52.8% | 11,355 | 301 |
| Eco Biomass Energy Sdn. Bhd.(*7) . . . . . . | Power generation | MALAYSIA | 61.53% | 9,661 | — |
| Datang Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | 27,660 | 28,239 |
| Shuweihat Asia Power Investment B.V. . | Holding company | NETHERLANDS | 49.00% | 46,037 | — |
| Shuweihat Asia Operation & Maintenance Company(*7) . . . . . . . . . . . . . . . . . . . . | Maintenance of utility plant | CAYMAN | 55.00% | 30 | 450 |
| Waterbury Lake Uranium L.P. . . . . . . . . . | Resources development | CANADA | 36.97% | 26,602 | 21,314 |
| ASM-BG Investicii AD . . . . . . . . . . . . . . | Power generation | BULGARIA | 50.00% | 16,101 | 21,488 |
| RES Technology AD . . . . . . . . . . . . . . . | Power generation | BULGARIA | 50.00% | 15,595 | 13,582 |
| KV Holdings, Inc. . . . . . . . . . . . . . . . . . | Power generation | PHILIPPINES | 40.00% | 2,103 | 2,098 |
| KEPCO SPC Power Corporation(*7) . . . . | Construction and operation of utility plant | PHILIPPINES | 75.20% | 94,579 | 245,367 |
| Canada Korea Uranium Limited Partnership(*5) . . . . . . . . . . . . | Resources development | CANADA | 12.50% | 5,404 | — |
| Gansu Datang Yumen Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | 16,621 | 12,821 |
| Datang Chifeng Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | 121,928 | 166,535 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . | Power generation | CHINA | 40.00% | 10,858 | 10,843 |
| Rabigh Electricity Company . . . . . . . . . . | Power generation | SAUDI ARABIA | 40.00% | 109,743 | 97,802 |
| Rabigh Operation & Maintenance Company . . . . . . . . . . . . . . . . . . . . . . | Maintenance of utility plant | SAUDI ARABIA | 40.00% | 70 | 4,427 |
| Jamaica Public Service Company Limited . . . . . . . . . . . . . . . . . . . . . . . | Power generation | JAMAICA | 40.00% | 301,910 | 249,453 |
| KW Nuclear Components Co., Ltd. . . . . . . | Manufacturing | KOREA | 45.00% | 833 | 7,133 |
| Busan Shinho Solar Power Co., Ltd. . . . . . | Power generation | KOREA | 25.00% | 2,100 | 3,814 |
| GS Donghae Electric Power Co., Ltd. . . . . | Power generation | KOREA | 34.00% | 204,000 | 205,948 |
| Global Trade Of Power System Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Exporting products and technology of small or medium business by proxy | KOREA | 29.00% | 290 | 477 |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 29.00% | 1,856 | 2,343 |
| KODE NOVUS I LLC . . . . . . . . . . . . . . . | Power generation | USA | 50.00% | 19,213 | — |
| KODE NOVUS II LLC . . . . . . . . . . . . . . | Power generation | USA | 50.00% | 12,756 | — |
| Daejung Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Power generation | KOREA | 49.90% | 4,990 | 3,015 |

F-90

| Investees | Key operation activities | Location | Percentage of ownership | | Acquisition cost | Book value |
|---|---|---|---|---|---|---|
| | | | | | In millions of won | |
| Amman Asia Electric Power Company(*7) ... | Power generation | JORDAN | 60.00% | ₩ | 111,476 | 153,857 |
| KAPES, Inc. (formerly, KEPCO-ALSTOM Power Electronics Systems, Inc.)(*7) ...... | R&D | KOREA | 51.00% | | 5,629 | 4,758 |
| Dangjin Eco Power Co., Ltd. .............. | Power generation | KOREA | 34.00% | | 56,100 | 53,253 |
| Honam Wind Power Co., Ltd. .............. | Power generation | KOREA | 29.00% | | 3,480 | 4,451 |
| Chun-cheon Energy Co., Ltd. .............. | Power generation | KOREA | 29.90% | | 52,700 | 50,592 |
| Yeonggwangbaeksu Wind Power Co., Ltd.(*3) ............................. | Power generation | KOREA | 15.00% | | 3,000 | 2,689 |
| Nghi Son 2 Power Ltd. ................... | Power generation | VIETNAM | 50.00% | | 1,788 | 229 |
| Kelar S.A(*7) ......................... | Power generation | CHILE | 65.00% | | 4,180 | — |
| PT. Tanjung Power Indonesia .............. | Power generation | INDONESIA | 35.00% | | 746 | 1,946 |
| Incheon New Power Co., Ltd. .............. | Power generation | KOREA | 29.00% | | 461 | 563 |
| Seokmun Energy Co., Ltd. ................ | Power generation | KOREA | 29.00% | | 580 | 391 |
| Daehan Wind Power PSC ................ | Power generation | JORDAN | 50.00% | | 285 | 16 |
| Barakah One Company(*16) .............. | Power generation | UAE | 18.00% | | 118 | 116 |
| Nawah Energy Company(*16) ............ | Operation of utility plant | UAE | 18.00% | | 296 | 290 |
| MOMENTUM ......................... | International thermonuclear experimental reactor construction management | FRANCE | 33.33% | | 1 | 67 |
| Daegu Green Power Co., Ltd.(*15) ......... | Power generation | KOREA | 29.00% | | 46,225 | 47,528 |
| | | | | | 1,349,360 | 1,418,196 |
| | | | | ₩ | 3,484,271 | 5,510,448 |

(*1)   The effective percentage of ownership is 21.57% considering treasury stocks.

(*2)   The Company can exercise significant influence by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*3)   The Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity.

(*4)   The Company can exercise significant influence by virtue of its contractual right to appoint one out of four members of the steering committee of the entity. Moreover, the Company has significant financial transactions, which can affect its influence on the entity.

(*5)   The Company has joint control over the entity by virtue of its contractual right to appoint directors to the board of directors of the entity, and by strict decision criteria of the Company's financial and operating policy of the board of directors.

(*6)   The Government regulates the Company's ability to make operating and financial decisions over the entity, as the Government requires maintaining arms-length transactions between KPX and the Company's other subsidiaries. The Company can exercise significant influence by its right to nominate directors to the board of directors of the entity.

(*7)   According to the shareholders' agreement, all critical financial and operating decisions must be agreed to by all ownership parties. For these reasons, the entities are classified as joint ventures.

(*8)   As of reporting date, the reporting period of all associates and joint ventures ends in December 31, except for Pioneer Gas Power Limited whose reporting period ends on March 31.

(*9)   As of December 31, 2016, 15.64% of ownership of Hyundai Energy Co., Ltd. is held by NH Power II Co., Ltd. and NH Bank. According to the shareholders' agreement reached on March 2011, not only does the Company have a call option to acquire the investment in Hyundai Energy Co., Ltd. from NH Power II Co., Ltd. and NH Bank with a certain rate of return, NH Power II Co., Ltd. and NH Bank also have put options to dispose of their investment to the Company. In connection with this agreement, the Company applied the equity method on the investment in Hyundai Energy Co., Ltd. with 46.30% of ownership.

(*10)  The Company's percentage of ownership has decreased due to the acquisition of Daeryun Power Co., Ltd. and the effective percentage of ownership is 19.45% considering stock purchase options.

(*11)  The Company's effective percentage of ownership excluding the redeemable convertible preferred stock is 25.54%.

(*12)  The effective percentage of ownership is less than 20% but the Company can exercise significant influence by virtue of its contractual right to appoint a director to the board of directors of the entity and the fact that the dominant portion of the investee's sales transactions is generated from the Company.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

(*13) The effective percentage of ownership is more than 50% but the Company does not hold control over relevant business while it exercises significant influence by participating in the Investment Decision Committee. For this reason, the entity is classified as an associate.

(*14) The effective percentage of ownership is more than 50%, but the Company does not control the entity according to the shareholders' agreement. For this reason, the entity is classified as an associate.

(*15) The entity is reclassified from associates to joint ventures since the terms of the shareholders' agreement had been amended.

(*16) The effective percentage of ownership is less than 20%, but the Company has joint control over the entity as decisions on the major activities require the unanimous consent of the parties that collectively control the entity.

(*17) Although the percentage of ownership temporarily decreased to 8.33% from the difference in timing of capital payment by shareholders, the Company can exercise significant influence by virtue of its right to appoint a director to the board of directors of the entity based on the shareholders' agreement. The percentage of ownership is 25.00% at the time of completion of capital payment.

**(2)  The fair value of associates which are actively traded on the open market and have a readily available market value as of December 31, 2015 and 2016 are as follows:**

| Investees | 2015 | 2016 |
|---|---|---|
| | In millions of won | |
| **<Associates>** | | |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . . . . . . . | ₩ 46,514 | 45,474 |
| Korea Gas Corporation(*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 696,465 | 915,705 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26,235 | 22,320 |
| SPC Power Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 65,552 | 70,253 |
| PT. Bayan Resources TBK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 446,250 | 359,200 |

(*)   The carrying amount of Korea Gas Corporation ("KOGAS") is ₩1,933,877 million as of December 31, 2016 and management has determined that there is objective evidence of impairment. As a result of the impairment test, the Company has not recognized any impairment loss as the value in use is greater than the carrying amount. The recoverable amount of KOGAS based on its value in use is calculated by considering the long-term natural gas supply and demand programs of future cash flows approved by Ministry of Trade, Industry & Energy and the discount rate of 4.66%.

**(3)  Changes in investments in associates and joint ventures for the years ended December 31, 2015 and 2016 are as follows:**

| | | | | | | | | 2015 |
|---|---|---|---|---|---|---|---|---|
| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
| | In millions of won | | | | | | | |
| **<Associates>** | | | | | | | | |
| Daegu Green Power Co., Ltd. . . . . . . . | ₩ 71,387 | — | — | — | 8,902 | — | (22) | 80,267 |
| Korea Gas Corporation . . . . . . . . . . . | 2,097,539 | — | — | (4,725) | 67,949 | (55,453) | (2,497) | 2,102,813 |
| Korea Electric Power Industrial Development Co., Ltd. . . . . . . . . . . | 21,622 | — | — | (1,267) | (1,792) | — | 431 | 18,994 |
| YTN Co., Ltd. . . . . . . . . . . . . . . . . | 39,889 | — | — | (90) | (188) | (935) | (311) | 38,365 |
| Cheongna Energy Co., Ltd. . . . . . . . . | 28,771 | — | — | — | (9,281) | — | — | 19,490 |
| Gangwon Wind Power Co., Ltd. . . . . . | 12,385 | — | — | (852) | 1,279 | 78 | — | 12,890 |
| Hyundai Green Power Co., Ltd. . . . . . | 113,033 | — | — | (8,889) | 9,520 | — | — | 113,664 |
| Korea Power Exchange . . . . . . . . . . . | 198,021 | — | — | — | 9,944 | — | 770 | 208,735 |
| AMEC Partners Korea Ltd. . . . . . . . . | 200 | — | — | — | 30 | — | — | 230 |
| Hyundai Energy Co., Ltd.(*1) . . . . . . . | 35,925 | — | — | — | (13,731) | — | (15,204) | 6,990 |
| Ecollite Co., Ltd. . . . . . . . . . . . . . . . | — | — | — | — | — | — | — | — |
| Taebaek Wind Power Co., Ltd. . . . . . . | 5,525 | — | — | — | (569) | — | — | 4,956 |
| Taeback Guinemi Wind Power Co., Ltd. (formerly, Muju Wind Power Co., Ltd.) . . . . . . . . . . . . . . . . . . . | 2,706 | — | — | — | (119) | — | — | 2,587 |

F-92

|  | 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|  | In millions of won | | | | | | | |
| Pyeongchang Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . ₩ | 3,693 | — | — | — | (291) | — | — | 3,402 |
| Daeryun Power Co., Ltd. . . . . . . . . . . . | 41,951 | — | — | — | (5,798) | — | 3 | 36,156 |
| JinanJangsu Wind Power Co., Ltd. . . . | 77 | — | — | — | — | — | — | 77 |
| Changjuk Wind Power Co., Ltd. . . . . . | 6,486 | — | — | — | (343) | — | — | 6,143 |
| KNH Solar Co., Ltd. . . . . . . . . . . . . . | 1,744 | — | — | — | 178 | 2 | — | 1,924 |
| SPC Power Corporation . . . . . . . . . . . | 47,799 | — | — | (1,349) | 5,375 | 381 | 5,827 | 58,033 |
| Gemeng International Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 667,578 | — | — | (37,163) | 51,766 | 89,481 | (43,266) | 728,396 |
| PT. Cirebon Electric Power . . . . . . . . | 43,335 | — | — | — | 12,210 | 5,029 | — | 60,574 |
| KNOC Nigerian East Oil Co., Ltd. . . . | — | — | — | — | (880) | (641) | 1,521 | — |
| KNOC Nigerian West Oil Co., Ltd. . . | — | — | — | — | (1,092) | (599) | 1,691 | — |
| Dolphin Property Limited . . . . . . . . . . | 61 | — | — | — | — | — | — | 61 |
| PT Wampu Electric Power . . . . . . . . . | 16,071 | 2,357 | — | — | (600) | 1,135 | — | 18,963 |
| PT. Bayan Resources TBK . . . . . . . . . | 540,011 | — | — | — | (11,341) | (3,604) | — | 525,066 |
| S-Power Co., Ltd. . . . . . . . . . . . . . . . | 104,244 | 24,300 | — | — | 2,364 | — | — | 130,908 |
| Pioneer Gas Power Limited . . . . . . . . | 50,668 | — | — | — | 59 | 460 | — | 51,187 |
| Eurasia Energy Holdings . . . . . . . . . . . | — | — | — | — | — | — | — | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 22,152 | 9,244 | — | — | (749) | 1,216 | — | 31,863 |
| Busan Solar Co., Ltd. . . . . . . . . . . . . . | 853 | — | — | — | 72 | — | — | 925 |
| Hadong Mineral Fiber Co., Ltd. . . . . . | 3 | — | — | — | (3) | — | — | — |
| Green Biomass Co., Ltd. . . . . . . . . . . . | — | — | — | — | — | — | — | — |
| PT. Mutiara Jawa . . . . . . . . . . . . . . . . | 818 | — | — | — | (818) | — | — | — |
| Samcheok Eco Materials Co., Ltd. . . . | 212 | — | — | — | (178) | (34) | — | — |
| Noeul Green Energy Co., Ltd. . . . . . . | 189 | 200 | — | — | (91) | (3) | — | 295 |
| Naepo Green Energy Co., Ltd. . . . . . . | 28,064 | — | — | — | (1,318) | — | — | 26,746 |
| Goseong Green Energy Co., Ltd. . . . . . | 2,586 | — | — | — | 84 | — | — | 2,670 |
| Gangneung Eco Power Co., Ltd. . . . . . | 2,783 | — | — | — | (95) | — | — | 2,688 |
| Shin Pyeongtaek Power Co., Ltd. . . . . | — | — | — | — | — | — | — | — |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 221 | — | — | — | (32) | — | — | 189 |
| DS POWER Co., Ltd. . . . . . . . . . . . . . | 15,642 | — | — | — | (4,671) | — | (11) | 10,960 |
| Dongducheon Dream Power Co., Ltd.(*2) . . . . . . . . . . . . . . . . . . . . . . | 100,545 | — | — | — | (3,412) | — | (41,466) | 55,667 |
| KS Solar Co., Ltd. . . . . . . . . . . . . . . . | 325 | — | — | — | 293 | — | — | 618 |
| Yeongwol Energy Station Co., Ltd. . . | 1,741 | — | — | — | (451) | — | — | 1,290 |
| Jinbhuvish Power Generation Pvt. Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 8,344 | — | — | — | (42) | 48 | — | 8,350 |
| SE Green Energy Co., Ltd. . . . . . . . . . | 3,623 | — | — | — | (48) | — | — | 3,575 |
| Daegu Photovoltaic Co., Ltd. . . . . . . . | 1,581 | — | — | — | 305 | — | — | 1,886 |
| Jeongam Wind Power Co., Ltd. . . . . . | 93 | 880 | — | — | (271) | — | — | 702 |
| Korea Power Engineering Service Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | 1,334 | — | — | (44) | 542 | — | (27) | 1,805 |
| Busan Green Energy Co., Ltd. . . . . . . | — | 14,564 | — | — | (52) | — | — | 14,512 |
| Jungbu Bio Energy Co., Ltd. . . . . . . . . | — | 1,000 | — | — | (96) | — | — | 904 |
| Korea Electric Vehicle Charging Service . . . . . . . . . . . . . . . . . . . . . . | — | 1,596 | — | — | (135) | — | (15) | 1,446 |
| Ulleungdo Natural Energy Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . . | — | 8,000 | — | — | (583) | — | — | 7,417 |
| Korea Nuclear Partners Co., Ltd. . . . . | — | 290 | — | — | (1) | — | — | 289 |
|  | 4,341,830 | 62,431 | — | (54,379) | 111,801 | 36,561 | (92,576) | 4,405,668 |
| **<Joint ventures>** | | | | | | | | |
| KEPCO-Uhde Inc. . . . . . . . . . . . . . . . | 9,042 | — | — | — | (493) | — | — | 8,549 |
| Eco Biomass Energy Sdn. Bhd. . . . . . | — | — | — | — | — | — | — | — |
| Datang Chaoyang Renewable Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . . | 27,514 | — | — | — | (135) | 261 | — | 27,640 |

F-93

|  |  | 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Investees |  | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|  |  | In millions of won | | | | | | | |
| Shuweihat Asia Power Investment B.V. | ₩ | 16,241 | 108 | — | — | 4,008 | 117 | — | 20,474 |
| Shuweihat Asia Operation & Maintenance Company |  | 345 | — | — | (798) | 922 | 24 | (7) | 486 |
| Waterbury Lake Uranium L.P. |  | 22,010 | — | — | — | — | (2,507) | 796 | 20,299 |
| ASM-BG Investicii AD |  | 19,608 | — | — | — | 1,384 | (789) | — | 20,203 |
| RES Technology AD |  | 14,725 | — | — | — | (318) | (618) | — | 13,789 |
| KV Holdings, Inc. |  | 1,902 | — | — | — | 74 | 34 | — | 2,010 |
| KEPCO SPC Power Corporation |  | 190,519 | — | — | (28,986) | 43,801 | 3,190 | — | 208,524 |
| Canada Korea Uranium Limited Partnership |  | — | — | — | — | — | — | — | — |
| KEPCO Energy Resource Nigeria Limited |  | — | — | — | — | — | — | — | — |
| Gansu Datang Yumen Wind Power Co., Ltd. |  | 17,467 | — | — | — | (1,546) | 186 | — | 16,107 |
| Datang Chifeng Renewable Power Co., Ltd. |  | 169,496 | — | — | (8,239) | 8,512 | 1,464 | (9) | 171,224 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. |  | 10,539 | — | — | — | (33) | 74 | — | 10,580 |
| Rabigh Electricity Company |  | 8,121 | — | — | — | 21,582 | 29,703 | (38) | 59,368 |
| Rabigh Operation & Maintenance Company |  | 4,628 | — | — | (1,780) | 533 | 205 | — | 3,586 |
| Jamaica Public Service Company Limited |  | 226,892 | — | — | — | — | 15,027 | (1) | 241,918 |
| KW Nuclear Components Co., Ltd. |  | 2,899 | — | — | (1,016) | 3,065 | — | 37 | 4,985 |
| Busan Shinho Solar Power Co., Ltd. |  | 3,284 | — | — | — | 394 | — | — | 3,678 |
| GS Donghae Electric Power Co., Ltd. |  | 201,409 | — | — | — | (1,064) | — | 34 | 200,379 |
| Global Trade Of Power System Co., Ltd. |  | 343 | — | — | — | 83 | — | — | 426 |
| Expressway Solar-light Power Generation Co., Ltd. |  | 2,087 | — | — | — | 13 | — | — | 2,100 |
| KODE NOVUS I LLC |  | 12,207 | — | — | — | (11,639) | 588 | (1,156) | — |
| KODE NOVUS II LLC |  | 8,248 | — | — | — | (8,104) | 413 | (557) | — |
| Daejung Offshore Wind Power Co., Ltd. |  | 3,711 | — | — | — | (359) | — | — | 3,352 |
| Amman Asia Electric Power Company |  | 122,391 | — | — | (19,510) | 25,131 | 10,244 | (588) | 137,668 |
| KAPES, Inc. (formerly, KEPCO-ALSTOM Power Electronics Systems, Inc.) |  | 4,617 | — | — | — | (98) | — | (18) | 4,501 |
| Dangjin Eco Power Co., Ltd. |  | 37,837 | 20,000 | (8,851) | — | (712) | 70 | (63) | 48,281 |
| Honam Wind Power Co., Ltd. |  | 3,555 | — | — | — | 371 | — | — | 3,926 |
| Nepal Water & Energy Development Company Private Limited |  | 17,872 | — | — | — | (1,277) | 1,170 | — | 17,765 |
| Chun-cheon Energy Co., Ltd. |  | — | 32,853 | — | — | (719) | (158) | — | 31,976 |
| Yeonggwangbaeksu Wind Power Co., Ltd. |  | 2,962 | — | — | — | (294) | — | — | 2,668 |
| Nghi Son 2 Power Ltd. |  | 102 | 722 | — | — | (562) | 2 | 5 | 269 |
| Kelar S.A |  | 3,156 | — | — | — | — | (407) | (2,749) | — |
| PT. Tanjung Power Indonesia |  | 700 | — | — | — | (98) | — | 15 | 617 |
| Incheon New Power Co., Ltd. |  | 465 | — | — | — | 49 | — | — | 514 |
| Seokmun Energy Co., Ltd. |  | — | — | (100) | — | — | — | 100 | — |
|  |  | 1,166,894 | 53,683 | (8,951) | (60,329) | 82,471 | 58,293 | (4,199) | 1,287,862 |
|  | ₩ | 5,508,724 | 116,114 | (8,951) | (114,708) | 194,272 | 94,854 | (96,775) | 5,693,530 |

(*1) 'Others' include ₩15,204 million of assets held-for-sale (note 42).

(*2) 'Others' include ₩41,170 million of assets held-for-sale (note 42).

F-94

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | 2016 | | | |
| | | | | In millions of won | | | | |
| <Associates> | | | | | | | | |
| Daegu Green Power Co., Ltd. ...... ₩ | 80,267 | 3,347 | (34,422) | — | (1,814) | 148 | (47,526) | — |
| Korea Gas Corporation ........... | 2,102,813 | — | — | (3,213) | (146,308) | (14,551) | (4,864) | 1,933,877 |
| Korea Electric Power Industrial .... | | | | | | | | |
| Development Co., Ltd. ........... | 18,994 | — | — | (1,598) | 4,491 | — | (1,412) | 20,475 |
| YTN Co., Ltd. ................. | 38,365 | — | — | — | (227) | 32 | (14) | 38,156 |
| Cheongna Energy Co., Ltd. ....... | 19,490 | — | — | — | (7,117) | — | — | 12,373 |
| Gangwon Wind Power Co., Ltd. .... | 12,890 | — | — | (1,136) | 1,270 | 45 | — | 13,069 |
| Hyundai Green Power Co., Ltd. .... | 113,664 | — | — | (8,888) | 11,222 | — | — | 115,998 |
| Korea Power Exchange ........... | 208,735 | — | — | — | 15,847 | — | (1,344) | 223,238 |
| AMEC Partners Korea Ltd. ....... | 230 | — | — | — | (5) | — | — | 225 |
| Hyundai Energy Co., Ltd. ......... | 6,990 | — | — | — | (21,163) | — | 15,204 | 1,031 |
| Ecollite Co., Ltd. ............... | — | — | — | — | — | — | — | — |
| Taebaek Wind Power Co., Ltd. ..... | 4,956 | — | — | — | (206) | — | — | 4,750 |
| Taeback Guinemi Wind Power Co., Ltd. (formerly, Muju Wind Power Co., Ltd.) .................... | 2,587 | 570 | — | — | (26) | — | — | 3,131 |
| Pyeongchang Wind Power Co., Ltd. ........................ | 3,402 | — | — | — | (19) | — | — | 3,383 |
| Daeryun Power Co., Ltd. ......... | 36,156 | — | — | — | (6,282) | (1) | — | 29,873 |
| JinanJangsu Wind Power Co., Ltd. ........................ | 77 | — | (64) | — | (13) | — | — | — |
| Changjuk Wind Power Co., Ltd. .... | 6,143 | — | — | (190) | 977 | — | — | 6,930 |
| KNH Solar Co., Ltd. ............ | 1,924 | — | — | — | 144 | 5 | — | 2,073 |
| SPC Power Corporation .......... | 58,033 | — | — | (7,151) | 6,416 | (477) | (3) | 56,818 |
| Gemeng International Energy Co., Ltd. ........................ | 728,396 | — | — | (16,476) | 26,714 | (58,493) | (76) | 680,065 |
| PT. Cirebon Electric Power ....... | 60,574 | — | — | (1,242) | 31,511 | 2,568 | 3,247 | 96,658 |
| KNOC Nigerian East Oil Co., Ltd. ........................ | — | — | — | — | (1,346) | (398) | 1,744 | — |
| KNOC Nigerian West Oil Co., Ltd. ........................ | — | — | — | — | (973) | (356) | 1,329 | — |
| Dolphin Property Limited ......... | 61 | — | — | (35) | — | (69) | 43 | — |
| PT Wampu Electric Power ........ | 18,963 | — | — | — | 3,493 | (3) | 735 | 23,188 |
| PT. Bayan Resources TBK(*2) ..... | 525,066 | — | — | (23,257) | 208 | (99,350) | 402,667 |
| S-Power Co., Ltd. ............... | 130,908 | — | — | (7,006) | — | 10 | 123,912 |
| Pioneer Gas Power Limited ........ | 51,187 | — | — | — | (698) | 251 | — | 50,740 |
| Eurasia Energy Holdings .......... | — | — | — | — | — | — | — | — |
| Xe-Pian Xe-Namnoy Power Co., Ltd. ........................ | 31,863 | 16,402 | — | — | 1,576 | 1,703 | — | 51,544 |
| Busan Solar Co., Ltd. ........... | 925 | — | (887) | — | (38) | — | — | — |
| Hadong Mineral Fiber Co., Ltd. .... | — | — | — | — | — | — | — | — |
| Green Biomass Co., Ltd. .......... | — | — | — | — | (138) | — | 185 | 47 |
| PT. Mutiara Jawa ................ | — | — | — | — | — | — | — | — |
| Samcheok Eco Materials Co., Ltd. .. | — | — | — | — | — | — | — | — |
| Noeul Green Energy Co., Ltd. ...... | 295 | 1,340 | — | — | (418) | — | — | 1,217 |
| Naepo Green Energy Co., Ltd. ..... | 26,746 | — | — | — | (1,308) | — | — | 25,438 |
| Goseong Green Energy Co., Ltd. .... | 2,670 | — | — | — | 71 | — | (78) | 2,663 |
| Gangneung Eco Power Co., Ltd. .... | 2,688 | — | — | — | 56 | — | (98) | 2,646 |
| Shin Pyeongtaek Power Co., Ltd. ... | — | — | — | — | — | — | — | — |
| Heang Bok Do Si Photovoltaic Power Co., Ltd. ............... | 189 | — | — | — | (10) | — | 2 | 181 |
| DS POWER Co., Ltd. ............ | 10,960 | — | — | — | (3,738) | — | (32) | 7,190 |
| Dongducheon Dream Power Co., Ltd. ........................ | 55,667 | — | — | — | (8,757) | — | (34) | 46,876 |
| KS Solar Co., Ltd. .............. | 618 | — | — | — | (14) | — | — | 604 |
| Yeongwol Energy Station Co., Ltd.(*1) ..................... | 1,290 | — | — | — | 85 | 25 | (1,400) | — |
| Jinbhuvish Power Generation Pvt. Ltd.(*3) ..................... | 8,350 | — | — | — | (49) | (198) | (8,103) | — |

F-95

| Investees | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|
| | | | | | 2016 | | | |
| | | | | In millions of won | | | | |
| SE Green Energy Co., Ltd. ......... ₩ | 3,575 | — | — | — | (50) | — | — | 3,525 |
| Daegu Photovoltaic Co., Ltd. ...... | 1,886 | — | — | (411) | 225 | — | — | 1,700 |
| Jeongam Wind Power Co., Ltd. ..... | 702 | 3,900 | — | — | (602) | — | — | 4,000 |
| Korea Power Engineering Service Co., Ltd. ...................... | 1,805 | — | — | — | 1,005 | — | — | 2,810 |
| Busan Green Energy Co., Ltd. ..... | 14,512 | — | — | — | (709) | — | — | 13,803 |
| Jungbu Bio Energy Co., Ltd. ....... | 904 | — | — | — | (904) | — | — | — |
| Korea Electric Vehicle Charging Service ...................... | 1,446 | — | — | — | (343) | — | — | 1,103 |
| Ulleungdo Natural Energy Co., Ltd. ......................... | 7,417 | — | — | — | (516) | — | (7) | 6,894 |
| Korea Nuclear Partners Co., Ltd. ... | 289 | — | — | — | (41) | — | — | 248 |
| Tamra Offshore Wind Power Co., Ltd. ......................... | — | 8,910 | — | — | (1,895) | — | — | 7,015 |
| Korea Electric Power Corporation Fund ....................... | — | 51,500 | — | — | (644) | — | — | 50,856 |
| Energy Infra Asset Management Co., Ltd. ......................... | — | 297 | — | — | (38) | — | — | 259 |
| Daegu clean Energy Co., Ltd. ...... | — | 140 | — | — | — | — | — | 140 |
| YaksuESS Co., Ltd .............. | — | 210 | — | — | (14) | — | — | 196 |
| Nepal Water & Energy Development Company Private Limited ....... | — | — | — | — | — | — | 18,667 | 18,667 |
| | 4,405,668 | 86,616 | (35,373) | (40,340) | (131,583) | (69,561) | (123,175) | 4,092,252 |
| **\<Joint ventures\>** | | | | | | | | |
| KEPCO-Uhde Inc.(*4) ........... | 8,549 | — | — | — | (159) | — | (8,089) | 301 |
| Eco Biomass Energy Sdn. Bhd. ...... | — | — | — | — | — | — | — | — |
| Datang Chaoyang Renewable Power Co., Ltd. ..................... | 27,640 | — | — | — | 1,417 | (818) | — | 28,239 |
| Shuweihat Asia Power Investment B.V. ......................... | 20,474 | — | (14,154) | (2,957) | 6,131 | (9,494) | — | — |
| Shuweihat Asia Operation & Maintenance Company ......... | 486 | — | — | (931) | 941 | (46) | — | 450 |
| Waterbury Lake Uranium L.P. ...... | 20,299 | — | — | — | — | 1,138 | (123) | 21,314 |
| ASM-BG Investicii AD .............. | 20,203 | — | — | — | 1,508 | (223) | — | 21,488 |
| RES Technology AD .............. | 13,789 | — | — | — | (68) | (139) | — | 13,582 |
| KV Holdings, Inc. .............. | 2,010 | — | — | (302) | 429 | (39) | — | 2,098 |
| KEPCO SPC Power Corporation ... | 208,524 | — | — | (5,955) | 48,132 | (5,308) | (26) | 245,367 |
| Canada Korea Uranium Limited Partnership ................... | — | — | — | — | — | — | — | — |
| Gansu Datang Yumen Wind Power Co., Ltd. ..................... | 16,107 | — | — | — | (2,836) | (450) | — | 12,821 |
| Datang Chifeng Renewable Power Co., Ltd. ..................... | 171,224 | — | — | (7,384) | 7,455 | (4,760) | — | 166,535 |
| Datang KEPCO Chaoyang Renewable Power Co., Ltd. ...... | 10,580 | — | — | (440) | 1,002 | (299) | — | 10,843 |
| Rabigh Electricity Company ........ | 59,368 | — | — | — | 18,961 | 19,473 | — | 97,802 |
| Rabigh Operation & Maintenance Company ................... | 3,586 | — | — | (1,934) | 2,253 | 229 | 293 | 4,427 |
| Jamaica Public Service Company Limited ................... | 241,918 | — | — | — | — | 7,535 | — | 249,453 |
| KW Nuclear Components Co., Ltd. ......................... | 4,985 | — | — | (2,191) | 4,344 | — | (5) | 7,133 |
| Busan Shinho Solar Power Co., Ltd. ......................... | 3,678 | — | — | (185) | 321 | — | — | 3,814 |
| GS Donghae Electric Power Co., Ltd. ......................... | 200,379 | — | — | — | 5,575 | — | (6) | 205,948 |
| Global Trade Of Power System Co., Ltd. ......................... | 426 | — | — | — | 51 | — | — | 477 |

F-96

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved

| Investees | | Beginning balance | Acquisition | Disposal | Dividends received | Share of income (loss) | Other comprehensive income (loss) | Others | Ending balance |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | In millions of won | | | | |
| Expressway Solar-light Power Generation Co., Ltd. . . . . . . . . . . . | ₩ | 2,100 | — | — | — | 243 | — | — | 2,343 |
| KODE NOVUS I LLC . . . . . . . . . . | | — | — | — | — | — | — | — | — |
| KODE NOVUS II LLC . . . . . . . . . . | | — | 258 | — | — | (260) | — | 2 | — |
| Daejung Offshore Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 3,352 | — | — | — | (337) | — | — | 3,015 |
| Amman Asia Electric Power Company . . . . . . . . . . . . . . . . . . . . | | 137,668 | — | — | (12,684) | 17,811 | 11,062 | — | 153,857 |
| KAPES, Inc. (formerly, KEPCO-ALSTOM Power Electronics Systems, Inc.) . . . . . . . . . . . . . . . . | | 4,501 | — | — | — | 311 | — | (54) | 4,758 |
| Dangjin Eco Power Co., Ltd. . . . . . . | | 48,281 | 5,100 | — | — | (696) | (26) | 594 | 53,253 |
| Honam Wind Power Co., Ltd. . . . . . . | | 3,926 | — | — | (104) | 629 | — | — | 4,451 |
| Nepal Water & Energy Development Company Private Limited . . . . . . . | | 17,765 | — | — | — | 359 | 543 | (18,667) | — |
| Chun-cheon Energy Co., Ltd. . . . . . . | | 31,976 | 19,832 | — | — | (1,121) | (95) | — | 50,592 |
| Yeonggwangbaeksu Wind Power Co., Ltd. . . . . . . . . . . . . . . . . . . . . . | | 2,668 | — | — | — | 16 | — | 5 | 2,689 |
| Nghi Son 2 Power Ltd. . . . . . . . . . . | | 269 | 716 | — | — | (740) | (16) | — | 229 |
| Kelar S.A . . . . . . . . . . . . . . . . . . . . | | — | — | — | — | — | — | — | — |
| PT. Tanjung Power Indonesia . . . . . . | | 617 | — | — | — | 1,337 | — | (8) | 1,946 |
| Incheon New Power Co., Ltd. . . . . . . | | 514 | — | — | — | 41 | 8 | — | 563 |
| Seokmun Energy Co., Ltd. . . . . . . . . | | — | — | — | — | (197) | 793 | (205) | 391 |
| Daehan Wind Power PSC . . . . . . . . . | | — | 285 | — | — | (261) | (8) | — | 16 |
| Barakah One Company . . . . . . . . . . | | — | 118 | — | — | — | — | (2) | 116 |
| Nawah Energy Company . . . . . . . . . | | — | 296 | — | — | — | — | (6) | 290 |
| MOMENTUM . . . . . . . . . . . . . . . . . | | — | 1 | — | — | 65 | — | 1 | 67 |
| Daegu Green Power Co., Ltd. . . . . . . | | — | — | — | — | — | — | 47,528 | 47,528 |
| | | 1,287,862 | 26,606 | (14,154) | (35,067) | 112,657 | 19,060 | 21,232 | 1,418,196 |
| | ₩ | 5,693,530 | 113,222 | (49,527) | (75,407) | (18,926) | (50,501) | (101,943) | 5,510,448 |

(*1) 'Others' include ₩1,400 million of assets held-for-sale (note 42).

(*2) It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩99,338 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

(*3) Due to discontinue of operations during the current year, the Company recognized an impairment loss of ₩8,103 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

(*4) It was determined that there is objective evidence of impairment due to prolonged operating losses. As a result, the Company recognized an impairment loss of ₩8,099 million in impairment loss on investments in associates and joint ventures for the year ended December 31, 2016.

Filed By: aprice@wileyrein.com, Filed Date: 4/3/19 6:44 PM, Submission Status: Approved