Slip Op. 22-37

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NEXTEEL CO., LTD. ET AL.,** | |
|     **Plaintiff and Consolidated Plaintiffs,** | |
| **and** | |
| **HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY,** | |
|     **Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 20-03898** |
| **UNITED STATES,** | |
|     **Defendant,** | |
| **and** | |
| **CALIFORNIA STEEL INDUSTRIES, INC. ET AL.,** | |
|     **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the 2017–2018 antidumping administrative review of welded line pipe from the Republic of Korea.]

Dated: April 19, 2022

Henry D. Almond and Leslie C. Bailey, Arnold & Porter Kaye Scholer LLP, of Washington, D.C. argued on behalf of plaintiff NEXTEEL Co., Ltd.  Also on the brief were J. David Park, Daniel R. Wilson, and Kang Woo Lee.

Jeffrey M. Winton, Amrietha Nellan, and Jooyoun Jeong, Winton & Chapman PLLC, of Washington, D.C. argued on behalf of consolidated plaintiff SeAH Steel Corporation.  Also on the brief were Michael J. Chapman and Vi N. Mai.

Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, D.C. argued on behalf of consolidated plaintiff and plaintiff-intervenor Hyundai Steel Company.  Also on the brief was Robert G. Gosselink.

Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S. Hodgins, and Eugene Degnan, Morris, Manning, & Martin, LLP, of Washington, D.C. for plaintiff-intervenor Husteel Co., Ltd.

Robert R. Kiepura, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C. argued for defendant United States. Also on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director and Franklin E. White Jr., Assistant Director. Of counsel was Reza Karamloo, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, of Washington D.C.

Elizabeth J. Drake, Schagrin Associates, of Washington, D.C. argued on behalf of defendant-intervenors California Steel Industries, Inc. and Welspun Tubular LLC USA. Also on the brief was Roger R. Schagrin.

Timothy C. Brightbill, Wiley Rein, LLP, of Washington, D.C. argued on behalf of defendant-intervenors American Cast Iron Pipe Company and Stupp Corporation, a Division of Stupp Bros., Inc. Also on the brief was Laura El-Sabaawi.

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Matthew W. Solomon, White & Case LLP, of Washington, D.C. for defendant-intervenors Maverick Tube Corporation and IPSCO Tubulars Inc.

Kelly, Judge:  Before the court are four Rule 56.2 motions for judgment on the agency record challenging various aspects of the U.S. Department of Commerce's ("Commerce") final determination in its 2017–2018 administrative review of the antidumping duty ("ADD") order covering welded line pipe ("WLP") from the Republic of Korea ("Korea") ("WLP from Korea").  Pl. Husteel Co., Ltd.'s Mot. J. Agency R., May 24, 2021, ECF No. 58 ("Husteel's Rule 56.2 Mot.") and accompanying Pl.-

Intervenor Husteel Co., Ltd.'s Br. in Supp. Mot. for J. Agency R., May 24, 2021, ECF No. 58-2 ("Husteel's Br."); R. 56.2. Mot. J. Agency R. of Pl. and Consol. Pl. NEXTEEL Co., Ltd., May 24, 2021, ECF Nos. 59, 60 ("NEXTEEL's R. 56.2 Mot.") and accompanying Memo. in Supp. of [NEXTEEL's R. 56.2 Mot.], May 24, 2021, ECF Nos. 59-2, 60-2 ("NEXTEEL's Br."); Mot. of Pl. SeAH Steel Corporation for J. Agency R., May 24, 2021, ECF Nos. 61, 62 ("SeAH's R. 56.2 Mot.") and accompanying Br. of SeAH Steel Corporation in Supp. of R. 56.2 Mot. for J. Agency R., May 24, 2021, ECF Nos. 61-1, 62-1 ("SeAH's Br."); Consol. Pl. and Pl.-Intervenor Hyundai Steel Company's R. 56.2 Mot. J. Agency R., May 24, 2021, ECF No. 63 ("Hyundai's R. 56.2 Mot.") and accompanying Memo. in Supp. of [Hyundai's R. 56.2 Mot.], May 24, 2021, ECF No. 63-1 ("Hyundai's Br."); see generally [WLP from Korea] 85 Fed. Reg. 76,517 (Dep't Commerce Nov. 30, 2020) (final results of [ADD] admin. review; 2017–2018) ("Final Results") and accompanying Issues and Decision Memo., A-580-876, Nov. 20, 2020, ECF No. 52-4 ("Final Decision Memo."); Order on Consent Mot. to Consol. Cases, Jan. 21, 2021, ECF No. 50 (consolidating Ct. Nos. 20-03898, 20-03935, and 20-03940).

Plaintiff, consolidated plaintiffs and plaintiff-intervenors (collectively, "Plaintiffs") challenge Commerce's determination of a particular market situation ("PMS"), SeAH's Br. at 8–21; NEXTEEL's Br. at 21–31; Hyundai's Br. at 6–9;[1] Husteel's Br. at 7–13, Commerce's application of a PMS adjustment to the sales-

---

[1] Joining in the arguments set forth in SeAH's, NEXTEEL's and Husteel's briefs. Hyundai's Br. at 6.

below-cost test, SeAH's Br. at 8–11; NEXTEEL's Br. at 18–21; Hyundai's Br. at 7–8;

Husteel's Br. at 15–18,[2] and Commerce's PMS adjustment methodology, SeAH's Br.

at 21–28; NEXTEEL's Br. at 34–42; Hyundai's Br. at 8–9, as unsupported by

substantial evidence and contrary to law.   Additionally, NEXTEEL Co., Ltd.

("NEXTEEL") challenges Commerce's non-prime cost calculation and Commerce's

classification of NEXTEEL's suspension loss costs as unsupported by substantial

evidence and contrary to law.   NEXTEEL's Br. at 42–48.   SeAH Steel Corporation

("SeAH")  challenges two additional aspects of the Final Results; Commerce's denial

of a constructed export price ("CEP") offset for SeAH's U.S. sales and its decision to

cap adjustments for freight revenue when calculating SeAH's constructed export

price.  SeAH's Br. at 29–35.  Hyundai and Husteel challenge Commerce's separate

rate calculation as unsupported by substantial evidence, reasoning that any errors

made when calculating NEXTEEL's and SeAH's dumping margins impact the

separate rate because the separate rate is calculated by averaging the final weighted-

average dumping margins of the mandatory respondents.   Hyundai's Br. at 9–11;

Husteel's Br. at 18.  For the following reasons, the Final Results are remanded for

reconsideration or additional explanation consistent with this opinion.

---

[2] Adopting and incorporating by reference the arguments set forth in SeAH's and
NEXTEEL's briefs related to other issues impacting SeAH's and NEXTEEL's
dumping margins.  Husteel's Br. at 18.

## BACKGROUND

In March 2019, Commerce initiated an administrative review of its ADD order for WLP from Korea covering the period of December 1, 2017, to November 30, 2018. Initiation of [ADD] and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 9,297 (Dep't Commerce Mar. 14, 2019). Commerce selected NEXTEEL and SeAH as mandatory respondents. Resp't Selection Memo. at 4–5, PD 20 bar code 3812218-01 (Mar. 28, 2019).[3] On June 24, 2019, California Steel Industries ("California Steel"), TMK IPSCO, and Welspun Tubular LLC USA ("Welspun") (collectively, "Domestic Interested Parties") alleged that a PMS existed in the Korean hot-rolled coil steel ("HRC") market, distorting the price of HRC. Ltr. Re: [PMS] Allegation and Supporting Factual Information, PD 95–690 CD 110–339 (June 24, 2019) ("PMS Allegation"). The Domestic Interested Parties provided a regression model for Commerce to use to quantify any adjustment to the price of HRC, should Commerce determine that a PMS in Korea distorted the price of HRC during the period of review. PMS Allegation at Ex. 62. On July 8, 2020, Commerce supplemented the record with steel reports and information from a statistical analysis textbook and invited interested parties to submit comments and rebuttal evidence in response.

---

[3] On January 22, 2021, Commerce filed indices to the public and confidential administrative records underlying Commerce's Final Results. These indices are located on the docket at ECF Nos. 52-1 and 52-2. All references to documents from the public and confidential record are identified by the numbers assigned by Commerce in the indices, see ECF Nos. 52-1 & 52-2, and preceded by "PD" or "CD" to denote public or confidential documents, respectively.

Memo. Re: New Factual Information, PDs 841-842 bar codes 3998238-01, -02 (July 8,

2020); see also Final Decision Memo. at 2–3, 35.

Commerce published the Final Results on November 30, 2020, determining

that a PMS existed in the Korean HRC market based on the cumulative effects of

subsidies provided to the HRC market by the Government of Korea ("GOK"), imports

of low-priced HRC from the People's Republic of China ("China"), strategic alliances

between Korean HRC suppliers and WLP producers, and GOK intervention in the

electricity market.  Final Decision Memo. at 17; Final Results.  Finding sufficient

record evidence existed to quantify the impact of the PMS on production costs,

Commerce calculated the amount of the upward adjustment using the beta coefficient

for uneconomic capacity from an ordinary least squares fixed-effects regression model

originally submitted by the Domestic Interested Parties as part of the PMS Allegation

with certain modifications by Commerce.   Final Decision Memo. at 32–44; PMS

Allegation at Exs. 56, 62.

Commerce determined the normal value of NEXTEEL's subject merchandise

using constructed value, based on data submitted by NEXTEEL, with adjustments to

NEXTEEL's reported costs for HRC to account for the PMS, non-prime WLP

products, costs of goods sold ("COGS"), and general and administrative expenses.

[WLP from Korea] 85 Fed. Reg. 7,269 (Dep't Commerce Feb. 7, 2020) (prelim. admin.

review) and accompanying Issues and Decision Memo. at 19–20.  Issues and Decision

Memo. at 19–20, A-580-876, Jan. 31, 2020 ("Prelim. Decision Memo."); Final Decision

Memo. at 3; NEXTEEL's Prelim. Calculation Memo., CD 459 bar code 3938526-01 (Jan. 31, 2020); NEXTEEL's Final Calculation Memo., CD 480 bar code 4056576-01 (Nov. 20, 2020). Commerce determined the normal value of SeAH's subject merchandise using SeAH's home market sales, with adjustments to SeAH's reported HRC cost to account for the PMS for the purpose of the sales-below-cost test; and constructed value where there were no identical home market sales in the ordinary course of trade, with an adjustment to SeAH's reported cost for HRC to account for the PMS. Prelim. Decision Memo. at 21–22; Final Decision Memo. at 3; SeAH's Prelim. Calculation Memo., CD 461 bar code 3938891-01 (Jan. 31, 2020) ("SeAH's Prelim. Calc."); SeAH's Final Calculation Memo., CD 484 bar code 4056688-01 (Nov. 20, 2020).

Between September 22, 2021, and October 20, 2021, parties fully briefed the issues. Def.'s Resp. Pls.' Mots. J. Agency R., Sept. 22, 2021, ECF No. 69 ("Def. Br."); Resp. Br. Def.-Intervenors Maverick Tube Corporation and IPSCO Tubulars Inc., Sept. 22, 2021, ECF No. 70 ("Maverick's and IPSCO's Br."); Def.-Intervenors' Resp. Br., Sept. 22, 2021, ECF No. 71 ("Def.-Intervenors' Br."); Pl.-Intervenor [Husteel]'s Reply Br. Supp. Mot. J. Agency R., Oct. 20, 2021, ECF No. 74; Reply Br. [SeAH], Oct. 20, 2021, ECF No. 75; Reply Br. Supp. [NEXTEEL]'s Mot. for J. Agency R., Oct. 20, 2021, ECF No. 76; Reply Br. of Consol. Pl. and Pl.-Intervenor [Hyundai], Oct. 20, 2021, ECF No. 77. On January 21, 2022, the court denied California Steel's and Welspun's motion to stay. Opinion and Order, Jan. 21, 2022, ECF No. 86; Partial

Consent Mot. to Stay Proceedings, Jan. 13, 2022, ECF No. 84; Pls.' Joint Opp. To Def.-Intervenors' Mot. to Stay Proceedings, Jan. 20, 2022, ECF No. 85.  On February 4, 2022, the court held oral argument.  Order, Nov. 19, 2021, ECF No. 83; Order, Jan. 26, 2022, ECF No. 88; Remote Oral Arg., Feb. 4, 2022, ECF No. 89.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii)[4] and 28 U.S.C. 1581(c) (2018), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.  The Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.   Particular Market Situation and the Sales-Below-Cost Test

The court remands Commerce's application of the PMS adjustment to SeAH's direct material costs when conducting the sales-below-cost test because such application is contrary to law.  When determining the normal value of a respondent's subject merchandise, Commerce generally bases the normal value on the price at which the foreign like product is sold in either the respondent's home market, or a third country market.  See id. § 1677b(a)(1).  In selecting the home market sales on

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

which to base normal value, Commerce may disregard home market sales made at less than the cost of production if the sales (1) have "been made within an extended period of time in substantial quantities" and (2) "were not made at prices which permit recovery of all costs within a reasonable period of time." Id. § 1677b(b). After disregarding sales, Commerce bases normal value on the remaining home market sales made in the ordinary course of trade. Id. § 1677b(b)(1). If there are no remaining sales, Commerce bases normal value "on the constructed value of the merchandise." Id. The Trade Preferences Extension Act of 2015 ("TPEA") amended section 1677b(e), allowing Commerce to make adjustments to "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise" for the purpose of calculating the subject merchandise's constructed value if "a particular market situation exists such that" the cost does "not accurately reflect the cost of production in the ordinary course of trade." Id. § 1677b(e). Congress has not enacted any amendments to the framework of section 1677b(b), enabling Commerce to make a PMS adjustment to a respondent's reported costs for the purpose of determining whether those sales were made below cost. Hyundai Steel Co. v. United States, 19 F.4th 1346 (Fed. Cir. 2021).

Here, Commerce applies an upward adjustment of 25.62% to SeAH's HRC cost to account for a PMS in the Korean HRC market before conducting the sales-below-cost test. Final Decision Memo. at 41. Such adjustment is not permitted by the statute; thus, Commerce's adjustment to SeAH's HRC cost for the purpose of

conducting the sales-below-cost test is remanded for reconsideration consistent with this opinion.

## II.    Particular Market Situation Determination

Plaintiffs argue that Commerce's PMS determination is not supported by substantial evidence.  Specifically, Plaintiffs argue that the market phenomena on which Commerce relies do not give rise to a PMS, SeAH's Br. at 11–17; NEXTEEL's Br. at 21–31; Hyundai Br. at 6–8; Husteel's Br. at 7–15, Commerce may not base its determination on the totality of the circumstances without additional explanation, SeAH's Br. at 18, and Commerce has failed to show that HRC costs are outside of the course of ordinary trade.   SeAH's Br. at 19–21.   Defendant and Defendant-Intervenors argue that Commerce's PMS determination is supported by substantial evidence.   Def.-Intervenors' Br. at 8–23; Def. Br. at 14–20.   The court remands Commerce's PMS determination for reconsideration or additional explanation consistent with this opinion.

The TPEA allows Commerce to adjust a respondent's cost of materials and fabrication or other processing when Commerce calculates constructed value "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."   19 U.S.C. § 1677b(e).   Although "particular market situation" is not defined in either the statute or the legislative history to the TPEA, the phrase predates the TPEA in sections § 1677b(a)(1)(B) and (C).   NEXTEEL Co.,

Ltd. v. United States, 28 F.4th 1226, 1234 (Fed. Cir. 2022) ("NEXTEEL I").  The

Statement of Administrative Action to the Uruguay Round Agreements Act (the

"SAA") provides examples of situations that "distort[] costs so that they are not set

based on normal market forces or do not move with the rest of the market."  Id.; see

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No.

103–316, vol. 1, at 822 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4162 ("SAA").

The language of section 1677b(e) "adopts both a comparative requirement and a

causal requirement" requiring Commerce to find the existence of one or more unique

market phenomena and demonstrate how those market phenomena render the cost

of materials and fabrication inaccurate in the ordinary course of trade.  See 19 U.S.C.

§ 1677b(e);  Garg Tube Export LLC v. United States, Ct. No. 20-00026, 2022 WL

836402 *1, 4–5 (Ct. Int'l Trade Mar. 11, 2022).

Commerce may choose the methodology it employs to identify the unique

market phenomena that render the cost of materials and fabrication an inaccurate

reflection of the cost of production, so long as the methodology comports with its

statutory mandate and provides a reasoned explanation supported by substantial

evidence.  See Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05

(1986) (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S.

837, 843 (1984); Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir.

1996); Universal Camera Corp. v. N.R.L.B., 340 U.S. 474, 488 (1951).  The evidence

must be sufficient such that a reasonable mind might accept the evidence as adequate

Consol. Court No. 20-03898                                        Page 12

to support its conclusion while considering contradictory evidence.  See Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938); see also Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).

Commerce bases its PMS determination on the cumulative impact of subsidies for HRC products by the GOK, unfairly traded Chinese HRC, "strategic alliances between Korean HRC suppliers and Korean WLP producers," and government control over electricity prices in Korea.  Final Decision Memo. at 17.  Although Commerce identifies each of the market phenomena it believes contribute to a PMS in the Korean HRC market, the court cannot discern how Commerce combined these phenomena to reach its determination that a PMS exists in the Korean HRC market. Commerce also fails to demonstrate that the market phenomena identified distort the price of HRC such that the cost does not accurately reflect the price of HRC in the ordinary course of trade.   Commerce can support its PMS determination with evidence of subsidies, but in doing so, Commerce must show that the subsidies "affect the price of the input so that it does 'not accurately reflect the cost of production in the ordinary course of trade.'" NEXTEEL I, 28 F.4th at 1235–36.  Commerce must also show that the effect of the subsidies is "'particular' to producers of the subject merchandise." Id.  Here, Commerce has only shown that HRC subsidies were in place during the period of review and that NEXTEEL and SeAH purchased HRC from entities receiving subsidies.  Final Decision Memo. at 18.  On remand, if Commerce wishes to continue relying on the provision of subsidies as a market phenomenon

contributing to a PMS in the Korean HRC market, it should explain how the subsidies distort the price of HRC preventing an accurate reflection of the cost of production in the ordinary course of trade and demonstrate that the effect of the subsidies is particular to producers of the subject merchandise.  NEXTEEL I, 28 F.4th at 1235–36.

Commerce asserts that strategic alliances contribute to the PMS in the Korean HRC market.  In support of its assertion, Commerce points to record evidence that in December 2017 the Korea Fair Trade Commission ("KFTC") fined six Korean steel producers, including Hyundai "for rigging bids for pipe sold to a Korean gas company over a period of ten years," and that the KFTC has not found that Hyundai or SeAH have discontinued their anticompetitive practices.  Final Decision Memo. at 20. Commerce argues that the KFTC's findings are consistent with Commerce's conclusion that strategic alliances have previously created distortions in the past and may continue to do so now.  Id.  Commerce fails to demonstrate that the alleged strategic alliances created distortions during the period of review.  Instead, it speculates that distortions are occurring due to the alleged alliances.  Id.  However, Commerce's PMS determination must be supported by substantial evidence, not speculation.  See NEXTEEL I, 28 F.4th at 1236.  Commerce concedes that the existence of strategic alliances alone is not dispositive of a PMS but is part of Commerce's consideration of the totality of the circumstances in the Korean HRC market.  Final Decision Memo. at 20.  The court cannot discern from Commerce's

explanation how Commerce combined and weighed each market phenomenon it identified to reach its determination of a PMS and must remand. On remand, in addition to demonstrating that strategic alliances have distorted HRC prices in the Korean HRC market, such that the cost of HRC is no longer an accurate reflection of the cost in the ordinary course of trade, Commerce should explain how it combined each of the market phenomena it identifies to reach its PMS determination.

Commerce also relies on the GOK's control over electricity prices as a contributing factor to its PMS determination, arguing that the GOK's control results in a distortion in the Korean electricity market. Id. Although the SAA contemplates that government control over prices may constitute a PMS, government control must be so pervasive "that home market prices cannot be considered to be competitively set." SAA at 822. Commerce fails to establish that level of government control here. Commerce's countervailing duty determinations have found that electricity is not countervailable; therefore, Commerce has determined that the GOK is not conferring a benefit on Korean steel producers. See, e.g., NEXTEEL I, 28 F.4th at 1237–38 (collecting cases). Furthermore, Commerce fails to explain how a distortion in the Korean electricity market distorts the price of HRC. On remand, if Commerce wishes to continue relying on electricity prices, it should explain why the facts of this case warrant a departure from its previous determinations and how distortions in the electricity market result in distorted HRC prices. See id.

Finally, Commerce relies on China's overproduction of steel as a market phenomenon supporting its PMS determination arguing that Chinese steel production exerts "downward pressure" on the price of HRC.  Final Decision Memo. at 18.  Commerce explains record evidence shows "that Korea is one of the top two destinations of Chinese exports of hot-rolled steel," id., and "the average unit value (AUV) for HRC imported from China into Korea was lower than the AUV of China's exports to other countries." Id. at 19.  Yet, Commerce also acknowledges that China exported steel to 160 destinations in 2017 and 2018, and the AUV of steel imports was lower in some other countries.  See id.  Thus, low-priced steel imports from China cannot be considered unique to the Korean market.  Commerce is not precluded from relying on steel overcapacity as a market phenomenon contributing to a PMS in Korea, see NEXTEEL I, 28 F.4th at 1237, but it must explain how overcapacity combines with the other market phenomena it relies on to create a unique distortion in the Korean market and demonstrate that the price of HRC is impacted by the distortion.  Commerce does neither here.  On remand, if Commerce wishes to continue relying on global steel overcapacity, Commerce should explain how it combines with the other market phenomena Commerce relies on to give rise to a PMS and demonstrate that Korean HRC costs are distorted.

## III.  Particular Market Situation Adjustment

Plaintiffs challenge Commerce's PMS adjustment calculation methodology as arbitrary and unsupported by substantial evidence.   NEXTEEL argues that

Consol. Court No. 20-03898                                          Page 16

"Commerce's reliance on a 'regression-based' methodology" is arbitrary because it is

"a complete departure from its prior PMS determinations." NEXTEEL's Br. at 34–35.

Plaintiffs argue that the regression-based methodology is unsupported by substantial

evidence because unrebutted expert testimony demonstrates that the regression

model is invalid, SeAH's Br. at 22–24, the relationship between uneconomic capacity

and steel prices is not stable over time, SeAH's Br. at 23–27; NEXTEEL's Br. at 40,

Commerce did not use product-specific data, NEXTEEL's Br. at 40–41, and

Commerce's use of 2017 HRC prices is improper because most of the period of review

is in 2018.    SeAH's Br. at 27–28; NEXTEEL's Br. at 37–40.    Defendant and

Defendant-Intervenors counter that the regression-based methodology employed by

Commerce to calculate the PMS adjustment is supported by substantial evidence and

in accordance with law.  Def. Br. at 27–32; Def.-Intervenors' Br. at 29–35.  For the

following reasons, Commerce's PMS adjustment methodology is remanded for

reconsideration or further explanation consistent with this opinion.

Where Commerce identifies a PMS such that the cost of materials and

fabrication are not accurate, section 1677b(e) permits Commerce to use any other

calculation methodology to quantify the impact of the PMS on the costs of materials

and fabrication.  19 U.S.C. § 1677b(e).  The chosen methodology must be reasonable,

and the determination must be supported by substantial evidence.  See Garg, 2022

WL 836402 at 5.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  Universal Camera, 340 U.S.

at 477 (quoting <u>Consol. Edison Co.</u>, 305 U.S. at 229).  "The substantiality of evidence

must take into account whatever in the record fairly detracts from its weight."  <u>Id.</u> at

488.  In providing its explanation Commerce must articulate a "rational connection

between the facts found and the choice made."  <u>Burlington Truck Lines, Inc. v. United</u>

<u>States</u>, 371 U.S. 156, 168 (1962).  "A court may 'uphold [an agency's] decision of less

than ideal clarity if the agency's path may reasonably be discerned.'"  <u>Ceramica</u>

<u>Regiomontana, S.A. v. United States</u>, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (quoting

<u>Bowman Transportation v. Ark.-Best Freight Sys.</u>, 419 U.S. 281, 286 (1974)); <u>Colo.</u>

<u>Interstate Gas Co. v. FPC</u>, 324 U.S. 581, 595, (1945).  Moreover, the court will remand

Commerce's determination if it is arbitrary.  The court will find Commerce's

determination arbitrary where the "agency offer[s] insufficient reasons for treating

similar situations differently."  <u>SKF USA v. United States</u>, 263 F.3d 1369, 1382 (Fed.

Cir. 2001).

Here, Commerce calculates the PMS adjustment using the beta coefficient for

uneconomic capacity[5] derived from an ordinary least squares ("OLS") regression

---

[5] The beta coefficient for uneconomic capacity measures the relationship between the
import AUV for HRC and uneconomic capacity when all other explanatory variables
are held constant.  <u>See</u> Final Decision Memo. at 40.  Commerce explains that relying
on the beta coefficient for uneconomic capacity allows Commerce to "to isolate the
factors contributing to a cost-based PMS in the Korean HRC market [and] capture
the effect of global uneconomic capacity in the steel industry on the cost of imported
HRC in Korea." <u>Id.</u> at 39.  The Domestic Interested Parties define "uneconomic
capacity" as "the amount of steel capacity in a given year in excess of the largest
possible quantity of steel that may be demanded in that year (i.e., global capacity
minus the highest global production ever experienced prior to that year)." PMS
Allegation at 46.

model provided in the Domestic Interested Parties' PMS Allegation (the "OLS Regression Model").[6]   Final Decision Memo. at 32; see generally PMS Allegation at Ex. 62.   Commerce adjusts SeAH's and NEXTEEL's reported HRC costs by a rate of 25.62%, which it finds is the amount that the import AUV for HRC would increase "if uneconomic capacity were eliminated."   Prelim. Results Regression Analysis for [PMS] Adjustment at 2, PD 798 bar code 3938102-01 (Jan. 31, 2020); Final Decision Memo. at 41.   Commerce arrives at the upward adjustment using the following equation:

$$Change\ in\ AUV =$$

$$\left( \frac{(Global\ Prod._{5\ yr\ avg.} \div Capacity\ Utilization\ Rate) - GlobalProd._{Max}}{Global\ Capacity_{2017} - Global\ prod._{Max}} \right) \beta Uneconomic\ Capacity - 1.[7] \quad \underline{Id.}\ at$$

40–41.

---

[6] Multiple regression models estimate relationships between explanatory variables and a dependent variable, showing the estimated impact that a particular independent variable has on the dependent variable.   Jeffrey M. Wooldridge, Introductory Econometrics A Modern Approach 68 (South-Western Cengage Learning 5th ed.) (2013) ("Wooldridge, Econometrics"); see PMS Allegation at 40.   The OLS regression model submitted by the Domestic Interested Parties uses panel data from 2008–2017 for several countries and attempts "to estimate the effect of global excess capacity on prices of HRC at the national level."   Final Decision Memo. at 39–40; PMS Allegation at 44–45, Ex. 62.

[7] Where "Global Prod.$_{5\ year\ avg.}$" is the average of global steel production from 2013–2017, "Capacity Utilization Rate" is the level of global capacity desired, "$\beta$UneconomicCapacity" is the beta coefficient for uneconomic capacity derived from the OLS Regression Model, id. at 40–41, citing PMS Allegation at Ex. 56a, regression model 3, "Global Capacity$_{2017}$" is the global production capacity in 2017 and "Global Production $_{max}$" "is the maximum level of Global Production during the years before the current year."   See id.

Commerce's has discretion to choose "any reasonable methodology" to quantify a PMS adjustment.  Here, Commerce explains its formula captures the distortion created by the PMS phenomena because quantifies the relationship the actual AUV of HRC and a counterfactual AUV of HRC.  Commerce's PMS adjustment methodology is reasonable.[8]  19 U.S.C. § 1677b(e); <u>Fujitsu</u>, 88 F.3d at 1039.

Plaintiffs challenge the application of Commerce's methodology.  In applying its methodology Commerce relies upon the beta coefficient for uneconomic capacity supplied in the Domestic Parties' OLS Regression Model.  Final Decision Memo at 41. <u>See also</u> PMS Allegation at Ex. 56a, Regression Model 3; SeAH's Br. at 21–28; NEXTEEL's Br. at 37–42.  Because in Commerce's application of it PMS methodology

---

[8] In its brief before the court, NEXTEEL argues that Commerce's reliance on a regression-based methodology is arbitrary because in prior reviews Commerce based its PMS determination on the same four market phenomena it identifies in the current review and based the PMS adjustment on subsidy rates for the input. NEXTEEL Br. at 34–35; <u>see, e.g.</u>, <u>Certain Oil Country Tubular Goods from [Korea]</u>, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of [ADD] admin. review; 2014– 2015), as amended, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of [ADD] admin. review; 2014–2015) and accompanying Issues and Decision Memo. at 40–44, A-580-870 bar code 3562289-01, Apr. 11, 2017 ("For HRC purchased from Korean producers, [Commerce] bases this adjustment on the subsidy rates found for . . . producers of HRC in the final determination in Hot-Rolled Steel Flat Products from Korea. [Commerce] has quantified this adjustment as the net domestic subsidization rate"). NEXTEEL does not raise this issue in its agency brief, <u>see generally</u> NEXTEEL's Case Brief, bar code 3953030-01 (Mar. 11, 2020), and although the government does not argue NEXTEEL has failed to exhaust its administrative remedies, Commerce nonetheless provides a reasonable explanation for its decision to rely on a regression-based methodology.  Prelim. Decision Memo. at 14–16. (explaining that Commerce finds a regression-based methodology "sufficiently quantifies the impact of the PMS on the material cost of HRC, and derives a corresponding adjustment factor that, when applied to the costs of HRC, accounts for the distortions induced by the observed PMS.")

it relies in part on the beta coefficient for uneconomic capacity, and the court finds

that the OLS Regression Model that supplies the coefficient is not supported by

substantial evidence, Commerce's PMS adjustment is not supported by substantial

evidence.

Although Commerce explains why it included data from 2008 and 2009 in the

OLS Regression Model, it fails to address record evidence demonstrating that the

inclusion of the data renders the OLS Regression Model unstable.  SeAH placed an

expert report on the record examining the validity of the OLS Regression Model.

Submission of Factual Information Rebutting, Clarifying, or Correcting Pets.'

Allegation of a [PMS] at App. 11, PDs 726–728 CD 356 bar codes 3877486-01– -03,

3877426-01– -03 (Aug. 12, 2019) (the "Northeim Report").  The Northeim Report

found that the OLS Regression Model "does not represent an appropriate statistical

analysis and cannot be expected to provide reliable estimates concerning the pricing

behavior that it was designed to predict . . . [b]ecause many of the key assumptions

for an OLS model are not met."[9]  Northeim Report at 5; see generally, Woolridge,

_____

[9] The Northeim Report identifies additional problems with the variance of the error terms, autocorrelation, and the validity of the panel data used.  Northeim Report at 12–18.  Commerce addresses these problems, explaining that although the OLS Regression Model may include some level of abnormality in the error terms, some level of abnormality is expected when using time series data and the record evidence does not suggest that the level of abnormality in the error terms is high enough to render the model invalid.  Final Decision Memo. at 38–39.  With respect to the presence of autocorrelation, Commerce rejects the evidence explaining that it does not consider in the Durbin Watson test used in the Northeim Report to be appropriate for the data.  Id.

Econometrics at 509 (listing assumptions for fixed-effects OLS regression models). The Northeim Report tested "the sensitivity of the [OLS Regression Model] over time" by comparing OLS regression models "constructed using a rolling 5-year window" to measure the impact that the inclusion or exclusion of annual data had on the beta coefficients and the import AUV prediction.[10]    Northeim Report at 7–10.    In comparing the various models, the Northeim Report states that "the time period used significantly affects the [beta] coefficients  of the model" showing that depending on the time period used, the uneconomic capacity beta coefficient ranges from -0.6112– 18.6713. Id. at 10–11.    The OLS regression models in the Northeim Report demonstrate that depending on the time period examined, uneconomic capacity may have a variable positive or negative impact on the import AUV of HRC.  Id.  Implicit in the Northeim Report's finding is that the OLS Regression Model does not accurately estimate the relationship between uneconomic capacity and import AUV for HRC when data from 2008 and 2009 is used because the data are outliers.  Id.  In response, Commerce explains that it includes the data from 2008 and 2009 because its prior regression models have been based on ten years of data and the financial crisis of 2008–2009 "is the main event of interest in the analysis," but does not explain why such inclusion is supported by substantial evidence in light of the Northeim

---

[10] Wooldridge explains that OLS regression models are sensitive to outlier data, also known as influential observations.  Wooldridge, Econometrics at 326.  Wooldridge further explains that generally "an observation is an influential observation if dropping it from the analysis changes the key OLS estimates[, i.e., the beta coefficients,] by a practically 'large' amount."  Id. at 326–327.

Report's finding that the model is unstable.  See Final Decision Memo. at 37; see

Northeim Report at 10–11.[11]  On remand, Commerce should explain why its inclusion

of the 2008 and 2009 data is supported by substantial evidence in light of evidence

detracting from its inclusion.[12]

---

[11] Defendant's brief provides several reasons why reliance on the OLS Regression Model is still appropriate in light of the instability identified by SeAH.  Def. Br. at 29–30.  Those reasons are not included in the Final Decision Memo. and the court will not consider them at this time.

[12] NEXTEEL also challenges the product specifications Commerce used for the regression model, arguing that Commerce should have relied on the 6-digit HTS classification rather than the 4-digit HTS classification. NEXTEEL's Br. at 40–42. Commerce explains that although the 4-digit HTS classification may be over inclusive,  "OECD data on steel capacity and WSA data on steel production are only provided at the broader four-digit HTS level" and using data in the regression analysis at the four- and six- digit level would "prevent[] an accurate quantification of the PMS." Final Decision Memo. at 32.  Commerce adequately explains its decision to rely on the six-digit HTS classification.

Furthermore, although Commerce's explanation could be clearer, it is discernible that Commerce reasonably excluded the 2018 data for global steel production and capacity. Commerce explains that despite eleven months of the period of review occurring in 2018, it declines to include the data from 2018 because some production in 2018 likely relates to sales occurring outside of the period of review and further, a portion of production in 2018 falls outside of the period of review.  Id. at 36–37.  Implicit in Commerce's explanation is that it believes there is a lag between the time production costs are incurred and recuperated through sale of the product. See id.; see also Def. Br. at 31–32; Oral Arg. at 37:15–38:11.  Therefore, data from 2017 is more representative of the costs incurred to produce products sold in 2018 than data from 2018.  See Final Decision Memo. at 36–37; see also Def. Br. at 31–32; Oral Argument at 37:15–38:11.  In light of this explanation, the court cannot say Commerce's choice to exclude the 2018 data was unreasonable.

## IV.  NEXTEEL's Non-Prime Costs

NEXTEEL argues that Commerce erred in calculating the cost of NEXTEEL's non-prime WLP by valuing it at its sale price rather than its reported cost of production, a valuation inconsistent with 19 U.S.C. § 1677b(f)(1)(A) and the U.S. Court of Appeals for the Federal Circuit's ("Court of Appeals") decision in Dillinger France S.A. v. United States, 981 F.3d 1318, 1322 (Fed. Cir. 2020).  NEXTEEL's Br. at 42–45.  Defendant argues that assigning the full cost of production does not reasonably reflect the costs associated with the production and sale of the merchandise because the non-prime products cannot be used for the same general application as prime products; therefore, Commerce's valuation is correct.  Def. Br. at 34–35.  Defendant further argues that Commerce's calculation is reasonable and consistent with the Court of Appeals' decision in Dillinger.  Def. Br. at 34–35.  For the reasons that follow, Commerce's determination is remanded.

When determining the constructed value of subject merchandise, Commerce normally calculates cost "based on the records of the exporter or producer of the merchandise" if the records "are kept in accordance with the generally accepted accounting principles [("GAAP")] of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).  Sometimes, Commerce finds that a portion of a respondent's reported costs relate to the production of "non-prime" products.  See, e.g., Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375,

Consol. Court No. 20-03898                                              Page 24

1381 (Fed. Cir. 2008).  Commerce classifies a product as non-prime on a case-by-case

basis after examining "how the products are treated in the respondent's normal books

and records, whether [the products] remain in scope, and whether [the products] can

be used in the same applications as the prime product."  Final Decision Memo. at 45.

When a product is no longer capable of being used in the same applications as the

prime product, Commerce typically considers the product's market value to be

"significantly impaired, often to a point where its full cost cannot be recovered," and

believes it would be unreasonable to assign full costs to the product.  Id.  In those

cases, Commerce applies an adjustment to the reported cost of production of the non-

prime product, valuing it at its sale price, and allocates the difference between the

production cost and sales price to the production cost of prime products.  Id. at 47.  In

Dillinger, the Court of Appeals held that Commerce's constructed value calculation

must reasonably reflect a respondent's actual costs, whether or not the respondent's

books and records reasonably reflect such costs.  981 F.3d at 1321–23.  Specifically,

the Dillinger court held that Commerce was not permitted to use a respondent's costs

as reflected in its books and records because those reported costs did not reasonably

reflect the respondent's actual costs, even though the respondent kept its books and

records in accordance with GAAP.  Id. at 1324.

Although Commerce explains how its evaluation of NEXTEEL's non-prime

products is consistent with its practice, Final Decision Memo. at 46–47; contra

Husteel Co., Ltd. v. United States, 471 F. Supp. 3d 1349, 1366–1368 (Ct. Int'l Trade

Consol. Court No. 20-03898                                              Page 25

2020) ("Husteel I"), it does not explain how adjusting the price of non-prime products

accords with the Court of Appeals' instruction in Dillinger to use actual costs when

calculating constructed value. See Dillinger, 981 F.3d at 1321–24. Here, NEXTEEL's

books and records allocate the costs of prime and non-prime products based on the

cost of production for each. Final Decision Memo. at 45. Commerce explains that

NEXTEEL's non-prime WLP was downgraded at the end of the production process

and never certified as WLP for oil and gas pipe. Id. at 46. Commerce continues,

explaining that because the non-prime WLP does not meet the same certifications as

prime WLP, it cannot be used in the same applications as prime WLP and the market

value of the non-prime products is significantly impaired such that it "may not be

sufficient to recover production costs."[13]  Id. at 46–47. However, the legislative

history to section 1677b(f) demonstrates Congress' clear intent that costs used to

construct the subject merchandise's value "accurately reflect the resources actually

used in the production of the merchandise in question," not costs based on a product's

market value. See Dillinger, 981 F.3d at 1322 (quoting S. REP. NO. 103-412 at 75

(1994)); see also id. at 1321 n.1. Commerce's methodology uses the likely market

value of the non-prime product rather than the actual cost of production reported by

NEXTEEL and its explanation is inadequate in light of the Court of Appeals'

---

[13] Prime WLP is "used in pipeline transportation systems in the petroleum and natural gas industries as permitted by API 5L usage." Final Decision Memo. at 46-47. Customers do not use non-prime WLP in pipeline transportation systems because of the potential costs and liabilities associated with pipe failure and instead use it for structural purposes such as piling. Id. at 47.

precedent.  Therefore, the court remands for further explanation or reconsideration consistent with this opinion.

## V.      NEXTEEL's Suspension Loss Costs

NEXTEEL argues that Commerce's decision to reallocate costs related to the suspended production of certain non-subject production lines and one subject merchandise forming line, from cost of goods sold to general and administrative expenses, contravenes section 1677b(f)(1)(A). NEXTEEL's Br. at 45–46.  Defendant argues that the reallocation is reasonable because although NEXTEEL's accounting records are kept in accordance with Korean International Financial Reporting Standards ("K-IFRS"), the records do not reasonably reflect the cost of production and Commerce's reallocation is consistent with its established practice.  See Def. Br. at 36–37.  Defendant also counters that NEXTEEL's argument is a disagreement with Commerce's evidentiary conclusion which is an insufficient basis for a legal challenge. See id. at 36.  For the reasons that follow, Commerce's determination is remanded.

Commerce normally calculates costs based on the respondent's records if such records are kept in accordance with GAAP and reasonably reflective of the cost of production.  See 19 U.S.C. § 1677b(f)(1)(A).  As discussed, Dillinger requires that constructed value reasonably reflect a respondent's actual costs, whether or not the respondent's books and records reasonably reflect such costs.  981 F.3d at 1321–23. However, even if a respondent's normal books and records are GAAP-compliant, Commerce may deviate from the costs reflected in a respondent's books and records

if it determines that such costs do not "reasonably reflect the costs associated with the production and sales of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).   When confronted with the shutdown of a production line, Commerce's practice is to include routine shutdown expenses in reported costs, "associat[ing] them to products produced on [the] line," and include losses related to extended shutdowns in the general expenses of the company because "products are not produced on those production lines to recover the costs associated with them." Final Decision Memo. at 48–49.

Here, NEXTEEL reported losses associated with suspended production lines related to subject and non-subject merchandise. Id. at 48; see also NEXTEEL's Br. at 45–46.   NEXTEEL allocated losses related to suspended production to the cost of goods sold ("COGS") in its books and records, consistent with K-IFRS.   See Final Decision Memo. at 49.   However, Commerce reclassified those losses "as [general and administrative] expenses and deducted them from the COGS denominator in the general and administrative and financial expense ratios." Id. at 48.   Commerce reasons that because NEXTEEL "suspended the production lines for an extended period of time" it considers "the associated costs to be related to the general operations of the company as a whole, and not specific to products associated with that production line." Id. at 49.   Commerce believes that its reclassification and adjustment results in a reasonable reflection of the cost of production. Id. at 48–49.

Consol. Court No. 20-03898                                            Page 28

It is unclear from Commerce's explanation whether NEXTEEL suspended production on the lines in question for a portion of the period of review or the entirety of the period of review.  If NEXTEEL suspended production for only a portion of the period of review, then merchandise may have been produced on those lines during the period of review, allowing Commerce to associate the suspended production losses with the revenue generated from that merchandise.  <u>Contra</u> <u>Husteel Co., Ltd. v. United States</u>, 520 F. Supp. 3d 1296, 1307–1308, 1307 n.5 (Ct. Int'l Trade 2021) ("<u>Husteel II</u>") (Commerce determined that "'[n]o revenue from any products normally produced on [the suspended] lines was generated for the period'" (quoting Final Results of Redetermination Pursuant to Ct. Remand in Consol. Court No. 19-00112 at 30, Jan. 8, 2021, ECF No. 84)).  Furthermore, Commerce's analysis does not address the extent to which losses associated with the suspension of non-subject merchandise production lines relate to the general and administrative expenses incurred in the production of subject merchandise, such that NEXTEEL's K-IFRS compliant books and records do not reasonably reflect costs.  On remand, Commerce should clarify whether any merchandise was produced on the suspended production lines at issue during the period of review and explain why NEXTEEL's books and records do not reasonably reflect costs.

**VI.   SeAH's Freight Revenue**

SeAH alleges that Commerce impermissibly capped SeAH's freight revenue in its calculation of SeAH's constructed export price and only included the separately

invoiced freight in the constructed export price "to the extent that doing so increased the dumping margin." SeAH's Br. at 35. SeAH further argues that Commerce's methodology is contrary to the statute because section 1677a(c) only allows Commerce to deduct freight expense if it is included in the starting price. Id. at 34. Defendant and Defendant-Intervenors argue that Commerce capped SeAH's freight revenue consistent with the statute, case law, and Commerce's practice. Def. Br. at 37–39; Maverick's and IPSCO's Br. at 16–20. For the following reasons, Commerce's determination is sustained.

To determine "whether subject merchandise is being, or is likely to be, sold at less than fair value" Commerce makes a "fair comparison . . . between the export price or the constructed export price and normal value" of the subject merchandise. 19 U.S.C. § 1677b(a). Commerce arrives at the export price or constructed export price, as appropriate, by making certain adjustments to the starting price of the subject merchandise enumerated in 19 U.S.C. § 1677a(c)–(d). 19 U.S.C. § 1677a(c)–(d); 19 C.F.R. § 351.402(a). Pursuant to section 1677a, Commerce increases the price used for constructed export price by:

> (A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States,
> (B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States, and
> (C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy, and

Commerce decreases the price by

> (A) except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, and
> (B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

Commerce further provides in its regulations

> Use of price net of price adjustments. In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable). The Secretary will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment.[14]

19 C.F.R. § 351.402.

Recently, in NEXTEEL I the Court of Appeals affirmed as reasonable Commerce's use of a freight cap on nearly identical facts. 28 F.4th at 1239–40. The Court explained that it gave deference to Commerce's methodology for its treatment of freight. Id. Although SeAH's correctly asserts that the statute only allows a freight deduction for "the amount, if any, included in such price," 19 U.S.C. § 1677a(c)(2)(A); SeAH's Br. at 34, it is reasonably discernable that Commerce's

---

[14] "'Price adjustment' means a change in the price charged for subject merchandise or the foreign like product . . . reflected in the purchaser's net outlay." 19 C.F.R. § 351.102(b)(38).

adjustment for freight expense, net of freight revenue subject to the freight expense cap, is the means by which Commerce determines the extent to which freight is "included in such price." See Final Decision Memo. at 51–52.  The Court of Appeals has found Commerce's methodology reasonable and that determination controls this case. NEXTEEL I 28 F.4th at 1239–40.

## VII.   Denial of SeAH's Constructed Export Price Offset

SeAH argues that unrebutted record evidence indicates that SeAH's constructed U.S. sales were less advanced than its home-market sales, with SeAH performing "additional activities . . . at a much greater intensity to unaffiliated customers in Korea;" therefore, Commerce's refusal to include a constructed export price offset when calculating the normal value of SeAH's subject merchandise is unsupported by substantial evidence.  SeAH's Br. at 29–33.   Defendant argues that Commerce reasonably determined that no constructed export price offset was warranted because SeAH's selling functions in the U.S. and home markets were at the same or similar level of trade and supported its determination with substantial evidence.  Def. Br. at 41–44.  For the following reasons Commerce's determination is remanded.

Commerce compares the export price or constructed export price to "the price the subject merchandise is first sold for consumption in the home market," and "to the extent practicable, at the same level of trade."  19 U.S.C. § 1677b(a)(1)(A)–(B). Where the home market sales and the U.S. sales are not at the same level of trade,

Commerce adjusts the home market sale to bring the sale to the same level of trade "if the difference in level of trade— (i) involves the performance of different selling activities; and (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined." Id. § 1677b(a)(7)(A).  Commerce grants a CEP offset if the normal value is at a level of trade constituting "a more advanced stage of distribution than the level of trade of the constructed export price" and data on the record does not provide an appropriate basis to determine the adjustment under 19 U.S.C. § 1677b(a)(7)(A).  Id. § 1677b(a)(7)(B); 19 C.F.R. § 351.412(f)(1).  The amount of the offset is equal to "the amount of indirect selling expenses included in normal value, up to the amount of indirect selling expenses[15] deducted in determining constructed export price."  19 C.F.R. § 351.412(f)(2); 19 U.S.C. § 1677b(a)(7)(B).

Commerce must support its determinations with substantial evidence. "Substantial evidence is more than a mere scintilla." Consol. Edison Co., 305 U.S. at 229.  The evidence must be sufficient such that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence. See id.; Universal Camera, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight").

---

[15] "'[I]ndirect selling expenses means selling expenses, other than direct selling expenses or assumed selling expenses . . .  that the seller would incur regardless of whether particular sales were made, but that reasonably may be attributed, in whole or in part, to such sales."  19 C.F.R. § 351.412(f)(2).

Consol. Court No. 20-03898                                                    Page 33

Commerce determines the level of trade for SeAH's home and U.S. market sales by identifying the chain of distribution, "including selling functions and class of customer . . . and the level of selling expenses for each type of sale." Prelim. Decision Memo. at 17. Commerce classifies SeAH's selling functions into five categories: (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; and (5) performance of sales-related administrative activities. Prelim. Decision Memo. at 18. Commerce compares the selling functions for each channel of distribution of SeAH's home market sales to determine if multiple levels of trade exist in the home market. Id. Commerce compares the selling functions for each channel of distribution of SeAH's U.S. sales to determine if multiple levels of trade exist in the U.S. market. Id. Finally, Commerce compares the level of trade in SeAH's home market to the level of trade in the U.S. market to determine whether a CEP offset is appropriate. Id.

The court cannot discern how Commerce arrived at its determination that SeAH's home and U.S. markets were at the same level of trade in light of record evidence showing that SeAH performed the same selling activities at different levels of intensity in each market. Commerce asked SeAH to identify both the selling functions SeAH performed in its home and U.S. markets and the level of intensity with which SeAH performed them. Request for Information [ADD] Admin. Review for SeAH Steel Corporation at A-15, PD 21 bar code 38313088-1 (Apr. 1, 2019) ("Request for Information") ("Report level of intensity information using a scale of

zero to ten"). SeAH reported making sales in its home market through two channels of distribution, performing the same selling functions for all its home market customers. Prelim. Decision Memo. at 17–18. In the U.S. market, SeAH reported making sales through four channels of distribution and performed the same selling functions for all its U.S. market customers. Id. at 18. SeAH reported that it performed several selling functions at a "high level of activity" in its home market and a "low level of activity" in the U.S. market.[16] SeAH's Resp. to [Request for Information] at App. A-5-A, CD 7 bar code 3836300-04 (Apr. 29, 2019) ("SeAH's Sales Activities"). Commerce does not address this difference when comparing the two markets, rather, Commerce summarily concludes that the evidence SeAH provided in support of a CEP offset "does not demonstrate that there were significant differences in the selling functions performed for its home market and U.S. sales." Final Decision Memo. 58; see also Prelim. Decision Memo. at 19.

On remand, if Commerce continues to determine that a CEP offset is not warranted, it should explain how it compared SeAH's home and U.S. sales and arrived at its conclusion that the markets were at the same level of trade.

---

[16] SeAH largely performed the same selling functions in both of its markets however, SeAH performed the provision of cash discounts, distributor/dealer training, warehouse operations, provision of post-sale warehousing, and technical assistance in its home market only. See Prelim. Decision Memo. at 18 (listing the selling functions SeAH performed in each market). Commerce acknowledges that SeAH performed additional selling functions in its home market but explains that it does not believe that these additional activities were significant enough to constitute a different level of trade. Final Decision Memo. at 58.

Specifically, Commerce should address the differences in the level of intensity of SeAH's selling functions in its home and U.S. markets and explain why those differences combined with the additional selling functions SeAH performed in its home market are not significant enough to conclude that the sales in each market are at different levels of trade.  Commerce should also explain how the facts of this case differ such that a CEP offset is not warranted in this case but was warranted in <u>Large Diameter Welded Pipe from the Republic of Korea</u> 83 Fed. Reg. 43,651 (Dep't Commerce Aug. 27, 2018) (prelim. deter. of sales at less than fair value and postponement of final deter.) ("<u>LDWP from Korea</u>") and explain the impact that selling function categories have on Commerce's level of trade determination.  <u>See</u> Final Decision Memo. at 58–59, 59 n.318 (explaining that a CEP offset determination "is a fact-intensive and case-specific inquiry" and comparing the selling function categories used in <u>LDWP from Korea</u> to the selling function categories used in this determination).

## VIII. Commerce's Separate Rate Calculation

Commerce's determination in the <u>Final Results</u> to apply the weighted-average dumping margins calculated for NEXTEEL and SeAH to the separate rate respondents is not supported by substantial evidence. The separate rate is "the weighted average of the estimated weighed average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins and any margins determined entirely under [19 U.S.C. § 1677e]." 19 U.S.C.

Consol. Court No. 20-03898                                                        Page 36

§ 1673d(c)(5)(a).  Thus, because the separate rate is based on the rate calculated for

NEXTEEL and SeAH, and the court has found that those rates are not supported by

substantial evidence, Commerce's separate rate calculation is also not supported by

substantial evidence and is remanded for reconsideration consistent with this

opinion.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determination to cap

SeAH's freight revenue.  Commerce's PMS determination and adjustment

methodology, application of a PMS adjustment to SeAH's home market sales for the

purpose of the sales-below-cost test, denial of a constructed export price offset for

SeAH, reallocation of NEXTEEL's suspended loss and non-prime product costs, and

separate rate calculation are remanded.  In accordance with the foregoing, it is

**ORDERED** that Commerce's Final Results are remanded for further

explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the

court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand

redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the

comments on the remand redetermination; and it is further

Consol. Court No. 20-03898                                      Page 37

**ORDERED** that the parties shall file the Joint Appendix within 14 days after the filing of replies to the comments on the remand redetermination; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing its remand redetermination.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:      April 19, 2022
            New York, New York