A-580-876
Remand
Court No. 20-03898
Slip Op. 22-37
POR:  12/1/2017 – 11/30/2018
**Public Document**
E&C/OII:  DJG

***NEXTEEL Co., Ltd. et al. v. United States*,**
**Consol. Court No. 20-03898, Slip Op. 22-37 (CIT April 19, 2022)**
**Welded Line Pipe from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court) issued in *NEXTEEL Co., Ltd. et al. v. United States*, Slip Op. 22-37, Consol.

Court No. 20-03898 (CIT 2022) (*NEXTEEL*).[1]  This action arises out of the final results in the

2017-2018 administrative review of the antidumping duty (AD) order on welded line pipe

(WLP) from the Republic of Korea (Korea).[2]  The Court remanded to Commerce its:  (1)

particular market situation (PMS) determination and resulting adjustment to the reported cost of

production (COP) for WLP for SeAH Steel Corporation (SeAH) and for purposes of calculating

constructed value (CV) for NEXTEEL Co. Ltd. (NEXTEEL); (2) application of the PMS

adjustment to SeAH for purposes of the sales-below COP test; (3) adjustment to NEXTEEL's

CV to account for sales of non-prime products; (4) reclassification of NEXTEEL's reported

losses relating to the suspended production of certain product lines; (5) denial of a constructed

---

[1] *See NEXTEEL Co., Ltd. et al. v. United States*, Slip Op. 22-137, Consol. Court No. 20-03898 (CIT 2022) (*NEXTEEL*).
[2] *See Welded Line Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 76517 (November 30, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

export price (CEP) offset for SeAH; and (6) calculation of the rate assigned to the non-examined companies in light of any adjustments made to the calculations for either respondent stemming from this remand.  In light of the Court's remand order, on remand Commerce:  (1) found insufficient evidence of a PMS that distorts the COP of WLP and, therefore, recalculated NEXTEEL's and SeAH's margins without applying a PMS adjustment to the COP; (2) recalculated NEXTEEL's CV without making an adjustment to account for sales of non-prime products; (3) provided further explanation regarding its reclassification of NEXTEEL's reported losses associated with suspended production as general and administrative (G&A) expenses; and (4) revised the rate calculated for the non-examined companies in light of the calculation adjustments made in response to this remand.  Moreover, regarding the denial of SeAH's CEP offset claim, because SeAH's revised margin without applying a PMS adjustment to the COP is zero, Commerce did not reach a conclusion on this issue for purposes of these final results of redetermination.  The revised weighted-average dumping margins for NEXTEEL and SeAH are 1.12 and zero percent, respectively.  Moreover, as a result of Commerce's recalculation of the weighted-average dumping margins for the mandatory respondents, the review-specific rate applied to the non-examined respondents is 1.12 percent.

## II.   BACKGROUND

Commerce published the *Final Results* on November 30, 2020.[3]  As discussed in the *Final Results*, Commerce:  (1) determined that a PMS existed in the Korean market, which distorted the COP of WLP, and made an adjustment to NEXTEEL's and SeAH's cost of hot-rolled coil (HRC) to account for the PMS;[4] (2) adjusted NEXTEEL's reported costs to account

---

[3] *See Final Results*.
[4] *See Final Results* IDM at Comments 1-3.

for sales of non-prime products;[5] (3) included NEXTEEL's suspended losses as part of its G&A expenses;[6] and (4) determined that a CEP offset for SeAH under section 773(a)(7)(B) of the Tariff Act of 1930, as amended (the Act) was not warranted.[7]

In its April 19, 2022 opinion, the Court remanded the *Final Results* to Commerce, concluding that Commerce's PMS determination was not supported by substantial evidence.[8] According to the Court, Commerce failed to substantiate each of the four factors upon which it based the PMS finding (*i.e.*, (a) Korean imports of HRC from the People's Republic of China; (b) the Government of Korea's (GOK) subsidization of hot-rolled steel products; (c) strategic alliances; and (d) government involvement in the Korean electricity market).[9]  The Court pointed out that Commerce predicated its PMS adjustment on the cumulative effect of these factors without substantiating its findings regarding each one or explaining how they prevent a proper comparison between U.S. price and normal value (NV).[10]  Further, the Court questioned the following additional elements of Commerce's PMS determination:  (1) the validity of the underlying regression methodology Commerce used;[11] and (2) Commerce's application of the PMS adjustment to SeAH's reported COP for the purposes of the sales-below COP test.[12]

Additionally, the Court held that Commerce:  (1) erred in calculating the cost of NEXTEEL's non-prime WLP by valuing it at its sale price, rather than its reported COP, ordering Commerce to provide a detailed explanation of why NEXTEEL's non-prime WLP is valued in this manner or reconsider the valuation; (2) failed to address NEXTEEL's argument

---

[5] *Id.* at Comment 5.
[6] *Id.* at Comment 6.
[7] *Id.* at Comment 9.
[8] *See NEXTEEL* at 10-15.
[9] *Id.* at 12-15.
[10] *Id.* at 12.
[11] *Id*. at 20-21.
[12] *Id*. at 9-10.

that Commerce's reallocation of NEXTEEL's suspended production costs contravenes section 773(f)(1)(A) of the Act;[13] (3) failed to explain how it concluded that SeAH's home market and U.S. sales were at the same level of trade, given the different levels of selling intensity and additional home market selling functions SeAH reported;[14] and (4) must recalculate the rate assigned to the non-examined companies to reflect any adjustments to the dumping margins for NEXTEEL and SeAH.[15]

## III.   ANALYSIS

### A. PMS Determination

In the underlying determination, Commerce concluded that the weight of the evidence on the record of the administrative review, cited in the *Final Results*, demonstrated the existence of a PMS with respect to the individual and cumulative effects of:  (1) subsidization of Korean hot-rolled steel products by the Korean government; (2) the distortive pricing of unfairly traded Chinese HRC; (3) strategic alliances between Korean HRC suppliers and Korean WLP producers; and (4) distortive government control over electricity prices in Korea.[16]  The Court found that Commerce failed to demonstrate how each of these factors distorted HRC prices in the Korean HRC market and how these factors combined so that the cost of HRC was not an accurate reflection of the cost in the ordinary course of trade.[17]

In the *Final Results*, Commerce detailed how the record evidence supported Commerce's conclusion that the cumulative effect of the four factors distorted the costs of HRC which, in turn, prevented a proper comparison of NV to U.S. price.[18]  Specifically, Commerce considered

---

[13] *Id*. at 28.
[14] *Id.* at 34-35.
[15] *Id*. at 35-36.
[16] *See Final Results* IDM at Comment 2.
[17] *See NEXTEEL* at 12-15.
[18] *See Final Results* IDM at Comment 2.

the four PMS allegations raised by the domestic interested parties as a whole, based on their cumulative effect on the Korean WLP market through the COP for WLP and its inputs.  Based on the totality of the conditions in the Korean market, we found that the allegations represent facets of a single PMS.  Record evidence showed that the Korean government provides subsidies on hot-rolled steel, which includes HRC, and that the mandatory respondents purchased HRC from POSCO, which received such subsidies.[19]  Record evidence also showed that the subsidies received by Korean hot-rolled steel producers totaled almost 60 percent of the cost of hot-rolled steel, the primary input into WLP production.[20]  Additionally, the respondents reported that HRC, as an input of WLP, constitutes the largest portion of the cost of WLP production; thus, distortions in the HRC market have a significant impact on production costs for WLP.[21]  Further, as a result of significant overcapacity in Chinese steel production, which stems in part from the distortions and interventions prevalent in the Chinese economy, the Korean steel market has been flooded with imports of cheaper Chinese steel products, placing downward pressure on Korean domestic steel prices.[22]  We found that this situation, along with the domestic steel production being heavily subsidized by the Korean government, distorted the Korean market prices of HRC, the main input in Korean WLP production.

Although Commerce continues to believe that this explanation was adequate and that the record provides sufficient evidence to support our analysis of the PMS factors alleged, we recognize that the Court disagrees.  In particular, the Court has interpreted the language of section 773(e) of the Act to mean "'both a comparative requirement and a causal requirement'

---

[19] *See, e.g.*, Domestic Interested Parties' Letter, "Particular Market Situation Allegation and Other Factual Information," dated August 6, 2018 (PMS Allegation), at 15-16 and Exhibit 15.
[20] *Id.* at Exhibit 17.
[21] *Id.* at 15-16.
[22] *Id.* at Exhibits 18 and 19.

requiring Commerce to find the existence of one or more unique market phenomena and demonstrate how those market phenomena render the cost of materials and fabrication inaccurate in the ordinary course of trade."[23]  For the provision of subsidies, the Court ruled that "if Commerce wishes to continue to rely on the provision of subsidies as a market phenomenon contributing to a PMS in the Korea HRC market, it should explain how the subsidies distort the price of HRC preventing an accurate reflection of the cost of production in the ordinary course of trade and demonstrate that the effect of the subsidies is particular to producers of the subject merchandise."[24]

However, for purposes of these final results of redetermination, we are unable to provide the Court with the expansive explanation it envisions in light of the limitations of the information on the record of this proceeding.  Therefore, we are unable to address all of the Court's concerns.  Accordingly, in light of the Court's opinion, we are unable to determine that a PMS exists that distorts the COP of WLP; as a result, we recalculated NEXTEEL's and SeAH's weighted-average dumping margins without making a PMS adjustment to the COP and the calculation of CV.

Further, because we have not found that a PMS exists for purposes of these final results of redetermination, the issues of the validity of Commerce's regression analysis to determine the PMS adjustment, and the application of the PMS adjustment to the sales-below-COP test for SeAH, are moot.  Therefore, we need not address these issues for purposes of these final results of redetermination.

---

[23] *See NEXTEEL* at 11.
[24] *Id*. at 12-13.

### B. Adjustment to NEXTEEL's CV to Account for Non-Prime Products

Prior to the decision in *Dillinger*, Commerce's practice with respect to non-prime products was to determine how such products are treated in the respondent's normal books and records, whether they remained in scope, and likewise whether they could still be used in the same applications as the prime subject merchandise.[25]   In some cases, the downgrading of the product is minor and the product remains within its product group, while in other cases the downgraded product differs so significantly that it no longer belongs to the same product group and cannot be used for the same applications as the prime product.   If a product is not capable of being used for the same applications, typically the product's market value is significantly impaired, often to a point where its full actual cost cannot be recovered.   Thus, under our prior practice, assigning full costs to that product was not considered to be reasonable.[26]   However, in *Dillinger*, the U.S. Court of Appeals for the Federal Circuit (CAFC) held that Commerce's CV calculation must reasonably reflect a respondent's actual cost, whether or not the respondent's books and records reflect such costs.[27]   In the instant case, NEXTEEL does not separately classify prime products differently for inventory purposes, but rather assigns the same manufacturing costs to both prime and non-prime products.[28]   Moreover, in its normal books and records, NEXTEEL calculates the cost for non-prime products in the same manner as prime

---

[25] *See, e.g., Steel Concrete Reinforcing Bar from Mexico:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 27233 (June 14, 2017), and accompanying IDM, at Comment 3; *Welded Line Pipe from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61366 (October 13, 2015), and accompanying IDM, at Comment 9; and *Steel Concrete Reinforcing Bar from Turkey:  Final Negative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances*, 79 FR 21986 (September 15, 2014), and accompanying IDM, at Comment 15.

[26] *See Welded Line Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 33919 (July 18, 2018), and accompanying IDM, at Comment 9.

[27] *See Dillinger France S.A. v. United States,* 981 F.3d 1318, 1321-24 (Fed. Cir. 2020) (*Dillinger*).

[28] *See* NEXTEEL's Letter, "NEXTEEL's Submission of Supplemental Questionnaire Response to Sections A, C and D," dated September 5, 2019, at S-21.

products.[29]  Consequently, NEXTEEL's reported costs reflect the full actual costs of producing

its prime and non-prime products as required in *Husteel*.[30]  Therefore, for purposes of this

remand and consistent with the CAFC's decision in *Dillinger*,[31] we have reversed the adjustment

made in the *Final Results* and rely on what the CAFC referred to as the actual costs of prime and

non-prime products as reported by NEXTEEL.

### C. Reclassification of NEXTEEL's Suspension Losses

Commerce's normal practice is to include routine short-term shutdown expenses (*i.e.*,

maintenance shutdowns) in a respondent's reported costs, and to associate them with the

products produced on those lines (*i.e.*, as part of cost of manufacturing) because they are

necessary to keep the production lines properly functioning.[32]  However, in the underlying

review, the suspended loss was not related to a routine short-term shutdown; rather, it related to

NEXTEEL's suspension of production on certain lines (suspended losses) for an extended period

of time.[33]  Unlike a routine "maintenance" shutdown, once a production line is suspended, it no

longer relates to ongoing production.  A company can suspend production lines for numerous

reasons; for example, if the company has low current sales and does not need to generate

inventory of the product produced on a particular production line.  A company may also suspend

a production line while it assesses whether it should permanently close the production line.

Regardless of the reason for the suspension, in contrast to a routine maintenance

shutdown, there are no longer products produced on those production lines or current intentions

---

[29] *Id*.

[30] *See Husteel Co., Ltd. et al. v. United States*, 520 F. Supp. 3d 1296, 1308-1309 (CIT 2021) (*Husteel*).

[31] *See Dillinger*, 981 F.3d at 1318 and 1324.

[32] *See, e.g., Gray Portland Cement and Clinker from Mexico:  Final Results of Antidumping Duty Administrative Review*, 62 FR 17148 (April 9, 1997), and accompanying IDM, at Comment 9.

[33] *See* NEXTEEL's Letter, "NEXTEEL's December 4, 2019 Submission of Second Supplemental Questionnaire Responses to Section D," dated December 4, 2019 (NEXTEEL December 4, 2019 SDQR2), at Exhibit SD-6.

to produce products on those lines that can bear the burden of the costs associated with them.[34] In these situations, the suspended lines are akin to idled assets; they remain available to the company pending the resumption of production on those lines and represent excess capacity held by the company.[35] The cost of holding idle assets is more appropriately considered to be a period cost as it relates to the general operations of the company as a whole, not to the manufacture of specific products. Our practice, therefore, has been to include the depreciation on idle assets as part of the calculation of the G&A expense ratio.[36] NEXTEEL did not allocate suspension losses to individual products, but rather allocated suspension losses directly to the cost of goods sold (COGS) in its books and records, consistent with Korean International Financial Reporting Standards (K-IFRS).[37] Therefore, these costs were never assigned to individual subject or non-subject products, and were expensed to COGS for the period, which is similar to the treatment of G&A expenses.[38] Thus, NEXTEEL's normal books and records, although K-IFRS compliant, do not reasonably reflect the actual COP of individual products, as the resulting COP does not capture the full amount of general expenses incurred during the period. As a result, in the *Final Results*, Commerce reclassified NEXTEEL's suspended losses (*i.e.*, production line costs related to the suspension on production lines) as G&A expenses and excluded from the COGS denominator the reclassified suspended loss.

---

[34] *See Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18105 (April 17, 2017), and accompanying IDM, at Comment 34.

[35] *See Certain Polyester Staple Fiber from Korea: Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663 (December 10, 2007), and accompanying IDM, at Comment 8.

[36] *See Certain Pasta from Italy: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 91120 (December 16, 2016), and accompanying IDM, at Comment 7.

[37] *See Final Results* IDM at Comment 6.

[38] *Id*.

The Court stated that, "Commerce's analysis does not address the extent to which losses associated with the suspension of non-subject merchandise production lines relate to the general and administrative expenses incurred in the production of subject merchandise, such that NEXTEEL's K-IFRS compliant books and records do not reasonably reflect costs."  On remand, the Court directed that "Commerce should clarify whether any {non-subject} merchandise was produced on the suspended production lines at issue during the period of review and explain why NEXTEEL's books and records do not reasonably reflect costs."

The issue raised by the Court is whether the costs should be assigned only to the products produced on the respective production lines (*i.e.,* only to either subject or non-subject merchandise) or to both subject and non-subject merchandise through NEXTEEL's G&A expenses.  In the *Final Results*, NEXTEEL argued that the suspended production line costs should be assigned respectively to the products produced on those lines which, in this case, would largely be to non-subject merchandise, as those were the lines most affected.[39]  In response, Commerce considered these suspended production line costs, both for the production lines producing subject and non-subject merchandise, as not related to specific products because NEXTEEL had stopped producing products on those lines.[40]  As such, Commerce determined that those costs must reasonably be carried by the company as a whole, as a general expense. For the same reason that costs related to suspended production lines for subject merchandise no longer in operation must be treated as G&A expenses, the costs related to production lines for non-subject merchandise that are no longer in operation must likewise be treated as G&A expenses.  Commerce explained its reasoning in the *Final Results* and cited to record evidence.[41]

---

[39] *See NEXTEEL* at 26-28.
[40] *Id.*
[41] *Id.*

Further, in prior litigation regarding NEXTEEL on this issue, the Court ruled that, although a company may shut down product lines from time to time for various intervals, at some point, an extended shutdown suggests that the costs of that product line are more akin to the expenses borne by the company in its general operations.[42]

In this case, the Court stated that, "{i}t is unclear from Commerce's explanation whether NEXTEEL suspended production on the lines in question for a portion of the period of review or the entirety of the period of review"[43] and that "If NEXTEEL suspended production for only a portion of the period of review, then merchandise may have been produced on those lines during the period of review, allowing Commerce to associate the suspended production losses with the revenue generated from that merchandise."[44]  While products may have been produced during the period of review (POR) on those lines that were later shut down,[45] such production occurred prior to the shutdown.  Revenues from products produced prior to the shutdown should not be associated with the suspended losses incurred during the shutdown periods, as those products already carry the full operating costs related to producing products on those lines.  If Commerce were to attribute the costs associated with the suspension of production to the subject or non-subject merchandise produced on each line earlier in the POR, the production costs would be double counted because the cost of the suspended lines would be added on top of the products' full cost of production.  Hence, the cost of the suspended lines should not be associated with the revenue that was generated prior to the suspension of production.

In *Dillinger*, the Court also stated that Commerce was required to construct a value which reasonably reflects a respondent's "actual costs," whether or not the respondent's books and

---

[42] *See Husteel*, 520 F. Supp. 3d at 1306-07.
[43] *See NEXTEEL* at 28.
[44] *Id*.
[45] *See* NEXTEEL December 4, 2019 SDQR2 at Exhibit 6.

records reasonably reflect such costs.[46]  The costs incurred prior to the shutdown are the actual costs of the products with an associated revenue.  During the shutdown, the costs incurred for those production lines are not identifiable to specific products because nothing was produced on those production lines, nor is the shutdown comparable to a scenario of reduced production quantities that must carry the burden of the overcapacity.  Here, the production lines are shut down for long periods.  Hence, *Dillinger* does not address the issue of losses associated with production line suspensions, which cannot be considered as part of the actual cost of a product and associated with the revenue.  The suspended losses are associated with the general operations of the company and are not directly associated with any products.  Therefore, Commerce's adjustment in the *Final Results* was necessary to accurately reflect NEXTEEL's reported costs.

### D. CEP Offset for SeAH

As a result of Commerce's finding that a PMS does not exist and subsequent removal of the PMS adjustment from NEXTEEL's and SeAH's calculations, SeAH's estimated weighted-average dumping margin is zero percent.[47]  SeAH's margin would only be further reduced if Commerce were to adjust its calculations to grant SeAH a CEP offset.  Accordingly, because a reexamination of the CEP offset issue for SeAH does not affect the ultimate outcome of these final results of redetermination (*i.e.*, a zero margin calculated for SeAH resulting in no duties being assessed during the POR), SeAH's CEP offset is moot and need not be addressed for purposes of these final results of redetermination.

---

[46] *See Dillinger*, 981 F.3d at 1318 and 1324.
[47] *See* Memorandum, "Margin Calculations for SeAH Steel Corporation Pursuant to Draft Results of Redetermination," dated June 16, 2022.

IV.    **INTERESTED PARTY COMMENTS**

On June 16, 2022, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[48]  On June 27, 2022, we received timely filed comments from the domestic interested parties, Husteel Co., Ltd. (Husteel), Hyundai Steel Company (Hyundai Steel), NEXTEEL, and SeAH.[49]  Hyundai Steel agrees that Commerce's Draft Results complied with the Court's order.  SeAH also agrees that the evidence does not support a PMS finding in this review and, as a result, it is not necessary for Commerce to address:  (1) the permissibility of making a PMS adjustment for purposes of the sales-below-cost test and the calculation of the PMS adjustment; or (2) whether Commerce's denial of a CEP offset for SeAH was supported by substantial evidence.[50]  NEXTEEL also agrees with Commerce's Draft Results on the issues of the PMS finding and the adjustment to NEXTEEL's CV to account for the actual cost of non-prime products.[51]  The comments of the remaining interested parties, as well as NEXTEEL's comments on the reclassification of its suspension losses, are summarized below.

**Comment 1:  PMS Determination**

*Domestic Interested Parties' Comments*

- Commerce should explicitly state that it is reversing its PMS finding under respectful protest.[52]

---

[48] *See* Draft Results of Redetermination Pursuant To Court Remand, *NEXTEEL Co., Ltd. et al. v. United States* Consol. Court No. 20-03898, Slip Op. 22-37 (CIT April 19, 2022), issued June 16, 2022 (Draft Results).
[49] *See* Domestic Interested Parties' Letter, "Comments on Draft Results of Redetermination," dated June 27, 2022 (Domestic Interested Parties' Comments); Husteel's Letter, "Comments on the Department's Draft Remand Results," dated June 27, 2022 (Husteel's Comments); Hyundai Steel's Letter, "Comments of Draft Remand Results," dated June 27, 2022; NEXTEEL's Letter, "NEXTEEL's Comments on Draft Remand Redetermination," dated June 27, 2022 (NEXTEEL's Comments); and SeAH's Letter, "Comments on Draft Redetermination," dated June 27, 2022 (SeAH's Comments).
[50] *See* SeAH's Comments at 2-4.
[51] *See* NEXTEEL's Comments at 2-4.
[52] *See* Domestic Interested Parties' Comments at 5.

- The Court's opinion did not require Commerce to reverse its PMS finding. The underlying administrative record contains substantial evidence in support of Commerce's PMS finding which can be used to provide further explanation to the Court.[53]

- Commerce's conclusion that it could not support the PMS in the Draft Results is unsupported by substantial evidence, as outlined below. Alternatively, to the extent it believes that the underlying record did not contain sufficient information, Commerce should have reopened the record to collect the required additional information.[54]

- The Court's opinion was in error because the statute permits Commerce to make a PMS adjustment for purposes of the sales-below-cost test. Thus, Commerce's calculation of SeAH's dumping margin in the underlying administrative review was lawful.[55]

- Commerce's PMS finding and adjustment to NEXTEEL's margin calculation in the underlying administrative review was also supported by substantial evidence. Specifically:

  o Record evidence demonstrates the GOK's subsidization of hot-rolled steel products during the POR. The entire market for HRC is distorted and all Korean steel producers compete for HRC in the same market, making them all affected by HRC price distortions.[56]

  o Commerce has previously found that overcapacity in steel production in China has led to large volumes of cheap steel being exported from China. Korea is one

---

[53] *Id*.
[54] *Id*. at 5-6.
[55] *Id*. at 6.
[56] *Id*. at 6-7 (citing *Final Results* IDM at Comment 2).

of the top two destinations for Chinese steel and, as a result, its domestic steel prices have dropped significantly, further distorting the HRC market.[57]

  o  Commerce should find that strategic alliances between Korean steel producers exist, keeping the cost of HRC lower than market value.  Record evidence illustrates that a history of collusion between Korean pipe manufacturers distorts the cost of HRC in an effort to lower COP.[58]

  o  The GOK uses electricity as a tool of industrial policy.  Government-controlled KEPCO is the largest electricity provider in Korea, and it operated at a loss during the POR due to its practice of selling electricity at less than market value.  Heavily subsidized electricity distorts the COP for WLP in Korea.[59]

- Based on substantial evidence of these intertwined factors, Commerce properly concluded that the production costs of WLP, and especially the acquisition prices of HRC in Korea, were distorted and not in the ordinary course of trade.  Therefore, for the final results of redetermination, Commerce should provide further explanation to the Court to find that a PMS exists in Korea and apply the PMS adjustment to both NEXTEEL and SeAH.[60]

*Husteel's Comments*

- Commerce's Draft Results comply with the Court's order on the issue of the PMS adjustment.[61]

---

[57] *Id*. at 7 (citing *Final Results* IDM at Comment 2).
[58] *Id*. at 8 (citing *Final Results* IDM at Comment 2).
[59] *Id*. at 9 (citing *Final Results* IDM at Comment 2).
[60] *Id*. at 10.
[61] *See* Husteel's Comments at 1-2.

- Commerce incorrectly claims that it previously detailed how distortions to the cost of HRC in Korea prevented a proper comparison of NV to U.S. price.[62]  The record is clear that Commerce made no attempt to show a connection between the alleged PMS factors and U.S. prices.

- Commerce claims that subsidies received by Korean hot-rolled steel producers totaled almost 60 percent of the cost of hot-rolled steel.  However, the subsidies found on HRC in Korea during the POR were close to *de minimis*, not 60 percent.[63]

- Commerce's characterization that the Court has interpreted the law to require an "expansive explanation" of how the factors distort the respondents' costs is incorrect. The Court simply requires that, as with all of its determinations, Commerce's methodology provides a reasoned explanation supported by substantial evidence.[64]

- Commerce should correct these unsupported statements for the final results of redetermination.

**Commerce's Position:**

While the domestic interested parties argue that Commerce should provide a fuller explanation to the Court to support its PMS finding in these final results of redetermination, the further explanation the domestic interested parties propose is essentially what Commerce already provided in the *Final Results*.  Indeed, in their comments, the domestic interested parties cite the *Final Results* when discussing record evidence to support the PMS finding.[65]  Thus, such an explanation would be a recitation of explanation and argument already before the Court.

---

[62] *Id*. at 2.
[63] *Id*. (citing *Countervailing Duty Order on Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Amended Final Results of the First Administrative Review*, 84 FR 35604 (July 24, 2019)).
[64] *Id*. at 2-3.
[65] *See, e.g.*, Domestic Interested Parties' Comments at 6-10.

We recognize that, in the alternative, the domestic interested parties argue that we could have opened the record to supplement the information in support of a PMS, but given the Court's findings on the thorough and comprehensive PMS analysis we provided in the *Final Results*, it is unclear what more information Commerce could have requested that would have satisfied the PMS criteria required by the Court in this case.  Therefore, we have concluded that taking such efforts would not be constructive.

Accordingly, for the reasons explained above, in light of the Court's judgment and under respectful protest, we are unable to determine that a PMS exists that distorts the COP of WLP for these final results of redetermination.[66]

**Comment 2:  NEXTEEL's Suspended Production Costs**

*NEXTEEL's Comments*

- Commerce incorrectly treats the entire cost from the suspended production as G&A expenses.[67]

- The production lines that were shut down were not used to make subject merchandise and, therefore, should not be used in the G&A expense calculations in this segment.[68]

- Commerce can only reclassify costs if NEXTEEL's normal, K-IFRS compliant, accounting treatment is not reasonable.  Commerce does not explain why it finds NEXTEEL's accounting treatment unreasonable.  Therefore, it cannot reclassify costs.[69]

- Commerce should accept NEXTEEL's costs without any adjustment because the shutdowns during the POR were temporary, the allocation of the costs from suspended

---

[66] We also disagree with Husteel that we made unsupported statements regarding our PMS finding in the Draft Results.  However, given that we are not making a PMS finding in these final results of redetermination, Husteel's arguments are moot.
[67] *See* NEXTEEL's Comments at 5.
[68] *Id*. at 6.
[69] *Id.* at 6-8.

production is K-IFRS complaint, and the costs of the shutdown are not attributable to the production of WLP because the shutdown only affected non-subject merchandise.[70]

**Commerce's Position:**

We disagree with NEXTEEL that the Draft Results do not comply with the Court's order. First, NEXTEEL states that Commerce did not explain whether its decision relied on NEXTEEL's suspended production on the lines for either a portion or the entirety of the POR. However, NEXTEEL failed to consider that, regarding this comment by the Court, the Court also stated that "if NEXTEEL suspended production for only a portion of the POR, then merchandise may have been produced on those lines during the period of review, allowing Commerce to associate the suspended production losses with the revenue generated from that merchandise."[71] We addressed the issue stating that, while products may have been produced during the POR on those lines that were later shut down, such production occurred prior to the shutdown and carry the cost of those lines during those periods.  Revenues from products prior to the shutdown should not be associated with the suspended losses incurred during the shutdown periods, as those products already carry the full operating costs related to producing the products on those lines.  This of course applies to the suspended production lines that were in operation at the start of the POR.  The production line that was not in operation for the whole POR has no products produced and, thus, no related revenue during the POR and could not carry the associated costs under this theory.  Therefore, based on our response, above, it is clear that NEXTEEL had production lines that were both suspended for the whole POR and for a portion of the POR.

Second, NEXTEEL stated that Commerce did not "address the extent to which losses associated with the suspension of non-subject merchandise production lines related to the general

---

[70] *Id.* at 7.
[71] *See NEXTEEL* at 28.

and administrative (G&A) expenses incurred in the production of subject merchandise, such that NEXTEEL's K-IFRS compliant books and records do not reasonably reflect costs."[72]  Again, NEXTEEL fails to analyze Commerce's response.  We discussed that, when a production line is suspended, in contrast to a routine maintenance shutdown, there are no longer products produced on those production lines or current intentions to produce products on those lines that can bear the burden of the cost associated with them.[73]  The cost of holding idle assets is more appropriately considered to be a period cost related to the general operations of the company as a whole, not to the manufacture of specific products.  The suspended asset is essentially held by the company for future needs.  Therefore, the costs associated with the suspension of production lines for an extended period of time, regardless of whether they can produce subject or non-subject merchandise, must be recovered by the sales of all merchandise produced by the company, both subject and non-subject.  NEXTEEL's normal books and records do not allocate such suspension losses to specific products.  Instead, such costs are expensed in full as part of the company-wide cost of sales.  While NEXTEEL's K-IFRS compliant books and records classify the suspension losses as a cost of sales in form, in substance such losses are treated as general expenses related to the company as a whole.  It appears that NEXTEEL was confused with the "individual products" Commerce referenced.  Our primary concern here is, of course, the subject merchandise.  Statutorily, in determining the costs to produce a specific product, be it subject or non-subject, Commerce's calculations must include G&A expenses.  By not including costs for the general expenses appropriately, such as the cost of the suspended losses, the costs reflected in NEXTEEL's normal books and records for the individual products, including the subject

---

[72] *Id*.

[73] *See Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18105 (April 17, 2017), and accompanying IDM, at Comment 34.

merchandise, do not reflect the actual costs.  This is consistent with the Court's interpretation in *Dillinger*, "that constructed value reasonably reflects the respondent's actual costs, whether or not the respondent's books and records reasonably reflect such costs."[74]

## V.    FINAL RESULTS OF REDETERMINATION

As noted above, we recalculated SeAH's estimated weighted-average dumping margin without making the PMS adjustment to the COP.  As a result, SeAH's estimated weighted-average dumping margin is zero percent.[75]  We also recalculated NEXTEEL's estimated weighted-average dumping margin without making either the PMS or nonprime adjustments to the CV and using SeAH's CV profit and selling expenses from our calculations for the draft results of redetermination.  As a result, NEXTEEL's estimated weighted-average dumping margin is 1.12 percent.[76]  Consequently, we based the review-specific rate applicable to the non-examined respondents on NEXTEEL's estimated weighted-average dumping margin of 1.12 percent.[77]

---

[74] *See NEXTEEL* at 26-27.

[75] *See* Memorandum, "Margin Calculations for SeAH Pursuant to Draft Results of Redetermination," dated June 16, 2022.

[76] *See* Memorandum, "Margin Calculations for NEXTEEL Pursuant to Draft Results of Redetermination," dated June 16, 2022.

[77] Under section 735(c)(5)(A) of the Act, the all-others rate is normally "an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually examined, excluding any margins that are zero or *de minimis* margins, and any margins determined entirely {on the basis of facts available}."  Because SeAH's weighted-average dumping margin is now zero, we have assigned NEXTEEL's rate to the non-examined respondents.

Because the weighted-average dumping margins and the review-specific rate are different from those in the *Final Results*, we intend to issue a *Timken*[78] notice with the amended final results should the Court sustain these final results of redetermination.

7/15/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[78] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).