## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| NEXTEEL CO., LTD., *et al.*, |
|                     **Plaintiff and Consolidated Plaintiffs,** |
|    **and** |
| HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY, |
|                     **Plaintiff-Intervenors,** |
|    v. |
| UNITED STATES, |
|                     **Defendant,** |
|    **and** |
| AMERICAN CAST IRON PIPE COMPANY, *et al.*, |
|                     **Defendant-Intervenors and Consolidated Defendant-Intervenors.** |

**Before: Hon. Claire R. Kelly,**
      **Judge**

**Consol. Court No. 20-03898**

## DEFENDANT-INTERVENORS' COMMENTS ON REMAND DETERMINATION

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Elizabeth Lee, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to American Cast Iron Pipe Company and Stupp Corporation*

Dated: August 17, 2022

**Consol. Ct. No. 20-03898**

## **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...........................................................................................................1

II.     BACKGROUND ............................................................................................................1

III.    COMMERCE SHOULD CONTINUE TO FIND THE EXISTENCE OF A
        PMS THAT DISTORTED THE COST OF PRODUCTION OF SUBJECT
        MERCHANDISE...........................................................................................................4

IV.     CONCLUSION.............................................................................................................9

Consol. Ct. No. 20-03898

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cemex, S.A. v. United States,*
    133 F.3d 897 (Fed. Cir. 1998)....................................................................................9

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837, 842 (1984)..........................................................................................5

*Maverick Tube Corp. v. United States*,
    273 F. Supp. 3d 1293, 1306 (Ct. Int'l Trade 2017) .................................................8

**Statutes**

19 U.S.C. § 1677b(e) ........................................................................................................9

**Consol. Ct. No. 20-03898**

## I.      <u>INTRODUCTION</u>

On behalf of Defendant-Intervenors American Cast Iron Pipe Company, *et al.* ("Domestic Interested Parties"), we respectfully submit the following comments on the final results of redetermination pursuant to remand issued by the U.S. Department of Commerce ("Commerce") regarding the 2017-2018 administrative review of the antidumping duty order on welded line pipe ("WLP") from the Republic of Korea ("Korea").  Final Results of Redetermination Pursuant to Court Remand, *NEXTEEL Co., Ltd. et al. v. United States*, Consol. Court No. 20-03898, Slip. Op. 22-37 (CIT Apr. 19, 2022) (July 18, 2022), ECF No. 96 ("Final Remand Results").  Domestic Interested Parties respectfully submit that Commerce's modification to its final results in the administrative review related to its finding of a particular market situation ("PMS") that distorted the cost of respondents' production of subject pipe is inconsistent with both the facts and law.  For the reasons provided below, Domestic Interested Parties request that this Court reject the redetermination results and remand to Commerce with instructions to reinstate the agency's original determination in its final results.

## II.      <u>BACKGROUND</u>

In its April 19, 2022 opinion, the Court remanded certain aspects of Commerce's final results in the administrative review at issue, including with respect to the agency's finding of a PMS in Korea.  In particular, the U.S. Court of International Trade ("CIT") concluded that the statute does not permit a PMS adjustment to a respondent's reported costs for purposes of determining whether those sales were made below cost, and, accordingly, remanded for reconsideration Commerce's application of a PMS adjustment to mandatory respondent SeAH Steel Corporation's ("SeAH") hot-rolled coil steel ("HRC") cost for the purpose of conducting the

**Consol. Ct. No. 20-03898**

sales-below-cost test.  *Nexteel Co., Ltd. et al., v. United States*, Consol. Ct. No. 20-03898, slip op. 22-37 at 8-10 (Ct. Int'l Trade Apr. 19, 2022), ECF No. 92 ("Slip Op. 22-37").

The CIT also remanded for reconsideration or additional explanation Commerce's factual finding of the existence of a PMS.  The Court recognized that Commerce based its PMS determination on the cumulative impact of subsidies for HRC products by the Government of Korea ("GOK"), unfairly traded Chinese HRC, strategic alliances between Korean HRC suppliers and Korean WLP producers, and government control over electricity prices in Korea.  *Id.* at 12. While acknowledging that Commerce identified each of the market phenomena that it believes contribute to a PMS, the Court concluded that it could not discern how the agency combined these phenomena to reach a determination that a PMS exists in the Korean HRC market, and also that Commerce failed to demonstrate that the identified market phenomena distort the price of HRC such that the cost does not accurately reflect the price of HRC in the ordinary course of trade.  *Id.*

The Court also raised issues with respect to the individual market phenomena for Commerce to address on remand.  For instance, the CIT opined that Commerce only showed that HRC subsidies were in place during the period of review ("POR") and that the respondents purchased HRC from entities receiving subsidies.  *Id.*  The Court held that if Commerce wishes to continue relying on the provision of subsidies as a market phenomenon, it should explain how the subsidies distort the price of HRC, preventing an accurate reflection of the cost of production in the ordinary course of trade, and also demonstrate that the effect of the subsidies is particular to producers of the subject merchandise.  *Id.* at 12-13.  The CIT also held that Commerce failed to demonstrate that the alleged strategic alliances created distortions during the POR.  *Id.* at 13.  The Court directed Commerce to demonstrate that strategic alliances have distorted HRC prices in the Korean HRC market, such that the cost of HRC is no longer an accurate reflection of costs in the

Consol. Ct. No. 20-03898

ordinary course of trade.  *Id.* at 13-14.  With respect to the GOK's control over electricity prices, the CIT held that Commerce failed to establish that the level of government control is so pervasive "that home market prices cannot be considered to be competitively set." *Id.* at 14 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 ("SAA")).  The CIT explained that if Commerce wishes to continue relying on electricity prices, it should explain why the facts of this case warrant a departure from its previous countervailing duty ("CVD") determinations, and also explain how distortions in the electricity market result in distorted HRC prices. *Id.*  Finally, while the CIT found that Commerce is not precluded from relying on steel overcapacity as a market phenomenon, the court held that the agency must explain how overcapacity combines with the other market phenomena to create a unique distortion in the Korean market, noting that low-priced Chinese steel imports cannot be considered unique to the Korean market, and must also demonstrate that the price of HRC is impacted by the distortion.  *Id.* at 15.

Lastly, the CIT remanded Commerce's PMS adjustment calculation methodology for reconsideration or further explanation.   While the Court found the agency's adjustment methodology to be reasonable, it found the adjustment to be unsupported by substantial evidence because in the application of the methodology, the agency relied, in part, on the beta coefficient for uneconomic capacity, and the CIT found the OLS Regression Model supplying the coefficient to be unsupported by substantial evidence.  *Id.* at 19-22.  Accordingly, the CIT directed the agency to explain why the inclusion of the 2008 and 2009 data is supported by substantial evidence.  *Id.* at 22.

The CIT also remanded for further explanation or reconsideration Commerce's adjustment to mandatory respondent NEXTEEL Co. Ltd.'s ("NEXTEEL") CV for non-prime products;

Consol. Ct. No. 20-03898

Commerce's reclassification of NEXTEEL's reported losses related to the suspended production of certain product lines; Commerce's denial of SeAH's constructed export price offset; and the calculation of the rate assigned to the non-examined companies, which was based on the rates calculated for NEXTEEL and SeAH that the court found to be unsupported by substantial evidence. *See generally* Final Remand Results; Slip Op. 22-37.[1]

### III.    COMMERCE SHOULD CONTINUE TO FIND THE EXISTENCE OF A PMS THAT DISTORTED THE COST OF PRODUCTION OF SUBJECT MERCHANDISE

In its final remand results, while reiterating the record evidence supporting Commerce's original determination, the agency noted the CIT's disagreement and concluded that it is unable to find a PMS that distorts the COP of WLP because it is unable to provide the court with the expansive explanation envisioned due to limitations in the information on the record of the proceeding. *See* Final Remand Results at 6.[2] Commerce appears to be, but does not explicitly state that it is, making this decision under protest. *See id.* Domestic Interested Parties submit that Commerce's conclusion is in error. The CIT's opinion did not require the agency to reverse its finding of a PMS. The underlying administrative record contains substantial evidence in support of Commerce's original finding of a PMS and, thus, includes the information necessary for the agency to provide further explanation in support of its determination. Commerce's conclusion otherwise in the final remand results is unsupported by substantial evidence. In the alternative, to

---

[1]    Domestic Interested Parties believe, consistent with the response brief filed by Maverick Tube Corporation and IPSCO Tubulars Inc., that Commerce's original determination with respect to these issues was correct. For this reason, Commerce's continued finding that an adjustment for NEXTEEL's suspended losses was necessary is correct and should be maintained in the final remand results. For the same reason, Commerce should have maintained its underlying decisions on the remaining issues as well. Lastly, as Commerce should have maintained its original determination, the agency should have maintained its calculation of the rate assigned to non-examined companies.

[2]    Because Commerce did not find that a PMS exists, the agency did not address the issues of the validity of the regression analysis to determine the PMS adjustment or the application of the PMS adjustment to the sales-below-cost test for SeAH. *See* Final Remand Results at 6.

Consol. Ct. No. 20-03898

the extent that Commerce believes that the underlying record did not contain sufficient information, rather than simply overturning its original finding, the agency should have reopened the record to collect the required additional information.

As an initial matter, Domestic Interested Parties disagree with the CIT's opinion and maintain that the statute permits Commerce to make a PMS adjustment to cost for purposes of the sales-below-cost test and, thus, that the agency's original calculation of SeAH's dumping margin was lawful.  *See* Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 85 Fed. Reg. 76,517 (Dep't Commerce Nov. 30, 2020) (final results of antidumping duty admin. rev.; 2017-2018), ECF No. 52-4 at 6-8 ("Final I&D Memo").  Commerce reasonably interpreted the Trade Preferences Extension Act of 2015, consistent with its purpose, and the agency's interpretation should be upheld pursuant to *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc*.  467 U.S. 837, 842 (1984).

In addition, Commerce's original finding of the existence of a PMS with regard to NEXTEEL's margin calculation was supported by substantial evidence and complied with the statute.  First, record evidence demonstrated subsidization of hot-rolled steel products by the Korean government during the POR.  Final I&D Memo at 18.  Commerce explained in its final results in the underlying review:

> The record evidence shows that the Korean government subsidized HRC, the primary input into WLP production, and that the mandatory respondents purchased HRC from entities receiving these subsidies, including POSCO.  Further, record evidence shows that HRC constitutes a substantial proportion of the cost of WLP production; thus, distortions in the HRC market have a significant impact on the COP for WLP.

*Id.* (citations omitted).  Domestic Interested Parties also note that a PMS determination, by definition, is made with respect to a "market" as a whole and not a specific respondent.  Where a whole market is distorted, the costs of materials and fabrication or other processing for companies

**Consol. Ct. No. 20-03898**

that operate within that market are necessarily distorted.  All respondents compete for HRC in the same market and thus they are all affected by market-wide distortions to HRC prices.

Second, Commerce found that "as a result of the significant overcapacity in Chinese steel production . . . the Korean steel market has been sharply impacted by imports of cheap Chinese steel products, placing downward pressure on Korean domestic steel prices."  *Id.* (citations omitted).  Commerce also explained that Korea was especially affected by this overcapacity, as "Korea is one of the top two destinations of Chinese exports of hot-rolled steel, and import prices of HRC from China have generally been significantly lower than they are from the rest of the world." *Id.* (citations omitted).  Commerce provided further explanation to demonstrate that Korea was particularly impacted, noting that:

> {T}he average unit value (AUV) for HRC imported from China into Korea was lower than the AUV of China's exports to other countries, with AUVs for HRC imported from China into Korea in the bottom 15 percent of all 160 Chinese export destinations in 2017 and 2018.  In addition, imports from China have constituted at least 12 percent of Korean domestic production of HRC from 2013 through 2017.

*Id.* at 19 (citation omitted).  While global overcapacity necessarily affects global prices, the impacts are felt differently in each country depending on various factors.  Indeed, the regression analysis that Commerce relied on for the PMS adjustment provided a method for measuring the relationship between global overcapacity and the specific market conditions in Korea, reflected in Korean import AUVs for HRC.  *Id.* at 32, 39-40.  The resulting adjustment reflected what prices in Korea would have been but for persistent overcapacity, and was specific to the Korean market. Domestic Interested Parties submit, however, that a showing that the distortive effect of Chinese overcapacity and exports was unique to Korea is not required by the statute.

Consol. Ct. No. 20-03898

Third, Commerce found that "the record evidence supports that strategic alliances exist in Korea . . . {which} led to prices of HRC significantly below prevailing market value . . . ." *Id.* at 19-20 (citations omitted).  Commerce explained:

> Because strategic alliances have led to prices of HRC significantly below prevailing market value, as evidenced by the record information, we find that such strategic alliances are a contributing factor to the PMS in Korea, impacting the COP for WLP.  Such evidence supports the allegation that these strategic alliances may have affected prices in the period covered by the prior administrative review, up to and including this POR.  For example, in December 2017, the Korea Fair Trade Commission (KFTC) fined Hyundai Steel along with five other Korean steel producers 92.1 billion won for rigging bids for pipe sold to a Korean gas company over a period of ten years.  Hyundai Steel and five other Korean steel producers received the largest fines among the group of steelmakers and the practice was referred to by a KFTC official as a "long-term chronic practice."  Moreover, the KFTC has not made any findings that Hyundai Steel and SeAH have discontinued their anticompetitive practices by the end of 2017, when the KFTC report was issued.  This is consistent with our conclusion that strategic alliances and price fixing schemes have created distortions in the prices of HRC in the past and may continue to impact HRC pricing in a distortive manner during the instant POR and in the future.

*Id.*  The conduct in question was recent enough for the fine to be assessed during the POR, and Commerce appropriately weighed the evidence and concluded that such recent conduct would have continued to impact the marketplace.  The record evidence illustrated a history of collusion between Korean pipe manufacturers, which, in turn, indicated that Korean pipe producers collude with others in the industry to fix, and therefore distort, costs in Korea.

Fourth, Commerce reasonably found that the GOK's involvement in the electricity market is a contributing factor to the PMS in Korea impacting the COP for WLP.  *Id.* at 20.  Specifically, record evidence supported Commerce's conclusions that "electricity in Korea functions as a tool of the government's industrial policy," that "the largest electricity supplier, KEPCO, is a government-controlled entity," and that government-controlled KEPCO incurred an operating loss in 2018 (*i.e.*, during the POR).  *Id.* (citations omitted).  As Commerce rightly concluded, "{i}t is

Consol. Ct. No. 20-03898

implausible that losses of this magnitude, associated with KEPCO's pricing, would have occurred without government control, particularly when KEPCO explicitly states that its costs are submitted to the Korean government to establish the electricity rate." *Id.* (citations omitted).  The record evidence showed that the Korean government set electricity prices to support its industrial policies, Letter from Schagrin Associates to Sec'y Commerce, re: *Welded Line Pipe from the Republic of Korea: Particular Market Situation Allegation and Supporting Factual Information* (June 25, 2019), C.R. 110-339, P.R. 95-696 at 24-27, Exhibits 37-40, distorting the costs of producing subject merchandise in Korea.  Pursuant to the SAA, a PMS may exist where there is government control over prices to such an extent that home market prices cannot be considered to be competitively set.  Final I&D Memo at 20.

While in certain CVD cases, Commerce has decided that the respondents did not receive electricity rates from KEPCO that were lower than the rates for other customers in Korea, and, therefore, found no countervailable subsidies, *see, e.g.*, *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1306 (Ct. Int'l Trade 2017), a determination on whether a government provision of electricity constitutes a countervailable subsidy within the meaning of the CVD law is different from a determination that government intervention distorts an electricity market and is a contributing factor to a PMS in an AD case.  The analysis that Commerce undertook here was based on considerations that government control over prices, as a tool of the Korean government's industrial policy, distorted all Korean electricity prices such that they cannot be considered to be competitively set.

Commerce properly concluded that "{t}hese intertwined market conditions signify that the production costs of WLP, especially the acquisition prices of HRC in Korea, are distorted and are not in the ordinary course of trade."  Final I&D Memo at 20.  Commerce's conclusion was based

Consol. Ct. No. 20-03898

on substantial evidence supporting each of the four factors and their cumulative impact on the cost of producing subject merchandise in Korea.  Commerce properly relied on the totality of the circumstances, considering the facts as a whole, *see Cemex, S.A. v. United States*, 133 F.3d 897, 900 (Fed. Cir. 1998) ("Determining whether home market sales are in the ordinary course of trade is a question of fact.  Commerce must evaluate not just 'one factor taken in isolation but rather . . . all the circumstances particular to the sales in question.'") (citation omitted), to find the existence of a PMS.  The statute does not impose an obligation on Commerce to quantify a causal link between factors that are distorting an input market and the extent of that distortion.  *See* 19 U.S.C. § 1677b(e).

## IV.    **CONCLUSION**

For the reasons contained herein, Domestic Interested Parties respectfully request that the Court reject Commerce's final results of redetermination and remand to Commerce for further consideration.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to American Cast Iron Pipe Company and Stupp Corporation*

Dated: August 17, 2022

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Defendant-Intervenors' Comments on Remand Determination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 2,835 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

*American Cast Iron Pipe Company and Stupp Corporation*
(Representative Of)

August 17, 2022
(Date)