Slip Op. 22-135

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **NEXTEEL CO., LTD. ET AL.,** | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| **and** | |
| **HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY,** | |
| **Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 20-03898** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **CALIFORNIA STEEL INDUSTRIES, INC. ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's remand redetermination and final results in the 2017–2018 antidumping administrative review of welded line pipe from the Republic of Korea.]

Dated: December 6, 2022

<u>J. David Park</u>, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for plaintiff NEXTEEL Co., Ltd.  Also on the brief were, <u>Daniel R. Wilson</u>, <u>Henry D. Almond</u> and <u>Kang Woo Lee</u>.

<u>Jeffrey M. Winton</u>, Winton & Chapman PLLC, of Washington, D.C., for consolidated plaintiff SeAH Steel Corporation.  Also on the brief were <u>Amrietha Nellan</u>, <u>Jooyoun Jeong</u>, and <u>Ruby Rodriguez</u>.

<u>Jarrod M. Goldfeder</u>, Trade Pacific PLLC, of Washington, D.C., for consolidated plaintiff and plaintiff-intervenor Hyundai Steel Company.  Also on the brief was <u>Robert G. Gosselink</u>.

<u>Brady W. Mills</u>, Morris, Manning, & Mart.in, LLP, of Washington, D.C., for plaintiff-intervenor Husteel Co., Ltd.  Also on the brief were <u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Mary S. Hodgins</u>, and <u>Eugene Degnan</u>.

<u>Robert R. Kiepura</u>, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for defendant United States.  Also on the brief were <u>Brian M. Boynton</u>, Principal Assistant Deputy Attorney General, <u>Patricia McCarthy</u>, Director, and <u>Franklin E. White Jr.</u>, Assistant Director. Of counsel was <u>Benjamin Juvelier</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, of Washington D.C.

<u>Timothy C. Brightbill</u>, Wiley Rein, LLP, of Washington, D.C., for defendant-intervenors American Cast Iron Pipe Company and Stupp Corporation. Also on the brief were <u>Laura El-Sabaawi</u> and <u>Elizabeth Lee</u>.

Kelly, Judge:  Before the court is the U.S. Department of Commerce's ("Commerce") redetermination on remand filed pursuant to the court's order in <u>NEXTEEL Co. v. United States</u>, 569 F. Supp. 3d 1354 (Ct. Int'l Trade 2022) ("<u>NEXTEEL I</u>") in connection with Commerce's 2017–2018 administrative review of the antidumping duty ("ADD") order covering welded line pipe ("WLP") from the Republic of Korea.  On remand, Commerce: (1) found that there was insufficient evidence of a particular market situation ("PMS") in the Korean hot-rolled coil steel ("HRC") market; (2) recalculated Plaintiff NEXTEEL Co's ("NEXTEEL") costs without making an adjustment for non-prime products; (3) further explained its

classification of NEXTEEL's suspended production line costs ("suspension losses"), and (4) revised the non-examined companies' rate.  Final Results of Redetermination Pursuant to Ct. Remand, April 19, 2022, ECF No. 96-1 ("Remand Results").

## BACKGROUND

The court presumes familiarity with the facts of this case as set forth in its previous opinion remanding Commerce's determination for further consideration, and recounts only the facts necessary to consider the Remand Results.  Commerce published the final results of its administrative review on November 30, 2020, determining that a PMS existed in the Korean HRC market based on the cumulative effects of subsidies provided by the Government of Korea, imports of low-priced HRC from the People's Republic of China, strategic alliances between Korean HRC suppliers and WLP producers, and government intervention in the electricity market. [WLP] from the Republic of Korea, 85 Fed. Reg. 76,517 (Dep't Commerce Nov. 30, 2020) (final results of [ADD] admin. review; 2017–2018) ("Final Results").

On April 19, 2022, the court sustained Commerce's determination to cap Consolidated Plaintiff SeAH Steel's ("SeAH") freight revenue, but remanded Commerce's PMS determination, application of a PMS adjustment to SeAH's home market sales for the purpose of the sales-below-cost test, denial of a constructed export price offset for SeAH, reallocation of NEXTEEL's suspension losses and non-prime product costs, and separate rate calculations.  NEXTEEL I, 569 F. Supp 3d at 1376.  On July 18, 2022, Commerce published the final results of its determination

on remand.  On remand, Commerce found insufficient evidence of a PMS and therefore recalculated SeAH's and NEXTEEL's margins without applying a PMS adjustment, recalculated NEXTEEL's costs without making an adjustment for non-prime products, further explained its classification of NEXTEEL's suspension losses as general and administrative ("G&A") expenses, and revised the rate for non-examined companies. Remand Results at 2.

NEXTEEL, SeAH, and Plaintiff-intervenors Husteel and Hyundai Steel all urge the court to affirm Commerce's determination on remand that there was insufficient evidence to show a PMS.  See Pl. NEXTEEL's Cmts. on Remand, Aug. 17, 2022, ECF No. 105 ("Pl.'s Cmts."); Cmts. Consol. Pl. SeAH Steel Corp. on Commerce's Determ. on Remand., Aug. 17, 2022, ECF No. 104; Pl.-Int. Husteel's Cmts. on Redetermination, Aug. 17, 2022, ECF No. 103; Cmts. Consol. Pl. and Pl.-Int. Hyundai Steel on Commerce's Remand Redetermination, Aug. 17, 2022, ECF No. 107. Defendant-intervenors American Cast Iron Pipe Company and Stupp Corporation ("Domestic Interested Parties") urge the court to reject the remand results, and find that Commerce supported its PMS finding in the HRC market with substantial evidence.  See [Domestic Interested Parties'] Cmts. on Remand Redeterm., Aug. 17, 2022, ECF No. 106 ("Def.-Ints.' Cmts.").   Defendant asks the court to affirm Commerce's PMS determination.   See Def.'s Resp. to Cmts. on Remand Redetermination, Sept. 16, 2022, ECF No. 109 ("Def.'s Br.").

NEXTEEL contests Commerce's decision to continue treating its suspension losses as G&A expenses.  <u>See</u> Pl.'s Cmts.; Pl. NEXTEEL's Reply Cmts. on Remand, Sept. 16, 2022, ECF No. 110 ("Pl.'s Br.").  Defendant argues that Commerce's remand results with respect to NEXTEEL's suspension losses are supported by substantial evidence, and should be sustained.  Def.'s Br. at 9–11.  For the following reasons, the court sustains the Remand Results with respect to Commerce's PMS determination, NEXTEEL's non-prime product costs, and the separate rate calculation, and remands Commerce's decision with respect to NEXTEEL's suspension losses for reconsideration or additional explanation consistent with this opinion.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to  28 U.S.C. § 1581(c) (2018), which grants the court authority to review actions initiated under 19 U.S.C. § 1516a(a)(2)(B)(iii)[1] contesting the final determination in an administrative review of an ADD order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  <u>Xinjiamei Furniture Co. v. United States</u>, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014) (citation omitted).

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

## DISCUSSION

### I.      Particular Market Situation

In its remand redetermination, Commerce under respectful protest concludes there was no PMS affecting the costs of production for WLP in Korea during the period of review ("POR").  Remand Results at 16–17.  NEXTEEL, SeAH, Husteel Co., and Hyundai Steel Co. support Commerce's determination, and urge the court to sustain the Remand Results with respect to this issue.  Domestic Interested Parties urge the court to reject the Remand Results, and find that Commerce's initial PMS determination was supported by substantial evidence. For the following reasons, Commerce's determination is sustained.

As the court explained in <u>NEXTEEL I</u>, a PMS exists when "the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."  19 U.S.C. § 1677b(e).  Neither the statute nor the legislative history defines what constitutes a PMS.   The Trade Preferences Extension Act ("TPEA") added the phrase "particular market situation" to 19 U.S.C. § 1677b(e) in 2015, but the phrase existed prior to the TPEA, and appears in 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) and (C)(iii). The Statement of Administrative Action to the Uruguay Round Agreements Act explains that:

> The Agreement does not define "particular market situation," but such a situation might exist where a single sale in the home market constitutes five percent of sales to the United States or where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set. It also may be the case that a particular market situation could arise from differing

> patterns of demand in the United States and in the foreign market. For example, if significant price changes are closely correlated with holidays which occur at different times of the year in the two markets, the prices in the foreign market may not be suitable for comparison to prices to the United States.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 822 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4162.

If a PMS exists, Commerce may "use another calculation methodology under this part or any other calculation methodology," so long as the methodology comports with its statutory mandate and provides a reasoned explanation supported by substantial evidence. 19 U.S.C. § 1677b(e); see Ceramica Regiomontana, S.A. v. United States, 636 F.Supp. 961, 966 (1986) (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 (1984); Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)). The evidence must be sufficient such that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence. See Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938); Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).

Here, Commerce concludes that in light of the limitations of the record, it cannot adequately address all of the court's concerns in the Remand Results; therefore, Commerce concludes under respectful protest that it does not find a PMS affecting WLP. Remand Results at 5–6. Specifically, Commerce finds that it cannot

show both a comparative and a causal connection between particular market phenomena, including subsidies, and their effects on WLP producers' costs of production.[2] Id. at 6. Domestic Interested Parties argue the record contains adequate information for Commerce to have further explained its finding of a PMS. Def.-Ints.' Cmts. at 5. They also argue Commerce should have reopened the record on remand, and point to four reasons showing why Commerce's PMS determination was supported by substantial evidence. Id. at 4–9.

Domestic Interested Parties urge Commerce to re-adopt its position from Final Results for the same reasons that the court already addressed. As Commerce points out, Domestic Interested Parties cite to the Final Results and accompanying Issues and Decision Memorandum to support their argument in favor of finding a PMS. Remand Results at 16; Def.-Ints.' Cmts. at 4–9. The court considered and rejected this reasoning in NEXTEEL I, and Commerce correctly reasons that adopting its prior position would be no more than a "recitation of explanation and argument already before the Court." Remand Results at 16. Commerce also adequately addressed Domestic Interested Parties' comment that Commerce could have reopened the record to supplement its PMS finding with more information explaining

---

[2] Because it no longer applies a PMS adjustment, Commerce finds that the issues of the validity of its regression analysis, the application of the PMS adjustment to the sales-below-cost test, and the constructed export price offset for SeAH are moot, and does not discuss them in the Remand Results. Remand Results at 5, 6, 12.

it was unclear what additional information Commerce could have requested.  Id. at

17.  Therefore, Commerce's determination on this issue is sustained.

## II.    Cost Adjustment for Non-Prime Products

In its remand determination, Commerce found NEXTEEL's reported costs

reflected the actual costs of producing both its prime and non-prime goods, and

therefore reversed its decision to apply an adjustment to NEXTEEL's constructed

value for non-prime products.   Remand Results at 7–8.   No parties submitted

comments on this issue.

As the court explained in NEXTEEL I, when determining the constructed

value of subject merchandise, Commerce normally calculates cost "based on the

records of the exporter or producer of the merchandise" if the records "are kept in

accordance with the generally accepted accounting principles of the exporting country

. . . and reasonably reflect the costs associated with the production and sale of the

merchandise." 19 U.S.C. § 1677b(f)(1)(A); NEXTEEL I, 569 F. Supp. 3d at 1370.

Sometimes, Commerce finds that a portion of a respondent's reported costs relate to

the production of "non-prime" products.  See, e.g., Mittal Steel Point Lisas Ltd. v.

United States, 548 F.3d 1375, 1381 (Fed. Cir. 2008).   In those cases, Commerce

applies an adjustment to the reported cost of production of the non-prime product,

valuing it at its sale price, and allocates the difference between the production cost

and sales price to the production cost of prime products.  Id. at 1381–82.  Commerce's

adjustment must still comply with the Court of Appeals' decision in Dillinger France

S.A. v. United States, 981 F.3d 1318, 1321–24 (Fed. Cir. 2020), where the court held that Commerce's constructed value calculation must reasonably reflect a respondent's actual costs.  Id. at 1324.

Here, Commerce found that in its normal books and records, NEXTEEL calculates the costs for both prime and non-prime products in the same manner. Remand Results at 7–8.  In accordance with Dillinger and the court's instructions, Commerce reversed its decision to apply an adjustment to NEXTEEL's non-prime products.  Id. at 7–8; see Xinjiamei Furniture, 968 F. Supp. 2d at 1259.  No party objects to Commerce's decision to reverse the adjustment.  Therefore, Commerce's determination on this issue is sustained.

**III.    Separate Rate Calculation**

In its remand results, Commerce recalculated the separate rate applicable to non-examined respondents.  Remand Results at 20.  The separate rate is "the weighted average of the estimated weighed average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins and any margins determined entirely under [19 U.S.C. § 1677e]." 19 U.S.C. § 1673d(c)(5)(a).  Because the separate rate is based on the rate calculated for NEXTEEL and SeAH, and the court concluded that those rates were not supported by substantial evidence, Commerce properly recalculated the separate rate on remand.  No party submitted comments on this issue.  Commerce's decision on this issue therefore is sustained.

## IV.    NEXTEEL's Suspension Losses

In its remand determination, Commerce again classified NEXTEEL's costs associated with certain suspended production lines as G&A expenses, and provided further explanation for this determination.  Remand Results at 2, 8–12.  NEXTEEL argues that Commerce's explanation does not comply with the court's instructions to clarify whether production lines were suspended for part of or all of the POR, and how losses associated with those lines relate to G&A expenses.  Pl.'s Cmts. at 2–6. For the following reasons, Commerce's determination on this issue is remanded for further explanation or reconsideration.

Commerce normally calculates costs based on the respondent's records if such records are kept in accordance with generally accepted accounting practices ("GAAP").  See 19 U.S.C. § 1677b(f)(1)(A); see also NEXTEEL I, 569 F. Supp. 3d at 1371–72.  However, § 1677b(f)(1)(A) requires that constructed value reasonably reflect a respondent's actual costs.  Dillinger, 981 F.3d at 1321–23.  Thus, even if a respondent's normal books and records are GAAP-compliant, Commerce may deviate from the costs reflected in a respondent's books and records if it determines that such costs do not "reasonably reflect the costs associated with the production and sales of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

In NEXTEEL I, the court asked Commerce to (1) clarify whether NEXTEEL suspended production on the lines in question for all or only part of the POR, explaining that if merchandise was produced during the POR, suspension losses could

be associated with the revenue generated from that merchandise.  NEXTEEL I, 569

F. Supp. 3d at 1372 (citing Husteel Co., Ltd. v. United States, 520 F. Supp. 3d 1296

(Ct. Int'l Trade 2021)); and (2) further explain how losses associated with the

suspension of NEXTEEL's production lines relate to the G&A expenses incurred in

the production of subject merchandise, or else reconsider its determination.  Id.

Here, based on a practice which distinguishes short-term and long-term

shutdown expenses, Commerce again concludes NEXTEEL's reported costs do not

reflect its actual costs.  Remand Results at 9.  Commerce explains it includes routine

short-term shutdown expenses in a respondent's reported costs of goods, and

attributes the long-term shutdown costs to G&A expenses because a suspended

production line is like a depreciating asset.  Id.  Commerce views a routine or

temporary shutdown as generating costs that relate to the products produced on that

line, but considers a long-term shutdown as generating costs that must be borne by

the business as a whole.  Remand Results at 10, 19 ("when a production line is

suspended, in contrast to a routine maintenance shutdown, there are no longer

products produced on those production lines or current intentions to produce products

on those lines that can bear the burden of the cost associated with them"); see also id.

at 19 ("The cost of holding idle assets is more appropriately considered to be a period

cost related to the general operations of the company as a whole, not to the

manufacture of specific products.")

Consol. Court No. 20-03898                                          Page 13

     Commerce does not explain whether there were any products produced during the POR on the suspended lines, and therefore fails to support its assumption that NEXTEEL's allocation is not reasonably reflective of actual costs.  The statute directs Commerce to calculate costs based on a respondent's records if those records are GAAP-compliant and "reasonably reflective of the cost associated with the production and sale of merchandise." 19 U.S.C. § 1677b(f)(1)(A).  Commerce may deviate from a respondent's allocation in its GAAP-complaint books and records when it concludes that the respondent's allocation is not reasonably reflective of the actual costs.  Id. Although Commerce's long-term/short-term construct may be a useful tool for Commerce when it establishes that a respondent's cost allocation is unreasonable, here it does not establish that allocating suspension losses to cost of goods is unreasonable when NEXTEEL produced goods during the POR.  See 19 U.S.C. § 1677b(f)(1)(A); Dillinger, 981 F.3d at 1321–23.  Where there are products to bear costs, and the producer assigns those costs to those products, consistent with GAAP, it is unclear to the court how Commerce can conclude a respondent's books and records do not accurately reflect the cost of the merchandise.

     In the Remand Results, Commerce, instead of answering the court's inquiry as to whether there were products produced during the POR on suspended lines, states:

> While products may have been produced during the period of review []
> on those lines that were later shut down, such production occurred prior
> to the shutdown. Revenues from products produced prior to the
> shutdown should not be associated with the suspended losses incurred
> during the shutdown periods, as those products already carry the full
> operating costs related to producing products on those lines.

Remand Results at 11.  Commerce seems to conclude the court's inquiry is irrelevant, because post-suspension costs cannot be attributed to the cost of goods sold for products produced during the POR.  Id.  Commerce's own statements about its practice undermine its view that NEXTEEL's allocation is not reasonably reflective of actual costs.  In the Final Results, Commerce focused on whether certain lines produced products with which costs could be associated.  Issues and Decision Memo., A-580-876, Nov. 20, 2020, ECF No. 52-4 at 49 ("Regardless of the reason for the extended suspension of production activity . . .  products are not produced on those production lines to recover the costs associated with those production lines.")  Thus, the Final Results indicated that the relevant question was whether any products were produced on suspended lines during the relevant period.  See Husteel Co., Ltd. v. United States, 520 F. Supp. 3d 1296, 1307 (Ct. Int'l Trade 2021) (noting Commerce's position that because "[n]o revenue from any products normally produced on [the suspended] lines was generated for the period . . . the costs associated with the suspended production lines were necessarily covered by all the other products NEXTEEL produced").  Commerce's explanation is therefore not reasonable and conflicts with its stated practice.

Commerce does address the court's second question, as to why it would be reasonable to allocate costs from suspended lines to G&A expenses.  Commerce makes clear that it views losses from suspended lines as G&A costs, akin to depreciating assets, the losses from which are normally attributable to the entire company in the

form of a G&A expense.  Remand Results at 9.  Commerce notes that, in accordance

with Korean International Financial Reporting Standards, NEXTEEL assigned its

suspension losses directly to the cost of goods sold, rather than to individual products.

Id.  Commerce explains that attributing suspension losses to the cost of goods sold

generally spreads the costs across all products, akin to spreading the costs throughout

the company by attributing them to G&A expenses.  Id. at 19.  Thus, Commerce's

view is that NEXTEEL is already distributing the costs of the suspended lines across

the company—just to costs of goods sold, instead of as G&A expenses.  However,

Commerce views long-term shutdown costs as more appropriately allocated to G&A

because Commerce views them as a cost of the general business of the company.  Id.

at 18–19.  Commerce's explanation of how long-term suspension of product lines are

considered akin to depreciating assets is helpful.  But Commerce's practice regarding

the treatment of costs for long-term shutdowns does not lead to the conclusion that

allocating expenses to the cost of goods sold, in cases where goods were produced

during the POR on suspended lines, would not be reflective of the actual cost of the

goods.  See 19 U.S.C. § 1677b(f)(1)(A).  Thus, because Commerce fails to explain how

NEXTEEL's allocation of costs was not reasonably reflective of the actual costs,

Commerce's determination is remanded for further explanation or reconsideration.

On remand, Commerce should clarify whether NEXTEEL suspended production on

the lines in question for all or only part of the POR, and if NEXTEEL suspended

production for only part of the POR, Commerce should explain why NEXTEEL's costs

as reported for those lines would not be "reasonably reflective of the cost associated with the production and sale of merchandise." 19 U.S.C. § 1677b(f)(1)(A). [3]

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determinations regarding the (1) PMS for WLP, (2) adjustment for NEXTEEL's non-prime product costs, and (3) separate rate calculation. Commerce's determination regarding NEXTEEL's suspension losses is remanded.

In accordance with the foregoing, it is

**ORDERED** that Commerce's Remand Results are remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

---

[3] Commerce indicates that some production lines may have been suspended for the entirety of the POR. <u>See</u> Remand Results at 18.

Consol. Court No. 20-03898                                                    Page 17

     **ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing its remand redetermination.

<br>

                                        /s/ Claire R. Kelly
                                        Claire R. Kelly, Judge

Dated:       December 6, 2022
              New York, New York