A-580-876<br>
Remand<br>
Court No. 20-03898<br>
Slip Op. 22-135<br>
POR: 12/1/2017 – 11/30/2018<br>
**Public Document**<br>
E&C/OII: Team

*NEXTEEL Co., Ltd. et al. v. United States*,
Consol. Court No. 20-03898, Slip Op. 22-135 (CIT December 6, 2022)
Welded Line Pipe from the Republic of Korea

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.    SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (Court) issued in *NEXTEEL II*.[1]  This action arises out of the final results in the 2017-2018 administrative review of the antidumping duty (AD) order on welded line pipe (WLP) from the Republic of Korea (Korea).[2]  The Court previously remanded to Commerce its:  (1) particular market situation (PMS) determination and resulting adjustment to the reported cost of production (COP) for WLP for SeAH Steel Corporation (SeAH) and for purposes of calculating constructed value (CV) for NEXTEEL Co. Ltd. (NEXTEEL); (2) application of the PMS adjustment to SeAH for purposes of the sales-below COP test; (3) adjustment to NEXTEEL's CV to account for sales of non-prime products; (4) reclassification of NEXTEEL's reported losses relating to the suspended production of certain product lines; (5) denial of a constructed export price (CEP) offset for SeAH; and (6) calculation of the rate assigned to the non-examined companies in light

---

[1] *See NEXTEEL Co., Ltd. et al. v. United States*, 601 F. Supp. 3d 1373 (CIT 2022) (*NEXTEEL II*).
[2] *See Welded Line Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 76517 (November 30, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

of any adjustments made to the calculations for either respondent stemming from the remand.[3] In light of the Court's remand order, on remand Commerce: (1) found insufficient evidence of a PMS that distorts the COP of WLP and, therefore, recalculated NEXTEEL's and SeAH's margins without applying a PMS adjustment to the COP; (2) recalculated NEXTEEL's CV without making an adjustment to account for sales of non-prime products; (3) provided further explanation regarding its reclassification of NEXTEEL's reported losses associated with suspended production as general and administrative (G&A) expenses; and (4) revised the rate calculated for the non-examined companies in light of the calculation adjustments made in response to the remand.[4] The Court sustained Commerce's *First Remand Results* with respect to all issues, except for the classifying of costs associated with NEXTEEL's suspended production lines as G&A expenses. Specifically, the Court remanded to Commerce to provide further explanation and reconsideration of whether NEXTEEL actually produced products on the suspended production lines during the POR and how NEXTEEL's allocation of costs is not reasonably reflective of its actual costs.[5] Accordingly, in these final results of redetermination, Commerce provides further explanation of the period of suspension for certain production lines, and explains why it is appropriate to continue to include the suspension losses as part of G&A expenses. Given that Commerce made no changes to the calculation of the weighted-average dumping margin for NEXTEEL, the weighted-average dumping margin for NEXTEEL is unchanged from that presented in the *First Remand Results* (*i.e.*, 1.12 percent).

---

[3] *See NEXTEEL Co., Ltd. v. United States*, 569 F. Supp. 3d 1354 (CIT 2022) (*NEXTEEL I*).
[4] *See Final Results of Redetermination Pursuant to Court Remand, NEXTEEL Co., Ltd. et al. v. United States* Consol. Court No. 20-03898, dated July 15, 2022 (*First Remand Results*), available at https://access.trade.gov/Resources/remands/22-37.pdf.
[5] *See NEXTEEL II*, 601 F. Supp. 3d at 1381.

2

## II.  BACKGROUND

Commerce published its *Final Results* on November 30, 2020.[6]  For purposes of its *Final Results*, Commerce included NEXTEEL's suspended losses as part of its G&A expenses.[7]

In *NEXTEEL I*, the Court held that Commerce failed to address NEXTEEL's argument that Commerce's reallocation of NEXTEEL's suspended production costs contravenes section 773(f)(1)(A) of the Tariff Act of 1930, as amended (the Act).[8]

In *NEXTEEL II*, the Court held that Commerce failed to explain whether NEXTEEL produced any products during the period of review (POR) on the suspended lines,[9] and how NEXTEEL's allocation of costs was not reasonably reflective of the actual costs.[10]  Accordingly, the Court remanded to Commerce for:  (1) clarification on whether NEXTEEL suspended production on the lines in question for all or only part of the POR; and (2) if NEXTEEL suspended production for only part of the POR, for explanation on why NEXTEEL's costs as reported for those lines would not be "reasonably reflective of the cost associated with the production and sale of merchandise," as per section 773(f)(1)(A) of the Act.[11]

## III.  ANALYSIS

### *Reclassification of NEXTEEL's Suspension Losses*

Under Commerce's normal practice for determining whether particular items should be included in G&A expenses, Commerce reviews the nature of the item and its relation to the general operations of the company as a whole.[12]  In this case, NEXTEEL reported that it

---

[6] *See Final Results*.
[7] *Id*. at accompanying IDM at Comment 6.
[8] *See NEXTEEL I,* 569 F. Supp. 3d at 1371-1372.
[9] *See NEXTEEL II*, 601 F. Supp. 3d at 1379-1380.
[10] *Id*. at 1381.
[11] *Id*.
[12] *See Magnesium Metal from Russian Federation:  Notice of Final Determination of Sales at Less Than Fair Value*, 70 FR 9041 (February 24, 2005), and accompanying IDM at Comment 10.

suspended certain production lines for the entire POR and other production lines for only a portion of the POR.[13] When production lines are suspended, no corresponding products are produced and, hence, the company does not manufacture products on those lines that will generate revenues. As such, the costs associated with the suspended production lines when not in operation are necessarily recovered by all products produced by NEXTEEL. Commerce reasonably associated the recovery of the costs incurred during suspension with the general operations of the company as a whole (*i.e.*, with the production and sale of all products during the year), and not to the specific products associated with that production line, as there were no products produced and sold from those suspended production lines during the suspension periods. Section 773(b)(3)(B) of the Act directs Commerce to include costs associated with the general operations of the company (*i.e.*, normal costs that are not directly associated with a product) as part of the company's G&A expenses.

a. *Clarification of Period of Suspension*

NEXTEEL suspended the operations of four production lines at different periods in the POR. Three of the suspended lines were used to produce oil country tubular goods (OCTG), which is non-subject merchandise, and the fourth suspended line is a forming line used to produce the subject merchandise. Of the three OCTG lines, one was suspended for the entire POR and the two remaining lines were suspended for the last five months of the POR. The suspended forming line on which NEXTEEL produces the subject merchandise was suspended for the last ten months of the POR.[14] Accordingly, all four lines were suspended for an extended period of time, not just for a month or two for routine repairs or maintenance.

---

[13] *See* NEXTEEL's Letter, "NEXTEEL's Submission of Second Supplemental Questionnaire Responses to Section D," dated December 4, 2019, at Exhibit SD-6.
[14] *Id.*

4

  b.  *Why NEXTEEL's Reported Costs are not Reasonably Reflective*

  In its normal books and records and for cost reporting purposes, NEXTEEL assigned the costs incurred at each production line when in operation to the cost of manufacturing (COM) for the respective products produced on those lines.[15]  Commerce agrees with NEXTEEL on this treatment because there is a proper matching of costs incurred and the resulting products produced.  However, in its normal books and records, the costs associated with those lines while in suspension (*i.e.*, the suspended losses) were not assigned directly to any products by NEXTEEL.[16]  Instead, NEXTEEL treated these costs as a company-wide cost of goods sold (COGS), not tied to any specific product, because no products were produced on these lines once operations on those lines were suspended.[17]  NEXTEEL argues that, since it assigned these suspension costs directly to the COGS for the fiscal year on its financial statements, these costs should not be accounted for in the antidumping duty calculation as part of the COP.[18]  Consequently, NEXTEEL claims that Commerce incorrectly included these costs in the antidumping duty calculation by adding them in G&A expenses when calculating COP.[19]  Commerce included the suspension losses as G&A expenses, rather than COM, because these costs (whether from those lines suspended for only a part of the POR or for the whole period) had no corresponding production while the lines were in extended suspension.[20]  When in suspension, the lines become assets held for future activities, but still required expenditures to maintain them in the current period.  Therefore, for the time frame during which they remain

---

[15] See NEXTEEL's Letter, "NEXTEEL's Sections C and D Questionnaire Response," dated May 21, 2019 (DQR), at D-11 to D-12 (NEXTEEL explains how the cost components are recorded in its accounting system).
[16] *Id*. at D-10.
[17] *See* NEXTEEL's Letter, "NEXTEEL's Submission of Supplemental Questionnaire Responses to Sections A, C and D," dated September 5, 2019 (SQR1), at S-16.
[18] *See* NEXTEEL's Letter, "NEXTEEL's Case Brief," dated March 11, 2020, at 36-37.
[19] *Id.* at 37.
[20] *See* DQR at D-10 ("NEXTEEL did suspend production on certain OCTG lines and one of the forming lines for the subject merchandise for some periods during the POR").

5

non-productive assets, it is appropriate to attribute those expenditures to the general operations of the company.[21] These suspension losses are actual costs incurred by the company and such costs need to be recovered when setting prices. Commerce's point is that, once the suspended production lines are taken out of operation for an extended period of time, the recovery of such related costs becomes a company-wide burden, as opposed to a burden only on the products that are being produced on those lines. These costs are more associated with the company's general operations (*i.e.*, G&A) rather than product-specific costs (*i.e.*, COM). Although products were produced during the POR on three of the four lines that were later shut down,[22] such production occurred prior to the extended shutdown. Products produced on the suspended lines prior to the shutdown have already been assigned all direct costs incurred on those lines while they were in operation. As such, those products already carry the full operating costs related to producing products on those lines and should not be the only products bearing the cost associated with the shutdown period. If Commerce were to attribute the costs associated with the suspension of production only to the merchandise produced on each line, the per-unit production costs for such merchandise would be unreasonably high because the cost of the suspended lines would be added on top of the normal operating cost for those lines.

Commerce's position, as described by the Court in its remand order, is that because "{n}o revenue from any products normally produced on {the suspended} lines was generated for the period…the costs associated with the suspended production lines were necessarily covered by all the other products NEXTEEL produced."[23] According to the Court, "Commerce's explanation is… not reasonable and conflicts with its stated practice."[24] The Court added that

---

[21] *See Final Results* IDM at Comment 6.
[22] *Id*.
[23] *See NEXTEEL II*, 601 F. Supp. 3d at 1380.
[24] *Id*.

6

"Commerce's practice regarding the treatment of costs for long-term shutdown does not lead to the conclusion that allocating expenses to the COGS, in cases where goods were produced during the POR on suspended lines would not be reflective of the actual cost of the goods."[25] Commerce clarifies that, when it said no revenue from any products produced on those lines were generated for the period (and, therefore, the costs were necessarily covered by all other products produced by NEXTEEL), Commerce was referring specifically to the period when the production lines were shut down, not generally to the POR.  The related shutdown cost should not be considered as part of the COM of products produced on those lines, and the shutdown costs were not attributable to specific products that generated revenue because no products were produced while the lines were shut down.  Therefore, Commerce's position on this case is not in conflict with its stated practice, and it appropriately included the suspension losses as part of G&A expenses.

When NEXTEEL was asked to identify where the depreciation {on the suspended lines} was recognized as COGS for non-operating losses shown in NEXTEEL's trial balance, NEXTEEL responded that "the depreciation from the suspended lines and the costs that were allocated to these lines from the common cost centers are directly transferred to COGS in NEXTEEL's trial balance at year end."[26]  This shows that the costs of the suspended lines, although recorded as part of COGS, were not included as part of the actual product costing for the subject and non-subject merchandise during the period because NEXTEEL does not treat the cost of the suspended lines related to producing a product, but, instead, directly "transferred" them to COGS.  In addition, when NEXTEEL was asked to identify where the cost of the suspended lines was included in the reported costs, NEXTEEL replied that "the costs of the

---

[25] *Id*. at 1381.
[26] *See* SQR1 at S-16.

suspended lines were not included in the reported costs…thus NEXTEEL believes that these costs were unrelated to the COM of the subject merchandise."[27]  Commerce agrees with NEXTEEL that the suspended loss was not directly attributable to a specific product;[28] for that reason, consistent with Commerce's practice, we included these costs in G&A expenses.

## IV.    INTERESTED PARTY COMMENTS

On February 7, 2023, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[29]  On February 14, 2023, we received comments from NEXTEEL and Hyundai Steel Company (Hyundai Steel).[30]  These comments are summarized below.

*NEXTEEL's Comments*[31]

- Commerce's draft results of redetermination are inconsistent with the statute and do not adequately address the Court's order.
- Commerce's temporal approach is misguided, in that it appears to establish yet another entirely new rule in an attempt to support its reallocation of costs from COGS to G&A expenses -- namely, that extended shutdown costs can be attributed to COGS if there is subsequent production during the POR, but not if there is only production preceding the shutdown during the POR.
- Because these shutdowns are temporary, there will always be production both before and after the shutdown; the only question is what the POR happens to be in a particular case.
- Commerce's new rule creates a situation where the same shutdown period would be treated differently depending on whether the POR at issue happened to capture production before or after the shutdown.
- NEXTEEL's accounting treatment and reported costs are reasonable because, were NEXTEEL to include the shutdown costs in the reported product costs, the costs for producing merchandise on these lines would be unreasonably high.  Thus, no adjustment to NEXTEEL's reported costs is necessary.
- The suspended losses at issue are not G&A expenses, but, rather, maintenance and depreciation expenses NEXTEEL incurred on its temporarily suspended production lines.

---

[27] *Id*.
[28] *Id*. at S-16 and S-17.
[29] *See* "Draft Results of Redetermination Pursuant To Second Court Remand Welded Line Pipe from the Republic of Korea, *NEXTEEL Co., Ltd. et al. v. United States*, Consol. Court No. 20-03898, Slip Op. 22-135 (CIT 2022)," dated February 7, 2023.
[30] *See* NEXTEEL's Letter, "NEXTEEL's Comments on Draft Remand Redetermination," dated February 14, 2023 (NEXTEEL's Comments); and Hyundai Steel's Letter, "Comments on Draft Second Remand Results," dated February 14, 2023 (Hyundai Steel's Comments).
[31] *See* NEXTEEL's Comments.

- Commerce can only legally reclassify NEXTEEL's reported costs of its normal, generally accepted accounting principles (GAAP)-compliant accounting treatment is not reasonable, pursuant to section 773(f)(1)(A) of the Act. However, Commerce continues to fail to show that NEXTEEL's suspended production costs do not reasonably reflect the costs associated with the production and sales of the subject merchandise.
- Commerce, in the draft results of redetermination, does not show that NEXTEEL's reported costs are unreasonable, as the statute requires but, instead, that Commerce's reallocation is reasonable.
- Therefore, Commerce should reconsider its analysis for purposes of the final results of redetermination and accept NEXTEEL's reported costs (and G&A expenses) as reported.

*Hyundai Steel's Comments*[32]

- Hyundai Steel concurs with and incorporates by reference NEXTEEL's comments with respect to this issue.
- To the extent that Commerce recalculates NEXTEEL's AD margin in response to NEXTEEL's comments on the draft results of redetermination, Commerce should reflect any such changes in the review-specific average rate applicable to non-examined companies that are parties to this litigation, including Hyundai Steel.

**Commerce's Position:**

Consistent with Commerce's practice, we have continued to include NEXTEEL's costs associated with the suspension of production lines as a loss component of its G&A expenses, to be carried by all production.[33] We disagree with NEXTEEL that Commerce created a new rule to support the reallocation of costs recorded directly to COGS for financial statement purposes to G&A expenses for purposes of the AD calculations. NEXTEEL states that "it appears that Commerce established a rule that extended shutdown costs can be attributed to COGS if there is subsequent production during the POR, but not if there is only production preceding the shutdown during the POR."[34] However, in the draft results of redetermination we also stated that "Commerce included the suspension losses as G&A expenses, rather than COM, because these costs (whether from those lines suspended for only a part of the POR or for the whole period)

---

[32] *See* Hyundai Steel's Comments.
[33] *See Final Results* IDM at Comment 6.
[34] *See* NEXTEEL's Comments at 3.

9

had no corresponding production while the lines were in extended suspension."[35]  Therefore, in situations where there is no production during the whole POR, or only production prior to or after the production lines are suspended during the POR, it is reasonable for Commerce to treat such costs in the same way.  The costs related to these suspensions are a company-wide burden and, thus, correctly associated with the company's general operations, regardless of when within the POR the shutdown occurs.  Consequently, we disagree with NEXTEEL that such costs, which NEXTEEL did not include in either the per-unit product costs or in G&A expenses, should be left out of the calculations.  As a result, we find that NEXTEEL's claim that Commerce created a new rule, where shutdown period costs would be treated differently depending on whether the POR at issue happened to capture production before or after the shutdown, has no merit.

Finally, we agree with NEXTEEL that Commerce can only reclassify its costs if NEXTEEL's normal, GAAP-compliant, accounting treatment is not reasonable, pursuant to section 773(f)(1)(A) of the Act.  Commerce has repeatedly made the case that it is unreasonable to exclude these costs from the AD analysis by not assigning them either to product costs or to G&A expenses but, instead, assigning them directly to COGS.  Indeed, the issue of reclassifying NEXTEEL's suspension losses from COGS to G&A expenses was upheld by the Court in litigation on the prior segment of this review.[36]  In its ruling, the Court elaborated that even if a respondent's normal books and record are GAAP compliant, "the statute affords Commerce some discretion to depart from those records if it determines that they do not 'reasonably reflect the costs associated with the production and sale of the merchandise.'"[37]  The Court added that,

---

[35] *See supra* at 5.
[36] *See Husteel Co. Ltd. v. United States,* 520 F. Supp. 3d 1296, 1306-07 (CIT 2021).
[37] *Id.* at 1306.

10

although a company may shut down product lines from time to time for various intervals, at some point, an extended shutdown suggests that the costs of that product line are more akin to expenses borne by the company in its general operations.[38] Accordingly, in this case, where there was production on certain lines during the POR, Commerce's reallocation of the suspended losses to G&A expenses is reasonable. As for NEXTEEL's claim that, because these costs were not assigned to products or listed in the financial statements as G&A expenses but, rather, directly recorded to COGS, these suspension costs should reasonably be excluded,[39] Commerce has found:

> Products produced on the suspended lines prior to the shutdown have already been assigned all direct costs incurred on those lines while they were in production. As such, those products already carry the full operating costs related to producing products on those lines and should not be the only products bearing the cost associated with the shutdown period. If Commerce were to attribute the costs associated with the suspension of production only to the merchandise produced on each line, the per-unit production costs for such merchandise would be unreasonably high because the cost of the suspended lines would be added on top of the normal operating cost for those lines.[40]

This is also true if there was production after the shutdown. Thus, it is not reasonable to treat the cost of the suspended loss as part of COGS, because it would double count the costs of the products that already carry the full operating costs. However, since the suspended loss was incurred while specific products were not generating revenue, but the lines were being maintained for future service, it is reasonable to include these costs as part of G&A expenses. Therefore, NEXTEEL's claims that Commerce failed to show the company's suspended production costs do not reasonably reflect the costs associated with the production and sale of the

---

[38] *Id*. at 1307-08.
[39] *See* SQR1 at S-17; *see also* NEXTEEL's Comments at 5-6.
[40] *See supra* at 6.

11

merchandise and that Commerce's draft results of redetermination do not show that Commerce's reallocation is reasonable, have no merit.

## V.     FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, Commerce has provided further explanation of the period of suspension for certain production lines, and explained why it is appropriate to continue to include the suspension losses as part of G&A expenses.  As a result, Commerce made no changes to its calculations and the weighted-average dumping margin for NEXTEEL is unchanged from that presented in the *First Remand Results* (*i.e.*, 1.12 percent).

3/3/2023

X 

Signed by: LISA WANG

_____
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance