## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE CLAIRE R. KELLY

_____

|  |  |
|---|---|
| NEXTEEL CO., LTD. ET AL., | ) |
|  | ) |
| *Plaintiff and Consolidated Plaintiffs*, | ) |
|  | ) |
| **and** | ) |
|  | ) |
| HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY | ) |
|  | ) |
| *Plaintiff-Intervenors*, | ) Consol. Ct. No.:  20-03898 |
|  | ) |
| **v.** | ) |
|  | ) |
| UNITED STATES, | ) |
|  | ) |
| *Defendant*, | ) |
|  | ) |
| **and** | ) |
|  | ) |
| CALIFORNIA STEEL INDUSTRIES, INC. ET AL., | ) |
|  | ) |
| *Defendant-Intervenors* **and** *Consolidated Defendant-Intervenors*. | ) |

_____

## NEXTEEL CO., LTD.'s COMMENTS ON REMAND

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Kang Woo Lee

*Counsel to NEXTEEL Co., Ltd.
Plaintiff*

Dated:  April 5, 2023

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ........................................................................................................1

II.    ARGUMENT................................................................................................................1

       A.    THE COURT SHOULD FIND THAT COMMERCE'S ALLOCATION
             OF COSTS ASSOCIATED WITH SUSPENDED PRODUCTION LINE
             LOSSES TO G&A EXPENSES IS UNREASONABLE.......................................1

       B.    COMMERCE'S TREATMENT OF NEXTEEL'S SUSPENDED LOSSES
             IS INCONSISTENT WITH ITS STATUTORY OBLIGATION ............................4

III.   CONCLUSION.............................................................................................................7

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Federal Cases</u>

*Dillinger France S.A. v. United States*,
    981 F.3d 1318 (Fed. Cir. 2020)................................................................................7

*Husteel Co. Ltd. v. United States*,
    520 F. Supp. 3d 1296 (Ct. Int'l Trade 2021) ...........................................................7

*NEXTEEL Co., Ltd. et al. v. United States*,
    601 F. Supp. 3d 1373 (Ct. Int'l Trade 2022) .................................................. *passim*

*NEXTEEL Co. v. United States*,
    569 F. Supp. 3d 1354 (Ct. Int'l Trade 2022) ...........................................................7

*Seah Steel Corp. v. United States*,
    513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) ...........................................................7

### <u>Federal Statutes</u>

19 U.S.C. § 1677b(f)(1)(A)............................................................................................7

I.      INTRODUCTION

On behalf of Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL"), we hereby submit these

comments on the U.S. Department of Commerce's ("Commerce") Final Results of

Redetermination Pursuant to Court Remand, ECF No. 116, March 6, 2023 ("Second Remand

Results").  *See NEXTEEL Co., Ltd. et al. v. United States*, 601 F. Supp. 3d 1373 (Ct. Int'l Trade

2022) ("*NEXTEEL II*").  Commerce's Second Remand Results addressed just one issue

pertaining to NEXTEEL, relating to the treatment of costs NEXTEEL incurred associated with

suspended production on certain of its production lines during the POR.

In its Second Remand Results, Commerce continued to treat these costs as part of

NEXTEEL's general and administrative ("G&A") costs, despite the fact that the costs were not

recorded as such in NEXTEEL's normal books and were not costs associated with producing

subject merchandise in the period of review ("POR").  As discussed below, the Court should

remand this issue again to Commerce so that the agency can recalculate NEXTEEL's

antidumping duty margin without treating these costs as part of the company's G&A expenses.

II.     ARGUMENT

A.      THE COURT SHOULD FIND THAT COMMERCE'S ALLOCATION OF
        COSTS ASSOCIATED WITH SUSPENDED PRODUCTION LINE
        LOSSES TO G&A EXPENSES IS UNREASONABLE

With respect to the allocation of costs for losses associated with suspended production on

certain production lines, Commerce's Remand Results do not comply with the Court's Remand

Order in *NEXTEEL II*.  There, the Court remanded this issue to Commerce, asking that

Commerce: (1) "clarify whether NEXTEEL suspended production on the lines in question for all

or only part of the POR, and" (2) "if NEXTEEL suspended production for only part of the POR.

. . explain why NEXTEEL's costs as reported for those lines would not be 'reasonably reflective

of the cost associated with the production and sale of merchandise.'" *NEXTEEL II,* 601 F. Supp. 3d. at 1381 (citing 19 U.S.C. § 1677b(f)(1)(A)).

In its Second Remand Results, Commerce accurately explained that NEXTEEL suspended operations on four of its production lines, three of which produced oil country tubular goods ("OCTG"), and one of which was used to produce subject line pipe. *See* Second Remand Results at 4.  One OCTG  production line was suspended for the entirety of the POR, while the other two OCTG lines were suspended for only five months of the POR.  The line pipe production line was suspended for ten months of the POR.  Without distinguishing between these lines, half of which had production for most of the POR, Commerce treated all four production lines as having been "suspended for an extended period of time." *Id.*  While Commerce did provide the details necessary to respond to the Court's question regarding the length of time during the POR in which these production lines were shut down,  Commerce did not sufficiently address why NEXTEEL's reporting was not reasonably reflective of the costs associated with the production and sale of line pipe.

As an initial matter, the Court's analysis focused on whether products were produced on the suspended lines at some point during the POR. *NEXTEEL II*, 601 F. Supp. 3d. at 1380.  In particular, the Court stated that "{w}here there are products to bear costs, and the producer assigns those costs to those products, consistent with GAAP, it is unclear to the court how Commerce can conclude a respondent's books and records do not accurately reflect the cost of the merchandise." *Id.*

However, despite the fact that the Court explicitly distinguished between production lines without POR production and lines with POR production, in its analysis, Commerce treated all four production lines in the exact same manner without sufficient explanation of its reasoning for

doing so.  Rather than addressing the Court's inquiry and revising its calculations accordingly, Commerce instead reiterated its practice regarding short-term and long-term shutdown expenses, explaining that long-term shutdown expenses are "associated with the company's general operations (i.e., G&A) rather than product-specific costs (i.e., COM)."  Second Remand Results at 10.

Commerce justified its reasoning by explaining that it would continue to allocate costs to G&A based on the timing of the shut downs relative to production during the POR.  In particular, Commerce reasoned that the production in the POR "occurred prior to the extended shutdown" and thus "costs were not attributable to specific products that generated revenue because no products were produced while the lines were shut down." *Id*. at 6-7.  This explanation does not sufficiently address the Court's observation that "Commerce's practice regarding the treatment of costs for long-term shutdown does not lead to the conclusion that allocating expenses to the COGS, in cases where goods were produced during the POR on suspended lines would not be reflective of the actual cost of the goods," as is the case here.  *NEXTEEL II*, 601 F. Supp. 3d at 1381.  Indeed, Commerce's approach is misguided in that it appears to establish a rule that extended shutdown costs can be attributed to COGS if there is *subsequent* production during the POR, but not if there is only production *preceding the shutdown* during the POR (as is the case with NEXTEEL's shutdowns at issue here).

This delineation is entirely arbitrary and necessarily depends on the particular POR at issue.  It is undisputed in these proceedings that these shutdowns are temporary, regardless of the length of the shutdown.  As such, there will always be production both *before* and *after* the shut down; the only distinction that can be drawn is arbitrarily where the POR happens to fall in relation to the temporary shutdown.  Commerce's new rule, therefore, creates a situation where

the same shutdown period would be treated differently – possibly even in the same proceeding – depending on whether the POR at issue happened to capture production before or after the shutdown.  On this basis, Commerce's Second Remand Results create an unreasonable new rule dependent on the timing of administrative reviews.

However, in response to NEXTEEL's comments on Commerce's Draft Second Remand Results, Commerce argues that it did not "create{ } a new rule" because these suspension loses "had no corresponding production while the lines were in extended production."  *Id*. at 9-10. This reasoning does not provide adequate explanation for why Commerce would consider a production line with POR production *after* a suspension differently.  Although Commerce denied creating any new rules, Commerce thereafter offered a clearer statement of its new rule: "in situations where there is no production during the whole POR, or only production prior to or after the production lines are suspended during the POR, it is reasonable for Commerce to treat such costs in the same way."  Second Remand Results at 10.  More importantly, this new rule does not address the Court's observation that temporarily suspended production lines do have "products to bear costs" where there is production during the POR, regardless of when that production took place.

### B.    COMMERCE'S TREATMENT OF NEXTEEL'S SUSPENDED LOSSES IS INCONSISTENT WITH ITS STATUTORY OBLIGATION

In any event, regardless of how long the lines were shut down, NEXTEEL continues to submit that 19 U.S.C. § 1677b(f)(1)(A) mandates that Commerce accept NEXTEEL's costs as reported.  Under this section of the statute, Commerce is to rely upon a company's normal books and records when they are prepared in accordance with the home country generally accepted accounting principles ("GAAP") and "reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  As the Court stated, "*Dillinger*

4

requires that constructed value reasonably reflect a respondent's actual costs, whether or not the respondent's books and records reasonably reflect such costs." *NEXTEEL Co. v. United States,* 569 F. Supp. 3d 1354, 1371 (Ct. Int'l Trade 2022) (citing *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321-23 (Fed. Cir. 2020)). While Commerce "may deviate from the costs reflected in a respondent's books and records," the Court interpreted *Dillinger* as requiring that Commerce show that "such costs do not 'reasonably reflect the costs associated with the production and sales of the merchandise.'" *Id.* Commerce's analysis does not show that NEXTEEL's costs of suspended production do not "reasonably reflect the costs associated with the production and sales of the merchandise." While this Court has also recently reasoned that "at some point an extended shutdown suggests that the costs of that product line are more akin to expenses borne by the company in its general operations," *see Husteel Co. Ltd. v. United States,* 520 F. Supp. 3d 1296, 1307-08 (Ct. Int'l Trade 2021), NEXTEEL continues to submit that Commerce has not established that NEXTEEL's reported costs to produce welded line pipe are not reasonable.

Here, NEXTEEL's treatment of its suspension losses is consistent with its normal accounting treatment, which is in line with Korean GAAP. Commerce does not dispute that NEXTEEL's accounting methodology is GAAP compliant in these proceedings. As a result, in order to "depart{} from Commerce's statutory preference for determining costs according to an exporter's or producer's records" Commerce must provide an explanation as to why NEXTEEL's records are deficient or why relying on NEXTEEL's reporting would be unreasonable. *Seah Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1400 (Ct. Int'l Trade 2021).

Further, as detailed above, NEXTEEL's accounting treatment of its suspended losses reasonably reflects its costs.  G&A expenses are those general administrative expenses relating to the operations of a company as a whole, which excludes expenses incurred in producing or selling the merchandise.  In its Second Remand Results, Commerce erroneously identified the suspension losses at issue as related the "the general operations of the company as a whole (i.e., with the production and sale of all products during the year)."  Second Remand Results at 4. However, suspended losses are not related to the company's overall management of its operations, but instead consist of maintenance and depreciation expenses incurred on specific production lines that were temporarily suspended.  Here, NEXTEEL incurred the suspension losses at issue only on production lines that were temporarily suspended.  Therefore, NEXTEEL's ordinary accounting treatment of these costs was reasonable and Commerce's conclusory analysis continues to offer inadequate explanation as to why it views NEXTEEL's reporting to be unreasonable, as required by the statute prior to departing from the company's costs.

In sum, NEXTEEL's costs from suspended production are both GAAP compliant *and* the reported costs for welded line pipe production reasonably reflect the costs associated with the production and sales of the subject merchandise. Under these circumstances, 19 U.S.C. § 1677b(f)(1)(A) instructs Commerce to accept NEXTEEL's reported actual costs with respect to temporarily suspended production lines.

6

## III.    CONCLUSION

For the foregoing reasons, NEXTEEL respectfully requests that this Court hold Commerce's treatment of NEXTEEL's suspended production line costs to be unsupported by substantial evidence and otherwise not in accordance with law.  NEXTEEL further requests that this Court remand the agency's determination with instructions to Commerce to revise its treatment of NEXTEEL's suspended production line costs consistent with these comments.

Respectfully submitted,

/s/ J. David Park

J. David Park
Henry D. Almond
Daniel R. Wilson
Kang Woo Lee

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20001
PHONE:  (202) 942-5000
FAX:  (202) 942-5999

*Counsel to NEXTEEL Co., Ltd.*
*Plaintiff*

Date:  April 5, 2023

7

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE CLAIRE R. KELLY

_____

| | |
|---|---|
| NEXTEEL CO., LTD. ET AL., | ) |
| | ) |
| *Plaintiff and Consolidated Plaintiffs,* | ) |
| | ) |
| **and** | ) |
| | ) |
| HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY | ) |
| | ) |
| *Plaintiff-Intervenors,* | ) **Consol. Ct. No.:  20-03898** |
| | ) |
| **v.** | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| **and** | ) |
| | ) |
| CALIFORNIA STEEL INDUSTRIES, INC. ET AL., | ) |
| | ) |
| *Defendant-Intervenors* **and** *Consolidated Defendant-Intervenors.* | ) |

_____ )

## <u>CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)</u>

The undersigned hereby certifies that the attached Remand Comments of NEXTEEL Co., Ltd. filed on April 5, 2022 contain 1,795 words, exclusive of the Table of Contents, Table of Authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this memorandum, and therefore complies with the 10,000 word count limitation set forth in the Court's Chambers Procedures.

By:                                                    /s/ J. David Park
                                                        J. David Park

**Date: April 5, 2023**