## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| NEXTEEL CO., LTD., *et al.*,  Plaintiff and Consolidated Plaintiffs,  and  HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY,  Plaintiff-Intervenors,  v.  UNITED STATES,  Defendant,  and  CALIFORNIA STEEL INDUSTRIES, INC., *et al.*,  Defendant-Intervenors and Consolidated Defendant-Intervenors. | Consol. Court No. 20-03898 |

**DEFENDANT'S RESPONSE TO
COMMENTS ON REMAND REDETERMINATION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:
Benjamin Juvelier
Attorney
Office of the Chief Counsel
 for Trade Enforcement & Compliance
U.S. Department of Commerce

ROBERT R. KIEPURA
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 305-4436
Email: robert.kiepura@usdoj.gov

May 5, 2023

Attorneys for Defendant

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................2

    I.     Commerce's Final Results ..............................................................................2

    II.    Litigation Of The *Final Results* ....................................................................3

    III.   Court's First Remand Order .........................................................................3

    IV.   First Remand Results ....................................................................................4

    V.    Court's Second Remand Order .....................................................................5

    VI.   Second Remand Results ................................................................................5

ARGUMENT ....................................................................................................................6

    I.     Standard Of Review .......................................................................................6

    II.    Commerce's Second Remand Results Comply With The Second Remand Order ..6

         A.  Commerce's Treatment Of The Suspended Losses As G&A Costs .................9

CONCLUSION ................................................................................................................12

**TABLE OF AUTHORITIES**

**Case(s)**                                                                                                                          **Page(s)**

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938)......................................................................................................................6

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)......................................................................................................................6

*Dillinger France S.A. v. United States*,
   921 F.3d 1318 (Fed. Cir. 2020)...................................................................................................12

*Husteel Co. v. United States*,
   520 F. Supp. 3d 1296 (Ct. Int'l Trade 2021)...................................................................8, 9, 10

*I.N.S. v. Elias-Zacarias*,
   502 U.S. 478 (1992)......................................................................................................................6

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015)................................................................................6

*NEXTEEL Co., Ltd. v. United States*,
   601 F. Supp. 3d 1373 (Ct. Int'l Trade 2022)........................................................................*passim*

*NEXTEEL v. United States*,
   569 F. Supp.3d 1354 (Ct. Int'l Trade 2022)................................................................................3

**Statutes**

19 U.S.C. § 1516a(b)..........................................................................................................................6

19 U.S.C. § 1677(b)............................................................................................................................4

19 U.S.C. § 1677b(a)..........................................................................................................................3

19 U.S.C. § 1677b(f).........................................................................................................................11

**Other Authorities**

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   84 Fed. Reg. 9,297 (Dep't. of Commerce March 14, 2019)......................................................2

*Welded Line Pipe from the Republic of Korea*,
    85 Fed. Reg. 76,517 (Dep't. of Commerce Nov. 30, 2020) (*Final Results*) ............................. 2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| NEXTEEL CO., LTD., *et al.*, <br><br> Plaintiff and Consolidated Plaintiffs, <br><br> and <br><br> HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY, <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALIFORNIA STEEL INDUSTRIES, INC., *et al.*, <br><br> Defendant-Intervenors and Consolidated Defendant-Intervenors. | Consol. Court No. 20-03898 |

**DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments briefs (ECF Nos. 118 and 119) filed by plaintiff NEXTEEL Co., Ltd. (NEXTEEL) (NEXTEEL's Cmts.) and consolidated plaintiff and plaintiff-intervenor Hyundai Steel Company (Hyundai's Cmts) concerning the Final Results of Redetermination Pursuant to Court Remand filed by the United States Department of Commerce on March 6, 2023, in accordance with this Court's decision and remand order in *NEXTEEL Co., Ltd. v. United States*, 601 F. Supp. 3d 1373 (Ct.

Int'l Trade 2022) (*NEXTEEL II*).[1]  *See* Final Results of Redetermination Pursuant to Court Remand (Second Remand Results), March 6, 2023, ECF No. 116.  For the reasons below, we respectfully request that the Court sustain Commerce's Second Remand Results and enter final judgment for the United States.

## BACKGROUND

### I.   Commerce's Final Results

On March 14, 2019, Commerce initiated an antidumping review of welded line pipe (WLP) from the Republic of Korea (Korea).  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Dep't. of Commerce March 14, 2019) (P.R. 6).[2]  Commerce selected NEXTEEL and SeAH as mandatory respondents.  *See Welded Line Pipe from the Republic of Korea*, 85 Fed. Reg. 76,517 (Dep't. of Commerce Nov. 30, 2020) (*Final Results*) (P.R. 860) and accompanying Issues and Decision Memorandum at 2 (IDM) (P.R. 854).  In the *Final Results*, Commerce:  (1) determined that a particular market situation (PMS) existed in the Korean market, which distorted the cost of production of WLP, and made an adjustment to NEXTEEL's and SeAH's costs of hot-rolled coil steel to account for the PMS; (2) adjusted NEXTEEL's reported costs to account for sales of non-prime products; (3) included NEXTEEL's suspended losses as part of its general and administrative (G&A) expenses; and (4)

---

[1]  In its comments, Hyundai indicated that, as it is a non-individually investigated respondent, any changes to the calculation of its antidumping duty will be contingent on Commerce's treatment of NEXTEEL's calculation.  ECF No. 119 at 2.  Therefore, Hyundai "concurs with and hereby incorporates by reference the comments submitted today by NEXTEEL."  *Id*.  Accordingly, this response only addresses those comments filed by NEXTEEL.  ECF No. 118.

[2]  Citations to the public record "P.R. __" and confidential record "C.R. __" refer to the underlying administrative review record.  Citations to "First Remand P.R. __" and "First Remand C.R.__" refer to the public and confidential record of the first remand redetermination, respectively.  Citations to "Second R.R." refers to the public record of the second remand redetermination.

determined that a constructed export price offset for SeAH under 19 U.S.C. § 1677b(a)(7)(B) was not warranted. *See Final Results* (P.R. 860) and *see* IDM at comments 1, 5, 6, and 9 (P.R. 854).

## II.     Litigation Of The *Final Results*

Commerce published the *Final Results* on November 30, 2020. *Final Results*, P.R. 860. NEXTEEL Co., Husteel Co. Ltd., SeAH Steel Corporation, and Hyundai Steel Company filed suit challenging the *Final Results* on several counts, including: (1) the use of a PMS in the sales-below-cost test, the PMS determination, and PMS calculation methodology; (2) the evaluation of non-prime products; (3) application of suspension loss costs; (4) validity of a constructed export price offset for differing levels of trade; (5) the separate rate calculations; and (6) freight revenue calculations. Compl., Dec. 11, 2020, ECF No. 6. California Steel Industries, Inc., Welspun Tubular LLC USA, American Cast Iron Pipe Company, Stupp Corporation, Maverick Tube Corporation, and IPSCO Tubulars Inc. joined the suit as defendant-intervenors. *Id*.

## III.    Court's First Remand Order

On April 19, 2022, the Court issued its first remand order. The Court held that Commerce's PMS determination was not supported by substantial evidence. *See NEXTEEL v. United States*, 569 F. Supp.3d 1354, 1362-1369 (Ct. Int'l Trade 2022) (*NEXTEEL I*). Specifically, the Court held that Commerce failed to demonstrate that substantial evidence on the record supported its finding that the four factors upon which it based the PMS finding, *i.e.*, (a) Korean imports of hot-rolled coil steel from the Peoples' Republic of China; (b) the government of Korea's subsidization of hot-rolled coil steel products; (c) strategic alliances; and (d) government involvement in the Korean electricity market, have a cumulative effect of preventing a proper comparison between the U.S. price and normal value. *Id*. at 1363-1365. Further, the

3

Court also questioned the validity of the regression methodology Commerce used to apply the PMS adjustment and held that a PMS adjustment for the purposes of the sales-below-cost test is not permitted by statute. *Id.* at 1363, 1366-69.

Additionally, the Court held that Commerce: (1) erred in calculating the cost of NEXTEEL's non-prime WLP by valuing it at its sale price, rather than its reported cost of production; (2) failed to address NEXTEEL's argument that Commerce's reallocation of NEXTEEL's suspended production costs contravenes 19 U.S.C. § 1677(b)(f)(1)(A); (3) failed to explain how it concluded that SeAH's home market and U.S. sales were at the same level of trade; and (4) must recalculate the rate assigned to the non-examined companies to reflect any adjustments to the dumping margins for NEXTEEL and SeAH. *Id.* at 1370-71, 1372, 1374-76.

### IV. First Remand Results

Commerce issued draft remand results to interested parties for comment. *See* Draft Remand Determination (June 16, 2022) (First Remand P.R. 1). Both NEXTEEL and Domestic Interested Parties submitted comments on the draft results. *See* NEXTEEL Comments on Draft Remand Results (June 27, 2022) (First Remand P.R. 11); Domestic Interested Parties Comments on Draft Remand (June 27, 2022) (First Remand P.R. 9).

Commerce filed the final First Remand Results with the Court on July 18, 2022. *See* First Remand Results, July 18, 2022, ECF No. 96 (First Remand P.R. 12). In its remand results, Commerce: (1) found that the record evidence did not support a finding of a PMS that distorts the cost of production of WLP and, therefore, recalculated NEXTEEL's and SeAH's margins without applying a PMS adjustment to the cost of production; (2) recalculated NEXTEEL's constructed value without making an adjustment to account for sales of non-prime products; (3) provided further explanation regarding its reclassification of NEXTEEL's reported losses

4

associated with suspended production as G&A expenses; and (4) revised the rate calculated for the non-examined companies in light of the calculation adjustments made in the remand. *See* First Remand Results at 2. Additionally, as a result of Commerce's finding that a PMS does not exist and the subsequent removal of the PMS adjustment from the margin calculations, SeAH's estimated weighted average dumping margin dropped to zero percent. *See* First Remand Results at 12. Therefore, the issue of a constructed export price offset for differing levels of trade is moot. *Id*.

## V. Court's Second Remand Order

On December 6, 2022, the Court issued its remand order in response to Commerce's First Remand Results. The Court sustained Commerce's redetermination findings that (1) record evidence did not support a finding of a PMS; (2) an adjustment to constructed value calculations to account for NEXTEEL's sales of non-prime products was not required; and (3) revisions to the rate calculated for non-examined companies complied with the first remand order. *See NEXTEEL II*, 601 F. Supp. 3d at 1377-1379. The Court also held, however, that Commerce's explanation in the First Remand Results failed to comply with the Court's First Remand Order with respect to NEXTEEL's suspension losses, and that Commerce must further explain or reconsider its classification of losses associated with suspended production lines as G&A expenses. *Id.* at 1379-1381.

## VI. Second Remand Results

Commerce issued draft remand results to interested parties for comment. *See* Draft Remand Redetermination, Feb. 7, 2023, Second R.R. 1. Both NEXTEEL and Hyundai submitted comments on the draft results. *See* NEXTEEL Cmts. on Draft Remand (NEXTEEL Cmts.) and Hyundai Steel Cmts. on Draft Remand (Hyundai Cmts.), Second R.R. 2 and 3.

5

Commerce filed the final Second Remand Results with the Court on March 6, 2023. *See* Second Remand Results. In its second remand results, Commerce complied with the Court's order by (1) clarifying which of NEXTEEL's production lines were suspended and when, and (2) further explaining its determination on the issue of NEXTEEL's suspension losses. *Id*. at 4-7, 9-11.

## ARGUMENT

### I. Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Under this standard, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted). Instead, when, as here, Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, Commerce's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

### II. Commerce's Second Remand Results Comply With The Second Remand Order

Commerce has complied with the Court's second remand order, which ordered Commerce to "clarify whether NEXTEEL suspended production on the lines in question for all

6

or only part of the {period of review} (POR), and if NEXTEEL suspended production for only part of the POR, Commerce should explain why NEXTEEL's costs as reported for those lines would not be 'reasonably reflective of the cost associated with the production and sale of merchandise.'" *NEXTEEL II* at 1380. NEXTEEL's arguments to the contrary are both without merit, as we explain below.

In the Second Remand Results, Commerce began by clarifying the periods of suspension for each of the four lines in question. *See* Second Remand Results at 4. Three of the lines which were suspended were used to produce non-subject merchandise, oil country tubular goods (OCTG); of these lines, one was suspended for the entire POR and two were suspended for the final five months of the POR. *Id*. The remaining line, which produced subject merchandise, was suspended for the last ten months of the POR. *Id*. Commerce concluded that "all four lines were suspended for an extended period of time, not just for a month or two for routine repairs or maintenance." *Id*. Plaintiffs agree that Commerce provided "the details necessary to respond to the Court's question" about when these lines were active. *See* NEXTEEL's Cmts. at 2.

Next, and consistent with Commerce's normal practice, Commerce continued to treat NEXTEEL's suspended production lines as non-productive assets, where such costs incurred are attributed to the general operations of the company. *See* Second Remand Results at 5. In its reporting, NEXTEEL treated those costs associated with the lines while they were suspended (i.e., the suspension losses) as part of the company-wide cost of goods sold and not tied to any particular product, because no products were produced on these lines while they were suspended. *Id*. This is similar to how Commerce treated these costs in the *Final Results* and again in the Remand Results: G&A expenses are such costs that are borne by the entire company rather than accounted for in the pricing of specific products. *Id*. at 6. As Commerce stated in the Second

7

Remand Results, "once the suspended production lines are taken out of operation for an extended period of time, the related costs become a company-wide burden, as opposed to a burden only on the products that are being produced on those lines." *Id*. Further, despite the fact that products (including non-subject merchandise) were produced on three of the four lines during the POR, those products already carry operating costs associated with running the production lines. *Id*. They cannot reasonably also carry the full expenses associated with the shutdown in addition to the normal operating costs, because then the per-unit production costs of those products would be unreasonably and unrealistically high. *Id*.

In its second remand order, the Court stated that Commerce's position is that because "no revenue from any products normally produced on {the suspended} lines was generated for the period … the costs associated with the suspended production lines were necessarily covered by all the other products NEXTEEL produced." *NEXTEEL II* at 1380 (quoting *Husteel Co. v. United States*, 520 F. Supp. 3d 1296, 1307 (Ct. Int'l Trade 2021) (*Husteel*)). This is consistent with the reasoning and evidence in the *Final Results*, which the Court pointed out "indicated that the relevant question was whether any products were produced on the suspended lines during the relevant period." *Id.*, *see Final Results* IDM at 49. In the Second Remand Results, Commerce clarifies that "when it said no revenue from any products produced on those lines were generated for the period (and, therefore, the costs were necessarily covered by all products produced by NEXTEEL), Commerce was referring specifically to the period where the production lines were shut down, not generally to the POR." Second Remand Results at 7. As such, Commerce's position in this case is neither in conflict with its stated practice, nor in conflict with Court precedent in *Husteel Co. v. United States*. *See Husteel*, 520 F. Supp. 3d. at 1306-1307 (sustaining Commerce's determination to reclassify certain of NEXTEEL's suspension losses as

8

G&A costs rather than as the cost of merchandise where product lines were suspended during the POR).

  A. <u>**Commerce's Treatment Of The Suspended Losses As G&A Costs**</u>

  NEXTEEL argues that Commerce did not comply with the Court's second remand order with respect to the allocation of costs for the losses associated with the four suspended production lines, stating that Commerce's treatment of costs is both unreasonable and inconsistent with statute. *See* NEXTEEL's Cmts. at 2, 4. NEXTEEL argues, as it did in comments on the draft remand, that Commerce's approach in this case "creates a new rule" whereby shutdown costs can only be attributable to the products produced on the lines shutdown if such production occurred after the line was shut down, but not before the line was shut down. *Id*. at 3. However, this is an exaggeration of Commerce's explanation; in fact, Commerce is applying its *existing* rule as articulated by the Court with respect to a prior segment of this proceeding. *See* Second Remand Results at 9-10. In *Husteel*, the Court described Commerce's practice to associate costs from suspended production lines with G&A expenses because no revenue from products produced on those lines existed to cover those costs. *See Husteel* at 1307. In other words, when there is no longer "ongoing production and revenue generation from those products during the period of review . . . those costs more reasonably relate to the general operations of the company." *Id*. (internal citations removed).

  Here, Commerce applies this practice, albeit in a situation where the POR overlaps with the shutdown in a slightly different manner than it did in *Husteel*. *See* Second Remand Results at 9-10. Shutdown costs are not, as NEXTEEL argues, treated differently if they occur at the beginning of the POR or at the end of the POR. Rather, when lines are shut down for an extended period, no products are produced which may confer a benefit that can outweigh the cost

9

of maintaining those lines. *Id.*, *see also Husteel* at 1307 (finding as reasonable Commerce's supposition that "costs should generally relate to a benefit during the period of review" and when production lines are shut down no benefit exists). Although goods *were* produced during the POR, those goods did not account for the costs of maintaining the production lines once they were shut down for an extended period. *Id*.

Likewise, NEXTEEL's argument that extended shutdown costs could be "attributed to COGS {cost of goods sold} if there is subsequent production during the POR" under this 'new rule' is a misguided hypothetical. *See* NEXTEEL's Cmts. at 3. Goods produced *after* the shutdown would also bear the full costs of operating the production lines, and so it would be similarly unreasonable to apply to them the costs of maintaining the lines while no goods were produced; likewise, it is unreasonable to apply the costs of maintaining the lines to goods produced *before* the shutdown. *See* Second Remand Results at 10. Put more simply: where production lines are shut down for an extended period of time, they are "akin to depreciating assets" where costs are "more appropriately allocated to G&A … as a cost of the general business of the company." *NEXTEEL II* at 1381. It does not matter whether production occurs before or after the shutdown within the framework of the POR, or whether there is no production at all during the POR; what matters is the length of time of the shutdown itself. *See* Second Remand Results at 10. For shorter, routine shutdown expenses, it is Commerce's normal practice to include such expenses in the company's reported costs. *Id.* at 11. However, in this case—and in similar cases where the production lines are suspended—it no longer relates to ongoing production. *Id*. During *that* time period, the production lines are a non-productive asset whose costs are attributable to G&A expenses because there are no products to bear the costs directly. *Id*.

Finally, NEXTEEL argues that Commerce, in its Second Remand Results, failed to explain why NEXTEEL's treatment of the suspension loss costs was unreasonable. *Id.* at 4-5. According to NEXTEEL, this alleged failure necessarily violates the statute which requires Commerce to rely on a company's "normal books and records" when they "reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* (quoting 19 U.S.C. § 1677b(f)(1)(A)). Therefore, NEXTEEL argues, Commerce should not have even approached the question of whether to classify suspension losses as G&A expenses. *Id.* NEXTEEL's argument is based upon a misreading of the statute.

The question is not whether the accounting treatment used by an exporter or producer is *generally reasonable*, but whether the records "reasonably reflect the costs associated with the production and sale of the merchandise." *See* 19 U.S.C. § 1677b(f)(1)(A). In this case, such costs are *not* reasonably reflected because NEXTEEL's books do not adequately represent how costs from the production lines are spread out throughout the company. *See* Second Remand Results at 6 (discussing how costs would be "unreasonably high" if the shutdown costs were to be applied to the per-unit production costs of only merchandise produced prior to the shutdown, which already bear the full cost of production of the normally running line). Commerce "repeatedly made the case that it is unreasonable to exclude these costs from the AD analysis," as NEXTEEL does by assigning them directly to cost of goods sold. *Id.* at 10.

The Court stated that "where there are products to bear costs, and the producer assigns those costs to those products, consistent with GAAP, it is unclear to the court how Commerce can conclude a respondent's books and records do not accurately reflect the cost of the merchandise." *NEXTEEL II* at 1380. Here, NEXTEEL's own books and records "treated these costs as a company-wide cost . . . not tied to any specific product" rather than assigning them

11

directly to products once the shutdown occurred. *See* Second Remand Results at 5 (citing NEXTEEL's Letter, "NEXTEEL's Submission of Supplemental Questionnaire Responses to Sections A, C, and D," (SQR1) dated Sept. 5, 2019, at S-16, P.R. 755). Additionally, NEXTEEL itself directly stated, when asked how it treated the cost of the suspended lines, that "costs of the suspended lines were not included in the reported costs {because} NEXTEEL believes that these costs were unrelated to the COM of the subject merchandise." *Id*. at 7-8 (citing SQR1 at S-16, P.R. 755). Commerce treating these expenses as G&A expenses and allocating them across NEXTEEL's company-wide cost of goods sold is a more reasonable treatment of these expense than NEXTEEL overburdening the cost of products produced prior to or after the extended suspension on the specific production lines. *See* Second Remand Results at 5. Commerce, seeking to follow the Court's interpretation of *Dillinger*, constructed an appropriate way in which those costs can accurately be reflected in the antidumping calculations. Second Remand Results at 7; *see NEXTEEL II* at 1380; *see also Dillinger France S.A. v. United States*, 921 F.3d 1318, 1321-1323 (Fed. Cir. 2020).

Therefore, substantial evidence supports Commerce's determination that NEXTEEL's suspension loss costs must reasonably be treated as G&A expenses attributable to the general operations of the company, and Commerce's adjustment in the *Final Results* was necessary. *See* Second Remand Results at 12.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's Second Remand Results and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON

|  |  |
|---|---|
|  | Principal Deputy Assistant Attorney General |
|  | PATRICIA M. McCARTHY<br>Director |
|  | /s/ Franklin E. White, Jr.<br>FRANKLIN E. WHITE, JR.<br>Assistant Director |
| OF COUNSEL:<br><br>Benjamin Juvelier<br>Attorney<br>Office of the Chief Counsel<br> for Trade Enforcement & Compliance<br>U.S. Department of Commerce | /s/ Robert R. Kiepura<br>Robert R. Kiepura<br>Trial Attorney<br>Commercial Litigation Branch<br>Civil Division<br>U.S. Department of Justice<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C. 20044<br>(202) 305-4436<br>Email: robert.kiepura@usdoj.gov |

May 5, 2023

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 3,459 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

/s/ Robert R. Kiepura

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
)
NEXTEEL CO., LTD., *et al.*, )
)
        Plaintiff and Consolidated )
        Plaintiffs, )
)
  and )
)
HUSTEEL CO., LTD. and HYUNDAI )
STEEL COMPANY, )
)
        Plaintiff-Intervenors, )
)
  v. )    Consol. Court No. 20-03898
)
UNITED STATES, )
)
        Defendant, )
)
  and )
)
CALIFORNIA STEEL INDUSTRIES, INC., )
*et al.*, )
        Defendant-Intervenors and )
        Consolidated Defendant- )
        Intervenors. )
_____)

## **ORDER**

Upon consideration of the Department of Commerce's final redetermination pursuant to remand, parties' comments, defendant's response, and all other pertinent papers, it is hereby

ORDERED that the Department of Commerce's remand redetermination is sustained in all respects.

Dated: _____, 2022        _____
      New York, New York                                      JUDGE