Slip Op 23-103

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NEXTEEL CO., LTD. ET AL., <br><br>    Plaintiff and Consolidated Plaintiffs, <br><br> and <br><br> HUSTEEL CO., LTD. and HYUNDAI STEEL COMPANY, <br><br>    Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br>    Defendant, <br><br> and <br><br> CALIFORNIA STEEL INDUSTRIES, INC. ET AL., <br><br>    Defendant-Intervenors and Consolidated Defendant-Intervenors. | Before: Claire R. Kelly, Judge <br><br> Consol. Court No. 20-03898 |

**OPINION AND ORDER**

[Sustaining the U.S. Department of Commerce's second remand redetermination in the 2017–2018 antidumping administrative review of welded line pipe from the Republic of Korea.]

Dated: July 14, 2023

J. David Park, Daniel R. Wilson, Henry D. Almond and Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for plaintiff NEXTEEL Co., Ltd.

Jarrod M. Goldfeder and Robert G. Gosselink, Trade Pacific PLLC, of Washington, D.C., for consolidated plaintiff and plaintiff-intervenor Hyundai Steel Company.

Robert R. Kiepura, Trial Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for defendant United States. On the brief were Brian M. Boynton, Principal Assistant Deputy Attorney General, Patricia McCarthy, Director, and Franklin E. White Jr., Assistant Director. Of counsel was Benjamin Juvelier, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, of Washington D.C.

Kelly, Judge: Before the Court is the U.S. Department of Commerce's ("Commerce") second redetermination on remand filed pursuant to the Court's order in NEXTEEL Co. v. United States, 601 F. Supp. 3d 1373 (Ct. Int'l Trade 2022) in connection with Commerce's 2017–2018 administrative review of the antidumping duty order covering welded line pipe from the Republic of Korea. On remand, Commerce offers further explanation for its decision to classify NEXTEEL's suspended production line costs as general and administrative expenses. See Final Results of Redetermination Pursuant to Ct. Remand, Mar. 6, 2023, ECF No. 116-1 ("Remand Results"). For the following reasons, the Court sustains Commerce's second remand redetermination.

## BACKGROUND

The Court presumes familiarity with the facts of this case as set forth in its previous opinions remanding Commerce's determination, and recounts only the facts necessary to consider the Remand Results. On March 14, 2019, Commerce initiated an antidumping review of welded line pipe from the Republic of Korea, and selected NEXTEEL as a mandatory respondent. See Initiation of Antidumping and

Countervailing Duty Admin. Rev., 84 Fed. Reg. 9,297 (Dep't. of Commerce March 14, 2019). On May 22, 2019, NEXTEEL responded to Commerce's Section D questionnaire, stating that "NEXTEEL did suspend production on certain OCTG (non-subject) lines and one of the forming lines [ ] for the subject merchandise production for some periods during the POR. . . . The costs of suspended lines were transferred directly to [cost of goods sold] in accordance with NEXTEEL's normal accounting treatment." NEXTEEL's Sec. C & D Questionnaire Resp. at Ex. D-10, A-580-876, PR 80, bar code 3838281-01 (May 22, 2019). On August 8, 2019, Commerce requested additional information concerning NEXTEEL's Section C and D questionnaire responses, including specific details about how NEXTEEL accounted for its suspension losses. See Req. for Supp. Sec. C & D Info. at 6, A-580-876, PR 725, bar code 3876365-01 (Aug. 8, 2019). On September 5, 2019, NEXTEEL responded to Commerce's request for supplemental information concerning its suspension losses, explaining that these losses "were not included in reported costs" and were "unrelated to the cost of manufacturing the subject merchandise." NEXTEEL's Supp. Sec. C & D Questionnaire Resp. at S-16, A-580-876, PR 755, bar code 3887719-01 (Sept. 5, 2019).

On January 31, 2020, Commerce released the preliminary results of its administrative review, in which it "revised NEXTEEL's [general and administrative ("G&A")] and financial expense ratios to reclassify certain shutdown losses related to the company as a whole from the [cost of goods sold] denominators to G&A expenses"

Consol. Court No. 20-03898                                                                                          Page 4

for the purposes of calculating constructed value ("CV"). See Decision Memo. for the Prelim. Results 2017–2018 Admin. Rev. of [ADD] Order on [WLP] from Korea at 20, A-580-876, PR 796, bar code 3937984-01 (Jan. 31, 2020). Specifically, Commerce removed certain costs which NEXTEEL had reported as cost of goods sold ("COGS"), and added these costs to NEXTEEL's G&A expenses. See Cost of Production and [CV] Calc. Adjustments for NEXTEEL at Attach. 2, A-580-876, PR 802, bar code 3938529-01 (Jan. 31, 2020). On November 20, 2020, Commerce published the final results of its administrative review. See Issues and Decision Memo. Final Results 2017–2018 Admin. Rev. of [ADD] Order on [WLP] from Korea, A-580-876, PR 854, bar code 4056558-01 (Nov. 20, 2020). In the final results, Commerce continued to treat NEXTEEL's suspension losses as G&A expenses. See id. at 47–49.

On December 11, 2020, NEXTEEL challenged Commerce's decision to reclassify its suspension losses, among other issues, and on April 19, 2022, the Court remanded this issue to Commerce for further explanation or reconsideration. See NEXTEEL Co. v. United States, 569 F. Supp. 3d 1354 (Ct. Int'l Trade 2022) ("NEXTEEL I"). On remand, Commerce determined that it correctly classified NEXTEEL's suspension losses as G&A expenses, rather than COGS. See Final Results of Redetermination Pursuant to Ct. Remand, July 18, 2022, ECF No. 96-1. On December 6, 2022, the Court again remanded Commerce's determination for further explanation or reconsideration. See NEXTEEL Co. v. United States, 601 F. Supp. 3d 1373 (Ct. Int'l Trade 2022) ("NEXTEEL II"). Specifically, the Court

requested that Commerce: (1) clarify which of NEXTEEL's production lines were suspended during what time periods, (2) explain whether Commerce treats suspension losses occurring at the beginning and end of the POR differently, and (3) explain why NEXTEEL's allocation of suspension losses to COGS is not reasonably reflective of costs. See id. at 1380–81. On remand, Commerce has provided additional explanation for its decision regarding NEXTEEL's suspension losses, and additional information regarding the suspended production lines. See Remand Results at 3–12. NEXTEEL and Consolidated Plaintiff / Plaintiff-Intervenor Hyundai Steel Company have submitted comments contesting the final results, see [NEXTEEL's] Cmts. on Remand, Apr. 5, 2023, ECF No. 118 ("Pl. Br."); [Hyundai Steel's] Cmts. on Commerce's Second Remand Results, Apr. 5, 2023, ECF No. 119, and Defendant has submitted comments urging the Court to sustain the final results, see Defendant's Resp. Cmts. on Remand Redetermination, May 5, 2023, ECF No. 120 ("Def. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2018), which grants the Court authority to review actions initiated under 19 U.S.C. § 1516a(a)(2)(B)(iii)[1] contesting the final determination in an administrative review of an antidumping duty order. The Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture Co. v. United States, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014) (citation omitted).

## DISCUSSION

In its remand redetermination, Commerce again classifies NEXTEEL's suspension losses as G&A expenses, rather than COGS, and provides further explanation for this determination. See Remand Results at 3–12. NEXTEEL argues that Commerce continues to treat suspension losses differently based on when they occur during the POR, and has not adequately explained why NEXTEEL's accounting does not reasonably reflect the cost of production for subject merchandise. See Pl. Br. at 3–6. Defendant counters that Commerce has clarified how it treats all significant suspensions the same, regardless of when they occur during the POR, and that Commerce has explained that NEXTEEL's accounting does not reflect the cost of merchandise because it results in unreasonably high per-unit costs. Def. Br. at 7–12. For the following reasons, Commerce's determination is sustained.

Commerce normally calculates costs based on the respondent's records if such records are kept in accordance with generally accepted accounting practices. See 19 U.S.C. § 1677b(f)(1)(A); see also NEXTEEL I, 569 F. Supp. 3d at 1371–72. However, § 1677b(f)(1)(A) requires that constructed value reasonably reflect a respondent's actual costs. See Dillinger France S.A. v. United States, 981 F.3d 1318, 1321–23 (Fed.

Consol. Court No. 20-03898 Page 7

Cir. 2020). Thus, even if a respondent's normal books and records are compliant with generally accepted accounting practices, Commerce may deviate from the costs reflected in a respondent's books and records if it determines that such costs do not "reasonably reflect the costs associated with the production and sales of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

"Cost of goods sold" generally refers to the "price of buying or making an item," and in the context of manufacturing, "includes direct material, direct labor, and factory overhead associated with producing it." Coalition for Fair Trade of Hardwood Plywood v. United States, 180 F. Supp. 3d 1137, 1164 (Ct. Int'l Trade 2016) quoting Siegel, Joel G. & Shim, Jae K., Dictionary of Accounting Terms 101 (2d ed. 1995). "General and administrative expenses" are "generally understood to mean expenses which relate to the activities of the company as a whole rather than to the production process." Torrington Co. v. United States, 146 F. Supp. 2d 845, 885 (Ct. Int'l Trade 2001). In order to calculate the per-unit amount of G&A expenses, Commerce multiplies the G&A expense ratio by the total cost of manufacture for each product. See Mid Continent Steel & Wire, Inc. v. United States, 273 F. Supp. 3d 1161, 1166 (Ct. Int'l Trade 2017). The G&A expense ratio is defined as a company's total G&A expenses divided by the company's total COGS. See id.

As an initial matter, Commerce answers the Court's question regarding which of NEXTEEL's production lines were suspended during which parts of the POR. Commerce explains that only one of the four production lines in question produced

subject merchandise, and this line was suspended during the last ten months of the POR. Remand Results at 4. It further explains that two of the lines producing non-subject merchandise were suspended during the last five months of the POR, and one non-subject line was suspended for the entirety of the POR. Id. NEXTEEL concedes that Commerce's timeline of line suspensions is accurate. See Pl. Br. at 2 ("Commerce did provide the details necessary to respond to the Court's question regarding the length of time during the POR in which these production lines were shut down"). Therefore, Commerce has satisfied the Court's instructions to specify when NEXTEEL suspended production on its product lines. See NEXTEEL II, 601 F. Supp. 3d at 1381.

Commerce also clarifies that it does not differentiate between suspension periods based on whether they occur at the beginning or the end of the POR. In NEXTEEL I, it was unclear to the Court whether Commerce treated suspension losses differently based on their timing relative to the POR. See NEXTEEL II, 601 F. Supp. 3d at 1380. On remand, Commerce has explained that:

> [I]n situations where there is no production during the whole POR, or only production prior to or after the production lines are suspended during the POR, it is reasonable for Commerce to treat such costs in the same way. The costs related to these suspensions are a company-wide burden and, thus, correctly associated with the company's general operations, regardless of when within the POR the shutdown occurs.

Remand Results at 10. Previously, Commerce had stated that "[r]evenues from products produced prior to the shutdown should not be associated with the suspended losses incurred during the shutdown periods," creating ambiguity as to whether only

Consol. Court No. 20-03898                                                                 Page 9

products produced "prior to" a shutdown could carry subsequent suspension losses. See Final Results of Redetermination Pursuant to Ct. Remand at 11, July 18, 2022, ECF No. 96-1.  However, it is evident from Commerce's explanation on remand, and in light of the clarified timeline, that Commerce's use of "prior to" did not imply that timing relative to the POR affected Commerce's determination.  Rather, for each of the three production lines which were partially suspended, the suspension period occurred at the end of the POR, and in this case Commerce could only refer to products that had been produced prior to shutdowns.  See Remand Results at 4. NEXTEEL thus misinterprets Commerce's narrow reference to its production lines, which all happen to have been suspended at the end of the POR, as a broad statement of practice.  See Pl. Br. at 3–4.  Commerce has adequately explained on remand that the only factor relevant to its classification of suspension costs is the length of suspension.  See Remand Results at 10; see also Def. Br. at 9.  Therefore, Commerce's explanation complies with the Court's order in NEXTEEL II.  See Xinjiamei, 968 F. Supp. 2d at 1259.

Finally, Commerce explains that NEXTEEL's allocation of suspension losses to COGS is unreasonable because these costs are more appropriately classified as G&A expenses carried by the entire company.  Although Commerce ordinarily calculates costs based on a respondent's records, see 19 U.S.C. § 1677b(f)(1)(A), it may reject a respondent's accounting if that respondent's costs do not reasonably reflect the costs associated with the production and sales of the merchandise.  See id.  Here,

Consol. Court No. 20-03898                                                                Page 10

Commerce explains that under NEXTEEL's current accounting method, products produced on suspended production lines are not only assigned normal operating costs, but then must also carry the full expenses associated with an idled production line. See Remand Results at 6; Def. Br. at 8.  Specifically, Commerce states that under NEXTEEL's accounting, "the per-unit production costs for such merchandise would be unreasonably high because the cost of the suspended lines would be added on top of the normal operating cost for those lines." Remand Results at 6.  Commerce further explains that "it is not reasonable to treat the cost of the suspended loss as part of COGS, because it would double count the costs of the products that already carry the full operating costs." Id. at 11.  It is reasonably discernable from these explanations that Commerce believes that a product bearing both direct costs of manufacturing and separate costs associated with suspension losses will no longer reasonably represent the true cost of production.

   Moreover, Commerce adequately explains that the depreciation and other costs associated with idled production lines are more akin to a company-wide cost, than a cost of manufacturing to be borne by specific products.  As the Court has previously recognized, at a certain point the costs flowing from an extended shutdown are more akin to general expenses than costs associated with any specific product. See Remand Results at 11; see also Husteel Co. Ltd. v. United States, 520 F. Supp. 3d 1296, 1307–08 (Ct. Int'l Trade 2021).  Indeed, as Commerce discusses, NEXTEEL does not attribute these costs to specific products, instead including them only in COGS and

as a result removing those costs from the antidumping duty calculations. See Remand Results at 7–8 ("the costs of suspended lines, although recorded as COGS, were not included as part of the actual product costing"). As NEXTEEL itself asserts in its supplemental questionnaire response, "NEXTEEL believes that these costs were unrelated to the COM of the subject merchandise." NEXTEEL's Supp. Sec. C & D Questionnaire Resp. at S-16, A-580-876, PR 755, bar code 3887719-01 (Sept. 5, 2019). In its remand results, Commerce acknowledges NEXTEEL's position that its suspension losses should not be associated with individual products, and supports its determination that these costs would be more appropriately considered as G&A expenses with NEXTEEL's own reasoning. See Remand Results at 8 ("Commerce agrees with NEXTEEL that the suspended loss was not directly attributable to a specific product; for that reason, consistent with Commerce's practice, we included these costs in G&A expenses.") From this explanation, it is reasonably discernable that Commerce found NEXTEEL's cost allocations to be unreasonable because, in addition to being too high, the appropriateness of the allocation was contradicted by NEXTEEL's own explanation of its costs.

## CONCLUSION

Commerce explains which of NEXTEEL's production lines were suspended during what time periods, and why NEXTEEL's allocation of suspension losses to COGS is not reasonably reflective of costs. Commerce further adequately explains why its allocation of suspension costs is reasonable. For the foregoing reasons, the

Consol. Court No. 20-03898 Page 12

Court sustains Commerce's second remand redetermination.  A separate judgment will issue.

                                                         /s/ Claire R. Kelly
                                                       Claire R. Kelly, Judge

Dated:      July 14, 2023
             New York, New York